AMY L. BOMSE (No. 218669)
SHARON D. MAYO (No. 150469)
JEE YOUNG YOU (No. 241658)
ARNOLD & PORTER LLP
Three Embarcadero Center, 10th Floor
San Francisco, California 94111-4024
Telephone:   (415) 471-3100
Facsimile:   (415) 471-3400
Email:   amy.bomse@aporter.com
         sharon.mayo@aporter,com
         jeeyoung.you@aporter.com

Attorneys for Plaintiffs

BETH H. PARKER (No. 104773)
PLANNED PARENTHOOD AFFILIATES OF
CALIFORNIA
551 Capitol Mall, Suite 510
Sacramento, California  95814-4581
Telephone:   (916) 446-5247
Email:   beth.parker@ppacca.org

HELENE T. KRASNOFF (*pro hac vice*)
PLANNED PARENTHOOD FEDERATION OF
AMERICA
1110 Vermont Avenue, NW, Suite 300
Washington, DC 20005
Telephone:   (202) 973-4800
Email:   helene.krasnoff@ppfa.org

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

PLANNED PARENTHOOD FEDERATION OF
AMERICA, INC., PLANNED PARENTHOOD:
SHASTA-DIABLO, INC. dba PLANNED
PARENTHOOD NORTHERN CALIFORNIA;
PLANNED PARENTHOOD MAR MONTE, INC.;
PLANNED PARENTHOOD OF THE PACIFIC
SOUTHWEST; PLANNED PARENTHOOD LOS
ANGELES; PLANNED PARENTHOOD/ORANGE
AND SAN BERNARDINO COUNTIES, INC.;
PLANNED PARENTHOOD OF SANTA BARBARA,
VENTURA AND SAN LUIS OBISPO COUNTIES,
INC; PLANNED PARENTHOOD PASADENA AND
SAN GABRIEL VALLEY, INC.; PLANNED
PARENTHOOD OF THE ROCKY MOUNTAINS;
PLANNED PARENTHOOD GULF COAST AND
PLANNED PARENTHOOD CENTER FOR CHOICE

                    Plaintiffs,
         v.

CENTER FOR MEDICAL PROGRESS; BIOMAX
PROCUREMENT SERVICES, LLC; DAVID
DALEIDEN (aka "ROBERT SARKIS"); TROY
NEWMAN; ALBIN RHOMBERG; PHILLIP S.
CRONIN; SANDRA SUSAN MERRITT (aka "SUSAN
TENNENBAUM"); GERARDO ADRIAN LOPEZ; and
UNKNOWN CO-CONSPIRATORS, inclusive,

                    Defendants.

Case No.  3:16-cv-00236-WHO

**FIRST AMENDED COMPLAINT
FOR DAMAGES AND FOR
DECLARATORY AND
INJUNCTIVE RELIEF; DEMAND
FOR JURY TRIAL**

**INTRODUCTION**

1.      This complaint details a complex criminal enterprise conceived and executed by anti-abortion extremists.  The express aim of the enterprise—which stretched over years and involved fake companies, fake identifications, and large-scale illegal taping—was to demonize Planned Parenthood, harass and intimidate its dedicated staff, and interrupt its operations, all with the ultimate goal of interfering with women's access to legal abortion.

2.      Plaintiff  Planned Parenthood Federation of America, Inc., through its 59 member-affiliates, including the Plaintiff affiliates (collectively hereafter "Planned Parenthood"), provides professional, high-quality reproductive and in some cases primary health care services to more than two and a half million women, men, and young people each year.  Planned Parenthood is one of the country's largest providers of reproductive health care for women, the majority of whom are from lower-income communities.  Planned Parenthood provides, **every year**, over 2.9 million birth control services and information, hundreds of thousands of Pap tests, nearly half a million breast examinations, nearly 4.5 million tests for sexually transmitted illnesses (including HIV), and a range of critically necessary treatments including safe, legal abortion.  A small number of Planned Parenthood affiliates have offered women the option of donating fetal tissue for medical research.

3.      Fetal tissue donation is entirely legal and plays a vital role in medical research. Virtually every person in the United States has benefited from research that relies on fetal tissue. Vaccines for polio, hepatitis, rubella, chicken pox, shingles, rabies, and an experimental vaccine for Ebola, have been developed through research involving fetal tissue.  Fetal cells are critical for studying conditions that affect the health of fetuses and newborn infants, brain injuries in the womb that lead to cerebral palsy, and eye conditions that lead to macular degeneration. Researchers also have used fetal tissue to develop treatments for patients with HIV, end-stage breast cancer, diabetes, Parkinson's Disease, multiple sclerosis, cancer, cardiovascular disease, ALS (Lou Gehrig's Disease), Alzheimer's and glaucoma, among many others.  The National Institutes of Health spent approximately $76 million to support fetal tissue research efforts in 2014.

FIRST AMENDED COMPLAINT FOR DAMAGES AND FOR DECLARATORY AND INJUNCTIVE RELIEF

4.      Many women who have made the decision to have an abortion appreciate the opportunity to further medical research through tissue donation.  There is no financial gain for women or health care providers involved in tissue donation, and the few Planned Parenthood affiliates that have facilitated fetal tissue donation have done so solely for the benefit of medical research.

5.      Defendants' conspiracy focused on Planned Parenthood affiliates' facilitation of fetal tissue donation.  As part of this conspiracy, Defendants set up a fake company called BioMax Procurement Services, LLC ("BIOMAX"), which dishonestly held itself out as a legitimate fetal tissue procurement company.  Certain individual Defendants pretended to be officers and employees of BIOMAX.  They created pseudonyms, manufactured fake identification, stole one woman's identity, and used a credit card with a fake name.  Defendants used those fake corporate and personal identities to gain access to private conferences including those held by Planned Parenthood and the National Abortion Federation ("NAF").  To secure admission into these conferences, Defendants and their agents signed binding agreements making promises they had no intention of keeping.  Once admitted, Defendants wore hidden video cameras and secretly taped hundreds of hours of conversations with Plaintiffs' staff.

6.      Next, Defendants leveraged the "professional" relationships they made at the conferences to seek access to individual Planned Parenthood doctors and affiliates, lying their way into private meetings – and even inside secure Planned Parenthood office and clinical space in Colorado and Texas.  Defendants peppered Planned Parenthood staff with requests for meetings, lying at every step about who they were and what they were doing.  Planned Parenthood senior medical and other staff members made time to meet with Defendants in good faith.  These doctors and other staff were completely unaware that they were being secretly taped and that they would later be featured in malicious videos.

7.      Defendants then went public with a vicious online video smear campaign, releasing a series of YouTube videos purporting to show that Planned Parenthood violated federal law related to tissue donation.  In fact, these videos were heavily manipulated, with critical content deliberately deleted, and disconnected portions sewn together to create a misleading impression.

According to expert forensic analysis, Defendants "heavily edited the short videos so as to misrepresent statements made by Planned Parenthood's representatives." As a consequence, the experts concluded that the videos "cannot be relied upon for any official inquiries" and "also lacked credibility as journalistic products."

8.     Nonetheless, the deceptive videos did their intended damage. Millions of people who viewed the manipulated videos and inflammatory accusations were made to believe that Planned Parenthood had violated the law and acted improperly. There was a dramatic increase in the threats, harassment, and criminal activities targeting abortion providers and their supporters and, in particular, Planned Parenthood health centers after the release of Defendants' videos. The doctors and staff targeted in the videos have been the subject of online attacks, harassment at their homes and in their neighborhoods, and death threats.

9.     In addition, Federal and state governments were spurred to initiate investigations by CMP's fallacious claims. To date, officials in twelve states (Florida, Georgia, Indiana, Kansas, Massachusetts, Michigan, Missouri, Nevada, Ohio, Pennsylvania, South Dakota and Washington) that conducted investigations into claims that Planned Parenthood profited from fetal tissue donation have cleared Planned Parenthood affiliates of all wrongdoing. Another eight states (California, Iowa, Delaware, Idaho, Minnesota, New Hampshire, Virginia and Colorado) have declined to even investigate Planned Parenthood — finding nothing to substantiate claims of wrongdoing.

10.     Defendants' false statements, breaches of contractual agreements, illegal recordings and the video smear campaign constitute a conspiracy to demonize and intimidate Plaintiffs and to interfere with Plaintiffs' and other Planned Parenthood affiliates' operations. This conspiracy has cost Plaintiffs millions of dollars and put the safety and security of Planned Parenthood's personnel and patients at serious risk, as witnessed most horrifically in the shootings at a Planned Parenthood health center in Colorado Springs on November 27, 2015.

11.     In January 2016, a grand jury in Texas indicted Defendants Daleiden and Merritt for their conduct in connection with this scheme, including tampering with governmental record, a felony, and for Daleiden only, offering to purchase human organs.

FIRST AMENDED COMPLAINT FOR DAMAGES AND FOR DECLARATORY AND INJUNCTIVE RELIEF

12.     This action is brought to further expose the falsity and illegality of Defendants' methods and to recover damages for the ongoing harm to Planned Parenthood emanating from the video smear campaign.

**JURISDICTION AND VENUE**

13.     This action arises under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1964, 18 U.S.C. § 1028 (fraud and related activity in connection with identification documents), 18 U.S.C. § 1341 (mail fraud) & § 1343 (wire fraud), 18 U.S.C. § 2511 (interception and disclosure of wire, oral, or electronic communications), as well as various state laws.  This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331, 1343, 2201, and 2202.  This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1367 (supplemental jurisdiction).

14.     Defendants The Center for Medical Progress ("CMP"), BioMax Procurement Services, LLC ("BIOMAX"), David Daleiden (aka "Robert Sarkis") ("DALEIDEN"), Troy Newman ("NEWMAN"), Albin Rhomberg  ("RHOMBERG"), Phillip S. Cronin ("CRONIN"), Sandra Susan Merritt (aka "Susan Tennenbaum") ("MERRITT"), and Gerardo Adrian Lopez ("LOPEZ") are subject to personal jurisdiction in California because they have directed, participated in, and provided material support for a scheme to deceive Plaintiffs and their staff within this District and throughout California.  Each Defendant has actively participated in the conspiracy to defraud Plaintiffs with the intent to injure Plaintiffs within this District and throughout California.

15.     Defendants CMP, BIOMAX, DALEIDEN, MERRITT, RHOMBERG, CRONIN and LOPEZ are subject to personal jurisdiction in this District because these Defendants: (1) are based in, are incorporated in, or reside in the state of California; and (2) have conducted business and/or purported to conduct transactions within this District, and such conduct has caused injury to Plaintiffs in this District.

16.     Venue is proper in the Northern District of California under 28 U.S.C. § 1391(b)(2) because Defendants' conduct in this District constitutes a substantial part of the acts and omissions giving rise to Plaintiffs' claims.  Defendants set their tortious conspiracy in motion in this District

1   when they came to San Francisco in April 2014 to fraudulently gain admittance to the NAF's

2   annual meeting where they met many of Plaintiffs' representatives and set up follow-up meetings.

3       17.    Plaintiffs have suffered significant harm in this District as a direct result of

4   Defendants' wrongful conduct.  For example, Defendants' publication of the illegally and

5   wrongfully obtained recordings include images of and references to Planned Parenthood clinics in

6   this District, exposing these clinics, their staff, and their patients to unfair and damaging publicity

7   that disrupted patient care and required costly measures ensure safety and security at the clinic.

8   Plaintiff PLANNED PARENTHOOD NORTHERN CALIFORNIA, which serves patients in the

9   San Francisco Bay Area and much of Northern California, has already suffered considerable harm,

10   including damage to its operations, finances, and ability to deliver patient care.

11   **INTRADISTRICT ASSIGNMENT**

12       18.    Assignment to the San Francisco Division is appropriate because a substantial part

13   of the events and omissions giving rise to Plaintiffs' claims occurred in San Francisco County,

14   when Defendants fraudulently gained admittance to NAF's 2014 annual meeting in San Francisco.

15   **PARTIES**

16       19.    **PLAINTIFF PLANNED PARENTHOOD FEDERATION OF AMERICA,**

17   **INC. ("PPFA")** is a not-for-profit corporation duly organized and validly existing in New York.

18   PPFA supports 59 independently incorporated affiliates that collectively operate more than 650

19   health centers that provide care to approximately 2.5 million women and men each year.  PPFA's

20   mission is to provide comprehensive reproductive health care services, to provide educational

21   programs relating to reproductive and sexual health, and to advocate for public policies to ensure

22   access to health services, including safe, legal abortion.

23       20.    **PLAINTIFF PLANNED PARENTHOOD: SHASTA-DIABLO, INC., dba**

24   **Planned Parenthood Northern California ("PLANNED PARENTHOOD NORTHERN**

25   **CALIFORNIA" or "PPNC")** is a not-for-profit organization and one of seven California

26   Planned Parenthood affiliates.  PPNC delivers clinical, educational, and counseling services to

27   patients at 20 health centers in the San Francisco Bay Area and Northern California.  In 2014, the

28   affiliate had 96,683 patients and 189,401 total patient visits.  PPNC provides primary care

5

services, as well as a full range of reproductive health services, including:  contraceptive services, sexually transmitted disease screening and treatment, HIV education and testing, pregnancy testing and options, education, emergency contraceptives and supplies, and safe, legal abortion.

21.    **PLAINTIFF PLANNED PARENTHOOD MAR MONTE, INC. ("PPMM")** is a not-for-profit organization and one of seven California Planned Parenthood affiliates.  PPMM delivers clinical, educational, and counseling services to patients at 34 health centers in parts of Northern California, the Southern Bay Area, Central California and Nevada.  In 2014, the affiliate had 236,173 patients and 447,549 total patient visits.  PPMM provides primary care services, as well as a full range of reproductive health services, including:  contraceptive services, sexually transmitted disease screening and treatment, HIV education and testing, pregnancy testing and options, education, emergency contraceptives and supplies, and safe, legal abortion.

22.    **PLAINTIFF PLANNED PARENTHOOD OF THE PACIFIC SOUTHWEST ("PPPSW")** is a not-for-profit organization and one of seven California Planned Parenthood affiliates.  PPPSW delivers clinical, educational, and counseling services to patients at 18 health centers in San Diego, Imperial, and Riverside counties.  In 2014, the affiliate had 141,318 patients and 276,648 total patient visits.  PPPSW provides a full range of reproductive health services, including:  contraceptive services, sexually transmitted disease screening and treatment, HIV education and testing, pregnancy testing and options, education, emergency contraceptives and supplies, cancer screening for cervical and breast cancer, colposcopy and cryosurgery, tubal ligation and vasectomies, and safe, legal abortion.

23.    **PLAINTIFF PLANNED PARENTHOOD LOS ANGELES ("PPLA")** is a not-for-profit organization and one of seven California Planned Parenthood affiliates.  PPLA delivers clinical, educational, and counseling services to patients at 19 health centers in Los Angeles and surrounding counties.  In 2014, the affiliate had 149,387 patients and 273,641 total patient visits.  PPLA provides some primary care services, as well as a full range of reproductive health services, including:  contraceptive services, sexually transmitted disease screening and treatment, HIV education and testing, pregnancy testing and options, education, emergency contraceptives and supplies, and safe, legal abortion.

24.    **PLAINTIFF PLANNED PARENTHOOD/ORANGE AND SAN BERNARDINO COUNTIES, INC. ("PPOSBC")** is a not-for-profit organization and one of seven California Planned Parenthood affiliates.  PPOSBC delivers clinical, educational, and counseling services to patients at nine health centers in Orange and San Bernardino Counties.  In 2014, the affiliate had 95,540 patients and 177,375 total patient visits.  PPOSBC provides primary care services, as well as a full range of reproductive health service including:  contraceptive services, sexually transmitted disease screening and treatment, HIV education and testing, pregnancy testing and options, education, emergency contraceptives and supplies, and safe, legal abortion.

25.    **PLAINTIFF PLANNED PARENTHOOD OF SANTA BARBARA**, **VENTURA & SAN LUIS OBISPO COUNTIES, INC. ("PPSBVSLO")** is a not-for-profit organization and one of seven California Planned Parenthood affiliates.  PPSBVSLO delivers clinical, educational, and counseling services to patients at five health centers in Santa Barbara, Ventura, and San Luis Obispo Counties.  In 2014, the affiliate had 34,258 patients and 67,644 total patient visits.  PPSBVSLO provides a full range of reproductive health services, including: pregnancy diagnosis and counseling, contraceptive services, sexually transmitted disease screening, diagnosis and treatment, HIV education and testing, pregnancy testing and options, education, emergency contraceptives and supplies, cancer screening for cervical and breast cancer, colposcopy and cryosurgery, tubal ligation and vasectomies, and safe, legal abortion.

26.    **PLAINTIFF PLANNED PARENTHOOD PASADENA AND SAN GABRIEL VALLEY, INC. ("PPPSGV")** is a not-for-profit organization and one of seven California Planned Parenthood affiliates.  PPPSGV delivers clinical, educational, and counseling services to patients at four health centers in Pasadena and surrounding parts of Los Angeles County.  In 2014, the affiliate had 27,592 patients and 47,261 total patient visits.  PPPSGV provides primary care services, as well as a full range of reproductive health services, including:  primary care services, contraceptive services, sexually transmitted disease screening and treatment, HIV education and testing, pregnancy testing and options, education, emergency contraceptives and supplies, and safe, legal abortion.

27.     **PLAINTIFF PLANNED PARENTHOOD OF THE ROCKY MOUNTAINS**

**("PPRM")** is a not-for-profit corporation duly organized and validly existing in Colorado.  PPRM

delivers clinical, educational, and counseling services to patients at 29 health centers in the states

of Colorado, New Mexico, Wyoming and Nevada.  In 2014, the affiliate had 103,161 patients and

137,722 total patient visits.  PPRM provides a full range of reproductive health services,

including: pregnancy diagnosis and patient education; contraceptive patient education; provision

of all methods of contraception; HIV education and testing, pregnancy testing and options,

education, emergency contraceptives and supplies, cancer screening for cervical and breast cancer,

colposcopy and cryosurgery, tubal ligation and vasectomies, and safe, legal abortion.

28.     **PLANNED PARENTHOOD GULF COAST ("PPGC") and PLANNED**

**PARENTHOOD CENTER FOR CHOICE ("PPCFC")** are not-for-profit corporations duly

organized and validly existing in Texas.  PPGC delivers clinical, educational, and counseling

services to patients at nine health centers in Texas and Louisiana.  The service area of PPGC

covers 125 counties in Texas and the entire state of Louisiana.  In 2014, the affiliate had 53,432

patients and 66,691 total patient visits.  PPGC provides limited primary care services, as well as a

full range of reproductive health services, including: pregnancy diagnosis and counseling;

contraceptive counseling; provision of all methods of contraception; HIV education, testing and

counseling; testing, diagnosis, and treatment of sexually transmitted infections; options counseling

for pregnant women; cancer screening for cervical and breast cancer; and dysplasia services,

including colposcopy and cryosurgery.  PPGC leases space to PPCFC which provides options

counseling for pregnant women; ultrasound services; abortion services; miscarriage management;

contraceptive counseling; provision of all methods of contraception; and testing, diagnosis, and

treatment of sexually transmitted infections.

29.     **DEFENDANT CENTER FOR MEDICAL PROGRESS ("CMP")** is an entity

that holds itself out as a charitable trust based in Irvine, California.  CMP made false

representations to the public and to multiple government bodies, including the State of California

and the Internal Revenue Service (IRS) to obtain tax exempt status as a "charitable organization."

CMP's three registered officers are Defendant DALEIDEN (CEO), Defendant RHOMBERG

1  (CFO), and Defendant NEWMAN (Secretary).

2       30.     **DEFENDANT BIOMAX PROCUREMENT SERVICES, LLC (BIOMAX)** is a

3  California Limited Liability Company headquartered in Norwalk, California.  BIOMAX was

4  formed on October 11, 2013, and held itself out as a legitimate tissue procurement company.  In

5  reality, the company was and is a sham company that CMP, DALEIDEN and others formed to

6  fraudulently gain access to Planned Parenthood conferences and meetings as a core part of the

7  scheme to defraud and demonize Planned Parenthood that is the subject of this lawsuit.

8       31.     **DEFENDANT DAVID DALEIDEN** is an individual who, on information and

9  belief, resides in Yolo County, California.  He is a known anti-abortion extremist with ties to the

10  discredited anti-abortion group Live Action, for which he previously served as "Director of

11  Research" according to published reports.  Using the fake name "Robert Daoud Sarkis," he held

12  himself out as Procurement Manager and Vice President of Operations for BIOMAX to

13  fraudulently gain access to Planned Parenthood conferences and meetings, as well as other private

14  meetings and conferences where Planned Parenthood staff would be, and to otherwise perpetrate

15  the wrongdoing that is the subject of this lawsuit.  According to published reports, DALEIDEN

16  has, over the last eight years, repeatedly facilitated anti-abortion activists gaining access to

17  Planned Parenthood facilities under false pretenses, taping staff and even patients without their

18  knowledge, even prior to embarking on the conspiracy that is the subject of this lawsuit—the so-

19  called Human Capital Project.  He is identified as CMP's Chief Executive Officer.

20       32.     **DEFENDANT TROY NEWMAN** is an individual who, on information and

21  belief, resides in Wichita, Kansas.  NEWMAN is a dangerous and reckless extremist who operates

22  the discredited anti-abortion group Operation Rescue and is associated with Live Action.

23  Operation Rescue operates a website that includes photos and home addresses of abortion doctors

24  across the nation so they get targeted and harassed.  Not only is NEWMAN the Secretary of CMP,

25  according to published reports, NEWMAN and Operation Rescue provided "consultation services

26  and material support" to DALEIDEN and the other co-conspirators.  NEWMAN has publicly

27  stated that he "advised Daleiden, providing consultation services and material support," and that

28  the "Human Capital Project" was conducted "in consultation with Operation Rescue."  According

to NEWMAN, the "genesis" of this conspiracy began in his office in Wichita.  NEWMAN has also boasted that he remains in control of the release of CMP's illegally-obtained recordings, and that, "at a time of our choosing, we will release more damning evidence of the abortion cartel's illegal, ghastly, and repugnant butchery."

33.   **DEFENDANT ALBIN RHOMBERG** is an individual who, on information and belief, resides in or near Sacramento, California.  RHOMBERG is a well-known anti-abortion extremist who repeatedly has harassed and accosted women and reproductive health care providers at Planned Parenthood health centers and events.  In 1991, he was arrested for disrupting a religious service held in honor of Governor Pete Wilson, claiming it was "sacrilegious" for a Catholic Cathedral to hold a nondenominational service for a pro-choice politician.  RHOMBERG is the Chief Financial Officer of CMP, and has participated in and supported the illegal activities of DALEIDEN and the other co-conspirators.

34.   **DEFENDANT PHILLIP S. CRONIN** is an individual who, on information and belief, resides in or near Ventura County, California.  CRONIN was the registered agent for BIOMAX from October 11, 2013 through July 7, 2015.  On information and belief, CRONIN allowed BioMax staff use of his credit card .  On information and belief, CRONIN paid for BIOMAX's registration to NAF's 2014 annual meeting, held in San Francisco, with his personal credit card.

35.   **DEFENDANT SANDRA SUSAN MERRITT** is an individual who, on information and belief, resides in or near San Jose, California.  MERRITT presented herself as BIOMAX's purported CEO and assumed the fake name "Susan Tennenbaum," going so far as to procure what, on information and belief, is a fake California driver's license.  She set up a phony Facebook page, where her "likes" include Hillary Clinton, The Rachel Maddow Show, and Stem Cell Research.

36.   **DEFENDANT GERARDO ADRIAN LOPEZ** is an individual who, on information and belief, resides in or near Long Beach, California.  LOPEZ attended multiple PPFA conferences with DALEIDEN, and has represented himself to Plaintiffs and others as BIOMAX's "Procurement Technician."

37.     **UNKNOWN CO-CONSPIRATORS** Who Participated in the Conspiracy to Defraud.  Defendants DALEIDEN, NEWMAN, RHOMBERG, CRONIN, MERRITT, LOPEZ, BIOMAX, and CMP did not act alone.  Other co-conspirators, discussed below, assumed fake names and identities or otherwise assisted in the scheme to defraud and harm Plaintiffs.

38.     "Brianna Allen" is the assumed name of the woman who has held herself out to Plaintiffs and others as Susan Tennenbaum's assistant.  A news report documented that "Brianna Allen" is in fact the name of one of DALEIDEN's high school classmates who is pro-choice, has not had communications with DALEIDEN for several years, and has no connection with CMP, BIOMAX, or any aspect of the events discussed herein.

39.     "Rebecca Wagner" has represented herself to Plaintiffs and others as a Contract Administrator for BIOMAX.

40.     "Sofia Mireles" used her credit card to fraudulently register BIOMAX representatives MERRITT (posing as "Susan Tennenbaum") and "Brianna Allen" to attend the Association of Reproductive Health Professionals Conference in Denver in September 2013.

41.     **Alter Egos:** Plaintiffs are informed and believe and on that basis allege that there exists, and at all times herein mentioned there existed, a unity of interest and ownership between Defendants such that any individuality and separateness between these Defendants have ceased. Defendants established BIOMAX as a fake company for the purpose of perpetrating a fraud on Plaintiffs and other abortion providers.  Defendants have at all times exercised dominion and control over BIOMAX and CMP, and have acted with total disregard for the separate legal status of BIOMAX and CMP, in order to promote their wrongful and illegal conduct.  Adherence to the fiction of the separate existence of BIOMAX and CMP as separate entities distinct from each other, DALEIDEN, NEWMAN, RHOMBERG, CRONIN, MERRITT, LOPEZ, and the UNKNOWN CO-CONSPIRATORS, would permit an abuse of the corporate privilege and would sanction fraud and promote injustice.

## FACTS

### Planned Parenthood's Record Of Providing Safe, High-Quality, Essential Health Care

42.     Approximately one out of every five women in the United States has relied on a

11

Planned Parenthood health center for care at some point in her lifetime.  Planned Parenthood's track record for providing safe, high-quality, essential health care to women – and particularly, women from low income families and underserved areas – is unparalleled.

43.     From October 1, 2013 through September 30, 2014 alone, Planned Parenthood health centers saw 2.5 million patients, who collectively received 9.5 million services, including the provision of more than 2.9 million birth control information and services, more than 270,000 Pap tests, more than 360,000 breast exams, and more than 4.2 million sexually transmitted infection tests and treatments, including HIV tests.

44.     A substantial majority of Planned Parenthood's patient population is low or middle income.  Three quarters of Planned Parenthood's patients (75%) with known income live with incomes of 150 percent of the federal poverty level or less (the equivalent of $36,375 a year for a family of four in 2015).  More than half of Planned Parenthood's health centers are in health-professional short, rural, or medically underserved areas.  In California, approximately 95% of Planned Parenthood patients are low income.

45.     A small number of Planned Parenthood affiliates have offered women seeking abortions the option of donating fetal tissue for medical research.  These Planned Parenthood health care providers, with the full informed and separately obtained consent of the patient who has chosen to have an abortion, facilitate donation of fetal tissue which researchers use to study and develop potential treatments for diseases such as cancer, diabetes, birth defects, Parkinson's, Alzheimer's and more.  Planned Parenthood affiliates who have facilitated fetal tissue donation programs have done so in full compliance with all applicable federal and state law.

**Anti-Abortion Extremists' Campaign Of Violence, Intimidation, And Harassment Against Planned Parenthood**

46.     CMP and the individuals associated with it are the latest in a long history of extremists who target Planned Parenthood, its health care providers, and its patients.  This harassment runs the gamut from aggressive picketing (thrusting false medical literature at clients, blocking clinic entrances, forcing clients to pass through a gauntlet of protestors to access the health centers), personal attacks on providers including picketing their residences and posting their

names and addresses on websites, to violence against clinic and abortion providers.  Extremists have used chemicals to block women's access to abortion, employed butyric acid to vandalize clinics, and sent anthrax threat letters to frighten clinic staff and disrupt service.  At least eight doctors who provided abortions to women have been killed over the years, and many more have received death and other violent threats.

47.    Defendants are veterans of extremist anti-abortion groups with a deadly history of threatening and inciting violence against abortion clinics and providers.  CMP's Secretary NEWMAN has been the President of Operation Rescue since 1999.  In 2003, NEWMAN issued a press release claiming that the murder of an abortion doctor, Dr. John Britton, was "justifiable defensive action."  He and his organization are tied to the killing of another abortion doctor, George Tiller.  Operation Rescue harassed Dr. Tiller for a decade until 2009, when Dr. Tiller was murdered.  His killer received specific information about Dr. Tiller's whereabouts from Operation Rescue, according to published news reports.  The words "Op Rescue" were found on an envelope inside the car of Dr. Tiller's killer.  Operation Rescue member James Kopp admitted to the 1998 murder of abortion doctor Barnett Slepian.  NEWMAN's frequent associate and co-author, Cheryl Sullenger, pleaded guilty to conspiring to blow up an abortion clinic in 1988 and served two years in U.S. federal prison.  Ms. Sullenger is currently employed by Operation Rescue as a senior policy advisor.

48.    The attacks and harassment of medical providers and patients have been so severe and persistent that federal and state legislatures have felt compelled to enact legislation to prohibit the use of force or threats to interfere with those providing or seeking reproductive health services and to protect the privacy of reproductive health service providers or patients.

49.    Notwithstanding these legislative efforts, anti-abortion activists continue to harass and obstruct Planned Parenthood health centers nationwide.  In 2013, there were 264 incidents of trespassing, 420 incidents of hate mail or harassing calls, and 396 incidents of obstruction

committed against abortion providers in the U.S. and Canada.[1]  A nationwide survey of women's health clinics found that in 2014, clinics reported higher levels of targeted intimidation of clinic staff, as well an increasing number of clinics impacted by these tactics.[2]  In California alone in the last five years there were 442 security incidents at health centers reported across the state including 11 bomb threats and 37 incidents of vandalism.

50.     Another tactic employed by extremist anti-abortion groups like Operation Rescue is the "sting operation."  These stings, which purport to "expose" some wrongdoing at Planned Parenthood, have consistently been debunked.

51.     One such discredited operation involved the very same bogus claim now being peddled by these Defendants – alleged illegal profit from the sale of fetal tissue.  In 2000, Life Dynamics, founded by Mark Crutcher, issued a report that claimed that a Planned Parenthood affiliate profited from fetal tissue sales.  But the report was thoroughly discredited.  Life Dynamics' key witness, a purported whistleblower, admitted under oath that he had fabricated his claims and been paid more than $20,000 by Life Dynamics.  The FBI concluded that the clinic had broken no laws.  Defendant DALEIDEN has explained that a conversation with Crutcher inspired him to launch his scheme.

52.     NEWMAN, the founder of Operation Rescue, also has a history of making surreptitious recordings of doctors, and then publishing those recordings online.  Last year, NEWMAN published a book on "how to do undercover investigations to find the hidden secrets the abortion industry wants no one to know."  His book praises those who "have no problem whatsoever stretching the truth to a godless enemy who is bent on destroying innocent lives – especially if it can be used to save babies."

53.     NEWMAN's book specifically describes tactics like "making up stories" and

---

[1] National Abortion Federation, *NAF Violence and Disruption Statistics: Incidents of Violence & Disruption Against Abortion Providers in the U.S. & Canada* (2014), http://prochoice.org/wp-content/uploads/violence_stats.pdf.
[2] Feminist Majority Foundation, *2014 National Clinic Violence Survey* (Jan. 2015), http://www.feminist.org/rrights/pdf/2015NCAPsurvey.pdf.

conducting "stings."  He writes that Operation Rescue has been conducting such stings "for years."  He suggests "send[ing] a team into [a] clinic with a hidden video camera….  This requires a team that is good at role-playing, as well as specialized video cameras that are undetectable during the personal interview.  We have used cameras that look like ballpoint pens and small 'spy cameras' that can be hidden in a purse."

54.     These "sting" operations, and the video footage they generate are then posted on anti-abortion websites and circulated on YouTube, Facebook, and other social media.  The videos reliably elicit extreme reactions and lead to further threats of violence.  In one example, Operation Rescue staff members pretended to be patients to make secret recordings of an abortion provider in Maryland.  The recordings are still posted on YouTube, yielding comments such as "Please someone just shoot the f***ers !! Thats the only way they stopped tiller."   In another example from 2013, NEWMAN pretended to be a reporter so that he could interview an abortion provider who was planning on providing abortion care at a Kansas clinic.  Even though the provider stated "I had been hoping not to be mentioned by name" because she was scared of "crazy people with guns," NEWMAN secretly taped the conversation and published it online, along with the provider's name.

55.     Planned Parenthood has been the main target of DALEIDEN's covert video-taping operations over the years.  During his five-year employment as the "director of research" with the discredited anti-abortion organization Live Action, the organization produced and published several similar undercover and misleadingly edited videos attacking Planned Parenthood.  In one such "sting," Live Action attempted to infiltrate Planned Parenthood and at least three other progressive advocacy groups by sending a woman to the organizations posing as an owner of an abortion clinic, using a fake name, presenting fake business cards, with a fake website for her clinic, to ask questions about policy topics related to abortion.  The "sting" did not uncover any wrongdoings at Planned Parenthood.  Of his role at the organization, DALEIDEN boasted that he "helped construct most of the undercover projects that [Live Action] did."

**Defendants Hatch Their Scheme To Defraud Planned Parenthood**

56.     On information and belief, Defendants DALEIDEN and NEWMAN hatched a

scheme in 2012 to secretly "embed" DALEIDEN and other recruits within the reproductive health community and "expose" Planned Parenthood as violating the law.  As NEWMAN has publicly described:

> The genesis happened three years ago in my office in Wichita, Kansas, where we discussed the fact that we already knew that Planned Parenthood was breaking the law in trafficking in human organs after their abortions, and so we decided and set out to go ahead and expose that and create an investigative journalism organization that would embed ourselves into the abortion cartel and to catch them off script.

57.     As NEWMAN further described:  "we began discussing all of the various techniques that he [DALEIDEN] would have to use in order to infiltrate Planned Parenthood…. Alternate identities had to be set up.  Alternate companies had to be set up."

58.     NEWMAN, DALEIDEN and their UNKNOWN CO-CONSPIRATORS set up two false entities:  CMP and BIOMAX.  On March 7, 2013, Defendants formed CMP as a California corporation.

59.     In its Articles of Incorporation – filed with the California Secretary of State – Defendants state that CMP is a "nonpartisan" organization and that "no substantial part of the activities of the Corporation shall consist of carrying on propaganda, or otherwise attempting to influence legislation."  CMP made similarly false representations in seeking tax-exempt status with the IRS.  In claiming tax-exempt status, DALEIDEN swore under penalty of perjury that CMP does not "attempt to influence legislation."  This was false:  CMP's website home page advocates for Congress to take legislative action to defund Planned Parenthood.  CMP also falsely identified itself as a not-for-profit under the IRS's category for "Diseases, Disorders, Medical Disciplines: Biomedicine, Bioengineering."  There is a different IRS category that actually applies to anti-abortion groups like CMP.

60.     CMP's application for tax exempt status provides an address of 5325 Elkhorn Blvd., Sacramento CA – which is nothing more than a Postal Annex+ mailbox rental.  Postal Annex+ advertises its rental mailboxes as giving its customers a "professional appearance" rather than the appearance of a "here today, gone tomorrow … operation."

61.     On October 11, 2013, Defendants formed BioMax Procurement Services, LLC, as a

16

California corporation purporting to be a "tissue procurement company." Defendants then proceeded to develop fictitious materials designed to deceive Plaintiffs and others into thinking that BIOMAX was a legitimate company that "provides tissue and specimen procurement for academic and private bioscience researchers" and had a "commitment [] to provide the highest-quality specimens with efficient, professional service to facilitate world-changing discoveries." They made up a fictitious CEO, "Susan Tennenbaum," describing her in BIOMAX's advertising materials as a "passionate patient advocate and entrepreneur with a vision to bridge the gap between routine medical practice and cutting edge medical research" and as someone with experience working "in surgical offices and patient advocacy." "Susan Tennenbaum" is not a real person, but was a role played by MERRITT. MERRITT presented a fake "Susan Tennenbaum" California driver's license to Plaintiffs' staff and others on multiple occasions.

62.     In order to gain access to private Planned Parenthood and NAF conferences, as well as to Planned Parenthood meetings and facilities, Defendants aggressively and fraudulently promoted BIOMAX as a legitimate tissue procurement organization. On information and belief, NEWMAN and DALEIDEN recruited and trained more conspirators to pass themselves off as legitimate officers and employees of BIOMAX. DALEIDEN told a Fox News reporter that "[t]here was a lot of intensive training and preparation that went into preparing them to actually go undercover." Defendants ultimately recruited at least four co-conspirators, some of whom used fake names, including "Susan Tennenbaum," "Brianna Allen," and "Rebecca Wagner."

63.     Throughout the course of this conspiracy, Defendants have received support and direction from the anti-abortion group Life Legal Defense Foundation ("LLDF"). Catherine Short, one of the founders of LLDF, served as CMP's registered agent since CMP's inception. On July 14, 2015, the day Defendants went public with their conspiracy with the posting of the first defamatory video and public statement, LLDF issued a press release bragging that it was "finally able to reveal its support of a two-year undercover operation," and took credit for "having been with the project from its inception" and having played an "active, essential role" in the scheme and referred to Planned Parenthood doctors as "contract killers."

**Defendants Fraudulently Gain Access To The 2014 San Francisco NAF Conference**

64.     Beginning in or about September 2013, Defendants moved forward with their fraudulent scheme.  MERRITT and unknown co-conspirator "Brianna Allen," posing as representatives of BIOMAX, registered under phony names and attended the Reproductive Health Professionals Conference in Denver, Colorado.  MERRITT and her "colleague" surreptitiously taped at least one Planned Parenthood affiliate staff member from Plaintiff PPPSW.  MERRITT and unknown co-conspirator "Brianna Allen" registered for the conference using a credit card belonging to "Sofia Mireles."

65.     Shortly thereafter, in November 2013, Defendants (through unknown co-conspirator "Brianna Allen") contacted the National Abortion Foundation ("NAF") to request Exhibitor space at its April 2014 annual conference in San Francisco.  NAF is a membership organization whose mission is to ensure women's access to safe, legal abortion.

66.     The NAF conference has been held annually since 1977, and provides unique opportunities for abortion and other reproductive health care providers to meet, learn about the latest research, and to network without fear of harassment, intimidation, and violence.  Companies that apply to exhibit at NAF's annual meetings include health care product manufacturers, service providers, and reproductive rights advocates.  Attendees include clinicians, facility administrators, counselors, researchers, educators, and thought leaders in the pro-choice field, who have long-standing commitments to health care, women's rights, and reproductive choice.  Staff from PPFA and Planned Parenthood affiliates regularly attend the NAF annual conferences.

67.     Given the horrific history of violence and intimidation perpetrated by anti-abortion extremists against abortion providers, NAF has developed extraordinary security measures for its conferences, including:

- NAF's full-time security staff are involved in the selection process for hotels in order to ensure that conference sites meet strict security guidelines.
- NAF staff meet with hotel management, hotel security, local law enforcement, FBI and/or ATF agents, and fire/rescue personnel to discuss security issues potential threats, and the security needs of NAF members.

- NAF provides on-site security teams at its conference, and conducts strict security checks of identification badges to ensure that no unauthorized individuals gain access to conference events.

- NAF has strict security requirements designed to ensure that the dates and locations of their meetings remain private.

- NAF requires attendees to show photo identification before gaining access to the annual conference.

- NAF requires all attendees and exhibitors to sign strict confidentiality agreements. Exhibitors must sign written agreements representing that they are legitimate organizations with goals that are consistent with those of NAF, and promising to hold any information received at the meeting in confidence.

- NAF requires all attendees to sign a non-disclosure agreement that prohibits making video, audio, photographic, or other recordings of the meetings or discussions at the conference.

68.     DALEIDEN, MERRITT, and an UNKNOWN CO-CONSPIRATOR lied their way into the NAF conference in San Francisco, which was held from April 5 to April 8, 2014. They attended as Exhibitors, posing as BIOMAX representatives "Susan Tennenbaum," CEO (*i.e.*, MERRITT), "Brianna Allen," Tennenbaum's assistant, and "Robert Sarkis," Vice President for Operations (*i.e.*, DALEIDEN). They knowingly entered into NAF's confidentiality and non-disclosure agreements, described above, without any intention to comply with those agreements and, on information and belief, took surreptitious video and audio recordings of conference attendees without their knowledge or consent.

69.     On information and belief, Defendants intended to – and did – exploit their fraudulently obtained access to the NAF conference to develop "professional" relationships and secure connections for future efforts to infiltrate Planned Parenthood. Defendants aggressively and specifically targeted multiple Planned Parenthood doctors, from California and elsewhere, fraudulently promoting themselves as legitimate attendees. For example, Defendants aggressively pursued PPFA Senior Director of Medical Research, Dr. Deborah Nucatola, forging on false pretenses a relationship that they would later leverage to secure additional meetings with her and

19

other Planned Parenthood staff members.

70.     Dr. Nucatola and other Planned Parenthood staff trusted the Defendants' representations about who they were based upon their presence at the NAF conference.  Planned Parenthood reasonably relied on NAF's extensive screening and security measures designed to ensure that all conference participants were legitimate and were attending the conferences to enhance the quality and safety of reproductive health care services.  Based upon NAF's screening and security measures alleged herein, Plaintiffs' staff had a reasonable expectation that the professional conversations they engaged in during the conference were confidential, private and not being listened to or recorded by anti-abortion activists.

71.     Defendants aggressively pursued Planned Parenthood staff at the NAF conference, engaged them in conversations on false pretenses, and secretly filmed Plaintiffs' staff and others. Defendants tried to bait Planned Parenthood staff with proposals that were illegal and inappropriate.  In one case, DALEIDEN asked a Planned Parenthood staff person "Can we give you $2,000 for fetal tissue donations?"  The staff member told DALEIDEN that he was behaving inappropriately.

72.     On information and belief, Defendants obtained confidential documents and media from NAF.  This includes a thumb drive that was provided to attendees at the annual meeting. The thumb drive contained confidential electronic documents and other materials, including those related to presentations that were given at NAF's annual meeting (*e.g.*, slideshows, videos, and presentation software).  The thumb drive also contained an extensive list of NAF faculty, including Planned Parenthood staff, as well as faculty biographies.  This material was not available to the public, and it contained highly sensitive information.

73.     Defendants have bragged about their efforts to surreptitiously record their Planned Parenthood targets.  When asked by a Fox News reporter how he came up with the technology, NEWMAN noted how simple it was to get the equipment they needed:  "It's as simple as a Google search and a credit card."

74.     Any recordings that Defendants made and the information that they obtained during the San Francisco NAF conferences are among the materials subject to the Temporary Restraining

Order in *NAF v. The Center for Medical Progress, et al.* (8/3/15 Order, Docket No. 27, N.D. Cal. Case No. 3:15-cv-03522-WHO).

**Defendants Target Dr. Nucatola**

75.    After the San Francisco NAF conference, Defendants parlayed the "professional" relationships they forged at the highly secure NAF conference to target Planned Parenthood staff. Using false pretenses, their first move was to leverage their status as a NAF exhibitor to arrange a meeting with Dr. Nucatola to discuss their "tissue procurement company." Dr. Nucatola trusted that DALEIDEN and his cohorts were legitimate based on their attendance at the NAF conference. She reasonably relied on NAF's extensive security measures to ensure that conference attendees were committed to enhancing the quality and safety of reproductive health care services, *not* to viciously attack Planned Parenthood and others. She would never have agreed to meet with or speak with Defendants if she had known who they were.

76.    On July 25, 2014, Dr. Nucatola met with DALEIDEN (posing as "Robert Sarkis") and MERRITT (posing as BIOMAX's CEO "Susan Tennenbaum"). Dr. Nucatola intended for the meeting, which occurred at a Southern California restaurant, to be a confidential communication. She intended that the communications be confined to only the parties to the meeting and reasonably believed that the communications were so confined. Dr. Nucatola intentionally arranged for their meeting to occur in a private booth inside the restaurant. Dr. Nucatola sat with her back to the corner wall of the restaurant, a position that enabled her to be able to observe the presence of others. The music and ambient noise in the restaurant were very loud and Dr. Nucatola held the reasonable belief that no other individuals in the restaurant were in a position to overhear or otherwise observe their conversation. The subject matter of the communications involved disclosure of Plaintiffs' internal operations, which by their nature are confidential and proprietary. Defendants nonetheless surreptitiously and illegally recorded the conversation without Dr. Nucatola's knowledge or consent, later posting a deceptive and heavily manipulated cut-and-splice version of the recording in their first online video, discussed below.

**Defendants Lie Their Way Into PPFA's Private Conferences**

77.    After secretly recording Dr. Nucatola, Defendants continued to exploit their

21

1    contacts from the highly secure NAF conference to gain access to Planned Parenthood staff.

2         78.    PPFA organizes and convenes regular conferences to give its affiliates, staff, and

3    volunteers the opportunity to gather together, to share developments in several fields of health

4    care, to discuss best practices, and to support the dedicated health care professionals who provide

5    essential services to so many patients nationwide.

6         79.    Maintaining a safe and secure space for such events is of critical importance.  Thus,

7    PPFA takes significant steps to ensure that these conferences and related events are limited to

8    health care providers and other professionals committed to providing high-quality reproductive

9    health care.

10        80.    Through fraudulent representations, Defendants infiltrated three major PPFA

11   conferences.  At each conference, Defendants posed as representatives of BIOMAX, the sham

12   tissue procurement company, in order to gain access as "Exhibitors."  They did so as part of their

13   scheme to exploit the trust of well-intentioned, highly professional attendees, to surreptitiously

14   record private presentations and meetings, to establish relationships with Planned Parenthood staff

15   and ultimately to produce a smear campaign against Planned Parenthood.

16   **Defendants Lie Their Way Into The North American Forum On Family Planning (Miami),**
17                            **October 2014**

18        81.    On or about September 16, 2014, Defendants registered themselves as Exhibitors

19   for the PPFA North American Forum on Family Planning (the "Forum").  The Forum, which was

20   held in Miami from October 12 to October 14, 2014, is a major scientific and educational

21   conference for medical and social scientists, clinical providers, and staff.  Planned Parenthood

22   imposed several security measures to protect the safety and privacy of conference participants.

23   Planned Parenthood required all attendees, including Exhibitors, to show valid identification when

24   registering at the conference and to wear special badges designed to identify attendees who were

25   present for reasons consistent with Planned Parenthood's mission.  In addition, Planned

26   Parenthood limited distribution of the Forum's program information to conference attendees to

27   protect the security of providers and faculty at the conference.

28        82.    To attend the Forum, Exhibitors were required to agree to specific Terms and

Conditions.  Planned Parenthood explicitly conditioned any Exhibitor's participation on agreement to Terms and Conditions that included:

- "The purpose of PPFA's sponsorship program is to further the education of the registrants. The exhibits and sponsored meetings must be educational and informative, emphasizing information about products and services useful to the registrants' practice and beneficial to the interests of their clients and patients."

- Any "Exhibitor" attending the conference had to "agree … to comply with all applicable federal, state and local laws and regulations in performance of its respective obligations pursuant to this Agreement, including, without limitation, laws related to fraud, abuse, privacy … [and] confidentiality."

83.    DALEIDEN (posing as "Robert Sarkis") and his co-conspirator LOPEZ registered as Exhibitors for the Forum.  Defendants electronically confirmed that they had read the Exhibitor Terms and Conditions, that they understood them, and that they were in compliance with them. Defendants had no intention of complying with the agreement's provisions, and they knowingly breached the Terms and Conditions.

84.    For security and other reasons, PPFA requires that exhibitors at the Forum be known to PPFA.  Defendants would not have been admitted as exhibitors but for their prior fraudulently-obtained attendance at the 2014 NAF conference and the contacts with PPFA staff that they had been able to make at the NAF conference by falsely representing their identities and purpose.

85.    Defendants presented themselves at registration as representatives of BIOMAX. DALEIDEN – who identified himself as "Robert Sarkis" – presented a fake California drivers' license to Planned Parenthood's registration personnel to gain access to this and other PPFA conferences:



86.     This identification is phony.  On information and belief, Defendants produced or caused to be produced this phony identification document and other similarly phony identification documents used by their co-conspirators, like MERRITT (posing as "Susan Tennenbaum"), to gain access to Planned Parenthood meetings and private spaces:



87.     Having fraudulently gained access to the Forum, DALEIDEN, LOPEZ, and MERRITT provided fraudulent advertising materials about the sham BIOMAX company at the conference.  Defendants created and distributed phony business cards, shown here, at the Forum, as they did at other Planned Parenthood conferences and meetings:



FIRST AMENDED COMPLAINT FOR DAMAGES AND FOR DECLARATORY AND INJUNCTIVE RELIEF



88.     Likewise, on information and belief, Defendants presented and disseminated advertising materials that were phony and designed to deceive Plaintiffs' staff and other reproductive health care professionals at the PPFA conferences.  An excerpt from BIOMAX's fake advertising material is shown below:

89.     Defendants' brochures contained the following statement:  "BioMax Procurement Services, LLC is a biological specimen procurement organization headquartered in Norwalk, CA. BioMax provides tissue and specimen procurement for academic and private bioscience

1   researchers.  Our commitment is to provide the highest-quality specimens with efficient,

2   professional service to facilitate world-changing discoveries."  This statement – which also

3   appeared on BIOMAX's fake website until it was locked – is a complete falsehood.

4          90.     Defendants aggressively pursued Planned Parenthood doctors at the Forum,

5   including doctors employed by Plaintiffs, to develop "professional" contacts.  On information and

6   belief, Defendants also surreptitiously and illegally recorded private conversations with attendees

7   who reasonably expected their communications at the conferences to be private and kept

8   confidential.  Defendants, posing as representatives of a purportedly legitimate business,

9   repeatedly approached Planned Parenthood staff about fetal tissue donation, seeking to elicit

10  statements they could use out of context or otherwise manipulate in the smear campaign videos

11  Defendants later would release.

12         91.     Defendants leveraged their fraudulently obtained attendance at the Forum to exploit

13  the trust of conference attendees and to secure additional meetings also on false pretenses.  For

14  example, just days after the Forum, DALEIDEN – posing as "Robert Daoud Sarkis, Procurement

15  Manager/VP Operations" for BioMax Procurement Services, LLC – contacted doctors from the

16  Planned Parenthood affiliates in Arizona and California, representing that Dr. Nucatola had

17  advised that he reach out to them.

18         92.     In an email in which he cc'd "our founder & CEO, Susan Tennenbaum," Defendant

19  DALEIDEN attached the phony BIOMAX brochure describing the company as a "biological

20  specimen procurement organization" that "provides tissue and specimen procurement for

21  academic and private bioscience researchers" and whose "commitment is to provide the highest-

22  quality specimens with efficient, professional service to facilitate world-changing discoveries."

23  DALEIDEN also attached a phony "Welcome Letter" from "Susan Tennenbaum" and requested

24  various specimens, including "intact liver."

25         93.     Every word of DALEIDEN's correspondence was a lie.  But Plaintiffs' and other

26  affiliates' staff reasonably trusted registered Planned Parenthood conference exhibitors like

27  "Robert Sarkis," who had agreed to Planned Parenthood's Terms and Conditions providing that

28  they were at the conference to provide "products and services useful to the registrants' practice

1    and beneficial to the interests of their clients and patients."

2        94.    Although Planned Parenthood Arizona does not facilitate fetal tissue donation, the

3    Arizona physicians responded professionally and courteously to "Robert Sarkis."  They agreed to

4    discuss a potential professional partnership that would promote medical science.  Like all of

5    Plaintiffs' staff who have been victims of Defendants' malicious and illegal conduct, they never

6    engaged in – or agreed to engage in – any unlawful or improper activity.

7            **Defendants Target Planned Parenthood Health Care Professional Dr. Gatter**

8        95.    In the months after the NAF and PPFA conferences described above, Defendants

9    also began pursuing Dr. Mary Gatter, the Medical Director of California Planned Parenthood

10   affiliate PPPSGV.  DALEIDEN (who again falsely identified himself as "Robert Daoud Sarkis")

11   and MERRITT (who again falsely identified herself as BIOMAX CEO "Susan Tennenbaum")

12   requested a meeting in correspondence to Dr. Gatter following up on connections made during the

13   NAF and PPFA conferences.  DALEIDEN expressed an interest in discussing PPPSGV's

14   operations and a possible partnership for fetal tissue donations.  Defendants sent numerous emails

15   to Dr. Gatter, providing completely false company information and a phony draft contract.

16       96.    Dr. Gatter and a PPPSGV colleague, who also met with Defendants, reasonably

17   trusted the representations made by Defendants about who they were based upon their purportedly

18   legitimate presence at the conferences.  They relied on the extensive screening and security

19   measures of NAF and Planned Parenthood to ensure that all conference participants were

20   legitimate and were attending the conferences to enhance the quality and safety of reproductive

21   health care services.

22       97.    On February 6, 2015, DALEIDEN and MERRITT met with Dr. Gatter and her

23   colleague at a Pasadena restaurant.  Dr. Gatter and her colleague intended for the meeting to be a

24   strictly confidential communication.  They intended their communications to be confined to only

25   the parties to the meeting and reasonably believed that the communications were so confined, for

26   reasons that include:  (a) there were no other patrons in the restaurant during the meeting; (b) the

27   group was seated at the back of the restaurant; (c) Dr. Gatter and her colleague stopped their

28   conversation whenever the restaurant's wait staff approached and they did not speak in loud

voices; (d) Dr. Gatter stated at one point in the conversation, when a waiter approached, that she wanted to be "discreet"; and (e) Dr. Gatter noted the loud music playing in the background, which would have made it impossible for any other patrons, had there been any, to overhear the conversation.  The subject matter of the communications involved disclosure of Plaintiff PPPSGV's internal operations, which by their nature are confidential and proprietary.  Defendants nonetheless surreptitiously and illegally recorded the conversation without Dr. Gatter's or her colleague's knowledge or consent, later posting a deceptive and heavily manipulated cut-and-splice version of the recording, discussed below.

**Defendants Fraudulently Gain Access To PPFA's Medical Directors' Council (MeDC) Conference (Orlando), February-March 2015**

98.     Meanwhile, Defendants continued to actively seek access to additional private PPFA conferences, further expanding their fraudulent scheme.  On February 6, 2015, the same day as the meeting with Dr. Gatter, Defendants registered for the PPFA MeDC Conference, to be held in Orlando, Florida from February 25 to March 2, 2015.  They registered as Exhibitors and as attendees at the event's reception and group dinner, which were firmly restricted to registered conference participants.

99.     PPFA required Exhibitors to agree to specific Terms and Conditions in order to attend the MeDC conference, including the following provisions:

- "The purpose of MeDC's sponsorship program is to further the education of the registrants. The exhibits and sponsored meetings must be educational and informative, emphasizing information about products and services useful to the registrants' practice and beneficial to the interests of their clients and patients."

- "Exhibitor … agree[s] … to comply with all applicable federal, state and local laws and regulations in performance of its respective obligations pursuant to this Agreement, including, without limitation, laws related to fraud, abuse, privacy … [and] confidentiality."

100.    The Terms and Conditions further stated that Exhibitors and other conference attendees were required to show identification when registering at the conference and to wear

28

special badges at all times.  Such badges were necessary for admittance to conference sessions, and were used by attendees to identify other attendees who had registered and were purportedly present for reasons consistent with PPFA's mission.

101.    Defendants, purporting to attend as representatives of BIOMAX, completed the Exhibitor registration for DALEIDEN (posing as "Robert Sarkis") and his co-conspirator LOPEZ. They electronically agreed to the Exhibitor Terms and Conditions.  Once again, they had no intention of complying with these Terms and Conditions and violated them repeatedly and with malicious intent.

102.    Having fraudulently gained access to the MeDC conference, Defendants aggressively pursued Planned Parenthood doctors, again to develop "professional" contacts that could be leveraged in to future meetings at PPFA affiliate heath care centers.  On information and belief, Defendants surreptitiously and illegally recorded private conversations without other attendees' knowledge or consent and baited conference participants in hopes of securing secretly taped statements whose meaning could be twisted to support Defendants' smear campaign.

103.    On information and belief, Defendants attempted to force their way into sessions that Exhibitors were not permitted to attend.  Defendants were successful in infiltrating at least one conference session that Exhibitors were prohibited from attending.

104.    Immediately following the conference, Defendants emailed a PPOSBC doctor with the same fraudulent BIOMAX brochure and introduction letter they had previously sent to other Planned Parenthood staff seeking a private meeting under the same false pretenses.

**Defendants Infiltrate The Third PPFA Conference:  The PPFA National Conference (Washington, D.C.), March 2015**

105.    Defendants infiltrated a third Planned Parenthood conference, the PPFA National Conference in Washington, D.C., which was held from March 16 to March 20, 2015.  As with the other Planned Parenthood conferences, in order to attend the PPFA National Conference, Exhibitors were required to agree to specific Terms and Conditions, including the following provisions:

- "PPFA reserves the right to award exhibit space only to those Exhibitors whose exhibits

FIRST AMENDED COMPLAINT FOR DAMAGES AND FOR DECLARATORY AND INJUNCTIVE RELIEF

will best meet the needs of conference participants.  PPFA may exclude sponsors and/or sponsorship materials that it deems inconsistent with PPFA policies or for any other reason PPFA deems in its best interests."

- "Exhibitor … agree[s] … to comply with all applicable federal, state and local laws and regulations in performance of its respective obligations pursuant to this Agreement, including, without limitation, laws related to fraud, abuse, privacy … [and] confidentiality."

106.    On or about February 17, 2015, Defendants registered for the PPFA National Conference and electronically confirmed that they had read the Exhibitor Terms and Conditions, that they understood them, and that they were in compliance with them.  They also registered to attend the conference's major fundraising dinner event.  In the registration, Defendants fraudulently represented themselves and BIOMAX as follows: "BioMax Procurement Services, LLC is a biological specimen procurement organization headquartered in Long Beach, CA.  BioMax provides tissue and specimen procurement for academic and private bioscience researchers.  Our commitment is to provide the highest-quality specimens with efficient, professional service to facilitate world-changing discoveries."  None of these representations are remotely true.

107.    All Exhibitors and other conference attendees were required to show identification when registering and to wear special badges at all times.  Such badges were necessary for admittance to certain conference sessions, and were used by attendees to identify other attendees who had registered and purportedly were present for reasons consistent with PPFA's mission.  Only Exhibitors who registered, agreed to the conference Terms and Conditions, and obtained an official PPFA conference badge were permitted inside the conference's exhibit hall.

108.    Having fraudulently gained access to the PPFA National Conference, Defendants followed the same script they used at the Forum in Miami and the MeDC conference in Orlando, hounding Planned Parenthood doctors and, on information and belief, surreptitiously and illegally recording private conversations without the attendees' knowledge or consent, seeking to elicit statements that could be misleadingly edited as part of their smear campaign.

**Defendants Target A Planned Parenthood Health Center In Colorado**

109.     Defendants next targeted the staff of PPFA affiliate Planned Parenthood of the Rocky Mountains ("PPRM").  On April 7, 2015, Defendants fraudulently gained entrance into a Planned Parenthood conference room in a secure wing of its Denver administrative offices. Defendants subsequently gained entrance into the secure patient treatment and laboratory areas of PPRM's co-located health center, as well as its medical research program office.  DALEIDEN and MERRITT arranged a meeting with staff by posing as BIOMAX representatives seeking partnership opportunities for fetal tissue donations.  They had made contact with a PPRM physician through their fraudulently obtained access to the NAF and Planned Parenthood conferences discussed above.

110.     A PPRM physician agreed to meet with Defendants to discuss the fetal tissue donation for medical research she understood they would be proposing.  She understood the April 7, 2015 meeting, in a private conference room and clinical space, to be a meeting with representatives from a legitimate company that facilitated legal fetal tissue donations.  PPRM staff would never have permitted DALEIDEN and MERRITT into the secure, non-public areas of their facility if Defendants had not fraudulently represented themselves.  Furthermore, PPRM staff intended their communications to be confined to only the parties to the meeting and reasonably believed that the communications were so confined.  The subject matter of the communications involved disclosure of PPRM's internal operations, which by their nature are confidential and proprietary.  Significant portions of the conversations occurred inside a private conference room and the private clinical space at the PPRM facility.  Defendants surreptitiously recorded the conversations, without consent.

**Defendants Target A Planned Parenthood Heath Center In Texas**

111.     On April 9, 2015, just two days after fraudulently obtaining access to PPRM's private and secure facility in Colorado, Defendants took their conspiratorial expedition to a Planned Parenthood health center in Texas.  There they used fraudulent means to infiltrate the private office and clinical space at a Houston health center operated by Planned Parenthood Gulf Coast ("PPGC").

FIRST AMENDED COMPLAINT FOR DAMAGES AND FOR DECLARATORY AND INJUNCTIVE RELIEF

112.    Based on past and current threats at the facility, PPGC has implemented extensive security protocols to ensure the safety and privacy of its patients and staff.  For example, PPGC posts security officers at the clinic's entrance and requires all visitors to pass through a metal detector before entering the facility.

113.    Consistent with its regular security protocols, PPGC required DALEIDEN and MERRITT to provide valid government identification to enter the clinic.  DALEIDEN provided a fake California driver's license in which he is falsely identified as "Robert Sarkis," and MERRITT provided a fake California driver's license in which she is falsely identified "Susan Tennenbaum." PPGC scanned and copied these licenses, checking the names against a database of known anti-abortion extremists and harassers.  Defendants' use of  false identities ensured that the database would not identify them as the fraudsters they are.  In fact, had DALEIDEN and MERRITT honestly identified themselves, PPGC would have identified them as known anti-abortion activists and taken steps to stop Defendants' fraudulent and defamatory campaign.

114.    PPGC also required these pretend BIOMAX representatives to sign a strict Non-Disclosure and Confidentiality Agreement ("NDA") as a precondition for Defendants' entrance into the clinic and private meeting with staff.  Under the NDA, Defendants agreed that "all information disclosed by PPGC "shall be deemed confidential" other than certain narrow carve-outs such as information in the public domain.  Defendants signed the agreement, which provides:

> 2. …"Confidential Information" shall be deemed to include (i) all written information of the Disclosing Party [i.e. PPGC], and (ii) all oral information of the Disclosing Party, which in either case is identified at the time of disclosure as being of a confidential or proprietary nature or is reasonably understood by the Recipient to be confidential under the circumstances of the disclosure.
>
> 3. Recipient shall maintain the Disclosing Party's Confidential Information strictly confidential, shall not use the Confidential Information for any purpose other than to evaluate, negotiate and consummate the Transaction and shall not disclose to any third party or use any Confidential Information for any other purpose following the date of disclosure of such Confidential Information ….
>
> 4. Recipient will not copy any Confidential Information of the Disclosing Party, except as authorized in writing by the Disclosing Party, and shall protect any such authorized copies in accordance with this Agreement.

115.    After signing the NDA, DALEIDEN, posing as "Robert Sarkis," and MERRITT, posing as BIOMAX CEO "Susan Tennenbaum," met with PPGC staff.  These staff understood the

meeting, in the private medical office and clinical space, to be with a legitimate company that facilitated legal fetal tissue donations, and intended the meeting to be a confidential communication.

116.    PPGC's staff intended their communications to be confined to the parties to the meeting and reasonably believed that the communications were so confined.  The subject matter of the communications involved disclosure of PPGC's internal operations, which by their nature are confidential and proprietary and fit squarely within the NDA that Defendants voluntarily signed. PPGC staff permitted Defendants into the private facility to discuss a possible professional relationship, not so that Defendants could secretly record the conversations using hidden cameras. But yet again, Defendants surreptitiously recorded the conversations without  PPGC staff's knowledge or consent.

117.    Defendants violated the NDA when, in August 2015, they posted a video recording they had secretly recorded at their meeting at PPGC.

**Defendants Gain Admission to the 2015 Baltimore NAF Conference By Fraudulent Representations**

118.     Defendants also fraudulently infiltrated NAF's 2015 annual meeting in Baltimore, Maryland, which was held from April 18-21, 2015.  Their fraudulently obtained access to this meeting was months in the making.  On September 23, 2014, DALEIDEN – using his fake name "Sarkis" and, on information and belief, falsely claiming to have an M.S. in Biological Science – submitted a proposal online to NAF that BIOMAX would conduct a panel discussion on "providing fetal tissue for medical research," going so far as to propose that Dr. Nucatola, the very physician he had lied to and secretly recorded, be on the panel.  DALEIDEN's "proposed panel discussion" concerned "how providers can integrate tissue donation services into their clinical practice to contribute to medical research and augment patient choice and provider satisfaction." The proposal was rejected by the NAF Annual Meeting Planning Committee.

119.    Nevertheless, on February 10, 2015, "Brianna Allen" emailed NAF looking for "information for exhibiting at the 39th NAF meeting in Baltimore this April" because BIOMAX "definitely want[s] to have a booth again. Thanks!"

120.    On March 25, 2015, Defendants entered into NAF's Agreement for Exhibit Space, making the same false representation to the effect that BIOMAX was in the business of "fetal tissue procurement" and "human biospecimen procurement."  Defendants again falsely agreed to represent their business "truthfully" and "accurately" at the annual meeting, and further agreed not to disclose any information they learned at the meeting absent NAF's written consent.  Defendants registered "Susan Tennenbaum, CEO," "Robert Sarkis, Procurement Manager/VP Operations," "Rebecca Wagner, Contract Administrator," and LOPEZ, "Procurement Technician" as the BIOMAX representatives attending the conference.  On the first day of the meeting, on information and belief, four individuals identifying themselves as Tennenbaum, Sarkis, Wagner, and LOPEZ presented themselves at the registration desk purporting to be representatives of BIOMAX.  Because no one is admitted to the annual meeting absent presenting a valid identification, on information and belief, DALEIDEN and his co-conspirators presented false identification to NAF registration personnel in order to gain access to the exhibit hall and meeting sessions.

121.    Before gaining entrance to the meeting, LOPEZ, on behalf of BIOMAX, signed the non-disclosure agreements in which they promised (1) not to make video or audio recordings of the meetings or discussions, (2) to only use information learned at the annual meeting to "enhance the quality and safety of services provided by NAF members and other participants," and (3) not to disclose information learned at the meeting to third parties without NAF's consent.

122.    Upon gaining admittance to NAF's annual meeting, Defendants surreptitiously taped conversations with attendees and particularly targeted the staff of PPFA and its affiliates.

123.    Any recordings that Defendants made and the information that they obtained during the Baltimore NAF conference are among the materials subject to the Temporary Restraining Order in *NAF v. The Center for Medical Progress, et al.* (8/3/15 Order, Docket No. 27, N.D. Cal. Case No. 3:15-cv-03522-WHO).

**Defendants Go Public with Their Fraudulent Smear Campaign To Malign Planned Parenthood and to Mislead the Public**

124.     Defendants' long-planned conspiracy to demonize Planned Parenthood came to fruition with what they called "The Human Capital Project" – a series of heavily-edited and deceptive short videos that they claimed proved that Planned Parenthood had violated federal law related to fetal tissue donation.  These short videos were composed in part of clips from the fraudulently obtained video footage of PPFA staff and affiliates' health care professionals.  The videos were posted on their CMP website and widely disseminated on YouTube and Facebook.

125.     Defendants accompanied each video with a press release featuring outrageous accusations such as assertions that Planned Parenthood engages in "illegal trafficking of aborted fetal parts," "Planned Parenthood's criminal conspiracy to make money off of aborted baby parts reaches to the very highest levels of their organization," and that Planned Parenthood had committed "atrocities against humanity."  On information and belief, these statements were specifically intended to motivate anti-abortion extremists to take action – violent, harassing, or otherwise – against Plaintiffs, their clinics, and their staff.

126.     The content of these videos was wrongfully and illegally obtained.  Moreover, according to expert forensic analysis, Defendants' heavily edited short videos and transcripts do not present a complete or accurate record of the events they purport to depict.  Rather, the heavily edited short videos "significantly distort and misrepresent the conversations depicted."  They contain "edited conversations where some spoken words are eliminated and some spoken words are added out of context."  (GPS Fusion, "CMP Video Analysis," August 25, 2015 (hereafter "GPS Fusion Report")).  In other words, Defendants' short videos "substantively and significantly alter the meaning of the dialog" that actually occurred.  In addition, expert analysis determined that Defendants' "transcripts" contain "numerous errors," "discrepancies," and "substantive omissions," and in some cases were "grossly edited."  *Id.*  Even the purported "full footage" was manipulated and incomplete, according to expert analysis.

127.     The expert analyst reached the following conclusion:

[I]t is impossible to characterize the extent to which CMP's undisclosed edits and

cuts distort the meaning of the encounters the videos purport to document. However, the manipulation of the videos does mean **they have no evidentiary value in a legal context and cannot be relied upon for any official inquiries** unless supplemented by CMP's original material and forensic authentication that this material is supplied in unaltered form. **The videos also lack credibility as journalistic products.**

*See* GPS Fusion Report at 2.1 (emphasis added).

### First Secret Video: Dr. Nucatola

128.    On July 14, 2015, Defendants posted the first deceptively edited short video of PPFA staff.  The video uses strategically selected clips from the meeting Defendants had with Dr. Nucatola, which they secretly filmed.  Through deceptive editing, Defendants present an entirely false picture of Dr. Nucatola's views and statements.  According to the expert analysis, even the long-form video Defendants posted is unreliable: "blatant manipulation of this video renders it useless as 'evidence' and means  it cannot be relied upon in official inquiries as a credible record of events." *Id.*

129.    The video was deceptively edited to make it look as if Dr. Nucatola (and Planned Parenthood affiliates) were "selling" fetal tissue for profit.  This is entirely untrue, and Defendants willfully ignored (and edited out) facts that make this clear.  For example:

- During the taped meeting Dr. Nucatola stated that "nobody should be selling tissue.  That's just not the goal here."  This statement was omitted by Defendants from their excerpted tape.

- Ten times during the conversation, Dr. Nucatola said Planned Parenthood would not sell tissue or profit in any way from tissue donations.  All ten instances were cut out of the video released by Defendants.

- At one point, Dr. Nucatola stated that reimbursement costs for a tissue specimen could range from $30 to $100.  This statement was immediately clarified by Dr. Nucatola, who explained that the reimbursement amount was based on the clinic's costs – a practice that is entirely lawful.  Dr. Nucatola explained: "It just has to do with space issues, are you sending someone there who's going to be doing everything, is there shipping involved, is somebody going to have to take it out… [I]t's really just about if anyone were ever to ask them, well what do you do for this $60, how can you justify that? …. So it needs to be justifiable."  This important passage was omitted by Defendants.

- Dr. Nucatola repeatedly stated that Planned Parenthood affiliates do *not* profit from tissue donation.  For example, she says: "To them, this is not a service they should be making money from, it's something they should be

able to offer this to their patients, in a way that doesn't impact them"; "affiliates are not looking to make money by doing this.  They're looking to serve their patients and just make it not impact their bottom line"; "we're not looking to make money from this, our goal is to keep access available"; and "this is not a new revenue stream that affiliates are looking at, this is a way to offer the patient the service that they want, do good for the medical community and still have access."  Not a single one of these comments was included in Defendants' excerpted short video.  They were purposely cut to create the false impression that Dr. Nucatola was saying the exact opposite of what she actually said.

130.    The reaction to this inflammatory and misleading video was immediate.  Within an hour and a half of the posting, Dr. Nucatola was forced to shut down her Twitter account. Inflammatory comments on right-wing blogs and websites targeting Dr. Nucatola have since proliferated.  Comments like:  "[Dr.] Nucetela wil have her own wing in Hell," "she deserves everything she has coming to her," and she will "suffer for eternity in a roasting pit" are commonly directed to her.  Anonymous internet posters have even leveled death threats against Dr. Nucatola:  "Dr. Deborah Nucatola should be summarily executed.  I'll do it myself if no one else does"; "I'll pay ten thousand dollars to anyone in need of a defense fund for the murder of Dr. Deborah Nucatola . . . ."

131.    After posting the video online, DALEIDEN began giving press interviews in which he openly admitted to the conspiracy.  In a July 16, 2015 interview with Bill O'Reilly on Fox News, he stated that he and his co-conspirators had "spent three years with actors" who "pos[ed] as representatives of a middleman biotech company" (*i.e.*, BIOMAX) in order to fraudulently infiltrate PPFA and Planned Parenthood affiliates.  During the interview, DALEIDEN promised "a lot more [videos] to come."  He stated his and his co-conspirator's plan to release one misleadingly edited video each week.

132.    Meanwhile, NEWMAN appeared on various news media to brag about how he and DALEIDEN were "discussing all of the various techniques" that were and would be used in the infiltration, as well as the process for setting up fake identities and fake companies.  As he told one reporter:  "But this is just the beginning, we have moles and spies deep inside the abortion cartel.  And at a time of our choosing, we will release more damning evidence of the abortion cartel's illegal, ghastly, and repugnant butchery."

**Second Secret Video: Dr. Gatter**

133.    On July 21, 2015, Defendants posted on their website a misleadingly edited video containing segments of the February 6, 2015 meeting with Dr. Gatter.  Again, the short video is misleadingly edited.  In six separate instances, the content was spliced together to create the appearance of a seamless conversation.  Portions of the secretly recorded tape that do not fit Defendants' fiction were cut from the short video.  For example, after Defendants repeatedly urged Dr. Gatter to demand more money as part of a fetal tissue donation contract, she responded, "we are not in this for the money."  In response to Defendants' "requests" that Planned Parenthood doctors make illegal adjustments to their medical procedures, Dr. Gatter flatly rejected the idea, stating "That's not going to happen."  Dr. Gatter also stated clearly that any Planned Parenthood involvement in fetal tissue donation would have to comply with federal law:  "[I]t's absolutely a requirement that we use only the official federal government form for tissue donation, that we don't modify it in any way."  All of these portions of the surreptitious recording were edited out of the widely distributed short video.

134.    Defendants preferred instead to focus on a single out-of-context statement Dr. Gatter made – in jest – that she "want[s] a Lamborghini," to suggest that Dr. Gatter is greedy and even committing a federal crime.  That Dr. Gatter was joking is made crystal clear by the comment she made next:  "I wouldn't even know how to drive a Lamborghini."  Defendants edited that statement out, too.

135.    Like Dr. Nucatola, this video exposed Dr. Gatter to vicious personal attacks and death threats.  Since the video's release, Dr. Gatter has been called a "baby butcher," "evil," and a "vicious demonic force" who deserves "a hangman's noose."  Like Dr. Nucatola, she has been described online as a "demon," and compared to Adolf Hitler and Joseph Mengele.  Threats of violence followed:  "SICK F***ING B**** SHOULD BE ABORTED HERSELF."  Another poster proclaimed "Kil all leftard maggots."  Another:  "FILTHY OLD ROACH!!! PLANNED PARENTHOOD NEEDS TO BE BLOWN INTO HELL!!!"  Another: "[T]his bitch needs to be killed."  Since the publication of the videos, Dr. Gatter has been harassed by anti-abortion protestors at her home.  The group also left grisly postcards in Dr. Gatter's mailbox, and on

38

1  information and belief, the mailboxes of her neighbors.

2        136.    The next day, July 22, 2015, DALEIDEN, interviewed by Sean Hannity of Fox

3  News, boasted that he and his co-conspirators "probably have hundreds to even thousands of hours

4  total of videotape over the past two-and-a-half years," which would "continue to be released in the

5  days and months to come."

6  **PPRM Video**

7        137.    On July 30, 2015, Defendants posted on their website another misleadingly edited

8  short video using footage surreptitiously taken inside the PPRM health center in Denver.  The

9  released video entirely misrepresents what PPRM staff said.  On 13 separate occasions, PPRM

10  staff said that any arrangements related to fetal tissue donation need to be reviewed by attorneys

11  and follow all laws.  But Defendants edited all of these statements out of their deceptive short

12  video.  Furthermore, according to expert analysis, the publicly released short video and transcript

13  contain multiple segments that "were deemed to be suspicious."  *See* GPS Fusion Report.  For

14  example, the analysis found that Defendants' transcript attributes the statement "It's a baby" to

15  PPRM clinic staff.  PPRM staff did not make that statement:  it was instead manufactured by

16  Defendants "either through transcription error or intentional fabrication."  *Id.*  Furthermore, the

17  expert found that DALEIDEN and his co-conspirator repeatedly attempted to "bait[] Planned

18  Parenthood staff into making unethical statements," and asked "questions that seem designed to

19  elicit 'soundbites' pertaining to fetal viscera."  *Id.*

20        138.    As with Drs. Nucatola and Gatter, the PPRM staff member targeted by Defendants

21  became an immediate target of anti-abortion extremist threats following the video's release.

22  Online death threats ensued: "I look forward to a time when abortionists can be . . . publicly

23  hanged."  And: "[T]hey should all be shot."  On August 9, 2015, she was met by a group of 50

24  extremists at her home, holding signs stating "Planned Parenthood sells baby parts."  The group

25  left fliers around her neighborhood written in massive, bold print, accusing her of murdering

26  children.

27  **PPGC Video**

28        139.    On August 4, 2015, Defendants posted on their website a misleadingly edited short

video using footage from the April 9, 2015 meeting inside the PPGC office and clinic space in Texas.  Once again, Defendants edited out any statement that was not consistent with their false narrative.  For example, the PPGC staff member who met with Defendants stated on four separate occasions that abortion methods are not substantively changed because of a patient's decision to donate tissue.  Defendants edited out all four statements from their widely disseminated short video.  Similarly, in nine instances, the staff member confirms that there is no "profit" related to fetal tissue donation.  All nine of these statements are edited out of the short video.  In addition, the analysis found that Defendants' transcript omitted portions in which the PPGC staff member strongly and explicitly rejects Defendants' baiting.  When Defendants cynically offer "participation bonuses to doctors" related to tissue donation, the staff member forcefully responds: "No way."  *Id.*  Defendants omitted these telling portions, instead painting a picture of Planned Parenthood's policies and practices that is wholly inconsistent with reality.  According to expert analysis, even the allegedly "full footage" of the video recorded at the PPGC health center was "substantially manipulated."  *See* GPS Fusion Report.

140.    Like the other targets of Defendants' videos, the PPGC staff person targeted has been thrust into the public sphere, where she has been described as "ghoulish," an "evil witch," and a "monster."  Countless commenters on Defendants' YouTube page have threatened violence against the staff person and Planned Parenthood in general:  "they should be publicly executed."; "Sick bastards should be killed.  All of them."; "These people need executed and their body parts sold for charity."; "I really hope it gets bombed and every abortion supporter gets publicly lynched by lynch mobs."

141.    Since August, Defendants have continued to release more deceptive short videos, containing clips from numerous private PPFA and affiliate meetings and spaces, including the Exhibit Hall of a private conference, as well as a Planned Parenthood affiliate's secure office and laboratory space.  Defendants released "recut" videos of old footage on January 6 and January 12, 2016.  All of the conversations involving PPFA or Planned Parenthood affiliate personnel that appear in the videos were recorded without the knowledge or consent of the subjects.  In every instance, Defendants posted a deceptively edited short-form video along with a press release by

40

Defendants accusing Planned Parenthood of breaking the law.

**The Extensive Harm to Plaintiffs Caused by Defendants' Conspiracy to Defraud**

142.    Defendants' misconduct has substantially disrupted Plaintiffs' operations and their delivery of services.  Plaintiffs have had to expend significant resources to identify and address threats to the safety of their staff, affiliates, health care providers, and patients; to address cyber-attacks on the Planned Parenthood website; and to deal with other problems that have arisen as a result of the fraud, lies, and other misconduct perpetrated by Defendants.  After the release of Defendants' videos there was a dramatic increase in the threats, harassment, and criminal activities targeting abortion providers and their supporters and in particular Planned Parenthood health centers.  Across the country, there were 849 reported incidents of vandalism against Planned Parenthood in the months of July 2015 and August 2015 alone – incidents of harassment at Planned Parenthood health centers increased ***nine fold*** in July compared to reported incidents in June, and the reported incidents of harassment were even more numerous in August.  There have been attempted arsons at Planned Parenthood health centers on July 19, 2015 (Aurora, Illinois) and August 3, 2015 (New Orleans).  And most tragically, on November 27, 2015, an armed gunman killed three people and injured another nine at a Planned Parenthood health center in Colorado Springs.  In California, there has been a five-fold increase in the number of security incidents since the beginning of Defendants' video smear campaign.

143.    Plaintiffs have expended significant resources to identify potential threats to their clinics and staff and to provide additional security in order to ensure the safety of their staff, patients, facilities, and operations.  Because of Defendants' actions, the PPFA and affiliate staff who appear in the videos have been placed in significant danger, including being subjected to death threats, and Plaintiffs' costs to protect these individuals are considerable.  PPFA has expended significant resources to increase security at all future conferences as a direct result of Defendants' illegal intrusion into several PPFA conferences.

144.    Furthermore, shortly after the release of the first illegal and fraudulently obtained video, the PPFA website was hacked, with those claiming credit for the hack making reference to Defendants' campaign.  The PPFA website is a crucial tool in Plaintiffs' efforts to make

reproductive health care accessible to all women: more than half of PPFA's affiliates make the website available to their patients to book online appointments.  Over 60 million people access the website annually to gain valuable information about their reproductive health care.  The hack rendered the PPFA website inoperable for several weeks, cutting off the health centers that rely on the PPFA website network to schedule and coordinate patient care appointments, and preventing women and men from accessing health care information.  Plaintiffs lost income from the loss of ability to serve clients over those days and had to expend significant IT resources to bring the website back and to maintain it against further attack.

145.    Defendants' actions have also led to the loss of vendors, who have terminated their relationship with Plaintiffs following the release of the videos.  Furthermore, the entirely meritless controversy and the violence that has accompanied, and was intended to accompany, the controversy has made it difficult for some affiliates to hire staff.

146.    In the aftermath of the release of Defendants' videos, five separate Congressional Committees, and politicians in numerous states, have commenced investigations of Planned Parenthood's operations.  Each of these investigations has required Plaintiffs to expend considerable hours researching the allegations, preparing for interviews with federal and state officials, and responding to requests for documents.  While these "investigations" are all meritless and politically motivated, they have required thousands of hours of Plaintiffs' time, hours that should have been spent on improving healthcare for women across the country.

147.    Defendants' release of videotapes and transcripts (or any other confidential information) obtained through fraudulent representations, and their intrusions into PPFA and other private reproductive health care conferences and private meetings with PPFA and affiliate personnel, have damaged Plaintiffs and their staff in incalculable and irreversible ways.

### FIRST CLAIM FOR RELIEF
### (VIOLATION OF RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS (RICO) ACT, 18 U.S.C. §§ 1962(c) and 1962(d))
### (By All Plaintiffs Against All Defendants)

148.    Plaintiffs incorporate and reallege paragraphs 1 through 147, inclusive, as though fully set forth herein.

149.    Plaintiffs are each a "person" as that term is defined in 18 U.S.C. § 1961(3).  At all relevant times, in violation of 18 U.S.C. § 1962(c), Defendants conducted the affairs of an associated-in-fact enterprise identified herein, the affairs of which affected interstate commerce through a pattern of racketeering activity.  Furthermore, in violation of 18 U.S.C. § 1962(d), Defendants knowingly agreed and conspired to conduct or participate in the conduct of said enterprise's affairs through a pattern of racketeering activity.

150.    The Enterprise had a hierarchical decision-making structure headed by NEWMAN and DALEIDEN.  Both of these individuals directed how the scheme was to be perpetrated.  While the full extent of the conspiracy and its participants is not yet known, for purposes of this claim, the RICO enterprise is an associated-in-fact enterprise consisting of, at minimum, Defendants CMP, BIOMAX, DALEIDEN, NEWMAN, RHOMBERG, CRONIN, MERRITT, LOPEZ, and UNKNOWN CO-CONSPIRATORS "Brianna Allen," "Rebecca Wagner," and "Sofia Mireles" (the "Enterprise").  The purpose of the Enterprise was to perpetrate a scheme targeting Plaintiffs and other Planned Parenthood affiliates in order to disrupt and burden their core mission to provide safe quality reproductive health care to women and to demonize them in a professed attempt to "close all abortion clinics" and to "stop the infliction of human misery upon vulnerable women and their innocent babies."  The fraudulent and illegal actions undertaken by the Enterprise were intended to inflict the type of injury and harm suffered by Plaintiffs.

151.    The Enterprise is an ongoing and continuing business organization consisting of corporations, supposed charitable trusts, and individuals that are and have been associated for the common or shared purposes of, among other things, (1) defrauding Plaintiffs to unlawfully obtain access to PPFA conferences and affiliate offices and health centers; (2) compromising Plaintiffs' and their employees' ability and right to hold and attend secure and confidential meetings; (3) carrying out an illegal and surreptitious videotaping campaign; (4) publishing deceptively edited and grossly misleading videos and accusing Plaintiffs of being a "criminal" organization; (5) placing Plaintiffs' staff and health care providers in personal jeopardy through publication of their images in grossly misleading and widely disseminated videos; (6) unlawfully burdening Plaintiffs' staffs' constitutional right to freedom of association; and (7) unlawfully burdening the

43

1   constitutional right of women to access safe, legal abortion in the United States.

2   152.   According to DALEIDEN's and NEWMAN's own statements, the Enterprise has

3   operated for a period of two-and-a-half to three years, continues to operate, and has taken

4   hundreds if not thousands of hours of videotape of individuals who provide or support the

5   provision of safe, legal abortion, including physicians.  The Enterprise, acting through

6   DALEIDEN, has released numerous surreptitiously taken and deceptively edited videotapes, and

7   has threatened and continues to threaten the release of more such videotapes.

8   153.   At all relevant times, on information and belief, DALEIDEN, CMP, BIOMAX,

9   NEWMAN, RHOMBERG, CRONIN, MERRITT, LOPEZ, and the UNKNOWN CO-

10   CONSPIRATORS were aware of each other's conduct in furtherance of the scheme, and were

11   knowing and willing participants in that conduct.  By NEWMAN's and DALEIDEN's own

12   admissions, they discussed and agreed upon what "techniques" they would use.

13   154.   The Enterprise affected interstate commerce by registering a fraudulent business

14   and a purported charitable institution, by purchasing the right to set up an exhibit booth at PPFA

15   conferences, by registering as an Exhibitor and paying the associated fees, and by communicating

16   with and traveling to multiple Planned Parenthood affiliate offices and health centers.  The

17   Enterprise further affected interstate commerce because it has diverted Plaintiffs from their core

18   mission of providing quality reproductive health care services and forced Plaintiffs to divert

19   resources to protect their health centers and staff from threats to their personal safety and related

20   harm and combat the misrepresentations disseminated by Defendants.

21   155.   Defendants participated in the conduct of the affairs of the Enterprise, and not just

22   their own affairs.  DALEIDEN has given press interviews in which he boasted about the scheme

23   and his, CMP's, and BIOMAX's knowing and willing participation in the scheme.

24   156.   Defendants exerted control over the Enterprise and, in violation of section 1962(c)

25   of RICO, Defendants have conducted or participated in the affairs of those RICO enterprises in at

26   least the following ways:

27   a.   By setting up a sham company – BIOMAX – which falsely held itself out as

28   a legitimate tissue procurement organization;

b.      By setting up a sham "nonprofit" and "nonpartisan" charitable trust, CMP;

c.      By creating, transferring, and maintaining false identities and documentation to obtain access to PPFA and other reproductive health care organization meetings and Planned Parenthood affiliate offices and health centers;

d.      By creating and disseminating false promotional materials for a fake tissue procurement company;

e.      By making false and misleading representations to Plaintiffs and their staff concerning BIOMAX and the reasons its agents wanted to attend PPFA and other reproductive health care organization meetings and to visit to Planned Parenthood affiliate offices and health centers; and

f.      By engaging in an ongoing campaign to surreptitiously videotape Plaintiffs' staff in violation of law.

157.    The Enterprise engaged in a pattern of racketeering activity, consisting of, among other crimes, mail and wire fraud violations.  Defendants have publicly boasted about the illegal nature and pervasiveness of the scheme.  The racketeering activities of DALEIDEN, CMP, BIOMAX, NEWMAN, RHOMBERG, CRONIN, MERRITT, LOPEZ, and their UNKNOWN CO-CONSPIRATORS amounted to a common course of conduct, with similar pattern and purpose.  Each separate use of the U.S. mails and/or interstate wire facilities employed by the co-conspirators was related, had similar intended purposes, involved similar participants and methods of execution, and had the same results affecting the same victims, including Plaintiffs.

158.    Plaintiffs do not and cannot now know the full extent of the conspiracy.  At a minimum, however, Defendants used the U.S. mails and interstate wire facilities for the purpose of executing their unlawful scheme, including, *inter alia*, the following, all of which are identified with specificity:

- September 15, 2013 wire transmission of registration for Association of Reproductive Health Professionals Conference in Denver and the associated payment of registration fees through a credit card;

- September 16, 2014 wire transmission of the Exhibitor registration for the PPFA North American Forum on Family Planning, and the associated payment of registration fees through a credit card that, on information and belief, was obtained

45

under a phony name;

- October 17, 2014 email from BIOMAX representative to Planned Parenthood affiliate staff – sending fraudulent proposal for tissue donation partnership, with phony BIOMAX brochure and "welcome letter" containing phony description of BIOMAX;

- November 5, 2014 email from BIOMAX representative to PPMM staff requesting a site visit in Arizona;

- December 11, 2014 email from BIOMAX representative to Planned Parenthood affiliate staff – sending fraudulent proposal for tissue donation partnership, with phony BIOMAX brochure and "welcome letter" containing phony description of BIOMAX;

- February 6, 2015 wire transmission of the Exhibitor registration for the PPFA Planned Parenthood MeDC Conference, and the associated payment of registration fees through a credit card;

- February 11, 2015 email from BIOMAX representative to Planned Parenthood staff – sending fraudulent proposal for tissue donation partnership, with phony BIOMAX biospecimen materials transfer agreement;

- February 17, 2015 wire transmission of the Exhibitor registration for the PPFA National Conference, and the associated payment of registration fees through a credit card;

- February 19, 2015 email from BIOMAX representative to Planned Parenthood staff requesting a site visit of a Planned Parenthood health center where surgical procedures are performed to "gauge flow and logistics in the path lab";

- April 14, 2015 email from BIOMAX representative to Planned Parenthood staff requesting a site visit at PPPSGV;

- March 6, 2015 introductory letter from "Susan Tennenbaum" to Planned Parenthood staff about BIOMAX, including phony representations about BIOMAX's business and purpose;

- June 3, 2015 email from BIOMAX representative to Planned Parenthood staff requesting lunch or dinner meeting to discuss logistics for moving forward with a "partnership" for tissue collection in Phoenix, Arizona; and

- Each other email alleged in this Complaint.

159.    The foregoing emails and wire transmissions were sent for the purpose of deceiving and defrauding Plaintiffs into believing that BIOMAX was a legitimate fetal procurement organization whose interests were aligned with those of Plaintiffs, to fraudulently obtain confidential and proprietary information related to Planned Parenthood and other reproductive health care organization meetings, to obtain the identities of Plaintiffs' members, to purchase exhibit booth space in, and access to, Planned Parenthood and other reproductive health care

46

organization meetings, and to obtain access to Planned Parenthood clinics and offices for private meetings with Planned Parenthood staff through fraud and deceit.  In sending the foregoing false and fraudulent emails and wire transmissions, Defendants intended Plaintiffs to rely on their false and fraudulent misrepresentations, and Plaintiffs did rely on those misrepresentations in permitting Defendants access to their meetings.

160.   In addition, on information and belief, Defendants also produced, transferred, and possessed with the intent to use, false identification documents in order to gain admission to PPFA and other reproductive health care organization meetings and Planned Parenthood affiliate offices and health centers in 2014 and 2015 in violation of 18 U.S.C. § 1028(a), and conspired to do the same in violation of 18 U.S.C. § 1028(f).  Specifically, BIOMAX representatives – including DALEIDEN and MERRITT – presented fake photo IDs to gain access to private meetings where Plaintiffs' staff would be in attendance, and to gain access to Planned Parenthood affiliate offices and health centers for private meetings with Planned Parenthood staff.  On information and belief, Defendants produced these false photo identifications, and also knowingly transferred, possessed, or used, without lawful authority, a means of identification of another person – to wit, fake photo identification of DALEIDEN's high school classmate Brianna Allen – with the intent to violate federal and state law.

161.   Plaintiffs have been injured in their business and property by reason of these violations.  Plaintiffs have incurred financial losses as a direct result of Defendants' fraudulent conduct, including the costs of hiring additional security to protect Plaintiffs' offices, clinics, and staff; costs related to the hacking into PPFA's website, which is used by patients of affiliates nationwide to make appointments online; costs related to responding to multiple state and federal investigations and inquiries; costs related to loss of vendors; costs related to loss of opportunity to treat clients; and the costs of the vandalism, arson, and other incidents that have physically damaged Planned Parenthood facilities and disrupted the delivery of care to patients, all stemming from Defendants' campaign of lies.  Planned Parenthood was the primary intended victim of Defendants' multi-year scheme, and the injuries suffered by Plaintiffs were both foreseeable and a natural consequence of Defendants' actions.

162.    Under the provisions of section 1964(c) of RICO, each of the Defendants is jointly and severally liable for three times the damages that Plaintiffs have sustained, plus the costs of bringing this lawsuit, including reasonable attorneys' fees.

**SECOND CLAIM FOR RELIEF**
**(VIOLATION OF 18 U.S.C. § 2511)**
**(By All Plaintiffs Against DALEIDEN, MERRITT, LOPEZ, CMP, BIOMAX, and**
**UNKNOWN CO-CONSPIRATORS)**

163.    Plaintiffs incorporate and reallege paragraphs 1 through 162, inclusive, as though fully set forth herein.

164.    In violation of 18 U.S.C. § 2511(a) and (b), Defendants intentionally intercepted the oral communications of Plaintiffs and their staff at conferences and private meetings as described herein.  Defendants also intentionally procured other people to intercept, and to endeavor to intercept, such oral communications.  On information and belief, Defendants did so by using concealed electronic devices that make video and audio recordings that transmit such recordings through a wire or by radio, and these devices were transported through interstate commerce when purchased by Defendants and/or when transported to Plaintiffs' private conferences, to private meetings with Plaintiffs' staff members, and to secure Planned Parenthood facilities.

165.    On information and belief, Defendants endeavored to use and disclose the contents of the intercepted oral communications, in violation of 18 U.S.C. § 2511(c) and (d).  They did so with knowledge that the information was obtained through the interception of protected oral communications.

166.    Defendants' use of devices to intercept oral communications in Colorado and Texas, discussed above, took place inside the private office and clinical spaces of Planned Parenthood health centers – that is, on the premises of a business or other commercial establishment the operations of which affect interstate or foreign commerce.  Defendants intercepted oral communications with the purpose of obtaining information relating to Planned Parenthood's operations.

167.    Plaintiffs reasonably and justifiably expected that their oral communications, and

those of their staff, would not be subject to interception.  18 U.S.C. § 2510(2).

168.    Neither Plaintiffs, nor any of Plaintiffs' staff, consented to Defendants' recording of their oral communications.

169.    In surreptitiously intercepting the communications, Defendants acted with the purpose and intent of committing criminal and tortious acts.  Such criminal and tortious acts include, but are not limited to:

a.    Defendants intercepted the communications with the purpose of furthering their conspiracy to violate the federal RICO statute, 18 U.S.C. §§ 1962(c) and 1962(d) (as described in the first claim for relief); and

b.    Defendants intercepted the communications with the purpose of invading the privacy of Plaintiffs' staff.

170.    Plaintiffs have been damaged by Defendants' violations.

171.    As  "persons" (as used in 18 U.S.C. § 2520 and 18 U.S.C. § 2510(6)) whose oral communications were intercepted in violation of 18 U.S.C. § 2511, Plaintiffs are authorized to seek injunctive relief, civil damages (including both actual and statutory damages), punitive damages, and reasonable attorneys' fees and costs pursuant to 18 U.S.C. § 2520.

### THIRD CLAIM FOR RELIEF
### (CIVIL CONSPIRACY)
### (By All Plaintiffs Against All Defendants)

172.    Plaintiffs incorporate and reallege paragraphs 1 through 171, inclusive, as though fully set forth herein.

173.    Defendants and Defendants' co-conspirators knowingly and willfully conspired and/or agreed among themselves to defraud Plaintiffs and to injure Plaintiffs with a pattern of fraudulent and malicious conduct, including but not limited to:

a.    By setting up a sham company – BIOMAX – which falsely held itself out as a legitimate tissue procurement organization;

b.    By making false and misleading promises and representations to Plaintiffs concerning BIOMAX and the reasons its agents wanted to attend PPFA and other reproductive health care organization meetings and conferences, and to make visits to Planned Parenthood

49

1    affiliate offices and health centers;

2          c.    By sending false information to Plaintiffs and their employees about

3    BIOMAX;

4          d.    By setting up a false website;

5          e.    By engaging in an ongoing campaign to surreptitiously videotape Plaintiffs'

6    staff in violation of law;

7          f.    By creating, transferring, and maintaining false identities and

8    documentation to obtain access to PPFA and other reproductive health care organization meetings

9    and the offices and clinics of Planned Parenthood affiliates.

10         174.    As a proximate result of the wrongful acts herein alleged, Plaintiffs have diverted

11    and expended substantial resources to address the consequences of Defendants' fraud, thereby

12    suffering pecuniary loss.

13         175.    Defendants' ongoing conspiracy to defraud, as described above, presents a

14    continuing threat to Plaintiffs.  If Defendants are allowed to continue their wrongful acts, Plaintiffs

15    will suffer further irreparable injury and loss.

16         176.    Defendants and Defendants' co-conspirators did the acts and things herein alleged

17    pursuant to, and in furtherance of, the conspiracy and the above-alleged agreement.  In doing the

18    things herein alleged, Defendants acted with malice, oppression, willfulness, and wantonness with

19    the intent to cause injury to Plaintiffs, thereby warranting an assessment of punitive damages in an

20    amount appropriate to punish Defendants and deter others from engaging in similar misconduct.

21                   **FOURTH CLAIM FOR RELIEF**
                      **(BREACH OF CONTRACT)**

22    **(By PPFA Against DALEIDEN, MERRITT, LOPEZ, CMP, BIOMAX, and UNKNOWN**
                      **CO-CONSPIRATORS)**

23         177.    Plaintiffs incorporate and reallege paragraphs 1 through 176, inclusive, as though

24    fully set forth herein.

25         178.    On September 16, 2014, on February 6, 2015, and again on February 17, 2015,

26    Defendants DALEIDEN, MERRITT, LOPEZ, CMP, BIOMAX, and "Brianna Allen" entered into

27    written Exhibitor Agreements with PPFA related to registration for the PPFA conferences in

28

FIRST AMENDED COMPLAINT FOR DAMAGES AND FOR DECLARATORY AND INJUNCTIVE RELIEF

Miami, Orlando, and Washington, D.C., respectively.  Defendants represented that BIOMAX was a legitimate biological specimen procurement organization.  Defendants agreed that their contribution to the conferences would be useful to attendees and beneficial to the interests of their clients and patients and that they would comply with all applicable laws related to fraud, abuse, privacy, and confidentiality.

179.    Defendants have breached these agreements.  Contrary to the Exhibitor Terms and Conditions to which Defendants agreed:  (a) BIOMAX's participation at the PPFA conferences was not consistent with Plaintiffs' purposes and was not useful to attendees and beneficial to the interests of their clients and patients; (b) Defendants misrepresented who they were in order to fraudulently forge "professional" contacts, and to make video, audio, photographic, or other recordings with the intent of harming Plaintiffs; and (c) Defendants violated numerous laws related to fraud, abuse, privacy, and confidentiality.

180.    Plaintiffs have performed all of the conditions of the agreements on their part, and performed in accordance with the terms of the agreements.

181.    As a direct result of Defendants' breaches of their agreements with PPFA, Plaintiffs have been damaged, including by being forced to expend additional, extensive resources on security and IT services, property damage, and responding to multiple state and federal investigations and inquiries.

**FIFTH CLAIM FOR RELIEF**
**(BREACH OF CONTRACT)**
**(By PPFA, PPNC, PPPSW, PPMM, PPOSB,  PPGC, and PPCFC Against DALEIDEN, MERRITT, LOPEZ, CMP, BIOMAX, and UNKNOWN CO-CONSPIRATORS)**

182.    Plaintiffs incorporate and reallege paragraphs 1 through 181, inclusive, as though fully set forth herein.

183.    On February 5, 2014 and again on March 25, 2015, Defendant MERRITT entered into written Exhibitor Agreements with NAF in which she promised that BIOMAX was a biological specimen procurement company, that BIOMAX's exhibit for the annual meetings would be consistent with NAF's purposes, that BIOMAX would identify and display its services truthfully and accurately, and that any information disclosed orally or visually at the annual

1   meeting would not be disclosed to any third party absent NAF's written consent.

2       184.    On April 5, 2014 and again on April 18, 2015, Defendants DALEIDEN,

3   MERRITT, LOPEZ, and "Brianna Allen" signed non-disclosure agreements in which they

4   promised not to make video, audio, photographic, or other recordings at the NAF annual meetings,

5   that they would not disclose any information learned at NAF's annual meetings to third parties

6   absent NAF's consent, and that they would only use information learned at NAF's annual

7   meetings in order to enhance the quality and safety of services provided by NAF members and

8   other annual meeting participants.

9       185.    Defendants were aware that the purpose of these agreements was to protect NAF

10  and any confidential information shared at its meetings, and to protect the safety and security of

11  NAF's staff, its members, and the attendees at NAF's annual meetings.  Attendees at NAF's

12  annual meetings, including Plaintiffs are intended third party-beneficiaries to each and every

13  contract described in the preceding paragraphs.

14      186.    Defendants have breached these agreements. Contrary to their written Exhibitor

15  Agreements, BIOMAX is not a biological specimen procurement company, BIOMAX's exhibit

16  for the annual meetings was not consistent with NAF's purposes, and BIOMAX did not identify

17  itself or its services truthfully and accurately.  Contrary to their written Exhibitor Agreements, on

18  information and belief, Defendants have disclosed information orally or visually at the annual

19  meetings to third parties without NAF's written consent.  Contrary to their written agreements, on

20  information and belief, Defendants did make video, audio, photographic, or other recordings at the

21  NAF annual meetings, have disclosed information learned at NAF's annual meetings to third

22  parties without NAF's consent, and have not used information learned at NAF's annual meetings

23  in order to enhance the quality and safety of services provided by NAF members and other annual

24  meeting participants.

25      187.    On information and belief, NAF has performed all of the conditions of the

26  agreements on its part, and performed in accordance with the terms of the agreements.

27      188.    As a direct result of Defendants' breaches of their agreements with NAF, Plaintiffs

28  have been damaged, including by being forced to expend additional, extensive resources on

52

security and IT services, property damage, and responding to multiple state and federal investigations and inquiries.

**SIXTH CLAIM FOR RELIEF**
**(TRESPASS)**
**(By PPFA, PPGC, PPCFC, and PPRM Against DALEIDEN, MERRITT, LOPEZ, CMP, BIOMAX, and UNKNOWN CO-CONSPIRATORS)**

189.    Plaintiffs incorporate and reallege paragraphs 1 through 188, inclusive, as though fully set forth herein.

190.    PPFA possesses a right to exclusive use of the real property it leases for Planned Parenthood meetings.  PPGC, PPCFC, and PPRM possess rights to exclusive use of the real property they lease or own as office and clinic space.

191.    As alleged herein, Defendants intentionally entered or caused another person to enter the aforementioned property that was in PPFA, PPGC, PPCFC, and/or PPRM's possession.

192.    As alleged herein, Defendants fraudulently induced PPFA's conditional consent to permit Defendants to attend PPFA conferences.  PPFA conditioned its consent on Defendants' agreement that their participation in the PPFA conferences would be useful to attendees and beneficial to the interests of Plaintiffs' clients and patients, and that Defendants would comply with all applicable laws related to fraud, abuse, privacy, and confidentiality.  On information and belief, Defendants subsequently exceeded the scope of Plaintiffs' consent to enter by knowingly and intentionally, surreptitiously videotaping Plaintiffs' staff at those meetings without their knowledge or consent.  Defendants' participation at the PPFA conferences was not consistent with Plaintiffs' purposes and was not useful to attendees and beneficial to the interests of their clients and patients, thereby further exceeding Plaintiffs' conditioned consent.

193.    Defendants fraudulently obtained PPGC, PPCFC, and PPRM's conditional consent to enter their facilities by misrepresenting their identities and purpose.  PPGC and PPCFC conditioned their consent on Defendants' promise to keep all information confidential.  PPGC and PPRM both conditioned their consent on Defendants' false representations that they were representatives of a fetal tissue procurement company and that they sought entry to discuss fetal tissue donation.  Defendants subsequently exceeded the scope of their consent to enter by

53

knowingly, intentionally, and surreptitiously videotaping their staff at those meetings without their knowledge or consent and by engaging in conduct designed to disrupt, not further, PPGC and PPRM's businesses.

194.    Defendants' knowing and intentional conduct alleged herein, which exceeded the scope of PPFA, PPGC, PPCFC, and PPRM's conditioned consents to enter their meetings and clinics, constitutes trespass.

195.    As a result of Defendants' trespass, PPFA, PPGC, PPCFC, and PPRM have suffered – and continue to suffer – economic harm and irreparable harm that includes, but is not limited to: being forced to divert resources to combat Defendants' misrepresentations in intentionally distorted videos taken while trespassing on Plaintiffs' property; and dealing with security threats, property damage, governmental investigations, harassment and intimidation, online hacking, and other harms that have been the direct result of Defendants' illegal conduct.

196.    Defendants' actions constitute malice and oppression, as defined under California Civil Code § 3294(c), as Defendants fraudulently induced Plaintiffs into gaining access to Plaintiffs' meetings.  Defendants' actions further constitute intentional misconduct or gross negligence, as defined under Fla. Stat. § 768.72;  malice and oppression, as defined under the laws of the District of Columbia; malice or willful and wanton conduct, as defined under Colorado Rev. Stat. Ann. § 13-21-102; and malice or gross negligence, as defined under Texas Stat. & Codes Ann. § 41.003.  Punitive damages are appropriate to punish Defendants and deter others from engaging in similar misconduct.

**SEVENTH CLAIM FOR RELIEF**
**(VIOLATIONS OF CALIF. BUS. & PROFS. CODE § 17200, *ET SEQ.***
**FOR UNLAWFUL, UNFAIR, AND FRAUDULENT ACTS)**
**(By All Plaintiffs Against All Defendants)**

197.    Plaintiffs incorporate and reallege paragraphs 1 through 196, inclusive, as though fully set forth herein.

198.    As alleged herein, Defendants have committed "unlawful" business acts as defined by California Business and Professions Code § 17200, by:  (1) violating 18 U.S.C. § 1962(c); (2) violating 18 U.S.C. § 2511; (3) violating California Penal Code §§ 632 and 634; (4) violating §

1  10-402 of the Courts and Judicial Proceedings Article of the Maryland Annotated Code; and (5)

2  violating Section 934 Title XLVII of the Florida Criminal Procedure Law.

3  199.   Plaintiffs reserve the right to allege other violations of law which constitute

4  unlawful business practices.  Defendants have committed "unfair" and "fraudulent" acts of unfair

5  competition, as defined by California Business and Professions Code § 17200, by engaging – and

6  continuing to engage – in conduct that is likely to deceive members of the public. This conduct

7  includes, but is not limited to: (1) conspiring to defraud and defrauding the public and Plaintiffs

8  for the purpose of gaining access to Plaintiffs' conferences and their staff; and (2) secretly taping

9  Plaintiffs' staff members at conferences and meetings.  Defendants engaged in such conduct with

10  the intent of harassing and intimidating Plaintiffs, their staff, and patients, discrediting life-saving,

11  legal fetal tissue donation, and undermining Planned Parenthood's mission to provide essential

12  reproductive health care to millions of patients across the United States.

13  200.   An action for injunctive relief and restitution is specifically authorized under

14  California Business and Professions Code § 17203.

15  201.   As a result of Defendants' "unlawful," "unfair," and "fraudulent" acts, Plaintiffs

16  have been damaged, including by being forced to expend additional, extensive resources on

17  security and IT services, property damage, and responding to multiple state and federal

18  investigations and inquiries.  Plaintiffs have thus suffered injury in fact and have lost money and

19  property as a direct result of Defendants' unlawful, unfair, and fraudulent conduct.

20  202.   Defendants' unlawful, unfair, and fraudulent conduct is ongoing.  They have

21  publicly stated that they "have moles and spies deep inside the abortion cartel," an explicit threat

22  that they intend to continue to engage in unlawful and fraudulent acts meant to harm Plaintiffs

23  through further wrongful invasions and malicious lies.

24  203.   Defendants' unlawful, unfair, and fraudulent practices, as described above, present

25  a continuing threat to Plaintiffs.  If Defendants are allowed to continue their wrongful acts,

26  Plaintiffs will suffer further irreparable injury and loss.

27

28

**EIGHTH CLAIM FOR RELIEF**
**(FRAUDULENT MISREPRESENTATION)**
**(By PPFA, PPGC, PPCFC, and PPRM Against DALEIDEN, MERRITT, LOPEZ, CMP, BIOMAX, and UNKNOWN CO-CONSPIRATORS)**

204.     Plaintiffs incorporate and reallege paragraphs 1 through 203, inclusive, as though fully set forth herein.

205.     Defendants have made numerous false representations to PPFA, PPGC, and PPRM in order to gain access to meetings and clinic or office spaces to which they otherwise never would be permitted.  Defendants created a fictitious company and presented fake identifications to infiltrate and gain access to PPFA's private conference and PPGC's and PPCFC's facilities.

206.     When Defendants made these representations, Defendants knew them to be false. Defendants made these representations with the intent to deceive and defraud PPFA, PPGC, and PPRM and to induce PPFA, PPGC, PPCFC, and PPRM to act in reliance on the representations in the manner herein alleged, or with the expectation that PPFA, PPGC, PPCFC, and PPRM would so act.

207.     At the time Defendants made these representations and at the time of the actions herein alleged, PPFA, PPGC, PPCFC, and PPRM were not aware of the falsity of the Defendants' representations and believed them to be true.

208.     In reliance on Defendants' misrepresentations, PPFA, PPGC, PPCFC, and PPRM provided Defendants with access to private conferences, clinics, and office space.

209.     As a result of Defendants' wrongful acts, PPFA, PPGC, PPCFC, and PPRM have suffered and/or will suffer economic harm and irreparable harm caused by the improper acquisition, use, and disclosure of Plaintiffs' confidential information, including harm to the safety, security, and privacy of Plaintiffs and their staff, and harm caused by being forced to expend additional, extensive resources on security and IT services, property damage, and responding to multiple state and federal investigations and inquiries.  If Defendants are allowed to continue their wrongful acts, PPFA, PPGC, PPCFC, and PPRM will suffer further irreparable injury and loss.

210.     Defendants' actions constitute malice and oppression, as defined under California

FIRST AMENDED COMPLAINT FOR DAMAGES AND FOR DECLARATORY AND INJUNCTIVE RELIEF

Civil Code § 3294(c), as Defendants fraudulently induced PPFA into gaining access to PPFA's meetings.  Defendants' actions further constitute intentional misconduct or gross negligence, as defined under Fla. Stat. § 768.72; malice and oppression, as defined under the laws of the District of Columbia; malice or willful and wanton conduct, as defined under Colorado Rev. Stat. Ann. § 13-21-102; and malice or gross negligence, as defined under Texas Stat. & Codes Ann. § 41.003. Punitive damages are appropriate to punish Defendants and deter others from engaging in similar misconduct.

**NINTH CLAIM FOR RELIEF**
**(VIOLATION OF CALIFORNIA PENAL CODE § 632)**
**(By PPFA, PPNC, PPPSW, PPMM, PPOSB, PPGC, PPCFC and PPRM Against**
**DALEIDEN, MERRITT, LOPEZ, CMP, BIOMAX, and UNKNOWN CO-**
**CONSPIRATORS)**

211.    Plaintiffs incorporate and reallege paragraphs 1 through 210, inclusive, as though fully set forth herein.

212.    On information and belief, DALEIDEN and his co-conspirators intentionally recorded confidential communications made during the NAF 2014 annual conference in San Francisco.  Staff representatives from PPFA, PPPSW, PPMM, PPOSBC, PPNC, PPGC, PPCFC and PPRM attended the NAF 2014 annual conference in San Francisco.

213.    DALEIDEN and his co-conspirators also intentionally recorded confidential communications made during private meetings with PPFA and Planned Parenthood affiliate staff members in which PPFA and Planned Parenthood affiliate staff members had a reasonable expectation of privacy, in violation of California Penal Code § 632.

214.    Plaintiffs and their staff had a reasonable expectation of privacy regarding their communications during the 2014 NAF annual meeting.  Their expectation was reasonable because: (1) all attendees at the meeting, including Defendants, were required to sign non-disclosure agreements with confidentiality provisions prior to entering the meeting and all attendees received and were required to wear badges demonstrating that they had signed such agreements; (2) NAF had in place a Security Program to ensure that communications concerning and made during the annual meeting would be confidential and restricted to NAF members and trusted others; and (3) the nature and subject matter of the conferences were highly sensitive.

57

215.     Defendants' recordings of Plaintiffs' staff were made without Plaintiffs' consent or the consent of their staff.

216.     As a direct result of Defendants' wrongful and illegal invasions of privacy, Plaintiffs have been damaged, including by being forced to expend additional, extensive resources on security and IT services, property damage, and responding to multiple state and federal investigations and inquiries.

217.     Plaintiffs are authorized by statute to bring a civil action for $5,000 per violation or three times the amount of actual damages, as well as injunctive relief, pursuant to California Penal Code § 637.2.

### TENTH CLAIM FOR RELIEF
### (VIOLATION OF CALIFORNIA PENAL CODE § 634)
### (By PPFA, PPNC, PPPSW, PPMM, PPOSB, PPGC, PCFC, and PPRM Against DALEIDEN, MERRITT, LOPEZ, CMP, BIOMAX, and UNKNOWN CO-CONSPIRATORS)

218.     Plaintiffs incorporate and reallege paragraphs 1 through 217, inclusive, as though fully set forth herein.

219.     NAF possessed a right to exclusive use of the real property they leased for the 2014 NAF conference held in San Francisco in 2014.

220.     As alleged herein, NAF granted conditional consent to "Robert Sarkis" (Defendant DALEIDEN), "Susan Tennenbaum" (Defendant MERRITT), "Brianna Allen," CMP (through its agents DALEIDEN and MERRITT), and BIOMAX to attend the NAF 2014 conference.

221.     Defendants DALEIDEN, MERRITT, "Brianna Allen," CMP, and BIOMAX exceeded the limited scope of NAF's conditional consent by fraudulently representing their identities and purpose for attending the NAF conference, by failing to hold confidential any information received at the conference, and by making secret video recordings in violation of NAF's non-disclosure agreement.

222.     Defendants' knowing and intentional conduct alleged herein, which exceeded the scope of NAF's conditional consent to enter its conference, constituted a trespass.

223.     On information and belief, Defendants trespassed on NAF's conference for the purpose of violating Penal Code § 632, as alleged herein.

224.     Plaintiffs were injured by Defendants' violation of Penal Code § 634 and § 632.

225.     Plaintiffs are authorized by statute to bring a civil action for $5,000 per violation or three times the amount of actual damages, as well as injunctive relief, pursuant to California Penal Code § 637.2.

**ELEVENTH CLAIM FOR RELIEF**
**(VIOLATION OF SECTION 934 TITLE XLVII OF THE FLORIDA CRIMINAL PROCEDURE LAW)**
**(By All Plaintiffs Against DALEIDEN, MERRITT, LOPEZ, CMP, BIOMAX, and UNKNOWN CO-CONSPIRATORS)**

226.     Plaintiffs incorporate and reallege paragraphs 1 through 225, inclusive, as though fully set forth herein.

227.     On information and belief, Plaintiffs allege that Defendant DALEIDEN and his co-conspirators intentionally intercepted and/or procured other persons to intercept private oral communications made during the 2015 PPFA Medical Directors Council Conference in Orlando, Florida, and the 2014 PPFA North American Forum on Family Planning Conference in Miami, Florida, in violation of Section 934 of the Florida Criminal Procedure & Corrections Law.  Staff from all Plaintiffs attended these conferences.

228.     Plaintiffs and their staff had a reasonable expectation of privacy regarding Plaintiffs' communications during the 2015 PPFA Medical Directors Council Conference and the 2014 PPFA North American Forum on Family Planning Conference.  Their expectation was reasonable because: (1) all attendees at the meeting, including Defendants, were required to agree to terms and conditions designed to ensure that all conference participants held interests consistent with those of Planned Parenthood and would disclose any conflicts of interest; (2) PPFA had in place security protocols requiring all conference participants to provide legal identification and ensuring that communications concerning and made during the conferences would be confidential and restricted to legitimate conference participants and trusted others; and (3) the nature and subject matter of the conferences were highly sensitive.

229.     Defendants' recordings of Plaintiffs' staff's private communications were made without Plaintiffs' staff's consent and/or the consent or authorization of all parties.

230.    As a direct result of Defendants' wrongful and illegal invasions of privacy, Plaintiffs have been damaged, including by being forced to expend additional, extensive resources on security and IT services, property damage, and responding to multiple state and federal investigations and inquiries.

231.    Plaintiffs are authorized by statute to bring a civil action for equitable or declaratory relief, actual damages, or liquidated damages computed at the rate of $100 a day for each day of violation or $1,000, whichever is higher, punitive damages, and reasonable attorneys' fees and costs, pursuant to Title XLVII of Florida's Criminal Procedure & Corrections Code § 934.10.

**TWELFTH CLAIM FOR RELIEF**
**(VIOLATION OF § 10-402 OF THE COURTS AND JUDICIAL PROCEEDINGS ARTICLE OF THE MARYLAND ANNOTATED CODE)**
**(By PPFA, PPNC, PPPSW, PPMM, PPOSB, PPGC, PPCFC, and PPRM Against DALEIDEN, MERRITT, LOPEZ, CMP, BIOMAX, and UNKNOWN CO-CONSPIRATORS)**

232.    Plaintiffs incorporate and reallege paragraphs 1 through 231, inclusive, as though fully set forth herein.

233.    On information and belief, Plaintiffs allege that DALEIDEN and his co-conspirators willfully intercepted and/or procured other persons to intercept private oral communications during the 2015 NAF annual meeting in Baltimore, Maryland, in violation of the Maryland Wiretapping and Electronic Surveillance Act, section 10-402 of the Courts and Judicial Proceedings Article of the Maryland Annotated Code.  Staff representatives from PPFA, PPNC, PPPSW, PPMM, PPOSB, PPGC, PPCFC, and PPRM attended the NAF annual meeting in Baltimore, Maryland.

234.    Plaintiffs and their staff had a reasonable expectation of privacy regarding Plaintiffs' communications during the 2015 NAF annual meeting.  Plaintiffs' expectation was reasonable because: (1) all attendees at the meeting, including Defendants, were required to sign non-disclosure agreements with confidentiality provisions prior to entering the meeting and all attendees received and were required to wear badges demonstrating that they had signed such agreements; (2) NAF had in place a Security Program to ensure that communications concerning

60

and made during the annual meeting would be confidential and restricted to NAF members and trusted others; and (3) the nature and subject matter of the conferences were highly sensitive.

235.    Defendants' recordings of Plaintiffs' private communications, and those of their staff, at the 2015 NAF annual meeting were made without NAF's consent and/or the consent or authorization of all parties.

236.    As a direct result of Defendants' wrongful and illegal invasions of privacy, Plaintiffs have been damaged, including by being forced to expend additional, extensive resources on security and IT services, property damage, and responding to multiple state and federal investigations and inquiries.

237.    Plaintiffs are authorized by statute to bring a civil action for actual damages, or liquidated damages computed at the rate of $100 a day for each day of violation or $1,000, whichever is higher, punitive damages, and reasonable attorneys' fees and costs, pursuant to Md. Code Ann., Cts. & Jud. Proc. § 10-410(a).

## THIRTEENTH CLAIM FOR RELIEF
### (INVASION OF PRIVACY: INTRUSION UPON A PRIVATE PLACE)
### (By All Plaintiffs Against DALEIDEN, MERRITT, LOPEZ, CMP, BIOMAX, and UNKNOWN CO-CONSPIRATORS)

238.    Plaintiffs incorporate and reallege paragraphs 1 through 237, inclusive, as though fully set forth herein.

239.    Plaintiffs present this claim on behalf of their staff.  Plaintiffs have standing to present this claim on behalf of their staff because: (1) their staff would otherwise have standing to sue in their own right; (2) the privacy and safety issues Plaintiffs seek to vindicate on behalf of their staff are central to their core purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual staff members in the lawsuit.

240.    Plaintiffs' staff had an objectively reasonable expectation that the conversations and interactions between participants at the PPFA conferences (in Miami, Orlando, and Washington, D.C.) and the NAF conferences (in San Francisco and Baltimore), would be private and not be covertly recorded by anyone, let alone by representatives from anti-abortion groups, or published to the public at large via the internet.  Those expectations were reasonable because: (1)

in order to access the conferences, Defendants represented that BIOMAX was a legitimate biological specimen procurement organization, and that their contribution to the conferences would be useful to attendees and beneficial to the interests of their clients and patients, and that they would comply with all applicable laws related to fraud, abuse, privacy, and confidentiality; (2) all attendees at the meetings, including Defendants, were required to sign terms and conditions or non-disclosure agreements with confidentiality provisions prior to entering the meeting and all attendees received and were required to wear badges demonstrating that they had signed such agreements; (3) NAF had in place a Security Program to ensure that communications concerning and made during the annual meeting would be confidential and restricted to NAF members and trusted others; and (4) the nature and subject matter of the conferences were highly sensitive.

241.    Plaintiffs' staff had an objectively reasonable expectation that the private business conversations they had with DEFENDANTS who were posing as BIOMAX representatives would not be covertly recorded, listened to by anti-abortion activists, or published to the public at large via the internet.  The expectation was reasonable because of the setting in which the conversations took place, the false representations made to the staff members about the purpose of the meeting and the identity of those they met with, and the subject matter of the conversations.

242.    By fraudulently inducing Plaintiffs' consent to permit their attendance at these private conferences and meetings and by surreptitiously videotaping and recording Planned Parenthood staff thereafter, Defendants intentionally intruded upon the privacy of Plaintiffs' staff.

243.    Defendants' intentional intrusion upon the privacy of Plaintiffs' staff would be highly offensive to a reasonable person in light of the malice and oppression underlying Defendants' motives and objectives, the nature of the invasion (covert surveillance by electronic recording devices), Defendants' intrusion by deceit and disregard for the law, the history of violence, harassment, and oppression perpetrated by anti-abortion extremists against anyone connected with abortion and especially abortion providers, and the likelihood that publication of Defendants' video tapes would lead to similar harassment and violence against Plaintiffs' staff. As a result of Defendants' conduct, Plaintiffs' staff have suffered and will continue to suffer irreparable injury.

**FOURTEENTH CLAIM FOR RELIEF**
**(INVASION OF PRIVACY: CALIFORNIA CONSTITUTION ART. I § I)**
**(By PPFA, PPNC, PPPSW, PPMM, and PPOSB Against DALEIDEN, MERRITT, LOPEZ, CMP, BIOMAX, and UNKNOWN CO-CONSPIRATORS)**

244.     Plaintiffs incorporate and reallege paragraphs 1 through 243, inclusive, as though fully set forth herein.

245.     Plaintiffs present this claim on behalf of their staff.  Plaintiffs have standing to present this claim on behalf of their staff because: (1) their staff would otherwise have standing to sue in their own right; (2) the privacy and safety issues Plaintiffs seek to vindicate on behalf of their staff are central to their core purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual staff members in the lawsuit.

246.     Plaintiffs' staff had an objectively reasonable expectation that the conversations and interactions between participants at the PPFA conferences (in Miami, Orlando, and Washington, D.C.) and the NAF conferences (in San Francisco and Baltimore) described herein, would be private from covert electronic recording by representatives from anti-abortion groups. Plaintiffs' staff's expectation was reasonable because: (1) in order to access the conferences, Defendants represented that BIOMAX was a legitimate biological specimen procurement organization, and that their contribution to the conferences would be useful to attendees and beneficial to the interests of their clients and patients, and that they would comply with all applicable laws related to fraud, abuse, privacy, and confidentiality; (2) all attendees at the meetings, including Defendants, were required to sign terms and conditions or non-disclosure agreements with confidentiality provisions prior to entering the meeting and all attendees received and were required to wear badges demonstrating that they had signed such agreements; (3) NAF had in place a Security Program to ensure that communications concerning and made during the annual meeting would be confidential and restricted to NAF members and trusted others; and (4) the nature and subject matter of the conferences were highly sensitive.

247.     Plaintiffs' staff had an objectively reasonable expectation that the private business conversations they had with Defendants who were posing as BIOMAX representatives described herein would not be covertly recorded, listened to by anti-abortion activists, or published to the

FIRST AMENDED COMPLAINT FOR DAMAGES AND FOR DECLARATORY AND INJUNCTIVE RELIEF

public at large.  The expectation was reasonable because of the setting in which the conversations took place, the false representations made to the staff members, and the subject matter of the conversations.

248.    By fraudulently inducing Plaintiffs' consent to attend these private conferences and meetings and by surreptitiously videotaping and recording Planned Parenthood staff thereafter, Defendants intentionally intruded upon the privacy of Plaintiffs' staff.

249.    Defendants' intentional intrusion upon the privacy of Plaintiffs' staff would be highly offensive to a reasonable person in light of the malice and oppression underlying Defendants' motives and objectives, the nature of the invasion (covert surveillance by electronic recording devices), Defendants' intrusion by deceit and disregard for the law, the history of violence, harassment, and oppression perpetrated by anti-abortion extremists against anyone connected with abortion and especially abortion providers, and the likelihood that publication of Defendants' video tapes would lead to similar harassment and violence against Plaintiffs' staff. As a result of Defendants' conduct, Plaintiffs' staff have suffered and will continue to suffer irreparable injury.

### FIFTEENTH CLAIM FOR RELIEF
### (BREACH OF NON-DISCLOSURE AND CONFIDENTIALITY AGREEMENT)
### (By PPGC and PPCFC Against BIOMAX, DALEIDEN, and MERRITT)

250.    On April 4, 2015 MERRITT, posing as BIOMAX CEO "Susan Tennenbaum," entered into "A Non-Disclosure And Confidentiality Agreement" ("NDA") with PPGC.  Under the terms of that agreement, BIOMAX, expressly including its representatives, including all employees and officers, promised to maintain PPGC's confidential information, including all written information and all confidential oral information, in strict confidence.  BIOMAX and its representatives further promised not to use the confidential information for any purpose other than for a scientific research program and not to disclose confidential information to any third party. BIOMAX and all of its employees further agreed that in the event that BIOMAX or its representatives breached the agreement, PPGC would be entitled to specific performance as well as such further relief to be granted by a court of competent jurisdiction.

251.    Defendants breached the NDA by disclosing confidential oral communications to

third parties when they published secretly recorded tapes of conversations with PPGC and PPCFC staff and by using confidential information for a purpose other than the putative research transaction in which BIOMAX, DALEIDEN, and MERRITT falsely claimed interest.

252.   PPGC performed all of the conditions of the NDA in accordance with its terms.

253.   As a result of Defendants' wrongful acts, PPGC has suffered and/or will suffer economic harm and irreparable harm caused by the improper acquisition, use, and disclosure of PPGC's confidential information, including harm to the safety, security, and privacy of PPGC and its staff, and harm caused by being forced to expend additional, extensive resources on security and IT services, property damage, and responding to multiple state and federal investigations and inquiries.  If Defendants are allowed to continue their wrongful acts, PPGC will suffer further irreparable injury and loss.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request relief as follows:

1.   That judgment be entered in favor of Plaintiffs and against Defendants on each and every claim in this Complaint.

2.   Appropriate injunctive relief to which Plaintiffs are entitled, including but not limited to enjoining Defendants and their officers, agents, servants, employees, owners, and representatives, and all other persons, firms, or corporations in active concert or participation with them, from:

- Entering or attempting to enter a PPFA conference or affiliate health center without fully disclosing their true identity, their purpose for seeking entrance, and whether they intend to take any video, audio, photographic, or other recordings once inside; and

- Filming or otherwise recording any private meeting or conversation with Plaintiffs' staff or at a Planned Parenthood affiliate health center facility without the informed consent of all parties being recorded.

3.   Restitution of all monies expended by Plaintiffs as a result of Defendants' unlawful, unfair, and fraudulent business practices as provided by California Business and Professions Code § 17203.

4.   Compensatory damages in such amounts as the Court deems just and proper.

FIRST AMENDED COMPLAINT FOR DAMAGES AND FOR DECLARATORY AND INJUNCTIVE RELIEF

1      5.      Statutory penalties and damages in such amounts as the Court deems just and

2 proper.

3      6.      On Plaintiffs' Civil RICO claim and California Penal Code claims, three times the

4 damages Plaintiffs have sustained as a result of Defendants' conduct.

5      7.      Punitive damages pursuant to applicable state laws.

6      8.      That the Court award Plaintiffs costs and disbursements for this lawsuit, including

7 for reasonable attorneys' fees as permitted by law.

8      9.      Such other and further relief as this Court may deem just and proper.

9 DATED: March 24, 2016                    Respectfully submitted,

10                                          ARNOLD & PORTER LLP

11                                          By:    /s/ Amy L. Bomse

12                                                 Amy L. Bomse

13                                          Attorneys for Plaintiffs

FIRST AMENDED COMPLAINT FOR DAMAGES AND FOR DECLARATORY AND INJUNCTIVE RELIEF

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a jury trial for all claims for relief properly tried to a jury.

DATED: March 24, 2016                    Respectfully submitted,

                                         ARNOLD & PORTER LLP


                                    By:  */s/ Amy L. Bomse*
                                         Amy L. Bomse

                                         Attorneys for Plaintiffs

FIRST AMENDED COMPLAINT FOR DAMAGES AND FOR DECLARATORY AND INJUNCTIVE RELIEF