1

2

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

3

4

5

6

7

8

9

PLANNED PARENTHOOD FEDERATION
OF AMERICA, INC., et al.,

                    Plaintiffs,

          v.

CENTER FOR MEDICAL PROGRESS, et
al.,

                    Defendants.

Case No.  16-cv-00236-WHO

**ORDER ON MOTIONS TO DISMISS
AND STRIKE**

Re: Dkt. Nos. 78, 79, 81, 86, 87

10

11

12

13

14

15

16

17

18

19

20

        Plaintiffs' First Amended Complaint alleges that defendants created a complex criminal

enterprise involving fake companies, fake identifications, and large-scale illegal taping of

reproductive health care conferences and private meetings in order to advance their goal of

interfering with women's access to legal abortion.  FAC (Dkt. No. 59) ¶ 1.[1]  Defendants move to

dismiss the FAC, arguing that plaintiffs failed to adequately allege facts supporting their fifteen

claims for relief as well as facts supporting their standing.[2]  Defendants separately move to strike

the claims in the FAC under California's anti-SLAPP statute arguing, similarly, that plaintiffs fail

to allege facts to support their state law claims and their standing.  For the reasons discussed

below, while defendants have raised serious arguments with respect to some of the claims in the

FAC, as a matter of pleading plaintiffs have alleged sufficient plausible facts to state their claims.

21

22

23

24

25

26

[1] Plaintiffs are Planned Parenthood Federation Of America, Inc. (PPFA), Planned Parenthood:
Shasta-Diablo, Inc., Dba Planned Parenthood Northern California (Planned Parenthood Northern
California or PPNC), Planned Parenthood Mar Monte, Inc. (PPMM), Planned Parenthood of the
Pacific Southwest (PPPSW), Planned Parenthood Los Angeles (PPLA), Planned
Parenthood/Orange and San Bernardino Counties, Inc. (PPOSBC), Planned Parenthood Of Santa
Barbara, Ventura & San Luis Obispo Counties, Inc. (PPSBVSLO), Planned Parenthood Pasadena
and San Gabriel Valley, Inc. (PPPSGV), Planned Parenthood of the Rocky Mountains (PPRM),
Planned Parenthood Gulf Coast (PPGC) and Planned Parenthood Center For Choice (PPCFC).
Defendants are the Center for Medical Progress (CMP), BioMax Procurement Services LLC
(BioMax), David Daleiden (aka "Robert Sarkis") (Daleiden), Troy Newman (Newman), Albin
Rhomberg (Rhomberg), Phillip S. Cronin (Cronin), Sandra Susan Merritt (aka "Susan
Tennenbaum") (Merritt), and Gerardo Adrian Lopez (Lopez).

27

28

[2] Defendant Sandra Merritt moved separately and filed her own motion to dismiss and motion to
strike.  Dkt. Nos. 78, 81.  The other defendants joined in filing one motion to dismiss and one
motion to strike.  Dkt. Nos. 79, 87.

United States District Court
Northern District of California

The motions to dismiss and strike are DENIED.

## BACKGROUND

Plaintiffs allege that defendants formed a conspiracy in 2012 to secretly embed defendant David Daleiden and others within the reproductive health community in order to "expose" what defendants believed were violations of law but what Planned Parenthood contends were legal facilitations of fetal tissue donation. FAC ¶¶ 5, 56. As part of the alleged conspiracy, defendants set up a fake company called BioMax Procurement Services, LLC ("BioMax"), which "dishonestly" held itself out as a legitimate fetal tissue procurement company. *Id*. ¶¶ 5, 57-58, 61.[3] The individual defendants pretended to be officers and employees of BioMax, creating pseudonyms, manufacturing fake identification, and using a credit card with a fake name. *Id*. ¶¶ 5, 61-62, 85-86. Defendants allegedly used these fake corporate and personal identities to gain access to private conferences held by Planned Parenthood and the National Abortion Federation ("NAF"). *Id*. ¶¶ 5, 64-65, 68-69, 80-89, 98-104, 105-108, 118-123.[4] Plaintiffs allege that defendants signed binding confidentiality agreements in order to gain admission into these conferences, making promises that they had no intention of keeping; defendants planned to wear and did wear hidden video cameras, secretly taping hundreds of hours of conversations with plaintiffs' staff. *Id*. ¶¶ 5, 67-68, 70-71, 82-83, 99-101, 105-107, 114, 120-121.

Plaintiffs allege that defendants then leveraged the "professional" relationships they made at the conferences to seek access to individual Planned Parenthood doctors and affiliates in private meetings, some of them in secure Planned Parenthood offices and clinical spaces in Colorado and Texas. *Id*. ¶¶ 6, 69-70, 75-76, 109-110, 111, 115. Defendants then repeatedly requested additional meetings with Planned Parenthood staff, "lying at every step about who they were and

---

[3] Plaintiffs also allege that defendants set up and incorporated CMP as a non-profit under California law, and falsely represented that CMP would be nonpartisan and not engage in any legislative advocacy. *Id*. ¶ 59.

[4] The meetings allegedly accessed by defendants are: the 2014 NAF Conference in San Francisco, California (FAC ¶¶ 64-74); the PPFA North American Forum on Family Planning in Miami, FL in October 2014 (*id*. ¶¶ 81-89); the PPFA Medical Directors' Council Conference in Orlando, Florida in February-March 2015 (*id*. ¶¶ 98-103); the PPFA National Conference in Washington, DC in March 2015 (*id*. ¶¶ 105- 108); and the NAF 2015 Conference in Baltimore, Maryland (*id*. ¶¶ 118-123).

United States District Court
Northern District of California

1    what they were doing." *Id*. ¶ 5.   As a result, Planned Parenthood senior medical staff and other

2    staff members made time to meet with defendants -- the staff were completely unaware that they

3    were being secretly taped and that they would later be featured in "malicious videos." *Id*. ¶¶ 5, 75-

4    76, 95-97.[5]

5            Plaintiffs contend that defendants went public with an online video campaign as part of

6    their "Human Capital Project" by releasing a series of YouTube videos purporting to show that

7    Planned Parenthood violated federal law related to fetal tissue. *Id*. ¶¶ 7, 124-127.  According to

8    plaintiffs, the videos were heavily manipulated, with critical content deliberately deleted and

9    disconnected portions sewn together to create a misleading impression. *Id*. ¶¶ 5,126-127, 128-

10   128, 133-134, 137, 139, 141.  Those misleading videos led people to believe that Planned

11   Parenthood had violated the law and acted improperly.  As a result, after the release of defendants'

12   videos there was a dramatic increase in threats, harassment, and criminal activities targeting

13   abortion providers and their supporters and, in particular, Planned Parenthood health centers. *Id*.

14   ¶¶ 8, 130.  The doctors and staff targeted in the videos have been the subject of online attacks,

15   harassment at their homes and in their neighborhoods, and death threats. *Id*. ¶¶ 5, 135, 138, 140.

16           As a result of defendants' "false statements, breaches of contractual agreements, illegal

17   recordings and the video smear campaign," plaintiffs have incurred millions of dollars in costs and

18   put the safety and security of Planned Parenthood's personnel and patients at serious risk, as

19   "witnessed most horrifically" in the shootings at a Planned Parenthood health center in Colorado

20   Springs on November 27, 2015. *Id*. ¶¶ 9, 142-147.

21           Based on these allegations, plaintiffs assert fifteen claims for relief: (1) Violation Of

22   Racketeer Influenced And Corrupt Organizations (RICO) Act, 18 U.S.C. §§ 1962(c) and 1962(d))

23   by all plaintiffs against all defendants; (2) Violation of 18 U.S.C. § 2511 by all plaintiffs against

24   Daleiden, Merritt, Lopez, CMP, BioMax, and Unknown Co-Conspirators; (3) Civil Conspiracy by

25   all plaintiffs against all defendants; (4) Breach Of Contract by PPFA Against Daleiden, Merritt,

26   Lopez, CMP, BioMax, and Unknown Co-Conspirators; (5) Breach Of Contract by PPFA, PPNC,

27   _____

28   [5] The senior medical staff who met with defendants include Dr. Deborah Nucatola in California
     (FAC ¶¶ 75-76) and Dr. Mary Gatter in California (*id*. ¶¶ 95-97).

1   PPPSW, PPMM, PPOSB, PPGC, and PPCFC against Daleiden, Merritt, Lopez, CMP, BioMax,

2   and Unknown Co-Conspirators; (6) Trespass by PPFA, PPGC, PPCFC, and PPRM against

3   Daleiden, Merritt, Lopez, CMP, BioMax, and Unknown Co-Conspirators; (7) Violations of Calif.

4   Bus. & Profs. Code § 17200, *et seq.* for Unlawful, Unfair, and Fraudulent Acts by all plaintiffs

5   against all defendants; (8) Fraudulent Misrepresentation by PPFA, PPGC, PPCFC, and PPRM

6   Against Daleiden, Merritt, Lopez, CMP, BioMax, and Unknown Co-Conspirators; (9) Violation

7   Of California Penal Code § 632 by PPFA, PPNC, PPPSW, PPMM, PPOSB, PPGC, PPCFC and

8   PPRM against Daleiden, Merritt, Lopez, CMP, BioMax, and Unknown Coconspirators; (10)

9   Violation Of California Penal Code § 634 by PPFA, PPNC, PPPSW, PPMM, PPOSB, PPGC,

10  PPCFC, and PPRM against Daleiden, Merritt, Lopez, CMP, BioMax, and Unknown

11  Coconspirators; (11) Violation of Section 934 Title XLVII of the Florida Criminal Procedure Law

12  by all plaintiffs against Daleiden, Merritt, Lopez, CMP, BioMax, and Unknown Co-Conspirators;

13  (12) Violation of § 10-402 of the Courts And Judicial Proceedings Article of the Maryland

14  Annotated Code by PPFA, PPNC, PPPSW, PPMM, PPOSB, PPGC, PPCFC, and PPRM against

15  Daleiden, Merritt, Lopez, CMP, BioMax, And Unknown Coconspirators (13) Invasion of Privacy:

16  Intrusion Upon A Private Place by All Plaintiffs Against Daleiden, Merritt, Lopez, CMP, BioMax,

17  and Unknown Co-Conspirators; (14) Invasion of Privacy: California Constitution Art. I § I by

18  PPFA, PPNC, PPPSW, PPMM, and PPOSB against Daleiden, Merritt, Lopez, CMP, BioMax, and

19  Unknown Co-Conspirators; and (15) Breach of Non-Disclosure and Confidentiality Agreement by

20  PPGC and PPCFC against BioMax, Daleiden, and Merritt.

**DISCUSSION**

21

22  **I.       MOTIONS TO DISMISS**

23          Defendants, and separately Merritt, move to dismiss the claims asserted by plaintiffs for

24  failure to plead adequate and plausible facts to support their claims, as well as facts to establish

25  standing.  Defendants also move to strike the state law claims in the FAC under California's anti-

26  SLAPP statute arguing (similar to their motions to dismiss) that plaintiffs have failed to allege

27  sufficient facts to support their claims and their standing to assert them.  Each argument is

28  addressed below.

United States District Court
Northern District of California

### A. Legal Standard

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). A claim is facially plausible when the plaintiff pleads facts that "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). There must be "more than a sheer possibility that a defendant has acted unlawfully." *Id.* While courts do not require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 570.

In deciding whether the plaintiff has stated a claim upon which relief can be granted, the court accepts the plaintiff's allegations as true and draws all reasonable inferences in favor of the plaintiff. *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). However, the court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

If the court dismisses the complaint, it "should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000).

### B. Violation of RICO Act, 18 U.S.C. §§ 1962(c) and 1962(d), by all plaintiffs against all defendants

The elements of a RICO claim are: (i) the conduct of (ii) an enterprise that affects interstate commerce (iii) through a pattern (iv) of racketeering activity or collection of unlawful debt. 18 U.S.C. § 1962(c); *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 997 (9th Cir. 2014). In addition, the conduct must be the proximate cause of harm to the victim. Under § 1964(c), plaintiffs must also allege that they have been injured in their "property or business" by reason of the alleged racketeering activities.

#### 1.    Injury to "property or business"

Defendants argue that plaintiffs' RICO claim fails because plaintiffs have not alleged

United States District Court
Northern District of California

injury in "business or property" to satisfy RICO, and point out that reputational harm does not constitute an injury to a business or property interest sufficient to support RICO standing.  *See, e.g., Hamm v. Rhone-Poulenc Rorer Pharms.*, 187 F.3d 941, 954 (8th Cir. 1999) ("Damage to reputation is generally considered personal injury and thus is not an injury to 'business or property' within the meaning of 18 U.S.C. § 1964(c)."); *see also Chaset v. Fleer/Skybox Int'l*, 300 F.3d 1083, 1086-87 (9th Cir. 2002) ("To demonstrate injury for RICO purposes, plaintiffs must show proof of concrete financial loss, and not mere injury to a valuable intangible property interest."); *cf. Doe v. Roe*, 958 F.2d 763, 770 (7th Cir. 1992) (where plaintiff had to invest in a home security system and missed several days of work due to hostile conduct of former lover, alleged injuries were personal and not injuries to a business or property interest).

Plaintiffs respond that they have alleged injury to their business and property interests as a result of defendants' enterprise because: (i) their ability to serve their clients has been impaired, FAC ¶¶ 142, 151, 161; (ii) they incurred increased operational costs to ensure safety of patients and staff, *id*. ¶¶ 142-43; (iii) PPFA's website was hacked by individuals who referenced defendants' videos and campaigns, resulting in additional costs to PPFA, *id*. ¶¶ 144; and (iv) business relations with vendors have been interrupted or terminated as a result of defendants' video and press campaign. *Id.* ¶ 145.  Plaintiffs rely on *Nat'l Org. for Women v. Scheidler*, 510 U.S. 249, 256 (1994) and *Planned Parenthood v. Am. Coal. of Life Activists*, 945 F. Supp. 1355, 1382 (D. Or. 1996) as recognizing that disruption of services confers RICO standing on plaintiffs. *See, e.g., Nat'l Org. for Women v. Scheidler*, 510 U.S. 249, 256 (1994) (allegations that defendants conspired to use force to induce clinic staff to quit and patients to seek care elsewhere sufficient at pleading stage to support standing); *Planned Parenthood v. Am. Coal. of Life Activists*, 945 F. Supp. 1355, 1382 (D. Or. 1996) (allegations that defendants' racketeering activities decreased the volume of business of plaintiffs or increased their cost of doing business and were calculated to induce clinic personnel to give up their jobs and doctors to forego their economic right to practice medicine sufficient to confer standing at pleading stage).  Plaintiffs also rely on *Diaz v. Gates*, 420 F.3d 897, 900 (9th Cir. 2005), where the Ninth Circuit concluded that interference with business relations was sufficient to allege injury to a business or property interest.

United States District Court
Northern District of California

1   Defendants reply that *Scheidler* has been limited by a subsequent Ninth Circuit case –

2   *Ass'n of Wash. Pub. Hosp. Dists. v. Philip Morris, Inc.*, 241 F.3d 696, 700 (9th Cir. 2001) – such

3   that the portion of *Scheidler* relied on by plaintiffs here is only relevant to Article III standing and

4   can no longer be relied on to establish RICO statutory standing.  Defs. MTD Reply at 1-2.[6]

5   However, the *Philip Morris* case and the other authorities defendants rely on in their attempt to

6   limit *Scheidler* addressed a different question; proximate cause and the "directness" of plaintiffs'

7   injuries.  Those cases do not address whether the type of injuries alleged in *Scheidler* and the

8   similar allegations here are sufficient to establish statutory standing under RICO's "business or

9   property" prong.

10   In *Ass'n of Wash. Pub. Hosp. Dists. v. Philip Morris, Inc.*, 241 F.3d 696, 700 (9th Cir.

11   2001), hospital districts sued tobacco companies under RICO alleging that the tobacco companies

12   "conspired to misrepresent and to conceal the addictive nature of nicotine and the health risks

13   associated with tobacco use" and damaged the health care districts who sought to recover their

14   increased costs for treating their patients' tobacco-related illnesses.  *Id*. at 700.  The Ninth Circuit,

15   consistent with the decisions of other circuits and decisions regarding union trust funds that had

16   attempted to sue under similar theories, concluded that the hospital districts lacked standing

17   because their injuries lacked proximate cause and were entirely derivative of the injuries to the

18   smokers themselves.  *Id*. at 702-704.  The court did not address what direct injuries satisfied the

19   "business or property" prong.[7]  *See also Perry v. Am. Tobacco Co.*, 324 F.3d 845, 850 (6th Cir.

20   2003) ("*Scheidler* is inapposite, however, since the Supreme Court did not address the direct

21   injury requirement that is at issue in the present case.").

22   Defendants also argue that because the harms at issue here resulted from defendants'

23   _____

24   [6] Defendants' *Scheidler* argument, if accepted, would likewise limit the reach of *Planned
    Parenthood v. Am. Coal. of Life Activists*, 945 F. Supp. 1355, 1382 (D. Or. 1996) (following
25   *Scheidler*).

26   [7] I recognize that the Ninth Circuit rejected plaintiffs' arguments that standing requirements
    should be relaxed for health care providers, and in doing so described *Scheidler* in a footnote as a
27   case concerning "constitutional standing, not RICO or antitrust standing."  *Id*. at 704 n.4.  But the
    Ninth Circuit did not address or otherwise limit the Supreme Court's determination that plaintiffs
28   in *Scheidler* had adequately alleged injury to "business or property" under the RICO statute.

United States District Court
Northern District of California

1    speech – the publishing of the videos and related Human Capital Project press – the injuries

2    caused to defendants must be reputational, and any financial injuries flowing therefrom cannot

3    confer standing.  Defs. MTD at 2-3; Defs. MTD Reply at 2.  There is no support for defendants'

4    leap in logic, and their reliance on *Doe v. Roe*, 958 F.2d 763, does not help them.  There the

5    plaintiff's injuries (costs for installing a security system and lost wages from plaintiff's missed

6    work) were derivative of her *personal* injuries and not injuries to her business or property.  Here

7    plaintiffs are not attempting to recover damages that arise out of a personal injury.  *But see*

8    *Jackson v. Sedgwick Claims Mgmt. Servs*., 731 F.3d 556, 564-565 (6th Cir. 2013) (distinguishing

9    cases holding that individuals personally harmed by actions of RICO enterprise could not state a

10    RICO claim).  The injuries plaintiffs plead here are directly tied to their business interests.  They

11    confer standing under RICO.[8]

12         **2.**        **Predicate Acts**

13       Defendants argue that plaintiffs have not sufficiently alleged predicate acts supporting their

14    RICO claim.  In opposition, plaintiffs rely on their wire and mail fraud allegations, FAC ¶¶ 157-

15    158 (September 15, 2013, wire transmission of registration; September 16, 2014, wire

16    transmission of registration; October 17, 2014, email from BioMax; and March 6, 2015,

17    introductory letter) and their allegations under the federal Identity Theft Statute, 18 U.S.C. § 1028.

18         **a.**   **Wire/Mail Fraud**

19       Claims of wire fraud and mail fraud under 18 U.S.C. §§ 1341 and 1343 require three

20    elements: (i) the formation of a scheme to defraud, (ii) the use of the mails or wires in furtherance

21    of that scheme, and (iii) the specific intent to defraud.  *Eclectic Props. E., LLC v. Marcus &*

22    *Millichap Co*., 751 F.3d 990, 997 (9th Cir. 2014).

23       The parties' initial dispute is whether there must be allegations that property or money was

24    intended to be acquired or actually acquired through the fraud to state a claim for wire or mail

25

---

26    [8] Defendants' reliance on *Rylewicz v. Beaton Services, Lt*d., 698 F. Supp. 1391, 1395 (N.D. Ill.

27    1988) does not help them either.  There, the court concluded that "effort and time" the plaintiffs spent on an investigation into defendants' alleged campaign to intimidate them were "personal

28    injuries or political damages" not damages to "business or property" as required by § 1964(c). Here the damages are to PFFA and its affiliates *as businesses*.

fraud. Defs. MTD at 5; Defs. MTD Oppo. at 6. Plaintiffs contend that all that is required is that "a plaintiff was wronged in his or her property rights." Defs. MTD Oppo. at 6. However, defendants' reliance on more recent cases is persuasive; allegations regarding an attempt to *acquire* money or property through fraud are required. *See, e.g., United States v. Ali*, 620 F.3d 1062, 1070 (9th Cir. 2010) ("*Cleveland* requires that the property taken be property 'in the hands of the victim,' . . . suggesting that at least some level of convergence between the fraud and the loss is required. Second, we held in *United States v. Lew*, 875 F.2d 219 (9th Cir. 1989), that, for mail fraud, 'the intent must be to obtain money or property from the one who is deceived.'"); *United States v. Lew*, 875 F.2d 219, 221 (9th Cir. 1989) ("While it is true that after *McNally* the elements of mail fraud remain unchanged except that the intent of the scheme must be to obtain money or property, the Court made it clear that the intent must be to obtain money or property from the one who is deceived").

To meet this element, plaintiffs rely first on their allegations about defendants' attempts to interfere with their operations, arguing that the right to carry on one's business is a property right. Oppo. at 6. As support, plaintiffs rely on two RICO cases where the predicate act was a violation of extortion under the Hobbs Act. *See Ne. Women's Ctr., Inc. v. McMonagle*, 868 F.2d 1342, 1350 (3d Cir. 1989); *United States v. Zemek*, 634 F.2d 1159, 1174 (9th Cir. 1980). As defendants point out, the Supreme Court in *Scheidler v. NOW, Inc.*, 537 U.S. 393 (2003), *rejected* an attempt to satisfy the Hobbs Act's requirement of "obtaining of property from" based on an argument that "the right to control the use and disposition of an asset is property [and] petitioners, who interfered with, and in some instances completely disrupted, the ability of the clinics to function, obtained or attempted to obtain respondents' property." *Id.* at 401.

Plaintiffs also rely on defendants' attempted and actual acquisition of plaintiffs' confidential information to satisfy this element. Defs. MTD Oppo. at 7. Plaintiffs rely exclusively on *Carpenter v. United States*, 484 U.S. 19 (1987), where the Supreme Court held that "confidential business information" – there the Wall Street Journal's publication schedule and content of a column – was property protected by the mail and wire fraud statutes. *Id.* at 25. While *Carpenter* concluded that "confidential business information" could be property fraudulently

United States District Court
Northern District of California

acquired under those statutes, recent cases explain that whether information actually constitutes "property" must be determined by reference to applicable state laws.  *See, e.g., United States v. Shotts*, 145 F.3d 1289, 1294 (11th Cir. 1998) ("state law appears to control the definition of property under Section 1341"); *Borre v. United States*, 940 F.2d 215, 220 (7th Cir. 1991) ("It is logical, therefore, for this court to look to state law in determining whether a cable television franchise constitutes 'property' for purposes of the mail fraud statute.").

Defendants argue that confidential information can only constitute "property" under the state laws at issue[9] *if* the information meets the definition of a trade secret under the Uniform Trade Secrets Act, as adopted by those states.  They rely heavily on *SunPower Corp. v. SolarCity Corp.*, No. 12-CV-00694-LHK, 2012 WL 6160472, at *5 (N.D. Cal. Dec. 11, 2012), where the court concluded that the only cause of action that could be stated for misappropriation of confidential business information under California law was a claim under CUTSA for misappropriation of trade secret information.  In essence, if confidential information did not qualify as trade secret under CUTSA, then there was no common law claim protecting against its misappropriation.  The court recognized that absent status as trade secret, plaintiff needed to (but could not) identify a separate "property interest" in its confidential business information.  *Id.* at *9-12; *see also Silvaco Data Sys. v. Intel Corp.*, 184 Cal. App. 4th 210, 239 (2010), *as modified on denial of reh'g* (May 27, 2010) disapproved of on other grounds by *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310 (2011) ("Information that does not fit this definition, and is not otherwise made property by some provision of positive law, belongs to no one, and cannot be converted or stolen.").[10]

According to defendants, because plaintiffs have failed to allege facts identifying trade secrets that were allegedly acquired through wire or mail fraud, plaintiffs have failed to plead

---

[9] California, Colorado, Maryland, and Texas.

[10] Plaintiffs rely also on *United States v. Mahaffy*, 693 F.3d 113, 135 (2d Cir. 2012) a securities fraud case which held, without analysis, that "[i]formation may qualify as confidential under *Carpenter* even if it does not constitute a trade secret."  That may be correct as a matter of securities law or in a state that has not adopted UTSA, but that position was explicitly rejected under California law in *SunPower*.

these predicate acts.  I agree.  Plaintiffs have not pleaded that the information defendants'

attempted to or did acquire qualifies as trade secret under the USTA-adopting states at issue.  At

oral argument, plaintiffs did not make any argument that they could plead (or should be given

leave to plead) that the information at issue constitutes a trade secret.

Plaintiffs, therefore, cannot rest their RICO claim on their mail or wire fraud allegations.

### b.  Federal Identity Theft

Plaintiffs also allege as a predicate act that defendants violated the federal identity theft

statute by producing or transferring false identification documents and by possessing and using,

without authority, the name of a real person.  FAC ¶ 160.[11]  The FAC contains references to

defendants' use of two specific fake identifications to gain access to plaintiffs' conferences and

meetings.  FAC ¶¶ 85-86.  While defendants point out that mere possession of false identification

is not covered by the statute, the plaintiffs allege not just possession but use.  *See, e.g., United

States v. Rohn*, 964 F.2d 310, 313 (4th Cir. 1992) (mere possession not criminalized, instead

"government is required to establish two things: first, the uses to which appellant intended to put

the false identifications; and, second, that those intended uses would violate one or more federal,

state, or local laws.").  However, to the extent plaintiffs are attempting to state a claim under §

1028(a)(3) for possession and intended use, they fail to do so because that provision requires

knowing possession with intent to use unlawfully or transfer unlawfully five or more identification

documents.  Plaintiffs have not alleged that any defendant possessed five or more identification

documents. [12]

However, plaintiffs also rely on §§ 1028(a)(1) and (a)(2) – knowing production or transfer

---

[11] 18 U.S.C. § 1028(a)(1)-(2) makes it unlawful to "(1) knowingly and without lawful authority produces an identification document, authentication feature, or a false identification document" and "(2) knowingly transfers an identification document, authentication feature, or a false identification document knowing that such document or feature was stolen or produced without lawful authority."  § 1028(a)(7) makes it unlawful to "knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person with the intent to commit, or to aid or abet, or in connection with, any unlawful activity that constitutes a violation of Federal law, or that constitutes a felony under any applicable State or local law."

[12] Plaintiffs disclaim any reliance on (a)(3) in their Opposition at 10 n.7.

United States District Court
Northern District of California

of fake identification – and argue that their allegations "are sufficient at the pleading stage for the court to infer that Defendants played an active role in obtaining the fake IDs they used."  Defs. MTD Oppo. at 8.[13]  I recognize that the allegations regarding production and transfer are bare: "[o]n information and belief, Defendants produced these false photo identifications."  FAC ¶ 160. However, we are at the pleading stage and any more detailed information regarding the fake IDs is within the sole possession of defendants.  Plaintiffs' allegations are plausible and sufficient with respect to production or transfer.

Defendants also argue that plaintiffs have failed to plead facts that any of the alleged fake ID conduct was "in or affecting" interstate commerce as required by § 1028(c)(3)(A).[14]  Plaintiffs respond that this is not an issue of pleading, but simply one of proof at trial.  I agree.[15]

With respect to the alleged violation of § 1028(a)(7), plaintiffs base that claim on defendants' use of the name of an unnamed co-conspirator, Brianna Allen, to pose as a representative of BioMax, and allege that Brianna Allen was a former classmate of Daleiden. FAC ¶¶ 38, 68, 178.  These allegations, according to plaintiffs, "plausibly allege Defendants used the name of a specific person without her authorization."  Defs. MTD Oppo. at 9.  Defendants respond that the FAC does not allege a specific use of "identification" but only the use of the name "Allen" and the absence of any additional facts make this claim implausible.  More persuasively, defendants also argue that under (a)(7), the "means of identification" must be used in connection

---

[13] "Production" includes "alter, authenticate, or assemble." 18 U.S.C. § 1028(a)(9)*; see also United States v. Jaensch*, 665 F.3d 83, 95 (4th Cir. 2011) ("Because Jaensch's ID contained Jaensch's signature, jurors could reasonably infer that Jaensch both signed and laminated his ID after it was shipped to his home address—acts of "production" under the statutory definition."); *but see United States v. Rashwan*, 328 F.3d 160, 165 (4th Cir. 2003) (conviction upheld under § 1028(a)(1) where defendant did not produce but simply procured false identification *in significant part* under an aiding and abetting theory).

[14] *See, e.g., United States v. Villarreal*, 253 F.3d 831, 835 (5th Cir. 2001) ("with respect to [the] jurisdictional element, we do not focus on whether the identification document actually traveled in interstate or foreign commerce or whether the transfer actually affected interstate or foreign commerce.  Rather, we focus on whether the identification document would have traveled in interstate or foreign commerce or whether the transfer would have affected interstate or foreign commerce if Villarreal had successfully accomplished his intended goals.").

[15] The cases defendants rely on regarding use in commerce are post-trial cases reviewing the sufficiency of the evidence supporting those claims.  *See* Defs. MTD at 9.

United States District Court
Northern District of California

1   with unlawful activity that constitutes a violation of Federal law, or that constitutes a felony under

2   any applicable State or local law.  Because plaintiffs do not allege any other violation of federal

3   law (except wire and mail fraud which as discussed above are insufficiently pleaded), and

4   plaintiffs have failed to allege any *felony* conduct under state law, plaintiffs cannot rest their RICO

5   claim on a predicate act under § 1028(a)(7).

6          Finally, while defendants argue plaintiffs have failed to allege that the predicate acts create

7   a "pattern" of RICO activity, I disagree.  Plaintiffs have adequately alleged that defendants

8   repeatedly (and continuously) used their fake IDs (produced or procured in violation of federal

9   law) as key steps in defendants' ongoing RICO enterprise.

10         **3.        Proximate Cause**

11         Finally, defendants argue that the FAC fails to allege facts showing that the RICO

12  predicate acts, as opposed to other actions and the actions of others who may have been influenced

13  by the Human Capital Project videos and press, proximately caused plaintiffs' injuries.  *See Anza*

14  *v. Ideal Steel Supply Corp.*, 547 U.S. 451, 458 (2006) ("The proper referent of the proximate-

15  cause analysis is" is predicate acts alleged).  "When a court evaluates a RICO claim for proximate

16  causation, the central question it must ask is whether the alleged violation led directly to the

17  plaintiff's injuries."  *Id.* at 461.  Defendants contend that because the acts complained of (the

18  mail/wire fraud and false identification) did not directly cause the harms plaintiffs complain of

19  (disrupted and delayed services, expending additional resources on physical and cyber security,

20  increase in threats, harassment, and vandalism, loss of vendors, and time and expense in

21  responding to legislative inquiries, FAC ¶¶ 142- 147), proximate cause has not been alleged.

22  Instead, defendants contend that the harms suffered by plaintiffs were caused by a complex causal

23  chain of events resulting in the acts of third-parties and legislative bodies beyond the control of

24  defendants.

25         Defendants describe plaintiffs' causal chain as follows:  "(1) Defendants allegedly used

26  fake identifications and communicated by email (the only alleged predicate acts); (2) which

27  induced Plaintiffs and others to admit Defendants to conferences; (3) which led to site visits and

28  business meetings; (4) at which Defendants recorded various conversations; (5) Defendants later

13

published those recordings; (6) thereby harming Plaintiffs' reputation; (7) causing unrelated third parties to harass or physically attack Plaintiffs, governmental entities to investigate Plaintiffs, and third parties to fear associating with Plaintiffs; (8) which in turn caused economic harms to Plaintiffs." Defs. MTD Reply at 8-9. Plaintiffs, at oral argument, countered that the chain consists of only two elements: (1) defendants used the fake identifications and communications to access the meetings and record plaintiffs' staff, and (2) plaintiffs were harmed by that breach of their security protocols.

Defendants rely on a series of cases where the Supreme Court and other courts have concluded that plaintiffs who were only *indirectly* injured by the alleged RICO enterprise could not sue where others were more directly injured. For example in *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258 (1992), the Court concluded that indirectly injured plaintiffs (non-purchasing customers) could not sue because there were too many intervening causation and damage apportionment questions. *Id* at 272-273; *id.* at 268 (there is a "demand for some direct relation between the injury asserted and the injurious conduct alleged. Thus, a plaintiff who complained of harm flowing merely from the misfortunes visited upon a third person by the defendant's acts was generally said to stand at too remote a distance to recover."); *see also Imagineering, Inc. v. Kiewit Pac. Co.*, 976 F.2d 1303, 1312 (9th Cir. 1992) ("The direct harm in this case runs to the prime contractors. It was the intervening inability of the prime contractors to secure the contracts that was the direct cause of plaintiffs' injuries. Under *Holmes*, the MWBE plaintiffs are missing the direct relationship needed to show Kiewit proximately caused their injuries."). Here, however, the issue is not damage to third-parties for which plaintiffs are trying to recover (and the related difficulties apportioning damages), but damage to plaintiffs directly. This line of cases is inapposite.

Defendants also argue that because the injuries here were the results of the publication of the Human Capital Project videos and press, and not the predicate acts of wire/mail fraud and use of fake IDs, plaintiffs cannot allege a RICO claim. *See, e.g., Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 458 (2006) ("The cause of Ideal's asserted harms, however, is a set of actions (offering lower prices) entirely distinct from the alleged RICO violation (defrauding the State)."); *see also*

14

*Hemi Grp., LLC v. City of New York, N.Y.*, 559 U.S. 1, 11 (2010) ("the conduct directly responsible for the City's harm was the customers' failure to pay their taxes. And the conduct constituting the alleged fraud was Hemi's failure to file [cigarette sales report with the state]. Thus, as in *Anza*, the conduct directly causing the harm was distinct from the conduct giving rise to the fraud.").

Relatedly, defendants rely on cases concluding that RICO claims cannot be pursued where the causal nexus between the defendants' conduct and the harm alleged to plaintiff is too distant. In *Canyon Cty. v. Syngenta Seeds, Inc.*, 519 F.3d 969 (9th Cir. 2008), the Ninth Circuit concluded that the county plaintiff "cannot, as a matter of law, show an adequate causal nexus between the four defendant companies' employment of undocumented workers and the financial harm the County claims to have suffered" in providing health care and criminal justice services to the undocumented immigrants. *Id.* at 980; *see also Reddy v. Litton Indus., Inc.*, 912 F.2d 291, 294 (9th Cir. 1990) (employee who was fired after reporting racketeering activities to employer lacked RICO standing because he was not harmed by the racketeering activity itself). Defendants also rely on cases refusing to extend the causal nexus to situations where the complained of harms were most-directly caused by third parties. *See, e.g., Hemi Grp., LLC v. City of New York, N.Y.*, 559 U.S. 1, 2-3 (2010) ("the City's theory of liability rests not just on separate actions, but separate actions carried out by separate parties."); *Mattel, Inc. v. MGA Entm't, Inc.*, 782 F. Supp. 2d 911, 1027 (C.D. Cal. 2011) ("Mattel cannot rest its theory of liability on 'the independent actions of third and even fourth parties' to its counter-claim"); *see also Wodka v. Causeway Capital Mgmt. LLC*, 433 F. App'x 563, 564 (9th Cir. 2011) (rejecting as "too attenuated" allegations of harms that were directly caused by a series of intervening third-party actions).

The only case relied on by plaintiffs is *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 658 (2008). There, the Court addressed a scheme where property lien auction bidders made fraudulent representations to the county, thereby securing a disproportionate amount of liens at auction and reducing the pool of liens available for plaintiffs. The Court concluded that plaintiffs were injured as "the direct result of petitioners' fraud," because there were fewer liens available to them to bid on. *Id.* at 658. The Court characterized plaintiffs' harm as "a foreseeable and natural

consequence of petitioners' scheme to obtain more liens for themselves that other bidders would obtain fewer liens." *Id*. But whether foreseeability can still be considered is questionable in light of *Hemi Grp., LLC v. City of New York, N.Y.*, 559 U.S. 1 (2010), which rejected the idea that proximate cause under RICO could "turn on foreseeability, rather than on the existence of a sufficiently 'direct relationship' between the fraud and the harm." *Id*. at 12. In the specific context of RICO, "[o]ur precedents make clear that [] the focus is on the directness of the relationship between the conduct and the harm. Indeed, *Anza* and *Holmes* never even mention the concept of foreseeability." *Id*.

Having thoroughly reviewed the cases cited by both sides and the extensive allegations in the FAC, I conclude that at this juncture plaintiffs have adequately alleged proximate cause for damages caused directly by defendants' actions. I agree that plaintiffs may not be able to recover for damages that were not *directly* caused by the actions of defendants, but caused instead by intervening actions of *third parties* who were motivated by the videos and press released by the Human Capital Project. For example, the damages plaintiffs incurred because their website was hacked by a third-party[16] would appear to be too distant, too far down the causal chain, for plaintiffs to seek them under RICO. But other damages alleged – including the increase in security costs at conferences, meetings, and clinics that plaintiff incurred when *they learned* about defendants' infiltration of their conferences, meetings, and clinics – are much more directly tied to defendants' conduct and do not raise the problem of intervening actions of third-parties.[17]

How far the actual causal link stretches for each category of damages plaintiffs' allege is

---

[16] There are no allegations that defendants were directly responsible for hacking plaintiffs' website.

[17] Defendant Merritt raises a slightly different proximate cause argument, saying that the damages identified by plaintiffs are simply costs of engaging in their chosen business and were not incurred as the result of Merritt's attending the conferences and meetings alleged. Merritt MTD at 3-4. Those arguments are without merit as (i) plaintiffs pleaded they incurred *additional* security costs as a result of defendants' fraud; and (ii) plaintiffs need not tie Merritt's specific actions to specific damages, but rather tie the predicate acts committed as part of the RICO enterprise to proximately caused damages. Relatedly, defendants' characterization of plaintiffs' decision to incur additional security costs as a "voluntary" act in light of defendants' infiltrations is not dispositive at this juncture. Whether plaintiffs' costs were necessarily incurred is a matter to be explored in discovery.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    something that will need to be developed in discovery and tested on summary judgment.  But for

2    purposes of the motions to dismiss, they are sufficiently alleged.

3        For the foregoing reasons, plaintiffs have adequately alleged their RICO claim based on

4    the predicate acts of using false identification under Federal law.

5    **C.  Violation of the Federal Wiretap Act by all plaintiffs against Daleiden, Merritt,
     Lopez, CMP, BioMax, and Unknown Co-Conspirators**

6

7        Plaintiffs allege that defendants violated the federal Wiretap Act by intercepting plaintiffs'

8    and their staffs' communications without their consent in order to further their RICO conspiracy

9    and to invade the privacy of plaintiffs' staff.  18 U.S.C. § 2511(1), (2)(d); FAC ¶¶ 164-165,

10   169(a)(b).  Because defendants were participants in those conversations, the recordings can only

11   violate the Act if they were intercepted for the purpose of committing criminal or tortious acts.  18

12   U.S.C. § 2511(2)(d); *see Sussman v. American Broadcasting Cos*., 186 F.3d 1200, 1202 (9th

13   Cir.1999) ("the focus is not upon whether the interception itself violated another law; it is upon

14   whether the purpose for the interception – its intended use – was criminal or tortious." (internal

15   quotations and citation omitted)).  Defendants contend that because they have shown that plaintiffs

16   cannot state a RICO claim (*supra*) nor invasion of privacy claims (*infra*), these crimes and torts

17   cannot support this claim.  However, as discussed above, the RICO claim is plausibly alleged at

18   this juncture.

19       Defendants also challenge whether plaintiffs can plead that the intercepted

20   communications were made for the purpose of committing the RICO act, given the fact that all of

21   the RICO predicate acts predated the interception of the communications at issue.  However, the

22   RICO enterprise allegations, by their nature and as expressly pled in the FAC, encompass actions

23   that occurred after the interceptions at issue.  Defendants also argue that plaintiffs cannot rely on

24   invasion of privacy to support this claim because plaintiffs fail to allege facts showing that at the

25   time defendants intercepted the communications, defendants intended to commit a *further*

26   invasion of privacy tort against plaintiffs or their staff.  However, defendants' subsequent

27   disclosure of the contents of the intercepted conversations for the alleged purpose of *further*

28   invading the privacy of plaintiffs' staff satisfies that element.  *See, e.g., In re Google Inc*., 806

F.3d 125, 145 (3d Cir. 2015) (plaintiffs must plead "'sufficient facts to support an inference that the offender intercepted the communication for the purpose of a tortious or criminal act that is *independent* of the intentional act of recording.'" (quoting *Caro v. Weintraub*, 618 F.3d 94, 100 (2d Cir. 2010)).  Whereas the court in *In re Google Inc*., 806 F.3d at 145, dismissed the § 2511 claim because plaintiff pled "no tortious or criminal use" of the intercepted information, here the public release of the videos (the fruits of the interception), including allegedly misleading summary videos, could constitute the further tortious act.

Finally, in their Motion and Reply, defendants attempt to draw a distinction between the privacy interest the plaintiff organizations have in the intercepted conversations and the privacy interests of their staff in the same.  Defs. MTD at 16; Defs. MTD Reply at 10 (relying on *Smoot v. United Transp. Union*, 246 F.3d 633 (6th Cir. 2001)).  But for purposes of the federal Wiretap Act claim, plaintiffs have sufficiently alleged that the intercepted conversations concerned their organizational activity (even if the conversations may also implicate the privacy interests of the staff) and, therefore, the plaintiff organizations have a cognizable interest in the privacy of those conversations under the Act.  *See id.* at 639.

**D.  Civil Conspiracy by all plaintiffs against all defendants**

Both sides agree that conspiracy is not "is not a cause of action, but a legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration."  *Applied Equip. Corp. v. Litton Saudi Arabia Ltd*., 7 Cal. 4th 503, 510-11 (1994).  Defendants challenge plaintiffs' conspiracy claim on two grounds: (1) plaintiffs fail to tie specific actions of each defendant to each of the underlying tort claims; and (2) because plaintiffs allege that all defendants are agents of corporate entities BioMax or CMP (and allege that BioMax and CMP are not distinct legal entities), the conspiracy claim fails because a corporate entity cannot conspire with itself nor can corporate employees acting within the scope of their employment, conspire with the corporate entity.  *See, e.g., Black v. Bank of Am*., 30 Cal. App. 4th 1, 6 (1994) (discussing "single-entity" rule).

Reviewing the FAC, I find that the allegations adequately identify and link each defendant,

including Merritt, to the underlying tort they are alleged to either have committed directly or conspired to commit.  FAC ¶¶ 56-58, 62, 173(a) – (f); *but see* Merritt MTD at 7.  With respect to the impact of plaintiffs' alter ego allegations – that BioMax and CMP are alter egos of the individual defendants and each other, FAC ¶ 41 – at this stage of the litigation, those allegations will not preclude the assertion of a conspiracy claim.  *See, e.g., AccuImage Diagnostics Corp v. Terarecon, Inc.*, 260 F. Supp. 2d 941, 947 (N.D. Cal. 2003) (recognizing the single-entity rule does not apply in cases where directors and officers of a corporation directly order, authorize, or participate in the tortious conduct).[18]  As discovery progresses, the roles of the individual defendants in connection with BioMax or CMP may be explored, as well as whether BioMax or CMP adhered to the corporate form.

Defendants' motion to dismiss the conspiracy claim is DENIED.

### E. Breach of Contract by PPFA, PPNC, PPPSW, PPMM, PPOSB, PPGC, and PPCFC against Daleiden, Merritt, Lopez, CMP, BioMax, and Unknown Co-Conspirators

#### 1.     Breach of PPFA Agreements

Plaintiffs' fourth claim alleges breach of contract by PPFA against Daleiden, Merritt, Lopez, CMP, and BioMax with respect to defendants' conduct on September 16, 2014, February 6, 2015, and on February 17, 2015, when defendants allegedly entered into Exhibitor Agreements and registrations for the PPFA conferences in Miami, Orlando, and Washington, DC.  FAC ¶¶ 177-181.  Plaintiffs contend that the defendants falsely represented BioMax as a legitimate specimen procurement organization and "defendants agreed that their contribution to the conferences would be useful to attendees and beneficial to the interests of their clients and patients and that they would comply with all applicable laws related to fraud, abuse, privacy, and confidentiality."  *Id*. ¶ 178.

---

[18] Merritt argues in Reply that the alter ego allegations are facially deficient as well.  Merritt MTD Reply at 6-7.  Plaintiffs have adequately alleged that BioMax was set up as a fake company through the *direct participation* of Merritt and that Merritt consistently held herself out as the CEO of BioMax and distributed BioMax advertising materials.  *See, e.g.,* FAC ¶¶ 5, 35, 41, 61, 87.  The alter ego cases discussed by Merritt (addressing the more common ownership, beneficial interest, and co-mingled fund allegations typically presented in alter ego cases) are inapposite considering the factual allegations in this case.  Plaintiffs' very specific factual allegations are sufficient at this juncture to support plaintiffs' alter ego assertions.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Defendants argue that the FAC fails to allege facts supporting the alleged breaches or that

2    any breach proximately caused damage to PPFA.  With respect to the PPFA agreements, plaintiffs

3    allege that defendants breached two sections: (i) a requirement that exhibits be "educational and

4    informative," and (ii) a provision requiring exhibits to be "beneficial to attendees" and requiring

5    exhibits to "comply with all applicable laws, particularly those related to fraud, privacy and

6    confidentiality."  FAC ¶¶ 82, 99, 105, 178; FAC Exs. B & D, "Sponsor, Exhibitor/Advertisement

7    Package Terms and Conditions" at ¶ 1 "PURPOSE AND USE OF SPONSORSHIP SUPPORT"

8    ("The exhibits and sponsored meetings must be educational and informative, emphasizing

9    information about products and services useful to the registrants' practice and beneficial to the

10   interests of their clients and patients."); LEGAL AND COMPLIANCE MATTERS ¶ 3 ("Exhibitor

11   and PPFA each agree that they shall comply with all applicable federal, state and local laws and

12   regulations in performance of its respective obligations pursuant to this Agreement, including,

13   without limitation, laws related to fraud, abuse, privacy, discrimination, disabilities, samples,

14   confidentiality, false claims and prohibition of kickbacks.").

15   With respect to the first provision, while defendants argue that it binds only sponsors, the

16   language at issue specifically applies to "[t]he exhibits and sponsored meetings." While the

17   paragraph heading is "PURPOSE AND USE OF SPONSORSHIP SUPPORT," the language of

18   that portion of the agreements appears to apply by its terms to *both* exhibitors and sponsors.

19   Defendants also argue that the requirements of this provision (requiring exhibits to be

20   "educational," "useful," and "beneficial" to participants) are too vague to support a claim of

21   breach.  *See, e.g.*, *Tauber v. Quan*, 938 A.2d 724, 730 (D.C. 2007) (applying concept of

22   "reasonable definiteness in the essential terms of a purported contract" so that a court may

23   determine "whether a breach has occurred"); *Soderlun v. Pub. Serv. Co. of Colorado*, 944 P.2d

24   616, 620 (Colo. App. 1997) (collecting cases recognizing that contract must have "such certainty

25   and definiteness as to be capable of enforcement"); *see also Moncada v. W. Coast Quartz Corp.*,

26   221 Cal. App. 4th 768, 793 (2013) (recognizing the unenforceability of contracts that are so

27   uncertain and indefinite that the intent of the parties cannot be ascertained, but requiring courts

28   nonetheless interpret contracts to "carry into effect the reasonable intentions of the parties"  if

possible).[19]  But given the structure and overall content of the agreements at issue, I conclude that the specific portion alleged to have been breached – "The exhibits and sponsored meetings must be educational and informative, emphasizing information about products and services useful to the registrants' practice and beneficial to the interests of their clients and patients" – is sufficiently definite to be enforceable.

With respect to the second provision, defendants argue that a contractual provision requiring parties to follow the law has no legal effect.  *See, e.g.*, Rest., Contracts, § 578 ("A bargain, the sole consideration of which is refraining or promising to refrain from committing a crime or tort, or from deceiving or wrongfully injuring the promisee or a third person, is illegal."); *see also Landucci v. State Farm Ins. Co.*, 65 F. Supp. 3d 694, 715 (N.D. Cal. 2014) ("In California, a promise to refrain from unlawful conduct is unlawful consideration.").  However, as plaintiffs point out, the agreement to refrain from breaking the law was not the sole consideration for the contracts at issue.  *See also* Rest., Contracts, § 578, comment ("but a bargain with sufficient legal consideration is not rendered illegal by the addition of a promise to refrain from misconduct, unless that promise was used as a means of exacting greater compensation.").

Defendants also contend that plaintiffs' allegations as to which laws defendants violated – allegedly breaching this provision – are likewise vague and conclusory.  Not so.  Reading the FAC as a whole, plaintiffs have adequately identified which laws they believe defendants violated.  *See, e.g.*, FAC ¶¶ 148-62 (RICO), ¶¶ 163-71 (Federal Wiretap Act), ¶¶ 179, 211-17 (Cal. Penal Code § 632), ¶¶ 218-25 (Cal. Penal Code § 634), ¶¶ 226-31 (Florida Wiretap Act), ¶¶ 232-37 (Maryland Wiretap Act).

Finally, defendants argue that plaintiffs have not alleged sufficient facts to show that their damages were "reasonably foreseeable damages proximately caused" by defendants' conduct.  The damages identified by plaintiffs as a result of defendants' alleged breach of contract include: being forced to expend additional extensive resources on security and IT services; property

---

[19] I recognize that the laws of the states of Colorado, Florida, District of Columbia, Maryland and Texas apply to the contacts at issue.  *See* Oppo. at 15 n.11.  Neither side contends that the specific law of any of these jurisdictions differs in any significant respect with respect to the analysis of the breach of contract claims.  The California cases cited in this Order were relied on by the parties.

United States District Court
Northern District of California

damage; and responding to multiple state and federal investigations and inquiries.  FAC ¶¶ 181,188, 253.

Damages as a result of a breach of contract are recoverable only to the extent those damages were "foreseeable as the probable result of the breach."  *Core-Mark Midcontinent Inc. v. Sonitrol Corp.*, 370 P.3d 353, 360 (Colo. App. 2016); *see also id*. at 360-361 (foreseeable damages include those: "that have usually existed in similar cases within that person's experience"; the "injury actually suffered must be one of a kind that the defendant had reason to foresee"; the "loss must have been a foreseeable, though not a necessary or certain, result of the breach"; and "[f]oreseeability is judged by what was foreseeable when the contract was entered into.") (internal citations omitted); *Mnemonics, Inc. v. Max Davis Associates, Inc*., 808 So. 2d 1278, 1281 (Fla. Dist. Ct. App. 2002)  ("It is not necessary to prove that the parties contemplated the precise injuries that occurred so long as the actual consequences could have reasonably been expected to flow from the breach."); *see also Civic Ctr. Drive Apartments Ltd. P'ship v. Sw. Bell Video Servs*., 295 F. Supp. 2d 1091, 1107 (N.D. Cal. 2003)  (under California law, "[w]hether damages arising from a breach of contract were reasonably foreseeable is a question of fact."). Given the allegations here – including defendants' past history and alleged intentions for the Human Capital Project – the facts alleged support an inference that the damages pleaded by plaintiffs were foreseeable and exactly the ones intended by defendants.  *See, e.g*., FAC ¶¶ 53-55, 56, 125, 132, 141.

Defendant Merritt raises an additional argument; that because none of the PPFA agreements attached to the FAC show that Merritt/Tennenbaum was a signatory to those agreements or was registered for the Washington, DC or Florida meetings, these breach claims cannot be asserted against her.  Merritt MTD at 7-8.  In response, plaintiffs rest on their alter ego theory, asserting that Merritt is liable because she is an alter ego of BioMax and BioMax entered the agreement at issue.  FAC ¶ 41; *see also id*. ¶ 35.  The alter ego allegations, as well as the allegation regarding BioMax's representations and contractual agreement with respect to the PPFA meetings, are sufficiently pleaded and Merritt's motion to dismiss is DENIED on this ground.  Merritt can challenge the merit of those allegations on summary judgment and trial.

### 2.      Breach of PPCG Agreement

Plaintiffs' fifteenth claim alleges breach of non-disclosure and confidentiality agreements by PPGC and PPCFC against BioMax, Daleiden, and Merritt based on Merritt's (posing as BioMax CEO) signing in April 2015 of a "Non-Disclosure And Confidentiality Agreement" ("NDA") with PPGC.  FAC ¶¶ 250-253.  As above, defendants argue that the FAC fails to adequately allege facts supporting the alleged breaches and that any breach proximately caused damage to PPGC.

As to the adequacy of facts supporting breach, in order to gain access to the PPCG clinic, Merritt on behalf of BioMax signed a NDA that prohibited visitors from disclosing any confidential information, defined as "all oral information of the Disclosing Party, which in either case is identified at the time of disclosure as being of a confidential or proprietary nature or is reasonably understood by the Recipient to be confidential under the circumstances of the disclosure."  FAC ¶ 114, Ex. M at ¶ 1.  Plaintiffs allege that despite signing the NDA, defendants Daleiden and Merritt surreptitiously filmed their entire private meeting at PPCG and published that recording on the internet.   FAC ¶ 139.  Defendants argue that plaintiffs have failed to identify the specific contents of the PPGC meeting that plaintiffs contend are confidential, or that the necessity for confidentiality was "reasonably understood" by Merritt or Daleiden.  But considering the allegations of the FAC, including the security protocols implemented by PPGC and circumstances surrounding the private meetings (in private spaces off limits to the public), sufficient facts have been alleged that Merritt and Daleiden would have reasonably understood that the information they received was considered confidential.   FAC ¶¶ 112, 115-116, 124.  Those allegations may not withstand scrutiny once admissible evidence has been developed, but plausible inferences can be drawn at this juncture from the facts alleged.[20]

### 3.      Breach of NAF Agreements

Plaintiffs' fifth claim alleges breach of contract by PPFA, PPNC, PPPSW, PPMM, PPOSB, PPGC, and PPCFC against Daleiden, Merritt, Lopez, CMP, and BioMax, when

---

[20] The adequacy of the allegations regarding PPCG's damages is satisfied for the reasons discussed above.

United States District Court
Northern District of California

1    defendants agreed in February 2014, April 2014, March 2015, and April 2015 to NAF's Exhibitor

2    Agreements and non-disclosure agreements in connection with exhibiting and attending NAF's

3    2014 and 2015 annual conference.  FAC ¶¶ 182-188.

4           Defendants argue first that because the NAF policy was that all "people" attending its

5    meeting sign the NDA agreement, corporate entities like plaintiffs are not "people" and therefore

6    are not intended third-party beneficiaries of the confidentiality agreements.  *See* FAC ¶ 66 (NAF

7    Conference attendees "include clinicians, facility administrators, counselors, researchers,

8    educators, and thought leaders in the pro-choice field, who have longstanding commitments to

9    health care, women's rights, and reproductive choice. Staff from PPFA and Planned Parenthood

10   affiliates regularly attend the NAF annual conferences.").

11          Given the language of the agreements at issue, their alleged purpose, and the alleged

12   circumstances under which they were entered, plaintiffs have alleged plausible facts showing the

13   *intent* to consider plaintiffs as third-party beneficiaries of the NAF confidentiality agreements.  As

14   alleged, the explicit purpose of the NAF confidentiality agreements was to provide confidentiality

15   and ensure security for the attendees, and the language of the agreements considered in full bears

16   out that intent.  FAC ¶ 185.  Even though plaintiffs were not specifically identified in the

17   agreements, they are included within the class of "people" who were required to sign and abide by,

18   and as a result receive protection from, the NAF confidentiality agreements.  *See, e.g., Spinks v.*

19   *Equity Residential Briarwood Apartments*, 171 Cal. App. 4th 1004, 1023 (2009) ("Ultimately, the

20   determination turns on the manifestation of intent to confer a benefit on the third party."); *see also*

21   *Northstar Fin. Advisors, Inc. v. Schwab Investments*, 781 F. Supp. 2d 926, 942 (N.D. Cal. 2011)

22   ("Under California law, a contract must be clear in its *intention* to benefit a third party in order for

23   that party to establish beneficiary status." (emphasis in original)); *Jones v. Aetna Cas. & Sur. Co.*,

24   26 Cal. App. 4th 1717, 1725 (1994) ("Whether a third party is an intended beneficiary or merely

25   an incidental beneficiary to the contract involves construction of the parties' intent, gleaned from

26   reading the contract as a whole in light of the circumstances under which it was entered.").  The

27   intent of NAF to benefit plaintiffs is plausibly pleaded and supported facially by the agreements at

28   issue.

United States District Court
Northern District of California

24

Defendants also argue that plaintiffs fail to adequately allege breach of the NAF agreements. I disagree. The allegations in the FAC are sufficient. FAC ¶¶ 67, 185, 186.[21]

For the foregoing reasons, plaintiffs have adequately alleged their breach of contract claims and defendants' motion to dismiss these claims is DENIED.

### F. Trespass by PPFA, PPGC, PPCFC, and PPRM against Daleiden, Merritt, Lopez, CMP, BioMax, and Unknown Co-Conspirators

Defendants challenge the adequacy of plaintiffs' allegations of trespass under Florida, District of Columbia, Colorado and Texas law.

#### 1. Possessory Interest Under Florida and District of Columbia Law

Defendants argue that the claims of trespass under Florida and District of Columbia law fail as a matter of law because plaintiffs did not and cannot plead a "possessory interest" in the property onto which defendants allegedly trespassed. *Greenpeace, Inc. v. Dow Chem. Co*., 97 A.3d 1053, 1060 (D.C. 2014) (tort of trespass requires an "unauthorized" entry onto property that "results in interference with the property owner's possessory interest therein," and "possessory interest" is the ability "to control and exclude others from using those areas"); *Winselmann v. Reynolds*, 690 So. 2d 1325, 1327 (Fla. Dist. Ct. App. 1997) ("To obtain a recovery for a trespass to real property then, it is clear that the aggrieved party must have had an ownership or possessory interest in the property at the time of the trespass.").

Defendants assert the FAC is devoid of any facts establishing that plaintiffs have a possessory interest in the hotel conference rooms where the meetings took place in Florida and the District of Columbia. However, PPFA *has* alleged that "PPFA possesses a right to exclusive use of the real property it leases for Planned Parenthood meetings." FAC ¶ 190; *see also* ¶¶ 81, 98, 100, 107 & Exs. B, D, F (requiring registration, identification, and badges for access and reserving right to exclude exhibitors). At this juncture, the clear allegation that PFFA leased the property at issue (as opposed to simply being a guest) and that PFFA had the right to exclusive use are sufficient. The facts alleged here distinguish this case from those relied on by defendants, where

---

[21] For the reasons discussed above, plaintiffs have adequately alleged damages proximately caused by the breach of the NAF agreements.

the plaintiff did not have exclusive control or the right to exclude, or where the plaintiff simply rented a hotel room for one night. *But see Greenpeace, Inc. v. Dow Chem. Co*., 97 A.3d 1053, 1060 (D.C. 2014) ("Greenpeace cannot demonstrate "exclusive" control of the trash and recycling areas because it concedes that those areas were for all tenants' common use."); *Young v. Harrison*, 284 F.3d 863, 868 (8th Cir. 2002) (distinguishing between a right afforded under unlawful detainer statute between a tenant and a hotel guest, in part because "the guest acquires no estate and has mere use without the actual or exclusive possession."); *Winselmann v. Reynolds*, 690 So. 2d 1325, 1327 (Fla. Dist. Ct. App. 1997) ("where it is clear from the allegations of the amended complaint that Winselmann allegedly had only an easement or a right to the use of the subject property, the trial court properly determined that a trespass action could not lie.").

The evidence may or may not support PPFA's lease and exclusive use allegations, but at this juncture the express factual assertions are sufficient.[22]

### 2.    Authorized Access under Colorado, District of Columbia, Florida, and Texas Law

Defendants also argue that because they had consent to access the meetings – by signing the Exhibitor and NDA agreements and by paying the necessary fees – the claims for trespass fail under Colorado, District of Columbia, Florida and Texas law. *See, e.g*., *Daniel v. Morris*, 181 So. 3d 1195, 1199 (Fla. Dist. Ct. App. 2015), *reh'g denied* (Jan. 19, 2016) ("Trespass to real property is the unauthorized entry onto another's real property."); *Greenpeace, Inc. v. Dow Chem. Co*., 97 A.3d 1053, 1060 (D.C. 2014) ("The tort of trespass is defined as 'an unauthorized entry onto property'"); *Pub. Serv. Co. of Colorado v. Van Wyk*, 27 P.3d 377, 389 (Colo. 2001) ("physical intrusion upon the property of another without the proper permission from the person legally entitled to possession of that real estate."). Plaintiffs claim, however, that defendants either vitiated the consent by obtaining it by misrepresentation or exceeded the scope of the consent when they secretly filmed the proceedings. FAC ¶¶ 192, 193.

Defendants cite a number of cases that have rejected trespass claims where defendants

United States District Court
Northern District of California

---

[22] Defendants complain that plaintiffs should be required to state more facts – as to the location of the conferences and the terms of the lease agreements – but those facts will come out in discovery and are not necessary at this juncture for defendants to be able to defend against the trespass claim.

1    misrepresented their identities in order to conduct surreptitious filming on business properties.

2    Defs. MTD at 25.  In each of those cases, however, the trespass claim failed because the

3    defendants recorded in *publicly* accessible places.  *See, e.g., Desnick v. Am. Broad. Companies,*

4    *Inc.*, 44 F.3d 1345, 1352 (7th Cir. 1995) ("The test patients entered offices that were open to

5    *anyone*" (emphasis in original); *Am. Transmission, Inc. v. Channel 7 of Detroit, Inc.*, 239 Mich.

6    App. 695, 708-09 (2000) ("Stern entered only those areas of plaintiffs' shop that were open to

7    anyone seeking transmission repair services and videotaped plaintiffs' employee engaging in a

8    professional discussion with her.").  Other cases conclude that a claim for trespass can be made

9    where defendants fraudulently gained access to places not open to the public.  *See, e.g., Pitts*

10   *Sales, Inc. v. King World Prods., Inc.*, 383 F. Supp. 2d 1354, 1367 (S.D. Fla. 2005)  (denying

11   summary judgment where defendant "was able to access areas of plaintiff's business not open to

12   the public"); *Food Lion, Inc. v. Capital Cities/ABC, Inc.*, 951 F. Supp. 1217, 1222 (M.D.N.C.

13   1996) ("the misrepresentations which allowed Litt and Barnett to enter the restricted parts of Food

14   Lion's stores could negate the consent which they were given.").

15        Defendants also rely on *Baugh v. CBS, Inc.*, 828 F. Supp. 745, 756-57 (N.D. Cal. 1993).

16   But in that case, the court dismissed the trespass claim because plaintiff had expressly allowed the

17   film crew onto her property and consented to the filming.  *Id.* 767.  The defendants exceeded the

18   scope of consent *later* by, contrary to plaintiff's direction, broadcasting the footage.  That the

19   subsequent broadcast might have exceeded the scope of consent could not support the trespass

20   claim.  *Id.* at 756-757.

21        The alleged facts of this case are starkly different:plaintiffs were never aware of the intent

22   of or actual recording by defendants.  That recording, on its own, is alleged to have exceeded the

23   explicit scope of consent from the start.  *See also Berger v. Cable News Network Inc.*, No. CV 94-

24   46-BLG-JDS, 1996 WL 390528, at *5 (D. Mont. Feb. 26, 1996) (film crew accompanying FBI

25   executing a search warrant had consent of government which had "temporary control and

26   possession of the property" and although plaintiff acknowledged film crew was present, did not

27

28

1    ask them to leave).[23]

2        **3.        Damages Barred by the First Amendment**

3        Finally, defendants argue that the trespass claims fail because the damages plaintiffs seek

4    from the alleged trespasses are barred by the First Amendment as they flow exclusively from the

5    publication of the Human Capital Project recordings, and plaintiffs do not seek nominal damages

6    or any other damages that do not stem from the publication of the recordings.  Although not

7    *expressly* pleaded, plaintiffs confirmed at oral argument that nominal damages are sought and are

8    at issue in this case.

9        Numerous courts acknowledge that nominal damages support a trespass claim, even where

10   other damages are not sought or not available.  *See, e.g.*, *Daniel v. Morris*, 181 So. 3d 1195, 1199

11   (Fla. Dist. Ct. App. 2015), *reh'g denied* (Jan. 19, 2016) ("Even if no actual damages are proven,

12   the plaintiff is still entitled to nominal damages and costs." (internal citations omitted));  *Pitts*

13   *Sales, Inc. v. King World Prods., Inc.*, 383 F. Supp. 2d 1354, 1365 (S.D. Fla. 2005) ("Florida

14   courts have allowed the recovery of nominal damages in civil trespass actions. The courts have

15   found that when trespass occurs and no actual damages are proven, the plaintiff is entitled to a

16   judgment for nominal damages and costs."); *see also Med. Lab. Mgmt. Consultants v. Am. Broad.*

17   *Companies, Inc.*, 306 F.3d 806, 820 (9th Cir. 2002) (upholding summary judgment on trespass

18   claim under Arizona law where plaintiff did not request nominal damages and failed to show it

19   suffered any damage from broadcast of 52 seconds of tape secured by trespass, as opposed to

20   damages flowing from other segments of broadcast).  It is not necessary to plead them separately.

21       Defendants' motion to dismiss plaintiffs' trespass claims, therefore, is DENIED.[24]  I

22

---

23   [23] Defendants also argue – specifically with respect to Colorado and Texas – that the FAC itself
     establishes that consent was given to defendants to access the clinics in those states.  Defs. MTD
24   at 26.  However, plaintiffs have adequately alleged plausible facts supporting their contentions that
     consent was impermissibly obtained by misrepresentation or exceeded by defendants.  What
25   plaintiffs can prove as to these arguments under the requirements of Colorado and Texas law is
     more appropriately addressed on summary judgment.

26   [24] Merritt argues that she cannot be liable for trespass at the PPFA meetings in Florida or the
     District of Columbia because she did not attend those meetings.  The PPFA trespass claim,
27   however, is also based on Merritt's alleged trespass at the PPFA Texas and Colorado clinics.
     Therefore the claim for trespass against Merritt will not be dismissed at this juncture.
28

United States District Court
Northern District of California

address the question of whether all or some of plaintiffs' compensatory damages claims are barred by the First Amendment later in connection with the fraudulent misrepresentation claim.

### G. Violations of Calif. Bus. & Profs. Code § 17200, et seq. for Unlawful, Unfair, and Fraudulent Acts by all plaintiffs against all defendants

California's Unfair Competition Law prohibits "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200. Each prong of the UCL – unlawful, unfair, or fraudulent – creates a separate and distinct basis for liability. *Levitt v. Yelp! Inc*., 765 F.3d 1123, 1129-30 (9th Cir. 2014).[25]

#### 1.    Unlawful

In prohibiting "any unlawful" practice, section 17200 "borrows" violations of other laws and "treats them as unlawful practices that the unfair competition law makes independently actionable." *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co*., 20 Cal. 4th 163, 180 (1999) (internal quotations omitted). Plaintiffs identify each of their other claims as supporting their unlawful prong claim. As discussed above and below, because I conclude that plaintiffs have adequately alleged violations of other federal and state laws, plaintiffs have adequately pleaded the basis for an unlawful UCL claim.

#### 2.    Unfair

There are two standards for determining what "unfair competition" is under the UCL. The first standard, advocated by defendants and applicable to claims between competitors, is whether the conduct complained of threatens "an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." *Cel–Tech*, 20 Cal.4th at 187. The second standard, advocated by plaintiffs and applicable to claims brought by a consumer, "involves balancing the harm to the consumer against the utility of the defendant's

---

[25] Merritt contends that because her conversations at the conferences, clinics, and restaurants cannot be considered "business practices," the UCL claim must fail. Merritt MTD at 12-13. However, the FAC adequately alleges that Merritt's conduct was necessarily part of her efforts on behalf of BioMax (albeit a fake business) and intended to injure the business of plaintiffs and injure consumers. FAC ¶¶ 35, 61, 64, 68, 69, 80, 87, 88, 95, 109, 115. These allegations are sufficient to state a claim under the UCL at this juncture.

29

practice." *Lozano v. AT & T Wireless Servs., Inc.*, 504 F.3d 718, 735 (9th Cir. 2007).[26]  While

plaintiffs have alleged economic harm to their business interests, that does not mean the consumer

protection balancing test would not apply.  *Cf. Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1136 (9th Cir.

2014) (where "crux of the business owners' complaint is that Yelp's conduct unfairly injures their

economic interests to the benefit" of their competitors, first standard applied).  Plaintiffs

persuasively argue that they are in no way "competitors" with defendants and do not allege that

defendants' action benefitted plaintiffs' competitors.  Instead, plaintiffs posit that they were

potential "consumers" of the fake services defendants purported to offer.  Applying the balancing

test, plaintiffs have alleged sufficient facts to state an unfairness claim; defendants' practices were

aimed at reducing the availability of plaintiffs' services and injured plaintiffs' as potential

customers of fetal tissue procurement companies as well as plaintiffs' ultimate customers.

However, even if I apply the first standard, plaintiffs still adequately allege an unfair claim

at this juncture.  The FAC alleges that defendants' goal was to put plaintiffs – one of the largest

provider of reproductive health services in the country – out of business.  FAC ¶¶ 1,2. That goal

threatens the type of harm the antitrust and federal consumer protection laws aim to prevent.

### 3.      Fraudulent

The "fraudulent" prong of the UCL "requires a showing [that] members of the public are

likely to be deceived."  *Wang v. Massey Chevrolet*, 97 Cal. App. 4th 856, 871 (2002).  "[W]hether

a business practice is deceptive will usually be a question of fact not appropriate for decision on

demurrer."  *Williams v. Gerber Products Co.*, 552 F.3d 934, 938 (9th Cir. 2008).  Plaintiffs allege

that defendants defrauded the plaintiffs and the public when defendants held themselves out to be

representatives of a legitimate tissue procurement company.  FAC ¶¶ 30, 31, 35-36, 61-62.

Defendants argue that the fraud prong claim fails because plaintiffs are not entitled to any

form of restitution or injunctive relief available under the statute.  Plaintiffs admit that they do not

and cannot seek restitution from defendants, and instead seek only injunctive relief.  Defs. MTD

Oppo. at 26 n.18.  As to injunctive relief, plaintiffs have adequately alleged facts plausibly

---

[26] As the *Lorzano* Court noted, whether or not the *Cel-Tech* test is also applicable to consumer claims is an open issue in the California courts.  *Id.* at 736.

United States District Court
Northern District of California

United States District Court
Northern District of California

showing that defendants will engage in similar conduct in the future if they are not enjoined.  FAC ¶ 54 ("Planned Parenthood has been the main target of DALEIDEN's covert video-taping operations over the years"), ¶ 132 (defendant Newman disclosing to the media the techniques used to infiltrate and that "this is just the beginning, we have moles and spies deep inside the abortion cartel".), ¶ 202 ("Defendants' unlawful, unfair, and fraudulent conduct is ongoing. They have publicly stated that they 'have moles and spies deep inside the abortion cartel,' an explicit threat that they intend to continue to engage in unlawful and fraudulent acts meant to harm Plaintiffs through further wrongful invasions and malicious lies.").

These allegations suffice to support injunctive relief under the UCL because they establish the specific threat of ongoing conduct and are not simply based on past wrongs.  *But see Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 985 (9th Cir. 2007) (recognizing that past wrongs are evidence of wrongs are "evidence bearing on whether there is a real and immediate threat of repeated injury" but not sufficient by themselves to make out a case for a "real and immediate threat of repeated injury") (internal quotations omitted)).[27]

Defendants' motion to dismiss plaintiffs' UCL claim is DENIED.

## H. Fraudulent Misrepresentation by PPFA, PPGC, PPCFC, and PPRM Against Daleiden, Merritt, Lopez, CMP, BioMax, and Unknown Co-Conspirators

Defendants challenge plaintiffs' claim for fraudulent misrepresentation because plaintiffs fail to plead that their damages were proximately caused by defendants' conduct and because any damages are barred by the First Amendment.[28]  Plaintiffs' alleged damages are:

---

[27] Defendants reliance on *Frenzel v. AliphCom*, 76 F. Supp. 3d 999, 1015 (N.D. Cal. 2014) is misplaced.  There, the court concluded a claim for injunctive relief under the UCL based on misrepresentations about the functionalities and battery life of a fitness tracker could not be alleged because the plaintiff already knew the falsity of those claims and could not plausibly allege he would be deceived by them in the future.  Here, while plaintiffs may reasonably expect defendants to continue their attempts to infiltrate meetings and clinics, the individuals who might attempt to do so at defendants' direction or the exact methods to be used are not so obviously known as to render injunctive relief unnecessary.

[28] Merritt also argues that plaintiffs fail to adequately allege detrimental reliance by plaintiffs on any of Merritt's specific misrepresentations.  Merritt MTD at 16-18.  However, plaintiffs specifically identify the misrepresentations by Merritt and BioMax in their applications, agreements, advertising materials, and verbal statements and that plaintiffs relied on in giving Merritt and BioMax access.  FAC ¶¶ 81, 84, 87-89, 98, 102, 105-106, 108, 109-110, 113-115.  The fact that plaintiffs have not identified *the employees* of plaintiffs who received these

> As a result of Defendants' wrongful acts, PPFA, PPGC, PPCFC, and PPRM have suffered and/or will suffer economic harm and irreparable harm caused by the improper acquisition, use, and disclosure of Plaintiffs' confidential information, including harm to the safety, security, and privacy of Plaintiffs and their staff, and harm caused by being forced to expend additional, extensive resources on security and IT services, property damage, and responding to multiple state and federal investigations and inquiries. If Defendants are allowed to continue their wrongful acts, PPFA, PPGC, PPCFC, and PPRM will suffer further irreparable injury and loss

FAC ¶ 209.

### 1.        Proximate Cause

"Under California law, '[a] complete causal relationship between the fraud or deceit and the plaintiff's damages is required.'" *See, e.g., City Sols., Inc. v. Clear Channel Commc'ns*, 365 F.3d 835, 840 (9th Cir. 2004) (quoting *Small v. Fritz Cos.*, 30 Cal.4th 167, 202 (2003)). Defendants argue that the "complete causal" nexus for proximate cause cannot be satisfied here because each of the harms complained of stems not from the fraud but from the subsequent publication of the recordings that were surreptitiously made.

Defendants rely on *Food Lion, Inc. v. Capital Cities/ABC, Inc.*, 964 F. Supp. 956 (M.D.N.C. 1997), *aff'd on other grounds*, 194 F.3d 505 (4th Cir. 1999). In that case, employees of ABC went undercover to secure footage of improper food handling at plaintiff's store and ABC's *Prime Time Live* broadcast it. Plaintiff sought to recover damages for lost profits resulting from that broadcast. Reviewing the jury's verdict post-trial, the court recognized that the doctrine of "independent cause" applied under South Carolina law and "provides that an event occurring after the tortious conduct of the plaintiff may intervene to break the causal chain and cut off plaintiff's liability for the ultimate harm." *Id.* at 961. As applied to the facts of that case, the court concluded that while:

> tortious activities may have enabled access to store areas in which the public was not allowed and the consequent opportunity to film people, equipment and events from a perspective not available to the ordinary shopper, but it was the food handling practices themselves—not the method by which they were recorded or

---

misrepresentations, given the context of this case and the specificity as to the content and timing of the representations, does make the allegations deficient.

> published—which caused the loss of consumer confidence. Those
> practices were not the probable consequence of Defendants' fraud
> and trespass and it cannot be argued under the evidence in this case
> that the filming of those practices by the Prime Time Live producers
> set any of those activities in motion.

*Id*. at 963.

Defendants contend that, similar to *Food Lion*, all of the alleged damages here arise from the publication of the recordings, not from any purported misrepresentations that occurred prior to the recordings.  *See also Med. Lab. Mgmt. Consultants v. Am. Broad. Companies, I*nc., 30 F. Supp. 2d 1182, 1199 (D. Ariz. 1998), *aff'd*, 306 F.3d 806 (9th Cir. 2002) (where undercover reporters misrepresented their identification in gathering information about a lab that conducted faulty test, court conclude that "[b]ecause any negative portrayal of Plaintiffs during the broadcast was not proximately caused by Defendants' misrepresentation of their identities at the March 18, 1994 meeting, Defendants are entitled to summary judgment on this portion of the fraud claim."); *Frome v. Renner*, No. 97 CIV 5641, 1997 WL 33308718, at *2 (C.D. Cal. Oct. 1, 1997) ("'48 Hours'" merely served as a forum through which the public could learn about Plaintiff's medical practices. Profits lost subsequent to the broadcast could not have been proximately caused by Renner's misrepresentation.").

Plaintiffs distinguish their damages from the ones precluded in defendants' cases, arguing that they have alleged that they suffered damage as the "direct" result of defendants' fraud in securing access to plaintiffs' private conferences and clinics, including incurring increased security costs for the protection of their staff, their clinics, their conferences, and their websites and IT systems.  MTD Oppo. at 27 (relying on FAC ¶ 143).[29]  I agree with defendants in part.  The allegations of damages currently included in plaintiffs' FAC do not clearly differentiate between damages that were *directly* caused by the breaches of plaintiffs' security measures themselves as opposed to damages that were caused by the *publication* of the videos and related Human Capital

---

[29] In addition to attempting to distinguish *Med. Lab. Mgmt. Consultants v. Am. Broad. Companies, Inc.*, 30 F. Supp. 2d 1182 (D. Ariz. 1998), *aff'd*, 306 F.3d 806 (9th Cir. 2002), plaintiffs also rely on it, noting that the court denied summary judgment on the aspect of the fraud claim where plaintiff claimed emotional distress damages for the deception – the fraudulent access by plaintiffs to a meeting with defendant – separate from any emotional distress damages stemming from the publication.  *Id*. at 1200-1201.

United States District Court
Northern District of California

1   Project press which resulted – through the acts of third-parties – in increased security threats,

2   harassment, and acts of violence.   However, as noted above, plaintiffs may have implemented

3   security measures simply upon discovering defendants' breaches before the full extent of the

4   publications was known and the backlash from them occurred.  While the proximate cause

5   standard may at summary judgment or trial prevent plaintiffs from recovering on some categories

6   of damages, for purposes of pleading I conclude that plaintiffs have adequately alleged

7   proximately-caused damages.

8          2.        **First Amendment**

9          Relatedly, defendants argue that because plaintiffs seek damages resulting from the

10   publication of the recordings, plaintiffs must satisfy the First Amendment requirements for

11   defamation claims.  Defendants rely on a line of Supreme Court cases and other precedent

12   applying First Amendment defamation standards to tort and statutory claims where the damages

13   sought from publishers stemmed from the act of publication.  *See, e.g., Hustler Magazine, Inc. v.*

14   *Falwell*, 485 U.S. 46, 50, 55-56 (1988) (requiring public figure to satisfy First Amendment

15   requirements under defamation law for claim of intentional infliction of emotional distress); *Time,*

16   *Inc. v. Hill*, 385 U.S. 374, 387-88 (1967) ("We hold that the constitutional protections for speech

17   and press preclude the application of the New York statute to redress false reports of matters of

18   public interest in the absence of proof that the defendant published the report with knowledge of

19   its falsity or in reckless disregard of the truth."); *see also Blatty v. New York Times Co*., 42 Cal. 3d

20   1033, 1042 (1986) (recognizing in context of intentional interference with economic advantage

21   claim "[a]lthough the limitations that define the First Amendment's zone of protection for the

22   press were established in defamation actions, they are not peculiar to such actions but apply to all

23   claims whose gravamen is the alleged injurious falsehood of a statement.").[30]

24          As the Fourth Circuit Court of Appeals explained in *Food Lion, Inc. v. Capital Cities/ABC,*

25

26   ───────────────
[30] *See also Hornberger v. Am. Broad. Companies, Inc*., 351 N.J. Super. 577, 630 (App. Div. 2002)
(plaintiff police officers filmed conducting traffic stops of African-American males sued for the

27   broadcast on Prime Time Live and sought emotional distress and reputational damages, the court
concluded that "plaintiffs are not entitled to these reputational and emotional distress damages,

28   resulting from a publication, without showing that the publication contained a false statement of
fact that was made with actual malice.").

United States District Court
Northern District of California

1    *Inc.*, 194 F.3d 505, 522 (4th Cir. 1999), plaintiff could not "avoid the First Amendment limitations

2    on defamation claims by seeking publication damages under non-reputational tort claims, while

3    holding to the normal state law proof standards for these torts. This is precluded by *Hustler*

4    *Magazine v. Falwell*, 485 U.S. 46, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988)."  Under the First

5    Amendment standard, defendants contend that plaintiffs fail to specifically identify any false

6    statements of fact made with the requisite level of malice in order to plausibly plead a claim for

7    the damages they seek.

8         In response, plaintiffs argue that defendants' line of cases is limited to precluding recovery

9    of reputational or state of mind damages that flow from an expressive act and note that *Hustler,*

10   *Blatty,* and *Hornberger* dealt with emotional distress claims or claims whose gravamen is an

11   injurious falsehood.  Plaintiffs *also* rely on *Food Lion, Inc.*

12        Helpful to defendants, in *Food Lion* the Fourth Circuit affirmed the district court's refusal

13   to allow plaintiff to use its non-reputational tort claims (breach of duty of loyalty, trespass, etc.) to

14   recover compensatory damages for ABC's broadcast of the *PrimeTime Live* program that targeted

15   Food Lion.  The court concluded that because the loss of good will and lost sales were related to

16   Food Lion's reputation, they were "publication damages" that resulted from diminished consumer

17   confidence related to the disclosed food-handling practices (as opposed to damages stemming

18   from the *method* by which the recordings were made or published).  *Id.*, 194 F.3d at 522.  To

19   allow Food Lion to seek those publication damages without meeting the heightened First

20   Amendment standard would be the prohibited run-around prohibited by *Hustler*.  *Id.*

21        However, helpful to plaintiffs, the court rejected the application of heightened First

22   Amendment scrutiny to the breach of duty of loyalty and trespass claims, where the jury found in

23   favor of plaintiffs but only awarded nominal damages, because those laws did not "single out the

24   press or have more than an incidental effect upon its work."  *Id.* at 522.  Similarly, in *Cohen v.*

25   *Cowles Media Co*., 501 U.S. 663, 669 (1991) a source was allowed to sue a publication after the

26   newspaper identified Cohen (contrary to the paper's express promise) as its source and Cohen was

27   fired from his job.  The Supreme Court refused to apply heightened scrutiny, concluding that

28   application of the doctrine of promissory estoppel had "no more than [an] incidental" effect on the

United States District Court
Northern District of California

1    press's ability to gather or report news. *Id*. at 671–72.

2          Whether First Amendment scrutiny applies, therefore, does not turn on the label of the

3    cause of action but on whether the "challenged conduct" is to some form of expression and

4    relatedly whether the damages sought stemmed from that form of expression.  *See, e.g., Food*

5    *Lion, Inc. v. Capital Cities/ABC, Inc*., 194 F.3d 505, 522 (4th Cir. 1999) (viewing "the challenged

6    conduct in *Cowles* to be the breach of promise and not some form of expression.").  Here, the First

7    Amendment does not impose heightened standards on plaintiffs' tort claims as long as plaintiffs

8    *do not seek* reputational damages (lost profits, lost vendors) stemming from the publication

9    conduct of defendants.  As with proximate cause, discovery will shed light on the nature of the

10   damages for which plaintiffs seek recovery.  Resolution of this issue is more appropriately

11   addressed at summary judgment or trial.

12   **I.   Violations of California Penal Code §§ 632 & 634 by PPFA, PPNC, PPPSW, PPMM,**
     **PPOSB, PPGC, PPCFC and PPRM against Daleiden, Merritt, Lopez, CMP, BioMax,**
13   **and Unknown Coconspirators**

14        **1.         Recordings under Section 632**

15        Defendants argue that plaintiffs fail to allege claims for unlawful recording under

16   California Penal Code section 632 because the FAC does not include facts plausibly suggesting

17   that the conversations at issue – unspecified conversations at conferences and clinics and the lunch

18   meetings with Drs. Nucatola and Gatter – were made with a reasonable expectation of privacy.

19   Defendants also argue that the plaintiff organizations do not have standing to assert this claim.

20        Under Section 632, "a conversation is confidential if a party to that conversation has an

21   objectively reasonable expectation that the conversation is not being overheard or recorded."

22   *Flanagan v. Flanagan*, 27 Cal. 4th 766 (2002).  The term "confidential communication" includes

23   "any communication carried on in circumstances as may reasonably indicate that any party to the

24   communication desires it to be confined to the parties thereto, but excludes a communication made

25   in a public gathering or in any legislative, judicial, executive or administrative proceeding open to

26   the public, or in any other circumstance in which the parties to the communication may reasonably

27   expect that the communication may be overheard or recorded."  Cal. Penal Code § 632(c).

28        A "communication is not confidential when the parties may reasonably expect other

                                          36

persons to overhear it." *Lieberman v. KCOP Television, Inc.*, 110 Cal. App. 4th 156, 168 (2003). As the California Court of Appeal explained in *Lieberman,* "[t]he concept of privacy is relative. Whether a person's expectation of privacy is reasonable may depend on the identity of the person who has been able to observe or hear the subject interaction." *Id.* Importantly for determination of this motion, the "presence of others does not necessarily make an expectation of privacy objectively unreasonable, but presents a question of fact for the jury to resolve." *Id.*

Here, plaintiffs allege that Daleiden and his co-conspirators "intentionally recorded confidential communications made during the NAF 2014 annual meeting in San Francisco," which staff representatives from PPFA, PPPSW, PPMM, PPOSBC, PPNC, PPGC, PPCFC and PPRM attended. FAC ¶ 212. Daleiden and his co-conspirators also "intentionally recorded confidential communications made during private meetings with PPFA and Planned Parenthood affiliate staff members in which PPFA and Planned Parenthood affiliate staff members had a reasonable expectation of privacy." *Id.* ¶ 213. Plaintiffs assert that the staff who were recorded at NAF 2014 meeting had a reasonable expectation of privacy on the recorded conversations because "(1) all attendees at the meeting, including Defendants, were required to sign nondisclosure agreements with confidentiality provisions prior to entering the meeting and all attendees received and were required to wear badges demonstrating that they had signed such agreements; (2) NAF had in place a Security Program to ensure that communications concerning and made during the annual meeting would be confidential and restricted to NAF members and trusted others; and (3) the nature and subject matter of the conferences were highly sensitive." *Id.* ¶ 214.

### a.  Staff Conversations at NAF 2014 Annual Meeting

Defendants argue that these allegations do not plausibly suggest a reasonable expectation of privacy because no specific conversations at the NAF Annual 2014 meeting have been identified, much less facts about where and when those alleged conversations occurred, that could overcome the admission that the conversations were recorded at a conferences attended by hundreds of individuals. Defs. MTD at 34; Defs. MTD Reply. at 18. However, given the particular circumstances of this case – where defendants have publicly acknowledged that they recorded hours and hours of conversations at the NAF Conference, but the actual contents of those

1    recordings only came into the possession of plaintiffs after the inception of this lawsuit – I

2    conclude that the allegations regarding conversations at the 2014 NAF Annual meeting are

3    sufficient for present purposes.[31]  At summary judgment, plaintiffs will be required to prove

4    through admissible evidence which members of their staff were recorded and what circumstances

5    surrounding those particular recordings support their Section 632 claim.[32]

6            **b.        Lunch Meetings with Drs. Nucatola and Gatter and Laurel Felczer**

7            Defendants argue first that the FAC does not allege facts to plausibly support that Dr.

8    Nucatola was acting in her capacity as an employee of PPFA.  They rely on allegations in the FAC

9    that Nucatola was an employee of PPFA but then point to allegations they contend are "contrary,"

10   namely that Daleiden sought a meeting with Nucatola to discuss the operations of PPPSGV (not

11   PPFA).  FAC ¶¶ 69, 95.  I conclude that plaintiffs have stated sufficient facts, in particular that

12   defendants sought a meeting with Dr. Nucatola in her capacity as an employee of PPFA *or*

13   PPSGV to discuss tissue procurement.  *See also* FAC ¶¶ 75-76.  The allegations are not inherently

14   contradictory and nothing further is required at this juncture.

15           Defendants also argue that there are no allegations that Dr. Gatter and Laurel Felczer were

16   acting in their capacities as employees of specific plaintiff organizations when they were recorded

17   and that plaintiffs fail to identify which plaintiff organizations those individuals were employees

18   of at the time of the recording.  However, plaintiffs have plausibly pleaded that defendants sought

19   out private meetings and recorded those meetings with PPFA and affiliate staff members.   FAC ¶¶

20

21   [31] Defendants' reliance on *Turnbull v. Am. Broad. Companies*, No. CV 03-3554 SJO(FMOX),
     2005 WL 6054964, at *6 (C.D. Cal. Mar. 7, 2005), does not help them on this motion to dismiss.
22   There, the court affirmed the jury verdict where plaintiffs conceded they "were talking openly"
     and were aware that others were in the room.  Those circumstances supported the jury's
23   conclusion that a reasonable person would have expected that the conversations may be overheard.

24   [32] Defendants argue that the NAF NDA agreements are irrelevant to the question of a reasonable
     expectation of privacy in light of the *Flanagan* court's clarification that a violation of Section 632
25   turns more on expectations regarding "simultaneous dissemination" of conversations rather than
     "secondhand repetition," which would be prohibited by the NDA.  27 Cal. 4th at 775.  However,
26   the NDAs are not irrelevant concerning whether there has been an "intentional eavesdropping or
     recording" prohibited by Section 632.  *Id.* at 776.  In *Flanagan*, the California Supreme Court
27   adopted a standard that gave *greater* protection to privacy interests in private conversations.  *Id.*
     Similarly, defendants' arguments that NAF's efforts to limit and screen participants at the meeting
28   and that plaintiffs' characterizations of the contents of the recorded conversations as "sensitive"
     are irrelevant under *Flanagan* are also without merit.

69-70, 75-76, 95-97, 213.  That is sufficient at this juncture.

With respect to the meeting with Dr. Nucatola, defendants challenge the adequacy of the allegations regarding the "confidentiality" of the communications as that meeting was held in a restaurant.  FAC ¶ 76.  However, the facts as alleged – that Dr. Nucatola believed the communications were confidential, she arranged for the meeting to be held in a private booth, she "sat with her back to the corner wall of the restaurant, a position that enabled her to be able to observe the presence of others," and the "music and ambient noise in the restaurant were very loud," FAC ¶ 76 – are sufficient for pleading purposes.  FAC ¶ 76; *see also Lieberman v. KCOP Television, Inc*., 110 Cal. App. 4th 156, 168 (2003) (presence of others creates at most a question of fact for jury as to objective reasonableness).

### c.      Standing

Finally, with respect to standing, defendants argue that any claim under Section 632 brought by plaintiffs may only cover the confidential communications of *those entities* and not the confidential conversations of staff or meeting attendees.  Defendants complain that there are no allegations in the FAC to support the inference that *all* of plaintiffs' staff were attending on behalf of their employer, so as to confer standing on the employer to bring the Section 632 claim.  Defs. MTD at 36.  The only case they rely on is *Ion Equip. Corp. v. Nelson*, 110 Cal. App. 3d 868, 880 (Cal. Ct. App. 1980), where the court simply held that a corporation is a person who may not only be liable under Section 632, but also may also prosecute an action under that section.

Plaintiffs point to allegations that defendants intended to and did engage plaintiffs' staff at the 2014 NAF meeting about developing business relationships to demonstrate that those employees, and the subsequent recordings, related to the staff members' employment with plaintiffs.  FAC ¶¶ 69-71, 75-76, 95-97.  I agree.  The facts alleged are sufficient to establish plaintiffs' standing under Section 632.[33]

---

[33] Defendants challenge the adequacy of the allegations regarding defendant Lopez, who is not named as attending the 2014 NAF meeting or participating in the Nucatola or Gatter meetings.  In Opposition, plaintiffs argue that Lopez is included with the "DALEIDEN and his co-conspirators" allegations in paragraph 212 with respect to the 2014 NAF meeting.  I conclude that at this juncture, prior to discovery, it is not appropriate to dismiss Lopez from the Section 632 claim.

United States District Court
Northern District of California

United States District Court
Northern District of California

### 2.     Trespass under Section 634

Defendants argue that plaintiffs fail to allege a claim for criminal trespass under California Penal Code section 634 at NAF's 2014 Annual Meeting because the trespass (if any) was against NAF, not plaintiffs.  California Penal Code section 634 makes it illegal to trespass for purpose of committing a violation of Section 632.  Plaintiffs clarify that they are not seeking to assert a claim for trespass to the NAF conference under Section 634 itself, but instead bring their claim under Section 637.2, which provides a cause of action for anyone injured under Section 634 to bring an action against the person who committed the violation.  FAC ¶ 225.

Defendants also argue that plaintiffs fail to allege the necessary facts to state this claim, because plaintiffs fail to plead "aggravating factors" to establish "criminal trespass" under Section 634 and that plaintiffs fail to allege that NAF had possessory interest in the conference rooms used during the 2014 NAF meeting.  I have already concluded that plaintiffs adequately pleaded their possessory interest to state a claim for trespass at the 2014 NAF meeting.  In the absence of any case law to support defendants' argument, I find no need for plaintiffs to plead aggravating factors that would be required for criminal trespass when plaintiffs seek to use Section 634 as a basis for a civil action under Section 637.2.

The motions to dismiss the California Penal Code sections 632 and 634 claims are DENIED.

### J.  Violation of Florida and Maryland Wiretapping

Defendants challenge the adequacy of the allegations regarding defendants' violation of Florida's Wiretapping Statute, Section 934 of Title XLVII of the Florida Criminal Procedure Law based on recording made at the 2015 PPFA Medical Directors Council Conference in Orlando, Florida, and the 2014 PPFA North American Forum on Family Planning Conference in Miami, Florida.  "[F]or an oral conversation to be protected under section 934.03 the speaker must have an actual subjective expectation of privacy, along with a societal recognition that the expectation is reasonable." *State v. Smith*, 641 So. 2d 849, 852 (Fla. 1994).  Florida case law "establishes that the following factors are considered in determining whether, under the totality of the

United States District Court
Northern District of California

1   circumstances, the expectation of privacy is one which society recognizes as reasonable" including

2   "(1) the location where the communication took place; (2) the manner in which the

3   communication was made; (3) the nature of the communication; (4) the intent of the speaker

4   asserting Chapter 934 protection at the time the communication was made; (5) the purpose of the

5   communication; (6) the conduct of the speaker; (7) the number of people present; and (8) the

6   contents of the communication." *Brevard Extraditions, Inc. v. Fleetmatics, USA, LLC*, No. 8:12-

7   CV-2079-T-17MAP, 2013 WL 5437117, at *5 (M.D. Fla. Sept. 27, 2013).  Given the highly fact-

8   intensive "totality of the circumstances" test under Florida law, absent factually similar case law to

9   the contrary, I cannot conclude at this juncture that plaintiffs' current allegations preclude a claim

10  under Florida's statute.[34]

11      Defendants also challenge the adequacy of the allegations under Maryland's Wiretapping

12  Statute, § 10-402 of the Courts and Judicial Proceedings Article of the Maryland Annotated Code.

13  Under Maryland law, a plaintiff must have both a "subjectively and objectively reasonable

14  expectancy of privacy" in the conversation.  *Hawes v. Carberry*, 103 Md. App. 214, 220 (1995),

15  abrogated on other grounds by *Deibler v. State*, 365 Md. 185 (2001); *see also Benford v. Am.*

16  *Broad. Companies, Inc.*, 554 F. Supp. 145, 154 (D. Md. 1982) ("A person's 'reasonable

17  expectation of privacy' is a matter to be considered on a case-by-case basis, taking into

18  consideration its unique facts and circumstances.").  Defendants argue that given the facts alleged

19  – conversations during a conference with hundreds of participants – individuals recorded could not

20  have had a subjectively and objectively reasonable expectation of privacy.  Given the highly fact-

21  intensive question at issue, and in absence of any case from Maryland on similar facts, I cannot

22  conclude at this juncture that plaintiffs' current allegations preclude a claim under Maryland's

23

24  [34] While defendants point to case law rejecting the idea that there can be a privacy interest
    in a conference call held to conduct the business of a company by participants acting on behalf of

25  the company, *Cohen Bros., LLC v. ME Corp., S.A.*, 872 So. 2d 321, 325 (Fla. Dist. Ct. App. 2004),
    that case does not support defendants' argument that there can be no privacy interest in "closed

26  business meetings," even if the Florida conferences could be analogized to closed business
    meetings.  *See also Morningstar v. State*, 428 So. 2d 220, 221 (Fla. 1982) (rejecting constitutional

27  challenge to wiretapping statute as applied to "expectation of privacy in" a "private office"); *Jatar*
    *v. Lamaletto*, 758 So. 2d 1167, 1169 (Fla. Dist. Ct. App. 2000), cause dismissed, 786 So. 2d 1186

28  (Fla. 2001) (rejecting right to privacy because "[s]ociety is not prepared to recognize as reasonable
    an expectation of privacy" in a conversation in someone else's business office seeking extortion).

41

1    statute.[35]

2           Finally, as to both the Florida and Maryland claims – and as with the claim under

3    California law – defendants complain that the FAC lacks necessary facts to support the

4    reasonableness of the expectation of privacy, including which exact conversations were recorded,

5    the specific circumstances for each of those conversations, and why the expectation of

6    confidentiality was reasonable given that there were hundreds of employees attending a multi-day

7    conference.  Defs. MTD at 42.  However, given the allegations in this case – the surreptitious

8    recording of many hours at the conference of conversations with dozens of individuals that were

9    only turned over to plaintiffs after the inception of this lawsuit – plaintiffs are not in a position to

10   provide more specifics at this juncture.  Those specifics will be tested at summary judgment.[36]

11          Defendants' motions to dismiss the wiretapping claims under Florida and Maryland law

12   are DENIED.

13   **K.   Invasion of Privacy: Intrusion Upon A Private Place by All Plaintiffs Against
          Daleiden, Merritt, Lopez, CMP, and BioMax and Invasion of Privacy: California
14        Constitution Art. I § I by PPFA, PPNC, PPPSW, PPMM, and PPOSB against
          Daleiden, Merritt, Lopez, CMP, and BioMax**

15          Plaintiffs' thirteenth and fourteen claims allege invasions of privacy; specifically that

16   Daleiden, Merritt, Lopez, CMP, BioMax intruded on a private place and violated the rights of all

17   plaintiffs; and that Daleiden, Merritt, Lopez, CMP, BioMax invaded the rights of privacy of

18   PPFA, PPNC, PPPSW, PPMM, and PPOSB under the California Constitution.

19

20   [35] The cases defendants contend are factually analogous are not.  *Matter of John Doe Trader No.*
21   *One*, 894 F.2d 240, 245 (7th Cir. 1990) ("The environment of the trading floor, the presence of the
     [government] agent and other traders all indicate that a reasonable expectation of privacy did not
22   exist."); *Med. Lab. Mgmt. Consultants v. Am. Broad. Companies, Inc.*, 306 F.3d 806, 818 (9th Cir.
     2002) (defendants covert videotaping of "external" semi-public workplace communications by
23   "strangers" who could have been potential partners or competitors  could not support objectively
     reasonable expectation of privacy); *Kemp v. Block*, 607 F. Supp. 1262, 1264 (D. Nev. 1985) (no
24   reasonable expectation of privacy where argument conducted in "loud voices," defendant and the
     other coworkers who overheard the argument were in a place they had a right to be (therefore
25   plaintiff may be deemed to have knowingly exposed the discussion to them), relatively small size
     of the instrument shop and its lack of interior walls further indicated that an expectation of privacy
26   within it would not be objectively reasonable, and plaintiff had no right to exclude other persons
     from entering the shop while the argument ensued).

27   [36] Merritt argues the wiretapping claim under Florida law should be dismissed as to her because
     she did not attend the Florida meetings.  Merritt MTD at 20.  Plaintiffs, again, rely on their alter
28   ego allegations.  That claim will not be dismissed as to Merritt at this juncture.

                                                      42

United States District Court
Northern District of California

United States District Court
Northern District of California

Defendants argue that plaintiffs lack "associational" standing to bring these claims on behalf of their employees because: (i) the claims at issue require the participation of the individual members in the lawsuit; and (ii) associational standing does not allow corporations to assert the interests of their employees.  Defendants also challenge the adequacy of the facts alleged to support the substantive privacy claims.

### 1.        Individual Participation

Defendants assert that if plaintiffs are attempting to plead "associational standing," the Ninth Circuit has held that an association lacks standing where "the relief requested requires the participation of individual members in the lawsuit." *Associated Gen. Contractors of Am. v. Metro. Water Dist. of S. Cal.*, 159 F.3d 1178, 1181 (9th Cir.1998).[37]  Defendants note that "'the right of privacy is purely a personal one; it cannot be asserted by anyone other than the person whose privacy has been invaded, that is, plaintiff must plead and prove that *his* privacy has been invaded.'" *Ass'n for Los Angeles Deputy Sheriffs v. Los Angeles Times Comm'ns LLC*, 239 Cal. App. 4th 808, 821 (2015), *review denied* (Nov. 18, 2015) (emphasis in original) (quoting *Hendrickson v. California Newspapers, Inc.*, 48 Cal.App.3d 59, 62 (1975)).

"A privacy violation based on the common law tort of intrusion has two elements. First, the defendant must intentionally intrude into a place, conversation, or matter as to which the plaintiff has a reasonable expectation of privacy. Second, the intrusion must occur in a manner highly offensive to a reasonable person." *Hernandez v. Hillsides, Inc.*, 47 Cal. 4th 272, 286 (2009).  Similarly, the elements of the California constitutional claim for invasion of privacy are: (i) the identification of a specific, legally protected privacy interest; (ii) a "reasonable expectation of privacy on plaintiff's part"; and (iii) a sufficiently serious invasion.  *Hill v. Nat'l Collegiate Athletic Assn.*, 7 Cal. 4th 1, 35-37. (1994).

Defendants contend that whether any particular employee actually possessed a statutory or

---

[37] To establish associational standing, a plaintiff must demonstrate: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Associated Gen. Contractors of Am. v. Metro. Water Dist. of S. Cal.*, 159 F.3d 1178, 1181 (9th Cir.1998) (citation omitted).

United States District Court
Northern District of California

constitutional expectation of privacy in a particular conversation with defendants – when those employees were recorded at different times, in different settings, and disclosed different information – would differ from employee to employee and, therefore, require the participation of each employee/member whose privacy was allegedly violated. *See also Spinedex Physical Therapy USA Inc. v. United Healthcare of Arizona, Inc*., 770 F.3d 1282, 1293 (9th Cir. 2014), *cert. denied sub nom. United Healthcare of Arizona v. Spinedex Physical Therapy USA, Inc*., 136 S. Ct. 317 (2015) (distinguishing between claims that depend on whether payments for services were withheld from association members and the individual situations of its members versus cases alleging "systematic policy violations" that make extensive individual participation unnecessary). This need for individual participation, defendants argue, runs to plaintiffs' request for injunctive relief and is also heightened by the plaintiffs' request for money damages because "[t]he courts that have addressed this issue have consistently held that claims for monetary relief necessarily involve individualized proof and thus the individual participation of association members, thereby running afoul of the third prong of the *Hunt* test." *United Union of Roofers, Waterproofers, & Allied Trades No. 40 v. Ins. Corp. of Am*., 919 F.2d 1398, 1400 (9th Cir. 1990).

In their Opposition, plaintiffs clarify that they only seek injunctive and declaratory relief for the invasion of privacy claims, not damages.  FAC Prayer for Relief ¶ 2.  As to individual participation, plaintiffs rely on cases challenging "systematic policy violations" that would make individual participation unnecessary.  For example, in *Pennsylvania Psychiatric Soc. v. Green Spring Health Servs., Inc*., 280 F.3d 278 (3d Cir. 2002), plaintiffs challenged "systemic policy violations," namely the methods defendants employ for authorizing or denying mental health services, credentialing physicians, and reimbursement that plaintiff contended could be "established with sample testimony, which may not involve specific, factually intensive, individual medical care determinations."  *Id*. at 286.  While the appellate court questioned whether plaintiffs could, in fact, make that showing utilizing only limited individual participation, it allowed the claim to proceed past the motion to dismiss stage.  *Id*.  Plaintiffs assert that this case is more akin to *Pennsylvania Psychiatric Soc* than *United Healthcare of Arizona* because plaintiffs allege a consistent course of defendants' conduct (surreptitious recording) and the same injury to

44

its employees (invasion of privacy) and will be able to establish that defendants' conduct was highly offensive to all employees by representative testimony given defendants' history of violence, harassment, and targeting abortion providers. Similarly, the intrusion alleged here – all recordings – may be shown to be offensive to a "reasonable person" that would cover all staff given defendants' past history.

As in *Pennsylvania Psychiatric Soc.*, as this case continues and discovery progresses, the evidence may support defendants' argument that individual participation is necessary. Given the broad but plausible allegations in the FAC, I should not make that determination at this juncture.

### 2.      Standing to Assert Claims on Behalf of Employees

As to the second standing challenge, defendants rely on *Region 8 Forest Serv. Timber Purchasers Council v. Alcock*, 993 F.2d 800 (11th Cir. 1993), which concluded that the "associational standing test articulated in [*Hunt v. Washington Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977)] is properly reserved for voluntary membership organizations—like trade associations or environmental groups—and has no application to a corporation's standing to assert the interests of its employees." *Id*. at 810, n.15.

Plaintiffs argue that the footnote comment in *Region 8* is not binding nor persuasive in the Ninth Circuit, and instead rely on cases finding associational standing appropriate in similar circumstances. For example, in *Planned Parenthood Arizona, Inc. v. Brnovich*, No. CV-15-01022-PHX-SPL, 2016 WL 1158890 (D. Ariz. Mar. 23, 2016), the court concluded that the Planned Parenthood affiliate could represent its employees in challenging a statute that allegedly infringed on its doctors' First Amendment rights. *Id*. *8.   The court noted that Planned Parenthood's interest in challenging the statute was "in every practical sense identical" to the physicians it employs, that its physicians would otherwise have standing to sue in their own right, the interests they sought to protect were germane to their purpose of providing reproductive health care services, and because the parties were seeking injunctive and declaratory relief, individual participation of the physicians was unnecessary. *Id*.; *see also Presidio Golf Club v. Nat'l Park Serv*., 155 F.3d 1153, 1159 (9th Cir. 1998) (concluding that an association could represent its members challenging the demolition of a historic club house where "the individual members'

45

1    interests are largely identical to the organization's goals of maintaining the Clubhouse for the

2    members' use in a manner suitable for the social and athletic activities surrounding the game of

3    golf."); *but see Fleck & Associates, Inc. v. Phoenix, City of, an Arizona Mun. Corp.*, 471 F.3d

4    1100, 1106 (9th Cir. 2006) (rejecting associational standing to challenge ordinance prohibiting

5    live sex acts by an association who ran that type of business because plaintiff had customers and

6    not members and suit to allegedly vindicate "putative privacy interests of its customers" was not

7    germane to plaintiff's purpose).

8          As above, given the breadth of plaintiffs' plausible allegations, standing by plaintiffs has

9    been sufficiently alleged.  It may be challenged upon a fuller evidentiary record at summary

10   judgment or trial.

11         **3.       Adequacy of Allegations**

12         Defendants challenge the factual allegations regarding the plaintiffs' employees'

13   reasonable expectations of privacy and whether the intrusions suffered would be highly

14   objectionable to all staff.  These arguments largely track the ones raised against plaintiffs' claims

15   under the wiretapping statutes discussed above.  In short, as to the privacy claims under California

16   law and for purposes of ruling on these motions to dismiss, I conclude that plaintiffs have alleged

17   facts plausibly supporting their employees' reasonable expectations of privacy and the

18   objectionable nature of defendants' intrusions.

19         The unique question here is whether the newsworthiness of defendants' disclosures – a

20   position asserted by defendants – turns what might otherwise be considered an "offensive"

21   intrusion into a justified intrusion.  Defs. MTD at 50.  Whether defendants' disclosures were

22   newsworthy and whether public interest can diminish the offensiveness of the intrusions are not

23   appropriately determined on a motion to dismiss.  *See,e.g., Shulman v. Grp. W Prods., Inc.*, 18

24   Cal. 4th 200, 236 (1998), *as modified on denial of reh'g* (July 29, 1998) (recognizing, in reviewing

25   lower court's summary judgment opinion, that "the constitutional protection of the press does

26   reflect the strong societal interest in effective and complete reporting of events, an interest that

27   may-as a matter of tort law-justify an intrusion that would otherwise be considered offensive.").

28         For the foregoing reasons, defendants' motions to dismiss are DENIED.  At this early

United States District Court
Northern District of California

46

1    stage of the case and given the plausibly alleged allegations, the claims may proceed.

2    **II.    ANTI-SLAPP MOTIONS TO STRIKE**

3           As relevant to this set of motions, the parties submit evidence through declarations and

4    requests for judicial notice.[38]  Defendants rely on the declaration of David Daleiden.  Dkt. No. 87-

5    1.  He declares that he is an investigative journalist and founder of CMP.  *Id.* ¶ 2.  He explains that

6    CMP is a California not-for-profit, 501(c)(3) corporation founded for the purpose of monitoring

7    and reporting on medical ethics, with a focus on abortion and the use and disposal of aborted fetal

8    tissue.  *Id.*  ¶¶ 203.  He asserts that CMP carries out its mission through investigatory journalism

9    that complies with all applicable laws.  *Id.*  His aim has been to gather information about illegal

10   activities, including for-profit sale of fetal tissue, altering of abortion procedures to obtain fetal

11   tissue for research, and the commission of partial-birth abortions, and in that process also gather

12   information about the difficulties of disposing of fetal tissue, the practical difficulties of fetal

13   tissue procurement, the stigma abortion providers feel is attached to their work, and the toll their

14   work takes on them.  *Id.* ¶ 4.  As part of his research, Daleiden gathered information from medical

15   journals, legislative hearing and websites, spoke with researchers, scientists, abortion providers,

16   current and former tissue procurement specialists, and attended seven scientific and industry

17   conferences under the assumed name of Robert Sarkis.  *Id.* ¶ 5.

18          On July 14, 2015, CMP released two videos of Daleiden's lunch meeting with Dr.

19   Nucatola, one a summary version and the other showing the full meeting.  *Id.* ¶ 6.  A week later,

20   CMP released two videos of his lunch meeting with Dr. Gatter, one a summary version and the

21   other showing the full meeting.  *Id.* ¶ 7.  Nine days after that, CMP released two additional videos

22   of recorded conversations with Dr. Ginde of PPRM, one a summary and the other the full version.

23   *Id.* ¶ 8.  After four more days, CMP released a short highlight video of Daleiden's meeting with

24   Melissa Farrell of PPGC (because of technical difficulties the fuller video was not released until

25

26   _____

27   [38] This evidence is relevant only to the determination of the anti-SLAPP motions and irrelevant to
     the determination of the motions to dismiss.  In ruling on an anti-SLAPP motion, the court
     considers, "the pleadings, and supporting and opposing affidavits stating the facts upon which the
28   liability or defense is based."  *Mindys Cosmetics, Inc. v. Dakar*, 611 F.3d 590, 598 (9th Cir. 2010)
     (quoting Cal. Civ. Proc. Code § 425.16(b)(2)).

United States District Court
Northern District of California

August 6, 2015).  *Id.* ¶ 9.

Defendant Merritt also submits a declaration in support of her separate anti-SLAPP motion.  Dkt. No. 78-1.  Merritt declares that that she is an "investigative journalist" of the abortion industry, but does not provide any explanation of her educational background, credentials, work experience, or names of outlets that have published any of her work other than CMP.  Merritt Decl. ¶ 3.[39]  She explains that she performed investigative work for CMP's Human Capital Campaign from 2013 through 2015, using the name Susan Tennenbaum to portray herself as CEO of BioMax.  *Id.* ¶ 4-5.  She admits that she used that alias to attend the 2014 and 2015 NAF Annual meetings in San Francisco and Baltimore, but did not attend any other PPFA conferences or meetings identified in the FAC.  *Id.* ¶ 6.  She admits that she met with Planned Parenthood representatives (along with Daleiden who was using the name Sarkis) at clinics in Colorado and Texas to discuss fetal tissue transactions between BioMax and those clinics in order to further "her research."  *Id.* ¶ 7.  She also admits she and Daleiden met with Dr. Nucatola in Southern California to discuss BioMax purchasing fetal tissue specimens from Planned Parenthood to further "her research." *Id.* ¶ 8.   She admits that she and an unnamed colleague met with Dr. Gatter in Southern California to discuss BioMax purchasing fetal tissue specimens from Planned Parenthood to further "her research."  *Id.* ¶ 9.  She declares that she participated in and recorded during those meetings in order to gain evidence of illegal conduct in the abortion industry.  *Id.* ¶¶ 10-11.

Both sets of defendants rely on the Declaration of Charles S. Limandri (Dkt. No. 85-2).  That declaration attaches various documents to show that CMP's Human Capital Project videos generated a tremendous amount of public and media interest and spurred several state and federal investigations into the conduct of Planned Parenthood and its affiliates.  Limandri Decl. ¶¶ 2-3.  Finally, both sets of defendants also request Judicial Notice of: (i) a ruling by a judge of the

---

[39] Plaintiffs rely on Merritt's deposition testimony in *StemExpress, LLC, et al v. The Center For Medical Progress, et al*, Case No. BC 589145, pending in Los Angeles County Superior Court, in which Merritt admits she has never published any articles.  Declaration of Amy L. Bomse (Dkt. No. 94), Ex. A, Depo. Trans. of Sandra Susan Merritt at 27:20-21.  A full copy of that deposition transcript is filed in support of Merritt's reply on her motion to strike.  Dkt. No. 102.

United States District Court
Northern District of California

United States District Court
Northern District of California

1  Superior Court of the State of California, County of Los Angeles in *StemExpress, LLC, et al v. The*

2  *Center For Medical Progress, et al*, Case No. BC 589145 (Los Angeles County Superior Court)

3  finding that defendants' secret videotaping of representatives of StemExpress LLC and subsequent

4  publication of videos containing that footage met the first prong of California's anti-SLAPP

5  statute (that defendants' complained-of actions were taken in furtherance of their rights to petition

6  and speech) and (ii) an amicus brief submitted to the Ninth Circuit in support of the appeal of the

7  granting of a preliminary injunction in related case *Center for Medical Progress, et al. v. National*

8  *Abortion Federation et al.*, Case No. 16-15360.[40]

9      In response to Merritt's motion, plaintiffs submit declarations from Dr. Nucatola and Dr.

10  Gatter describing their initial communications and interactions with Daleiden and BioMax, their

11  lunch meetings with Daleiden and Merritt, their expectations that the information they shared with

12  Daleiden and Merritt would be treated confidentially, and their expectations of privacy in the

13  conversations at those lunch meetings.   Dkts. Nos. 95, 96.

14      **A.  Legal Standard**

15      California Code of Civil Procedure section 425.16 is California's response to "strategic

16  lawsuits against public participation," or SLAPP lawsuits.  It was enacted "to provide a procedure

17  for expeditiously resolving nonmeritorious litigation meant to chill the valid exercise of the

18  constitutional rights of freedom of speech and petition in connection with a public issue." *Hansen*

19  *v. California Dep't of Corr. & Rehab.*, 171 Cal. App. 4th 1537, 1542-43 (2008).  It provides that a

20  cause of action against a person "arising from any act of that person in furtherance of the person's

21  right of petition or free speech under the United States Constitution or the California Constitution

22  in connection with a public issue shall be subject to a special motion to strike, unless the court

23  determines that the plaintiff has established that there is a probability that the plaintiff will prevail

24  on the claim." Cal. Civ. Proc. Code § 425.16(b)(1).  An "act in furtherance of the person's right of

25  petition or free speech under the United States Constitution or the California Constitution in

26

27  [40] I grant the request for Judicial Notice, but only as to the existence of this opinion and pleadings,
    and not for purposes of noticing the truth of the facts or arguments made therein. *See, e.g., Lee v.*
28  *City of Los Angeles*, 250 F.3d 668, 689-90 (9th Cir. 2001).

connection with a public issue" includes

> (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law,
>
> (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law,
>
> (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, or
>
> (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest.

Cal. Civ. Proc. Code § 425.16(e).

"When served with a SLAPP suit, the defendant may immediately move to strike the complaint under Section 425.16." *Id.* at 1543. That motion is known as an anti-SLAPP motion. To determine whether an anti-SLAPP motion should be granted, the trial court must engage in a two-step process. "First, the defendant must make a prima facie showing that the plaintiff's suit arises from an act in furtherance of the defendant's rights of petition or free speech." *Mindys Cosmetics, Inc. v. Dakar*, 611 F.3d 590, 595 (9th Cir. 2010) (citation and internal quotation marks omitted). "Second, once the defendant has made a prima facie showing, the burden shifts to the plaintiff to demonstrate a probability of prevailing on the challenged claims." *Id.*

"At [the] second step of the anti-SLAPP inquiry, the required probability that [a party] will prevail need not be high." *Hilton v. Hallmark Cards*, 599 F.3d 894, 908 (9th Cir. 2009). A plaintiff must show "only a 'minimum level of legal sufficiency and triability.'" *Mindys*, 611 F.3d at 598 (quoting *Linder v. Thrifty Oil Co.*, 23 Cal. 4th 429, 438 n.5 (2000)). The plaintiff need only "state and substantiate a legally sufficient claim." *Id.* at 598-99 (citation and internal quotation marks omitted). In conducting its analysis, the "court 'does not weigh the credibility or comparative probative strength of competing evidence,' but 'should grant the motion if, as a matter of law, the defendant's evidence supporting the motion defeats the plaintiff's attempt to establish evidentiary support for the claim.'" *Id.* at 599 (quoting *Wilson v. Parker, Covert &*

1   *Chidester*, 28 Cal. 4th 811, 821 (2002).  At this stage, the court considers "the pleadings, and

2   supporting and opposing affidavits stating the facts upon which the liability or defense is based."

3   *Id*. at 598 (quoting Cal. Civ. Proc. Code § 425.16(b)(2)).

4          "[T]he anti-SLAPP statute cannot be used to strike federal causes of action."  *Hilton v.*

5   *Hallmark Cards*, 599 F.3d 894, 901 (9th Cir. 2010).

6          **B.  Protected Activity**

7          Defendants assert that they were acting in furtherance of their rights of petition or free

8   speech as shown in part by their publication of the fruits of their surreptitious recordings and also

9   by the significant public reaction to those videos.  Plaintiffs counter that defendants' acts do not

10  fall within the protection of California's anti-SLAPP statute because defendants waived any First

11  Amendment rights by signing the NAF confidentiality agreements discussed above and because

12  defendants engaged in illegal conduct in order to secure their recordings.

13         I need not reach this issue in order to resolve the motions to strike.  Instead, I assume for

14  the purpose of deciding these motions that defendants have made a prima facie showing that the

15  plaintiffs' suit arises from acts in furtherance of defendants' rights of petition or free speech.

16  However, as discussed below, plaintiffs have shown a probability of prevailing on the merits

17  sufficient to defeat the motions to strike.

18         **C.  Probability of Success**

19         **1.      Defendants' Joint Motion to Strike**

20         As to plaintiffs' probability of success on the merits, defendants repeat the *identical*

21  arguments they made on their motions to dismiss.  Other than the declaration from Daleiden –

22  asserting that he was acting as an investigative journalist in his work for CMP and on the Human

23  Capital Project, which goes solely to the first prong of the anti-SLAPP statute – defendants present

24  no evidentiary-based argument to undermine plaintiffs' probability of success on the state causes

25  of action discussed above.

26         Defendants correctly argue that once a defendant meets the burden on the first prong, the

27  burden shifts to plaintiff to substantiate a legally sufficient claim.  *See, e.g., Mindys Cosmetics,*

28  *Inc. v. Dakar*, 611 F.3d 590, 598 (9th Cir. 2010).   However, this does not mean that plaintiffs

United States District Court
Northern District of California

were required to come forward with evidence to prove up the merits of their claims when

defendants' *attacks* on those claims were based solely on *pleading* deficiencies.  Defendants'

initial motion set out the parameters of defendants' anti-SLAPP motion to strike.  Defendants

argued that they were entitled to "judgment as a matter of law" on the state law claims in the FAC.

Defendants' challenges were not *evidentiary* (or even allegations that plaintiffs would be unable to

produce adequate evidence in support of their claims), but targeted to the allegedly deficient

pleadings.  *See, e.g.*, Defs. MTS (Dkt. No. 87) at 5 ("As Defendants described in detail in their

Motion to Dismiss, the Complaint fails to plausibly allege any state-law claims against

Defendants.  *See* Doc. 79. Defendants incorporate by reference the arguments in their Motion to

Dismiss, as summarized and expanded upon below.").

Defendants, therefore, expressly limited their challenge in the MTS to the sufficiency

arguments made in their MTD as "summarized and expanded."  They did not expressly challenge

plaintiffs' ability to prove with evidence the substance of any of plaintiffs' state law claims.  In

their Reply in support of their motion to strike, defendants fail to identify any instances of

"expanded" arguments (as opposed to arguments repeated from their motion to dismiss) or

instances where defendants expressly argued that defendants would be unable to come forth with

*evidence* to support a specific claim.

The limitation of defendants' motion to strike is confirmed, in part, by the evidence they

offer in support.  That evidence consists, as noted above, of the declarations of Daleiden and

Limandri (and the exhibits to Limandri's declaration).  Daleiden's declaration discusses only

Daleiden's purported work as an investigative journalist, the work of CMP, and the release of the

Human Capital Project videos in July and August 2015.  Dkt. No. 87-1.  Limandri's declaration

basically authenticates documents regarding government investigations into the operations of

Planned Parenthood following the release of the Human Capital Project videos to substantiate

defendants' claim that the disclosures created significant public and government interest.  Dkt. No.

85-2.[41]  There is no evidentiary-based challenge to plaintiffs' probability of success.

---

[41] In their Reply, defendants refer to "evidence" regarding the PPCG meeting and cite to a specific
portion of a video.  Defs. MTS Reply at 9.  Daleiden's declaration provided a link to the whole

United States District Court
Northern District of California

1    While defendants are correct that they did not need to present evidence in support of their

2    opening motion to strike, that does not mean they were *not required* to raise explicit arguments

3    that plaintiffs would not be able to prove (as opposed to plead) specific claims.   Defendants

4    cannot make those evidentiary-based arguments for the first time in their reply.

5    Confining my analysis to the arguments actually raised in defendants' motion to strike, and

6    for the reasons discussed with respect to their motion to dismiss, the motion to strike is DENIED.

7    ### 2.        Merritt's Motion to Strike

8    Merritt's motion to strike (Dkt. No. 78) similarly argues that plaintiffs failed to "allege

9    sufficient facts" and, like the other defendants' motion, largely copies the arguments made in her

10   motion to dismiss.  *See, e.g.*, Merritt MTS at 9 ("Since Plaintiffs are unable to allege sufficient

11   facts"), 15 ("Since Plaintiffs cannot allege sufficient facts or meet the standing requirements"); 19

12   ("Plaintiffs have not alleged sufficient facts to state claims for fraud, invasion of privacy or

13   trespass against Ms. Merritt").  Merritt, however, asserts two discrete evidentiary-based arguments

14   that require separate analysis.

15   First, Merritt appears to argue that the circumstances surrounding the lunch meetings with

16   Drs. Nucatola and Gatter preclude a finding that any of the communications during those meetings

17   were "confidential."   Merritt MTS at 3.  In her declaration, Merritt does not provide *any facts*

18   regarding the circumstances of or occurrences in those meetings except that they occurred in

19   restaurants.  Merritt Decl. ¶¶ 8, 9.  In their opposition, plaintiffs submit declarations from Drs.

20   Nucatola and Gatter, explaining further why they believed those conversations were confidential.

21   Dkt. Nos. 95-96.  In reply, Merritt does not counter that evidence.  Reviewing the allegations and

22   _____

23   video, but the specific contents of that video were *not discussed* in it or in defendants' moving
     papers.  If I were to consider this "evidence" and the argument improperly raised for the first time
24   in Reply, it would not result in my granting the motion to strike the breach of contract claim with
     respect to the PPCG meeting.  It would only support an argument that *some portion* of the taping
25   or subsequent disclosure may not have breached the PPCG contract, an issue appropriate for
     resolution on summary judgment or trial.  The second piece of evidence discussed, again for the
26   first time in Reply, is the video of the Dr. Nucatola lunch that defendants contend shows that Dr.
     Nucatola "clearly viewed" the lunch as an opportunity to provide information to defendants and
27   not a business meeting on behalf of PPFA. Defs. MTS Reply at 13 & n2.  Again, if I were to
     consider that evidence, it at most raises a question of fact that cannot be resolved on a motion to
28   strike under the anti-SLAPP statute.

United States District Court
Northern District of California

1    evidence submitted, I conclude that, at most, a question of fact has been raised regarding the

2    reasonable expectation of privacy in the conversations that occurred during those lunch meetings.

3          Second, Merritt argues that she cannot be liable for violations of California Penal Code

4    section 632 and trespass to effect an illegal recording under Section 634 because she is exempt

5    from liability under Section 633.5.  California Penal Code section 633.5 provides that nothing in

6    Section 632 "prohibits one party to a confidential communication from recording the

7    communication for the purpose of obtaining evidence reasonably believed to relate to the

8    commission by another party to the communication of the crime of extortion, kidnapping, bribery,

9    any felony involving violence against the person."  Merritt argues that because she attended the

10   meetings and conference in her capacity as an investigative journalist gathering evidence of what

11   she "reasonably believed" were plaintiffs' commissions of crimes of violence against unborn

12   children, she is exempt as a matter of law under Section 633.5  Merritt MTS at 14-15; Merritt

13   Decl. (Dkt. No. 78-1) ¶ 11.

14         Section 633.5 is an affirmative defense to liability under Section 632, and "[a]lthough the

15   anti-SLAPP statute 'places on the plaintiff the burden of substantiating its claims, a defendant that

16   advances an affirmative defense to such claims properly bears the burden of proof on the

17   defense.'" *Davis v. Elec. Arts Inc*., 775 F.3d 1172, 1177 (9th Cir. 2015), *cert. denied*, 136 S. Ct.

18   1448 (2016) (*quoting Peregrine Funding, Inc. v. Sheppard Mullin Richter & Hampton LLP*, 133

19   Cal.App.4th 658 (2005)).  Moreover, whether a belief is "reasonable" is typically resolved by the

20   finder of fact.  *Kuschner v. Nationwide Credit, Inc*., 256 F.R.D. 684, 689 (E.D. Cal. 2009)

21   ("Although plaintiff has submitted a declaration stating his actual belief [under § 633.5],

22   resolution of this issue plainly cannot be done on the pleadings. It requires the types of credibility

23   determinations and weighing of evidence quintessentially performed by a fact-finder.").

24         In her declaration submitted in support of her motion to strike, Merritt declares that her

25              research revealed that abortion providers were doing business with
                 fetal tissue procurement companies, and as part of those business
26              dealings abortion providers such as Planned Parenthood would alter
                 abortion procedures so as to obtain an intact baby from which
27              organs could be harvested for sale to procurement companies. My
                 research further revealed that in order to obtain intact fetuses,
28              abortion providers would perform what is known as "partial birth

                                              54

1

abortions" or would use techniques that would result in a live fetus
being removed from the mother and then killed and dissected.

2

Merritt Decl. ¶ 3.  She also states that she "recorded these meetings because I believed that the

3

communications would reveal evidence related to Planned Parenthood's commission of violent

4

felonies against unborn, partially born, and born children whose bodies were dissected and sold

5

piecemeal."  *Id.* ¶ 11.

6

In support of their positions on Merritt's motion to strike, both plaintiffs and Merritt rely

7

on portions of Merritt's deposition in the *StemExpress* case pending in Los Angeles County

8

Superior Court.  Plaintiffs contend that this deposition testimony undermines Merritt's current

9

assertion that her belief was reasonable (Merritt MTS Oppo. at 15 & n.9) and Merritt (supplying

10

the full deposition transcript in Reply) relies on it to demonstrate that her belief had a reasonable

11

basis.  Merritt MTS Reply at 14-15.  These portions of the Merritt deposition transcript

12

*demonstrate* that that this issue cannot be decided on this motion to strike, but instead, presents a

13

question of fact as to the reasonableness of Merritt's belief. [42]

14

Merritt does not raise any other evidentiary or new arguments in her motion to strike.  For

15

the reasons discussed above and with respect to her motion to dismiss, the motion to strike is

16

DENIED.

17

18

19

20

21

22

23

24

25

26

27

28

---

[42] This is not an "uncontroverted" record, unlike in the case relied on by Merritt.  *People v. Parra*, 165 Cal. App. 3d 874, 879 (Cal. Ct. App. 1985)  (affirming admission of evidence because recording fell within § 633.5, where "recording was clearly for the purpose of obtaining evidence of appellant's intent to carry out her prior written threats of physical violence").  Where there is controverted evidence, the issue is for the jury. *See Moore v. Telfon Commc'ns Corp.*, 589 F.2d 959, 965 (9th Cir. 1978) (the "jury alternatively found either that Moore impliedly consented, the communication was not confidential, or Anderson recorded the conversation for the purpose of obtaining evidence reasonably believed to relate to the crime of extortion.").

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CONCLUSION**

Defendants have raised a number of arguments that may cause the claims in this case to be narrowed after discovery on summary judgment. However, plaintiffs have alleged sufficient facts to plausibly state their claims at this juncture. For the foregoing reasons, the motions to dismiss and motions to strike are DENIED.

**IT IS SO ORDERED**.

Dated: September 30, 2016



WILLIAM H. ORRICK
United States District Judge