UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

PLANNED PARENTHOOD FEDERATION
OF AMERICA, INC., et al.,

Plaintiffs,

v.

CENTER FOR MEDICAL PROGRESS, et
al.,

Defendants.

Case No. 16-cv-00236-WHO   (DMR)

**ORDER ON JOINT DISCOVERY LETTERS**

Re: Dkt. No. 166, 222

The parties filed an omnibus joint submission consisting of five individual discovery motions addressing 17 separate disputes which they labeled P1 through P10 and D1 through D7. [Docket Nos. 166 (Exs. A-E), 191.]  After the court scheduled a hearing, which was continued twice at the parties' request, the parties reached agreement on some disputes and narrowed others, and submitted further briefing on some of them.  [Docket Nos. 218, 222, 224, 230, 233.]

The court held a hearing on February 8, 2018.  [Docket No. 229 (Minute Order).] Following the hearing, the court twice ordered the parties to submit additional briefing regarding Defendants' privilege assertions and objections.  [Docket No. 237, 256.]  The parties timely filed the additional briefing.  [Docket No. 242, 259.]  The court now enters this order on the following disputes which are ripe for adjudication: P1, P2, P3, P4, P5, P6, P7, P8, P9, and P10.

I.      **BACKGROUND**

        A.  **Factual Background**

        Plaintiffs are Planned Parenthood Federation of America, Inc. ("PPFA"), seven individual California Planned Parenthood affiliates, Planned Parenthood of the Rocky Mountains, Planned Parenthood Gulf Coast, and Planned Parenthood Center for Choice.  Defendants are Center for Medical Progress ("CMP"), which holds itself out as a charitable trust; BioMax Procurement

Services, LLC ("BioMax"); David Daleiden, aka Robert Sarkis, who is BioMax's Procurement Manager and Vice President of Operations as well as CMP's CEO; CMP Secretary Troy Newman; CMP Chief Financial Officer Albin Rhomberg; BioMax registered agent Phillip S. Cronin; BioMax CEO Sandra Susan Merritt, aka Susan Tennebaum; and BioMax Procurement Technician Gerardo Adrian Lopez.  [Docket No. 59 (First Amended Complaint, "FAC").]

Plaintiffs allege in the first amended complaint ("FAC") that Defendants created a "complex criminal enterprise . . . involv[ing] fake companies, fake identifications, and large-scale illegal taping" of reproductive health care conferences and private meetings in order to advance their goal of "interfering with women's access to legal abortion."  FAC ¶ 1.  According to Plaintiffs, Defendants' conspiracy focused on Planned Parenthood affiliates' facilitation of fetal tissue donation.  Defendants set up a fake company called BioMax that falsely held itself out as a legitimate fetal tissue procurement company.  *Id.* at ¶ 5.  The individual defendants pretended to be officers and employees of BioMax using pseudonyms and fake names.  They used those fake identities to gain access to private conferences held by Planned Parenthood and the National Abortion Federation.  Once admitted, they wore hidden video cameras and secretly taped hundreds of hours of conversations with Plaintiffs' staff.  *Id.*  Plaintiffs allege that Defendants then "leveraged the 'professional' relationships they made at the conferences" to obtain access to individual Planned Parenthood doctors and affiliates in private meetings, some of them held inside secure Planned Parenthood offices and clinical spaces in Colorado and Texas.  *Id.* at ¶ 6.

Plaintiffs assert that Defendants then went public with a "vicious online video smear campaign," called the "Human Capital Project."  *Id.* at ¶¶ 7, 124.  Starting in July 2015, Defendants allegedly released a series of YouTube videos purporting to show that Planned Parenthood violated federal law related to tissue donation.  *Id.* at ¶¶ 7, 128.  The videos were heavily manipulated, with critical content deliberately deleted and disconnected portions sewn together to create a misleading impression.  *Id.* at ¶¶ 7, 129, 133, 137, 139, 141.  Plaintiffs allege that after Defendants released the videos, there was a "dramatic increase in the threats, harassment, and criminal activities targeting abortion providers and their supporters," as well as Planned Parenthood health centers.  *Id.* at ¶ 8.

Plaintiffs assert fifteen claims for relief, including claims against all Defendants for violation of the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1962(c), and conspiracy to violate RICO, 18 U.S.C. § 1962(d); and violation of the federal Wiretap Act, 18 U.S.C. § 2511, against Daleiden, Merritt, Lopez, CMP, BioMax, and Unknown Co-Conspirators. Plaintiffs bring the remaining thirteen claims under state law. These include claims for breach of contract, trespass, and violation of state wiretapping laws.

This case is related to *National Abortion Federation v. Center for Medical Progress, et al.*, 15-cv-3522 WHO, which was filed on July 31, 2015. [Docket No. 10 ("*NAF*").] In that action, Plaintiff NAF, the professional association of abortion providers, sues CMP, BioMax, Daleiden, and Newman, alleging claims based on the same conduct at issue in this case—namely, that CMP, Daleiden, and Newman set up a fake company known as BioMax that held itself out as a legitimate fetal tissue procurement organization. NAF alleges that the individuals used fake names and identities to gain access to NAF's meetings and then released heavily edited, misleading videos resulting in anti-abortion harassment—the so-called "Human Capital Project."

### B. Procedural History

Plaintiffs filed the FAC on March 24, 2016. Defendants moved to dismiss the FAC and separately moved to strike the state law claims pursuant to California's anti-SLAPP statute. [Docket Nos. 78, 79, 81, 87.] The Honorable William H. Orrick denied the motions to dismiss and strike on September 30, 2016.[1] [Docket No. 124.] Defendants appealed the denial of the anti-SLAPP motions, which automatically stayed all proceedings regarding the state law claims, including discovery. [Docket Nos. 129 (Notice of Appeal), 146.] Defendants then moved to stay the remaining federal claims pending resolution of their appeal. [Docket No. 138 (Mot. to Stay).] Judge Orrick denied the motion on December 22, 2016, and ordered that written discovery and

---

[1] Defendants argued in part that Plaintiffs' RICO claim should be dismissed for failure to sufficiently allege predicate acts. Plaintiffs relied on various alleged predicate acts, including wire and mail fraud and violations of the federal Identity Theft Statute, 18 U.S.C. § 1028. Judge Orrick held that Plaintiffs could only rest their RICO claim on the predicate acts of producing or transferring false identification documents in violation of 18 U.S.C. § 1028(a)(1) and (2). [*See* Docket No. 124 at 8-13.]

document production on the RICO and Wiretap Act claims "shall not be stayed and shall continue." [Docket No. 146.]

In May 2016, Judge Orrick denied CMP, BioMax, and Daleiden's motion to quash a subpoena issued by Plaintiffs to NAF. That subpoena sought the production of all documents, information, and recordings produced by the defendants in the *NAF* case, as well as copies of all transcripts and exhibits for depositions taken of any of the *NAF* defendants. [Docket No. 90 (Order on Mot. to Quash).] In denying the motion to quash, Judge Orrick ordered that Plaintiffs "are bound by the provisions of the *NAF v. CMP* Protective Order with respect to any and all uses of the materials produced pursuant to the subpoena." *Id.* On August 31, 2016, Judge Orrick entered a stipulated protective order in this case. [Docket No. 117.]

On June 14, 2017, the parties filed the present submission to which they attached five joint letters addressing their discovery disputes. Following resolution of Defendants' motion to disqualify Judge Orrick, he referred discovery to the undersigned on October 18, 2017. [Docket No. 187.] Although the court set a hearing for December 21, 2017, the parties twice requested that it be postponed. [Docket Nos. 189, 208, 213.] During that time, the parties continued to meet and confer and provided updates regarding the status of the disputes discussed in the five individual joint letters. Ultimately, the parties sought adjudication of issues in three of the letters, which were labeled Exhibits A, B, and C. [*See* Docket Nos. 218, 224.]

On February 8, 2018, the court held a hearing regarding the following disputes: P1, P2, P3, P4, P5, P6, P7, P8, and D2.[2] As to D2, the court ordered the parties to meet and confer further and to submit a joint letter if disputes remained.[3] [Docket No. 229 (Minute Order).] In compliance

---

[2] The court did not take oral argument on P9 or P10, and decides them without further oral argument pursuant to Civil Local Rule 7-1(b). As to P9, the parties informed the court shortly before the hearing that the issue had been partially resolved. Based on their submission, the court ordered further briefing, as well as in camera review of the documents at issue. The briefing and in camera submission were due after the hearing. P9 is now ripe for adjudication. [Docket No. 225.] As to P10, the parties asserted that the dispute, which was briefed in Exhibit B, would be resolved by the court's determination of P1, P2, and P3. [Docket No. 222 at 1 n.1.]

[3] The parties briefed D2 in Exhibit C. As the parties have not filed a post-meet and confer letter on this dispute, the court assumes that they have now resolved D2 in its entirety.

4

with four subsequent court orders (Docket Nos. 219, 225, 237, 256), the parties filed supplemental briefing and/or evidence regarding disputes P1 through P6, P8, and P9. [Docket Nos. 222, 230, 233, 242, 259.] The disputes determined through this order are P1, P2, P3, P4, P5, P6, P7, P8, P9, and P10.

On May 16, 2018, after the parties completed their briefing on the present motions, the Ninth Circuit affirmed Judge Orrick's decision denying Defendants' anti-SLAPP motion. *Planned Parenthood Fed. of Am., Inc. v. Ctr. for Medical Progress*, ---F.3d---, 2018 WL 2223990 (9th Cir. May 16, 2018) (affirming district court's application of Rule 12(b)(6) standard to anti-SLAPP motion to strike challenging legal sufficiency of the complaint); *Planned Parenthood Fed. of Am., Inc. v. Ctr. for Medical Progress*, ---Fed. Appx.---, 2018 WL 2229329 (9th Cir. May 16, 2018) (affirming district court's denial of anti-SLAPP motion to strike).

## II.     LEGAL STANDARDS

Federal Rule of Civil Procedure 26 provides

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

Fed. R. Civ. P. 26(b)(1). "Information within this scope of discovery need not be admissible in evidence to be discoverable." *Id*. "Relevancy, for the purposes of discovery, is defined broadly, although it is not without ultimate and necessary boundaries." *Gonzales v. Google, Inc.*, 234 F.R.D. 674, 679-80 (N.D. Cal. 2006). The party seeking discovery has the initial burden of establishing that its request satisfies Rule 26(b)(1)'s relevancy requirement, *La. Pac. Corp. v. Money Mkt. 1 Institutional Inv. Dealer*, 285 F.R.D. 481, 485 (N.D. Cal. 2012), while "[t]he parties and the court have a collective responsibility to consider the proportionality of all discovery and consider it in resolving discovery disputes." Fed. R. Civ. P. 26, Advisory Committee Notes to 2015 Amendments, Subdivision (b)(1). "[T]he party opposing discovery has the burden of showing that discovery should not be allowed, and also has the burden of clarifying, explaining and supporting its objections with competent evidence." *La. Pac. Corp.*, 285 F.R.D. at 485.

Federal Rule of Civil Procedure 26 also provides that a party withholding information under a claim that it is privileged or subject to protection as trial preparation material must: (i) expressly make the claim; and (ii) describe the nature of the documents, communications, or tangible things not produced or disclosed in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim. Fed. R. Civ. Proc. 26(b)(5)(A). A privilege should be asserted within thirty days of a request for production. *See* Fed. R. Civ. P. 34(b)(2)(A).

This court exercises federal question jurisdiction over Plaintiffs' federal RICO and Wiretap Act claims pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction over Plaintiffs' pendent state law claims. The Ninth Circuit has held that "[w]here there are federal question claims and pendent state law claims present, the federal law of privilege applies." *Agster v. Maricopa Cty.*, 422 F.3d 836, 839 (9th Cir. 2005). The court will therefore rely on federal law in its analysis.

## III. DISCUSSION

The disputes discussed in this order are P1, P2, P3, P4, P5, P6, P7, P8, P9, and P10. They involve Plaintiffs' efforts to compel further responses to requests for production (RFPs) and interrogatories from CMP, BioMax and Daleiden. The original briefing on these disputes is located in Exhibits A and B. With the exception of P7, all of the disputes are also the subject of supplemental briefing and/or evidence, which the court discusses where appropriate below.[4]

### A. P1, P2, & P3- RFP Nos. 3, 49, and 15

In P1, P2, and P3, Plaintiffs challenge Defendants' responses to RFP Nos. 3, 49, and 15. RFP No. 3 seeks "[a]ll communications by or among any of the Defendants regarding investigation of Planned Parenthood." Plaintiffs clarified that this RFP seeks "documents

---

[4] On May 16, 2018, the parties submitted supplemental briefing addressing the relevance and discoverability of Defendants' communications with certain law enforcement, legislators, and public officials in light of a recent change in Plaintiffs' damage theories. This supplemental briefing was aimed at disputes P4 and P6. [Docket No. 259.] However, Defendants argue that disputes P1, P2, P3, and P5 are also "tangentially" affected by their new relevance arguments. *See, e.g., id.* at 2-3. For the sake of clarity, the court addresses all of the parties' arguments regarding discovery of Defendants' communications with law enforcement, legislators, and public officials under disputes P4 and P6, below.

regarding the investigation that ultimately culminated in the release of videos called the Human Capital Project." Ex. A at ECF 9.[5]  RFP No. 49 seeks "[a]ll documents and recordings related to the Human Capital Project."  RFP No. 15 seeks "[a]ll documents and communications regarding your planning for the undercover investigation of Planned Parenthood."

An overview of the evolution of these disputes helps to explain the parties' current positions.  Plaintiffs assert that CMP initially refused to produce any responsive documents other than those regarding planning for specific undercover operations as part of the Human Capital Project for the period March 1, 2013 to July 14, 2015.  Defendants produced fewer than 50 communications between the members of the alleged conspiracy.  [Docket No. 222 at 2.]  In December 2017, defense counsel disclosed that there were an additional 2,300 communications created before July 14, 2015 between Defendants and others that had not been produced, because "they were not deemed to be related to 'planning for specific undercover operations.'"  *Id.*

CMP later agreed to produce all communications prior to July 14, 2015 "between Daleiden and any individual involved in planning or executing the infiltrations and recording of Plaintiffs' employees, and to produce all those related to the Human Capital Project," with the exception of two categories of communications which form the basis for the current dispute: 1) communications between Defendants and donors, other than those discussing specific investigations; and 2) communications regarding "publication" of the videos.  *Id.* at 4.  Defendants contend that these two categories of communications should not be subject to discovery at this time because the only documents that are relevant to the federal claims are those relating to "planning for specific undercover operations."  *Id.* at 2.  In subsequent briefing, Defendants added an assertion that communications with donors are protected by the First Amendment privilege, and communications regarding publication of the videos are protected by the journalist's privilege.  [Docket No. 242 at 2-3; *see also* Docket No. 222 at 5.]

Plaintiffs contend that Defendants' position is based on an overly narrow view of

---

[5] All further references to page numbers in the parties' discovery submissions are to the ECF page numbers.

relevance. They assert that these two categories call for documents that are related to "general planning and discussion of the operation," and that such documents are relevant to intent, motive, causation, and the propriety of punitive damages. [Docket No. 222 at 2-3.] They also challenge Defendants' withholding of documents pursuant to the journalist's privilege and First Amendment associational rights. *Id*. at 3.

### 1. Relevance

At the time the parties completed briefing on these motions, per Judge Orrick's order, they were only permitted to seek discovery regarding Plaintiffs' federal claims for violation of RICO and the Wiretap Act during the pendency of Defendants' appeal. The Ninth Circuit has now affirmed Judge Orrick's denial of Defendants' anti-SLAPP motions. As the parties did not brief the relevance of the requested discovery to the state law claims, the court confines its analysis to the federal claims, and notes that the scope of relevance obviously has expanded as a result of the Ninth Circuit's ruling.

Defendants argue that both of the disputed categories of communications are not relevant to the federal claims. [Docket No. 222 at 3.] They assert that the RICO claim rests solely on the allegation that Defendants produced or transferred fake identification documents. According to Defendants, these narrow predicate acts are insufficient to "make relevant everything about CMP and Daleiden's undercover journalism work: their intent, motives, goals, expectations, donors, media contacts, and connections with 'anti-abortion activist groups.'" *Id*. Essentially, Defendants contend that Plaintiffs have alleged "a conspiracy to produce and transfer two fake IDs," and that these discrete acts delimit the scope of relevant discovery on the RICO claims. [Docket No. 242 at 3.]

Defendants' position ignores Plaintiffs' allegations, as well as the elements that Plaintiffs must prove in order to establish a RICO violation. Plaintiffs allege that Defendants created a "complex criminal enterprise . . . involv[ing] fake companies, fake identifications, and large-scale illegal taping" of reproductive health care conferences and private meetings in order to advance their goal of "interfering with women's access to legal abortion." FAC ¶ 1; *see also id*. at ¶ 150 (the purpose of the alleged enterprise "was to perpetrate a scheme targeting Plaintiffs and other

Planned Parenthood affiliates in order to disrupt and burden their core mission to provide safe quality reproductive health care to women"). They further allege that Defendants' actions "constitute a conspiracy to demonize and intimidate Plaintiffs and to interfere with Plaintiffs' and other Planned Parenthood affiliates' operations." *Id.* at ¶ 10. Defendants' enterprise engaged in a pattern of racketeering activity consisting of the predicate acts of production and transfer of fake IDs. *Id.* at ¶¶ 157, 160.

By confining the scope of relevance to the predicate acts, Defendants' narrow framing ignores the fact that the alleged RICO conspiracy and enterprise are distinct from the predicate acts, and that the goals of the RICO enterprise are not limited to the predicate acts. As the Second Circuit has explained, "[t]he concepts of racketeering conspiracy, enterprise, and pattern . . . are not interchangeable," and "it is neither the enterprise standing alone nor the pattern of racketeering activity by itself which RICO criminalizes, but rather, the combination of these two elements." *United States v. Pizzonia*, 577 F.3d 455, 463 (2d Cir. 2009) (quotation omitted). "[A] RICO conspiracy is never simply an agreement to commit specified predicate acts that allegedly form a pattern of racketeering. . . . [r]ather, it is an agreement to conduct or to participate in the conduct of a charged enterprise's affairs *through* a pattern of racketeering." *Id.* (citation omitted) (emphasis in original).[6]

Thus, Plaintiffs must establish more than the commission of the predicate acts in order to prove their RICO claim. They must establish a pattern of racketeering activity, which includes proving that Defendants committed the predicate acts of "knowing production or transfer of fake identification" in violation of 18 U.S.C. § 1028(a)(1), (2), and that the predicate acts are related. "Predicates are related if they have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not

---

[6] Although *Pizzonia* was a criminal RICO case, the court's discussion of RICO conspiracy was based upon its interpretation of 18 U.S.C. § 1962(d), the same statute at issue here. Its observation that a RICO conspiracy is not "simply an agreement to commit specified predicate acts" is not limited to the criminal RICO context. *See, e.g.*, *De Sole v. Knoedler Gallery, LLC*, 137 F. Supp. 3d 387, 409 (S.D.N.Y. 2015) (citing *Pizzonia* for that proposition in civil RICO action); *In re Trilegiant Corp., Inc.*, 11 F. Supp. 3d 82, 108 (D. Conn. 2014) (same).

United States District Court
Northern District of California

isolated." *Sever v. Alaska Pulp Corp.*, 978 F.2d 1529, 1535 (9th Cir. 1992) (quotation omitted). Additionally, Plaintiffs must establish the existence of the alleged associated-in-fact enterprise. To do so, they must show three structural features of the enterprise: "(A) a common purpose, (B) a structure or organization, and (C) longevity necessary to accomplish the purpose." *Eclectic Props. E, LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 997 (9th Cir. 2014) (citing *Boyle v. United States*, 556 U.S. 938, 946 (2009)).

As to their 18 U.S.C. § 1962(d) RICO conspiracy claim, Plaintiffs must prove an agreement to violate RICO, but they need not prove an express conspiratorial agreement "as long as its existence can be inferred from the words, actions, or interdependence of activities and persons involved." *Oki Semiconductor Co. v. Wells Fargo Bank, Nat. Ass'n*, 298 F.3d 768, 775 (9th Cir. 2002) (citing *Aetna Cas. Sur. Co. v. P & B Autobody*, 43 F.3d 1546, 1562 (1st Cir. 1994)).

Given the broad scope of discovery permitted by the Federal Rules,[7] and in light of the elements that Plaintiffs must prove to establish their RICO claims, Defendants' position that discovery must be narrowly circumscribed is untenable.

Defendants cite *Beck v. Prupis*, 529 U.S. 494, 505 (2000), but it does not support their position. [*See* Docket No. 222 at 4-5.] In *Beck*, the Supreme Court considered the scope of a RICO private right of action for violation of section 1962(d), which makes it "unlawful for any person to conspire to violate" RICO's criminal prohibitions. 529 U.S. at 500. Section 1964(c) states that a RICO claim is available to anyone "injured . . . by reason of a violation of section 1962." 18 U.S.C. § 1964(c). The petitioner in *Beck* sought to bring a RICO claim against his former employers. He alleged that his employment had been terminated after he discovered the respondents' racketeering activity and that the termination had been "done in furtherance of

---

[7]  Rule 26(b)(1) authorizes parties to "obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case."  Under Federal Rule of Evidence 401, "[t]he test for relevance is not overly exacting: evidence is relevant if it has 'any tendency to make . . .  more or less probable . . . [a] fact [that] is of consequence in determining the action.'"  *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, No. MDL 2672 CRB (JSC), 2018 WL 340640, at *1 (N.D. Cal. Jan. 9, 2018) (quoting Fed. R. Evid. 401); *see also Gonzales*, 234 F.R.D. at 679-80 ("Relevancy, for the purposes of discovery, is defined broadly").

respondents' conspiracy," and had caused injury to him.  *Id*. at 499.  The Court considered

"whether a person injured by an overt act in furtherance of a conspiracy may assert a civil RICO

conspiracy claim under § 1964(c) for a violation of § 1962(d) even if the overt act does not

constitute 'racketeering activity.'"  529 U.S. at 500.  The Court answered this question in the

negative, holding that "injury caused by an overt act that is not an act of racketeering or otherwise

wrongful under RICO is not sufficient to give rise to a cause of action under § 1964(c) for a

violation of § 1962(d)."  *Id*. at 505 (citation omitted).

Although their argument is far from clear, Defendants appear to assert that *Beck* somehow

limits Plaintiffs to discovery regarding the predicate acts.  [*See* Docket No. 222 at 4-5.]  This is a

distortion of *Beck*, which addresses the issue of who has standing to assert a civil RICO

conspiracy claim.  *Beck* does not discuss the scope of discovery, and cannot be read to limit

discovery related to an alleged RICO conspiracy to the racketeering acts underlying that claim.

The court finds that the two categories of documents at issue—communications between

Defendants and donors, and communications regarding the publication of the videos—satisfy the

Rule 26 standard of "relevan[ce] to any party's claim or defense."  *See* Fed. R. Civ. P. 26(b)(1).[8]

Specifically, as to communications between Defendants and donors regarding the investigation of

Planned Parenthood that led to the release of videos (RFP No. 3), the Human Capital Project (RFP

No. 49), and the planning for the undercover investigation of Planned Parenthood (RFP No. 15),

such communications may show how Defendants planned and intended to carry out the alleged

enterprise, including Defendants' planned commission of the predicate acts of production and

transfer of fake IDs.  They are therefore relevant to establishing the purpose and existence of the

alleged enterprise, the relationships among those associated with the enterprise, and the

relatedness of the predicate acts, as well as any agreement to violate RICO.  Such communications

are also relevant to identifying the individual defendants' roles in the alleged enterprise and each

defendant's awareness of the nature and scope of the enterprise.  They may also identify potential

co-conspirators and possible additional defendants.

---

[8] Defendants do not argue that the discovery at issue is not "proportional to the needs of the case."
*See* Fed. R. Civ. P. 26(b)(1).

As to communications regarding the publication of the videos, Plaintiffs clarify that this category seeks "communications with publication outlets, communications among Defendants or others involved in the scheme about publishing the videos, and communications about shaping the videos." [Docket No. 222 at 3.] Plaintiffs have alleged a specific RICO enterprise and conspiracy to violate RICO, the purpose of which was to disrupt Planned Parenthood's provision of reproductive health care, including abortions, by means of the release of misleading videos. Communications between the Defendants, publication outlets, and others may include discussions about the means by which Defendants sought to carry out the alleged enterprise, as well as the goals of the enterprise and their efforts to significantly impact Plaintiffs through publication of the videos. Such documents are relevant to the purpose and existence of the alleged enterprise, as well as the relationship between the alleged members of the enterprise and causation.

The communications are also relevant to causation, which Defendants have placed at issue in this case. In their motion to dismiss, Defendants argued that the predicate acts "did not directly cause the harms plaintiffs complain of," including "disrupted and delayed services, expending additional resources on physical and cyber security, increase in threats, harassment, and vandalism, loss of vendors, and time and expense in responding to legislative inquiries." [Docket No. 124 at 13.] Instead, Defendants asserted, "the harms suffered by plaintiffs were caused by a complex causal chain of events resulting in the acts of third-parties and legislative bodies beyond the control of defendants." *Id.* Judge Orrick rejected Defendants' argument, and found that Plaintiffs had adequately alleged proximate cause. In so doing, he specifically noted that "[h]ow far the actual causal link stretches for each category of damages plaintiffs allege is something that will need to be developed in discovery and tested on summary judgment." *Id.* at 16-17. For example, the requested discovery may reveal connections or relationships between Defendants and those responsible for causing Plaintiffs' alleged damages. Plaintiffs are entitled to test Defendants' claim that their damages were exclusively caused by third parties who were beyond Defendants' control. As a further example, Defendant Rhomberg states that he "communicated with others within [CMP], [CMP's] consultants, donors, and others about journalistic strategy and especially maximum public impact from publishing" the videos. [Docket No. 242-2 (Rhomberg

12

Decl., Feb. 28, 2018) ¶ 4.] The requested communications are therefore relevant to the issue of the "maximum public impact" Defendants intended and the steps they took to that end. This is directly relevant to the issue of causation, an issue which the presiding judge has directed the parties to "develop[] in discovery."

## 2. First Amendment Privilege

Defendants also object to producing communications with donors based on the First Amendment. [Docket No. 222 at 5.] Defendants argue that the disclosure of these communications will reveal the identities of their donors and supporters, which implicates those individuals' First Amendment rights, including the right to associational privacy, the right to free speech, and the right to petition the government. [Docket No. 242 at 1, 3.]

In *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984), the Supreme Court observed that "[a]n individual's freedom to speak, to worship, and to petition the government for the redress of grievances could not be vigorously protected from interference by the State unless a correlative freedom to engage in group effort toward those ends were not also guaranteed." Therefore, the Court stated, it has "long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Id.*; *see also Buckley v. Valeo*, 424 U.S. 1, 15 (1976) ("[t]he First Amendment protects political association as well as political expression"). "Association for the purpose of engaging in protected activity is itself protected by the First Amendment," *Santopietro v. Howell*, 857 F.3d 980, 989 (9th Cir. 2017), and the "First Amendment right to associate for the purpose of speaking . . . [is] termed a 'right of expressive association.'" *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 68 (2006) (citation omitted).

In *Perry v. Schwarzenegger*, 591 F.3d 1147, 1160 (9th Cir. 2010), *amending and denying reh'g en banc of* 591 F.3d 1126 (9th Cir. 2009), the Ninth Circuit held that "[a] party who objects to a discovery request as an infringement of the party's First Amendment rights is in essence asserting a First Amendment *privilege*." (emphasis in original) (citation omitted). An assertion of that privilege in response to discovery is subject to a two-part framework. *Id.* First, "[t]he party

asserting the privilege 'must demonstrate . . . a prima facie showing of arguable first amendment infringement,'" demonstrating that enforcement of the discovery requests "will result in (1) harassment, membership withdrawal, or discouragement of new members, or (2) other consequences which objectively suggest an impact on, or 'chilling' of, the members' associational rights." *Id.* (quotations omitted). If the party asserting the privilege makes the necessary prima facie showing, the burden shifts to the party seeking the information to show that the information sought is "rationally related to a compelling governmental interest" and that there are no other less restrictive means of securing that information. *Id.* at 1161. "[T]he party seeking the discovery must show that the information sought is highly relevant to the claims or defenses in the litigation—a more demanding standard of relevance than that under Federal Rule of Civil Procedure 26(b)(1). The request must also be carefully tailored to avoid unnecessary interference with protected activities, and the information must be otherwise unavailable." *Id.* "[T]he second step of the analysis is meant to make discovery that impacts First Amendment associational rights available only after careful consideration of the need for such discovery, but not necessarily to preclude it." *Id.*

In their earlier submissions, Defendants failed to address the standards applicable to the First Amendment privilege, and only asserted that Plaintiffs' requests are not carefully tailored. [Docket Nos. 166, 222 at 5.] In supplemental briefing, Defendants submitted declarations from Defendants Daleiden and Rhomberg, as well as pseudonymous declarants John Doe and Jane Roe, who are all individuals associated with CMP. Defendants assert that these declarations establish a prima facie case that producing the requested discovery will have a chilling effect on the donors' exercise of protected activities.[9] [Docket No. 242 at 3.]

Daleiden describes CMP and the Human Capital Project. He states that CMP was "formed for the purpose of monitoring and reporting on medical ethics and advances with a particular concern for contemporary bioethical issues that impact human dignity," and "carries out its work

---

[9] Defendants do not contend that enforcing the discovery at issue will result in "harassment, membership withdrawal, or discouragement of new members." *See Perry II*, 591 F.3d at 1160.

by means of investigative journalism." [Docket No. 242-1 (Daleiden Decl., Feb. 27, 2018) ¶ 2.] According to Daleiden, "[t]he *Human Capital Project* focused on documenting illegal and unethical fetal tissue procurement practices in the abortion industry, with a special emphasis on the Planned Parenthood organization." *Id*. at ¶ 4. He states that CMP "developed significant ties with the pro-life community nationwide," and that "[m]any donors . . . specifically donated funds to CMP for use with respect to the *Human Capital Project* because they are members of the pro-life community who are interested in seeing unethical and illegal conduct in the abortion industry brought to light." *Id*. at ¶ 6.

Rhomberg, a member of CMP's board of directors, describes his communications with CMP's donors and supporters. He states that at the time he joined CMP, he understood that "CMP was going to engage in a project which would be an investigative journalism study" regarding Planned Parenthood's practices. Rhomberg Decl. ¶¶ 1, 2. While the study was ongoing, he "communicated with supporters, donors, and/or volunteers of CMP about [his] deeply held moral and political views, including on abortion." *Id*. at ¶ 4. He also "communicated with others within the organization, the organization's consultants, donors, and others about journalistic strategy," and the impact on the public of publishing videos "from CMP's investigative journalism efforts." *Id*.

John Doe states that he contributed money to CMP in 2013, intending that his funds would "be used in an investigation of illegal fetal tissue procurement and abortion practices." [Docket No. 242-4 (Doe Decl., Feb. 28, 2018) ¶ 2.] Doe describes himself as pro-life and states that he "would not have contributed to CMP if [he] had known that Planned Parenthood or other pro-abortion groups would learn [his] identity or [his] private communications with CMP." He asserts that he fears reprisals, including harm to his business, if his identity is disclosed. *Id*. at ¶¶ 2, 3. He further states that his communications with CMP about the investigation into Planned Parenthood reveal his and others' "deeply held political and religious views," and that if CMP is required to turn over its communications with him, he would change what he says, who he speaks to, and who he associates with in the future. Doe Decl. ¶¶ 6, 7.

Jane Roe began supporting CMP after it released its first videos in 2015. [Docket No. 242-

15

3 (Roe Decl., Feb. 27, 2018) ¶ 2.] She states that since this lawsuit was filed, she has been "wary of assisting CMP in potential future investigations," and that "[i]f the broad discovery demanded in this case is permitted, [she] will have to consider changing the way [she] communicate[s] with CMP to avoid having [her] personal views and opinions on abortion and journalism shared with [her] ideological opponents." *Id*. at ¶ 3.

Plaintiffs first argue that Defendants cannot satisfy their prima facie showing because there is no "First Amendment right to associate for the purpose of committing or supporting fraud."[10] [Docket No. 242 at 6.] As Judge Orrick observed in *NAF*, such an argument is "premature" as it "assumes the merits of [Plaintiffs'] claims against defendants." *See Nat'l Abortion Fed'n v. Ctr. for Med. Progress*, No. 15-CV-03522-WHO, 2015 WL 13333328, at *3 n.3 (N.D. Cal. Nov. 20, 2015).

Plaintiffs also contend that CMP cannot make the necessary prima facie showing because it is not a "membership organization," an argument to which Defendants do not respond. *See id*. Although the First Amendment privilege test from *Perry* is framed in terms of "members' associational rights," 591 F.3d at 1160, Plaintiffs cite no authority requiring CMP to establish that it is a formal membership organization in order to assert the First Amendment privilege on behalf of its donors. Associational rights derive from individuals' own First Amendment protections, *see Roberts*, 468 U.S. at 622, and the Ninth Circuit has suggested that the formal organizational status of individuals claiming the First Amendment privilege is immaterial. Instead, the key inquiry appears to be whether the individuals claiming the privilege are part of an "association subject to First Amendment protection." *Perry v. Schwarzenegger* ("*Perry II*"), 602 F.3d 976, 981 (9th Cir. 2011). In *Perry II*, the Ninth Circuit denied a subsequent writ of mandamus following its decision in *Perry*, and noted the following:

> In [its] March 22, 2010 order, the district court said as a matter of law that "the First Amendment privilege does not cover

---

[10] Plaintiffs assert that "[s]upporters like [Doe] were informed that CMP intended to use unlawful methods," citing CMP's First Quarter Operating Report (lodged with the court at Docket No. 230-3, Ex. 3). [Docket No. 242 at 6.] However, there is no evidence that Doe specifically was provided a copy of this document.

United States District Court
Northern District of California

> communications between [or among] separate organizations." If the
> district court meant that the privilege cannot apply to persons who
> are part of a political association spanning more than one
> organization or entity, then this interpretation was questionable.
> Under *Perry I*, the privilege applies to the *core group of persons
> engaged in the formulation of strategy and messages, whether or not
> they are members of a single organization or entity*. The operative
> inquiry is whether they are part of an *association* subject to First
> Amendment protection. We did not hold that the privilege cannot
> apply to a core group of associated persons spanning more than one
> entity.

*Perry II*, 602 F.3d at 981 (first emphasis added). The case law does not suggest that the formal

organizational status of the "association" at issue controls application of the privilege.

To the extent Plaintiffs seek to draw a distinction between "members" of an organization,

and donors like John Doe and Jane Roe, such a distinction has been firmly rejected. The First

Amendment protects not only the right of persons to join together for effective advocacy to

promote their common ideas, *NAACP*, 357 U.S. at 460, but also the right of contributors to join

together and pool resources to promote their political beliefs. *See Buckley*, 424 U.S. at 65-66. In

fact, the Supreme Court observed in *Buckley* that "the invasion of privacy of belief may be as great

when the information sought concerns the giving and spending of money as when it concerns the

joining of organizations, for '(f)inancial transactions can reveal much about a person's activities,

associations, and beliefs.'" 424 U.S. at 66 (quotation omitted). The Court went on to note that its

"past decisions have not drawn fine lines between contributors and members but have treated them

interchangeably." *Id.* (citations omitted); *see also Perry*, 591 F.3d at 1160 ("Disclosure of

political affiliations and activities that have a 'deterrent effect on the exercise of First Amendment

rights' are . . . subject to this same 'exacting scrutiny.'" (quoting *Buckley*, 424 U.S. at 64-65)).

The court concludes that Defendants have made a prima facie showing of "arguable first

amendment infringement" because they have demonstrated that enforcement of the discovery

requests at issue will have "an impact on, or 'chilling' of," their supporters' rights. *See Perry*, 591

F.3d at 1160. In *Perry*, the court noted that "[t]he existence of a prima facie case turns not on the

type of information sought, but on whether disclosure of the information will have a deterrent

effect on the exercise of protected activities." 591 F.3d at 1162. It further held that "[i]mplicit in

the right to associate with others to advance one's shared political beliefs is the right to exchange

ideas and formulate strategy and messages, and to do so in private." *Id.* Here, John Doe describes his communications with CMP as revealing his and others' "deeply held political and religious views." He states that enforcement of the discovery would impact his future communications: "I would change what I say, who I feel I can speak to, and who I associate with for fear that such communications would not remain private as they were intended." Doe Decl. ¶¶ 6, 7. Doe also asserts that he will not be able to help CMP in the future if his "identity and communications with CMP become publicized," and asserts that he fears reprisals, including harm to his business, if his identity is disclosed. *Id.* at ¶¶ 2, 3, 5.[11] Rhomberg confirms that he communicated with donors and supporters about "journalistic strategy" regarding CMP's work. Rhomberg Decl. ¶ 4. Defendants' showing is a sufficient basis from which the court may draw "a reasonable inference that disclosure would have the practical effects of discouraging . . . association and inhibiting . . . communications that are essential to effective association and expression," including "the internal exchange of ideas." *Perry,* 591 F.3d 1163. Accordingly, the court concludes that Defendants have satisfied their burden at step one of the *Perry* framework. *See id.* at 1163-64 (declaration attesting that disclosure of internal political campaign communications would "drastically alter" member's future communications and make him "less willing to engage in such communications" in the future established prima facie showing).

Having found that Defendants have established a prima facie case of arguable First Amendment infringement, the burden shifts to Plaintiffs to demonstrate "an interest in obtaining the disclosure [they] seek[] . . . which is sufficient to justify the deterrent effect . . . on the free exercise . . . of [the] constitutionally protected right of association." *Perry,* 591 F.3d at 1161. Plaintiffs must show that communications with donors are "highly relevant" to the federal claims, "carefully tailored to avoid unnecessary interference with protected activities," and "otherwise

[11] In contrast, Jane Roe's statements about the impact of the discovery on her First Amendment rights are fairly unspecific and tentative; she states that she is "wary of assisting CMP in potential future investigations" and will "consider" changing the way she communicates with CMP if the discovery is permitted. Roe Decl. ¶ 3. The court also notes that Roe's own communications with CMP are not at issue since Plaintiffs seek only communications regarding the investigation of Planned Parenthood and publication of the videos prior to July 14, 2015. Roe did not begin supporting CMP until *after* its first release of videos. *Id.* at ¶ 2.

unavailable." *Id.* at 1161. To determine whether the interest in disclosure outweighs the harm, courts consider the importance of the litigation, the centrality of the information sought to the issues in the case, the existence of less intrusive means of obtaining the information, and the substantiality of the First Amendment interests at stake. *Id.*

The court concludes that the communications at issue are highly relevant to Plaintiffs' RICO claims. As Rhomberg stated in his declaration, he "helped formulate strategy regarding the publication" of the videos and communicated about "journalistic strategy and especially maximum public impact from publishing" the videos with a number of others, including CMP's donors. Rhomberg Decl. ¶ 4. Therefore, by Rhomberg's own admission, the requested communications reflect discussions of the strategy and goals of the alleged conspiracy. They are thus highly relevant to the existence and purpose of the alleged conspiracy. Additionally, Plaintiffs submitted two emails produced by Rhomberg in which he discussed funding with Daleiden. In one, he asked Daleiden if he needed "cash for the next coming events," and stated that he had been "in contact with a fairly wealthy activist" who was interested in making a cash contribution. [Docket No. 242-6 (Bomse Decl., Mar. 2, 2018) Ex. A.] These emails suggest that Rhomberg was involved in fundraising efforts on behalf of CMP, and it is reasonable to presume that he discussed details of the alleged conspiracy with potential donors, including CMP's plans, goals, and methods. Donors who communicated with CMP about such matters are witnesses at a minimum, and may also be potential co-conspirators. Defendants do not argue that the communications are available from any other source, nor do they suggest that there are any less intrusive means of obtaining these communications or the identities of such potential co-conspirators and witnesses.

The court also concludes that Plaintiffs' interest in obtaining the communications at issue outweighs the harm of such disclosure. This litigation is unquestionably important, given the "strong public interest on the issue of abortion on both sides of that debate." *Nat'l Abortion Fed'n v. Ctr. for Med. Progress*, No. 15-CV-03522-WHO, 2016 WL 454082, at *23 (N.D. Cal. Feb. 5, 2016) (granting NAF's motion for preliminary injunction). Defendants themselves describe their actions in investigating Plaintiffs as "constitutionally protected speech and petitioning activity involving one of the most ideologically contentious topics of the day," and describe the parties as

different sides "of an ideological, political, and moral battle." Ex. A at 8, 10. As to the centrality of the information sought to the issues in the case, as discussed above, communications with CMP's donors are "highly relevant" to Plaintiffs' RICO claims. Further, while Defendants have shown that disclosure of the communications could have an impact on their donors' associational rights, as in *NAF*, "whatever impact there is has not been shown to be *substantial*." *Nat'l Abortion Fed'n*, 2015 WL 13333328, at *3 (emphasis in original). For example, there is no indication that CMP would be unable to continue its mission of "monitoring and reporting on medical ethics and advances" if the court ordered this discovery. *See* Daleiden Decl. ¶ 2.

The defendants in *NAF* resisted similar discovery that called for CMP's production of the names and individuals who received NAF's confidential information. *Nat'l Abortion Fed'n*, 2015 WL 13333328, at *1. The court ordered the production of the information under an attorneys' eyes only ("AEO") provision of the protective order, and the defendants moved for reconsideration. *Id*. The court denied the motion, holding that the order did not require the disclosure of CMP's members or funders, but was narrowly tailored to permit NAF to learn the identities of those who had received its confidential information from the defendants so that it could ensure that the appropriate individuals were covered by the court's TRO and included in the scope of its request for a preliminary injunction. *Id*. Notwithstanding this conclusion, the court applied the *Perry* framework. At the first step, the court noted that the record regarding CMP and its supporters was "thin," finding that "[w]ithout more information about CMP and its supporters, [the court] can only speculate how or whether the limited disclosure at issue could adversely impact CMP's ability to undertake its mission or chill individuals' rights to associate freely or voice personal views through organizational ties with CMP." *Id*. at *2-3. At the second step, the court concluded that the information at issue was "central to determine the appropriate scope of any preliminary injunction and [that] there [was] no less intrusive way to obtain that information." *Id*. at *3. He also held that any impact on associational rights "ha[d] not been shown to be *substantial*," and that the disclosure order was narrowly tailored by means of the attorneys' eyes only designation. *Id*. (emphasis in original).

The Ninth Circuit affirmed the order denying reconsideration in December 2015. *Nat'l*

20

*Abortion Fed'n v. Ctr. for Med. Progress et al.*, No. 15-17318 (9th Cir. Dec. 3, 2015). The court observed that "even if CMP had established a prima facie showing of First Amendment harm, its petition would fail at the second step. The district court ordered discovery pursuant to 'a carefully tailored request for the production of highly relevant information'—exactly the sort of request that *Perry* noted fell outside the scope of its holding." Slip Op. at 5 (citing *Perry*, 591 F.3d at 1165 n.13). The court also held that subjecting the production to an attorneys' eyes only provision "further limited the potential for First Amendment infringement." *Id.* at 6.

In this case, Defendants object to the disclosure of communications with CMP's donors, one of whom asserts that he may not be able to help CMP in the future if his identity and communications "become publicized." Doe Decl. ¶ 5. He also expresses fear of retaliation against his "very public" business if his "identity is made known." *Id.* at ¶ 3. At the hearing, Defendants estimated that there are approximately 25 CMP donors at issue with respect to this discovery request. This includes a subgroup of approximately ten individuals whose names the court ordered disclosed to the plaintiffs in *NAF*, as discussed above. [Docket No. 236 (Feb. 8, 2018 Hr'g Tr.) 8-9.] Thus, the discovery request will affect a relatively small group of individuals, and Defendants have not expressed any concern that those whose names were disclosed in *NAF* have experienced retaliation or harassment related to the disclosure. Accordingly, in order to address the donors' concerns about having their identities made public, and to carefully tailor discovery to avoid unnecessary interference with protected activities, the communications at issue shall be produced to Plaintiffs pursuant to the AEO provision of the existing protective order, which the Ninth Circuit has held "limit[s] the potential for First Amendment infringement." *See Nat'l Abortion Fed'n*, No. 15-17318, slip op. at 6; *see also In re Anonymous Online Speakers*, 661 F.3d 1168, 1178 (9th Cir. 2011) ("[a] protective order is just one of the tools available to the district court to oversee discovery of sensitive matters that implicate First Amendment rights." (citing *Perry*, 591 F.3d at 1164)).

### 3. Journalist's Privilege

Defendants assert the journalist's (or "reporter's") privilege with respect to the second category of documents that Defendants seek to withhold from discovery, namely, communications

about publication of the videos. Daleiden states that CMP engaged in an "investigative journalism study which sought to investigate, document, and report on the procurement, transfer, and sale of aborted fetal tissue," with "a special emphasis on the Planned Parenthood organization." Daleiden Decl. ¶¶ 3, 4. According to Daleiden, "[t]he public release of the information gathered was titled the *Human Capital Project*." *Id*. at ¶ 3. Defendants claim that since CMP is a "group of investigative journalists," Daleiden Decl. ¶ 5, the journalist's privilege broadly shields from discovery information about the Human Capital Project and CMP's investigation of the Planned Parenthood organization. They argue that the privilege protects information such as "what journalists choose to investigate, whom they talk to, what information they gather, what they choose to publish or not publish, and why." [Docket No. 222 at 5.] Defendants do not seek to invoke the privilege to protect confidential sources, but instead seek to shield their own communications with third parties about publication of the Human Capital Project videos.

"[W]hen facts acquired by a journalist in the course of gathering the news become the target of discovery, a qualified privilege against compelled disclosure comes into play." *Shoen v. Shoen* ("*Shoen I*"), 5 F.3d 1289, 1292 (9th Cir. 1993).[12] "Rooted in the First Amendment, the privilege is a recognition that society's interest in protecting the integrity of the newsgathering process, and in ensuring the free flow of information to the public, is an interest 'of sufficient social importance to justify some incidental sacrifice of sources of facts needed in the administration of justice.'" *Id*. (quotation omitted). An individual may invoke the journalist's privilege if the person had "the intent to use material—sought, gathered or received—to disseminate information to the public and such intent existed at the inception of the newsgathering process." *Id*. at 1293. Defendants bear the burden of showing that they may assert the privilege. *Id.* at 1296.

Once invoked, the privilege may be overcome if the requesting party can demonstrate a "sufficiently compelling need for the journalist's materials." *Id*. "[A] civil litigant is entitled to

---

[12] In *Shoen I*, the court held that the qualified privilege for journalists protected an investigative author from having to testify and produce notes regarding his interviews with a journalistic source who was the defendant in a defamation action.

requested discovery notwithstanding a valid assertion of the journalist's privilege by a nonparty only upon a showing that the requested material is: (1) unavailable despite exhaustion of all reasonable alternative sources; (2) noncumulative; and (3) clearly relevant to an important issue in the case." *Shoen v. Shoen*, 48 F.3d 412, 416 (9th Cir. 1995) ("*Shoen II*"). A party seeking to overcome the qualified privilege must show "actual relevance; a showing of potential relevance will not suffice." *Id.*

Here, Daleiden states that starting in 2013, CMP engaged in a "journalism study" which culminated in the Human Capital Project. Daleiden Decl. ¶ 3. He states that his intent with respect to the study "was always to publish [his] findings and build a body of evidence that would be strong enough to trigger criminal prosecution and other official enforcement actions against entities involved in legal and ethical violations" with respect to "the procurement, transfer, and sale of aborted fetal tissue." *Id.*

In two briefs, Plaintiffs do not dispute Defendants' claim that they are journalists. [*See* Docket Nos. 222 at 3; 233 at 2.] For the first time in a third brief, Plaintiffs argue that "there is a substantial question as to whether CMP is a journalism organization," since "[i]ts goal was not to disseminate accurate information, but falsehoods," and a defendant in a fraud case "has no 'special privilege' to avoid the general rules of discovery."[13] [*See* Docket No. 242 at 5.] Even in the third brief, Plaintiffs do not discuss this argument in any detail. The court generally is not inclined to address arguments that could have been presented and briefed in the parties' original submissions. This is especially true where, as here, the argument remains undeveloped. For this reason, and for purposes of these motions only, the court will assume that Defendants have sufficiently shown that they were engaged in journalism for purposes of invoking the journalist's privilege.

Plaintiffs argue that the journalist's privilege does not apply in these circumstances. Their arguments are thin, and both sides provided few, if any, cases in support of their positions. First, Plaintiffs argue that Defendants seek to stretch *Shoen II* "far beyond anything that court contemplated," because that case involved discovery from a *nonparty* who had not been accused

---

[13] This argument again "assumes the merits" of Plaintiffs' claims against Defendants, and is therefore premature. *See Nat'l Abortion Fed'n*, 2015 WL 13333328, at *3 n.3.

of any wrongdoing.  [Docket No. 242 at 5.]  Defendants do not respond in detail to this argument,
stating only that they "could find no law expressly limiting the reporter's privilege to nonparties."
[Docket No. 222 at 5 n.7.]  Although the test from *Shoen II* is framed in terms of a nonparty's
right to assert the privilege, Plaintiffs cite no authority limiting the privilege to nonparties from
whom discovery is sought.  The court's own research indicates that at least one court in this circuit
has suggested that the privilege may be applied in suits against journalists themselves.  *See Condit
v. National Enquirer, Inc.*, 289 F. Supp. 2d 1175, 1180 (E.D. Cal. 2003) (noting, "[t]he cases do
not find that the privilege goes away merely because a publisher or a journalist is named in the
civil action."); *see also Dangerfield v. Star Editorial, Inc*., 817 F. Supp. 833, 836-39 (C. D. Cal.
1993) (in pre-*Shoen II* case, examining litigant's need for information, availability of alternative
sources for information, and merits of litigant's claim where defendant-publisher invoked the
privilege).

Plaintiffs next argue that the privilege does not apply because the policy concerns
underlying the journalist's privilege are not present here, since Defendants do not seek to invoke
the privilege to protect the relationship between Daleiden and his sources.  In *Shoen I*, the Ninth
Circuit noted that "the compelled disclosure of non-confidential information [from journalists]
harms the press' ability to gather information by damaging confidential sources' trust in the press'
capacity to keep secrets and, in a broader sense, by converting the press in the public's mind into
an investigative arm of prosecutors and the courts."  5 F.3d at 1295 (quotation omitted).  Citing
this language, Plaintiffs argue that since Defendants' "sources" were members of Planned
Parenthood's staff, there are no confidential sources to protect.  For their part, Defendants do not
explain how the interests described in *Shoen II* are present in this case or otherwise respond to
Plaintiffs' argument.  Instead, they rest on the generic assertion that the privilege shields
"information gathered in the course of [journalists'] work."  [Docket No. 242 at 2.]

Plaintiffs' argument is unclear, but to the extent they contend that the journalist's privilege
is confined to the protection of sources, they do not persuade.  Neither *Shoen I* or *Shoen II* limit
the application of the journalist's privilege to the protection of confidential sources.  In fact, *Shoen*
itself supports the opposite, for it had nothing to do with confidential sources.  In *Shoen*, which

was a defamation suit, the plaintiffs sought the production of a nonparty-journalist's notes and tapes of his conversations with the defendant. *Shoen I*, 5 F.3d at 1290-91.

Although the parties did not address the journalist's privilege in any depth, the court acknowledges that Defendants' assertion of the privilege is unique. Defendants essentially claim that because they were involved in journalistic efforts, their communications about those efforts are cloaked in privilege. But even if Defendants can assert the privilege, it is a qualified one. It can be overcome if the requesting party can demonstrate a sufficiently compelling need for the materials. *Shoen I*, 5 F.3d at 1296. At this step of the analysis, Defendants' unique assertion of privilege is overcome, for the communications they seek to protect—namely, their own communications about their own acts—are at the core of this litigation. "[A] civil litigant is entitled to requested discovery notwithstanding a valid assertion of the journalist's privilege by a nonparty only upon a showing that the requested material is: (1) unavailable despite exhaustion of all reasonable alternative sources; (2) noncumulative; and (3) clearly relevant to an important issue in the case." *Shoen II*, 48 F.3d at 416. Neither party contends that the communications regarding publication of the videos are available from another source, or are cumulative. As to the third prong, Defendants argue that the communications are not "clearly relevant to an important issue in the case," but that argument is wholly unpersuasive. The communications at issue bear on the precise conduct that Plaintiffs challenge in this litigation, i.e., Defendants' publication of allegedly misleading videos about Plaintiffs. As discussed above in connection with the First Amendment privilege, communications about publication of the videos, including communications with publication outlets, communications among Defendants and others involved with publishing the videos, and communications about shaping the videos are "clearly relevant" to the purpose of the alleged RICO enterprise and the intent of the participants. Such communications may reflect discussion of the strategy and goals of the alleged conspiracy, including how to achieve "maximum public impact from publishing" the videos. *See* Rhomberg Decl. ¶ 4. The communications are also relevant to causation, which, as discussed above, Defendants have made an "important issue in the case." In sum, to the extent a qualified journalist's privilege applies to Defendants, Plaintiffs have overcome it.

Plaintiffs' motion to compel with respect to the discovery at issue in disputes P1, P2, and P3 is granted.

## B. P4- RFP Nos. 42 and 43

RFP Nos. 42 and 43 seek "communications between Defendants and any law enforcement agency or state or federal legislator or their staff regarding Defendants' investigation of Planned Parenthood." Ex. A at 11. Defendants object based on relevance. They also assert California Civil Code section 47(b), which they claim "creat[es] an absolute privilege for statements to law enforcement and legislators." *Id.* at 12. Defendants initially disclaimed any reliance on the law enforcement privilege. *See id.* However, they now assert that the communications are protected by that privilege, as well as California Evidence Code section 1040. [Docket No. 242 at 2.] Additionally, in the parties' final round of supplemental briefing, Defendants argue that the communications are protected by their First Amendment rights to petition the government. [Docket No. 259 at 3.]

### 1. Relevance

According to Plaintiffs, these RFPs seek documents relevant to the scope of the alleged conspiracy to harm Planned Parenthood and the methods used to do so. Ex. A at 13. Plaintiffs allege that Defendants sought to harm Planned Parenthood by causing meritless state and federal investigations. In fact, Daleiden states that his intent with respect to the Human Capital Project was to "build a body of evidence that would be strong enough to trigger criminal prosecution and other official enforcement actions against entities involved in legal and ethical violations." Daleiden Decl. ¶ 3. RFP Nos. 42 and 43 therefore seek documents relevant to the purpose of the alleged enterprise and any agreement to violate RICO. Responsive documents may also aid in identifying witnesses.

The requested documents are also relevant to causation and damages, since Plaintiffs allege that they were harmed by those investigations. Plaintiffs explain in supplemental briefing that they will seek to recover the costs of "responding to Texas investigations spurred by Defendants' videos but no other investigation-related costs." [Docket No. 259 at 1.] In that briefing, Defendants concede that communications with governmental officials are "generally

26

relevant," but argue that the communications do not meet the heightened relevance standard that they contend applies given Defendants' First Amendment objection. *Id*. at 4. The court addresses Defendants' heightened relevance arguments below.

## 2. Privilege Claims

Defendants assert that the documents at issue are shielded from discovery pursuant to California Civil Code section 47(b) and California Evidence Code section 1040. Since the federal law of privilege applies in this case, *Agster*, 422 F.3d at 839, these state law provisions are inapplicable.

Even if state privilege law did apply, neither section 47(b) nor section 1040 would bar the discovery at issue. California Civil Code section 47(b) provides that "[a] privileged publication or broadcast is one made . . . [i]n any (1) legislative proceeding, (2) judicial proceeding, (3) in any other official proceeding authorized by law, or (4) in the initiation or course of any other proceeding authorized by law and reviewable pursuant to Chapter 2 (commencing with Section 1084) of Title 1 of Part 3 of the Code of Civil Procedure." Cal. Civ. Code § 47(b). The privilege codified at section 47(b) "is not an evidentiary privilege. Rather, it is an immunity under California law from liability for certain types of conduct." *Amaretto Ranch Breedables, LLC v. Ozimals, Inc.*, 790 F. Supp. 2d 1024, 1030 (N.D. Cal. 2011) (citing *Oren Royal Oaks Venture v. Greenberg, Bernhard, Weiss & Karma, Inc.*, 42 Cal. 3d 1157, 1168 (1986)). Specifically, section 47(b) "preclud[es] use of the protected communications and statements as a basis for a tort action other than for malicious prosecution." *Moore v. Conliffe*, 7 Cal. 4th 634, 638 n.1 (1994).[14]

As to California Evidence Code section 1040, that statute creates a conditional privilege for "information acquired in confidence by a public employee in the course of his or her duty and not open, or officially disclosed, to the public prior to the time the claim of privilege is made." Cal. Evid. Code § 1040(a). Defendants do not explain how they have standing to invoke section 1040, the state equivalent of the federal Freedom of Information Act ("FOIA"), which provides

---

[14] It is "well-settled that the California litigation privilege does not apply to [bar] federal causes of action." *Oei v. N. Star Capital Acquisitions, LLC*, 486 F. Supp. 2d 1089, 1098 (C.D. Cal. 2006) (collecting cases).

that the privilege may be invoked either by a public entity or its authorized representative.  Cal. Evid. Code § 1040(b); *see also Music Grp. Macao Commercial Offshore Ltd. v. Foote*, No. 14-CV-03078-JSC, 2015 WL 3993147, at *4 (N.D. Cal. June 30, 2015) ("As the state equivalent of the FOIA, only the government entity holds the privilege" codified at California Evidence Code section 1040).

Accordingly, Defendants may not refuse to produce documents responsive to RFP Nos. 42 and 43 on the basis of section 47(b) or section 1040.

### 3.  Law Enforcement Privilege

Defendants next assert that documents responsive to RFP Nos. 42 and 43 are shielded by the law enforcement privilege.  "[T]he federal privilege applicable to the government interest in preserving confidentiality of law enforcement records has various names," including the "official information privilege" and the "law enforcement privilege."  *Deocampo v. City of Vallejo*, Civ. No. S-06-1283 WBS GGH, 2007 WL 1589541, at *4 (E.D. Cal. June 1, 2007) (citing *Sanchez v. City of Santa Ana*, 936 F.2d 1027, 1033 (9th Cir. 1991) and *In re Dep't of Investigation of City of N.Y.*, 856 F.2d 481, 484 (2d Cir. 1988).  The purpose of the qualified privilege is "to prevent disclosure of law enforcement techniques and procedures, to preserve the confidentiality of sources, to protect witness and law enforcement personnel, to safeguard the privacy of individuals involved in an investigation, and otherwise to prevent interference with an investigation."  *In re Dep't of Investigation*, 856 F.2d at 484.

The party asserting the privilege must make a "substantial threshold showing."  *Soto v. City of Concord*, 162 F.R.D. 603, 613 (N.D. Cal. 1995) (citation omitted).  In order to fulfill this requirement, the party opposing disclosure must submit a declaration or affidavit from a "responsible official with personal knowledge of the matters to be attested to in the affidavit."  *Id.* (citation omitted).  The affidavit must include:

> 1) an affirmation that the agency generated or collected the material in issue and has maintained its confidentiality; (2) a statement that the official has personally reviewed the material in question; (3) a specific identification of the governmental or privacy interests that would be threatened by disclosure of the material to plaintiff and/or his lawyer; (4) a description of how disclosure subject to a carefully crafted protective order would create a substantial risk of harm to significant governmental or privacy interests, and (5) a projection of

how much harm would be done to the threatened interests if disclosure were made.

*Kelly*, 114 F.R.D. at 670.  If the party asserting the privilege "meets the threshold requirements, the court will order an in camera review of the material and balance each party's interests," *Soto*, 162 F.R.D. at 613 (citations omitted), i.e., whether the government's need for confidentiality outweighs the requesting party's need for the information.

Defendants have not properly invoked the law enforcement privilege.  First, the privilege may only be claimed by the government.  *U.S. ex rel. Burroughs v. DeNardi Corp.*, 167 F.R.D. 680, 687 (S.D. Cal. 1996); *Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc.*, 125 F.R.D. 51, 53 (S.D.N.Y. 1989).  Although Defendants have attempted to invoke the privilege on behalf of three states' Attorneys General, they have not submitted a declaration or affidavit from a "responsible official" in accordance with *Kelly* or stated an attempt or effort to satisfy this requirement. Defense counsel states that he has communicated with the offices of the attorneys general of Texas, Arizona, and Michigan.  [Docket No. 242-5 (Jonna Decl., Feb. 27, 2018) ¶¶ 2-4.]  He attaches a letter from an attorney with the Office of the Attorney General of Texas in which the writer states that his office "has an open investigation of Planned Parenthood," and states that any documents "that relate to any civil or criminal investigation in Texas of Planned Parenthood . . . should be considered confidential and should not be required to be disclosed."  Jonna Decl. Ex. A. Defense counsel also attaches an email from the Deputy Division Chief of the Office of the Arizona Attorney General requesting the opportunity to review any communications between Daleiden and his office "prior to those being turned over pursuant to a court subpoena."  Jonna Decl. Ex. B.  Neither letter addresses with any specificity the communications at issue and how their disclosure would threaten a governmental interest.  *See Kelly*, 114 F.R.D. at 670.  As to the Michigan Attorney General, defense counsel states only that "[t]hat office verbally indicated . . . that they object to production of Defendants' communications unless they are given the opportunity to review them to determine whether to assert the law enforcement privilege."  Jonna Decl. ¶ 4.  None of these third parties have requested leave to participate in this case to assert the law enforcement privilege.

Defendants have failed to establish that the requested communications are protected by the

law enforcement privilege.

#### 4. First Amendment Privilege

On April 6, 2018, Defendants submitted a unilateral discovery letter brief in which they state that Plaintiffs have now limited their damages to responding to governmental investigations in Texas. [Docket No. 247.] According to Defendants, Plaintiffs therefore can no longer argue that "communications outside of the Texas context are 'highly relevant' to this case." *Id*. The court ordered the parties to file a joint discovery letter in which they set forth the exact discovery requests that were impacted by the change in Plaintiffs' damages position and explain any such impact. [Docket No. 256.] Given Defendants' pattern of raising new arguments, the court also specifically ordered that Defendants "may not raise any objections that they did not previously assert in earlier briefing on the pending motions." *Id.*[15]

In the parties' subsequent joint letter, Defendants devote their entire submission to arguing that communications with law enforcement and governmental officials are protected by the First Amendment right to petition the government. [Docket No. 259 at 3.] This is the first time that Defendants have clearly made this argument. For example, in the parties' March 2, 2018 brief, Defendants argued only that "the law enforcement privilege provides another basis, independent from the First Amendment right to petition the government, for shifting the burden to Plaintiffs to show high relevance." [Docket No. 242 at 3.] This was Defendants' sole statement connecting this discovery to a possible objection based on the right to petition. Defendants provided no explanation of how the discovery impacted the "right to petition the government," cited no evidence in support of their claim that the discovery could chill their First Amendment right to petition the government, and cited no cases supporting their position. *See id*. The court has

---

[15] At the hearing, the court repeatedly admonished defense counsel for raising objections that they had not briefed in the parties' submissions. *See, e.g.*, Tr. 11, 16-17, 19, 22. For example, at the hearing, Defendants argued that the law enforcement privilege applied to disputes P4 and P6, despite admitting that they did not brief the privilege. *See id*. at 25-29, 35-36 ("I'm not saying [the law enforcement privilege] [has] been briefed, your Honor."). Defendants had previously expressly disclaimed any reliance on that privilege in their briefing. *See* Ex. A at 12 ("Defendants' objections to [RFP Nos. 42 and 43] were based not on the 'law enforcement privilege' cited by Plaintiffs, but on Cal. Civil Code [section] 47(b) . . .").

warned Defendants that they cannot make their positions a moving target. The court declines to consider this new argument, raised in the *fourth* round of briefing on Plaintiffs' motions to compel. Defendants had ample opportunity to brief this objection earlier and chose not to.[16]

Plaintiffs' motion to compel Defendants to produce documents responsive to RFP Nos. 42 and 43 is granted.

## C. P5: RFP No. 12

RFP No. 12 asks for "[a]ll documents regarding the transmission, distribution, dissemination, or transfer of any Planned Parenthood confidential information." According to Plaintiffs' briefing, this request is targeted to "documents relating to Planned Parenthood's Confidential Information, a defined term relating to information obtained as a result of the scheme alleged in the complaint." Ex. A at 13. Plaintiffs state that the purpose of the RFP is to learn the identities of those with whom Defendants shared confidential information procured from any Planned Parenthood affiliate. Plaintiffs state that they also propounded an interrogatory seeking this information, but that Defendants have refused to provide responsive information.

At the hearing, Plaintiffs clarified that RFP No. 12 seeks documents reflecting "entities or individuals to whom [Defendants] sent video taken surreptitiously at a Planned Parenthood conference or Planned Parenthood clinic[.]" Tr. 30. Defense counsel confirmed the parties' agreement about the scope of this RFP, and confirmed that they have withdrawn their previous objection based on vagueness. *Id*. at 32, 34-35. Defense counsel also stated that the resolution of this issue rises and falls with the court's decision on P1, P2, and P3, because these documents fall within the categories of communications with donors and communications regarding publication

---

[16] Even in their late assertion, Defendants do very little to develop an argument that the requested discovery seeks documents protected by their First Amendment right to petition the government. In their fourth letter brief, Defendants state that "it should go without saying that requiring Defendants to turn over their petitions to law enforcement to investigate Plaintiffs' wrongdoing would chill Defendants' exercise of their First Amendment right to petition the government," but cite no evidence for this claim. The sole case cited by Defendants in support of this assertion, *Guthrey v. California Dept. of Corrections & Rehabilitation*, No. 1:10-cv-02177-AWI-BAM, 2012 WL 2499938, at *10 (E.D. Cal. June 27, 2012), does not even address the First Amendment right to petition the government. Instead, *Guthrey* discussed discovery objections based upon the defendant's First Amendment protection of an indvidual's "religious beliefs . . . [and] religious associations." *See id*.

of the videos. *Id.* at 31-32. Given the court's rulings on P1, P2 and P3 that Plaintiffs have overcome Defendants' asserted privileges with respect to those two categories of communications, the court grants Plaintiffs' motion to compel documents responsive to RFP No. 12.

### D. P6: PPFA's Interrogatories

PPFA moves to compel further responses to seven interrogatories propounded to CMP and BioMax. PPFA argues that the interrogatories seek "plainly relevant information." Ex. A. at 14.

#### 1. Interrogatory Nos. 3 and 4

Interrogatory Nos. 3 and 4 seek "the identity of public officials with whom Defendants, or anyone acting at their direction, communicated regarding any of the recordings [before or after the recordings were recorded]; and for each, a description of the communications," including "the date of the communication, the participants in the communication, the method of communication, and the contents of the communication." Ex. A at 14-15. Defendants object based on California Civil Code section 47(b), the law enforcement privilege, and relevance. *See* Tr. 35. As discussed above section 47(b) is not an evidentiary privilege, and Defendants have not properly invoked the law enforcement privilege. Those objections are therefore overruled.

As to relevance, Plaintiffs have alleged the existence of an enterprise, the purpose of which was to target Planned Parenthood, to disrupt and burden its mission to provide reproductive health care, and to "demonize them." FAC ¶ 150. The communications that Defendants had with public officials are relevant to establishing Defendants' intent as it relates to the purpose of the alleged enterprise. For example, Daleiden states that his intent with respect to the Human Capital Project was to "build a body of evidence that would be strong enough to trigger criminal prosecution and other official enforcement actions against entities involved in legal and ethical violations." Daleiden Decl. ¶ 3. As with RFP Nos. 42 and 43, the information sought through these interrogatories is relevant to Plaintiffs' assertion that Defendants caused meritless state and federal investigations. These interrogatories also seek information relevant to any agreement to violate RICO, which may be inferred from words, actions, and the interdependence of activities and persons involved. Finally, these interrogatories are relevant to causation and damages, since Plaintiffs allege that they incurred costs related to the investigations in Texas. Therefore,

Plaintiffs' motion to compel further responses to Interrogatory Nos. 3 and 4 is granted.

## 2. Interrogatory Nos. 5, 6, and 7

Interrogatory Nos. 5 and 6 seek "the identity of each person to whom Defendants, or anyone acting at their direction, provided any of the recordings (excepting, by agreement of the parties, in those case[s] where they were provided via YouTube publication); and for each, a description of the recording provided," including "the date or dates on which any such recording was provided to that person." Ex. A at 15. Interrogatory No. 7 seeks "the identity of each person to whom Defendants, or anyone acting on their behalf, provided [oral or written] reports about the Defendants' attendance at any of the conferences or health centers." *Id*. at 16. Plaintiffs narrowed the time period for No. 7; they seek only the identity of individuals who received reports before the release of the videos in July 2015. Tr. 41. At the hearing, the court found that all three interrogatories seek relevant information. *Id*. at 38, 41.

Defendants object based on the First Amendment privilege and the journalist's privilege. *See* Tr. 37-39, 41; Docket No. 242 at 2-3. As discussed above, Defendants have satisfied their burden to establish their prima facie case of arguable First Amendment infringement and, for purposes of this motion, they have met their burden to invoke the journalist's privilege. Therefore, the burden to overcome the privileges shifts to Plaintiffs.

As to the First Amendment privilege, Plaintiffs must show that the requested information is "highly relevant" to the federal claims, "carefully tailored to avoid unnecessary interference with protected activities," and "otherwise unavailable." *Perry,* 591 F.3d at 1161. The court concludes that the information at issue, namely, the identities of those to whom Defendants provided recordings and reports about Defendants' attendance at conferences or health centers, is highly relevant to Plaintiffs' RICO claim because such individuals are witnesses and potential co-conspirators. These interrogatories are appropriately narrowly tailored to learn the identities of such individuals and seek information that is otherwise unavailable. In order to minimize the potential for First Amendment infringement, the individuals' identities shall be disclosed to Plaintiffs pursuant to the AEO provision of the protective order.

The journalist's privilege can be overcome if the requesting party can demonstrate a

sufficiently compelling need for the materials. *Shoen I*, 5 F.3d at 1296. "[A] civil litigant is entitled to requested discovery notwithstanding a valid assertion of the journalist's privilege by a nonparty only upon a showing that the requested material is: (1) unavailable despite exhaustion of all reasonable alternative sources; (2) noncumulative; and (3) clearly relevant to an important issue in the case." *Shoen II*, 48 F.3d at 416. As with the RFPs at issue in P1, P2, and P3, the parties' arguments focus on the third prong, which is whether the information sought it "clearly relevant to an important issue in the case." The court concludes that the identities of those to whom Defendants provided recordings and reports about Defendants' attendance at conferences or health centers is clearly relevant to identifying potential witnesses and/or co-conspirators. Identifying these individuals may lead to discoverable evidence about the relationships among those associated with the enterprise, the relatedness of the predicate acts, the purpose of the enterprise, potential co-conspirators, any agreement to violate RICO, and causation.

Plaintiffs' motion to compel further responses to Interrogatory Nos. 5, 6, and 7 is granted.

### 3. Interrogatory Nos. 8 and 10

Interrogatory Nos. 8 (to BioMax) and 10 (to CMP) seek "the identity of persons who, directly or indirectly, funded CMP's 'Human Capital Project.'" Ex. A at 16. At the hearing, Plaintiffs abandoned their request for "indirect" funders of the Human Capital Project, clarifying that these interrogatories seek the identification of the same group of 25 donors at issue in P1, P2, and P2. Tr. 42. Defendants confirmed that they object based on the First Amendment privilege, and that the interrogatories "rise[] and fall[]" with the court's ruling on P1, P2, and P3. *Id.* For the reasons stated above, Plaintiffs have overcome Defendants' First Amendment privilege with respect to this information. The motion to compel further responses to Interrogatory Nos. 8 (to BioMax) and 10 (to CMP) is granted. In order to minimize the potential for First Amendment infringement, the individuals' identities shall be disclosed to Plaintiffs' pursuant to the AEO provision of the protective order.

### E. P7: Planned Parenthood Mar Monte's Interrogatories

Planned Parenthood Mar Monte ("PPMM") moves to compel CMP and BioMax to respond to Interrogatory Nos. 8-10, which ask for all facts supporting Defendants' assertions that

the individuals recorded at three locations (the PPFA National Conference in March 2015; in PPGC/PPCFC's office and clinic space; and in Planned Parenthood of the Rocky Mountains' office and clinic space) "did not reasonably expect that the recorded material was confidential." Ex. A at 18. Defendants refused to respond, taking the position in meet and confer correspondence that they "do not understand how the recorded individuals' expectation of confidentiality is relevant to any of Plaintiffs' claims." *Id.* PPMM offered no theory of relevance in their written submissions.

At the hearing, PPMM conceded that the interrogatories do not seek information relevant to their RICO claims, but argued that these interrogatories seek information relevant to the Wiretap Act claim. According to PPMM, Defendants are likely to raise a defense that the individuals who were recorded did not have a reasonable expectation of privacy when they were recorded, and PPMM therefore seeks to conduct discovery on this potential defense. Tr. 45, 49. In response, Defendants represented that they have raised the defense of whether the individuals recorded have a "reasonable expectation of privacy," but have not raised the defense of "reasonable expectation of confidentiality," which is how these interrogatories are phrased. *Id.* at 46-47. Defendants argue that the expectation of privacy and expectation of confidentiality are "[t]wo completely separate notions"; they declined to state whether they may argue in the future that the individuals recorded did not reasonably expect that the recorded material was confidential. *See id.* at 47-48. Since Defendants have not yet raised the defense described in the interrogatories, Plaintiffs' motion to compel further responses to PPMM's Interrogatory Nos. 8-10 is denied without prejudice. If Defendants ever take the position that the individuals who were recorded did not reasonably expect that the recorded material was confidential, they must immediately provide amended responses to these interrogatories without a further order of the court.

### F. P8: Planned Parenthood of the Pacific Southwest's Interrogatories

Planned Parenthood of the Pacific Southwest ("PPPSW") propounded Interrogatory Nos. 8-11 to Daleiden. These interrogatories ask how Daleiden produced or obtained a driver's license in the name of "Robert Daoud Sarkis" (No. 8). They also seek the identity of any persons to whom he transferred the license (No. 9); any persons from whom he obtained the license (No. 10);

and each state in which the license was produced, obtained, or used (No. 11). PPPSW asserts that these interrogatories pertain directly to the RICO predicate act, which is use of false identification documents in violation of 18 U.S.C. § 1028.

Daleiden refused to respond to the interrogatories, asserting the Fifth Amendment testimonial privilege and the journalist's privilege. He also asserts the attorney-client privilege with respect to Interrogatory No. 9.

At the hearing, the parties clarified their dispute with respect to these interrogatories. Plaintiffs acknowledge that Daleiden has invoked the Fifth Amendment; they do not seek an order overruling that objection and compelling him to provide responses. Tr. 53-54. Instead, Plaintiffs assert that they will ultimately ask Judge Orrick to give an adverse inference instruction at trial with respect to these four interrogatories based on Daleiden's invocation of the Fifth Amendment. At this time, Plaintiffs seek a ruling on the remaining objections to the interrogatories—the journalist's privilege and attorney-client privilege—so that at trial, the only issue before Judge Orrick with respect to these interrogatories will be Daleiden's invocation of the Fifth Amendment. *Id*. at 55. Defendants agree that Judge Orrick will decide the question of whether Plaintiffs are entitled to an adverse inference instruction at trial. [*See* Docket No. 242 at 4.] However, Defendants argue that Plaintiffs' motion to strike all of the objections is premature, and that all the objections should be considered at the same time Judge Orrick decides the question of whether to give an adverse inference instruction. *Id*.

The court concludes that it serves both judicial economy and efficiency to address the objections other than the Fifth Amendment at this time.

### 1. Journalist's Privilege

Daleiden asserts that the journalist's privilege applies to the information sought by these interrogatories "because the identities of those potential individuals were gathered as part of [his] investigative journalism work." Ex. A at 19. This is his sole argument supporting his claim of the journalist's privilege and appears to apply only to Interrogatory Nos. 8, 9, and 10. As discussed above, solely for purposes of these motions, the court assumes that Daleiden has met his burden to invoke the journalist's privilege.

PPPSW argues that even if the qualified privilege applies, it would not limit discovery under these circumstances because: "there are no alternative sources; the requests are not cumulative; and the information is relevant." Ex. A at 19. Daleiden does not reply to this argument. PPPSW's argument is well taken. Daleiden identifies no alternative sources for the information sought in the interrogatories. The interrogatories do not appear to be cumulative, and they seek information that is clearly relevant to Plaintiffs' RICO claim, which alleges predicate acts of violations of the federal identity theft statute by producing or transferring false identification documents to gain access to Plaintiffs' conferences and meetings. Accordingly, PPPSW has demonstrated that it has a sufficiently compelling need for the information. Daleiden's objection to PPPSW's Interrogatory Nos. 8 through 11 based on the journalist's privilege is overruled.

### 2. Attorney-Client Privilege

As previously noted, federal privilege law applies in this action. Under federal law, the attorney-client privilege protects from discovery "confidential communications between attorneys and clients, which are made for the purpose of giving legal advice." *United States v. Richey*, 632 F.3d 559, 566 (9th Cir. 2011) (citation omitted); *see Vasudevan Software, Inc. v. IBM Corp.*, No. 09-5897-RS (PSG), 2011 WL 1599646, at * 1 (N.D. Cal. Apr. 27, 2011). The privilege is "narrowly and strictly construed," and the party asserting it bears the burden of proving that it applies. *Vasudevan Software, Inc.*, 2011 WL 1599646, at *1 (footnotes and quotation marks omitted); *accord United States v. Bergonzi*, 216 F.R.D. 487, 493 (N.D. Cal. 2003) (holding that party asserting privilege "must make a *prima facie* showing" that privilege applies) (citing *In re Grand Jury Investigation*, 974 F.2d 1068, 1071 (9th Cir. 1992)); *see Richey*, 632 F.3d at 566. The privilege attaches when:

> (1) legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) unless the protection be waived.

*Richey*, 632 F.3d at 566 (brackets, citation, and quotation marks omitted). "The party asserting the privilege bears the burden of proving each essential element." *United States v. Ruehle*, 583 F.3d

600, 608 (9th Cir. 2009).

Daleiden asserts that the names of persons to whom he transferred a Sarkis license implicate the attorney client privilege "to the extent that Mr. Daleiden might have transferred any such license to an attorney, at the attorney's direction." Ex. A at 19. The only authority he cites to support this position is *Mitchell v. Superior Court*, 37 Cal.3d 591, 600 (1984), in which the California Supreme Court noted that "[i]n California the privilege has been held to encompass not only oral or written statements, but additionally actions, signs, or other means of communicating information." (citations omitted). There, the court held that the privilege "covers the transmission of documents which are available to the public . . . [because] it is the actual fact of the transmission which merits protection, since discovery of the transmission of specific public documents might very well reveal the transmitter's intended strategy." *Id.* (citation omitted). The court in *Mitchell* was discussing attorney-client privilege under California law, which is governed by statute. *See Mitchell*, 37 Cal.3d at 599-600. Under California law, all communications made in the course of an attorney-client relationship are presumed confidential. *See* Cal. Evid. Code § 917(a). The Ninth Circuit has observed that this "liberal view of the privilege . . . conflicts with the strict view applied under federal common law," which places the burden on the party asserting the privilege "to establish the privileged nature of the communications." *Ruehle*, 583 F.3d at 608-09. *Mitchell* is therefore inapplicable.

Daleiden has failed to meet his burden to show that the names of individuals to whom he transferred a driver's license constitute a "confidential communication" between an attorney and client, made for the purpose of giving legal advice. *See Richey*, 632 F.3d at 566. He has also failed to show how identifying the mere fact of a transfer of a license reveals the contents of a privileged communication. Accordingly, he has failed to establish that this information is privileged under applicable federal law. Daleiden's objection to Interrogatory No. 9 based on the attorney-client privilege is overruled.

### G. P9: Defendants' Privilege Assertions

Finally, Plaintiffs challenge Defendants' withholding of two documents responsive to RFP Nos. 49 and 50 based on various asserted privileges. Ex. A at 20. RFP No. 49 asks for "all

documents and recordings related to the Human Capital Project," and RFP No. 50 asks for "your publications, advertisements, websites, business cards, exhibits, or other materials that you created in connection with the Human Capital Project."

Before the February 2018 hearing, the parties submitted a letter in which they explain that they have narrowed this dispute to two memoranda regarding investigation of the fetal tissue procurement industry. Defendants have withheld both documents on the basis of the First Amendment, reporter's privilege, and trade secrets. [Docket No. 218 at 2.] The court ordered Defendants to lodge the documents for in camera review and ordered the parties to provide further briefing regarding Defendants' privilege assertions. [Docket No. 225.] The parties timely filed and lodged the requested submissions. [Docket Nos. 230, 233.[17]]

Defendants lodged four exhibits for the court's review. Exhibits 1 and 2 are the memoranda at issue in this motion. Exhibit 1 is a "[m]emo regarding investigating [the] fetal tissue procurement industry." [Docket No. 230-3.] The three-page document appears to be a version of a script or briefing which sets forth profiles of various organizations and business entities, including Planned Parenthood Federation of America and NAF; descriptions of "key" abortion-related terms and language; and definitions of stem cell-related terminology. Defendants state that Exhibit 2 is a "[m]emo regarding conversing with individuals in [the] fetal tissue procurement industry." [Docket No. 230-3.] The three-page document appears to be a transcript or exemplar of a conversation between a "BioMax representative" and a "Planned Parenthood representative" discussing initiating a "procurement relationship" with a Planned Parenthood affiliate. Exhibits 3 and 4 are "two reports written by CMP while the [Human Capital Project] was underway, setting out very precisely its goals and methods." [Docket No. 230-1 at 3.] Exhibits 3 and 4 have been produced to Plaintiffs. *Id.*

---

[17] Docket No. 230 consists of a cover page (230), CMP's supplemental brief (230-1), Daleiden's February 14, 2018 declaration (230-2), and a notice of lodging of documents (230-3). Defendants lodged four exhibits for the court's review. Exhibits 1 and 2 are the memoranda at issue in this motion. Exhibits 3 and 4 are "two reports written by CMP while the [Human Capital Project] was underway, setting out very precisely its goals and methods." [Docket No. 230-1 at 3.] Exhibits 3 and 4 have been produced to Plaintiffs. *Id.*

United States District Court
Northern District of California

### 1. First Amendment Privilege

As discussed above, an assertion of the First Amendment privilege in response to discovery is subject to a two-part framework. *Perry*, 591 F.3d at 1160. First, "[t]he party asserting the privilege 'must demonstrate . . . a prima facie showing of arguable first amendment infringement,'" demonstrating that enforcement of the discovery requests "will result in (1) harassment, membership withdrawal, or discouragement of new members, or (2) other consequences which objectively suggest an impact on, or 'chilling' of, the members' associational rights." *Id.* (quotations omitted). If the party asserting the privilege makes the necessary prima facie showing, the burden shifts to the party seeking the information to show that the information sought is "rationally related to a compelling governmental interest" and that there are no other less restrictive means of securing that information. *Id.* at 1161.

Defendants submit a declaration by Daleiden that they argue satisfies their burden at step one. [Docket No. 230-2 (Daleiden Decl., Feb. 14, 2018 ("Daleiden Decl. I").] In his declaration, Daleiden describes the "investigative journalism study" that culminated in the Human Capital Project. *Id.* at ¶¶ 2, 3, 5, 6. According to Daleiden, the "study was highly successful due to CMP personnel's unique understanding of the abortion industry and highly tailored investigative journalism practices," and that "[t]hat understanding and those practices are identified in two memoranda that [his] attorneys are currently withholding as trade secrets." *Id.* at ¶ 2. He asserts that "if a news-gathering organization is forced to divulge intimate information about and from the sources who had agreed to help it in its investigation to those sources' ideological opponents, it is unlikely to be able to convince those or any other sources to cooperate with it in the future." *Id.* at ¶ 9. Daleiden's reference to CMP's "sources" is confusing, since the memoranda do not appear to identify any sources. Other than broadly stating that the memoranda identify CMP's understanding of the abortion industry and journalism practices, Daleiden does not discuss the two documents in a meaningful way, nor does he describe how the disclosure of those specific documents to Plaintiffs could impact or chill protected activity. Daleiden merely states that "simply being forced to respond to a broad document request seeking all documents about the *Human Capital Project* will necessarily chill CMP's First Amendment rights." *Id.* Since

Defendants do not explain how disclosure of these two particular memoranda could impact protected activity, the court concludes that they have failed to meet their burden at step one of the *Perry* inquiry.

### 2. Journalist's Privilege

Defendants next assert that the two memoranda are protected from disclosure by the journalist's privilege. Daleiden states that he "inaugurated the Human Capital Project at CMP to investigate, document, and report on the procurement, transfer, and sale of aborted fetal tissue," and that from the project's commencement, "[his] intent was always to publish [his] findings." Daleiden Decl. II ¶ 6. As discussed above, the court assumes solely for purposes of these motions that Defendants have satisfied their burden to invoke the journalist's privilege.

The journalist's privilege can be overcome if the requesting party can demonstrate a sufficiently compelling need for the materials. *Shoen I*, 5 F.3d at 1296. "[A] civil litigant is entitled to requested discovery notwithstanding a valid assertion of the journalist's privilege by a nonparty only upon a showing that the requested material is: (1) unavailable despite exhaustion of all reasonable alternative sources; (2) noncumulative; and (3) clearly relevant to an important issue in the case." *Shoen II*, 48 F.3d at 416.

Plaintiffs argue that the memoranda are not available from any other source and are not cumulative. In response, Defendants state that Plaintiffs have already received in discovery two reports written by CMP while the Human Capital Project was underway, which "set[] out very precisely its goals and methods." [Docket No. 230-1 at 3.] According to Defendants, "[t]hese reports provide far more insight into the topics Plaintiffs claim to be interested in than the withheld documents." *Id*. However, under *Shoen II*, a party may overcome the qualified journalist's privilege if the *requested material* is both unavailable and non-cumulative. 48 F.3d at 416. Having carefully reviewed the two withheld memoranda as well as the two reports already produced, the court finds that the two memoranda contain information that is different from what is in the reports and are therefore not cumulative.

As to whether the memoranda are "clearly relevant to an important issue in the case," the court concludes that they are. Defendants argue that the documents are not relevant to the

41

"alleged RICO conspiracy . . . to produce and transfer two fake IDs." [Docket No. 230-1.] However, as discussed above, the RICO conspiracy is not so limited; Plaintiffs do not allege a "conspiracy to commit predicate acts." *See Pizzonia*, 577 F.3d at 463. They allege that Defendants created a "complex criminal enterprise . . . involv[ing] fake companies, fake identifications, and large-scale illegal taping" of reproductive health care conferences and private meetings in order to advance their goals. FAC ¶ 1. The memoranda document Defendants' methods to gain access to Plaintiffs' conferences and meetings as well as what appears to be the results of one such access. They are therefore clearly relevant to the purpose and conduct of the alleged enterprise.

### 3. Trade Secrets

Finally, Defendants argue that the two memoranda contain information that constitutes trade secrets under California law. While they acknowledge that a protective order confers some protection on trade secrets, they argue that a protective order is "the minimum requirement," and that the court should preclude production altogether, given the posture of this case, where "an organization has sued its ideological opponent." [Docket No. 230-1 at 1.]

Under California law, a trade secret is "information, including a formula, pattern, compilation, program, device, method, technique, or process, that: (1) [d]erives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and (2) [i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Cal. Civ. Code § 3426.1(d). "The subject matter of a trade secret must be secret, not obvious." *Self Directed Placement Corp. v. Control Data Corp*., 908 F.2d 462, 465 (9th Cir. 1990) (citing *Walker v. University Books, Inc*., 602 F.2d 859, 865 (9th Cir. 1979)).

According to Defendants, the memoranda "are a confidential compilation of information through which CMP was able to carry out its successful investigative work and thereby attract financial support." [Docket No. 230-1 at 1.] They assert that their journalism study "emanat[ed] from [CMP's] unique understanding of aspects of the abortion industry that are shielded from public view." *Id*. (citing Daleiden Decl. II ¶ 2). However, the Ninth Circuit has held that

California "[does] not recognize information as a trade secret unless it confer[s] on its own an actual economic advantage over competitors." *Religious Tech. Ctr., Church of Scientology Intern., Inc. v. Scott*, 869 F.2d 1306, 1309 (9th Cir. 1989) (citing *Religious Tech. Ctr. v. Wollersheim*, 796 F.2d 1076, 1091 (9th Cir. 1986)). For example, in *Wollersheim*, a plaintiff church brought an action alleging RICO and misappropriation of trade secret claims against a splinter group that had acquired stolen copies of the church's religious materials. 796 F.2d at 1077-79. The Ninth Circuit reversed the district court's order granting the church a preliminary injunction, holding that the church was not entitled to injunctive relief under RICO. *Id*. at 1089. As to the trade secret claim, the court held that the religious materials were not trade secrets where the church "alleged no competitive market advantage from maintaining the secrecy of its . . . materials." The court held that since the value of the materials was "spiritual not commercial, . . . the materials cannot be said to have the 'independent economic value' necessary to qualify as a protectable trade secret." *Id*. at 1091. *See also Yield Dynamics, Inc. v. TEA Sys. Corp.*, 154 Cal. App. 4th 547, 564 (2007) (the economic advantage "need not be great, but must be more than trivial." (citations omitted)).

Here, Defendants do not assert that the information confers "an actual or potential *commercial* advantage" over their competitors. *See Wollersheim*, 796 F.2d at 1090 (emphasis in original). Plaintiffs are the subjects of Defendants' investigations; they are not Defendants' competitors. Defendants cite no authority holding that a "confidential compilation of information" through which an organization "carr[ied] out its successful investigative work" is a protectable trade secret under California law.[18]

For their part, Plaintiffs dispute whether the information in the memoranda constitutes

---

[18] Defendants cite *Eli Research, LLC v. Must Have Info Inc.*, No. 2:13-cv-695-FtM-38CM, 2015 WL 5254287, at *2 (M.D. Fla. Sept. 9, 2015), as support for their claim that "[c]onfidential investigatory journalism practices can constitute trade secrets." Not so. In *Eli Research*, the court addressed a motion to strike an expert report and to exclude certain expert testimony by a journalism professor. The defendants sought to introduce the expert's opinion on a number of subjects, including whether an "Editorial Style Guide" and "Editorial Manual" "contain[ed] unique content which would amount to confidential trade secrets or if that information is known throughout the industry and taught in journalism schools." *Id*. The court did not address whether the documents in question were trade secrets under California law.

protectable trade secrets, but state that even if it does, the use of a protective order is sufficient to protect the information.  [Docket No. 233 at 1.]

The court concludes that Defendants have failed to show that the withheld memoranda contain information that constitutes trade secrets which deserve heightened protection beyond the protective order that is already in place.  Plaintiffs' motion to compel production of the two memoranda is therefore granted.

IV.   **CONCLUSION**

For the foregoing reasons, Plaintiffs' motion to compel is granted in part and denied in part.  Defendants shall produce documents and further responses in accordance with this order within ten days of the date of this order.

**IT IS SO ORDERED.**

Dated: May 31, 2018



Donna M. Ryu
United States Magistrate Judge