Pages 1-53

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE DONNA M. RYU, MAGISTRATE JUDGE

PLANNED PARENTHOOD           )
FEDERATION OF AMERICA,       )
INC., et al.,                )
                             )
            Plaintiffs,      )
                             )
  VS.                        )  NO. CV-16-236 WHO (DMR)
                             )
CENTER FOR MEDICAL           )
PROGRESS, et al.,            )
                             )  OAKLAND, CALIFORNIA
            Defendants.      )  THURSDAY
                             )  JULY 19, 2018
_____)  11:00 O'CLOCK A.M.


**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

**For Plaintiffs:**      ARNOLD & PORTER KAY SCHOLER, LLP
                         Three Embarcadero Center, 7th Floor
                         San Francisco, California 94111

                         BY:  **AMY L. BOMSE, ATTORNEY AT LAW**
                              **DIANA STERK, ATTORNEY AT LAW**

**For Defendant DAVID DALEIDEN:**

                         **LIFE LEGAL DEFENSE FOUNDATION**
                         P.O. BOX 1313
                         Ojai, California 93024
                         BY:  **CATHERINE W. SHORT, ATTORNEY AT LAW**

(FURTHER APPEARANCES ON NEXT PAGE.)


*Reported By:   Katherine Wyatt, CSR 9866, RMR, RPR*
                *Pro Tem Reporter - US District Court*
                *Computerized Transcription By Eclipse*

```
 1   FURTHER APPEARANCES:

 2   ALSO FOR DEFENDANT DALEIDEN:

 3   THOMAS MORE SOCIETY

 4   PETER BREEN, SPECIAL COUNSEL

 5   THOMAS BREJCHA, JR., ESQUIRE

 6   19 S. LASALLE STREET, SUITE 603

 7   CHICAGO, ILLINOIS 60603

 8

 9   FOR DEFENDANT RHOMBERG:

10   MICHAEL MILLEN, ESQUIRE

11   119 CALLE MARGUERITA #100

12   LOS GATOS, CALIFORNIA 95032

13

14   FOR DEFENDANT NEWMAN:

15   MAYALL HURLEY

16   BY:  VLADIMIR KOZINA, ESQUIRE

17   2453 GRAND CANAL BOULEVARD

18   STOCKTON, CALIFORNIA 95207

19

20   FOR DEFENDANTS CENTER FOR MEDICAL PROGRESS, ET AL:

21   LAW OFFICES OF CHARLES LIMANDRI, APC

22   BY:  PAUL M. JONNA, ESQUIRE (BY PHONE)

23   P. O. BOX 9120

24   RANCHO SANTE FE, CALIFORNIA 92067

25
```

1    FURTHER APPEARANCES NEXT PAGE

2    **FURTHER APPEARANCES:**

3    **FOR DEFENDANT MERRITT:**

4    **LIBERTY COUNSEL**

5    **BY:  HORATIO MIHET, ESQUIRE  (BY PHONE)**

6    P. O. BOX 540774

7    ORLANDO, FLORIDA 32854

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   JULY 19,  2018                        11:00 O'CLOCK  A.M.

 2

 3                    P R O C E E D I N G S

 4        THE CLERK:  Calling civil case C-16-0236 WH0,

 5   Planned Parenthood of America versus Center for Medical

 6   Progress, et al.

 7             Please state your appearances, Counsel.

 8        MS. BOMSE:  Good morning, Your Honor.  Amy Bomse,

 9   of Arnold & Porter on behalf of Plaintiffs.  And with me is

10   Diana Sterk of my office.

11        THE COURT:  Good morning.

12        MR. BREEN:  Good morning, Your Honor.  Peter

13   Breen on behalf of Defendant Daleiden.  And along with me

14   is Thomas Brejcha, all Counsel.  Cathy Short is here on

15   behalf of Albin Rhomberg.  Vladimar Kozina and Mike Millen.

16             And I'm not sure which -- Mr. Kozina

17   represents Mr. Newman.  Mr. Millen also represents

18   Mr. Rhomberg.

19             And we have the Defendant Daleiden present in

20   court, as well.

21        THE COURT:  All right.  Good morning, everyone.

22   I know we have a few people by court call.  But before we

23   get your appearances, you say Mr. Brejcha, that's how he

24   pronounces his name?

25        MR. BREEN:  Yes, B-R-E-J-C-H-A.
```

```
 1                    THE COURT:  All right.  Who do we have on the

 2      phone?

 3                    MR. JONNA (BY PHONE):  Good morning, Your Honor.

 4      Paul Jonna on behalf of Defendant --

 5                    THE COURT:  Good morning.

 6                    MR. JONNA (BY PHONE):  -- CMP and BioMax.

 7                    THE COURT:  Good morning.

 8                    MR. MIHET (BY PHONE):  Horatio Mihet for

 9      Defendant Merritt.

10                    THE COURT:  Good morning.  Is Mr. Heffron on the

11      phone?  He asked for a court call appearance, but he hasn't

12      made an appearance yet.  Are we expecting him?

13                    MR. BREEN:  Well, he's out of our office, so

14      maybe something happened.  I don't know.

15                    THE COURT:  Okay.

16                    MR. BREEN:  We're here in court.

17                    THE COURT:  Any reason why we can't go forward?

18                    MR. BREEN:  No, Your Honor.

19                    THE COURT:  Okay. So we're here on Defendants'

20      motion to compel further responses to an interrogatory that

21      was sent to the four affiliate plaintiffs PPLA, PPMM, PPNC

22      and PPPSW.  And these are interrogatories that followed on

23      a request for admission.  And all of this has to do with

24      getting information about those affiliates' compliance with

25      Federal law on fetal tissue donation practices.
```

```
 1              So in order to be discoverable, information

 2   has to be both relevant and proportional under Federal Rule

 3   of Civil Procedure 26 (B) (1).

 4              So, Mr. Breen, let me ask you some

 5   foundational questions here.  Is there any evidence that

 6   any Planned Parenthood affiliate has violated Federal law

 7   by receiving money in excess of the allowable reimbursement

 8   costs under Federal law?

 9         MR. BREEN:  And, Your Honor, I would point you to

10   the United States Congress criminal referrals of several of

11   the plaintiffs here on that very basis.

12         THE COURT:  Have there been any findings

13   whatsoever?  And I understand there's an investigation

14   going, but any findings?

15         MR. BREEN:  But that was a formal finding of both

16   the United States House, the specific panel that they

17   convened for that purpose.  The United States Senate,

18   Senator Grassley of the Judiciary Committee, they made

19   findings and referred it out.

20         THE COURT:  Okay.

21         MR. BREEN:  And then, Your Honor, the issue --

22         THE COURT:  Mr. Breen, I have to tell you that I

23   don't -- I don't know what those findings are.  I mean, I

24   would need to get the record to understand what you're

25   talking about with respect to findings.
```

1          Are they somewhere that I can access on the

2   docket?  Because maybe they have already been submitted

3   somewhere.

4          MR. BREEN:  They are likely on the docket

5   somewhere.  But a quick Goggle search they are on the first

6   page of the Goggle search, "United States Congress Fetal

7   Tissue Reports."

8          And we could provide that to the Court, but

9   it's a public document.

10         THE COURT:  Okay.  And from your perspective,

11  what do they say?

12         MR. BREEN:  Well, and Your Honor, so what we've

13  got at issue right now are the four affiliates in

14  California who are four of the plaintiffs who took direct

15  monies in exchange for fetal tissue specimens.

16         And so in that, the reports explain the model

17  which Mr. Daleiden and Center for Medical Progress showed,

18  began showing through their videos and in their public

19  communications the fetal tissue.  They call it "TPP,"

20  tissue procurement business.

21         They go to the abortion facility.  They send a

22  tech into the abortion facility on abortion days.  So they

23  will take the fetal remains --

24         THE COURT:  I'm just going to stop you,

25  Mr. Breen.  I apologize, but I want to make sure my

1    question gets answered first.

2              MR. BREEN:  Right.

3              THE COURT:  So I'm just trying to understand what

4    record evidence we have, because nothing was submitted, and

5    I understand that.  But if you could just point me to the

6    evidence.  You identified a couple of pieces out of

7    Congress, but what is it that those -- if I open those

8    documents, what findings, what evidence do they contain

9    that support that a Planned Parenthood affiliate has broken

10   Federal law on fetal tissue reimbursement?

11             MR. BREEN:  So what you'll see, Your Honor, is --

12   just if I may, just to explain the business models, because

13   that gives you -- it's explained in the reports and it's in

14   our public domain.

15             THE COURT:  And my understanding is there can be,

16   under Federal law, fetal tissue donation where there's

17   money flowing back for that as long as it's reimbursement

18   of allowable costs set forth in the regulation and not

19   above that, because it would be profiteering and in

20   violation of Federal law.  Correct?

21             MR. BREEN:  And the Congressman from California,

22   Mr. Waxman, was adamant when this regulation was enacted in

23   1993 at the Federal level that there would be no market in

24   fetal tissue.

25             THE COURT:  Understood.

```
 1              MR. BREEN:  Right.  So the idea is the money's

 2   coming and there's no justification within the six

 3   allowable categories of costs incurred by the abortion

 4   facility.

 5              THE COURT:  Still waiting for the answer to my

 6   question.

 7              MR. BREEN:  Okay.  That's in the Congressional

 8   report.  So, Your Honor, if a -- if an abortion facility

 9   provides, say, the tech goes in.  They collect ten

10   specimens in a day.  They take them with them.  They ship

11   them off to researchers.

12              At the end of the month, the facility gets a

13   check for $550 and they had no expenses, they violated this

14   statute.

15              THE COURT:  Well, that's sort of an

16   interpretation of how you apply the statutes.  But so I'm

17   not sure.  I'm just asking, because I'm expecting that when

18   I -- you've pointed me to evidence in the record that a

19   Planned Parenthood affiliate has violated the Federal law

20   on fetal tissue donation.

21              MR. BREEN:  And, Your Honor, this is -- this is a

22   core point of dispute between the parties.  And we've --

23   and, Your Honor, in terms of --

24              THE COURT:  Is there any evidence that you can

25   point me to?
```

1          **MR. BREEN:**  I would respectfully request, Your

2    Honor go -- and you can do a keyword search for the

3    affiliates that are actually at issue here.

4          **THE COURT:**  I'm happy to do that.  I plan on

5    doing that.  I just want a straight answer to my question.

6          **MR. BREEN:**  Yes, absolutely.

7          **THE COURT:**  Tell me what it is so that when I

8    open the reports I don't have to dig around.  I can see

9    what you're talking about.

10          **MR. BREEN:**  You will see the Congress laying

11   out -- there were explanations apparently provided by some

12   of the plaintiffs here as to their costs.  The Congress

13   goes through each of their alleged costs and notes how they

14   do not comply, for the most part, with the Federal law.  So

15   they don't fall into any of the allowable categories, the

16   alleged costs that they came forward.

17          Now, in this case, Your Honor, they are

18   refusing to even give us that alleged cost structure that

19   they provided to Congress.

20          **THE COURT:**  Right.  That's why we are here today.

21          **MR. BREEN:**  So what we're saying.

22          **THE COURT:**  Is there anything else you say is

23   evidence of a violation?

24          Anything that you found or that your clients

25   were able to garner through when they infiltrated the

1    conferences that are at issue?

2            **MR. BREEN:**  Sure.  And, Your Honor, there are

3    violations of other Federal laws, as well.  So there was --

4    you're talking about the partial abortion issues?  There's

5    other issues.

6            **THE COURT:**  I'm talking about the one that is in

7    front of me today.

8            **MR. BREEN:**  Okay.  Just narrowing to this

9    statute, what my client is showing, as well, is the general

10   idea of the first -- when you look at the videos and look

11   at what occurred, you see a negotiation about price per

12   specimen, with the relevant doctors.  That is not a

13   negotiation over how much are your allowable costs.

14           Just by nature of that negotiation it's a

15   profit negotiation.  It's not a cost negotiation.

16           **THE COURT:**  Okay.  For the videos that you are

17   referring to, are those -- do those take place in -- well,

18   let me just ask you:  Are those ones that Judge Orrick has

19   reviewed?  Because, if not, I need to understand what they

20   are.

21           **MR. BREEN:**  Just, again, Your Honor, we've got

22   hundreds of hours of video.  But the first two -- the first

23   one was Dr. Nucatola.  That's the -- there was a lunch

24   meeting.  And the doctor is talking about how she will

25   modify her abortion procedure in order to get better fetal

1    tissue, which we also contend is illegal.

2            But, then they talk about the process that the

3    tech comes in.  They do all of the work, and then the

4    clinic gets a check.

5        **THE COURT:**  Are these videos -- so I know that

6    Judge Orrick has reviewed a number of videos and talked

7    about them and made findings about them in the order that

8    he issued in the NAF case.  All I'm trying to understand is

9    whether the videos that you are referring to are things

10   that Judge Orrick has already made that finding on or not.

11   Because, if not, I need to know what they are, and I need

12   to see them.

13       **MR. BREEN:**  I don't believe that -- I believe the

14   Judge was -- again, I don't know the full corpus of what he

15   reviewed.  But the videos --

16       **THE COURT:**  It's right in the order so we can go

17   through.

18       **MR. BREEN:**  And maybe so.  The videos in issue,

19   though, are NAF join videos for two-year conferences.

20   These other videos are public videos.  The lunches, the

21   first lunch is the doctor is -- she was the medical

22   director for Planned Parenthood Federation of America, but

23   also works at one of the affiliates that is an affiliate

24   plaintiff here.

25       **THE COURT:**  Okay.  Are there any unedited, the

1    raw video, not the ones that were provided to the public,

2    because the allegation here is that the ones that were

3    provided to the public were manipulated, were edited.

4    Right.

5                So can -- if you are saying:  "Judge, there's

6    evidence that Planned Parenthood affiliates violated the

7    Federal Fetal Tissue Donation law, and here's the

8    evidence."

9                You pointed me to two Congressional reports.

10   I can take a look at them.

11            **MR. BREEN:**  Sure.

12            **THE COURT:**  You said there's video.  I want to

13   know if there's raw video.  And, if so, what you're talking

14   about.  And I might ask you to submit them.

15            **MR. BREEN:**  Sure.

16            **THE COURT:**  Okay?  But I'd also like you to

17   identify enough for Ms. Bomse to know what you're talking

18   about.  So you said Dr. Nucatola --

19            **MR. BREEN:**  And Dr. Nucatola was the first.  Dr.

20   Gatter was the second that was the -- there was a

21   negotiation on price per specimen there.  And there are

22   other videos. I don't have all of them right at the top of

23   my mind.

24                But those are the first two.  There was

25   massive public interest.  Those were the first two released

```
 1   that I recall --

 2              THE COURT:  Okay.

 3          MR. BREEN:  -- that caused the --

 4              THE COURT:  Anything else?

 5          MR. BREEN:  Certainly, Your Honor.  We would --

 6   we would say when you look through this complaint, there is

 7   an allegation --

 8              THE COURT:  Okay.  I meant --

 9          MR. BREEN:  Okay.

10              THE COURT:  -- any other evidence that you would

11   point to?

12                   And, Ms. Short, I see you standing up, and

13   I'll get you up here in just a minute.

14          MR. BREEN:  And there are contracts, as well,

15   Your Honor.  We have got contracts for fetal tissue

16   specimens, things like that.  I mean, there's a -- Your

17   Honor, what you're asking me is:

18                   "To your core defense in the case, do you

19   have any evidence?"

20                   I'm saying:  "Yes," and I can -- I mean, if we

21   need supplemental briefing on that I'm glad to provide it.

22   But in this format it's probably not the best way to do it.

23   I can point you to the parts of the Congressional record.

24                   We can point you to raw evidence that we've

25   got.  If you need the unedited videos, I believe were
```

```
 1    placed online along with the edited videos.

 2              THE COURT:  Okay.

 3              MR. BREEN:  We can find more or give you official

 4    Bates-stamped, what have you, videos.  We can do all of

 5    that, Your Honor, but that's -- you're asking us can we

 6    make at least a preliminary showing, as I understand your

 7    question.  Can we at least make a preliminary showing that

 8    we're not on a fishing expedition.

 9              And I will represent to you absolutely, yes.

10    And this is the core of our case.  The Defendants claim

11    that the Plaintiffs have violated Federal law.  The

12    Plaintiffs have said that that's wrong.  They have complied

13    with all Federal law.

14              THE COURT:  Okay.  I was just trying to

15    understand --

16              MR. BREEN:  Sure.

17              THE COURT:  -- what's out there.  So, yes, to get

18    at your point, there is an initial showing that there is

19    something.

20              So I'm now going to, first of all, make

21    sure -- and I'm guilty of this, too, so I apologize --

22    let's make sure that we don't speak over each other because

23    our reporter has a tough enough job.  But also, I reserve

24    the right to cut you off, Mr. Breen, because -- and I'm

25    sorry, but that's what comes with getting to sit up here.
```

1    Because, really, I want to make sure that I get the answers

2    before we go forward.  So apologies, but that's what was

3    going on.

4            Ms. Short, is there something you would like

5    to add?

6            **MS. SHORT:**  I would like to, yes, Your Honor.

7            The requests for admissions were part of the

8    entire set of requests for admissions that were sent to

9    each of these affiliates, and as well, to Planned

10   Parenthood Federation of America.  And they did not -- they

11   refused to answer a number of them, but we're going with

12   the ones they actually denied.

13           And the other -- we led up to this question

14   that we're talking about, the one that talks about:

15               "Admit that you took in more than you

16   spent on these costs," by asking whether they had an

17   audited -- someone audited those costs for them.

18               "No."

19           We then said:

20               "Admit that you did not attempt to

21   determine the actual costs of your fetal tissue program

22   until after July 13, 2015."

23           In other words, they had years of doing this

24   and admit that you didn't actually try to figure out what

25   your costs were until after the videos were released.

1           "Plaintiff admits that the cost analysis

2     related to its Fetal Tissue Donation Program that was

3     produced to the Judiciary Committee of the United States

4     Senate was conducted in response to the Judiciary

5     Committee's request and that plaintiff had not previously

6     conducted any similar such cost analysis."

7           So they are admitting that they weren't

8     keeping track of their costs.  And they had nobody -- they

9     were actually not in compliance with Planned Parenthood's

10    own policies about conducting these programs.  All of this

11    was admitted in other portions of the request for

12    admissions that we sent out.

13          **THE COURT:**  Okay.  Thank you.

14          Ms. Bomse, I'm trying to understand from the

15    Planned Parenthood's perspective whether there's any

16    evidence.  And so this is, in part, responsive to

17    Mr. Breen's points and Ms. Short's points.  What does the

18    record tell us about compliance with that Federal

19    regulation?

20          **MS. BOMSE:**  Thank you, Your Honor.  So, first,

21    the record tells us that there are 59 Planned Parenthood

22    affiliates, and there were only four that even had programs

23    where they facilitated the patients who wished to donate

24    fetal tissue and received reimbursement for that process.

25          I welcome the court reviewing the reports by

1    the Senate.  I think what you'll find is there were no

2    findings.  That there was a conclusion by Senator Grassley

3    and his subcommittee that they thought more should be done.

4    And that's what they asked the Department of Justice to do.

5                But Mr. Breen represented to the Court that

6    Planned Parenthood had no expenses related -- that the four

7    affiliates have no expenses related to the facilitation of

8    fetal tissue, and that is simply absurd.

9                Many of the affiliates had the obligation of

10   seeking or obtaining consent, which is a request.  You're

11   required by law to obtain a separate consent for donation

12   of fetal tissue.

13               I'm aware that some of -- some of the tissue

14   procurement organizations provide that service.  Others

15   don't.

16               There's staff time allowing the clinician to

17   come in.  There's space that's taken up by the clinician.

18               There's a good deal of overhead and staff time

19   that's required.  And the amounts that are coming in, which

20   is evidence that's in this record and also in these

21   reports, were not significant.

22               So in the end, the notion that the costs and

23   the money that was coming in -- the costs were as much, if

24   not more, than what was coming in, is perfectly reasonable.

25               And, Your Honor, Counsel's correct.  Planned

```
1    Parenthood did, at the request of Senator Grassley, prepare

2    a cost analysis of one-year for all four Planned Parenthood

3    affiliates and what that cost analysis, which was prepared

4    under Planned Parenthood's Counsel, showed that it was that

5    there was a significant loss to each of those affiliates.

6              Now, it's true that people can quibble over

7    line items.  And there is quibbling over line items.  But

8    Planned Parenthood did that at the request of Senator

9    Grassley.  And the result of that was that there was no

10   profit.

11             So there is no evidence in any record.

12   There's been no finding that any of the four affiliates

13   ever profited.  And there's been no finding that any of

14   those Planned Parenthood affiliates violated this law that

15   is at issue.

16        THE COURT:  Can I ask you about the report that

17   was prepared?

18        MS. BOMSE:  Yes.

19        THE COURT:  So was that for -- separately for

20   each of the affiliates or lumped together?

21        MS. BOMSE:  No.  It was separately for each.

22        THE COURT:  And for what period of time did it

23   cover?

24        MS. BOMSE:  It was for 2015.  And it's at page

25   279 of Senator Grassley's report.
```

1    **THE COURT:**  Okay.  Now, Mr. Breen also talked

2    about two -- well, he said two key videos are Nucatola and

3    Gatter.

4    **MS. BOMSE:**  Right.

5    **THE COURT:**  What do you think I would see if I

6    looked at that?

7    **MS. BOMSE:**  So I would welcome Your Honor to look

8    at the raw video, because what you will see in it is that

9    both doctors emphatically denied that there was any intend

10   to profit.  And, in fact, as we've said in our complaint,

11   Dr. Nucatola said ten separate times:

12            "There's no intent to make money here.

13   All we're doing is trying to recoup our costs."

14            All of that was left on the cutting room floor

15   when Mr. Daleiden of CMP released their video accusing

16   Planned Parenthood of engaging in selling fetal tissue for

17   profit.

18            And as to Dr. Gatter, Counsel for CMP

19   emphasized that what was going on there was a negotiation.

20   Well he's learned from the documents that Mr. Daleiden

21   communicated to his co-defendant, his co-conspirator that

22   they wanted -- before they went into this secret meeting

23   wearing cameras, they wanted to make it look like a

24   negotiation.  Try to make it look like she's haggling.

25            And lo and behold what do you get?  You get a

1    video release by CMP that says:

2                      "Planned Parenthood doctor haggles over

3    fetal tissue."

4                But watch the whole video.  Don't watch the

5    short -- well, watch the short video, too, to see what they

6    kept and what they deleted.  But those videos are not

7    evidence of anyone seeking to profit from fetal tissue.

8                **THE COURT:**  That's Nucatola and Gatter?

9                **MS. BOMSE:**  Right.

10               **THE COURT:**  Now, Ms. Short, I had a number of

11   requests for admissions which should be easy for me to see

12   here in writing.  Okay.  So I have --

13               **MS. BOMSE:**  Your Honor, I'm sorry.  If the Court

14   would consider those responses evidence of violation of

15   law, I'd want to respond to that.

16               **THE COURT:**  Go ahead.

17               **MS. BOMSE:**  Thank you.  So, Your Honor, it's

18   absolutely correct that Planned Parenthood responded, as

19   Ms. Short stated.

20               First of all, there's nothing in Federal law

21   that requires an audit.  The Federal law says simply that

22   you can recoup your reasonable coats for a series of

23   different categories of expenses.

24               It's true Planned Parenthood Federation of

25   America had its own more strict obligation that they

 1  required that was not always complied with.

 2          That's the way it often goes with the people

 3  at the top are very careful and say:

 4          "This is what we should do for our own

 5  benefit, our own protection."  But it wasn't followed.

 6          But that is not evidence that anyone was

 7  intending to profit.  In fact, it's the opposite.  If you

 8  want to profit you need to know what it's costing you.

 9          **THE COURT:**  Okay.

10          **MR. JONNA (BY PHONE):**  Your Honor, this is Paul

11  Jonna.  May I briefly respond to a couple of points?

12          **THE COURT:**  Sure.

13          **MR. JONNA (BY PHONE):**  So Your Honor knows, the

14  Select Investigative Panel's reports and the introduction,

15  number 15, specifically says that the panel uncovered

16  documents and received testimony from confidential

17  informants indicating that four Planned Parenthood Clinic

18  may have violated Federal law, specifically Title 42, USC

19  Section 289 (G), which prohibited the transfer of fetal

20  tissue for valuable consideration.

21          And the next page, panel also says that it

22  determined that Planned Parenthood affiliates which then

23  expressed procured fetal tissue, had no legally

24  reimbursable costs.

25          And also, Your Honor, on page 172 of that

1    report it states that the panel determined that PPSA

2    affiliates which --

3              **THE COURT:**  Mr. Jonna?  Mr. Jonna.

4              **MR. JONNA (BY PHONE):**  Yes.

5              **THE COURT:**  I need you to stop just for a moment.

6    So your voice is cutting in and out.  I've had been

7    watching our court reporter to see how she's handling this.

8    I think she got it up until this last example you used.  I

9    would like you to restate it for the record because I think

10   you were cutting out too much for us to get it.

11             **MR. JONNA (BY PHONE):**  Sorry.  So the last

12   example would be the point that the panel determined that

13   Planned Parenthood affiliates, which StemExpress, procured

14   fetal tissue, had no legally reimbursable costs.

15             And then, on page 172 of the report, it states

16   that the panel determined that PPSA affiliates, which

17   StemExpress procured fetal tissue had no allowable costs

18   under 42 U.S.C. 289 (G).

19             And it says that StemExpress embedded tissue

20   technicians to obtain consent to donate fetal tissue.  And

21   then, it goes on to say the panel determined PPSA

22   affiliates had no allowable costs.

23             And then, the next -- there's just two other

24   quick examples, Your Honor.

25             The next report is the Majority Staff Report

1    of the Committee of the Judiciary.  Both of these reports

2    are online.  If you look at page three, it says that --

3    let's see.

4              The companies failed to provide meaningful

5    cost analysis that would justify the amounts received.

6    They have attempted to rely on vague, expansive and

7    undefined, indirect costs and general overhead to justify

8    the payments required.

9              And so these categories are so broad as to

10   allow them would be inconsistent with the law's clear

11   intent to prevent the buying and selling of fetal tissue

12   since prohibited payments can simply be recategorized and

13   falsely justified.

14             And then, Your Honor, another example I would

15   point you to is on page five, under .7.  It says:

16                  "Four Planned Parenthood affiliates have

17   had paid fetal tissue programs" -- I'm sorry, Your Honor.

18   I'm pointing at the wrong one.  It's page seven.

19             It says:

20                  "It appears that the affiliates' payments

21   may have violated the ban on buying and selling fetal

22   tissue.  In addition, the actions of PPSA and its

23   affiliates after PPSA learned of the affiliates' violation,

24   suggest the possibility of a violation of the Federal

25   criminal conspiracy law."

1          And then, the last example I'll point the

2   Court to is on page 53.  It said:

3              "There is a reason to question whether

4   Planned Parenthood fully complied with Federal requirements

5   relating to fetal tissue transfer payments.  As noted

6   above, when PPSA learned that its affiliates had failed to

7   comply with the policy it had in place to prevent breaking

8   the law, PPSA reportedly contacted the affiliates, and then

9   modified PPSA's accreditation reviews in a manner that

10  facilitated the continuation of those fetal tissue

11  payments.

12             "PPSA and the affiliates' actions may

13  implicate the Federal conspiracy statute."

14          I do encourage the Court to read their report.

15  I just wanted to point out those examples.

16      **THE COURT:**  Okay.  Thank you.

17          Ms. Bomse?

18      **MS. BOMSE:**  Your Honor, I would ask the Court

19  also to note that there are minority reports that were also

20  issued.  This was a down-the-line Republican-Democratic,

21  you know, politically-charged situation.

22          There are people who were on that committee

23  who have been committed for years and years to defunding

24  Planned Parenthood.

25          So I think the Court needs to review anything

```
 1    that's in that report with that in mind.

 2              THE COURT:  Okay.

 3              MS. BOMSE:  And I would also note that each time,

 4    or virtually each time Mr. Jonna quoted the conclusions,

 5    the conclusions were "may have violated, reason to

 6    question."

 7              It's the opposite of a finding.

 8              THE COURT:  Okay. I would like to have the

 9    request for admission, just so that I have them, the ones

10    that you pointed out, Ms. Short.

11              MS. SHORT:  Okay.

12              THE COURT:  So if you can put those -- submit

13    them on the record.  I'm not asking for more than what

14    you've identified.  I'm counting on Counsel to just say

15    "This is key stuff."

16              So there were several that you -- I don't need

17    the whole body of RFA's.  Just give me the several that you

18    pointed out that you think I should consider.

19              Mr. Breen and colleagues, please give me the

20    Nucatola and Gatter video.  I would like the raw video as

21    well as if there's an edited video you want me to see,

22    that's fine.

23              But I want the underlying raw video of those

24    two segments.  The rest I can get.

25              Well, why don't you make it easy on me?  Go
```

```
1   ahead and submit the two, or point them out to me if they
2   are already in the record.  The latter is preferable so we
3   don't litter the record with Congressional reports.  Okay?
4         MS. BOMSE:  Your Honor, would you like both the
5   democratic minority report and the majority report?
6         THE COURT:  The entire so I can see the context.
7   Again, if it's already in the record we don't need to kill
8   another tree.  Just tell me where I should look.
9              I don't need more citations.  I don't want
10  more argument on it.  Okay?
11             You've told me what I should consider, and I
12  will take a look.
13        THE COURT:  All right?
14      MR. BREEN:  And, Your Honor, I think the
15  contracts and invoices, just to give you a slight --
16  because there are also attachments to these documents.
17        THE COURT:  I understand there's contracts and
18  invoices.  And I've seen some of the invoices because that
19  was part of the last round.  I don't think that's
20  particularly helpful.  So I understand that they exist.
21  Okay?
22      MR. BREEN:  Okay.
23        THE COURT:  All right.  So let me ask you,
24  Ms. Bomse, just thinking through the proportionality
25  issues, how hard would it be for each of the affiliates to
```

```
 1   generally explain, because we have it for 2015.  Right?
 2   It's actually not general.  Sounds pretty specific.
 3            MS. BOMSE:  Right.
 4            THE COURT:  But if there were a general
 5   explanation for each of those four affiliates for the
 6   period of time at issue, that is 2011 through 2015.
 7            MS. BOMSE:  Right.
 8            THE COURT:  Is that terribly burdensome?
 9            MS. BOMSE:  Well, I think the answer to that is,
10   Your Honor, preparing the 2015 cost analysis that we've
11   talked about was unbelievably burdensome.
12            THE COURT:  I'm not saying --
13            MS. BOMSE:  A cost analysis.  I understand.
14   Sure.
15            THE COURT:   I'm talking about:
16                  "Here's how we do it.  We look at, you
17   know, the overhead.  And we" -- sort of a more generalized
18   explanation --
19            MS. BOMSE:  Right.
20            THE COURT:  -- of how those affiliates make sure
21   they are complying with Federal law.
22            MS. BOMSE:  Yes, Your Honor.  So as has been
23   acknowledged and was acknowledged in Congress and was
24   acknowledged here today, there wasn't a process to do it.
25   There was a -- it was very ad hoc.
```

1          These were extremely small programs going on.

2     And when we say "at affiliates," we're talking about

3     actually at a couple of locations for very, very large

4     affiliates who had, you know, 10, 20, 30 health centers

5     where abortions were being provided.  And at maybe one or

6     two of them these were going on.

7          At the time Mr. Daleiden's videos came out

8     there were numerous people at Planned Parenthood who had no

9     idea that these programs existed, because they were small

10    and they were ad hoc.

11         So I wouldn't want to represent to the Court

12    that we can tell defendants:

13              "Here's how we did it over the years."

14         It is certainly the case that we could answer

15    the question:

16              "Here is what we generally consider to be

17    costs that we incur related to the -- facilitating the

18    donation of fetal tissue."

19         Now, that's the answer to your question, so I

20    want to stop.  But I do have other things I want to say

21    about that.

22         **THE COURT:**  Okay.  General costs that we incur

23    related to the facilitation of fetal tissue.  Is that what

24    you said?

25         **MS. BOMSE:**  Right.

1    **THE COURT:**  And are those different for each of

2    the four affiliates?

3    **MS. BOMSE:**  I expect they would be somewhat

4    different because, for example, there were different tissue

5    TP -- TPOs providing different services.  So that would

6    mean if a TPO provided certain services the affiliate

7    wouldn't incur those costs.  So they would be -- they would

8    be different.

9    **THE COURT:**  Okay.  All right.  So what do you

10    want to say?

11    **MS. BOMSE:**  What I want to say is I want the

12    Court to consider to the extent that the Court's

13    contemplating requiring us to do that where this goes.  I

14    think we need to remember why we're here.  We're here

15    because there was a three-year campaign to get inside

16    Planned Parenthood to smear Planned Parenthood.

17    And the kind of evidence that is now being

18    sought is precisely what defendants hoped that they could

19    sneak inside of some office and obtain.  And so what I'm

20    concerned about is we will answer this question, and there

21    will be more questions.  And none of it, none of it goes to

22    the claims in this case.

23    **THE COURT:**  So I understand and I read your

24    papers.  Okay?  There's some things that were unanswered,

25    folks, honestly.  And part of that is about

1  proportionality.  Part of it is what is out there, and I

2  got that information from you. I want to review it myself,

3  because I need to analyze it through 26 (B) (1).  And part

4  of that is are we going down a rabbit hole that, you know,

5  if you look at the 26 (B) (1) factors, the two most

6  important ones in this case have to do with whether or what

7  is the importance of the discovery resolving the issues in

8  the case.  Okay?

9           So how key is this to resolving the issues in

10  the case?  And whether the burden or expense of the

11  proposed discovery outweighs its likely benefits.  Because

12  I think we all agree the case is very important, and that's

13  the first factor.

14           And there's no dispute there.  There's no

15  dispute that Planned Parenthood has greater access to this

16  information than the defendants.  There's nothing on the

17  record about your relative resources so that's kind of a

18  wash.  But the two most important are the ones I mentioned:

19  How critical is this information to resolving something in

20  the case that's important?

21           So it's not just:  Is it something that

22  defendants want?  But:  Is it critical or how critical is

23  it to your defense?

24           I have looked at what you've argued in your

25  papers, and I want to understand better what the state of

1  evidence is, which is why I asked you the initial question

2  and I'll get that.  I'll review that.

3          Without that I can't really walk through.  But

4  I understand your point, Ms. Bomse.  I mean, the Court

5  needs to figure it out.  If it turns out this is a rabbit

6  hole, this is not particularly relevant, or even if it's

7  marginally relevant or marginally relevant on something

8  that is not going to be a big issue in the case, okay?

9  Then, there may be no further discovery or limited

10 discovery.

11         If it turns out to be central in someway,

12 that's always going to justify more discovery.  So that's

13 what I'm -- that's what I need to get at.  But I need to

14 review the kinds of things that we just talked about.

15         **MR. BREEN:**  And if I may, Your Honor.

16         **THE COURT:**  Sure.

17         **MR. BREEN:**  Thank you for giving us your insight

18 on that.  I mean, Your Honor, this is something we

19 anticipate presenting to the jury.  This is the issue of

20 whether they violated the Federal laws is core to their

21 claim of whether it's a smear.  I mean, this is so central.

22         **THE COURT:**  Here's the point.  Here's the point

23 that nobody really talked about, but I think is critical.

24 I mean, the allegations here are that defendants illegally

25 infiltrated protected conferences and purposefully tried to

1  engage Planned Parenthood representatives in discussions to

2  try to catch them on tape saying things that would

3  incriminate their violation of Federal Fetal Tissue

4  Donation Laws.  Right?  That's the allegations.

5           And that further allegation is that defendants

6  then took that video footage and spliced it together in a

7  very misrepresenting way, put it out to the public, and

8  caused a wave of threats and violence against Planned

9  Parenthood that they then had to respond to with expensive

10  security costs and the like.

11           So I am not at all clear that it's admissible

12  or even relevant, but I'm not sure yet.  If there's things

13  that turn out after the fact to be something that's dug up

14  that's a problem, but that was not part of what you -- what

15  your clients found in the conference, then that's a very

16  different relevance calculation.

17           **MR. BREEN:**  And, Your Honor, remember it's not

18  just videos.  So we've had our media releases, our media

19  appearances, all of that.  So the defendants have been

20  alleging they were violating the law.  So if they were

21  violating the law, that was part of the harm here.

22           So that's what they are saying:

23              "Well, we were smeared."

24           And just like in Food Lion, if it turns out

25  the defendants are correct, they were violating the law,

1    then your damages go all the way down because then they

2    were responding to the truth.

3            **THE COURT:**  Right.  I think that's a bit of a

4    gloss, Mr. Breen.  But I understand the point.  But I'm

5    also concerned.  I hear the point that you're saying this

6    is central the -- I mean both sides have a very different

7    view of this.  Right?

8                Defense says:  "This is our defense."

9                Plaintiffs say:  "This isn't relevant at all."

10   Okay?

11               I think there's a difference and whether this

12   is potential after-the-fact justification versus something

13   that is flowing from what turned up as part of the

14   defense's objections in the case.  So I'll leave it at

15   that.  But is there something more you want to argue?

16           **MR. BREEN:**  I would just say, Your Honor, it's

17   going to be the Plaintiffs' burden to argue and to prove

18   that they were in compliance with Federal laws and State

19   laws that were relevant.  That's going to be their burden.

20           **THE COURT:**  I'm not sure that that's something

21   that they need to prove.  That's for Judge Orrick to sort

22   out about what are the claims and defenses in the case.

23           **MR. BREEN:**  Right.

24           **THE COURT:**  I don't understand that to be an

25   issue in the case.

 1          **MR. BREEN:**  Well, and that, again, Your Honor,

 2     we've got evidence of a willingness to violate law.  You've

 3     got evidence of violations.  And then, a claim that this is

 4     a smear when, in reality, they were willing to violate the

 5     law.  They did violate the law.

 6              So the issue of whether they actually violated

 7     the law is very much in play.

 8          **THE COURT:**  Okay.

 9          **MR. BREEN:**  That was part of the public debate.

10     They are saying that we were lying.  And we're saying:

11     "No, we were correct."

12              And, I mean, that's core to the case that

13     whether there were or were not violations of various

14     Federal laws.

15          **THE COURT:**  Okay.  I understand the position.

16              Looks like Ms. Short has something.  Come to

17     the mic.

18          **MS. SHORT:**  I'm sorry.  I just wanted to add one

19     thing about how this discovery itself is relevant.  This is

20     about the costs.  And that's one of the things in the

21     videos.  There's a lot of discussion, as their defense is:

22     "We were just getting our reasonable costs."

23              No.  At this point, there is no debate anymore

24     about whether they were receiving money.  The question is

25     about the costs.  And that's what this discovery is,

1    directly.  How do you explain those costs?  And that's what

2    is in the videos, too.

3            They say:  "Well, it was consent."  But

4    consent isn't a legally recoverable cost.  And how much was

5    that consent?  It is all very much bound up with what was

6    in those videos about what they were saying:

7                    "Well, you have to make it look right.

8    Well, you know, there is time spent consenting to patients.

9    And you have to make it look right.  You have to be able to

10   justify it."

11           I mean, the idea of what were those costs is

12   central to the legality of the action and is central to

13   what was in those videos, too, in terms of:  Were they

14   really saying "We're going to make a profit"?

15           Were they saying:  "Well, we do have some

16   costs, but they are not legally allowable costs."

17           So I don't see how you separate those two

18   because, you know, this discovery goes to what were they

19   talking about in those videos.

20           They say it was one thing.  It sure doesn't

21   look like that to other people.  So, I mean, I think those

22   are -- that's what we're trying to straighten out here:

23   What were they talking about in the videos when they talked

24   about:

25                   "Well, there are costs"?

    1            **THE COURT:**  Okay.  Ms. Bomse?

    2            **MS. BOMSE:**  Yes.  So I think Your Honor is

    3    exactly right.  This is an after-the-fact attempt to find

    4    the evidence that they said they had.

    5                  I'd like to share with the Court the

    6    statements that CMP released, their press releases when

    7    they released these videos, because what they said is:

    8                      "We have the evidence."

    9                  So it strikes me as odd that we're here now

   10    with them saying:

   11                      "We need the evidence."

   12                  And this is why we were harmed.  The

   13    representation was:

   14                      "We've got them.  We caught them

   15    read-handed."

   16                  David Daleiden said:

   17                      "Planned Parenthood's system-wide

   18    conspiracy to make money off aborting fetal tissue is now

   19    undeniable."

   20                  Three weeks later he said:

   21                      "The evidence that Planned Parenthood

   22    profits from the sale of aborted baby parts is

   23    overwhelming."

   24                  These are -- I'd be happy, Your Honor -- I

   25    have copies with me today, and I'd be happy to submit these

1    press releases, although they are also available online.

2                    But the point is that they said they had the

3    evidence.  And it's not enough that they released a press

4    release saying:

5                            "You violated the law."

6                    And then, when we sue them for our harm they

7    can say:

8                            "Oh, now we can come in and see whether

9    anyone in your organization violated the law."

10                   Three of the four affiliates, Your Honor,

11   don't appear in any video.  The only affiliate who Dr.

12   Nucatola, who is not identified as a doctor at Planned

13   Parenthood Los Angeles, who worked part-time as a PPLA

14   doctor, but also was senior leadership in Planned

15   Parenthood.  And that is what Defendants were so excited

16   about.  That's how they refer to her.

17                   But I just want to say I don't want to

18   represent to the Court that none of the four affiliates

19   were even talked to.  But three of four were not talked to.

20   This --

21            THE COURT:  So just PPLA through Nucatola.

22            MS. BOMSE:  That's right.  And there was nothing

23   about PPLA in any event.

24            THE COURT:  Can I ask you, Ms. Bomse, the press

25   releases, are those part of the record already?

1      **MS. BOMSE:**  I don't believe so, Your Honor.

2      **THE COURT:**  Okay.  So along with what I've asked

3  for, please submit them.

4      **MS. BOMSE:**  Your Honor, it's not our burden to

5  show that we were in compliance with the law.  It's our

6  burden to show that their videos were a substantial cause

7  of our harm.

8          And Mr. Breen's reference to <u>Food Lion,</u> Your

9  Honor said it was gloss.  I agree it's a gloss.

10         This case is entirely different from Food

11  Lion.  Food Lion, the claim was they lost their customers.

12  We're not claiming anyone stopped going to seek healthcare

13  at Planned Parenthood because of these videos.

14         We're claiming the opposite.  We're claiming

15  the opposite of our customers.  People who already were

16  hostile to Planned Parenthood were motivated to act out

17  against Planned Parenthood, and we have to secure our

18  facilities for that.

19      **THE COURT:**  Okay.  I'll take some last comments,

20  but what I really need is the evidence that I've asked you

21  to submit.  And then, I'll take a look.  If I need you

22  back, then I'll have you back.  Okay?

23         So the last comments are, Mr. Breen?

24      **MR. BREEN:**  Thank you, Your Honor.  Just there

25  are clarifications here on the record that just, very

 1    quickly, we talked to PPLA.  We talked to PPSW, P make

 2    more, too.  PP more than California.  We talked to all

 3    these affiliates.

 4              But, as well, Your Honor, you continue to hear

 5    now we're looking at press releases.  You've got

 6    allegations that this is a smear campaign that goes to

 7    broader than:  Were your videos edited correctly?  Or what

 8    have you.  Were you right or wrong?

 9              You're making allegations, and Planned

10    Parenthood is saying:  "Those are false allegations."

11              We are entitled to prove, you know, we were --

12    it's true.  And they respectfully contend it is the

13    Plaintiff's burden to prove that we have somehow falsified

14    those allegations.

15         **THE COURT:**  Here's the gloss.  And what is the --

16    and I'm not accusing you of gloss, Mr. Breen.  It's just

17    the one I'm concerned about.

18              If there's nothing there and now your clients

19    are looking for something.  Right?  That's an entirely

20    different proposition.

21              That's what I need to focus on with respect to

22    whether something is relevant or not.  As I said, that

23    likely is not admissible if it's after-the-fact materials.

24    Okay?

25              I don't want to go -- that's Judge Orrick's

1    call.  But what I'm saying is if it's -- if it turns out

2    there is no evidence of violating the law.  Okay?  And you

3    get this discovery and it looks like -- it turns out, just

4    theoretically, that there is a violation.  I'm not sure

5    that's admissible.  Okay?

6            Now, admissibility is not where you draw the

7    line on discovery, so that doesn't answer the question.

8    But that is what I'm concerned about.  That's why I'm

9    asking these questions.  Okay?

10        **MR. BREEN:**  And, again, you can see, Your Honor,

11    for us that, I mean, it's certainly relevant to whether

12    they are correct.  If their claims that they did not

13    violate the law are wrong, well, then they need to --

14    that's certainly relevant.

15        **THE COURT:**  Mr. Breen, I'm not sure it's relevant

16    if it all happens after the fact.  But I don't know.  And

17    that's why I would like to look at the information and only

18    the information.  Don't start piling on.  Counsel, identify

19    key information.  That's all I want.  I will disregard

20    anything that you put in the record that I didn't just ask

21    for.  Let me be clear.  Okay?

22            So I see a Conga line forming behind you.  I

23    will take two quick comments, and then I think we've had a

24    pretty thorough discussion here.

25        **MR. MILLEN:**  Michael Millen for Defendant

1    Rhomberg.

2               Your Honor, to me there's a kind of a

3    procedural conundrum that this -- I've heard all your

4    concerns and what you're saying that this brings up, which

5    is the judge who rules on the discovery -- which is, of

6    course, is you -- is not the same judge who rules on the

7    motions in limine.

8               And so there is a concern, at least speaking

9    on behalf of my client, that if, indeed, it's true that,

10   you know, this is a smear campaign is not relevant.  In

11   other words, it's not important.  I suppose in the world

12   where there's a motion in limine where Planned Parenthood

13   is not allowed to say "And they made untrue statements,"

14   suddenly I begin to see the Court's point, which is:  They

15   are not talking about whether untrue statements were made,

16   so why are we getting into it?

17        **THE COURT:**  Mr. Millen, I don't think there's a

18   problem here.  And if I wasn't clear about this, let me

19   just state it:  The scope of discovery, in other words,

20   what I allow in discovery is not defined by what is

21   admissible.

22               So if I think it's not admissible, it still

23   may be discoverable.  And I'm well aware of that.  So I

24   will not be making decisions that are essentially motions

25   in limine in hiding.  I can't do that.  That would be

1     inconsistent with Rule 26.  I think that's the point you're

2     making.

3          MR. MILLEN:  I just wondered if there was a world

4     where in this sort of situation it actually made sense to

5     go to Judge Orrick -- even though we have like a trial for

6     next year.  We're way, way early here in 2018 -- to ask

7     judge Orrick, because I've heard you talk about evidence

8     and admissibility, and I understand what the Court is

9     saying.  Whether that's something where to get out of this

10    interesting conundrum we go to Judge Orrick and say:

11              "Is there a time for a motion in limine to

12    figure it out?"  Because, obviously, if he said:  "Don't

13    want to hear it" --

14          THE COURT:  I don't -- you know, that is not the

15    way I'm planning on handling it.  In other words, suggest

16    that he do a way premature motion in limine.  Okay?

17              If I need to consult with him or if he needs

18    to consult with me, that's always available.  So --

19          MR. MILLEN:  Thank you.

20          THE COURT:  But I think that's something you need

21    to leave to me.  But I hear your point, which is that this

22    is not about admissibility.  And I've acknowledged that.

23    Okay?

24              But I was using that as a way to express the

25    way I'm thinking about this, which is the relevance is tied

1    to whether this is something that is relevant to an issue

2    that is going to be discussed at trial.

3              **MR. MILLEN:**  Thank you.

4              **THE COURT:**  Okay.  Ms. Short, your brief comment.

5              **MS. SHORT:**  First of all, please note the dates

6    on the press releases, because already various panels have

7    started working.

8                   So when Mr. Daleiden contributed those in the

9    context of what was going on at the time, Mr. Daleiden

10   might have been referring to the work of the select panel

11   at the time he made those comments:

12                      "But now we have the evidence.  Now we

13   see."

14                   And the second thing is, I mean, I guess the

15   question is if you say it's not discoverable, I think you

16   said you well understand how something may be discoverable

17   but not admissible, we worry about the flip side of that.

18   Which that you will say "It's not discoverable," but then

19   come trial, they will be saying:

20                      "And, by the way, we were totally in

21   compliance with the law."

22                   And, you know --

23             **THE COURT:**  I get it.

24             **MS. SHORT:**  -- what are you supposed to say at

25   that point?

1      **THE COURT:**  I get it.  You're entitled to -- I'm

2   sorry if I'm repeating myself -- relevant and proportional.

3   That's what defines discoverability.

4            The rule changed in 2015.  It is now part of

5   the definition of what you're allowed to discover.

6            So if it turns out there's some information

7   that make it proportional, but other things that are not,

8   that may be what that ruling looks like.  Okay?

9      **MS. SHORT:**  I would -- Planned Parenthood of

10  Northern California indicated that it had done an

11  accounting, some sort of contemporaneous accounting, so

12  that one should not be very difficult for your people.

13     **MS. BOMSE:**  Sorry?

14     **THE COURT:**  Say that again?

15     **MS. SHORT:**  In their request for admissions

16  Planned Parenthood indicated that it -- it denied it had

17  not been doing contemporaneous accounting.  That's as much

18  as I can say.  They denied -- they did not -- they said

19  that it was not keeping contemporaneous records.

20            That's false.  So that should factor into

21  proportionality, because apparently one of those affiliates

22  was keeping contemporaneous records.

23     **THE COURT:**  I see.

24            Go ahead, Ms. Bomse.

25     **MS. BOMSE:**  Thank you, Your Honor.  So when the

1    Court's thinking about this, what I want the Court -- what

2    Plaintiffs would like the Court to think about is:  What is

3    the smear?

4                And the smear is not some affiliate had

5    greater reimbursements than costs.  That smear, the smear

6    here was that Planned Parenthood was a Little Shop of

7    Horrors, bringing in babies, aborting them in order to sell

8    their baby parts.

9                And let me give you an example of what was

10   said by Mr. Daleiden.

11                   "The entire Planned Parenthood

12   organization is a horrific late-term abortion and baby

13   parts business.  Videos about Planned Parenthood and the

14   babies they kill and part out like used cars.  That's what

15   the videos show."

16                And so that's why our position here is they

17   can't now say, years after we already suffered the harm:

18                   "No, now what we really said was you may

19   have violated some law, and we're entitled to find out if

20   you did," because that's not what caused our harm.

21                What caused our harm were these extraordinary

22   claims and claims that they had the evidence of it.

23                Lastly, Your Honor, just in response to Ms.

24   Short --

25                **THE COURT:**  Yes.  Okay.

1      **MS. BOMSE:**  -- on July 15th, when the first video

2  was released, Center for Medical Progress issued a press

3  release that said that:

4              "The videos show that Planned

5  Parenthood's criminal conspiracy to make money off aborted

6  baby parts reaches to the very highest levels of the

7  organization."

8              So they weren't talking about what Congress

9  had figured out.  They were talking about the evidence that

10  they claimed to have uncovered.

11              So let's go to trial and see what they

12  actually uncovered.

13      **THE COURT:**  Okay.  I'd actually like you to

14  address Ms. Short's last point, which is that there is some

15  affiliate that actually kept track so that it's not

16  burdensome.

17      **MS. BOMSE:**  Thank you.  Thank you, Your Honor. I

18  would have to go back and talk to the client.

19              My recollection is that at -- prior to --

20  we've been told prior to beginning this program at Planned

21  Parenthood Northern California, there was an effort to

22  figure out the costs.  This is a long time ago.  I don't

23  know if these are still extant or not.

24              And I would still maintain that without any

25  burden there's absolutely no relevance.  But we'll

1    certainly be happy to go back and find out from the client

2    and let the Court know what the status is of that.

3              **THE COURT:**  Okay.

4              Because Ms. Short raised it, so it sounds --

5    here's what I think you said, Ms. Short.  You can infer

6    from the way that the RFA's were answered that at least one

7    affiliate actually did keep some accounting, which would

8    make it easy for them, or not so burdensome for that

9    accounting to be turned over in discovery.

10             So I would like you to follow up on that point

11   and submit a brief factual report.

12             So I'm asking -- I'm actually ordering the

13   parties to only give me what I ask for and not include any

14   further evidence or argument.

15             And I'm saying that because in the first round

16   where we did the omnibus, there was -- I had to deal with

17   so many issues of things that were not brought up before

18   and were brought up later, and it became a moving target.

19   I will not put up with that.  I just want folks to know.

20             If you do something beyond what I just

21   ordered, I'm going to ignore it.

22             If there's something more I want, I will let

23   you know.  And if I want you to come back, then I'll have

24   you back in and we'll do some more argument.  Okay?

25             **MR. BREEN:**  And then, Your Honor, just so our

1  list is correct, we've got the request to admit we were

2  discussing.  Those should be submitted to the Court.

3          **THE COURT:**  Not all of them.  Just the ones

4  Ms. Short mentioned.  So sounded like there was a handful

5  of them.

6          **MS. SHORT:**  I think there's one.  The excerpts or

7  the pages --

8          **THE COURT:**  No.  What I'm picturing is is there's

9  a big set of RFA's, but there's only five to ten that you

10  were just talking about.

11              I only want those five to ten.  Okay?

12          **MS. SHORT:**  Pages, okay.  Or pages that have

13  those five to ten.

14          **THE COURT:**  Right.  I don't need the entire set

15  of things that I'm not going to be reviewing.  Okay?

16          **MR. BREEN:**  And then, the unedited videos of the

17  Nucatola and Gatter lunches, and then the posted videos,

18  the ones that were --

19          **THE COURT:**  Of the same.  What was created of

20  that raw video that became the Nucatola and Gatter public

21  videos.

22          **MR. BREEN:**  And then, you want the press releases

23  that were sent out by Center for Medical Progress on this

24  topic or with those videos or --

25          **THE COURT:**  No, just what Ms. Bomse had

1    referenced here today.

2            **MR. BREEN:**  And, Your Honor, there's a blog.

3    They posted it on the blog with the video and the release.

4    So for each of the Nucatola and Gatter videos there was a

5    video and release that went with it.

6            **MS. BOMSE:**  Counsel, I have those press releases.

7            **MR. BREEN:**  I don't think it's going to be an

8    issue.  I thought Your Honor wanted those.

9            **MS. BOMSE:**  Right.  And we can easily get them.

10   I don't think there's confusion about them.  And I know

11   exactly which ones they were.

12           **THE COURT:**  Okay. So those, the press releases

13   and the short factual summary about what auditing practices

14   may or may not happen in one affiliate.  That's something

15   the plaintiff should provide.

16           **MS. BOMSE:**  Right.  Exactly.

17           **THE COURT:**  Everything else so far should come

18   from the defense.  There's Congressional reports, two of

19   those.

20           **MS. SHORT:**  Would Your Honor like those

21   highlighted or do you think you have the --

22           **THE COURT:**  Mr. Jonna gave me some pinpoints, as

23   did each of you.  And Ms. Bomse had some comments.

24           And, again, because I don't want further

25   argument, because then it just sort of spins out of

1    control, folks.  And I can review them and take a look.

2                   So you don't need to highlight them, although

3    I appreciate the offer.

4                   So those two, except if they are already in

5    the record, just tell me where they are in the record and

6    you don't need to resubmit them.

7                   I think that's it.

8           **MS. BOMSE:**  That's it.

9           **THE COURT:**  That was it.

10          **MS. BOMSE:**  And, Your Honor, I assume Counsel for

11   defendants will share with us the video that they are

12   planning to provide to the Court before they provide it.

13          **MR. BREEN:**  I'm assuming it's been turned over in

14   discovery previously.

15          **MS. BOMSE:**  Well, I just want to know exactly

16   what has been given to the Court.

17          **MR. BREEN:**  Certainly.

18          **THE COURT:**  Right.  Because we have an issue.  We

19   can't post these as a part of the docket.  Right?

20                  You are going to have to submit them in

21   camera.

22          **MS. BOMSE:**  Yes.

23          **MR. BREEN:**  They are not secret or in any way

24   enjoined.

25          **MS. BOMSE:**  Right.  They are not enjoined, that's

1   true.

2         **THE COURT:**  Well, I think it still is better

3   because it's video, please just go ahead and submit them to

4   Ms. Bomse for -- so she can approve as to form.  And then

5   submit them in camera to me.

6               We didn't need to post the videos on the

7   website, on our docket.  Okay?

8               How much time, Counsel, do you need to get

9   this homework done?

10        **MS. BOMSE:**  On my end the only issue is whether

11   someone at that affiliate is on vacation right now.  So I

12   guess I would say two weeks to be safe.

13              Everything else, I think the materials that

14   exist already seems like a week should be more than enough.

15        **MR. BREEN:**  Two weeks.

16        **THE COURT:**  All right.  Why don't we say two

17   weeks?

18              So that puts us out to August 2nd.

19              Okay?  I promise to take a look at everything.

20              And if I have questions, I'm going to have you

21   back.

22              Otherwise, I'll be issuing an order.

23              Okay?

24        **MS. BOMSE:**  Thank you, Your Honor.

25        **THE COURT:**  All right.  Thank you.

1          **THE CLERK:**  Court is now adjourned.

2               (Thereupon, this hearing was concluded.)

3    Stenography certification

4          "I certify that the foregoing is a correct transcript
     from the record of proceedings in the above-entitled matter."
5               July 22, 2018
                /s/Katherine Wyatt
6    _____