Exhibit 2-1

# Clinic Procedures and Policies

As a representative of StemExpress you are required to act in a professional manner and follow all clinic policies. Please take note the following procedures and policies are **extremely important** regarding our presence in the clinics:

1. **Communication with the Assistant Manager and HSS's** – Upon arrival, inform the staff clearly what you are procuring for the day. Just as important, **you must inform the Assistant Manager and HSS's when you have completed your work.** This will insure they do not continue to consent and draw unnecessary blood samples. In addition, please **notify the Assistant Manager** upon departure of the clinic and remember to thank them for their assistance.

2. **Cell Phone Use** – It is essential we follow clinic rules with respect to cell phone use. **Please DO NOT pull your cell phones out in the hallways for ANY reason.** While we realize our cell phones are critical to our internal communication, we need to follow the etiquette set by the clinic. If you receive a text or call, step to an appropriate private area or into the nearest unoccupied room to read the text or answer your phone. Phones should always be on vibrate while in the clinics.

3. **Perfume Free Policy** – All clinics have a Perfume Free Policy, Please refrain from applying perfume or any fragrance prior to or when you are in the clinic.

4. **General Clinic Etiquette:**
   - Calm demeanor
   - Sensitive to Patients' Privacy and Situation
   - Professional at all Times
   - Respectful to Patients and Clinic Staff
   - Maintain Confidentially for Patient Information

I have read and understand the above Clinic Procedures and Policies



Print Name          Signature          Date

776 Pacific Street / Placerville CA 95667
T: 530-626-7000 F: 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 / info@stemexpress.com / www.stemexpress.com

# Exhibit 2-2

January 3, 2011

Protocol Number: 101-01

Protocol Date: January 24, 2011

Study Title: Tissue Procurement for Non-therapeutic Research

Sponsor: StemExpress, LLC.

Primary Investigator:  [ Redacted ]
StemExpress, LLC
778 Pacific Street
Placerville, CA 95667

[ Redacted ]

## Standard Operating Procedure

### 1.  Purpose
This SOP covers Tissue Procurement for Non-therapeutic Research.

This protocol describes the set up, equipment and procedures for procuring cadaverous tissue to use in non-therapeutic research.

### 2.  Scope
This applies to all procurements for non-therapeutic research.

### 3.  Prerequisites
The day before surgery:
Check WebOffice for researcher requests;
Determine your location for the next day;
Call the clinic to verify how many surgeries are scheduled.

### 4.  Responsibilities
It is the procurement technician's responsibility to bring the general and medical supplies listed in this SOP to each clinic. The clinic staff will identify donors. It is the procurement technician's responsibility to retrieve the tissue and package it appropriately for the given researcher. It is also the procurement technician's responsibility to update WebOffice so everyone is aware what tissue has been obtained and for whom.

### 5.  Equipment
General supplies:
Current blank RPR (Researcher Procurement Record)
logs Pre-printed FedEx forms

General supplies:
Current blank RPR (Researcher Procurement Record) logs
Pre-printed FedEx forms

Medical supplies:
Scrubs
RPMI
Hepes Solution with antibiotic added
Petri dishes
Shipping boxes
Personal instruments to procure
Conical tubes
Mini urine specimen cups
Cold packs

## 6. Procedure

On the day of surgery, the following steps are taken to procure tissue
from POC: Arrive at the clinic and change into scrubs.
Inform the consenting staff of which gestations to
consent. Place chucks down.
Set up the light box, instruments, RPMI, Hepes, petri dishes and
tubes or cups. Set up enough blood draw bags for the day.
Get out the sequential numbering labels.
Print a copy of the day's Procurement Schedule.
Follow along with the chart flow so you know what gestations to expect.
If required, initiate blood draw from clinic staff. We do NOT want a patient
label on the blood tube. Give the clinic staff the blood bags and correct blood
tubes for the given researcher. If these are blood samples to accompany the
tissue sample, number them in order as soon as complete. See the SOP
"Maternal Blood Samples for Infectious Disease Testing" for specific guidance
on those blood samples.
Once a consenting donor has undergone surgery, procure the specimen(s) on
the petri dish and light box.
With minimal manipulation after isolating the specimen(s), move the petri dish
to the packaging room and carefully transfer the specimen(s) to the appropriate
container (conical tube or mini urine specimen cup). Add the researchers media
of choice and seal with parafilm.
Keep track of time, gestation, fetal foot size or sono report and date.
Package the specimens and blood tubing for shipment once all specimens have a
number. Be sure to place them on ice or cold packs.
Note the specimen numbers on the
RPR log. For delivery:
If the specimen is local courier, be sure to call the courier once you know you
have obtained an appropriate specimen.
If the specimen is going by FedEx, be sure to know the local cut-off times for
your closest FedEx office. Each FedEx location is listed under "contacts" in
WebOffice. Always know which FedEx you will be dropping off at and consider
traffic. Log on to www.fedex.com with your assigned log on and password. Print
shipping label and affix to box.
All instruments must be sterilized once you are done for the day.
Clean the area(s) thoroughly and discard all unused POC in the appropriate
receptacle. Gather your supplies to leave and change out of your scrubs.

# Exhibit 2-3

7-17-15

① 18 mm = 15.2 week    in Trizol @ 3:30
— than leg & forearm

② — 30 mm = 19.6 weeks
forearm          BL in Trizol + Tper 5:05

*NB - Clinic now uses
digoxin only on 20 wk

9-10-15
24 mm = 17.4 wks.

███████  sm. intestine project
Day 1

9-11-15
(1) 20 mm = 16 weeks

(2) 17 mm = 13 weeks

divided into 3 parts :
1) duodenum =        no stomach, but definitely a widening
mounted & stretched over scissors blade
2) GI around appendix
stretched over forceps
3) general intestine, No meconium present, took from smaller
diameter end + 4 cm
stretched over forceps

10-2-15
(1) 26 mm = 18 wks

10-21-15
(1) 9 mm = 12 wks
90 cm long segment - know it's small intestine because it was attached
to the stomach. Divided into 4 pieces

(2) 19 mm = 15.4 wks
14.5 cm long small intestine segment

HIGHLY CONFIDENTIAL

8 ─ ─

1-15-10

(1) 26mm ~ 18 weeks

Skin from upper arm (looks degradated)
Retina →█████

n₂  ████

1-15-10

(3) 23mm - 17 weeks

SKIN from lower leg →

ℓ n₂  ████
of appendix
→  ████

(4) 41mm = 25 weeks    Treated with digoxin

heart mushy ; GI discolored . + liver . skin loose
Eyes discolored red  2 retinas → ████ for coverslips w/
                                        • ∅ Epo  /2  10 Epo

(5) 30mm = 19.6 weeks (DIG)

2-4-10
(1) 33mm = 20.7 weeks   Digoxin - observations
                            • heart - entire organ mushy
  - Cord blood             • Kidneys - discolored dark red; Lack of form
  - Lung   ⎫
  - heart  ⎬ TriZol       • GI discolored -
  - skin   ⎭               • Lungs - mushy, + discolored w/ blood
  - brain
  Lungs ⎫ formalin
  Skin  ⎭

  6 coverslips - Brain - DMEM complete

HIGHLY CONFIDENTIAL

Thanks for the update, that is fantastic data! We will try to get later gestation lung for you, sometimes we can get up to 20-22 weeks, but it is unusual these days to get non-digoxin exposed samples beyond 18 weeks (i.e., no living tissues). We can get cord blood, which I am sure you can as well. What about MSCs from tracheal aspirates of ELBW infants? I know the yield would be low, but perhaps the first 48 hours of tracheal secretions could be collected. We will continue to look for later gestational age samples for you.

>>> ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ 8/1/2012 1:17 PM >>>
Dear Prof. ▮▮▮▮▮ dear ▮▮▮▮▮▮
Thank you very much for the lung samples you have sent me so far. I just want to give you a quick update on what I have done by now and what I am up to:

I managed to isolate the mesenchym from those tissues and showed that at 15.6 wk of age (the latest lung) all of the cells are what we call "Mesenchymal Stem Cell" by now. I have included FACS-data, showing the positivity for the standard MSC-markers CD105 (PerCP-Cy 5.5), CD90 (FITC) and CD73 (APC) as well as for the newly proposed CD146 (PE as drop-in in CD105/CD73/CD90 cocktail). The population is negative for CD34, CD45, CD14, CD19 and HLA-DR (as "negative Cocktail", all PE), fulfilling the actual criteria to state them MSC's. Interestingly, no GD2 (Disialoganglioside 2, PE as drop-in in CD105/CD73/CD90 cocktail) can be found on those cells: This marker has been described on MSC's from the bone marrow, non-expression on our cells supports the hypothesis of a huge MSC family with a large variety of differentially expressed markers. It is obvious that the term "MSC" represents are a huge family of cells, each with different properties, abilities, living in different niches of the body.

It has been described (Hershenson et.al.: *Pediatrics*, 2010 and *Am J Physiol Lung Cell Mol Physiol*, 2012) that resident lung MSC's (e.g. the ones I've isolated) play a major roll in the development of BPD, e.g. that there is a coincidence of MSC's in the tracheal aspirate and the risk to develop BPD later on. The (premature?) differentiation of MSC's into Myofibroblasts might be one of the major processes here. However, it still remains unclear how the Mesenchym with its stem cells and all the other resident lung cells interact in the normal and disrupted development, leading to either healthy or BPD-lung.

We want to address this point using
a) isolated MSC's from fetal lungs, showing their functional properties and abilities in Hyperoxia and Normoxia
b) a human fetal lung explant culture in Hyperoxia and Normoxia.
We also want to see if MSC's from the human umbilical cord have beneficial effects on cell survival, growth and development in those settings.

For all the experiments, it might be best to have "older" tissue >15 week of age, for the lung explant culture the oldest lung available is best. Prof. ▮▮▮▮ told me, that you are working on the effects of Digoxin (right?) in extreme premature babies - is there a chance to get one of those lungs? I'm very excited about this collaboration and happy with the way it works right now! If you have any questions, please feel free to contact me via eMail or lab-phone.
Once again, thank you very much for the opportunity to work with those tissues!
Regards from Edmonton,
▮▮▮▮▮

Ps: I also managed to isolate SP-C positive cells form the same sample, but have to fine-tune the separation process to increase the yield. I'll keep you posted.

Attachments:
Flow Cytometry Data for human fetal lung derived MSC's
Immunocytochemistry revealing a MSC - Myofibroblast subpopulation

HIGHLY CONFIDENTIAL

# IX. Biomedical Research and Fetal Tissue Exhibits

Exhibit 9.1

# Congress of the United States

## House of Representatives

### COMMITTEE ON ENERGY AND COMMERCE

2125 RAYBURN HOUSE OFFICE BUILDING
WASHINGTON, DC 20515–6115

Majority (202) 225–2927
Minority (202) 225–3641

February 16, 2016

Dr. David Brenner
Vice Chancellor & Dean
University of California San Diego School of Medicine
9500 Gilman Drive, Dept 0012
La Jolla, CA 92093-0012

Dear Dr. Brenner:

I am writing on behalf of the Democratic Members of the Select Investigative Panel of the Energy & Commerce Committee ("Select Panel"). On January 21, 2016, the Chair of the Select Panel, Marsha Blackburn, sent a letter requesting documents related to the Select Panel's investigation of "issues related to fetal tissue research."

Chair Blackburn's request asks for extensive documentation about how fetal tissue is obtained but appears not to seek information that would allow the Select Panel to explore why fetal tissue research is important or how it has helped advance our understanding and treatment of a range of diseases and conditions. The Democratic Members of the Select Panel believe that an objective and balanced inquiry must consider the past and potential future benefits of fetal tissue research.

I am therefore writing to request your assistance in providing the Panel with information that will further our understanding of the following:

1) Past benefits of fetal tissue research.

2) Potential future benefits that might be gained through continued fetal tissue research.

3) Unique aspects of fetal tissue in research, in comparison with adult cells, stem cells, or other cellular organisms that might be used for research purposes.

The Chair's document requests to you and others also ask for extremely sensitive information, including the identities of persons involved in fetal tissue research, such as the names of clinical and supervisory personnel at academic institutions and medical schools. Some

of the information that has been requested is the type of information that is generally protected from disclosure by state and federal laws such as the Health Insurance Portability and Accountability Act of 1996 (HIPAA) and the Family Educational Rights and Privacy Act (FERPA).

The Democratic Members of the Select Panel are concerned that some of the Chair's requests, including the request for names of certain clinical and supervisory personnel, seek information that puts people's privacy and safety at risk. As of now, this information is being sought without any rules in place to govern the Select Panel's handling of personally identifiable and other sensitive information. Without any formal rules on this subject, the Select Panel cannot provide the kind of assurances or protective measures that are often preconditions to disclosure under federal or state privacy laws.[1]

The Democratic Members have asked the Chair both to stop requesting certain types of personally identifiable information, and to work with us to have the Select Panel vote on formal rules that would protect information that we receive. To date, however, our requests to establish such rules have gone unanswered, leaving it to each individual recipient to negotiate the terms under which information might be withheld or provided. We have asked to be included in these discussions but the majority has refused.

The privacy and safety of individual researchers, healthcare providers, medical students, and patients requires much more than any potential ad hoc and unenforceable assurance of the Chair or her staff, and I want you to know that we will keep fighting to have clear rules put in place.

Please contact Jacquelyn Bolen on the Select Panel Democratic Staff at (202) 226-9471 or by email at jacquelyn.bolen@mail.house.gov to discuss a timeline for providing the additional information that we have requested.

We appreciate your cooperation in the Select Panel's work.

Sincerely,

Jan Schakowsky
Ranking Member
Select Investigative Panel

cc:     The Honorable Marsha Blackburn, Chair
        Select Investigative Panel

---

[1] See, e.g., 45 C.F.R. § 164.512(e)(1)(ii)(requiring notice of the request for protected health information to affected individuals and "reasonable efforts to secure a qualified protective order" for the information prior to any disclosure in response to a lawful subpoena issued as part of judicial or administrative proceedings).

Exhibit 9.2



**Association of
American Medical Colleges**
655 K Street, N.W., Suite 100, Washington, D.C. 20001-2399
T 202 828 0460  F 202 862 6161
www.aamc.org

**Darrell G. Kirch, M.D.**
President and Chief Executive Officer

April 22, 2016

The Honorable Marsha Blackburn
Chairman
Select Investigative Panel
Committee on Energy and Commerce
House of Representatives
Washington, DC  20515

Dear Chairman Blackburn:

I write on behalf of the Association of American Medical Colleges (AAMC) in response to your March 30 letter regarding the AAMC's support for human fetal tissue research. We would like to thank you personally, along with other members of the Energy and Commerce Committee, for your dedication to medical research as reflected in your support of the 21st Century Cures Act.

The Panel has requested information that will help it better understand assertions included in the joint statement organized by the AAMC expressing concerns over state legislative proposals that would restrict the use of human fetal tissue in research. We welcome the opportunity to provide the Panel with additional information on the importance of fetal tissue research in the context of biomedical research in general.

The AAMC believes where research pathways have been or can be discovered, such accomplishments reflect the strength of the research system as a whole. Research that looks promising today for one purpose may lead to discoveries in unexpected areas, provide insights about existing knowledge, or indicate that a new pathway should be explored. By closing the door on one type of research, we may never know what advances we might have attained. For every bit of knowledge or advance that has resulted from research using fetal tissue, alone or in combination with other research, there may be other questions and potential lines of inquiry that merit further exploration, using all available methods.

Scientists must consider and explore diverse paths, while leveraging available knowledge from the work and findings of previous research. When a particular approach appears successful, the research may illuminate other approaches that could lead to similar results or different outcomes. Similarly, researchers are unlikely to determine in hindsight whether their work could have been accomplished using another method. The testing of approaches in different scientific models, however, can be critical for understanding both the mechanisms of disease and the opportunities for translation and applicability of the knowledge for further clinical research.

For example, Gelber and colleagues in a recent review in the *American Journal of Obstetrics and Gynecology* note that "fetal tissue benefits scientific research across many fields, including physicians and scientists who may not even realize its contribution to their work."[1] Gelber et al. note, for example, that the HEK293 cell line useful in transfection and production and purification of human proteins, originated from the kidney cells of an aborted embryo. The cell line has been referenced in more than 28,000 articles, and has also been useful in the study of preeclampsia, fetal drug exposure, placental gene transfer, and development of therapeutics.[2]

The cell lines themselves have limitations, and access to fresh fetal tissue remains critically important. "[O]ff-the-shelf fetal cell lines are of limited use for scientists because they do not faithfully mimic native tissue and represent only a subset of cell types: WI-38 and MRC-5, for example, were derived from fetal lungs. The lines can also accumulate mutations after replicating in vitro over time…For all of these reasons, researchers turn to fresh tissue."[3]

In parts of the letter to the AAMC, the Panel has requested "scientific information" on topics that are not readily addressed through the scientific process. For example, the Panel requests information describing any medical research using fetal tissue "that cannot or could not be conducted with other human tissue" (item 4); and a list of vaccines developed using fetal tissue "that could not have been developed using other human tissue, or cannot now be developed using other human tissue" (item 6). Where we stand today, it remains uncertain. Such questions could not be answered about most types of discoveries even with perfect hindsight. We support multiple approaches in continuing research to validate results in different models, which is especially important when moving new knowledge into clinical application.

In our quest to develop knowledge that can enhance health, lengthen life, and reduce illness, scientists need to understand such issues in human development, across all stages of life. Understanding the unique properties of human development at each stage is important to translate discovery from basic research to applications that enhance health. For example, primary human astrocytes derived from human fetal tissue and primary monocytes cells derived from blood donations are used to understand dysfunction of the blood-brain barrier, which is seen in neuroinflammation, and contributes to mortality and morbidity in multiple sclerosis, encephalitis, traumatic brain injury, and stroke. Fetal tissue cells also have been used to generate a 3-dimensional *organoid* model of the human stomach. The model helps characterize molecular signals and cell types present in the developing stomach, and of disease resulting from Heliobacter pylori infection.[4] Human fetal and adult liver cells producing hepatitis B viral proteins in culture helped identify barriers to developing cell models of hepatitis B, such as cellular production of antiviral microRNAs.[5]

Fetal tissue has uniquely enabled the growth and study of viruses and ultimately, the development of vaccines. Research focused on the cultivation of poliovirus proved to be successful in aborted human embryo brain tissue after failure in chick, mouse, and monkey cells.[6] Subsequent research demonstrated that this success was not linked to the use of neurons, and that the virus could be grown in cell lines from other embryonic tissues.[7] The cell lines from this, and similar work, provided a host for cultivating adenovirus, MMR, varicella, rabies, and other viruses resulting in the development of

lifesaving vaccines (items 1 and 2).[8,9] The AAMC stands by its statement, joined by more than 60 scientific and academic organizations, that restrictions on fetal tissue research "…would limit new research on vaccines not yet developed, for treatments not yet discovered, for causes of diseases not yet understood."[10]

Although cures for serious diseases and chronic conditions are the ultimate hope of health care providers, patients, families, and society, improvements in medical care that result from research are often incremental, adding new information to the body of knowledge about a disease to provide more effective treatments, slow disease progression, and improve quality of life. No one type of research is guaranteed to lead to a cure for a specific condition, and in no case do we ask scientists to prove that cures have been obtained or will be the outcome of the research before allowing the research to go forward (item 5).

In regard to AAMC's view on medical advancements that have been achieved using induced pluripotent stem cells (iPSCs) and other resources, and to information that addresses resources other than human tissue procured from aborted fetuses that can be used "when scientists need a cellular system that is less differentiated" (item 3), our response would be similar. The AAMC fully supports use of human tissue, including fetal and placental tissue, cell lines – including iPSCs, adult and embryonic stem cell lines, animal models, genetically modified or synthetic organisms, and other approaches to further knowledge to improve the health of all.

At the March 2 hearing of the Panel, Dr. Lawrence Goldstein of the University of California-San Diego Medical Center provided expert testimony on the properties of fresh fetal tissue distinct from other cell lines, as well as on differences between tissues from aborted fetuses and spontaneous abortion or miscarriage. To a question about research on the Zika virus and microcephaly, Dr. Goldstein responded that fetal tissue would be an efficient and important area of focus for this research. Two weeks later, the Panel noted in a press release a breakthrough in Zika research made by three academic medical centers, Johns Hopkins University, Florida State University, and Emory University, that was conducted with induced pluripotent stem cells. We believe this is an excellent illustration of our points above. The breakthrough using iPSC is not contrary to -- or undermining of any part of -- the importance of working directly with fetal tissue in Zika research. The AAMC celebrates advances in research and potential clinical applications for this devastating virus, from any avenue, and not knowing where the breakthroughs will come only supports the need to conduct many types of research.

More recently, results reported in the journal *Nature* further indicate how the Zika virus may affect fetal development, using fetal tissue. The investigator at the University of Pittsburgh Medical Center is quoted, "It is absolutely essential to study Zika infection in human fetal tissue." This research does not suggest there is no role for iPSCs or other models. Nor does the research at Johns Hopkins suggest fetal tissue research should be abandoned because of an outcome in another area. We are cautiously encouraged at the pace of these discoveries on the Zika virus, and look forward to more progress in our understanding and development of an effective vaccine and treatment for microcephaly. Medical research must be both deliberate and responsive to urgent public health needs and new discoveries.

In closing, we note that a vital part of the United States research system's success is the diversity of approach and competition, as well as collaboration among investigators and laboratories. Research gives hope to those suffering and plants the seeds for our nation's future development and economic growth.

Please contact Heather Pierce, JD, MPH (hpierce@aamc.org) with any questions or further comments.

Sincerely,

Darrel G. Kirch, MD
President and Chief Executive Officer

cc: The Honorable Jan Schakowsky

[1] Gelber SE, McCullough LB, Chervenak FA. Fetal tissue research: an ongoing sotry of professionally responsible success. *AJOB*, 2015 December;213(6):819-20.

[2] Gelber SE, AJOB 2015.

[3] Wadman M. The truth about fetal tissue research. Nature 2016 Jan 4;528(7581):178-81.

[4] McCracken KW, Cata EM, Crawford CM et al. Modelling human development and disease in pluripotent stem-cell-derived gastric organoids. *Nature*. 2014 Dec 18;516(7531):400-4.
http://www.ncbi.nlm.nih.gov/pubmed/25363776

[5] Kumar M, Sharma Y, Bandi S, and Gupta S. Endogenous antiviral microRNAs determine permissiveness for hepatitis B virus replication in cultured human fetal and adult hepatocytes. *Journal of Medical Virology*, 2015 July; 87(7): 1168-83.
http://onlinelibrary.wiley.com/doi/10.1002/jmv.24145/abstract

[6] Olitsky PK, Sabin AB, Cox HR. An acquired resistance of growing animals to certain neurotropic viruses in the absence of humoral antibodies or previous exposure to infection. *J Experimental Medicine* 1936;64: 723-37.

[7] Enders JF, Weller TH, Robbins FC. Cultivation of the Lansing strain of poliomyelitis virus in cultures of various human embryonic tissues. *Science* 1949;109:85-7.

[8] Nobel Foundation. Presentation speech: Nobel Prize in Physiology or Medicine 1954. Nobel Lectures, Physiology or Medicine 1942-1962. Amsterdam (United Kingdom): Elsevier Publishing Company; 1954: 443-7.

[9] Wadman M. Nature, 2015, op cit.

[10] Association of American Medical Colleges. Statement in support of fetal tissue research.
https://www.aamc.org/download/444248/data/statementinsupportoffetaltissueresearch.pdf.
March 18, 2016. Accessed April 21, 2106.

# American Academy of Pediatrics

DEDICATED TO THE HEALTH OF ALL CHILDREN®

AAP Headquarters
141 Northwest Point Blvd
Elk Grove Village, IL 60007-1019
Phone: 847/434-4000
Fax: 847/434-8000
E-mail: kidsdocs@aap.org
www.aap.org

Reply to
Department of Federal Affairs
Homer Building, Suite 400 N
601 13th St NW
Washington, DC 20005
Phone: 202/347-8600
Fax: 202/393-6137
E-mail: kids1st@aap.org

Executive Committee

President
Benard P. Dreyer, MD, FAAP

President-Elect
Fernando Stein, MD, FAAP

Immediate Past President
Sandra G. Hassink, MD, FAAP

Executive Director/CEO
Karen Remley, MD, FAAP

Board of Directors

District I
Carole E. Allen, MD, FAAP
Arlington, MA

District II
Warren M. Seigel, MD, FAAP
Brooklyn, NY

District III
David I. Bromberg, MD, FAAP
Frederick, MD

District IV
Jane M. Foy, MD, FAAP
Winston Salem, NC

District V
Richard H. Tuck, MD, FAAP
Zanesville, OH

District VI
Pamela K. Shaw, MD, FAAP
Kansas City, KS

District VII
Anthony D. Johnson, MD, FAAP
Little Rock, AR

District VIII
Kyle Yasuda, MD, FAAP
Seattle, WA

District IX
Stuart A. Cohen, MD, FAAP
San Diego, CA

District X
Sara H. Goza, MD, FAAP
Fayetteville, GA

April 25, 2016

The Honorable Marsha Blackburn
Chairman, Select Investigative Panel of the Committee on Energy and Commerce
U.S. House of Representatives
Washington, DC 20515

Dear Chairman Blackburn:

On behalf of the American Academy of Pediatrics (AAP), a non-profit professional organization of 64,000 primary care pediatricians, pediatric medical sub-specialists, and pediatric surgical specialists dedicated to the health, safety, and well-being of infants, children, adolescents, and young adults, I write in response to your letter dated March 30, 2016 on fetal tissue research.

We appreciate your dedication to our shared goal of improving the health of America's children. In particular, we are pleased to continue to work with you to ensure that the National Institutes of Health (NIH) is appropriately including children in the clinical research it funds. We greatly appreciate your successful effort to include language in the 21st Century Cures Act that would require NIH to begin systematically collecting and reporting data on the actual numbers of children enrolled in NIH studies.

I am happy to provide further clarification to several points you addressed in your letter. Everyday there is a growing body of evidence regarding the detrimental effects associated with the Zika virus (ZIKV), including congenital microcephaly and Guillain-Barré syndrome, and yet there is a great deal that we do not know about Zika and how it may affect the health of women and children. It is essential that we aggressively expand medical research in this area to gain a greater understanding of this serious public health crisis. According to the Centers for Disease Control and Prevention (CDC), between January 1, 2015 and April 13, 2016 there had been 833 confirmed cases of Zika reported in the United States and its territories. Indeed, experts at the National Institute of Allergy and Infectious Diseases have confirmed that Zika infection in the United States will continue to grow. Further, a recent article in the *Lancet* estimates that approximately one percent of babies born to women infected with Zika during the first trimester of pregnancy will develop microcephaly.

It is essential to study the Zika virus in human tissue of different stages to learn how the virus is causing its damage so that we may be find out how to protect the brain as it develops. While this research can be performed in animal models, it is unclear how reliably the growth and development of such animal brains replicates the growth and development of the human brain. A recent report in the *New England Journal of Medicine* concludes that "(f)uture studies at various gestational ages will offer better insight into the role of ZIKV infection in abnormal brain development and provide markers for its detection."

The use of fetal tissue has been an important factor in the development of numerous lifesaving vaccines for children. The chicken pox, hepatitis A, polio, rabies, and rubella vaccines are grown in human cell cultures developed from two cell lines that were derived from fetal tissue in the 1960s. According to the CDC, it is estimated that for just the children born between 1994 and 2013, "vaccination will prevent an estimated 322 million illnesses, 21 million hospitalizations, and 732,000 deaths over the course of their lifetimes." While it is possible that these vaccines could have been developed using other human tissue, it would have no doubt delayed these lifesaving vaccines from reaching the children who needed them. Re-developing new vaccines without fetal tissue would expose children to unnecessary risk since the current vaccines are known to be safe and effective, and developing new vaccines would subject children to unnecessary clinical trials.

These established cell lines derived from fetal tissue are currently being used to develop an Ebola vaccine. According to data from the World Health Organization and the United Nations Children's Fund (UNICEF), in March 2015, the recent Ebola outbreak had killed over 5,000 children and "another 16,000 lost a primary caregiver." Akin to the research currently being conducted on the Zika virus, it is important that researchers have every resource at their disposal to develop new treatment breakthroughs given the uncertain and changing landscape of infectious disease research.

Given the historical and future potential benefits of this research, particularly in light of the Zika virus outbreak and its impact on child health, the AAP reaffirms it strong commitment to continued federal funding for fetal tissue research.

Sincerely,

Benard P. Dreyer, MD, FAAP
President

BPD/jdb

cc.     The Honorable Janice Schakowsky, Ranking Member, Select Investigative Panel of the
        Committee on Energy and Commerce


April 25, 2016

The Honorable Marsha Blackburn
Chair, Select Investigative Panel
Committee on Energy and Commerce
U.S. House of Representatives
Washington, D.C. 20515

Dear Chairman Blackburn:

Thank you for your March 30, 2016 letter to the American Congress of Obstetricians and
Gynecologists (ACOG) regarding fetal tissue research.

Representing more than 57,000 physicians and partners in women's health, ACOG is committed
to fostering improvements in all aspects of the health care of women and establishing and
maintaining the highest standards of practice. Although ACOG does not conduct fetal tissue
research, we recognize the value of medical research in improving the lives of our patients and
their families. As an organization of physicians and other women's health care practitioners who
work every day to save and improve women's lives, ACOG strongly supports the continued
practice of such research.

Fetal tissue research has played an integral role in the development of life-saving vaccines. For
example, the polio vaccine was developed based on cultures derived from fetal cells. Vaccines
for measles, rubella, and hepatitis A were also developed in cell lines initially derived from fetal
tissue. Today, researchers are using fetal cells to help develop and test vaccines against Ebola,
HIV, and hepatitis B and C.

Researchers are also currently working to develop a vaccine for the Zika virus, which causes
severe birth defects, and has been linked to pregnancy loss and other serious complications.
ACOG's members work with their patients every day to achieve healthy pregnancy outcomes.
But, because there currently is no cure or vaccine for Zika and much remains unknown about the
virus, diagnosis and care options will remain limited until more research is completed. As
summer approaches, the virus is predicted to spread within the United States, and more
American families will be affected. As a society, we must use the full potential of science,
including fetal tissue research, if we hope to develop a vaccine that will prevent Zika-related
birth defects and fetal and infant deaths. Fetal tissue analysis has already provided researchers
with important information about the virus. Given the evidence that Zika causes birth defects,
fetal tissue research is likely to continue to play a strong role in combating this disease.

The nature of scientific research is that it frequently yields unanticipated results. *See* April 6,
2016 Letter from Department of Health and Human Services, Assistant Secretary for Legislation

The American Congress of Obstetricians and Gynecologists
409 12th Street SW, Washington, DC 20024-2188
Mailing Address: PO Box 70620 Washington, DC 20024-9998
Telephone 202/638-5577    www.acog.org

Jim R. Esquea to Hon. Jan Schakowsky. While much of the current research utilizing fetal tissue is aimed at examining certain diseases or developing specific vaccines, researchers cannot, today, identify which diseases may be cured or when. These studies could yield important discoveries with applications to myriad other sicknesses, helping countless individuals. Accordingly, closing the door on fetal tissue research would not only halt promising ongoing research but could negatively affect future medical research, and prevent development of future treatments and cures, in ways that are impossible to predict.

Again, thank you for your letter, and for soliciting our input on this important issue.

Sincerely,

Mark DeFrancesco.

Mark S. DeFrancesco, MD, MBA, FACOG
President


cc: The Honorable Jan Schakowsky

34th Street and
Civic Center Boulevard
Philadelphia, PA 19104-4399
215-590-1000
www.chop.edu

Peter M. Grollman
Senior Vice President, Public Affairs
Executive Offices
Suite 1420, Abramson Research Center
3615 Civic Center Blvd.
Philadelphia, Pa 19104-4318
T 267-426-6480 F 267-426-6995

[Via Email]

September 15, 2016

The Honorable Jan Schakowsky
Ranking Member
Select Panel on Infant Lives
2266 Rayburn House Office Building
Washington, D.C. 20515

Dear Representative Schakowsky:

I am writing on behalf of The Children's Hospital of Philadelphia (CHOP) in response to your letter of July 28, 2016.

The use of fetal tissue for medical research has led to many discoveries that have allowed scientists and physicians to better understand human development, fetal and newborn diseases, and to develop new treatments for adult and pediatric illnesses. Researchers who work on tissue regeneration with the hope that people who currently rely on organ transplants or need daily medications to replace hormones their sick organs no longer make, gain significant knowledge about normal tissue development that they try to mimic in the laboratory. Scientists who focus on preventing and treating newborn diseases such as infant leukemia can make faster progress because disease-causing mutations target fetal cells specifically. Fetal tissue has been used to seek treatments and cures for patients who suffer from devastating diseases, including diabetes, Down syndrome and rare blood disorders.

Additionally, many vaccines that are now used to prevent devastating infections in children and adults were discovered because scientists had access to fetal tissues. It is clear that fetal tissue research has been instrumental in countless discoveries and scientific advances. These have translated to improving the health of people globally, and currently, giving hope to countless others who are waiting for new scientific breakthroughs to help them overcome their specific diseases.

Sincerely,

Peter M. Grollman
Senior Vice President, Public Affairs
The Children's Hospital of Philadelphia

cc:  The Honorable Marsha Blackburn, Chair
     Select Panel on Infant Lives

**⊕H** The Children's Hospital *of* Philadelphia®
Hope lives here.

Specialty Care Centers • Child Development Centers • Ambulatory Surgery Centers • Primary Care Centers • Kids First™ Pediatric and Adolescent Practices • CHOP Connection • Poison Control Center • Children's Hospital Home Care
The Joseph Stokes, Jr. Research Institute • The Children's Hospital of Philadelphia is an equal opportunity employer and patients are accepted without regard to race, creed, color, handicap, national origin or sex.

November 10, 2016

**By E-mail**

The Honorable Jan Schakowsky
2367 Rayburn House Office Building
Washington, DC 20515

Dear Congresswoman Schakowsky:

I am responding to your letter of July 28th, 2016 to Lee C. Bollinger, President of Columbia University. I apologize for the delay in getting back to you.

Dr. Hans Snoeck, Professor of Medicine in Microbiology and Immunology at Columbia University Medical Center (CUMC), prepared the attached response to the questions you posed in your letter. I believe you and the other members of the Select Committee will find this information useful.

Please let me know if Dr. Snoeck, I, or any other member of the CUMC faculty can be of any further assistance on this or any other matter. Thank you.

Very truly yours,

Patricia Sachs Catapano
Associate General Counsel

cc:    The Honorable Marsha Blackburn
       Dr. Hans Snoeck
       Lee Bollinger
       Ms. Jacquelyn Bolen

## 1. Past benefits of fetal tissue research

Scientists have used fetal tissue in biomedical research for over sixty years. While not used as widely today, fetal tissue research (FTR) has played a significant role in the discovery of several treatments that are commonplace today. Vaccines are the prime example. Developing a vaccine requires being able to grow a virus. Viruses grow in cells. Early on fetal cells were much easier to grow than adult cells. Hence many vaccines currently used (such as rubella and rabies) were developed and are still produced using cell lines generated previously from fetal lung tissue.

Ender, Weller and Robbins, whose work was a crucial step in the eventual discovery of the polio vaccine, used fetal cells for some of their work. While the polio vaccine was not developed using fetal cells, the research leading to its identification and to the understanding of its biology was built upon FTR conducted a decade earlier. A final example is aging research. A fetal cell line was used in the 1960s to show that all cells, even those free of viruses and prior environmental exposures, have a limited capacity to keep dividing. This concept, known as the Hayflick limit, is the subject of one of the most cited papers of all time and is the foundation of human aging research.

This observation led to the discovery of telomeres by Blackburn, Greider and Szostak, who were awarded the Nobel Prize in 2009 for this work. Equally important, and perhaps somewhat ironically, FTR has played a crucial role in the development of several new and improved research and cell generation techniques that has obviated some, but by no means all of the need for FTR. In other words, if not for FTR, scientists would not have many of the research tools at their disposal that they do today. A perfect example of this are induced pluripotent stem (IPS) cells. These cells are similar to embryonic stem cells (ESCs), which are isolated and grown from early embryos, but, in contrast to the latter, have been generated by reprogramming adult cells to an 'embryonic' state. IPS cells would never have been developed if ESCs had not been discovered first. In essence, the fact that ESC generation required embryos was one of the driving forces behind reprogramming research.

There is no doubt that IPS cells may hold the key to unlocking the mysteries on many diseases and may lead to treatment and cures, but it is also true that were it not for FTR and research involving ESCs, iPS cells would not exist. Furthermore, although there are many similarities between IPS cells and ESCs, they are not identical. There are many instances where FTR are still very much irreplaceable. This is because, while IPS cells are very similar to ESCs, they are genetically manipulated cells that do show molecular differences compared to ESCs. The question how reliably they model human development and disease

compared to ESCs has not been fully resolved yet, and ESCs remain the 'gold standard' for the field for now.

## 2. Potential future benefits

The list below is just a few examples of how FTR may lead to a better understanding of disease and possible future treatments and cures.

### A. Diseases that affect the fetus

Congenital abnormalities can be genetic or acquired. Acquired abnormalities are often caused by a virus, such as Zika, cytomegaly virus or rubella, which affect the brain of a developing fetus. To study any type of congenital abnormality, access to 'normal' control tissue for comparison is essential, but for obvious reasons, it is very difficult, and would be in many cases unethical, to conduct research experiments on the brains of normally developing fetuses. Research using fetal tissue makes it possible to examine how viruses and other ailments affect a developing brain. Using FTR, scientists can study brain tissue in the petri dish and better understand how viruses and other diseases progress and how best to stop them. Zika is a perfect example. Zika can prevent the full development of the fetal brain – microcephaly. By using FTR, researchers can gain much better knowledge of how and where the virus attacks the brain. Scientists are currently working with three dimensional structures known as organoids. Brain organoids, which are grown from ESCs and IPS cells, have shown strong promise in being able to model the disease; however, the validity of these models cannot be confirmed without the use of FTR.

### B. Disease modeling and regenerative medicine

As mentioned in the response to question 1, without FTR, we would never have had access to many of the research tools, such as IPS cells, upon which we rely today, tools which are slowly but surely leading to advances in the field of regenerative medicine. Whether it is generating new cells and potentially organ systems, or perhaps more importantly, generating better and more precise disease models upon which researchers can more safely and more efficiently conduct their experiments, FTR has played a crucial role in getting us to where we are today. Will they play as large a role going forward? With the development of IPS and ES cells, perhaps not, but it is important to remember that (a) we would never have made the advances we have without FTR, and (b) nobody knows for sure where will be the next steps forward. Don't we want science to have at its disposal as many tools as possible? FTR is no doubt one of those tools.

Humanized mice are an example of this. These are mice with a human immune system. In the fetus, the blood and therefore the cells of the immune system are made in the liver, not in the bone marrow as in adults. Studies in the mouse have

shown fetal liver blood stem cells engraft much better in another individual than adult bone marrow blood stem cells. While this was an interesting finding, no one would conclude from this that human fetal liver transplantation should replace bone marrow transplantation for leukemia. However, the last fifteen years have seen a renewed interest in fetal liver blood stem cells. It was found that human fetal liver blood stem cells could easily engraft the bone marrow of severely immunodeficient mice, thus creating mice with human blood cells and a human immune system. Furthermore, T cells, the cells infected by HIV, are made from blood stem cells in an organ called the thymus during fetal life. Hence, humanized mice with human blood stem cells, human blood cells and a human thymus that recapitulate many features of the human immune system can now be made. This is critical in many fields, but one good example is HIV. HIV does not infect mouse cells, but does infect human immune cells in humanized mice. This has therefore become an important tool in HIV research.

### C. Understanding human biology

Looking beyond the need to assist in the development of stem cell-based approaches to disease modeling and regenerative medicine, judicious use of fetal material will be required to perform biomedical research that is specifically relevant to humans. This research is not limited to disease, but also to normal and abnormal human development.

### 3. Unique aspects of fetal tissue research

Fetal tissue has characteristics in terms of cell types present, cell proliferation, migration, gene expression, organization and architecture that are specific to a given stage of development. While some types of somatic stem cells can indeed be procured from non-fetal sources such as blood stem cells from cord blood, other types of cells, such as Mesenchymal stem cells, which can differentiate into fat, bone and other connective tissues, can only be generated from fetal. Access to human fetal tissue is still essential. The brain is an example. The human cortex is much more complex than that of a mouse, and is built layer by layer during development from dividing cells in the brain, called radial glia. While we have learned a lot from the mouse, and while novel technologies such as brain organoids derived from ES and IPS cells are extremely promising, fetal brain tissue is a unique resource in this field because scientists can study how specifically the human cortical architecture develops.

### 4. Fetal tissue research at CUMC

Dr. Megan Sykes, Professor of Medicine, directs the Columbia Center for Translational Immunology (CCTI). This Center has developed methods for generating human immune systems in mice that lack immune systems of their own. This model, which requires fetal human bone marrow stem cells and thymus tissue, allows new insights into the workings of the human immune

system and, most importantly, the testing of new treatments such as transplantation tolerance induction and cancer immunotherapies. This mouse model, which is available to the entire Columbia research community as a core service, is of great importance for studies of human immunology throughout the medical center. More recently, the CCTI extended the technology into a "personalized immune" mouse model, in which patients' bone marrow stem cells are used in combination with fetal thymus tissue to generate and thereby recapitulate the patient's own immune system in a cohort of mice. This model is being used to obtain a new understanding of human autoimmune disease, such as type 1 diabetes, and develop new treatments for these diseases as well as cancer.

Dr. Hans Snoeck, Professor of Medicine, has pioneered the differentiation of embryonic stem cells and iPS cells into lung organoids, which are now used to gain insight into idiopathic pulmonary fibrosis, a lethal disease for which there is currently no treatment. They may also be of use in developing ways to replace diseased lung tissue. A critical question in these studies is to what extent the organoids are identical to human lung, and exactly at which stage of development are they. To answer this question, a genome-wide comparison with human fetal and adult lung is required. As an example of this type of studies, the Snoeck lab determined the expression of level of all the genes expressed in the organoids, and compared, using sophisticated bioinformatics approaches, with publicly available databases on gene expression in human organs in the first and second trimester of gestation, and of adult organs. The data are illustrated in the figure below --the brighter green the box, the higher the similarity. The data show that the thirteen organoids used in these experiments are the most similar to second trimester human fetal lung (green rectangle). This is extremely important information, as it indicates that the organoids still represent mid-gestation fetal, and not adult human lung. In this context, the broader field of human development and regenerative medicine needs more detailed gene expression profiles of a larger set of fetal tissues and cells.



## 5. Obtaining fetal tissue for research

It is becoming more difficult to obtain human fetal tissue for these important studies. We are very concerned because all of the above work depends on the availability of fetal human tissues. For the generation of humanized mice, post-natal surgical thymus specimens cannot substitute, as these do not grow in the immunodeficient mice, and there is currently no method available for making these tissues from stem cells, though there is an effort underway in the CCTI to meet this difficult challenge. This effort, of course, again requires human tissue to gauge our in vitro differentiated cells against. Similarly, the work on generation of lung organoids is not possible without the information gained from studying human fetal lung. The unavailability fetal tissue cells threatens the continuation of the important studies of human immune and lung disease as well as the development of novel therapies in these areas.

# Dartmouth College

*Office of the Provost*

HANOVER • NEW HAMPSHIRE • 03755-3529
*6004 Parkhurst Hall, Rm. 111 • Tel (603) 646-4091*

Martin N. Wybourne

*martin.n.wybourne@Dartmouth.edu*

*Senior Vice Provost for Research*
*Francis and Mildred Sears Professor of Physics*

September 12, 2016

The Honorable Jan Schakowsky
United States House of Representatives
Ranking Member
Select Investigative Panel

Dear Representative Schakowsky,

I write in response your letter to Dartmouth's President Philip Hanlon dated July 28th, 2016. Your letter posed several questions regarding the benefits of fetal tissue research.

Much has been written about the importance and distinctiveness of fetal tissue research. In response to your questions, we have provided a sample of this literature:

> Wadman, Meredith. "The Truth about Fetal Tissue Research." *Nature* 528 (December 10, 2015): 178–81. See article here: http://www.nature.com/news/the-truth-about-fetal-tissue-research-1.18960.

> "FAQs on Fetal Tissue Research." The American Society for Cell Biology, April 2016. http://www.ascb.org/wp-content/uploads/2015/12/fetal-tissue.pdf.

> Chapman, Audrey, Mark Frankel, and Michele Garfinkel. "Stem Cell Research and Applications Monitoring the Frontiers of Biomedical Research." American Association for the Advancement of Science and Institute for Civil Society, November 1999. https://www.aaas.org/sites/default/files/content_files/Stem%20Cell%20Research%20and%20Applications%20Report.pdf. (see The Science of Stem Cell Research and Potential Therapies)

You should also know that Dartmouth has not experienced any recent changes related to the availability of fetal tissue, although Dartmouth has historically used very little of this material.

Please let me know if you have any additional questions.

Sincerely,

Martin Wybourne

## Why is human fetal material needed for research?

University-based biomedical research aims to improve human health and the United States has made an enormous investment in this enterprise, largely through research grants provided by the National Institutes of Health (NIH). Despite innumerable breakthroughs in medical research and practice arising directly from this support, many diseases, whether common like diabetes, sickle cell disease, Parkinson's, and cancer or rare like amyotrophic lateral sclerosis (ALS or Lou Gehrig's disease) and Fanconi anemia, remain "lost causes" of medicine. Though in certain cases maintenance therapies provide a degree of relief, such as insulin injections for diabetes or hydroxyurea therapy for sickle cell anemia, they nevertheless entirely fail to correct the underlying problem. In the worst of cases, comfort care is all that can be offered. The field of regenerative medicine seeks to do more than ease pain and slow decline; the goal is to cure by better understanding the mechanisms of how diseases develop and how to repair or replace the very cells and tissues impaired or lost due to disease, damage, and decay.

Scientists working in these fields are investigating ways to repair or create the cells, tissues or organs that have been damaged by disease. But, how does a researcher know that the tissue they have repaired or engineered will actually function as it should once transplanted into a patient? For that matter, by what method does an investigator actually learn *how* to repair or engineer a type of cell or tissue? It does not take a trained scientist to understand that an effective approach to this problem is to compare the engineered cells or tissue to their healthy counterparts prior to transplantation. From where is this "comparison" tissue obtained?

Despite various ethical and moral tensions expressed by individuals throughout the ages, the use of human biopsies, excess surgical or pathology specimens, and cadaveric tissues has enabled physicians and scientists to better understand the form and function of our own bodies and more recently, to obtain the very cells and tissue to which rudimentary repaired or engineered versions might be functionally compared. Healthy donors, patients, and others whose tissues and sometimes entire bodies have been donated to research via their own decision or by that of a legally-recognized surrogate, literally give of themselves to improve the world for all of us. In this way, many people working in the field of biomedical research take tragedy and turn it into knowledge that benefits humankind.

Human fetal material falls within this spectrum of tissue donation and research. The field of vaccine R&D is probably the best known example of how fetal material provides an invaluable resource to scientific and medical progress; most recently in work seeking to better understand and combat the spread of Zika virus, just as it did chicken pox and polio, among others. But, there are many avenues of active biomedical research beyond vaccine development and a number of those areas likewise benefit significantly from the use of fetal material; in many cases the use of fetal material is the *only* effective approach. Why, despite the availability of modern tools and methods, including the use of embryonic and "reprogrammed" stem cells, does fetal tissue remain needed? The most obvious answer is rather straightforward: nature is far better at making tissues and organs than scientists are.

Every field of human endeavor leading to ground-breaking technologies began simply but then built upon itself through a series of transitional technologies and approaches until goals were reached. Here, one might trace the path from tin cans connected via a length of string, through Bell's telephone, to the wall-mounted rotary, to the cordless, to the "brick" mobile, to the latest smart phone. Though the field of regenerative medicine seeks to replace defective cells and tissues, it must first understand how they are made, why they may fail, how to repair them, how to mimic or engineer them in the laboratory and how they can be protected from a patient's immune response when used in transplantation. The best clues to these processes come from nature itself and one must go the anatomic place and time during development to find those answers.

For example, if a researcher seeks to better understand the heart and post-heart attack tissue damage, it is relatively simple to obtain human heart tissue from various adult sources including from victims of heart attack. However, if one wants to understand how to generate new or replacement heart tissue, one must understand the *formation* of the heart, what types of cells during development first make the heart, what genes are "on" and "off" in those cells relative to non-heart cells, and how do those genetic "switches" change over time as the heart forms? Such information might then be used to engineer or "coax" non-heart cells to form cardiac tissues in the laboratory for use in transplantation. Scientists investigate these questions by obtaining and studying the "pre-heart" cells from the only time in development when they are present: the fetal period. This same principle holds true for many other types of cells during development that are present for only a short period of time and then disappear as organs grow and mature. We obtain various types of cells from critical developmental timepoints in nature and use them to teach us how to mimic or engineer their cognates in the laboratory for use in regenerative therapy.

Another example of this includes research to provide insulin-producing cells for transplantation into diabetics, including juvenile diabetics. Children suffering from Type I or juvenile diabetes lack the capacity to make the hormone insulin because their insulin-producing cells (pancreatic beta cells) have been destroyed by what is likely an immune system attack launched by their own body; an "autoimmune" disease. One goal of such research is to use stem cells to make human pancreatic beta cells for transplantation into diabetics, thereby relieving them of the daily finger pricks and insulin injections they need to stay alive.

Pancreatic beta cells are made during the early stages of human development. From a fertilized egg to a newborn, the development of different cells and tissues is a stepwise process involving many genes and different types of cells. We need to understand the normal or "natural" process of pancreatic beta cell formation, in order to learn how to direct the maturation or "differentiation" of human stem cells into functional beta cells. We use human fetal material to understand how pancreatic beta cells are normally made and then use that information to design experiments that direct the differentiation of stem cells.

In addition, we use fetal blood- and immune system-forming tissue to study the human immune response. This involves replacing the mouse immune system with a human immune

system. Mice that have human immune systems are an invaluable scientific resource, but these mice are engineered to this condition only by means of the use of human fetal material. These mice allow us to model and better understand the auto-immune attack that leads to type I diabetes, among other diseases. This works by combining human immune and insulin-producing cells in a living system (the mouse). Similar approaches are being used to learn how to make other transplantable cells and tissue "invisible" to immune system attack so that they might serve as "universal donor" stem cells for use in a wide variety of different transplantation strategies. Here, the use of fetal blood- and immune system-forming cells transplanted into mice allows the "universal donor" cells and tissues to be tested for their ability to resist rejection by a human immune system. In these experiments the use of fetal blood-forming material is far superior to other sources such as adult bone marrow or even cord blood. Better research leads to better therapies.

If human fetal tissue is needed, why can it not be obtained from miscarriages instead of abortion? Here, timing is very important. Almost all miscarriages happen at home or in locations in which fetal material is not recovered and, importantly, preserved in a usable state. Just as obtaining tissue during a scheduled surgery or an in-hospital autopsy soon after death provides tissue that is untainted by decay relative to obtaining those same tissues from the morgue or a funeral home, obtaining fetal material from elective pregnancy termination is far superior to obtaining whatever material might be recoverable following spontaneous miscarriage, even assuming a mechanism existed for the collection of such material.

Some have pointed out that despite the scarcity of tissue available from miscarriages, that even a small amount of this rare material could be used to generate cell lines capable of additional growth/expansion in the laboratory to the potential benefit of hundreds of other laboratories. While it is true that cell lines are invaluable resources in biomedical research, cell lines cannot teach us about the operation of cells that are organized into systems that perform bodily functions, such as integrated organs and tissues. In other words, as an organ, the heart (for example), is more than a collection of cardiac cells. There are multiple different types of heart cells along with other organ-specific supporting cell types and structures that form/combine at specific times during development. Simply put, an organ's cell lines do not tell the story of how that organ develops or works.

What is more, there are many types of cells in nature, including almost all neurons, that scientists have not been able to make grow or multiply as cell lines. Neurons, heart cells, and certain kidney cells, to name but three types critical to our understanding of human disease and cellular therapies, appear never to divide again once they are formed in nature; yet continued cellular division is an absolute requirement for the formation of a cell line. Non-dividing cells are termed "post-mitotic" and the only way to generate a cell line from them is to genetically engineer and/or damage them such that they ignore their own regulatory signals and continue to grow unchecked in a manner that is quite similar to what occurs in advanced stages of cancer. While such so-called "immortalized" cell lines remain of value to certain avenues of research, they are completely unsuitable for many areas of research designed to understand how cells normally grow and develop. For studies such as these, as well as research designed to better

understand complex tissue organization and function, the use of formed tissue, not cells, is the only effective approach.

Why not study animal tissues instead? While humans and lower animals share an amazing amount of biology in common, and have similarities that contribute enormously to ideas relevant to human health, not everything is the same between us. There are many conditions, diseases, and basic biological features of our species that are uniquely human. To understand human-specific differences, one must use human tissue. A case in point is the human fovea within the eye. We possess high acuity color vision due to a specialized area of the human retina, the fovea. Such a high-acuity area does not exist in most mammals or other experimental model organisms. Tragically, this is the very area that is prone to degenerate as we age. Age-related macular degeneration, which occurs in approximately 25% of people over age 75, leads to loss of high-acuity vision. All of the activities of daily living, even those as simple as face recognition, are lost in macular degeneration. To understand the vulnerability of this area, or to regenerate it someday, we need to understand its development and function. Although some retinal stem cells exist, including those from humans, they do not form a fovea in the lab. Our lack of knowledge of the normal development of the fovea stymies attempts to generate this tissue in the lab. Because the fovea develops during gestation, and is almost unique to humans, human fetal tissue provides the required starting point for such studies.

Science is a tool for methodically exploring the world and improving the human condition. It can proceed most rapidly and efficiently when investigators have the best available resources. The advancement of science is not, however, an unqualified objective. Scientists must take into account societal and ethical concerns. The use of human fetal tissue in research can be conducted in a fair and responsible manner. Abortions occur in this country because they are a legal medical procedure. Fetal remains from this procedure can simply be discarded as medical waste. Or, adult women can donate those remains to research, in much the way other human tissue and organs, following surgery or death, is donated to research. The process requires attention to issues of informed consent and other ethical considerations (no financial or other inducements, a separation between the decision to undergo the procedure and a decision to donate, no change in treatment afforded whether a donation is made or not). With these issues taken into consideration and properly conducted, the important and unique resource of human fetal tissue can be used responsibly in research.

Select resources for further reading:

An authoritative overview describing the use of mice containing a human immune system to study infectious disease and vaccine development - Table 4 therein describes many infectious diseases studies using this system:
http://www.nature.com/nri/journal/v12/n11/full/nri3311.html

A fundamental understanding of many biological processes relevant to human health and disease has stemmed from experimental studies in similar "humanized" animal models, particularly in rodents. A few examples of these include:

Hepatitis C
http://www.nature.com/nprot/journal/v7/n9/abs/nprot.2012.083.html

HIV
http://www.nature.com/cmi/journal/v9/n3/full/cmi20127a.html

Malaria
http://www.cell.com/trends/parasitology/fulltext/S1471-4922(15)00145-2

Graft-versus-host disease (GvHD)
http://www.ncbi.nlm.nih.gov/pubmed/26588186
http://www.nature.com/cmi/journal/v9/n3/full/cmi20122a.html

Cancer
http://www.ncbi.nlm.nih.gov/pubmed/25185190
https://www.ncbi.nlm.nih.gov/pubmed/26479923
http://www.nature.com/onc/journal/v35/n3/full/onc201594a.html
http://www.humouse.org/images/publications/vatakis2011.pdf





# HARVARD
## UNIVERSITY

July 7, 2016

Ms. Jacquelyn Bolen
Investigative Counsel, Democratic Staff
Select Investigative Panel of Energy & Commerce
2367 Rayburn House Office Building
Washington, DC 20515

Dear Jacquelyn:

I am responding on behalf of Dean Jeffrey Flier to Representative Schakowsky's February 16, 2016 letter seeking information on the past and future benefits of fetal tissue research and the unique role fetal tissue continues to play in critical areas of biomedical research. In response to your letter and other inquiries regarding the importance of fetal tissue research, we have prepared the attached background paper that we offer in response to your questions.

I hope you find the document helpful in regards to your inquiry and will remain available to facilitate answers to any additional questions you may have as your review continues.

Sincerely,

Kevin Casey
Associate Vice President for Public Affairs & Communications
Harvard University

cc:    The Honorable Marsha Blackburn, Chair
       Select Investigative Panel



**Paul B. Rothman, M.D.**
*The Frances Watt Baker, M.D. and Lenox D. Baker, Jr., M.D.*
*Dean of the Medical Faculty*
*Chief Executive Officer*

September 20, 2016

The Honorable Jan Schakowsky
Ranking Member, Select Panel on Infant Lives
U.S. House of Representatives
Committee on Energy and Commerce
2125 Rayburn House Office Building
Washington, DC 20515-6115

Dear Representative Schakowsky:

In response to your request dated July 28, 2016, Johns Hopkins is pleased to provide additional information on the use of human fetal tissue in biomedical research. As a leading recipient of federal research funds, we appreciate the opportunity to inform the Select Panel on Infant Lives about the unique importance of this material and applaud your interest in its value.

It is critical that human fetal tissue continue to be available to academic researchers as it exhibits unique characteristics that thus far have not been replicated in any other systems. Human fetal cells enable our researchers to develop laboratory models of diseases that can be investigated in ways not possible in patients. A number of our researchers are working in areas that already have, or we anticipate will benefit from the use of fetal tissue to better understand disease progression, test potential therapies and ultimately relieve human suffering.

### 1) Past benefits of fetal tissue research.

Through the use of human fetal cells acquired from collaborators in Germany, one of our research teams has developed new and genetically accurate models of medulloblastoma, glioblastoma, uveal melanoma and other tumors of the brain and eye—and some other rare cancers for which no good treatments or laboratory models exist. This team also discovered that a key molecule, BRAF, can activate cells to transform to cancer. More study is needed to understand how to stop BRAF or possibly even prevent it from transforming these cells in the first place.

The hallmark of amyotrophic lateral sclerosis, or ALS, is gradual degeneration of nerve cells in the brain and spinal cord that normally control muscles. As the nerve cells degenerate, the muscles they control grow weak and ultimately stop working and ALS patients typically die by suffocation. Although biomedical research often requires decades to get basic discovery to the bedside, one of our research teams has been working with human fetal cells for more than 10 years in hopes of developing a way to use these cells as a treatment to slow or stop the progression of ALS. They originally discovered that injecting a certain type of fetal cell into mouse ALS models appears to protect the existing cells from degenerating. This finding was so promising for a potential ALS treatment that the FDA has approved an investigational new drug application for early stage clinical trials.

degenerating. This finding was so promising for a potential ALS treatment that the FDA has approved an investigational new drug application for early stage clinical trials.

Normal eye development and our ability to see requires significant blood flow: characterized by growth of blood vessels in the developing eye that then disappear once the retina is formed. Using fetal eye tissue, our researchers were the first to show the location of two forms of the VEGF protein, which are responsible for the growth and disappearance of these blood vessels, are located. In that study, they found that although it is difficult to know where VEGF is in the blood vessels of fully developed eyes, in human fetal eye tissue, they were able to see that VEGF is clearly associated with two specific cell types. This discovery can be used to learn more about how tumors and diabetic retinopathy progress.

**2) Potential future benefits that might be gained through continued fetal tissue research.**

Because of the unique nature of fetal tissue, a wide array of neurological conditions likely could benefit from the use of human fetal cells in research. Unlike some other adult tissues, the human brain cannot be regenerated in the laboratory. Moreover, brain cells are difficult to remove from live patients without significantly invasive procedures and adult brain cells grow slowly in the lab.

One leading cause of death in malaria patients is a complication known as cerebral malaria. In these cases, although the parasite does not infect the brain directly (because it cannot cross the blood brain barrier), it still can lead to abnormal behavior, loss of consciousness, seizures and coma. One of our research teams uses human fetal cells to induce adult brain cells to grow better in culture, in order to understand how microbes and parasites activate the blood brain barrier and cause inflammation. Knowing this will help us get certain drugs across the blood brain barrier to better treat countless brain infections, disorders and diseases.

Cell-based therapies, treatments that involve transplanting cells that can grow to repair or replace diseased tissue like that in ALS, will only come to fruition with access to human fetal cells.

**3) Unique aspects of fetal tissue in research, in comparison with adult cells or other cellular organisms that might be used for research purposes.**

Human fetal tissue is unique because we are not yet able to replicate *the development* of human tissues using any other methods. In order to develop new therapies to treat disease, we need to understand how normal tissue transforms to disease to identify the best "entry" points to stop the process. This is why it is so important to be able to model diseases in the lab. Due to limited access to all human tissues, most research has been performed in mouse models or more recently, with the use of induced pluripotent stem cells (iPSCs). While both are easier to access and work with, both are limited in their abilities to fully mimic human disease.

Many researchers have shown that cells from mice or other animals do not transform into cancer or respond to certain drugs the same way as human cells. Others have found that iPSCs are not a useful model.

Our researchers have shown that human fetal cells hold unique properties that are not shared even with human iPSCs: human fetal cells survive, mature and migrate more reliably. They also have found that human fetal cells behave more reliably than human embryonic or iPSC-derived neural stem cells, and they do not appear to form tumors as these other cells do. These properties make human fetal cells important for developing cell-based therapies.

For example, our researchers who study pilocytic astrocytoma, the most common pediatric brain tumor, need to look at regional effects in the brain, which cannot be modeled by iPSCs. In addition, benign prostatic hyperplasia and prostate cancer together affect more than 90 percent of all men during their lifetime. Although our researchers have tried and failed at developing models of these conditions with adult cells from the prostate or bone marrow, they have successfully generated models using human fetal prostate cells.

4) **Summary of any research conducted since 2010 that Johns Hopkins University has been involved in that used fetal tissue or relied upon other studies that used fetal tissue.**

Since 2010, our researchers have used human fetal cells to:

- Develop new brain tumor models to treat brain cancer
- Confirm that certain discoveries made in mice hold true in humans, whereas others do not
- Show that, unlike other types of cells, human fetal cells do not develop tumors when transplanted into mice
- Demonstrate that human fetal cell transplants in mice are not toxic
- Successfully transplant into mouse spinal cord human fetal cells that survived, migrated and grew as hoped
- Discover that as prostate cancer progresses, cells from the bone marrow are recruited to the tumor and these cells could be exploited to deliver drugs directly to the tumor to avoid exposing the rest of the body to aggressive cancer drugs. At least one clinical trial testing this is now underway.
- Discover where specific proteins are located in blood vessels to promote or inhibit vessel growth

5) **Description of any recent changes experienced by Johns Hopkins University in the availability of fetal tissue for research and the related impact of these changes, including whether or not there have been interruptions and/or delays in research as a result.**

One research team reported that adverse publicity led a private funder to request that they alter their research approach to use mouse instead of human fetal cells. Some researchers have not experienced much change to date. However, we are generally concerned that changes in the availability of human fetal tissue will result in major setbacks in the understanding of devastating diseases and development of future treatments and cures for patients. We also are concerned that, due to the sensational nature of linking fetal tissue research to broader concerns about abortion, faculty will be discouraged from pursuing important scientific questions due to difficulty in acquiring needed material or out of fear of personal reprisal.

Sincerely,

Paul B. Rothman, M.D.
Dean of the Medical Faculty
CEO, Johns Hopkins Medicine


OHSU

May 25, 2016

Jan Schakowsky
Ranking Member
Select Investigative Panel
House Energy and Commerce Committee
2125 Rayburn House Office Building
Washington, D.C. 20515

Office of the Senior
Vice President for Research

tel    503 494-1085
fax   503 494-1099

Daniel Dorsa, PhD
*Senior Vice President for Research*

dorsad@ohsu.edu
www.ohsu.edu/research

Mail code: L335
3181 S.W. Sam Jackson Park Rd.
Portland, OR 97239-3098

Dear Ranking Member Schakowsky,

On behalf of Oregon Health & Science University (OHSU), thank you for your letter inquiring about the overall benefits of research that include the use of fetal tissue.

OHSU is pleased to join with over 61 academic medical centers, scientific and medical societies in Association of American Medical Colleges-organized letter in support of current federal policies governing research that includes fetal tissue.

The AAMC letter highlights the many benefits of research using fetal tissue, including past lifesaving discoveries, such as the development of vaccines for diseases such as polio, hepatitis A, measles, mumps, rubella, chickenpox, and rabies.

Research using fetal tissue helps researchers replicates human systems and is also used when scientists need a cellular system that is less differentiated than adult cells. This type of research has helped improve our understanding of numerous health issues including early brain development, neurocognitive disorders, maternal and fetal health conditions, congenital heart defects, Down syndrome, and other infectious diseases such as HIV/AIDS and influenza.

For example, in HIV/AIDS research, the use of fetal tissue has been critical to advancing animal models that can mimic the human immune system. Having an animal model that can generate a human immune response is crucial to developing much needed vaccines for this terrible disease and others, such as Hepatitis C Virus, Dengue Virus, Epstein Barr Virus and Cytomegalovirus.

"Research that looks promising today for one purpose may lead to discoveries in unexpected areas, provide insights about existing knowledge, or indicate that a new pathway should be explored" stated AAMC President Darryl Kirsch in his April 22 letter to Chairman Blackburn. "By closing the door on one type of research, we may never know what advances we might have attained." While we can only guess what future benefits lie in store as a result of research using fetal tissue, we know that research using fetal tissue has saved millions of lives and we hope it will continue to save millions more.

Thank you for your interest in the benefits of research using fetal tissue. Should you have additional questions, don't hesitate to contact Lynne Boyle, Director, Federal Relations.

Sincerely,

Daniel Dorsa, Ph.D.
Senior Vice President for Research

## HARRIET S. RABB

VICE PRESIDENT and
GENERAL COUNSEL

PHONE: 212-327-8070
FAX: 212-327-7688
E-MAIL: HRABB@ROCKEFELLER.EDU

September 21, 2016

Honorable Jan Schakowsky
Ranking Member
Select Investigative Panel
House of Representatives
Committee on Energy and Commerce
2125 Rayburn House Office Building
Washington, DC 20515-6115

Dear Congresswoman Schakowsky,

The Rockefeller University offers our response to your request for information regarding the importance and availability of fetal tissue as a critical resource in aspects of our scientific research. We set forth below your concerns and our responses.

## Past benefits of fetal tissue research

Human fetal cells and tissues have had a decisive and major impact on our current understanding of the molecular and cellular origins of human organs and tissues. Human fetal tissues have allowed researchers to explore and understand the biology and uniqueness of human development. This knowledge has translated into the rational design of both treatment and prevention of numerous human diseases and has saved innumerable human lives.

Fetal tissue has contributed directly to the improvement of child and adult human health. In the 1960s, cell lines derived from fetal tissue were used to manufacture vaccines including those that counter measles, rubella, rabies, chicken pox, shingles and hepatitis A, cumulatively saving millions of lives. The rubella vaccine alone eliminates 5000 miscarriages each year.

Fetal tissue has been used to uncover disease pathways that overlap with natural developmental processes and may guide development of therapeutic treatments for heart disease. Fetal cell lines have been used in medical advances for the production of pharmaceuticals, including an arthritis drug and therapeutic proteins that fight cystic fibrosis and hemophilia. Every indication emphatically supports the notion that further understanding of degenerative diseases such as Alzheimer's, Huntington's, and a host of other devastating and as yet incurable conditions, depend specifically on access to fetal tissue.

Ongoing fetal tissue research is critical for continued advances in regenerative medicine, including organ/tissue regeneration of heart, liver, pancreas, lung, muscle, skin, and more, holding out hope for a wide variety of therapeutic discoveries.

Human tissue-based models for studying uniquely human viral diseases are important for understanding mechanisms of disease progression and developing preventive measures and therapies. Fetal tissue has been used to build increasingly complex models of human disease. A single human fetal liver yields material sufficient to produce dozens of humanized mice. Certain human viruses are severely host-range restricted, meaning they infect humans and no other animals. Fetal tissues are essential for production of humanized mice that can be used in learning about such uniquely human conditions.

## Potential future benefits that might be gained through continued fetal tissue research

Future benefits of fetal tissue research will include the enhancement of our basic knowledge of human development. It will inevitably impact clinical approaches and provide new means to address currently incurable diseases by providing new technological platforms. Scientists have used information gleaned from studies of motor neuron development to guide stem cells to become neurons and establish stem cell-derived models of Amyotrophic Lateral Sclerosis, a currently untreatable and fatal disease. These models have allowed researchers to develop new drugs that already are being used in clinical trials to treat ALS. Another of the most promising novel technical platforms in regenerative medicine is using cell-based therapy strategies to replace defective organs rather than attempting to repair the diseased tissue.

For some conditions, potential future benefits must be gained by human fetal tissue research. Certain humanized mice can be produced best with human fetal tissues. Such mice are unique in their ability to support long term infection, thus allowing evaluation of therapies aimed at finding cures.

It is increasingly important to study infection, disease mechanisms and antiviral interventions in human cells. Fetal tissue provides a rich source of stem cells for studies in cell culture and also engraftment into small animals that can then be used to model infection, disease progression and test therapies. These provide valuable preclinical models that increase the chances of success before progressing to human clinical trials.

Investigators continue to mine existing gene expression information from fetal tissue samples in order to understand gene function and growth-regulating pathways encountered in normal versus tumor samples. Much that applies to cancer can be learned from gene expression analysis in organ development.

Wide ranges of adult diseases and disorders have their origin during very early human development. Examples include types 1 and 2 diabetes, schizophrenia, and Huntington's disease. Knowledge of how the human fetus generates discrete organs will provide the blueprint for applying human embryonic stem cells for the generation of specific organs used for supportive and regenerative medicine.

## Unique aspects of fetal tissue in research

Neither adult stem cells, nor reprogrammed somatic cells approach the versatility and quality of the natural stem cells derived from the fetus which remains the best resource for regenerative medicine. Model organisms, from the fruit fly to rodents, unfortunately cannot fully model human diseases.

We are aware of how many times promising solutions for diabetes, cancer, and neurodegenerative diseases have been shown to cure the mouse or rat but fail when tested in humans. The human neocortex, for example, contains cells and anatomy that are specifically human, and not found even in other primates. Fetal tissue provides a unique source of human cells that have the potential to be used directly or engrafted into immunodeficient animals. Human fetal tissue offers an important and unique resource for basic and medical research. There is no comparable substitute for fetal tissue for the accurate understanding of human development.

The adult immune system is "educated" to reject animal hosts, complicating the creation and production of animal models with humanized immune systems. In contrast to the adult, fetal immune cells have not yet been educated and therefore do not recognize the host as foreign. As a result, fetal tissues do not reject the host but rather are engrafted, leading to a chimera that is composed of mouse tissues and human immune cells. These mice are uniquely suited to finding cures through research.

Modern technologies have opened the door to studying the cellular interplay in complex human tissues during their development, normal, and disease states, as well as in aging. From single-cell expression analysis of fetal tissue, a great deal about intracellular communication can be learned that will increase our understanding of how normal as well as malignant growth is governed, and how therapeutic interventions may take advantage of these molecular programs.

### Recent changes experienced in the availability of fetal tissue for research

Currently, there is a paucity of sources from which to obtain human fetal tissue, creating roadblocks to the conduct of important biomedical research. Entities that previously provided the sources of human fetal tissue have either closed, due to external pressure, or currently offer more limited options than previously proffered.

Laboratories have experienced significant difficulties in securing fetal tissue for research. One lab reported: We used to receive fetal tissue once or more every week. Over the past year, the supply of fetal tissue has dwindled and become increasingly unavailable and unreliable – to the point where we can no longer depend on this important resource for our studies.

Another lab despaired: In the past, our laboratory was able to obtain fetal tissues nearly every week. For the last several months, we have been unable to obtain any fetal tissue. Humanized mouse production has come to a standstill, and we are currently unable to perform research that we hope will lead to cures for human disease.

\*                \*                \*

Thank you for your interest in our research and the challenges it faces. I hope you find the information provided here responsive to your questions.

Sincerely,

Harriet S. Rabb


UCLA HEALTH | DAVID GEFFEN SCHOOL OF MEDICINE AT UCLA
OFFICE OF GOVERNMENT RELATIONS
924 WESTWOOD BOULEVARD
SUITE 350
LOS ANGELES, CALIFORNIA 90024

September 19, 2016

VIA E-MAIL (Heather.Sawyer@mail.house.gov)

The Honorable Jan Schakowsky
Ranking Member
Select Investigative Panel on Infant Lives
Energy and Commerce Committee
United States House of Representatives
2367 Rayburn House Office Building
Washington, DC 20515-6115

Dear Representative Schakowsky:

On behalf of the University of California, Los Angeles ("UCLA"), I have attached UCLA's response to your letter of July 28, 2016, requesting that UCLA provide the Select Investigative Panel on Infant Lives with information to better understand the importance of and risk to fetal tissue research.

UCLA conducts research using fetal tissue that is vital to an understanding of human biology and to efforts directed toward new treatments for a wide variety of adult and childhood diseases and medical conditions. Our research is conducted in full compliance with federal and state law and in accordance with our tripartite mission of education, research, and public service. The information provided below answers the five specific requests made in your letter.

Please note that UCLA has omitted identifying information from the enclosed documents based on concerns for the safety and security of individuals conducting research. Should you have any questions regarding this response, please contact me at (310) 267-7064 or maltschule@mednet.ucla.edu.

Sincerely,

Michael Altschule
Executive Director, Government Relations
UCLA Health / David Geffen School of Medicine

cc: Honorable Marsha Blackburn c/o Matthew Tallmer
(via e-mail, Matthew.Tallmer@mail.house.gov)

1. **Past benefits of fetal tissue research.**

Since the 1930's, fetal tissue has been used in a broad range of research that has led to lifesaving discoveries. The Association of American Medical Colleges (AAMC), of which UCLA is a member, has previously noted that human fetal tissue research has been critical in establishing permanent cell lines for use in vaccine research for diseases such as polio, hepatitis A, measles, mumps, rubella, chickenpox, and rabies. These established cell lines are currently being used to develop an Ebola vaccine[1].

Fetal tissue proved to be necessary for the production of consumer vaccines against measles, rubella, rabies, chicken pox, shingles and hepatitis A. According to the journal Nature, at least 5.8 billion vaccine doses have been derived from fetal tissue lines.[2]

2. **Potential future benefits that might be gained through continued fetal research.**

Biomedical research continues to benefit from the use of new fetal tissue. According to the U.S. Department of Health and Human Services, "fetal tissue continues to be a critical resource for important efforts such as research on degenerative eye disease, human development disorders such as Down syndrome, and infectious diseases, among a host of other diseases.[3]"

As noted in the journal Nature, "In the past 25 years, fetal cell lines have been used in a roster of medical advances, including the production of a blockbuster arthritis drug and therapeutic proteins that fight cystic fibrosis and haemophilia." Yet, existing fetal material and cell lines "…are of limited use for scientists because they do not faithfully mimic native tissue and represent only a subset of cell types…. The lines can also accumulate mutations after replicating *in vitro* over time." New fetal material is critical if we are to continue to pursue vaccines for HIV and other diseases as well as create treatments and cures for devastating illnesses such as Parkinson's and Alzheimer's Disease, blinding eye disorders such a macular degeneration, diabetes, and schizophrenia. [4]

Our response to question 4 below cites a diverse range of diseases being studied by UCLA laboratories whose research requires the use of fetal tissues. These research activities are critical for the development of new therapies for the treatment of these diseases.

3. **Unique aspects of fetal tissue in research, in comparison with adult cells or other cellular organisms that might be used for research purposes**

As described in the following summary of research performed in UCLA laboratories (response to question 4), human fetal tissues are critical for current and future research activities for multiple

---

[1] AAMC Statement (March 18, 2016)
[2] http://www.nature.com/news/the-truth-about-fetal-tissue-research-1.18960
[3] HHS Letter to Senators Joni Ernst and Roy Blunt, August 14, 2015.
[4] http://www.nature.com/news/the-truth-about-fetal-tissue-research-1.18960

reasons. First, human fetal tissues exhibit biological properties that are distinct from those of tissues derived from children or adults, and these properties, often related to an enhanced capacity for growth and regeneration, can be highly desirable for the development of novel therapies. It therefore is critical to understand the unique properties of fetal tissues, which can be accomplished only through a direct analysis. Some therapies under development would require the direct use of fetal cells, such as recent clinical trials using fetal neural cells to treat patients with spinal cord injury or Parkinson's Disease. Most therapies, however, will emerge from the study of fetal tissues rather than directly including the cells in the ultimate drug product.

Second, the direct study of human fetal tissues is essential for an understanding of human development. This understanding is necessary for the advancement of fundamental biology, for the pursuit of therapies for the treatment of developmental diseases, such as Down syndrome and the microcephaly associated with Zika virus infection, and for the pursuit of therapies for the treatment of many other diseases that have been linked to developmental defects, including several cancers.

Third, human fetal tissues are critical for the establishment of mouse models for the study of human diseases and for the testing of potential new drugs and other therapies. For example, rodents are highly valuable for biomedical research, but they are inadequate for many studies of human disease and for the advanced testing of new therapies (e.g. HIV does not infect rodent cells). To circumvent the limitations of rodents, human fetal tissues can be implanted into immunocompromised mice, thereby generating an invaluable model system for studies that require the use of a living animal, such as the testing of new drugs. Importantly, human fetal tissues are essential for the establishment of these models due to their unique properties in comparison to tissues from children and adults.

4. **Summary of any research conducted since 2010 that UCLA has been involved in that used fetal tissue or relied upon other studies that used fetal tissue**

Research laboratories at UCLA studying a wide array of human diseases have used fetal tissues for their medical research projects since 2010. A survey of these researchers resulted in a consistent response that the use of fetal tissues has been, and will continue to be, essential for progress in their fields. While much remains to be learned about the specific properties of fetal tissues, it has been well-established that their properties are distinct from those of adult tissues. Fetal cells often differ from other cells because the fetal cells need to support the rapid growth and maturation of the tissue during fetal and neonatal development; in contrast, the functions of cells from children and adults are usually restricted to maintenance of the physiological functions of the tissue. An understanding of the unique properties of fetal cells and tissues is likely to be of great value for the development of new treatments for a number of devastating human diseases.

We provide here a summary of seven representative research efforts at UCLA that rely on fetal tissues and for which the research is strongly dependent on continued availability of fetal tissue

CANCER: One project focuses on an effort to improve the treatment of a form of lymphocyte leukemia in young children. Although the survival rate of these patients has improved dramatically, approximately 15% of pediatric patients with the most aggressive forms of the leukemia continue to die. A growing body of evidence suggests that these fatal leukemias may be unusually aggressive because they emerged from a unique type of B cell progenitor (B cells are white blood cells that secrete antibodies) generated only during fetal development. Research recently completed at UCLA has shown that the genetic regulation of fetal and adult B cell development is distinct. The aim of the ongoing research is to identify genes expressed only in fetal B-cell progenitors that contribute to the development of the aggressive forms of leukemia observed in young children.

IMMUNITY: Another UCLA research laboratory is immersed in an analysis of fetal T cells, another important type of white blood cell generated in the thymus. A primary goal of this laboratory is to develop improved strategies for rejuvenation of the immune system in cancer patients and in HIV patients whose immune systems have been compromised by chronic virus infection. Human fetal T cell progenitors have been found to be completely different from progenitors found in children and adults in their ability to rejuvenate the immune system. This laboratory has been performing detailed comparisons of the molecular properties of the fetal and adult cells in an effort to understand how to speed up immune system rejuvenation and make the immune system healthier.

As exemplified above, one general reason several UCLA laboratories rely on fetal tissues for their research is that an examination of the properties of the fetal tissues is needed to understand how they differ from older tissues and from tissues derived from induced pluripotent stem cells (iPSCs). iPSC are cells with embryonic stem cell like properties that can be generated from a patient's own skin cells (by a method developed less than 10 years ago), and then matured into any of a wide variety of human tissues; these cells hold great promise for the treatment of many degenerative and chronic diseases. One goal of the researchers is to engineer adult cells and iPSC to possess the unique, beneficial properties of fetal cells. This goal can be achieved only if the molecular features of the fetal cells have been clearly defined.

LUNG DISEASES: A UCLA laboratory is pursuing new treatments for a form of lung disease in infants. A long-term goal is to treat this disease by generating iPSC from a patient and then converting the iPSC into therapeutic lung cells. The ultimate therapy would not require the use of fetal cells. However, successful development of the therapy depends on an understanding of the unique properties of fetal lung cells, which have been found by the UCLA laboratory to grow and divide far more robustly than comparable cells from children or adults. The laboratory has developed a disease model that is being used to understand the unusual growth properties of he fetal cells and how these properties can be harnessed for therapeutic benefit.

GENETIC AND MUSCLE DISORDERS: Another UCLA laboratory studies diseases of muscle, including muscular dystrophy, toward the goal of regenerating functional muscle in patients. Similar to the findings with fetal lung, this laboratory has found that the regenerative capacity of human fetal muscle cells greatly exceeds that of older muscle satellite cells. Recent studies of the underlying mechanisms have revealed possible molecular explanations for the differences between the fetal cells and older cells. This professor considers fetal muscle cells to be the "gold standard" for all efforts to develop therapies for degenerative muscle diseases, due to the powerful and unique regenerative properties of these cells. Quite simply, for an understanding of the important differences between fetal muscle cells and older muscle cells, which are critical for the development of novel therapies, there is no alternative to the ability to analyze the fetal tissues themselves. It is also noteworthy that several of these studies are moving rapidly toward clinical trials, which necessitates the focus on human cells rather than rodent models.

HIV: Another reason several researchers rely on the availability of fetal tissues is that the fetal tissues can be used to create mice implanted with a specific human tissue, thereby providing an animal model in which potential therapies for the treatment of diseases of that human tissue can be tested. Such mice can eliminate the need for the testing of therapies in non-human primates, and are often preferable to studies of non-human primates because they allow the direct study of human cells.

Some UCLA laboratories use mice containing a human immune system for their studies of potential HIV therapies. These mice, which can be generated successfully only with the use of human fetal cells, are extremely important for progress of the HIV field, as HIV does not infect rodent cells. Currently, these mice are being used to study gene therapy approaches for the treatment of HIV infection, with the studies leading rapidly toward clinical trials.

BRAIN/SPINAL CORE INJURY: Human fetal tissues are also of great value for studies of the unique structure of the human brain, which is dramatically different from that of the mouse brain. UCLA research has used human embryonic stem cell lines to generate brain organoids (collections of neuronal cells that self-assemble into structures that resemble small portions of the brain). A comparison to fetal brain tissue is essential for the researchers to evaluate the validity of their organoid method, which is currently being used to understand developmental diseases of the brain, as well as the impact of Zika virus on brain development. The laboratory hopes to use this model to screen for drugs that may protect the fetal brain from the growth impairment caused by Zika virus infection. This same laboratory is also studying strategies for the generation of spinal cord neurons in the laboratory, for use in determining the underlying causes of neurodegenerative diseases, such as spinal muscular atrophy and amyotrophic lateral sclerosis, and for screening for drugs that could slow disease progression and extend patient lifespan.

INFERTILITY: The final UCLA laboratory discussed in this report uses fetal tissues for studies aimed at the diagnosis and treatment of human infertility. State-of-the-art genomics methods are being used to develop reference maps of germ cells and of fertilized eggs at the earliest stages of embryonic development. One goal of these studies is to better understand the reasons for spontaneous miscarriages. These studies are strongly dependent on human fetal tissues because early embryonic development in mice differs substantially from that in humans. The reference maps being developed by this laboratory are also of great importance for the study of germ cell cancers.

5. **Description of any recent changes experienced by UCLA in the availability of fetal tissue for research and the related impact of these changes, including whether or not there have been interruptions and/or delays in research as a result.**

Most UCLA researchers surveyed emphasized that recent national events have increased the challenge of obtaining the fetal tissues required for the research projects described above. One reputable company was forced to close due to legal expenses associated with challenges to its operations. This has delayed important studies and has forced laboratories to spend a considerable amount of time and resources searching for alternative suppliers. One laboratory has identified a reliable source of fetal tissues in Germany. Another laboratory has reduced their effort on studies that require fetal tissues, despite the importance of this research, due to concerns about personal safety. Of further note, recent publicity surrounding the procurement of fetal tissue delayed publication of a manuscript submitted by UCLA investigators to a renowned journal by more than seven months. The findings reported in that study have the potential to impact the development of therapies for HIV, cancer, multiple sclerosis, asthma, and organ transplant rejection.

# UC San Diego Health

**UC San Diego Health**
Office of the Vice Chancellor Health Sciences
9500 Gilman Drive
La Jolla, CA 92093-0602
T: 858.534.1501
F: 858.822.0084

**David A. Brenner, M.D.**
Vice Chancellor Health Sciences
Dean, School of Medicine

September 15, 2016

VIA E-MAIL (Heather.Sawyer@mail.house.gov)

The Honorable Jan Schakowsky
Ranking Member
Select Investigative Panel
U.S. House of Representatives
Committee on energy and Commerce
2125 Rayburn House Office Building
Washington, DC 20515-6115

Dear Ranking Member Schakowsky:

On behalf of the University of California San Diego ("UC San Diego"), I have attached UC San Diego's response to your letter of February 16, 2016, requesting that UC San Diego provide the Select Investigative Panel on Infant Lives with information that will further your understanding of the importance of fetal tissue research to advance our understanding and treatment of a range of diseases and conditions.

UC San Diego conducts research using fetal tissue which is vital to our understanding of human biology and for accelerating innovative stem cell research into patient diagnostics and therapy. Our research is conducted in full compliance with federal and state laws and in accordance with our mission of education, research, and public service. The information provided below answers the three specific questions made in your letter. UC San Diego has omitted identifying information from the attached document based on concerns for the safety and security of individuals conducting research.

Should you have any questions regarding this response, please contact Angela Phillips Diaz, Executive Director, Government Research Relations, UC San Diego at (202) 974-6323 or apdiaz@ucsd.edu.

1

I want to thank the Members of the Select Panel for their support of biomedical research and the opportunity to emphasize the importance of fetal tissue and cells to biomedical research.

Sincerely,

David A. Brenner, MD
Vice Chancellor, UC San Diego Health Sciences
Dean, UC San Diego School of Medicine

cc:  Honorable Marsha Blackburn c/o Matthew Tallmer
(via email, Matthew.Tallmer@mail.house.gov)

Attachments

# UC San Diego Health

1. Past benefits of fetal tissue research

Cell lines derived from fetal tissue have been instrumental in the development of vaccines for the following diseases: measles, mumps, rubella, chicken pox, polio, hepatitis A, rabies, shingles, and adenovirus (for military personnel). [1]

2. Potential future benefits that might be gained through continued fetal tissue research

Three examples of vital cutting edge, state-of-the-art medical research being conducted at UC San Diego that depends upon the use of fetal tissue and cells:

   a. Alzheimer's disease: Alzheimer's disease cells are used to understand why brain cells with Alzheimer's disease are abnormal and to try to develop drugs to mitigate the disease. A type of cell that is valuable in this work is an astrocyte, which is a support cell type in the brain. Fetal astrocytes, vital to these research investigations, are used. These fetal astrocytes provide growth factors that keep nerve cells healthy and other factors that are not yet defined that help the neurons establish connections and maintain long-term growth and viability. Although cells that are similar to astrocytes from stem cells can be made, the fetal astrocytes are the "gold standard". Astrocytes made from stem cells cannot be used to replace the fetal astrocytes because they are not identical in capacity to the best of our current knowledge. The fetal astrocytes are vital to these investigations and could be instrumental in treating and or curing Alzheimer's disease.

   b. Spinal cord injury: At the Sanford Stem Cell Clinical Center, fetal neural stems cells are being used in clinical trials for spinal cord injury in human patients. These fetal neural stem cells have previously been shown to yield remarkable results in animals that have spinal cord injury. These fetal stem cells, when implanted at the site of a spinal cord injury in animals develop into new neurons that appear to function as relays across the site of the injury rendering the animals able to function in a way that is superior to their performance before the injury. As a result of these investigations, the Center received FDA approval to test the fetal stem cells in human patients. Physicians and surgeons have initiated an FDA-approved phase 1 clinical trial of these cells and have implanted them in four patients to date. The trial has been successful to date. We have learned that at a minimum the surgery is safe and the fetal cells are safe. We will track the patients over the next few years to observe what we are hopeful

---

[1] The American Society for Cell Biology (ASCB), FAQs on Fetal Tissue Research, April 2016.

will be evidence of beneficial effect on the patients' paralysis. The next goal is to advance this trial to cervical spinal cord injuries soon. We hope to see evidence of positive impact on these patients as time progresses over the next 3-5 years. This trial and others like it are vital to advancing medical science attempts to cure spinal cord injury. These same fetal neural stem cells are also being used in NIH clinical trials at various sites nationwide for ALS also known as Lou Gehrig's disease.

c. Kidney generation: A group of NIH-funded scientists are working together to try to learn whether it is possible to build new kidneys from stem cells. The hoped-for building of new kidneys is significant because 93,000 Americans are on waiting lists for kidney transplant. The goal of building a functional kidney is ambitious, but one that we believe can be obtained through hard work, determination, and time. Fetal tissue is vital to the future of this investigation as it is only by examining this fetal tissue that it will be possible to determine the earliest biochemical signals that cells use to tell some cells to make kidneys and other cells to make other organs.

Our ability to examine the earliest stages of human development are vital to our understanding and our ability to treat many diseases in the future including diseases of pregnancy, diseases of the placenta, and diseases of children and adults. Development of many of these new therapies will rely on our learning and understanding of the proper developmental signals that cells use at the earliest stages of development. Without fetal tissue, vital research such as these three examples will take longer and slow the development of therapies and vaccines in the future which could be life changing for individuals and their families.

3. Unique aspects of fetal tissue in research, in comparison with adult cells, stem cells, or other cellular organisms that might be used for research purposes.

Fetal tissue and cells play a vital role in modern cutting edge medical research. These fetal tissues and cells cannot be replaced by embryonic stem cells, reprogrammed stem cells, or adult stem cells. These other cell types do not make astrocytes with identical properties as those from fetal sources. These fetal astrocytes provide growth factors that keep nerve cells healthy and other factors that are not yet defined that help the neurons establish connections and maintain long-term growth and viability.

UC San Diego's researchers are leaders nationally and internationally in biomedical research and fetal tissue and cells are critical tools for their ground-breaking work.

 University of Colorado
Anschutz Medical Campus

August 29, 2016

The Honorable Jan Schakowsky
Ranking Member, Select Investigative Panel
House Energy and Commerce Committee
Washington, D.C. 20515
*Via Email Only To: Jacquelyn.Bolen@mail.house.gov*

Dear Congresswoman Schakowsky,

I write in response to your previous letter regarding the scientific importance of fetal tissue research and the practices of the House Select Committee on Infant Lives. Thank you for your concern about the safety and privacy of our faculty and employees. Nowhere are those concerns more deeply felt than in Colorado, and they have been of paramount importance to me and my staff as we have determined responses to questions about fetal tissue research. In all instances, we have chosen to redact the names of faculty, students, staff or other individuals involved in fetal tissue research in documents disclosed outside the university. We made this decision to ensure those individuals are able to pursue their research without interference and in a manner consistent with the requirements promulgated by the National Institutes of Health and other federal and state authorities. We appreciate your strong support for our researchers in this matter. For that reason, we have also chosen not to publicly identify details of research involving fetal tissue conducted on our campus, because such specifics on that research would lead to the identification of individual researchers.

In 2014-2015, the CU Anschutz Medical Campus received about $420 million in sponsored research funding and currently has about 5,600 active research protocols encompassing research involving basic science, clinical trials, human research, and animal trials and research. While research depending on fetal tissue is used in very few research projects on our campus, faculty members have relied on this type of research when they saw opportunities to advance science and alleviate human suffering.

The University of Colorado complies with the long-standing federal and state statutes that relate to the use of fetal tissue for research. Since 2012, CU Anschutz has also maintained a policy that requires all researchers to demonstrate the scientific necessity of using fetal tissue for research before initiating a research protocol that employs the tissue. That policy also requires researchers to demonstrate that the research is translational – meaning that it is likely to move the science towards real-world impact. Thus, all active research projects employing fetal tissue do so because of unique scientific properties that cannot be replicated with adult tissue, and are intended to lead towards improvements in human health.

In September 2015, the University of Colorado School of Medicine signed the AAMC's open letter in support of fetal tissue research because we support the rights of our faculty members to pursue legal and ethical avenues of research to end human suffering and prevent disease. We continue to support the AAMC's further explanation of the scientific necessity of fetal tissue as detailed in its April 22nd letter to Chairwoman Blackburn. As that letter states, "By closing the door on one type of research, we may never know what advances we might have attained."

Thank you for your continued advocacy to preserve important lines of scientific inquiry and to protect the faculty, students, and staff who have chosen to conduct this research.

Sincerely,

Donald M. Elliman, Jr.
Chancellor, University of Colorado Anschutz Medical Campus

**OFFICE OF THE CHANCELLOR**
Building 500 | Mail Stop F565 | 13001 East 17th Place | Aurora, Colorado 80045
Phone 303 724 8900 | www.ucdenver.edu

2



August 10, 2016

The Honorable Jan Schakowsky
Ranking Member, Select Panel on Infant Lives
Committee on Energy & Commerce
United States Congress
2367 Rayburn House Office Building
Washington, DC 20515

Dear Congresswoman Schakowsky:

I write to respond to your request for information dated July 28, 2016, and received in my office on July 29th. You indicated that the Select Panel 'are extremely concerned that increased restrictions…are having a chilling effect on research' and requested our assistance in addressing several aspects concerning research involving fetal tissues for the Panel. The responses to your inquiries are provided below and reflect feedback from the University of Illinois at Chicago (UIC) faculty working with fetal tissues or related cell types.

**1) Past benefits of fetal tissue research.**

Fetal tissue has played an indispensable role for over 50 years, in advancing biomedical research particularly in pioneering innovative approaches for vaccine development and regenerative medicine. Fetal tissue cultures were used to generate large quantity of poliomyelitis virus, which facilitated development of vaccines against polio [1]. Subsequently, fetal tissues aided in creating vaccines for measles, mumps, chicken pox, whooping cough, and a number of other diseases. Recent data from the U.S. Center for Disease Control and Prevention show the major impact that availability of these vaccines for childhood immunizations has had on the morbidity and mortality in children born between 1994 and 2013 in the U.S. (http://www.cdc.gov/pdf/wk/mm6316.pdf#12).

Transplantation of fetal tissues into patients with immunological, hematological and neurological diseases has stimulated progress in regenerative medicine. Successful transplantation of fetal liver in an infant with severe combined immunodeficiency occurred in 1975 [2]. Additionally, substantial evidence exists supporting the benefit of fetal tissue transplantation as a therapeutic option for Parkinson's disease (PD). Studies in this area began following a clinical trial in the late 1980s and showed a dramatic improvement in two PD patients who received transplantation of fetal mesencephalic substantia nigra tissue [3]. Subsequent trials of fetal brain transplantation to PD patients have been conducted in many countries.

**2) Potential future benefits that might be gained through continued fetal tissue research.**

As noted above, fetal tissue research holds great promise for providing cell-based approaches for treating diseases where currently no effective therapies exist.

The positive findings in PD have led to clinical trials evaluating fetal cell-based treatment for other neurogenerative diseases such as Huntington's disease [4], Amyotrophic Lateral Sclerosis, and injuries to the spinal cord. Clinical trials with cells derived from fetal tissues are also ongoing for age-related macular degeneration and chronic liver disease.

UNIVERSITY OF ILLINOIS AT CHICAGO
Office of the Chancellor

2833 University Hall (MC 102)
601 South Morgan Street
Chicago, Illinois 60607

Phone  (312) 413-3350
Fax      (312) 413-3393
Web     chancellor.uic.edu



The emergence of potentially devastating viral epidemics such as Zika or Ebola is a reminder of how important it is for us to continue developing vaccines, and the availability of fetal tissue cells are essential for these efforts [5]. Another valuable application of fetal tissues in the area of immunology is re-creation of the human immune system by using blood-forming cells from the fetus. This allows scientists to develop therapies that are compatible with the human immune system instead of relying on studies of animals whose immune system may have subtle but important differences from humans.

Finally, fetal tissue is essential for studying birth defects and the impact of premature birth on infant health and development. Knowledge from this research is needed to guide development of therapies to prevent or reduce the morbidity and mortality from birth defects and developmental disorders.

**3) Unique aspects of fetal tissue in research, in comparison with adult cells or other cellular organisms that might be used for research purposes.**

There are four kinds of stem or regenerative cells currently used in research:

Adult stem cells are obtained from an individual after birth. Examples of adult stem cells are bone marrow derived adult blood stem cells. They are routinely used in bone marrow transplants to help patients with leukemia. The main limitation with these adult cells is that they are not very pliable and cannot be kept alive in the laboratory for very long. For example, a blood forming adult stem cell cannot be converted into neurons to treat and study brain disorders. Researchers are therefore limited to studying very few diseases.

The second group of stem cells is that of human embryonic stem cells. They are obtained from excess in vitro fertilized eggs from fertility clinics that are no longer needed after a couple has become pregnant. As long as proper consent is obtained from the couple, the eggs are donated and used for the derivation of stem cells. Unlike fetal cells, these embryonic stem cells have never been in a human womb and thus are dependent on laboratory (i.e., artificial) manipulation for generating desired cell types.

A third group of stem cells is that of induced pluripotent stem cells which are created by forcing an adult skin cell to become like an embryonic stem cell by inserting certain genes. They are very similar to embryonic stem cells except for the fact that they undergo a "stress" as they are being forced to take on the new stem cell identity. The "stress" may potentially alter the expected functioning of the derived cell. The potential for deviation from "normal" behavior is why many researchers study embryonic stem cells and induced pluripotent stem cells side-by-side.

The fourth group of stem cells are **fetal tissue derived cells**. Fetal tissues are unique in that they contain stem or progenitor cells that can be readily expanded. The major advantage of using these cells is that they are further along in their maturity. Complex cell types such as neurons are not readily generated in a laboratory from embryonic stem cells or induced pluripotent stem cells. Nature has its own complex machinery of generating functioning neurons that we cannot yet fully emulate. Since neural progenitor cells in the fetal tissues are already regionally specified (for example, fetal ventral midbrain tissues for transplantation to PD patients), the transplantation of the fetal tissues to patients is safer as compared to pluripotent stem cells that have the potential to become any cell types in the body. Importantly, fetal tissue is not only a significant source of advanced regenerative cells such as fetal neurons, it also allows us to study actual events in human development that are essential to understanding human birth defects that could never be examined in laboratory derived cells.



Finally, fetal cells can be used to develop cell lines that are long lived, i.e., several years, and allow researchers to replicate, confirm and standardize research results.

**4) Summary of any research conducted since 2010 at UIC that involved fetal tissue or relied upon other studies that used fetal tissue.**

Fetal brain tissue obtained from a commercial vendor is being used for a laboratory-based study evaluating the neuroreplacement of degenerative dopaminergic neurons in PD by human stem cells. The hypothesis for this research is that mononuclear bone marrow (BM) cells can be converted into neural stem cell-like cells (NSC-like cells) that are similar to brain-derived NSCs (fetal tissue). This effort to establish an alternative effective neuroreplacement therapy for PD is to avoid possible immunological rejection.

HEK293 cells, a cell line derived from fetal tissue, are being used to express proteins to study the interaction of metabolic enzymes in order to develop new treatments for severe inflammation in the lung.

**5) Description of any changes experienced by UIC in the availability of fetal tissue for research and the related impact of these changes, including whether or not there have been interruptions and/or delays in research as a result.**

There are certain questions that can be asked and answered with the use of fetal tissues for research that cannot be addressed through other means including one investigator's research on the fetal basis of adult disease, focusing on prostate cancer. Early life exposures to certain toxicants are thought to increase susceptibility to prostate cancer with aging. The availability of human fetal prostate tissue to test this in the laboratory would allow this investigator to directly test whether the human prostate gland is similarly susceptible or responsive to these environmental factors. However, because of difficulty in obtaining fetal tissues and concerns about their continued availability, this researcher opted to use a less satisfactory alternative, human prostate organoids grown in vitro.

To conclude, our faculty support the statement from the International Society for Stem Cell Research regarding their opposition to the efforts to limit or prohibit biomedical research using fetal tissue http://www.isscr.org/home/about-us/news-press-releases/2016/2016/02/26/isscr-endorses-fetal-tissue-research-as-essential.

As your own website has demonstrated, the researchers, federal agencies and academic institutions who have confirmed the need for fetal tissue research are numerous https://selectpaneldems-energycommerce.house.gov/our-work/benefits-fetal-tissue-research. The Congressional Research Services (CRS) Report from 2015 provides a succinct overview of the regulations and use of fetal tissue [6] for those involved in this research.

We support our colleagues in the American Association for the Advancement of Science (AAAS), American Association of Medical Colleges (AAMC), the Association of American Universities (AAU) and the Association of Public and Land-Grant Universities (APLU) in their concern regarding the Select Panel's request for information which seem to go beyond the Panel's stated scope https://www.aamc.org/download/457826/data/aamc-aau-apluletteronfetaltissuesubpoenas.pdf.



We trust that our open and honest feedback provided above can assist you and the other members of the Select Panel in continuing your important discussions with respect to the past and future vital need of fetal tissue research.

Sincerely,

Michael D. Amiridis
Chancellor


## References

[1] Enders JF, Weller TH, Robbins FC. Cultivation of the Lansing Strain of Poliomyelitis Virus in Cultures of Various Human Embryonic Tissues. Science. 1949;109:85-7.

[2] Keightley RG, Lawton AR, Cooper MD, Yunis EJ. Successful fetal liver transplantation in a child with severe combined immunodeficiency. Lancet 1975; 2: 850-853 [PMID:53333].

[3] Madrazo I, León V, Torres C, Aguilera MC, Varela G, Alvarez F, Fraga A, Drucker-Colín R, Ostrosky F, Skurovich M. Transplantation of fetal substantia nigra and adrenal medulla to the caudate nucleus in two patients with Parkinson's disease. N Engl J Med 1988; 318: 51 [PMID: 3336384 DOI: 10.1056/nejm198801073180115].

[4] Rosser AE, Barker RA, Harrower T, Watts C, Farrington M, Ho AK, Burnstein RM, Menon DK, Gillard JH, Pickard J, Dunnett SB. Unilateral transplantation of human primary fetal tissue in four patients with Huntington's disease: NEST-UK safety report ISRCTN no 36485475. J Neurol Neurosurg Psychiatry 2002; 73: 678-685 [PMID: 12438470].

[5] Hayden, EC. Zika highlights role of controversial fetal tissue research. Nature. 2016:532-7597. http://www.nature.com/polopoly_fs/1.19655!/menu/main/topColumns/topLeftColumn/pdf/nature.2016.19655.pdf

[6] Finklea, K, Jansen DJ, Johnson JA, Panangala SV, Redhead CS, Reyes-Akinbileje B, Shimabukuro JO. Fetal Tissue Research: Frequently Asked Questions, Congressional Research Services (CSR) Report. 2015. https://fas.org/sgp/crs/misc/R44129.pdf

CYNTHIA H. WILBANKS
VICE PRESIDENT FOR GOVERNMENT RELATIONS

# UNIVERSITY OF MICHIGAN

6008 FLEMING ADMINISTRATION BUILDING
503 THOMPSON STREET
ANN ARBOR, MICHIGAN 48109-1340
734 763-5554    FAX: 734 764-3316
wilbanks@umich.edu
http://www.umich.edu/~govrel/

February 29, 2016

**BY ELECTRONIC MAIL**

Mr. Matthew Tallmer
United States House of Representatives
Committee on Energy and Commerce
2125 Rayburn House Office Building
Washington, DC  20515-6115

Dear Mr. Tallmer:

Thank you for your January 21, 2016, letter to Dr. Marschall S. Runge, Executive Vice President of Medical Affairs and Dean of the Medical School, from the Select Panel on Infant Lives ("Select Panel"). I am pleased to respond on Dr. Runge's behalf.

We very much appreciate the opportunity to provide the Select Panel with information on the conduct of fetal tissue research at the University of Michigan ("University"). The research enterprise at the University is substantial and is a critical component of the University's mission. In order to demonstrate the size, scope, and productivity of the research enterprise at the University, certain data for FY 2015 are instructive. Illustratively, in FY 2015 the University's research expenditures totaled $1.3 billion, exceeding the billion-dollar mark for the seventh straight year; this remains one of the highest levels in the nation. In addition to federal funding of $738 million, direct research contracts from industry increased almost 25 percent, to a record high of $62 million in FY 2015. Finally, the Office of Technology Transfer reported record numbers of licensing agreements and startup companies for FY 2015, demonstrating the entrepreneurial and innovative spirit that is present at the University.

We have diligently sought to gather information responsive to the Select Panel's request within the brief time period provided for a response. This review is ongoing, and the University will supplement this response as additional, responsive information becomes available.

As you know, the University is an extraordinarily complex, large organization. With an enterprise this size, it is important to note that, in providing the requested information, we have used our best efforts to gather accurate information. Thus, in preparing this response, we have sought information throughout the University. For example, we searched research protocols by the

1

keyword search function, using "fetal tissue," and arrived at a lengthy list of studies that could potentially involve the use of fetal tissue. Many studies on this list were "false positives" that did not involve fetal tissue.

At this point in its review, for the time period for which the Select Panel has requested information, the University has located eight (8) studies that involved the use of fetal tissue. A brief description of each study follows:

1. **Blindness**: One researcher in the Department of Ophthalmology procured tissue from Advance Bioscience Resources, Inc. ("ABR") to perform research that places the tissue in culture and expands it so that it can be used for certain experiments over the course of several months. The ultimate goal of this research is to study pathways potentially involved in age-related blindness. The research team uses cultures to screen compounds and perform other studies to find ways to therapeutically tackle age-related blindness and age-related macular degeneration.

   Another researcher in the Department of Ophthalmology procured fetal tissue from ABR to understand macular degeneration, the leading cause of blindness. This research study involved establishing primary cultures for retinal pigment epithelium. Primary cultures are a category of growing cells that more realistically model actual tissues in the body, relative to cell lines. Cell lines lose many properties over time that make them less like the tissues from which they came. The goal of this research is to model age-related macular degeneration. At this time, therapies exist for only ten to fifteen percent of patients and animal models are not very good. Fetal human retinal pigment epithelium behaves more like the type of tissue that researchers are attempting to model.

2. **Pediatric Behavioral Disorders**: One researcher in the Department of Psychiatry procured fetal tissue from the University of Michigan Health System. This research study examined the impact of steroids given to children with membrane disease as part of their standard clinical care to determine whether there is an impact of the steroid treatment on the children's behavior and brain structure.

3. **Prostate Cancer**: One researcher in the Department of Urology procured fetal tissue from University of Washington. This research seeks to better understand how prostate cancer spreads to bone.

4. **Cancer in Young Boys**: One researcher in the Department of Human Genetics procured fetal tissue from Novogenix. This research study was an attempt to confirm previously successful experiments that used fetal gonadal tissues isolated from mice. The work was undertaken with the goal of giving young boys treated for cancer the opportunity to have their own children and lead normal lives after radiation or chemical cancer therapy. Although a useful experimental system for understanding the development of the gonad, the

2

mouse fetal gonad is not an exact analog of human development. In order to apply preliminary mouse-based findings to improvements in human health, it is important to confirm the results in human cells. The goal of this research was to uncover the mechanisms that control germ cell development and may allow the growth of germ cells independent of the development of other tissues (i.e., in vitro germ cell development).

5. **Genetic Impacts of Environmental Toxins**: One researcher in the Department of Environmental Health Sciences procured fetal tissue from University of Washington to conduct research examining the impact of early environmental toxins on the epigenome with the goal of protecting people from disease that is environmentally-induced. This research examines how early exposure to toxins can change gene expression.

6. **Pediatric Eye Cancer and Congenital Blindness**: Another researcher in the Department of Ophthalmology procured fetal tissue from ABR to conduct research to establish whether a new children's eye cancer biomarker and therapeutic target is also required for human retinal development. The ultimate goal of this research study was to better understand childhood eye cancer, congenital blindness, and for comparison of cultured stem cell lines against proteins that are actually produced during development for treatment of blinding diseases and cancer.

7. **Cellular Development**: One researcher in the Department of Internal Medicine procured tissue from two (2) sources: Novogenix and ABR. This research generates tissue cultures. Over the last five (5) years, the research team has generated human organ-like tissue in culture ("organoid") as part of an effort to validate the understanding that the organoid operates like tissue derived from natural sources. This research uses the tissue culture system to study disease with the ultimate goal of understanding how organs and tissues develop in embryos.

We are proud of our faculty's efforts in the pursuit of new discoveries that will result in fewer deaths from cancer and other diseases and improved quality of life.

The University of Michigan very much appreciates the opportunity to provide additional information on the importance of fetal tissue in the pursuit of groundbreaking discoveries in the areas of cancer, ophthalmic disease, and brain development. The University will also provide a response to the inquiry received from Ranking Member Schakowsky, as requested.

Sincerely,

Cynthia H. Wilbanks

Cynthia H. Wilbanks
Vice President for Government Relations

*Twin Cities Campus*　　　**Office of the Dean**　　　*Office at C607 Mayo*
　　　　　　　　　　　　　*Medical School*　　　　　　*Mayo Mail Code 293*
　　　　　　　　　　　　　　　　　　　　　　　　　*420 Delaware Street S.E.*
　　　　　　　　　　　　　　　　　　　　　　　　　*Minneapolis, MN 55455*

　　　　　　　　　　　　　　　　　　　　　　　　　*Office: 612-626-4949*
　　　　　　　　　　　　　　　　　　　　　　　　　*Fax: 612-626-4911*

March 22, 2016

The Honorable Jan Schakowsky
Ranking Member
Select Investigative Committee
2367 Rayburn House Office Building
Washington, DC  20515

Dear Representative Schakowsky:

Thank you for the opportunity to comment on the past and potential benefits of fetal tissue research.  I also appreciate your efforts to protect the privacy and safety of our faculty.  As you understand, the inclusion of their names has been of concern to them, to me in my role as Dean/VP, and to other senior leaders at the University of Minnesota.

Your letter requests additional information about the past benefits of fetal tissue research.  Many of these are well-known.  Human fetal tissue has played a role in advancing breakthroughs that have saved countless lives, including vaccines for Polio, Hepatitis A, German measles, chickenpox, rabies, and rubella.  Research using human fetal tissue has led to a widely used arthritis medication, as well as treatments that greatly improve the lives of people with Cystic Fibrosis and hemophilia.  It was also critical in my research to develop an intervention to prevent mother-to-child transmission of HIV.  That research alone has saved over 1 million infants in the last 10 years, while also reducing elective abortion in HIV positive women by more than half in this country.

There are also many potential future benefits of research using human fetal tissue.  At the University of Minnesota, researchers are working on more effective treatments for diabetes, Parkinson's and other neurological disorders, HIV/AIDS, spinal cord injuries and efforts to counter the adverse effects of chemotherapy and bone marrow transplant for children.

Other researchers use fetal tissue to understand cell biology and human development, to do research on preventing birth defects or on eyesight-robbing macular degeneration.

Finally, you asked about the unique aspects of fetal tissue in research, in comparison with adult cells, stem cells, or other cellular sources that might be used for research purposes

Many have asked why fetal tissue has remained a necessity in biomedical research.  The reason is that fetal tissue has vital properties that are not found in any other biological cell or tissue: rapid cell division and growth, specific immune properties and adaptation.

To provide just one example, those properties have established an important animal model for research into the HIV virus, which infects only humans and chimpanzees. A decade ago, with the use of fetal tissue, scientists at the University of Minnesota and elsewhere developed a mouse model that closely mimics a human immune system and, unlike ordinary mice, can be infected with HIV. The development of that mouse model was critical because before treatments can be tested on humans, they must be tested using animal models.

There is currently no substitute for the use of human fetal tissue in some areas of research. Where possible, researchers have looked for alternatives, such as using adult cells that have been "reprogrammed" to their earlier forms. But those techniques are still being refined, and some fields, such as the study of fetal development, are likely to remain reliant on fetal tissue. Although researchers seek answers in many different ways, there are some lines of inquiry--ones related to devastating diseases-- where scientists have not been able to develop alternatives to research using fetal tissue.

Neither can other suggested alternatives such as cell cultures, developed cell lines, computer modeling or umbilical or placental tissue substitute for fetal tissue at the present time, although they are potentially promising in the future.

Thank you, again, for the opportunity to provide this information and for your strong support of biomedical research. If you have additional questions, please do not hesitate to contact me.

Sincerely,

Brooks Jackson

Brooks Jackson, M.D., M.B.A
Dean of the Medical School
Vice President for Health Sciences

cc:     Dean Johnson, Chair of the Board of Regents
        Eric Kaler, President
        Brian Herman, Vice President for Research
        William Donohue, General Counsel
        Brian Steeves, Executive Director, Board of Regents' Office


August 10, 2016

The Honorable Jan Schakowsky
Ranking Member, Select Investigative Panel
Committee on Energy and Commerce
U.S. House of Representatives
2125 Rayburn House Office Building
Washington, DC  20515-6115

Dear Representative Schakowsky:

I am responding to your July 28, 2016 letter to Dr. Amy Gutmann, the President of the University of Pennsylvania. The University believes strongly that there have been very significant scientific benefits from past research using human fetal tissues, and that there will be tremendous future benefits through continued research using human fetal tissues, that could not, and cannot, be achieved, without using human fetal tissues. I have spoken with researchers at Penn, who have provided the following examples:

One of the most promising areas of research involving the use of human fetal tissue is the study of how and why congenital abnormalities develop in a fetus. Congenital anomalies occur in 3-4% of pregnancies and cost society billions of dollars per year in long term disability care, and cause incalculable emotional toll on patients and families. A major goal in human biology research is to understand what happens during human embryonic and fetal development that causes these anomalies. Human fetal tissue research enables scientists to learn what is normal development and how abnormalities arise, either those that are immediately apparent in the fetus or that can manifest themselves many years later, such as in the central nervous system. This understanding will lead to treatments that could decrease the frequency of the anomalies and to appropriate postpartum treatments that may improve the quality of life for the patients. Furthermore, researchers are now learning that the events during human embryonic and fetal development set the stage for many other conditions, such as autism, and some ailments that will not present until many decades later in life, such as degenerative diseases including Alzheimer's and Parkinson's.

Another important area of research involving the use of human fetal tissue is the emerging science of epigenetics – the study of environmental effects on the way genes are expressed. Scientists at Penn Medicine are in the forefront of this rapidly evolving field. Our knowledge of mammalian developmental biology over many years has come from studying model systems, mainly with the mouse. We have learned that developmental mechanisms have been conserved through evolution, that humans and mice share many protein-coding genes and that the differences between species are unlikely to be due to gene diversity (although these exist.) Instead, research shows that

differences between species largely result from modifications in regulatory programs that control gene expression; that is, when and where specific genes are expressed. In plain language, it is not necessarily our genes that separate us from our brethren in the animal kingdom and from each other, but also when these genes are 'turned on and off'. While humans share many similarities with the mouse and other mammalian models in developmental mechanisms, researchers have learned there are many differences in how genes are expressed. The reality of this finding has proved that it is problematic, misleading, frustrating and wrong to extrapolate what researchers have learned in other animals to humans, without direct studies on human tissues, including human fetal tissue. The clearest example of this is the human brain: the development of the brain has changed dramatically in the evolution of the human and with greater complexity than in any other species on earth. As other human organs and tissues are investigated, significant differences in gene expression are realized as well, reinforcing the need to study and use human fetal tissue directly. Only by studying human fetal tissue can we better understand how we are different from our animal brothers and develop treatments targeted to our particular genetic and epigenetic codes.

Opponents to human fetal tissue research argue that its use in research is unnecessary because they believe there are other model systems and techniques that can be used. But science has refuted that argument. As one example, opponents of fetal tissue research tout the use of human stem cells to recreate human embryogenesis in a dish as an alternative to fetal tissue. However, investigators learned quickly that human embryonic stem cells (those that can produce all tissues in our bodies) were very different from the mouse counterparts. These differences have been responsible for the general lack of cell-based interventions that have been promised and desperately sought since the introduction of human embryonic stem cell research in 1998 – a full 18 years ago. It has taken years to figure out how to grow the different cells we need to effect human therapies, because of the lack of information on human cells. Work with the stem cells cannot happen in a vacuum because any progress with these cells must be validated against the standard of normal tissues. What happens in a dish in a laboratory does not mean that is what is happening in the embryo – it must be confirmed. The study of human fetal tissue is, and will continue to be, needed to inform the studies with stem cells so that eventually these stem cells can generate safe and effective therapies. We now are beginning to see many publications on human 'organoids' – tissue-like structures that are being used to claim recapitulations of events in human embryogenesis. We must approach these claims with circumspection until they are confirmed with fetal tissues studies. Finally, fetal tissues continue to be the source of other types of stem cells that are involved in development of specific tissues within the embryo and are of important value as well for potential therapies, for diseases like HIV and AIDS, and vaccine production.

This work has the potential to save many lives from both genetic and non-genetic diseases. The University of Pennsylvania believes that responsible and ethical biomedical research involving human fetal tissue is a public health imperative. Investigators recognize that it is a privilege to work with this tissue, as it is with any human tissue. If there were effective alternatives, they would be used instead. So much

good can come from the study of fetal tissue, whereas its normal fate following abortion is to be discarded, sacrificing its potential to be useful in the advancement of biomedical science, as we race the clock to treat and cure a variety of devastating diseases.

Thank you for this opportunity to share with the Panel our University's experience conducting responsible and ethical biomedical research using human fetal tissue, and our belief why research with such tissues must continue.

Sincerely,

Susan E. Phillips
Senior Vice President for Public Affairs

cc:    The Honorable Marsha Blackburn, Chair



School of Medicine
and Public Health
UNIVERSITY OF WISCONSIN-MADISON

Administration

February 24, 2016

Select Investigative Panel, Minority Staff
Committee on Energy and Commerce
U.S. House of Representatives
Via email: *heather.sawyer@mail.house.gov*

Select Panel on Infant Lives, Majority Staff
Committee on Energy and Commerce
U.S. House of Representatives
Via email: *matthew.tallmer@mail.house.gov*

Re: Your letter dated February 11, 2016

To Whom it Concerns:

We are in receipt of your letter dated February 11, 2016, subsequently sent via email on February 16, 2016, seeking information related to the benefits of research using fetal tissue. Below, we both reiterate some of the information we included in our February 15, 2016, letter to the Select Panel on Infant Lives ("Panel"), and provide additional information.

**1) Past benefits of fetal tissue research**

As noted in our letter to the Panel dated February 15, 2016, the development of the human polio vaccine would not have been possible without cells of fetal origin. Other vaccines for rabies, chicken pox, German measles, and hepatitis A were all developed with the help of fetal-derived cells.

A search of *PubMedCentral* using four commonly used fetal cell lines as a search term yielded the information below:

- Cell line HEK-293 (also called 293T), derived in the Netherlands in the 1970s: 9,014 publications focusing on multiple types of cancer, stroke, Parkinson's disease, epilepsy, Alzheimer's disease, diabetes, cardiac and vision issues, and addiction.
- Cell line MRC-5, derived at the U.K. Medical Research Council in the 1970s: 1,424 published studies focusing on such diseases as conditions as multiple cancers, viruses, lung inflammation, polio vaccine, and the parasite that causes sleeping sickness.
- Cell line WI-38, derived at the Wistar Institute in the early 1960s: 1,387 published studies focusing on such diseases and conditions as multiple types of cancer, cell growth, cell aging, anti-cancer drugs, and gene expression.
- Cell line IMR-90, derived in the U.K. in the 1970s: 493 published studies focusing on such diseases and conditions as aging, lung injury, and other topics.

Office of the Dean
608/263-4910
Fax 608/265-3286

750 Highland Avenue
Madison, WI 53705
www.med.wisc.edu

General Information
608/263-4900
Fax 608/262-2327

UW Health
UW School of Medicine and Public Health
UW Hospital and Clinics
UW Medical Foundation

2) **Potential future benefits that might be gained through continued fetal tissue research**

*Also noted in our letter to the Panel dated February 15, 2016,* researchers around the country are using fetal tissue in research with the goal of understanding, mitigating the effects of, and discovering cures for a host of debilitating and deadly conditions. Such areas of research include:

- Preventing spontaneous pregnancy loss and recurrent spontaneous miscarriage.
- Preventing maternal diseases of pregnancy, including preeclampsia, and other such conditions which limit human fertility and reproductive success, and prevent couples from having healthy babies.
- Treating or curing many forms of cancer.
- Treating acute or chronic Graft-versus-Host-Disease (GVHD). Chronic GVHD arises in about 30-50% of patients who receive transplanted immune cells as a way of treating their cancer (acute GVHD treatments are only partially effective, and there is currently no effective treatment for chronic GVHD).
- Studying white blood cells that mediate transplant rejection or acceptance, so that ultimately transplants need not be accompanied by drugs that suppress the immune system globally, making the patient more vulnerable to infections and cancer.
- Using mouse models to provide a way for scientists to test human organ replacement therapies such as stem-cell derived heart or nerve transplants, before offering these approaches to a patient.
- Examining the responses of human immune cells to viral or bacterial infections. This could lead to the development of new vaccine or treatment strategies for viruses that are specific for humans and for major bacterial pathogens (e.g. tuberculosis or typhoid fever) or against multi-drug resistant bacteria (e.g. multi-drug resistant Staph aureus).
- Studying the involvement of white blood cells in atherosclerosis (a disease which results in heart attacks and sudden cardiac death).
- Studying how the maternal vascular system contributes to successful pregnancy and provides appropriate nutrient support for the growing fetus.
- Conducting research on how Trisomy 21 (Down's syndrome) affects fetal growth and development, which directly leads to physiological problems for Down's individuals postnatally and throughout their lifetime.

3) **Unique aspects of fetal tissue in research, in comparison with adult cells, stem cells, or other cellular organisms that might be used for research purposes**

Fetal tissues and cells are less specialized and more flexible, and can be grown in the lab in situations where adult cells and tissue do not survive. Many living tissues from adults are difficult or impossible to obtain for research purposes, such as brain, heart, and other vital tissues. In this way, tissue from legal abortions with proper consent of the patient providing the tissue is in some cases the only accessible source for many human tissues.

Office of the Dean
608/263-4910
Fax 608/265-3286

750 Highland Avenue
Madison, WI 53705
www.med.wisc.edu

General Information
608/263-4900
Fax 608/262-2327

UWHealth

UW School of Medicine and Public Health
UW Hospital and Clinics
UW Medical Foundation

The human fetal thymus is the ultimate reference tissue for anti-tumor and anti-viral vaccine development, and for discovery of novel cell types involved in immune rejection or protection of tissue transplants. Cutting off access to this reference tissue will cripple basic research on the development of the human thymus, a critical organ for understanding and correcting inborn immunologic defects in children. While some valuable research can be done on the fetal thymus of other mammals, ultimately the human fetal thymus will be a key reference point for human clinical trials of transplants to correct inborn immune defects.

It is not possible to form fully functional, intact tissue or organs from stem cells in the laboratory at this point, but fetal tissue provides access to this human tissue. Additionally, interactions among various tissues and organ systems are typical of many disease processes which cannot be mimicked using stem cells in the laboratory.

And because fetal tissue is less likely to stimulate rejection, it is used for cell and tissue transplants, with the potential to treat diabetes, Parkinson's, and other illnesses. Stillbirths and spontaneous abortions are poor sources of material because the cells are typically severely damaged or dead.

I hope this information answers your questions. If you have additional questions related to this response, please do not hesitate to contact me.

Sincerely,

Robert N. Golden, MD
Robert Turell Professor in Medical Leadership
Dean, School of Medicine and Public Health
Vice Chancellor for Medical Affairs
University of Wisconsin-Madison

Office of the Dean
608/263-4910
Fax 608/265-3286

750 Highland Avenue
Madison, WI 53705
www.med.wisc.edu

General Information
608/263-4900
Fax 608/262-2327

UW Health
UW School of Medicine and Public Health
UW Hospital and Clinics
UW Medical Foundation

# Yale SCHOOL OF MEDICINE

ROBERT J. ALPERN, MD
*Dean*
*Ensign Professor of Medicine*

PO Box 208055
New Haven CT 06520-8055
T 203 785-4672
F 203 785-7437
robert.alpern@yale.edu

*courier*
Sterling Hall of Medicine (SHM)
Room C-203
333 Cedar Street
New Haven CT 06510

May 9, 2016

The Honorable Jan Schakowsky
Ranking Member
Select Investigative Panel
2367 Rayburn House Office Building
Washington, D.C. 20515

Dear Congresswoman Schakowsky,

I am writing in response to your recent letter seeking information on the past and potential future benefits of research involving fetal tissue.

As a leading research institution, Yale has had a long history of contributions to the field of medicine that have had major impacts on the health and welfare of people around the world. Included among these were the first use of chemotherapy as a cancer treatment in the U.S., the development of the first artificial heart pump in the U.S., and the first insulin pump for diabetes. These discoveries were the result of years of basic, investigator-driven research and scientific collaboration that sought to make clear the mechanisms by which living organisms function and the operations by which drugs act.

Transformative medical and technological advances like these have been accompanied by national, institutional, and community-based conversations about the social and ethical issues raised by the participation of human subjects in novel experimental treatments and cures. These discussions have sought to address the impact of scientific innovation through the development of practical information, guidance, regulation, and, where necessary, the control of particular practices that have allowed potentially lifesaving research to continue and the public to benefit from the advances resulting from its historic investment in biomedical research.

In 1988, the Human Fetal Tissue Transplantation Research Panel, chaired by Judge Arlin Adams, provided an important public forum to consider the scientific value and ethical acceptability of fetal tissue research, hearing testimony from lawyers, ethicists, religious leaders, biomedical researchers, clinical physicians, and the general public, including families with children afflicted by disease and disability. At its conclusion, the panel determined that the research was in the public interest, with the potential to help millions, and that it would not increase the number of abortions, with the moral imperatives and research exigencies not incompatible. This in turn led to policy and regulation to ensure that fetal tissue would be made available for research purposes while establishing important safeguards to prevent the development of a market for such tissue



and to insulate the decision to obtain the medical procedure from any decision to donate the tissue to research.

Others have written extensively on the past benefits of fetal tissue research, including the vaccines for rubella and varicella, which effectively eradicated a major source of child mortality and mental retardation. Also, as widely discussed, research utilizing fetal kidney cells was crucial to the ultimate development of the polio vaccine. (Many types of tissue contributed to the discovery of the vaccine against polio, including human embryonic tissue, although the vaccine developed by Jonas Salk was cultured in monkey kidney tissue.) In addition, fetal tissue research has resulted in significant improvements in the care of the unborn threatened by premature delivery, death, or disease, as in the case of the development of amniocentesis as a tool to detect and, in some cases, to treat fetal abnormalities in utero.

Today, researchers use fetal tissue to investigate and understand the complex events that occur during normal human development and that cannot be studied in laboratory animals. Some of our most serious medical conditions are due to abnormal specification and differentiation of developing cells, and it is hoped that a better understanding of normal cell processes will allow us to identify – and correct – the abnormalities that cause deadly disease and illness. Researchers also use this tissue to study fetal pharmacology and the effects of chemical and other agents in the fetus and to improve techniques to save the lives of premature infants.

The field of neuroscience provides one particularly compelling example of how fetal tissue is used in research, permitting a detailed exploration of the questions raised in your letter. Neuronal production, neuronal migration and the regional patterning of the brain mostly occur in the first 2 – 5 months of gestation. More than 2/3 of human genes are expressed in this developing brain, and nearly all of the genetically-based developmental disorders are likely the result of structural and/or functional alteration occurring prenatally, even when the symptoms of disease may not appear until childhood, adolescence or adulthood. Without model systems based on the prenatal human brain, we would be unable to investigate the normal – and abnormal – forms and structures, functions, and genetic differences that are unique to the developing human brain and may be crucial for understanding and, eventually, treating major neurological and psychiatric disorders.

In the past, researchers have used animal models – primarily rodents – to explore brain structure and development. Although these models have led to important scientific insights, their broad application has been limited by the lack of complexity and sophistication in the rodent brain. When compared to a rodent brain, the human brain has a 1,000-fold expansion in the cortical surface area and gyrification of the surface as well as specific types of neurons that are not present in rodents. In addition, human brains develop entire areas of higher association not present in rodents or other animals that are important for logical thought, language, and abstraction. As a result, animal models for neuropsychiatric disorders are difficult to interpret, and research has confirmed that animal models in general are not a reliable tool for predicting neurological responses in humans, making them a poor guide for later research or clinical decision making. Consequently, virtually no therapeutics for neurological and psychiatric disorders have been developed based solely on experimental animal models. While comparisons

between animal and human brain specimens allow us to understand similarities and differences between human and rodent model system, thereby providing clues to the pathogenesis of neurological and psychiatric disorders, animals are not a substitute for experimental systems based on the developing human brain.

Similarly, adult brains are not an adequate model for studying prenatal brains and their development. Of critical importance, the expression of genes in the prenatal brain differs in fundamental ways from the expression of genes in an infant, child or adult brain. Researchers have discovered that the embryonic brain's genetic program draws to a close and new gene expression emerges around the time of birth. In demonstrating this effect, researchers have confirmed that the genes that guide the construction and assembly of the brain are quite different from those that must govern its function during maturation postnatally. In fact, the differences are so profound, with so many genes that are expressed differently, that the fetal brain at the molecular level is almost a different organ from the adult brain, making adult brain cells a poor proxy for fetal brain cells.

Over the past several years, researchers have identified the conditions that have allowed specialized adult cells to be genetically reprogrammed, coaxing them to assume a stem cell-like, or pluripotent, state. In this short span of time, and informed by investigations involving fetal tissue and embryonic stem cells (ESCs), researchers have made great strides in improving the techniques to generate these de-differentiated adult cells, known as induced pluripotent stem cells (iPSCs), whose developmental fates, until recently, had been assumed to be fixed. The idea that a patient's own cells, harvested from accessible areas like the skin, could provide a sufficient amount of immune-matched cells that could be reprogrammed into the cell types that have been compromised or destroyed by disease or injury is exciting and is being pursued by researchers worldwide.

As of this writing, however, there are significant technical challenges that must be overcome before iPSCs are used for these purposes – or before we can be confident that they are a reliable alternative to fetal tissue. Although there have been successes in reprogramming some adult cells, the technique needs to be refined and the process made more efficient. In order to serve as a good model for reenacting the trajectory of early brain development in normal and diseased states, iPSCs must be able to recapitulate the later stages of human brain development. Currently, both iPSCs and ESCs only recapitulate some of the fundamental mechanisms underlying neurodevelopment at the very earliest stages of the human brain.

Also, iPSCs and ESCs currently provide very simplified models of human brain development. In fact, the extent to which these cellular models are able to recapitulate true human brain development *at any stage* is still actively investigated and open to scientific debate. As researchers learn more about the molecular mechanisms that underlie reprogramming, they must seek to understand any alterations in DNA that would determine whether these cell types are truly clinically similar. For example, adult stem cells may contain more DNA abnormalities caused by environmental factors, such as exposures to sunlight and toxins and unexpected errors in DNA replication that inevitably occur during the course of a lifetime. Researchers must understand, minimize and fully characterize this variability between ESCs, iPSCs, and fetal cell

lines so they can fully appreciate how their results match to the biology of the disease being studied.

Whether the differences between human iPSCs, ESCs and fetal tissue cells will be consequential remains to be determined, but the most important uses for newly sourced fetal brain tissue is to validate these alternative model systems and provide tissue for those cellular and molecular processes that cannot be studied using human iPSCs or ESCs. In addition to understanding and accounting for any variation, researchers also need to compare fetal cells with the alternatives in terms of their ability to proliferate, differentiate, survive and function after transplant, and avoid immune rejection in an animal or human recipient. As noted above, researchers are actively developing new models that have the potential to substitute for fetal tissue. Yet, only time and further research will determine if alternative models will be viable replacements for fetal tissue in clinical settings.

Some have questioned the need for continued access to new sources of fetal tissue for comparison with adult cells, stem cells and other cellular organisms that might be used for research purposes. As in any field, progress toward scientific goals, be it understanding how the nervous system functions in health or disease or developing alternatives to existing models, is limited by experiments that are technically and conceptually possible. Although neuroscience is in a period of significant innovation, the vast complexity of the human brain makes it one of the greatest challenges in modern medicine. Recent advances, such as the sequencing of the human genome, the development of new tools to map neuronal connections, and higher fidelity imaging technologies, now allow researchers to observe how the human brain is structurally and functionally connected – moving them ever closer to understanding the timing and regulation of signaling pathways at the cellular, intercellular and intracellular levels.

So far, these new tools have advanced our understanding of the maturing adolescent and adult brain, but there is still much to understand about how and when brain systems come "on-line" and how fetal brain development may shape the trajectory for brain plasticity across development and adulthood. Moving forward, new sources of fetal tissue are key to understanding these basic neural developmental processes. In turn, understanding these foundational early brain developmental processes, including how neural systems emerge, lights the way to understanding how to reopen the brain's own regeneration capacities and develop new therapeutic approaches to a host of degenerative neural diseases or even the sequelae of brain injury.

Currently, research involving fetal tissue represents a small proportion of the overall NIH budget, but this is a reflection of emphasis within existing budget constraints – not a lack of scientific opportunity offered by work with fetal tissue. NIH does an enviable job of balancing many competing priorities, but its research portfolio is, in fact, more heavily invested in understanding what goes wrong in adulthood, such as the development of cardiovascular disease, and less on understanding how early developmental processes and events shape the risk for later diseases across organ systems, especially the brain. As they should, conversations about priority-setting at NIH focus on both the burden of disease and the opportunity to support meaningful health benefits, but many diseases may have their origins in the earliest developmental processes.

Clues to innovative treatments may also lie in understanding how these early developmental processes, especially at the neural level, are regulated. Although neuroscience is a rapidly maturing field, research into epigenetics of neurological and neuropsychiatric disease and disorders, at the very earliest stages of human development, has not attracted significant support in the past. Yet, as new technological and conceptual approaches are developed, it is hoped that the share of the NIH budget dedicated to human neuroscience will increase.

The burden of major disorders, such as cancer, intellectual disabilities, Alzheimer's disease, and autism spectrum disorder, are enormous, exacting a great emotional and financial toll on families as well as health and social welfare agencies. We all want our children and grandchildren to live healthier lives, benefitting from more sophisticated medical approaches to treat and, ultimately, spare them from age-associated diseases and disorders. In fact, many researchers, including those who work with fetal tissue, enter their fields with the hope that they can make a difference for those with chronic or acute conditions that degrade quality of life. In too many cases, we do not fully understand the symptoms or causes of the different types of diseases and disorders that can affect the human condition, and, when we do, our efforts often fall short of finding a cure. The knowledge gained through research using fetal tissue has already provided critical insights into etiologies of certain human disorders and offers the possibility of hope for reducing this burden, either directly through the development of new targets for treatments or indirectly through a deep knowledge of individual cells and whole systems. To abandon this research would significantly impede progress toward scientific understanding and the alleviation of human suffering.

Thank you for your interest in continuing this important research.

Sincerely,

Robert J. Alpern, MD
Dean and Ensign Professor of Medicine
Yale School of Medicine



Rush D. Holt
Chief Executive Officer and
Executive Publisher, *Science*

April 25, 2016

To:    Chairwoman Marsha Blackburn
        Select Investigative Panel, House Energy and Commerce Committee

Dear Chairwoman Blackburn:

On behalf of the American Association for the Advancement of Science (AAAS), the world's largest general scientific society, I write in response to the March 30 letter from Chairwoman Blackburn of the Select Panel on Infant Lives. I appreciate the opportunity to present scientific information on the efficacy of fetal tissue research and to assist the committee in understanding its important role in addressing questions about medical research to promote human health.

As we indicated in our March 15 letter,[1] the decision to terminate a pregnancy does not bear on the decision to donate tissue. Scientific studies, such as one conducted by the University of California, San Francisco (UCSF),[2] reveal that reasons for this decision may relate to socioeconomic status, age, health, and marital status. Furthermore, the guidelines set forth in the National Institutes of Health Revitalization Act, PL 103-43, clearly stipulate that the option to donate tissue cannot be discussed with the woman until after she has made a decision to terminate a pregnancy.

Scientists who work with fetal tissue—many of whom are hesitant to be cited due to safety concerns— state that fetal tissue is unique and useful because it can offer information that other types of research, such as research using animal or adult tissue, do not always provide. Studies on animals may be predictive of results in humans, but not always. Fetal tissue is specific to early human development and may provide a level of assurance that may not be found solely utilizing adult or animal tissue.

It is used to study areas such as infectious diseases, eye development and disease, and to better understand fetal development.[3] AAAS has long taken the position that research on cells derived from all sources, when conducted under strong ethical guidelines, should be conducted to answer questions about human health and development.[4] This is in part because science is unpredictable. We do not know where the next medical advance will emerge, but we do know that sometimes, breakthroughs come from surprising places.

Regarding your inquiries about scientific information surrounding medical advances, vaccines, or cures achieved through the use of human fetal tissue research, fetal tissue research has been conducted since the

---

[1] http://www.aaas.org/sites/default/files/AAAS_FTR_March%202016.pdf

[2] http://bmcwomenshealth.biomedcentral.com/articles/10.1186/1472-6874-13-29

[3] http://www.nature.com/news/the-truth-about-fetal-tissue-research-1.18960#graphic

[4] http://www.aaas.org/sites/default/files/content_files/Stem%20Cell%20Research%20and%20Applications%20Report.pdf

American Association for the Advancement of Science
1200 New York Avenue, NW, Washington, DC 20005 USA
Tel: 202 326 6640  Fax: 202 371 9526
Email: rholt@aaas.org

1930's and was instrumental, for example, in discovering the vaccine for polio, where researchers infected fetal kidney cells in petri dishes to produce a large amount of virus that they could then harvest, purify and use to vaccinate people. This kind of discovery is made possible by allowing multiple lines of inquiry, and by utilizing a range of tools, which include fetal tissue research.

Perhaps the timeliest example to demonstrate the potential for scientific advancement from research that uses donated tissue involves the Zika virus. As you are aware, the Zika virus has been linked to fetal deaths and birth defects such as microcephaly, prompting the World Health Organization to declare it an international public health emergency. In order to understand the virus' effect on pregnant women and their fetus, scientists are using fetal tissue to test how the virus may cause these birth defects. Donated tissue gives unique insight as to the *in vivo* effects of the virus, and as stated by the Nowakowski study on Zika,[5] it provides scientists a more comprehensive understanding of how the virus operates. Donated fetal tissue allows scientists to gain the necessary information on how the virus affects the fetus *in utero*, and to test a range of potential therapies and treatments for safety and efficacy.

To cite another recent example, there is a potential new prenatal stem-cell therapy to treat *osteogenesis imperfecta,* known as brittle bone disease, which was featured in a news article in *Science*.[6] This debilitating disease is genetic, and researchers are preparing a clinical trial to test this therapy in pregnant women. The therapy involves the use of mesenchymal stem cells (MSCs) from donated fetal liver that is infused through an umbilical vein that directly treats bone development of the fetus before birth. Early tests overseas have shown sufficient promise to move to a clinical trial, and one of the promises of this therapy is that this specific type of stem cell has not demonstrated as strong of an immune reaction as blood stem cells.

Examples like these demonstrate the need to explore many different types of research, including research using donated tissue. By limiting the scope of research and restricting the scientific community's ability to follow the evidence, we thereby limit the possibility of discovering new medical advances, vaccines, or cures aimed at bettering society.

Finally, we want to reiterate our concern expressed in our March 15 letter over reports that the Select Panel plans to issue subpoenas that would risk making public the names of researchers, students, and others involved in fetal tissue research. There is, unfortunately, a history of scientists being harassed and threatened for conducting certain types of research, and AAAS has long sought to support and defend these researchers. Scientists do not choose their careers to court controversy. They do so because they want to answer important questions, and to advance science in service of society. As history has shown, answers to these questions can sometimes change the world for the better.

Sincerely,

Rush D. Holt, PhD
Chief Executive Officer and
Executive Publisher, *Science* Family of Journals


cc:     Rep. Jan Schakowsky

[5] http://www.sciencedirect.com/science/article/pii/S1934590916001181
[6] http://science.sciencemag.org/content/352/6283/284.full

Exhibit 9.3

**Vaccinations currently FDA-approved for use in the United States, based on:**

http://www.fda.gov/BiologicsBloodVaccines/Vaccines/ApprovedProducts/ucm093833.htm

| | Product Name | Trade Name | Sponsor | FDA approval | Propagated in | Animal or other cells | Historic cell lines | Fetal tissue |
|---|---|---|---|---|---|---|---|---|
| | | | Vaccines currently under development or recently approved | | | | | |
| 1 | Ebola virus | rVSV-ZEBOV-GP | New Link Genetics | 2016 | Vero monkey kidney cells | X | | |
| | | RV144 (ALVAC) HIV-1 | Sanofi Pasteur GlaxoSmithKline | 2016 HVTN 702 (Phase 11/111 trial) | Chicken embryo fibroblasts | XX | | |
| 2 | HIV | gp120/MF59 | | | Chinese Hamster Ovary cells | | | |
| 3 | Malaria | RTS,S and *Pf*s25-EPA | GlaxoSmithKline Biologicals | n/a | Yeast cells | X | | |
| 4 | Cancer | Sipuleucel-t (Provenge) | Dendreon Corporation | 2010 | Patient's blood cells in culture | X | | |
| | | Tumor antigens | | n/a | Patient's cancer cells in culture | X | | |
| | | | Vaccines produced using human fetal cell lines | | | | | |
| 1 | Adenovirus Type 4 and Type 7 Vaccine, Live, Oral | No Trade Name | Barr Labs, Inc. | 2011 | WI-38 | | X | |
| 2 | Diphtheria and Tetanus Toxoids and Acellular Pertussis Adsorbed and Inactivated | Quadracel | Sanofi Pasteur Limited | 2015 | Corynebacterium diphtheriae, Clostridium tetani and Bordetella | XXX | X | |

| # | Vaccine | Trade Name | Manufacturer | Year | Cultures/Substance | | |
|---|---|---|---|---|---|---|---|
| | Poliovirus Vaccine | | | | pertussis cultures; MRC-5 (Polio) | XXXX | X |
| 3 | Diphtheria and Tetanus Toxoids and Acellular Pertussis Adsorbed, Inactivated Poliovirus and Haemophilus b Conjugate (Tetanus Toxoid Conjugate) Vaccine | Pentacel | Sanofi Pasteur Limited | 2008 | Corynebacterium diphtheriae, Clostridium tetani, Bordetella pertussis and Haemophilus influenza B cultures; MRC-5 (Polio) | XXXX | X |
| 4 | Hepatitis A Vaccine, Inactivated | Havrix | GlaxoSmithKline Biologicals | 2005 | MRC-5 | | X |
| 5 | Hepatitis A Vaccine, Inactivated | VAQTA | Merck & Co, Inc | 1996 | MRC-5 | | X |
| 6 | Hepatitis A Inactivated and Hepatitis B (Recombinant) Vaccine | Twinrix | GlaxoSmithKline Biologicals | 2007 | MRC-5 | | X |
| 7 | Measles, Mumps, and Rubella Virus Vaccine, Live | M-M-R II | Merck & Co, Inc | 2008 | Embryonated chicken eggs (Measles and Mumps); WI-38 for RA 23/7 (rubella) | XX | X |

| # | Vaccine | Trade Name | Manufacturer | Year | Cell line / culture | | |
|---|---------|-----------|--------------|------|---------------------|---|---|
| 8 | Measles, Mumps, Rubella and Varicella Virus Vaccine Live | ProQuad | Merck & Co, Inc | 2005 | Embryonated chicken eggs (Measles and Mumps); WI-38 for RA 23/7 (rubella); MRC-5 for Varicella | XX | XX |
| 9 | Rabies Vaccine | Imovax | Sanofi Pasteur, SA | 2011 | MRC-5 | | X |
| 10 | Varicella Virus Vaccine Live | Varivax | Merck & Co, Inc | 1995 | Wi-38 and MRC-5 | | X |
| 11 | Zoster Vaccine, Live, (Oka/Merck) | Zostavax | Merck & Co., Inc. | 2006 | MRC-5 | | X |
| | **Vaccines produced without human fetal tissue or fetal cell lines** | | | | | | |
| 1 | Anthrax Vaccine Adsorbed | Biothrax | Emergent BioDefense Operations Lansing Inc. | 2010 | Bacillus Anthracis culture | X | |
| 2 | BCG Live | BCG Vaccine | Organon Teknika Corp LLC | 2010 | Mycobacterium bovi culture | X | |
| 3 | BCG Live | TICE BCG | Organon Teknika Corp LLC | 2010 | | X | |
| 4 | Diphtheria & Tetanus Toxoids Adsorbed | No Trade Name | Sanofi Pasteur, Inc | 2003 | Corynebacterium diphtheriae and Clostridium tetani cultures | XX | |
| 5 | Diphtheria & Tetanus Toxoids & Acellular Pertussis Vaccine Adsorbed | Infanrix | GlaxoSmithKline Biologicals | 1997 | Corynebacterium diphtheriae, Clostridium tetani and | XXX | |

| | Diphtheria & Tetanus Toxoids & Acellular Pertussis Vaccine Adsorbed | | Bordetella pertussis cultures | | |
|---|---|---|---|---|---|
| 6 | Diphtheria & Tetanus Toxoids & Acellular Pertussis Vaccine Adsorbed | DAPTACEL | Sanofi Pasteur, Ltd | 2002 | Corynebacterium diphtheriae, Clostridium tetani and Bordetella pertussis cultures | XXX |
| 7 | Diphtheria & Tetanus Toxoids & Acellular Pertussis Vaccine Adsorbed, Hepatitis B (recombinant) and Inactivated Poliovirus Vaccine Combined | Pediarix | GlaxoSmithKline Biologicals | 2002 | Corynebacterium diphtheriae, Clostridium tetani and Bordetella pertussis cultures; genetically engineered yeast (Hepatitis antigen); Vero monkey kidney cell culture cells (Polio) | XXXXX |
| 8 | Diphtheria and Tetanus Toxoids and Acellular Pertussis Adsorbed and Inactivated Poliovirus Vaccine | KINRIX | GlaxoSmithKline Biologicals | 2008 | Corynebacterium diphtheriae, Clostridium tetani and Bordetella pertussis cultures; Vero | XXXX |

| # | Vaccine | Brand | Manufacturer | Year | monkey kidney cell culture cells (Polio) | |
|---|---------|-------|--------------|------|------------------------------------------|---|
| 9 | Haemophilus b Conjugate Vaccine (Meningococcal Protein Conjugate) | PedvaxHIB | Merck & Co, Inc | 2011 | Haemophilus influenzae type b and Neisseria meningitidis serogroup B culture | XX |
| 10 | Haemophilus b Conjugate Vaccine (Tetanus Toxoid Conjugate) | ActHIB | Sanofi Pasteur, SA | 1996 | Haemophilus influenza type b and Clostridium tetani cultures | XX |
| 11 | Haemophilus b Conjugate Vaccine (Tetanus Toxoid Conjugate) | Hiberix | GlaxoSmithKline Biologicals, S.A. | 2009 | Haemophilus influenza type b and Clostridium tetani cultures | XX |
| 12 | Haemophilus b Conjugate Vaccine (Meningococcal Protein Conjugate) & Hepatitis B Vaccine (Recombinant) | Comvax | Merck & Co, Inc | 1996 | Haemophilus influenza type b and Neisseria meningitides serogroup B cultures; yeast cells (Hepatitis) | XX |
| 13 | Hepatitis B Vaccine (Recombinant) | Recombivax HB | Merck & Co, Inc | 1999 | Genetically engineered yeast culture | X |
| 14 | Hepatitis B Vaccine (Recombinant) | Engerix-B | GlaxoSmithKline Biologicals | 1998 | Genetically engineered yeast culture | X |

| | Vaccine | Trade Name | Manufacturer | Year | Substrate | | | |
|---|---|---|---|---|---|---|---|---|
| 15 | Human Papillomavirus Quadrivalent (Types 6, 11, 16, 18) Vaccine, Recombinant | Gardasil | Merck & Co., Inc. | 2006 | Genetically engineered yeast culture | X | | |
| 16 | Human Papillomavirus 9-valent Vaccine, Recombinant | Gardasil 9 | Merck & Co., Inc | 2014 | Genetically engineered yeast culture | X | | |
| 17 | Human Papillomavirus Bivalent (Types 16, 18) Vaccine, Recombinant | Cervarix | GlaxoSmithKline Biologicals | 2009 | Trichoplusia ni insect cell culture | X | | |
| 18 | Influenza A (H1N1) 2009 Monovalent Vaccine | No Trade Name | CSL Limited | 2009 | Embryonated chicken eggs | X | | |
| 19 | Influenza A (H1N1) 2009 Monovalent Vaccine | No Trade Name | MedImmune LLC | 2009 | Embryonated chicken eggs | X | | |
| 20 | Influenza A (H1N1) 2009 Monovalent Vaccine | No Trade Name | ID Biomedical Corporation of Quebec | 2009 | Embryonated chicken eggs | X | | |
| 21 | Influenza A (H1N1) 2009 Monovalent Vaccine | No Trade Name | Novartis Vaccines and Diagnostics Limited | 2009 | Embryonated chicken eggs | X | | |
| 22 | Influenza A (H1N1) 2009 Monovalent Vaccine | No Trade Name | Sanofi Pasteur, Inc. | 2009 | Embryonated chicken eggs | X | | |

| # | Product | Trade Name | Manufacturer | Year | Substrate | | |
|---|---------|-----------|-------------|------|-----------|---|---|
| 23 | Influenza Virus Vaccine, H5N1 (for National Stockpile) | No Trade Name | Sanofi Pasteur, Inc. | 2007 | Embryonated chicken eggs | X | |
| 24 | Influenza A (H5N1) Virus Monovalent Vaccine, Adjuvanted | No Trade Name | ID Biomedical Corporation of Quebec | 2013 | Embryonated chicken eggs | X | |
| 25 | Influenza Vaccine, Adjuvanted | FLUAD | Novartis Vaccines and Diagnostics Limited | 2015 | Embryonated chicken eggs | X | |
| 26 | Influenza Virus Vaccine (Trivalent, Types A and B) | Afluria | CSL Limited | 2008 | Embryonated chicken eggs | X | |
| 27 | Influenza Virus Vaccine (Trivalent, Types A and B) | FluLaval | ID Biomedical Corp of Quebec | 2008 | Embryonated chicken eggs | X | |
| 28 | Influenza Vaccine, Live, Intranasal (Trivalent, Types A and B) | FluMist | MedImmune, LLC | 2007 | Embryonated chicken eggs | X | |
| 29 | Influenza Virus Vaccine (Trivalent, Types A and B) | Fluarix | GlaxoSmithKline Biologicals | 2005 | Embryonated chicken eggs | X | |
| 30 | Influenza Virus Vaccine (Trivalent, Types A and B) | Fluvirin | Novartis Vaccines and Diagnostics Ltd | 2005 | Embryonated chicken eggs | X | |
| 31 | Influenza Virus Vaccine (Trivalent, Types A and B) | Agriflu | Novartis Vaccines and Diagnostics S.r.l. | 2009 | Embryonated chicken eggs | X | |
| 32 | Influenza Virus | Fluzone, | Sanofi Pasteur, | 2002 | Embryonated | X | |

| # | Vaccine | Product | Manufacturer | Year | Substrate | | | |
|---|---|---|---|---|---|---|---|---|
| | Vaccine (Trivalent, Types A and B) | Fluzone High-Dose and Fluzone Intradermal | Inc | | chicken eggs | | | |
| 33 | Influenza Virus Vaccine (Trivalent, Types A and B) | Flucelvax | Novartis Vaccines and Diagnostics, Inc. | 2012 | Madin Darby Canine Kidney (MDCK) cell culture | X | | |
| 34 | Influenza Vaccine (Trivalent) | Flublok | Protein Sciences Corporation | 2013 | Spodoptera frugiperda (Sf9) insect cell culture | X | | |
| 35 | Influenza Vaccine, Live, Intranasal (Quadrivalent, Types A and Types B) | FluMist Quadrivalent | MedImmune, LLC | 2012 | Embryonated chicken eggs | X | | |
| 36 | Influenza Virus Vaccine (Quadrivalent, Types A and Types B) | Fluarix Quadrivalent | GlaxoSmithKline Biologicals | 2012 | Embryonated chicken eggs | X | | |
| 37 | Influenza Virus Vaccine (Quadrivalent, Types A and Types B) | Fluzone Quadrivalent | Sanofi Pasteur, Inc | 2013 | Embryonated chicken eggs | X | | |
| 38 | Influenza Virus Vaccine (Quadrivalent, | FluLaval | ID Biomedical Corporation | 2013 | Embryonated chicken eggs | X | | |

| # | Types A and Types B) | | | | |
|---|---|---|---|---|---|
| 39 | Japanese Encephalitis Virus Vaccine, Inactivated, Adsorbed | Ixiaro | Intercell Biomedical | 2009 | Vero monkey kidney cell culture | X |
| 40 | Meningococcal (Groups A, C, Y, and W-135) Oligosaccharide Diphtheria CRM197 Conjugate Vaccine | Menveo | Novartis Vaccines and Diagnostics, Inc. | 2010 | N. meningitidis and Corynebacterium diphtheriae culture | XX |
| 41 | Meningococcal Groups C and Y and Haemophilus b Tetanus Toxoid Conjugate Vaccine | MenHibrix | GlaxoSmithKline Biologicals | 2012 | Neisseria meningitides, Haemophilus influenza and Clostridium tetani cultures | XXX |
| 42 | Meningococcal (Groups A, C, Y and W-135) Polysaccharide Diphtheria Toxoid Conjugate Vaccine | Menactra | Sanofi Pasteur, Inc | 2005 | Neisseria meningitides and Corynebacterium diphtheriae cultures | XX |
| 43 | Meningococcal Group B Vaccine | BEXSERO | Novartis Vaccines and Diagnostics, Inc | 2015 | Neisseria meningitides and recombinant Escherichia coli cultures | XX |
| 44 | Meningococcal Group B Vaccine | TRUMENBA | Wyeth Pharmaceuticals, | 2014 | Recombinant Escherichia coli | X |

| # | Vaccine | Trade Name | Manufacturer | Year | Cultures | |
|---|---------|-----------|--------------|------|----------|---|
| 45 | Meningococcal Polysaccharide Vaccine, Groups A, C, Y and W-135 Combined | Menomune-A/C/Y/W-135 | Sanofi Pasteur, Inc | 2009 | Neisseria meningitides culture | X |
| 46 | Pneumococcal Vaccine, Polyvalent | Pneumovax 23 | Merck & Co, Inc | 2008 | Streptococcus pneumoniae cultures | X |
| 47 | Pneumococcal 7-valent Conjugate Vaccine (Diphtheria CRM197 Protein) | Prevnar | Wyeth Pharmaceuticals Inc | 2000 | Streptococcus pneumoniae and Corynebacterium diphtheriae cultures | XX |
| 48 | Pneumococcal 13-valent Conjugate Vaccine (Diphtheria CRM197 Protein) | Prevnar 13 | Wyeth Pharmaceuticals Inc | 2010 | Streptococcus pneumoniae and Corynebacterium diphtheriae cultures | XX |
| 49 | Poliovirus Vaccine Inactivated (Monkey Kidney Cell) | IPOL | Sanofi Pasteur, SA | 2012 | Vero monkey kidney cell culture | X |
| 50 | Rabies Vaccine | RabAvert | Novartis Vaccines and Diagnostics | 1997 | Primary chicken fibroblast culture | X |
| 51 | Rotavirus Vaccine, Live, Oral | ROTARIX | GlaxoSmithKline Biologicals | 2008 | Vero monkey kidney cell culture | X |
| 52 | Rotavirus Vaccine, Live, Oral, | RotaTeq | Merck & Co., Inc. | 2006 | Vero monkey kidney cell | X |

| # | Pentavalent | Trade Name | Manufacturer | Year | culture | | |
|---|---|---|---|---|---|---|---|
| 53 | Smallpox (Vaccinia) Vaccine, Live | ACAM2000 | Sanofi Pasteur Biologics Co. | 2007 | Vero monkey kidney cell culture | X | |
| 54 | Tetanus & Diphtheria Toxoids Adsorbed for Adult Use | No Trade Name | MassBiologics | 2014 | Corynebacterium diphtheriae and Clostridium tetani cultures | XX | |
| 55 | Tetanus & Diphtheria Toxoids Adsorbed for Adult Use | DECAVAC | Sanofi Pasteur, Inc | 2014 | Corynebacterium diphtheriae and Clostridium tetani cultures | XX | |
| 56 | Tetanus & Diphtheria Toxoids Adsorbed for Adult Use | TENIVAC | Sanofi Pasteur, Ltd | 2003 | Corynebacterium diphtheriae and Clostridium tetani cultures | XX | |
| 57 | Tetanus Toxoid Adsorbed | No Trade Name | Sanofi Pasteur, Inc | 2005 | Corynebacterium diphtheriae and Clostridium tetani cultures | XX | |
| 58 | Tetanus Toxoid, Reduced Diphtheria Toxoid and Acellular Pertussis Vaccine, Adsorbed | Adacel | Sanofi Pasteur, Ltd | 2005 | Corynebacterium diphtheriae, Bordetella pertussis and Clostridium tetani cultures | XXX | |
| 59 | Tetanus Toxoid, Reduced Diphtheria Toxoid and Acellular Pertussis Vaccine, Adsorbed | Boostrix | GlaxoSmithKline Biologicals | 2005 | Corynebacterium diphtheriae, Bordetella pertussis and Clostridium | XXX | |

| | | | | | tetani cultures |
|---|---|---|---|---|---|---|
| 60 | Typhoid Vaccine Live Oral Ty21a | Vivotif | Berna Biotech, Ltd | 2013 | Salmonella typhi cultures | X |
| 61 | Typhoid Vi Polysaccharide Vaccine | TYPHIM Vi | Sanofi Pasteur, SA | 2014 | Salmonella typhi cultures | X |
| 62 | Yellow Fever Vaccine | YF-Vax | Sanofi Pasteur, Inc | 2008 | Embryonated chicken eggs | X |

References

http://www.historyofvaccines.org/content/articles/human-cell-strains-vaccine-development
http://www.immunize.org/packageinserts/
http://www.fda.gov/BiologicsBloodVaccines/Vaccines/ApprovedProducts/ucm093833.htm
https://www.medicines.org.uk/emc/medicine/25927

Exhibit 9.4

Table X:  Clinical Trials using fetal tissue and/or cell lines derived originally from embryos or fetuses.

| | Studies involving transplantation of human fetal tissue | | |
|---|---|---|---|
| | Title | Clinical trial number | Status |
| 1 | Human Fetal Liver Cell Transplantation in Chronic Liver Failure | NCT01013194 | completed |
| 2 | Using [18F]FDOPA PET/CT to Monitor the Effectiveness of Fetal Dopaminergic Grafts in Parkinson Disease Patients | NCT01013194 | not yet recruiting |
| 3 | Human Neural Stem Cell Transplantation in Amyotrophic Lateral Sclerosis | NCT01640067 | completed |
| 4 | Safety Study in Retinal Transplantation for Dry Age Related Macular Degeneration | NCT00346060 | completed |
| 5 | Safety Study in Retinal Transplantation for Retinitis Pigmentosa | NCT00345917 | completed |
| 6 | TRANSEURO Open Label Transplant Study in Parkinson's Disease (TRANSEURO) | NCT01898390 | completed |
| 7 | Evaluation of Safety and Tolerability of Fetal Mesencephalic Dopamine Neuronal Precursor Cells for Parkinson's Disease | NCT01860794 | recruiting |
| | Studies involving transplantation of stem cell lines derived from embryonic or fetal tissue (huCNS-sc; MA09-hRPE; OPC1; PEC-01/VC-01 PF-05206388) | | |
| | Title | Clinical trial number | Status |
| | *Completed, no published results* | | |
| 1 | Study of HuCNS-SC Cells in Patients With Infantile or Late Infantile Neuronal Ceroid Lipofuscinosis (NCL) | NCT00337636 | completed |
| 2 | Study of Human Central Nervous System Stem Cells (HuCNS-SC) in Age-Related Macular Degeneration (AMD) | NCT01632527 | completed |
| 3 | Study of Human Central Nervous System Stem Cells (HuCNS-SC) in Patients With Thoracic Spinal Cord Injury | NCT01321333 | completed |
| 4 | Long-Term Follow-Up Study of Human Stem Cells Transplanted in Subjects With Connatal Pelizaeus-Merzbacher Disease (PMD) | NCT01391637 | completed |
| 5 | Study of Human Central Nervous System (CNS) Stem Cells Transplantation in Pelizaeus-Merzbacher Disease (PMD) Subjects | NCT01005004 | completed |
| 6 | Sub-retinal Transplantation of hESC Derived RPE(MA09-hRPE)Cells in Patients With Stargardt's Macular Dystrophy | NCT01345006 | completed |

| 7 | Safety and Tolerability of Sub-retinal Transplantation of hESC Derived RPE (MA09-hRPE) Cells in Patients With Advanced Dry Age Related Macular Degeneration | NCT01344993 | completed |
|---|---|---|---|
| 8 | Safety and Tolerability of Sub-retinal Transplantation of Human Embryonic Stem Cell Derived Retinal Pigmented Epithelial (hESC-RPE) Cells in Patients With Stargardt's Macular Dystrophy (SMD) | NCT01469832 | completed |
| 9 | Safety Study of GRNOPC1 in Spinal Cord Injury | NCT01217008 | completed |
| 10 | Observational Study of Ischaemic Stroke | NCT01859572 | completed |
| 11 | A Pilot Feasibility Study of Oral 5-Fluorocytosine and Genetically-Modified Neural Stem Cells Expressing E.Coli Cytosine Deaminase for Treatment of Recurrent High Grade Gliomas | NCT01859572 | completed |
| *Active and/or recruiting patients or "unknown"* | | | |
| 12 | A Phase I/IIa, Open-Label, Single-Center, Prospective Study to Determine the Safety and Tolerability of Sub-retinal Transplantation of Human Embryonic Stem Cell Derived Retinal Pigmented Epithelial (MA09-hRPE) Cells in Patients With Advanced Dry Age-related Macular Degeneration(AMD) | NCT01674829 | recruiting |
| 13 | Safety and Tolerability of MA09-hRPE Cells in Patients With Stargardt's Macular Dystrophy (SMD) | NCT01625559 | active, not recruiting |
| 14 | Long Term Follow Up of Sub-retinal Transplantation of hESC Derived RPE Cells in Stargardt Macular Dystrophy Patients | NCT02445612 | active, not recruiting |
| 15 | Long Term Follow Up of Sub-retinal Transplantation of hESC Derived RPE Cells in Patients With AMD | NCT02463344 | active, not recruiting |
| 16 | Dose Escalation Study of AST-OPC1 in Spinal Cord Injury | NCT02302157 | recruiting |
| 17 | Three Year Follow-up Safety Study in Subjects Previously Implanted With VC-01™; [] | NCT02939118 | enrolling by invitation |
| 18 | A Safety, Tolerability, and Efficacy Study of VC-01™ Combination Product in Subjects With Type I Diabetes Mellitus | NCT02239354 | recruiting |
| 19 | Safety Study of Human Spinal Cord-derived Neural Stem Cell Transplantation for the Treatment of Chronic SCI | NCT01772810 | active, not recruiting |

| 20 | Dose Escalation and Safety Study of Human Spinal Cord Dervied Neural Stem Cell Transplantation for the Treatment of Amyotrophic Lateral Sclerosis | NCT01730716 | unknown |
|---|---|---|---|
| 21 | Human Spinal Cord Derived Neural Stem Cell Transplantation for the Treatment of Amyotrophic Lateral Sclerosis | NCT01348451 | active, not recruiting |
| 22 | Safety and Tolerability of hRPC in Retinitis Pigmentosa | NCT02464436 | recruiting |
| 23 | Pilot Investigation of Stem Cells in Stroke Phase II Efficacy | NCT02117635 | active, not recruiting |
| 24 | Safety Trial of CTX Cells in Patients with Lower Limb Ischaemia | NCT01916369 | recruiting |
| 25 | Pilot Investigation of Stem Cells in Stroke | NCT01151124 | active, not recruiting |
| 26 | Genetically Modified Neural Stem Cells, Flucytosine, and Leucovorin for Treating Patients with Recurrent High-Grade Gliomas | NCT02015819 | recruiting |
| 27 | A Study of Implantation of Retinal Pigment Epithelium in Subjects with Acute Wet Age Related Macular Degeneration | NCT01691261 | active, not recruiting |
| 28 | Transplantation of Human Embryonic Stem Cell-derived Progenitors in Severe Heart Failure | NCT02057900 | recruiting |
| *Terminated, Withdrawn or Suspended* | | | |
| 29 | Study of HUCNS-SC Subretinal Transplantation in Subjects With GA of AMD | NCT02467634 | terminated |
| 30 | Study of Human Central Nervous System (CNS) Stem Cell Transplantation in Cervical Spinal Cord Injury | NCT02163876 | terminated |
| 31 | Safety and Efficacy Study of HuCNS-SC in Subjects With Neuronal Ceroid Lipofuscinosis | NCT01238315 | withdrawn |
| 32 | Long-Term Follow-Up of Transplanted Human Central Nervous System Stem Cells (HuCNS-SC) in Spinal Cord Trauma Subjects | NCT01725880 | terminated |
| 33 | Long-Term Follow-up Safety Study of Human Central Nervous System Stem Cells in Subjects With Geographic Atrophy of Age-Related Macular Degeneration | NCT02137915 | terminated |
| 34 | Research With Retinal Cells Derived From Stem Cells for Myopic Macular Degeneration | NCT02122159 | withdrawn |
| 35 | Study to Evaluate Sub-retinal Transplantation of Retinal Pigmented Epithelial Cells in Patients With Dry AMD | NCT02563782 | suspended |

Exhibit 9.5

| Class 1:  Fetal tissue is required | | | |
|---|---|---|---|
| | Area of Research | Use of human fetal tissue | Alternatives | Focus |
| 1 | Sudden infant death (SIDS) and brain development | To compare brains from infants who died of SIDS to normal brain tissue | N/A | Fetal development |
| 2 | Normal brain development and multiple sclerosis | To determine whether cells in the subventricular zone produce oligodendrocyte progenitor cells in development | N/A | Fetal development |
| 3 | Interaction of bacteria and intestinal cells in development | To study the maturation of intestinal tissue with respect to intestinal disease | N/A | Fetal development |
| 4 | The effects of breast milk on intestinal development | To study the maturation of intestinal tissue and the effects of breast milk | N/A | Fetal development |
| 5 | Development of the cerebral cortex | To study the cellular and molecular maturation of the human brain | N/A | Fetal development |
| 6 | The effects of human Cytomegalovirus (CMV) on brain development | To study the effects of CMV on cellular gene expression | N/A | Fetal development |
| 7 | Population cytogenetics | Human fetal oocytes | N/A | Meiotic errors in fetal development |
| 8 | The role of maternal antibodies in the development of neonatal lupus | To study the mechanism of disease in the fetus | N/A | Fetal development |
| Class 2:  The value of fetal tissue is limited and alternatives are available | | | |
| | Area of Research | Use of human fetal tissue | Alternatives | Focus |
| 1 | The effects of Varicella-Zoster-Virus (VZV) on neural function | Humanized mice and tissue distribution of molecules in fetal sensory neurons | Because VSV specifically infects human and primate cells, the use of human tissue to study VSV infection is justified, but not strictly required.  Because this study examines changes in tissue structure and the tissue distribution of specific molecules, the use of intact tissue is justified. However, no element of the experimental design requires the tissue to be of fetal | **Adult** neural function in VZV infection |

| | | | origin. Moreover, adult tissue would have more clinical relevance to VSV infection and human disease. Primate tissue or adult human sensory tissue could be used. Humanized mice can be produced using cord blood, PBMC, or adult thymic and liver tissue | |
|---|---|---|---|---|
| 2 | The effects of Varicella-Zoster-Virus (VZV) skin and sensory neurons | Humanized mice and tissue distribution of molecules in fetal sensory neurons and tonsillar cells | Because VSV specifically infects human and primate cells, the use of human tissue to study VSV infection is justified, but not strictly required.  Because this study examines changes in tissue structure and the tissue distribution of specific molecules, the use of intact tissue is justified. However, no element of the experimental design requires the tissue to be of fetal origin. Moreover, adult tissue would have more clinical relevance to VSV infection and human disease. Primate tissue or adult human sensory tissue and tonsillar tissue could be used. Humanized mice can be produced using cord blood, PBMC, or adult thymic and liver tissue. | **Adult** neural and skin function in VZV infection |
| 3 | Human Immunodeficiency Virus (HIV) pathogenesis | BLT humanized mice | This project does not study HIV infection in fetal life, and no specific justification is given for the use of human fetal tissue. Humanized mice can be produced using cord | **Adult** HIV infection |

| | | | blood, PBMC, or adult thymic and liver tissue | |
|---|---|---|---|---|
| 4 | HIV and Herpes Simplex Virus (HSV) interaction | BLT humanized mice | This project does not study HIV or Herpes infection in fetal life, and no specific justification is given for the use of human fetal tissue.  Humanized mice can be produced using cord blood, PBMC, or adult thymic and liver tissue | **Adult** HIV and HSV infection |
| 5 | Study of Epstein-Barr (EBV), lymphocytic choriomeningitis (LCMV) and influenza A (IAV) | BLT humanized mice | This project does not study viral infection in fetal life, and no specific justification is given for the use of human fetal tissue for the study of basic cellular and molecular mechanisms of disease. Humanized mice can be produced using cord blood, PBMC, or adult thymic and liver tissue | **Adult** EBV, LCMV and IAV infection |
| **Class 3:  Fetal tissue is not required or advantageous; alternatives are available** | | | | |
| | Area of Research | Use of human fetal tissue | Alternatives | Focus |
| 1 | HSV transport in neurons | Fetal sensory neurons | The proposed studies do not specifically address the role of HSV infection during human neuronal development, but rather focus on basic cellular mechanisms of viral transport in neurons. No justification is provided for the use of human tissue, and there is no scientific advantage to fetal neurons, compared to the existing models, for this basic, cell culture research. The investigator proposes the use of animal neurons and human neural cell lines.  In addition, human | **Adult** HSV infection |

| | | | neurons derived from iPSCs or primary adult human brain tissue derived from surgical or post-mortem donation could be used for neural cell culture. | |
|---|---|---|---|---|
| 2 | Role of lactate transporters in retinal survival | Fetal retinal cells | The proposed studies do not specifically address retinal development or the metabolic coupling of retinal cells during fetal life, but rather focus on basic cellular mechanisms of neuronal survival and function. No justification is provided for the use of human tissue, and there is no scientific advantage to fetal neurons, compared to the existing models, for this basic, cellular research. The majority of the prior studies from this laboratory and the studies proposed in this grant employ smouse model systems. In addition, human neurons derived from iPSCs or primary adult human retinal tissue derived from surgical or post-mortem donation could be used. | **Basic mechanisms** of retinal survival |
| 3 | Age-related macular degeneration (AMD) | Fetal retina for biochemical and electrophysiologic analysis | Because AMD causes structural degeneration of retinal tissue the use of intact tissue to study AMD is justified. However, no element of the experimental design requires the tissue to be of fetal or of human origin. Moreover, adult tissue would have more clinical relevance to | **Adult** onset AMD |

| | | | AMD. Finally, all of the proposed studies involving human fetal tissue are biochemical, and do not examine the unique structural aspects of intact fetal tissue. Use of mouse retina, human retinal cell lines (ARPE-19) and donated post-mortem human eyes are proposed by the investigator and would be superior scientific models. | |
|---|---|---|---|---|
| 4 | HIV, immunity and dementia | Fetal liver and brain to create humanized mice. Fetal neural cell cultures. | The grant proposes the use of cord-blood derived CD34+ cells as an alternative to the use of human fetal liver tissue, yet elects to use fetal tissue as the "primary cell source" largely for reasons of convenience and economics, stating, "Collections of blood are limited as one cord blood sample can reconstitute only 4-5 animals." Human neural cell lines, human neurons derived from iPSCs or primary adult human brain tissue derived from surgical or post-mortem donation could be used for neural cell culture. | **Adult** HIV infection |
| 5 | Mechanisms of neuron survival and growth in HIV | Fetal neuron culture | The proposed studies do not specifically address the role of HIV infection during human neuronal development, but rather focus on basic cellular mechanisms of neuronal survival and differentiation. No justification is provided for the use of human | **Basic mechanisms** of neuron survival in HIV |

| | | | tissue, and there is no scientific advantage to fetal neurons, compared to the existing models, for this basic, cellular research. The majority of the prior studies from this laboratory and the studies proposed in this grant employ rat PC12 cells as a model system. In addition, human neurons derived from iPSCs or primary adult human brain tissue derived from surgical or post-mortem donation could be used for neural cell culture. | |
|---|---|---|---|---|
| 6 | Effects of HIV on neural and vascular systems | Fetal neuron culture | The proposed studies do not specifically address the role of HIV infection during human neuronal development, but rather focus on basic cellular mechanisms of neuronal survival and differentiation. No justification is provided for the use of human tissue, and there is no scientific advantage to fetal neurons, compared to the existing models, for this basic, cellular research. Adult neural progenitors as well as patient-specific NPCs obtained by reprogramming, and have been employed in studies of disease in similar models. Human neural cell lines, human neurons derived from iPSCs or primary adult human brain tissue derived from surgical or | **Basic mechanisms** of neural and vascular function in HIV |

| | | | post-mortem donation could be used for neural cell culture. | |
|---|---|---|---|---|
| 7 | Down syndrome (DS) | Fetal neurons from aborted DS infants | DS alters the normal development of the brain, and therefore the use of human fetal tissue is relevant to the study of DS. However, this study does not directly address developmental changes in DS neural tissue, and primarily uses human fetal tissue to "validate" the iPSC model. Adult DS and normal brain tissue, as well rodent hippocampal neurons and neurons from a mouse model of DS (Ts65Dn) could be used. | **Basic mechanisms** of neural function in DS |
| 8 | Development of retinal vasculature | Fetal eyes | While human tissue is likely to exhibit distinct properties relative to animal models, the justification for the use of human tissue in these basic studies of cell-biology is not clear. The investigators have previously used animal models of retinal development, and will continue to employ both these models and iPSC derived tissue for the current studies. | **Basic mechanisms** of retinal vasculature formation |
| 9 | Shigella flexneri bacterial infection | Fetal intestinal epithelial cells (IEC) and human cell lines | Shigella is a human-specific pathogen and therefore only human cells can be used for this study. No specific justification is provided for the use of human fetal tissue. Human colon-cancer derived cell lines T-84 and HCT-8 or adult intestinal tissue could be used, | **Basic mechanisms** of Shigella infection |

| | | | and would be a more scientifically appropriate model. | |
|---|---|---|---|---|
| 10 | Genetic basis of hearing | Fetal cochlea | No justification is provided regarding significant differences between human and animal development that would require the use of human tissue for these basic, molecular and cellular studies. Studies from this group demonstrate a high degree of similarity in expression of cochlear transcripts between humans and mouse, indicating mouse models could be used. | **Basic biology** of hearing |
| 11 | HIV associated neurocognitive disorders | Fetal brains and astrocytes | This study does not address the effects of HIV infection during fetal stages, and no specific justification is given for the use of human fetal astrocytes. Human astrocyte cell lines (A735; hTERT; HASTR/ci35), adult human astrocytes from post-mortem donation or astrocytes derived from hESCs or hiPSCs are alternatives. | **Adult** cognitive disorders and HIV |
| 12 | Chron's disease | Fetal intestinal tissue for production of humanized mice | No justification is provided for the use of human fetal tissue for the study of the basic molecular mechanisms of immune regulation. The grant proposes the use of mouse iso-grafts for the same experimental series in which human tissue is also employed. Adult human intestinal tissue obtained from surgical procedures could also potentially be used for this analysis, and would | **Adult** onset bowel disease |

| | | | be a scientifically more appropriate model. | |
|---|---|---|---|---|
| 13 | Cellular and molecular mechanisms of retinal function | Fetal eyes and retinal pigment epithelium | This study does not directly examine the development of cell polarity in fetal stages, and no justification is given for the use of human fetal cells. The study proposes a number of alternatives, including a human RPE cell line (ARPE-19), adult bovine RPE, young porcine RPE, adult cow eye culture, and mouse RPE. | **Basic mechanisms** of retinal function |
| 14 | Treatment for HIV | Fetal liver for humanized mice | This study does not directly examine the HIV infection in fetal stages, and no justification is given for the use of human fetal cells. The investigator indicates that humanized mice can be made using Umbilical Cord Blood (UBC), but proposes using fetal tissue instead, due to "substantial increases in the cost of UBC from our current vendor." | Treatment of **Adult** HIV infection |
| 15 | The molecular and genetic mechanisms of oxidative stress in HIV infection | Fetal brain derived microglia and astrocytes | This study does not address the role of HIV infection in fetal life, and no specific justification is given for the use of fetal brain tissue. Human astrocyte cell lines (A735; hTERT; HASTR/ci35), adult human astrocytes from post-mortem donation astrocytes derived from hESCs or hiPSCs could be used for these studies. Tissue from adult HIV-infected patients has been used for similar studies, | **Basic mechanisms** of HIV infection |

| | | | including studies of oxidative stress, and would be a more scientifically appropriate model. | |
|---|---|---|---|---|
| 16 | Study of AKIP signaling pathways in the pancreas | Fetal pancreatic beta cells | This project does not study the role of PKA signaling in fetal life, and no specific justification is given for the use of human fetal tissue for the study of basic cellular and molecular mechanisms of PKA-signaling, other than its availability through the core associated with this project. The proposed studies use both fetal and adult islet cells. Preliminary data from this grant indicates that AKIP is strongly expressed by human adult islet cells. | **Basic mechanisms** of pancreas function |
| 17 | Inflammation in HIV infection | Fetal brain and liver for humanized mice | This project does not study HIV infection in fetal life, and no specific justification is given for the use of human fetal tissue for the study of basic cellular and molecular mechanisms of the disease. The study proposes several model systems, including CD34+/CD38+ cells from bone marrow, and peripheral blood as well as a number of cell types derived from Peripheral Blood Mononuclear Cells (PBMC). Humanized mice can be produced using non-fetal sources of CD34+ progenitors, including cells from cord blood. | **Basic Mechanisms** of HIV infection |

| 18 | Gene expression in myopia | Fetal eyes | This study does not examine eye disease that arises in fetal development, and provides no specific justification for the use of fetal tissue. The proposal lists adult eye and animal models of myopia as alternatives to the use of fetal tissue. | **Basic mechanisms** of myopia |
|---|---|---|---|---|
| 19 | HIV and neural progenitor Cells (NPC) | Fetal neural tissue | This study does not directly examine the role of HIV infection in fetal neurogenesis, and no specific justification is provided for the use of fetal NPCs. Adult neural progenitors as well as patient-specific NPCs obtained by reprogramming, and have been employed in similar disease models. | **Basic mechanisms** of HIV infection |
| 20 | Study of anti-retroviral therapy in NeuroAids | Fetal astrocytes to construct a model of the blood-brain barrier | This study does not directly examine the role of HIV infection in fetal neurogenesis, and no specific justification is provided for the use of fetal astrocytes. Adult astrocytes obtained by reprogramming, astrocyte cell lines (animal or human) and primary astrocytes from adult patients and have been employed in similar disease models. | **Adult** HIV infection |
| 21 | Genes involved in neurotransmission | Cortical neurons from Down syndrome (DS) fetuses | DS alters the normal development of the brain, and therefore the use of human fetal tissue is relevant to the study of DS. However, this study does not directly address developmental changes in DS neural tissue, and | **Basic mechanisms** of neural transmission |

| | | | primarily uses human fetal tissue to "validate" results obtained from adult DS neurons and iPSC-derived neurons. The investigators proposed the use of adult DS and normal brain tissue, as well rodent hippocampal neurons and neurons from a mouse model of DS (Ts65Dn) as alternatives. | |
|---|---|---|---|---|

Exhibit 5.1



*Confidential Commercial Information*
*Not For Public Release*

## StemExpress Second Response to Senate Judiciary Committee September 17 Letter

| Request No. | Description |
|---|---|
| 1 | **Please provide a list of all the entities from which StemExpress has ever acquired fetal tissue, including each entity's address and point of contact.** |

StemExpress has obtained fetal tissue from two Planned Parenthood affiliates, Planned Parenthood Mar Monte ("PPMM") and Planned Parenthood Shasta Pacific ("PPSP"). As you know, StemExpress terminated its relationship with PPMM and PPSP in August 2015. The contact information for PPMM and PPSP is listed below.

- PPMM: 691 The Alameda, San Jose, CA 95126; POC: Dorothy Fergerson, MD; Medical Director
- PPSP: 2185 Pacheco Street, Concord, CA 94520; POC: Phyllis Scheonwald, MD; VP of Medical Services

StemExpress has also obtained fetal tissue from five independent (non-Planned Parenthood) clinics. StemExpress agrees to identify the states where it has agreements with independent clinics, but will not be providing the names of these clinics to protect their safety and security. To that end, StemExpress has agreements with independent clinics in the following five states:

- Arkansas – one independent clinic
- Arizona – one independent clinic
- California – one independent clinic
- Florida – one independent clinic
- Washington – one independent clinic

| Request No. | Description |
|---|---|
| 2 | **Please provide copies of all contracts StemExpress has, had, or proposed with suppliers of fetal tissue since the company's creation in 2010, regardless of affiliation with Planned Parenthood, not including the two particular contracts StemExpress has already provided. If StemExpress has acquired fetal tissue from any source without a contract, please list the source entity and the terms of the acquisition.** |

See enclosed production of two exemplar agreements between StemExpress and independent clinics, redacted to remove identifying information. The terms of all of StemExpress's agreements with independent clinics are substantially similar to one of these two agreements.

1



*Confidential Commercial Information*
*Not For Public Release*

## StemExpress Second Response to Senate Judiciary Committee September 17 Letter

| Request No. | Description |
|---|---|
| 3 | **Please provide copies of all monthly invoices StemExpress received from Planned Parenthood Mar Monte from April 2010 to the present.** |

Please see enclosed production.

| Request No. | Description |
|---|---|
| 4 | **Please provide copies of all monthly invoices StemExpress received from Planned Parenthood Shasta Pacific from May 2012 to the present.** |

Please see enclosed production.

| Request No. | Description |
|---|---|
| 5 | **Please provide all records relating to communications with Planned Parenthood Mar Monte personnel regarding StemExpress' contract with that affiliate, including communications regarding initial requests to enter into a contract, to convince the affiliate that StemExpress would be a better contractual partner than its competitor, discussions of contractual terms, and any other sales pitches or promotional materials provided.** |

Please see enclosed production.

CONFIDENTIAL / PROPRIETARY BUSINESS RECORDS

STEM.JUD00000025
STEM.HOUSE.SELECT_ 0058

Exhibit 5.2



## StemExpress First Response to House Select Panel Document Requests

| Request No. | Description |
|---|---|
| 1 | A list of all entities, including firms, corporations, non-profit organizations, and educational institutions, from which StemExpress receives or procures fetal tissue. |

StemExpress LLC ("StemExpress") has previously obtained fetal tissue from two Planned Parenthood affiliates:

- Planned Parenthood Mar Monte ("PPMM")
- Planned Parenthood Shasta Pacific ("PPSP")

StemExpress terminated its relationship with PPMM and PPSP in August 2015 and, therefore, has not received any tissue from either Planned Parenthood affiliate since that time.

StemExpress has also received fetal tissue from independent (non-Planned Parenthood) clinics. StemExpress agrees to identify the states where it has agreements with independent clinics, but will not be voluntarily providing the names of these clinics to protect their safety and security. To that end, StemExpress has active agreements with independent clinics in the following three states to procure fetal tissue that is used solely for the production of isolated stem cells (*i.e.*, StemExpress LLC no longer provides unaltered fetal tissue to any of its research partners or customers):

- California – one independent clinic
- Florida – one independent clinic
- Washington – one independent clinic

1



## StemExpress First Response to House Select Panel Document Requests

| Request No. | Description |
|---|---|
| 2 | A list of all entities, including firms, corporations, non-profit organizations, and educational institutions, to which StemExpress sells or donates fetal tissue. |

StemExpress is a small life sciences company that supports leading research institutions in the United States and internationally—including medical schools, pharmaceutical companies, and federal agencies—to provide stem cells and other human tissue critical to medical research. Cells produced by the physicians, scientists, medical technicians and nurses at StemExpress are currently used in research globally aimed at finding cures and treatments for cancer, diabetes, HIV/AIDS, cardiac disease, and other significant medical conditions.

StemExpress deeply values the confidentiality of its research partners and customers; in fact, many of the company's contracts are subject to non-disclosure agreements and, therefore, cannot be voluntarily produced. However, as discussed with Select Panel staff, several of StemExpress' customer relationships are public and can be identified for your consideration:

**Universities and Medical Schools:**

- Dartmouth College
- Duke University
- Harvard Medical School
- Johns Hopkins University
- Stanford University
- University of California, Los Angeles
- University of Connecticut
- University of Pennsylvania
- Yale University

**Pharmaceutical and Life Sciences Companies:**

- Ariosa Diagnostics
- BD
- Genentech
- The Jackson Laboratory
- Novartis
- PerkinElmer
- Pfizer
- Quest Diagnostics
- Roche

**Federal Government:**

- U.S. Food and Drug Administration (FDA)

2



## StemExpress First Response to House Select Panel Document Requests

| Request No. | Description |
|---|---|
| 3 | A list of all entities, including firms, corporations, non-profit organizations, and educational institutions, to which StemExpress transferred, subcontracted or sold any business interest or business assets related to the procurement or sale of fetal tissue. |

StemExpress' response to this request is in process and is expected to be completed by January 29, 2016.

3



## StemExpress First Response to House Select Panel Document Requests

| Request No. | Description |
|---|---|
| 4 | An organization chart that details StemExpress personnel that procure fetal tissue at the clinic level and the supervisory personnel for those procurers of fetal tissue. |

Please see the enclosed production for a copy of StemExpress' organizational chart (pasted below for reference). During the time period when StemExpress was working with Planned Parenthood, StemExpress Procurement Technicians (some of which were full-time employees and others of which were contractors) assisted Planned Parenthood personnel with the procurement of tissues for use in medical research and reported to StemExpress' Procurement Manager. These positions were eliminated when StemExpress terminated its relationship with Planned Parenthood in August 2015. At present, StemExpress does not have any personnel working in clinics other than to provide initial training for independent clinic staff.



4



**StemExpress First Response to House Select Panel Document Requests**

| Request No. | Description |
|---|---|
| 5 | All communications, whether internal or external, that direct StemExpress personnel to procure fetal tissue, including, but not limited to memoranda, emails, telephone messages, and purchase orders or bills of sale. |

StemExpress' response to this request is in process and is expected to be completed by January 29, 2016. Per the agreement reached with the Select Panel staff, StemExpress is collecting responsive materials for the period of January to April 2015.

5


**StemExpress First Response to House Select Panel Document Requests**

| Request No. | Description |
|---|---|
| 6 | **All accounting records including accounting memoranda related to the cost and pricing of fetal tissue.** |

The overwhelming majority of StemExpress' business involves isolating and purifying cells derived from donated adult tissue and blood (described in greater detail below). A small portion of our work-flow involves isolated cells that are manufactured using fetal tissue. As of January 2016, StemExpress has discontinued completely the sale of unaltered fetal tissue.

To be clear, <u>less than one percent</u> of StemExpress' business in 2014 and 2015 dealt with unaltered fetal tissue, which has been the source of criticism in the attacks against StemExpress and Planned Parenthood since July 2015. In fact, the central reason that StemExpress offered unaltered fetal tissue to our customers was as an extension of our cell isolation business, as some customers sought both isolated cells manufactured by StemExpress and, on occasion, decided to perform their own cell isolations using unaltered tissue they sought from our company.

<u>Unaltered Fetal Tissue</u>

As a general matter, StemExpress' limited business in unaltered fetal tissue—which represented less than one percent of the company's revenue in 2014 and has since been discontinued—resulted in a *net loss* for the company. For example, StemExpress manually reviewed records for 2014 and determined that unaltered fetal tissue procured from Planned Parenthood affiliates generated approximately $50,000 in gross (pre-tax) revenue against expenses in excess of $75,000. StemExpress charged researchers a fee of roughly $500 to $600 for unaltered tissues, but incurred directly associated expenses of approximately $750 to $1,000 for each procurement. Part of those expenses included the roughly $30,000 paid to two Planned Parenthood clinics for reasonable costs and expenses before StemExpress terminated our relationship with them in August 2015. Other expenses included compensation paid to StemExpress' tissue procurement personnel and costs associated with training, packaging and ordering supplies, overnight shipping charges, infectious disease screening, and general overhead associated with safely and securely providing these products to our customers.

Some may ask why would we offer any service/product at a loss, and the answer is our mission statement – *StemExpress accelerates the cure and prevention of significant medical conditions at life changing speed.*

CONFIDENTIAL / PROPRIETARY BUSINESS RECORDS



**StemExpress First Response to House Select Panel Document Requests**

Manufactured Isolated Cells

The remainder of StemExpress' work with fetal tissue consists of a complex, time-intensive, and expensive cell isolation manufacturing process that takes place in the company's Placerville, California laboratory. We are not alone in the production of isolated cells using fetal tissue (some of our peer competitors in this space include two publicly traded companies with market caps of $6.9 billion and $43 million, respectfully). StemExpress employs a highly educated, extensively trained laboratory staff that includes several university-trained molecular biologists. Our laboratory staff often spends thousands of hours developing and optimizing specific protocols used to manufacture cell isolations. Those protocols may take several shifts in the lab to implement for each batch of isolated cell product that is prepared to meet our customers' requests. Fetal tissues received are unusable for cell isolation processing over forty percent of the time. This low number is exacerbated because as often as a quarter of the time, the results of our laboratory staff's efforts produce such low production yields that no salable output is produced due to anticipated complications in the manufacturing process. While StemExpress' cell isolation protocols are highly confidential and proprietary and have taken four years to develop, we are producing a third-party (public) description of cell isolation procedures for developing CD34 stem cells (one of the isolated cell products offered by StemExpress) to provide additional context regarding the complexity of this manufacturing process.


**StemExpress First Response to House Select Panel Document Requests**

| Request No. | Description |
|---|---|
| 7 | All specific requests made to StemExpress for fetal tissue made by any and all firms, corporations, non-profit organizations, educational institutions, or other entities, including, but not limited to, order lists, billing records, payment records, payment vouchers, and receipts. |

StemExpress' response to this request is in process and is expected to be completed by January 29, 2016. Per the agreement reached with the Select Panel staff, StemExpress is collecting responsive materials for the period of January to April 2015.

8


### StemExpress First Response to House Select Panel Document Requests

| Request No. | Description |
|---|---|
| 8 | All documents relating to the purchase, ownership, or rental by StemExpress of equipment involving fetal tissue research, the preparation of fetal tissue for research, the modification of fetal tissue into cell lines, or any other actions taken by StemExpress related to fetal tissue including, but not limited to, the date the equipment was purchased, its purchase price, its maintenance costs, and records of the depreciation treatment under the tax code of any such equipment. |

StemExpress' response to this request is in process and is expected to be completed by January 29, 2016.

9

 **stem**express®

*Confidential Commercial Information*
*Not For Public Release*

### StemExpress First Response to House Select Panel Document Requests

| Request No. | Description |
|---|---|
| 9 | An inventory record of all fetal tissues obtained, sold, or retained by StemExpress, as well as an inventory of current fetal tissue including, in particular, any records that refer to multiple tissue samples or organs or body parts harvested from a single fetus. |

StemExpress' response to this request is in process and is expected to be completed by January 29, 2016. Per the agreement reached with the Select Panel staff, StemExpress is collecting responsive materials for the period of January to April 2015.

CONFIDENTIAL / PROPRIETARY BUSINESS RECORDS


### StemExpress First Response to House Select Panel Document Requests

| Request No. | Description |
|---|---|
| 10 | **All records related to any fetal tissue or cell lines procured or sold from twin fetuses.** |

StemExpress' response to this request is in process and is expected to be completed by January 29, 2016. Per the agreement reached with the Select Panel staff, StemExpress is collecting responsive materials for the period of January to April 2015.

As a general matter, however, StemExpress has previously received requests for fetal tissue (or isolated cells) derived from twin fetuses, but has very rarely been able to fulfill these isolated and uncommon customer requests. To the extent that StemExpress is able to look beyond the four-month period in 2015 to identify such requests, we will endeavor to provide additional information.

11

CONFIDENTIAL / PROPRIETARY BUSINESS RECORDS



### StemExpress First Response to House Select Panel Document Requests

| Request No. | Description |
|---|---|
| 11 | All documents relating to rent or site fees paid to entities from which StemExpress obtained, sold, or donated fetal tissue. |

StemExpress does not pay any rent or site fees to the independent clinics with which it currently works to obtain fetal tissue used solely in the production of isolated stem cells. Similarly, at the time when StemExpress personnel were onsite at Planned Parenthood clinics (prior to the August 2015 termination), the company did not pay a separate rent or site fee to PPMM or PPSP. Instead, any costs/expenses related to rent or space usage were rolled into the single payment to reimburse the clinic for its expenses.

The costs incurred by StemExpress were not uniform across all procurement of fetal tissues. However, the estimated costs below are a conservative estimate (*i.e.*, underestimate) of the costs and expenses associated with the procurement of fetal liver tissue at a Planned Parenthood clinic (*i.e.*, prior to August 2015, when StemExpress had personnel working onsite in the clinics). The costs/expenses of procurement were generally the same whether the tissue was being sent directly to a researcher in unaltered form or back to StemExpress' laboratory for use in the manufacture of isolated cells.

#### Estimated Cost for Procurement of Fetal Liver Tissue Sample

| Item | Description | Time | Est. Cost |
|---|---|---|---|
| Procurement Manager labor | Receive and evaluate purchase order, enter into Sage and task board, assign to clinics | 1 hour x $35 | $35 |
| Packaging supplies | Packaging all supplies needed for procurement | 1 hour x $10 | $10 |
| FedEx | Supplies to clinic | N/A | $85 |
| Mileage | Mileage paid to technician (.56/mile) | N/A | $142 |
| Supply cost | Box, conical tube, media, petri dish, labels, biohazard bag, gel packs, etc. | N/A | $30 |
| Technician labor | Patient consent, procurement, paperwork, packaging | 8 hours x $10 | $80 |
| Technician compensation | Technician compensation package | N/A | $50 |
| Clinic Reimbursement | Technician space, storage of supplies, blood draw chair usage, consent space | N/A | $55 |
| Infectious disease draw | Supplies: tubes, labels, needle, biohazard bag, etc | N/A | $15 |
| Infectious disease screening | Screening for HIV, HepB, HepC, LCMV | N/A | $155 |
| FedEx | Shipment to the lab | N/A | $85 |
| Procurement Manager labor | Review paperwork, communications with courier, communications with researcher | 1 hours x $35 | $35 |
| Product Receipt | Receipt of product at front desk, check into Sage, check into log | 1 hour x $15 | $15 |
| Inventory & Supply Management | Prorated stores management | 1 hour x $20 | $20 |

#### Total Estimated Cost/Expenses for Procurement of Fetal Liver Tissue: $812.00

CONFIDENTIAL / PROPRIETARY BUSINESS RECORDS       STEM.HOUSE.SELECT_ 0238


**StemExpress First Response to House Select Panel Document Requests**

| Request No. | Description |
|---|---|
| 12 | All training materials used by StemExpress for the procurement of fetal tissue, preparation of fetal tissue, storage of fetal tissue, and training materials or guidance documents related to StemExpress staff relations with personnel or patients at the source entities from which fetal tissue is procured. |

Please see the enclosed production. However, please note that at present, no StemExpress personnel are directly involved in the procurement of fetal tissue onsite at any clinics in the United States. Since the termination of StemExpress' relationship with Planned Parenthood in August 2015, all fetal tissue obtained by StemExpress for use in the manufacture of isolated cells has been procured from independent (non-Planned Parenthood) clinics. These independent clinics handle all aspects of the patient consent process, the procurement of tissue following a termination procedure, and the packaging and shipment of the tissues to StemExpress for use in the production of isolated cells. As noted in response to Request No. 4, StemExpress personnel are only onsite at these independent clinics for initial training for the clinic's staff.

For your reference, today's production includes the following policies and training materials used by StemExpress, as well as sample protocols reflecting the complexity of the cell isolation production process that constitutes the entirety of StemExpress' current business relative to fetal tissue:

- StemExpress Policy – Infectious Disease Screening Sample
- StemExpress Policy – Labeling Blood Tubes
- StemExpress Policy – Navigating the Task Board
- StemExpress Policy – Packaging Blood and Tissue Samples
- StemExpress Policy – Researcher Procurement Record
- StemExpress Procurement Kit Overview
- Training – National Institutes of Health ("NIH") Office of Extramural Research Protecting Human Research Participants
- Miltenyi Biotec Diamond CD34 Isolation Kit

13



*Confidential Commercial Information*
*Not For Public Release*

### StemExpress First Response to House Select Panel Document Requests

| Request No. | Description |
|---|---|
| 13 | All StemExpress banking records related to the procurement, sale, donation, or distribution or shipment of fetal tissue. |

StemExpress' response to this request is in process and is expected to be completed by January 29, 2016. Per the agreement reached with the Select Panel staff, StemExpress is collecting responsive materials for the period of January to April 2015.

CONFIDENTIAL / PROPRIETARY BUSINESS RECORDS

Exhibit 5.3

# SUBPOENA

## BY AUTHORITY OF THE HOUSE OF REPRESENTATIVES OF THE CONGRESS OF THE UNITED STATES OF AMERICA

*To* StemExpress, LLC

You are hereby commanded to be and appear before the

Committee on Energy and Commerce

Select Investigative Panel on Infant Lives

of the House of Representatives of the United States at the place, date, and time specified below.

☑ **to produce the things identified on the attached schedule** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

Place of production: 316 Ford House Office Building, Washington, DC 20515

Date: February 17, 2016          Time: 5:00 p.m.

☐ **to testify at a deposition** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

Place of testimony:_____

Date:_____          Time:_____

☐ **to testify at a hearing** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

Place of testimony:_____

Date:_____          Time:_____

*To*_____

_____ to serve and make return.

Witness my hand and the seal of the House of Representatives of the United States, at

the city of Washington, D.C. this  12th  day of  February , 20 16 .

*Chairman or Authorized Member*

Attest:

*Karen L. Haas*

*Clerk*

## PROOF OF SERVICE

Subpoena for

    StemExpress, LLC

Address c/o M. Amandeep S. Sidhu, Esq., as attorney for StemExpress, LLC,

McDermott Will & Emery, 500 North Capitol Street, N.W., Washington, D.C., 20001-1531

before the Committee on Energy and Commerce

Select Investigative Panel on Infant Lives

*U.S. House of Representatives*
*114th Congress*

---

Served by (print name)

Title

Manner of service


Date

Signature of Server

Address

# StemExpress, LLC Schedule

**In accordance with the attached schedule, instructions, and definitions, you, StemExpress, LLC ("StemExpress"), are required to produce all documents in unredacted form described below:**

1) Documents sufficient to show (a) all entities from which StemExpress procured fetal tissue, and (b) all entities to which StemExpress transported, sold, donated, moved, or shipped fetal tissue. Should StemExpress wish to produce a list of such entities referenced in (a) and (b) in lieu of documents, it may do so.

2) Documents sufficient to show the name and title of all StemExpress current and former personnel whose responsibilities included procuring, researching, storing, packaging for donation, sale, transport, or disposal of fetal tissue, and the identity, of any supervisory personnel under whom such individuals worked.

3) All communications and documents relating to StemExpress employee compensation resulting from or relating to fetal tissue samples procured by current and former StemExpress personnel or other persons or entities that transact business with StemExpress.

4) All communications and documents that identify any federal, state, or local government funds received, directly or indirectly, by StemExpress.

5) All communications referring or relating to abortion or fetal tissue between StemExpress and any federal, state, or local government officials or employees.

6) All communications and documents regarding any direction to StemExpress current or former personnel with respect to the procurement or disposal of fetal tissue.

7) All communications and documents that StemExpress utilizes to obtain patient consent for fetal tissue at any clinic. (See instruction below regarding HIPAA.)

8) All communications and documents, including but not limited to accounting memoranda, referring or relating to the cost and pricing of fetal tissue by StemExpress.

9) All communications and documents, sorted by customer, referring or relating to requests or orders made to StemExpress regarding fetal tissue and the amount paid by each customer to StemExpress.

10) All communications and documents referring or relating to the purchase, ownership, or rental by StemExpress of equipment for the storage, disposal, modification, or research of fetal tissue, including equipment price, purchase date, maintenance costs, and records of the depreciation treatment under the tax code of any such equipment.

11) All StemExpress banking and accounting documents, sorted by any source of fetal tissue and any customer of StemExpress, that reflect accounts payable and/or funds received that in any way refer or relate to the procurement, sale, donation, or distribution or shipment of fetal tissue.

12) Documents sufficient to show any known litigation in which StemExpress is named as a party, including any threatened or anticipated litigation. Should StemExpress wish to produce a list of such litigation, including appropriate docket information, in lieu of documents, it may do so.

## Instructions

1) The relevant time period for above-referenced documents is January 1, 2011, to the present.

2) In complying with this subpoena, you are directed that no document may be redacted in any way except that all patient information protected by American Health Portability and Accountability Act of 1998 (HIPAA) shall be redacted.

3) In complying with the subpoena, be apprised that the U.S. House of Representatives and the Committee on Energy and Commerce, Select Investigative Panel on Infant Lives ("Select Panel") do not recognize any of the non-disclosure privileges associated with the common law, with the Freedom of Information Act, with attorney client privilege, or contractual privileges such as non-disclosure agreements.

4) In complying with this subpoena, you are directed to produce all responsive documents that are in your possession, custody, or control, whether held by you or your past or present agents, employees, and representatives acting on your behalf. You are also directed to produce records that you have a legal right to obtain, that you have a right to copy or to which you have access, as well as records that you have placed in the temporary possession, custody, or control of any third party.

5) No records, documents, data or information called for by this request shall be destroyed, modified, removed, transferred or otherwise made inaccessible to the Select Panel.

6) In the event that any entity, organization or individual denoted in this subpoena has been, or is also known by any other name than that herein denoted, the subpoena shall be read also to include them under that alternative identification.

7) Each document produced shall be produced in a form that renders the document capable of being copied.

8) Documents produced in response to this subpoena shall be produced together with copies of file labels, dividers or identifying markers with which they were associated when this

subpoena was served. To the extent that documents were not stored with file labels, dividers, or identifying markers, they shall be organized into separate folders by subject matter prior to production

9) All documents, or groups of documents, produced shall be identified by the paragraph number in the Attachment to the subpoena to which the documents, or groups of documents, are responsive.

10) It shall not be a basis for refusal to produce documents that any other person or entity also possesses non-identical or identical copies of the same document.

11) If any of the subpoenaed information is available in machine-readable or electronic form (such as on a computer server, hard drive, CD, DVD, memory stick, or computer back-up tape), you shall consult with Panel staff to determine the appropriate format in which to produce the information. Documents produced in electronic format shall be organized, identified, and indexed electronically in a manner comparable to the organizational structure called for in Paragraphs 8 and 9 above. Documents produced in an electronic format shall also be produced in searchable format.

12) If compliance with the subpoena cannot be made in full, compliance shall be made to the extent possible, and your production shall be accompanied by a written explanation of why full compliance is not possible.

13) In the event that a document is withheld on any basis, provide the following information concerning each and every such document withheld from production: (a) the reason the document is not being produced; (b) type of document; (c) general subject matter; (d) date, author and addressee; and (e) relationship of author and addressee to each other.

14) If any document responsive to this subpoena was, but no longer is, in your possession, custody, or control, identify the document (stating its date, author, subject and recipient(s)) and explain the circumstances by which the document ceased to be in your possession, custody, or control.

15) If a date or other descriptive detail set forth in this subpoena referring to a document is inaccurate, but the actual date or other descriptive detail is known to you or is otherwise apparent from the context of the request, you should produce all documents which would be responsive as if the date or other descriptive detail were correct.

16) This request is continuing in nature and applies to any newly-discovered information. Any record, document, compilation of data or information, not produced because it has not been located or discovered by the return date, shall be produced immediately upon location or discovery subsequent thereto.

17) All documents shall be bates-stamped sequentially and produced sequentially.

18) Two sets of responsive records shall be produced, one set to the Majority staff and one set to the Minority staff. The Majority set shall be delivered to Majority staff in Room 316 of the Ford House Office Building and the Minority set shall be delivered to the Minority staff at 361 Ford House Office Building. You shall consult with the Select Panel staff regarding the method of delivery prior to sending any material.

19) Upon completion of the document production, you must submit a written certification, signed by you or your counsel, stating that: (1) a diligent search has been completed of all documents in your possession, custody, or control which reasonably could contain responsive documents; (2) documents responsive to the request have not been destroyed, modified, removed, transferred, or otherwise made inaccessible to the Select Panel since the date of receiving the Select Panel's request or in anticipation of receiving the Select Panel's request, and (3) all documents identified during the search that are responsive have been produced to the Select Panel, or identified in a log provided to the Select Panel, as described in Paragraph 13 above.

## Definitions

1) The term "document" means any written, recorded, or graphic matter of any nature whatsoever, regardless of how recorded, and whether original or copy, including but not limited to, the following: memoranda, reports, expense reports, books, manuals, instructions, financial reports, working papers, records, notes, letters, notices, confirmations, telegrams, receipts, appraisals, pamphlets, magazines, newspapers, prospectuses, interoffice and intra-office communications, electronic mail ("e-mail"), instant messages, text messages, calendars, contracts, cables, notations of any type of conversation, telephone call, meeting or other communication, bulletins, printed matter, computer printouts, invoices, transcripts, diaries, analyses, returns, summaries, minutes, bills, accounts, estimates, projections, comparisons, messages, correspondence, press releases, circulars, financial statements, reviews, opinions, offers, studies and investigations, questionnaires and surveys, power point presentations, spreadsheets, and work sheets. The term "document" includes all drafts, preliminary versions, alterations, modifications, revisions, changes, and amendments to the foregoing, as well as any attachments or appendices thereto. The term "document" also means any graphic or oral records or representations of any kind (including, without limitation, photographs, charts, graphs, voice mails, microfiche, microfilm, videotapes, recordings, and motion pictures), electronic and mechanical records or representations of any kind (including, without limitation, tapes, cassettes, disks, computer server files, computer hard drive files, CDs, DVDs, back up tape, memory sticks, recordings, and removable computer media such as thumb drives, flash drives, memory cards, and external hard drives), and other written,

printed, typed, or other graphic or recorded matter of any kind or nature, however produced or reproduced, and whether preserved in writing, film, tape, electronic format, disk, videotape or otherwise. A document bearing any notation not part of the original text is considered to be a separate document. A draft or non-identical copy is a separate document within the meaning of this term.

2) The term "documents in your possession, custody or control" means (a) documents that are in your possession, custody, or control, whether held by you or your past or present agents, employees, officers, directors, contractors, consultants, or representatives acting on your behalf; (b) documents that you have a legal right to obtain, that you have a right to copy, or to which you have access; and (c) documents that have been placed in the possession, custody, or control of any third party.

3) The term "communication" means each manner or means of disclosure, transmission, or exchange of information, in the form of facts, ideas, opinions, inquiries, or otherwise, regardless of means utilized, whether oral, electronic, by document or otherwise, and whether face-to-face, in a meeting, by telephone, mail, e-mail, instant message, text message, discussion, release, personal delivery, or otherwise.

4) The terms "and" and "or" should be construed broadly and either conjunctively or disjunctively as necessary to bring within the scope of this request any information which might otherwise be construed to be outside its scope. The singular includes the plural number, and vice versa. The masculine includes the feminine and neuter genders.

5) The terms "entity" means natural persons, firms, partnerships, associations, limited liability corporations and companies, limited liability partnerships, corporations, subsidiaries, divisions, departments, joint ventures, proprietorships, syndicates, other legal, business or government entities, or any other organization or group of persons, and all subsidiaries, affiliates, divisions, departments, branches, and other units thereof.

6) The term "person or persons" mean natural persons, firms, partnerships, associations, limited liability corporations and companies, limited liability partnerships, corporations, subsidiaries, divisions, departments, joint ventures, proprietorships, syndicates, other legal, business or government entities, or any other organization or group of persons, and all subsidiaries, affiliates, divisions, departments, branches, and other units thereof.

7) The term "procure" includes fetal tissue procurement, which means to get, acquire, purchase, appropriate, aggregate, gather, compile, accumulate, collect, or obtain possession or control of fetal tissue by any means, whether solicited or unsolicited, and whether with or without consideration. This includes but is not limited to gaining consent to acquire, physically identifying, separating, dissecting, cultivating, handling, processing, and shipping fetal tissue by any methods or means.

8) The term "fetal tissue" means tissue, organs, body parts, and cell lines.

9) The terms "referring" or "relating," with respect to any given subject, mean anything that constitutes, contains, embodies, reflects, identifies, states, refers to, deals with, or is in any manner whatsoever pertinent to that subject.

10) The terms "you" and "your" refer to StemExpress, LLC, including any associated foundations whether known by this name or a different name, its past and present officers, directors, employees, consultants, contractors, agents, representatives, subsidiaries, and/or parents.

Exhibit 5.4

<u>StemExpress Third Response to House Select Panel Subpoena</u>

| Subpoena Specification No. | Description |
|---|---|
| 1 | Documents sufficient to show (a) all entities from which StemExpress procured fetal tissue, and (b) all entities to which StemExpress transported, sold, donated, moved, or shipped fetal tissue.  Should StemExpress wish to produce a list of such entities referenced in (a) and (b) in lieu of documents, it may do so. |

Consistent with our agreement with the Select Panel Majority staff, StemExpress is identifying the names of all entities responsive to Subpoena Specification No. 1(a).  In additional to the two Planned Parenthood affiliates previously identified for the Select Panel, StemExpress has received fetal tissue for use in medical research from the five independent women's clinics listed below:

- Camelback Family Planning
- Cedar Rivers Clinics
- Family Planning Specialists Medical Group
- Presidential Women's Center
- Planned Parenthood Mar Monte
- Planned Parenthood Shasta Pacific
- Women's Health Specialists

StemExpress urges the Select Panel to treat these clinics, in particular the previously undisclosed independent clinics, with the utmost confidentiality protections.  As reflected in our prior correspondence with the Select Panel, we remain deeply concerned about the safety and security of institutions and individuals that may be targeted by extremists due to their involvement in the Select Panel's investigation.

Also consistent with our agreement with the Select Panel Majority staff, StemExpress is identifying the names of all entities responsive to Subpoena Specification No. 1(b). StemExpress urges the Select Panel to treat the names of these private companies, universities, and medical centers with the utmost confidentiality protections.  As reflected in our prior correspondence with the Select Panel, we remain deeply concerned about the safety and security of institutions and individuals that may be targeted by extremists due to their involvement in the Select Panel's investigation.

1. AllCells
2. Baylor College of Medicine
3. Children's Hospital of Philadelphia
4. City of Hope

1

## StemExpress Third Response to House Select Panel Subpoena

5. Colorado State University
6. Columbia University
7. Dartmouth University
8. Drexel University
9. Ganogen, Inc.
10. George Washington University
11. Harvard University
12. John's Hopkins Medical
13. Massachusetts General Hospital
14. Medical College of Wisconsin
15. Neurona Therapeutics
16. Ohio State University
17. Roche
18. Rockefeller University
19. Stanford University
20. SUNY Upstate Medical University
21. Temple University
22. Thomas Jefferson University
23. UCLA
24. UMASS Medical School
25. University of Illinois at Chicago
26. University of Connecticut Health Center
27. University of Illinois at Chicago
28. University of North Carolina, Chapel Hill
29. University of Pennsylvania
30. Vanderbilt University
31. Vanderbilt University Medical Center
32. Yale University
33. Yale University School of Medicine
34. Zyagen

2



**StemExpress Third Response to House Select Panel Subpoena**

| Subpoena Specification No. | Description |
|---|---|
| 2 | Documents sufficient to show the name and title of all StemExpress current and former personnel whose responsibilities included procuring, researching, storing, packaging for donation, sale, transport, or disposal of fetal tissue, and the identity, of any supervisory personnel under whom such individuals worked. |

As articulated in our February 19, 2016 correspondence in response to this subpoena, StemExpress remains gravely concerned about the safety and security risks associated with identifying individual StemExpress personnel involved in the procurement of fetal tissue. In the alternative, StemExpress is offering one of its employees, ▮▮▮▮▮ as a corporate witness (consistent with Fed. R. Civ. P. 30(b)(6)). ▮▮▮▮▮ currently serves as StemExpress' Procurement Director and previously served as a Procurement Manager and Procurement Technician at StemExpress. As StemExpress' second employee, ▮▮▮▮▮will be prepared to answer written or oral questions from the Select Panel regarding the fetal tissue procurement process at StemExpress.

Consistent with ongoing discussions with the Select Panel Majority Staff, StemExpress is compiling a list of current and former employees and independent contractors that are/were involved in various aspects of fetal tissue procurement processes to facilitate additional discussions regarding this specification.

| Subpoena Specification No. | Description |
|---|---|
| 3 | All communications and documents relating to StemExpress employee compensation resulting from or relating to fetal tissue samples procured by current and former StemExpress personnel or other persons or entities that transact business with StemExpress. |

Please see the enclosed production.

3



### StemExpress Third Response to House Select Panel Subpoena

| Subpoena Specification No. | Description |
|---|---|
| 4 | All communications and documents that identify any federal, state, or local government funds received, directly or indirectly, by StemExpress. |

StemExpress has confirmed that there are no communications or documents responsive to this specification. While StemExpress counts certain federal entities amongst its customers—*e.g.*, U.S. Food and Drug Administration and National Institutes of Health—neither of these entities has purchased fetal tissue or fetal tissue related products. StemExpress has no visibility into the funding sources for its academic and commercial customers.

| Subpoena Specification No. | Description |
|---|---|
| 5 | All communications referring or relating to abortion or fetal tissue between StemExpress and any federal, state, or local government officials or employees. |

StemExpress has confirmed that there no communications or documents responsive to this specification.

4



**StemExpress Third Response to House Select Panel Subpoena**

| Subpoena Specification No. | Description |
|---|---|
| 6 | All communications and documents regarding any direction to StemExpress current or former personnel with respect to the procurement or disposal of fetal tissue. |

Consistent with ongoing discussions with the Select Panel Majority Staff, StemExpress is preparing an accounting report of 2015 fetal tissue transactions, organized by customer, to satisfy this specification.

| Subpoena Specification No. | Description |
|---|---|
| 7 | All communications and documents that StemExpress utilizes to obtain patient consent for fetal tissue at any clinic. (See instruction below regarding HIPAA.) |

Please see the enclosed production.

| Subpoena Specification No. | Description |
|---|---|
| 8 | All communications and documents, including but not limited to accounting memoranda, referring or relating to the cost and pricing of fetal tissue by StemExpress. |

StemExpress previously produced to the Select Panel communications and documents responsive to this specification.

5



### StemExpress Third Response to House Select Panel Subpoena

| Subpoena Specification No. | Description |
|---|---|
| 9 | All communications and documents, sorted by customer, referring or relating to requests or orders made to StemExpress regarding fetal tissue and the amount paid by each customer to StemExpress. |

Consistent with ongoing discussions with the Select Panel Majority Staff, StemExpress is preparing an accounting report of 2015 fetal tissue transactions, organized by customer, to satisfy this specification.

| Subpoena Specification No. | Description |
|---|---|
| 10 | All communications and documents referring or relating to the purchase, ownership, or rental by StemExpress of equipment for the storage, disposal, modification, or research of fetal tissue, including equipment price, purchase date, maintenance costs, and records of the depreciation treatment under the tax code of any such equipment. |

StemExpress previously produced to the Select Panel communications and documents responsive to this specification.

| Subpoena Specification No. | Description |
|---|---|
| 11 | All StemExpress banking and accounting documents, sorted by any source of fetal tissue and any customer of StemExpress, that reflect accounts payable and/or funds received that in any way refer or relate to the procurement, sale, donation, or distribution of shipment of fetal tissue. |

Consistent with ongoing discussions with the Select Panel Majority Staff, StemExpress is preparing an accounting report of 2015 fetal tissue transactions, organized by customer, to satisfy this specification.

HIGHLY CONFIDENTIAL INFORMATION / NOT FOR PUBLIC RELEASE



**StemExpress Third Response to House Select Panel Subpoena**

| Subpoena Specification No. | Description |
|---|---|
| 12 | Documents sufficient to show any known litigation in which StemExpress is named as a party, including any threatened or anticipated litigation. Should StemExpress wish to produce a list of such litigation, including appropriate docket information, in lieu of documents, it may do so. |

StemExpress is a plaintiff in *StemExpress LLC, et al. v. The Center for Medical Progress, et al.*, Case No. BC589145, currently pending before Judge Rafael A. Ongkeko in the Los Angeles Superior Court. Please see the enclosed production for a copy of the docket sheet for this case and a recent order reflecting the current status of the litigation. StemExpress is not a party to any other active, threatened, or anticipated litigation at this time.

7

Exhibit 5.5

| From: | ████████ █████ @stemexpress.com> |
| Sent: | Wednesday, March 25, 2015 10:47 AM |
| To: | ████████ |
| Subject: | Partnership Agreement - StemExpress |
| Attachments: | DEV 20150325.1 StemExpress-NAF Partnership Agreement .doc |

| Importance: | High |

Good morning, ████████ :

Please find a draft Partnership Agreement for your consideration. I've taken the liberty of reformatting a bit of it to follow our more-routine contract structure (no real change to the substantive content). I removed the language pertaining to alternative donations ($5K and $10K) since we have elected to go with $10K and participate in the upcoming NAF meeting ████ and ████ ████████ will attend). There will appear to be a lot of redlining in the Appendix, but this is largely an artifact of changing the content to reflect StemExpress business and remove the information from the company that was listed from prior use of this agreement template.

If the agreement with changes are acceptable, please 'accept changes,' sign and return to me at your earliest convenience. If you need to make changes, please reply with your redline as soon as possible and I'll get the document turned around promptly.

With kind regards,

████████

████████
VP Corporate Development

StemExpress LLC

████████ @stemexpress.com
stemexpress.com

1

## PARTNERSHIP AGREEMENT

This Partnership Agreement (this "Agreement") is entered into as of March 25, 2015 ("Effective Date"), between StemExpress, LLC, a California limited liability company having an office located at ███████████████████████████ "StemExpress"), and the National Abortion Federation, a 501(c)3 non-profit organization, having its headquarters at ██████ ████████████████████

### Recitals

WHEREAS:

A. The National Abortion Federation ("NAF") is the Professional Association of abortion service providers in North America. NAF's work supports the dedicated health care professionals who make reproductive choice a reality, as well as the women they serve;

B. Roe v. Wade legalized abortion, however, the stigma or lack of acceptance causes concern for both providers and patients. NAF has expanded programs to address the growing needs of abortion providers and patients by establishing standards of care, protocols, and clinical education. NAF continues to provide programs, resources, pro-choice advocacy and anti-violence protection to members; and

C. Right now women have the right to choose. NAF continues to work towards its mission of safe, legal and accessible abortion care. The support of corporations like StemExpress who are deeply committed to reproductive choice, health and justice for women is essential to our communities.

NOW, THEREFORE, in consideration of the mutual covenants and consideration set forth herein, and intending to be legally bound hereby, the parties agree as follows:

Services and Donation:

~~In consideration of support and a partnership with NAF, StemExpress agrees to one of the following:~~

~~(a) For the agreed upon sum of $ 5,000, NAF commits to performing the services outlined in this document under Appendix A.~~

(a) ~~For the agreed upon sum of $10,000,~~ NAF commits to performing the services outlined in this document under Appendix ~~B~~A.

(b) StemExpress agrees to make a donation to the NAF in the amount of US$10,000.00 and undertake the activities listed in Appendix B

~~(b)~~

The services offered ~~under Appendix A or B~~by either Party ~~can~~ may be modified ~~at~~by ~~the~~ written request ~~of StemExpress~~ and at~~at~~ NAF's discretion, provided ~~payment~~ the donation by StemExpress has been received by NAF for the relevant membership year.

Participation Reports and Statements:
In partial consideration for the services outlined above, StemExpress will provide NAF with quarterly reports of executed participation agreements with NAF members for the collection services facilitated under the terms of this Aagreement.

NAF shall provide StemExpress with a statement, which shall indicate NAF's federal tax identification number, for each charitable gift received from StemExpress, including that donation, as described, above.

> **Formatted:** Space Before: 6 pt

Any notice or other communication required or permitted under this Agreement shall be sent by certified mail or courier service, charges prepaid, to the address specified below or to such other address as a Party may specify in a written notice duly given to the sender as provided herein.

**IF TO NAF:**
National Abortion Federation

████████████████████

Attention: President/CEO


**IF TO STEMEXPRESS:**
STEMEXPRESS StemExpress LLC

████████████

Attention: Office of the CEOExecutive Vice President

Service of any such notice shall be deemed complete when received on the day of actual delivery thereof as evidenced by the return receipt or the date such notice is first refused, if that be the case.

Assignment:
Neither party may, without the prior written consent of the other, transfer or assign, in whole or in part, any of its rights, duties or obligations hereunder to a third party or parties; however, StemExpress may assign this Agreement to an acquirer without notice to PI pursuant to an acquisition or merger of StemExpress involving greater than 50% of the company; provided further, provided that any respective successor or permitted assign shall have thereby assume all of such StemExpress' rights, and shall be subject to all of such StemExpress' duties and obligations, hereunder. No assignment will constitute a release of the assigning party without the written consent of the other party.

Confidentiality:
Each party acknowledges and agrees that pursuant to this Agreement, valuable information of a confidential nature may be disclosed by each party to the other or may be learned by one party from the other in connection with its performance under this Agreement; that such information will be

retained by the receiving party in confidence; that the transmittal of such information by the disclosing party to the receiving party is upon the condition that the information is to be used solely for the purpose of effectuating this Agreement; and that neither party shall use, publish or disclose or cause anyone else to use, publish or disclose any information supplied to it by the other party other than for the purposes described above. The above restrictions shall not prohibit any disclosure which is required pursuant to a court order or administrative proceeding; provided that the party being required to disclose such information shall promptly notify the other party of the need for any such disclosure and shall give the other party a reasonable time to oppose such process. The above restrictions shall apply during the term of this Agreement and for all times thereafter.

Neither party will make any press release or other public announcement regarding this Agreement without the other party's express prior written consent, except as required under applicable law or by any governmental agency, in which case the party required to make the public disclosure shall use commercially reasonable efforts to obtain the approval of the other party as to the form, nature and extent of the public announcement prior to making the public announcement.

Retention of Membership Information
Under the terms of this agreement, NAF will provide StemExpress with detailed information and listings regarding NAF members. Upon the termination of this contract, StemExpress agrees to destroy any and all ~~copies~~ of NAF membership lists and will ~~be prohibited from Stem Express~~discontinue the use of these lists to pursue new clients or to release this information in any way.

Force Majeure:
Neither party hereto shall be responsible to the other or to any third party for any failure, in whole or in part, to perform any of its obligations to manufacture and supply or to order and purchase, as the case may be, any products and/or services hereunder to the extent and for the length of time that such failure is due in whole or in substantial part to circumstances beyond the control of the party failing in such performance. Such circumstances shall include (but shall not be limited to) acts of God, labor disputes, materials or labor shortages, damage to facilities, public disturbances and governmental acts.

Proprietary Names and Marks:
Neither party shall have any right in any respect to use or to permit others to use any trademark, service mark, trade name or copyrighted material owned or used by the other party without express written permission.

Governing Law:
This Agreement shall be governed by the laws of the District of Columbia, without regard to such jurisdiction's conflicts of laws principles. The parties agree that venue for any suit, action, proceeding or litigation arising out of or in relation to this Agreement shall be in federal or district court in the District of Columbia having subject matter jurisdiction.

Partial Invalidity:
In the event that any provision of this Agreement should for any reason be held illegal, invalid,

ineffective, and unenforceable or contrary to public policy, the remainder of this Agreement shall remain in full force and effect.

Entire Agreement:
This Agreement with attachments embodies the entire agreement and understanding between NAF and StemExpress and there are no agreements, understandings, conditions, warranties, or representations, oral or written, express or implied, with reference to the subject matter hereof, that are not merged herein and superseded hereby. This Agreement may not be modified except by an instrument in writing executed by the party against whom the modification is sought to be enforced. This Agreement supersedes all previous written or oral negotiations, commitments, representations and agreements pertaining to the same subject matter between the parties hereto, and all products and/or services provided after the effective date of this Agreement, notwithstanding.

Acceptance
IN WITNESS WHEREOF, the Parties, through their authorized officers, have duly executed this Agreement as of the Effective Date.

FOR STEMEXPRESS LLC:                    FOR NAF:

By:                                     By:

▮▮▮▮▮, CEO & Founder

*[rest of page left blank]*

| Formatted Table |
| Formatted: Tab stops: 2.93", Left,Leader: __ |

| Formatted: Font: Italic, No underline |

NAF-000049

## Appendix A

NAF's Commitment

For the aforementioned sum mentioned in the section marked "Payment for Services," NAF commits to performing the following for one year to assist StemExpress in marketing NAF members:

- Create and disseminate to NAF members correspondence from NAF's Group Purchasing Manager about StemExpress and its products and services twice yearly at the request of StemExpress.
- Determine whether CME credit can be obtained for StemExpress webinars on malpractice insurance and related information.
- Disseminate to NAF members the name and contact information of StemExpress' representative who is available to answer questions about services and participation on an ongoing basis.
- Include a StemExpress marketing brochure and questionnaire regarding participation benefits in the NAF membership welcome packet.
- Invite the top 10% of potential customers to join NAF on a conference call paid for by StemExpress to discuss StemExpress capabilities and specified coverages at least once a year.
- Feature StemExpress in the NAF Group Purchasing newsletter at least once a year.
- Provide mailing list for StemExpress to send out marketing "slicks" regarding the background of StemExpress, its capabilities, and highlights of coverages.
- Provide assistance to StemExpress in gathering testimonials from existing customers among NAF members.
- Supply StemExpress with a quarterly updated list of members.
- Give StemExpress an exhibit booth at the NAF Annual Conference in April.

NAF-000050

## ~~Appendix B~~

NAF's Commitment

For the aforementioned sum mentioned in the section marked "Payment for Services," NAF commits to performing the following for one year to assist StemExpress in ~~marketing~~ presenting its ~~insurance~~ collection program~~products~~ to NAF members:

> Create and disseminate to NAF members correspondence from NAF's Group Purchasing Manager about StemExpress and the collection program ~~its products and services~~ twice yearly at the request of StemExpress.

> Create a content section on NAF's members-only website dedicated to StemExpress ~~and~~, including a ~~StemExpress~~ link to ~~applications~~ a StemExpress email address ~~that can be downloaded, filled out, and faxed, mailed, or emailed to StemExpress~~ for contacts and.collection program information.

> ~~Determine whether CME credit can be obtained for StemExpress webinars on malpractice insurance and related information.~~

> Disseminate to NAF members the name and contact information of StemExpress' ~~claims~~ collection program representative who is available to answer questions about ~~services~~ the StemExpress collection program and participation on an ongoing basis.

> Provide a cover letter from NAF's President and CEO pertaining to ~~changes in laws that may affect members' coverage,~~ the StemExpress collection program which StemExpress can use to accompany marketing materials for NAF members.

> Include a StemExpress marketing brochure ~~and questionnaire~~ regarding ~~existing services~~ StemExpress collection program in ~~the~~ each NAF membership welcome packet.

> Invite ~~the top 10% of potential customers~~ select NAF members to join NAF on a conference call paid for by StemExpress to discuss StemExpress' ~~capabilities and specified coverages~~ collection program and the benefits of member participation at least once a year.

> Provide mailing list for StemExpress to send out marketing ~~"slicks"~~ materials to NAF members regarding the background of StemExpress, its ~~capabilities~~ collection program, and ~~highlights~~ benefits of ~~coverages~~ member participation in the program.

6

➢ Provide assistance to StemExpress in gathering testimonials from existing ~~customers~~ program participants from among NAF members.

➢ Provide one complimentary exhibit space at NAF's Annual Meeting in the spring for StemExpress with up to 3 complimentary exhibitor registrations and up to 4 invitations to the member luncheon. In addition, the opportunity to create a bag insert that will be given to every attendee at registration.

➢ Supply StemExpress with a quarterly updated list of members.


## Appendix B


StemExpress' Commitment.


-StemExpress commits to performing the following for one year to market its collection services to NAF's members:

➢ Conduct a webinar for NAF members with a question and answer forum ~~on their current processes, benefits, laws, etc. surrounding~~discussing  member ~~participating~~ participation in the StemExpress collection ~~service~~program at the launch and yearly thereafter.

➢ Create and produce a marketing brochure detailing StemExpress' ~~capabilities~~ collection service program~~from a service aspect~~. This brochure shall include StemExpress contact information.   StemExpress will provide a supply of the brochures to NAF to include in their membership ~~application~~ welcome packets.

➢ ~~Create and Produce a Questionnaire to be sent out asking for expiration date, members' current coverage, premium amount, and contact information. This Questionnaire may be designed to fit into the brochure above so that members get both materials together.~~

➢ Create and Produce marketing "slicks" on the background of StemExpress, its capabilities, and highlights participation benefits.

➢ ~~Create a current list of clients that potential clients can call for a recommendation.~~

➢ ~~Produce testimonials from StemExpress' current client base on satisfaction, pricing, as well as reflection on the current service model.~~

➢ Provide, at no charge to NAF, -informative sessions or meetings that ~~inquire~~ present the collection program ~~free of charge.~~

➢ Develop client success stories on how StemExpress bought a value added service to participating members. This will help to inform members about StemExpress' offerings.

NAF-000052

- ➢ Commit to attending NAF's Annual Meeting in April of each year.
- ➢ Pursue all leads from NAF, introducing StemExpress and what StemExpress' capabilities are.

NAF-000053

Exhibit 5.6

**From:**
**Sent:** Thursday, February 20, 2014 2:29 PM
**To:**
**Subject:** RE: Stem Express GP vendor

Hi ███,

I like the idea of setting benchmarks and NAF getting fees based on usage. Is this something ███ seemed open to discussing? Do they have arrangements like this with any other orgs?

I think the three of us should chat briefly and then just go ask ███ which she would prefer. This will save all of us time and prevent us from developing a fee structure in a direction she won't want to go. This is something totally different so let's just pop in her office and take her temperature on it. I think it could be an exciting addition to our program!

Thanks,

███

**From:** ███
**Sent:** Thursday, February 20, 2014 2:09 PM
**To:** ███
**Subject:** Stem Express GP vendor

Hi ███ and ███
I spoke with ███ from Stem Express today regarding them becoming a Group Purchasing vendor in the program. As ███ and I discussed yesterday theirs is a unique service that would not fall under the 3% administrative fee realm. From my conversation today I feel it is even more unique than I initially anticipated.

Here is a summarization of the process as ███ described it:
1. Stem Express collects the maternal blood from the patient and/or the fetal tissue after the procedure.
2. Either a Stem Cell employee located at the clinic or a clinic employee gathers and stores the collection.
3. The collection (product) is sent to the lab and cells are isolated for research.
4. The participating clinic is paid by Stem Express a fee per collection.

The fact that Stem Express is the payer and our member is the payee changes the fee structure. Perhaps we can access a fee or value for each member that participates or base it on financial payouts to the member. For instance, when a member is paid up to $500 than Stem Cell would owe X amount to NAF or a flat yearly fee based on the number of participating members.

I know the final decision would be ███'s regarding payment terms however I wanted to have a concrete suggestion to put forth. What are your thoughts?

Thanks,

███

Group Purchasing Manager

NATIONAL ABORTION FEDERATION

███

NAF-000016

Exhibit 5.7

Begin forwarded message:

**From:** ███████████ < ████ @prochoice.org>
**Subject: RE: NAF GP membership**
**Date:** October 24, 2014 8:43:56 AM PDT
**To:** ███████ < ████ @stemexpress.com>

Hi ,

Just checking in to see how the vendor agreement is coming. Please let me know if you need anything.

Thanks,

████████

**From:** ████████ [mailto: ████ @stemexpress.com]
**Sent:** Friday, August 08, 2014 4:09 PM
**To:** ████████
**Subject:** Re: NAF GP membership

Thanks ████████

This one looks like it aligns better with us. I will discuss with ████ and try to get it back to you by the end of next week.

Thank you,

████████

Accounting Department Manager

StemExpress

██████████████

████ @stemexpress.com
**stemexpress.com**

<2015 Stem Express Contract.doc>

NAF-000034

Exhibit 5.8

On Jan 8, 2015, at 11:24 AM, ████████ <████@prochoice.org> wrote:

Hi 

Well that explains her lack of response. I am glad you are still interested.

I have attached an initial draft of an agreement. As I explained to ████ this is unique as it is not a product therefore the standard admin fee process does not apply.

Please review the attach and fill in the blanks. Let me know if we need to a call to discuss.

On another note, we are gearing up for our Annual Meeting in Baltimore. I will have a prospectus in the next week or so.

Please let me know if you have any questions.

Kind regards,



**From:** ████ [mailto:████@stemexpress.com]
**Sent:** Tuesday, January 06, 2015 2:33 PM
**To:** ████
**Cc:** ████
**Subject:** Fwd: NAF GP membership

Hi ████,

████ is no longer with the company and I want to make sure the vendor agreement doesn't get put on the back burner so could you please resend this agreement and we will get it turned around to you.

Thank you,

████

CEO & Founder

StemExpress

████@stemexpress.com
**stemexpress.com**

This email message and any attached documents are for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message. If you are the intended recipient, please be advised that the content of this message is subject to access, review and disclosure by the sender's Email System Administrator.

Please consider the environment before printing this e-mail.

NAF-000033

Exhibit 5.9

| From: |  @stemexpress.com> |
|---|---|
| Sent: | Thursday, January 15, 2015 10:54 AM |
| To: | |
| Cc: | |
| Subject: | Re: NAF GP membership |
| Attachments: | 2015 StemExpress NAF Contract_cmd.doc; ATT00001.htm |

Hi ▮,

Attached is the draft agreement with marked up comments. It might be best to set up a conference call next week to discuss this in further detail as a lot of this agreement had language in it that looked like it was for a professional liability insurance company, which we clearly aren't, so I just wanted to make sure we were on the same page about what should be included in this agreement. Tuesday the 20th I am wide open after 11am PST so let me know if there is a good time that would work for you?

I look forward to it,



CEO & Founder

StemExpress

▮ @stemexpress.com
**stemexpress.com**

This email message and any attached documents are for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message. If you are the intended recipient, please be advised that the content of this message is subject to access, review and disclosure by the sender's Email System Administrator.
Please consider the environment before printing this e-mail.

NAF-000023

## PURCHASE AGREEMENT

This agreement ("Agreement"), is made this ——10th day of ——,Janaury, 2015, by and between NAF, a non-profit corporation with its principal place of b~~Stem Expressness~~ usiness located at ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛ and Stem Express, LLC a corporation with its principal place of business b~~Stem Expressness~~ located at ⬛⬛⬛⬛⬛⬛

Subject Matter of Agreement:
NAF accepts Stem-Express's offer to provide NAF members with collection procedures in accordance with the terms and conditions of this Agreement.

Term:
This Agreement shall commence on ——February, 1st——, 2015, and shall continue for the period of twelve (12) months (the "Initial Term"). After the expiration of the Initial Term, the A~~a~~greement shall automatically be renewed for successive one-year terms, unless terminated by either party in writing thirty days prior to the renewal date.

Products/Services:
Stem-Express works with local hospitals and medical professionals to collect tissue and blood samples for research. A complete and accurate list of all collection services, processes and associated payments currently ~~to be~~ offered by Stem-Express shall be made available by StemExpress to all participating NAF members and NAF.

Procedures:
Stem-Express agrees to abide by NAF's established procedures, which may be reasonably modified from time to time. The current procedures are as follows:

- NAF considers any collection made by Stem-Express from a NAF member to be governed by this A~~a~~greement.
- NAF will confirm that any participating member is eligible for program participation by providing a list of qualifying participants to Stem-Express on a quarterly basis.
- Stem-Express will develop ~~any~~ marketing materials- and NAF will have the right to review and approve the marketing materials, marketing plan and all written marketing communications to members before participating NAF members are contacted.

Payment Terms:
NAF members who participate in the collection program with Stem-Express are solely responsible for executing any payment agreements directly with Stem-Express. NAF assumes no financial responsibility for payment agreements executed by NAF members.

**Comment [⬛]:** I am uncertain what is meant in this sentence. Is it that we will offer services to all NAF memebers?

**Comment [⬛]:** Yes, that's how I interpret it.

1

**Payments:**
For the agreed-upon sum of $\underline{\hspace{1cm}}$. NAF commits to performing the services outlined in this document. Payment is due upon signature.

Comment [████]: Is this where you stated in your email that NAF is waiving the fee?

**Participation Reports:**
In partial consideration for the services outlined above, ~~STEM EXPRESS~~StemExpress will provide NAF with quarterly reports of executed participation agreements to include points of contact with NAF members for the collection services under the terms of this ~~A~~greement.

**Indemnity:**
~~STEM EXPRESS~~StemExpress hereby agrees to indemnify, defend, and hold NAF harmless from and against any and all claims, demands, causes of action, liabilities, losses, damages, costs, or expenses which directly or indirectly arises out of or are in any way associated with any the collections pursuant to this Agreement, which is not due to the sole negligence of NAF and or NAF members. ~~STEM EXPRESS~~StemExpress further agrees to pay all costs and expenses, including reasonable attorneys' fees, which may be incurred by NAF and/or NAF members in enforcing any of the covenants and agreements of this indemnification.

Comment [████]: This section should be mutual or stricken.
Comment [████]: Agreed!

**Warranty:**
~~STEM EXPRESS~~StemExpress warrants that the collection process to be supplied under this Agreement are fit and sufficient for the purpose.

**Compliance With Law:**
~~STEM EXPRESS~~StemExpress has been, and shall continue to be, in compliance with all applicable laws, rules, ordinances, regulations, orders, judgments and decrees of all governmental authorities (federal, state, local and foreign) having jurisdiction over Stem Express and the products of ~~STEM EXPRESS~~StemExpress. ~~STEM EXPRESS~~StemExpress shall have obtained all permits, applications, notices, consents, approvals, orders, qualifications, waivers from, or authorizations of any governmental authority necessary in connection with the execution and delivery by ~~STEM~~ ~~EXPRESS~~StemExpress of this Agreement or the consummation by ~~STEM~~ ~~EXPRESS~~StemExpress of the transactions contemplated hereby. ~~STEM~~ ~~EXPRESS~~StemExpress agrees to indemnify NAF and/or NAF members for any loss or damage sustained because of ~~STEM EXPRESS's~~ StemExpress noncompliance with any applicable laws, rules, ordinances, regulations, orders, judgments or decrees.

**Notice:**
NAF and ~~STEM EXPRESS~~StemExpress are deemed independent contractors and neither shall hold itself out as agent or principal of the other, or have the power to bind the other in any regard. All notices, requests, consents and other communications required or

2

permitted to be given hereunder shall be in writing and may be delivered personally (including by courier), by next day delivery service or by first class registered or certified mail, postage prepaid, return receipt requested, addressed to the following addresses or to other such addresses as may be furnished in writing by one party to the other:

IF TO NAF:
National Abortion Federation

███████████████████

Attention:  President/CEO

Formatted: Indent: Left: 0", First line: 0"

IF TO STEM EXPRESS:
~~STEM EXPRESS~~StemExpress
Attn: ███████ CEO

███████████████

~~Attention:  Executive Vice President~~

Service of any such notice shall be deemed complete when received on the day of actual delivery thereof as evidenced by the return receipt or the date such notice is first refused, if that be the case.

Assignment:
Neither party may, without the prior written consent of the other, transfer or assign, in whole or in part, any of its rights, duties or obligations hereunder to a third party or parties; provided that any respective successor or permitted assign shall have all of such party's rights, and shall be subject to all of such party's duties and obligations, hereunder. No assignment will constitute a release of the assigning party without the written consent of the other party.

Confidentiality:
Each party acknowledges and agrees that pursuant to this Agreement, valuable information of a confidential nature may be disclosed by each party to the other or may be learned by one party from the other in connection with its performance under this Agreement; that such information will be retained by the receiving party in confidence; that the transmittal of such information by the disclosing party to the receiving party is upon the condition that the information is to be used solely for the purpose of effectuating this Agreement; and that neither party shall use, publish or disclose or cause anyone else to use, publish or disclose any information supplied to it by the other party other than for the purposes described above.

3

The above restrictions shall not prohibit any disclosure which is required pursuant to a court order or administrative proceeding; provided that the party being required to disclose such information shall promptly notify the other party of the need for any such disclosure and shall give the other party a reasonable time to oppose such process. The above restrictions shall apply during the term of this Agreement and for all times thereafter.

Neither party will make any press release or other public announcement regarding this Agreement without the other party's express prior written consent, except as required under applicable law or by any governmental agency, in which case the party required to make the public disclosure shall use commercially reasonable efforts to obtain the approval of the other party as to the form, nature and extent of the public announcement prior to making the public announcement.

Retention of Membership Information

Under the terms of this agreement, NAF will provide ~~STEM EXPRESS~~StemExpress with detailed information and listings regarding NAF members. Upon the termination of this contract, ~~STEM EXPRESS~~StemExpress agrees to destroy any and all copies of NAF membership_-lists and will be prohibited from using~~Stem Express~~ng these lists to pursue new clients or to release this information in any way.

Force Majeure:

Neither party hereto shall be responsible to the other or to any third party for any failure, in whole or in part, to perform any of its obligations to manufacture and supply or to order and purchase, as the case may be, any products and/or services hereunder to the extent and for the length of time that such failure is due in whole or in substantial part to circumstances beyond the control of the party failing in such performance. Such circumstances shall include (but shall not be limited to) acts of God, labor disputes, materials or labor shortages, damage to facilities, public disturbances and governmental acts.

Proprietary Names and Marks:

Neither party shall have any right in any respect to use or to permit others to use any trademark, trade name or copyrighted material owned or used by the other party without express written permission.

Governing Law:

This Agreement shall be governed by the laws of the District of Columbia, without regard to such jurisdiction's conflicts of laws principles. The parties agree that venue for any suit, action, proceeding or litigation arising out of or in relation to this Agreement shall be in federal or district court in the District of Columbia having subject matter jurisdiction.

Partial Invalidity:

In the event that any provision of this Agreement should for any reason be held illegal, invalid, ineffective, unenforceable or contrary to public policy, the remainder of this

4

NAF-000027

Agreement shall remain in full force and effect.

Entire Agreement:
This Agreement with attachments embodies the entire agreement and understanding between NAF and ~~STEM EXPRESS~~StemExpress and there are no agreements, understandings, conditions, warranties, or representations, oral or written, express or implied, with reference to the subject matter hereof, that are not merged herein and superseded hereby.  This Agreement may not be modified except by an instrument in writing executed by the party against whom the modification is sought to be enforced.  This Agreement supersedes all previous written or oral negotiations, commitments, representations and agreements pertaining to the same subject matter between the parties hereto, and all products and/or services provided after the effective date of this Agreement, notwithstanding.

Acceptance
IN WITNESS WHEREOF, the parties hereto have themselves or through their officers thereunto duly authorized set their hands and seals the day and year first above written.

NATIONAL ABORTION FEDERATION

Name: _____

Signature: _____

Title: _____

STEM-EXPRESS

Name: ███████_____  _____

Signature: _____

Title: _CEO_____  _____

5

NAF's Commitment

For the aforementioned sum mentioned in the section marked "Payment for Services," NAF commits to performing the following for one year to assist STEM EXPRESS in marketing its insurance products to NAF members:

> Create and disseminate to NAF members correspondence from NAF's President and CEO about STEM EXPRESS and its products and services.

> Create a content section on NAF's members-only website dedicated to STEM EXPRESS ~~which includes and inclStem Expresson of~~ a link to applications that can be downloaded, filled out, and faxed, mailed, or emailed to STEM-EXPRESS.

> Determine whether CME credit can be obtained for STEM-EXPRESS webinars on malpractice insurance and related information.

> Disseminate to NAF members the name and contact information of STEM EXPRESS's claims representative who is available to answer questions about a potential claim and the coverage affects of a claim.

> Provide a cover letter from NAF's President and CEO pertaining to changes in laws that may affect members' coverage, which STEM-EXPRESS can use to accompany marketing materials for NAF members.

> Include a STEM-EXPRESS marketing brochure and questionnaire regarding existing coverage in the NAF membership welcome packet.

> Invite the top 10% of potential customers to join NAF on a conference call paid for by STEM-EXPRESS to discuss STEM-EXPRESS's capabilities and specified coverages.

> Provide mailing list for STEM-EXPRESS to send out marketing "slicks" regarding the background of STEM-EXPRESS, its capabilities, and highlights of coverages.

> Provide assistance to STEM-EXPRESS in gathering testimonials from existing customers among NAF members.

> Provide complimentary exhibit space at NAF's two meetings per year (spring Annual Meeting and autumn Risk Management Meeting) for STEM-EXPRESS to connect with potential clients.

> Supply STEM-EXPRESS with a quarterly updated list of NAF members.


STEM EXPRESS's Commitment.

STEM EXPRESS commits to performing the following for one year from the date of this Agreement to market its insurance products and services to NAF's members:

NAF-000029

- Conduct ~~quarterly risk management~~ webinars for all NAF members describing ~~coverages~~benefits of working with and collaborating with StemExpress.~~; changes in any malpractice laws, as well as how coverage protection on the professional liability policy is the broadest for the price.~~
- ~~Conduct a webinar for NAF members with a question and answer forum on their current insurance hosted by experts in property, general liability and professional liability.~~Those webinars will include a question and answer period.
- ~~Create a section on STEM EXPRESS's main website or a separate linked website that provides information and materials for NAF members about insurance.~~
- ~~Conduct a quarterly webinar where STEM EXPRESS's Claims Manager leads a session describing malpractice claims, outcomes, and laws that will affect clinics and the way they do b~~Stem Expressness.
- Create and produce a marketing brochure detailing STEM-EXPRESS's capabilities from a service ~~aspect, such as certificates~~and partner aspect.~~ as well as available coverages,~~.  This brochure shall include STEM-EXPRESS contact information.  STEM-EXPRESS will provide a supply of the brochures to NAF to include in their membership application welcome packets.
- ~~Create and Produce a Questionnaire to be sent out asking for expiration date, members' current coverage, premium amount, and contact information. This Questionnaire may be designed to fit into the brochure above so that members get both materials together.~~
- ~~Create and Produce marketing "slicks" on the background of STEM-EXPRESS, its capabilities, and highlights of coverages.~~
- Create a current list of clients that potential clients can call for a recommendation.
- Produce testimonials from STEM-EXPRESS's current ~~insureds~~clinics, which are willing to be included in any marketing material of NAF.~~on product, pricing, coverage, as well as reflection on the current service model.~~
- ~~Provide a free coverage analysis of members' professional liability policy, detailing coverages that are vacant or underinsured areas of their current policy that could potentially result in claim denial.~~
- ~~Develop~~Provide ~~client~~research success stories on how STEM-EXPRESS has impacted researchers globally, and how the clinics participate in that by working with StemExpress.~~saved them money on premium and provided them with broader coverage. This will help to inform members about STEM EXPRESS's offerings.~~
- Sponsor a break or luncheon at the NAF conference.
- Commit to attending both NAF member meetings: one in April and the other in the Fall.
- Pursue all leads from NAF, introducing STEM–EXPRESS and what STEM EXPRESS's capabilities are.

~~STEM EXPRESS and NAF agree to the following:~~

Comment [ ]: Something's missing here.

Formatted: Highlight

Formatted: Highlight

Formatted: Highlight

Comment [ ]: hat is cost to do this?  Who will be responsible for this?

Comment [ ]: Wow! This could be very costly – how many people typically attend these conferences?

NAF-000030

Insurance Policies

In order for a NAF member to be eligible to receive professional liability coverage under this Aagreement, the member must provide STEM EXPRESS with:
  1. a copy of the NAF/Rockbridge Application and all requested attachments;
  2. a copy of their current policy with all forms and endorsements; and
  3. their current in force premium, if not evidenced on the policy.

STEM EXPRESS will then continue by:
  1. determining the competition coverage;
  2. determining the competition form;
  3. identifying the premium level needed to obtain the account;
  4. allowing for the calculation of Annual Premium Savings if the applicant cancelled their existing policy at the time of application; and
  5. identifying the rating plan of the competition.

Current Professional Liability Program Enhancements:

Policies offered under this Aagreement will include the following enhancements:

  1. Affirmative Coverage for Medical Directors
  2. Dedicated Limits for Each Clinic
  3. Available Retentions as Low as $10,000
  4. Ability to Schedule Individual Physicians
  5. No need to schedule Nurses, Nurse Practitioners, Nurse Anesthetists if employed or under contract
  6. Silent on Mifepristone
  7. Competitive Premiums
  8. Insurance backed by A++ Rated Berkshire Hathaway Company
  9. Duty to defend
  10. Claim Broadening
  11. No gestational limit, no 3rd term exelStem Expresson

Potential Lines of Coverages that can be Marketed/Cross Sold

Under the terms of the Aagreement, the types of policies that may be offered include, but are not limited to:
  1. Benefits
  2. Personal Lines
  3. Auto
  4. Worker's Compensation
  5. Property

8

6. General Liability
7. Professional Lines—Director's and Officer's, EPL, Fiduciary, Crime

NAF-000032

Exhibit 5.10

**From:** ▓▓▓▓▓▓
**Sent:** Friday, February 27, 2015 4:00 PM
**To:** ▓▓▓▓ '<▓▓▓▓@stemexpress.com>
**Cc:** ▓▓▓▓ <▓▓▓▓@stemexpress.com>
**Subject:** RE: NAF revised agreement

Hi ▓▓ ,

I have attached a revised agreement. Please submit any changes and contact me with any questions.

Thanks,
▓▓▓▓

**From:** ▓▓▓▓ [mailto ▓▓@stemexpress.com]
**Sent:** Wednesday, February 18, 2015 4:28 AM
**To:** ▓▓▓▓
**Cc:** ▓▓▓▓
**Subject:** Fwd: NAF GP membership

Hi ▓▓▓▓ ,

I haven't forgot to send this I have just been buried. I am copying ▓▓▓▓ who oversees our contracts, ▓▓ and I have been in the process of updating a few contracts here at the beginning of the year. The clinic contract is one of them. We should have it to you in the next two weeks.

Thank you for your patience,

▓▓▓▓
CEO & Founder

StemExpress
▓▓▓▓

▓▓▓▓

▓▓@stemexpress.com
**stemexpress.com**

1

| From: | ███████████ |
| --- | --- |
| Sent: | Thursday, April 09, 2015 3:44 PM |
| To: | ███████ |
| Subject: | DEV 20150325 1 StemExpress-NAF Partnership Agreement .doc |
| Attachments: | DEV 20150325 1 StemExpress-NAF Partnership Agreement .doc |

NAF-000054

<u>PARTNERSHIP AGREEMENT</u>

The National Abortion Federation ("NAF") is the Professional Association of abortion providers in North America. NAF's work supports the dedicated health care professionals who make reproductive choice a reality, as well as the women they serve.

Roe v. Wade legalized abortion however the stigma or lack of acceptance causes concern for both providers and patients. NAF has expanded programs to address the growing needs of abortion providers and patients by establishing standards of care, protocols, and clinical education. NAF continues to provide programs, resources, pro-choice advocacy and anti-violence protection to members.

Right now women have the right to choose. NAF continues to work towards its mission of safe, legal and accessible abortion care. The support of corporations like Stem Express who are deeply committed to reproductive choice, health and justice for women is essential to our communities.

<u>Donation:</u>
In consideration of support and a partnership with NAF, Stem Express agrees to one of the following:
- (a) For the agreed-upon sum of $ 5,000, NAF commits to performing the services outlined in this document under Appendix A.
- (b) For the agreed-upon sum of $10,000, NAF commits to performing the services outlined in this document under Appendix B.

The services offered under Appendix A or B can be modified at the written request of Stem Express at NAF's discretion provided payment has been received by NAF for the year.

<u>Participation Reports:</u>
In partial consideration for the services outlined above, STEM EXPRESS will provide NAF with quarterly reports of executed participation agreements with NAF members for the collection services under the terms of this agreement.

<u>IF TO NAF:</u>
National Abortion Federation

1

NAF-000037

Attention: President/CEO


IF TO STEM EXPRESS:
STEM EXPRESS

███████████████

Attention: Executive Vice President

Service of any such notice shall be deemed complete when received on the day of actual delivery thereof as evidenced by the return receipt or the date such notice is first refused, if that be the case.

Assignment:
Neither party may, without the prior written consent of the other, transfer or assign, in whole or in part, any of its rights, duties or obligations hereunder to a third party or parties; provided that any respective successor or permitted assign shall have all of such party's rights, and shall be subject to all of such party's duties and obligations, hereunder. No assignment will constitute a release of the assigning party with the written consent of the other party.

Confidentiality:
Each party acknowledges and agrees that pursuant to this Agreement, valuable information of a confidential nature may be disclosed by each party to the other or may be learned by one party from the other in connection with its performance under this Agreement; that such information will be retained by the receiving party in confidence; that the transmittal of such information by the disclosing party to the receiving party is upon the condition that the information is to be used solely for the purpose of effectuating this Agreement; and that neither party shall use, publish or disclose or cause anyone else to use, publish or disclose any information supplied to it by the other party other than for the purposes described above. The above restrictions shall not prohibit any disclosure which is required pursuant to a court order or administrative proceeding; provided that the party being required to disclose such information shall promptly notify the other party of the need for any such disclosure and shall give the other party a reasonable time to oppose such process. The above restrictions shall apply during the term of this Agreement and for all times thereafter.

Neither party will make any press release or other public announcement regarding this Agreement without the other party's express prior written consent, except as required under applicable law or by any governmental agency, in which case the party required to make the public disclosure shall use commercially reasonable efforts to obtain the approval of the other party as to the form, nature and extent of the public announcement prior to making the public announcement.

NAF-000038

Retention of Membership Information
Under the terms of this agreement, NAF will provide Stem Express with detailed information and listings regarding NAF members. Upon the termination of this contract, Stem Express agrees to destroy any and all copies of NAF membership lists and will be prohibited from Stem Express these lists to pursue new clients or to release this information in any way.

Force Majeure:
Neither party hereto shall be responsible to the other or to any third party for any failure, in whole or in part, to perform any of its obligations to manufacture and supply or to order and purchase, as the case may be, any products and/or services hereunder to the extent and for the length of time that such failure is due in whole or in substantial part to circumstances beyond the control of the party failing in such performance. Such circumstances shall include (but shall not be limited to) acts of God, labor disputes, materials or labor shortages, damage to facilities, public disturbances and governmental acts.

Proprietary Names and Marks:
Neither party shall have any right in any respect to use or to permit others to use any trademark, trade name or copyrighted material owned or used by the other party without express written permission.

Governing Law:
This Agreement shall be governed by the laws of the District of Columbia, without regard to such jurisdiction's conflicts of laws principles. The parties agree that venue for any suit, action, proceeding or litigation arising out of or in relation to this Agreement shall be in federal or district court in the District of Columbia having subject matter jurisdiction.

Partial Invalidity:
In the event that any provision of this Agreement should for any reason be held illegal, invalid, ineffective, and unenforceable or contrary to public policy, the remainder of this Agreement shall remain in full force and effect.

NAF-000039

<u>Appendix A</u>

<u>NAF's Commitment</u>

For the aforementioned sum mentioned in the section marked "Payment for Services," NAF commits to performing the following for one year to assist STEM EXPRESS in marketing NAF members:

- ➢ Create and disseminate to NAF members correspondence from NAF's Group Purchasing Manager about STEM EXPRESS and its products and services twice yearly at the request of Stem Express.
- ➢ Determine whether CME credit can be obtained for STEM EXPRESS webinars on malpractice insurance and related information.
- ➢ Disseminate to NAF members the name and contact information of STEM EXPRESS's representative who is available to answer questions about services and participation on an ongoing basis.
- ➢ Include a STEM EXPRESS marketing brochure and questionnaire regarding participation benefits in the NAF membership welcome packet.
- ➢ Invite the top 10% of potential customers to join NAF on a conference call paid for by STEM EXPRESS to discuss STEM EXPRESS's capabilities and specified coverages at least once a year.
- ➢ Feature Stem Express in the NAF Group Purchasing newsletter at least once a year.
- ➢ Provide mailing list for STEM EXPRESS to send out marketing "slicks" regarding the background of STEM EXPRESS, its capabilities, and highlights of coverages.
- ➢ Provide assistance to STEM EXPRESS in gathering testimonials from existing customers among NAF members.
- ➢ Supply STEM EXPRESS with a quarterly updated list of members.
- ➢ Give STEM EXPRESS an exhibit booth at the NAF Annual Conference in April.

4

NAF-000040

## Appendix B

For the aforementioned sum mentioned in the section marked "Payment for Services," NAF commits to performing the following for one year to assist STEM EXPRESS in marketing its insurance products to NAF members:

➤ Create and disseminate to NAF members correspondence from NAF's Group Purchasing Manager about STEM EXPRESS and its products and services twice yearly at the request of Stem Express.

➤ Create a content section on NAF's members-only website dedicated to STEM EXPRESS and including Stem Express link to applications that can be downloaded, filled out, and faxed, mailed, or emailed to STEM EXPRESS.

➤ Determine whether CME credit can be obtained for STEM EXPRESS webinars on malpractice insurance and related information.

➤ Disseminate to NAF members the name and contact information of STEM EXPRESS's claims representative who is available to answer questions about services and participation on an ongoing basis.

➤ Provide a cover letter from NAF's President and CEO pertaining to changes in laws that may affect members' coverage, which STEM EXPRESS can use to accompany marketing materials for NAF members.

➤ Include a STEM EXPRESS marketing brochure and questionnaire regarding existing services in the NAF membership welcome packet.

➤ Invite the top 10% of potential customers to join NAF on a conference call paid for by STEM EXPRESS to discuss STEM EXPRESS's capabilities and specified coverages at least once a year.

➤ Provide mailing list for STEM EXPRESS to send out marketing "slicks" regarding the background of STEM EXPRESS, its capabilities, and highlights of coverages.

➤ Provide assistance to STEM EXPRESS in gathering testimonials from existing customers among NAF members.

➤ Provide one complimentary exhibit space at NAF's Annual Meeting in the spring for STEM EXPRESS with up to 3 complimentary exhibitor registrations and up to 4 invitations to the member luncheon. In addition, the opportunity to create a bag insert that will be given to every attendee at registration.

➤ Supply STEM EXPRESS with a quarterly updated list of members.

NAF-000041

STEM EXPRESS's Commitment.

STEM EXPRESS commits to performing the following for one year to market its collection services to NAF's members:

> Conduct a webinar for NAF members with a question and answer forum on their current processes, benefits, laws, etc. surrounding participating in the collection service at the launch and yearly thereafter.
> Create and produce a marketing brochure detailing STEM EXPRESS's capabilities from a service aspect. This brochure shall include STEM EXPRESS contact information. STEM EXPRESS will provide a supply of the brochures to NAF to include in their membership application welcome packets.
> Create and Produce a Questionnaire to be sent out asking for expiration date, members' current coverage, premium amount, and contact information. This Questionnaire may be designed to fit into the brochure above so that members get both materials together.
> Create and Produce marketing "slicks" on the background of STEM EXPRESS, its capabilities, and highlights participation benefits.
> Create a current list of clients that potential clients can call for a recommendation.
> Produce testimonials from STEM EXPRESS's current client base on satisfaction, pricing, as well as reflection on the current service model.
> Provide informative sessions or meetings that inquire free of charge.
> Develop client success stories on how STEM EXPRESS bought a value added service to participating members. This will help to inform members about STEM EXPRESS's offerings.
> Commit to attending NAF's Annual Meeting in April of each year.
> Pursue all leads from NAF, introducing STEM EXPRESS and what STEM EXPRESS's capabilities are.

Entire Agreement:

This Agreement with attachments embodies the entire agreement and understanding between NAF and Stem Express and there are no agreements, understandings, conditions, warranties, or representations, oral or written, express or implied, with reference to the subject matter hereof, that are not merged herein and superseded hereby. This Agreement may not be modified except by an instrument in writing executed by the party against whom the modification is sought to be enforced. This Agreement supersedes all previous written or oral negotiations, commitments, representations and agreements pertaining to the same subject matter between the parties hereto, and all products and/or services provided after the effective date of this Agreement, notwithstanding.

6

NAF-000042

<u>Acceptance</u>
IN WITNESS WHEREOF, the parties hereto have themselves or through their officers thereunto duly authorized set their hands and seals the day and year first above written.

<u>NATIONAL ABORTION FEDERATION</u>

Name: _____

Signature: _____

Title: _____

<u>STEM EXPRESS</u>

Name: _____

Signature: _____

Title: _____

NAF-000043

NAF-000044

Exhibit 5.11

| | |
|---|---|
| **From:** |  |
| **Sent:** | Thursday, April 09, 2015 4:16 PM |
| **To:** | |
| **Cc:** | |
| **Subject:** | RE: Partnership Agreement - StemExpress |
| **Attachments:** | DEV 20150325 1 StemExpress-NAF Partnership Agreement .doc |

Hi ▉ ,

My apologies as my promise to respond by COB today comes with a delay. There is cause for concern regarding the added text under the Assignment section. It denotes, "StemExpress may assign this Agreement to an acquirer without notice to PI pursuant to an acquisition or merger of StemExpress involving greater than 50% of the company; provided further, that any respective successor or permitted assign shall thereby assume all of such StemExpress' rights, and shall be subject to all of such StemExpress' duties and obligations, hereunder.

That clause takes away a discretion that is essential to the prescreen process and creates privacy concern that we go great lengths to protect. Although I agree there is no other changes that impact the substantive content, ▉ , our general counsel, is giving it a quick read. I did think however that in the interest of time, you could respond to the deletion request noted above.

Please let me know if you have any questions. I am also happy to discuss by phone. I will be in the office all day tomorrow.

Thanks,



**From:** ▉ [mailto:▉@stemexpress.com]
**Sent:** Wednesday, March 25, 2015 10:47 AM
**To:** ▉
**Subject:** Partnership Agreement - StemExpress
**Importance:** High

Good morning, ▉ :

Please find a draft Partnership Agreement for your consideration. I've taken the liberty of reformatting a bit of it to follow our more-routine contract structure (no real change to the substantive content). I removed the language pertaining to alternative donations ($5K and $10K) since we have elected to go with $10K and participate in the upcoming NAF meeting ▉ and ▉  will attend). There will appear to be a lot of redlining in the Appendix, but this is largely an artifact of changing the content to reflect StemExpress business and remove the information from the company that was listed from prior use of this agreement template.

If the agreement with changes are acceptable, please 'accept changes,' sign and return to me at your earliest convenience. If you need to make changes, please reply with your redline as soon as possible and I'll get the document turned around promptly.

With kind regards,



1

Exhibit 5.12

# STEM-EX, LLC

### Services Agreement

This agreement is made as of <u>April 1st, 2010</u> between Stem-Ex, LLC, a limited liability company, and Planned Parenthood Mar Monte, a professional corporation.

WHEREAS, Stem-Ex is a company devoted to providing services related to the procurement of human organs, tissues, and blood for medical research in order to facilitate medical research utilizing those tissues; and

WHEREAS, Planned Parenthood Mar Monte provides medical services, education programs, and advocacy initiatives in order to improve people's lives;

NOW, THEREFORE, in consideration of the premises and mutual covenants contained in this Agreement, and in order to further their mutual goals, the parties agree as follows:

1. The term "fetal organ" has the same meaning as the term defined in the National Organ Transplant Act (42 U.S.C.A. 274e(c)(1)) and means the human kidney, liver, heart, lung, pancreas, bone marrow, cornea, eye, bone, and skin or any subpart thereof and any other human organ or any subpart thereof, as from a fetus.

2. The term "product of conception" ("POC") means any fetal organ or other fetal or placental material taken from the human uterus during an abortion.

3. The term "maternal bloods" means blood samples taken from a pregnant woman.

4. Planned Parenthood Mar Monte will provide, and Stem-Ex will pay the reasonable costs for, services and facilities at mutually agreed upon health centers (hereinafter collectively referred to as "services") associated with the following: the removal of fetal organs from POCs; the processing, preservation, quality control, and transportation of the fetal organs; appropriate space in which Stem-Ex representatives and employees may work; disposal services for non-used portions of cadaveric materials; obtaining maternal bloods; seeking consent for donation of fetal organs and maternal bloods from appropriate donors, and; maintaining records of such consents so that verification of consent can be supported.

5. The reasonable costs associated with the services specified in this Agreement shall be fifty-five dollars ($55.00) per POC determined in the clinic to be usable, and ten dollars ($10.00) per maternal blood. Planned Parenthood Mar Monte will invoice Stem-Ex monthly for the number of POC's and number of maternal bloods procured by Stem-Ex. Stem-Ex will pay Planned Parenthood Mar Monte within two weeks of receipt of the invoice.

CONFIDENTIAL / PROPRIETARY BUSINESS RECORDS

STEM.HOUSE.OGR_000001
STEM.HOUSE.SELECT_0167

6. Any information obtained from Planned Parenthood Mar Monte patients' charts shall be privileged, and Stem-Ex will treat the information in order to preserve the confidentiality of the patients. Stem-Ex will not receive any information concerning identity of donors except as necessary to obtain patients' consent for use of POCs and maternal bloods.

7. The term of this Agreement shall be for one year, beginning from the date hereof, and terminating one year thereafter. Parties may, at any time, give each other thirty days written notice of the intention to terminate this Agreement, whereupon the Agreement shall terminate thirty days after the receipt of such notice. In the absence of such termination, this Agreement shall continue for further successive terms of one year thereafter.

8. Written notices pursuant to this Agreement shall be sent to the following:



Attn: Medical Director
Planned Parenthood Mar Monte



Stem-Ex



9. The parties do not know how many patients will consent to donate POCs or maternal bloods for research, and thus do not know how many POCs or maternal bloods will be obtained pursuant to this Agreement. Planned Parenthood Mar Monte is not obligated to provide any minimum number of POCs or maternal bloods. Stem-Ex is not obligated to take any minimum number of POCs or maternal bloods, nor is Stem-Ex obligated to take all the POCs or maternal bloods made available by Planned Parenthood Mar Monte.

10. The parties mutually agree to defend, protect, and hold harmless each other's officers, directors, agents, employees, and consultants from and against any and all expenses, liabilities, demands or claims for loss or damage to property, or for personal injury or death suffered as a result of any actions by the parties in the performance of the Agreement and attributable to the fault or negligence of the parties or their respective officers, directors, agents, employees, or consultants.

11. No modification to this Agreement, nor any waiver of any rights, shall be effective unless agreed to in writing by the party charged with such waiver or modification. Waiver of any breach or default shall not constitute a waiver of any other right hereunder, or any subsequent breach or default.

12. This Agreement constitutes the entire and exclusive agreement between the parties.

CONFIDENTIAL / PROPRIETARY BUSINESS RECORDS

STEM.HOUSE.OGR_000002
STEM.HOUSE.SELECT_0168

13. This Agreement shall be governed by and interpreted under the laws of the State of California, and venue for any dispute arising hereunder shall be in the County of Sacramento.

14. The prevailing party in any action to enforce the terms of the Agreement shall be entitled to reimbursement by the other party for all costs, including the reasonable attorney fees and professional fees, incurred in connection with such proceeding.

15. This Agreement may be executed in counterparts, each of which will be deemed an original, but both of which together will constitute one and the same instrument.

IN WITNESS WHEREOF, the parties have executed this agreement by their duly authorized representatives as of the date written above.

Planned Parenthood Mar Monte

By: ██████████████████████

Title: Medical Director

Stem-Ex, LLC

By: ██████████████████████

Title: President

CONFIDENTIAL / PROPRIETARY BUSINESS RECORDS

STEM.HOUSE.OGR_000003
STEM.HOUSE.SELECT_0169



## Services Agreement

This agreement is made as of ___5/15/2012___ between StemExpress, LLC, a limited liability company, and Planned Parenthood Shasta Pacific, a professional corporation.

WHEREAS, StemExpress is a company devoted to providing services related to the procurement of human organs, tissues, and blood for medical research in order to facilitate medical research utilizing those tissues; and

WHEREAS, Planned Parenthood Shasta Pacific provides medical services, education programs, and advocacy initiatives in order to improve people's lives;

NOW, THEREFORE, in consideration of the premises and mutual covenants contained in this Agreement, and in order to further their mutual goals, the parties agree as follows:

1. The term "fetal organ" has the same meaning as the term defined in the National Organ Transplant Act (42 U.S.C.A. 274e(c)(1)) and means the human kidney, liver, heart, lung, pancreas, bone marrow, cornea, eye, bone, and skin or any subpart thereof and any other human organ or any subpart thereof, as from a fetus.

2. The term "product of conception" ("POC") means any fetal organ or other fetal or placental material taken from the human uterus during an abortion.

3. The term "maternal bloods" means blood samples taken from a pregnant woman.

4. Planned Parenthood Shasta Pacific will provide, and StemExpress will pay the reasonable costs for, services and facilities at mutually agreed upon health centers (hereinafter collectively referred to as "services") associated with the following: the removal of fetal organs from POCs; the processing, preservation, quality control, and transportation of the fetal organs; appropriate space in which StemExpress representatives and employees may work; disposal services for non-used portions of cadaveric materials; obtaining maternal bloods; seeking consent for donation of fetal organs and maternal bloods from appropriate donors, and; maintaining records of such consents so that verification of consent can be supported.

5. The reasonable costs associated with the services specified in this Agreement shall be fifty-five dollars ($55.00) per POC determined in the clinic to be usable, and ten dollars ($10.00) per maternal blood. Planned Parenthood Shasta Pacific will invoice StemExpress monthly for the number of POC's and number of maternal bloods procured by StemExpress. StemExpress will pay Planned Parenthood Shasta Pacific within thirty days of receipt of the invoice.

CONFIDENTIAL / PROPRIETARY BUSINESS RECORDS



6. Any information obtained from Planned Parenthood Shasta Pacific patients' charts shall be privileged, and StemExpress will treat the information in order to preserve the confidentiality of the patients. StemExpress will not receive any information concerning identity of donors except as necessary to obtain patients' consent for use of POCs and maternal bloods.

7. The term of this Agreement shall be for one year, beginning from the date hereof, and terminating one year thereafter. Parties may, at any time, give each other thirty days written notice of the intention to terminate this Agreement, whereupon the Agreement shall terminate thirty days after the receipt of such notice. In the absence of such termination, this Agreement shall continue for further successive terms of one year thereafter.

8. Written notices pursuant to this Agreement shall be sent to the following:

> Attn: Medical Director
> Planned Parenthood Shasta Pacific



> StemExpress

9. The parties do not know how many patients will consent to donate POCs or maternal bloods for research, and thus do not know how many POCs or maternal bloods will be obtained pursuant to this Agreement. Planned Parenthood Shasta Pacific is not obligated to provide any minimum number of POCs or maternal bloods. StemExpress is not obligated to take any minimum number of POCs or maternal bloods, nor is StemExpress obligated to take all the POCs or maternal bloods made available by Planned Parenthood Shasta Pacific.

10. The parties mutually agree to defend, protect, and hold harmless each other's officers, directors, agents, employees, and consultants from and against any and all expenses, liabilities, demands or claims for loss or damage to property, or for personal injury or death suffered as a result of any actions by the parties in the



CONFIDENTIAL / PROPRIETARY BUSINESS RECORDS

performance of the Agreement and attributable to the fault or negligence of the parties or their respective officers, directors, agents, employees, or consultants.

11. No modification to this Agreement, nor any waiver of any rights, shall be effective unless agreed to in writing by the party charged with such waiver or modification. Waiver of any breach or default shall not constitute a waiver of any other right hereunder, or any subsequent breach or default.

12. This Agreement constitutes the entire and exclusive agreement between the parties.

13. This Agreement shall be governed by and interpreted under the laws of the State of California, and venue for any dispute arising hereunder shall be in the County of Sacramento.

14. The prevailing party in any action to enforce the terms of the Agreement shall be entitled to reimbursement by the other party for all costs, including the reasonable attorney fees and professional fees, incurred in connection with such proceeding.

15. This Agreement may be executed in counterparts, each of which will be deemed an original, but both of which together will constitute one and the same instrument.

IN WITNESS WHEREOF, the parties have executed this agreement by their duly authorized representatives as of the date written above.

Planned Parenthood Shasta Pacific

5/16/12

Title: President/CEO

StemExpress, LLC

By:

Title: CEO    5/16/12

CONFIDENTIAL / PROPRIETARY BUSINESS RECORDS



## Services Agreement

This agreement is made as of <u>October 23, 2103</u> between StemExpress, a limited liability company, and Planned Parenthood of Santa Barbara, Ventura & San Luis Obispo Counties, Inc. (PPSBVSLO) a professional corporation.

WHEREAS, StemExpress is a company devoted to providing services related to the procurement of human organs, tissues, and blood for medical research in order to facilitate medical research utilizing those tissues; and

WHEREAS, PPSBVSLO provides medical services, education programs, and advocacy initiatives in order to improve people's lives;

NOW, THEREFORE, in consideration of the premises and mutual covenants contained in this Agreement, and in order to further their mutual goals, the parties agree as follows:

1. The term "fetal organ" has the same meaning as the term defined in the National Organ Transplant Act (42 U.S.C.A. 274e(c)(1)) and means the human kidney, liver, heart, lung, pancreas, bone marrow, cornea, eye, bone, and skin or any subpart thereof and any other human organ or any subpart thereof, as from a fetus.

2. The term "product of conception" ("POC") means any fetal organ or other fetal or placental material taken from the human uterus during an abortion.

3. The term "maternal bloods" means blood samples taken from a pregnant woman.

4. PPSBVSLO will provide, and StemExpress will pay the reasonable costs for, services and facilities at mutually agreed upon health centers (hereinafter collectively referred to as "services") associated with the following: the removal of fetal organs from POCs; the processing, preservation, quality control, and transportation of the fetal organs; appropriate space in which StemExpress representatives and employees may work; disposal services for non-used portions of cadaveric materials; obtaining maternal blood; seeking consent for donation of fetal organs and maternal blood from appropriate donors, and; maintaining records of such consents so that verification of consent can be supported.

5. The reasonable costs associated with the services specified in this Agreement shall be fifty dollars ($50.00) per 60cc's of maternal blood, and seventy five dollars ($75.00) for the collection of fetal tissue, if collected solely by PPSBVSLO staff. If StemExpress staff is onsite to physically collect the sample, then there would be a cost adjustment for the collection of the sample. PPSBVSLO will invoice StemExpress monthly for the number of POC's and number of maternal bloods





procured by StemExpress. StemExpress will pay PPSBVSLO within thirty days of receipt of the invoice.

6. Any information obtained from PSBVSLO patients' charts shall be privileged, and StemExpress will treat the information in order to preserve the confidentiality of the patients. StemExpress will not receive any information concerning identity of donors except as necessary to obtain patients' consent for use of POCs and maternal bloods. This will always be done in accordance with HIPAA guidelines.

7. The term of this Agreement shall be for one year, beginning from the date hereof, and can be renegotiated for successive years there after. Parties may, at any time, give each other a ninety days written notice of the intention to terminate this Agreement, whereupon the Agreement shall terminate ninety days after the receipt of such notice. .

8. Written notices pursuant to this Agreement shall be sent to the following:



Attn: ███████████ MD | Medical Director
Planned Parenthood of Santa Barbara, Ventura
& San Luis Obispo Counties, Inc ▊
████████████████████████

Attn: ████████, CEO
StemExpress
████████████████

9. The parties do not know how many patients will consent to donate POCs or maternal bloods for research, and thus do not know how many POCs or maternal bloods will be obtained pursuant to this Agreement. PPSBVSLO is not obligated to provide any minimum number of POCs or maternal bloods. StemExpress is not obligated to take any minimum number of POCs or maternal bloods, nor is StemExpress obligated to take all the POCs or maternal bloods made available by PPSBVSLO.

10. The parties mutually agree to defend, protect, and hold harmless each other's officers, directors, agents, employees, and consultants from and against any and all expenses, liabilities, demands or claims for loss or damage to property, or for personal injury or death suffered as a result of any actions by the parties in the performance of the Agreement and attributable to the fault or negligence of the parties or their respective officers, directors, agents, employees, or consultants.

████████████████████████████████████


11. No modification to this Agreement, nor any waiver of any rights, shall be effective unless agreed to in writing by the party charged with such waiver or modification. Waiver of any breach or default shall not constitute a waiver of any other right hereunder, or any subsequent breach or default.

12. This Agreement constitutes the entire and exclusive agreement between the parties.

13. This Agreement shall be governed by and interpreted under the laws of the State of California, and venue for any dispute arising hereunder shall be in the County of Sacramento.

14. The prevailing party in any action to enforce the terms of the Agreement shall be entitled to reimbursement by the other party for all costs, including the reasonable attorney fees and professional fees, incurred in connection with such proceeding.

15. This Agreement may be executed in counterparts, each of which will be deemed an original, but both of which together will constitute one and the same instrument.

IN WITNESS WHEREOF, the parties have executed this agreement by their duly authorized representatives as of the date written above.

**StemExpress, LLC**

By: ███████████████

Name: ██████████

Title: _____ **CEO** _____

**Planned Parenthood Santa Barbara, Ventura & San Luis Obispo Inc.**

By: ████████████████

Name: ████████████████

Title: _Presedent / CEO_

███████████████████████

Exhibit 5.13


## Services Agreement

### CLN 2015050427.1

This Services Agreement (the" "Agreement") is made as of the Effective Date, as defined herein, by and between StemExpress, a limited liability company, and Camelback Family Planning (the "Clinic").

WHEREAS, StemExpress is a company devoted to providing services related to the procurement of human organs, tissues, and blood for medical research in order to facilitate medical research utilizing those tissues; and

WHEREAS, Clinic provides medical services, education programs, and advocacy initiatives in order to improve people's lives;

NOW, THEREFORE, in consideration of the premises and mutual covenants contained in this Agreement, and in order to further their mutual goals, the parties agree as follows:

1. The term "fetal organ" has the same meaning as the term defined in the National Organ Transplant Act (42 U.S.C.A. 274e(c)(1)) and means the human kidney, liver, heart, lung, pancreas, bone marrow, cornea, eye, bone, and skin or any subpart thereof and any other human organ or any subpart thereof, as from a fetus.

2. The term "Product of Conception" ("POC") means any fetal organ or other fetal or placental material taken from the human uterus during an abortion.

3. The term "maternal bloods" means blood samples taken from a pregnant woman.

4. Clinic will provide, and StemExpress will pay the reasonable costs for, services associated with the following: the removal of fetal organs from POCs; the processing, preservation, quality control, and transportation of the fetal organs; disposal services for non-used portions of cadaveric materials; obtaining maternal blood; seeking consent for donation of fetal organs and maternal blood from appropriate donors; and, maintaining records of such consents so that verification of consent can be supported.

5. The reasonable costs associated with the services specified in this Agreement shall be:
   a. two hundred dollars ($200.00) for the collection of 5cc or more of fetal liver tissue and three (3) tubes maternal peripheral blood (collection tubes supplied by StemExpress)

(HSH 19054.)

b. two hundred fifty dollars ($250.00) for the collection of fetal liver (5cc) *and* thymus from the same POC *and* three (3) tubes maternal peripheral blood (collection tubes supplied by StemExpress);

c. seventy five dollars ($75) for other fetal tissues as requested by StemExpress with three (3) tubes maternal peripheral blood (collection tubes supplied by StemExpress), the availability and supply of such other tissues to be agreed upon in advance by StemExpress and Clinic.

Clinic will invoice StemExpress monthly for the number of tissue and number of maternal bloods procured for StemExpress. StemExpress will pay Clinic within thirty (30) days of receipt of the invoice.

6. StemExpress will pay Clinic the reasonable costs in Section 5 for the first four (4) POCs collected by Clinic; thereafter, StemExpress will pay Clinic only for those POCs that are 5cc or greater volume (fetal liver) and intact (fetal thymus).

7. StemExpress will provide Clinic with POC collection kits, at no cost to Clinic, that will include:
   a. Conical tubes and media for tissue storage
   b. Blood collection kit and tubes
   c. Researcher Procurement Form
   d. IRB patient consent form
   e. Packaging materials
   f. Detailed written instructions
   g. StemExpress pre-printed label with courier account information

8. Any information obtained from Clinic patients' charts shall be privileged and confidential, and StemExpress will treat the information as such in order to preserve the confidentiality of the patients. StemExpress will not receive any information concerning identity of donors except as necessary to obtain patients' consent for use of POCs and maternal bloods. This handling of donor information will always be undertaken in accordance with HIPAA guidelines.

9. The term of this Agreement shall be for three (3) years, beginning from the Effective Date, and terminating three years thereafter. This agreement may be terminated early if either company fails to perform his/her duties or materially breaches any obligation in the agreement, and the failure or breach is not corrected within ninety (90) days of receiving written notice from the opposing party. This Agreement may be terminated by either party upon thirty (30) days' advance written notice to the non-terminating party. In the absence of such termination, this Agreement shall continue for further successive terms of one year thereafter.



10. Written notices pursuant to this Agreement shall be sent to the following:

To Clinic: 
Camelback Family Planning

To StemExpress: Office of the CEO
StemExpress

11. The parties do not know how many patients will consent to donate POCs for research, and thus do not know how many POCs will be obtained pursuant to this Agreement. Clinic is not obligated to provide any minimum number of POCs and StemExpress is not obligated to take any minimum number of POCs nor is StemExpress obligated to take all the POCs made available by Clinic.

12. The parties mutually agree to defend, protect, and hold harmless each other's officers, directors, agents, employees, and consultants from and against any and all expenses, liabilities, demands or claims for loss or damage to property, or for personal injury or death suffered as a result of any actions by the parties in the performance of the Agreement and attributable to the fault or negligence of the parties or their respective officers, directors, agents, employees, or consultants.

13. No modification to this Agreement, nor any waiver of any rights, shall be effective unless agreed to in writing by the party charged with such waiver or modification. Waiver of any breach or default shall not constitute a waiver of any other right hereunder, or any subsequent breach or default.

14. This Agreement constitutes the entire agreement between the parties.

15. This Agreement shall be governed by and interpreted under the laws of the State of California, and venue for any dispute arising hereunder shall be in the County of Sacramento.

16. The prevailing party in any action to enforce the terms of the Agreement shall be entitled to reimbursement by the other party for all costs, including the reasonable attorney fees and professional fees, incurred in connection with such proceeding.

17. This Agreement may be executed in counterparts, each of which will be deemed an original, but both of which together will constitute one and the same instrument.



IN WITNESS WHEREOF, the parties have executed this agreement by their duly authorized representatives as of the date written above.

**StemExpress, LLC**                    **Camelback Family Planning**

By: _____        B ███████████████████████

Name: ███████████                   Name: ███████████████████
Title: _CEO_____                   Title: _Medical Director__

stem
express

CLN20150504.1

IN WITNESS WHEREOF, the parties have executed this agreement by their duly authorized representatives as of the date written above.

StemExpress, LLC                                    Camelback Family Planning

By ........................................          By
Name: ████████████████████                          Name:
Title: _CEO_____                             Title: _Medical Director_

CFP000006

# Services Agreement

This agreement is made as of November 15, 2013 between StemExpress, a limited liability company, and Cedar River Clinics (CEDAR RIVER CLINCS), a professional corporation.

WHEREAS, StemExpress is a company devoted to providing services related to the procurement of human organs, tissues, and blood for medical research in order to facilitate medical research utilizing those tissues; and

WHEREAS, CEDAR RIVER CLINCS provides medical services, education programs, and advocacy initiatives in order to improve people's lives;

NOW, THEREFORE, in consideration of the premises and mutual covenants contained in this Agreement, and in order to further their mutual goals, the parties agree as follows:

1. The term "fetal organ" has the same meaning as the term defined in the National Organ Transplant Act (42 U.S.C.A. 274e(c)(1)) and means the human kidney, liver, heart, lung, pancreas, bone marrow, cornea, eye, bone, and skin or any subpart thereof and any other human organ or any subpart thereof, as from a fetus.

2. The term "product of conception" ("POC") means any fetal organ or other fetal or placental material taken from the human uterus during an abortion.

3. The term "maternal bloods" means a blood sample taken from a pregnant woman.

4. The term "human blood" means blood sample taken from A healthy non-pregnant human.

5. CEDAR RIVER CLINCS will provide, and StemExpress will pay the reasonable costs for, services, and facilities at mutually agreed upon health centers (hereinafter collectively referred to as "services") associated with the following: the removal of fetal organs from POCs; the processing, preservation, quality control, and transportation of the fetal organs; appropriate space in which StemExpress representatives and employees may work; disposal services for non-used portions of cadaveric materials; obtaining human and maternal blood; seeking consent for donation of fetal organs and maternal blood from appropriate donors; patient gift cards distributed for blood samples; and; maintaining records of such consents so that verification of consent can be supported.

6. StemExpress will pay CEDAR RIVER CLINICS for medical supplies purchased by CEDAR RIVER CLINICS associated with the services of this agreement.

7. StemExpress will pay CEDAR RIVER CLINICS the reasonable cost associated with the services specified in this Agreement in accordance with the agreed upon procurement fee schedule (see exhibit A). If StemExpress staff is onsite to physically provide services, then there would be an agreed upon cost adjustment for those services provided by StemExpress. CEDAR RIVER CLINICS will invoice StemExpress monthly for the number of fetal organs, POC, and blood samples collected. StemExpress will pay CEDAR RIVER CLINICS within thirty (30) days of the invoice date.

8. Confidential proprietary and/or Protected Health Information (PHI) shared between StemExpress and CEDAR RIVER CLINICS shall be privileged and protected in accordance with the HIPAA BUSINESS ASSOCIATE AGREEMENT (see exhibit B). In addition and in accordance with the ethical

CRC001

principles and guidelines for research involving human subjects, patient identity of donors shall not be shared with StemExpress except as necessary to obtain patients' inform consent for the use POCs and blood.

9. Written notices pursuant to this Agreement shall be sent to the following:



Director of Operations

Cedar River Clinics

CEO

StemExpress

10. The parties do not know how many patients will consent to donate POCs or blood for research, and thus do not know how many POCs or blood samples will be obtained pursuant to this Agreement. CEDAR RIVER CLINCS is not obligated to provide any minimum number of POCs or blood samples. StemExpress is not obligated to take any minimum number of POCs or blood samples, nor is StemExpress obligated to take all the POCs or blood samples made available by CEDAR RIVER CLINCS.

11. The parties mutually agree to defend, protect, and hold harmless each other's officers, directors, agents, employees, and consultants from and against any and all expenses, liabilities, demands or claims for loss or damage to property, or for personal injury or death suffered as a result of any actions by the parties in the performance of the Agreement and attributable to the fault or negligence of the parties or their respective officers, directors, agents, employees, or consultants.

12. No modification to this Agreement, nor any waiver of any rights, shall be effective unless agreed to in writing by the party charged with such waiver or modification. Waiver of any breach or default shall not constitute a waiver of any other right hereunder, or any subsequent breach or default.

13. This Agreement constitutes the entire agreement between the parties.

14. This Agreement shall be governed by and interpreted under the laws of the State of California, and venue for any dispute arising hereunder shall be in the County of Sacramento.

15. This Agreement shall be governed by and interpreted under the laws of the State of California, and venue for any dispute arising hereunder shall be in the County of Sacramento.

16. The prevailing party in any action to enforce the terms of the Agreement shall be entitled to reimbursement by the other party for all costs, including the reasonable attorney fees and professional fees, incurred in connection with such proceeding.

17. This Agreement may be executed in counterparts, each of which will be deemed an original, but both of which together will constitute one and the same instrument.

CRC002

IN WITNESS WHEREOF, the parties have executed this agreement by their duly authorized representatives as of the date written above.

StemExpress, LLC                          Cedar River Clinics

By: _____            By: _____

Name: _____            Name: _____

Title: _____CEO_____                Title: ___Director Of Operations___

## PROCURMENT FEE SCHEDULE

The reasonable cost associated with the services specified in the Service Agreement between StemExpress and Cedar River Clinics, if collected solely by Cedar River Clinics staff, shall be as follows:

| | |
|---|---|
| Maternal and/or human blood donations (10-60ml) | $50 |
| Fetal Tissue per organ/component donations (i.e. heart, lung, skin, placental) | $75 (i.e. 1- heart + 1 lung + 1 skin +placental tissue = 4 organs x $75= $300 |
| Fetal Tissue with IDS Blood Sample | $125 |
| Patient Gift Cards distributed to blood donors ($25) | Face Value |
| Maternal Blood and Tissue Kits | $125 |
| Fetal Aneuploidy Blood Sample by Classification as Defined* FIA FIB FIC FID | $100 $200 $300 $400 |

StemExpress, LLC

By: _____

Name: _____

Title: _____CEO_____

Date: _____


Cedar River Clinics

By: _____

Name: _____

Title: ___Director Of Operations_____

Date: _____


\* See attached definition page

Exhibit A

## PROCURMENT FEE SCHEDULE

The reasonable cost associated with the services specified in the Service Agreement between StemExpress and Cedar River Clinics, if collected solely by Cedar River Clinics staff, shall be as follows:

| Maternal and/or human blood donations (10-60ml) | $50 |
|---|---|
| Fetal Tissue per organ/component donations (i.e. heart, lung, skin, placental) | $75 (i.e. 1 heart + 1 lung + 1 skin +placental tissue = 4 organs x $75 = $300 |
| Patient Gift Cards distributed to blood donors ($25) | Face Value |

StemExpress, LLC

By: ███████████

Name: ██████

Title: _____CEO_____

Date: __November 11th 2013__

Cedar River Clinics

By: ___████████

Name: ___████████

Title: ___Director Of Operations___

Date: _____



## Services Agreement

This agreement is made as of February 14, 2014 between StemExpress, a limited liability company, and Presidential Women's Center (PRESIDENTIAL WOMEN'S CENTER), a professional corporation.

WHEREAS, StemExpress is a company devoted to providing services related to the procurement of human organs, tissues, and blood for medical research in order to facilitate medical research utilizing those tissues; and

WHEREAS, PRESIDENTIAL WOMEN'S CENTER provides medical services, education programs, and advocacy initiatives in order to improve people's lives;

NOW, THEREFORE, in consideration of the premises and mutual covenants contained in this Agreement, and in order to further their mutual goals, the parties agree as follows:

1. The term "fetal organ" has the same meaning as the term defined in the National Organ Transplant Act (42 U.S.C.A. 274e(c)(1)) and means the human kidney, liver, heart, lung, pancreas, bone marrow, cornea, eye, bone, and skin or any subpart thereof and any other human organ or any subpart thereof, as from a fetus.

2. The term "product of conception" ("POC") means any fetal organ or other fetal or placental material taken from the human uterus during an abortion.

3. The term "maternal bloods" means blood samples taken from a pregnant woman.

4. PRESIDENTIAL WOMEN'S CENTER will provide, and StemExpress will pay the reasonable costs for, services and facilities at mutually agreed upon health centers (hereinafter collectively referred to as "services") associated with the following: the removal of fetal organs from POCs; the processing, preservation, quality control, and transportation of the fetal organs; appropriate space in which StemExpress representatives and employees may work; disposal services for non-used portions of cadaveric materials; obtaining maternal blood; seeking consent for donation of fetal organs and maternal blood from appropriate donors, and; maintaining records of such consents so that verification of consent can be supported.

5. The reasonable costs associated with the services specified in this Agreement shall be fifty dollars ($50.00) per 60cc's of maternal blood, and seventy five dollars ($75.00) for the collection of fetal tissue, if collected solely by PRESIDENTIAL WOMEN'S CENTER staff. If StemExpress staff is onsite to physically collect the sample, then there would be a cost adjustment for the collection of the sample. PRESIDENTIAL WOMEN'S CENTER will invoice StemExpress monthly for the number of tissue and number of maternal bloods procured for StemExpress.



StemExpress will pay PRESIDENTIAL WOMEN'S CENTER within thirty days of receipt of the invoice.

6. Any information obtained from PRESIDENTIAL WOMEN'S CENTER patients' charts shall be privileged, and StemExpress will treat the information in order to preserve the confidentiality of the patients. StemExpress will not receive any information concerning identity of donors except as necessary to obtain patients' consent for use of POCs and maternal bloods. This will always be done in accordance with HIPAA guidelines.

7. The term of this Agreement shall be for ~~three years~~, beginning from the date hereof, and terminating three years thereafter. This agreement may be terminated early if either company fails to perform his/her duties or materially breaches any obligation in the agreement, and the failure or breach is not corrected within 90 days of receiving written notice from the opposing party. In the absence of such termination, this Agreement shall continue for further successive terms of one year thereafter.

*[handwritten: On year]*

8. Written notices pursuant to this Agreement shall be sent to the following:



Attn: ▓▓▓, CEO
PRESIDENTIAL WOMEN'S CENTER
▓▓▓▓▓▓▓▓▓▓▓▓

Attn: ▓▓▓, CEO
StemExpress
▓▓▓▓▓▓▓▓▓▓▓▓

9. The parties do not know how many patients will consent to donate POCs or maternal bloods for research, and thus do not know how many POCs or maternal bloods will be obtained pursuant to this Agreement. PRESIDENTIAL WOMEN'S CENTER is not obligated to provide any minimum number of POCs or maternal bloods. StemExpress is not obligated to take any minimum number of POCs or maternal bloods, nor is StemExpress obligated to take all the POCs or maternal bloods made available by PRESIDENTIAL WOMEN'S CENTER.

10. The parties mutually agree to defend, protect, and hold harmless each other's officers, directors, agents, employees, and consultants from and against any and all expenses, liabilities, demands or claims for loss or damage to property, or for



personal injury or death suffered as a result of any actions by the parties in the performance of the Agreement and attributable to the fault or negligence of the parties or their respective officers, directors, agents, employees, or consultants.

11. No modification to this Agreement, nor any waiver of any rights, shall be effective unless agreed to in writing by the party charged with such waiver or modification. Waiver of any breach or default shall not constitute a waiver of any other right hereunder, or any subsequent breach or default.

12. This Agreement constitutes the entire and exclusive agreement between the parties.

13. This Agreement shall be governed by and interpreted under the laws of the State of California, and venue for any dispute arising hereunder shall be in the County of Sacramento.

14. The prevailing party in any action to enforce the terms of the Agreement shall be entitled to reimbursement by the other party for all costs, including the reasonable attorney fees and professional fees, incurred in connection with such proceeding.

15. This Agreement may be executed in counterparts, each of which will be deemed an original, but both of which together will constitute one and the same instrument.

IN WITNESS WHEREOF, the parties have executed this agreement by their duly authorized representatives as of the date written above.

StemExpress, LLC                          PRESIDENTIAL WOMEN'S CENTER

By: _____                      By: _____

Name: _____                          Name: _____
Title: __CEO_____                      Title: __CEO_____



Exhibit 5.14

# StemExpress Briefing Notes

**Briefer and Company Background**

1. ███████ is the Founder and CEO of StemExpress. She began working at Santa Barbara Cottage Hospital at age 19 in departments of Emergency Medicine, Surgery, and Psychology. She also worked with human dissections and organ donations.
2. When she was pre-med she noticed 3 things; 1) that they could not collect disease tissue; 2) she became acquainted with physicians and scientists who needed tissue for research; and 3) wanted to stop diseases instead of dealing with them at the end.
3. StemExpress was founded in 2010. ███████ s the sole owner and there are no investors.
   a. StemExpress coordinated with clinics and hospitals to collect tissue that would otherwise be disposed as medical waste.
   b. They have an internal quality assurance department, physician oversight, and an independent review board.
      i. Last year, FDA visited StemExpress and found no issues.
   c. Staff of 35 people. The majority of people are doing lab work – more than half of the staff. On the procurement side, they have very few staff. They laid off someone one of the procurement staff when they terminated their relationship with PPFA.
   d. There is board of directors – they reach out to the scientific community for guidance but no board.
   e. Unaltered fetal tissue accounts for 1%
   f. StemExpress is asked to collect a host of different things (i.e. bone marrow, white blood cell/stem cells from healthy patients) and tissue (i.e. from cancerous tumors).
      i. The majority of procurements come to the lab, processed, cultured, manufacture for what client is looking for to create the final product.
      ii. 1% - fetal activity (fetal tissue that you do not alter). Fetal tissue can be used for a number of things (e.g. vaccines).
         1. This does not include placental research.
      iii. Fetal tissue that is unaltered and isolated accounts for 10% of material that comes into the company.
      iv. 15-17% of business is coming from tissue from planned parenthood

**Relationship with Providers and Buyers/Researchers**

1. They conduct business outside of California. They are acquiring and providing outside of California. They are providing (but not acquiring) altered fetal tissue outside of the United States.

2. StemExpress does not have a formal sales team. The majority of the business is from journalism mentions and then they are contacted by people who see/read that. Their internal reps deal with calls/and see how feasible it is.
3. No inventory – they only collect/manufacture for what they have orders for. They don't function as a bank, the only time they keep samples is when they are working to complete an order – so if they are working to fill an order that might take 90 days to collect, they keep the samples as they go until the full order can be completed.
4. Facilities function from purchase orders and StemExpress terms and conditions (i.e. that it's for research or in vivo purposes only).
   a. It could take months to complete an order because sometimes the requests are for rare samples.
   b. StemExpress has standing agreements with certain researchers.
   c. A high percentage of orders are able to be filled.
5. Despite terminating the relationship with PPFA, StemExpress still has agreements with other clinics. ▉ couldn't comment on how similar the other agreements were to PPFA's, but believes that they broadly contain the same language.
   a. When we asked how discontinuing their agreement with PPFA would affect their overall fetal tissue procurement rates ▉ didn't know the annual breakdowns and therefore how not having PPFA would affect their numbers.
   b. Independent clinics/other agreements are located in the United States.
6. StemExpress does not use another third party to help source the fetal tissue, despite the "high demand."
   a. StemExpress claims that the video done by CMP was regarding BioMax and CMP folks were offering to help connect StemExpress with a third party to source tissues out to more researchers.
7. ▉ volunteered that they terminated their contract with PPFA because of pressure from the public and community, harassment, death threats, etc.
   a. ▉ has received death threats, one of which is picked up and is being processed by the FBI and it turns out it was a murder for hire situation.
8. When we asked for clarification on other contracts that StemExpress has with other companies, ▉ indicated that there are two other companies – Luanza (sp?) – the larger of the two, and Stem Cells Inc.

## Fetal Tissue Acquisition

1. StemExpress staff are the only ones procuring tissue at PPFA facilities. On occasion PPFA staff would help do things like pull blood – this happens in less than half of the instances.
   a. 96% of the work done at PPFA facilities was blood based, and 4% is fetal tissue based.

    b. There is a room at PPFA where our staff would meet with the patient and take blood.
2. There are 1-3 companies sourcing cord blood.
3. When asked how it was decided how it is determined if StemExpress staff or PPFA staff work with a patient, ⬛responded that it depends on the facility and its size. If small, PPFA (or other clinic's staff) could work with the patient on consenting. How busy the clinic is and what their schedule is also plays a factor into how the activities transpire.
    a. StemExpress staff travels to different locations and clinics depending on the clinics schedule.
        i. For PPFA clinics, they didn't have additional staff, so if StemExpress couldn't make it, no tissue procurement occurred.
        ii. For independent clinics, they would obtain it and ship it to us.
4. Terms and conditions are not for purposes of transplanting. That was always the platform that StemExpress focused on; build a program that would monitor/oversee collections.
5. ⬛stated that StemExpress has never received or procured an intact fetus. She claims that the tissue is so severely damaged that they can't obtain any tissue at all most of the time.
6. ⬛stated that 12% of abortion clinics decline per year. (I can't remember the context – maybe referencing that 12% decline to participate in fetal tissue donation?)
    a. She referenced the NEJM article, and said that as long as there is still a need for research she feels an obligation to continue their work.

## Fetal Tissue Compensation

1. StemExpress has the understanding that it cannot obtain valuable consideration.
2. PPFA worked with clinics/affiliates on tissue donation before StemExpress was founded. PPFA set costs and prices, there were no negotiations.
    a. Our "reimbursements" are considerably less than what is being reported in the media; $55 and $10 and they are per P.O.C., not per tissue.
        i. When asked if you could get multiple fetal tissue samples from one P.O.C. ⬛said that it was unlikely, but possible.
    b. PPFA should be the one to comment on how they set the $. It is a nationally drive number, set by them.
3. Cost v. Reimbursement
    a. Reimbursement for taking space in the clinic, lab staff, sterilizing equipment, staff participation (e.g. consent). The costs are more for labor than they are for space, because PPFA staff is working in conjunction with StemExpress staff.
    b. The responsibility of handling the medical waste does not fall on StemExpress.
    c. StemExpress believes that it is losing money.

     d. Reimbursement is similar regardless of if it's PPFA or non-PPFA. StemExpress has a couple of agreements, but Dyer couldn't provide specific numbers on how many. The reimbursements are slightly higher with non-PPFA because StemExpress staff is not at those clinics and their staff is doing more of the work.

4. Valuable Consideration Statute

     a. When asked how they decide what to charge, ███ said that they do so at a loss. StemExpress looks at the costs associated with collection and attempt to cover cost and expenditure. The overhead cost is higher than what StemExpress provides; therefore they do so at a net loss.

     b. When asked how they know what it costs and therefore what to charge, ███ said that there are so many isolated incidents that there isn't one set cost per collection. There are 300-400 moving parts within each procurement process to associate a specific cost.

     c. When asked about obtaining unaltered fetal tissue, what it costs, and what the process is, ███ said that StemExpress doesn't have a spreadsheet or matrix for all of its costs, but they intentionally are below.

          i. StemExpress knew before the calculations that the lawyers did that they were losing money. In 2014 there were less than 200 tissue samples for the entire year (implying that it wasn't hard to keep track of).

          ii. ███ made a comment that the FedEx rates that were being thrown around were actually low, it's more in the $100s because they need to overnight the shipments.

     d. When asked about obtaining altered fetal tissue, what it costs, and what the process is, ███ said that there is an extremely high failure rate. With respect to the cost, she said that StemExpress is not the only company providing cells for research and mentioned Larza (or Luanza?), which is a multi-million dollar company and that prices were set before StemExpress was founded.

          i. The process of preparing altered tissue is lab staff checks samples, wash them, test cells for functionality, determine whether you can move forward (about half cannot move forward in isolation because cells won't survive).

               1. Cultured cells generally cost $1,000 per million cells

     e. StemExpress claims that their focus was never on cost, as a growing business they are lucky to break even and grow as a company.

5. Dashboard

     a. This is the document where any orders from clients are listed and staff are trying to procure those. StemExpress said that it is rare to be able to collect anything from a sample because the tissue is often destroyed in the termination process. ███ gave the estimate that for every 30 terminations, maybe 1 sample is collected.

    b. We asked if there is communication between PPFA and StemExpress after the procedure is done, ██ said that the physician will come in to verify that everything is complete, at that moment StemExpress is involved with the tissue.

    c. ██ is not aware of fetal tissue banks.

6. Consent

    a. StemExpress employee can obtain consent. Once it is already determined that the patient is having an abortion, they are moved to a different waiting room, at that point staff meets with the patient. If she agrees, they go over the paperwork and she signs. There are times that PPFA does the consent.

        i. When asked if tissue is collected regardless of consent if the tissue came out intact, ██ said that tissue is only collected if there was consent, StemExpress does not obtain at the waste stage.

        ii. When asked to comment on the timing of when consent is retrieved, ██ said that it depends on if the facility needs to free up the room or StemExpress staff is tied up.

        iii. When asked if PPFA staff goes through training in order to perform consent, ██ said that because they are trained already, they are already trained on that topic. She later mentioned training participation and providing training documentation.

    b. At PPFA there is a PPFA consent form, which is different than the consent form at non-PPFA facilities.

        i. Non-PPFA facilities use the StemExpress consent form. The process at non-PPFA facilities is that the clinic staff is doing the consent and obtaining it before the procedure. At this point the staff and/or StemExpress have no idea what will be collected, if they will be able to collect a sample at all.

    c. Approximately 80-85% of women consent to participate in donation.

    d. At the very end of the briefing the lawyers mentioned that StemExpress had $4.1 million in gross revenue last year (not net revenue).

**Miscellaneous**

1. ██ mentioned that StemExpress was registered with FDA (forgot code) as a biotechnology company. FDA came out to inspect their facility and found no issues. Because StemExpress was registered FDA reviewed the processes and facility and later determined that they don't fall under FDA regulations because they don't manufacture and put back into humans.

Exhibit 5.15

# StemExpress Estimated Costs and Expenses Associated with Fetal Tissue Procurement (2011-2015)

HIGHLY CONFIDENTIAL INFORMATION
NOT FOR PUBLIC RELEASE

stemexpress®

| Item | Description | Time | Estimated Cost/Expenses 2015 | Estimated Cost/Expenses 2014 | Estimated Cost/Expenses 2013 | Estimated Cost/Expenses 2012 | Estimated Cost/Expenses 2011 |
|---|---|---|---|---|---|---|---|
| Procurement Manager Labor | Receive and evaluate purchase order, enter into computer system and task board, assign to clinics | 1 hour x $35 | $ 35.00 | $ 35.00 | $ 25.00 | $ 10.00 | $ 10.00 |
| Packaging Supplies Labor | Packaging all supplies needed for procurement | 1 hour x $10 | $ 10.00 | $ 10.00 | $ 10.00 | $ 10.00 | $ 10.00 |
| Shipping | Supplies to clinic | N/A | $ 45.00 | $ 45.00 | $ 15.00 | $ - | $ - |
| Mileage | Mileage paid to technician (.50/mile) | N/A | $ 142.00 | $ 142.00 | $ 75.00 | $ 71.00 | $ 71.00 |
| Supply Costs | Box, conical tube, media, petri dish, labels, biohazard bag, gel packs, etc. | N/A | $ 30.00 | $ 30.00 | $ 30.00 | $ 30.00 | $ 30.00 |
| Technician Base Labor | Patient consent, procurement, paperwork, packaging | 8 hours x $10 | $ 80.00 | $ 80.00 | $ 80.00 | $ 80.00 | $ 80.00 |
| Technician Supplemental Compensation | Technician Supplemental Compensation | N/A | $ 50.00 | $ 50.00 | $ 30.00 | $ 25.00 | $ - |
| Clinic Reimbursement | Technician space, storage of supplies, blood draw chair usage, consent space | N/A | $ 55.00 | $ 55.00 | $ 55.00 | $ 55.00 | $ 55.00 |
| Infectious Disease Draw | Supplies: tubes, labels, needle, biohazard bag, etc. | N/A | $ 15.00 | $ 15.00 | $ 15.00 | $ 15.00 | $ 15.00 |
| Infectious Disease Screening | Screening for HIV, HepB, HepC, LCMV | N/A | $ 155.00 | $ 155.00 | $ 70.00 | $ 66.00 | $ 66.00 |
| Shipping | Average Shipment cost to the lab (blood and/or tissue) | N/A | $ 45.00 | $ 45.00 | $ 20.00 | $ 10.00 | |
| Procurement Manager labor | Review paperwork, communications with courier, communications with researcher | 1 hour x $35 | $ 35.00 | $ 35.00 | $ 35.00 | $ 35.00 | $ 35.00 |
| Product Receipt | Receipt of product at front desk, check into computer system, check into log | 1 hour x $15 | $ 15.00 | $ 15.00 | $ 15.00 | $ 15.00 | $ 15.00 |
| Inventory & Supply Management | Prorated stores management | 1 hour x $20 | $ 20.00 | $ 20.00 | $ 20.00 | $ 20.00 | $ 20.00 |
| TOTAL | | | $ 732.00 | $ 732.00 | $ 495.00 | $ 442.00 | $ 407.00 |

STEM.HOUSE.SELECT_0915

Exhibit 5.16



| Subpoena Specification No. | Description |
|---|---|
| 6 | All communications and documents regarding any direction to StemExpress current or former personnel with respect to the procurement or disposal of fetal tissue. |
| 9 | All communications and documents, sorted by customer, referring or relating to requests or orders made to StemExpress regarding fetal tissue and the amount paid by each customer to StemExpress. |
| 11 | All StemExpress banking and accounting documents, sorted by any source of fetal tissue and any customer of StemExpress, that reflect accounts payable and/or funds received that in any way refer or relate to the procurement, sale, donation, or distribution of shipment of fetal tissue. |

Consistent with earlier express agreements with the Select Panel's Majority staff, today's production by StemExpress supplements earlier productions of "roll-up" accounting reports for the provision of fetal tissue, organized by customer, for the years 2011 through 2015. These accounting reports were generated by StemExpress personnel directly from the company's accounting and software systems. Other than formatting adjustments, the data included in these accounting reports are not altered in any way. Based on our agreement with the Select Panel Majority staff, these reports were generated directly from StemExpress's accounting system in lieu of producing additional email correspondence requesting fetal tissue, purchase orders, invoices, and other documentation related to fetal tissue transactions in response to Feb. 12 Subpoena Spec. Nos. 6, 9, and 11. A substantial production of all of these various supporting materials were previously produced for the January through April 2015 timeframe and are representative of how all fetal tissue orders are received, procured, and invoiced to customers. While these roll-up reports from StemExpress's accounting system provide additional granularity regarding fetal tissue orders and associated pricing and revenue, we are nonetheless gathering all of StemExpress's fetal tissue invoices to customers (correlated to the invoices listed in these roll-up reports) and expect to produce these materials by May 12, 2016.

In response to the continued confusion present in the Select Panel's April 20 hearing entitled "The Pricing of Fetal Tissue," StemExpress is also voluntarily producing today additional information regarding the costs and expenses associated with the collection, processing, preservation, quality control, transportation, and storage of fetal tissue. The roll-up accounting reports produced today include a detailed analysis of these estimated costs and expenses compared against charges to StemExpress's customers. Based on a review and internal audit of

1



| Subpoena Specification No. | Description |
| --- | --- |
| 6 | All communications and documents regarding any direction to StemExpress current or former personnel with respect to the procurement or disposal of fetal tissue. |
| | |
| 9 | All communications and documents, sorted by customer, referring or relating to requests or orders made to StemExpress regarding fetal tissue and the amount paid by each customer to StemExpress. |
| | |
| 11 | All StemExpress banking and accounting documents, sorted by any source of fetal tissue and any customer of StemExpress, that reflect accounts payable and/or funds received that in any way refer or relate to the procurement, sale, donation, or distribution of shipment of fetal tissue. |

Consistent with earlier express agreements with the Select Panel's Majority staff, today's production by StemExpress supplements earlier productions of "roll-up" accounting reports for the provision of fetal tissue, organized by customer, for the years 2011 through 2015. These accounting reports were generated by StemExpress personnel directly from the company's accounting and software systems. Other than formatting adjustments, the data included in these accounting reports are not altered in any way. Based on our agreement with the Select Panel Majority staff, these reports were generated directly from StemExpress's accounting system in lieu of producing additional email correspondence requesting fetal tissue, purchase orders, invoices, and other documentation related to fetal tissue transactions in response to Feb. 12 Subpoena Spec. Nos. 6, 9, and 11. A substantial production of all of these various supporting materials were previously produced for the January through April 2015 timeframe and are representative of how all fetal tissue orders are received, procured, and invoiced to customers. While these roll-up reports from StemExpress's accounting system provide additional granularity regarding fetal tissue orders and associated pricing and revenue, we are nonetheless gathering all of StemExpress's fetal tissue invoices to customers (correlated to the invoices listed in these roll-up reports) and expect to produce these materials by May 12, 2016.

In response to the continued confusion present in the Select Panel's April 20 hearing entitled "The Pricing of Fetal Tissue," StemExpress is also voluntarily producing today additional information regarding the costs and expenses associated with the collection, processing, preservation, quality control, transportation, and storage of fetal tissue. The roll-up accounting reports produced today include a detailed analysis of these estimated costs and expenses compared against charges to StemExpress's customers. Based on a review and internal audit of

1



selected accounting records, StemExpress determined estimated costs across the following 15 line items associated with the processing, preservation, quality control, transportation, and storage of fetal tissue: (1) procurement manager labor costs; (2) packaging supplies labor costs; (3) shipping costs for supplies; (4) mileage for procurement technicians; (6) procurement supply costs; (7) procurement technician base labor costs; (8) procurement technician supplemental compensation; (9) reimbursement to clinics for costs and expenses; (10) infectious disease screening supply costs; (11) infectious disease screening laboratory charge; (12) shipping costs to lab for infectious disease screening; (13) procurement manager labor costs; (14) labor costs for receipt and intake of products at laboratory; and (15) labor costs for inventory and supply management. These estimates are conservative as we did not include any allocated direct or indirect overhead costs incurred by StemExpress to support the procurement of fetal tissue. These estimates are also based on the procurement model where StemExpress personnel were directly involved in the procurement process at individual clinics.

1. **Procurement Manager Labor Costs:** This line item includes time spent by StemExpress's Procurement Manager reviewing and responding to emails with individual research customers; data entry time to put orders into the system; adding purchase orders into the system; assign customer orders to certain clinics based on the specific request of order (*e.g.*, tissue requested for a specific gestational age may never be attainable at certain clinics due to cutoffs for termination procedures); determining which specific supplies will be necessary for the particular procurement and requested that those supplies be ordered or prepared for shipment to the assigned clinic; and additional email exchange with customer regarding status of order.

2. **Packaging Supplies Labor Costs:** This line item includes time spent by StemExpress support staff at the headquarters to confirm whether unique supplies required for each clinic (*e.g.*, blood tubes, media, packaging, and other customer-specific requirements) are available, and packaged and shipped to clinics on a weekly basis; requesting the ordering additional supplies from accounts payable; and monitoring expiration dates of supplies to ensure that supplies are refreshed periodically to avoid issues with expiration.

3. **Shipping Costs for Supplies:** This line item consists of the expense of shipping supplies from StemExpress' headquarters to individual clinics on at least a weekly basis, based on specific customer orders and volume of procurement activity.

4. **Mileage for Procurement Technicians:** This line item consists of average reimbursable mileage for Procurement Technicians that traveled to clinics in California to handle StemExpress' procurement function. In 2011-2012, StemExpress employed personnel located closer to clinics in/around Fresno, California and, therefore, had lower mileage

STEM.HOUSE.SELECT_ 0909



reimbursement for clinics in that region. From 2012-2015, StemExpress Procurement Technicians were predominantly based in the Sacramento metropolitan region and, accordingly, had much higher mileage reimbursement to travel to other parts of the state. It was not uncommon for StemExpress Procurement Technicians to travel 240 miles round-trip in a single day for procurement at certain clinics.

5. **Procurement Supply Costs:** This line item allocates costs for various supplies required for procurement of fetal tissue and associated blood draws. These supplies include: blood tubes; specialized shipping boxes with Styrofoam inserts to handle ice; box liners; gel ice packs; syringes and hubs; alcohol swabs; Band-Aids; Coflex wraps; shipping labels; specimen number labels; and other customer-specific supplies that are specified in certain orders.

6. **Procurement Technician Base Labor Costs:** This line item consists of the hourly rate that was paid to StemExpress Procurement Technicians for consenting patients, doing paperwork, and sometimes simply waiting for several hours a day because there was no guarantee that even if a patient consented to tissue donation whether there would be any tissue recovered for evaluation to determine viability for researchers. On average, StemExpress would procure no more than 3-4 viable tissues in any given day at a Planned Parenthood clinic. It was not uncommon for <u>no</u> tissues to be procured in a single day, in which case the Procurement Technician was only paid the base compensation.

7. **Procurement Technician Supplemental Compensation:** Because some clinics had significant amount of down time, the supplemental compensation structure allowed StemExpress to pay a higher rate to Procurement Technicians for time spent working harder. A lot of time was spent by Procurement Technicians on paperwork and packaging for each sample so this supplemental compensation was a way to compensate for this additional time based on a tangible item, which was measured by the number of samples procured.

8. **Reimbursement to Clinics for Costs and Expenses:** This line item reflects the direct reimbursement paid to Planned Parenthood or other clinics for their labor cost associated with supporting fetal tissue donation, use of space for consenting and evaluating tissue for procurement, and storage space to house StemExpress's procurement-related supplies. These reimbursement amounts varied from clinic to clinic based on different variables, including higher/lower cost of living in urban versus rural settings that impacted the cost of providing StemExpress with space to handle patient consents and tissue procurement. StemExpress personnel also had access to

3


Planned Parenthood printers and scanners and, in some clinics, Planned Parenthood staff assisted with patient blood draws. Planned Parenthood was reimbursed per product of conception ("POC"), *not per specimen/tissue as has been misrepresented.* If multiple tissue specimens were procured from one POC, Planned Parenthood was only reimbursed once for each individual tissue. It was also rare that more than one tissue type could be procured from a POC due to the process of the abortion.

9. **Infectious Disease Screening Supply Costs:** This line item is for direct expenses associated with infectious disease blood draws, including blood tubes, boxes, and labels.

10. **Infectious Disease Screening Laboratory Charge:** This line item is for direct expenses charged by independent laboratories or hospitals that perform infectious disease screening for StemExpress and generate a detailed de-identified report regarding infectious disease status of the donor. These reports would be faxed or mailed back to StemExpress staff, audited, uploaded into our software systems and forwarded on to the end researcher.

11. **Shipping Costs to Lab for Infectious Disease Screening:** This line item is for shipping costs directly to laboratory or to the StemExpress headquarters laboratory for consolidation with other blood draws and courier delivery to local laboratory for screening.

12. **Procurement Manager Labor Costs:** This line item reflects estimated labor costs associated with the post-procurement processing related to tissue procurement. This includes audit and review of paperwork and quality control to ensure that all paperwork was filled out correctly by Procurement Technicians. Where there are discrepancies in data entry, coordinating corrections with Procurement Technicians and communicating with customers to ensure that corrected paperwork is on file before the tissue is delivered. Delivery notifications and emails are generated as requested by clients. All paperwork would then be scanned and/or uploaded in StemExpress software systems.

13. **Labor Costs for Receipt and Intake of Products at Laboratory:** This line item covers labor costs for tissue and blood that arrives at the StemExpress headquarters laboratory, which is handled by administrative staff with medical training (*e.g.,* bloodborne pathogen training).

14. **Labor Costs for Inventory and Supply Management:** This line item represents the immeasurable supply management function handled by StemExpress personnel to ensure that supplies are in stock and available for future procurements. This line item

STEM.HOUSE.SELECT_ 0911



includes time from accounting personnel producing purchase orders, processing supply orders and coordinating with medical supply vendors. It also includes time inventorying supply orders, and stocking and restocking materials.

StemExpress applied estimated costs and expenses—as explained above—to the 2011 through 2015 accounting reports. We have also included "explanatory notes" to provide additional detail regarding complex or more time-consuming procurements that resulted in higher charges to customers. The resulting data are reflected in the enclosed spreadsheet but are also summarized briefly below.

Table 1: StemExpress Revenue and Financial Losses on Provision of Fetal Tissue (2011-2015)

| | 2011 | 2012 | 2013 | 2014 | 2015 | TOTAL |
|---|---|---|---|---|---|---|
| Fetal Tissue Gross Revenue (Actual) | $ 103,690.00 | $ 119,585.00 | $ 80,810.00 | $ 49,280.00 | $ 25,675.00 | $ 379,040.00 |
| Fetal Tissue Costs/Expenses (Est.) | $ 171,560.50 | $ 216,580.00 | $ 148,005.00 | $ 62,220.00 | $ 32,940.00 | $ 631,305.50 |
| Loss Incurred Supporting Fetal Tissue Research (Est.) | $ (75,397.50) | $ (100,883.00) | $ (69,040.00) | $ (12,940.00) | $ (7,265.00) | $ (265,526.50) |

This table is a high-level summary of the detailed data in the enclosed accounting reports. As you can see, StemExpress has consistently incurred a financial loss on fetal tissue totaling approximately $265,000 over the past five years. As depicted in the chart below, the volume of loss on fetal tissue transfers was higher in the earlier years of StemExpress's operations, but in 2014-2015, StemExpress's costs and expenses were more closely aligned with actual charges to customers. Correspondingly, in the earlier years (2011-2013), StemExpress's charges to customers were substantially exceeded by estimated costs and expenses.

STEM.HOUSE.SELECT_ 0912



**StemExpress Sixth Response to House Select Panel Subpoenas**
*Produced on May 10, 2016*

Chart 1: StemExpress Estimated Cost and Expenses
Related to Fetal Tissue Procurement (2011-2015)



As previously stated to the Select Panel, these roll-up reports are limited to StemExpress's provision of unaltered fetal tissue. StemExpress does not procure or produce cell lines, which are established in tissue culture, with cells growing in the first or later subculture from a primary culture. Rather, StemExpress employs highly educated, extensively trained laboratory staff—including several university-trained molecular biologists—to manufacture isolated cell products by (i) selecting a particular tissue type (*e.g.*, liver tissue); (ii) homogenizing the tissue; (iii) applying complex, proprietary cell isolation protocols; (iv) positively selecting particular stem cell types present in the homogenized tissue material; and then (v) creating a manufactured product consisting of more than just the isolated cells. All of these processes are performed directly in response to specific orders from individual researchers for StemExpress's manufactured cell products, which include CD34+ Stem/Progenitor Cells, CD35+ Erythroid Progenitor Cells, CD133+ Stem/Progenitor Cells, Mononuclear Cells, and Stromal Cells. StemExpress does not culture cells derived from fetal tissue to divide in culture to create cell lines.

STEM.HOUSE.SELECT_ 0913

Exhibit 5.17



EXHIBIT
20
10-6-16
PENGAD 800-631-6989

Exhibit 5.18



Schedule An Appointment     FAQ    News    Contact Us



# Get Involved

Make a direct impact on sustaining the quality of life of another by donating blood or bone marrow. StemExpress works with local hospitals in your area to collect tissue and blood samples for research. Donating to StemExpress costs you nothing. All donations are used for research purposes only. Leading medical scientists require live cells for research, testing and product development. By donating, you're helping to advance medical science and save

STEM.HOUSE.OGR_000026
STEM.HOUSE.SELECT_ 0192

lives. Learn more ...

**Schedule An Appointment**

## Our Story

  

The Donation Center doors opened in 2013 and continues to grow thanks to the support of our donors. StemExpress works closely with the community in an effort to find people, like you, willing to make a difference. All of the blood collected at the Donor Center is provided for life saving research. This research is vital in making improvements in treatments, procedures, and patient care. All of our donors receive a gift card for their donation ranging from $25-$250. StemExpress is grateful to have donors who are willing to support our research efforts and enjoys giving back to the community.
In 2014 StemExpress gave out over $140,000 in gift cards to donors in our community!

## Donation Options And Compensation

   

Whole Blood      Maternal Blood      Leukopak/Apheresi      Bone Marrow

STEM.HOUSE.OGR_000027
STEM.HOUSE.SELECT_ 0193

| Donation | Donation | s Donation | Donation |
|----------|----------|------------|----------|
| $25 | $50 | $100 | $250 |

## Testimonials From Current Donors

"StemExpress is fabulous. The building is clean, and the donation process is sterile and quick. The staff is knowledgeable and friendly. I stopped donating at a local blood donation center because the process at StemExpress is so much more enjoyable. And the doctor also makes marrow donation nearly painless."

**Nicole D**

"My experiences at StemExpress have been fantastic. From walking through the door, to donating, to leaving, the StemExpress staff provide a friendly, welcoming and cozy environment. The best thing about StemExpress is that the phlebotomists NEVER miss!"

**Alex F**

"I donate to StemExpress because it's for a good cause and extra money is always nice. I continue to donate because the staff is great and there is always a good atmosphere when I'm there. I hate needles but I've never had any problems with it hurting or having to be poked more than once to draw the blood."

**Amber E**

Read more»



Join us in making a difference by **Sustaining Quality of Life through Donation.**

ABOUT US

The Donation Center doors opened in 2013

SCHEDULE AN APPOINTMENT

CONTACT US

getinvolved@stemexpress.com

OUR PARTNERS



STEM.HOUSE.OGR_000028
STEM.HOUSE.SELECT_ 0194

and continues to
grow thanks to
the support of
our donors.
StemExpress
works closely
with the
community in an
effort to find
people, like you,
willing to make a
difference. All of
the blood
collected at the
... Read More...



PHONE:



LOCATION:
Main Office and
Laboratory:

Copyright © 2015 StemExpress Donor Center - A Clinical Division of StemExpress. All Rights
Reserved.

STEM.HOUSE.OGR_000029
STEM.HOUSE.SELECT_ 0195

Exhibit 5.19

January 3, 2011

Protocol Number: 101-01

Protocol Date: January 24, 2011

Study Title: Tissue Procurement for Non-therapeutic Research

Sponsor: StemExpress, LLC.

Primary Investigator:  **Redacted**

StemExpress, LLC

**Redacted**

## Standard Operating Procedure

### 1. Purpose

This SOP covers Tissue Procurement for Non-therapeutic Research.

This protocol describes the set up, equipment and procedures for procuring cadaverous tissue to use in non-therapeutic research.

### 2. Scope

This applies to all procurements for non-therapeutic research.

### 3. Prerequisites

The day before surgery:
Check WebOffice for researcher requests;
Determine your location for the next day;
Call the clinic to verify how many surgeries are scheduled.

### 4. Responsibilities

It is the procurement technician's responsibility to bring the general and medical supplies listed in this SOP to each clinic. The clinic staff will identify donors. It is the procurement technician's responsibility to retrieve the tissue and package it appropriately for the given researcher. It is also the procurement technician's responsibility to update WebOffice so everyone is aware what tissue has been obtained and for whom.

### 5. Equipment

General supplies:
Current blank RPR (Researcher Procurement Record)
logs Pre-printed FedEx forms

General supplies:
Current blank RPR (Researcher Procurement Record) logs
Pre-printed FedEx forms

Medical supplies:
Scrubs
RPMI
Hepes Solution with antibiotic added
Petri dishes
Shipping boxes
Personal instruments to procure
Conical tubes
Mini urine specimen cups
Cold packs

## 6.    *Procedure*

On the day of surgery, the following steps are taken to procure tissue
from POC: Arrive at the clinic and change into scrubs.
Inform the consenting staff of which gestations to
consent. Place chucks down.
Set up the light box, instruments, RPMI, Hepes, petri dishes and
tubes or cups. Set up enough blood draw bags for the day.
Get out the sequential numbering labels.
Print a copy of the day's Procurement Schedule.
Follow along with the chart flow so you know what gestations to expect.
If required, initiate blood draw from clinic staff. We do NOT want a patient
label on the blood tube. Give the clinic staff the blood bags and correct blood
tubes for the given researcher. If these are blood samples to accompany the
tissue sample, number them in order as soon as complete. See the SOP
"Maternal Blood Samples for Infectious Disease Testing" for specific guidance
on those blood samples.
Once a consenting donor has undergone surgery, procure the specimen(s) on
the petri dish and light box.
With minimal manipulation after isolating the specimen(s), move the petri dish
to the packaging room and carefully transfer the specimen(s) to the appropriate
container (conical tube or mini urine specimen cup). Add the researchers media
of choice and seal with parafilm.
Keep track of time, gestation, fetal foot size or sono report and date.
Package the specimens and blood tubing for shipment once all specimens have a
number. Be sure to place them on ice or cold packs.
Note the specimen numbers on the
RPR log. For delivery:
If the specimen is local courier, be sure to call the courier once you know you
have obtained an appropriate specimen.
If the specimen is going by FedEx, be sure to know the local cut-off times for
your closest FedEx office. Each FedEx location is listed under "contacts" in
WebOffice. Always know which FedEx you will be dropping off at and consider
traffic. Log on to www.fedex.com with your assigned log on and password. Print
shipping label and affix to box.
All instruments must be sterilized once you are done for the day.
Clean the area(s) thoroughly and discard all unused POC in the appropriate
receptacle. Gather your supplies to leave and change out of your scrubs.

### 7. *Cautions*

Health and Safety Warnings

All blood and tissue should be handled with standard Biohazard care. Gloves and other personal protective equipment should be worn at all times when handling blood or tissue. Meticulous care should be taken while using sharp dissecting instruments. Immediately report any injury to StemExpress.

Interferences

Care should be taken to preserve the longevity of the equipment. This includes dissecting tools, light boxes, packaging supplies and media. Gentle handling of specimens is essential to quality control. Do not move or manipulate the tissue any more than is absolutely necessary. Ensure proper printer functioning first thing in the day, and contact StemExpress immediately if there are printer problems.

If you have an excellent sample with no researcher listed on today's schedule, please contact ███████ immediately, and they will work to call researchers who may be interested even though they are not currently scheduled.

### 8. *References*

Researcher Procurement Record
MSDS for RPMI
MSDS for Hepes
MSDS for Antibiotic
SOP "Blood Samples for Infectious Disease"
HIPAA
Biohazard
Presentation

I agree to conduct this clinical study in accordance with the design and specific provisions of this protocol; deviations from the protocol are acceptable only with a mutually agreed upon protocol amendment with the IRB approval. I also agree to report all information or data in accordance with the protocol, and in particular I agree to report serious adverse experiences as defined in this protocol.

**Redacted**

3/17/2011

_____          _____
Signature of Principal Investigator          Date

**Redacted**

_____
Printed Name of Principal
Investigator

Exhibit 5.20

From: ████ @stemexpress.com
Subject: Updated Task Assignment: Procurement Schedule Wednesday 3/20/13
Date: March 20, 2013 at 9:00 AM
To: ████ @stemexpress.com

The following task has been updated on the "StemExpress" web office site.


TASK NAME: Procurement Schedule Wednesday 3/20/13
ASSIGNED BY: ████
PROJECT: Procurement Schedule
CATEGORY: Procurement Schedule
PRIORITY: 2-Normal
STATUS: 1-Not Started
ASSIGNED TO: ████

████

VISIBLE TO: Everyone

DETAILS:
Liver & Thymus (same donor)/16-20wks/RPMI/Wet Ice/HIV,HBSAG,HCV,CMV/FedEx
Priority Overnight/Mass General Hospital ████ )
1 SPEC=
*IMPORTANT: Please document ████ in the reference section*

Liver & Thymus (Same donor)/16-20wks/RPMI /Wet Ice/ HIV,HBsAG,HCV/FedEx Priority
Overnight/UMASS ████
1 SPEC=
*IMPORTANT: Please document ████ n the reference section.*


Liver/18-22wks/RPMI/Wet Ice/FedEx Priority Overnight/ UCLA (Rezek)
*IMPORTANT: Please document ████ in the reference section.*
2 SPEC=
**This used to be researcher- UCLA: ████ **


Liver, Thymus & Skin (Same donor)/16-20wks/RPMI /Wet Ice/ HIV,HBsAG,HCV/FedEx
Priority Overnight/HARVARD ████
1 SPEC=
**IMPORTANT: Use FedEx account ████ Note: THE LIVER AND THYMUS SHIP
TO MICHAEL BREHM AT UMASS AND THE SKIN SHIPS TO ████ AT HARVARD. SHIP
ALL TISSUE UNDER HARVARD'S FEDEX NUMBER.**
* ████
████ mcb.harvard.edu, ████


**PROCURE ON WEDNESDAY ONLY**- Pancreas/14wks/HEPES with antibiotic/Gel Pack/HIV,
HBSAG, HCV/FedEx Priority Overnight/UMASS ████ )
2 SPEC=
*IMPORTANT: Use gel packs that are NOT frozen but just chilled.*
*IMPORTANT: Please document ████ in the reference section.*


Brain /16-18wks/Complete but can be in piecest/Use Client Supplied Media/Wet
Ice/HIV,HBSAG,HCV/Use Clients FedEx Priority Overnight/Temple Univ ████ )

1 SPEC=
**Note: Media contains anti-fungal/anti-mycotic and antibiotics**
Researcher: ████


Mid Brain/10+wks/RPMI/Wet Ice//HIV, HBSAG/FedEx Priority Overnight/University
of Illinois at Chicago ████
1 SPEC=
Researcher: ████

Brain/14+wks (2cm in width)/Whole brain In-tact or one whole Hemis intact/Dry

Brain/11 wks (2cm in width)/Whole brain in tact or one whole Hemis intact/Dry
Ice on aluminum foil protocol/FedEx Priority Overnight/HIV,HCV,HbC,HBSAG,RPR/Yale
█████ )
*IMPORTANT: Please document ████████████ in the reference section. Donor
information required: Sex of fetus if identifiable,Age,Ethnicity,Past drug
use if known.*
3 SPEC=
Researcher:████████████████████

**Same Day, Pick Up**
_____

**PROCURE ON THURSDAY ONLY**Fetal kidney (In-tact: Renal vein/artery, ureter,
inferior vena cava(descending aorta); without Digoxin applied)/18-20 wks/RPMI/Wet
Ice/Same day pick-up/ Ganogen, Inc. █████ )
1 Spec=
**Call ██████████████. Personal pick-up on site near clinic
location to reduce ishemia time**

**PROCURE ON THURSDAY ONLY**- Brain/17+ gestation/Both Hemis In-tact -or-
call for approval of hemis, forebrain, hindbrain, brainstem(semi-intact(70%)approved)/RPMI/Wet
Ice/Stanford █████
1 SPEC=
Note: Please call ████████ with a best guess delivery time window (Ex:
eta- 11am to 1pm)██████████████

Brain 8+wks/Inact Calvarium -or- <7wks/Whole Embryo/RPMI(1-2hrs;ASAP)/Wet
Ice+barrier/The Rockefeller University ████ )
1 Spec=
**Ships to StemExpress Lab for procedure**
*IMPORTANT: Please document ██████████ in the reference section.*

**Same Day, Local Delivery**
_____

Exhibit 5.21



## Consenting Patients

It's important to connect with the patient, be compassionate as well as offering them an opportunity to make a difference in our future.

Blood and Tissue

I work with a company that assists researchers in finding cures for many debilitating diseases like cancer, diabetes and many other. The law in the state of California requires that the tissue from your procedure be incinerated.     Would you be willing to give your consent to donate blood and the tissue from your procedure to research? Participation is completely anonymous.

Blood Only

I work with a company that assists researchers in finding cures for many debilitating diseases like cancer, diabetes and many other. Would you be willing to give your consent to donate a blood sample to research? Participation is completely anonymous.

Exhibit 5.22

(affiliate name, address, and telephone number)

Client Information for Informed Consent

## DONATION OF BLOOD AND/OR ABORTED PREGNANCY TISSUE FOR MEDICAL RESEARCH, EDUCATION, OR TREATMENT

Research using the blood from pregnant women and tissue that has been aborted has been used to treat and find a cure for such diseases as diabetes, Parkinson's disease, Alzheimer's disease, cancer, and AIDS.

You can donate your blood and/or pregnancy tissue after an abortion. Before you give your consent, **read each of the following statements and initial the line to the right.** We will be happy to answer any questions you have.

Before I was shown this consent, I had already decided to have an abortion and signed a consent form for it.                                                                          _____

I agree to give my blood and/or the tissue from the abortion as a gift to be used for education, research, or treatment.                                                          _____

I understand I have no control over who will get the donated blood and/or tissue or what it will be used for.                                                                         _____

I have not been told the name of any person who might get my donation.        _____

I understand there will be no changes to how or when my abortion is done in order to get my blood or the tissue.                                                                  _____

I understand I will not be paid.                                                                            _____

I understand that I don't have to give my blood or pregnancy tissue, and this will not affect my current or future care at _____(affiliate name)_____        _____

Signature:_____          Date:_____

Witness:_____          Date:_____

1

**Confidential Proprietary Business Information**
**Produced Pursuant to House Confidentiality Rules**

PPGC-HOU_E&C-000006

Exhibit 5.23



**BioMed·IRB**

**Study Title:**      Tissue Procurement for Non-therapeutic Research

**Sponsor:**      Stem Express, LLC

**Protocol Number:**      101-01

**Protocol Dates:**      January 24, 2011
Amendment # 1 dated January 24, 2011

**Principal
Investigator:**
**Approved Facilities:**

BioMed IRB has approved the above referenced study as having satisfied the criteria for continuing research at the February 3, 2015 meeting. This approval is effective from February 5, 2015.

The IRB committee has determined that the risk assessment for this study is Minimal. The IRB has determined that continuing review of this study will occur annually.

Approximately thirty days before February 5, 2016, you will be required to complete a Continuing Review Report Form. Continual review is the responsibility of the Principal Investigator. If you do not receive this form, please contact the IRB office immediately. The Continual Review Report Form must be received by the due date to allow ample time for ongoing review before the study's expiration date.

IRB approval is granted conditional on your adherence to the following requirements:
* The information submitted to the IRB is true and correct.
* Research will be conducted in accordance with the approved protocol.
* All materials used to recruit study subjects must be pre-approved by the IRB.
* Additional safeguards will be followed when vulnerable subjects, such as children or minors, are participants in the study.

The investigator agrees to report the following information to the IRB:
* Serious Adverse Events occurring at your site should be reported within ten (10) calendar days from the date of discovery by the investigator.
* Serious Adverse Events (IND Safety Reports) occurring at other sites should be reported no later

www.BIOMEDIRB.com

HIGHLY CONFIDENTIAL INFORMATION / NOT FOR PUBLIC RELEASE

than thirty (30) days from the date of discovery.
* Any changes in the research activity (i.e. changes in study staff, facility etc.) should be reported promptly. In addition, the investigator will not make any changes in the research without the IRB's approval, except when necessary to eliminate apparent immediate hazards to study subjects.
* Any other unanticipated problems involving risks to study subjects.

BioMed IRB is comprised of a diverse group of individuals in accordance with the Federal Regulations and the International Conference on Harmonization, Global Harmonization or other appropriate guidance for Good Clinical Practice. BioMed IRB follows written procedures for performing review, documenting meeting minutes, disclosure of member conflict of interest prior to deliberation or voting, as well as the retention of all records containing research materials as required by the Code of Federal Regulations (21CFR parts 50 and 56; and 45 CFR part 46).

On behalf of the BioMed IRB, I certify that the information contained in this letter is true and correct as verified by the minutes and records of the BioMed IRB.

Please keep a copy of the continual review material, as well as a copy of this letter, in your files for future reference. Should you have questions or concerns, please do not hesitate to contact this office.

Sincerely,

_____
Authorized Signature

_____
Chairman Emeritus
Title

_____
Printed Name

_____
February 3, 2015
Date

HIGHLY CONFIDENTIAL INFORMATION / NOT FOR PUBLIC RELEASE

Exhibit 5.24



| **Work Instruction** | Page 1 of 7 |
| StemExpress Procurement Kit 1 | VERSION #: 1.0 |
| Document Control Number (DCN #): FP500.02 | Effective Date: 12 May 2015 |

**StemExpress Procurement Kit 1 Overview:**

Tissue procured in the clinics must be packaged and sent to the StemExpress laboratory for processing. StemExpress Procurement Kit 1 is for the procurement of liver tissue and a required blood sample. The kits used for this procedure will be sent to the clinics prior to tissue procurement.

- **Use this work instruction as:**
  - A guide for packaging tissue and blood for the StemExpress Procurement Kit 1
  - A guide for filling out paperwork for the samples in the StemExpress Procurement Kit 1

**Receiving the StemExpress Procurement Kit 1**

There are parts of the kit that must remain between 34 and 44 degrees Fahrenheit (1°C - 7°C). These items include the 50ml conical tube with RPMI and the gel packs. Once the clinic receives the kit(s), refrigerate the entire kit or the conical tube and gel packs immediately.

Conical tube with media and gel packs must be kept between 34°F and 44°F:



The StemExpress Procurement Kit 1 will have the following items:
- Cardboard box
- Styrofoam box
- IRB approved patient consent form
- Sample procurement form
- Plastic bag liner
- Gel packs
- 50ml conical tube with 40ml of RPMI 1640 media
- Two 10ml EDTA blood collection tubes
- One 5ml Z serum sep. clot activator blood collection tube
- Two biohazard bags
- Venipuncture kit (needle and hub or leur-lok depending on clinic need)
- Parafilm
- Two biohazard stickers
- FedEx shipping label
  **Procuring and Packaging Samples Using the StemExpress Procurement Kit**

2015_StemExpress_Procurement_Kit

CONFIDENTIAL / PROPRIETARY BUSINESS RECORDS


### Consenting the Patient

All patients who donate tissue and blood must sign the IRB approved StemExpress Informed to Participate in a Clinical Research Study.

The consent allows the donation of the fetal tissue and blood for research. It clarifies that the patient decided to have an abortion *before* the consent was offered and that all patient identifying information will not be connected to the donation. The patient can change their mind and choose not to donate while in the clinic but once they leave the clinic the donation cannot be cancelled because the donation is anonymous. There would not be any way to link the sample to the patient. Clinic staff is expected to understand all aspects of the consenting process before asking the patient to consent.

The patient must initial in the bottom right hand corner of each page of the consent. Page 3 must be signed and dated by the patient as well as the trained staff member that is consenting. The areas to be initialed or signed have been highlighted on Page 3 of this work instruction. Page 4 of the consent is to be completed only if the patient is a resident of California.

The completed consent, signed by the patient and the clinic staff, is kept at the clinic for their records. StemExpress will not receive or store any documents that identify the patient.

CONFIDENTIAL / PROPRIETARY BUSINESS RECORDS


**stem** **express**
SUSTAINING QUALITY OF LIFE THROUGH RESEARCH™

**Work Instruction**
**StemExpress Procurement Kit 1**

**Page 3 of 7**

**VERSION #: 1.0**

**Document Control Number (DCN #): FP500.02**

**Effective Date: 12 May 2015**

---

**INFORMED CONSENT TO PARTICIPATE IN A CLINICAL RESEARCH STUDY**

**Study Title:** Tissue Procurement for Non-therapeutic Research

**Sponsor:** Stem Express, LLC

**Protocol Number:** 101-01

**Protocol Date:** January 24, 2011

**Principal Investigator:**

**24-Hour Phone Number:** 877-900-7836

Client Information for Informed Consent
**DONATION OF ABORTED PREGNANCY TISSUE FOR MEDICAL RESEARCH, EDUCATION, OR TREATMENT**

Research using donated tissue and blood is currently underway to uncover the causes of and ultimately find cures for things like: Heart Disease, Diabetes, Parkinson's Disease, Sickle Cell Anemia, Leukemia, Lymphoma, Cancer, Spinal Cord Disease, and many more. Tissue can be obtained as a result of donation of pregnancy tissue after an abortion. Before you give your consent to donate pregnancy tissue and/or a blood sample, read each of the following statements. If there is any statement you do not understand, or if you have any questions, someone will discuss them with you. Your participation is entirely voluntary.

Before this consent was ever offered to me, I had previously decided to have an abortion and signed an informed consent document.

I agree to donate the tissue from the abortion and/or miscarriage, and a blood sample if needed, as a bodily gift to be used for the advancement of medical science. I also agree that a sample of my blood may be taken after the abortion and that it may be used for research and routine testing for AIDS, hepatitis, or other infectious agents. I understand that, if there is testing, the results will be confidential unless the law requires that they be disclosed. The benefits of consenting to donation today include furthering medical research in finding cures for diseases like diabetes, leukemia, lymphoma, Parkinson's disease and more. The risks to this donation are minimal in that your abortion procedure will not change in any way; your health information will be protected at all times; and most blood donors have only minor discomfort from the needle stick, although some people may have a light-headed feeling, an upset stomach, bruising, or pain where the needle stick was. The alternative to this donation is to refuse consent.

**Protocol Number:** 101-01     Subject Initials ____

**Consent Date: March 19, 2013**     *BioMed IRB Approved*     Page 1 of 4

I understand the donation is made without any restriction regarding who might receive the donated tissue or for what research purpose it might be used. I have not been informed of the identity of any individual who will receive the tissue that I am donating, and I understand that cells derived from the donation may be stored for years.

If you choose to participate, you will have your blood drawn by a trained phlebotomist or nurse. The amount is small, usually 10-60ml which is about 1-3 tablespoons. You will have no responsibilities once you leave the clinic.

In accordance with federal laws (HIPAA), your personal identifying information will be protected and not connected with your donation once the procedure is completed. Your health information related to this study, may be used or disclosed in connection with this research study, including, but not limited to, your age, ethnicity, medical history, and number of previous pregnancies or abortions. All of this information will NOT be connected to your name or any other personal identifier.

**Protocol Number:** 101-01     Subject Initials ____

**Consent Date: March 19, 2013**     *BioMed IRB Approved*     Page 2 of 4

---

**CONSENT**

You have the right to withdraw your donation at any time while in the clinic. Since your donation is completely ANONYMOUS, you cannot withdraw your donation once you leave the clinic as it will no longer be possible to know which donation was yours.

I understand there will be no payment to me for the donated tissue or for any product, process or service that may result from this donation.

I understand the method, timing or procedure of abortion cannot and will not be substantively altered for the purpose of obtaining the tissue. I understand that I may refuse to donate pregnancy tissue, and this will not affect my current medical care or my ability to get any future medical services at this clinic.

I understand that, if I have any questions about my donation, I can contact StemExpress at 877-900-7836.

By signing below, I agree to donate tissue and/or blood as described above.

_____ Date ____
_____ Time ____

**Protocol Number:** 101-01     Subject Initials ____

**Consent Date: March 19, 2013**     *BioMed IRB Approved*     Page 3 of 4

**FOR CALIFORNIA RESIDENTS ONLY**
**EXPERIMENTAL SUBJECT'S BILL OF RIGHTS**

Any person who is requested to consent to participate as a subject in a research study involving a medical experiment, or who is requested to consent on behalf of another, has the right to:

1. Be informed of the nature and purpose of the experiment.
2. Be given an explanation of the procedures to be followed in the medical experiment, and any drug or device to be used.
3. Be given a description of any attendant discomforts and risks reasonably to be expected from the experiment.
4. Be given an explanation of any benefits to the subject reasonably to be expected from the experiment, if applicable.
5. Be given a disclosure of any appropriate alternative procedures, drugs, or devices that might be advantageous to the subject, and their relative risks and benefits.
6. Be informed of the avenues of medical treatment, if any, available to the subject after the experiment if complications should arise.
7. Be given an opportunity to ask any questions concerning the experiment or other procedures involved.
8. Be instructed that consent to participate in the medical experiment may be withdrawn at any time, and the subject may discontinue participation in the medical experiment without prejudice.
9. Be given a copy of a signed and dated written consent form when one is required.
10. Be given the opportunity to decide to consent or not to consent to a medical experiment without the intervention of any element of force, fraud, deceit, duress, coercion, or undue influence on the subject's decision.

_____     _____ Date
Printed Name of Subject     Signature of Subject

_____     _____ Date
Printed Name of Witness     Signature of Witness

**Protocol Number:** 101-01     Subject Initials ____

**Consent Date: March 19, 2013**     *BioMed IRB Approved*     Page 4 of 4

---

2015_StemExpress_Procurement_Kit



| **Work Instruction** | Page 4 of 7 |
| StemExpress Procurement Kit 1 | VERSION #: 1.0 |
| Document Control Number (DCN #): FP500.02 | Effective Date: 12 May 2015 |

### Packaging Tissue

After the liver is identified and separated from other tissue, place it in the 50ml conical tube provided in the kit.

- Separate the liver from the other fetal tissue. It can be in pieces or damaged but the combined volume must equal more than 5ml. The 5ml mark is clearly identifiable and visible on the conical tube.



5ml

- Remove and dispose of the parafilm from around the opening of the 50ml conical tube with the RPMI media.
- Place the liver tissue into the conical tube with the RPMI media and screw the top on tightly.
- Wrap the conical tube with parafilm to prevent any leakage.
    - Remove the paper backing from the parafilm.
    - Hold the parafilm down against the lid and with the other hand stretch the parafilm.
    - Stretch the parafilm around the lid of the conical tube in a clockwise direction.
    - Push the end of the parafilm into the conical tube to create a seal.
- Place the conical tube into a biohazard bag and seal the bag.

CONFIDENTIAL / PROPRIETARY BUSINESS RECORDS

STEM.HOUSE.SELECT_ 0269



| **Work Instruction** | Page 5 of 7 |
| StemExpress Procurement Kit 1 | VERSION #: 1.0 |
| **Document Control Number (DCN #): FP500.02** | **Effective Date: 12 May 2015** |

### Maternal Blood Collection

There are 3 tubes in the StemExpress Procurement Kit 1: two 10ml EDTA and one 5ml Z serum sep. clot activator blood collection tube. All 3 tubes must be filled with maternal blood.

After the liver has been procured, use the items in the venipuncture collection kit, which will be either a leur-lok to collect from an existing IV or a needle and hub to collect the blood sample.

- Follow the clinic protocol for sterile blood collection.
- Fill the red 5ml Z serum sep. clot activator blood collection tube first and follow with the two 10ml EDTA tubes
- Once the blood is procured, all 3 tubes can go into the second biohazard bag.
- Seal the biohazard bag.

- If a failed blood draw occurs, StemExpress can accept the liver tissue with a minimum of 2ml of maternal blood collected into the 5ml Z serum sep. clot activator blood collection tube. If the clinic is unable to procure any maternal blood for the tissue sample, StemExpress is unable to accept the tissue.

### Filling out the Procurement Form

The sections of the Procurement Form that need to be filled out by the clinic are highlighted. The clinic is responsible for providing the following information:

- Date- date of procurement
- Time- time of procurement in military time
- Gest- gestation in weeks and days. For example: *18.3wks*
- Sex- sex of the fetus. *F* for female, *M* for male or *Unk* for unknown
- Donor age- age of the patient who consented to donate tissue and blood
- Height- in feet and inches. For example *5'3"*
- Weight- in pounds. For example *145 lbs*
- Ethnicity- ethnicity of the patient
- Smoker?- answer *yes* or *no*

CONFIDENTIAL / PROPRIETARY BUSINESS RECORDS

STEM.HOUSE.SELECT_0270




**stem express**

**Researcher Procurement Form**

DATE  5|1|15

**Delivery Instructions:** ◯ Billed/Recipient   ◯ Billed/StemExpress

**Ship To:**

| Name | StemExpress | | Email: | laboratory@stemexpress.com |
|---|---|---|---|---|
| C/O | | | Email 2: | |
| Address | | | Email 3: | |
| Address 2 | | | Phone # | |
| City | | | Cell Phone | |
| Country | | | Alt. Phone # | |

FedEx Account  1231-6486-5        Tracking #

Ref#                    Local Delivery:  ◯ AM  ◯ PM   Deliver By

Procurement Tech        Additional Techs            Location  CFP-70

| ID# | TIME | PATIENT# | SPEC# | GEST | SPECIMEN | SEX | COMMENTS |
|---|---|---|---|---|---|---|---|
| | 14:00 | | 6306 | 18.3wks | Liver | M | Donor age: 23 Height: 5'3" Weight: 145 lbs Ethnicity: Hispanic Smoker? No |
| | 14:15 | | 31187B | | Maternal Blood | F | 2EDTA, 1 Z Serum Sep |

2015_StemExpress_Procurement_Kit



**Work Instruction**
**StemExpress Procurement Kit 1**

Page 7 of 7

VERSION #: 1.0

Document Control Number (DCN #): FP500.02

Effective Date: 12 May 2015

### Assembling the kit for shipment

The items of the kit should be reassembled in the same placement as they were when the kit was received.

- Place the specimens inside of the plastic bag liner
  - One sealed biohazard bag with the 50ml conical tube (containing RPMI and the liver specimen)
  - One sealed biohazard bag with 3 tubes of maternal blood (two 10ml EDTA and one 5ml Z serum sep. clot activator blood collection tube)
  - 2 chilled gel packs
- Seal the plastic bag liner by tying it in a knot
- Place the tied plastic bag inside of the Styrofoam box
- Place the Styrofoam lid on the Styrofoam box
- Adhere a biohazard sticker on opposite sides of the Styrofoam box so they seal the top of the box to the bottom.
- Place Styrofoam box inside the cardboard box
- Place completed Procurement Form on top of the Styrofoam box
- Tape the cardboard box shut
- Adhere the FedEx shipping label to the top of the cardboard box

Once the package is ready for shipment call FedEx (1 800 GoFedEx or 1 800 463 3339) to schedule a pick up or drop the package off at the nearest FedEx location by 16:30 on the day of procurement.

CONFIDENTIAL / PROPRIETARY BUSINESS RECORDS

STEM.HOUSE.SELECT_ 0272

Exhibit 5.25


# PACKAGING BLOOD AND TISSUE SAMPLES

## APPROVALS

*All approvals are maintained and controlled in the ███████ system.*
*Please refer to the ███████ e system for the current controlled revision and approval records.*

## REVISION HISTORY

| AUTHOR | REVISED SECTION/PARAGRAPH | REV | RELEASED |
|---|---|---|---|
| ███████ | **Initial Release** | | 01/16/2014 |

*Draft and Archived/Obsolete revisions are not to be used.*
*Access ███████ e system to verify revision.*

## TABLE OF CONTENTS

1. PURPOSE ................................................................................................................................2
2. SCOPE ...................................................................................................................................2
3. DEFINITIONS .........................................................................................................................2
4. RESPONSIBILITIES ...............................................................................................................2
5. POLICY...................................................................................................................................2
5.1 Overview ..........................................................................................................................2
5.2 Details...............................................................................................................................2
5.2.1 Packaging Samples.....................................................................................................2
6. APPLICABLE REFERENCES.................................................................................................4

Copyright **StemExpress.** All rights reserved. May not be reproduced without permission. All hard copies should be checked against the current electronic version within ███████ prior to use and destroyed promptly thereafter. All hard copies are considered Uncontrolled documents.


1. **PURPOSE**

   All shipments need to be packaged according to StemExpress standards. This SOP will provide a guideline to packaging samples for local delivery or FedEx shipments.

2. **SCOPE**

   This document is a step-by-step procedure for packaging samples.

3. **DEFINITIONS**
   - RPR- Researcher Procurement Record.
   - SOP- Standard Operating Procedure.

4. **RESPONSIBILITIES**
   - Training Officer – Shall ensure that all personnel are properly trained and oriented to the SOP by providing initial instruction, reviewing the material, and any further instruction or correction at a later time. Shall also maintain training log for the SOP.
   - Procurement Technician – Shall follow the SOP to properly perform all aspects of tissue and/or blood procurement.
   - Regional Procurement Manager – Shall ensure that the above personnel are correctly performing their job duties.

5. **POLICY**

   **5.1 Overview**

   After the procurement of tissue or blood, the sample needs to be packaged for delivery. The steps below cover how to package a sample after it is properly labeled.

   **5.2 Details**

   **5.2.1 Packaging Samples**

   5.2.1.1 StemExpress uses two boxes: F80 and F55. F80 is the large Styrofoam box and RSC80 is the corresponding large cardboard box. F55 is the small Styrofoam that goes with RSC55 is the corresponding small cardboard box.

   5.2.1.2 Choose the box size based on the size and quantity of samples. Ideally, the samples will fit snug within the box so there is little to no movement during the shipping process. Too much movement can cause damage to the specimen.

   5.2.1.3 First, place 2 box liners (small plastic bags) inside of the Styrofoam box.

Copyright **StemExpress.** All rights reserved. May not be reproduced without permission. All hard copies should be checked against the current electronic version within ▊▊▊▊▊ prior to use and destroyed promptly thereafter. All hard copies are considered Uncontrolled documents.


5.2.1.4 The samples can then be added to the box. Bubble wrap should be placed around any samples that are breakable. If the samples require ice, cold packs, or dry ice, the information would be listed under the *shipping temp* section on the Daily Task Page. Please refer to *Navigating the Daily Task Page Standard Operating Procedure* for more information on this. If ice, cold packs, or dry ice are required, they should be placed inside of the box liners with the samples.



5.2.1.5 The box liners should be tied.



5.2.1.6 The top of the Styrofoam box can then be placed on the bottom portion of the box with the samples, and two biohazard stickers adhered to the box to secure it shut (one on each side).



5.2.1.7 Tape the cardboard box together and place the Styrofoam box inside of it.

5.2.1.8 The RPR should be folded into 4 and placed into a Ziploc bag. The Ziploc bag with the RPR inside is placed on top of the Styrofoam box. The cardboard box is then sealed with StemExpress tape.

Copyright **StemExpress.** All rights reserved. May not be reproduced without permission. All hard copies should be checked against the current electronic version within **WebOffice** prior to use and destroyed promptly thereafter. All hard copies are considered Uncontrolled documents.

| stem express | **StemExpress**<br>**Packaging Blood and Tissue Samples** | | **Pg. 4 of 4** |
|---|---|---|---|
| | **Doc Number: SEC-FP-0005** | **Rev:** | |



5.2.1.9 The FedEx label goes in the FedEx pouch that is adhered to the top of the cardboard box. Instructions on how to print the FedEx label can be found in the *FedEx Shipments Standard Operating Procedure.*



5.2.1.10 The package is ready to be shipped and can be taken to a FedEx center.

5.2.1.11 For local deliveries, the FedEx label does not need to be created. The RPR will be folded in half (so that no patient information is visible) and placed in a shipping pouch on the top of the package. The sample is then ready for courier pick up.

## 6. APPLICABLE REFERENCES

- FedEx Shipments Standard Operating Procedure
- Navigating the Daily Task Page Standard Operating Procedure

Copyright **StemExpress.** All rights reserved. May not be reproduced without permission. All hard copies should be checked against the current electronic version within ▮▮▮▮e prior to use and destroyed promptly thereafter. All hard copies are considered Uncontrolled documents.

Exhibit 5.26



**StemExpress First Response to House Select Panel's March 29, 2016 Subpoenas**

| 3/29/16 StemExpress Subpoena Specification No. | Description |
|---|---|
| 1 | All communications and documents referring or relating to Institutional Review Board (IRB), as defined by Title 45 of the Code of Federal Regulations, Part 46, consents for the period of March 29, 2012 through January 26, 2013. |

Please see enclosed production for documents responsive to this subpoena specification pertaining to fetal tissue donation. StemExpress is in the process of identifying additional communications and documents that may be responsive to this subpoena specification and will produce these materials on a rolling basis.

| 3/29/16 StemExpress Subpoena Specification No. | Description |
|---|---|
| 2 | All communications and documents referring or relating to Biomedical Research Institute of America, BioMed IRB, or BioMed Institutional Review Board. |

Please see enclosed production for documents responsive to this subpoena specification pertaining to fetal tissue donation. StemExpress is in the process of identifying additional communications and documents that may be responsive to this subpoena specification and will produce these materials on a rolling basis.

1

STEM.HOUSE.SELECT_ 0713



**StemExpress First Response to House Select Panel's March 29, 2016 Subpoenas**

| 3/29/16 Individual Subpoena Specification No. | Description |
|---|---|
| 1 | Documents sufficient to show the name(s) of all persons who serve as StemExpress's Director of Finance, Finance Manager, Accountant Manager, or equivalent position(s). You may provide a list identifying such individuals and their corresponding positions in lieu of producing documents. |

Consistent with ongoing discussions with the Select Panel Majority Staff—and as articulated in our counsel's February 19, 2016 correspondence regarding the pertinence of having the names of individual employees—StemExpress remains gravely concerned about the safety and security risks associated with identifying additional personnel.



With that context, StemExpress's financial review/auditing function is handled by ▮▮▮▮▮▮▮, a licensed CPA with the Scinto Group, LLP. To the extent that the Select Panel wishes to contact ▮▮▮▮▮▮▮ we will provide his contact information. We are also aware that the Select Panel has subpoenaed ▮▮▮▮▮▮▮▮▮▮ for a deposition. As you know, ▮▮▮▮▮▮▮ served in an accounting role while she worked with StemExpress from 2010 to 2013, and would be in a position to provide information regarding her work with the company.

HIGHLY CONFIDENTIAL INFORMATION / NOT FOR PUBLIC RELEASE                    STEM.HOUSE.SELECT_ 0714



## StemExpress First Response to House Select Panel's March 29, 2016 Subpoenas

| 3/29/16 Individual Subpoena Specification No. | Description |
|---|---|
| 2 | All communications and documents sufficient to show accounts payable and accounts receivable concerning in any way the sale, storage, purchase, or transport of fetal tissue received by or sent by StemExpress's Director of Finance, Finance Manager, Accountant Manager, or equivalent position(s). |

Please see the enclosed production for "roll-up" reports of StemExpress's 2011 through 2013 fetal tissue sales, organized by customer, which complement the 2014 and 2015 reports that were previously produced in response to the Feb. 12, 2016 subpoena issued to StemExpress. These roll-up reports reflect all relevant information regarding accounts payable and accounts receivable related to the sale of fetal tissue.

Consistent with our agreement with the Select Panel Majority Staff, these reports were generated in lieu of producing additional email correspondence, purchase orders, invoices, and other documentation related to fetal tissue transactions in response to Spec. Nos. 6, 9, and 11 in the Feb. 12, 2016 subpoena. A substantial production of these various materials were previously produced for the January through April 2015 timeframe and are representative of how all fetal tissue orders are received, procured, and invoiced to customers.

Exhibit 5.27

Redacted

## PURCHASE ORDER

| DATE | PURCHASE ORDER NO. |
|---|---|
| 16-DEC-2014 | 60858758 |
| | REVISION NO. |
| PAGE NO. | 0 |
| Page 1 of 1 | |

Winter Closure Warning: [Redacted] will be closed for Winter Break from Thursday, December 25, 2014 through January 4, 2015. [Redacted] [Redacted] will be open on Monday, December 22, 2014. Because of the term arrangements with you to be here to receive this shipment. If you cannot deliver by Friday, December 19, 2014 please schedule your shipment to arrive as soon as possible on or after, Monday January 5, 2015.

To: STEMEXPRESS LLC

Ship To:

Redacted

| ORDER PLACED WITH | FOB | FREIGHT | VENDOR, if freight not included in price, prepay and add |
|---|---|---|---|
| | Destination | | |

| DELIVERY DATE | TERMS |
|---|---|
| 17-DEC-2014 | N30 |

| ITEM NUMBER | DESCRIPTION | QUANTITY | UNIT | UNIT PRICE | EXTENDED PRICE |
|---|---|---|---|---|---|
| 1 | FT0101F Human Fetal Tissue (Estimate 5251) - Gestation requirements: 17-18 weeks -- upper and lower limbs with hands and feet | 1 | EACH | 890.00 | 890.00 |
| 2 | FT0101F Human Fetal Tissue (Estimate 5251) - Calvarium - Matched to upper and lower limbs | 1 | EACH | 595.00 | 595.00 |

| TAXABILITY | |
|---|---|
| Exempt because items are for resale. California Sellers Permit: Redacted | Exempt as purchase on behalf of U.S. Government | Exempt because use is exempted. |

Unless specifically stated otherwise, [Redacted] is subject to Sales Tax. Suppliers should invoice for taxable items. If a Supplier does not have the authority to collect California Sales Tax, [Redacted] will accrue the tax and remit to the State Board of Equalization in the form of Use Tax.

California Revenue and Taxation Code, Section 18662, require withholding for payments made to nonresidents of California for income earned in California related to independent contractor services, rent, and royalty distributions. For more information on this requirement reference https://www.ftb.ca.gov/forms/2012/12_1017.pdf.

|  | ESTIMATED TAX: | 129.95 |
|---|---|---|
| Direct questions to Redacted | | |
| | TOTAL: | 1,614.95 |

Authorized Signature

Redacted

Chief Procurement Officer

This Purchase Contract may be accepted only on the terms set forth herein. The complete Terms and Conditions can be found at: Link. Terms in any acceptance by Seller which are in addition hereto or not identical with the terms hereof will not become a part of any Purchase Contract unless Buyer specifically and expressly agrees in writing that such other terms are accepted. By accepting this Purchase Contract or any part hereof, Seller agrees to and accepts all the provisions of the Purchase Contract.

INSTRUCTIONS

A. Invoices - Separate invoices for each purchase order. Show purchase order number on all documents. Mail invoices to Accounts Payable at:

Redacted

If this order involves services and you have not advised [Redacted] of your tax status, please contact the Financial Support Center at: Redacted [Failure to provide tax information] may result in delayed payment. For more information, email: Redacted

B. Correspondence -
Redacted

C. Transportation - If freight is not included in price, prepay and state separately on invoice. Do not ship collect. Include a packing list with each shipment, and attach to outside (not inside) of container. Show purchase order number on outside of each container

D. Late Shipment - Advise at once if order will not reach destination on time.

E. Terms and Conditions - Link.

CONFIDENTIAL / PROPRIETARY BUSINESS RECORDS

STEM.HOUSE.SELECT_0369



Delivery Instructions          Billed/Recipient                    FedEx #



| Name | | Email |
|---|---|---|
| Customer | | Email 2 |
| Address | **Redacted** | Email 3 |
| Address 2 | | Phone |
| Address 3 | | **Redacted** |
| City | | Phone 2 |
| Zip | **Redacted** | State Redacted | Mobile |
| | | Country USA | |

| Lot No. | Time | Spec # | Specimen Type | Tech ID | Sex | Additional Info |
|---|---|---|---|---|---|---|
| 001012220151631 | 1:00 PM | 8422 | Fetal Limbs | 31 | Unknown | POC: 3<br>Gestation: 18wks<br>Age: 22<br>Ethnicity: Caucasian<br>Fetus Sex: unknown<br>Comments: In Rpmi via local courier |
| 002012220151631 | 1:00 PM | 8423 | Fetal Calvarium | 31 | Unknown | POC: 03<br>Gestation: 18wks<br>Age: 22<br>Ethnicity: Caucasian<br>Fetus Sex: unknown<br>Comments: In Rpmi via local courier |

CONFIDENTIAL / PROPRIETARY BUSINESS RECORDS          STEM.HOUSE.SELECT_ 0370



# Invoice

| Date | Invoice # |
|------|-----------|
| 01/22/2015 | 5601 |

| Terms | Due Date |
|-------|----------|
| Net 30 | 03/10/2015 |

SUSTAINING QUALITY OF LIFE
THROUGH RESEARCH

| Bill To | Ship To |
|---------|---------|
| **Redacted** | **Redacted** |



| Balance Due | Enclosed |
|-------------|----------|
| $0.00 | |

| Ship Date | Ship Via | Researcher | P.O. No. | Shipping |
|-----------|----------|------------|----------|----------|
| 01/22/2015 | Courier | Redacted | 60858758 | StemEx Courier |

| Date | Activity | Quantity | Rate | Amount |
|------|----------|----------|------|--------|
| 01/22/2015 | Item #FT0101F: Human Fetal Tissue - 18wk Limbs    POC #03 | 1 | 890.00 | 890.00 |
| 01/22/2015 | Item #FT0101F: Human Fetal Tissue - 18wk Calvarium    POC #03 | 1 | 595.00 | 595.00 |
| 01/22/2015 | Item #PKG0100: Packaging | 1 | 15.00 | 15.00 |
| 01/22/2015 | Item #SD00103: Local Delivery Flat Rate - 101 to 150 miles | 1 | 225.00 | 225.00 |

Thank you for your business. If you have any questions, please contact
Accounts Receivable at [ Redacted ]
Please note: Invoices not paid within the designated terms are subject to a late
fee equal to 10% of the balance and a 1.5% per month (18% annum) interest
fee, compounded monthly.

| Total | $1,725.00 |
|-------|-----------|
| Payment | $1,725.00 |
| Balance Due | $0.00 |

Subject: FYI: **Redacted** Purchase Order 60858758, 0

Date: Tuesday, December 16, 2014 7:15:12 AM Pacific Standard Time

From:

To: **Redacted**

CC:

From
To **Redacted**
Sent 16-DEC-14 07:14:12
ID **Redacted**

**Winter Closure Warning**

**Redacted** will be closed for Winter Break from Monday, December 22, 2014 through January 4, 2015. **Redacted** will reopen on Monday, January 5, 2015. No staff will be here to receive deliveries during this closure unless they have made special arrangements with you to be here to receive this shipment. If you cannot deliver by Friday, December 19, 2014 please schedule your shipment to arrive as soon as possible on or after, Monday January 5, 2015.

**This email represents** **Redacted** official release of Purchase Order 60858758

**ACTION REQUIRED:**

1. Please click on the link(s) below to acknowledge receipt of this purchase order and any related information/attachments.

**Redacted**

2. Please process this order per Purchase Order 60858758 specifications and any related instructions.

If you cannot open documents by clicking on the above link(s), please check the following in order:
- Make sure that any pop-up blockers are disabled and review Adobe Reader browser settings.
- Review client browser proxy setting to allow access to **Redacted**
- If you still encounter issues, please contact the Financial Support Center at **Redacted** or at **Redacted**

For questions about this order, contact **Redacted**

CONFIDENTIAL / PROPRIETARY BUSINESS RECORDS

STEM.HOUSE.SELECT_ 0372

**Subject:** Re: PO# 60858758
**Date:** Thursday, February 5, 2015 at 1:58:50 PM Pacific Standard Time
**From:**
**To:** Redacted
**CC:**

Hi Redacted

I procured a 17.5 limbs and calvarium for you. The limbs are intact, the calvarium is somewhat crushed but looks to be all there. Please confirm if you would like one or both as soon as possible, as I will be contacting my courier shortly.

Thank you,

**Redacted**

From: Redacted
Sent: Monday, February 02, 2015 4:18 PM
To: Redacted
Cc:
Subject: Re: PO# 60858758

Hi Redacted

I would be happy to put you on the schedule for this week. Please send over a new PO if you have not already.

Thank you,

**Redacted**

From: Redacted
Sent: Monday, February 02, 2015 11:14 AM
To: Redacted
Subject: Re: PO# 60858758

Hi Redacted

The sample we received the other week was perfect thanks for all your help with procurement. We are ready for the next one. Can you please put us on the list for Tues Wed and Thurs of this week for the same order.

Thanks again,

**Redacted**

----- Original Message -----
From: Redacted
To: Redacted
Sent: Thursday, January 22, 2015 1:57:00 PM

CONFIDENTIAL / PROPRIETARY BUSINESS RECORDS

Subject: RE: PO# 60858758

Redacted

Limbs and Calvarium will be there between 3:30 and 4:00.

Thank you,

Redacted

From: Redacted
Sent: Thursday, January 22, 2015 1:07 PM
To: Redacted
Subject: Re: PO# 60858758

Redacted

That sounds great we would like both of them.

Please send them our way,

Thanks again,

Redacted

----- Original Message -----
From: Redacted
To:
Cc: Redacted
Sent: Thursday, January 22, 2015 1:02:32 PM
Subject: RE: PO# 60858758

Redacted

The Calvarium is mostly intact, with a tear up the back suture line, but all pieces look to be there.

The limbs, one upper and one lower are totally intact, with one upper broken at the humerus, and one lower broken right above the knee. Please let me know if these are acceptable. I have set them aside and will await your reply.

Thank you,

Redacted

From: Redacted
Sent: Thursday, January 22, 2015 12:33 PM
To: Redacted
Subject: Re: PO# 60858758

Great thank you so much.

----- Original Message -----
From: Redacted
To: Redacted
Cc: Redacted

CONFIDENTIAL / PROPRIETARY BUSINESS RECORDS          STEM.HOUSE.SELECT_ 0374

Sent: Thursday, January 22, 2015 12:30:11 PM
Subject: RE: PO# 60858758

Hello,

There is one case currently in the room, I will let you know how the limbs and calvarium look to see if you are able to take them in about fifteen minutes.

Thank you,

Redacted

From: Redacted
Sent: Thursday, January 22, 2015 12:26 PM
To: Redacted
Cc:
Subject: Re: PO# 60858758

Hi Redacted

Just wanted to check in and see if there were any cases within our gestation range for today? Need to book some time on the equipment if so.

Thanks,

Redacted

----- Original Message -----
From: Redacted
To:
Cc:
Sent: Wednesday, January 21, 2015 3:23:30 PM
Subject: RE: PO# 60858758

Redacted

I will be happy to do that.

Thank you,

Redacted

From: Redacted
Sent: Wednesday, January 21, 2015 3:19 PM
To: Redacted
Cc:
Subject: Re: PO# 60858758

Redacted

Thank you for letting me know. We are now ready to include the skull so if you could please include that in our order for tomorrow that would be great. Just to clarify we are happy to receive one or the other depending on damage/integrity. If there is a case tomorrow could you please have someone contact me with the condition of both the long bones and the calvarium and I will be happy to let you know if we would like one or both.

CONFIDENTIAL / PROPRIETARY BUSINESS RECORDS

Can't thank you enough,

**Redacted**

----- Original Message -----
From: Redacted
To: ' Redacted
Sent: Wednesday, January 21, 2015 2:24:54 PM
Subject: RE: PO# 60858758

Hi Redacted

We were not able to procure a sample for you today. I will definitely try for tomorrow, and send an email to follow up then.

Thank you,

**Redacted**

From: Redacted
Sent: Wednesday, January 21, 2015 2:07 PM
To: Redacted
Cc: **Redacted**
Subject: Re: PO# 60858758

Congratulations. Thank you. It is much appreciated.

Redacted

----- Original Message -----
From: Redacted
To: **Redacted**
Cc:
Sent: Wed, 21 Jan 2015 14:05:10 -0800 (PST)
Subject: Re: PO# 60858758

Hello,

Not a problem at all. I have copied Redacted on this email because she will be able to answer your questions and update you faster than I can. I had a baby last week so I am working minimally from home. Hopefully we will have the sample for you by tomorrow. Thank you,

Redacted

On Jan 21, 2015, at 1:38 PM, **Redacted** wrote:

Hi Redacted

CONFIDENTIAL / PROPRIETARY BUSINESS RECORDS

Sorry to keep pestering you but the boss is pushing pretty hard. Are there any potential samples in our gestation range for today?

Thanks for all your help,

Redacted

----- Original Message -----
From: Redacted
To: Redacted
Sent: Tuesday, January 20, 2015 3:39:44 PM
Subject: Re: PO# 60858758

Thanks Redacted Appreciate it.
----- Original Message -----
From: Redacted
To:
Cc: Redacted
Sent: Tue, 20 Jan 2015 15:22:10 -0800 (PST)
Subject: Re: PO# 60858758

Hi Redacted

We did not have any patients in the gestational range today, but we will hope for tomorrow or Thursday and will keep you updated. Thank you!

Redacted

StemExpress

Redacted

Redacted
stemexpress.com

On Jan 20, 2015, at 3:01 PM, Redacted wrote:

Redacted

Just wanted to check to see if there was a possibility of a sample today?

Best,
Redacted
----- Original Message -----
From: Redacted
To: Redacted
Sent: Tue, 20 Jan 2015 04:34:00 -0800 (PST)
Subject: Re: PO# 60858758

CONFIDENTIAL / PROPRIETARY BUSINESS RECORDS

Hi [Redacted]

You will be on the schedule for limbs only. We will keep you updated on procurement. Thank you,

[Redacted]


On Jan 20, 2015, at 1:40 AM, [Redacted] wrote:

Hi [Redacted]

We have been unable to secure time on the required equipment. For this week we will only be able to process the limbs. Can you please remove the skull from this week's orders and put us on the list for limbs only. Any day this week would be great.

Thanks,

[Redacted]

----- Original Message -----
From: [Redacted]
To: [Redacted]
Sent: Tue, 13 Jan 2015 09:02:20 -0800 (PST)
Subject: Re: PO# 60858758

Hi [Redacted]

I have notified the techs and taken you off of the schedule this week. Thank you,

[Redacted]


On Jan 13, 2015, at 8:22 AM, [Redacted] wrote:

[Redacted]

Sorry for the short notice but could you please take us off of the list this week as we were unable to schedule time on the equipment we need to process the sample. We have reserved time for Tues, Wed, and Thur of next week if you could put us on the list for those days that would be much appreciated.

Thanks,

**Redacted**

----- Original Message -----
From: [Redacted]
To: "[Redacted]
Sent: Thursday, January 8, 2015 2:21:27 PM

CONFIDENTIAL / PROPRIETARY BUSINESS RECORDS

Subject: Re: PO# 60858758

Sounds good. I will talk to you next week. Thank you,

**Redacted**

StemExpress

**Redacted**

████████████

**Redacted**

stemexpress.com

On Jan 8, 2015, at 2:20 PM, **Redacted** wrote:

For next week can you please only put us on the list for Tuesday and Wed. as I will be out of town on Thursday.

Thanks again,

Redacted

----- Original Message -----
From: Redacted
To: Redacted
Sent: Thursday, January 8, 2015 2:18:38 PM
Subject: Re: PO# 60858758

Redacted

Thank you so much for letting me know. I will speak with you next week.

Best,

Redacted

----- Original Message -----
From: Redacted
To:
Cc: **Redacted**
Sent: Thursday, January 8, 2015 1:26:09 PM
Subject: Re: PO# 60858758

Hi Redacted

The samples within the gestational age requested were very damaged. I will have you on the schedule for next week for the skull and limbs unless I hear otherwise. Thank you for your patience.

Redacted

CONFIDENTIAL / PROPRIETARY BUSINESS RECORDS

**Redacted**

StemExpress

**Redacted**

778 Pacific Street
Placerville, CA 95667

**Redacted**

stemexpress.com

On Jan 7, 2015, at 8:50 AM, **Redacted** wrote:

Redacted

Thank you for the update. Fingers crossed for tomorrow.

Best,

Redacted

----- Original Message -----
From: **Redacted**
To:
Cc: **Redacted**
Sent: Wednesday, January 7, 2015 7:25:52 AM
Subject: Re: PO# 60858758

Hi Redacted

There are not any cases that fall into your gestational range today, but we will try to get the specimen for you tomorrow. I will keep you updated. Thank you,

**Redacted**

StemExpress

**Redacted**

778 Pacific Street
Placerville, CA 95667

**Redacted**

stemexpress.com

On Jan 5, 2015, at 2:46 PM, **Redacted** wrote:

Hi Redacted

The new address is right next door to the old one but I would prefer that the sample be delivered to the original address

CONFIDENTIAL / PROPRIETARY BUSINESS RECORDS

Redacted

And as far as the skull is concerned yes we are mostly interested in the calvarium and the dura, so as long as the top portion of the skull is in tact we would be interested. Per usual, if you could please contact me with information about the sample (damage) I will let you know if it is what we are looking for.

This week we are only looking for the fetal limbs. Please put us on the list for fetal limbs (only) for this week. Tomorrow, Wed and thurs (1/6, 1/7 and 1/8) If we do not receive a sample this week we would like to be on the list next week for the skull and the limbs.

Thank you for all your help,

Happy New Year,

# Redacted

----- Original Message -----
From:
To:
Cc:

Redacted

Redacted

Sent: Monday, December 22, 2014 2:46:31 PM
Subject: PO# 60858758

Hello,

I just received PO#60858758 and noticed that the address for delivery is Redacted Redacted The last sample was sent to Redacted Redacted I just wanted to verify the new address.

I also wanted to confirm that you need the skull for cells and receiving the top portion of the skull intact is more important than the facial structures.

The sample will most likely be procured after 1/6/15 due to reduced scheduling in the clinics for the holidays.

Thank you,

# Redacted

StemExpress

# Redacted

CONFIDENTIAL / PROPRIETARY BUSINESS RECORDS

STEM.HOUSE.SELECT_ 0381


stemexpress.com

CONFIDENTIAL / PROPRIETARY BUSINESS RECORDS

Exhibit 5.1.1

ONE HUNDRED FOURTEENTH CONGRESS

# Congress of the United States

## House of Representatives

### COMMITTEE ON ENERGY AND COMMERCE

2125 RAYBURN HOUSE OFFICE BUILDING
WASHINGTON, DC 20515–6115

Majority (202) 225–2927
Minority (202) 225–3641

December 17, 2015

Ms. █████████
Founder & CEO
StemExpress
█████████████████

Dear Ms. █████

    We thank you for your August 21, 2015, production of StemExpress materials to the Committee on Energy and Commerce. On October 7, 2015, the U.S. House of Representatives passed H. Res. 461, which created the Select Panel on Infant Lives and empowered the panel to investigate issues related to fetal tissue research. This document request is made pursuant to the scope of investigative responsibility of the panel.

    As a result, we are hereby requesting that you produce the following categories of documents and information created or dated on or after January 1, 2010:

1) A list of all entities, including firms, corporations, non-profit organizations, and educational institutions, from which StemExpress receives or procures fetal tissue.[1]

2) A list of all entities, including firms, corporations, non-profit organizations, and educational institutions, to which StemExpress sells or donates fetal tissue.

3) A list of all entities, including firms, corporations, non-profit organizations, and educational institutions, to which StemExpress transferred, subcontracted or sold any business interest or business assets related to the procurement or sale of fetal tissue.

4) An organization chart that details StemExpress personnel that procure fetal tissue at the clinic level and the supervisory personnel for those procurers of fetal tissue.

---

[1] Please note that, for the purposes of this request, the term "fetal tissue" includes tissue, organs, body parts, and cell lines.

5) All communications, whether internal or external, that direct StemExpress personnel to procure fetal tissue, including, but not limited to memoranda, emails, telephone messages, and purchase orders or bills of sale.

6) All accounting records including accounting memoranda related to the cost and pricing of fetal tissue.

7) All specific requests made to StemExpress for fetal tissue made by any and all firms, corporations, non-profit organizations, educational institutions, or other entities, including, but not limited to, order lists, billing records, payment records, payment vouchers, and receipts.

8) All documents relating to the purchase, ownership, or rental by StemExpress of equipment involving fetal tissue research, the preparation of fetal tissue for research, the modification of fetal tissue into cell lines, or any other actions taken by StemExpress related to fetal tissue including, but not limited to, the date the equipment was purchased, its purchase price, its maintenance costs, and records of the depreciation treatment under the tax code of any such equipment.

9) An inventory record of all fetal tissues obtained, sold, or retained by StemExpress, as well as an inventory of current fetal tissue including, in particular, any records that refer to multiple tissue samples or organs or body parts harvested from a single fetus.

10) All records related to any fetal tissue or cell lines procured or sold from twin fetuses.

11) All documents relating to rent or site fees paid to entities from which StemExpress obtained, sold, or donated fetal tissue.

12) All training materials used by StemExpress for the procurement of fetal tissue, preparation of fetal tissue, storage of fetal tissue, and training materials or guidance documents related to StemExpress staff relations with personnel or patients at the source entities from which fetal tissue is procured.

13) All StemExpress banking records related to the procurement, sale, donation, or distribution or shipment of fetal tissue.

Please produce the requested documents by the close of business on December 29, 2015. Instructions for responding to the Select Panel's document requests are included as an attachment to this letter.

If you have any questions about this request, please contact Matthew Tallmer of the Select Panel Staff at (202) 225-2927, or by email at ██████████████


Sincerely,

Marsha Blackburn
Chair
Select Panel on Infant Lives

Attachment(s)

cc:    The Honorable Jan Schakowsky, Ranking Member
Select Panel on Infant Lives

Exhibit 5.1.2



McDermott
Will & Emery

Boston Brussels Chicago Dallas Düsseldorf Frankfurt Houston London Los Angeles Miami
Milan Munich New York Orange County Paris Rome Seoul Silicon Valley Washington, D.C.
Strategic alliance with MWE China Law Offices (Shanghai)

Amandeep S. Sidhu
Attorney at Law

March 18, 2016

**DELIVERED VIA EMAIL**

March Bell
Matthew Tallmer
Select Panel on Infant Lives
House Energy & Commerce Committee
2125 Rayburn House Office Building
Washington, DC 20510-6115

      **Re:    Response to March 18 Email Demands**

Dear March & Matt:

On behalf of our client, StemExpress LLC, we are writing in response to your email correspondence from earlier today, March 18 (enclosed here for your reference). In your email, you unilaterally reneged on our previous agreement regarding the terms and scope of StemExpress's response to the Select Panel's February 12 subpoena. To be clear, during our March 4 teleconference we expressed concern that—in light of the prior production of <u>four months</u> of documents responsive to Subpoena Specification Nos. 6, 9, and 11—complete response to the subpoena across five years would be abusive, unduly burdensome, and not likely to produce information that is necessary for the Select Panel to fulfill its so-called "mandate" under House Res. 461. As a reasonable alternative to these subpoena requests, we offered to confirm with our client the possibility of generating a "roll-up" accounting report listing StemExpress's transfer of fetal tissue to researchers, organized by customer, and including the amounts paid by each customer. While this report would constitute work product created for the Select Panel (*i.e.*, not maintained in the regular course of business), we understood that the proposed contents of such a report would meet the needs of the Select Panel.

On our call earlier this week, on March 14, we confirmed that our client is able to produce such a report for 2015 and would produce that report on or before March 28. It was our understanding that you agreed to review this 2015 roll-up report and determine whether additional years would be necessary in subsequent productions. We neither discussed the dates for such future productions nor agreed to any specific deadlines. While we have now confirmed that we will be able to produce a similar report for 2014 by March 28, as well, we did not and could not agree to an identical production schedule for similar reports from 2011-2013 at that time for specific reasons described here. As a small start-up company, StemExpress only recently migrated to an accounting system capable of generating the types of reports. While we have confirmed that the

new accounting system can generate reports for 2014 and 2015 fetal tissue sales, our client has not yet determined whether similar reports can be generated for 2011-2013 using the old accounting system. Based on our agreement to limit the initial production to a 2015 report, and now a 2014 report, the effort to determine what information is available for 2011-2013 is ongoing. The other years may take some additional time and are unlikely to be ready on for production by April 1, as you sought in today's email. We will advise you when we believe we can add the three additional reports or take the position we cannot easily do so.

Similarly, your email demands the production of payment invoices for the five independent clinics identified to the Select Panel. While this is likely feasible, we will need to confer with our client to determine whether this information can be produced by April 1 or if we need additional time. We are more likely to be able to accomplish this by April 1 or soon thereafter.

Finally, for the first time today you demand the identification of StemExpress's "bookkeeper or accountant by close of business today." First, your demand for this information within a few hours is not achievable. Counsel do not know and will obtain this information from the relevant personnel that perform this function at StemExpress when they are available on Monday. Second, the basis for your request may be to send a duplicative request to the "bookkeeper or accountant" for the same information you are demanding directly from StemExpress. Therefore, if you intend to issue a separate subpoena to such individual(s) requests that will duplicate the very information you are still seeking from StemExpress, we object. Third, and notwithstanding or first two objections noted above, your email does not constitute an official communication from the Congress to which we are obligated to respond. If you do intend to "require" this information, we could reasonably ask that you do so through a letter from Chairman Blackburn or a new subpoena. Cooperation is something we can only accomplish when treated in a cooperative manner. We will have no answer for you tonight.

Since December 2015, StemExpress has endeavored to be fully cooperative with the Select Panel's requests for information. This cooperation comes on the heels of full cooperation with the prior Congressional investigations. As reflected in our March 14 production, our client has now provided complete responses to nearly all of the subpoena specifications. We were pleased with the mutual cooperation and progress we made on our March 14 teleconference, but your email today is not consistent with that discussion.

If you have any questions about this correspondence, please do not hesitate to contact me at 202-756-8380.

Sincerely,

Amandeep S. Sidhu

Enclosure

cc (w/encl.):

Heather Sawyer, Select Panel Minority Chief Counsel



Boston  Brussels  Chicago  Dallas  Düsseldorf  Frankfurt  Houston  London  Los Angeles  Miami
Milan  Munich  New York  Orange County  Paris  Rome  Seoul  Silicon Valley  Washington, D.C.

Strategic alliance with MWE China Law Offices (Shanghai)

Amandeep S. Sidhu
Attorney at Law
███████████

May 6, 2016

## DELIVERED VIA EMAIL

The Honorable Marsha Blackburn
Chair, Select Investigative Panel
House Energy & Commerce Committee
2125 Rayburn House Office Building
Washington, DC 20510

The Hon. Jan Schakowsky
Ranking Member, Select Investigative Panel
House Energy & Commerce Committee
2322A Rayburn House Office Building,
Washington, DC 20515

**Re:** **StemExpress Response to Chairman Blackburn's April 28 Letter to StemExpress**

Dear Chairman Blackburn & Ranking Member Schakowsky:

On behalf of our client, StemExpress LLC ("StemExpress"),[1] this letter responds to Chairman Blackburn's April 28, 2016 letter addressed to StemExpress's CEO, ███████ The Chairman's letter raises several issues regarding perceived deficiencies in StemExpress's production of documents and information to the Select Panel. The factual record demonstrates that the Majority is mistaken in its characterizations of the company's responses to the Select Panel's investigation. The Chairman's most recent letter perpetuates an incorrect narrative of "non-cooperation" that is not supported by the facts.

Chronology of StemExpress's Responses to Select Panel

From the outset of the Select Panel's investigation, StemExpress has endeavored to respond to each of the Majority's requests – whether voluntarily or in response to various subpoenas. Upon receipt of Chairman Blackburn's December 17, 2015 letter requesting documents, StemExpress's counsel immediately contacted the Majority's staff and offered to produce all documents that were previously produced to the House Oversight & Government Reform Committee and the Senate Judiciary Committee. This volume of over 200 pages of documents was produced to the Select Panel three business days later, complementing over 700 pages of materials that were

---

[1] StemExpress is a privately held life sciences company that supports leading research institutions in the United States and internationally—including medical schools, pharmaceutical companies, and federal agencies—to provide stem cells and other human tissue critical to medical research. Cells produced by the physicians, scientists, medical technicians and nurses at StemExpress are currently used in research globally aimed at finding cures and treatments for cancer, diabetes, HIV/AIDS, cardiac disease, and other significant medical conditions. StemExpress plays a critical role in helping the global research community as they strive to achieve medical breakthroughs to stamp out global disease and improve quality of life.

produced to the House Energy & Commerce Committee in its earlier investigation. Based on explicit agreements with the Majority staff, StemExpress made two additional productions spanning over 400 pages of materials that responded to nearly all of the Majority's requests. Borne out of specific death threats directed and StemExpress and its employees[2] and the murderous attacks at a Planned Parenthood clinic in Colorado,[3] StemExpress only questioned three areas of inquiry based on demonstrably legitimate safety and security concerns: (1) identification of individual StemExpress employees and the identification of individual scientists and researchers employed by StemExpress's fetal tissue customers; (2) identification of StemExpress's fetal tissue customers; and (3) identification of independent (*i.e.*, non-Planned Parenthood) women's clinics that have partnered with StemExpress to support fetal tissue procurement.

The Select Panel Majority subsequently issued a subpoena on February 12, 2016. StemExpress's counsel again conferred with the Majority staff and indicated that the company would respond completely to the request to identify StemExpress's fetal tissue customers and independent clinics once those entities could be contacted and advised to take necessary safety and security arrangements that could result the Select Panel's inquiry. StemExpress produced this information in full two weeks after receipt of the February 12 subpoena. Through subsequent discussions with the Majority staff, StemExpress also agreed to produce "roll-up" reports generated from the company's accounting system to reflect all fetal tissue transfers from January 1, 2011 through December 31, 2015. StemExpress produced the accounting reports for 2014 and 2015 on March 28 and indicated that the reports for 2011-2013—which were being pulled from a separate accounting system—would follow shortly. Amid StemExpress's continued cooperation and commitment to produce the remaining accounting records the following week, the Majority nonetheless issued additional subpoenas on March 29 that, in part, requested the *very information* that StemExpress had already agreed to produce. Nonetheless, StemExpress produced the remaining accounting reports for fetal tissue transfers from 2011-2013 on April 11, along with additional documents responsive to the March 29 subpoenas and documents voluntarily produced in response to separate requests from the Majority's staff.

Combined with the earlier productions to the Energy & Commerce Committee, StemExpress has produced over 1,600 pages of documents in response to the Majority's various inquiries. Below is an index of the productions that have been made by StemExpress in response to the various requests for information.

---

[2] Mark Anderson, *Anti-abortion activist pleads guilty to threatening StemExpress CEO*, SACRAMENTO BUSINESS JOURNAL (Apr. 19, 2016), http://www.bizjournals.com/sacramento/news/2016/04/19/anti-abortion-activist-pleads-guilty-death-threats.html.

[3] Jack Healy, *Documents Detail Scene of Planned Parenthood Shooting in Colorado Springs*, THE NEW YORK TIMES (Apr. 11, 2016), http://www.nytimes.com/2016/04/12/us/documents-detail-scene-of-planned-parenthood-shooting-in-colorado-springs.html?_r=0.

| Production No. | Production Date | Bates Range |
|---|---|---|
| Prior Production to House E&C | August-September 2015 | STEM.HOUSE.EC_0001-0710 |
| 1 | December 22, 2015 | STEM.HOUSE.SELECT_0001-226 |
| 2 | January 15, 2016 | STEM.HOUSE.SELECT_0227-282 |
| 3 | February 1, 2016 | STEM.HOUSE.SELECT_0283-659 |
| 4 | February 26, 2016 | STEM.HOUSE.SELECT_0660-661 |
| 5 | March 4, 2016 | STEM.HOUSE.SELECT_0662-663 |
| 6 | March 14, 2016 | STEM.HOUSE.SELECT_0664-705 |
| 7 | March 28, 2016 | STEM.HOUSE.SELECT_0706-712 |
| 8 | April 11, 2016 | STEM.HOUSE.SELECT_0713-891 |
| 9 | April 19, 2016 | STEM.HOUSE.SELECT_0892-907 |

Additionally, we have compared Appendix A in Chairman Blackburn's letter, described as "StemExpress Production Log," with the actual productions made by the company since December 2015. *See* Appendix A: Corrected StemExpress Production Log. *With very few exceptions, nearly every single characterization of the status of StemExpress's productions to date is inaccurate. Id.* In at least twelve instances, the Majority characterizes StemExpress's response as "no" when, in fact, the company has *already completed its production. Id.* These misstatements perpetuate the factually incorrect narrative of noncooperation that is apparently being promulgated by the Majority.

StemExpress's Future Responses to Select Panel

StemExpress is committed to cooperating with the Select Panel's investigation. However, we ask for fairness and accuracy in the Select Panel's characterization of StemExpress and the company's responses in this investigation. This concern was made readily apparent in the April 20 hearing entitled "The Pricing of Fetal Tissue," when the Majority used documents purporting to be from StemExpress that were apparently from the stolen cache of materials held by ███████ ███████ and the Center for Medical Progress. *See* Exhibit A, Letter from StemExpress to Chairman Blackburn re April 20 Hearing Exhibits (Apr. 19, 2016). Member of the press picked up incorrect statements of facts from these exhibits and repeated them to the American public.[4]

StemExpress also remains gravely concerned about the Majority's insistence on "naming names" of individual researchers associated with StemExpress's customers and identifying StemExpress personnel without any explanation of why this information is required. To date, the Majority has not provided any explanation as to why it needs the names of all StemExpress personnel rather than accept the witnesses that have been offered, including a corporate witness to provide

---

[4] *See, e.g.*, Rachel Stoltzfoos, *Two Sickening Charts Show Explosive Growth Of Fetal Tissue Buyer*, THE DAILY CALLER (Apr. 30, 2016), http://dailycaller.com/2016/04/30/two-sickening-charts-show-explosive-growth-of-fetal-tissue-buyer/ (citing to the Majority's Exhibit B4 as evidence that StemExpress worked with 250 abortion clinics in 2016 when, in fact, StemExpress has *never* actively procured fetal tissue from more than *nine clinics*, and that was in 2012; in 2016 that number is *only four*).

testimony consistent with Fed. R. Civ. P. 30(b)(6) on the fetal tissue procurement process. While the Chairman is correct that an investigatory Congressional committee has broad power of inquiry, the U.S. Supreme Court has made clear and that this power "is not unlimited" and "[t]here is no general authority to expose the private affairs of individuals without justification in terms of the functions of the Congress." *Watkins v. United States*, 354 U.S. 178, 187 (1957). It is also important to note that "Congress [is not] a law enforcement or trial agency," as "[t]hese are functions of the executive and judicial departments of government." *Id.* The Majority seems intent on inappropriately to be acting as if it is a law enforcement agency, a function that is reserved for the Executive Branch.[5] With regard to the Majority's unwavering demand to collect names of individuals without providing a justifiable basis or demonstrating pertinence, the Majority should note that "[n]o inquiry is an end in itself; it must be related to, and in furtherance of, a legitimate task of the Congress. Investigations conducted solely for the personal aggrandizement of the investigators or to 'punish' those investigated are indefensible." *Id.*; *see also United States v. Rumely*, 345 U.S. 41, 47 (1953).

The Chairman's letter cites to *Ashland Oil*, *Exxon Corp.*, and *FTC v. Owens-Corning Fiberglass Corp.* to stand for the proposition that witnesses must provide Congressional committees materials that could pose serious safety and security concerns for the witnesses because "committees of Congress will exercise their powers responsibly and with due regard for the rights of affected parties." However, as the D.C. Circuit in *Owens-Corning* noted, "[b]oth *Ashland* and *Exxon* leave open the possibility of judicial intervention to block the FTC's release to Congress of data containing trade secrets, if the owners of that data can establish that it is likely that Members of Congress or Congressional employees will act irresponsibly, such as by demonstrating a history of past releases by them to the public of data containing trade secrets." *F.T.C. v. Owens-Corning Fiberglass Corp.*, 626 F.2d 966, 981 (D.C. Cir. 1980).

StemExpress and its employees were directly targeted by an individual who was investigated by the FBI, arrested and prosecuted by the U.S. Department of Justice, and recently pled guilty in federal court for his illegal death threats. StemExpress has made the Majority aware of these concerns on numerous occasions, but has received little by way of assurance that the Majority will ultimately protect the names of any individual employees. The Chairman's recent focused attention on StemExpress's CEO—including the April 28 letter itself, which was made public with a May 2 press release that unequivocally "names names"—raises additional questions about the protection of individuals' identities involved in the Select Panel's investigation. Ultimately, StemExpress's narrowly tailored interest in the safety of individual employees and client personnel outweighs the Majority's claim to certain information. *Cf. Bergman v. Senate Special Comm. on Aging*, 389 F. Supp. 1127, 1130 (S.D.N.Y. 1975) (citing *Watkins*, 354 U.S. 178 ("[W]here the inquiry or the request for documents is not 'justified by a specific legislative

---

[5] *See Select Investigative Panel Issues Subpoenas for StemExpress Accounting & Banking Records*, Energy & Commerce Cmte. (May 5, 2016), https://energycommerce.house.gov/news-center/press-releases/select-investigative-panel-issues-subpoenas-stemexpress-accounting ("[d]ocuments uncovered by our investigation so far point to the very troubling possibility that StemExpress may have violated federal law by profiting from the sale of baby body parts").

need,' the threat of a violation of an individual's constitutional rights, including his or her 'personal interest in privacy,' outweighs any right the Subcommittee might claim to the subpoenaed documents and requires that disclosure not be compelled.").

Select Panel Majority's Latest New Requests to StemExpress

As outlined in the earlier discussion, the Majority has consistently "moved the goalposts" over the past several months to perpetuate an inaccurate narrative of noncooperation. The Chairman's April 28 letter does this once more by adding over a dozen _new_ requests for extensive financial and accounting information. These 13 new requests, listed below, cover a large volume of reports and data, some of which has already been produced but much of which is not pertinent to the Select Panel's scope of inquiry authorized by H. Res. 461.

| Request No. | Description |
|---|---|
| 1 | All StemExpress accounting records, including but not limited to accounting memoranda related to the cost and pricing of fetal tissue. |
| 2 | Copies of all invoices (by month and year), reflecting the billing that Stem Express issued to all institutions or entities to which StemExpress donated or provided fetal tissues for the following years: 2010, 2011, 2012, 2013, 2014 and 2015. |
| 3 | Copies of all invoices (by month and year), reflecting the billing that Stem Express issued to all institutions or entities to which StemExpress donated or provided fetal tissues for the following years: 2010, 2011, 2012, 2013, 2014 and 2015. |
| 4 | Copies of all invoices (by month and year) reflecting the billing or payment of funds for fetal tissues obtained by StemExpress for the following years: 2010, 2011, 2012, 2013, 2014 and 2015. |
| 5 | A copy of any chart of accounts for StemExpress, including but not limited to account descriptions from any financial recording system relating to StemExpress. |
| 6 | All documents reflecting StemExpress' statement of revenues (i.e., a breakdown by product categories) for the following years: 2010, 2011, 2012, 2013, 2014 and 2015. |
| 7 | All documents reflecting StemExpress' record of costs and expenses (i.e., a breakdown by operations, including fetal tissue acquisition) for administrative costs and expenses as well as compensation and benefits, for the following years: 2010, 2011, 2012, 2013, 2014 and 2015. Where applicable, records should include identification of vendors and descriptions of expenses. |
| 8 | StemExpress' balance sheets for the following years: 2010, 2011, 2012, 2013, 2014 and 2015. Audited statements should be provided, if available. |
| 9 | StemExpress' income statements, including but not limited to any profit and loss statements, statements of operations and statements of activities for the following years: 2010, 2011, 2012, 2013, 2014 and 2015. Audited statements should be provided, if available. |
| 10 | Copies of StemExpress' filed tax returns for the following years: 2010, 2011, 2012, 2013, 2014 and 2015. |
| 11 | All StemExpress bank statements from any financial institution where StemExpress has |

| Request No. | Description |
|---|---|
| | maintained an account for the following years: 2010, 2011, 2012, 2013, 2014 and 2015. |
| 12 | Documents sufficient to show how StemExpress calculates(d) the cost of a fetal tissue and all factors applied in determining pricing of fetal tissue. In lieu of these documents, you may provide a written explanation. |
| 13 | All communications and documents to or from the Director of Finance, Finance Manager, Accountant Manager, or equivalent position(s). |

The new requests also expand the scope of the earlier investigation by adding 2010, whereas all prior requests were limited to 2011 through 2015. In light of the Majority's interactions with StemExpress in recent months, the company will not be responding to these new requests unless and until a subpoena requesting this new information is duly served. StemExpress will, however, begin collecting documents responsive to these new requests and determining what information is pertinent to the Select Panel's investigation and could be produced in response to a future subpoena, which we assume will be forthcoming.

* * * * *

StemExpress remains committed to responding to the Select Panel's inquiries, but respectfully implores upon the Chairman and the leadership of the Majority party to restore a sense of order and decency to this investigation. We are certainly willing to work with the Majority staff—in conjunction and consultation with the Minority staff—to reach common ground and provide requested information in a reasonable but timely manner. However, the ever-shifting prerogative of the Majority staff, including reneging on explicit agreements reached during the course of the investigation, and the recent foray into law enforcement by the Majority members on the Select Panel, all raises serious questions about purpose and legitimacy of this investigation.

If you have any questions about this correspondence, please do not hesitate to contact me at ███

Sincerely,

Amandeep S. Sidhu

Encl.

cc (via email w/encl.):

Kerry W. Kircher, General Counsel, U.S. House of Representatives
Karen Christian, General Counsel, Committee on Energy and Commerce

Mark Epley, General Counsel, Office of the Speaker
Jo-Marie S. Green, General Counsel, Office of the Minority Leader
March Bell, Select Panel Majority Staff Director
Heather Sawyer, Select Panel Minority Chief Counsel

# Exhibit 5.1.3

# SUBPOENA

## BY AUTHORITY OF THE HOUSE OF REPRESENTATIVES OF THE CONGRESS OF THE UNITED STATES OF AMERICA

To Five Star Bancorp
_____

You are hereby commanded to be and appear before the

Committee on Energy and Commerce
_____

Select Investigative Panel on Infant Lives
_____

of the House of Representatives of the United States at the place, date, and time specified below.

[✓] **to produce the things identified on the attached schedule** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

Place of production: Room 316 Ford House Office Building, Washington, D.C. 20515

Date: May 17, 2016                    Time: 5:00 p.m.

[ ] **to testify at a deposition** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

Place of testimony:_____

Date:_____                    Time:_____

[ ] **to testify at a hearing** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

Place of testimony: _____

Date:_____                    Time:_____

To_____

_____ to serve and make return.

Witness my hand and the seal of the House of Representatives of the United States, at

the city of Washington, D.C. this _2 9th_ day of _April_ , 20_16_ .

_Martha Blackburn_
_Chairman or Authorized Member_

Attest:

_Karen L. Haas_
_Clerk_

# PROOF OF SERVICE

---

Subpoena for

     Five Star Bancorp

Address  c/o Todd A. Devogd, Agent for Service of Process, 6810 Five Star Boulevard, Suite 100

 Rocklin, CA 95677

before the  Committee on Energy and Commerce

 Select Investigative Panel on Infant Lives

*U.S. House of Representatives*
*114th Congress*

---

Served by (print name) _____

Title _____

Manner of service _____

_____

Date _____

Signature of Server _____

Address _____

_____

# Five Star Bancorp

**In accordance with the attached schedule, instructions, and definitions, you, Five Star Bancorp ("Five Star"), are required to produce all documents in unredacted form described below:**

For the period January 1, 2010, through the present, all documents relating to any Five Star Bank account(s) held by or in the name of Stem Express, LLC, and all documents relating in any way to account number ███████████

This request encompasses, but is not limited to, all:

1) Monthly account statements;

2) Credit card transaction receipts;

3) Documents reflecting payments related to the account(s), including, but not limited to, checks (front and back), debit memos, cash in tickets, and wire transfers; and

4) Correspondence related to the account(s).

## Instructions

1) The relevant time period for above-referenced documents is January 1, 2010, to the present.

2) In complying with this subpoena, you are directed that no document may be redacted in any way except that that all patient information protected by American Health Portability and Accountability Act of 1998 (HIPAA) shall be redacted.

3) In complying with the subpoena, be apprised that the U.S. House of Representatives and the Committee on Energy and Commerce, Select Investigative Panel on Infant Lives ("Select Panel") do not recognize any of the non-disclosure privileges associated with the common law, with the Freedom of Information Act, with attorney client privilege, or contractual privileges such as non-disclosure agreements.

4) In complying with this subpoena, you are directed to produce all responsive documents that are in your possession, custody, or control, whether held by you or your past or present agents, employees, and representatives acting on your behalf. You are also directed to produce records that you have a legal right to obtain, that you have a right to copy or to which you have access, as well as records that you have placed in the temporary possession, custody, or control of any third party.

5) No records, documents, data or information called for by this request shall be destroyed, modified, removed, transferred or otherwise made inaccessible to the Select Panel.

6) In the event that any entity, organization or individual denoted in this subpoena has been, or is also known by any other name than that herein denoted, the subpoena shall be read also to include them under that alternative identification.

7) Each document produced shall be produced in a form that renders the document capable of being copied.

8) Documents produced in response to this subpoena shall be produced together with copies of file labels, dividers or identifying markers with which they were associated when this subpoena was served. To the extent that documents were not stored with file labels, dividers, or identifying markers, they shall be organized into separate folders by subject matter prior to production

9) All documents or groups of documents, produced shall be identified by the paragraph number in the Attachment to the subpoena to which the documents, or groups of documents, are responsive.

10) It shall not be a basis for refusal to produce documents that any other person or entity also possesses non-identical or identical copies of the same document.

11) If any of the subpoenaed information is available in machine-readable or electronic form (such as on a computer server, hard drive, CD, DVD, memory stick, or computer back-up tape), you shall consult with Select Panel staff to determine the appropriate format in which to produce the information. Documents produced in electronic format shall be organized, identified, and indexed electronically in a manner comparable to the organizational structure called for in Paragraph 8 and 9 above. Documents produced in an electronic format shall also be produced in searchable format.

12) If compliance with the subpoena cannot be made in full, compliance shall be made to the extent possible, and your production shall be accompanied by a written explanation of why full compliance is not possible.

13) In the event that a document is withheld on any basis, provide the following information concerning each and every such document withheld from production: (a) the reason the document is not being produced; (b) type of document; (c) general subject matter; (d) date, author and addressee; and (e) relationship of author and addressee to each other.

14) If any document responsive to this subpoena was, but no longer is, in your possession, custody, or control, identify the document (stating its date, author, subject and

recipient(s)) and explain the circumstances by which the document ceased to be in your possession, custody, or control.

15) If a date or other descriptive detail set forth in this subpoena referring to a document is inaccurate, but the actual date or other descriptive detail is known to you or is otherwise apparent from the context of the request, you should produce all documents which would be responsive as if the date or other descriptive detail were correct.

16) This request is continuing in nature and applies to any newly-discovered information. Any record, document, compilation of data or information, not produced because it has not been located or discovered by the return date, shall be produced immediately upon location or discovery subsequent thereto.

17) All documents shall be bates-stamped sequentially and produced sequentially.

18) Two sets of responsive records shall be produced, one set to the Majority staff and one set to the Minority staff. The Majority set shall be delivered to Majority staff in Room 316 of the Ford House Office Building and the Minority set shall be delivered to the Minority staff at 361 Ford House Office Building. You shall consult with the Select Panel staff regarding the method of delivery prior to sending any material.

19) Upon completion of the document production, you must submit a written certification, signed by you or your counsel, stating that: (1) a diligent search has been completed of all documents in your possession, custody, or control which reasonably could contain responsive documents; (2) documents responsive to the request have not been destroyed, modified, removed, transferred, or otherwise made inaccessible to the Select Panel since the date of receiving the Select Panel's request or in anticipation of receiving the Select Panel's request, and (3) all documents identified during the search that are responsive have been produced to the Select Panel, identified in a log provided to the Select Panel, as described in Paragraph 13 above.

## Definitions

1) The term "document" means any written, recorded, or graphic matter of any nature whatsoever, regardless of how recorded, and whether original or copy, including but not limited to, the following: memoranda, reports, expense reports, books, manuals, instructions, financial reports, accounting and financial records of any kind (including checks (front and back), wire transfers, cash or check payments or receipts, and check requests), working papers, records, notes, letters, notices, confirmations, telegrams, receipts, appraisals, pamphlets, magazines, newspapers, prospectuses, interoffice and intra-office communications, electronic mail ("e-mail"), instant messages, text messages, calendars, contracts, cables, notations of any type of conversation, telephone call,

meeting or other communication, bulletins, printed matter, computer printouts, invoices, transcripts, diaries, analyses, returns, summaries, minutes, bills, accounts, estimates, projections, comparisons, messages, correspondence, press releases, circulars, financial statements, reviews, opinions, offers, studies and investigations, questionnaires and surveys, power point presentations, spreadsheets, and work sheets. The term "document" includes all drafts, preliminary versions, alterations, modifications, revisions, changes, and amendments to the foregoing, as well as any attachments or appendices thereto. The term "document" also means any graphic or oral records or representations of any kind (including, without limitation, photographs, charts, graphs, voice mails, microfiche, microfilm, videotapes, recordings, and motion pictures), electronic and mechanical records or representations of any kind (including, without limitation, tapes, cassettes, disks, computer server files, computer hard drive files, CDs, DVDs, back up tape, memory sticks, recordings, and removable computer media such as thumb drives, flash drives, memory cards, and external hard drives), and other written, printed, typed, or other graphic or recorded matter of any kind or nature, however produced or reproduced, and whether preserved in writing, film, tape, electronic format, disk, videotape or otherwise. A document bearing any notation not part of the original text is considered to be a separate document. A draft or non-identical copy is a separate document within the meaning of this term.

2) The term "documents in your possession, custody or control" means (a) documents that are in your possession, custody, or control, whether held by you or your past or present agents, employees, officers, directors, contractors, consultants, or representatives acting on your behalf; (b) documents that you have a legal right to obtain, that you have a right to copy, or to which you have access; and (c) documents that have been placed in the possession, custody, or control of any third party.

3) The term "communication" means each manner or means of disclosure, transmission, or exchange of information, in the form of facts, ideas, opinions, inquiries, or otherwise, regardless of means utilized, whether oral, electronic, by document or otherwise, and whether face-to-face, in a meeting, by telephone, mail, e-mail, instant message, text message, discussion, release, personal delivery, or otherwise.

4) The terms "and" and "or" should be construed broadly and either conjunctively or disjunctively as necessary to bring within the scope of this request any information which might otherwise be construed to be outside its scope. The singular includes the plural number, and vice versa. The masculine includes the feminine and neuter genders.

5) The terms "person" or "persons" mean natural persons, firms, partnerships, associations, limited liability corporations and companies, limited liability partnerships, corporations, subsidiaries, divisions, departments, joint ventures, proprietorships, syndicates, other

legal, business or government entities, or any other organization or group of persons, and all subsidiaries, affiliates, divisions, departments, branches, and other units thereof.

6) The term "StemExpress, LLC" includes StemExpress, LLC and any affiliates or related entities, all referred to herein, both individually and collectively, as "StemExpress".

7) The term "fetal tissue" means tissue, organs, body parts, and cell lines.

8) The term "study" or "proposal" means any work or regime of biomedical research that led to a report or memoranda, whether published or not.

9) The terms "referring" or "relating," with respect to any given subject, mean anything that constitutes, contains, embodies, reflects, identifies, states, refers to, deals with, or is in any manner whatsoever pertinent to that subject.

10) The terms "you" and "your" refer to Five Star Bancorp, whether known by this name or a different name, its past and present officers, directors, employees, consultants, contractors, agents, representatives, subsidiaries, and/or parents.

Exhibit 5.1.4

| Year | Date | Nature of Transaction | Description | Check Number | Entity | Amount |
|------|------|----------------------|-------------|--------------|--------|--------|
| 2015 | 13-Aug | Withdrawal | Check | 15316 | Shred-it USA | 73.49 |
| 2015 | 25-Aug | Withdrawal | Check | 15346 | Shred-it USA | 73.49 |
| 2015 | 29-Sep | Withdrawal | Check | 15466 | Shred-it USA | 72.80 |
| 2015 | 10-Nov | Withdrawal | Check | 15540 | Shred-it USA | 72.11 |
| 2015 | 10-Dec | Withdrawal | Check | 15636 | Shred-it USA | 72.11 |
| 2016 | 12-Jan | Withdrawal | Check | 15733 | Shred-it USA | 72.11 |
| 2016 | 27-Jan | Withdrawal | Check | 15771 | Shred-it USA | 74.52 |
| 2016 | 21-Mar | Withdrawal | Check | 15908 | Shred-it USA | 73.49 |
| 2016 | 26-Apr | Withdrawal | Check | 16018 | Shred-it USA | 73.49 |

Exhibit 5.1.5

# Congress of the United States

## House of Representatives

### COMMITTEE ON ENERGY AND COMMERCE

2125 RAYBURN HOUSE OFFICE BUILDING
WASHINGTON, DC 20515–6115

Majority (202) 225–2927
Minority (202) 225–3641

September 8, 2016

**DELIVERED VIA EMAIL**

Mr. Kevin M. Murphy
Carr Maloney PC
2020 K Street, N.W.
Washington, D.C. 20006

Dear Mr. Murphy:

I am in receipt of your letter dated June 28, 2016, in which Scinto Group asserts several arguments that it alleges excuse compliance with a lawful congressional subpoena issued by the Select Investigative Panel. For the reasons stated below, your reasoning is hereby rejected and thus, the Select Panel will proceed to schedule a Business Meeting to consider a Contempt Report describing your refusal and will vote on whether to refer that Report to the full House of Representative for consideration.

On October 7, 2015, the House voted to enact House Resolution 461, which established the Select Investigative Panel and "authorized and directed [it] to conduct a full and complete investigation and study and issue a final report of its findings . . . regarding (1) medical procedures and business practices used by entities involved in fetal tissue procurement; (2) any other relevant matters with respect to fetal tissue procurement; . . . and (6) any changes in law or regulation necessary as a result of any findings made under [those investigations and studies]."[1]

In House Report 114-288 on H. Res. 461, the authority of the Panel to issue subpoenas is summarized. "Section 4 provides that rule XI of the Rules of the House of Representatives and the rules of the Committee on Energy and Commerce shall apply to the select panel in the same manner as any other subcommittee, except that the chair of the select panel (1) is authorized to authorize and issue subpoenas, including for the purpose of taking depositions; (2) may order the taking of depositions by members or counsel of the select panel and that any deposition taken pursuant to this authority will be governed by the regulations issued by the chair of the Committee on Rules; and (3) may recognize members or staff to question witnesses for periods

---

[1] H. Res. 461, Section 3.

longer than five minutes as though pursuant to clause 2(j)(2) of rule XI." The Chairman of the Panel is required to consult to the extent practicable with the ranking minority but need not gain approval prior to issuance of a subpoena.

Pursuant to the authority delegated to it under House Resolution 461, the Select Investigative Panel is investigating whether entities that procure fetal tissue are using loopholes in federal law or engaging in business practices that have the effect of undermining the purpose of laws prohibiting the interstate transfer of any fetal tissue for valuable consideration. As part of that investigation, the Panel is examining whether 42 U.S.C. § 289g-2 is effective, or needs to be amended to better achieve the legislative goals of the statute. Under Title 42 U.S.C. § 289g-2, which is, at its heart, an accounting statute, it is unlawful for any person to knowingly acquire, receive, or otherwise transfer any fetal tissue for valuable consideration if the transfer affects interstate commerce. The term "valuable consideration" does not include reasonable payments associated with the transportation, implantation, processing, preservation, quality control, or storage of human fetal tissue.

Through publicly available information and the Select Investigative Panel's investigation, the Panel identified StemExpress, LLC ("StemExpress"), as an entity that procured fetal tissue from abortion clinics and transferred it to researchers. In accordance with its authorization under House Resolution 461, and consistent with its interest in examining whether any changes in federal laws or regulations are necessary as a result of its investigation, the Select Investigative Panel sought documents from StemExpress. As a result of StemExpress' failure to comply fully with the Panel's voluntary request for documents, the Panel was forced to subpoena StemExpress, its CEO, ███████████████████, and its outside accountant, Scinto Group, LLP ("Scinto"). Despite many accommodations and much negotiation with the subpoena recipients, StemExpress and ███████ willfully and inexcusably have refused to comply with important aspects of the Panel's congressional subpoenas. Further, after refusing to comply with the Panel's subpoena, StemExpress also has willfully and successfully attempted to convince its outside accountant, Scinto, to similarly refuse any compliance with the Panel's subpoena.

Due to StemExpress' and ███████'s failure to comply with the Panel's subpoenas and their continual refusal to provide accounting information directly pertinent to the Panel's investigation and study, conducted pursuant to House Resolution 461, the Panel was forced to subpoena Scinto, StemExpress' outside accountant. Scinto has indicated that it consulted with StemExpress counsel and that StemExpress expressly instructed Scinto not to produce its financial records in response to the Panel's subpoena.

Scinto Group, the accountant for StemExpress, states that it will observe and protect the "applicable privileges and confidentiality rights that it [StemExpress] has in it documents." Scinto offers the explanation that based upon communications from StemExpress it does not want exposure to civil or criminal liability should it violate StemExpress' privileges or confidentiality. Then, Scinto Group proposes a remarkable and novel solution: the Panel should subpoena the "same records" from StemExpress as a way to negate the applicability to Scinto of a California privilege and confidentiality statute. Scinto Group's proposal that the Panel should seek documents from one noncomplying entity to obtain compliance from another noncomplying entity when one is the privileged client of the other sullies the integrity of Congress, asking it to

2

play musical chairs, hoping that someone will someday comply with a subpoena. "[I]t is unquestionably the duty of all citizens to cooperate with the Congress in its efforts to obtain the facts needed for intelligent legislative action. **It is their unremitting obligation to respond to subpoenas** [emphasis added], to respect the dignity of the Congress and its committees and to testify fully with respect to matters within the province of proper investigation." *Watkins*, 354 U.S. at 187-88.

Scinto Group next questions the applicably of C.F.R. §7216-2(f)(3) which provides a clear congressional subpoena exception to 26 U.S.C. §7216 and 26 U.S.C. §6713 by asserting that the regulation somehow does not apply because the full House of Representatives has not acted or because the minority does not agree with the issuance of the subpoena to Scinto Group. As noted above, H., Res. 461 conferred subpoena authority upon the Chairman of the Select Panel. Thus, the House has acted.

Scinto Group also relies upon a novel grammatical reading of a California statute, (CA Code, Bus. & Prof., §5063.3) to propose that it cannot disclose the information the Congress seeks. Scinto cites the phrase "enforceable by a court" (an exception to non-disclosure rules) to suggest that since the House of Representatives has not yet secured a court order to enforce its subpoena that its subpoena is outside the definition of "enforceable by a court" thus excusing Scinto from compliance. Counsel for Scinto could easily research the history of Congress enforcing its subpoenas in federal court to realize this argument is without merit.

Scinto also suggests that attorney-client privilege somehow extends to accountant client privilege thereby excusing it compliance. Since as a matter of law Congress does not recognize either privilege this argument is without merit.

Should the Panel fail to obtain compliance from Scinto Group, the Chairman of the Select Investigative Panel will recommend that Scinto be held in contempt for their willful failure to fully comply with the Panel's subpoenas issued to them. The Chairman will also recommend that the Speaker of the House of Representatives, pursuant to 2 U.S.C. §§ 192 and 194, certify this report of the Select Investigative Panel to the United States Attorney for the District of Columbia, and that Scinto Group be proceeded against in the manner and form provided by law.

Sincerely,

T. March Bell
Chief Counsel and Staff Director
Select Investigative Panel of
the Committee on Energy and Commerce

cc:     Heather Sawyer
        Democratic Staff Director
        Select Investigative Panel

Exhibit 5.1.6

**CARR MALONEY** PC.

Offices in Washington, DC  Maryland  Virginia

2020 K Street, NW, Suite 850, Washington, DC 20006

carrmaloney.com

Kevin M. Murphy

Admitted in MD & DC

September 16, 2016

Via Email Only to: March.Bell@mail.house.gov

T. March Bell, Esq.
Chief Counsel and Staff Director
Select Investigative Panel on Infant Lives
2125 Rayburn House Office Building
Washington, DC 20510

   Re: Subpoena to Scinto Group, LLP

Dear Mr. Bell:

  As you know, this law firm represents the CPA firm, Scinto Group, LLP. This letter is in response to your letter to me of September 8, 2016, in which you described an intention to pursue contempt resolutions and referral against Scinto Group, LLP.

  First, let me reiterate that, if not for the potential application of the privilege and/or confidentiality laws, Scinto Group LLP would be willing and able to comply with a valid subpoena from the Select Investigative Panel. However, in light of the potential application of those laws, under the current circumstances, Scinto Group is not in a position to unilaterally respond to the subpoena with the requested documents, absent client consent. I explained in my letter of June 28, 2016, in some detail, our specific legal analysis in that regard. I believe that the status of our discussion is, at most, a difference of opinion on the scope and interpretation of privilege and confidentiality laws. However, because your letter describes an intention to pursue contempt proceedings, it appears that you do not see this as a valid difference of opinion about the applicability of privilege and confidentiality laws and subpoena procedure. Nevertheless, I believe there is merit to further discussion of this matter, and so I ask you to please review this letter and respond.

  Contrary to the suggestion in your letter, Scinto Group had no intent to "sully the integrity of Congress" when it suggested to you a method to resolve the privilege and confidentiality legal hurdles. To the contrary, we simply presented our view of the legal impediments that we face with respect to the subpoena, and then we proposed what seemed to be a perfectly reasonable and logical solution to the hurdles presented by the privilege and confidentiality laws – the Select Panel could issue a subpoena for the same records directly to StemExpress, since the records that Scinto Group has in its files were almost entirely provided to it by StemExpress. On the issue of that suggestion, we are a bit confused by some of the discussion in your letter, and we ask for clarification. Your



T. March Bell, Esq.
September 16, 2016
Page Two

letter appears to suggest in one part (p.2, ¶3) that StemExpress has received and failed to comply with a subpoena for the tax, financial statement, ledger and expense records that were covered by the subpoena to Scinto Group. But, in other parts of your letter (p.2, ¶2 and ¶4), it appears to suggest that there has not yet been a subpoena to StemExpress that covers those specific requests, and rather there have only been voluntary requests to StemExpress for those items. Our understanding is that StemExpress has not received a subpoena for those specific tax, financial statement and related items that were requested in the subpoena to Scinto Group. If that understanding is correct, then it still seems clear to me that our suggestion remains the most efficient means to eliminate the privilege and confidentiality problems that are presented by the subpoena to Scinto Group. If that understanding is incorrect, please let me know.

In regard to another comment in your letter, you say that "Congress does not recognize either privilege (attorney-client or accountant-client)". However, that is not my understanding of applicable rules and precedent, as discussed in footnote 1 of my letter and in CRS Report 7-5700. If you are aware of some applicable legal precedent that supports that proposition in your letter, would you please provide it, so that I can consider it as we further address this matter?

Also, your letter says that because H. Res. 461 conferred subpoena authority upon the Chair of the Select Investigative Panel, "the House has acted." It sounds as though you are taking the position that when a committee or panel is authorized to issue subpoenas, there are no limits to the scope or terms of the subpoenas it issues, and no circumstances under which such subpoenas could be questioned or invalidated, either for purposes of procedural deficiencies, application of privilege or confidentiality statutes, or the like. Am I reading your position correctly? If so, I again ask if you have legal precedent for that position, and if so would you please provide it; because, as I read the various cases discussed in CRS Report 7-5700, that is not my understanding of prior precedent in regard to congressional subpoenas. But, I am willing to review and reconsider based on what you may reference to me.

I also ask that you tell me what is the process that you anticipate, and the timing of that process. I presume, based on the fact that your letter of September 8 was sent more than two months after my letter to you of June 28, that there is not an intent to rush to initiate proceedings aimed at a contempt resolution until we have had at least a reasonable time to consider and further discuss this matter in light of your letter of September 8 and potential further communication. But, if that is not correct, and if there is an intent to move on some expedited time basis, please let me know the expected timing.

I see that your letter references a process that would include a Business Meeting of the Select Investigative Panel and a Report to the full House for consideration. But, then your letter also refers to the Chair of the Select Investigative Panel certifying "this report", presumably a


T. March Bell, Esq.
September 16, 2016
Page Three

report of the Select Investigative Panel, to the Speaker with a recommendation to certify the report to the United States Attorney. That seems to suggest two different procedures, one involving the full House and one possibly not involving the full House. Also, I do not see any reference to presentation of the matter to the Committee on Energy and Commerce before proceeding to either the full House or to the Speaker. Do you anticipate that the matter will not be presented to the Committee? Could you clarify what is the planned procedure, and the timing? Also, would you please let me know if we will have an opportunity to further or directly discuss and/or explain our objections to the subpoena at any point in the process – e.g. to the Select Investigative Panel, or to the Committee, or to the House?

Thank you.

Sincerely,

Kevin M. Murphy

cc:     Heather Sawyer, Democratic Staff Director, Select Investigative Panel (via email only)

Exhibit 5.1.7

# Congress of the United States

## House of Representatives

### COMMITTEE ON ENERGY AND COMMERCE

2125 RAYBURN HOUSE OFFICE BUILDING
WASHINGTON, DC 20515–6115
Majority (202) 225–2927
Minority (202) 225–3641

September 8, 2016

Mr. Frank Radoslovich, Esq.
Radoslovich Parker Turner, PC Attorneys
701 University Ave., Ste. 100
Sacramento, CA 95825

Dear Mr. Radoslovich:

The Select Investigative Panel, formed by H. Res. 461, has reached an impasse with StemExpress and its noncompliance with lawful congressional subpoenas. The Panel will soon proceed to schedule a Business Meeting to consider a Report recommending that the U.S. House of Representatives hold StemExpress in contempt of Congress.

On October 7, 2015, the House voted to enact H. Res. 461, which established the Select Investigative Panel and "authorized and directed [it] to conduct a full and complete investigation and study and issue a final report of its findings . . . regarding (1) medical procedures and business practices used by entities involved in fetal tissue procurement; (2) any other relevant matters with respect to fetal tissue procurement; . . . and (6) any changes in law or regulation necessary as a result of any findings made under [those investigations and studies]."[1]

In House Report 114-288 on House Resolution 461, the authority of the Panel to issue subpoenas is summarized. "Section 4 provides that rule XI of the Rules of the House of Representatives and the rules of the Committee on Energy and Commerce shall apply to the select panel in the same manner as any other subcommittee, except that the chair of the select panel (1) is authorized to authorize and issue subpoenas, including for the purpose of taking depositions; (2) may order the taking of depositions by members or counsel of the select panel and that any deposition taken pursuant to this authority will be governed by the regulations issued by the chair of the Committee on Rules; and (3) may recognize members or staff to question witnesses for periods longer than five minutes as though pursuant to clause 2(j)(2) of rule XI." The Chairman of the Panel is required to consult to the extent practicable with the ranking minority but need not gain approval prior to issuance of a subpoena.

---

[1] H. Res. 461, Section 3.

Pursuant to the authority delegated to it under House Resolution 461, the Select Investigative Panel is investigating whether entities that procure fetal tissue are using loopholes in federal law or engaging in business practices that have the effect of undermining the purpose of laws prohibiting the interstate transfer of any fetal tissue for valuable consideration. As part of that investigation, the Panel is examining whether 42 U.S.C. § 289g-2 is effective, or needs to be amended to better achieve the legislative goals of the statute. Under Title 42 U.S.C. § 289g-2, which is, at its heart, an accounting statute, it is unlawful for any person to knowingly acquire, receive, or otherwise transfer any fetal tissue for valuable consideration if the transfer affects interstate commerce. The term "valuable consideration" does not include reasonable payments associated with the transportation, implantation, processing, preservation, quality control, or storage of human fetal tissue.

Through publicly available information and the Select Investigative Panel's investigation, the Panel identified StemExpress, LLC ("StemExpress"), as an entity that procured fetal tissue from abortion clinics and transferred it to researchers. In accordance with its authorization under House Resolution 461, and consistent with its interest in examining whether any changes in federal laws or regulations are necessary as a result of its investigation, the Select Investigative Panel sought documents from StemExpress. As a result of StemExpress' failure to comply fully with the Panel's voluntary request for documents, the Panel was forced to subpoena StemExpress, its CEO, ███████████████████████, and its outside accountant, Scinto Group, LLP ("Scinto") and it bank, "Five Star Bank". Despite many accommodations and much negotiation with the subpoena recipients, StemExpress and ███████ willfully and inexcusably have refused to comply with important aspects of the Panel's congressional subpoenas. Further, after refusing to comply with the Panel's subpoena, StemExpress also has willfully and successfully attempted to convince its outside accountant, Scinto, to similarly refuse any compliance with the Panel's subpoena.

On February 16, 2016, the Select Investigative Panel first issued a subpoena to StemExpress requiring the unredacted production of, among other items, the identities of StemExpress employees involved in the procurement of fetal tissue, so that staff could interview and/or depose them to determine how, among other things, fetal tissue procurement entities such as Stem Express operated, how StemExpress calculates what constitutes "valuable consideration" under 42 U.S.C. § 289g-2, and whether such employees could provide information concerning StemExpress' business practices that could shed light on whether fetal tissue procurement entities may be using loopholes or unclarity in the law to actually make a profit on fetal tissue procurement.[2] At no time has the Select Investigative Panel threatened to expose the names of StemExpress employees for exposure's sake or otherwise; as communicated to StemExpress and its counsel, the Panel merely sought identification of various employees and their job responsibilities to be able to obtain from appropriate individuals information necessary

---

[2] *See* February 16, 2016 Subpoena Schedule at 2, 3, 6. For example, the subpoena sought: "Documents sufficient to show the name and title of all StemExpress current and former personnel whose responsibilities included procuring, researching, storing, packaging for donation, transport or disposal of fetal tissue, and the identify, of any supervisory personnel under whom such individuals worked." *Id.* at 2. The subpoena also called for "all communications and documents regarding any direction to Stem Express current or former personnel with respect to the procurement and disposal of fetal tissue," as well as "[a]ll communications and documents relating to StemExpress employee compensation resulting from or relating to fetal tissue samples procured by current and former StemExpress personnel or other persons or entities that transact business with StemExpress. *Id.* at 3, 6.

to the Panel's investigation. Citing safety and security concerns, the firm refused to identify such individuals. StemExpress took this position even though some employee names are already in the public domain, including as reflected in a recent article about the company in *The Washington Post*.[3]

Further, to investigate whether 42 U.S.C. § 289g-2 effectively prohibits the procurement of fetal tissue for "valuable consideration", the Select Investigative Panel also sought production of StemExpress' banking and accounting records reflecting the company's "accounts payable and/or funds received that in any way refer to or relate to the procurement, sale, donation, or distribution or shipment of fetal tissue."[4] Such information is invaluable to assist the Panel in examining business practices used by entities involved in fetal tissue procurement, and in informing the Panel's decisions concerning potential recommendations for amendments to or enactment of legislation relating to fetal tissue procurement. The Panel's first subpoena thus called for the production of all accounting records maintained by Stem Express relating to fetal tissue.[5] StemExpress declined to produce actual banking and accounting records and, instead, unilaterally produced attorney-created accounting summaries, among other summaries. After months of non-compliance without any reasonable explanation and StemExpress' continuing, willful refusal to respond to the Panel's straightforward requests for the accounting records related to fetal tissue procurement, the Chairman of the Panel wrote a letter to StemExpress demanding the production of those records, and stating that failure to produce would leave the Panel with no choice but to pursue all means necessary to compel compliance. The attorney for StemExpress stated that the firm would not produce the accounting documents unless and until a new subpoena is issued. Eventually, in response to the Chairman's entreaty for compliance, in May 2016, StemExpress made a partial production of invoices for the provision of fetal tissue to researchers. That modest, partial production, however, was incomplete, did not contain invoices for all of StemExpress' clients, and fell far short of the subpoena's request. Without comprehensive accounting and banking information, it is nearly impossible for the Select Investigative Panel to fully complete its investigation, and provide meaningful recommendations regarding legislation about fetal tissue procurement and the business practices of entities that engage in such procurement.

On March 29, 2016, the Panel issued a second subpoena to ██████████████, StemExpress' founder and chief executive officer, requiring documents sufficient to identify (or, if she preferred, a list identifying) the firm's finance director, finance manager, or account manager. ███████ refused to comply with the subpoena's requirement. That subpoena also required the production, in unredacted form, of "all communications and documents sufficient to show accounts payable and receivable concerning in any way the storage purchase or transport of fetal tissue, received by or sent by Stem Express's Director of Finance, Finance Manager, Account Manager, or equivalent positions."[6] Such information is vital for the Select Investigative Panel to assess the efficacy of § 289g-2, as is the accounting information requested from StemExpress, as confirmed by hearing witnesses during the Panel's April 20, 2016 hearing,

---

[3] *See* Danielle Paquette, *A Tiny Firm Caught In Abortion War*, WASH. POST, May 29, 2016, at G1.
[4] February 16, 2016 Subpoena Schedule at 10.
[5] *See* February 16, 2016 Subpoena Schedule at 9, 12.
[6] *See* March 29, 2016 Subpoena Schedule.

"The Pricing of Fetal Tissue." Even though she is under subpoena, and despite the Panel's clear and direct need for the documents, ██████ still refuses to comply with the Panel's subpoena.

Due to StemExpress' and ██████'s failure to comply with the Panel's subpoenas and their continual refusal to provide accounting information directly pertinent to the Panel's investigation and study, conducted pursuant to House Resolution 461, the Panel was forced to subpoena Scinto, StemExpress' outside accountant. Scinto has indicated that it consulted with StemExpress counsel and that StemExpress expressly instructed Scinto not to produce its financial records in response to the Panel's subpoena.

Since Stem Express has been unwilling to comply with the Panel's subpoenas and having exhausted its efforts to obtain compliance from the subpoena recipients, the Chairman of the Select Investigative Panel will recommend that StemExpress and ██████ be held in contempt for their willful failure to fully comply with the Panel's subpoenas issued to them, and for StemExpress' willful interference with the Panel's subpoena issued to StemExpress' accountant, Scinto. The Chairman will also recommend that the Speaker of the House of Representatives, pursuant to 2 U.S.C. §§ 192 and 194, certify this report of the Select Investigative Panel to the United States Attorney for the District of Columbia, and that StemExpress and ██████ be proceeded against in the manner and form provided by law. Should StemExpress and ██████ seek to comply with the subpoenas please contact March Bell on ██████.

Sincerely,

*Marsha Blackburn*

Marsha Blackburn
Chairman
Select Investigative Panel of
the Committee on Energy and Commerce

cc: The Honorable Jan Schakowsky
Ranking Member
Select Investigative Panel

Exhibit 5.1.8

FRED UPTON, MICHIGAN
CHAIRMAN

FRANK PALLONE, JR., NEW JERSEY
RANKING MEMBER

ONE HUNDRED FOURTEENTH CONGRESS

# Congress of the United States

## House of Representatives

COMMITTEE ON ENERGY AND COMMERCE
2125 RAYBURN HOUSE OFFICE BUILDING
WASHINGTON, DC 20515–6115
Majority (202) 225 2927
Minority (202) 225 3641

**VIA EMAIL TO ATTORNEY OF RECORD**

April 28, 2016

Ms. ■■■■■■■
Founder & CEO
StemExpress
Placerville, CA 94501

Dear Ms. Dyer:

Over the last several months, we have made numerous attempts to acquire business and accounting documents from StemExpress that are necessary to complete our work at the Select Investigative Panel. All of these requests have been met with verbal and written objections from your attorneys. In light of recent public comments you have made and the consensus reached by witnesses at our April 20 hearing on *The Pricing of Fetal Tissue* that a complete review of StemExpress business and accounting documents was necessary, I am writing to personally request you turn this information over to our investigators.

On October 6, 2015, the Committee on Rules issued Report 114-288 establishing the basis for a *Select Investigative Panel* of the Energy and Commerce Committee. In that Report's "Background and Need for Legislation" section it identified several video tapes that were made public that "raise[d] most troubling questions . . ." with regard to the procurement and sale of fetal tissue. Prior to the creation of the *Select Investigative Panel*, a precursor investigation requested information and testimony from several entities, including StemExpress, a biotech company that procures fetal tissue and then resells it to researchers.

You recently were quoted in the media as saying:

"I am appalled by Chairman [Marsha] Blackburn's statement," ███████, founder of StemExpress, told POLITICO. "StemExpress has provided over 2000 pages of material to the Senate and House committees which clearly illustrate we do not profit from the provision of fetal tissue to researchers. Unfortunately, the Select Panel continues to ignore the evidence - instead citing documents that courts have already found to be fabricated and falsified."

At our hearing held on April 20, 2016, the consensus among witnesses was that in order to get to the bottom of StemExpress involvement in the fetal tissue industry it would require the following:

1) A majority of witnesses agreed that banking records were necessary;
2) A majority of witnesses agreed that a forensic accounting review of StemExpress financial records was necessary;
3) Witnesses pointed out that although exhibits were redacted, a complete production of unredacted StemExpress business records is necessary to gain a complete understanding of whether StemExpress was profiting from the sale of baby body parts.

Although your press statement, if accurate, states that you have produced 2000 pages of documents, we have yet to receive accounting, banking and other business documents, for which subpoenas were issued to StemExpress. Instead, we have received attorney created estimates and summaries without back up materials. These summaries provide insufficient information to complete the Panel's review of the fetal tissue industry and they ignore the advice of the experts who testified at our April 20 hearing.

A comparison of "documents requested" and "documents received" was undertaken by the panel. The results of this review is visually displayed at Appendix A, attached with this letter.

Additionally, for your convenience please find documentation of the Panel's 4 month attempt to obtain compliance with its request and subpoenas attached at Appendix B.

Finally, your attorney raised a number of objections to our subpoena. Having reviewed all of these written and verbal objections, I find all of StemExpress' objections to the subpoena to be invalid and without legal merit. Please see Appendix C.

To fully comply with the subpoena, we require the production of the following missing documents:

1) Documents sufficient to reflect StemExpress' organization chart, including information detailing StemExpress personnel who procure(d) fetal tissue at the clinic level and the supervisory personnel for those procurers of fetal tissue.

2) All communications, whether internal or external, that direct or relate to a direction to StemExpress personnel to procure fetal tissue, including, but not limited to memoranda, emails, telephone messages, and purchase orders or bills of sale.

3) All StemExpress accounting records, including but not limited to accounting memoranda related to the cost and pricing of fetal tissue.

4) Copies of all invoices (by month and year), reflecting the billing that StemExpress issued to all institutions or entities to which StemExpress donated or provided fetal tissues for the following years: 2010, 2011, 2012, 2013, 2014 and 2015.

5) Copies of all invoices (by month and year) reflecting the billing or payment of funds for fetal tissues obtained by StemExpress for the following years: 2010, 2011, 2012, 2013, 2014 and 2015.

6) A copy of any chart of accounts for StemExpress, including but not limited to account descriptions from any financial recording system relating to StemExpress.

7) StemExpress' end of year trial balance report and trial balance details for the following years: 2010, 2011, 2012, 2013, 2014 and 2015.

8) All documents reflecting StemExpress' statement of revenues (i.e., a breakdown by product categories) for the following years: 2010, 2011, 2012, 2013, 2014 and 2015.

9) All documents reflecting StemExpress' record of costs and expenses (i.e., a breakdown by operations, including fetal tissue acquisition) for administrative costs and expenses as well as compensation and benefits, for the following years: 2010, 2011, 2012, 2013, 2014 and 2015. Where applicable, records should include identification of vendors and descriptions of expenses.

10) StemExpress' balance sheets for the following years: 2010, 2011, 2012, 2013, 2014 and 2015. Audited statements should be provided, if available.

11) StemExpress' income statements, including but not limited to any profit and loss statements, statements of operations and statements of activities for the following years: 2010, 2011, 2012, 2013, 2014 and 2015. Audited statements should be provided, if available.

12) Copies of StemExpress' filed tax returns for the following years: 2010, 2011, 2012, 2013, 2014 and 2015.

13) All StemExpress bank statements from any financial institution where StemExpress has maintained an account for the following years: 2010, 2011, 2012, 2013, 2014 and 2015.

14) Documents sufficient to show how StemExpress calculates(d) the cost of a fetal tissue and all factors applied in determining pricing of fetal tissue. In lieu of these documents, you may provide a written explanation.

Please produce them no later than the close of business on May 12, 2016. Failure to comply will leave the Panel with no choice but to pursue all means necessary to compel compliance.

Respectfully yours,

Marsha Blackburn
Chair
Select Investigative Panel

cc: The Honorable Jan Schakowsky

**Appendix A**

# STEMEXPRESS PRODUCTION LOG

| Document Requested | Received |
|---|---|
| A list of all entities, including firms, corporations, non-profit organizations, and educational institutions, from which StemExpress receives or procures fetal tissue. | NO |
| A list of all entities, including firms, corporations, non-profit organizations, and educational institutions, to which StemExpress sells or donates fetal tissue | NO |
| A list of all entities, including firms, corporations, non-profit organizations, and educational institutions, to which StemExpress transferred, subcontracted or sold any business interest or business assets related to the procurement or sale of fetal tissue. | NO |
| An organization chart that details StemExpress personnel that procure fetal tissue at the clinic level and the supervisory personnel for those procurers of fetal tissue | YES (both with no names) |
| All communications, whether internal or external, that direct StemExpress personnel to procure fetal tissue, including, but not limited to memoranda, emails, telephone messages, and purchase orders or bills of sale. | NO |
| All specific requests made to StemExpress for fetal tissue made by any and all firms, corporations, non-profit organizations, educational institutions, or other entities, including, but not limited to, order lists, billing records, payment records, payment vouchers, and receipts. | NO |

| Document Requested | Received |
|---|---|
| All documents relating to the purchase, ownership, or rental by StemExpress of equipment involving fetal tissue research, the preparation of fetal tissue for research, the modification of fetal tissue into cell lines, or any other actions taken by StemExpress related to fetal tissue, including but not limited to, the date the equipment was purchased, its purchase price, its maintenance costs, and records of the depreciation treatment under the tax code of any such equipment. | NO |
| All accounting records including accounting memoranda related to the cost and pricing of fetal tissue. | NO |
| All specific requests made to StemExpress for fetal tissue made by any and all firms, corporations, non-profit organizations, educational institutions, or other entities, including, but not limited to, order lists, billing records, payment records, payment vouchers, and receipts. | NO |
| All documents relating to the purchase, ownership, or rental by StemExpress of equipment involving fetal tissue research, the preparation of fetal tissue for research, the modification of fetal tissue into cell lines, or any other actions taken by StemExpress related to fetal tissue, including but not limited to, the date the equipment was purchased, its purchase price, its maintenance costs, and records of the depreciation treatment under the tax code of any such equipment. | NO |
| An inventory record of all fetal tissues obtained, sold, or retained by StemExpress, as well as an inventory of current fetal tissue including, in particular, any records that refer to multiple tissue samples or organs or body parts harvested from a single fetus. | NO |

| Document Requested | Received |
|---|---|
| List of all institutions or entities to whom you have donated or provided fetal tissues for the five years ended 2010, 2011, 2012, 2013, 2014 and 2015. | NO |
| Copies of all transaction logs and invoices (by month and year ) you issued to all institutions or entities to whom you have donated or provided fetal tissues for the five years ended 2010, 2011, 2012, 2013, 2014 and 2015. | NO |
| List of all institutions or entities from whom you have obtained fetal tissues for the five years ended 2010, 2011, 2012, 2013, 2014 and 2015. | YES |
| A copy of your chart of accounts including account descriptions from your financial recording system. | NO |
| Trial balance and trial balance details for the five years ended 2010, 2011, 2012, 2013, 2014 and 2015. | NO |
| Statement of revenues – breakdown by product (fetal tissue) categories for the five years ended 2010, 2011, 2012, 2013, 2014 and 2015. | NO |
| Record of expenses – breakdown by operations (including fetal tissue acquisition), administration, as well as compensation and benefits for the five years ended 2010, 2011, 2012, 2013, 2014 and 2015. Where applicable, record should include vendors and description of expenses. | NO |
| Balance sheet for the five years ended 2010, 2011, 2012, 2013, 2014 and 2015. Audited statements should be provided, if available. | NO |

| Document Requested | Received |
|---|---|
| Income statement (or profit & loss statement, or statement of operations) or statement of activities) for the five years ended 2010, 2011, 2012, 2013, 2014 and 2015. Audited statements should be provided, if available. | NO |
| Copies of filed tax returns for the five years ended 2010, 2011, 2012, 2013, 2014 and 2015. | NO |
| All monthly bank statements from all banks where you own accounts for the five years ended 2010, 2011, 2012, 2013, 2014 and 2015. | NO |
| Explain your cost structure and factors applied in determining the cost of a fetal tissue. | NO |
| All communications and documents relating to StemExpress employee compensation resulting from or relating to fetal tissue samples procured by current and former StemExpress personnel or other persons or entities that transact business with StemExpress. | NO |
| All communications and documents that identify any federal, state, or local government funds received, directly or indirectly, by StemExpress. | YES |
| All communications referring or relating to abortion or fetal tissue between StemExpress and any federal, state, or local government officials or employees. | YES |
| All communications and documents regarding any direction to StemExpress current or former personnel with respect to the procurement or disposal of fetal tissue. | NO |

| Document Requested | Received |
|---|---|
| All communications and documents that StemExpress utilizes to obtain patient consent for fetal tissue at any clinic. | YES |
| All communications and documents, including but not limited to accounting memoranda, referring or relating to the cost and pricing of fetal tissue by StemExpress | NO |
| All communications and documents, sorted by customer, referring or relating to requests or orders made to StemExpress regarding fetal tissue and the amount paid by each customer to StemExpress. | NO |
| All communications and documents referring or relating to the purchase, ownership, or rental by StemExpress of equipment for the storage, disposal, modification, or research of fetal tissue, including equipment price, purchase date, maintenance costs, and records of the depreciation treatment under the tax code of any such equipment. | NO |
| Documents sufficient to show any known litigation in which StemExpress is named as a party, including any threatened or anticipated litigation. Should StemExpress wish to produce a list of such litigation, including appropriate docket information, in lieu of documents, it may do so. | YES |
| All communications and documents referring or relating to Independent Review Board consents for the period of March 29, 2012 through January 26, 2013. | YES |
| All communication and documents referring or relating to Biomedical Research Institute of America, BioMed IRB, or BioMed Institutional Review Board. | NO |

| Document Requested | Received |
|---|---|
| The name(s) of all persons who serve as Director of Finance, Finance Manager, Accountant Manager, or equivalent position(s). | NO |
| All communications and documents to or from the Director of Finance, Finance Manager, Accountant Manager, or equivalent position(s). | NO |

# Appendix B

**History of Select Panel Attempt to Gain Cooperation for Stem Express.**

The Select Panel requested on December 17, 2015, documents since January 1, 2010, from StemExpress, including a list of where it obtained fetal tissue, where it distributed fetal tissue, and all communications related to the procurement and distribution of fetal tissue. In a December 18, 2015, letter to the Select Investigative Panel, StemExpress' attorneys called the original document request "overbroad." In a December 21, 2015 conference call with Panel staff, the attorneys for StemExpress explained that they **would not produce** the identity of any names of the entities from which they received fetal tissue, and that StemExpress' clients (those to whom they distributed fetal tissue) were covered by non-disclosure agreements (NDAs) and, thus, they **would not produce** those names. During that conference call, the Panel agreed to narrow the scope of its request, and to a rolling production, but did not agree to forego the identity of the sources or end uses of fetal tissue.

During a January 11, 2016 conference call with Panel staff, counsel for StemExpress stated it **would not produce** the names of entities from which it received fetal tissue, or the clients that were covered by NDAs; staff explained that was unacceptable. In a January 15, 2016, production (the second of its rolling productions), StemExpress stated it **"will not be voluntarily providing the names"** of where it obtained fetal tissue, and repeated that its contracts with clients "are subject to non-disclosure agreements and, therefore, cannot be voluntarily produced." In a February 1, 2014 production (the third of its rolling productions) StemExpress only produced communications dating from 2014, and those were replete with **large redactions**. In at least two instances, **entire pages were redacted**. During a February 9, 2016, the Select Panel's Staff Director told StemExpress' attorney that refusing to produce the names of the entities from which it received, and to whom it distributed, fetal tissue was unacceptable, as was redacting large portions of the requested communications.

As a result, the Select Investigate Panel was forced to issue a subpoena on February 12, 2016 which required the production in an unredacted form of 12 items. Despite that explicit legal instruction, StemExpress' production was replete with redations. **Your firm flatly refused to produce one item, and produced an attorney-created accounting report, rather than required accounting documents.**

On April 11, 2016, the Select Investigative Panel issued two additional subpoenas: one to the firm, and the other to you personally. The subpoenas collectively called for the production of four items. **You outright refused to fully comply with the subpoena issued to you personally;** and, once again, produced an attorney-created accounting report, rather than required documents.

# Appendix C

## Objections to Congressional Subpoenas are Invalid

Your attorney has made numerous objections to the Panel's document requests and subpoenas. Please take notice of the mateials below that explain the law with respect to Congressional investigations.

### Scope Objections

As best we can discern, your communication through counsel make four general objections. First, that the vast majority of documents demanded "are far outside the seeming scope of [the Panel's] Congressional purpose . . . ." Such an objection is wholly without merit, and documents responsive to the Subpoena must be produced forthwith.

The Panel's investigation and its Subpoena are well within its constitutional power and within the scope of its authority. The U.S. House of Representatives performs a quintessentially legislative role. *See, e.g.*, U.S. Const. art. I, § 1 ("All legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives."); *see also, e.g., id.* art. I, § 7 (outlining legislative process). Inherent in its legislative role, the House maintains a "power of inquiry . . . as penetrating and far-reaching as the potential power to enact and appropriate under the Constitution." *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 504 n.15 (1975); *see also McGrain v. Daugherty*, 273 U.S. 135, 174 (1927) ("the power of inquiry—with process to enforce it—is an essential and appropriate auxiliary to the legislative function"). Indeed, the Supreme Court "has often noted that the power to investigate is inherent in the power to make laws because a legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change." *Eastland*, 421 U.S. at 504 (quotation marks and brackets omitted).

To be constitutionally valid, a congressional subpoena must only (i) be properly authorized in accordance with House Rules, and (ii) seek information pertinent to a valid legislative purpose within the jurisdiction of the particular committee. *See Wilkinson v. United States*, 365 U.S. 399, 408-09 (1961). Such is the case here.

The House, through its rules, has delegated relevant substantive legislative jurisdiction, and its full investigative powers to the Select Panel. *See generally* Rules of the House of Representatives, 114th Cong. (2015) ("House Rules"), *available at* http://clerk.house.gov/legislative/house-rules.pdf.[1] As adopted by the House, H. Res. 461

---

[1] The House Rules are promulgated pursuant to the Rulemaking Clause, U.S. Const. art. I, § 5, cl. 2 ("Each House may determine the Rules of its Proceedings . . . ."). The Rulemaking Clause provides a "broad grant of authority," *Consumers Union of the U.S., Inc. v. Periodical Correspondents' Ass'n*, 515 F.2d 1341, 1343 (D.C. Cir. 1975), that sits "[a]t the very core of our constitutional separation of powers," *Walker v. Jones*, 733 F.2d 923, 938 (D.C. Cir. 1984) (MacKinnon, J., concurring in part and dissenting in

created the Panel and "authorized and directed [the Panel] to conduct a full and complete investigation . . . regarding— (1) medical procedures and business practices used by entities involved in fetal tissue procurement; [and] (2) any other relevant matters with respect to fetal tissue procurement . . . ." To this end, House Rules authorize the Chairman of the Panel "to authorize and issue subpoenas."

Here, the Chairman of the Select Panel authorized the issuance of the Subpoena to StemExpress. That Subpoena seeks materials pertinent to the Committee's investigation into the fetal tissue industry, which plainly is within its legislative and oversight jurisdiction. The Select Committee's investigative judgment, of course, generally cannot be questioned. *See Eastland*, 421 U.S. at 506 (citing *Tenney v. Brandhove*, 341 U.S. 367, 378 (1951)).

## Safety & Security Objections

Stem Express objects on the ground that it desires to stem the risk of harm that might flow from the public disclosure of materials. However, the Panel is not "the public," and, as a legal matter, disclosure of these materials to the Panel does not implicate the stated concerns. Courts repeatedly have held that disclosure of information to a congressional committee is not a "public disclosure." *See, e.g., F.T.C. v. Owens-Corning Fiberglass Corp.*, 626 F.2d 966, 970 (D.C. Cir. 1980) (holding that executive agency "may not deny Congress access to confidential documents, including those that contain trade secrets," because "[r]elease to a congressional requestor is not a public disclosure forbidden by section 6(f) of the [Federal Trade Commission] Act"); *Exxon Corp.*, 589 F.2d at 585-86 (similar); *Ashland Oil, Inc. v. F.T.C.*, 548 F.2d 977, 979 (D.C. Cir. 1976) (per curiam) (similar). Indeed, courts have presumed just the opposite is true—that "[o]nce documents are in congressional hands . . . 'committees of Congress will exercise their powers responsibly and with due regard for the rights of affected parties.'" *Owens-Corning Fiberglass Corp.*, 626 F.2d at 970 (quoting *Exxon Corp.*, 589 F.2d at 589); *see also, e.g., Jaymar-Ruby, Inc. v. F.T.C.*, 496 F. Supp. 838, 845 (N.D. Ind. 1980) ("[W]hile Courts have held that as a matter of law, it cannot be presumed that private persons will honor commitments not to disclose information, Courts do presume that government officials will honor similar commitments.") (internal citation omitted).

This presumption reflects the general deference due to a coordinate branch of government, as well as the specific concern that "the judiciary must refrain from slowing or otherwise interfering with the legitimate investigatory functions of Congress." *Owens-Corning Fiberglass Corp.*, 626 F.2d at 970; *see also Exxon Corp.*, 589 F.2d at 588-89. Thus, absent some actual showing that Congress intends to make documents public—a showing which plainly is lacking here—courts have rejected the notion that documents provided to Congress inevitably will be made public. *See, e.g., Exxon Corp.*, 589 F.2d at 589; *Ashland Oil, Inc.*, 548 F.2d at 979.[2]

part). Rules promulgated pursuant to the Rulemaking Clause, within constitutional limitations, are "absolute and beyond the challenge of any other body or tribunal." *United States v. Ballin*, 144 U.S. 1, 5 (1892); *see also United States v. Smith*, 286 U.S. 6, 33 (1932) (same).

[2] Consistent with this principle, the judiciary has deferred to congressional interests in two other areas of federal law involving access to private or confidential information. First, courts routinely have permitted congressional committees to obtain secret grand jury materials protected under Rule 6(e) of the Federal Rules of Criminal Procedure. *See, e.g., In re Request for Access to Grand Jury Materials*, 833 F.2d 1438,

1444 (11th Cir. 1987); *In re Grand Jury Investig. of Ven-Fuel*, 441 F. Supp. 1299, 1307-08 (M.D. Fla. 1977); *In re Report & Recommendation of June 5, 1972 Grand Jury.Concerning Transmission of Evidence to the House of Representatives*, 370 F. Supp. 1219, 1226 (D.D.C. 1974). Second, courts have recognized that executive agencies do not forfeit their ability to withhold documents from public scrutiny under the Freedom of Information Act simply by providing the information to congressional committees. *See, e.g., Fla. House of Representatives v. U.S. Dep't of Commerce*, 961 F.2d 941, 946 (11th Cir. 1992); *Murphy v. Dep't of Army*, 613 F.2d 1151, 1158-60 (D.C. Cir. 1979).

Exhibit 5.1.9

[Extracted from a NAF 2014 conference brochure]



[Extracted from a NAF 2015 conference brochure]



Exhibit 5.28

1  TONY RACKAUCKAS, DISTRICT ATTORNEY
   COUNTY OF ORANGE, STATE OF CALIFORNIA
2  BY:   JOE D'AGOSTINO, SBN 115774
         Senior Assistant District Attorney
3        KELLY A. ERNBY, SBN 222969
         Deputy District Attorney
4  POST OFFICE BOX 808
5  SANTA ANA, CALIFORNIA 92702
   TELEPHONE: (714) 834-3600
6

7

8              **IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9                   **IN AND FOR THE COUNTY OF ORANGE,**

10                          **CENTRAL JUSTICE CENTER**

11

12  THE PEOPLE OF THE STATE OF CALIFORNIA, )   Case No.:
                                           )
13                             Plaintiff,  )   **CIVIL COMPLAINT FOR**
                                           )   **VIOLATIONS OF BUSINESS AND**
14              vs.                        )   **PROFESSIONS CODE SECTION**
                                           )   **17200 (UNLAWFUL, UNFAIR AND**
15                                         )   **FRAUDULENT BUSINESS**
16  DV BIOLOGICS, LLC; DAVINCI BIOSCIENCES,)   **PRACTICES)**
    LLC; ███████████████████████ ;        )
17  ██████████████ and DOES 1-10          )   *Filing Fees Exempt (Govt. Code §*
                                           )   *6103)*
18                             Defendants  )
                                           )
19  ─────────────────────────────────────

20

21        The People of the State of California, by and through Tony Rackauckas, District Attorney

22  for the County of Orange, hereby allege as follows:

23                               **INTRODUCTION**

24        1.      DV Biologics, LLC and DaVinci Biosciences, LLC obtained aborted fetus

25  donations from Planned Parenthood and turned those donations into a profit-driven business.

26  They did so by selling tissues and stem cells from the heart, lungs, kidneys, brain, intestines,

27  skeletal muscle and bones of the aborted fetus donations. The companies advertised and sold

28

─────────────────────────────────────

                                          1

1  these "prenatal products" from 2009-2015 to companies all around the world, earning hundreds

2  of thousands of dollars in revenue.

3      2.      Although donations are permitted, the sale of fetal tissue and cells for "valuable

4  consideration" is illegal under both California and federal law. (Cal. Health & Safety Code §

5  125320; 42 U.S.C. § 289g-2.) These laws were adopted to address the "significant ethical and

6  policy concerns" that arose with the legalization of stem cell research and "to ensure that

7  researchers have the tools necessary to fulfill the promise of stem cell research" -- an objective

8  that cannot be achieved if stems cells are too expensive for the scientific community to acquire

9  for research purposes. (Stats 2002, ch. 789 [S.B. No. 253] § 1 (g)-(h).)

10     3.      Nonetheless, Defendants pressed onward, year-after-year, in an attempt to beat

11  their "competition" and increase margins -- just as any profit-seeking enterprise may otherwise

12  attempt to do. Indeed, rather than limiting their income on these sales, the companies

13  intentionally set their prices as high as possible in an effort to maximize their profits. Sales and

14  marketing staff were hired, paid commissions, and pressured to "push" sales in order to meet

15  increasing revenue objectives every year. They were encouraged to offer discounts, coupons,

16  and sales-pricing on fetal "products" to move "inventory" more quickly as well.

17     4.      The business was lucrative. To be sure, fetal stem cell "products" were routinely

18  sold at a 10-fold, or higher, mark-up over the minimal costs that were required to handle, process

19  and distribute these "products" for sale. The company also charged packaging and handling fees,

20  as well as marked-up shipping fees, so as to earn a little extra profit on every transaction.

21     5.      It is estimated that the companies sold hundreds of different fetal tissue and stem

22  cell "products" for valuable consideration in violation of the law. Each unlawful sale is a

23  separate act of unlawful and unfair competition under California's Business and Professions

24  Code Section 17200 for which civil penalties and injunctive relief are warranted and hereby

25  sought by way of this Complaint.

26                              **JURISDICTION AND VENUE**

27     6.      At the relevant time period in this case, Defendants transacted business, employed

28  workers and/or controlled a place of business in the County of Orange, in the state of California.

---

2

COMPLAINT

1   The unlawful conduct -- involving the unlawful sale of fetal tissue for valuable consideration --
2   occurred in the County of Orange, in the state of California at the Defendants' place of business.
3       7.      Jurisdiction and venue are proper in this Court pursuant to California Code of
4   Civil Procedure Sections 395 and 395.5 because the conduct giving rise to liability occurred in
5   the County of Orange at the Defendants' places of business located at ████████████████
6   ████████████████████████████████████.

7   **PARTIES**

8       8.      Tony Rackauckas, as District Attorney for the County of Orange, acting to protect
9   the public from unlawful, unfair, or fraudulent business practices, brings this action in the public
10  interest on behalf of the People.  As such, the Plaintiff in this action includes the People of the
11  State of California and the County of Orange (hereinafter, the "Plaintiff" or the "People").

12      9.      Incorporated in November 2007, Defendant DaVinci Biosciences, LLC, is a
13  Delaware Limited Liability Company with its principal place of business, as of June 24, 2015,
14  located at █████████████████████, in the County of Orange.  Prior to June 2015,
15  the principal place of business for DaVinci Biosciences was located at █████████████
16  ████████ in the County of Orange.  The company filed an application for registration with the
17  California Secretary of State in 2007; however, the California Franchise Tax Board forfeited the
18  entity's powers, rights and privileges on July 28, 2015 and the entity's powers, rights and
19  privileges have remained forfeited ever since.

20      10.     Defendant DV Biologics, LLC was incorporated in Delaware on March 3, 2009,
21  and shares its principal place of business, as of June 24, 2015, with DaVinci Biosciences, located
22  at █████████████████████, in the County of Orange.  Prior to June 2015, the
23  principal place of business for both companies was located at █████████████████,
24  in the County of Orange.  The company filed an application for registration with the California
25  Secretary of State in 2009; however, the California Franchise Tax Board forfeited the entity's
26  powers, rights and privileges on November 3, 2014 and the entity's powers, rights and privileges
27  have remained forfeited ever since.
28

3

11.     DaVinci Biosciences is jointly owned and managed by █████████████ and █████████, █████████████████, and █████████ also own and manage DV Biologics. The two companies share the same office space, employees, and management. The organization charts of both companies, demonstrating the unity of ownership, management and employees, in 2015 is attached hereto as **Exhibit A**. There is no separate accounting of the financials of the two companies; the accounting of revenue and expenses for both companies is 100% commingled. There is thus a unity of ownership and sharing of management, operations, revenues and expenses between the two companies such that there is little to no separation between the two. The two companies are alter egos of one another and are collectively referred to herein as "DV" or "Defendants."

12.     Since 2012, the two companies also share office space, employees and operations with a third company called "TheBioBox LLC." TheBioBox LLC is a Delaware Limited Liability Company incorporated in 2012 which is doing business in California as a stem cell bank and laboratory. Defendant █████████ is the President of TheBioBox. █████████ applied to register TheBioBox as a foreign Limited Liability Company in the state of California in November 2012; however, the California Franchise Tax Board forfeited the entity's powers, rights and privileges on August 1, 2016 and the entity's powers, rights and privileges have remained forfeited ever since.

13.     Defendant █████████ is one of the founding members of the DV Defendants. In January 2011, he became the President of both companies and at all relevant time periods thereafter, he was the officer and manager in control of the business operations and activities of the DV Defendants. █████████, along with the other family members, managed and controlled the financial decisions, books and records for the DV companies from the time they were formed until the present date. █████████ exercised control over the DV companies and directly participated in their operations by attending several business strategy and sales meetings at the California DV headquarters, facilitating an audit of the value of DV's inventory, and by requiring regular financial and other reports from DV employees from approximately 2009 to the

present date. ███████ filed and signed, as President, the most recent Statement of Information for both DV Defendants with the California Secretary of State on January 31, 2011.

14.    Defendants ████████████████ are father and son. Both ████████████████ participated in the founding of the DV Defendants with ██████████, who is the brother of ██████████ and also the son of ██████ In January 2011, "██████████" was designated as a manager and/or member of both companies and at all relevant time periods thereafter, has been one of the official managing members of the companies in control of the business operations and activities of the DV employees. ██████████, and ██████████, along with other family members, managed and controlled the financial decisions, books and records for the DV companies from the time they were formed until the present date. Both ██████████, and ████ exercised control over the DV companies and directly participated in their operations by working in concert with ██████████ to manage the companies, by attending several business strategy and sales meetings at the California DV headquarters, auditing the value of DV's inventory, and reviewing regular financial and other reports from DV employees from approximately 2009 to the present date. The individual defendants are collectively referred to herein as the "Isaias Defendants."

15.    Plaintiff is ignorant of the true names and capacities of Defendants sued herein as DOES 1-10. inclusive, and therefore sues these Defendants by such fictitious names. Plaintiff will amend this complaint to allege their true names and capacities when ascertained.

**GENERAL ALLEGATIONS**

16.    DaVinci Biosciences started doing business in Orange County as a biotechnology research and development laboratory in 2008. The company did not sell any products, or earn any revenue, but rather, dedicated its resources to "the discovery and development of cell-based therapeutics … that aid in the treatment of human degenerative disorders." (DV 2012 Business Plan.)

///

///

5

COMPLAINT

17. According to the company's website:

> DaVinci Biosciences, LLC is dedicated to improving the quality of life for individuals suffering from degenerative disease and injury. Through responsible research and development, we strive to be innovative leaders in biotechnology and regenerative medicine; renowned worldwide for our scientific and medical achievements and contributions to the health and well-being of communities.

(http://dvbiosciences.com.) In particular, the company is "investigating the use of stem cells to treat patients suffering from" diseases like cardiovascular disease, neurological disease, autoimmune disease, as well as spinal cord injuries, arthritis and other sports injuries. (http://dvbiosciences.com/ clinical-applications /cardiovascular-diseases.).

18. A stem cell is "an unspecialized cell that gives rise to differentiated cells." (Merriam-Webster.com.) There are adult, embryonic and fetal stem cells in humans. Adult stem cells are located in blood, bone marrow and fatty tissues, and generally "act as a repair system for the body, replenishing adult tissues." (https://en.wikipedia.org/wiki/Stem_cell.) Embryonic stem cells are "derived from the inner cell mass of a blastocyst, an early stage embryo" which exists "4-5 days post fertilization." (*Id.*) Fetal stem cells may be located in the "organs of fetuses," "the tissue of the fetus proper" or "extraembryonic membranes." (*Id.*)

19. There is a "right to conduct stem cell research" in the State of California. (Cal. Const. Art. 35 § 5.) The research is believed to hold great promise for the future of medicine. According to DV's 2012 Business Plan, "[s]tem cells or cell therapies have been used for greater than 40 years" for the treatment of disease, and the "cell-based" market related thereto is estimated "to be in the several billion dollar range." (*Id.*)

///

///

///

6

**A.    DaVinci Obtained And Used Aborted Fetus Donations From Planned Parenthood For Their Stem Cell Research**

20.     DaVinci Biosciences secured its first fetal tissue donations from Planned Parenthood in late 2008 for its research.  DV continued to receive fetal tissue donations on a regular basis from Planned Parenthood until 2015.  The companies obtained adult tissue samples from donations procured from local hospitals and/or tissue donation centers.

21.     Since its founding, the work of DaVinci Biosciences has resulted in two published scientific papers.  In its 2014 published study, DaVinci Biosciences reported the results of their initial research on "17- to 18-week-old pre-natal small intestine tissue made available from elective medical abortions," finding "that these cells are a potential in vitro model for drug discovery and development, and possibly in cell transplantation and tissue engineering studies." (Nasrallah et al., *Human Prenatal Small Intestine Cell as a Valuable Source of Stem Cells and Epithelial Cells: Phenotypic and Functional Characterization*, CELL & TISSUE TRANSPLANTATION & THERAPY 2014:6, at pp.1-9.)  On July 8, 2015, the company announced that "their paper on 'Stem Cells Targeting Inflammation as Potential Anti-Aging Strategies and Therapies' has been accepted for publication in the peer-reviewed journal Cell & Tissue Transplantation & Therapy."  (http:// www. dvbiologics.com/blog/2015/07/published-paper-stem-cells-targeting-inflammation-potential-anti-aging-strategies-therapies/.)  The company reports that they are the "first to publish on the process of using stem cells as anti-aging strategies."  (*Id*.)

///

///

///

7

**B.** **DV Biologics Was Launched In 2009 To Provide A Revenue Stream To The Research And Development Company**

22.     In early 2009, the ███ Defendants and DaVinci's then-manager and "CEO" ███, among others, collaborated and decided to expand the DaVinci business to include a revenue-driven unit.  They decided to start selling products derived from the cells and tissues they were already collecting, processing, storing and using for research purposes.  DV Biologics was then incorporated as the sister company to DaVinci Biosciences to generate income using the already established infrastructure of DaVinci Biosciences.  DV Biologics began "commercial operations in May 2009 with a minimal product inventory and no marketing or sales."  (DV 2012 Business Plan, at p.18.)

23.     A few months later, DV launched its first marketing campaign to start producing sales.  According to their marketing plan: "The marketing challenge for [2009-2010] will be to introduce our products in a politically conscious way given that the material is both human and in some cases pre-natal derived …. [¶] The challenge will be to form a sales tactic team, infiltrate markets … to change existing buyer's outlook and purchasing behaviors … [and to make] human cell-derived products well understood and appear worthy of any additional cost to purchase."  (DV Biologics Marketing Plan 2009-2010.)

24.     The companies hired an outside marketing consultant to develop marketing materials, including a catalog, to support their sales effort.  The 2010 catalog was posted on the company's website in January 2010 and sent to various sales leads in an effort to drive sales.

25.     In addition to "post-natal" and diseased tissues and cells, DV advertised the sale of numerous "pre-natal" "products," including fetal "tissue-derived cells" as part of their LIFEbank™ brand.  Prenatal tissue and cells from fetal heart, brain, lungs, kidneys, liver, large

COMPLAINT

intestines, small intestines, skin, skeletal muscle and bones were all offered for sale. They advertised prices in a range as low as $40/vial for "Total RNA" cells from several fetal parts to as high as $1,100/vial for specific cells from fetal brain tissue. Most "products" were priced somewhere in the middle of this range, including, *e.g.*, $300-375/vial for fetal lung cells; $300-450/vial for fetal kidney cells; $500-700/vial for fetal heart cells; and $250-700/vial for fetal liver cells.

26. From one fetus donation, DV created dozens of different types of prenatal "products," and hundreds of individual units of each type for sale. DV was able to do so with a limited number of labor hours (ranging from approximately 2-9 labor hours per "product") and at very minimal costs (usually less than $20/vial). With just a few hours of time, and very little cost, therefore, DV scientists created hundreds of vials of fetal stem cells, which they packaged separately for sale on a per vial basis. DV maintained an inventory of vials "in stock," in one or two refrigerated locations (provided by DaVinci Biosciences) until sold. If they ran out of inventory, they could "easily" make more units from the prior fetus donations or secure a new donation to meet customer demands.

27. In addition to charging a price for each vial/unit of "product," DV also separately charged between $50-75 per purchase order for the "packaging and handling" and "dry ice" used to facilitate the delivery of the products to their customers. An additional "freight" or "shipping charge" was assessed to some customers as well.

28. Between 2009 and 2011, sales revenues nearly tripled as the business started to take shape. "Sales increased 59% in 2011 from 2010" and the DV "product catalog ha[d] grown to greater than 48 pages for 2011-2012." (DV 2012 Business Plan, at p.18.) Defendants sold both adult-derived and fetal-derived tissues and cells to pharmaceutical companies and academic

institutions around the world through a network of distributors. By the end of 2011, DV had 13 worldwide distributors in place and the majority of its revenue was earned from international sales. (*Id.*, at p.2.)

**C.** **Management's 2012-2013 Directive To Push Sales, Beat The Competition, And Increase Revenue Drives Business Forward**

29. In late 2011, at the direction of and with the knowledge and participation of the ███ Defendants, DV executives met to strategize a business plan going forward. According to their 2012 Business Plan developed shortly thereafter, the Defendants' "3 year goals [were] to infiltrate the cell-based market, be a major competitor in the cell-based therapies and tools market for improving health and quality of life, and provide a healthy and conservative balance sheet." (DV 2012 Business Plan, at p.2.) Their "objective" was to develop their "business units into revenue and value generating subsidiaries." (*Id.*, at p.6.)

30. They planned to achieve these goals by "hiring a commercial representative" and/or "a dedicated sales/marketing person," increasing "the amount of marketing" and the "number of distributors throughout the world and tak[ing] advantage of the internet, distributors, newsletters, educational presentations, and direct marketing/sales." (*Id.,* at p.2) They planned "on penetrating the local American market" by securing a United States distributorship agreement. (*Id.*, at p.6.) DV Biologics was required to "market no less than 10 new products yearly." (*Id.*, at p.24.) Management set forth these directives with the "aim to increase sales yearly by no less than 30% each year for the next 3 years ..." (*Id.*, at p.6.)

31. By 2012, DV Biologics had over 500 products in its inventory "with some 13,900 units available," for sale -- an inventory that DV "valued at much greater than $4.4 Million

10

dollars." (*Id.*, at p.6.) At one point, based on an audit facilitated by the ▮▮▮ Defendants, the companies believed the value of the inventory could be as high as $10 million.

32.    DV started implementing the directives of the 2012 Business Plan, including retaining additional sales personnel and increasing their marketing efforts by distributing their catalog, newsletters, product brochures and other materials at conferences, via email or by publishing the materials on their website.

33.    There was little competition for the sale of many of their prenatal derived "products," so the company began a push to sell their prenatal stem cells as part of their direct marketing efforts. A fall 2012 newsletter, for instance, was distributed that featured small intestine epithelial cells (pD0015-F) for diabetes and weight control research. In late 2012, the DV catalog was also amended to more prominently highlight the distinction between prenatal derived and post-natal derived stem cells for their customers.

34.    With a new "Regional Sales Manager" on board in early 2013, the Defendants then implemented a "2013 Sales Launch Plan" to further increase sales. "The primary objective of this plan" was to "help DV Biologics meet or exceed its bottom-line goals & objectives," including a goal to "[g]enerate $550,000 in gross revenue by the end of 2013." (2013 Sales Launch Plan, at p.6.) In addition to improving their "selling techniques," the 2013 Plan called for the hiring of two additional Sales Managers and focusing their efforts on selling "the hottest selling products" (which included, among others, DV's prenatal cardiac cells and small intestine epithelial cells). The 2013 Plan also documented the expectation that the "sales team will go 'above & beyond' what is generally expected," including engaging in "heavy prospecting" to generate "leads" and secure sales. (2013 Sales Launch Plan, at pp.9 & 11.)

COMPLAINT

35.     Beginning in 2012, and continuing for years thereafter under the updated marketing and sales plans, there was a consistent top-down push for staff to sell more "product" and increase revenue. Beginning in 2013, sales staff were also financially incentivized to sell as much as possible by the payment of commissions.

36.     From 2012-2015, DV advertised and successfully sold numerous "products," including both "prenatal" and "postnatal" human tissues, cells and systems. A copy of DV's 2013-2014 Catalog is attached hereto as **Exhibit B,** and is fully incorporated herein by reference. "Products" were sold to pharmaceutical companies, academic institutions and distributors both domestically and in countries around the world, including Japan, China, Singapore, Korea, Germany, Switzerland, Spain, Australia, Netherlands, Canada, and the United Kingdom.

37.     Although DV did not achieve all of its optimistic revenue goals, their marketing efforts paid off. In both 2013 and 2014, the company grossed in excess of $400,000 in revenue, which was double the gross revenues earned in 2012. In 2015, DV continued its upward momentum and reached its earlier goal to exceed $550,000 in gross revenues. When subtracting the cost of goods sold, DV produced a gross profit on sales every year, except 2012.

38.     From 2009-2015, the Defendants also collected approximately $56,678.09 in "packing and handling" fees, which was marked-up approximately 50% over the actual cost of packing and handling. Specifically, DV incurred a total cost of $26,740.92 for packing and handling, and thus profited on the "packing and handling" fees in the amount of approximately $30,000. As a reward to its employees, Defendants also paid commissions on the profits they earned from the packing and handling charges from 2013-2015.

///

///

COMPLAINT

**D.** **It Is Illegal To Sell Fetal Tissue And Cells For Valuable Consideration Under Both Federal And State Law**

39.   Under California Health and Safety Code Section 125320:

(a) A person may not knowingly, for valuable consideration, purchase or sell embryonic or cadaveric fetal tissue for research purposes pursuant to this chapter.

(b) For purposes of this section, "valuable consideration" does not include reasonable payment for the removal, processing, disposal, preservation, quality control, storage, transplantation, or implantation of a part.

(c) Embryonic or cadaveric fetal tissue may be donated for research purposes pursuant to this chapter.

(Cal. Health & Safety Code § 125320.)

40.   If the "transfer [of fetal tissue] affects interstate commerce" it is also a violation of federal law to "knowingly acquire, receive or otherwise transfer any human fetal tissue for valuable consideration." (42 U.S.C. § 289g-2(a).) As above, "valuable consideration" does not include "reasonable payments associated with the transportation, implantation, processing, preservation, quality control, or storage of human fetal tissue." (42 U.S.C. § 289g-2(e)(3).)

41.   The term "human fetal tissue" is defined broadly to include any "tissue or cells obtained from a dead human embryo or fetus after a spontaneous or induced abortion, or after a stillbirth." (42 U.S.C. § 289g-1(g).) The term "tissue" is also broadly defined generally to "mean[] a human cell, group of cells, including the cornea, sclera, or vitreous humor and other segments of, or the whole eye, bones, skin, arteries, sperm, blood, other fluids, and any other portion of a human body ..." (Cal. Health & Safety Code § 1635(c).)

42.   DV knowingly sold hundreds of fetal tissue and stem cell "products" for valuable consideration in violation of these laws.

13

COMPLAINT

**E.     Defendants Set Prices For Fetal "Products" Arbitrarily, Without Any Attempt To Comply With The Law, In An Effort To Maximize Their Profits And Sales**

43.     In setting the prices for their prenatal "product" sales, DV ignored both federal and state laws that restrict earning "valuable consideration" on such sales entirely. There was no attempt to limit the prices charged on any of their prenatal "product" sales, or related fees, only to "reasonable payments associated with the transportation, implantation, processing, preservation, quality control, or storage of human fetal tissue" as the law requires. Indeed, there was no separate accounting for any such allowable charges conducted to support the prices DV charged for prenatal tissues and cells at all.

44.     Instead, the majority of sales prices were arbitrarily set initially by the Director of Research and Development for DaVinci Biosciences, ███████████, who set prices based on the "market" value and what other potential "competitors" charged on similar research "tools." In a 2011 email he explained that he relied on the competitors to "do the analysis" on what prices to charge because "[i]f we were to price out each one it would be extremely time consuming."

45.     Prices were also intentionally set as high as possible to leave room to offer discounts and negotiate a lower price so as to ensure a profit on sales even with discounts. According to DV's Chief Executive Officer, ███████████'s, 2010 directive: when setting prices: "we always negotiate from the top down."

46.     Given this price-as-high-as-possible strategy, in an effort to drive sales, DV offered numerous discounts, including distributor discounts (20-30%); first time buyer discounts (10-15%); and bulk purchase discounts (sometimes as high as 50%). The company also regularly offered "sales" pricing promotions, including, for example, a "25% off" summer sale

and "25% off" fall promotion in 2013. Sales staff were given wide flexibility in using discounts in order to close a sale, because they all knew they still ended up "on top."

47.     As a result of the pricing structure and the various discounts available, the same "product" was randomly sold to different customers at different prices. The highest prices were typically charged to U.S. customers and educational institutions, while the deepest discounts were offered to international distributors in countries all around the world. Yet, the allowable costs to produce the same "product" did not vary from customer to customer. Thus, only the margin of profit changed, depending on the ultimate price that was negotiated, for each particular sale.

48.     Sales personnel knew they were making money on sales, even despite large discounts. For example, in an October 2009 email exchange between DaVinci's Business Development Manager, ███████, and CEO, ███████████, regarding the pricing of prenatal bone cDNA (pM007-cD), ███████ confirmed her understanding that "it costs us roughly $25 per unit to manufacture and we are selling for $170." She said offering a 30-40% discount price "would leave us with a margin profit of $94-77 per unit" and if they increase the discount to 50%, they "would still have a marginal profit of $60 per unit."

49.     ███████████ also routinely mentioned how "easily" they could create tissue-derived "products" for sale when discussing pricing. In an email exchange in April 2014 regarding a promotional discount on "chondrocytes and muscle progenitors," ███████ explained: "margins on both products are much higher than 50%. The costs range from $40-50 per vial and we sell them at a 10 fold mar[k] up."

50.     In July 2014, DV executives ███████ and Vice President of Sales, ███████ ███████ specifically discussed the pricing of prenatal renal (kidney) fibroblasts via email.

15

explained that they were currently selling the "product" for $350/vial. He said there was no competition for this "product," the cost to make one vial of the postnatal fibroblast was only "in the range of 40 dollars a vial," and thus he recommended they raise the price to $375/vial. ▮▮▮▮▮ said he would work on a pricing formula "based on infrastructure, hours spent and intellectual property" but noted: "1000% gross does not seem unreasonable based on infrastructure and lack of competition." Consistent with DV's maximize-the-price culture, ▮▮▮▮▮ also said "if the market can handle a higher price then we will go with [that] since we will be giving discounts to the distributors." After this discussion, the 2015 list price for prenatal kidney fibroblasts was set at $450/vial.

51.     In 2014 and early 2015, DV's management reviewed the actual cost, including labor, to produce products for purposes of evaluating more specifically the current pricing and their profit margins. The detail was reviewed and edited by ▮▮▮▮▮ and presented in a report to ▮▮▮▮▮ on January 14, 2015 entitled "Pricing per Product FINAL." Only one prenatal "product" type that was analyzed ("RNA products") at or around this time frame appeared to be selling below cost. For the remaining fetal products analyzed, it was clear that there was a substantial profit margin being earned on the prenatal sales, most of which were selling at a profit margin of 70% or more.

**F.     DV Sold Hundreds Of Units Of Fetal Tissue And Cells For Valuable Consideration**

52.     From August 2012 to October 2015, it is estimated, using DV's 2015 "Pricing per Product FINAL" analysis (the "2015 Analysis") that DV sold approximately 500 fetal tissue/cell "products" for valuable consideration.

53.     For example, one of DV's 2015 "Top Seller" "products" was "Human Cardiomyocytes" cells (pC008-F) derived from fetal heart tissue donations. According to DV's

COMPLAINT

2015 Analysis, DV can produce 40 vials in a lot, at a cost (including labor) of $25.92 per vial. From 2012-2015, DV sold this "product" at prices of $350/vial (50% off pricing); $490/vial (distributor discount pricing); $560/vial; $595/vial (15% off discount pricing); and $700/vial. Profits on these sales ranged from $324.08 to $674.08 per vial, not including any profits earned on packaging and handling or any other fees charged.

54.     One of DV's other 2015 "Top Seller" "products" included "Human Cardiac Progenitor" cells (pC0015-F) derived from fetal heart tissue donations. According to DV's 2015 Analysis, DV can produce 10 vials in a lot, at a cost (including labor) of $62.31 per vial. From 2012-2015, DV sold this "product" at prices of $455/vial; $520/vial; $552.50/vial and $650/vial. Profits on these sales ranged from $392.69 to $587.69 per vial, not including any profits earned on packaging and handling or any other fees charged.

55.     Another "Top Seller" included "Human Whole Liver Cells" (pD001-F) derived from fetal liver tissue donations. According to DV's 2015 Analysis, DV can produce 10 vials in a lot, at a cost (including labor) of $18.46 per vial. From 2012-2015, DV sold this product at prices of $125/vial; $175/vial and $200/vial. Profits on these sales ranged from $106.54 to $181.54 per vial, not including any profits earned on packaging and handling or any other fees charged.

56.     Similarly, for DV's "Top Seller" "Human CD34 Positive Cells" (pD002-F) derived from fetal liver tissue donations, DV could prepare 10 vials in a lot at a cost (including labor) of $126.17 per vial. DV sold this product at prices of $225/vial and $360 per vial, earning the Defendants a profit between $98.83 and $233.83 per vial on these sales, not including any profits earned on packaging and handling or any other fees charged.

17

57. DV's "Top Selling" "Stomach cells (uncultured)" (pD005-F), derived from fetal stomach tissue donations, sold for $210, $225 and $240 per vial. Ten vials could be produced in a lot of this product at a cost of $18.46 per vial (including labor). DV earned a profit in a range of $191.54 and $221.54 per vial for these product sales, not including any profits earned on packaging and handling or any other fees charged.

58. "Human Small Intestine Cells (uncultured)" (pD007-F) and "Human Large Intestine Cells (uncultured) (pD008-F), both derived from fetal intestine tissue donations could be produced for sale at a volume of 10 per lot and at a cost (including labor) of $18.46 per vial. These were also "Top Sellers." Prices of $210/vial, $255/vial and $300/vial were charged for these sales, earning DV a profit ranging from $191.54 to $281.54, not including any profits earned on packaging and handling or any other fees charged.

59. Another "Top Seller" included DV's "Human Small Intestine Epithelial Cells" (pD0015-F), also derived from fetal intestine tissue donations. Defendants produced 10 vials in a lot of this product at a cost of $35.91 per vial (including labor). From 2012-2015, DV charged various prices for this "product," including $297.50/vial (50% off discount pricing); $560/vial; $595/vial; $630/vial and $700/vial, therefore profiting in a range of $261.59 to $664.09 per vial on these sales, not including any profits earned on packaging and handling or any other fees charged.

60. With the exception of some of DV's "Total RNA" (-R) fetal tissue derived products, and a handful of free samples that were distributed at a loss, based on its own cost and profit-margin analysis, Defendants profited by large margins on the vast majority of its sales of fetal tissue stem cell "products" from 2009-2015. Defendants knowingly sold each of these "products" with the specific intent to profit on such sales. Each of the 500 prenatal "products"

that were sold for valuable consideration between August 2012 and the present date is a separate

violation of both California and federal law for which civil penalties and an injunction

preventing any further violations are sought by way of this action.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**(Violation Of Business And Professions Code Section 17200**

**Against All Defendants)**

61.     Plaintiff realleges the allegations of paragraphs 1 through 60 above as though fully set forth herein.

62.     From 2009-2015, Defendants advertised and sold hundreds of fetal tissue stem cell "products" at prices well in excess of the allowable "reasonable payment for the removal, processing, disposal, preservation, quality control, transplantation or implantation of a part." For every such sale, Defendants sold fetal tissue for valuable consideration in violation of California Health and Safety Code Section 125320 and 42 U.S.C. Section 289g-2.

63.     Defendants' conduct was knowing and intentional and in complete disregard of the law.  Indeed, rather than attempt to limit their income on sales to allowable amounts, Defendants ignored their legal obligations entirely and affirmatively set forth, at the direction of the ███ Defendants, a business objective and plan to profit on their sales efforts.  From 2009 to 2015, the company acted on these intentions with increasing efforts, resulting in hundreds of profitable sales of fetal tissue and stem cell "products" from 2009-2015.  The Isaias Defendants had an obligation and duty to ensure that their companies complied with all such laws, but failed to prevent the violations and knowingly encouraged the unlawful activity to continue.  Indeed, throughout, the pressure to make money selling "products" on DV employees was driven by the Isaias Defendants and the other "funding brothers."

64.     Defendants' failure to comply with California Health and Safety Code Section 125320 and 42 U.S.C. Section 289g-2 amounts to an unlawful, unfair and fraudulent business practice under California Business and Professions Code Section 17200.

19

1    65.    The People hereby seek civil penalties of up to $2,500 per violation to the

2    maximum extent permitted by law for Defendants' illegal sales from August 2012 to the present

3    date.  It is estimated that DV sold 503 fetal tissue "products" for valuable consideration between

4    August 2012 and the present date, and each such sale is a separate violation.

5    66.    Additionally, the Defendants operated the DV companies without paying all

6    required taxes/fees required for the right to transact business in California, thus resulting in the

7    forfeiture of their rights and powers in the State by the California Franchise Tax Board.  (Cal.

8    Rev. & Tax Code §§ 23001 *et seq.*; Cal. Rev. & Tax Code §§ 25101; Cal. Corp. Code §§ 2100 *et*

9    *seq.*; Cal. Corp. Code §§ 2258-2259.)  For every day after November 3, 2014, when the DV

10   Defendants operated their "product" sales business, and for every day after July 28, 2015 when

11   the DV Defendants operated their stem cell research company, without paying all required

12   taxes/fees and thereby reinstating their "powers, rights and privileges" forfeited by the California

13   Franchise Tax Board, Defendants committed further unlawful, unfair and/or fraudulent business

14   practices under California Business and Professions Code Section 17200.  The People hereby

15   further seek civil penalties of up to $2,500 per violation for every day the DV Defendants

16   transacted business in the State with a "forfeited" status.

17   67.    The People further hereby seek all appropriate injunctive relief pursuant to

18   Business and Professions Code Section 17203 to prevent any further unlawful activity and any

19   applicable restitution in an amount to be determined at trial.

20                              **PRAYER FOR RELIEF**

21   WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, as

22   follows:

23   1.    For civil penalties and restitution in an amount to be determined at trial;

24   2.    An order enjoining Defendants, and each of them, from further violation of California

25        and Federal laws concerning the sale of fetal tissue and cells and from continuing to

26        engage in business in California while their powers rights and privileges remain

27        forfeited;

28

20

1    3.  An award of costs and any other applicable fees for prosecuting this action; and

2    4.  Any such other relief as the Court may deem just and proper.

3   DATED: October 11, 2016

4                                      TONY RACKAUCKAS, DISTRICT ATTORNEY
                                       COUNTY OF ORANGE, STATE OF CALIFORNIA
5
                                       By:_____
6

7                                              Deputy District Attorney

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT

Exhibit 5.29

# SUBPOENA

## BY AUTHORITY OF THE HOUSE OF REPRESENTATIVES OF THE CONGRESS OF THE UNITED STATES OF AMERICA

*To* DV Biologics, LLC

You are hereby commanded to be and appear before the

Committee on Energy and Commerce

Select Investigative Panel on Infant Lives

of the House of Representatives of the United States at the place, date, and time specified below.

☑ **to produce the things identified on the attached schedule** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

Place of production: 316 Ford House Office Building, Washington, DC 20515

Date: May 23, 2016               Time: 5:00 P.M.

☐ **to testify at a deposition** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

Place of testimony: _____

Date: _____           Time: _____

☐ **to testify at a hearing** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

Place of testimony: _____

Date: _____           Time: _____

*To* United States Marshals or any authorized staff member

_____ to serve and make return.

Witness my hand and the seal of the House of Representatives of the United States, at

the city of Washington, D.C. this 15th day of May , 20 16 .

*Chairman or Authorized Member*

Attest:

*Clerk*

# PROOF OF SERVICE

Subpoena for
  DV Biologics, LLC
_____

Address  c/o R. Joseph Burby, IV, attorney of record, Bryan Cave
_____

 1201 W. Peachtree Street, N.W., Atlanta, GA 30309
_____

before the  Committee on Energy and Commerce
_____

Select Investigative Panel on Infant Lives
_____

*U.S. House of Representatives*
*114th Congress*

---

Served by (print name) _____

Title _____

Manner of service _____

_____

Date _____

Signature of Server _____

Address _____

_____

# DV Biologics, LLC

**In accordance with the attached schedule, instructions, and definitions, you, DV Biologics, LLC. ("DV"), are required to produce all documents in unredacted form described below:**

1) Documents sufficient to show all entities, including firms, corporations, non-profit organizations, and educational institutions, from which DV receives or procures fetal tissue.[1] DV may produce a list of such entities in lieu of documents.

2) Documents sufficient to show all entities, including firms, corporations, non-profit organizations, and educational institutions, to which DV sells or donates fetal tissue. DV may produce a list of such entities in lieu of documents.

3) Documents sufficient to show all entities, including firms, corporations, non-profit organizations, and educational institutions, to which DV transferred, subcontracted or sold any business interest or business assets related to the procurement or sale of fetal tissue. DV may produce a list of such entities in lieu of documents.

4) Documents sufficient to reflect DV organization chart, including information detailing DV personnel that procure(d) fetal tissue at the clinic level and the supervisory personnel for those procurers of fetal tissue.

5) All communications, whether internal or external, that direct or relate to a direction to DV personnel to procure fetal tissue, including, but not limited to memoranda, emails, telephone messages, and purchase orders or bills of sale.

6) All DV accounting records, including accounting memoranda related to the cost and pricing of fetal tissue.

7) Documents sufficient to show all institutions or entities to which DV donated or provided fetal tissues for the following years: 2010, 2011, 2012, 2013, 2014 and 2015. You may provide a list of such institutions and entities in lieu of producing these documents.

8) Copies of all invoices (by month and year), reflecting the billing that DV issued to all institutions or entities to which DV donated or provided fetal tissues for the following years: 2010, 2011, 2012, 2013, 2014 and 2015.

9) Documents sufficient to show all institutions or entities from which DV obtained fetal tissues for the following years: 2010, 2011, 2012, 2013, 2014 and 2015. You may provide a list of such institutions and entities in lieu of producing these documents.

---

[1] Please note that, for the purposes of this request, the term "fetal tissue" includes tissue, organs, body parts, and cell lines. *See* Definition ¶7.

10) Copies of all invoices (by month and year) reflecting the billing or payment of funds for fetal tissues obtained by for the following years: 2010, 2011, 2012, 2013, 2014 and 2015.

11) A copy of any chart of accounts for DV, including but not limited to account descriptions from any financial recording system relating to DV.

12) DV's end of year trial balance report and trial balance details for the following years: 2010, 2011, 2012, 2013, 2014 and 2015.

13) All documents reflecting DV's statement of revenues (i.e., a breakdown by product categories) for the following years: 2010, 2011, 2012, 2013, 2014 and 2015.

14) All documents reflecting DV's record of costs and expenses (i.e., a breakdown by operations, including fetal tissue acquisition) for administrative costs and expenses as well as compensation and benefits, for the following years: 2010, 2011, 2012, 2013, 2014 and 2015. Where applicable, records should include identification of vendors and descriptions of expenses.

15) DV's balance sheets for the following years: 2010, 2011, 2012, 2013, 2014 and 2015. Audited statements should be provided, if available.

16) DV's income statements, including but not limited to any profit and loss statements, statements of operations and statements of activities for the following years: 2010, 2011, 2012, 2013, 2014 and 2015. Audited statements should be provided, if available.

17) Copies of DV's filed tax returns for the following years: 2010, 2011, 2012, 2013, 2014 and 2015.

18) All DV bank statements from any financial institution where DV has maintained an account for the following years: 2010, 2011, 2012, 2013, 2014 and 2015.

19) Documents sufficient to show how DV calculates(d) the cost of a fetal tissue and all factors applied in determining pricing of fetal tissue. In lieu of these documents, you may provide a written explanation.

20) All specific requests made to DV for fetal tissue made by any and all firms, corporations, non-profit organizations, educational institutions, or other entities, including, but not limited to, order lists, billing records, payment records, payment vouchers, and receipts.

21) All documents relating to the purchase, ownership, or rental by DV of equipment involving fetal tissue research, the preparation of fetal tissue for research, the modification of fetal tissue into cell lines, or any other actions taken by DV related to fetal tissue, including but not limited to, the date the equipment was purchased, its purchase price, its maintenance costs, and records of the depreciation treatment under the tax code of any such equipment.

22) An inventory record of all fetal tissues obtained, sold, or retained by DV, as well as an inventory of current fetal tissue including, in particular, any records that refer to multiple tissue samples or organs or body parts harvested from a single fetus.

23) All records related to any fetal tissue or cell lines procured or sold from twin fetuses.

24) All documents relating to rent or site fees paid to entities from which DV obtained, sold, or donated fetal tissue.

25) All training materials used by DV for the procurement of fetal tissue, preparation of fetal tissue, storage of fetal tissue, and training materials or guidance documents related to DV Staff relations with personnel or patients at the source entities from which fetal tissue is procured.

26) All communications and documents referring or relating to Institutional Review Board (IRB), as defined by Title 45 of the Code of Federal Regulations, Part 46, consents for the period of March 29, 2012 through January 26, 2013.

### Instructions

1) The relevant time period for above-referenced documents is January 1, 2010, to the present.

2) If there are no responsive documents, provide a written explanation detailing why no such documents exist.

3) In complying with this subpoena, you are directed that no document may be redacted in any way except that that all patient information protected by the American Health Portability and Accountability Act of 1998 (HIPAA) shall be redacted.

4) In complying with the subpoena, be apprised that the U.S. House of Representatives and the Committee on Energy and Commerce, Select Investigative Panel on Infant Lives ("Select Panel") do not recognize any of the non-disclosure privileges associated with the common law, with the Freedom of Information Act, with attorney client privilege, or contractual privileges such as non-disclosure agreements.

5) In complying with this subpoena, you are directed to produce all responsive documents that are in your possession, custody, or control, whether held by you or your past or present agents, employees, and representatives acting on your behalf. You are also directed to produce records that you have a legal right to obtain, that you have a right to copy or to which you have access, as well as records that you have placed in the temporary possession, custody, or control of any third party.

6) No records, documents, data or information called for by this request shall be destroyed, modified, removed, transferred or otherwise made inaccessible to the Select Panel.

7) In the event that any entity, organization or individual denoted in this subpoena has been, or is also known by any other name than that herein denoted, the subpoena shall be read also to include them under that alternative identification.

8) Each document produced shall be produced in a form that renders the document capable of being copied.

9) Documents produced in response to this subpoena shall be produced together with copies of file labels, dividers or identifying markers with which they were associated when this subpoena was served. To the extent that documents were not stored with file labels, dividers, or identifying markers, they shall be organized into separate folders by subject matter prior to production.

10) All documents or groups of documents, produced shall be identified by the paragraph number in the Attachment to the subpoena to which the documents, or groups of documents, are responsive.

11) It shall not be a basis for refusal to produce documents that any other person or entity also possesses non-identical or identical copies of the same document.

12) If any of the subpoenaed information is available in machine-readable or electronic form (such as on a computer server, hard drive, CD, DVD, memory stick, or computer back-up tape), you shall consult with Select Panel staff to determine the appropriate format in which to produce the information. Documents produced in electronic format shall be organized, identified, and indexed electronically in a manner comparable to the organizational structure called for in Paragraphs 8 and 9 above. Documents produced in an electronic format shall also be produced in searchable format.

13) If compliance with the subpoena cannot be made in full, compliance shall be made to the extent possible, and your production shall be accompanied by a written explanation of why full compliance is not possible.

14) In the event that a document is withheld on any basis, provide the following information concerning each and every such document withheld from production: (a) the reason the document is not being produced; (b) type of document; (c) general subject matter; (d) date, author and addressee; and (e) relationship of author and addressee to each other.

15) If any document responsive to this subpoena was, but no longer is, in your possession, custody, or control, identify the document (stating its date, author, subject and

recipient(s)) and explain the circumstances by which the document ceased to be in your possession, custody, or control.

16) If a date or other descriptive detail set forth in this subpoena referring to a document is inaccurate, but the actual date or other descriptive detail is known to you or is otherwise apparent from the context of the request, you should produce all documents which would be responsive as if the date or other descriptive detail were correct.

17) This request is continuing in nature and applies to any newly-discovered information. Any record, document, compilation of data or information, not produced because it has not been located or discovered by the return date, shall be produced immediately upon location or discovery subsequent thereto.

18) All documents shall be Bates-stamped sequentially and produced sequentially.

19) Two sets of responsive records shall be produced, one set to the Majority staff and one set to the Minority staff. The Majority set shall be delivered to Majority staff in Room 316 of the Ford House Office Building and the Minority set shall be delivered to the Minority staff at 361 Ford House Office Building. You shall consult with the Select Panel staff regarding the method of delivery prior to sending any material.

20) Upon completion of the document production, you must submit a written certification, signed by you or your counsel, stating that: (1) a diligent search has been completed of all documents in your possession, custody, or control which reasonably could contain responsive documents; (2) documents responsive to the request have not been destroyed, modified, removed, transferred, or otherwise made inaccessible to the Select Panel since the date of receiving the Select Panel's request or in anticipation of receiving the Select Panel's request, and (3) all documents identified during the search that are responsive have been produced to the Select Panel, identified in a log provided to the Select Panel, as described in Paragraph 14 above.

## Definitions

1) The term "document" means any written, recorded, or graphic matter of any nature whatsoever, regardless of how recorded, and whether original or copy, including but not limited to, the following: memoranda, reports, expense reports, books, manuals, instructions, financial reports, accounting and financial records of any kind (including checks (front and back), wire transfers, cash or check payments or receipts, and check requests), working papers, records, notes, letters, notices, confirmations, telegrams, receipts, appraisals, pamphlets, magazines, newspapers, prospectuses, interoffice and intra-office communications, electronic mail ("e-mail"), instant messages, text messages, calendars, contracts, cables, notations of any type of conversation, telephone call,

meeting or other communication, bulletins, printed matter, computer printouts, invoices, transcripts, diaries, analyses, returns, summaries, minutes, bills, accounts, estimates, projections, comparisons, messages, correspondence, press releases, circulars, financial statements, reviews, opinions, offers, studies and investigations, questionnaires and surveys, power point presentations, spreadsheets, and work sheets. The term "document" includes all drafts, preliminary versions, alterations, modifications, revisions, changes, and amendments to the foregoing, as well as any attachments or appendices thereto. The term "document" also means any graphic or oral records or representations of any kind (including, without limitation, photographs, charts, graphs, voice mails, microfiche, microfilm, videotapes, recordings, and motion pictures), electronic and mechanical records or representations of any kind (including, without limitation, tapes, cassettes, disks, computer server files, computer hard drive files, CDs, DVDs, back up tape, memory sticks, recordings, and removable computer media such as thumb drives, flash drives, memory cards, and external hard drives), and other written, printed, typed, or other graphic or recorded matter of any kind or nature, however produced or reproduced, and whether preserved in writing, film, tape, electronic format, disk, videotape or otherwise. A document bearing any notation not part of the original text is considered to be a separate document. A draft or non-identical copy is a separate document within the meaning of this term.

2) The term "documents in your possession, custody or control" means (a) documents that are in your possession, custody, or control, whether held by you or your past or present agents, employees, officers, directors, contractors, consultants, or representatives acting on your behalf; (b) documents that you have a legal right to obtain, that you have a right to copy, or to which you have access; and (c) documents that have been placed in the possession, custody, or control of any third party.

3) The term "communication" means each manner or means of disclosure, transmission, or exchange of information, in the form of facts, ideas, opinions, inquiries, or otherwise, regardless of means utilized, whether oral, electronic, by document or otherwise, and whether face-to-face, in a meeting, by telephone, mail, e-mail, instant message, text message, discussion, release, personal delivery, or otherwise.

4) The terms "and" and "or" should be construed broadly and either conjunctively or disjunctively as necessary to bring within the scope of this request any information which might otherwise be construed to be outside its scope. The singular includes the plural number, and vice versa. The masculine includes the feminine and neuter genders.

5) The terms "person" or "persons" mean natural persons, firms, partnerships, associations, limited liability corporations and companies, limited liability partnerships, corporations, subsidiaries, divisions, departments, joint ventures, proprietorships, syndicates, other

legal, business or government entities, or any other organization or group of persons, and all subsidiaries, affiliates, divisions, departments, branches, and other units thereof.

6) The term "DV" includes DV Biologics, LLC and any affiliates or related entities, all referred to herein, both individually and collectively, as "DV".

7) The term "fetal tissue" means tissue, organs, body parts, and cell lines.

8) The term "study" or "proposal" means any work or regime of biomedical research that led to a report or memoranda, whether published or not.

9) The terms "referring" or "relating," with respect to any given subject, mean anything that constitutes, contains, embodies, reflects, identifies, states, refers to, deals with, or is in any manner whatsoever pertinent to that subject.

10) The terms "you" and "your" refer to DV Biologics, LLC, as defined herein, whether known by this name or a different name, its past and present officers, directors, employees, consultants, contractors, agents, representatives, subsidiaries, and/or parents.

Exhibit 5.30



CELLUTIONS FOR INNOVATION™

SEARCH

**HOME**      **ABOUT US**      **PRODUCTS**      **SERVICES**      **RESOURCES**      **NEWS**      **CONTACT**



## Overview

## LIFEbank Products

**LIFEbank** is a collection of product lines which include tissue-derived, cell-based, genomics, transcriptomics, and proteomic biological tools produced from a diverse range of human specimens from multiple pathological and genetic states and various developmental stages.



### LIFEbank CELLULAR SYSTEMS
A line of normal, non-diseased, human-derived primary cells and cultured cells for research. Each product is classified according to classical anatomy systems such as hematopoetic, endocrine, neural, etc. and further classified according to their cell lineage and developmental stage.

| | | |
|---|---|---|
| Neural | Hematopoietic | Urinary |
| Cardiovascular | Skeletal Muscle | Digestive |
| Integumentary | Reproductive | Pulmonary |



### LIFEbank GENOMIC/PROTEOMIC SYSTEMS
Each product is from a single source and non-pooled. All products are validated under strict quality assurance and control parameters, providing customers with reliable, quality products for reproducible results with maximum impact. LIFEbank GENOMIC/PROTEOMIC SYSTEMS products are classified into categories based on their cell lineage and developmental stage.

| | | | |
|---|---|---|---|
| Neural | Hematopoietic | Urinary | Endocrine |
| Cardiovascular | Skeletal Muscle | Digestive | Miscellaneous |
| Integumentary | Reproductive | Pulmonary | Lymphatic |



### LIFEbank DISEASE-SPECIFIC SYSTEMS
Offers customers disease-specific cells and cultured cells for the most accurate study of particular medical and pharmaceutical research objectives, such as the specific study of endocrine or neurological disorders i.e. Diabetes, Parkinson's Disease, ALS, etc. Click here to view our November 2009 Newsletter with detailed information on our LIFEbank Disease-Specific Systems.

---

- LIFEbank CELLULAR SYSTEMS (58)
- LIFEbank GENOMIC/PROTEOMIC SYSTEMS (100)
- LIFEbank DISEASE-SPECIFIC SYSTEMS (180)
- CELLUTIONS MEDIA (28)

Questions? Contact Us or email info@dvbiologics.com

| | | | |
|---|---|---|---|
| Neurological | Genetic | Congenital | Degenerative |
| Oncogenic | Autoimmune | Cardiovascular | Blood |
| Muscular | Endocrine | Metabolic | |



## CELLUTIONS MEDIA

A line of optimized media products designed specifically for maximum growth and maintenance of human-derived primary and cultured cells. DV Biologics also provides media options for culture, growth and differentiation of various progenitor cell types. Each product is classified according to classical anatomical systems such as neural, stromal (hematopoietic), skeletal and cardiac muscle, fibroblast, epithelial, etc. DV Biologics' custom media provide your cells with the best possible growth and differentiation requirements for results that are guaranteed. In addition, we also carry conditioned media that will facilitate your differentiation experiments.

Cardiac Muscle Media   Hematopoietic Media
Skeletal Muscle Media   Integumentary Media
Neural Media

To request LIFEbank Products, please send an email to: **orders@dvbiologics.com**.

About Us   Products   Services   Resources   News   Contact   Ordering Information   Ethics & Quality   Privacy Policy   Site Map



CELLUTIONS FOR INNOVATION™

SEARCH

**HOME**     **ABOUT US**     **PRODUCTS**     **SERVICES**     **RESOURCES**     **NEWS**     **CONTACT**

## Categories

- ▼ LIFEbank CELLULAR SYSTEMS (58)
  - Cardiovascular (37)
  - Digestive (29)
  - General (30)
  - Endocrine (31)
  - Integumentary (30)
  - Hematopoietic (33)
  - Neural (29)
  - Urinary (31)
  - Skeletal Muscle (38)
  - Reproductive (31)
  - Pulmonary (29)
- ▶ LIFEbank GENOMIC/PROTEOMIC SYSTEMS (100)
- ▶ LIFEbank DISEASE-SPECIFIC SYSTEMS (180)
- ▶ CELLUTIONS MEDIA (28)

Questions? Contact Us or email info@dvbiologics.com



### Adipose Stromal Cells
SKU: AA002-F

Adipose Stromal Cells 500,000 cells/vial... More Details

**$375.00**

Quantity 1    Add to cart



### Adrenal Gland Cells (Uncultured)
SKU: AE006-F

Adrenal gland cells are derived from dissociated... More Details

**$850.00**

Quantity 1    Add to cart



### Adrenal Gland Tissue cDNA
SKU: AE001-CD

DV Biologics cDNA is synthesized from a... More Details

**$350.00**

Quantity 1    Add to cart



### Adrenal Gland Tissue Lysate
SKU: AE001-L

DV Biologics cell and tissue lysates are... More Details

**$260.00**

Quantity 1    Add to cart



### Adrenal Gland Tissue Total RNA
SKU: AE001-R

DV Biologics total RNA passes extensive... More Details

**$400.00**

Quantity 1    Add to cart



### Adult Tenocytes
SKU: AM014-F

Tendon cells or tenocytes are fibroblastic-like... More Details

**$650.00**

Quantity 1    Add to cart



## Aorta Tissue Total RNA
SKU: AC003-R

DV Biologics total RNA passes extensive... More Details

**$300.00**

Quantity [1]    Add to cart

## Bone Marrow Mononuclear Cells
SKU: AH002-F-10

Bone Marrow Mononuclear Cells 10 x 10^6 cells ... More Details

**$150.00**

Quantity [1]    Add to cart

## Bone Marrow Mononuclear Cells
SKU: AH002-F-2.5

Bone Marrow Mononuclear Cells 2.5 x 10^6 cells... More Details

**$50.00**

Quantity [1]    Add to cart

## Bone Marrow Mononuclear Cells
SKU: AH002-F-MD-10

The bone marrow mononuclear cells are... More Details

**$300.00**

Quantity [1]    Add to cart

1   2   3   4   5   6       next :   last »

About Us   Products   Services   Resources   News   Contact   Ordering Information   Ethics & Quality   Privacy Policy   Site Map

MY CART (0)



CELLUTIONS FOR INNOVATION™

SEARCH

HOME      ABOUT US      PRODUCTS      SERVICES      RESOURCES      NEWS      CONTACT

### Categories

- ▼ LIFEbank CELLULAR SYSTEMS (58)
  - Cardiovascular (37)
  - Digestive (29)
  - General (30)
  - Endocrine (31)
  - Integumentary (30)
  - Hematopoietic (33)
  - Neural (29)
  - Urinary (31)
  - Skeletal Muscle (38)
  - Reproductive (31)
  - Pulmonary (29)
- ▶ LIFEbank GENOMIC/PROTEOMIC SYSTEMS (100)
- ▶ LIFEbank DISEASE-SPECIFIC SYSTEMS (180)
- ▶ CELLUTIONS MEDIA (28)

Questions? Contact Us or email info@dvbiologics.com



## Bone Marrow Mononuclear Cells
SKU: AH002-F-MD-2.5
The bone marrow mononuclear cells are isolated by... More Details
**$100.00**

Quantity | 1 |    Add to cart



## Bone Marrow Stromal Cells
SKU: AH005-F
Bone Marrow Stromal Cells 500,000 cells/vial ... More Details
**$500.00**

Quantity | 1 |    Add to cart



## Cardiac Progenitor Cells
SKU: AC015-F
Cardiac Progenitor Cells 500,000 cells/vial... More Details
**$800.00**

Quantity | 1 |    Add to cart



## Cardiac Stromal Cells
SKU: AC009-F
Cardiac Stromal Cells 500,000 cell/vial... More Details
**$700.00**

Quantity | 1 |    Add to cart



## Cardiomyocytes
SKU: AC008-F
Cardiomyocytes 500,000 cells/vial Postnatal... More Details
**$850.00**

Quantity | 1 |    Add to cart



## CD34(-) Bone Marrow Cells
SKU: AH008-F
Bone marrow mononuclear cells of a single donor... More Details
**$200.00**

Quantity | 1 |    Add to cart



### CD34+ Bone Marrow Cells
SKU: AH003-F
Post-natal derived    500,000 cells    The CD34... More Details
**$800.00**

Quantity [1]    [ Add to cart ]



### Chondrocytes
SKU: AM006-F
Chondrocytes 1.0x10^6 cells    Postnatal... More Details
**$750.00**

Quantity [1]    [ Add to cart ]



### Cortical Epithelial Cells Total RNA
SKU: AU003-R
DV Biologics total RNA passes an extensive... More Details
**$350.00**

Quantity [1]    [ Add to cart ]



### Cortical Kidney Epithelial Cell Total RNA
SKU: AU003-R
DV Biologics total RNA passes an extensive... More Details
**$350.00**

Quantity [1]    [ Add to cart ]

[ « first ] [ ‹ previous ] [ 1 ] [ 2 ] [ 3 ] [ 4 ] [ 5 ] [ 6 ]      [ next › ] [ last » ]

About Us   Products   Services   Resources   News   Contact   Ordering Information   Ethics & Quality   Privacy Policy   Site Map



MY CART (0)

CELLUTIONS FOR INNOVATION™

[SEARCH]                    SEARCH

**HOME**        **ABOUT US**        **PRODUCTS**        **SERVICES**        **RESOURCES**        **NEWS**        **CONTACT**



### Cortical Kidney Epithelial Cells
SKU: AU003-F
The cortex of a kidney of a single donor is... More Details
**$600.00**

Quantity [1]        [ Add to cart ]

---



### Cortical Kidney Epithelial Cells cDNA
SKU: AU003-CD
DV Biologics cDNA is synthesized from a highly... More Details
**$375.00**

Quantity [1]        [ Add to cart ]

---

### Cortical Kidney Epithelial Cells Lysate
SKU: AU003-L
DV Biologics cell and tissue lysates are prepared... More Details
**$375.00**

Quantity [1]        [ Add to cart ]

---



### Endometrial Menstrual Cells
SKU: AR007-F
Endometrial Menstrual Cells 500,000 cells/vial... More Details
**$550.00**

Quantity [1]        [ Add to cart ]

---



### Kidney Cells
SKU: AU017-F
Kidney tissue of a single donor is dissociated... More Details
**$650.00**

Quantity [1]        [ Add to cart ]

---



### Kidney Cells (Uncultured)
SKU: AU001-F
Kidney Cells (Uncultured) 5.0 × 10^5 cells... More Details
**$525.00**

Quantity [1]        [ Add to cart ]

---

## Categories

- **LIFEbank CELLULAR SYSTEMS (58)**
  - Cardiovascular (37)
  - Digestive (29)
  - General (30)
  - Endocrine (31)
  - Integumentary (30)
  - Hematopoietic (33)
  - Neural (29)
  - Urinary (31)
  - Skeletal Muscle (38)
  - Reproductive (31)
  - Pulmonary (29)
- LIFEbank GENOMIC/PROTEOMIC SYSTEMS (100)
- LIFEbank DISEASE-SPECIFIC SYSTEMS (180)
- CELLUTIONS MEDIA (28)

Questions? Contact Us or email info@dvbiologics.com



## Kidney Cells cDNA
SKU: AU017-CD

cDNA is synthesized from a highly pure and intact... More Details

**$375.00**

**Quantity** 1    Add to cart



## Kidney Cells Lysate
SKU: AU017-L

Kidney cells (AU017-F) are homogenized in ice-... More Details

**$375.00**

**Quantity** 1    Add to cart



## Kidney Cells Total RNA
SKU: AU017-R

RNA is isolated using a modified guanidinium... More Details

**$350.00**

**Quantity** 1    Add to cart



## Kidney Cortex Cells
SKU: AU018-F

The cortex of a kidney of a single donor is... More Details

**$650.00**

**Quantity** 1    Add to cart

« first   ‹ previous   1   2   3   4   5   6               next :   last »

About Us   Products   Services   Resources   News   Contact   Ordering Information   Ethics & Quality   Privacy Policy   Site Map

MY CART (0)



CELLUTIONS FOR INNOVATION™

SEARCH

**HOME**      **ABOUT US**      **PRODUCTS**      **SERVICES**      **RESOURCES**

**NEWS**      **CONTACT**



### Kidney Cortex Cells (Uncultured)
SKU: AU011-F
The cortex of a kidney of a single donor is... More Details
**$550.00**

Quantity [ 1 ]   [ Add to cart ]



### Kidney Cortex Cells (Uncultured) cDNA
SKU: AU011-CD
cDNA is synthesized from a highly pure and intact... More Details
**$350.00**

Quantity [ 1 ]   [ Add to cart ]



### Kidney Cortex Cells (Uncultured) Lysate
SKU: AU011-L
Uncultured kidney cortex cells (AU011-F) are... More Details
**$350.00**

Quantity [ 1 ]   [ Add to cart ]



### Kidney Cortex Cells (Uncultured) Total RNA
SKU: AU011-R
RNA is isolated using a modified guanidinium... More Details
**$450.00**

Quantity [ 1 ]   [ Add to cart ]



### Kidney Cortex Cells cDNA
SKU: AU018-CD
cDNA is synthesized from a highly pure and intact... More Details
**$400.00**

Quantity [ 1 ]   [ Add to cart ]



### Kidney Cortex Cells Lysate
SKU: AU018-L
Kidney cortex cells (AU018-F) are homogenized in... More Details
**$400.00**

Quantity [ 1 ]   [ Add to cart ]

## Categories

- ▼ LIFEbank CELLULAR SYSTEMS (58)
  - Cardiovascular (37)
  - Digestive (29)
  - General (30)
  - Endocrine (31)
  - Integumentary (30)
  - Hematopoietic (33)
  - Neural (29)
  - Urinary (31)
  - Skeletal Muscle (38)
  - Reproductive (31)
  - Pulmonary (29)
- ▶ LIFEbank GENOMIC/PROTEOMIC SYSTEMS (100)
- ▶ LIFEbank DISEASE-SPECIFIC SYSTEMS (180)
- ▶ CELLUTIONS MEDIA (28)

Questions? Contact Us or email info@dvbiologics.com



### Kidney Cortex Cells Total RNA

SKU: AU018-R

RNA is isolated using a modified guanidinium... More Details

**$500.00**

Quantity 1    Add to cart



### Kidney Fibroblasts

SKU: AU009-F

500,000 cells/vial   Postnatal derived  ... More Details

**$650.00**

Quantity 1    Add to cart



### Kidney Medulla Cells (Uncultured)

SKU: AU012-F

The medulla of a kidney of a single donor is... More Details

**$550.00**

Quantity 1    Add to cart



### Kidney Tissue cDNA

SKU: AU008-CD

DV Biologics cDNA is synthesized from a highly... More Details

**$340.00**

Quantity 1    Add to cart

---

« first   ‹ previous   1   2   3   4   5   6              next :   last »

About Us   Products   Services   Resources   News   Contact   Ordering Information   Ethics & Quality   Privacy Policy   Site Map

MY CART (0)



CELLUTIONS FOR INNOVATION™

SEARCH

**HOME**      **ABOUT US**      **PRODUCTS**      **SERVICES**      **RESOURCES**      **NEWS**      **CONTACT**

Categories



### Kidney Tissue Lysate
SKU: AU008-L
DV Biologics cell and tissue lysates are prepared... More Details
**$260.00**

Quantity [1]  [ Add to cart ]

▾ LIFEbank CELLULAR SYSTEMS (58)
    Cardiovascular (37)
    Digestive (29)
    General (30)
    Endocrine (31)
    Integumentary (30)
    Hematopoietic (33)
    Neural (29)
    Urinary (31)
    Skeletal Muscle (38)
    Reproductive (31)
    Pulmonary (29)

▸ LIFEbank GENOMIC/PROTEOMIC SYSTEMS (100)
▸ LIFEbank DISEASE-SPECIFIC SYSTEMS (180)
▸ CELLUTIONS MEDIA (28)

Questions? Contact Us or email info@dvbiologics.com



### Male Gonadal Stromal Cells
SKU: AR005-F
Male Gonadal Stromal Cells 500,000 cells/vial... More Details
**$550.00**

Quantity [1]  [ Add to cart ]



### Mitral Valve cDNA
SKU: AC026-CD
DV Biologics cDNA is synthesized from a... More Details
**$160.00**

Quantity [1]  [ Add to cart ]



### Mitral Valve Cell Lysate
SKU: AC026-L
DV Biologics cell and tissue lysates are... More Details
**$300.00**

Quantity [1]  [ Add to cart ]



### Muscle Fibroblasts
SKU: AM008-F
5.0 x 10^5 cells Postnatal derived Human muscle... More Details
**$300.00**

Quantity [1]  [ Add to cart ]



### Osteoblasts
SKU: AM005-F
Osteoblasts 500,000 cells/vial Postnatal... More Details
**$500.00**

Quantity [1]  [ Add to cart ]



### Skeletal Muscle Cells
SKU: AM003-F
Skeletal Muscle Cells 500,000 cells/vial... More Details
**$750.00**

Quantity [1]    Add to cart



### Skeletal Muscle Progenitor Cells
SKU: AM002-F
500,000 cells/vial Postnatal derived Skeletal... More Details
**$900.00**

Quantity [1]    Add to cart



### Skin Fibroblasts
SKU: AI001-F
500,000 cells/vial Postnatal derived Fibroblasts... More Details
**$300.00**

Quantity [1]    Add to cart



### Synovial Fluid
SKU: AM011-FL
1 ml Postnatal derived Human synovial... More Details
**$260.00**
Product not available

| « first | ‹ previous | 1 | 2 | 3 | 4 | 5 | 6 | | next › | last » |

About Us   Products   Services   Resources   News   Contact   Ordering Information   Ethics & Quality   Privacy Policy   Site Map



MY CART (0)

CELLUTIONS FOR INNOVATION™

[SEARCH]

HOME      ABOUT US      PRODUCTS      SERVICES      RESOURCES      NEWS      CONTACT

### Categories

▼ LIFEbank CELLULAR SYSTEMS (58)
    Cardiovascular (37)
    Digestive (29)
    General (30)
    Endocrine (31)
    Integumentary (30)
    Hematopoietic (33)
    Neural (29)
    Urinary (31)
    Skeletal Muscle (38)
    Reproductive (31)
    Pulmonary (29)
▶ LIFEbank GENOMIC/PROTEOMIC SYSTEMS (100)
▶ LIFEbank DISEASE-SPECIFIC SYSTEMS (180)
▶ CELLUTIONS MEDIA (28)

Questions? Contact Us or email info@dvbiologics.com

## Synovial Tissue FFPE Block
SKU: AM010-PS
28×40 mm Parrafin Embedded Block Postnatal... More Details
**$1,750.00**

Quantity `1`   [ Add to cart ]

## Synovial Tissue OCT Block
SKU: AM010-FS
22x22 cm or 22x40 cm Frozen Tissue Block... More Details
**$1,750.00**

Quantity `1`   [ Add to cart ]

## Thyroid Fibroblasts
SKU: AE009-F
5.0 x 10^5 cells Post-natal derived Thyroid... More Details
**$650.00**

Quantity `1`   [ Add to cart ]



## Umbilical Cord Blood Mononuclear Cells
SKU: AC014-F-10
10 x 10^6 cells Postnatal derived Human umbilical... More Details
**$200.00**

Quantity `1`   [ Add to cart ]



## Umbilical Cord Blood Mononuclear Cells
SKU: AC014-F-2.5
2.5 x 10^6 cells Postnatal derived Human... More Details
**$75.00**

Quantity `1`   [ Add to cart ]

## Umbilical Cord Blood Mononuclear Cells
SKU: AC014-F-25
25 x 10^6 cells Postnatal derived Human umbilical... More Details
**$325.00**

Quantity `1`   [ Add to cart ]



## Umbilical Vein Endothelial Cells (HUVEC)
SKU: AC005-F

500,000 cells/vial Postnatal derived The HUVEC... More Details

**$200.00**

Quantity 1    [ Add to cart ]

---



## Wharton's Jelly Stem Cells
SKU: AC006-F

500,000 cells/vial Postnatal derived Wharton's... More Details

**$450.00**

Quantity 1    [ Add to cart ]

« first    ‹ previous   1   2   3   4   5   6

About Us   Products   Services   Resources   News   Contact   Ordering Information   Ethics & Quality   Privacy Policy   Site Map

MY CART (0)



CELLUTIONS FOR INNOVATION™

SEARCH

**HOME**    **ABOUT US**    **PRODUCTS**    **SERVICES**    **RESOURCES**    **NEWS**    **CONTACT**

Categories



### Kidney Tissue Total RNA
SKU: AU008-R
Adult Kidney Tissue Total RNA... More Details
**$350.00**

Quantity `1`    [ Add to cart ]

### Adenoid Tissue Lysate
SKU: AL001-L
100 µg/vial Postnatal derived DV Biologics... More Details
**$300.00**

Quantity `1`    [ Add to cart ]



### Adipose Tissue cDNA
SKU: AA003-CD
Postnatal derived 100 µg/vial DV Biologics... More Details
**$170.00**

Quantity `1`    [ Add to cart ]



### Adipose Tissue Lysate
SKU: AA003-L
Postnatal derived 100 µg/vial DV Biologics... More Details
**$100.00**

Quantity `1`    [ Add to cart ]



### Adipose Tissue Total RNA
SKU: AA003-R
Postnatal derived 1 µg/vial DV Biologics... More Details
**$130.00**

Quantity `1`    [ Add to cart ]



### Aortic Valve Tissue cDNA
SKU: AC022-CD
Postnatal derived 20 rxns/vial DV Biologics... More Details
**$400.00**

Quantity `1`    [ Add to cart ]

Categories

- LIFEbank CELLULAR SYSTEMS (58)
- LIFEbank GENOMIC/PROTEOMIC SYSTEMS (100)
  - Digestive (1)
  - General (4)
  - Urinary (1)
  - Integumentary (9)
  - Hematopoietic (7)
  - Endocrine (1)
  - Lymphatic (5)
  - Miscellaneous (1)
  - Skeletal Muscle (26)
  - Reproductive (10)
  - Pulmonary (1)
  - Neural (6)
  - Cardiovascular (38)
- LIFEbank DISEASE-SPECIFIC SYSTEMS (180)
- CELLUTIONS MEDIA (28)

Questions? Contact Us or email info@dvbiologics.com



## Aortic Valve Tissue Lysate
SKU: AC022-L
Postnatal derived 100 µg/vial DV Biologics... More Details
**$300.00**

Quantity 1    Add to cart

## Aortic Valve Tissue Total RNA
SKU: AC022-R
Postnatal derived 1 µg/vial DV Biologics... More Details
**$350.00**

Quantity 1    Add to cart

## Bone cDNA
SKU: AM007-CD
Postnatal derived 20 rxns/vial DV Biologics... More Details
**$175.00**

Quantity 1    Add to cart

## Bone Lysate
SKU: AM007-L
Postnatal derived 100 µg/vial DV Biologics... More Details
**$150.00**

Quantity 1    Add to cart

1  2  3  4  5  6  7  8  9                          next :    last »

About Us   Products   Services   Resources   News   Contact   Ordering Information   Ethics & Quality   Privacy Policy   Site Map

MY CART (0)



CELLUTIONS FOR INNOVATION™

SEARCH

| HOME | ABOUT US | PRODUCTS | SERVICES | RESOURCES | NEWS | CONTACT |



## Bone Marrow Cell (Uncultured) cDNA
SKU: AH001-CD
Postnatal derived 20 rxns/vial DV Biologics... More Details
**$250.00**

Quantity [ 1 ]  Add to cart



## Bone Marrow Cell (Uncultured) Total RNA
SKU: AH001-R
Postnatal derived 10 µg/vial DV Biologics... More Details
**$350.00**

Quantity [ 1 ]  Add to cart



## Bone Marrow Stromal Cell cDNA
SKU: AH005-CD
Postnatal derived 20 rxns/vial DV Biologics... More Details
**$550.00**

Quantity [ 1 ]  Add to cart



## Bone Marrow Stromal Cell Lysate
SKU: AH005-L
Postnatal derived 100 µg/vial DV Biologics... More Details
**$500.00**

Quantity [ 1 ]  Add to cart



## Bone Marrow Stromal Cell Total RNA
SKU: AH005-R
Postnatal derived 10 µg/vial DV Biologics... More Details
**$700.00**

Quantity [ 1 ]  Add to cart



## Bone Total RNA
SKU: AM007-R
Postnatal derived 1 µg/vial DV Biologics... More Details
**$300.00**

Quantity [ 1 ]  Add to cart

### Categories

- LIFEbank CELLULAR SYSTEMS (58)
- ▼ LIFEbank GENOMIC/PROTEOMIC SYSTEMS (100)
  - Digestive (1)
  - General (4)
  - Urinary (1)
  - Integumentary (9)
  - Hematopoietic (7)
  - Endocrine (1)
  - Lymphatic (5)
  - Miscellaneous (1)
  - Skeletal Muscle (26)
  - Reproductive (10)
  - Pulmonary (1)
  - Neural (6)
  - Cardiovascular (38)
- ▶ LIFEbank DISEASE-SPECIFIC SYSTEMS (180)
- ▶ CELLUTIONS MEDIA (28)

Questions? Contact Us or email info@dvbiologics.com



## Cardiac Progenitor Cell cDNA
SKU: AC015-CD
Postnatal derived 20 rxns/vial DV Biologics... More Details
**$600.00**

Quantity 1    Add to cart



## Cardiac Progenitor Cell Lysate
SKU: AC015-L
Postnatal derived 100 µg/vial DV Biologics... More Details
**$600.00**

Quantity 1    Add to cart



## Cardiac Progenitor Cell Total RNA
SKU: AC015-R
Postnatal derived 10 µg/vial DV Biologics... More Details
**$750.00**

Quantity 1    Add to cart



## Cardiac Stromal Cell cDNA
SKU: AC009-CD
Postnatal derived 20 rxns/vial DV Biologics... More Details
**$550.00**

Quantity 1    Add to cart

« first   ‹ previous   1   2   3   4   5   6   7   8   9    next ›   last »

About Us   Products   Services   Resources   News   Contact   Ordering Information   Ethics & Quality   Privacy Policy   Site Map

MY CART (0)



CELLUTIONS FOR INNOVATION™

SEARCH

HOME            ABOUT US            PRODUCTS            SERVICES            RESOURCES            NEWS            CONTACT

### Categories

- ▸ LIFEbank CELLULAR SYSTEMS (58)
- ▾ LIFEbank GENOMIC/PROTEOMIC SYSTEMS (100)
  - Digestive (1)
  - General (4)
  - Urinary (1)
  - Integumentary (9)
  - Hematopoietic (7)
  - Endocrine (1)
  - Lymphatic (5)
  - Miscellaneous (1)
  - Skeletal Muscle (26)
  - Reproductive (10)
  - Pulmonary (1)
  - Neural (6)
  - Cardiovascular (38)
- ▸ LIFEbank DISEASE-SPECIFIC SYSTEMS (180)
- ▸ CELLUTIONS MEDIA (28)

Questions? Contact Us or email info@dvbiologics.com



### Cardiac Stromal Cell Lysate
SKU: AC009-L

Postnatal derived 100 µg/vial DV Biologics... More Details

**$550.00**

Quantity [ 1 ]     Add to cart



### Cardiac Stromal Cell Total RNA
SKU: AC009-R

Postnatal derived 10 µg/vial DV Biologics... More Details

**$600.00**

Quantity [ 1 ]     Add to cart



### Cardiomyocyte cDNA
SKU: AC008-CD

Postnatal derived 20 rxns/vial DV Biologics... More Details

**$700.00**

Quantity [ 1 ]     Add to cart



### Cardiomyocyte Lysate
SKU: AC008-L

Postnatal derived 100 µg/vial DV Biologics... More Details

**$700.00**

Quantity [ 1 ]     Add to cart



### Cardiomyocyte Total RNA
SKU: AC008-R

Postnatal derived 10 µg/vial DV Biologics... More Details

**$780.00**

Quantity [ 1 ]     Add to cart



### Cartilage Tissue cDNA
SKU: AM009-CD

Postnatal derived 20 rxns/vial DV Biologics... More Details

**$500.00**

Quantity [ 1 ]     Add to cart



## Cartilage Tissue Lysate
SKU: AM009-L

DV Biologics cell and tissue lysates are prepared... More Details

**$200.00**

Quantity 1      Add to cart

## Cartilage Tissue Total RNA
SKU: AM009-R

1 µg/vial Postnatal derived DV Biologics total... More Details

**$500.00**

Quantity 1      Add to cart

## Chondrocyte cDNA
SKU: AM006-CD

DV Biologics cDNA is synthesized from a highly... More Details

**$300.00**

Quantity 1      Add to cart

## Chondrocyte Lysate
SKU: AM006-L

DV Biologics cell and tissue lysatesare prepared... More Details

**$300.00**

Quantity 1      Add to cart

« first   ‹ previous   1   2   3   4   5   6   7   8   9        next ›   last »

About Us   Products   Services   Resources   News   Contact   Ordering Information   Ethics & Quality   Privacy Policy   Site Map

MY CART (0)



CELLUTIONS FOR INNOVATION™

SEARCH

**HOME**       **ABOUT US**       **PRODUCTS**       **SERVICES**       **RESOURCES**       **NEWS**       **CONTACT**



### Chondrocyte Total RNA
SKU: AM006-R
DV Biologics total RNA passes extensive testing... More Details
**$400.00**

Quantity  1    Add to cart



### Dermis Tissue cDNA
SKU: AI006-CD
DV Biologics cDNA is synthesized from a... More Details
**call for price**

Quantity  1    Add to cart



### Dermis Tissue Total RNA
SKU: AI006-R
DV Biologics total RNA passes extensive... More Details
**call for price**

Quantity  1    Add to cart



### Endometrial Menstrual Cell cDNA
SKU: AR007-CD
Postnatal derived 20 rnxs/vial DV Biologics... More Details
**$500.00**

Quantity  1    Add to cart



### Endometrial Menstrual Cell Lysate
SKU: AR007-L
Postnatal derived 100 µg/vial DV Biologics... More Details
**$300.00**

Quantity  1    Add to cart



### Endometrial Menstrual Cell Total RNA
SKU: AR007-R
Postnatal derived 10 µg/vial DV Biologics... More Details
**$550.00**

Quantity  1    Add to cart

Categories

- ▶ LIFEbank CELLULAR SYSTEMS (58)
- ▼ LIFEbank GENOMIC/PROTEOMIC SYSTEMS (100)
  - Digestive (1)
  - General (4)
  - Urinary (1)
  - Integumentary (9)
  - Hematopoietic (7)
  - Endocrine (1)
  - Lymphatic (5)
  - Miscellaneous (1)
  - Skeletal Muscle (26)
  - Reproductive (10)
  - Pulmonary (1)
  - Neural (6)
  - Cardiovascular (38)
- ▶ LIFEbank DISEASE-SPECIFIC SYSTEMS (180)
- ▶ CELLUTIONS MEDIA (28)

Questions? Contact Us or email info@dvbiologics.com



### Epidermis Tissue cDNA
SKU: AI005-CD
DV Biologics cDNA is synthesized from a... More Details
**$250.00**

Quantity 1        Add to cart



### Epidermis Tissue Total RNA
SKU: AI005-R
DV Biologics total RNA passes extensive... More Details
**$250.00**

Quantity 1        Add to cart



### Glioblastoma Multiforme Cell (Uncultured) cDNA
SKU: AN010-CD-GM
Postnatal derived 20 rxns/vial DV Biologics... More Details
**$500.00**

Quantity 1        Add to cart



### Glioblastoma Multiforme Cell (Uncultured) FFPE Block
SKU: AN010-PS-GM
Postnatal derived The formalin fixed paraffin... More Details
**$1,200.00**

Quantity 1        Add to cart

« first    ‹ previous    1  2  3  4  5  6  7  8  9              next :    last »

About Us   Products   Services   Resources   News   Contact   Ordering Information   Ethics & Quality   Privacy Policy   Site Map

MY CART (0)



CELLUTIONS FOR INNOVATION™

SEARCH

**HOME**    **ABOUT US**    **PRODUCTS**    **SERVICES**    **RESOURCES**    **NEWS**    **CONTACT**



## Glioblastoma Multiforme Cell (Uncultured) Lysate
SKU: AN010-L-GM
Postnatal derived 100 µg/vial DV Biologics... More Details
**$500.00**

Quantity [1]    [ Add to cart ]



## Glioblastoma Multiforme Cell (Uncultured) Total RNA
SKU: AN010-R-GM
Postnatal derived 10µg DV Biologics total RNA... More Details
**$500.00**

Quantity [1]    [ Add to cart ]



## Glioblastoma Multiforme Cells (Uncultured)
SKU: AN010-F-GM
Postnatal derived 500,000 cell/vial Human... More Details
**call for price**

Quantity [1]    [ Add to cart ]



## Heart Auricle Tissue cDNA
SKU: AC023-CD
Postnatal derived 20 rxns/vial DV Biologics... More Details
**$375.00**

Quantity [1]    [ Add to cart ]



## Heart Auricle Tissue Lysate
SKU: AC023-L
Postnatal derived 100 µg/vial DV Biologics... More Details
**$260.00**

Quantity [1]    [ Add to cart ]



## Heart Auricle Tissue Total RNA
SKU: AC023-R
Postnatal derived 1 µg/vial DV Biologics... More Details
**$600.00**

Quantity [1]    [ Add to cart ]

### Categories

▶ LIFEbank CELLULAR SYSTEMS (58)
▼ LIFEbank GENOMIC/PROTEOMIC SYSTEMS (100)
   Digestive (1)
   General (4)
   Urinary (1)
   Integumentary (9)
   Hematopoietic (7)
   Endocrine (1)
   Lymphatic (5)
   Miscellaneous (1)
   Skeletal Muscle (26)
   Reproductive (10)
   Pulmonary (1)
   Neural (6)
   Cardiovascular (38)
▶ LIFEbank DISEASE-SPECIFIC SYSTEMS (180)
▶ CELLUTIONS MEDIA (28)

Questions? Contact Us or email info@dvbiologics.com



## Heart Tissue Lysate
SKU: AC027-L

DV Biologics cell and tissue lysates are... More Details

**$300.00**

Quantity [1]     [ Add to cart ]



## Heart Tissue Total RNA
SKU: AC027-R

DV Biologics total RNA passes extensive... More Details

**$350.00**

Quantity [1]     [ Add to cart ]



## Heart Tissue cDNA
SKU: AC027-CD

DV Biologics cDNA is synthesized from a... More Details

**$300.00**

Quantity [1]     [ Add to cart ]



## Human Bone Marrow Plasma
SKU: AH011-FL

Bone marrow plasma contains proteins, glucose,... More Details

**$200.00**

Quantity [1]     [ Add to cart ]

« first    ‹ previous    1   2   3   4   5   6   7   8   9          next :    last »

MY CART (0)



CELLUTIONS FOR INNOVATION™

SEARCH

**HOME**     **ABOUT US**     **PRODUCTS**     **SERVICES**     **RESOURCES**     **NEWS**     **CONTACT**



## Male Gonadal Stromal Cell Lysate
SKU: AR005-L
Postnatal derived 100 µg/vial DV Biologics... More Details
**$300.00**

Quantity [1]    Add to cart



## Male Gonadal Stromal Cell cDNA
SKU: AR005-CD
Postnatal derived 20 rxns/vial DV Biologics... More Details
**$200.00**

Quantity [1]    Add to cart



## Male Gonadal Stromal Cell Total RNA
SKU: AR005-R
Postnatal derived 10 µg/vial DV Biologics... More Details
**$300.00**

Quantity [1]    Add to cart



## Neural Cell cDNA
SKU: AN009-cD
20 reactions   Postnatal derived   DV Biologics... More Details
**$300.00**

Quantity [1]    Add to cart



## Osteoblast cDNA
SKU: AM005-CD
20 rxns/vial Postnatal derived DV Biologics... More Details
**$300.00**

Quantity [1]    Add to cart

## Osteoblast Lysate
SKU: AM005-L
100 µg/vial Postnatal derived DV Biologics cell... More Details
**$300.00**

Quantity [1]    Add to cart

### Categories

▸ LIFEbank CELLULAR SYSTEMS (58)

▾ LIFEbank GENOMIC/PROTEOMIC SYSTEMS (100)
    Digestive (1)
    General (4)
    Urinary (1)
    Integumentary (9)
    Hematopoietic (7)
    Endocrine (1)
    Lymphatic (5)
    Miscellaneous (1)
    Skeletal Muscle (26)
    Reproductive (10)
    Pulmonary (1)
    Neural (6)
    Cardiovascular (38)

▸ LIFEbank DISEASE-SPECIFIC SYSTEMS (180)

▸ CELLUTIONS MEDIA (28)

Questions? Contact Us or email info@dvbiologics.com



## Osteoblast Total RNA
SKU: AM005-R

10 µg/vial Postnatal derived DV Biologics total... More Details

**$350.00**

Quantity  1          Add to cart



## Pericardium Tissue cDNA
SKU: AC021-CD

20 rxns/vial Postnatal derived DV Biologics... More Details

**$300.00**

Quantity  1          Add to cart



## Pericardium Tissue Lysate
SKU: AC021-L

100 µg/vial Postnatal derived DV Biologics cell... More Details

**$300.00**

Quantity  1          Add to cart



## Pericardium Tissue Total RNA
SKU: AC021-R

1 µg/vial Postnatal derived DV Biologics total... More Details

**$400.00**

Quantity  1          Add to cart

« first    ‹ previous   ...   2   3   4   5   6   7   8   9   10          next :   last »

MY CART (0)



CELLUTIONS FOR INNOVATION™

SEARCH

**HOME       ABOUT US       PRODUCTS       SERVICES       RESOURCES       NEWS       CONTACT**

## Categories

▸ LIFEbank CELLULAR SYSTEMS (58)

▾ LIFEbank GENOMIC/PROTEOMIC SYSTEMS (100)
  Digestive (1)
  General (4)
  Urinary (1)
  Integumentary (9)
  Hematopoietic (7)
  Endocrine (1)
  Lymphatic (5)
  Miscellaneous (1)
  Skeletal Muscle (26)
  Reproductive (10)
  Pulmonary (1)
  Neural (6)
  Cardiovascular (38)

▸ LIFEbank DISEASE-SPECIFIC SYSTEMS (180)

▸ CELLUTIONS MEDIA (28)

Questions? Contact Us or email info@dvbiologics.com

---



### Right Atrium Tissue cDNA
SKU: AC020-CD
10 µg/vial Postnatal derived DV Biologics cDNA... More Details
**$300.00**

Quantity [1]     [ Add to cart ]

---



### Right Atrium Tissue Lysate
SKU: AC020-L
100 µg/vial Postnatal derived DV Biologics cell... More Details
**$300.00**

Quantity [1]     [ Add to cart ]

---



### Right Atrium Tissue Total RNA
SKU: AC020-R
1 µg/vial Postnatal derived DV Biologics total... More Details
**$300.00**

Quantity [1]     [ Add to cart ]

---



### Skeletal Muscle Cell (Uncultured) cDNA
SKU: AM001-CD
20 rxns/vial Postnatal derived DV Biologics... More Details
**$170.00**

Quantity [1]     [ Add to cart ]

---



### Skeletal Muscle Cell (Uncultured) Lysate
SKU: AM001-L
100 µg/vial Postnatal derived DV Biologics cell... More Details
**$130.00**

Quantity [1]     [ Add to cart ]

---

### Skeletal Muscle Cell (Uncultured) Total RNA
SKU: AM001-R
10 µg/vial Postnatal derived DV Biologics total... More Details
**$300.00**

Quantity [1]     [ Add to cart ]



### Skeletal Muscle Cell cDNA
SKU: AM003-CD
20 rxns/vial Postnatal derived DV Biologics... More Details
**$400.00**

Quantity 1 　　[ Add to cart ]

### Skeletal Muscle Cell Lysate
SKU: AM003-L
100 µg/vial Postnatal derived DV Biologics cell... More Details
**$225.00**

Quantity 1 　　[ Add to cart ]

### Skeletal Muscle Cell Total RNA
SKU: AM003-R
10 µg/vial Postnatal derived DV Biologics total... More Details
**$900.00**

Quantity 1 　　[ Add to cart ]

### Skeletal Muscle Progenitor Cell cDNA
SKU: AM002-CD
20 rxns/vial Postnatal derived DV Biologics... More Details
**$600.00**

Quantity 1 　　[ Add to cart ]

« first 　 ‹ previous 　 ... 　 2 　 3 　 4 　 5 　 6 　 7 　 8 　 9 　 10 　　　　 next › 　 last »

About Us　Products　Services　Resources　News　Contact　Ordering Information　Ethics & Quality　Privacy Policy　Site Map

MY CART (0)



**CELLUTIONS FOR INNOVATION™**

SEARCH

HOME　　　ABOUT US　　　PRODUCTS　　　SERVICES　　　RESOURCES　　　NEWS　　　CONTACT



### Skeletal Muscle Progenitor Cell Lysate
SKU: AM002-L

100 µg/vial Postnatal derived DV Biologics cell... More Details

**$600.00**

Quantity [1]　　[ Add to cart ]

---



### Skeletal Muscle Progenitor Cell Total RNA
SKU: AM002-R

10 µg/vial Postnatal derived DV Biologics total... More Details

**$750.00**

Quantity [1]　　[ Add to cart ]

---



### Skeletal Muscle Tissue cDNA
SKU: AM015-CD

DV Biologics cDNA is synthesized from a highly... More Details

**$170.00**

Quantity [1]　　[ Add to cart ]

---



### Skeletal Muscle Tissue Total RNA
SKU: AM015-R

DV Biologics' Skeletal Muscle Tissue Total RNA is... More Details

**$175.00**

Quantity [1]　　[ Add to cart ]

---



### Skin Fibroblast cDNA
SKU: AI001-CD

20 rxns/vial Postnatal derived DV Biologics... More Details

**$300.00**

Quantity [1]　　[ Add to cart ]

---



### Skin Fibroblast Lysate
SKU: AI001-L

100 µg/vial Postnatal derived DV Biologics cell... More Details

**$200.00**

Quantity [1]　　[ Add to cart ]

---

**Categories**

- LIFEbank CELLULAR SYSTEMS (58)
- LIFEbank GENOMIC/PROTEOMIC SYSTEMS (100)
  - Digestive (1)
  - General (4)
  - Urinary (1)
  - Integumentary (9)
  - Hematopoietic (7)
  - Endocrine (1)
  - Lymphatic (5)
  - Miscellaneous (1)
  - Skeletal Muscle (26)
  - Reproductive (10)
  - Pulmonary (1)
  - Neural (6)
  - Cardiovascular (38)
- LIFEbank DISEASE-SPECIFIC SYSTEMS (180)
- CELLUTIONS MEDIA (28)

Questions? Contact Us or email info@dvbiologics.com



### Skin Fibroblast Total RNA
SKU: AI001-R

10 µg/vial Postnatal derived DV Biologics total... More Details

**$400.00**

Quantity 1    Add to cart



### Skin Tissue Lysate
SKU: AI004-L

100 µg/vial Prenatal derived DV Biologics cell... More Details

**$200.00**

Quantity 1    Add to cart



### Synovial Tissue cDNA
SKU: AM010-CD

20 rxns/vial Postnatal derived DV Biologics... More Details

**$500.00**

Quantity 1    Add to cart



### Synovial Tissue Lysate
SKU: AM010-L

100 µg/vial Postnatal derived DV Biologics cell... More Details

**$500.00**

Quantity 1    Add to cart

« first | ‹ previous | ... | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | next › | last »

About Us   Products   Services   Resources   News   Contact   Ordering Information   Ethics & Quality   Privacy Policy   Site Map

MY CART (0)



CELLUTIONS FOR INNOVATION™

SEARCH

**HOME**      **ABOUT US**      **PRODUCTS**      **SERVICES**      **RESOURCES**      **NEWS**      **CONTACT**

## Synovial Tissue Total RNA
SKU: AM010-R
10 µg/vial Postnatal derived DV Biologics total... More Details
**$500.00**

Quantity 1    Add to cart

## Tonsil Tissue cDNA
SKU: AL002-CD
20 rxns/vial Postnatal derived DV Biologics... More Details
**$170.00**

Quantity 1    Add to cart

## Tonsil Tissue Lysate
SKU: AL002-L
100 µg/vial Postnatal derived DV Biologics cell... More Details
**$130.00**

Quantity 1    Add to cart

## Tonsil Tissue Total RNA
SKU: AL002-R
1 µg/vial Postnatal derived DV Biologics total... More Details
**$175.00**

Quantity 1    Add to cart



## Umbilical Cord Tissue cDNA
SKU: AC007-CD
20 rxns/vial Postnatal derived DV Biologics... More Details
**$170.00**

Quantity 1    Add to cart



## Umbilical Cord Tissue Lysate
SKU: AC007-L
100 µg/vial Postnatal derived DV Biologics cell... More Details
**$130.00**

Quantity 1    Add to cart



### Categories

▶ LIFEbank CELLULAR SYSTEMS (58)
▼ LIFEbank GENOMIC/PROTEOMIC SYSTEMS (100)
   Digestive (1)
   General (4)
   Urinary (1)
   Integumentary (9)
   Hematopoietic (7)
   Endocrine (1)
   Lymphatic (5)
   Miscellaneous (1)
   Skeletal Muscle (26)
   Reproductive (10)
   Pulmonary (1)
   Neural (6)
   Cardiovascular (38)
▶ LIFEbank DISEASE-SPECIFIC SYSTEMS (180)
▶ CELLUTIONS MEDIA (28)

Questions? Contact Us or email info@dvbiologics.com



### Umbilical Cord Tissue Total RNA
SKU: AC007-R

10 µg/vial Postnatal derived DV Biologics total... More Details

**$175.00**

Quantity `1`    Add to cart

---

### Umbilical Vein Endothelial Cells (HUVEC) cDNA
SKU: AC005-CD

20 rxns/vial Postnatal derived DV Biologics... More Details

**$300.00**

Quantity `1`    Add to cart

---

### Umbilical Vein Endothelial Cells (HUVEC) Lysate
SKU: AC005-L

100 µg/vial Postnatal derived DV Biologics cell... More Details

**$200.00**

Quantity `1`    Add to cart

---

### Umbilical Vein Endothelial Cells (HUVEC) Total RNA
SKU: AC005-R

10 µg/vial Postnatal derived DV Biologics total... More Details

**$300.00**

Quantity `1`    Add to cart

---

« first | ‹ previous | ... | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | | next › | last »

MY CART (0)



CELLUTIONS FOR INNOVATION™

SEARCH

**HOME**      **ABOUT US**      **PRODUCTS**      **SERVICES**      **RESOURCES**      **NEWS**      **CONTACT**

Categories

▶ LIFEbank CELLULAR SYSTEMS (58)

▼ LIFEbank GENOMIC/PROTEOMIC SYSTEMS (100)
- Digestive (1)
- General (4)
- Urinary (1)
- Integumentary (9)
- Hematopoietic (7)
- Endocrine (1)
- Lymphatic (5)
- Miscellaneous (1)
- Skeletal Muscle (26)
- Reproductive (10)
- Pulmonary (1)
- Neural (6)
- Cardiovascular (38)

▶ LIFEbank DISEASE-SPECIFIC SYSTEMS (180)

▶ CELLUTIONS MEDIA (28)

Questions? Contact Us or email info@dvbiologics.com



### Uterine Myoma cDNA
SKU: AR009-CD-UM
1 block Postnatal derived DV Biologics cDNA is... More Details
**$500.00**

Quantity [ 1 ]   [ Add to cart ]



### Uterine Myoma Lysate
SKU: AR009-L-UM
100 µg/vial Postnatal derived DV Biologics cell... More Details
**$500.00**

Quantity [ 1 ]   [ Add to cart ]



### Uterine Myoma Total RNA
SKU: AR009-R-UM
10 µg/vial Postnatal derived DV Biologics total... More Details
**$500.00**

Quantity [ 1 ]   [ Add to cart ]



### Valvular Interstitial Cell cDNA
SKU: AC024-CD
20 rxns/vial Postnatal derived DV Biologics... More Details
**$750.00**

Quantity [ 1 ]   [ Add to cart ]



### Valvular Interstitial Cell Lysate
SKU: AC024-L
100 µg/vial Postnatal derived DV Biologics... More Details
**$700.00**

Quantity [ 1 ]   [ Add to cart ]



### Valvular Interstitial Cell Total RNA
SKU: AC024-R
10 µg/vial Postnatal derived DV Biologics total... More Details
**$160.00**

Quantity [ 1 ]   [ Add to cart ]



### Valvular Interstitial Cells
SKU: AC024-F
5.0 x 10^5 cells/ml   Postnatal derived   Human... More Details
**$750.00**

Quantity 1     [ Add to cart ]

---



### Wharton's Jelly Stem Cell cDNA
SKU: AC006-CD
20 rnxs/vial Postnatal derived DV Biologics... More Details
**$300.00**

Quantity 1     [ Add to cart ]

---



### Wharton's Jelly Stem Cell Lysate
SKU: AC006-L
100 µg/vial Postnatal derived DV Biologics cell... More Details
**$500.00**

Quantity 1     [ Add to cart ]

---



### Wharton's Jelly Stem Cell Total RNA
SKU: AC006-R
10 µg/vial Postnatal derived DV Biologics total... More Details
**$600.00**

Quantity 1     [ Add to cart ]

---

« first  ‹ previous  ...  2  3  4  5  6  7  8  9  10

About Us  Products  Services  Resources  News  Contact  Ordering Information  Ethics & Quality  Privacy Policy  Site Map

Exhibit 5.31



CELLUTIONS FOR INNOVATION™

SEARCH

**HOME**    **ABOUT US**    **PRODUCTS**    **SERVICES**    **RESOURCES**    **NEWS**    **CONTACT**



## Ordering Information

Questions? Contact Us or email info@dvbiologics.com

### Ways To Place An Order

Orders may currently be placed on our website and by phone, fax, or email. Please **click here** to download DV Biologics PDF Order Form to place an order via fax.

**MAIN OFFICE:**
**DV Biologics, LLC**
**1239 Victoria Street, Costa Mesa, CA 92627**

By fax: ███████████████████████
By phone: ███████████████████████
By email:   **orders@dvbiologics.com**

**MAIN OFFICE HOURS:**
Monday through Friday, 9:00 am - 5:00 pm Pacific Standard Time.

Order anytime, 24 hours a day, 365 days a year by email or fax. If your order arrives outside our normal business hours, it will be quickly processed at the beginning of the next business day.

**SHIPPING & DELIVERY**
US. All North American orders are shipped from DV Biologics headquarters in Southern California and freight is pre-paid and added to your invoice as a separate item unless customers references their own separate shipping account and vendor. DV Biologics will not be held responsible or liable for any packages that are lost, damaged or otherwise compromised if customer requests DV Biologics ship via customer's shipping method in lieu of DV Biologics shipping method. Orders usually ship within 1 or 2 business days, depending upon the availability of the item. Shipments are sent every Monday to Thursday via overnight courier service for delivery on the next business day.

International. International orders are shipped from DV Biologics headquarters in Southern California every Monday unless specially requested to be shipped on another date.

**CONDITIONS**
Products are sold for laboratory research use only and are not to be used in humans for any purpose. As a condition of purchase, the purchaser shall not make products available for the purpose of further resale or alter the product label and the DV Biologics mark of origin without the express written permission of DV Biologics, LLC.

**TERMS**
All invoices are issued at time of shipment and are payable within 30 days. Payments should be made to the following address:

**DV Biologics, LLC**
**Accounts Receivable**

███████████████████████████████████

Please contact us for bank account details when submitting remittance by bank wire transfer.

**CLAIMS & RETURNS**

Product returns will not be accepted without prior written authorization. Any claim for credit or returned goods must be made within seven days of receipt. DV Biologics reserves the right to test a sample of the product prior to authorizing the return of the remaining product and to deny return if, in the opinion of DV Biologics, the product complaint is a result of a specialized or inappropriate usage or handling rather than a failure of the product to meet specifications. No return of custom products will be authorized if product meets specifications on custom order form. In case of a purchasing error or change in order after the product has been shipped, a 30% restocking fee will be charged. If DV Biologics makes a shipping error, a replacement product will be shipped at no charge or the customer's account will be credited.

**LIMITED PRODUCT WARRANTY**

Product Information in our catalog is abbreviated. Full product information is available on Product Insert Sheets provided with our products or available from us by request. All products supplied by DV Biologics are warranted to meet or exceed the specifications provided on our Product Insert Sheets when used under normal conditions in your laboratory. Should any product fail to perform as specified, DV Biologics will credit the purchase price to the customer's account or replace the product free of charge. This warranty is exclusive and limits our liability to the replacement of the product or, at our option, full credit of the original purchase price. This warranty will not apply to product that fails to perform its specific function due to misuse, improper storage, use beyond expiry date or accidental damage to the product.

NO OTHER WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION, IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, ARE PROVIDED BY DV BIOLOGICS LLC. DV BIOLOGICS LLC SHALL HAVE NO LIABILITY FOR ANY DIRECT, INDIRECT, CONSEQUENTIAL OR INCIDENTAL DAMAGES ARISING OUT OF THE USE, THE RESULTS OF USE OR THE INABILITY TO USE ANY PRODUCT.

**Note:** Orders placed by phone require a written confirmation by fax or email. Confirmations should be clearly marked "Confirmation: Do not Duplicate". For all orders that are received, DV Biologics will send a written confirmation by return email or fax with the shipping date, expected day of arrival, any corrected pricing and an estimated shipping charge.

Exhibit 5.32

# DV Biologics LLC          DVCSE-002

# Guidelines for Payment and Discounts

CONTROLLED DOCUMENT          Effective Date: FEB 1 2 2015          Version 1

## 1   Introduction

### 1.1   Purpose

This Standard Operating Procedure (SOP) describes the process for determining the amount of discount offered to distributor and end-user and is to be used only as a negotiation tool.

### 1.2   Scope

This SOP is a mandatory document and shall be implemented by all employees and contractors when engaged in handling new and existing customer orders. The Credit terms and Discounts shall only be used as tool when needed and not automatically offered to Distributors or End-users.

### 1.3   Definitions

- **Products:**       Any material manufactured or purchased for re-sale by DV Biologics, LLC.
- **Distributor:**    A company that resells products that are manufactured or sold by DV Biologics, LLC.
- **End-user:**       A company or individual that purchases a product directly from DV Biologics, LLC or an authorized distributor.
- **Employee:**       An individual responsible for order intake or sales representative employed by DV Biologics, LLC.

## 2   Materials and Equipment

### 2.1   Materials

- N/A

### 2.2   Equipment

- N/A

## 3   Procedure

To correctly perform this protocol, please complete the following steps:

| Step | Action |
|------|--------|
| 3.1 | Sales/Customer Service Representative receives request from and end-user or distributor to purchase PRODUCTS from DV Biologics, LLC |
| 3.2 | Sales/Customer Service Representative determines if the end-user or distributor is an active CUSTOMER of DV Biologics, LLC by checking in customer database |
| 3.3 | If Customer is new to DV Biologics, LLC and requests credit, Customer Credit Application (Appendix A) must be filled out by customer. Otherwise, a credit card shall be preferred payment method |
| 3.4 | Employee sends the completed Customer Credit Application to the Operations Department for verification of information and status of accounts. |

Property of DV Biologics LLC-CONFIDENTIAL DOCUMENT-Any unauthorized copy and distribution is strictly prohibited.

CONFIDENTIAL

DVB_00000013

# DV Biologics LLC ORIGINAL DVCSE-002

## Guidelines for Payment and Discounts

3.5 The operations assistant review credit application and contacts the Business References provided and ask the following questions:

  3.5.1 How long has Company X been doing business with you?

  3.5.2 What is their credit limit?

  3.5.3 Do they always pay on time?

  3.5.4 What is your name and position?

  The information provided by the Business Reference will become part of the credit application and kept in the customer file.

3.6 The information is forwarded to the VP of Operations for approval of credit line.

3.7 If the Distributor or End User has 3 favorable references they will be given a $5000.00 Maximum terms is 30 days net, unless approved by VP of Operations and VP of Sales.

3.8 If a larger term is required, it shall require approval by the VP of Operations and VP of Sales.

3.9 An early payment discount of 1.5% may be offered if the invoice is paid within 10 days of invoice date.

3.10 Distributor discounts will be determined by the Sales representative and VP of Sales during the Distributor Contracting process and will be outline in the final signed Distribution Agreement.

## 4  Revision History

| Version No. | Effective Date | CR No. | Summary of Changes |
|---|---|---|---|
| 1 | FEB 1 2 2015 | NA | New Document |

## 5  Approvals



| Document Author: | |
| Document Reviewer: | |
| QA Document Approver: | |

Property of DV Biologics LLC-CONFIDENTIAL DOCUMENT-Any unauthorized copy and distribution is strictly prohibited

CONFIDENTIAL

Exhibit 5.33

Appendix A—DV Biologics' Ad for Local Tradeshows/Vendor Showcases



**UC Riverside Biotechnology Vendor Showcase Attendees receive 20% off their first order!**

DV Biologics is a global supplier of the highest quality, primary and cultured cells. Our LIFEbank Cellular System includes 300+ unique human cell types from over 25 healthy & disease states isolated from prenatal and adult donors. Additionally, we provide fresh and frozen tissue, optimized CELLUTIONS Media, genomics and proteomics products, and OCT & FFPE tissue blocks.

## CALL NOW FOR YOUR DISCOUNT!

Product Highlights:

* Kidney Fibroblasts
* Skeletal Muscle Progenitor Cells- *Duchenne Muscular Dystrophy*
* CD34+ Endothelial Liver Cells
* Synovial Fluid- *Rheumatoid & Osteoarthritis*

Full product catalog can be found at dvbiologics.com

Property of DV Biologics LLC-CONFIDENTIAL DOCUMENT-Any unauthorized copy and distribution is strictly prohibited.

CONFIDENTIAL     DVB_00000289

Exhibit 5.34

# DV Biologics LLC

DVMKT 007

# Customer Referral Program

CONTROLLED DOCUMENT    Effective Date:   9/5/14      Version 1

## 1 Introduction

### 1.1 Purpose

This Standard Operating Procedure (SOP) describes the concept, promotion, and execution of DV Biologics' Referral Program

### 1.2 Scope

The program is managed by sales and operation and will benefit all direct customers

## 2 Responsibility

**2.1** Sales Department is responsible for promotion of the program, distribution of referral discounts and tracking distribution and redemption of coupons.

**2.2** Marketing Department is responsible for the creation and distribution of promotional materials

**2.3** Operations Department is responsible for capturing participating customer information in QuickBooks

**2.4** Shipping Department is responsible for capturing participating customer information on Form 232

## 3 Procedure

To correctly perform this protocol, please complete the following steps:

| Step | Action |
|------|--------|
| 3.1 | Concept—Existing Customers will receive 10% discount on their next order, if they refer a colleague |
|  | 3.1.1   Existing Customer (Customer A) refers a new customer (Customer B). |
|  | 3.1.2   Upon fulfillment of Customer B's order, Customer A will receive a coupon for 10% its next purchase. |
|  | 3.1.3   Coupon will be sent to Customer A from sales. |
| 3.2 | Terms and Conditions—Cannot be combined with any other promotion. Referred colleague must be a new DV Biologics customer. Referred colleague must mention referring party at the time of purchase. Promotional coupon is valid once per new referral. For direct customers only, not for distributor use. Can be applied to all products and services. No maximum purchase price. Discount given after new customer order is fulfilled. Program is subject to change at any time |
| 3.3 | Promotion |
|  | 3.3.1   Email blast—proof Attached as Appendix A |
|  | 3.3.2   Email blast-linked internal page—text attached as Appendix B |
|  | 3.3.3   Direct phone call from Marty to reward our "loyal" customers |
|  | 3.3.4   Blog/LinkedIn |
|  | 3.3.5   DV Biologics landing page rotating banner—proof attached as Appendix C |

Property of DV Biologics LLC-CONFIDENTIAL DOCUMENT-Any unauthorized copy and distribution is strictly prohibited

CONFIDENTIAL

DVB_00000249

| | | |
|---|---|---|
| 3.4 | Execution and Management | |
| | 3.4.1 | Names of interested existing customers will be captured through internal page and sales department |
| | | 3.4.1.1 Spreadsheet of contact information will be compiled 10 days after email blast and distributed to sales department |
| | | 3.4.1.2 Follow up with interested parties is the responsibility of the sales department |
| | 3.4.2 | When Customer B mentions (via email or phone) that they were referred by Customer A the following steps will occur: |
| | | 3.4.2.1 Operations Department will add Customer A's name and contact information to the Internal "Memo" field on the invoice |
| | | 3.4.2.2 Shipping department will add Customer A's name and contact information in the comment section (column M) of Form 232 Comment section for Customer B's sales order |
| | | 3.4.2.3 Sales, upon the review of invoice or Form 232, will send Coupon to Customer A. Sales will maintain a spreadsheet of coupon distribution and redemption |

## 4  Documents

### 4.1  Internal Documents

4.1.1  Form 232 Sales Order Summary

## 5  Revision History

| Version No. | Effective Date | CR No. | Summary of Changes |
|---|---|---|---|
| 1 | 9/5/14 | NA | New Document |

## 6  Approvals

| | |
|---|---|
| Marketing Assistant | |
| VP of Operations | |
| VP of Sales | |

Property of DV Biologics LLC-CONFIDENTIAL DOCUMENT-Any unauthorized copy and distribution is strictly prohibited.

CONFIDENTIAL

DVB_00000250

# DV Biologics LLC DVMKT-007

## Customer Referral Program

CONTROLLED DOCUMENT        Effective Date: 9/5/14        Version 1

Appendix A—Proof of eBlast









Property of DV Biologics LLC-CONFIDENTIAL DOCUMENT-Any unauthorized copy and distribution is strictly prohibited.

CONFIDENTIAL

DVB_00000252

# DV Biologics LLC

## Customer Referral Program

CONTROLLED DOCUMENT     Effective Date: 9/5/14     Version 1

Appendix B—internal page text

### Welcome to the DV Biologics Referral Program

Thank you for your interest in our new program. Receiving 10% off your next order is as easy as referring a colleague. Don't forget to let your colleagues know to mention your name.

**Join Today!**
*Form*
Full Name
Business Name
Phone Number
Email Address
*Submit to info@dvbiologics.com*

Not part of the program? Don't worry, we will honor your referrals regardless and give you 10% off your next order as well.

*Terms and Conditions*
Cannot be combined with any other promotion. Referred colleague must be a new DV Biologics customer. Referred colleague must mention referring party at the time of purchase. Promotion is valid once per new referral. Can be applied to all products and services. No maximum purchase price. For direct customers only, not for distributor use. Discount given after new customer order is fulfilled. Program is subject to change at any time

Property of DV Biologics LLC-CONFIDENTIAL DOCUMENT-Any unauthorized copy and distribution is strictly prohibited.

CONFIDENTIAL     DVB_00000253

# DV Biologics LLC

DVMKT-007

## Customer Referral Program

Appendix C — DV Biologics landing page rotating banner





Property of DV Biologics LLC-CONFIDENTIAL DOCUMENT-Any unauthorized copy and distribution is strictly prohibited.

CONFIDENTIAL

DVB_00000254

Exhibit 5.35

**U.S. House of Representatives Committee on Energy & Commerce**
**Subcommittee on Oversight & Investigations**
**Follow-Up Questions Dated August 20, 2015**

Our fact development is ongoing, and therefore our responses are based on the best information that we have gathered to date. We will supplement these responses, if needed, as we receive additional information.

1. **Please identify the affiliates currently facilitating fetal tissue donation.**

   We are aware of two affiliates that presently facilitate fetal tissue donation to a tissue procurement organization ("TPO"), or to organizations using fetal tissue in research. Those affiliates are Planned Parenthood of the Pacific Southwest and Planned Parenthood of Greater Washington and North Idaho. We are not including in this total affiliates that have provided tissue to organizations using only placental tissue, decidua, and/or maternal or cord blood in research.

2. **Please identify which affiliates have facilitated fetal tissue donation in the past ten years, including the following information for each case:**
   - **When did the affiliate initiate such program**
   - **When did the affiliate discontinue such program (if discontinued)**
   - **What was the reason for discontinuing the program (if it has been discontinued)**

   We are aware of six affiliates that have facilitated fetal tissue donation to TPOs, or to organizations using fetal tissue in research, in the past five years. We are not including in this total affiliates that have provided tissue to organizations using only placental tissue, decidua, and/or maternal or cord blood in research.

   Planned Parenthood of Greater Washington and North Idaho entered into a research contract in December 2011 to facilitate fetal tissue donation by its patients. The affiliate did not begin to facilitate tissue donation under this program until 2014. The affiliate's participation in the program is ongoing.

   Planned Parenthood of San Diego and Riverside Counties entered into an agreement with a TPO in June 1999 to facilitate fetal tissue donation by its patients. That affiliate changed its name to Planned Parenthood of the Pacific Southwest, and renewed the tissue donation agreement, in October 2010. The affiliate's participation in the program is ongoing. Planned Parenthood of San Diego and Riverside Counties also received approval for a research program involving fetal tissue donation in October 2008. That program is ongoing through Planned Parenthood of the Pacific Southwest as well.

   Planned Parenthood Los Angeles entered into an agreement in March 2010 to facilitate fetal tissue donation by its patients. The affiliate suspended its participation in the program on July 14, 2015, via telephone notice to the TPO,

1

Confidential Proprietary Business Information
Produced Pursuant to House Confidentiality Rules

and is not presently facilitating tissue donation. The affiliate suspended the program after it received threatening communications following the release of the first Center for Medical Progress video; the affiliate leadership concluded that continued participation in the donation program would raise safety concerns for the affiliate's patients and staff.

Planned Parenthood of Orange and San Bernardino Counties entered into an agreement in September 2008 to facilitate fetal tissue donation by its patients. The affiliate last facilitated tissue donation on June 5, 2015. The program was suspended because the tissue recipient's laboratory was undergoing renovations. The affiliate has not resumed facilitating tissue donation.

Planned Parenthood Northern California entered into an agreement in May 2012 to facilitate fetal tissue donation by its patients. This affiliate last facilitated tissue donation in March 2015. The TPO terminated the program on August 14, 2015.

Planned Parenthood Mar Monte renewed in 2007 an agreement dating back to November 1997 to facilitate fetal tissue donation by its patients. The affiliate subsequently contracted with another TPO in April 2010 and terminated the agreement with the first TPO in July 2010. The second TPO terminated its agreement with the affiliate on August 14, 2015.

5. **If a Planned Parenthood affiliate receives any compensation in the course of facilitating tissue donation, is any portion of those funds paid to PPFA?**

   No. Planned Parenthood affiliates that receive reimbursement for the costs of facilitating tissue donation do not pay any portion of the reimbursement to PPFA.

7. **Please explain what services provided by Planned Parenthood affiliates are considered by PPFA to be "core" services.**

   Planned Parenthood's Core Services are as follows:
   - Well Woman Exams, including cervical screening and breast exams.
   - Pregnancy Testing and Options Education.
   - Contraception, Education, Prescribing/Dispensing for all FDA approved methods.
     - Capability to dispense: Affiliate-selected formulary of both combination and progestin-only oral contraceptives based on affordability, patient and clinician choice; Emergency Contraception; Male Condom.
     - Capability to provide for insertion of: Contraceptive Implant; Copper bearing IUD; Levonorgestrel IUC.
     - Capability to provide for injection of: Depot Medroxyprogesterone Acetate (DMPA).
     - Prescribing or dispensing of other methods: Contraceptive Ring; Contraceptive Patch; FemCap or Diaphragm; Female Condom.

2

- STI screening, testing, treatment for women and men.
    - STI screening or testing (according to CDC STD treatment guidelines): Chlamydia; Gonorrhea; Trichomonas/Bacterial Vaginosis; HIV; Syphilis; Hepatitis B; Hepatitis C; Genital Herpes Simplex Virus.
    - STI treatment or disease management for: Chlamydia; Gonorrhea; Trichomonas/Bacterial Vaginosis; Genital Herpes Simplex Virus; External Genital Warts; Scabies; Pedioculosis Pubis.
- HIV Point of Service Rapid Testing for Women and Men.
- HPV Vaccine.

Additionally, abortion services must be offered in at least one health center per affiliate, as follows:
- First Trimester medical abortion;
    AND/OR
- First Trimester surgical abortion.

8. **Please identify the approximate date at which PPFA converted from a process of requiring PPFA approval of an affiliate's tissue donation program, to a process whereby affiliates were allowed to facilitate fetal tissue donation without prior approval. Please describe why PPFA implemented this change.**

As of November 6, 2013, PPFA affiliates have been permitted to elect to facilitate fetal tissue donation without prior approval. PPFA implemented this policy change as part of a broader effort to reduce the administrative burden on affiliates and support affiliate service expansion. This overhaul affected other affiliate services besides facilitation of tissue donation; PPFA no longer requires prior approval for an affiliate to offer certain other non-core services.

10. **Please provide background information regarding the PPFA research department, its mission, and the types of research under its purview. Please also describe how PPFA's research agenda implicates the affiliates, for example, are affiliates required to participate in the PPFA research program, or are affiliates permitted to develop their own research programs? If affiliates have their own research programs, please describe what oversight PPFA has of such research programs.**

*Research Department Mission*

Research is an explicit part of the Planned Parenthood mission, one tenet of which is "to promote research and the advancement of technology in reproductive health care and encourage understanding of their inherent bioethical, behavioral, and social implications." *See* http://www.plannedparenthood.org/about-us/who-we-are/mission. As such, PPFA conducts research to answer key clinical

3

questions, test innovations in clinical care, and conduct health outcomes research and service delivery research to improve patient outcomes.

*About the PPFA Research Department*

The purpose of the PPFA Research Department is to carry out and support affiliates in clinical and health services research efforts to advance reproductive health. The Research Department has three primary areas of responsibility: technical assistance to affiliates on research related matters and registration of research studies conducted at affiliates; leadership and coordination of multi-center grant-funded and industry-sponsored trials; and development and implementation of PPFA-led studies to improve patient health outcomes. The PPFA Research Department comprises clinical and public health researchers.

The Research Department has a 12-year history of successful implementation and administrative oversight of clinical trials including studies of the safety, efficacy, and acceptability of contraceptive methods; diagnostic and treatment options for sexually transmitted diseases; and other critical areas of reproductive health.

The Research Department has also engaged in investigator-initiated studies and health services research, including a grant-funded study to improve contraceptive use in collaboration with the University of California, San Francisco recently published in the *Lancet*; a randomized controlled trial testing an intervention to increase HPV vaccine completion that was published in *Vaccine*; and an ongoing grant-funded study on contraceptive counseling in collaboration with New York University.

*Types of Research Under Research Department Purview*

There are three broad categories of research that fall under the purview of the PPFA Research Department:  1) Affiliate-initiated research; 2) PPFA-coordinated research; and 3) PPFA-initiated research.

   1)   *Affiliate-initiated research* is research that is conducted by or at an affiliate in which Planned Parenthood clients and/or staff are the participants. The research project may be developed by affiliate staff or the affiliate may partner or engage with external researchers. The affiliate is responsible for compiling all appropriate documentation and registering the study with the PPFA Research Department. The affiliate involvement may vary depending on the research project. Studies may include grant-funded or industry-sponsored trials, as well as internal affiliate research projects for which there is no funding.

   2)   *PPFA-coordinated research* is research that is conducted at multiple affiliates that has been reviewed and coordinated by the PPFA

4

Research Department. Because PPFA has coordinated the study and reviewed all protocols, contracts, budgets, and regulatory documents in advance, no registration with PPFA by individual affiliates is necessary. Sometimes PPFA is the investigator or co-investigator on such a study. PPFA remains involved in the study conduct through to study close out. These studies may include grant-funded or industry-sponsored trials.

3) *PPFA-initiated research* is research that is conceived and conducted by the PPFA Research Department. This may include research with Planned Parenthood clients or staff or with non-Planned Parenthood clients. PPFA staff are responsible for submitting for external IRB review any research involving human subjects (as governed by the *Code of Federal Regulations*). Studies may include grant-funded or investigator-initiated studies with industry support, as well as internal research projects for which there is no discrete funding source.

All research studies involving fetal tissue have been affiliate-initiated research. PPFA has never initiated or coordinated a research study involving fetal tissue.

*Description of How PPFA's Research Agenda Implicates Affiliates*

Affiliate participation in research studies is entirely voluntary. The PPFA Research Department makes research study opportunities available to those affiliates that have expressed an interest in research, but participation is not required.

*PPFA Research Department Oversight of Affiliates*

Affiliates are permitted to develop their own research programs. If affiliates do participate in research, they are required to register that research with PPFA. All research projects conducted at a Planned Parenthood affiliate, those using data generated from or through a Planned Parenthood affiliate, or those conducted by the Planned Parenthood national office must be submitted to and registered by the PPFA Research Department prior to initiation. This includes projects generated within the affiliate and those generated externally, but conducted at the affiliate with Planned Parenthood clients and/or staff.

The PPFA Research Department is not an Institutional Review Board (IRB). All human subjects research studies must be submitted to an external IRB to allow them to make the final determination of exemption or expedited review and must be registered with the PPFA Research Department, whether the research obtains IRB exemption, expedited approval, or full review approval.

Confidential Proprietary Business Information
Produced Pursuant to House Confidentiality Rules

PPFA-HOU_E&C-000166

To register a research study, affiliates must submit each of the following documents to PPFA:

- a completed research registration form;
- documentation of IRB approval or a letter from the IRB stating that the research is exempt from IRB oversight;
- IRB-approved Informed Consent form (if applicable);
- any contracts or agreements, including data use agreements (if applicable);
- a list of departures or deviations from PPFA or affiliate written standards or protocols (if applicable); and
- the study instrument(s) — survey questionnaire and/or interview guide (if applicable).

Upon receipt of all appropriate study materials and documentation, the PPFA Research Department will process the registration and forward any contract indemnification agreements to Affiliate Risk Management Services (ARMS) for review and approval. Protocol or study instrument modifications may be suggested or required to obtain approval. The affiliate contact person and the affiliate medical director then receive an approval letter. Once the approval letter is received, study activities can begin.

During the conduct of the study activities, affiliates must notify the PPFA Research Department if any of the following occurs:

- a major change in the research design, methods, or planned duration of the project;
- early termination of the research for any reason;
- IRB continuing approval is denied;
- the study site is subjected to FDA audit;
- a change in the Principal Investigator;
- a serious adverse event is experienced by any participant;
- a data breach occurs;
- the study may get media attention prior to completion — affiliates should inform the PPFA Research Department for organizational preparedness.

The PPFA Research Department must be contacted immediately if any serious adverse effects or events occur as part of involvement in a research study.

Non-compliance with any required PPFA standards may affect the affiliate's accreditation status and ultimately result in actions that jeopardize the affiliate's ability to continue to use the Planned Parenthood trademark. Compliance with the mandatory or required standards and/or criteria contained within the PPFA Research Manual is assessed through, but not limited to, the accreditation process which includes Elements of Performance (EOPs) related to research.

6

13. **Please describe whether PPFA is involved in any research involving the use of digoxin in abortion procedures.**

To our knowledge, PPFA itself has not been involved in any research studying the use of digoxin in abortion procedures. We are aware of a total of four studies involving digoxin that were conducted at Planned Parenthood affiliates (and registered through the PPFA Research Department), as well as an initial registration request for a qualitative study on women's experiences with digoxin that is still pending additional document submission.

14. **Please explain whether PPFA provides any guidance on criteria to affiliates for selecting the direct recipients of fetal tissue donations. If yes, please provide the guidance.**

PPFA does not provide any guidance to affiliates on criteria for selecting the recipients who directly receive donated fetal tissue from an affiliate.

16. **Please clarify how the affiliates account for costs related to fetal tissue donation. Is any of this information reported to PPFA, either episodically or at regular intervals, such as in quarterly reports or at the time of reaccreditation review?**

PPFA policies require that an affiliate that chooses to accept reimbursement for allowable expenses must be able to demonstrate the reimbursement represents its actual costs. PPFA recommends that an affiliate consult with PPFA's Consortium of Abortion Providers ("CAPS") about steps to document and demonstrate actual costs. CAPS works with affiliates to improve access to high-quality abortion services by providing limited clinical training, providing assistance to affiliates operating in restrictive regulatory environments, and administering grants to low-income patients who cannot afford their care.

Individual affiliates decide how to account for their costs related to fetal tissue donation. PPFA expects affiliates to comply with all applicable state and federal laws, but does not require affiliates to report to PPFA on their accounting for the costs related to facilitating fetal tissue donation.

20. **Please provide further information on the question of whether doctors performing abortions may know before performing the procedure whether the patient has consented to donate fetal tissue.**

Some physicians performing abortions are sometimes aware prior to the abortion that the patient has requested to donate fetal tissue following the abortion. However, whether any particular physician is aware before performing the

7

Confidential Proprietary Business Information
Produced Pursuant to House Confidentiality Rules

procedure varies by affiliate, by physician and, in some instances, by the specific circumstances of each patient.

21. **Please explain whether PPFA provides, or has provided, any training on tissue donation or tissue procurement. If so, please provide copies of any materials used in such training.**

In the Spring of 2015, ▮▮▮▮▮▮▮, PPFA Senior Counsel, Law and Policy, gave a presentation on PPFA's fetal tissue donation policy at PPFA's Spring 2015 Annual Conference. There were no written materials other than the May 2015 guidance document titled "Programs for Donation of Blood and/or Aborted Pregnancy Tissue for Medical Research" (previously produced as PPFA-HOU_E&C-000043-45) used in the presentation. Other than this oral presentation, we are not aware of PPFA providing any other training on tissue donation or tissue procurement.

24. **Please explain the reasons why the number of PPFA affiliates has declined from over one hundred to 59. Please explain whether this trend is expected to continue.**

Over the years, PPFA has experienced a significant reduction in the number of affiliates due primarily to mergers, and in some cases disaffiliation. Some examples include Texas shifting from ten independent affiliates to three. Pennsylvania has gone from seven to three affiliates, and more recently, Florida has shifted from five to two affiliates in the past year.

Mergers can primarily be attributed to the recognition that better economies of scale would allow for affiliates to reduce duplication in overhead, more effectively invest in patient care and programs, and build stronger leadership. It is anticipated that while mergers will continue, they will not occur at the same pace.

PPFA has provided leadership to affiliates to help guide thoughtful processes for affiliates when they decide to merge with a neighboring affiliate to ensure strong continuity of care, strong leadership and strong programs. In cases of disaffiliation, contributing factors range from compliance with MS&Gs, specifically the adoption of Core Services, and protection of the Trademark to strategic restructuring.

25. **Please provide examples of actions PPFA has taken when an employee has failed to adhere to PPFA standards.**

PPFA has imposed disciplinary action against PPFA employees for violations of PPFA policies commensurate with the severity of the violation. Discipline options range from conversations and coaching sessions through termination of employment for more severe offenses.

8

Exhibit 5.36

**U.S. House of Representatives Committee on Energy & Commerce**
**Subcommittee on Oversight & Investigations**
**Follow-Up Questions Dated August 20, 2015**

Our fact development is ongoing, and therefore our responses are based on the best information that we have gathered to date. We will supplement these responses, if needed, as we receive additional information.

3. **Please describe the dues structure for Planned Parenthood affiliates.**

Planned Parenthood affiliates are required to pay annual dues, known as National Program Support (NPS) dues, to Planned Parenthood Federation of America, Inc. ("PPFA") to support PPFA programs and leadership. The NPS dues are calculated based on 1.25% of an affiliate's audited operating expenses. Affiliates may elect to participate in fee-for-service programs not covered by their NPS dues, such as the national website. For participation in these fee-for-service programs, affiliates and PPFA make individual agreements to define the scope of services and associated fees.

11. **Please describe the range and types of research that fetal tissue from Planned Parenthood fetal tissue donation programs is used for.**

As a general matter, PPFA has insight into the research projects for which donated fetal tissue is used only where affiliates facilitate tissue donation directly to research institutions. Two affiliates—Planned Parenthood of Greater Washington and North Idaho ("PPGWNI") and Planned Parenthood of the Pacific Southwest ("PPPSW")—currently facilitate tissue donation to research institutions for use in fetal tissue research. As stated in PPFA's September 4, 2015 production at PPFA-HOU_E&C-000162, we are not including in this total affiliates that have provided tissue to organizations using only placental tissue, decidua, and/or maternal or cord blood in research.

Of the two affiliates currently donating tissue to research institutions for use in fetal tissue research, only PPPSW has an understanding of the specific type of research for which the donated fetal tissue is used. PPGWNI donates fetal tissue to a research institution that itself collects and re-distributes tissue to individual researchers studying birth defects and a variety of other diseases.

PPPSW facilitates fetal tissue donation for a study by a research university on the comprehensive cellular and molecular characterization of fetal human tissue. The objective of this study is to create a bank of high-quality fetal tissue samples and cell cultures from normal to abnormal gestations, which will be profiled using state-of-the-art molecular characterization methods, as well as to store samples and cell cultures for future studies which can be used as new techniques become available.

1

**Confidential Proprietary Business Information**
**Produced Pursuant to House Confidentiality Rules**

12. **Please describe whether an affiliate with a fetal tissue donation program is aware of the specific research project for which specific tissue is donated.**

Affiliates that facilitate fetal tissue donation are sometimes aware of the specific research project for which specific fetal tissue is donated. An affiliate's knowledge varies depending largely on whether it facilitates fetal tissue donation to a tissue procurement organization ("TPO") or to organizations using fetal tissue in research.

Affiliates that facilitate fetal tissue donation to a TPO are generally not aware of the specific research project for which specific fetal tissue is donated. It is possible that, in some instances, an individual employee of an affiliate may learn information regarding the specific research project for which specific fetal tissue is donated, but that type of information is not routinely exchanged as part of the affiliate-TPO relationship.

Where an affiliate facilitates fetal tissue donation to a research university for a specific research project, that affiliate may have knowledge of the research project for which specific fetal tissue is donated. Alternatively, an affiliate might facilitate fetal tissue donation to a research university that itself collects and distributes fetal tissue for fetal tissue research. In those circumstances, the affiliate would know that the specific tissue was donated to the university-run tissue collection, but may not know whether it was distributed further.

Finally, one affiliate, Planned Parenthood of Orange and San Bernardino Counties, ("PPOSBC") has facilitated tissue donation directly to a biosciences research company. PPOSBC was not a partner in the company's research and is not aware of the specific research project for which the company used any specific tissue sample.

15. **Do any affiliates facilitate donations involving derivatives of fetal tissue?**

No Planned Parenthood affiliates facilitate donations of derivatives of fetal tissue.

17. **Does PPFA have a process or guidelines for how affiliates should vet vendors for fetal tissue disposal? If yes, please provide the process or guidelines.**

PPFA does not have a process or guidelines for how affiliates should vet disposal vendors. The Consortium of Abortion Providers ("CAPS") provides some assistance to Planned Parenthood affiliates with disposal vendors, if requested, but does not provide a process or guidelines. For example, if disposal vendors fail to collect an affiliate's medical waste, CAPS can assist affiliates with resolving the issue.

Confidential Proprietary Business Information
Produced Pursuant to House Confidentiality Rules

18. **Do affiliates have responsibility for conducting oversight over disposal vendors?**

Disposal vendors are independently required to comply with all local, state, and federal laws and regulations regarding disposal of medical waste. PPFA does not require its affiliates to conduct oversight over whether disposal vendors meet their own legal obligations.

19. **Please provide background information concerning two independent contractors (who may or may not have been disposal contractors) terminated by a Planned Parenthood affiliate, allegedly for profiting from fetal tissue collection. This is a follow-up issue referenced in a July 23, 2015 AP news story.**

The July 23, 2015, article refers to events concerning contractors that the Planned Parenthood affiliate terminated in approximately 1998, not to anything recent or related to the current Center for Medical Progress videos.

We are unable at this time to confirm precise details about these business relationships that the affiliate terminated seventeen years ago. However, we can confirm, as the AP story notes, that there was an FBI investigation, no laws were found to have been violated, and Planned Parenthood was not accused of any wrongdoing.

22. **Please provide information on PPFA's policy regarding the use of contract employees. If contract employees are permitted, can an abortion provider be a contract provider and can that individual have his or her own research projects for which fetal tissue is sought?**

PPFA does not have a standalone policy regarding the use of contract employees. Each affiliate has discretion concerning the use of contract employees.

PPFA's accreditation process requires affiliates to have all physicians who provide services as independent contractors sign a conflict-of-interest agreement. PPFA's Medical Standards & Guidelines ("MS&Gs") mandate, among other things, that affiliates require contract physicians to complete all mandatory trainings, and that such providers receive an annual evaluation that includes an evaluation of clinical skills. PPFA mandates that any licensed staff that provide services at Planned Parenthood health centers meet appropriate educational, certification and licensing requirements.

An abortion provider at an affiliate can be a contract provider, again at the discretion of the individual affiliate.

If a contract abortion provider is engaged in any Planned Parenthood research, the affiliate's research would be subject to all applicable regulatory requirements

3

and PPFA Research Department guidelines. Such research, if it meets the regulatory requirements and PPFA Research Department guidelines, could properly include a contract abortion provider's own research projects involving fetal tissue.

Confidential Proprietary Business Information
Produced Pursuant to House Confidentiality Rules

PPFA-HOU_E&C-000262

Exhibit 5.37

# SPECIMEN DONATION AGREEMENT

This Specimen Donation Agreement (the "Agreement") is effective as of September 23, 2008 (the "Effective Date") by and between DaVinci Biosciences LLC, a Delaware limited liability company located at ███████████ ("DaVinci"), and Planned Parenthood® of Orange and San Bernardino Counties, a California nonprofit public benefit corporation located at ███████████ ("PPOSBC"). DaVinci and PPOSBC shall individually be referred to herein as a "Party" and collectively as the "Parties".

1. **Specimens.**

   PPOSBC agrees to provide to DaVinci aborted pregnancy tissue which consists of raw, unmanipulated or unprocessed, biological material/cells ("Specimen" or "Specimens") from PPOSBC clients who have undergone an elective abortion during the first or second trimester, are at least 18 years of age or older, have signed the Donation Consent Form, attached hereto as **Exhibit A**, and who are not known by PPOSBC to be infected by HIV or Hepatitis C.

2. **Use of Specimens.**

   a. DaVinci shall use Specimens for cell and stem cell research only, which research on such Specimens shall be conducted exclusively in the State of California. DaVinci shall not, directly or indirectly, involve any individual, organization or other entity or funding source that is prohibited from affiliating with DaVinci or is otherwise prohibited from participating or supporting the activities described in this Section 2.a. The intended "scope of use" for the Specimens is described in DaVinci's Research Summary, which is attached hereto as **Exhibit B** (and incorporated as terms and conditions of this Agreement), and generally provides that DaVinci will isolate cell types from Specimens and use the sorted cell types to culture organ-specific cell and stem cell lines. Cultured or manipulated cells and stem cells will be cryopreserved and used for future cellular studies (e.g., cell surface marker analysis, gene expression profile, and telomere length), in vitro studies (e.g., differentiation potential of various stem cell types) and animal studies (in vivo functionality of various cell and stem cell types).

   b. DaVinci represents and warrants that it has conducted cell and stem cell research in adherence with the highest ethical and privacy standards for research and in compliance with all applicable federal and state laws as well as in accordance with DaVinci's internal Bioethics Policy Statement, and DaVinci covenants that it will continue to adhere to such standards during the term hereof.

3. **Procedures.**

   a. DaVinci will provide PPOSBC with a sterile container, including storage media, for each Specimen ("Container").

DVB_00001613

b. On each PPOSBC operating surgery day during which the retrieval of Specimen is scheduled, PPOSBC will: (i) following retrieval, store each Specimen in a separate Container; and (ii) before the end of the day on which the Specimen was collected, notify DaVinci's designated contact, specified in Section 8.b., below, that Specimen is ready for pick-up by DaVinci's designated transporting representative.

c. PPOSBC will not provide to DaVinci any Specimens which are known by PPOSBC to be infected with HIV or Hepatitis C.

d. To protect the privacy of donors, PPOSBC will provide to DaVinci only "de-identified" Specimens as defined under the Privacy Rule of the Health Insurance Portability and Accountability Act of 1996's (HIPAA), 45 C.F.R. Parts 160 and 164. Specimens will not include any identifying information about the donor. All Donation Consent Forms signed by PPOSBC clients will contain a provision indicating that the donor and PPOSBC relinquish any and all rights to the Specimens upon delivery to DaVinci.

e. Within a reasonable amount of time after receipt of each Specimen, DaVinci will submit a portion or sample of the Specimen to a serology laboratory to be screened for HIV and Hepatitis C. If the Specimen is found to be infected with either of these pathogens, the Specimen will be collected by DaVinci's biohazard/medical waste management service provider and incinerated at the biohazard/medical waste management service provider's designated disposition site. All Specimens will be de-identified and neither DaVinci nor PPOSBC will be obligated or able to notify PPOSBC clients of any positive test results for HIV or Hepatitis C.

f. DaVinci will not transfer Specimens to any third party except to: (i) a serology lab to perform the pathology screening as described in Section 3.e., above; and (ii) a biohazard/medical waste management service provider solely for destruction purposes, as described in Sections 3.e. and 3.h.

g. DaVinci will transport Specimens in accordance with all applicable federal, state and local storage and transfer requirements.

h. DaVinci will store all Specimens in a place not open to the public and will use all reasonable efforts to store Specimens so as to prevent deterioration that would create a health hazard. All waste tissue from each Specimen will be collected by DaVinci's biohazard/medical waste management service provider and incinerated at such provider's designated disposition site. "Waste tissue" in this Agreement means any or all parts of Specimens that DaVinci does not use for research.

i. DaVinci shall notify PPOSBC within five (5) business days of its discovery of any failure (whether material or non-material) by DaVinci, or any subcontractor or agent of DaVinci, to comply with the terms and conditions of Section 3.e., f., g., or h. The notice, which may be orally communicated to the Chief Executive Officer or his/her

DVB_00001614

designee of PPOSBC, shall include the circumstance of the failure and the steps taken to remedy the failure and to avoid future recurrence of the failure.

4. **Confidentiality.**

DaVinci and PPOSBC agree to keep confidential and shall not disclose without the prior written consent of the other or as otherwise required by law, all confidential information of the other party. "Confidential Information" is (i) any information, documents or materials disclosed by either party to the other during the course of negotiating this Agreement or pursuant to this Agreement; (ii) all information related to this Agreement itself, the terms and conditions of the Agreement, and (iii) information contained in the Donation Consent Forms signed by PPOSBC clients. Confidential Information shall exclude such information which, (i) is or lawfully becomes generally available to the public' (ii) is lawfully acquired from third parties who have a right to disclose such information; or (iii) by prior mutual written agreement, is released from a confidential status. Prompt written notice of any disclosure required by law shall be provided by the disclosing Party to the other Party.

5. **Ownership.**

a. Once in the possession of DaVinci, all Specimens and any cell lines or stem cell lines derived therefrom by a method of isolation, processing or cellular manipulation shall become the sole property of DaVinci. Neither PPOSBC nor any PPOSBC client will have or retain any right, title, interest in or to the Intellectual Property Rights or materials resulting from DaVinci's use of the Specimens. "Intellectual Property Rights" means all intellectual property rights throughout the world, whether existing under intellectual property, unfair competition or trade secret laws, or under statute or at common law or equity, including but not limited to: (i) copyrights, trade secrets, trademarks, trade names, patents, inventions, designs, logos and trade dress, "moral rights," mask works, rights of personality, publicity or privacy, and any other intellectual property and Proprietary rights; (ii) any registration, application or right to apply for any of the rights referred to in this clause; and (iii) any and all renewals, reexaminations, extensions and restorations thereof, now or hereafter in force and effect.

b. PPOSBC, on behalf of itself and of all clients who donate Specimens, hereby assigns, and agrees to assign in the future, to DaVinci and its affiliates all rights PPOSBC or such client have or may acquire by operation of law or otherwise in the (i) Specimens; or (ii) Intellectual Property Rights or materials (including but not limited to isolated cell lines or stem cell lines) resulting from DaVinci's use of the Specimens. PPOSBC, on behalf of itself and all clients who donate Specimens, agrees to fully cooperate with DaVinci and its affiliates in securing and preserving the rights of DaVinci and its affiliates in the (i) Specimens; or (ii) Intellectual Property

DVB_00001615

Rights or materials resulting from DaVinci's use of the Specimens and processing and manipulation thereof.

6. **Representations and Warranties.**

a. Each Party represents and warrants that it is authorized to enter into this Agreement and to perform the services to be performed by it hereunder.

b. PPOSBC represents and warrants that prior to providing any Specimens to DaVinci, PPOSBC will obtain any and all necessary clearances, releases, approvals or consents from PPOSBC's clients, to allow DaVinci to receive and use the Specimens under this Agreement and to obtain the rights set forth in Section 5, above.

c. DaVinci represents and warrants that it has previously received and used specimens and DaVinci covenants that it will receive and use Specimens for cell and stem cell research in compliance with all applicable federal and state laws and regulations, including without limitation The Uniform Anatomical Gift Act (codified in California as California Health and Safety Code §§ 7150-7156.5), The National Organ Transplantation Act (42 U.S.C. § 274e), The NIH Revitalization Act of 1993 (42 U.S.C. §§ 289 g-1 & 289 g-2), California Health and Safety Code §§ 123440 & 123445, and California Health and Safety Code §§ 125300-125320.

d. PPOSBC does not, and shall not assume any liability for the activities of DaVinci. DaVinci represents and warrants that it maintains and DaVinci covenants that it will maintain comprehensive and general liability insurance and/or other applicable insurance covering the acts and omissions of DaVinci arising in connection with DaVinci's duties herein, with liability limits in the amounts of $1,000,000 per occurrence and $3,000,000 annual aggregate. DaVinci shall maintain this coverage for claims arising during the term of this Agreement and during the applicable statute of limitations. DaVinci shall provide PPOSBC with a current certificate evidencing the coverage required by this section. DaVinci shall promptly notify PPOSBC of any change in the amount or scope of its coverage.

e. Each Party (the "Indemnitor") hereby indemnifies, defends and holds the other Party (the "Indemnitee") harmless from and against any and all damages, liabilities, loss, costs or expenses (including, without limitation, reasonable attorneys' fees) arising out of or in connection with any breach or alleged breach by the Indemnitor of any of the warranties, representations or agreements made by the Indemnitor herein. The Indemnitee shall: (i) provide the Indemnitor reasonably prompt notice in writing of any claim or action and permit the Indemnitor, through counsel reasonably acceptable to the Indemnitee, to answer and defend such claim or action; and (ii) provide the Indemnitor information, assistance and authority, at Indemnitor's expense, to help the Indemnitor to defend such claim or action. The Indemnitor shall not be responsible for any settlement made by the Indemnitee without the Indemnitor's written permission, which permission shall not be unreasonably withheld. The Indemnitee

DVB_00001616

shall have the right to employ separate counsel and participate in the defense of any claim or action. The Indemnitor may not settle any claim or action under this Section on the Indemnitee's behalf without first obtaining the Indemnitee's written permission, which permission will not be unreasonably withheld. The Indemnitee shall reimburse the Indemnitee on demand for any payment made or loss suffered by the Indemnitee regarding an amount subject to the foregoing indemnity, including all reasonably related costs, expenses and attorneys' fees. The indemnity hereunder shall be limited to claims reduced to judgment by´a court of law and settlements entered into with the Indemnitor's consent.

f.   NOT WITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT, THE SPECIMENS ARE BEING SUPPLIED "AS IS", WITH NO WARRANTIES, EXPRESS OR IMPLIED, AND PPOSBC EXPRESSLY DISCLAIMS ALL IMPLIED WARRANTIES, INCLUDING BUT NOT LIMITED TO ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, AND NON-INFRINGEMENT OF THIRD PARTY PROPRIETARY RIGHTS WITH RESPECT THERETO.

7.  **Term and Termination.**

a.   The term of this Agreement shall commence as of the Effective Date (specified on page 1 of this Agreement) and shall continue until terminated pursuant to Section 7.b.

b.   Either Party may terminate this Agreement immediately upon written notice at any time with or without cause. Such termination shall be effective upon written notice to such Party or as soon thereafter as is permitted by applicable law. In lieu of termination, PPOSBC may temporarily suspend the provision of Specimens to DaVinci upon the receipt of notice under Section 3.i. or any event coming to its attention with respect to a failure of DaVinci to comply with the terms and conditions of this Agreement.

c.   Upon termination of this Agreement, neither Party shall have any further obligation hereunder except for (i) obligations occurring prior to the date of termination; and (ii) obligations, promises and covenants (including without limitation, Sections 3, 4, and 5) contained herein that expressly extend beyond the term of this Agreement.

8.  **Notices.**

a.   **General Notices.** All written notices and statements to be sent to any Party hereunder shall be addressed to the applicable address set forth on page 1 of this Agreement or at such other address as may be designated in writing from time to time. All notices shall either be served by personal delivery (with written receipt of delivery), certified or registered mail, return receipt requested, or overnight courier (with written receipt of delivery), all charges paid. Except as otherwise provided

DVB_00001617

herein, such notices shall be deemed given when personally delivered, one (1) day after delivered by overnight courier, or five (5) days after mailing, except that notices of change of address shall be effective only after actual receipt.

b. **Notice of Specimen Delivery.**  Telephonic notice to DaVinci that a Specimen or Specimens are ready to be collected by DaVinci's designated transportation representative should be made in accordance to Section 3.e., above, to ███████████ at ███████████ Monday through Friday and to ███████████████████ on Saturday.

9. **Miscellaneous.**

a. If for any reason a court of competent jurisdiction finds any provision of this Agreement, or portion thereof, to be unenforceable, that provision of the Agreement will be enforced to the maximum extent permissible so as to affect the intent of the Parties, and the remainder of this Agreement will continue in full force and effect. No waiver of any breach of any provision of this Agreement shall constitute a waiver of any prior, concurrent or subsequent breach of the same or any other provisions hereof, and no waiver shall be effective unless made in writing and signed by an authorized representative of the waiving Party.  The Parties and their respective counsel have had an opportunity to review this Agreement which will be interpreted fairly and in accordance with its terms and without any strict construction in favor of or against either Party.

b. This Agreement shall be construed and controlled according to the laws of the State of California applicable to contracts entered into and entirely performed therein.  Any dispute arising under, in connection with, or incident to this Agreement or concerning its interpretation will be resolved exclusively in the state or federal courts located in Los Angeles, California, and the Parties irrevocably consent to the exercise of jurisdiction by said courts over them.

c. In the event of any action, suit or proceeding arising from or based upon this Agreement brought by either Party hereto against the other, the prevailing Party shall be entitled to recover from the other its reasonable attorneys' fees in connection therewith in addition to the costs of such action, suit or proceeding.

d. This Agreement may be executed in one or more counterparts and by facsimile, all of which shall be considered one and the same Agreement and each of which shall be deemed an original.

e. Neither Party may assign any of its rights or obligations hereunder without the prior written consent of the other Party.  Any attempted assignment in violation of this Section shall be null and void. In addition, DaVinci shall notify PPOSBC in writing in the event of any acquisition of DaVinci (including an acquisition of stock

DVB_00001618

exceeding 50% of its then outstanding shares) or any merger in which DaVinci is a party.

f. Nothing in this Agreement should be construed as creating an agency, partnership, joint venture, franchise, or employment relationship between the Parties. Neither Party has the authority to make any statements, representations or commitments of any kind, nor to take any action binding on the other, except to the extent (if any), provided for in this Agreement.

g. This Agreement, including any exhibits attached hereto which are incorporated by this reference, constitutes the entire agreement between the Parties with respect to its subject matter and merges all prior and contemporaneous communications. It shall not be modified except by a written agreement dated subsequent to the date of this Agreement and signed on behalf of the Parties by their respective authorized representatives.


**AUTHORIZED SIGNATURES**

IN WITNESS WHEREOF, the Parties have entered into this Agreement as of the Effective Date written above.

| DaVinci Biosciences, LLC | Planned Parenthood® of Orange and San Bernardino Counties |
|---|---|
|  |  |
| Title: President | Title: President/CEO |
| Date: September 23, 2008 | Date: 9/23/08 |


**Exhibit A.** Donation Consent Form

**Exhibit B.** Research Summary

DVB_00001619



## CONSENT FOR DONATION OF ABORTED PREGNANCY TISSUE
## FOR MEDICAL RESEARCH, EDUCATION, OR TREATMENT

Recent advances in medical science have been developed through research using tissue that has been aborted. This research is being done to treat and find a cure for such diseases as diabetes, Parkinson's disease, Alzheimer's disease, cancer and AIDS.

Tissue can be obtained as a result of donation of pregnancy tissue after an abortion. Before you give your consent to donate pregnancy tissue, **read each of the following statements and initial the line to the right**. If there is any statement you do not understand, or if you have any questions, someone will discuss them with you.

Before this consent was ever offered to me, I had previously decided
to have an abortion and signed an informed consent document.                          _____

I agree to donate the tissue from the abortion and/or miscarriage as
a bodily gift to be used for education, research, stem cell research,
treatment or the advancement of medical science.                                      _____

The donation is made without any restriction regarding
who might receive the donated tissue or for what purpose it might be used.             _____

I have not been informed of the identity of any individual who will receive
the tissue that I am donating.                                                         _____

The method, timing or procedure of abortion cannot and will
not be substantively altered for the purpose of obtaining the tissue.                 _____

There will be no payment to me for the donated tissue or for
any product, process or service that may result from this donation.                   _____

I may refuse to donate pregnancy tissue, and this will not affect my
current medical care or my ability to get any future medical services
at Planned Parenthood of Orange and San Bernardino Counties.                          _____

Signature:_____    Date:_____

Witness:_____    Date:_____

DVB_00001620

Tissue Collection/Processing Protocol

To be performed by PPOSBC employees at the Orange medical facility:

1. Fetal Material of gestational development between 8-20 weeks will be obtained under Informed Consent.

2. Fetal Material will be collected and transferred to a sterile container provided by DaVinci.

3. The sterile container will be stored in a refrigerator in preparation for transfer.

4. DaVinci will be responsible for picking up and transporting specimens from PPOSBC to DaVinci per an agreed upon schedule.

To be performed at DaVinci's Costa Mesa laboratory:

1. Fetal material will be processed at DaVinci under biosafety level II standard operating procedures.

2. Fetal material will be removed from container and placed into a sterile pan containing DPBS(-), all identifiable organs will be removed and placed into separate sterile containers.

3. Fetal material that is not identifiable will be placed into a separate sterile container.

4. Identified fetal organs will be mechanically minced and enzymatically digested with 1 mg/mL of collagenase containing 100 units of DNAse I and incubated in a shaking water bath for 30 minutes at 37°C to create a single cell suspension.

5. Enzymatic digestion will be quenched by the addition of 20% FBS/DMEM.

6. Cell suspension will then be centrifuged and washed 3X at 300 x g for 10 minutes with DPBS(-).

7. Cell suspension will then undergo an erythrocytes lysis procedure with 1 X RBC lysis buffer.

DVB_00001621

8. Cell suspension will then be centrifuged and washed 3 X at 300 x g for 10 minutes with DPBS(-).

9. Cell suspension will be incubated with appropriate primary antibodies overnight at 4 °C to isolate organ-specific cells and stem cells.

10. Following the 24 hour primary antibody incubation period the cell suspension will be centrifuged and washed 3 X at 300 x g for 10 minutes with DPBS(-).

11. Cell suspension will then be sent to a Molecular Flow Cytometry facility for sorting of targeted organ-specific cells and stem cells.

12. Sorted cells and stem cells will then be collected by and to DaVinci.

13. DaVinci's laboratory will be responsible for culturing isolated organ-specific cells and stem cells in appropriate cell culture medium and expanding these cells until passage 4, wherein some cells will be cryopreserved at DaVinci for future studies; not limited to cell surface marker analysis, gene expression profile, telomere length, in vitro differentiation potential comparison between organ-specific cells and stem cells, in vitro differentiation potential comparison between fetal and adult stem cells, and in vivo efficacy of fetal organ-specific cells and stem cells.

DVB_00001622

Exhibit 5.38



**DaVinci Biosciences LLC**
**Characterization of Human Fetal Stem Cells**
**and**
**Determination of Research and Therapeutic Tool Potential**

Tissue Processing Protocol:

To be performed at Planned Parenthood® Orange and San Bernardino County (Orange):

1. After medical consultation and patient consent for procedure, Planned Parenthood staff present informed consents and discuss tissue donation with potential donor
2. Fetal material (products of conception) of gestational ages between 5-20 weeks will be obtained with signed consent
3. Informed consents are stored at Planned Parenthood.
4. Fetal material (products of conception) will be collected and washed 3x with Dulbecco's Phosphate Buffered Saline solution (DPBS(-)) and transferred to a sterile container with age of sample written on container.
5. The sterile container will be stored on wet ice and transported from Planned Parenthood ® to DaVinci Biosciences LLC only by the appointed DaVinci Biosciences LLC employee

To be performed at DaVinci Biosciences, LLC (in Yorba Linda):

1. Fetal material (products of conception) will be processed at DaVinci Biosciences LLC under biosafety level II standard operating procedures.
2. Fetal material is checked in and assigned a sequential number
3. Fetal material (products of conception) will be removed from container and placed in a sterile tray with DPBS (-). All fetal organs will be isolated and placed into individual sterile containers.
4. Fetal material (products of conception) which are not identifiable will be stored in a separate sterile container.
5. Identified fetal organs will be mechanically minced and enzymatically digested with 1 mg/ml of collagenase containing 1 00 units of DNAse I and incubated in a shaking water bath for 30 minutes at 37°C to create a single cell suspension.
6. Enzymatic digestion will be quenched by the addition of 20% FBS/DMEM.
7. Cell suspension will be then be centrifuged and washed 3X at 300 x g for 10 minutes with DPBS (-).
8. Cell suspension will then undergo an erythrocyte lysis procedure with 1X RBC lysis buffer.
9. Cell suspension will then be centrifuged and washed 3X at 300 x g for 10 minutes with DPBS (-).
10. Cell suspension will be incubated with appropriate primary antibodies overnight at 4°C to isolate organ specific stem cells.
11. Following the 24 hour primary antibody incubation period the cell suspension will be centrifuged and washed 3X at 300 x g for 1 0 minutes with DPBS (-).
12. DaVinci Biosciences will then culture isolated organ-specific stem cells in the appropriate cell culture medium and expand the cells to passage 4. Following this, some cells will be

Protocol 0810306v3

**CONFIDENTIAL**

DVB_00001611



cryopreserved at DaVinci Biosciences LLC for future studies which are not limited to cell surface marker analysis, gene expression profile, telomere length, in vitro differentiation potential comparison between organ specific stem cells, in vitro differentiation potential comparison between fetal and adult stem cells, in vivo efficacy of fetal organ specific stem cells.

CONFIDENTIAL

Exhibit 5.39

| DaVinci Biosciences | | | | | | Form 101 | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Prenatal Receiving** | | | | | | | | | |
| CONTROLLED DOCUMENT | | Effective Date: 10/03/2012 | | | | | Version 2 | | |

Use this form in connection with SOP DALAB-CC-031

| Sample # | Harvest Date | Pick up time | Arrival Time | Organ/Tissue | Age (wks) | Gender (M/F/U) | Code | Picked up by | Operator(s) | Was collected tissue discarded? (Yes or No. If yes, why?) |
|---|---|---|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |  |

Property of DaVinci Biosciences-CONFIDENTIAL DOCUMENT-Any unauthorized copy and distribution is strictly prohibited.

CONFIDENTIAL

# DaVinci Biosciences

## FORM 102

## PreNatal Tissue Tracking

| CONFIDENTIAL | Approved: 07/03/2012 | Version 1 |
|---|---|---|

**1. Sample and Collection Information**

Sample ID:_____    Age:_____    Gender: _____    Pathology:_____

Date Harvested: _____    Time:_____    Date Received: _____    Time: _____

Comments: _____

Technicians Processing Materials: _____; _____; _____

WARNING: TREAT EACH SAMPLE AS POTENTIALLY INFECTIOUS MATERIAL

**2. List of Organs and Samples Collected**

| Tissue | Amount | Processing Code* | # of Vials | Comments | LOT # | Reference |
|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |

*Process Codes B, Fl, P (Blocks, Fluids, Cell Pellets) may not require further analysis

| QA Review By: | Date: | Approved ☐ Rejected ☐ | Signature:_____ |
|---|---|---|---|
|  |  |  | Quality Assurance Manager |

CONFIDENTIAL

DVB_00000603

**3. QC Summary:**

### 3.1. Frozen and Fresh Cells:

| | | Form 105 | | Form 206 | Form 207 | Form 208 | | |
| | | Cell Count/ Viability | Cell Propagation | Mycoplasma | Pathogen | Sterility | By: | Date: |
| Cat # | LOT # | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | Pass/Fail | Pass/Fail/N/A | Pass/Fail/N/A | Pass/Fail/N/A | Pass/Fail | | |
| | | Pass/Fail | Pass/Fail/N/A | Pass/Fail/N/A | Pass/Fail/N/A | Pass/Fail | | |
| | | Pass/Fail | Pass/Fail/N/A | Pass/Fail/N/A | Pass/Fail/N/A | Pass/Fail | | |
| | | Pass/Fail | Pass/Fail/N/A | Pass/Fail/N/A | Pass/Fail/N/A | Pass/Fail | | |

### 3.2. RNA—Form 203

| Cat # | LOT # | Gel | A260/A280 | Housekeeping Gene | By: | Date: |
|---|---|---|---|---|---|---|
| | | Pass/Fail | Pass/Fail | Pass/Fail | | |
| | | Pass/Fail | Pass/Fail | Pass/Fail | | |

### 3.3. cDNA—Form 204

| Cat # | LOT # | Housekeeping Gene | By: | Date |
|---|---|---|---|---|
| | | Pass/Fail | | |
| | | Pass/Fail | | |

### 3.4. Lysate—Form 205

| Cat # | LOT # | Coomassie Gel | Immunoblot | By: | Date: |
|---|---|---|---|---|---|
| | | Pass/Fail | Pass/Fail | | |
| | | Pass/Fail | Pass/Fail | | |

| QA Review By: | Date: | Approved ☐ Rejected ☐ | Signature:_____ |
|---|---|---|---|
| | | | Quality Assurance Manager |

Property of DaVinci Biosciences-CONFIDENTIAL DOCUMENT-Any unauthorized copy and distribution is strictly prohibited.
Page 2 of 2

CONFIDENTIAL

Exhibit 5.40

**REMIT PAYMENT TO:**

DV Biologics LLC

# Invoice

| Date | Invoice # |
|------|-----------|
| 2/9/2010 | 017 |

PAID
04/12/2010

| Bill To | Ship To |
|---------|---------|
| Life Technologies | Life Technologies |

| S.O. No. | P.O. No. | Terms |
|----------|----------|-------|
| 12 | Pushkala Subraman... | Net 30 |

| Item | Lot # | Description | U/M | Ordered | Rate | Amount |
|------|-------|-------------|-----|---------|------|--------|
| PN006-F | | Human A2B5 Positive (A2B5+) Neural Cells (prenatal derived) 500,000 cells/vial | | 3 | 450.00 | 1,350.00 |
| PACKAGING ... | | Packaging & Handling Fee | | 1 | 15.00 | 15.00 |
| SHIPPING CH... | | Shipping Charge - Overnight | | 1 | 135.00 | 135.00 |

**PLEASE REMIT PAYMENT WITHIN 30 DAYS OF INVOICE DATE**

| | |
|---|---|
| Subtotal | $1,500.00 |
| Sales Tax | $0.00 |
| Total | $1,500.00 |
| Payments/Credits | -$1,500.00 |
| **Balance Due** | $0.00 |

| Phone # | Fax # |
|---------|-------|
| | |

**REMIT PAYMENT TO:**

DV Biologics LLC

# Invoice

| Date | Invoice # |
|------|-----------|
| 6/29/2010 | 042 |



| Bill To | Ship To |
|---------|---------|
| Life Technologies | Life technologies |

| S.O. No. | P.O. No. | Terms |
|----------|----------|-------|
| 26 | N/A | Net 30 |

| Item | Lot # | Description | U/M | Ordered | Rate | Amount |
|------|-------|-------------|-----|---------|------|--------|
| PN006-F | | Human A2B5 Positive (A2B5+) Neural Cells (prenatal derived) 500,000 cells/vial ------ LOT pN006f-031810KB | | 2 | 450.00 | 900.00 |
| PN006-F | | Human A2B5 Positive (A2B5+) Neural Cells (prenatal derived) 500,000 cells/vial ------ LOT pN006f-021810KE | | 3 | 450.00 | 1,350.00 |
| PACKAGING ... | | Packaging & Handling Fee | | 1 | 15.00 | 15.00 |
| SHIPPING CH... | | Shipping Charge - Overnight | | 1 | 160.00 | 160.00 |

**PLEASE REMIT PAYMENT WITHIN 30 DAYS OF INVOICE DATE**

| | |
|---|---|
| Subtotal | $2,425.00 |
| Sales Tax | $0.00 |
| Total | $2,425.00 |
| Payments/Credits | -$2,425.00 |
| **Balance Due** | $0.00 |

| Phone # | Fax # |
|---------|-------|
| | |

# Invoice



| Date | Invoice # |
|------|-----------|
| 6/29/2010 | 043 |

**Bill To**

Life Technologies

**Ship To**

Life technologies

| S.O. No. | P.O. No. | Terms |
|----------|----------|-------|
| 48 | N/A | Net 30 |

| Item | Lot # | Description | U/M | Ordered | Rate | Amount |
|------|-------|-------------|-----|---------|------|--------|
| PN003-F | | Human Neural Progenitor Cells. (prenatal derived) (EVALUATION PRICING) Shipping 6.29.10 ---- LOT 081009RA | | 2 | 450.00 | 900.00 |
| PN003-F | | Human Neural Progenitor Cells. (prenatal derived) (EVALUATION PRICING) Estimated Shipping Date of 7.27.10 ---- LOT TBD | | 2 | 450.00 | 900.00 |
| N-GRO-001-500 | | Neural Cellutions media 500 mL  (EVALUATION PRICING) | | 2 | 150.00 | 300.00 |
| PACKAGING ... | | Packaging & Handling Fee | | 1 | 15.00 | 15.00 |
| SHIPPING CH... | | Shipping Charge - Overnight Tracking No. 7936 7767 1334 | | 1 | 150.00 | 150.00 |
| SHIPPING CH... | | Shipping Charge - Overnight Tracking No. 7988 0410 6886 | | 1 | 125.00 | 125.00 |
| SHIPPING CH... | | Shipping Charge - Overnight Tracking No. 7988 0040 7495 ---- Complimentary | | 1 | 0.00 | 0.00 |

**PLEASE REMIT PAYMENT WITHIN 30 DAYS OF INVOICE DATE**

| | |
|--|--|
| Subtotal | $2,390.00 |
| Sales Tax | $0.00 |
| Total | $2,390.00 |
| Payments/Credits | -$2,390.00 |
| **Balance Due** | $0.00 |

| Phone # | Fax # |
|---------|-------|
| | |

**REMIT PAYMENT TO:**
DV Biologics LLC

# Invoice

| Date | Invoice # |
|------|-----------|
| 8/3/2010 | 053 |

**PAID**
**10/21/2011**

| Bill To | Ship To |
|---------|---------|
| Life Technologies | Life Technologies |

| S.O. No. | P.O. No. | Terms |
|----------|----------|-------|
| 54 | Anne Chen | Net 30 |

| Item | Lot # | Description | U/M | Ordered | Rate | Amount |
|------|-------|-------------|-----|---------|------|--------|
| PN006-F | | Human A2B5 Positive (A2B5+) Neural Cells (prenatal derived) 500,000 cells/vial (EVALUATION PRICING) ----- LOT 041410ZA | | 1 | 450.00 | 450.00 |
| PACKAGING ... | | Packaging & Handling Fee | | 1 | 15.00 | 15.00 |
| SHIPPING CH... | | Shipping Charge - Overnight | | 1 | 166.00 | 166.00 |

**PLEASE REMIT PAYMENT WITHIN 30 DAYS OF INVOICE DATE**

| | |
|---|---|
| Subtotal | $631.00 |
| Sales Tax | $0.00 |
| Total | $631.00 |
| Payments/Credits | -$631.00 |
| **Balance Due** | $0.00 |

| Phone # | Fax # |
|---------|-------|
| | |

**REMIT PAYMENT TO:**
DV Biologics LLC

# Invoice


PAID
09/09/2010

| Date | Invoice # |
| --- | --- |
| 9/7/2010 | 064 |

**Bill To**
Life Technologies

**Ship To**
Life Technologies

| S.O. No. | P.O. No. | Terms |
| --- | --- | --- |
| 63 | Soo | Net 30 |

| Item | Lot # | Description | U/M | Ordered | Rate | Amount |
| --- | --- | --- | --- | --- | --- | --- |
| PN006-F | | Human A2B5 Positive (A2B5+) Neural Cells (prenatal derived) 500,000 cells/vial (EVALUATION PRICING) ----- LOT 041410ZA | | 2 | 450.00 | 900.00 |
| PN006-F | | Human A2B5 Positive (A2B5+) Neural Cells (prenatal derived) 500,000 cells/vial (EVALUATION PRICING) ----- LOT 083010KD | | 3 | 450.00 | 1,350.00 |
| PACKAGING ... | | Packaging & Handling Fee | | 1 | 15.00 | 15.00 |
| SHIPPING CH... | | Shipping Charge - Overnight FedEx | | 1 | 150.00 | 150.00 |

USE DV Biologics FedEX Account

**PLEASE REMIT PAYMENT WITHIN 30 DAYS OF INVOICE DATE**

| | |
| --- | --- |
| Subtotal | $2,415.00 |
| Sales Tax | $0.00 |
| Total | $2,415.00 |
| Payments/Credits | -$2,415.00 |
| **Balance Due** | $0.00 |

| Phone # | Fax # |
| --- | --- |
| | |

**REMIT PAYMENT TO:**

DV Biologics LLC

# Invoice

| Date | Invoice # |
|------|-----------|
| 10/6/2010 | 073 |

PAID
08/09/2011

**Bill To**

Life Technologies

**Ship To**

Life Technologies

| S.O. No. | P.O. No. | Terms |
|----------|----------|-------|
| 72 | 80997-OS-00100 | Net 30 |

| Item | Lot # | Description | U/M | Ordered | Rate | Amount |
|------|-------|-------------|-----|---------|------|--------|
| PN006-F | | Human A2B5 Positive (A2B5+) Neural Cells (prenatal derived) 500,000 cells/vial (EVALUATION PRICING) ----- LOT 041410ZA | | 2 | 450.00 | 900.00 |
| PACKAGING ... | | Packaging & Handling Fee | | 1 | 15.00 | 15.00 |
| SHIPPING CH... | | Shipping Charge - Overnight  FedEx Tracking Number: | | 1 | 163.00 | 163.00 |

USE DV Biologics FedEX Account

**PLEASE REMIT PAYMENT WITHIN 30 DAYS OF INVOICE DATE**

| | |
|---|---|
| **Subtotal** | $1,078.00 |
| **Sales Tax** | $0.00 |
| **Total** | $1,078.00 |
| **Payments/Credits** | -$1,078.00 |
| **Balance Due** | $0.00 |

| Phone # | Fax # |
|---------|-------|
| | |

DV Biologics LLC



# Invoice

| Date | Invoice # |
|---|---|
| 10/31/2012 | 387 |

**PAID 01/25/2013**

**Bill To**
Applied StemCell, Inc.

**Ship To**
Applied Stem Cell

| P.O. Number | Terms | Rep | Ship | Via | F.O.B. | Project |
|---|---|---|---|---|---|---|
| A0130 | Due on receipt | MTK | 10/25/2012 | Federal Express | | |

| Quantity | Item Code | Description | U/M | Price Each | Amount |
|---|---|---|---|---|---|
| 1 | PN003-R | Human Neural Progenitor Cells Total RNA (prenatal derived) 1 µg/vial | | 400.00 | 400.00T |
| 1 | PN003-R | Human Neural Progenitor Cells Total RNA (prenatal derived) 1 µg/vial | | 0.00 | 0.00T |
| 1 | DRY ICE-ICE/O... | DRY ICE-ICE/OUTBOUND PACKAGING | EA | 25.00 | 25.00 |
| 1 | PACKAGING & ... | Packaging & Handling Fee - US | | 25.00 | 25.00 |
| | | Sales Tax | | 0.00% | 0.00 |

Use Client's Fedex Account #

| Total | $450.00 |
|---|---|

DV Biologics LLC

# Invoice

| Date | Invoice # |
| --- | --- |
| 5/16/2013 | 504 |

**PAID 08/12/2013**

**Bill To**

Applied StemCell, Inc.

**Ship To**

Applied Stem Cell

| P.O. Number | Terms | Rep | Ship | Via | F.O.B. | Project |
| --- | --- | --- | --- | --- | --- | --- |
| A0496 | Net 30 | MTK | 5/16/2013 | UPS | | |

| Quantity | Item Code | Description | U/M | Price Each | Amount |
| --- | --- | --- | --- | --- | --- |
| 2 | PU002-F | Human Kidney Epithelial Cells,500,000 cells/vial | | 360.00 | 720.00T |
| 3 | D-PRO-015-100 | Epithelial Pro-Conditioned Medium 100mL | | 148.00 | 444.00T |
| 1 | PACKAGING & ... | Packaging & Handling Fee - US | | 25.00 | 25.00 |
| 1 | DRY ICE-ICE/O... | DRY ICE-ICE/OUTBOUND PACKAGING | EA | 25.00 | 25.00 |
| | | UPS Tracking #: | | | |
| | | Sales Tax | | 0.00% | 0.00 |

| Total | $1,214.00 |
| --- | --- |

DV Biologics LLC

# Invoice



| Date | Invoice # |
|------|-----------|
| 6/4/2013 | 517 |

**Bill To**

Applied StemCell, Inc.

**Ship To**

Applied Stem Cell

| P.O. Number | Terms | Rep | Ship | Via | F.O.B. | Project |
|-------------|-------|-----|------|-----|--------|---------|
| A0516 | Net 30 | MTK | 6/4/2013 | UPS | | |

| Quantity | Item Code | Description | U/M | Price Each | Amount |
|----------|-----------|-------------|-----|-----------|--------|
| 1 | PI004-R | Human Skin Total RNA. (prenatal derived) 10 µg/vial | | 32.00 | 32.00T |
| 1 | PD008-R | Human Whole Large Intestine Total RNA | | 32.00 | 32.00T |
| 1 | PD001-R | Human Whole Liver Total RNA  10 ug/vial | | 32.00 | 32.00T |
| 1 | DRY ICE-ICE/O... | DRY ICE-ICE/OUTBOUND PACKAGING | EA | 25.00 | 25.00 |
| 1 | PACKAGING & ... | Packaging & Handling Fee - US | | 25.00 | 25.00 |
| 1 | Freight Outbound | UPS Pick-Up fee | EA | 6.99 | 6.99T |
| | | UPS Tracking#: | | | |
| | | Sales Tax | | 0.00% | 0.00 |

| | |
|---|---|
| **Total** | $152.99 |

DV Biologics LLC

# Invoice

| Date | Invoice # |
|------|-----------|
| 9/9/2013 | 600 |



**Bill To**

Applied StemCell, Inc.

**Ship To**

Applied Stem Cell

| P.O. Number | Terms | Rep | Ship | Via | F.O.B. | Project |
|-------------|-------|-----|------|-----|--------|---------|
| A0721 | Net 30 | MTK | 9/9/2013 | UPS | | |

| Quantity | Item Code | Description | U/M | Price Each | Amount |
|----------|-----------|-------------|-----|-----------|--------|
| 1 | PI004-R | Skin Tissue Total RNA (prenatal derived) | | 32.00 | 32.00T |
| 1 | DRY ICE-ICE/O... | DRY ICE-ICE/OUTBOUND PACKAGING | EA | 25.00 | 25.00 |
| 1 | PACKAGING & ... | Packaging & Handling Fee - US | | 25.00 | 25.00 |
| | | UPS Tracking #: | | | |
| | | Sales Tax | | 0.00% | 0.00 |

| | **Total** | $82.00 |
|--|-----------|--------|

DV Biologics LLC



# Invoice

| Date | Invoice # |
|---|---|
| 10/1/2013 | 618 |

**Bill To**

Applied StemCell, Inc.

**Ship To**

Applied Stem Cell

| P.O. Number | Terms | Rep | Ship | Via | F.O.B. | Project |
|---|---|---|---|---|---|---|
| A0771 | Net 30 | MTK | 10/1/2013 | UPS | | |

| Quantity | Item Code | Description | U/M | Price Each | Amount |
|---|---|---|---|---|---|
| 1 | PM005-CD | Osteoblast cDNA (prenatal derived) | | 160.00 | 160.00T |
| 1 | AM005-CD | Osteoblast cDNA (postnatal derived) | | 240.00 | 240.00T |
| 1 | DRY ICE-ICE/O... | DRY ICE-ICE/OUTBOUND PACKAGING | EA | 25.00 | 25.00 |
| 1 | PACKAGING & ... | Packaging & Handling Fee - US | | 25.00 | 25.00 |
| | | The UPS tracking # is | | | |
| | | Sales Tax | | 0.00% | 0.00 |

Use Applied Stems Cells UPS ▪▪▪▪ when possible

| **Total** | $450.00 |
|---|---|

# DV Biologics LLC



# Invoice

| Date | Invoice # |
|------|-----------|
| 10/7/2013 | 622 |

**Bill To**

Applied StemCell, Inc.

**Ship To**

Applied Stem Cell

| P.O. Number | Terms | Rep | Ship | Via | F.O.B. | Project |
|-------------|-------|-----|------|-----|--------|---------|
| AO784 | Net 30 | MTK | 10/7/2013 | UPS | | |

| Quantity | Item Code | Description | U/M | Price Each | Amount |
|----------|-----------|-------------|-----|------------|--------|
| 2 | AH005-F | Bone Marrow Stromal Cells (postnatal derived) | | 400.00 | 800.00T |
| 1 | PC015-F | Cardiac Progenitor Cells (prenatal derived) | | 520.00 | 520.00T |
| 1 | C-M-GRO-001-500 | Cardiac Cellutions Media 500mL | | 200.00 | 200.00T |
| 1 | DRY ICE-ICE/O... | DRY ICE-ICE/OUTBOUND PACKAGING | EA | 25.00 | 25.00 |
| 1 | PACKAGING & ... | Packaging & Handling Fee - US | | 25.00 | 25.00 |
| | | UPS Tracking #: | | | |
| | | Sales Tax | | 0.00% | 0.00 |

| | Total | $1,570.00 |
|---|-------|-----------|



DV Biologics LLC

# Invoice

| Date | Invoice # |
|------|-----------|
| 3/6/2014 | 754 |

**Bill To**

Applied StemCell, Inc.

**Ship To**

Applied Stem Cell

| P.O. Number | Terms | Rep | Ship | Via | F.O.B. | Project |
|-------------|-------|-----|------|-----|--------|---------|
| A1091 | Net 30 | MTK | 3/6/2014 | UPS | | |

| Quantity | Item Code | Description | U/M | Price Each | Amount |
|----------|-----------|-------------|-----|-----------|--------|
| 6 | PC008-F | Cardiomyocytes (prenatal derived) | | 560.00 | 3,360.00 |
| 4 | C-MAIN-001-500 | Cardiomyocyte Cellutions Maintenance Medium 500 ml | | 150.00 | 600.00 |
| 1 | DRY ICE-ICE/O... | DRY ICE-ICE/OUTBOUND PACKAGING | EA | 25.00 | 25.00T |
| 1 | PACKAGING & ... | Packaging & Handling Fee - US | | 25.00 | 25.00T |
| 1 | Freight Outbound | Shipping Charges | EA | 6.99 | 6.99T |
| | | UPS Tracking #: | | | |
| | | Sales Tax | | 0.00% | 0.00 |

| | | | | **Total** | $4,016.99 |

DV Biologics LLC



# Invoice

| Date | Invoice # |
|------|-----------|
| 6/30/2014 | 837 |

**PAID 08/21/2014**

**Bill To**
Applied StemCell, Inc.

**Ship To**
Applied Stem Cell

| P.O. Number | Terms | Rep | Ship | Via | F.O.B. | Project |
|-------------|-------|-----|------|-----|--------|---------|
| A1362 | Net 30 | MTK | 6/25/2014 | UPS | | |

| Quantity | Item Code | Description | U/M | Price Each | Amount |
|----------|-----------|-------------|-----|------------|--------|
| 1 | PI004-R | Skin Tissue Total RNA (prenatal derived) | | 32.00 | 32.00T |
| 1 | AA003-CD | Adipose Tissue cDNA (postnatal derived) | | 136.00 | 136.00T |
| 1 | DRY ICE-ICE/O... | DRY ICE-ICE/OUTBOUND PACKAGING | EA | 25.00 | 25.00T |
| 1 | PACKAGING & ... | Packaging & Handling Fee - US | | 25.00 | 25.00T |
| | | Sales Tax | | 0.00% | 0.00 |

Tracking Number

| **Total** | **$218.00** |
|-----------|-------------|



DV Biologics LLC

# Invoice

| Date | Invoice # |
|------|-----------|
| 8/13/2014 | 869 |



PAID
09/29/2014

**Bill To**

Applied StemCell, Inc.

**Ship To**

Applied Stem Cell

| P.O. Number | Terms | Rep | Ship | Via | F.O.B. | Project |
|-------------|-------|-----|------|-----|--------|---------|
| A1434 | Net 30 | MTK | 8/13/2014 | UPS | | |

| Quantity | Item Code | Description | U/M | Price Each | Amount |
|----------|-----------|-------------|-----|------------|--------|
| 1 | PC003-CD | Aorta Tissue cDNA (prenatal derived) | | 136.00 | 136.00 |
| 1 | PC016-CD | Aortic Cell cDNA (prenatal derived) | | 400.00 | 400.00 |
| 1 | DRY ICE-ICE/O... | DRY ICE-ICE/OUTBOUND PACKAGING | EA | 25.00 | 25.00 |
| 1 | PACKAGING & ... | Packaging & Handling Fee - US | | 25.00 | 25.00 |
| 1 | Freight Outbound | Shipping Charges | EA | 6.99 | 6.99T |
| | | Sales Tax | | 0.00% | 0.00 |

| Tracking Number | | **Total** | $592.99 |
|-----------------|--|-----------|---------|

DV Biologics LLC 

# Invoice

| Date | Invoice # |
|------|-----------|
| 8/18/2014 | 871 |



| Bill To |
|---------|
| Applied StemCell, Inc. |

| Ship To |
|---------|
| Applied Stem Cell |

| P.O. Number | Terms | Rep | Ship | Via | F.O.B. | Project |
|-------------|-------|-----|------|-----|--------|---------|
| A1467 | Net 30 | MTK | 8/18/2014 | UPS | | |

| Quantity | Item Code | Description | U/M | Price Each | Amount |
|----------|-----------|-------------|-----|------------|--------|
| 2 | PC001-F | Heart Cells (Uncultured) (prenatal derived) | | 400.00 | 800.00 |
| 1 | DRY ICE-ICE/O... | DRY ICE-ICE/OUTBOUND PACKAGING | EA | 25.00 | 25.00 |
| 1 | PACKAGING & ... | Packaging & Handling Fee - US | | 25.00 | 25.00 |
| 1 | Freight Outbound | Shipping Charges | EA | 6.99 | 6.99T |
| | | Sales Tax | | 0.00% | 0.00 |

| Tracking Number | Total | $856.99 |
|-----------------|-------|---------|

DV Biologics LLC



# Invoice

| Date | Invoice # |
|------|-----------|
| 2/24/2015 | 1077 |

**PAID**
**04/30/2015**

**Bill To**

Applied StemCell, Inc.

**Ship To**

Applied Stem Cell

| P.O. Number | Terms | Rep | Ship | Via | F.O.B. | Project |
|-------------|-------|-----|------|-----|--------|---------|
| A1878 | Net 30 | MTK | 2/24/2015 | UPS | | |

| Quantity | Item Code | Description | U/M | Price Each | Amount |
|----------|-----------|-------------|-----|-----------|--------|
| 1 | PN001-F | Neural Cells (Uncultured) (prenatal derived) Lot #031610KC | | 480.00 | 480.00T |
| 1 | PN003-F | Neural Progenitor Cells (prenatal derived) Lot #112310KA | | 720.00 | 720.00T |
| 1 | DRY ICE-ICE/O... | DRY ICE-ICE/OUTBOUND PACKAGING | EA | 25.00 | 25.00T |
| 1 | PACKAGING & ... | Packaging & Handling Fee - US | | 25.00 | 25.00T |
| | | Tracking Number | | | |
| | | Sales Tax | | 0.00% | 0.00 |

Interest charged at 2% per month will be added to past due invoices.

| Total | $1,250.00 |
|-------|-----------|

Exhibit 5.41

# SPECIMEN DONATION AGREEMENT

This Specimen Donation Agreement (the "Agreement") is effective as of March 1, 2010 (the "Effective Date") by and between Novogenix Laboratories™, LLC ("Novogenix"), a California limited liability company, and Planned Parenthood® Los Angeles, a California nonprofit public benefit corporation located at ███████████████████████████ ("PPLA"). Novogenix and PPLA shall individually be referred to herein as a "Party" and collectively as the "Parties".

1. **Specimens**

   PPLA agrees to provide Novogenix aborted pregnancy tissue which consists of raw, unmanipulated or unprocessed, biological material/cells ("Specimen" or "Specimens") from PPLA clients who have undergone an elective abortion during the first or second trimester, are at least 18 years of age or older, and have signed the Donation Consent Form, attached hereto as **Exhibit A**.

2. **Use of Specimens**

   a. Novogenix shall use Specimens for cell and stem cell research only. The intended "scope of use" for the Specimens is described in Novogenix's Research Summary, which is attached hereto as **Exhibit B** (and incorporated as terms and conditions of this Agreement), and generally provides that Novogenix will isolate cell types from Specimens and use the sorted cell types to culture organ-specific cell and stem cell lines. Cultured or manipulated cell and stem cells will be cryopreserved and used for future cellular studies (e.g., cell surface marker analysis, gene expression profile, and functional comparison to pluripotent cell-derived cell types), in vitro studies (e.g., differentiation potential of various stem cell types) and animal studies (in vivo functionality of various cell and stem cell types.

   b. Novogenix agrees to conduct cell and stem cell research in compliance with all applicable federal and state laws.

3. **Procedures**

   a. Novogenix will provide PPLA with a sterile container, including storage media, for each Specimen ("Container").

   b. On each PPLA operating surgery day during which the retrieval of Specimens is scheduled, PPLA will: (i) identify patients for potential donation; (ii) obtain informed consent from patients who agree to participate in tissue donation programs; (iii) following pathology analysis of donated specimens, allow Novogenix's designated contact, specified in Section 9(c), below to select material for collection.

1

Confidential - For production to House Energy and Commerce Only

NOVOEC-0000165

c. To protect the privacy of donors, PPLA will provide to Novogenix only "de-identified" Specimens as defined under the Privacy Rule of the Health Insurance Portability and Accountability Act of 1996's (HIPAA), 45 C.F.R. Parts 160 and 164. Specimens will not include any identifying information about the donor.

d. Novogenix will transport Specimens in accordance with all applicable federal, state and local storage and transfer requirements.

e. Novogenix will store all Specimens in a place not open to the public and will use all reasonable efforts to store Specimens so as to prevent deterioration that would create a health hazard. All waste tissue from each Specimen will be collected by Novogenix's biohazard/medical waste management service provider and incinerated at such provider's designated disposition site. "Waste tissue" in this Agreement means any or all parts of Specimens that Novogenix does not use for research.

f. Novogenix shall notify PPLA within (5) business days of its discovery of any failure (whether material or non-material) by PPLA, or any subcontractor or agent of PPLA, to comply with the terms and conditions of Section 3(b) or (c). The notice, which may be orally communicated to the Chief Medical Officer or his/her designee of PPLA, shall include the circumstances of the failure and the steps taken to remedy the failure and to avoid future reoccurrence of the failure.

## 4. Payment

a. Novogenix will reimburse PPLA for reasonable administrative costs associated with the identification of potential donors, as well as the obtaining of informed consent. This amount will be $45 per donated specimen. Novogenix will issue monthly payment to PPLA for any month in which specimens are collected and such payments shall be made within 30 days of the close of the month in which the samples were collected.

## 5. Confidentiality

Novogenix and PPLA agree to keep confidential and shall not disclose without the prior written consent of the other as otherwise required by law, all confidential information of the other part. "Confidential Information" is (i) any information, documents or materials disclosed by either party to the other during the course of negotiating this Agreement or pursuant to this Agreement; (ii) all information related to this Agreement itself, the terms and conditions of the Agreement, and (iii) information contained in the Donation Consent Forms signed by PPLA clients. Confidential Information shall exclude such information which, (i) is or lawfully becomes generally available to the public, (ii) is lawfully acquired from third parties who have a right to disclose such information; or (iii) by prior mutual written agreement, is released from a confidential status. Prompt written notice of any disclosure required by law shall be provided by the disclosing Party to the other Party.

2

Confidential - For production to House Energy and Commerce Only

## 6. Ownership

Once in the possession of Novogenix, all Specimens and any cell lines or stem cell lines derived therefrom by a method of isolation, processing or cellular manipulation shall become the sole property of Novogenix. Neither PPLA nor any PPLA client will have or retain any right, title, interest in or to the Intellectual Property Rights or materials resulting from Novogenix's use of the Specimens. "Intellectual Property Rights" means all intellectual property rights throughout the world, whether existing under intellectual property, unfair competition or trade secret laws, or under statute or at common law or equity, including but not limited to: (i) copyrights, trade secrets, trademarks, trade names, patents, inventions, designs, logos and trade dress, "moral rights," mask works, rights of personality, publicity or privacy, and any other intellectual property and Proprietary rights; (ii) any registration, application or right to apply for any of the right referred to in this clause; and (iii) any and all renewals, reexaminations, extensions and restorations thereof, now or hereafter in force and effect.

## 7. Representations and Warranties

a. Each Party represents and warrants that it is authorized to enter into this Agreement and to perform the services to be performed by it hereunder.

b. PPLA represents and warrants that prior to providing any Specimens to Novogenix, PPLA will obtain any and all necessary clearances, releases, approvals or consents from PPLA's clients in compliance with all applicable federal and state laws and regulations.

c. Novogenix represents and warrants that it will receive and use Specimens for cell and stem cell research in compliance with all applicable federal and state laws and regulations, including without limitation The Uniform Anatomical Gift Act (codified in California as California Health and Safety Code §§ 7150-7156.5), The National Organ Transplantation Act (42 U.S.C § 274e), the HIH Revitalization Act of 1993 (42 U.S.C. §§ 289 g-1 & 289 g-2), California Health and Safety Code §§ 123440 & 123445, and California Health and Safety Code §§ 125300-125320.

d. PPLA does not, and shall not assume any liability for the activities of Novogenix. Novogenix represents and warrants that it maintains and Novogenix covenants that it will maintain comprehensive and general liability insurance and/or other applicable insurance covering the acts and omissions of Novogenix arising in connection with Novogenix's duties herein, with liability limits in the amounts of $1,000,000,000 per occurrence and $3,000,000 annual aggregate. Novogenix shall maintain coverage for claims arising during the term of this Agreement. Novogenix shall provide PPLA with a current certificate evidencing the coverage required by this section. Novogenix shall promptly notify PPLA of any change in the amount or scope of its coverage.

3

Confidential - For production to House Energy and Commerce Only

NOVOEC-0000167

e. Novogenix hereby indemnifies, defends and holds harmless PPLA, its agents and representatives, from and against any and all damages, liabilities, loss, costs or expenses (including, without limitation, reasonable attorneys' fees) arising out of or in connection with any breach or alleged breach by Novogenix of any of the warranties, representations or agreements made by Novogenix herein, or any action, inaction omission or errors by Novogenix. PPLA hereby indemnifies, defends and holds harmless Novogenix, its agents and representatives, from and against any and all damages, liabilities, loss, costs or expenses (including, without limitation, reasonable attorneys' fees) arising out of or in connection with any breach or alleged breach by PPLA of any of the warranties, representations or agreements made by the PPLA herein, or any action, inaction omission or errors by PPLA.

The Indemnitee (whether Novogenix or PPLA) shall: (i) provide the Indemnitor reasonable prompt notice in writing of any claim or action and permit the Indemnitor, through counsel reasonably acceptable to the Indemnitee, to answer and defend such claim or action; and (ii) provide the Indemnitor information, assistance and authority, at Indemnitor's expense, to help the Indemnitor to defend such claim or action. The Indemnitor shall not be responsible for any settlement made by the Indemnitee without the Indemnitor's written permission, which permission shall not be unreasonably withheld. The Indemnitee shall have the right to employ separate counsel and participate in the defense of any claim or action. The Indemnitor may not settle any claim or action under this Section on the Indemnitee's behalf without first obtaining the Indemnitee's written permission, which permission will not be unreasonably withheld. The Indemnitor shall reimburse the Indemnitee on demand for any payment made or loss suffered by the Indemnitee regarding an amount subject to the foregoing indemnity, including all reasonably related costs, expenses and attorneys' fees.

f. NOT WITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT, THE SPECIMENS ARE BEING SUPPLIED "AS IS", WITH NO WARRANTIES, EXPRESS OR IMPLIED, AND PPLA EXPRESSLY DISCLAIMS ALL IMPLIED WARRANTIES, INCLUDING BUT NOT LIMITED TO ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, AND NON-INFRINGEMENT OF THIRD PARTY PROPRIETARY RIGHTS WITH RESPECT THERETO.

8. **Term and Termination**

4

Confidential - For production to House Energy and Commerce Only

a. The term of this Agreement shall commence as of the Effective Date (specified on page 1 of this Agreement) and shall continue until terminated pursuant to Section 8(b).

b. Either Party may terminate this Agreement immediately upon written notice at any time with or without cause. Such termination shall be effective upon written notice to such Party or as soon thereafter as is permitted by applicable law. In lieu of termination, PPLA may temporarily suspend the provision of Specimens to Novogenix upon the receipt of notice under Section 9 or any event coming to its attention with respect to a failure of Novogenix to comply with the terms and conditions of this Agreement.

c. Upon termination of this Agreement, neither Party shall have any further obligation hereunder except for (i) obligations occurring prior to the date of termination; and (ii) obligations, promises and covenants contained herein that by their nature expressly extend beyond the term of this Agreement.

## 9. Notices

a. **General Notices.** Except for Notice of Specimen Delivery under section 9(b), all written notices and statements to be sent to any Party hereunder shall be addressed to the applicable address as may be designated in writing from time to time. All notices shall either be served by personal delivery (with written receipt of delivery), certified or registered mail, return receipt requested, or overnight courier (with written receipt of delivery), all charges paid. Except as otherwise provided herein, such notices hall be deemed given when personally delivered, one (1) day after delivered by overnight courier, or five (5) days after mailing, except that notices of change of address shall be effective only after actual receipt.

b. **Notice of Specimen Delivery.** Telephonic or email notice to Novogenix that a Specimen or Specimens are ready to be collected by Novogenix's designated transportation representative should be made to:

 Vice President of Operations

## 10. Miscellaneous

a. If for any reason a court of competent jurisdiction finds any provision of this Agreement, or portion thereof, to be unenforceable, that provision of the Agreement will be enforced to the maximum extent permissible so as to affect the intent of the Parties, and the remainder of this Agreement will continue in full force and effect. No waiver of any breach of any provision of this Agreement shall constitute a waiver of any prior, concurrent or subsequent breach of the same or any other provisions hereof, and no waiver shall be effective unless made in

5

Confidential - For production to House Energy and Commerce Only

writing and signed by an authorized representative of the waiving Party. The Parties and their respective counsel have had an opportunity to review this Agreement which will be interpreted fairly and in accordance with its terms and without any strict construction in favor of or against either Party.

b. This Agreement shall be construed and controlled according to the laws of the State of California applicable to contracts entered into and entirely performed therein. Any dispute arising under, in connection with, or incident to this Agreement or concerning its interpretation will be resolved exclusively in the state or federal courts located in Los Angeles, California, and the Parties irrevocably consent to the exercise of jurisdiction by said courts over them.

c. In the event of any action, suit or proceeding arising from or based upon this Agreement brought by either Party hereto against the other, the prevailing Party shall be entitled to recover from the other its reasonable attorneys' fees in connection therewith in addition to the cost of such action, suit or proceeding.

d. This Agreement may be executed in one or more counterparts and by facsimile, all of which shall be considered one and the same Agreement and each of which shall be deemed an original.

e. Neither Party may assign any of its rights or obligations hereunder without the prior written consent of the other Party. Any attempted assignment in violation of this Section shall be null and void. In addition, Novogenix shall notify PPLA in writing in the event of any acquisition of Novogenix (including an acquisition of stock exceeding 50% of its then outstanding shares) or any merger in which Novogenix is a party.

f. Nothing in this Agreement should be construed as creating an agency, partnership, joint venture, franchise, or employment relationship between the Parties. Neither Party has the authority to make any statements, representation or commitments of any kind, not to take any action binding on the other, except to the extent (if any), provided for in this Agreement.

g. This Agreement, including any exhibits attached hereto which are incorporated by this reference, constitutes the entire agreement between the Parties with respect to its subject matter and merges all prior and contemporaneous communications. It shall not be modified except by a written agreement dated subsequent to the date of this Agreement and signed on behalf of the Parties by their respective authorized representatives.

**AUTHORIZED SIGNATURES**

6

Confidential - For production to House Energy and Commerce Only

IN WITNESS WHEREOF, The Parties have entered into this Agreement as of the Effective Date written above.

| Novogenix Laboratories™, LLC | Planned Parenthood ® of Los Angeles |
|---|---|
| By (sign): | By (sign): |
| ███████████████████ | ███████████████████ |
| Title: President | Title:  CEO |
| Date:  3/29/10 | Date:  3/22/10 |

Confidential - For production to House Energy and Commerce Only

Exhibit A. Donation Consent Form

 **Planned Parenthood®**
Los Angeles

**Client Information for Informed Consent**

**DONATION OF ABORTED PREGNANCY TISSUE FOR MEDICAL
RESEARCH, EDUCATION, OR TREATMENT**

Recent advances in medical science have been developed through research using tissue that has been aborted. This research is being done to treat and find a cure for such diseases as diabetes, Parkinson's disease, Alzheimer's disease, cancer, and AIDS.

Tissue can be obtained as a result of donation of pregnancy tissue after an abortion. Before you give your consent to donate pregnancy tissue, **read each of the following statements and initial the line to the right.** If there is any statement you do not understand, or if you have any questions, someone will discuss them with you.

Before this consent was ever offered to me, I had previously decided
to have an abortion and signed an informed consent document.          ____
I agree to donate the tissue from the abortion and/or miscarriage as
a bodily gift to be used for education, research, treatment or the
advancement of medical science.                                        ____

I understand the donation is made without any restriction regarding
who might receive the donated tissue or for what purpose it might be used.  ____

I have not been informed of the identity of any individual who will receive
the tissue that I am donating.                                          ____

I understand the method, timing or procedure of abortion cannot and will
not be substantively altered for the purpose of obtaining the tissue.   ____

I understand there will be no payment to me for the donated tissue or for
any product, process or service that may result from this donation.     ____

I understand that I may refuse to donate pregnancy tissue, and this will not
affect my current medical care or my ability to get any future medical services
at Planned Parenthood Los Angeles.                                      ____

Signature:_____          Date:_____


Witness:_____          Date:_____

8

Confidential - For production to House Energy and Commerce Only

## Exhibit B
## Research Summary

The foundation of Novogenix Laboratories is based on the premise that collectively, scientists supporting scientists will advance biomedical research. The company will supply the necessary tools to optimize stem cell research and propel regenerative medicine to the forefront of available treatment options for patients. Specifically, these tools will include tissue preparation services and contract research, all conducted in accordance with the highest ethical standards. To this end, tissue from elective terminations will be collected onsite at PPLA, screened for pathogens and processed further for distribution to researchers in academia or industry or used in research conducted within Novogenix. These agreements will be pursued with the highest degree of ethical and scientific standards as defined by the Bioethics and Scientific Committees maintained by Novogenix Laboratories.

Confidential - For production to House Energy and Commerce Only

NOVOEC-0000173

Exhibit 5.42

Novogenix Notes 9/3/15 – (attending: Alan Slobodin, Emily Felder, Adrianna Simonelli, Heidi Stirrup, Lindsay Letter, Uma Lee, Chris ?, Attorney: Joshua Levy, Partner, Cunningham Levy; ██████ – ED Novogenix Laboratories LLC

1. Background
   a. Dr. ██████ is executive director, daily responsibilities include supervising personnel, consulting, financials, interacting with future clients; PhD from UCLA Molecular Cell, Stem Cell Biology; B.S. BioChemistry from Northern Michigan. Devoted his life to science. Started Novogenix in 2010 due to his dedication to science. Provide material for research – not transplantation or therapeutic; details specifically outlined in contract; 100 clients; 98% are researchers at academic institutions throughout the U.S. and the world. All fetal tissue and stem cell work have operated at a loss; detail accounting – expenses, direct costs, specimen collection, processing, overhead, downstream costs. He does not buy or sell tissue. See this in the contracts we provided.
   b. Q: Explain your day-to-day responsibilities at the company. A: I supervise personnel; working with clients in consulting, data analysis, financials, and consider and work on potential future clients.
   c. Q: How many employees? A: 2 employees total, including Dr. ██████ ; other employee manages all operations and is responsible for collection at clinics, scheduling activities related to that, accounts receivable/payable; manages lab – materials, reagents. Q: Who works in the lab? A: we both do. How many clinics? 2 clinics: PP of Los Angeles (PPLA)
   d. Q: What percent of Novogenic business is related to fetal tissue research? A: 70-80% of business is selling "services" related to fetal tissue (don't buy or sell f/t)
   e. 98% of clients are researchers (other 2% contract for consulting/analysis services)
   f. Q: Explain the nature of your work – when you obtain fetal tissue, what do you do? A: stem cell, isolating, prepare and preserve, work with scientist to plan experiments to provide w/ specific cell types they want to investigate. Perform services to isolate cells. Example – isolate different cell types in developing lung to understand how cancer starts. Generate a single cell suspension from parent tissue. Then machine to allow for simultaneous separation into 4-6 populations of cells based on protein expression on surface of cells. Start with fetal lung tissue; isolate cells; different population of cells; consult with researcher to define what population of cells; separate out; prepare and preserve. End experiments are domain of researchers. These cells represent blank slates. The cells can be manipulated into cancer cells. Genetic mutations driving.
2. Relationship with Providers and Fetal Tissue Acquisition
   a. Has tissue donation programs with 2 PPLA clinics – contracts provided to the Committee Contracts with scientists, particular type of ? comes to company, provide services, Q: Do you provide unaltered fetal tissue? A: No. Work is in preparation and processing.
   b. Obtained tissue from other clinics on ad hoc basis – no contracts, no written document, just informal agreements
      i. Novogenix created its own consent form at these other clinics, based on the PPLA consent form – does not have a copy
      ii. Dr. ██████ may have created the form, does not remember
   c. Novogenix procures fetal tissue at the clinic and then takes the tissue back to the lab

d. Rare to procure tissue from other sources. While ago – related to specific research. Q: How many times have you gone to other clinics besides PP? Less than 5, more than once, but not many.

e. Different ranges of "services" provided once the tissue is procured
   i. Highest level of service is very extensive consultation and interaction with researchers regarding their goals, discussions about data analysis, tissue procurement services to assist with researcher experiments and figure out the best way to accomplish their goals.
   ii. Middle level would be collection of material at the clinic, take it back to the lab, freeze the tissue with various chemical "fixatives" which preserves the cells, later wash the chemicals out of the material and prep for shipping; also includes histological sections (cutting thin slices in the material for researcher use)
   iii. Lowest level would be fetal tissue material that is isolated and prepared, transferred to a solution, stored onsite at Novogenvix lab, double layered to preserve it , prepared for shipment (same as middle level minus any histological sectioning) – essentially what stem express calls selling "unaltered" tissue but Novogenix calls it selling a service (essentially preserving, storing, packaging)

f. Does not take blood samples from maternal donors, treats all tissue like it is contagious (different from StemExpress and ABR)

g. Q: How did your relationship with PP come to be? A: I approached PPLA to see if we could work together. I presented my scientific credentials. Novogenix cold-called PPLA to establish donation program; PPLA proposed $45 and Novogenix accepted, Dr. ▇ ▇ spoke with Dr. ▇ at PPLA
   i. Contract signed with PPLA in 2010, tissue donation started in 2011 (verbal agreement to re-evaluate each year)
   ii. Q: Is your agreement still active? A: Agreement is still in place, but Arrangement with PPLA is no longer active (since July) as a result of the videos and reports in the media – said that PPLA was concerned about the safety of doctors and patients and Novogenix agreed to suspend the donation program (however, they did not publicize this decision – no interest in publicizing. Q: Has PP publicized – A: No.)
   iii. Q: Have you met/do you know Dr. ▇ ? A: Dr. ▇ met Dr. ▇ at PPLA; she was the providing physician that day and I was checking on my staff; introduced by Novogenix employee who works at clinic
   iv. PPLA clinic uses digoxin in 2nd trimester, so Novogenix does not accept donations over 20 weeks (when digoxin is used) – only 19 weeks and 6 days.
      1. Dr. ▇ asked if digoxin would be detrimental – Dr. ▇ said yes, tissue would not be usable – and Dr. ▇ responded that they use digoxin after 20 weeks – Dr. ▇ responded that they would not use donations over 20 weeks

3. Relationship with Buyers/Researchers and the Sale of Fetal Tissue
   a. Q: How does someone find Novogenix? A: Through me. Researchers reach out to Novogenix for fetal tissue needs because of Dr. ▇ s research papers. I've

published a few papers in my career; people read my papers and contact me – can you help me with my research?

4. Fetal Tissue Revenue
    a. Yearly numbers provided to Committee
    b. Says fetal tissue business operates at a loss; goal is to operate at a loss (later revised to specify the goal is to break even but they still operate at a loss) Business unit pertaining to stem cell and fetal tissue – runs negative – by definition – because of ethical and legal standards. Legally, there are certain services that we can provide and be reimbursed for – since the inception of this company, and because of importance and sensitivity, they operate at a loss or break even. It's a decision we made at the beginning – decide to operate at a loss – you're not seeking reimbursement – break even, under budgeting. Miscalculated volume, could charge more, but did not. Calculated direct costs associated with tissue preparation and processing; overhead and fixed costs. Did not calculate how many services, how many researchers, to what extent, underestimated our service volume. You would be entitled to seek reimbursement for storage costs. A scientist who contracts with Novogenix for services; $200 for each service performed. $50 related to reagents, equipment. Added $150 based on projection of fixed costs (salary, health insurance, etc) More services company provides to researcher, greater likelihood break even. Set projection of ?; increased price in second year. Volume did not correct itself. Seeking reimbursement for estimated and actual costs. Unpredictable. Documents provide very detailed breakdown (see Exhibit C) fixed costs each month.
    c. Emphasizes they pay for "services" and sells "services," not tissue
    d. Factors that go into pricing: tissue prep and processing, fixed costs, how many researchers, volume of tissue donation, lease payments, staff, salary
    e. Says operating at a loss because Novogenix underbudgeted, underestimated service volume

5. Informed Consent
    a. Can't remember if Novogenix employee obtains consent although Nucatola stated in videos that Novogenix sometimes did obtain consent
    b. Novogenix uses PPLA form
    c. Novogenix created another consent form based on PPLA form for other abortion providers

6. No Valuable Consideration
    a. Understanding of costs that are reimbursable is based on legal understanding that Novogenix sells services not fetal tissue – would not answer question about what law he was trying to comply with because it was A-C privilege
    b. Bills for materials, reagents, salary, lease payments
    c. No price sheet because each service is different so comes up with price based on conversations with researchers

7. Miscellaneous
    a. Does not sell to researchers for use in transplantation
    b. Q: Have you ever procured an intact fetal cadaver? – could not result. Termination procedure. But you're not a physician – no, it's my understanding. Q: do you get gender

requests (requests for male or female tissue). A: One or two – gender specific research – for example for prostate cancer research.

c.  ███████████'s understanding is that an intact fetus could not result from an abortion procedure, no knowledge of one donated to Novogenix

d.  Responds to comment in videos where Dr. ███████ says that sometimes after an abortion procedure the heart is beating – Dr. ███████ remarked that the heart was spontaneously contracting because of electrical discharge – he would not refer to that as a heart beat

e.  Q: What are the most common types of source material? You get requests from researchers, scientists are asking for what types of cells? A: It varies. I work with a lot of different scientists. Fetal liver - cells derived from fetal liver. Q: What gestational age is minimum? A: In the early stages, very rarely able to prepare and process at such early stages. The integrity is not good. For liver, second trimester. Main research. Creating mice with humanized immune system. Researchers using mice that have been genetically engineered to have a compromised immune system and then adopt a human immune system – using correct fetal tissue. Have been attempts to use blood stem cells from cord blood or from adult, but those are limited in their capabilities. Q: What about CD-133 – A: that's not the best marker to use. Do you isolate those cells? No. Not the right marker. Blood stem cells. CD-34 better. Fetal blood stem cells are more naïve; they can/able to adapt to new environment; generate a much broader range.

Exhibit 5.43

**FY 2011**

| | Jul-11 | Aug-11 | Total |
|---|---|---|---|
| **EXPENSES** | | | |
| WebEx | 55.00 | 65.80 | 120.80 |
| IT | 600.00 | 0.00 | 600.00 |
| Attorney (privileged and confidential) | | | |
| Lease | 4314.34 | 4314.34 | 8628.68 |
| Insurance | 372.90 | 372.90 | 745.80 |
| Employee Salary and Insurance | 5505.00 | 5505.00 | 11010.00 |
| Accountant | 154.17 | 154.17 | 308.34 |
| California Franchise Tax | 66.67 | 66.67 | 133.34 |
| PPLA Payments | 450.00 | 855.00 | 1305.00 |
| Materials/Reagents | 105.55 | 149.14 | 254.69 |
| (Estimated Amount Used) | | | |
| Delivery to researchers | 3.00 | 12.00 | 15.00 |
| Flow Cytometry Services | | | |
| Committee Meeting Expenses | | | |
| Admin Supplies | 96.09 | 92.12 | 188.21 |
| **Total (Monthly Expenses)** | 11722.72 | 11865.57 | 23309.86 |

| | Jul-11 | Aug-11 | Total |
|---|---|---|---|
| **REVENUE** | | | |
| Revenue - Stem Cell and Tissue Services | 0.00 | 4125.00 | 4125.00 |
| Revenue - Additional Stem Cell Services | 0.00 | 0.00 | 0.00 |
| **Total (Monthly Revenue)** | 0.00 | 4125.00 | 4125.00 |

| NET INCOME | -$11,722.72 | -$7,740.57 | -$19,184.86 |
|---|---|---|---|

Confidential - For production to House Energy and Commerce Only

FY2012

| EXPENSES | Sep-11 | Oct-11 | Nov-11 | Dec-11 | Jan-12 | Feb-12 | Total |
|---|---|---|---|---|---|---|---|
| WebEx | 58.45 | 49.00 | 49.00 | 59.80 | 55.90 | 54.70 | 326.85 |
| Attorney (privileged and confidential) | | | | | | | |
| Lease | 4314.34 | 4314.34 | 4314.34 | 4314.34 | 4314.34 | 4314.34 | 25886.04 |
| Insurance | 372.90 | 372.90 | 372.90 | 372.90 | 372.90 | 372.90 | 2237.40 |
| Employee Salary and Insurance | 5505.00 | 5505.00 | 5505.00 | 5505.00 | 5505.00 | 5505.00 | 33030.00 |
| Accountant | 154.17 | 154.17 | 154.17 | 154.17 | 162.50 | 162.50 | 941.68 |
| California Franchise Tax | 66.67 | 66.67 | 66.67 | 66.67 | 66.67 | 66.67 | 400.02 |
| PPLA Payments | 990.00 | 585.00 | 855.00 | 990.00 | 450.00 | 900.00 | 4770.00 |
| Materials/Reagents (Estimated Amount Used) | 509.92 | 99.60 | 1617.21 | 1506.11 | 116.55 | 154.29 | 4003.68 |
| Delivery to researchers | 12.00 | 37.02 | 74.44 | 15.00 | 0.00 | 11.43 | 149.89 |
| Flow Cytometry Services | | | | 75.00 | | | 75.00 |
| Committee Meeting Expenses | 280.81 | | | | | | 280.81 |
| Admin Supplies | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 175.36 | 175.36 |
| Total (Monthly Expenses) | 12316.33 | 11608.17 | 13008.73 | 13379.62 | 11133.86 | 11717.19 | 73163.90 |

| REVENUE | Sep-11 | Oct-11 | Nov-11 | Dec-11 | Jan-12 | Feb-12 | Total |
|---|---|---|---|---|---|---|---|
| Revenue - Stem Cell and Tissue Services | 4300.00 | 2500.00 | 3900.00 | 4500.00 | 3850.00 | 6350.00 | 25400.00 |
| Revenue - Additional Stem Cell Services | 0.00 | 900.00 | 0.00 | 0.00 | 2700.00 | 3700.00 | 7300.00 |
| Total (Monthly Revenue) | 4300.00 | 3400.00 | 3900.00 | 4500.00 | 6550.00 | 10050.00 | 32700.00 |

| NET INCOME | -$8,016.33 | -$8,208.17 | -$9,108.73 | -$8,879.62 | -$4,583.86 | -$1,667.19 | |

Confidential - For production to House Energy and Commerce Only

NOVOEC-0000007

## FY2012 (continued)

### EXPENSES

| | Mar-12 | Apr-12 | May-12 | Jun-12 | Jul-12 | Aug-12 | Total |
|---|---|---|---|---|---|---|---|
| WebEx | 83.80 | 67.90 | 58.15 | 98.35 | 55.00 | 52.00 | 415.20 |
| Attorney (privilieged and confidential) | | | | | | | |
| Lease | 4314.34 | 4314.34 | 4314.34 | 4314.34 | 4314.34 | 4314.34 | 25886.04 |
| Insurance | 372.90 | 372.90 | 372.90 | 372.90 | 372.90 | 372.90 | 2237.40 |
| Employee Salary and Insurance | 5505.00 | 5505.00 | 5505.00 | 5505.00 | 5505.00 | 5505.00 | 33030.00 |
| Accountant | 162.50 | 162.50 | 162.50 | 162.50 | 162.50 | 162.50 | 975.00 |
| California Franchise Tax | 66.67 | 66.67 | 66.67 | 66.67 | 66.67 | 66.67 | 400.02 |
| PPLA Payments | 900.00 | 450.00 | 1575.00 | 945.00 | 945.00 | 1170.00 | 5985.00 |
| Materials/Reagents (Estimated Amount Used) | 1591.03 | 64.38 | 1051.37 | 711.05 | 267.26 | 294.16 | 3979.25 |
| Delivery to researchers | 10.61 | 0.00 | 74.18 | 23.59 | 21.00 | 11.44 | 140.82 |
| Flow Cytometry Services | | | | | 75.00 | 0.00 | 75.00 |
| Committee Meeting Expenses | | | | | 47.65 | 0.00 | 47.65 |
| Admin Supplies | 156.59 | 42.40 | 0.00 | 45.66 | 0.00 | 0.00 | 244.65 |
| Total (Monthly Expenses) | 13354.91 | 11200.86 | 13180.11 | 12313.48 | 11932.32 | 12098.29 | 73416.03 |

### REVENUE

| | Mar-12 | Apr-12 | May-12 | Jun-12 | Jul-12 | Aug-12 | Total |
|---|---|---|---|---|---|---|---|
| Revenue - Stem Cell and Tissue Services | 4950.00 | 1900.00 | 8075.00 | 5575.00 | 7500.00 | 8956.00 | 36956.00 |
| Revenue - Additional Stem Cell Services | 3000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 3000.00 |
| Total (Monthly Revenue) | 7950.00 | 1900.00 | 8075.00 | 5575.00 | 7500.00 | 8956.00 | 39956.00 |

| NET INCOME | $5,404.91 | $9,300.86 | $5,105.11 | $6,738.48 | $4,432.32 | $3,142.29 | $68,911.76 |

Confidential - For production to House Energy and Commerce Only

NOVOEC-0000008

| FY 2013 | Sep-12 | Oct-12 | Nov-12 | Dec-12 | Jan-13 | Feb-13 | Total |
|---|---|---|---|---|---|---|---|
| **EXPENSES** | | | | | | | |
| WebEx | 87.55 | 49.00 | 54.10 | 66.85 | 104.20 | 54.40 | 416.10 |
| Attorney (privileged and confidential) | | | | | | | |
| Lease | 4314.34 | 4314.34 | 4314.34 | 4314.34 | 4314.34 | 4314.34 | 25886.04 |
| Insurance | 372.90 | 372.90 | 372.90 | 372.90 | 372.90 | 372.90 | 2237.40 |
| Employee Salary and Insurance | 5505.00 | 5505.00 | 5505.00 | 5505.00 | 5505.00 | 5505.00 | 33030.00 |
| Accountant | 162.50 | 162.50 | 162.50 | 162.50 | 162.50 | 162.50 | 975.00 |
| California Franchise Tax | 66.67 | 66.67 | 66.67 | 66.67 | 66.67 | 66.67 | 400.02 |
| PPLA Payments | 1395.00 | 720.00 | 990.00 | 630.00 | 540.00 | 1035.00 | 5310.00 |
| Materials/Reagents (Estimated Amount Used) | | | | | | | |
| Used for sample-preservation at clinic ($2.22) | 159.84 | 102.12 | 113.22 | 75.48 | 71.04 | 95.46 | 617.16 |
| Used for cell-isolation to be shipped to researcher (e.g., cryogenic freezing) ($3.33) | 166.51 | 89.25 | 131.87 | 84.25 | 76.59 | 116.55 | 665.02 |
| Used for isolation of cell-types | | 272.38 | 509.95 | 110.27 | 251.14 | 509.04 | 1652.78 |
| Delivery and Shipping | 23.25 | 7.50 | 105.58 | 13.00 | 12.00 | 23.08 | 184.41 |
| Committee Meeting Expenses | 85.00 | 0.00 | 0.00 | 311.82 | 769.70 | 0.00 | 1166.52 |
| Admin Supplies | 0.00 | 0.00 | 0.00 | 2.72 | 0.00 | 0.00 | 2.72 |
| Total (Monthly Expenses) | 12338.56 | 11661.66 | 12326.13 | 11715.80 | 12246.08 | 12254.94 | 72543.17 |
| | Sep-12 | Oct-12 | Nov-12 | Dec-12 | Jan-13 | Feb-13 | Total |
| **REVENUE** | | | | | | | |
| Revenue - Stem Cell Services | 10710.00 | 5525.00 | 10001.00 | 5528.00 | 4516.00 | 8262.98 | 44543 |
| Revenue - Additional Stem Cell Services | 3450.00 | 0.00 | 600.00 | 4000.00 | 6300.00 | 3600.00 | 17950 |
| Total (Monthly Revenue) | 14160.00 | 5525.00 | 10601.00 | 9528.00 | 10816.00 | 11862.98 | 62492.98 |
| **NET INCOME** | $1,821.44 | $6,136.66 | $1,725.13 | $2,187.80 | $1,430.08 | $391.96 | |

Confidential - For production to House Energy and Commerce Only

NOVOEC-0000009

| FY 2013 (continued) | Mar-13 | Apr-13 | May-13 | Jun-13 | Jul-13 | Aug-13 | Total |
|---|---|---|---|---|---|---|---|
| **EXPENSES** | | | | | | | |
| WebEx | 65.05 | 62.65 | 0.00 | 0.00 | 0.00 | 0.00 | 127.70 |
| Attorney (privileged and confidential) | | | | | | | |
| Lease | 4314.34 | 4314.34 | 4314.34 | 4314.34 | 4314.34 | 4314.34 | 25886.04 |
| Insurance | 372.90 | 372.90 | 390.92 | 390.92 | 390.92 | 390.92 | 2309.48 |
| Employee Salary and Insurance | 5505.00 | 5505.00 | 5505.00 | 5505.00 | 5505.00 | 5505.00 | 33030.00 |
| ED Salary Dedicated to Cell and Tissue Services | | | | | 2083.00 | 2083.00 | 4166.00 |
| Accountant | 162.50 | 162.50 | 162.50 | 162.50 | 162.50 | 162.50 | 975.00 |
| California Franchise Tax | 66.67 | 66.67 | 66.67 | 66.67 | 66.67 | 66.67 | 400.02 |
| PPLA Payments | 1215.00 | 765.00 | 1215.00 | 990.00 | 1305.00 | 990.00 | 6480.00 |
| Materials/Reagents | | | | | | | |
| (Estimated Amount Used) | | | | | | | |
| Used for sample-preservation at clinic ($2.22) | 119.88 | 68.82 | 153.18 | 106.56 | 159.84 | 102.12 | 710.40 |
| Used for cell-isolation to be shipped to researcher (e.g., cryogenic freezing) ($3.33) | 106.56 | 79.92 | 179.49 | 126.54 | 189.82 | 99.90 | 782.23 |
| Used for isolation of cell-types | 1667.65 | 513.04 | 0.00 | 123.82 | 1892.80 | 999.55 | 5196.86 |
| Delivery and Shipping | 19.36 | 7.00 | 34.94 | 14.00 | 69.43 | 3.00 | 147.73 |
| Committee Meeting Expenses | 313.26 | 0.00 | 163.56 | 0.00 | 0.00 | 0.00 | 476.82 |
| Admin Supplies | 128.01 | 0.00 | 0.00 | 0.00 | 8.52 | 0.00 | 136.53 |
| **Total (Monthly Expenses)** | 14056.18 | 11917.84 | 12185.60 | 11800.35 | 16147.84 | 14717.00 | 80824.81 |
| | Mar-13 | Apr-13 | May-13 | Jun-13 | Jul-13 | Aug-13 | Total |
| **REVENUE** | | | | | | | |
| Revenue – Stem Cell Services | 6920.00 | 5962.98 | 10369.00 | 9116.00 | 12010.00 | 8325.00 | 52703 |
| Revenue – Additional Stem Cell Services | 0.00 | 0.00 | 0.00 | 4500.00 | 2200.00 | 700.00 | 7400 |
| **Total (Monthly Revenue)** | 6920.00 | 5962.98 | 10369.00 | 13616.00 | 14210.00 | 9025.00 | 60102.98 |
| **NET INCOME** | -$7,136.18 | -$5,954.86 | -$1,816.60 | $1,815.65 | -$1,937.84 | -$5,692.00 | -$20,772.02 |

Confidential - For production to House Energy and Commerce Only

| FY 2014 EXPENSES | Sep-13 | Oct-13 | Nov-13 | Dec-13 | Jan-14 | Feb-14 | Total |
|---|---|---|---|---|---|---|---|
| WebEx | 49.00 | 57.70 | 66.10 | 62.20 | 49.15 | 64.45 | 348.60 |
| Basecamp | | | | | | | |
| Attorney (privileged and confidential) | | | | | | | |
| Lease | 4314.34 | 4314.34 | 4314.34 | 4314.34 | 4314.34 | 4314.34 | 25886.04 |
| Insurance | 390.92 | 390.92 | 390.92 | 390.92 | 390.92 | 390.92 | 2345.52 |
| Employee Salary and Insurance | 5501.50 | 5467.00 | 5467.00 | 5467.00 | 5467.00 | 5467.00 | 32836.50 |
| ED Salary for Cell and Tissue Services | 2088.00 | 2088.00 | 2088.00 | 2088.00 | 2088.00 | 2088.00 | 12528.00 |
| Accountant | 162.50 | 162.50 | 162.50 | 162.50 | 162.50 | 162.50 | 975.00 |
| USC Parking for Employee | 34.50 | 25.50 | 12.00 | 29.00 | 63.25 | 23.75 | 188.00 |
| California Franchise Tax | 191.56 | 66.67 | 66.67 | 66.67 | 66.67 | 66.67 | 524.91 |
| PPLA Payments | 945.00 | 1530.00 | 675.00 | 810.00 | 1170.00 | 1530.00 | 6660.00 |
| Materials/Reagents (estimated) | | | | | | | |
| Used for sample-preservation at clinic ($2.22) | 111.00 | 157.62 | 77.70 | 73.26 | 150.96 | 199.80 | 770.34 |
| Used for cell-isolation to be shipped to researcher (e.g., cryogenic freezing) ($3.33) | 126.54 | 180.16 | 74.26 | 53.28 | 126.54 | 156.51 | 717.29 |
| Used for isolation of cell-types | 1071.06 | 2459.08 | 601.90 | 187.27 | 748.51 | 1607.00 | 6674.82 |
| Delivery and Shipping | 144.96 | 10.50 | 0.00 | 6.50 | 21.30 | 0.00 | 183.26 |
| Flow Cytometry Services | 0.00 | 300.00 | 460.00 | 230.00 | 0.00 | 805.00 | 1795.00 |
| Core Services | | | | | 20.00 | 360.00 | 380.00 |
| Committee Meeting Expenses | 33.75 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 33.75 |
| Admin Supplies | 0.00 | 335.05 | 0.00 | 0.00 | 13.07 | 0.00 | 348.12 |
| Total (Monthly Expenses) | 15164.63 | 17545.04 | 14456.39 | 13940.94 | 14852.21 | 17235.94 | 93195.15 |
| FY 2014 REVENUE | Sep-13 | Oct-13 | Nov-13 | Dec-13 | Jan-14 | Feb-14 | Total |
| Revenue - Stem Cell Services | 10060.00 | 10995.00 | 4950.00 | 3275.00 | 6761.00 | 10515.00 | 46556 |
| Revenue - Additional Stem Cell Services | 7250.00 | 4850.00 | 2600.00 | 0.00 | 2950.00 | 0.00 | 17650 |
| Total (Monthly Revenue) | 17310.00 | 15845.00 | 7550.00 | 3275.00 | 9711.00 | 10515.00 | 64206.00 |
| NET INCOME | $2,145.37 | -$1,700.04 | -$6,906.39 | -$10,665.94 | -$5,141.21 | -$6,720.94 | |

Confidential - For production to House Energy and Commerce Only

NOVOEC-0000011

| FY 2014 EXPENSES (cont'd) | Mar-14 | Apr-14 | May-14 | Jun-14 | Jul-14 | Aug-14 | Total |
|---|---|---|---|---|---|---|---|
| WebEx | 99.40 | 67.45 | 49.00 | 60.85 | 61.00 | 49.00 | 386.70 |
| Basecamp | 50.00 | 50.00 | 50.00 | 50.00 | 50.00 | 50.00 | 300.00 |
| Attorney (privileged and confidential) | | | | | | | |
| Lease | 4314.34 | 4314.34 | 4314.34 | 4314.34 | 4314.34 | 4314.34 | 25886.04 |
| Insurance | 390.92 | 390.92 | 379.17 | 379.17 | 379.17 | 379.17 | 2298.52 |
| Employee Salary and Insurance | 5467.00 | 5527.00 | 5467.00 | 5467.00 | 5467.00 | 5467.00 | 32862.00 |
| ED Salary for Cell and Tissue Services | 2088.00 | 2088.00 | 2088.00 | 2088.00 | 2088.00 | 2088.00 | 12528.00 |
| Accountant | 162.50 | 162.50 | 162.50 | 162.50 | 162.50 | 162.50 | 975.00 |
| USC Parking for Employee | 67.00 | 67.00 | 67.00 | 30.25 | 32.00 | 69.25 | 332.50 |
| California Franchise Tax | 66.67 | 66.67 | 66.67 | 66.67 | 66.67 | 66.67 | 400.02 |
| PPLA Payments | 1125.00 | 1530.00 | 1980.00 | 1800.00 | 1350.00 | 1890.00 | 9675.00 |
| Materials/Reagents (estimated) | | | | | | | |
| Used for sample-preservation at clinic ($2.22) | 144.30 | 182.04 | 182.04 | 182.04 | 197.58 | 208.68 | 1096.68 |
| Used for cell-isolation to be shipped to researcher (e.g., cryogenic freezing) ($3.33) | 173.16 | 226.44 | 209.79 | 229.77 | 233.10 | 189.81 | 1262.07 |
| Used for isolation of cell-types | 468.00 | 695.32 | 841.04 | 128.00 | 435.39 | 809.80 | 3377.55 |
| Delivery and Shipping | 35.20 | 6.00 | 3.00 | 0.00 | 0.00 | 15.06 | 59.26 |
| Flow Cytometry Services | 0.00 | 0.00 | 230.00 | 0.00 | 0.00 | 690.00 | 920.00 |
| Core Services | | | | 20.00 | 1679.00 | 0.00 | 1699.00 |
| Committee Meeting Expenses | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Admin Supplies | 0.00 | 0.00 | 74.35 | 0.00 | 0.00 | 0.00 | 74.35 |
| Total (Monthly Expenses) | 14651.49 | 15373.68 | 16163.90 | 14978.59 | 16515.75 | 16449.28 | 94132.69 |

| FY 2014 REVENUE (cont'd) | Mar-14 | Apr-14 | May-14 | Jun-14 | Jul-14 | Aug-14 | Total |
|---|---|---|---|---|---|---|---|
| Revenue - Stem Cell Services | 9564.00 | 12909.00 | 12150.00 | 11816.00 | 15775.00 | 10157.50 | 72372 |
| Revenue - Additional Stem Cell Services | 0.00 | 0.00 | 3600.00 | 3900.00 | 3000.00 | 0.00 | 10500 |
| Total (Monthly Revenue) | 9564.00 | 12909.00 | 15750.00 | 15716.00 | 18775.00 | 10157.50 | 82871.50 |
| NET INCOME | -$5,087.49 | -$2,464.68 | -$413.90 | $737.41 | $2,259.25 | -$6,292.28 | -$40,250.34 |

Confidential - For production to House Energy and Commerce Only

NOVOEC-0000012

| FY 2015 | Sep-14 | Oct-14 | Nov-14 | Dec-14 | Jan-15 | Total |
|---|---|---|---|---|---|---|
| **EXPENSES** | | | | | | |
| WebEx | 59.65 | 49.00 | 49.00 | 49.00 | 49.00 | 255.65 |
| Basecamp | 50.00 | 50.00 | 50.00 | 50.00 | 50.00 | 250.00 |
| IT | 0.00 | 0.00 | 0.00 | 1440.00 | 0.00 | 1440.00 |
| Attorney (privileged and confidential) | | | | | | |
| Lease | 4314.34 | 4314.34 | 4314.34 | 4314.34 | 4314.34 | 21571.70 |
| Insurance | 379.17 | 379.17 | 379.17 | 379.17 | 379.17 | 1895.85 |
| Employee Salary and Insurance | 5804.78 | 5804.78 | 5804.78 | 5804.78 | 5874.22 | 29093.34 |
| ED Salary for Tissue and Cell Services | 2088.00 | 2088.00 | 2088.00 | 2088.00 | 2088.00 | 10440.00 |
| Accountant | 162.50 | 162.50 | 162.50 | 162.50 | 787.50 | 1437.50 |
| USC Parking | 96.75 | 82.25 | 65.75 | 55.25 | 83.00 | 383.00 |
| California Franchise Tax | 941.43 | 1602.12 | 0.00 | 0.00 | 0.00 | 2543.55 |
| PPLA Payments | 1215.00 | 1845.00 | 810.00 | 945.00 | 1620.00 | 6435.00 |
| Materials/Reagents | | | | | | |
| (Estimated Amount Used) | | | | | | |
| Used for sample-preservation at clinic ($2.22) | 175.38 | 188.70 | 117.66 | 104.34 | 241.98 | 828.06 |
| Used for cell-isolation to be shipped to researcher (e.g., cryogenic freezing) ($3.33) | 209.79 | 306.36 | 146.52 | 123.21 | 269.73 | 1055.61 |
| Used for isolation of cell-types | 246.90 | 738.89 | 630.27 | 222.09 | 939.62 | 2777.77 |
| Delivery and Shipping | 12.53 | 5.99 | 0.00 | 3.00 | 8.99 | 30.51 |
| Admin Supplies | 2.73 | 167.78 | 0.00 | 0.00 | 0.00 | 170.51 |
| Total (Monthly Expenses) | 15758.95 | 17784.88 | 14617.99 | 15740.68 | 16705.55 | 80608.05 |
| **REVENUE** | Sep-14 | Oct-14 | Nov-14 | Dec-14 | Jan-15 | Total |
| Revenue - Stem Cell Services | 11169.50 | 17385.00 | 9132.50 | 7632.50 | 15487.00 | 60806.50 |
| Revenue - Additional Stem Cell Services | 6800.00 | 3900.00 | 2500.00 | 2500.00 | 12500.00 | 28200.00 |
| Total (Monthly Revenue) | 17969.50 | 21285.00 | 11632.50 | 10132.50 | 27987.00 | 89006.50 |
| **NET INCOME** | $2,210.55 | $3,500.12 | $2,985.49 | $5,608.18 | $11,281.45 | |

Confidential - For production to House Energy and Commerce Only

NOVOEC-0000013

| FY 2015 EXPENSES (cont'd) | Feb-15 | Mar-15 | Apr-15 | May-15 | Jun-15 | Jul-15 | Total |
|---|---|---|---|---|---|---|---|
| WebEx | 64.30 | 65.00 | 49.00 | 0.00 | 61.00 | 0.00 | 239.30 |
| Basecamp | 50.00 | 50.00 | 50.00 | 50.00 | 50.00 | 50.00 | 300.00 |
| Attorney (privileged and confidential) | | | | | | | 0.00 |
| Lease | 4314.34 | 4314.34 | 4314.34 | 4314.34 | 4314.34 | 4314.34 | 25886.04 |
| Insurance | 379.17 | 379.17 | 379.17 | 359.16 | 359.16 | 359.16 | 2214.99 |
| Employee Salary and Insurance | 5874.22 | 6023.04 | 5874.22 | 5874.22 | 5874.22 | 5874.22 | 35594.14 |
| ED Salary for Tissue and Cell Services | 2088.00 | 2088.00 | 2088.00 | 2088.00 | 2088.00 | 2088.00 | 12528.00 |
| Accountant | 187.50 | 187.50 | 187.50 | 187.50 | 187.50 | 187.50 | 1125.00 |
| USC Parking | 81.00 | 111.25 | 70.25 | 84.75 | 74.25 | 71.50 | 493.00 |
| California Franchise Tax | 1650.28 | 800.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2450.28 |
| PPLA Payments | 1080.00 | 1710.00 | 1440.00 | 720.00 | 1125.00 | 270.00 | 6345.00 |
| Materials/Reagents (estimates) | | | | | | | 974.58 |
| Used for sample-preservation at clinic ($2.22) | 170.94 | 248.64 | 177.60 | 122.10 | 202.02 | 53.28 | 974.58 |
| Used for cell-isolation to be shipped to researcher (e.g., cryogenic freezing) ($3.33) | 173.16 | 246.42 | 206.46 | 129.87 | 78.33 | 69.93 | 904.17 |
| Used for isolation of cell-types | 932.18 | 1265.27 | 1050.00 | 0.00 | 0.00 | 10.00 | 3257.45 |
| Delivery and Shipping | 8.50 | 3.00 | -97.00 | 14.80 | 0.00 | 28.00 | -42.70 |
| Flow Cytometry Services | 127.50 | 63.75 | 0.00 | 0.00 | 0.00 | 0.00 | 191.25 |
| Committee Meeting Expenses | 0.00 | 0.00 | 70.00 | 0.00 | 0.00 | 0.00 | 70.00 |
| Admin Supplies | 0.00 | 152.45 | 0.00 | 152.55 | 0.00 | 0.00 | 305.00 |
| Total (Monthly Expenses) | 17181.09 | 17707.83 | 15859.54 | 14097.29 | 14413.82 | 13375.93 | 92635.50 |
| REVENUE | Feb-15 | Mar-15 | Apr-15 | May-15 | Jun-15 | Jul-15 | Total |
| Revenue - Stem Cell Services | 11859.50 | 17873.00 | 13987.50 | 9052.50 | 16043.50 | 4350.00 | 73166 |
| Revenue - Additional Stem Cell Services | 6650.00 | 0.00 | 3000.00 | 0.00 | 0.00 | 0.00 | 9650 |
| Total (Monthly Revenue) | 18509.50 | 17873.00 | 16987.50 | 9052.50 | 16043.50 | 4350.00 | 82816.00 |
| NET INCOME | $1,328.41 | $165.17 | $1,127.96 | $5,045.29 | $1,629.68 | $9,025.93 | |
| NET INCOME FY15 THRU JUNE 2015 | | | | | | | $1,421.05 |

Confidential - For production to House Energy and Commerce Only

NOVOEC-0000014

Exhibit 5.44

(affiliate name, address, and telephone number)

Client Information for Informed Consent

## DONATION OF BLOOD AND/OR ABORTED PREGNANCY TISSUE FOR MEDICAL RESEARCH, EDUCATION, OR TREATMENT

Research using the blood from pregnant women and tissue that has been aborted has been used to treat and find a cure for such diseases as diabetes, Parkinson's disease, Alzheimer's disease, cancer, and AIDS.

You can donate your blood and/or pregnancy tissue after an abortion. Before you give your consent, **read each of the following statements and initial the line to the right**. We will be happy to answer any questions you have.

Before I was shown this consent, I had already decided to have an abortion and signed a consent form for it.  _____

I agree to give my blood and/or the tissue from the abortion as a gift to be used for education, research, or treatment.  _____

I understand I have no control over who will get the donated blood and/or tissue or what it will be used for.  _____

I have not been told the name of any person who might get my donation.  _____

I understand there will be no changes to how or when my abortion is done in order to get my blood or the tissue.  _____

I understand I will not be paid.  _____

I understand that I don't have to give my blood or pregnancy tissue, and this will not affect my current or future care at _____ (affiliate name) _____  _____

Signature: _____  Date: _____

Witness: _____  Date: _____

PPFA *Manual of Medical Standards and Guidelines*
Confidential property of Planned Parenthood Federation of America, Inc.

**Confidential Proprietary Business Information**
**Produced Pursuant to House Confidentiality Rules**

PPFA-HOU_E&C-000031

Exhibit 5.45

# MEMORANDUM

TO: **AFFILIATE CHIEF EXECUTIVES**
**AFFILIATE MEDICAL DIRECTORS**
**PATIENT SERVICE DIRECTORS**

FROM: ███████████████, **Senior Director, Public Policy Litigation and Law**
███████████████ **Acting Vice President for Medical Affairs**
███████████████ **Vice President For Medical Services**

RE: **Federal Regulations for Aborted Pregnancy Tissue Donation Programs**

DATE: **April 4, 2001**

Among the enclosed standards is a new standard for "Aborted Pregnancy Tissue Donation Programs. This Memorandum is to supplement the standard by advising affiliates of the federal law relating to payment for participation in such programs, and to provide affiliates with two alternative approaches to assuring compliance with these laws.

A. An Overview of the Federal Law

Fetal tissue donation programs are governed by two federal laws, the National Organ Transplant Act (42 U.S.C. 274e) (NOTA) and the NIH Revitalization Act of 1993 (42 U.S.C. 289g-1 and 2) (NIHRA). These laws, particularly NIHRA, govern many aspects of fetal tissue donation programs, and the attached Standard addresses all of these issues that affect medical practice and clinical functions.

These laws also forbid the payment or receipt of valuable consideration for fetal tissue. However, they permit "reasonable payments associated with the transportation, implantation, processing, preservation, quality control, or storage" of fetal tissue. In addition, NOTA permits reasonable payments for the "removal" of fetal tissue when the research is supported by federal funds. (These laws do not affect a provider's ability to charge its normal and customary fee for the abortion.)

Confidential Proprietary Business Information
Produced Pursuant to House Confidentiality Rules

B. Assuring Compliance With Federal Law

Affiliates can choose one of two methods to comply with these laws.

1. One method would be to recover *no costs* associated with any aspect of participation in a fetal tissue donation program. This would mean that all staff time, clinic space, supplies, etc., would be donated by the affiliate, and the affiliate would receive no payments or in-kind services from the entity to whom the tissue is being donated.

2. The second method would be to employ an independent auditor to conduct a credible and good-faith analysis of the actual costs incurred *by the affiliate* in the transportation, implantation, processing, preservation, quality control, or storage of the fetal tissue and, if the research is supported by federal funds, for the removal of the fetal tissue. Under this method, affiliates must maintain careful records of actual tissue donations and of payments received from the researcher or the tissue-gathering entity. Affiliates must be able to demonstrate that the payments do not exceed the actual costs of the actual tissue donations.

Sometimes tissue-gathering entities offer to pay rent for space occupied by one of their employees who would be on-site at a clinic on a regular basis. If an affiliate determines to enter into such an arrangement, then the independent auditor would also conduct a credible and good-faith computation of the actual cost of the space occupied by the tissue-gathering entity employee, in order to determine the amount of rent to be paid by that entity.

PPFA accreditation reviews will confirm, in the same way as for any other Medical Standard, that one of these two methods has been employed by any affiliate that chooses to participate in an aborted pregnancy tissue donation program.

C. Compliance With State Laws

We remind affiliates that, in addition to the federal laws outlined above, there are laws in many states governing fetal tissue donation programs. Affiliates must take great care to assure compliance with those laws as well.

If you have questions about the federal statutes, feel free to call ▮▮▮▮▮▮ at: ▮▮▮▮▮▮▮.