UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PLANNED PARENTHOOD FEDERATION OF AMERICA, INC., et al., Plaintiffs, v. CENTER FOR MEDICAL PROGRESS, et al., Defendants. | Case No. 16-cv-00236-WHO (DMR) **ORDER ON DEFENDANTS' MOTION TO COMPEL** Re: Dkt. No. 358 |

Defendants Center for Medical Progress ("CMP"), BioMax Procurement Services, LLC ("BioMax"), David Daleiden, and Troy Newman move to compel Plaintiffs to respond to discovery.  [Docket No. 358.]  This matter is appropriate for resolution without oral argument.  Civ. L.R. 7-1(b).  For the following reasons, the motion is granted in part and denied in part.

## I.  BACKGROUND

### A.  Overview of Defendants' Motion

Plaintiffs are Planned Parenthood Federation of America, Inc. ("PPFA"), seven individual California Planned Parenthood affiliates, Planned Parenthood of the Rocky Mountains, Planned Parenthood Gulf Coast, and Planned Parenthood Center for Choice.  The court has described Plaintiffs' allegations in the operative complaint in detail in previous orders and does not repeat them here.  In this motion, Defendants move for an order compelling Plaintiffs to respond to 16 requests for production ("RFPs") and one interrogatory.[1]  Defendants' motion is divided into two parts.  In the first part of their motion, Defendants move to compel responses to 11 RFPs and one

---

[1] The discovery requests at issue are CMP's RFP Nos. 4, 8, 10, 11, 20-27, 48, 121, and 131; Newman's RFP No. 16; and Newman's interrogatory No. 8.  [Docket No. 358-1 (Defs.' Sep. Statement).]

interrogatory that seek information about Plaintiffs' compliance with federal law related to fetal tissue procurement and the federal partial-birth abortion ban. *See* 42 U.S.C. §§ 289g-1, 289g-2; 18 U.S.C. § 1531.

In the second part of their motion, Defendants move to compel Plaintiffs to respond to an additional five RFPs which seek documents that they claim are relevant to their California Penal Code section 633.5 defense to Plaintiffs' seventh and ninth claims for relief. Those claims allege that Defendants violated California Penal Code section 632, which prohibits intentional, non-consensual eavesdropping on or recording of confidential communications.[2]

Plaintiffs oppose the motion, arguing that Defendants are "attempt[ing] to use civil discovery as a Trojan horse to obtain confidential materials to which they otherwise have no access." Opp'n 1. They state that they have already produced responsive documents or confirmed the non-existence of documents for many of the categories of documents that Defendants seek. As to the remaining categories, Plaintiffs argue that Defendants seek irrelevant, burdensome and non-proportional, and/or confidential information.

### B.    Procedural History

In October 2018, Defendants filed an administrative motion for relief from the court's Standing Order on civil discovery, seeking leave to file a regularly-noticed, formal motion to compel discovery from Plaintiffs in lieu of a five-page joint letter. [Docket No. 326.] On October 24, 2018, the court granted the administrative motion and gave Defendants leave to file a duly noticed motion to compel in accordance with the Local Rules, subject to certain page limits. [Docket No. 331.]

Defendants filed a motion to compel on October 25, 2018, seeking to compel further responses to 30 RFPs and one interrogatory. [Docket No. 332.] Upon review of the briefing, on November 26, 2018, the court issued an order describing Defendants' motion as "confusing and convoluted" and identifying numerous material shortcomings. These deficiencies included

---

[2] Plaintiffs' seventh claim for relief is for violation of California Business & Professions Code section 17200, based in part on Defendants' alleged violations of California Penal Code section 632. Their ninth claim for relief is for violation of section 632.

Defendants' failure to address the specific relevance of any of the 31 discovery requests at issue; failure to comply with the Local Rules, including addressing "how the proportionality and other requirements of Fed. R. Civ. P. 26(b)(2) are satisfied"; introduction of new arguments on reply; and a "clear attempt" to skirt the page limits. [Docket No. 352 (Nov. 26, 2018 Order) (citing Civ. L.R. 37-2).] The court offered Defendants the opportunity to withdraw the motion and file a renewed motion that comported with the Local Rules and the court's orders, or to submit the matter for decision on the papers already filed. *Id*. On November 27, 2018, Defendants withdrew their motion. [Docket No. 353.] They filed the present motion on December 5, 2018.

## II.  LEGAL STANDARDS

Federal Rule of Civil Procedure 26 provides

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

Fed. R. Civ. P. 26(b)(1). "Information within this scope of discovery need not be admissible in evidence to be discoverable." *Id*. "Relevancy, for the purposes of discovery, is defined broadly, although it is not without ultimate and necessary boundaries." *Gonzales v. Google, Inc.*, 234 F.R.D. 674, 679-80 (N.D. Cal. 2006). The party seeking discovery has the initial burden of establishing that its request satisfies Rule 26(b)(1)'s relevancy requirement, *La. Pac. Corp. v. Money Mkt. 1 Institutional Inv. Dealer*, 285 F.R.D. 481, 485 (N.D. Cal. 2012), while "[t]he parties and the court have a collective responsibility to consider the proportionality of all discovery and consider it in resolving discovery disputes." Fed. R. Civ. P. 26, Advisory Committee Notes to 2015 Amendments, Subdivision (b)(1).

## III.  DISCUSSION

### A.  Procedural Deficiencies in Defendants' Motion

Defendants' renewed motion still does not comply with the Local Rules or the court's express instructions. The motion is in two parts, which Defendants confusingly describe as separate "motions." The first part seeks information "regarding Plaintiffs' fetal tissue

United States District Court
Northern District of California

procurement programs," and moves to compel further responses to 11 RFPs and one interrogatory. *Id*. at 1, 5-14. In the second part, Defendants move to compel further responses to five additional RFPs that they argue seek information relevant to their section 633.5 defense. *Id*. at 14-15.

Unfortunately, Defendants' motion specifically addresses the relevance of only three of the 17 discovery requests at issue, and even there, they do so in very general terms. *See* Mot. 6-7 (discussing RFP Nos. 10 (mislabeled as No. 9), 24, and 48).[3] They also mention RFP No. 25 in passing. *See id*. at 15. Defendants' motion is completely silent as to the relevance of any of the other 13 discovery requests for which they seek further responses. Furthermore, although Defendants' motion contains a section entitled "Proportionality Analysis," they do not address the factors listed in Rule 26(b)(1) with respect to any specific discovery request or grouping of discovery requests. *See id*. at 3-4.

CMP's RFP No. 4 illustrates Defendants' failure to provide a particularized discussion of relevance or proportionality, and its negative impact on the court's ability to analyze the issues and reach a determination. RFP No. 4 requests the following documents:

> Paragraph 45 of the FAC makes a factual allegation that PPFA affiliates obtained 'the full informed and separately obtained consent of the patient who has chosen to have an abortion . . .'
>
> Provide the following, from January 1, 2006, through the present:
>
> a. all such informed consent forms used at each of the Plaintiffs' facilities, or provided, recommended, or utilized by PPFA;
>
> b. all communications, other than attorney-client communications, concerning the creation, drafting, wording, revising, or editing these consent forms;
>
> c. all written policies and procedures at each of the Plaintiffs' facilities concerning obtaining patient consent, including but not limited to all pertinent sections of PPFA's Manual of Medical Standards and Guidelines, including any drafts or outdated versions.

[Docket No. 358-1 (Defs.' Separate Statement) 1.] Defendants narrowed this RFP to seek the following three categories of documents:

---

[3] Confusingly, Defendants discuss the relevance of RFP 24 in the first part of their motion, but identify this RFP as falling under the second part of the motion.

a. "From January 1, 2006, through the present all such informed consent forms used at each of the Plaintiffs' facilities, or provided, recommended, or utilized by PPFA"; and

b. "[a]ll written communications" between approximately 60 of Plaintiffs' custodians and nearly 20 "Fetal Tissue Company personnel" for the time period 2010 and July 13, 2015; and

c. "all documents in the Plaintiffs' custodians' email accounts containing the following 12 terms: 'StemExpress;' 'Stem-Ex;' 'Novogenix;' 'ABR;' 'DaVinci;' 'DV;' 'tissue procurement;' 'tissue program;' 'BioMax;' 'Perrin;' 'Larton;' and 'Dyer.'"

*Id*. at 1-2.[4]

For "narrowed" category (b), Defendants make no attempt to justify their request for "all written communications" between 80 individuals for a five-year period, unbounded by subject matter. Similarly, category (c) calls for emails from approximately 60 custodians for an unlimited time period. The court can only guess at the significance of the designated search terms in category (c), because Defendants provide no explanation. Indeed, these "narrowed" requests do not even appear to relate to RFP No. 4 as originally propounded. In sum, Defendants do not explain how the broad swaths of documents contemplated by categories (b) and (c) are relevant to the claims or defenses in the case, and if so, how each of these requests is "proportional to the needs of the case" considering the Rule 26(b)(1) factors.[5]

RFP No. 4 illustrates a fundamental problem that Defendants repeat with respect to the majority of the discovery requests that they purport to challenge in this motion. In the absence of Defendants' specific relevance and proportionality arguments, the court lacks sufficient information to analyze such requests under Rule 26. Defendants bear the burden of establishing that each request satisfies Rule 26(b)(1)'s relevancy requirement. *See La. Pac. Corp*., 285 F.R.D. at 485. Further, as the moving party, Defendant is required to "detail the basis for [its] contention that it is entitled to the requested discovery, including addressing "how the proportionality and

---

[4] Defendants repeat the same request for documents in categories (b) and (c) in CMP's RFP Nos. 8, 10, and 26 and Newman's RFP No. 16.

[5] Plaintiffs apparently produced some documents in response to narrowed category (a); the status of any remaining dispute regarding this category of documents is not clear from the parties' briefing.

United States District Court
Northern District of California

other requirements of Fed. R. Civ. P. 26(b)(2) are satisfied." Civ. L.R. 37-2. The court has no obligation to guess at Defendants' unstated relevance and proportionality arguments, especially where it has already given Defendants a second chance to move to compel further responses to this discovery and expressly ordered Defendants to comply with the Local Rules as well as court orders in any subsequent motion. Nov. 26, 2018 Order. Instead, Defendants repeat some of the same shortcomings that the court identified in Defendants' first motion. *See id.*

In sum, Defendants' renewed second chance motion does not comply with the Local Rules or the court's explicit instructions. Therefore, the court will consider the motion only as to those discovery requests for which Defendants provided a reasonably identifiable relevance argument in the motion—that is, CMP's RFP Nos. 10, 24, 25, and 48. In the interests of justice, the court will also consider CMP's RFP Nos. 8 and 23, Newman's RFP No. 16, and Newman's interrogatory No. 8, even though Defendants failed to specifically address them. Those requests can fairly be read to seek information that is connected with the other RFPs for which Defendants provided relevance arguments.[6] The motion is denied as to the remaining discovery requests due to Defendants' failure to provide adequate relevance and/or proportionality arguments, as well as their failure to follow the Local Rules and this court's prior order.

## B. Summary of Defendants' Relevance Arguments

In the FAC, Plaintiffs allege that Defendants engaged in a conspiracy to gain access to Planned Parenthood's conferences, offices, and doctors by using fake companies and fake identifications in order to surreptitiously videotape Planned Parenthood employees. They further allege that Defendants released a video "smear" campaign accusing Plaintiffs of engaging in a "criminal conspiracy to make money off of aborted baby parts" and "engag[ing] in 'illegal trafficking of aborted fetal parts.'" *See* FAC ¶ 125.

The court divides the discovery requests into two groups in order to track the parties'

---

[6] The court includes requests where they seek discovery that is clearly related to the requests at issue in the motion *and* where the parties provided sufficient information to enable the court to analyze the request. For example, the court does not include CMP's RFP No. 26. Although it appears to be related to CMP's RFP No. 8 and Newman's RFP No. 16, Defendants did not provide sufficient context for the requested information to allow the court to analyze the relevance and proportionality of the request.

primary relevance arguments in this particular motion.[7]  The first group involves discovery related to Defendants' assertion that Plaintiffs profited from the sale of fetal tissue in violation of federal law, which provides that it is "unlawful for any person to knowingly acquire, receive, or otherwise transfer any human fetal tissue for valuable consideration if the transfer affects interstate commerce."  42 U.S.C. § 289g-2(a).  "The term 'valuable consideration' does not include reasonable payments associated with the transportation, implantation, processing, preservation, quality control, or storage of human fetal tissue."  42 U.S.C. § 289g-2(e)(3).  According to Plaintiffs, four of 59 Planned Parenthood affiliates "facilitated their patients' donation of fetal tissue for research and accepted reasonable payments to reimburse for the costs incurred to facilitate such donations" as of July 2015, the date Defendants began releasing the videos at issue in this case.  [*See* Docket No. 258 at 4.]  These affiliates are Plaintiffs Planned Parenthood Mar Monte, Inc. ("PPMM"), Planned Parenthood Northern California ("PPNC"), Planned Parenthood Los Angeles ("PPLA"), and Planned Parenthood of the Pacific Southwest ("PPPSW").  *See id*. at 1.

As to this first group, Defendants argue that discovery into whether Plaintiffs profited from the sale of fetal tissue is relevant to Defendants' "substantial veracity" defense under the *Food Lion* cases, as well as to other affirmative defenses.  *See Food Lion, Inc. v. Capital Cities/ABC, Inc.*, 964 F. Supp. 956, 966 (M.D.N.C. 1997) ("*Food Lion I*") and *Food Lion, Inc. v. Capital Cities/ABC, Inc.*, 194 F.3d 505, 522 (4th Cir. 1999) ("*Food Lion II*").  They also argue that discovery regarding Plaintiffs' tissue procurement programs and practices is relevant to test Plaintiffs' express denial in the FAC that they did not violate the laws related to fetal tissue procurement.

The second group of discovery relates to Defendants' assertions about the procedures that

---

[7] The parties filed an earlier dispute in which Defendants moved to compel discovery that was also related to Plaintiffs' compliance with 42 U.S.C. § 289g-2(a).  [*See* Docket No. 258.]  There, Defendants presented different arguments to support their position than the ones they now offer; Plaintiffs' positions have also shifted somewhat between the earlier motion and this one.  For this reason, the court's analysis of each motion is different, even though both motions speak to related subject matter.

Plaintiffs used to obtain the fetal tissue that they purportedly sold for a profit, including the assertion that Plaintiffs violated the federal partial-birth abortion ban, 18 U.S.C. 1531.[8] As to the second group of requests, Defendants argue that they accused Plaintiffs not only of profiting from the sale of fetal tissue, but also modifying their abortion procedures in order to facilitate fetal tissue sales.[9] According to Defendants, such modifications included performing abortions by delivering intact fetuses instead of using digoxin or other feticides, which resulted in the delivery of "born-alive infants" and partial-birth abortions. Defendants argue that discovery regarding their assertions of this illegal conduct is relevant to their "substantial veracity" defense and other affirmative defenses. As with the first group of discovery requests, Defendants also argue that discovery regarding Plaintiffs' procedures to obtain fetal tissue is relevant to allegations in the FAC that Plaintiffs' fetal tissue donation programs were "in full compliance with all applicable federal and state law," and that Plaintiffs never engaged in unlawful activity. *See* FAC ¶¶ 45, 94.

As previously noted, the court divides the discovery requests into the two groups in order to correspond to the parties' arguments. The FAC alleges that Defendants used material they gathered through surreptitious infiltration and filming to create videos and engage in a "smear campaign" that portrayed Plaintiffs as having engaged in a "criminal conspiracy to make money off of aborted baby parts" and "illegal trafficking of aborted fetal parts." *See* FAC ¶ 125. The parties disagree about the scope of discovery relevant to the alleged smear suffered by Plaintiffs. Plaintiffs argue that, "viewed as a whole," Defendants' "message was that Planned Parenthood was engaged in a scheme to make money off of baby parts that 'reached to the very highest levels of their organization.'" According to Plaintiffs, *that* is the message of the smear campaign that Plaintiffs allege in the FAC. Opp'n 2 (citation omitted). Plaintiffs assert that the FAC does not

---

[8] 18 U.S.C. § 1531, the Partial-Birth Abortion Ban Act of 2003, defines the term "partial-birth abortion" and provides that any physician who "knowingly performs a partial-birth abortion" is subject to civil and criminal penalties. 18 U.S.C. § 1531(a).

[9] Under federal law, "human fetal tissue may be used only if the attending physician with respect to obtaining the tissue from the woman involved makes a statement" attesting to certain facts, including that "no alteration of the timing, method, or procedures use to terminate the pregnancy was made solely for the purposes of obtaining the tissue." 42 U.S.C. § 289(g)-1(b)(2)(A)(ii).

contain any allegation about Defendants' accusations about partial-birth abortion or live births, and Plaintiffs never intended to discuss Defendants' statements about those subjects. Using this framing of their lawsuit, Plaintiffs argue that any discovery into partial-birth abortions should be ruled out of bounds. Plaintiffs further argue that Defendants are attempting to use this discovery as "a means of continuing their effort to attack, delegitimize and defund Planned Parenthood by obtaining irrelevant information that they can then distort and misuse to launch further attacks" against Plaintiffs. *Id.* at 10-11.

For their part, Defendants argue that the assertions they made in their public campaign attacked Plaintiffs' entire fetal tissue process, which included the manner in which Plaintiffs obtained fetal tissue (i.e., through violations of the partial-birth abortion ban), as well as illegal profiteering through violations of the fetal tissue procurement laws. According to Defendants, the illegal conduct connected with obtaining fetal tissue was motivated by Plaintiffs' financial incentive associated with fetal tissue sales. Mot. 11-12.

The court now turns to the discovery requests in each of the two groups.

### C. Group One: Discovery Related to Plaintiffs' Fetal Tissue Procurement Programs

CMP's RFP No. 8, Newman's RFP No. 16, and Newman's Interrogatory No. 8 seek information related to the first group of requests, which is discovery related to Plaintiffs' adherence to the fetal tissue procurement laws.

#### 1. Description of CMP's RFP No. 8, Newman's RFP No. 16, and Newman's Interrogatory No. 8

CMP's RFP No. 8 asks Plaintiffs to produce "[a]ll of Plaintiffs' publications, advertisements, websites, documents, or electronically stored information concerning the procurement, or disposition, or donation of fetal tissue, specimens, 'products of conception,' and/or fetal remains from January 1, 2006, through the present." Separate Statement 5. Newman's RFP No. 16 asks for "[a]ll documents and tangible things pertaining to your fetal tissue donation or disposal policies and practices from January 1, 2006, to the present." *Id.* at 20. Plaintiffs objected to the requests on the grounds that they seek documents that are not relevant to the claims or defenses in this action and are disproportionate relative to the needs of the case; are

vague, ambiguous, overbroad, and unduly burdensome; and "seek[] Plaintiffs' information that is confidential, proprietary, private, or financial information." [Docket No. 375 (Pls.' Response to Separate Statement) 6-7, 24-25.] Plaintiffs refused to produce documents in response to CMP's RFP No. 8. *Id.* at 6-7. As to Newman's RFP No. 16, Plaintiffs referred Defendants to their response to CMP's RFP No. 9, which stated, "Plaintiffs will produce written policies and procedures of any of the Plaintiffs concerning fetal tissue donation from January 1, 2010 through July 15, 2015. *Id.* at 24-25.

Defendants state that they have narrowed both RFPs to the same eight categories of documents, as follows:

> a. All remaining contractual, billing, and policy documents from Plaintiff-affiliate fetal tissue donation programs.
>
> b. The notes, documents, and recordings from Roger Evans' presentation on fetal tissue programs at the PPFA National Conference on March 18, 2015 (including those in the custody and control of Plaintiff PPFA's Deborah Vanderhei and the Consortium of Abortion Providers).
>
> c. Advertisements given to Plaintiffs by fetal tissue procurement services (*e.g.,* the StemExpress advertisement endorsed by Plaintiff PPMM from the National Abortion Federation 2014 and 2015 annual meetings).
>
> d. Advertisements or notices by Plaintiffs to provide fetal tissue procurement or donation (*e.g.,* the Plaintiff PPGC Research Department services list).
>
> e. Dr. Lawrence Goldstein's lectures or speeches to Plaintiff PPPSW referenced in Congressional testimony.
>
> f. The PowerPoint concerning Novogenix presented to Plaintiff PPLA senior management team and Board of Directors, as described by Dr. Gatter in the September 2015 Congressional interview.
>
> g. Documents regarding the January 2011 PPFA Clinical Services call with affiliates about fetal tissue programs (referenced in the Senate Judiciary Committee report), and internal communications regarding the same.
>
> h. With respect to Plaintiffs' custodians and fetal tissue personnel identified above in Request for Production No. 4, all written communications from Plaintiffs' custodians with the Fetal Tissue Company personnel between 2010 and July 13, 2015, and all documents in the Plaintiffs' custodians' email accounts containing the following terms: "StemExpress;" "Stem-Ex;" "Novogenix;" "ABR;" "DaVinci;" "DV;" "tissue procurement;" "tissue program;"

"BioMax;" "Perrin;" "Larton;" and "Dyer."

Defs.' Separate Statement 5-6, 20-22.[10]

In their response to the separate statement, Plaintiffs state that they have produced or will produce responsive documents, or have confirmed the non-existence of responsive documents in their possession, for categories (a), (b), (d), (e), and (f).  Pls.' Resp. to Separate Statement 8-9. Defendants objected to Plaintiffs' response to the separate statement as containing "improper argument and explanation," pointing to the court's previous order regarding improprieties in Defendants' separate statement and "reply separate statement."  Reply 2 (citing Nov. 26, 2018 Order).  They ask the court to strike Plaintiffs' submission and sanction Plaintiffs.  *Id.*

The Local Rules provide that "[i]n addition to complying with applicable provisions of Civil L.R. 7, a motion to compel further responses to discovery requests must set forth each request in full, followed immediately by the objections and/or responses thereto."  Civ. L.R. 37-2. The purpose of a separate statement setting forth disputed discovery is to enable the court to understand which discovery requests are at issue, as well as the responding party's objections and responses thereto.  If a propounding party has narrowed a request, the separate statement should set out the revised version of the request and the responding party's response to it so that the court can evaluate the request as narrowed.  In this case, Plaintiffs provided factual statements in response to some of Defendants' narrowed requests, such as "Plaintiffs do not have responsive documents."  *See* Pls.' Response to Separate Statement 9.  Such factual assertions set forth Plaintiffs' current response.  They are not improper argument and the court may properly consider them.  The court denies Defendants' request to strike the statement and sanction Plaintiffs.[11]

---

[10] Plaintiffs do not dispute that the narrowed versions of Newman's RFP No. 16 and CMP's RFP No. 8 seek the same documents.

[11] Both parties attempted to skirt the court-ordered page limits by including argument in their supporting declarations and/or statements.  For example, the December 5, 2018 Trissell declaration again is "replete with legal argument in violation of Civil Local Rule 7-5(b)," even though the court specifically identified this problem with Defendants' first motion in its November 26, 2018 order.  [*See* Docket No. 358-4 (Trissell Decl., Dec. 5, 2018).]  Plaintiffs also included argument in their response to Defendants' separate statement.  In the interest of reaching decisions on the merits, the court has considered some of the parties' arguments in these submissions, even though the parties should have included them in their briefs.  The court is confident that the issues could have been fully and cogently presented within the rules and page limits.

As to category (a), which calls for "contractual, billing, and policy documents" related to Plaintiffs' fetal tissue donation programs, Plaintiffs state that they completed their production of responsive documents and "have no further documents to produce for this request." Pl.'s Resp. to Separate Statement 8. Although defense counsel makes a general statement in his declaration that "Plaintiffs have actually produced very little regarding their involvement in fetal tissue transfers," Defendants do not directly dispute the veracity of Plaintiffs' response to this request. *See* Trissell Decl. ¶ 3. Instead, Defendants essentially argue that Plaintiffs' document production is inadequate to show what Defendants want it to show, namely, a way to directly compute the amounts that affiliates received through fetal tissue procurement programs, and the amount of Plaintiffs' allowable costs for such programs. *See id*. at ¶ 5. This argument does not refute Plaintiffs' statement about the completeness of their production. Nevertheless, Defendants are entitled to rely on Plaintiffs' representation that their production is complete. Therefore, Plaintiffs shall amend their responses to state that they have now produced all documents responsive to category (a) in their possession, custody, or control.

Similarly, Plaintiffs assert that they either "do not have responsive documents" or "have agreed to produce the one responsive document in their possession" as to categories (b), (d), (e), and (f). Pl.'s Resp. to Separate Statement 8-9. Defendants do not directly dispute Plaintiffs' assertions. Plaintiffs shall amend the specific responses to state, as applicable, that they have produced all responsive documents in their possession, custody, or control, or that they have no responsive documents.

For category (g), which calls for documents regarding a "January 2011 PPFA Clinical Services call with affiliates about fetal tissue programs" and "internal communications regarding the same," Plaintiffs' final position is that this is "a new request," and that "[t]here is no such pending request." *Id*. at 9. In a June 26, 2018 meet and confer letter, Plaintiffs' counsel took the position that the request does not "fit within any of the existing requests despite their breadth." [Docket No. 376 (Bomse Decl., Dec. 19, 2018) ¶ 7, Ex. E.] However, RFP No. 8 is broadly written to request all of Plaintiffs' documents or electronically stored information concerning "the procurement, or disposition, or donation of fetal tissue." A request for documents regarding a

"PPFA call with affiliates about fetal tissue programs" that took place two years before Defendants allegedly formed CMP appears to fall within the scope of the RFP as written. However, Defendants did not respond to Plaintiffs' position, and made no attempt to explain the specific relevance or proportionality of this category of documents. Defendants' motion is therefore denied as to category (g).

Category (h) is facially overbroad, as it calls for "all written communications" for an over five-year period between 80 individuals, as well as documents from 60 custodians' email accounts unbounded by any relevant time period.[12] Defendants do not discuss the specific relevance or proportionality of the documents requested in that category, which they admit "was intended to be a catch-all request for all documents relating to Plaintiffs' fetal tissue transfer programs." Defs.' Separate Statement 6 n.5. The motion to compel is therefore denied as to that category of documents.

Therefore, the remaining dispute for CMP's RFP No. 8 and Newman's RFP No. 16 is category (c), "[a]dvertisements given to Plaintiffs by fetal tissue procurement services (*e.g.,* the StemExpress advertisement endorsed by Plaintiff PPMM from the National Abortion Federation 2014 and 2015 annual meetings)."

Newman's interrogatory No. 8 also seeks information related to fetal tissue procurement. It states, "[i]dentify each person that was employed by you, or volunteered for you, who was responsible for compliance with fetal tissue donation and disposal laws and regulations from January 1, 2006, to the present." Separate Statement 25. Plaintiffs objected that the interrogatory seeks irrelevant information that is disproportionate; is vague, ambiguous, overbroad, and unduly burdensome; and seeks confidential, proprietary, private, or financial information. They provided the following response:

> Executive staff and/or senior management including general counsel and/or compliance officers and medical directors or associate medical directors are responsible for compliance with laws and regulations governing provision of medical services, including fetal tissue donation programs, at those Plaintiff-Affiliates that maintain such programs.

---

[12] CMP's RFP No. 8, category (h), is identical to CMP's RFP No. 4, categories (b) and (c), which is discussed above.

*Id*. at 26. Plaintiffs did not identify any specific individuals by name or affiliate.

### 2.    Analysis

Defendants assert that discovery that could support the truthfulness of the public assertions that Defendants made about Plaintiffs is relevant to their "substantial veracity defense" under the *Food Lion* cases, because Plaintiffs seek defamation-type damages stemming from those assertions. *Id*. at 5, 8-10; Reply 1. Defendants' argument on this point is not a model of clarity, but appears to be as follows: Plaintiffs seek to recover reputational or publication damages resulting from Defendants' assertions that Plaintiffs were "engaging in a criminal conspiracy to make money off of aborted baby parts" and "engage[d] in 'illegal trafficking of aborted fetal parts,'" even though they have not pleaded a defamation claim. *See* Mot. 9. According to Defendants, under both *Food Lion I* and *Food Lion II*, in order to claim damages resulting from Defendants' assertions about Plaintiffs, Plaintiffs must either bring a defamation claim and satisfy the stricter First Amendment standards applicable to such a claim,[13] or the court must instruct the jury that the claims in Defendants' videos are assumed to be true for all purposes. If the court does not rule that Defendants' public statements about Plaintiffs' illegal acts must be accepted as true, then Defendants argue that they are entitled to present evidence to the jury establishing that their statements about Plaintiffs "were substantially true," in order to defeat Plaintiffs' claim for publication damages. Mot. 9-10. Defendants argue that discovery regarding the truthfulness of their assertions about Plaintiffs is therefore relevant to that inquiry. *Id*.

Plaintiffs dispute the basic premise of Defendants' argument, arguing that neither of the *Food Lion* decisions stand for the proposition offered by Defendants. Opp'n 9.

In *Food Lion*, television reporters went undercover to obtain footage of the plaintiff grocery store's food handling practices and "secretly videotaped what appeared to be unwholesome food handling practices." *Food Lion II*, 194 F.3d at 510. Defendant ABC later

---

[13] Where a plaintiff is a public figure, he or she "cannot recover [for defamation] unless he proves by clear and convincing evidence that the defendant published the defamatory statement with actual malice, i.e., with 'knowledge that it was false or with reckless disregard of whether it was false or not.'" *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 510 (1991) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964)).

broadcast the footage on the program *Prime Time Live*. The plaintiff sought to recover damages for lost profits, lost sales, and other losses that it labeled "publication damages," claiming that such damages were attributable to the defendants' fraud, trespass, and other state law violations. *Food Lion I*, 964 F. Supp. at 958-59. Following a jury verdict for the plaintiff in the liability phase of the trial, the court ruled on the issue of whether the plaintiff would be permitted to present proof of its publication damages. *Id*. at 958. The court noted that "[f]or the purposes of this opinion and this case, it is assumed that the content of the *Prime Time Live* broadcast about Food Lion was true," as the plaintiff had not challenged the content of the broadcast by bringing a defamation claim. *Id*. at 959. The court held that the plaintiff could not present proof of publication damages because it could not show that the defendants' tortious activities, including fraud and trespass, were the legal cause of those damages. *Id*. at 962-63. Instead, "Food Lion's lost sales and profits were the direct result of diminished consumer confidence in the store." *Id*. at 963.

The Fourth Circuit affirmed the district court's decision on First Amendment grounds in *Food Lion II*. The court explained that "Food Lion attempted to avoid the First Amendment limitations on defamation claims by seeking publication damages under non-reputational tort claims, while holding to the normal state law proof standards for these torts. This is precluded by *Hustler Magazine v. Falwell*, 485 U.S. 46, 108 S. Ct. 876, 99 L.Ed.2d 41 (1988)." *Food Lion II*, 194 F.3d at 522. The court rejected the plaintiff's effort "to recover defamation-type damages under non-reputational tort claims, without satisfying the stricter (First Amendment) standards of a defamation claim." *Id*.

As an initial matter, this court only presides over discovery in this case; Defendants must direct any argument about jury instructions to the trial judge. As to the discovery dispute, the *Food Lion* cases have limited bearing in light of the information submitted to the court after the parties' briefing on this motion was complete. On January 3, 2019, in connection with a separate discovery dispute, the court ordered Plaintiffs to submit a "clear and specific articulation of the categories of damages that Plaintiffs are and are not seeking" in this litigation. [Docket No. 409.] Plaintiffs timely filed the requested statement, in which they represent that they "are not seeking

reputational damages such as loss of good will or loss of revenue," and that "no plaintiff seeks to recover lost revenue or profits as a result of any negative impact on Plaintiffs' reputation." [Docket No. 420 (Pls.' Damages Statement).] According to Plaintiffs, "[i]n the aftermath of the videos, Planned Parenthood saw a nine-fold spike in security incidents nationally" and that these incidents "necessitated increased protection." *Id.* Further, they state that Defendants' "three-year infiltration of private spaces . . . and public exposure of doctors who were named and identified by location left all Planned Parenthood staff feeling . . . threatened and vulnerable," resulting in damages related to short term security costs, conference and health center security improvements, and property damage. They also seek damages related to the costs one affiliate incurred in responding to state investigations. *Id*.

Defendants' sole argument that the requested discovery is relevant to their substantial veracity defense is based on Plaintiffs' purported claim for reputational damages. As Plaintiffs have conceded that they are not seeking reputational damages, Defendants have not shown that they are entitled to the requested discovery on this basis.

Defendants also argue that the requested discovery is relevant to test Plaintiffs' allegation in the FAC that they have not engaged in unlawful activity related to fetal tissue procurement. The FAC contains the following statement: "Planned Parenthood affiliates who have facilitated fetal tissue donation programs have done so in full compliance with all applicable federal and state law" (FAC ¶ 45). In response, Plaintiffs assert that they "have already produced documents and information relevant to proving and testing their claim that Defendants' [sic] falsely accused Planned Parenthood of a massive, organization-wide scheme to profit from 'sale' of fetal tissue." Opp'n 6. According to Plaintiffs, they have "produced thousands of pages that pertain to Defendants' false claim that Planned Parenthood was engaged in a profit-driven scheme to sell fetal tissue, including invoices, contracts, policies and communications between Plaintiffs' staff and" Defendant BioMax. *Id*. at 2. Plaintiffs' position is that they have produced sufficient documents and information relevant to their claim that they complied with the fetal tissue procurement laws. In so doing, Plaintiffs tacitly concede that the discovery is at least somewhat relevant. They object to further discovery on the ground that Defendants should not be allowed to

United States District Court
Northern District of California

use discovery as a means of continuing their attack on Planned Parenthood "by obtaining irrelevant information that they can then distort and misuse to launch further attacks." *Id.* at 10.

Therefore, the issue before the court is whether Defendants' request for discovery regarding Plaintiffs' fetal tissue procurement programs, beyond what Plaintiffs have already produced, is proportional.

As discussed above, the only remaining category of documents responsive to CMP's RFP No. 8 and Newman's RFP No. 16 at issue is category (c), "[a]dvertisements given to Plaintiffs by fetal tissue procurement services (*e.g.,* the StemExpress advertisement endorsed by Plaintiff PPMM from the National Abortion Federation 2014 and 2015 annual meetings)." Advertisements by fetal tissue procurement services are relevant because Plaintiffs' fetal tissue procurement programs are at issue in this case, but the request is overbroad because it is not limited to the companies that entered into agreements with the four affiliates with fetal tissue procurement programs. The request is also overbroad to the extent that it is unbounded as to time. Neither party addresses this request in the moving papers, and the importance of this discovery "in resolving the issues" is not clear. *See* Fed. R. Civ. P. 26(b)(1). However, Plaintiffs do not argue that responding to the request would be burdensome. They also do not contend that they do not have such advertisements in their possession, custody, or control. In the absence of a showing that producing such documents would impose an undue burden, the court now orders Plaintiffs to produce responsive documents for the time period January 1, 2011, which is two years before Defendants' alleged infiltration began, to July 15, 2015, the date Defendants released their first videos about Plaintiffs. Defendants have not explained how documents created after July 15, 2015 are relevant to the claims or defenses in this case. Plaintiffs' response shall be further limited to advertisements by fetal tissue procurement services with whom PPMM, PPNC, PPLA, and PPPSW entered into agreements to supply fetal tissue.

Newman's interrogatory No. 8 asks Plaintiffs to identify the persons "responsible for compliance with fetal tissue donation and disposal laws and regulations from January 1, 2006, to the present." Plaintiffs' response identified only titles of individuals, such as executive staff, senior management, compliance officers, and medical directors or associate medical directors.

17

United States District Court
Northern District of California

The identity of individuals responsible for compliance with fetal tissue donation laws and regulations is relevant and discoverable as to the four affiliates that participated in fetal tissue donation programs during the relevant time period. Plaintiffs have not explained how identifying the relevant individuals for those four affiliates would be burdensome or disproportionate to the needs of the case. Concerns about the privacy or security of those individuals shall be addressed through use of the protective order. Therefore, Defendants' motion to compel a further response to this interrogatory is granted in part.[14] Plaintiffs shall identify the names of those individuals responsible for fetal tissue donation laws and regulations at the four affiliates (PPMM, PPNC, PPLA, and PPPSW), and shall limit their response to the time period January 1, 2011 to July 15, 2015.[15]

**D.     Group Two: Discovery Related to Procedures Used to Obtain Fetal Tissue**

Defendants' make overlapping relevance arguments as to CMP's RFP Nos. 10, 24, and 48, so the court discusses these three RFPs together, along with RFP No. 23, which seeks related documents. The court discusses CMP's RFP No. 25 on its own, because Defendants make a separate relevance argument in support of that request.

**1.   CMP's RFP Nos. 10, 23, 24, and 48**

**a.      Description of the RFPs**

CMP's RFP Nos. 10, 23, 24, and 48 are as follows:

- RFP No. 10: "[a]ll documents or electronically stored information and communications of any kind from January 1, 2006, through the present concerning the use of digoxin or any other feticides in abortion procedures."

- RFP No. 23: "[a]ll documents or electronically stored information regarding

---

[14] The parties do not explain the significance of fetal tissue "disposal laws and regulations," and whether that phrase refers to something other than 42 U.S.C. § 289g-2. To the extent Defendants seek discovery about fetal tissue disposal practices as separate from those relating to fetal tissue donation, they have not explained the relevance of such discovery to the claims and defenses in this case.

[15] As the court concludes that the discovery at issue in group one is relevant to Plaintiffs' claims, it does not reach Defendants' remaining relevance arguments as to that group of requests.

Plaintiffs' modifying abortion procedures in order to facilitate the donation of fetal tissue."

- RFP No. 24: "[a]ll documents or electronically stored information regarding inadvertent live births at Plaintiffs' facilities in the course of or following abortion procedures."

- RFP No. 48: "[a]ll documents or electronically stored information relating to compliance with the federal Partial Birth Abortion Ban Act of 2003 (18 U.S.C. § 1531) including but not limited to protocols or forms for documenting compliance with the federal law and documenting the provider's intent when performing an abortion procedure."

Defs.' Separate Statement 8, 12, 20, 33. Plaintiffs made a number of objections to the original requests, including that they seek documents that are not relevant to the claims or defenses in this action; are vague, ambiguous, overbroad, and unduly burdensome; and "seek[] Plaintiffs' information that is confidential, proprietary, private, or financial information." Defs.' Separate Statement 8-9, 12, 16-17, 33-34. Plaintiffs refused to produce documents responsive to the original requests.

Defendants then narrowed three of the four RFPs as follows:

- RFP No. 10:

    a. PPFA's Manual of Medical Standards & Guidelines policies, for 2010-present, regarding use of digoxin or other feticides; (2) all analogous policies from the PPFA Intranet concerning use of digoxin or other feticides; and (3) all corresponding affiliate policies for each Plaintiff-affiliate concerning use of digoxin or other feticides.

    b. With respect to Plaintiffs' custodians and fetal tissue personnel identified above in Request for Production No. 4, all written communications from Plaintiffs' custodians with the Fetal Tissue Company personnel between 2010 and July 13, 2015, and all documents in the Plaintiffs' custodians' email accounts containing the following terms: "StemExpress;" "Stem-Ex;" "Novogenix;" "ABR;" "DaVinci;" "DV;" "tissue procurement;" "tissue program;" "BioMax;" "Perrin;" "Larton;" and "Dyer."

- RFP No. 24:

    a. All records or summaries (which may be appropriately redacted) of abortion cases involving an intact procedure, fetal expulsion, or transient fetal survival, for Plaintiffs PPLA, PPPSW, PPOSBC,

19

PPGC, and PPCFC.

b. [(1)] PPFA's Manual of Medical Standards & Guidelines policies, for 2010-present, regarding mechanical vacuum aspiration; (2) all analogous policies from the PPFA Intranet concerning mechanical vacuum aspiration; and (3) all corresponding affiliate policies for each Plaintiff-affiliate concerning mechanical vacuum aspiration.

c. [(1)] PPFA's Manual of Medical Standards & Guidelines policies, for 2010-present, regarding management/prevention of transient fetal survival/out-of-center deliveries, and 2nd trimester and later abortion care, particularly cervical preparation, and use of D&E vs. induction; (2) all analogous policies from the PPFA Intranet concerning management/prevention of transient fetal survival/out-of-center deliveries, and 2nd trimester and later abortion care, particularly cervical preparation, and use of D&E vs. induction; and (3) all corresponding affiliate policies for each Plaintiff-affiliate concerning management/prevention of transient fetal survival/out-of-center deliveries, and 2nd trimester and later abortion care, particularly cervical preparation, and use of D&E vs. induction.

- RFP No. 48:

[(1)] PPFA's Manual of Medical Standards & Guidelines policies, for 2010-present, regarding compliance with the partial-birth abortion law; (2) all analogous policies from the PPFA Intranet concerning compliance with the partial-birth abortion law; and (3) all corresponding affiliate policies for each Plaintiff-affiliate concerning compliance with the partial-birth abortion law.

*Id*. at 8, 16, 33.

### b. Defendants' Relevance Arguments

Defendants generally argue that discovery regarding the truthfulness of their accusations about Plaintiffs is relevant to their affirmative defenses, as well as to their ability to test Plaintiffs' allegation in the FAC that they did not engage in unlawful activity.

Defendants also make specific relevance arguments as to portions of RFP Nos. 10, 24, and 48. RFP No. 10 category (a) calls for Plaintiffs' policies regarding the use of digoxin or any other feticides in abortion procedures. Defendants argue that even though the FAC does not focus on this, Defendants' public campaign accused Plaintiffs of obtaining fetal tissue in a manner that violated the law in order to maximize Plaintiffs' opportunity to make money through sale of the fetal tissue:

Defendants' fourth, eighth, and eleventh press releases discuss the two basic means of ensuring fetal demise in an abortion: dismemberment and poison. They further discuss how fetal tissue

20

> that has been poisoned cannot be harvested, and point out that, since the subjects of those press releases offer to deliver intact fetuses that were not poisoned, the fetuses they are delivering may be born-alive infants. Plaintiffs' policies regarding feticidal poisons will shed light on Defendants' (and a whistleblower's) claims that the perverse incentives here led to Plaintiffs delivering born-alive infants to companies for sale of their body parts.

Mot. 6 (internal citations omitted).

Defendants make similar relevance arguments in support of RFP No. 24:

> Defendants' fourth, fifth, seventh, and ninth press releases discuss intact fetuses generally. In one, a whistleblower named Holly O'Donnell stated that she was instructed to procure tissue from a born-alive infant. In another, a separate fetal tissue procurement technician discussed how a fetus "just fell out." Living fetuses that "f[a]ll out" are born-alive infants. Thus, Defendants publicly claimed that Plaintiffs engage in murder or manslaughter to facilitate their fetal tissue transfer programs. The requested policies on "transient fetal survival" and viable "second-trimester abortion[s]" will shed light on the veracity of Defendants' claims.

Mot. 6 (internal citations omitted).

As to policies concerning "mechanical vacuum aspiration," (RFP No. 24(b)), Defendants assert that discovery into Plaintiffs' procedures for obtaining fetal tissue will shed light on Plaintiffs' financial incentives for using certain procedures:

> Defendants' second press release highlighted one abortion provider's offer to use a "less crunchy" technique—mechanical vacuum aspiration—to procure fetal tissue. The doctor stated that by using mechanical vacuum aspiration, she would be increasing the length of, and the pain of, the abortion procedure but that she may be willing to do so anyway. Plaintiffs' policies regarding mechanical vacuum aspiration, and when it is appropriate to use it, would shed light on the profit incentive which would motivate a doctor to switch to that procedure even if it is not ideal for the patient.

*Id*. at 7.

With respect to RFP No. 24(a), which seeks records or summaries of abortion cases involving an intact procedure, fetal expulsion, or transient fetal survival for PPLA and four affiliates, Defendants state that they learned in their investigation "that intact fetal cadavers are more valuable." *Id*. Since "Plaintiffs were paid per organ," Defendants assert that "an analysis of the total number of intact fetuses would reveal information about Plaintiffs' profit potential." *Id*. Such information could also corroborate Defendants' accusations that Plaintiffs illegally modified their procedures to extract "born-alive infants, and then kill[ed] them" in order to sell their

cadavers. *Id.* at 7-8.

Finally, with respect to RFP No. 48, which seeks documents relating to compliance with the ban on partial birth abortions, Defendants argue:

> Defendants' first and last press releases state that Plaintiffs have a cavalier approach to compliance with the partial-birth abortion ban, such that Plaintiffs had no problem violating it for the purpose of facilitating fetal tissue sales. Plaintiffs' policies regarding the ban will shed light on the veracity of Defendants' public statements, as well as Plaintiffs' denials of those statements.

Mot. 6 (internal citations omitted).

In sum, Defendants' relevance argument in support of these four RFPs appears to be as follows: In their press releases, Defendants made numerous public assertions about Plaintiffs' violations of federal law, including that Plaintiffs modified abortion procedures in order to facilitate fetal tissue donation. According to Defendants, such modifications included performing abortions by delivering "intact fetuses" instead of using digoxin or other feticides, which resulted in the delivery of "born-alive infants" and thus violations of the partial-birth abortion ban. Defendants assert that they should be allowed to obtain discovery to test Plaintiffs' claim in the FAC that they did not engage in unlawful behavior.

### c. Analysis

To begin with, Defendants do not discuss the specific relevance or proportionality of the documents requested in CMP's RFP No. 10 category (b), which incorporates language from CMP's RFP No. 4, which names 60 custodians who communicated with 20 employees of third party companies. As discussed above in connection with CMP's RFPs No. 4 categories (b) and (c), and RFP No. 8 category (h), this is overbroad and unduly burdensome on its face. Accordingly, the motion to compel is denied as to CMP RFP No. 10 category (b).

As to the remaining requests, Defendants argue that discovery regarding the truthfulness of their accusations about Plaintiffs' procedures to obtain fetal tissue is relevant to their affirmative defenses, including their substantial veracity defense, as well as their defenses based on proximate causation, unclean hands, and public policy. They also argue that the requested discovery is relevant to impeachment, and to testing Plaintiffs' allegation in the FAC that they did not engage

22

in unlawful activity.

The court begins by addressing Defendants' argument that the discovery is relevant to their substantial veracity defense. This is based on the theory that Plaintiffs are attempting to seek reputational or publication damages resulting from Defendants' public statements about Plaintiffs without satisfying the strict First Amendment standards applicable to defamation claims. As already discussed, Plaintiffs do not seek reputational or publication damages. Accordingly, Defendants have not shown that the requested discovery is relevant to their substantial veracity defense.

Defendants next argue that because the FAC contains a blanket denial of unlawful activity related to Plaintiffs' fetal tissue procurement programs, Defendants are entitled to discovery to test that allegation. With respect to this argument, as previously discussed, the parties each frame the case differently to support their respective positions. For their part, Plaintiffs object to any discovery regarding procedures to obtain fetal tissue. They emphasize the fact that the FAC contains no allegations about being smeared by Defendants' statements about partial-birth abortion or "born alive" infants. Plaintiffs argue that they were injured as a result of Defendants' "smear" regarding their fetal tissue procurement programs, and that any discovery beyond fetal tissue procurement and into methods for obtaining fetal tissue is irrelevant. Opp'n 2. Plaintiffs argue that Defendants are trying to use discovery in this lawsuit as an illegitimate means to continue their longstanding efforts to "attack, delegitimize and defund Planned Parenthood by obtaining irrelevant information" that Defendants can then use "to launch further attacks" against Plaintiffs. *Id*. at 10. They ask the court to reject Defendants' attempt to use "the defense that their smear campaign was substantially true into the legal equivalent of a skeleton key" to access Plaintiffs' confidential documents. *Id*. at 10-11.

Defendants concede that the FAC is silent as to Defendants' public statements about Plaintiffs' alleged violations of the partial-birth abortion ban. Nevertheless they argue that their accusations about how Plaintiffs obtained fetal tissue are part of their overall assertion that Plaintiffs were engaged in a criminal conspiracy to illegally profit from the sale of aborted body parts. *See* FAC ¶ 125. Defendants argue that the accusations about how Plaintiffs illegally

obtained fetal tissue were key to the overall message that Plaintiffs committed unlawful activity in order to facilitate their profiteering from the sale of fetal tissue. Mot. 11-12.

The irony of these positions is not lost on the court. Plaintiffs argue that they suffered a limited smear, which should result in limited discovery; Defendants argue that they allegedly smeared Plaintiffs in a much broader way, which justifies broader discovery. On the one hand, Plaintiffs' description of the "smear" is unduly truncated. The FAC alleges the following:

> Defendants accompanied each video with a press release featuring outrageous accusations such as assertions that Planned Parenthood engages in "illegal trafficking of aborted fetal parts," "Planned Parenthood's criminal conspiracy to make money off of aborted baby parts reaches to the very highest levels of their organization," and that Planned Parenthood had committed "atrocities against humanity." On information and belief, these statements were specifically intended to motivate anti-abortion extremists to take action – violent, harassing, or otherwise – against Plaintiffs, their clinics, and their staff.

FAC ¶ 125. Although Plaintiffs may have carefully limited the allegations in the FAC to avoid discussing Defendants' accusations about the procedures to obtain fetal tissue, it is artificial to limit the "smear" described in paragraph 125 of the FAC to violation of the fetal tissue procurement laws.

However, this does not mean that Defendants should be given carte blanche discovery into Plaintiffs' procedures in obtaining fetal tissue for which they received reimbursement funds. Permitting broad discovery here would create a perverse outcome by inviting future defendants in similar cases to make broad accusations in order to justify greater access to sensitive information through the litigation process. Discovery in this case poses special concerns, especially given its political backdrop. Plaintiffs have expressed concern that Defendants are attempting to use this discovery as a way to continue their efforts to "delegitimize and defund Planned Parenthood by obtaining irrelevant information that they can then distort and misuse to launch further attacks" against Plaintiffs. Opp'n 10. Plaintiffs' concern about potential misuse is not unfounded, especially in light of the fact that Judge Orrick previously found Defendant Daleiden in civil contempt for disseminating information that he had been enjoined from publishing or otherwise disclosing to any third party in the related case, *National Abortion Federation v. Center for*

*Medical Progress. See Nat'l Abortion Fed'n v. Ctr. for Med. Progress*, No. 15-CV-03522-WHO, 2017 WL 3021024 (N.D. Cal. July 17, 2017).  With these concerns in mind, the court concludes that Plaintiffs' use of digoxin and other feticides, compliance with the partial-birth abortion ban, and abortion techniques are at least somewhat relevant to issues that may be presented at trial. Defendants' publicity campaign accused Plaintiffs of obtaining and selling fetal tissue in an illegal manner.  Plaintiffs allege that they have not violated the laws governing these practices.  For this reason, Defendants should be allowed to test that allegation to some degree.  However, on this record, the court concludes that Defendants have not established their entitlement to broad discovery into these topics.  Even as narrowed, the court finds that the discovery requests in this group are overbroad and disproportionate to the needs of the case.  Moreover, Plaintiffs have already produced invoices for fetal tissue reimbursement for the four affiliates, fetal tissue procurement contracts, and portions of their Manual of Medical Standards & Guidelines governing "Programs for Donation of Blood and/or Aborted Pregnancy Tissue."  *See* Trissell Decl. Ex. 17. Therefore, Defendants' motion to compel further responses to CMP's RFP Nos. 10, 23, 24, and 48 is granted in part and denied in part as follows:

RFP No. 10(a): Defendants' request for PPFA's Manual of Medical Standards & Guidelines policies, for 2010-present, regarding the use of digoxin or other feticides, and all analogous policies from the PPFA Intranet and corresponding affiliate policies for each Plaintiff-affiliate concerning the same is granted in part.  As narrowed, the request is overbroad as to time and as to the individual affiliates for whom Defendants request policies, since only four affiliates participated in fetal tissue donation programs.  Further, Defendants do not provide any information about what is available on PPFA's Intranet and how affiliates use the Intranet, including whether affiliates that did not participate in fetal tissue donation programs post information there. Therefore, the request for policies from the PPFA Intranet is denied as overbroad and disproportionate to the needs of the case.  Plaintiffs shall produce the Manual of Medical Standards & Guidelines policies regarding the use of digoxin or other feticides for the time period January 1, 2011 to July 15, 2015 as well as corresponding policies for PPMM, PPNC, PPLA, and PPPSW for the same time period.

RFP No. 23: Defendants made no attempt to narrow this request, which broadly seeks "[a]ll documents or electronically stored information regarding Plaintiffs' modifying abortion procedures in order to facilitate the donation of fetal tissue" without limitation.  However, it appears that Plaintiffs produced the portion of the Manual of Medical Standards & Guidelines that is pertinent to this issue.  *See* Trissell Decl. Ex. 17 at PP0000288, PP0000294 ("[t]he timing, method, or procedure of abortion **must** not be substantively altered for the purpose of obtaining the tissue and/or blood." (emphasis in original)).  Plaintiffs shall produce any corresponding policies for PPMM, PPNC, PPLA, and PPPSW for the time period January 1, 2011 to July 15, 2015.  Defendants' motion to compel a further response to this RFP is denied.

RFP No. 24: Defendants' motion to compel production of documents in category (a), records or summaries involving an intact procedure, fetal expulsion, or transient fetal survival for the four affiliates with fetal tissue donation programs plus a fifth affiliate, PPOSBC, is denied. The request is overbroad as to time and the affiliates requested, as there is no evidence that PPOSBC participated in a fetal tissue donation program.  Further, at least two of the affiliates, PPPSW and PPLA, state that they do not have summaries or compilations of such events, and that the only way to comply with the request would be to search through highly sensitive individual medical records.  [*See* Docket Nos. 377 (Marengo Decl., Dec. 19, 2018) ¶¶ 3-4; 378 (Dunlap Decl., Dec. 19, 2018) ¶¶ 3-4.]  Responding to this request would be overly burdensome and disproportionate, and implicates significant patient privacy concerns.

Defendants' request for documents in category (b), PPFA's Manual of Medical Standards & Guidelines policies, for 2010-present, regarding mechanical vacuum aspiration, and all analogous policies from the PPFA Intranet and corresponding affiliate policies for each Plaintiff-affiliate concerning the same is granted in part.  As narrowed, the request is overbroad as to time and as to the individual affiliates for whom Defendants request policies, since only four affiliates participated in fetal tissue donation programs.  Therefore, Plaintiffs shall produce the Manual of Medical Standards & Guidelines policies regarding mechanical vacuum aspiration for the time period January 1, 2011 to July 15, 2015 and corresponding policies for PPMM, PPNC, PPLA, and PPPSW for the same time period.

Defendants' request for documents in category (c), PPFA's Manual of Medical Standards & Guidelines policies, for 2010-present, regarding management/prevention of transient fetal survival/out-of-center deliveries, and 2nd trimester and later abortion care, particularly cervical preparation, and use of D&E vs. induction, and all analogous policies from the PPFA Intranet and corresponding affiliate policies for each Plaintiff-affiliate concerning the same is denied. Defendants made no effort to explain the significance of these events and procedures and how they relate to Defendants' accusations that Plaintiffs engaged in illegal conduct, and the court will not speculate as to their relevance.

RFP No. 48: Defendants' request for PPFA's Manual of Medical Standards & Guidelines policies, for 2010-present, regarding compliance with the partial-birth abortion ban, and all analogous policies from the PPFA Intranet and corresponding affiliate policies for each Plaintiff-affiliate concerning the same is granted in part. As narrowed, the request is overbroad as to time and as to the individual affiliates for whom Defendants request policies, since only four affiliates participated in fetal tissue donation programs. Therefore, Plaintiffs shall produce the Manual of Medical Standards & Guidelines policies regarding compliance with the partial-birth abortion ban for the time period January 1, 2011 to July 15, 2015 and corresponding policies for PPMM, PPNC, PPLA, and PPPSW for the same time period.

The court has considered Defendants' remaining arguments that this group of discovery requests is relevant to their affirmative defenses of causation, unclean hands, public policy, and impeachment. Even if the court accepted Defendants' arguments that the discovery is somehow relevant to those defenses, it concludes that Defendants have not shown that they are entitled to additional discovery beyond that which it ordered above.

### 2. CMP's RFP No. 25

Finally, CMP's RFP No. 25 seeks "[a]ll documents or electronically stored information regarding the procurement of fetal tissue from patients following inadvertent live births at Plaintiffs' facilities in the course or following abortion procedures." Defs.' Separate Statement 35. Plaintiffs objected that the RFP seeks documents that are not relevant to the claims or defenses in this action; is vague, ambiguous, overbroad, and unduly burdensome; and "seeks Plaintiffs'

information that is confidential, proprietary, private, or financial information." Pls.' Response to Separate Statement 41. Plaintiffs refused to produce documents responsive to the request. *Id.*

The sole relevance argument that Defendants offer in support of RFP No. 25 is that the documents sought by the request are relevant to their section 633.5 defense to Plaintiffs' seventh and ninth claims for relief, which allege that Defendants violated California Penal Code section 632. Mot. 14-15. Section 632, California's Invasion of Privacy Act, provides that any person who "intentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to eavesdrop upon or record the confidential communication" violates the statute and is subject to civil and criminal penalties. Cal. Penal Code § 632. California Penal Code section 633.5 contains an exception to section 632; it provides that section 632 "do[es] not prohibit one party to a confidential communication from recording the communication for the purpose of obtaining evidence reasonably believed to relate to the commission by another party to the communication of the crime of . . . any felony involving violence against the person[.]" Cal. Penal Code § 633.5.

In *Kuschner v. Nationwide Credit, Inc.*, 256 FRD 684, 698 (E.D. Cal. 2009), the court held that "the liability exception of Penal Code section 633.5 only applies where the person making the recording 'reasonably believed' that [the other party's] conduct violated that section. Thus, both the question of what [the recording party] actually believed at the time of recording the calls and whether that belief was reasonable would need to be resolved in order for [the recording party] to be exempted from liability."

Defendants argue that the requested discovery is relevant to establishing their section 633.5 defense to Plaintiffs' claims, because it seeks documents relevant to "the truth of their beliefs" about Plaintiffs' violations of federal law, including their belief "that certain fetuses were harvested even though they met the legal definition of a 'person' and thus were entitled to the same rights as any other person." Mot. 15. According to Defendants, the requested discovery will "provide both direct and circumstantial evidence that such beliefs were reasonable." *Id.* Defendants' position is without merit. Documents that were not known to or in Defendants' possession at the time of the recordings are irrelevant to whether Defendants' beliefs about

Plaintiffs' alleged misconduct at the time of the recordings were reasonable. Defendants' motion to compel Plaintiffs' response to RFP No. 25 is denied.[16]

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion to compel is granted in part and denied in part. Plaintiffs shall serve amended discovery responses and responsive documents in accordance with this order within seven days of the date of this order.

**IT IS SO ORDERED.**

Dated: January 24, 2019



Donna M. Ryu
United States Magistrate Judge

---

[16] Defendants also argued that the documents and information requested in CMP's RFP No. 24 are relevant to their section 633.5 defense. Mot. 15. As discussed above, the court grants in part and denies in part the motion to compel documents responsive to RFP No. 24. The court finds that Defendants are not entitled to additional documents responsive to No. 24 on the basis of their section 633.5 defense.