UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PLANNED PARENTHOOD FEDERATION OF AMERICA, INC., et al., <br><br>Plaintiffs,<br><br>v.<br><br>CENTER FOR MEDICAL PROGRESS, et al.,<br><br>Defendants. | Case No. 16-cv-00236-WHO (DMR)<br><br>**PARTIAL ORDER ON PLAINTIFFS' MOTION CHALLENGING DEFENDANTS' PRIVILEGE LOG**<br><br>Re: Dkt. No. 385 |

Plaintiffs filed a motion for in camera review of certain documents on Defendants' privilege log. [Docket No. 385.] Defendants also moved for in camera review of documents on Plaintiffs' privilege log. [Docket No. 383.]

On February 6, 2019, in advance of the hearing on both motions, the court ordered Defendants to submit four categories of documents for in camera review. [Docket No. 459.] The court held a hearing on February 14, 2019, and ordered the parties to submit supplemental briefing. [Docket No. 473.] The parties timely filed the requested briefing. [Docket Nos. 482, 483, 487, 488, 495, 496.]

Having conducted in camera review, and having considered the parties' oral arguments and written submissions, the court now enters the following partial order on Plaintiffs' motion, which is granted in part and denied in part. This order documents the rulings made at the February 14, 2019 hearing, and addresses other disputes that were taken under submission. This order does not address the parties' disputes regarding (1) communications shared with CMP's contractors; (2) communications with attorney Catherine Short that may be discoverable under the crime fraud exception; and (3) Defendants' motion. The court will address those issues in separate orders to follow.

## I. BACKGROUND

The court has described Plaintiffs' allegations in the operative complaint in detail in previous orders and does not repeat them here. In December 2018, the parties filed six unilateral discovery letters in which each side challenged alleged deficiencies in the other side's privilege log. On December 13, 2018, the court denied the letters without prejudice based on the parties' failure to meet and confer on the issues raised in the letters. [Docket No. 372.] The court ordered the parties to immediately meet and confer regarding the issues and "revise their privilege logs consistent with any agreements or changes in position." *Id*. If disputes remained after meeting and conferring, the court granted the parties leave to file a motion challenging the other side's privilege log, subject to a briefing schedule and page limits. *Id*.

The present motion followed. Plaintiffs moves for production of several categories of documents withheld by Defendants upon their assertion of the attorney-client privilege. Defendants oppose.

## II. LEGAL STANDARDS

This court exercises federal question jurisdiction over Plaintiffs' RICO claims pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction over Plaintiffs' pendent state law claims. "Where there are federal question claims and pendent state law claims present, the federal law of privilege applies." *Agster v. Maricopa Cty.*, 422 F.3d 836, 839 (9th Cir. 2005); *see also* Fed. R. Evid. 501, Advisory Committee Notes ("In nondiversity jurisdiction civil cases, federal privilege law will generally apply.").

The attorney-client privilege protects from discovery "confidential communications between attorneys and clients, which are made for the purpose of giving legal advice." *United States v. Richey*, 632 F.3d 559, 566 (9th Cir. 2011) (citation omitted). The privilege attaches when:

> (1) legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) unless the protection be waived.

*Richey*, 632 F.3d at 566 (brackets and citation omitted). The privilege is "narrowly and strictly

construed." *United States v. Gray*, 876 F.2d 1411, 1415 (9th Cir. 1989) (citing *Weil v. Inv./Indicators, Research & Mgmt., Inc.*, 647 F.2d 18, 24 (9th Cir. 1981)).

The privilege extends to versions of electronic communications and preliminary drafts of communicated documents, *Laethem Equip. Co. v. Deere & Co.*, 261 F.R.D. 127, 139-40 (E.D. Mich. 2009) (citations omitted), as well as communications with "third parties who have been engaged to assist the attorney in providing legal advice." *Richey*, 632 F.3d at 566 (footnote omitted). If the advice sought from the professional legal advisor is not legal advice, the privilege does not apply. *Id*. at 566.

A party asserting the attorney-client privilege bears the burden of demonstrating that the privilege applies. *Richey*, 632 F.3d at 566; *accord In re Grand Jury Investigation*, 974 F.2d at 1071 (party asserting privilege "must make a *prima facie* showing" that privilege protects information the party intends to withhold). Producing a privilege log is a recognized means of sufficiently establishing the privilege. *In re Grand Jury Investigation*, 974 F.2d at 1071. A party challenging an assertion of privilege must "show a factual basis sufficient to support a reasonable, good faith belief that in camera inspection may reveal evidence that information in the materials is not privileged." *Id*. at 1075. The Ninth Circuit has described this burden as "minimal." *Id*. at 1071, 1074 (citing *United States v. Zolin*, 491 U.S. 554, 572 (1989)). "If the party makes such a showing, the decision whether to conduct the review rests within the discretion of the district court." *Id*. at 1075.

### III. DISCUSSION

Plaintiffs move for production of communications between Defendants and four groups of third parties that Defendants characterize as "CMP Attorneys" and "Law Firm Staff." They also move for production of communications between Defendant David Daleiden, various attorneys, and third party CMP donors. The court addresses each category below.

#### A. Americans United for Life

Plaintiffs assert that Defendants have claimed the attorney-client privilege with respect to over 300 communications between Daleiden and approximately 16 individuals affiliated with Americans United for Life ("AUL"). AUL is a public interest law firm in Arlington, Virginia.

3

Aden Decl., Dec. 6, 2018, ¶ 1. Defendants' privilege log includes communications with AUL's former general counsel, Ovide Lamontagne, and AUL's employees and officers, including its former CEO and President Charmaine Yoest. Plaintiffs dispute whether CMP had an attorney-client relationship with Lamontagne, who was AUL's general counsel at the time of the communications. They also argue that CMP cannot claim the privilege with respect to its communications with non-attorneys like Yoest. Plaintiffs further assert that Defendants' privilege log fails to provide sufficient detail to show that CMP's communications with AUL-affiliated individuals fall within the scope of the privilege. In response, Defendants submitted the declarations of Daleiden and Steven H. Aden, who is AUL's current Chief Legal Officer and General Counsel. Daleiden identifies the AUL-affiliated individuals listed on the privilege log and states that CMP "had an attorney-client relationship" with AUL "during the time periods listed on its privilege log." Daleiden Decl., Dec. 31, 2018, ¶¶ 9, 13. He states that CMP consulted AUL "for general legal advice related to numerous aspects of its project" investigating fetal tissue. *Id*. at ¶ 13.

Aden states that he has been AUL's Chief Legal Officer and General Counsel since August 2017. Aden Decl. ¶ 1. According to Aden, in January 2015, Daleiden engaged AUL and its counsel, including Lamontagne, "in an attorney-client relationship for the purpose of providing legal counsel and strategic assistance relating to proposed investigations" by Daleiden and CMP into the fetal tissue procurement industry. He states that AUL counsel and staff "had conversations and communications with Mr. Daleiden in furtherance of this relationship" from January 2015 through approximately July 2015. *Id*. at ¶ 2. As Aden did not explain the basis for his personal knowledge of those facts, the court ordered Defendants to submit a supplemental declaration by Aden in which he sets forth the basis for his personal knowledge of the matters to which he attested. [Docket No. 459.] Defendants timely submitted a second declaration by Aden in which he explains that after he joined AUL, he became the custodian of Lamontagne's documents. He reviewed the documents relating to AUL's relationship with Daleiden and CMP and also spoke with Lamontagne "at length" regarding his representation of Daleiden and CMP. [Docket No. 470-2 (Aden Decl., Feb. 11, 2019) ¶ 2.] The court now finds that the second Aden

4

declaration sufficiently establishes his personal knowledge of the relationship between AUL and CMP, and that the Daleiden and Aden declarations are sufficient to establish the existence of an attorney-client relationship between CMP and AUL.

However, neither Aden nor Daleiden explained how CMP's communications with AUL non-lawyers fall within the scope of attorney-client privilege. Moreover, the descriptions of the communications on the privilege log do not contain sufficient detail to enable Plaintiffs and the court to evaluate whether privilege attaches. For that reason, the court concluded that Plaintiffs had "show[n] a factual basis sufficient to support a reasonable, good faith belief that in camera inspection" of Defendants' communications with non-attorneys affiliated with AUL "may reveal evidence that information in the materials is not privileged." *See In re Grand Jury Investigation*, 974 F.2d at 1075. The court ordered Defendants to submit for in camera review "all logged communications between CMP and any individual affiliated with [AUL] who is not an attorney where an attorney was not a sender or recipient of the communication." [Docket No. 459 at 3.]

In the course of its review of the lodged communications, the court identified a number of communications that did not appear to fall under the attorney-client privilege, as they did not appear to be communications related to a request for or the provision of legal advice. *See Richey*, 632 F.3d at 566. At the hearing, defense counsel conceded that communications between CMP and non-attorney AUL staff discussing matters such as travel arrangements, public relations strategies, feedback on a draft press release and video, and expenditures of funds are not privileged. [Docket No. 485 (Feb. 14, 2019 Hr'g Tr.) 16-18, 21-22, 24.] At the hearing, the court ordered Defendants to produce communications at the following privilege log entries to Plaintiffs by February 19, 2019: 1780, 1782, 1791, 1795, 1806, 1807, 1809, 1810, 1841, 1842, 1843, 1868, 1870, 1902, 1990, 1992, 2037, 2052, 2115, 2235, 2239, 2244, 2246, 2248, 2251, 2304, 2469, 2474, 2476, 2476, 2480, 2481, and 2483.

### B. Life Legal Defense Foundation

Defendants have withheld over 80 communications with five individuals associated with

the law firm Life Legal Defense Foundation ("LLDF").[1] This includes communications with attorneys Catherine Short, Dana Cody, Kevin Bedolla, and Marcella Ketelhut, and non-attorney Mary Riley. Short Decl., Dec. 31, 2018, ¶ 2. Plaintiffs argue that Defendants' "vague descriptions" of entries reflecting these communications in their log do not support their invocation of the attorney-client privilege with respect to these communications. Mot. 6.

According to Short, LLDF entered into a formal attorney-client relationship with Daleiden in August 2013 that was memorialized with a retainer agreement. Short Decl. ¶ 2. She states that "LLDF provided legal advice to Mr. Daleiden as requested, to ensure that Mr. Daleiden and his investigators' and sources' activities complied with California law." *Id*. Daleiden identifies Short, Bedolla, Cody, and Ketelhut as LLDF attorneys, and states that "CMP consulted LLDF . . . for advice on California specific issues." Daleiden Decl. ¶¶ 12, 13. He explains that in a prior declaration, he "mistakenly stated that Ms. Cody and Ms. Ketelhut were not attorneys," but that he now knows that they are attorneys. *Id*. at ¶ 12; *see also* Docket No. 369-3 (Daleiden Decl., Dec. 6, 2018) ¶ 12 (identifying only Short and Bedolla as LLDF attorneys).

In response, Plaintiffs submit emails produced in this litigation that they argue indicate that Defendants' "communications with CMP were substantially non-legal in nature." *Id*. (citing Suppl. Mayo Decl., Jan. 4, 2019, ¶ 2 Ex. L). In one of the emails, Daleiden emailed a project proposal to Cody, Short, and Ketelhut and noted that he is "also attaching the two one-page 'Mission Summaries' that [Cody] requested about the project components that are in need of funding ASAP." Suppl. Mayo Decl. Ex. L (July 25, 2013 email from Daleiden). In another, he discussed coordinating a fundraiser event with Ketelhut at her home. *Id*. (Oct. 17, 2013 email). Plaintiffs also argue that since Daleiden only recently learned that Cody and Ketelhut are attorneys, he could not have been communicating with them in their capacity as attorneys. Reply 2.

While the attorney-client privilege extends to communications with attorneys and "third

---

[1] This does not include the approximately 30 communications between CMP and LLDF attorney Catherine Short that Plaintiffs challenge as discoverable under the crime-fraud exception to the attorney-client privilege, which will be addressed in a separate order.

parties who have been engaged to assist the attorney in providing legal advice," *Richey*, 632 F.3d at 566, not all such communications are privileged. *See United States v. Martin*, 278 F.3d 988, 999 (9th Cir. 2002) ("The fact that a person is a lawyer does not make all communications with that person privileged."). In order for the privilege to apply, "the communication must be between the client and lawyer for the purpose of obtaining legal advice." *Id*. at 1000. If the advice sought from the professional legal advisor is not legal advice, the privilege does not apply. *Richey*, 632 F.3d at 566. The emails submitted by Plaintiffs indicate that LLDF-affiliated individuals played a role in CMP's fundraising efforts, and that Daleiden communicated with LLDF-affiliated individuals about such matters, separate and apart from any communications about legal advice. Based on that evidence, the court concluded that Plaintiffs had "show[n] a factual basis sufficient to support a reasonable, good faith belief that in camera inspection" of Defendants' communications LLDF-affiliated individuals "may reveal evidence that information in the materials is not privileged." *See In re Grand Jury Investigation*, 974 F.2d at 1075. The court ordered Defendants to submit for in camera review "all logged communications between CMP and any other individual affiliated with LLDF[.]" [Docket No. 459 at 3.]

The court reviewed a sampling of the lodged communications in advance of the hearing and identified several emails that did not appear to be attorney-client privileged communications. These communications included discussions related to LLDF's funding of CMP and billing and payment logistics, as well as emails related to an LLDF attorney's request for nonlegal advice from Daleiden. At the hearing, defense counsel conceded that to the extent such communications did not involve a request for or the provision of legal advice, they were not privileged. Hr'g Tr. 39-40. *See Richey*, 632 F.3d at 566. Having completed its review of the lodged communications, the court ordered Defendants to produce communications at the following privilege log entries by 5:00 p.m. on April 12, 2019: 155, 172, 176, 178, 190, 191, 195, 796, 797, and 798. [*See* Docket No. 537.]

### C. Attorneys L.L. and J.B.[2]

Defendants' privilege log lists 35 entries reflecting communications with attorneys L.L. and J.B. It describes L.L. as a "CMP Attorney" and J.B. as a "CMP/Claude Allen Attorney." Mayo Decl. Ex. H. Plaintiffs challenge this group of entries, arguing that both attorneys are "well-known leaders of . . . an organization far more likely to have been involved with CMP's fundraising efforts than legal representation." Mot. 6. They also assert that the log's descriptions of these communications are deficient. *Id.* (citing Mayo Decl. Ex. H, entries 2500 ("Confidential email providing legal communication with counsel regarding legal planning"), 2488 ("Confidential email providing legal communication with counsel regarding pertinent facts or information")).

Defendants argue that "CMP did not have a relationship with [L.L. and J.B.'s] employers, . . . but instead had a relationship with the attorneys themselves." Opp'n 8 (citing Daleiden Decl. ¶¶ 7, 13). Daleiden states that "CMP consulted Attorneys [L.L. and J.B.] about how to ensure successful prosecutions of various entities illegally profiting from the sale of fetal tissue." Daleiden Decl. ¶ 13. Defendants also submit a declaration by attorney Claude Allen. Allen Decl., Dec. 31, 2018. According to Allen, he was representing donor R.R. at the time, and R.R. "was interested in donating to Mr. Daleiden's project, but wanted [Allen] to provide legal advice regarding aspects of Mr. Daleiden's project." *Id.* at ¶ 2. Allen states that he then "entered into a joint representation relationship providing legal advice to both [R.R.] and Mr. Daleiden," and that "[a]s part of that representation," he introduced Daleiden to attorneys [L.B. and J.B.]." *Id.* Allen states, "[w]e consulted [L.L. and J.B.] to receive legal advice on specific aspects of Mr. Daleiden's project, which they provided." *Id.*

The court concludes that Defendants have sufficiently established the existence of an attorney-client relationship between CMP and attorneys LL. and J.B. While many of the log's descriptions of the communications between CMP and the two attorneys are somewhat vague, Plaintiffs have not satisfied their burden to "show a factual basis sufficient to support a reasonable,

---

[2] In order to protect their privacy, the court refers to certain individuals who are well known to the parties by their initials instead of their full name. The court will separately rule on Defendants' motions to seal submissions in connection with these motions.

8

1  good faith belief that in camera inspection" of Defendants' communications with L.L. and J.B.
2  "may reveal evidence that information in the materials is not privileged." *See In re Grand Jury*
3  *Investigation*, 974 F.2d at 1075. Accordingly, this portion of Plaintiffs' motion is denied.

### D. Attorney Claude Allen

Plaintiffs next ask the court to review nearly 200 communications involving attorney Claude Allen. The privilege log entries reflecting communications involving CMP and Allen fall into three categories: (1) communications solely between Daleiden and Allen; (2) communications between Daleiden, Allen, and CMP attorneys Phill Kline and Hannah Tomlinson; and (3) communications between Daleiden, Allen, and at least one other person, such as a donor, CMP contractor, or/or other attorney. Plaintiffs state that they believe that the communications "more likely were efforts to get money from [potential donor R.R.] than about any legal advice." Mot. 6. In support, they cite a June 20, 2013 email from R.R. to Daleiden and Allen in which R.R. writes, "We have talked and, although we are extremely interested in this topic, we are not going to provide any funds at this time." The email also expresses R.R.'s doubt that "any meaningful legislation" would result from Daleiden's project. Suppl. Mayo Decl. Ex. L (Jun. 20, 2013 email). Daleiden later sent an email to other individuals with the subject, "Most pressing financial needs" in which he wrote, "[R.R.] and his assistant Claude Allen are 'extremely interested' (their words) and are contributing their practical assistance at the moment, perhaps (but not guaranteed) funding at some point in the near future." Suppl. Mayo Decl. Ex. L (Jul. 2, 2013 email).

In response, Defendants cite Allen's declaration, in which he states that his communications with Daleiden and R.R. "were part of an attorney-client relationship and were specifically made in anticipation of litigation." Allen Decl. ¶ 2. Daleiden also states that he and R.R. "jointly consulted" Allen "to provide legal advice regarding CMP's investigative journalism project." Daleiden Decl. ¶ 13. Defendants argue in a conclusory fashion that the common interest doctrine applies to this group of communications because Allen, R.R., and Daleiden "expected that Mr. Daleiden's project would ultimately result in litigation against the various bad actors whose illegal conduct his project unearthed." Opp'n 8; Allen Decl. ¶ 2. They do not explain this argument in any detail.

9

The court finds that the Daleiden and Allen declarations are sufficient to establish the existence of an attorney-client relationship between CMP and Allen. However, Plaintiffs presented evidence that CMP communicated with Allen regarding matters unrelated to the provision of legal advice, such as fundraising efforts. Additionally, Defendants provided little evidence or argument to support their claim that a common interest existed between CMP and Allen's other client, R.R., at the time of the communications. Therefore, the court concluded that Plaintiffs had "show[n] a factual basis sufficient to support a reasonable, good faith belief that in camera inspection" of certain of Defendants' communications with Allen "may reveal evidence that information in the materials is not privileged." *See In re Grand Jury Investigation*, 974 F.2d at 1075. The court ordered Defendants to submit for in camera review the communications in category (3) (communications between Daleiden, Allen, and at least one other person, such as a donor, CMP contractor, or/and other attorney), but did not order in camera review of documents that fell into categories (1) and (2).[3]

The documents in category (3) overlap with another set of communications challenged by Plaintiffs, which includes approximately 100 communications between Defendants and three third party donors, including Allen's client, R.R. The parties did not brief the application of the attorney-client privilege to the communications in this category in any detail, confining their arguments to one footnote each. *See* Mot. 8 n.5; Opp'n 10 n.10. As with Daleiden's communications with Allen and R.R., Defendants cursorily argued that the communications shared with donors are privileged due to the existence of a common interest between CMP and its donors at the time of the communications. Therefore, the court ordered Defendants to submit for in camera review all logged communications that CMP shared with donors. [Docket No. 459 at 3.] Following its review of the communications in these categories, the court ordered the parties to submit further briefing on whether the common interest doctrine applied to CMP's

---

[3] The order required in camera submission of the following documents: "all logged communications between CMP and [Allen], except those communications that are solely between David Daleiden and [Allen] (approximately 40 emails) and communications that are solely between David Daleiden, [Allen] and [Kline and/or Tomlinson] (approximately 26 emails)." [Docket No. 459 at 3.]

10

communications with donors (Docket No. 473), which the court addresses in the following section.

### E. Communications with Donors

The court ordered the parties to submit briefing "addressing the common interest doctrine and how it applies to protect communications between CMP, various attorneys, and three third party donors [R.R., J.H., and E.S.]," including "tailored analyses for each relationship for which Defendants assert a common interest privilege."[4] [Docket No. 473.] The parties timely filed the requested briefing. [Docket Nos. 482, 484, 488, 496.]

#### 1. Common Interest Doctrine

"Under the attorney-client privilege, it is a general rule that attorney-client communications made in the presence of, or shared with, third-parties destroys the confidentiality of the communications and the privilege protection that is dependent upon that confidentiality." *Nidec Corp. v. Victor Co. of Japan*, 249 F.R.D. 575, 578 (N.D. Cal. 2007) (citation and quotation omitted). The common interest doctrine, also known as the joint defense doctrine or privilege, "is a doctrine that prevents waiver of a pre-existing privilege if the privileged information is shared only with those with a common legal interest." *Waymo LLC v. Uber Techs., Inc.*, No. 17CV00939-WHA (JSC), 2017 WL 2485382, at *7 (N.D. Cal. June 8, 2017). The common interest doctrine is not an independent privilege; rather, as an "exception[ ] to the rule on waiver . . . . it comes into play only if the communication at issue is privileged in the first instance." *Nidec Corp.*, 249 F.R.D. at 578.

The common interest doctrine applies where (1) a communication is made by separate parties in the course of a matter of common legal interest; (2) the communication is designed to further that effort; and (3) the privilege has not been waived. *Nidec Corp.*, 249 F.R.D. at 578 (citing *United States v. Bergonzi*, 216 F.R.D. 487, 495 (N.D. Cal. 2003)). The common interest doctrine is not limited to parties to litigation, but can extend to "interested third parties who have a community of interests with respect to the subject matter of the communications," and "is

---

[4] The court notes that Defendants' supplemental brief is devoid of any "tailored analyses for each relationship."

11

applicable whenever parties with common interests join[ ] forces for the purpose of obtaining more effective legal assistance." *Id.* "However, a shared desire to see the same outcome in a legal matter is insufficient to bring a communication between two parties within this exception. Instead, the parties must make the communication in pursuit of a joint strategy in accordance with some form of agreement—whether written or unwritten." *In re Pac. Pictures Corp.*, 679 F.3d 1121, 1129 (9th Cir. 2012) (citations omitted).

### 2. Analysis

#### a. Communications with Allen's Client, Donor R.R.

As noted, the common interest doctrine is not an independent source of privilege, but is instead an exception to waiver of an already-privileged communication that is shared with third parties. Therefore, in order to invoke the common interest doctrine and withhold communications that CMP shared with its donors, Defendants must first establish that the communications are attorney-client privileged communications. *See In re Commercial Money Ctr., Inc., Equip. Lease Litig.*, 248 F.R.D. 532, 536 (N.D. Ohio 2008)) ("[i]f a communication or document is not otherwise protected by the attorney-client privilege or work-product doctrine, the common interest doctrine has no application."). "[A] party asserting the attorney-client privilege has the burden of establishing the relationship *and* the privileged nature of the communication." *United States v. Ruehle*, 583 F.3d 600, 607 (9th Cir. 2009) (quotation and citation omitted; emphasis in original). Moreover, "[u]nder federal law, the attorney-client privilege is strictly construed." *Id.* at 609.

CMP argues that Allen represented both CMP and R.R., and that CMP and R.R. shared a common interest.[5] The communications between Allen, R.R., and Daleiden that Defendants submitted for in camera review are dated from June 14, 2013 through July 13, 2015. Having carefully reviewed the communications, the court concludes that Defendants have not satisfied their burden to show that all of the communications are "privileged in the first instance," *Nidec*

---

[5] Allen's declaration makes a conclusory reference to a "joint representation relationship" in which he provided legal advice to both R.R. and Daleiden." Allen Decl. ¶ 2; *see also* Docket No. 484-6 (Daleiden Decl., Feb. 21 2019, "2d Daleiden Decl.", ¶ 4, under seal). However, Defendants only assert the common interest exception to waiver. They do not argue that a joint client relationship between CMP and R.R. protects their communications. Therefore, the court does not analyze whether such a relationship existed and/or whether it shields the communications at issue.

12

*Corp.*, 249 F.R.D. at 578, because, as detailed below, they have not established that Allen began an attorney-client relationship with CMP before April 2014.

Daleiden explains that the reason Allen became CMP's attorney is because donor R.R. "conditioned the grants which he gave to CMP on being kept informed as to CMP's activities," which "further required that I enter into a joint-representation relationship with [R.R.'s] counsel, Claude Allen, so that Mr. Allen could provide legal advice to both [R.R.] and myself as to CMP's activities." 2d Daleiden Decl." ¶ 4. According to Daleiden, Allen's legal advice "included both whether CMP's activities were lawful and whether the evidence and information which CMP uncovered indicated that third parties were engaged in unlawful activity which could lead to prosecution of them." *Id*. He also states that "[R.R.] was only interested in donating to CMP if his counsel [Allen] could and would provide legal advice regarding CMP's activities." *Id*.

Neither Daleiden nor Allen states when Allen's representation of CMP began, although Allen states that Daleiden "approached [him]" in approximately June 2013 "in search of legal advice about his investigative journalism project." Allen Decl. ¶ 2. Defendants do not otherwise address this issue, and nothing in the record suggests that Allen had an attorney-client relationship with CMP before fulfilling R.R.'s condition of donation. Allen's suggestion that his representation of CMP began in June 2013 is contradicted by the record, for it appears that R.R. did not become a CMP donor until sometime *after* June 2013. On June 20, 2013, R.R. sent an email to Daleiden, copied to Allen, in which R.R. wrote, "although we are extremely interested in this topic, we are not going to provide any funds at this time." R.R. asked Daleiden to "keep [R.R. and Allen] abreast of [Daleiden's] progress say, once or twice a year . . . ." Suppl. Mayo Decl. Ex. L (Jun. 20, 2013 email); Privilege Log Entry 114. Since Daleiden states that R.R. required that Allen represent CMP as a condition of R.R.'s financial support, it follows that Allen's representation of CMP did not begin until R.R. became a donor. Defendants offer no explanation or evidence to the contrary. Therefore, Defendants have not established that communications between Allen, Daleiden, and/or R.R. that pre-dated R.R.'s donations are privileged, because they have not established the existence of an attorney-client relationship between Allen and CMP during that time.

In order to determine when Allen began representing CMP, Defendants must establish when R.R. began donating to CMP, for this is what triggered the condition that Allen enter into an attorney-client relationship with CMP. The record is not clear on this point. Following a July 25, 2013 email from Daleiden to Allen, R.R., and other attorneys (Privilege Log Entry 154), the next communication between Daleiden, Allen, and R.R. is an email from Daleiden dated January 30, 2014. In that email, Daleiden wrote, "a lot has happened in the past six months" and described an upcoming NAF meeting he was planning to attend. Privilege Log Entry 1074. He attached to the email three documents titled, "NAF Infiltration Budget," "Project Proposal for R.R.," and "Confidential—Progress Report on Investigative Journalism." Privilege Log Entry 1076, 1077, 1078. Based on the contents of the email and its attachments, it appears that Daleiden was still attempting to solicit R.R.'s financial support as of January 30, 2014.

The earliest communication that supports the conclusion that R.R. had donated to CMP is an email dated April 11, 2014. In the email, Daleiden wrote to R.R. and Allen, "[w]e successfully pulled off the infiltration earlier this week . . . I'm working on the First Quarter Report that Claude gave me an extension on in order to include the NAF results . . . ." Privilege Log Entry 1206. Daleiden concluded his email by saying, "I want to express my profound gratitude to you for making this trip possible," indicating that R.R. had finally provided funding. Accordingly, since Defendants did not establish the existence of an attorney-client relationship between Allen and CMP prior to April 11, 2014, they must produce the following privilege log entries to Plaintiffs **by 9:00 p.m. on Friday, April 12, 2019**:[6] 91, 93, 97, 98, 99, 100, 104, 107, 108, 109, 110, 111, 112, 114, 119, 122, 123, 128, 131, 133, 134, 146, 147, 153, 154, 1074, 1076, 1077, 1078, 1110, 1112, 1124, 1129, 1134, 1136, 1137, 1138, 1139, 1140, 1154, 1206. **By the same deadline, Defendants must also produce to Plaintiffs any logged communications between Daleiden and Allen that predate April 11, 2014 and were not submitted for in camera review**,

---

[6] The court realizes that this is a tight deadline. However, certain depositions are scheduled to take place during the week of April 15, 2019, and the documents should be produced in advance of those depositions to avoid further delays in the discovery process. The documents are already Bates-stamped, and their production should not be difficult or time-consuming. Issuance of this order was delayed by the large volume of discovery disputes filed in this case, as well as the sheer volume of documents that were submitted for in camera review.

including any such communications involving other individuals, for the same reason: Defendants did not meet their burden to establish that an attorney-client relationship existed between CMP and Allen prior to that date.

Turning to the communications with R.R. dated on or after April 11, 2014, Defendants must establish that such communications fall within the scope of the attorney-client privilege. Under Ninth Circuit law, "[t]he fact that a person is a lawyer does not make all communications with that person privileged." *Martin*, 278 F.3d at 999. In order for the privilege to apply, "the communication must be between the client and lawyer for the purpose of obtaining legal advice." *Id*. at 1000; *see also Richey*, 632 F.3d at 566 n.3 ("What is vital to the privilege is that the communication be made in confidence for the purpose of obtaining *legal* advice *from the lawyer*." (quotation and citation omitted; emphasis in original)).

Many of the communications in this timeframe involve Daleiden's continued requests for funding and updates to R.R. and Allen regarding the progress of CMP's investigation, along with emails forwarding previews of videos and communications regarding scheduling. The communications also include Daleiden's own opinions and analysis regarding the information he was learning in the course of the investigation. These communications do not involve a request for or the provision of legal advice and do not appear to be related to a request for legal advice. As the party asserting the attorney-client privilege, Defendants are "obliged by federal law to establish the privileged nature of the communications and, if necessary, to segregate the privileged information from the non-privileged information." *See Ruehle*, 583 F.3d at 609. Defendants made no attempt to do so. Accordingly, the court concludes that Defendants have not met their burden to establish that the following communications are privileged, and must produce them to Plaintiffs by **9:00 p.m. on April 12, 2019**: 1206, 1207, 1217, 1343, 1344, 1366, 1375, 1376, 1446, 1461, 1572, 1585, 1640, 1670, 1708, 1709, 1716, 1717, 1725, 1726, 1736, 1795, 1811, 2055, 2067, 2126, 2127, 2132, 2137, 2138, 2175, 2203, 2390, 2391, 2392, 2393, 2478, 2479, 2485, 2486, 2517, 2518, 2519, 2520, 2521, 2522, and 2523.

The final group of communications in the post-April 11, 2014 timeframe includes requests for or discussions of legal advice and/or strategy from R.R. and/or Daleiden to Allen and other

15

attorneys, and includes the following privilege log entries: 1573, 1575, 1583, 1584, 1587, 2417, 2419, 2439, 2440, 2441, 2442, 2443, 2452, 2456, 2457, 2459, 2466, 2488, 2489, and 2490. The court finds that Defendants have established the first step of the analysis, i.e., that these communications are privileged. Therefore, it must determine whether the privilege was waived when the communications were shared with R.R., or whether the common interest doctrine applies as an exception to waiver.

Defendants' supplemental brief on the common interest doctrine is convoluted and difficult to follow. In addition, Defendants' identification of the common interest between CMP and R.R. has been somewhat of a moving target. In their opening brief on the common interest doctrine, Defendants suggest that its donors sought to help CMP "accomplish its mission" and "prompt litigation against the bad actors it investigated." They also state that "the likelihood that CMP's mission would succeed also involved the extent to which CMP's activities would expose both CMP and its donors to litigation—and the likelihood that CMP and its donors would prevail in such litigation." [Docket No. 482 at 3.] In response to Plaintiffs' argument that Defendants had not clearly identified a common interest between CMP and its donors, Defendants' reply brief states that CMP "has repeatedly noted" that "CMP and [its major donors] shared an interest in knowing that CMP's investigation was complying with all federal and state laws," because "[o]nly if CMP were complying with all laws, could it accomplish its mission, prevail in litigation, and ensure successful prosecutions like the one in Orange County, California." [Docket No. 496 at 1.] At the hearing, defense counsel made no mention of the need for advice regarding CMP's compliance with the laws, but instead stated that Allen gave CMP legal advice "as to whether there could be a potential for litigation against bad actors who they uncovered had engaged in illegal conduct [sic]." Tr. 41-42.

Defendants cite only one case in support of their position that a shared interest between a nonprofit and its donors in ensuring that the nonprofit complies with applicable laws in order to "accomplish its mission" is a legal interest sufficient to invoke the common interest doctrine. In *Hewlett-Packard Co. v. Bausch & Lomb, Inc.*, 115 F.R.D. 308, 310 (N.D. Cal. 1987), the defendant, Bausch & Lomb, voluntarily disclosed its attorney's opinion letter to a non-party, GEC,

16

with whom it was attempting to negotiate the sale of a business. The letter addressed the validity and possible infringement of a patent which was part of the division that GEC was considering purchasing, and which was the subject of the present litigation. *Id*. at 308. The court found that Bausch & Lomb and GEC "anticipated litigation in which they would have a common interest," since they would likely both be sued if the sale of the business proceeded, and that their "common interest" in such litigation "would have been in identical issues of law and of fact" such that "they could be expected to conduct a joint defense on all the liability issues." *Id*. at 310. It concluded that Bausch & Lomb had a duty to disclose to GEC the existence of potential litigation over the patent, and that the disclosure of the opinion letter did not constitute a waiver of attorney-client privilege. *Id.* at 308-309.

According to Defendants, CMP's donors are akin to "'investor' benefactors" who faced potential litigation in connection with their donations, similar to the potential buyer in *Hewlett-Packard*. Their argument is as follows:

> Just as the success of the investment in *Hewlett-Packard* would depend on whether the buyer would be exposed to litigation and whether he was likely to prevail in that litigation, the likelihood that CMP's mission would succeed also involved the extent to which CMP's activities would expose both CMP and its donors to litigation—and the likelihood that CMP and its donors would prevail in such litigation.

[Docket No. 483 at 3.] Defendants' argument is not persuasive. In *Hewlett-Packard*, the prospective buyer contemplated a business transaction to purchase a division of another company, which would result in the prospective buyer assuming all of the division's assets and liabilities. Those liabilities included the likelihood of a lawsuit in which the buyer and seller's interests would be "identically aligned." *Id*. at 310. The policy concerns underlying such business transactions was an important factor supporting the court's decision not to find waiver:

> This court also is concerned about the effect that finding waiver too freely might have on the sort of business transaction in which defendant and GEC were involved. Holding that this kind of disclosure constitutes a waiver could make it appreciably more difficult to negotiate sales of businesses and products that arguably involve interests protected by laws relating to intellectual property. . . . Legal doctrine that impedes frank communication between buyers and sellers also sets the stage for more lawsuits, as buyers are more likely to be unpleasantly surprised by what they receive. By refusing

17

> to find waiver in these settings courts create an environment in which businesses can share more freely information that is relevant to their transactions. This policy lubricates business deals and encourages more openness in transactions of this nature.

*Id.* at 311.

The legal common interest described in *Hewlett-Packard* is based on very narrow facts: a buyer was stepping into the shoes of the seller, and could therefore expect to be stepping into the anticipated patent litigation faced by the seller. The court in *Hewlett-Packard* relied heavily on the fact that the parties anticipated joint litigation related to the patent, "and that in that litigation defendant and GEC would be identically aligned, fighting to protect interests distinguished only by the time frame in which the marketing took place." *Id*. at 310. The current case does not involve a similar transaction or "identically aligned" shared threat. Here, the donors may support CMP's efforts and have an interest in CMP's success, but the donors are not standing in CMP's shoes. As previously noted, the Ninth Circuit has held that the "shared desire to see the same outcome in a legal matter is insufficient to bring a communication between two parties within [the common interest] exception." *In re Pac. Pictures Corp.*, 679 F.3d at 1129. Although Defendants make vague reference to possible exposure of "CMP and its donors to litigation," they do not specifically describe any shared litigation threat in which their interests are "identically aligned" that might put this case closer to the facts in *Hewlett-Packard*.[7] Moreover, recognition of a common interest on the record presented by Defendants would distort the well-established rule that the attorney-client privilege must be narrowly construed. It would pave the way for organizations that work on litigation-fraught causes to argue that their donors are entitled to participate in privileged communications without resulting in a waiver.

In sum, Defendants have not established the existence of a common legal interest between CMP and its three major donors that is sufficient to invoke the common interest doctrine. Even

---

[7] Defendants also cite *Eagle Harbor Holdings, LLC v. Ford Motor Co*., No. C11-5503 BHS, 2014 WL 1681623, at *1 (W.D. Wash. Apr. 28, 2014), in which the court held that "otherwise privileged communications with investors or potential investors will not waive the privileged nature of that communication," apparently on the basis that the common interest doctrine applied. However, other than setting forth a test for the common interest doctrine from the Third Circuit, the decision provides no analysis of this issue. *See id*. (citing *In re Bevill, Bresler & Schulman Asset Mgmt. Corp.,* 805 F.2d 120, 126 (3d Cir. 1986)). The court declines to follow it.

18

assuming that Defendants had identified such an interest, Defendants do not address, let alone explain, how the communications satisfy the three-part test articulated in *Nidec Corp*. Under that test, Defendants bear the burden of showing that each communication (1) was made by separate parties in the course of a matter of common legal interest; (2) was designed to further that legal effort; and (3) the privilege has not been waived. *Nidec Corp.*, 249 F.R.D. at 578. Defendants make no effort to explain how the communications involving R.R. were "designed to further that effort." *See id*. at 579. Accordingly, the court concludes that Defendants have failed to meet their burden of establishing that the common interest doctrine applies to the final group of communications. Therefore, any privilege over the communications was waived by disclosing them to R.R. Defendants must produce the following communications **by 9:00 p.m. on April 12, 2019**: 1573, 1575, 1583, 1584, 1587, 2417, 2419, 2439, 2440, 2441, 2442, 2443, 2452, 2456, 2457, 2459, 2466, 2488, 2489, and 2490.

### b. Communications with Donors J.H. and E.S.

Defendants also seek to withhold communications that they claim are attorney-client privileged communications that were shared with donors J.H. and E.S., arguing that the common interest doctrine applies to prevent waiver of the privilege. Daleiden does not identify any legally cognizable common interest between CMP, these two donors, and various attorneys, including Allen, LaMontagne, and others. Instead, he states that he had "an ethical duty to them, and an ethical duty to CMP" to keep the donors apprised of CMP's activities, strategies, and legal advice "as the only way for CMP to ensure that they continue donating significant sums" to the project. 2d Daleiden Decl. ¶ 5. For this reason, as well as the reasons discussed above, Defendants have not met their burden to establish application of the common interest doctrine, as they have not identified a common legal interest between CMP and these two donors, and have not shown that the specific communications at issue were "designed to further that effort." *See Nidec*, 249 F.R.D. at 579.[8] Accordingly, Defendants must produce the following communications to Plaintiffs by

---

[8] Finally, Plaintiffs also challenge CMP's withholding of communications involving Daleiden's personal spiritual director and a therapist, arguing that the disclosure of the communications to those individuals resulted in waiver. Mot. 8. In response, Defendants assert that they also claim the patient-therapist and clergy-communicant privileges over the communications. Opp'n 10 n.10.

**9:00 p.m. on April 12, 2019**: 149, 150, 231, 1023, 1373, 1389, 1446, 1465, 1974, 1982, 1990, 1992, 2086, 2113, 2115, 2116, 2146, 2147, 2234, 2235, 2240, and 2279.[9]

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs' motion for in camera review is granted in part and denied in part.

**IT IS SO ORDERED.**

Dated: April 11, 2019



Donna M. Ryu
United States Magistrate Judge

---

Plaintiffs do not respond to this argument in their reply and it appears that they do not challenge Defendants' withholding of communications on the bases of these privileges.

[9] This list contains one entry, 1446, that also appears in another category of communications listed above. In both categories, the court determines that the document must be produced.