Charles S. LiMandri (CA Bar No. 110841)
Paul M. Jonna (CA Bar No. 265389)
Jeffrey M. Trissell (CA Bar No. 292480)
B. Dean Wilson (CA Bar No. 305844)
FREEDOM OF CONSCIENCE DEFENSE FUND
P.O. Box 9520
Rancho Santa Fe, CA 92067
Tel: (858) 759-9948
cslimandri@limandri.com
pjonna@limandri.com
jtrissell@limandri.com
dwilson@limandri.com

*Attorneys for Defendant the Center
for Medical Progress*

Denise M. Harle (CA Bar No. 275561)
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd., NE
Suite D1100
Lawrenceville, GA 30043
Tel: (770) 339-0774
dharle@ADFlegal.org

Harmeet K. Dhillon (CA Bar No. 207873)
Gregory R. Michael (CA Bar No. 306814)
DHILLON LAW GROUP INC.
177 Post Street, Suite 700
San Francisco, CA 94108
415-433-1700
415-520-6593 (fax)
harmeet@dhillonlaw.com

*Attorneys for Defendant the Center
for Medical Progress*

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| PLANNED PARENTHOOD FEDERATION OF AMERICA, INC., et al.,<br><br>Plaintiff,<br><br>vs.<br><br>THE CENTER FOR MEDICAL PROGRESS, et al.,<br><br>Defendants. | Case No. 3:16-CV-00236 (WHO)<br><br>Hon. William H. Orrick III<br><br>Defendant the Center for Medical Progress's Motion for Summary Judgment<br><br>Hearing Date: July 17, 2019, 2:00 p.m.<br>Courtroom 2, 17th Floor |

# PUBLIC VERSION

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................1

ARGUMENT ...........................................................................................................1

1. All Counts for which Plaintiffs allege damages fail because Plaintiffs cannot show that Defendants proximately caused any damages or that Plaintiffs suffered any cognizable damages. ........................................................................1

    A. Plaintiffs cannot recover for alleged damages caused by intervening actions of third parties. ..........................................................................1

    B. Costs of increased security are not recoverable because they are not compensatory/restitutionary. ...............................................................3

    C. Costs unattributed between Defendants' alleged wrongful conduct and other circumstances are not recoverable. .........................................4

    D. Plaintiffs expressly disclaimed all defamation/publication damages. ............6

    E. Plaintiffs cannot recover threat or incitement damages. ...........................8

2. Summary judgment is appropriate on Plaintiffs' RICO claim because there is no evidence that Defendants' alleged predicate acts affected interstate commerce or constituted a RICO "pattern." (Count 1). .................................9

    A. Defendants have committed no "predicate acts" under RICO, because their actions fall short of affecting interstate commerce as required for application of 18 U.S.C. § 1028. ...........................................9

    B. There was no "pattern" of "continuous" prohibited acts. ........................11

        i. The record indicates only sparse and sporadic acts of "production" and/or "transfer" of identifications. ................................12

        ii. "Continuity" sufficient to establish a "pattern" requires more than "isolated" or "sporadic" predicate acts. ...............................12

            a. The alleged predicate acts did not occur over a substantial period of time. ..............................................13

            b. The alleged predicate acts did not threaten to continue into the future. ....................................................14

3. Plaintiffs cannot prove an "Unfair . . . Business Act or Practice" because Defendants' conduct did not threaten to violate antitrust principles, and the value of Defendants' conduct far outweighed any actual harm to Plaintiffs (Count 7 – Unfair Competition Law). ...............................................17

    A. Defendants sought to expose illegal acts. ...............................................18

    B. The utility of Defendants' conduct far outweighed any alleged harm to Plaintiffs as "potential 'consumers'" of fetal tissue procurement services. ......................................................................................21

CONCLUSION ......................................................................................................22

# TABLE OF AUTHORITIES

*Cases:*

*Antioch Co. Litig. Trust v. Morgan* .................................................................... 5, 6
    No. 10-156, 2014 WL 1365949 (S.D. Ohio Apr. 7, 2014)

*Apex Hosiery Co. v. Leader* ............................................................................. 18, 19
    310 U.S. 469 (1940)

*Apple, Inc. v. Pepper et al.* ................................................................................... 18
    587 U.S. ___, 2019 WL 2078087 (2019)

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters* ........... 2
    459 U.S. 519 (1983)

*Atkins v. City of Los Angeles* .................................................................................. 4
    8 Cal. App. 5th 696 (Ct. App. 2017)

*Berry v. San Francisco & N. Pac. R. Co.* ................................................................... 2
    50 Cal. 435 (1875)

*Brandenburg v. Ohio* ............................................................................................. 7
    395 U.S. 444 (1969)

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.* ...................................... 16
    20 Cal. 4th 163 (1999)

*Cole v. Doe 1 thru 2 Officers of City of Emeryville Police Dep't* ................................ 3
    387 F. Supp. 2d 1084 (N.D. Cal. 2005)

*Cole v. Homier Distrib. Co.* .................................................................................... 6
    No. 07-1493, 2009 WL 775627 (E.D. Mo. Mar. 20, 2009)

*Council for Employment & Econ. Energy Use v. WHDH Corp.* ................................ 19
    580 F.2d 9 (1st Cir. 1978)

*E. R. R. Presidents Conference v. Noerr Motor Freight, Inc.* ................................... 19
    365 U.S. 127 (1961)

*Feinstein v. Resolution Tr. Corp.* .......................................................................... 12
    942 F.2d 34 (1st Cir. 1991)

*Food Lion, Inc. v. Capital Cities/ABC, Inc.* ..................................................... 2, 6, 20
    194 F.3d 505 (4th Cir. 1999)

*Food Lion, Inc. v. Capital Cities/ABC, Inc.* .......................................................... 2, 7
    964 F. Supp. 956 (M.D.N.C. 1997)

*Hemi Grp., LLC v. City of New York, N.Y.* ............................................................... 2
    559 U.S. 1 (2010)

*H.J. Inc. v. Northwestern Bell Telephone Co.* ......................................................... 11
    492 U.S. 229 (1989)

# TABLE OF AUTHORITIES

*Cases:*

*Howard v. Am. Online Inc.* .................................................................................... 13
   208 F.3d 741 (9th Cir. 2000)

*Huntingdon Life Scis., Inc. v. Rokke* .................................................................. 20
   978 F. Supp. 662 (E.D. Va. 1997)

*Jarvis v. Regan* ...................................................................................................... 14, 15
   833 F.2d 149 (9th Cir. 1987)

*Kehr Packages, Inc. v. Fidelcor, Inc.* ................................................................. 12
   926 F.2d 1406 (3d Cir. 1991)

*Lozano v. AT & T Wireless Servs., Inc.* ............................................................. 16, 21
   504 F.3d 718 (9th Cir. 2007)

*Medallion Television Enterprises, Inc. v. SelecTV of California, Inc.* .......... 14
   833 F.2d 1360 (9th Cir. 1987)

*N. A. A. C. P. v. Claiborne Hardware Co.* ......................................................... 19
   458 U.S. 886 (1982)

*Nat'l Org. for Women, Inc. v. Scheidler* ........................................................... 19
   968 F.2d 612 (7th Cir. 1992)

*Nat'l Org. for Women, Inc. v. Scheidler* ........................................................... 19
   No. 86 C 7888, 1997 WL 610782 (N.D. Ill. Sept. 23, 1997)

*O'Hara v. Storer Commc'ns, Inc.* ....................................................................... 6, 7
   231 Cal. App. 3d 1101 (Ct. App. 1991)

*Parcoil Corp. v. Nowsco Well Service, Ltd.* ...................................................... 12, 13
   887 F.2d 502 (4th Cir.1989)

*People v. Kinder Morgan Energy Partners, L.P.* .............................................. 4, 5
   159 F. Supp.3d 1182 (S.D. Cal. 2016)

*People v. Silva* ......................................................................................................... 3, 4
   No. C080378, 2016 WL 4761936 (Cal. Ct. App. Sept. 13, 2016)

*Piscitelli v. Friedenberg* ....................................................................................... 3, 4
   87 Cal. App. 4th 953 (2001)

*Planned Parenthood v. CMP* ................................................................................ 2, 3
   735 F. App'x 241 (9th Cir. 2018)

*Planned Parenthood of Greater Texas Family Planning & Preventative Health
Servs., Inc v. Smith* ................................................................................................ 6
   913 F.3d 551 (5th Cir. 2019)

# TABLE OF AUTHORITIES

*Cases:*

*Planned Parenthood of Greater Texas Family Planning & Preventative Health Servs., Inc. v. Smith* .......................................................................................... 6
    914 F.3d 994 (5th Cir. 2019)

*Religious Tech. Ctr. v. Wollersheim* ........................................................... 13, 14
    971 F.2d 364 (9th Cir. 1992)

*Renick v. Dun & Bradstreet Receivable Mgmt. Servs.* .................................... 3
    290 F.3d 1055 (9th Cir. 2002)

*Robertson v. Red Rock Canyon Sch., LLC* ....................................................... 5
    No. 2:05-CV-758 TC, 2008 WL 2989245 (D. Utah July 31, 2008)

*Schreiber Distributing Co. v. Serv-Well Furniture Co.* ................................... 15
    806 F.2d 1393 (9th Cir.1986)

*State of Mo. v. Nat'l Org. for Women, Inc.* ..................................................... 19
    620 F.2d 1301 (8th Cir. 1980)

*Streck v. Peters* ........................................................................................... 13, 14
    855 F. Supp. 1156 (D. Haw. 1994)

*Sutherland v. O'Malley* .................................................................................. 13
    882 F.2d 1196 (7th Cir.1989)

*Tribeca Cos., LLC v. First Am. Title Ins. Co.* .............................................. 1, 2
    239 Cal. App. 4th 1088 (2015)

*Turner v. Cook* ....................................................................................... 12, 13, 14
    362 F.3d 1219 (9th Cir. 2004)

*United States v. Berry* .................................................................................... 10
    583 F.Supp.2d 749 (E.D. Va. 2008)

*United States v. Della Rose* .............................................................................. 9
    278 F. Supp.2d 928 (N.D. Ill. 2003)

*United States v. Gilbert* .................................................................................... 7
    884 F.2d 454 (9th Cir.1989)

*United States v. Klopf* .................................................................................. 9, 10
    423 F.3d 1228 (11th Cir. 2005)

*United States v. Lopez* ..................................................................................... 9
    514 U.S. 549 (1995)

*United States v. Morrison* ................................................................................. 9
    529 U.S. 598 (2000)

*United States v. Orozco-Santillan* ..................................................................... 7
    903 F.2d 1262 (9th Cir. 1990)

# TABLE OF AUTHORITIES

*Cases:*

*United States v. Spears* ............................................................................ 10
    729 F.3d 753 (7th Cir. 2013)

*United States v. Spears* ............................................................................ 10
    697 F.3d 592 (7th Cir. 2012)

*United States v. Spears* ............................................................................ 10
    *No. 11-1683, 2013 WL 515786 (7th Cir. Jan. 14, 2013)*

*Virginia v. Black* ....................................................................................... 7
    538 U.S. 343 (2003)

*Walker v. Contra Costa Cty.* ................................................................... 4, 5
    No. C03-3723 TEH, 2006 WL 3371438 (N.D. Cal. Nov. 21, 2006)

*Ward v. Kroger Co.* .................................................................................. 13
    372 F. App'x 738 (9th Cir. 2010)

*Federal Statutes:*

Fed. R. Civ. P. 26 ....................................................................................... 4

Fed. R. Civ. P. 26(a)(2)(A) ......................................................................... 4

Fed. R. Civ. P. 26(a)(2)(B) ......................................................................... 5

Fed. R. Civ. P. 30(b)(6) ........................................................................... 6, 7

Fed. R. Civ. P. Rule 702 ............................................................................. 4

18 U.S.C. § 1028 ........................................................................... 8, 9, 10, 11

18 U.S.C. § 1028(a) ................................................................................... 10

18 U.S.C. § 1028(a)(1) ........................................................................... 8, 10

18 U.S.C. § 1028(a)(2) ........................................................................... 8, 10

18 U.S.C. § 1028(c) ..................................................................................... 8

18 U.S.C. § 1028(c)(3)(A) ........................................................................... 9

18 U.S.C. § 1028(c)(3)(B) ........................................................................... 9

18 U.S.C. § 1962 ....................................................................................... 11

*Other Statutes:*

Cal. Bus. & Prof. Code §17200 ................................................................ 16

California Rule of Court 8.1115 .................................................................. 3

# NOTICE OF MOTION

TO PLAINTIFF AND ITS ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE THAT on Wednesday, July 17, 2019, at 2:00 p.m. in Courtroom 2 of the Honorable William H. Orrick III at the United States District Court for the Northern District of California, 17th Floor, 450 Golden Gate Ave., San Francisco, CA 94102, Defendant the Center for Medical Progress will, and hereby does move for summary judgment on the ground that there is no genuine issue as to any material fact and that the Center for Medical Progress is entitled to judgment as a matter of law for the reason that Plaintiffs:

- cannot prove damages (all Counts for which Plaintiffs allege damages, including but not limited to Count 8 (Fraud) and Count 1 (RICO));
- cannot prove a RICO "pattern" or an alleged predicate act occurring in or affecting interstate commerce (Count 1 – RICO); and
- cannot prove a "business" threat (Count 7 – Unfair Competition Law).

This motion will be based upon the attached points and authorities, the declarations of Jeffrey Trissell, Esq. and David Daleiden, the concurrent motions for summary judgment filed by co-Defendants, the pending motion to exclude Plaintiffs' unretained experts, all pleadings and records on file in this action, and any argument at the hearing on this matter.

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

# INTRODUCTION

CMP incorporates herein co-Defendants' motions for summary judgment as to Counts 1–15. This motion focuses on:

1. the failure of proof of damages (all Counts for which Plaintiffs allege damages, including but not limited to Count 8 (Fraud) and Count 1 (RICO));

2. the absence of a RICO "pattern," and the alleged predicate act not occurring in or affecting interstate commerce (Count 1 – RICO); and

3. the absence of a "business" threat (Count 7 – Unfair Competition Law).

For these reasons, Plaintiffs' claims against CMP, including RICO, Fraud, and Unfair Competition, fail as a matter of law, and summary judgment should be granted.

# ARGUMENT

**1.  All Counts for which Plaintiffs allege damages fail because Plaintiffs cannot show that Defendants proximately caused any damages or that Plaintiffs suffered any cognizable damages.**

Plaintiffs seek recovery of alleged (1) damages caused by intervening actions of third parties, (2) costs of increased security which are voluntary improvements not compensatory damages, (3) costs lacking the requisite expert support, and (4) publication damages that Plaintiffs previously disclaimed.  Plaintiffs' Damages Statement (Dkt. 420); Plaintiffs' Third Amended Response to Defendant Troy Newman's Second Set of Interrogatories (Dkt. 547-6); Plaintiffs' Third Amended Initial Disclosures (Dkt. 547-11) at 10-13.  Some of these claimed-damages categories overlap.  As discussed below (and in co-Defendants' motions for summary judgment), Plaintiffs are not entitled to any of these damages as a matter of law, and all of Plaintiffs' claims for which they allege compensatory/restitutionary damages therefore fail.

### A.  Plaintiffs cannot recover for alleged damages caused by intervening actions of third parties.

A defendant must proximately cause damages for a plaintiff to recover them.  *See, e.g.*, Order on Motions to Dismiss and Strike (proximate cause is element of fraudulent misrepresentation and RICO) (Doc. 124) at 16-17 (RICO) & 32-33 (fraudulent misrepresentation); *Tribeca Cos., LLC v. First Am. Title Ins. Co.*, 239 Cal. App. 4th 1088, 1103 (2015) (proximate cause is element of breach of

contract). A defendant does not and cannot proximately caused damages that are caused by an intervening action of a third party. *See, e.g.*, *Hemi Grp., LLC v. City of New York, N.Y.*, 559 U.S. 1, 2-3 (2010) (rejecting RICO liability for "separate actions carried out by separate parties"); *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 534 (1983) (holding that recovery for an antitrust violation requires "proximate cause" of damages, and union cannot recover for alleged injuries to it that were "indirect result" of coercion against particular members); *see also Food Lion, Inc. v. Capital Cities/ABC, Inc.*, 964 F. Supp. 956 (M.D.N.C. 1997) (*Food Lion II*) (investigative reporters' alleged fraud and trespass was not proximate cause of damages to grocery store company), *aff'd on other grounds*, 194 F.3d 505 (4th Cir. 1999) (*Food Lion III*).

By Plaintiffs' own admissions, third parties caused several types of Plaintiffs' alleged damages. Plaintiffs' Damages Statement (Dkt. 420). Plaintiffs identify four categories: (1) "short term security;" (2) "conference and health center security improvements;" (3) "property damage;" and (4) PPGC "responding to state investigations." *Id.* at 2. Within those categories, Plaintiffs admit the third-party causes. *Id.* at 1-2. For example:

- o Third-party "hacking" caused Plaintiffs' "lost revenues" and caused Plaintiffs to incur costs to repair their website;

- o Third-party "protests" caused Plaintiffs to incur security costs to respond to the protests;

- o Third-party "vandalism" to Plaintiffs' offices and clinics caused Plaintiffs to incur repair costs;

- o Third-party "graffiti" caused Plaintiffs to incur graffiti-removal costs; and

- o Third-party "state investigations" caused one Plaintiff to incur costs of responding to those investigations.

*Id.* As the District Court foresaw in its Order on Motions to Dismiss, Plaintiffs cannot recover such damages. Order (Doc. 124) at 16-17, 32-33; *see also Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, 735 F. App'x 241, 247 (9th Cir. 2018) ("Notions of proximate cause may preclude Plaintiffs from recovering some of the damages claimed such as damages from the publication of the

videos,[1] costs associated with responding to multiple state and federal investigations, and damages for increased acts of violence because of intervening or superseding causes.").

### B. Costs of increased security are not recoverable because they are not compensatory/restitutionary.

The costs of improving security are not recoverable as damages. *See People v. Silva*, No. C080378, 2016 WL 4761936, *3 (Cal. Ct. App. Sept. 13, 2016)[2] ("The installation of a new security system may well have been a prudent step by the hostel management, but to award that by way of restitution would leave the hostel better off, and thus constitutes an improper windfall."). Plaintiffs' alleged damages are primarily costs of increasing or improving security, which Plaintiffs allegedly (and discretionarily) implemented following Defendants' allegedly wrongful acts. Plaintiffs' Damages Statement. Plaintiffs do not and cannot contend that Defendants *damaged* any security systems warranting repairs or that the costs they seek are to make Plaintiffs whole. *Id.*[3] Accordingly, recovery of costs of increased security would be a "windfall." *Silva*, 2016 WL 4761936 at *3; *see also Piscitelli v. Friedenberg*, 87 Cal. App. 4th 953, 981 (2001) ("Where the stated goal is to make an injured plaintiff 'whole,' a windfall award should not be included in the damage equation.").

Indeed, Plaintiffs expressly characterize portions of their increased-security costs as costs for "increased" or "additional" security, security "improvements," and security "enhancements." Plaintiffs' Damages Statement. An award of such costs would not compensate Plaintiffs for any

---

[1] As discussed below, Plaintiffs now do not seek damages from the publication of the videos. (Dkt 442, at 23).

[2] *Renick v. Dun & Bradstreet Receivable Mgmt. Servs.*, 290 F.3d 1055, 1058 (9th Cir. 2002) ("Ninth Circuit Rule 36–3 . . . does not apply to unpublished dispositions issued by any other courts"); *Cole v. Doe 1 thru 2 Officers of City of Emeryville Police Dep't*, 387 F. Supp. 2d 1084, 1103 n.7 (N.D. Cal. 2005) ("California Rule of Court [8.1115] prohibits citation or reliance by a court of an unpublished California Court of Appeal decision. However, the rule is not binding in the federal courts").

[3] This Court and the Ninth Circuit previously suggested that Plaintiffs "may" be able to establish that they incurred security costs *as a result of* Defendants' alleged breaches, Order (Doc. 124) at 16 (RICO) & 32-33 (fraudulent misrepresentation), but discovery now confirms that Plaintiffs' alleged security "costs" are all for *new* security systems and practices, rather than for the repair of any damage actually *caused by* Defendants. *See Silva*, 2016 WL 4761936, *3 (denying restitution damages for improving security because defendant "did not damage" the existing security system).

actual loss. *Silva*, 2016 WL 4761936 at *3; *Piscitelli*, 87 Cal. App. 4th at 981. As a matter of law, Plaintiffs cannot recover these costs. As discussed herein, increased-security costs are otherwise unrecoverable, because they resulted from intervening third-party acts, the costs are speculative and unapportioned, and, to the extent they were adopted in connection with the Human Capital Project's publication of the videos, they are disclaimed publication damages.

**C.     Costs unattributed between Defendants' alleged wrongful conduct and other circumstances are not recoverable.**

Unapportioned, speculative costs are not recoverable. *See Atkins v. City of Los Angeles*, 8 Cal. App. 5th 696, 738 (Ct. App. 2017) ("it is fundamental that damages which are speculative, remote, imaginary, contingent, or merely possible cannot serve as a legal basis for recovery") (internal quotation and citation omitted). Plaintiffs contend that they incurred certain costs for, *e.g.*, "staff time" in "responding to video," "security training," and "responding to protests and increased security incident." Plaintiffs' Damages Statement; Plaintiffs' Third Amended Response to Defendant Troy Newman's Second Set of Interrogatories; Plaintiffs' Third Amended Initial Disclosures (Dkt. 547-11) at 10-13.

Proving that Defendants' alleged acts caused the expenditure of such costs, and apportioning such costs between Defendants' alleged wrongful conduct and other circumstances, requires technical or other specialized expert testimony. *See Walker v. Contra Costa Cty.*, No. C03-3723 TEH, 2006 WL 3371438, *8-9 (N.D. Cal. Nov. 21, 2006) (causation witness must be disclosed as expert; "[w]itnesses planning to offer opinions based on 'scientific, technical, or other specialized knowledge' must be disclosed as expert witnesses pursuant to Fed. R. Civ. P. 26(a)(2)(A). . . ."); Advisory Committee Notes to 2000 Amendments to Federal Rule 26 ("*any part* of a witness' testimony that is based upon scientific, technical, or other specialized knowledge within the scope of Rule 702 is governed by the standards of Rule 702 and the corresponding disclosure requirements of the Civil and Criminal Rules") (cited by *Walker*); *People v. Kinder Morgan Energy Partners, L.P.*, 159 F. Supp. 3d 1182, 1199 (S.D. Cal. 2016) ("None of the evidence cited by the City in support of causation can substitute for expert testimony."); *Robertson v. Red Rock Canyon Sch., LLC*, No. 2:05-CV-758 TC, 2008 WL 2989245, at *2–3 (D. Utah July 31, 2008)

4

1  ("Witnesses who otherwise plan to testify as to causation, damages, and liability are required to

2  comply with disclosure under Fed. R. Civ. P. 26(a)(2)(B).").

3      But Plaintiffs disclosed no such expert. *See* Declaration of Charles S. LiMandri, Esq. (Dkt.

4  546-1) at ¶ 16, Ex. 15. Plaintiffs' expert-disclosure deadline has come and gone (Dkt. 461; Minute

5  Order setting March 15, 2019 expert-disclosure deadline), and they have sought no leave to disclose

6  out of time. *See* Defendants' Motion to Exclude Testimony of Plaintiffs' Unretained Damages

7  Experts (Dkt. 546 & 547-2) at 12–13. Absent such expert testimony, damages tied to such costs are

8  speculative and therefore not recoverable. *Walker*, 2006 WL 3371438, at *8-9. *See also*

9  Defendants' Motion to Exclude Testimony of Plaintiffs' Unretained Damages Experts (Dkt. 546 &

10  547-2) at 12–13; Defendants' Reply in Support of Motion to Exclude Testimony of Plaintiffs'

11  Unretained Damages Experts (Dkt. 583) at 5-7.

12      The discovery Plaintiffs provided does not suffice. Plaintiffs produced hundreds of pages of

13  raw, unapportioned numbers allegedly relating to such costs, *see* Declaration of Charles S.

14  LiMandri, Esq. (Dkt. 546-1 & 547-6) at ¶ 7, Ex. 6, and offered some lay testimony about them, *see*

15  Declaration of Charles S. LiMandri, Esq. (Dkt. 546-1 & 547-12) at ¶ 17, Ex. 16, but Plaintiffs chose

16  to offer no expert opinion. Lay witnesses here may testify only as to what they personally observed

17  and did. *Walker*, 2006 WL 3371438, at *8-9. As lay witnesses, they cannot opine as to causation.

18  *Id.* Absent an expert, Plaintiffs cannot seek these costs.

19      In fact, Plaintiffs conceded in discovery that they would need a damages expert and

20  represented that they would designate one. Defendants' Motion to Exclude Testimony of

21  Plaintiffs' Unretained Damages Experts (Dkt. 546 & 547-2) at 4–5; Declaration of Charles S.

22  LiMandri, Esq. (Dkt. 546-1, 547-3, 547-4, 547-5, 547-6, 547-7, 547-8, 547-9, 547-10, 547-11) at Ex. 3–

23  12. When Plaintiffs failed to designate a damages expert by the deadline, they attempted to claim

24  that they actually didn't need one. Declaration of Charles S. LiMandri, Esq. (Dkt. 546-1) at ¶ 16,

25  Ex. 15. This new assertion that they can somehow provide a basis for their damages, absent any

26  expert testimony, is groundless. *See, e.g.*, *Antioch Co. Litig. Trust v. Morgan*, No. 10-156, 2014 WL

27  1365949, *5-6 (S.D. Ohio Apr. 7, 2014) (granting summary judgment on claims requiring proof of

28  damages after precluding "Plaintiff's new attempt to claim that its damages can be proven without

5

an expert," where factual record closed with plaintiff providing "no information about its claimed damages" and plaintiff's Rule 30(b)(6) witness having testified that "an expert was required"); *Cole v. Homier Distrib. Co.*, No. 07-1493, 2009 WL 775627, *5 (E.D. Mo. Mar. 20, 2009) (granting defendant summary judgment on plaintiffs' breach of contract claims since defendant was not able to perform discovery "on **Plaintiffs' new assertion that they can provide a reasonable basis for their damages, absent any expert testimony**," where plaintiffs had stated under oath until fact discovery closed that they would rely upon an expert to calculate damages) (emphasis added).

### D. Plaintiffs expressly disclaimed all defamation/publication damages.

Plaintiffs' alleged damages all relate to the publication of the videos. *See* Trissell Decl., Ex. 37. Bonner (PPPSGV) Depo., 70:12–25; Ex. 39. Boyett (PPNC) Depo., 307:23–308:7, 313:13–17; Ex. 40. Szymanski (PPMM) Depo., 188:6–16, 224:4–9, 226:14–227:8; Ex. 41. Dunn (PPPOSB) Depo., 277:7–278:9; Ex. 42. Palmer (PPGC) Depo., 31:14–32:10; Ex. 43. Tosh (PPCCC) Depo., 169:11–16; Ex. 44. Pahl (PPLA) Depo., 300:20–301:3; Ex. 46. Paul (PPRM) Depo., 185:5–9, 189:9–190:4; Ex. 48. Noah (PPFA) Depo., 77:21–79:12, 114:2–16; Ex. 49. Pickford (PPPSW) Depo., 284:17–285:10; *see also* Breen Decl. (Dkt. 558) (attaching relevant excerpts of Plaintiffs' Rule 30(b)(6) testimony); co-Defendants Rhomberg and Newman's Motion for Summary Judgment and record evidence cited therein.

But Plaintiffs expressly disclaimed all such damages. *See, e.g.*, Order (Dkt. 442, at 23) ("Plaintiffs do not seek reputational or publication damages."); Plaintiffs' Damages Statement (Dkt. 420) ("Plaintiffs are not seeking reputational damages. . . . Planned Parenthood incurred significant expenses to protect its brand and reputation after the smear, but it does not seek to recover any such costs."). Publication damages are broad. *See O'Hara v. Storer Commc'ns, Inc.*, 231 Cal. App. 3d 1101, 1113 (Ct. App. 1991) ("[T]here is no rule of law relieving the publisher from liability because of the manner in which the publication has resulted in the harm") (quoting Restatement Second of Torts § 622A). As such, Plaintiffs have broadly disclaimed damages. Plaintiffs know that they cannot recover such damages, because, for example, the published videos were demonstrably not false. *Planned Parenthood of Greater Texas Family Planning & Preventative*

1  *Health Servs., Inc. v. Smith*, 913 F.3d 551, 568, 559 n.6 (5th Cir. 2019);[4] *see also Food Lion III*, 194 F.3d

2  at 522–24 (no reputational damages absent proof of defamation—falsity and malice).

3        Yet Plaintiffs attempt to seek such publication damages anyway, characterizing them instead

4  as damages resulting from Defendants' wrongful *entry* rather than the *publication*. Plaintiffs'

5  Damages Statement; Plaintiffs' Third Amended Response to Defendant Troy Newman's Second

6  Set of Interrogatories; Plaintiffs' Third Amended Initial Disclosures (Dkt. 547-11) at 10-13. For

7  example, Plaintiffs complain that they incurred costs related to third-party "hacking," "protests,"

8  "vandalism," "graffiti," and "state investigations" following Defendants' entry. Plaintiffs'

9  Damages Statement. But the hacker, protestors, vandals, graffiti artists, and state investigators

10  allegedly acted *based on the publication. See id.*; *see also Food Lion II*, 964 F. Supp. at 962.

11  Accordingly, these damages are publication damages. *Id.*; *O'Hara*, 231 Cal. App. 3d at 1113.

12  Because Plaintiffs disclaimed such publication damages, they cannot recover them.[5]

13        And to the extent Plaintiffs attempt to seek these security costs or other amounts *as*

14  publication damages, they, again, have disclaimed all such publication damages. Even if they

15  somehow hadn't disclaimed them, Plaintiffs have sought to curtail Defendants' rights to discovery

16  regarding Plaintiffs' alleged damages, which, the Court recognized, could proportionally curtail

17  Plaintiffs' damages claim itself. *See* Order (Dkt. 533) ("Plaintiffs bear the risk that by successfully

18  seeking to  preclude discovery into specific topics, and thereby limiting defendants' ability to test

19  those  damages, plaintiffs could be precluded from seeking some portion of those damages or may

20  have any damages awarded reduced or set aside post-trial."). No matter how Plaintiffs try to

21  characterize their damages, they are not entitled to them.

22

23

---

24  [4] *Reh'g en banc granted sub nom. Planned Parenthood of Greater Texas Family Planning & Preventative
Health Servs., Inc. v. Smith*, 914 F.3d 994 (5th Cir. 2019). To the extent Plaintiffs contend the

25  videos were somehow false notwithstanding the Fifth Circuit's determination, the evidence here is
uncontroverted that the videos were not false. Attached to the Trissell declaration as Exhibits 1

26  through 20 is incontrovertible proof that Defendants' allegations were correct: Plaintiffs were
profiteeting from the sale of fetal tissue. *See also* Section 3.B. below.

27  [5] These damages are unrecoverable for additional, independent reasons, as discussed above.

28

**E. Plaintiffs cannot recover threat or incitement damages.**

Several of Plaintiffs' Fed. R. Civ. P. 30(b)(6) witnesses have characterized Defendants' publications as "threatening." But this is not a basis for recovering publication damages. Under the First Amendment, allegedly threatening speech is protected unless it is a "true threat." *Virginia v. Black*, 538 U.S. 343, 359 (2003). A true threat is "an expression of an intention to inflict evil, injury, or damage on another." *United States v. Gilbert*, 884 F.2d 454, 457 (9th Cir.1989) (citation omitted), one that a "reasonable person would foresee that the listener will believe he will be subjected to physical violence upon his person." *United States v. Orozco-Santillan*, 903 F.2d 1262, 1265–66 (9th Cir. 1990). A defendant must intentionally or knowingly communicate the threatening words. *Id.* at 1265 n.3. Plaintiffs have repeatedly conceded that Defendants have never made such threats. *See* Trissell Decl., Ex. 39. Boyett (PPNC) Depo., 241:9–23; Ex. 41. Dunn (PPPOSB) Depo., 305:4–19; Ex. 42. Palmer (PPGC) Depo., 33:20–23; Ex. 46. Paul (PPRM) Depo., 57:2–18; Ex. 48. Noah (PPFA) Depo., 80:25–81:9, 113:18–24, 115:13–24.

Moreover, there is no liability in negligence for the bad acts of third parties unless, at a minimum, the speaker (1) directly advocated unlawful action, (2) intended to incite or produce such action, (3) such action was likely to occur, *and* (4) such occurrence was imminent. *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969). Only "advocacy [which] is directed to inciting or producing *imminent* lawless action *and is likely* to incite or produce such action" is unprotected. *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 928 (1982) (emphasis added) (holding that "strong language" and "emotionally charged rhetoric" that arguably advocated racial violence was nonetheless protected, even though violence ultimately resulted, because "the acts of violence . . . occurred weeks or months after the . . . speech," and thus it was not imminent). Plaintiffs do not have the evidence to recover threat or incitement damages. It is undisputed, for example, that Defendants did not make or intend threats, at any time, to Plaintiffs or to anyone else, and that Defendants did not directly advocate any unlawful action. *See* Trissell Decl., Ex. 37. Bonner (PPPSGV) Depo., 125:6–24; Ex. 39. Boyett (PPNC) Depo., 220:20–223:13; Ex. 40. Szymanski (PPMM) Depo., 238:19–243:11; Ex. 43. Tosh (PPCCC) Depo., 114:20–24; Ex. 44. Pahl (PPLA) Depo., 196:13–200:11; Ex. 48. Noah (PPFA) Depo., 115:13–24; Ex. 49. Pickford (PPPSW) Depo., 227:5–9.

**2.**   **Summary judgment is appropriate on Plaintiffs' RICO claim because there is no evidence that Defendants' alleged predicate acts affected interstate commerce or constituted a RICO "pattern." (Count 1).**

Following development of the record in discovery, it is now possible for the Court to decide on summary judgment two issues it previously flagged as "bare[ly]" or not at all pleaded: namely, whether Defendants have committed predicate acts under 18 U.S.C. § 1028 that (1) adequately affect interstate commerce and (2) form a "pattern" under RICO. *See* Order (Doc. 124) at 13.

**A.**   **Defendants have committed no "predicate acts" under RICO, because their actions fall short of affecting interstate commerce as required for application of 18 U.S.C. § 1028.**

Ruling on Motions to Dismiss, this Court dismissed the lion's share of Plaintiffs' RICO claims. Order (Doc 124) at 11-13. Accordingly, only alleged predicate acts of "production" and "transfer" of false identifications, as prohibited under 18 U.S.C. § 1028(a)(1) and (a)(2), remain at issue on summary judgment. *Id.* In its Order, this Court specifically held that the question of whether Defendants' alleged production or transfer was "in or affecting" interstate commerce was a factual issue that awaited further development. *Id.* at 12. Following discovery, summary judgment for Defendants is now appropriate on this question, and, consequently, on Plaintiffs' entire RICO claim.

Subsections (a)(1) and (2) of § 1028, prohibiting "production" and "transfer" of false identifications are limited by section (c), which requires that "(A) the *production, transfer, possession, or use prohibited by this section is in or affects interstate or foreign commerce*, including the transfer of a document by electronic means; *or* (B) the means of identification, identification document, false identification *document*, or document-making implement *is transported in the mail in the course of the production, transfer*, possession, or use *prohibited by this section*." 18 U.S.C. § 1028(c) (emphasis added). A connection with interstate commerce or use of the mail is a jurisdictional element, without which § 1028 cannot be applied to Defendants' actions. *See, e.g., United States v. Klopf*, 423 F.3d 1228, 1237 (11th Cir. 2005) (noting that the Supreme Court has found there must be a minimal connection to interstate commerce for jurisdiction under the Commerce Clause in both *United States v. Lopez*, 514 U.S. 549 (1995) and *United States v. Morrison*, 529 U.S. 598 (2000)).

9

Courts have interpreted the language of § 1028(c)(3)(A) to require that plaintiffs must show that it is specifically the "production [or] transfer prohibited by this section [rather than possession or later use]" that "is in or affects interstate commerce."[6] 18 U.S.C. § 1028(c)(3)(A). As the court in *United States v. Della Rose*, 278 F. Supp. 2d 928 (N.D. Ill. 2003), noted:

> [I]n this case, the only conduct Defendant was charged with that was 'prohibited by this section' was *production* of false identification documents. Thus, under the plain language of the statute, it is the *production* that must be in or affect interstate commerce.

*Della Rose*, 278 F. Supp. 2d at 933 n.2 (emphasis added).

The factual record developed in discovery establishes definitively that Defendants' alleged actions of "production" and "transfer" were not "in or affecting" interstate commerce sufficient to satisfy § 1028(c)(3)(A). Nor were any identification documents ever transported in the mail as necessary to meet the alternate requirement of § 1028(c)(3)(B).

All evidence elicited as to production and transfer of Defendants' identification documents shows Defendants' actions taking place entirely within California. Daleiden produced the Robert Sarkis identification himself at his home in California. Ex. 50, Daleiden Depo., 228:14–229:14; Daleiden Decl., ¶ 116. He approached a person in California—his home state—to produce the documents for "Susan Tennenbaum" and "Brianna Allen." Ex. 50, Daleiden Depo., 230:4–231:24, 232:19–233:15; Daleiden Decl., ¶ 116. Those documents were hand delivered to Daleiden, and he hand-delivered them to Merritt and Baxter, in California. Daleiden Decl., ¶¶ 116–17. He paid for these documents in cash. Daleiden Decl., ¶ 116. Thus, all evidence as to production and transfer involves only the State of California, without the use of the mail.

An interstate nexus need not be strong, but it must be present in order for the federal government to be able to regulate the behavior prohibited under § 1028. *United States v. Berry*, 583 F. Supp. 2d 749, 755 (E.D. Va. 2008) ("The Court is well aware that the Government need only

---

[6] As noted above, this Court has dismissed Plaintiffs' allegations that Defendants engaged in **possession** or **use** of false IDs as "prohibited by this section." Order (Doc. 124) at 11 (plaintiffs fail to state claim for possession and intended use).

prove a minimal nexus with interstate commerce in a 18 U.S.C. § 1028(a) prosecution to satisfy the 'in or affect interstate or foreign commerce' requirement. However, this Court also notes that there is a difference between 'minimal nexus' and no nexus at all." (citation omitted)); *see also Klopf*, 423 at 1237 (requiring minimal connection to interstate commerce for jurisdiction under the Commerce Clause). "Commerce implies an economic exchange of something—whether it be goods or services." *Berry*, 583 F. Supp. 2d at 754-55.

Because no evidence in the record suggests that either the production or the transfer of the identification documents was in or affecting interstate commerce or used the mail, Plaintiffs cannot establish this Court's jurisdiction to apply 18 U.S.C. § 1028(a)(1) or (2) to Defendants' actions. Because those provisions are inapplicable, Plaintiffs' RICO claims lack any remaining allegations of predicate acts.[7] Therefore, summary judgment for the Defendants on the RICO claim is appropriate.

**B. There was no "pattern" of "continuous" prohibited acts.**

Moreover, even if it were possible for Plaintiffs yet to prove that Defendants had committed predicate acts of "production" and/or "transfer" of false identifications, RICO further requires, among other elements, that defendants have engaged in a "pattern of criminal activity." 18 U.S.C. § 1962. The Supreme Court has made clear that a "pattern" under RICO consists of "predicate criminal acts [that are] 'related' and 'continuous.'" *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 239 (1989) (emphasis added). At this summary-judgment stage, it is now clear that Plaintiffs cannot demonstrate a "pattern" of "continuous" production or transfer of false identifications. The Court should therefore grant Defendants summary judgment on the RICO claim.

---

[7] *See also, e.g.*, Daleiden Decl., ¶¶ 115–19; *United States v. Spears*, 697 F.3d 592, 600 (7th Cir. 2012) ("false identification" under § 1028 requires that a document "at least appear to be government-issued and of a type commonly accepted for identification"), *reh'g en banc granted, opinion vacated,* No. 11-1683, 2013 WL 515786 (7th Cir. Jan. 14, 2013), and *opinion reinstated in part on reh'g,* 729 F.3d 753 (7th Cir. 2013). Regardless, Defendants have no RICO liability for the reasons set forth in this Motion at Sections 2.A. and 2.B. herein and in co-Defendants' Motions.

### i. The record indicates only sparse and sporadic acts of "production" and/or "transfer" of identifications.

The only evidence in the record of any defendant engaging in "production" or "transfer" of identifications is Defendant Daleiden's admissions in his deposition to (1) having typed a pseudonym over a scan of an expired government-issued identification; (2) having arranged on one occasion for the production of two novelty identifications in the names of "Sandra Merritt" and "Brianna Allen;" and (3) having delivered the identifications to his associates. Ex. 50, Daleiden Depo., 228:14–233:15; Daleiden Decl. ¶¶ 116–17. All three identifications were intended for limited use in Daleiden's investigative journalism exposing the misuse of human remains by the abortion industry. Ex. 50, Daleiden Depo., 228:14–233:15; Daleiden Decl., ¶ 115. Although the exact dates of Defendant Daleiden's actions with the identifications are not known, they all occurred within a maximum of six months' time. Daleiden Decl. ¶¶ 116–17.

Even assuming that these facts could support a conviction for violating 18 U.S.C. § 1028, which Defendants do not concede,[8] allegations of sparse and sporadic prohibited activity, such as these, are insufficient to establish a "pattern" of predicate acts under RICO.

### ii. "Continuity" sufficient to establish a "pattern" requires more than "isolated" or "sporadic" predicate acts.

Under RICO, predicate acts can be sufficiently continuous to form a "pattern" in two ways: either they occurred in the past over a substantial period of time, *H.J., Inc.*, 492 U.S. at 242, or they threaten to continue into the future, *id.* at 242-43. The Supreme Court thus noted in *H.J. Inc.*, that "[p]redicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement." *Id.* at 242. "Congress was concerned in RICO with long-term criminal conduct." *Id.*

---

[8] Defendants do not concede that they have committed any valid predicate acts under § 1028 or any other federal law. *See supra* section 2.A. For the purposes of this section, Defendants argue only that, even if their activities constituted "predicate acts," Plaintiffs' RICO claims fail for lack of a "pattern."

There is no genuine issue of material fact supporting the existence of either type of RICO continuity in this case. Defendant Daleiden's alleged predicate offenses neither occurred over a substantial period of time nor threatened to continue into the future.

a. <u>The alleged predicate acts did not occur over a substantial period of time.</u>

Two or three isolated alleged acts of production and transfer within six months' time are far from establishing "continuity" sufficient to support a RICO claim. The Ninth Circuit, like other Circuits, has made abundantly clear that it requires far more long-term activity than a couple of predicate acts within six months to establish that predicate acts occurred "over a substantial period of time."

For example, in *Turner v. Cook*, 362 F.3d 1219 (9th Cir. 2004), the Ninth Circuit held that there was insufficient "continuity" to support a RICO claim in a scheme that involved 94 allegedly fraudulent communications sent over two months' time, in addition to three other allegedly fraudulent communications that occurred "only sporadically in the preceding year." *Id.* at 1230-31; *see also Feinstein v. Resolution Tr. Corp.*, 942 F.2d 34, 45–46 (1st Cir. 1991) (25 real estate closings over two months was "too short a period to support a claim that the appellees were engaged in the long-term criminal conduct at which RICO is aimed.") (citing *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1418 (3d Cir. 1991) (eight-month period of fraudulent activity did not constitute a pattern, absent threat of future criminal acts); *Parcoil Corp. v. Nowsco Well Service, Ltd.*, 887 F.2d 502, 503–05 (4th Cir.1989) (seventeen falsified reports sent over a period of four months did not establish continuity); *Sutherland v. O'Malley*, 882 F.2d 1196, 1204–05 (7th Cir.1989) (three acts of mail fraud within five months did not satisfy continuity plus relatedness requirement)).

Similarly, in *Religious Tech. Ctr. v. Wollersheim*, 971 F.2d 364, 366–67 (9th Cir. 1992), the Ninth Circuit held that activity that "continued for six months at most" did not satisfy the Supreme Court's standard in *H.J., Inc.*, where the Court had made clear that "[p]redicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this [continuity] requirement." *RTC v. Wollersheim*, 971 F.2d at 366-67 (quoting *H.J. Inc.*, 492 U.S. at 242); *see also Ward v. Kroger Co.*, 372 F. App'x 738, 739-40 (9th Cir. 2010) ("Plaintiffs' allegations

encompass a shorter period of time than the time period at issue in *Wollersheim*, which we rejected as insufficient."); *Howard v. Am. Online Inc.*, 208 F.3d 741, 750 (9th Cir. 2000) ("Activity that lasts only a few months is not sufficiently continuous."); *Streck v. Peters*, 855 F. Supp. 1156, 1165 (D. Haw. 1994) ("Four months is not a substantial period of time under *Northwestern Bell* or *Religious Technology Center*."). Yet again, Defendants here find themselves in the same position as the reporters in *Food Lion*, where the court held early on that RICO did not apply to their short-term investigative project: "A series of predicate acts occurring over a six month span and directed at one victim cannot be said to possess closed continuity." *Food Lion, Inc. v. Capital Cities/ABC, Inc.*, 887 F. Supp. 811, 820 (M.D.N.C. 1995) (*Food Lion I*).

In a Circuit that rejected 97 predicate acts over a year or so as insufficiently continuous, *Turner*, 362 F.3d at 1230-31, there is no hope for a RICO claim here, where the facts indicate at most, two or three instances of alleged activity within six months. Even if these events were fully proven at trial, they would fall far short of what the Ninth Circuit requires to find "continuity" under RICO for activity extending over a "substantial period of time."

> b. The alleged predicate acts did not threaten to continue into the future.

In Plaintiffs' own words, the Defendants' plan of investigative journalism "came to fruition" in their release of videos in "The Human Capital Project." FAC ¶ 124. Indeed, it is undisputed that Defendants' alleged production and/or transfer of three identifications were part of a plan that was aimed at the very specific and public goal of releasing videos exposing Plaintiffs' and other abortion provider's misuse of human remains. *Compare Food Lion I*, 887 F. Supp. at 820 ("The acts of mail and wire fraud were part of a limited purpose, to obtain information from Food Lion to be aired on PTL."). As such, Defendants' endeavor had a definite endpoint: the public exposure not only of its targets but also of Defendants' own true identities. Because their only alleged predicate acts were taken to initiate a finite project with a definite endpoint, the record will not support a finding at trial that those predicate acts were "continuous" in the sense that they threatened to continue indefinitely into the future.

Predicate acts in furtherance of an endeavor with a distinct beginning and end point are not "continuous" under RICO. For example, in 2004, the Ninth Circuit considered an alleged "pattern" of fraudulent mailings, faxes and telephone calls perpetrated by attorneys attempting to collect an outstanding tort judgment. *Turner v. Cook*, 362 F.3d 1219 (9th Cir. 2004). The Court held that RICO "continuity" was not established because "the alleged actions were finite in nature in that the mailings, faxes and telephone calls would cease once appellees collected the outstanding tort judgment." *Id*. at 1230. Similarly, the Ninth Circuit has held that fraudulent acts in service of obtaining a single contract were not "continuous" under RICO. *Medallion Television Enterprises, Inc. v. SelecTV of California, Inc.*, 833 F.2d 1360, 1364 (9th Cir. 1987); *see also, e.g.*, *Religious Tech. Ctr. v. Wollersheim*, 971 F.2d 364, 366 (9th Cir. 1992) ("Since the only goal of the Greene defendants was the successful prosecution of the *Wollersheim* state tort suit, there was no threat of activity continuing beyond the conclusion of that suit."); *Streck v. Peters*, 855 F. Supp. 1156, 1166 (D. Haw. 1994) ("In the case at bar, all of the predicate acts allegedly committed by defendants arose from the single event of attempting to 'ruin Plaintiff's law practice. . . .' Thus, the predicate acts here are isolated and fail to form a pattern.").

In 1987, the Ninth Circuit settled almost the precise question raised in this case: whether "three specific predicate acts" in service of a single scheme are sufficiently continuous to support a RICO claim. The defendants in *Jarvis v. Regan*, 833 F.2d 149 (9th Cir. 1987), were political groups whose alleged "three specific predicate acts" were "acts of mail and wire fraud" in support of a fraudulent scheme to obtain a federal grant "with the intent to use it to campaign against" a proposition on the California ballot. *Id*. at 153.

The Ninth Circuit first made clear in *Jarvis* that RICO continuity had to be established with respect to the Defendants' allegedly illegal predicate acts, not their entire scheme to use illegally obtained funds politically: "It is the acquisition of funds that constitutes the alleged criminal violations or predicate acts, according to plaintiffs, not the actual use of those funds. Thus, the question presented here is whether the requisite continuity and relationship implicit in the concept of 'pattern' is established by this discreet [*sic*] activity, which has a distinct and easily defined beginning and end, even though supported by several alleged predicate acts of mail and wire fraud."

1   *Id.*   Similarly, in this case, Plaintiffs have alleged predicate acts taken as part of Defendants'

2   investigation of Plaintiffs.  Order (Doc. 124) at 13; FAC ¶ 160.  As such, Plaintiffs must establish

3   RICO continuity with regard to the allegedly illegal activities, which terminated not only in the

4   revelation of Defendants' true identities by release of the videos, but long beforehand, with the last

5   act of production or transfer of false identifications.

6       Applying Ninth Circuit precedents, the Court in *Jarvis* then considered whether the

7   Defendants' predicate acts leading to obtaining the grant "pose[d] a threat of continuing activity,"

8   and concluded that they did not, because the alleged illegal activities were "isolated and presented

9   no threat of continuing."  *Id.* (citing, *inter alia, Schreiber Distributing Co. v. Serv-Well Furniture Co.*,

10  806 F.2d 1393, 1399 (9th Cir.1986) (finding no "threat of continuing activity" in alleged acts of mail

11  and wire fraud that led to only one shipment of goods).  "Even if [a fraudulent] scheme existed and

12  [illegal acts] were used to facilitate it, it was, at most, isolated and presented no threat of continuing.

13  Although the alleged predicate acts . . . were indeed related to that objective, this is not sufficient to

14  constitute a pattern of racketeering activity."  *Id.*

15      Like in *Jarvis*, allegations in this case, even fully proven, can only establish two or three

16  "isolated" predicate acts under RICO that "presented no threat of continuing."  Like in *Jarvis* and

17  in cases cited therein, these alleged predicate acts were an initial step in a plan with a definite goal

18  and endpoint: publication of videos publicly exposing misuse of human remains for profit by the

19  abortion industry.  With that final step always in view, there is now and never was at any time any

20  "threat of continuing activity" with respect to Defendants' production or transfer of false

21  identifications. Consequently, there is also no "continuity" sufficient to support a "pattern" of

22  illegal activity under RICO.  Plaintiffs' inability to establish a "pattern" of RICO predicate acts is

23  an additional, independent basis for granting Defendants summary judgment on the RICO claim.

24      RICO is particularly inapplicable to investigative journalism, such as CMP's.  Undercover

25  journalistic activities, protected under the First Amendment, begin and end, with the results

26  provided to the public.  *See, e.g., Food Lion I*, 887 F. Supp. at 820 ("The acts of mail and wire fraud

27  were part of a limited purpose, to obtain information from Food Lion to be aired on PTL.").  This is

28  a far cry from the "organized crime" RICO was intended to combat.  *See Globe Int'l, Inc. v. Superior*

1  *Court*, 9 Cal. App. 4th 393, 400-01 (1992) ("The covert taking of photographs of a public figure . . .
2  and the publication and distribution of the photographs in a newspaper may be outrageous and
3  offensive; however, such conduct does not constitute 'racketeering' under RICO. . . . RICO was
4  intended to combat organized crime, not to provide triple damages to every tort claimant.").
5  Defendants engaged in no RICO "pattern."

6  **3.  Plaintiffs cannot prove an "Unfair . . . Business Act or Practice" because
     Defendants' conduct did not threaten to violate antitrust principles, and the value of
7     Defendants' conduct far outweighed any actual harm to Plaintiffs (Count 7 – Unfair
     Competition Law).**
8

9      In its Order denying Defendants' Motion to Dismiss, this Court held that Plaintiffs had
10  adequately alleged a violation of the "unfair" prong of California's Unfair Competition Law
11  ("UCL"), Cal. Bus. & Prof. Code §17200, *et seq.*, on two different theories:

12      (1) That Defendants' conduct "threatens an incipient violation of an antitrust law, or
13          violates the policy or spirit of one of those laws because its effects are comparable to or
14          the same as a violation of the law, or otherwise significantly threatens **or harms**
15          **competition**." *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163,
16          186 (1999) (emphasis added). The Court held Plaintiffs survived a motion to dismiss by
17          alleging that "defendants' **goal was to put plaintiffs**—one of the largest provider [*sic*]
18          of reproductive health services in the country—**out of business**." Order (Doc. 124) at
19          30 (emphasis added).

20      (2) That Defendants' conduct caused Plaintiffs harm as "**potential 'consumers'**" of fetal
21          tissue procurement services that **outweighed the "utility"** of Defendants' conduct.
22          Order at 29-30 ("The second standard, advocated by plaintiffs and applicable to claims
23          brought by a consumer, 'involves balancing the harm to the consumer against the utility
24          of the defendant's practice.'") (quoting *Lozano v. AT & T Wireless Servs., Inc.*, 504 F.3d
25          718, 735 (9th Cir. 2007)).[9] The Court held Plaintiffs survived a motion to dismiss by

26  ───────────────────────────

27  [9] California law is unsettled as to which of these two standards applies to UCL unfairness claims
    brought by a consumer, rather than a competitor. *Lozano*, 504 F.3d at 736.
28

1      alleging that "defendants' practices were aimed at reducing the availability of plaintiffs'

2      services and injured plaintiffs' [*sic*] as potential customers of fetal tissue procurement

3      companies as well as plaintiffs' ultimate customers." Order at 30.

4 Following discovery, Defendants are entitled to summary judgment on both of these theories.

5      **A.    Defendants sought to expose illegal acts.**

6      The goal of the Human Capital Project was to expose, and put an end to, unethical and

7 illegal practices. Plaintiffs acknowledged that fact in the First Amended Complaint:

8           On information and belief, Defendants DALEIDEN and NEWMAN
9           hatched a scheme in 2012 to secretly "embed" DALEIDEN and
            other recruits within the reproductive health community and
10           **"expose" Planned Parenthood as violating the law.** As
            NEWMAN has publicly described:
11

12               The genesis happened three years ago in my office in
              Wichita, Kansas, where we discussed the fact that we
13               already knew that **Planned Parenthood was breaking
              the law in trafficking in human organs after their
14               abortions, and so we decided and set out to go ahead
              and expose that** and create an investigative journalism
15               organization that would embed ourselves into the
              abortion cartel and to catch them off script.
16

17 FAC ¶ 56 (emphasis added).

18      Evidence adduced in discovery has confirmed that exposing illegal conduct was the goal of the

19 HCP. For example, a February 2013 proposal for the "project to expose the commercial exploitation

20 of aborted children," Ex. 50, Daleiden Depo., Exh. 339 at 1, lists nine project goal the principal of

21 which is to "[c]atch fetal traffickers, especially Planned Parenthood clinics, violating laws, regulations

22 and common decency," *id.* at 6. *See also* Ex. 50, Daleiden Depo., 193:4–194:18, 206:8–208:10, 210:5–

23 214:14, 218:5–221:7 (discussing goals of HCP without mentioning putting any organization "out of

24 business"); Ex. 50, Daleiden Depo. 208:2–10 ("The whole point was to create public outrage in order

25 to—as—as part of *a campaign to expose criminality* within the abortion industry, expose criminality

26 among your clients, expose criminality among the fetal trafficking industry, *and see that justice was*

27 *done under the law for these atrocities against humanity* that are perpetrated when unborn children

28 are harvested for body parts and sold for profit.") (emphasis added).

The structure of the project confirms that its principal objective was not to do financial harm to a market competitor but to end corrupt practices by Plaintiffs and others. For example, Defendants' investigation did not target Planned Parenthood exclusively; the investigators spoke to representatives of many different actors involved in fetal tissue trafficking. Daleiden Decl., *passim*; Ex. 50, Daleiden Depo., Exh. 339 at 1 ("The fieldwork will be an investigation 3 levels (clinic, wholesaler, and end user)"); *id.* at 2-4 (discussing the participation of middlemen companies and the scientific community in the fetal tissue industry, in addition to the abortion industry); *id.* at 6 (discussing the intended product of the investigation as a "documentary [that] will feature . . . candid interviews with ***major players in the fetal trafficking industry***, and will present a ***comprehensive picture of the phenomenon of fetal exploitation*** and commentary on the dehumanization of the unborn").

Even if Defendants' overarching goal had been to put Plaintiffs out of business, Defendants' actions still would not have "threaten[ed] an incipient violation of an antitrust law, or violate[d] the policy or spirit of one of those laws . . .," because Defendants' motivations were ethical and political, not seeking to control or manipulate a commercial market or competition. *Compare Apple, Inc. v. Pepper et al.*, 587 U.S. ___, 2019 WL 2078087, at *8 (2019) ("Ever since Congress overwhelmingly passed and President Benjamin Harrison signed the Sherman Act in 1890, protecting consumers from monopoly prices has been the central concern of antitrust."); *Apex Hosiery Co. v. Leader*, 310 U.S. 469, 493 (1940) ("The end sought [in the enactment of the Sherman Act] was the prevention of restraints to free competition in business and commercial transactions which tended to restrict production, raise prices or otherwise control the market to the detriment of purchasers or consumers of goods and services. . . ."). It is beyond peradventure that, while antitrust principles may apply to the internal workings of a particular market, those principles do not inform the question of whether that market should exist at all.

And as a matter of law, *there is no lawful market in human fetal tissue.* Neither Plaintiffs nor the companies to which they transfer fetal tissue are legally permitted to profit from the transaction. *See* 42 U.S.C. § 289g-2(a) ("It shall be unlawful for any person to knowingly acquire, receive, or otherwise transfer any human fetal tissue for valuable consideration if the transfer affects interstate

commerce."). Planned Parenthood has denied receiving any compensation in excess of its costs for fetal tissue. *See* Letter from Cecile Richards, President, Planned Parenthood Federation of America, to Speaker John A. Boehner, Minority Leader Nancy Pelosi, Majority Leader Mitch McConnell, and Minority Leader Harry Reid at 5-6 (Aug. 27, 2015), *available at* https://www.plannedparenthood.org/files/8314/4709/3497/PPFA_Letter_to_Congressional_Leadership.pdf. Therefore, Plaintiffs cannot claim that Defendants' investigation of their fetal tissue procurement practices aimed to inflict *commercial* harm on them as sellers or consumers of any good or service related to human fetal tissue.

Courts have rightly rejected attempts to shoehorn conduct that is ethical or political in motivation into the antitrust mold. *See, e.g.*, *E. R. R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 144–45 (1961) (holding that a political campaign to influence governmental action to the disadvantage of competitors did not violate antitrust law); *Apex Hosiery Co.*, 310 U.S. at 501 (holding that a labor strike did not violate antitrust law, because it did not aim to "have an effect upon prices in the market or otherwise to deprive purchasers or consumers of the advantages which they derive from free competition"); *Nat'l Org. for Women, Inc. v. Scheidler*, 968 F.2d 612, 618 (7th Cir. 1992), *rev'd on other grounds*, 510 U.S. 249 (1994) (finding that aggressive protest tactics aimed at shutting down abortion clinics did not violate antitrust law: "the legislative debates preceding passage of the Sherman Act indicate that the Act was not intended to reach the activities of organizations espousing social causes"); *Council for Employment & Econ. Energy Use v. WHDH Corp.*, 580 F.2d 9, 12 (1st Cir. 1978) (dismissing an antitrust claim against broadcasters for giving an advocacy group free radio time: "This case involves political opponents, not commercial competitors; and political objectives, not market place goals.").

In fact, courts have blessed direct and deliberate impositions of significant economic harm as exempt from antitrust law where their purpose was expressive or political and therefore protected by the First Amendment. *See, e.g.*, *N. A. A. C. P. v. Claiborne Hardware Co.*, 458 U.S. 886, 914 (1982) (Even where "petitioners certainly foresaw—and directly intended—that the merchants would sustain economic injury as a result of their campaign, . . . [t]he right of the States to regulate economic activity could not justify a complete prohibition against a nonviolent,

politically motivated boycott designed to force governmental and economic change and to effectuate rights guaranteed by the Constitution itself."); *State of Mo. v. Nat'l Org. for Women, Inc.*, 620 F.2d 1301, 1319 (8th Cir. 1980) ("We hold that NOW's boycott activities are privileged on the basis of the First Amendment right to petition and the Supreme Court's recognition of that important right when it collides with commercial effects of trade restraints."); *Nat'l Org. for Women, Inc. v. Scheidler*, No. 86 C 7888, 1997 WL 610782, at *28 (N.D. Ill. Sept. 23, 1997) ("nonviolent campaigns that are (1) politically motivated, and (2) waged against an entity by a commercial noncompetitor are protected under the First Amendment").

This case bears a striking similarity to *Food Lion III*, in which the plaintiff corporation tried to apply a North Carolina unfair competition statute to undercover journalists who had infiltrated it and exposed misconduct. The Fourth Circuit rejected the attempt, noting that "the deception—the misrepresentations in [the undercover journalist's job] application—did not harm the consuming public." *Food Lion III*, 194 F.3d at 520. In fact, the Court acknowledged, "ABC ***intended to benefit the consuming public by letting it know about Food Lion's food handling practices.*** *Id.* (emphasis added). The exact same principle applies here: Defendants' aim was to expose unethical and unlawful practices. Their conduct was in no way aimed at hindering competition or harming consumers within a market; in fact, in this case, the conduct did not even relate to any actual, legal market. Therefore, their conduct does not "violate[] the policy or spirit" of antitrust law. *Cf. Huntingdon Life Scis., Inc. v. Rokke*, 978 F. Supp. 662, 666 (E.D. Va. 1997) (finding that a laboratory could not level a Lanham Act claim against PETA for false advertising or promotion where PETA's activities—an undercover investigation culminating in publication of video footage—had no economic motive but rather aimed "to disseminate its political message of preventing alleged cruelty to animals").

> **B.** **The utility of Defendants' conduct far outweighed any alleged harm to Plaintiffs as "potential 'consumers'" of fetal tissue procurement services.**

As demonstrated above, the principal aim of Defendants' investigation was to expose misconduct in a context that was non-commercial as a matter of law: fetal tissue procurement. Defendants were not pursuing any commercial or market-related goal such as "reducing the

availability of plaintiffs' services and injur[ing] plaintiffs as potential customers of fetal tissue procurement companies as well as plaintiffs' ultimate customers." Order (Doc. 124) at 30. Moreover, the record is devoid of evidence that Defendants actually did Plaintiffs, or their customers, any market-related harm. In fact, Defendants' actions caused Plaintiffs no legally cognizable harm. *See* Section 1 above. This Court has acknowledged only one category of "harm" that they could possibly claim—namely, increased security costs incurred in response to Defendants' infiltration of their conferences—and Defendants have now shown that no such harms were proximately caused by Defendants' actions. *See* Section I.A. But even if Defendants "caused" Plaintiffs "harm" in the form of increased security costs, that provides no support for the claim that Defendants "injured plaintiffs as potential customers of fetal tissue procurement customers" or that they injured "plaintiffs' ultimate customers." There is simply no basis for Plaintiffs to claim any market-related harm.

On the other side of the scale, Defendants' investigative activities demonstrably served the good of exposing unethical and illegal conduct. Daleiden Decl., ¶¶ 57–98; Trissell Decl., Exs. 1–20; *Planned Parenthood of Greater Texas*, 913 F.3d at 559 n.6. A representative of Plaintiffs, Emily Schifrin, even testified that Plaintiffs' own fetal tissue procurement procedures and oversight have been substantially improved as a result of the release of the HCP videos. *See* Ex. 47, Schifrin Depo., 20:15–21:6 (███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
███████████████ Defendants' conduct produced substantial good and inflicted no legally cognizable harm. Therefore, even if the Court chooses to apply the less rigorous "balancing test" suggested by Plaintiffs,[10] their attempt to assert an "unfairness" claim under California's UCL fails.

## CONCLUSION

For the foregoing reasons, this Court should grant Defendant CMP's motion for summary judgment, and dismiss this action.

---

[10] Though, again, the test is not certainly applicable under California case law. *Lozano*, 504 F.3d at 736.

DEF. CMP'S MTN. FOR SUMMARY JUDGMENT—3:16-CV-236

Respectfully submitted

May 22, 2019,

/s/ Charles S. LiMandri
Charles S. LiMandri (CA Bar No. 110841)
Paul M. Jonna (CA Bar No. 265389)
Jeffrey M. Trissell (CA Bar No. 292480)
B. Dean Wilson (CA Bar No. 305844)
FREEDOM OF CONSCIENCE DEFENSE FUND
P.O. Box 9520
Rancho Santa Fe, CA 92067
Tel: (858) 759-9948
Facsimile: (858) 759-9938
cslimandri@limandri.com
pjonna@limandri.com
jtrissell@limandri.com

Denise M. Harle (CA Bar No. 275561)
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd., NE
Suite D1100
Lawrenceville, GA 30043
Tel: (770) 339-0774
dharle@ADFlegal.org

Harmeet K. Dhillon (CA Bar No. 207873)
Gregory R. Michael (CA Bar No. 306814)
DHILLON LAW GROUP INC.
177 Post Street, Suite 700
San Francisco, CA 94108
415-433-1700
415-520-6593 (fax)
harmeet@dhillonlaw.com

*Attorneys for Defendant BioMax
Procurement Services, LLC*