STEVEN L. MAYER (No. 62030)
SHARON D. MAYO (No. 150469)
ARNOLD & PORTER KAYE SCHOLER LLP
Three Embarcadero Center, 10th Floor
San Francisco, California 94111-4024
Telephone:    (415) 471-3100
Facsimile:    (415) 471-3400
Email:    steven.mayer@aporter.com
            sharon.mayo@aporter.com

DIANA STERK (admitted *pro hac vice*)
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019-9710
Telephone:    (212) 836-8000
Email:    diana.sterk@arnoldporter.com

RHONDA R. TROTTER (No. 169241)
ARNOLD & PORTER KAYE SCHOLER LLP
777 S. Figueroa Street, 44th Floor
Los Angeles, California 90017
Telephone:    (213) 243-4000
Email:    rhonda.trotter@arnoldporter.com

Attorneys for Plaintiffs

BETH H. PARKER (No. 104773)
PLANNED PARENTHOOD NORTHERN CALIFORNIA
2185 Pacheco Street
Concord, California 94520
Telephone:    (415) 531-1791
Email: beth.parker@ppnorcal.org

HELENE T. KRASNOFF
(admitted *pro hac vice*)
PLANNED PARENTHOOD FEDERATION OF AMERICA
1110 Vermont Avenue, NW, Suite 300
Washington, DC 20005-6300
Telephone:    (202) 973-4800
Email:    helene.krasnoff@ppfa.org

AMY L. BOMSE (No. 218669)
ROGERS JOSEPH O'DONNELL
311 California St., 10th Floor
San Francisco, California 94104
Telephone:  (415) 956-2828
Email:  ABomse@rjo.com

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| PLANNED PARENTHOOD FEDERATION OF AMERICA, INC., et al.,<br><br>                    Plaintiffs,<br><br>          v.<br><br>CENTER FOR MEDICAL PROGRESS, et al.,<br><br>                    Defendants. | Case No. 3:16-cv-00236-WHO<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT AND PARTIAL SUMMARY JUDGMENT**<br><br><br>Hearing Date:    July 17, 2019<br>Time:        2:00 pm<br>Court:      Courtroom 2, 17th Floor<br>Judge:      Honorable William H. Orrick |

# NOTICE OF MOTION AND MOTION

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

PLEASE TAKE NOTICE that on July 17, 2019 at 2:00 p.m. or as soon thereafter as the matter may be heard, before the Honorable William Orrick, in Courtroom 2, 17th Floor of this Court, located at 450 Golden Gate Avenue, San Francisco, CA 94102, Plaintiffs will and hereby do move the Court for an Order granting summary judgment as to Defendants' affirmative defenses of unclean hands, public policy and California Penal Code § 633.5, summary judgment as to Counts 4, 6-8 and 15, and partial summary judgment of Count 1 of Plaintiffs' Amended Complaint.

This Motion is made pursuant to Rule 56 of the Federal Rules of Civil Procedure on the grounds that no genuine issue of material fact exists with respect to Plaintiffs' claims. Because no genuine issue of material fact exists with respect to these claims, Plaintiffs are entitled to summary judgment or partial summary judgment.

This Motion is further made pursuant to Rule 56 of the Federal Rules of Civil Procedure on the grounds that no genuine issue of material fact exists with respect to certain of Defendants' Affirmative Defenses such that Plaintiffs are entitled to summary judgment or partial summary judgment with respect to the Defendants' Affirmative Defenses of unclean hands, public policy and California Penal Code § 633.5 to the Amended Complaint, such that Defendants are not entitled to rely on those Affirmative Defenses.

This motion is supported by the accompanying memorandum of law, the declarations and exhibits attached thereto, the [Proposed] Order, the filings to date in this case, and any oral argument the Court may hear concerning the applicable claims.

Dated: May 22, 2019                    Respectfully submitted,

ARNOLD & PORTER KAYE SCHOLER LLP

By:    /s/  *Diana K. Sterk*
         Diana K. Sterk
         Attorneys for Plaintiffs

INTRODUCTION ....................................................................................................1

STATEMENT OF FACTS .......................................................................................3

I.  PLANNED PARENTHOOD HOLDS PRIVATE EDUCATIONAL
    CONFERENCES TO HELP IT PURSUE ITS MISSION TO PROVIDE
    REPRODUCTIVE HEALTH CARE TO MILLIONS. ..............................3

II. DALEIDEN, NEWMAN AND RHOMBERG AGREE TO TARGET
    PLANNED PARENTHOOD BY INFILTRATING ITS CONFERENCES
    AND HEALTH CENTERS TO CREATE SMEAR VIDEOS. ....................5

III. DALEIDEN SETS UP A FRONT COMPANY AND PROCURES FAKE
    IDENTIFICATION TO TO GAIN ACCESS TO PRIVATE
    CONFERENCES, MEETINGS AND HEALTH CARE CENTERS. ............6

IV. BY INFILTRATING NAF, DALEIDEN AND MERRITT ESTABLISH
    THE FRONT COMPANY AS A KNOWN AND TRUSTED ENTITY
    PAVING THE WAY TO INFILTRATE PPFA CONFERENCES. .................8

V.  DALEIDEN AND LOPEZ INFILTRATE THREE PLANNED
    PARENTHOOD CONFERENCES AS REPRESENTATIVES OF
    BIOMAX. ....................................................................................................9

VI. DALEIDEN AND MERRITT SET UP FOUR MEETINGS WITH
    HEALTH CARE STAFF CLAIMING TO BE REPRESENTATIVES OF
    A FETAL TISSUE COMPANY AND SECRETLY FILM THEIR
    MEETINGS. ..............................................................................................11

VII. CMP AND DALEIDEN USE THE ILLEGALLY OBTAINED
    VIDEOTAPES TO CREATE A SMEAR CAMPAIGN DESIGNED TO
    PROVOKE OUTRAGE AND MAKE VIEWERS ANGRY AND UPSET
    AT PLANNED PARENTHOOD....................................................................13

ARGUMENT ...........................................................................................................15

I.  SUMMARY JUDGMENT STANDARD...................................................15

II. PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON
    THEIR TRESPASS CLAIMS (COUNT SIX)...........................................15

III. PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON
    THEIR FRAUDULENT MISREPRESENTATION CLAIM (COUNT
    EIGHT) ......................................................................................................18

    A.  Daleiden, Merritt and Lopez knowingly misrepresented material
        facts to PPFA, PPRM, PPPSGC, PPGC and PPCFC.....................18

    B.  Defendants intended for Plaintiffs to rely on Defendants'
        misrepresentations...........................................................................20

    C.  Plaintiffs justifiably relied on Defendants' misrepresentations. .................20

    D.  Plaintiffs were harmed by Defendants' misrepresentations.........................21

IV.  PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' CLAIM UNDER CALIFORNIA UNFAIR COMPETITION LAW (§ 17200) (COUNT SEVEN) ..............................................21

V.  PLAINTIFF PPGC IS ENTITLED TO SUMMARY JUDGMENT ON ITS BREACH OF CONTRACT CLAIM AS TO PPGC'S NON-DISCLOSURE AGREEMENT (COUNT FIFTEEN)..............................................22

VI.  PLAINTIFF PPFA IS ENTITLED TO SUMMARY JUDGMENT ON ITS BREACH OF CONTRACT CLAIM (COUNT FOUR)..............................................24

VII.  PLAINTIFFS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW ON THE PREDICATE OFFENSE ELEMENT OF THEIR RICO CLAIM (COUNT ONE) ..............................................26

    A.  Defendants Violated 18 U.S.C. § 1028..............................................27

    B.  Defendants Committed Mail and/or Wire Fraud ..............................................27

VIII.  DEFENDANTS' SECTION 633.5 AFFIRMATIVE DEFENSE FAILS AS A MATTER OF LAW ..............................................29

IX.  DEFENDANTS' UNCLEAN HANDS AFFIRMATIVE DEFENSE FAILS AS A MATTER OF LAW ..............................................32

X.  DEFENDANTS' PUBLIC POLICY DEFENSE FAILS AS A MATTER OF LAW ..............................................34

CONCLUSION ..............................................36

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allmerica Fin. Life Ins. & Annuity Co. v. Dalessio*,
No. C-96-0385 VRW, 2006 WL 408538 (N.D. Cal. Feb. 20, 2006) .......................................... 33

*Barnes v. Mathis*,
353 S.W.3d 760,764 (Tex. 2011) .......................................................... 16

*Bland v. Freightliner LLC*,
206 F. Supp. 2d 1202 (M.D. Fla. 2002) ........................................... 24

*Bowerman v. Field Asset Servs. Inc.*,
242 F. Supp. 3d 910 (N.D. Cal. 2017), *reconsideration denied*, No. 13-CV-
00057-WHO, 2018 WL 3753054 (N.D. Cal. Aug. 8, 2018) ...................................... 15

*Branzburg v. Hayes*,
408 U.S. 665 (1972) .......................................................... 34, 36

*Butler v. Yusem*,
44 So.3d 102 (Fla.2010) .......................................................... 18

*Carpenter v. United States*,
484 U.S. 19 (1987) .......................................................... 28

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) .......................................................... 15

*Chitkin v. Lincoln Nat'l Ins. Co.*,
879 F. Supp. 841 (S.D. Cal. 1995) .......................................................... 33

*Clark v. Green Tree Servicing LLC*,
69 F. Supp. 3d 1203,1223 (D. Colo. 2014) .......................................... 18

*Council on Am.-Islamic Relations Action Network, Inc. v. Gaubatz*,
793 F. Supp. 2d 311 (D.D.C. 2011) .......................................... 17

*Democracy Partners v. Project Veritas Action Fund*,
285 F. Supp. 3d 109 (D.D.C. 2018) .......................................... 18

*Engler v. Hatch*,
472 P.2d 680 (Colo. App. 1970) .......................................................... 16

*Envtl. Processing Sys., L.C. v. FPL Farming Ltd.*,
457 S.W.3d 414 (Tex. 2015) .......................................................... 28

*Farmers Alliance Mut. Ins. Co. v. Cutrone*,
448 F. Supp. 2d 1226 (D. Colo. 2006) .......................................... 25

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT AND PARTIAL SUMMARY JUDGMENT

*Fomby-Denson v. Dep't of Army*,
   247 F.3d 1366 (Fed. Cir. 2001) ............................................................................ 34, 36

*Food Lion, Inc. v. Capital Cities/ABC, Inc.*,
   951 F. Supp. 1217 (M.D.N.C. 1996) ........................................................................... 17

*Gaetan v. Weber*,
   729 A.2d 895 (D.C. 1999) ........................................................................................... 16

*Hunter Vending Co. v. D.C. Vending Co.*,
   345 A.2d 142 (D.C. 1975) ........................................................................................... 24

*Huthwaite, Inc. v. Randstad Gen. Partner (US)*,
   No. 06–C–1548, 2006 WL 3065470 (N.D. Ill. Oct. 24, 2006) ..................................... 34

*Intamin, Ltd. v. Magnetar Techs. Corp.*,
   623 F. Supp. 2d 1055 (C.D. Cal. 2009), *aff'd*, 404 F. App'x 496 (Fed. Cir. 2010) ................... 32

*Kaiser Aetna v. United States*,
   444 U.S. 164 (1979) .................................................................................................... 28

*Kearney v. Salomon Smith Barney, Inc.*,
   137 P.3d 914 (2006) .................................................................................................... 30

*Kelly v. Bd. of Cty. Comm'rs of Summit Cty.*,
   No. 17-CA-0431, 2018 WL 2436836 ......................................................................... 28

*Levitt v. Yelp! Inc.*,
   765 F.3d 1123 (9th Cir. 2014) ..................................................................................... 21

*Makreas v. First Nat. Bank of N. Cal.*,
   856 F.Supp.2d 1097 (N.D.Cal 2012) ................................................................. 16, 21, 25

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986) .................................................................................................... 15

*May v. Ticor Title Ins.*,
   422 S.W.3d 93 (Tex. App. 2014) ................................................................................. 22

*McKinney/Pearl Restt. Partners, L.P. v. Metro. Life Ins. Co.*,
   241 F. Supp. 3d 737 (N.D. Tex. 2017) ........................................................................ 18

*McNally v. United States*,
   483 U.S. 350 (1987) .................................................................................................... 28

*Mesler v. Bragg Mgmt. Co.*,
   39 Cal. 3d 290 (1985) ................................................................................................. 16

*In re Mktg. Inv'rs Corp.*,
   80 S.W.3d 44 (Tex. App. 1998) .................................................................................. 23

*Nat'l Abortion Fed'n, NAF v. Ctr. for Med. Progress*,
   685 F. App'x 623 (9th Cir. 2017) .................................................................... 24

*Nat'l Abortion Federation v. Center for Medical Progress*,
   No. 15-CV-03522-WHO, 2016 WL 454082 (N.D. Cal. February 5, 2016) *aff'd
   sub nom. Nat'l Abortion Fed'n, NAF v. Ctr. for Med. Progress*, 685 Fed. App'x
   623 (9th Cir. 2017), ECF No. 354 ........................................................ 34, 35, 36

*Pearson v. Ford Motor Co.*,
   694 So. 2d 61 (Fla. Dist. Ct. App. 1997) .......................................................... 16

*People v. Hart*,
   86 Cal. Rptr. 2d 762 (1999), *as modified on denial of reh'g* (Aug. 23, 1999).............. 30

*Pitts Sales, Inc. v. King World Prods., Inc.*,
   383 F. Supp. 2d 1354 (S.D. Fla. 2005) .............................................................. 16

*Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*,
   No. 16-CV-00236-WHO (DMR) 2019 WL 1102988 (N.D. Cal. Mar. 8, 2019),
   aff'd No. 16-cv-00236-WHO (N.D. Cal. Apr. 9, 2019)............................................ 33

*Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*,
   No. 16-CV-00236-WHO (DMR) 2019 WL 311622 (N.D. Cal. Jan. 24, 2019),
   *aff'd* No. 16-CV-00236-WHO (N.D. Cal. Feb. 8, 2019) ........................................ 36

*Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*,
   No. 16CV00236WHODMR, 2019 WL 317597 (N.D. Cal. Jan. 24, 2019), aff'd,
   No. 16-CV-00236-WHO, 2019 WL 495600 (N.D. Cal. Feb. 8, 2019)........................ 30

*Pom Wonderful LLC v. Welch Foods, Inc.*,
   737 F. Supp. 2d 1105 (C.D. Cal. 2010)............................................................. 33

*Pub. Serv. Of Colo. v. Van Wyk*,
   27 P.3d 377 (Colo. 2001) ............................................................................. 16

*Ralphs Grocery Co. v. Victory Consultants, Inc.*,
   225 Cal. Rptr. 3d 305 (Ct. App. 2017), *as modified* (Nov. 6, 2017)........................ 28

*Riddle v. Leuschner*,
   51 Cal. 2d 574 (1959) ................................................................................. 16

*Roe v. Wade*,
   410 U.S. 113 (1973), *holding modified by Planned Parenthood of Se. Pa. v.
   Casey*, 505 U.S. 833 (1992) ......................................................................... 32

*San Luis Unit Food Producers v. United States*,
   772 F. Supp. 2d 1210 (E.D. Cal. 2011), aff'd, 709 F.3d 798 (9th Cir. 2013)............. 30

*Sanders v. Future Com, Ltd.*,
   No. 02-15-00077-CV, 2017 WL 2180706 (Tex. App. May 18, 2017) ...................... 23

*Sarete, Inc. v. 1344 U St. Ltd. P'ship*,
    871 A .2d 480, 490 (D .C. 2005) ............................................................................ 16

*Schwartz v. Pillsbury Inc.*,
    969 F.2d 840 (9th Cir. 1992) ................................................................................ 16

*SEC v. Colello*,
    139 F.3d 674 (9th Cir. 1998 ) .................................................................................. 5

*SEC v. Fujinaga*,
    698 F. App'x 865 (9th Cir. 2017) ............................................................................ 5

*State v. Adams*,
    5 P.3d 903 (Ariz. Ct. App. 2000), *as amended* (May 12, 2000) ("One of the main
    rights attached to property is the right to exclude others.") ............................ 29

*Sun Microsystems, Inc. v. Microsoft Corp.*,
    188 F.3d 111 (9th Cir. 1999) ................................................................................ 22

*Terra Ins. Co. v. N.Y. Life Inv. Mgmt. LLC*,
    717 F. Supp. 2d 883 (N.D. Cal. 2010) ................................................................ 18

*Travelers Cas. & Sur. Co. of Am. v. K.O.O. Constr., Inc.*,
    No. 16-CV-00518-JCS, 2016 WL 7324988 (N.D. Cal. Dec. 16, 2016) .................... 15

*Troyk v. Farmers Grp., Inc.*,
    171 Cal. App. 4th 1305 (2009) ............................................................................ 16

*United States v. Frey*,
    42 F.3d 795 (3d Cir. 1994) .................................................................................. 28

**Statutes**

18 U.S.C. § 1028 ................................................................................................ 21, 26, 27

18 U.S.C. § 1028(a)(1)-(2) ............................................................................................ 27

18 U.S.C. § 1028(d)(4) .................................................................................................. 27

18 U.S.C. § 1343 .......................................................................................................... 28

18 U.S.C. § 1531 .......................................................................................................... 32

18 U.S.C. § 1961(1) ...................................................................................................... 27

Cal. Bus. & Prof. Code §17200, *et seq.* ...................................................................... 21

Cal. Penal Code § 118 .................................................................................................. 21

Cal. Penal Code § 187(a) .............................................................................................. 32

Cal. Penal Code § 470 ........................................................................................ 21

California Penal Code § 632 .......................................................................... 3, 29, 30, 31

California Penal Code §633.5 ........................................................................ 3, 29, 32

California's Unfair Competition Law .................................................................... 21

**Other Authorities**

Fed. R. Civ. P. 8(c) ........................................................................................... 30

Fed. R. Civ. P. 12(b) ........................................................................................ 30

Fed. R. Civ. P. 56(a) ........................................................................................ 15

Restatement (Second) of Torts § 173 (1965) .................................................. 18

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# INTRODUCTION

The material facts in this case are not, and have never been, disputed. With help from Defendants Newman and Rhomberg, Defendant Daleiden orchestrated an elaborate fraudulent scheme to "tar and cripple Planned Parenthood."  He first created a fake tissue procurement company, BioMax Procurement Services ("BioMax"), and then registered the company as an exhibitor at National Abortion Federation ("NAF") and Planned Parenthood conferences, providing false names of BioMax "staff" and agreeing to contract terms that he had no intention of complying with.  Defendants Daleiden, Merritt and another conspirator also presented fake California drivers licenses that Daleiden had procured and/or created.

Relying on these misrepresentations and the phony documents, Planned Parenthood Federation of America (PPFA) let Daleiden and his coconspirators, including Defendants Merritt and Lopez, attend three private conferences.  In addition, two Planned Parenthood physicians, Drs. Nucatola and Gatter, met with purported BioMax representatives in restaurants.  And two Planned Parenthood affiliates admitted Daleiden and Merritt (who claimed to be the BioMax CEO) into their health centers.  Defendants' ostensible purpose of these encounters was to discuss a professional relationship under which the affiliates would facilitate donation of fetal tissue for medical research.

Through infiltrating the conferences and health centers, and without disclosing what they were doing or who they were, Defendants secretly recorded videos of Deborah Nucatola, Mary Gatter, Melissa Farrell, Tram Nguyen, Savita Ginde, and numerous other employees of Planned Parenthood.  They then edited and posted videos on the internet, accusing Planned Parenthood of selling "baby body parts" for profit.  Defendants posted those videos with press releases that similarly accused Planned Parenthood of a "conspiracy to make money off of aborted baby parts."

As a result of their campaign, the doctors and staff targeted in the videos were harassed, threatened and targeted at their homes.  Incidents of protests, vandalism, harassing calls and other security incidents surged.  Plaintiffs incurred millions of dollars in additional expenses to protect their staff and patients.

Based on these undisputed facts, PPFA, Planned Parenthood Gulf Coast ("PPGC"), Planned Parenthood Center for Choice ("PPCFC"), Planned Parenthood Rocky Mountains ("PPRM"), and

Planned Parenthood Pasadena and San Gabriel Valley ("PPPSGV") are entitled to summary judgment as to liability of their fraud and trespass claims against Daleiden, Merritt, Lopez, BioMax and CMP. *See* Sections II and III, *infra*.

In addition, all Plaintiffs are entitled to summary judgment, and an injunction, on their claim against all Defendants under section 17200 of California's Business & Professions Code, California's Unfair Competition statute. *See* Section IV, *infra*. In creating a fake company, submitting fraudulent documents to the State of California to register BioMax and creating fraudulent identification to access Plaintiffs' facilities and trick Plaintiffs' staff into meetings, they engaged in fraudulent business practices. Defendants' discovery responses make clear that they intend to continue engaging in undercover operations aimed at Planned Parenthood. To prevent further intrusions, Plaintiffs are entitled to an injunction against Defendants entering or assisting in the entry into any of their health centers, facilities, or conference spaces.

Likewise, PPFA and PPGC/PPCFC are entitled to summary judgment on Defendants CMP, BioMax, Daleiden, Merritt and Lopez's liability on their breach of contract claims. *See* Sections V and VI, *infra*. It is undisputed that Daleiden executed three exhibitor agreements with PPFA on behalf of BioMax, each of which required exhibitors to comply with all applicable laws and disclose conflicts of interest. Two of these agreements also required that the exhibit be educational and provide information about services and products that would be useful to conference attendees. Defendants breached these provisions because BioMax was a sham company, set up only to serve as a vehicle for Defendants' fraud, and offered no services or products. Daleiden also signed a non-disclosure agreement on behalf of BioMax promising to keep confidential all information disclosed to him by PPGC. Defendants Daleiden, Merritt, CMP and BioMax breached this promise by recording for the purpose of disclosing PPGC's confidential information, and then actually disclosing the information by posting the recordings on the internet.

Plaintiffs are also entitled to a finding as a matter of law that Defendants committed identification, mail and wire fraud--predicate acts of Plaintiffs' RICO claim--by creating or transferring fake IDs, and using the mails and wires to further misrepresent their identities. These acts of misrepresenting their identities and company over the wires fraudulently deprived PPFA,

PPRM and PPGC/PPCFC of their right to exclude from its conferences and facilities people who were aiming to harm the organization and its staff.  *See* Section VII, *infra*.

Finally, Plaintiffs are entitled to judgment as a matter of law with respect to Defendants' three key affirmative defenses: California Penal Code §633.5, unclean hands, and public policy. *See* Sections VIII-X, *infra*.  Section 633.5 provides a defense to illegal taping under § 632 where the taper reasonably believed that there was a commission of a violent felony *by the other party to the communication*.  Defendants did not have any belief, let alone a reasonable one, that the individuals they taped in California had committed, or were committing, a violent felony against the person. The conduct that Defendants' rely on for their unclean hands defense does not directly relate to Plaintiffs' claims.  Therefore, the defense fails.  And Defendants cannot avoid liability for their contract breaches by claiming that they breached their agreements to report criminal activity to law enforcement.  The exception does not apply to disclosures where, as here, the disclosures were made to the public to create a public smear campaign against Planned Parenthood.

STATEMENT OF FACTS

## I. PLANNED PARENTHOOD HOLDS PRIVATE EDUCATIONAL CONFERENCES TO HELP IT PURSUE ITS MISSION TO PROVIDE REPRODUCTIVE HEALTH CARE TO MILLIONS.

Planned Parenthood, through its 49 member affiliates, provides professional, high-quality reproductive and, in some cases, primary health care services to approximately two and a half million individuals each year at more than 600 health centers across the country.  Declaration of Kimberly Custer ¶ 4 (Sterk Decl. Ex. 1).[1]  Planned Parenthood is the country's largest provider of reproductive health care for women, and the majority of its patients are from lower-income communities.  *Id.*  Each year, Planned Parenthood provides a full range of critically necessary sexual and reproductive health services, including safe, legal abortions. *Id.*

PPFA hosts several national conferences every year.  Declaration of Deborah Nucatola ¶ 3 (Sterk Decl. Ex. 2).  Planned Parenthood physicians and staff attend these conferences for

---

[1] Exhibit numbers refer to the attachments to Declaration of Diana Sterk in Support of Plaintiffs' Motion for Summary Judgment ("Sterk Decl.").

1  educational purposes and to interact with colleagues. *Id.* ¶ 4.

2      PPFA takes steps to provide a confidential environment and limit attendees to those who

3  share its mission.[2]  All attendees are required to register in advance.  Declaration of Vikky Graziani

4  ¶ 3 Sterk Decl. Ex. 7).  No on-site registration is allowed.  Names of attendees are checked in

5  advance against staff lists (and against membership lists for conferences held in conjunction with

6  other groups).  *Id*.  Attendees not affiliated with PPFA or other member groups, must provide two

7  references to be admitted.  PPFA staff also checks all attendee and exhibitor names against an

8  extensive list of known anti-abortion groups and individuals.  *See* Deposition of Brandon Minow

9  ("Minow Dep.") (Sterk Decl. Ex. 78) at 295-97; 300-1; 336-38.

10      At the conference, attendees must show photo identification to receive their badge and

11  registration materials.  Security staff monitored doors and other access points to ensure only those

12  with badges enter.  Sterk Decl. Ex. 7, ¶ 5.  On site-security is also provided with information about

13  abortion opponents.  *See* Minow Dep. at 295-97, 300-1, 336-38 (Sterk Decl. Ex. 78).

14      PPFA conferences are held in hotel conference rooms and spaces that it reserves pursuant to

15  contracts.  Declaration of Brandon Minow ¶ 5 (Sterk Decl. Ex. 6); *see also* Minow Dep. Exs. 1911,

16  1916, 1921 (Sterk Decl. Ex. 3, 4, and 5).  Those contracts contain terms which further ensure the

17  safety and confidentiality of conference attendees.  For example, PPFA requires its conference

18  hotels to disclose the names of groups with space reserved at the same time and to refrain from

19  renting space to any group who, in Planned Parenthood's judgment, would create a threat of harm.

20  *See* Sterk Decl. Ex. 6, ¶ 6; Sterk Decl. Ex. 3 at 12; Sterk Decl. Ex. 4 at 7; Sterk Decl. Ex. 5 at 12. A

21  list of such groups, maintained by PPFA, is provided to the hotels.  In addition, the contracts contain

22  confidentiality clauses that all hotel staff are required to abide by.  *See* Minow Dep. at 241:14-21

23  (Sterk Decl. Ex. 77);  Sterk Decl. Ex. 3 at 12; Sterk Decl. Ex. 4 at 7; Sterk Decl. Ex. 5 at 12.

24      PPFA invites a limited number of businesses whose products or services are relevant to

25  reproductive health care to exhibit their products or services.  Exhibitors must register in advance,

26

27  _____

28  [2] The conference security measures described herein were in effect for the conferences at issue in this litigation.

1    provide the names of any representatives who will attend the conference and agree to PPFA's terms

2    and conditions. Sterk Decl. Ex. 7, ¶ 4. Most exhibitors are repeat exhibitors known to PPFA. *Id*.

3    Where an exhibitor is not known, PPFA staff checks whether partner organizations, such as NAF,

4    have knowledge of them. *Id*.

5    **II.    DALEIDEN, NEWMAN AND RHOMBERG AGREE TO TARGET PLANNED
         PARENTHOOD BY INFILTRATING ITS CONFERENCES AND HEALTH
6        CENTERS TO CREATE SMEAR VIDEOS.**

7            In late 2012 and again in early 2013, David Daleiden traveled to Wichita, Kansas, the

8    headquarters of Troy Newman's virulently anti-abortion organization Operation Rescue.

9    Deposition of David Daleiden (Apr. 16, 2019) ("Daleiden Dep. I") at 114:10-16  (Sterk Decl. Ex.

10   8).  Newman has described the murder of an abortion doctor as "justifiable defensive action."  Press

11   Release, Operation Rescue West, Execution of Paul Hill Nothing Less than Murder (Sept. 3, 2003)

12   (Sterk Decl. Ex. 10). He and his organization harassed Dr. George Tiller, a Kansas abortion

13   provider, for years until Tiller was murdered in 2009.  Deposition of Albin Rhomberg ("Rhomberg

14   Dep.") at 358-59 (Sterk Decl. Ex. 14).  Operation Rescue also operates a website that publishes the

15   photos, names and addresses of abortion providers.  AbortionDocs.org, at

16   http://abortiondocs.org/mission/ ("AbortionDocs.Org is a project of Operation Rescue.") (Sterk

17   Decl. Ex. 11); Deposition of Troy Newman ("Newman Dep.") at 54-55 (Sterk Decl. Ex. 13).[3]

18           Daleiden met with Newman to discuss a plan to target Planned Parenthood through a series

19   of undercover videos.  *See* CM05624, at CM05627, CM05634 (Sterk Decl. Ex. 14); Newman Dep.

20   at 97, 108-110 (Sterk Decl. Ex. 13).  Daleiden already had a years-long track record of creating

21   video smears of Planned Parenthood in his role as the Director of Research for Live Action, an

22   extremist anti-abortion group.  *See* Daleiden Dep. I at 44:12-45:6 (Sterk Decl. Ex. 8).

23           In March 2013, Newman, Daleiden and Defendant Albin Rhomberg, "a veteran of the pro-

24   life movement in California," (Rhomberg Dep." at 118:17-119:8 (Sterk Decl. Ex. 14)), formed the

25

26   _____

27   [3] The Court may rely on assertions of the Fifth Amendment in ruling on summary judgment. *SEC
     v. Colello*, 139 F.3d 674, 677 (9th Cir. 1998 ) (affirming district court's grant of the SEC's motion
     for summary judgment, drawing an adverse inference from invocation of the Fifth Amendment);
28   *SEC v. Fujinaga*, 698 F. App'x 865, 866 (9th Cir. 2017) (affirming district court's grant of
     summary judgment which relied in part on assertion of Fifth Amendment privilege).

Center for Medical Progress ("CMP"). Daleiden Dep. I at 180:25-182:10 (Sterk Decl. Ex. 8); Sterk Decl. Ex. 15. CMP's purpose was to create a video smear campaign against Planned Parenthood with the objective of creating "Maximum negative impact – legal, political, professional, public – on Planned Parenthood." *See* Sterk Decl. Ex. 16; Daleiden Dep. I at 219:18-221:16 (Sterk Decl. Ex. 8). Daleiden was CMP's CEO. *See* Sterk Decl. Ex. 15.

All three served on CMP's board and each took different roles in the project. Rhomberg Dep. I at 115:9-20 (Sterk Decl. Ex. 14); Newman Dep. at 76:6-14 (Sterk Decl. Ex. 13). Newman was Secretary of CMP. *Id.* He assisted Daleiden and CMP with fundraising, and advised on project goals, undercover activities, use of fake names and IDs, and other actions of CMP "throughout the three-year undercover investigation." *See* Newman Dep at 73-74, 118-129, 176 (Sterk Decl. Ex. 13). Rhomberg was CMP's "Chief Financial Officer." Rhomberg Dep. at 115:9-20(Sterk Decl. Ex. 14). He assisted Daleiden in fundraising and strategized with consultants to ensure the secretly recorded videos had "maximum impact." Rhomberg Dep. at 128-129 (Sterk Decl. Ex. 14). He also advised on CMP's undercover activities. *Id.* at 21-22, 89, 125-127, 226:7-227:11.

## III. DALEIDEN SETS UP A FRONT COMPANY AND PROCURES FAKE IDENTIFICATION TO TO GAIN ACCESS TO PRIVATE CONFERENCES, MEETINGS AND HEALTH CARE CENTERS.

Daleiden was the ringmaster. He set up a front company called BioMax Procurement Services, LLC ("BioMax"). Sterk Decl. Ex. 17 ("We have established a front organization (BioMax Procurement Services) that purportedly supplies medical researchers with human biological specimens"); Deposition for David Daleiden (Apr. 17, 2019) ("Daleiden Dep. II") at 32:24-33:2 (Sterk Decl. Ex. 9); *see also id.* at 19:8-20:13, 31:11-21; CM07126, at 7128 (Sterk Decl. Ex. 18). He filed Articles of Organization with the California Secretary of State asserting that the purpose of the LLC was to engage in "any lawful activity for which a limited liability company may be organized." Sterk Decl. Ex. 19; Daleiden Dep. II at 60:25-61:15 (Sterk Decl. Ex. 9). In his filings with the state, he listed "Susan Tennenbaum," as the manager of the LLC and signed the name of the fake manager. *Id.* 61:17-63:9. There was no such person. *Id.* at 54:3-7.

Daleiden, with help from Defendants and other CMP consultants, went to great lengths to make BioMax appear authentic. They created a website, business cards and promotional materials

describing BioMax as "a biological specimen procurement organization headquartered in Norwalk, California" and touting tissue donation as a "rewarding and empowering experience for patients and their healthcare providers." Daleiden Dep. II at 22-25, 42:16, 64-68 (Sterk Decl. Ex. 9); Sterk Decl. Ex. 20; Sterk Decl. Ex. 21. Daleiden also created a Facebook page for BioMax "founder" Susan Tennenbaum. Daleiden Dep. I at 232:1-6 (Sterk Decl. Ex. 8).

Daleiden recruited friends and acquaintances from his anti-abortion work to pose as BioMax representatives. He provided them with fake names, detailed fake biographies and trained them to speak like abortion supporters. Sandra Susan Merritt, known to Daleiden from her participation in prior Live Action sting operations, was paid thousands of dollars by CMP to be "Susan Tennenbaum," BioMax's CEO. *See* Deposition of Sandra Merritt ("Merritt Dep.") at 310:21-312:3; 39:7-9 (Sterk Decl. Ex. 24). Brianna Baxter used the name "Brianna Allen" and posed as Tennenbaum's assistant, niece, and a part-time procurement technician. Sterk Decl. Ex. 61; Daleiden Dep. II at 45:1-50:9 (Sterk Decl. Ex. 9). Daleiden coached his "actors" on using terms that would avoid suspicion as anti-abortionists. Deposition of Geraldo Adrian Lopez ("Lopez Dep.") at 188:25-189:23, 193 (Sterk Decl. Ex. 27); Sterk Decl. Ex. 28 (providing "target lines"); CM16036 ("Confidential: Field Worker Dictionary") (Sterk Decl. Ex. 9).

Finally and critically, Daleiden created and solicited the production of fake California drivers licenses with the fake names for himself, Merritt, and Baxter. For his own ID, he used an expired drivers' license and typed "Robert Dauod Sarkis" over his true name. Daleiden Dep. I at 227:14-229:19 (Sterk Decl. Ex. 6)6 [4] Through Craigslist, Daleiden located a service in Southern California which he paid to produce phony drivers' licenses with the names Susan Tennenbaum and Brianna Allen. *Id*. at 230:4-231:24; 233:7-15.

Defendants Rhomberg and Newman were fully cognizant of these lies. They participated in Board meetings or calls with Daleiden every few months to discuss and receive updates on the progress of the project. Rhomberg Dep. at 342-345 (Sterk Decl. Ex. 14). They were also sent direct

---

[4] Daleiden's fake identification is attached as Sterk Decl. Ex. 32. Merritt's is attached at Sterk Decl. Ex. 33. Defendants did not produce a copy of the fake identification created for Baxter.

emails from Daleiden laying out a roadmap of the goals and activities of CMP.  Sterk Decl. Ex. 25;

Sterk Decl. Ex. 26.

## IV.     BY INFILTRATING NAF, DALEIDEN AND MERRITT ESTABLISH THE FRONT COMPANY AS A KNOWN AND TRUSTED ENTITY PAVING THE WAY TO INFILTRATE PPFA CONFERENCES.

Daleiden then began to register BioMax as an exhibitor at reproductive health conferences.

He registered Brianna Allen and Susan Tennenbaum of BioMax as attendees at the Association of

Reproductive Healthcare Providers ("ARHP") in Denver in 2013.  *See* Merritt Dep. at 269:19-272:3

(Sterk Decl. Ex. 24).

Daleiden then used contacts made at ARHP to leverage his way into the National Abortion

Federation's 2014 meeting in San Francisco, California.[5]  Sterk Decl. Ex. 30; Daleiden Dep. II at

87:7-24, 88:20-89:16 (Sterk Decl. Ex. 7).  Daleiden signed NAF's Exhibitor Agreement

representing that BioMax was a legitimate business interested in reaching reproductive health care

professionals.  Sterk Decl. Ex. 31; Daleiden Dep. II at 86-89 (Sterk Decl. Ex. 7).  Daleiden, Merritt

and Baxter checked-in at NAF's registration desk using their fake California drivers' licenses.

Daleiden Dep. I at 249:9-19 (Sterk Decl. Ex. 6).  "Sarkis," "Tennenbaum" and "Allen" also signed

confidentiality agreements to gain access to NAF's meetings promising not to make any video

recordings.[6]  *See* Defendants CMP and BioMax's Responses to PP NorCal Interrogatories (Set

One), No.18 (Sterk Decl. Ex. 34).  Meanwhile, the goal was to videotape "reproductive healthcare

providers, in circumstances where they trusted" Defendants.  Deposition of Brianna Baxter ("Baxter

Dep.") at 120:7-18 (Sterk Decl. Ex. 23).

After meeting Dr. Nucatola at the 2014 NAF conference, "Sarkis" invited her to lunch with

him and "Tennenbaum," again posing as representatives of a new tissue procurement company, to

purportedly seek Dr. Nucatola's advice on breaking into the field.  *See* Nucatola Dep. at 344:7-11

(Sterk Decl. Ex. 35); Sterk Decl. Ex. 2, ¶ 6 ; Sterk Decl. Ex. 36; *see also* Sterk Decl. Ex. 37

---

[5] The annual NAF meetings provided an opportunity for abortion providers, including Planned Parenthood employees, to discuss the latest developments in abortion care.  Deposition of Deborah Nucatola ("Nucatola Dep.") at 424-426 (Sterk Decl. Ex. 35).

[6] Lopez also signed the NAF confidentiality agreement prohibiting videotaping prior to attending the 2015 NAF annual meeting.  Lopez Dep. Ex. 248 (Sterk Decl. Ex. 40).

(Daleiden instructed Merritt to preselect wine). Nucatola agreed and they met for lunch in July 2014 in Los Angeles, California. Daleiden and Merritt secretly recorded Dr. Nucatola during that lunch. Merritt Dep. at 348:19-25 (Sterk Decl. Ex. 24). Afterwards, Daleiden emailed Rhomberg to say Dr. Nucatola "bought it all hook line and sinker." Sterk Decl. Ex. 38; Daleiden Dep. II 108-16-109:10 (Sterk Decl. Ex. 6). "Delicious!" Rhomberg responded. Sterk Decl. Ex. 38.

## V. DALEIDEN AND LOPEZ INFILTRATE THREE PLANNED PARENTHOOD CONFERENCES AS REPRESENTATIVES OF BIOMAX.

The infiltration of NAF achieved its purpose. As Daleiden reported to his funders, "[t]he infiltration was successful, and BioMax is now a known and trusted entity to many key individuals in the upper echelons of the abortion industry." Sterk Decl. Ex. 17. Or, as Daleiden later laughed with co-defendant Merritt, "we're so vetted now that we've been at NAF." Video excerpt from meeting with Stem Express (Sterk Decl. Ex. 39).

In September 2014, Daleiden as "Briana Allen" emailed PPFA staff asking to register for PPFA's 2014 North American Forum on Family Planning ("Forum") in Miami, Florida, specifically using Dr. Nucatola's name as a reference. Sterk Decl. Ex. 97, at Ex. A ("Dr. Nucatola…suggested that we get in touch with you about exhibiting at the PPFA/Society of Family Planning meeting in Miami…"). Believing that BioMax was a genuine tissue procurement organization known to high-level PPFA employees, Vikky Graziani provided information to "Allen" about registering as an exhibitor. Sterk Decl. Ex. 7,¶ 7-8.

As a condition of participation in the Planned Parenthood conferences, exhibitors must agree to a set of written terms and conditions. Exhibitors must agree that their products or services are "educational and informative" provide information about services that were useful to the provision of reproductive health care and "beneficial to the interests of [ ] clients and patients." Sterk Decl. Ex. 41 at 1 ¶ 1. Exhibitors also must promise to "comply with all applicable federal, state and local laws and regulations in performance" as an exhibitor "including, without limitation, laws related to fraud, abuse, privacy...[and] confidentiality...." *Id.* at 4, ¶ 3. Daleiden (acting as "Brianna Allen") checked the box to acknowledge PPFA's terms and conditions for Forum Exhibitors for BioMax's

registration.[7]  Based on these representations about the existence and purpose of BioMax, combined

with the referral from Dr. Nucatola, PPFA permitted BioMax to register as an exhibitor.   Sterk

Decl. Ex. 7, ¶ 7; Sterk Decl. Ex. 2, ¶ 7.

Again, Daleiden used the name "Robert Sarkis," and provided a doctored California drivers'

license at the registration table.  Daleiden Dep. II at 114:7-19 (Sterk Decl. Ex. 9); Daleiden Dep. I at

248:13-18 (Sterk Decl. Ex. 8).  Although he knew that the license was not real (a "novelty item"),

Daleiden never told anyone at PPFA that he was using a novelty identification. Daleiden Dep. I at

250:9-17 (Sterk Decl. Ex. 8).  Lopez claimed to be a BioMax procurement technician, but was not.

Lopez Dep. at 99:4-8 (Sterk Decl. Ex. 28).  Lopez knew that Daleiden was using a fake name and

ID to enter the conferences.[8]  Lopez Dep. 92-93; 108-109 (Sterk Decl. Ex. 28).  PPFA relied on

Daleiden and Lopez's false representations that they were employees of a tissue procurement

company interested in developing business relationships with conference attendees in granting them

admission to its conferences.  Sterk Decl. Ex. 7, ¶ 7; Sterk Decl. Ex. 2, ¶ 7..

Soon thereafter, Daleiden registered BioMax to be an exhibitor at PPFA's annual Medical

Director Conference ("MeDC") in Orlando, Florida, identifying "Robert Sarkis" and Adrian Lopez

as BioMax representatives, and again promising that its services would be educational and

beneficial to attendees and their patients and promising to "comply with all applicable federal, state

and local laws and regulations in performance" as an exhibitor "including, without limitation, laws

related to fraud, abuse, privacy...[and] confidentiality . . . ."  Sterk Decl. Ex. 43 at 2. ; *see also*

Minow Dep. at 69:11-19 (Sterk Decl. Ex. 78).

In February 2015, Daleiden (still using the "Brianna Allen" email address) registered

BioMax as an exhibitor for the PPFA 2015 National Conference in Washington D.C. CM00915

(Sterk Decl. Ex. 46).  As with the other two PPFA conferences, Daleiden bound BioMax to the

---

[7] As part of the registration, each exhibitor was required to give a description of their business.  The terms and conditions stated that PPFA "reserves the right to award exhibit space only to those Exhibitors whose exhibits will best meet the educational, scientific or practice needs of the conference attendees."  Sterk Decl. Ex. 41 at 3 ¶ 1.

[8] Lopez was able to present his own identification because he had not participated in anti-abortion activities prior to his involvement in CMP.  *See* Lopez Dep. at 250:16-21(Sterk Decl. Ex. 27).

Exhibitor terms and conditions. Sterk Decl. Ex. 44; Minow Dep. 96:23-99:4 (Sterk Decl. Ex. 78). "Robert Sarkis" and Adrian Lopez were identified as the BioMax attendees for the conference. *See* Sterk Decl. Ex. 44.

At all three conferences, Daleiden introduced himself as Robert Sarkis and told attendees that he represented BioMax, a start-up tissue procurement company. He and Lopez, handed out BioMax business cards with their fake titles. Sterk Decl. Ex. 20; Daleiden Dep. II at 64-68 (Sterk Decl. Ex. 9). They offered attendees brochures describing BioMax as "a biological specimen procurement organization headquartered in Norwalk, California." Sterk Decl. Ex. 21; Daleiden Dep. II at 42:16 (Sterk Decl. Ex. 9). *See*, *e.g.*, Screenshot from FNNI0773_20150227061943 at 6:42:35 (Sterk Decl. Ex. 22). Lopez's role was to seek out targeted abortion providers and "bring them to David because he knows exactly how he wants things to go." Lopez Dep. at 181:4-20 (Sterk Decl. Ex. 27). Posing as BioMax representatives, "Sarkis" and Lopez lured Plaintiffs' staff into conversations about abortion practices and fetal tissue donation in order to fil them. CM02961 (Sterk Decl. Ex. 28); Daleiden Dep. II at 96:25-98:4, 109:9-15(Sterk Decl. Ex. 9); Lopez Dep. at 178:16-180:6, 37:22-38:12, 230:10-15 (Sterk Decl. Ex. 27). Plaintiffs' staff had no idea that they were being filmed and never consented to be filmed. *See* Daleiden Dep. II at 111:22-114:15 (Sterk Decl. Ex.9); Lopez Dep. 234:5-234:9, 234:19-21 (Sterk Decl. Ex. 27).

## VI. DALEIDEN AND MERRITT SET UP FOUR MEETINGS WITH HEALTH CARE STAFF CLAIMING TO BE REPRESENTATIVES OF A FETAL TISSUE COMPANY AND SECRETLY FILM THEIR MEETINGS.

Daleiden and Merritt also used the connections Daleiden had made posing as an employee of BioMax to set up meetings with Planned Parenthood physicians and staff.

On October 16, 2014, Daleiden sent an email to Dr. Savita Ginde, medical director of PPRM. Sterk Decl. Ex. 45. He enclosed a copy of the BioMax brochure and a "welcome letter from our founder CEO, Susan Tennenbaum." *Id*. PPRM operates 24 health centers across three states, including at the Denver Stapleton center in Colorado, which PPRM owns and where Dr. Ginde had her office. Declaration of Kevin Paul, ¶ 3 (Sterk Decl. Ex. 47). Dr. Ginde agreed to meet with "Sarkis" and "Tennenbaum" and admitted them into the PPRM clinic and her private

office.  Daleiden and Merritt both wore hidden cameras and filmed the entire meeting.  Merritt

Dep. at 389:10-19 (Sterk Decl. Ex. 24); Daleiden Dep. II at 109:10-110:2 (Sterk Decl. Ex. 9).  Dr.

Ginde and her staff were unaware they were being filmed and did not consent to the filming.

Merritt Dep. at 389:10-19 (Sterk Decl. Ex. 24).

Daleiden also contacted Dr. Mary Gatter, the medical director of Planned Parenthood of

Pasadena and San Gabrial Valley (PPPSGV).  Daleiden had met Dr. Gatter when he infiltrated the

Forum in 2014.  As "Sarkis," he set up a lunch meeting with Dr. Gatter to discuss the possibility of

starting a fetal tissue donation program at PPPSGV.  PP0005567 (Sterk Decl. Ex. 48).  He sent Dr.

Gatter the same "welcome letter" from "Tennenbaum."  *Id*.  Daleiden and Merritt met with Dr.

Gatter and her colleague, Laurel Felczer, in February 2015 in Pasadena, California.  *Id*.  Daleiden

and Merritt held themselves out as their BioMax characters and (Sterk Decl. Ex. 24).

Daleiden's next target was PPGC.[9]  After meeting PPGC staff at the 2015 PPFA National

conference that he had infiltrated, Daleiden sent a follow up email.  CM00125, at 130 (Sterk Decl.

Ex. 50) (" It was refreshing to speak to someone who understands the potential for research project

in this area."); Daleiden Dep. II at 107:20-108:5 (Sterk Decl. Ex. 9).  Once again, Daleiden enclosed

the BioMax brochure and welcome letter from the CEO "who is cc'ed on this email."  Sterk Decl.

Ex. 50.  Daleiden claimed that BioMax "need[ed] to fill a variety of researcher requests for whole

tissue/organ samples" and proposed a site visit.  *Id*. at CM00128.  Ms. Farrell agreed to meet with

"Sarkis" and "Tennenbaum" because she believed that they were representatives of a start-up tissue

procurement company "committed," as Daleiden wrote, "to providing biospecimens to those who

can do the most good with them." Declaration of Melissa Farrell ¶¶ 2, 4 (Sterk Decl. Ex. 51).

PPGC owns and operates Prevention Park Health Center in Houston, Texas.  Sterk Decl. Ex.

55, ¶ 3.  All visitors to PPGC's headquarters are required to present photo identification.  Decl. of

---

[9] Due to a former Texas state law that mandated separate of abortion services from family planning services, Planned Parenthood Center for Choice ("PPCFC") is a separate corporate entity from PPGC with separate accounting and financials.  PPCFC and PPGC, however, falls within the same Planned Parenthood affiliate umbrella and are located in the same building.  Deposition of Jeffrey Palmer ("Palmer Dep.") at 13-14 (Sterk Decl. Ex. 55).

Larissa Lindsay ¶ 2, Dkt. 391; Palmer Dep. at 42-43(Sterk Decl. Ex. 53). PPGC's security director maintains a list of known anti-abortion activists who are placed on the "no list." Names of visitors are checked against the "no list," which includes people not allowed in the building because of security concerns, including known anti-abortion activists. Decl. of Larissa Lindsay ¶ 2, Dkt. 391; Palmer Dep. at 52-53 (Sterk Decl. Ex. 53). Daleiden's name was on that list and has been since 2009. Decl. of Larissa Lindsay, Dkt. 391 ¶ 2, Dkt. 391; Palmer Dep. at 52-53 (Sterk Decl. Ex. 53).

In addition, as a matter of practice, Ms. Farrell executes Non-Disclosure and Confidentiality Agreements with researchers before any site visit at PPGC is conducted. *See* Farrell Dep. at 192:20-193:4 (Sterk Decl. Ex. 52). Following that practice, she sent a copy of PPGC's NDA to "Sarkis" prior to his visit. *See* Sterk Decl. Ex. 51, ¶ 3; Farrell Dep. Ex. 1727 (Sterk Decl. Ex. 54). Daleiden signed the name Susan Tennenbaum, on behalf of BioMax, on the NDA. *See* Sterk Decl. Ex. 34; Merritt Dep. Ex. 447 (Sterk Decl. Ex. 65); Merritt Dep. at 430:24-431:6 (Sterk Decl. Ex. 24).

On April 9, 2015, "Sarkis" and "Tennenbaum" met with Ms. Farrell at PPGC. After presenting fake identification at the sign-in desk and therefore avoiding being flagged by the "no list," they were allowed into Prevention Park. Daleiden and Merritt surreptitiously recorded the entire meeting including a tour of the employee-only pathology lab. Merritt Dep. at 392:-393:4 (Sterk Decl. Ex. 24); Daleiden Dep. II at 109:10-110:2 (Sterk Decl. Ex. 9).

## VII. CMP AND DALEIDEN USE THE ILLEGALLY OBTAINED VIDEOTAPES TO CREATE A SMEAR CAMPAIGN DESIGNED TO PROVOKE OUTRAGE AND MAKE VIEWERS ANGRY AND UPSET AT PLANNED PARENTHOOD.

On July 14, 2015, CMP released its first video, an eight-minute "summary" with clips from the lunch with Dr. Nucatola taken out of context, low ominous music, and intertitles claiming that Dr. Nucatola was engaged in illegal abortion procedures and violated federal law by "selling baby parts." Within hours of the release, Dr. Nucatola began receiving threats on her voicemail and on Twitter and Facebook.[10] Fearing for her safety, PPFA hired a 24-hour armed guard. Dr. Nucatola feared for her family, her elderly parents and her dog. Nucatola Dep. at 383:20- 25, 435:15-436:8

---

[10] https://twitter.com/58Bjh/status/628554305625280512 (Sterk Decl. Ex. 57) (printed on May 22, 2019).

(Sterk Decl. Ex. 35). As CMP released new videos weekly, other physicians were subject to the same attacks: Drs. Nucatola and Ginde deserved "the electric chair" and "to be drawn and quartered,"[11] Dr. Ginde deserved to be "dismembered and sold for parts." Protestors showed up at Dr. Ginde's home with signs calling her a murderer and baby killer. PP0011720 (Sterk Decl. Ex. 35, Ex. A). Like PPFA, PPRM spent thousands of dollars protecting Dr. Ginde and ultimately relocating her and her family. After an anonymous caller left a threatening voicemail for Melissa Farrell, law enforcement recommended she relocate to a remote location with armed security. Farrell Dep. at 213:9-215:15; 243:5-8 (Sterk Decl. Ex. 52).[12] PPGC incurred costs for security guards and installing a new security systems and locks were at her home. *Id*. at 218:12-219:20.

The result was no surprise. From the start, Daleiden's and his co-conspirators' express goal was to "create public *outrage* at Planned Parenthood" and to "awaken the public *to take actions* to end the American holocaust of prenatal murder." CM04565, at CM04566 (Sterk Decl. Ex. 79); Daleiden Dep. I at 193:19-194:18 (Sterk Decl. Ex. 9); CM6004, at CM06005 (Sterk Decl. Ex. 80); Daleiden Dep I at 206:12-208:10 (Sterk Decl. Ex. 9); Rhomberg Dep. at 157-158 (Sterk Decl. Ex. 14). Defendants understood precisely the impact their videos would have as they spread on the internet, noting that it was important to keep the videos short to ensure that the maximum number of viewers became "angry/upset" and "stigmatiz[ed] the [abortion] industry." CM03937 (Sterk Decl. Ex.55); Deposition of Andrew Moore at 182:17-19 (Sterk Decl. Ex. 54). On November 28, one of those potentially angry/upset people, Robert Dear, drove to the PPRM clinic run by Dr. Ginde, and shot eight people, killing three, including a police officer and Planned Parenthood volunteers.

---

[11] *See e.g.* https://twitter.com/EONealIII/status/626211813223452672 ("In a just world, Dr. Ginde would be dismembered and sold for parts.") (Sterk Decl. Ex. 358) (printed on May 22, 2019).

[12] Farrell's relocation occurred after a voicemail threat that said "we're coming for you" was received. PP0008070 (Sterk Decl. Ex. 60). There were also on-line threats made against Farrell. *See* PP0008598-99 (a fake Facebook community page about Farrell included as post that read "kill this murder-bitch") (Sterk Decl. Ex. 60).

# ARGUMENT

## I.      SUMMARY JUDGMENT STANDARD

Summary judgment should be granted "if the "movant [through pleadings, the discovery and disclosure materials on file, and any affidavits] show(s) that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). Partial summary judgment is appropriate where no genuine issue of material fact exists regarding a part or an element of a party's claim or defense.  *See id*.  Plaintiffs can move for summary judgment on all or part of their claims. *See*, *e.g.*, *Travelers Cas. & Sur. Co. of Am. v. K.O.O. Constr., Inc.*, No. 16-CV-00518-JCS, 2016 WL 7324988, at *6 (N.D. Cal. Dec. 16, 2016) (granting plaintiff's partial summary judgment motion as to the existence and terms of the contracts).  They may also move for partial summary judgment as to the opposing party's affirmative defense.  *See Bowerman v. Field Asset Servs. Inc.*, 242 F. Supp. 3d 910 (N.D. Cal. 2017), *reconsideration denied*, No. 13-CV-00057-WHO, 2018 WL 3753054 (N.D. Cal. Aug. 8, 2018) (granting partial summary judgment).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party has met that burden, including identifying portions of the record that show the absence of a genuine issue of material fact, the burden shifts to the person opposing the motion to controvert that showing "with specific facts showing that there is a genuine issue for trial."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).  If "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  *Id.* at 587.

## II.     PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON THEIR TRESPASS CLAIMS (COUNT SIX)

To obtain summary judgment for trespass, Plaintiffs PPFA, PPRM and PPGC must prove that Defendants (1) entered property (2) owned or possessed by Plaintiffs (3) without Plaintiffs'

consent.[13]  Damage to the property or person is not an element of trespass claims.[14]  The requisite

showings are easily made here.

     *First*, there is no dispute that Defendants CMP, BioMax, Daleiden, Merritt and Lopez

entered property when they attended conferences organized by PPFA and health centers owned

and/or operated by PPRM, PPCFC, and PPGC.[15]

     *Second*, the relevant properties were owned or leased by the relevant Plaintiffs.  PPRM,

PPCFC and PPGC own the health centers that Defendants Daleiden and Merritt entered.  Sterk

Decl. Ex. 47, ¶ 3; Sterk Decl. Ex. 49, ¶ 3.  Moreover, the areas of Plaintiffs' property which

Defendants entered were not open to the public including office space and the pathology labs,

---

[13] The elements of trespass are the same in all four relevant jurisdictions.  *See Pub. Serv. Of Colo. v. Van Wyk*, 27 P.3d 377, 389 (Colo. 2001) (trespass is "a physical intrusion upon the property of another without the proper permission from the person legally entitled to possession of that real estate") (citation omitted); *see also, e.g.*, *Barnes v. Mathis*, 353 S.W.3d 760,764 (Tex. 2011) (trespass involves "unauthorized entry upon the land of another"); *Sarete, Inc. v. 1344 U St. Ltd. P'ship*, 871 A .2d 480, 490 (D .C. 2005) ("trespass is an unauthorized entry onto property that results in interference with the property owner's possessory interest therein") (citation omitted); *Gaetan v. Weber*, 729 A.2d 895, 898 (D.C. 1999) ("Tenants have standing to sue third parties for damages arising from . . . trespass"); *Pearson v. Ford Motor Co.*, 694 So. 2d 61, 69 (Fla. Dist. Ct. App. 1997)("trespass is an unauthorized entry onto another's property").

[14] Although nominal damages may be recovered for claims of trespass without any showing of actual loss, *Pitts Sales, Inc. v. King World Prods., Inc.*, 383 F. Supp. 2d 1354, 1367 (S.D. Fla. 2005) (courts have "allowed the recovery of nominal damages in civil trespass actions"), Plaintiffs intend to prove damages above nominal damages at trial.

[15] Although Defendants Rhomberg and Newman did not enter any Plaintiff properties, they are liable because they were officers and board members of CMP and in their roles were aware of. Advised on and approved of on CMP's scheme and undercover tactics.  *Engler v. Hatch*, 472 P.2d 680, 682 (Colo. App. 1970)(" Any person who . . . encourages . . . another in the commission of a trespass, even though not personally present at its commission, is liable equally with him who commits it."); *Schwartz v. Pillsbury Inc.*, 969 F.2d 840, 844 (9th Cir. 1992) ("Tacit consent is enough to prove a conspiracy against a director or officer of a corporation.") (internal citations omitted).

In addition, CMP is the parent company of BioMax and thus liable as its alter ego.  As board members of CMP, Newman and Rhomberg are liable for the wrongful acts of CMP and BioMax, the entity CMP formed to conduct its fraud. Daleiden Dep. II at 26-29 (Sterk Decl. Ex. 9).  Under the alter ego doctrine, where the corporate form is used to "accomplish some . . . wrongful or inequitable purpose, the courts will ignore the corporate entity and deem the corporation's acts to be those of the persons or organizations actually controlling the corporation." *Troyk v. Farmers Grp., Inc.*, 171 Cal. App. 4th 1305, 1341 (2009) (quoting *Sonora Diamond Corp. v. Superior Court*, 83 Cal. App. 4th 523, 538 (2000)); *see also Riddle v. Leuschner*, 51 Cal. 2d 574, 579 (1959) (principal liable for corporation's breach of contract*); Mesler v. Bragg Mgmt. Co.*, 39 Cal. 3d 290, 299 (1985) (The essence of the alter ego doctrine is that justice be done.).

which are only open to employees--not to patients or the public. Sterk Decl. Ex. 49, ¶ 4PPFA leased the space it used for its conferences. *See* Sterk Decl. Exs. 3, 4, 5. It controlled access to the reserved space through registration, identification, and use of badges and door monitors.  Sterk Decl. Ex. 7 ¶¶ 4-5; Minow Dep. at 295-97,300-1, 316-17, 336-38 (Sterk Decl. Ex. 78).  Its contracts with hotel venues provided it with the right to exclude people from the space. *See* Sterk Decl. Ex. 3 at 12; Sterk Decl. Ex. 4 at 7; Sterk Decl. Ex. 5 at 12.

*Third*, Defendants entered Plaintiffs' private property without consent.  Plaintiffs consented to allow professional representatives of a tissue procurement company to enter their property for the purpose of exhibiting useful information to conference attendees (PPFA) and for the purpose of discussing a potential professional relationship (PPGC and PPRM).  Plaintiffs did not consent, and would never would have consented, however, to allow extremist anti-abortion activists wearing hidden cameras into their private conferences and health centers.  Indeed, PPFA maintains lists of anti-abortion activists like Defendants and PPGC maintains a "no list" for the specific purpose of excluding, *i.e.* denying consent to enter their property.  David Daleiden was on that list.  Minow Dep. at 277-279 (Sterk Decl. Ex. 78); Decl. of Larissa Lindsay, Dkt. 391 ¶ 2, Dkt. 391; Palmer Dep. at 52-53 (Sterk Decl. Ex. 53)

Defendants knew that Plaintiffs would not have consented to their entry onto Plaintiffs' private, secured properties which is precisely why they misrepresented their purpose and identities. Daleiden Dep. II at 31-32 (Sterk Decl. Ex. 9); Daleiden Dep. I at 220:2-222:2 (Sterk Decl. Ex. 8); Newman Dep. at 173 (Sterk Decl. Ex. 13); Lopez Dep. at 108-110 (Sterk Decl. Ex. 27); Deposition of Annamarie Bettisworth Davin ("Davin Dep.") at 287:8-288:1 (Sterk Decl. Ex. 62); Baxter Dep. at 125-26 (Sterk Decl. Ex. 23).  Simply put, the consent Defendants' secured was based on fundamental and pervasive misrepresentations and was therefore, ineffective. *See* MTD Order at 27 ("a claim for trespass can be made where defendants fraudulently gained access to places not open to the public"); *Council on Am.-Islamic Relations Action Network, Inc. v. Gaubatz*, 793 F. Supp. 2d 311, 345 (D.D.C. 2011) ("Consent may be ineffective if . . . induced by the other's misrepresentation") (internal quotation marks omitted); *Food Lion, Inc. v. Capital Cities/ABC, Inc.*, 951 F. Supp. 1217, 1222 (M.D.N.C. 1996) ("the misrepresentations which allowed Litt and Barnett

to enter the restricted parts of Food Lion's stores could negate the consent which they were given."); Restatement (Second) of Torts § 173 (1965) ("A conscious misrepresentation as to the purpose for which admittance to the land is sought, may be a fraudulent misrepresentation of a material fact").

As a direct result of Defendants trespass, Plaintiffs have had to upgrade their security systems and procedures in an effort to prevent additional future trespass. Palmer Dep. at 289 (Sterk Decl. Ex. 49; Minow Dep. at 95 (Sterk. Decl. Ex. 78).

## III. PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON THEIR FRAUDULENT MISREPRESENTATION CLAIM (COUNT EIGHT)

To prove fraudulent misrepresentation, Plaintiffs PPFA, PPRM, PPPSGV, PPCFC, and PPGC must show that Defendant knowingly misrepresented material facts with the intent to induce reliance; that Plaintiffs justifiably relied on those misrepresentations; and that they suffered harm as a result. *See Terra Ins. Co. v. N.Y. Life Inv. Mgmt. LLC*, 717 F. Supp. 2d 883, 890 (N.D. Cal. 2010) (citing *Hahn v. Mirda*, 54 Cal. Rptr. 3d 527 (2007)); *see also Democracy Partners v. Project Veritas Action Fund,* 285 F. Supp. 3d 109, 116-18 (D.D.C. 2018); *McKinney/Pearl Restt. Partners, L.P. v. Metro. Life Ins. Co.*, 241 F. Supp. 3d 737 (N.D. Tex. 2017)*; Clark v. Green Tree Servicing LLC*, 69 F. Supp. 3d 1203,1223 (D. Colo. 2014); *Butler v. Yusem,* 44 So.3d 102, 105 (Fla.2010).[16] There is no triable issue of disputed fact with respect to any of these elements.[17]

### A. Daleiden, Merritt and Lopez knowingly misrepresented material facts to PPFA, PPRM, PPPSGC, PPGC and PPCFC.

Daleiden, Merritt and Lopez knowingly misrepresented all material facts about themselves and BioMax to Plaintiffs (for purposes of Part III, Plaintiffs refers to PPFA, PPRM, PPPSGV,

---

[16] In Florida, a party only needs to prove reliance on the misrepresentation, not justifiable reliance. *Butler,* 44 So.3d at 105 ("a recipient may rely on the truth of a representation, even though its falsity could have been ascertained had he made an investigation, unless he knows the representation to be false or its falsity is obvious to him. As we have explained, the policy behind our holding in *Besett* is to purposely prohibit one who purposely uses false information to induce another into a transaction from profiting from such wrongdoing.") (internal quotation marks omitted).

[17] Plaintiffs seek summary judgment as to liability, but intend to prove the amount of their damages at trial.

PPGC and PPCFC).[18] Daleiden created BioMax as a "front" company (CM04228 (Sterk Decl. Ex. 17)) after submitting an application with false information to the California Secretary of State. *See* Sterk Decl. Ex. 19. Daleiden, Merritt and Lopez represented to Plaintiffs' employees that BioMax was involved in procuring human tissue for the purposes of research. *See* CM07126 (Sterk Decl. Ex. 18); CM04228 (Sterk Decl. Ex. 17); Daleiden Dep. II at 19:8-20:13 (Sterk Decl. Ex. 9). Lopez claimed to be procurement technician but was not. Lopez Dep. at 90:16 - 91:11, 99:3-8, 179:7-10, 182:6-17 (Sterk Decl. Ex. 27). Ms. Baxter, who Daleiden instructed to say that she was a part-time procurement technician and assistant to the CEO, was not. CM03466 (Sterk Decl. Ex. 61). Defendants Daleiden, Lopez, and Merritt were not actually employees of Biomax. NAF0000687 (Sterk Decl. Ex. 20); CM00003 (Sterk Decl. Ex. 63). Daleiden and Merritt used false names in their interactions with Plaintiffs' staff, false photo IDs for the purpose of registering for conferences, and entering the facilities owned by PPGC and PPRM, and setting up a meeting with PPPSGV's medical director.[19] PP0005935 (Sterk Decl. Ex. 32); Daleiden Dep. I at 227-229 (Sterk Decl. Ex. 8);; Daleiden Dep. II at 36:15-37:7 (Sterk Decl. Ex. 9); Merritt Dep. at 838:1-13, 389:10-391:13 (Sterk Decl. Ex. 24).

In conversations with Plaintiffs, the Daleiden, Merritt and Lopez continuously represented that their goal was to obtain tissue to provide to researchers, when they never had any intention of participating in fetal tissue donation. Lopez Dep. at 99:4-8 (Sterk Decl. Ex. 27). Defendants concealed their true purpose for attending the conferences, entering the health centers and setting up lunch meetings--to record and publish videos of their encounters with Plaintiffs' employees. *See e.g.* Merritt at 32:16-22 (Sterk Decl. Ex. 24). Nor did they disclose that they were wearing hidden video cameras and recording conversations with Plaintiffs. *Id*. at 389:10-18; 393:2-4. Further, Defendants signed contracts with Plaintiffs that they never intended to adhere to.

---

[18] Although Defendants Rhomberg and Newman did not utter statements to Plaintiffs, they are still liable. *See* fn.15, *infra*.

[19] Anna Bettisworth and Brianna Baxter also created false identities as BioMax employees, and created business cards with those false names. Daleiden Dep. II at 64:10-17; 66:15-19 (Sterk Decl. Ex. 9). Defendants used Ms. Allen's false identity to book BioMax as an exhibitor for the PPFA conferences. *See e.g.* Sterk Decl. Ex. 46; Sterk Decl. Ex. 7 at Ex. A.

## B. Defendants intended for Plaintiffs to rely on Defendants' misrepresentations.

As Defendants concede, and understood at the time, their misrepresentations were necessary to obtain entry to Plaintiffs' conferences and properties. Daleiden Dep. I at 220:2-222:2 (Sterk Decl. Ex.8); Daleiden Dep. II at 31-32 (Sterk Decl. Ex. 9); Newman Dep. at 173 (Sterk Decl. Ex. 13). Defendants used their attendance at the PPFA conferences to establish relationships with PPRM, PPPSGV, PPGC/PPCFC, and other Planned Parenthood staff that led to Defendants being admitted into those parties' facilities and/or having meetings with them. CM00125-131 (Sterk Decl. Ex. 50); CM00693 (Sterk Decl. Ex. 45). That is exactly what they intended to do. Merritt Dep. at 358-361 (Sterk Decl. Ex. 24); Sterk Decl. Ex. 12.)

## C. Plaintiffs justifiably relied on Defendants' misrepresentations.

Plaintiffs PPFA, PPRM, PPPSGV, PPCFC, and PPGC relied on Defendants' misrepresentations, just as Defendants intended and expected. Defendants were permitted to register for and attend PPFA conferences because they (1) had already been to NAF conferences, (2) met with Nucatola under false pretenses, who then vouched for them, and (3) agreed to terms and conditions governing their exhibits and providing for compliance with applicable laws, including laws relating to privacy, fraud and confidentiality. Sterk Decl. Ex. 2, ¶¶ 4-5; PP0000034 (Sterk Decl. Ex. 68)). Likewise, Defendants signed a Non-Disclosure Agreement with PPGC prior to their visit to that facility. Sterk Decl. Ex. 51, ¶¶ 3-4. Had Defendants not signed these agreements, they would not have been able to attend the conferences and enter the clinics. Id.; Sterk Decl. Ex. 7, ¶¶ 6-7.

Plaintiffs' reliance on Defendants' willingness to be bound by these agreements was reasonable. They had no reason to believe that Defendants were anything other than what they represented themselves to be through conversations, emails, photo IDs, the BioMax website, signatures, brochures, and business cards: representatives of a company that supplied medical researchers with fetal tissue. Nor did they have reason to believe that Defendants were signing these agreements with no intent to comply. To the contrary, they had every reason to believe that their contracts with Defendants would be honored. There can be no issue of fact as to justifiable reliance here, where Defendants and their co-conspirators concede that Plaintiffs would not have

spoken to them, or let them enter conferences, absent the misrepresentations.  Daleiden Dep. II at

31-32 (Sterk Decl. Ex. 69) ; Daleiden Dep. I at 220:2-222:2 (Sterk Decl. Ex. 8); Newman Dep. at

173 (Sterk Decl. Ex. 13); Lopez Dep. at 108-110 (Sterk Decl. Ex. 27); Baxter Dep. at 125-26 (Sterk

Decl. Ex. 23); Davin Dep. at 287:8-288:1 (Sterk Decl. Ex. 62) ("Planned Parenthood employees

would not have spoke with" Defendants "if they had known [CMP's] true intent").

### D.  Plaintiffs were harmed by Defendants' misrepresentations.

After Defendants fraudulently mispresented themselves to Plaintiffs, they released

selectively edited videos of PPFA, PPRM, PPPSGV, and PPGC/PPCFC employees on the internet.

The employees in those videos received threats and were forced to hire security or leave their home

for a period of time.  *See* Section X, *supra*.  PPFA, PPRM, PPPSGV, and PPGC/PPCFC had to

spend hundreds of thousands of dollars to protect their employees, instituting new building and

conference security measures, and hiring security guards to protect their staff.

### IV.  PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' CLAIM UNDER CALIFORNIA UNFAIR COMPETITION LAW (§ 17200) (COUNT SEVEN)

California's Unfair Competition Law ("UCL"), creates a cause of action against anyone

engaged in an "unlawful, unfair, or fraudulent business act or practice."  Cal. Bus. & Prof. Code

§17200, *et seq*.  "Each prong of the UCL is a separate and distinct theory of liability . . . ."  *Levitt v.

Yelp! Inc.*, 765 F.3d 1123, 1136 (9th Cir. 2014) (citation omitted).  The undisputed evidence

demonstrates that Defendants' actions were clearly unlawful and fraudulent.

*First*, Defendants have engaged in an unlawful business act or practice in California.  "The

'unlawful' prong of Section 17200 prohibits 'any practices forbidden by law, be it civil criminal,

federal, state, or municipal, statutory, regulatory, or court-made.'"  *Makreas v. First Nat. Bank of N.

Cal.*, 856 F.Supp.2d 1097, 1102 (N.D.Cal 2012).  They set up a fake business and lied to the IRS

and California Secretary of State to do so.  Cal. Penal Code § 470.  *See* Section III, *supra*.  They

created or procured and used falsified drivers' licenses in California in violation of California and

federal law.  Cal. Penal Code § 118; 18 U.S.C. § 1028 (*see* Section, VII.A, *supra*).

*Second*, Defendants engaged in fraudulent business practices.  They created a false tissue

procurement company, submitted documents with phony signatures and false representations about

the purpose of BioMax to the state of California to register the phony enterprise, created fraudulent government identification, signed contracts in California under fake names, and attended events with disguised identities for the purposes of obtaining access to Plaintiffs' facilities. Daleiden Dep. I, 137:9-138:23, 227:20-229:5 (Sterk Decl. Ex. 8); Daleiden Dep. II, 61:10-62:23, 85:4-90:5 (Sterk Decl. Ex. 9). Indeed, Defendants admitted that fraud was necessary to carry out their scheme, for Plaintiffs would not allow them to attend their conferences had they revealed their true identities and the fact that BioMax was a fraud. Daleiden Dep. II at 31-32 (Sterk Decl. Ex. 9); Daleiden Dep. I at 220:2-222:2 (Sterk Decl. Ex. 8); Newman Dep. at 173 (Sterk Decl. Ex. 13) ; Lopez Dep. at 108-110 (Sterk Decl. Ex. 27); Baxter Dep. at 125-26 (Sterk Decl. Ex. 23); Davin Dep. at 287:8-288:1 (Sterk Decl. Ex. 62).

Plaintiffs do not seek restitution under the UCL. But they are entitled to an injunction under the UCL if they can show "that the conduct will probably recur." *Sun Microsystems, Inc. v. Microsoft Corp.*, 188 F.3d 111, 1123 (9th Cir. 1999). That showing is easily made here. First, when asked to identify any of Plaintiffs' or NAF's conferences or meetings that Defendants plan to attend or enter in the future, Defendants stated that they have "no *definitive* plans at this time," but "would do so for the purpose of journalism." CMP's Response to PPFA Interrogatories (Set One) Nos. 20 and 22 (Sterk Decl. Exs. 64; 27) (emphasis added). Mr. Daleiden reiterated this position during his deposition.

## V. PLAINTIFF PPGC IS ENTITLED TO SUMMARY JUDGMENT ON ITS BREACH OF CONTRACT CLAIM AS TO PPGC'S NON-DISCLOSURE AGREEMENT (COUNT FIFTEEN)

The Court should grant Plaintiffs' motion for summary judgment as to Defendants' liability for their breach of PPGC's NDA because there is no genuine issue of material fact.[18]

Under Texas law, to recover for breach of contract, a party must prove "(1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of contract by the defendant; and (4) damages as a result of [defendant's] breach." *May v. Ticor Title Ins.*, 422

---

[18] Although the fact of damages is clear, Plaintiffs will prove the amount of damages at trial. In addition, Rhomberg and Newman are liable for this claim. *See* fn.15, *infra*.

S.W.3d 93, 100 (Tex. App. 2014). The purpose of a nondisclosure agreement is to "prevent the disclosure of confidential information and trade secrets." *In re Mktg. Inv'rs Corp.*, 80 S.W.3d 44, 47 (Tex. App. 1998). Texas courts have routinely found that disclosing information deemed confidential under the agreements breaches the nondisclosure agreement. *Sanders v. Future Com, Ltd.*, No. 02-15-00077-CV, 2017 WL 2180706, at *10 (Tex. App. May 18, 2017) (affirming grant of permanent injunction where plaintiff breached nondisclosure agreement by "disclosing the identity of one of its customers, a disclosure expressly prohibited by the Employment Agreement."). All four elements are clearly established here.

First, it is undisputed that David Daleiden signed a valid NDA with PPGC on behalf of BioMax under the signature of Susan Tennenbaum--the fake name for Susan Merritt.[19] Defendants CMP and BioMax's Responses to PP NorCal Interrogatories (Set One), No. 18 (Sterk Decl. Ex. 34); Sterk Decl. Ex. 65; Merritt Dep. at 430:24-431:6 (Sterk Decl. Ex. 24). The NDA bound all of Biomax's employees and agents. Sterk Decl. Ex. 65, ¶ 5.

Second, in reliance on the NDA, PPGC performed under the contract by allowing Defendants to enter PPGC's premises and then discussing confidential business information with them. *See* Farrell Dep. at 189:18-190:9; 269:20-270:17; 272:1-8 (Sterk Decl. Ex. 52).

Third, Defendants breached the NDA. The agreement provided that "*all information disclosed by [PPGC] to [Biomax] shall be deemed to be "Confidential Information*"" except in limited circumstances. Sterk Decl. Ex. 65 ¶¶ 1-2 (emphasis added). It also provided that Biomax "shall not disclose to any third party or use any Confidential Information for any other purpose following the date of disclosure" other than to "evaluate, negotiate and consummate the Transaction"—*i.e.*, the scientific research that BioMax was supposedly undertaking. *Id.* ¶ 3. Defendants Daleiden and Merritt breached this agreement by videotaping conversations they had with PPGC employees relating to PPGC's participation in research, clinic processes and other PPGC information. They then breached the NDA again by disclosing this information to third

---

[19] To the extent Defendants argue that the NDA is invalid based on public policy, that affirmative defense fails as discussed in Section X.

parties by posting videos and articles on the CMP website and Youtube. *Id.* ¶ 3.

Fourth, the breach harmed PPGC. Indeed, by signing the NDA, Biomax acknowledged that any breach of the Agreement, including disclosure or unauthorized use of the confidential information, would cause PPGC "irreparable injury." *Id.* ¶ 10. But more than that, PPGC was damaged by the Defendants' disclosure of the information to the world by posting pieces of footage on their website and on Youtube. PPGC employee Melissa Farrell was threatened, which required PPGC to hire security guards. Farrell Dep. at 213:9-215:15; 243:5-8 (Sterk Decl. Ex. 52). Due to the threats, she also had to relocate to a remote location and have an upgraded security system installed at her home. *Id.* at 218:12-219:20. PPGC itself saw many more security incidents after the Defendants' disclosure, which led to PPGC upgrading its security systems for the increased risk they faced. *See* Palmer Dep. at 289:7-23; 297-10-18 (Sterk Decl. Ex. 55).[20]

## VI. PLAINTIFF PPFA IS ENTITLED TO SUMMARY JUDGMENT ON ITS BREACH OF CONTRACT CLAIM (COUNT FOUR)

The Court should grant Plaintiffs' motion for summary judgment for their breach of PPFA's conference agreements because there is no genuine issue of material fact.[21]

The contracts that Daleiden signed for the three PPFA conferences that Defendants illegally entered are governed by the laws of Florida, Colorado and Washington, D.C.[22] The elements of a breach of contract claim in those three states, are the same as in Texas. *See Hunter Vending Co. v. D.C. Vending Co.*, 345 A.2d 142, 143 (D.C. 1975)(elements of breach of contract are: "(1) a contract; (2) knowledge of the contract; (3) intentional procurement of its breach by the defendant; and (4) damages resulting from the breach"); *Bland v. Freightliner LLC*, 206 F. Supp. 2d 1202, (M.D. Fla. 2002) (same); *Farmers Alliance Mut. Ins. Co. v. Cutrone*, 448 F. Supp. 2d 1226, 1234

---

[20] The First Amendment is not a defense to harm that PPGC suffered as a result of disclosure of information protected by an NDA. *Nat'l Abortion Fed'n, NAF v. Ctr. for Med. Progress*, 685 F. App'x 623, 626 (9th Cir. 2017) (defendants waived any First Amendment rights to disclose that information publicly by knowingly signing the agreements with NAF.").

[21] Although the fact of damages is clear, Plaintiffs will prove the amount of damages at trial. In addition, Rhomberg and Newman are liable for this claim. *See* fn.15, infra.

[22] No conference took place in Colorado, but the contract for the PPFA Forum, which was held in Florida, state it is governed by Colorado law.

(D. Colo. 2006) (same). Here, summary judgment for PPFA is appropriate because it has
established each of the elements.[23]

First, there are enforceable contracts. As set forth above, on September 16, 2014, February 6, 2015, and February 17, 2015, Defendants Daleiden, Merritt, Lopez, CMP, and BioMax (along with their co-conspirators) entered into written Exhibitor Agreements with PPFA related to registration for PPFA conferences in Miami, Orlando, and Washington, D.C., respectively. Sterk Decl. Exs. 41 42, 43, 44.

Second, PPFA performed its obligations under the Exhibitor Agreements, allowing BioMax and its "employees" to participate as exhibitors at each of the three conferences. See Minow Dep. at 23 (Sterk Decl Ex. 78).

Third, each Defendant signatory, and BioMax "employees"[24] also bound by the contracts, breached the Exhibitor Agreements by failing to exhibit on the terms set forth in the contract. For example, two of the Exhibitor Agreements required that each exhibitor's exhibits be "educational and informative, emphasizing information about products and series useful to the registrants' practice and beneficial to the interests of their clients and patients." Sterk Decl. Ex. 66 at 1 ¶ 1; Sterk Decl. Ex 67 , at 2. Defendants' exhibits were nothing of the sort; indeed, far from being "useful to the registrants' practice," Defendants' exhibits were for non-existent services, and their actions were (by their own admission) intended to try and shut down PPFA. See CM00992 (Sterk Decl. Ex. 21); Daleiden Dep. II at 42:16 (Sterk Decl. Ex. 9); Lopez Dep. at 99:4-8 (Sterk Decl. Ex. 27). Moreover, the Exhibitor Agreements also required each signatory (and its attendees) to "comply with all applicable federal, state and local laws and regulations in performance of its respective obligations pursuant to this Agreement, including, without limitations, laws related to fraud, abuse, privacy, discrimination, disabilities, samples, confidentiality, false claims and prohibition of kickbacks." Sterk Decl. Ex. 66 at 4 ¶ 3; Sterk Decl. Ex. 67 at 2; Sterk Decl. Ex. 68

---

[23] As discussed in Section II, Defendants' claims that the contracts are invalid based on Defendants' First Amendment rights are unavailing.

[24] Those bound by the contracts include Daleiden, Merritt, Lopez, CMP and BioMax. However, Rhomberg and Newman are liable for this claim as alter egos of BioMax. See fn.15, infra.

at 1-2. (emphasis added). Defendants breached this provision by failing to comply with laws regarding fraud, privacy, and confidentiality when they used false identities to attend the conferences, without disclosing their true purpose, when they taped participants without their knowledge or consent under false pretenses, and when they blasted the surreptitiously recorded tapes across the internet. *See* Sections III.A, *supra*.

Defendants also breached the Exhibitor Agreements by misrepresenting themselves as members of "BioMax," an allegedly legitimate tissue-procurement company. In addition to the obligations set forth above, the Exhibitor Agreements required BioMax employees to disclose "any real of apparent conflict(s) of interest," as well as to show "only products manufactured or represented by their company in the regular course of business." Sterk Decl. Ex. 66, at 1 ¶ 3; Sterk Decl. Ex. 667, at 1 ¶ 3. Here, the signatories did not reveal the most basic conflict of interest--*i.e.*, that they were secretly filming conference attendees with the specific intent to develop videos that would severely harm Planned Parenthood. Daleiden Dep. II at 111:22-114:15 (Sterk Decl. Ex. 9); Lopez Dep. 234:5 - 234:9; 234:19-21 (Sterk Decl. Ex. 9).

*Fourth*, PPFA has shown that Defendants' breach of the Exhibitor Agreements has caused the organization significant harm. At minimum, Daleiden, Merritt, Lopez, CMP and BioMax's breach caused PPFA to upgrade its security measures at its conferences. *See* Minow Dep. at 95 (Sterk. Decl. Ex. 78).

## VII. PLAINTIFFS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW ON THE PREDICATE OFFENSE ELEMENT OF THEIR RICO CLAIM (COUNT ONE)

Plaintiffs seek a ruling by this Court that the Defendants committed predicate offenses of Plaintiffs' RICO claim. Particularly, Defendants committed identification fraud (18 U.S.C. § 1028), as well as mail and wire fraud.[25]

---

[25] In ruling on Defendants' motion to dismiss, the Court held that Plaintiffs could not base their RICO claim on the predicate offense of mail/wire fraud because the confidential business information that Defendants fraudulently obtained from Plaintiffs was not a trade secret. *See* [MTD Ruling at 10-11] This motion does not ask the Court to revisit that ruling, and instead provides a separate basis for mail/wire fraud.

## A.    Defendants Violated 18 U.S.C. § 1028

Violations of 18 U.S.C. § 1028 constitute predicate acts under RICO.  18 U.S.C. § 1961(1).

Thre is no genuine issue of fact as to whether Defendants Daleiden, Merritt, CMP and BioMax

violated 18 U.S.C. § 1028, so summary judgment as to this element should be granted.  It is illegal

to "knowingly and without lawful authority produce[] an identification document, authentication

document, or a false identification document" or to "knowingly transfer[]" the same "knowing that

such document or feature was stolen or produced without lawful authority."  18 U.S.C. §

1028(a)(1)-(2).  A false identification document is defined as:

> [A] document of a type intended or **commonly accepted for the
> purposes of identification** of individuals that— (A) is **not issued by
> or under the authority of a governmental entity or** was issued
> under the authority of a governmental entity but was **subsequently
> altered for purposes of deceit**; and (B) **appears to be issued by or
> under the authority of the United States Government, a State**, a
> political subdivision of a State, a sponsoring entity of an event
> designated by the President as a special event of national significance,
> a foreign government, a political subdivision of a foreign government,
> or an international governmental or quasi-governmental organization

18 U.S.C. § 1028(d)(4)(emphasis added).  Here, Defendants both produced and transferred false

identification documents.  First, Daleiden admitted that he created an photo identification in the

form of a California State driver's license by altering the name on the driver's license that was

originally issued to him by the State.  Daleiden Dep. I at 227:14 -229:19 (Sterk Decl. Ex. 8).

Second, Daleiden admitted that he purchased additional photo identification documents purporting

to be issued by the State of California for Merritt and Baxter  *Id*. at 230:4-231:24; 233:7-15.  He

then transferred those fake IDs to his co-conspirators, and he and Merritt, through CMP and

BioMax, proceeded to transfer the fake IDs to PPFA, NAF and PPGC to register for conferences

and enter secured, private buildings or areas.  *See* Merritt Dep. II at 392:-393:4 (Sterk Decl. Ex. 24);

Daleiden Dep. II at 109:10-110:2 (Sterk Decl. Ex. 9).

## B.    Defendants Committed Mail and/or Wire Fraud

There are no genuine issues of fact as to whether Defendants devised a scheme to defraud

Plaintiffs of their fundamental property right to exclude others from their conferences and offices.

Therefore, judgment as a matter of law must be granted on this element of Plaintiffs' RICO claim.

A violation of the wire fraud statute requires that Defendants, "having devised . . . any scheme or artifice to defraud . . ., transmit[ed] or cause[d] to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme." 18 U.S.C. § 1343.  The elements of mail fraud are identical to wire fraud, except that mail fraud uses the mail instead of electronic communications.  *United States v. Frey*, 42 F.3d 795, 797 (3d Cir. 1994).  The mail fraud statute is "limited in scope to the protection of property rights."  *McNally v. United States*, 483 U.S. 350, 360 (1987).  But "*McNally* did not limit the scope of § 1341 to tangible as distinguished from intangible property rights."  *Carpenter v. United States*, 484 U.S. 19, 25 (1987).

As discussed in Section II, the undisputed evidence shows that Defendants trespassed at health centers in Colorado and Texas belonging to PPRM and PPGC, respectively, and at PPFA conferences in Florida and Washington, D.C.  The Supreme Court has made clear that "the right to exclude others" is "one of the most essential sticks in the bundle of rights that are commonly characterized as property."  *Kaiser Aetna v. United States*, 444 U.S. 164, 176 (1979).  Likewise, the right to exclude is an essential property right in all of the states in which Defendants obtained access to Plaintiffs' conferences and/or health centers through misrepresentation.[26]  *See, e.g.*, *Kelly v. Bd. of Cty. Comm'rs of Summit Cty.*, No. 17-CA-0431, 2018 WL 2436836, at ¶¶ 18, 26,, as modified (June 14, 2018), *cert. granted sub nom. Bd. of Assessment Appeals v. Kelly*, No. 18SC499, 2019 WL 1026366 (Colo. Mar. 4, 2019) (discussing how "the rights to exclude" are "traditional benefits of real property ownership" and the "right to control the property is essential to owning property"); *Envtl. Processing Sys., L.C. v. FPL Farming Ltd.*, 457 S.W.3d 414, 424 (Tex. 2015) ("[W]e recognize the fundamental notion that generally, an owner of realty has the right to exclude all others from use of the property.") (internal quotation marks omitted); *Ralphs Grocery Co. v. Victory*

---

[26] This Court held in its MTD Order that what constitutes "property" for purposes of the mail/wire fraud statute must be determined by reference to state law.  *See* MTD Order at 10 (citing *United States v. Shotts*, 145 F.3d 1289, 1294 (11th Cir. 1998) ("state law appears to control the definition of property under Section 1341"); and *Borre v. United States*, 940 F.2d 215, 220 (7th Cir. 1991) ("It is logical, therefore, for this court to look to state law in determining whether a cable television franchise constitutes 'property' for purposes of the mail fraud statute.")).

*Consultants, Inc.*, 225 Cal. Rptr. 3d 305, 315 (Ct. App. 2017), *as modified* (Nov. 6, 2017) ("[T]he right to exclude persons is a fundamental aspect of private property ownership"); *State v. Adams*, 5 P.3d 903, 907 (Ariz. Ct. App. 2000), *as amended* (May 12, 2000) ("One of the main rights attached to property is the right to exclude others.").

Consequently, when Defendants committed trespass in each of these jurisdictions through their fraudulent acts, *see* Section II, *supra*, they deprived Plaintiffs PPFA, PPRM and PPGC of the fundamental property right to exclude others. Moreover, they did so using the mails and wires. *See* Minow Dep. at 302 (Sterk Decl. Ex. 78). They therefore committed mail/wire fraud.

## VIII. DEFENDANTS' SECTION 633.5 AFFIRMATIVE DEFENSE FAILS AS A MATTER OF LAW

It is undisputed that Defendants secretly recorded private conversations with employees of Plaintiffs in California, both at the 2014 NAF conference (in San Francisco, California) and during private meetings with Nucatola (in Los Angeles, California) and Gatter (in Pasadena, California). Merritt Dep. at 76:2-77:6; 383:1-13 (Sterk Decl. Ex. 24). In response to claims that this secret taping violates California's statutes prohibiting invasions of privacy, California Penal Code § 632, Defendants have asserted that their taping falls under Penal Code § 633.5, an exception to § 632. That statute provides that Section 632 does "not prohibit one party to a confidential communication from recording the communication **for the purpose of obtaining evidence reasonably believed to relate to the commission by another party to the communication**" of a series of listed felonies, including "any felony involving violence against the person." Pen. Code § 633.5 (emphasis added).

Several of Defendants' Answers allege that the basis of their defense under § 633.5 is that "the purpose of the recording of any confidential communication was to gather evidence of the commission of violent felonies, specifically, the killing of an infant born alive or the commission of a partial birth abortion."[27] David Daleiden's Answer to Plaintiffs' First Amended Complaint at 63

---

[27] Daleiden testified that he believed Planned Parenthood had committed the following felonies: (1) covering up and aiding and abetting child sex trafficking; (2) violation of mandatory reporting laws; (3) battery; and (4) the sale of aborted fetal body parts; (5) infanticide of born-alive infants; and (6) illegal partial-birth abortions. Apr. 16, 2019 Daleiden Dep. at 133-34. While Daleiden is wrong on all accounts, he and Rhomberg have waived this defense as to (1)-(4) by failing to assert them in

(Sterk Decl. Ex. 69); Answer of Defendant Rhomberg to First Amended Complaint at 26 (Sterk

Decl. Ex. 70); *see also* Answer to Plaintiffs' First Amended Complaint Filed by the Center for

Medical Progress and BioMax Procurement Services, LLC at 65 (Sterk Decl. Ex. 71); Defendant

Sandra Susan Merritt's Answer and Defenses to Plaintiffs' First Amended Complaint at 21 (Sterk

Decl. Ex. 72); Answer to Plaintiffs' First Amended Complaint filed by Gerardo Adrian Lopez at 66

(Sterk Decl. Ex. 73). The California statute is crystal clear. To qualify for the defense, the

recording must relate to a reasonable belief that the **person being recorded** committed a violent

felony. It specifically tethers the "reasonable belief" to the "commission by another party to the

communication" of a specifically enumerated crime.[28] Moreover, that belief must have been

present prior to taping.[29] *Hart,* 86 Cal. Rptr. 2d 762, 772 (1999); *see Planned Parenthood Fed'n of

Am., Inc. v. Ctr. for Med. Progress*, No. 16CV00236WHODMR, 2019 WL 317597, at *17 (N.D.

Cal. Jan. 24, 2019), aff'd, No. 16-CV-00236-WHO, 2019 WL 495600 (N.D. Cal. Feb. 8, 2019)

(inquiry under the statute is "whether Defendants' beliefs about Plaintiffs' alleged misconduct *at the*

---

their Answers. See Fed. R. Civ. P. 8(c) ("In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense."); *see* Fed. R. Civ. P. 12(b) ("Every defense to a claim for relief in any pleading must be asserted in the responsive pleading"). *San Luis Unit Food Producers v. United States*, 772 F. Supp. 2d 1210, 1229 (E.D. Cal. 2011), aff'd, 709 F.3d 798 (9th Cir. 2013) ("A defendant is barred from raising any avoidance or affirmative defense by failing to plead it in the answer."). Lopez and Merritt similarly cannot assert most of these defenses. Lopez claims to have been gathering evidence of illegal sale of fetal tissue, and changing of abortion methods. *See* Lopez Dep. 132 (Sterk Decl. Ex. 27). Merritt believed Planned Parenthood committed sex trafficking and infanticide. Merritt Dep. at 47:19-48:12: 48:23-55:17 (Sterk Decl. Ex. 24). They are therefore barred from asserting any other crimes as the basis for their 633.5 defenses at trial.

[28] This language is consistent with the approach generally used in Fourth Amendment cases, on which section 632 was based. *Kearney v. Salomon Smith Barney, Inc.,* 137 P.3d 914, 928 n.4 (2006). Courts have recognized a narrow exception under the Fourth Amendment for warrantless stop-and-frisk encounters based on "reasonable suspicion." *People v. Hart,* 86 Cal. Rptr. 2d 762, 772 (1999), *as modified on denial of reh'g* (Aug. 23, 1999) ("an officer, suspicious of criminal activity, has the right to conduct a limited search of a person only if the officer entertains a reasonable suspicion or belief, based upon the facts known to him at the time, that the person may be armed and presently dangerous."); *see also*, ECF 501 ("Information that Defendants did not already know or possess at the time they recorded Plaintiffs' employees is not relevant to the reasonableness of their beliefs about Plaintiffs' alleged misconduct.").

[29] Although Defendants claim that they were videotaping these encounters to capture evidence of violent felonies that they believe Planned Parenthood was committing (Daleiden Dep. I at 133-134, (Sterk Decl. Ex. 8)) prior to taping, they had no knowledge as to any illegal actions of particular individuals employed by Plaintiffs.

*time of the recordings* were reasonable") (emphasis added).

Defendants had no such belief. Instead, they claimed only that they were investigating Planned Parenthood and its affiliates for alleged crimes.[30] *See* Daleiden Dep. I at 133-134 (Sterk Decl. Ex. 8) ("[P]rior to April of 2014, I believe that . . . Planned Parenthood Federation of America and the Planned Parenthood affiliates . . . was involved in [certain felonies]."). Indeed, they had no information at all about the specific individuals they taped in California. In CMP, BioMax's and Daleiden's responses to interrogatories setting for the bases for its beliefs of criminal activity, CMP never mentions any information about individuals at Planned Parenthood that did not directly come from CMP's undercover videos themselves. CMP & BioMax's Resp. to PPPSW's Interrogatories (Set One), No. 2 (Sterk Decl. Ex. 75); Daleiden Resp. to PPPSW Interrogatories (Set One), No. 2 (Sterk Decl. Ex. 76). Nor do Daleiden's declarations.[31] Further, in at least forty pages of testimony regarding Mr. Daleiden's beliefs about felonies supposedly committed by Planned Parenthood, Mr. Daleiden only once mentions information specific to an individual employed by Planned Parenthood--Dr. Katharine Sheehan--but all she said was that her affiliate had a relationship with Advanced Bioscience Resources. Daleiden Dep. I at 139-142 (Sterk Decl. Ex. 8). Lopez, similarly, pointed to no information about any Planned Parenthood employee he taped at the 2014 NAF conference in San Francisco prior to his undercover work. He testified that he had not spoken to Planned Parenthood, did not get any information from Planned Parenthood's website, and could not point to any article that formed his beliefs that even mentioned Planned Parenthood.[32] Lopez Dep. at 40-47 (Sterk Decl. Ex. 27).

The lack of a basis for the beliefs claimed by Defendants was made clear when Lopez

---

[30] Defendants Rhomberg, Newman, and Merritt seem to have simply relied on Mr. Daleiden and conducted none of their own research to come to any beliefs at all, (Merritt Dep. at 47:19-48:12, 48:23-55:17, 58:23-60:25, 225:8-24 (Sterk Dep. Ex. 24); Rhomberg at 91-93 (Sterk Dep. Ex. 14)), so their beliefs are inherently unreasonable.

[31] Daleiden mentions a conversation with Katharine Sheehan, a Planned Parenthood employee, but she is not one of the people for whom Plaintiffs are bringing a § 632 claim as she was not taped in California. *See* Plaintiffs' Corrected Am. Resps. to Def. David Daleiden's Interrogs [Set Two], Interrog. No. 2 (Sterk Decl. Ex. 77).

[32] Lopez had not spoken to anyone other than Daleiden about these alleged crimes prior to taping undercover. *Id*. at 41-42.

testified that he did not report his suspicions or any evidence from the 2014 NAF conference in San Francisco to law enforcement because he "didn't know enough" to do so. *Id*. at 133, 156. Moreover, Defendants taped indiscriminately at that conference, even though they did not know the specific people who would be in attendance. *Id*. at 130-131; 231-232. As a matter of law, they could not have had a reasonable belief that each and every conference participant had committed a violent felony against a person. In short, Defendants have not asserted, and have presented no evidence, that they had any belief--let alone a reasonable belief--that the specific Planned Parenthood employees they taped were committing a violent felony against a person.[33] Therefore, § 633.5 does not apply to Defendants' recordings.

## IX. DEFENDANTS' UNCLEAN HANDS AFFIRMATIVE DEFENSE FAILS AS A MATTER OF LAW

Defendants assert in their respective answers that, "Plaintiffs' claims for injunctive relief are barred by the doctrine of unclean hands, because Plaintiffs have engaged in illegal and/or unethical conduct." Daleiden Answer ¶ 26 (Sterk Decl. Ex. 69). Specifically, Defendants claim that Plaintiffs violated laws regarding abortions and fetal tissue procurement. *See* Def. D. Daleiden's Resp. to PPPSW Interrogatories No. 1. (Sterk Decl. Ex. 76); Daleiden Dep. Iat 133-35 (Sterk Decl. Ex. 8). This Court has already rejected Defendants' unclean hands defense. ECF 501 ("the doctrine of unclean hands does not apply in these circumstances"). It should do so again.

For the doctrine of unclean hands to apply, "plaintiffs seeking equitable relief must have acted fairly and without fraud or deceit *as to the controversy in issue*." *Intamin, Ltd. v. Magnetar Techs. Corp.*, 623 F. Supp. 2d 1055, 1074 (C.D. Cal. 2009), *aff'd*, 404 F. App'x 496 (Fed. Cir. 2010) (emphasis added) (finding unclean hands where a patent assignee forged a chain of title

---

[33] Sale of fetal tissue is clearly not a violent felony against a person, And nor is violation of the so-called partial birth abortion ban. *Roe v. Wade*, 410 U.S. 113, 158 (1973), *holding modified by Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833 (1992) ("[T]he word 'person,' as used in the Fourteenth Amendment, does not include the unborn."). The "partial birth abortion" law itself refers to a "fetus," and not to a "person." 18 U.S.C. § 1531. Since the term "fetus" is absent from 633.5's affirmative defense, a "felony involving violence against the person" does not include so-called "partial birth" abortion. *Cf.* Cal. Penal Code § 187(a) ("Murder is the unlawful killing of a human being, or a *fetus*, with malice aforethought")(emphasis added) with Cal Penal Code § 633.5 ("any felony involving violence against the *person*").

recorded before the PTO and then brought a patent infringement claim against its competitor). Thus, "the relevant inquiry is not [whether] the plaintiff's hands are dirty, but [whether] he dirtied them in acquiring the right he now asserts, or [whether] the manner of dirtying renders inequitable the assertion of such rights against the defendants." *Pom Wonderful LLC v. Welch Foods, Inc.*, 737 F. Supp. 2d 1105, 1110 (C.D. Cal. 2010) (internal quotation marks and citation omitted). The defendant must show that the plaintiff "directly 'infected' the actual cause of action before the court, and is not merely guilty of unrelated improper past conduct." *Id.* (quoting *Pond v. Ins. Co. of N. Am.*, 198 Cal. Rptr. 57 (Ct. App. 1984)).

This Court has already determined that Plaintiffs' alleged unclean conduct is not directly related to their claim against Defendants. In its decision on a joint discovery letter this Court stated:

> Plaintiffs allege that Defendants engaged in a criminal conspiracy to gain access to Plaintiffs' conferences and clinics in order to surreptitiously film their employees and then released deceptively-edited videos intended to "demonize" Planned Parenthood. By contrast, Defendants seek discovery into whether Plaintiffs violated federal laws regarding abortions and fetal tissue procurement. ***These subjects are not related within the meaning of the unclean hands doctrine. Accordingly, the doctrine of unclean hands does not apply in these circumstances . . . .***

*Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, No. 16-CV-00236-WHO (DMR), 2019 WL 1102988, at *5 (N.D. Cal. Mar. 8, 2019), aff'd No. 16-cv-00236-WHO (N.D. Cal. Apr. 9, 2019). The legality of Plaintiffs' practices related to abortion and fetal tissue is completely unrelated to Plaintiffs' claims that Defendants unlawfully intercepted and recorded conversations, and engaged in racketeering activities, unlawful business practices, invasions of privacy, and breaches of confidentiality agreements and other contracts. Defendants' unclean hands defense therefore fails as a matter of law.[34]

---

[34] In addition, Defendants have not suffered harm as a result of Plaintiffs' alleged actions. "[C]ourts do not apply the doctrine of unclean hands where the defendant has suffered no harm as a result of the plaintiff's actions." *Allmerica Fin. Life Ins. & Annuity Co. v. Dalessio*, No. C-96-0385 VRW, 2006 WL 408538, at *7 (N.D. Cal. Feb. 20, 2006); *Chitkin v. Lincoln Nat'l Ins. Co.*, 879 F. Supp. 841, 854 (S.D. Cal. 1995). Defendants do not, and cannot, assert that Plaintiffs' alleged actions related to abortions or fetal tissue harmed Defendants in any way. Instead, Defendants allege supposed harm to others. For example, Defendant Daleiden testified that, "Planned Parenthood was

## X. DEFENDANTS' PUBLIC POLICY DEFENSE FAILS AS A MATTER OF LAW

Defendants' Public Policy affirmative defense as to Plaintiffs' breach of contract claims, including breaches of PPFA, PPGC and NAF contracts,[35] should be rejected. It is undisputed that Defendants Daleiden and Merritt entered into nondisclosure and other agreements with PPGC and PPFA fully intending to breach those contracts. *See e.g.* Merritt at 266-267 (Sterk Decl. Ex. 24) Nevertheless, Defendants assert that they would be immune from liability if they could show "Plaintiffs' violation of federal and state law" because then the agreements would be void as a matter of public policy.[36]

The purpose of the public policy exception is to allow for reporting of criminal activity to law enforcement, even if a contract would otherwise bar such reporting. *See, e.g., Branzburg v. Hayes*, 408 U.S. 665, 696 (1972); *Fomby-Denson v. Dep't of Army*, 247 F.3d 1366, 1367–77 (Fed. Cir. 2001) (holding on public policy grounds settlement agreement did not bar government party from reporting other party's criminal activity to foreign government). It does not apply here for several independent reasons.

First, the public policy exception does not apply when a defendant has a pre-formed intention to violate the contract.[37] *Huthwaite, Inc. v. Randstad Gen. Partner (US)*, No. 06–C–1548, 2006 WL 3065470, *6 (N.D. Ill. Oct. 24, 2006)(finding that cases in which the party "only later learned the other party was violating the law" do not apply when the breaching party was aware of the operative facts prior to signing the contract). As this Court noted in the parallel NAF case, the record demonstrates that "[D]efendants infiltrated the NAF meetings *with the intent to disregard the confidentiality provisions* and secretly record participants and presentations at those meetings." Order Granting Mot. for Prelim. Inj. at 34, *Nat'l Abortion Federation v. Center for Medical Progress*, No. 15-CV-03522-WHO, 2016 WL 454082 (N.D. Cal. February 5, 2016) *aff'd sub nom.*

---

involved in committing *battery against their patients* by making changes to their abortion procedures . . . ." *See* Apr. 16, 2019 Daleiden Dep. at 134 (emphasis added).

[35] Plaintiffs have brought claims for breach of NAF contracts as third party beneficiaries.

[36] This Court has already expressed that it is "highly questionable" whether public policy is a defense to any of Plaintiffs' claims. ECF 446.

[37] When that is the case, the party can choose not to enter into the contract at all.

*Nat'l Abortion Fed'n, NAF v. Ctr. for Med. Progress*, 685 Fed. App'x 623 (9th Cir. 2017) ("*NAF*"),

ECF No. 354 (emphasis added).  The same is true for the PPFA conferences, and PPGC meetings.

Defendants' planned to misrepresent their identities and purpose to infiltrate Planned Parenthood

and disclose information disclosed in private meetings scheme, starting from at least 2013.  *See*

Section III, *supra*.  In fact, Lopez freely admitted that he intended to breach the NAF agreement

when he signed.  Lopez Dep. at 224:4-10, 230.  Neither law nor contractual obligation that they

agreed to limited them in any way.

        Second, the exception does not apply to disclosures of a defendant beyond those made to

law enforcement, or when the intent of disclosure was not to report to law enforcement.  *NAF*, 2016

WL 454082 at *20.  Where the evidence shows that the defendant's intent in breaching the contract

was not to report to law enforcement but to publish the stolen information through "continued

release" of videos, the public policy exception does not apply.  *Id*. at *20-21 n.35 (finding

"inapposite" cases holding confidentiality agreements unenforceable to extent they purported to

prohibit reporting illegal conduct to law enforcement).  Even if a public policy defense would allow

Defendants to provide information on potential wrongdoing to law enforcement, that "does not

obviate the confidentiality agreements for all purposes." *Id*. at *21; *see also*, *Cafasso, U.S. ex rel. v.*

*Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1062 (9th Cir. 2011) (finding that relator's "vast and

indiscriminate appropriation" of files did not fall under a public policy exception to void her

confidentiality agreement, even though files were taken to disclose false claims action).  Defendants

did not breach the non-disclosure and confidentiality agreements for the sole purpose of providing

information to law enforcement.  Instead, broad disclosure to the public was the primary purpose of

Defendants' scheme.  Sterk Decl. Ex. 25-26.  This Court has agreed:

> I also find it significant that while defendants' repeatedly assert that
> their primary interest in infiltrating NAF was to uncover evidence of
> criminal wrongdoing . . . defendants *did not* provide any of the NAF
> recordings to law enforcement following the 2014 Annual Meeting. . .
> . Instead, defendants decided it was more important to "curate" and
> release the Project videos starting in July 2015.

*NAF*, 2016 WL 454082, at *19.  Again, the same facts and logic apply to PPFA and PPGC.

        Third, the public policy exception does not apply when the disclosure does not reasonably

show criminal wrongdoing.  *See Branzburg*, 408 U.S. at 696; *Fomby-Denson*, 247 F.3d at 1367–77; *NAF*, 2016 WL 454082, at *20.  "The viability of the defense turns on whether the information protected by the agreements actually included illegal conduct. If the information protected by the agreements did not include evidence of illegal conduct, then the defense does not apply." *Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, No. 16-CV-00236-WHO (DMR), 2019 WL 311622, at *4 (N.D. Cal. Jan. 24, 2019), *aff'd* No. 16-CV-00236-WHO (N.D. Cal. Feb. 8, 2019).  Here, neither the videos that Defendants took and published, nor any other documents pointed to by Defendants, show criminal activity.  In fact, when provided with an opportunity by the Court to provide evidence of wrongdoing, Hearing Tr. (July 19, 2018) at 6, 11-13 (asking if there is "any evidence that any Planned Parenthood affiliate has violated Federal law" and for Defendants to provide cited video evidence to the Court), this Court found that none of the videos or other materials provided showed illegal conduct.

> Defendants did not identify any information purportedly covered by the exhibitor and non-disclosure/confidentiality agreements that they contend constitutes evidence of illegal conduct. This fact alone is fatal to Defendants' argument. Moreover, **the court reviewed all the documents and videos that Defendants identified at the hearing as evidence that Plaintiffs violated federal law regarding the transfer of fetal tissue**, even though none of it was covered by the exhibitor and non-disclosure/confidentiality agreements. Consistent with Judge Orrick's review in the NAF case, none of the submitted videos reviewed by the court for this dispute contain evidence of actual criminal wrongdoing.

*Id.*  This Court made the same finding in the parallel NAF case after reviewing videos taken at the NAF conferences.  *NAF*, 2016 WL 454082, at *8 (finding "no evidence of criminal activity" and concluding "the recordings tend to show an express rejection of Daleiden's and his associates' proposals, or, at most, discussions of interest in being paid to recoup the costs incurred by clinics to facilitate collection of fetal tissue for scientific research, which NAF argues is legal.").  Therefore, the public policy defense does not apply in this case.

## CONCLUSION

For the reasons set for above, Plaintiffs respectfully request that the Court grant Plaintiffs' Motion for Summary Judgment.

Dated: May 22, 2019            Respectfully submitted,

ARNOLD & PORTER KAYE SCHOLER LLP

By:    <u>/s/  *Diana K. Sterk*         </u>
             Diana K. Sterk
             Attorneys for Plaintiffs