United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

PLANNED PARENTHOOD
FEDERATION OF AMERICA, INC., et al.,

Plaintiffs,

v.

CENTER FOR MEDICAL PROGRESS, et
al.,

Defendants.

Case No.  16-cv-00236-WHO

**ORDER ON PENDING MOTIONS**

Re: Dkt. Nos. 595, 598, 600, 601, 602, 603,

605, 606, 609, 611, 641, 643

## INTRODUCTION

At the core of this case are defendants' undisputed actions in infiltrating conferences of

plaintiff Planned Parenthood Federation of America (PPFA) and other organizations as well as

two PPFA-affiliated facilities (who are also plaintiffs) and the intentional targeting of particular

staff members employed by PPFA or the PPFA-affiliate plaintiffs in order to surreptitiously record

conversations with the conference attendees and plaintiffs' targeted staff.  Defendants contend that

all of their efforts were part of the Human Capital Project (HCP or Project) "to investigate,

document, and report on the procurement, transfer, and sale of aborted fetal tissue."  Declaration

of David Daleiden ISO MSJ (Daleiden MSJ Decl.) [Dkt. No. 609-1] ¶ 3; Declaration of David

Daleiden ISO Oppo. (Daleiden Oppo. Decl.) [Dkt. No. 659-2] ¶ 3.  In July 2015, the public phase

of the Project began with defendants' publication of a series of curated videos, including

recordings of plaintiff' staff from the conferences, from the facilities, and from lunch meetings.

Daleiden MSJ Decl. ¶ 57.[1]

---

[1] The plaintiffs are Planned Parenthood Federation of America (**PPFA**); Planned Parenthood:
Shasta-Diablo, Inc. dba Planned Parenthood Northern California (**PPNorCal**); Planned
Parenthood Mar Monte, Inc. (**PPMM**);  Planned Parenthood of the Pacific Southwest (**PPPSW**);
Planned Parenthood Los Angeles (**PPLA**); Planned Parenthood/Orange and San Bernardino

On July 17, 2019, the parties argued seven motions for summary judgment, one special motion to strike the complaint, a *Daubert* motion, and a motion to strike an expert.  After reviewing the record laid out in the motions, certain issues are beyond dispute.  Defendants set out to damage Planned Parenthood with a scheme that involved creating a phony corporation and false identities, infiltrating conferences and facilities, ignoring confidentiality agreements, and trading on relationships established under false pretenses for the purpose of secretly videotaping individuals without their consent in the hopes of getting them to make damaging statements.  There are distinctions between which defendants are responsible for what acts, but there is no doubt that several defendants committed fraud, breached contracts, and trespassed at the conferences and in the Planned Parenthood facilities.  However, given scope of the claims and the manner in which the issues were framed on this motion, even partial summary judgment is not feasible on most of those claims.

A harder question is to what extent Planned Parenthood was damaged by defendants' conduct.  While it is beyond dispute that Planned Parenthood expended hundreds of thousands of dollars in order to protect their staff and enhance security after the publication of some of the videos that defendants took, much of that expense was incurred in anticipation of and in response to a marked increase of third-party threats and security incidents.  Planned Parenthood cannot recover for reputational damages or "publication" damages under the First Amendment, but there is no bright line in the precedent establishing when a category of damages should be analyzed by proximate cause or the First Amendment.

This Order draws the line for compensable damages between those caused by defendants' direct conduct and those caused by third parties.  The potentially recoverable damages are for personal security costs for individuals targeted by the defendants and for measures to investigate the intrusions and upgrade the security measures meant to vet and restrict future access to the conferences and facilities.  Excluded are more general expenses to upgrade physical security at

Counties (**PPOSBC**); Planned Parenthood of Santa Barbara, Ventura, and San Luis Obispo Counties (**PPSBVSLO**); Planned Parenthood Pasadena and San Gabriel Valley, Inc. (**PPPSGV**); Planned Parenthood of the Rocky Mountains (**PPRM**); and Planned Parenthood Gulf Coast (**PPCG**) and Planned Parenthood Center for Choice (**PPCFC**).

Planned Parenthood facilities as well as the time and expense plaintiffs incurred in responding to the threats and acts of third parties following release of the videos. This Order also addresses the myriad of other issues generated in the ten motions before me.

## TABLE OF CONTENTS

I.    Creation of CMP and BioMax, and Use of False Identities to Allow Defendants to Infiltrate the Conferences and Facilities.................................................................................................. 5

II.   Plaintiffs' Conferences and Facilities ....................................................................... 9

     A.   PPFA Conferences and Security Measures ....................................................... 9

     B.   Defendants' Infiltration of Conferences, Facilities, and Meetings................... 10

III.  Publication of the Videos, this Lawsuit and Claims ............................................. 12

I.    Motions for Summary Judgment............................................................................. 15

     A.   Damages ............................................................................................................ 15

     B.   RICO (Count 1) ................................................................................................ 22

          1.   RICO Predicate Acts.............................................................................. 23

          2.   RICO Proximate Causation of Injury/Damage ..................................... 29

          3.   Rhomberg, Newman, and Lopez ............................................................ 31

     C.   Breach of Contracts .......................................................................................... 34

          1.   Breach of PPFA Exhibitor Agreements (Count 4) ................................ 34

          2.   Breach of NAF Contracts (Count 5) ...................................................... 43

          3.   Breach PPCG/PPCFC Contract (Count 15).......................................... 51

          4.   Defendants' Public Policy Defense ....................................................... 55

     D.   Trespass (Count 6)............................................................................................ 59

United States District Court
Northern District of California

1.   PPFA ............................................................................................................ 60

2.   Consent and Misrepresentation to Secure Access ....................................... 64

3.   Damages ...................................................................................................... 67

4.   Merritt ......................................................................................................... 68

5.   Rhomberg and Newman ............................................................................... 69

E.   Fraudulent Misrepresentation (Count 8) ............................................................. 71

1.   PPPSGV ...................................................................................................... 71

2.   Elements of Fraudulent Misrepresentation and Framing of this Claim ...................... 72

3.   *Wasden* ...................................................................................................... 73

4.   Damages ...................................................................................................... 74

5.   CMP, Rhomberg, and Newman ................................................................... 76

6.   Merritt ......................................................................................................... 76

F.   Illegal Recording Claims ..................................................................................... 77

1.   Federal (Count 2) ......................................................................................... 77

2.   Florida (Count 11) ....................................................................................... 85

3.   Maryland (Count 12) ................................................................................... 87

4.   Standing and Dropped Claims ..................................................................... 87

5.   California (Counts 9-10) .............................................................................. 87

G.   Invasion of Privacy .............................................................................................. 101

1.   Intrusion on a Private Place (Count 13) ....................................................... 101

2.   California Constitution, Article I (Count 14) ................................................ 106

H.   Civil Conspiracy (Count 3) ................................................................................. 109

1.   Rhomberg and Newman ............................................................................... 109

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

     2.     Lopez ..................................................................................................... 110

  I.  Unfair Business Practices (Count 7) ...................................................................... 110

     1.     Evidence of Unfair Acts ...................................................................... 110

     2.     Lost Money or Property ...................................................................... 111

     3.     Business Acts and Conduct Outside of California .............................. 112

     4.     Injunctive Relief ................................................................................. 113

     5.     Rhomberg, Newman, Merritt, and Lopez .......................................... 114

  J.  Defendants' Unclean Hands Affirmative Defense ................................................. 115

II.  Defendants' Anti-Slapp Motion ..................................................................................... 116

III.  Defendants' Motion to Exclude Cohen ........................................................................ 119

  A.  Advocate-Witness Rule .......................................................................................... 120

  B.  FRE 702 .................................................................................................................. 122

     1.     Methodology ....................................................................................... 122

     2.     Sufficient Data .................................................................................... 123

     3.     Application of Theory to Data ............................................................ 124

     4.     Confusing and Prejudicial .................................................................. 124

IV.  Motion to Strike ............................................................................................................ 126

V.  Motions to Seal .............................................................................................................. 133

**BACKGROUND**

I.    **CREATION OF CMP AND BIOMAX, AND USE OF FALSE IDENTITIES TO ALLOW DEFENDANTS TO INFILTRATE THE CONFERENCES AND FACILITIES**

        Defendant David Daleiden established the Center for Medical Progress (CMP) in 2013 for the "purpose of monitoring and reporting on medical ethics and advances, with a special focus on

United States District Court
Northern District of California

United States District Court
Northern District of California

1   contemporary bioethical issues that impact human dignity, such as induced abortion and aborted

2   fetal tissue and organ harvesting." Daleiden MSJ Decl. ¶ 2.[2]  He invited defendants Troy Newman

3   and Albin Rhomberg to be directors.  Declaration of David Daleiden April 16, 2019 (Daleiden

4   Depo. I, Declaration of Diana Sterk ISO MSJ (Sterk Decl.), Ex. 8) at 109-110.  In March 2013,

5   Newman, Daleiden, and Albin Rhomberg formed CMP as a California not-for-profit corporation.

6   Daleiden Depo. I at 180:25-182:10.  Daleiden was CMP's CEO and Director.  *Id*.  Application of

7   CMP to California Secretary of State & Articles of Incorporation (CMP AoI), Ex. 15 to Sterk

8   Decl. [Dkt. No. 607]; Declaration of David ISO Anti-SLAPP Motion (Daleiden Anti-SLAPP

9   Decl. [Dkt. No. 600-2]) ¶ 2.  Newman was the Secretary of CMP.[3]  CMP AoI, NAF0001805.

10  Rhomberg was the CFO.  CMP AoI NAF0001805;  Deposition of Albin Rhomberg March 14,

11  2019 (Rhomberg Depo. I, Sterk Decl., Ex. 14) at 115:9-20.  Newman, Daleiden, and Rhomberg

12  each served on CMP's board.  CMP AoI, NAF0001804, 1805; Rhomberg Depo. I at 115:9-20.[4]

13       Through CMP, Daleiden inaugurated HCP in 2013 in order to "investigate, document, and

14  report on the procurement, transfer, and sale of aborted fetal tissue."  Daleiden MSJ Decl. ¶ 3;

15  Daleiden Anti-SLAPP Decl. [Dkt. No. 600-1] ¶ 3.  HCP intended to use "undercover journalism

16  tools" such as hidden cameras and misrepresentations about identities to secure entrance to

17  Planned Parenthood conferences and facilities.  Daleiden MSJ Decl. ¶¶ 23, 39.

18       HCP project proposals, shared with Newman and Rhomberg in early 2013, explained the

---

[2] Plaintiffs object to paragraphs 2-5 of Daleiden's MSJ Decl., and paragraphs 2-5 of Daleiden's Oppo. Decl. based on hearsay; speculation as to feelings, thoughts, and intentions of others; and as improper lay opinion.  Dkt. No. 697.  These objections are OVERRULED as to the portions of the declaration I rely on.  In general, I will address the parties' evidentiary objections [Dkt. Nos. 659-1, 697, 698-1, and 706] only to the extent I discuss the objected-to evidence.  All other objections are DENIED as moot.

[3] Plaintiffs repeatedly cite pages from Newman's deposition where Newman invoked the Fifth Amendment and refused to answer most questions about his role with CMP and knowledge of the Project as evidence in support of their motion or in opposition to defendants' motions.  Plaintiffs contend that each of Newman's refusals to answer should be construed against him and defendants.  As described below, plaintiffs have not laid out an adequate foundation to create specific inferences based on Newman's invocation of the Fifth Amendment.  Prior to trial, plaintiffs must lay that foundation and identify with specificity each inference they seek to put in place against Newman for trial.

[4] Defendant Lopez helped Daleiden create a logo for CMP.  Declaration of Gerardo Adrian Lopez [Dkt. No. 603-1] ¶ 5.

United States District Court
Northern District of California

Project's plan to infiltrate Planned Parenthood and National Abortion Federation (NAF) conferences and facilities to implement "creative scenario-based 'gotcha' stings" and "undercover stings" to catch "fetal traffickers, especially Planned Parenthood clinics" violating laws regulating the procurement and transfer of fetal tissue, create "outrage" at Planned Parenthood (and researchers), deliver a "major public relations blow to Planned Parenthood," promote "defunding efforts for Planned Parenthood," and initiate criminal prosecution and investigations of clinics, wholesalers, and doctors.  2013 Project Proposal (Proposal, Sterk Decl. [Dkt. No. 608-1], Ex. 12), CM05623, 05635; *see also* March 2013 Project Proposal (Sterk Decl., Ex. 80).  The "foundational goal" of the Project was to target and "hurt" Planned Parenthood.  Planned Parenthood affiliates were specific targets, as were "high-level PP national officials."  *Id*. CM05635, 2015 Project Roadmap, CM04988 (Sterk Decl. Ex, 16).

Rhomberg was on the HCP "Team"  as an "expert" at acquiring hidden and hard-to-access documentation about the abortion industry; Newman was on the team given his experience in investigating, seeking disciplinary action against, and shutting down abortion clinics.  Proposal, CM0536.  Plaintiffs allege that Newman assisted Daleiden and CMP with fundraising and advised on Project goals, undercover activities, use of fake names and IDs, and other actions "throughout the three-year undercover investigation" for the Project.[5]  Rhomberg assisted Daleiden in fundraising and strategized with consultants to ensure that the secretly recorded videos had maximum impact.  Rhomberg Depo. at 128-129.  He also advised on CMP's undercover activities.  *Id*. at 89, 226:7-227:11.

As part of the Project, Daleiden set up a phony front company called BioMax Procurement

---

[5] CMP and Newman produced a number of communications between Newman and Daleiden, showing that after the release of the initial Project videos, Newman took substantial credit for various aspects of the Project.  *See* Newman Dep. Ex. 44 (Mayo MSJ Opp. Decl. Ex. 48) (commenting that the first video "has exceeded our expectations" and reminding the email recipients that "[t]his is about Planned Parenthood. Putting them in jail. Defunding them. Taking down their empire."); Newman Dep. Ex. 28 at 1 (Mayo MSJ Opp. Decl. Ex.  25) (characterizing the videos as "the end result of a three year undercover investigation by" his organization [Operation Rescue].  He explained that "it was my project for the past three years."); Newman000056, Newman Dep. Ex. 29 at 1 (Mayo MSJ Opp. Decl. Ex. 26) (press release drafted by Newman explaining that he "advised project leader David Daleiden throughout the three-year undercover investigation" and "was integral in directing the project.").

1   Services, LLC (BioMax), as a "wholly-owned entity of CMP," created by CMP to further the

2   Project.  April 2014 Report, CM04229 (Sterk Decl., Ex. 17) ("We have established a front

3   organization (BioMax Procurement Services) that purportedly supplies medical researchers with

4   human biological specimens."); Summer 2014 Roadmap CM07126 at 7128 (Sterk Decl. Ex. 18);

5   Deposition of David Daleiden April 17, 2019 (Daleiden Depo. II, Sterk Decl., Ex. 9) at 19-20, 31-

6   21; Daleiden Anti-SLAPP Decl. ¶ 3.  He filed Articles of Organization with the California

7   Secretary of State, asserting that the purpose of the LLC was to engage in "any lawful activity for

8   which a limited liability company may be organized." Daleiden Oppo. Decl., Ex. RR;[6] Daleiden

9   Depo. II at 60:25-61:15.  In his filings with the state, he listed "Susan Tennenbaum," as the

10  manager of the LLC, although there was no such person, and signed that name for the "organizer."

11  *Id.* at 60-63; *see also* Ex. RR.

12      Daleiden created a website, business cards, and promotional materials for BioMax, and a

13  Facebook page for BioMax "founder" Susan Tennenbaum.  Daleiden Depo. I at 232:1-6.  CMP

14  paid defendant Sandra Susan Merritt "thousands of dollars" to be "Susan Tennenbaum," BioMax's

15  CEO.  *See* Deposition of Sandra Merritt (Merritt Depo., Sterk Decl., Ex. 24) at 310:21-312:3.

16  Brianna Baxter used the name "Brianna Allen" and posed as Tennenbaum's assistant, niece, and a

17  part-time procurement technician for BioMax.  CM0346 (Sterk Decl. Ex. 61); Daleiden Depo. II at

18  45:1-50:9.  Lopez was paid to attend the conferences as a contractor by CMP, where his job was to

19  facilitate introductions for Daleiden as "Sarkis."  Declaration of Gerardo Adrian Lopez [Dkt. No.

20  603-1], ¶¶ 5, 6, 8, 9.

21      Daleiden created and solicited the production of fake California drivers' licenses (IDs)

22  with the fake names for himself (Sarkis), Merritt (Tennenbaum), and Baxter (Allen).  For his own,

23  he used an expired driver's license and typed "Robert Dauod Sarkis" over his name.  Daleiden

24  Depo. I at 227:14-229:19.  Through Craigslist, Daleiden located a service in Southern California

25  that he paid to produce phony driver's licenses with the names Susan Tennenbaum and Brianna

26

27  _____

28  [6] Plaintiffs object to Ex. RR and Daleiden's description of it (Daleiden Oppo. Decl.¶ 4) as
    improper lay opinion, confusion, and hearsay to the extent it is offered for the truth.  Those
    objections are OVERRULED given my limited reliance on RR.

United States District Court
Northern District of California

1   Allen. *Id.* at 230-233. Daleiden, Merritt, and Baxter used these fake IDs to gain access to the

2   NAF and PPFA conference and facilities as described below. Lopez used his own, authentic ID.

3   As the Project progressed, defendants Rhomberg and Newman participated in Board

4   meetings or calls with Daleiden every few months to discuss and receive updates on the progress

5   of the Project. April 2014 Report, CM04229 (Sterk Decl., Ex. 17) (describing establishing

6   BioMax as a "front" that "purportedly supplies" biological specimens and "infiltration" of NAF

7   conference and recording 30 plus hours of conversations with Planned Parenthood affiliates and

8   "Planned Parenthood/NAF officials"); May 2015 Roadmap, CM09373, CM05551 (Sterk Decl.,

9   Exs. 25, 26); *see also* Declaration of Sharon D. Mayo ISO Opposition to MSJs [Dkt. No. 662-1],

10  Ex 32 (Rhomberg Depo. Ex. 76, July 2013 emails from Daleiden and sent to Rhomberg and others

11  regarding a donor who objected to deception involved in the Project); Mayo MSJ Oppo. Decl., Ex.

12  33 CM17821 (April 2015 email between Daleiden, Rhomberg, Newman and others about

13  "incredibly successful site visits" to Planned Parenthood locations warning that they "will

14  probably get suspicious within the next month or so").

15  **II.      PLAINTIFFS' CONFERENCES AND FACILITIES**

16  **A.      PPFA Conferences and Security Measures**

17  PPFA hosts several national conferences. Declaration of Deborah Nucatola (Sterk Decl.,

18  Ex. 2) ¶ 3. Planned Parenthood physicians and staff attend these conferences for educational

19  purposes and to have frank conversations with colleagues. *Id.* ¶ 4. PPFA takes steps to provide a

20  confidential environment and limit attendees to those who share its mission. *Id.* For example, it

21  requires attendees to register in advance and does not permit on-site registrations. Declaration of

22  Vikky Graziani (Sterk Decl., Ex. 7) ¶ 3. Names of attendees are checked in advance against staff

23  lists and membership lists. *Id.* Attendees not affiliated with PPFA or other member groups must

24  provide two references to be admitted. *Id.*

25  On site at conferences attendees must show photo identification to receive their badge and

26  registration materials. Security staff monitors doors and access points to "ensure only those with

27  badges enter." Graziani Decl. ¶ 5. The "front-line" reception and security staff also check

28  attendees and exhibitors against a "lookbook" list of "known anti-abortion groups and

9

individuals."  Deposition of Brandon Minow (Minow Depo., Sterk Decl., Ex. 78) at 295-97; 300-301.[7]

PPFA conferences are held in hotel conference rooms and spaces that it reserves pursuant to contracts.  Declaration of Brandon Minow (Sterk Decl., Ex. 6) ¶ 5; *see also* Minow Depo. Exs. 1911 (Sterk Decl., Ex. 3 "Miami Contract"), 1916 (Sterk Decl., Ex. 4 "Orlando Contract"), 1921 (Sterk Decl., Ex. 5 "DC Contract").  The contracts "typically" require the conference hotels to disclose the names of groups with space reserved at the same time and to refrain from renting space to any group that, in PPFA's judgment, would create a threat of harm.  Minow Decl. ¶ 6; Miami Contract at 12; Orlando Contract at 7; DC Contract at 12.  The hotel contracts also contain confidentiality clauses to which hotel staff are required to adhere.  Miami Contract at 12; Orlando Contract at 7; DC Contract at 12.

PPFA invites a limited number of businesses whose products or services are relevant to reproductive health care to exhibit their products or services at the conferences.  Exhibitors must register in advance and provide the names of any representatives who will attend the conference and who agree to PPFA's terms and conditions.  Graziani Decl. ¶ 4.  Most exhibitors are "repeat exhibitors known to PPFA."  *Id.*  Where an exhibitor is unknown to PPFA, staff checks whether partner organizations, such as NAF, have knowledge of them.  *Id.*

**B.    Defendants' Infiltration of Conferences, Facilities, and Meetings**

Defendants first gained entrance as "Brianna Allen and Susan Tennenbaum of BioMax" to attend at the Association of Reproductive Healthcare Providers (ARHP) meeting in Denver, Colorado in September 2013.  Defendants used the contacts BioMax gained at that meeting to make contacts with NAF staff, who "encouraged" BioMax to attend NAF's April 2014 conference in San Francisco, California.  Daleiden MSJ Decl. ¶ 9; Sterk Decl. Ex. 30 (email correspondence

---

[7] Defendants object to these portions of the Minow Deposition under FRE1002.  That objection is OVERRULED.  Defendants generally challenge the "strength" of these vetting and admission procedures and specifically object to Minow's testimony and the lack of evidence regarding the "lookbook" because the existence of it was not addressed in the Graziani Declaration. Newberg/Rhomberg Oppo. at 2-4.  The objection too is OVERRULED.

United States District Court
Northern District of California

re NAF meeting)[8]; Daleiden Depo. II at 87-89.  Daleiden, Merritt, and non-party Baxter (posing as Brianna Allen) secured access to that conference using their fake California driver's licenses and recorded staff members of plaintiffs during that conference.  Daleiden Depo. I at 249:9-19. Defendants used those contacts, including Dr. Deborah Nucatola of PPFA, whom they met at the NAF conference and later had lunch with in July 2014, to access PPFA conferences, specifically: (1) the PPFA North American Forum on Family Planning in Miami, Florida in October 2014, where defendants Daleiden and Lopez recorded conference participants and presentations; (2) the PPFA Medical Director conference in Orlando, Florida in February/March 2015, where Daleiden and Lopez attended and recorded; and (3) the PPFA national conference in Washington, DC in March 2015, where Daleiden and Lopez attended and recorded.  Defendants also obtained access to NAF's annual meeting in Baltimore, Maryland in April 2015 where Daleiden, Lopez, and Merritt recorded plaintiffs' staff.

On July 25, 2014, taking advantage of the introduction Daleiden secured at NAF's 2014 conference in San Francisco, Daleiden (posing as Sarkis) and Merritt (posing as Tennenbaum) met with Nucatola at a Southern California restaurant.  Daleiden and Merritt surreptitiously recorded that meeting.  On February 6, 2015, Daleiden and Merritt recorded a lunch meeting with Dr. Mary Gatter, the medical director of PPPSGV, and her colleague Laurel Felczer of PPPSGV, at a Pasadena restaurant.

On April 7, 2015, posing as Sarkis and Tennenbaum from BioMax, Daleiden and Merritt accessed the Denver Facility of PPRM and had a meeting with Dr. Savita Ginde, a medical director at PPRM.  During this visit, Daleiden and Tennenbaum gained access to a conference room in a secure wing of PPRM's administrative offices, the patient treatment and laboratory areas of PPRM's co-located health center and its medical research program office.  Daleiden and Merritt surreptitiously recorded during that visit.  On April 9, 2015, Daleiden and Merritt, posing as Sarkis and Tennenbaum from BioMax, secured a meeting with Melissa Farrell and gained access to the Houston facilities of PPGC and PPCFC, including to private office and clinic space.

---

[8] Defendants object to Ex. 30, arguing the comments by Davis and Hart are hearsay and lack foundation.  The objection is OVERRULED.

United States District Court
Northern District of California

To gain that access, Daleiden provided his fake California driver's license, identifying him as Sarkis, and Merritt used a fake California driver's license, falsely identifying her as Tennenbaum. Daleiden and Merritt recorded during that visit.

### III.    PUBLICATION OF THE VIDEOS, THIS LAWSUIT AND CLAIMS

The first video containing portions of defendants' surreptitious recordings was released to the public on July 14, 2015.  Daleiden MSJ Decl. ¶ 57.  That release and the subsequent releases of additional HCP videos generated significant press coverage and resulted in Congressional and other government investigations into the sale of fetal tissue and whether laws had been broken.  *Id.* ¶¶ 57-96.[9]

Plaintiffs filed this lawsuit in January 2016.  The claims asserted in the FAC are:

Count 1: Violation of Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. §§ 1962(c) and 1962(d) by all plaintiffs against all defendants;

Count 2: Violation of 18 U.S.C. § 2511 by all plaintiffs against Daleiden, Merritt, Lopez, CMP, BioMax, and Unknown Co-Conspirators;

Count 3: Civil Conspiracy by all plaintiffs against all defendants;

Count 4: Breach of Contract by PPFA Against Daleiden, Merritt, Lopez, CMP, BioMax, and Unknown Co-Conspirators;

Count 5: Breach of Contract by PPFA, PPNC PPPSW, PPMM, PPOSB, PPGC, and PPCFC against Daleiden, Merritt, Lopez, CMP, BioMax, and Unknown Co-Conspirators;

---

[9] Defendants repeatedly point out that following the release of the HCP videos, Congressional investigations began and, as a result of referrals from those investigations, two fetal tissue procurement companies pleaded guilty to violating laws.  Daleiden MSJ Decl., ¶ 75. But, other than for PPGC, defendants do not identify or argue on these motions that any other plaintiff in this case was found by any investigative or law enforcement body to have possibly violated any law or regulation.  As to PPGC, defendants rely on the conclusions of the Fifth Circuit's now-depublished decision in *Planned Parenthood of Greater Texas Fam. Plan. and Preventative Health Services, Inc v. Smith*, 913 F.3d 551, 554 (5th Cir. 2019).  In that case, the Fifth Circuit affirmed an agency decision, based in part of the HCP videos of PPGC, to terminate Medicare provider status based on evidence that PPGC violated ethical standards imposed under Texas law.  That opinion is under *en banc* review.  Plaintiffs object to Daleiden's declaration and exhibits regarding investigations following the release of the HCP videos "to the extent offered to prove the truth of any matter asserted."  I do not rely on Daleiden's declaration or the exhibits he attaches for the truth of any governmental findings, but only as to the existence of the investigations.  The objections are OVERRULED.

United States District Court
Northern District of California

Count 6: Trespass by PPFA, PPGC, PPCFC, and PPRM against Daleiden, Merritt, Lopez, CMP, BioMax, and Unknown Co-Conspirators;

Count 7: Violations of Calif. Bus. & Profs. Code § 17200, et seq. for Unlawful, Unfair, and Fraudulent Acts by all plaintiffs against all defendants;

Count 8: Fraudulent Misrepresentation by PPFA, PPGC, PPCFC, and PPRM Against Daleiden, Merritt, Lopez, CMP, BioMax, and Unknown Co-Conspirators;

Count 9: Violation of California Penal Code § 632 by PPFA, PPNC, PPPSW, PPMM, PPOSB, PPGC, PPCFC and PPRM against Daleiden, Merritt, Lopez, CMP, BioMax, and Unknown Coconspirators;

Count 10: Violation of California Penal Code § 634 by PPFA, PPNC, PPPSW, PPMM, PPOSB, PPGC, PPCFC, and PPRM against Daleiden, Merritt, Lopez, CMP, BioMax, and Unknown Coconspirators;

Count 11: Violation of Section 934 Title XLVII of the Florida Criminal Procedure Law by all plaintiffs against Daleiden, Merritt, Lopez, CMP, BioMax, and Unknown Co-Conspirators;

Count 12: Violation of § 10-402 of the Courts and Judicial Proceedings Article of the Maryland Annotated Code by PPFA, PPNC, PPPSW, PPMM, PPOSB, PPGC, PPCFC, and PPRM against Daleiden, Merritt, Lopez, CMP, BioMax, And Unknown Coconspirators;

Count 13: Invasion of Privacy: Intrusion Upon A Private Place by All Plaintiffs Against Daleiden, Merritt, Lopez, CMP, BioMax and Unknown Co-Conspirators;

Count 14: Invasion of Privacy: California Constitution Art. I § I by PPFA, PPNC, PPPSW, PPMM, and PPOSB against Daleiden, Merritt, Lopez, CMP, BioMax, and Unknown Co-Conspirators;

Count 15: Breach of Non-Disclosure and Confidentiality Agreement by PPGC and PPCFC against BioMax, Daleiden, and Merritt.

Plaintiffs clarify, in their combined Opposition to defendants' six separate motions for summary judgment as well as in their Reply in support of their own motion for partial summary judgment, that claims by particular plaintiffs against specific defendants have been dropped. Those dropped claims are:

13

- Count 4 - Breach of PPFA Contracts as to Merritt. Pls. Reply MSJ at 8 n.9.
- Count 6 – Trespass against Merritt with respect to the PPFA conferences, but not as to the intrusions into PPRM and PPGC/PPCFC. Pls. Oppo. MSJ at 40 n.27.
- Counts 9 & 10 - California recording claims as to PPPSW, PPGC, PPRM, PPOSBC, and PPMM. Pls. Oppo. MSJ at 52 n.35.
- Count 11 – Illegal Recording under Florida law as to Merritt only, but also as to the claims by PPNorCal, PPMM and PPLA staff. Pls. Oppo. MSJ at 66 n.50.
- Count 12 – Maryland wiretapping claim as to PPNorCal, PPPSW, PPMM, and PPOSBC. Pls. Oppo. MSJ at 79 n.59.

## LEGAL STANDARD

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to identify "specific facts showing there is a genuine issue for trial." *Id.* The party opposing summary judgment must present affirmative evidence from which a jury could return a verdict in that party's favor. *Anderson v. Liberty Lobby*, 477 U.S. 242, 257 (1986).

On summary judgment, the court draws all reasonable factual inferences in favor of the non-movant. *Id.* at 255. In deciding the motion, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* However, conclusory and speculative testimony does not raise genuine issues of fact and is insufficient to defeat summary judgment. *See Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

1

2                                    **DISCUSSION**

3   **I.      MOTIONS FOR SUMMARY JUDGMENT**

4         The defendants move for summary judgment on multiple grounds for each of the fifteen

5   claims alleged.  Plaintiffs move for summary judgment or partial summary judgment on a

6   narrower set of claims: trespass, fraudulent misrepresentation, California's unfair competition law,

7   breach of contract as to PPGC's nondisclosure agreement (NDA), the RICO predicate offenses,

8   and also defendants' California Penal Code § 633.5, unclean hands, and public policy affirmative

9   defenses.

10        **A.      Damages**

11        CMP, on behalf of all defendants, moves generally for summary judgment on all counts on

12  which plaintiffs seek "damages."[10]  Defendants argue that all of the claims fail because causation

13  is lacking or is too distant, or that the causal chain was broken by acts of third parties.  Defendants

14  also argue that the First Amendment protection for publications on matters of public interest

15  precludes any award of the damages that plaintiffs seek in this case because plaintiffs' damages

16  flow solely from the actual or feared response of third parties to the publication of the HCP

17  videos.  Defendants point out that none of the damages sought were incurred prior to the

18  publication of the videos.[11]

19        Defendants rely most heavily on *Food Lion, Inc. v. Capital Cities/ABC, Inc*., 194 F.3d 505

20  (4th Cir. 1999) (*Food Lion III*).  In that case involving ABC's undercover journalism regarding

21  Food Lion's food handling practices, Food Lion wanted to use "non-reputational tort claims

22  (breach of duty of loyalty, trespass, etc.) to recover compensatory damages," which the court

23

24  ───────────────

    [10] Defendants apportioned their motions and briefing so one party (or Rhomberg/Newman jointly)

25  could address specific issues in-depth and the remaining defendants could simply "join" those

    arguments.  In addressing these arguments, I will endeavor to identify the party that briefed it, but

26  then refer to the argument being made on behalf of defendants generally.

27  [11] That is true except for some discrete security enhancements that defendants claim plaintiffs
    incurred or planned for prior to the release of the first HCP video and prior to plaintiffs realizing

28  that defendants had infiltrated conferences and facilities and recorded their staff.  Those costs are
    not recoverable under any of theory in this case.

United States District Court
Northern District of California

characterized as "publication damages" "for items relating to its reputation, such as loss of good will and lost sales." *Id.* at 522.  The district court excluded those damages based on the lack of proximate cause to the tort claims because the damages were caused by loss of customer confidence given the food handling practices disclosed by the undercover reporters, not from the tortious newsgathering acts of the reporters themselves.  The Fourth Circuit affirmed under "the First Amendment principle" that precludes "publication damages" from non-reputational torts that are not pleaded to heightened standards (including actual malice) that the First Amendment imposes on defamation claims.  *Id.*[12]

Defendants argue that the damages plaintiffs seek here are the same; they stem from the public's reaction (or feared or expected reaction) to the contents of the HCP videos and should have been sought through a defamation claim.[13]  *See La Luna Enterprises, Inc. v. CBS Corp.*, 74 F. Supp. 2d 384, 392 (S.D.N.Y. 1999 ("Plaintiff's complaint alleges damages . . . for injury to plaintiff's reputation allegedly caused by defendants' fraudulent conduct. . . . If allowed to proceed on this claim, plaintiff could succeed regardless of its defamation claim and the truth or falsity of the broadcast. Such a result threatens to circumvent the constitutional requirement that a media defendant may not be held liable to a private figure for reputational injury caused by publication of defamatory statements that are true and at least not negligently reported."); *see also Council on Am.-Islamic Rel. Action Network, Inc. v. Gaubatz*, 793 F. Supp. 2d 311, 332 (D.D.C. 2011) (recognizing "the principle that the special protections that the First Amendment affords defendants charged with defamation may also extend to other kinds of legal claims where the

_____

[12] The principle was recognized by the Supreme Court in *Hustler Magazine v. Falwell*, 485 U.S. 46 (1988), where the Court rejected the attempt to seek emotional distress damages under a tort theory to avoid the higher "actual malice" standard for proving defamation as to a public figure under *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964).

[13] Reputational damages have been disclaimed by all plaintiffs.  Dkt. No. 420 (disclaiming "reputational damages such as loss of goodwill or loss of revenue," as well as "expenses to protect [Planned Parenthood's] brand and reputation.").  Defendants' repeated attempts to characterize the damages that plaintiffs *are* continuing to seek as barred "reputational" damages based on the lay testimony of plaintiffs' witnesses are not persuasive.  *Compare* Rhomberg/Newman MSJ at 6-10; *with Howard v. HMK Holdings, LLC*, CV175701DMGJPRX, 2018 WL 3642131, at *5 (C.D. Cal. June 11, 2018) (asking deposition witnesses to make a "law-to-fact application that is beyond the competence of most lay persons," "by memory and on the spot," without the aid of counsel is improper (relying on *Rifkind v. Superior Court*, 22 Cal. App. 4th 1257 (1994)).

1   plaintiff seeks damages for reputational or emotional harm allegedly flowing from the publication

2   of protected speech").

3         Plaintiffs reply with cases discussing the general and well-accepted rule that simply

4   claiming the mantel of a journalist does not give someone a license to trespass, illegally record, or

5   otherwise commit violations of generally applicable laws.[14]  The more difficult question is, in light

6   of plaintiffs' failure to file a defamation claim, where to draw the line between impermissible

7   defamation-like publication damages that were caused by the actions and reactions of third parties

8   *to the HCP videos* and permissible damages that were directly caused by the breaches of contract,

9   tortious acts, and acts of targeted recording in which defendants indisputably engaged as part of

10  the Project.

11        Plaintiffs attempt to draw that line as one limited to "reputational" damages that seek to

12  compensate for harm to reputation or state of mind and argue that the mere fact that injury is

13  caused in response to someone learning something from a publication does not turn that injury into

14  impermissible "reputational damages."  They cite *Cohen v. Cowles Media Co.*, 501 U.S. 663

15  (1991), where reporters breached their promise that Cohen would not be identified as a source and

16  identified him in their articles.  After he was publicly identified in the resulting news articles, he

17  was fired by his employer.  The Court held that because he sought damages for the breach of the

18  promise that caused him to lose his job and lowered his earning capacity, and did not attempt to

19  use a promissory estoppel cause of action to avoid the strict requirements for establishing a libel or

20  defamation claim, his claim for damages (loss of his job and loss of future employment

21  opportunities) was not barred by the First Amendment.  That is so even though Cohen's

22  immediate injury was most directly caused by a third party (his employer) in response to the

United States District Court
Northern District of California

---

[14] "[G]enerally applicable laws do not offend the First Amendment simply because their enforcement against the press has incidental effects on its ability to gather and report the news." *Cohen v. Cowles Media Co.*, 501 U.S. 663, 669 (1991); *see also Desnick v. American Broadcasting Companies*, 44 F.3d 1345, 1355 (7th Cir. 1995) ("the media have no general immunity from tort or contract liability"); *Council on Am.-Islamic Rel. Action Network, Inc. v. Gaubatz*, 793 F. Supp. 2d 311, 330 (D.D.C. 2011) ("[T]he protections afforded by the First Amendment, far reaching as they may be, do not place the unlawful acquisition of information beyond the reach of judicial review.").

publication of his name as a source.[15]

Plaintiffs also rely on the First Circuit's decision in *Veilleux v. Natl. Broad. Co*., 206 F.3d 92, 129 (1st Cir. 2000). There, plaintiffs alleged that defendants portrayed them in a distorted, untrue manner in a "Dateline NBC" television program concerning the perils to highway users caused by tired long-distance truck drivers. Plaintiffs' voluntary participation in the program was secured by defendants' false promises that the show would not include a group critical of the trucking industry, Parents Against Tired Truckers (PATT). The First Circuit allowed recovery of damages, including lost trucking customers, under the common law misrepresentation claim but limited recovery to plaintiffs' "pecuniary losses" caused by statements that PATT would not be included in the program "because that did not offend the First Amendment."

District court opinions have attempted to draw similar lines. For example, in *Steele v. Isikoff*, 130 F. Supp. 2d 23, 29 (D.D.C. 2000), the plaintiff brought a number of claims against a reporter and publishers based on her allegations that she spoke with the reporter on a promise of "confidentiality" and that the conversation would be "off the record." The court recognized that some of plaintiffs' damages, including reputational damages, might be barred by the First Amendment, but because plaintiff alleged some "occupational injury" as in *Cohen*, the case would be allowed to proceed beyond the motion to dismiss stage except for the claim to "reputational damages." *Id*. at 29. In doing so, the court explained: "Viewed in tandem, *Hustler* and *Cohen* divide claims against the news media by categorizing the damages sought. If a party seeks damages for harm to reputation or state of mind, the suit can only proceed if that party meets the constitutional requirements of a defamation claim. If a party seeks damages for non-reputational harms, which include lost jobs and diminished employment prospects, then the First Amendment does not bar suit as long as the claims are brought under generally applicable laws." *Id.*

In *Smithfield Foods, Inc. v. United Food and Com. Workers Intern. Union*, 585 F. Supp. 2d

---

[15] The *Food Lion III* opinion itself distinguished the damages allowed in *Cowles* from those sought by Food Lion because plaintiff "in seeking compensation for matters such as loss of good will and lost sales, is claiming reputational damages from publication, which the *Cowles* Court distinguished by placing them in the same category as the emotional distress damages sought by Falwell in *Hustler*." 194 F.3d at 523.

United States District Court
Northern District of California

815 (E.D. Va. 2008), a union undertook a campaign against a particular anti-union employer.  The court distinguished damages that were more "economic" in nature from ones that were more "reputational" in nature, ignoring the labels the plaintiff used to characterize his damages.  The court noted that, "Smithfield has placed its damages into five categories, which include: (1) the 'direct' expenses realized by Smithfield as a result of the corporate campaign; (2) customer specific lost profits; (3) a loss of free advertising on the Oprah Winfrey show; (4) nationwide lost profits; and (5) the cumulative abnormal returns on Smithfield's stock price."  *Id*. at 817.  Attempting to "determine whether each of Smithfield's asserted damages are either 'reputational' or 'economic' in substance," the court concluded that of "the five categories of damage identified by Smithfield, only the alleged loss of free advertising on the Oprah Winfrey show asserts a claim for purely economic damages. That particular component of Smithfield's damages is based solely on the loss of a business expectancy caused by the Defendants active interference and is not based on any harm to Smithfield's reputation."  *Id*. at 824.  All other damages were disallowed as being impermissibly based on the public's reaction to the union's campaign.  *Id*.

Considering these cases – and their somewhat inconsistent analyses of the line between impermissible reputational or publication damages and allowable economic or pecuniary damages – I agree with defendants that some of the damages plaintiffs seek here are more akin to publication or reputational damages that would be barred by the First Amendment.  Others, however, are economic damages that are not categorically barred.  Those that fall in the latter category result *not* from the acts of third parties who were motivated by the contents of the videos, but from the *direct* acts of defendants – their intrusions, their misrepresentations, and their targeting and surreptitious recording of plaintiffs' staff.  Defendants are not immune from the damages that their intrusions into the conferences and facilities directly caused, nor from the damages caused by their direct targeting of plaintiffs' staff, that caused plaintiffs to bear costs in the form of private security for those staff members after plaintiffs became aware of defendants' ruse and recordings.  Defendants' "lack of recoverable damages" theories do not entitle them to summary judgment.

The allowable damages – subject to proof and defenses at trial (including whether the

United States District Court
Northern District of California

damages were reasonably incurred or unnecessary as "voluntarily incurred") – include costs to investigate the intrusions and to implement access-security measures (*e.g.*, improved screening or background check procedures, implementation of new or improved protocols for access to conferences or facilities) to prevent future surreptitious intrusions.  Also allowed are personal security costs for staff whom defendants targeted (*e.g.*, costs of personal security guards, costs to temporarily or otherwise relocate residences, and costs to improve physical security at personal residences).  In this context, "targeted" means staff who were intentionally recorded by defendants – most obviously Nucatola, Ginde, Gatter, and Farrell – but also any other staff who, upon realizing that they had likely been recorded by defendants when they had conversations with BioMax representatives, incurred personal security costs paid for by plaintiffs.  Nominal and statutory damages are separately allowable.

The excluded damages are: (1) costs of physical security assessments for plaintiffs' buildings and additional building and IT-security measures to physically protect plaintiffs' patients, information, offices, and clinics; (2) grants for security enhancements to affiliates experiencing increased security threats as a result of CMP's videos (PPFA only), other than personal security expenses for staff who were targeted by defendants; (3) costs of repairing and protecting PPFA website after hacking; (4) costs of repairing and protecting online appointment systems; (5) loss of revenue due to hack of the PPFA patient portal; (6) staff time spent monitoring threats and responding to protests and increased security incidents; (7) costs relating to vandalism to plaintiffs' offices and clinics; and (8) costs of the grief/stress hotline for staff related to the increase in threats.[16]

---

[16] At the hearing, plaintiffs argued that the First Amendment does not bar them from seeking damages for the costs PPGC incurred to respond to government investigations because they flow from defendants' violation of the PPCG NDA and, as a result, defendants knowingly, voluntarily, and intelligently waived any First Amendment rights they otherwise would have.  Defendants raise a further defense to that narrow category of damages: that allowing those damages would impermissibly infringe on their First Amendment rights of petition to seek redress from the government.  Regardless, I find that PPGC's costs of responding to the government investigations (which presumably stemmed from the publication of the videos, but also defendants' direct provision of information to government agencies) cannot be recovered as a breach of contract remedy for a different reason.  The discretion inherent in governmental decisions whether to prosecute or investigate a potential violation of law generally breaks any existing causal chain. *See, e.g.*, *Hartman v. Moore*, 547 U.S. 250, 263 (2006) ("Herein lies the distinct problem of

Defendants also move for summary judgment on the issue of "incitement or threat damages," arguing there is no basis to impose those sorts of damages on them because there is no evidence that any defendant made threats or caused harm to plaintiffs' facilities or staff, or that any defendants directly encouraged or incited others to do so.  I agree that plaintiffs have not uncovered any evidence of that kind of conduct by defendants.  However, given my analysis above regarding allowable damages, this argument is inapposite.[17]  The only allowable damages are those that are directly tethered to defendants' own conduct.

Defendants move for summary judgment on "causation," seeking to exclude damages that "were most directly" caused by third parties, including damages that plaintiffs incurred because plaintiffs expected and, according to plaintiffs, saw, a spike in third parties reacting threateningly or violently towards plaintiffs and their staff following the release of the Project videos.  Given the exclusion of the damages identified above, this argument has lessened force.  That said, the causal nexus for the damages categorically allowed will still need to be shown at trial.  I will address this issue further when I discuss the particular claims at issue later in this Order.

Finally, defendants move to preclude plaintiffs categorically from seeking damages covering "increased security."  Defendants argue that no costs for increased security are recoverable, relying on *People v. Silva*, No. C080378, 2016 WL 4761936 (Cal. Ct. App. Sept. 13,

---

causation in cases like this one.  Evidence of an inspector's animus does not necessarily show that the inspector induced the action of a prosecutor who would not have pressed charges otherwise.  Moreover, to the factual difficulty of divining the influence of an investigator or other law enforcement officer upon the prosecutor's mind, there is an added legal obstacle in the longstanding presumption of regularity accorded to prosecutorial decisionmaking."); *see also Smiddy v. Varney*, 665 F.2d 261, 267 (9th Cir .1981) (noting police officers "are not liable for damages suffered by the arrested person after a district attorney files charges unless the presumption of independent judgment by the district attorney is rebutted").  I recognize that this is not a 42 U.S.C. section 1983 claim were damages are sought against government actors, but the concept of the break in the causal chain in light of the inherent discretion of investigators and prosecutors is similar.

[17] As discussed below with respect to defendants' motion to strike the testimony of plaintiffs' expert David S. Cohen, the history of anti-abortion activists targeting abortion providers and the historical consequences of that targeting are permissible areas of testimony from Cohen.  That testimony is relevant to whether the steps plaintiffs took after they learned of defendants' intrusions and the steps plaintiffs took to provide personal security for members of their staff that were targeted by defendants were reasonable.  Cohen will not be permitted to testify whether these defendants intended, by their actions, to incite threats or violence against plaintiffs or their staff or whether defendants' actions proximately caused the allowable damages.

United States District Court
Northern District of California

2016).  There, the California Court of Appeal concluded that a criminal defendant, who was

convicted of assault and burglary from his forced entry into a youth hostel, was not liable to pay

for an improved secure entry system for the youth hostel as "restitution."  The court recognized

that "[t]he installation of a new security system may well have been a prudent step by the hostel

management, but to award that by way of restitution would leave the hostel better off, and thus

constitutes an improper windfall."  *Id*. at *3.

*People v. Silva's* discussion of the permissible scope of criminal restitution under

California law is of limited to no utility here in considering the damages issues under various

states' laws for the trespass, tort, and recording claims or in considering whether the access

security and personal security measures plaintiffs implemented following their discovery of the

intrusions and recording were reasonable and allowable.  That the systems implemented by PPFA

or PPGC following the intrusions were new or improved does not make them unrecoverable as a

matter of law.  Plaintiffs may seek the narrow categories of access-security improvements and

personal security expenses I have identified, and defendants may argue to the jury that they were

unreasonable, unnecessary, or speculative.[18]

## B.      RICO (Count 1)

All plaintiffs allege that all defendants violated the Racketeer Influenced and Corrupt

Organizations (RICO) Act, 18 U.S.C. §§ 1962(c) and 1962(d).  The elements of a RICO claim are:

(i) the conduct of (ii) an enterprise that affects interstate commerce (iii) through a pattern (iv) of

racketeering activity or collection of unlawful debt.  18 U.S.C. § 1962(c); *Eclectic Props. E., LLC

v. Marcus & Millichap Co*., 751 F.3d 990, 997 (9th Cir. 2014).  The conduct must be the

proximate cause of harm to the victim.  Under Section 1964(c), plaintiffs must also allege that

they have been injured in their "property or business" by reason of the alleged racketeering

activities.

---

[18] I have already rejected defendants' argument that plaintiffs' damages are so complex or so
difficult to apportion that expert testimony is required.  Dkt. No. 613.  Defendants raised this same
argument on these motions and at the hearing.  There is no need to revisit this issue.  Plaintiffs will
be required to appropriately limit and prove up the damages they seek (as permitted under this
Order).  The jury will decide whether the damages sought have been adequately supported and
their decision may be reviewed, if appropriate, through post-trial motions.

United States District Court
Northern District of California

CMP argues, on behalf of defendants, that plaintiffs have failed to meet the predicate act requirement or make a sufficient showing of causation between the predicate acts and the claimed RICO damages.  In addition, defendants Rhomberg, Newman, and Lopez assert that they are not individually liable under the direct RICO claim or the RICO conspiracy claim.  Plaintiffs cross-move for partial summary judgment on the RICO predicate acts only.

### 1.    RICO Predicate Acts

Defendants argue that the RICO claim fails because the predicate acts alleged under the federal Identity Theft Statute lack any connection to interstate commerce or were not the result of the requisite pattern of continuous prohibited acts.  Plaintiffs contend that they have sufficiently met the minimum showing required for an interstate nexus and the undisputed evidence shows an open-ended conspiracy.

#### a.    Interstate Commerce

Defendants first argue that summary judgment is appropriate because there is no evidence that any defendants committed cognizable predicate acts, meaning acts that affected interstate commerce as required by federal Identity Theft Statute, 18 U.S.C. § 1028.[19]  That showing can be made with evidence that fake IDs were produced or transferred through means of interstate commerce or use of the U.S. mails, and the interstate nexus is satisfied by a "minimal showing." *See, e.g.*, *U.S. v. Klopf*, 423 F.3d 1228, 1238 (11th Cir. 2005) (noting Fourth, Sixth, Eighth, and Eleventh Circuits require only a minimal nexus to interstate commerce).[20]

Defendants contend that undisputed facts show that both the production of the fake IDs

---

[19] Following my Order on plaintiffs' motion to dismiss, the only remaining predicate acts allowed under 18 U.S.C. §§ 1028 are subsections (a)(1) and (a)(2), which prohibit knowing production or transfer of fake identification.  *See* 18 U.S.C. § 1028 ("(a) Whoever, in a circumstance described in subsection (c) of this section – (1) knowingly and without lawful authority produces an identification document, authentication feature, or a false identification document; (2) knowingly transfers an identification document, authentication feature, or a false identification document knowing that such document or feature was stolen or produced without lawful authority.").

[20] Subsection (c)(3) of the statute provides: "(c) The circumstance referred to in subsection (a) of this section is that – . . . (3) either – (A) the production, transfer, possession, or use prohibited by this section is in or affects interstate or foreign commerce, including the transfer of a document by electronic means; or (B) the means of identification, identification document, false identification document, or document-making implement is transported in the mail in the course of the production, transfer, possession, or use prohibited by this section."

and their transfer were done entirely in California and that the U.S. mails were not used.  There is undisputed testimony from Daleiden that he produced the Robert Sarkis identification himself at his home in California.  Daleiden Depo. I 227:14–229:19; Daleiden MSJ Decl. ¶ 116.  He approached a person in California to produce the documents for Merritt and Baxter under the names "Susan Tennenbaum" and "Brianna Allen."  Daleiden Depo. I 230:4–231:24, 232:19–233:15; Daleiden MSJ Decl. ¶ 116.  Those documents were hand delivered to Daleiden, and he hand delivered them to Merritt and Baxter in California. Daleiden MSJ Decl. ¶¶ 116–17.  He paid for these documents in cash.  *Id.* ¶ 116.

Plaintiffs point out that Daleiden used Craigslist – an internet site – to arrange for the purchase of the fake IDs for Merritt and Baxter, and argue that is a sufficient connection to establish the "minimal nexus" to interstate commerce.  Daleiden Depo. I at 230-231.  They rely on *U.S. v. Agarwal*, 314 Fed. App'x 473 (3d Cir. 2008) (unpublished), which found that evidence reflecting a defendant's "use of the Internet, an instrumentality of interstate commerce, to make arrangements to purchase the fraudulent identification card," was proof of a nexus to interstate commerce.  *Id.* at 475; *but see id.* (noting there was also evidence the components of the IDs travelled in interstate commerce).

Defendants challenge plaintiffs' reliance on the unpublished and out-of-circuit *Agarwal* decision that also relied on additional jurisdictional connections.  Defendants, instead, analogize to *U.S. v. Sutcliffe*, 505 F.3d 944 (9th Cir. 2007), where the court held that evidence that defendant's website was uploaded to servers in different states "supports the conclusion that Defendant electronically sent threats and social security numbers to internet servers located across state lines," and concluded that the "interstate transfer of information by means of the internet" satisfied the jurisdictional elements for the statute.  *Id.* at 953 (citing § 1028(c)(3)).  Defendants argue that the *Sutcliffe* court, like *Agarwal*, found additional jurisdictional connections (use of servers located in different states, sending threats across state lines) to meet the showing there, and that those connections are wholly absent here.

In addition to Daleiden's use of the internet to secure the IDs for Merritt and Baxter, plaintiffs contend that because use of the fake IDs was "integral" to the scheme to "defraud"

1    plaintiffs – as the fake IDs were necessary to gain access to the conferences and clinics – that use

2    also provides the nexus to interstate commerce.  Plaintiffs cite *U.S. v. Klopf*, 423 F.3d 1228 (11th

3    Cir. 2005), where the Eleventh Circuit explained and adopted the Eighth Circuit's expansive

4    interpretation of acts that establish jurisdiction.  *Id*. at 1238.  The *Klopf* court noted,

> The Eighth Circuit also has given § 1028(c)(3)(A) an expansive
> interpretation by noting that "the statute presents two options:
> possession may be 'in' interstate commerce or it may 'affect'
> interstate commerce." *United States v. Jackson*, 155 F.3d 942, 947
> (8th Cir.1998). The *Jackson* court concluded that the government
> demonstrates that possession of unlawful identity documents, such as
> stolen driver's licenses, affected interstate commerce by proof that
> possession 'was integral to [defendant's] scheme to defraud
> businesses and banks operating in interstate commerce.' *Id*.
> Therefore, fraudulently inducing a bank to issue a credit card through
> fraudulent identification documentation would be sufficient evidence
> of a § 1028(a) violation to satisfy § 1028(c)(3)(A).

11    *Id*.  Plaintiffs contend, and there can be no dispute, that the creation and transfer of the fake IDs by

12    Daleiden's efforts was integral to defendants' scheme to defraud PPFA and others who were

13    operating in interstate commerce.

14          Relatedly, plaintiffs suggest that while the "possession and intended use" prong of

15    §1028(a)(3) is no longer in play, *see* September 2016 Order at 11, undisputed facts show that

16    Daleiden, Merritt, and Baxter used their IDs to gain access to restricted spaces in various states.

17    Evidence supports plaintiffs' position that the intent of the defendants in creating and transferring

18    the IDs and the alleged criminal enterprise was to affect interstate commerce.  Plaintiffs rely on

19    *U.S. v. Villarreal*, 253 F.3d 831 (5th Cir. 2001), where the defendant transferred a false birth

20    registration card to an undercover agent whom he knew would possibly use that card to travel

21    outside of the state.  Although the transfer took place wholly in one town, "[p]resumably, the

22    Mexican National would have used the Registration Card to remain in the United States and

23    possibly travel between the United States and Mexico or beyond Texas," so a "rational trier of fact

24    could have found beyond a reasonable doubt that the transfer would have been in or affected

25    interstate or foreign commerce had" the purchaser not been an undercover agent, and jurisdiction

26    was satisfied.  *Id*. at 834-35; *see also U.S. v. Agarwal*, 314 Fed. Appx. 473, 475 (3d Cir. 2008)

27    (unpublished) (noting the "record establishes that the identification card at issue [procured in

28    Pennsylvania] could have been used to gain access to facilities at a branch campus in California").

1     Defendants assert that both *Jackson* and *Klopf* are distinguishable, as those cases addressed

2     substantive provisions where "possession" with "intent to use" were elements and, therefore, the

3     intent of the defendant was relevant even if the interstate use was never consummated.  They point

4     out that unlike the sections addressed in those two cases, the provisions here (sections 1028(a)(1)

5     and (a)(2)) govern only production or transfer that is "in or affects" interstate commerce, and the

6     eventual or intended use is irrelevant.  Defendants also contend that the *Villareal* court got it

7     wrong when it imported the concept of use from other inapposite cases into the "transfer" prong of

8     section 1028(a)(2).

9     Instead of *Villareal*, defendants contend that I should follow *U.S. v. Della Rose*, 278 F.

10    Supp. 2d 928 (N.D. Ill. 2003).  There, the district court considered whether the "government

11    provide[d] sufficient evidence that the production of the false identification document was in or

12    affects interstate commerce" under a section 1028(a)(3) charge.  *Id.* at 930.  Because there was no

13    evidence of any out-of-state activity – the defendant drafted a legitimate check against funds

14    belonging to his intrastate client and had a third-party use the false ID to cash the check at an

15    intrastate, local bank – the jurisdictional nexus was not met.  But here, distinguishing this case

16    from *Della Rosa*, the ultimate target of the alleged fraud was not intrastate, although some

17    California entities and persons were targeted.  Instead, PPFA and entities across state lines were

18    not only targeted, but successfully infiltrated.[21]

19    Recognizing the absence of Ninth Circuit authority but also that only a "minimum nexus"

20    with interstate commerce is required under this statute, I find that plaintiffs have established the

21    requisite interstate connection.  Daleiden admitted that he used the internet to secure two of the

22    IDs, the defendants intended to affect interstate commerce in creating the false IDs, and the

23    defendants used those IDs across state lines.  Plaintiffs have adequately established this element of

24    the RICO predicate act as a matter of law, and their motion for partial summary judgment is

25

26    [21] The *Della Rose* court itself distinguished *Villareal* concluding, "In the case before the Court, we
      need not engage in supposition: the Defendant did accomplish his intended goals. Yet there is no

27    evidence that the accomplishment was in or affected interstate commerce beyond the cashing of a
      check at a bank. *Villareal*, too, is readily distinguished."  *Della Rose*, 278 F. Supp. 2d at 932.

28    Here, of course, the undisputed evidence is that the use of the fake IDs was central to
      accomplishing defendants' goals to infiltrate conferences and clinics in different states.

United States District Court
Northern District of California

1    GRANTED in this limited respect.[22]

2              b.        False under 18 U.S.C. § 1028(d)(4)

3         Defendants also argue that summary judgment cannot be granted on this predicate act

4    because given the poor quality of the fake IDs, they could not be considered "commonly accepted"

5    as a matter of law.  Daleiden describes the fake IDs for "Sarkis," "Tennenbaum," and "Allen" as

6    produced on copy paper with rigid thick PVC of "laughable quality" such that they could not be

7    considered of sufficient quality under 18 U.S.C. § 1028(d)(4).[23]  Daleiden Decl. ¶ 118; *see also*

8    CMP MSJ at 11 n.7.

9         Defendants rely on *U.S. v. Spears*, 697 F.3d 592 (7th Cir. 2012), *reh'g en banc granted,*

10   *opinion vacated*, 11-1683, 2013 WL 515786 (7th Cir. Jan. 14, 2013), and *opinion reinstated in*

11   *part on reh'g*, 729 F.3d 753 (7th Cir. 2013).  There, the Seventh Circuit discussed the "commonly

12   accepted for the purposes of identification" that "appears to be" but was not issued by a state,

13   elements of section 1028(d)(4).  The court held that the fake driver's license there was

14   "sufficiently realistic that a reasonable jury could conclude that it appears to be issued by the State

15   of Indiana."  *Id*. at 594-95.

16        I am not convinced that "sufficient quality" is an element or defense of this claim.  The

17   statute itself ties "commonly accepted" not to the quality of the fake document but to the type of

18   document.  A driver's license is one commonly accepted for the purposes of identification of

19   individuals.  Absent more persuasive authority than the dicta in *U.S. v. Spears*, defendants'

20

21   _____

22   [22] As such, I do not need to address plaintiffs' alternate predicate acts, mail fraud and wire fraud under 18 U.S.C. §§ 1341, 1343 committed for the purpose of trespassing at the conferences.  *See* Plaintiffs' MSJ at 27-29.  Defendants object to plaintiffs' newly raised theory, arguing that it is barred as it was not expressly pleaded in the SAC.  Nor do I need to reach plaintiffs' argument, made in passing and without any case law support, that showing the IDs to gain access to the PPFA and NAF conferences or to gain access to clinics is a "transfer" covered by the statute. Finally, I likewise need not reach the assertion – disputed by defendants – that Daleiden used the fake IDs to secure debit cards (impacting interstate commerce) in aid of the enterprise.

26   [23] Under 18 U.S.C. 1028(d)(4): "the term 'false identification document' means a document of a type intended or commonly accepted for the purposes of identification of individuals that-- (A) is not issued by or under the authority of a governmental entity or was issued under the authority of a governmental entity but was subsequently altered for purposes of deceit; and (B) appears to be issued by or under the authority of the United States Government, a State, a political subdivision of a State, []."

arguments about the shoddy quality of their particular fake IDs does not preclude summary

judgment to plaintiffs on the existence of predicate acts under section 1028 or require summary

judgment in defendants' favor.

### c.      Pattern

Defendants also contend that plaintiffs have not identified evidence of a pattern of

continuous prohibited predicate acts.  They argue that the evidence shows at most "sporadic

production or transfer of fake IDs" and that there is neither evidence that the acts of using or

transferring the fake IDs occurred over a substantial period of time ("closed-ended continuity")

nor evidence that defendants will continue to engage in the act of producing or transferring fake

IDs in the future ("open-ended continuity").  *See H.J. Inc. v. N.W. Bell Tel. Co.*, 492 U.S. 229, 241

(1989) (discussing requirements to show either closed- or open-ended continuity with respect to

predicate acts).

Plaintiffs respond that they are relying on "open-ended" continuity, which only requires

showing that the predicate acts "threaten repetition."  *Allwaste, Inc. v. Hecht*, 65 F.3d 1523, 1526

(9th Cir. 1995) (discussing open-ended continuity).  They argue that the pattern here is open-ended

because defendants have not disavowed future attempts to infiltrate plaintiffs' conferences and

facilities, defendants' goals are to "finish off PP" and "end abortion" using "moles and spies," and

that they intend to "release more damning evidence."[24]  Given the former and continued

requirement of IDs for access to plaintiffs' conferences and facilities, plaintiffs argue that the use

of false IDs by these defendants to seek further infiltration is almost guaranteed.

Defendants respond that open-ended continuity cannot be established because there was

one use of the fake IDs to secure the recordings and information for the now-concluded Human

Capital Project.  They claim that their limited conduct is similar to that in *Jarvis v. Regan*, 833

F.2d 149, 153 (9th Cir. 1987), where defendants made misrepresentations, through mail and wire

fraud, in order to fraudulently secure a federal grant to be used to oppose one specific ballot

measure.

---

[24] Newman Dep. Ex. 39 (Mayo MSJ Opp. Decl. Ex. 17, July 2015 emails from Newman);
Newman Dep. Ex. 50 (Mayo MSJ Opp. Decl. Ex. 24, emails from Newman).

United States District Court
Northern District of California

United States District Court
Northern District of California

1    The facts in *Jarvis*, however, are obviously different than the ones here.  While the Project

2  may, if defendants are to be believed, be over, defendants' zealous activism against plaintiffs is

3  not.  There is evidence from which a reasonable juror could conclude that defendants will attempt

4  similar tactics to those at play in this case (use of fake ID and false identification in order to

5  personally or help others gain access to plaintiffs' conference and facilities) again in the future.

6  Defendants dispute that characterization of their future intents, repeatedly asserting that the work

7  of the Project is "complete" and "finished."  This only demonstrates that there is a dispute of

8  material fact.  Plaintiffs have presented sufficient evidence to satisfy the open-ended continuity

9  prong because a reasonable juror could rely on it to determine that defendants present a continuing

10  threat of infiltration either by personal use of fake IDS or by assisting others' use of fake IDs to

11  target plaintiffs in the future.  A jury must decide whether to believe plaintiffs' characterization of

12  the facts or defendants' characterization that their plan "came to fruition" with the Project and

13  their acts are not likely to repeat.[25]  Neither party is entitled to summary judgment concerning the

14  pattern element of predicate acts under Section 1028.

15    ## 2.    **RICO Proximate Causation of Injury/Damage**

16    Defendants then argue that plaintiffs have failed to show that the predicate acts

17  proximately caused their RICO injuries.  As noted in my September 2016 Order, the "proper

18  referent of the proximate-cause analysis" is the predicate acts alleged.  *Anza v. Ideal Steel Supply*

19  *Corp.*, 547 U.S. 451, 458 (2006).  "When a court evaluates a RICO claim for proximate causation,

20  the central question it must ask is whether the alleged violation led directly to the plaintiff's

21  injuries."  *Id.* at 461.  As to that directness requirement, after reviewing the relevant case law I

22  concluded:

23    I agree that plaintiffs may not be able to recover for damages that were

24  _____

25  [25] Defendants' reliance on *Food Lion, Inc. v. Capital Cities/ABC, Inc.*, 887 F. Supp. 811, 820 (M.D.N.C. 1995) is not persuasive given the context of this case.  There, the court held that a

26  "series of predicate acts occurring over a six month span and directed at one victim cannot be said to possess closed continuity."  *Id.* at 820.  Not only are plaintiffs here alleging open-ended

27  continuity, unlike in *Food Lion* where there was no dispute that the "acts of mail and wire fraud were part of a limited purpose, to obtain information from Food Lion to be aired on PTL," but

28  there is a dispute as to defendants' future intents to again infiltrate plaintiffs' conferences and facilities.  *Id.*

> not directly caused by the actions of defendants, but caused instead by intervening actions of third parties who were motivated by the videos and press released by the Human Capital Project. For example, the damages plaintiffs incurred because their website was hacked by a third-party would appear to be too distant, too far down the causal chain, for plaintiffs to seek them under RICO. But other damages alleged – including the increase in security costs at conferences, meetings, and clinics that plaintiff incurred when they learned about defendants' infiltration of their conferences, meetings, and clinics – are much more directly tied to defendants' conduct and do not raise the problem of intervening actions of third-parties.

September 2016 Order at 16. I indicated that "[h]ow far the actual causal link stretches for each category of damages plaintiffs' allege is something that will need to be developed in discovery and tested on summary judgment." *Id*. at 16-17. I also noted, in passing, "whether foreseeability can still be considered is questionable in light of *Hemi Group LLC v. City of New York, New York*, 559 U.S. 1 (2010), which rejected the idea that proximate cause under RICO could 'turn on foreseeability.'" *Id.* at 16.

In these motions, defendants argue that foreseeability and intent are irrelevant under the RICO proximate cause analysis (Dkt. No. 596-6 at 14-19). Plaintiffs dispute that, arguing that post-*Hemi* cases, most significantly *Fields v. Twitter, Inc*., 881 F.3d 739 (9th Cir. 2018), recognize that foreseeability and intent remain relevant. Dkt. No. 661. In *Fields*, the Ninth Circuit considered the proximate cause required under the civil remedies provision of the Anti–Terrorism Act (ATA, 18 U.S.C. § 2333(a)), which the panel determined was identical to proximate cause required under RICO. *Id*. at 745. The court recognized "that foreseeability is another of the 'judicial tools' in the proximate cause toolshed," but for "purposes of the ATA, it is a direct relationship, rather than foreseeability, that is required." *Id.* at 747 (relying on *Hemi* and *Anza*). Therefore, while foreseeability is not irrelevant, the "touchstone" for both the ATA and RICO is the directness of the connection between defendants' act and plaintiffs' injuries. *Id.* at 748.

Plaintiffs also argue that the "one-step" litmus test for proximate cause used in *Hemi* (which, according to defendants, precludes any damages that are caused by more than one-step away in the causal chain) was clarified by the *Fields* court to apply only where the harm at issue is most immediately suffered by third parties. Dkt. No. 661 at 2. That is certainly a distinguishing characteristic between this case and the facts in *Hemi* and *Fields*; the harms at issue here were

suffered not by third parties but by plaintiffs.[26]  However, I did not conclude at the motion to dismiss stage and I do not conclude now that a strict one-step requirement is all that is allowed for proximate causation under RICO.  Instead, my focus remains on the "touchstone" of directness.

That said, as explained in the analysis of damages in Section A above, I agree with defendants that certain categories of damages sought by plaintiffs are not recoverable under the First Amendment.  For the damages that are allowable, sufficient evidence exists for a reasonable juror to conclude that those damages were directly caused by defendants' actions in infiltrating conferences and facilities and their targeting plaintiffs' staff members.  Given the allegedly necessary role the false IDs played in allowing defendants their initial introductions to key members of plaintiffs' staff – at the NAF 2014 conference among others – and then for access to PPFA's conferences (and at least PPGC's facilities) in order to target plaintiffs' staff in aid of the Project, a reasonable juror could determine that defendants' conduct directly caused these categories of expenses.  Any failure of evidence concerning the allowed categories of damages will be determined by the jury or on post-trial motions.

### 3.     Rhomberg, Newman, and Lopez

Separately, defendants Rhomberg, Newman, and Lopez move for summary judgment arguing that because none of them committed a predicate act, they cannot be liable for RICO conspiracy under 18 U.S.C. §1962(d).  In order to prove a RICO conspiracy claim, a "conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor." *Salinas v. United States*, 522 U.S. 52, 65 (1997).  A defendant must also have been "aware of the essential nature and scope of the enterprise and intended to participate in it." *Baumer v. Pachl*, 8 F.3d 1341, 1346 (9th Cir.1993) (internal quotation marks omitted).  Therefore, plaintiffs must prove either an agreement that is a substantive violation of RICO or that the

---

[26] *See also Pillsbury, Madison & Sutro v. Lerner*, 31 F.3d 924, 929 (9th Cir. 1994) (finding that "the necessary direct relationship between the plaintiff and the defendant is missing in this case" where the harm was suffered most directly by a third party, and recognizing that allegations of "specific intent" to harm plaintiff not enough "to override the necessity to evaluate the directness of injury").

defendants agreed to commit, or participated in, a violation of two predicate offenses. *Howard v. Am. Online Inc*., 208 F.3d 741, 751 (9th Cir. 2000). "The illegal agreement need not be express as long as its existence can be inferred from the words, actions, or interdependence of activities and persons involved." *Oki Semiconductor Co. v. Wells Fargo Bank, Nat. Ass'n*, 298 F.3d 768, 775 (9th Cir. 2002).

None of the three defendants played a direct role in securing or using the three fake IDs at issue, but each is potentially liable for RICO conspiracy. While Lopez used his own ID to gain access to the conferences, certain aspects of his role that he admitted to create a dispute of material fact concerning his knowledge of or expectation that those with him at those conferences had procured and used fake IDs. Lopez introduced Daleiden under the false name Sarkis and made connections for Daleiden under that name. Given that Lopez himself had to use an ID matching his registered name to gain entrance to the conferences, a reasonable jury could conclude that he expected that those using false names were also using fake IDs. This evidence is sufficient to support a conspiracy under 18 U.S.C. § 1962(d). Although Lopez professed no direct knowledge of the others' use of fake IDs (Lopez MSJ Decl. ¶ 9) and testified that he thought Daleiden might just be using another of his "casual" names as Sarkis (Lopez Depo. at 114-117), his statements at best go to a credibility determination. Jurors will decide whether to believe his current testimony or whether the circumstantial evidence discredits him.[27]

The issue regarding Rhomberg and Newman is closer. They contend that there is no evidence that they took any steps (or were in agreement) with Daleiden's efforts to procure and transfer fake IDs to use in the alleged criminal enterprise. Rhomberg initially refused to answer

---

[27] Merritt also argues that the fact she played no direct role in producing or transferring the fake IDs shields her from liability under RICO. Merritt Oppo. at 15-17. But her connection to the fake IDs (securing one from Daleiden and using it multiple times for purposes of furthering the alleged RICO enterprise) is even more direct than for Lopez. The RICO conspiracy claim survives as to Merritt as well. In light of that conclusion, whether or not Merritt can be directly liable under RICO (as opposed to liable under only the conspiracy provision) will be determined at trial. Given the overlap in relevant evidence and my doubts that the dicta in *United States v. Christian*, 356 F.3d 1103, 1107 (9th Cir. 2004) relied on by Merritt but regarding a different statute and the issue of probable cause, establishes the correct framework for determining what is a "transfer" is under section 1028, both the direct and conspiracy RICO claims may proceed to trial with respect to Merritt.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    questions about the fake IDs, but was eventually compelled to do so.  Even though Rhomberg

2    denied knowledge about efforts to procure, transfer, and use the fake IDs, Daleiden admitted that

3    he sought out Rhomberg for his experience with the type of "undercover operation" he was

4    considering.  At the inception of the project, Daleiden sent Rhomberg (and Newman) proposals

5    describing the use of undercover operatives to create "stings" and "gotcha" videos where "trained

6    actors" pretend to be "fetal traffickers" to gain access to plaintiffs' conferences, meetings, and

7    staff.  2013 Project Proposal; Mayo MSJ Oppo. Decl. Ex. 31.  Rhomberg was also kept informed

8    of "deceptions" being used against plaintiffs and Daleiden's meetings with "targets" who might

9    become suspicious.  Rhomberg contends that being given high-level overviews of the Project a

10   few times a year is insufficient to show knowledge or consent, but there is enough disputed

11   evidence to let the jury decide whether Rhomberg must have known about the use of the fake IDs.

12   Any disclaiming of knowledge about the use of fake IDs by Rhomberg, as well as Daleiden's

13   minimizing Rhomberg's role in the Project (Daleiden MSJ Decl. ¶¶ 121-126), at most raise

14   questions of material fact for resolution by the jury.

15        Similarly, the minimal but significant undisputed evidence regarding Newman's

16   knowledge of the scope and methods to be used in the Project could lead a reasonable juror to

17   conclude that he knew that fake identification was going to be used in order to orchestrate and

18   make the "gotcha videos" and allow the "trained actors" to "pose" as "fetal traffickers" and access

19   the otherwise restricted conferences and meetings at issue.  Specifically, Newman received project

20   proposals from Daleiden that outlined the plan to infiltrate and surreptitiously record conferences

21   and meetings, and he claimed he was "integral" to and "planned" the Project with Daleiden.  *See,*

22   *e.g.*, 2013 Project Proposal (circulated to both Newman and Rhomberg).  That is sufficient to

23   allow plaintiffs to ask the jury to resolve the depth of Newman's knowledge of and the scope of

24   his agreement to the RICO conspiracy, and specifically the use of the fake IDs.[28]

25

26   [28]  For purposes of this civil litigation, plaintiffs contend that inferences may be drawn against
     Newman because he asserted the Fifth Amendment right against self-incrimination and refused to
27   answer questions regarding his knowledge of the procurement and use of the fake IDs.  Newman
     counters that no Fifth Amendment inference may be drawn against him because plaintiffs have
28   failed to meet all the requirements to impose such an inference, including that no "independent
     evidence exists of the fact to which the party refuses to answer."  *Doe ex rel. Rudy-Glanzer v.*

In sum, plaintiffs have established a minimal but sufficient nexus to interstate commerce with respect to the predicate acts under 18 U.S.C. §§ 1028(a)(1) and (a)(2).  The remainder of the parties' cross-motions on the elements of the RICO claim are DENIED.

### C.    Breach of Contracts

BioMax moves, on behalf of the defendants, for summary judgment on each of plaintiffs' breach claims: the breach of PPFA's Exhibit Agreements (EAs) (Count 4), the breach of NAF's contracts, brought by the plaintiffs whose staff were recorded as third-party beneficiaries under the NAF contracts (Count 5), and the breach of the PPGC/PPCFC NDA signed by Daleiden on behalf of BioMax to secure entry for himself and Merritt (Count 15).  Plaintiffs move for partial summary judgment for liability for the breach of the PPFA EAs and the PPGC NDA only; they do not move for summary judgment as to the breach of the NAF agreements.  Plaintiffs acknowledge that the amount of their recoverable damages under the two claims on which they move must be determined by the jury, but contend that undisputed facts show that liability should be entered in their favor as to the PPFA EAs and the PPGC NDA.

### 1.    Breach of PPFA Exhibitor Agreements (Count 4)

There is no dispute that Daleiden, on behalf of BioMax, agreed to Exhibitor Agreements for each of the three PPFA conferences at issue.  Miami EA, Sterk Decl., Ex. 66; Orlando EA, Sterk Decl., Ex. 67; and DC EA, Sterk Decl., Ex. 68.  He signed the Miami EA using the Brianna Allen pseudonym.  Given the representations about the existence and purpose of BioMax plus the referral from Dr. Nucatola, PPFA allowed BioMax to register as an exhibitor for the Miami conference.  Graziani Decl. ¶ 7; Nucatola Decl. ¶ 7.[29]  Daleiden used the name "Robert Sarkis"

_____

*Glanzer*, 232 F.3d 1258, 1264 (9th Cir. 2000); *see also id.* at 1265 ("no negative inference can be drawn against a civil litigant's assertion of his privilege against self-incrimination unless there is a substantial need for the information and there is not another less burdensome way of obtaining that information.").  It seems apparent that for some of the questions asked of Newman in his deposition, including requests to authenticate or discuss correspondence that Newman apparently drafted, Newman's testimony is required and no other source is available.  However, plaintiffs have not fully engaged with the requirements necessary to support their request for various and unspecified adverse inferences.  **What inferences are or are not appropriate at trial, with respect to any defendant's assertion of the Fifth Amendment privilege and refusal to answer in this case, should be addressed** *in limine.*

[29] Defendants dispute the "strength" or efficacy of the screening and vetting measures undertaken

and provided the fake California drivers' license at the registration table.  Daleiden Depo. II at 114:7-19.  Lopez used his own ID.  Both recorded participants at the conference.  Daleiden also registered BioMax as an exhibitor at the Orlando conference, listing Sarkis and Lopez as the attendees.  Sterk Decl. Ex. 42 (MeDC Registration).  In February 2015, he registered BioMax as an exhibitor for the DC conference using the false Brianna Allen email at BioMax.  CM00915 (Sterk Decl. Ex. 46).  He identified Sarkis and Lopez as the attendees.

The PPFA EAs for the Miami and Orlando conferences both provide in their first paragraphs that all exhibits and sponsored meetings were to be "educational and informative, emphasizing information about products and services useful to the registrants' practice and beneficial to the interests of their clients and patients."  Sterk Decl., Ex. 66 (Miami EA)[30]; Ex. 67 (Orlando EA).  Paragraph 12 of the Miami EA and Paragraph 11 of the Orlando EA both require, under "Exhibit Space," that the exhibits be "of an educational nature."  *Id.*

All three EAs at issue, including the EA for the DC conference, required that exhibitors "comply with all applicable federal, state and local laws and regulations in performance of its respective obligations pursuant to this Agreement, including, without limitation, laws related to fraud, abuse, privacy, discrimination, disabilities, samples, confidentiality, false claims and prohibition of kickbacks."  DC EA ¶ 16; Orlando EA ¶ 3; Miami EA at 3.

The Miami EA's choice of law provision requires application of Colorado law, the Orlando EA requires application of Florida law, and the DC EA requires application of the laws of Washington, DC.  Both sides agree that the elements of a breach of contract claim are identical

---

by PPFA prior to the intrusions, noting that it only took one recommendation from Nucatola (based on defendants' attendance at the NAF conference) to get BioMax into the Miami conference in 2014 and no further recommendations to get into the other conferences.  *See* Rhomberg/Newman Oppo. [Dkt. No. 652] at 2-4.  Defendants also object to paragraph 7 of the Nucatola Declaration as "contradicting prior deposition testimony."  Dkt. No. 659-1.  That objection is OVERRULED.

[30] For example, the Miami EA on page 1 provided "The exhibits and sponsored meetings must be educational and informative, emphasizing information about products and services useful to the registrants' practice and beneficial to the interest of their clients and patients."  On page 2, the Miami EA obligated exhibitors to "show only products manufactured or represented by their company in the regular course of business," only show exhibits "of an educational character . . . for use in the attendee's medical practice, teaching, or research".

United States District Court
Northern District of California

1   under all three jurisdictions' laws: (1) a valid contract between the parties; (2) an obligation or

2   duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by breach.

3                          **a.      Duty/Breach**

4          BioMax, on behalf of all defendants, argues that EAs did not impose any obligation that

5   BioMax (or presumably Daleiden or Lopez) breached as an "exhibitor," and notes that none of the

6   EAs expressly prohibited defendants from recording or publishing recordings of the conferences

7   or otherwise required defendants to keep any information they learned confidential.  Plaintiffs

8   respond that defendants breached the EA requirements regarding (1) the "educational nature" of

9   the exhibits, as required by the Miami EA and the Orlando EAs, as well as the requirement to

10  show "products" under the DC EA and, relatedly, (2) the "rights and duties" sections – requiring

11  both PPFA and the Exhibitors to comply with "laws related to fraud, abuse, privacy."

12         Defendants reply, first, that there is a "disconnect" between the Exhibit Space "duties"

13  sections for Exhibitors and the more general "rights and duties" section because plaintiffs do not

14  have evidence that BioMax or any defendant violated any federal, state, or local law in performing

15  its "actual obligations" as set forth in the Exhibit Space sections of the EAs.  Accepting

16  defendants' hinging of the "rights and duties" section to violations of Exhibit Space "duties,"

17  plaintiffs *have* evidence of such violations because BioMax's "products" and exhibits were wholly

18  fictional and neither educational nor useful to participants.  In addition, although the DC EA does

19  not clearly define "exhibitor duties" as the other two EAs do, it still requires exhibitors to have

20  "products" that BioMax did not have.  The company was a front and never had any of the products

21  or services that were described in the BioMax brochures and described orally by Daleiden and

22  Lopez to conference attendees.  Sterk Decl. Ex. 22 (Screenshot from FNNI0773_

23  20150227061943 at 6:42:35 showing BioMax brochures and business card on Exhibitor table);

24  Daleiden Depo. II at 24-25.

25         Defendants' only response to the undisputed evidence that BioMax was a front company

26  offering no real products or services is that a PPFA witness (Minow) "admitted" that conference

27  participants would be interested in learning about fetal tissue procurement, the topic of Daleiden's

28  and Lopez's conversations with participants.  Minow Depo. 46:22-47:3 (Declaration of Gregory

                                              36

United States District Court
Northern District of California

R. Michael, Ex. 53).  Interest in a topic is materially different than hearing about that topic from representatives of a fake company who never provided that product or service.[31]

Defendants also contend that they could not have breached the EAs because their requirements terminated at the end of each conference, and therefore any post-conference conduct (such as the release of the videos) could not have breached those contracts.  BioMax MSJ at 10. But numerous breaches of the contractual provisions occurred *during* the conferences, specifically when defendants pretended to represent a real company, provided no real educational content, and exhibited no "useful" products.  This argument does not work.

Defendants next assert that the general "legal rights and duties" provisions in the EAs (requiring both PPFA and the Exhibitors to comply with "laws related to fraud, abuse, privacy") are ineffectual and void, relying on a line of cases recognizing that contractual provisions requiring parties to "obey the law" have no legal effect.  However, as I held on the motion to dismiss, a contract is void for lack of consideration only where the promise not to break the law is the *only* contractual promise, which is not the case with the PPFA EAs.  September 2016 Order at 21.[32]

Finally, even if the "legal rights and duties" section is not void, defendants argue that there is no breach of that section here because the "fraud" (if any) committed by defendants was not done with respect to the defendants' Exhibitor obligations under the EA.  BioMax Reply at 3.[33]  I

---

[31] Defendants also argue that the "educational nature" language only applies to "sponsors" and not "exhibitors" like BioMax.  BioMax MSJ at 8-9.  But the relevant language, under the "unlabeled sponsorship section" states: "The exhibits and sponsored meetings must be educational and informative" – and defendants admit that they were there to *exhibit*.  This language applies to exhibitors like defendants.

[32] The case defendants rely on in CMP's MSJ are no different.  *Landucci v. State Farm Ins. Co.*, 65 F. Supp. 3d 694, 715 (N.D. Cal. 2014) ("Defendants are correct. In California, a promise to refrain from unlawful conduct is unlawful consideration. . . . Thus, a contract that includes such a promise as consideration is illegal, and thus void."); *see also Schaefer v. Williams*, 15 Cal.App.4th 1243, 1246–47 (1993) (holding that a contract cannot be premised on a promise to not break the law); *Floor Seal Technology, Inc. v. Sinak Corp.*, 156 Fed. Appx. 903, at *1 (9th Cir.2005) (same).

[33] This section required PPFA and exhibitors to "comply with all applicable federal, state and local laws and regulations in performance of its respective obligations pursuant to this Agreement, including, without limitation, laws related to fraud, abuse, privacy, discrimination, disabilities, samples, confidentiality, false claims and prohibition of kickbacks."  DC EA ¶ 16; Orlando EA ¶

1    rejected that argument above because there is no dispute that defendants' exhibits and products

2    were not educational, useful, or actual as the EAs required they be.

3          The undisputed, material facts establish that BioMax and Daleiden breached the PPFA

4    EAs.

5                    **b.      Damages:  First Amendment/Publication Damages**

6          Daleiden separately argues, on behalf of all defendants, that damages from any breach of

7    the EAs are barred by the First Amendment because plaintiffs' damages flow from the subsequent

8    publication of the videos and not from the breach of the EAs themselves.  Defendants argue that in

9    discovery responses PPFA identified the following categories of damages stemming from the

10   breach of its contracts: (1) physical and IT-related security costs, including costs related to

11   safeguarding taped individuals; (2) cost of repairing, cleaning up, or replacing damages to

12   buildings and personal property arising from vandalism, arson, and other security incidents; (3)

13   lost revenue stemming from lost opportunities to treat patients due to the unavailability of the

14   Planned Parenthood online appointment scheduling system because of a hack; (4) and other costs

15   related to defendants' alleged wrongful conduct, staff time responding to the videos, security

16   training for health center staff, and legal and other vendor fees.  *See* Declaration of Michael Millen

17   ISO Rhomberg and Newman's Motion for Summary Judgment (hereinafter "Millen Decl."), Ex.

18   101 (Damages Chart), at 9-10.

19         Defendants assert it is "undisputed" that these damages were allegedly and "substantially"

20   caused by the publication of the videos alone and not by the narrower breach of the EAs at issue.

21   As previously discussed, to the extent plaintiffs seek damages that stemmed from publication of

22   the videos, those damages are not recoverable given the First Amendment protections for

23   publications, even under a breach of contract claim based on the PPFA EAs.[34]  On the other hand,

24   _____

25   3; Miami EA at 3.

26   [34]  I reject plaintiffs' argument made in passing that "state action" is necessary for First
     Amendment protections to apply in the context of breach of contract claims based on the PPFA
27   EAs. *See* Pls. Oppo. MSJ at 22.  The cases identified by plaintiffs deal with enforcement of
     settlement agreements and are inapposite to the claims here.  *See United Egg Producers v.*
28   *Standard Brands, Inc*., 44 F.3d 940, 942–43 (6th Cir.1995) (no state action triggered by plaintiff's
     suit to enforce a settlement agreement barring disparagement of the parties' products); *Merrell v.*

1   damages that resulted from *defendants'* own actions are not barred by the First Amendment.[35]

2           **c.**        **Damages: Causation Related to Breach**

3         Relatedly, defendants contend that none of plaintiffs' non-publication damages is

4   recoverable because they were not caused by the breaches of the EAs.  Plaintiffs argue that even if

5   some of their damages are precluded, significant damages remain that are directly tied to the cost

6   of investigating how defendants breached their contracts and remedying any future possible

7   breaches at their conferences.  *See* Minow Depo. at 95:17–24.  They contend that the amount of

8   those damages, and defendants' defenses thereto (*e.g.*, damages were unnecessary or not related to

9   the breaches of the EAs), should be resolved at trial.  I agree.

10        Finally, plaintiffs assert that even if all actual damages claims are barred (which as noted

11  above they are not), PPFA is nonetheless entitled to nominal damages for the breach under each

12  relevant jurisdictions' laws.  *Patel v. Howard Univ.*, 896 F. Supp. 199, 205 (D.D.C. 1995)

13  (plaintiff may recover nominal damages even if it "suffered no loss as a result of the breach,"

14  applying District of Columbia law) (citations omitted); *City of Westminster v. Centric-Jones*

15  *Constructors*, 100 P.3d 472, 481 (Colo. App. 2003) ("Nominal damages are recoverable for a

16  breach of contract even if no actual damages resulted or if the amount of actual damages has not

17  been proved.");  *Muroff v. Dill*, 386 So. 2d 1281, 1283 (Fla. Dist. Ct. App. 1980) (noting plaintiffs

18  were "entitled to nominal damages once the breach of contract had been established,

19  notwithstanding the absence of evidence regarding the correct measure of damages").

20        Defendants do not dispute PPFA's theoretical entitlement to nominal damages, but say

21  they should not be able to seek them "in light of their repeated failure to demonstrate how

22  Defendant breached any contractual obligations."  As discussed above, that assertion is not true.

23  *See supra*.  Even if plaintiffs' damages might be found by the jury or on post-trial motions to be

24  too vague or speculative, nominal damages are still available and have been adequately supported

25  _____

26  *Renier*, No. C 06 404 JLR, 2006 WL 3337368, at *7 (W.D. Wash. Nov. 16, 2008) (no state action from attempt to enforce settlement agreement limiting picketing).

27  [35] As noted above, defendants' reliance on the testimony of plaintiffs' lay witnesses who, when

28  asked about whether various plaintiffs' damages "resulted from the publication of the videos," linked some of plaintiffs' damages to "the videos" is not persuasive.

United States District Court
Northern District of California

1    on this record.  *See, e.g.*, *Klayman v. Judicial Watch, Inc.*, 255 F. Supp. 3d 161, 167 (D.D.C. 2017)

2    ("If the plaintiff establishes breach of contract, but . . . proof of damages is vague or speculative,

3    then the party is entitled to no more than nominal damages.") (internal quotations omitted).[36]

### d.    Lopez, Rhomberg, and Newman

5           As noted, Daleiden and BioMax are liable for breach of contract.  CMP did not move for

6    summary judgment on the ground that none of the contracts were signed on its behalf, and

7    plaintiffs simply assert that CMP is directly liable for each of the breach claims.  It is not clear

8    under what theory plaintiffs contend that CMP is liable, but I assume it is on an alter ego theory as

9    the "parent" of non-existent BioMax and as the entity through which costs for the project were

10   paid.  However, because plaintiffs did not fully engage on this issue with respect to CMP on this

11   or the other breach claims, plaintiffs are not entitled to summary judgment against CMP.

12          Lopez specifically moves for summary judgment, arguing that he cannot be bound to any

13   PPFA contracts because he never signed one and that he cannot be considered the alter ego of

14   BioMax.  Lopez Oppo. at 8-9.  Plaintiffs respond that the PPFA EAs covered and bound

15   "employees" and "agents" of the Exhibitors, and therefore Lopez is bound as the agent of BioMax.

16   However, plaintiffs do not cite any cases that could hold Lopez *individually* liable (as opposed to

17   the person or entity actually signing the contract, here Daleiden as BioMax) even if he was

18   considered an employee, agent, or contractor of signatory BioMax.[37]  In that light on this record

19   _____

20   [36] Merritt separately argues that she cannot be liable for any breach as to PPFA because she did
     not sign any of the EAs on behalf of BioMax, and civil conspiracy cannot be used as a hook for

21   breach of contact claims.  Plaintiffs admit that Merritt cannot be liable for breach of the PPFA
     exhibitor agreements.  Pls. Reply MSJ at 8 n.9.

22   [37] At the hearing, plaintiffs identified *Sanchez v. City of Fresno*, 914 F. Supp. 2d 1079, 1120 (E.D.

23   Cal. 2012) as supportive authority.  There, the court recognized a line of California authority
     "holding non-signatories may be bound by the terms of an agreement if they are agents of a

24   signatory."  *Id.* at 1120.  In *Sanchez*, the individual defendants were agents of the city of Fresno
     and were liable for their individual actions in violating a Settlement Agreement agreed to by

25   Fresno.  That context (government agents taking actions on behalf of the government) is obviously
     different than here.  The *Sanchez* court, itself, relied solely on *Rowe v. Exline*, 153 Cal.App.4th

26   1276, 1284 (2007), where the California Court of Appeal held, in a "matter of first impression,"
     that individual corporate directors "who were not signatories to arbitration agreement but were

27   sued as alter egos of corporation, were entitled to compel arbitration of breach of contract claim."
     *Id.* at 1284-85; *see also id.* (discussing other cases allowing agents of corporations to enforce

28   arbitration agreements).  And at the hearing plaintiffs cited an arbitration case from Texas, binding
     an adult child who brought a personal injury action to an arbitration agreement signed by the

1   and given plaintiffs' failure to provide apposite case law, Lopez's motion for summary judgment

2   regarding his liability for this claim is GRANTED.

3          Finally, plaintiffs expressly assert that Rhomberg and Newman are liable for breach of

4   contract as "alter egos" of BioMax, given their roles with CMP.  Pls. MSJ at25 n.24; *see also id.* at

5   16 n.15 (citing alter ego cases).  There are two problems.  First, plaintiffs never identified

6   Rhomberg and Newman as defendants on this claim.  As a result, they did not affirmatively move

7   for summary judgment on it; they argue that allowing plaintiffs to pursue this claim against them

8   individually would be prejudicial.  Second, plaintiffs almost wholly fail to engage with any case

9   law addressing alter ego liability and fail to offer the facts they have uncovered with respect to

10  these defendants to support their alter ego theory.  *See* Pls. Oppo. MSJ at 43-44 (asserting CMP is

11  alter ego of BioMax); Pls MSJ at 16 n.15 & 25 n.24.

12         The sum of plaintiffs' alter ego showing as to Rhomberg and Newman is their assertion

13  that CMP, as the parent of a company formed solely for a fraudulent purpose, is liable as the alter

14  ego of BioMax.  They contend that Rhomberg and Newman, as directors of CMP, are directly

15  liable for the breaches (and, as discussed below, trespasses) committed by BioMax and the other

16  individual defendants.  Because CMP was established to "perpetuate a fraud, circumvent a statute,

17  or accomplish some other wrongful or inequitable purpose," the corporation's acts are deemed "to

18  be those of the persons or organizations actually controlling the corporation."  *Troyk v. Farmers*

19  *Group, Inc*., 171 Cal. App. 4th 1305, 1341 (Cal. App. 4th Dist. 2009) (citing *Sonora Diamond*

20  *Corp. v. Superior Court*, 83 Cal.App.4th 523, 538 (2000)).

21         Plaintiffs fail to address the multi-factor test required to establish alter ego liability.  They

22  also fail to acknowledge my determination in the related *NAF v. CMP* case, Case No. 15-cv-3522,

23  that NAF's allegations of "alter ego" liability against Newman were insufficient.  NAF argued for

24  alter ego liability, as plaintiffs assert here, that where a corporation is used to "evade the law" the

25

26  ──────────────
    parent/homeowners.  *In re Weekley Homes, L.P.*, 180 S.W.3d 127 (Tex. 2005).  These arbitration
27  agreement cases offer little persuasive analysis for this situation, where plaintiffs seek to bind
    employee/contractors to agreements signed by their purported employers.  The result would be
28  different if plaintiffs asserted a sufficient alter ego theory of liability but, as noted, they no longer
    pursue that theory as to Merritt or Lopez.

United States District Court
Northern District of California

fiction of corporate separateness can be pierced to hold the individual liable. *See, e.g.*, *Say & Say, Inc. v. Ebershoff*, 20 Cal. App. 4th 1759, 1768 (Cal. App. 2d Dist. 1993) (recognizing under California law two general requirements necessary to pierce the corporate veil: (1) there is unity of interest and ownership such that the separate personalities of the corporation and the individual no longer exist and (2) that, if the acts are treated as those of the corporation alone, an inequitable result will follow).[38]  In my November 2018 Order, when I addressed whether NAF had adequately pleaded its breach of contract claim against Newman as the "alter ego" of CMP as the "alter ego" of BioMax,  I noted the complexity that neither Newman nor CMP signed any of the contracts at issue while BioMax and Daleiden and the other co-conspirators did, using pseudonyms.  November 2018 Order at 24.  I also noted that there were no allegations that Newman was an officer of BioMax (the entity that did enter into the contracts), although there were allegations that Newman was responsible with Daleiden for creating, setting up, and directing the activities of BioMax.  *Id.*  Given the lack of allegations regarding Newman's role with BioMax and the absence of any apposite cases (permitting what would be in essence a finding of two-level alter ego), I dismissed the breach of contract-alter ego theory as to Newman, but allowed the breach of contract direct liability claim to proceed under an agency theory of direct liability.  *Id.* at 25.

Plaintiffs ignore the case law, my prior analysis in the related *NAF* case, and any facts regarding how liability flows up from BioMax through CMP and then to CMP officers Rhomberg and Newman.  Plaintiffs have not done enough to secure summary judgment against Rhomberg and Newman on this (or the other) breach claims.  That, and because neither of these defendants was named in any of the breach claims, not only precludes plaintiffs' motion for summary

---

[38]  On "unity of interest," courts consider whether there is evidence of commingling of funds or other assets, the holding out by one entity that it is liable for the debts of the other, identical equitable ownership of the entities, use of the same offices and employees, use of one as a mere shell or conduit for the affairs of the other, inadequate capitalization, disregard of corporate formalities, and identical directors and officers. *See Stewart v. Screen Gems-EMI Music, Inc.*, 81 F. Supp. 3d 938, 954 (N.D. Cal. 2015) (internal quotation omitted). As to "inequity," courts look to whether defendant's use of the corporate form would be inequitable, fraudulent, unjust or otherwise used in bad faith. *Id*. at 956.

United States District Court
Northern District of California

1    judgment but requires me to hold that this claim cannot be asserted against either of them.[39]

2        Defendants' motion for summary judgment as to Count 4 and PPFA's contracts is

3    DENIED, except as to Merritt, Lopez, Rhomberg, and Newman.  Plaintiffs' motion for partial

4    summary judgment on liability as to BioMax and Daleiden for breach and nominal damages under

5    this claim is GRANTED.  Whether CMP can be held liable for these breaches under the alter ego

6    theory will be determined at trial.  The amount, if any, of actual damages available will also be

7    determined at trial.

8            2.       **Breach of NAF Contracts (Count 5)**

9        This breach claim is brought by PPFA, PPNC, PPPSW, PPMM, PPOSBC, and

10   PPGC/PPCFC as alleged third-party beneficiaries under NAF's Exhibitor Agreements (NAF EAs)

11   and the required NAF non-disclosure agreements (NAF NDAs) for NAF's February 2014 and

12   March 2015 conferences.  Defendants move for summary judgment, challenging these plaintiffs'

13   standing as third-party beneficiaries, and arguing that there was lack of consideration for the

14   separate NAF NDAs, the NAF agreements are void for vagueness, there is a lack of evidence that

15   defendants breached the NAF EAs or NAF NDAs, and there is a lack of recoverable damages

16   flowing from any breach.  Plaintiffs do not move for partial summary judgment on this breach

17   claim, presumably because they concede that disputes of material fact exist.

18       Daleiden signed the NAF EAs in February 2014 and March 2015, a few weeks before the

19   California and then the Maryland NAF conferences.  Sterk Decl. Ex. 31; Daleiden Depo. II at

20   87:7-24, 88:20-89:16.  This claim is also based on the NAF NDAs that Daleiden, Merritt, and

21   Baxter allegedly signed as "Sarkis," "Tennenbaum," and "Allen" prior to attending the 2014

22   Meeting and that Daleiden, Merritt, and Lopez allegedly signed prior to attending the 2015

23   meeting.  The NDAs contain a provision prohibiting videotaping or recording of "meetings or

24   discussions" at the conferences.  NAF NDA (2015), Sterk Decl. Ex. 40.  The NAF contracts do

25   not contain choice of law provisions, and therefore the parties agree that the law of the jurisdiction

26

27   _____

     [39] Nor can Rhomberg or Newman be held indirectly liable for the breaches of contract under the
28   Conspiracy cause of action (Count III) discussed below.  Plaintiffs admit their conspiracy claim is
     grounded in defendants' fraudulent conduct underlying their tort claims.

where each contract was performed (California and Maryland) applies.

### a.  Third Party Beneficiary Status

Under California law, a "contract, made expressly for the benefit of a third person, may be enforced by him at any time before the parties thereto rescind it."  Cal. Civ. Code § 1559. Whether a third party is an intended beneficiary or merely an incidental beneficiary to the contract involves construction of the parties' intent, gleaned from reading the contract as a whole in light of the circumstances under which it was entered.  *Jones v. Aetna Cas. & Sur. Co.*, 26 Cal. App. 4th 1717, 1725 (1994); *see also Spinks v. Equity Residential Briarwood Apartments*, 171 Cal. App. 4th 1004, 1023 (2009) ("Ultimately, the determination turns on the manifestation of intent to confer a benefit on the third party."); *Northstar Fin. Advisors, Inc. v. Schwab Investments*, 781 F. Supp. 2d 926, 942 (N.D. Cal. 2011) ("Under California law, a contract must be clear in its intention to benefit a third party in order for that party to establish beneficiary status." (emphasis in original)).

Defendants argue, first, that plaintiffs, as attendees at the conferences, could not have been intended beneficiaries to those contacts because the specific conference participants (the actual people who would, in fact, be attending) were "unknown" to both defendants and each other. Therefore, "omitting" those very people as express beneficiaries from the express language of the contract would be "unnatural."  Defendants also contend that there is no evidence in the language of the NAF EA that PPFA or anyone else was an intended beneficiary because the NAF EA discusses only NAF and does not imply "benefits" to anyone else.  Finally, defendants argue that the NAF NDA has no language conveying an intent to benefit attendees (as opposed to NAF itself) much less the employers or associations of those attendees.

Reviewing these same contracts on defendants' motion to dismiss, I concluded that the "intent of NAF to benefit plaintiffs is plausibly pleaded and supported facially by the agreements at issue," and that plaintiffs could plausibly be  "third party beneficiaries [because] they are included within the class of 'people' who were required to sign and abide by, and as a result receive protection from, the NAF confidentiality agreements."  Sept. 2016 Order at 24.

Defendants have not pointed to any unconsidered legal arguments or undisputed evidence

44

that would cause me to reconsider my plausibility conclusion based on the contractual language itself.  Indeed, that conclusion is only strengthened if I look to more recently uncovered extrinsic evidence.  *Software Design & Application, Ltd. v. Price Waterhouse,* 49 Cal. App. 4th 464, 470 (Cal. App. 1st Dist. 1996) (noting even if a contract is integrated "extrinsic evidence is admissible [] where relevant to prove a meaning to which the language of the instrument is reasonably susceptible"); *see also* Deposition of Nichelle Davis at 233:23–234:3 (Mayo MSJ Opp. Decl. Ex. 39) ("Davis Depo.") (noting the purpose of the NAF confidentiality agreements was to "protect all members and attendees at the conference"); 240:25–241:5 (purpose was to ensure confidentiality). However, because intent is generally a question of fact and plaintiffs did not move on this claim, it goes to the jury for final resolution.

Finally, while defendants may not have known each Planned Parenthood-affiliated entity and staff member who would be in attendance, defendants cite no case law showing that level of specific knowledge is a requirement for intent and third-party beneficiary status.  In addition, there is ample evidence that defendants knew some of them would be; indeed defendants' own documents show their intent to target plaintiffs and plaintiffs' staff at the NAF conferences.  *See, e.g.*, Sterk MSJ Decl. Ex. 16 (Roadmap for Project Release, "We will exhibit at the NAF Annual Meeting in Baltimore from April 17 to 21 . . . This will be our last opportunity to network with new targets of interest, and to communicate in person with high-level PP national officials.").

Defendants dispute the meaning and implication of this testimony.  Their position confirms the material facts in dispute concerning their intent and knowledge.  Summary judgment is not warranted on the third-party beneficiary issue.

### b.    Consideration

Defendants argue that the NAF NDA lacks separate consideration because, in their view, consideration to access the conference as Exhibitors was secured by signing by the EA only.  Once the EA was signed for each conference, defendants reason that they were required to be given access to each conference and, therefore, that no separate "consideration" was given for the later-signed NDA.  Defendants point to language in the EA that when the EA was "countersigned by NAF, this serves as a contract for exhibit space and the following [Exhibitor Agreement] are

45

expressly incorporated here."  They also note that the exhibit fee was required to be paid at the time the EA was submitted and was "non-refundable" so that could not act as consideration for the subsequently required NDA.  Once the EA was signed and the exhibit fee paid, according to defendants, NAF had promised defendants entrance as an Exhibitor.  Nothing else was communicated to them until they arrived on-site to register and enter and were forced to sign the NDAs.

Defendants made the same argument in opposing NAF's motion for a preliminary injunction in the related *NAF* case, 15-3522.  When considering it, albeit on a more limited evidentiary record, I concluded, "Nothing in the language of the EAs or [NDAs], or the other facts in the record, support defendants' argument that upon signing the EAs, NAF had the legal obligation to permit Daleiden's group access to the meetings without further requirement." February 2016 Order in Case No. 15-3522, Dkt. No. 354.[40]

Defendants do not identify any other new, materially different facts to support their lack of consideration argument except their own testimony that once the registration fee was paid and EA signed, they expected they would be admitted.  Daleiden MSJ Decl. ¶¶104-107.[41]  However, to the extent that defendants' subjective intent is relevant to consideration, that points only to disputes of fact for resolution by the jury.[42]

In Reply, defendants raise one new argument: that the NAF agreements fail "due to fraud in the inception/execution" because NAF hid the need to sign the NDA from defendants until they arrived at the conferences.  As an initial matter, this would apply (if at all) only to the 2014 NDA. But defendants cite *no evidence* that NAF intended a fraud or intended to hide the requirement of the NDA to coerce exhibitors into paying their fees and then turn them away if they did not sign

---

[40] Evidence submitted by plaintiffs on these motions establish that NAF required an  NDA  for all attendees.  Davis Depo. at 186:6 - 187:12.

[41] Plaintiffs object to paragraph 107 about the scope and coverage of the NAF NDAs as improper lay opinion/conclusion of law.  That objection is OVERRULED as to consideration.

[42] If defendants' subjective expectations about admission are relevant, they apply at most to the 2014 NAF conference.  They could not have had a reasonable expectation that they would be admitted in 2015 without a BioMax representative signing another NDA.

United States District Court
Northern District of California

the NDAs.  Instead, considering the language of the EAs and other registration forms, as well as the *context* of the conferences themselves and the expectations of participants (the discussion of sensitive aspects of their abortion practices),[43] defendants' contention that they were fraudulently tricked into signing an NDA so they could enter to perpetrate their breach (and fraud) is meritless.

Defendants' lack of consideration arguments fail to support summary judgment on this claim.

### c.      Void for Vagueness

Defendants separately argue that the EA is void for vagueness because the EAs do not define the term "confidential information."  They admit that the EAs obligate exhibitors to hold in trust and confidence "any confidential information received in the course of exhibiting at the NAF Annual Meeting and [to] agree not to reproduce or disclose confidential information."  Minow Depo. Exs. 1922, 1923.  But they assert that because there is no definition of the boundaries of that confidential information, the EAs could be construed to cover even mundane and publicly known information making them impermissibly vague and overbroad.

I rejected similar arguments at the preliminary injunction stage in the related *NAF* case. February 2016 Order at 23-25.  On this round of motions, defendants have not shown that the EAs (or NDAs) are so vague that a court cannot appropriately enforce them (or the parties cannot understand them) or that they have been enforced in a way that makes their application to defendants here unreasonable.  There is no need to revisit those arguments.[44]

Defendants also raise a few evidentiary-based arguments to argue that NAF's own actions indicate that the information sought and secured by defendants at the NAF conference was not

---

[43] *See also* Davis Depo. at 233:23–234:3; 240:25–241:5.

[44] On these motions, plaintiffs identify the NAF provisions in the EA and NDA that they argue adequately define what conduct is prohibited and what information is confidential.  They note that cases require that "[t]o be enforceable, a promise must be definite enough that a court can determine the scope of the duty and the limits of performance must be sufficiently defined to provide a rational basis for the assessment of damages."  *Ladas v. California State Auto. Assn*., 19 Cal. App. 4th 761, 770 (Cal. App. 1st Dist. 1993).  On this second consideration of the same overbreadth arguments, defendants point to no cases invalidating broad, but defined, non-disclosure agreements like the ones at issue here.  And even if the agreement could be considered overbroad in some respects, as noted in my previous Order, California law allows courts to reasonably interpret the terms.

United States District Court
Northern District of California

confidential and that the EAs and NDAs should not be enforced against them.  They claim that NAF allowed some individuals to access the conferences without personally signing an NDA because others in the group had signed it.  Michael Decl., Ex. 57 (noting production of only a limited number of NDAs).  In addition, they contend that because NAF only cursorily investigated new exhibitors by reviewing a company's website and failed to conduct any further investigation into companies who wanted to exhibit at their conferences, vetting has been inconsistent and these NAF agreements should, therefore, not be enforced against defendants.  Plaintiffs dispute the extent of non-enforcement and the efficacy of vetting new vendors or exhibitors; the record does not support summary judgment in defendants' favor.

### d.    Breach

BioMax also argues on behalf of defendants that it (presumably Daleiden) reasonably understood that the "confidential information" covered by the EAs and NDAs was limited to trade secret and/or proprietary information shared at the conference, and did not include the type of information secured by defendants for the purpose of the Project's "collection of opinions, statistical data, and criminal investigation."  Daleiden Decl., ¶ 108.  Defendants contend that at most the NAF NDA prohibited the dissemination of trade secret information and plaintiffs cannot prove (and do not contend) that any trade secret information was published in the HCP videos.

There are a number of weaknesses with this argument.  First, defendants' pinched interpretation of the NAF EAs and NDAs is not accurate.  The NDAs prevented attendees from, for example, *making* video, audio, or other recordings of meetings or discussions.  Sterk Decl. Ex. 40 ¶ 1.  Defendants do not dispute that their conduct violated that provision.

Second, the broader provisions in the EAs and NDAs protect against release of essentially all information learned at the conference, absent agreement of NAF.  As discussed, these provisions are not problematic when reasonably construed by a court to cover confidential or sensitive information but not publicly known mundane information.  What is a reasonable construction here depends on the context of the industry and claims at issue. *See, e.g.*, *Retail Ventures, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa*., 691 F.3d 821, 834 (6th Cir. 2012) (noting that "confidential information of any kind" is "most certainly general and should be

interpreted as part of the sequence to refer to "other secret information of Plaintiffs which involves the manner in which the business is operated").[45]

Finally, Paragraph 15 of the EAs obligates exhibitors to "identify, display, and/or represent their businesses, products, and/or services truthfully, accurately, and consistently with the information provided in the Application." Sterk Decl. Ex. 31 ¶ 15. Defendants argue that the terms "truthfully" and "accurately" are modified by the clause "with the information provided in the Application," suggesting that any representations regarding defendants' identity or BioMax at the conferences need only mirror the misrepresentations listed on the exhibitor application forms. According to Daleiden, this is exactly what BioMax and he understood those terms to mean. Daleiden MSJ Decl. ¶108. That subjective interpretation is simply not reasonable as a matter of law, given the industry context and the reason for these contracts. Interpreting "with the information provided in the Application" as modifying only "consistently" is the reasonable, objective interpretation. NAF presumably relied on the information provided in the Application to allow Exhibitors to exhibit their products and services. More fundamentally, Daleiden's subjective intent is legally irrelevant. *Winet v. Price*, 4 Cal. App. 4th 1159, 1166-67 & n. 3 (Cal. App. 4th Dist. 1992) ("[E]vidence of the undisclosed subjective intent of the parties is irrelevant to determining the meaning of contractual language.").[46]

Defendants are not entitled to summary judgment on breach.

### e. Damages

Defendants repeat their argument that the damages being sought by plaintiffs are barred by the First Amendment as publication damages. I addressed those arguments above. Defendants also argue that no damages could arise *after* the expiration of the NAF contracts (which according to defendants occurred at the end of the conference), and any other damages are barred by the lack

---

[45] *Dowell v. Biosense Webster, Inc*., 179 Cal. App. 4th 564, 575–76 (Cal. App. 2d Dist. 2009), where the court limited the non-compete agreement to cover only trade secret information is not helpful because it addressed California's strong policy in favor of employee mobility and strict construction of non-compete agreements codified in Cal. Bus. & Prof. Code §16600.

[46] Plaintiffs object to paragraph 108 and Daleiden's subjective intent as improper lay opinion and conclusion of law. That objection, based on contract interpretation, is SUSTAINED.

United States District Court
Northern District of California

of proximate causation flowing from breach of the NAF contracts.

As an initial matter, defendants do not dispute that nominal damages are available under both California and Maryland law.  Plaintiffs also assert that their damages from being recorded at NAF's conferences – in violation of various provisions of the EAs and NDAs – led to other damages, including statutory damages for the illegal recordings under Maryland and California law.  *See, e.g.*, *Sweet v. Johnson*, 169 Cal. App. 2d 630, 632 (Cal. App. 3d Dist. 1959) ("A plaintiff is entitled to recover nominal damages for the breach of a contract, despite inability to show that actual damage was inflicted upon him.").

Further, defendants' contention that any obligations under the NAF agreements terminated at the end of each conference relies only on the contracts' lack of an express duration statement and on NAF's requirement that exhibitors and attendees sign the same EA and same NDA year after year, conference after conference.  Neither case law nor language from the contracts at issue supports these arguments.  As to the lack of an express termination date, that reasonably suggests only that the agreements exist beyond the duration of the conferences.  In addition, because there were breaches both within the duration of the conferences and, for the NDA, following the conference, defendants' unsupported argument fails.  Finally, the reasonable implication from the fact that new EA and NDAs were required each year is that new information would be disclosed at each subsequent conference, hence the need for newly signed EAs and NDAs.  The proximate cause arguments fail.

Defendants are not entitled to summary judgment for this claim on damages.  I note that plaintiffs argue with respect to the breach of contract claims based on NAF's NDAs that the damages analysis described in Section A above should not apply because defendants expressly waived their First Amendment rights by knowingly, voluntarily, and intelligently agreeing to the NDAs.  As this issue was not adequately addressed or briefed on these motions, I do not determine it in this Order.  **It should be raised in a motion *in limine* prior to trial**.

### f.    Merritt

Finally, Merritt argues that she cannot be liable for any breach as to the NAF contracts because, as with the PPFA EAs, she did not personally sign them; Daleiden signed the

50

"Tennenbaum" name onto the NAF EAs.  While Merritt is correct as to the EAs, there is evidence – from Merritt's own recordings – that she personally signed at least the NDA that allowed her entrance into the 2014 NAF conference.  Mayo MSJ Oppo. Decl. Ex. 41 (Merritt Depo. Ex. 417), Ex. 42 (audio file).[47]  The breach claim with respect to that NAF NDA can proceed against Merritt.

More broadly, plaintiffs contend that because the NAF agreements by their own terms apply to the "officers, employees, and agents" of Exhibitors, Merritt remains on the hook for all NAF breaches.  But, as with Lopez and Count 4, plaintiffs cite no case law that would hold anyone other than the signatories (BioMax or Daleiden) liable for breach of the EAs or NDAs absent an exception to the general rule that only signatories are responsible for breaches of contract.  Merritt is a defendant only for purposes of the NDA that she signed.[48]

Defendants' motion for summary judgment on the breach of the NAF agreements is DENIED.

### 3.  **Breach PPCG/PPCFC Contract (Count 15)**

PPCG/PPCFC brings this claim alleging a breach of the Non-Disclosure Agreement (PPCG NDA) Daleiden signed (using Tennenbaum's signature) to gain access to the PPFC/PPCFC facilities in Houston.  Both sides move for summary judgment on this claim, with plaintiffs reserving for trial the issue of the amount of damages exceeding nominal damages.  Plaintiffs argue that defendants Daleiden, Merritt, CMP, and BioMax breached the PPGC NDA by recording for the purpose of disclosing PPGC/PPCFC's confidential information and then disclosing information by posting those recordings as part of the HCP.

The PPGC NDA provides, "[A]ll information disclosed by [PPCG] to the Recipient [BioMax] shall be deemed to be 'Confidential Information.'  In particular, 'Confidential

---

[47] The facts that Merritt testified she had "no recollection" of signing it during her deposition, and that this recording is audio only and (according to Merritt) "muffled," raise, at most, a dispute of material fact.

[48] Somewhat similarly, Lopez claims that he did not violate the 2015 NAF NDA because he did not "publish" anything and simply turned over all of his recordings to Daleiden.  However, the NDAs prohibited recording, which Lopez indisputably did.

United States District Court
Northern District of California

Information' shall be deemed to include (i) all written information of [PPCG], and (ii) all oral information of [PPCG], which in either case is identified at the time of disclosure as being of a confidential or proprietary nature or is reasonably understood by the Recipient to be confidential under the circumstances of the disclosure." Sterk Decl., Ex. 54 (PPCG NDA, Dkt. No. 607-6]) ¶ 1. The PPGC NDA clarified that "[t]he term 'confidential Information' shall not be deemed to include information that (a) is or becomes a part of the public domain through no act or omission of the Recipient; (b) is lawfully disclosed to the Recipient by a third party without restriction on disclosure; or (c) is independently developed by the Recipient without breach of this Agreement." *Id*. ¶ 2. The NDA restricted BioMax's use of the Confidential Information to "evaluate, negotiate and consummate" scientific research programs and provided BioMax "shall not disclose to any third party or use any Confidential Information for any other purpose." *Id*. ¶ 3.

The PPCG NDA required that BioMax "not disclose or permit its Representatives [defined as employees, agents, consultants and others] to disclose any Confidential Information," other than to help consummate the research programs. *Id*. ¶ 5. Finally, the PPCG NDA provided that any breach could cause an "irreparable injury" and entitle PPCG to equitable remedies. *Id*. ¶ 10.

### a. Breach

Defendants argue that there is no evidence of a breach of the PPCG NDA because plaintiffs never identified to defendants "at the time of disclosure or otherwise" what specific oral information plaintiffs considered to be confidential, and the NDA covers only release of designated "confidential information." In addition to the failure of PPCG to contemporaneously identify what information it considered confidential, defendants contend that PPCG has failed to show a breach because plaintiffs have not identified any confidential information that was contained in the recordings from the PPCG published by defendants.

Plaintiffs rely on the first sentence from Paragraph 1 of the PPGC NDA to argue that *all* information disclosed is "Confidential Information," despite the "in particular language" in Paragraph 1 further defining what is covered. Under that broader interpretation, plaintiffs argue that breach cannot be disputed because the HCP videos heavily featured Farrell and Tram Nguyen from PPCG/PPCFC.

52

United States District Court
Northern District of California

1        Under Texas law, which governs the PPCG NDA, the written contract is construed "to

2  determine the parties' intent as expressed in the writing, not the parties' present interpretation,"

3  and terms are given "their plain, ordinary, and generally accepted meaning unless the contract

4  shows that the parties used them in a technical or different sense." *In re Mktg. Inv'rs Corp.*, 80

5  S.W.3d 44, 48 (Tex. App. 1998) (internal citations omitted). Unambiguous contracts are

6  construed as a matter of law, and courts should not "rewrite contracts to insert provisions parties

7  could have included or imply restraints for which they did not bargain." *Id.*

8        Here, I find that the first "all information" sentence of the NDA is expressly modified and

9  further defined by the second "in particular" sentence. Therefore, in order to be "Confidential

10  Information" protected by the PPCG NDA, the information must have been identified as

11  confidential by a PPGC representative at the time of disclosure or be information reasonably

12  understood – under an objective standard – as "confidential under the circumstances of the

13  disclosure." There is no dispute that no one at PPCG identified any particular information

14  disclosed as "confidential." However, given the context of the disclosures here (made only after

15  the NDA was executed, "mostly behind" closed doors, in a secure environment), and given the

16  context of the discussion, defendants are not entitled to summary judgment of non-breach even if

17  they subjectively believed the information disclosed did not qualify as confidential.[49] That issue is

18  for the jury.

19        Finally, while defendants argue that the information disclosed on-site and at the restaurant

20  in Texas "mixed personal topics with professional topics," precluding a finding that any

21  "Confidential Information" was misused by defendants contrary to the terms of the NDA (*e.g.*,

22  was recorded and subsequently disclosed for purposes irrelevant to a scientific research program),

23

24

---

[49] Plaintiffs also argue that if I reject their position that all information disclosed is "Confidential
Information" under the first sentence, the import of the second sentence goes to the jury because
ambiguous contractual provisions are interpreted by the jury. *See Coker v. Coker*, 650 S.W.2d
391, 394 (Tex. 1983) ("When a contract contains an ambiguity, the granting of a motion for
summary judgment is improper because the interpretation of the instrument becomes a fact
issue."). I do not find that the PPGC NDA is ambiguous. I find that the second sentence clearly
modifies and defines the first.

1    that just proves that material questions of fact remain.[50]  Whether information received by

2    defendants during the site visit should have been "reasonably understood" by defendants to be

3    "Confidential Information" covered by the NDA and whether it was used by defendants (disclosed

4    through the HCP videos or otherwise) contrary to the purposes of the NDA are questions to be

5    resolved by the jury.[51]

6                              **b.      PPCFC Standing**

7            Defendants also challenge the standing of PPCFC to assert a breach of the PPCG NDA,

8    because the NDA itself does not mention PPCFC; "Disclosing Party" is defined solely as PPCG.

9    *See MCI Telecomm. Corp. v. Texas Utilities Elec. Co.*, 995 S.W.2d 647, 651 (Tex. 1999) ("A

10   court will not create a third-party beneficiary contract by implication. [ ] The intention to contract

11   or confer a direct benefit to a third party must be clearly and fully spelled out or enforcement by

12   the third party must be denied.").

13          Plaintiffs respond that because PPCFC's offices are "included within" PPGC, and both

14   entities' spaces were recorded, the fact that PPCFC was separately incorporated from PPGC

15   (pursuant to requirements under Texas law) should not undermine PPCFC's standing.  I disagree.

16   Plaintiffs cite no supporting Texas law or point to any language in the NDA that shows PPCFC

17   was a third party "clearly intended" to benefit from the NDA as required under Texas authority.

18   PPCFC does not have standing to bring this breach claim.

19                              **c.      Merritt**

20          Separately, Merritt argues that she cannot be liable for any breach of the PPCG NDA

21   because she did not sign it; instead it is undisputed that Daleiden signed it using the signature of

22   Merritt's fake persona Susan Tennenbaum.  Plaintiffs respond that the clear terms of the NDA

23   bound BioMax's agents and employees, therefore Merritt should be bound because she purported

24

25   ───────────────────

     [50] Contrary to defendants mischaracterization, plaintiffs have identified arguably "Confidential
26   Information" that defendants recorded and otherwise "used" in alleged violation of the PPGC
     NDA.  *See* Pls. MSJ Reply [Dkt. No. 694] at 15 n.16.  Again, whether that information qualifies as
27   "Confidential Information" that was misused will be decided by the jury.

28   [51] Plaintiffs have clarified that the PPCG NDA breach claim is not based on any information
     disclosed at the restaurant.

United States District Court
Northern District of California

herself to be BioMax's CEO during the PPGC visit.  Plaintiffs, however, cite no authority, much less apposite authority that would hold an individual – even one purporting to be the CEO of a company – liable under an NDA which she did not sign.  Summary judgment is GRANTED to Merritt on this narrow claim.[52]

### d.   Damage

Finally, defendants argue that there is no evidence of actionable damage stemming from the breach of the PPCG NDA because the only harms plaintiffs have identified (responses to threats) stem from the actions of third parties that are either barred as publication damages or for lack of proximate cause.  However, as above, plaintiffs are entitled to nominal damages.  *MBM Fin. Corp. v. Woodlands Operating Co., L.P.*, 292 S.W.3d 660, 664–65 (Tex. 2009) ("we agree that nominal damages may be recovered for breach of contract.").  In addition, as I have noted, damages for security measures implemented for targeted staff (*e.g.*, Farrell and Nguyen) are actionable as linked directly to defendants' actions targeting and recording those staff members. What damages are appropriate – within the boundaries I have outlined – is for the jury to decide.[53]

Defendants' motion for summary judgment on the PPCG breach claim and plaintiffs' motion for summary judgment are DENIED, except for the limited respect that Merritt is not liable for any breach.

### 4.   Defendants' Public Policy Defense

Finally, plaintiffs contend that summary judgment in their favor is warranted on defendants' public policy defense to each of plaintiffs' breach of contract claims.  The laws of the jurisdictions at issue – Florida, Colorado, Washington, DC, California, and Texas – provide that whether a contract is against public policy "is a question of law to be determined from the circumstances of the particular case."  *Bovard v. Am. Horse Enterprises, Inc*., 201 Cal. App. 3d

---

[52] As noted above, with respect to Lopez, plaintiffs' only cases purporting to bind non-signatories are an inapposite line of cases arising in the context of who may compel or be bound by arbitration agreements.

[53] Plaintiffs' argument that because the NDA characterizes a violation as "irreparable injury," they need not demonstrate any actual damages is not particularly persuasive, as that provision contemplates injunctive or other equitable relief like "specific performance."  PPCG NDA ¶ 10.

United States District Court
Northern District of California

832, 838 (Cal. App. 3d Dist. 1988); *Jankowiak v. Allstate Prop. & Cas. Ins. Co.*, 201 S.W.3d 200, 209–10 (Tex. App. 2006) ("Whether a contract violates public policy is a question of law we review de novo."); *Calvert v. Mayberry*, 440 P.3d 424, 429 (Colo. 2019), reh'g denied (May 20, 2019) ("We review de novo whether a contract violates public policy.").

In opposition, defendants argue that summary judgment is not appropriate on this defense because there are material disputes of fact that I cannot resolve on the record before me. The first is whether defendants' waivers of their free speech rights by signing the contracts were "knowing, voluntary, and intelligent." *See, e.g., Leonard v. Clark*, 12 F.3d 885, 889 (9th Cir. 1993), *as amended* (Mar. 8, 1994) ("First Amendment rights may be waived upon clear and convincing evidence that the waiver is knowing, voluntary and intelligent."). Defendants bear the burden of proof on this affirmative defense. They do not dispute that the agreements each personally signed were done so knowingly and voluntarily, and plaintiffs submit evidence that they were.[54]

Defendants also contend that because the NAF NDA was presented "immediately" before entering the conference, the "record does not establish that Defendants had enough time to formulate an intention to breach the NDA." BioMax Oppo. at 13. They offer no evidence (through declaration or citation to deposition testimony) in support and ignore that at least the 2015 NAF NDA was signed after defendants had a year's warning that one was required. The undisputed evidence is that the defendants who signed the agreements did so knowingly and not as the result of coercion or ignorance, even if they subjectively believed that they would not be bound by them as a matter of public policy. *See* February 2016 Preliminary Injunction Order at 29 (rejecting subjective intent as part of public policy defense).

As to the "free speech" issue raised by defendants, as I noted in the Preliminary Injunction Order in the related *NAF* case, whether a contract, or more specifically a non-disclosure agreement, should be enforced despite a claim that enforcement would impinge on First Amendment rights depends on weighing "the competing public interests in determining whether to enforce confidentiality agreements that restrict First Amendment rights." February 2016 Order at

---

[54] Sterk MSJ Decl. Ex. 40 (Lopez NAF NDA); Lopez Depo. at 224:4-10 (Mayo Decl. ISO Opp. to Anti-SLAPP Ex. 4); Sterk MSJ Decl. Ex. 31 (2014 NAF EA); Daleiden Depo. II at 86-89.

United States District Court
Northern District of California

29 (also relying on *Leonard v. Clark*, 112 F.3d 885, 890 (9th Cir. 1993), *as amended* (Mar. 8,

1994) ("even if a party is found to have validly waived a constitutional right, we will not enforce

the waiver 'if the interest in its enforcement is outweighed in the circumstances by a public policy

harmed by enforcement of the agreement.'") (internal quotation omitted); *see also Perricone v.

Perricone*, 292 Conn. 187, 221-22 (Conn. 2009) (in weighing the public interests as to whether to

enforce the agreement, the court observed:  "The agreement does not prohibit the disclosure of

information concerning the enforcement of laws protecting important rights, criminal behavior, the

public health and safety or matters of great public importance, and the plaintiff is not a public

official.").

        Weighing the evidence at the preliminary injunction stage in the *NAF* case, I concluded

that "balancing the significant interests at stake on both sides supports enforcement of the

confidentiality agreements at this juncture."  February 2016 Order at 29.  Reviewing the public

policy justifications asserted by both sides, I concluded:

> The record before me demonstrates that defendants infiltrated the
> NAF meetings with the intent to disregard the confidentiality
> provisions and secretly record participants and presentations at those
> meetings.  Defendants also admit that only a small subset of the total
> material gathered implicate any potential criminal wrongdoing.
> Oppo. Br. at 10-14.  I have reviewed those transcripts and recordings
> and find no evidence of actual criminal wrongdoing.  That defendants
> did not promptly turn over those recordings to law enforcement
> likewise belies their claim that they uncovered criminal wrongdoing,
> and instead supports NAF's contention that defendants' goal instead
> is to falsely portray the operations of NAF's members through
> continued release of its "curated" videos as part of its strategy to alter
> the political landscape with respect to abortion and the public
> perception of NAF's members.  I conclude that NAF has shown a
> strong likelihood of success on its breach of contract claims against
> CMP and Daleiden.   Enforcement of NAF's confidentiality
> provisions for purposes of continuing the injunction prohibiting
> defendants from releasing the NAF materials is not against public
> policy.

*Id*. at 34-35.[55]  Plaintiffs contend the same result should be found here.  Defendants merely

---

[55] I also noted "[a]t most, defendants might have a defense to a breach of contract claim based on
production of NAF materials to law enforcement.  However, the question of whether defendants
should be excused from complying with NAF's confidentiality agreements in order to provide
NAF materials to law enforcement has not been placed directly at issue."  *Id*. at 34.  Here,
defendants do not make that sort of as applied challenge.  But even if they did, it would not
succeed because the severity of the breaches – the use of a fake company to surreptitiously record

United States District Court
Northern District of California

characterize these findings as from a "separate case" whose findings I am free to disregard. BioMax Oppo. at 12.

Instead, defendants assert that because of their subjective interpretation of the contracts and their individual beliefs that they would not be bound by them, there are disputes of material fact whether any defendant "intended" to breach them. Those arguments are based on the same "void" for vagueness or lack of breach arguments addressed and rejected above. More significantly, they have no relevance to whether public policy would excuse a breach found by the trier of fact.

Defendants also argue that the agreements are "void" because their "purpose is the concealment of criminal activity." BioMax Oppo. at 11. But they cite no evidence from either the face of the contracts or from any witness to support that purpose. Indeed, the undisputed evidence is that the purpose of the contracts was to protect the security of participants and the confidentiality of information discussed or shared. Davis Depo. at 240:25–242:22, 249:22–250:14;[56] Deposition of Melissa Farrell (Sterk MSJ Decl. Ex. 52) at 192:2-193:4; Declaration of Melissa Farrell [Dkt. No. 607-6] ¶¶ 3–4.

Defendants next rely on cases that voided contracts as against public policy where the contracts on their face "directly contravened" public policy. Those cases are inapposite, as each of involved a contract that "directly contravened" statutory or regulatory public policy. *See, e.g., Jankowiak v. Allstate Prop. & Cas. Ins. Co.*, 201 S.W.3d 200, 209–10 (Tex. App. 2006); *Bovard v. Am. Horse Enterprises, Inc.*, 201 Cal. App. 3d 832, 838 (Cal. App. 3d Dist. 1988). Here, there is no evidence that the contracts at issue "directly contravene" the public policy behind "the federal and state statutes illegalizing the sale of fetal tissue." BioMax Oppo. at 12.

---

and disclose significant amounts of footage that showed no misconduct – makes this case more akin to *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc*., 637 F.3d 1047, 1062 (9th Cir. 2011), where the Ninth Circuit declined to adopt a public policy defense to invalidate an NDA based on plaintiff's subsequent use of some of the materials to file a qui tam action, because any such exception "would not cover [the] conduct given her vast and indiscriminate appropriation of" information covered by the NDA.

[56] Defendants object to lines 249:22-250:14 of the Davis deposition as irrelevant, a legal conclusion, lacking foundation, and speculation. The objections are OVERRULED.

United States District Court
Northern District of California

Defendants then shift to a more "as applied" challenge, arguing that the public policy defense is relevant where the application of an agreement "results in the concealment of criminal activity." BioMax Oppo. at 14–16. Defendants argue that HCP footage reveals evidence of illegal activity, citing the Fifth Circuit's now depublished decision in *Planned Parenthood of Greater Texas Fam. Plan. and Preventative Health Services, Inc v. Smith*, 913 F.3d 551, 554 (5th Cir. 2019), *reh'g en banc granted sub nom. Planned Parenthood of Greater Texas Fam. Plan. and Preventative Health Services, Inc. v. Smith*, 914 F.3d 994 (5th Cir. 2019). There, the panel upheld an agency decision terminating Medicare provider agreements with PPFA affiliates including PPCG based "largely on undercover video footage of graphic discussions with Planned Parenthood personnel concerning the prospective sale of liver, thymus, and neural tissue from fetuses aborted during the second trimester of pregnancy. The videos justified terminating the affiliates' provider agreements, the agency contended, because they *indicated noncompliance with accepted medical and ethical standards*." *Id*. at 554. While that decision relied heavily on the preceding italicized phrase, the opinion did not indicate that the HCP videos included evidence of any criminal wrongdoing. Defendants also point me to the recordings of Nguyen and Farrell from PPCG as showing evidence of illegal activity. These excerpts were reviewed by the Hon. Donna M. Ryu, who concluded they did not, in fact, contain evidence of actual criminal wrongdoing regarding the sale or transfer of fetal tissue. Dkt. No. 441 at 7.[57]

Reviewing the issue as a matter of law and based on the full record before me, I GRANT plaintiffs' motion as to defendants' public policy defense to plaintiffs' claims of breach of contract. The public policy defense is not applicable as a matter of law.

### D.      Trespass (Count 6)

Plaintiffs assert trespass claims based on three sets of intrusions: trespass claims by PPFA for intrusions into the hotels at two conferences in Florida and the conference in Washington, DC; a trespass claim by PPRM for the intrusion into their facilities in Denver, Colorado; and a trespass

---

[57] Two of the statutes cited by defendants as evidence that Farrell admitted to "possible" illegality focus on "researcher certifications," not requirements imposed on abortion providers. The third imposes obligations on attending physicians, which Farrell indisputably is not. BioMax Oppo. at 16.

United States District Court
Northern District of California

claim by PPGC/PPCFC for the intrusion into their facilities in Houston, Texas.[58]

Both sides move for summary judgment on the trespass claims.[59]  Plaintiffs contend that the only question for trial is the amount of damages (in addition to nominal damages), for each intrusion.  They argue that because damages is not an element of a trespass claim in any of the jurisdictions, summary judgment on liability should be entered in their favor.  Defendants raise various legal defenses to the elements and contend that summary judgment should be entered in their favor.

### 1. PPFA

On behalf of the defendants, Lopez argues that no defendant can be liable for trespass at the PPFC conferences in Washington, DC and Florida under those jurisdictions' laws.  Defendants contend that the trespass must "interfere" with "the owner's possessory interest" in the property and that because these conferences were held at hotels, plaintiffs had no possessory interest of their own to exercise and did not in fact exercise sufficient possessory interest because they could not exclude the hotel owners and staff.  Minow Depo. 112:21-113:6–10 ("We had exclusive use of the spaces that we contracted and are able to arrange for our own access control in those spaces" but PPFA did not "have the right to exclude, you know, caterers and housekeeping staff, et cetera.").  In addition, because the right to possess and control must be exclusive and the hotels maintained various rights and placed contractual limitations on PPFA's rights to the space (to

---

[58] The undisputed evidence shows that: (1) Daleiden and Lopez "attended" the PPFA conference in Miami in October 2014, Daleiden MSJ Decl. ¶ 53; (2) Daleiden and Lopez "attended" the PPFA conference in Orlando in February 2015, Daleiden MSJ Decl. ¶ 54; (3) Daleiden and Lopez attended the PPFA conference in Washington, DC in March 2015, Declaration of Jeffrey M. Trissell [Dkt. No. 603-2] ¶3vii; (4) Merritt did not attend or record at any PPFA conferences in Florida or Washington, DC, Daleiden MSJ Decl. ¶ 132; (5) Daleiden and Merritt accessed the PPRM facilities in Denver, Colorado on April 7, 2015, Trissell Decl. ¶ 3viii; and (6) Daleiden and Merritt accessed the PPCG/PPCFC facilities in Houston, Texas on April 9, 2015, Trissell Decl. ¶3ix.  Plaintiffs object to paragraph 3 of the Trissell Decl. as hearsay, lacking foundation, lack of personal knowledge, and improper lay opinion.  However, I only rely on that paragraph to the extent is explains the timeline for the intrusions and which defendants were individually involved; facts not in dispute.  Plaintiffs did not provide (or did not draw my attention to) a similarly helpful chart.  The objections are OVERRULED to the limited extent of my reliance on paragraph 3.  **As a pretrial matter, the parties should consider preparing a joint chart based on undisputed facts containing this basic information.**

[59] The basic elements of the trespass claim are not in dispute:  an intrusion upon the property of another without permission.

switch rooms, to approve PPFA's uses, etc.), Lopez argues that plaintiffs did not have sufficient control or sufficient rights to exclude as a matter of law.[60]

These is no dispute that "a recognized possessory interest is the 'key requirement' for a successful claim of trespass." *Greenpeace, Inc. v. Dow Chem. Co*., 97 A.3d 1053, 1060 (D.C. App. 2014) (internal citation omitted).  "A 'possessory interest' is defined as '[t]he present right to control property, including the right to exclude others, by a person who is not necessarily the owner.'"  *Id*. (quoting Black's Law Dictionary 1203 (8th ed.2004)); *see also Annex Indus. Park, LLC v. Corner Land, LLC*, 206 So. 3d 739, 741 (Fla. Dist. Ct. App. 2016) ("exclude unauthorized persons from interfering with that right").

Defendants cite no cases defining the scope of the "exclusive" right to possess and exclude in the context of rented space in hotels or conference facilities.  Instead they rely on cases that recognize a distinction between the rights conferred by a lease and the rights conferred by a license, identifying that a key feature of a lease is the right to exclude even the owner.  *See Turner v. Fla. State Fair Auth.*, 974 So. 2d 470, 473 (Fla. 2d Dist. App. 2008) ("A license does not confer an interest in the land but merely gives the licensee the authority to do a particular act on another's land" and recognizing that a tenant under a lease "is one who has been given a possession of land which is 'exclusive even of the landlord'" and a licensee "is one who has a 'mere permission to use land, dominion over it remaining in the owner and no interest in or exclusive possession of it

---

[60] For example, under the Miami hotel contract: the hotel retained the right to "reassign conference rooms"; "show" the meeting space; provide PPFA access only to "the meeting space"; require approval and the right to set up rigging; preclude PPFA from providing its own food, drinks, or decorations; preclude PPFA from using the premises for any purpose other than its conference; and refuse the right for "entertainment" it deemed incompatible with its image.  Sterk Decl., Ex 3 (Miami Contract).  The Orlando conference hotel contract  was described as one for "meeting room rental"; precluded PPFA from "bring[ing] any food or beverage into the function space" or removing "[f]ood and beverage . . . from the reserved function space"; and precluded PPFA from "us[ing] any items in the function space that create any amplified noise, smell, or visual effect other than decorations without advance notification and written approval." Ex. 53, PPFA Depo., 89:13–90:24; Sterk Decl., Ex. 4 (Orlando Contract).  The D.C. conference hotel contract stated that "[s]pecific meeting rooms cannot be guaranteed and are subject to change"; required PPFA to guarantee that its "use of function space will not create any unreasonable disturbance to other guests or meetings"; precluded PPFA from using "smoke or fog machines, dry ice, confetti cannons, candles, incense" or other items "without advance approval from Hotel"; precluded PPFA from "bring[ing] alcoholic beverages into the Hotel for [the] Event"; and required "prior approval for [PPFA to] bring any food or non-alcoholic beverages from outside sources into [the] Hotel." Sterk Decl., Ex. 5 at 12 (DC Contract).

United States District Court
Northern District of California

being given' to the occupant."); *Harnett v. Washington Harbour Condo. Unit Owners' Ass'n*, 54 A.3d 1165, 1172 n.2 (D.C. App. 2012) (discussing the distinction between leases (generally assignable, confers exclusive use on a tenant "against all the word, including the owner") and licenses (generally not assignable, is a "privilege," "conveys no estate or interest, and is revocable," and does not confer exclusive possession)); *see also Young v. Harrison*, 284 F.3d 863, 868 (8th Cir. 2002) (in context of evictions, "[m]any jurisdictions draw a distinction between a tenant and a hotel guest by reasoning that the tenant acquires an interest in the real estate and has the exclusive possession of the leased premises, whereas the guest acquires no estate and has mere use without the actual or exclusive possession.").  Because the contracts at issue reserve a number of rights to the hotels – including the right of hotel staff to be in the spaces reserved by PPFA – defendants contend that the required "exclusive" possessory interest for trespass cannot be established as a matter of law.

Plaintiffs similarly cite no cases arising in the context of hotels or conferences but rely on cases giving "tenants" or signatories to leases the right to exclude; those cases are not helpful because plaintiffs have not established that PPFA could be considered a tenant.  Pls. Oppo. MSJ at 34.[61]  In my Tentative Rulings and Procedure outline filed before the hearing, I asked plaintiffs to identify cases that supported their position that the hotel contracts were akin to leases, as opposed to licenses, or cases otherwise in support of their right to control the hotel spaces.  Dkt. No. 718.  At the hearing, plaintiffs identified *Prestige Restaurants and Ent., Inc. v. Bayside Seafood Rest., Inc.*, 09-23128-CIV, 2010 WL 680905, at *5 (S.D. Fla. Feb. 23, 2010), *aff'd sub nom. Prestige*

---

[61] Plaintiffs' cases simply recognize the rights of tenants to exclude.  *See Gaetan v. Weber*, 729 A.2d 895, 898 (D.C. 1999) (*tenants* have standing to sue for trespass); *Coddington v. Staab*, 716 So. 2d 850, 851 (Fla. Dist. Ct. App. 1998) ("Generally, as to a lessee of real property, the proper measure of damages for trespass includes the *lessee's* loss of use and enjoyment of the land.") (emphasis added); *see also Envtl. Processing Sys., L.C. v. FPL Farming Ltd*., 457 S.W.3d 414, 424 (Tex. 2015) (recognizing that an owner or "possessory interest holder" generally "has the right to exclude all others from use of the property"); *Kelly v. Bd. of County Commissioners of Summit County*, 17CA0431, 2018 WL 2436836, at *3 (Colo. App. May 31, 2018), as modified (June 14, 2018), *cert. granted sub nom. Bd. of Assessment Appeals v. Kelly*, 18SC499, 2019 WL 1026366 (Colo. Mar. 4, 2019 (discussing the "traditional benefits of real property *ownership*, including the rights to exclude"); *Ralphs Grocery Co. v. Victory Consultants, Inc*., 17 Cal. App. 5th 245, 258 (Cal. App. 4th Dist. 2017), *as modified* (Nov. 6, 2017) ("Generally, landowners and tenants have a right to exclude persons from trespassing on private property; the right to exclude persons is a fundamental aspect of private property ownership.").

*Restaurants and Ent., Inc. v. Bayside Seafood Restaurant, Inc*., 417 Fed. Appx. 892 (11th Cir. 2011), which itself relied on *Turner*, 974 So. 2d 470.  In *Prestige*, the court determined as a matter of law that the contract at issue was more akin to a license to operate a nightclub on part of a combined nightclub-restaurant property, and not a "a right of exclusive possession or occupancy" that would be conferred by a lease.  *Prestige*, 2010 WL 680905, at \*5

Plaintiffs then focus on the language of three hotel contracts at issue.  Plaintiffs assert that the contracts gave PPFA the right to control access to the reserved spaces in the hotel and the "right to exclude" people from those spaces and that is sufficient.  Miami Contract at 12; Orlando Contract at 7; DC Contract at 12.  There are unique provisions in each of the contracts that distinguish them from mere licenses.  For example, the contracts require the hotels to refrain from booking guest rooms or facilities space to individuals or groups with "conflicting" views to PPFA that PPFA believes could create a threat of harm to it or the attendees.  Those provisions allow PPFA to exercise a right to prior approval before the hotel can provide rooms or facility space to those individuals or groups.  Miami Contract at ECF pg. 13 ("Other Conflicting Bookings"); Orlando Contract at 7 (same); DC Contract at 12 (same).  Significantly, the contracts also provide that all hotel staff (as well as hotel agents, vendors, etc.) are bound by confidentiality agreements with PPFA.  *Id*.

After reviewing the language of the contracts and undisputed circumstances surrounding their performance, which is an issue of law for the court,[62] I conclude that because the contracts on their face provide PPFA the express right to exclude (other than hotel staff and agents of the hotel who are allowed access by the contract but covered by contracts' confidentiality agreements), they confer sufficient "possessory interest" for a trespass claim.  Plaintiffs had authority under the contracts:  (1) to exclude others from being able to book rooms or facility space at the hotels during the PPFA conference; (2) to restrict the hotels ability to change or reallocate rooms/spaces without PPFA's approval (Orlando and Miami); (3) to prevent the hotels from "showing" the

---

[62] *See Prestige*, 2010 WL 680905, at \*4 (the "intention of the parties concerning whether a contract is a lease or a license is determined by an 'objective interpretation' of the writings and surrounding circumstances" and is a "a question of law").

conference spaces to potential clients during PPFA sessions;[63] (4) to require the contractual confidentiality of hotel staff who were there to provide services to PPFA and its attendees; and (5) during its use of the conference facilities, PPFA was allowed to restrict who could access those reserved areas.[64] All of that undisputed evidence provides sufficient evidence of their possessory interest as a matter of law.  That possessory interest is not undermined by the reservation of certain, limited rights (*e.g.*, to approve certain vendors PPFA might want to use) to the hotels.[65]

### 2.    Consent and Misrepresentation to Secure Access

Daleiden separately argues, on behalf of all defendants, that common law trespass under Texas and Colorado law fails because plaintiffs "consented" to defendants' entry.  Defendants recognize that both jurisdictions allow trespass claims where consent may have been improperly induced, as alleged here.  *See, e.g., Landry's, Inc. v. Animal Leg. Def. Fund*, 566 S.W.3d 41, 64 (Tex. App. 2018), *reh'g denied* (Dec. 31, 2018) ("Consent will be negated if 'the person consenting to the conduct of another is induced to consent by a substantial mistake concerning the nature of the invasion of his interests or the extent of the harm to be expected from it and the mistake is known to the other or is induced by the other's misrepresentation, the consent is not effective for the unexpected invasion or harm.'") (quoting Restatement (Second) of Torts § 892B(2) (1979)).  But defendants attempt to avoid that rule by arguing that the mistake must be "substantial" and cannot result from "mistakes concerning other matters."

Defendants contend that the "consent" to enter by both PPGC/PPCFC and PPRM, as well as PFFA for the conferences, was conditioned on the representation that defendants were representatives from a fetal tissue procurement company when, in fact, they were journalists. Defendants assert that because Daleiden and Merritt's lies to gain access to those facilities were "protected speech" there can be no civil liability under any jurisdictions' laws pursuant to the

---

[63] Minow Depo. at 65:7-22.

[64] Plaintiffs also point out that in the DC contract, PPFA is given the right to assign its rights under the contract with approval of the hotel, which is typically a term used in leases and not licenses. *See* DC Contract at 13.

[65] Plaintiffs admit that Merritt is entitled to summary judgment to the limited extent of the claim for trespass based on infiltration of the three PPFA conferences.  Pls. Oppo. MSJ at 40 n.27.

United States District Court
Northern District of California

Ninth Circuit's decision in *Animal Legal Defense Fund v. Wasden*, 878 F.3d 1184 (9th Cir. 2018).

The issue before the *Wasden* court was different.  There, the court struck down part of an overbroad criminal statute.  As *Wasden* affirmed with respect to the trespass claim, journalists or others acting undercover do not have carte blanche to lie or misrepresent themselves to gain access to an otherwise secure or private facility.  Moreover, if I applied *Wasden* as broadly as defendants suggest, it would not help them because plaintiffs have evidence (and a reasonable juror could find) that defendants intended to trespass for purposes of their material gain and to inflict harms on plaintiffs (tortious or contractual); the concerns expressed by the *Wasden* court striking down part of that law are satisfied by the evidence here.  *Id*. at 1194.

Defendants then argue that under *Desnick v. American Broadcasting Companies*, 44 F.3d 1345 (7th Cir. 1995), even when fraud is used to gain access, trespass cannot be penalized as long as access is to areas that are commonly accessed by clients seeking services.  In *Desnick*, the court rejected the claim for trespass where test patients, wearing hidden cameras, "entered offices that were open to anyone expressing a desire for ophthalmic services and videotaped physicians engaged in professional, not personal communications with strangers."  *Id*. at 1352.  Defendants similarly rely on *Pitts Sales, Inc. v. King World Productions, Inc*., 04-60664-CIV-COHN, 2005 WL 4038673, at *4 (Bankr. S.D. Fla. July 29, 2005), which rejected trespass claims based on an undercover reporter gaining access not "to special areas" of the business operation but to "areas that were open to anyone expressing a desire to join or travel with Pitts Sales" that were "easily accessible to others" including hotel rooms, travel vans, and hotel rooms where numerous agents were present.  *Id*. at 4.  The court in *Pitts Sales* also relied on the fact that plaintiffs' hiring practices – through which the reporter gained admission to the "open areas" – were "far from rigorous," based on minimal and unchecked information provided by the prospective employee. *Id*.; *see also Am. Transmission, Inc. v. Channel 7 of Detroit, Inc.,* 239 Mich. App. 695, 708–09 (Mich. Ct. App. 2000) ("Stern entered only those areas of plaintiffs' shop that were open to anyone seeking transmission repair services and videotaped plaintiffs' employee engaging in a

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

professional discussion with her.").[66]

The facts here are significantly different from those in *Desnick*, *Pitts Sales*, and *American Transmission*.  To start, the PPFA conferences had more rigorous screening requirements for access than for employment in *Pitts Sales*, including verification of identification and screening procedures, although defendants' challenge the level and efficacy of these measures.  Both the context of the intrusions into PPGC/PPCGC and PPRM facilities (facilities that provide access to abortions, family planning, or healthcare services) and the areas accessed by Daleiden and Merritt (*e.g.*, private office, labs, etc. that included areas where even clients seeking those services did not have access) distinguish this case from *Desnick* (where the clients were seeking ophthalmic services) and *Pitt Sales* (employees of plaintiff and plaintiffs' *competitors* picked up materials and gathered to prepare for magazine sales jobs), and *American Transmission* (only filmed in publicly accessible spaces).[67]  These cases do not foreclose the trespass claims here with respect to PPFA's conferences or PPRM and PPGC/PPCFC's facilities.

Separately, defendants contend that because PPGC/PPCFC also conditioned its consent to

---

[66] It was significant to the *Pitt Sales* court that competitors of Pitts Sales also had access to many of the same areas that the defendant reporter had access to as an employee.  *Id.* at *5; *see also IMAPizza, LLC v. At Pizza Ltd.*, 334 F. Supp. 3d 95, 126 (D.D.C. 2018) ("the fact that Defendants entered a *public* space makes any fraud or mistake about their intentions irrelevant to the issue of consent") (emphasis in original).

[67] This distinction also applies to *Food Lion III,* where the Fourth Circuit was clearly concerned about turning every misrepresentation on a resume into a basis for trespass.  *Food Lion III*, 194 F.3d at 518 ("we have not found any case suggesting that consent based on a resume misrepresentation turns a successful job applicant into a trespasser the moment she enters the employer's premises to begin work. Moreover, if we turned successful resume fraud into trespass, we would not be protecting the interest underlying the tort of trespass.")  That is not what is at issue here.  The misrepresentations were not simply resume misrepresentations.  Defendants used false identifications and misrepresentations about a fake company operating in an industry where discretion and confidentiality are expected if not contractually required.  Defendants cannot ignore the context.  *Cf. Shiffman v. Empire Blue Cross and Blue Shield*, 681 N.Y.S.2d 511, 512 (N.Y. App. Div.1998) (reporter who gained entry to medical office by posing as potential patient using false identification and insurance cards could not assert consent as defense to trespass claim "since consent obtained by misrepresentation or fraud is invalid"). With respect to the common law trespass claims, *Baugh v. CBS, Inc.*, 828 F. Supp. 745 (N.D. Cal. 1993) (Smith, J.) is inapposite.  In that case, where the plaintiff let a film crew into her home along with government investigators based upon the misrepresentation that the film crew was filming for the DA's office, the court dismissed the trespass claim despite the consent being induced in part by fraud.  *Id.* at 757.  Here, not only was there no consent to recording – the purpose of defendants in entering the conferences and facilities is undisputed– but California law is not at issue.

enter on defendants' separate agreement to maintain confidentiality, PPCG/PPCFC can only seek

relief through its breach of contract claim, not through trespass.  The only case defendants rely on

dealt with the inapposite situation of prosecution for criminal trespass.  *See Lilly Industries, Inc. v.*

*Health-Chem Corp*., 974 F. Supp. 702, 709 (S.D. Ind. 1997) ("a person who obtained possession

to land through a fraudulent contract cannot be prosecuted for trespass").  In any event, the

contract was not the only step in securing PPGC/PPCGC's consent to enter.  Daleiden and Merritt

used false identification and misrepresentations about BioMax to induce PPGC/PPCFC's

"mistaken" consent to defendants' entry.  Those misrepresentations were not collateral to the

mistaken consent, they were the reason for it.

### 3.   **Damages**

Next, Merritt argues on behalf of defendants that all trespass claims fail for failure to show

recoverable damages (*e.g*., damages that are not barred publication damages, discussed above).

Defendants do not dispute that each jurisdiction where there is a common law trespass claim

(Florida, DC, Texas, and Colorado) allows an award for nominal damages.  Therefore, summary

judgment on "damages" is not appropriate given that plaintiffs seek nominal damages.  *See*

*Corral-Lerma v. Border Demolition & Envtl. Inc*., 467 S.W.3d 109, 120 (Tex. App. 2015),

*opinion modified and supplemented*, 474 S.W.3d 481 (Tex. App.--El Paso 2015); ("[T]respass

against a possessory interest . . . does not require actual injury to be actionable and may result in

an award of nominal damages") (internal quotation omitted);[68] *but see Med. Lab. Mgmt.*

*Consultants v ABC*, 306 F.3d 806 (9th Cir. 2002) (dismissing trespass claim that only sought

publication damages and noting that plaintiffs did not request nominal damages).[69]

In addition, certain plaintiffs have identified recoverable damages, such as upgrades in

access-security and screening procedures to prevent future infiltrations to conferences incurred by

PPFA (Minow Depo. at 95) and PPGC (Deposition of Jeffrey Palmer at 289, Sterk Decl., Ex. 53),

---

[68] Defendants' cases discussing necessity to prove actual damages under Texas law do not address nominal damages.  *See, e.g.*, *City of Mineral Wells v. McDonald*, 141 Tex. 113, 118-119 (Tex. 1943); *S.W. Airlines Co. v. Farechase, Inc*., 318 F. Supp. 2d 435, 442 (N.D. Tex. 2004).

[69] *Boston Prop. Exch. Transfer Co. v. Iantosca*, 720 F.3d 1 (1st Cir. 2013) relied on by Merritt is inapposite because it did not address trespass or nominal damages.

United States District Court
Northern District of California

1   and personal security damages for targeted staff.  The amount of those damages, if any, will be

2   determined by the jury.[70]

3          Defendants also argue that PPGC cannot maintain a trespass claim for nominal damages

4   because it has consistently represented that it is seeking "only" injunctive relief.[71]  Plaintiffs

5   respond that PPFA suffered damage from the PPRM trespass because PPFA gave a grant to PPRM

6   to improve its facility-access-security following the intrusion.  Declaration of Kevin Paul (Sterk.

7   Decl., Ex. 47) ¶ 4.[72]  Plaintiffs contend that PPFA has the ability to seek those damages under

8   Colorado law regarding subrogation as a result of PPRM's intrusion.  Pls. Oppo. MSJ at 40 n.27.

9   If subrogation is applicable on these facts, the question remains whether PPRM can allege its

10  trespass claim, not whether PPFA can recover the grant it paid to PPRM under a claim it brings in

11  its own right.  *Cotter Corp. v. Am. Empire Surplus Lines Ins. Co.*, 90 P.3d 814, 833 (Colo. 2004),

12  *as modified on denial of reh'g* (June 7, 2004) (noting that subrogation allows the party seeking the

13  recovery to file its own action).  That said, under Colorado law, damages is not an element of the

14  trespass claim.  PPRM may seek injunctive relief under this claim.

15              4.      **Merritt**

16         Merritt also claims that she is entitled to summary judgment on trespass because she did

17  not attend any of the PPFA conferences.  Plaintiffs do not dispute this and no longer pursue the

18  trespass claim against Merritt with respect to the PPFA conferences.

19  _____

20  [70] Defendants repeatedly argue that various plaintiffs, including PPGC/PPCGC in particular, have not adequately identified the sources of their damages so that defendants have clarity on whether the "security" damages they seek are for now-disallowed physical upgrades to the facilities

21  (security cameras) or access-security upgrades (new systems for screening visitors).  But that may be worked out at trial or through post-trial motions.  The burden of demonstrating that various

22  invoices/categories of damages are recoverable within the bounds that I have adopted rests with plaintiffs.

23

24  [71] In response to an interrogatory asking plaintiffs to "State the specific amount of claimed

25  damages that falls within each category (for instance, 'cost of additional security including physical and IT-related to protect Plaintiffs' offices, clinics, and staff')" identified by plaintiffs in a prior interrogatory response, plaintiffs asserted various objections and, subject to amendment,

26  disclosed that "PPRM seeks only injunctive relief."  Millen Decl., Ex. 101 at 10 n.2.  In that same document, plaintiffs disclosed that PPFA was seeking recovery of grants it gave to its affiliates

27  including PPRM for security measures in response to defendants' intrusions.  *Id.* at 10.

28  [72] Defendants object to paragraph 4 of the Paul Declaration on lack of personal knowledge, lack of foundation, and hearsay.  The objection is OVERRULED as to the narrow information I rely on.

### 5.    Rhomberg and Newman

Plaintiffs admit that neither Rhomberg nor Newman entered any of the properties at issue but nonetheless assert that they can be liable under a few, again raised in passing, theories.  The first is liability under the theory that a "person who aids, abets, encourages, or authorizes another in the commission of a trespass, even though not personally present at its commission, is liable equally with him who commits it." *Engler v. Hatch*, 472 P.2d 680, 682 (Colo. App. 1970) (citing Am.Jur. Trespass § 33).  The second is that "[t]acit consent is enough to prove a conspiracy against a director or officer of a corporation, so long as the director or officer 'concurred in the tortious scheme with knowledge of its unlawful purpose.'" *Schwartz v. Pillsbury Inc*., 969 F.2d 840, 844 (9th Cir. 1992) (quoting *Wyatt v. Union Mortg*. Co., 24 Cal. 3d 773, 785 (Cal. 1979) (which recognized that "[d]irectors and officers of a corporation are not rendered personally liable for its torts but may become liable if they directly ordered, authorized or participated in the tortious conduct")).

The third is under the alter ego doctrine.  As noted above, with respect to the breach causes of action, plaintiffs argue that CMP, as the parent of BioMax, is liable as the alter ego of BioMax. They then contend that Rhomberg and Newman, as directors of CMP, are directly liable for the trespasses of CMP and BioMax because CMP was established to "perpetuate a fraud, circumvent a statute, or accomplish some other wrongful or inequitable purpose" and therefore the corporation's acts are deemed "to be those of the persons or organizations actually controlling the corporation." *Troyk v. Farmers Group, Inc*., 171 Cal. App. 4th 1305, 1341 (Cal. Ct. App. 2009) (citing *Sonora Diamond Corp. v. Superior Court*, 83 Cal.App.4th 523, 538 (Cal. Ct. App. 2000)).  Plaintiffs recognize that there are material disputes of fact as to the roles Rhomberg and Newman played with respect to BioMax through their positions as officers and directors of CMP and their relationship, control, or support of the actual trespassers.

However, as with the breach of contract claim, there are a number of problems with plaintiffs' attempts to pin this claim directly on Rhomberg and Newman.  To start, as with the breach of contract claims, this claim is not brought against Rhomberg and Newman in the FAC. The FAC identifies the defendants as Daleiden, Merritt, Lopez, CMP, and BioMax.  FAC at 53.

United States District Court
Northern District of California

United States District Court
Northern District of California

Second, addressing their roles with CMP and potential alter ego liability, Rhomberg and Newman again rely on my November 2018 Order rejecting the sufficiency of alter ego liability for NAF's breach of contract claim alleged against Newman.

In plaintiffs' reply in support of their motion for summary judgment on trespass, plaintiffs do not address alter ego liability as to Rhomberg or Newman and say only that they agree there are disputes of material facts over the connections between Rhomberg and Newman and the "trespassers."[73]  However, their mere assertion that Rhomberg and Newman can be directly liable for the trespass claim based on an alter ego theory of liability through their roles at CMP has not been supported by caselaw or facts.  On this record, and in light of plaintiffs' failure to plead Rhomberg's and Newman's liability on these claims in the FAC, I hold that this claim cannot be directly pursued against Romberg and Newman individually.[74]

In sum, plaintiffs' request for partial summary judgment for liability with respect to BioMax, Daleiden, and Lopez for trespass into PPFA's conferences is GRANTED.  The only issues for trial are whether CMP is directly liable and the amount of actual damages.

Plaintiffs' request for partial summary judgment against BioMax, Daleiden, and Merritt for the trespasses to PPGC/PPCFC and PPRM is GRANTED.  The only issues for trial are whether CMP is directly liable and actual damages.  Whether PPRM is entitled to injunctive relief for this claim will be determined post-trial.

Defendants' motions for summary judgment on the trespass claim are DENIED, except that partial summary judgment is GRANTED with respect to Merritt and trespass at the PPFA conferences and as to Lopez with respect to direct liability for the PPCG/PPCFC and PPRM trespasses.  I also hold that Rhomberg and Newman are not directly liable for trespass.

---

[73] Plaintiffs do not address alter ego liability in their opposition to defendants' motions for summary judgment.  Plaintiffs do, however, discuss Rhomberg and Newman's acts in furtherance of the "conspiracy" relevant to the RICO claim (First Count) and the Conspiracy claim (Third Count).

[74] As discussed below under the Conspiracy count, Rhomberg and Newman may be held indirectly liable if plaintiffs prove at trial their knowledge of, agreement to, or support of the fraudulent conduct that enabled the trespasses and other tortious conduct.

### E.   Fraudulent Misrepresentation (Count 8)

This claim is based primarily on defendants' representations to the various plaintiffs of their identities (which were indisputably false)[75] and of who and what BioMax did and could do (which likewise were indisputably false).[76]   Defendants move for summary judgment with respect to plaintiffs PPFA, PPRM, PPGC/PPCFC, and PPPSGV's fraud claims under the laws of the five relevant jurisdictions: Florida and DC (PPFA conferences), Colorado and Texas (facility intrusions), and California (meetings with Nucatola and Gatter).   Plaintiffs also move for partial summary judgment on liability, leaving only the issue of damages from the fraudulent misrepresentations for trial.

#### 1.   PPPSGV

As an initial matter, defendants point out that PPPSGV was not identified as a plaintiff asserting the fraud claim in the FAC with respect to defendants' representations to Gatter and Felczer during their lunch meeting, and therefore, summary judgment must be entered for defendants as to PPPSGV and the lunch meeting.   While it is true that PPPSGV was not identified as a plaintiff in the FAC for this claim, plaintiffs have consistently identified PPPSGV as the entity asserting this claim.   Because at "the summary judgment stage, Defendants had ample notice of [this claim], and the issue did not require further discovery," amendment should be allowed.   *Desertrain v. City of Los Angeles*, 754 F.3d 1147, 1155 (9th Cir. 2014).   There is no evidence of bad faith, undue delay, or prejudice to defendants from this claim.   *Id.* at 1154 (noting

---

[75] It is undisputed that Lopez used his real identification and did not make misrepresentations as to his identity.   But, it is also undisputed that Lopez introduced and referred to Daleiden as Sarkis to plaintiffs' staff at the conferences and discussed and touted the services of BioMax, which were false.   Lopez Decl. ¶¶ 8-9.

[76] Categorized generally, the challenged false statements and omissions presumably include: (1) Daleiden, Merritt, and Baxter's statements to plaintiffs' staff when they registered as or pretended to be Sarkis, Tennenbaum, and Lopez of BioMax and their statements about their roles at BioMax; (2) Daleiden, Lopez, and Merritt's representations to plaintiffs' staff at the conferences, facilities, and lunches that BioMax wanted to obtain tissue to provide to researchers, when that intention or ability did not exist; (3) Daleiden, Merritt, and Lopez handed out business cards and other materials on behalf of the "front" company BioMax; (4) the defendants concealed the purpose for attending the conferences, facilities, and lunch meetings, which was to record and publish videos of plaintiffs' staff; (5) defendants concealed recording devices and failed to disclose they were recording conversations with plaintiffs' staff; and (6) defendants filed documents with the California Secretary of State to create BioMax misrepresenting that the purpose of the LLC was to engage in "any lawful activity," and listing Tennenbaum as the manager.

United States District Court
Northern District of California

United States District Court
Northern District of California

leave to amend should be allowed where there is no evidence of bad faith, undue delay, or prejudice).  Given the lack of prejudice flowing from plaintiffs' mistake and because defendants have had ample opportunity to seek discovery from PPPSGV and Gatter, this claim remains in this case.[77]

2.      **Elements of Fraudulent Misrepresentation and Framing of this Claim**

Plaintiffs, but not defendants, move for summary judgment on the elements of their fraudulent misrepresentation claim.  The parties do not dispute the basic elements of the fraud claim under the various jurisdictions' laws.[78]  Defendants, however, draw distinctions between affirmative fraudulent misrepresentations (about BioMax and employee status) and fraudulent omissions and concealment (failing to disclose surreptitious recording and true purpose).  Under fraudulent concealment, there must generally be a fiduciary or contractual relationship between the parties that imposes the duty to disclose on defendants.  *See, e.g., Deteresa v. Am. Broad. Companies, Inc*., 121 F.3d 460, 467 (9th Cir. 1997) (discussing fraudulent concealment claims under California law).  In their motion for summary judgment, plaintiffs do not address specifically the requirements of a fraudulent concealment claim, *but do* identify "concealments" they claim support Court 8 and presumably support their motion for summary judgment.  Pls. MSJ at 19:18-23.  However, given plaintiffs' failure to address the legal requirements for fraudulent concealment in their motion, summary judgment is not appropriate on Count 8 in this respect.

Second, and even more problematic for plaintiffs' motion for summary judgment on the affirmative misrepresentations, is that plaintiffs have not adequately framed the actionable misrepresentations they seek judgment on.  They have not provided me with a concise list identifying the specific *actionable* affirmative misrepresentations as to each plaintiff.  Instead, they generally assert that unspecified defendants made actionable misrepresentations about BioMax in the PPFA EAs and *perhaps* other application materials submitted to PPFA prior to the

---

[77] To the extent there is a dispute over whether PPFA can assert a fraud claim based on the misrepresentations made to secure the lunch meeting with Nucatola, *see* CMP Mot. at 3, CMP Oppo. at 9, that claim is fairly encompassed in the FAC and is actionable.

[78] Daleiden points to some minor distinctions between the jurisdictions, but those distinctions do not matter for purposes of these motions.  Daleiden Oppo. at 16-17.

conferences.  They generally assert that defendants (Daleiden, Merritt, Lopez) made misrepresentations when showing up at the conferences and facilities and presented false identification to unidentified staff.  They generally assert defendants (Daleiden, Merritt, Lopez) made oral misrepresentations to various unidentified staff about BioMax.  They generally assert defendants (Daleiden, Merritt, Lopez) made oral misrepresentations to various unidentified staff about their identities and roles at BioMax.[79]  This broad-brush approach is wholly insufficient to support the "judgment" plaintiffs seek.

In opposition, defendants make similarly broad responses on the elements of falsity, materiality, and reliance.  Looking to those broad defenses, some are specious.  For example, Daleiden's assertion that because BioMax might have attempted to secure and sell fetal tissue (as it had represented to some of plaintiffs' staff that BioMax *had*) cannot defeat falsity.  Daleiden Oppo. at 18-21.  Similarly, Daleiden's contention that use of the Sarkis name (and presumably the use of the fake ID bearing that name) was his "common law" practice and right (relying on wholly inapposite "doing business as" cases), is not a defense to falsity as a matter of law.  But because I have not been presented with a manageable way to rule on each actionable statement as to each of the elements in play, I will not further consider plaintiffs' motion on this claim or defendants' oppositions.

Plaintiffs have failed to identify in their motion **but will be required to do so for the jury** the specific written or oral statements they believe are actionable misrepresentations, why each was false, why each was material, who reasonably relied on each, and what recoverable damage was caused from one or more misrepresentations to specific plaintiffs.  Plaintiffs' motion for summary judgment on fraudulent misrepresentation is DENIED.

### 3.   *Wasden*

Defendants argue that any fraudulent conduct they engaged in – with respect to use of the false identities and portraying BioMax as a real company when it was undisputable fake – is

---

[79] In Reply, plaintiffs identify with more specificity *some* of the actionable statements. Pls. MSJ Reply at 29-30.  But then they go on to say "[t]hese statements—and everything else they told Plaintiffs about BioMax—were indisputably false" and "Plaintiffs therefore have proven that Defendants' representations about Lopez were false."  *Id*. at 30, 31.

protected conduct as a matter of law under the Ninth Circuit's recent decision in *Animal Leg. Def. Fund v. Wasden*, 878 F.3d 1184 (9th Cir. 2018). I disagree. In *Wasden*, the Ninth Circuit did not immunize misrepresentations made to aid undercover journalism (assuming that is what defendants were engaged in for the HCP). *Wasden*, instead, applied strict scrutiny to invalidate as overbroad a statute that criminalized entry into an agricultural production facility for "misrepresentation." *Id*. at 1194; *see also id*. at 1195 ("The hazard of this subsection is that it criminalizes innocent behavior, that the overbreadth of this subsection's coverage is staggering, and that the purpose of the statute was, in large part, targeted at speech and investigative journalists."). *Wasden* did not impact laws of general applicability, like common law fraudulent misrepresentation. *Id*. at 1190 ("However, the First Amendment right to gather news within legal bounds does not exempt journalists from laws of general applicability.").

The *Wasden* court was also careful to distinguish regulation of misrepresentations that are done for personal gain or cause cognizable harm. *Id*. at 1195, 1199. Plaintiffs have pointed to disputed evidence that defendants' goals here were not "legitimate journalism," but instead to create "public outrage" to assist defendants' fundraising and ultimate goal to put plaintiffs out of business. *See supra*. I cannot resolve those issues on these motions but note that plaintiffs' assertions are fervently denied by defendants.

### 4. Damages

Defendants also argue plaintiffs' failure to show that they suffered any consequential damages proximately caused by defendants' specific misrepresentations that are not barred publication damages is fatal to their fraud claim. *See e.g., Orcilla v. Big Sur, Inc.*, 244 Cal. App. 4th 982, 1008 (Cal. App. 6th Dist. 2016), *as modified* (Mar. 11, 2016) ("Misrepresentation, even maliciously committed, does not support a cause of action unless the plaintiff suffered consequential damages." (internal quotation omitted)); *see also Kurinij v. Hanna & Morton*, 55 Cal. App. 4th 853, 866 (Cal. App. 2d Dist. 1997) (*rejecting* argument that nominal damages award could not sustain jury verdict because "without actual damages, there is no fraud," where the nominal award represented jury's determination of fact of actual damage).

However, after removing the damages that I have found are not recoverable (*see supra*),[80] the potentially recoverable damages are on their face like those allowed in *Comm. On Children's TV, Inc. v. Gen. Foods Corp*., 35 Cal. 3d 197, 220 (1983).[81]  Plaintiffs have evidence that they expended funds directly as a result of the frauds to investigate them, remedy them, and protect against their repetition in the future with respect to access to their conferences and facilities.  *See, e.g., Blackburn v. Sturgeon Services Intern., In*c., 1:13-CV-00054-JLT, 2014 WL 1275919, at *8 (E.D. Cal. Mar. 27, 2014) (citing California law that allows for recovery of tort damages where "those acts causing the damage were the necessary or legal and natural consequence of the wrongful act.").  Plaintiff also, upon learning of the deception, paid for personal security expenses for some of their employees who were targeted by defendants for recording.  Those expenses – at least on this record – are tied *directly* to defendants' conduct and plaintiffs' reactions to discovering it.  That some of those staff members who were targeted by defendants' conduct may have *also* received threats from third parties in response to the videos and those threats were part of the motivation for paying for additional personal security measures does not break the causal chain for purposes of this motion.  On this record, the access-security measures and personal security measures that I have outlined above are pecuniary damages that flow directly from

---

[80] Defendants also argue that under Florida, District of Columbia, and California common law harm caused by CMP's truthful publication of PPFA's wrongdoing cannot be attached to the fraud claim because any damage was caused by defendants' gathering information they intended to publish.  But the cases defendants rely on do not stand for that broad of a proposition.  Instead, in *Pitts Sales, Inc. v. King World Prods., Inc*., 383 F. Supp. 2d 1354, 1364 (S.D. Fla. 2005), there was no evidence that particular misrepresentations caused the particular damages plaintiff sought (the administrative costs associated with hiring the reporters and the wages paid to the reporters).  In *Steele v. Isikoff*, 130 F. Supp. 2d 23, 35 & n.10 (D.D.C. 2000) under District of Columbia common-law, there were no allegations of proximately caused damages in that media-fraud case because plaintiffs' own lie caused the damages she claimed.  Similarly, in *Frome v. Renner*, No. 97 CIV 5641, 1997 WL 33308718, at *2 (C.D. Cal. Oct. 1, 1997), the plaintiff failed to show how the reporter's misrepresentation affected the doctor-patient relationship, because the doctor treated the reporter just like any patient.

[81] In that case, the court rejected the claims of organizations like the California Society of Dentistry for Children who "spent funds to counter the influence of defendants' [fraudulent] advertising" because those "organizational expenditures were voluntary in character and not the result of any legally cognizable injury to the organization" itself, but allowed the claims brought by the targets of the fraud, the parents and children who purchased sugary cereals.  *Id*. at 220.  Here, of course, there is ample evidence that plaintiffs were both the target of the frauds and the ones who spent money to investigate and rectify the consequences of the frauds.

United States District Court
Northern District of California

defendants' own actions, and not the intervening actions of third parties.

Defendants' repeated claims that plaintiffs' security improvement expenses were "merely voluntary" or were required because of previously identified or well-known weaknesses in plaintiffs' access-security measures at their conferences or facilities, or based on unreasonable fears of future intrusions, are defenses to the amount of damages to be argued to the jury. These arguments do not entitle defendants to summary judgment on fraud damages. *See, e.g., City Sols., Inc. v. Clear Channel Commun.*, 365 F.3d 835, 840 (9th Cir. 2004) (noting the causal relationship between fraudulent misrepresentations and damages is an issue "properly left to a jury").[82]

### 5. **CMP, Rhomberg, and Newman**

CMP separately argues that it cannot be liable because it, as an entity, did not make any affirmative misrepresentations. Similarly, Rhomberg and Newman argue that this claim fails as to them individually because they did not make any identified false misrepresentations on which plaintiffs relied.

CMP's liability for purposes of this claim is based, first, under civil conspiracy, which has been adequately supported by disputed evidence. Second, there is ample evidence that the purpose of CMP was to assist (and indeed pay for) BioMax, Daleiden, Merritt, and Lopez's fraudulent activities committed in order to gain access to plaintiffs' conferences, facilities, and staff. The fraud claim against CMP is based in large part on *its own* conduct and affirmative acts. Rhomberg and Newman's indirect liability for fraudulent misrepresentation is based on the civil conspiracy theory, which as discussed below has been adequately supported by disputed evidence.

### 6. **Merritt**

Merritt argues that the fraud claim against her should be dismissed because it is undisputed that she was not involved in and did not participate in the editing and publication of the CMP

---

[82] The fraud claim was reversed on appeal after trial in the *Food Lion* case because the plaintiff could not show that their "administrative costs were an injury caused by reasonable reliance on the misrepresentations" of the journalists. *Food Lion, Inc. v. Capital Cities/ABC, Inc.*, 194 F.3d 505, 513 (4th Cir. 1999); *but see Pitts Sales, Inc. v. King World Productions, Inc.*, 383 F. Supp. 2d 1354, 1364 (S.D. Fla. 2005) (concluding based on facts not in dispute that plaintiff had not reasonably relied on misrepresentations "to its injury" of alleged costs of hiring journalists as employees "as required to prove a claim for fraud under Florida law").

United States District Court
Northern District of California

videos.  Merritt MSJ at 17-18.  However, she was directly involved in numerous acts of fraud: she presented false identification, purported to be someone she was not, and purported to represent a real company when it was fake.  That Merritt claims she was merely a contract employee of CMP, hired for her acting skills, and played no role in the editing or release of the HCP videos, are not defenses to the fraud claims based on her own conduct.

### F.    Illegal Recording Claims

Defendants move for summary judgment on each of the recording claims.

#### 1.    Federal (Count 2)

Plaintiffs allege that defendants Daleiden, Merritt, Lopez, CMP, and BioMax violated 18 U.S.C. § 2511, the federal Wiretap Act, by intercepting plaintiffs' and their staffs' communications without their consent in order to further their RICO conspiracy and to invade the privacy of plaintiffs' staff. 18 U.S.C. § 2511(1), (2)(d); FAC ¶¶ 164-165, 169(a)(b). Section 2511 applies to anyone who "intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication." 18 U.S.C. § 2511(1)(a).  In determining whether communications are "uttered under circumstances justifying an expectation of privacy," courts consider the factors identified by the Supreme Court in *Katz v. United States*, 389 U.S. 347 (1967), specifically: "whether the communications  . . . "were uttered by a person (1) who has a subjective expectation of privacy, and (2) whose expectation was objectively reasonable."  *U.S. v. McIntyre*, 582 F.2d 1221, 1223 (9th Cir. 1978).

#### a.    Purpose of Committing a Crime or Tort

Because defendants were participants in the recorded conversations, the recordings can violate the Act only if they were intercepted for the purpose of committing criminal or tortious acts.  18 U.S.C. § 2511(2)(d); *see Sussman v. American Broadcasting Cos*., 186 F.3d 1200, 1202 (9th Cir.1999) ("the focus is not upon whether the interception itself violated another law; it is upon whether the purpose for the interception – its intended use – was criminal or tortious." (internal quotations and citation omitted)); *see also id*. 1202–03 ("Where the taping is legal, but is done for the purpose of facilitating some further impropriety, such as blackmail, section 2511 applies. Where the purpose is not illegal or tortious, but the means are, the victims must seek

redress elsewhere."). Significantly, an illegal purpose does not have to be the sole purpose of the recording. *See Med. Laboratory Mgt. Consultants v. Am. Broad. Companies, Inc*., CIV-95-2494-PHX-ROS, 1997 WL 405908, at *5 (D. Ariz. Mar. 27, 1997) (the "statute does not provide that secretly recording a conversation would not be illegal if it were motivated simultaneously by a legitimate objective *and* a criminal purpose." (emphasis in original)). The purpose or purposes of the recordings are generally questions for the jury. *Brown v. Am. Broad. Co., Inc*., 704 F.2d 1296, 1305 (4th Cir. 1983) (the "purpose in taping and broadcasting the meeting of November 2 clearly presents a factual issue for the jury.").

Defendants, through Lopez, argue that because there was no illegal purpose in the recording – *e.g*., no purpose to further violate RICO or further invade anyone's privacy – there can be no liability under the federal statute. As discussed above, the RICO claim against defendants survives and the elements of pattern and damages will go to trial.

As to invasion of privacy, defendants argue that the only further potential invasion that could be alleged by plaintiffs as having been intended by defendants is tortious publication of the recordings.[83] There is no evidence, for example, that the recordings were intended to be used to secure additional records. The only tort that followed the recordings is, theoretically, the publishing of those recordings as part of the Project. Defendants claim that plaintiffs cannot satisfy the elements of that tort because there is no evidence that defendants when making the recordings intended or had the purpose of publishing "private facts," which they claim they did not. Defendants also point out that the facts disclosed by the recordings must be truly private. So, for example, the publication that someone was gay, a fact that was known by hundreds in his community given his activities, was not disclosure of "private facts." *Sipple,* 154 Cal. App. 3d at 1048 (Cal. App. 1st Dist. 1984) ("since appellant's sexual orientation was already in public

---

[83] The elements of the tortious disclosure of private facts or tortious publication are: (1) the disclosure of the private facts must be a public disclosure; (2) the facts disclosed must be private facts, and not public ones; (3) the matter made public must be one which would be offensive and objectionable to a reasonable person of ordinary sensibilities; and (4) "due to the supreme mandate of the constitutional protection of freedom of the press even a tortious invasion of one's privacy is exempt from liability if the publication of private facts is truthful and newsworthy." *Sipple v. Chron. Publg. Co*., 154 Cal. App. 3d 1040, 1045–46 (Cal. App. 1st Dist. 1984).

78

United States District Court
Northern District of California

domain and since the articles in question did no more than to give further publicity to matters which appellant left open to the eye of the public, a vital element of the tort was missing rendering it vulnerable to summary disposal."); *see also Vo v. City of Garden Grove*, 115 Cal. App. 4th 425, 448 (Cal. App. 4th Dist. 2004) (publication of a person's physical factures are not confidential).

Defendants argue that none of the recordings during the conferences could have disclosed "private" facts because they were disclosed at the conferences to other conference attendees and covered information "well known to others in the industry." Lopez MSJ at 16. However, they paint with too broad a brush. Defendants' insistence – without any citations to the videos themselves – that no private facts sufficient to sustain a tortious disclosure claim were in fact broadcast is contrary to the record.

Defendants' other arguments against any finding that defendants' intended to commit a tortious disclosure are also unpersuasive. They argue that because defendants' intent was to disclose illegal conduct, the surreptitious recordings were "legal means" that preclude application of the statute. The cases they rely on, again, do not support that broad of an argument. *See, e.g., Moore v. Telfon Commun. Corp*., 589 F.2d 959, 966 (9th Cir. 1978) ("Congress did not intend to prohibit recording a conversation when its purpose was to preserve evidence of extortion directed against the recorder to be used later for the purpose of terminating a franchise agreement.").

Finally, defendants argue that the disclosures here must be considered newsworthy as a matter of law because of the press, investigations, and prosecutions that stemmed from the HCP disclosures. That defense may preclude liability as to some of the recordings, but contrary to defendants' broad assertions of the "newsworthiness" of the HCP *as a whole*, defendants do not cite *any specific recordings of plaintiffs* to show that those specific recordings were newsworthy for the reasons defendants assert. That *some* subset of the videos recorded and published of plaintiffs' staff might have contained newsworthy content does not immunize the recording and publication of all of the videos.

Of course, the actual intent of defendants is hotly disputed. Plaintiffs are allowed to elicit testimony to attempt to prove that defendants' intent *at the time of the recording* was not to disclose truthful, newsworthy facts about these plaintiffs but to misinform and distort the activities

79

United States District Court
Northern District of California

of these plaintiffs as part of a "smear" campaign.  Defendants strenuously disagree with that characterization. That highlights the material questions of fact that preclude determining newsworthiness as matter of law at this juncture.  In the end, whether defendants had an illegal purpose in mind when making the recordings – as their sole purpose or as a purpose in addition to a legitimate purpose – will be determined by the jury.  *See, e.g., Boddie v. Am. Broad. Companies, Inc.*, 731 F.2d 333, 338 (6th Cir. 1984) (disputes as to defendants' intent under wiretapping statute to be decided by the jury).

> **b.**     **Circumstances or Exhibition of Expectation of Privacy**

Defendants also argue that there was no "exhibition" of an expectation of privacy by those taped, so the federal claim fails.  They contend that the federal statute requires the speakers to "visibly or audibly" communicate that their particular conversation was confidential or off the record.  Lopez MSJ at 17.  I disagree that there has to be some kind of verbal or physical "exhibition" of an expectation of privacy announced by each person being recorded under the federal (or the Florida) statutes.[84]  In support of this argument, defendants cite no federal cases adopting or discussing the affirmative "exhibition" test under Section 2511.[85]  Instead, looking to the circumstances surrounding *each* recording, the question is whether the person being recorded had a subjective expectation of privacy and whether that expectation was reasonable under the

---

[84] In the declarations, filed in support of their motions for summary judgment, both Lopez and Daleiden assert that during their taping they never heard or saw any "verbal" or "physical" signs showing any participants "expectation of privacy."  Declaration of Gerardo Adrian Lopez (Dkt. No. 603-1) ¶ 16; Daleiden MSJ Decl. ¶¶ 53-54.

[85] The case interpreting Florida law that Daleiden cites in support, *McDonough v. Fernandez-Rundle*, 862 F.3d 1314, 1319 (11th Cir. 2017), explained that the Florida statute requires "that the expectations of privacy needed to trigger application of the statute must be exhibited; in other words they must be 'shown externally' or 'demonstrated.'"  In *McDonough*, the claim failed with respect to plaintiff's video recording a police chief during a meeting the chief himself called, noting that "Chief Rolle set no ground rules for the meeting he elected to call. At no point did anyone from the HPD suggest that the meeting was confidential or 'off the record.' Nor was there advance notice or published or displayed rules that established confidentiality and certainly none that prohibited note taking or recordings. It is therefore clear to us that because Chief Rolle failed to 'exhibit' the expectation of privacy that is required by the statute, the government is not entitled to invoke it and McDonough did not violate it."  *Id*. at 1319.  Rather than announcing some new test for expectation of privacy, the court was conducting the typical contextual analysis of the evidence, looking at the circumstances of the recording.  One would reasonably expect that a meeting with a public official would not be confidential, absent any statement to the contrary.

80

circumstances.  *U.S. v. McIntyre*, 582 F.2d 1221, 1223 (9th Cir. 1978).

There is testimony from those recorded that they expected their conversations at the conferences and meetings to be private for a variety of reasons, including the confidentiality agreements governing the conferences and meetings and their experiences in the industry.  *See* Pls. Oppo. MSJ 67-68 (citing deposition testimony).  At trial, defendants can challenge those assertions through evidence, for example, that certain conversations were so loud they could have been overhead by others in publicly accessible spaces (restaurants, lobbies, etc.).  That some of plaintiffs' witnesses admitted in deposition that there was a "chance" hidden cameras could be snuck into the conferences or that a Planned Parenthood employee might "turn against the organization" does not defeat the reasonable expectation of privacy as a matter of law.

### c.      Subjective and Objective Expectations of Privacy

Defendants argue that plaintiffs have failed to show sufficient evidence of the subjective privacy expectations of the employees recorded in any of the 147 segments of video plaintiffs assert are actionable.  Defendants claim that plaintiffs approached only a few of the recorded employees to inquire about their subjective beliefs – Doe1005, Deborah VanDerhei, and Cecile Richards.

However, plaintiffs submit evidence of the steps they took to restrict access to their conferences that could create a subjective expectation of privacy in conversations between participants.[86]  They identify testimony from some of their staff on subjective expectations about the security of their conversations with vetted attendees at the conferences.  *See* Deposition of Deborah VanDerhei at 125-126, 346 (Mayo MSJ Oppo. Decl., Ex. 56); Deposition of Mary Gatter at 282-284 (Mayo MSJ Oppo. Decl., Ex. 53).[87]  They also point to testimony regarding steps NAF took to restrict access to their conferences,[88] and the subjective beliefs of participants that NAF

---

[86] *See* Pls. Oppo. MSJ 67, citing evidence regarding PPFA security measures.  Defendants challenge the efficacy of those measures and whether they were always implemented.  But those disputes simply raise material issues of fact.

[87] Defendants object to 284:13-22 of the Gatter deposition as an impermissible legal conclusion or opinion.  The objections are OVERRULED.

[88] *See* Pls. Oppo. MSJ 68, citing evidence regarding NAF security measures.

created "a safe space to talk to colleagues."  Deposition of Tram Nguyen at 129-132, 424-26 (Mayo MSJ Oppo. Decl., Ex. 60);[89] Deposition of Deborah Nucatola at 428-430 (Mayo MSJ Oppo. Decl., Ex. 49).[90]  That evidence is enough to create disputes of material fact as to subjective beliefs on expectations of privacy at the PPFA and NAF conferences.

On whether those expectations of privacy were reasonable, defendants break their challenges down into three sets of locations.  Defendants first question the reasonable expectations for conversations recorded at restaurants (the California lunch meetings) and in the lobby or bar of hotels (the Florida conferences).  As to these "public space" recordings, defendants argue that there can be no objective expectation of privacy as a matter of law.  But the cases they rely on consider contextual facts in addition to the fact that the recorded conversation was in a public and open space.  *See, e.g., Wentz v. Project Veritas*, 617CV1164ORL18GJK, 2019 WL 1716024, at *5 (M.D. Fla. Apr. 16, 2019 (noting a third party "was present during the entirety of the conversation. Unsurprisingly, background noise can be heard throughout the conversation."); *U.S. v. Gonzalez*, CRIM 07-748 (FSH), 2008 WL 4837468, at *2 (D.N.J. Oct. 31, 2008) (facts that a third party was present and the conversation conducted on a cell phone, added to conclusion that there was no "reasonable expectation of privacy under the circumstances"); *see also U.S. v. Giraudo*, CR 14-534 CRB, 2016 WL 4073243, at *8-9 (N.D. Cal. Aug. 1, 2016), *order clarified*, 225 F. Supp. 3d 1078 (N.D. Cal. 2016) (noting under a Fourth Amendment analysis courts have found a "reasonable expectation of privacy in a hushed conversation on the courthouse steps" and rejecting argument presented without supporting expert testimony that "bystanders" could have "overheard the sensitive conversations").[91]

---

[89] Defendants object to 424:25-425:15,425:22-426:9, and 426:13-23 as "leading," vague and ambiguous, irrelevant, and based on an incomplete hypothetical.  The objections are OVERRULED.

[90] Defendants object to these portions of Nucatola's deposition as irrelevant, lacking personal knowledge, calling for speculation, and "leading."  Those objections are OVERRULED.

[91] Defendants' cases involving arrests in "public places" based on probable cause are wholly inapposite.  *See, e.g., U.S. v. Watson,* 423 U.S. 411, 423 (1976); *Smith v. Bd. of County Com'rs for County of Otero, N.M.*, 316 Fed. Appx. 786, 788 (10th Cir. 2009) (unpublished).

1    So too here.  The context of each recording must be analyzed based on its specific facts.

2    *Per se* summary judgment as a matter of law is inappropriate.  *Cf. Safari Club Intl. v. Rudolph*,

3    862 F.3d 1113, 1124 (9th Cir. 2017) (rejecting argument that "there can be no objectively

4    reasonable expectation of confidentiality because the conversation occurred in a place that was

5    open to the public.  That contention is at odds with California authority viewing privacy as

6    relative.").[92]

7    Second, defendants urge more directly with respect to recordings at the conferences that

8    the only comparable cases are ones discussing an employee's expectation of privacy in common

9    areas of his workplace.  They contend that those cases hold that employees have objective

10   expectations of privacy only in personal offices, lockers, or filing cabinets set aside for their

11   personal use and no expectation in shared areas.  In the conference context, defendants assert that

12   translates into privacy only in hotel rooms or other rooms where "individual participants in a

13   conversation had taken steps to exclude non-participants from overhearing."  Lopez MSJ at 20.

14   Again, even in the context of the employee-recording cases the particular facts and the

15   context of the recordings matter.  *See, e.g., Gray v. Royal*, 181 F. Supp. 3d 1238, 1253 (S.D. Ga.

16   2016) (finding no reasonable expectation of privacy where employee recorded speech occurred on

17   office telephones and could be overheard by others, speech concerned office affairs, plaintiffs'

18   speech was not phrased in way showing "that they were communicating confidential matters,"

19   plaintiffs worked office doors open, spoke at normal volume, and plaintiffs took no other steps to

20   shield the contents of their communications); *see also Tancredi v. Malfitano*, 567 F. Supp. 2d 506,

21   510 (S.D.N.Y. 2008) ("Whether a public employee has a reasonable expectation of privacy

22   depends on the context of the employment relationship and must be determined on a 'case-by-case

23

24   [92]  The subjects of the lunch meetings, Gatter and Nucatola, testified that their expectation of
privacy in the restaurant conversations was based on their seating locations (in booths or far from

25   other customers) and their conduct (refraining from discussing sensitive information when
waitstaff were near).  *See* Pls. Oppo. MSJ at 76-77.  For the conversations recorded in the hotel

26   bar, plaintiffs submit that  only one other group was in the bar that group was not close, and that
group could not overhear the recorded conversations.  *See* Recordings # 22-23, 32-33.  PPFA's

27   witness also testified the music playing in the bar, and other noise added to the expectation of
privacy in the bar conversation.  Minow Depo. 211-12.  Defendants object to this portion of

28   Minow's testimony as speculative, lack of personal knowledge, and opinion.  The objections are
OVERRULED.

basis.'").[93]

Here, the context is that PPFA and NAF restricted the right of access to their conferences to people working in the field or who provide helpful products to those working in the field, NAF additionally imposed NDAs on conference attendees, and participants relied on those measures to provide them some security and confidence that they could share information with others in their field when discussing topics that were confidential or sensitive in nature. Some of those conversations may have taken place in particular circumstances that negated the reasonable expectation of privacy as to those specific conversations. But defendants are not entitled to a finding that none of the conference participants had a reasonable expectation of privacy in any of their conversations that were recorded by defendants as a matter of law.[94]

Moreover, employees can have reasonable expectations of privacy in their office spaces, in particular closed spaces like personal offices and conference rooms, and reasonable expectations that they would not be surveilled in their office spaces.[95] Similarly, conference participants may have a reasonable expectation of privacy in conversations held in the restricted-areas of the conferences as well as a reasonable expectation that they would not be surveilled or recorded during those conferences.

---

[93] The Fourth Amendment search cases relied on by defendants are not particularly helpful, as "courts have found that an action for violation of the anti-wiretap statute may be maintained even in the absence of an expectation of privacy as generally understood in the Fourth Amendment search and seizure context." *Walker v. Darby*, 911 F.2d 1573, 1578 (11th Cir. 1990). These cases, however, highlight that a fact-bound analysis determines the scope of any Fourth Amendment right. *See, e.g.*, *People v. Thompson*, 205 Cal. App. 3d 1503, 1509 (Cal. App. 5th Dist. 1988) ("The floor underneath the three-inch lip of a counter is not normally used to store personal belongings, records, receipts or anything else."); *Martinez v. State*, 880 S.W.2d 72, 77 (Tex. App. 1994) (noting the record "does not indicate that Martinez had any financial, proprietary, possessory, or other interest in the automobile dealership. Indeed, the evidence shows that he was only one of several employees there and had no ownership interest in the business or the shed where the cocaine was seized."); *Faulkner v. State*, 317 Md. 441, 448 (1989) ("[u]nder all of these circumstances, including particularly Faulkners disclaimer of any expectation of privacy in the second locker" and acknowledged right of management to search lockers, no reasonable expectation of privacy).

[94] At the hearing, plaintiffs noted that they are not asserting claims based on recordings made at the Association of Reproductive Healthcare Providers ("ARHP") meeting in Denver in 2013.

[95] *Cf. U.S. v. Taketa*, 923 F.2d 665, 676 (9th Cir. 1991 (Under Fourth Amendment analysis, defendants "has no general privacy interest in O'Brien's office, but he may have an expectation of privacy against being videotaped in it.").

Third, defendants discuss the recordings taken at the PPRM and PPGC/PPCFC offices. They argue that "information shared with" defendants was the sort of information that plaintiffs might have shared coworkers or potential business partners and that type of information "cannot be private." They cite only cases arising in the inapposite context of governmental informers. Those cases hold that there is no Fourth Amendment violation (and no reasonable expectation of privacy) when a criminal defendant voluntarily shares information with an informant or when someone under government investigation voluntarily shares information with the government. *Fazaga v. Fed. Bureau of Investigation*, 916 F.3d 1202, 1220 (9th Cir. 2019) ("use of a government informant under the invited informer doctrine—even if not in good faith in the First Amendment sense—does not implicate the privacy interests protected by the Fourth Amendment."); *Stewart v. Evans*, 351 F.3d 1239, 1244 (D.C. Cir. 2003) (no Fourth Amendment violation). Those cases are wholly inapposite to the facts here.[96]

The record shows that the staff of PPRM and PPCG/PPCFC intended their conversations to be private and had no expectations that those conversations would be recorded. The evidence regarding the steps Daleiden and Merritt had to take to set up those meetings and gain entry both into PPRM and PPGC/PPCFC, including showing ID, being personally escorted into the secure-parts of the facilities, and the signing of the PPGC NDA, all indicate circumstances of a reasonable expectation of privacy of those that were recorded. Defendants' motion for summary judgment on the federal claim is DENIED.

### 2. **Florida (Count 11)**

Unlike the federal statute, under Florida law there is no element of subsequent use or disclosure or purpose to commit a criminal or tortious act. But, as with the federal claim, Lopez argues that the Eleventh Circuit in *McDonough v. Fernandez-Rundle*, 862 F.3d 1314, 1319 (11th Cir. 2017) recognized a separate requirement that those taped must "show externally" and "demonstrate" their expectation that they would not be recorded under Florida law. I have

---

[96] *See Walker v. Darby*, 911 F.2d 1573, 1578–79 (11th Cir. 1990) (noting that "courts have found that an action for violation of the anti-wiretap statute may be maintained even in the absence of an expectation of privacy as generally understood in the Fourth Amendment search and seizure context").

United States District Court
Northern District of California

United States District Court
Northern District of California

rejected that argument.  The Eleventh Circuit in *McDonough* simply looked to the facts in that case – including the facts that the conversation at issue was invited by a public official and took place in a public department – in determining that there was no demonstrated expectation of privacy.  Defendants cite no case under Florida law imposing an "affirmative" requirement for anyone (other than perhaps public employees) to visibly or audibly communicate that a particular conversation was confidential or "off the record."  This challenge, as with the federal statute, fails.[97]

Defendants also argue, exhibition or demonstration aside, that there is no evidence of a "reasonable" expectation of privacy of the persons recorded, as required under Florida's law consistent with the *Katz* factors.  *See Katz v. United States*, 389 U.S. 347 (1967).[98]  As above, this challenge rests on disputed questions of material fact, considering the steps PPFA took to restrict access to its conferences and the participants' experiences that their conversations were sensitive, private, and would not be recorded.  That the conversations took place at a conference, in an exhibit hall, or in a lobby do not by themselves mean the conversations were not subject to a subjective and objectively reasonable expectation of privacy.  All of the facts and the contexts for each recording have to be considered.  *See, e.g., Abdo v. State*, 144 So. 3d 594, 596 (Fla. 2d Dist. App. 2014) (noting that "conversations occurring inside an enclosed area or in a secluded area are more likely to be protected") (internal citation omitted).

The motion for summary judgment on the Florida statute fails, except as to Merritt.  It is undisputed that Merritt never recorded in Florida and, therefore, she cannot be directly liable for

---

[97] Under the Florida law, "oral communication" is defined "any oral communication uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation and does not mean any public oral communication uttered at a public meeting or any electronic communication." Fla. Stat. § 934.02 (2016). Consistent with the federal statute, "what matters under Florida law" is that "if the person whose conversation or voice is being recorded expects that their conversation or voice will not be recorded and the circumstances justify that expectation and society is prepared to accept that expectation as reasonable, a violation of section 934.03 has occurred regardless of whether the recorded words are of a private nature or privileged content." *LaPorte v. State*, 512 So. 2d 984, 986 (Fla. 2d Dist. App. 1987).

[98] Considering whether the communications, "were uttered by a person (1) who has a subjective expectation of privacy, and (2) whose expectation was objectively reasonable." *U.S. v. McIntyre*, 582 F.2d 1221, 1223 (9th Cir. 1978).

1   this claim.

### 3.   Maryland (Count 12)

2

3       This claim is based on recordings defendants made at the 2015 NAF Annual conference in

4   Baltimore, Maryland.  Under the Maryland statute, Maryland Code, § 10–402(a)(1) of the Courts

5   and Judicial Proceedings Article, defendants admit that there is no "exhibiting" concern of privacy

6   requirement that they wrongly contend exists under the Florida and federal statutes, but argue that

7   there is no evidence of a "reasonable" expectation of privacy of the persons recorded as required

8   under Maryland law consistent with the federal *Katz* factors.[99]  For the reasons just described with

9   respect to the federal and Florida statutes, the motion for summary judgment on Maryland law

10  fails.[100]

### 4.   Standing and Dropped Claims

11

12      Defendants argue that there are standing problems for some of the claims.  At the hearing,

13  plaintiffs conceded they were not asserting claims: (1) for recording Taylor on behalf of PPRM;

14  (2) for recording David on behalf of PPFA; (3) for recording staff of PPNorCal, PPMM, or PPLA

15  under Florida law; and (4) for recording staff of PPNorCal, PPPSW, PPRMM, and PPOSBO

16  under Maryland law.

### 5.   California (Counts 9-10)

17

18      The California recording claims are based on recordings defendants made of plaintiffs'

19  staff during the 2014 NAF conference in San Francisco, as well as based on the recordings

20  Daleiden and Merritt made during the two lunch meetings with Gatter/Felczer and Nucatola in

21  Southern California.  The persons who were recorded are alleged to be staff of PPFA, PPNorCal,

22  

23  [99] Section 10–402(a)(1) makes it unlawful for a person "willfully to intercept" a wire, oral, or
    electronic communication, but willfulness does not require "knowledge on the part of the
24  defendant that his or her action is unlawful—that it is prohibited by the statute."  *Deibler v. State*,
    365 Md. 185, 188 (2001); *id*. at 199 (adopting the federal and "moderate conception of the
25  required mental state—purposeful conduct, requiring neither a bad motive nor knowing
    unlawfulness").

26  [100] Merritt brings a separate challenge, arguing that prior to the discovery cutoff, plaintiffs failed to
    identify any video segments that she personally recorded in Baltimore as actionable.  Merritt MSJ
27  at 19-20.  Merritt contends that it was only after the discovery cutoff that plaintiffs identified five
    videos recorded by Merritt.  However, as explained below addressing the motion to strike, the
28  claims based on these recordings remain.

United States District Court
Northern District of California

1    PPCG/PPCFC, and PPPSGV.[101]

2                    a.        Violation of Penal Code section 632 (Count 9)

3            California Penal Code section 632(a) prohibits the use of a recording device "to eavesdrop

4    upon or record the confidential communication, whether the communication is carried on among

5    the parties in the presence of one another."  "Confidential communication" is defined in Section

6    632(c) as "communication carried on in circumstances as may reasonably indicate that any party

7    to the communication desires it to be confined to the parties thereto, but excludes a

8    communication made in a public gathering or in any legislative, judicial, executive, or

9    administrative proceeding open to the public, or in any other circumstance in which the parties to

10   the communication may reasonably expect that the communication may be overheard or

11   recorded."  "[W]hether a communication is confidential is a question of fact normally left to the

12   fact finder." *Safari Club Intl. v. Rudolph*, 862 F.3d 1113, 1126 (9th Cir. 2017).

13           "A section 632 violation is committed the moment a confidential communication is

14   secretly recorded regardless of whether it is subsequently disclosed."  *Lieberman v. KCOP TV,*

15   *Inc.*, 110 Cal. App. 4th 156, 164 (Cal. App. 2d Dist. 2003).  Statutory damages for violation of

16   section 632, therefore, occur upon recording and actual damage evidence is not required.  *Id.* at

17   167.  Actual damages may be awarded, but those "must relate directly to the surreptitious

18   recording," for example from emotional distress or outrage upon discovering the recording, or to

19   recoup legal expenses to recover the recording, but damages incurred from any subsequent

20   broadcast are generally not allowed under the statute.  *Id.*

21           In addition, California Penal Code section 633.5 provides an exception.  It does not

22   "prohibit one party to a confidential communication from recording the communication for the

23   purpose of obtaining evidence reasonably believed to relate to the commission by another party to

24   the communication of the crime of extortion, kidnapping, bribery, any felony involving violence

25   against the person, including, but not limited to, human trafficking . . . or a [domestic violence]

26   violation."  *See, e.g.*, *In re Trever P.*, 14 Cal. App. 5th 486, 488 (Cal. App. 5th Dist. 2017), review

27   _____

28   [101] Plaintiffs admit that they no longer assert claims under California law for secret recordings of
     staff of PPPSW, PPGC/PPCFC, PPRM, PPOSBC, or PPMM.  Pls. Oppo. MSJs at 52 n.35

United States District Court
Northern District of California

1    denied (Nov. 15, 2017) (allowing admission of recording where the "victim's mother reasonably

2    suspected such a crime when she arranged to make the recording.").

3                    **i.        Standing & Reasonable Expectation of Privacy**

4            Daleiden, on behalf of defendants, argues that the California statute is substantively

5    different from the federal, Florida, and Maryland statutes addressed above because the question is

6    not reasonable expectation of privacy in general, but the narrower question of reasonable

7    expectation that the communication would not be "overheard or recorded."  That is generally a

8    question of fact, subject to individualized proof.  *See Hataishi v. First Am. Home Buyers Protec.*

9    *Corp.*, 223 Cal. App. 4th 1454, 1457 (Cal. App. 2d Dist. 2014); *but see Reynolds v. City and*

10   *County of San Francisco*, C 09-0301 RS, 2012 WL 1143830, at *6 (N.D. Cal. Mar. 30, 2012),

11   *aff'd*, 576 Fed. Appx. 698 (9th Cir. 2014) (unpublished) (considering the undisputed

12   circumstances, summary judgment appropriate where "no reasonable trier of fact could conclude

13   that Reynolds retained an expectation of privacy in his conversation with the stalking suspect that

14   was reasonable, from either a subjective or objective perspective.").  That a conversation was

15   recorded in a public place does not mean a claim is barred.  *See Safari Club Intl. v. Rudolph*, 862

16   F.3d 1113, 1126 (9th Cir. 2017) ("privacy is relative and, depending on the circumstances, one can

17   harbor an objectively reasonable expectation of privacy in a public location.").

18           Nonetheless, defendants contend that each of the conversations identified as actionable by

19   plaintiffs *could* have been overheard and therefore no reasonable expectation of privacy exists as

20   to any of them as a matter of law.  They also contend that some of the employees were not

21   speaking on behalf of their employers or about their employer's internal matters during the

22   recordings and, for those, the employer would not have standing.  *See, e.g., Bona Fide*

23   *Conglomerate, Inc. v. SourceAmerica*, 14CV00751-GPC-DHB, 2016 WL 3543699, at *6 (S.D.

24   Cal. June 29, 2016 (finding standing where defendant "was allegedly recording SourceAmerica

25   employees—including its former general counsel and compliance officer—regarding

26   SourceAmerica's internal matters.").

27           PPPSGV Claim/Gatter and Felczer lunch.  Defendants argue that Gatter and Felczer, who

28   were recorded at a restaurant in Southern California, were not "employees" of any of the plaintiffs

United States District Court
Northern District of California

United States District Court
Northern District of California

1    asserting this claim, and, instead, attended the meeting on behalf of plaintiff PPPSGV who is not

2    listed as a plaintiff asserting this claim in the FAC.  Defendants contend, therefore, that PPPSVG

3    cannot assert the Penal Code claim (nor the invasion of privacy claim) on behalf of Gatter or

4    Felczer.  Merritt MSJ at 21-22.

5         Plaintiffs have consistently asserted during discovery and all phases of litigation

6    subsequent to the FAC that they intend to base the California recording claim in significant part on

7    this lunch, and PPPSGV claimed damages from the lunch recordings.  In addition, defendants

8    actually deposed Gatter about the circumstances surrounding the lunch meeting.  They had

9    adequate notice of all facts relevant to this claim.  Even if leave to amend were necessary to

10   correct the failure of plaintiffs to identify PPPSGV as the entity asserting this claim, amendment is

11   granted because of the lack of prejudice to defendants.

12        Defendants next assert that Gatter and Daleiden agree that parts of the lunch meeting

13   conversation could be overhead by wait staff.  Daleiden Decl. [Dkt. No. 609-1], ¶ 22 ("Multiple

14   times, wait staff approached and serviced our table and remained at the table while our

15   conversation continued.  During the course of our conversation, there were other restaurant

16   patrons seated nearby our table. I noted that I could overhear the conversations of restaurant

17   patrons seated around us, and therefore concluded that they could overhear us as well. I attended

18   Dr. Gatter's deposition in this case and I agree with her that the third parties in the restaurant could

19   overhear our conversation.").[102]  They argue that neither Gatter nor Felczer, therefore, had a

20   reasonable expectation that the communication would not be "overheard or recorded" as a matter

21   of law.

22        Plaintiffs respond that Gatter believed the conversations she and Felczer had at that lunch

23   were private and confidential.  The restaurant was "largely empty," the party was seated in a

24   booth, and there was loud music playing.  Those facts would inhibit others from overhearing the

25   conversations.  Gatter Decl. [Dkt. No. 95] ¶ 5.  Gatter also cautioned defendants to be "discrete"

26   when wait staff were near; she did not disclose confidential information when the wait staff could

27

28   [102] Plaintiffs object to paragraph 20-22 as to whether others could overhear as speculative.  Those
objections are OVERRULED.

1    overhear.  Gatter Depo. at 269-274, 279-281.  These different characterizations of the

2    circumstances, and the reasonableness of Gatter's beliefs, raise material disputes of fact precluding

3    summary judgment on these claims.

4         PPFA Claims/Nucatola.  Nucatola was recorded during a lunch meeting in Southern

5    California by Daleiden and Merritt and at the NAF 2014 conference in San Francisco.  Defendants

6    argue that Nucatola admitted in her deposition that she attended the lunch meeting in her "personal

7    capacity," that she was not authorized to disclose any confidential PPFA information at the lunch,

8    and that she did not disclose any confidential information at the lunch.  In light of Nucatola's

9    "admissions,"  Daleiden and Merritt argue that she could not have disclosed any information about

10   PPFA and that PPFA does not have standing to pursue this claim on her behalf with respect to the

11   lunch meeting.

12        In response, plaintiffs point out that the Penal Code section 637.2 expressly defines

13   corporations as persons who can sue, and cases have explained that corporations have standing

14   where recordings were made of their employees discussing the corporation's "internal matters."

15   *See Bona Fide Conglomerate, Inc. v. SourceAmerica*, 14CV00751-GPC-DHB, 2016 WL

16   3543699, at *6.  It is undisputed that Nucatola attended the 2014 NAF conference in San

17   Francisco – where she was recorded[103] – as an employee of PPFA.  It was her introduction to

18   Daleiden and "BioMax" at that conference which led directly to the lunch meeting.  There is also

19   evidence that Nucatola was targeted by defendants precisely because she could and did divulge

20   information about PPFA's practices, and the HCP videos featured Nucatola's PPFA business card

21   in its segments about Nucatola.  Pls. Oppo. MSJ at 54-55 (citing evidence of text accompanying

22   YouTube video from HCP); *see also* Mayo Oppo. Decl., Ex. 51 (transcript of Nucatola

23   recording).[104]  Finally, plaintiffs assert that it was the disclosure of PPFA's internal matters by

24

25   ────────────

[103]  Plaintiffs note that defendants do not dispute that Nucatola testified at her deposition that she
26   attended the NAF Conference, where she was recorded, as both a PPFA and PPLA employee, and
     that she was employed by PPFA at that time.  Those two Nucatola recordings (#68-69), are subject
27   to defendants' motion to strike but, as discussed below, remain in this case.

28   [104] Defendants object to the transcript on the grounds of lack of authentication and as it was not
     previously produced.  The objections are OVERRULED.  **To the extent the parties are going to
     introduce or otherwise rely on transcripts of recordings at trial, they shall meet and confer**

1    Nucatola at the lunch meeting that impacted it and supports its standing.

2         All of this shows that there are questions of fact whether Nucatola attended the lunch

3    meeting in her "personal capacity" and whether the information disclosed was about PPFA's

4    internal matters sufficient to provide PPFA standing.[105]

5         As to reasonable beliefs and whether their lunch conversation could be overheard,

6    defendants argue that Nucatola also repeatedly confirmed in her deposition that their conversation

7    could be overhead by wait staff.  However, while parts of the conversation were overheard,

8    Nucatola testified that her position in the booth at the back of the restaurant allowed her to

9    perceive when she might be overheard and that she "stopped talking" about sensitive information

10   when wait staff approached.  Nucatola Depo. 243-246.  As with the Gatter/Felczer recordings, the

11   different characterization of the circumstances, and the reasonableness of Nucatola's beliefs, raise

12   material disputes of fact.

13        The final video segment that is a basis of PPFA's California recording claim is Doe1023,

14   and video #35.  Defendants address this segment in passing, contending that PPFA's witness

15   undermined this claim because that witness – when showed the video – "agreed that [he]

16   potentially could be overheard."  Minow Depo. at  265-267.  But the deponent also pointed out the

17   loud level of background noise, refused to agree that any particular conversation could be

18   overheard, and explained the general expectation of confidentiality amongst attendees.  *Id*.  Again,

19   whether some of all of the recorded conversation could be overheard, and whether the individual

20   actually involved had reasonable beliefs that the conversations, or the sensitive parts of those

21   conversations, could or could not be overheard, raise material disputes of fact precluding summary

22   judgment.

23        PPNorCal's Claims.  Defendants assert that PPNorCal lacks standing because Doe8002 is

---

**to provide an agreed-to transcription unless there are material differences that preclude
agreement.**

[105] Merritt separately argues that Nucatola did not disclose "confidential information," but whether
disclosure of "internal matters" was sufficient to confer standing on PPFA and whether the
"communication" was reasonably expected to be confidential are issues for the jury.

United States District Court
Northern District of California

1    not an employee of PPNorCal but "merely a contract abortion provider" and because PPNorCal

2    testified that it does not generally pay for "contract providers" to attend conferences and had no

3    specific knowledge whether Doe8002 attended the NAF conference on behalf of PPNorCal.

4    Plaintiffs respond that Doe8002 was a part-time physician; while PPNorCal classifies such part-

5    time physicians as "contractors," they are nonetheless considered "staff."  Plaintiffs also submit

6    evidence that PPNorCal expected its providers, like Doe8002, to routinely attend these

7    conferences as part of their PPNorCal duties.  Plaintiffs also point out that Doe8002 was asked

8    about and divulged information about PPNorCal's internal matters, which is sufficient to confer

9    standing.  There are, again, disputes of fact as to PPNorCal's standing to pursue this claim.

10       Defendants next argue that the conversations of Doe8001 and Doe8002 could both be

11   overheard.  But the only evidence to support this comes from the questioning of PPNorCal's Rule

12   30(b)(6) witness, who speculated that people passing by the conversation might have been able to

13   overhear it.  Again, that creates a question of fact for the jury to weigh.  Simply because the

14   conversations at issue were recorded in an exhibit hall where many people were conversing and

15   milling about does not necessarily make the recorded communications not confidential or fatally

16   undermine a reasonable belief of privacy.  Additional factors, including that NAF restricted access

17   to the exhibit hall during the conference and that the participants were vetted (having signed

18   confidentiality agreements and secured access badges), raise material questions of fact precluding

19   summary judgment.  *See, e.g., Safari Club Intl.,* 862 F.3d at 1125 (the fact a conversation took

20   place in public place was to be weighed in connection with the context of who parties believed

21   they were speaking to among other factors).

22       PPGC/PPCFC's Claims.  Defendants contend that no individual shown in video #2 is

23   affiliated with PPCFC because PPCFC's Rule 30(b)(6) witness could not identify PPCFC's lead

24   educator (Doe9001) in that recorded segment.  However, Doe9001identified *herself* as an

25   employee of Planned Parenthood "from Houston" in the recording.  While defendants object that

26   this identification is "hearsay," and instead want PPGC to be bound to its Rule 30(b)(6) witness's

27   failure to recognize Doe9001, there is a sufficient dispute of fact to confer standing and allow this

28

1     segment to remain in the case.[106]

2                              ii.        **Intentional Communications**

3           Defendants assert that the California statute, unlike the federal, Maryland, and Florida

4     statutes discussed above, requires malintent; evidence that defendants intended to record a

5     conversation that they knew others could not reasonably overhear.  In support, Daleiden explains

6     that he has been acutely aware of Section 632 since the inception of the HCP and that he even had

7     to present evidence to donors that CMP would not violate Section 632.  He directed that "CMP

8     personnel only videotape in California at large tradeshows and in public restaurants."  Daleiden

9     Decl. ¶ 19.  Because Daleiden had "no purpose or desire" to record confidential conversations in

10    California, he argues that summary judgment must be granted.

11          As support, defendants rely on *People v. Super. Ct. of Los Angeles County*, 70 Cal. 2d 123,

12    133 (1969).  There, the court noted that it was "not the purpose of the statute to punish a person

13    who intends to make a recording but only a person who intends to make a recording of a

14    confidential communication" and rejected argument that "the mere intent to activate a tape

15    recorder which subsequently 'by chance' records a confidential communication is sufficient to

16    constitute an offense."  That case does not address malintent, but chance intent.  More recent

17    opinions have confirmed that the "test of confidentiality is objective.  [The recorder's] subjective

18    intent is irrelevant."  *Coulter v. Bank of Am.*, 28 Cal. App. 4th 923, 929 (Cal. App. 4th Dist. 1994).

19    Therefore, even if Daleiden had the intent to avoid recording what *he* perceived were confidential

20    communications because of the risk, his mere belief that by recording in public places he would

21    not violate the statute does not immunize his actions.  These recorded conversations were not "by

22    chance" but were intended.  Whether all of the participants to them had an objectively reasonable

23    expectation that they were "confidential communications" under Section 632 will be determined at

24    trial.[107]

25    _____

26    [106]  Daleiden also challenges any California recording claims asserted by PPRM and PPOSBC, but
      plaintiffs have clarified they are no longer pursing those claims on behalf of those entities.  Pls.
27    Oppo. MSJ at 52 n.35.

28    [107]  There is also evidence that Rhomberg advised Daleiden to choose "a quiet corner table, alcove,
      et cetera" for the meetings "so you can have some good private conversation, without too much

United States District Court
Northern District of California

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### iii.      633.5

Both sides move for summary judgment on defendants' affirmative defense under Penal Code section 633.5.  Defendants argue that because Daleiden and other CMP personnel had reasonable beliefs that plaintiffs were engaged in violent felonies against fetuses and women and that the purpose of each recording was to secure evidence related to those suspected felonies, defendants are entitled to summary judgment.  Defendants rely on their contention that the goal of the HCP was to uncover federal crimes regarding sale of fetal tissue, brought about in part by violations of the Partial Birth Abortion Ban and practices dangerous to women.  Daleiden MSJ Decl. ¶¶ 23 – 52.[108]  However, whether the defendants genuinely believed the targets of their recordings would disclose evidence regarding commission of violence felonies during the recorded conversations and whether those beliefs, if genuinely held, *were* reasonable, are questions of fact for the jury to decide, weighing evidence of what the defendants knew at the time they first started recording for the HCP, how they selected their targets, and who their targets were.

That said, whether defendants secured evidence of the commission of violent felonies in some or all of the conversations is not material.  The focus is on what the defendants knew *at the time* they made their first recording for the HCP.  *People v. Parra*, 165 Cal. App. 3d 874, 879–80 (Cal. App. 1st Dist. 1985) (concluding that the "recording was clearly for the purpose of obtaining evidence of appellant's intent to carry out her prior written threats of physical violence; that [recorder] did not succeed in accomplishing such purpose does not alter that purpose. Thus, [recorder's] uncontradicted testimony of why he recorded the appellant's voice was sufficient to except that recording from the prohibition of section 632.").

Plaintiffs seek summary judgment on the inapplicability of this defense.  They argue that this section does not apply to any of the recorded conversations because defendants had no

---

noise."  Mayo Oppo. Decl., Ex. 58 (May 2015 email).  Plaintiffs argue that this shows Daleiden himself took steps to increase the privacy of the conversation, despite the public location.

[108] The parties dispute whether a violation of the Partial Birth Abortion Ban, 18 U.S.C. § 1531 would qualify as a "violent felony" covered by Section 633.5.  I need not resolve that to decide this motion, but will simply assume it could.

United States District Court
Northern District of California

reasonable belief that the individuals they actually recorded were the ones who had or might commit a violent felony.  They point out that the statutory scheme uses the word "person" in Section 632(a) – which as noted is broadly defined to include corporations and others – but "another party" in Section 633.5.  Plaintiffs assert that use of the narrower term "party" was an intentional effort to limit the exception to situations where the recorder reasonably believed that the specific person they were recording was the one who had or might commit the violent felony. They contend that there is no evidence in the record that defendants had any specific belief that any of the staff defendants' recorded at NAF 2014, many of whom the defendants came across by happenstance, had personally committed or might commit the violent felonies  identified by defendants (violence to a fetus made illegal under the Partial Birth Abortion Ban or violence to a woman).  Nor is there evidence that defendants had specific knowledge that Gatter or Nucatola personally committed or planned to commit one of those felonies other than that they had "participated in fetal tissue procurement."  Fetal tissue procurement, by itself, is not a violent felony.  *See* Pls MSJ at 31 (citing evidence in record showing defendants' lack of knowledge regarding specific staff prior to the recordings).

Defendants respond, first, that whether any defendant's belief was "reasonable" is inherently a question of fact to be resolved by the jury.  Second, they dispute plaintiffs' narrow interpretation of "party" in Section 633.5.  They proffer, instead, that the reasonable belief necessary is only that the recording might obtain evidence relating to the commission of a violent felony by a person, not just the person being recorded.

Defendants rely on *People v. Suite*, 101 Cal. App. 3d 680 (Cal. App. 1st Dist. 1980), but in that case – where a criminal defendant sought to exclude the police recording of his calls of bomb threats – the Court of Appeal noted first that it "was ludicrous" for the defendant to argue his calls were confidential communications because "[s]urely a telephone call to the law enforcement officials of a state university, threatening that a bomb has been placed and set to go off in a university building, is not a confidential communication within the meaning of the statute."  *Id*. at 688.  To dispel all doubt about whether the call was a confidential communication, the court simply held in that particular circumstance, a "bomb threat unquestionably involves the potential

United States District Court
Northern District of California

1  for such violence" under Section 633.5.  The court did not in any way reach the question of

2  whether Section 633.5 exempted from 632 recordings of persons who were not personally

3  suspected of committing any crimes.

4      Defendants then argue that section 632(a)'s only use of "person" as opposed to "party" –

5  the distinction relied on by plaintiffs – is in reference to the "person" who does the recording in

6  violation of the statute, not in reference to the "party" who was recorded.  They point out that to

7  provide plaintiffs with standing in the first instance, as a corporation defined as a "person" in

8  Section 632(b), plaintiffs necessarily define "person" and "party" coextensively.  Defendants

9  contend that plaintiffs' motion should be denied because they merely recorded the "corporations"

10  who are the plaintiffs here in order to secure evidence that defendants reasonably believed would

11  show those corporations commit violent felonies.

12      Moving beyond the statutory construction issue, the parties spend much time disputing the

13  evidence that Daleiden had regarding the commission of violent felonies prior to recording

14  plaintiffs' staff.  However, it is undisputed that neither Daleiden nor any other defendant had

15  evidence that any plaintiff or their staff members had violated the Partial Birth Abortion Ban,

16  harmed a woman in order to harvest fetal tissue, or committed any other violent felony covered by

17  Penal Code section 633.5.  Daleiden did have evidence that some affiliates had sold fetal tissue,

18  but that is not a violent felony.  Daleiden MSJ Decl. ¶¶ 29-31, 42.[109]  Daleiden also had evidence

19  that two companies, who had contracts with two plaintiff-affiliates at different points and who

20  shared staff with plaintiff-affiliates, might have secured tissues from unidentified abortion

21  providers that had possibly violated the Partial Birth Abortion Ban.  *Id*. ¶¶ 32-34, 40, 42-46.  But

22  defendants point to no evidence that those companies secured those particular tissues from any

23  Planned Parenthood affiliate or plaintiff staff member, or even that those tissues were secured by

24  those companies during the general times that plaintiff-affiliates had contracts with them.  Instead,

25  Daleiden made assumptions that, given his belief as to the percentages of times fetuses are born

26

27  [109] Plaintiffs object to the paragraphs of Daleiden's declaration where he discusses his "evidence

28  of violent felonies" arguing the statements are hearsay to the extent offered for truth, but I do not
    rely on these statements for the truth of the matters asserted.  The objections on that ground are
    OVERRULED.

alive and the "financial incentives" some abortion clinics might sell tissue, that some Planned Parenthood affiliates must be engaging in violent felonies. *Id.* ¶ 38.  As to Merritt, the only other individual defendant who actually recorded in California, her knowledge was apparently based exclusively on what Daleiden told her as well as her "general" knowledge from being active in the anti-abortion movement for decades.  Merritt Depo. 47-55.

On this record, although defendants' "evidence" is based on inferences and assumptions, I cannot say as a matter of law that no juror could find that what defendants Daleiden and Merritt believed about plaintiffs committing violent felonies was unreasonable as a matter of law.  That is inherently a question of fact that goes to the jury.  Plaintiffs' motion for summary judgment on the Section 633.5 defense is DENIED.

#### iv.  Individual Defendants

There is no dispute that Daleiden and Merritt are appropriate, identified defendants under this claim.  BioMax (as the front company they purported to represent) and CMP (as the real company who they represented and who paid Merritt as a contractor) are likewise appropriate and identified defendants.

Lopez is also identified as a defendant on this claim.  Plaintiffs argue that any belief Lopez had about plaintiffs' commissions of violent felonies came through Daleiden and, therefore, was inherently unreliable.  Pls. MSJ at 31 n.30.  It is undisputed that Lopez did not record anyone in California.  Plaintiffs have not identified any alter ego or agency theory as to Lopez.  Therefore, the only possible way Lopez could be liable is under the Conspiracy claim (Count 3), that defendants agreed to "defraud Plaintiffs and to injure Plaintiffs with a pattern of fraudulent and malicious conduct" in connection with setting up and making fraudulent misrepresentations about BioMax, securing access to plaintiffs' conferences and staff through misrepresentations, engaging in an ongoing campaign to surreptitiously videotape plaintiffs' staff, and by creating, transferring, and maintaining false identities and documentation to obtain access to conferences and facilities. FAC ¶ 173.  The conspiracy claim expressly encompasses surreptitious recordings. Given the allegations against Lopez, this claim survives as to him only for a conspiracy to violate Penal Code section 632.

United States District Court
Northern District of California

United States District Court
Northern District of California

Similarly, while Rhomberg and Newman are not identified as defendants to this claim, plaintiffs do assert that Rhomberg's and Newman's beliefs as to the alleged commission of violent felonies are "inherently unreliable."  Pls MSJ at 31 n.30.  As CMP was named as a defendant, plaintiffs may be hinging Rhomberg and Newman's direct liability on an alter ego theory.  Consistent with the analysis above, plaintiffs have failed to raise undisputed or material disputed facts in support of a finding of alter ego as to Rhomberg or Newman.  Instead, as with Lopez, Rhomberg and Newman may be held indirectly liable under the conspiracy claim.  *See* FAC ¶ 173 ("co-conspirators knowingly and willfully conspired and/or agreed among themselves to defraud Plaintiffs and to injure Plaintiffs with a pattern of fraudulent and malicious conduct, including . . . engaging in an ongoing campaign to surreptitiously videotape Plaintiffs' staff in violation of law").

### b.   Criminal Trespass Under Penal Code § 634, with intent to violate § 632 (Count 10)

The violation of California Penal Code section 634 is based on the alleged trespass to the NAF 2014 conference in San Francisco, with the "intent" to illegally record the video segments identified above under Section 632.[110]  Section 634 covers "trespasses on property for the purpose of committing any act, or attempting to commit any act" in violation of Section 632.  Defendants, through Daleiden, argue that this claim fails because plaintiffs have not shown that NAF had a sufficient "possessory" interest in the 2014 conference facilities, and therefore, the right to be able to exclude others from the San Francisco conference.  Defendants also argue that the Section 634 claim fails because the Section 632 claim fails, plaintiffs were not injured by any criminal trespass, and the claim is impermissibly duplicative of the Section 632 claim as it seeks the same damages.

Defendants argue that for the same reasons the common law trespass fails as to PPFA's conference hotels and possessory interest, the claim fails with respect to NAF's lack of adequate possessory interest.  Defendants contend that plaintiffs have no evidence regarding NAF's

---

[110] The restaurant recordings of Gatter/Felczer and Nucatola are not alleged as grounds for the Section 634 claim.

1    possessory interest, they simply assume it "based on the risk that [PPFA] was aware of at the

2    time." Minow Depo. at 159-160. However, as I have discussed with respect to the similar PPFA

3    conference contracts, the evidence established a sufficient possessory interest. Here, defendants

4    do not identify any provision in the NAF contract that indicates that NAF had less possessory

5    interest in its conference space than PPFA did under its contracts, or any other reason why the

6    analysis should be different with respect to the NAF conference.

7         With respect to the Section 632 claim and duplication, defendants note that the provision

8    allowing for a civil action, Cal. Penal Code section 637.2, provides: "Civil action by person

9    injured; injunction:" "(a) Any person who has been injured by a violation of this chapter may

10   bring an action against the person who committed the violation for the greater of the following

11   amounts . . . ." They argue that this language allows for *one* recovery for the violation of "this

12   section" and that means one claim stemming from the NAF conference. *Franklin v. Ocwen Loan*

13   *Servicing, LLC*, 18-CV-03333-SI, 2018 WL 5923450, at *7 (N.D. Cal. Nov. 13, 2018), order

14   clarified, 18-CV-03333-SI, 2019 WL 452027 (N.D. Cal. Feb. 5, 2019) (concluding Cal. Penal

15   Code section 637.2 "does not provide per violation statutory damages"). Plaintiffs respond that at

16   this juncture they are allowed to plead claims in the alternative, and if they fail on Section 632

17   with the jury, they may nonetheless recover under Section 634. I agree.

18        Finally, with respect to injury flowing to these plaintiffs from the NAF 2014 conference

19   trespass, defendants argue that the only harm from the trespass could be injury to the hotel or

20   NAF, but not plaintiffs. However, the statute itself notes, "It is not a necessary prerequisite to an

21   action pursuant to this section that the plaintiff has suffered, or be threatened with, actual

22   damages." Cal. Penal Code § 637.2(c). Similarly, the fact that "publication damages" are not

23   available, as outlined above, does not mean plaintiffs cannot seek a remedy under this section.

24        Separately, Merritt argues that plaintiffs have identified no videos that she personally

25   recorded during the 2014 NAF conference as being actionable and, therefore, this claim fails as to

26   her. However, the statute covers trespass "for the purpose," and there is a material dispute of fact

27   as to Merritt's purpose. She is not out of this claim on summary judgment.

28

United States District Court
Northern District of California

### G.   Invasion of Privacy

Defendants move for summary judgment on the two "invasion of privacy, intrusion on seclusion" claims.  I will address each in turn.

#### 1.   Intrusion on a Private Place (Count 13)

The first intrusion claim under "common law," is brought by all plaintiffs against defendants Daleiden, Merritt, Lopez, CMP, and BioMax.  As alleged in the Amended Complaint, this claim is based on defendants' intrusions at the PPFA conferences (in Miami, Orlando, and Washington, DC) and the NAF conferences (in San Francisco and Baltimore), as well as on the intrusions in the PPGC/PPCFC facility in Texas and the PPRM facility in Colorado.

In opposition, however, plaintiffs only discuss this claim with respect to the intrusions into facilities in Colorado and Texas (addressing only Colorado and Texas law) and with respect to the taped lunches with Gatter and Nucatola (under California law).  Plaintiffs do not address the intrusion claim with respect to their conferences.  In my Tentative Ruling and Procedure Order (Dkt. No. 718), I asked plaintiffs to confirm whether they were dropping these claims with respect to the conferences.  In response, they clarified that they were pursuing the invasion of privacy claim under Colorado law for PPRM and for PPGC under Texas law, and presumably although not stated, the common law claims for Gatter and Nucatola under California law.  July 17, 2019 Hearing Transcript at 55.  I will confine my analysis accordingly.

#### a.   Privacy Interest Under Colorado and Texas Law

Lopez contends that the intrusion claims fail under Colorado and Texas law because no "private information" was gleaned from anyone during the recordings at either PPMM or PPCG/PPCFC.  These were instead "business meetings" about business proposals that cannot form the basis of an invasion of privacy claim. *See Smith v. Colorado Interstate Gas Co.*, 777 F. Supp. 854, 857 (D. Colo. 1991) (dismiss "intrusion of seclusion" claim because  "the allegations do not involve invasions of Smith's personal solitude or personal affairs. . . . Instead, the allegations concern Smith's business affairs."); *see also Patton v. United Parcel Serv., Inc.*, 910 F. Supp. 1250, 1276 (S.D. Tex. 1995) (no intrusion on seclusion case where defendants demanded plaintiff answer questions during business hours and on business premises regarding business

101

investigation).

In opposition, plaintiffs dispute the assertion that Colorado or Texas protect only intrusions which disclose "private information." Instead, they argue these states follow the Restatement (Second) of Torts § 652B (1981), which provides: "One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person." *See Doe v. High-Tech Inst., In*c., 972 P.2d 1060, 1065 (Colo. App. 1998) (adopting § 652B); *Valenzuela v. Aquino*, 853 S.W.2d 512, 513 (Tex. 1993) (applying § 652B test).[111]  However, even if disclosure of private information is required to sustain the intrusion torts under Colorado and Texas law, plaintiffs submit evidence that at least some  of the information disclosed during defendants' visits to the PPGC/PPCFC and PPRM facilities could be considered "private" by those recorded.  Pls. Oppo. MSJ at 83.

That theme was continued by plaintiffs during the hearing where they posited that given the context of this industry and the sensitive nature of the information being discussed – which is more personal, more private, and akin to medical information – Colorado and Texas laws would protect it from invasion.  Plaintiffs point to no specific facts or specific content from any of the videos at issue to support their argument that the information disclosed by PPRM or PPCG/PPCFC is akin to "personal" information covered by the tort.  Instead, they admit that defendants sought and received "sensitive information about the rate and types of abortions

---

[111] Defendants also rely on *Morrison v. Weyerhaeuser Co*., 119 Fed. Appx. 581, 589 (5th Cir. 2004) (unpublished). That case rejected an invasion of privacy claim in connection with an investigation into a workplace accident when a supervisor insisted on attending a medical exam following the accident.  *Id*. at 589 (because plaintiff testified "he did not have an expectation of privacy in anything that occurred at the examination" room and it was "doubtful that Morrison had a reasonable expectation of privacy in information sought by the employer as part of an investigation directly related to its business interests.").  Defendants also rely on *Pascouau v. Martin Marietta Corp*., 185 F.3d 874 (10th Cir. 1999).  In that case the court confirmed that "Colorado law requires" plaintiff "to show that another person 'has intentionally intruded, physically or otherwise, upon [her] seclusion or solitude,' and that a reasonable person would consider such intrusion offensive," but explained that the "tort of intrusion into seclusion requires more than a mere inquiry that reveals nothing."  *Id*. at *14 (invasion claim failed where plaintiff had been asked sexually suggestive questions but which were not answered because "liability attaches only to an unconsented invasion through physical or other means that actually gleans private information.").  These cases support defendants' position that the information actually disclosed must be private to the person disclosing it.

United States District Court
Northern District of California

procedures performed, how Plaintiffs work with research partners, and Planned Parenthood policies and internal considerations about fetal tissue donation." *Id*. That information is not "private" to any *person* in particular – and therefore not personal – although it may be considered confidential and sensitive by PPRM or PPCG/PPCFC.

When asked at the hearing to identify any cases that covered corporate information of the type disclosed here, plaintiffs identified *Arroyo v. Rosen*, 102 Md. App. 101 (Md. Spec. App. 1994).[112] In that case, the invasion of privacy verdict was upheld based on the disclosure of a confidential report issued by a University committee concluding a professor may have falsified data in published articles. *Id*. at 106. While the underlying investigation and disclosure occurred in the context of a business (a university), the information disclosed was *personal* to the professor. Plaintiffs have no evidence of a similar intrusion into private affairs or concerns with respect to the PPRM and PPFC tapings.

Summary judgment is GRANTED to defendants on Count 13 with respect to claims under Colorado and Texas Law.

### b.    California Common Law Claims

Plaintiffs are also asserting common law invasion claims for the taping of Gatter and Nucatola at the lunches in Southern California. Under California law, the "intrusion tort" has "two elements: (1) intrusion into a private place, conversation or matter, (2) in a manner highly offensive to a reasonable person." *Sanders v. Am. Broad. Companies, Inc*., 20 Cal. 4th 907, 914 (1999). "Privacy for purposes of the intrusion tort must be evaluated with respect to the identity of the alleged intruder and the nature of the intrusion." *Id*. at 918. And, particularly relevant to this case, the *Sanders* court noted that "that a person may reasonably expect privacy against the electronic recording of a communication, even though he or she had no reasonable expectation as to confidentiality of the communication's contents." *Id*. at 915. Taken together, whether a "reasonable expectation of privacy is violated by such recording depends on the exact nature of the conduct and all the surrounding circumstances. In addition, liability under the intrusion tort

---

[112] Plaintiffs and defendants agree that Maryland law is consistent with Colorado and Texas law with respect to intrusion claims.

United States District Court
Northern District of California

1    requires that the invasion be highly offensive to a reasonable person, considering, among other

2    factors, the motive of the alleged intruder."  *Id*. at 911.

3         Lopez, arguing on behalf of the defendants, essentially admits that with respect to the

4    recording of Gatter and Nucatola, this question goes to the jury.  Nonetheless, defendants

5    challenge the standing of PPPSGV and PPFA to assert these claims on behalf of Gatter and

6    Nucatola and assert that the newsworthiness of the information uncovered in those recordings

7    precludes the California claims as matter of law.

8                                    **i.      Standing**

9         Defendants argue that plaintiffs cannot establish the required "associational" or third-party

10   standing sufficient to assert the intrusion claims on behalf of their staff who were recorded.

11   Plaintiffs respond that the PPPSGV and PPFA have standing to pursue the claims under California

12   law with respect to the taping of their employees at the lunch meetings.  Standing, they argue,

13   exists because: (1) PPPSGV and PPFA have alleged "injury in fact" to themselves – at  a

14   minimum they incurred costs with respect to personal security for these targeted staff; and (2) they

15   are a "proper proponent" of the legal rights on which the claim is based.  Pls. Oppo. MSJ at 83.[113]

16   Plaintiffs also argue that considering the threats that these individuals, including Gatter and

17   Nucatola, experienced following the disclosures, the individuals were reluctant to be named as

18   plaintiffs themselves, a concern well recognized under California law.  *See, e.g.*, *Novartis*

19   *Vaccines & Diagnostics, Inc. v. Stop Huntingdon Animal Cruelty USA, Inc*., 143 Cal. App. 4th

20   1284, 1298 (Cal. App. 1st Dist. 2006) (concluding employer had standing to assert privacy claims

21   on behalf of employees, in part because "[i]t is unlikely that employees who had already been

22   targeted by SHAC USA would permit themselves to be further targeted by becoming a named

23   party to a lawsuit.").[114]

24

25   [113] Plaintiffs rely on *McCormack v. Herzog*, 788 F.3d 1017 (9th Cir. 2015), which considered
     those two factors to determine whether a physician had third-party standing to challenge laws
26   regarding abortion on behalf of himself and his patients.  Lopez's reliance on cases recognizing
     that corporations do not "a common law right to privacy and therefore cannot bring an action for
27   invasion of privacy" is not helpful as those cases do not discuss the third-party standing asserted
     here.  *See, e.g.*, *Coulter v. Bank of Am*., 28 Cal. App. 4th 923, 930 (Cal. App. 4th Dist. 1994).

28   [114] Daleiden argues *Novartis* is distinguishable from this case because there are no allegations that

United States District Court
Northern District of California

1    Whether PPPSGV and PPFA are proper proponents of the rights of Gatter and Nucatola,

2 and therefore whether they have standing to assert this claim on their behalf goes to the jury.

3                    **ii.     Newsworthiness**

4    Finally, defendants argue that the intrusion claims fail as a matter of law in light of

5 defendants' recording for their journalistic purposes and public dissemination of newsworthy

6 information.  Relatedly, defendants contend that given their journalistic intents there can be "no

7 debate" that their intrusions were not "offensive" under California law.

8    It is well settled that "the press in its newsgathering activities enjoys no immunity or

9 exemption from generally applicable laws" like the invasion of privacy claim asserted here.

10 *Shulman v. Group W Productions, Inc.*, 18 Cal. 4th 200, 238 (1998), *as modified on denial of reh'g*

11 (July 29, 1998).  Defendants nonetheless ask me to weigh the newsworthiness versus

12 offensiveness factors now and find that newsworthiness outweighs any offensiveness here on

13 summary judgment because of the danger of "jury overreach."  Lopez Mot. at 9 (citing *Diaz v.*

14 *Oakland Trib., Inc.*, 139 Cal. App. 3d 118 (Cal. App. 1st Dist. 1983)).  But the *Diaz* court

15 confirmed that in intrusion cases, newsworthiness is measured in a common law right to privacy

16 claim, "along a sliding scale of competing interests: the individual's right to keep private facts

17 from the public's gaze versus the public's right to know" and is generally a question for the jury.

18 *Id*. at 133.  The opinion recognized that courts may check the "risk of prejudice" through "close

19 judicial scrutiny at the stages of litigation such as summary judgment, directed verdict, and

20 judgment notwithstanding the verdict" to correct against "jury overreaching."  *Id*.

21    This is not one of those atypical situations where newsworthiness versus privacy can be

22 determined as a matter of law at summary judgment.  *But see Sipple v. Chron. Publg. Co*., 154

23 Cal. App. 3d 1040, 1050 (Cal. App. 1st Dist. 1984) (record failed to present any triable issue of

24 fact, therefore "trial court could determine as a matter of law that the facts contained in the articles

25 were not private facts within the purview of the law and also that the publications relative to the

26

27 ───────────────

28 any particular defendants have harassed any particular plaintiffs, but that is disputed, particularly
with respect to Gatter and Nucatola, who reasonable jurors may believe were specifically targeted
for recording by these defendants.

United States District Court
Northern District of California

1    appellant were newsworthy."); *Four Navy Seals v. Associated Press*, 413 F. Supp. 2d 1136, 1146

2    (S.D. Cal. 2005) (determining newsworthiness as a matter of law where "the public has

3    demonstrated an intense interest in, and concern about, Iraqi prisoner abuse scandals,"

4    "Defendants' intrusion into an ostensibly private matter was negligible," and "Plaintiffs

5    voluntarily assumed a position of public notoriety"); *Baughman v. State of California*, 38 Cal.

6    App. 4th 182, 190 (Cal. App. 2d Dist. 1995 ("The investigation of this serious crime pursuant to a

7    search warrant is a defense which justifies the invasion of his privacy as a matter of law.").

8         Putting aside plaintiffs' assertion that defendants are not journalists to whom these

9    protections apply, there are material disputes regarding whether all, some, or none of content of

10   the recordings from these lunch meetings that *were published* were newsworthy or were

11   newsworthy enough to overcome Gatter and Nucatola's privacy interests.  That defendants'

12   recordings made news and that *some* of the evidence uncovered during the Project from *some* of

13   its targets might have led to successful prosecutions or changes in governmental policy does not –

14   on the record presented on these motions – foreclose the intrusion claims as a matter of law

15   concerning these specific plaintiffs based on the recordings of them.[115]

16        Defendants' motion for summary judgment on Count 13 under California law is DENIED.

17             2.    **California Constitution, Article I (Count 14)**

18        The second claim is for invasion of privacy in violation of Article I of the California

19   Constitution.  In the FAC, the claim was asserted by PPFA, PPNorCal, PPPSW, PPMM, and

20   PPOSBC against Daleiden, Merritt, Lopez, CMP and BioMax.  It is unclear which plaintiffs assert

21   this claim at this juncture.  Plaintiffs dropped their California Penal Code illegal recording claim

22   as to PPPSW, PPOSBC, and PPMM (as well as others), admitting that staff of those plaintiffs

23   were not recorded in California.  Pls. Oppo. MSJ at  52 n.35.  In the summary judgment briefing,

24   defendants assert that conduct outside the boundaries of California cannot form the basis of this

---

[115] Defendants repeatedly assert that the truth of the HCP publications must be assumed as true for all purposes in this litigation, because plaintiffs have not filed a defamation-type claim to contest the truth.  The "assume as true" standard, however, is relevant when assessing the tort and contract claims on the question of whether the damages sought are barred publication damages.  For the purposes of that analysis, truth is assumed.  But defendants cite no cases applying an assumption of truth to the offensiveness and related newsworthiness analyses under these causes of action.

United States District Court
Northern District of California

1   claim.  Daleiden MSJ at 11.  Plaintiffs did not respond but instead focus, for purposes of the

2   California invasion of privacy claim, on the taping of Gatter and Nucatola in California.

3   Therefore, I will similarly limit the scope of this claim and accordingly my analysis to PPPSVG

4   and PPFA with respect to the taping of Gatter and Nucatola at the Southern California restaurants.

5          An invasion of privacy claim under the California Constitution "requires three essential

6   elements: (1) the claimant must possess a legally protected privacy interest . . .; (2) the claimant's

7   expectation of privacy must be objectively reasonable . . .; and (3) the invasion of privacy

8   complained of must be serious in both its nature and scope."  *County of Los Angeles v. Los*

9   *Angeles County Employee Rel. Com.*, 56 Cal. 4th 905, 926 (2013).  "If the claimant establishes all

10  three required elements, the strength of that privacy interest is balanced against countervailing

11  interests."  *Id.* (relying on *Hill v. National Collegiate Athletic Assn.*, 7 Cal.4th 1, 26 (1994)).

12         Defendants, through Daleiden, argue that this claim fails because defendants did not

13  intrude on any "extremely private content," plaintiffs lack standing to assert the interest on behalf

14  of their employees, and the newsworthiness outweighs the privacy intrusion.

15         As to the privacy interest in the information disclosed, plaintiffs argue that all they need to

16  show is an interest in "precluding the dissemination or misuse of sensitive and confidential

17  information."  *Id.* at 927 (characterized as "informational privacy" by the *Hill* court).  "The

18  reasonableness of a privacy expectation depends on the surrounding context. We have stressed that

19  'customs, practices, and physical settings surrounding particular activities may create or inhibit

20  reasonable expectations of privacy.'"  *County of Los Angeles v. Los Angeles County Employee*

21  *Rel. Com.*, 56 Cal. 4th at (quoting *Hill*, 7 Cal. 4th at 37).

22         Defendants counter that none of the information disclosed by Gatter or Nucatola is

23  confidential or sensitive.  I disagree.  On this record, plaintiffs have raised material questions of

24  fact whether the information disclosed by Gatter and Nucatola can objectively be considered

25  sensitive and confidential.  *See, e.g.*, Nucatola Depo. at 234–235, 244 (discussing abortion

26  procedures and witness' practice of not discussing abortion "in front of other people"); Gatter

27  Depo. at 272:5–15; 273:1–3 (identifying tissue donation and number and types of procedures

28

United States District Court
Northern District of California

PPPSGV performs as confidential information).[116]

As to the reasonableness of Gatter and Nucatola's expectations of privacy, recognizing that the recorded conversations took place in restaurants does not automatically defeat a reasonable expectation. *See, e.g.*, *Sanders v. Am. Broad. Companies, Inc.*, 20 Cal. 4th 907, 914 (1999) (no bar to common law invasion claim based simply because recording was in area where others who were not parties to the conversation were present). Whether Gatter and Nucatola had reasonable expectations concerning the content of their conversations or that those conversations would not be recorded are issues to be resolved by the jury based on testimony regarding the context of the conversations, *e.g.*, did they speak in low voices, did they choose tables away from other patrons, did they continue to discuss the information when servers drew near, etc.[117]

In his motion, Daleiden makes similar lack of third-party standing and newsworthiness overcoming offensiveness arguments as Lopez made with respect to the common law claims. Those arguments are rejected for the same reasons.[118]

Defendants' motion for summary judgment on Count 14 is DENIED regarding the claims of PPPSGV and PPFA for the recordings of Gatter and Nucatola, but is GRANTED concerning

---

[116] Defendants argue the information disclosed must be "extremely sensitive" and cite cases where, indeed, extremely sensitive information was at issue like possible HIV or sexually transmitted disease status. Daleiden MSJ at 10. However, there is no requirement that the information be "extremely sensitive." For example, in *County of Los Angeles v. Los Angeles County Employee Rel. Com.*, 56 Cal. 4th 905, public employees had a privacy interest in their home addresses and contact information.

[117] The cases relied on by defendants in support of summary judgment on the reasonableness issue are readily distinguishable. *See, e.g., Vo v. City of Garden Grove*, 115 Cal. App. 4th 425, 448 (Cal. App. 4th Dist. 2004) (no reasonable expectation of privacy for information shown on a publicly observable computer screen in a "cyber café"); *Gonzales v. Uber Techs., Inc.*, 305 F. Supp. 3d 1078, 1090 (N.D. Cal. 2018), *on reconsideration*, 17-CV-02264-JSC, 2018 WL 3068248 (N.D. Cal. June 21, 2018) ("Plaintiff consented to the tracking of his vehicle through his cellphone when he signed up to be a Lyft driver."); *see also In re Yahoo Mail Litig.*, 7 F. Supp. 3d 1016, 1038 (N.D. Cal. 2014) (discussing "high bar" cases holding that disclosure of "routine commercial information" like home address, geolocation data, and device identifier information do not state an actionable claim for invasion of privacy).

[118] Under the California Constitution balancing test, "[a]n otherwise actionable invasion of privacy may be legally justified if it substantively furthers one or more legitimate competing interests. . . . Conversely, the invasion may be unjustified if the claimant can point to "feasible and effective alternatives" with "a lesser impact on privacy interests." *Hill v. National Collegiate Athletic Assn.*, 7 Cal.4th 1, 40 (1994). All of these issues, again, are disputed and subject to material disputes of fact.

United States District Court
Northern District of California

1     the dropped claims of other plaintiffs.

2         **H.      Civil Conspiracy (Count 3)**

3         Plaintiffs admit that the basis of this count is defendants' tortious conduct, specifically,

4     defendants' "pattern of fraudulent and malicious conduct."  Pls. Oppo. MSJ at 16-17 n.11; FAC ¶

5     173.

6             **1.      Rhomberg and Newman**

7         Rhomberg and Newman argue that this claim fails as to them because corporate directors

8     cannot be liable for tortious conduct unless the director "specifically authorized, directed, or

9     participated in the allegedly tortious conduct."  *Frances T. v. Village Green Homeowners Ass'n*,

10    42 Cal. 3d 490, 508 (1986)).  However, "[t]acit consent is enough to prove a conspiracy against a

11    director or officer of a corporation, so long as the director or officer concurred in the tortious

12    scheme with knowledge of its unlawful purpose." *Schwartz v. Pillsbury Inc*., 969 F.2d 840, 844

13    (9th Cir. 1992) (citation and internal quotation marks omitted); *PMC, Inc. v. Kadisha*, 78 Cal.

14    App. 4th 1368, 1380 (2000) ("A corporate director or officer's participation in tortious conduct

15    may be shown not solely by direct action but also by knowing consent to or approval of unlawful

16    acts").

17        Plaintiffs have adduced thin but sufficient evidence that these two defendants could have

18    authorized, directed, or encouraged the specific fraudulent behaviors of Daleiden, BioMax, and the

19    other individual defendants.  The implications from that evidence, as well as the implications of

20    defendants' assertions of the Fifth Amendment, are strenuously debated and raise material,

21    disputed questions of fact on civil conspiracy.  But there is sufficient evidence to get these issues

22    to the jury.[119]

23    _____

24    [119] Rhomberg and Newman also argue that plaintiffs' claim based on their roles as corporate
      directors of CMP fails because plaintiffs have not proved and cannot "prove that an ordinarily
25    prudent person, knowing what the director knew at that time, would not have acted similarly under
      the circumstances." *Frances T. v. Village Green Owners Assn*., 42 Cal. 3d 490, 509 (1986).  I
26    addressed and rejected this exact argument in my November 2018 Order in the related *NAF* case,
      explaining, "[t]hat concept applies only where a director knows of a condition hazardous to third
27    parties or that the corporate conduct will likely cause harm and then knowingly fails to act. . . .
      That type of allegation is not required where the individual defendant is alleged to hav[e]
28    knowingly directed or otherwise affirmatively help cause the tortious conduct, as in this case."
      November 2018 Order at 26 (case citations omitted).  The same is true here.

United States District Court
Northern District of California

2.      **Lopez**

Lopez generally argues that he cannot remain a defendant to numerous claims in which he had "no direct participation" through the conspiracy claim.  He admits that he directly participated in accessing and surreptitiously recording during the three PPFA conference (although he did not sign any agreements with PPFA) and the 2015 NAF conference (where he admits he signed the NAF NDA).  Those events were held in Florida, the District of Columbia, and Maryland.  However, he argues that because he did not personally engage in any tortious conduct in California, Texas, or Colorado, he cannot be liable for the other defendants' tortious conduct in those jurisdictions.  As plaintiffs point out, Lopez played a key role from the start of the Project, as a procurement technician for "BioMax" and assisting Daleiden in making introductions for Daleiden as Sarkis and helping Daleiden target plaintiffs' staff and high-level officials at the conferences.  Plaintiffs assert that these deceptions were material and supported the deceptions that followed (*e.g.*, Daleiden and Merritt's infiltration of plaintiffs' facilities and setting up the lunch meetings).  I agree.  The evidence is sufficient to send the conspiracy claim with respect to Lopez to the jury.[120]

Defendants' motion for summary judgment on civil conspiracy is DENIED.

**I.      Unfair Business Practices (Count 7)**

Defendants (through the motions of Rhomberg/Newman and CMP) and plaintiffs both move for summary judgment on this Count.

1.      **Evidence of Unfair Acts**

CMP argues on behalf of the defendants that the claim under the "unfair prong" fails because defendants' conduct did not threaten to violate antitrust principles and the value of its conduct outweighed any actual harm to plaintiffs.  This argument only applies to the "unfair

---

[120] Lopez cannot rely on the "agent immunity rule" that a corporate agent cannot generally be liable for conspiring with his principal operating within his duties for the corporation for the corporation's advantage.  That rule does not fit onto the facts as characterized by Lopez himself; a mere "contractor" for CMP hired to play a role and who had no interest in the work of CMP beyond receiving his wages.  Lopez Decl. ¶ 12.  Lopez cannot ignore than in performing his "role" he allegedly committed numerous acts of fraud and other tortious conduct.  *See, e.g.*, *Frances T. v. Village Green Owners Assn.*, 42 Cal. 3d 490, 508 (1986) ("the corporate fiction, however, was never intended to insulate officers from liability for their own tortious conduct.").

United States District Court
Northern District of California

prong." As discussed above, I have found sufficient evidence that the defendants engaged in both illegal and fraudulent conduct, which are separate prongs under the UCL.[121] Therefore, I do not need to reach the unfair prong.

This issue is not appropriate for resolution at this juncture in any event. Whether defendants' intent to expose illegal acts and conduct outweighs the harm to consumers is a subject of significant material dispute. Whether UCL-cognizable unfair acts occurred and what the social utility of those acts were is hotly debated and best determined post-trial after all the evidence has come in.

For similar reasons, I will not reach the issue of whether plaintiffs have – on undisputed facts – shown that defendants *have* engaged in fraudulent or illegal acts under the UCL. In support of their motion for summary judgment on this claim, plaintiffs focus on a number of misrepresentations that Daleiden and CMP made to the California Secretary of State regarding both CMP and BioMax and arguing that those misrepresentations violated provisions of California law, establishing liability. Pls. Reply MSJ at 24-25; *see also* Daleiden Oppo. Decl., Ex. RR. But because liability for fraudulent or illegal under the UCL is a question for me and not the jury to determine, I need not reach it here. Instead, I will reach it on a full evidentiary record following trial.

## 2.   **Lost Money or Property**

Separately, Rhomberg and Newman argue on behalf of the defendants that plaintiffs have not demonstrated that they "lost money or property" as required under the UCL. However, plaintiffs point out that their right to exclude and manage their intellectual property were both diminished by defendants' actions. *See Kwikset Corp. v. Super. Ct.*, 51 Cal. 4th 310, 323 (2011) ("There are innumerable ways in which economic injury from unfair competition may be shown. A plaintiff may (1) surrender in a transaction more, or acquire in a transaction less, than he or she

---

[121] With respect to fraudulent conduct, there is sufficient disputed evidence that Rhomberg and Newman knew of, directed, or otherwise encouraged fraudulent conduct sufficient to meet the fraudulent prong of the UCL. As a defense to "fraud," Rhomberg and Newman rely, again, on the Ninth Circuit's *Wasden* case. As discussed above, *Wasden* does not give defendants or anyone else free reign to commit fraud or other torts in efforts to uncover information, even if that information is of significant public interest.

United States District Court
Northern District of California

otherwise would have; (2) have a present or future property interest diminished; (3) be deprived of money or property to which he or she has a cognizable claim; or (4) be required to enter into a transaction, costing money or property, that would otherwise have been unnecessary.").  Similarly, plaintiffs contend (although defendants dispute) that they were required to spend resources investigating and responding to the security breaches, expenses that "would otherwise have been unnecessary."  *Id.*; *see also Witriol v. LexisNexis Group*, C05-02392 MJJ, 2006 WL 4725713, at *6 (N.D. Cal. Feb. 10, 2006) ("costs associated with monitoring and repairing credit impaired by the unauthorized release of private information" confer standing under UCL).[122]  This is sufficient to defeat defendants' motion for summary judgment on this issue.

That plaintiffs are not seeking damages under the UCL (and have disclaimed an intent to seek damages from reputational injury) does not impact their *standing* under the UCL to seek injunctive relief in light of the (disputed) evidence that plaintiffs lost money and property.

### 3.  Business Acts and Conduct Outside of California

Rhomberg and Newman argue that this claim fails as to each of them because they did not personally commit any unlawful, unfair, or fraudulent "business practices."  More generally, they contend on behalf of defendants that there were no "business practices" that any defendant engaged in with respect to each plaintiff,  defendants cannot be liable for "unfair business acts" because there is "no market" – presumably a for-profit market – for fetal tissue, and that any acts taken by or on behalf of BioMax or CMP could not, as a matter of law, constitute unfair business acts.

Plaintiffs have shown that Rhomberg and Newman – as well as CMP, BioMax, and Daleiden – engaged in practices that on their face can be considered "business practices" under the UCL.  There is evidence, some of it disputed, showing that defendants' intent and purpose was to

---

[122] Rhomberg and Newman's cases are inapposite.  In *Hall v. Time Inc*., 158 Cal. App. 4th 847 (Cal. App. 4th Dist. 2008), as modified (Jan. 28, 2008), the claim failed for lack of an "injury in fact" where the plaintiff did not adequately allege any loss.  *Id*. at 855 ("He expended money by paying Time $29.51—but he received a book in exchange. He did not allege he did not want the book, the book was unsatisfactory, or the book was worth less than what he paid for it."); *see also Butler v. Adoption Media, LLC*, 486 F. Supp. 2d 1022, 1062 (N.D. Cal. 2007) ("plaintiffs have not previously identified any loss of money or property in connection with their unfair competition claims, and cannot now attempt to establish such a loss").

United States District Court
Northern District of California

United States District Court
Northern District of California

1   set up BioMax as a fictitious company operating in a real industry in competition with other

2   companies (including Stem Express and other targets of the HCP).  There is evidence that

3   defendants made misrepresentations to the California Secretary of State as part of setting up the

4   "front" company BioMax as well as websites, business cards, and business brochures that

5   plaintiffs disputedly relied on to provide defendants access to *their* conferences and businesses.

6   These acts by defendants on their face are *business* acts.  There is also evidence, some disputed,

7   that the *purpose* of both CMP and the HCP (including the creation of the fake BioMax company)

8   was to run plaintiffs' businesses out of business.  These allegations are sufficient to bring a claim

9   under the UCL.

10      As to the California connection, both CMP and BioMax are *based* in California.  That the

11   conduct of these California-located entities' had impacts both inside and outside of California does

12   not create a jurisdictional problem to asserting the UCL claim against defendants.[123]

### 4.    Injunctive Relief

14      Defendants generally argue that plaintiffs are not entitled to injunctive relief under Section

15   17200 because plaintiffs have no evidence that there is an "imminent threat" of harm from future

16   violations.  They also contend that plaintiffs can only obtain an injunction against activity in

17   California, and there is no evidence of any ongoing or imminently threatened activity in

18   California.

19      Whether and what injunctive relief is appropriate under the UCL, on behalf of which

20   plaintiffs, and against which defendants, is more appropriately determined post-trial based on the

21   evidence adduced at trial.  It is premature to determine those matters now.  The potential

22   availability of injunctive relief cannot be foreclosed because plaintiffs have some (albeit disputed)

23   evidence of defendants' past and future intent with respect to plaintiffs' businesses and their need

---

[123] Defendants' reliance on the wage and hour *Sullivan v. Oracle Corp*., 51 Cal. 4th 1191, 1208 (2011) case does not help them.  There the adoption of an erroneous overtime classification policy was not the cause of the out-of-state plaintiffs' harm, it was the failure to pay overtime to those out-of-state plaintiffs.  Here, however, there are allegations of fraudulent conduct by these defendants in communications of the California Secretary of State and other alleged improper business practices *in California* that adequately tether jurisdiction in this state.

for continued use of fraud (including false identities) to continue to "investigate" or attempt to "infiltrate" plaintiffs' businesses.

### 5. Rhomberg, Newman, Merritt, and Lopez

The individual defendants, other than Daleiden, make a number of arguments specific to themselves that they should be excluded from the UCL claim.

Merritt argues, and her counsel repeatedly emphasized at the hearing, that there is no chance that she will undertake similar conduct against plaintiffs again.  She declares that she has a currently-impaired physical condition, is busy with her family, and has expressly disclaimed  any intent to go "undercover" again.  Given plaintiffs' upgrades to their security and screening services, she contends there is particularly little support for an injunction under the UCL against her.  *See* Supplemental Declaration of Sandra Susan Merritt [Dkt. No. 667-1] ¶¶ 6, 8; *see also id*. ¶ 9 ("I do not have the time, interest, desire or physical ability to participate in any undercover investigation, including of any Plaintiff in this action. I have no plans or intention of participating in any undercover investigation, of Plaintiffs or otherwise, in the future.").  But plaintiffs respond that Merritt's frequent (continuing into 2019) speeches against Planned Parenthood, her residency in California,  her "long history" of similar undercover work by herself and assisting others, and her other anti-abortion activities, undermine those disclaimers.  There are obvious disputes as to material facts concerning Merritt, and it is not appropriate to exclude her from this claim now.

Rhomberg and Newman make a similar request because they allege that there is no evidence or dispute of material fact about their future intent to engage in similar conduct against plaintiffs.  But given Rhomberg's and Newman's longstanding and very public opposition to plaintiffs and expressed intent to ensure plaintiffs are run out of business, there is even less reason to exclude them from the UCL claim before trial.

Finally, Lopez argues that he cannot be covered by an injunction under the UCL because he did not record in California or commit any torts or crimes in California.  But he was paid by CMP, a California company, and he pretended to be a procurement technician from California for a fake company purporting to be based in California.  These undisputed facts are sufficient to keep Lopez as a defendant on this claim at this juncture.  Whether any injunction will be justified

114

against him or any other defendant will be determined following the trial testimony and verdict of the jury on the other claims.

In sum, defendants' motion for summary judgment and plaintiffs' motion for summary judgment on the UCL claim are DENIED.

### J.      Defendants' Unclean Hands Affirmative Defense

Plaintiffs argue that defendants' unclean hands affirmative defense fails as a matter of law because the "illegal or unethical conduct" defendants allege that plaintiffs committed does not "directly relate" to plaintiffs' claims against defendants. "Under this doctrine, plaintiffs seeking equitable relief must have acted fairly and without fraud or deceit as to the controversy in issue." *Adler v. Fed. Republic of Nigeria*, 219 F.3d 869, 877 (9th Cir.2000) (internal quotation marks and citations omitted). Thus, the unclean hands doctrine "closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant." *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co*., 324 U.S. 806, 814 (1945). "The misconduct that brings the unclean hands doctrine into play must relate directly to the cause at issue. Past improper conduct or prior misconduct that only indirectly affects the problem before the court does not suffice. The determination of the unclean hands defense cannot be distorted into a proceeding to try the general morals of the parties." *Kendall-Jackson Winery, Ltd. v. Super. Ct*., 76 Cal. App. 4th 970, 979 (Cal. App. 5th Dist. 1999), *as modified on denial of reh'g* (Jan. 3, 2000).

For this defense to apply, defendants must show that plaintiffs engaged in racketeering activities, trespass, fraud, secret recordings, or unfair business practices of the sorts in which defendants engaged. Defendants identified, in their discovery responses, the illegal or unethical conduct they believe plaintiffs are engaged in as violating laws regarding abortions and fetal tissue procurement. That conduct – even if true – does not directly relate to the rights and equities plaintiffs are asserting against defendants here. In their opposition, defendants further identify mistreatment of pregnant women, infants, and fetuses as illegal or unethical conduct, but that too does not relate directly to the affirmative claims being pursued by plaintiffs.

I have previously indicated that the unclean hands defense did not apply given the

allegations in this case.  *See* Dkt. No. 501 at 10, *affirmed* Dkt. No. 533 at 3-4.  Nothing in

defendants' opposition calls that decision into question.  That the HCP videos have led to multiple

government investigations (and indeed some criminal pleas from entities who are not parties in

this case) does nothing to bring defendants' allegations regarding *plaintiffs'* illegal or unethical

conduct (which, again, have not been substantiated against *these* plaintiffs) into the sort of "direct

relation" to the causes of actions plaintiffs' assert in this case.  Instead, defendants are attempting

to "try the general morals of the parties," which is beyond the scope of this affirmative defense.

*Kendall-Jackson Winery, Ltd*., 76 Cal. App. 4th at 979.

Plaintiffs' motion for summary judgment as to the unclean hands defense is GRANTED.

## II.    DEFENDANTS' ANTI-SLAPP MOTION

In conjunction with their motions for summary judgment, defendants filed a special motion

to strike under California's anti-SLAPP statute, California Code of Civil Procedure § 425.16.  Dkt.

No. 600.  This is defendants' second special motion to strike.  Defendants assume that they are

entitled to file this successive motion to strike because it is "evidentiary based" and filed in

conjunction and on materially identical bases as their individual motions for summary judgment

under Rule 56, whereas their first special motion to strike was based on deficient pleading

arguments considered under the Rule 12(b)(6) standard.  Defendants admit that they are filing this

separate, successive motion for two purposes only: to seek the "boons" of the statute's attorney

fees and automatic appeal provisions.  Anti-SLAPP Motion at 2.

In my Tentative Ruling and Procedure Order issued before the hearing, I asked the parties

to identify any cases that support allowing defendants to file a successive special motion to strike

given the posture of this case.  Neither side provided authority that in federal court a successive

anti-SLAPP motion can be filed at the summary judgment stage after the close of full, not simply

expedited, discovery and based on arguments fully co-extensive with the contemporaneous

motions for summary judgment.

As the legislative history and cases interpreting the anti-SLAPP statute confirm, the

purpose of the fee provision is to provide a significant disincentive to filing frivolous or weak suits

seeking to quash speech.  *Ketchum v. Moses*, 24 Cal. 4th 1122, 1131 (2001) ("The fee-shifting

provision was apparently intended to discourage such strategic lawsuits against public participation by imposing the litigation costs on the party seeking to 'chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances.'").  The justification for the interlocutory appeal and stay provisions is routinely described as providing a route for early review and appellate consideration of free speech and petition cases.  *DC Comics v. P. Pictures Corp.*, 706 F.3d 1009, 1014 (9th Cir. 2013) (recognizing interlocutory appeal necessary because "[w]ithout [it], a defendant will have to incur the cost of a lawsuit before having his or her right to free speech vindicated." (internal quotation omitted)).  Defendants benefitted from that early review procedure by having their first anti-SLAPP motion considered by me in the first instance and then by the Ninth Circuit on interlocutory appeal.  Defendants *chose* to base their anti-SLAPP motion to strike on a Rule 12/insufficiency of the pleadings argument; they lost at both levels.[124]

Now defendants file a second special motion and assert materially identical arguments to their motions for summary judgment.  Nothing in the structure or the history of the California anti-SLAPP statute countenances this approach.  *See Newport Harbor Ventures, LLC v. Morris Cerullo World Evangelism,* 4 Cal. 5th 637, 639–40 (2018) (Because "the anti-SLAPP statute is designed to resolve these lawsuits early, but not to permit the abuse that delayed motions to strike might entail, we conclude . . . a defendant must move to strike a cause of action within 60 days of service of the earliest complaint that contains that cause of action."); *Sweetwater Union High Sch. Dist. v. Gilbane Bldg. Co*., 6 Cal. 5th 931, 945 (2019) (addressing difference between summary judgment motions under California law and anti-SLAPP motions, noting "Chief among them is that an anti-SLAPP motion is filed much earlier and before discovery."); *see also id*. at 949 ("Ultimately, the SLAPP Act was 'intended to end meritless SLAPP suits early without great cost to the target' . . . not to abort potentially meritorious claims due to a lack of discovery.").

The Ninth Circuit's requirement that courts allow sufficient discovery before addressing an evidence-based anti-SLAPP special motion to strike stems from a concern that the anti-SLAPP

---

[124] I note that Merritt, in fact, made evidence-based arguments and did not limit her first anti-SLAPP motion to legal sufficiency.

United States District Court
Northern District of California

1   statute otherwise impermissibly conflicts with the protections available to non-movants under the

2   Federal Rules.[125]  Allowing for an immediate interlocutory appeal at this juncture of the case

3   would similarly and impermissibly conflict with the Federal Rule provisions governing the limited

4   circumstances where interlocutory appeals are appropriate as well as Federal Rule of Civil

5   Procedure 1's mandate for the "just, speedy, and inexpensive determination of every action."

6         Defendants identified three cases in response to my request before the hearing that counsel

7   for both sides provide authority addressing the propriety of a successive special motion to strike in

8   circumstances similar to ours, but none of them provide guidance given the procedural posture of

9   this case.  In *Manufactured Home Communities, Inc. v. County of San Diego*, 606 F. Supp. 2d

10  1266, 1268 (S.D. Cal. 2009), *aff'd*, 655 F.3d 1171 (9th Cir. 2011), the district court initially

11  *granted* a special motion to strike and entered judgment in defendants' favor.  When that judgment

12  was reversed on appeal, the district court considered and granted in full the "renewed" motion to

13  strike. In *Batzel v. Smith*, 333 F.3d 1018, 1025 (9th Cir. 2003), the Ninth Circuit recognized that

14  because "the anti-SLAPP motion is designed to protect the defendant from having to litigate

15  meritless cases aimed at chilling First Amendment expression" that substantive right – exercised

16  on a sixty-day timeframe in state court – meant that a denial in federal court was subject to

17  interlocutory review under 28 U.S.C. § 1291.  In *Varian Med. Sys., Inc. v. Delfino*, 35 Cal. 4th

18  180, 191 (2005), the California Supreme Court decided that, under California law, trial court

19  proceedings on the merits are stayed following an appeal from the denial of an anti-SLAPP

20  motion.

21        Plaintiffs' cases were slightly more helpful.  For example, in *U.S. ex rel. Newsham v.

22  Lockheed Missiles & Space Co., Inc.*, 190 F.3d 963, 972 (9th Cir. 1999), the Ninth Circuit

23  concluded that there was no "direct collision" between the anti-SLAPP statute's special motion

24  and fees provisions and Federal Rules 8, 12, and 56 because "if successful, the litigant may be

25  entitled to fees pursuant to § 425.16(c).  If unsuccessful, the litigant remains free to bring a Rule

26

27  _____

28  [125] *See Planned Parenthood Fedn. of Am., Inc. v. Ctr. for Med. Progress*, 890 F.3d 828, 833 (9th Cir. 2018), *amended*, 897 F.3d 1224 (9th Cir. 2018), *and cert. denied sub nom. Ctr. for Med. Progress v. Planned Parenthood Fedn. of Am.*, 139 S. Ct. 1446 (2019).

12 motion to dismiss, or a Rule 56 motion for summary judgment." *Id*. at 972.  The court, therefore, failed "to see how the prior application of the anti-SLAPP provisions will directly interfere with the operation of Rule 8, 12, or 56.  In summary, there is no 'direct collision' here.'"[126]

        Here, however, I am addressing an anti-SLAPP motion to strike that not only is fully co-extensive with Rule 56 summary judgment motions but was also filed on the eve of trial, much later than the California legislature believed anti-SLAPP motions should be heard.  *See* Cal. Code Civ. Proc. § 425.15(f) ("The special motion may be filed within 60 days of the service of the complaint or, in the court's discretion, at any later time upon terms it deems proper."); *see also Equilon Enterprises v. Consumer Cause, Inc.*, 29 Cal. 4th 53, 65 (2002) (recognizing that "early resolution is consistent with the statutory design 'to prevent SLAPPs by ending them early and without great cost to the SLAPP target'. . . a purpose reflected in the statute's short time frame for anti-SLAPP filings and hearings.").[127]

        This case is set for trial on October 2, 2019.  It appears that at least one of reasons defendants filed this successive motion is their desire to delay trial.  I do not intend to delay this case any further.  I can decide any appropriate motions for attorneys' fees after the trial.  Defendants' special motion to strike is DENIED.  None of the state law claims are stayed.  All claims that survive this Order will proceed to trial as scheduled.

## III.    DEFENDANTS' MOTION TO EXCLUDE COHEN

        Defendants move to strike and exclude the testimony of plaintiffs' expert, Professor David S. Cohen.  Dkt. No. 641.  Cohen has been designated by plaintiffs to testify on the following opinions: "Because of the Center for Medical Progress Videos Created by Defendants, Plaintiffs

---

[126] Plaintiffs also cited *Fid. Natl. Title Ins. Co. v. Cothran*, B258692, 2016 WL 1162192, at *1 (Cal. App. 2d Dist. Mar. 23, 2016) (unpublished), where the California Court of Appeal held that a party "may not use a second anti-SLAPP motion to challenge the same allegations" that were challenged in the first anti-SLAPP motion.

[127] I recognize that the Ninth Circuit has held that the strict timeframe under section 425.16(f) for filing a special motion to strike does not apply in the Ninth Circuit.  *See Sarver v. Chartier*, 813 F.3d 891, 900 (9th Cir. 2016).  I cite this as a recognition of the California legislature's common-sense concern that these motions be brought and resolved early in the life of the case.

United States District Court
Northern District of California

1    and Other Abortion Providers Around the County Faced Increased Targeted Harassment."  His

2    report discusses the "History of Violence and Harassment of Abortion Providers and its Impact on

3    Medical Providers and Staff in this Field."  Cohen Expert Report [Dkt. No. 641-4].  He opines that

4    "splashing recordings of abortion providers across the internet in deceptive and inflammatory

5    videos had uniquely devastating impact on abortion providers everywhere, including plaintiffs"

6    and the CMP videos "do not exist in a vacuum" but within the context of a history of violence

7    against providers, and "no one with any familiarity with the word of abortion, including

8    Defendants, could have possible been unaware of this context and what impact the videos would

9    have on abortion providers, including the possibility of violence, a possibility realized here."  *Id.*

10   Cohen has taught constitutional and gender law at Drexel University for 13 years and in

11   addition to his academic work, he "represents and counsels" clinics and individuals in cases

12   arising out of harassment including violations of the Federal Access to Clinic Entries (FACE) law.

13   His area of expertise is the history of anti-abortion violence and its current effect on abortion

14   providers.  In particular, he opines that "targeted harassment" of individual abortion providers and

15   the making of "egregious claims" against them "with the implicit message that something must be

16   done" are the tactics "that in the past have triggered those on the fringes of the anti-abortion

17   movement to engage in violence."  *Id.*

18       **A.    Advocate-Witness Rule**

19   Defendants initially argue that Cohen's testimony must be excluded under the "advocate-

20   witness" rule because he has served as "counsel" in capacities related to this case.  The advocate-

21   witness rule "prohibits an attorney from appearing as both a witness and an advocate in the same

22   litigation. *See United States v. Prantil*, 764 F.2d 548, 552–53 (9th Cir.1985). The policies

23   underlying this rule "are related to the concern that jurors will be unduly influenced by the prestige

24   and prominence of the prosecutor's office and will base their credibility determinations on

25   improper factors." *United States v. Edwards*, 154 F.3d 915, 921 (9th Cir.1998); *see also U.S. v.*

26   *Sayakhom*, 186 F.3d 928, 943 (9th Cir. 1999), *amended*, 197 F.3d 959 (9th Cir. 1999).

27   Defendants contend Cohen crosses that line because, first, he has been counsel to three

28   East Coast Planned Parenthood affiliates for over 20 years.  Those affiliates are not plaintiffs in

120

this case.  Second, he has engaged in public and private advocacy against the defendants in this

case, including publishing an "open letter" to Planned Parenthood affiliates less than one week

after the HCP videos were first released advocating that the Planned Parenthood affiliates sue

CMP.  He also sent a letter to then California Attorney General Kamala Harris urging her to

investigate CMP and suggesting legal reasoning for the AG to consider.  One or both of these

letters were sent through colleagues of Cohen to three of the individuals recorded:  Nucatola,

Gatter, and Ginde.  Cohen responded to this "group" and kept them informed of his efforts to get

YouTube to take down the CMP videos.[128]

Third, Cohen was retained by Nucatola and other individuals recorded in the videos for

legal advice.  He asserted the attorney-client privilege in his deposition in response to questions

regarding his conversations with people recorded in the videos and refused to identify some of the

people to whom he provided counsel.  Fourth and finally, defendants point out that Cohen has

filed three amicus briefs, including in the related *NAF* case (on behalf of the Southern Poverty

Law Center and Feminist Majority) in support of the preliminary injunction issued in the *NAF*

case as well as in the unrelated University of Washington FOIA case brought by CMP.  Those

briefs, according to defendants, "bear a striking resemblance" to his expert report in this case.

Defendants contend that Cohen's status as amicus counsel means  that he has a fiduciary duty to

ensure that defendants lose, which crosses the line from expert to advocate.

Plaintiffs respond that because Cohen has not sought to be both a witness and advocate in

the same litigation – *e.g.*, this case – the advocate-witness rule does not apply.  Each of the cases

relied on by defendants and plaintiffs that discuss the rule involved an attorney who was counsel

and then who was or likely could have been a witness in the same case.  Here, Cohen's amicus

briefs were filed in other cases.  He has not represented any of the plaintiffs (which are all entities)

in this case or any clinic in a similar case.  Plaintiffs also argue that Cohen did not actually assert

the attorney-client privilege during his deposition, but merely indicated that he would assert the

---

[128] Defendants characterize Cohen's statements in these communications as "baseless," relying on
deposition testimony from Cohen where he admitted to having no information about any of
Planned Parenthood or its affiliates' dealings with fetal tissue procurement companies or whether
the CMP videos had been deceptively edited.

United States District Court
Northern District of California

privilege if defense counsel pursued and demanded answers to specific questions.[129]

Finally, plaintiffs argue that even though Cohen's politics are clearly pro-choice and he advocates for legal protection for abortion and clinics, that does not undermine his ability to give "valid, historically grounded and empirically researched testimony" here. *See Planned Parenthood Southeast v. Strange*, 33 F. Supp. 3d 1381 (M.D. Ala. 2014) (admitting testimony from sociologist who had personal opposition to abortion restrictions, which were at issue).[130]

The facts of this case do not fit squarely into the confines of the advocate-witness rule and I will not bar Cohen's expert testimony on that basis. That said, as discussed below, defendants' motion to exclude will be granted in part under Federal Rule of Evidence 702.

### B.    FRE 702

Defendants also move to exclude Cohen's testimony under Federal Rule of Evidence 702 because Cohen did not use a reliable methodology, did not have sufficient data, did not reliably apply his theory to the data, will confuse and not help the jury, and will be extremely prejudicial to defendants.

#### 1.    Methodology

Defendants assert that Cohen does not have any methodology, theory, or technique to support his statement that "anyone with any familiarity with the world of abortion" would have known the CMP videos could lead to violence and did. Defendants contend that his methodology, or lack thereof, cannot be tested, was not peer reviewed, and cannot be assessed for known rates of

---

[129] I note that whether or not Cohen formally invoked the attorney-client privilege and whether defense counsel should have pushed him or his counsel to more clearly invoke that privilege, it is undisputed that Cohen did not answer questions about the advice he gave to Nucatola or others who had been recorded by the defendants in this case.

[130] In that case, the court explained that the "sociologist and epidemiologist" had for "the last 35 years, [] been affiliated in some manner with the Guttmacher Institute, an organization that advocates for abortion rights and access to contraception. At trial, he presented a number of studies of the effects of distance and cost on women's likelihood of obtaining an abortion and on delays in obtaining abortion. Henshaw has a bias against abortion restrictions and regulations. Nonetheless, having viewed the witness and listened to his testimony, the court found that he testified credibly and helpfully about the nature of the various studies and their strengths and limitations." *Planned Parenthood S.E., Inc. v. Strange*, 33 F. Supp. 3d 1381, 1395 (M.D. Ala. 2014).

United States District Court
Northern District of California

1   error or under accepted standards, making it excludable under *Daubert*.

2          More specifically, defendants point out that during his deposition Cohen could not define

3   "world of abortion" and argue that his foreseeability arguments – that release of the videos would

4   encourage third parties to acts of violence and threats – would encompass subsequent reports on

5   the HCP videos by the *New York Times* as well as Cohen's own articles covering the CMP videos.

6   Defendants argue, under Cohen's own logic, that anyone discussing or republishing the HCP

7   videos would be responsible for "foreseeable" damage caused by third parties.  Defendants also

8   contend that his assertion tying the supposed increase in violence to the HCP videos is unreliable

9   because he fails to account for alternative explanations for violence following the release of the

10  HCP videos – explanations including the presidential campaign, Supreme Court abortion cases,

11  and states passing restrictive abortion laws.

12         As to methodology, plaintiffs point out that in Cohen's deposition he explained he did

13  consider alternate causes of the increase in violence/threats following the release of the HCP

14  videos (even if he did not address them in his short report) and that he provided reasons to tie the

15  foreseeability to defendants' conduct and not subsequent reports on that conduct (which typically

16  did not include or link to the full content of the HCP videos).  Defendants' points on methodology

17  are, in the end, the sorts of issues that are appropriately used to discredit or undermine an expert

18  on cross-examination.  I will not exclude Cohen on this basis.

19                    2.    **Sufficient Data**

20         Defendants contend that Cohen's opinions do not rest on sufficient data because the data

21  Cohen relies on is itself unreliable.  Cohen's first source is his 2015 book "Living in the

22  Crosshairs," released prior to the HCP videos.  The book discussed the impact of targeted

23  harassment on the lives of abortion providers and was based on interviews with 87 abortion

24  providers.  Defendants argue that because the interviewees were not chosen randomly or

25  methodically and the "surveys" were not designed in accordance with any standards, the result is

26  inadmissible self-reported data infected with self-interest bias.

27         However, Cohen testified in his deposition to his use of several widely-accepted methods

28  to validate his research (comparative method, triangulation, member/respondent validation, and

United States District Court
Northern District of California

transparency), which are common in the field of qualitative research.  He also noted that he relied on secondary sources and statistics and that his book was "peer-reviewed" by its publisher, the Oxford University Press.  Considering this, defendants' criticisms of Cohen's methodology in his book is not a basis to exclude him.  The cases defendants rely on are largely inapposite (for example, addressing deficient surveys in antitrust and consumer protection cases), and do not readily apply to the sort of qualitative research Cohen undertook.

Defendants also challenge Cohen's reliance on "violence" data as collected and reported by NAF and Feminist Majority Foundation, pointing out that Cohen knows very little about that data collection and that he did not test or validate that data in any way before relying on it in to draw his opinions in this case.  In particular, defendants criticize Cohen for failing to analyze or address any of PPFA's own security reporting data following the release of the HCP videos. Finally, defendants argue – without citation to any apposite case law – that Cohen's reliance on reports of bad acts by third parties is the same as excludable "prior bad acts" evidence under the Federal Rules of Evidence.

Plaintiffs respond, simply, that experts like Cohen are permitted to rely on data (like the NAF and Feminist Majority Foundation data) that they have not collected or validated themselves. At most, this provides a basis for defendants to attempt to undermine Cohen on cross-examination. I agree.  The failure to verify the underlying threat data is not a basis to exclude, but is a basis for cross-examination.

### 3.    Application of Theory to Data

Defendants then challenge Cohen's application of theory to data, basically rehashing their prior two arguments as to Cohen's methodology and data.  This argument is rejected for the same reasons.

### 4.    Confusing and Prejudicial

Finally, defendants argue that Cohen's testimony should be excluded as it will be extremely confusing to the jury and prejudicial to defendants because Cohen identifies them as extremists, his testimony is entirely unobjective, and it is tinged with bias and stereotyping.  They point out that Cohen did not review any of plaintiffs' actual claims of damage in this case and

argue that his testimony goes to "publication" damages which are irrelevant and protected by the First Amendment. They further contend that Cohen's opinions on foreseeability and causation are excludable legal conclusions. Finally, they assert that Cohen's testimony – at deposition and in his report – that the HCP videos caused the Colorado Springs clinic shooting is allegedly contradicted by testimony from plaintiffs PPFA and PPRM in separate lawsuits in Colorado that "no one could have foreseen" that isolated violent event.

In response, plaintiffs point to cases where experts have been allowed to provide "history" evidence regarding cults, police abuse, and historical discrimination, and assert that Cohen's testimony describing the history of violence against abortion clinics and providers over the last 40 years is no different. Plaintiffs rely on *Scott v. Ross*, 140 F.3d 1275, 1286 (9th Cir. 1998), where the Ninth Circuit held that a sociologist's opinions on "the history and general practice of deprogramming and the origin and practices of the 'anti-cult movement'" including "as to the entrepreneurial nature of deprogramming and its origins in religious intolerance" were not inappropriately admitted because those topics were beyond general knowledge of jury and were based on a "generally accepted explanatory theory." Plaintiffs characterize Cohen's testimony likewise, asserting that the history opinions will be helpful to the jury as well as relevant to "whether the increase and threats and harassment of abortion providers was a foreseeable and natural consequence of the CMP videos." Pls. Oppo. Cohen [Dkt. No. 674] at 8.

Plaintiffs also point out that bias goes to weight, not admissibility. *U.S. v. Abonce-Barrera*, 257 F.3d 959, 965 (9th Cir. 2001) ("Generally, evidence of bias goes toward the credibility of a witness, not his competency to testify, and credibility is an issue for the jury."). And as to legal conclusions, plaintiffs say first that Cohen will not testify as to "causation" but only on "Defendants' awareness of the harassment and violence that would likely result from the release of the CMP videos." Pls. Oppo. Cohen at 14. But they also say on page 8 that Cohen's testimony is relevant as to foreseeability and "natural consequences." *Id*. at 8. As to confusion and contradiction, plaintiffs explain that there is none because in the Colorado case (which was brought by victims of the Colorado Springs shooting against PPFA and PPRM), Planned Parenthood's position was simply that the *specific* event was unforeseeable at that location, not

1   that violence or threats in general were not unforeseeable.

2          Both sides have good points.  I will not exclude Cohen in full because of bias or prejudice.

3   Cohen may testify as to the background and history of anti-abortion activists targeting abortion

4   providers.  He may also testify concerning his understanding of whether there was an increase in

5   the number or types of threats to abortion providers following the release of the HCP videos.  This

6   information is relevant to whether plaintiffs' incurred damages (in the categories allowed) were

7   reasonably incurred, or speculative or voluntary.  However, Cohen will not be allowed to testify

8   about the causation of plaintiffs' damages *in this case*, or the intent of these defendants, or the

9   foreseeability of acts of violence perpetrated by third parties following the release of the HCP

10  videos.  These are beyond his area of expertise, verge on legal conclusions, and his testimony

11  would likely venture into areas in which he advised third party witnesses in this case and shut

12  down questioning at his deposition on the basis of privilege.

13         Defendants' motion to exclude is, accordingly, GRANTED in part and DENIED in part.

## IV.    MOTION TO STRIKE

15         Defendants move to strike and preclude plaintiffs from relying on late-identified segments

16  of defendants' recordings in support of plaintiffs' illegal or tortious recording claims.  Defs. MTS

17  [Dkt. No. 601].  Through an interrogatory, defendants asked plaintiffs to identify each video file

18  that plaintiffs contended showed an illegal or tortious recording.  Plaintiffs eventually identified

19  119 video segments in amended responses in November 2018.  But on April 27, 2019, plaintiffs

20  served amended interrogatory responses identifying 147 video segments.[131]  For the 25 "newly

21  identified" segments at issue, they contain 17 distinct conversations or interactions 11 of which

22  were recorded at NAF conferences.

23         Defendants object and move to exclude the additionally identified segments because they

24  came almost four months after the written fact discovery cutoff (December 31, 2018) and two

25  weeks after the full fact discovery cutoff (April 15, 2019, not including the depositions which

---

[131] The parties agree that one amended designation was in error and one is a duplicate, so there are only 25 newly identified segments at issue.  Pls. Oppo. MTS [Dkt. No. 655] at 1 n.1; Defs. Reply MTS [Dkt. No. 691] at 3 n.1.

1   were allowed to take place thereafter by stipulation and Order).  Defendants also note that the

2   parties entered into a stipulation providing that the parties had until January 18, 2019, to provide

3   "amended initial disclosures, additional documents on which either party intends to rely (of which

4   the party is currently aware)."  Trissell Decl., Ex. 30.

5       Defendants argue that under Federal Rule of Evidence 37(c)(1) the amendments should be

6   struck because they have been prejudiced by the late identification.  They were unable to ask

7   plaintiffs' witnesses questions about the circumstances surrounding the added recordings because

8   the only depositions occurring after April 27, 2019 were of fact-witnesses who were not alleged to

9   have been unlawfully recorded.  The circumstances surrounding each of the recordings – whether

10  the witness believed the conversation could be overheard, whether there was private content – is

11  "core" evidence.  That prejudice cannot be cured given the cutoff, the pending motions for

12  summary judgment, and the approaching trial.

13      Plaintiffs respond that they learned of their inadvertent omission at the March 2019 PPFA

14  deposition and promptly moved to identify the missing segments and serve the amended

15  responses.  Therefore, under Rule 26(e), which requires prompt corrections to an incomplete or

16  incorrect discovery response, their response was appropriate and timely.[132]

17      Plaintiffs also contend that if, instead, Rule 37(c)(1) applies, there is no prejudice or harm

18  under Rule37(c)(1) because on October 22, 2018 (two months before the discovery cutoff), in

19  response to discovery requests from defendant Daleiden, plaintiffs identified by name (or Doe

20  identifier) all persons illegally recorded, including the event/location of the illegal recordings and

21  the recording dates.  Those responses covered 18 of the 25 segments at issue in this motion.  What

22  was missing from those responses, and only requested in Rhomberg's requests, were the video file

23  names or start/end times.  When plaintiffs served their November 2, 2018 responses to Rhomberg

24  providing that additional information, they inadvertently omitted the file names of 18 segments

---

[132] Plaintiffs also point out that the email confirming the stipulation covered only "amended initial disclosures" and documents.  Plaintiffs argue that it did not cover other amended or corrected written responses, while defendants assert that it did and the confirmatory email was "poorly drafted."  Defs. Reply MTS [Dkt. No. 691] at 2.  If the confirmatory email was poorly drafted, defendants should have objected to it and clarified their understanding.  There is no evidence they did so.

United States District Court
Northern District of California

1   where six of the individuals identified in the October 22, 2018 discovery responses were

2   recorded.[133]

3        With respect to the other 7 segments at issue on this motion, plaintiffs admit that in neither

4   the October 22, 2018 or November 2, 2018 responses were those 7 segments identified by file

5   name much less by person/location.  However, plaintiffs state that in response to one of Daleiden's

6   requests, in their October 22, 2018 responses, plaintiffs identified each of the employees in those

7   segments by name or Doe identifier as having been illegally recorded at "some point in time."

8        Plaintiffs assert, therefore, that they had identified each employee they considered illegally

9   recorded and were not trying to hide the ball.  Their failure to identify the specific file names for

10  some of the recordings was inadvertent and promptly corrected.  They also contend that there is no

11  prejudice to defendants because defendants made the recordings and know all the facts regarding

12  the circumstances of each.  Defendants, according to plaintiffs, also had ample opportunity to

13  depose both fact and corporate witnesses about the circumstances of the recordings and have not,

14  in their motion, identified any particular "newly identified" segment that shows something

15  materially different from the segments they did explore with plaintiffs' witnesses.

16       In Reply, defendants provide a new explanation for their prejudice – they contend that they

17  in fact could not identify, even roughly, which conversations plaintiffs contend were illegally

18  recorded because plaintiffs' court-sanctioned use of the Doe identifiers made it uniquely complex

19  for defendants to puzzle out which specific individuals were allegedly illegally recorded and

20  when.  Also in Reply, defendants attempt to explain the prejudice to them by discussing with

21  specificity some of the newly added segments.  Reply ISO MTS [Dkt. No. 691] at 5-6.  They point

22  out that for some of the newly added segments new Does have been identified (*e.g.*, Doe9002 who

23  was recorded by Daleiden at PPCG's offices in Houston) but admit that other segments of the

24  recordings had been previously identified by plaintiffs with respect to other Does and named

25  employees.

26

27  ───────────────

28  [133] Plaintiffs admit they omitted one employee DOE4001 from the October 22, 2018 responses but included some specific recording of DOE4001 in the November 2, 2018 responses.  Plaintiffs just did not include all of the segments including DOE4001 in their November responses.

United States District Court
Northern District of California

1   What defendants did not do in either their Motion  or the Reply is show or explain why the

2   circumstances surrounding the newly added segments, for example of Doe9002, differed

3   materially from the circumstances surrounding the other segments identified by plaintiffs prior to

4   the discovery cutoff dates.  Defendants did not, for example with the Doe9002 segment, identify

5   what questions they would have asked PPGC's Rule 30(b)(6) witness that differed from the

6   questions they asked that witness regarding the other staff recorded in the same video.

7   Given defendants' arguments raised in Reply and their failure to specifically show

8   prejudice or harm from the late disclosures, in my Tentative Rulings and Procedure Order I

9   directed the parties to file supplemental brief of ten pages or less explaining "why late

10   identification of each of the approximately 25 late-disclosed video segments is [or is not]

11   prejudicial, focusing on the existence of unique circumstances in each of those segments that

12   differentiates them from the other, prior-disclosed video segments on which defendants had the

13   opportunity depose plaintiffs' witnesses."  Dkt. No. 718.  Considering those supplemental briefs, I

14   rule on each as follows.

15   **NAF Conference Recordings**:  As clarified by the supplemental briefs, the majority of the

16   late-disclosed recordings still at issue were taken at either the NAF 2014 San Francisco conference

17   or the 2015 NAF Baltimore conference.  Prior to the late disclosure, defendants argue that only

18   one NAF conference video had been specifically identified as actionable by plaintiffs; a recording

19   of Doe1023 at the 2014 conference taken at the NAF exhibit table.

20   Plaintiffs argue that there can be no prejudice because in their October 22, 2018 corrected

21   responses to Daleiden's Interrogatory responses, they specifically identified each name/Doe

22   identifier of each staff member recorded at the NAF 2015 conference in Maryland, as well as its

23   staff who were illegally recorded in California (which could have only been at the 2014 NAF

24   conference or at the Gatter and Nucatola lunch meetings).  Dkt. No. 662-7 at ECF pgs. 70-72.

25   Plaintiffs, however, accidentally omitted these recordings (as well as the requested timestamps)

26   from plaintiffs' November 2018 responses to Rhomberg's requests.  Plaintiffs argue that

27   defendants' reliance on plaintiffs' accidental omission – defendants contend they believed

28   plaintiffs might have intentionally omitted those recordings – was not reasonable, plaintiffs'

United States District Court
Northern District of California

129

1    responses to Daleiden remained valid, and defendants' should have sought clarification from

2    plaintiffs before assuming those prior disclosed videos were no longer at issue.  Plaintiffs also

3    argue that because Daleiden and Lopez, and now counsel, were and are intimately familiar with

4    the contents of the records (for the initial transcribing and production of the HCP videos as well as

5    for submission of relevant recordings to me), it is unreasonable for defendants to claim ignorance

6    or prejudice about which of plaintiffs' employees were recorded and the circumstances

7    surrounding those recordings.

8         Turning to each video at issue:

9         Recordings #14-15/25-26 (taken by Merritt at NAF 2015 Baltimore conference of

10   Doe1001 and VanDerhei (Doe1003) in the lobby area of the hotel).  Defendants argue prejudice

11   on these videos because Merritt was not on notice that any of her videos from the NAF 2015

12   conference were at issue and so she did not have the opportunity to question PPFA's Rule 30(b)(6)

13   witness or VanDerhei about the confidential nature of the conversations or VanDerhei's concern

14   that conference participants might be secretly recorded.  These two individuals, however, were

15   disclosed as having been illegally recorded *at that specific conference* in plaintiffs' October 22,

16   2018 responses, although time stamps were not provided.  As to the VanDerhei comment about

17   possible secret recordings, defendants obviously had notice of it as it was relied upon *by*

18   defendants in their motions for summary judgment and defendants – had they wanted to – could

19   have asked VanDerhei about it in her deposition.  Defendants had adequate notice that recordings

20   of these individuals were at issue.  Claims related to these recordings remain.

21        Recording #72 (taken by Merritt at NAF 2015 Baltimore conference of Nucatola).

22   Defendants assert that no other recording of this conversation has been disclosed, so none of the

23   defendants had the opportunity to ask Nucatola about the circumstances surrounding this

24   encounter.  However, defendants do not identify what "circumstances" in this particular

25   conversation were different than other, timely disclosed conference tapings that would have

26   altered the information sought or possibly the answers given.  Nucatola, a central figure in this

27   case, was deposed extensively and defendants had adequate opportunity to probe the

28   circumstances surrounding the recordings of Nucatola in the various contexts where she was

130

1    recorded.  The claims regarding this recording remain.

2        Recording #69 (duplicate of #87) (taken by stationary camera at NAF 2014 San Francisco

3    conference of Nucatola conversing with Merritt and Baxter at the exhibit table).  Defendants argue

4    that their prejudice on this recording is significant because they did not get to ask PPFA's Rule

5    30(b)(6) witness which defendant PPFA believes is responsible for the "stationary camera" or why

6    this conversation was confidential.  However, defendants deposed Nucatola about various NAF

7    2014 recordings and have identified no particular circumstances in this video that differentiate it

8    from those Nucatola was asked about.  As to which defendant was responsible for the stationary

9    camera, that can be readily probed at trial and there is no prejudice from defendants not being able

10   to ask that discrete question to PPFA's deposition witness.  Claims related to this recording

11   remain.

12       Recordings #19-21 (recordings of a panel presentation by Doe1002 at NAF 2015

13   Baltimore conference).  This is the only recording of a panel presentation, as opposed to individual

14   or small group conversations, identified by plaintiffs as actionable.  Doe1002 was disclosed as

15   having been illegally recorded at this conference in plaintiffs' October 22, 2018 responses.  More

16   significantly, the circumstances surrounding this video obviously differ materially from the other

17   timely-disclosed videos.  However, defendants asked VanDerhei about a portion of *this* very

18   recording, exploring the expectation of privacy of those involved.  Defendants have not shown

19   prejudice.  Claims related to this recording remain.

20       Recording #24 (taken by Daleiden at NAF 2015 Baltimore conference of Doe1003).

21   Defendants claim prejudice because this is the only recording of Doe1003 at this meeting, so no

22   defendant had an opportunity to question PPFA about it.  However, Doe1003 *was specifically*

23   identified in plaintiffs' October 22, 2018 responses as having been illegally recorded at this

24   conference.  If this is the only video of that Doe from that conference, defendants necessarily had

25   adequate notice.  Moreover, defendants identify no circumstances regarding this particular video

26   that set it apart from the other recorded conference conversations that were timely disclosed.

27   Claims related to this recording remain.

28       Recording #71 (taken by Daleiden at NAF 2015 Baltimore conference of Nucatola).

1    Defendants argue prejudice because this video is the only one of Nucatola from the Maryland

2    conference identified.  However, Nucatola was disclosed in plaintiffs' October 22, 2018 responses

3    as having been illegally recorded in Maryland; therefore, defendants were on notice of this

4    recording.  Further, defendants do not identify any specifics regarding this conference or this video

5    that set it apart from the other recorded conference conversations that were timely disclosed.

6    Claims related to this recording remain.

7        Recording #68 (duplicate of #88) (taken by Daleiden at NAF 2014 San Francisco

8    conference of Nucatola).  Defendants argue that they were not on notice to ask questions about the

9    NAF 2014 conference with Nucatola, but plaintiffs point out that defendants asked Nucatola

10   questions about this very recording during her deposition (as it was part of one of the HCP

11   videos).  There is no prejudice to defendants and claims related to this recording remain.

12       Recording #70 (taken by non-party Bettisworth at 2015 NAF Baltimore conference of

13   Nucatola).  The result here is the same with respect to prejudice because Nucatola was specifically

14   identified as having been illegally taped at the 2015 NAF conference and defendants identify no

15   circumstances surrounding this video that would have altered the questions asked or possible

16   answers with respect to privacy at conferences in general.  Plaintiffs, however, seem to admit they

17   mistakenly listed this video (by non-party Bettisworth) instead of the video of the same

18   conversation recorded on Daleiden's device.  *See* Dkt. No. 730 at 5.  Assuming that there are no

19   circumstances surrounding Daleiden's recording that differentiate it from the one taken by

20   Bettisworth, the recording taken by Daleiden may be late-identified and claims related to it may

21   presented at trial.

22       **PPFA Conference**.  Recordings #27-28 (taken by Daleiden at the PPFA Washington, DC

23   conference of VanDerhei (Doe1003)).  Defendants argue that they were prejudiced because no

24   other recordings of VanDerhei in this jurisdiction or setting were disclosed, and defendants did not

25   question her about her expectation of privacy at this conference in this "one-party consent"

26   jurisdiction.  Plaintiffs respond that there can be no prejudice because this very recording was used

27   in the HCP videos, so defendants clearly knew about it.  In addition, defendants do not identify

28   any particular circumstances from *this* recording that differed from the other timely-disclosed

132

United States District Court
Northern District of California

1    Washington DC conference recordings that were identified.  That VanDerhei was not asked about

2    her particular expectations is not significantly prejudicial.  Defendants had ample opportunities to

3    question others about their expectations at this conference.  Claims related to these recordings

4    remain.

5        **PPCG Facility**.  Recording #3 (taken by Daleiden at PPCG's Houston offices of

6    Doe9002).  Defendants acknowledge that similar recordings of other PPCG staff were timely

7    disclosed, and admit that there is no prejudice if PPCG seeks only one statutory damage award for

8    taping of all staff.  But if plaintiffs seek statutory damages for each person recorded during the

9    visit, defendants object because they were prejudiced by not being able to specific questions

10   PPCG's Rule 30(b)(6) witness about (1) PPCG's standing, because Doe9002 is neither a PPCG or

11   PPCFC employee, and (2) the confidential nature of the conversation where the only thing

12   Doe9002 said was "OK."  However, Doe9002 was specifically identified as having been illegally

13   recorded in PPGC's responses and identified as a PPCFC employee in PPCG's November 2, 2018

14   amended responses, and plaintiffs simply used an incorrect filename for the video itself.  Sterk

15   Decl. [Dkt. No. 730-1], Ex. 1 at 5.  That error was corrected in the amended Rhomberg responses.

16   Defendants have not shown prejudice.  The claims over recording #3 remain.

17       For the foregoing reasons, defendants' motion to strike is DENIED.

18   **V.   MOTIONS TO SEAL**

19       There are numerous administrative motions to file under seal pending.  The ruling on those

20   motions is deferred.  Within twenty (20) days of the date of this Order, the parties shall file one,

21   consolidated chart identifying:

22       Each document (by ECF docket number and sub-docket number) containing information a

23   party contends should remain under seal, and identifying the information they wish to keep sealed

24   by paragraph or page/line number.

25       For each such document or part of a document identified, the party seeking to keep the

26   information under seal shall provide:

27       • a description of the information they seek to keep under seal;

28       • a justification for sealing, with a citation to a declaration from a party

United States District Court
Northern District of California

representative establishing a compelling justification and/or a citation to a prior Court order allowing that exact information to remain under seal under the compelling justification standard.

For each document that is conditionally sealed in the Court's docket that the parties agree may be unsealed, the parties shall identify them by ECF docket number, including each sub-docket number.

When submitting the joint chart, the parties should not e-file revised redacted versions of documents, assuming the parties agree during this process that some currently sealed information may be unsealed. After I rule on the sealing motions, I will instruct the parties at that juncture to e-file revised redacted versions, redacting only the information I allow them to continue to seal.

In compiling the joint chart, the parties shall consider the following: this case is approaching trial and I will not seal information that is highly material to the issues to be resolved at trial, the discussion of which would not justify closure of the courtroom during trial. I will not seal information that has already been discussed in open court or in my prior Orders.

**With respect to the continued use of Doe identifiers, the parties shall meet and confer on a proposal (or competing proposals) as to how persons currently identified as Does should be treated at trial and submit the proposal(s) prior to the pretrial conference**.

## CONCLUSION

**Motions for Summary Judgment**

Count 1: RICO

Partial summary judgment is GRANTED to plaintiffs on the interstate commerce nexus for the false identification predicate acts. Motions are otherwise DENIED.

Count 2: Federal Wiretapping

Defendants' motions for summary judgment are DENIED.

Count 3: Civil Conspiracy

Defendants' motions for summary judgment are DENIED.

Count 4: Breach of PPFA Contracts

Partial summary judgment is GRANTED to plaintiffs on Daleiden and BioMax's breach of the PPFA EAs.  Summary judgment is GRANTED to Merritt and Lopez, and the Court clarifies that Rhomberg and Newman cannot be liable for this claim directly or indirectly (through Count 3).  The motions for summary judgment are otherwise DENIED.

Count 5: Breach of NAF Contracts

Defendants' motions for summary judgment are DENIED.

Count 6: Trespass

Plaintiffs' motion for partial summary judgment against BioMax, Daleiden, and Lopez is GRANTED as to the PPFA conferences in Florida and Washington, DC.  Plaintiffs' motion for partial summary judgment against as to BioMax, Daleiden, and Merritt for the trespasses to PPGC/PPCFC and PPRM is GRANTED.  The only issues for trial on those trespass claims are whether CMP is directly liable and actual damages.  Whether PPRM is entitled to injunctive relief for its claim will be determined post-trial.

Summary judgment is GRANTED to Merritt with respect to the PPFA conferences, but not otherwise.  The Court clarifies that Rhomberg and Newman may not be held directly liable for this claim, but may be liable under Count 3 (Conspiracy).  Defendants' motions are otherwise DENIED.

Count 7: California UCL

The motions for summary judgment are DENIED.

Count 8:  Fraudulent Misrepresentation

The motions for summary judgment are DENIED.

Counts 9 & 10: California Penal Code Recording Claims

Summary judgment is GRANTED to defendants as to claims dropped by PPPSW, PPGC, PPRM, PPOSBC, and PPMM.  Defendants' motions are otherwise DENIED.

Plaintiffs' motion for partial summary judgment on the Penal Code section 633.5 defense

135

is DENIED.

Count 11: Florida Recording Claim

Summary judgment is GRANTED as to Merritt for direct liability.  Summary judgement is GRANTED to defendants as to claims dropped by PPNorCal, PPMM, and PPLA.  Defendants' motions for summary judgment are otherwise DENIED.

Count 12: Maryland Recording Claim

Summary judgment is GRANTED as to claims dropped by PPNorCal, PPPSW, PPMM, and PPOSBC.  Defendants' motions for summary judgment are otherwise DENIED.

Count 13: Invasion of Privacy: Intrusion Upon A Private Place

Summary judgment as to the intrusion claims of PPRM and PPGC/PPCFC is GRANTED to defendants and GRANTED to defendants as to the claims based on intrusions at conferences, but DENIED as to the claims based on the Nucatola and Gatter lunch meetings under California law.

Count 14: Invasion of Privacy: California Constitution Art. I § I

Summary judgment as to the intrusion claims is GRANTED to defendants as to all plaintiffs *except* PPPSGV and PPFA based on the Nucatola and Gatter lunch meetings.  As to those limited claims, defendants' motions are DENIED.

Count 15: Breach of Non-Disclosure and Confidentiality Agreement by PPGC/PPCFC

Summary judgment is GRANTED as to Merritt and as to PPCFC's lack of standing.  The motions are otherwise DENIED.

Public Policy Defense

Plaintiffs' motion for summary judgment is GRANTED.  The public policy defense is not applicable as a matter of law.

Unclean Hands

Plaintiffs' motion for summary judgment is GRANTED.  The unclean hands defense is not

United States District Court
Northern District of California

applicable as a matter of law.

**Other Motions**

The special motion to strike under the anti-SLAPP law is DENIED.  The motion to exclude Cohen is GRANTED in part and DENIED in part. The motion to strike late-disclosed recordings is DENIED.  The administrative motions to seal are DEFERRED for meet and confer and submission of a joint chart.

**IT IS SO ORDERED.**

Dated: August 23, 2019

William H. Orrick
United States District Judge