# EXHIBIT 1

1              UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3

4   PLANNED PARENTHOOD            )
    FEDERATION OF AMERICA, INC., )
5   et al.,                      )
                                 )
6          Plaintiffs,           ) CASE NO.
                                 ) 3:16-CV-00236
7                                )
    vs.                          )
8                                )
                                 )
9   THE CENTER FOR MEDICAL       )
    PROGRESS, et al.,            )
10                               )
           Defendants.           )
11  _____ )

12

13

                  **CONFIDENTIAL**
14
                **ATTORNEYS EYES ONLY**
15

16

17

18   VIDEOTAPED DEPOSITION OF DAVID DALEIDEN
19        TUESDAY, APRIL 16, 2019
20              9:37 A.M.
21

22

23

24  REPORTED BY:  KATHERINE FERGUSON, CSR NO. 12332
25             JOB NO. 158911

1    A    I remember that Albin had -- Albin had been

2  a pretty big supporter of Live Action, like a big

3  moral supporter of our work at Live Action for, you

4  know, over the prior three or four years that I, sort

5  of, knew of him being someone, from 2009.  And so --

6  so you just -- I sort of -- I guess in 2013, I just

7  had always sort of thought of Albin as someone who

8  understood the undercover methodology, who really

9  appreciated good, well-done citizen journalism and

10  wanted to see it succeed and wanted to see it done,

11  you know, professionally and carefully and

12  meticulously.  And Albin and I had a -- had a pretty

13  extensive conversation in January 2013 about -- just

14  about the whole concept of fetal body parts

15  trafficking, and I've been doing this kind of

16  undercover work with Live Action previously, but now

17  I want to the do something a little more in depth and

18  the little more long term and kind of scale it up a

19  lot.  And Albin seemed like he really understood

20  that, and sort of, you know, again, appreciated the

21  methodology, so that's why Albin was someone that I

22  trusted to serve in that capacity as a board

23  director.

24    Q    And what gave you the belief that

25  Mr. Newman was sufficiently trustworthy to be a board

1  Planned Parenthood was engaged in violent felonies;

2  is that accurate?

3      A    Could you ask me the question again?

4      Q    Prior to April of 2014, you believed that

5  Planned Parenthood, and or its affiliates or some of

6  them, were involved or engaged in violent felonies;

7  is that correct?

8          MR. JONNA:  Objection, compound, vague and

9  ambiguous, overbroad.

10          THE WITNESS:  That's correct.

11  BY MS. TROTTER:

12      Q    What was the basis for that belief?

13          MR. JONNA:  Objection, calls for a

14  narrative, overbroad, calls for a legal conclusion.

15          THE WITNESS:  Oh, I'll try and give sort of

16  the shortest foundational answer that I can, and then

17  there's probably a lot more that we would have to

18  either add onto that or unpack.  But prior to April

19  of 2014, I believe that Planned Parenthood, really

20  overall -- and by Planned Parenthood, I mean both

21  Planned Parenthood Federation of America and the

22  Planned Parenthood affiliates, I think the whole

23  brand is, sort of, responsible for the whole thing,

24  was involved in -- was involved in the participation

25  in child sex trafficking by covering it up and -- and

1    aiding and abetting it as well as -- as well as

2    failing to follow state mandatory reporting laws for

3    minors.  I believe that Planned Parenthood was

4    involved in violent felonies including the

5    infanticide of born-alive infants, and meaning

6    infants born alive after an attempted induced

7    abortion procedure.  I believed that Planned

8    Parenthood was involved in committing criminal

9    partial-birth abortions which have been a federal

10   felony since, at the latest, 2007.  The law was

11   passed in 2003.

12         I also believe that Planned Parenthood was

13   involved in committing battery against their patients

14   by making changes to their abortion procedures that

15   were not justified by medical considerations or

16   medical needs.

17         And I believe you just asked me -- did you

18   ask me what were the crimes that I believed Planned

19   Parenthood was committing, or did you ask me why --

20   BY MS. TROTTER:

21        Q   I asked you why --

22        A   -- I believed Planned Parenthood --

23        Q   -- or what the basis was for your belief.

24        A   What the basis was.  Okay so I gave you --

25   I just sort of gave you a foundation of the different

1  topics.  I guess that's not -- foundation is a little

2  different from basis.  I could -- are you asking

3  for -- this is why we objected.  Are you asking me to

4  give you a prima facie case, or --

5       Q   No, I'm not.  Let me break it down.

6       A   Okay.

7       Q   So you've listed out for us that -- things

8  that prior to April 2014, you believed, were illegal,

9  violent felony actions by Planned Parenthood and/or

10 its affiliates were involvement in child -- in

11 violating laws as it related to child sex

12 trafficking, infanticide of born-alive infants,

13 illegal partial-birth abortions, and battery -- and

14 batteries against patients by making changes to

15 abortion procedures.  Is that accurate?

16      MR. JONNA:  Objection, misstates the

17 testimony, move to strike counsel's remarks.

18      THE WITNESS:  That is -- that's a more --

19 more or less a complete recitation of what I just

20 said on the record.  In addition, I would add -- I

21 would add that on some level, I consider now and also

22 believed then that the sale of aborted fetal body

23 parts for profit, that that itself is a kind of

24 violent felony.  The exact -- you know, there may be

25 sort of a legal question there and I'm not a lawyer

1 as to how it all fits together, but I think when you

2 consider the human trafficking element of it, the

3 transaction over human body parts and sometimes over

4 an entire fetus, which is against the law -- against

5 the federal law, and also something that a patient

6 cannot properly consent to, to have that kind of

7 crime committed, I think there's an element of

8 violence in the crime of trafficking baby body parts

9 and trafficking, in whole, aborted fetuses as well,

10 that I would ascribe to Planned Parenthood, although

11 I'm not -- I don't know that I'm capable of making a

12 hard-and-fast legal classification of it here for how

13 that -- how that -- what constitutes a violent felony

14 and for what purpose, under what statutory framework.

15 BY MS. TROTTER:

16     Q   Now I want to delve in a little more to the

17 various items you've listed.  Your belief that

18 Planned Parenthood and/or its affiliates were

19 involved in the infanticide of born-alive infants.

20 What was the basis of that belief that you had prior

21 to April of 2014?

22         MR. JONNA:  Objection, calls for a

23 narrative.  Overbroad.

24         THE WITNESS:  Sure.  So I can -- so, you

25 know, I'll start with -- how about I start with

1  giving you one basis and we can, sort of, go from

2  there, if we need to -- you know, as many more as we,

3  kind of, want to put on the record, because it would

4  be a little difficult for me to try and encapsulate

5  everything all in one answer here, where I don't have

6  access to my notes, I don't have, you know, access

7  to -- I'm just here, you know, off the top of my

8  head.

9          Back in -- back in June of 2013, I had a

10  conversation undercover with Ms. Perrin Larton, who

11  is the procurement manager of Advanced Bioscience

12  Resources.  Advanced Bioscience Resources is, sort

13  of, the original middleman wholesaler of aborted baby

14  body parts.  StemExpress arose out of ABR.  ABR sort

15  of provided a model for NovaGenix to follow.  So

16  they've been -- they're sort of -- they're the source

17  in a lot of ways for a lot of this stuff.  And I met

18  Perrin Larton, the procurement manager for ABR in

19  June 2013 at a stem cell conference, and I had a

20  conversation with her, which is recorded on video

21  that CMP has, you know, released previously, about --

22  just about the general practices of her and her

23  organization in their body parts harvesting business.

24  And Perrin told me that sometimes when they're

25  waiting for a harvesting case, for a late-term

1  harvesting case for 21, 22, 23, or 24 weeks or above

2  gestation, that she said sometimes the patient will

3  be out of the operating room after three minutes and

4  she's wondering what just happened, this an abortion,

5  we were waiting for it to harvest body parts from,

6  and she said that the answer she sometimes gets is

7  the fetus was already in the process of being

8  expelled from the patient at the time that they

9  started the procedure, so the whole fetus just fell

10  out whole as they were waiting to do the -- to do the

11  fetal body parts procurement. And in a case where --

12  where body parts are to be harvested for

13  experimentation, no feticide can be used before the

14  abortion procedure, so there's no digoxin, no

15  potassium chloride that's being used to kill the

16  fetus ahead of time, and that's something Perrin

17  confirmed during that conversation to me, was very,

18  you know, was something that ABR was very scrupulous

19  about, that there would be no digoxin applied to

20  their specimens ahead of the abortion. And so, to

21  me, that sounded like a born-alive infant, a fetus

22  that had not been killed before the abortion

23  procedure, a fetus that was a healthy fetus that the

24  procurement company was waiting there in the clinic

25  to harvest body parts from, and a fetus that just

1  fell out, all in one piece.  To me that sounds like a

2  situation where you have a born-alive infant.  And

3  Perrin Larton, the procurement manager of ABR, was

4  talking about harvesting body parts from that infant

5  that would be born alive.  And Perrin confirmed to me

6  during that same conversation that ABR had been

7  working with an abortion clinic in San Diego as one

8  of their suppliers, and then in another conversation

9  that Susan had with -- had in September of 2013 at

10  the Association of Reproductive Health Professionals

11  conference in Denver, Colorado in September 2013, at

12  my direction, undercover, video recording, Susan

13  spoke with Dr. Katharine Sheehan, who at that point

14  had been a long-time medical director and the head of

15  the abortion services at your client's plaintiff's

16  Planned Parenthood of the Pacific Southwest.  And

17  Katharine Sheehan told our undercover investigators

18  that they had been working with Advanced Bioscience

19  Resources for over 10 years, and had just

20  renegotiated their contract with them in order to do

21  very high-level government collection work for -- at

22  Planned Parenthood for ABR.  And so putting those two

23  things together, it sounded to me like it was very

24  likely that in ABR's baby body parts harvesting

25  business, fetuses were being delivered alive and

1   killed through the dissection and harvested for body

2   parts and sold, and Planned Parenthood of the Pacific

3   Southwest is one of the locations where that could be

4   going on.

5   BY MS. TROTTER:

6       Q    Going back for a moment to Ms. Larkin?

7       A    Larton.

8       Q    To Ms. Larton and that discussion that you

9   had with her, was that all on video?

10      A    That is all on video.

11      Q    Was there any portion of the discussion

12  that you had with Ms. Larton that was not captured on

13  video?

14      A    No, there was not.  Although, as sort of,

15  you know, an added detail, I was -- I was attending

16  that conference undercover with my friend Giorgio

17  Navarini, and as I was getting ready to go and meet

18  Ms. Larton, I was standing in the poster -- in the

19  poster hall of the exhibit, and before I went to go

20  and meet her -- and I don't know if this discussion

21  with Giorgio shows up on the camera or not.  I can't

22  remember if we talked about it right before I went

23  into the restroom and turned the camera on or right

24  after.  But Giorgio had been scoping the area in the

25  exhibit hall previously and he said to me, oh, my

1  gosh, you know what?  I just heard that lady at ABR

2  say, she was talking to researchers who just went up

3  to her, and she said that -- she said that the --

4  that the fetal heart is still -- that the fetus's

5  heart is still beating after the abortion sometimes

6  as long as five minutes after.  And they were asking

7  for hearts.

8         So that was something that Giorgio had said

9  to me about what he overheard Perrin saying, just

10  right before I went to have that conversation with

11  her.  But as far as my conversation with Perrin

12  directly, my entire conversation with her was

13  captured on video that day.  And it's been released

14  in its entirety by Center for Medical Progress.

15     Q    That was going to be my next question.  The

16  conversation with Dr. Sheehan in September of 2013,

17  was that entire conversation videotaped?

18     A    To my knowledge, yes, that entire

19  conversation was videotaped.

20     Q    And the entire videotape released?

21     A    That's correct.

22     Q    There was no part of the discussion with

23  Dr. Sheehan that wasn't captured on videotape?

24     A    As far as that discussion, all of it was

25  captured because you see Susan and Brianna walking up

1    to meet her on the videotape, you see them having

2    conversation with no cuts and then you see them

3    saying goodbye and then walking away.  So as far as

4    that conversation, that is, the entire thing was

5    captured on video.

6        Q    Other than the June 2013 discussion with

7    Ms. Larton and the September 2013 discussion with

8    Dr. Sheehan, prior to April 2014, did you have any

9    other basis for believing that Planned Parenthood or

10    its affiliates were involved in infanticide of

11    born-alive infants?

12        MR. JONNA:  Objection, overbroad, calls for

13    a narrative.

14        THE WITNESS:  Yes, I did.

15    BY MS. TROTTER:

16        Q    What other basis did you have?

17        A    So another basis that I had was the sworn

18    congressional testimony of a whistleblower named Dean

19    Alberti, who had been discovered by my friend Mark

20    Crutcher at the Organization of Life Dynamics, which

21    really did the first -- the first major expose of

22    fetal body parts trafficking for profit in our

23    country.  And this was published, at this point,

24    about 20 years ago, in 1999, 2000, and 2001.  And

25    this whistleblower, Dean Alberti had worked for one

1   of these middleman wholesaler companies, similar to

2   ABR or StemExpress.  He had embedded inside the

3   Comprehensive Health Planned Parenthood Clinic in

4   Overland Park, Kansas back in the late 1990s, early

5   2000s.  And he testified under oath to a

6   congressional committee in March of 2000 that he saw

7   the Planned Parenthood doctor bring out two -- two

8   born-alive twins about 24 weeks' gestation for him to

9   harvest body parts from, and he said that the doctor

10  drowned them in a pan in front of him.  It was an

11  incident that was so horrific that it caused him to

12  report it to the FBI because he thought he had been a

13  witness to a murder committed by the Planned

14  Parenthood doctor there in the clinic there in

15  Overland Park, Kansas.  Dean Alberti also described

16  under oath that -- he described many other instances

17  of seeing other fetuses of varying gestations, some

18  past the point of viability, some, we don't know, who

19  were born alive.  He would sometimes cut the chest

20  cavity open and see that the heart was still beating,

21  things like that.  And that is all stuff that that

22  whistleblower testified to under oath before a

23  congressional committee.

24          I first read that whole transcript probably

25  in -- that was in the summer of 2011, possibly the

1  summer of 2010.  But summer of 2010 or summer of 2011

2  is when I first read that whole transcript,

3  start-to-finish, including Mr. Alberti's sworn

4  testimony.

5      Q   Did anything else form the basis of your

6  belief that Planned Parenthood or its affiliates were

7  involved in the infanticide of born-alive infants,

8  other than what you've testified to?

9          MR. JONNA:  Same objections.

10          THE WITNESS:  Definitely.  Another basis

11  for that belief was the -- was the Kermit Gosnell

12  case, which we've mentioned before that was

13  prosecuted in Philadelphia.  In the Kermit Gosnell

14  case, the grand jury report came out, I think that

15  was in January of 2011, was when that was first

16  publicized.  And Dr. Gosnell had had an illegal

17  third-trimester abortion practice that he was

18  operating in Philadelphia.  His clinic had not been

19  inspected for almost -- I think it was over 17 years

20  because abortion clinics were considered to be a,

21  sort of, special class immune from criticism and

22  immune from oversight, very similar to what the

23  National Abortion Federation has argued in a related

24  case to this lawsuit.  So Kermit Gosnell was able to

25  run this filthy practice for 17 years, doing illegal

1  abortions far past the state abortion limit, no

2  digoxin, no feticide.  The fetuses were delivered

3  alive, late term, and he would snip their necks with

4  spinal cords -- snip their spinal cords with surgical

5  scissors in order to kill them.  The local Planned

6  Parenthood branches, it was reported in the grand

7  jury report, knew about Dr. Gosnell's clinic, knew

8  that it was dangerous, knew there were problems

9  there, and yet continued to refer patients to it.

10  And the Kermit Gosnell case, to me, stands for the

11  proposition that if you're doing late-term abortions

12  and you're not using feticide, if you know, you're

13  not using digoxin ahead of time to kill the fetus,

14  then there's a substantial likelihood that you're

15  going to be delivering those children alive.  And yet

16  we don't -- you know, we don't hear about a lot of

17  cases of children born alive in abortion clinics

18  being transported to the hospital immediately to take

19  care of them.  Instead it seems like those cases are

20  just covered up.  So that's another basis that -- the

21  incidents around the Kermit Gosnell case.

22  BY MS. TROTTER:

23      Q    The San Diego clinic that you discussed

24  with Ms. Larton was not a Planned Parenthood clinic;

25  is that correct?

1    A    No, that's not true.  It's the -- that

2 would be the Michelle Wagner Center on First Avenue

3 in San Diego that does -- it's the Planned Parenthood

4 of the Pacific Southwest, the surgical abortion

5 facility that does procedures up to 24 weeks.

6    Q    And that was the specific clinic that

7 Ms. Larton was referring to during your taped

8 discussion of her?

9    A    I believe it was, yes.

10    Q    The Kermit Gosnell clinic that you just

11 referred to was not a Planned Parenthood clinic; is

12 that correct?

13    A    I don't know every aspect of Dr. Gosnell's

14 professional history, but my understanding is that

15 the grand jury testimony was that the local Planned

16 Parenthood affiliate in Philadelphia was referring

17 patients to Dr. Gosnell.

18    Q    That's not my question.  Do you have any

19 knowledge that Dr. Gosnell's clinic was a Planned

20 Parenthood clinic?

21    A    My answer is that my knowledge is that

22 Planned Parenthood was referring patients to Dr.

23 Kermit Gosnell.

24    Q    So your answer is no, you don't have any

25 basis for understanding that Dr. Gosnell's clinic

1   where he was performing these procedures was a

2   Planned Parenthood clinic?

3           MR. JONNA:  Objection, asked and answered.

4           MS. SHORT:  Objection, asked and answered.

5           MR. MIHET:  Misstates the testimony.

6           THE WITNESS:  I think the fact that Planned

7   Parenthood was referring patients to Kermit Gosnell

8   is a basis to believe that there was a relationship

9   between Dr. Gosnell and the local Planned Parenthood.

10  BY MS. TROTTER:

11      Q   You understand, Mr. Daleiden, that there

12  are certain clinics that are affiliated with Planned

13  Parenthood that are called Planned Parenthood

14  affiliated clinics, correct?

15      A   I do.

16      Q   Okay.  You understand that the clinic of

17  Dr. Gosnell was not a Planned Parenthood affiliated

18  clinic, correct?

19          MR. JONNA:  Objection, asked and answered,

20  calls for speculation.

21          MS. SHORT:  Objection.  Calls for

22  speculation.

23          MR. MIHET:  Join.

24          MR. MONAGHAN:  Join.

25          THE WITNESS:  Dr. Gosnell's clinic, from

1  what I'm aware, did not -- has not represented itself

2  as part of Planned Parenthood affiliate.

3  BY MS. TROTTER:

4      Q    What was the basis for your belief prior to

5  April of 2014 that Planned Parenthood or its

6  affiliates were involved in illegal partial-birth

7  abortions?

8           MR. JONNA:  Objection, overbroad, calls for

9  a narrative.

10          THE WITNESS:  Most of -- most of the --

11  most of -- well, let me say this first.  The bases

12  that I just described for the belief that Planned

13  Parenthood was involved in the infanticide of

14  born-alive infants after failed abortions, most of

15  that -- most of that cross-applies to the

16  partial-birth abortion crime because necessarily a --

17  based on the way that partial-birth abortion works,

18  based that the federal prohibition on partial-birth

19  abortion works, if you have a born-alive infant that

20  you're intending to kill after it's been born alive

21  in a late-term abortion procedure, that's a violation

22  of the partial-birth abortion law.  The partial-birth

23  abortion -- the federal partial-birth abortion law

24  applies to a situation where you fully deliver the

25  baby and kill it right after, and it can be a

1  full-birth abortion law as well, or a full-birth

2  abortion procedure as it were.

3  BY MS. TROTTER:

4     Q   So other than those things that you've

5  already testified to, are there any other bases for

6  that -- that weren't encapsulated in that?

7         MR. JONNA:  Same objection.

8         THE WITNESS:  Yeah, there are others.  So

9  another one that I think probably applies to both is

10  in -- I think this was in 2012, when I first found --

11  this is when it was published, there was a scientific

12  paper that was a -- a research study -- actually a

13  series of papers that were published about a research

14  study that had been done at Stanford University.  And

15  I think they started to publish the series in May of

16  2012, where there had been some kind of -- some kind

17  of fetal heart stem cell study that was being done.

18  And this study noted in its Materials and Methods

19  section, which is typically in any published

20  scientific study where they describe how it was done

21  and where they got their materials and what they did

22  with them, this study series was published in the

23  journal Circulation, which is the journal of the

24  American Heart Association.  They said that they had

25  obtained intact fetal hearts from StemExpress, which

1 they identified as a commercial vendor of fetal body

2 parts in their Materials and Methods section, which

3 itself is shocking because nobody is supposed to be

4 commercially vending human body parts in the United

5 States of America. But this study in the Materials

6 section said that they had obtained multiple intact

7 fetal hearts from StemExpress and they had done

8 something on them called Langendorff perfusion, which

9 is a mechanism where you can -- where after you have

10 taken a beating, living heart out of another

11 organism -- typically it is done on animals because

12 it would be horrific to do it on a human being, but

13 typically done on animals, they cut a beating heart

14 out of the host organism, and then they can hook it

15 up to the Langendorff machine, which does perfusion

16 on it so it is -- it's flushing different nutrients,

17 different solutions through the organ, and that's a

18 way to keep the heart viable and beating when it's

19 extracorporeal, when it's outside the body. And all

20 of the -- all of the information that I could find on

21 the Langendorff perfusion technique in 2012 indicated

22 that you had to have a heart cut out of a living

23 organism in order to make it work.

24          So reading a study saying that they had

25 obtained intact fetal hearts from StemExpress and

1  done Langendorff perfusion on them indicated to me

2  that -- that fetuses had been born alive at the

3  clinics that StemExpress was harvesting from and that

4  the hearts had been cut out while those fetuses were

5  still alive and hooked up to the Langendorff

6  perfusion machine.  And at the time, I was only aware

7  of StemExpress working with only one abortion

8  provider, which was Planned Parenthood Mar Monte, who

9  are plaintiffs in this lawsuit.

10  BY MS. TROTTER:

11      Q   Did the Stanford -- I think you said a

12  Stanford study?

13      A   Stanford University.

14      Q   Did the article reporting on that study

15  mention Planned Parenthood anywhere in it?

16      A   The article mentioned StemExpress.

17      Q   But not Planned Parenthood, correct?

18      A   The article did not mention Planned

19  Parenthood.

20      Q   Did you talk to the authors of that article

21  at any point in time?

22      A   No, I don't believe I did.

23      Q   Do you know if at the time of that

24  article's publication -- let me withdraw that.

25          Do you know whether, at the time of the

1  study that was reported in that article was done,

2  whether StemExpress received fetal tissue from any

3  clinics other than Planned Parenthood clinics?

4      A    To my knowledge, at the time -- to my

5  knowledge at that time, StemExpress's sole source of

6  fetal tissue was Planned Parenthood.

7      Q    What's the basis of that knowledge?

8      A    The basis of that knowledge is -- well,

9  number one, my knowledge at the time was that Planned

10  Parenthood was the only source, and that's based on

11  StemExpress's own statements, their advertisements

12  for procurement technicians and where they said they

13  would be working.  It's based on -- it's also based

14  on, subsequent to that time, 2012, it's based on my

15  conversations with -- my conversations with my friend

16  Holly O'Donnell who used to work as a procurement

17  technician at StemExpress during the 2000- -- late

18  2012, early 2013 timeframe, and, according to her,

19  the only clinics they were harvesting from at the

20  time was Planned Parenthood in Northern California.

21  And I believe from what I have seen from -- and this

22  is speaking just today, contemporarily, from what

23  I've seen from the documents that have come out from

24  the congressional investigations and other places, it

25  looks to me like the -- like the abortion -- the

1 non-Planned Parenthood abortion clinics that

2 StemExpress was working with, signed contracts with

3 StemExpress in 2013 and later, not in 2011 and 2012.

4 So that all leads me to believe that my original

5 belief was, in fact, correct, that the sole source of

6 fetal tissue that StemExpress had at the time,

7 especially for those intact fetal hearts was Planned

8 Parenthood.

9 Q   What was the basis for your belief prior to

10 April 2014 that Planned Parenthood or its affiliates

11 were committing a battery against parents -- against

12 patients, I should say, by making changes to

13 procedures?

14 A   Yeah.  So some of that comes from the --

15 from the congressional investigation and the -- the

16 news reports and -- and published investigative

17 journalism that was done around that back in 1999,

18 2000, 2001, with Dean Alberti's testimony and the

19 congressional investigation surrounding that.  The --

20 there had been a lot of both testimony and some -- I

21 think I remember some documents and also physical

22 evidence presented that the -- that the abortion

23 clinics involved at the time, including the Planned

24 Parenthood in Overland Park, Kansas had been

25 over-dilating their patients in order to harvest more

1  intact fetuses and more intact fetal organs and

2  tissues.  So that's -- that's one basis for that.

3          Another basis is -- another basis would be

4  my -- my conversation with Perrin Larton, when she --

5  when she speculated briefly about ways that -- that

6  over-dilation or changes in the abortion procedure

7  could be done in order to make sure to get more

8  marketable fetal tissue.  And another basis -- and

9  this is actually the basis for the other two topics

10  we've discussed, but we'll keep on -- we'll add more

11  as we go on -- is my -- my conversations and the

12  documents that Holly O'Donnell provided to me when I

13  first met her in October 2013.  Holly describes

14  situations where she saw -- she saw fetuses with

15  hearts that were still beating after the abortion was

16  done, which would be an indication of a born-alive

17  infant.  She described extremely late abortion

18  procedures, past the California state limit.  She

19  described situations where -- she described one

20  situation where she saw StemExpress technicians

21  talking on their -- talking on their instant

22  messenger communication clients about a doctor at

23  Planned Parenthood in Fresno delivering a completely

24  intact fetus for harvesting, that they were shipping

25  straight back to the StemExpress lab in Placerville

1  because they were so excited about it.  And Holly

2  also described situations where she believed that the

3  StemExpress supervisors were working with the Planned

4  Parenthood doctors to change the procedures in order

5  to -- in order to obtain better specimens.  And some

6  of Holly's e-mails corroborated that -- those

7  experiences that she described to me.  So that's

8  another basis for my beliefs about all those

9  different violent crimes that I believe Planned

10  Parenthood was involved in.

11      Q   What was the basis for your belief, prior

12  to April 2014, that Planned Parenthood and/or its

13  affiliates was involved in the sale of fetal body

14  parts for profit?

15          MR. JONNA:  Objection, overbroad, calls for

16  a narrative.

17          THE WITNESS:  One big basis is the

18  congressional investigation and the surrounding news

19  reports and reporting on the expose and the whistle

20  blowing of Dean Alberti and Life Dynamics in 1999,

21  2000, 2001.  The federal law only allows for payments

22  to be made to an abortion provider in a fetal

23  harvesting case or in a fetal tissue donating case if

24  there's actual -- actual costs associated with the

25  harvesting of the body parts or the harvesting of the

1  fetal tissue, the supply, the transportation of the

2  packaging, things like that.  Both in the cases

3  exposed back in 1999, 2000, and 2001, and also in the

4  contemporary cases that I became aware of in 2010,

5  2011, 2012, 2013, with StemExpress and ABR, the same

6  kind of model where you have a middleman wholesaler

7  company for the body parts that embeds its own

8  workers inside of the Planned Parenthood facilities

9  in order to perform all of the work associated with

10  making any given fetal tissue, so-called "donation"

11  happening.  And yet, at the same time, they're still

12  paying the Planned Parenthood facility in exchange

13  for the privilege of harvesting the body parts.  That

14  seems like a cut-and-dried case to me of the law

15  being violated and body parts being sold -- sold for

16  profit in violation of the law.  And -- and

17  StemExpress themselves, on their website in 2010 and

18  2011, and I think up through 2012, openly advertised

19  that they were proud to return a portion of their

20  fees that they got from their research clients for

21  providing them with fetal body parts.  They said they

22  were proud to provide a portion of their fees back to

23  the clinics that work with them.  They said that

24  Planned Parenthood were the clinics that were working

25  with them.

1       And that brings up a second level of

2   violation that I think is actually more to the point

3   of the whole statute and even the violence involved

4   in trafficking in body parts because returning a

5   portion of StemExpress researcher fees meaning

6   actually giving Planned Parenthood a cut of the --

7   you know, based on the volume of body parts that are

8   sold.  So it's no longer even, you know, any kind of

9   question of pretending to be reimbursement, it's --

10  the sole unit of value in the transaction is the

11  volume of body parts being traded.  And I can't

12  imagine -- well, I can't imagine -- that is one of

13  the greatest violences against human dignity and

14  against a human person that I can imagine.

15  BY MS. TROTTER:

16      Q   Did you ever have any discussion with --

17  prior to April 2014 with a Dr. Geisher?

18      A   Can you ask me the question again?

19      Q   Prior to April of 2014, did you ever have

20  any discussion with a Dr. Geisher?

21      A   Yes, I did.

22      Q   On how many occasions prior to April of

23  2014?

24      A   I first started speaking to Dr. Geisher

25  when I was at Live Action.  I believe the first time

1  that I ever spoke with her was in 2010.  Sometimes

2  Lila and I would speak to her together and other

3  times separately.  And so I consulted with

4  Dr. Geisher probably once or twice a year from

5  between 2010 and -- and April 2014.  So I would

6  say -- I would estimate I talked to her at least once

7  in 2010, 2011, 2012.  So I'd say I maybe spoke to her

8  four or five times before -- before April 2014.

9        Q    You understand Dr. Geisher to be pro-life?

10       A    I believe that Dr. Geisher has pro-life

11 beliefs about abortion.  I also know that she's a --

12 she's an expert in stem cells and regenerative

13 medicine and has many years of experience in the

14 biotech industry.

15       Q    You understand Dr. Geisher to believe that

16 fetal tissue should not be used in research?

17            MS. SHORT:  Objection, lacks foundation.

18            MR. JONNA:  Join.

19            THE WITNESS:  You know, I actually -- I

20 don't know what Dr. Geisher's -- I don't know what

21 her exact opinions are about the level of regulation

22 and the different statutes involved and, even,

23 actually the moral theology or the moral philosophy

24 of the use of certain kinds of cells and tissues and

25 their sources from fetuses and embryos.  Some people

1  have different shades of nuance in that area,

2  actually, and I'm not an expert in Dr. Geisher's --

3  how she applies all those different principles that I

4  think she believes.  So I don't know.

5  BY MS. TROTTER:

6      Q    You testified earlier about discussions

7  that you had with Holly O'Donnell, correct?

8      A    Yeah, I've had discussions with Holly

9  O'Donnell before.

10     Q    When did you first meet Holly O'Donnell?

11     A    I first met Holly O'Donnell in October of

12  2013.

13     Q    How did you meet her?

14     A    I found Holly O'Donnell on Facebook in

15  early October 2013.  We first met by phone and had a

16  phone conversation or two, maybe three or four, in

17  the early part of October 2013.  And then I believe I

18  first met her in person on October 25th, 2013.  It

19  may be late October 2013, but I sort of remember

20  seeing that date somewhere, the 25th.

21     Q    How did you come to find Ms. O'Donnell on

22  Facebook?

23     A    So back at that time, in -- in late 2013,

24  Facebook had something called Graph Search, and it

25  was a special search mechanism where you could

1    actually tell it, I want to see all the people who
2    are age 18 to 35, who list Sacramento, California as
3    their -- as their hometown, and who list Starbucks as
4    their employment, and press search and Facebook would
5    spit out a list of like, you know, 10 or 20 or 30 --
6    however many people matched that criteria.  So in --
7    I'm sure I did this multiple times, but sometime or
8    maybe multiple times during the fall of 2013, I ran
9    Facebook Graph Searches for everyone that listed
10   StemExpress as their place of employment.  And so
11   that spat out a list of, maybe, 10 to 15 people.  So
12   I went through them and some of them became -- some
13   of them were individuals who had -- who had quit
14   their job at StemExpress because they were really
15   dissatisfied with the practices of that company.  One
16   of those was Holly O'Donnell.  And so I contacted
17   Holly and we had a -- the first time we ever spoke
18   was, it was one evening in early October 2013.  I
19   called her up by phone, we talked for about two
20   hours.  She had me crying in tears within the first
21   30 minutes because of the things that she was telling
22   me about her job working for Planned -- working for
23   StemExpress, harvesting body parts for profit inside
24   of Planned Parenthood Mar Monte were so horrific it
25   was very difficult to hear.  And -- but it was

1  incredibly clarifying.  Holly and I met for the first

2  time at the end of October in 2013.  She provided

3  hundreds and hundreds of pages of documents from her

4  time at StemExpress and at Planned Parenthood, and my

5  work would not have been possible without her.  And

6  Holly died a couple of -- a couple of months ago in

7  the fall of -- in the fall of 2018, and I miss her a

8  lot.  And Holly was a hero.  Holly was absolutely a

9  hero, and I have not met anyone in this case yet or

10  in this movement who can hold a candle to her.  So --

11  so Holly was -- Holly was a big part of everything.

12  Holly was a big part of everything and I miss her a

13  lot.

14      Q   I'm going to ask you more about your

15  communications with Ms. O'Donnell, but I'm going to

16  go back to your Facebook searches.  You said you ran

17  searches for -- and looked for matches basically to

18  StemExpress?  Is that --

19      A   Matches to people who listed StemExpress as

20  their place of employment.

21      Q   And you came across, from that search, 10

22  to 15 people?

23      A   Approximately 10 to 15 people, yeah.

24      Q   Do you recall the names of any of those

25  people other than Ms. O'Donnell?

1    A    Yes, I recall some of them.

2    Q    Who do you recall?

3    A    I recall Kristy Rebolcava, who was the

4  laboratory manager for StemExpress for sometime in

5  2012, 2013, at their Placerville laboratory.

6    Q    Any others?

7    A    No, I don't recall any of the other names

8  from that search specifically.

9    Q    After you came across the list, having run

10  the search on Facebook, what did you do, if anything,

11  to reach out to those who were -- were the results of

12  that search?

13    A    Besides contacting Holly, which I already

14  described, I also contacted Kristy Rebolcava and

15  Kristy was also -- was also an informant for CMP's

16  undercover journalism work.  Kristy was the

17  laboratory manager.  She was not -- she didn't

18  actually do fetal tissue procurement, at least not

19  that she told me.  But she described to me just some

20  bigger picture stuff about the overall StemExpress

21  business.

22         Kristy as the lab manager was responsible

23  for some of the stem cell isolations that they would

24  do, so she talked about -- she talked about some of

25  the fetal organs that they would receive after the

1    procurement technicians had harvested them at the

2    Planned Parenthood clinics in the field, and then

3    transferred them back to the StemExpress laboratory.

4    She had one very disturbing story about -- she called

5    it the biggest fetal liver that they had ever

6    received from a Planned Parenthood clinic. She said

7    it was a 19-week baby, healthy mom, healthy baby.

8    They received the liver back at the StemExpress

9    laboratory. She said they ran a stem cell isolation

10   on it, pulled millions and millions of stem cells out

11   of it, put it all in a little vial and sold that vial

12   for $17,000. And that story hit me really hard in

13   October 2013, because I think that 17 grand for, you

14   know, the people who are considering having an

15   abortion or having a late-term abortion, that could

16   be -- that's like half of somebody's salary right

17   there, somebody who is of a low socioeconomic status

18   in downtown Sacramento or in some of the worst parts

19   of Sacramento -- so that could be enough to pay for

20   somebody's rent or to make them feel like they --

21   like they don't have to choose between putting food

22   on the table and having a child. And yet in the

23   current system, the way that it's set up, and this is

24   a taxpayer-funded researcher, paying 17 grand for an

25   aborted fetal liver from Planned Parenthood. Some of

1    it was worth more in the current system for that

2    child to die than for that child to be alive.

3          Q    That purchase was made from StemExpress?

4          A    That purchase was made from StemExpress by

5    Jackson Laboratories.

6          Q    You've mentioned Ms. O'Donnell and Kristy

7    is it Rebolcava?

8          A    Rebolcava -- that's R-E-B-O-L-C-A-V-A.

9          Q    Did you reach out to any others who were

10   the results of that search that you ran on Facebook

11   who had a connection to StemExpress?

12         A    I don't believe I reached out to any of the

13   others who were the result of that search.

14         Q    Why not?

15         A    For two reasons.  Number one, because it

16   was harder to find either contact information or even

17   just confirm whether or not they were still working

18   at StemExpress and in what capacity.  Like, their

19   profiles were more limited, basically, on Facebook so

20   it was harder to see what was going on there.  And

21   then -- actually, those are basically the two

22   reasons.  Like, number one, it was hard to -- their

23   profiles were more limited, and so it was hard to

24   ascertain not only what their current StemExpress

25   status was, but what the best way would be to contact

1  them.

2      Q    Were you only interested in people who had

3  been employed by StemExpress but were no longer

4  employed there?

5      A    No, not necessarily.

6      Q    But neither Kristy nor Ms. O'Donnell were

7  still employed by StemExpress at the time you reached

8  out; is that accurate?

9      A    Yes, I think that's correct.

10          MS. TROTTER:  Let's go off the record.

11          THE VIDEOGRAPHER:  Going off the record at

12  3:00 p.m.

13          (Brief recess.)

14          THE VIDEOGRAPHER:  Back on the record at

15  3:20 p.m.  Start of Media Number 4.

16

17  BY MS. TROTTER:

18      Q    Mr. Daleiden, have we now heard all of the

19  bases for your belief prior to April of 2014 that

20  Planned Parenthood and/or its affiliates were

21  involved in committing violent felonies?

22          MR. JONNA:  Objection, overbroad, compound.

23          MR. MIHET:  Jane.

24          MS. SHORT:  Join.

25          MR. MONAGHAN:  Join.

1          THE WITNESS:  No, I have not said

2    everything yet.

3    BY MS. TROTTER:

4        Q    What other bases -- withdraw that.

5          Prior to April of 2014, what were the other

6    bases for your belief that Planned Parenthood or its

7    affiliates were committing violent felonies?

8          MR. JONNA:  Same objections.

9          THE WITNESS:  Sure, there's several more

10   things.  So there's the -- there's the undercover

11   investigation that I did with Live Action in late

12   2012, early 2013, that they released as their -- they

13   call today their InHuman Project, and that was

14   specifically an undercover journalism study on

15   late-term abortion services in the United States and

16   born-alive infants and infanticide after they were

17   born alive.  And there were several pieces of really

18   shocking undercover footage that was gathered during

19   that investigation of -- of various abortion

20   facilities who were -- you know, who admitted that it

21   was a possibility that, and something they had

22   experienced with fetuses that could be born alive and

23   that they would either take no steps to provide

24   medical care to them afterwards, or actively kill

25   them sometimes.  One talked about drowning them.

1    BY MS. TROTTER:

2        Q    Let me stop you there.  I'm going to let

3    you continue, but just ask a question on that.  That

4    undercover footage, was that footage all released to

5    the public by Live Action?

6        A    No, not all that footage has been released.

7        Q    In that undercover footage, was there

8    express reference to Planned Parenthood in any of it?

9        A    Yes.

10       Q    What was specifically stated about Planned

11   Parenthood?

12       A    I do not remember the exact statements in

13   the Planned Parenthood footage from that

14   investigation.

15       Q    Do you have access to the undercover

16   footage from the Live Action InHuman Project?

17       A    I'm not sure.  I would have several years

18   ago, but that -- all of that footage I had on a hard

19   drive that was an external hard drive that was seized

20   by the California attorney general's office at the

21   behest of plaintiffs, so I haven't -- I suspect that

22   that exists on the -- on the evidence that we've

23   been -- the evidence drive that we've been provided

24   in the criminal case by the California attorney

25   general, although I haven't had an opportunity to go

1 through it in depth or in detail.  It is actually a

2 very cumbersome and difficult thing to access.  So

3 yeah, so that's my answer about that.

4      Q   You can -- I think I cut you off as you

5 were going to describe the other bases for your

6 belief prior to April of 2014.

7      A   Right.  Another --

8          MR. MIHET:  Objection, overbroad, vague and

9 ambiguous, calls for a narrative.

10          MR. JONNA:  Join.

11          THE WITNESS:  Another basis, this is more

12 specifically referring to -- more specifically on the

13 battery against patients and changes in the abortion

14 procedure.  Susan and Brianna had a conversation at

15 the ARHP 2013 meeting in Denver, Colorado with Ruth

16 Arick, who runs Choice Pursuits.  It's an abortion

17 clinic consulting firm.  And in their undercover

18 conversation with Ruth, which was recorded in Denver,

19 Ruth Arick explicitly told them that they should be

20 looking -- and this -- they were attending as BioMax

21 -- so Ruth Arick specifically told BioMax that they

22 should be looking for abortion providers who would

23 be -- who would be open to over-dilating their

24 patients in order to obtain intact fetuses for them.

25 And Ruth Arick explicitly stated in that conversation

1   that that may present an increase risk to the

2   patient, but it was something that was important for

3   the business and so they should find the providers

4   who were interested in doing that.  And Ruth Arick

5   said a couple of other thing that, I think, sort of

6   applied, and I thought at the time sort of applied to

7   the born-alive infant and partial-birth abortion

8   angle as well.  Although I couldn't tell you off the

9   top of my head right now.  I don't have the

10  transcript in front of me of that conversation.

11  BY MS. TROTTER:

12      Q   Was that videotape released to the public

13  in full?

14      A   No, that videotape has never been released.

15      Q   Was there, to your knowledge, any part of

16  the conversation with Ruth Arick that was not

17  videotaped?

18      A   There were -- to my knowledge, there were

19  two conversations with Ruth Arick.  One conversation,

20  the first conversation, is only audio recorded.  I

21  don't believe we have video of it.  We might have

22  video of the surroundings, like, it might be a

23  situation where somebody's purse was, like, covering

24  the video camera or something.  You know, sometimes

25  that happens.  Although I don't -- I don't know off

1  the top of my head and I can't give a hard answer on

2  that.  So the first conversation was at least audio

3  recorded, and we have the complete audio recording of

4  that conversation.  And then there was a second

5  conversation that was much shorter, and I don't know

6  if there was much that was substantially said in it.

7  But that second conversation is on video.

8       Q   And do you have those recordings in your

9  possession?

10      A   Yes, I believe I do.

11      Q   And any other bases?

12      MR. JONNA:  Objection, overbroad, calls for

13  a narrative.

14      MR. MIHET:  Join.

15      THE WITNESS:  Yes, I would just expressly

16  put on the record, all other facts about these issues

17  and my bases for reasonable belief that I have put in

18  many declarations and other filings in other -- in

19  this case and in other related cases over the past

20  three or so years, and I would also state for the

21  record that there are a lot of other -- either other

22  bases or additional bases cumulative with the ones

23  that I've already mentioned, that are memorialized

24  and documented in many articles and reports and other

25  things that I have written over the past, what, I

1  guess, almost nine years now at this point, as well

2  as -- as well as -- I know for a fact there are a lot

3  of other facts, documents, reports and other things

4  that were part of my knowledge through my work up

5  until April of 2014, that I would point to that form

6  the basis for that belief, but which not being

7  superhuman, I cannot recite for you in detail right

8  now in detail off the top of my head.

9  BY MS. TROTTER:

10      Q   The declarations that you say were filed in

11  what you termed related cases, what are the related

12  cases that you're referring to?

13      A   I'm referring to the -- the National

14  Abortion Federation lawsuit, the explicitly Capital R

15  related case in this matter.  I'm also referring to

16  the StemExpress lawsuit from the Los Angeles -- that

17  was in the Los Angeles Superior Court, and I'm also

18  referring to the -- to the pending state case in San

19  Francisco Superior Court from the attorney general

20  brought at the behest of your clients, the

21  plaintiffs.  And then -- and then also -- especially,

22  but not limited to, my declaration that was submitted

23  with an offer of proof in that case a month or so

24  ago.  It was a couple months ago.  And there might

25  even be something in the -- in the -- in the District

1  Attorney Harris County case from Texas, although I

2  don't know for sure.

3        But I think that would be the extent of --

4  of declarations or any other things that I have

5  submitted in legal proceedings and court proceedings

6  that are connected to this one, in some form or

7  another.

8     Q   Do you recall the titles of any articles

9  that you have written, yourself, that you think may

10  contain facts that you had prior to April 2014

11  supporting your belief that Planned Parenthood or its

12  affiliates had committed or were committing violent

13  felonies?

14     A   Yeah, I could give you a couple of

15  examples.  There was a special report that Center for

16  Medical Progress recently published on Planned

17  Parenthood partial-birth abortion, and that is up on

18  the CMP website.  I'm the author of that report, and

19  that incorporates a certain amount of background

20  information that, I think, predates 2014, and is

21  stuff that I'm aware of today because I've been aware

22  of it since, you know, 2010, 2011, 2012, 2013,

23  through work at Live Action.  There's -- there's a

24  few fact sheets that Adrian and I put together for --

25  for the CMP project release originally, we put

1 together in May or June of 2015.  One of those fact

2 sheets on digoxin and feticide.  I think one of them

3 is on partial-birth abortion, and there might have

4 been a few others.  I couldn't tell you off the top

5 of my head but I'm pretty sure that there are studies

6 and other documents that are cited in those fact

7 sheets that are some of the same studies that have

8 been, sort of, part of my research collection from my

9 time at Live Action, and that informed my

10 understanding of all these issues going into them in

11 April of 2014.

12          And -- and then -- I'm sorry, did you ask

13 me sort of generally about articles or did you ask me

14 for specific -- if there are specific articles?

15 That's probably as specific as I can get for you

16 right now, but those are the sorts of things that I'm

17 describing.

18     Q   Yes.  I'm asking you to exhaust your memory

19 as you sit here today as to the specific articles

20 that you have authored that you believe contain facts

21 that you had prior to April 2014 that supported your

22 belief that Planned Parenthood or its affiliates were

23 engaged in committing violent felonies.

24          MR. MIHET:  Objection, form, overbroad,

25 calls for a narrative.

1          MR. JONNA:   Join.

2          THE WITNESS:   Okay.   Yeah, then I'm

3    attempting to exhaust my memory for you here today,

4    understanding that exercise is not coextensive with,

5    you know, any other notes and documents and

6    memorializations and everything else that would, you

7    know, justifiably support my reasonable belief in

8    2014.   I believe that there -- there's probably at

9    least one blog or article that I would have written

10   for Live Action News or for the Live Action blog,

11   really any time between 2010 and 2013, when I left.

12   There might even be multiple blogs or articles like

13   that.   But yeah, I could not tell you off the top of

14   my head exactly when they were and all of that.

15          And that -- that probably exhausts my

16   memory as far as articles or reports that I, myself,

17   personally authored and wrote.   And then I could

18   refer you to other -- you know, other published

19   studies that I know that I relied on at the time,

20   have relied on since and relied on even before.

21   There's studies from the UK that I think we've even

22   produced in this case about the frequency of

23   born-alive infants after late-term abortion

24   procedures.   There's actually -- there's a whole book

25   that formed a really big, kind of, formative part of

1  what I was aware of and what I was interested in

2  investigating on the whole fetal trafficking issue.

3  The book is "Beyond Abortion, a Chronicle of Fetal

4  Experimentation" by an investigative journalist named

5  Suzanne Rini.  And it was first published in the late

6  1980s and it was updated in the early 1990s.  That

7  report is an extensive accumulation of many, many

8  published research studies on not only -- not only

9  using harvested aborted fetal organs and tissues, but

10  also on the incidence of live fetal experimentation

11  and borderline fetal experimentation, which -- which

12  is something Lila and I first came across in 2010,

13  and there's a couple of very disturbing studies

14  done -- studies published in peer-reviewed journals

15  in the late 1960s and early 1970s about fetuses

16  actually being intentionally -- viable fetuses being

17  intentionally delivered alive in late-term abortions

18  and then used for experimentation because, under the

19  current abortion -- or under the contemporary

20  abortion law framework, they were not considered to

21  be human beings with constitutional rights so they

22  could be experimented on at will.  And so there are

23  documented cases of that in our history, sadly in our

24  country, and that formed part of my suspicion and

25  part of what all of CMP's investigative work was

1  formed to do and follow up on.

2          So those are sort of casting around in the

3  exhausted recesses of my memory what I can deliver to

4  you today, off the top of my head, on the record.

5  But that is -- I believe and remember that there is

6  more, but I don't feel like I can remember it off the

7  top of my head for you right now.

8  BY MS. TROTTER:

9      Q   When you were at Davis High School, did you

10  know a young woman by the name of Brianna Allen?

11     A   I didn't really know a Brianna Allen at

12  Davis High School.  I know that -- I know that there

13  was a Brianna Allen.  I don't know if I -- I think

14  I -- I do remember, like, sort of, what she looked

15  like, and knowing that I knew she was one of my

16  classmates, broadly speaking, in the class of 2007.

17  But that's the extent of what I remember about her.

18     Q   Did you ever speak with Brianna Allen after

19  you graduated high school?

20     A   No.

21     Q   Now, I believe you testified earlier that

22  it was during the time while you were still working

23  at Live Action when you developed or began to develop

24  the project that became known as the Human Capital

25  Project; is that correct?

1          MS. TROTTER:  Go off the record.

2          THE VIDEOGRAPHER:  Going off the record at

3     5:02 p.m.

4          (Brief recess.)

5          THE VIDEOGRAPHER:  Back on the record at

6     5:21 p.m.  Start of Media Number 5.

7

8          MS. TROTTER:  Going to have the court

9     reporter mark as Exhibit 344, a one-page document

10    which is Bates stamped PP 5935.

11         (Exhibit 344 was marked for

12    identification.)

13    BY MS. TROTTER:

14         Q   Mr. Daleiden, showing you what the court

15    reporter has marked as Exhibit 344.  Do you recognize

16    that document?

17         A   I believe I do.

18         Q   The picture of the person on Exhibit 344 is

19    you, correct?

20         A   That is -- that is me when I was 15.

21         Q   And so it's you, correct?  At whatever age?

22         I'm kidding.  The name that is on Exhibit

23    344, Robert Sarkis, that's not your name, correct?

24         A   Robert Sarkis is my pseudonym.

25         Q   It's not your legal name?

1     A    It is not --

2          MS. SHORT:  Objection, calls for a legal

3     conclusion.

4          MR. JONNA:  Join.

5          THE WITNESS:  It's not the name on my birth

6     certificate.

7     BY MS. TROTTER:

8     Q    Have you ever filed with any governmental

9     authority a name change application?

10    A    No, I have not.

11    Q    Have you ever used the name Robert Sarkis

12    on any government applications of any kind?

13    A    No, I have not.

14    Q    How did you obtain or create the ID that is

15    reflected in Exhibit 344?

16         MR. JONNA:  Objection, compound, vague and

17    ambiguous, lacks foundation.

18         MR. MIHET:  Also assumes facts not in

19    evidence.

20         MR. MONAGHAN:  Join in those objections.

21         MS. SHORT:  Join.

22         THE WITNESS:  I -- I printed it out.

23    BY MS. TROTTER:

24    Q    And when you say you printed it out -- let

25    me withdraw that.

1        How did the name Robert Dow Sarkis come to

2 appear on Exhibit 344?

3        MR. JONNA: Objection, vague and ambiguous.

4        THE WITNESS: I typed that over my name on

5 a scan of my expired driver's license.

6 BY MS. TROTTER:

7     Q    And when did you do that?

8     A    Sometime in late 2013. I don't remember

9 the exact month.

10     Q    Where were you when you did that?

11     A    I believe I was at home in Orange County.

12     Q    Why did you do that?

13     A    I did that in order to create a -- a

14 novelty photo ID for my citizen journalism work.

15     Q    For what purpose?

16        MR. JONNA: Objection, asked and answered.

17        THE WITNESS: In order to have a photo

18 identification that would match the name -- that

19 would match the pseudonym Robert Sarkis.

20 BY MS. TROTTER:

21     Q    Who did you intend, if anyone, to provide

22 Exhibit 344 to after you created it?

23        MR. JONNA: Objection, lacks foundation.

24        THE WITNESS: Only to individuals who asked

25 me for a photo ID, though I never intended to use

1  this to drive or register to vote or purchase

2  alcohol.  And I never did.

3  BY MS. TROTTER:

4     Q    Did you ever create an ID like is contained

5  in 344 for any other person?

6           MR. JONNA:  Objection, vague and ambiguous.

7           MR. MIHET:  I'll join.

8           THE WITNESS:  I asked for a document like

9  this exhibit to be created for another person.

10 BY MS. TROTTER:

11    Q    For whom?

12    A    For Susan Merritt.

13    Q    And who did you ask to create that

14 document?

15    A    I asked some guy in -- it was either in

16 Irvine or Santa Ana.  I'm not sure exactly where.  It

17 might have been Newport Beach.  I don't know the

18 exact location.  And I don't remember his name.

19    Q    Was this person in Irvine or Newport Beach

20 in a business establishment of some type?

21           MR. JONNA:  Objection, vague and ambiguous.

22           THE WITNESS:  He was in an industrial

23 office park.

24 BY MS. TROTTER:

25    Q    How did you come to have contact with this

1   person in Irvine or Newport Beach?

2       A    I believe I found his contact information

3   on Craigslist.

4       Q    Had you done some search on Craigslist in

5   order to find this person?

6       A    I don't -- I don't remember exactly if it

7   required a search or just looking through the

8   directories.  I don't remember.

9       Q    You saw a listing in the Craigslist

10  directory for this person in either Irvine or Newport

11  Beach?

12      A    I saw a listing for the service of novelty

13  IDs.

14      Q    At the time that you made contact with this

15  person in Irvine or Newport Beach to create the

16  document for Susan, had you already created Exhibit

17  344?

18      A    I don't remember.

19      Q    Why did you ask this person in Irvine or

20  Newport Beach to create the ID for Susan?

21          MR. JONNA:  Objection, misstates testimony.

22          THE WITNESS:  Because -- because I needed a

23  novelty photo ID with the name Susan Tennenbaum for

24  CMP's undercover journalism study.

25  BY MS. TROTTER:

1    Q   Did you create a fake Facebook page for

2 Susan?

3        MR. MIHET:  Objection, form.

4        MR. JONNA:  Join.

5        THE WITNESS:  I created a rudimentary

6 Facebook profile for the name Susan Tennenbaum.

7 BY MS. TROTTER:

8    Q   Did you create a Facebook page for Robert

9 Sarkis?

10   A   No.

11   Q   Do you have a physical version, not a copy,

12 but a physical, original version of what is contained

13 in Exhibit 344?

14   A   I believe that we have produced that or

15 produced the opportunity to inspect that physical

16 version in this litigation.

17   Q   Do you have that in your possession?

18   A   No, it's in my counsel's possession.

19   Q   Okay.  Other than Susan, did you create any

20 documents like Exhibit 344 for any other person?

21   A   No, I did not create such a document for

22 another person.

23   Q   Did you direct anyone else to create a

24 document like Exhibit 344 for any other person other

25 than yourself or Susan?

1    A    Yes, I directed one for -- or one for

2  Brianna as well.

3    Q    Who did you direct to create one for

4  Brianna?

5    A    Also from the gentleman in the industrial

6  office park in Irvine or Newport.

7    Q    Did you ask that gentleman to create the

8  documents for Brianna and Susan at the same time?

9    A    Yes.

10   Q    How much did that gentleman charge you for

11  those documents?

12   A    I can't remember.  I would estimate that it

13  was -- that the total charge was -- or the total

14  price was between $40 total and probably $120, total

15  would be the maximum.  But I really don't remember.

16   Q    Have you ever signed anyone's name to any

17  document without their authorization?

18        MR. JONNA:  Objection, overbroad.

19        MR. MIHET:  Vague and ambiguous.

20        MS. SHORT:  Join.

21        MR. MONAGHAN:  Join.

22        THE WITNESS:  I don't believe so.

23  BY MS. TROTTER:

24   Q    Have you ever signed any document with the

25  name Phil Cronin without authorization?

1    that's the basis and the metric by which he was paid.

2        Q   I believe it's Exhibit 344 that we were

3    looking at earlier, which is the ID.  It's probably

4    flipped over, maybe the first one on the pile there.

5    I'm not sure exactly where it is.

6            You testified earlier that you viewed the

7    ID as a novelty item?

8        A   That's correct.

9        Q   Did you ever tell anyone associated with

10   NAF that the ID was a novelty item?

11       A   No, I don't know that I ever told anybody

12   at NAF anything about this document.

13       Q   Did you ever -- let me ask you this.  Did

14   you ever use the ID that is reflected in Exhibit 344

15   to enter any conferences or events?

16           MR. JONNA:  Objection, compound, overbroad.

17           THE WITNESS:  I used -- I used this

18   document to obtain my badge at event registration

19   tables.

20   BY MS. TROTTER:

21       Q   Did you ever use the document for any other

22   purpose, the ID for any other purpose other than

23   entering events or conferences or obtaining your

24   badge for events or conferences?

25       A   Other than to present -- present -- present

1  identification at Planned Parenthood Gulf Coast in

2  Houston, no.

3      Q   When you presented the ID to Planned

4  Parenthood Gulf Coast in Houston, did you tell any of

5  the Planned Parenthood Gulf Coast personnel that the

6  ID was a novelty item?

7      A   I didn't tell them anything about this

8  document.

9      Q   Did you, at any point in time in which you

10 used the ID to obtain a badge for any event, tell

11 anyone connected with the event that the ID was a

12 novelty item?

13         MR. JONNA:  Objection, vague and ambiguous,

14 overbroad.

15         THE WITNESS:  I had no conversations

16 whatsoever with anybody at the events about those

17 documents.

18         MS. TROTTER:  No further questions.

19         MS. MALTZER:  I need to go off the record

20 so I can get resettled.

21         THE VIDEOGRAPHER:  Off the record at 6:08.

22         (Brief recess.)

23         THE VIDEOGRAPHER:  Back on the record at

24 6:23 p.m.

25



# EXHIBIT 2

1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3

4   PLANNED PARENTHOOD              )
    FEDERATION OF AMERICA, INC.,   )
5   et al.,                        )
                                   )
6          Plaintiffs,             ) CASE NO.
                                   ) 3:16-CV-00236
7                                  )
    vs.                            )
8                                  )
                                   )
9   THE CENTER FOR MEDICAL         )
    PROGRESS, et al.,              )
10                                 )
           Defendants.             )
11  _____  )

12

13

                    **CONFIDENTIAL**

14

                 **ATTORNEYS EYES ONLY**

15

16

17      VIDEOTAPED DEPOSITION OF 30(b)(6) OF

18         THE CENTER OF MEDICAL PROGRESS

19                (DAVID DALEIDEN)

20          WEDNESDAY, APRIL 17, 2019

21                  9:37 A.M.

22

23

24  REPORTED BY:  KATHERINE FERGUSON, CSR NO. 12332

25            JOB NO. 158912

1  which begins on the third page of the exhibit.  And

2  it's actually the first page of the attachment, Bates

3  stamped 7128.  And turn your attention to the section

4  that is headed "remaining components"; do you see

5  where I am?

6      A    Yes, I see that.

7      Q    And then underneath that, there is a number

8  1 with a heading or subheading "follow-up stings,"

9  correct?

10     A    That's correct.

11     Q    And the text under that subheading reads,

12 "the project's front corporation has become a known

13 and trusted entity to many important individuals in

14 the upper echelons of the abortion industry,

15 including key Planned Parenthood leaders"; do you see

16 that?

17     A    Yes, I see that.

18     Q    The front corporation that is referred to

19 in that sentence was Biomax, correct?

20     A    I believe that that is Biomax.

21     Q    The paragraph goes on to read, "we need to

22 leverage these contacts to secure follow-up meetings

23 with medical directors and strategic Planned

24 Parenthood affiliates to discuss fetal tissue

25 procurement contracts at length," correct?

1    A    That's correct.

2    Q    So CMP was using the trust that it had

3  built up utilizing Biomax to make contact with

4  important individuals in Planned Parenthood and

5  others in order to leverage those contacts to set up

6  meetings with medical directors at Planned

7  Parenthood, correct?

8         MR. JONNA:  Objection, vague and ambiguous.

9    A    I don't think that's exactly what I wrote

10 in this paragraph.

11 BY MS. TROTTER:

12   Q    Was that what CMP was doing?

13   A    What CMP was doing was using the networking

14 that Biomax did in order to explore the market in

15 aborted fetal tissue and organ harvesting and to

16 explore that with Planned Parenthood medical

17 directors and others.

18        MS. TROTTER:  I'll have the court reporter

19 mark as exhibit 355 a document, first page of which

20 is Bates stamped CM 4228.

21        (Exhibit 355 was marked for

22 identification.)

23 BY MS. TROTTER:

24   Q    Mr. Daleiden, the first page of Exhibit 355

25 is an e-mail from you to Mr. Rhomberg, dated April

1    A    Dr. Janet Smith was mainly -- mainly an

2  adviser, although I believe she did contribute a

3  little bit of money at some point.

4    Q    And you attached to the e-mail to Dr. Smith

5  the operation report for Center For Medical Progress,

6  correct?

7    A    Yes, I did.

8       MS. TROTTER:  I'll have the court reporter

9  mark as Exhibit 359 a document, first page of which

10  is Bates stamped CM 3.

11      (Exhibit 359 was marked for

12  identification.)

13  BY MS. TROTTER:

14    Q    Mr. Daleiden, Exhibit 359 is a copy of the

15  brochure that you testified earlier that you created

16  for Biomax; is that correct?

17    A    That's correct.

18    Q    On the first page of that exhibit, in the

19  middle section, there is a section that is entitled

20  "about Biomax"; do you see where I am?

21    A    Yes, I see that.

22    Q    And the text under that section reads,

23  "Biomax Procurement Services, LLC is a biological

24  specimen procurement organization," correct?

25    A    Yes, I see that.

1    Q    That's a false statement, correct?

2         MR. JONNA:   Objection, argumentative.

3    A    No, I don't believe it is.

4  BY MS. TROTTER:

5    Q    It's your belief that Biomax Procurement

6  Services, LLC is a biological specimen procurement

7  organization?

8    A    Biomax is identified as a biological

9  specimen procurement organization.

10   Q    That sentence goes on to read,

11 "headquartered in Norwalk, California," correct?

12   A    Correct.

13   Q    That's a false statement, correct?

14   A    No, that is not a false statement.

15   Q    Did Biomax ever have offices in Norwalk,

16 California?

17   A    Biomax was headquartered and I believe the

18 actual LLC formation papers for Biomax specified the

19 headquarters at Biomax's post office box in Norwalk,

20 California.

21   Q    So Biomax had a post office box in Norwalk,

22 California?

23   A    Correct.  That was the extent of Biomax's

24 physical plant space.

25   Q    That paragraph goes on to say, "Biomax

1   provides tissue and specimen procurement for academic

2   and private bioscience researchers"; that's what it

3   says, correct?

4       A    That's what it says.

5       Q    That's a false statement, right?

6       A    That's advertising language.

7       Q    That's a false statement, correct?

8            MR. JONNA:  Objection, asked and answered.

9       A    I don't believe that normal advertising

10  language for a company is a false statement, no.

11  BY MS. TROTTER:

12      Q    Did Biomax ever provide tissue or specimen

13  procurement for academic and private bioscience

14  research?

15      A    Biomax explored that market and ultimately

16  was not able to do so.

17           MR. JONNA:  I think a couple people joined

18  the call.  Can you please identify yourself besides

19  Albin Rhomberg.

20           MR. MIHET:  Katie Short for Defendant Albin

21  Rhomberg.

22           MR. JONNA:  Anyone else on the phone

23  besides Albin Rhomberg and Katie Short?

24           (No response)

25  BY MS. TROTTER:

1    A    The -- the individual who portrayed Susan

2  Tennenbaum actually did have some medical experience

3  in the 1980s, or clinical experience in the 1980s, to

4  my knowledge, or at least in the past, to my

5  knowledge, however, this -- this statement is not

6  meant to be literally true.

7    Q    The next name down is the name Brianna

8  Allen?

9    A    Yes, I see that.

10    Q    And it says, in parentheses, "procurement

11  assistant," correct?

12    A    Yes, I see that.

13    Q    And Brianna Allen is a pseudonym?

14    A    That's correct, Brianna Allen is a

15  pseudonym.

16    Q    What is the legal name of the person who

17  used the synonym Brianna Allen?

18         MR. JONNA:  Objection, calls for

19  speculation.

20    A    In 2014, I believe her legal name is

21  Brianna Baxter.  I know she has gotten married

22  recently, so I believe her legal name is now

23  different.

24  BY MS. TROTTER:

25    Q    Underneath the pseudonym Brianna Allen, it

1 And I don't believe they ever asked.

2 BY MS. TROTTER:

3     Q   Did Biomax ever have any W2 employees?

4     A   Not to my knowledge.

5     Q   Did Biomax ever have any 1099 independent

6 contractors?

7     A   I don't believe so.

8     Q   Anna Bettisworth used a pseudonym as well

9 in connection with Biomax, correct?

10     A   Yes, I believe she did.

11     Q   And that pseudonym was Rebecca Wagner?

12     A   Yes, it was Rebecca Wagner.

13     Q   We looked yesterday, during your individual

14 deposition, at some copies of identifications; do you

15 recall that?  There were two, one Robert Sarkis, the

16 other Susan Tennenbaum; do you recall that?

17     A   Yes, I remember those.

18     Q   Was there also an identification prepared

19 for the pseudonym Rebecca Wagner?

20     A   I am not sure.

21     Q   Did Mr. Lopez ever adopt a pseudonym in

22 connection with Biomax?

23     A   No, Adrian always used his nickname, middle

24 name, Adrian Lopez.

25     Q   And that was because Mr. Lopez was not an

1    anti-abortion activist, correct?

2        A    No, that was -- that was because Adrian

3    Lopez is a very, very, very common name and it was

4    felt that -- that the commonality of his name was

5    sufficient to protect his associational privacy

6    interest in doing undercover work part-time and then

7    going on with the rest of his life.

8        Q    And to hide his identity, correct?

9        A    No, I don't know that anyone tried to hide

10   Adrian's identity.

11       Q    But you tried to hide your identity?

12           MR. JONNA:  Objection, vague and ambiguous,

13   overbroad.

14       A    I tried to protect my First Amendment

15   rights to do citizen journalism work on the fetal

16   trafficking market in America.

17   BY MS. TROTTER:

18       Q    Were you involved in selecting the

19   pseudonym for Ms. Merritt?

20       A    I believe that I was involved in a

21   conversation about it.

22       Q    With Ms. Merritt?

23       A    I believe so.

24       Q    Were you involved in selecting the

25   pseudonym of Brianna Baxter?

1    Q   Did you ever tell anyone that you

2  understood to be connected with NAF that you were

3  engaged in LARPing?

4       MR. JONNA:  Objection, asked and answered.

5    A   No one at NAF ever asked me about that.

6  BY MS. TROTTER:

7    Q   Did you ever tell them that?

8       MR. JONNA:  Same objection.

9    A   I never had any discussion with anyone at

10 NAF about journalism or about LARPing or about poetry

11 or acting or any other kind of communication.  My

12 communications with people at NAF were about the

13 market, were about exploring the market for fetal

14 tissue harvesting and sales.

15 BY MS. TROTTER:

16   Q   So the answer to my question is you never

17 had any discussion with anyone who you understood to

18 be connected with NAF in which you told them you were

19 involved in LARPing, correct?

20      MR. JONNA:  Objection, asked and answered.

21   A   That's correct.

22      MR. MIHET:  I'll join.

23   A   We never talked about LARPing with NAF.

24       MS. TROTTER:  Okay.  Thank you.

25       Now, I want to have marked as Exhibit 364 a

1 card at any point in time to anyone that you believe

2 to be connected with Planned Parenthood?

3        MR. JONNA:  Objection, overbroad, calls for

4 speculation.

5      A   Yes, I believe I did.

6 BY MS. TROTTER:

7      Q   Do you know if the business card with the

8 pseudonym Susan Tennenbaum was ever provided to

9 anyone associated with Planned Parenthood?

10        MR. JONNA:  Same objections.

11      A   Yes, I believe it was.

12 BY MS. TROTTER:

13      Q   Was the business card with the pseudonym

14 Susan Tennenbaum provided to anyone associated with

15 NAF?

16        MR. JONNA:  Same objections.

17      A   Yes, I believe it was.

18 BY MS. TROTTER:

19      Q   Same question as to the pseudonym Robert

20 Daoud Sarkis.

21        MR. JONNA:  Same objections.

22      A   Yes, I believe it was.

23 BY MS. TROTTER:

24      Q   Was the business card with the pseudonym

25 Brianna Allen provided to anyone associated with

1    Planned Parenthood?

2            MR. JONNA:  Same objections.

3        A    Yes, I believe it was.

4    BY MS. TROTTER:

5        Q    Was the business card with the pseudonym

6    Brianna Allen ever provided to anyone associated with

7    NAF?

8            MR. JONNA:  Same objections.

9        A    Yes, I believe it was.

10   BY MS. TROTTER:

11       Q    Other than the three business cards that

12   are reflected in Exhibit 366, did you create any

13   other business cards for Biomax?

14       A    Yes, I did.

15       Q    What other business cards did you create

16   for Biomax?

17       A    I remember creating a business card for

18   Adrian Lopez and I also remember creating a business

19   card for Rebecca Wagner.

20       Q    And Rebecca Wagner was the pseudonym for

21   Ms. Bettisworth?

22       A    That's correct.

23       Q    And -- and Adrian Lopez is Mr. Lopez's

24   actual legal name?

25       A    His legal name is Gerardo Adrian Lopez.

1    Q   The business cards for Biomax that

2  contained the name Adrian Lopez, were those business

3  cards ever provided to anyone associated with Planned

4  Parenthood?

5        MR. JONNA:  Objection, calls for

6  speculation.

7    A   Yes, I believe they were.

8        MR. JONNA:  Overbroad.

9    A   Yes, I believe they were.

10  BY MS. TROTTER:

11    Q   Same question as to NAF.

12        MR. JONNA:  Same objections.

13    A   Yes, I believe they were.

14  BY MS. TROTTER:

15    Q   The business cards that contained the

16  pseudonym Rebecca Wagner, was that business card ever

17  provided to anyone associated with Planned

18  Parenthood?

19        MR. JONNA:  Same objections.

20    A   Yes, I believe it was.

21  BY MS. TROTTER:

22    Q   Was the business card with the pseudonym

23  Rebecca Wagner ever provided to anyone associated

24  with NAF?

25        MR. JONNA:  Same objections.

1    A    Yes, I believe it was.

2         MS. TROTTER:  I'll have the court reporter

3    mark as Exhibit 367 a document that contains the

4    Bates number CM 5.

5         (Exhibit 367 was marked for

6    identification.)

7    BY MS. TROTTER:

8    Q    Mr. Daleiden, do you recognize the cards

9    that are copied and appear in Exhibit 367?

10   A    Yes, I believe I do.

11   Q    Were you personally involved in obtaining

12   any of the three cards that appear in Exhibit 367?

13   A    Yes, I was.

14   Q    Were you personally involved in obtaining

15   all three of the cards that appear in Exhibit 367?

16   A    Yes, I was.

17   Q    I'll start with the cards which bear the

18   name Bank of America that are on -- I guess it's the

19   bottom of the page.  If you don't turn it sideways

20   you should have it.

21        There are two Bank of America cards; do you

22   see that?

23   A    Yeah, I see that.

24   Q    Let me first ask you, do -- does CMP have

25   possession of the actual cards that are copied in

1  Q   Did you ever use that debit card?

2  A   Yes, I have used that debit card before.

3  Q   Have you ever had a Bank of America debit

4  card with the name Robert Sarkis?

5  A   Yes, CMP has had a Robert Sarkis customized

6  CMP debit card before.

7  Q   And was that a Bank of America debit card?

8  A   I know that there was a Chase debit card

9  for Robert Sarkis on the Biomax Procurement Services

10 Chase account.  I am not sure -- there may have been

11 a Robert Sarkis business debit card on The Center For

12 Medical Progress account, although I don't know if it

13 was ever activated.

14 Q   The card that is underneath -- I'll call it

15 underneath because you have it sideways there -- that

16 is the other Bank of America card on Exhibit 367,

17 bears the pseudonym Brianna Allen; do you see that?

18 A   Yes, I see that.

19 Q   Was that card obtained at the same time as

20 the card bearing the name Phil Cronin?

21 A   I would estimate it was obtained around the

22 same time.  I do not remember specifically if both

23 cards were -- were literally requested on the same

24 day and shipped together or if there was a time gap

25 of a couple of weeks or maybe a month.  Yeah, that's

1  the extent to what I remember about the timing of

2  those two.

3      Q   Do you recall personally going onto the

4  Bank of America portal in order to request a card

5  that bears the name Brianna Allen?

6      A   I'm sure that I did, the same way I'm sure

7  I did for the Phil Cronin one.  I don't necessarily

8  have a clear picture memory of me actually sitting on

9  my laptop in the CMP Bank of America portal and

10  typing in Phil Cronin and typing in Brianna Allen.

11  That is the process that I remember having used

12  multiple times, but I don't remember the specific

13  event.

14      Q   I'll note, as I look at the two cards

15  there, the Bank of America cards in Exhibit 367, the

16  one bearing Mr. Cronin's name appears to have an

17  expiration date of September 2017 and the one bearing

18  the pseudonym Brianna Allen has an expiration date

19  that appears to be March 2018; do you see that?

20      A   Yes, I see that.

21      Q   Do you know why it is there were two

22  different expiration dates?

23      MR. JONNA:  Objection, calls for

24  speculation.

25      A   I do not know for a fact, but looking at

1  those two dates does refresh my recollection a little

2  bit.  I think, I suspect, although not sure, but I

3  suspect that there may have been multiple iterations

4  of the Brianna Allen CMP business card, that is, that

5  there might have been a first one that was requested

6  and then that one itself may have expired.  So

7  perhaps it was earlier than the Phil Cronin one.  And

8  then I think we requested a replacement one.  But I

9  don't remember for sure, but I have a feeling that

10  might be part of it, just looking at the dates on it.

11  BY MS. TROTTER:

12      Q    The cards bearing the name Robert Sarkis,

13  do you still have those in your possession?

14      A    I believe The Center For Medical Progress

15  still has those physical document -- physical items.

16      Q    When you went onto the Bank of America

17  portal in order to request the cards, did you have to

18  check off any boxes after you -- either before or

19  after you put in the name?

20          MR. JONNA:  Objection, vague and ambiguous.

21      A    Not that I remember.

22  BY MS. TROTTER:

23      Q    Did you have to click on any buttons in

24  order to submit the request?

25          MR. JONNA:  Same objection.

1    A    I believe that -- I mean, I do remember a

2 final either finish button or submit button or some

3 kind of final button at the end of the form.  I also

4 am pretty sure we produced a screen shot of that form

5 or screen shots of the multistep form, whatever that

6 was in this litigation.  So that is a document that I

7 think that plaintiffs have, if you wanted to show me

8 that document or if you have it.

9 BY MS. TROTTER:

10    Q    The portal that you described going on to

11 get the Bank of America cards, was that at the

12 website BankofAmerica.com?

13    A    Yes, I believe it was.

14    Q    I want to turn now to the Chase card that

15 is in Exhibit 367.

16         That card bears the name Gerardo A. Lopez,

17 correct?

18    A    Yes, that's correct.

19    Q    And underneath that, it says "Biomax

20 Procurement Services," correct?

21    A    Yes, that's correct.

22    Q    Did Biomax Procurement Services, LLC have

23 an account at Chase?

24    A    Yes, Biomax did.

25    Q    When did Biomax open that account?

1    A    I would estimate that Biomax opened that

2  account either in -- either in late 2014 or in early

3  2015.

4    Q    Were you personally involved in requesting

5  the Chase card that is reflected in Exhibit 367?

6    A    Yes, I was.

7    Q    How did you go about requesting that card?

8    A    So after Adrian requested it from me, I

9  went to -- I physically went to one of the Chase

10  branches here in Orange County because Chase did not

11  have a very developed online business portal thing.

12  And so I went to -- to the Chase -- to the Chase

13  branch, I don't remember exactly where it was, it

14  might have been Fountain Valley, and they had a

15  terminal in their -- in the bank branch, like a

16  computer terminal that was specifically set up for

17  the purpose of requesting complementary customized

18  employee or associate business debit cards on your

19  business's bank account.

20        And so I went to that terminal and I

21  requested one in the name of Gerardo Adrian Lopez and

22  they -- it was a form, I think, more or less

23  functionally identical to the one from the Bank of

24  America business portal, just for Chase.  And I

25  clicked submit and we got this card a few weeks

1  later, shipped from Chase.

2      Q    When you went into the Chase branch in

3  order to make the request for the card containing

4  Mr. Lopez's name, did you, at that same time, request

5  cards in any other people's names?

6      A    I may have requested a Robert Sarkis, a

7  Biomax Procurement Services associate debit card

8  customized with the Robert Sarkis name.  And I may

9  have requested one with the Susan Tennenbaum name on

10  it as well.  Although, I don't remember exactly if

11  that -- if that all happened at once or if there were

12  multiple visits.  I can't remember for sure.

13      Q    Do you have, in your possession, all of the

14  Chase cards that you obtained with the Biomax name?

15      A    Yes, I believe that CMP and Biomax still

16  have possession of all of the old Biomax business

17  debit cards on the Biomax Chase account.

18      Q    Did Mr. Lopez tell you why it was that he

19  was asking you to procure a card with his name on it?

20      A    Yes, I remember him saying that, more or

21  less, he wanted to be able to -- to make Biomax

22  purchases while we were -- while we were on

23  undercover trips.

24      Q    Are you aware of Mr. Lopez using the card

25  containing his name in order to purchase alcohol?

1 Family Planning put on with PPFA site of family

2 planning in Miami in October 2014.

3     Q   In the CC line of the e-mail, there's the

4 address to the pseudonym Susan Tennenbaum; do you see

5 that?

6     A   Yes, I see that.

7     Q   And then an e-mail address following that

8 pseudonym, correct?

9     A   Yeah.

10     Q   At any point in time, did you personally

11 ever send any e-mail to anyone from the e-mail

12 address Susan@Biomaxps.com?

13     A   Yes, I believe I have.

14     Q   On how many occasions, do you recall?

15     A   No, I don't really recall a number.  That

16 would be hard for me to estimate right now.

17     Q   Did anyone, other than you, at any point in

18 time that you're aware of, ever send any e-mail to

19 anyone from the e-mail address Bob@Biomaxps.com?

20     MR. JONNA:  Objection, calls for

21 speculation.

22     A   No, not that I'm aware of.

23 BY MS. TROTTER:

24     Q   At any point in time, did anyone, to your

25 knowledge, ever send any e-mail to anyone else from

1 thread is an Ashley Baldwin; do you see that?

2     A   Yes.

3     Q   Who is Ashley Baldwin?

4     A   Ashley Baldwin is a friend of mine.  I met

5 her -- I think I met her through Anna Bettisworth

6 back when I was still working with Lila at Live

7 Action.  And so I met Ashley in -- I think in 2012.

8 Anna has, I guess, known her much, much longer than

9 that.  And Ashley is just someone who I thought has a

10 good, friendly outsider perspective, especially at

11 this time, on a lot of the work that I had been

12 doing.  So Ashley, along with Anna and Kate, were

13 sort of part of a -- part of a group of just three

14 old friends, old colleagues that I started running

15 some things by in, like, May and June and July of

16 2015, gearing up for the project release.

17     Q   And the Kate that you just referenced in

18 your answer is Kate Bryan?

19     A   Kate Bryan.

20     Q   If you look at the first page of Exhibit

21 393, at the bottom, there is an e-mail from Ashley

22 Baldwin to you, with a number of people on CC; do you

23 see that?

24     A   Yes, I see that e-mail.

25     Q   And Ms. Baldwin writes to you, "Like I've

# EXHIBIT 3

1

2               UNITED STATES DISTRICT COURT

3              NORTHERN DISTRICT OF CALIFORNIA

4

5   PLANNED PARENTHOOD FEDERATION OF        )
    AMERICA, INC., et al.,                  )
6                                           )
                 Plaintiffs,                )
7                                           )
        vs.                                 )No. 3:16-cv-00236
8                                           )
    CENTER FOR MEDICAL PROGRESS, et al.,    )
9                                           )
                 Defendants.                )
10  _____ )

11

12

13

14

15                 Irvine, California

16   CONFIDENTIAL VIDEOTAPED DEPOSITION OF SUSAN MERRITT

17                      TAKEN ON

18              THURSDAY, APRIL 18, 2019

19

20

21

22

23   Job No. 159294

24   Reported by:

25   JENNIFER K. WINTERS, CSR NO. 8543

1    Ms. Baxter?

2        A.    I believe so.

3        Q.    All right.  You didn't know Ms. Baxter I take

4    it before then?

5        A.    Correct.

6        Q.    Ms. Merritt, I've placed in front of you

7    what's been marked as Deposition Exhibit Number 415.  Do

8    you have that document in front of you?

9        (Whereupon Exhibit 415 is marked for the record.)

10       A.    I do.

11       Q.    Do you recognize it?

12       A.    Do I recognize --

13       Q.    Yeah.

14       A.    -- the document?  I see the document, yes.

15       Q.    Okay.  What is it?

16       A.    This is a picture of the novelty piece that

17   was used to -- in case ever we had to show

18   identification, in case that was ever needed this

19   novelty piece was used.

20       Q.    Okay.  When you say novelty piece you're

21   referring to the picture of something that purports to

22   be a DMV California driver's license, correct?

23       MR. MIHET:  Objection, the document speaks for

24   itself.

25       THE WITNESS:  I'm talking about this -- the picture

1   of what's on the Exhibit 415.

2        MR. FORAN:

3        Q.    Right.  And the novelty piece --

4        A.    Yes.

5        Q.    -- to use your phrase, has the words

6   California Driver License on it, right?

7        A.    Yes, it does.

8        Q.    And it has the words DMV on it, right?

9        A.    Yes.

10       Q.    It looks like a driver's license, right?

11       MR. MIHET:  Objection, form.

12       THE WITNESS:  I would say yes.

13       MR. FORAN:

14       Q.    All right.  And you carried this on your

15  person when you entered NAF's annual meeting in 2014,

16  correct?

17       A.    I don't know if I carried it then.

18       Q.    All right.  Well, have you possessed this

19  novelty piece that is reflected in Exhibit 415

20  previously?  You had it on your person, right?

21       A.    Correct.

22       Q.    Okay.  Where did you get it?

23       A.    It was given to me by one of the team

24  members.

25       Q.    Which team member?

1    A.    David.

2    Q.    All right.  And what did he say?

3    A.    What did he say?

4    Q.    Yeah, when he gave it to you.

5    A.    I don't know what he said when he gave it to

6    me.

7    Q.    You have no recollection of anything that he

8    said in connection with him giving you this novelty

9    piece that's reflected in Exhibit 415?

10   A.    Five years ago?

11   Q.    Yeah.

12   A.    Here.

13   Q.    Okay.  Anything else?

14   A.    Probably but do I remember it?  Can I state

15   it today from five years ago what he said?  I would be

16   guessing.

17   Q.    Just generally, do you have a general

18   recollection of what Mr. Daleiden told you when he

19   handed you the novelty piece that's reflected in

20   Exhibit Number 415?

21   A.    Put this in your wallet.

22   Q.    Anything else?

23   A.    I don't think so.

24   Q.    All right.  Did he tell you where -- where he

25   got this?

1    A.    No.

2    Q.    Okay.  Did you ask?

3    A.    No.

4    Q.    Did you have any questions of Mr. Daleiden

5    when he handed you the novelty piece that's reflected in

6    Exhibit Number 415?

7    A.    Did I have any questions?

8    Q.    Yeah.

9    A.    Did I have any questions?  I think at that

10   point in time, no.

11   Q.    Did you use the novelty piece that is

12   reflected in Exhibit Number 415 -- did you use this

13   novelty piece to gain access to meetings of abortion

14   providers?

15   MR. MIHET:  Objection, vague and ambiguous.

16   THE WITNESS:  I don't have a clear memory of where

17   I used it, when I used it, if I had to use it.  Wait, I

18   remember going to a front desk at a hotel where we were

19   registered and they asked -- the hotel clerk asked to

20   see it.  I do remember that.

21   MR. FORAN:

22   Q.    Did you present it to the hotel clerk?

23   A.    I did.

24   Q.    All right.  But you don't have any

25   recollection as you sit here today of using this ID, of

1  presenting this ID in connection with gaining access to

2  meetings of abortion providers?

3       A.    It would only be a guess, not a clear one.

4  It stands out in my mind the hotel clerk where we had

5  registered for a room.  I do know that I used it then.

6  And could you restate where you're asking if I used it?

7       Q.    Let me just ask you --

8       A.    Sure.

9       Q.    -- so -- okay.  Let's get at it this way, you

10 see -- you see the number down at the bottom of the

11 document?  That's a NAF Bates number, NAF 586.  Do you

12 see that?

13      A.    I do.

14      Q.    I'll represent to you that NAF produced this

15 copy of this ID in discovery in Jujork's (phonetic)

16 litigation.  Are you with me?

17      A.    I'm with you.

18      Q.    Okay.  So NAF had a copy of your ID.  And I'm

19 going to ask you again.  Isn't it the case that you used

20 this ID and presented a copy of this ID to NAF in order

21 to gain access to its meetings?

22      MR. MIHET:  Objection to the characterization --

23 the mischaracterization of the testimony, vague,

24 ambiguous, compound.

25      THE WITNESS:  So to the best of my recollection I

1 remember it -- presenting it to a hotel clerk.  If

2 you're telling me that NAF says that I did and they have

3 a copy of it I'm going to trust your -- what you're

4 telling me --

5      Q.    Go ahead, sorry.

6      A.    -- and it seems reasonable.

7      Q.    All right.  Again, what I say doesn't matter.

8 It's not evidence.  I'm just asking you for your memory.

9 It sounds to me like you don't remember one way or the

10 other.  Is that a fair statement?

11      A.    It's a fair statement.  I'm just looking at

12 what you're presenting and thinking it's reasonable

13 but -- your conclusion or what you're asking me so

14 I'm --

15      Q.    Is there -- Ms. Merritt, do you have any

16 issues with your memory?  Do you suffer from memory

17 lapse?

18      A.    Is it as good as it used to be?  I would have

19 to say, no, it's not as good as it used to be.  I'm

20 almost 70 so, you know, if that answers the question.

21      Q.    Do you suffer from memory lapse from time to

22 time?  I don't mean to pry, I'm just wondering.

23      MR. MIHET:  Objection.

24      THE WITNESS:  I -- I think that in certain

25 situations I have to think through something a little

# EXHIBIT 4

1     UNITED STATES DISTRICT COURT

2     NORTHERN DISTRICT OF CALIFORNIA

3     SAN FRANCISCO DIVISION

4

5  PLANNED PARENTHOOD FEDERATION

   OF AMERICA, INC., et al.,          Case No.

6                                      3:16-cv-00236-WHO

       Plaintiffs,

7    vs.

8  CENTER FOR MEDICAL PROGRESS,

   et al.,

9

       Defendants.

10  _____

11

12

13    ** CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER **

14

15    VIDEO-RECORDED DEPOSITION OF BRIANNA BAXTER

16           San Francisco, California

17           Saturday, May 11, 2019

18

19

20

21

22

23

24  REPORTED BY:

   CYNTHIA MANNING, CSR No. 7645, CLR, CCRR

25  JOB NO. 159681

Page 2

3    May 11, 2019
4    9:35 a.m.

8         Video deposition of BRIANNA BAXTER, held
9    at Arnold & Porter LLP, Three Embarcadero Center,
10   San Francisco, California, before Cynthia Manning,
11   Certified Shorthand Reporter No. 7645, Certified
12   LiveNote Reporter, California Certified Realtime
13   Reporter.

Page 3

1    A P P E A R A N C E S:

4         ARNOLD & PORTER
5         Attorneys for Plaintiffs
6              Three Embarcadero Center
7              San Francisco, CA 94111
8         BY:  SHARON MAYO, ESQ.

11        MORRISON & FOERSTER
12        Attorneys for National Abortion Federation
13             425 Market Street
14             San Francisco, CA 94105
15        BY:  SPENCER MCMANUS, ESQ.

18        LAW OFFICES OF BENEDICT J. KOLLER
19        Attorneys for Brianna Baxter
20             586 North 1st Street
21             San Jose, CA 95112
22        BY:  BENEDICT KOLLER, ESQ.

Page 4

1    A P P E A R A N C E S (Continued):

4         MAYALL HURLEY
5         Attorneys for Defendant Troy Newman
6              2453 Grand Canal Boulevard
7              Stockton, CA 95207
8         BY:  VLADIMIR KOZINA, ESQ.
9              (Telephonically)

12        Also present:
13             Marcus Majers, Videographer

Page 5

1         SAN FRANCISCO, CALIFORNIA;
2    SATURDAY, MAY 11, 2018; 9:35 A.M.

5         THE VIDEOGRAPHER:  Good morning.
6         This is the start of media labeled Number 1
7    of the recorded video deposition of Brianna Baxter,
8    in the matter of Planned Parenthood Federation of
9    American, Inc., et al., versus The Center for
10   Medical Progress, et al., in the United States
11   District Court, Northern District of California, San
12   Francisco Division.  Case Number 3:16-CV-00236 WHO.
13        This deposition is being held at Arnold &
14   Porter, Three Embarcadero Center, 10th Floor, San
15   Francisco, California, on May 11th, 2019, at
16   approximately 9:35 a.m.
17        My name is Marcus Majers.  I am the legal
18   video specialist from TSG Reporting, Inc.,
19   headquartered at 747 Third Avenue, New York, New
20   York.
21        The court reporter is Cynthia Manning, in
22   association with TSG Reporting.
23        Will all counsel present please introduce
24   themselves.
25        MS. MAYO:  Sharon Mayo, of Arnold & Porter,

1  on behalf of the Planned Parenthood plaintiffs.
2  MR. MCMANUS: Spencer McManus, from
3  Morrison & Foerster, on behalf of the National
4  Abortion Federation.
5  MR. KOLLER: Benedict Koller, K-O-L-L-E-R,
6  on behalf of Ms. Baxter.
7  THE VIDEOGRAPHER: Thank you.
8  And also those joining on the phone?
9  MS. MAYO: Mirko, can you state your
10  appearance?
11  MR. KOZINA: Yeah. I got knocked off. I'm
12  back on. Okay.
13  Can you hear me?
14  MS. MAYO: Yes. Can you state your
15  appearance? We're just starting.
16  MR. KOZINA: Okay. Thank you.
17  It's Vladimir Kozina on behalf of Troy
18  Newman and with Mayall Hurley.
19  Thank you.
20  MS. MAYO: Is there anyone else on the
21  phone?
22  MR. KOZINA: I think they accidentally put
23  me down as the second one because I dialed back in.
24  MS. MAYO: Okay.
25  MR. KOZINA: I'm sorry.

1  MS. MAYO: That's okay.
2  THE VIDEOGRAPHER: Will the court reporter
3  please swear in the witness.
4
5  BRIANNA BAXTER,
6  having first been duly sworn, testified as
7  follows:
8
9  EXAMINATION
10  BY MS. MAYO:
11  Q. Good morning, Ms. Baxter.
12  A. Hi.
13  Q. We introduced ourselves off the record, but
14  my name is Sharon Mayo, and I represent the
15  plaintiffs in this case.
16  And could you state your full name for the
17  record.
18  A. Yeah. Brianna Baxter.
19  Q. All right. And what is your address?
20  A. 15119 Union Avenue.
21  Q. In what city?
22  A. San Jose, California.
23  Q. All right. No doubt your counsel has gone
24  over the rules of a deposition for you, but just so
25  that you and I are on the same page I'm going to go

1  over those rules again for you.
2  First of all, the court reporter, sitting
3  to your right, is transcribing the deposition, all
4  of my questions and your answers. So it's very
5  important that you give verbal answers; nods and
6  shakes of the head, while they show up on the video
7  camera, don't show up on the transcript.
8  Do you understand that?
9  A. Yes.
10  Q. It's also important that you wait until I
11  finish my question before you begin your answer even
12  if you anticipate what the answer is going to be, or
13  what my question is going to be, because it's very
14  hard for the court reporter to take down two people
15  talking at the same time.
16  Do you understand that?
17  A. Yes.
18  Q. If you don't understand one of my
19  questions, please ask me and I will rephrase it or
20  reask it. I will try to clarify it.
21  If you answer a question, then the reader
22  and I -- the reader of your transcript and I will
23  assume that you understood the question.
24  Do you understand that?
25  A. Yes.

1  Q. If you need a break, please tell me. We
2  can take a break at any time. The only caveat to
3  that is if I have a question pending. If I have a
4  question pending, then I would like you to give me
5  an answer before we take a break, unless you need to
6  consult with your client [sic] about an
7  attorney-client privileged issue. But otherwise,
8  please answer my questions before we take a break.
9  Do you understand that?
10  A. Yes.
11  Q. And do you understand that you're under the
12  same oath to tell the truth as you would be if you
13  were testifying here in -- if you were testifying in
14  court today?
15  A. Yes.
16  Q. And do you understand that your testimony
17  may be used at the trial in this case?
18  A. Yes.
19  Q. Now, for all of my questions, when you
20  answer them, I don't want you to guess, but I am
21  entitled to your best estimate of something.
22  Do you understand the difference between a
23  guess and estimate?
24  A. Yes.
25  Q. All right. You will also have an

1  opportunity to review your transcript after the
2  deposition is concluded and make any corrections to
3  it that you think are necessary; but I'll caution
4  you that if you make a major change, like changing a
5  "yes" to a "no," or something significant like that,
6  it will affect your credibility and I can comment on
7  that at trial.
8      Do you understand that?
9      A.  Yes.
10     Q.  Are you taking any medication or drugs or
11  under the influence of anything that might impact
12  your ability to testify truthfully and honestly and
13  accurately today?
14     A.  No.
15     Q.  All right.  Is there any other reason why
16  you can't give us your best, most accurate testimony
17  today?
18     A.  No.
19     Q.  What did you do to prepare for your
20  deposition?
21     A.  I met with my lawyer.
22     MR. KOZINA:  Excuse me for a second.
23  I cannot hear her answers at all.  I hear
24  you wonderfully, but I do not hear her at all.
25     MS. MAYO:  Is that --

1      THE REPORTER:  That's mine.  This one is
2  mine.
3      MS. MAYO:  Ah.  Okay.
4      THE REPORTER:  It has nothing to do with
5  the phone.
6      MS. MAYO:  Okay.  Let's see if I can turn
7  up -- I don't know that there is anything I can do
8  on my end.
9  BY MS. MAYO:
10     Q.  I guess we'll just ask you to speak louder.
11     A.  Sorry.
12     Q.  Sorry.
13     A.  I tend to be quiet.
14     Q.  I think you said you met with your counsel
15  to prepare for your deposition today; is that
16  correct?
17     A.  Yes.
18     Q.  And when did you meet with him?
19     MR. KOZINA:  I still can't hear a word from
20  her.  I hear you wonderfully, Sharon, but I don't
21  hear anything else.
22     MS. MAYO:  She had paused, so --
23     MR. KOZINA:  Oh, okay.  Thank you.
24     THE WITNESS:  Twice this week and I think
25  maybe a few other times leading up to that.

1  BY MS. MAYO:
2      Q.  All right.  Could you tell me approximately
3  how much time in total, in hours, that you spent
4  meeting with your counsel?
5      A.  I think maybe an hour total.
6      Q.  And did you review any documents that
7  refreshed your recollection of things that happened
8  a few years ago?
9      A.  No.  No.
10     Q.  All right.  And when you referred to your
11  counsel, you mean Mr. Koller sitting next to you;
12  correct?
13     A.  Yes.
14     Q.  Did you meet with anyone else?
15     A.  I spoke with another lawyer initially and
16  then Mr. Koller.
17     Q.  Who was the other lawyer?
18     A.  Katie Short.
19     Q.  All right.  Was Katie Short representing
20  you at the time?
21     MR. KOLLER:  Answer to the best of your
22  ability.
23     THE WITNESS:  I'm not totally sure if she
24  was.
25  //

1  BY MS. MAYO:
2      Q.  Was the purpose of your discussion with
3  Ms. Short to get a referral to another lawyer?
4      A.  Yes.
5      Q.  Okay.  Was anyone else present at your
6  conversation with your lawyer?
7      A.  No.
8      Q.  Have you spoken with any of the defendants
9  in this case about your deposition?
10     MR. KOLLER:  Objection; vague, ambiguous.
11  BY MS. MAYO:
12     Q.  Have you spoken with David Daleiden about
13  your deposition?
14     MR. KOLLER:  Objection; vague and
15  ambiguous.
16     And also, I advise her under her Fifth
17  Amendment rights not to testify to that as it might
18  incriminate her.
19  BY MS. MAYO:
20     Q.  Are you going to assert your Fifth
21  Amendment rights?
22     A.  Yes.
23     MR. KOLLER:  Speak up a little louder so
24  the other person can hear.
25  //

1 BY MS. MAYO:
2     Q. Did you speak with Mr. Rhomberg about your
3 deposition?
4     MR. KOLLER: Objection; vague, ambiguous.
5     Also, I'd advise my client to assert her
6 Fifth Amendment rights.
7 BY MS. MAYO:
8     Q. Are you going to assert your Fifth
9 Amendment rights in response to that question?
10     A. Yes.
11     Q. Did you speak with Adrian Lopez about your
12 deposition?
13     MR. KOLLER: I'd advise her again -- I
14 think it's vague and ambiguous.
15     I'd advise her under the Fifth Amendment
16 right against self-incrimination not to answer that.
17 BY MS. MAYO:
18     Q. Are you going to assert your Fifth
19 Amendment right?
20     A. Yes.
21     Q. Did you speak with Troy Newman about your
22 deposition?
23     MR. KOLLER: Again, I would object as to
24 vague and ambiguous.
25     And also advise her not to testify on the

1 grounds that it may incriminate her pursuant to the
2 Fifth Amendment to the United States Constitution.
3 BY MS. MAYO:
4     Q. Are you going to assert your Fifth
5 Amendment right?
6     A. Yes.
7     Q. Did you speak with anyone else about your
8 deposition today other than your counsel?
9     A. My husband and parents.
10     Q. All right.
11     A. Just so they know where I am today,
12 basically.
13     Q. Okay. Have you reviewed the transcripts of
14 any of the depositions that have been taken in this
15 case?
16     A. No.
17     Q. Have you spoken with anyone else about this
18 lawsuit?
19     And by "this lawsuit," I mean the lawsuit
20 in which your deposition is being taken, which is
21 Planned Parenthood Federation of America and other
22 Planned Parenthood affiliates versus Center for
23 Medical Progress, BioMax, and the individuals that I
24 just asked you about.
25     MR. KOLLER: I'd object as to vague and

1 ambiguous.
2     Also advise her not to answer that pursuant
3 to the Fifth Amendment to the United States
4 Constitution on the grounds it may incriminate her.
5 BY MS. MAYO:
6     Q. Are you going to assert your Fifth
7 Amendment right in response to that question?
8     A. Yes.
9     Q. When was the last time you spoke with
10 Mr. Daleiden?
11     MR. KOLLER: Again, object as to vague and
12 ambiguous.
13     And advise her not to answer that question
14 based on the right against self-incrimination
15 pursuant to the Fifth Amendment.
16 BY MS. MAYO:
17     Q. Are you going to assert your Fifth
18 Amendment right in response to that question?
19     A. Yes.
20     Q. Did you bring anything with you today to
21 assist in your testimony?
22     A. No.
23     Q. Have you ever given a deposition or
24 testified in court?
25     A. No.

1     Q. Have you ever been arrested?
2     A. Yes.
3     Q. When?
4     A. I think it was five or six years ago.
5     Q. And what was -- what were the circumstances
6 of the arrest? What were you doing?
7     MR. KOLLER: I'd object as to vague and
8 ambiguous.
9     But you may answer.
10 BY MS. MAYO:
11     Q. Yeah, before you answer, one rule that I
12 didn't go over is that your counsel is here today to
13 assert objections, and unless he either instructs
14 you not to answer, or, as he has done, recommended
15 that you not answer based on the Fifth Amendment
16 privilege, then I'm entitled to an answer from
17 you --
18     A. Okay.
19     Q. -- to the extent you can understand my
20 question.
21     A. I was engaged in free-speech activities on
22 a public sidewalk, and a police officer was upset
23 and arrested me. And since then the charges have
24 been dropped.
25     Q. Okay. And where -- were you protesting in

1  front of a particular building or location?
2     A.  I was speaking with high school students on
3  a public sidewalk in front of a high school.
4     Q.  And what was the subject of the protest?
5       MR. KOLLER:  I'd object as to vague and
6  ambiguous.
7       But you may answer.
8       THE WITNESS:  It wasn't a protest.  We were
9  distributing educational materials to students on
10  issues of sexual health and sex education and life
11  issues.
12  BY MS. MAYO:
13     Q.  And by "life issues," do you mean what is
14  commonly known in the public as pro-life issues?
15       MR. KOLLER:  Objection; vague and
16  ambiguous.
17       But you may answer.
18       THE WITNESS:  I suppose so, from birth to
19  natural death.
20  BY MS. MAYO:
21     Q.  I guess another way to ask the question is:
22  What do you mean by you were handing out materials
23  that related to life issues?  What specifically?
24     A.  Like educational materials larger than a
25  brochure, sort of like a packet.

1     Q.  What was contained in the packet?
2     A.  It was really long ago.  I can't remember
3  exactly.
4     Q.  Were any of the materials related to the
5  topic of abortion?
6       MR. KOLLER:  Objection; vague and
7  ambiguous, calls for a legal conclusion.
8       But you may answer.
9       THE WITNESS:  In part, yes.
10  BY MS. MAYO:
11     Q.  And in which part?
12       MR. KOLLER:  Objection; vague and
13  ambiguous.
14       But you may answer.
15       THE WITNESS:  What do you mean by "which
16  part"?
17  BY MS. MAYO:
18     Q.  Well, you said "in part" they were about
19  abortion, as I understood your testimony.  So what
20  do you mean by that?
21     A.  So they were concerning life issues, and
22  that would include the issue of abortion.  They were
23  also about sexual health and sex education.  So it
24  was a varied amount of information on those topics.
25       And I don't remember exactly what was in

1  the information, but I think I could assume abortion
2  would be one of those topics falling under that
3  umbrella.
4     Q.  And I think you testified that the charges
5  were subsequently dropped?
6     A.  Yes.  Yes.
7     Q.  Have you ever been charged or convicted of
8  a crime that involved lying?
9     A.  No.
10     Q.  Do you have any criminal convictions?
11     A.  No.
12     Q.  To your knowledge, have you ever been the
13  subject of a civil or criminal investigation by the
14  government?
15     A.  Not to my knowledge.
16     Q.  Have you ever had a lawsuit filed against
17  you?
18     A.  No.
19     Q.  Have you ever been a plaintiff in a
20  lawsuit?
21     A.  No, not that I'm aware of.
22     Q.  Prior to today, have you ever asserted your
23  rights under the Fifth Amendment in a deposition?
24       MR. KOLLER:  Objection; vague and
25  ambiguous, calls for a legal conclusion.

1       But you can answer.
2       THE WITNESS:  No.
3  BY MS. MAYO:
4     Q.  To your knowledge, are you currently under
5  investigation by any law enforcement agency?
6     A.  No.
7     Q.  To your knowledge, since 2015 have you --
8  let me withdraw that.
9       To your knowledge, since 2013 have you ever
10  been under any investigation by a law enforcement
11  agency?
12     A.  No.
13     Q.  Have you been called to testify in any
14  federal or state grand jury proceedings?
15     A.  No.
16     Q.  Have you been called to testify in any
17  criminal proceedings?
18     A.  No.
19       MR. KOLLER:  Objection; vague and
20  ambiguous, relevance.
21       But you may answer.
22       THE WITNESS:  No.
23       MR. KOZINA:  I'll also impose an objection
24  on behalf of that last question because grand jury
25  proceedings are supposed to be secret and you're

1 asking her to violate that.
2 BY MS. MAYO:
3    Q. Are you a defendant in any criminal
4 proceedings related to CMP?
5    MR. KOLLER: Objection; vague and
6 ambiguous, lacks foundation as to what "CMP" is.
7    So I would advise her not to answer that at
8 this time.
9 BY MS. MAYO:
10    Q. Let me rephrase the question.
11    You've heard of the Center for Medical
12 Progress?
13    A. Yes.
14    Q. And if I refer to that in shorthand as
15 "CMP," will you understand what I'm referring to?
16    A. Yes.
17    Q. Are you a defendant in any criminal
18 proceedings relating to CMP?
19    A. No.
20    Q. Have any criminal charges been filed
21 against you in connection with CMP?
22    MR. KOLLER: Objection; vague and
23 ambiguous, lack of foundation.
24    But if you know, you can answer.
25    THE WITNESS: No.

1 BY MS. MAYO:
2    Q. Are you married?
3    A. Yes.
4    Q. Do you have any children?
5    A. Not born, but yes.
6    Q. Adopted?
7    A. Like, I'm pregnant right now.
8    Q. Oh. Okay.
9    Where did you attend high school?
10    A. Leigh High School.
11    Q. That's in San Jose?
12    A. Yes.
13    Q. And what year did you graduate?
14    A. 2011.
15    Q. Do you have any formal education beyond
16 high school?
17    A. Yes.
18    Q. What is that?
19    A. Bachelor's degree in microbiology.
20    Q. And where did you get that bachelor's
21 degree?
22    A. University of Idaho.
23    Q. What year?
24    A. 2017.
25    Q. Do you have any other formal education

1 beyond the University of Idaho?
2    MR. KOLLER: Objection; vague and
3 ambiguous.
4    But you may answer.
5    THE WITNESS: No.
6 BY MS. MAYO:
7    Q. Are you currently employed?
8    A. Yes.
9    Q. Where?
10    A. Valley Christian High School.
11    Q. How long have you been employed by Valley
12 Christian High School?
13    A. Two years.
14    Q. And what is your position there?
15    A. High school biology teacher.
16    Q. And prior to working at Valley Christian
17 High School, did you have any other employment?
18    MR. KOLLER: Objection; vague and ambiguous
19 as to time.
20    So I would instruct her -- if you can parse
21 that out a bit.
22    MS. MAYO: Sure. Sure.
23 BY MS. MAYO:
24    Q. What -- did you have any employment
25 immediately prior to becoming a teacher at Valley

1 Christian High School?
2    A. Yes.
3    Q. What was that employment?
4    A. I worked for a lab at University of Idaho
5 doing research.
6    Q. Was that while you were still in college at
7 the University of Idaho?
8    A. Yes.
9    Q. Did it continue after you graduated?
10    A. No.
11    Q. And what were your duties at the research
12 lab at the University of Idaho?
13    A. As part of some larger experiments, I
14 worked with chlamydia in different cell lines. I
15 ran several experiments that contributed to a paper.
16    Q. Is this a paper published by the University
17 of Idaho?
18    A. No. It was published by a separate
19 journal.
20    Q. And what was the title of the paper?
21    MR. KOLLER: I'd object as to relevance,
22 but I'll allow her to answer.
23    THE WITNESS: It's a super-interesting
24 paper and it's really great, but it's -- it's really
25 long and changed several times before publishing. I

1 think it's...
2 BY MS. MAYO:
3 　　Q. Your best recollection is fine.
4 　　A. I think it's something along the lines of
5 Chlamydial Infectious Body Infectivity or -- like --
6 it changed a lot of times. They had a lot of issues
7 with the title.
8 　　Q. What year was it published?
9 　　A. May of last year.
10 　　Q. May 2018?
11 　　A. In the Journal of Bacteriology.
12 　　Q. And did you have any -- how long were you
13 employed at the research lab at University of Idaho?
14 Over what time period?
15 　　A. I was employed for one year at the lab.
16 　　Q. Did you work in the lab not as an employee
17 prior to that?
18 　　A. Yes. I was a student in the lab prior to
19 that for course credit.
20 　　Q. And did you have any employment prior to
21 working at the research lab at University of Idaho?
22 　　　　MR. KOLLER: Again, vague as to time.
23 Objection.
24 BY MS. MAYO:
25 　　Q. Immediately prior to the University of

1 Idaho research lab position.
2 　　A. I think prior to that I had several various
3 nannying and babysitting jobs.
4 　　Q. Do you agree that abortion is legal in the
5 United States?
6 　　　　MR. KOLLER: Objection; vague and
7 ambiguous.
8 　　　　But you may answer.
9 　　　　THE WITNESS: Yes.
10 BY MS. MAYO:
11 　　Q. Do you engage in any activities to prevent
12 people from getting abortions?
13 　　　　MR. KOLLER: Objection; vague and
14 ambiguous.
15 　　　　And I'd advise her not to answer on the
16 grounds it may incriminate her pursuant to the Fifth
17 Amendment.
18 BY MS. MAYO:
19 　　Q. And are you going to assert your Fifth
20 Amendment right not to answer that question?
21 　　A. Yes.
22 　　Q. Do you engage in any activities to limit
23 resources for abortion providers --
24 　　　　MR. KOLLER: I --
25 　　//

1 BY MS. MAYO:
2 　　Q. -- like Planned Parenthood?
3 　　　　MR. KOLLER: Sorry.
4 　　　　MS. MAYO: It's okay.
5 　　　　MR. KOLLER: It's a habit I have of
6 interrupting. I apologize.
7 　　　　But I would object as to vague and
8 ambiguous.
9 　　　　And again, advise my client not to testify
10 or answer that question based on her right against
11 self-incrimination.
12 BY MS. MAYO:
13 　　Q. And are you going to follow your counsel's
14 instruction?
15 　　A. Yes.
16 　　　　MR. KOLLER: I will try and wait. Just
17 like you've asked the client -- my client to wait,
18 I'll try and wait until you're done.
19 　　　　MS. MAYO: I appreciate that. Sometimes --
20 　　　　MR. KOLLER: Again, I'm sorry.
21 　　　　MS. MAYO: Sometimes in these depositions
22 people talk over one another and it's a little
23 frustrating.
24 BY MS. MAYO:
25 　　Q. What are your views on women who choose to

1 get abortions?
2 　　　　MR. KOLLER: Objection; vague and
3 ambiguous.
4 　　　　And I'd advise her not to testify on the
5 grounds that it might incriminate her pursuant to
6 the Fifth Amendment.
7 BY MS. MAYO:
8 　　Q. Are you going to assert your Fifth
9 Amendment right not to respond to that question?
10 　　A. Yes.
11 　　Q. Do you work to prevent doctors from
12 performing abortions?
13 　　　　MR. KOLLER: Objection; vague and
14 ambiguous.
15 　　　　And I would advise her under the Fifth
16 Amendment right against self-incrimination not to
17 answer that question.
18 BY MS. MAYO:
19 　　Q. Are you going to assert your Fifth
20 Amendment right not to respond to that question?
21 　　A. Yes.
22 　　Q. What are your views on doctors who perform
23 abortions?
24 　　　　MR. KOLLER: Again, advise her not to
25 testify on the grounds that it might incriminate her

## Page 30

1  pursuant to the Fifth Amendment.
2      It's also vague and ambiguous.
3  BY MS. MAYO:
4      Q.  Are you going to assert your Fifth
5  Amendment right not to respond to that question?
6      A.  Yes.
7      Q.  What do you think should happen to doctors
8  who perform abortions?
9      MR. KOLLER:  Objection; relevance, vague
10  and ambiguous.
11      And I would advise my client not to answer
12  that on the grounds it might incriminate her
13  pursuant to the Fifth Amendment.
14  BY MS. MAYO:
15      Q.  Are you going to assert your Fifth
16  Amendment right not to respond to that question?
17      A.  Yes.
18      Q.  Now, because of your views on abortion,
19  you've become involved in avtivities to oppose
20  abortion; is that correct?
21      MR. KOLLER:  Objection; vague, ambiguous,
22  assumes facts not in evidence.
23      And I advise my client not to answer that
24  on the Fifth Amendment grounds that it might
25  incriminate her.

## Page 31

1  BY MS. MAYO:
2      Q.  Are you going to assert your Fifth
3  Amendment right not to respond to that yes?
4      A.  Yes.
5      Q.  Would you describe yourself as an
6  anti-abortion activist?
7      MR. KOLLER:  Objection; vague and
8  ambiguous.
9      Advise my client not to answer that on the
10  grounds that it might incriminate her pursuant to
11  the Fifth Amendment.
12  BY MS. MAYO:
13      Q.  Are you going to assert your Fifth
14  Amendment right not to respond to that question?
15      A.  Yes.
16      Q.  You are a pro-life activist; is that
17  correct?
18      MR. KOLLER:  Objection as to the term
19  "activist."  It's vague and ambiguous, assumes facts
20  not in evidence.
21      And I would advise my client not to answer
22  that on the grounds it might incriminate her.
23  BY MS. MAYO:
24      Q.  Are you going to assert your Fifth
25  Amendment right in response to that question?

## Page 32

1      A.  Yes.
2      Q.  Do you belong to groups with anti-abortion
3  views?
4      MR. KOLLER:  Objection; vague and
5  ambiguous, calls for a legal conclusion.
6      But I will let her answer that.
7      THE WITNESS:  No.
8  BY MS. MAYO:
9      Q.  When you were in -- attending Leigh High
10  School, did you form a pro-life group at the high
11  school?
12      MR. KOLLER:  Objection; vague and
13  ambiguous.
14      Ask my -- advise my client not to answer
15  that on the grounds it might incriminate her
16  pursuant to the Fifth Amendment.
17  BY MS. MAYO:
18      Q.  Are you going to assert your Fifth
19  Amendment right not to respond to that question?
20      A.  Yes.
21      Q.  In fact, when you were a senior at Leigh
22  High School you were the president of a pro-life
23  club on campus; correct?
24      MR. KOLLER:  Objection; assumes facts not
25  in evidence, vague and ambiguous.

## Page 33

1      Advise my client not to answer that on the
2  grounds it might incriminate her.
3  BY MS. MAYO:
4      Q.  Are you going to assert your Fifth
5  Amendment right not to respond to that question?
6      A.  Yes.
7      Q.  Why did you form a pro-life club at Leigh
8  High School?
9      MR. KOLLER:  Objection; assumes facts not
10  in evidence, vague and ambiguous.
11      Advise my client not to the answer that on
12  the grounds it might incriminate her.
13  BY MS. MAYO:
14      Q.  Are you going to assert your Fifth
15  Amendment right not to respond to that question?
16      A.  Yes.
17      Q.  The pro-life club at Leigh High School that
18  you were the president of was affiliated with the
19  group Live Action; correct?
20      MR. KOLLER:  Objection; assumes facts not
21  in evidence, vague and ambiguous.
22      Advise my client not to answer that on the
23  grounds it might incriminate her.
24  BY MS. MAYO:
25      Q.  Are you going to assert your Fifth

1  Amendment right not to respond to that question?
2      A.  Yes.
3      Q.  You've heard of the group Live Action;
4  correct?
5          MR. KOLLER:  Vague and ambiguous.
6          But I'll allow you to answer that.
7          THE WITNESS:  I've heard of them, yes.
8  BY MS. MAYO:
9      Q.  Have you done any work with Live Action
10 since high school?
11         MR. KOLLER:  Objection; vague and
12 ambiguous, assumes facts not in evidence.
13         And I'd advise my client not to answer that
14 on the grounds it might incriminate her.
15 BY MS. MAYO:
16     Q.  Are you going to assert your Fifth
17 Amendment right in response to that question?
18     A.  Yes.
19     Q.  Have you participated in any Live Action
20 activities?
21         MR. KOLLER:  Objection; vague and
22 ambiguous.
23         Advise my client not to answer that on the
24 grounds it might incriminate her.
25 //

1  BY MS. MAYO:
2      Q.  Are you going to assert your Fifth
3  Amendment right in response to that question?
4      A.  Yes.
5      Q.  You've worked with the Survivors of the
6  Abortion Holocaust, haven't you?
7          MR. KOLLER:  Objection; assumes facts not
8  in evidence, vague and ambiguous.
9          I'd advise my client not to answer that on
10 the grounds it might incriminate her.
11 BY MS. MAYO:
12     Q.  Are you going to assert your Fifth
13 Amendment right in response to that question?
14     A.  Yes.
15     Q.  The Survivors of the Abortion Holocaust
16 hold a bootcamp every year to train youth; correct?
17         MR. KOLLER:  Objection; assumes facts not
18 in evidence, vague and ambiguous.
19         I'd advise my client not to answer that on
20 the grounds it might incriminate her.
21 BY MS. MAYO:
22     Q.  Are you going to assert your Fifth
23 Amendment right in response to that question?
24     A.  Yes.
25     Q.  The Survivors of the Abortion Holocaust are

1  often referred to as "the marines" of the pro-life
2  movement because of their reputation for being boots
3  on the ground on the front lines of the battle to
4  save the preborn babies of America"; isn't that
5  correct?
6          MR. KOLLER:  Objection; vague and
7  ambiguous, assumes facts not in evidence, lacks
8  foundation.
9          I advise my client not to answer that on
10 the grounds it might incriminate her.
11 BY MS. MAYO:
12     Q.  Are you going to assert your Fifth
13 Amendment right not to respond to that question?
14     A.  Yes.
15     Q.  Have you attended the bootcamp put on every
16 summer or every year by the Survivors of the
17 Abortion Holocaust?
18         MR. KOLLER:  Objection; vague and
19 ambiguous.
20         Advise my client not to answer that on the
21 grounds it might incriminate her.
22 BY MS. MAYO:
23     Q.  Are you going to assert your Fifth
24 Amendment right in response to that question?
25     A.  Yes.

1      Q.  You worked with the Survivors of the
2  Abortion Holocaust's Campus Outreach program;
3  correct?
4          MR. KOLLER:  Objection; vague and
5  ambiguous, assumes facts not in evidence.
6          I advise my client not to answer that on
7  the grounds it might incriminate her.
8  BY MS. MAYO:
9      Q.  Are you going to assert your Fifth
10 Amendment right not to respond to that question?
11     A.  Yes.
12         MS. MAYO:  Let's go ahead and mark as
13 Exhibit 531 a blog post from the Survivors of the
14 Abortion Holocaust website from June 12, 2015.
15         (Deposition Exhibit 531 was marked for
16         identification.)
17         MR. KOLLER:  If I could have a moment to
18 review it.
19         MS. MAYO:  Absolutely.
20 BY MS. MAYO:
21     Q.  And, Ms. Baxter, you can look at that --
22         MR. KOLLER:  Oh, okay.
23         THE WITNESS:  Thanks.
24 BY MS. MAYO:
25     Q.  -- one or over at the other one if you

1  want.
2      A. (Reviewing document.)
3      Q. Ms. Baxter, have you seen this blog post
4  before?
5      A. No.
6      Q. There is a quote attributed to a Brianna
7  Baxter that says:
8          "When I graduated high school, I had no
9      idea what I wanted to do with my life. I
10     signed up for Campus Outreach because it
11     seemed like the best opportunity I had to
12     fight injustice. And it was, every day."
13         Did you give that quote to the Survivors
14 blog to use?
15     MR. KOLLER: Objection; vague and
16 ambiguous.
17         But you may answer.
18     THE WITNESS: Honestly, I don't remember
19 giving that quote.
20 BY MS. MAYO:
21     Q. Did you sign up for something called Campus
22 Outreach?
23     MR. KOLLER: Objection; vague and
24 ambiguous.
25         I advise my client not to answer on the

1  grounds it might incriminate her.
2  BY MS. MAYO:
3      Q. Are you going to assert your Fifth
4  Amendment right in response to that question?
5      A. Yes.
6      Q. Was Campus Outreach the best opportunity
7  you had to fight injustice?
8      MR. KOLLER: Objection; vague and
9  ambiguous, assumes facts not in evidence.
10         I advise my client not to answer on the
11 grounds it might incriminate her.
12 BY MS. MAYO:
13     Q. Are you going to assert your Fifth
14 Amendment right not to respond to that question?
15     A. Yes.
16     Q. The injustice that you were fighting was
17 abortion; isn't that correct?
18     MR. KOLLER: Objection; vague and
19 ambiguous, assumes facts not in evidence.
20         Advise my client not to answer on the
21 grounds it might incriminate her.
22 BY MS. MAYO:
23     Q. Are you going to assert your Fifth
24 Amendment right not to respond to that question?
25     A. Yes.

1      Q. What organized anti-abortion activities
2  have you participated in?
3      MR. KOLLER: Objection; vague and
4  ambiguous, vague as to time.
5          Maybe if you can put a time on it we can --
6      MS. MAYO: Sure.
7  BY MS. MAYO:
8      Q. The 2013 to 2015 time period.
9      MR. KOLLER: I would advise my client not
10 to answer that on the grounds it might incriminate
11 her.
12 BY MS. MAYO:
13     Q. Are you going to assert your Fifth
14 Amendment right not to respond to that question?
15     A. Yes.
16     Q. Have you called or e-mailed or in any way
17 communicated with doctors who perform abortions?
18     MR. KOLLER: Objection; vague and
19 ambiguous.
20         I advise my client not to answer that on
21 the grounds it might incriminate her.
22 BY MS. MAYO:
23     Q. Are you going to assert your Fifth
24 Amendment right not to respond to that question?
25     A. Yes.

1      Q. Have you protested at healthcare centers
2  where abortions are performed?
3      MR. KOLLER: Objection; vague and
4  ambiguous, calls for a legal conclusion.
5          I advise my client not to answer that on
6  the grounds it might incriminate her.
7  BY MS. MAYO:
8      Q. Are you going to assert your Fifth
9  Amendment right not to respond to that question?
10     A. Yes.
11     Q. Do you know David Daleiden?
12     MR. KOLLER: I advise my client not to
13 answer that on the grounds it might incriminate her.
14 BY MS. MAYO:
15     Q. Are you going to assert your Fifth
16 Amendment right not to respond to that question?
17     A. Yes.
18     Q. You first met Mr. Daleiden in 2013;
19 correct?
20     MR. KOLLER: Objection; assumes facts not
21 in evidence, vague and ambiguous.
22         Advise my client not to answer that on the
23 grounds it might incriminate her.
24 BY MS. MAYO:
25     Q. And are you going to assert your Fifth

Page 42

1  Amendment right not to respond to that question?
2      A. Yes.
3      Q. Where did you meet Mr. Daleiden?
4      MR. KOLLER: Objection; assumes facts not
5  in evidence, vague and ambiguous.
6      Advise my client not to answer that on the
7  grounds it might incriminate her.
8  BY MS. MAYO:
9      Q. Are you going to assert your Fifth
10  Amendment right not to respond to that question?
11     A. Yes.
12     Q. What were the circumstances of your first
13  meeting with Mr. Daleiden?
14     MR. KOLLER: Objection; assumes facts,
15  vague and ambiguous.
16     Advise my client not to answer on the
17  grounds it might incriminate her.
18  BY MS. MAYO:
19     Q. Are you going to assert your Fifth
20  Amendment right in response to that question?
21     A. Yes.
22     Q. Mr. Daleiden approached you about working
23  on an undercover video project sometime in 2013; is
24  that correct?
25     MR. KOLLER: Objection; assumes facts not

Page 43

1  in evidence, vague and ambiguous.
2      I advise my client not to answer on the
3  grounds it might incriminate her.
4  BY MS. MAYO:
5      Q. Are you going to assert your Fifth
6  Amendment right not to respond to that question?
7      A. Yes.
8      Q. Mr. Daleiden approached you in person about
9  participating in the undercover video project in
10  2013; is that correct?
11     MR. KOLLER: Objection; assumes facts not
12  in evidence, vague and ambiguous.
13     I would advise my client not to answer on
14  the grounds it might incriminate her.
15  BY MS. MAYO:
16     Q. Are you going to assert your Fifth
17  Amendment right in response to that question?
18     A. Yes.
19     Q. When you met Mr. Daleiden, he asked you to
20  participate in his undercover video project; is that
21  correct?
22     MR. KOLLER: Objection; vague and
23  ambiguous, assumes facts not in evidence.
24     Advise my client not to answer that on the
25  grounds it might incriminate her.

Page 44

1  BY MS. MAYO:
2      Q. Are you going to assert your Fifth
3  Amendment right in response to that question?
4      A. Yes.
5      MS. MAYO: Let's mark as Exhibit 532 a
6  document with beginning Bates number CM00044. It's
7  an August 21st, 2013, e-mail from David Daleiden.
8      (Deposition Exhibit 532 was marked for
9  identification.)
10     THE WITNESS: (Reviewing document.)
11     MR. KOLLER: Just look up when you're
12  ready.
13  BY MS. MAYO:
14     Q. Ms. Baxter, have you seen the e-mail and
15  attachment that have been marked as Exhibit 532
16  before --
17     MR. KOLLER: Object as to --
18  BY MS. MAYO:
19     Q. -- today?
20     MR. KOLLER: Sorry. Vague and ambiguous as
21  to time. I mean, obviously she has just seen it
22  now. Do you mean prior to today?
23     MS. MAYO: That was the end of my question.
24     MR. KOLLER: Oh, I knew it.
25     MS. MAYO: I said "before today."

Page 45

1      MR. KOLLER: Objection; vague and
2  ambiguous.
3      Advise my client not to answer that on the
4  grounds it might incriminate her.
5      Sorry.
6      MS. MAYO: That's okay.
7  BY MS. MAYO:
8      Q. Are you going to assert your right under
9  the Fifth Amendment in response to that question?
10     A. Yes.
11     Q. According to Exhibit 532, Mr. Daleiden met
12  with you last night, and the date of this e-mail is
13  August 21st, 2013, which I take to mean that you met
14  Mr. Daleiden on August 20th, 2013; is that correct?
15     MR. KOLLER: Objection; assumes facts not
16  in evidence, vague and ambiguous.
17     I advise my client not to answer on the
18  grounds it might incriminate her.
19  BY MS. MAYO:
20     Q. Are you going to assert your Fifth
21  Amendment right in response to that question?
22     A. Yes.
23     Q. You spoke with Mr. Daleiden on August 20th,
24  2013, about his undercover video project; correct?
25     MR. KOLLER: Objection; vague and

Page 46

1   ambiguous, assumes facts not in evidence.
2        I'd advise my client not to answer on the
3   grounds it might incriminate her.
4   BY MS. MAYO:
5        Q.  Are you going to assert your right under
6   the Fifth Amendment in response to that question?
7        A.  Yes.
8        Q.  In Mr. Daleiden's e-mail he includes a
9   couple of links.  Did you review the information at
10  those links?
11       MR. KOLLER:  Objection; assumes facts not
12  in evidence, vague and ambiguous.
13       I'd advise my client not to answer that on
14  the grounds it may incriminate her.
15  BY MS. MAYO:
16       Q.  Are you going to assert your right under
17  the Fifth Amendment not to respond to that question?
18       A.  Yes.
19       Q.  He states:
20           "For an example of the altruistic
21           justification for your dirty work, see this
22           presentation by Dr. Aileen Anderson of U.C.
23           Irvine on her neural stem cell research."
24           What "dirty work" was Mr. Daleiden asking
25  you to perform?

Page 47

1        MR. KOLLER:  Objection; assumes facts not
2   in evidence, vague and ambiguous.
3        Advise my client not to answer on the
4   grounds it might incriminate her.
5   BY MS. MAYO:
6        Q.  Are you going to assert your Fifth
7   Amendment right in response to that question?
8        A.  Yes.
9        Q.  The "dirty work" that Mr. Daleiden was
10  referring to in that paragraph was going undercover
11  at gatherings of abortion providers and videotaping
12  them; correct?
13       MR. KOLLER:  Objection; assumes facts not
14  in evidence, vague and ambiguous.
15       I'd advise my client not to answer on the
16  grounds it might incriminate her.
17  BY MS. MAYO:
18       Q.  Are you going to assert your Fifth
19  Amendment right in response to that question?
20       A.  Yes.
21       Q.  And Mr. Daleiden was providing to you an
22  altruistic justification for that "dirty work"
23  because what he was proposing was against the law;
24  correct?
25       MR. KOLLER:  Objection; assumes facts not

Page 48

1   in evidence, vague and ambiguous, calls for a legal
2   conclusion.
3        I'd advise my client not to testify on the
4   grounds it might incriminate her.
5   BY MS. MAYO:
6        Q.  Are you going to assert your Fifth
7   Amendment right in response to that question?
8        A.  Yes.
9        Q.  And Mr. Daleiden was providing to you an
10  "altruistic justification for your dirty work"
11  because what he was asking you to do involved lying
12  to doctors; correct?
13       MR. KOLLER:  Objection; vague and
14  ambiguous, assumes facts not in evidence.
15       I'd ask -- advise my client not to testify
16  or answer that on the grounds it might incriminate
17  her.
18  BY MS. MAYO:
19       Q.  Are you going to assert your Fifth
20  Amendment right in response to that question?
21       A.  Yes.
22       THE WITNESS:  Can we pause for a moment so
23  I can discuss something with my lawyer?
24       MS. MAYO:  We can take a -- there isn't a
25  question pending so, yes, you can.

Page 49

1        MR. KOLLER:  Okay.  Thank you.
2        MS. MAYO:  Watch your mic.
3        THE VIDEOGRAPHER:  Don't forget your mic.
4        This marks the end of media file labeled
5   Number 1.  Off the record at 10:21 a.m.
6        (Recess taken)
7        THE VIDEOGRAPHER:  This marks the beginning
8   of media file labeled Number 2.  Back on the record
9   at 10:26 a.m.
10  BY MS. MAYO:
11       Q.  Ms. Baxter, was your e-mail address in
12  August of 2013 briannabaxter497@gmail.com?
13       MR. KOLLER:  Objection; assumes facts not
14  in evidence.
15       I'd advise my client not to answer on the
16  grounds it might incriminate her.
17  BY MS. MAYO:
18       Q.  Ms. Baxter, are you going to assert your
19  Fifth Amendment right not to respond to that
20  question?
21       A.  Yes.
22       Q.  Mr. Daleiden copied Anna Bettisworth on the
23  e-mail that is on Exhibit 532.  Who is
24  Ms. Bettisworth?
25       MR. KOLLER:  Objection; vague and

---

**Page 50**

1　ambiguous, assumes facts not in evidence.
2　　　I'd advise my client not to answer on
3　the grounds it might incriminate her.
4　BY MS. MAYO:
5　　　Q.　Are you going to assert your Fifth
6　Amendment right not to respond to that question?
7　　　A.　Yes.
8　　　Q.　And you met Ms. Bettisworth -- or met with
9　Ms. Bettisworth the night before this e-mail was
10　sent; correct?
11　　　MR. KOLLER:　Objection; assumes facts not
12　in evidence, vague and ambiguous.
13　　　I'd advise my client not to answer on the
14　grounds it might incriminate her.
15　BY MS. MAYO:
16　　　Q.　Are you going to assert your Fifth
17　Amendment right in response to that question?
18　　　A.　Yes.
19　　　Q.　And Ms. Bettisworth was working with
20　Mr. Daleiden at that time; correct?
21　　　MR. KOLLER:　Objection; assumes facts not
22　in evidence, lacks foundation, vague and ambiguous.
23　　　I'd advise my client not to answer on the
24　grounds it might incriminate her.
25　//

---

**Page 51**

1　BY MS. MAYO:
2　　　Q.　Are you going to assert your Fifth
3　Amendment right in response to that question?
4　　　A.　Yes.
5　　　Q.　Mr. Daleiden attached an Individual
6　Nondisclosure Agreement to this e-mail.　You signed
7　this nondisclosure agreement; correct?
8　　　MR. KOLLER:　Objection; vague and
9　ambiguous, assumes facts not in evidence.
10　　　I'd advise my client not to answer on the
11　grounds it might incriminate her.
12　BY MS. MAYO:
13　　　Q.　Are you going to assert your Fifth
14　Amendment right in response to that question?
15　　　A.　Yes.
16　　　Q.　And you signed the Individual Nondisclosure
17　Agreement with Mr. Daleiden so that he would provide
18　you with more information regarding his undercover
19　video project; is that correct?
20　　　MR. KOLLER:　Objection; assumes facts not
21　in evidence, vague and ambiguous.
22　　　I'd advise my client not to answer that on
23　the grounds it might incriminate her.
24　BY MS. MAYO:
25　　　Q.　Are you going to assert your Fifth

---

**Page 52**

1　Amendment right in response to that question?
2　　　A.　Yes.
3　　　Q.　In the second paragraph of Mr. Daleiden's
4　e-mail, Exhibit 532, he says:
5　　　　　"Pay special attention to the Order Forms
6　　　　　(page 3), Tissue Logs (page 5), and Clinic
7　　　　　Protocols/Consent (page 7), as those are
8　　　　　things your character should be familiar
9　　　　　with."
10　　　By "your character," Mr. Daleiden was
11　referring to a character that you were going to play
12　in a series of underground video projects; correct?
13　　　MR. KOLLER:　Objection; assumes facts not
14　in evidence, vague and ambiguous.
15　　　I'd advise my client not to answer on the
16　grounds it might incriminate her.
17　BY MS. MAYO:
18　　　Q.　Are you going to assert your Fifth
19　Amendment right in response to that question?
20　　　A.　Yes.
21　　　Q.　The character that Mr. Daleiden was
22　referring to in Exhibit 532 is -- ultimately, was
23　the character Brianna Allen; correct?
24　　　MR. KOLLER:　Objection; assumes facts not
25　in evidence, vague and ambiguous.

---

**Page 53**

1　　　I'd advise my client not to answer on the
2　grounds it might incriminate her.
3　BY MS. MAYO:
4　　　Q.　Are you going to assert your Fifth
5　Amendment right in response to that question?
6　　　A.　Yes.
7　　　Q.　After you signed the NDA, Mr. Daleiden
8　provided you with more information regarding his
9　undercover project to secretly videotape abortion
10　providers; correct?
11　　　MR. KOLLER:　Objection; assumes facts not
12　in evidence, vague and ambiguous.
13　　　I'd advise my client not to answer on the
14　grounds it might incriminate her.
15　BY MS. MAYO:
16　　　Q.　Are you going to assert your Fifth
17　Amendment right in response to that question?
18　　　A.　Yes.
19　　　Q.　Mr. Daleiden explained to you that one
20　purpose of his undercover video project was to
21　attack Planned Parenthood and accuse them of selling
22　baby body parts; is that correct?
23　　　MR. KOLLER:　Objection; assumes, vague and
24　ambiguous.
25　　　I'd advise my client not to answer on the

---

1  grounds it might incriminate her.
2  BY MS. MAYO:
3      Q.  Are you going to assert your Fifth
4  Amendment right in response to that question?
5      A.  Yes.
6      Q.  And Anna Bettisworth, who is copied on this
7  e-mail, was going to play the role of someone named
8  Rebecca Wagner; is that correct?
9      MR. KOLLER:  Objection; assumes facts not
10 in evidence, vague and ambiguous.
11     I'd advise my client not to answer on the
12 grounds it might incriminate her.
13 BY MS. MAYO:
14     Q.  Are you going to assert your Fifth
15 Amendment right in response to that question?
16     A.  Yes.
17     Q.  What is your understanding of a
18 nondisclosure agreement?
19     MR. KOLLER:  Objection; vague and
20 ambiguous.
21     But I'll allow her to answer.
22     THE WITNESS:  It would be an agreement to
23 not disclose information.
24 BY MS. MAYO:
25     Q.  Did you have an attorney review this

1  nondisclosure agreement prior to signing it?
2      MR. KOLLER:  Objection; vague and
3  ambiguous, assumes facts not in evidence.
4      I'd advise my client not to answer on the
5  grounds it might incriminate her.
6  BY MS. MAYO:
7      Q.  Are you going to assert your Fifth
8  Amendment right in response to this question?
9      A.  Yes.
10     Q.  You have a general understanding that a
11 nondisclosure agreement is a contract; correct?
12     MR. KOLLER:  Objection; vague and
13 ambiguous, calls for a legal conclusion.
14     But you can answer if you can.
15     THE WITNESS:  Generally, yes.
16 BY MS. MAYO:
17     Q.  Is it also your understanding that if you
18 break a nondisclosure agreement that you can be sued
19 by the other party?
20     MR. KOLLER:  Objection; vague and
21 ambiguous, assumes facts not in evidence.  But --
22 and calls for a legal conclusion.
23     But you can answer it.
24     THE WITNESS:  Yeah, I think so.
25 //

1  BY MS. MAYO:
2      Q.  Do you believe that people should sign
3  nondisclosure agreements if they do not intend to be
4  bound by their terms?
5      MR. KOLLER:  Objection; vague and
6  ambiguous.
7      But you can answer.
8      THE WITNESS:  Could you repeat the
9  question?
10 BY MS. MAYO:
11     Q.  Sure.  I'll rephrase it a little bit.  I'll
12 clarify it a little bit more.
13     Do you think people should sign
14 nondisclosure agreements if they don't intend to
15 follow that contract, follow that agreement?
16     MR. KOLLER:  Objection; vague and
17 ambiguous, relevance.
18     But you can answer if you can.
19     THE WITNESS:  I would say that probably
20 wouldn't be a good idea to sign it if you're not
21 going to follow it.
22 BY MS. MAYO:
23     Q.  When did you agree to be part of
24 Mr. Daleiden's project?
25     MR. KOLLER:  Objection; assumes facts not

1  in evidence, vague and ambiguous, lacks foundation.
2      I'd advise my client not to answer on the
3  grounds it might incriminate her.
4  BY MS. MAYO:
5      Q.  Are you going to assert your Fifth
6  Amendment right in response to that question?
7      A.  Yes.
8      Q.  You agreed to be part of Mr. Daleiden's
9  undercover video project in order to put your
10 anti-abortion beliefs into action; correct?
11     MR. KOLLER:  Objection; assumes facts not
12 in evidence, vague and ambiguous.
13     I'd advise my client not to answer on the
14 grounds it might incriminate her.
15 BY MS. MAYO:
16     Q.  Are you going to assert your Fifth
17 Amendment right in response to that question?
18     A.  Yes.
19     Q.  What is the Center for Medical Progress?
20     MR. KOLLER:  Objection; lacks foundation,
21 vague and ambiguous.
22     You can answer if you can.
23     THE WITNESS:  Could you clarify the
24 question?
25 //

1 BY MS. MAYO:
2 Q. Sure.
3 You've heard of the Center for Medical
4 Progress; correct?
5 A. Yes.
6 Q. What do you know about it?
7 MR. KOLLER: Objection; vague and
8 ambiguous, lacks foundation.
9 But you can answer if you can.
10 THE WITNESS: It's an organization that
11 works towards medical progress.
12 BY MS. MAYO:
13 Q. What do you mean it "works toward medical
14 progress"?
15 MR. KOLLER: Objection; asked and answered.
16 But you can follow up.
17 THE WITNESS: I'm not really sure exactly
18 what they do, but that's -- just based on their
19 name, that's what I would assume.
20 BY MS. MAYO:
21 Q. When did you first hear about the Center
22 for Medical Progress?
23 MR. KOLLER: Objection; vague and
24 ambiguous, lacks foundation.
25 Advise my client not to answer that on the

1 grounds it might incriminate her.
2 BY MS. MAYO:
3 Q. Are you going to assert your Fifth
4 Amendment right in response to that question?
5 A. Yes.
6 Q. The Center for Medical Progress was formed
7 by David Daleiden; correct?
8 MR. KOLLER: Objection; lacks foundation.
9 I advise my client not to answer that on
10 the grounds it might incriminate her.
11 BY MS. MAYO:
12 Q. Are you going to assert your Fifth
13 Amendment right in response to that question?
14 A. Yes.
15 Q. Were you involved in the creation of the
16 Center for Medical Progress?
17 MR. KOLLER: Objection; vague and
18 ambiguous, lacks foundation.
19 Ask my client not to answer that on the
20 grounds it might incriminate her.
21 BY MS. MAYO:
22 Q. Are you going to assert your Fifth
23 Amendment right in response to that question?
24 A. Yes.
25 Q. Were you at any time employed by the Center

1 for Medical Progress?
2 MR. KOLLER: Objection.
3 I'd advise my client not to answer that on
4 the grounds it might incriminate her.
5 BY MS. MAYO:
6 Q. Are you going --
7 MR. KOLLER: Vague and ambiguous as well.
8 MS. MAYO: My turn to apologize for
9 speaking over you.
10 BY MS. MAYO:
11 Q. Are you going to assert your Fifth
12 Amendment right in response to that question?
13 A. Yes.
14 Q. CMP holds itself out to be a nonprofit
15 organization; correct?
16 MR. KOLLER: Objection; assumes facts not
17 in evidence, vague and ambiguous, calls for a legal
18 conclusion.
19 Advise my client not to answer that on the
20 grounds it might incriminate her.
21 BY MS. MAYO:
22 Q. Are you going to assert your Fifth
23 Amendment right in response to that question?
24 A. Yes.
25 Q. Have you ever solicited donations to CMP?

1 MR. KOLLER: Objection; vague and
2 ambiguous.
3 Advise my client not to answer that on the
4 grounds it might incriminate her.
5 BY MS. MAYO:
6 Q. Are you going to assert your Fifth
7 Amendment right in response to that question?
8 A. Yes.
9 Q. The Center for Medical Progress is an
10 organization that released videotapes that attacked
11 Planned Parenthood and accused Planned Parenthood of
12 selling baby body parts; correct?
13 MR. KOLLER: Objection; assumes facts not
14 in evidence, vague and ambiguous.
15 I'd advise my client not to answer that on
16 the grounds it might incriminate her.
17 BY MS. MAYO:
18 Q. Are you going to assert your Fifth
19 Amendment right in response to that question?
20 A. Yes.
21 Q. And you were employed by the Center for
22 Medical Progress to pose as Brianna Allen to
23 infiltrate conferences of abortion providers to
24 secretly videotape them; correct?
25 MR. KOLLER: Objection; assumes facts not

1  in evidence, vague and ambiguous.
2      Advise my client not to answer on the
3  grounds it might incriminate her.
4  BY MS. MAYO:
5      Q. Are you going to assert your Fifth
6  Amendment right in response to that question?
7      A. Yes.
8      Q. You entered into an independent contractor
9  agreement with the Center for Medical Progress to
10 perform undercover work as Brianna Allen; correct?
11     MR. KOLLER: Objection; assumes facts not
12 in evidence, vague and ambiguous.
13     I'd advise my client not to answer that on
14 the grounds it might incriminate her.
15 BY MS. MAYO:
16     Q. Are you going to assert your Fifth
17 Amendment right in response to that question?
18     A. Yes.
19     Q. The Center for Medical Progress paid you
20 for undercover work at conferences of abortion
21 providers where you were posing as Brianna Allen and
22 videotaping those that you came into contact with;
23 correct?
24     MR. KOLLER: Objection; assumes facts not
25 in evidence, vague and ambiguous.

1      I'd advise my client not to answer that
2  question on the grounds it might incriminate her.
3  BY MS. MAYO:
4      Q. Are you going to assert your Fifth
5  Amendment right in response to that question?
6      A. Yes.
7      Q. Were you paid for your work with the Center
8  for Medical Progress by check?
9      MR. KOLLER: Objection; vague and
10 ambiguous, assumes facts not in evidence.
11     I'd advise my client not to answer on the
12 grounds it might incriminate her.
13 BY MS. MAYO:
14     Q. Are you going to assert your Fifth
15 Amendment right in response to that question?
16     A. Yes.
17     Q. Did CMP, or the Center for Medical
18 Progress, provide you with any tax documents for the
19 money that you received; for example, Form 1099?
20     MR. KOLLER: Objection; vague and
21 ambiguous, assumes facts not in evidence.
22     I'd advise my client not to answer that on
23 the grounds it might incriminate her.
24 BY MS. MAYO:
25     Q. Are you going to assert your Fifth

1  Amendment right in response to that question?
2      A. Yes.
3      Q. Did you claim the money that you earned
4  from CMP on your taxes for the relevant years?
5      MR. KOLLER: Objection; assumes facts not
6  in evidence.
7      I'd advise my client not to answer that on
8  the grounds it might incriminate her.
9  BY MS. MAYO:
10     Q. Are you going to assert your Fifth
11 Amendment right in response to that question?
12     A. Yes.
13     MS. MAYO: Let's go ahead and mark as
14 Exhibit 533 an e-mail, dated September 10th, 2013,
15 from David Daleiden.
16     (Deposition Exhibit 533 was marked for
17     identification)
18     THE WITNESS: (Reviewing document.)
19 BY MS. MAYO:
20     Q. Ms. Baxter, have you seen Exhibit 533
21 before?
22     MR. KOLLER: Objection.
23     I'd advise my client not to answer that on
24 the grounds it might incriminate her.
25 //

1  BY MS. MAYO:
2      Q. Are you going to assert your Fifth
3  Amendment right in response to that question?
4      A. Yes.
5      Q. Exhibit 533 is a Southwest Airlines
6  confirmation for a flight from San Jose, California
7  to Denver, Colorado and back in September 2013;
8  correct?
9      MR. KOLLER: I would object the document
10 speaks for itself, but it does appear to be what it
11 is.
12     So you can answer if you can.
13     THE WITNESS: Yeah, that's what I'm seeing
14 in the document.
15 BY MS. MAYO:
16     Q. All right. And you took this trip to
17 Denver in September 2013 to attend the Association
18 of Reproductive Health Providers [sic] conference in
19 Denver; correct?
20     MR. KOLLER: Objection; assumes facts not
21 in evidence.
22     I'd advise my client not to answer that on
23 the grounds it might incriminate her.
24 BY MS. MAYO:
25     Q. Are you going to assert your Fifth

Page 66

1  Amendment right in response to that question?
2      A.  Yes.
3      Q.  And Mr. Daleiden booked this ticket for
4  you; correct?
5      MR. KOLLER:  Objection; assumes facts not
6  in evidence, vague and ambiguous, lack of
7  foundation.
8      Advise my client not to answer that on the
9  grounds it might incriminate her.
10  BY MS. MAYO:
11      Q.  Are you going to assert your Fifth
12  Amendment right in response to that question?
13      A.  Yes.
14      Q.  You attended the Association for
15  Reproductive Health Providers conference in Denver
16  in September of 2013 at the request of Mr. Daleiden;
17  correct?
18      MR. KOLLER:  Objection; assumes facts not
19  in evidence, vague and ambiguous.
20      I'd advise my client not to answer on the
21  grounds it might incriminate her.
22  BY MS. MAYO:
23      Q.  Are you going to assert your Fifth
24  Amendment right in response to that question?
25      A.  Yes.

Page 67

1      Q.  The purpose of your attending the
2  Association of Reproductive Health Providers
3  conference in Denver was to wear a hidden camera and
4  videotape abortion providers that you came into
5  contact with; correct?
6      MR. KOLLER:  Objection; vague and
7  ambiguous, assumes facts not in evidence.
8      I'd advise my client not to answer on the
9  grounds it might incriminate her.
10  BY MS. MAYO:
11      Q.  Are you going to assert your Fifth
12  Amendment right in response to that question?
13      A.  Yes.
14      Q.  You registered for the Association of
15  Reproductive Health Providers conference under the
16  name Brianna Allen; correct?
17      MR. KOLLER:  Objection; vague and
18  ambiguous, assumes facts not in evidence.
19      Advise my client not to answer that on the
20  grounds it might incriminate her.
21  BY MS. MAYO:
22      Q.  Are you going to assert your Fifth
23  Amendment right in response to that question?
24      A.  Yes.
25      Q.  And you were wearing a concealed video

Page 68

1  camera at the association of reproductive health
2  providers conference in Denver, Colorado on
3  September 2013; correct?
4      MR. KOLLER:  Objection; assumes facts not
5  in evidence.
6      I'd advise my client not to answer that on
7  the grounds it might incriminate her.
8  BY MS. MAYO:
9      Q.  Are you going to assert your Fifth
10  Amendment right in response to that question?
11      A.  Yes.
12      Q.  While you were at the Association of
13  Reproductive Healthcare Providers conference in
14  Denver of September of 2013, you recorded
15  conversations with healthcare providers that you
16  came into contact with; correct?
17      MR. KOLLER:  Objection; assumes facts not
18  in evidence.
19      I'd advise my client not to answer on
20  grounds it might incriminate her.
21  BY MS. MAYO:
22      Q.  Are you going to assert your Fifth
23  Amendment right in response to that question?
24      A.  Yes.
25      Q.  Mr. Daleiden gave you a cover story to use

Page 69

1  in conversations with people at the Association of
2  Reproductive Healthcare Providers conference in
3  Denver in September 2013; correct?
4      MR. KOLLER:  Objection; vague and
5  ambiguous, assumes facts not in evidence.
6      Advise my client not to answer on the
7  grounds it might incriminate her.
8  BY MS. MAYO:
9      Q.  Are you going to assert your Fifth
10  Amendment right in response to that question?
11      A.  Yes.
12      MS. MAYO:  I'm going to mark as Exhibit 534
13  a document Bates-numbered CM16036 through -38.
14      (Deposition Exhibit 534 was marked for
15  identification)
16      THE WITNESS:  (Reviewing document.)
17      MR. KOLLER:  Look up when you're ready.
18  BY MS. MAYO:
19      Q.  Ms. Baxter, have you seen Exhibit 534
20  before today?
21      MR. KOLLER:  Objection; vague and
22  ambiguous.
23      I'd advise my client not to answer on the
24  grounds it might incriminate her.
25  //

Page 70

BY MS. MAYO:

Q. Are you going to assert your Fifth Amendment right in response to that question?

A. Yes.

Q. Exhibit 534 is a Confidential Field Worker Vocabulary document that provided the cover story you were to use at the Association for Reproductive Healthcare Providers conference in Denver; correct?

MR. KOLLER: Objection; assumes facts not in evidence, vague and ambiguous.

Advise my client not to answer on the grounds it might incriminate her.

BY MS. MAYO:

Q. Are you going to assert your Fifth Amendment right in response to that question?

A. Yes.

Q. And the purpose of your attending the association of Reproductive Healthcare Providers conference is set forth in the first paragraph of Exhibit 534, where it says:

"You are hoping to network with abortion providers, clinic directors, and Planned Parenthood executives at the Association of Reproductive Health Professionals annual meeting who may be interested in

Page 71

participating in a tissue donation program with you."

Correct?

MR. KOLLER: Objection; vague and ambiguous.

I'd advise my client not to answer on the grounds it may incriminate her.

BY MS. MAYO:

Q. Are you going to assert your Fifth Amendment right in response to that question?

A. Yes.

Q. While you were at the Association of Reproductive Health Professionals conference in Denver, you did, in fact, network with abortion providers, clinic directors, and Planned Parenthood executives; correct?

MR. KOLLER: Objection; assumes facts not in evidence.

I'd advise my client not to answer on the grounds it might incriminate her.

BY MS. MAYO:

Q. Are you going to assert your Fifth Amendment right in response to that question?

A. Yes.

Q. While you were attending the Association of

Page 72

Reproductive Health Professionals conference, you videotaped your interactions with persons attending that conference; correct?

MR. KOLLER: Objection; assumes facts not in evidence.

I'd advise my client not to answer that question on the grounds it might incriminate her.

BY MS. MAYO:

Q. Are you going to assert your Fifth Amendment right in response to that question?

A. Yes.

Q. When you attended the ARHP conference in Denver in September 2013, no one told you that Planned Parenthood was engaging in any violent felonies; correct?

MR. KOLLER: Objection; assumes facts not in evidence, vague and ambiguous.

I'd advise my client not to answer on the grounds it might incriminate her.

BY MS. MAYO:

Q. Are you going to assert your Fifth Amendment right in response to that question?

A. Yes.

Q. And, in fact, when you attended the ARHP conference in Denver in 2013, you didn't learn

Page 73

anything that would lead you to believe that Planned Parenthood was engaging in violent felonies; correct?

MR. KOLLER: Objection; assumes facts not in evidence.

Advise my client not to answer on the grounds it might incriminate her.

BY MS. MAYO:

Q. Are you going to assert your Fifth Amendment right in response to that question?

A. Yes.

Q. Before you attended the ARHP conference in Denver, did you do any research into fetal tissue donation?

MR. KOLLER: Objection; assumes facts not in evidence, vague and ambiguous.

I'd advise my client not to answer on the grounds it might incriminate her.

BY MS. MAYO:

Q. Are you going to assert your Fifth Amendment right in response to that question?

A. Yes.

MS. MAYO: I'm going to mark as Exhibit 535 a September 13th, 2013, e-mail. It's Bates numbered CM00014.

19

## Page 74

1   (Deposition Exhibit 535 was marked for
2   identification)
3   THE WITNESS:  (Reviewing document.)
4   BY MS. MAYO:
5   Q.  Ms. Baxter, have you seen Exhibit 535
6   before today?
7   MR. KOLLER:  Objection.
8   I'd advise my client not to answer that on
9   the grounds it may incriminate her.
10  BY MS. MAYO:
11  Q.  Are you going to assert your Fifth
12  Amendment right in response to that question?
13  A.  Yes.
14  Q.  Have you ever used the e-mail address
15  brianna@biomaxps.com?
16  MR. KOLLER:  Objection; vague and
17  ambiguous.
18  I'd advise my client not to answer that on
19  the grounds it may incriminate her.
20  BY MS. MAYO:
21  Q.  Are you going to assert your Fifth
22  Amendment right in response to that question?
23  A.  Yes.
24  Q.  Did you send this e-mail to
25  alaynaflorman@arhp.org on or about September 13th,

## Page 75

1   2013?
2   MR. KOLLER:  Objection; vague and
3   ambiguous.
4   I'd advise my client not to answer this on
5   the grounds it may incriminate her.
6   BY MS. MAYO:
7   Q.  Are you going to assert your Fifth
8   Amendment right in response to that question?
9   A.  Yes.
10  Q.  In fact, David Daleiden was using the
11  brianna@biomaxps.com e-mail address and sending out
12  e-mails using the identity of the person that you
13  portrayed at the ARHP conference in Denver; correct
14  be?
15  MR. KOLLER:  Objection; assumes facts not
16  in evidence, vague and ambiguous, compound.
17  I'd advise my client not to answer on the
18  grounds it may incriminate her.
19  BY MS. MAYO:
20  Q.  Are you going to assert your Fifth
21  Amendment right in response to that question?
22  A.  Yes.
23  MS. MAYO:  I'm going to mark as Exhibit 536
24  a document Bates number PP0000136 through -141.
25  (Deposition Exhibit 536 was marked for

## Page 76

1   identification)
2   THE WITNESS:  (Reviewing document.)
3   BY MS. MAYO:
4   Q.  Ms. Baxter, have you seen Exhibit 536
5   before today?
6   MR. KOLLER:  Objection; vague and
7   ambiguous.
8   Advise my client not to answer on the
9   grounds it may incriminate her.
10  BY MS. MAYO:
11  Q.  Are you going to assert your Fifth
12  Amendment right in response to that question?
13  A.  Yes.
14  Q.  Exhibit 536 is the registration
15  confirmation for your attendance at the ARHP
16  conference in Denver in September 2013; correct?
17  MR. KOLLER:  Objection; assumes facts not
18  in evidence, vague and ambiguous.
19  I'd advise my client not to answer on the
20  grounds it may incriminate her.
21  BY MS. MAYO:
22  Q.  Are you going to assert your Fifth
23  Amendment right in response to that question?
24  A.  Yes.
25  Q.  And you were registered at the ARHP

## Page 77

1   conference under the name of Brianna Allen; correct?
2   MR. KOLLER:  Objection; assumes facts not
3   in evidence, vague and ambiguous.
4   I'd advise my client not to answer on the
5   grounds it may incriminate her.
6   BY MS. MAYO:
7   Q.  Are you going to assert your Fifth
8   Amendment right in response to that question?
9   A.  Yes.
10  Q.  And Brianna Allen is in fact not your real
11  name; correct?
12  MR. KOLLER:  You can answer that.
13  THE WITNESS:  My real name is Brianna
14  Baxter.
15  BY MS. MAYO:
16  Q.  Did you have any involvement in picking the
17  name Brianna Allen?
18  MR. KOLLER:  Objection; assumes facts not
19  in evidence.
20  I'd advise my client not to answer on the
21  grounds it may incriminate her.
22  BY MS. MAYO:
23  Q.  Are you going to assert your Fifth
24  Amendment right in response to that question?
25  A.  Yes.

BY MS. MAYO:

Q. Mr. Daleiden picked the name Brianna Allen because he attended high school with a pro-choice classmate named Brianna Allen; correct?

MR. KOLLER: Objection; assumes facts not in evidence, lacks foundation, vague and ambiguous.

I'd advise my client not to answer on the grounds it may incriminate her.

BY MS. MAYO:

Q. Are you going to assert your Fifth Amendment right in response to that question?

A. Yes.

Q. Did you ever look into whether using the name Brianna Allen might be stealing a real person's identity?

MR. KOLLER: Objection. It lacks foundation.

I would advise my client not to answer on the grounds it may incriminate her.

BY MS. MAYO:

Q. Are you going to assert your Fifth Amendment right in response to that question?

A. Yes.

Q. The job title listed on this registration, Exhibit 536, is "Clinical Assistant" with a company

known -- excuse me -- with a company known as BioMax.

And you were never a clinical assistant with a company called BioMax; correct?

MR. KOLLER: I would object that it's vague and ambiguous, but you can answer it if you can.

THE WITNESS: No, I have not.

BY MS. MAYO:

Q. In fact, you never worked for a company called BioMax; correct?

MR. KOLLER: Objection; vague and ambiguous.

But you can answer if you can.

THE WITNESS: No, I have not.

BY MS. MAYO:

Q. The registration for this conference was $270. Where did that money come from?

MR. KOLLER: Objection; vague and ambiguous, assumes facts not in evidence.

Advise my client not to answer on the grounds it may incriminate her.

BY MS. MAYO:

Q. Are you going to assert your Fifth Amendment right in response to that question?

A. Yes.

Q. The Visa card used to pay for admission to the ARHP conference as reflected in Exhibit 536 was in the cardholder name Sofia Mireles.

Who is Sofia Mireles?

MR. KOLLER: Objection; vague and ambiguous.

I'd advise my client not to answer that on the grounds it may incriminate her.

BY MS. MAYO:

Q. Are you going to assert your Fifth Amendment right in response to that question?

A. Yes.

Q. Do you know anyone named Sofia Mireles?

MR. KOLLER: Objection; vague and ambiguous.

I'd advise my client not to answer that on the grounds it may incriminate her.

BY MS. MAYO:

Q. Are you going to assert your Fifth Amendment right in response to that question?

A. Yes.

Q. The registration was paid for with a card in the name of Sofia Mireles because had David Daleiden paid for the conference he would have been found out and denied registration for that

conference; correct?

MR. KOLLER: Objection; assumes facts not in evidence, vague and ambiguous, lacks foundation.

I'd advise my client not to answer that on the grounds it may incriminate her.

BY MS. MAYO:

Q. Are you going to assert your Fifth Amendment right in response to that question?

A. Yes.

Q. You attended the ARHP conference in Denver along with a woman by the name of Sandra Susan Merritt who was posing as Susan Tennenbaum; correct?

MR. KOLLER: Objection; assumes facts not in evidence, vague and ambiguous.

And advise my client not to answer on the grounds it may incriminate her.

BY MS. MAYO:

Q. Are you going to assert your Fifth Amendment right in response to that question?

A. Yes.

Q. Ms. Merritt was also wearing a hidden camera when she accompanied you to the ARHP conference in Denver in 2013; correct?

MR. KOLLER: Objection; assumes facts not in evidence, lacks foundation, vague and ambiguous.

Page 82

1 And I would advise my client not to answer
2 that on the grounds it may incriminate her.
3 BY MS. MAYO:
4 Q. Are you going to assert the Fifth Amendment
5 in response to that question?
6 A. Yes.
7 Q. You recorded the people that you interacted
8 with at the ARHP conference in Denver in 2013;
9 correct?
10 MR. KOLLER: Objection; assumes facts not
11 in evidence.
12 Advise my client not to answer that on the
13 grounds it may incriminate her.
14 BY MS. MAYO:
15 Q. Are you going to assert the Fifth Amendment
16 in response to that question?
17 A. Yes.
18 Q. And you did not disclose to anyone that you
19 interacted with that you had a hidden camera and
20 were recording your interactions with them; correct?
21 MR. KOLLER: Objection; assumes facts not
22 in evidence, vague and ambiguous.
23 I'd advise my client not to answer on the
24 grounds it may incriminate her.
25 //

Page 83

1 BY MS. MAYO:
2 Q. Are you going to assert the Fifth Amendment
3 in response to that question?
4 A. Yes.
5 Q. And you made several hours of undercover
6 recordings at the ARHP conference; correct?
7 MR. KOLLER: Objection; assumes facts not
8 in evidence.
9 Advise my client not to answer that on the
10 grounds it may incriminate her.
11 BY MS. MAYO:
12 Q. Are you going to assert the Fifth Amendment
13 in response to that question?
14 A. Yes.
15 Q. Have you ever watched the recordings that
16 you made at the ARHP conference?
17 MR. KOLLER: Objection; assumes facts not
18 in evidence.
19 I'd advise my client not to answer that on
20 the grounds it may incriminate her.
21 BY MS. MAYO:
22 Q. Are you going to assert the Fifth Amendment
23 in response to that question?
24 A. Yes.
25 Q. In order to gain access to conferences of

Page 84

1 reproductive healthcare providers, CMP created the
2 front company BioMax Procurement Services; correct?
3 MR. KOLLER: Objection; assumes facts not
4 in evidence, lacks foundation.
5 I'd advise my client not to answer that on
6 the grounds it may incriminate her.
7 BY MS. MAYO:
8 Q. Are you going to assert your Fifth
9 Amendment right in response to that question?
10 A. Yes.
11 Q. BioMax was a company that CMP formed;
12 correct?
13 MR. KOLLER: Objection; assumes facts not
14 in evidence, lacks foundation.
15 I'd advise my client not to answer that on
16 the grounds it might incriminate her.
17 BY MS. MAYO:
18 Q. Are you going to assert your Fifth
19 Amendment right in response to that question?
20 A. Yes.
21 Q. And CMP formed the company BioMax for the
22 purpose of gaining access to conferences of abortion
23 providers; correct?
24 MR. KOLLER: Objection; assumes facts not
25 in evidence, lacks foundation.

Page 85

1 I'd advise my client not to answer that on
2 the grounds it may incriminate her.
3 BY MS. MAYO:
4 Q. Are you going to assert the Fifth Amendment
5 in response to that question?
6 A. Yes.
7 Q. And, in particular, CMP formed the company
8 BioMax for the purpose of entering conferences of
9 abortion providers sponsored by the National
10 Abortion Federation; correct?
11 MR. KOLLER: Objection; assumes facts not
12 in evidence, lacks foundation, vague and ambiguous.
13 Advise my client not to answer that on
14 grounds it might incriminate her.
15 BY MS. MAYO:
16 Q. Are you going to assert your Fifth
17 Amendment right in response to that question?
18 A. Yes.
19 Q. When was BioMax created?
20 MR. KOLLER: Objection; assumes facts not
21 in evidence, lacks foundation.
22 I'd advise my client not to answer that on
23 the grounds it may incriminate her.
24 BY MS. MAYO:
25 Q. Are you going to assert the Fifth Amendment

Page 86

1 in response to that question?
2   A. Yes.
3   Q. Were you involved in creating BioMax?
4     MR. KOLLER: Objection; vague and
5 ambiguous.
6     Advise my client not to answer that on the
7 grounds it may incriminate her.
8 BY MS. MAYO:
9   Q. Are you going to assert the Fifth Amendment
10 in response to this question?
11   A. Yes.
12   Q. BioMax was created to provide a cover for
13 the people involved in undercover videotaping for
14 CMP; correct?
15     MR. KOLLER: Objection; assumes facts not
16 in evidence, lacks foundation, vague and ambiguous.
17     Advise my client not to answer that on the
18 grounds it may incriminate her.
19 BY MS. MAYO:
20   Q. Are you going to assert the Fifth Amendment
21 in response to that question?
22   A. Yes.
23   Q. BioMax was a company that held itself out
24 as supplying medical researchers with human
25 biological specimens; correct?

Page 87

1     MR. KOLLER: Objection; assumes facts not
2 in evidence.
3     I'd advise my client not to answer that on
4 the grounds it may incriminate her.
5 BY MS. MAYO:
6   Q. Are you going to assert the Fifth Amendment
7 in response to that question?
8   A. Yes.
9     MS. MAYO: Let's mark as 537 a document
10 Bates-numbered PP0000256 through -257.
11     (Deposition Exhibit 537 was marked for
12     identification)
13     THE WITNESS: (Reviewing document.)
14 BY MS. MAYO:
15   Q. Ms. Baxter, have you seen Exhibit 537
16 before today?
17     MR. KOLLER: Objection.
18     I'd advise my client not to answer that on
19 the grounds it may incriminate her.
20 BY MS. MAYO:
21   Q. Are you going to assert your Fifth
22 Amendment right in response to that question?
23   A. Yes.
24   Q. Exhibit 537 is a brochure that BioMax
25 created as part of its cover for the undercover

Page 88

1 video operation; correct?
2     MR. KOLLER: Objection; assumes facts not
3 in evidence.
4     I'd advise my client not to answer that on
5 the grounds it may incriminate her.
6 BY MS. MAYO:
7   Q. Are you going to assert your right under
8 the Fifth Amendment in response to that question?
9   A. Yes.
10   Q. Did you help draft Exhibit 537?
11     MR. KOLLER: Objection; assumes facts not
12 in evidence.
13     I'd advise my client not to answer that on
14 the grounds it may incriminate her.
15 BY MS. MAYO:
16   Q. Are you going to assert the Fifth Amendment
17 in response to that question?
18   A. Yes.
19   Q. Did Mr. Daleiden consult you for your
20 training in microbiology to review the brochure for
21 BioMax that's marked as Exhibit 537?
22     MR. KOLLER: Objection; vague and
23 ambiguous.
24     Advise my client not to answer that on the
25 grounds it may incriminate her.

Page 89

1 BY MS. MAYO:
2   Q. Are you going to assert your Fifth
3 Amendment right in response to that question?
4   A. Yes.
5   Q. In the center column of Exhibit 537 under
6 the heading "About BioMax," it says:
7     "BioMax Procurement Services, LLC is a
8     biological specimen procurement
9     organization headquartered in Norwalk,
10     California. BioMax provides tissue and
11     specimen procurement for academic and
12     private bioscience researchers."
13     The first -- BioMax Procurement Services,
14 LLC is not, in fact, a biological specimen
15 procurement organization; correct?
16     MR. KOLLER: Objection; lacks foundation.
17     I'd advise my client not to answer that on
18 the grounds it may incriminate her.
19 BY MS. MAYO:
20   Q. Are you going to assert your Fifth
21 Amendment right in response to that question?
22   A. Yes.
23   Q. And the statement that "BioMax provides
24 tissue and specimen procurement for academic and
25 private bioscience researchers" is also false

1 because BioMax has never provided tissue and
2 specimen procurement services for any purposes
3 whatsoever; correct?
4     MR. KOLLER:  Objection; assumes facts not
5 in evidence, lacks foundation.
6     I'd advise my client not to answer that on
7 the grounds it may incriminate her.
8 BY MS. MAYO:
9     Q.  Are you going to assert your Fifth
10 Amendment right in response to this question?
11     A.  Yes.
12     Q.  In fact, BioMax has never collected any
13 biological specimens; correct?
14     MR. KOLLER:  Objection; lacks foundation,
15 vague and ambiguous.
16     Advise my client not to answer that on the
17 grounds it may incriminate her.
18 BY MS. MAYO:
19     Q.  Are you going to assert the Fifth Amendment
20 in response to that question?
21     A.  Yes.
22     Q.  The CMP actors in these undercover videos
23 were telling abortion care providers that BioMax
24 was, in fact, supplying specimens to researchers;
25 correct?

1     MR. KOLLER:  Objection; assumes facts not
2 in evidence, lack of foundation, vague and
3 ambiguous.
4     I'd advise my client not to answer that on
5 the grounds it may incriminate her.
6 BY MS. MAYO:
7     Q.  Are you going to assert the Fifth Amendment
8 in response to that question?
9     A.  Yes.
10     Q.  And, in fact, posing as Brianna Allen, you
11 told reproductive healthcare providers that you came
12 into contact with that you were employed by BioMax;
13 correct?
14     MR. KOLLER:  Objection; assumes facts not
15 in evidence.
16     Advise my client not to answer that on the
17 grounds it may incriminate her.
18 BY MS. MAYO:
19     Q.  Are you going to assert the Fifth Amendment
20 in response to that question?
21     A.  Yes.
22     Q.  And posing as Brianna Allen at conferences,
23 you told reproductive healthcare providers that you
24 came into contact with that BioMax was a biological
25 specimen procurement company supplying specimens to

1 researchers; correct?
2     MR. KOLLER:  Objection; assumes facts not
3 in evidence, vague and ambiguous.
4     I'd advise my client not to answer that on
5 the grounds it may incriminate her.
6 BY MS. MAYO:
7     Q.  Are you going to assert the Fifth Amendment
8 in response to that question?
9     A.  Yes.
10     Q.  So the CMP actors, including yourself, were
11 lying to the reproductive healthcare providers that
12 they came into contact with about BioMax; correct?
13     MR. KOLLER:  Objection; assumes facts not
14 in evidence, vague and ambiguous.
15     I'd advise my client not to answer that on
16 the grounds it may incriminate her.
17 BY MS. MAYO:
18     Q.  Are you going to assert the Fifth Amendment
19 in response to that question?
20     A.  Yes.
21     Q.  And you, along with the other CMP actors,
22 lied about BioMax in order to gain the trust of
23 Planned Parenthood employees; correct?
24     MR. KOLLER:  Objection; assumes facts not
25 in evidence, vague and ambiguous, lacks foundation.

1     Advise my client not to answer that on the
2 grounds it may incriminate her.
3 BY MS. MAYO:
4     Q.  Are you going to assert the Fifth Amendment
5 in response to that question?
6     A.  Yes.
7     Q.  And Planned Parenthood employees would not
8 have scheduled meetings with the CMP actors if they
9 knew about these lies and about CMP's true goals;
10 correct?
11     MR. KOLLER:  Objection; assumes facts not
12 in evidence, lacks foundation, vague and ambiguous.
13     And I'd advise my client not to answer that
14 on the grounds it may incriminate her.
15 BY MS. MAYO:
16     Q.  Are you going to assert the Fifth Amendment
17 in response to that question?
18     A.  Yes.
19     Q.  Who is Susan Tennenbaum?
20     MR. KOLLER:  Objection; vague and
21 ambiguous.
22     I'd advise my client not to answer that on
23 the grounds it may incriminate her.
24 BY MS. MAYO:
25     Q.  Are you going to assert the Fifth Amendment

## Page 94

1  in response to that question?
2      A.  Yes.
3      Q.  Who is Robert Sarkis?
4      MR. KOLLER:  Objection; vague and
5  ambiguous.
6      I'd advise my client not to answer that on
7  the grounds it may incriminate her.
8  BY MS. MAYO:
9      Q.  Are you going to assert the Fifth Amendment
10  in response to that question?
11      A.  Yes.
12      Q.  Who is Rebecca Wagner?
13      MR. KOLLER:  Objection; vague and
14  ambiguous.
15      I'd advise my client not to answer that on
16  the grounds it may incriminate her.
17  BY MS. MAYO:
18      Q.  Are you going to assert the Fifth Amendment
19  in response to that question?
20      A.  Yes.
21      Q.  And, in fact, Susan Tennenbaum is the false
22  name assumed by Sandra Susan Merritt in connection
23  with this undercover video project; correct?
24      MR. KOLLER:  Objection; assumes facts not
25  in evidence, lacks foundation, vague and ambiguous.

## Page 95

1      I'd advise my client not to answer that on
2  the grounds it might incriminate her.
3  BY MS. MAYO:
4      Q.  Are you going to assert the Fifth Amendment
5  in response to that question?
6      A.  Yes.
7      Q.  And, in fact, Robert Sarkis is the false
8  name assumed by Daleiden in connection with this
9  undercover video project; correct?
10      MR. KOLLER:  Objection; assumes facts not
11  in evidence, vague and ambiguous, lacks foundation.
12      I'd advise my client not to answer it on
13  the grounds it might incriminate her.
14  BY MS. MAYO:
15      Q.  Are you going to assert the Fifth Amendment
16  in response to that question?
17      A.  Yes.
18      Q.  And Rebecca Wagner is the false name
19  assumed by Annamarie Bettisworth in connection with
20  the undercover video project; correct?
21      MR. KOLLER:  Objection; assumes facts not
22  in evidence, lacks foundation, vague and ambiguous.
23      Advise my client not to answer on the
24  grounds it might incriminate her.
25  //

## Page 96

1  BY MS. MAYO:
2      Q.  Are you going to assert your Fifth
3  Amendment right in response to that question?
4      A.  Yes.
5      Q.  The false identities of Brianna Allen,
6  Susan Tennenbaum, Robert Sarkis, and Rebecca Wagner
7  were created to allow you and the others access into
8  conferences of reproductive healthcare providers;
9  correct?
10      MR. KOLLER:  Objection; assumes facts not
11  in evidence, vague and ambiguous.
12      I'd advise my client not to answer that on
13  the grounds it might incriminate her.
14  BY MS. MAYO:
15      Q.  Are you going to assert the Fifth Amendment
16  in response to that question?
17      A.  Yes.
18      Q.  You, and Susan Merritt, David Daleiden,
19  Annamarie Bettisworth assumed false identities
20  because you were afraid that you would not be
21  allowed to enter conferences of reproductive
22  healthcare providers if you used your own names;
23  correct?
24      MR. KOLLER:  Objection; assumes facts not
25  in evidence, vague and ambiguous.

## Page 97

1      Advise my client not to answer that on the
2  grounds it might incriminate her.
3  BY MS. MAYO:
4      Q.  Are you going to assert the Fifth Amendment
5  in response to that question?
6      A.  Yes.
7      Q.  Were you involved in selecting the fake
8  names used by Mr. Daleiden, Ms. Merritt, or
9  Ms. Bettisworth?
10      MR. KOLLER:  Objection; assumes facts not
11  in evidence, compound, vague and ambiguous.
12      And I'd advise my client not to answer that
13  on the grounds it might incriminate her.
14  BY MS. MAYO:
15      Q.  Are you going to assert the Fifth Amendment
16  in response to that question?
17      A.  Yes.
18      Q.  In order for Mr. Daleiden to use the name
19  Sarkis at conferences, he needed a form of
20  identification; correct?
21      MR. KOLLER:  Objection; assumes facts not
22  in evidence.
23      I'd advise my client not to answer that on
24  the grounds it might incriminate her.
25  //

Page 98

1  BY MS. MAYO:
2  Q.  Are you going to assert the Fifth Amendment
3  in response to that question?
4  A.  Yes.
5  Q.  When you attended conferences, what
6  identification did you provide?
7  MR. KOLLER:  Objection; assumes facts not
8  in evidence, vague and ambiguous.
9  Advise my client not to answer that on the
10  grounds it might incriminate her.
11  BY MS. MAYO:
12  Q.  Are you going to assert the Fifth Amendment
13  in response to that question?
14  A.  Yes.
15  Q.  When you attended conferences, what was the
16  name on the identification that you provided to
17  enter those conferences?
18  MR. KOLLER:  Objection; vague and
19  ambiguous, assumes facts not in evidence.
20  I'd advise my client not to answer that on
21  the grounds it might incriminate her.
22  BY MS. MAYO:
23  Q.  Are you going to assert the Fifth Amendment
24  in response to that question?
25  A.  Yes.

Page 99

1  Q.  Did you use a false identification in the
2  name of Brianna Allen in order to enter the ARHP
3  conference?
4  MR. KOLLER:  Objection; assumes facts not
5  in evidence, lacks foundation, vague and ambiguous.
6  Advise my client not to answer on the
7  grounds it may incriminate her.
8  BY MS. MAYO:
9  Q.  Are you going to assert the Fifth Amendment
10  in response to that question?
11  A.  Yes.
12  MS. MAYO:  I'm going to mark as Exhibit 538
13  a document with the Bates number PP0000253 and -254.
14  (Deposition Exhibit 538 was marked for
15  identification.)
16  THE WITNESS:  (Reviewing document.)
17  BY MS. MAYO:
18  Q.  Have you seen Exhibit 538 before today?
19  MR. KOLLER:  Objection; lacks foundation.
20  I'd advise my client not to answer that on
21  the grounds it may incriminate her.
22  BY MS. MAYO:
23  Q.  Are you going to assert the Fifth Amendment
24  in response to that question?
25  A.  Yes.

Page 100

1  Q.  These are the driver's licenses that Susan
2  Merritt and David Daleiden used to infiltrate
3  conferences of reproductive healthcare providers;
4  correct?
5  MR. KOLLER:  Objection; lacks foundation.
6  I'd advise my client not to answer that on
7  the grounds it may incriminate her.
8  BY MS. MAYO:
9  Q.  Are you going to assert the Fifth Amendment
10  in response to that question?
11  A.  Yes.
12  Q.  Did you have any involvement in obtaining
13  these false driver's licenses?
14  MR. KOLLER:  Objection; assumes facts in --
15  assumes facts not in evidence, lacks foundation.
16  I'd advise my client not to answer this on
17  the grounds it may incriminate her.
18  BY MS. MAYO:
19  Q.  Are you going to assert the Fifth Amendment
20  in response to that question?
21  A.  Yes.
22  Q.  Have you ever used a false ID for any
23  purpose?
24  MR. KOLLER:  Objection.
25  Advise my client not to answer that on the

Page 101

1  grounds it may incriminate her.
2  BY MS. MAYO:
3  Q.  Are you going to assert the Fifth Amendment
4  in response to that question?
5  A.  Yes.
6  Q.  Did you ever obtain a false identification
7  in the name of Brianna Allen?
8  MR. KOLLER:  I'm going to advise my client
9  not to answer that on the grounds it may incriminate
10  her.
11  BY MS. MAYO:
12  Q.  Are you going to assert in response to that
13  question?
14  A.  Yes.
15  Q.  Now, in order to pay for the fees
16  associated with admittance to conferences, the CMP
17  actors needed payment cards that didn't have their
18  real names on them; correct?
19  MR. KOLLER:  Objection; assumes facts not
20  in evidence, lacks foundation.
21  I'd advise my client not to answer that on
22  the grounds it may incriminate her.
23  BY MS. MAYO:
24  Q.  Are you going to assert the Fifth Amendment
25  in response to that question?

1    A.  Yes.
2    Q.  And CMP obtained payment cards under false
3  names; correct?
4    MR. KOLLER:  Objection; assumes facts not
5  in evidence, lack of foundation.
6    Advise my client not to answer that on the
7  grounds it may incriminate her.
8  BY MS. MAYO:
9    Q.  Are you going to assert the Fifth Amendment
10  in response to that question?
11    A.  Yes.
12    MS. MAYO:  I'm going to mark as Exhibit 539
13  a document with the Bates number CM00005.
14    (Deposition Exhibit 539 was marked for
15    identification)
16  BY MS. MAYO:
17    Q.  Ms. Baxter, Exhibit 539 depicts three
18  payment cards.
19    Have you seen these cards before?
20    MR. KOLLER:  Objection; lacks foundation.
21    I'd ask -- I'd ask -- try that again.
22    I'd advise my client not to answer that on
23  the grounds it may incriminate her.
24  BY MS. MAYO:
25    Q.  Are you going to assert the Fifth Amendment

1  in response to that question?
2    A.  Yes.
3    Q.  Were you involved in obtaining these debit
4  cards depicted in Exhibit 539?
5    MR. KOLLER:  Objection; assumes facts not
6  in evidence, lacks foundation.
7    Advise my client not to answer on the
8  grounds it may incriminate her.
9  BY MS. MAYO:
10    Q.  Are you going to assert the Fifth Amendment
11  in response to that question?
12    A.  Yes.
13    Q.  Do you know how CMP obtained these debit
14  cards?
15    MR. KOLLER:  Objection; assumes facts not
16  in evidence.
17    I'd advise my client not to answer this on
18  the grounds it may incriminate her.
19  BY MS. MAYO:
20    Q.  Are you going to assert the Fifth Amendment
21  in response to that question?
22    A.  Yes.
23    Q.  Were you consulted by Mr. Daleiden about
24  obtaining these debit cards?
25    MR. KOLLER:  Objection; assumes facts not

1  in evidence, vague and ambiguous.
2    I'd advise my client not to answer on the
3  grounds it may tend to incriminate her.
4  BY MS. MAYO:
5    Q.  Are you going to assert the Fifth Amendment
6  in response to that question?
7    A.  Yes.
8    Q.  Were you aware that a debit card in the
9  name of Brianna Allen was obtained by the Center for
10  Medical Progress?
11    MR. KOLLER:  Objection; vague and
12  ambiguous.
13    I'd advise my client not to answer on the
14  grounds it may incriminate her.
15  BY MS. MAYO:
16    Q.  Are you going to assert the fifth in
17  response to that question?
18    A.  Yes.
19    Q.  Have you ever used a debit card in the name
20  of Brianna Allen to purchase anything?
21    MR. KOLLER:  Objection; vague and
22  ambiguous.
23    I'd ask my client not to answer that on the
24  grounds it may incriminate her.
25  //

1  BY MS. MAYO:
2    Q.  Are you going to assert the Fifth Amendment
3  in response to that question?
4    A.  Yes.
5    Q.  Have you ever been involved in obtaining
6  debit cards under any false name?
7    MR. KOLLER:  I'd advise my client not to
8  answer that on the grounds it may incriminate her.
9  BY MS. MAYO:
10    Q.  Are you going to assert the Fifth Amendment
11  in response to that question?
12    A.  Yes.
13    Q.  You were aware that CMP had obtained debit
14  cards under fake names; correct?
15    MR. KOLLER:  Objection; assumes facts not
16  in evidence, lacks foundation, vague and ambiguous.
17    Advise my client not to answer that on the
18  grounds it may incriminate her.
19  BY MS. MAYO:
20    Q.  Are you going to assert the Fifth Amendment
21  in response to that question?
22    A.  Yes.
23    Q.  As you can see on Exhibit 539, one of the
24  debit cards was issued in the name of Phil Cronin.
25    Do you know who Phil Cronin is?

## Page 106

1        MR. KOLLER:  Objection; vague and
2  ambiguous.
3       I'd advise my client not to answer that on
4  the grounds it may incriminate her.
5  BY MS. MAYO:
6     Q.  Are you going to assert the Fifth Amendment
7  in response to that question?
8     A.  Yes.
9     Q.  Were you aware that CMP used the name Phil
10  Cronin on a Visa debit card?
11       MR. KOLLER:  Objection; assumes facts not
12  in evidence, vague and ambiguous.
13       Advise my client not to answer this on the
14  grounds it may incriminate her.
15  BY MS. MAYO:
16     Q.  Are you going to assert the Fifth Amendment
17  in response to that question?
18     A.  Yes.
19     Q.  Were you aware that the debit card in the
20  name of Phil Cronin was obtained without
21  Mr. Cronin's consent?
22       MR. KOLLER:  Objection; lacks foundation,
23  vague and ambiguous.
24       Advise my client not to answer that on the
25  grounds it may incriminate her.

## Page 107

1  BY MS. MAYO:
2     Q.  Are you going to assert the Fifth Amendment
3  in response to that question?
4     A.  Yes.
5       MS. MAYO:  Okay.  Let's take a quick break.
6       THE VIDEOGRAPHER:  This marks the end of
7  media file labeled Number 2.  Off the record at
8  11:34 a.m.
9       (Recess taken)
10       THE VIDEOGRAPHER:  This marks the beginning
11  of media file labeled Number 3.  Back on the record
12  at 11:43 a.m.
13       MS. MAYO:  I'm going to mark as Exhibit 540
14  a document that's Bates-numbered CM02531 through
15  532.
16       (Deposition Exhibit 540 was marked for
17  identification.)
18       THE WITNESS:  (Reviewing document.)
19  BY MS. MAYO:
20     Q.  Ms. Baxter, have you seen Exhibit 540
21  before today?
22       MR. KOLLER:  Advise my client not to answer
23  that on the grounds it may incriminate her.
24  BY MS. MAYO:
25     Q.  Are you going to assert the Fifth Amendment

## Page 108

1  in response to that question?
2     A.  Yes.
3     Q.  This is an e-mail exchange with someone
4  named Kathy Snow regarding a humanized mice webinar
5  registration.
6       Have you ever participated in a humanized
7  mice webinar?
8       MR. KOLLER:  I'd advise my client not to
9  answer that on the grounds it may incriminate her.
10  BY MS. MAYO:
11     Q.  Are you going to assert the Fifth Amendment
12  in response to that question?
13     A.  Yes.
14     Q.  Do you know what "humanized mice" refers
15  to?
16       MR. KOLLER:  You can go ahead and answer.
17       THE WITNESS:  If I remember right, they are
18  -- they are typically used for neurological models,
19  and they're injected with human neurological stem
20  cells.
21  BY MS. MAYO:
22     Q.  Now, when Kathy Snow asked Brianna for more
23  information about BioMax's interest in this
24  humanized mice webinar, Brianna responded at the
25  middle of the page there:

## Page 109

1       "We are a tissue procurement service that
2      provides researchers with human gestational
3      specimens for tissue/cell xenografts to
4      construct SCID-hu models, such as the
5      Thy/Liv and BLT models frequently used in
6      HIV studies."
7       That's a false statement because BioMax did
8  not do any of that; correct?
9       MR. KOLLER:  Objection; assumes facts not
10  in evidence, lack of foundation.
11       Advise my client not to answer that on the
12  grounds it may incriminate her.
13  BY MS. MAYO:
14     Q.  Are you going to assert the Fifth Amendment
15  in response to that question?
16     A.  Yes.
17     Q.  Going further in that same paragraph, the
18  person identified or the Brianna -- the person
19  identified as Brianna on Exhibits 540 writes:
20      "I manage our relationships with surgical
21      clinics participating in specimen
22      donation."
23       That is also a false statement; right?
24       MR. KOLLER:  Objection; assumes facts not
25  in evidence, lack of foundation.

1     Advise my client not to answer that on the
2 grounds it may incriminate her.
3 BY MS. MAYO:
4     Q. Are you going to assert the Fifth Amendment
5 in response to that question?
6     A. Yes.
7     Q. Did you draft any portion of the e-mails
8 reflected in Exhibit 540?
9     MR. KOLLER: Objection; vague and
10 ambiguous.
11     Advise my client not to answer that on the
12 grounds it may incriminate her.
13 BY MS. MAYO:
14     Q. Are you going to assert the Fifth Amendment
15 in response to that question?
16     A. Yes.
17     Q. Did Mr. Daleiden ever call upon your
18 education and knowledge of microbiology in
19 connection with his undercover video project?
20     MR. KOLLER: Objection; assumes facts not
21 in evidence.
22     Advise my client not to answer that on the
23 grounds it may incriminate her.
24 BY MS. MAYO:
25     Q. Are you going to assert the Fifth Amendment

1 in response to that question?
2     A. Yes.
3     Q. Did Mr. Daleiden ever call upon you to help
4 him do research into fetal tissue or stem cell
5 research?
6     MR. KOLLER: I would advise my client not
7 to answer that on the grounds it may incriminate
8 her.
9 BY MS. MAYO:
10     Q. Are you going to assert the Fifth Amendment
11 in response to that question?
12     A. Yes.
13     Q. Prior to your involvement with CMP or
14 Mr. Daleiden, did you have any experience with or
15 knowledge about fetal tissue procurement?
16     MR. KOLLER: Objection; assumes facts not
17 in evidence, vague and ambiguous.
18     And I'd advise my client not to answer that
19 on the grounds it may incriminate her.
20 BY MS. MAYO:
21     Q. Are you going to assert the Fifth Amendment
22 in response to that question?
23     A. Yes.
24     Q. Did you do any research into fetal tissue
25 procurement as part of your involvement with CMP and

1 Mr. Daleiden?
2     MR. KOLLER: Objection; assumes facts not
3 in evidence, vague and ambiguous.
4     I'd advise my client not to answer that on
5 the grounds it may incriminate her.
6 BY MS. MAYO:
7     Q. Are you going to assert the Fifth Amendment
8 in response to that question?
9     A. Yes.
10     MS. MAYO: I'm going to mark as Exhibit 541
11 a document Bates-numbered CM03463 and 34 -- through
12 -3465.
13     (Deposition Exhibit 541 was marked for
14     identification)
15     MR. KOLLER: Thank you.
16     MS. MAYO: Sure.
17     THE WITNESS: (Reviewing document.)
18 BY MS. MAYO:
19     Q. And for the record, Exhibit 541 is
20 comprised of an e-mail between Brianna Baxter and
21 David, and attached to it is what purports to be a
22 résumé for Brianna Leigh.
23     Have you ever seen Exhibit 541 before
24 today?
25     MR. KOLLER: I'd advise my client not to

1 answer that on the grounds it may incriminate her.
2 BY MS. MAYO:
3     Q. Are you going to assert the Fifth Amendment
4 in response to that question?
5     A. Yes.
6     Q. Did you prepare the résumé that's attached
7 as -- the second page of the attachment -- the
8 second page of Exhibit 541?
9     MR. KOLLER: I'd advise my client not to
10 answer that on the grounds it may incriminate her.
11 BY MS. MAYO:
12     Q. Are you going to assert the Fifth Amendment
13 in response to that question?
14     A. Yes.
15     Q. Did Mr. Daleiden ever request that you
16 prepare a résumé under the false name of Brianna
17 Leigh?
18     MR. KOLLER: Objection; assumes facts not
19 in evidence.
20     I'd advise my client not to answer that on
21 the grounds it may incriminate her.
22 BY MS. MAYO:
23     Q. Are you going to assert the Fifth Amendment
24 in response to that question?
25     A. Yes.

Page 114

1  Q. Mr. Daleiden asked you to prepare a résumé
2 so that you could apply for a job undercover in a
3 name other than your own; correct?
4      MR. KOLLER: I would advise my client not
5 to answer that on the grounds it may incriminate
6 her.
7 BY MS. MAYO:
8  Q. Are you going to assert the Fifth Amendment
9 in response to that question?
10  A. Yes.
11  Q. And this résumé for Brianna Leigh was
12 prepared for the purpose of getting hired by a
13 company as part of Mr. Daleiden's attempt to obtain
14 information he could use to attack Planned
15 Parenthood; correct?
16      MR. KOLLER: Objection; assumes facts not
17 in evidence, lacks foundation, vague and ambiguous.
18      I'd advise my client not to answer that on
19 the grounds it may incriminate her.
20 BY MS. MAYO:
21  Q. Are you going to assert the Fifth Amendment
22 in response to that question?
23  A. Yes.
24  Q. In the bold section of the résumé about a
25 quarter of the page up from the bottom, you wrote:

Page 115

1  "Heads up David, there are so many things
2 in this section that cannot stay. Big time
3 pro-life goody-two-shoes."
4      You were warning Mr. Daleiden that some of
5 your actual experience on this résumé would tip off
6 someone that you were a pro-life activist as opposed
7 to a pro-choice person; correct?
8      MR. KOLLER: Objection; assumes facts not
9 in evidence. It's compound, lacks foundation, vague
10 and ambiguous.
11      I'd advise my client not to answer on the
12 grounds it may incriminate her.
13 BY MS. MAYO:
14  Q. Are you going to assert the Fifth Amendment
15 in response to that question?
16  A. Yes.
17  Q. Now, the next conference that you attended
18 undercover as Brianna Allen was the 2014 NAF
19 conference in San Francisco; correct?
20      MR. KOLLER: Sorry. Just was taking a
21 drink of water.
22      I'd advise my client not to answer that on
23 the grounds it may incriminate her.
24 BY MS. MAYO:
25  Q. Are you going to assert the Fifth Amendment

Page 116

1 in response to that question?
2  A. Yes.
3      MS. MAYO: I'm going to mark as Exhibit 542
4 a document with the Bates number PP0007917.
5      (Deposition Exhibit 542 was marked for
6      identification)
7 BY MS. MAYO:
8  Q. Ms. Baxter, this is a photograph of you and
9 Sandra Susan Merritt sitting at a BioMax table at
10 the 2014 NAF conference in San Francisco; correct?
11      MR. KOLLER: Objection; assumes facts not
12 in evidence.
13      I'd advise my client not to answer on the
14 grounds it may incriminate her.
15 BY MS. MAYO:
16  Q. Are you going to assert the Fifth Amendment
17 in response to that question?
18  A. Yes.
19  Q. After the 2014 NAF conference in San
20 Francisco, did Mr. Daleiden ask you to attend any
21 other conferences for his undercover project?
22      MR. KOLLER: Objection; vague and
23 ambiguous, assumes facts not in evidence.
24      Advise my client not to answer on the
25 grounds it may incriminate her.

Page 117

1 BY MS. MAYO:
2  Q. Are you going to assert the Fifth Amendment
3 in response to that question?
4  A. Yes.
5  Q. Did you continue to work with Mr. Daleiden
6 in any capacity after the 2014 NAF conference?
7      MR. KOLLER: Objection; assumes facts not
8 in evidence.
9      I'd advise my client not to answer that on
10 the grounds it may incriminate her.
11 BY MS. MAYO:
12  Q. Are you going to assert the Fifth Amendment
13 in response to that question?
14  A. Yes.
15  Q. When did you stop your work for CMP or
16 Mr. Daleiden?
17      MR. KOLLER: Objection; assumes facts not
18 in evidence, lacks foundation.
19      I'd advise my client not to answer that on
20 the grounds it may incriminate her.
21 BY MS. MAYO:
22  Q. Are you going to assert your Fifth
23 Amendment right in response to that question?
24  A. Yes.
25  Q. Did you stop working with Mr. Daleiden

## Page 118

1  because you didn't like lying for him?
2      MR. KOLLER:  Objection; assumes facts not
3  in evidence.
4      I'd advise my client not to answer on the
5  grounds it may incriminate her.
6  BY MS. MAYO:
7      Q.  Are you going to assert the Fifth Amendment
8  in response to that question?
9      A.  Yes.
10     Q.  Are you proud of the work that you did for
11 Mr. Daleiden and CMP?
12     MR. KOLLER:  Objection; assumes facts not
13 in evidence.
14     Advise my client not to answer that on the
15 grounds it may incriminate her.
16 BY MS. MAYO:
17     Q.  Are you going to assert the Fifth Amendment
18 in response to that question?
19     A.  Yes.
20     Q.  In addition to Mr. Daleiden, who else did
21 you communicate with at CMP?
22     MR. KOLLER:  Objection; assumes facts not
23 in evidence, vague and ambiguous.
24     Advise my client not to answer on the
25 grounds it may incriminate her.

## Page 119

1      BY MS. MAYO:
2      Q.  Are you going to assert the Fifth Amendment
3  in response to that question?
4      A.  Yes.
5      Q.  Did you ever communicate with CMP board
6  member Troy Newman?
7      MR. KOLLER:  Objection; vague and
8  ambiguous.
9      Advise my client not to answer that on the
10 grounds it may incriminate her.
11 BY MS. MAYO:
12     Q.  Are you going to assert the Fifth Amendment
13 in response to this question?
14     A.  Yes.
15     Q.  Have you ever communicated with CMP board
16 member Albin Rhomberg?
17     MR. KOLLER:  Objection; assumes facts not
18 in evidence.
19     I'd advise my client not to answer that on
20 the grounds it may incriminate her.
21 BY MS. MAYO:
22     Q.  Are you going to assert the Fifth Amendment
23 in response to that question?
24     A.  Yes.
25     Q.  Do you know a Ryan Gonzales?

## Page 120

1      MR. KOLLER:  I'd advise my client not to
2  answer that on the grounds it may incriminate her.
3  BY MS. MAYO:
4      Q.  Are you going to assert the Fifth Amendment
5  in response to that question?
6      A.  Yes.
7      Q.  So one goal of CMP was to create undercover
8  videos of interactions with healthcare providers,
9  reproductive healthcare providers, in circumstances
10 where they trusted you; correct?
11     MR. KOLLER:  Objection; assumes facts not
12 in evidence, vague and ambiguous, lacks foundation.
13     Advise my client not to answer on the
14 grounds it may incriminate her.
15 BY MS. MAYO:
16     Q.  Are you going to assert the Fifth Amendment
17 in response to that question?
18     A.  Yes.
19     Q.  So CMP sent people, including yourself,
20 posing as BioMax employees to attend conferences put
21 on by reproductive organizations and abortion
22 providers; correct?
23     MR. KOLLER:  Objection; vague and
24 ambiguous.
25     I'd advise my client not to answer on the

## Page 121

1  grounds it may incriminate her.
2  BY MS. MAYO:
3      Q.  Are you going to assert the Fifth Amendment
4  in response to that question?
5      A.  Yes.
6      Q.  And everyone who went undercover for CMP
7  carried a concealed video camera or tape recorder;
8  correct?
9      MR. KOLLER:  Objection; assumes facts not
10 in evidence, lacks foundation, vague and ambiguous.
11     I'd advise my client not to answer on the
12 grounds it may incriminate her.
13 BY MS. MAYO:
14     Q.  Are you going to assert the Fifth Amendment
15 in response to that question?
16     A.  Yes.
17     Q.  And you wore a concealed video camera or
18 tape recorder at an ARHP conference and at a NAF
19 conference; correct?
20     MR. KOLLER:  Objection; assumes facts not
21 in evidence, compound, vague and ambiguous.
22     I'd advise my client not to answer on the
23 grounds it may incriminate her.
24 BY MS. MAYO:
25     Q.  Are you going to assert the Fifth Amendment

Page 122

1  in response to that question?
2       A. Yes.
3       Q. To make an undercover video, people cannot
4  know that you're taping them; correct?
5       MR. KOLLER: Objection; lack of foundation,
6  vague and ambiguous.
7       Advise my client not to answer that on the
8  grounds it may incriminate her.
9  BY MS. MAYO:
10      Q. Are you going to assert the Fifth Amendment
11 in response to that question?
12      A. Yes.
13      Q. So you never told the people that you spoke
14 to go at the ARHP conference that you were wearing a
15 video camera; correct?
16      MR. KOLLER: Objection; assumes facts not
17 in evidence, vague and ambiguous.
18      I'd advise my client not to answer that on
19 the grounds it may incriminate her.
20 BY MS. MAYO:
21      Q. Are you going to assert the Fifth Amendment
22 in response to that question?
23      A. Yes.
24      Q. You didn't tell the people that you
25 interacted with at the ARHP conference that you were

Page 123

1  wearing a video camera because you wanted them to
2  trust you; correct?
3       MR. KOLLER: Objection; assumes facts not
4  in evidence, vague and ambiguous.
5       Advise my client not to answer on the
6  grounds it may incriminate her.
7  BY MS. MAYO:
8       Q. Are you going to assert the Fifth Amendment
9  in response to that question?
10      A. Yes.
11      Q. And you didn't tell the people that you
12 interacted with at the ARHP conference that you were
13 wearing an hidden video camera because you wanted
14 them to speak openly with you; correct?
15      MR. KOLLER: Objection; assumes facts not
16 in evidence, vague and ambiguous.
17      I'd advise my client not to answer on the
18 grounds it may incriminate her.
19 BY MS. MAYO:
20      Q. Are you going to assert are the Fifth
21 Amendment in response to that question?
22      A. Yes.
23      Q. And you needed the people that you were
24 speaking with to trust you; correct?
25      MR. KOLLER: Objection; assumes facts not

Page 124

1  in evidence, vague and ambiguous.
2       Advise my client not to answer that on the
3  grounds it may incriminate her.
4  BY MS. MAYO:
5       Q. Are you going to assert the Fifth Amendment
6  in response to that question?
7       A. Yes.
8       Q. And you needed the people that you were
9  speaking with at the conferences to think that you
10 were in the same industry and had the same goals;
11 correct?
12      MR. KOLLER: Objection; assumes facts not
13 in evidence, lacks foundation, vague and ambiguous.
14      Advise my client not to answer on the
15 grounds it may incriminate her.
16 BY MS. MAYO:
17      Q. Are you going to assert the Fifth Amendment
18 in response to that question?
19      A. Yes.
20      Q. And to get people that you were speaking
21 with to trust you, that was one reason for creating
22 BioMax; correct?
23      MR. KOLLER: Objection; assumes facts not
24 in evidence.
25      I'd advise my client not to answer on the

Page 125

1  grounds it may incriminate her.
2  BY MS. MAYO:
3       Q. Are you going to assert the Fifth Amendment
4  in response to that question?
5       A. Yes.
6       Q. And to get people that you were speaking
7  with to trust you, you used a fake name because if
8  they looked you up as Brianna Baxter they would find
9  out that you were associated with pro-life causes;
10 correct?
11      MR. KOLLER: Objection; assumes facts not
12 in evidence, vague and ambiguous, lacks foundation.
13      Advise my client not to answer that on the
14 grounds it may incriminate her.
15 BY MS. MAYO:
16      Q. Are you going to assert the Fifth Amendment
17 in response to that question?
18      A. Yes.
19      Q. And going undercover at an ARHP or NAF
20 conference helped build trust between you and the
21 reproductive healthcare providers with whom you
22 interacted there; correct?
23      MR. KOLLER: Objection; assumes facts not
24 in evidence, lacks foundation.
25      I'd advise my client not to answer on the

1  grounds it may incriminate her.
2  BY MS. MAYO:
3    Q. Are you going to assert the Fifth Amendment
4  in response to that question?
5    A. Yes.
6    Q. Do you consider using a false name to be a
7  lie?
8       MR. KOLLER: Objection.
9       Advise my client not to answer that on the
10 grounds it may incriminate her.
11 BY MS. MAYO:
12   Q. Are you going to assert the Fifth Amendment
13 in response to that question?
14   A. Yes.
15   Q. Do you consider using a false --
16   A. Excuse me.
17      MR. KOLLER: Bless you.
18 BY MS. MAYO:
19   Q. Bless you.
20   A. Sorry.
21   Q. That's okay.
22      Ms. Baxter, do you consider using a false
23 ID to be a lie?
24      MR. KOLLER: Objection; relevance.
25      Advise her not answer that.

1       Asked and answered.
2       So I'd advise you not to answer on the
3  grounds it may incriminate you.
4  BY MS. MAYO:
5    Q. Are you going to assert the Fifth Amendment
6  in response to that question?
7    A. Yes.
8    Q. Who is Janet Smith?
9       MR. KOLLER: Objection; vague and
10 ambiguous.
11      Advise my client not to answer that on
12 grounds it may incriminate her.
13 BY MS. MAYO:
14   Q. Have you ever communicated with Janet Smith
15 directly?
16      MR. KOLLER: Objection; lack of foundation.
17      I'd advise my client not to answer that on
18 the grounds it may incriminate her.
19 BY MS. MAYO:
20   Q. Are you going to assert the Fifth Amendment
21 in response to that question?
22   A. Yes.
23   Q. CMP asked Janet Smith to write an opinion
24 on the morality of undercover investigations like
25 the one that CMP was undertaking; correct?

1       MR. KOLLER: Objection; assumes facts not
2  in evidence, lacks foundation.
3       I'd advise my client not to answer on the
4  grounds it may incriminate her.
5  BY MS. MAYO:
6    Q. Are you going to assert the Fifth Amendment
7  in response to that question?
8    A. Yes.
9    Q. Did you read the opinion that Janet Smith
10 wrote for CMP on the morality of undercover
11 investigations?
12      MR. KOLLER: Objection; vague and
13 ambiguous.
14      I'd advise my client not to answer that on
15 the grounds it might incriminate her.
16 BY MS. MAYO:
17   Q. Are you going to assert the Fifth Amendment
18 in response to that question?
19   A. Yes.
20   Q. Did Mr. Daleiden provide you with that
21 opinion in order to help justify the work that you
22 were doing undercover?
23      MR. KOLLER: Objection; assumes facts not
24 in evidence, vague and ambiguous.
25      And I'd advise my client not to answer on

1  the grounds it may incriminate her.
2  BY MS. MAYO:
3    Q. Are you going to assert the Fifth Amendment
4  in response to that question?
5    A. Yes.
6       Excuse me.
7       MR. KOLLER: Do you need more tissue or are
8  you okay?
9       THE WITNESS: Oh, I came prepared.
10 Allergies have been bad. Thank you, though.
11      MR. KOLLER: Mm-hmm.
12 BY MS. MAYO:
13   Q. Do you think it was moral to assume fake
14 names, set up a fake company, use hidden cameras to
15 tape people without their consent?
16      MR. KOLLER: Objection; assumes facts not
17 in evidence, relevance.
18      And I'd advise my client not to answer on
19 the grounds it may incriminate her.
20 BY MS. MAYO:
21   Q. Are you going to assert the Fifth Amendment
22 in response to that question?
23   A. Yes.
24   Q. And you had no problem lying to carry out
25 this project with Mr. Daleiden; correct?

1      MR. KOLLER: Objection; assumes facts not
2  in evidence, vague and ambiguous.
3     I'd advise my client not to answer on the
4  grounds it may incriminate her.
5  BY MS. MAYO:
6     Q. Are you going to assert the Fifth Amendment
7  in response to that question?
8     A. Yes.
9     Q. Did you think it was moral to release clips
10  from videotapes that edited out any statements
11  denying what CMP accused Planned Parenthood of
12  doing?
13     MR. KOLLER: Objection; assumes facts not
14  in evidence, vague and ambiguous.
15     I'd advise my client not to answer on the
16  grounds it may incriminate her.
17  BY MS. MAYO:
18     Q. Are you going to assert are you going to
19  assert the Fifth Amendment in response to that
20  question?
21     A. Yes.
22     Q. In fact, you had no problem with CMP
23  releasing edited videotapes to falsely portray
24  Planned Parenthood as selling baby body parts
25  because it would harm Planned Parenthood; correct?

1      MR. KOLLER: Objection; assumes facts not
2  in evidence, vague and ambiguous.
3     I'd advise my client not to answer on the
4  grounds it may incriminate her.
5  BY MS. MAYO:
6     Q. Are you going to assert the Fifth Amendment
7  in response to that question?
8     A. Yes.
9     Q. You've heard of the Human Capital Project?
10     MR. KOLLER: Objection; relevance.
11     But you can answer.
12     THE WITNESS: No, I don't think so.
13  BY MS. MAYO:
14     Q. Okay. Did you know that Mr. Daleiden's
15  undercover video project was released under the
16  heading Human Capital Project?
17     MR. KOLLER: Objection; lacks foundation,
18  assumes facts not in evidence.
19     I'd advise my client not to answer that on
20  the grounds it may incriminate her.
21  BY MS. MAYO:
22     Q. Are you going to assert your Fifth
23  Amendment right in response to that question?
24     A. Yes.
25     Q. The purpose of the Human Capital Project

1  was to release false videotapes that would harm
2  Planned Parenthood; correct?
3     MR. KOLLER: Objection; assumes facts not
4  in evidence, lack of foundation, vague and
5  ambiguous.
6     And I'd advise my client not to answer that
7  on the grounds it may incriminate her.
8  BY MS. MAYO:
9     Q. Are you going to assert the Fifth Amendment
10  in response to that question?
11     A. Yes.
12     Q. When Mr. Daleiden recruited you to
13  participate in his undercover video project, he told
14  you that he was going to release tapes that would --
15  that were intended to portray Planned Parenthood in
16  a very negative light; correct?
17     MR. KOLLER: Objection; assumes facts not
18  in evidence, lack of foundation.
19     I'd advise my client not to answer that on
20  the grounds it may incriminate her.
21  BY MS. MAYO:
22     Q. Are you going to assert the Fifth Amendment
23  in response to that question?
24     A. Yes.
25     Q. And, in fact, Mr. Daleiden told you that

1  the purpose of obtaining this undercover video was
2  so that he could release videotapes or video clips
3  that would demonize Planned Parenthood; correct?
4     MR. KOLLER: Objection; assumes facts not
5  in evidence, vague and ambiguous.
6     I'd advise my client not to answer that on
7  the grounds it may incriminate her.
8  BY MS. MAYO:
9     Q. Are you going to assert the Fifth Amendment
10  in response to that question?
11     A. Yes.
12     Q. Did Mr. Daleiden let you know in advance
13  the date of the first video clip release?
14     MR. KOLLER: Objection; assumes facts not
15  in evidence, vague and ambiguous.
16     I'd advise my client not to answer that on
17  the grounds it may incriminate her.
18  BY MS. MAYO:
19     Q. Are you going to assert the Fifth Amendment
20  in response to that question?
21     A. Yes.
22     Q. And, in fact, in July of 2015 CMP
23  released -- began releasing a series of videotapes
24  that falsely accused Planned Parenthood of selling
25  baby body parts; correct?

1 MR. KOLLER: Objection; assumes facts not
2 in evidence.
3 I'd advise my client not to answer that on
4 the grounds it may incriminate her.
5 BY MS. MAYO:
6 Q. Are you going to assert the Fifth Amendment
7 in response to that question?
8 A. Yes.
9 Q. Did Mr. Daleiden consult with you in
10 editing those videos?
11 MR. KOLLER: Objection; vague and
12 ambiguous.
13 I'd advise my client not to answer that on
14 the grounds it may incriminate her.
15 BY MS. MAYO:
16 Q. Are you going to assert the Fifth Amendment
17 in response to that question?
18 A. Yes.
19 Q. Did Mr. Daleiden send you any previews of
20 the videotapes he released under the cover of CMP in
21 July of 2015?
22 MR. KOLLER: Objection; vague and
23 ambiguous.
24 Advise my client not to answer that on the
25 grounds it may incriminate her.

1 BY MS. MAYO:
2 Q. Are you going to assert the Fifth Amendment
3 in response to that question?
4 A. Yes.
5 Q. Have you ever viewed the videos released by
6 CMP beginning in July of 2015?
7 MR. KOLLER: Objection; assumes facts not
8 in evidence.
9 I'd advise my client not to answer that on
10 the grounds it may incriminate her.
11 BY MS. MAYO:
12 Q. Are you going to assert the Fifth Amendment
13 in response to that question?
14 A. Yes.
15 Q. Have you watched any of the videos that
16 included footage that you taped at the ARHP
17 conference?
18 MR. KOLLER: Objection; assumes facts not
19 in evidence, lacks foundation.
20 I'd advise my client not to answer that on
21 the grounds it may incriminate her.
22 BY MS. MAYO:
23 Q. Are you going to assert the Fifth Amendment
24 in response to that question?
25 A. Yes.

1 Q. Have you watched any of the videos released
2 by CMP that included footage you taped at the NAF
3 conference in 2014?
4 MR. KOLLER: Objection; assumes facts not
5 in evidence.
6 I will advise my client not to answer that
7 on the grounds it may incriminate her.
8 BY MS. MAYO:
9 Q. Are you going to assert the Fifth Amendment
10 in response to that question?
11 A. Yes.
12 Q. CMP recorded several hundred hours of
13 videotape over the course of its undercover
14 operations; correct?
15 MR. KOLLER: Objection; lacks foundation,
16 vague and ambiguous.
17 I'd advise my client not to answer that on
18 the grounds it may incriminate her.
19 BY MS. MAYO:
20 Q. Are you going to assert the Fifth Amendment
21 in response to that question?
22 A. Yes.
23 Q. And, in fact, Mr. Daleiden never expected
24 anyone to watch all of the undercover video that he
25 recorded -- or that was recorded at his direction;

1 correct?
2 MR. KOLLER: Objection; assumes facts not
3 in evidence, lacks foundation, vague and ambiguous.
4 I'd advise my client not to answer on the
5 grounds it may incriminate her.
6 BY MS. MAYO:
7 Q. Are you going to assert the Fifth Amendment
8 in response to that question?
9 A. Yes.
10 Q. And, in fact, CMP never published all of
11 the video that it recorded undercover with actors
12 posing as representatives of BioMax; correct?
13 MR. KOLLER: Objection; assumes facts not
14 in evidence, lacks foundation.
15 I'd advise my client not to answer that on
16 the grounds it may incriminate her.
17 BY MS. MAYO:
18 Q. Are you going to assert the Fifth Amendment
19 in response to this question?
20 A. Yes.
21 Q. The short videos that were released by CMP
22 beginning in July of 2015 did not include the
23 portions of the videos where Planned Parenthood
24 employees said that they could not profit from fetal
25 tissue donation; correct?

## Page 138

1      MR. KOLLER: Objection; assumes facts not
2  in evidence.
3      I'd advise my client not to answer on the
4  grounds it may incriminate her.
5  BY MS. MAYO:
6      Q. Are you going to assert the Fifth Amendment
7  in response to that question?
8      A. Yes.
9      Q. And, in fact, the short videos released by
10  CMP beginning in July of 2015 did not include
11  portions of the videos where Planned Parenthood
12  employees specifically said that they did not profit
13  from fetal tissue donation; correct?
14      MR. KOLLER: I'm going to object assumes
15  facts not in evidence, lack of foundation, vague and
16  ambiguous.
17      Advise my client not to answer on the
18  grounds it may incriminate her.
19  BY MS. MAYO:
20      Q. Are you going to assert the Fifth Amendment
21  in response to that question?
22      A. Yes.
23      Q. The short videos released by CMP beginning
24  in July of 2015 did not include the portions of the
25  tapes where Planned Parenthood employees said that

## Page 139

1  they followed fetal tissue donation laws; correct?
2      MR. KOLLER: Objection; assumes facts not
3  in evidence, lack of foundation.
4      I'd advise my client not to answer on the
5  grounds it may incriminate her.
6  BY MS. MAYO:
7      Q. Are you going to assert the Fifth Amendment
8  in response to that question?
9      A. Yes.
10      Q. Instead, in the short videos that CMP
11  released, they only included portions that made
12  Planned Parenthood look the worst it could possibly
13  look and fit CMP's narrative; correct?
14      MR. KOLLER: Objection; assumes facts not
15  in evidence, vague and ambiguous.
16      Advise my client not to answer on the
17  grounds it may incriminate her.
18  BY MS. MAYO:
19      Q. Are you going to assert the Fifth Amendment
20  in response to that question?
21      A. Yes.
22      Q. CMP's theme for the posted videos was that
23  Planned Parenthood was profiting from the sale of
24  fetal tissue; correct?
25      MR. KOLLER: Objection; assumes facts not

## Page 140

1  in evidence, vague and ambiguous.
2      I'd advise my client not to answer on the
3  grounds it may incriminate her.
4  BY MS. MAYO:
5      Q. Are you going to assert the Fifth Amendment
6  in response to that question?
7      A. Yes.
8      Q. The terms that CMP used in the videos it
9  posted online for the theme of profit included
10  inflammatory phrases like "body parts," "baby body
11  parts"; correct?
12      MR. KOLLER: Objection; assumes facts not
13  in evidence, lack of foundation.
14      Advise my client not to answer that on the
15  grounds it may incriminate her.
16  BY MS. MAYO:
17      Q. Are you going to assert the Fifth Amendment
18  in response to that question?
19      A. Yes.
20      Q. The videos that were released by CMP
21  beginning in July of 2015 caused public outrage
22  against Planned Parenthood; correct?
23      MR. KOLLER: Objection; assumes facts not
24  in evidence, lacks foundation.
25      I'd advise my client not to answer on the

## Page 141

1  grounds it may incriminate her.
2  BY MS. MAYO:
3      Q. Are you going to assert the Fifth Amendment
4  in response to that question?
5      A. Yes.
6      Q. And outrage was the intention of releasing
7  those videos to the public; correct?
8      MR. KOLLER: Objection; vague and
9  ambiguous.
10      Advise my client not to answer on the
11  grounds it may incriminate her.
12  BY MS. MAYO:
13      Q. Are you going to assert the Fifth Amendment
14  in response to that question?
15      A. Yes.
16      Q. The careful language used by CMP provoked
17  protests against Planned Parenthood; correct?
18      MR. KOLLER: Objection; assumes facts not
19  in evidence, vague and ambiguous, lacks foundation.
20      Advise my client not to answer on the
21  grounds it may incriminate her.
22  BY MS. MAYO:
23      Q. Are you going to assert the Fifth Amendment
24  in response to that question?
25      A. Yes.

Page 142

1    Q. And the purpose of releasing these edited
2  videos to the public was to provoke protests against
3  Planned Parenthood; correct?
4      MR. KOLLER: Objection; assumes facts not
5  in evidence, vague and ambiguous.
6      Advise my client not to answer on the
7  grounds it may incriminate her.
8  BY MS. MAYO:
9    Q. Are you going to assert the Fifth Amendment
10  in response to that question?
11    A. Yes.
12    Q. And you knew that some of those outraged by
13  the videos released to the public would take out
14  their rage on Planned Parenthood healthcare centers;
15  correct?
16      MR. KOLLER: Objection; assumes facts not
17  in evidence, vague and ambiguous.
18      Advise my client not to answer that on the
19  grounds it may incriminate her.
20  BY MS. MAYO:
21    Q. Are you going to assert the Fifth Amendment
22  in response to that question?
23    A. Yes.
24    Q. And you knew that some of those outraged by
25  CMP's videos would engage in violence; correct?

Page 143

1      MR. KOLLER: Objection; assumes facts not
2  in evidence, vague and ambiguous.
3      Advise my client not to answer on the
4  grounds it may incriminate her.
5  BY MS. MAYO:
6    Q. Are you going to assert the Fifth Amendment
7  in response to that question?
8    A. Yes.
9      MS. MAYO: It's 12:22. When did you want
10  to take a lunch break?
11      MR. KOLLER: What do you figure, another
12  hour?
13      MS. MAYO: I will probably have maybe
14  another hour, but then NAF's counsel has questions.
15      MR. KOLLER: How much do you have, do you
16  think?
17      MR. MCMANUS: Probably a little bit over an
18  hour.
19      MR. KOLLER: Yeah, we should probably take
20  a break.
21      MS. MAYO: Okay. This will be a good time.
22  Let's go off the record.
23      MR. KOLLER: Okay.
24      THE VIDEOGRAPHER: This marks the end of
25  media file labeled Number 3. Off the record at

Page 144

1    12:23 p.m.
2      (Lunch recess taken)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 145

1      AFTERNOON SESSION
2    SATURDAY, MAY 11, 2018; 1:06 P.M.
3
4
5      THE VIDEOGRAPHER: This marks the beginning
6  of media file labeled Number 4. Back on the record
7  at 1:06 p.m.
8  BY MS. MAYO:
9    Q. Ms. Baxter, along with releasing the videos
10  in July of 2015 CMP also posted press releases
11  online; correct?
12      MR. KOLLER: Objection; assumes facts not
13  in evidence.
14      Advise my client not to answer on the
15  grounds it may incriminate her.
16  BY MS. MAYO:
17    Q. Are you going to assert the Fifth Amendment
18  in response to that question?
19    A. Yes.
20    Q. And the press releases were intended to
21  enflame the outrage of the public in what was
22  included in the videotapes; correct?
23      MR. KOLLER: Again, objection; assumes
24  facts not in evidence, vague and ambiguous.
25      Ask my client -- I'd advise my client not

1  to answer the question on the grounds it may
2  incriminate her.
3  BY MS. MAYO:
4      Q.  Are you going to assert the Fifth Amendment
5  in response to that question?
6      A.  Yes.
7      Q.  Prior to publishing the videos online, CMP
8  also showed them to selected law enforcement
9  agencies in order to trigger investigations of
10  Planned Parenthood; correct?
11      MR. KOLLER:  Objection; assumes facts not
12  in evidence, lack of foundation.
13      I'd advise my client not to answer on the
14  grounds it may incriminate her.
15  BY MS. MAYO:
16      Q.  Are you going to assert the Fifth Amendment
17  in response to that question?
18      A.  Yes.
19      Q.  Prior to publishing the videos, CMP showed
20  them to select legislators in order to trigger
21  attempts to defund Planned Parenthood; correct?
22      MR. KOLLER:  Objection; assumes facts not
23  in evidence, vague and ambiguous.
24      I'd advise my client not to answer on the
25  grounds it may incriminate her.

1  BY MS. MAYO:
2      Q.  Are you going to assert the Fifth Amendment
3  in response to that question?
4      A.  Yes.
5      Q.  You knew that when the videos were released
6  to the public that they would create outrage because
7  of the way they had been edited to reflect falsely
8  that Planned Parenthood was selling baby body parts;
9  correct?
10      MR. KOLLER:  Objection; assumes facts not
11  in evidence, vague and ambiguous.
12      Advise my client not to answer that on the
13  grounds it may incriminate her.
14  BY MS. MAYO:
15      Q.  Are you going to assert the Fifth Amendment
16  in response to that question?
17      A.  Yes.
18      Q.  And you expected that people would go and
19  protest against Planned Parenthood after watching
20  the videos that were released by CMP; correct?
21      MR. KOLLER:  Objection; assumes facts not
22  in evidence, vague and ambiguous.
23      I'd advise my client not to answer on the
24  grounds it may incriminate her.
25  //

1  BY MS. MAYO:
2      Q.  Are you going to assert the Fifth Amendment
3  in response to that question?
4      A.  Yes.
5      Q.  And you expected that some people would
6  threaten Planned Parenthood or Planned Parenthood
7  doctors after watching the videos; correct?
8      MR. KOLLER:  Objection; assumes facts not
9  in evidence, vague and ambiguous.
10      Advise my client not to answer on the
11  grounds it may incriminate her.
12  BY MS. MAYO:
13      Q.  Are you going to assert the Fifth Amendment
14  in response to that question?
15      A.  Yes.
16      Q.  You wanted people to watch the videos that
17  CMP posted about Planned Parenthood; correct?
18      MR. KOLLER:  Objection; assumes facts not
19  in evidence.
20      Advise my client not to answer on the
21  grounds it may incriminate her.
22  BY MS. MAYO:
23      Q.  Are you going to assert the Fifth Amendment
24  in response to that question?
25      A.  Yes.

1      Q.  And you wanted people to go protest against
2  Planned Parenthood after watching the videos that
3  CMP released in July of 2015; correct?
4      MR. KOLLER:  Objection; assumes facts not
5  in evidence, vague and ambiguous.
6      Advise my client not to answer on the
7  grounds it may incriminate her.
8  BY MS. MAYO:
9      Q.  Are you going to assert the Fifth Amendment
10  in response to that question?
11      A.  Yes.
12      Q.  And you wanted people to show up to Planned
13  Parenthood health centers and express their outrage
14  at Planned Parenthood because of what the CMP videos
15  showed; correct?
16      MR. KOLLER:  Objection; assumes facts not
17  in evidence, vague and ambiguous.
18      Advise my client not to answer on the
19  grounds it may incriminate her.
20  BY MS. MAYO:
21      Q.  Are you going to assert the Fifth Amendment
22  in response to that question?
23      A.  Yes.
24      Q.  What steps did you take to publicize CMP's
25  videos?

1      MR. KOLLER:  Objection; vague and
2  ambiguous, assumes facts not in evidence.
3      Advise my clients -- my client not to
4  answer that on the grounds it may incriminate her.
5  BY MS. MAYO:
6      Q.  Are you going to assert the Fifth Amendment
7  in response to that question?
8      A.  Yes.
9      Q.  What did you do to increase views of the
10  videos?
11      MR. KOLLER:  Objection; assumes facts not
12  in evidence, vague and ambiguous.
13      Advise my client not to answer on the
14  grounds it may incriminate her.
15  BY MS. MAYO:
16      Q.  Are you going to assert the Fifth Amendment
17  in response to that question?
18      A.  Yes.
19      Q.  What was your reaction to the videos that
20  CMP released in July of 2015?
21      MR. KOLLER:  Objection; relevance, vague
22  and ambiguous.
23      I'd advise my client not to answer on the
24  grounds it may incriminate her.
25  //

1  BY MS. MAYO:
2      Q.  Are you going to assert the Fifth Amendment
3  in response to that question?
4      A.  Yes.
5      Q.  Part of your reaction to the release of the
6  videos was to lock down your own Facebook page;
7  correct?
8      MR. KOLLER:  Objection; assumes facts not
9  in evidence, vague and ambiguous.
10      Advise my client not to answer the
11  question.
12  BY MS. MAYO:
13      Q.  Are you going to assert the Fifth Amendment
14  in response to that question?
15      A.  Yes.
16      Q.  Another reaction that you had to the
17  release of the videos by CMP in July of 2015 was to
18  wipe out your profile on the Internet to the best
19  you could; correct?
20      MR. KOLLER:  Objection; assumes facts not
21  in evidence, vague and ambiguous.
22      Advise my client not to answer on the
23  grounds it may incriminate her.
24  BY MS. MAYO:
25      Q.  Are you going to assert the Fifth Amendment

1  in response to that question?
2      A.  Yes.
3      Q.  In fact, you were concerned about being
4  associated with the CMP videos; correct?
5      MR. KOLLER:  Objection; assumes facts not
6  in evidence, vague and ambiguous.
7      Advise my client not to answer that on the
8  grounds it may incriminate her.
9  BY MS. MAYO:
10      Q.  Are you going to assert the Fifth Amendment
11  in response to that question?
12      A.  Yes.
13      MS. MAYO:  I'm going to mark as Exhibit 543
14  a document that is Bates-numbered CM19457.
15      (Deposition Exhibit 543 was marked for
16      identification.)
17      MR. KOLLER:  Thank you.
18      THE WITNESS:  (Reviewing document.)
19  BY MS. MAYO:
20      Q.  Ms. Baxter, have you seen Exhibit 543
21  before today?
22      MR. KOLLER:  I'd advise my client not to
23  answer that on the grounds it may incriminate her.
24  BY MS. MAYO:
25      Q.  Are you going to assert the Fifth Amendment

1  in response to that question?
2      A.  Yes.
3      Q.  Exhibit 543 begins at the bottom with an
4  e-mail from Father Claude Williams to David Daleiden
5  with a subject "Brianna Allen Credit Card
6  Controversy."
7      First of all, who is Father Claude
8  Williams?
9      MR. KOLLER:  I'd advise my client not to
10  answer that on the grounds it may incriminate her.
11  BY MS. MAYO:
12      Q.  Are you going to assert your Fifth
13  Amendment right in response to that question?
14      A.  Yes.
15      Q.  Father Claude Williams was an advisor to
16  CMP in connection with the undercover video project;
17  correct?
18      MR. KOLLER:  Objection; assumes facts not
19  in evidence, vague and ambiguous.
20      I'd advise my client not to answer on the
21  grounds it may incriminate her.
22  BY MS. MAYO:
23      Q.  Are you going to assert the Fifth Amendment
24  in response to that question?
25      A.  Yes.

1  Q. The next e-mail in the chain from David
2  Daleiden to you says:
3  "May want to start hiding your FB."
4  Mr. Daleiden was suggesting that you start
5  hiding your Facebook page; correct?
6  MR. KOLLER: I'd object as to lack of
7  foundation, vague and ambiguous.
8  I'd advise my client not to answer on the
9  grounds it may incriminate her.
10  BY MS. MAYO:
11  Q. Are you going to assert the Fifth Amendment
12  in response to that question?
13  A. Yes.
14  Q. Your response to Mr. Daleiden was:
15  "Dangit! Thanks for the heads-up."
16  Is that correct?
17  MR. KOLLER: Objection; vague and
18  ambiguous.
19  I'd ask my client not to answer on the
20  grounds it may incriminate her.
21  BY MS. MAYO:
22  Q. Are you going to assert the Fifth Amendment
23  in response to that question?
24  A. Yes.
25  Q. You were grateful to Mr. Daleiden for

1  giving you a warning that people might be on to the
2  fact that you were involved in his undercover video
3  project; correct?
4  MR. KOLLER: I'd object vague and
5  ambiguous.
6  I'd advise my client not to answer on the
7  grounds it may incriminate her.
8  BY MS. MAYO:
9  Q. Are you going to assert the Fifth Amendment
10  in response to that question?
11  A. Yes.
12  Q. Mr. Daleiden says:
13  "I think there was a photographer at NAF so
14  they must have got the photo from those
15  archives."
16  Mr. Daleiden was referring to the photo of
17  you that is depicted in Exhibit 542; correct?
18  MR. KOLLER: I'd object assumes facts not
19  in evidence.
20  Advise my client not to answer on the
21  grounds it may incriminate her.
22  BY MS. MAYO:
23  Q. Are you going to assert the Fifth Amendment
24  in response to that question?
25  A. Yes.

1  Q. And in response to Mr. Daleiden, you wrote:
2  "My Facebook is all set, but there is a
3  news article from a few years ago with a
4  picture that I can't do anything about."
5  So in response to Mr. Daleiden's warning,
6  you went ahead and started hiding your Facebook
7  account or locking down your Facebook account as
8  Mr. Daleiden suggested; correct?
9  MR. KOLLER: I'd object assumes facts not
10  in evidence.
11  I'd advise my client not to answer on the
12  grounds it may incriminate her.
13  BY MS. MAYO:
14  Q. Are you going to assert the Fifth Amendment
15  in response to that question?
16  A. Yes.
17  Q. You were hiding your Facebook profile when
18  the CMP videos were released because you weren't
19  very proud of the fact that you were lying to people
20  in order to get them to talk to you at conferences
21  of reproductive healthcare providers; correct?
22  MR. KOLLER: Objection; assumes facts not
23  in evidence.
24  Advise my client not to answer on the
25  grounds it may incriminate her.

1  BY MS. MAYO:
2  Q. Are you going to assert your Fifth
3  Amendment right in response to that question?
4  A. Yes.
5  Q. And you were hiding your Facebook profile
6  because you were afraid of backlash from the fact
7  that you were lying in order to infiltrate
8  conferences; correct?
9  MR. KOLLER: Objection; assumes facts not
10  in evidence.
11  I'd advise my client not to answer on the
12  grounds it may incriminate her.
13  BY MS. MAYO:
14  Q. Are you going to assert the Fifth Amendment
15  in response to that question?
16  A. Yes.
17  Q. Did you personally contact any pro-life
18  organizations to encourage them to watch the videos?
19  MR. KOLLER: Objection; vague and
20  ambiguous.
21  I'd advise my client not to answer on the
22  grounds it may incriminate her.
23  BY MS. MAYO:
24  Q. Are you going to assert the Fifth Amendment
25  in response to that question?

1     A. Yes.

2     Q. CMP reached out to a number of pro-life or

3     anti-abortion organizations to encourage them to

4     spread the word about the videos; correct?

5     MR. KOLLER: Objection; assumes facts not

6     in evidence, vague and ambiguous.

7     Advise my client not to answer on the

8     grounds it may incriminate her.

9     BY MS. MAYO:

10    Q. Are you going to assert the Fifth Amendment

11    in response to that question?

12    A. Yes.

13    Q. Did you have any involvement with the group

14    Protest PP?

15    MR. KOLLER: I'm going to advise my client

16    not to answer that on the grounds it may incriminate

17    her.

18    BY MS. MAYO:

19    Q. Are you going to assert the Fifth Amendment

20    in response to that question?

21    A. Yes.

22    Q. There was a huge amount of public outrage

23    after the videos were released by CMP beginning in

24    July of 2015; correct?

25    MR. KOLLER: Objection; assumes facts not

1     in evidence.

2     Advise my client not to answer that on

3     Fifth Amendment grounds.

4     BY MS. MAYO:

5     Q. Are you going to assert the Fifth Amendment

6     in response to that question?

7     A. Yes.

8     Q. In fact, you knew that there were threats

9     made against Planned Parenthood healthcare centers

10    after the videos were posted; correct?

11    MR. KOLLER: Objection; assumes facts not

12    in evidence.

13    I'd advise my client not to answer on the

14    grounds it may incriminate her.

15    BY MS. MAYO:

16    Q. Are you going to assert the Fifth Amendment

17    in response to that question?

18    A. Yes.

19    Q. And you knew that there were threats made

20    against specific Planned Parenthood doctors who

21    appeared in the altered videos by CMP; correct?

22    MR. KOLLER: Objection; assumes facts not

23    in evidence.

24    Advise my client not to answer on the

25    grounds it may incriminate her.

1     BY MS. MAYO:

2     Q. Are you going to assert the Fifth Amendment

3     in response to that question?

4     A. Yes.

5     Q. Did you participate in any protests related

6     to the videos released by CMP?

7     MR. KOLLER: Objection; lacks foundation,

8     vague and ambiguous.

9     Advise my client not to answer on the

10    grounds it may incriminate her.

11    BY MS. MAYO:

12    Q. Are you going to assert the Fifth Amendment

13    in response to that question?

14    A. Yes.

15    Q. In fact, CMP was involved in planning

16    protests outside of Planned Parenthood clinics

17    following the release of the videos; correct?

18    MR. KOLLER: Objection; assumes facts not

19    in evidence.

20    I'd advise my client not to answer on the

21    grounds it may incriminate her.

22    BY MS. MAYO:

23    Q. Are you going to assert the Fifth Amendment

24    in response to that question?

25    A. Yes.

1     Q. Following the release of the videotapes,

2     you heard that there had been a shooting at a

3     Planned Parenthood healthcare center in Colorado

4     Springs; correct?

5     MR. KOLLER: I'd advise my client not to

6     answer that on the grounds it may incriminate her.

7     BY MS. MAYO:

8     Q. Are you going to assert the Fifth Amendment

9     in response to that question?

10    A. Yes.

11    Q. In fact, at that shooting at the Planned

12    Parenthood healthcare center in Colorado Springs, a

13    number of people were killed and injured; correct?

14    MR. KOLLER: I'd object that assumes facts

15    not in evidence.

16    I'd advise my client not to testify -- not

17    to answer that on the Fifth Amendment grounds.

18    BY MS. MAYO:

19    Q. Are you going to assert the Fifth Amendment

20    in response to that question?

21    A. Yes.

22    Q. And police officers were killed in

23    connection with that shooting at the healthcare

24    center, the Planned Parenthood healthcare center, in

25    Colorado Springs; correct?

## Page 162

1      MR. KOLLER:  Objection; assumes facts not
2  in evidence.
3      I'd advise my client not to answer on the
4  grounds it may incriminate her.
5  BY MS. MAYO:
6      Q.  Are you going to assert the Fifth Amendment
7  in response to that question?
8      A.  Yes.
9      Q.  And the shooter at the Planned Parenthood
10  center in Colorado Springs was heard talking about
11  baby body parts in connection with that shooting;
12  correct?
13      MR. KOLLER:  Objection; assumes facts not
14  in evidence.
15      I'd advise my client not to answer that on
16  the grounds it may incriminate her.
17  BY MS. MAYO:
18      Q.  Are you going to assert the Fifth Amendment
19  in response to that question?
20      A.  Yes.
21      Q.  In fact, the videos released by CMP
22  instigated Robert Dear to engage in that shooting
23  incident at the Planned Parenthood healthcare center
24  in Colorado Springs; correct?
25      MR. KOLLER:  Object; assumes facts not in

## Page 163

1  evidence, lacks foundation.
2      I'd advise my client not to answer that on
3  the grounds it might incriminate her.
4      MR. KOZINA:  I'm also going to object --
5  sorry.
6      I'm also going to object on the basis
7  that's a bad faith question since Planned Parenthood
8  specifically, in a court document, has asserted
9  there was no way of knowing Mr. Dear was going to do
10  this and there is no connection to the videos.
11      MS. MAYO:  Well, that statement is
12  incorrect, but you've made your statement for the
13  record.
14  BY MS. MAYO:
15      Q.  Ms. Baxter, are you going to assert your
16  Fifth Amendment in response to that question?
17      A.  Yes.
18      Q.  CMP never spoke out about the violence
19  against Planned Parenthood that was caused by its
20  release of videotapes; correct?
21      MR. KOLLER:  I'd object it assumes facts
22  not in evidence, lacks foundation, vague and
23  ambiguous.
24      I'd advise my client not to answer on the
25  grounds it may incriminate her.

## Page 164

1  BY MS. MAYO:
2      Q.  Are you going to assert the Fifth Amendment
3  in response to that question?
4      A.  Yes.
5      Q.  And you never spoke out about the violence
6  against Planned Parenthood following the release of
7  CMP's videos; correct?
8      MR. KOLLER:  Object; assumes facts not in
9  evidence.
10      I'd advise my client not to answer on the
11  grounds it may incriminate her.
12  BY MS. MAYO:
13      Q.  Are you going to assert the Fifth Amendment
14  in response to that question?
15      A.  Yes.
16      Q.  And CMP did nothing to stop the violence
17  against Planned Parenthood caused by the release of
18  its videos; correct?
19      MR. KOLLER:  Objection; vague and
20  ambiguous, lacks foundation, assumes facts not in
21  evidence.
22      I'd advise my client not to answer on the
23  grounds it may incriminate her.
24  BY MS. MAYO:
25      Q.  Are you going to assert the Fifth

## Page 165

1  Amendment in response --
2      MR. KOZINA:  Object.  Assumes a duty on the
3  part of CMP to undertake any action.
4  BY MS. MAYO:
5      Q.  Are you going to assert the Fifth Amendment
6  in response to that question?
7      A.  Yes.
8      MR. KOLLER:  Are we boring you?
9      MS. MAYO:  I'm hurt.
10      THE WITNESS:  I've been sitting too long.
11  BY MS. MAYO:
12      Q.  Ms. Baxter, how would you characterize your
13  current relationship with David Daleiden?
14      MR. KOLLER:  Objection; assumes facts not
15  in evidence.
16      I'd advise my client not to answer that on
17  the grounds it may incriminate her.
18  BY MS. MAYO:
19      Q.  Are you going to assert your Fifth
20  Amendment right in response to that question?
21      A.  Yes.
22      Q.  Are you angry with David Daleiden at all
23  for getting you involved in this?
24      MR. KOLLER:  Objection; assumes facts not
25  in evidence, vague and ambiguous.

Page 166

1    Advise my client not to answer on the
2  grounds it may incriminate her.
3  BY MS. MAYO:
4    Q. Are you going to assert the Fifth Amendment
5  in response to that question?
6    A. Yes.
7    Q. When did you first meet Susan Merritt?
8    MR. KOLLER: Objection; assumes facts not
9  in evidence, lacks foundation.
10    I'd advise my client not to answer on the
11  grounds it may incriminate her.
12  BY MS. MAYO:
13    Q. Are you going to assert the Fifth Amendment
14  in response to that question?
15    A. Yes.
16    Q. How would you characterize your current
17  relationship with Ms. Merritt?
18    MR. KOLLER: Objection; assumes facts not
19  in evidence.
20    I'd advise my client not to answer on the
21  grounds it may incriminate her.
22  BY MS. MAYO:
23    Q. Are you going to assert the Fifth Amendment
24  in response to that question?
25    A. Yes.

Page 167

1    Q. When was the last time you spoke with Susan
2  Merritt?
3    MR. KOLLER: Objection; assumes facts not
4  in evidence.
5    Advise my client not to answer on the
6  grounds it may incriminate her.
7  BY MS. MAYO:
8    Q. Are you going to assert the Fifth Amendment
9  in response to that question?
10    A. Yes.
11    Q. Have you met Adrian Lopez?
12    MR. KOLLER: Objection; vague and
13  ambiguous.
14    I'd advise my client not to answer on the
15  grounds it may incriminate her.
16  BY MS. MAYO:
17    Q. Are you going to assert the Fifth Amendment
18  in response to that question?
19    A. Yes.
20    Q. How would you characterize your current
21  relationship with Adrian Lopez?
22    MR. KOLLER: Objection; assumes facts not
23  in evidence, vague and ambiguous.
24    I'd advise my client not to answer that on
25  the grounds it may incriminate her.

Page 168

1  BY MS. MAYO:
2    Q. Are you going to assert the Fifth Amendment
3  right in response to that question?
4    A. Yes.
5    Q. When was the last time you spoke with
6  Adrian Lopez?
7    MR. KOLLER: Objection; assumes facts not
8  in evidence, vague and ambiguous.
9    I'd advise my client not to answer on the
10  grounds it may incriminate her.
11  BY MS. MAYO:
12    Q. Are you going to assert the Fifth Amendment
13  in response to that question?
14    A. Yes.
15    Q. You know that Troy Newman is the president
16  of Operation Rescue; correct?
17    MR. KOLLER: Objection; assumes facts not
18  in evidence.
19    I'd advise my client not to answer on the
20  grounds it may incriminate her.
21  BY MS. MAYO:
22    Q. Are you going to assert the Fifth Amendment
23  in response to that question?
24    A. Yes.
25    Q. Have you met Troy Newman?

Page 169

1    MR. KOLLER: Objection; vague and
2  ambiguous.
3    I'd advise my client not to answer that on
4  the grounds it might incriminate her.
5  BY MS. MAYO:
6    Q. Are you going to assert the Fifth Amendment
7  in response to that question?
8    A. Yes.
9    Q. And you knew that Operation Rescue has long
10  promoted stopping abortion providers through any
11  means necessary; correct?
12    MR. KOLLER: Objection; assumes facts not
13  in evidence, vague and ambiguous, lacks foundation.
14    I'd advise my client not to answer on the
15  grounds it may incriminate her.
16  BY MS. MAYO:
17    Q. Are you going to assert the Fifth
18  Amendment --
19    MR. KOZINA: And I'll object on the basis
20  that it misstates facts.
21  BY MS. MAYO:
22    Q. Are you going to assert the Fifth Amendment
23  in response to that question?
24    A. Yes.
25    Q. And you knew that working with an

## Page 170

1  organization that Troy Newman was a part of would
2  risk you being associated with an organization that
3  wants to put an end to all abortions by any means
4  necessary; correct?
5      MR. KOLLER:  Objection; assumes facts not
6  in evidence, vague and ambiguous.
7      I'd advise my client not to answer on the
8  grounds it may incriminate her.
9  BY MS. MAYO:
10      Q.  Are you going to assert the Fifth Amendment
11  in response to that question?
12      A.  Yes.
13      Q.  When was the last time you spoke with
14  Mr. Newman?
15      MR. KOLLER:  Objection; vague and
16  ambiguous.
17      Advise my client not to answer that on the
18  grounds it may incriminate her.
19  BY MS. MAYO:
20      Q.  Are you going to assert the Fifth Amendment
21  in response to that question?
22      A.  Yes.
23      Q.  You've met Albin Rhomberg; correct?
24      MR. KOLLER:  Objection; assumes facts not
25  in evidence.

## Page 171

1      I'd advise my client not to answer on the
2  grounds it may incriminate her.
3  BY MS. MAYO:
4      Q.  Are you going to assert the Fifth Amendment
5  in response to that question?
6      A.  Yes.
7      Q.  And you met Albin Rhomberg in connection
8  with the CMP video project; correct?
9      MR. KOLLER:  Objection; assumes facts not
10  in evidence.
11      I'd advise my client not to answer on the
12  grounds it may incriminate her.
13  BY MS. MAYO:
14      Q.  Are you going to assert the Fifth Amendment
15  in response to that question?
16      A.  Yes.
17      Q.  When was the last time you spoke with Albin
18  Rhomberg?
19      MR. KOLLER:  Objection; assumes facts not
20  in evidence.
21      I'd advise my client not to answer that on
22  the grounds it may incriminate her.
23  BY MS. MAYO:
24      Q.  Are you going to assert the Fifth Amendment
25  in response to that question?

## Page 172

1      A.  Yes.
2      MS. MAYO:  I'm going to pass the witness
3  now to counsel for NAF to question, subject to any
4  follow-up questions that I may have based on his
5  testimony -- or his questioning and Ms. Baxter's
6  testimony.
7      We should probably go off the record so
8  that we can switch places.
9      MR. KOLLER:  However you want to do it.
10      THE VIDEOGRAPHER:  This marks the end of
11  media file labeled Number 4.  Off the record at 1:35
12  p.m.
13      (Pause in the proceedings )
14      THE VIDEOGRAPHER:  This marks the beginning
15  of media file labeled Number 5.  Back on the record
16  at 1:37 p.m.
17
18          EXAMINATION
19  BY MR. MCMANUS:
20      Q.  Good afternoon, Ms. Baxter.  My name is
21  Spencer McManus, and I represent the National
22  Abortion Federation.
23      If I abbreviate that as "NAF" today, will
24  you understand me to mean the National Abortion
25  Federation?

## Page 173

1      A.  Yes.
2      Q.  You testified earlier that you were aware
3  of a group called Live Action; correct?
4      A.  Yes.
5      Q.  Live Action is a pro-life advocacy group
6  that engaged in so-called sting operations by taking
7  surreptitiously video of Planned Parenthood events
8  and clinics and releasing viral videos of those
9  encounters online; correct?
10      MR. KOLLER:  Object; assumes facts not in
11  evidence.
12      Advise my client not to answer on the
13  grounds it may incriminate her.
14  BY MR. MCMANUS:
15      Q.  Do you intend to take the Fifth Amendment
16  with respect to that question?
17      A.  Yes.
18      Q.  The purpose of those videos was to create
19  public outrage at Planned Parenthood and other
20  abortion providers; correct?
21      MR. KOLLER:  Objection; assumes facts not
22  in evidence, asked and answered.
23      Advise my client not to answer on the
24  grounds it may incriminate her.
25  //

Page 174

BY MR. MCMANUS:

Q. Do you intend to take the Fifth Amendment with respect to that question?

A. Yes.

Q. Do you know Lila Rose, the founder of Live Action?

MR. KOLLER: Advise my client not to answer that on the grounds it may incriminate her.

And assumes facts not in evidence.

BY MR. MCMANUS:

Q. Do you intend to take the Fifth Amendment with respect to that question?

A. Yes.

Q. In one video Lila Rose, who was then 19, walked into a Planned Parenthood clinic claiming she was a 15-year-old sex worker who had been impregnated by a 23-year-old male in an undercover sting video designed to create a narrative that Planned Parenthood condones child sex trafficking; is that correct?

MR. KOLLER: Objection; assumes facts not in evidence, lack of foundation, vague and ambiguous.

Advise my client not to answer on the grounds it may incriminate her.

Page 175

BY MR. MCMANUS:

Q. Do you intend to take the Fifth Amendment with respect to that question?

A. Yes.

Q. Lila Rose went on to create more videos at Planned Parenthood facilities in which actors played roles as pimps and prostitutes and solicited advice from Planned Parenthood staff on how to procure abortions; correct?

MR. KOLLER: Objection; assumes facts not in evidence, vague and ambiguous.

Advise my client not to answer on the grounds it may incriminate her.

BY MR. MCMANUS:

Q. Do you intend to take the Fifth Amendment with respect to that question?

A. Yes.

Q. Did your work in high school in your group affiliated with Live Action involve surreptitiously recording events at Planned Parenthood clinics or other facilities of abortion providers?

MR. KOLLER: Objection; vague and ambiguous.

Advise my client not to answer on the grounds it may incriminate her.

Page 176

BY MR. MCMANUS:

Q. Do you intend to take the Fifth Amendment with respect to that question?

A. Yes.

Q. Mr. Daleiden also worked for Live Action; correct?

MR. KOLLER: Objection; lacks foundation.

Advise my client not to answer that on the grounds it may incriminate her.

BY MR. MCMANUS:

Q. Do you intend to take the Fifth Amendment with respect no that question?

A. Yes.

Q. Through the Center for Medical Progress Mr. Daleiden wanted to extend what he was doing at Live Action by creating undercover sting videos of NAF members and Planned Parenthood officials; correct?

MR. KOLLER: Objection; assumes facts not in evidence, vague and ambiguous.

Advise my client not to answer on the grounds it may incriminate her.

BY MR. MCMANUS:

Q. Do you intend to take the Fifth Amendment with respect to that question?

Page 177

A. Yes.

Q. One of CMP's goals was to create public outrage toward NAF and Planned Parenthood officials by releasing viral undercover sting videos relating to fetal tissue donation issues; correct?

MR. KOLLER: Objection; assumes facts not in evidence.

Advise my client not to answer on the grounds it may incriminate her.

BY MR. MCMANUS:

Q. Do you intend to take the Fifth Amendment with respect to that question?

A. Yes.

Q. Another of CMP's goals was to advocate for the defunding of Planned Parenthood; correct?

MR. KOLLER: Objection; assumes facts not in evidence, lack of foundation.

Advise my client not to answer on the grounds it may incriminate her.

BY MR. MCMANUS:

Q. Do you intend to take the Fifth Amendment with respect to that question?

A. Yes.

Q. Another of CMP's goals was to influence legislation on the topic of abortion; correct?

1        MR. KOLLER:  Objection; assumes facts not
2    in evidence.
3        Advise my client not to answer on the
4    grounds it may incriminate her.
5    BY MR. MCMANUS:
6        Q.  Do you intend to take the Fifth Amendment
7    with respect to that question?
8        A.  Yes.
9        Q.  I'd like to briefly turn back to what's
10   been marked as Exhibit 532.
11       Again, for the record, this is an e-mail
12   from David Daleiden to a redacted e-mail address,
13   copying Annamarie Bettisworth.  The subject is
14   "Introductory Materials" with the attachment of a
15   NondisclosureAgreement.pdf.
16       Did you sign this nondisclosure agreement
17   that David Daleiden sent you on August 21st, 2013?
18       MR. KOLLER:  Objection; assumes facts not
19   in evidence.
20       Advise my client not to answer on the
21   grounds it may incriminate her.
22   BY MR. MCMANUS:
23       Q.  Do you intend to take the Fifth Amendment
24   with respect to that question?
25       A.  Yes.

1        Q.  Did you intend to honor this nondisclosure
2    agreement with David Daleiden when you signed it?
3        MR. KOLLER:  Objection; assumes facts not
4    in evidence.
5        Advise my client not to answer on the
6    grounds it may incriminate her.
7    BY MR. MCMANUS:
8        Q.  Do you intend to take the Fifth Amendment
9    with respect to that question?
10       A.  Yes.
11       Q.  The intent behind this nondisclosure
12   agreement marked as Exhibit 532 was that CMP could
13   keep secret the true nature of its undercover
14   operations until it chose to go public with them;
15   correct?
16       MR. KOLLER:  Objection; assumes facts not
17   in evidence --
18       MR. KOZINA:  Objection; document speaks for
19   itself.
20       THE REPORTER:  I'm sorry?
21       MR. KOZINA:  Objection; document speaks for
22   itself.
23       MR. KOLLER:  I'd advise my client not to
24   answer on the grounds it may incriminate her.
25   //

1    BY MR. MCMANUS:
2        Q.  Do you intend to take the Fifth Amendment
3    with respect to that question?
4        A.  Yes.
5        Q.  Because if those operations became public
6    before CMP wanted them to, that could jeopardize
7    CMP's undercover operations because abortion
8    providers would not want people with those types of
9    pro-life views at their conferences; correct?
10       MR. KOLLER:  Objection; assumes facts not
11   in evidence, vague and ambiguous, lacks foundation,
12   calls for a legal conclusion.
13       I'd advise my client not to answer on the
14   grounds it may incriminate her.
15   BY MR. MCMANUS:
16       Q.  Do you intend to take the Fifth Amendment
17   with respect to that question?
18       A.  Yes.
19       Q.  Did you understand that the nondisclosure
20   agreement that's marked as Exhibit 532 that
21   Mr. Daleiden asked you to sign in connection with
22   your work for CMP also protected your identity from
23   unauthorized disclosure to others?
24       MR. KOLLER:  Objection; assumes facts not
25   in evidence and vague and ambiguous.

1        Advise my client not to answer on the
2    grounds it may incriminate her.
3    BY MR. MCMANUS:
4        Q.  Do you intend to take the Fifth Amendment
5    with respect to that question?
6        A.  Yes.
7        Q.  Did you understand that the nondisclosure
8    agreement marked as Exhibit 532 that Mr. Daleiden
9    asked you to sign in connection with your work for
10   CMP also provided for injunctive relief as a remedy?
11       MR. KOLLER:  I'd object it assumes facts
12   not in evidence, calls for a legal conclusion, vague
13   and ambiguous.
14       And advise my client not to answer on the
15   grounds it may incriminate her.
16   BY MR. MCMANUS:
17       Q.  Do you intend to take the Fifth Amendment
18   with respect to that question?
19       A.  Yes.
20       Q.  Do you understand that injunctive relief
21   can prohibit you from disclosing information that's
22   covered under the injunction?
23       MR. KOLLER:  Objection; assumes facts not
24   in evidence, calls for a legal conclusion, vague and
25   ambiguous.

## Page 182

1     Advise my client not to answer on the
2  grounds it may incriminate her.
3  BY MR. MCMANUS:
4     Q.  Do you intend to take the Fifth Amendment
5  with respect to that question?
6     A.  Yes.
7     MR. MCMANUS:  I'd like to mark as Exhibit
8  544 this document with a Bates-stamped CM02525.  It
9  is an e-mail from David Daleiden to Brianna Baxter,
10  dated August 31st, 2013, with the subject "More
11  Materials."
12     (Deposition Exhibit 544 was marked for
13     identification)
14  BY MR. MCMANUS:
15     Q.  Ms. Baxter, do you recognize this document
16  that's been labeled as Exhibit 544?
17     MR. KOLLER:  I would advise my client not
18  to answer that on the grounds it may incriminate
19  her.
20  BY MR. MCMANUS:
21     Q.  Do you intend to take the Fifth Amendment
22  with respect to that question?
23     A.  Yes.
24     Q.  This e-mail was sent to you ten days after
25  the e-mail that attached the nondisclosure agreement

## Page 183

1  that's shown in Exhibit 532; correct?
2     MR. KOLLER:  Objection; assumes facts not
3  in evidence.
4     Advise my client not to answer on the
5  grounds it may incriminate her.
6  BY MR. MCMANUS:
7     Q.  Do you intend to take the Fifth Amendment
8  with respect to that question?
9     A.  Yes.
10     Q.  In this e-mail, Mr. Daleiden says:
11     "Hi Brianna, Please log into the Gmail
12     account" -- and then a redacted e-mail
13     account -- "for more materials.  Let me
14     know if you have any questions!"
15     So Mr. Daleiden was asking you to log into
16  a Gmail account to access more materials related to
17  CMP's undercover video operation; correct?
18     MR. KOLLER:  Objection; assumes facts not
19  in evidence.
20     Advise my client not to answer on the
21  grounds it may incriminate her.
22  BY MR. MCMANUS:
23     Q.  Do you intend to take the Fifth Amendment
24  with respect to that question?
25     A.  Yes.

## Page 184

1     Q.  Was the e-mail account that Mr. Daleiden
2  asked you to log in to brianna@biomaxps.com?
3     MR. KOLLER:  Objection; vague and
4  ambiguous, lacks foundation, assumes facts not in
5  evidence.
6     I'd advise my client not to answer on the
7  grounds it may incriminate her.
8  BY MR. MCMANUS:
9     Q.  Do you intend to take the Fifth Amendment
10  with respect to that question?
11     A.  Yes.
12     Q.  Did you ever log in to the Gmail account
13  that Mr. Daleiden asked you to log in to in this
14  e-mail which has been marked as Exhibit 544?
15     MR. KOLLER:  Objection; vague and
16  ambiguous.
17     Advise my client not to answer on the
18  grounds it may incriminate her.
19  BY MR. MCMANUS:
20     Q.  Do you intend to take the Fifth Amendment
21  with respect to that question?
22     A.  Yes.
23     Q.  Did you download any materials that
24  Mr. Daleiden asked you to look at in the logged in
25  Gmail account depicted in Exhibit 544?

## Page 185

1     MR. KOLLER:  Objection; assumes facts not
2  in evidence.
3     Advise my client not to answer on the
4  grounds it may incriminate her.
5  BY MR. MCMANUS:
6     Q.  Do you intend to take the Fifth Amendment
7  with respect to that question?
8     A.  Yes.
9     Q.  Did you keep any of the materials that
10  Mr. Daleiden asked you to look at in this e-mail
11  that's been marked as Exhibit 544?
12     MR. KOLLER:  Objection; assumes facts not
13  in evidence, vague and ambiguous.
14     Advise my client not to answer on the
15  grounds it may incriminate her.
16  BY MR. MCMANUS:
17     Q.  Do you intend to take the Fifth Amendment
18  with respect to that question?
19     A.  Yes.
20     Q.  Did you ever follow up with Mr. Daleiden
21  with any questions as he asked you to in Exhibit
22  544?
23     MR. KOLLER:  Objection; assumes facts not
24  in evidence.
25     Advise my client not to answer on the

1  grounds it may incriminate her.
2  BY MR. MCMANUS:
3      Q.  Do you intend to take the Fifth Amendment
4  with respect to that question?
5      A.  Yes.
6      MR. MCMANUS:  I'd like to mark the
7  following documents as Exhibits 545 and 546.
8      Exhibit 545 is a document Bates-stamped
9  CM03481.  It is an e-mail on February 17th, 2014,
10 from David Daleiden to a Brianna.
11     (Deposition Exhibit 545 was marked for
12     identification)
13     MR. MCMANUS:  And Exhibit 546 is another
14 e-mail, dated February 14th, 2014, from a David
15 Daleiden to a Brianna.  It is Bates-stamped CM03493.
16     (Deposition Exhibit 546 was marked for
17     identification)
18 BY MR. MCMANUS:
19     Q.  I'll give you a minute to review the
20 document.
21     A.  (Reviewing document.)
22     Q.  Ms. Baxter, have you seen either of these
23 documents prior to today?
24     MR. KOLLER:  I'd advise my client not to
25 answer on the grounds it may incriminate her.

1  BY MR. MCMANUS:
2      Q.  Do you intend to take the Fifth Amendment
3  with respect to that question?
4      A.  Yes.
5      Q.  Ms. Baxter, in this e-mail David Daleiden
6  attaches as screenshots an e-mail --
7      MR. KOLLER:  Just a question, Counsel.  I'm
8  sorry.  You said "this e-mail."  There is two
9  exhibits.
10     MR. MCMANUS:  My apologies.
11 BY MR. MCMANUS:
12     Q.  In Exhibit 545 Mr. Daleiden attaches a
13 series of images that appear to be a chain of
14 e-mails between a brianna@biomaxps and various NAF
15 and Planned Parenthood representatives; is that
16 correct?
17     MR. KOLLER:  Objection; assumes facts not
18 in evidence.
19     Advise my client not to answer on the
20 grounds it may incriminate her.
21 BY MR. MCMANUS:
22     Q.  Do you intend to take the Fifth Amendment
23 with respect to that question?
24     A.  Yes.
25     Q.  In the first e-mail on the chain, from what

1  appears to be November 27th, 2013, someone claiming
2  to be Brianna Allen, a procurement assistant at
3  BioMax, LLC, e-mails a redacted e-mail address; is
4  that correct?
5      MR. KOLLER:  I'd object.  Assumes facts not
6  in evidence.  The document speaks for itself.
7      And I'd advise my client not to answer on
8  the grounds it may incriminate her.
9  BY MR. MCMANUS:
10     Q.  Do you intend to take the Fifth Amendment
11 with respect to that question?
12     A.  Yes.
13     Q.  In that same e-mail, the second paragraph,
14 it says:
15     "I was hoping to catch you before all the
16     Thanksgiving/holiday craziness starts here
17     about reserving exhibitor space at the
18     conference your organization will have in
19     San Francisco.  We were too late to reserve
20     space for ARHP, and I feel like you
21     mentioned something about an
22     end-of-the-year deadline?"
23     Did I read that correctly?
24     MR. KOLLER:  Yes.  You're asking me or
25 my --

1      THE WITNESS:  Yes, you read it correctly.
2  BY MR. MCMANUS:
3      Q.  The -- when the person claiming to be
4  Brianna Allen says "I was hoping to catch you," and
5  then goes on, "about reserving exhibitor space at
6  the conference your organization will have in San
7  Francisco," that refers to the NAF 2014 annual
8  meeting; correct?
9      MR. KOLLER:  Objection; assumes facts not
10 in evidence.
11     Advise my client not to answer on the
12 grounds it may incriminate her.
13 BY MR. MCMANUS:
14     Q.  Do you intend to take the Fifth Amendment
15 with respect to that question?
16     A.  Yes.
17     Q.  Did you send this e-mail from the
18 brianna@biomaxps.com e-mail account?
19     MR. KOLLER:  Objection; vague and
20 ambiguous.
21     I'd advise my client not to answer on the
22 grounds it may incriminate her.
23 BY MR. MCMANUS:
24     Q.  Do you intend to take the Fifth Amendment
25 with respect to that question?

1    A. Yes.
2    Q. You didn't ever send any e-mails from the
3  brianna@biomaxps.com e-mail account; correct?
4        MR. KOLLER: Objection; assumes facts not
5  in evidence.
6        I'd advise my client not to answer that on
7  the grounds it may incriminate her.
8  BY MR. MCMANUS:
9    Q. Do you intend to take the Fifth Amendment
10  with respect to that question?
11    A. Yes.
12    Q. Mr. Daleiden was the only one sending
13  e-mails from the brianna@biomaxps.com account;
14  correct?
15        MR. KOLLER: Objection; assumes facts not
16  in evidence, vague and ambiguous.
17        I'd advise my client not to answer that on
18  the grounds it may incriminate her.
19  BY MR. MCMANUS:
20    Q. Do you intend to take the Fifth Amendment
21  with respect to that question?
22    A. Yes.
23    Q. Mr. Daleiden forwarded you these e-mails so
24  that when you posed at Brianna Allen at the 2014 NAF
25  annual meeting you would be familiar with the people

1  who corresponded with the brianna@biomaxps.com
2  account; correct?
3        MR. KOLLER: Objection; assumes facts not
4  in evidence, vague and ambiguous.
5        I'd advise my client not to answer on the
6  grounds it may incriminate her.
7  BY MR. MCMANUS:
8    Q. Do you intend to take the Fifth Amendment
9  with respect to that question?
10    A. Yes.
11    Q. If Mr. Daleiden had not forwarded you these
12  e-mails shown in Exhibits 544 -- or 545 and 546 and
13  you met these people in person at the NAF 2014
14  annual meeting, they would have became suspicious of
15  you if you didn't recall having e-mail conversations
16  with them; correct?
17        MR. KOLLER: Objection; assumes facts not
18  in evidence, lacks foundation, vague and ambiguous.
19        Advise my client not to answer on the
20  grounds it may incriminate her.
21  BY MR. MCMANUS:
22    Q. Do you intend to take the Fifth Amendment
23  with respect to that question?
24    A. Yes.
25        MR. MCMANUS: I'm now marking as Exhibit

1  547 a document with the Bates stamp CM03441, an
2  e-mail from February 17th, 2014, from David Daleiden
3  to a Brianna.
4        (Deposition Exhibit 547 was marked for
5        identification)
6  BY MR. MCMANUS:
7    Q. The document also includes the attachment
8  entitled "NAF 2014 Exhibitor Prospectus.pdf."
9        I'll give you a moment to review the
10  document.
11    A. (Reviewing document.)
12    Q. Ms. Baxter, do you recognize the e-mail
13  that is Exhibit 547?
14        MR. KOLLER: Objection; assumes facts not
15  in evidence.
16        Advise my client not to answer on the
17  grounds it may incriminate her.
18  BY MR. MCMANUS:
19    Q. Do you intend to take the Fifth Amendment
20  with respect to that question?
21    A. Yes.
22    Q. Ms. Baxter, do you recognize the attachment
23  entitled "NAF 2014 Exhibitor Prospectus.pdf" that
24  begins at Bates stamp CM03442 and extends to the
25  page Bates-stamped CM03451?

1        MR. KOLLER: I'd advise my client not to
2  answer that on the grounds it may incriminate her.
3  BY MR. MCMANUS:
4    Q. Do you intend to take the Fifth Amendment
5  with respect to that question?
6    A. Yes.
7    Q. This attachment is NAF's Annual Meeting
8  Exhibitor Prospectus for the 2014 annual meeting
9  held in San Francisco from April 5th through April
10  8th, 2014; correct?
11        MR. KOLLER: Objection; document speaks for
12  itself.
13        But you can answer if you know the answer
14  to it.
15        THE WITNESS: Yes, that's what it looks
16  like it is.
17  BY MR. MCMANUS:
18    Q. And Mr. Daleiden sent you this NAF 2014
19  Exhibitor Prospectus to help you prepare for
20  infiltrating NAF's 2014 annual meeting in San
21  Francisco; correct?
22        MR. KOLLER: Objection; assumes facts not
23  in evidence, vague and ambiguous.
24        I'd advise my client not to answer on the
25  grounds it may incriminate her.

## Page 194

BY MR. MCMANUS:

Q. Do you intend to take the Fifth Amendment with respect to that question?

A. Yes.

Q. I'll now point you to the page that's Bates-stamped CM03449 toward the back of the packet. That page is entitled "Application and Agreement for Exhibitor Space, NAF Annual Meeting, San Francisco, California, April 5th through 8th, 2014"; is that correct?

MR. KOLLER: Is your question that the title of that document on page 5 -- 3449 is "Application and Agreement for Exhibit Space"? Is that the question?

MR. MCMANUS: Yes, that's correct.

MR. KOLLER: You can answer.

THE WITNESS: Yes, that's the title.

BY MR. MCMANUS:

Q. In that black area at the top of the page, it says:

"Please complete all information. Complete and sign the application form. Return the completed application with credit card information or check payable to NAF for the full cost of exhibiting and registration

## Page 195

for educational sessions."

Then later in that paragraph it says: "When countersigned by NAF, this serves as a contract for exhibit space and the following Rules and Regulations are expressly incorporated herein."

Did I read that accurately?

A. Yes.

Q. I'm going to refer you to the next page, Bates-stamped CM03450, entitled "Exhibit Rules and Regulations."

Is it your understanding that to exhibit at NAF's annual meetings a representative of a company exhibiting at that meeting would have to sign this form?

MR. KOLLER: Objection; assumes facts not in evidence.

Advise my client not to answer on the grounds it may incriminate her.

BY MR. MCMANUS:

Q. Do you intend to take the Fifth Amendment with respect to that question?

A. Yes.

Q. Point you to paragraph 17 on that page. Paragraph 17 reads:

## Page 196

"In connection with NAF's Annual Meeting Exhibitor understands that any information NAF may furnish is confidential and not available to the public. Exhibitor agrees that all written information provided by NAF, or any information which is disclosed orally or visually to Exhibitor, or any other exhibitor or attendee, will be used solely in conjunction with Exhibitor's business and will be made available only to Exhibitor's officers, employees, and agents. Unless authorized in writing by NAF, all information is confidential and should not be disclosed to any other individual or third parties."

You had no intent to honor this clause of NAF's Exhibit Rules and Regulations when you infiltrated the 2014 NAF annual meeting; correct?

MR. KOLLER: Objection; assumes facts not in evidence, vague and ambiguous.

Advise my client not to answer on the grounds it may incriminate her.

BY MR. MCMANUS:

Q. Do you intend to take the Fifth Amendment with respect to that question?

## Page 197

A. Yes.

Q. I'll now point you to paragraph 19, which says:

"By signing this Agreement, the Exhibitor affirms that all information contained herein, contained in any past and future correspondence with either NAF and/or in any publication, advertisements, and/or exhibits displayed at, or in connection with, NAF's Annual Meeting, is truthful, accurate, complete, and not misleading."

You had no intent of complying with this paragraph of NAF's Exhibit Rules and Regulations in connection with your infiltration of NAF's 2014 annual meeting; correct?

MR. KOLLER: Objection; assumes facts not in evidence, lack of foundation, vague and ambiguous.

Advise my client not to answer on the grounds it may incriminate her.

BY MR. MCMANUS:

Q. Do you intend to take the Fifth Amendment with respect to that question?

A. Yes.

MR. MCMANUS: I'm going introduce as

50

Page 198

1 Exhibit 548 a document Bates-stamped CM03743 [sic].
2 This is an e-mail from David Daleiden to Brianna on
3 February 21st, 2014.
4 (Deposition Exhibit 548 was marked for
5 identification)
6 BY MR. MCMANUS:
7 Q. And the e-mail attaches three images
8 entitled r1, r2, and r3.jpg.
9 I'll give you a moment to review the
10 document.
11 A. (Reviewing document.)
12 Q. Ms. Baxter, have you seen this e-mail and
13 attachments prior to today?
14 MR. KOLLER: Objection; vague and
15 ambiguous.
16 Advise my client not to answer on the
17 grounds it may incriminate her.
18 BY MR. MCMANUS:
19 Q. Do you intend to take the Fifth Amendment
20 with respect to that question?
21 A. Yes.
22 Q. Ms. Baxter, the three image attachments to
23 this e-mail are BioMax's application to exhibit at
24 the NAF 2014 annual meeting; correct?
25 MR. KOLLER: Objection; lack of foundation,

Page 199

1 calls for speculation.
2 But you can answer if you know the answer.
3 THE WITNESS: It looks like it is.
4 BY MR. MCMANUS:
5 Q. Did you fill out this form?
6 MR. KOLLER: Objection; assumes facts not
7 in evidence.
8 Advise my client not to answer on the
9 grounds it may incriminate her.
10 BY MR. MCMANUS:
11 Q. Do you intend to take the Fifth Amendment
12 with respect to that question?
13 A. Yes.
14 Q. You'll notice on the page entitled "Exhibit
15 Rules and Regulations" that it has been signed by
16 someone whose printed name reads "Susan Tennenbaum"
17 with the title CEO for the company BioMax
18 Procurement Services.
19 Susan Tennenbaum is the alias that Sandra
20 Susan Merritt used to infiltrate NAF's 2014 annual
21 meeting; correct?
22 MR. KOLLER: Objection; lacks foundation,
23 vague and ambiguous.
24 Advise my client not to answer on the
25 grounds it may incriminate her.

Page 200

1 BY MR. MCMANUS:
2 Q. Do you intend to take the Fifth Amendment
3 with respect to that question?
4 A. Yes.
5 Q. Susan Tennenbaum was not in fact the CEO of
6 a company called BioMax Procurement Services;
7 correct?
8 MR. KOLLER: Objection; assumes facts not
9 in evidence, vague and ambiguous, lacks foundation.
10 Advise my client not to answer on the
11 grounds it may incriminate her.
12 BY MR. MCMANUS:
13 Q. Do you intend to take the Fifth Amendment
14 with respect to that question?
15 A. Yes.
16 Q. On the next image entitled "Application and
17 Agreement for Exhibit Space, NAF Annual Meeting, San
18 Francisco, California, April 5th through 8th, 2014,"
19 you'll see in number one that someone named Brianna
20 Allen has placed her name on this form representing
21 to be someone from BioMax Procurement Services.
22 Did you fill out this page of NAF -- of the
23 application to exhibit at NAF's annual meeting in
24 2014?
25 MR. KOLLER: I would object as assumes

Page 201

1 facts not in evidence.
2 And would advise my client not to answer on
3 the grounds it may incriminate her.
4 BY MR. MCMANUS:
5 Q. Do you intend to take the Fifth Amendment
6 with respect to that question?
7 A. Yes.
8 Q. You'll notice a little bit farther down in
9 Number 4, it says "Name and title of exhibitor
10 representative(s)," and there is a name "Brianna
11 Allen" under "Primary Representative" with the title
12 "Procurement Assistant" and the e-mail
13 "brianna@biomaxps.com."
14 This name is the one you used to infiltrate
15 NAF's 2014 annual meeting; correct?
16 MR. KOLLER: Objection; assumes facts not
17 in evidence.
18 I would advise my client not to answer on
19 the grounds it may incriminate her.
20 BY MR. MCMANUS:
21 Q. Do you intend to take the Fifth Amendment
22 with respect to that question?
23 A. Yes.
24 Q. Procurement assistant was the title that
25 you used for your character that you used to

Page 202

1  infiltrate NAF's annual 2014 meeting; correct?
2      MR. KOLLER:  Objection; assumes facts not
3  in evidence, vague and ambiguous.
4      I'd advise my client not to answer on the
5  grounds it may incriminate her.
6  BY MR. MCMANUS:
7      Q.  Do you intend to take the Fifth Amendment
8  with respect to that question?
9      A.  Yes.
10     Q.  You are, in fact, not a procurement
11 assistant for BioMax Procurement Services; correct?
12     MR. KOLLER:  Objection; lack of foundation.
13     Advise my client not to answer on the
14 grounds it may incriminate her.
15 BY MR. MCMANUS:
16     Q.  Do you intend to take the Fifth Amendment
17 with respect to that question?
18     A.  Yes.
19     Q.  Under that, it says "Additional
20 Representative: Susan Tennenbaum" with the title CEO
21 and the e-mail susan@biomaxps.com.
22     That name was the name that Sandra Susan
23 Merritt used to infiltrate NAF's 2014 annual
24 meeting; correct?
25     MR. KOLLER:  Objection; assumes facts not

Page 203

1  in evidence.
2      Advise my client not to answer on the
3  grounds it may incriminate her.
4  BY MR. MCMANUS:
5      Q.  Do you intend to take the Fifth Amendment
6  with respect to that question?
7      A.  Yes.
8      Q.  Immediately under that, it says "Additional
9  Representative: Robert Sarkis, VP Operations" with
10 the e-mail bob@biomaxps.com.
11     Robert Sarkis was the alias that David
12 Daleiden used to infiltrate NAF's 2014 annual
13 meeting; correct?
14     MR. KOLLER:  Objection; assumes facts not
15 in evidence.
16     Advise my client not to answer on the
17 grounds it may incriminate her.
18 BY MR. MCMANUS:
19     Q.  Do you intend to take the Fifth Amendment
20 with respect to that question?
21     A.  Yes.
22     Q.  On the right-hand side of the page, it says
23 "List" -- it's a little bit unclear, but it says:
24     "List the products designed [sic] to be
25     exhibited: biological specimen procurement,

Page 204

1      stem cell research."
2      BioMax Procurement Services did not in fact
3  specialize in biological specimen -- excuse me --
4  biological specimen procurement or stem cell
5  research; correct?
6      MR. KOLLER:  Objection; assumes facts not
7  in evidence vague and ambiguous.
8      Advise my client not to answer on the
9  grounds it may incriminate her.
10 BY MR. MCMANUS:
11     Q.  Do you intend to take the Fifth Amendment
12 with respect to that question?
13     A.  Yes.
14     Q.  So BioMax Procurement Services submitted
15 this Application and Agreement for Exhibit Space to
16 NAF with false statements; correct?
17     MR. KOLLER:  Objection; assumes facts not
18 in evidence.
19     Advise my client not to answer on the
20 grounds it may incriminate her.
21 BY MR. MCMANUS:
22     Q.  Do you intend to take the Fifth Amendment
23 with respect to that question?
24     A.  Yes.
25     MR. MCMANUS:  Now marking as Exhibit 547 --

Page 205

1      MS. MAYO:  549.
2      MR. MCMANUS:  -- 549, my apologies, a
3  document with the Bates stamp CM03468.
4      (Deposition Exhibit 549 was marked for
5      identification)
6  BY MR. MCMANUS:
7      Q.  This document is an e-mail from February
8  21st, 2014, from David Daleiden to a Brianna -- a
9  series of e-mails, excuse me.
10     A.  (Reviewing document.)
11     Q.  Ms. Baxter, do you recognize this string of
12 e-mails from prior to today?
13     MR. KOLLER:  Objection; assumes facts not
14 in evidence.
15     Advise my client not to answer on the
16 grounds it may incriminate her.
17 BY MR. MCMANUS:
18     Q.  Do you intend to assert the Fifth Amendment
19 with respect to that question?
20     A.  Yes.
21     Q.  This e-mail is Mr. Daleiden sending you a
22 list of characters he planned to use to infiltrate
23 NAF's 2014 annual meeting; correct?
24     MR. KOLLER:  Objection; assumes facts not
25 in evidence, lacks foundation, vague and ambiguous.

Page 206

1    I'd advise my client not to answer on the
2  grounds it may incriminate her.
3  BY MR. MCMANUS:
4    Q.  Do you intend to assert the Fifth Amendment
5  with respect to that question?
6    A.  Yes.
7    Q.  Starting under where it says "BioMax
8  Procurement Services, LLC" the document says:
9        "Startup founded at the end of summer by
10        Susan Tennenbaum.  Tissue and organ
11        procurement organization.  We provide
12        biological specimens to medical
13        researchers."
14        Each of those sentence is a false
15  statement; correct?
16    MR. KOLLER:  Objection; assumes facts not
17  in evidence.
18        Advise my client --
19        Well, first of all, it's vague and
20  ambiguous as well.
21        Advise my client not to answer on the
22  grounds it may incriminate her.
23  BY MR. MCMANUS:
24    Q.  Do you intend to assert the Fifth Amendment
25  with respect to that question?

Page 207

1    A.  Yes.
2    Q.  And in the third paragraph under that, it
3  says:
4        "We've been working on getting out-of-state
5        licensing, investors, et cetera.  Bank
6        finally approved start-up loan, yah!"
7        Was BioMax Procurement Services in fact
8  working on getting out-of-state licensing and
9  investments?
10    MR. KOLLER:  Objection; lack of foundation,
11  vague and ambiguous.
12        Advise my client not to answer on the
13  grounds it may incriminate her.
14  BY MR. MCMANUS:
15    Q.  Do you intend to assert the Fifth Amendment
16  with respect to that question?
17    A.  Yes.
18    Q.  Did BioMax Procurement Services in fact get
19  a bank start-up loan -- strike that.
20        Did BioMax Procurement Services in fact get
21  a start-up loan from a bank?
22    MR. KOLLER:  Objection; assumes facts not
23  in evidence, lacks foundation.
24        Advise my client not to answer on the
25  grounds it may incriminate her.

Page 208

1  BY MR. MCMANUS:
2    Q.  Do you intend to assert the Fifth Amendment
3  with respect to that question?
4    A.  Yes.
5    Q.  Did you fill out a loan application to a
6  bank for BioMax Procurement Services?
7    MR. KOLLER:  Objection; assumes facts not
8  in evidence, vague and ambiguous.
9        Advise my client not to answer on the
10  grounds it may incriminate her.
11  BY MR. MCMANUS:
12    Q.  Do you intend to assert the Fifth Amendment
13  with respect to that question?
14    A.  Yes.
15    Q.  Listed under that, it says "Susan
16  Tennenbaum (CEO), Brianna's aunt."
17        Is Susan Tennenbaum, in fact, Brianna
18  Allen's aunt?
19    MR. KOLLER:  Objection; assumes facts not
20  in evidence, lack of foundation.
21        Advise my client not to answer on the
22  grounds it may incriminate her.
23  BY MR. MCMANUS:
24    Q.  Do you intend to assert the Fifth Amendment
25  with respect to that question?

Page 209

1    A.  Yes.
2    Q.  Did you pose as Susan Tennenbaum's niece to
3  reduce suspicion when you infiltrated NAF's annual
4  meeting in 2014?
5    MR. KOLLER:  Objection; assumes facts not
6  in evidence, lacks foundation, vague and ambiguous.
7        Advise my client not to answer on the
8  grounds it may incriminate her.
9  BY MR. MCMANUS:
10    Q.  Do you intend to assert the Fifth Amendment
11  with respect to that question?
12    A.  Yes.
13    Q.  Under that, it says:
14        "Brianna Allen (Procurement Assistant)
15        General assistant to Susan and part-time
16        procurement technician.  Grad student at
17        USC (molecular bio/stem cells.)"
18        You were, in fact, not a grad student at
19  USC; correct?
20    MR. KOLLER:  Are you asking in her private
21  capacity as Brianna Baxter?
22    MR. MCMANUS:  Let me rephrase.
23    MR. KOLLER:  Thank you.
24  BY MR. MCMANUS:
25    Q.  You did not attend grad school at USC;

1 correct?
2 MR. KOLLER: Again, it's vague.
3 Again, are you talking about her as Brianna
4 Baxter or this person Brianna Allen? Just so I'm --
5 just so we're clear what the question is.
6 MR. MCMANUS: I'm talking about the
7 witness' actual experience.
8 MR. KOLLER: You may answer.
9 THE WITNESS: No.
10 BY MR. MCMANUS:
11 Q. But you went to NAF's annual meeting
12 claiming to be Brianna Allen, a grad student from
13 USC; correct?
14 MR. KOLLER: Objection; assumes facts not
15 in evidence, vague and ambiguous.
16 I'd advise my client not to answer on the
17 grounds it may incriminate her.
18 BY MR. MCMANUS:
19 Q. Do you intend to assert the Fifth Amendment
20 with respect to that question?
21 A. Yes.
22 Q. You yourself are not a part-time
23 technician; correct?
24 MR. KOLLER: Objection; vague, ambiguous,
25 calls for a legal conclusion.

1 I'd ask -- or I'd advise my client not to
2 answer on the grounds it may incriminate her.
3 BY MR. MCMANUS:
4 Q. Do you intend to assert the Fifth Amendment
5 with respect to that question?
6 A. Yes.
7 Q. Under that, it says "Robert Sarkis (VP for
8 Operations)."
9 That was the name David Daleiden used to
10 infiltrate NAF's 2014 annual meeting; correct?
11 MR. KOLLER: Objection; assumes facts not
12 in evidence.
13 Advise my client not to answer on the
14 grounds it may incriminate her.
15 BY MR. MCMANUS:
16 Q. Do you intend to assert the Fifth Amendment
17 with respect to that question?
18 A. Yes.
19 Q. In that paragraph following that it says:
20 "Brianna knows him from undergrad (San Jose
21 State)."
22 You yourself did not attend undergraduate
23 at San Jose State; correct?
24 A. No, I did not.
25 Q. But at NAF's 2014 annual meeting you posed

1 as Brianna Allen who claimed to know Robert Sarkis
2 from his -- from their undergrad at San Jose State;
3 correct?
4 MR. KOLLER: Objection; assumes facts not
5 in evidence, vague and ambiguous.
6 Advise my client not to answer on the
7 grounds it may incriminate her.
8 BY MR. MCMANUS:
9 Q. Do you intend to assert the Fifth Amendment
10 with respect to that question?
11 A. Yes.
12 MR. MCMANUS: Now introducing as Exhibit
13 550 a document Bates-stamped CM03471, which is an
14 e-mail dated March 22nd, 2014, from David Daleiden
15 to a Brianna and an Anna Bettisworth, attaching a
16 document entitled "BioMax Donor Center App.pdf."
17 (Deposition Exhibit 550 was marked for
18 identification.)
19 THE WITNESS: (Reviewing document.)
20 BY MR. MCMANUS:
21 Q. Ms. Baxter, have you seen this document
22 prior to today?
23 MR. KOLLER: Objection; lack of foundation,
24 vague and ambiguous.
25 I'd advise my client not to answer on the

1 grounds it may incriminate her.
2 BY MR. MCMANUS:
3 Q. Do you intend to assert the Fifth Amendment
4 with respect to that privilege -- with respect to
5 that question? Excuse me.
6 A. Yes.
7 Q. To this e-mail Mr. Daleiden attached a
8 document entitled "BioMax Procurement Services, LLC
9 Donor Center Application."
10 You, Mr. Daleiden, and others posing as
11 officials of BioMax Procurement Services, LLC handed
12 out this Donor Center Application at NAF's 2014
13 annual meeting; correct?
14 MR. KOLLER: Objection; assumes facts not
15 in evidence, vague and ambiguous.
16 Advise my client not to answer on the
17 grounds it may incriminate her.
18 BY MR. MCMANUS:
19 Q. Do you intend to assert the Fifth Amendment
20 with respect to that question?
21 A. Yes.
22 Q. Did you ever respond to Mr. Daleiden's
23 request for thoughts on this draft Donor Center
24 Application that he attached as Exhibit 550?
25 MR. KOLLER: Objection; assumes facts not

## Page 214

1  in evidence, vague and ambiguous.
2      I'd advise my client not to answer on the
3  grounds it may incriminate her.
4  BY MR. MCMANUS:
5      Q.  Do you intend to assert the Fifth Amendment
6  with respect to that question?
7      A.  Yes.
8      Q.  In preparing to infiltrate NAF in 2014, CMP
9  created a front company called BioMax Procurement
10  Services; correct?
11      MR. KOLLER:  Objection; assumes facts not
12  in evidence, vague and ambiguous.
13      I'd advise my client not to answer on the
14  grounds it may incriminate her.
15  BY MR. MCMANUS:
16      Q.  Do you intend to assert the Fifth Amendment
17  with respect to that question?
18      A.  Yes.
19      Q.  BioMax created a fake website, fake phone
20  numbers, fake e-mails, and fake executives with
21  titles to infiltrate reproductive health
22  conferences, including NAF's 2014 annual meeting;
23  correct?
24      MR. KOLLER:  Objection; assumes facts not
25  in evidence, lack of foundation.

## Page 215

1      Advise my client not to answer on the
2  grounds it may incriminate her.
3  BY MR. MCMANUS:
4      Q.  Do you intend to assert the Fifth Amendment
5  with respect to that question?
6      A.  Yes.
7      Q.  You were aware that NAF meetings were not
8  open to the general public; correct?
9      MR. KOLLER:  Objection; assumes facts not
10  in evidence.
11      Advise my client not to answer on the
12  grounds it may incriminate her.
13  BY MR. MCMANUS:
14      Q.  Do you intend to assert the Fifth Amendment
15  with respect to that question?
16      A.  Yes.
17      MR. MCMANUS:  I'm now marking as Exhibit
18  551 a document with the Bates stamped NAF0000379.
19      (Deposition Exhibit 551 was marked for
20  identification)
21      THE WITNESS:  (Reviewing document.)
22  BY MR. MCMANUS:
23      Q.  This document is entitled "Confidentiality
24  Agreement for NAF Annual Meeting April 5th through
25  8th, 2014."

## Page 216

1      You signed this confidentiality agreement
2  to obtain access to NAF's 2014 annual meeting;
3  correct?
4      MR. KOLLER:  Objection; assumes facts not
5  in evidence, lacks foundation.
6      I'd advise my client not to answer on the
7  grounds it may incriminate her.
8  BY MR. MCMANUS:
9      Q.  Do you intend to take the Fifth Amendment
10  with respect to that question?
11      A.  Yes.
12      Q.  I'll appoint you to Number 1, which says:
13      "Videotaping or Other Recording Prohibited:
14      Attendees are prohibited from making video,
15      audio, photographic, or other recordings of
16      the meetings or discussions at this
17      conference."
18      You had no intention of complying with
19  paragraph 1 of the confidentiality agreement marked
20  as Exhibit 551; correct?
21      MR. KOLLER:  Objection; assumes facts not
22  in evidence, lack of foundation.
23      Advise my client not to answer on the
24  grounds it may incriminate her.
25  //

## Page 217

1  BY MR. MCMANUS:
2      Q.  Do you intend to assert the Fifth Amendment
3  with respect to that question?
4      A.  Yes.
5      Q.  In fact, when you attended NAF's 2014
6  annual meeting you did not comply with paragraph 1
7  of the confidentiality agreement which you signed;
8  correct?
9      MR. KOLLER:  Objection; assumes facts not
10  in evidence, lacks foundation.
11      Advise my client not to answer on the
12  grounds it may incriminate her.
13  BY MR. MCMANUS:
14      Q.  Do you intend to assert the Fifth Amendment
15  with respect to that question?
16      A.  Yes.
17      Q.  I'll point you now to paragraph 3, which
18  says:
19      "Disclosure of NAF Materials to Third
20      Parties:  Attendees may not disclose any
21      NAF Conference Information to third parties
22      without first obtaining NAF's express
23      written consent, which will not be
24      unreasonably withheld."
25      You had no intent of complying with

paragraph 3 of NAF's -- of the confidentiality agreement for NAF's 2014 annual meeting; correct?
MR. KOLLER: Objection; assumes facts not in evidence, lack of foundation.
Advise my client not to answer on the grounds it may incriminate her.
BY MR. MCMANUS:
Q. Do you intend to take the Fifth Amendment with respect to that question?
A. Yes.
Q. In fact, when you infiltrated NAF's 2014 annual meeting you did not comply with paragraph 3 of the confidentiality agreement for NAF's 2014 annual meeting; correct?
MR. KOLLER: Objection; assumes facts not in evidence, lack of foundation.
I'd advise my client not to answer on the grounds it may incriminate her.
BY MR. MCMANUS:
Q. Do you intend to assert the Fifth Amendment with respect to that question?
A. Yes.
Q. You did not, in fact, first obtain NAF's express written consent for disclosing NAF materials to third parties; correct?

MR. KOLLER: Objection; assumes facts not in evidence, vague and ambiguous.
Advise my client not to answer on the grounds it may incriminate her.
BY MR. MCMANUS:
Q. Do you intend to assert the Fifth Amendment with respect to that question?
A. Yes.
Q. You knew that if you were to ask NAF for its express written consent to release videotapes taped at NAF's 2014 annual meeting without the consent of attendees, that it would not be unreasonable for NAF to withhold consent for that disclosure; correct?
MR. KOLLER: Objection; assumes facts not in evidence, vague and ambiguous, lacks foundation.
Advise my client not to answer on the grounds it may incriminate her.
BY MR. MCMANUS:
Q. Do you intend to assert the Fifth Amendment with respect to that question?
A. Yes.
Q. At the bottom, it says "Name: Brianna Allen. Name of Organization: BioMax," with a signature dated 4/5/14, that is April 5th, 2014, and

a blank "Professional Title."
Is that the signature you used for the character Brianna Allen on Exhibit 551?
MR. KOLLER: Objection; assumes facts not in evidence, lacks foundation.
Advise my client not to answer on the grounds it may incriminate her.
BY MR. MCMANUS:
Q. Do you intend to assert the Fifth Amendment with respect to that question?
A. Yes.
Q. When you infiltrated NAF's 2014 annual meeting, you had no intention of honoring any portion of this nondisclosure agreement which prohibited the video and audio recording of NAF's annual meetings and its attendees; correct?
MR. KOLLER: Objection; assumes facts not in evidence, lack of foundation.
Advise my client not to answer on the grounds it may incriminate her.
BY MR. MCMANUS:
Q. Do you intend to take the Fifth Amendment with respect to that question?
A. Yes.
MR. MCMANUS: Okay. I'm about to play a

clip.
Can we just go off the record for one moment.
MS. MAYO: Yeah.
THE VIDEOGRAPHER: This marks the end of media labeled Number 5. Off the record at 2:26 p.m.
(Pause in the proceedings)
THE VIDEOGRAPHER: This marks the beginning of media file labeled Number 6. Back on the record at 2:32 p.m.
MR. MCMANUS: I'm going to introduce as Exhibit 552 this document.
(Deposition Exhibit 552 was marked for identification)
BY MR. MCMANUS:
Q. This document represents counsel for NAF's best efforts to transcribe the audio clip that I'm about to show you.
I will not purport this transcript is entirely accurate because, as you will tell, sometimes the audio is difficult to hear, but it represents our best efforts.
Do you understand?
A. Yes.
Q. All right. I'm going to play this audio

1 clip.
2 　　If you could please listen to it, and I'm
3 happy to play it again if you need to hear it again.
4 　　(Audio clip marked as Exhibit 553 was
5 　　played during the proceedings)
6 BY MR. MCMANUS:
7 　　Q. Would you like to hear that again?
8 　　A. No.
9 　　Q. This is audio of you filling out a
10 confidentiality agreement at NAF's 2014 annual
11 meeting; correct?
12 　　MR. KOLLER: Objection; assumes facts not
13 in evidence, lack of foundation.
14 　　I'd advise my client not to answer on the
15 grounds it may incriminate her.
16 BY MR. MCMANUS:
17 　　Q. Do you intend to assert the Fifth Amendment
18 with respect to that question?
19 　　A. Yes.
20 　　Q. Did you recognize your voice in that
21 video -- that audio --
22 　　MR. KOLLER: I'd --
23 　　MR. MCMANUS: -- I'm sorry, strike that.
24 BY MR. MCMANUS:
25 　　Q. Did you recognize your voice in that audio

1 clip?
2 　　MR. KOLLER: I'd advise my client not to
3 answer that on the grounds it may incriminate her.
4 BY MR. MCMANUS:
5 　　Q. Do you intend to assert the Fifth Amendment
6 with respect to that question?
7 　　A. Yes.
8 　　Q. Did you recognize the voice of Sandra Susan
9 Merritt in that video?
10 　　MR. KOLLER: I would object lack of
11 foundation, assumes facts not in evidence.
12 　　And advise my client not to answer on the
13 grounds it may incriminate her.
14 BY MR. MCMANUS:
15 　　Q. Do you intend to assert the Fifth Amendment
16 with respect to that question?
17 　　A. Yes.
18 　　Q. On the transcript about halfway down, it
19 says:
20 　　"Allen: What did we decide my title was
21 　　again?"
22 　　Do you remember hearing that in the audio
23 clip?
24 　　A. Yes, I remember hearing that in the audio
25 clip.

1 　　Q. Was that you asking Ms. Merritt who was
2 posing as Susan Tennenbaum, the CEO of BioMax
3 Procurement Services, what title they had assigned
4 to you in connection with your character Brianna
5 Allen?
6 　　MR. KOLLER: I'm going to object assumes
7 facts not in evidence, lack of foundation.
8 　　Advise my client not to answer on the
9 grounds it may incriminate her.
10 BY MR. MCMANUS:
11 　　Q. Do you intend to assert the Fifth Amendment
12 with respect to that question?
13 　　A. Yes.
14 　　Q. Ms. Merritt responds:
15 　　"You don't have one, my dear."
16 　　Do you remember hearing that in the audio
17 clip?
18 　　MR. KOLLER: I will lodge an objection as
19 it relates to ascribing it to a particular person.
20 　　If you're asking if she just heard that
21 line, I have no objection. She can answer that.
22 　　MR. MCMANUS: I'll rephrase my question.
23 BY MR. MCMANUS:
24 　　Q. Did you hear someone say that in the audio
25 clip?

1 　　A. Yes.
2 　　Q. That person was Ms. Merritt; correct?
3 　　MR. KOLLER: Objection; assumes facts not
4 in evidence, lack of foundation.
5 　　I'd advise my client not to answer on the
6 grounds it may incriminate her.
7 BY MR. MCMANUS:
8 　　Q. Do you intend to assert the Fifth Amendment
9 with respect to that question?
10 　　A. Yes.
11 　　Q. Ms. Merritt's statement "You don't have
12 one, my dear" explains why you left the title field
13 blank on Exhibit 551, which is the confidentiality
14 agreement you signed with NAF to enter its 2014
15 annual meeting; correct?
16 　　MR. KOLLER: Objection; assumes facts not
17 in evidence, compound question, lack of foundation.
18 　　I'd advise my client not to answer on the
19 grounds it may incriminate her.
20 BY MR. MCMANUS:
21 　　Q. Do you intend to assert the Fifth Amendment
22 with respect to that question?
23 　　A. Yes.
24 　　Q. A little ways down, it says -- the
25 transcript says: "Merritt: Niece. Yes."

1      Do you remember someone saying "niece" in
2  the audio clip?
3      A. I think so. It was a little unclear.
4      Q. Would you like me to play the audio clip
5  again?
6      A. I remember that part.
7      Q. Okay.
8      A. And that particular word wasn't terribly
9  clear, but it could have been "niece."
10      Q. That person was Ms. Merritt; correct?
11      MR. KOLLER: Objection; assumes facts not
12  in evidence, lack of foundation.
13      Advise my client not to answer on the
14  grounds it may incriminate her.
15  BY MR. MCMANUS:
16      Q. Do you intend to assert the Fifth Amendment
17  with respect to that question?
18      A. Yes.
19      Q. Ms. Merritt said that because you were
20  posing as Susan Tennenbaum's niece when you
21  impersonated Brianna Allen at NAF's 2014 annual
22  meeting; correct?
23      MR. KOLLER: Objection; assumes facts not
24  in evidence, lack of foundation, vague and
25  ambiguous.

1      I advise my client not to answer on the
2  grounds it may incriminate her.
3  BY MR. MCMANUS:
4      Q. Do you intend to assert the Fifth Amendment
5  with respect to that question?
6      A. Yes.
7      Q. Under that, it says:
8      "NAF Employee: Nope, that's it. Thank
9      you. This is your badge and the lanyard to
10      hook up your badge on is in this bag."
11      Did I read that correctly?
12      A. Yes.
13      Q. Do you remember hearing that in the audio
14  clip?
15      A. Yes.
16      Q. A NAF employee told you that when you were
17  checking in and signing the confidentiality
18  agreement to enter NAF's 2014 annual meeting;
19  correct?
20      MR. KOLLER: Objection; assumes facts not
21  in evidence, lack of foundation.
22      Advise my client not to answer on the
23  grounds it may incriminate her.
24  BY MR. MCMANUS:
25      Q. Do you intend to assert the Fifth Amendment

1  with respect to that question?
2      A. Yes.
3      Q. You needed a NAF conference badge to get
4  access to all sessions at NAF's annual meeting in
5  2014; correct?
6      MR. KOLLER: Objection; assumes facts not
7  in evidence, lack of foundation, vague and
8  ambiguous.
9      I'd advise my client not to answer on the
10  grounds it may incriminate her.
11  BY MR. MCMANUS:
12      Q. Do you intend to assert the Fifth Amendment
13  to that question?
14      A. Yes.
15      Q. You received a NAF conference badge under
16  the assumed name of Brianna Allen through fraud and
17  false pretenses; correct?
18      MR. KOLLER: Objection; assumes facts not
19  in evidence, lack of foundation, vague and
20  ambiguous, calls for a legal conclusion.
21      Advise my client not to answer on the
22  grounds it may incriminate her.
23  BY MR. MCMANUS:
24      Q. Do you intend to assert the Fifth Amendment
25  with respect to that question?

1      A. Yes.
2      Q. You're aware that to get a NAF conference
3  badge a person is required to present valid,
4  personal identification; correct?
5      MR. KOLLER: Objection; assumes facts not
6  in evidence, lack of foundation.
7      Advise my client not to answer on the
8  grounds it may incriminate her.
9  BY MR. MCMANUS:
10      Q. Do you intend to assert the Fifth Amendment
11  with respect to that question?
12      A. Yes.
13      Q. You were aware that David Daleiden used a
14  fake California driver's license bearing the name
15  Robert Sarkis to get access to NAF's 2014 annual
16  meeting; correct?
17      MR. KOLLER: Objection; assumes facts not
18  in evidence, lack of foundation, vague and
19  ambiguous.
20      Advise my client not to answer on the
21  grounds it may incriminate her.
22  BY MR. MCMANUS:
23      Q. Do you intend to assert the Fifth Amendment
24  with respect to that question?
25      A. Yes.

## Page 230

1  Q.  You were aware that Sandra Susan Merritt
2  used a fake California driver's license bearing the
3  name Susan Tennenbaum to gain access to NAF's 2014
4  annual meeting; correct?
5      MR. KOLLER:  Objection; assumes facts not
6  in evidence, lack of foundation, vague and
7  ambiguous.
8      Advise my client not to answer on the
9  grounds it may incriminate her.
10 BY MR. MCMANUS:
11     Q.  Do you intend to assert the Fifth Amendment
12 with respect to that question?
13     A.  Yes.
14     Q.  What ID did you use to get access to NAF's
15 annual meeting in 2014?
16     MR. KOLLER:  Objection; assumes facts not
17 in evidence, lack of foundation, vague and
18 ambiguous.
19     I'd advise my client not to answer on the
20 grounds it may incriminate her.
21 BY MR. MCMANUS:
22     Q.  Do you intend to assert the Fifth Amendment
23 with respect to that question?
24     A.  Yes.
25     Q.  Did the identification you used to gain

## Page 231

1  access to NAF's annual meeting in 2014 bear the name
2  Brianna Allen?
3      MR. KOLLER:  Objection; assumes facts not
4  in evidence, lack of foundation, vague and
5  ambiguous.
6      I'd advise my client not to answer on the
7  grounds it may incriminate her.
8  BY MR. MCMANUS:
9      Q.  Do you intend to assert the Fifth Amendment
10 with respect to that question?
11     A.  Yes.
12     Q.  You were aware that NAF prohibited video
13 and audio recording of any session or of
14 participants in NAF's annual meetings; correct?
15     MR. KOLLER:  Objection; assumes facts not
16 in evidence, lack of foundation.
17     I would advise my client not to answer on
18 the grounds it may incriminate her.
19 BY MR. MCMANUS:
20     Q.  Do you intend to assert the Fifth Amendment
21 with respect to that question?
22     A.  Yes.
23     Q.  You brought hidden video and audio
24 recording equipment with you into NAF's annual
25 meeting in 2014; correct?

## Page 232

1      MR. KOLLER:  Objection; assumes facts not
2  in evidence, lacks foundation, vague and ambiguous.
3      I'd advise my client not to answer on the
4  grounds it may incriminate her.
5  BY MR. MCMANUS:
6      Q.  Do you intend to assert the Fifth Amendment
7  with respect to that question?
8      A.  Yes.
9      Q.  Once in NAF's annual meeting in 2014, you
10 recorded everything you saw and everyone you talked
11 to, indiscriminately; correct?
12     MR. KOLLER:  Objection; assumes facts not
13 in evidence, lacks foundation, vague and ambiguous.
14     I'd advise my client not to answer on the
15 grounds it may incriminate her.
16 BY MR. MCMANUS:
17     Q.  Do you intend to assert the Fifth Amendment
18 with respect to that question?
19     A.  Yes.
20     Q.  You kept the hidden video and audio
21 equipment running all the time during your
22 attendance at the 2014 NAF annual meeting; correct?
23     MR. KOLLER:  Objection; assumes facts not
24 in evidence, lack of foundation, vague and
25 ambiguous.

## Page 233

1      I'd advise my client not to answer on the
2  grounds it may incriminate her.
3  BY MR. MCMANUS:
4      Q.  Do you intend to assert the Fifth Amendment
5  with respect to that question?
6      A.  Yes.
7      Q.  You taped conference presentations at the
8  2014 NAF annual meeting; correct?
9      MR. KOLLER:  Objection; assumes facts not
10 in evidence, lacks foundation.  It's vague and
11 ambiguous.
12     I'd advise my client not to answer on the
13 grounds it may incriminate her.
14 BY MR. MCMANUS:
15     Q.  Do you intend to assert the Fifth Amendment
16 with respect to that question?
17     A.  Yes.
18     Q.  You taped individual conversations --
19 excuse me.  Strike that.
20     You taped individual conversations with NAF
21 members that you met at the 2014 NAF annual meeting;
22 correct?
23     MR. KOLLER:  Objection; assumes facts not
24 in evidence, lack of foundation, vague and
25 ambiguous.

Page 234

1    Advise my client not to answer on the
2  grounds it may incriminate her.
3  BY MR. MCMANUS:
4    Q.  Do you intend to assert the Fifth Amendment
5  with respect to that question?
6    A.  Yes.
7    Q.  You didn't tell the people that you
8  surreptitiously recorded that you were filming them
9  and recording them; correct?
10    MR. KOLLER:  Objection; assumes facts not
11  in evidence, lacks foundation, vague and ambiguous.
12    I'd advise my client not to answer on the
13  grounds it may incriminate her.
14  BY MR. MCMANUS:
15    Q.  Do you intend to assert the Fifth Amendment
16  with respect to that question?
17    A.  Yes.
18    Q.  You were aware at the time that anti-wire
19  tapping laws made it illegal to surreptitiously
20  record a conversation of another person without
21  their consent; correct?
22    MR. KOLLER:  Objection; assumes facts not
23  in evidence, vague and ambiguous, lack of
24  foundation, calls for a legal conclusion.
25    And I would advise my client not to answer

Page 235

1  on the grounds it may incriminate her.
2  BY MR. MCMANUS:
3    Q.  Do you intend to assert the Fifth Amendment
4  with respect to that privilege [sic]?
5    A.  Yes.
6    Sorry, you mean "question"; right?
7    Q.  Question.  Sorry, I keep saying that.
8    CMP intended to gather short, viral,
9  undercover, gotcha videos that Mr. Daleiden would
10  post to YouTube at the end of the project; correct?
11    MR. KOLLER:  Objection; assumes facts not
12  in evidence, lack of foundation, vague and
13  ambiguous.
14    Advise my client not to answer on the
15  grounds it may incriminate her.
16  BY MR. MCMANUS:
17    Q.  Do you intend to assert the Fifth Amendment
18  with respect to that question?
19    A.  Yes.
20    Q.  You received training from Mr. Daleiden to
21  get NAF meeting attendees to say specific things;
22  correct?
23    MR. KOLLER:  Objection; assumes facts not
24  in evidence, lacks foundation, vague and ambiguous.
25    Advise my client not to answer on the

Page 236

1  grounds it may incriminate her.
2  BY MR. MCMANUS:
3    Q.  Do you intend to assert the Fifth Amendment
4  with respect to that question?
5    A.  Yes.
6    MR. MCMANUS:  552?
7    THE REPORTER:  553.  Are you marking the
8  video?
9    MR. MCMANUS:  Yes.  I'm sorry, I forgot to
10  do that.
11    I'm going to mark this CD as Exhibit 553.
12  I'm also marking that as highly confidential,
13  attorneys' eyes only in compliance with the
14  protective order in both the NAF and Planned
15  Parenthood cases.
16    (Deposition Exhibit 553 was marked for
17    identification)
18    MR. KOZINA:  Is that the entirety of that
19  exhibit or just a portion of it, Counsel?
20    MR. MCMANUS:  It is the entirety of the
21  clip that I just played.
22    MR. KOZINA:  Thank you.
23    MR. MCMANUS:  Now I'm marking as Exhibit
24  554 this photograph.
25    (Deposition Exhibit 554 was marked for

Page 237

1    identification)
2  BY MR. MCMANUS:
3    Q.  Ms. Baxter, do you recognize this
4  photograph?
5    MR. KOLLER:  I'm going to object as asked
6  and answered.
7    This is a color photo of Exhibit 542.  So I
8  would object on that grounds.
9    Basically, also advise my client not to
10  answer on the grounds it may incriminate her.
11  BY MR. MCMANUS:
12    Q.  Do you intend to assert the Fifth Amendment
13  with respect to that question?
14    A.  Yes.
15    Q.  This is a color version of Exhibit 542;
16  correct?
17    A.  Yes.
18    Q.  The person sitting next to you is Sandra
19  Susan Merritt; correct?
20    MR. KOLLER:  Objection; asked and answered.
21  Also, it assumes facts not in evidence.  I would
22  object.
23    And I also advise my client not to answer
24  on the grounds it may incriminate her.
25    //

1 BY MR. MCMANUS:
2    Q. Do you intend to assert the Fifth Amendment
3 with respect to that question?
4    A. Yes.
5    Q. And that's you on the right; correct?
6    MR. KOLLER: Objection; again, asked and
7 answered.
8    And I'd advise my client not to answer on
9 the grounds it may incriminate her.
10 BY MR. MCMANUS:
11    Q. Do you intend to assert the Fifth Amendment
12 with respect to that question?
13    A. Yes.
14    Q. Both of you are wearing NAF exhibitor name
15 badges; correct?
16    MR. KOLLER: Objection; lacks foundation.
17    Advise my client not to answer on the
18 grounds it may incriminate her.
19 BY MR. MCMANUS:
20    Q. Do you intend to assert the Fifth Amendment
21 with respect to that question?
22    A. Yes.
23    Q. Those name badges bear the names Susan
24 Tennenbaum and Brianna Allen; correct?
25    MR. KOLLER: Objection; assumes facts not

1 in evidence, lacks foundation.
2    I'd advise my client not to answer on the
3 grounds it may incriminate her.
4 BY MR. MCMANUS:
5    Q. Do you intend to assert the Fifth Amendment
6 with respect to that question?
7    A. Yes.
8    Q. Are you wearing video or audio recording
9 equipment in this photograph?
10    MR. KOLLER: I'd advise my client not to
11 answer that on the grounds it may incriminate her.
12 BY MR. MCMANUS:
13    Q. Do you intend to assert the Fifth Amendment
14 with respect to that question?
15    A. Yes.
16    Q. The scarf that's around your neck is hiding
17 video and audio recording equipment; correct?
18    MR. KOLLER: Objection; assumes facts not
19 in evidence, lacks foundation.
20    I'd advise my client not to answer on the
21 grounds it may incriminate her.
22 BY MR. MCMANUS:
23    Q. Do you intend to assert the Fifth Amendment
24 with respect to that question?
25    A. Yes.

1    MR. MCMANUS: Marking as 555 an image
2 Bates-stamped NAF0001198.
3    (Deposition Exhibit 555 was marked for
4    identification.)
5 BY MR. MCMANUS:
6    Q. Is this the business card that you used in
7 conjunction with impersonating Brianna Allen at
8 NAF's 2014 annual meeting?
9    MR. KOLLER: First of all, object. Assumes
10 facts not in evidence. Also, this is a 9-by-11
11 piece of paper which has a --
12    MR. MCMANUS: Let me -- sorry. Let me
13 rephrase the question.
14 BY MR. MCMANUS:
15    Q. Is this a scan of a business card that you
16 used in conjunction with impersonating Brianna Allen
17 at NAF's 2014 annual meeting?
18    MR. KOLLER: Objection; assumes facts not
19 in evidence, lacks foundation, vague and ambiguous.
20    I'd advise my client not to answer on the
21 grounds it may incriminate her.
22 BY MR. MCMANUS:
23    Q. Do you intend to assert the Fifth Amendment
24 with respect to that question?
25    A. Yes.

1    Q. Referring back to Exhibit 554, which is the
2 color image that I just showed you, the business
3 card depicted in Exhibit 555 is one of the business
4 cards depicted in the stack on the table in the
5 image; correct?
6    MR. KOLLER: Objection; assumes facts not
7 in evidence, lacks foundation, vague and ambiguous.
8    And I'd advise my client not to answer on
9 the grounds it may incriminate her.
10 BY MR. MCMANUS:
11    Q. Do you intend to assert the Fifth Amendment
12 with respect to that question?
13    A. Yes.
14    Q. You handed out the business card depicted
15 in Exhibit 555 to NAF members when they came to the
16 BioMax table at NAF's 2014 annual meeting; correct?
17    MR. KOLLER: Objection; assumes facts not
18 in evidence, lack of foundation, vague and
19 ambiguous.
20    I'd advise my client not to answer on the
21 grounds it may incriminate her.
22 BY MR. MCMANUS:
23    Q. Do you intend to assert the Fifth Amendment
24 with respect to that question?
25    A. Yes.

1    Q.  You handed out these business cards with
2  the intention that the NAF members to whom you
3  handed them would follow up with you after NAF's
4  2014 annual meeting; correct?
5        MR. KOLLER:  Objection; assumes facts not
6  in evidence, lack of foundation, vague and
7  ambiguous.
8        I'd advise my client not to answer on the
9  grounds it may incriminate her.
10  BY MR. MCMANUS:
11    Q.  Do you intend to assert the Fifth Amendment
12  with respect to that question?
13    A.  Yes.
14    Q.  In Exhibit 554 you'll notice various
15  pamphlets and literature on the BioMax Procurement
16  Services table.
17        You handed these brochures and pamphlets
18  out to NAF members when they came to the BioMax
19  Procurement Services table; correct?
20        MR. KOLLER:  Objection; assumes facts not
21  in evidence, lacks foundation as to what those items
22  are on the table.
23        I would advise my client not to answer on
24  the grounds it may incriminate her.
25  //

1  BY MR. MCMANUS:
2    Q.  Do you intend to assert the Fifth Amendment
3  with respect to that question?
4    A.  Yes.
5    Q.  NAF members did, in fact, approach you at
6  the BioMax Procurement Services table at NAF's 2014
7  annual meeting; correct?
8        MR. KOLLER:  Objection; assumes facts not
9  in evidence, lacks foundation, vague and ambiguous.
10        I'd advise my client not to answer on the
11  grounds it may incriminate her.
12  BY MR. MCMANUS:
13    Q.  Do you intend to assert the Fifth Amendment
14  with respect to that question?
15    A.  Yes.
16    Q.  Did you infiltrate any conferences of
17  reproductive healthcare providers after NAF's 2014
18  annual meeting?
19        MR. KOLLER:  I'd advise my client not to
20  answer that on the grounds it may incriminate
21  herself.
22  BY MR. MCMANUS:
23    Q.  Do you intend to assert the Fifth Amendment
24  with respect to that question?
25    A.  Yes.

1    Q.  Did you have any contact with David
2  Daleiden after NAF's 2014 annual meeting?
3        MR. KOLLER:  Objection; lack of foundation,
4  vague and ambiguous.
5        I'd advise my client not to answer that on
6  the grounds it may incriminate her.
7  BY MR. MCMANUS:
8    Q.  Do you intend to assert the Fifth Amendment
9  with respect to that question?
10    A.  Yes.
11        MR. MCMANUS:  I'm introducing as Exhibit
12  556 this document which is Bates-stamped CM03498.
13  It is an e-mail, dated July 8, 2014, with the
14  subject "Reimbursement?" from David Daleiden to a
15  Brianna, attaching CMP Contract 2014BB.pdf.
16        (Deposition Exhibit 556 was marked for
17        identification)
18  BY MR. MCMANUS:
19    Q.  I'll give you a moment to look over the
20  document and its attachment.
21    A.  (Reviewing document.)
22    Q.  Ms. Baxter, have you seen this e-mail,
23  Exhibit 556, before today?
24        MR. KOLLER:  I would advise my client not
25  to answer that on the grounds it may incriminate

1  herself.
2  BY MR. MCMANUS:
3    Q.  Do you intend to assert the Fifth Amendment
4  with respect to that question?
5    A.  Yes.
6    Q.  The document says:
7        "Hi Brianna!  I hope you are well."
8        Daleiden was saying "hope you are well"
9  because you had not been in -- you two had not been
10  in contact recently; correct?
11        MR. KOLLER:  Objection; assumes facts not
12  in evidence, lack of foundation.
13        I'd advise my client not to answer on the
14  grounds it may incriminate herself.
15  BY MR. MCMANUS:
16    Q.  Do you intend to assert the Fifth Amendment
17  with respect to that question?
18    A.  Yes.
19    Q.  Mr. Daleiden then says:  "School is over,
20  right?"
21        That's because you had gone back to school
22  following your infiltration of NAF's 2014 annual
23  meeting; correct?
24        MR. KOLLER:  Objection; assumes facts not
25  in evidence, lack of foundation, vague and

1 ambiguous.
2     I'd advise my client not to answer on the
3 grounds it may incriminate her.
4 BY MR. MCMANUS:
5     Q. Do you intend to assert the Fifth Amendment
6 with respect to that question?
7     A. Yes.
8     Q. Mr. Daleiden then says:
9       "I don't think I ever got any claims for
10       reimbursement from you."
11     What would Mr. Daleiden be reimbursing you
12 for?
13     MR. KOLLER: Objection; assumes facts not
14 in evidence, lack of foundation.
15     I'd advise my client not to answer on the
16 grounds it may incriminate herself.
17 BY MR. MCMANUS:
18     Q. Do you intend to assert the Fifth Amendment
19 with respect to that question?
20     A. Yes.
21     Q. Mr. Daleiden then asks:
22       "Otherwise, I think I owe you $500 for the
23       operation."
24     Was that the total amount that Mr. Daleiden
25 paid you for the operation?

1     MR. KOLLER: Objection; assumes facts not
2 in evidence, vague and ambiguous, lack of
3 foundation.
4     Advise my client not to answer on the
5 grounds it may incriminate her.
6 BY MR. MCMANUS:
7     Q. Do you intend to assert the Fifth Amendment
8 with respect to that question?
9     A. Yes.
10     Q. "The operation" that Mr. Daleiden refers to
11 was your infiltration of NAF's 2014 annual meeting;
12 correct?
13     MR. KOLLER: Objection; lack of foundation,
14 vague and ambiguous.
15     Advise my client not to answer on the
16 grounds it may incriminate her.
17 BY MR. MCMANUS:
18     Q. Do you intend to assert the Fifth Amendment
19 with respect to that question?
20     A. Yes.
21     Q. Mr. Daleiden then says:
22       "[...]if you can just sign the same
23       contract as last time (back date to April
24       3rd, 2014 or so) I can send that."
25     Mr. Daleiden is referring to the attached

1 Independent Contractor Agreement starting on the
2 page Bates-numbered CM03499 in Exhibit 556; correct?
3     MR. KOLLER: Objection; lack of foundation,
4 calls for speculation.
5     Advise my client not to answer on the
6 grounds it may incriminate her.
7 BY MR. MCMANUS:
8     Q. Do you intend to assert the Fifth Amendment
9 with respect to that question?
10     A. Yes.
11     Q. Now, in the Independent Contractor
12 Agreement that is attached to that e-mail, it says:
13       "This Contractor Agreement ('Agreement') is
14       effective as of" -- blank -- "('Effective
15       Date') by and between The Center for
16       Medical Progress, a California corporation,
17       as one Party, and Brianna Baxter
18       ('Contractor') as the other Party to this
19       Agreement."
20     You are the Brianna Baxter that this
21 Independent Contractor Agreement refers to; correct?
22     MR. KOLLER: Objection; vague and
23 ambiguous, lacks foundation.
24     Advise my client not to answer on the
25 grounds it may incriminate her.

1 BY MR. MCMANUS:
2     Q. Do you intend to assert the Fifth Amendment
3 with respect to that question?
4     A. Yes.
5     Q. In paragraph 1, "Services," it says:
6       "Contractor shall provide certain services
7       for The Center for Medical Progress as an
8       independent contractor (including, without
9       limitation, services such as investigative
10       research and journalism, expert analysis,
11       and other similar services ('Services')."
12     Do you have any training in journalism?
13     MR. KOLLER: I'd object as to relevance.
14     But you can answer.
15     THE WITNESS: No.
16 BY MR. MCMANUS:
17     Q. Did you ever take any journalism classes at
18 any point in your schooling?
19     MR. KOLLER: Objection; relevance.
20     But, again you can answer.
21     THE WITNESS: No.
22 BY MR. MCMANUS:
23     Q. Are you aware of any ethical standards that
24 apply to journalists?
25     MR. KOLLER: Objection; lacks foundation,

Page 250

1  assumes facts not in evidence, and calls for a legal
2  conclusion.
3       And I would advise her not to answer on the
4  grounds it may incriminate her.
5  BY MR. MCMANUS:
6       Q. Do you intend to assert the Fifth Amendment
7  with respect to that question?
8       A. Yes.
9       Q. In paragraph 4, "Compensation and
10  Reimbursement," under subsection (a) it says:
11          "Compensation: The Center for Medical
12          Progress agrees to pay Contractor $500 for
13          undercover work in the field from April 5th
14          to April 8th, 2014."
15          That refers to your infiltration of the NAF
16  2014 annual meeting; correct?
17       MR. KOLLER: Objection; assumes facts not
18  in evidence, lack of foundation, vague and
19  ambiguous.
20       And I'd advise my client not to answer on
21  the grounds it would -- it could -- it could
22  incriminate her.
23  BY MR. MCMANUS:
24       Q. Do you intend to assert the Fifth Amendment
25  with respect to that question?

Page 251

1       A. Yes.
2       Q. I am going to turn to paragraph 6 now,
3  which is on the next page. It says:
4          "Return of Work Product: Upon completion
5          of the Services, termination of this
6          Agreement or at The Center for Medical
7          Progress's request, Contractor shall
8          promptly return or deliver to The Center
9          for Medical Progress any and all work
10          product of any kind including, without
11          limitation, any and all video or audio
12          materials[...]"
13          And the list continues on.
14          Did you, in fact, return all work product
15  to the Center for Medical Progress as defined by
16  this Independent Contractor Agreement at the
17  termination of your -- at the termination of this
18  agreement with the Center for Medical Progress?
19       MR. KOLLER: I'd object assumes facts not
20  in evidence, compound question, lacks foundation,
21  vague, ambiguous, and calls for a legal conclusion.
22       And I'd advise my client not to answer on
23  the grounds it may incriminate her.
24  BY MR. MCMANUS:
25       Q. Do you intend to assert the Fifth Amendment

Page 252

1  with respect to that question?
2       A. Yes.
3       Q. Did you retain any documents or video that
4  you obtained from NAF's 2014 annual meeting?
5       MR. KOLLER: Objection; assumes facts not
6  in evidence, lack of foundation, vague and
7  ambiguous.
8       Advise my client not to answer on the
9  grounds it may incriminate her.
10  BY MR. MCMANUS:
11       Q. Do you intend to assert the Fifth Amendment
12  with respect to that question?
13       A. Yes.
14       MR. KOLLER: Doing okay?
15       THE WITNESS: Yeah.
16       MR. KOLLER: Okay.
17  BY MR. MCMANUS:
18       Q. Did you retain any e-mails, text messages,
19  voicemail messages, or other communications with
20  David Daleiden in conjunction with your work for the
21  Center for Medical Progress?
22       MR. KOLLER: Objection; assumes facts not
23  in evidence, lacks foundation, vague and ambiguous.
24       And I would advise my client not to answer
25  on the grounds it may incriminate her.

Page 253

1  BY MR. MCMANUS:
2       Q. Do you intend to assert the Fifth Amendment
3  with respect to that question?
4       A. Yes.
5       Q. I'm turning now to the next page under
6  paragraph 9. It says "Confidential Information."
7       Near the bottom of the page, after the
8  bolded "Confidential Information," the document
9  says:
10          "Contractor agrees that, upon termination
11          of this Agreement for any reason,
12          Contractor will immediately deliver to The
13          Center for Medical Progress all
14          documentation, computer files or other
15          items containing or relating to
16          Confidential Information as well as any
17          other matters which may involve the
18          operations of The Center for Medical
19          Progress or any of its associates[...]"
20          And it goes on.
21          What did you understand "Confidential
22  Information" to include?
23       MR. KOLLER: Objection; calls for a legal
24  conclusion, vague and ambiguous.
25       And I'd advise my client not to answer on

64

1 the grounds it may incriminate her.
2 BY MR. MCMANUS:
3 Q. Do you intend to assert the Fifth Amendment
4 with respect to that question?
5 A. Yes.
6 Q. Did you, in fact, return "all
7 documentation, computer files or other items
8 containing or relating to Confidential Information"
9 to the Center for Medical Progress at the
10 termination of this agreement?
11 MR. KOLLER: Objection; assumes facts not
12 in evidence, lack of foundation.
13 Advise my client not to answer on the
14 grounds it may incriminate her.
15 BY MR. MCMANUS:
16 Q. Do you intend to assert the Fifth Amendment
17 with respect to that question?
18 A. Yes.
19 Q. Did you in fact sign this agreement?
20 MR. KOLLER: Objection; assumes facts not
21 in evidence, lack of foundation.
22 Advise my client not to answer on the
23 grounds it may incriminate her.
24 BY MR. MCMANUS:
25 Q. Do you intend to assert the Fifth Amendment

1 with respect to that question?
2 A. Yes.
3 Q. Did Mr. Daleiden pay you $500 for your
4 infiltration of NAF's 2014 annual meeting?
5 MR. KOLLER: Objection; assumes facts not
6 in evidence, lack of foundation, vague and
7 ambiguous.
8 Advise my client not to answer on the
9 grounds it may incriminate her.
10 BY MR. MCMANUS:
11 Q. Do you intend to assert the Fifth Amendment
12 with respect to that question?
13 A. Yes.
14 Q. Did you know that the viral undercover
15 videos published by CMP on and after July 14th,
16 2015, would result in harassment, hate speech and
17 death threats to NAF meeting attendees and Planned
18 Parenthood officials who were depicted in those
19 videos?
20 MR. KOLLER: I'd object it assumes facts
21 not in evidence. I believe it's asked and answered.
22 Lacks foundation, vague and ambiguous, compound.
23 And I would advise my client not to answer
24 on the grounds it may incriminate her.
25 //

1 BY MR. MCMANUS:
2 Q. Do you intend to assert the Fifth Amendment
3 with respect to that question?
4 A. Yes.
5 Q. You intended to inflict harm on NAF with
6 these videos; correct?
7 MR. KOLLER: Objection; assumes facts not
8 in evidence, lacks foundation.
9 I'd advise my client not to answer that on
10 the grounds it may incriminate her.
11 BY MR. MCMANUS:
12 Q. Do you intend to assert the Fifth Amendment
13 with respect to that question?
14 A. Yes.
15 Q. Did you personally intend for the subjects
16 of CMP's viral video campaign to be victimized by
17 violence at the hands of extremists?
18 MR. KOLLER: Objection; assumes facts not
19 in evidence. Also, I believe it's been asked and
20 answered, lacks foundation, vague and ambiguous.
21 And I'd advise my client not to answer that
22 on the grounds it may incriminate her.
23 BY MR. MCMANUS:
24 Q. Do you intend to assert the Fifth Amendment
25 with respect to that question?

1 A. Yes.
2 Q. Are you aware that a court order prohibits
3 public disclosure of any video or audio recordings
4 taken from NAF annual meeting in 2019?
5 MR. KOLLER: Objection; assumes facts not
6 in evidence, lacks foundation, vague and ambiguous.
7 I'd advise my client not to answer on the
8 grounds it may incriminate her.
9 BY MR. MCMANUS:
10 Q. Do you intend to assert the Fifth Amendment
11 with respect to that question?
12 A. Yes.
13 Q. Are you currently engaged in any undercover
14 sting operations involving NAF's annual meetings?
15 MR. KOLLER: Objection; assumes facts not
16 in evidence, lacks foundation, vague and ambiguous.
17 And ask my client not to answer on the
18 grounds it may incriminate her.
19 BY MR. MCMANUS:
20 Q. Do you intend to assert the Fifth Amendment
21 with respect to that question?
22 A. Yes.
23 Q. Are you currently engaged in undercover
24 sting operations involving Planned Parenthood
25 clinics or events?

Page 258

1    MR. KOLLER: I'd object assumes facts not
2  in evidence.
3    I believe this has been asked and answered.
4    Lack of foundation, vague and ambiguous.
5    I'd advise my client not to answer on the
6  grounds it may incriminate her.
7  BY MR. MCMANUS:
8    Q. Do you intend to assert the Fifth Amendment
9  with respect to that question?
10   A. Yes.
11   Q. Are you currently a mole inside any
12 reproductive health organization or pro-choice
13 organization?
14   MR. KOLLER: Object; assumes facts not in
15 evidence, vague and ambiguous.
16   I'd advise my client not to answer on the
17 grounds it may incriminate her.
18 BY MR. MCMANUS:
19   Q. Do you intend to assert the Fifth Amendment
20 with respect to that question?
21   A. Yes.
22   Q. Are you wearing any hidden audio or video
23 recording equipment on your person right now?
24   MR. KOLLER: Objection; vague and
25 ambiguous, lacks foundation.

Page 259

1    I'd advise my client not to answer that on
2  the grounds it may incriminate her.
3  BY MR. MCMANUS:
4    Q. Do you intend to take the Fifth Amendment
5  with respect to that question?
6    A. Yes.
7    MR. MCMANUS: And I am going to pass the
8  witness back to Ms. Mayo if she has any questions.
9    MS. MAYO: I think I just have one
10 follow-up question. It really doesn't merit us
11 switching, so I'll talk loud.
12
13   FURTHER EXAMINATION
14 BY MS. MAYO:
15   Q. I think in response to some of your
16 questions -- or in response to some of my questions,
17 your counsel advised you to assert the Fifth
18 Amendment, and I may have neglected to follow up and
19 ask you if you were intending to assert the Fifth
20 Amendment.
21   So to clean that up, you intend to assert
22 the Fifth Amendment with respect to every question
23 where your counsel advised you to do so regardless
24 of whether I or Mr. McManus specifically asked you;
25 correct?

Page 260

1    A. That is correct.
2    Q. Okay.
3    A. I think you got them all, though.
4    Q. I think I missed one, actually. And I
5  think Mr. McManus missed one.
6    MS. MAYO: But with that, I have no further
7  questions.
8    THE VIDEOGRAPHER: I'll go ahead and
9  conclude.
10   This concludes today's deposition of
11 Brianna Baxter on May 11th, 2019, which consists of
12 six media files.
13   The original media files will remain in the
14 custody of TSG Reporting, Inc.
15   Off the record at 3:12 p.m.
16   (Time noted: 3:12 p.m.)
17
18
19
20
21
22
23
24
25

Page 261

1    DECLARATION UNDER PENALTY OF PERJURY
2
3    I, BRIANNA BAXTER, do hereby certify under
4  penalty of perjury that I have read the foregoing
5  transcript of my deposition taken on May 11, 2019;
6  that I have made such corrections as appear noted
7  herein in ink, initialed by me; that my testimony as
8  contained herein, as corrected, is true and correct.
9
10   DATED this        day of
11 2019, at                  , California.
12
13
14
15   BRIANNA BAXTER
16
17
18
19
20
21
22
23
24
25

## Page 262

REPORTER'S CERTIFICATE

I, CYNTHIA MANNING, a Certified Shorthand
Reporter of the State of California, do hereby
certify:

That the foregoing proceedings were taken
before me at the time and place herein set forth;
that any witnesses in the foregoing proceedings,
prior to testifying, were placed under oath; that a
verbatim record of the proceedings was made by me
using machine shorthand which was thereafter
transcribed under my direction; further, that the
foregoing is an accurate transcription thereof.

I further certify that I am neither
financially interested in the action, nor a relative
or employee of any attorney of any of the parties.

Before completion of the deposition, review
of the transcript [ ] was [X] was not requested.  If
requested, any changes made by the deponent (and
provided to the reporter) during the period allowed
are appended hereto.

In witness whereof, I have subscribed my
name this 14th day of May, 2019.

_____

CYNTHIA MANNING, CSR No. 7645, CCRR, CLR

## Page 263

I N D E X
SATURDAY, MAY 11, 2019
DEPOSITION OF BRIANNA BAXTER

EXAMINATION                          PAGE
BY MS. MAYO                        7, 259
AFTERNOON SESSION                   145
BY MR. MCMANUS                      172

* * *

## Page 264

I N D E X (Continued)
DEPOSITION EXHIBITS

EXHIBIT                              PAGE

Exhibit 531   Web page printout from      37
              Survivors of the Abortion
              Holocaust blog

Exhibit 532   E-mail(s)                   44
              CM00044 - CM00045

Exhibit 533   E-mails(s)                  64
              CM00100 - CM00102

Exhibit 534   Document titled "Confidential:  69
              Field Worker Vocabulary"
              CM16036 - CM16038

Exhibit 535   E-mail(s)                   74
              CM00014

Exhibit 536   Registration Confirmation for  75
              AHRP conference for Brianna Allen
              PP0000136 - PP0000141

## Page 265

I N D E X (Continued)
DEPOSITION EXHIBITS

EXHIBIT                              PAGE

Exhibit 537   BioMax brochure             87
              PP0000256 - PPOOOO257

Exhibit 538   Photocopies of California    99
              driver's licenses
              PP0000253 - PP0000254

Exhibit 539   Photocopy of Visa cards     102
              CM00005 - CM00006

Exhibit 540   E-mail(s)                  107
              CM02531 - CM02532

Exhibit 541   E-mail(s)                  112
              CM03463 - CM03465

Exhibit 542   Black and white photo of    116
              BioMax Exhibitors
              PP0007917

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

I N D E X (Continued)
DEPOSITION EXHIBITS

EXHIBIT                                    PAGE

Exhibit 543   E-mail(s)              152
              CM19457

Exhibit 544   E-mail(s)              182
              CM02525

Exhibit 545   E-mail(s)              186
              CM03481 - CM03484

Exhibit 546   E-mail(s)              186
              CM03493

Exhibit 547   E-mail(s), NAF Exhibitor      192
              Prospectus
              CM03441 - CM03451

Exhibit 548   E-mail(s), Application and     198
              Agreement for Exhibit Space
              CM03473 - CM03476

I N D E X (Continued)
DEPOSITION EXHIBITS

EXHIBIT                                    PAGE

Exhibit 549   E-mail(s)              205
              CM03468 - CM03472

Exhibit 550   E-mail(s)              212
              CM03471 - CM03472

Exhibit 551   NAF Confidentiality Agreement   215
              NAF0000379

Exhibit 552   Written transcript of        221
              140405_001_11700-11820.mp3

Exhibit 553   CD of Audio Clip for Exhibit    236
              552

Exhibit 554   Color photocopy of Exhibit     236
              542

I N D E X (Continued)
DEPOSITION EXHIBITS

EXHIBIT                                    PAGE

Exhibit 555   Photocopy of Brianna Allen's    240
              BioMax business card
              NAF0001198

Exhibit 556   E-mail(s), Independent        244
              Contractor Agreement
              CM03498 - CM03502
                        * * *

ERRATA SHEET FOR THE TRANSCRIPT OF:
Case Name:
Dep. Date:
Deponent:
               CORRECTIONS:
Pg. Ln.   Now Reads      Should Read   Reason

              Signature of Deponent
SUBSCRIBED AND SWORN BEFORE ME
THIS     DAY OF         , 2019.

(Notary Public)  MY COMMISSION EXPIRES:



# EXHIBIT 5

1                    UNITED STATES DISTRICT COURT

2                             FOR THE

3                  NORTHERN DISTRICT OF CALIFORNIA

4

5    _____

     PLANNED PARENTHOOD FEDERATION OF AMERICA,    )

6    INC., ET AL,                                  )

                                                   )

7           Plaintiff                              )

                                                   )

8        VS.                                       )

                                                   )

9    THE CENTER FOR MEDICAL PROGRESS, ET AL,       )

                                                   )

10          Defendant                              )

                                                   )

11

12          HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

13

14       Deposition of Annamarie Davin, taken on behalf of

15   the Plaintiffs, pursuant to the Federal Rules of Procedure,

16   before Tamara Gschwandtner, Professional Reporter and Notary

17   Public, at Fairfield Inn & Suites, 121 Circuit Lane,

18   Jacksonville, North Carolina on the 22nd day of March, 2019,

19   commencing at 9:37 a.m.

20

21

22

23

24

25   JOB NO. 156582

## Page 2

```
 1          A P P E A R A N C E S
 2
 3   On Behalf of Plaintiff NAF:
 4        CHRISTOPHER ROBINSON, ESQUIRE
          MORRISON & FOERSTER
 5        425 Market Street
          San Francisco, California 94105
 6
 7
 8   On Behalf of Plaintiff Planned Parenthood:
 9        JEREMY KAMRAS, ESQUIRE
          Arnold & Porter
          Three Embarcadero Center
10
          San Francisco, California 94111
11
12
13   On Behalf of Defendant Davin:
14        B. BROOKS, ESQUIRE
          4050 Yellowfield Way
          Cary, North Carolina 27518
15
16
17   On Behalf of Defendant Newman:
18        ERIK ZIMMERMAN, ESQUIRE
          AMERICAN CENTER FOR LAW & JUSTICE
          3001 Plymouth Road
19
          Ann Arbor, Michigan 48105
20
21
22
23
24
25
```

## Page 3

```
 1   On Behalf of Defendant Merritt:
 2        HORATIO MIHET, ESQUIRE
          LIBERTY COUNSEL
 3        Post Office Box 540774
          Orlando, Florida 32854
 4
 5
 6   On Behalf of Defendant Rhomberg:
 7        CATHERINE SHORT, ESQUIRE
          LIFE LEGAL DEFENSE FOUNDATION
 8        Post Office Box 1313
 9        Ojai, California 93024
          Appearing via telephone
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
 1              I N D E X
 2
 3   By Mr. Robinson                        7
 4   By Mr. Kamras                        253
 5
 6          E X H I B I T S
 7   PLAINTIFF'S      DESCRIPTION        MARKED
 8   Exhibit 200    Subpoena              6
 9   Exhibit 201    Linked In Profile     20
10   Exhibit 202    1-27-13 Email & Nondisclosure   38
                    agreement
11
12   Exhibit 203    Fetal Trafficking Road Map    53
13   Exhibit 204    Daleiden/Bettisworth Email with  72
                    draft proposal
14   Exhibit 205    2-17-13 Email & Undercover   106
                    Project Draft
15
16   Exhibit 206    Mettler Letter to Dyer 3-6-13  125
17   Exhibit 207    Daleiden/Mettler Email 3-2-13  126
18   Exhibit 208    David/Anna Email 5-3-13   136
19   Exhibit 209    David/Anna Email 5-3-13   150
20   Exhibit 210    Daleiden/Bettisworth Email   153
                    5-4-13 re: Resume
21   Exhibit 211    Daleiden/Bettisworth Email   158
                    5-9-13 & Gates Resume
22
23   Exhibit 212    Anna Christine Gates Resume   162
                    5-13-13
24   Exhibit 213    Daleiden/Brianna Email       181
                    Nondisclosure Agreement
25
```

## Page 5

```
 1   Exhibit 214    Bettisworth/Daleiden Email    186
                    8-22-13
 2
     Exhibit 215    California Driver's License    188
 3                  Annamarie Gates Bettisworth
 4   Exhibit 216    Three photos 4-18-15          200
 5   Exhibit 217    NAF Annual Meeting Registration 207
                    form for Wagner & Allen
 6
     Exhibit 218    Daleiden/Bettisworth Email    228
 7                  3-29-15 Road Map for Project
                    Release June 2015
 8
     Exhibit 219    Daleiden Email 7-13-15 Re:    237
 9                  Planned Parenthood
10   Exhibit 220    Bio Max, Rebecca Wagner business 241
                    card
11
     Exhibit 221    Survivo Brochure              265
12
     Exhibit 222    Bio Max Brochure              270
13
     Exhibit 223    Bio Max Donor Application     274
14
     Exhibit 224    California Driver's License    279
15                  Sarkis & Tennenbaum
16   Exhibit 225    Daleiden/Fred Email Re: Support 288
                    for undercover activity
17
     Exhibit 226    Janet Smith Article 6-20-13   288
18
19
20
21
22
23
24
25
```

## Page 6

1          (Plaintiff's Exhibit Number 200

2          marked for identification)

3          (The Video Deposition commenced at 9:37 a.m.)

4          THE VIDEOGRAPHER: The following will be the

5 videotaped deposition of Anna Marie Davin in the matter of

6 Planned Parenthood Federation of America, Incorporated et al

7 versus the Center for Medical Progress. Today's date is

8 March 22, 2019 and the time is 9:37 a.m.. We are here today

9 at the Fairfield Inn and Suites located a 121 Circuit Lane

10 Jacksonville, North Carolina. The court reporter today is

11 Ms. Tammy Gschwandtner and the videographer is Mr. Jon

12 Landau. At this time I will ask all attorneys present to

13 state your name and whom they represent for the record.

14          MR. ROBINSON: Christopher Robinson with

15 Morrison and Foerster for plaintiff NAF.

16          MR. KAMRAS: Jeremy Kamras with Arnold, Porter

17 for Plaintiff Planned Parenthood Federation of America and

18 affiliates.

19          MR. MIHET: Horatio Mihet, Liberty Counsel for

20 Defendant Sandra Susan Merritt.

21          MR. ZIMMERMAN: Erik Zimmerman, American Center

22 for Law and Justice for Defendant Troy Newman.

23          MR. BROOKS: Tyler Brooks, Law office of B.

24 Tyler Brooks Counsel for the witness, Annamarie Davin.

25          THE VIDEOGRAPHER: You may swear the witness.

## Page 7

1          ANNAMARIE DAVIN

2       The Witness, after being duly sworn

3          testified as follows:

4          DIRECT EXAMINATION

5 BY MR. ROBINSON:

6     Q. Hi, good morning, you heard me introduce myself,

7 Christopher Robinson, counsel for NAF. Thank you for

8 spending the day with us today. Could you please state your

9 name for the record?

10     A. Annamarie Gates Davin.

11     Q. Where do you currently live?

12          MR. BROOKS: If I could ask, I think there's a

13 protective order in this case, and if we could designate this

14 deposition transcript as attorneys eyes only, highly

15 confidential.

16          MR. ROBINSON: Okay.

17          MR. MIHET: I'll second that.

18 BY MR. ROBINSON:

19     Q. So the pending question, where do you currently

20 live?

21     A. Jacksonville, North Carolina.

22     Q. Do you go by any other legal names?

23     A. No.

24     Q. Have you previously held yourself out as Rebecca

25 Wagner in connection with your work at the Center for Medical

## Page 8

1 Progress?

2          MR. BROOKS: I'm going to object to the

3 question for form and lack of foundation; and also instruct

4 the witness not to answer on the grounds of the Fifth

5 Amendment of the U.S. Constitution as well as state privilege

6 including California Constitution Article 1, Section 15 and

7 Article 1, section 23 of the North Carolina Constitution and

8 instruct the witness not to answer.

9 BY MR. ROBINSON:

10     Q. Will the witness answer?

11     A. I am asserting my rights under the Fifth Amendment

12 to the United States Constitution as well as state law

13 including Article 1, Section 15 of the California

14 Constitution and Article 1, Section 23 of the North Carolina

15 Constitution and therefore I respectfully decline to answer.

16     Q. So the Center for Medical Progress I might

17 abbreviate to CMP. You will understand me if I do that?

18     A. Yes.

19     Q. Have you assumed any other adopted names in

20 connection with your work for CMP?

21          MR. BROOKS: Again, we object on the grounds of

22 form, lack of foundation, and also under the Fifth Amendment

23 of the U.S. Constitution as well as state privilege including

24 California Constitution Article 1, Section 15 and Article 1

25 Section 23 of the North Carolina Constitution and I therefore

## Page 9

1 instruct the witness not to answer.

2     A. I am asserting my rights under the Fifth Amendment

3 to the United States Constitution as well as state law

4 including Article 1, Section 15 of the California

5 constitution and Article 1, Section 23 of the North Carolina

6 Constitution and therefore I respectfully decline to

7 answer.

8 BY MR. ROBINSON:

9     Q. Have you ever been convicted of a felony?

10     A. No.

11     Q. Have you ever been arrested?

12     A. Yes.

13     Q. Describe in what context you have previously been

14 arrested.

15          MR. MIHET: Form, relevance.

16          MR. BROOKS: Ill join that objection.

17     A. I was arrested for using sidewalk chalk on the wrong

18 part of a sidewalk. It was the private part of a sidewalk

19 versus the public part of a sidewalk, and it was accidental.

20 I offered to use a water bottle to wash it off.

21 BY MR. ROBINSON:

22     Q. Did that occur in connection with some kind of

23 protest work?

24          MR. BROOKS: Objection, relevance and form, but

25 you can answer.

## Page 10

1    A.  I wouldn't consider it protest work.  It was
2  educational work.
3  BY MR. ROBINSON:
4    Q.  What was the nature of the work?
5    MR. BROOKS: Objection to form, relevance, but
6  you can answer.
7    MR. KAMRAS: Counsel, you know that's not a
8  proper objection in a deposition.
9    MR. BROOKS: Thank you very much.  I appreciate
10 your assistance.
11   A.  Could you repeat the question.
12 BY MR. ROBINSON:
13   Q.  Could you describe for us the nature of the work
14 that led to the arrest you just described?
15   MR. BROOKS: Same objection.
16   A.  The nature of work was educating those that were
17 there about the rights of the pre-born.
18 BY MR. ROBINSON:
19   Q.  Was this in North Carolina?
20   A.  No.
21   Q.  Where was it?
22   MR. BROOKS: Objection, form and relevance, but
23 you can answer.
24   A.  I believe it was in Virginia.
25 BY MR. ROBINSON:

## Page 11

1    Q.  Were you charged with a crime in connection with
2  that?
3    MR. BROOKS: Same objection.
4    A.  You will have to forgive me, I don't know exactly
5  which legal terminology I should be using.
6  BY MR. ROBINSON:
7    Q.  I can rephrase.  Did you appear in court in
8  connection with that arrest?
9    A.  I did --
10   MR. BROOKS: Objection, vague, form, relevance,
11 but you can answer.
12   A.  I did appear in court.
13 BY MR. ROBINSON:
14   Q.  What was the outcome of that court appearance?
15   MR. BROOKS: Same objections.
16   A.  I, again, apologize if I don't know the proper
17 terminology.  I don't have anything on my record.  I believe
18 there was an agreement reached.
19 BY MR. ROBINSON:
20   Q.  Have you been arrested on any other occasion other
21 than the one you just described?
22   A.  No.
23   MR. BROOKS: Same objection.
24 BY MR. ROBINSON:
25   Q.  Have you ever been charged with a crime on any other

## Page 12

1  occasion other than the one you described?
2    MR. BROOKS: Form, relevance, and vagueness,
3  but you can answer.
4    A.  No.
5  BY MR. ROBINSON:
6    Q.  What did you do to prepare for your deposition
7  today?
8    MR. BROOKS: I want to object to the extent
9  that that question calls for discussion of attorney-client
10 privileged materials.  I would instruct the witness not to
11 discuss anything that she and I have discussed.
12   A.  Nothing.
13 BY MR. ROBINSON:
14   Q.  Typically people describe what they did.  Like, I
15 met with my lawyer; I reviewed documents; I did something.
16 I'm not looking for any communications between you and your
17 lawyer, so I don't want to encroach upon the privilege, but I
18 am entitled to know whether you met previously with someone;
19 a lawyer in prep for your depo; what you reviewed, if
20 anything, to help refresh your recollection about events that
21 happened; and that's the kind of information I'm seeking.
22 With that clarification, let me try again.  What did you do
23 to prepare for your deposition today?
24   MR. MIHET: Form, asked and answered.
25   MR. BROOKS: Form, asked and answered and also

## Page 13

1  and invasion of attorney-client privilege as stated.  I would
2  instruct the witness not to disclose anything that we
3  discussed.
4  BY MR. ROBINSON:
5    Q.  So the question pending is still, what did you do to
6  -- I'm gathering from the objections you met with your
7  lawyers before today.  So let me try one more time.
8    MR. ROBINSON:  And, Counsel, I think the
9  objections are a little obtrusive, I think.  The witness is
10 not quite responding, I think, listening to the objections.
11 I don't mind the objections to form, that's fine.  I don't
12 mind the instructions not to reveal privileged information,
13 that's fine; but I'm not seeking privileged information.
14 This is a basic question asked in every case, and I just want
15 to make sure that we're not unduly lengthening the day.
16   MR. BROOKS: If I could just suggest to Counsel
17 if he rephrases the question or appendages an exception to
18 the end of it, I will withdraw the instruction not to answer.
19   MR. ROBINSON: You're instructing not to answer
20 that question?  Let me try one more take.
21   MR. BROOKS: No, if you'd just exclude
22 attorney-client privilege --
23 BY MR. ROBINSON:
24   Q.  Let me try one more time.  What did you do to
25 prepare for your deposition today?

## Page 14

1       MR. BROOKS: Again, objection to the extent
2  that calls for materials or information discussed with me.
3       MR. MIHET: Also asked and answered.
4       MR. BROOKS: Yes, and form.
5  BY MR. ROBINSON:
6    Q.  This is --
7    A.  I'm sorry, I spoke with my attorney.
8    Q.  You're refusing to answer the question?
9       MR. MIHET:  No, she answered.
10  BY MR. ROBINSON:
11    Q.  I just didn't hear it, then.
12    A.  I'm sorry.  I spoke with my attorney.
13    Q.  When did you meet with your attorney in preparation
14  for your deposition today?
15       MR. MIHET: Objection, misstates the testimony,
16  assumes facts not in evidence, lacks foundation.
17       MR. BROOKS: I'll join in those objections.
18  BY MR. ROBINSON:
19    Q.  Let me rephrase.  When did you speak with your
20  attorney in preparation for your deposition today?
21       MR. BROOKS: Same objections.
22    A.  I spoke with him on the phone.  I couldn't tell you
23  exactly when.
24  BY MR. ROBINSON:
25    Q.  Was it yesterday?

## Page 15

1    A.  Yes.
2       MR. BROOKS: Belated objection to form and also
3  assuming facts not in evidence.
4  BY MR. ROBINSON:
5    Q.  About how long did that communication last?
6    A.  I'm not exactly sure.
7    Q.  Did you review any documents in preparing for your
8  deposition today?
9       MR. BROOKS: I would just object to the extent
10  that requires any information discussed with me as invasive
11  of the attorney-client privilege, and I would instruct the
12  witness not to disclose anything that we discussed.
13       MR. MIHET: Also lacks foundation.
14       MR. BROOKS: I would also join that
15  objection.
16       MR. ROBINSON:  Are you instructing the witness
17  not to answer?
18       MR. BROOKS: I'm instructing the witness not to
19  answer to the extent it requires disclosure of information
20  that we might have discussed.
21  BY MR. ROBINSON:
22    Q.  Do you have want to hear the question again?
23    A.  Certainly.
24    Q.  Did you review any documents in preparing for your
25  deposition today?

## Page 16

1       MR. BROOKS: Same objection.
2       MR. MIHET: Lacks foundation.
3       MR. BROOKS: Yes, additionally lacks
4  foundation.
5    A.  No.
6  BY MR. ROBINSON:
7    Q.  Did you review any video in preparing for your
8  deposition today?
9       MR. BROOKS: Again, I would object to the
10  extent that requires discussion of any material that we might
11  have discussed invasive of attorney-client privilege.  I'm
12  objecting to the extent your asking anything that is invasive
13  of the attorney-client privilege and instructing her not to
14  disclose anything that we might have discussed.
15       MR. MIHET: Also lacks foundation.
16       MR. BROOKS: Yes, and lacks foundation.
17  BY MR. ROBINSON:
18    Q.  Do you remember the question?
19    A.  No, could you please repeat it.
20    Q.  Did you review any video in preparing for your
21  deposition today?
22    A.  No.
23    Q.  The phone call that you described, that was with the
24  attorney sitting next to you, Mr. Brooks?
25    A.  Yes.

## Page 17

1    Q.  Was anyone else on that call?
2       MR. BROOKS:  Again, I will object to the
3  extent that lacks foundation; and also to the extent that
4  this is invasive of attorney-client privilege, and remind the
5  witness not to disclose anything that she and I might have
6  discussed; and also lacks foundation and vague, the form of
7  the question.
8    A.  My husband was on the call.
9  BY MR. ROBINSON:
10    Q.  Anyone else?
11    A.  No.
12    Q.  What was the purpose of your husband being on the
13  call?
14       MR. BROOKS: I'll object and instruct the
15  witness not to answer on the basis of attorney-client
16  privilege, joint representation privilege, and spousal
17  privilege, and instruct the witness not to answer the
18  question.
19  BY MR. ROBINSON:
20    Q.  Were any lawyers from CMP on the call?
21       MR. BROOKS:  I'm going to instruct -- I'm
22  going to object on the grounds of lack of foundation and
23  form.
24  BY MR. ROBINSON:
25    Q.  I'll rephrase.  Was anyone else on the call other

1 than you, your husband and Mr. Brooks?
2     MR. BROOKS: Same objections.
3     A. No.
4 BY MR. ROBINSON:
5     Q. Did you meet with any of CMP's lawyers in preparing
6 for your deposition today?
7     MR. BROOKS: Objection, form.
8     A. No.
9 BY MR. ROBINSON:
10     Q. You didn't meet with either of these two gentlemen
11 sitting to your right, correct?
12     MR. BROOKS: Objection, asked and answered.
13     MR. MIHET: Objection, assumes facts not in
14 evidence; and for the record, I am not a CMP lawyer. I think
15 counsel's question wrongly implies that I am.
16     MR. BROOKS: And also vague as to the identity
17 of the two gentlemen here. I'm not sure the witness knows
18 who these gentlemen are.
19     A. I did not meet with these two gentlemen.
20 BY MR. ROBINSON:
21     Q. Thank you. I'm going to hand you what's been
22 premarked as Exhibit 200.
23     MR. BROOKS: Do you have a copy for me?
24     MR. ROBINSON: Sure. It's the deposition
25 subpoena.

1     MR. BROOKS: Thank you, sir, appreciate it.
2 BY MR. ROBINSON:
3     Q. You understand you're here under a subpoena to give
4 testimony under oath today, correct?
5     MR. BROOKS: Objection, form.
6     A. Yes.
7 BY MR. ROBINSON:
8     Q. Do you intend to tell the truth today?
9     MR. BROOKS: Objection, argumentative and form.
10     A. Of course.
11 BY MR. ROBINSON:
12     Q. Have you ever had your deposition taken?
13     A. No.
14     Q. So let me just explain a little bit about the
15 proceeding. We have a court reporter. She is taking down
16 everything that we say. It's important for us not to talk
17 over each other. Does that make sense?
18     A. Yes.
19     Q. There's a videographer also creating a video record
20 for us. We might play that video for the jury. Do you
21 understand that?
22     A. Yes.
23     Q. If at anytime you need a break, just let me know, we
24 can take a break. There's coffee and water behind you if you
25 want it.

1     A. Mm-hmm.
2     Q. And I think that's the basics, but if you have any
3 questions about the proceeding today just let me know. If
4 you don't understand a question that I'm asking, for example,
5 you're free to ask for clarification. Does all of that make
6 sense?
7     A. Yes, and if I could, I do have a nursing infant that
8 I would like to schedule some sort of a nursing break for. I
9 just would need a heads up so we can have ample time to get
10 the infant. Some sort of time window would be great.
11     Q. I'll plan to take breaks every hour, and if you need
12 a longer break after every 3rd hour or 2-1/2 hours, however
13 old your infant is, that's fine, just let us know.
14     A. Okay, I'll just need probably close to 11:30 or 12
15 if you let me know, let's say lunch break, then I can send a
16 pick up back to get the baby.
17     Q. Absolutely. Let's mark as Exhibit 201, next in
18 order.
19     (Plaintiff's Exhibit Number 201
20     marked for identification)
21     Q. Take whatever time you need to review the document
22 that's in front of you. The first question simply is, do you
23 recognize the document?
24     MR. BROOKS: I'm going to object on the grounds
25 of lack of foundation and also instruct the witness not to

1 answer under the Fifth Amendment of the U.S. Constitution as
2 well as state law including Article 1, Section 15 of the
3 California Constitution and Article 1, Section 23 of the
4 North Carolina Constitution and instruct the witness not to
5 answer.
6     A. I am asserting my rights under the Fifth Amendment
7 to the United States Constitution as well as state law
8 including Article 1, Section 15 of the California
9 Constitution and Article 1, Section 23 of the North Carolina
10 Constitution and therefore I respectfully decline to
11 answer.
12 BY MR. ROBINSON:
13     Q. The document in front of you is a Linked In Profile
14 that you created detailing your education and professional
15 history, correct?
16     MR. BROOKS: Objection, mischaracterizes prior
17 testimony, assumes facts not in evidence; and again, I
18 instruct the witness not to answer on the basis of the Fifth
19 Amendment of the U.S. Constitution as well as state laws
20 including Article 1, Section 15 of the California
21 Constitution and Article 1, Section 23 of the North Carolina
22 Constitution and again, I instruct the witness not to answer.
23     MR. MIHET: Also lacks foundation.
24     MR. BROOKS: I'll join that objection.
25     A. I am asserting my rights under the Fifth Amendment

Page 22

1 to the United States Constitution as well as state law
2 including Article 1, Section 15 of the California
3 Constitution and Article 1, Section 23 of the North Carolina
4 Constitution and therefore I respectfully decline to
5 answer.
6 BY MR. ROBINSON:
7 Q. Your Linked In Profile accurately summarizes your
8 educational and professional experience, correct?
9 MR. BROOKS: Objection, form, lacks foundation,
10 assumes facts not in evidence; and again, I instruct the
11 witness not to answer on the grounds of the Fifth Amendment
12 of the U.S. Constitution as well as state laws including
13 Article 1, Section 15 of the California Constitution and
14 Article 1, Section 23 of the North Carolina Constitution.
15 A. I am asserting my rights under the Fifth Amendment
16 to the United States Constitution as well as state law
17 including Article 1, Section 15 of the California
18 Constitution and Article 1, Section 23 of the North Carolina
19 Constitution and therefore I respectfully decline to
20 answer.
21 BY MR. ROBINSON:
22 Q. Sorry, didn't mean to jump the gun. You received a
23 Bachelor of Arts in Sociology from Charter Oak State College
24 in Hartford, Connecticut in 2009, correct?
25 A. Yes.

Page 23

1 Q. You received a Masters of Public Administration from
2 Andrew Jackson University of California, correct?
3 MR. BROOKS: We'll object to the form of the
4 question. It's not clear whether Counsel is talking about
5 the document or just necessarily talking about the document.
6 A. That's not what is listed on the document.
7 BY MR. ROBINSON:
8 Q. New Charter University is listed on the document?
9 A. I just wanted to clarify, I believe they may have
10 changed their name.
11 Q. But it's the same school?
12 A. Correct.
13 Q. You received a Masters in Public Administration from
14 New Charter University in about 2012, correct?
15 MR. BROOKS: Again, I'll just object to form
16 again and ask Counsel to clarify whether he's talking about
17 the document or whether he's just asking about Ms. Davin's
18 background generally?
19 MR. ROBINSON: I don't mind you creating a
20 record, but I'm not going to engage in a dialogue about
21 clarifying a question. If the witness has an issue she can
22 certainly pipe up.
23 MR. BROOKS: You can clarify the question or
24 not, it's up to you.
25 A. Yes.

Page 24

1 BY MR. ROBINSON:
2 Q. New Charter University is a for profit online
3 school?
4 MR. BROOKS: Objection, relevance and
5 foundation.
6 A. I'm sorry, I can't speak to their --
7 BY MR. ROBINSON:
8 Q. Is it an online school?
9 A. I do not know the current status of the school.
10 Q. Did you attend classes in person?
11 A. No.
12 Q. Did you attend classes online?
13 A. Yes.
14 Q. Do you have any formal education in journalism?
15 MR. BROOKS: Objection, form and relevance.
16 MR. MIHET: Vague, ambiguous.
17 MR. BROOKS: Join that objection.
18 A. I would ask you to clarify what you mean by formal
19 education.
20 BY MR. ROBINSON:
21 Q. You have no degrees in journalism from a school,
22 correct?
23 A. That is correct.
24 Q. You have no -- let me withdraw that. Have you ever
25 taken any academic classes under journalism?

Page 25

1 MR. BROOKS: Objection, vague, form.
2 A. I don't recall.
3 BY MR. ROBINSON:
4 Q. You were a project manager at Live Action from 2008
5 to 2012, correct?
6 MR. BROOKS: Objection, form, relevance.
7 MR. ROBINSON: Hold on, before you go through
8 the litany, let me withdraw that.
9 BY MR. ROBINSON:
10 Q. You were a project manager at Live Action from 2009
11 to 2012, correct?
12 MR. BROOKS: Now objection, form, vagueness,
13 relevance; and again I instruct the witness not to answer on
14 the basis of the Fifth Amendment of the U.S. Constitution as
15 well as state laws including Article 1, Section 15 of the
16 California Constitution and Article 1, Section 23 of the
17 North Carolina Constitution.
18 MR. MIHET: Also lacks foundation.
19 MR. BROOKS: I'll join that objection.
20 A. I am asserting my rights under the Fifth Amendment
21 to the United States Constitution as well as state law
22 including Article 1, Section 15 of the California
23 Constitution and Article 1, Section 23 of the North Carolina
24 Constitution and therefore I respectfully decline to
25 answer.

1   BY MR. ROBINSON:
2       Q.   What is Live Action?
3            MR. BROOKS: Objection, foundation, vague,
4   assumes facts not in evidence; and again, I instruct the
5   witness not to answer on the basis of the Fifth Amendment of
6   the United States Constitution as well as state law including
7   Article 1, Section 15 of the California Constitution and
8   Article 1, Section 23 of the North Carolina Constitution, and
9   again, instruct the witness not to answer.
10      A.   I am asserting my rights under the Fifth Amendment
11  to the United States Constitution as well as state law
12  including Article 1, Section 15 of the California
13  Constitution and Article 1, Section 23 of the North Carolina
14  Constitution and therefore I respectfully decline to
15  answer.
16  BY MR. ROBINSON:
17      Q.   Live Action is a pro-life advocacy group that
18  engaged in so-called sting operations by taking surreptitious
19  video of Planned Parenthood events and clinics, and releasing
20  viral video of those encounters online, correct?
21           MR. BROOKS: Objection, form, compound
22  question, lacks foundation and relevance; and I instruct the
23  witness not to answer on the grounds of the Fifth Amendment
24  of the United States Constitution as well as state laws
25  including Article 1, Section 15 of the California

1   Constitution and Article 1, Section 23 of the North Carolina
2   Constitution and instruct the witness not to answer.
3            MR. MIHET:  Also argumentative and assumes
4   facts not in evidence.
5            MR. BROOKS: I'll join those objections.
6       A.   I am asserting my rights under the Fifth Amendment
7   to the United States Constitution as well as state law
8   including Article 1, Section 15 of the California
9   Constitution and Article 1, Section 23 of the North Carolina
10  Constitution and therefore I respectfully decline to
11  answer.
12  BY MR. ROBINSON:
13      Q.   The purpose of the videos produced by Live Action
14  during your tenure there between 2009 and 2012 was to create
15  public outrage at Planned Parenthood by releasing viral
16  videos of surreptitious clinic events, correct?
17           MR. BROOKS: objection form, argumentative,
18  compound question.  Also vague and also object under and I
19  instruct the witness not to answer under the Fifth Amendment
20  to the United States Constitution as well as state law
21  including Article 1, Section 15 of the California
22  Constitution and Article 1, Section 23 of the North Carolina
23  Constitution.
24           MR. MIHET:  Also foundation and assumes facts
25  not in evidence.

1            MR. BROOKS:  I'll join those objections.
2       A.   I am asserting my rights under the Fifth Amendment
3   to the United States Constitution as well as state law
4   including Article 1, Section 15 of the California
5   Constitution and Article 1, Section 23 of the North Carolina
6   Constitution and therefore I respectfully decline to
7   answer.
8   BY MR. ROBINSON:
9       Q.   Do you know Lila Rose, founder of Live Action?
10           MR. BROOKS: Objection, form, compound
11  question, assumes facts not in evidence, foundation; and I
12  also object under and I instruct the witness not to answer
13  under the Fifth Amendment of the United States Constitution
14  as well as state law including Article 1, Section 15 of the
15  California Constitution and Article 1, Section 23 of the
16  North Carolina Constitution.
17      A.   I am asserting my rights under the Fifth Amendment
18  to the United States Constitution as well as state law
19  including Article 1, Section 15 of the California
20  Constitution and Article 1, Section 23 of the North Carolina
21  Constitution and therefore I respectfully decline to
22  answer.
23  BY MR. ROBINSON:
24      Q.   In one Live Action video Lila Rose, who is then 19
25  years old, walked into a Planned Parenthood clinic claiming

1   she was a 15 year sex worker who had been impregnated by a 23
2   year old male in an undercover sting video designed to create
3   the narrative that Planned Parenthood condones child sex
4   trafficking.  Are you aware of that video?
5            MR. BROOKS: Objection, form, compound
6   question, lack of foundation, assumes facts not in evidence;
7   and I also object under and instruct the witness not to
8   answer under the Fifth Amendment of the United States
9   Constitution as well as state laws including Article 1,
10  Section 15 of the California Constitution and Article 1,
11  Section 23 of the North Carolina Constitution.
12      A.   I am asserting my rights under the Fifth Amendment
13  to the United States Constitution as well as state law
14  including Article 1, Section 15 of the California
15  Constitution and Article 1, Section 23 of the North Carolina
16  Constitution and therefore I respectfully decline to
17  answer.
18  BY MR. ROBINSON:
19      Q.   Did you play any role in connection with that video
20  or any other like it during your work at Live Action?
21           MR. BROOKS: Objection, form, foundation,
22  argumentive, vague.  Also, I object under and instruct the
23  witness not to answer pursuant to the Fifth Amendment of the
24  United States Constitution as well as state law including
25  Article 1, Section 15 of the California Constitution and

1 Article 1, Section 23 of the North Carolina Constitution.
2        MR. MIHET: Plus assumes facts not in
3 evidence.
4        MR. BROOKS: I'll join that objection.
5    A. I am asserting my rights under the Fifth Amendment
6 to the United States Constitution as well as state law
7 including Article 1, Section 15 of the California
8 Constitution and Article 1, Section 23 of the North Carolina
9 Constitution and therefore I respectfully decline to
10 answer.
11 BY MR. ROBINSON:
12    Q. Your Linked In Profile indicates that you assisted
13 with the recruitment and training of 60 students for social
14 media promotion while at Live Action. Is that correct?
15        MR. BROOKS: Objection, form, assumes facts not
16 in evidence, argumentative and also object under and instruct
17 the witness not to answer under the Fifth Amendment of the
18 United States Constitution as well as state law including
19 Article 1, Section 15 of the California Constitution and
20 Article 1, Section 23 of the North Carolina Constitution.
21    A. I am asserting my rights under the Fifth Amendment
22 to the United States Constitution as well as state law
23 including Article 1, Section 15 of the California
24 Constitution and Article 1, Section 23 of the North Carolina
25 Constitution and therefore I respectfully decline to

1 answer.
2 BY MR. ROBINSON:
3    Q. You trained undercover actors while at Live Action
4 to infiltrate Planned Parenthood clinics and events, correct?
5        MR. BROOKS: Objection, form, compound
6 question, argumentative, lacks foundation; and also I object
7 under and instruct the witness not to answer pursuant to the
8 Fifth Amendment to the United States Constitution as well as
9 state law including Article 1, Section 15 of the California
10 Constitution and Article 1, Section 23 of the North Carolina
11 Constitution.
12    A. I am asserting my rights under the Fifth Amendment
13 to the United States Constitution as well as state law
14 including Article 1, Section 15 of the California
15 Constitution and Article 1, Section 23 of the North Carolina
16 Constitution and therefore I respectfully decline to
17 answer.
18 BY MR. ROBINSON:
19    Q. Did you personally go undercover to infiltrate
20 Planned Parenthood clinics and events while at Live Action in
21 order to create so-called sting videos?
22        MR. BROOKS: Objection, form, lack of
23 foundation, assumes facts not in evidence; and also I object
24 under and instruct the witness not to answer pursuant to the
25 Fifth Amendment of the United States Constitution as well as

1 state law including Article 1, Section 15 of the California
2 Constitution and Article 1, Section 23 of the North Carolina
3 Constitution.
4    A. I am asserting my rights under the Fifth Amendment
5 to the United States Constitution as well as state law
6 including Article 1, Section 15 of the California
7 Constitution and Article 1, Section 23 of the North Carolina
8 Constitution and therefore I respectfully decline to
9 answer.
10 BY MR. ROBINSON:
11    Q. Do you know David Daleiden?
12        MR. BROOKS: Objection, form, vague. I also
13 object under and instruct the witness not to answer pursuant
14 to the Fifth Amendment of the United States Constitution as
15 well as state law including Article 1, Section 15 of the
16 California Constitution and Article 1, Section 23 of the
17 North Carolina Constitution.
18    A. I am asserting my rights under the Fifth Amendment
19 to the United States Constitution as well as state law
20 including Article 1, Section 15 of the California
21 Constitution and Article 1, Section 23 of the North Carolina
22 Constitution and therefore I respectfully decline to
23 answer.
24 BY MR. ROBINSON:
25    Q. You met David Daleiden at Live Action during your

1 tenure there from 2009 to 2012, correct?
2        MR. BROOKS: Objection, form, compound
3 question, assumes facts not in evidence, lacks foundation;
4 and I also object under and instruct the witness not to
5 answer pursuant to the Fifth Amendment of the United States
6 Constitution as well as state law including Article 1,
7 Section 15 of the California Constitution and Article 1,
8 Section 23 of the North Carolina Constitution.
9    A. I am asserting my rights under the Fifth Amendment
10 to the United States Constitution as well as state law
11 including Article 1, Section 15 of the California
12 Constitution and Article 1, Section 23 of the North Carolina
13 Constitution and therefore I respectfully decline to
14 answer.
15 BY MR. ROBINSON:
16    Q. Did you collaborate with David Daleiden on any
17 undercover sting operations during your tenure at Live
18 Action?
19        MR. BROOKS: Objection, form, assumes facts not
20 in evidence, compound question, lacks foundation; and also, I
21 object under and instruct the witness not to answer pursuant
22 to the Fifth Amendment of the United States Constitution as
23 well as state law including Article 1, Section 15 of the
24 California Constitution and Article 1, Section 23 of the
25 North Carolina Constitution.

## Page 34

1    A.  I'm asserting my rights under the Fifth Amendment to
2  the United States Constitution as well as state law including
3  Article 1, Section 15 of the California Constitution and
4  Article 1, Section 23 of the North Carolina Constitution and
5  therefore I respectfully decline to answer.
6  BY MR. ROBINSON:
7    Q.  How did you first get involved with CMP?
8         MR. BROOKS: Objection, form, assumes facts not
9  in evidence, lacks foundation.  Also, I object under and
10 instruct the witness not to answer pursuant to the Fifth
11 Amendment of the United States Constitution as well as state
12 law including Article 1, Section 15 of the California
13 Constitution and Article 1, Section 23 of the North Carolina
14 Constitution and instruct the witness not to answer.
15        MR. MIHET:  Assumes facts not in evidence.
16        MR. BROOKS:  I'll join that objection.
17   A.  I am asserting my rights under the Fifth Amendment
18 to the United States Constitution as well as state law
19 including Article 1, Section 15 of the California
20 Constitution and Article 1, Section 23 of the North Carolina
21 Constitution and therefore I respectfully decline to
22 answer.
23 BY MR. ROBINSON:
24   Q.  You were involved in CMP from its inception,
25 correct?

## Page 35

1         MR. BROOKS: Objection, form, assumes facts not
2  in evidence, lacks foundation; and I also object under and
3  instruct the witness not to answer pursuant to the Fifth
4  Amendment to the United States Constitution as well as state
5  law including Article 1, Section 15 of the California
6  Constitution and Article 1, Section 23 of the North Carolina
7  Constitution.
8    A.  I am asserting my rights under the Fifth Amendment
9  to the United States Constitution as well as state law
10 including Article 1, Section 15 of the California
11 Constitution and Article 1, Section 23 of the North Carolina
12 Constitution and therefore I respectfully decline to
13 answer.
14 BY MR. ROBINSON:
15   Q.  Through CMP you and David Daleiden wanted to extend
16 what you were doing at Live Action to create further
17 undercover sting videos of Planned Parenthood events and
18 clinics, correct?
19        MR. BROOKS: Objection, form, compound
20 question, lacks foundation, assumes facts not in evidence.  I
21 also object under and instruct the witness not to answer
22 pursuant to the Fifth Amendment of the United States
23 Constitution as well as state law including Article 1,
24 Section 15 of the California Constitution and Article 1,
25 Section 23 of the North Carolina Constitution.

## Page 36

1    A.  I am asserting my rights under the Fifth Amendment
2  to the United States Constitution as well as state law
3  including Article 1, Section 15 of the California
4  Constitution and Article 1, Section 23 of the North Carolina
5  Constitution and therefore I respectfully decline to
6  answer.
7  BY MR. ROBINSON:
8    Q.  One of CMP's goals from its inception was to create
9  public outrage towards Planned Parenthood by releasing viral
10 undercover sting videos related to fetal tissue practices,
11 correct?
12        MR. BROOKS: Objection, form, argumentative,
13 assumes facts not in evidence and lacks foundation.  I also
14 object under and instruct the witness not to answer pursuant
15 to the Fifth Amendment of the United States Constitution as
16 well as state law including Article 1, Section 15 of the
17 California Constitution and Article 1, Section 23 of the
18 North Carolina Constitution.
19   A.  I am asserting my rights under the Fifth Amendment
20 to the United States Constitution as well as state law
21 including Article 1, Section 15 of the California
22 Constitution and Article 1, Section 23 of the North Carolina
23 Constitution and therefore I respectfully decline to
24 answer.
25 BY MR. ROBINSON:

## Page 37

1    Q.  Another of CMP's goals is to advocate for defunding
2  of Planned Parenthood, correct?
3         MR. BROOKS: Objection, form, compound
4  question, assumes facts not in evidence and lacks foundation.
5  Also, I object under and instruct the witness not to answer
6  pursuant to the Fifth Amendment of the United States
7  Constitution as well as state law including Article 1,
8  Section 15 of the California Constitution and Article 1,
9  Section 23 of the North Carolina Constitution.
10   A.  I am asserting my rights under the Fifth Amendment
11 to the United States Constitution as well as state law
12 including Article 1, Section 15 of the California
13 Constitution and Article 1, Section 23 of the North Carolina
14 Constitution and therefore I respectfully decline to
15 answer.
16 BY MR. ROBINSON:
17   Q.  Another of CMP's goals from the inception is to
18 influence legislation on the topic of abortion, correct?
19        MR. BROOKS: Objection, form, assumes facts not
20 in evidence, also mischaracterizes prior testimony, lacks
21 foundation and argumentative; and I also object under and
22 instruct the witness not to answer pursuant to the Fifth
23 Amendment of the United States Constitution as well as state
24 law including Article 1, Section 15 of the California
25 Constitution and Article 1, Section 23 of the North Carolina

1 Constitution.
2    A. I am asserting my rights under the Fifth Amendment
3 to the United States Constitution as well as state law
4 including Article 1, Section 15 of the California
5 Constitution and Article 1, Section 23 of the North Carolina
6 Constitution and therefore I respectfully decline to
7 answer.
8 BY MR. ROBINSON:
9    Q. Let's mark the next in order.
10      (Plaintiff's Exhibit Number 202
11      marked for identification)
12     MR. ROBINSON: Why don't we go off the record.
13     THE VIDEOGRAPHER: Going off record. The time
14 is 10:18 a.m.
15     (RECESS TAKEN)
16     THE VIDEOGRAPHER: We are going back on record.
17 The time is 10:36 a.m.
18 BY MR. ROBINSON:
19    Q. I'm handing you what we premarked as Exhibit 202.
20 Actually, if you could show that to your Counsel for a
21 second.
22     MR. ROBINSON: Counsel, I apologize, I don't
23 have another copy of the cover Email, but it's literally just
24 the cover Email, and then I gave you the substantive
25 attachment. I just wanted to make sure you had an

1 opportunity to look at it.
2     MR. MIHET: Is that the only copy?
3     MR. ROBINSON: It is.
4     MR. MIHET: Can I take a quick peek at it?
5     MR. ROBINSON: Absolutely.
6 BY MR. ROBINSON:
7    Q. Take a minute to review the document and let me know
8 when you're ready for a question or two.
9     MR. ROBINSON: For the record, we have marked
10 as Exhibit 202 an Email and attachment with Bates Number
11 CM03583 through 86.
12     (PAUSE)
13 BY MR. ROBINSON:
14    Q. Ready?
15    A. Yes.
16    Q. You have in front of you an Email that David
17 Daleiden wrote to you on January 27, 2013 with its
18 attachment, correct?
19     MR. BROOKS: Objection, form, assumes facts not
20 in evidence, compound; and also I object under and instruct
21 the witness not to answer under the Fifth Amendment of the
22 United States Constitution as well as state law including
23 Article 1, Section 15 of the California Constitution and
24 Article 1, Section 23 of the North Carolina Constitution.
25     MR. MIHET: Also lacks foundation.

1     MR. BROOKS: I'll join that objection.
2    A. I am asserting my rights under the Fifth Amendment
3 to the United States Constitution as well as state law
4 including Article 1, Section 15 of the California
5 Constitution and Article 1, Section 23 of the North Carolina
6 Constitution and therefore I respectfully decline to
7 answer.
8 BY MR. ROBINSON:
9    Q. David Daleiden's January 27, 2013 Email to you
10 attached a nondisclosure agreement, correct?
11     MR. BROOKS: Objection, form, assumes facts not
12 in evidence, lacks foundation and compound. Also, I object
13 under and instruct the witness not to answer pursuant to the
14 Fifth Amendment of the United States Constitution as well as
15 state law including Article 1, Section 15 of the California
16 Constitution and Article 1, Section 23 of the North Carolina
17 Constitution.
18    A. I am asserting my rights under the Fifth Amendment
19 to the United States Constitution as well as state law
20 including Article 1, Section 15 of the California
21 Constitution and Article 1, Section 23 of the North Carolina
22 Constitution and therefore I respectfully decline to
23 answer.
24 BY MR. ROBINSON:
25    Q. Daleiden supplied you with a form nondisclosure

1 agreement in January 2013 for you to sign in connection with
2 your work for CMP, correct?
3     MR. BROOKS: Objection, form, compound
4 question, assumes facts not in evidence and lacks foundation.
5 Also, I object under and instruct the witness not to answer
6 pursuant to the Fifth Amendment of the United States
7 Constitution as well as state law including Article 1,
8 Section 15 of the California Constitution and Article 1,
9 Section 23 of the North Carolina Constitution.
10    A. I am asserting my rights under the Fifth Amendment
11 to the United States Constitution as well as state law
12 including Article 1, Section 15 of the California
13 Constitution and Article 1, Section 23 of the North Carolina
14 Constitution and therefore I respectfully decline to
15 answer.
16 BY MR. ROBINSON:
17    Q. Did Daleiden explain to you why he wanted you to
18 sign a nondisclosure agreement in connection with your work
19 for CMP?
20     MR. BROOKS: Objection, foundation, assumes
21 facts not in evidence, compound question; and also I object
22 under and instruct the witness not to answer pursuant to the
23 Fifth Amendment of the United States Constitution as well as
24 state law including Article 1, Section 15 of the California
25 Constitution and Article 1, Section 23 of the North Carolina

1  Constitution.
2      A.  I am asserting my rights under the Fifth Amendment
3  to the United States Constitution as well as state law
4  including Article 1, Section 15 of the California
5  Constitution and Article 1, Section 23 of the North Carolina
6  Constitution and therefore I respectfully decline to
7  answer.
8  BY MR. ROBINSON:
9      Q.  Was the intent behind the nondisclosure agreement
10  that Daleiden asked you to sign in connection with your work
11  for CMP in order to keep secret the true nature of CMP's
12  undercover operations?
13          MR. BROOKS: Objection to form, lacks
14  foundation, assumes facts not in evidence; and also I object
15  under and instruct the witness not to answer pursuant to the
16  Fifth Amendment of the United States Constitution as well as
17  state law including Article 1, Section 15 of the California
18  Constitution and Article 1, Section 23 of the North Carolina
19  Constitution.
20          MR. MIHET:  Also compound.
21          MR. BROOKS:  I'll join that objection.
22      A.  I am asserting my rights under the Fifth Amendment
23  to the United States Constitution as well as state law
24  including Article 1, Section 15 of the California
25  Constitution and Article 1, Section 23 of the North Carolina

1  Constitution and therefore I respectfully decline to
2  answer.
3  BY MR. ROBINSON:
4      Q.  Did you understand the nondisclosure agreement that
5  Daleiden asked you to sign in connection with your work for
6  CMP protected your identity for unauthorized disclosure to
7  others?
8          MR. BROOKS: Objection, form, assumes facts not
9  in evidence, lacks foundation, compound; and I also object
10  under and instruct the witness not to answer pursuant to the
11  Fifth Amendment of the United States Constitution as well as
12  state law including Article 1, Section 15 of the California
13  Constitution and Article 1, Section 23 of the North Carolina
14  Constitution.
15      A.  I am asserting my rights under the Fifth Amendment
16  to the United States Constitution as well as state law
17  including Article 1, Section 15 of the California
18  Constitution and Article 1, Section 23 of the North Carolina
19  Constitution and therefore I respectfully decline to
20  answer.
21  BY MR. ROBINSON:
22      Q.  Can I turn your attention to page 2 of the
23  nondisclosure agreement that we marked, Exhibit 202,
24  paragraph 6.  Let me know when you're there.
25          MR. BROOKS: You mind giving us the Bates

1  number on that, Counsel?
2          MR. ROBINSON: CM03585, paragraph 6, Injunctive
3  Relief.
4  BY MR. ROBINSON:
5      Q.  Let me know when you're there.
6      A.  Yes.
7      Q.  The nondisclosure agreement that Daleiden asked you
8  to sign in connection with your work for CMP provided for
9  injunctive relief as a remedy in the event of breach,
10  correct?
11          MR. BROOKS: Objection, assumes facts not in
12  evidence, lacks foundation, compound; and also, I object
13  under and instruct the witness not to answer pursuant to the
14  Fifth Amendment of the United States Constitution as well as
15  state law including Article 1, Section 15 of the California
16  Constitution and Article 1, Section 23 of the North Carolina
17  Constitution.
18      A.  I am asserting my rights under the Fifth Amendment
19  to the United States Constitution as well as state law
20  including Article 1, Section 15 of the California
21  Constitution and Article 1, Section 23 of the North Carolina
22  Constitution and therefore I respectfully decline to
23  answer.
24  BY MR. ROBINSON:
25      Q.  Part of your past professional experience involved

1  initiating nonprofit and incorporation filings as well as
2  nonprofit set up, is that correct?
3          MR. BROOKS: Objection, lacks foundation,
4  assumes facts not in evidence, compound; and also I object
5  under and instruct the witness not to answer pursuant to the
6  Fifth Amendment of the United States Constitution as well as
7  state law including Article 1, Section 15 of the California
8  Constitution and Article 1, Section 23 of the North Carolina
9  Constitution and instruct the witness not to answer.
10      A.  I am asserting my rights under the Fifth Amendment
11  to the United States Constitution as well as state law
12  including Article 1, Section 15 of the California
13  Constitution and Article 1, Section 23 of the North Carolina
14  Constitution and therefore I respectfully decline to
15  answer.
16  BY MR. ROBINSON:
17      Q.  Do you have prior professional experience filing the
18  paperwork necessary to incorporate nonprofit organizations?
19          MR. BROOKS: Objection, form, and I object
20  under and instruct the witness not to answer pursuant to the
21  Fifth Amendment of the United States Constitution as well as
22  state law including Article 1, Section 15 of the California
23  Constitution and Article 1, Section 23 of the North Carolina
24  Constitution.
25          MR. MIHET:  Foundation, and assumes facts not

1 in evidence.
2 MR. BROOKS: I'll join those objections.
3 A. I am asserting my rights under the Fifth Amendment
4 to the United States Constitution as well as state law
5 including Article 1, Section 15 of the California
6 Constitution and Article 1, Section 23 of the North Carolina
7 Constitution and therefore I respectfully decline to
8 answer.
9 BY MR. ROBINSON:
10 Q. CMP set itself up as a charitable public benefit
11 corporation under California law, correct?
12 MR. BROOKS: Objection, assumes facts not in
13 evidence, lacks foundation, also calls for a legal
14 conclusion; and also, I object under and instruct the witness
15 not to answer pursuant to the Fifth Amendment of the United
16 States Constitution as well as state law including Article 1,
17 Section 15 of the California Constitution and Article 1,
18 Section 23 of the North Carolina Constitution.
19 A. I am asserting my rights under the Fifth Amendment
20 to the United States Constitution as well as state law
21 including Article 1, Section 15 of the California
22 Constitution and Article 1, Section 23 of the North Carolina
23 Constitution and therefore I respectfully decline to
24 answer.
25 BY MR. ROBINSON:

1 Q. Did you play any role in setting up CMP as a
2 nonprofit organization?
3 MR. BROOKS: Objection, form, assumes facts not
4 in evidence, and lacks foundation. Also, I object under and
5 instruct the witness not to answer pursuant to the Fifth
6 Amendment of the United States Constitution as well as state
7 law including Article 1, Section 15 of the California
8 Constitution and Article 1, Section 23 of the North Carolina
9 Constitution.
10 A. I am asserting my rights under the Fifth Amendment
11 to the United States Constitution as well as state law
12 including Article 1, Section 15 of the California
13 Constitution and Article 1, Section 23 of the North Carolina
14 Constitution and therefore I respectfully decline to
15 answer.
16 BY MR. ROBINSON:
17 Q. You assisted in preparing the paperwork necessary
18 for CMP to be organized as a nonprofit organization under
19 California law, correct?
20 MR. BROOKS: Objection, form, assumes facts not
21 in evidence and lacks foundation. Also, I object under and
22 instruct the witness not to answer pursuant to the Fifth
23 Amendment of the United States Constitution as well as state
24 law including Article 1, Section 15 of the California
25 Constitution and Article 1, Section 23 of the North Carolina

1 Constitution.
2 A. I am asserting my rights under the Fifth Amendment
3 to the United States Constitution as well as state law
4 including Article 1, Section 15 of the California
5 Constitution and Article 1, Section 23 of the North Carolina
6 Constitution and therefore I respectfully decline to
7 answer.
8 BY MR. ROBINSON:
9 Q. On the basis of CMP's status as a nonprofit
10 organization, CMP subsequently obtained federal tax exempt
11 status from the IRS as a 501C3 nonprofit organization,
12 correct?
13 MR. BROOKS: Objection, form, compound, assumes
14 facts not in evidence and lacks foundation. Also, I object
15 under and instruct the witness not to answer pursuant to the
16 Fifth Amendment of the United States Constitution as well as
17 state law including Article 1, Section 15 of the California
18 Constitution and Article 1, Section 23 of the North Carolina
19 Constitution.
20 A. I am asserting my rights under the Fifth Amendment
21 to the United States Constitution as well as state law
22 including Article 1, Section 15 of the California
23 Constitution and Article 1, Section 23 of the North Carolina
24 Constitution and therefore I respectfully decline to
25 answer.

1 BY MR. ROBINSON:
2 Q. You played a role in ensuring that CMP obtained
3 501C3 tax exempt status from the IRS, correct?
4 MR. BROOKS: Objection, form, assumes fact not
5 in evidence and lacks foundation. Also, I object under and
6 instruct the witness not to answer pursuant to the Fifth
7 Amendment of the United States Constitution as well as state
8 law including Article 1, Section 15 of the California
9 Constitution and Article 1, Section 23 of the North Carolina
10 Constitution.
11 A. I am asserting my rights under the Fifth Amendment
12 to the United States Constitution as well as state law
13 including Article 1, Section 15 of the California
14 Constitution and Article 1, Section 23 of the North Carolina
15 Constitution and therefore I respectfully decline to
16 answer.
17 BY MR. ROBINSON:
18 Q. Daleiden also played a role in setting up CMP as a
19 nonprofit organization, correct?
20 MR. BROOKS: Objection, form, assumes facts not
21 in evidence and lacks foundation. Also, I object under and
22 instruct the witness not to answer pursuant to the Fifth
23 Amendment of the United States Constitution as well as state
24 law including Article 1, Section 15 of the California
25 Constitution and Article 1, Section 23 of the North Carolina

## Page 50

1 Constitution.
2 　A. I am asserting my rights under the Fifth Amendment
3 to the United States Constitution as well as state law
4 including Article 1, Section 15 of the California
5 Constitution and Article 1, Section 23 of the North Carolina
6 Constitution and therefore I respectfully decline to
7 answer.
8 BY MR. ROBINSON:
9 　Q. Daleiden also played a role in ensuring that CMP
10 obtain 501C3 tax exempt status from the IRS, correct?
11 　　　MR. BROOKS: Objection, form, assumes facts not
12 in evidence, and lacks foundation, asked and answered; and
13 also, I object under and instruct the witness not to answer
14 pursuant to the Fifth Amendment of the United States
15 Constitution as well as state law including Article 1,
16 Section 15 of the California Constitution and Article 1,
17 Section 23 of the North Carolina Constitution.
18 　A. I am asserting my rights under the Fifth Amendment
19 to the United States Constitution as well as state law
20 including Article 1, Section 15 of the California
21 Constitution and Article 1, Section 23 of the North Carolina
22 Constitution and therefore I respectfully decline to
23 answer.
24 BY MR. ROBINSON:
25 　Q. Why did you and Daleiden choose to seek 501C3 tax

## Page 51

1 exempt status for CMP?
2 　　　MR. BROOKS: Objection, form, lacks foundation,
3 and assumes facts not in evidence, also calls for
4 speculation; and also, I object under and instruct the
5 witness not to answer pursuant to the Fifth Amendment of the
6 United States Constitution as well as state law including
7 Article 1, Section 15 of the California Constitution and
8 Article 1, Section 23 of the North Carolina Constitution.
9 　A. I am asserting my rights under the Fifth Amendment
10 to the United States Constitution as well as state law
11 including Article 1, Section 15 of the California
12 Constitution and Article 1, Section 23 of the North Carolina
13 Constitution and therefore I respectfully decline to
14 answer.
15 BY MR. ROBINSON:
16 　Q. You and Daleiden chose to seek tax exempt status for
17 CMP so CMP's donors could deduct their donations from their
18 taxes, correct?
19 　　　MR. BROOKS: Objection, form, lacks foundation,
20 assumes facts not in evidence, argumentative, speculation,
21 calls for speculation; also I object under and instruct the
22 witness not to answer pursuant to the Fifth Amendment of the
23 United States Constitution as well as state law including
24 Article 1, Section 15 of the California Constitution and
25 Article 1, Section 23 of the North Carolina Constitution.

## Page 52

1 　A. I am asserting my rights under the Fifth Amendment
2 to the United States Constitution as well as state law
3 including Article 1, Section 15 of the California
4 Constitution and Article 1, Section 23 of the North Carolina
5 Constitution and therefore I respectfully decline to
6 answer.
7 BY MR. ROBINSON:
8 　Q. The purpose of seeking tax exempt status for CMP was
9 to generate more money by allowing funders to deduct their
10 monetary contributions to CMP from their taxes, correct?
11 　　　MR. BROOKS: Objection, form, assumes facts not
12 in evidence, and lacks foundation, also calls for
13 speculation; and I am objecting under and instruct the
14 witness not to answer pursuant to the Fifth Amendment of the
15 United States Constitution as well as state law including
16 Article 1, Section 15 of the California Constitution and
17 Article 1, Section 23 of the North Carolina Constitution.
18 　　　MR. MIHET: Compound.
19 　　　MR. BROOKS: Join that objection.
20 　A. I am asserting my rights under the Fifth Amendment
21 to the United States Constitution as well as state law
22 including Article 1, Section 15 of the California
23 Constitution and Article 1, Section 23 of the North Carolina
24 Constitution and therefore I respectfully decline to
25 answer.

## Page 53

1 　　　(Plaintiff's Exhibit Number 203
2 　　　marked for identification)
3 BY MR. ROBINSON:
4 　Q. You're being handed a copy of Exhibit 203. Take
5 your time to have a look at the document and let me know when
6 you're ready to answer a question.
7 　　　(PAUSE)
8 　　　MR. ROBINSON: For the record, we've entered in
9 as Exhibit 203 an Email with Bates CM05463 through 65.
10 　　　(PAUSE)
11 　A. Yes.
12 BY MR. ROBINSON:
13 　Q. You have in front of you an Email that David
14 Daleiden sent to you on January 28, 2013 forwarding an Email
15 he had written for Troy Newman, correct?
16 　　　MR. BROOKS: Objection, assumes facts not in
17 evidence, and lacks foundation. Also, I object under and
18 instruct the witness not to answer pursuant to the Fifth
19 Amendment of the United States Constitution as well as state
20 law including Article 1, Section 15 of the California
21 Constitution and Article 1, Section 23 of the North Carolina
22 Constitution.
23 　A. I am asserting my rights under the Fifth Amendment
24 to the United States Constitution as well as state law
25 including Article 1, Section 15 of the California

## Page 54

1 Constitution and Article 1, Section 23 of the North Carolina
2 Constitution and therefore I respectfully decline to
3 answer.
4 BY MR. ROBINSON:
5   Q.  Who is Troy Newman?
6     MR. BROOKS: Objection, form, lacks foundation,
7 assumes facts not in evidence.  Also, I object under and
8 instruct the witness not to answer pursuant to the Fifth
9 Amendment to the United States Constitution as well as state
10 law including Article 1, Section 15 of the California
11 Constitution and Article 1, Section 23 of the North Carolina
12 Constitution.
13   A.  I am asserting my rights under the Fifth Amendment
14 to the United States Constitution as well as state law
15 including Article 1, Section 15 of the California
16 Constitution and Article 1, Section 23 of the North Carolina
17 Constitution and therefore I respectfully decline to
18 answer.
19 BY MR. ROBINSON:
20   Q.  Troy Newman was involved in CMP from its inception,
21 correct?
22     MR. BROOKS: Objection, form, assumes facts not
23 in evidence, and lacks foundation.  Also, I object under and
24 instruct the witness not to answer pursuant to the Fifth
25 Amendment to the United States Constitution as well as

## Page 55

1 Article 1, Section 15 of the California Constitution and
2 Article 1, Section 23 of the North Carolina Constitution.
3   A.  I am asserting my rights under the Fifth Amendment
4 to the United States Constitution as well as state law
5 including Article 1, Section 15 of the California
6 Constitution and Article 1, Section 23 of the North Carolina
7 Constitution and therefore I respectfully decline to
8 answer.
9 BY MR. ROBINSON:
10   Q.  Troy Newman is the President of Operation Rescue,
11 correct?
12     MR. BROOKS: Objection, form, assumes facts not
13 in evidence, and lacks foundation.  Also, I object under and
14 instruct the witness not to answer pursuant to the Fifth
15 Amendment to the United States Constitution as well as state
16 law including Article 1, Section 15 of the California
17 Constitution and Article 1, Section 23 of the North Carolina
18 Constitution.
19   A.  I am asserting my rights under the Fifth Amendment
20 to the United States Constitution as well as state law
21 including Article 1, Section 15 of the California
22 Constitution and Article 1, Section 23 of the North Carolina
23 Constitution and therefore I respectfully decline to
24 answer.
25 BY MR. ROBINSON:

## Page 56

1   Q.  Were you acquainted with Troy Newman at the time
2 David Daleiden reached out to him on January 28, 2013?
3     MR. BROOKS: Objection, form, compound
4 question, assumes facts not in evidence, and lacks
5 foundation.  Also, I object under and instruct the witness
6 not to answer pursuant to the Fifth Amendment to the United
7 States Constitution as well as state law including Article 1,
8 Section 15 of the California Constitution and Article 1,
9 Section 23 of the North Carolina Constitution.
10   A.  I'm asserting my rights under the Fifth Amendment to
11 the United States Constitution as well as state law including
12 Article 1, Section 15 of the California Constitution and
13 Article 1, Section 23 of the North Carolina Constitution and
14 therefore I respectfully decline to answer.
15 BY MR. ROBINSON:
16   Q.  In Troy Newman's book, THEIR BLOOD CRIES OUT
17 published in 2000, Troy Newman advocated for the execution by
18 the government of abortion doctors in order to expunge blood
19 guilt from land and people.  Are you aware of that?
20     MR. ZIMMERMAN: Objection, assumes facts not in
21 evidence.
22     MR. BROOKS: Objection, form, assumes facts not
23 in evidence, and lacks foundation.  Also, I object under and
24 instruct the witness not to answer pursuant to the Fifth
25 Amendment to the United States Constitution as well as state

## Page 57

1 law including Article 1, Section 15 of the California
2 Constitution and Article 1, Section 23 of the North Carolina
3 Constitution and compound question as well.
4     MR. MIHET:  Objection, mischaracterizes the
5 cite of work.
6     MR. BROOKS: I'll join in that objection.
7   A.  I am asserting my rights under the Fifth Amendment
8 to the United States Constitution as well as state law
9 including Article 1, Section 15 of the California
10 Constitution and Article 1, Section 23 of the North Carolina
11 Constitution and therefore I respectfully decline to
12 answer.
13 BY MR. ROBINSON:
14   Q.  Were you aware that Troy Newman held these views in
15 January 2013 when Daleiden reached out to him?
16     MR. BROOKS: Objection, form, compound
17 question, assumes facts not in evidence and lacks foundation.
18 Also vague, and I also object under and instruct the witness
19 not to answer pursuant to the Fifth Amendment to the United
20 States Constitution as well as state law including Article 1,
21 Section 15 of the California Constitution and Article 1,
22 Section 23 of the North Carolina Constitution.
23   A.  I am asserting my rights under the Fifth Amendment
24 to the United States Constitution as well as state law
25 including Article 1, Section 15 of the California

1  Constitution and Article 1, Section 23 of the North Carolina
2  Constitution and therefore I respectfully decline to
3  answer.
4  BY MR. ROBINSON:
5      Q.  Were you aware that Troy Newman had previously
6  advocated for the execution of abortion doctors by the
7  government when Daleiden reached out to him in January 2013
8  in connection with CMP's work?
9          MR. BROOKS: Objection, compound question,
10 vague.  Also, I object under and instruct the witness not to
11 answer pursuant to the Fifth Amendment to the United States
12 Constitution as well as state law including Article 1,
13 Section 15 of the California Constitution and Article 1,
14 Section 23 of the North Carolina Constitution.
15     A.  I am asserting my rights under the Fifth Amendment
16 to the United States Constitution as well as state law
17 including Article 1, Section 15 of the California
18 Constitution and Article 1, Section 23 of the North Carolina
19 Constitution and therefore I respectfully decline to
20 answer.
21 BY MR. ROBINSON:
22     Q.  Do you know who Cheryl Sullenger is?
23         MR. BROOKS: Objection, form.  Also I object
24 under and instruct the witness not to answer pursuant to the
25 Fifth Amendment to the United States Constitution as well as

1  state law including Article 1, Section 15 of the California
2  Constitution and Article 1, Section 23 of the North Carolina
3  Constitution.
4      A.  I am asserting my rights under the Fifth Amendment
5  to the United States Constitution as well as state law
6  including Article 1, Section 15 of the California
7  Constitution and Article 1, Section 23 of the North Carolina
8  Constitution and therefore I respectfully decline to
9  answer.
10 BY MR. ROBINSON:
11     Q.  Cheryl Sullenger is Senior Vice President of
12 Operation Rescue, correct?
13         MR. BROOKS: Objection, form, lacks foundation,
14 assumes facts not in evidence.  Also, I object under and
15 instruct the witness not to answer pursuant to the Fifth
16 Amendment to the United States Constitution as well as state
17 law including Article 1, Section 15 of the California
18 Constitution and Article 1, Section 23 of the North Carolina
19 Constitution.
20     A.  I am asserting my rights under the Fifth Amendment
21 to the United States Constitution as well as state law
22 including Article 1, Section 15 of the California
23 Constitution and Article 1, Section 23 of the North Carolina
24 Constitution and therefore I respectfully decline to
25 answer.

1  BY MR. ROBINSON:
2      Q.  Cheryl Sullenger is also a convicted felon in
3  connection with the attempted bombing of abortion clinics,
4  correct?
5          MR. BROOKS: Objection, form, argumentative,
6  lacks foundation, assumes facts not in evidence.  Also, I
7  object under and instruct the witness not to answer pursuant
8  to the Fifth Amendment to the United States Constitution as
9  well as state law including Article 1, Section 15 of the
10 California Constitution and Article 1, Section 23 of the
11 North Carolina Constitution.
12     A.  I am asserting my rights under the Fifth Amendment
13 to the United States Constitution as well as state law
14 including Article 1, Section 15 of the California
15 Constitution and Article 1, Section 23 of the North Carolina
16 Constitution and therefore I respectfully decline to
17 answer.
18 BY MR. ROBINSON:
19     Q.  Were you aware -- let me rephrase.  Were you aware
20 of Cheryl Sullenger's involvement in Operation Rescue when
21 Daleiden reached out to Troy Newman in January 2013 in
22 connection with CMP's work?
23         MR. BROOKS: Objection, form, compound
24 question, assumes facts not in evidence, also lacks
25 foundation.  also, I object under and instruct the witness

1  not to answer pursuant to the Fifth Amendment to the United
2  States Constitution as well as state law including Article 1,
3  Section 15 of the California Constitution and Article 1,
4  Section 23 of the North Carolina Constitution.
5      A.  I am asserting my rights under the Fifth Amendment
6  to the United States Constitution as well as state law
7  including Article 1, Section 15 of the California
8  Constitution and Article 1, Section 23 of the North Carolina
9  Constitution and therefore I respectfully decline to
10 answer.
11 BY MR. ROBINSON:
12     Q.  Did you perform work for Operation Rescue prior to
13 your involvement in CMP?
14         MR. BROOKS: Objection, form, compound
15 question, assumes facts not in evidence, and lacks
16 foundation.  Also vague.  I ALSO object under and instruct
17 the witness not to answer pursuant to the Fifth Amendment to
18 the United States Constitution as well as state law including
19 Article 1, Section 15 of the California Constitution and
20 Article 1, Section 23 of the North Carolina Constitution.
21     A.  I am asserting my rights under the Fifth Amendment
22 to the United States Constitution as well as state law
23 including Article 1, Section 15 of the California
24 Constitution and Article 1, Section 23 of the North Carolina
25 Constitution and therefore I respectfully decline to

1 answer.
2 BY MR. ROBINSON:
3    Q. You had previously performed work for Operation
4 Rescue before you became involved with CMP, correct?
5       MR. BROOKS: Objection, form, compound
6 question, lacks foundation, assumes fact not in evidence.
7 Also I object under and instruct the witness not to answer
8 pursuant to the Fifth Amendment to the United States
9 Constitution as well as state law including Article 1,
10 Section 15 of the California Constitution and Article 1,
11 Section 23 of the North Carolina Constitution.
12    A. I am asserting my rights under the Fifth Amendment
13 to the United States Constitution as well as state law
14 including Article 1, Section 15 of the California
15 Constitution and Article 1, Section 23 of the North Carolina
16 Constitution and therefore I respectfully decline to
17 answer.
18 BY MR. ROBINSON:
19    Q. Operation Rescue moved its operations to Wichita,
20 Kansas in order to harass NAF member and abortion care
21 provider Dr. George Tiller, correct?
22       MR. BROOKS: Objection, form, compound
23 question, assumes facts not in evidence, lacks foundation
24 argumentative. Also, I object under and instruct the witness
25 not to answer pursuant to the Fifth Amendment to the United

1 States Constitution as well as state law including Article 1,
2 Section 15 of the California Constitution and Article 1,
3 Section 23 of the North Carolina Constitution.
4    A. I am asserting my rights under the Fifth Amendment
5 to the United States Constitution as well as state law
6 including Article 1, Section 15 of the California
7 Constitution and Article 1, Section 23 of the North Carolina
8 Constitution and therefore I respectfully decline to
9 answer.
10 BY MR. ROBINSON:
11    Q. Are you aware that Dr. Tiller was assassinated by
12 Scott Rhoder?
13       MR. BROOKS: Objection, form, lacks foundation,
14 assumes facts not in evidence, also argumentative. Also, I
15 object under and instruct the witness not to answer pursuant
16 to the Fifth Amendment to the United States Constitution as
17 well as state law including Article 1, Section 15 of the
18 California Constitution and Article 1, Section 23 of the
19 North Carolina Constitution.
20    A. I am asserting my rights under the Fifth Amendment
21 to the United States Constitution as well as state law
22 including Article 1, Section 15 of the California
23 Constitution and Article 1, Section 23 of the North Carolina
24 Constitution and therefore I respectfully decline to
25 answer.

1 BY MR. ROBINSON:
2    Q. Are you aware that Cheryl Sullenger of Operation
3 Rescue provided information about Dr. Tiller's whereabouts to
4 Scott Rhoder shortly before Dr. Tiller's assassination?
5       MR. BROOKS: Objection, form, lacks foundation,
6 assumes facts not in evidence, compound and argumentative.
7 Also I object under and instruct the witness not to answer
8 pursuant to the Fifth Amendment to the United States
9 Constitution as well as state law including Article 1,
10 Section 15 of the California Constitution and Article 1,
11 Section 23 of the North Carolina Constitution.
12    A. I am asserting my rights under the Fifth Amendment
13 to the United States Constitution as well as state law
14 including Article 1, Section 15 of the California
15 Constitution and Article 1, Section 23 of the North Carolina
16 Constitution and therefore I respectfully decline to
17 answer.
18 BY MR. ROBINSON:
19    Q. Cheryl Sullenger was involved in CMP's work from the
20 beginning, correct?
21       MR. BROOKS: Objection, form, vague, assumes
22 facts not in evidence and lacks foundation. Also, I object
23 under and instruct the witness not to answer pursuant to the
24 Fifth Amendment to the United States Constitution as well as
25 state law including Article 1, Section 15 of the California

1 Constitution and Article 1, Section 23 of the North Carolina
2 Constitution.
3    A. I am asserting my rights under the Fifth Amendment
4 to the United States Constitution as well as state law
5 including Article 1, Section 15 of the California
6 Constitution and Article 1, Section 23 of the North Carolina
7 Constitution and therefore I respectfully decline to
8 answer.
9 BY MR. ROBINSON:
10    Q. Were you aware of Cheryl Sullenger's prior history
11 of advocating for violence against abortion doctors when
12 Daleiden reached out to Troy Newman in January of 2013 in
13 connection with CMP's work?
14       MR. BROOKS: Objection, form, compound
15 question, assumes facts not in evidence and lacks foundation.
16 Also, I object under and instruct the witness not to answer
17 pursuant to the Fifth Amendment to the United States
18 Constitution as well as state law including Article 1,
19 Section 15 of the California Constitution and Article 1,
20 Section 23 of the North Carolina Constitution.
21    A. I am asserting my rights under the Fifth Amendment
22 to the United States Constitution as well as state law
23 including Article 1, Section 15 of the California
24 Constitution and Article 1, Section 23 of the North Carolina
25 Constitution and therefore I respectfully decline to

Page 66

1 answer.
2 BY MR. ROBINSON:
3     Q.  Do you know why Daleiden was reaching out to Troy
4 Newman in January 2013?
5         MR. BROOKS:  Objection, form, assumes facts not
6 in evidence, compound and lacks foundation.  Also, I object
7 under and instruct the witness not to answer pursuant to the
8 Fifth Amendment to the United States Constitution as well as
9 state law including Article 1, Section 15 of the California
10 Constitution and Article 1, Section 23 of the North Carolina
11 Constitution.
12     A.  I am asserting my rights under the Fifth Amendment
13 to the United States Constitution as well as state law
14 including Article 1, Section 15 of the California
15 Constitution and Article 1, Section 23 of the North Carolina
16 Constitution and therefore I respectfully decline to
17 answer.
18 BY MR. ROBINSON:
19     Q.  Did you discuss with Daleiden whether Troy Newman
20 should be involved with CMP?
21         MR. BROOKS:  Objection, form, assumes facts not
22 in evidence and lacks foundation.  Also, I object under and
23 instruct the witness not to answer pursuant to the Fifth
24 Amendment to the United States Constitution as well as state
25 law including Article 1, Section 15 of the California

Page 67

1 Constitution and Article 1, Section 23 of the North Carolina
2 Constitution.
3     A.  I am asserting my rights under the Fifth Amendment
4 to the United States Constitution as well as state law
5 including Article 1, Section 15 of the California
6 Constitution and Article 1, Section 23 of the North Carolina
7 Constitution and therefore I respectfully decline to
8 answer.
9 BY MR. ROBINSON:
10     Q.  Did you express any misgivings to Daleiden about
11 bringing Troy Newman onboard to CMP?
12         MR. BROOKS:  Objection, form, assumes facts
13 not in evidence, lacks foundation, also vague.  Also object
14 under and instruct the witness not to answer pursuant to the
15 Fifth Amendment to the United States Constitution as well as
16 state law including Article 1, Section 15 of the California
17 Constitution and Article 1, Section 23 of the North Carolina
18 Constitution.
19     A.  I am asserting my rights under the Fifth Amendment
20 to the United States Constitution as well as state law
21 including Article 1, Section 15 of the California
22 Constitution and Article 1, Section 23 of the North Carolina
23 Constitution and therefore I respectfully decline to
24 answer.
25 BY MR. ROBINSON:

Page 68

1     Q.  Are you aware of whether anyone had misgivings to
2 Daleiden about bringing Troy Newman onboard CMP?
3         MR. BROOKS:  Objection, form, assumes facts not
4 in evidence, and lacks foundation, also vague.  Also object
5 under and instruct the witness not to answer pursuant to the
6 Fifth Amendment to the United States Constitution as well as
7 state law including Article 1, Section 15 of the California
8 Constitution and Article 1, Section 23 of the North Carolina
9 Constitution.
10     A.  I am asserting my rights under the Fifth Amendment
11 to the United States Constitution as well as state law
12 including Article 1, Section 15 of the California
13 Constitution and Article 1, Section 23 of the North Carolina
14 Constitution and therefore I respectfully decline to
15 answer.
16 BY MR. ROBINSON:
17     Q.  Was it David Daleiden's intent to involve actors
18 like Troy Newman who had a history for advocating violence
19 against abortion doctors in CMP's work?
20         MR. BROOKS:  Objection, form, compound
21 question, assumes facts not in evidence and lacks foundation.
22 Also calls for speculation.  Also, I object under and
23 instruct the witness not to answer pursuant to the Fifth
24 Amendment to the United States Constitution as well as state
25 law including Article 1, Section 15 of the California

Page 69

1 Constitution and Article 1, Section 23 of the North Carolina
2 Constitution and instruct the witness not to answer.
3         MR. MIHET:  Vague and ambiguous.
4         MR. BROOKS:  I'll join that objection.
5     A.  I am asserting my rights under the Fifth Amendment
6 to the United States Constitution as well as state law
7 including Article 1, Section 15 of the California
8 Constitution and Article 1, Section 23 of the North Carolina
9 Constitution and therefore I respectfully decline to
10 answer.
11 BY MR. ROBINSON:
12     Q.  What role did Troy Newman play in CMP?
13         MR. BROOKS:  Objection, form, vague, ambiguous,
14 assumes facts not in evidence, and lacks foundation.  Also I
15 object under and instruct the witness not to answer pursuant
16 to the Fifth Amendment to the United States Constitution as
17 well as state law including Article 1, Section 15 of the
18 California Constitution and Article 1, Section 23 of the
19 North Carolina Constitution.
20     A.  I am asserting my rights under the Fifth Amendment
21 to the United States Constitution as well as state law
22 including Article 1, Section 15 of the California
23 Constitution and Article 1, Section 23 of the North Carolina
24 Constitution and therefore I respectfully decline to
25 answer.

## Page 70

BY MR. ROBINSON:

Q. What role did Cheryl Sullenger play in CMP?

MR. BROOKS: Objection, form, assumes facts not in evidence and lacks foundation. Also vague and ambiguous. Also, I object under and instruct the witness not to answer pursuant to the Fifth Amendment to the United States Constitution as well as state law including Article 1, Section 15 of the California Constitution and Article 1, Section 23 of the North Carolina Constitution.

A. I am asserting my rights under the Fifth Amendment to the United States Constitution as well as state law including Article 1, Section 15 of the California Constitution and Article 1, Section 23 of the North Carolina Constitution and therefore I respectfully decline to answer.

BY MR. ROBINSON:

Q. Let's have a look at Daleiden's Email to you on January 28, 2013. I'll direct your attention to the middle portion of that document.

A. Which exhibit number?

Q. It's 202.

A. I'm sorry, can you --

Q. Sorry, 203. Exhibit 203, ending bates CM5463.

A. 203. I'm sorry, once again?

Q. That's it. You're there.

## Page 71

A. Okay. I don't know what bates numbers are.

Q. Bates numbers are the number on the bottom. It's legalese for a stamp we apply to each page after production so we can distinguish one page from the other.

A. Okay.

Q. I think someone named Bates invented it but I'm not sure. David Daleiden sent Troy Newman a road map of CMP's work on January 28, 2013, correct?

MR. BROOKS: Objection, form, lacks foundation, assumes facts not in evidence. Also, I object under and instruct the witness not to answer pursuant to the Fifth Amendment to the United States Constitution as well as state law including Article 1, Section 15 of the California Constitution and Article 1, Section 23 of the North Carolina Constitution.

A. I am asserting my rights under the Fifth Amendment to the United States Constitution as well as state law including Article 1, Section 15 of the California Constitution and Article 1, Section 23 of the North Carolina Constitution and therefore I respectfully decline to answer.

BY MR. ROBINSON:

Q. Under the first section of the road map there's a heading, Bad Guys. Do you see that?

A. Exhibit 203?

## Page 72

Q. Correct.

MR. BROOKS: Just object to the extent that assumes facts not in evidence.

A. I see the area you're indicating, yes.

BY MR. ROBINSON:

Q. And underneath that is written number one, abortion industry, Planned Parenthood preeminent and heavy NAF involvement expected. Do you see that?

A. Yes, I see the area you're indicating.

Q. From its inception CMP viewed Planned Parenthood and NAF as, quote, the bad guys, correct?

MR. BROOKS: Objection, form, assumes facts not in evidence, and lacks foundation. Also, I object under and instruct the witness not to answer pursuant to the Fifth Amendment to the United States Constitution as well as state law including Article 1, Section 15 of the California Constitution and Article 1, Section 23 of the North Carolina Constitution.

A. I'm asserting my rights under the Fifth Amendment to the United States Constitution as well as state law including Article 1, Section 15 of the California Constitution and Article 1, Section 23 of the North Carolina Constitution and therefore I respectfully decline to answer.

BY MR. ROBINSON:

(Plaintiff's Exhibit Number 204

## Page 73

marked for identification)

Q. I'm handing you what we have marked as Plaintiff's Exhibit 204. Please have a look at the document and let me know when you're ready to answer a question about it.

MR. ROBINSON: For the record, Exhibit 204 is Email sent from David Daleiden to the witness dated February 6, 2013 plus its attachment Bates CM05355 through 63.

MR. MIHET: I'm going to object to the characterization because it lacks foundation, and assumes facts not in evidence.

MR. BROOKS: I'll join that objection.

MR. ROBINSON: I'm sorry, why do you think it lacks foundation?

MR. MIHET: Because you haven't established whether or not that's in fact what the document is.

MR. ROBINSON: You dispute the fact it's an Email sent from Daleiden to the witness? Is that because of the redactions on the document?

MR. MIHET: No, that's because you haven't introduced any testimony to that effect.

MR. ROBINSON: Noted.

BY MR. ROBINSON:

Q. Do you recognize Exhibit 204?

MR. BROOKS: Objection, form, lacks foundation, assumes facts not in evidence. Also, I object under and

1  instruct the witness not to answer pursuant to the Fifth
2  Amendment to the United States Constitution as well as state
3  law including Article 1, Section 15 of the California
4  Constitution and Article 1, Section 23 of the North Carolina
5  Constitution.
6      A.  I am asserting my rights under the Fifth Amendment
7  to the United States Constitution as well as state law
8  including Article 1, Section 15 of the California
9  Constitution and Article 1, Section 23 of the North Carolina
10 Constitution and therefore I respectfully decline to
11 answer.
12 BY MR. ROBINSON:
13     Q.  David Daleiden wrote you an Email on February 6,
14 2013 attaching a document entitled, Project Draft Version
15 1.0, correct?
16         MR. BROOKS:  Objection, form, lacks foundation,
17 assumes facts not in evidence.  Also, I object under and
18 instruct the witness not to answer pursuant to the Fifth
19 Amendment to the United States Constitution as well as state
20 law including Article 1, Section 15 of the California
21 Constitution and Article 1, Section 23 of the North Carolina
22 Constitution.
23     A.  I am asserting my rights under the Fifth Amendment
24 to the United States Constitution as well as state law
25 including Article 1, Section 15 of the California

1  Constitution and Article 1, Section 23 of the North Carolina
2  Constitution and therefore I respectfully decline to
3  answer.
4  BY MR. ROBINSON:
5      Q.  Why is David Daleiden sending you a project draft on
6  February 6, 2013?
7          MR. BROOKS:  Objection, form, assumes facts not
8  in evidence, and lacks foundation, also compound; and I
9  object under and instruct the witness not to answer pursuant
10 to the Fifth Amendment to the United States Constitution as
11 well as state law including Article 1, Section 15 of the
12 California Constitution and Article 1, Section 23 of the
13 North Carolina Constitution and also --
14     A.  I'm sorry, I see someone motioning at the door.
15         MR. BROOKS:  Also I object because it calls
16 for speculation.
17 BY MR. ROBINSON:
18     Q.  Just wait a second.  I apologize for the
19 interruption.  You can answer.
20     A.  I am asserting my rights under the Fifth Amendment
21 to the United States Constitution as well as state law
22 including Article 1, Section 15 of the California
23 Constitution and Article 1, Section 23 of the North Carolina
24 constitution and therefore I respectfully decline to
25 answer.

1      Q.  Let's look at the attachment that David Daleiden
2  sent to you.  Do you see at the top of page 1 of 8, bates
3  CM5356, it states, Draft Project Proposal, Confidential
4  copyright 2013, David Daleiden.
5          MR. BROOKS:  Objection to characterization of
6  the document by Counsel, and also lack of foundation, and
7  assumes facts not in evidence and I'll actually just instruct
8  the witness based on the form of that question to not answer
9  based on the Fifth Amendment to the United States
10 Constitution as well as state law including Article 1,
11 Section 15 of the California Constitution and Article 1,
12 Section 23 of the North Carolina Constitution.
13     A.  I am asserting my rights under the Fifth Amendment
14 to the United States Constitution as well as state law
15 including Article 1, Section 15 of the California
16 Constitution and Article 1, Section 23 of the North Carolina
17 Constitution and therefore I respectfully decline to
18 answer.
19 BY MR. ROBINSON:
20     Q.  David Daleiden wrote the draft project proposal in
21 2013, correct?
22         MR. BROOKS:  Objection, form, assumes facts not
23 in evidence, and lacks foundation, also speculation; and I
24 object under and instruct the witness not to answer pursuant
25 to the Fifth Amendment to the United States Constitution as

1  well as state law including Article 1, Section 15 of the
2  California Constitution and Article 1, Section 23 of the
3  North Carolina Constitution.
4      A.  I am asserting my rights under the Fifth Amendment
5  to the United States Constitution as well as state law
6  including Article 1, Section 15 of the California
7  Constitution and Article 1, Section 23 of the North Carolina
8  Constitution and therefore I respectfully decline to
9  answer.
10 BY MR. ROBINSON:
11     Q.  Did anyone other than Daleiden contribute language
12 to the draft project proposal as it was circulated to you on
13 February 6, 2013, to your knowledge?
14         MR. BROOKS:  Objection, form, assumes facts not
15 in evidence and lacks foundation; also compound, calls for
16 speculation.  I also object under and instruct the witness
17 not to answer pursuant to the Fifth Amendment to the United
18 States Constitution as well as state law including Article 1,
19 Section 15 of the California Constitution and Article 1,
20 Section 23 of the North Carolina Constitution.
21     A.  I am asserting my rights under the Fifth Amendment
22 to the United States Constitution as well as state law
23 including Article 1, Section 15 of the California
24 Constitution and Article 1, Section 23 of the North Carolina
25 Constitution and therefore I respectfully decline to

1 answer.
2 BY MR. ROBINSON:
3 Q. The document uses words like ghastly tax payer
4 funded, billion dollar enterprise abortion clinics led by
5 Planned Parenthood, liberal university professors, murderest
6 abortionists and corrupt scientists who exploit their murder.
7 Those are David Daleiden's words, correct?
8 MR. BROOKS: Objection, form, lacks foundation,
9 assumes facts not in evidence, document speaks for itself;
10 and also, I object under and instruct the witness not to
11 answer pursuant to the United States Constitution as well as
12 state law including Article 1, Section 15 of the California
13 Constitution and Article 1, Section 23 of the North Carolina
14 Constitution and also I object, it calls for speculation.
15 A. I am asserting my rights under the Fifth Amendment
16 to the United States Constitution as well as state law
17 including Article 1, Section 15 of the California
18 Constitution and Article 1, Section 23 of the North Carolina
19 Constitution and therefore I respectfully decline to
20 answer.
21 BY MR. ROBINSON:
22 Q. This draft project proposal described what CMP's
23 project was intended to accomplish in its inception,
24 correct?
25 MR. BROOKS: Objection, form, assumes facts

1 not in evidence and lacks foundation. Also calls for
2 speculation, vague. I also object under and instruct the
3 witness not to answer pursuant to the Fifth Amendment of the
4 United States Constitution as well as state law including
5 Article 1, Section 15 of the California Constitution and
6 Article 1, Section 23 of the North Carolina Constitution.
7 A. I am asserting my rights under the Fifth Amendment
8 to the United States Constitution as well as state law
9 including Article 1, Section 15 of the California
10 Constitution and Article 1, Section 23 of the North Carolina
11 Constitution and therefore I respectfully decline to
12 answer.
13 BY MR. ROBINSON:
14 Q. On page 2 of this draft project proposal there's a
15 reference to conferences held by abortion industry. Can I
16 direct your attention to that portion of the document on page
17 2 of 8, Level 1.
18 A. I'm sorry, could you reference the exhibit, please.
19 Q. We're looking at Exhibit 204, page 2 of 8, Bates
20 Number CM5357 in the middle of the page.
21 A. I'm at the middle of the page, yes.
22 Q. Let me quote from the document. It states, the
23 abortion industry holds several conferences throughout the
24 year. The most prominent being the NAF annual meeting, and
25 the annual meeting of the Association of Reproductive Health

1 Professionals, ARHP, which is a Planned Parenthood affiliate.
2 In the past these conferences have been venues for tissue
3 procurers to identify new supply clinics and may continue to
4 harbor this sort of activity. Do you see that?
5 MR. BROOKS: I'm just gonna object. Actually,
6 you didn't read it exactly right.
7 MR. ROBINSON: Let me try it again.
8 MR. BROOKS: Sure.
9 BY MR. ROBINSON:
10 Q. Daleiden's draft project proposal on page 2 states,
11 quote, the abortion industry holds several conferences
12 throughout the year. The most prominent being the NAF annual
13 meeting and the annual meeting of the Association of
14 Reproductive Health Professionals, ARHP, which is Planned
15 Parenthood affiliated. Do you see that?
16 MR. BROOKS: Going to object to that as a
17 compound question -- form. It's a compound question and also
18 assumes facts not in evidence and lacks foundation. Also,
19 given the preface to the question, I am going to instruct the
20 witness not to answer pursuant to the Fifth Amendment to the
21 United States Constitution as well as state law including
22 Article 1, Section 15 of the California Constitution and
23 Article 1, Section 23 of the North Carolina Constitution.
24 A. I am asserting my rights under the Fifth Amendment
25 to the United States Constitution as well as state law

1 including Article 1, Section 15 of the California
2 Constitution and Article 1, Section 23 of the North Carolina
3 Constitution and therefore I respectfully decline to
4 answer.
5 BY MR. ROBINSON:
6 Q. It was the intent from the inception of CMP's
7 project as early as February 2013 to infiltrate NAF's annual
8 meeting, correct?
9 MR. BROOKS: Objection, lacks foundation, form,
10 lacks foundation, assumes facts not in evidence, also calls
11 for speculation by the witness. Also, I object under and
12 instruct the witness not to answer pursuant to the Fifth
13 Amendment to the United States Constitution as well as state
14 law including Article 1, Section 15 of the California
15 Constitution and Article 1, Section 23 of the North Carolina
16 Constitution.
17 A. I am asserting my rights under the Fifth Amendment
18 to the United States Constitution as well as state law
19 including Article 1, Section 15 of the California
20 Constitution and Article 1, Section 23 of the North Carolina
21 Constitution and therefore I respectfully decline to
22 answer.
23 BY MR. ROBINSON:
24 Q. It was the intent at the inception of CMP's project
25 as early as February 2013 to infiltrate the annual meeting of

## Page 82

1 the Association of Reproductive Health Professionals,
2 correct?
3 MR. BROOKS: Objection, form, compound
4 question, lacks foundation, assumes facts not in evidence,
5 asked and answered. Also, I object under and instruct the
6 witness not to answer pursuant to the Fifth Amendment to the
7 United States Constitution as well as state law including
8 Article 1, Section 15 of the California Constitution and
9 Article 1, Section 23 of the North Carolina Constitution.
10 A. I am asserting my rights under the Fifth Amendment
11 to the United States Constitution as well as state law
12 including Article 1, Section 15 of the California
13 Constitution and Article 1, Section 23 of the North Carolina
14 Constitution and therefore I respectfully decline to
15 answer.
16 BY MR. ROBINSON:
17 Q. Why did CMP want to infiltrate NAF and ARHP?
18 MR. BROOKS: Objection, facts not in evidence,
19 speculation, and I object under and instruct the witness not
20 to answer pursuant to the Fifth Amendment to the United
21 States Constitution as well as state law including Article 1,
22 Section 15 of the California Constitution and Article 1,
23 Section 23 of the North Carolina Constitution.
24 A. I am asserting my rights under the Fifth Amendment
25 to the United States Constitution as well as state law

## Page 83

1 including Article 1, Section 15 of the California
2 Constitution and Article 1, Section 23 of the North Carolina
3 Constitution and therefore I respectfully decline to
4 answer.
5 BY MR. ROBINSON:
6 Q. CMP wanted to -- sorry, strike that. At the time of
7 the February 2013 draft project proposal, CMP intended to
8 infiltrate the NAF and ARHP annual meetings in order to
9 further CMP's purpose to take Gotcha style undercover video
10 that could be used to inflict harm on Planned Parenthood,
11 correct?
12 MR. BROOKS: Objection to form, assumes facts
13 not in evidence and lacks foundation, calls for speculation,
14 argumentative. Also, I object under and instruct the witness
15 not to answer pursuant to the Fifth Amendment to the United
16 States Constitution as well as state law including Article 1,
17 Section 15 of the California Constitution and Article 1,
18 Section 23 of the North Carolina Constitution.
19 A. I am asserting my rights under the Fifth Amendment
20 to the United States Constitution as well as state law
21 including Article 1, Section 15 of the California
22 Constitution and Article 1, Section 23 of the North Carolina
23 Constitution and therefore I respectfully decline to
24 answer.
25 BY MR. ROBINSON:

## Page 84

1 Q. CMP knew at the time of the February 2013 draft
2 project proposal that the NAF annual meetings were not open
3 to the public, correct?
4 MR. BROOKS: Objection, form, lacks foundation,
5 assumes facts not in evidence, also argumentative; and I
6 object under and instruct the witness not to answer pursuant
7 to the United States Constitution as well as state law
8 including Article 1, Section 15 of the California
9 Constitution and Article 1, Section 23 of the North Carolina
10 Constitution. Also object because it calls for speculation.
11 A. I am asserting my rights under the Fifth Amendment
12 to the United States Constitution as well as state law
13 including Article 1, Section 15 of the California
14 Constitution and Article 1, Section 23 of the North Carolina
15 Constitution and therefore I respectfully decline to
16 answer.
17 BY MR. ROBINSON:
18 Q. CMP knew from the inception of its work it would
19 need to use fraud and false pretenses to gain access to NAF's
20 annual meetings, correct?
21 MR. BROOKS: Objection, form, assumes facts not
22 in evidence, and lacks foundation. Also argumentative and
23 compound question; and I object and instruct the witness not
24 to answer pursuant to the Fifth Amendment to the United
25 States Constitution as well as state law including Article 1,

## Page 85

1 Section 15 of the California Constitution and Article 1,
2 Section 23 of the North Carolina Constitution.
3 A. I am asserting my rights under the Fifth Amendment
4 to the United States Constitution as well as state law
5 including Article 1, Section 15 of the California
6 Constitution and Article 1, Section 23 of the North Carolina
7 Constitution and therefore I respectfully decline to
8 answer.
9 BY MR. ROBINSON:
10 Q. CMP knew at the time of the February 2013 draft
11 project proposal that the AHRP annual meetings were not open
12 to the public, correct?
13 MR. BROOKS: Objection, form, lacks foundation
14 and calls -- assumes facts not in evidence, so I believe
15 asked and answered, and compound question. I also object
16 under and assert -- object under and instruct the witness not
17 to answer pursuant to the Fifth Amendment to the United
18 States Constitution as well as state law including Article 1,
19 Section 15 of the California Constitution and Article 1,
20 Section 23 of the North Carolina Constitution and also I
21 object on grounds it calls for speculation.
22 A. I am asserting my rights under the Fifth Amendment
23 to the United States Constitution as well as state law
24 including Article 1, Section 15 of the California
25 Constitution and Article 1, Section 23 of the North Carolina

Page 86

1 Constitution and therefore I respectfully decline to
2 answer.
3 BY MR. ROBINSON:
4    Q.  CMP knew from the inception of its work it would
5 need to use fraud and false pretenses to gain access to the
6 AHRP annual meetings, correct?
7           MR. BROOKS: Objection, form, assumes facts not
8 in evidence, and lacks foundation, argumentative and
9 compound.  Also, I object under and instruct the witness not
10 to answer pursuant to the Fifth Amendment to the United
11 States Constitution as well as state law including Article 1,
12 Section 15 of the California Constitution and Article 1,
13 Section 23 of the North Carolina Constitution.
14    A.  I am asserting my rights under the Fifth Amendment
15 to the United States Constitution as well as state law
16 including Article 1, Section 15 of the California
17 Constitution and Article 1, Section 23 of the North Carolina
18 Constitution and therefore I respectfully decline to
19 answer.
20 BY MR. ROBINSON:
21    Q.  Did you discuss with Daleiden how best to infiltrate
22 NAF and AHRP annual meetings?
23           MR. BROOKS: Objection, form, assumes facts not
24 in evidence and lacks foundation.  Also, I object under and
25 instruct the witness not to answer pursuant to the Fifth

Page 87

1 Amendment to the United States Constitution as well as state
2 law including Article 1, Section 15 of the California
3 Constitution and Article 1, Section 23 of the North Carolina
4 Constitution.
5    A.  I am asserting my rights under the Fifth Amendment
6 to the United States Constitution as well as state law
7 including Article 1, Section 15 of the California
8 Constitution and Article 1, Section 23 of the North Carolina
9 Constitution and therefore I respectfully decline to
10 answer.
11 BY MR. ROBINSON:
12    Q.  Who else was involved in those discussions?
13           MR. BROOKS: Form.  Assumes facts not in
14 evidence and lacks foundation and argumentative.  Also, I
15 object under and instruct the witness not to answer pursuant
16 to the Fifth Amendment to the United States Constitution as
17 well as state law including Article 1, Section 15 of the
18 California Constitution and Article 1, Section 23 of the
19 North Carolina Constitution.
20    A.  I am asserting my rights under the Fifth Amendment
21 to the United States Constitution as well as state law
22 including Article 1, Section 15 of the California
23 Constitution and Article 1, Section 23 of the North Carolina
24 Constitution and therefore I respectfully decline to
25 answer.

Page 88

1 BY MR. ROBINSON:
2    Q.  How did CMP envision infiltrating the NAF and AHRP
3 annual meetings?
4           MR. BROOKS: Objection, form, lacks foundation,
5 assumes facts not in evidence.  Also compound, and I object
6 under and instruct the witness not to answer pursuant to the
7 Fifth Amendment to the United States Constitution as well as
8 state law including Article 1, Section 15 of the California
9 Constitution and Article 1, Section 23 of the North Carolina
10 Constitution.
11    A.  I am asserting my rights under the Fifth Amendment
12 to the United States Constitution as well as state law
13 including Article 1, Section 15 of the California
14 Constitution and Article 1, Section 23 of the North Carolina
15 Constitution and therefore I respectfully decline to
16 answer.
17 BY MR. ROBINSON:
18    Q.  Did you know that CMP's infiltration of the NAF and
19 AHRP's annual meetings would involve illegal acts among a
20 group of conspirators?
21           MR. BROOKS: Objection, form, assumes facts not
22 in evidence and lacks foundation, argumentative and compound.
23 I also object under and instruct the witness not to answer
24 pursuant to the Fifth Amendment to the United States
25 Constitution as well as state law including Article 1,

Page 89

1 Section 15 of the California Constitution and Article 1,
2 Section 23 of the North Carolina Constitution.
3    A.  I am asserting my rights under the Fifth Amendment
4 to the United States Constitution as well as state law
5 including Article 1, Section 15 of the California
6 Constitution and Article 1, Section 23 of the North Carolina
7 Constitution and therefore I respectfully decline to
8 answer.
9 BY MR. ROBINSON:
10    Q.  From the inception of CMP's work both Daleiden and
11 Newman knew that CMP's infiltration of the NAF and AHRP's
12 annual meetings would involve illegal acts among a group of
13 conspirators, correct?
14           MR. BROOKS: Objection, form, lacks foundation,
15 assumes facts not in evidence, compound and argumentative.
16 Also, I object under and instruct the witness not to answer
17 pursuant to the Fifth Amendment to the United States
18 Constitution as well as state law including Article 1,
19 Section 15 of the California Constitution and Article 1,
20 Section 23 of the North Carolina Constitution.  Also, I
21 object on the grounds it calls for speculation.
22    A.  I am asserting my rights under the Fifth Amendment
23 to the United States Constitution as well as state law
24 including Article 1, Section 15 of the California
25 Constitution and Article 1, Section 23 of the North Carolina

1  Constitution and therefore I respectfully decline to
2  answer.
3  BY MR. ROBINSON:
4    Q.  On page 6 of the February 2013 draft project
5  proposal there's a reference to documentary footage that
6  would come from real life moles and orchestrated stings,
7  correct?
8        MR. BROOKS: Objection, form, also on the
9  characterization of the document.  I instruct the witness not
10  to answer pursuant to the Fifth Amendment to the United
11  States Constitution as well as state law including Article 1,
12  Section 15 of the California Constitution and Article 1,
13  Section 23 of the North Carolina Constitution. Elaborating on
14  the form objection further, lacks foundation and assumes
15  facts not in evidence.
16    A.  I am asserting my rights under the Fifth Amendment
17  to the United States Constitution as well as state law
18  including Article 1, Section 15 of the California
19  Constitution and Article 1, Section 23 of the North Carolina
20  Constitution and therefore I respectfully decline to
21  answer.
22  BY MR. ROBINSON:
23    Q.  Through its infiltration of the NAF and AHRP annual
24  meetings CMP intended to gather short viral undercover Gotcha
25  videos that it would post to YouTube at the end of its

1  project, correct?
2        MR. BROOKS: Objection, form, lacks foundation
3  and assumes facts not in evidence, calls for speculation and
4  compound.  Also, I object under and instruct the witness not
5  to answer pursuant to the Fifth Amendment to the United
6  States Constitution as well as state law including Article 1,
7  Section 15 of the California Constitution and Article 1,
8  Section 23 of the North Carolina Constitution.
9    A.  I am asserting my rights under the Fifth Amendment
10  to the United States Constitution as well as state law
11  including Article 1, Section 15 of the California
12  Constitution and Article 1, Section 23 of the North Carolina
13  Constitution and therefore I respectfully decline to
14  answer.
15  BY MR. ROBINSON:
16    Q.  From its inception CMP intended to create propaganda
17  for release on YouTube intended to inflict damage on Planned
18  Parenthood, correct?
19        MR. BROOKS: Objection to form, assumes facts
20  not in evidence and argumentative and compound.  I also object
21  under and instruct the witness not to answer pursuant to the
22  Fifth Amendment to the United States Constitution as well as
23  state law including Article 1, Section 15 of the California
24  Constitution and Article 1, Section 23 of the North Carolina
25  Constitution.

1    A.  I am asserting my rights under the Fifth Amendment
2  to the United States Constitution as well as state law
3  including Article 1, Section 15 of the California
4  Constitution and Article 1, Section 23 of the North Carolina
5  Constitution and therefore I respectfully decline to
6  answer.
7  BY MR. ROBINSON:
8    Q.  As stated in the February 23, 2013 draft project
9  proposal, one of CMP's goals was to expose "ghoulish medical
10  cannibalism", correct?
11        MR. BROOKS: Objection, form, lacks foundation
12  and assumes facts not in evidence.  Again, given the
13  characterization of the document, I OBJECT under and instruct
14  the witness not to answer pursuant to the Fifth Amendment to
15  the United States Constitution as well as state law including
16  Article 1, Section 15 of the California Constitution and
17  Article 1, Section 23 of the North Carolina Constitution.
18    A.  I am asserting my rights under the Fifth Amendment
19  to the United States Constitution as well as state law
20  including Article 1, Section 15 of the California
21  Constitution and Article 1, Section 23 of the North Carolina
22  Constitution and therefore I respectfully decline to answer.
23  If possible, would now be a good time?
24        MR. ROBINSON:  Yes, thank you.  Let's go off
25  the record.

1        THE VIDEOGRAPHER: Going off record.  The time
2  is 11:45 a.m.  This is the end of DVD Number 1.
3        (RECESS TAKEN)
4        THE VIDEOGRAPHER: We're going back on record.
5  The time is 12:51 p.m..  This is the beginning of DVD Number
6  2.
7  BY MR. ROBINSON:
8    Q.  Before the break we were looking at Plaintiff's
9  Exhibit 204.  I will continue questioning on page 6 of 8 of
10  the document, Bates Number 5361.  Another one of CMP's goals
11  from the beginning was to create public outrage at Planned
12  Parenthood and liberal university professors, correct?
13        MR. BROOKS: Objection to form, lacks
14  foundation, and assumes facts not in evidence, argumentative,
15  and calls for speculation.  Also, I object under and instruct
16  the witness not to answer pursuant to the Fifth Amendment to
17  the United States Constitution as well as state law including
18  Article 1, Section 15 of the California Constitution and
19  Article 1, Section 23 of the North Carolina Constitution.
20    A.  I am asserting my rights under the Fifth Amendment
21  to the United States Constitution as well as state law
22  including Article 1, Section 15 of the California
23  Constitution and Article 1, Section 23 of the North Carolina
24  Constitution and therefore I respectfully decline to
25  answer.

BY MR. ROBINSON:

Q. According to the February 2013 draft project proposal, one of CMP's goals was "Create public outrage at Planned Parenthood and liberal university professors." Is that an accurate statement of one of CMP's goals?

MR. BROOKS: Objection, form, lacks foundation. It assumes facts not in evidence, compound question, and again calls for speculation. I also object under and instruct the witness not to answer pursuant to the Fifth Amendment to the United States Constitution as well as state law including Article 1, Section 15 of the California Constitution and Article 1, Section 23 of the North Carolina Constitution.

MR. MIHET: It also mischaracterizes the document which speaks for itself.

MR. BROOKS: I'll join in that objection.

A. I am asserting my rights under the Fifth Amendment to the United States Constitution as well as state law including Article 1, Section 15 of the California Constitution and Article 1, Section 23 of the North Carolina Constitution and therefore I respectfully decline to answer.

BY MR. ROBINSON:

Q. One of CMP's goals from the beginning was to deliver a major public relations blow to Planned Parenthood,

correct?

MR. BROOKS: Objection, form, lacks foundation, and assumes facts not in evidence. Also calls for speculation; and I further object under and instruct the witness not to answer pursuant to the Fifth Amendment to the U.S. Constitution as well as state law including Article 1, Section 15 of the California Constitution and Article 1, Section 23 of the North Carolina Constitution.

A. I am asserting my rights under the Fifth Amendment to the United States Constitution as well as state law including Article 1, Section 15 of the California Constitution and Article 1, Section 23 of the North Carolina Constitution and therefore I respectfully decline to answer.

BY MR. ROBINSON:

Q. Under the February 2013 draft project proposal one of CMP's stated goals was, quote, deliver a major public relations blow to Planned Parenthood. Does that accurately state one of CMP's goals?

MR. BROOKS: Objection, form, lacks foundation, and assumes facts not in evidence. Also calls for speculation, and also the document speaks for itself. I also object under and instruct the witness not to answer pursuant to the Fifth Amendment of the United States Constitution as well as state law including Article 1, Section 15 of the

California Constitution and Article 1, Section 23 of the North Carolina Constitution.

A. I am asserting my rights under the Fifth Amendment to the United States Constitution as well as state law including Article 1, Section 15 of the California Constitution and Article 1, Section 23 of the North Carolina Constitution and therefore I respectfully decline to answer.

BY MR. ROBINSON:

Q. One of CMP's --

MR. ZIMMERMAN: Excuse me real quick, is the phone line back on?

THE VIDEOGRAPHER: Going off record. The time is 12:56 p.m..

(RECESS TAKEN)

THE VIDEOGRAPHER: We're going back on record. The time is 12:57 p.m..

(Last question read back by the court reporter)

BY MR. ROBINSON:

Q. One of CMP's goals from the inception was to promote state defunding efforts for Planned Parenthood, correct?

MR. BROOKS: Objection, form, lacks foundation and assumes facts not in evidence, vague and calls for speculation by the witness. Also I object under and instruct

the witness not to answer pursuant to the Fifth Amendment to the United States Constitution as well as Article 1, Section 15 of the California Constitution and Article 1, Section 23 of the North Carolina Constitution.

A. I am asserting my rights under the Fifth Amendment to the United States Constitution as well as state law including Article 1, Section 15 of the California Constitution and Article 1, Section 23 of the North Carolina Constitution and therefore I respectfully decline to answer.

BY MR. ROBINSON:

Q. Under the February 2013 draft project proposal one of CMP's stated goals was, quote, promote state defunding efforts for Planned Parenthood. Does that accurately state one of CMP's goals?

MR. BROOKS: Objection, forms, lacks foundation, assumes facts not in evidence, document speaks for itself and calls for speculation. I also object pursuant to and instruct the witness not to answer under the Fifth Amendment of the United States Constitution as well as state law including Article 1, Section 15 of the California Constitution and Article 1, Section 23 of the North Carolina Constitution.

A. I am asserting my rights under the Fifth Amendment to the United States Constitution as well as state law

1 including Article 1, Section 15 of the California
2 Constitution and Article 1, Section 23 of the North Carolina
3 Constitution and therefore I respectfully decline to
4 answer.
5 BY MR. ROBINSON:
6    Q.  On page 7 of the February 2013 draft project
7 proposal there's a section under your name.  Do you see
8 that?
9    A.  I'm sorry, exhibit?
10    Q.  This is Exhibit 204, page 7 of 8 in the attachment
11 Bates ending CM5362.  The document states that -- sorry,
12 strike that.  The document has a line for Anna Bettisworth.
13 That refers to you, correct?
14         MR. BROOKS: Objection, form, lacks foundation,
15 and assumes facts not in evidence.  Also calls for
16 speculation; and I also object under and instruct the witness
17 not to answer pursuant to the Fifth Amendment to the United
18 States Constitution as well as state law including Article 1,
19 Section 15 of the California Constitution and Article 1,
20 Section 23 of the North Carolina Constitution.
21 BY MR. ROBINSON:
22    Q.  Let rephrase.  Are you Anna Bettisworth?
23         MR. BROOKS: Objection, vague, but you can
24 answer.
25    A.  My name is Annamarie Gates Davin.

1 BY MR. ROBINSON:
2    Q.  Is your maiden name Anna Bettisworth?
3    A.  I am asserting my rights under the Fifth Amendment
4 to the United States Constitution as well as state law
5 including Article 1, Section 15 of the California
6 Constitution and Article 1, Section 23 of the North Carolina
7 Constitution and therefore I respectfully decline to
8 answer.
9    Q.  Have you ever gone by the legal name Anna
10 Bettisworth Gates?
11         MR. BROOKS: Objection, vague -- objection to
12 form, vague.  Also, I object --
13         MR. ROBINSON:  I'll withdraw.
14         MR. BROOKS:  Okay.
15 BY MR. ROBINSON:
16    Q.  Have you ever gone by the name Annamarie Gates
17 Bettisworth?
18         MR. BROOKS: Now objection, form, and also I
19 object under and instruct the witness not to answer pursuant
20 to the Fifth Amendment to the U.S. Constitution as well as
21 state law including Article 1, Section 15 of the California
22 Constitution and Article 1, Section 23 of the North Carolina
23 Constitution.
24    A.  I am asserting my rights under the Fifth Amendment
25 to the United States Constitution as well as state law

1 including Article 1, Section 15 of the California
2 Constitution and Article 1, Section 23 of the North Carolina
3 Constitution and therefore I respectfully decline to
4 answer.
5 BY MR. ROBINSON:
6    Q.  Page 7 of 8 of the February 2013 draft project
7 proposal indicates that you have been active in the pro-life
8 movement and has worked with local pro-life groups in the
9 California Bay area, Survivors, Operation Rescue, and Live
10 Action.  Is that statement accurate?
11         MR. BROOKS: Objection, form, lacks foundation,
12 assumes facts not in evidence.  Also, compound and calls for
13 speculation.  And also I object under and instruct the
14 witness not to answer pursuant to the Fifth Amendment to the
15 United States Constitution as well as state law including
16 Article 1, Section 15 of the California Constitution and
17 Article 1, Section 23 of the North Carolina Constitution.
18    A.  I am asserting my rights under the Fifth Amendment
19 to the United States Constitution as well as state law
20 including Article 1, Section 15 of the California
21 Constitution and Article 1, Section 23 of the North Carolina
22 Constitution and therefore I respectfully decline to
23 answer.
24 BY MR. ROBINSON:
25    Q.  The February 2013 draft project proposal states from

1 2010 to 2012 Anna provided development and investigative
2 services to Live Action.  Do you see that?
3    A.  I'm sorry?
4    Q.  Exhibit 204, page 7 of 8, Bates CM5362, the document
5 under the section Anna Bettisworth one sentence in reads,
6 from 2010 to 2012 Anna provided development and investigative
7 services to Live Action.  Do you see that?
8    A.  I see the section you're referring to.
9    Q.  Is that statement accurate?
10         MR. BROOKS: Objection, form, assumes facts not
11 in evidence and lacks foundation.  Also vague, calls for
12 speculation.  I also object under and instruct the witness
13 not to answer pursuant to the Fifth Amendment to the United
14 States Constitution as well as state law including Article 1,
15 Section 15 of the California Constitution and Article 1,
16 Section 23 of the North Carolina Constitution.
17    A.  I am asserting my rights under the Fifth Amendment
18 to the United States Constitution as well as state law
19 including Article 1, Section 15 of the California
20 Constitution and Article 1, Section 23 of the North Carolina
21 Constitution and therefore I respectfully decline to
22 answer.
23 BY MR. ROBINSON:
24    Q.  The next sentence reads, Anna has trained multiple
25 undercover actors and participated in undercover stints

## Page 102

1 herself. Do you see that?
2     A. I see the section you're referring to.
3     Q. Is that statement accurate?
4         MR. BROOKS: Objection, form, assumes facts
5 not in evidence and lacks foundation. Also calls for
6 speculation, and I object under and instruct the witness not
7 to answer pursuant to the Fifth Amendment to the United
8 States Constitution as well as state law including Article 1,
9 Section 15 of the California Constitution and Article 1,
10 Section 23 of the North Carolina Constitution.
11     A. I am asserting my rights under the Fifth Amendment
12 to the United States Constitution as well as state law
13 including Article 1, Section 15 of the California
14 Constitution and Article 1, Section 23 of the North Carolina
15 Constitution and therefore I respectfully decline to
16 answer.
17 BY MR. ROBINSON:
18     Q. The next sentence reads, she has five years
19 experience running the day-to-day operations of nonprofits.
20 Do you see that?
21     A. I see the section you're referring to, yes.
22     Q. Is that statement accurate?
23         MR. BROOKS: Objection to form, lacks
24 foundation, assumes facts not in evidence, calls for
25 speculation by the witness. I also object under and instruct

## Page 103

1 the witness not to answer pursuant to the Fifth Amendment to
2 the United States Constitution as well as state law including
3 Article 1, Section 15 of the California Constitution and
4 Article 1, Section 23 of the North Carolina Constitution.
5     A. I am asserting my rights under the Fifth Amendment
6 to the United States Constitution as well as state law
7 including Article 1, Section 15 of the California
8 Constitution and Article 1, Section 23 of the North Carolina
9 Constitution and therefore I respectfully decline to
10 answer.
11 BY MR. ROBINSON:
12     Q. Part of the document that we were looking at falls
13 under the heading, The Team. It lists David Daleiden, Anna
14 Bettisworth, Albin Rhomberg and Troy Newman in that section,
15 correct?
16         MR. BROOKS: Objection, the document speaks for
17 itself, but you can answer.
18     A. I mean, I see the heading you're referring to.
19 BY MR. ROBINSON:
20     Q. Were all of those individuals part of CMP's team
21 from the beginning?
22         MR. BROOKS: Objection, form, lacks foundation,
23 assumes facts not in evidence, calls for speculation by the
24 witness; and I object under and instruct the witness not to
25 answer pursuant to the Fifth Amendment to the United States

## Page 104

1 Constitution as well as state law including Article 1,
2 Section 15 of the California Constitution and Article 1,
3 Section 23 of the North Carolina Constitution.
4     A. I am asserting my rights under the Fifth Amendment
5 to the United States Constitution as well as state law
6 including Article 1, Section 15 of the California
7 Constitution and Article 1, Section 23 of the North Carolina
8 Constitution and therefore I respectfully decline to
9 answer.
10 BY MR. ROBINSON:
11     Q. In this same part of the document, the following
12 individuals are listed as consultants; Mark Crutcher, Dr.
13 Theresa Daisher, Randy Angle. Do you see that?
14     A. I see the headings, yes.
15     Q. Were all of those individuals consultants for CMP
16 from the beginning?
17         MR. BROOKS: Objection, form, lacks
18 foundation, assumes facts not in evidence. Also a compound
19 question, and calls for speculation by the witness. I also
20 object under and insert -- and instruct the witness to not
21 answer under the Fifth Amendment to the United States
22 Constitution as well as state law including Article 1,
23 Section 15 of the California Constitution and Article 1,
24 Section 23 of the North Carolina Constitution.
25     A. I am asserting my rights under the Fifth Amendment

## Page 105

1 to the United States Constitution as well as state law
2 including Article 1, Section 15 of the California
3 Constitution and Article 1, Section 23 of the North Carolina
4 Constitution and therefore I respectfully decline to
5 answer.
6 BY MR. ROBINSON:
7     Q. Prior to your work with CMP you had previously
8 trained multiple undercover actors and participants in
9 undercover stints yourself, correct?
10         MR. BROOKS: Objection, form, compound question
11 -- compound question, lacks foundation, assumes facts not in
12 evidence. Also, I object under and instruct the witness to
13 not answer pursuant to the Fifth Amendment to the United
14 States Constitution as well as state law including Article 1,
15 Section 15 of the California Constitution and Article 1,
16 Section 23 of the North Carolina Constitution.
17     A. I am asserting my rights under the Fifth Amendment
18 to the United States Constitution as well as state law
19 including Article 1, Section 15 of the California
20 Constitution and Article 1, Section 23 of the North Carolina
21 Constitution and therefore I respectfully decline to
22 answer.
23 BY MR. ROBINSON:
24     Q. Turning to page 8 of the document -- actually,
25 strike that. Let me move on to the next Exhibit.

1      (Plaintiff's Exhibit Number 205
2      marked for identification)
3      Q.  You're being handed a copy of Exhibit 205.  For the
4  record, Exhibit 205 is Email from Dave Daleiden to Annamarie
5  Bettisworth attaching Project Draft V2.0, Bates CM4737
6  through 50.
7      MR. BROOKS: I'll just state an objection to
8  the characterization.
9  BY MR. ROBINSON:
10      Q.  Do you recognize Exhibit 205?
11      MR. BROOKS: Objection, form, lacks foundation,
12  assumes facts not in evidence.  Also, I object under and
13  instruct the witness not to answer pursuant to the Fifth
14  Amendment to the United States Constitution as well as state
15  law including Article 1, Section 15 of the California
16  Constitution and Article 1, Section 23 of the North Carolina
17  Constitution.
18      A.  I am asserting my rights under the Fifth Amendment
19  to the United States Constitution as well as state law
20  including Article 1, Section 15 of the California
21  Constitution and Article 1, Section 23 of the North Carolina
22  Constitution and therefore I respectfully decline to
23  answer.
24  BY MR. ROBINSON:
25      Q.  This is an Email from David Daleiden to you dated

1  February 17, 2013, correct?
2      MR. BROOKS: Objection, form, assumes facts not
3  in evidence, and lacks foundation.  Also, I object under and
4  instruct the witness not to answer pursuant to the Fifth
5  Amendment to the United States Constitution as well as state
6  law including Article 1, Section 15 of the California
7  Constitution and Article 1, Section 23 of the North Carolina
8  Constitution.
9      MR. MIHET:  Also vague, ambiguous and
10  mischaracterizes the document.
11      MR. BROOKS:  I'll join those objections as
12  well.
13      A.  I am asserting my rights under the Fifth Amendment
14  to the United States Constitution as well as state law
15  including Article 1, Section 15 of the California
16  Constitution and Article 1, Section 23 of the North Carolina
17  Constitution and therefore I respectfully decline to
18  answer.
19  BY MR. ROBINSON:
20      Q.  Do you dispute that you are the Ms. Bettisworth to
21  whom Daleiden sent the Email on February 2013?
22      MR. BROOKS: Objection, form, assumes facts not
23  in evidence and lacks foundation.  Also calls for
24  speculation.  I also object under and instruct the witness
25  not to answer pursuant to the Fifth Amendment to the United

1  States Constitution as well as state law including Article 1,
2  Section 15 of the California Constitution and Article 1,
3  Section 23 of the North Carolina Constitution.
4      A.  I am asserting my rights under the Fifth Amendment
5  to the United States Constitution as well as state law
6  including Article 1, Section 15 of the California
7  Constitution and Article 1, Section 23 of the North Carolina
8  Constitution and therefore I respectfully decline to
9  answer.
10  BY MR. ROBINSON:
11      Q.  Who is Fred Clark?
12      MR. BROOKS: Objection, form, assumes facts not
13  in evidence and lacks foundation.  Also calls for
14  speculation.  Additionally, I object under and instruct the
15  witness not to answer pursuant to the Fifth Amendment to the
16  United States Constitution as well as state law including
17  Article 1, Section 15 of the California Constitution and
18  Article 1, Section 23 of the North Carolina Constitution.
19      A.  I am asserting my rights under the Fifth Amendment
20  to the United States Constitution as well as state law
21  including Article 1, Section 15 of the California
22  Constitution and Article 1, Section 23 of the North Carolina
23  Constitution and therefore I respectfully decline to
24  answer.
25  BY MR. ROBINSON:

1      Q.  Why was David Daleiden reaching out to Fred Clark on
2  February 17, 2013?
3      MR. BROOKS: Objection to form, assumes facts not in
4  evidence, and lacks foundation.  Also calls for speculation.
5  I further object under and instruct the witness not to answer
6  pursuant to the Fifth Amendment to the United States
7  Constitution as well as state law including Article 1,
8  Section 15 of the California Constitution and Article 1,
9  Section 23 of the North Carolina Constitution.
10      A.  I am asserting my rights under the Fifth Amendment
11  to the United States Constitution as well as state law
12  including Article 1, Section 15 of the California
13  Constitution and Article 1, Section 23 of the North Carolina
14  Constitution and therefore I respectfully decline to
15  answer.
16  BY MR. ROBINSON:
17      Q.  Looking at the attachment of this document page 1 of
18  13, CM04738 this version of the 2013 draft project proposal
19  states, by exposing one of the most sickening abuses of the
20  abortion industry this project aims to ignite public outrage
21  against the abortion industry, permanently damaging Planned
22  Parenthood's brand, and prompt defunding and criminal
23  prosecutions.  Do you see that?
24      MR. BROOKS: Objection to the characterization
25  of the document, and is also vague and ambiguous.  I would

1 also instruct the witness not to answer pursuant to the Fifth
2 Amendment to the United States Constitution as well as state
3 law including Article 1, Section 15 of the California
4 Constitution and Article 1, Section 23 of the North Carolina
5 Constitution given the characterization of the document.
6    A. I am asserting my rights under the Fifth Amendment
7 to the United States Constitution as well as state law
8 including Article 1, Section 15 of the California
9 Constitution and Article 1, Section 23 of the North Carolina
10 Constitution and therefore I respectfully decline to
11 answer.
12 BY MR. ROBINSON:
13    Q. Does the sentence that I just read accurately state
14 one of CMP's goals in launching what later became known as
15 The Human Capital Project?
16       MR. BROOKS: Objection, form, lacks foundation
17 and assumes facts not in evidence. Also calls for
18 speculation by the witness. Additionally, I object under and
19 instruct the witness not to answer pursuant to the Fifth
20 Amendment to the United States Constitution as well as state
21 law including Article 1, Section 15 of the California
22 Constitution and Article 1, Section 23 of the North Carolina
23 Constitution.
24    A. I am asserting my rights under the Fifth Amendment
25 to the United States Constitution as well as state law

1 including Article 1, Section 15 of the California
2 Constitution and Article 1, Section 23 of the North Carolina
3 Constitution and therefore I respectfully decline to
4 answer.
5 BY MR. ROBINSON:
6    Q. One of CMP's goals from the beginning was to
7 permanently damage Planned Parenthood's brand through the
8 release of undercover sting videos, correct?
9       MR. BROOKS: Objection, form, assumes facts not
10 in evidence and lacks foundation. Additionally, calls for
11 speculation by the witness and compound question. Also, I
12 object under and instruct the witness not to answer pursuant
13 to the Fifth Amendment to the U.S. Constitution as well as
14 state law including Article 1, Section 15 of the California
15 Constitution and Article 1, Section 23 of the North Carolina
16 Constitution.
17    A. I am asserting my rights under the Fifth Amendment
18 to the United States Constitution as well as state law
19 including Article 1, Section 15 of the California
20 Constitution and Article 1, Section 23 of the North Carolina
21 Constitution and therefore I respectfully decline to
22 answer.
23 BY MR. ROBINSON:
24    Q. Let's look at page 3 of this document, CM04740.
25 Under the section at the top, The Project, the last sentence

1 of that section states, quote, The project's goals are to
2 trigger severely legal and financial consequences to the
3 abortion industry and permanently damage abortion stem cell
4 research in the public eye. Do you see that?
5    A. Yes, I see that section.
6    Q. That sentence accurately states one of CMP's goals
7 in launching what later became known as The Human Capitol
8 Project, correct?
9       MR. BROOKS: Objection, form, assumes facts not
10 in evidence, lacks foundation, calls for speculation by the
11 witness. Also -- well -- also, I object under and instruct
12 the witness not to answer pursuant to the Fifth Amendment to
13 the United States Constitution as well as state law including
14 Article 1, Section 15 of the California Constitution and
15 Article 1, Section 23 of the North Carolina Constitution.
16    A. I am asserting my rights under the Fifth Amendment
17 to the United States Constitution as well as state law
18 including Article 1, Section 15 of the California
19 Constitution and Article 1, Section 23 of the North Carolina
20 Constitution and therefore I respectfully decline to
21 answer.
22 BY MR. ROBINSON:
23    Q. Turning now to page 10 of 13, CM04747 there's a
24 section called Production And Release, do you see that?
25    A. Yes, I see that section.

1    Q. There's a screen shot from a video, do you see
2 that?
3       MR. BROOKS: Objection, calls for speculation
4 lacks foundation.
5    A. I see the section you're referring to.
6 BY MR. ROBINSON:
7    Q. That screen shot is an excerpt from a Live Action
8 video, correct?
9       MR. BROOKS: Objection, form, lacks foundation
10 and assumes fact not in evidence. Also calls for speculation
11 by the witness. The document speaks for itself, and I object
12 under and instruct the witness not to answer pursuant to the
13 Fifth Amendment to the United States Constitution as well as
14 state law including Article 1, Section 15 of the California
15 Constitution and Article 1, Section 23 of the North Carolina
16 Constitution.
17    A. I am asserting my rights under the Fifth Amendment
18 to the United States Constitution as well as state law
19 including Article 1, Section 15 of the California
20 Constitution and Article 1, Section 23 of the North Carolina
21 Constitution and therefore I respectfully decline to
22 answer.
23 BY MR. ROBINSON:
24    Q. To the right of the screenshot the document states,
25 A month before the documentary is released, the roll out of

Page 114

1 the project will begin with the release of short viral
2 undercover Gotcha videos posted to YouTube each week. In
3 essence, the public unveiling of the fetal trafficking
4 project will begin with the release of James O'Keefe/live
5 action style viral undercover videos. Do you see that?
6     A. I see that paragraph, yes.
7     Q. Then it continues these 5 to 7 minute videos will
8 spotlight some of most damning Gotcha undercover footage
9 recorded by the project. Do you see that?
10     A. I see that, yes.
11     Q. It was one of CMP's goals from the beginning to
12 gather Gotcha -- live action style viral undercover videos
13 that would be used to damage Planned Parenthood's brand and
14 image, correct?
15         MR. BROOKS: Objection, form, assumes facts not
16 in evidence and lacks foundation. Also vague and ambiguous
17 and compound question. I also object under and instruct the
18 witness not to answer pursuant to the Fifth Amendment of the
19 United States Constitution, as well as state law including
20 Article 1, Section 15 of the California Constitution and
21 Article 1, Section 23 of the North Carolina Constitution.
22     A. I am asserting my rights under the Fifth Amendment
23 to the United States Constitution as well as state law
24 including Article 1, Section 15 of the California
25 Constitution and Article 1, Section 23 of the North Carolina

Page 115

1 Constitution and therefore I respectfully decline to
2 answer.
3 BY MR. ROBINSON:
4     Q. One of CMP's intended goals in releasing live action
5 style viral undercover videos was to attract severe negative
6 attention to the Planned Parenthood and NAF members depicted
7 in those videos, correct?
8         MR. BROOKS: Objection, form, lacks
9 foundation -- lacks foundation, assumes facts not in
10 evidence, calls for speculation. Additionally I -- it's
11 additionally it's vague and ambiguous and I object under and
12 instruct the witness not to answer pursuant to the Fifth
13 Amendment to the United States Constitution as well as state
14 law including Article 1, Section 15 of the California
15 Constitution and Article 1, Section 23 of the North Carolina
16 Constitution.
17     A. I am asserting my rights under the Fifth Amendment
18 to the United States Constitution as well as state law
19 including Article 1, Section 15 of the California
20 Constitution and Article 1, Section 23 of the North Carolina
21 Constitution and therefore I respectfully decline to
22 answer.
23 BY MR. ROBINSON:
24     Q. One of CMP's intended goals in releasing live
25 style viral undercover video was to incite violence against

Page 116

1 the Planned Parenthood officials and NAF members depicted in
2 those videos, correct?
3         MR. BROOKS: Objection, form, assumes facts not
4 in evidence, lacks foundation, calls for speculation; also is
5 argumentative and harassing. I also object under and
6 instruct the witness not to answer pursuant to the Fifth
7 Amendment to the United States Constitution, as well as state
8 law including Article 1, Section 15 of the California
9 Constitution and Article 1, Section 23 of the North Carolina
10 Constitution.
11         MR. MIHET: I also object, because the
12 question goes to mischaracterizes the document about which
13 the witness is being questioned, as well as the testimony
14 used thus far in this case.
15         MR. BROOKS: I'll join in that objection.
16     A. I am asserting my rights under the Fifth Amendment
17 to the United States Constitution as well as state law
18 including Article 1, Section 15 of the California
19 Constitution and Article 1, Section 23 of the North Carolina
20 Constitution and therefore I respectfully decline to
21 answer.
22 BY MR. ROBINSON:
23     Q. One of CMP's intended goals in releasing live action
24 style viral undercover videos was to incite harassment and
25 death threats against the Planned Parenthood officials and

Page 117

1 NAF members depicted in those videos, correct?
2         MR. BROOKS: Objection, form, lacks foundation,
3 assumes facts not in evidence, calls for speculation by the
4 witness, is argumentative and harassing. I also object under
5 and instruct the witness not to answer pursuant to the Fifth
6 Amendment to the United States Constitution, as well as state
7 law including Article 1, Section 15 of the California
8 Constitution and Article 1, Section 23 of the North Carolina
9 Constitution.
10         MR. MIHET: I also object because the question
11 grossly mischaracterizes the document about which the witness
12 is purportedly being questioned, as well as the evidence
13 produced thus far in this case.
14         MR. BROOKS: I join in that objection.
15     A. I am asserting my rights under the Fifth Amendment
16 to the United States Constitution as well as state law
17 including Article 1, Section 15 of the California
18 Constitution and Article 1, Section 23 of the North Carolina
19 Constitution and therefore I respectfully decline to
20 answer.
21 BY MR. ROBINSON:
22     Q. CMP knew from its prior history in releasing live
23 action viral undercover video that harassment and death
24 threats to the persons depicted in those videos would likely
25 result from the publication of those videos, correct?

1   MR. BROOKS: Objection, form, lacks foundation,
2   assumes facts not in evidence.  Also calls for speculation by
3   the witness and mischaracterizes the document at issue and
4   the testimony in this case --
5   MR. ROBINSON: Actually, let me interrupt you
6   and rephrase that.
7   MR. BROOKS: Okay.
8   BY MR. ROBINSON:
9   Q.  CMP principals knew from the beginning, pursuant to
10  their prior work with Live Action that harassment and death
11  threats would likely result to the persons depicted in the
12  videos that they intended to gather?
13  MR. BROOKS: Objection, form, lacks foundation,
14  assumes facts not in evidence, calls for speculation by the
15  witness and is also vague and ambiguous and mischaracterizes
16  the document at issue, specifically Exhibit 205, and the
17  testimony in this case thus far.  Additionally, I object
18  under and instruct the witness not to answer pursuant to the
19  Fifth Amendment to the United States Constitution, as well as
20  state law including Article 1, Section 15 of the California
21  Constitution and Article 1, Section 23 of the North Carolina
22  Constitution.
23  MR. MIHET:  Also compound.
24  MR. BROOKS: I join in that objection.
25  A.  I am asserting my rights under the Fifth Amendment

1   to the United States Constitution as well as state law
2   including Article 1, Section 15 of the California
3   Constitution and Article 1, Section 23 of the North Carolina
4   Constitution and therefore I respectfully decline to
5   answer.
6   BY MR. ROBINSON:
7   Q.  In the same section that we were reading from this
8   document, the second to last sentence from the bottom refers
9   to, "These video should have a million views in just a few
10  weeks." Do you see that?
11  MR. BROOKS: Object, that is not the entire
12  sentence.
13  A.  I'm sorry, what page are you on?
14  BY MR. ROBINSON:
15  Q.  Page 10 of 13.
16  A.  10.
17  Q.  The words, a million views in just a few weeks.
18  MR. BROOKS: Objection.
19  MR. MIHET: Objection, mischaracterizes the
20  document.
21  MR. BROOKS: And objection, vague and
22  ambiguous.
23  A.  I see the sentence, yes.
24  BY MR. ROBINSON:
25  Q.  CMP intended from the videos that it intended to

1   release through The Human Capital Project that those videos
2   would garner millions of views in just a few weeks and
3   achieve major media coverage and airplay on national news,
4   correct?
5   MR. BROOKS: Object, objection form, lacks
6   foundation, assumes facts not in evidence, calls for
7   speculation by the witness.  Also mischaracterizes the
8   document.  I also -- as well as the evidence in this case.  I
9   also object under and instruct the witness not to answer
10  pursuant to the Fifth Amendment to the United States
11  Constitution, as well as state law including Article 1,
12  Section 15 of the California Constitution and Article 1,
13  Section 23 of the North Carolina Constitution.
14  A.  I am asserting my rights under the Fifth Amendment
15  to the United States Constitution as well as state law
16  including Article 1, Section 15 of the California
17  Constitution and Article 1, Section 23 of the North Carolina
18  Constitution and therefore I respectfully decline to
19  answer.
20  BY MR. ROBINSON:
21  Q.  In this same document on page 11 there's a section
22  at the top that states 9 items under the word goals, do you
23  see that?
24  A.  Yes, I see that.
25  Q.  Are the goals enumerated in the version of this

1   February 2013 draft project proposal accurate -- let me
2   rephrase that.  Does the section at the top that reads goals
3   and enumerate 9 items, accurately state CMP's goals for The
4   Human Capital Project?
5   MR. BROOKS: Objection, form, lacks foundation,
6   and assumes facts not in evidence.  Also vague, ambiguous and
7   I object under and instruct the witness not to answer
8   pursuant to the Fifth Amendment to the United States
9   Constitution, as well as state law including Article 1,
10  Section 15 of the California Constitution and Article 1,
11  Section 23 of the North Carolina Constitution.
12  A.  I am asserting my rights under the Fifth Amendment
13  to the United States Constitution as well as state law
14  including Article 1, Section 15 of the California
15  Constitution and Article 1, Section 23 of the North Carolina
16  Constitution and therefore I respectfully decline to
17  answer.
18  BY MR. ROBINSON:
19  Q.  The last page of this document contains a section at
20  the very bottom entitled, Appendix 3, Needs And Status, do
21  you see that?
22  A.  I see the section you're referring to.
23  Q.  The top item refers to moles.  The description for
24  that item states, quote, to act as informants on middle man
25  companies, universities and potential clinics; and the status

1  reads, quote, 2 already recruited. Do you see that?
2      A. I see that section.
3      Q. Who were the two moles that CMP had recruited to
4  infiltrate or to serve as moles?
5          MR. BROOKS: Objection, form, lacks foundation
6  and assumes facts not in evidence; also vague. Additionally,
7  I object under and instruct the witness not to answer
8  pursuant to the Fifth Amendment to the United States
9  Constitution, as well as state law including Article 1,
10  Section 15 of the California Constitution and Article 1,
11  Section 23 of the North Carolina Constitution.
12      A. I am asserting my rights under the Fifth Amendment
13  to the United States Constitution as well as state law
14  including Article 1, Section 15 of the California
15  Constitution and Article 1, Section 23 of the North Carolina
16  Constitution and therefore I respectfully decline to
17  answer.
18  BY MR. ROBINSON:
19      Q. In Appendix 2, Preliminary Timeline, there's a
20  reference to February 2013 begin StemExpress
21  infiltration/surveillance. Do you see that?
22      A. I see that section.
23      Q. What steps, if any, was CMP planning to infiltrate
24  StemExpress?
25          MR. BROOKS: Objection, form, lacks foundation,

1  assumes facts not in evidence, calls for speculation, and is
2  vague. I also object under and instruct the witness not to
3  answer pursuant to the Fifth Amendment to the United States
4  Constitution, as well as state law including Article 1,
5  Section 15 of the California Constitution and Article 1,
6  Section 23 of the North Carolina Constitution.
7      A. I am asserting my rights under the Fifth Amendment
8  to the United States Constitution as well as state law
9  including Article 1, Section 15 of the California
10  Constitution and Article 1, Section 23 of the North Carolina
11  Constitution and therefore I respectfully decline to
12  answer.
13  BY MR. ROBINSON:
14      Q. CMP took steps to infiltrate StemExpress through
15  fraud and false pretenses in early 2013, correct?
16          MR. BROOKS: Objection, form, lacks foundation,
17  assumes facts not in evidence, vague, calls for a legal
18  conclusion, and is argumentative. I also object under and
19  instruct the witness not to answer pursuant to the Fifth
20  Amendment to the United States Constitution as well as state
21  law including Article 1, Section 15 of the California
22  Constitution and Article 1, Section 23 of the North Carolina
23  Constitution. And I also object to the extent the question
24  mischaracterizes the document, which I'm not sure if it was
25  referencing or not

1      A. I am asserting my rights under the Fifth Amendment
2  to the United States Constitution as well as state law
3  including Article 1, Section 15 of the California
4  Constitution and Article 1, Section 23 of the North Carolina
5  Constitution and therefore I respectfully decline to
6  answer.
7  BY MR. ROBINSON:
8      Q. You were involved in CMP's attempts to infiltrate
9  StemExpress through fraud and false pretenses, correct?
10          MR. BROOKS: Objection, form, lacks foundation,
11  assumes facts not in evidence, and it's argumentative. I
12  also object under and instruct the witness not to answer
13  pursuant to the Fifth Amendment to the United States
14  Constitution, as well as state law including Article 1,
15  Section 15 of the California Constitution and Article 1,
16  Section 23 of the North Carolina Constitution.
17          MR. MIHET: Also compound.
18          MR. BROOKS: I join that objection.
19      A. I am asserting my rights under the Fifth Amendment
20  to the United States Constitution as well as state law
21  including Article 1, Section 15 of the California
22  Constitution and Article 1, Section 23 of the North Carolina
23  Constitution and therefore I respectfully decline to
24  answer.
25  BY MR. ROBINSON:

1          (Plaintiff's Exhibit Number 206
2          marked for identification)
3      Q. I'm handing you a copy of Plaintiff's Exhibit 206.
4  206 appears to be a letter addressed to StemExpress, Bate
5  CM05298 through 99.
6          MR. MIHET: Do you have another copy,
7  Counsel?
8  BY MR. ROBINSON:
9      Q. Do you recognize Exhibit 206?
10          MR. BROOKS: Objection, form, ambiguous and
11  lacks foundation. I also object under and instruct the
12  witness not to answer pursuant to the Fifth Amendment to the
13  United States Constitution, as well as state law including
14  Article 1, Section 15 of the California Constitution and
15  Article 1, Section 23 of the North Carolina Constitution.
16      A. I am asserting my rights under the Fifth Amendment
17  to the United States Constitution as well as state law
18  including Article 1, Section 15 of the California
19  Constitution and Article 1, Section 23 of the North Carolina
20  Constitution and therefore I respectfully decline to
21  answer.
22  BY MR. ROBINSON:
23      Q. Who is Kristin Mettler?
24          MR. BROOKS: Objection, form, assumes facts
25  not in evidence, calls for speculation. Also object and

1   instruct the witness not to answer pursuant to the Fifth
2   Amendment to the United States Constitution, as well as state
3   law including Article 1, Section 15 of the California
4   Constitution and Article 1, Section 23 of the North Carolina
5   Constitution.
6      A. I am asserting my rights under the Fifth Amendment
7   to the United States Constitution as well as state law
8   including Article 1, Section 15 of the California
9   Constitution and Article 1, Section 23 of the North Carolina
10   Constitution and therefore I respectfully decline to
11   answer.
12   BY MR. ROBINSON:
13      (Plaintiff's Exhibit Number 207
14        marked for identification.)
15      Q. Kristin Mettler was one of the two moles referred to
16   in the draft project proposal for CMP, correct?
17      MR. BROOKS: Objection, form, lacks foundation,
18   assumes facts not in evidence. Also calls for speculation
19   and is argumentative. I also assert or object under and
20   instruct the witness not to answer pursuant to the Fifth
21   Amendment to the United States Constitution, as well as state
22   law including Article 1, Section 15 of the California
23   Constitution and Article 1, Section 23 of the North Carolina
24   Constitution.
25      A. I am asserting my rights under the Fifth Amendment

1   to the United States Constitution as well as state law
2   including Article 1, Section 15 of the California
3   Constitution and Article 1, Section 23 of the North Carolina
4   Constitution and therefore I respectfully decline to
5   answer.
6   BY MR. ROBINSON:
7      Q. Daleiden intended for Kristin Mettler -- excuse me,
8   let me rephrase. Daleiden intended for Kristin Mettler to
9   infiltrate StemExpress masquerading to be a bonafide
10   candidate for a job at StemExpress, correct?
11      MR. BROOKS: Objection, form, lacks foundation,
12   assumes facts not in evidence. Also calls for speculation by
13   the witness and a compound question and argumentative. I
14   also object under and instruct the witness not to answer
15   pursuant to the Fifth Amendment of the United States
16   Constitution as well as state law including Article 1,
17   Section 15 of the California Constitution and Article 1,
18   Section 23 of the North Carolina Constitution.
19      A. I am asserting my rights under the Fifth Amendment
20   to the United States Constitution as well as state law
21   including Article 1, Section 15 of the California
22   Constitution and Article 1, Section 23 of the North Carolina
23   Constitution and therefore I respectfully decline to
24   answer.
25   BY MR. ROBINSON:

1      Q. Daleiden drafted this cover letter for Kristin
2   Mettler to use to apply for a job at StemExpress, correct?
3      MR. BROOKS: Objection, form, lacks foundation,
4   assumes facts not in evidence, calls for speculation,
5   additionally mischaracterizes the document, which speaks for
6   itself; is a compound question. I also object under and
7   assert or instruct the witness not to answer pursuant to the
8   Fifth Amendment to the United States Constitution, as well as
9   state law including Article 1, Section 15 of the California
10   Constitution and Article 1, Section 23 of the North Carolina
11   Constitution.
12      A. I am asserting my rights under the Fifth Amendment
13   to the United States Constitution as well as state law
14   including Article 1, Section 15 of the California
15   Constitution and Article 1, Section 23 of the North Carolina
16   Constitution and therefore I respectfully decline to
17   answer.
18   BY MR. ROBINSON:
19      Q. I'm handing you a copy of Exhibit 207. Do you
20   recognize Exhibit 207?
21      MR. BROOKS: Objection, form, lack of
22   foundation -- well, calls for speculation -- I'm sorry,
23   strike that. Ambiguous, form, ambiguous. Also, I object
24   under and instruct the witness not to answer under the the
25   Fifth Amendment to the United States Constitution as well as

1   state law including Article 1, Section 15 of the California
2   Constitution and Article 1, Section 23 of the North Carolina
3   Constitution.
4      A. I am asserting my rights under the Fifth Amendment
5   to the United States Constitution as well as state law
6   including Article 1, Section 15 of the California
7   Constitution and Article 1, Section 23 of the North Carolina
8   Constitution and therefore I respectfully decline to
9   answer.
10   BY MR. ROBINSON:
11      Q. This is an Email that David Daleiden sent to Kristin
12   Mettler on which you were BCCed on March 2, 2013, correct?
13      MR. BROOKS: Objection, form, assumes facts not
14   in evidence, and lacks foundation, calls for speculation; and
15   I object under and instruct the witness not to answer
16   pursuant to the Fifth Amendment to the United States
17   Constitution, as well as state law including Article 1,
18   Section 15 of the California Constitution and Article 1,
19   Section 23 of the North Carolina Constitution.
20      A. I am asserting my rights under the Fifth Amendment
21   to the United States Constitution as well as state law
22   including Article 1, Section 15 of the California
23   Constitution and Article 1, Section 23 of the North Carolina
24   Constitution and therefore I respectfully decline to
25   answer.

1 BY MR. ROBINSON:
2 　　Q.　In Daleiden's Email to Kristin Mettler he writes, "I
3 just shared you on a Google document tonight on a redraft of
4 your resume.　We'll format it nicely again, too, when the
5 content is all final.　For the most part we just took a lot
6 of the older content out and changed the order of the
7 different sections.　There are some items that are
8 highlighted that I need you fill in/expand because I don't
9 know the details.　Ha Ha.　Do you see that?
10 　　　　MR. BROOKS: Objection because it was not read
11 exactly.
12 　　A.　I see the section you're referring to.
13 BY MR. ROBINSON:
14 　　Q.　What was that purpose of Daleiden writing this
15 message to Kristin Mettler?
16 　　　　MR. BROOKS: Objection to form, lacks
17 foundation, assumes facts not in evidence, calls for
18 speculation by the witness.　Additionally, I object under and
19 instruct the witness not to answer pursuant to the Fifth
20 Amendment including Article 1, Section 15 of the California
21 Constitution and Article 1, Section 23 of the North Carolina
22 Constitution.
23 　　A.　I am asserting my rights under the Fifth Amendment
24 to the United States Constitution as well as state law
25

1 including Article 1, Section 15 of the California
2 Constitution and Article 1, Section 23 of the North Carolina
3 Constitution and therefore I respectfully decline to
4 answer.
5 BY MR. ROBINSON:
6 　　Q.　Daleiden is referring to fact that he is redrafting
7 Kristin Mettler's resume for submission to StemExpress in
8 order for her to serve as a mole, correct?
9 　　　　MR. BROOKS: Objection, form, lacks foundation,
10 assumes facts not in evidence, calls for speculation and
11 mischaracterizes the document, which speaks for itself.
12 Also, I object under and instruct the witness not to answer
13 pursuant to the Fifth Amendment to the United States
14 Constitution, as well as state law including Article 1,
15 Section 15 of the California Constitution and Article 1,
16 Section 23 of the North Carolina Constitution.
17 　　A.　I am asserting my rights under the Fifth Amendment
18 to the United States Constitution as well as state law
19 including Article 1, Section 15 of the California
20 Constitution and Article 1, Section 23 of the North Carolina
21 Constitution and therefore I respectfully decline to answer.
22 Is anyone opposed if I turn on the cool air?
23 BY MR. ROBINSON:
24 　　Q.　Let's do it.　Thank you.
25 　　　　MR. BROOKS: If you need a break, just let them

1 know.
2 　　A.　Just needed cool air.
3 BY MR. ROBINSON:
4 　　Q.　Good call.　In this Email Daleiden continues, quote,
5 in the skills section, especially, I want to just floor them
6 with your unique combination of bio/business skill sets which
7 is exactly what they should be looking for.　The they in that
8 sentence refers to StemExpress, correct?
9 　　　　MR. BROOKS: Objection, form, lacks foundation,
10 assumes facts not in evidence, calls for speculation by the
11 witness.　Also I object under and instruct the witness not to
12 answer pursuant to the Fifth Amendment to the United States
13 Constitution as well as state law, including Article 1,
14 Section 15 of the California Constitution and Article 1,
15 Section 23 of the North Carolina Constitution.
16 　　A.　I am asserting my rights under the Fifth Amendment
17 to the United States Constitution as well as state law
18 including Article 1, Section 15 of the California
19 Constitution and Article 1, Section 23 of the North Carolina
20 Constitution and therefore I respectfully decline to
21 answer.
22 BY MR. ROBINSON:
23 　　Q.　In the third paragraph Daleiden writes, quote, also
24 I think we should append your CV to hopefully one page resume
25 because it shows how serious your science background is.

1 Just need to take out any references to bible study,
2 Christian organizations, etcetera as I have done in the draft
3 resume.　Do you see that?
4 　　A.　I see that sentence.
5 　　Q.　Was the reason why Daleiden wanted to remove
6 reference to bible study and Christian organizations from
7 Kristin Mettler's resume to submit to StemExpress was to
8 further accomplish Daleiden's goal that Kristin Mettler would
9 serve as a mole in StemExpress?
10 　　　　MR. BROOKS: Objection, form, lacks foundation,
11 assumes facts not in evidence, compound question, and calls
12 for speculation.　Also, I object under and instruct the
13 witness not to answer pursuant to the Fifth Amendment to the
14 United States Constitution, as well as state law including
15 Article 1, Section 15 of the California Constitution and
16 Article 1, Section 23 of the North Carolina Constitution.
17 　　A.　I am asserting my rights under the Fifth Amendment
18 to the United States Constitution as well as state law
19 including Article 1, Section 15 of the California
20 Constitution and Article 1, Section 23 of the North Carolina
21 Constitution and therefore I respectfully decline to
22 answer.
23 BY MR. ROBINSON:
24 　　Q.　In the fourth paragraph of this letter Daleiden
25 writes, quote, as for the cover letter, I'm starting to draft

## Page 134

1   that, too, but we should talk about all that by phone

2   tomorrow. That should really be your voice, anyway. Do you

3   see that?

4      A. I see the sentence, yes.

5      Q. Daleiden contributed to the draft cover letter

6   authored -- reportedly authored by someone named Kristin

7   Mettler to submit to StemExpress in pursuit of a false job

8   application with them, correct?

9      MR. BROOKS: Objection, form, assumes facts not

10  in evidence, lacks foundation. Additionally, it's a compound

11  question, and calls for speculation by the witness. Also, I

12  object under and instruct the witness not to answer pursuant

13  to the Fifth Amendment to the United States Constitution, as

14  well as state law including Article 1, Section 15 of the

15  California Constitution and Article 1, Section 23 of the

16  North Carolina Constitution.

17     A. I am asserting my rights under the Fifth Amendment

18  to the United States Constitution as well as state law

19  including Article 1, Section 15 of the California

20  Constitution and Article 1, Section 23 of the North Carolina

21  Constitution and therefore I respectfully decline to

22  answer.

23  BY MR. ROBINSON:

24     Q. Was Kristin Mettler even her real name?

25     MR. BROOKS: Objection, form, assumes facts not

## Page 135

1   in evidence, and lacks foundation, vague and ambiguous. It

2   calls for speculation by the witness. Also, I object under

3   and instruct the witness not to answer pursuant to the Fifth

4   Amendment to the United States Constitution, as well as state

5   law including Article 1, Section 15 of the California

6   Constitution and Article 1, Section 23 of the North Carolina

7   Constitution.

8      A. I am asserting my rights under the Fifth Amendment

9   to the United States Constitution as well as state law

10  including Article 1, Section 15 of the California

11  Constitution and Article 1, Section 23 of the North Carolina

12  Constitution and therefore I respectfully decline to

13  answer.

14  BY MR. ROBINSON:

15     Q. Daleiden approved the resume and cover letter

16  purportedly authored by someone named Kristin Mettler before

17  they were sent to StemExpress, correct?

18     MR. BROOKS: Objection, form, lacks foundation,

19  assumes facts not in evidence, and calls for speculation by

20  the witness. Additionally, I object under and instruct the

21  witness not to answer pursuant to the Fifth Amendment to the

22  United States Constitution, as well as state law including

23  Article 1, Section 15 of the California Constitution and

24  Article 1, Section 23 of the North Carolina Constitution.

25     A. I am asserting my rights under the Fifth Amendment

## Page 136

1   to the United States Constitution as well as state law

2   including Article 1, Section 15 of the California

3   Constitution and Article 1, Section 23 of the North Carolina

4   Constitution and therefore I respectfully decline to

5   answer.

6   BY MR. ROBINSON:

7     Q. In March 2013 Daleiden instructed someone named

8   Kristin Mettler to submit a fake cover letter and fake resume

9   to apply for a job at StemExpress, correct?

10     MR. BROOKS: Objection, form, lacks foundation,

11  assumes facts not in evidence. Also vague and ambiguous and

12  calls for speculation by the witness. Additionally, I object

13  under and instruct the witness not to answer pursuant to the

14  United States Constitution's Fifth Amendment, as well as

15  state law including Article 1, Section 15 of the California

16  Constitution and Article 1, Section 23 of the North Carolina

17  Constitution.

18     A. I am asserting my rights under the Fifth Amendment

19  to the United States Constitution as well as state law

20  including Article 1, Section 15 of the California

21  Constitution and Article 1, Section 23 of the North Carolina

22  Constitution and therefore I respectfully decline to

23  answer.

24  BY MR. ROBINSON:

25     (Plaintiff's Exhibit Number 208

## Page 137

1     marked for identification)

2     Q. I'm handing you a copy of Plaintiff's Exhibit 208.

3   So the record's clear, the cover sheet is a compilation

4   Counsel prepared of the documents underlying it and have been

5   attached to the exhibit. We have --

6     MR. MIHET: Which counsel?

7     MR. ROBINSON: Counsel for NAF has prepared the

8   cover sheet, intending to serve as a FRE 1006 summary of the

9   documents that are attached underlying it. We have included

10  document ID, referring to the Bates number, the to and from

11  information, the sent date and time and the message content

12  from the series of communications that comprise this exhibit.

13  The Bates numbers of those exhibits are CM05143 through 65.

14     MR. MIHET: Counsel, was this two-page

15  purported summary provided to defense counsel prior to

16  today?

17     MR. ROBINSON: It's being provided to you now.

18     MR. MIHET: In that case, for the record, I

19  object because I haven't had an opportunity to check and

20  verify to make sure that this is in fact what it purports to

21  be. So I reserve an objection on that.

22     MR. BROOKS: I'll join in that reservation of

23  an objection.

24  BY MR. ROBINSON:

25     Q. Do you recognize the series of communications that

1  we've marked as Exhibit 207 -- 208. Do you recognize the
2  series of communications that we have marked as Exhibit 2008
3  (sic) with Bates numbers CM5143 through 65?
4      MR. BROOKS: Objection, form, vague and
5  ambiguous. Additionally, I object under and instruct the
6  witness not to answer pursuant to the Fifth Amendment to the
7  United States Constitution, as well as state law including
8  Article 1, Section 15 of the California Constitution and
9  Article 1, Section 23 of the North Carolina Constitution.
10     A. I am asserting my rights under the Fifth Amendment
11 to the United States Constitution as well as state law
12 including Article 1, Section 15 of the California
13 Constitution and Article 1, Section 23 of the North Carolina
14 Constitution and therefore I respectfully decline to
15 answer.
16 BY MR. ROBINSON:
17     Q. The subject of these communications is, quote, chat
18 with Annamarie Bettisworth. Do you see that?
19     A. I don't know where you're --
20     Q. I'm looking at the first page, CM5143 after the
21 cover sheet. So, for example, just to orient us, the top of
22 CM5143 has a sent line that refers to May 3, 2013, you see
23 that?
24     A. Yes, I see the sent.
25     Q. It has a subject line that refers to chat with

1  Annamarie Bettisworth. Do you see that?
2      A. I see.
3      Q. It has a from line that refers to David. Do you see
4  that?
5      MR. BROOKS: Objection to the characterization.
6      A. Yes, I see the line.
7  BY MR. ROBINSON:
8      Q. It has a to line, to Anna, do you see that?
9      A. I see that line.
10     Q. In the communication underneath states, your money
11 coming in. Do you see that?
12     MR. BROOKS: Objection. Lacks foundation,
13 assumes facts not in evidence, and calls for speculation by
14 the witness. Additionally I object under and instruct the
15 witness not to answer pursuant to the Fifth Amendment to the
16 United States Constitution, as well as state law including
17 Article 1, Section 15 of the California Constitution and
18 Article 1, Section 23 of the North Carolina Constitution
19 given the phrasing of that question.
20     A. I am asserting my rights under the Fifth Amendment
21 to the United States Constitution as well as state law
22 including Article 1, Section 15 of the California
23 Constitution and Article 1, Section 23 of the North Carolina
24 Constitution and therefore I respectfully decline to
25 answer.

1  BY MR. ROBINSON:
2      Q. Annamarie Bettisworth in the context of this
3  communication, that refers to you, correct?
4      MR. BROOKS: Objection, form, assumes facts not
5  in evidence and lacks foundation. Additionally calls for
6  speculation, and I object under and instruct the witness not
7  to answer pursuant to the Fifth Amendment to the United
8  States Constitution, as well as state law including Article
9  1, Section 15 of the California Constitution and Article 1,
10 Section 23 of the North Carolina Constitution.
11     A. I am asserting my rights under the Fifth Amendment
12 to the United States Constitution as well as state law
13 including Article 1, Section 15 of the California
14 Constitution and Article 1, Section 23 of the North Carolina
15 Constitution and therefore I respectfully decline to
16 answer.
17 BY MR. ROBINSON:
18     Q. Let's look at the next communication, CM05144. On
19 May 3rd, 2013 Daleiden wrote to you, "We have more than
20 enough to bring her and her sister out here now." Do you see
21 that?
22     MR. BROOKS: Objection, form, lacks foundation,
23 assumes facts not in evidence. Also vague, and given the
24 phrasing on that situation I object under and instruct the
25 witness not to answer pursuant to the Fifth Amendment to the

1  United States Constitution, as well as state law including
2  Article 1, Section 15 of the California Constitution and
3  Article 1, Section 23 of the North Carolina Constitution.
4      MR. MIHET: Also object because none of these
5  documents have been properly authenticated.
6      MR. BROOKS: I join in that objection.
7      A. I am asserting my rights under the Fifth Amendment
8  to the United States Constitution as well as state law
9  including Article 1, Section 15 of the California
10 Constitution and Article 1, Section 23 of the North Carolina
11 Constitution and therefore I respectfully decline to
12 answer.
13 BY MR. ROBINSON:
14     Q. That her in the message refers to Kristin Mettler,
15 correct?
16     MR. BROOKS: Objection, form, lacks foundation,
17 assumes facts not in evidence, calls for speculation
18 and there's a question about a document that's not been
19 authenticated. Additionally, I object under and instruct the
20 witness not to answer pursuant to the Fifth Amendment to the
21 United States Constitution, as well as state law including
22 Article 1, Section 15 of the California Constitution and
23 Article 1, Section 23 of the North Carolina Constitution.
24     A. I am asserting my rights under the Fifth Amendment
25 to the United States Constitution as well as state law

1  including Article 1, Section 15 of the California
2  Constitution and Article 1, Section 23 of the North Carolina
3  Constitution and therefore I respectfully decline to
4  answer.
5  BY MR. ROBINSON:
6      Q.  Now, what's going on in this series of
7  communications is Daleiden is expressing to you his concern
8  that Kristin Mettler will refuse to become a mole at
9  StemExpress, correct?
10         MR. BROOKS:  Objection, form, lacks foundation,
11  assumes facts not in evidence, continuous questions about a
12  document that's not been authenticated.  Additionally, is a
13  compound question and is argumentative.  Further, I object
14  under and instruct the witness not to answer pursuant to the
15  Fifth Amendment to the United States Constitution, as well as
16  state law including Article 1, Section 15 of the California
17  Constitution and Article 1, Section 23 of the North Carolina
18  Constitution.
19     A.  I am asserting my rights under the Fifth Amendment
20  to the United States Constitution as well as state law
21  including Article 1, Section 15 of the California
22  Constitution and Article 1, Section 23 of the North Carolina
23  Constitution and therefore I respectfully decline to
24  answer.
25  BY MR. ROBINSON:

1      Q.  To provide just a little bit more context about
2  what's going on in this communication, I'm going to read
3  from, starting from 5143 through 5152.  Daleiden writes, more
4  money coming in, we have more than enough to bring her and
5  her sister out here now, and I know that at least one thing
6  is legal, her going into work every day.  I will pay her to
7  do this.  Not just reimburse.  You respond, okay.  He
8  continues, what is she going to say, how can she say no, what
9  is her problem, what am I going to do -- sorry -- what am I
10  gonna tell the donors if she bails; and you reply, just deal
11  with one thing at a time.  Is that a true and correct series
12  of communications that you and Daleiden exchanged on May 3rd,
13  2013?
14         MR. BROOKS:  Objection, form, lacks foundation,
15  assumes facts not in evidence, questions about documents that
16  have not been authenticated.  Additionally, it is an
17  incomplete recitation of the documents and I object under and
18  assert -- instruct the witness not to answer pursuant to the
19  Fifth Amendment to the United States Constitution, as well as
20  state law including Article 1, Section 15 of the California
21  Constitution and Article 1, Section 23 of the North Carolina
22  Constitution.
23         MR. MIHET:  Hopelessly compound as well.
24         MR. BROOKS:  I will join that as well.
25     A.  I am asserting my rights under the Fifth Amendment

1  to the United States Constitution as well as state law
2  including Article 1, Section 15 of the California
3  Constitution and Article 1, Section 23 of the North Carolina
4  Constitution and therefore I respectfully decline to
5  answer.
6  BY MR. ROBINSON:
7      Q.  The next communication in the string is from David
8  to you and it states, yeah, but you had a vision.  Do you see
9  that?
10         MR. BROOKS:  Objection, form, lacks foundation,
11  assumes facts not in evidence, characterizes the document
12  that has not been authenticated.  Also calls for speculation,
13  and I object to and instruct the witness not to answer
14  pursuant to the Fifth Amendment to the United States
15  Constitution, as well as state law including Article 1,
16  Section 15 of the California Constitution and Article 1,
17  Section 23 of the North Carolina Constitution.
18     A.  I am asserting my rights under the Fifth Amendment
19  to the United States Constitution as well as state law
20  including Article 1, Section 15 of the California
21  Constitution and Article 1, Section 23 of the North Carolina
22  Constitution and therefore I respectfully decline to
23  answer.
24  BY MR. ROBINSON:
25     Q.  Is this a true and correct copy of a communication

1  that you exchanged with David Daleiden on May 3, 2013?
2         MR. BROOKS:  Objection, form, calls for
3  speculation.  Additionally, I object pursuant to and instruct
4  the witness not to answer pursuant to the Fifth Amendment to
5  the United States Constitution, as well as state law
6  including Article 1, Section 15 of the California
7  Constitution and Article 1, Section 23 of the North Carolina
8  Constitution.
9      A.  I am asserting my rights under the Fifth Amendment
10  to the United States Constitution as well as state law
11  including Article 1, Section 15 of the California
12  Constitution and Article 1, Section 23 of the North Carolina
13  Constitution and therefore I respectfully decline to
14  answer.
15  BY MR. ROBINSON:
16     Q.  Was it your vision that Kristin Mettler would serve
17  as a mole at StemExpress in furtherance of CMP's work?
18         MR. BROOKS:  Objection, form, lacks foundation
19  and assumes facts not in evidence, so object pursuant to and
20  instruct the witness not to answer in light of the Fifth
21  Amendment to the United States Constitution, as well as state
22  law including Article 1, Section 15 of the California
23  Constitution and Article 1, Section 23 of the North Carolina
24  Constitution and additionally, I object to the extent that it
25  mischaracterizes a document that's being questioned about.

1  A. I am asserting my rights under the Fifth Amendment
2  to the United States Constitution as well as state law
3  including Article 1, Section 15 of the California
4  Constitution and Article 1, Section 23 of the North Carolina
5  Constitution and therefore I respectfully decline to
6  answer.
7  BY MR. ROBINSON:
8  Q. Reading further through this string David writes,
9  you know it's hopeless; you respond, uh. You then write,
10  stop freaking out. You then ask, did she answer. You then
11  state I can't talk until, like, 9:30 or 10. David responds,
12  she didn't answer, no, I need you to be free at, like,
13  dinnertime. OMG. Just talked to the Mahers, they want
14  Kristin back. Do you see that?
15  MR. BROOKS: Objection, form, assumes facts not
16  in evidence, lacks foundation, continues questioning about a
17  document that's has not been authenticated, and also calls
18  for speculation and is compound. I also object under and
19  instruct the witness not to answer pursuant to the Fifth
20  Amendment to the United States Constitution, as well as state
21  law including Article 1, Section 15 of the California
22  Constitution and Article 1, Section 23 of the North Carolina
23  Constitution.
24  A. I am asserting my rights under the Fifth Amendment
25  to the United States Constitution as well as state law

1  including Article 1, Section 15 of the California
2  Constitution and Article 1, Section 23 of the North Carolina
3  Constitution and therefore I respectfully decline to
4  answer.
5  BY MR. ROBINSON:
6  Q. Is this a true and correct copy of a series of
7  communications between you and Daleiden on May 3, 2011 --
8  sorry, 2013, what we just read?
9  MR. BROOKS: Objection, form, vague and
10  ambiguous, lacks foundation, assumes facts not in evidence,
11  and continuously asking about a -- and is compound. I also
12  object pursuant to and instruct the witness not to answer
13  pursuant to the Fifth Amendment to the United States
14  Constitution, as well as state law including Article 1,
15  Section 15 of the California Constitution and Article 1,
16  Section 23 of the North Carolina Constitution.
17  A. I am asserting my rights under the Fifth Amendment
18  to the United States Constitution as well as state law
19  including Article 1, Section 15 of the California
20  Constitution and Article 1, Section 23 of the North Carolina
21  Constitution and therefore I respectfully decline to
22  answer.
23  BY MR. ROBINSON:
24  Q. Again, the Kristin in the series of communications
25  refers to Kristin Mettler, correct?

1  MR. BROOKS: Objection, form, assumes facts not
2  in evidence, lacks foundation, the question is about a
3  document that's not been authenticated, and I object under and
4  calls for speculation by the witness, and I object under and
5  instruct the witness not to answer pursuant to the Fifth
6  Amendment to the United States Constitution, as well as state
7  law including Article 1, Section 15 of the California
8  Constitution and Article 1, Section 23 of the North Carolina
9  Constitution.
10  A. I am asserting my rights under the Fifth Amendment
11  to the United States Constitution as well as state law
12  including Article 1, Section 15 of the California
13  Constitution and Article 1, Section 23 of the North Carolina
14  Constitution and therefore I respectfully decline to
15  answer.
16  BY MR. ROBINSON:
17  Q. Why did the person who used the name of Kristin
18  Mettler refuse to become a mole at StemExpress after Daleiden
19  instructed her to submit a fake cover letter and resume for a
20  job at StemExpress?
21  MR. BROOKS: Objection, form, lacks foundation,
22  assumes facts not in evidence, and is in effect a compound
23  question. Additionally calls for speculation by the witness.
24  MR. MIHET: Also mischaracterizes the documents
25  unauthenticated as they are.

1  MR. BROOKS: I join in that objection and I
2  object under and instruct the witness not to answer pursuant
3  to the Fifth Amendment to the United States Constitution, as
4  well as state law including Article 1, Section 15 of the
5  California Constitution and Article 1, Section 23 of the
6  North Carolina Constitution.
7  A. I am asserting my rights under the Fifth Amendment
8  to the United States Constitution as well as state law
9  including Article 1, Section 15 of the California
10  Constitution and Article 1, Section 23 of the North Carolina
11  Constitution and therefore I respectfully decline to
12  answer.
13  BY MR. ROBINSON:
14  Q. Kristin Mettler refused to work for CMP because she
15  was concerned about the legality of CMP's work. That was at
16  least one of her reasons, correct?
17  MR. BROOKS: Objection, form, lacks foundation,
18  assumes facts not in evidence, questions about
19  unauthenticated documents, mischaracterizes them as well.
20  Additionally, I object under and instruct the witness not to
21  answer pursuant to the Fifth Amendment to the United States
22  Constitution, as well as state law including Article 1,
23  Section 15 of the California Constitution and Article 1,
24  Section 23 of the North Carolina Constitution.
25  A. I am asserting my rights under the Fifth Amendment

## Page 150

1 to the United States Constitution as well as state law
2 including Article 1, Section 15 of the California
3 Constitution and Article 1, Section 23 of the North Carolina
4 Constitution and therefore I respectfully decline to
5 answer.
6 BY MR. ROBINSON:
7 (Plaintiff's Exhibit Number 209
8 marked for identification)
9 Q. I'm handing you what we have marked as Exhibit 209.
10 MR. BROOKS: Thank you, sir.
11 MR. ROBINSON: For the record, Exhibit 209 is
12 another series of communications exchanged between David and
13 Anna, subject line chat with Annamarie, Bates CM05189 through
14 96; and Counsel for NAF has provided the cover letter
15 summarizing the content to his communications.
16 BY MR. ROBINSON:
17 Q. Do you recognize Exhibit 209?
18 MR. MIHET: Can I interpose the same objection
19 because the documents haven't been authenticated. For
20 purposes of the summary, has not been timely provided to
21 Defendant's Counsel and I reserve objection.
22 MR. BROOKS: I join in that objection to the
23 summary and interpose an objection to the question,
24 underlying question that it is vague and ambiguous and lacks
25 foundation, assumes facts not in evidence, and calls for

## Page 151

1 speculation by the witness. Also, I object under and
2 instruct the witness not to answer pursuant to the Fifth
3 Amendment to the United States Constitution, as well as state
4 law including Article 1, Section 15 of the California
5 Constitution and Article 1, Section 23 of the North Carolina
6 Constitution.
7 A. I am asserting my rights under the Fifth Amendment
8 to the United States Constitution as well as state law
9 including Article 1, Section 15 of the California
10 Constitution and Article 1, Section 23 of the North Carolina
11 Constitution and therefore I respectfully decline to
12 answer.
13 BY MR. ROBINSON:
14 Q. This is a true and correct copy of a series of
15 communications between you and David Daleiden on May 3, 2013,
16 correct?
17 MR. BROOKS: Objection, form, assumes facts not
18 in evidence, and lacks foundation. More importantly, I
19 object under and instruct the witness not to answer pursuant
20 to the Fifth Amendment to the United States Constitution, as
21 well as state law including Article 1, Section 15 of the
22 California Constitution and Article 1, Section 23 of the
23 North Carolina Constitution.
24 A. I am asserting my rights under the Fifth Amendment
25 to the United States Constitution as well as state law

## Page 152

1 including Article 1, Section 15 of the California
2 Constitution and Article 1, Section 23 of the North Carolina
3 Constitution and therefore I respectfully decline to
4 answer.
5 BY MR. ROBINSON:
6 Q. In this series of communications David writes, call
7 now, she's bailing, what do we say, can you hear, and you
8 respond, how sure is she. David continues, she said, "I'm
9 pretty firm on this." You say, let her go, this isn't going
10 to get DTR. Do you see that?
11 MR. BROOKS: Objection to the characterization,
12 which lacks foundation and assumes facts not in evidence; and
13 therefore, I object under and instruct the witness not to
14 answer pursuant to the Fifth Amendment to the United States
15 Constitution, as well as state law including Article 1,
16 Section 15 of the California Constitution and Article 1,
17 Section 23 of the North Carolina Constitution; again, given
18 the characterizations embedded in the question.
19 A. I am asserting my rights under the Fifth Amendment
20 to the United States Constitution as well as state law
21 including Article 1, Section 15 of the California
22 Constitution and Article 1, Section 23 of the North Carolina
23 Constitution and therefore I respectfully decline to
24 answer.
25 BY MR. ROBINSON:

## Page 153

1 Q. This series of communications again relates to
2 Kristin Mettler's refusal to work for CMP, correct?
3 MR. BROOKS: Objection, form, lacks foundation,
4 assumes facts in evidence and questions about documents that
5 have not been authenticated. Additionally, calls for
6 speculation by the witness. I further object under and
7 instruct the witness not to answer pursuant to the Fifth
8 Amendment to the United States Constitution, as well as state
9 law including Article 1, Section 15 of the California
10 Constitution and Article 1, Section 23 of the North Carolina
11 Constitution.
12 A. I am asserting my rights under the Fifth Amendment
13 to the United States Constitution as well as state law
14 including Article 1, Section 15 of the California
15 Constitution and Article 1, Section 23 of the North Carolina
16 Constitution and therefore I respectfully decline to
17 answer.
18 BY MR. ROBINSON:
19 (Plaintiff's Exhibit Number 210
20 marked for identification)
21 Q. Handing you a copy of what was marked Exhibit 210.
22 Exhibit 210 is an Email between David Daleiden and Anna Marie
23 Bettisworth entitled, Resume sent May 4, 2013 Bates CM05240.
24 Do you have recognize Exhibit 210?
25 MR. BROOKS: Objection, form, assumes facts not

## Page 154

1  in evidence, lacks foundation and characterizes a document
2  that is yet to be authenticated. I also object under and
3  instruct the witness not to answer pursuant to the Fifth
4  Amendment to the United States Constitution, as well as state
5  law including Article 1, Section 15 of the California
6  Constitution and Article 1, Section 23 of the North Carolina
7  Constitution.
8      A. I am asserting my rights under the Fifth Amendment
9  to the United States Constitution as well as state law
10 including Article 1, Section 15 of the California
11 Constitution and Article 1, Section 23 of the North Carolina
12 Constitution and therefore I respectfully decline to
13 answer.
14 BY MR. ROBINSON:
15     Q. This is a true and correct copy of a E-mail Daleiden
16 sent on out May 4, 2013, correct?
17         MR. BROOKS: Objection, form, also speculation.
18 Additionally, I object under and instruct the witness not to
19 answer under the Fifth Amendment to the United States
20 Constitution, as well as state law including Article 1,
21 Section 15 of the California Constitution and Article 1,
22 Section 23 of the North Carolina Constitution.
23     A. I am asserting my rights under the Fifth Amendment
24 to the United States Constitution as well as state law
25 including Article 1, Section 15 of the California

## Page 155

1  Constitution and Article 1, Section 23 of the North Carolina
2  Constitution and therefore I respectfully decline to
3  answer.
4  BY MR. ROBINSON:
5      Q. In this Email Daleiden writes, will you please me
6  your resume. Anna Gates needs to apply for exec assistant.
7  Do you see that?
8         MR. BROOKS: Objection. Given the
9  characterization in that question, so I object to the form
10 because it assumes facts not in evidence, lacks foundation
11 and also compound. Also, again, given the characterization
12 of the question, I object under and instruct the witness not
13 to answer pursuant to the Fifth Amendment to the United
14 States Constitution, as well as state law including Article
15 1, Section 15 of the California Constitution and Article 1,
16 Section 23 of the North Carolina Constitution.
17     A. I am asserting my rights under the Fifth Amendment
18 to the United States Constitution as well as state law
19 including Article 1, Section 15 of the California
20 Constitution and Article 1, Section 23 of the North Carolina
21 Constitution and therefore I respectfully decline to answer.
22 Is it possible to take a short restroom break?
23     Q. Let's go off the record.
24         THE VIDEOGRAPHER: Going off record. The time
25 is 2:22 p.m.. This is the end of DVD Number 2.

## Page 156

1          (RECESS TAKEN)
2          THE VIDEOGRAPHER: We're going back on record.
3  The time is 2:34 p.m.. This is the beginning of DVD Number
4  3.
5      Q. So we were looking at Exhibit 210. Now, what's
6  going on here is that on May 4, 2013, the day after Daleiden
7  learns that Kristin Mettler bailed on becoming a mole at
8  StemExpress, Daleiden instructs you to submit a job
9  application for an executive assistant position at
10 StemExpress, correct?
11         MR. BROOKS: Objection, form, assumes facts not
12 in evidence, and lacks foundation, and lacks authentication
13 of and calls for speculation by the witness. Additionally,
14 compound, and I object under and instruct the witness not to
15 answer pursuant to the Fifth Amendment to the United States
16 Constitution, as well as state law including Article 1,
17 Section 15 of the California Constitution and Article 1,
18 Section 23 of the North Carolina Constitution.
19     A. I am asserting my rights under the Fifth Amendment
20 to the United States Constitution as well as state law
21 including Article 1, Section 15 of the California
22 Constitution and Article 1, Section 23 of the North Carolina
23 Constitution and therefore I respectfully decline to
24 answer.
25 BY MR. ROBINSON:

## Page 157

1      Q. In essence, Daleiden is instructing you to become a
2  mole, correct?
3         MR. BROOKS: Objection, form, asked and
4  answered, lack foundation, assumes facts not in evidence; and
5  I object under and instruct the witness not to answer
6  pursuant to the Fifth Amendment to the United States
7  Constitution, as well as state law including Article 1,
8  Section 15 of the California Constitution and Article 1,
9  Section 23 of the North Carolina Constitution.
10     A. I am asserting my rights under the Fifth Amendment
11 to the United States Constitution as well as state law
12 including Article 1, Section 15 of the California
13 Constitution and Article 1, Section 23 of the North Carolina
14 Constitution and therefore I respectfully decline to
15 answer.
16 BY MR. ROBINSON:
17     Q. What was your reaction to Mr. Daleiden's request
18 that you apply for the executive assistant position at
19 StemExpress?
20         MR. BROOKS: Objection, form, lacks foundation,
21 assumes facts not in evidence, asks about a document that has
22 not yet been authenticated; and also I object under and
23 instruct the witness not to answer pursuant to the Fifth
24 Amendment to the United States Constitution, as well as state
25 law including Article 1, Section 15 of the California

1 Constitution and Article 1, Section 23 of the North Carolina
2 Constitution.
3    A.  I am asserting my rights under the Fifth Amendment
4 to the United States Constitution as well as state law
5 including Article 1, Section 15 of the California
6 Constitution and Article 1, Section 23 of the North Carolina
7 Constitution and therefore I respectfully decline to
8 answer.
9 BY MR. ROBINSON:
10       (Plaintiff's Exhibit Number 211
11          marked for identification)
12    Q.  Handing you a copy of Plaintiff's Exhibit 211, that
13 is a true and correct copy of an Email that David Daleiden
14 sent to you on May 9, 2013 entitled ACG -- attaching ACG
15 resume, correct?
16       MR. BROOKS: Objection, form, lacks foundation,
17 and assumes facts not in evidence, and calls for
18 speculation from the witness, and I object under and instruct
19 the witness not to answer pursuant to the Fifth Amendment to
20 the United States Constitution, as well as state law
21 including Article 1, Section 15 of the California
22 Constitution and Article 1, Section 23 of the North Carolina
23 Constitution.
24    A.  I am asserting my rights under the Fifth Amendment
25 to the United States Constitution as well as state law

1 including Article 1, Section 15 of the California
2 Constitution and Article 1, Section 23 of the North Carolina
3 Constitution and therefore I respectfully decline to
4 answer.
5 BY MR. ROBINSON:
6    Q.  On May 9, 2013 Daleiden sent you a copy of a resume
7 that he intended for you to use to apply for an executive
8 assistant position at StemExpress, correct?
9       MR. BROOKS: Objection, form, lacks foundation,
10 assumes facts not in evidence, calls for speculation by the
11 witness.  Also, I object under and instruct the witness not
12 to answer pursuant to the Fifth Amendment to the United
13 States Constitution, as well as state law including Article
14 1, Section 15 of the California Constitution and Article 1,
15 Section 23 of the North Carolina Constitution.
16    A.  I am asserting my rights under the Fifth Amendment
17 to the United States Constitution as well as state law
18 including Article 1, Section 15 of the California
19 Constitution and Article 1, Section 23 of the North Carolina
20 Constitution and therefore I respectfully decline to
21 answer.
22 BY MR. ROBINSON:
23    Q.  The attachment is a resume with the name Anna
24 Christine Gates at the top, correct?
25       MR. BROOKS: Objection to form, assumes facts

1 not in evidence, and lacks foundation, and asks about a
2 document that has not yet been authenticated.  Additionally,
3 it calls for speculation.  I also object under and instruct
4 the witness not to answer pursuant to the Fifth Amendment to
5 the United States Constitution as well as state law including
6 Article 1, Section 15 of the California Constitution and
7 Article 1, Section 23 of the North Carolina Constitution.
8    A.  I am asserting my rights under the Fifth Amendment
9 to the United States Constitution as well as state law
10 including Article 1, Section 15 of the California
11 Constitution and Article 1, Section 23 of the North Carolina
12 Constitution and therefore I respectfully decline to
13 answer.
14 BY MR. ROBINSON:
15    Q.  Anna Christine Gates, that refers to you, correct?
16       MR. BROOKS: Objection, form, lacks foundation,
17 assumes facts not in evidence, calls for speculation by
18 witness, and again this document not been authenticated.  I
19 also object under and instruct the witness not to answer
20 pursuant to the Fifth Amendment to the United States
21 Constitution as well as state law including Article 1,
22 Section 15 of the California Constitution and Article 1,
23 Section 23 of the North Carolina Constitution and instruct
24 the witness not to answer.
25    A.  I am asserting my rights under the Fifth Amendment

1 to the United States Constitution as well as state law
2 including Article 1, Section 15 of the California
3 Constitution and Article 1, Section 23 of the North Carolina
4 Constitution and therefore I respectfully decline to
5 answer.
6 BY MR. ROBINSON:
7    Q.  The resume refers to the Bachelors of Art degree in
8 Sociology you earned at Charter Oak State College,
9 Connecticut in 2010.  Do you see that?
10       MR. BROOKS: Objection, form, lacks foundation,
11 assumes facts not in evidence, calls for speculation, and is
12 ambiguous.  Additionally, I object under and instruct the
13 witness not to answer pursuant to the Fifth Amendment to the
14 United States Constitution, as well as state law including
15 Article 1, Section 15 of the California Constitution and
16 Article 1, Section 23 of the North Carolina Constitution.
17 And, if I didn't say it before, I object, again, the
18 document's not been authenticated.
19    A.  I am asserting my rights under the Fifth Amendment
20 to the United States Constitution as well as state law
21 including Article 1, Section 15 of the California
22 Constitution and Article 1, Section 23 of the North Carolina
23 Constitution and therefore I respectfully decline to
24 answer.
25 BY MR. ROBINSON:

1  Q.  That line refers to the same degree that you
2  testified earlier today you earned from Charter Oak State
3  College, Connecticut, correct?
4      MR. BROOKS: Object to form, lacks foundation,
5  assumes facts not in evidence, calls for speculation.  Again,
6  the document's not been authenticated.  Additionally, I
7  object and instruct the witness not to answer pursuant to the
8  Fifth Amendment to the United States Constitution, as well as
9  state law including Article 1, Section 15 of the California
10  Constitution and Article 1, Section 23 of the North Carolina
11  Constitution.
12      A.  I am asserting my rights under the Fifth Amendment
13  to the United States Constitution as well as state law
14  including Article 1, Section 15 of the California
15  Constitution and Article 1, Section 23 of the North Carolina
16  Constitution and therefore I respectfully decline to
17  answer.
18  BY MR. ROBINSON:
19      (Plaintiff's Exhibit Number 212
20      marked for identification)
21      Q.  I'm handing you a copy of Plaintiff's Exhibit 212.
22  Plaintiffs Exhibit 212 is an Email from David Daleiden to
23  Annamarie Bettisworth dated May 13, 2013 Bates number CM05029
24  and with attachments goes through CM05033 -- nope 5034 --
25  5033.  This is a true and correct copy of an Email that David

1  Daleiden sent to you on May 13, 2013, correct?
2      MR. BROOKS: Objection, form, lacks foundation,
3  assumes facts not in evidence, and calls for speculation by
4  the witness; and I also object under and instruct the witness
5  not to answer pursuant to the Fifth Amendment to the United
6  States Constitution, as well as state law including Article
7  1, Section 15 of the California Constitution and Article 1,
8  Section 23 of the North Carolina Constitution.
9      A.  I am asserting my rights under the Fifth Amendment
10  to the United States Constitution as well as state law
11  including Article 1, Section 15 of the California
12  Constitution and Article 1, Section 23 of the North Carolina
13  Constitution and therefore I respectfully decline to
14  answer.
15  BY MR. ROBINSON:
16      Q.  The attachments to the Email are, one, your resume
17  and two, a cover letter made up for your signature, correct?
18      MR. BROOKS: Objection, form, lacks foundation,
19  assumes facts not in evidence, and this question's about a
20  document that the witness did not authenticate.
21  Additionally, calls for speculation by the witness, and I
22  object under and instruct the witness not to answer pursuant
23  to the Fifth Amendment to the United States Constitution, as
24  well as state law including Article 1, Section 15 of the
25  California Constitution and Article 1, Section 23 of the

1  North Carolina Constitution.
2      A.  I am asserting my rights under the Fifth Amendment
3  to the United States Constitution as well as state law
4  including Article 1, Section 15 of the California
5  Constitution and Article 1, Section 23 of the North Carolina
6  Constitution and therefore I respectfully decline to
7  answer.
8  BY MR. ROBINSON:
9      Q.  The cover letter attached to David Daleiden's May
10  13, 2013 E-mail, is a cover letter intended for you to use to
11  apply for the position of executive assistant at StemExpress,
12  correct?
13      MR. BROOKS: Objection, form, assumes facts not
14  in evidence, lacks foundation, question's about a document
15  that's not been authenticated, it calls for speculation.
16  Additionally, I object under and instruct the witness not to
17  answer pursuant to the Fifth Amendment to the United States
18  Constitution, as well as state law including Article 1,
19  Section 15 of the California Constitution and Article 1,
20  Section 23 of the North Carolina Constitution.
21      A.  I am asserting my rights under the Fifth Amendment
22  to the United States Constitution as well as state law
23  including Article 1, Section 15 of the California
24  Constitution and Article 1, Section 23 of the North Carolina
25  Constitution and therefore I respectfully decline to

1  answer.
2  BY MR. ROBINSON:
3      Q.  David Daleiden wrote the cover letter attached to
4  the May 13, 2013 Email, correct?
5      MR. BROOKS: Objection, form, lacks foundation,
6  assumes facts not in evidence, and again the document has not
7  been authenticated.  Additionally, calls for speculation, and
8  I also object under and instruct the witness not to answer
9  pursuant to the Fifth Amendment to the United States
10  Constitution, as well as state law including Article 1,
11  Section 15 of the California Constitution and Article 1,
12  Section 23 of the North Carolina Constitution.
13      A.  I am asserting my rights under the Fifth Amendment
14  to the United States Constitution as well as state law
15  including Article 1, Section 15 of the California
16  Constitution and Article 1, Section 23 of the North Carolina
17  Constitution and therefore I respectfully decline to
18  answer.
19  BY MR. ROBINSON:
20      Q.  In the body of the May 13, 2013 E-mail David
21  Daleiden provides you with instructions for uploading the
22  resume and cover letter to the StemExpress website in order
23  to apply for a job there, correct?
24      MR. BROOKS: Objection, form, lacks foundation,
25  assumes facts not in evidence, question's about a document

1  that's not been authenticated by the witness, and calls for
2  speculation. Also, I object under and instruct the witness
3  not to answer pursuant to the Fifth Amendment to the United
4  States Constitution, as well as state law including Article
5  1, Section 15 of the California Constitution and Article 1,
6  Section 23 of the North Carolina Constitution.
7      A. I am asserting my rights under the Fifth Amendment
8  to the United States Constitution as well as state law
9  including Article 1, Section 15 of the California
10  Constitution and Article 1, Section 23 of the North Carolina
11  Constitution and therefore I respectfully decline to
12  answer.
13  BY MR. ROBINSON:
14      Q. On the second page of the cover letter, the very
15  last paragraph, the first sentence reads, "People who know me
16  describe me as loyal, hard working and a quick learner." Do
17  you see that?
18          MR. BROOKS: Do you mind giving her the Bates
19  number?
20          MR. ROBINSON: CM05033.
21      A. I see the sentence you're describing.
22  BY MR. ROBINSON:
23      Q. In this cover letter you and Daleiden talk about
24  your loyalty in order to induce StemExpress to hire you,
25  correct?

1          MR. BROOKS: Objection, form, lacks foundation,
2  assumes facts not in evidence, asked questions about a
3  document that's not been authenticated. Additionally, calls
4  for speculation by the witness, argumentative. Additionally,
5  I object under and instruct the witness not to answer
6  pursuant to the Fifth Amendment to the United States
7  Constitution, as well as state law including Article 1,
8  Section 15 of the California Constitution and Article 1,
9  Section 23 of the North Carolina Constitution.
10      A. I am asserting my rights under the Fifth Amendment
11  to the United States Constitution as well as state law
12  including Article 1, Section 15 of the California
13  Constitution and Article 1, Section 23 of the North Carolina
14  Constitution and therefore I respectfully decline to
15  answer.
16  BY MR. ROBINSON:
17      Q. Your intent at the time, however, was to infiltrate
18  StemExpress in order to take surveillance to create live
19  action style undercover video and inflict damage on
20  StemExpress, correct?
21          MR. BROOKS: Objection, form, lacks
22  foundations, assumes facts not in evidence, compound, and
23  argumentative. Additionally I -- again, document has not
24  been authenticated to the extent the question asked about the
25  document. Also, I object under and instruct the witness not

1  to answer pursuant to the Fifth Amendment to the United
2  States Constitution, as well as state law including Article
3  1, Section 15 of the California Constitution and Article 1,
4  Section 23 of the North Carolina Constitution.
5      A. I am asserting my rights under the Fifth Amendment
6  to the United States Constitution as well as state law
7  including Article 1, Section 15 of the California
8  Constitution and Article 1, Section 23 of the North Carolina
9  Constitution and therefore I respectfully decline to
10  answer.
11  BY MR. ROBINSON:
12      Q. Do you know who Cate Dyer is?
13          MR. BROOKS: Objection, assumes facts not in
14  evidence, and lacks foundation. More importantly, I object
15  under and instruct the witness not to answer pursuant to the
16  Fifth Amendment to the United States Constitution, as well as
17  state law including Article 1, Section 15 of the California
18  Constitution and Article 1, Section 23 of the North Carolina
19  Constitution. And I'll add the vagueness to the objection to
20  form.
21      A. I am asserting my rights under the Fifth Amendment
22  to the United States Constitution as well as state law
23  including Article 1, Section 15 of the California
24  Constitution and Article 1, Section 23 of the North Carolina
25  Constitution and therefore I respectfully decline to

1  answer.
2  BY MR. ROBINSON:
3      Q. Cate Dyer is the CEO of StemExpress, correct?
4          MR. BROOKS: Objection, form, lacks foundation,
5  assumes facts not in evidence. More importantly, objection
6  pursuant to the Fifth Amendment to the United States
7  Constitution, as well as state law including Article 1,
8  Section 15 of the California Constitution and Article 1,
9  Section 23 of the North Carolina Constitution, because of the
10  objection, I instruct the witness not to -- because of the
11  privilege objection, I instruct the witness not to answer.
12      A. I am asserting my rights under the Fifth Amendment
13  to the United States Constitution as well as state law
14  including Article 1, Section 15 of the California
15  Constitution and Article 1, Section 23 of the North Carolina
16  Constitution and therefore I respectfully decline to
17  answer.
18  BY MR. ROBINSON:
19      Q. This cover letter is addressed to Cate Dyer, CEO,
20  StemExpress, correct?
21          MR. BROOKS: Objection, assumes facts not in
22  evidence and lacks foundation. Again, asked about a document
23  that has not been authenticated and calls for speculation.
24  Additionally, I object under and instruct the witness not to
25  answer pursuant to the Fifth Amendment of the United States

1  Constitution, as well as state law including Article 1,
2  Section 15 of the California Constitution and Article 1,
3  Section 23 of the North Carolina Constitution, and instruct
4  the witness not to answer on that privilege.
5      A.  I am asserting my rights under the Fifth Amendment
6  to the United States Constitution as well as state law
7  including Article 1, Section 15 of the California
8  Constitution and Article 1, Section 23 of the North Carolina
9  Constitution and therefore I respectfully decline to
10  answer.
11  BY MR. ROBINSON:
12      Q.  Did Daleiden discuss his views about Cate Dyer with
13  you?
14          MR. BROOKS: Objection, form, lack of
15  foundation, assumes facts not in evidence.  To the extent
16  it's asking about the document, the document's not been
17  authenticated.  Additionally, it's vague and I object under
18  and instruct the witness not to answer pursuant to the Fifth
19  Amendment of the United States Constitution, as well as state
20  law including Article 1, Section 15 of the California
21  Constitution and Article 1, Section 23 of the North Carolina
22  Constitution.
23      A.  I am asserting my rights under the Fifth Amendment
24  to the United States Constitution as well as state law
25  including Article 1, Section 15 of the California

1  Constitution and Article 1, Section 23 of the North Carolina
2  Constitution and therefore I respectfully decline to
3  answer.
4  BY MR. ROBINSON:
5      Q.  Daleiden had unusually strong negative feelings
6  towards Cate Dyer, correct?
7          MR. BROOKS: Objection, form, lacks foundation,
8  assumes facts not in evidence, vague and ambiguous; and I
9  object under and instruct the witness not to answer pursuant
10  to the Fifth Amendment of the United States Constitution, as
11  well as state law including Article 1, Section 15 of the
12  California Constitution and Article 1, Section 23 of the
13  North Carolina Constitution.
14      A.  I am asserting my rights under the Fifth Amendment
15  to the United States Constitution as well as state law
16  including Article 1, Section 15 of the California
17  Constitution and Article 1, Section 23 of the North Carolina
18  Constitution and therefore I respectfully decline to
19  answer.
20  BY MR. ROBINSON:
21      Q.  Cate Dyer was one of the subjects -- sorry, let me
22  rephrase.  Cate Dyer was the subject of one of CMP's
23  undercover viral videos, correct?
24          MR. BROOKS: Objection to form, lacks
25  foundation, assumes facts not in evidence, and calls for

1  speculation.  Also, I object under and instruct the witness
2  not to answer pursuant to the Fifth Amendment of the United
3  States Constitution as well as state law including Article 1,
4  Section 15 of the California Constitution and Article 1,
5  Section 23 of the North Carolina Constitution.
6      A.  I am asserting my rights under the Fifth Amendment
7  to the United States Constitution as well as state law
8  including Article 1, Section 15 of the California
9  Constitution and Article 1, Section 23 of the North Carolina
10  Constitution and therefore I respectfully decline to
11  answer.
12  BY MR. ROBINSON:
13      Q.  Cate Dyer received death threats in response to
14  CMP's viral undercover videos about her, correct?
15          MR. BROOKS: Objection, form, lacks foundation,
16  assumes facts not in evidence, argumentative and harassing.
17  Additionally, I object under and instruct the witness not to
18  answer pursuant to the Fifth Amendment to the United States
19  Constitution, as well as state law including Article 1,
20  Section 15 of the California Constitution and Article 1,
21  Section 23 of the North Carolina Constitution.
22      A.  I am asserting my rights under the Fifth Amendment
23  to the United States Constitution as well as state law
24  including Article 1, Section 15 of the California
25  Constitution and Article 1, Section 23 of the North Carolina

1  Constitution and therefore I respectfully decline to
2  answer.
3  BY MR. ROBINSON:
4      Q.  Are you aware that federal authorities arrested
5  Scott Horton, a Washington resident, and a Federal Court
6  sentenced him to over a year in prison after he blogged about
7  killing StemExpress employees and specifically Cate Dyer?
8          MR. BROOKS: Objection, form first, quite
9  compound, also assumes facts not in evidence, lacks
10  foundation, and is argumentative, harassing and irrelevant.
11  Additionally, I object under and instruct the witness not to
12  answer pursuant to the Fifth Amendment to the United States
13  Constitution as well as state law including Article 1,
14  Section 15 of the California Constitution and Article 1,
15  Section 23 of the North Carolina Constitution.
16      A.  I am asserting my rights under the Fifth Amendment
17  to the United States Constitution as well as state law
18  including Article 1, Section 15 of the California
19  Constitution and Article 1, Section 23 of the North Carolina
20  Constitution and therefore I respectfully decline to
21  answer.
22  BY MR. ROBINSON:
23      Q.  Scott Horton's death threats to Cate Dyer, which
24  resulted in his arrest and imprisonment, occurred in direct
25  response to CMP's viral undercover videos about Cate Dyer,

1 correct?

2 MR. BROOKS: Objection, form, again, compound,
3 argumentative, harassing, irrelevant, assumes facts not in
4 evidence and lacks foundation. Also calls for witness to
5 speculate, and offer legal opinion. Additionally, I object
6 under and instruct the witness not to answer pursuant to the
7 Fifth Amendment to the United States Constitution as well as
8 state law including Article 1, Section 15 of the California
9 Constitution and Article 1, Section 23 of the North Carolina
10 Constitution.

11 A. I am asserting my rights under the Fifth Amendment
12 to the United States Constitution as well as state law
13 including Article 1, Section 15 of the California
14 Constitution and Article 1, Section 23 of the North Carolina
15 Constitution and therefore I respectfully decline to
16 answer.

17 BY MR. ROBINSON:

18 Q. To your knowledge, Daleiden intended that its viral
19 undercover videos about Cate Dyer would result in harassment
20 and death threats against her, correct?

21 MR. BROOKS: Objection, form, lacks foundation,
22 assumes facts not in evidence, calls for speculation by the
23 witness, is argumentative and harassing. Additionally, I
24 object under and instruct the witness not to answer pursuant
25 to the Fifth Amendment to the United States Constitution, as

1 well as state law including Article 1, Section 15 of the
2 California Constitution and Article 1, Section 23 of the
3 North Carolina Constitution. And if I didn't say it before,
4 I object, I believe the question was compound.

5 A. I am asserting my rights under the Fifth Amendment
6 to the United States Constitution as well as state law
7 including Article 1, Section 15 of the California
8 Constitution and Article 1, Section 23 of the North Carolina
9 Constitution and therefore I respectfully decline to
10 answer.

11 BY MR. ROBINSON:

12 Q. Did you intend for CMP's viral undercover videos to
13 incite death threats against Cate Dyer?

14 MR. BROOKS: Objection, form, lacks foundation,
15 assumes facts not in evidence, is argumentative and
16 harassing. Also is a compound question. Additionally, I
17 object under and instruct the witness not to answer pursuant
18 to the Fifth Amendment to the United States Constitution, as
19 well as state law including Article 1, Section 15 of the
20 California Constitution and Article 1, Section 23 of the
21 North Carolina Constitution.

22 A. I am asserting my rights under the Fifth Amendment
23 to the United States Constitution as well as state law
24 including Article 1, Section 15 of the California
25 Constitution and Article 1, Section 23 of the North Carolina

1 Constitution and therefore I respectfully decline to
2 answer.

3 BY MR. ROBINSON:

4 Q. Do you feel any remorse or responsibility for your
5 actions against StemExpress sitting here today?

6 MR. BROOKS: Objection, form, lacks foundation,
7 assumes facts not in evidence, is argumentative and
8 harassing, is also vague and ambiguous. I also object under
9 and instruct the witness not to answer pursuant to the Fifth
10 Amendment to the United States Constitution, as well as state
11 law including Article 1, Section 15 of the California
12 Constitution and Article 1, Section 23 of the North Carolina
13 Constitution.

14 A. I am asserting my rights under the Fifth Amendment
15 to the United States Constitution as well as state law
16 including Article 1, Section 15 of the California
17 Constitution and Article 1, Section 23 of the North Carolina
18 Constitution and therefore I respectfully decline to
19 answer.

20 BY MR. ROBINSON:

21 Q. Let's talk about CMP's infiltration of NAF in 2014.
22 What steps did CMP take to illegally infiltrate NAF's meeting
23 in 2014?

24 MR. BROOKS: Objection, form, vague and
25 ambiguous. I don't think we have defined terms. Also,

1 assumes fact not in evidence and lacks foundation, calls for
2 speculation by the witness. Also, I object under and
3 instruct the witness not to answer pursuant to the Fifth
4 Amendment to the United States Constitution, as well as state
5 law including Article 1, Section 15 of the California
6 Constitution and Article 1, Section 23 of the North Carolina
7 Constitution.

8 A. I am asserting my rights under the Fifth Amendment
9 to the United States Constitution as well as state law
10 including Article 1, Section 15 of the California
11 Constitution and Article 1, Section 23 of the North Carolina
12 Constitution and therefore I respectfully decline to
13 answer.

14 BY MR. ROBINSON:

15 Q. In preparing to infiltrate NAF in 2014, CMP created
16 a front company named BioMax, correct?

17 MR. BROOKS: Objection to form, lacks
18 foundation, assumes facts not in evidence, calls for
19 speculation by the witness. Also it's effectively a compound
20 question. I also object under and instruct the witness not
21 to answer pursuant to the Fifth Amendment to the United
22 States Constitution, as well as state law including Article
23 1, Section 15 of the California Constitution and Article 1,
24 Section 23 of the North Carolina Constitution.

25 A. I am asserting my rights under the Fifth Amendment

1   to the United States Constitution as well as state law
2   including Article 1, Section 15 of the California
3   Constitution and Article 1, Section 23 of the North Carolina
4   Constitution and therefore I respectfully decline to
5   answer.
6   BY MR. ROBINSON:
7       Q.  Were you involved in the incorporation of or the
8   creation of the fake front company Bio Max in connection with
9   NAF -- sorry, let me rephrase.  Were you involved in the
10  creation of the fake front company, Bio Max, in connection
11  with CMP's infiltration of NAF's annual meeting in 2014?
12      MR. BROOKS:  Objection, foundation, assumes
13  facts not in evidence -- sorry, objection, form, assumes
14  facts not in evidence, lacks foundation, is also
15  argumentative; and I object under and instruct the witness
16  not to answer pursuant to the Fifth Amendment to the United
17  States Constitution, as well as state law including Article
18  1, Section 15 of the California Constitution and Article 1,
19  Section 23 of the North Carolina Constitution.
20      A.  I am asserting my rights under the Fifth Amendment
21  to the United States Constitution as well as state law
22  including Article 1, Section 15 of the California
23  Constitution and Article 1, Section 23 of the North Carolina
24  Constitution and therefore I respectfully decline to
25  answer.

1   BY MR. ROBINSON:
2       Q.  In connection with NAF's infiltration -- sorry.  In
3   connection with CMP's infiltration of NAF's annual meeting in
4   2014 CMP created a fake website, fake executives and titles,
5   fake business cards, and fake Email domain for Bio Max,
6   correct?
7       MR. BROOKS:  Objection, form, lacks foundation,
8   assumes facts not in evidence, calls for speculation by the
9   witness, and is a compound question.  Additionally I --
10  argumentative.  And I object under and instruct the witness
11  not to answer pursuant to the Fifth Amendment to the United
12  States Constitution, as well as state law including Article
13  1, Section 15 of the California Constitution and Article 1,
14  Section 23 of the North Carolina Constitution.
15      A.  I am asserting my rights under the Fifth Amendment
16  to the United States Constitution as well as state law
17  including Article 1, Section 15 of the California
18  Constitution and Article 1, Section 23 of the North Carolina
19  Constitution and therefore I respectfully decline to
20  answer.
21  BY MR. ROBINSON:
22      Q.  CMP recruited other actors to serve in undercover
23  capacity at NAF's annual meeting in 2014, correct?
24      MR. BROOKS:  Objection, vague and ambiguous,
25  lacks foundation, assumes facts not in evidence and it's

1   argumentative.  I also object under and instruct the witness
2   not to answer pursuant to the Fifth Amendment to the United
3   States Constitution, as well as state law including Article
4   1, Section 15 of the California Constitution and Article 1,
5   Section 23 of the North Carolina Constitution.
6       A.  I am asserting my rights under the Fifth Amendment
7   to the United States Constitution as well as state law
8   including Article 1, Section 15 of the California
9   Constitution and Article 1, Section 23 of the North Carolina
10  Constitution and therefore I respectfully decline to
11  answer.
12  BY MR. ROBINSON:
13      Q.  One of the people that CMP recruited to help
14  infiltrate NAF's annual meeting in 2014 masqueraded under the
15  name of Brianna Allen, correct?
16      MR. BROOKS:  Objection, form, lacks foundation,
17  assumes facts not in evidence, calls for speculation by the
18  witness.  Again, it's vague and ambiguous as well.  I also
19  object under and instruct the witness not to answer pursuant
20  to the Fifth Amendment to the United States Constitution, as
21  well as state law including Article 1, Section 15 of the
22  California Constitution and Article 1, Section 23 of the
23  North Carolina Constitution.
24      MR. MIHET:  The question is also
25  argumentative.

1       MR. BROOKS:  Yes, I join that objection.
2       A.  I am asserting my rights under the Fifth Amendment
3   to the United States Constitution as well as state law
4   including Article 1, Section 15 of the California
5   Constitution and Article 1, Section 23 of the North Carolina
6   Constitution and therefore I respectfully decline to
7   answer.
8       (Plaintiff's Exhibit Number 213
9           marked for identification)
10  BY MR. ROBINSON:
11      Q.  You're being handed a copy of Plaintiff's Exhibit
12  213.  It is an Email from David Daleiden to someone whose
13  presumably name is blacked out in this document.  The CC is
14  to Annamarie Bettisworth.  The subject is introductory
15  materials, the Bates number is CM00044 through 47.
16      MR. MIHET:  I object and move to strike
17  Counsel's characterization of the document as lacking
18  foundation and lacking authentication.
19      MR. BROOKS:  I likewise object and join in that
20  motion.
21  BY MR. ROBINSON:
22      Q.  Do you recognize Exhibit 213?
23      MR. BROOKS:  Objection, form.  It's vague,
24  ambiguous.  I also instruct the witness -- object and
25  instruct the witness not to answer pursuant to the Fifth

1  Amendment of the United States Constitution, as well as state
2  law including Article 1, Section 15 of the California
3  Constitution and Article 1, Section 23 of the North Carolina
4  Constitution.
5      A.  I am asserting my rights under the Fifth Amendment
6  to the United States Constitution as well as state law
7  including Article 1, Section 15 of the California
8  Constitution and Article 1, Section 23 of the North Carolina
9  Constitution and therefore I respectfully decline to
10  answer.
11  BY MR. ROBINSON:
12      Q.  David Daleiden's Email in which you were copied
13  addresses someone named Brianna.  That's Brianna Allen --
14  sorry -- that's the person who held herself out as Brianna
15  Allen at the NAF meeting in 2014, correct?
16      MR. BROOKS:  Objection, form, lacks foundation,
17  assumes facts not in evidence, question about a document that
18  the witness did not authenticate, and argumentative and
19  compound.  Additionally, I object under and instruct the
20  witness not to answer pursuant to the Fifth Amendment to the
21  United States Constitution, as well as state law including
22  Article 1, Section 15 of the California Constitution and
23  Article 1, Section 23 of the North Carolina Constitution.
24      A.  I am asserting my rights under the Fifth Amendment
25  to the United States Constitution as well as state law

1  including Article 1, Section 15 of the California
2  Constitution and Article 1, Section 23 of the North Carolina
3  Constitution and therefore I respectfully decline to
4  answer.
5  BY MR. ROBINSON:
6      Q.  The Brianna referred to in the Email refers to
7  Brianna Baxter, that's her real name, correct?
8      MR. BROOKS:  Objection, form, lacks foundation,
9  assumes facts not in evidence, calls for speculation by the
10  witness.  Again, this is about a document that has not been
11  authenticated.  Also, I object under and instruct the witness
12  not to answer pursuant to the Fifth Amendment to the United
13  States Constitution, as well as state law including Article
14  1, Section 15 of the California Constitution and Article 1,
15  Section 23 of the North Carolina Constitution.
16      MR. MIHET:  Also calls for speculation.
17      MR. BROOKS:  Yes, I join in that objection.
18      A.  I am asserting my rights under the Fifth Amendment
19  to the United States Constitution as well as state law
20  including Article 1, Section 15 of the California
21  Constitution and Article 1, Section 23 of the North Carolina
22  Constitution and therefore I respectfully decline to
23  answer.
24  BY MR. ROBINSON:
25      Q.  In paragraph 2 of this Email David Daleiden

1  identifies a number of things that he states, "Things your
2  character should be familiar with."  What is your
3  understanding of what Daleiden is referring to as your
4  character?
5      MR. BROOKS:  Objection, form, lacks foundation,
6  assumes facts not in evidence, calls for speculation by the
7  witness, and again this document has not been authenticated.
8  Also, I object under and instruct the witness not to answer
9  pursuant to the Fifth Amendment to the United States
10  Constitution as well as state law including Article 1,
11  Section 15 of the California Constitution and Article 1,
12  Section 23 of the North Carolina Constitution.
13      A.  I am asserting my rights under the Fifth Amendment
14  to the United States Constitution as well as state law
15  including Article 1, Section 15 of the California
16  Constitution and Article 1, Section 23 of the North Carolina
17  Constitution and therefore I respectfully decline to
18  answer.
19  BY MR. ROBINSON:
20      Q.  In paragraph 4 of this Email David Daleiden writes,
21  "For an example of the altruistic justification for your
22  dirty work, see this presentation by Dr. Eileen Henderson of
23  UC Irvine on her neuro stem cell research.  Do you see that?
24      MR. BROOKS:  Objection to form.  Also assumes
25  facts not in evidence, lacks foundation.  Again, the document

1  has not been authenticated, given the characterization of the
2  document and the question.  I also instruct the witness not
3  to answer pursuant to the Fifth Amendment to the United
4  States Constitution, as well as state law including Article
5  1, Section 15 of the California Constitution and Article 1,
6  Section 23 of the North Carolina Constitution, and object on
7  those bases.
8      A.  I am asserting my rights under the Fifth Amendment
9  to the United States Constitution as well as state law
10  including Article 1, Section 15 of the California
11  Constitution and Article 1, Section 23 of the North Carolina
12  Constitution and therefore I respectfully decline to
13  answer.
14  BY MR. ROBINSON:
15      Q.  What is your understanding of what Daleiden meant by
16  the phrase, your dirty work in that sentence?
17      MR. BROOKS:  Objection to form, lacks
18  foundation, assumes facts not in evidence, calls for
19  speculation; and, again, this document has not been
20  authenticated by the witness.  Also, I object under and
21  instruct the witness not to answer pursuant to the Fifth
22  Amendment to the United States Constitution, as well as state
23  law including Article 1, Section 15 of the California
24  Constitution and Article 1, Section 23 of the North Carolina
25  Constitution.

1  A. I am asserting my rights under the Fifth Amendment
2  to the United States Constitution as well as state law
3  including Article 1, Section 15 of the California
4  Constitution and Article 1, Section 23 of the North Carolina
5  Constitution and therefore I respectfully decline to
6  answer.
7  BY MR. ROBINSON:
8  (Plaintiff's Exhibit Number 214
9  marked for identification)
10  Q. By the use of the word, justification for dirty
11  work, David Daleiden was acknowledging that CMP's
12  infiltration of NAF in 2014 was illegal, correct?
13  MR. BROOKS: Objection, form, lacks foundation,
14  assumes facts not in evidence. Again, this document has not
15  been authenticated, and calls for speculation by the witness,
16  as well as legal conclusion. I also -- also vague and
17  ambiguous. I object under and instruct the witness not to
18  answer pursuant to the Fifth Amendment of the United States
19  Constitution, as well as state law including Article 1,
20  Section 15 of the California Constitution and Article 1,
21  Section 23 of the North Carolina Constitution.
22  MR. MIHET: I object and move to strike
23  Counsel's gross mischaracterization of the document.
24  MR. BROOKS: I also add another objection,
25  it's argumentative, and I join in the motion to strike.

1  A. I am asserting my rights under the Fifth Amendment
2  to the United States Constitution as well as state law
3  including Article 1, Section 15 of the California
4  Constitution and Article 1, Section 23 of the North Carolina
5  Constitution and therefore I respectfully decline to
6  answer.
7  BY MR. ROBINSON:
8  Q. I'm handing you a copy of Plaintiff's Exhibit 214.
9  This is an Email from Annamarie Bettisworth to David Daleiden
10  dated August 22, 2013, Bates number CM00067. This is a true
11  and correct copy of an Email that you wrote to David
12  Daleiden, correct?
13  MR. BROOKS: Objection, form, and I also object
14  under and instruct the witness not to answer under the Fifth
15  Amendment to the United States Constitution as well as state
16  law including Article 1, Section 15 of the California
17  Constitution and Article 1, Section 23 of the North Carolina
18  Constitution.
19  MR. MIHET: I'll object because the question
20  assumes facts not in evidence, lack of foundation, and is
21  premised on a document that has not been authenticated, and
22  misstates prior testimony.
23  MR. BROOKS: I'll join in all of those
24  objections to form as well. the preceding objections,
25  rather, by Mr. Mihet.

1  A. I am asserting my rights under the Fifth Amendment
2  to the United States Constitution as well as state law
3  including Article 1, Section 15 of the California
4  Constitution and Article 1, Section 23 of the North Carolina
5  Constitution and therefore I respectfully decline to
6  answer.
7  BY MR. ROBINSON:
8  Q. In this Email you say, quote, as usual, absolutely
9  genius. What did you mean by that?
10  MR. BROOKS: Objection form, assumes facts not
11  in evidence, lacks foundation. The witness did not
12  authenticate the document, and I also object under and
13  instruct the witness not to answer pursuant to the Fifth
14  Amendment to the United States Constitution, as well as state
15  law including Article 1, Section 15 of the California
16  Constitution and Article 1, Section 23 of the North Carolina
17  Constitution.
18  A. I am asserting my rights under the Fifth Amendment
19  to the United States Constitution as well as state law
20  including Article 1, Section 15 of the California
21  Constitution and Article 1, Section 23 of the North Carolina
22  Constitution and therefore I respectfully decline to
23  answer.
24  BY MR. ROBINSON:
25  (Plaintiff's Exhibit Number 215

1  marked for identification)
2  Q. I'm handing you a copy of Plaintiff's Exhibit 215.
3  Plaintiff's Exhibit 215 is a true and correct copy of your
4  California driver's license, correct?
5  MR. BROOKS: Objection to form -- objection,
6  form, vague and ambiguous as to the meaning of -- the
7  question's vague and ambiguous. Also, I instruct the witness
8  not to answer pursuant to the Fifth Amendment to the United
9  States Constitution, as well as state law including Article
10  1, Section 15 of the California Constitution and Article 1,
11  Section 23 of the North Carolina Constitution, and I object
12  on those bases.
13  A. I am asserting my rights under the Fifth Amendment
14  to the United States Constitution as well as state law
15  including Article 1, Section 15 of the California
16  Constitution and Article 1, Section 23 of the North Carolina
17  Constitution and therefore I respectfully decline to
18  answer.
19  MR. MIHET: Counsel, also for the record, I
20  don't see a Bate stamp on the document. Is there one?
21  MR. ROBINSON: This was a CMP produced
22  document. The Bates is very hard to read but it's CM14.
23  This is a CMP produced document. It looks to me like the
24  Bates number is CM14 or 04.
25  MR. BROOKS: Looks like it's 04. CM5004, I

1  think.
2         MR. ROBINSON:  It's either 14 or 04.
3         MR. BROOKS:  Looks like it's 04.
4         MR. ROBINSON:  You have better eyes than I do.
5  Yeah, sorry.  CM05004.
6  BY MR. ROBINSON:
7     Q.  That's you depicted on the image of this California
8  driver's license, correct?
9         MR. BROOKS:  Objection.  I instruct the witness
10  not to answer on the grounds of -- pursuant to the Fifth
11  Amendment to the United States Constitution as well as state
12  law including Article 1, Section 15 of the California
13  Constitution and Article 1, Section 23 of the North Carolina
14  Constitution.  Also, as to form objections, it assumes facts
15  not in evidence, and lacks foundation, and lacks
16  authentication from the witness.
17     A.  I am asserting my rights under the Fifth Amendment
18  to the United States Constitution as well as state law
19  including Article 1, Section 15 of the California
20  Constitution and Article 1, Section 23 of the North Carolina
21  Constitution and therefore I respectfully decline to
22  answer.
23  BY MR. ROBINSON:
24     Q.  The name on the California drivers license is
25  Annamarie Gates Bettisworth.  Again, that's you, correct?

1         MR. BROOKS: Objection to form, assumes facts
2  not in evidence, lacks foundation, lacks authentication, it's
3  a compound question; and again, I object under and instruct
4  the witness not to answer pursuant to the Fifth Amendment to
5  the United States Constitution, as well as state law
6  including Article 1, Section 15 of the California
7  Constitution and Article 1, Section 23 of the North Carolina
8  Constitution.
9     A.  I am asserting my rights under the Fifth Amendment
10  to the United States Constitution as well as state law
11  including Article 1, Section 15 of the California
12  Constitution and Article 1, Section 23 of the North Carolina
13  Constitution and therefore I respectfully decline to
14  answer.
15  BY MR. ROBINSON:
16     Q.  Are you aware that NAF required valid identification
17  in order to get into NAF's annual meetings?
18         MR. BROOKS: Objection, form, lacks foundation,
19  assumes facts not in evidence.  Again, also vague and
20  ambiguous; and I object under and instruct the witness not to
21  answer pursuant to the Fifth Amendment of the United States
22  Constitution as well as state law including Article 1,
23  Section 15 of the California Constitution and Article 1,
24  Section 23 of the North Carolina Constitution.
25     A.  I am asserting my rights under the Fifth Amendment

1  to the United States Constitution as well as state law
2  including Article 1, Section 15 of the California
3  Constitution and Article 1, Section 23 of the North Carolina
4  Constitution and therefore I respectfully decline to
5  answer.
6  BY MR. ROBINSON:
7     Q.  Are you aware that David Daleiden created a fake
8  California driver's license in order to get access to NAF's
9  annual meeting in 2014 using the name Robert Sarkis?
10         MR. BROOKS: Objection, form, assumes facts not
11  in evidence, lacks foundation, also is a compound question
12  and argumentative.  Additionally, I object under and instruct
13  the witness not to answer pursuant to the Fifth Amendment to
14  the United States Constitution, as well as state law
15  including Article 1, Section 15 of the California
16  Constitution and Article 1, Section 23 of the North Carolina
17  Constitution.
18     A.  I am asserting my rights under the Fifth Amendment
19  to the United States Constitution as well as state law
20  including Article 1, Section 15 of the California
21  Constitution and Article 1, Section 23 of the North Carolina
22  Constitution and therefore I respectfully decline to
23  answer.
24  BY MR. ROBINSON:
25     Q.  Are you aware that Sandra Merritt created a fake

1  California driver's license in order to get access to NAF's
2  annual meeting using the name Susan Tennenbaum?
3         MR. BROOKS: Objection, form, lacks foundation,
4  calls for speculation by the witness, and is argumentative
5  and compound.  I object under and instruct the witness not to
6  answer pursuant to the Fifth Amendment to the United States
7  Constitution, as well as state law including Article 1,
8  Section 15 of the California Constitution and Article 1,
9  Section 23 of the North Carolina Constitution.
10         MR. MIHET: I also join those objections and
11  additionally move to strike Counsel's mischaracterization of
12  the evidence on the basis that Counsel has no reasonable
13  basis to allege that Susan Merritt created a fake driver's
14  license.
15     A.  I am asserting my rights under the Fifth Amendment
16  to the United States Constitution as well as state law
17  including Article 1, Section 15 of the California
18  Constitution and Article 1, Section 23 of the North Carolina
19  Constitution and therefore I respectfully decline to
20  answer.
21  BY MR. ROBINSON:
22     Q.  How did David Daleiden procure a fake ID used to
23  access NAF's annual meetings?
24         MR. BROOKS:  Objection to form, assumes facts
25  not in evidence, lacks foundation, calls for speculation by

1  the witness, and is again, effectively a compound question.
2  I also object under and instruct the witness not to answer
3  pursuant to the Fifth Amendment to the United States
4  Constitution, as well as state law including Article 1,
5  Section 15 of the California Constitution and Article 1,
6  Section 23 of the North Carolina Constitution.
7      A.  I am asserting my rights under the Fifth Amendment
8  to the United States Constitution as well as state law
9  including Article 1, Section 15 of the California
10  Constitution and Article 1, Section 23 of the North Carolina
11  Constitution and therefore I respectfully decline to
12  answer.
13  BY MR. ROBINSON:
14      Q.  Who else procured a fake ID in connection with CMP's
15  infiltration of NAF's annual meetings?
16          MR. BROOKS: Objection, form, assumes facts not
17  in evidence, lacks foundation, is argumentative, harassing
18  and given the prior answer -- well, harassing given the prior
19  answers.  Also I -- and calls for speculation by the witness.
20  I also object under and instruct the witness not to answer
21  pursuant to the Fifth Amendment to the United States
22  Constitution as well as state law including Article 1,
23  Section 15 of the California Constitution and Article 1,
24  Section 23 of the North Carolina Constitution.
25      A.  I am asserting my rights under the Fifth Amendment

1  to the United States Constitution as well as state law
2  including Article 1, Section 15 of the California
3  Constitution and Article 1, Section 23 of the North Carolina
4  Constitution and therefore I respectfully decline to
5  answer.
6  BY MR. ROBINSON:
7      Q.  Did you get a fake ID in connection with CMP's
8  infiltration of NAF's annual meetings?
9          MR. BROOKS: Objection, lacks foundation,
10  assumes facts not in evidence.  Additionally, I object under
11  and instruct the witness not to answer pursuant to the Fifth
12  Amendment to the United States Constitution, as well as state
13  law including Article 1, Section 15 of the California
14  Constitution and Article 1, Section 23 of the North Carolina
15  Constitution.
16      A.  I am asserting my rights under the Fifth Amendment
17  to the United States Constitution as well as state law
18  including Article 1, Section 15 of the California
19  Constitution and Article 1, Section 23 of the North Carolina
20  Constitution and therefore I respectfully decline to
21  answer.
22  BY MR. ROBINSON:
23      Q.  Looking back at Exhibit 215, the California driver's
24  license for Annamarie Gates Bettisworth, you didn't show
25  anyone at NAF that license, correct?

1          MR. BROOKS: Objection, form, assumes facts not
2  in evidence, lacks foundation, also asks about a document
3  that has not been authenticated, and is a compound question
4  as a result.  Additionally, I object under and instruct the
5  witness not to answer pursuant to the Fifth Amendment to the
6  United States Constitution, as well as state law including
7  Article 1, Section 15 of the California Constitution and
8  Article 1, Section 23 of the North Carolina Constitution.
9      A.  I am asserting my rights under the Fifth Amendment
10  to the United States Constitution as well as state law
11  including Article 1, Section 15 of the California
12  Constitution and Article 1, Section 23 of the North Carolina
13  Constitution and therefore I respectfully decline to
14  answer.
15  BY MR. ROBINSON:
16      Q.  Why don't we take a break at this time.
17          THE VIDEOGRAPHER: We're going off record.  The
18  time is 3:28 p.m.
19          (CONVERSATION HELD OFF THE RECORD)
20          THE VIDEOGRAPHER: We're going back on record.
21  The time is 3:29 p.m.
22      Q.  At the time of CMP's infiltration of NAF's annual
23  meetings were you aware that NAF prohibited video and audio
24  recording of those meetings?
25          MR. BROOKS: Objection, form, assumes facts not

1  in evidence, lacks foundation, compound question, and is
2  argumentative.  Also, I object under and instruct the witness
3  not to answer pursuant to the Fifth Amendment to the United
4  States Constitution, as well as state law including Article
5  1, Section 15 of the California Constitution and Article 1,
6  Section 23 of the North Carolina Constitution.
7      A.  I am asserting my rights under the Fifth Amendment
8  to the United States Constitution as well as state law
9  including Article 1, Section 15 of the California
10  Constitution and Article 1, Section 23 of the North Carolina
11  Constitution and therefore I respectfully decline to
12  answer.
13  BY MR. ROBINSON:
14      Q.  CMP purchased hidden cameras in order to hide on the
15  actors who infiltrated NAF's annual meetings in 2014 and
16  2015, correct?
17          MR. BROOKS: Objection, form, lacks foundation,
18  assumes facts not in evidence, compound and argumentative and
19  harassing in light of prior answers.  Additionally, I object
20  to and instruct the witness not -- or object under and
21  instruct the witness not to answer pursuant to the Fifth
22  Amendment to the United States Constitution, as well as state
23  law including Article 1, Section 15 of the California
24  Constitution and Article 1, Section 23 of the North Carolina
25  Constitution.  Also calls for speculation by the witness.

1    A.  I am asserting my rights under the Fifth Amendment
2  to the United States Constitution as well as state law
3  including Article 1, Section 15 of the California
4  Constitution and Article 1, Section 23 of the North Carolina
5  Constitution and therefore I respectfully decline to
6  answer.
7  BY MR. ROBINSON:
8    Q.  Did you attend the NAF annual meeting in 2014?
9        MR. BROOKS: Objection, vague and ambiguous.
10  Also assumes facts not in evidence and lacks foundation.
11  Additionally, I object under and instruct the witness not to
12  answer pursuant to the Fifth Amendment to the United States
13  Constitution, as well as state law including Article 1,
14  Section 15 of the California Constitution and Article 1,
15  Section 23 of the North Carolina Constitution.
16    A.  I am asserting my rights under the Fifth Amendment
17  to the United States Constitution as well as state law
18  including Article 1, Section 15 of the California
19  Constitution and Article 1, Section 23 of the North Carolina
20  Constitution and therefore I respectfully decline to
21  answer.
22  BY MR. ROBINSON:
23    Q.  Did you attend NAF's annual meeting in 2015?
24        MR. BROOKS: Objection, form, assumes facts not
25  in evidence, lacks foundation and is vague.  Additionally, I

1  object under and instruct the witness not to answer pursuant
2  to the Fifth Amendment to the United States Constitution, as
3  well as state law including Article 1, Section 15 of the
4  California Constitution and Article 1, Section 23 of the
5  North Carolina Constitution.
6    A.  I am asserting my rights under the Fifth Amendment
7  to the United States Constitution as well as state law
8  including Article 1, Section 15 of the California
9  Constitution and Article 1, Section 23 of the North Carolina
10  Constitution and therefore I respectfully decline to
11  answer.
12  BY MR. ROBINSON:
13    Q.  You attended the NAF annual meeting in 2015 under
14  the assumed name Rebecca Wagner, correct?
15        MR. BROOKS: Objection, foundation --
16  objection, form, lacks foundation, assumes facts not in
17  evidence, is vague.  I also object under -- or object
18  pursuant to and instruct the witness not to answer pursuant
19  to the Fifth Amendment to the United States Constitution, as
20  well as state law including Article 1, Section 15 of the
21  California Constitution and Article 1, Section 23 of the
22  North Carolina Constitution.
23    A.  I'm asserting my rights under the Fifth Amendment to
24  the United States Constitution as well as state law including
25  Article 1, Section 15 of the California Constitution and

1  Article 1, Section 23 of the North Carolina Constitution and
2  therefore I respectfully decline to answer.
3  BY MR. ROBINSON:
4        (Plaintiff's Exhibit Number 216
5          marked for identification)
6    Q.  I'm handing you a copy of Plaintiff's Exhibit 216.
7  Do you recognize those three photos?
8        MR. BROOKS: Objection, vague and ambiguous.
9  Also, I object under and instruct the witness not to answer
10  pursuant to the Fifth Amendment to the United States
11  Constitution, as well as state law including Article 1,
12  Section 15 of the California Constitution and Article 1,
13  Section 23 of the North Carolina Constitution.
14        MR. ZIMMERMAN:  Were those also CMP produced
15  documents?
16        MR. ROBINSON: Yes, in the sense they're taken
17  from a CMP video.
18        MR. ZIMMERMAN:  Gotcha.  So these don't have
19  individual Bates numbers, but it's from produced materials?
20        MR. ROBINSON: Correct.
21        MR. MIHET: Did you have a copy for me on that
22  one?
23        MR. ROBINSON: I have this one I can hand to
24  you now you can look at but I want it back.
25  BY MR. ROBINSON:

1    Q.  Looking at that first photo on the first page,
2  that's a picture of you wearing a NAF badge made out to
3  Rebecca Wagner, correct?
4        MR. BROOKS: Objection, form, that's a compound
5  question.  Additionally, I object -- also, this -- we don't
6  have authentication for this document, but furthermore I
7  object under and instruct the witness not to answer pursuant
8  to the Fifth Amendment to the United States Constitution, as
9  well as state law including Article 1, Section 15 of the
10  California Constitution and Article 1, Section 23 of the
11  North Carolina Constitution.
12    A.  I am asserting my rights under the Fifth Amendment
13  to the United States Constitution as well as state law
14  including Article 1, Section 15 of the California
15  Constitution and Article 1, Section 23 of the North Carolina
16  Constitution and therefore I respectfully decline to
17  answer.
18  BY MR. ROBINSON:
19    Q.  Looking at Plaintiff's Exhibit 216, page 1, that's
20  you, right?
21        MR. BROOKS: Objection, form.  We have a lack
22  of authentication, but also, I object under and instruct the
23  witness not to answer pursuant to the Fifth Amendment to the
24  United States Constitution, as well as state law including
25  Article 1, Section 15 of the California Constitution and

1  Article 1, Section 23 of the North Carolina Constitution.

2     A.  I am asserting my rights under the Fifth Amendment

3  to the United States Constitution as well as state law

4  including Article 1, Section 15 of the California

5  Constitution and Article 1, Section 23 of the North Carolina

6  Constitution and therefore I respectfully decline to

7  answer.

8  BY MR. ROBINSON:

9     Q.  In this photograph you have a hidden camera

10  somewhere on your person, correct?

11     MR. BROOKS: Objection, form, assumes facts not

12  in evidence, lacks foundation; and this document, again, has

13  not been authenticated.  Therefore -- additionally, I object

14  under and instruct the witness not to answer pursuant to the

15  Fifth Amendment to the United States Constitution, as well as

16  state law including Article 1, Section 15 of the California

17  Constitution and Article 1, Section 23 of the North Carolina

18  Constitution.

19     A.  I am asserting my rights under the Fifth Amendment

20  to the United States Constitution as well as state law

21  including Article 1, Section 15 of the California

22  Constitution and Article 1, Section 23 of the North Carolina

23  Constitution and therefore I respectfully decline to

24  answer.

25  BY MR. ROBINSON:

1     Q.  Looking at Plaintiff's Exhibit 216, page 2, this

2  depicts you receiving a NAF ID badge under the assumed name

3  Rebecca Wagner, correct?

4     MR. BROOKS: Objection, form, assumes facts not

5  in evidence and lacks foundation.  Again, the document's not

6  been authenticated.  Additionally, I object under and

7  instruct the witness not to answer pursuant to the Fifth

8  Amendment of the United States Constitution, as well as state

9  law including Article 1, Section 15 of the California

10  Constitution and Article 1, Section 23 of the North Carolina

11  Constitution.

12     A.  I am asserting my rights under the Fifth Amendment

13  to the United States Constitution as well as state law

14  including Article 1, Section 15 of the California

15  Constitution and Article 1, Section 23 of the North Carolina

16  Constitution and therefore I respectfully decline to

17  answer.

18  BY MR. ROBINSON:

19     Q.  You had a hidden camera on your person at the time,

20  right?

21     MR. BROOKS: Objection to form, lacks

22  foundation, assumes facts not in evidence; and again, there's

23  a lack of foundation about the document being referenced.

24  Also, I object under and instruct the witness not to answer

25  pursuant to the Fifth Amendment to the United States

1  Constitution as well as state law including Article 1,

2  Section 15 of the California Constitution and Article 1,

3  Section 23 of the North Carolina Constitution.

4     A.  I am asserting my rights under the Fifth Amendment

5  to the United States Constitution as well as state law

6  including Article 1, Section 15 of the California

7  Constitution and Article 1, Section 23 of the North Carolina

8  Constitution and therefore I respectfully decline to

9  answer.

10  BY MR. ROBINSON:

11     Q.  The camera equipment hidden on your person also

12  recorded audio, correct?

13     MR. BROOKS: Objection, form, assumes facts not

14  in evidence, and lacks foundation.  Then, again, there's a

15  lack of foundation as to the document being referenced.  I

16  also object under and instruct the witness not to answer

17  pursuant to the Fifth Amendment to the United States

18  Constitution as well, as state law including Article 1,

19  Section 15 of the California Constitution and Article 1,

20  Section 23 of the North Carolina Constitution.

21     A.  I am asserting my rights under the Fifth Amendment

22  to the United States Constitution as well as state law

23  including Article 1, Section 15 of the California

24  Constitution and Article 1, Section 23 of the North Carolina

25  Constitution and therefore I respectfully decline to

1  answer.

2  BY MR. ROBINSON:

3     Q.  Plaintiff's Exhibit 216, page 3, that's you,

4  right?

5     MR. BROOKS: Objection, form, vague and lacks

6  authentication of this document.  Also, I object pursuant to

7  and instruct the witness not to answer pursuant to the Fifth

8  Amendment to the United States Constitution, as well as state

9  law including Article 1, Section 15 of the California

10  Constitution and Article 1, Section 23 of the North Carolina

11  Constitution.

12     A.  I am asserting my rights under the Fifth Amendment

13  to the United States Constitution as well as state law

14  including Article 1, Section 15 of the California

15  Constitution and Article 1, Section 23 of the North Carolina

16  Constitution and therefore I respectfully decline to

17  answer.

18  BY MR. ROBINSON:

19     Q.  You're wearing a NAF ID badge in the picture made

20  out to assumed name Rebecca Wagner, correct?

21     MR. BROOKS: Objection to form, assumes facts

22  not in evidence, lacks foundation.  Again we lack

23  authentication to this document.  Additionally, I object

24  pursuant to and instruct the witness to not answer pursuant

25  to the Fifth Amendment to the United States Constitution as

1  well as state law including Article 1, Section 15 of the
2  California Constitution and Article 1, Section 23 of the
3  North Carolina Constitution.
4     A.  I am asserting my rights under the Fifth Amendment
5  to the United States Constitution as well as state law
6  including Article 1, Section 15 of the California
7  Constitution and Article 1, Section 23 of the North Carolina
8  Constitution and therefore I respectfully decline to
9  answer.
10  BY MR. ROBINSON:
11     Q.  There's a hidden camera in the water bottle you are
12  holding in the photograph, correct?
13        MR. BROOKS: Objection, form, assumes facts not
14  in evidence, lacks foundation; and again, lack of
15  authentication.  Also, I object under and instruct the
16  witness not to answer pursuant to the Fifth Amendment to the
17  United States Constitution, as well as state law including
18  Article 1, Section 15 of the California Constitution and
19  Article 1, Section 23 of the North Carolina Constitution.
20     A.  I am asserting my rights under the Fifth Amendment
21  to the United States Constitution as well as state law
22  including Article 1, Section 15 of the California
23  Constitution and Article 1, Section 23 of the North Carolina
24  Constitution and therefore I respectfully decline to
25  answer.

1  BY MR. ROBINSON:
2     Q.  Let's take a break.
3        THE VIDEOGRAPHER: Going off record.  The time
4  is 3:43 p.m.. This is the end of DVD Number 3.
5        (RECESS TAKEN)
6        THE VIDEOGRAPHER: We're going back on record.
7  The time is 4:06 p.m..  This is the beginning of DVD Number
8  4.
9        (PAUSE)
10        (Plaintiff's Exhibit Number 217
11           marked for identification)
12     Q.  I'm handing you a copy of Plaintiff's Exhibit 217.
13  Do you recognize Exhibit 217?
14        MR. BROOKS: Objection, form, and lack of
15  authentication, but also I object under and direct the
16  witness not to answer pursuant to the Fifth Amendment to the
17  United States Constitution, as well as state law including
18  Article 1, Section 15 of the California Constitution and
19  Article 1, Section 23 of the North Carolina Constitution.
20     A.  I am asserting my rights under the Fifth Amendment
21  to the United States Constitution as well as state law
22  including Article 1, Section 15 of the California
23  Constitution and Article 1, Section 23 of the North Carolina
24  Constitution and therefore I respectfully decline to
25  answer.

1  BY MR. ROBINSON:
2     Q.  Plaintiff's Exhibit 217 is a NAF annual meeting
3  registration form with certain content filled in.  Did you
4  contribute to any of content filled in this form?
5        MR. BROOKS: Objection, form, assumes facts not
6  in evidence, lacks foundation and lacks authentication.
7  Additionally, I object and instruct the witness not to answer
8  pursuant to the Fifth Amendment to the United States
9  Constitution, as well as State Law, Article 1, section 15 of
10  the California Constitution and Article 1, Section 23 of the
11  North Carolina Constitution.
12     A.  I am asserting my rights under the Fifth Amendment
13  to the United States Constitution as well as state law
14  including Article 1, Section 15 of the California
15  Constitution and Article 1, Section 23 of the North Carolina
16  Constitution and therefore I respectfully decline to
17  answer.
18  BY MR. ROBINSON:
19     Q.  The NAF annual meeting registration form contains
20  credit card information for Bio Max Procurement Services.
21  Who is the owner of that card?
22        MR. BROOKS:  Objection, form, lacks
23  foundation, assumes facts not in evidence, lack of
24  authentication of this document, and also given the preface,
25  this is effectively a compound question.  Additionally, I

1  object and assert -- or object direct the witness not to
2  answer pursuant to the Fifth Amendment to the United States
3  Constitution as well as state law including Article 1,
4  Section 15 of the California Constitution and Article 1,
5  Section 23 of the North Carolina Constitution.
6     A.  I am asserting my rights under the Fifth Amendment
7  to the United States Constitution as well as state law
8  including Article 1, Section 15 of the California
9  Constitution and Article 1, Section 23 of the North Carolina
10  Constitution and therefore I respectfully decline to
11  answer.
12  BY MR. ROBINSON:
13     Q.  Whose signature appears above the line, signature of
14  card holder?
15        MR. BROOKS: Objection to form, lack of
16  foundation, assumes facts not in evidence, and the document
17  has not been authenticated.  Additionally, I object and
18  instruct the witness not to answer pursuant to the Fifth
19  Amendment to the United States Constitution, as well as state
20  law including Article 1, Section 15 of the California
21  Constitution and Article 1, Section 23 of the North Carolina
22  Constitution.
23     A.  I am asserting my rights under the Fifth Amendment
24  to the United States Constitution as well as state law
25  including Article 1, Section 15 of the California

1  Constitution and Article 1, Section 23 of the North Carolina
2  Constitution and therefore I respectfully decline to
3  answer.
4  BY MR. ROBINSON:
5      Q.  Do you recognize any of the handwriting on the NAF
6  Annual Meeting Registration Form?
7          MR. BROOKS:  Objection, form, assumes facts
8  not in evidence, lacks foundation, lacks authentication,
9  document lacks authentication, and calls for speculation from
10  the witness.  Additionally, I object and instruct the witness
11  not to answer pursuant to the Fifth Amendment to the United
12  States Constitution, as well as state law including Article
13  1, Section 15 of the California Constitution and Article 1,
14  Section 23 of the North Carolina Constitution.
15      A.  I am asserting my rights under the Fifth Amendment
16  to the United States Constitution as well as state law
17  including Article 1, Section 15 of the California
18  Constitution and Article 1, Section 23 of the North Carolina
19  Constitution and therefore I respectfully decline to
20  answer.
21  BY MR. ROBINSON:
22      Q.  David Daleiden filled out the information on behalf
23  of Bio Max that went into the NAF Annual Meeting Registration
24  Form, correct?
25          MR. BROOKS: Objection, form, assumes facts not

1  in evidence, lacks foundation, and again this document has
2  not been authenticated; and also I object and instruct the
3  witness not to answer pursuant to the Fifth Amendment to the
4  United States Constitution, as well as state law including
5  Article 1, Section 15 of the California Constitution and
6  Article 1, Section 23 of the North Carolina Constitution.
7          Also, it calls for speculation from the
8  witness and I would move to strike Counsel's characterization
9  of the document, again on the lack of authentication.
10      A.  I am asserting my rights under the Fifth Amendment
11  to the United States Constitution as well as state law
12  including Article 1, Section 15 of the California
13  Constitution and Article 1, Section 23 of the North Carolina
14  Constitution and therefore I respectfully decline to
15  answer.
16  BY MR. ROBINSON:
17      Q.  Page 3 of this document contains -- it's a little
18  hard to read, but it contains the exhibitor agreement
19  attached to the NAF Annual Meeting Registration Form.  Do you
20  see that?
21          MR. BROOKS: Objection, form, lacks foundation,
22  assumes facts not in evidence.  Again, this document has not
23  been authenticated; and additionally, I think, based on the
24  form of this document there was a lot of speculation as to
25  what it is.  So additionally, I object and assert or instruct

1  the witness to not answer pursuant to the Fifth Amendment to
2  the United States Constitution, as well as state law
3  including Article 1, Section 15 of the California
4  Constitution and Article 1, Section 23 of the North Carolina
5  Constitution.
6          Again, move to strike Counsel's
7  characterization of the document.
8      A.  I am asserting my rights under the Fifth Amendment
9  to the United States Constitution as well as state law
10  including Article 1, Section 15 of the California
11  Constitution and Article 1, Section 23 of the North Carolina
12  Constitution and therefore I respectfully decline to
13  answer.
14  BY MR. ROBINSON:
15      Q.  This page sets forth the terms of the Exhibitor
16  Agreement that Bio Max agreed to uphold when it applied to be
17  an Exhibitor at NAF's annual meeting, correct?
18          MR. BROOKS: Objection, form, lacks foundation,
19  assumes facts not in evidence.  The document has not been
20  authenticated, requires speculation from the witness; and
21  again, I object to the -- to the illegibility of the
22  document.  I also object and instruct the witness not to
23  answer pursuant to the Fifth Amendment to the United States
24  Constitution, as well as state law including Article 1,
25  Section 15 of the California Constitution and Article 1,

1  Section 23 of the North Carolina Constitution.
2          Also move to strike the Counsel's
3  characterization of the document.
4      A.  I am asserting my rights under the Fifth Amendment
5  to the United States Constitution as well as state law
6  including Article 1, Section 15 of the California
7  Constitution and Article 1, Section 23 of the North Carolina
8  Constitution and therefore I respectfully decline to
9  answer.
10  BY MR. ROBINSON:
11      Q.  Above the signature line it reads, I agree to comply
12  with Exhibitor rules and regulations 1 through 20.  I also
13  agree to hold in trust and confidence any confidential
14  information received in the course of exhibiting at the NAF
15  annual meeting, and agree not to reproduce or disclose
16  confidential information without express permission from NAF.
17  Violation of this paragraph could result in civil and/or
18  criminal penalties.  Do you see that?
19          MR. BROOKS: Objection to the form of the
20  question, because it contains a preface that lacks
21  foundation, assumes facts not in evidence, and has not been
22  authenticated; and also object to the extent this requires
23  speculation from this witness.  I also object and instruct
24  the witness not to answer pursuant to the Fifth Amendment to
25  the United States Constitution as well as state law including

1   Article 1, Section 15 of the California Constitution and
2   Article 1, Section 23 of the North Carolina Constitution.
3       A.  I am asserting my rights under the Fifth Amendment
4   to the United States Constitution as well as state law
5   including Article 1, Section 15 of the California
6   Constitution and Article 1, Section 23 of the North Carolina
7   Constitution and therefore I respectfully decline to
8   answer.
9           MR. ZIMMERMAN:  Can I just confirm this
10  doesn't have any Bate stamping on?  It's possible it was --
11          MR. ROBINSON:  No, I don't think it does.
12          MR. ZIMMERMAN:  Because I don't know -- I
13  mean, I've personally seen parts of these documents before,
14  but I don't think it has been produced before.
15          MR. KAMRAS:  You can find it as an exhibit at
16  some point.
17          MR. ZIMMERMAN:  It looked sort of familiar but
18  I was, like, I don't --
19          MR. ROBINSON:  We can produce a copy for you.
20          MR. ZIMMERMAN:  I just wanted to identify,
21  like, either that this -- yeah, where this came from, or if
22  it needs Bate stamp and doesn't, that's all.  Sorry.  Go
23  ahead.
24  BY MR. ROBINSON:
25      Q.  You were aware of this confidentiality provision

1   before you infiltrated NAF's annual meeting in 2015,
2   correct?
3           MR. BROOKS:  Objection, form, lacks foundation,
4   assumes facts not in evidence.  Again, this document lacks
5   authentication.  The question is also argumentative and
6   harassing, calls for speculation.  I also object and instruct
7   the witness not to answer pursuant to the Fifth Amendment to
8   the United States Constitution, as well as state law
9   including Article 1, Section 15 of the California
10  Constitution and Article 1, Section 23 of the North Carolina
11  Constitution.
12      A.  I am asserting my rights under the Fifth Amendment
13  to the United States Constitution as well as state law
14  including Article 1, Section 15 of the California
15  Constitution and Article 1, Section 23 of the North Carolina
16  Constitution and therefore I respectfully decline to
17  answer.
18  BY MR. ROBINSON:
19      Q.  You had no intention to honor the confidentiality
20  clause or the NAF Exhibitor Agreement when you infiltrated
21  NAF's annual meeting in 2015, correct?
22          MR. BROOKS:  Objection, form, lacks foundation,
23  assumes facts not in evidence, again references a document
24  that has not been authenticated.  It's also a compound
25  question and calls -- well, compound question.  Additionally,

1   I object and instruct the witness not to answer pursuant to
2   the Fifth Amendment to the United States Constitution, as
3   well as state law including Article 1, Section 15 of the
4   California Constitution and Article 1, Section 23 of the
5   North Carolina Constitution.
6       A.  I am asserting my rights under the Fifth Amendment
7   to the United States Constitution as well as state law
8   including Article 1, Section 15 of the California
9   Constitution and Article 1, Section 23 of the North Carolina
10  Constitution and therefore I respectfully decline to
11  answer.
12  BY MR. ROBINSON:
13      Q.  To the best of your knowledge, none of Bio Max
14  agents who infiltrated NAF's annual meetings intended to
15  honor the confidentiality clause of NAF's Exhibitor Agreement
16  at that time, correct?
17          MR. BROOKS:  Objection, vague, ambiguous, calls
18  for speculation, lacks foundation, asserts facts not in
19  evidence, and asked questions about a document that's not
20  been authenticated.  Additionally, I object under and
21  instruct the witness not to answer pursuant to the Fifth
22  Amendment to the United States Constitution, as well as state
23  law including Article 1, Section 15 of the California
24  Constitution and Article 1, Section 23 of the North Carolina
25  Constitution.

1       A.  I am asserting my rights under the Fifth Amendment
2   to the United States Constitution as well as state law
3   including Article 1, Section 15 of the California
4   Constitution and Article 1, Section 23 of the North Carolina
5   Constitution and therefore I respectfully decline to
6   answer.
7   BY MR. ROBINSON:
8       Q.  Did you sign a nondisclosure agreement with NAF in
9   connection with your infiltration of NAF's annual meeting in
10  2015?
11          MR. BROOKS:  Objection to form, assumes facts
12  not in evidence, lacks foundation, vague and ambiguous as to
13  whether it's referencing the document before us.
14  Additionally, I object under and instruct the witness not to
15  answer pursuant to the Fifth Amendment to the United States
16  Constitution, as well as state law including Article 1,
17  Section 15 of the California Constitution and Article 1,
18  Section 23 of the North Carolina Constitution.
19      A.  I am asserting my rights under the Fifth Amendment
20  to the United States Constitution as well as state law
21  including Article 1, Section 15 of the California
22  Constitution and Article 1, Section 23 of the North Carolina
23  Constitution and therefore I respectfully decline to
24  answer.
25  BY MR. ROBINSON:

1   Q.  Did you sign an agreement with NAF in 2015
2   prohibiting video and audio recording at NAF's annual
3   meeting?
4           MR. BROOKS: Objection, form, lacks foundation,
5   assumes facts not in evidence, and is vague and ambiguous.
6   Additionally, I object and instruct the witness not to answer
7   pursuant to the Fifth Amendment to the United States
8   Constitution, as well as state law including Article 1,
9   Section 15 of the California Constitution and Article 1,
10  Section 23 of the North Carolina Constitution.
11      A.  I am asserting my rights under the Fifth Amendment
12  to the United States Constitution as well as state law
13  including Article 1, Section 15 of the California
14  Constitution and Article 1, Section 23 of the North Carolina
15  Constitution and therefore I respectfully decline to
16  answer.
17  BY MR. ROBINSON:
18      Q.  When you infiltrated NAF's annual meeting in 2015,
19  you had no intention of honoring any nondisclosure agreement
20  prohibiting video and audio recording of those meetings,
21  correct?
22          MR. BROOKS: Objection, form, lacks foundation,
23  assumes facts not in evidence, argumentative and harassing.
24  Additionally, I object pursuant to and instruct the witness
25  to not answer pursuant to the Fifth Amendment to the United

1   States Constitution, as well as state law including Article
2   1, Section 15 of the California Constitution and Article 1,
3   Section 23 of the North Carolina Constitution.
4       A.  I am asserting my rights under the Fifth Amendment
5   to the United States Constitution as well as state law
6   including Article 1, Section 15 of the California
7   Constitution and Article 1, Section 23 of the North Carolina
8   Constitution and therefore I respectfully decline to
9   answer.
10  BY MR. ROBINSON:
11      Q.  You knew that you needed a NAF ID badge in order to
12  access NAF's annual meeting in 2015, correct?
13          MR. BROOKS: Objection, form, lacks foundation,
14  assumes facts not in evidence, and it is argumentative; and
15  additionally, I object under and instruct the witness not to
16  answer pursuant to the Fifth Amendment to the United States
17  Constitution, as well as state law including Article 1,
18  Section 15 of the California Constitution and Article 1,
19  Section 23 of the North Carolina Constitution.
20      A.  I am asserting my rights under the Fifth Amendment
21  to the United States Constitution as well as state law
22  including Article 1, Section 15 of the California
23  Constitution and Article 1, Section 23 of the North Carolina
24  Constitution and therefore I respectfully decline to
25  answer.

1   BY MR. ROBINSON:
2       Q.  You received a NAF identification badge under the
3   assumed name of Rebecca Wagner through fraud and false
4   pretenses, right?
5           MR. BROOKS: Objection to form, assumes facts
6   not in evidence, lacks foundation, is argumentative and
7   harassing.  Additionally, I object under and instruct the
8   witness not to answer pursuant to the Fifth Amendment to the
9   United States Constitution, as well as state law including
10  Article 1, Section 15 of the California Constitution and
11  Article 1, Section 23 of the North Carolina Constitution.
12      A.  I am asserting my rights under the Fifth Amendment
13  to the United States Constitution as well as state law
14  including Article 1, Section 15 of the California
15  Constitution and Article 1, Section 23 of the North Carolina
16  Constitution and therefore I respectfully decline to
17  answer.
18  BY MR. ROBINSON:
19      Q.  You brought hidden video and audio recording
20  equipment with you into NAF's annual meeting in 2015,
21  correct?
22          MR. BROOKS: Objection, form, lack of
23  foundation, assumes facts not in evidence.  Additionally, I
24  object and instruct the witness not to answer pursuant to the
25  Fifth Amendment to the United States Constitution, as well as

1   state law including Article 1, Section 15 of the California
2   Constitution and Article 1, Section 23 of the North Carolina
3   Constitution.
4       A.  I am asserting my rights under the Fifth Amendment
5   to the United States Constitution as well as state law
6   including Article 1, Section 15 of the California
7   Constitution and Article 1, Section 23 of the North Carolina
8   Constitution and therefore I respectfully decline to
9   answer.
10  BY MR. ROBINSON:
11      Q.  Once inside you recorded everything you saw and
12  everyone you talked to indiscriminately, correct?
13          MR. BROOKS: Objection, form, assumes facts not
14  in evidence, lacks foundation, is argumentative; and
15  additionally, I object under and instruct the witness not to
16  answer pursuant to the Fifth Amendment to the United States
17  Constitution as well as state law including Article 1,
18  Section 15 of the California Constitution and Article 1,
19  Section 23 of the North Carolina Constitution.
20      A.  I am asserting my rights under the Fifth Amendment
21  to the United States Constitution as well as state law
22  including Article 1, Section 15 of the California
23  Constitution and Article 1, Section 23 of the North Carolina
24  Constitution and therefore I respectfully decline to
25  answer.

Page 222

1  BY MR. ROBINSON:
2      Q.  You kept your hidden video and audio equipment
3  running all the time during your attendance at the 2015 NAF
4  annual meeting, correct?
5          MR. BROOKS:  Objection, form, lacks
6  foundation, assumes facts not in evidence.  Additionally, I
7  object and instruct the witness not to answer pursuant to the
8  Fifth Amendment to the United States Constitution, as well as
9  state law including Article 1, Section 15 of the California
10  Constitution and Article 1, Section 23 of the North Carolina
11  Constitution.  Also, I think the question is vague and
12  ambiguous.
13      A.  I am asserting my rights under the Fifth Amendment
14  to the United States Constitution as well as state law
15  including Article 1, Section 15 of the California
16  Constitution and Article 1, Section 23 of the North Carolina
17  Constitution and therefore I respectfully decline to
18  answer.
19  BY MR. ROBINSON:
20      Q.  You taped all NAF conference presentations you
21  attended, correct?
22          MR. BROOKS: Objection, form, assumes facts not
23  in evidence, lacks foundation, and is vague and ambiguous.
24  Additionally I object under and instruct the witness under
25  the -- and pursuant to the Fifth Amendment I instruct the

Page 223

1  witness -- strike that.  Let's start that again.  Under the
2  Fifth Amendment to the United States Constitution instruct
3  the witness not to answer and also instruct the witness not
4  to answer pursuant to Article 1, Section 15 of the California
5  Constitution and Article 1, Section 23 of the North Carolina
6  Constitution.
7      A.  I am asserting my rights under the Fifth Amendment
8  to the United States Constitution as well as state law
9  including Article 1, Section 15 of the California
10  Constitution and Article 1, Section 23 of the North Carolina
11  Constitution and therefore I respectfully decline to
12  answer.
13  BY MR. ROBINSON:
14      Q.  You taped your individual conversations with
15  everyone you met at NAF's annual meeting in 2015, correct?
16          MR. BROOKS:  Objection, form, lack of
17  foundation, assumes facts not in evidence, vague and
18  ambiguous.  Additionally, I object under and pursuant to --
19  or instruct the witness not to answer pursuant to the Fifth
20  Amendment to the United States Constitution, as well as state
21  law including Article 1, Section 15 of the California
22  Constitution and Article 1, Section 23 of the North Carolina
23  Constitution.
24      A.  I am asserting my rights under the Fifth Amendment
25  to the United States Constitution as well as state law

Page 224

1  including Article 1, Section 15 of the California
2  Constitution and Article 1, Section 23 of the North Carolina
3  Constitution and therefore I respectfully decline to
4  answer.
5  BY MR. ROBINSON:
6      Q.  You didn't tell any of NAF meeting attendees you
7  surreptitiously recorded that you were filming them and
8  recording them, correct?
9          MR. BROOKS: Objection, form, lacks foundation,
10  assumes facts not in evidence, compound question, and
11  argumentative.  Additionally, I object under and instruct the
12  witness not to answer pursuant to the Fifth Amendment to the
13  United States Constitution, as well as state law including
14  Article 1, Section 15 of the California Constitution and
15  Article 1, Section 23 of the North Carolina Constitution.
16      A.  I am asserting my rights under the Fifth Amendment
17  to the United States Constitution as well as state law
18  including Article 1, Section 15 of the California
19  Constitution and Article 1, Section 23 of the North Carolina
20  Constitution and therefore I respectfully decline to
21  answer.
22  BY MR. ROBINSON:
23      Q.  You were aware at the time that antiwire tapping
24  laws made it illegal to surreptitiously record a conversation
25  with another person without their consent, right?

Page 225

1          MR. BROOKS: Objection, form, lacks foundation,
2  assumes facts not in evidence, calls for a legal conclusion,
3  and is argumentative and harassing.  Additionally I --
4  additionally, I object under and instruct the witness not to
5  answer pursuant to the Fifth Amendment to the United States
6  Constitution, as well as state law including Article 1,
7  Section 15 of the California Constitution and Article 1,
8  Section 23 of the North Carolina Constitution.
9          MR. MIHET: Also object, calls for a legal
10  conclusion, and because it misstates the law.
11          MR. BROOKS:  I join that objection.
12      A.  I am asserting my rights under the Fifth Amendment
13  to the United States Constitution as well as state law
14  including Article 1, Section 15 of the California
15  Constitution and Article 1, Section 23 of the North Carolina
16  Constitution and therefore I respectfully decline to
17  answer.
18  BY MR. ROBINSON:
19      Q.  At the time CMP had lawyers advising them about the
20  legality or illegality of their campaign to gather covert
21  video at NAF's annual meetings, correct?
22          MR. BROOKS: Objection, form, assumes facts not
23  in evidence, lacks foundation, calls for speculation by the
24  witness and is a compound question.  Also, I object under and
25  instruct the witness not to answer pursuant to the Fifth

1  Amendment to the United States Constitution, as well as state
2  law including Article 1, Section 15 of the California
3  Constitution and Article 1, Section 23 of the North Carolina
4  Constitution.
5      A. I am asserting my rights under the Fifth Amendment
6  to the United States Constitution as well as state law
7  including Article 1, Section 15 of the California
8  Constitution and Article 1, Section 23 of the North Carolina
9  Constitution and therefore I respectfully decline to
10  answer.
11  BY MR. ROBINSON:
12      Q. Daleiden provided you with guidance on the kinds of
13  things he wanted you to discuss with NAF meeting attendees at
14  the 2015 NAF conference, correct?
15      MR. BROOKS: Objection, form, assumes facts not
16  in evidence, lacks foundation, is vague. Additionally, I
17  object under and instruct the witness not to answer pursuant
18  to the Fifth Amendment to the United States Constitution, as
19  well as state law including Article 1, Section 15 of the
20  California Constitution and Article 1, Section 23 of the
21  North Carolina Constitution.
22      A. I am asserting my rights under the Fifth Amendment
23  to the United States Constitution as well as state law
24  including Article 1, Section 15 of the California
25  Constitution and Article 1, Section 23 of the North Carolina

1  Constitution and therefore I respectfully decline to
2  answer.
3  BY MR. ROBINSON:
4      Q. Did you take any confidential documents, thumb
5  drives or other physical materials with you that had been
6  provided by NAF under confidence at the 2015 annual
7  meeting?
8      MR. BROOKS: Objection, form, lacks foundation,
9  assumes facts not in evidence, is vague and ambiguous.
10  Additionally, I object under and instruct the witness not to
11  answer pursuant to the Fifth Amendment to the United States
12  Constitution, as well as state law including Article 1,
13  Section 15 of the California Constitution and Article 1,
14  Section 23 of the North Carolina Constitution.
15      A. I am asserting my rights under the Fifth Amendment
16  to the United States Constitution as well as state law
17  including Article 1, Section 15 of the California
18  Constitution and Article 1, Section 23 of the North Carolina
19  Constitution and therefore I respectfully decline to
20  answer.
21  BY MR. ROBINSON:
22      Q. Bio Max agents took thumb drives containing
23  confidential materials provided by NAF at the 2015 annual
24  meeting, correct?
25      MR. BROOKS: Objection, form, vague, ambiguous,

1  lacks foundation, assumes facts not in evidence, calls for
2  speculation. Additionally, I object under and instruct the
3  witness not to answer pursuant to the Fifth Amendment to the
4  United States Constitution as well as state law including
5  Article 1, Section 15 of the California Constitution and
6  Article 1, Section 23 of the North Carolina Constitution.
7      MR. MIHET: I also object because the witness
8  is here in individual capacity not as a corporate
9  representative of Bio Max.
10      MR. BROOKS: I'll join in that objection.
11      A. I am asserting my rights under the Fifth Amendment
12  to the United States Constitution as well as state law
13  including Article 1, Section 15 of the California
14  Constitution and Article 1, Section 23 of the North Carolina
15  Constitution and therefore I respectfully decline to
16  answer.
17  BY MR. ROBINSON:
18      (Plaintiff's Exhibit Number 218
19      marked for identification)
20      Q. Handing you a copy of Plaintiff's Exhibit 218, this
21  is an Email from David Daleiden to Anna Bettisworth sent
22  March 29, 2015, subject, super confidential. Bates number
23  CM04986 through 92. (PAUSE) Is Plaintiff's Exhibit 218 a
24  true and correct copy of Email David Daleiden sent to you on
25  March 29, 2015?

1      MR. BROOKS: Objection, form. The preamble to
2  the question lacked foundation, assumes facts not in
3  evidence, and there's -- does not -- additional -- therefore,
4  I would object on those grounds. Additionally, I object
5  under and instruct the witness not to answer pursuant to the
6  Fifth Amendment to the United States Constitution, as well as
7  state law including Article 1, Section 15 of the California
8  Constitution and Article 1, Section 23 of the North Carolina
9  Constitution.
10      A. I am asserting my rights under the Fifth Amendment
11  to the United States Constitution as well as state law
12  including Article 1, Section 15 of the California
13  Constitution and Article 1, Section 23 of the North Carolina
14  Constitution and therefore I respectfully decline to
15  answer.
16  BY MR. ROBINSON:
17      Q. Do you recognize the attachment to this Email
18  entitled Confidential Road Map For Project Release in June
19  2015?
20      MR. BROOKS: Objection, form, vague.
21  Additionally, I object under and instruct the witness not to
22  answer pursuant to the Fifth Amendment to the United States
23  Constitution, as well as state law including Article 1,
24  Section 15 of the California Constitution and Article 1,
25  Section 23 of the North Carolina Constitution.

## Page 230

1    A.  I am asserting my rights under the Fifth Amendment
2  to the United States Constitution as well as state law
3  including Article 1, Section 15 of the California
4  Constitution and Article 1, Section 23 of the North Carolina
5  Constitution and therefore I respectfully decline to
6  answer.
7  BY MR. ROBINSON:
8    Q.  In the abstract section of this document it states,
9  the Center For Medical Progress has spent nearly 2-1/2 years
10  carrying out a long term investigative research project
11  documenting Planned Parenthood's illegal sale of aborted baby
12  parts.  CMP believes that the undercover video, documentary
13  paper trail and key witness testimony gathered in this
14  project can significantly damage Planned Parenthood's
15  abortion business through multiple legal processes,
16  penalties, intraorganizational turmoil and unwinnable
17  negative branding.  Do you see that?
18    A.  I see the section you're referring to.
19    Q.  Do you agree with that statement?
20      MR. BROOKS: Objection, form, vague, ambiguous.
21  Additionally, I object and instruct the witness not to answer
22  pursuant to the Fifth Amendment to the United States
23  Constitution, as well as state law including Article 1,
24  Section 15 of the California Constitution and Article 1,
25  Section 23 of the North Carolina Constitution.

## Page 231

1    A.  I am asserting my rights under the Fifth Amendment
2  to the United States Constitution as well as state law
3  including Article 1, Section 15 of the California
4  Constitution and Article 1, Section 23 of the North Carolina
5  Constitution and therefore I respectfully decline to
6  answer.
7  BY MR. ROBINSON:
8    Q.  This document relates to the timing of when CMP
9  should release the video that it covertly gathered during its
10  project, correct?
11      MR. BROOKS: Objection, form, mischaracterizes
12  the document which speaks for itself, assumes facts not in
13  evidence, and lacks foundation.  Additionally, this document
14  has not been authenticated.  Additionally, I object and
15  instruct the witness not to answer pursuant to the Fifth
16  Amendment to the United States Constitution, as well as state
17  law including Article 1, Section 15 of the California
18  Constitution and Article 1, Section 23 of the North Carolina
19  Constitution.
20    A.  I am asserting my rights under the Fifth Amendment
21  to the United States Constitution as well as state law
22  including Article 1, Section 15 of the California
23  Constitution and Article 1, Section 23 of the North Carolina
24  Constitution and therefore I respectfully decline to
25  answer.

## Page 232

1  BY MR. ROBINSON:
2    Q.  One of the factors that CMP considered when deciding
3  whether to release the video it had covertly gathered was the
4  timing of the presidential election season, correct?
5      MR. BROOKS: Objection, form, assumes facts not
6  in evidence, lacks foundation, appears to ask a question
7  about a document that's not been authenticated.
8  Additionally, I object under and instruct the witness not to
9  answer pursuant to the Fifth Amendment to the United States
10  Constitution, as well as state law including Article 1,
11  Section 15 of the California Constitution and Article 1,
12  Section 23 of the North Carolina Constitution.
13    A.  I am asserting my rights under the Fifth Amendment
14  to the United States Constitution as well as state law
15  including Article 1, Section 15 of the California
16  Constitution and Article 1, Section 23 of the North Carolina
17  Constitution and therefore I respectfully decline to
18  answer.
19  BY MR. ROBINSON:
20    Q.  On page 4 of 6 of this document, CM04990, there is a
21  reference to focus group sessions to be developed.  I'll read
22  a portion of that document just to orient you as to the page.
23  On page 4 of 6 of the Road Map For Project Release, the
24  document states, "CMP believes these two focus group sessions
25  will be very helpful to develop and then test messaging and

## Page 233

1  would trust Kelly Ann Conway Polling Company, Inc. to do
2  this."  Do you see this?
3    A.  I see the section you just read.
4    Q.  What focus groups are being discussed here?
5      MR. BROOKS: Objection, form, lack of
6  foundation, assumes facts not in evidence.  It calls for
7  speculation by the witness; and again, the document has not
8  been authenticated.  Additionally, I object under and
9  instruct the witness not to answer pursuant to the Fifth
10  Amendment to the United States Constitution, as well as state
11  law including Article 1, Section 15 of the California
12  Constitution and Article 1, Section 23 of the North Carolina
13  Constitution.
14    A.  I am asserting my rights under the Fifth Amendment
15  to the United States Constitution as well as state law
16  including Article 1, Section 15 of the California
17  Constitution and Article 1, Section 23 of the North Carolina
18  Constitution and therefore I respectfully decline to
19  answer.
20  BY MR. ROBINSON:
21    Q.  Did Kelly Ann Conway's Polling Company conduct focus
22  group sessions to advise CMP on the public release of video
23  that CMP gathered?
24      MR. BROOKS: Objection, form, lack of
25  foundation, assumes facts not in evidence, calls for

1  speculation from the witness. Additionally, the question is
2  based on a document that has not been authenticated. I also
3  object under and instruct the witness not to answer pursuant
4  to the Fifth Amendment to the United States Constitution, as
5  well as state law including Article 1, Section 15 of the
6  California Constitution and Article 1, Section 23 of the
7  North Carolina Constitution.
8      A. I am asserting my rights under the Fifth Amendment
9  to the United States Constitution as well as state law
10  including Article 1, Section 15 of the California
11  Constitution and Article 1, Section 23 of the North Carolina
12  Constitution and therefore I respectfully decline to
13  answer.
14  BY MR. ROBINSON:
15     Q. On pages 4 and 5 of this same document there are
16  references to collaborating with Congressional hearings and
17  investigations. Do you see that?
18        MR. BROOKS: Objection, form of that question,
19  which mischaracterizes the document that speaks for itself.
20  And also given the form of that question I will object and
21  instruct the witness not to answer pursuant to the Fifth
22  Amendment to the United States Constitution, as well as state
23  law including Article 1, Section 15 of the California
24  Constitution and Article 1, Section 23 of the North Carolina
25  Constitution, again, because of the form of that question.

1      A. I am asserting my rights under the Fifth Amendment
2  to the United States Constitution as well as state law
3  including Article 1, Section 15 of the California
4  Constitution and Article 1, Section 23 of the North Carolina
5  Constitution and therefore I respectfully decline to
6  answer.
7  BY MR. ROBINSON:
8      Q. Did you collaborate that any Congressional committee
9  or subcommittee in connection with your work for CMP?
10        MR. BROOKS: Objection, form, lack of
11  foundation, assumes facts not in evidence, question based on
12  a document that's not been authenticated. Additionally, I
13  object under and instruct the witness not to answer pursuant
14  to the Fifth Amendment to the United States Constitution, as
15  well as state law including Article 1, Section 15 of the
16  California Constitution and Article 1, Section 23 of the
17  North Carolina Constitution.
18      A. I am asserting my rights under the Fifth Amendment
19  to the United States Constitution as well as state law
20  including Article 1, Section 15 of the California
21  Constitution and Article 1, Section 23 of the North Carolina
22  Constitution and therefore I respectfully decline to
23  answer.
24  BY MR. ROBINSON:
25     Q. Do you know of a person named Charles Johnson of

1  Gotnews.Com?
2        MR. BROOKS: Objection, form. Additionally, I
3  object under and instruct the witness not to answer pursuant
4  to the Fifth Amendment to the United States Constitution, as
5  well as state law including Article 1, Section 15 of the
6  California Constitution and Article 1, Section 23 of the
7  North Carolina Constitution.
8      A. I am asserting my rights under the Fifth Amendment
9  to the United States Constitution as well as state law
10  including Article 1, Section 15 of the California
11  Constitution and Article 1, Section 23 of the North Carolina
12  Constitution and therefore I respectfully decline to
13  answer.
14  BY MR. ROBINSON:
15     Q. Did you participate in any scheme or plan for the
16  Congressional subcommittee to leak video of NAF's annual
17  meetings to Charles Johnson of Gotnews.Com?
18        MR. BROOKS: Objection, form, lacks foundation,
19  also argumentative and compound. Additionally, I object
20  under and instruct the witness not to answer pursuant to the
21  Fifth Amendment to the United States Constitution, as well as
22  state law including Article 1, Section 15 of the California
23  Constitution and Article 1, Section 23 of the North Carolina
24  Constitution.
25      A. I am asserting my rights under the Fifth Amendment

1  to the United States Constitution as well as state law
2  including Article 1, Section 15 of the California
3  Constitution and Article 1, Section 23 of the North Carolina
4  Constitution and therefore I respectfully decline to
5  answer.
6        (Plaintiff's Exhibit Number 219
7         marked for identification)
8  BY MR. ROBINSON:
9      Q. Handing you a copy of Plaintiff's Exhibit 219, this
10  is an Email from David Daleiden dated July 12, 2015, Bates
11  number CM038356 through 74. Do you recognize Plaintiff's
12  Exhibit 219?
13        MR. BROOKS: Objection, form. Given Counsel's
14  preamble it assumes facts not in evidence, and lacks
15  foundation, and that description also lacks authentication.
16  Additionally, I would instruct the witness not to answer
17  based on -- or instruct the witness not to answer pursuant to
18  the Fifth Amendment to the United States Constitution, as
19  well as state law including Article 1, Section 15 of the
20  California Constitution and Article 1, Section 23 of the
21  North Carolina Constitution.
22      A. I am asserting my rights under the Fifth Amendment
23  to the United States Constitution as well as state law
24  including Article 1, Section 15 of the California
25  Constitution and Article 1, Section 23 of the North Carolina

## Page 238

1 Constitution and therefore I respectfully decline to
2 answer.
3 BY MR. ROBINSON:
4    Q. This is a true and correct copy of an Email sent by
5 David Daleiden to numerous individuals including yourself
6 dated the day before CMP went public with its video campaign,
7 correct?
8        MR. BROOKS: Objection to form, assumes facts
9 not in evidence, and lacks foundation. Additionally, I
10 object under and instruct the witness not to answer pursuant
11 to the Fifth Amendment to the United States Constitution, as
12 well as state law including Article 1, Section 15 of the
13 California Constitution and Article 1, Section 23 of the
14 North Carolina Constitution. Also calls for speculation by
15 the witness.
16    A. I am asserting my rights under the Fifth Amendment
17 to the United States Constitution as well as state law
18 including Article 1, Section 15 of the California
19 Constitution and Article 1, Section 23 of the North Carolina
20 Constitution and therefore I respectfully decline to
21 answer.
22 BY MR. ROBINSON:
23    Q. Do you see name Anna Davin in the to line of this
24 Email?
25        MR. BROOKS: Objection, assumes facts not in

## Page 239

1 evidence -- objection, form, assumes facts not in evidence
2 and lacks foundation. Additionally, this document has not
3 been authenticated. I will also object under and instruct
4 the witness not to answer pursuant to the Fifth Amendment of
5 the United States Constitution, as well as state law
6 including Article 1, Section 15 of the California
7 Constitution and Article 1, Section 23 of the North Carolina
8 Constitution.
9    A. I am asserting my rights under the Fifth Amendment
10 to the United States Constitution as well as state law
11 including Article 1, Section 15 of the California
12 Constitution and Article 1, Section 23 of the North Carolina
13 Constitution and therefore I respectfully decline to
14 answer.
15 BY MR. ROBINSON:
16    Q. Anna Davin, that was you, correct?
17        MR. BROOKS: Objection, form, and vague,
18 ambiguous. Additionally, I object and instruct the witness
19 not to answer pursuant to the Fifth Amendment to the United
20 States Constitution, as well as state law including Article
21 1, Section 15 of the California Constitution and Article 1,
22 Section 23 of the North Carolina Constitution, given the form
23 and ambiguity of the question.
24    A. I am asserting my rights under the Fifth Amendment
25 to the United States Constitution as well as state law

## Page 240

1 including Article 1, Section 15 of the California
2 Constitution and Article 1, Section 23 of the North Carolina
3 Constitution and therefore I respectfully decline to
4 answer.
5 BY MR. ROBINSON:
6    Q. Others on the to line include Troy Newman and Cheryl
7 Sullenger, correct?
8        MR. BROOKS: Objection, form, assumes facts not
9 in evidence, lacks foundation. Again, this document has not
10 been authenticated by the witness. Additionally, I object
11 and instruct the witness not to answer pursuant to the Fifth
12 Amendment to the United States Constitution, as well as state
13 law including Article 1, Section 15 of the California
14 Constitution and Article 1, Section 23 of the North Carolina
15 Constitution.
16    A. I am asserting my rights under the Fifth Amendment
17 to the United States Constitution as well as state law
18 including Article 1, Section 15 of the California
19 Constitution and Article 1, Section 23 of the North Carolina
20 Constitution and therefore I respectfully decline to
21 answer.
22 BY MR. ROBINSON:
23    Q. The attachment to this Email contains messaging
24 guidelines for those on this Email list to follow following
25 CMP's release of the video it had taken during its project,

## Page 241

1 correct?
2        MR. BROOKS: Objection, form, assumes facts not
3 in evidence, lacks foundation, lacks authentication.
4 Additionally, I object under and instruct the witness not to
5 answer pursuant to the Fifth Amendment to the United States
6 Constitution, as well as state law including Article 1,
7 Section 15 of the California Constitution and Article 1,
8 Section 23 of the North Carolina Constitution. Additionally,
9 I'll object to mischaracterizing the document, which I think
10 speaks for itself.
11    A. I am asserting my rights under the Fifth Amendment
12 to the United States Constitution as well as state law
13 including Article 1, Section 15 of the California
14 Constitution and Article 1, Section 23 of the North Carolina
15 Constitution and therefore I respectfully decline to
16 answer.
17 BY MR. ROBINSON:
18        (Plaintiff's Exhibit Number 220
19            marked for identification)
20    Q. I'm handing you a copy of Plaintiff's Exhibit 220.
21 This is a document with Bates label CM03161. This is a true
22 and correct copy of a business card that you handed out at
23 NAF's annual meeting in 2015 purported to be Rebecca Wagner
24 as Contracts Administrator for Bio Max, correct?
25        MR. BROOKS: Objection, form, assumes facts not

Page 242

1 in evidence, lacks -- assumes facts not in evidence, lacks
2 foundation. Additionally is a compound question.
3 Furthermore, I object under and instruct the witness not to
4 answer pursuant to the Fifth Amendment to the United States
5 Constitution, as well as state law including Article 1,
6 Section 15 of the California Constitution and Article 1,
7 Section 23 of the North Carolina Constitution.
8      A. I am asserting my rights under the Fifth Amendment
9 to the United States Constitution as well as state law
10 including Article 1, Section 15 of the California
11 Constitution and Article 1, Section 23 of the North Carolina
12 Constitution and therefore I respectfully decline to answer.
13 Is everyone still comfortable with the air on?
14 BY MR. ROBINSON:
15      Q. CMP went public with its video campaign on July 14,
16 2014 -- sorry, 2015, correct?
17      MR. BROOKS: Objection, form, assumes facts not
18 in evidence and lacks foundation. Additionally, I object
19 under and instruct the witness not to answer pursuant to the
20 Fifth Amendment to the United States Constitution, as well as
21 state law including Article 1, Section 15 of the California
22 Constitution and Article 1, Section 23 of the North Carolina
23 Constitution.
24      A. I am asserting my rights under the Fifth Amendment
25 to the United States Constitution as well as state law

Page 243

1 including Article 1, Section 15 of the California
2 Constitution and Article 1, Section 23 of the North Carolina
3 Constitution and therefore I respectfully decline to
4 answer.
5 BY MR. ROBINSON:
6      Q. Did you know that the viral undercover video
7 published by CMP on and after July 14, 2015 would result in
8 harassment and hate speech and death threats to the Planned
9 Parenthood officials and NAF meeting attendees depicted in
10 those videos?
11      MR. BROOKS: Objection, form, lack of
12 foundation, lack of -- lack of foundation, assumes facts not
13 in evidence, is a compound question, is argumentative and
14 harassing, as well as vague and ambiguous. Additionally, I
15 object under and instruct the witness not to answer pursuant
16 to the Fifth Amendment to the United States Constitution, as
17 well as state law including Article 1, Section 15 of the
18 California Constitution and Article 1, Section 23 of the
19 North Carolina Constitution. Also, the questions calls for
20 speculation.
21      A. I am asserting my rights under the Fifth Amendment
22 to the United States Constitution as well as state law
23 including Article 1, Section 15 of the California
24 Constitution and Article 1, Section 23 of the North Carolina
25 Constitution and therefore I respectfully decline to

Page 244

1 answer.
2 BY MR. ROBINSON:
3      Q. One of the videos that CMP released targeted a
4 doctor named Dr. Gindi at a Colorado Springs Planned
5 Parenthood Clinic, correct?
6      MR. BROOKS: Objection, form, assumes facts not
7 in evidence, lacks foundation, refers to a video that has not
8 been presented, and the question is vague and ambiguous as a
9 result. Additionally, I -- the question is argumentative.
10 Additionally, I object under and instruct the witness not to
11 answer pursuant to the Fifth Amendment of the United States
12 Constitution, as well as state law including Article 1,
13 Section 15 of the California Constitution and Article 1,
14 Section 23 of the North Carolina Constitution.
15      A. I am asserting my rights under the Fifth Amendment
16 to the United States Constitution as well as state law
17 including Article 1, Section 15 of the California
18 Constitution and Article 1, Section 23 of the North Carolina
19 Constitution and therefore I respectfully decline to
20 answer.
21 BY MR. ROBINSON:
22      Q. After CMP's release the viral undercover video Dr.
23 Gindi -- Dr. Gindi experienced an increase in harassment,
24 especially at her home, correct?
25      MR. BROOKS: Objection, form, lacks foundation,

Page 245

1 assumes facts not in evidence, is argumentative and
2 harassing. Additionally calls for speculation from the
3 witness. I also object under and direct the witness not to
4 answer pursuant to the Fifth Amendment to the United States
5 Constitution, as well as state law including Article 1,
6 Section 15 of the California Constitution and Article 1,
7 Section 23 of the North Carolina Constitution.
8      A. I am asserting my rights under the Fifth Amendment
9 to the United States Constitution as well as state law
10 including Article 1, Section 15 of the California
11 Constitution and Article 1, Section 23 of the North Carolina
12 Constitution and therefore I respectfully decline to
13 answer.
14 BY MR. ROBINSON:
15      Q. A few months after CMP released its undercover video
16 of Dr. Gindi, a person by the name of Robert Deer committed a
17 mass shooting at a clinic location resulting in the deaths of
18 three civilians, correct?
19      MR. BROOKS: Objection, form, assumes facts not
20 in evidence, lacks foundation. Going to object also on
21 relevance, harassment and argumentative. Furthermore, I
22 object under and instruct the witness not to answer pursuant
23 to the Fifth Amendment of the United States Constitution, as
24 well as state law including Article 1, Section 15 of the
25 California Constitution and Article 1, Section 23 of the

Page 246

1  North Carolina Constitution.  I'd also note the question
2  requires the witness to speculate.
3      A.  I am asserting my rights under the Fifth Amendment
4  to the United States Constitution as well as state law
5  including Article 1, Section 15 of the California
6  Constitution and Article 1, Section 23 of the North Carolina
7  Constitution and therefore I respectfully decline to
8  answer.
9  BY MR. ROBINSON:
10     Q.  Were you aware that the police reported that Robert
11 Deer uttered the words, no more baby parts after they had
12 taken him into custody following the Colorado Springs
13 shooting?
14         MR. BROOKS: Objection, form, lacks foundation,
15 assumes facts not in evidence, is harassing and argumentative
16 and irrelevant.  Additionally, calls for the witness to
17 speculate.  I also object under and direct the witness not to
18 answer pursuant to the Fifth Amendment to the United States
19 Constitution as well as state law including Article 1,
20 Section 15 of the California Constitution and Article 1,
21 Section 23 of the North Carolina Constitution.
22     A.  I am asserting my rights under the Fifth Amendment
23 to the United States Constitution as well as state law
24 including Article 1, Section 15 of the California
25 Constitution and Article 1, Section 23 of the North Carolina

Page 247

1  Constitution and therefore I respectfully decline to
2  answer.
3  BY MR. ROBINSON:
4      Q.  Were you aware that Operation Rescue had published
5  the address of Dr. Gindi's Planned Parenthood Clinic on its
6  website, abortiondocs.org, before the Colorado Springs
7  shooting occurred?
8          MR. BROOKS: Objection, form, lacks foundation,
9  assumes facts not in evidence.  It's also vague and
10 ambiguous.  Additionally, I object because it is harassing
11 and irrelevant.  I also object under and instruct the witness
12 not to answer pursuant to the Fifth Amendment to the United
13 States Constitution, as well as state law including Article
14 1, Section 15 of the California Constitution and Article 1,
15 Section 23 of the North Carolina Constitution.
16     A.  I am asserting my rights under the Fifth Amendment
17 to the United States Constitution as well as state law
18 including Article 1, Section 15 of the California
19 Constitution and Article 1, Section 23 of the North Carolina
20 Constitution and therefore I respectfully decline to
21 answer.
22 BY MR. ROBINSON:
23     Q.  Did you personally intend for the subjects of CMP's
24 viral video campaign to be victimized by violence?
25         MR. BROOKS:  Objection, form, lacks

Page 248

1  foundation, assumes facts not in evidence, is argumentative
2  and harassing.  Additionally, I object under and instruct the
3  witness not to answer pursuant to the Fifth Amendment to the
4  United States Constitution, as well as state law including
5  Article 1, Section 15 of the California Constitution and
6  Article 1, Section 23 of the North Carolina Constitution.
7      A.  I am asserting my rights under the Fifth Amendment
8  to the United States Constitution as well as state law
9  including Article 1, Section 15 of the California
10 Constitution and Article 1, Section 23 of the North Carolina
11 Constitution and therefore I respectfully decline to
12 answer.
13 BY MR. ROBINSON:
14     Q.  At the time of CMP's release of its viral undercover
15 video, did you think it was likely that the subjects of CMP's
16 video would be victimized by violence?
17         MR. BROOKS: Objection, form, lacks foundation,
18 assumes facts not in evidence, calls for speculation by the
19 witness.  It is vague and ambiguous.  Additionally, I object
20 under and instruct the witness not to answer pursuant to the
21 Fifth Amendment to the United States Constitution, as well as
22 state law including Article 1, Section 15 of the California
23 Constitution and Article 1, Section 23 of the North Carolina
24 Constitution.
25     A.  I am asserting my rights under the Fifth Amendment

Page 249

1  to the United States Constitution as well as state law
2  including Article 1, Section 15 of the California
3  Constitution and Article 1, Section 23 of the North Carolina
4  Constitution and therefore I respectfully decline to
5  answer.
6  BY MR. ROBINSON:
7      Q.  Do you feel any remorse or responsibility for the
8  deaths of the three people killed at that Colorado Springs
9  shooting outside Dr. Gindi's clinic?
10         MR. BROOKS: Objection, form, lack of
11 foundation, lack -- assumes facts not in evidence, is
12 argumentative and harassing and irrelevant.  Additionally, I
13 object under and instruct the witness not to answer pursuant
14 to the Fifth Amendment to the United States Constitution, as
15 well as state law including Article 1, Section 15 of the
16 California Constitution and Article 1, Section 23 of the
17 North Carolina Constitution.
18         MR. MIHET:  Objection, move to strike.  Move
19 for sanction.  Counsel has no reasonable basis for the claims
20 he is making in light of testimony in the Colorado litigation
21 under oath that the event that took place there were the acts
22 -- the random acts of a deranged person not foreseeable to
23 anyone else.
24         MR. BROOKS:  I join in the motion to strike
25 made by Mr. Mihet.

Page 250

1       A.  I am asserting my rights under the Fifth Amendment
2  to the United States Constitution as well as state law
3  including Article 1, Section 15 of the California
4  Constitution and Article 1, Section 23 of the North Carolina
5  Constitution and therefore I respectfully decline to
6  answer.
7  BY MR. ROBINSON:
8       Q.  Do you currently have access to any of the NAF video
9  recordings taken at NAF's annual meetings?
10          MR. BROOKS: Objection, form, vague, ambiguous,
11  assumes facts not in evidence, lacks foundation, and refers
12  to videos that are not -- have not been presented here.
13  Additionally, I object under and direct the witness not to
14  answer pursuant to the Fifth Amendment to the United States
15  Constitution, as well as state law including Article 1,
16  Section 15 of the California Constitution and Article 1,
17  Section 23 of the North Carolina Constitution.
18      A.  I am asserting my rights under the Fifth Amendment
19  to the United States Constitution as well as state law
20  including Article 1, Section 15 of the California
21  Constitution and Article 1, Section 23 of the North Carolina
22  Constitution and therefore I respectfully decline to
23  answer.
24  BY MR. ROBINSON:
25      Q.  Are you still engaged in undercover sting operations

Page 251

1  involving Planned Parenthood clinics or events?
2          MR. BROOKS: Objection, form, assumes facts not
3  in evidence, lacks foundation.  It's also argumentative and
4  harassing.  Additionally, I object under and instruct the
5  witness not to answer pursuant to the Fifth Amendment to the
6  United States Constitution, as well as state law including
7  Article 1, Section 15 of the California Constitution and
8  Article 1, Section 23 of the North Carolina Constitution.
9          And if I didn't say it before, I also object on the
10  grounds the question is vague and ambiguous.
11      A.  I am asserting my rights under the Fifth Amendment
12  to the United States Constitution as well as state law
13  including Article 1, Section 15 of the California
14  Constitution and Article 1, Section 23 of the North Carolina
15  Constitution and therefore I respectfully decline to
16  answer.
17  BY MR. ROBINSON:
18      Q.  Are you still engaged in any undercover sting
19  operations involving NAF annual meetings?
20          MR. BROOKS: Objection, form, assumes facts not
21  in evidence, lacks foundation, is also vague.  Additionally,
22  I object under and instruct the witness not to answer
23  pursuant to the Fifth Amendment to the United States
24  Constitution as well as state law including Article 1,
25  Section 15 of the California Constitution and Article 1,

Page 252

1  Section 23 of the North Carolina Constitution.
2      A.  I am asserting my rights under the Fifth Amendment
3  to the United States Constitution as well as state law
4  including Article 1, Section 15 of the California
5  Constitution and Article 1, Section 23 of the North Carolina
6  Constitution and therefore I respectfully decline to
7  answer.
8  BY MR. ROBINSON:
9      Q.  Are you currently planning to infiltrate NAF in the
10  future?
11          MR. BROOKS: Objection, form, lacks foundation,
12  assumes facts not in evidence.  Additionally, I object
13  pursuant to and instruct the witness pursuant to not answer
14  the Fifth Amendment to the United States Constitution, as
15  well as state law including Article 1, Section 15 of the
16  California Constitution and Article 1, Section 23 of the
17  North Carolina Constitution.  I also object that the question
18  is argumentative.
19      A.  I am asserting my rights under the Fifth Amendment
20  to the United States Constitution as well as state law
21  including Article 1, Section 15 of the California
22  Constitution and Article 1, Section 23 of the North Carolina
23  Constitution and therefore I respectfully decline to
24  answer.
25  BY MR. ROBINSON:

Page 253

1      Q.  Let's take a short break.
2          THE VIDEOGRAPHER: Going off record.  The time
3  is 5:13 p.m..
4          (RECESS TAKEN)
5          THE VIDEOGRAPHER: We are going back on record.
6  The time is 5:25 p.m..  This is the beginning of DVD Number
7  5.
8          MR. KAMRAS: Mr. Robinson, you want to state
9  whether you're finished questioning?
10          MR. ROBINSON: Yes, I pass the witness.  Thank
11  you.
12          DIRECT EXAMINATION
13  BY MR. KAMRAS:
14      Q.  Good afternoon.  Just a reminder, I'm Jeremy Kamras.
15  I represent Planned Parenthood Federation of America and
16  certain of its affiliates --
17      A.  Yes, sir.
18      Q.  -- in this matter.  When was your wedding?
19          MR. BROOKS: I'm going to object to the
20  relevance of that, but you can answer.
21      A.  I am asserting my rights under the Fifth Amendment
22  to the United States Constitution as well as state law
23  including Article 1, Section 15 of the California
24  Constitution and Article 1, Section 23 of the North Carolina
25  Constitution and therefore I respectfully decline to

1  answer.
2  BY MR. KAMRAS:
3      Q.  Your wedding was in May of 2015, correct?
4          MR. BROOKS: I'm going to object to relevance
5  and I think this is harassing.
6      A.  I am asserting my rights under the Fifth Amendment
7  to the United States Constitution as well as state law
8  including Article 1, Section 15 of the California
9  Constitution and Article 1, Section 23 of the North Carolina
10 Constitution and therefore I respectfully decline to
11 answer.
12 BY MR. KAMRAS:
13     Q.  Are you aware that Kate Ryan is testifying, also,
14 today in this matter?
15         MR. BROOKS: Objection, lack of foundation,
16 assumes facts not in evidence, and relevance, harassing, and
17 I will instruct the witness to not answer under the Fifth
18 Amendment of the United States Constitution, as well as state
19 law including Article 1, Section 15 of the California
20 Constitution and Article 1, Section 23 of the North Carolina
21 Constitution.
22         MR. KAMRAS:  What's your basis for the
23 objection?
24         MR. BROOKS: I just stated the basis for the
25 basis of my objection, sir.

1          MR. KAMRAS:  As to the knowledge whether
2  someone else is testifying?
3          MR. BROOKS: Yes, sir.  I just stated the basis
4  for my objection.
5      A.  I am asserting my rights under the Fifth Amendment
6  to the United States Constitution as well as state law
7  including Article 1, Section 15 of the California
8  Constitution and Article 1, Section 23 of the North Carolina
9  Constitution and therefore I respectfully decline to
10 answer.
11 BY MR. KAMRAS:
12     Q.  I'll represent to you that Ms. Ryan testified that
13 Mr. Daleiden was at your wedding.  Is that correct?
14         MR. BROOKS: Objection, lack of foundation,
15 assumes facts not in evidence.  Counsel is testifying.  And I
16 also object on relevance and this is harassment and
17 argumentative.  Additionally, I direct the witness not to
18 answer pursuant to the Fifth Amendment to the United States
19 Constitution, as well as state law including Article 1,
20 Section 15 of the California Constitution and Article 1,
21 Section 23 of the North Carolina Constitution.
22     A.  I am asserting my rights under the Fifth Amendment
23 to the United States Constitution as well as state law
24 including Article 1, Section 15 of the California
25 Constitution and Article 1, Section 23 of the North Carolina

1  Constitution and therefore I respectfully decline not to
2  answer.
3  BY MR. KAMRAS:
4      Q.  Your husband's last name is Davin, correct?
5          MR. BROOKS: I'm going to object to that as
6  irrelevant and harassing of the witness, completely
7  irrelevant to this case.  You can answer if you'd like.
8      A.  I am asserting my rights under the Fifth Amendment
9  to the United States Constitution as well as state law
10 including Article 1, Section 15 of the California
11 Constitution and Article 1, Section 23 of the North Carolina
12 Constitution and therefore I respectfully decline to
13 answer.
14 BY MR. KAMRAS:
15     Q.  It was around the time of your wedding in May of
16 2015 when you took the last name Davin, correct?
17         MR. BROOKS: Objection, assumes facts not in
18 evidence, lacks foundation.  Again, I think that this is
19 harassing of the witness to bring in her husband, and I
20 object on that basis.
21         MR. KAMRAS: Counsel, you haven't let the
22 witness testify as to her maiden name, which is all over the
23 documents, so there's nothing at all harassing about any of
24 this and you know it.
25         MR. BROOKS: Sir, I have made my objection.

1  I'm not going to engage with you in an argument on the
2  record, and I also move to strike Counsel's comments.
3      A.  I am asserting my rights under the Fifth Amendment
4  to the United States Constitution as well as state law
5  including Article 1, Section 15 of the California
6  Constitution and Article 1, Section 23 of the North Carolina
7  Constitution and therefore I respectfully decline to
8  answer.
9  BY MR. KAMRAS:
10     Q.  Let's leave Mr. Daleiden out of this for a moment,
11 and CMP as well.  Let me ask you, you, in your past, have
12 been a member of certain pro-life organizations, is that
13 correct?
14         MR. BROOKS: I'm going to object to form and
15 also I instruct the witness not to answer under the Fifth
16 Amendment to the United States Constitution, as well as state
17 law including Article 1, Section 15 of the California
18 Constitution and Article 1, Section 23 of the North Carolina
19 Constitution.
20     A.  I am asserting my rights under the Fifth Amendment
21 to the United States Constitution as well as state law
22 including Article 1, Section 15 of the California
23 Constitution and Article 1, Section 23 of the North Carolina
24 Constitution and therefore I respectfully decline to
25 answer.

1  BY MR. KAMRAS:
2      Q.  You were a member of Gabriel's Project, correct?
3          MR. BROOKS: Objection, form, assumes facts not
4  in evidence, lacks foundation.  Additionally, I object under
5  and direct the witness not to answer pursuant to the Fifth
6  Amendment to the United States Constitution, as well as state
7  law including Article 1, Section 15 of the California
8  Constitution and Article 1, Section 23 of the North Carolina
9  Constitution.
10     A.  I am asserting my rights under the Fifth Amendment
11 to the United States Constitution as well as state law
12 including Article 1, Section 15 of the California
13 Constitution and Article 1, Section 23 of the North Carolina
14 Constitution and therefore I respectfully decline to
15 answer.
16 BY MR. KAMRAS:
17     Q.  Gabriel's Project is an organization that was
18 dedicated towards helping women who were pregnant so as to
19 avoid abortion, correct?
20         MR. BROOKS: I'm going to object to lack of
21 foundation -- form, lack of foundation, assumes facts not in
22 evidence.  I'm also going to direct the witness not to answer
23 under the Fifth Amendment to the United States Constitution,
24 as well as state law including Article 1, Section 15 of the
25 California Constitution and Article 1, Section 23 of the

1  North Carolina Constitution.
2      A.  I am asserting my rights under the Fifth Amendment
3  to the United States Constitution as well as state law
4  including Article 1, Section 15 of the California
5  Constitution and Article 1, Section 23 of the North Carolina
6  Constitution and therefore I respectfully decline to
7  answer.
8  BY MR. KAMRAS:
9      Q.  You understand that abortion is legal in the United
10 States?
11         MR. BROOKS: Objection, form, calls for a legal
12 conclusion, states law incorrectly.  Also assume facts not in
13 evidence, lacks foundation, and also is argumentative and
14 harassing.  Additionally, I instruct the witness not to
15 answer pursuant to the Fifth Amendment to the United States
16 Constitution as well as state law including Article 1,
17 Section 15 of the California Constitution and Article 1,
18 Section 23 of the North Carolina Constitution.
19 BY MR. KAMRAS:
20     Q.  What are your views of providers who perform
21 abortions?
22         MR. BROOKS: Objection --
23     Q.  Did you want me to answer your question?
24 BY MR. KAMRAS:
25     Q.  If you're going to answer, I'd love an answer.

1      A.  I am asserting my rights under the Fifth Amendment
2  to the United States Constitution as well as state law
3  including Article 1, Section 15 of the California
4  Constitution and Article 1, Section 23 of the North Carolina
5  Constitution and therefore I respectfully decline to
6  answer.
7  BY MR. KAMRAS:
8      Q.  So now I will restate my question which was that I
9  asked before you had stated your answer, what are your views
10 of people who perform abortion?
11         MR. BROOKS: Objection, form, and that it lacks
12 foundation and it's irrelevant.  Additionally, I object under
13 and direct the witness not to answer pursuant to the Fifth
14 Amendment to the United States Constitution, as well as state
15 law including Article 1, Section 15 of the California
16 Constitution and Article 1, Section 23 of the North Carolina
17 Constitution; and if I didn't say it before, the question is
18 harassing.
19     A.  I am asserting my rights under the Fifth Amendment
20 to the United States Constitution as well as state law
21 including Article 1, Section 15 of the California
22 Constitution and Article 1, Section 23 of the North Carolina
23 Constitution and therefore I respectfully decline to
24 answer.
25 BY MR. KAMRAS:

1      Q.  You've devoted much of your life to the cause of
2  ending abortion, isn't that correct?
3          MR. BROOKS: Objection, vague, ambiguous --
4  form objection, vague, ambiguous, lacks foundation, assumes
5  facts not in evidence.  Additionally, I direct the witness
6  not to answer the Fifth Amendment to the United States
7  Constitution, as well as state law including Article 1,
8  Section 15 of the California Constitution and Article 1,
9  Section 23 of the North Carolina Constitution.
10     A.  I am asserting my rights under the Fifth Amendment
11 to the United States Constitution as well as state law
12 including Article 1, Section 15 of the California
13 Constitution and Article 1, Section 23 of the North Carolina
14 Constitution and therefore I respectfully decline to
15 answer.
16 BY MR. KAMRAS:
17     Q.  You have devoted much of your life to the cause of
18 ending abortion regardless of gestational age, the
19 circumstances of pregnancy, or the circumstances of the
20 mother, isn't that correct?
21         MR. BROOKS: Objection, form, lacks foundation,
22 lacks -- or lacks foundation, assumes facts not in evidence.
23 Additionally, this line -- this question has been asked and
24 answered effectively, and I also instruct the witness not to
25 answer pursuant to the Fifth Amendment to the United States

1  Constitution as well as state law including Article 1,
2  Section 15 of the California Constitution and Article 1,
3  Section 23 of the North Carolina Constitution.
4          MR. MIHET:  The question is also compound.
5          MR. BROOKS:  Yes, I join that objection.
6      A.  I am asserting my rights under the Fifth Amendment
7  to the United States Constitution as well as state law
8  including Article 1, Section 15 of the California
9  Constitution and Article 1, Section 23 of the North Carolina
10  Constitution and therefore I respectfully decline to
11  answer.
12  BY MR. KAMRAS:
13      Q.  You were a member of Survivors of Abortion
14  Holocaust, correct?
15          MR. BROOKS:  I'm going to object to that
16  question as to form because it lacks foundation and assumes
17  facts.  I'm also going instruct the witness not to answer
18  pursuant to the Fifth Amendment of the United States
19  Constitution, as well as state law including Article 1,
20  Section 15 of the California Constitution and Article 1,
21  Section 23 of the North Carolina Constitution.
22      A.  I am asserting my rights under the Fifth Amendment
23  to the United States Constitution as well as state law
24  including Article 1, Section 15 of the California
25  Constitution and Article 1, Section 23 of the North Carolina

1  Constitution and therefore I respectfully decline to
2  answer.
3  BY MR. KAMRAS:
4      Q.  In fact, you are a participant in training for the
5  abortion -- excuse me, for Survivors of The Abortion
6  Holocaust, correct?
7          MR. BROOKS:  I'm going to object on form
8  grounds that this question lacks foundation, assumes facts
9  not in evidence, and has effectively been asked and answered
10  by the prior question.  Additionally, I direct the witness
11  not to answer pursuant to the Fifth Amendment to the United
12  States Constitution, as well as state law including Article
13  1, Section 15 of the California Constitution and Article 1,
14  Section 23 of the North Carolina Constitution.
15          MR. MIHET:  The question is also vague and
16  ambiguous.
17          MR. BROOKS:  I join in that objection.
18      A.  I am asserting my rights under the Fifth Amendment
19  to the United States Constitution as well as state law
20  including Article 1, Section 15 of the California
21  Constitution and Article 1, Section 23 of the North Carolina
22  Constitution and therefore I respectfully decline to
23  answer.
24  BY MR. KAMRAS:
25      Q.  Are you aware, therefore, of the mission of the

1  Survivors Of The Abortion Holocaust, correct?
2          MR. BROOKS:  I'm going to object on form
3  grounds that this lacks foundation, assumes facts not in
4  evidence, is harassing in light of the prior objection and
5  answer.  It's also vague and ambiguous, calls for
6  speculation.  Additionally, I direct the witness not to answer
7  on the grounds -- or pursuant to the Fifth Amendment to the
8  United States Constitution, as well as state law including
9  Article 1, Section 15 of the California Constitution and
10  Article 1, Section 23 of the North Carolina Constitution.
11      A.  I am asserting my rights under the Fifth Amendment
12  to the United States Constitution as well as state law
13  including Article 1, Section 15 of the California
14  Constitution and Article 1, Section 23 of the North Carolina
15  Constitution and therefore I respectfully decline to
16  answer.
17  BY MR. KAMRAS:
18      Q.  Are you member today of the Survivors Of The
19  Abortion Holocaust?
20          MR. BROOKS:  I'm going to object to the
21  question and direct the witness not to answer pursuant to the
22  Fifth Amendment to the United States Constitution, as well as
23  state law including Article 1, Section 15 of the California
24  Constitution and Article 1, Section 23 of the North Carolina
25  Constitution, and also make a form objection as to vagueness

1  and ambiguity.
2      A.  I am asserting my rights under the Fifth Amendment
3  to the United States Constitution as well as state law
4  including Article 1, Section 15 of the California
5  Constitution and Article 1, Section 23 of the North Carolina
6  Constitution and therefore I respectfully decline to
7  answer.
8  BY MR. KAMRAS:
9          (Plaintiff's Exhibit Number 221
10              marked for identification)
11      Q.  Ms. Davin, I'm going to hand you what's been marked
12  as Plaintiff's Exhibit 221.  I will represent to you that
13  this is a printout from the Survivors Of the Abortion
14  Holocaust website.  Let me direct you to the first page where
15  there is a picture at the top.  Is that a pictures that you
16  recognize?
17          MR. BROOKS:  I'm going to object to the form as
18  vague, ambiguous, lacks foundation, lacks -- assumes facts
19  not in evidence, and that document has not been authenticated
20  yet.  Additionally --
21          MR. MIHET:  Also --
22          MR. BROOKS:  Go ahead, Harry.
23          MR. MIHET:  Go ahead -- for the record, what's
24  the Bate stamp for the document?
25          MR. KAMRAS:  There's no Bate stamp.  I printed

1    it, as I said, from the website.

2        MR. BROOKS: Also I object under and direct the

3    witness not to answer pursuant to the Fifth Amendment to the

4    United States Constitution, as well as state law including

5    Article 1, Section 15 of the California Constitution and

6    Article 1, Section 23 of the North Carolina Constitution.

7        MR. MIHET: I object to questioning the

8    witness on a document that's not been produced in discovery.

9        MR. BROOKS: I would also object to that.

10    A. I am asserting my rights under the Fifth Amendment

11    to the United States Constitution as well as state law

12    including Article 1, Section 15 of the California

13    Constitution and Article 1, Section 23 of the North Carolina

14    Constitution and therefore I respectfully decline to

15    answer.

16    BY MR. KAMRAS:

17    Q. If I direct you to the first page of the document,

18    in the second sentence you'll see it says, often referred to

19    as the Marines of the pro-life movement due to our reputation

20    for being the boots on the ground on the front lines of the

21    battle to save the pre-born babies of America. Survivors,

22    approach, prioritizes, action. Do you agree with that

23    mission statement?

24        MR. BROOKS: Objection form.

25        MR. MIHET: Same objection.

1        MR. BROOKS: Objection, form, lacks foundation,

2    assumes facts not in evidence, vague and ambiguous. Also, I

3    direct the witness not to answer pursuant to the Fifth

4    Amendment to the United States Constitution, as well as state

5    law including Article 1, Section 15 of the California

6    Constitution and Article 1, Section 23 of the North Carolina

7    Constitution.

8    A. I am asserting my rights under the Fifth Amendment

9    to the United States Constitution as well as state law

10    including Article 1, Section 15 of the California

11    Constitution and Article 1, Section 23 of the North Carolina

12    Constitution and therefore I respectfully decline to

13    answer.

14    BY MR. KAMRAS:

15    Q. I'd direct you to the bottom of page 2 of the

16    document leading onto page 3. It says, dedicated to

17    defending the right to life of future generations. We are

18    engaged in a battle to end America's genocide. Do you

19    believe that you are engaged in a battle to end America's

20    genocide?

21        MR. BROOKS: I'm going to object --

22        MR. MIHET: Same objection.

23        MR. BROOKS: Object to form on the basis of the

24    fact that we are having questions about a document that's not

25    been authenticated, and it's not been produced prior to this

1    testimony. Counsel is the only one who can represent where

2    it came from. Additionally, I think this is irrelevant and

3    harassing, and I also object and instruct the witness not to

4    answer pursuant to the Fifth Amendment to the United States

5    Constitution, as well as state law including Article 1,

6    Section 15 of the California Constitution and Article 1,

7    Section 23 of the North Carolina Constitution. I also object

8    to the extent that it mischaracterizes the document.

9    A. I am asserting my rights under the Fifth Amendment

10    to the United States Constitution as well as state law

11    including Article 1, Section 15 of the California

12    Constitution and Article 1, Section 23 of the North Carolina

13    Constitution and therefore I respectfully decline to

14    answer.

15    BY MR. KAMRAS:

16    Q. On page 4 of the document there is a section

17    beginning, what we believe. I'll wait for you to get there.

18    So on page 4 there's a section beginning, what we believe,

19    and the last sentence of the first paragraph under the title,

20    what we believe, is we believe that abortion in all of its

21    forms is evil and mocks the sanctity of human life. Do you

22    agree with that statement?

23        MR. BROOKS: I'm going to object on form basis,

24    again, because lack of authentication, assumes facts not in

25    evidence, and lack of -- lacks foundation. I also object and

1    direct the witness not to answer pursuant to the Fifth

2    Amendment of the United States Constitution, as well as state

3    law including Article 1, Section 15 of the California

4    Constitution and Article 1, Section 23 of the North Carolina

5    Constitution, and object to the line of questioning as

6    argumentative and harassing.

7        MR. MIHET: Same objection.

8    A. I am asserting my rights under the Fifth Amendment

9    to the United States Constitution as well as state law

10    including Article 1, Section 15 of the California

11    Constitution and Article 1, Section 23 of the North Carolina

12    Constitution and therefore I respectfully decline to

13    answer.

14    BY MR. KAMRAS:

15    Q. Let me have you turn to page 7 of the same document.

16    There's a section that begins, you'll see, through activism.

17    Have you found it?

18    A. I'm here.

19    Q. So page 7, the section beginning, through activism,

20    the first sentence; survivors is a group of activists,

21    because to be pro-life means to act pro-life. Do you agree

22    with that?

23        MR. BROOKS: Again, I object having questions

24    about a document that has not been produced, has not been

25    authenticated. I also object on the basis this is

## Page 270

1  irrelevant, harassing and argumentative.  I also direct the
2  witness not to answer pursuant to the Fifth Amendment to the
3  United States Constitution, as well as state law including
4  Article 1, Section 15 of the California Constitution and
5  Article 1, Section 23 of the North Carolina Constitution.
6  I'd also note that I don't think the witness has had a chance
7  to review the entire document.
8      A.  I am asserting my rights under the Fifth Amendment
9  to the United States Constitution as well as state law
10  including Article 1, Section 15 of the California
11  Constitution and Article 1, Section 23 of the North Carolina
12  Constitution and therefore I respectfully decline to
13  answer.
14  BY MR. KAMRAS:
15          (Plaintiff's Exhibit Number 222
16           marked for identification)
17      Q.  Mrs. Davin, I'm handing you what's marked as
18  Plaintiff's Exhibit 222, document Bate stamp CM0003 through
19  04.
20          MR. BROOKS:  I'm sorry, Counsel, is this
21  Exhibit 222, is that correct?
22          MR. KAMRAS: That is correct.
23          MR. BROOKS: Thank you, sir.
24  BY MR. KAMRAS:
25      Q.  Ms. Davin, do you recognize this as a brochure for

## Page 271

1  Bio Max that was generated in connection with the Human
2  Capitol Project, correct?
3          MR. BROOKS: Objection, form, assumes facts not
4  in evidence, lacks foundation, it's also effectively a
5  compound question and is vague.  I also instruct the witness
6  not to answer pursuant to the Fifth Amendment to the United
7  States Constitution, as well as state law including Article
8  1, Section 15 of the California Constitution and Article 1,
9  Section 23 of the North Carolina Constitution.
10     A.  I am asserting my rights under the Fifth Amendment
11  to the United States Constitution as well as state law
12  including Article 1, Section 15 of the California
13  Constitution and Article 1, Section 23 of the North Carolina
14  Constitution and therefore I respectfully decline to
15  answer.
16  BY MR. KAMRAS:
17     Q.  Mrs. Davin, you distributed this brochure, did you
18  not?
19          MR. BROOKS: Objection, lack -- form, lack of
20  foundation, assumes facts not in evidence, also vague and
21  ambiguous.  Moreover, I object and direct the witness not to
22  answer pursuant to the Fifth Amendment to the United States
23  Constitution, as well as state law including Article 1,
24  Section 15 of the California Constitution and Article 1,
25  Section 23 of the North Carolina Constitution.

## Page 272

1      A.  I am asserting my rights under the Fifth Amendment
2  to the United States Constitution as well as state law
3  including Article 1, Section 15 of the California
4  Constitution and Article 1, Section 23 of the North Carolina
5  Constitution and therefore I respectfully decline to
6  answer.
7  BY MR. KAMRAS:
8      Q.  I want to direct you to the first page of the
9  document, the middle column it's titled Bi -- excuse me,
10  About Bio Max.  Do you see that?
11     A.  Middle column, yes.
12     Q.  The first sentence reads, Bio Max Procurement
13  Services, LLC is a biological specimen procurement
14  organization headquartered in Norwalk, California.  That's a
15  false statement, correct?
16          MR. BROOKS: I'm going to object, form, lack of
17  foundation, assumes facts not in evidence, calls for
18  speculation by the witness.  Additionally, this document's
19  not been authenticated.  Also, I object and direct the
20  witness not to answer pursuant to the Fifth Amendment to the
21  United States Constitution as well, as state law including
22  Article 1, Section 15 of the California Constitution and
23  Article 1, Section 23 of the North Carolina Constitution.
24     A.  I am asserting my rights under the Fifth Amendment
25  to the United States Constitution as well as state law

## Page 273

1  including Article 1, Section 15 of the California
2  Constitution and Article 1, Section 23 of the North Carolina
3  Constitution and therefore I respectfully decline to
4  answer.
5  BY MR. KAMRAS:
6      Q.  Directing your attention, again, to the first page,
7  middle column of Exhibit 222, under About Bio Max, the second
8  sentence; Bio Max provides tissue and specimen procurement
9  for academic and private bioscience researchers.  That also
10  is a false statement, correct?
11          MR. BROOKS: Again, objection to form, assumes
12  facts not in evidence, lack of foundation.  Again, the
13  witness has not authenticated this document; and also I
14  object under and direct the witness not to answer pursuant to
15  the Fifth Amendment to the United States Constitution, as
16  well as state law including Article 1, Section 15 of the
17  California Constitution and Article 1, Section 23 of the
18  North Carolina Constitution.  I also object to the extent
19  this calls for speculation.
20     A.  I am asserting my rights under the Fifth Amendment
21  to the United States Constitution as well as state law
22  including Article 1, Section 15 of the California
23  Constitution and Article 1, Section 23 of the North Carolina
24  Constitution and therefore I respectfully decline to
25  answer.

BY MR. KAMRAS:

Q.  Again, directing you to the first page of Exhibit 222, middle column, About Bio Max, the third sentence; our commitment is to provide the highest quality specimens with efficient professional service to facilitate world changing discoveries.  That is a false statement, correct?

MR. BROOKS: Objection form, lack of foundation, assumes facts not in evidence, calls for speculation, and actually a compound question; and I also object, again, the witness has not authenticated this document.  Moreover, I object and direct the witness not to answer pursuant to the Fifth Amendment of the United States Constitution, as well as state law including Article 1, Section 15 of the California Constitution and Article 1, Section 23 of the North Carolina Constitution.

A.  I am asserting my rights under the Fifth Amendment to the United States Constitution as well as state law including Article 1, Section 15 of the California Constitution and Article 1, Section 23 of the North Carolina Constitution and therefore I respectfully decline to answer.

BY MR. KAMRAS:

(Plaintiff's Exhibit Number 223 marked for identification)

Q.  Mrs. Davin, I'm handing you what's been marked as

Exhibit 223.  This is a one page document Bate stamped CM03472 entitled Bio Max Procurement Services, LLC Donor Center Application.  This is a document that you helped create, correct?

MR. BROOKS: Objection, form, lack of foundation, assumes facts not in evidence, also vague and ambiguous.  Moreover, I direct the witness not to answer pursuant to the Fifth Amendment to the United States Constitution, as well as state law including Article 1, Section 15 of the California Constitution and Article 1, Section 23 of the North Carolina Constitution.

A.  I am asserting my rights under the Fifth Amendment to the United States Constitution as well as state law including Article 1, Section 15 of the California Constitution and Article 1, Section 23 of the North Carolina Constitution and therefore I respectfully decline to answer.

BY MR. KAMRAS:

Q.  Bio Max never intended to facilitate the donation of fetal tissue to any research facility, correct?

MR. BROOKS: Objection, form, assumes facts not in evidence, lack of foundation, the witness has not authenticated this document.  Additionally, the terms are vague and ambiguous, particularly fetal tissue; and I would also direct the witness not to answer pursuant to the Fifth

Amendment to the United States Constitution, as well as state law including Article 1, Section 15 of the California Constitution and Article 1, Section 23 of the North Carolina Constitution.  Also calls for speculation.

A.  I am asserting my rights under the Fifth Amendment to the United States Constitution as well as state law including Article 1, Section 15 of the California Constitution and Article 1, Section 23 of the North Carolina Constitution and therefore I respectfully decline to answer.

BY MR. KAMRAS:

Q.  You understood that the Human Capital Project was an undercover operation, correct?

MR. BROOKS: Objection, form, assumes facts not in evidence, lack of foundation, vague, ambiguous and argumentative.  Additionally, I direct the witness not to answer pursuant to the Fifth Amendment to the United States Constitution, as well as state law including Article 1, Section 15 of the California Constitution and Article 1, Section 23 of the North Carolina Constitution.

A.  I am asserting my rights under the Fifth Amendment to the United States Constitution as well as state law including Article 1, Section 15 of the California Constitution and Article 1, Section 23 of the North Carolina Constitution and therefore I respectfully decline to

answer.

BY MR. KAMRAS:

Q.  That meant that participants in the Human Capitol Project, including yourself, would represent that they were actually working on behalf of a tissue procurement organization, correct?

MR. BROOKS: Objection, form, lack of foundation, assumes facts not in evidence, vague and ambiguous; and additionally I direct the witness not to answer pursuant to the Fifth Amendment to the United States Constitution, as well as state law including Article 1, Section 15 of the California Constitution and Article 1, Section 23 of the North Carolina Constitution.

A.  I am asserting my rights under the Fifth Amendment to the United States Constitution as well as state law including Article 1, Section 15 of the California Constitution and Article 1, Section 23 of the North Carolina Constitution and therefore I respectfully decline to answer.

BY MR. KAMRAS:

Q.  In fact, there was no such tissue procurement organization, correct?

MR. BROOKS: Objection, form, lack of foundation, assumes facts not in evidence, vague and ambiguous, also calls for speculation.  Additionally, I

Page 278

1 direct the witness not to answer pursuant to the Fifth
2 Amendment to the United States Constitution as well as state
3 law including Article 1, Section 15 of the California
4 Constitution and Article 1, Section 23 of the North Carolina
5 Constitution.
6     A.  I am asserting my rights under the Fifth Amendment
7 to the United States Constitution as well as state law
8 including Article 1, Section 15 of the California
9 Constitution and Article 1, Section 23 of the North Carolina
10 Constitution and therefore I respectfully decline to
11 answer.
12 BY MR. KAMRAS:
13     Q.  And the name of that organization, that fictitious
14 organization, was Bio Max Procurement Services, correct?
15         MR. BROOKS: Objection, form, vague, ambiguous,
16 lacks foundation, assumes facts not in evidence, calls for
17 speculation.  Additionally, I direct the witness not to
18 answer pursuant to the Fifth Amendment to the United States
19 Constitution, as well as state law including Article 1,
20 Section 15 of the California Constitution and Article 1,
21 Section 23 of the North Carolina Constitution.
22     A.  I am asserting my rights under the Fifth Amendment
23 to the United States Constitution as well as state law
24 including Article 1, Section 15 of the California
25 Constitution and Article 1, Section 23 of the North Carolina

Page 279

1 Constitution and therefore I respectfully decline to
2 answer.
3 BY MR. KAMRAS:
4         (Plaintiff's Exhibit Number 224
5         marked for identification)
6     Q.  Mrs. Davin, I'm handing you what's been marked as
7 Plaintiff's Exhibit 224, which was, although not Bate
8 stamped, previously produced in this matter at PP0005934
9 through 35.
10         MR. ZIMMERMAN:  It's the same document just
11 didn't put a Bate stamp?
12         MR. KAMRAS: Correct.
13         MR. ZIMMERMAN:  Thank you.
14         MR. KAMRAS:  It was produced natively.
15 BY MR. KAMRAS:
16     Q.  Mrs. Davin, if you look at the first page of this
17 exhibit, you recognize the picture as a picture of David
18 Daleiden, correct?
19         MR. BROOKS: I'm going to object to form, also
20 going to instruct the witness not to answer on the grounds
21 of the Fifth Amendment to the United States Constitution, as
22 well as state law including Article 1, Section 15 of the
23 California Constitution and Article 1, Section 23 of the
24 North Carolina Constitution.
25     A.  I am asserting my rights under the Fifth Amendment

Page 280

1 to the United States Constitution as well as state law
2 including Article 1, Section 15 of the California
3 Constitution and Article 1, Section 23 of the North Carolina
4 Constitution and therefore I respectfully decline to
5 answer.
6 BY MR. KAMRAS:
7     Q.  You see that the name that is in fact listed on the
8 ID is that of Robert Sarkis, correct?
9         MR. BROOKS: Objection, form.  The document
10 speaks for itself.  Additionally, the document has not been
11 authenticated, and there's a lack of foundation.  I will
12 direct the witness to not answer the question pursuant to the
13 Fifth Amendment of the United States Constitution, as well as
14 state law including Article 1, Section 15 of the California
15 Constitution and Article 1, Section 23 of the North Carolina
16 Constitution.
17     A.  I am asserting my rights under the Fifth Amendment
18 to the United States Constitution as well as state law
19 including Article 1, Section 15 of the California
20 Constitution and Article 1, Section 23 of the North Carolina
21 Constitution and therefore I respectfully decline to
22 answer.
23 BY MR. KAMRAS:
24     Q.  This is a picture of the false identification that
25 Mr. Daleiden used to gain entry into NAF conferences,

Page 281

1 correct?
2         MR. BROOKS: Objection to form, vague,
3 ambiguous, lacks foundation, assumes facts not in evidence,
4 is also an unauthenticated document and calling for
5 speculation by the witness.  I also direct the witness not to
6 answer pursuant to the Fifth Amendment to the United States
7 Constitution, as well as state law including Article 1,
8 Section 15 of the California Constitution and Article 1,
9 Section 23 of the North Carolina Constitution.
10     A.  I am asserting my rights under the Fifth Amendment
11 to the United States Constitution as well as state law
12 including Article 1, Section 15 of the California
13 Constitution and Article 1, Section 23 of the North Carolina
14 Constitution and therefore I respectfully decline to
15 answer.
16 BY MR. KAMRAS:
17     Q.  Did Mr. Daleiden obtain the driver's license that is
18 depicted in Exhibit 224 from the California Department of
19 Motor Vehicles?
20         MR. BROOKS: Objection, form, assumes facts not
21 in evidence, lacks foundation, document has not been
22 authenticated, also calls for speculation.  Additionally, I
23 direct the witness not to answer pursuant to the Fifth
24 Amendment to the United States Constitution, as well as state
25 law including Article 1, Section 15 of the California

## Page 282

1  Constitution and Article 1, Section 23 of the North Carolina
2  Constitution.
3      A.  I am asserting my rights under the Fifth Amendment
4  to the United States Constitution as well as state law
5  including Article 1, Section 15 of the California
6  Constitution and Article 1, Section 23 of the North Carolina
7  Constitution and therefore I respectfully decline to
8  answer.
9  BY MR. KAMRAS:
10     Q.  What did Mr. Daleiden tell you, if anything, about
11 how he procured the driver's license that is depicted in
12 Exhibit 224?
13         MR. BROOKS: Objection, form, assumes facts not
14 in evidence, lack of foundation, lack of authentication.
15 Additionally, I direct the witness not to answer pursuant to
16 the Fifth Amendment to the United States Constitution, as
17 well as state law including Article 1, Section 15 of the
18 California Constitution and Article 1, Section 23 of the
19 North Carolina Constitution.
20     A.  I am asserting my rights under the Fifth Amendment
21 to the United States Constitution as well as state law
22 including Article 1, Section 15 of the California
23 Constitution and Article 1, Section 23 of the North Carolina
24 Constitution and therefore I respectfully decline to
25 answer.

## Page 283

1  BY MR. KAMRAS:
2      Q.  Turning your attention to the second page of Exhibit
3  224.  You recognize the photograph in this driver's license
4  as that of Sandra Merit, correct?
5         MR. BROOKS: Objection, form, assumes facts not
6  in evidence, lack of foundation and lack of authentication.
7  Additionally I direct the witness not to answer pursuant to
8  the Fifth Amendment to the United States Constitution, as
9  well as state law including Article 1, Section 15 of the
10 California Constitution and Article 1, Section 23 of the
11 North Carolina Constitution.
12     A.  I am asserting my rights under the Fifth Amendment
13 to the United States Constitution as well as state law
14 including Article 1, Section 15 of the California
15 Constitution and Article 1, Section 23 of the North Carolina
16 Constitution and therefore I respectfully decline to
17 answer.
18 BY MR. KAMRAS:
19     Q.  This is a depiction, that is to say the second page
20 of Exhibit 224, is a depiction of the driver's license that
21 Sandra Merit used to gain access to NAF conferences, correct?
22         MR. BROOKS: Objection, form, lacks foundation,
23 assumes facts not in evidence, lacks authentication, and
24 calls for speculation.  Additionally, I object and direct the
25 witness not to answer pursuant to the Fifth Amendment to the

## Page 284

1  United States Constitution, as well as state law including
2  Article 1, Section 15 of the California Constitution and
3  Article 1, Section 23 of the North Carolina Constitution.
4      A.  I am asserting my rights under the Fifth Amendment
5  to the United States Constitution as well as state law
6  including Article 1, Section 15 of the California
7  Constitution and Article 1, Section 23 of the North Carolina
8  Constitution and therefore I respectfully decline to
9  answer.
10 BY MR. KAMRAS:
11     Q.  What, if anything, did -- excuse me.  What, if
12 anything, were you told about how the driver's license that
13 is depicted on the second page of Exhibit 224 was procured?
14         MR. BROOKS: Objection, form, as to lacking
15 foundation, assuming facts not in evidence, and lacking
16 authentication.  Additionally, I object and direct the
17 witness not to answer pursuant to the Fifth Amendment to the
18 United States Constitution, as well as state law including
19 Article 1, Section 15 of the California Constitution and
20 Article 1, Section 23 of the North Carolina Constitution.
21     A.  I am asserting my rights under the Fifth Amendment
22 to the United States Constitution as well as state law
23 including Article 1, Section 15 of the California
24 Constitution and Article 1, Section 23 of the North Carolina
25 Constitution and therefore I respectfully decline to

## Page 285

1  answer.
2  BY MR. KAMRAS:
3      Q.  You and the Human Capital Project used these
4  documents regarding Bio Max and these false identifications
5  in order to disguise the true purpose of the Human Capital
6  Project and the Center for Medical Progress, correct?
7         MR. BROOKS: Objection, form, quite compound,
8  lacks foundation, assumes facts not in evidence, lacks
9  authentication; is also vague and ambiguous, and calls for
10 speculation.  Additionally, I direct the witness not to
11 answer pursuant to the Fifth Amendment to the United States
12 Constitution, as well as state law including Article 1,
13 Section 15 of the California Constitution and Article 1,
14 Section 23 of the North Carolina Constitution.
15     A.  I am asserting my rights under the Fifth Amendment
16 to the United States Constitution as well as state law
17 including Article 1, Section 15 of the California
18 Constitution and Article 1, Section 23 of the North Carolina
19 Constitution and therefore I respectfully decline to
20 answer.
21 BY MR. KAMRAS:
22     Q.  You and other members of the Human Capitol Project
23 were lying to Planned Parenthood employees about Bio Max,
24 correct?
25         MR. BROOKS: Objection, form, lack of

1  foundation, assumes facts not in evidence, lack of
2  authentication, vague and ambiguous, also argumentative and
3  harassing. Additionally -- and also compound question, calls
4  for speculation. Additionally, I direct the witness not to
5  answer pursuant to the Fifth Amendment to the United States
6  Constitution, as well as state law including Article 1,
7  Section 15 of the California Constitution and Article 1,
8  Section 23 of the North Carolina Constitution.
9     A. I am asserting my rights under the Fifth Amendment
10  to the United States Constitution as well as state law
11  including Article 1, Section 15 of the California
12  Constitution and Article 1, Section 23 of the North Carolina
13  Constitution and therefore I respectfully decline to
14  answer.
15  BY MR. KAMRAS:
16     Q. You understood that Planned Parenthood employees
17  would not have spoken with you if they knew your true goals,
18  correct?
19         MR. BROOKS: Objection, form, lacks foundation,
20  assumes facts not in evidence, and is vague and ambiguous,
21  calls for speculation. Additionally, I direct the witness
22  not to answer pursuant to the Fifth Amendment to the United
23  States Constitution, as well as state law including Article
24  1, Section 15 of the California Constitution and Article 1,
25  Section 23 of the North Carolina Constitution.

1     A. I am asserting my rights under the Fifth Amendment
2  to the United States Constitution as well as state law
3  including Article 1, Section 15 of the California
4  Constitution and Article 1, Section 23 of the North Carolina
5  Constitution and therefore I respectfully decline to
6  answer.
7  BY MR. KAMRAS:
8     Q. You agree that Planned Parenthood employees would
9  not have spoken with you or other members of the Center for
10  Medical Progress -- excuse me, they would not have met with
11  you or other members of the Center for Medical Progress if
12  they had known its true intent, correct?
13         MR. BROOKS: Objection, form, lack of
14  foundation, assumes facts not in evidence, calls for
15  speculation. It's also argumentative. Additionally, I
16  direct the witness not to answer pursuant to the Fifth
17  Amendment to the United States Constitution, as well as state
18  law including Article 1, Section 15 of the California
19  Constitution and Article 1, Section 23 of the North Carolina
20  Constitution.
21     A. I am asserting my rights under the Fifth Amendment
22  to the United States Constitution as well as state law
23  including Article 1, Section 15 of the California
24  Constitution and Article 1, Section 23 of the North Carolina
25  Constitution and therefore I respectfully decline to

1  answer.
2  BY MR. KAMRAS:
3     Q. You agree that under certain circumstances lying is
4  justified, correct?
5         MR. BROOKS: Objection, form, lacks foundation,
6  assumes facts not in evidence, is irrelevant, harassing and
7  argumentative. Additionally, I direct the witness not to
8  answer pursuant to the Fifth Amendment to the United States
9  Constitution, as well as state law including Article 1,
10  Section 15 of the California Constitution and Article 1,
11  Section 23 of the North Carolina Constitution.
12     A. I am asserting my rights under the Fifth Amendment
13  to the United States Constitution as well as state law
14  including Article 1, Section 15 of the California
15  Constitution and Article 1, Section 23 of the North Carolina
16  Constitution and therefore I respectfully decline to
17  answer.
18  BY MR. KAMRAS:
19      (Plaintiff's Exhibit Numbers 225 & 226
20         marked For identification)
21     Q. Mrs. Davin, I'm going to hand you what has been
22  marked as Exhibits 225 and 226. They're going to go
23  together. 225 is a two page Email Bate stamped CM04088
24  through 89, and 226 is Bate stamped CM04090 through 12 --
25  112; an article entitled, Starting A Conversation On The

1  Morality Of Devious Tactics In The Pro-Life Movement by Janet
2  E. Smith. Directing your attention to the Exhibit 225, you
3  will see that it is a string, Email string. The first Email
4  is from Janet Smith to David Daleiden; second Email is from
5  David Daleiden forwarding the Email and blind copying
6  Annamarie Bettisworth. Do you see that?
7         MR. BROOKS: Before you answer, I'm going to
8  object to the characterization as lacking foundation, object
9  to the form of that question, because of the characterization
10  which lacks foundation, assumes facts not in evidence, and
11  has not been authenticated. And in light of that preamble to
12  the question, I will direct the witness not to answer
13  pursuant to the Fifth Amendment to the United States
14  Constitution, as well as state law including Article 1,
15  Section 15 of the California Constitution and Article 1,
16  Section 23 of the North Carolina Constitution, again because
17  of the phrasing of that question.
18         MR. KAMRAS: Thought I'd been so careful to
19  say it wasn't necessarily her that was Annamarie Bettisworth,
20  but just to say Annamarie Bettisworth was copied, but you're
21  going to object to that?
22         MR. BROOKS: I think there's a way to ask that
23  question without objection.
24         MR. KAMRAS: Alright.
25  BY MR. KAMRAS:

1    Q.  You can answer as in whatever way you intend to.
2    A.  I am asserting my rights under the Fifth Amendment
3  to the United States Constitution as well as state law
4  including Article 1, Section 15 of the California
5  Constitution and Article 1, Section 23 of the North Carolina
6  Constitution and therefore I respectfully decline to
7  answer.
8  BY MR. KAMRAS:
9    Q.  In fact, you have seen the Email that is Exhibit 225
10  before, correct?
11    MR. BROOKS: Objection, form, lack of
12  foundation, assumes facts not in evidence, also -- well, lack
13  of authentication at this point.  More importantly, I direct
14  the witness not to answer pursuant to the Fifth Amendment to
15  the United States Constitution, as well as state law
16  including Article 1, Section 15 of the California
17  Constitution and Article 1, Section 23 of the North Carolina
18  Constitution.
19    A.  I am asserting my rights under the Fifth Amendment
20  to the United States Constitution as well as state law
21  including Article 1, Section 15 of the California
22  Constitution and Article 1, Section 23 of the North Carolina
23  Constitution and therefore I respectfully decline to
24  answer.
25  BY MR. KAMRAS:

1    Q.  In the Email by Janet Smith you see that Ms. Smith
2  begins, Dear David, attached is my explanation why I think
3  the use of falsehoods in some situations is mortal, and do
4  not violate Catholic moral principles.  You agree with that,
5  correct?
6    MR. BROOKS, Objection, form, assumes facts not
7  in evidence, lack of foundation, lack of authentication.
8  Also, I direct the witness not to answer pursuant to the
9  Fifth Amendment to the United States Constitution, as well as
10  state law including Article 1, Section 15 of the California
11  Constitution and Article 1, Section 23 of the North Carolina
12  Constitution.
13    A.  I am asserting my rights under the Fifth Amendment
14  to the United States Constitution as well as state law
15  including Article 1, Section 15 of the California
16  Constitution and Article 1, Section 23 of the North Carolina
17  Constitution and therefore I respectfully decline to
18  answer.
19  BY MR. KAMRAS:
20    Q.  In the fourth paragraph of the same Email, again
21  Exhibit 225, the last sentence of the fourth paragraph; so I
22  argue that while no use of falsehoods would have been
23  permissible or necessary before the fall, afterwards it is.
24    MR. BROOKS: Objection, form --
25    MR. KAMRAS:  I haven't asked a question yet.

1    MR. BROOKS: You're right, you haven't asked a
2  question.
3  BY MR. KAMRAS:
4    Q.  You agree with that statement, correct?
5    MR. BROOKS: Objection, form, lack of
6  foundation, assumes facts not in evidence.  Again, this
7  document has not been authenticated.  Also, I direct the
8  witness not to answer pursuant to the Fifth Amendment to the
9  United States Constitution, as well as state law including
10  Article 1, Section 15 of the California Constitution and
11  Article 1, Section 23 of the North Carolina Constitution.
12    A.  I am asserting my rights under the Fifth Amendment
13  to the United States Constitution as well as state law
14  including Article 1, Section 15 of the California
15  Constitution and Article 1, Section 23 of the North Carolina
16  Constitution and therefore I respectfully decline to
17  answer.
18  BY MR. KAMRAS:
19    Q.  I draw your attention to the date of this Email from
20  Janet Smith, namely June 21st, 2013.  At that point you were
21  already working with David Daleiden in connection with the
22  Center For Medical Progress, correct?
23    MR. BROOKS: Objection, form, lack of
24  foundation, assumes facts not in evidence.  This document has
25  not been authenticated, and that question is also vague and

1  ambiguous.  I further direct the witness not to answer
2  pursuant to the Fifth Amendment to the United States
3  Constitution, as well as state law including Article 1,
4  Section 15 of the California Constitution and Article 1,
5  Section 23 of the North Carolina Constitution.
6    A.  I am asserting my rights under the Fifth Amendment
7  to the United States Constitution as well as state law
8  including Article 1, Section 15 of the California
9  Constitution and Article 1, Section 23 of the North Carolina
10  Constitution and therefore I respectfully decline to
11  answer.
12  BY MR. KAMRAS:
13    Q.  I direct your attention, again, to the first page of
14  Exhibit 225, same Email that we have been looking at.  Now,
15  the last line of the first page it begins, I applaud -- while
16  I applaud your courage and initiative -- she says to David
17  Daleiden, I applaud your courage and initiative in trying to
18  fight the evils of the abortion industry, and your
19  willingness to put yourself at great risk to do so.  You
20  understand that Ms. Smith was referring to the Human Capitol
21  Project as part of the Center For Medical Progress,
22  correct?
23    MR. BROOKS: Objection, form, assumes facts not
24  in evidence, lacks foundation, document has not been
25  authenticated, and calls for speculation by the witness.

1    Additionally, I direct the witness not to answer pursuant to
2    the Fifth Amendment to the United States Constitution, as
3    well as state law including Article 1, Section 15 of the
4    California Constitution and Article 1, Section 23 of the
5    North Carolina Constitution.
6        A.  I am asserting my rights under the Fifth Amendment
7    to the United States Constitution as well as state law
8    including Article 1, Section 15 of the California
9    Constitution and Article 1, Section 23 of the North Carolina
10   Constitution and therefore I respectfully decline to
11   answer.
12   BY MR. KAMRAS:
13       Q.  Mr. Daleiden then forwards this Email from Ms. Smith
14   to Fred, someone named Fred.  This is the Email which Ann,
15   Annamarie Bettisworth is copied, and he attaches a document
16   entitled, UFL -- a document that has the electronic title,
17   UFL Rev Smith.docsX.  You see that?
18       MR. BROOKS: Objection, form, mischaracterizes
19   the document, assumes facts not in evidence, and lacks
20   foundation, and lacks authentication.  Is also vague and
21   ambiguous.
22       A.  I'm sorry, I don't understand what you were trying
23   to ask.
24   BY MR. KAMRAS:
25       Q.  I was just noting to make sure were looking at the

1    same page.  If you look at the top of the Email you see that
2    this is the Email in which David Daleiden forwards Ms.
3    Smith's underlying Email; and that there is an indication of
4    an attachment; and that attachment is entitled, UFL Rev
5    Smith.docsX.  You see that?
6        MR. BROOKS: Again, I object to that
7    question on the grounds of form, and that it assumes facts
8    not in evidence.  It's not been authenticated, and there's a
9    lack of foundation.  Additionally, given that explanation,
10   I'm going to instruct the witness not to answer on the
11   grounds of the Fifth Amendment of the United States
12   Constitution, as well as state law including Article 1,
13   Section 15 of the California Constitution and Article 1,
14   Section 23 of the North Carolina Constitution, again because
15   of the characterization of what the document is.
16       A.  I am asserting my rights under the Fifth Amendment
17   to the United States Constitution as well as state law
18   including Article 1, Section 15 of the California
19   Constitution and Article 1, Section 23 of the North Carolina
20   Constitution and therefore I respectfully decline to
21   answer.
22   BY MR. KAMRAS:
23       Q.  In this Email now at the top of Exhibit 225, Mr.
24   Daleiden says in the second sentence, here is the statement
25   on the morality of undercover tactics that Dr. Janet Smith

1    sent me.  Do you see that?
2        MR. BROOKS: Objection, form, assumes facts not
3    in evidence, lack of foundation, lack of authentication, and
4    assumes facts not in evidence.  Also, Counsel did not exactly
5    read the statement as written.
6        MR. KAMRAS: I'm pretty sure I read it exactly
7    correctly, but go ahead.
8        MR. BROOKS: Therefore I object to the form.
9    Also, I object on the grounds of privilege and direct the
10   witness not to answer pursuant to the Fifth Amendment to the
11   United States Constitution, as well as state law including
12   Article 1, Section 15 of the California Constitution and
13   Article 1, Section 23 of the North Carolina Constitution.
14       A.  I am asserting my rights under the Fifth Amendment
15   to the United States Constitution as well as state law
16   including Article 1, Section 15 of the California
17   Constitution and Article 1, Section 23 of the North Carolina
18   Constitution and therefore I respectfully decline to
19   answer.
20   BY MR. KAMRAS:
21       Q.  So now I want to direct you to the attached document
22   which is Exhibit 226, and in particular the first paragraph.
23   You see that Ms. Smith writes, I chose this topic for two
24   reasons.  First, because I admire the work Lila Rose and
25   associates at Live Action who use devious tactics to expose

1    the horrific practice of Planned Parenthood.  Do you agree
2    with her characterization?
3        MR. BROOKS: Objection, form, lack of
4    foundation, assumes facts not in evidence, lack of
5    authentication, speculation.  Additionally, I direct the
6    witness not to answer pursuant to the Fifth Amendment to the
7    United States Constitution, as well as state law including
8    Article 1, Section 15 of the California Constitution and
9    Article 1, Section 23 of the North Carolina Constitution.
10       A.  I am asserting my rights under the Fifth Amendment
11   to the United States Constitution as well as state law
12   including Article 1, Section 15 of the California
13   Constitution and Article 1, Section 23 of the North Carolina
14   Constitution and therefore I respectfully decline to
15   answer.
16   BY MR. KAMRAS:
17       Q.  She continues in the same paragraph, I would like to
18   provide them with a strong defense of their tactics, for I
19   think one is available.  One that violates no principles of
20   Catholic moral theology.  You agree that the tactics -- the
21   devious tactics that she refers to violate no principle of
22   Catholic moral theologies, correct?
23       MR. BROOKS: Objection, form, lack of
24   foundation, assumes facts not in evidence, lack of
25   authentication, also vague and ambiguous.  Moreover, I direct

1 the witness not to answer pursuant to the Fifth Amendment to
2 the United States Constitution, as well as state law
3 including Article 1, Section 15 of the California
4 Constitution and Article 1, Section 23 of the North Carolina
5 Constitution.
6     A. I am asserting my rights under the Fifth Amendment
7 to the United States Constitution as well as state law
8 including Article 1, Section 15 of the California
9 Constitution and Article 1, Section 23 of the North Carolina
10 Constitution and therefore I respectfully decline to
11 answer.
12 BY MR. KAMRAS:
13     Q. I want to direct you to page 4 of Exhibit 226, which
14 has the Bate stamp CM04093; and in particular, the last
15 sentence of the first full paragraph. So the sentence
16 begins, a minority. Do you see where I am? It's the last
17 sentence of first full paragraph begins a minority. It's 4
18 lines from the bottom of the paragraph.
19     A. Yes, I see where you are.
20     Q. It reads, a minority of those who have published on
21 the issue going back to early church fathers such as Casian
22 and Chrysostom argue that telling some falsehoods,
23 particularly those told in defense of innocent life is moral.
24 You agree with that, correct?
25     MR. BROOKS: Objection, form, assumes facts not

1 in evidence, lack of foundation, lack of authentication, more
2 to the point -- it's vague and ambiguous. More to the point,
3 I direct the witness not to answer pursuant to the Fifth
4 Amendment to the United States Constitution, as well as state
5 law including Article 1, Section 15 of the California
6 Constitution and Article 1, Section 23 of the North Carolina
7 Constitution.
8     A. I am asserting my rights under the Fifth Amendment
9 to the United States Constitution as well as state law
10 including Article 1, Section 15 of the California
11 Constitution and Article 1, Section 23 of the North Carolina
12 Constitution and therefore I respectfully decline to
13 answer.
14 BY MR. KAMRAS:
15     Q. You believe that unborn children are innocent life,
16 correct?
17     MR. BROOKS: I'm going to object to that
18 question for form, and direct the witness not to answer on
19 the grounds of the Fifth Amendment to the United States
20 Constitution, as well as state law including Article 1,
21 Section 15 of the California Constitution and Article 1,
22 Section 23 of the North Carolina Constitution.
23     A. I am asserting my rights under the Fifth Amendment
24 to the United States Constitution as well as state law
25 including Article 1, Section 15 of the California

1 Constitution and Article 1, Section 23 of the North Carolina
2 Constitution and therefore I respectfully decline to
3 answer.
4 BY MR. KAMRAS:
5     Q. You believe, therefore, that abortions are morally
6 wrong, correct?
7     MR. BROOKS: Objection to form. Also, I object
8 pursuant to the Fifth Amendment to the United States
9 Constitution, as well as state law including Article 1,
10 Section 15 of the California Constitution and Article 1,
11 Section 23 of the North Carolina Constitution.
12     A. I am asserting my rights under the Fifth Amendment
13 to the United States Constitution as well as state law
14 including Article 1, Section 15 of the California
15 Constitution and Article 1, Section 23 of the North Carolina
16 Constitution and therefore I respectfully decline to
17 answer.
18 BY MR. KAMRAS:
19     Q. Planned parenthood conducts abortions, correct?
20     MR. BROOKS: I'm going to object to form, and
21 also direct the witness not to answer pursuant to the Fifth
22 Amendment to the United States Constitution, as well as state
23 law including Article 1, Section 15 of the California
24 Constitution and Article 1, Section 23 of the North Carolina
25 Constitution.

1     A. I am asserting my rights under the Fifth Amendment
2 to the United States Constitution as well as state law
3 including Article 1, Section 15 of the California
4 Constitution and Article 1, Section 23 of the North Carolina
5 Constitution and therefore I respectfully decline to
6 answer.
7 BY MR. KAMRAS:
8     Q. Stopping Planned Parenthood from conducting
9 abortions, therefore requires action in your view, correct?
10     MR. BROOKS: Objection, form, lack of
11 foundation, assumes facts not in evidence, is vague and
12 ambiguous. I direct the witness not to answer pursuant to
13 the Fifth Amendment to the United States Constitution, as
14 well as state law including Article 1, Section 15 of the
15 California Constitution and Article 1, Section 23 of the
16 North Carolina Constitution.
17     A. I am asserting my rights under the Fifth Amendment
18 to the United States Constitution as well as state law
19 including Article 1, Section 15 of the California
20 Constitution and Article 1, Section 23 of the North Carolina
21 Constitution and therefore I respectfully decline to
22 answer.
23 BY MR. KAMRAS:
24     Q. Hearkening back to the mission statement of the
25 Survivors Of The Abortion Holocaust, it's not enough to be

## Page 302

1  pro-life, you have to act pro-life, correct?
2          MR. BROOKS: Objection to form, vague,
3  ambiguous, assumes facts not in evidence, and lacks
4  foundation.  Also refers to a document that was not
5  authenticated.  Moreover, I direct the witness not to answer
6  pursuant to the Fifth Amendment to the United States
7  Constitution, as well as state law including Article 1,
8  Section 15 of the California Constitution and Article 1,
9  Section 23 of the North Carolina Constitution.
10      A.  I am asserting my rights under the Fifth Amendment
11  to the United States Constitution as well as state law
12  including Article 1, Section 15 of the California
13  Constitution and Article 1, Section 23 of the North Carolina
14  Constitution and therefore I respectfully decline to
15  answer.
16  BY MR. KAMRAS:
17      Q.  So if it stopped Planned Parenthood from conducting
18  abortions, you would lie, correct?
19          MR. BROOKS: Objection, form, assumes facts not
20  in evidence, lack of foundation, vague, ambiguous, also
21  argumentative and harassing.  I also direct the witness not
22  to answer pursuant to the Fifth Amendment to the United
23  States Constitution, as well as state law including Article
24  1, Section 15 of the California Constitution and Article 1,
25  Section 23 of the North Carolina Constitution.

## Page 303

1      A.  I am asserting my rights under the Fifth Amendment
2  to the United States Constitution as well as state law
3  including Article 1, Section 15 of the California
4  Constitution and Article 1, Section 23 of the North Carolina
5  Constitution and therefore I respectfully decline to
6  answer.
7  BY MR. KAMRAS:
8      Q.  Lying to stop Planned Parenthood from conducting
9  abortions would be morally justified in your view, correct?
10          MR. BROOKS: Objection to form, asked and
11  answered, lack of foundation, assumes facts not in evidence,
12  and also vague and ambiguous.  I also direct the witness not
13  to answer pursuant to the Fifth Amendment to the United
14  States Constitution, as well as state law including Article
15  1, Section 15 of the California Constitution and Article 1,
16  Section 23 of the North Carolina Constitution.
17      A.  I am asserting my rights under the Fifth Amendment
18  to the United States Constitution as well as state law
19  including Article 1, Section 15 of the California
20  Constitution and Article 1, Section 23 of the North Carolina
21  Constitution and therefore I respectfully decline to
22  answer.
23  BY MR. KAMRAS:
24      Q.  So Daleiden -- Mr. Daleiden lied as part of the
25  Center For Medical Progress's Human Capitol Project,

## Page 304

1  correct?
2          MR. BROOKS: Objection to form, assumes facts
3  not in evidence, lack of foundation, calls for speculation.
4  Additionally, I direct the witness not to answer pursuant to
5  the Fifth Amendment to the United States Constitution, as
6  well as state law including Article 1, Section 15 of the
7  California Constitution and Article 1, Section 23 of the
8  North Carolina Constitution.
9      A.  I am asserting my rights under the Fifth Amendment
10  to the United States Constitution as well as state law
11  including Article 1, Section 15 of the California
12  Constitution and Article 1, Section 23 of the North Carolina
13  Constitution and therefore I respectfully decline to
14  answer.
15  BY MR. KAMRAS:
16      Q.  Yet others lied for him, correct?
17          MR. BROOKS: Objection, form, lack of
18  foundation, assumes facts not in evidence, is vague,
19  ambiguous, argumentative and harassing.  I also direct the
20  witness not to answer pursuant to the Fifth Amendment to the
21  United States Constitution, as well as state law including
22  Article 1, Section 15 of the California Constitution and
23  Article 1, Section 23 of the North Carolina Constitution.
24      A.  I am asserting my rights under the Fifth Amendment
25  to the United States Constitution as well as state law

## Page 305

1  including Article 1, Section 15 of the California
2  Constitution and Article 1, Section 23 of the North Carolina
3  Constitution and therefore I respectfully decline to
4  answer.
5  BY MR. KAMRAS:
6      Q.  He lied about his identity, correct?
7          MR. BROOKS: Objection, form, lack of
8  foundation, assumes facts not in evidence, calls for
9  speculation.  Additionally, I direct the witness not to
10  answer under the basis of the Fifth -- pursuant to the Fifth
11  Amendment to the United States Constitution, as well as state
12  law including Article 1, Section 15 of the California
13  Constitution and Article 1, Section 23 of the North Carolina
14  Constitution.
15      A.  I am asserting my rights under the Fifth Amendment
16  to the United States Constitution as well as state law
17  including Article 1, Section 15 of the California
18  Constitution and Article 1, Section 23 of the North Carolina
19  Constitution and therefore I respectfully decline to
20  answer.
21  BY MR. KAMRAS:
22      Q.  He lied about Planned Parenthood, correct?
23          MR. BROOKS: Objection, form, vague, ambiguous,
24  lacks foundation, assumes facts not in evidence, and calls
25  for speculation.  Additionally, I direct the witness not to

1 answer pursuant to the Fifth Amendment to the United States
2 Constitution, as well as state law including Article 1,
3 Section 15 of the California Constitution and Article 1,
4 Section 23 of the North Carolina Constitution. And if I
5 didn't say it before, I object on the basis that this is
6 argumentative.
7 　A. I am asserting my rights under the Fifth Amendment
8 to the United States Constitution as well as state law
9 including Article 1, Section 15 of the California
10 Constitution and Article 1, Section 23 of the North Carolina
11 Constitution and therefore I respectfully decline to
12 answer.
13 BY MR. KAMRAS:
14 　Q. Bio Max was a lie, correct?
15 　　MR. BROOKS: Objection, form, vague, ambiguous,
16 lack of foundation, lack of -- lack of foundation, assumes
17 facts not in evidence, calls for speculation. Additionally,
18 I direct the witness not to answer pursuant to the Fifth
19 Amendment to the United States Constitution, as well as state
20 law including Article 1, Section 15 of the California
21 Constitution and Article 1, Section 23 of the North Carolina
22 Constitution.
23 　A. I am asserting my rights under the Fifth Amendment
24 to the United States Constitution as well as state law
25 including Article 1, Section 15 of the California

1 Constitution and Article 1, Section 23 of the North Carolina
2 Constitution and therefore I respectfully decline to
3 answer.
4 BY MR. KAMRAS:
5 　Q. The entire Human Capital Project was built on lies,
6 correct?
7 　　MR. BROOKS: Objection, form, lack of
8 foundation, assumes facts not in evidence, calls for
9 speculation, is argumentative. Additionally, I direct the
10 witness not to answer pursuant to the Fifth Amendment to the
11 United States Constitution, as well as state law including
12 Article 1, Section 15 of the California Constitution and
13 Article 1, Section 23 of the North Carolina.
14 　A. I am asserting my rights under the Fifth Amendment
15 to the United States Constitution as well as state law
16 including Article 1, Section 15 of the California
17 Constitution and Article 1, Section 23 of the North Carolina
18 Constitution and therefore I respectfully decline to
19 answer.
20 BY MR. KAMRAS:
21 　Q. In your view those lies were justified because they
22 served a greater good, right?
23 　　MR. BROOKS: Objection, form, lack of
24 foundation, assumes facts not in evidence, is also
25 argumentative and harassing, particularly since she hasn't

1 testified to anything in that regard.
2 　　MR. KAMRAS: You can probably just stop after
3 anything.
4 　　MR. BROOKS: That's not true. Also, I direct
5 the witness not to answer pursuant to the Fifth Amendment to
6 the United States Constitution, as well as state law
7 including Article 1, Section 15 of the California
8 Constitution and Article 1, Section 23 of the North Carolina
9 Constitution.
10 　A. I am asserting my rights under the Fifth Amendment
11 to the United States Constitution as well as state law
12 including Article 1, Section 15 of the California
13 Constitution and Article 1, Section 23 of the North Carolina
14 Constitution and therefore I respectfully decline to
15 answer.
16 BY MR. KAMRAS:
17 　Q. That greater good in your view is stopping abortion,
18 correct?
19 　　MR. BROOKS: Objection, form, lack of
20 foundation, assumes facts not in evidence, is vague and
21 ambiguous, also argumentative and harassing, and effectively
22 asked and answered. Additionally, I direct the witness not
23 to answer pursuant to the Fifth Amendment to the United
24 States Constitution, as well as state law including Article
25 1, Section 15 of the California Constitution and Article 1,

1 Section 23 of the North Carolina Constitution.
2 　A. I am asserting my rights under the Fifth Amendment
3 to the United States Constitution as well as state law
4 including Article 1, Section 15 of the California
5 Constitution and Article 1, Section 23 of the North Carolina
6 Constitution and therefore I respectfully decline to
7 answer.
8 BY MR. KAMRAS:
9 　Q. That greater good that those lies served, in your
10 view, was to stop any abortion, correct?
11 　　MR. BROOKS: Objection, form, lacks foundation,
12 assumes facts not in evidence, is vague, ambiguous,
13 argumentative and harassing. Additionally, I direct the
14 witness not to answer pursuant to the Fifth Amendment to the
15 United States Constitution, as well as state law including
16 Article 1, Section 15 of the California Constitution and
17 Article 1, Section 23 of the North Carolina Constitution.
18 　A. I am asserting my rights under the Fifth Amendment
19 to the United States Constitution as well as state law
20 including Article 1, Section 15 of the California
21 Constitution and Article 1, Section 23 of the North Carolina
22 Constitution and therefore I respectfully decline to
23 answer.
24 BY MR. KAMRAS:
25 　Q. That greater good that justified those lies was, in

Page 310

1  your view, to stop any abortion, even legal abortion,
2  correct?
3       MR. BROOKS: Objection, form, lacks foundation,
4  assumes facts not in evidence, is vague, ambiguous, calls for
5  a legal conclusion. Additionally, I direct the witness not
6  to answer pursuant to the Fifth Amendment to the United
7  States Constitution, as well as state law including Article
8  1, Section 15 of the California Constitution and Article 1,
9  Section 23 of the North Carolina Constitution. Also, I
10  object to these questions as argumentative and harassing.
11      A. I am asserting my rights under the Fifth Amendment
12  to the United States Constitution as well as state law
13  including Article 1, Section 15 of the California
14  Constitution and Article 1, Section 23 of the North Carolina
15  Constitution and therefore I respectfully decline to
16  answer.
17  BY MR. KAMRAS:
18      Q. I have no further questions.
19      MR. BROOKS: Time has expired.
20      MR. KAMRAS: I think time is close to
21  expiring, but in any event --
22      THE VIDEOGRAPHER: Two minutes.
23      MR. BROOKS: I have no questions. Do you want
24  to ask her about reading and waiving? You want to put that
25  on the record?

Page 311

1       MR. ROBINSON: That's you.
2       MR. BROOKS: Usually the deponent does that --
3  opposing witness does that.
4       MR. ROBINSON: Signing and reading?
5       MR. BROOKS: Yeah, but we're going to review
6  and sign and read.
7       MR. ROBINSON: Yeah, that's up to you.
8       MR. BROOKS: If you want me to invoke, I'm
9  going to invoke it. Usually the deposing lawyer asks --
10      (All Counsel speaking at once)
11      MR. BROOKS: In North Carolina everyone does
12  it. It has to be by agreement. You can insist on it if she
13  says no. If we say no, you can insist on it.
14      MR. ROBINSON: It would be Federal Rules
15  apply.
16      THE VIDEOGRAPHER: We're still on record.
17      MR. ROBINSON: You can go off record.
18      THE VIDEOGRAPHER: We're going off record. The
19  time is 6:47 p.m.. This is the end of DVD Number 5 and
20  concludes this deposition.
21      (The video deposition concluded at 6:47 p.m.)
22      (SIGNATURE RESERVED)
23
24
25

Page 312

1           UNITED STATES DISTRICT COURT
2                  FOR THE
3           NORTHERN DISTRICT OF CALIFORNIA
4  _____
   PLANNED PARENTHOOD FEDERATION OF AMERICA,  )
5  INC., ET AL,                               )
6       Plaintiff            )
7       VS.                  )
8  CENTER FOR MEDICAL PROGRESS, ET AL,     )
                                    )
9       Defendant        )
                            )
10
11
12      I, Tamara Violette, PR, a certified court reporter
   and notary public for Pender County, North Carolina, do
13  hereby certify that Annamarie Davin appeared before me on
   March 22, 2019 and was duly sworn by me; that she was
14  required to review the transcript; that she was thereupon
   examined and her testimony transcribed by me or under my
15  direct supervision; that the foregoing 311 pages constitute a
   true and accurate record of the proceedings to the best of my
16  knowledge and belief;
        I further certify that I am neither attorney or
17  counsel for, nor related to or employed by, any of the
   parties to the action in which this deposition was taken, and
18  further, that I am not a relative or employee of any attorney
   or counsel employed by the parties hereto, not interested,
19  directly or indirectly, in the matters of controversy nor
   financially interested in the results of this action.
20      In witness whereof, I have hereunto set my hand on
   this, the 5th day of April, 2019.
21
22  _____
23         TAMARA GSCHWANDTNER
           PROFESSIONAL REPORTER
24
25

Page 313

1           UNITED STATES DISTRICT COURT
2                  FOR THE
3           NORTHERN DISTRICT OF CALIFORNIA
   _____
   PLANNED PARENTHOOD FEDERATION OF AMERICA,  )
4  INC., ET AL,                          ) WITNESS
5       Plaintiff        )CERTIFICATE
                          )
6       VS.              )
                          )
7  THE CENTER FOR MEDICAL PROGRESS, ET AL,  )
                                    )
8       Defendant        )
                          )
9
10      I, Annamarie Davin, hereby certify that I was
   first duly sworn prior to the commencement of my
11  deposition, which was given before Tamara Gschwandtner, PR in
   Jacksonville, North Carolina, on March 22, 2019; and that
12  review, examination and signing of the transcript was not
   waived.
13      I further certify that the foregoing pages
   constitute a true and accurate transcript of said
14  examination:
15      (A)_____And no changes are necessary,
16
17      (B)_____However, I desire the changes attached
   hereto be incorporated into said transcript.
18
19      _____
20           Annamarie Davin
21      Witness my hand on this, the _____ day of
       _____, 2019.
22  State of_____
23  County of _____
   sworn to and subscribed before me on this,
24  the _____ day of _____, 2019.
25  My commission expires:  _____

79

Page 314

1    ERRATA SHEET
     DEPOSITION OF ANNAMARIE DAVIN
2    TAKEN ON MARCH 22, 2019

3    _____

     PAGE #  LINE #  CURRENT  CHANGE  REASON
4    _____
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
23   _____
24   _____
        WITNESS INITIALS
25

# EXHIBIT 6

116 New CA Clients - 116 new legal clients seeking a CA attorney. View their cases today. | **Read More »**

# Anna B.

---

San Francisco Bay Area | Government Relations

Previous     Santa Clara County Board of Supervisors, Live Action Films, Morgan Stanley Smith Barney
Education    New Charter University, San Francisco, CA

| Send Anna InMail |

**215**
connections

**Background**

 Experience

### Policy Analyst, County Supervisor Mike Wasserman's Office
Santa Clara County Board of Supervisors
2013 – 2015 (2 years) | San Francisco Bay Area

Policy issue areas:

- Mental Health, Drug & Alcohol Departments
- Public Health Department
- Social Services Agency
- Department of Child Support Services
- Senior Nutrition & Public Guardian
- Affordable Housing & Homelessness
- County Library District & Library JPA
- Children, Seniors and Families Committee
- Health & Hospital Committee
- Health & Hospital System (Valley Medical Center & Clinics)



 Next search result        ✕
**Anna Davin** scholar at history
workshop

 Search for people, jobs, companies, and more...

Home          Profile          My Network          Jobs          Interests

## Project Manager
Live Action Films
February 2009 – March 2012 (3 years 2 months) | San Jose, CA

• Assisted with public relations functions: matching grant campaigns, press releases, social media promotion, and Capitol Hill communication during election seasons and investigative releases.

• Coordinated 2011/12 $250/500k matching grant campaigns. Assisted with grant writing, large donor research and key cross-organizational relationships.

• Developed 2010-11 internship programs and office systems and policies. Managed eight cloud-based independent contractors.

• Transitioned organization to customized SalesForce CRM platforms.

• Doubled campus outreach coordinators to manage over three hundred national distributors of human rights magazine (circulation 250,000).

• Organized educational presentations on women's health in twenty-five states (coordinated with over fifty organizations and three hundred contacts).

• Assisted with the recruitment and training of sixty students for social media promotion. (Consistently reached fanbase of 300,000 with 30,000,000 views.)

## Marketing and Financial Research Analyst
Morgan Stanley Smith Barney
January 2012 – 2012 (less than a year) | San Jose, CA



## Development Administrator
Frontline USA
November 2006 – 2011 (5 years) | Rondebosch, Cape Town, South Africa

• Initiated non-profit and incorporation filing, merchant and payroll processing, and managed annual Form 990 reporting.

• Doubled US support within first three years. Oversaw transfers to various African countries ($1M budget) and managed office operations.

• Coordinated logistics for education shipments to Zambia, Nigeria, Sudan, the Congo, Zimbabwe, and Ghana.

• Coordinated conferences and donor development with South African based staff.

• Provided human trafficking and sexual abuse research for w  programs and training seminars.

**Anna Davin** scholar at history workshop                >

## Intern

**Silicon Valley GOP**

 Search for people, jobs, companies, and more...

Provided administrative support for voter initiation drives and new citizen ceremonies.

• Coordinated phone-banking/precinct divisions for Rep. Marilyn Musgrave's 2006 election (Denver, CO), and San Jose Mayor Chuck Reed and Councilmember Pete Constant.

### Development & Financial Assistant
Frontline, South Africa
June 2006 – July 2007 (1 year 2 months) | Cape Town Area, South Africa

---

 Organizations

### American Harp Society
Starting January 2008

### Additional Organizations

American Harp Society, United States Figure Skating Association (USFSA), Court Appointed Special Advocates (CASA), Diocese of San Jose, University of Cape Town - South Africa

---

 Certifications

### Guardian / Education Rights Certification
Child Advocates of Silicon Valley
Starting September 2012



### Sexual Assault Victim Counselor
California Emergency Management Agency
Starting August 2014



---

 Volunteer Experience & Causes

### NGO Development: 2013 Middle East Nominee
Peace Corps
2013 | Human Rights

Next search result   &times;
**Anna Davin** scholarly history workshop



>

### Court-Appointed Child Advocate: Dependency Court
Child Advocates of Silicon Valley

 
2012 – 2015 (3 years) | Social Services

• Appointed by the Superior Court to collaborate with social workers, attorneys, therapists and guardians involved in foster youth court cases.
• Investigate case facts and provide recommendations in written court reports.
• Hold parent/guardian education rights.

### Registrar of Voters: Election Officer
County of Santa Clara

2006 – 2015 (9 years) | Social Services



### Gabriel Project: Social Services Coordinator, South Bay
Diocese of San Jose

2012 – 2015 (3 years) | Social Services



• Coordinate emergency housing services for expectant mothers in crisis.
• Manage 50 volunteers and provide annual training classes to 30 parish communities.

### Rape Crisis Department: Sexual Assault Advocate
YWCA Silicon Valley

2014 – June 2015 (1 year) | Human Rights


eliminating racism
empowering women
**ywca**
silicon valley

• Provide confidential counseling to victims of rape and assault at emergency medical exams.
• Coordinate victim support with emergency room staff and law enforcement. (SART team)
• Provide counseling to child abuse and rape victims through Santa Clara County's assault hotline.

### Organizations Anna supports:

• Court Appointed Special Advocates
• Peace Corps
• United States Figure Skating Association
• YWCA Domestic Violence Intervention & Prevention Program
• Gabriel Project, Diocese of San Jose

---

 Education

### New Charter University, San Francisco, CA
Master of Public Administration (MPA)
2010 – 2012

### Charter Oak State College, Hartford, CT
Bachelor of Arts, Sociology
2009


Next search result          ×
**Anna Davin** scholar at history workshop          >



· **Advice for Contacting Anna**

email: annamariegb@gmail.com

### Skills

Top Skills

| | | |
|---|---|---|
| **2** | Public Relations | |
| | Local Government | |
| **2** | Grant Writing | |
| **2** | Program Management | |
| **1** | Public Policy | |
| **3** | Nonprofits | |
| **5** | Event Planning | |
| **4** | Public Speaking | |
| **3** | Research | |
| **1** | International... | |

Anna also knows about...

| **2** Social Services | Public Affairs | Administrative... | **2** Government | **2** Analysis |
|---|---|---|---|---|
| **2** Budgets | **1** Volunteer Management | **1** Fundraising | **2** Community Outreach | |
| **1** Social Media | | | | |

**Groups**

Global    Global Public Health    HOUSING

Next search result    ✕
**Anna Davin** scholar at history workshop




| Global Public Health | Global Public Health... | Housing 1000 | Center for Nonprofit... |
|---|---|---|---|
| 160,350 members | 12,466 members | 35 members | 2,079 members |
| Join | Join | Join | Join |

**Following**

## Companies



**U.S. Chamber of Co...**
Government Relations
Follow



**County of Santa Clara**
Government
Administration
Follow



**BUILD**
Nonprofit Organization
Management
Follow



**Kaiser Permanente**
Hospital & Health Care
Follow

**Zeiders Enterprises,...**
Individual & Family
Services
Follow

**NACo**

**National Association...**
Public Policy
Follow

Jacksonville•Onslow

**Jacksonville•Onslow...**
Hospitality
Follow

See 9 more

---

Help Center  |  About  |  Careers  |  Advertising  |  Talent Solutions  |  Sales Solutions  |  Small Business  |  Mobile  |  Lan

LinkedIn Corporation © 2015  |  User Agreement  |  Privacy Policy  |  Ad Choices  |  Community Guidelines  |  Cookie Poli



Next search result          ×
**Anna Davin** scholar at history
workshop                          >

# EXHIBIT 7

| From: | David Daleiden ███████████████████ |
|---|---|
| Sent: | 8/21/2013 7:43:28 PM |
| To: | ███████████████████ |
| CC: | Annamarie Bettisworth ███████████████ |
| Subject: | Introductory Materials |
| Attachments: | NondisclosureAgreement.pdf |

Hi Brianna,

Great to meet you and speak with you last night. Please find attached a Non-Disclosure Agreement to sign and return to me or Anna.

Also, please begin to familiarize yourself with the data from Mark Crutcher's investigation from 13 years ago (http://www.lifedynamics.com/Abortion_Information/Baby_Body_Parts/index.cfm). Pay special attention to the Order Forms (pg 3), Tissue Logs (pg 5), and Clinic Protocols/Consent (pg 7), as those are things your character should be familiar with.

Also, this article from WORLD Magazine, "The Harvest of Abortion," is a good intro to the entire subject: http://www.worldmag.com/1999/10/the_harvest_of_abortion

For an example of the altruistic justification for your dirty work, see this presentation by Dr. Aileen Anderson of UC Irvine on her neural stem cell research. Her treatment for spinal cord injury is far advanced in clinical trials and in the laboratory has made paralyzed mice walk again. However, it requires 2nd trimester aborted fetal brain cells to do so. She mentions this ever so briefly about 11 minutes in: http://www.youtube.com/watch?v=FB7Cij-RCFw

Thanks Brianna! Please let me know if you have any questions.

-David

███████████


PLAINTIFF'S
EXHIBIT
TG
213
Davin 3-22-19
PENGAD 800-631-6989

CM00044

# INDIVIDUAL NONDISCLOSURE AGREEMENT

This Nondisclosure Agreement (this "Agreement") is dated as of _____,
2013, between David Daleiden, (hereinafter referred to as "DISCLOSER") as one party
and _____ (hereinafter referred to as "RECIPIENT") as
the other party to this Agreement.

## RECITALS

    A.  In connection with the evaluation or pursuit of certain mutually desirable research
projects, DISCLOSER may disclose valuable proprietary information to
RECIPIENT relating to its respective investigative research and journalism,
expert analysis, and related media projects.

    B.  DISCLOSER would like to protect the confidentiality of, and maintain its
respective rights in and prevent the unauthorized use and disclosure of such
information.

## DISCLOSER AND RECIPIENT HEREBY AGREE AS FOLLOWS:

**1. Confidential Information.** As used in this Agreement, "Confidential Information"
means all information of DISCLOSER that is not generally known to the public, whether
of a technical, scientific, investigative, journalistic, or other nature (including, without
limitation, (i) investigative research and analysis, journalistic notes and writings,
surveillance studies, trade secrets, know-how and information relating to the science,
technology, political studies, written works, operations plans, media projects,
promotional activities, finances, and other affairs of DISCLOSER, and (ii) the identity of
operations and research associates, research subjects, research facilities, fellow
researchers and journalists, and the providers or source of information or documentation
for any DISCLOSER research), that is disclosed by DISCLOSER to RECIPIENT or that
is otherwise learned by RECIPIENT in the course of their discussions or dealings with, or
their physical or electronic access to the premises of, DISCLOSER, and that has been
identified as being proprietary and/or confidential or that by the nature of the
circumstances surrounding the disclosure or receipt ought to be treated as proprietary and
confidential. Confidential Information also includes all information concerning the
existence and progress of the parties' dealings, the subject matter of DISCLOSER's
investigative research and the identity of DISCLOSER's research affiliates, regardless of
whether any such information is marked or otherwise identified in writing as confidential.

**2. Use and Ownership of Confidential Information.** RECIPIENT, except as expressly
provided in this Agreement, will not disclose Confidential Information to anyone without
DISCLOSER's prior written consent. In addition, RECIPIENT will not use, or permit
others to use, Confidential Information for any purpose other than RECIPIENT's
evaluation of DISCLOSER's investigative research projects, media projects, general
operations and/or services as applicable, and, if pursued by the parties, negotiation and
consummation of a contractual arrangement regarding RECIPIENT's products and/or
services.

CM00045

RECIPIENT will take all reasonable measures to avoid disclosure, dissemination or unauthorized use of Confidential Information, including, at a minimum, those measures it takes to protect its own confidential information of a similar nature. All Confidential Information will remain the exclusive property of DISCLOSER, and RECIPIENT will have no rights, by license or otherwise, to use, disclose or discuss the Confidential Information with any third party except as expressly provided herein.

**3. Exceptions.** The provisions of Section 2 will not apply to any information that (i) is or becomes publicly available without breach of this Agreement; (ii) can be shown by documentation to have been known to RECIPIENT prior to its receipt from DISCLOSER; (iii) is rightfully received from a third party who did not acquire or disclose such information by a wrongful or tortuous act; or (iv) can be shown by documentation to have been developed by RECIPIENT without reference to any Confidential Information.

**4. Disclosures to Governmental Entities.** If RECIPIENT becomes legally obligated to disclose Confidential Information by any legal proceeding, governmental entity or regulatory agency with jurisdiction over it, RECIPIENT will give DISCLOSER prompt written notice to allow DISCLOSER to seek a protective order or other appropriate remedy. Such notice must include, without limitation, identification of the information to be so disclosed and a copy of the order or legal action. RECIPIENT will disclose only such information as is legally required and will use their reasonable best efforts to obtain confidential treatment for any Confidential Information that is so disclosed.

**5. Return of Confidential Information.** Upon DISCLOSER's written request, RECIPIENT promptly will return or destroy (or, in the case of electronic embodiments, permanently erase) all tangible material embodying Confidential Information (in any form and including, without limitation, all summaries, copies and excerpts of Confidential Information) in their possession or under their control.

**6. Injunctive Relief.** RECIPIENT acknowledges that disclosure or use of Confidential Information in violation of this Agreement could cause irreparable harm to DISCLOSER for which monetary damages may be difficult to ascertain or an inadequate remedy. RECIPIENT therefore agrees that DISCLOSER will have the right, in addition to its other rights and remedies, to injunctive relief for any violation of this Agreement without posting bond, or by posting bond at the lowest amount required by law.

**7. Limited Relationship.** This Agreement will not create a joint venture, partnership or other formal business relationship or entity of any kind, or an obligation to form any such relationship or entity. Each party will act as an independent contractor and not as an agent of the other party for any purpose, and neither will have the authority to bind the other.

**8. Cumulative Obligations.** Each party's obligations hereunder are in addition to, and not exclusive of, any and all of its other obligations and duties to the other party, whether express, implied, in fact or in law.

CM00046

**9. Entire Agreement; Amendment.** This Agreement constitutes the entire agreement between the parties relating to the matters discussed herein and supersedes all prior oral and written understandings with respect to any information disclosed or received under this Agreement. This Agreement may be amended or modified only with the mutual written consent of the parties.

**10. Term and Termination.** This Agreement is intended to cover Confidential Information disclosed by DISCLOSER prior or subsequent to the date of this Agreement. Unless otherwise earlier terminated, this Agreement automatically will expire three (3) years from the date first written above; provided, however, that RECIPIENT's obligations with respect to DISCLOSER's Confidential Information disclosed or received prior to termination or expiration will survive for two (2) additional years following the expiration or termination of this Agreement.

**11. Nonwaiver.** Any failure by either party to enforce the other party's strict performance of any provision of this Agreement will not constitute a waiver of its right to subsequently enforce such provision or any other provision of this Agreement.

**12. Attorney Fees.** In the event any court action is commenced by one party against the other, the prevailing party is entitled to recover its out-of-pocket and court costs and reasonable attorney fees.

**13. Governing Law; Severability; Etc.** This Agreement will be governed by internal laws of the State of California, without reference to its choice of law rules, may be executed in counterpart copies, and, in the absence of an original signature, faxed signatures or electronically scanned and emailed signatures will be considered the equivalent of an original signature. Each party hereby waives its right to a jury trial for any claims that may arise out of this Agreement. If a provision of this Agreement is held invalid under any applicable law, such invalidity will not affect any other provision of this Agreement that can be given effect without the invalid provision. Further, all terms and conditions of this Agreement will be deemed enforceable to the fullest extent permissible under applicable law, and, when necessary, the court is requested to reform any and all terms or conditions to give them such effect.

The parties have executed this Agreement on the date first written above.

| DISCLOSER | RECIPIENT |
|---|---|

David Daleiden

Date: _____     Date: _____

Mailing Address: David Daleiden     Mailing Address:

CM00047

# EXHIBIT 8

CALIFORNIA USA
DRIVER LICENSE

DL ████████
EXP ████████
DOB
AGE 21 IN ████

CLASS C
END NONE
RSTR CORR LENS

DONOR

LN BETTISWORTH
FN ANNAMARIE GATES

SEX
HAIR        EYES
HGT         WGT

DD

PLAINTIFF'S EXHIBIT
215
Davin
3-22-19
PENGAD 800-631-6989



# EXHIBIT 9





PENGAD 800-631-6989

PLAINTIFF'S
EXHIBIT
TG
2/6
Davin
3-22-19





# EXHIBIT 10



# NATIONAL ABORTION FEDERATION

## Annual Meeting Registration Form

### Register for the NAF Annual Meeting three ways:

 **ONLINE AT:**
http://members.prochoice.org
(This is a secure site. Any information entered at this site is encrypted and is only seen by NAF.)

 **FAX TO NAF AT:**
202-667-5899

 **MAIL TO NAF AT:**
NAF Training and Education Department
1660 L Street, NW, Suite 450
Washington, DC 20036

Questions can be directed to NAF's Training and Education Department at 202-667-5881.

Registered attendees will receive a confirmation letter sent to your unique email address within 10 business days of NAF's receipt of your registration. Please contact NAF if you do not receive a confirmation within 10 days of submission.

Early Bird registration closes on Thursday, March 26, 2015, 11:59pm EDT. Regular registration closes on Thursday, April 2, 2015, 11:59pm EDT. Forms received after this date will not be processed; attendees will need to register on-site.

*Photocopy this form as needed for additional registrants. Please pay by check in U.S. funds or by credit card.*

---

**Please Print Clearly:**

Rebecca Wagner
Name (as it should appear on badge) _____ Suffix or Degree

BioMax Procurement Services
Affiliation/Institution (as it should appear on badge)

6444 E Spring St 725
Affiliation Address

Long Beach
City

CA          90815          U.S.A.
State/Province   Zip/Postal Code   Country

562-281-5041
Telephone _____ Fax

rebecca@biomaxps.com
Email (A unique email address is required for all registrants.)

**Please check all that apply:**

☐ NAF Member ID#

☐ Non-member

☐ Medical/Clinical/Law student/Resident
Name of Program or School

_____

*Non-members who are not PPFA affiliate members must submit a letter of sponsorship from a NAF member or PPFA affiliate member. All non-members must preregister.*

**Special Needs:**
Please register in advance. The hotel is in compliance with the Americans with Disabilities Act.

☐ Assistance Required
Please specify:

_____

_____

**Payment Method**
To qualify for the Early Bird Rate, your registration must be postmarked by Thursday, March 26, 2015. All registrations received after this date will be subject to standard registration fees.

☐ Check enclosed (payable to NAF)
Checks must include "AM15" and names of registrants in Memo line or separate paper

Charge to my:
☒ VISA  ☐ MasterCard  ☐ American Express

4427-4270-4786-0756
Card number

8/18                    875
Expiration date          Security code

BioMax Procurement Services
Name of card holder

8400 Edinger Ave #P-107
Billing Address

Huntington Beach, CA  92647  U.S.A.
City          State/Province   Zip/Postal Code   Country

_____
Signature of card holder

---

Are you interested in NAF membership?     ☐ Yes   ☐ No

For more information about NAF membership, contact Melissa Fowler at 202-667-5881 ext. 217 or mfowler@prochoice.org.



PLAINTIFF'S
EXHIBIT
2/7
Davin  3-22-19
PENGAD 800-631-6989



# Application Agreement for Exhibit Space

**NATIONAL ABORTION FEDERATION**

Instructions: Please complete all information. Complete and sign the application form. Return the completed application with credit card information or a check, payable to NAF for the full cost of exhibiting and registration for educational sessions. A unique email address is required for each exhibitor personnel—registration will not be processed without this information, unless countersigned by NAF that serves as a contract for exhibit space and the following Rules and Regulations are expressly incorporated herein. Confirmation notices will be emailed within five business days of receipt.

Deadline: Applications and fees must be received in the NAF office by Monday, February 23, 2015.

1. The exact information for the list of exhibitors in the conference Final Program: (Please print clearly)

   Company/Organization Name: BioMax Procurement Services, LLC

   Address: 6444 E Spring St #725

   City: Long Beach   State/Prov: CA

   Zip/Postal Code: 90815   Country: U.S.A

   Contact Name: Brianna Allen

   Telephone: 562 281 5041   Fax:

   Email: procurement@biomaxps.com

   Website URL: biomaxps.com

2. Exhibiting Company or Organization Information:
   (if different from above)

   Company/Organization Name: _____

   Address: _____

   City: _____   State/Prov: _____

   Zip/Postal Code: _____   Country: _____

   Telephone: _____   Fax: _____

   Email: _____

   Contact Name: _____

3. Exact wording for your exhibit booth identification sign:

   BioMax Procurement Services, LLC

4. Name and title of exhibitor representative(s):

   Primary Representative (included in exhibit fee:
   Susan   Tennenbaum
   First   Last
   C.E.O.   susan@biomaxps.com
   Title   Email (required)

   Additional Representative:
   (Maximum of two (2) additional exhibitor personnel per purchased exhibit booth)
   Robert   Sarkis
   First   Last
   Procurement Manager   bob@biomaxps.com
   Title   Email (required)

   ☑ Add educational pass

   Additional Representative:
   Adrian   Lopez
   First   Last
   Procurement Technician   adrian@biomaxps.com
   Title   Email (required)

   ☑ Add educational pass

5. List the products or services to be exhibited:
   fetal tissue procurement,
   human biospecimen procurement

6. Exhibit Placement:
   NAF reserves the right to determine the final placement of all exhibiting companies.
   Colleagues/companies you wish to be positioned near:

   Competitors:
   Stem Express, ABR, Novogenix

7. Exhibit Booth Fees:
   ☑ $2,500 Commercial Firms   $ 2500
   ☐ $1,900 NAF Group Purchasing Vendor   $ _____
   ☐ $1,220 NAF Member   $ _____
   ☐ $1,500 Non Member, Nonprofit Organizations   $ _____

8. Sponsorship Opportunities.
   ☐ Welcome Reception: $20,000   $ _____
   ☐ Platinum Level, Continental Breakfast: $16,000   $ _____
   ☐ Gold Level, Treat Break: $12,000   $ _____
   ☐ Silver Level, Mix and Mingle Lounge: $10,000   $ _____
   ☐ Hotel Room Drop: $7,500   $ _____
   ☐ Lanyards: $3,000   $ _____
   ☐ Flash Drives: $2,500   $ _____
   ☐ Bag Insert: $1,500   $ _____

9. To advertise in NAF's 39th Annual Meeting Final Program, submit press-ready artwork in the following acceptable formats: PDF, TIF, JPG. Artwork must be submitted by Friday, February 20, 2015.
   ☐ Full page 8.5" x 11" advertisement - $1,000   $ _____
   ☐ Half-page 8.5" x 5.5" advertisement - $600   $ _____

10. Total
    Exhibit Booth: _____   1  Booths × $2,500 $ 2500
    Additional Exhibit Representatives: $300 × ____   $ _____
    Additional Reps w/Educational Pass: $395 × 2   $ 790
    Sponsorship:   $ _____
    Advertisement:   $ _____
    TOTAL FEES: $ 3290

11. Payment: Payment should accompany this application. NAF will notify exhibitor of acceptance of this application within five business days of receipt.

# Exhibit Rules and Regulations

The following Rules and Regulations are expressly incorporated as part of this Agreement. Exhibitors, their officers, employees, and agents agree to abide and be bound by these Rules and Regulations.

1. Eligibility to Exhibit — Companies with an intended business interest in reaching reproductive health care professionals, including NAF provider members, are invited to participate in the National Abortion Federation's (NAF) Annual Meeting.

2. Exhibitor expressly acknowledges NAF's right to accept or reject applications for exhibit space for any reason, including (without limitation) at NAF's sole discretion, that the proposed exhibit or the exhibitor's business, products, services or performance in the field are not consistent with NAF's purposes and objectives. NAF also reserves the right to request further information from any Exhibitor and/or persons or entities that have done business with Exhibitor in order to evaluate its application. Exhibitor expressly agrees to provide further information promptly if requested by NAF.

3. Refunds of the application fee and/or exhibit fee are made only as follows: the full amount of the exhibit fee paid will be refunded if the application is not accepted. A $100.00 service charge will be deducted from each refund requested before March 16, 2015. No refunds will be made after March 16, 2015.

4. Arrangements for shipment of materials and equipment and other set up requirements are at the Exhibitor's sole expense.

5. Use of Space — In Exhibitor shall assign, sublet, or share the space allotted without the advance knowledge and consent of NAF. Exhibitors must show only products provided by them in the regular course of their business. All demonstrations or other sales and promotional activities must be confined to the limits of each exhibition contracted exhibit space. Assigned areas of the conference venue remain strictly under control of NAF and signage, banners or other advertising materials shall not be displayed. It is the Exhibitor's responsibility to bring a display that fits within the contracted space.

6. For the integrity of the tradeshow, all exhibits must be fully erected by 3:00 pm on Sunday, April 19. No exhibit shall be dismantled prior to 2:00 pm on Tuesday, April 21. Exhibits not installed by 3:00 pm on Sunday, April 19, may forfeit space at the exhibitor's expense. NAF reserves the right to make changes to the Exhibit dates and hours stated. NAF will inform each Exhibitor in advance if such schedule changes are made.

7. Care of Premises & Compliance/Exhibit Facility Regulations — No part of the exhibit nor signs or other materials may be pasted, nailed or otherwise affixed to walls, doors, or other surfaces in a way that might mar or deface the premises or exhibit furnishings. Nothing may be rigged, suspended from, or attached to any Hyatt Regency Baltimore mechanical system. Damage from failure to observe this notice is payable by the Exhibitor.

8. All exhibiting company representatives must be registered for the NAF Annual Meeting, and must wear identifying badges as requested by NAF. Such identification will be required to gain entry to the exhibit area and all meeting rooms. Exhibiting companies are limited to two (2) additional representatives and 8 x 8' exhibit booth.

9. Exhibitors must comply fully with all applicable national, state, county, city, hotel, fire and safety regulations, and any relevant labor contracts as well as any further rules and regulations NAF adopts.

10. Security will be provided by NAF for the conference period including set up and dismantling. However, NAF makes no warranties and Exhibitors are responsible for any loss, damage, or injury to their exhibits, other property, or persons and/or any claims in any way arising out of their exhibiting at the Annual Meeting. Exhibitors expressly release NAF from any such responsibility or liability.

11. All insurance, including (without limitation) business interruption and public liability coverage are the sole responsibility of the Exhibitor. NAF does not maintain insurance covering Exhibitors, and Exhibitors expressly release NAF from any such responsibility or liability.

12. The Exhibitor agrees to indemnify and hold NAF harmless for any claims for loss, damage, or injury, including reasonable attorneys' fees, connected with the Exhibitor's exhibit at the Annual Meeting and expressly releases NAF from any such responsibility or liability.

13. Photography of exhibits by anyone other than NAF or the assigned Exhibitor of the space being photographed is strictly prohibited.

14. Exhibitor agrees to display and/or represent their products and/or services in a dignified and decorous manner. Any display or conduct that, at NAF's sole discretion, is not in keeping with the general decorum of the Annual Meeting and/or purposes and objectives of NAF, is grounds for removal of the exhibit by the Exhibitor, at the Exhibitor's expense, promptly upon notification by NAF. Prohibited activities by Exhibitors include, but are not limited to, any conduct or attention-getting devices of any kind that annoy, disturb, or in any way interfere with other exhibits.

15. Exhibitor agrees to identify, display, and/or represent their business, products, and/or services truthfully, accurately, and consistently with the information provided in the Application. Any display, conduct, or offer of any information of any kind that, at NAF's sole discretion, is determined to be inconsistent, inaccurate, misleading, or inconsistent with the information provided in the Application is grounds for cancellation of this Agreement and/or removal of the exhibit by the Exhibitor at the Exhibitor's expense promptly upon notification from NAF. Exhibitor understands that exhibitor shall attend educational content and not to engage in promotional activities within the CME activity or in any space outside the exhibit hall.

16. No refunds of fees will be made in the case of cancellations or removal of exhibits pursuant to paragraphs 14 and 15 of these Rules and Regulations. Additionally, Exhibitors agree to reimburse NAF for all costs incurred by NAF, including reasonable attorneys' fees, in handling or responding to any violations of any provisions of this entire agreement.

17. In connection with NAF's Annual Meeting, Exhibitor understands that any information NAF may furnish is confidential and not available to the public. Exhibitor agrees that all written information provided by NAF, or any information which is disclosed orally or visually to Exhibitor, or any other exhibitor or attendee, will be used solely in conjunction with Exhibitor's business and will be made available only to Exhibitor's officers, employees, and agents, unless authorized in writing by NAF. All information is confidential and should not be disclosed to any other individual or third parties.

18. It is further understood and agreed by Exhibitor that no failure or delay by NAF in exercising any right, power, or privilege hereunder shall operate as a waiver hereof, nor shall any single or partial exercise thereof preclude any other or further exercise of any right, power, or privilege hereunder. Exhibitor also understands and agrees that monetary damages would not be a sufficient remedy for any breach of this agreement by Exhibitor or Exhibitor's officers, employees, or agents and that NAF will be entitled to specific performance and injunctive relief as remedies for any such breach. Such remedies shall not be deemed to be exclusive remedies for breach of this Agreement by Exhibitor or Exhibitor's officers, employees, or agents, but shall be in addition to all other remedies available at law or equity.

19. By signing this Agreement, the Exhibitor affirms that all information contained herein, contained in any past and future correspondence with either NAF and/or in any publication, advertisements, and/or exhibits displayed at, or in connection with NAF's Annual Meeting, is truthful, accurate, complete, and not misleading.

20. Changes in the information provided to NAF are permitted only upon NAF's written approval. Exhibitor agrees to notify NAF of any such proposed changes at least 10 days prior to the commencement of the exhibit. NAF, at its sole discretion, may cancel this agreement, if (1) NAF does not approve the changes or (2) notification of the changes is less than 10 days before the exhibit.

I agree to comply with Exhibitor Rules and Regulations 1-20. I also agree to hold in trust and confidence any confidential information received in the course of exhibiting at the NAF Annual Meeting and agree not to reproduce or disclose confidential information without express permission from NAF. Violation of this paragraph could result in civil and/or criminal penalties.

Company Name: BioMax Procurement Services

Signature: _____

Print Name: Susan Tennenbaum

Title: C.E.O.

Date: 3-25-15

Submit contract and payment or payment information by mail or fax to:

National Abortion Federation
Attn: Michelle Davis
1660 L Street, NW, Suite 450
Washington, DC 20036
Phone: 202-667-5881 ext 450
Fax: 202-667-5890

ACCEPTED: NATIONAL ABORTION FEDERATION

Signature: _____

Print Name: Nichelle Davis

Title: Group Purchasing Manager

Date: _____

Exhibit Assignment: _____



## NATIONAL ABORTION FEDERATION
## WRITTEN AGREEMENT FOR COMMERCIAL SUPPORT

The National Abortion Federation (NAF) is accredited by the Accreditation Council for Continuing Medical Education (ACCME) to provide continuing medical education (CME) credits for our educational activities. As an Accredited Provider, NAF is committed to presenting CME activities that promote improvements or quality in healthcare and are independent of the control of commercial interests. As part of this commitment, NAF has outlined in this written agreement the terms, conditions, and purposes of commercial support for our CME activities. Commercial Support is defined as financial, or in-kind, contributions given by a Commercial Interest, which is used to pay all or part of the costs of a CME activity. The ACCME defines a Commercial Interest as "any proprietary entity producing health care goods or services, with the exemption of non-profit or government organizations and non-health care related companies." The ACCME does not consider providers of clinical services directly to patients to be commercial interests.

| Title of CME Activity | 2015 Annual Meeting and related workshops, seminars, and auxiliary meetings | | |
|---|---|---|---|
| Activity Location | Baltimore, MD | Activity Date | April 18-21, 2015 |
| Name of Commercial Interest | | | |
| BioMax Procurement | | | |
| Amount of Educational Grant Support (direct or in-kind) | | | |
| Amount of General Support (direct or in-kind) | $1900 | | |
| Support will be used for the following: | | | |
| Speaker Honoraria | Speaker Expenses (itemize) | Meeting Expenses (itemize) $1900 Exhibit booth | Other (list) |

# TERMS, CONDITIONS, AND PURPOSES

## Independence

1. This activity is for scientific and educational purposes only and will not promote any specific proprietary business interest of the Commercial Interest.

2. The Accredited Provider is responsible for all decisions regarding the identification of educational needs, determination of educational objectives, selection and presentation of content, selection of all persons and organizations that will be in a position to control the content of the CME, selection of education methods, and the evaluation of the activity.

## Appropriate Use of Commercial Support

3. The Accredited Provider will make all decisions regarding the disposition and disbursement of the funds from the Commercial Interest.

4. The Commercial Interest will not require the Accredited Provider to accept advice or services concerning teachers, authors, or participants or other education matters, including content, as conditions of receiving this grant.

5. All commercial support associated with this activity will be given with the full knowledge and approval of the Accredited Provider. No other payments shall be given to the director of the activity, planning committee members, teachers or authors, joint sponsor, or any others involved with the supported activity.

6. The Accredited Provider will upon request, furnish the Commercial Interest documentation detailing the receipt and expenditure of the commercial support.

## Commercial Promotion

7. Product-promotion material or product-specific advertisement of any type is prohibited in or during the CME activity. The juxtaposition of editorial and advertising material on the same products or subjects is not allowed. Live or enduring promotional activities must be kept separate from the CME activity. Promotional materials cannot be displayed or distributed in the education space immediately before, during or after a CME activity. Commercial Interests may not engage in sales or promotional activities while in the space or place of the CME activity.

8. The Commercial Interest may not be the agent providing the CME activity to the learners.

## Disclosure

9. The Accredited Provider will ensure that the source of support from the Commercial Interest, either direct or "in-kind," is disclosed to the participants, in program brochures, syllabi, and other program materials, and at the time of the activity. This disclosure will not include the use of a trade name or a product-group message. The acknowledgment of commercial support may state the name, mission, and clinical involvement of the company or institution and may include corporate logos and slogans, if they are not product promotional in nature.

The Commercial Supporter and NAF agree to abide by all requirements of the Accreditation Council for Continuing Medical Education (ACCME) *Standards for Commercial Support of Continuing Medical Education* (appended).

Name of Accredited Provider    National Abortion Federation

Tax ID Number
43-1097957

Contact Person    Nichelle Davis            Email            ndavis@prochoice.org
                                            Address
Phone Number    (202) 667-5881              Fax Number       (202) 667-5890

Name of Commercial Interest

Contact          BioMax Procurement         Email            procurement@bioxmaxps.com
Person                                      Address
Phone Number    562-281-5041                Fax Number
Tax ID
Number

Educational Partner (if
applicable)

Address
City, State, Zip
Contact                                     Email
Person                                      Address
Phone Number                                Fax Number

AGREED BY AUTHORIZED REPRESENTATIVES

Commercial Interest                         Accredited Provider

_____                     _____  4-15-15
Signature and Date                          Signature and Date

Robert Sarkis                               Nichelle Davis
_____                     _____
Print Name                                  Print Name

Procurement Manager                         Group Purchasing Manager
_____                     _____
Title                                       Title

Educational Partner (If applicable)

_____
Signature and Date

_____
Print Name

_____
Title

3

# EXHIBIT 11



# Who are the Survivors?

**MAKE A DONATION**

**SIGN UP FOR ACTION ALERTS**

  

Survivors is a youth based pro-life activism and apologetics ministry that exists to empower and equip the rising generation to end the abortion genocide in America. Often referred to as "the Marines" of the pro-life movement due to our reputation for being the "boots on the ground" on the front lines of the battle to save the pre-born babies of America, Survivors' approach prioritizes action. We train youth to be effective pro-life activists and apologists live on the job. The field is our classroom.





PENGAD 800-631-6989

PLAINTIFF'S
EXHIBIT
TG
221
Davin
3-22-19

Any person born after January 22, 1973 is a survivor of the American  abortion holocaust. On this date, the Roe vs. Wade decision legalized abortion on demand throughout all 50 states. Since this infamous decision, over 56 million children have been killed all in the name of "choice". If you were born after the legalization of abortion in the U.S., we challenge you to consider yourself a survivor of the abortion holocaust. One third of your generation has been killed by abortion.

The Survivors are taking an active stand on behalf of those who have already been lost, and for those who are scheduled to die through abortion. We are empowered by the truth, enabled by extensive training, and unafraid of condemning the death of innocents.

## Our Mission

Compelled by the Gospel of our Lord Jesus Christ and our respect for life, the Survivors of the Abortion Holocaust speak out on behalf of over 56,000,000 children lost to abortion in America since 1973.

Dedicated to defending the right to life of future

generations, **we are engaged in a battle to end America's genocide.** We recognize the urgency of this war, as over 3,500 children die each day in the United States because of abortion.

As Survivors, we the young people of this generation are directly affected by the horror of this holocaust because it happened to us -- we are its target. Abortion has claimed the lives of our classmates, our friends, our brothers and sisters. It is our obligation to tell their story and compel the world to recognize us as the Survivors of the Abortion Holocaust.

The Survivors **encourage and empower** the youth of today as they dare to rise up against the slaughter of innocent children through abortion. We are committed to educating and equipping young activists who have a heart for the pre-born and are willing to be used by God to "defend those unjustly sentenced to death."

Our mission embodies cherishing life and fighting adamantly to abolish that which takes it: abortion. In light of this, we are wholly pro-life and at the same time we are abortion abolitionists. It is not enough to

know that abortion is wrong. It is time we stand up and say: NO MORE. We are the generation of abortion abolitionists, and legalised child-killing will not survive us.

## What We Believe

We believe in God, the Creator of all things and the Giver of Life. We believe that human life is precious in the eyes of the Creator. Human life from conception until natural death should be protected and its sanctity upheld. We believe that abortion in all of its forms is evil and mocks the sanctity of human life.

Like our founding patriot fathers and the Civil War abolitionists, The Survivors believe that abortion is the issue of our day and we must labor in earnest to end this travesty so that our posterity need not bear the label of Survivors.

We believe sex was designed by God for marriage. We believe that to prevent unanticipated pregnancies people should behave responsibly by practicing sexual purity until marriage. Sexual abstinence is the first step to abortion prevention.

We believe in Jesus Christ, the Son of God, our one and only Savior and Redeemer. We

believe in the forgiveness of sins, including the sin of abortion, through His sacrifice on the cross. In our efforts to fight against abortion and educate our peers, our ultimate goal is to reach out to the lost and broken with the gospel of Christ and His message of life for all. We believe our work would be in vain if we were to educate and influence the minds of those around us, but ignore their hearts.

**We believe that it is not enough to know that abortion is wrong...**

**...we are called to expose the horrific truth to the world.**

## Where We Began

On the 22nd day of January 1998, we as a nation marked the 25th anniversary of the Supreme Court decision known as "Roe vs. Wade". This also marked the beginning of a  new breed of advocates for life: The Survivors.

Founded by Jeff White and Cheryl Conrad, national leaders in the pro-life movement, Survivors of the Abortion Holocaust has

affected thousands of lives by equipping and activating the youth of America to speak out against abortion. Unique in their focus, one of the first activist pro-life youth organizations on the scene, Survivors brought the activism into a broader forum, re-envisioned and revamped -- and gave a voice to the generation that had suffered the worst of legalised abortion's ravages.

Since then, trained Survivors have been bringing their honed debate skills and expert activism to events across the U.S. and the world...

**With ProLife Training:** Since 1998, the Survivors of the Abortion Holocaust have conducted annual ProLife Training Camps for high school and college students. Dedicated to education and activism, the summer camps equip youth to effectively fight against abortion in their churches, schools, towns, and across the nation. Camp attendees are trained in pro-life apologetics and leadership, law enforcement and legal issues, evangelism, and other extensive topics, both in the classroom and on the street.

As part of their dedication to equipping and activating youth, the Survivors offer one or multi-day training courses and seminars throughout the year. Geared toward groups of pro-life high school and college students desirous of making a difference, Survivors

seminars feature expertly trained speakers to educate the youth and lead them in cutting-edge activism.

On top of Camps held bi-yearly, and training seminars, Survivors has organized and facilitated the International ProLife Youth Conference in Los Angeles two years running, in which pro-life leaders from across the globe have spoken and passed on their experience, knowledge, and support to this generation. The impact of Survivors' training on the youth of America has been immeasurable: through the Conference and camps, the previous generation has made their ceiling our floor, enabling us to be the new wave of abortion abolitionists who will abolish abortion.

 **Through Activism:**
Survivors is a group of activists -- because to be pro-life means to act pro-life. Some of Survivors' regular activism events have included: annual A ProLife Christmas Carol; EarthFair in San Diego, California; Mother's Day Outreach; volunteer sidewalk counseling; Million-to-One Memorial die-ins, a signature event which peacefully and visually demonstrates the impact of abortion on our generation. More

demonstrative activism includes Show-the-Truth campaigns; annual events to mark the anniversary of Roe v. Wade; volunteering at a home for unwed mothers; and exposing abortion providers through neighbourhood pickets, along with other activities to educate our peers to the horrors of abortion.

The Survivors are pioneers in regular on-campus activism with the Survivors Campus Outreach. Using educational displays, literature and discussion as their tools, teams of college-age Survivors have been educating their peers at campuses across the U.S. since 2001. Tour members have dedicated semesters and even years of their lives to this important work, and over 2,500 high school and college campuses have been exposed to the truth of abortion since Campus Outreach's launch. Personal stories of lives affected by the Campus Outreach abound, and scores of preborn children have been saved because of the Survivors' dedicated efforts.

**With Special Events:** In addition to regular monthly and annual activities, the Survivors are often leaders and participants at national and international special events. The Survivors engaged in effective activism at the 1999 International Pro-Life Youth Conference in Dublin, Ireland; the 2000 Democratic National Convention in Los Angeles, California; the 2002 Winter Olympics in Salt Lake City, Utah; the pro-abortion 2004 March

for Women's Lives in Washington, D.C.; the 2004 Democratic National Convention in Boston, MA; 1998-2013 Roe v. Wade anniversary events in Washington, D.C., Los Angeles and Sacramento, California; advocating life for Terri Schiavo in 2005 in Florida; confirmation hearings for U.S. Supreme Court Justices in Washington, D.C; EarthFair in San Diego, California; the 2006 International Pro-Life and Family Conference in Dublin, Ireland; the 2008 New Hampshire presidential primaries; World Youth Day 2011. On top of that, Survivors organized and facilitated A Prayer for Change at the 2008 Democratic National Convention in Denver, Colorado, as well as the 2012 event, ActsFive29, in Washington, DC.

abortion is the evil of our generation.
it's our turn to make history.

© SURVIVORS OF THE ABORTION HOLOCAUST | P.O. BOX 52708, RIVERSIDE, CA 92517 | 951-750-1114 | INFO@SURVIVORS.LA

# EXHIBIT 12



Home / About Us / Training / Blog / Store / Donate

# Acting Pro-Life Saves Babies, Act Today!

June 12, 2015 / Survivors Staff

  

*When I graduated high school, I had no idea what I wanted to do with my life. I signed up for Campus Outreach because it seemed like the best opportunity I had to fight injustice. And it was, everyday. - Brianna Baxter*

Want to help abolish abortion by changing the culture? Our team is effectively turning the tide of public opinion against abortion. A few quotes from "pro-choice" students we talked to this semester: "Abortion is never justified!" "You totally changed my mind." "I could never do that to my baby." Wait a minute - "pro-choice" students?! Well, not anymore. These students, and hundreds



more like them, started as "pro-choice", but became convinced abortion is wrong after seeing an image of an abortion victim, talking to one of our team members, or reading a pamphlet we gave them. Every day, each team member has the opportunity to confront the culture of death head-on and convince hundreds of students that abortion is wrong. Because of our team and other activists like them, students are finally seeing the truth and rejecting abortion. Are you willing to stand with the victims and help end abortion? We're now accepting applications for the fall 2015 Campus Outreach team!

Survivors Campus Outreach Team takes the truth about abortion to high schools, colleges, and youth groups throughout the country.

### As a Survivors team member you will:

- Talk to hundreds of students about abortion.

- Plan and lead fun pro-life events with the team.

- Learn to be an effective pro-life presenter.

- Meet and work with national pro-life leaders.

- Live in community with other pro-life activists and missionaries.

- Grow in your faith.

**Your commitment includes:**

- Dedication to ending abortion and living out your faith.

- Willingness to work and learn on a team.

- Fundraising $100 per week to offset the cost of room, board, and transportation.

**APPLY NOW or
email campus@survivors.la for more
information.**

*The Campus Outreach team journeys
across the states to spread the Pro-Life
message by actively engaging students in
dialogue and creating a personal
connection with them with the aim of
making abortion a personal issue. That's
what makes it efficient, that's what makes
it successful, that's what makes the
Campus Outreach team the most fruitful
investment for any young person who
wants to make a difference. - Erick De La
O*

💬 Comment                    2 Likes        Share

‹ PRO-LIFE YOUTH TO , MY HEART IS BREAKING.

## Comments (0)

Newest First    Subscribe via e-mail

Preview    Post Comment...

abortion is the evil of our generation.
it's our turn to make history.

© SURVIVORS OF THE ABORTION HOLOCAUST | P.O. BOX 62708, RIVERSIDE, CA 92517 | 951-750-1114 | INFO@SURVIVORS.LA

# EXHIBIT 13

Message

| From: | David Daleiden ████████████████ |
|---|---|
| Sent: | 8/21/2013 7:43:28 PM |
| To: | ████████████ |
| CC: | Annamarie Bettisworth ████████████████ |
| Subject: | Introductory Materials |
| Attachments: | NondisclosureAgreement.pdf |

Hi Brianna,

Great to meet you and speak with you last night. Please find attached a Non-Disclosure Agreement to sign and return to me or Anna.

Also, please begin to familiarize yourself with the data from Mark Crutcher's investigation from 13 years ago (http://www.lifedynamics.com/Abortion_Information/Baby_Body_Parts/index.cfm). Pay special attention to the Order Forms (pg 3), Tissue Logs (pg 5), and Clinic Protocols/Consent (pg 7), as those are things your character should be familiar with.

Also, this article from WORLD Magazine, "The Harvest of Abortion," is a good intro to the entire subject: http://www.worldmag.com/1999/10/the_harvest_of_abortion

For an example of the altruistic justification for your dirty work, see this presentation by Dr. Aileen Anderson of UC Irvine on her neural stem cell research. Her treatment for spinal cord injury is far advanced in clinical trials and in the laboratory has made paralyzed mice walk again. However, it requires 2nd trimester aborted fetal brain cells to do so. She mentions this ever so briefly about 11 minutes in: http://www.youtube.com/watch?v=FB7Cij-RCFw

Thanks Brianna! Please let me know if you have any questions.

-David

████████████



EXHIBIT
Baxter
532
5/11/19

CM00044
CM00044

# INDIVIDUAL NONDISCLOSURE AGREEMENT

This Nondisclosure Agreement (this "Agreement") is dated as of _____,
2013, between David Daleiden, (hereinafter referred to as "DISCLOSER") as one party
and _____ (hereinafter referred to as "RECIPIENT") as
the other party to this Agreement.

## RECITALS

A. In connection with the evaluation or pursuit of certain mutually desirable research
   projects, DISCLOSER may disclose valuable proprietary information to
   RECIPIENT relating to its respective investigative research and journalism,
   expert analysis, and related media projects.
B. DISCLOSER would like to protect the confidentiality of, and maintain its
   respective rights in and prevent the unauthorized use and disclosure of such
   information.

## DISCLOSER AND RECIPIENT HEREBY AGREE AS FOLLOWS:

**1. Confidential Information.** As used in this Agreement, "Confidential Information"
means all information of DISCLOSER that is not generally known to the public, whether
of a technical, scientific, investigative, journalistic, or other nature (including, without
limitation, (i) investigative research and analysis, journalistic notes and writings,
surveillance studies, trade secrets, know-how and information relating to the science,
technology, political studies, written works, operations plans, media projects,
promotional activities, finances, and other affairs of DISCLOSER, and (ii) the identity of
operations and research associates, research subjects, research facilities, fellow
researchers and journalists, and the providers or source of information or documentation
for any DISCLOSER research), that is disclosed by DISCLOSER to RECIPIENT or that
is otherwise learned by RECIPIENT in the course of their discussions or dealings with, or
their physical or electronic access to the premises of, DISCLOSER, and that has been
identified as being proprietary and/or confidential or that by the nature of the
circumstances surrounding the disclosure or receipt ought to be treated as proprietary and
confidential. Confidential Information also includes all information concerning the
existence and progress of the parties' dealings, the subject matter of DISCLOSER's
investigative research and the identity of DISCLOSER's research affiliates, regardless of
whether any such information is marked or otherwise identified in writing as confidential.

**2. Use and Ownership of Confidential Information.** RECIPIENT, except as expressly
provided in this Agreement, will not disclose Confidential Information to anyone without
DISCLOSER's prior written consent. In addition, RECIPIENT will not use, or permit
others to use, Confidential Information for any purpose other than RECIPIENT's
evaluation of DISCLOSER's investigative research projects, media projects, general
operations and/or services as applicable, and, if pursued by the parties, negotiation and
consummation of a contractual arrangement regarding RECIPIENT's products and/or
services.

CM00045
CM00045

RECIPIENT will take all reasonable measures to avoid disclosure, dissemination or unauthorized use of Confidential Information, including, at a minimum, those measures it takes to protect its own confidential information of a similar nature. All Confidential Information will remain the exclusive property of DISCLOSER, and RECIPIENT will have no rights, by license or otherwise, to use, disclose or discuss the Confidential Information with any third party except as expressly provided herein.

**3. Exceptions.** The provisions of Section 2 will not apply to any information that (i) is or becomes publicly available without breach of this Agreement; (ii) can be shown by documentation to have been known to RECIPIENT prior to its receipt from DISCLOSER; (iii) is rightfully received from a third party who did not acquire or disclose such information by a wrongful or tortuous act; or (iv) can be shown by documentation to have been developed by RECIPIENT without reference to any Confidential Information.

**4. Disclosures to Governmental Entities.** If RECIPIENT becomes legally obligated to disclose Confidential Information by any legal proceeding, governmental entity or regulatory agency with jurisdiction over it, RECIPIENT will give DISCLOSER prompt written notice to allow DISCLOSER to seek a protective order or other appropriate remedy. Such notice must include, without limitation, identification of the information to be so disclosed and a copy of the order or legal action. RECIPIENT will disclose only such information as is legally required and will use their reasonable best efforts to obtain confidential treatment for any Confidential Information that is so disclosed.

**5. Return of Confidential Information.** Upon DISCLOSER's written request, RECIPIENT promptly will return or destroy (or, in the case of electronic embodiments, permanently erase) all tangible material embodying Confidential Information (in any form and including, without limitation, all summaries, copies and excerpts of Confidential Information) in their possession or under their control.

**6. Injunctive Relief.** RECIPIENT acknowledges that disclosure or use of Confidential Information in violation of this Agreement could cause irreparable harm to DISCLOSER for which monetary damages may be difficult to ascertain or an inadequate remedy. RECIPIENT therefore agrees that DISCLOSER will have the right, in addition to its other rights and remedies, to injunctive relief for any violation of this Agreement without posting bond, or by posting bond at the lowest amount required by law.

**7. Limited Relationship.** This Agreement will not create a joint venture, partnership or other formal business relationship or entity of any kind, or an obligation to form any such relationship or entity. Each party will act as an independent contractor and not as an agent of the other party for any purpose, and neither will have the authority to bind the other.

**8. Cumulative Obligations.** Each party's obligations hereunder are in addition to, and not exclusive of, any and all of its other obligations and duties to the other party, whether express, implied, in fact or in law.

CM00046
CM00045

**9. Entire Agreement; Amendment.** This Agreement constitutes the entire agreement between the parties relating to the matters discussed herein and supersedes all prior oral and written understandings with respect to any information disclosed or received under this Agreement. This Agreement may be amended or modified only with the mutual written consent of the parties.

**10. Term and Termination.** This Agreement is intended to cover Confidential Information disclosed by DISCLOSER prior or subsequent to the date of this Agreement. Unless otherwise earlier terminated, this Agreement automatically will expire three (3) years from the date first written above; provided, however, that RECIPIENT's obligations with respect to DISCLOSER's Confidential Information disclosed or received prior to termination or expiration will survive for two (2) additional years following the expiration or termination of this Agreement.

**11. Nonwaiver.** Any failure by either party to enforce the other party's strict performance of any provision of this Agreement will not constitute a waiver of its right to subsequently enforce such provision or any other provision of this Agreement.

**12. Attorney Fees.** In the event any court action is commenced by one party against the other, the prevailing party is entitled to recover its out-of-pocket and court costs and reasonable attorney fees.

**13. Governing Law; Severability; Etc.** This Agreement will be governed by internal laws of the State of California, without reference to its choice of law rules, may be executed in counterpart copies, and, in the absence of an original signature, faxed signatures or electronically scanned and emailed signatures will be considered the equivalent of an original signature. Each party hereby waives its right to a jury trial for any claims that may arise out of this Agreement. If a provision of this Agreement is held invalid under any applicable law, such invalidity will not affect any other provision of this Agreement that can be given effect without the invalid provision. Further, all terms and conditions of this Agreement will be deemed enforceable to the fullest extent permissible under applicable law, and, when necessary, the court is requested to reform any and all terms or conditions to give them such effect.

The parties have executed this Agreement on the date first written above.

| DISCLOSER | RECIPIENT |
|---|---|

_____     _____
David Daleiden
Date: _____       Date: _____

Mailing Address: David Daleiden       Mailing Address:

CM00047
CM00045

# EXHIBIT 14

# CONFIDENTIAL: FIELD WORKER VOCABULARY

**Synopsis:** You and your team member are business partners in a new venture to start up your own fetal tissue procurement corporation. Between the two of you, have contacts at multiple prestigious research universities and have thus identified initial demand and markets for your tissue services. All you need is a dependable supply of fetal tissue from capable and accessible women's clinics. You are hoping to network with abortion providers, clinic directors, and Planned Parenthood executives at the Association of Reproductive Health Professionals (ARHP) annual meeting who may be interested in participating in a tissue donation program with you.

## Key Organizations:
*(these and individuals associated with them will be profiled more in depth later)*

**Association of Reproductive Health Professionals (ARHP):** ARHP is an independent organization of multidisciplinary professionals working in reproductive health care (defined below). ARHP began as the "education arm" of Planned Parenthood, and PP still co-sponsors the ARHP annual meeting, so there is a high degree of crossover between the two groups.

**Planned Parenthood Federation of America (PPFA):** PPFA is the largest abortion provider in the country. Planned Parenthood is organized as a federation of about 80 affiliates nationwide. Affiliates are regional groupings of PP clinics, and may encompass a local region (PP Mar Monte), a state (PP Indiana), or a large multi-state region (Planned Parenthood of the Rocky Mountains). Many PP workers, especially higher-level ones, self-identify first as working for their *affiliate* ("I work for Planned Parenthood Mar Monte") rather than the national corporation (except for national officers).

**National Abortion Federation (NAF):** NAF is the professional organization of abortion providers in North America. They publish minimal standards for clinics to affiliate with them—NAF affiliation is more like a certification and not a corporate relationship like PPFA affiliation. NAF membership is primarily individual abortion providers and clinics, although every PP abortion clinic is also an NAF member. NAF leadership is split about 50-50 between independent abortion providers and PPFA executives. NAF does not have to put on a PR façade the way PP does, so NAF is a locus of "abortion-positive" thinking and language.

## Your Competition:

**Advanced Bioscience Resources:** "Non-profit" fetal tissue procurement company, operating since 1989. They work primarily with NAF clinics, but have some past and present relationships with Planned Parenthood clinics as well. Located in the CA Bay Area.

**StemExpress:** For-profit LLC fetal tissue procurement company, operating since 2010. They have exclusive contracts with Planned Parenthood and are aggressively trying to monopolize the supply chain of fetal tissue.

EXHIBIT
Burke
534
5/1/19

Highly Confidential—Attorneys' Eyes Only

CM16036

**Lonza:** Large biotech company that frequently provides custom biomaterials requests for researchers. There are many biotech companies, very large and very small, that provide custom services to researchers that may include fetal tissue procurement.

## Learning "Abortion-Speak":

unborn child/Products of Conception → **fetus**
abortionist/Abortion Doctor → **provider**
abortion → **abortion care**
abort → **terminate**
Pro-Lifers → **Antis**

## Key Terms:

**Abortion care:** abortion-positive phrase almost always used in place of simply "abortion"
**Reproductive health:** abortion, contraception, and STDs. Not fertility
**Antis:** short for anti-choicers. This is what clinical abortion workers call pro-lifers.
**Providers:** abortion doctors.
**Procurement:** the act of harvesting fetal tissue from an abortion clinic
**Sourcing:** used to refer to determining the site of procurement. "We source our tissue from Planned Parenthood," "Our tissue is ethically sourced"
**D&E:** Dilation and evacuation, most common 2nd trimester abortion procedure
**Induction:** Induction of labor and delivery using drugs, typically used for later 2nd trimester and 3rd trimester abortions
**Later Abortion:** Instead of "late-term" or 3rd trimester, there are only "later" abortions
**Digoxin:** Poison injected into the baby to induce fetal demise during a later abortion. Fetal tissue for research cannot have digoxin in it. A fetus killed with digoxin has been dig'ed (pronounced "ditched").
**Values Clarification:** Supportive intervention for abortion workers where they discuss their conflicting natural feelings and discomforts about abortion vs. their commitment to ideals of safe, legal, accessible abortion care

## Words That Will Raise Red Flags You Are An "Anti":

Unborn Child/Baby
Preborn Child/Baby
Products of Conception (*this is rarely used outside of clinic counseling and political messaging*)
Abortion Doctor
Abortionist
Abortion Mill
Pro-Life (*only ever use with air quotes "" mockingly*)
Abort (*the verb "terminate" is used instead of "abort"*)
Pro-Abortion

Highly Confidential—Attorneys' Eyes Only

## Stem Cell Uses:

**Translational Research:** stem cell research geared toward moving science from the laboratory to the medical clinic

**Regenerative Medicine:** therapies based on regenerating/repairing/replacing damaged body parts and/or managing/curing disease on a cellular level. Used to describe stem cell research industry

**Cell-Based Therapies:** Newer term to describe clinical applications of stem cell research

**Biotech:** biotechnology is the industry that manipulates biology for artificial productions

**Biologics:** medical products sourced from biological materials, such as cells, tissues, and tissue products

**SCID mouse/humanized mouse model:** pronounced "skid". Severe-Combined Immune Deficient mice are mice that lack an immune system and so do not reject foreign tissue grafts. Thus, you can implant human (fetal) tissues or stem cells from the liver, thymus, and bone marrow (hematopoietic stem cells) to create a model human immune system inside the rodent. Fetal tissue is in huge demand for humanized mice and they are a major part of cell-based therapy research.

**Allograft:** a transplant from the same species

**Xenograft:** a transplant from a different species

## Stem Cell Types Isolated From Fetal Tissue:

Neural (brain)
Cardiac (heart)
Hematopoietic (liver, thymus, bone marrow)
Retinal Pigment Epithelial (RPE) (eyes)
Fibroblasts (skin, connective tissue)
Germ Progenitors (gonads, sperm/oocyte production)

## Stem Cell Sources:

**Autologous Stem Cells:** stem cells from a patient's own body, usually multipotent

**Embryonic Stem Cells (ESCs):** stem cells taken from an embryo, pluripotent. Expensive, scarce, and high propensity for tumorigenisis

**Adult/Somatic Stem Cells:** stem cells isolated from adult body tissue, usually multipotent

**Fetal Stem Cells:** stem cells isolated from fetal tissue

**Induced Pluripotent Stem Cells (iPSCs):** pluripotent stem cells reverse-engineered from regular adult cells

**Direct Lineage Reprogramming:** Use of biochemical factors to directly transform a differentiated cell from one lineage to another. For example, introduction of a specific antibody solution can turn bone marrow cells into neural cells.

Highly Confidential—Attorneys' Eyes Only

CM16038

# EXHIBIT 15

PP0000136

## Attendee Info for Ms. Brianna Allen

Reproductive Health 2013 (#1232892 - Thursday, September 19, 2013)

Resend Confirmation | Generate Invoice | Cancel Registration | Generate Reg Details | Printable Schedule | Print Badge | Undo Check-in | • More>>

### Personal Information

Edit

- **ID:** 60315653
- **Status:** Attended
- **Registrant Type:** Nonmember Retired/Student/Resident Registration
- **Attendee:** Ms. Brianna Allen
- **Job Title:** Clinical Assistant
- **Company/Organization:** BioMax
- **Country:** United States
- **Address Line 1:** 10929 Firestone Blvd
- **Address Line 2:**
- **City/State/ZIP:** Norwalk, CA 90650

- **Work Phone:** 5622815041
- **Extension:**
- **Home Phone:**
- **Fax:**
- **Cell Phone:**
- **E-mail:** brianna@biomaxps.com
- **Registration directory opt-out:** No
- **Secondary Email Address (cc Email):**
- **Photo:**
- **Password:** Reset Password
- **Registered:** 15-Sep-2013 08:04 PM
- **Total Credits:** 0.00

**Name as it would appear on the badge:**
- **Membership Number:**
- **Customer Number:**
- **Social Security Number:**

- **Date of Birth:**
- **Gender:**

- **Emergency Contact Name:**
- **Emergency Contact Phone:**
- **Tax Identification Number:**

**Other Contact Info**
- **Name:**
- **Phone:**
- **Email:**

### Event Cost

Cost: $270.00

### Payment Info

- **Total Charges:** $270.00
- **Balance Due:** $0.00
- **Payment Method:** Credit Card (Visa)
- **CC Number:**

**Personal Information**
**Custom Fields**
**Agenda**
**Merchandise**
**Transactions**
**Lodging & Travel**

EXHIBIT
Baxter
536
5/1/19
tabbies®

CONFIDENTIAL

Update
History

Email
History

## Custom Fields

**Edit**

Badge Name
**Brianna Allen**

Badge Degree(s)
**Biology**

Badge Organization/Institution
**BioMax**

Badge City, State
Nowalk, CA

BS Other degree(s)

Dietary Restrictions Details
**Gluten Free**

Hear about conference?

Referral by colleague

## Agenda

**Edit**

Concurrent Pre-Conference Session II Details
Starts: September 19, 10:00 AM
Ends: September 19, 12:45 PM
**I do not plan to attend pre-conference session I**

Concurrent Pre-Conference Session II Details
Starts: September 19, 01:15 PM

**Ends:** September 19, 04:30 PM

**I do not plan to attend pre-conference session II**

 Lunch in the Exhibit Hall
**Starts:** September 20, 12:30 PM
**Ends:** September 20, 02:00 PM

Concurrent Sessions Details
**Starts:** September 20, 02:00 PM
**Ends:** September 20, 04:30 PM

**Abortion Care & Policy**

Roundtable Discussion
**Starts:** September 21, 01:30 PM
**Ends:** September 21, 02:30 PM

**Seizing Opportunities and Avoiding Pitfalls: Exploring the Intersections of Reproductive Justice and Clinical Practice (Liza Fuentes, MPH, Elizabeth Gay, MPH, Alicia Luchowski, MPH, and Amy Hagstrom Miller)**

Concurrent Sessions Details
**Starts:** September 21, 02:45 PM
**Ends:** September 21, 04:30 PM

**Hot Topics in Reproductive Health**

ARHP Donation

No, thank you

**Merchandise**
Edit

| Quantity | Amount | Sub-Total |
|---|---|---|
| Subtotal of options selected | | $270.00 |
| | **Total:** | **$270.00** |

PP0000138

CONFIDENTIAL

## Transactions
### New Transaction

| | Date | Type | Notes | Amount | Sub-Total | Add By | Mod By | Delete |
|---|---|---|---|---|---|---|---|---|
| 14062846 | 15-Sep-2013 | Transaction Amount | | $270.00 | $270.00 | Attendee | Attendee | |
| 14062847 | 15-Sep-2013 | Online Credit Card Payment ***********5184 (Details) | 1232892-60315653 | -$270.00 | $0.00 | Attendee | Attendee | |
| | | | **Total:** | | $0.00 | | | |

## Lodging + Travel + Additional Preferences
Edit

### Registration Update History

| User | Section | Additional Notes | Date |
|---|---|---|---|
| reproductivehealth | Status | | 19-Sep-2013 12:24 PM |
| Attendee | Registration | Created | 15-Sep-2013 08:10 PM |

### Email History

| Email Type | Subject | Action | Date |
|---|---|---|---|
| Admin confirmation notification | New Registration Summary For 9/15/2013 (1232892) | Sent | 16-Sep-2013 12:02 AM |
| Registration Confirmation | Reproductive Health 2013 Registration Confirmation | Sent | 15-Sep-2013 08:11 PM |

Transaction Details

**Type:** Online Credit Card Payment

**Amount:** $270.00

**Credit Card Type:** Visa

**Credit Card Number:** ***********5184

**Cardholder Name:** Sofia Mireles

# Merchant: Association of Reproductive Health Professionals

1300 19th Street, NW
Suite 200
Washington, DC 20036
US

202-466-3825

Order Information

Description:      Reproductive Health 2013
Order Number:                              P.O. Number:
Customer ID:                               Invoice Number:    1232892-60315653

---

**Billing Information**                    **Shipping Information**

Sofia Mireles
348 Greystone Ave
MONROVIA, CA 91016
US
Phone: 5622815041
BRIANNA@BIOMAXPS.COM

---

|  | Shipping: | 0.00 |
| --- | --- | --- |
|  | Tax: | 0.00 |
|  | **Total: USD** | **270.00** |

Visa XXXX5184

Date/Time:              15-Sep-2013 19:10:37 PDT
Transaction ID:         5539760957
Transaction Type:       Authorization w/ Auto Capture
Transaction Status:     Settled Successfully
Authorization Code:     359427
Payment Method:         Visa XXXX5184

CONFIDENTIAL                                                                PP0000140

# Merchant: Association of Reproductive Health Professionals

1300 19th Street, NW
Suite 200
Washington, DC 20036
US

202-466-3825

Order Information

Description:      Reproductive Health 2013
Order Number:                                P.O. Number:
Customer ID:                                 Invoice Number:    1232892-60314955

| **Billing Information** | **Shipping Information** |
|---|---|

Sofia Mireles
348 E Greystone Ave
MONROVIA, CA 91016
US
Phone: 5622815041
SUSAN@BIOMAXPS.COM

|  | Shipping: | 0.00 |
|---|---|---|
|  | Tax: | 0.00 |
|  | **Total: USD** | **775.00** |

Visa XXXX5184

Date/Time:              15-Sep-2013 18:38:01 PDT
Transaction ID:         5539712359
Transaction Type:       Authorization w/ Auto Capture
Transaction Status:     Settled Successfully
Authorization Code:     337898
Payment Method:         Visa XXXX5184

CONFIDENTIAL                                                                    PP0000141

# EXHIBIT 16



EXHIBIT
Buster
537
5/11/9

tabbies®

# BioMax
## PROCUREMENT SERVICES, LLC

*Providing quality biospecimens*
*for paradigm-shifting*
*medical research*

www.BioMaxPS.com

PP0000256

## About BioMax

**BioMax Procurement Services, LLC** is a biological specimen procurement organization headquartered in Norwalk, CA. *BioMax* provides tissue and specimen procurement for academic and private bioscience researchers. Our commitment is to provide the highest-quality specimens with efficient, professional service to facilitate world-changing discoveries.

## About our CEO

Susan Tennenbaum is a passionate patient advocate and entrepreneur with a vision to bridge the gap between routine medical practice and cutting-edge medical research. She has worked in surgical offices and patient advocacy. She founded *BioMax Procurement Services* to help give patients and providers an opportunity to give back and to connect medical researchers with critical biospecimens.

# Providers and Patients want to give back.



Biosample and biospecimen donation can be a rewarding and empowering experience for patients and their healthcare providers.

If your hospital, private practice, or outpatient surgical facility is interested in becoming a donation center, please contact us! We are committed to maintaining a diverse and forward-thinking donor network.

BioMax respects the integrity of your medical practice and handles all donor center relationships discretely and professionally to protect patient privacy.

# Don't wait to change the world.

Even the best academic and private scientists have one problem in common—inadequate materials supply slowing down the research pipeline!

**BioMax** exists to change that, because your research is going to change the world.

Don't let problems with supply chain access stop your progress! Let us handle your next specimen procurement.

## Procurement services:

**BioMax** can provide a variety of custom procurement services to your biomedical research team.

-Fetal tissue specimens
-Maternal blood
-Cadaveric tissue samples
-Cancer biopsies
-Adipose tissue
-Bone Marrow
-Peripheral blood
-Custom procurement

### Service Contact:

*Phone:* 562.281.5041
*Email:* procurement@biomaxps.com
*Web:* BioMaxPS.com



Regenerative medicine and cell-based therapies are the cutting-edge solution to curing disease, maintaining health, and improving quality of life for millions of people.

**BioMax Procurement Services** is a new biotech company for a new era in medical research.

We are excited to provide the research material to empower your process of discovery.

PP0000257

# EXHIBIT 17

**Subject:** Fwd:
**From:** Brianna Baxter <████████████████████
**Sent:** Tue, 14 Jan 2014 17:02:04 -0800
**To:** "david████████████████████████
Brianna Leigh resume.docx

Sent from my iPhone

Begin forwarded message:

> From: <brianna██████████████████
> Date: January 14, 2014 at 3:50:34 PM PST
> To: Brianna Baxter ██████████████████
>
>
>
> Sent from Windows Mail
>

p.MsoListParagraph, li.MsoListParagraph, div.MsoListParagraph { margin-top:0in; margin-right:0in; margin-bottom:0in;
margin-left:.5in; margin-bottom:.0001pt; } p.MsoListParagraphCxSpFirst, li.MsoListParagraphCxSpFirst,
div.MsoListParagraphCxSpFirst, p.MsoListParagraphCxSpMiddle, li.MsoListParagraphCxSpMiddle,
div.MsoListParagraphCxSpMiddle, p.MsoListParagraphCxSpLast, li.MsoListParagraphCxSpLast,
div.MsoListParagraphCxSpLast { margin-top:0in; margin-right:0in; margin-bottom:0in; margin-left:.5in; margin-
bottom:.0001pt; line-height:115%; } -->

Sent from Windows Mail



EXHIBIT
Baxter
541
5/11/19

CM03463

# Brianna Leigh



## Objective
To secure a position at a company where I have the opportunity to utilize my skills in efficiency, organization, and leadership.

## Education
Leigh High School, San Jose, CA – June 2011
Degree – High School Diploma

West Valley College, Saratoga, CA
Sophomore
I am very unsure of how to include this information in a resume, but this is my best guess
completed animal biology, cell biology, plant biology, general chemistry series, and first half of organic chemistry series
currently enrolled in second half of organic chemistry series, and human anatomy

## Work Experience
**Administrative Assistant**
*Tony Baxter Picture Framing*
San Jose, CA
Dates: 2007 – present
Duties include receiving packages, answering phones and taking messages from customers or suppliers, and other various administrative tasks.

**Child Care Provider**
*Independent*
San Jose and Los Gatos, CA
Dates: 2007 – present
Duties include supervising anywhere from one to thirty children at a time; this involved overseeing parties, preparing meals, organizing activities, cleaning up various messes, providing fun and entertainment.

**Client Care Specialist**
*Go Mobile Group Sprint Business Solutions Partner*
San Jose, CA
Dates: November 2011 – June 2012
Duties include speaking with and assisting clients with any questions, concerns, or plan updates and changes.

## Accomplishments/Interests/Volunteer Work
## Heads up David, there are so many things in this section that cannot stay
## Big time pro-life goody-two-shoes
Vacation Bible School Counselor
Home Church Junior Camp Counselor
Home Church Children's Ministry First and Second Grade Sunday School Teacher
Event Coordinator and Host for Home Church monthly missions luncheons
Member of the 2007 Home Church Mexico Missions Team
Spanish Language Speaker, beginner proficiency level
Leigh High School Junior Statesmen of America Chapter Secretary
Leo's Club Member

Leigh Live Action founding member and President
Leigh High School Home and School Club Scholarship winner
Performing Arts Parents Association Scholarship Award winner
Member of the 2011 Northern California Band Director's Association All-Northern Honor Band
Member of the 2010/2011 Leigh High School Spring Musical Orchestra
Principal bassoonist and soloist for the 2009/2010 CUHSD District Music Festival
Principal bassoonist and soloist for the 2010/2011 CUHSD District Music Festival Orchestra
California Scholarship Federation Life Member
Member of the 2011/2012 Survivors Campus Life Team
Classically trained bassoonist
Classically trained acrylic painter
2011/2012 Survivors of the Abortion Holocaust intern extraordinaire

CM03465

# EXHIBIT 18

Below: "Susan Tennenbaum" (real name unknown); "Brianna Allen" (real name unknown)





CONFIDENTIAL

# EXHIBIT 19

Message

| | |
|---|---|
| **From:** | Brianna Baxter |
| **Sent:** | 7/30/2015 4:00:05 AM |
| **To:** | David Daleider |
| **Subject:** | Re: Brianna Allen Credit Card Controversy |

My facebook is all set, but there is a news article from a few years ago with a picture that I can't do anything about.

On Wed, Jul 29, 2015 at 8:42 PM, Brianna Baxter <                              > wrote:
blerg :/

On Wed, Jul 29, 2015 at 8:01 PM, David Daleiden                              wrote:
I think there was a photographer at NAF so they must have got the photo from those archives :/

On Wed, Jul 29, 2015 at 7:59 PM, Brianna Baxter <                              > wrote:
Dangit!

Thanks for the heads up

On Wed, Jul 29, 2015 at 4:20 PM, David Daleiden <                              > wrote:
May want to start hiding your FB


---------- Forwarded message ----------
From: **Father Claude Williams** <                              >
Date: Wed, Jul 29, 2015 at 4:03 PM
Subject: Brianna Allen Credit Card Controversy
To: David Daleiden

http://rhrealitycheck.org/article/2015/07/28/exclusive-faces-fake-names-people-behind-planned-parenthood-attack-videos/



Highly Confidential—Attorneys' Eyes Only

# EXHIBIT 20

**Sent:** Fri, 21 Feb 2014 11:22:13 -0800
**From:** David Daleiden ◄███████████████████►
**To:** brianna ███████████████████
r1.jpg
r2.jpg
r3.jpg



EXHIBIT
baxter
548
5/14/19

CM03473



# APPLICATION AND AGREEMENT FOR EXHIBIT SPACE

NAF ANNUAL MEETING, San Francisco, CA, April 5-8, 2014

**Instructions:** Please complete all information, complete and sign the application form. Return the completed application with credit card information on back, payable to NAF for the full cost of exhibiting and registration for educational sessions. Each exhibitor attending any conference educational session or purchasing optional selected events must fill out a separate Annual Meeting registration form. **A unique email address is required for each exhibitor personnel—registration will not be processed without this information.** When countersigned by NAF, this serves as a contract for exhibit space and the following Rules and Regulations are expressly incorporated herein. Confirmation notices will be emailed within **five** business days of receipt.

**Deadline:** Application and fees must be received in the NAF office by **Monday, February 17, 2014.**

1. The exact information for the list of exhibitors in the conference Final Program:

Company/Organization Name: __BioMax Procurement Services__

Address: __10929 Firestone Blvd, #246__

City: __Norwalk__  State/Prov: __CA__

Zip/Postal Code: __90650__  Country __U.S.A.__

Contact Name: __Brianna Allen__

Telephone __562-281-5041__

Email: __procurement@biomaxps.com__

Website URL: __www.biomaxps.com__

2. Exhibiting Company or Organization Information (if different from above)

Company/Organization Name: ____

Address: ____

City: ____  State/Prov: ____

Zip/Postal Code: ____  Country ____

Telephone ____  Fax ____

Email: ____

Contact Name: ____

3. Exact wording for your exhibit booth identification sign:

__BioMax Procurement Services__

4. Name and title of exhibitor representative(s):

Primary Representative (included in exhibit fee):

__Brianna Allen__

Title __Procurement Assistant__  Email (required) __brianna@biomaxps.com__

Additional Representative:

(Maximum of two (2) additional exhibitor personnel per purchased exhibit booth)

__Susan Tennenbaum__

Title __C.E.O.__  Email (required) __susan@biomaxps.com__

[X] Requires educational pass

Additional Representative:

__Robert Sarkis__

Title __V.P. Operations__  Email (required) __bob@biomaxps.com__

[X] Requires educational pass

5. List the products or services to be exhibited:

__biological specimen procurement, stem cell research__

6. Exhibit Placement:
NAF reserves the right to determine the final placement of all exhibiting companies.

Colleagues/companies you wish to be positioned near:

Competitors: __A.B.R., StemExpress, Lonza, All Cells__

7. Exhibiting Fees:

[X] $7,100 Commercial Firms  [ ] $1,000 NAF Group Purchasing Vendor

[ ] $1,720 NAF Member  [ ] $1,400 Non-member, Nonprofit Organizations

8. Sponsorship Opportunities:

| | |
|---|---|
| [ ] $8,000 Gold Level | $ ____ |
| [ ] $5,000 Silver Level | $ ____ |
| [ ] $5,000 Welcome Reception | $ ____ |
| [ ] $3,000 Breakfast Reception | $ ____ |
| [ ] $1,500 Refreshment Break(s) | $ ____ |
| [ ] $1,000 Registration Bag Insert | $ ____ |
| [ ] Other ____ | $ ____ |
| Total: | $ ____ |

9. To advertise in NAF's Annual Meeting Final Program, submit camera-ready artwork in the following acceptable formats: PDF, TIF, JPG. Artwork must be submitted by Monday, February 17, 2014.

[ ] Full-page 8.5" x 11" advertisement - $1,000

[ ] Half-page 8.5" x 5.5" advertisement - $600

10. Payment: Payment should accompany this application. NAF will notify exhibitor of acceptance of this application within **five** business days of receipt.

Additional Exhibit Representatives: $300 x __2__  $ __790__

Additional Reps w/Educational Pass: $395 x ____  $ ____

Exhibit Booths: $2100 Booths x __1__  $ __2100__

Sponsorship: $ ____

Advertisement: $ ____

Total fees: $ __2890__

Are you interested in membership?  [X] Yes  [ ] No

For more information about NAF membership, contact Melissa Fowler at (202) 667-5881 ext. 217 or mfowler@prochoice.org

CM03474

# EXHIBIT RULES AND REGULATIONS

The following Rules and Regulations are expressly incorporated as part of this Agreement. Exhibitors, their officers, employees and agents agree to abide and be bound by these Rules and Regulations.

1. Eligibility to Exhibit — Companies with an intended business interest in reaching reproductive health care professionals, including NAF provider members, are invited to participate in the National Abortion Federation's (NAF) Annual Meeting.

2. Exhibitor expressly acknowledges NAF's right to accept or reject applications for exhibit space for any reason, including (without limitation), at NAF's sole discretion, if the proposed exhibit or the exhibitor's business, products, services or performance in the field are not consistent with NAF's purposes and objectives. NAF also reserves the right to request further information from any Exhibitor and/or persons or entities that have done business with Exhibitor in order to evaluate its application. Exhibitor expressly agrees to provide further information promptly if requested by NAF.

3. Refunds of the application fee and/or exhibit fee are made only as follows: the full amount of the exhibit fee paid will be refunded if the application is not accepted. A $100.00 service charge will be deducted from each refund requested before March 21, 2014. No refunds will be made after March 21, 2014.

4. Arrangements for shipment of materials and equipment and other set up requirements are at the Exhibitor's sole expense.

5. Use of Space - No Exhibitor shall assign, sublet, or share the space allotted without the advance knowledge and consent of NAF. Exhibitors must show only products provided by them in the regular course of their business. All demonstrations or other sales and promotional activities must be confined to the limits of each exhibitors contracted exhibit space. Assigned areas of the conference venue remain strictly under control of NAF and signage, banners, or other advertising materials shall not be displayed. It is the Exhibitor's responsibility to bring a display that fits within the contracted space.

6. For the integrity of the tradeshow, all exhibits must be fully erected by 5:00 pm on Sunday, April 6. No exhibit shall be dismantled prior to 2:30 pm on Tuesday, April 8. Exhibits not installed by 5:00 pm on Sunday, April 6, may forfeit space at the exhibitor's expense. NAF reserves the right to make changes to the Exhibit dates and hours stated. NAF will inform each Exhibitor in advance if such schedule changes are made.

7. Care of Premises & Compliance/Exhibit Facility Regulations -- No part of the exhibit nor signs or other materials may be pasted, nailed or otherwise affixed to walls, doors, or other surfaces in a way that might mar or deface the premises or exhibit furnishings. Nothing may be rigged, suspended from, or attached to any Westin St. Francis Avenue mechanical system. Damage from failure to observe this notice is payable by the Exhibitor.

8. All exhibiting company representatives must be registered for the NAF Annual Meeting, and must wear identifying badges as requested by NAF. Such identification will be required to gain entry to the exhibit area and all meeting rooms. Exhibiting companies are limited to two (2) additional representatives per 8' x 8' exhibit booth.

9. Exhibitors shall comply fully with all applicable national, state, county, city, hotel fire and safety regulations, and any relevant labor contracts as well as any further rules and regulations NAF adopts.

10. Security will be provided by NAF for the conference period, including set up and dismantling. However, NAF makes no warranties and Exhibitors are responsible for any loss, damage, or injury to their exhibits, other property, or persons and/or any claims in any way arising out of their exhibiting at the Annual Meeting. Exhibitors expressly release NAF from any such responsibility or liability.

11. All insurance, including (without limitation) business interruption and public liability coverage are the sole responsibility of the Exhibitor. NAF does not maintain insurance covering Exhibitors, and Exhibitors expressly release NAF from any such responsibility or liability.

12. The Exhibitor agrees to indemnify and hold NAF harmless for any claims for loss, damage, or injury including reasonable attorneys' fees, connected with the Exhibitor's exhibit at the Annual Meeting, and expressly releases NAF from any such responsibility or liability.

13. Photography of exhibits by anyone other than NAF or the assigned Exhibitor of the space being photographed is strictly prohibited.

14. Exhibitor agrees to display and/or represent their products and/or services in a dignified and decorous manner. Any display or conduct that, at NAF's sole discretion, is not in keeping with the general decorum of the Annual Meeting and/or purposes and objectives of NAF, is grounds for removal of the exhibit, by the Exhibitor, at the Exhibitor's expense, promptly upon notification by NAF. Prohibited activities by Exhibitors include, but are not limited to, any conduct or attention-getting devices of any kind that annoy, disturb, or in any way interfere with other exhibits.

15. Exhibitor agrees to identify, display, and/or represent their businesses, products, and/or services truthfully, accurately, and consistently with the information provided in the Application. Any display, conduct, or offer of any information of any kind that, at NAF's sole discretion, is determined to be incomplete, inaccurate, misleading, or inconsistent with the information provided in this Application is grounds for cancellation of this Agreement and/or removal of the exhibit by the Exhibitor, at the Exhibitor's expense, promptly upon notification from NAF. Exhibit staff who purchase an educational pass to attend educational content are not to engage in promotional activities within the CME activity or in any space outside the exhibit hall.

16. No refunds of fees will be made in the case of cancellations or removal of exhibits pursuant to paragraphs 14 and 15 of these Rules and Regulations. Additionally, Exhibitors agree to reimburse NAF for all costs incurred by NAF, including reasonable attorneys' fees, in handling or responding to any violations of any provision of this entire Agreement.

17. In connection with NAF's Annual Meeting, Exhibitor understands that any information NAF may furnish is confidential and not available to the public. Exhibitor agrees that all written information provided by NAF, or any information which is disclosed orally or visually to Exhibitor, or any other exhibitor or attendee, will be used solely in conjunction with Exhibitor's business and will be made available only to Exhibitor's officers, employees, and agents. Unless authorized in writing by NAF, all information is confidential and should not be disclosed to any other individual or third parties.

18. It is further understood and agreed by Exhibitor that no failure or delay by NAF in exercising any right, power, or privilege hereunder shall operate as a waiver hereof, nor shall any single or partial exercise thereof preclude any other or further exercise of any right, power, or privilege hereunder. Exhibitor also understands and agrees that monetary damages would not be a sufficient remedy for any breach of this agreement by Exhibitor or Exhibitor's officers, employees, or agents and that NAF will be entitled to specific performance and injunctive relief as remedies for any such breach. Such remedies shall not be deemed to be exclusive remedies for breach of this Agreement by Exhibitor or Exhibitor's officers, employees, or agents, but shall be in addition to all other remedies available at law or equity.

19. By signing this Agreement, the Exhibitor affirms that all information contained herein, contained in any past and future correspondence with either NAF and/or in any publication, advertisements, and/or exhibits displayed at, or in connection with, NAF's Annual Meeting, is truthful, accurate, complete, and not misleading.

20. Changes in the information provided to NAF are permitted only upon NAF's written approval. Exhibitors agree to notify NAF of any such proposed changes at least 10 days prior to the commencement of the exhibit. NAF, at its sole discretion, may cancel this agreement, if (1) NAF does not approve the changes or (2) notification of the changes is less than 10 days before the exhibit.

I agree to comply with Exhibitor Rules and Regulations 1-20. I also agree to hold in trust and confidence any confidential information received in the course of exhibiting at the NAF Annual Meeting and agree not to reproduce or disclose confidential information without express permission from NAF. Violation of this paragraph could result in civil and/or criminal penalties.

Company Name: BioMax Procurement Services

Signature: _____

Print Name: Susan Tennenbaum

Title: CEO

Date: 2/5/14

Submit contract and payment or payment information by mail or fax to:

National Abortion Federation
Attn: Nichelle Davis
1660 L Street, NW, Suite 450
Washington, DC 20036
Phone: 202-667-5881 ext 450
Fax: 202-667-5890

ACCEPTED: NATIONAL ABORTION FEDERATION

Signature: _____

Print Name: Nichelle Davis

Title: Group Purchasing Manager

Date: _____

Exhibit Assignment: _____

CM03475

# ANNUAL MEETING REGISTRATION FORM

Each exhibitor attending pre-conference or additional sessions or purchasing special ticketed events must fill out a separate Annual Meeting registration form.

## NAF Pre-Conference Events

### SATURDAY, APRIL 5, 2014

**Full-Day Sessions** (lunch included)
(please sign only one session)

| | Early Bird Rate | Standard Rate | |
|---|---|---|---|
| ☒ Second-Trimester Abortion Workshop | $345 | $370 | $ **345** |
| ☐ NAF Independent Providers' Meeting | $245 | $270 | $_____ |
| ☐ NAF Canadian Providers' Meeting | $175 | $195 | $_____ |

**Half-Day Sessions**
(please see included sessions or session lunch to purchase)

Basics of First-Trimester Abortion Workshop, 9:00am – 1:00pm
| | | | |
|---|---|---|---|
| ☐ Standard Registration | $175 | $200 | $_____ |
| ☐ Medical, Nursing, or Clinical Student | $100 | $125 | $_____ |

Clinicians for Choice Day, 1:00pm – 5:30pm
| | | | |
|---|---|---|---|
| ☐ NP, CNM, PA, or Nurse | $135 | $160 | $_____ |
| ☐ NP, CNM, PA, or Nursing Student | $80 | $105 | $_____ |

Full-Day Combo Registration, 1:00pm – 5:30pm
| | | | |
|---|---|---|---|
| ☐ Standard Registration | $275 | $300 | $_____ |
| ☐ NP, CNM, PA, or Nurse | $150 | $175 | $_____ |

Latin American Providers' Meeting, 1:00pm – 5:00pm
| | | | |
|---|---|---|---|
| ☐ Standard Registration | $50 | $65 | $_____ |
| ☐ Box Lunch for Saturday | | $66 | $_____ |

### APRIL 6, 2014

**Full-Day Sessions** (lunch included)
(please sign included session lunch to purchase)

| | Early Bird Rate | Standard Rate | |
|---|---|---|---|
| Counseling Skills Workshop | | | |
| ☐ Standard Registration | $275 | $325 | $_____ |
| ☐ Medical, Nursing, or Clinical Student | $150 | $200 | $_____ |
| Post-Graduate Seminar: Pre-Procedure Preparation and Evaluation | | | |
| ☐ NAF Member, Physician | $335 | $385 | $_____ |
| ☐ NAF Member, Non-physician | $285 | $335 | $_____ |
| ☐ Third or more **non-physician** from the same NAF facility site* | $255 | $305 | $_____ |
| ☐ NAF Retiree Member | $170 | $220 | $_____ |
| ☐ Non-member, Physician | $560 | $610 | $_____ |
| ☐ Non-member, Non-physician | $435 | $485 | $_____ |
| ☐ Resident | $200 | $250 | $_____ |
| ☐ Medical, Nursing, Clinical, or Law Student | $150 | $200 | $_____ |

**Half-Day Session**

Social Scientists' Research Meeting, 1:00pm – 5:00pm
| | | | |
|---|---|---|---|
| ☐ I plan to attend | $50 | $65 | $_____ |
| ☐ Box Lunch for Sunday | | $66 | $_____ |

*Welcome Reception*
No charge to Annual Meeting registrants. Please indicate if you plan to bring a guest.

☐ I will bring a guest(s)   Number: ____ x $60 each   $_____

Guest(s) Name, Affiliation, and Title (for badges):

_____

_____

## NAF Annual Meeting

### MONDAY AND TUESDAY, APRIL 7-8, 2014

(Breakfasts included; box lunches available for purchase on Tuesday)

*Cost of attendance after April 6th drops*
| | Early Bird Rate | Standard Rate | |
|---|---|---|---|
| ☐ NAF Member, Physician | $525 | $575 | $_____ |
| ☐ NAF Member, Non-physician | $445 | $495 | $_____ |
| ☐ Third or more **non-physician** from the same NAF facility site* | $395 | $445 | $_____ |
| ☐ NAF Retiree Member | $310 | $360 | $_____ |
| ☐ Non-member, Physician | $975 | $1,025 | $_____ |
| ☐ Non-member, Non-physician | $745 | $795 | $_____ |
| ☐ Resident | $385 | $435 | $_____ |
| ☐ Medical, Nursing, Clinical, or Law Student | $225 | $275 | $_____ |

### MONDAY SPECIAL EVENTS

*Membership Luncheon*
| | | | |
|---|---|---|---|
| ☐ I plan to attend | | $70 | $_____ |
| ☐ Number of guests | ____ x $105 each | | $_____ |

Guest(s) Name, Affiliation, and Title (for badges):

_____

_____

| | | | |
|---|---|---|---|
| ☐ Box Lunch for Tuesday | | $66 | $_____ |

### MEDICAL & NURSING STUDENTS' SCHOLARSHIP FUND

Your generosity subsidizes reduced registration fees for medical and clinical students attending the conference.

☐ I wish to donate the following amount:   $_____

Total   $_____

### TOTAL FEES

NAF Reserves the right to recalculate incorrect totals.

| | |
|---|---|
| Total fees for Exhibitor Space | $**2890** |
| Total fees for Annual Meeting Registration | $**345** |
| Total Due NAF: | $**3235** |

☐ Enclosed is my check for $_____

Charge total fees to my:

☒ VISA   ☐ MasterCard   ☐ American Express

**4815 8900 0006 6028**
Card number

**9/17**
Expiration date

**015**
CVS

**Phil Cronin**
Name of card holder

_(signature)_
Signature of card holder

All prices are in U.S. dollars.

CM03476

# EXHIBIT 21



# NATIONAL ABORTION FEDERATION

## CONFIDENTIALITY AGREEMENT FOR NAF ANNUAL MEETING
## APRIL 5 – 8, 2014

It is NAF policy that all people attending its conferences (Attendees) sign this confidentiality agreement. The terms of attendance are as follows:

**1. Videotaping or Other Recording Prohibited:** Attendees are prohibited from making video, audio, photographic, or other recordings of the meetings or discussions at this conference.

**2. Use of NAF Conference Information:** NAF Conference Information includes all information distributed or otherwise made available at this conference by NAF or any conference participants through all written materials, discussions, workshops, or other means. NAF Conference Information is provided to Attendees to help enhance the quality and safety of services provided by NAF members and other participants. Attendees may not use NAF Conference Information in any manner inconsistent with these purposes.

**3. Disclosure of NAF Materials to Third Parties:** Attendees may not disclose any NAF Conference Information to third parties without first obtaining NAF's express written consent, which will not be unreasonably withheld. An Attendee may distribute NAF Conference Information to the Attendee's employees without written consent, provided that the Attendee instructs each such employee concerning the Attendee's obligations under this Agreement. Attendees are responsible for ensuring that any third party (including employees) to whom it discloses NAF Conference Information complies with the terms of this Agreement, and are subject to enforcement, as described below, if any such third party (including employees) fails to comply.

**4. Requests for disclosure of NAF Conference Information:** Upon learning that NAF Conference Materials are or are likely to become the subject of a discovery request in a judicial, legislative, administrative, or other legal proceeding or investigation, Attendees must: (a) immediately notify NAF, (b) cooperate with NAF (if NAF so requests) in taking all lawful steps to resist or narrow the request or requirement, and (c) if disclosure is required or deemed advisable by NAF, cooperate with NAF in obtaining a protective order or other reliable assurance that the NAF Conference Information will receive confidential treatment.

**5. Inadvertent Disclosure of NAF Conference Information:** In the event that an Attendee discovers that he or she has inadvertently disclosed any NAF Conference Information to any third party without having first obtained NAF's express written permission, the Attendee must immediately notify NAF and shall cooperate with NAF in retrieving the NAF Conference Information or taking other reasonable steps to prevent further unauthorized disclosure.

**6. Enforcement:** NAF reserves the right to terminate the membership (where applicable) of any Attendee found to violate this agreement and/or take legal action to seek redress for any violations of this Agreement.

By signing below, you hereby agree to comply with all of the terms of this Agreement:

Brianna Allen
Name (Please print clearly.)

Signature

4/5/14
Date

B.O Max
Name of Organization

Professional Title

EXHIBIT
Baxter
551
5/11/19
tabbies

# EXHIBIT 22

# Transcript of 140405_001_11700-11820.mp3

| | |
|---|---|
| NAF Employee: | And then if you could fill out the confidentiality agreements. |
| Merritt: | That's what I did not read, but they said that it's OK. |
| NAF Employee: | Nah, you're **[inaudible]**. |
| Allen: | Do you have a pen? Make sure I don't forget this here. |
| NAF Employee: | There's your **[inaudible]**. |
| Allen: | Oh no, that's… There we go. |
| Merritt: | I'm hoping that they'll let me—so I'm registered, you're not for the—but I'm hoping we can switch out 'cause I'm about ready to fall asleep. |
| Allen: | What did we decide my title was again? |
| Merritt: | You don't have one, my dear. |
| Allen: | **[inaudible]** just change… |
| Allen: | Today is the fifth? |
| Merritt: | Niece. Yes. |
| Allen: | Is there a back? |
| NAF Employee: | Nope, that's it. Thank you. This is your badge and the lanyard to hook up your badge on is in the bag. |
| Merritt: | Thanks. |


EXHIBIT
Baxter
552
5/11/19
tabbies

# EXHIBIT 23

**Brianna Allen**
**Procurement Assistant**
brianna@biomaxps.com

562.281.5041 o
562.354.1806 c





EXHIBIT
Baxter
555
5/11/19
tabbies

# EXHIBIT 24

**Sent:** Tue, 8 Jul 2014 21:58:30 -0700
**Subject:** Reimbursement?
**From:** David Daleiden <████████████████████>
**To:** brianna████████████

CMPcontract2014BB.pdf

Hi Brianna!
I hope you are well! School is over, right?

I don't think I ever got any claims for reimbursement from you. Is there anything outstanding from the trip in April? Otherwise, I think I owe you $500 for the operation; if you can just sign the same contract as last time (back date to April 3, 2014 or so) I can send that.

Thanks!

-David



**EXHIBIT**
Baxter
556
5/11/19

tabbies

CM03498

# INDEPENDENT CONTRACTOR AGREEMENT

This Contractor Agreement ("**Agreement**") is effective as of _____
("**Effective Date**") by and between **THE CENTER FOR MEDICAL PROGRESS**, a
California corporation, as one Party and **BRIANNA BAXTER**, ("**Contractor**") as the
other Party to this Agreement.

**THE CENTER FOR MEDICAL PROGRESS** AND **CONTRACTOR** HEREBY
AGREE AS FOLLOWS:

**1.  Services**.  Contractor shall provide certain services for The Center for Medical
Progress as an independent contractor (including, without limitation, services such as
investigative research and journalism, expert analysis, and other similar services
("**Services**"). The Services will be described in separate addenda executed by both
Parties or mutually-acknowledged e-mails, each of which will be deemed to be
incorporated into and a part of this Agreement (each, an **"Attachment"**).

**2.  Contractor**.  Contractor is not an employee of The Center for Medical Progress and
will be solely responsible for payment of Contractor's own taxes, Social Security and
expenses, and will not be entitled to receive any benefits from The Center for Medical
Progress. Neither Party nor their employees are agents, employees or joint venturers of
the other Party and neither Party shall have any authority to bind the other Party to any
obligation by contract or otherwise. Contractor hereby agrees and acknowledges that
nothing herein shall be deemed to prevent, limit or restrict The Center for Medical
Progress's option to allocate projects between and among its Contractors at its discretion.

**3.  Subcontractors**.  Contractor agrees not to hire or engage any subcontractors to assist
in the performance of the Services except with the express written permission of The
Center for Medical Progress.

**4.  Compensation and Reimbursement**.  The Center for Medical Progress agrees to pay
Contractor:

  (a) Compensation: The Center for Medical Progress agrees to pay Contractor
  $500 for undercover work in the field from April 5 to April 8, 2014.
  Completeness of work product shall be determined by The Center for Medical
  Progress in its sole discretion, and Contractor agrees to make all revisions,
  additions, deletions or alterations as requested by The Center for Medical
  Progress.

  (b) Reimbursement: Upon presentation of receipts or records of purchase, The
  Center for Medical Progress shall reimburse Contractor for any travel or
  equipment expenses reasonably incurred by Contractor for the purpose of, and in
  connection with, Contractor's performance of Services for The Center for Medical
  Progress pursuant to this Agreement. No other fees and/or expenses will be paid
  to Contractor, unless such fees and/or expenses have been approved in advance by
  The Center for Medical Progress in writing.

CM03499

**5. Intellectual Property Rights.** Contractor agrees that all video, audio, and photographic materials, and any other work product or deliverables (**"Work Product"**) created and/or delivered to The Center for Medical Progress in connection with the Services performed by Contractor, are intended to be and remain the sole property of The Center for Medical Progress. Contractor hereby assigns to The Center for Medical Progress any and all right, license, copyright, title and interest in or to any Work Product as described above throughout the world in any and all media now existing or hereafter created for any and all uses without any additional consideration. Without prejudice and subordinate to the foregoing assignation, the Parties acknowledge and agree that any right, license, copyright, title or interest in and to the Work Product that constitute copyrightable aspects shall be deemed "works made for hire" (as that term is commonly understood and as specifically defined under 17 U.S.C. §101). If any copyrightable aspect is deemed not to be a "work made for hire" by a court of competent jurisdiction, then Contractor hereby expressly and automatically assigns to The Center for Medical Progress the ownership of all rights, licenses, copyrights, title and interests in or to such copyrightable aspects throughout the world in any and all media now existing or hereafter created and for any and all uses. The Center for Medical Progress shall have the right to obtain and hold in The Center for Medical Progress's own name (without obligation of any kind to Contractor), any patents, copyrights or other protection which may be available or become available with respect to such items. Contractor further agrees to give The Center for Medical Progress and The Center for Medical Progress's designees or assignees all assistance reasonably required to perfect such rights, licenses, copyrights, titles and interests. Contractor hereby appoints The Center for Medical Progress, as Contractor's attorney-in-fact for the purpose of securing intellectual property protection, applying for any intellectual property registrations, and any related or similar purposes with respect to the Work Product. For clarity, The Center for Medical Progress does not acknowledge that Contractor holds any right, license, copyright, title or interest in or to the Work Product. These obligations shall survive and continue beyond the termination or expiration and/or non-renewal of this Agreement and shall be binding upon Contractor's successors, assigns, heirs, executives, administrators and other legal representatives. The Center for Medical Progress shall be under no obligation to publish, distribute or otherwise exploit the Work Product.

**6. Return of Work Product.** Upon completion of the Services, termination of this Agreement or at The Center for Medical Progress's request, Contractor shall promptly return or deliver to The Center for Medical Progress any and all Work Product of any kind including, without limitation, any and all video or audio materials, software programs, documents, articles, books, photographs, disks or diskettes, drawings, or any other materials of any kind or nature. Contractor further agrees that no Work Product may be used by Contractor or any third party in any fashion other than for the expressed purpose of fulfilling the applicable Services without The Center for Medical Progress's prior written approval (which approval may be withheld in The Center for Medical Progress's sole discretion). For avoidance of doubt, Contractor shall not sell, offer to sell or otherwise make available the Work Product or any portion thereof to any third party. Contractor may perform Services for multiple projects for The Center for Medical Progress and all such Services are subject to the terms of this Agreement and the

CM03500

applicable Attachments.

**7. Ownership of Equipment**. All equipment provided by The Center for Medcial Progress to Contractor for the performance of Services shall remain under the sole ownership of The Center for Medical Progress. Upon completion of the Services, termination of this Agreement or at The Center for Medical Progress's request, Contractor shall promptly return or deliver to The Center for Medical Progress any and all equipment provided for the performance of Services.

**8. Representations and Warranties**. Contractor represents, warrants and covenants that:

> (a) all Services will be performed in a timely, professional and workmanlike manner consistent with best industry practices and consistent with the protocols of The Center for Medical Progress;

> (b) no Services shall be performed while under the influence of drugs or alcohol;

> (c) Contractor is legally competent to enter into this Agreement.

**9. Confidential Information**. Contractor recognizes that The Center for Medical Progress has acquired and will be developing certain advertising techniques and terms, business plans, models and strategies, donor lists and information, contact lists and information, referral sources, databases, web site information, software, marketing plans and analyses, research techniques and strategies, financial information and projections, trade secrets, know-how, systems, methods and other information of a technical, scientific, investigative, journalistic, or other nature (including, without limitation, (i) investigative research and analysis, journalistic notes and writings, surveillance studies, trade secrets, know-how and information relating to the science, technology, political studies, written works, operations plans, media projects, promotional activities, finances, and other affairs of The Center for Medical Progress, and (ii) the identity of operations and research associates, research subjects, research facilities, fellow researchers and journalists, and the providers or sources of information or documentation for any research by The Center for Medical Progress), that may be disclosed by The Center for Medical Progress to Contractor or that is otherwise learned by Contractor in the course of Contractor's discussions or dealings with, or Contractor's physical or electronic access to the premises of, The Center for Medical Progress, and that The Center for Medical Progress has identified as being proprietary and/or confidential or that by the nature of the circumstances surrounding the disclosure or receipt ought to be treated as proprietary and confidential (including the Work Product, specific Services, and this Agreement, "**Confidential Information**"). Contractor agrees that, upon termination of this Agreement for any reason, Contractor will immediately deliver to The Center for Medical Progress all documentation, computer files or other items containing or relating to Confidential Information as well as any other matters which may involve the operations of The Center for Medical Progress or any of its associates, together with all copies thereof, irrespective of whether Contractor created the same or was involved with the

CM03501

same and that Contractor will neither copy nor take any such materials or items. Contractor further agrees that Contractor will not at any time, either while acting as a Contractor to The Center for Medical Progress, or after termination of this Agreement, for any reason, directly or indirectly, reveal Confidential Information to any other person, corporation or entity or otherwise use the Confidential Information for Contractor's own benefit or the benefit of any other person. Contractor hereby acknowledges that Contractor may become aware of confidential information of third parties with which The Center for Medical Progress cooperates from time to time (including, without limitation, associates, partners, employees, officers and other contractors), and Contractor agrees to treat all such confidential information as Confidential Information hereunder.

**10.  Indemnification; Waiver**.  Contractor shall defend, indemnify and hold harmless The Center for Medical Progress, its subsidiaries, affiliates, and their respective officers, directors, agents, employees, sponsors and television or other exhibitors from and against any and all claims, causes of actions or allegations for judgments, losses, liabilities, damages, costs or expenses (including reasonable attorneys' fees) arising out of: (a) the acts or omissions of Contractor; (b) a breach of any warranty, representation or other provision of this Agreement by Contractor; or (c) any infringement, violation or misappropriation of any third party rights; provided that, in each case, Contractor shall not be responsible to the extent any of the foregoing arise solely out of a change or alteration of the Work Product made by The Center for Medical Progress after delivery by Contractor to The Center for Medical Progress. The Center for Medical Progress shall not, under any set of circumstances, be liable to Contractor for any indirect, special or consequential damages. Contractor shall be solely responsible for any and all damages, accidents, liabilities, destruction of personal property, injuries and/or deaths caused by Contractor or the performance of the Services, and as such, Contractor shall defend and indemnify The Center for Medical Progress from and against any claims arising out of any of the foregoing.

**11.  Term and Termination**.  Contractor agrees to work on an on-going, at-will basis. Either party may terminate this Agreement, with or without cause, immediately upon written notice to the non-terminating party. Contractor shall be paid only for Services rendered prior to notice of termination.

**12.  Governing Law**.  This Agreement shall be governed by the laws of the State of California.

**13.  Severability; Enforcement; No Waiver**.  If any provision of this Agreement shall be deemed invalid or unenforceable, in whole or in part, this Agreement shall be deemed amended to delete or modify, as necessary, the invalid or unenforceable provision to render it valid, enforceable and, insofar as possible, consistent with the original intent of the Parties. The failure of a Party to require performance of any obligations of the other Party hereunder shall not be deemed a waiver and shall not affect its right to enforce any provision of this Agreement at a subsequent time.

**14.  Headings**.  Titles and headings to sections in this Agreement are inserted for convenience of reference only and are not intended to affect the interpretation or

CM03502

construction of this Agreement. If an ambiguity or question of intent arises, this Agreement shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring either Party by virtue of authorship of any of the provisions of this Agreement.

**15. Counterparts.** This Agreement entered into hereunder may be executed in one or more duplicate counterparts (including by facsimile and/or e-mail .pdf), each of which shall be deemed an original, but which collectively shall constitute one and the same instrument.

**16. Amendment.** Any term or provision of this Agreement may be amended, and the observance of any term of this Agreement may be waived, only by mutual written agreement of the Parties thereto.

**17. Entire Agreement.** This Agreement (including all Attachments) constitutes the entire understanding and agreement of the Parties, whether written or oral, and supersedes all prior and contemporaneous agreements or understandings between the Parties with respect to the subject matter hereof.

**IN WITNESS WHEREOF,** the Parties have signed this Agreement as of the Effective Date.

<table>
<tr><td align="center">**THE CENTER FOR MEDICAL PROGRESS**</td><td align="center">**CONTRACTOR**</td></tr>
</table>

_____

Chief Executive Officer

Date: _____     Date: _____

Mailing Address:

      5325 Elkhorn Blvd #305
      Sacramento, CA 95842

Mailing Address:

CM03503

# EXHIBIT 26

Message

| | |
|---|---|
| **From:** | David Daleiden |
| **Sent:** | 8/14/2014 10:50:45 PM |
| **To:** | Scott Turicchi |
| **Subject:** | Re: I seeing George in an hour - any update or anything I can show him? |
| **Attachments:** | Project Completion Roadmap.pdf |

Please show him this Project Completion Roadmap, which is the plan and funding request we're working off of right now to have the project completed and public this winter.

Thanks Scott!

-David

On Thu, Aug 14, 2014 at 3:44 PM, David Daleiden <  > wrote:

**Update:**

-working with Phill Kline (former Attorney General prosecuted PP) preparing to present evidence to multiple District Attorneys in 3 jurisdictions of interest this fall

-we have video evidence implicating PP at the highest levels in multiple felonies

-preparing another infiltration op to snare top PP leaders

-excellent video editor has been hired to work on existing footage for YouTube shorts and longer documentary

**Previews:**

These videos show PP's top abortion doctor and national Medical Director discussing payment for fetal tissue, altering abortion procedures to supply intact specimens, apparent use of illegal partial-birth abortion procedure

1) (password:  )  http://vimeo.com

2) (password: ) http://vimeo.com/ 

**Most immediate funding needs:**

$10k for infiltration in 2 months

$10k for video editor retainer to do all footage

On Thu, Aug 14, 2014 at 3:34 PM, Scott Turicchi <  > wrote:



DEPOSITION
EXHIBIT
354

Outside Counsel Attorneys' Eyes Only



This email, its contents and attachments contain information from j2 Global, Inc. and/or its affiliates which may be privileged, confidential or otherwise protected from disclosure. The information is intended to be for the addressee(s) only. If you are not an addressee, any disclosure, copy, distribution, or use of the contents of this message is prohibited. If you have received this email in error please notify the sender by reply e-mail and delete the original message and any copies. © 2013 j2 Global, Inc. All rights reserved. eFax ®, eVoice ®, Campaigner ®, FuseMail ®, KeepItSafe ® and Onebox ® are registered trademarks of j2 Global, Inc. and its affiliates.

Outside Counsel Attorneys' Eyes Only

### The Center for Medical Progress – Project Completion Roadmap

### Abstract

Since January 2013, The Center for Medical Progress has been conducting a long-term, comprehensive investigation of the illegal traffick in aborted baby parts by Planned Parenthood and its abortion industry allies. The project has logged thousands of research hours, infiltrated multiple high-level abortion industry meetings, recorded several dozens of hours of undercover video and audio, obtained hundreds of pages of supporting evidence, and carried out extensive interviews with inside sources.

The project is building a body of evidence that will be strong enough to trigger criminal prosecution and civil litigation against Planned Parenthood, to precipitate pro-life political and cultural ramifications, and to generate massive negative publicity and permanent brand damage to Planned Parenthood when the revelations become public.

There are several final undercover stings and infiltrations necessary to complete the body of evidence. Existing footage needs to be produced into a format ready for presentation to the public. The entire project could be finished and ready for release in 6 months for $50,000.

### Remaining Components:

#### 1. Follow-Up Stings

The project's front corporation has become a known and trusted entity to many important individuals in the upper echelons of the abortion industry, including key Planned Parenthood leaders. We need to leverage these contacts to secure follow-up meetings with medical directors at strategic Planned Parenthood affiliates to discuss fetal tissue procurement contracts at length.

There are 6 top-priority targets based on our contacts with them, their known history with fetal trafficking, and their political context. Our goal is to have sit-down, in-person meetings with all of them to record their agreement to specific fetal tissue sale arrangements. This will require multiple, brief out-of-state trips for a team of two operatives.

#### 2. Conference Infiltration:

There are 3 major Planned Parenthood-affiliated meetings each year: *Reproductive Health* (Association of Reproductive Health Professionals), the *National Abortion Federation Annual Meeting* (NAF), and the *North American Forum on Family Planning* (Society of Family Planning/PPFA). We have infiltrated the first two, and

Outside Counsel Attorneys' Eyes Only   CM07128

been invited to exhibit at the third this October by PPFA's Senior Director of Medical Services. Multiple Planned Parenthood representatives have told us that the medical directors of all the Planned Parenthood affiliates attend the SFP/PPFA meeting, and that this will be the best place to make contact with the affiliates who are most interested in supplying baby parts. This meeting will give further access to PP representatives encountered previously and generate new contacts and leads for additional follow-up, deepening Planned Parenthood's implication in fetal trafficking. We also expect it to yield valuable information on the internal operations and strategies of Planned Parenthood's abortion program.

### 3. Footage Production:

We currently have dozens of hours of undercover footage illustrating how Planned Parenthood and other abortion industry insiders participate in the sale of aborted fetal parts. This footage includes one-on-one conversations, instructional videos, presentations, and phone calls. As described in (1) and (2), we anticipate obtaining many more hours of undercover footage before the end of the project, potentially doubling the quantity of video. We are also recording formal interviews with real-life witnesses to fetal tissue procurement and sales.

The best segments of footage need to be produced into clear, professional packages that can be easily presented to the public. We envision two presentation formats: the first, a collection of ~5-minute YouTube "gotcha" videos (we already have enough material for at least 10 such videos), and the second, a short-film documentary treatment that integrates undercover footage with real-world supporting evidence to tell the story of Planned Parenthood's sale of body parts. We have identified and interviewed an accomplished local video editor who is an excellent fit for the project.

### 4. Other Media Release Materials:

Several other elements also need to be in place before this project is presented to the public. We need a clean, professional website for the public and especially the media to easily access background information and further supporting documentation on the phenomenon of fetal trafficking. This will include fact sheets for lawmakers and opinion-shapers, banners and graphics for sharing on social media, and an online indexed and annotated catalogue of the real-world abortion industry emails, files, records, and publications that document the supply, sale, and use of aborted fetal parts. We already have an extensive archive of such materials, but over the next 6 months are logging more research hours to further recover and describe this paper trail.

Outside Counsel Attorneys' Eyes Only  CM07129

### Timeline

Considering the work remaining to be done, CMP can make this project ready for public release in December 2014 or January 2015, whichever ends up being more advantageous. The involvement of at least one District Attorney and his or her prosecutorial investigation is expected to commence this summer and be advanced enough to allow public release of project in the winter. If a prosecutor should advise that it is advantageous to delay public release of the project for a time further, we believe the eventual public release will still be best served by having everything prospectively ready by December/January.

The longer this project continues, the greater the risk that at some point, the opposition may catch on. For this reason, it is imperative that the remaining undercover components be executed as soon as possible, while the window of opportunity to obtain more footage is still comfortably open. Given the nature of this work, the best defense against preemptive damage control from the opposition is a good offense, so having project materials ready in advance for public release is a necessary precaution.

### Funding Needs

| Item | Cost |
|------|------|
| **Follow-Up Stings** | **$15,000** |
| *Hotel: $200* | *(6x) $2,500* |
| *Flights: $1,000* | |
| *Food/Travel: $500* | |
| *Actors: $500* | |
| *Costume/Prop/Misc: $300* | |
| | |
| **Conference Infiltration** | **$10,000** |
| *Exhibitor Reg: $3,000* | |
| *Hotel: $1,000* | |
| *Flights: $1,000* | |
| *Actors: $3,500* | |
| *Props/Supplies: $1,500* | |
| | |
| **Contract Research** | **$15,000** |
| | |
| **Video Production** | **$10,000** |
| | |
| **TOTAL** | **$50,000** |

Outside Counsel Attorneys' Eyes Only

# EXHIBIT 27

**archive.today**    Saved from http://web.archive.org/web/20080704070411/http://mttu.com/Articles/Execution%20o    search    3 Oct 2013 04:56:15 UTC
webpage capture                                    no other snapshots from this url

                     Original http://mttu.com/Articles/Execution%20of%20Paul%20Hill%20Nothing%20Less%20th    4 Jul 2008 07:04:11 UTC
                                                    ⓗhistory  ←prior next→

          All snapshots  from host archive.org
                        from host mttu.com

          Linked from  en.wikipedia.org » Cheryl Sullenger
                       en.wikipedia.org » Troy Newman (activist)

| Webpage | Screenshot |                              ✳ share    download .zip    report error or abuse

## MTTU NEWS          Prolife News for the Church Active

**Operation Rescue West
California Life Coalition**

Joint Press Release

For Immediate Release

September 3, 2003

Contact: Troy Newman, Director, Operation Rescue West (316) 841-1700

Cheryl Sullenger, Director, California Life Coalition (619) 277-0725

### Execution of Paul Hill Nothing Less than Murder

Paul Jennings Hill is scheduled to die by lethal injection today in the state of Florida for the murder of a Pensacola abortionist and his security guard in 1994. The following is a joint statement released by Operation Rescue West and the California Life Coalition regarding today's execution:

*"Today's scheduled execution of Paul Hill is not justice, but is another example of the judicial tyranny that is gripping our nation. A Florida judge denied Rev. Hill his right to present a defense that claimed that the killing of the abortionist was necessary to save the lives of the pre-born babies that were scheduled to be killed by abortion that day. Our system of justice is based upon 'innocent until proven guilty,' but in Rev. Hill's case, there was no justice because the court prevented him from presenting the legal defense that his conduct was justifiable defensive action.*

*"There are many examples where taking the life in defense of innocent human beings is legally justified and permissible under the law. Paul Hill should have been given the opportunity to defend himself with the defense of his choosing in a court of law. Because he was denied this right, the full truth and motivations behind Hill's actions were kept hidden from the jury. If Paul Hill's life can be taken by the state without the full advantage of the protections afforded him by due process simply because of the unpopularity of his views, then we have to wonder who is next? No one is safe from being denied a defense by an out-of-control and biased judicial system. Execution under these circumstances is nothing less than murder of a political prisoner.*

*"We pray for Paul Hill today, for his wife and children, and for our nation that sees no value in the lives of the innocent victims of abortion that Hill endeavored to rescue, but instead protects and defends their killers. Today, it is justice that has been aborted. May God have mercy on us!"*

Back to
**Missionaries to the UNBORN**



# EXHIBIT 28



## AbortionDocs.org
### THE LARGEST COLLECTION OF DOCUMENTS ON AMERICA'S ABORTION CARTEL

HOME | MISSION | DONATE | CONTACT US | CONTRIBUTE | DISCLAIMER | DEFINITIONS | WORST OFFENDERS | CLOSED

**ABORTION STATS 2018**

Surgical Abortion Clinics = 493
Abortion Pill Clinics = 226
Abortions = 1105
Abortionists = 17672

## DEBORAH L. NUCATOLA

### ABORTION MILL

S. MARK TAPER FOUNDATION - PLANNED PARENTHOOD (PP LOS ANGELES)
SANTA BARBARA CENTER-PLANNED PARENTHOOD

### MEDICAL SCHOOL

STATE UNIVERSITY OF NEW YORK HEALTH SCIENCE CENTER AT BROOKLYN, 1998

### PHONE NUMBER

### ADDRESS

518 GARDEN ST
SANTA BARBARA, CA 93101
MAP NOT FOUND

### OTHER INFO

Former abortionist at: Bixby Health Center

Planned Parenthood article - Deborah L. Nucatola

Planned Parenthood Official Taped Discussing Sale of Aborted Baby Body Parts

Surgery: Yes

Medication: Yes

### PHOTOS



### VIDEO



Abortionist Deborah Nucatola discusses harvesting body parts from aborted babies.

### DOCUMENTS

#### LICENSES

 **DEBORAH NUCATOLA CA PROFILE**
Profile for medical license in California

 **DEBORAH NUCATOLA CA APPS**
Application for medical license in California.

 **DEBORAH NUCATOLA NY PROFILE (1)**
Profile for medical license in New York.

 **DEBORAH NUCATOLA NY PROFILE (2)**
Profile for medical license in New York.

#### MALPRACTICE HISTORY




tabbies®
EXHIBIT
3/13/19

**MEESE V PP NEW YORK**
Summons, 2016

MISC DOCUMENTS

**THOMAS V PP HUDSON PECONIC**
Nucatola as expert, 2011

Get the latest news on Abortion Docs Here!

Email

SUBMIT

© Operation Rescue 2009, 2010, 2011, 2012, 2013, 2014, 2015, 2016, 2017, 2018

Pro Life Web Design

OR 000010

# Planned Parenthood Official Taped Discussing Sale of Aborted Baby Body Parts | Breitbart

*Austin Ruse*

**An undercover video shot last summer by a new pro-life organization called Center for Medical Progress purports to show the chief medical officer of Planned Parenthood of America talking on camera about how to abort a child intact so the child's body parts can be transferred for medical and scientific research.**

The video was shot by a team led by David Daleiden of the Center for Medical Progress posing as representatives of a start up biotech firm in the business of buying fetal body parts for medical and scientific research. Daleiden told Breitbart News, "It as remarkably easy to make contact with Planned Parenthood" to discuss procurement of fetal tissue.

Video Player is loading.

Current Time 0:00

Duration 1:46

Beginning of dialog window. Escape will cancel and close the window.

Text

ColorTransparency

OR 000011

Background
Color/Transparency

Window
Color/Transparency

Font Size

Text Edge Style

Font Family

End of dialog window.

The video purports to show, between bites of lunch and sips of wine, Dr. Deborah Nucatola saying, "A lot of people want intact hearts these days, because they are looking for specific nodes."

She adds: "Yesterday was the first time she said people wanted lungs. And then, like I said, always as many intact livers as possible. People just want... some people want lower extremities, too. I mean that's easy. I don't know what they're doing with it, I guess they want muscle."

In the 8-minute edited video released today by the Center for Medical Progress, Nucatola can be seen and heard discussing her ongoing relationship with another company called StemExpress that works as a middleman in the buying and selling of fetal tissue, a process that is legal so long as any moneys exchanged are strictly for expenses and not for profit.

The video also shows what is purported to be an actual online order form from Stem Express complete with a pull-down menu for "brain, heart, heart (veins and arteries attached), lungs, liver, liver and thymus, spleen, large intestine" and so on. The order form also specifies the "gestational range" from 4 weeks upwards.

According to Daleiden, the nearly three-hour video was shot without Nucatola's knowledge in a California restaurant on July 25 last summer. The full, unedited video of the encounter published by the Center for Medical Progress, can be seen here.

In the video Nucatola can be heard saying, "Every provider had patients who want to donate their tissue, and they absolutely want to accommodate them. They just want to do it in a way that is not perceived as 'this clinic is selling tissue, this clinic is making money off of this.'"

She talks about pricing. "You know, I would throw a number out, and I would say it's probably anywhere from $30 to $100 [per specimen] depending on the facility and what's involved."

In the video, Nucatola goes into great detail about ordering specific body parts and how the abortionist goes about ensuring those parts are not damaged in

---

the abortion. She says the abortionist uses "ultrasound guidance, so they'll know where they're putting their forceps."

And then she talks about the baby's head. "The kind of rate-limiting step is procedure is calvarium. Calvarium — the head — is basically the biggest part. Most of the other stuff can come out intact."

Nucatola says the doctor has to be "just kind of cognizant of where you put your graspers, you try to intentionally go above and below the thorax, so that, you know, we've been very good at getting heart, lung, liver, because we know that, so I'm not gonna crush that part, I'm going to basically crush below, and I'm gonna crush above, and I'm gonna see if I can get it all intact."

Nucatola explains how the position of the baby can be changed so that she can be extracted up to the head and then collapse the head so that all the other body parts can be extracted without damage.

Nucatola explains how to get around the federal ban on partial birth abortion. "The Federal [Partial Birth] Abortion Ban is a law, and laws are up to interpretation. So, if I say on day one, I do not intend to do this, what ultimately happens doesn't matter." Partial birth abortions are now a felony and punishable by up to 2 years in prison and a fine upwards of $250,000.

Nucatola talks about how the order for parts can change the way the abortions are done. "For example, so I had 8 cases yesterday. And I knew exactly what we needed, and I kinda looked at the list and said okay, this 17-weeker has 8 lams, and this one — so I knew which were the cases that were more probably likely to yield what we needed, and I made my decisions according to that, too, so its worth having a huddle at the beginning of the day and that's what I do."

Nucatola explains that in order to limit liability Planned Parenthood's "litigation and law department...really doesn't want us to be the middle people for this issue right now. Because, actually we were approached by StemExpress to do the same thing" but "it's too touchy an issue for us to be an official middleman."

The video ends with the investigator approaching what the video claims is Planned Parenthood President Cecile Richards at Planned Parenthood's national meeting in Washington DC last year. He identifies himself as doing "fetal tissue collection" and says, "Dr. Nucatola has been very helpful this past year." Richards says, "Okay, great. Thank you. She's amazing."

Breitbart News called Planned Parenthood several times for a comment, as well as Stem Express. Neither returned calls. Nucatola's Twitter feed was taken down this morning. And at least for a while Planned Parenthood's media phone number was "out of service."

According to the US Criminal Code, the buying or selling human body parts is a federal felony. The commercial traffic of body parts from an aborted baby is punishable by up to 10 years in prison and/or a fine of up to $500,000.

Daleiden promises more revelations in the days to come. He is no stranger to

OR 000012

undercover investigations of Planned Parenthood. For five years he was
director of research for Live Action, the group headed by Lila Rose that has
investigated Planned Parenthood for many years.

*Follow Austin Ruse on Twitter @austinruse*

OR 000013

# AbortionDocs.org
THE LARGEST COLLECTION OF DOCUMENTS ON AMERICA'S ABORTION CARTEL

HOME · MISSION · DONATE · CONTACT US · CONTRIBUTE · DISCLAIMER · DEFINITIONS · WORST OFFENDERS · CLOSED

## ABORTION STATS2018

Surgical Abortion Clinics = 493
Abortion Pill Clinics = 227
Abortionists = 1105
Documents = 17672

# MARY A. GATTER



## ABORTION MILL

S. MARK TAPER FOUNDATION - PLANNED PARENTHOOD (PP LOS ANGELES)
PLANNED PARENTHOOD PASADENA AND SAN GABRIEL VALLEY

## MEDICAL SCHOOL

HARVARD MEDICAL SCHOOL, 1975

## PHONE NUMBER

626-798-0706 800-576-5544

## ADDRESS

1045 N. LAKE AVE., 400 WEST 30TH STREET
PASADENA, LOS ANGELES, CA 91104 90007
MAP NOT FOUND

## OTHER INFO

Medical Director, PP Los Angeles until 2014 Now Medical Director of PP in Pasadena. No longer active in Connecticut. (10/2015)

"I want a Lamborghini" – New Video Shows Planned Parenthood Honcho Haggling over Baby Parts Price

Surgery: Yes

Medication: Yes

## PHOTOS

## VIDEO





## DOCUMENTS

## LICENSES

 MARY GATTER CT DRUG PROFILE
Profile for drug license in Connecticut

**MARY GATTER CT PROFILE**
Profile for medical license in Connecticut.

**MARY GATTER CT CREDENTIALS**
Credentials for Connecticut.

**MARY GATTER CA APPS**
Application for medical license in California.

Get the latest news on Abortion Docs. Now!

Name: _____

Email: _____

**SUBMIT**

© Operation Rescue, 2009, 2010, 2011, 2012, 2013, 2014, 2015, 2016, 2017, 2018.

Pro Life Web Design