# **Exhibit B**

1          ANDREW MOORE

2        UNITED STATES DISTRICT COURT

3       NORTHERN DISTRICT OF CALIFORNIA

4    ---------------------------------- )

5   PLANNED PARENTHOOD FEDERATION OF    )

6   AMERICA, INC., et al.,              )

7           Plaintiffs,      )Case No.

8        vs.                 )3:16-CV-00236-WHO

9   THE CENTER FOR MEDICAL PROGRESS,    )

10   et al.,                 )

11           Defendants.      )

12    ---------------------------------- )

13

14    *** CONTAINS CONFIDENTIAL PORTIONS ***

15    VIDEOTAPED DEPOSITION OF ANDREW MOORE

16           Washington, D.C.

17           April 10, 2019

18

19

20

21

22

23

24   Job No: 157976

25   REPORTED BY:  Tina Alfaro, RPR, CRR, RMR

Page 8

1　　　　　　　　ANDREW MOORE

2　Center for Law & Justice for Troy Newman.

3　　　　　MR. THERIOT:  Kevin Theriot, Alliance

4　Defending Freedom for the Defendants as well as for

5　the deponent.

6　　　　　MR. LANGDON:  David Langdon for the

7　witness.

8　　　　　MS. HARLE:  Denise Harle for Defendants,

9　David Daleiden and Center for Medical Progress, and

10　also representing Mr. Moore.

11　　　　　THE VIDEOGRAPHER:  Will the court reporter

12　please swear in the witness.

13　　　　　　　(Witness sworn.)

14　WHEREUPON:

15　　　　　　　ANDREW MOORE,

16　called as a witness herein, having been first duly

17　sworn, was examined and testified as follows:

18　　　　　　　EXAMINATION

19　BY MS. MARTIN:

20　　　Q.  Good morning, Mr. Moore.

21　　　A.  Hello.

22　　　Q.  First thing is state your name for the

23　record.

24　　　A.  My name is Andrew Moore.

25　　　Q.  And where do you live currently?

Plaintiffs' Trial Designations (8:13 to 8:17, 8:22 to 8:24)

1                    ANDREW MOORE

2          A.  Yes.

3          Q.  And did you graduate from university?

4          A.  No.

5          Q.  How long did you attend, how many years did

6    you attend?

7          A.  Approximately two and a half years.

8          Q.  Okay.  And so just to confirm, you do not

9    have any degree from the university?

10         A.  Correct.

11         Q.  Okay.

12                  (Moore Exhibit 275 was marked

13                   as requested.)

14   BY MS. MARTIN:

15         Q.  I'm giving you what has been marked as

16   Exhibit 275, which is a LinkedIn page.  Is this your

17   LinkedIn page?

18         A.  It appears to be.

19         Q.  I will say for whatever reason when we

20   print it out your picture does not print out, but if

21   you take a look this appears -- you say this appears

22   to be your...

23         A.  (Witness nodding.)

24             THE REPORTER:  I'm sorry.  He's nodding.

25             THE WITNESS:  Yes.

Plaintiffs' Trial Designations (18:15 to 18:18, 18:19 to 19:4)

MOORE, ANDREW

Page 19

1　　　　　　ANDREW MOORE

2　BY MS. MARTIN:

3　　　Q.　Did you create this page yourself?

4　　　A.　Yes.

5　　　Q.　And do you update it regularly?

6　　　A.　No.

7　　　Q.　When do you -- how often do you update it?

8　　　A.　Could be once a year, if that.

9　　　Q.　So I will -- on your page you state that

10　you have "Devoted my life to the abolition of

11　abortion, the greatest human rights violation of our

12　time"; do you see that?

13　　　A.　Yes.

14　　　Q.　And did you type that or write that

15　yourself?

16　　　A.　Yes.

17　　　Q.　And that is something that is important to

18　you -- important enough to you that you put it front

19　and center on your LinkedIn page, correct?

20　　　A.　Yes.

21　　　Q.　Okay.　Who is your current employer?

22　　　A.　Susan B. Anthony List.

23　　　Q.　Okay.　And how long have you worked for the

24　Susan B. Anthony List?

25　　　A.　Looks like three years and three months.

Plaintiffs' Trial Designations (19:9 to 20:3)

1             ANDREW MOORE

2      Q.  And that -- is that generally accurate?

3      A.  Yes.

4           (Moore Exhibit 276 was marked

5             as requested.)

6   BY MS. MARTIN:

7      Q.  I'm going to mark what is going to be Moore

8   Exhibit 276.

9      A.  Thank you.

10      Q.  Have you ever seen this before?  It's a

11   printout of a Website.  Have you ever seen this

12   Website before?

13      A.  Yes, I have.

14      Q.  Okay.  And you're familiar with this

15   Website?

16      A.  Yes.

17      Q.  And what is this Website?

18      A.  Well, this is the Susan B. Anthony List

19   Website.

20      Q.  Okay.  At the top it says "The SBA List's

21   mission is to end abortion by electing national

22   leaders and advocating for laws that save lives with

23   special calling to promote pro-life women leaders."

24   Is that the mission of the SBA List as you

25   understand it to be?

1              ANDREW MOORE

2       A.  Yes.

3       Q.  And do you support that mission?

4       A.  Yes.

5       Q.  What are your responsibilities at Susan B.

6   Anthony List?

7       A.  My responsibilities are updating the

8   Website and sending e-mails and social media and the

9   like.

10       Q.  When you say "sending e-mails," what types

11   of e-mails are you sending?

12       A.  E-mails to members of the organization.

13       Q.  Are those e-mails asking for donations?

14       A.  Some of them are.

15       Q.  Are they e-mails that are providing news --

16   current news or current events information to your

17   members?

18       A.  Yes, some of them.

19       Q.  Okay.  And when you say "members," are

20   these people who went onto the Website and signed up

21   to be on your mailing list, or are the names

22   gathered in a different way?

23       A.  When I say "members," I'm referring to

24   anyone who receives e-mails from the organization.

25       Q.  Okay.  And those -- do you know how that

1                     ANDREW MOORE

2        Q.  So it's not in use or it's not an active

3    blog?

4        A.  Correct.

5        Q.  But it exists, but just no one uses it?

6        A.  Not recently, no.

7        Q.  Okay.  And by "not recently," do you know

8    when the last time it was updated was?

9        A.  It could be as much as six months ago.

10        Q.  Okay.  Did you post to that blog prior to

11    six months ago?

12        A.  I have, yes.

13        Q.  And was that content that you wrote

14    yourself, or did you post something that was written

15    by another employee?

16        A.  It would be a combination of the two.

17        Q.  Okay.

18             So moving along on your LinkedIn page, it

19    says that you were the director at AbortionWiki; is

20    that correct?

21        A.  That is correct.

22        Q.  And how long have you been the director at

23    AbortionWiki?

24        A.  Approximately seven years.

25        Q.  And what is AbortionWiki?

Plaintiffs' Trial Designations (24:18 to 25:3)

1          ANDREW MOORE

2          A.  It's an on-line database with information

3     about the abortion industry.

4          Q.  Is that information with an anti-abortion

5     slant or -- yeah, is that information with an

6     anti-abortion slant?

7          MS. HARLE:  Objection, vague, ambiguous.

8     BY THE WITNESS:

9          A.  Let me -- the information is intended to be

10    representing fact.

11         Q.  And AbortionWiki, does -- do you post

12    content that is from third-party sources, like you

13    post links to things, or do you create original

14    content specifically for the Website?

15         A.  Both.

16         Q.  So for example, if you were posting a news

17    article, you might write a little blurb either

18    summarizing it or giving some context to the news

19    article?

20         A.  Correct.

21         Q.  Okay.  Why did you start AbortionWiki?

22         A.  I started AbortionWiki to document the

23    activities of the abortion industry.

24         Q.  Was anyone else involved in the creation of

25    AbortionWiki?

Plaintiffs' Trial Designations (25:21 to 25:23)

Page 28

1            ANDREW MOORE

2        Q.  Have you ever taken any computer

3    programming classes?

4        A.  Yes.

5        Q.  Where did you take those classes?

6        A.  University of Canterbury.

7        Q.  Have you ever taken any classes focused on

8    HTML or creating Websites?

9        A.  Not that I can recall.

10       Q.  Okay.  So when you created AbortionWiki,

11   did you have any training to -- about how to create

12   that Website?

13       A.  No, no training.

14       Q.  Had you read any books about how to create

15   a Website?

16       A.  Not that I can recall.

17       Q.  How did you know how to create a Website?

18       A.  Just through trial and error really.

19       Q.  We're going to go back to your LinkedIn

20   page, and moving along, prior to your current

21   position at Susan B. Anthony List, where were you

22   employed?

23       A.  Americans United for Life.

24       Q.  And how long were you at Americans United

25   For Life?

Page 29

1            ANDREW MOORE

2       A.  About two years and nine months.

3       Q.  If I refer to Americans United For Life as

4  AUL, will you understand what I mean?

5       A.  Yes.

6       Q.  Is that a normal abbreviation that people

7  use for --

8       A.  Yeah.  Yes.

9       Q.  Okay.  And what was your job at AUL?

10       A.  My job was director of marketing and

11  communications.

12       Q.  And does that include on-line

13  communications?

14       A.  Yes.

15       Q.  And what were your job responsibilities?

16       A.  Maintaining the Website and managing the

17  social media accounts and managing the e-mail

18  program were some of my responsibilities.

19       Q.  When you say "e-mail program," what do you

20  mean by that?

21       A.  Overseeing the sending of e-mails to the

22  members of the organization.

23       Q.  Okay.  And, again, what type of e-mails

24  were you sending?  Were they donation e-mails?

25       A.  Yes, some of them were.

Page 33

1                ANDREW MOORE

2        A.  Yes.

3        Q.  Were you involved in posting of those

4    Web -- posting of those press releases?

5        A.  Yes.

6        Q.  Were you involved in drafting the press

7    releases?

8        A.  No.

9        Q.  Were you involved in providing any edits to

10    the press releases?

11        A.  Occasionally.

12        Q.  And if you can recall, were those edits

13    substantive edits or were they typographical?

14        A.  Typographical edits.

15        Q.  Okay.

16            While -- while at AUL did any of your work

17    directly involved Planned Parenthood?

18        A.  Yes.

19        Q.  And how did your work involve Planned

20    Parenthood?

21        A.  It involved exposing the injustice

22    perpetrated by Planned Parenthood.

23        Q.  Was one way of doing that to work on trying

24    to defund Planned Parenthood?

25        A.  Yes.

Plaintiffs' Trial Designations (33:16 to 33:25)

1           ANDREW MOORE

2    Q.  Did people at AUL work with legislators to

3  pass defunding legislation?

4    A.  I'm not a hundred percent sure on that.

5    Q.  Would defunding legislation move AUL's

6  goals forward?

7      MS. HARLE:  Objection, vague, calls for

8  speculation.

9  BY THE WITNESS:

10    A.  I'm not -- I'm not sure.

11    Q.  I'll try to ask it a little differently.

12      Were people at -- did other people at AUL

13  besides yourself support defunding Planned

14  Parenthood?

15      MS. HARLE:  Objection, calls for

16  speculation.

17  BY THE WITNESS:

18    A.  I couldn't speak for them.

19    Q.  Did you ever have conversations with other

20  people at AUL about defunding Planned Parenthood?

21    A.  Yes.

22    Q.  Did you ever use the hashtag "Defund

23  planned parenthood" or "Defund PP" when posting for

24  AUL on social media?

25    A.  I believe so.

Plaintiffs' Trial Designations (34:22 to 34:25)

Page 40

1                   ANDREW MOORE

2   Life New Zealand?

3       A.  Varying tasks to support the mission.

4       Q.  Okay.  And you were not a founder of Right

5   To Life New Zealand?

6       A.  No, I wasn't.

7       Q.  Okay.  Your -- back to your LinkedIn.  It

8   says that you helped form decisions regarding Right

9   To Life's lawsuit against New Zealand's abortion

10   supervisory -- I apologize, it cuts off after that.

11   Do you recall what lawsuit that was?

12       A.  Yes.

13       Q.  What was the subject matter of that

14   lawsuit?

15       A.  I don't recall.

16       Q.  Were you a party to that lawsuit, or did

17   you just assist Right To Life with their work on

18   that lawsuit?

19       A.  I assisted, yes.

20       Q.  And why did you leave Right To Life New

21   Zealand?

22       A.  Due to being out of the country.

23       Q.  Okay.

24       Do you have any journalism background?

25       A.  I don't believe so.

MOORE, ANDREW

Page 41

1           ANDREW MOORE

2       Q.  Did you take any journalism classes at

3   university?

4       A.  Not that I can recall.

5       Q.  All right.  And you have no professional

6   journalism experience, correct?

7       A.  Correct.

8       Q.  Are you aware of any ethical standards that

9   apply to journalists?

10      A.  Yes.

11      Q.  And what are those standards?

12      A.  One of the standards would be to be

13  truthful in reporting.

14      Q.  Do you agree that abortion is legal in the

15  United States?

16          MS. HARLE:  Objection, calls for a legal

17  conclusion, overbroad.

18  BY THE WITNESS:

19      A.  I'm not sure how to answer that question

20  because it is a very broad question.

21      Q.  Do you agree that there are Supreme Court

22  rulings that allow for a woman's right to choose in

23  the United States?

24          MS. HARLE:  Objection, vague, incomplete

25  hypothetical.

Page 44

1              ANDREW MOORE

2    to the entire United States because of different

3    laws.

4        Q.  Okay.  Do you actively work to prevent

5    people from being able to get an abortion?

6        A.  Would you mind rephrasing that question?

7        Q.  Sure.

8            Do you actively work to limit resources for

9    abortion providers such as Planned Parenthood?

10           MR. LANGDON:  Objection, vague.  You may

11   answer.

12   BY THE WITNESS:

13       A.  Some resources.

14       Q.  And what would those resources be?

15       A.  One example would be taxpayer dollars.

16       Q.  And by "taxpayer dollars" does that refer

17   to various defunding Planned Parenthood campaigns?

18           MS. HARLE:  Objection, vague.

19   BY THE WITNESS:

20       A.  I don't fully understand that question.

21       Q.  Okay.  Let me try to rephrase.

22           When you say taxpayer dollars as a resource

23   that you're trying to limit, what do you mean by

24   that?

25       A.  I'm trying -- I'm anticipating activities

Plaintiffs' Trial Designations (44:8 to 44:9, 44:13 to 44:15, 44:22 to 45:3)

1          ANDREW MOORE

2   to limit the quantity of taxpayer dollars that

3   Planned Parenthood receives.

4     Q. Do you do work to limit the ability of

5   women -- sorry -- of people to access abortion?

6      MS. HARLE: Objection, vague.

7   BY THE WITNESS:

8     A. I'm not really familiar enough with the

9   individual situations that women find themselves in.

10   So I couldn't speak to that.

11     Q. Do you participate in work to help close

12   down abortion clinics?

13     A. No.

14     Q. Do you participate in any work related

15   to -- scratch that.

16      What are your views on people who choose to

17   get abortions?

18     A. I feel great sadness.

19     Q. And why do you feel that way?

20     A. Because I'm sad that they found themselves

21   in a position where they believe that to be the

22   correct choice to make and sadness for the unjust

23   death of the child.

24     Q. What do you think should happen to women

25   who have abortions?

Page 46

1              ANDREW MOORE

2          MS. HARLE:  Objection, vague, overbroad.

3     BY THE WITNESS:

4          A.  You know, I'm not fully sure I understand

5     the question.

6          Q.  Do you believe women who obtain abortions

7     should be criminally punished?

8          A.  No.

9          Q.  Do you do any work to prevent doctors from

10    being able to perform abortions?

11         MR. LANGDON:  Objection, vague.

12    BY THE WITNESS:

13         A.  Not that I'm aware of.

14         Q.  Do you know what a trap law is?

15         A.  Could you remind me?

16         Q.  Does the Susan B. Anthony List or your

17    prior employer, AUL, work with any state legislators

18    to pass laws restricting or putting -- sorry --

19    putting restrictions on abortion clinics and how

20    they provide their care?

21         MS. HARLE:  Objection, compound, vague,

22    overbroad.

23    BY THE WITNESS:

24         A.  I felt there was multiple aspects to that

25    question.  So it would be difficult to answer.

● Defs. 2d Set of X-designations and Objs. 9/27 (46:9 to 46:10, 46:13 to 46:13)

Page 47

1                    ANDREW MOORE

2      Q.  Okay.  Let me see if I can break it up.

3           Does your current employer or your former

4  employer work with any state legislators to draft or

5  pass laws related to abortion providers needing

6  hospital-admitting privileges?

7           MS. HARLE:  Overbroad, vague as to time.

8           MR. LANGDON:  Objection, vague.

9  BY THE WITNESS:

10      A.  They may have done.

11      Q.  Were you involved in any of those efforts?

12           MS. HARLE:  Objection, misstates testimony,

13  vague.

14  BY THE WITNESS:

15      A.  I was not involved with meetings with

16  legislators.

17      Q.  Okay.

18           What are your views on doctors who perform

19  abortions?

20      A.  They're not real doctors.

21      Q.  And why are they not real doctors?

22      A.  Because doctors heal, they don't kill.

23      Q.  Do you believe that doctors who perform

24  abortions should be criminally punished?

25           MS. HARLE:  Objection, incomplete

Page 48

1              ANDREW MOORE

2    hypothetical.

3    BY THE WITNESS:

4        A.  I'm, you know, not -- I don't have legal

5    experience.  So I don't know what -- if that should

6    be the case or not.

7        Q.  Do you think that doctors who perform

8    abortions should lose their medical licenses?

9        A.  That's not something I've ever given a

10    whole lot of thought.

11        Q.  What are your views on Planned Parenthood

12    as an organization?

13          MR. LANGDON:  Objection, vague.

14    BY THE WITNESS:

15        A.  One of my views is that they receive

16    $500 million from the taxpayer every year.

17        Q.  Do you have any other views about Planned

18    Parenthood?

19        A.  Yes.

20        Q.  And what are those views?

21        A.  One view would be that they were founded on

22    racist principles.

23        Q.  And do you actively work to get Planned

24    Parenthood defunded?

25          MS. HARLE:  Objection, vague.

● Plaintiffs' Trial Designations (48:17 to 48:24)

| 1 | ANDREW MOORE |
| 2 | BY THE WITNESS: |
| 3 | A.  Sometimes. |
| 4 | Q.  Okay.  Do you actively work to have Planned |
| 5 | Parenthood shut down or put out of business? |
| 6 | A.  It wouldn't really be my decision if they |
| 7 | shut down.  That would be their decision.  So I |
| 8 | don't see how I could impact that. |
| 9 | MS. HARLE:  Counsel, Megan, what do I call |
| 10 | you, can we take a break when you get to a good |
| 11 | stopping point? |
| 12 | MS. MARTIN:  One more question here. |
| 13 | MS. HARLE:  Sure. |
| 14 | BY MS. MARTIN: |
| 15 | Q.  Along with this, do you -- would you prefer |
| 16 | that Planned Parenthood shut down? |
| 17 | A.  No. |
| 18 | Q.  And why would you prefer that they not shut |
| 19 | down? |
| 20 | A.  I don't have a strong opinion that they |
| 21 | should be shut down. |
| 22 | MS. MARTIN:  Okay.  We can take a break. |
| 23 | THE VIDEOGRAPHER:  We are going off the |
| 24 | record at 10:32. |
| 25 | (A short break was had.) |

● Plaintiffs' Trial Designations (49:3 to 49:3)     ● Defs. 2d Set of X-designations and Objs.  9/27 (49:4 to 49:8)

1                    ANDREW MOORE

2      members to call, tweet, write.  In those did you

3      also provide any type of template language for the

4      members to use?

5          A.  Sometimes we did, yes.

6          Q.  And did you provide hashtags for members to

7      use when you were at AUL?

8          A.  Sometimes, yes.

9          Q.  When you were at AUL did you track the use

10     of those hashtags?

11         A.  Sometimes we did, yes.

12                    (Moore Exhibit 279 was marked

13                    as requested.)

14     BY MS. MARTIN:

15         Q.  Okay.  I'll show you what is marked as 279.

16         A.  Thank you.

17         Q.  So this is an article printed from

18     AbortionWiki.  Have you seen this article before?

19             MS. HARLE:  Counsel, can you give us a

20     moment to take a look.

21                    (Witness reviewing document.)

22     BY THE WITNESS:

23         A.  I have seen this before.

24         Q.  Okay.  What is this article?

25         A.  This is an article about a Chrome

Page 66

1          ANDREW MOORE

2    extension.

3        Q.  And what was that Chrome extension?

4        A.  It changed the term "pro-choice" to "pro-

5    abortion."  It's missing the end quote.

6        Q.  And did you create this Chrome extension?

7        A.  Yes.

8        Q.  And why did you feel the need to create

9    this extension -- this Chrome extension?

10       A.  It was something I just wanted to do.

11       Q.  Did anyone assist you with this, with the

12   creation of this Chrome extension?

13       A.  Not that I can recall.

14       Q.  Did anyone provide you funding to create

15   this Chrome extension?

16       A.  No.

17       Q.  Is this extension still available today?

18       A.  I'm unsure if it is or not.

19       Q.  Okay.  You know David Daleiden, correct?

20       A.  I do know him, yeah.

21       Q.  Okay.  When did you first meet

22   Mr. Daleiden?

23       A.  I think around 2012.

24       Q.  How did you come to meet him?

25       A.  I don't recall how I came to meet him.

Page 69

1          ANDREW MOORE

2     Q.  Do you know -- sorry.  When did he first

3  discuss with you the project that's the subject of

4  this lawsuit?

5     A.  I don't recall when that was.

6     Q.  Did Mr. Daleiden approach you directly

7  about the lawsuit -- sorry -- about the project

8  that's the subject of the lawsuit?

9        MS. HARLE:  Objection, lacks foundation.

10   You might want to state the project.  Vague.

11  BY MS. MARTIN:

12     Q.  Okay.  We'll get to that.  So do you know

13  what The Center for Medical Progress is?

14     A.  Yes.

15     Q.  Okay.  And going forward I may abbreviate

16  The Center for Medical Progress as CMP.  You

17  understand me when I use CMP?

18     A.  Yes.

19     Q.  Okay.  What is CMP?

20     A.  CMP is a pro-life organization.

21     Q.  And how did you become aware of CMP?

22     A.  I believe David Daleiden told me about the

23  organization.

24     Q.  Do you recall when David Daleiden told you

25  about the organization?

Plaintiffs' Trial Designations (69:12 to 69:14, 69:19 to 69:23)

MOORE, ANDREW

Page 70

1             ANDREW MOORE

2        A.  No, I don't recall when.

3        Q.  Did Mr. -- did Mr. Daleiden approach you

4   directly about the organization?

5        A.  Yes.

6        Q.  Did he e-mail you about the organization?

7         MS. HARLE:  Objection, vague.

8   BY THE WITNESS:

9        A.  I don't recall the medium he used to tell

10   me about the organization.

11       Q.  And do you recall when he first told you

12   about CMP?

13       A.  No.  No, I don't.

14       Q.  Was it prior to 2015?

15       A.  I don't -- I don't recall.

16       Q.  Do you recall what he told you about CMP in

17   the first instance, when he first spoke to you about

18   CMP?

19       A.  I mean, I recall generally, but no

20   specifics of the conversation about CMP.

21       Q.  And what were the -- what do you remember

22   generally about the conversation?

23       A.  That CMP was a pro-life organization that

24   existed to pursue pro-life ends.

25       Q.  Do you know when CMP was created?

● Plaintiffs' Trial Designations (70:3 to 70:5, 70:16 to 70:24)

Page 71

1              ANDREW MOORE

2       A.  No, I don't.

3       Q.  Were you involved in the creation of CMP?

4       A.  I don't fully understand that question.

5       Q.  When CMP was first founded, were you

6   involved in CMP at that -- at that time?

7       A.  I don't believe so, no.

8       Q.  When did you become involved in CMP?

9       A.  I don't recall the exact dates that I

10  became involved.

11      Q.  How did you first become involved with CMP?

12      A.  By way of David asking me to become

13  involved.

14      Q.  So Mr. Daleiden reached out to you directly

15  and asked you to become involved in CMP?

16      A.  Yes.

17      Q.  And just to confirm, you're not aware of

18  when that was or you can't recall when that was?

19      A.  No, I can't recall that, no.

20      Q.  When Mr. Daleiden reached out to you to

21  become involved with CMP, was he aware that you

22  worked for AUL?

23          MS. HARLE:  Objection, calls for

24  speculation.

25  BY THE WITNESS:

Plaintiffs' Trial Designations (71:8 to 71:16)

Page 78

1                ANDREW MOORE

2    video project?

3        A.  No.

4        Q.  How long did you work for CMP?

5          MS. HARLE:  Objection, lacks foundation.

6    BY THE WITNESS:

7        A.  I'm not sure I completely understand your

8    question.

9        Q.  Did you work for CMP?

10       A.  I don't fully understand that question.

11       Q.  Did you do any work to assist CMP?

12       A.  Yes, I did.

13       Q.  And what was that work?

14       A.  That was focused on Web design with a

15   little bit of focus on social media.

16       Q.  When did you begin this work -- that work

17   for CMP?

18       A.  I don't recall a specific time that I did.

19       Q.  Was it prior to 2015?

20       A.  I don't recall.

21       Q.  You said you assisted with Web design.  Did

22   you help CMP or Mr. Daleiden create the CMP Website?

23       A.  Yes.

24       Q.  Do you recall when you helped create that

25   Website?

Page 80

1                    ANDREW MOORE

2          Q.  Did you sign an independent contractor

3    agreement with CMP or Mr. Daleiden?

4          A.  I don't recall that.

5          Q.  Were you paid for your work by CMP or

6    Mr. Daleiden?

7          A.  Yes.

8          Q.  How much were you paid?

9          A.  I don't recall how much.

10         Q.  Was the pay determined by the hours you

11   worked?

12         A.  No.

13         Q.  Was the pay based on specific projects you

14   were doing?

15         A.  Yes.

16         Q.  Do you recall how many projects you were

17   paid for?

18         A.  No, I don't.

19         Q.  Did you negotiate your rate with

20   Mr. Daleiden or CMP prior to starting your work?

21         A.  I don't recall when that was decided.

22         Q.  Do you recall if you suggested the rate

23   that you would be paid?

24         A.  No, I don't recall that.

25         Q.  How were you paid?  Did you receive a

1               ANDREW MOORE

2    official CMP account?

3        A.  No, I don't recall that.

4        Q.  Did you receive a 1099 for your payment --

5    along with your payments for your taxes?

6        A.  I -- I don't recall that.

7        Q.  Do you recall if you included this income

8    on your taxes?

9        A.  I don't -- I don't recall that, no.

10        Q.  So at this time you were receiving payment

11    from CMP you were also collecting a paycheck from

12    AUL, correct?

13        A.  That's correct, yes.

14        Q.  In the course of your normal duties at AUL?

15        A.  Uh-huh.  Yes.

16        Q.  Was AUL aware of your work for CMP?

17        A.  At -- at one point they were.

18        Q.  Do you know -- can you specify -- can you

19    narrow down what you mean by "at one point"?

20        A.  Initially they were not aware, and then

21    they were aware.

22        Q.  And when did they become aware?

23        A.  I don't know the specific time that they

24    became aware.

25        Q.  Was it prior to the videos being released?

Plaintiffs' Trial Designations (83:4 to 83:21)

MOORE, ANDREW

Page 95

1              ANDREW MOORE

2              (A short break was had.)

3         THE VIDEOGRAPHER:  We're back on the record

4    at 12:09.

5    BY MS. MARTIN:

6         Q.  I think before we went on break we were --

7    I asked you if you knew of CMP's goals.

8         A.  Uh-huh.

9         Q.  I believe you said you were not aware of

10   what CMP's goals were?

11        A.  Correct.

12        Q.  All right.  So I believe you said that you

13   were involved with CMP's social media.  Were you

14   involved with CMP's social media strategy?

15        A.  Yes.

16        Q.  And what was that role?

17        A.  Offering advice on, you know, things --

18   ways to go about using social media.

19        Q.  And who did you offer this advice to?

20        A.  To -- to people who work with CMP.

21        Q.  Would that include Mr. Daleiden?

22        A.  Yes.

23        Q.  Who -- who else was involved with

24   developing CMP's social media strategy?

25        A.  David Daleiden was.

Plaintiffs' Trial Designations (95:12 to 95:22)

Page 96

1              ANDREW MOORE

2       Q.  Anyone else?

3       A.  I'm not aware of any others who were.

4       Q.  Was Mr. Daleiden your main point of contact

5    at CMP?

6       A.  He was.

7       Q.  What was the purpose of CMP's social media

8    strategy?

9       A.  To disseminate information.

10      Q.  Did CMP have social media accounts?

11      A.  Yes.

12      Q.  Which platforms did they use?

13      A.  Twitter and Facebook.

14      Q.  Instagram?

15      A.  Not that I know of.

16      Q.  Who created CMP's Twitter account?

17      A.  I don't recall.

18      Q.  Do you recall what Twitter handle CMP used?

19      A.  I believe so, yes.

20      Q.  And what -- what Twitter handle is that?

21      A.  I believe it is CTRMEDPROGRESS.

22              (Moore Exhibit 280 was marked

23                as requested.)

24    BY MS. MARTIN:

25      Q.  I'm going to -- we're going to mark this.

Page 97

1            ANDREW MOORE

2   So we're marking this as Moore Exhibit 280.

3     A.  Thank you.

4     Q.  Have you seen this document before?

5     A.  I believe so, yes.

6     Q.  This document is an e-mail chain dated

7   July 13, 2015 between Mr. Daleiden and yourself and

8   a few other people; is that correct?

9     A.  Sorry.  Could you repeat the question so

10   I'm clear?

11     Q.  Sorry.  The -- the document that I've put

12   in front of you appears to be an e-mail chain from

13   July 13, 2015 between you, Mr. Daleiden, and a few

14   others?

15     A.  I agree.

16     Q.  Okay.  And July -- sorry.  Do you know the

17   first -- do you know the date the first CMP video

18   was released?

19     A.  No.  I -- I don't recall what the specific

20   date was, no.

21     Q.  Would -- if I told that you the first video

22   was released on July 14, 2015, would you have any

23   reason to disagree with that?

24     A.  Sorry.  Could you please repeat the date

25   one more time?

Page 99

1                 ANDREW MOORE

2          A.  Sorry.  So I'm clear, could you please

3      repeat the question.

4          Q.  In this document Mr. Daleiden says "You

5      have authority to change the name of the Twitter

6      handle."  Did that -- sorry.  Do you -- are you

7      aware, did you also have authority to post from that

8      Twitter handle?

9          A.  Yes.

10         Q.  Were you the only person that had authority

11     to post from that Twitter handle?

12         A.  No.

13         Q.  Who else had authority to post from that

14     Twitter handle?

15         A.  I believe David would have had authority.

16         Q.  Okay.  Did you determine what was actually

17     posted or tweeted from the Twitter -- from the CMP

18     Twitter handle?

19         A.  I don't believe so.

20         Q.  Did Mr. Daleiden determine what was posted

21     or tweeted from the CMP Twitter handle?

22         A.  Sometimes.

23         Q.  Did anyone else provide -- did anybody else

24     tell you what should be posted or tweeted from the

25     CMP Twitter handle?

● Plaintiffs' Trial Designations (99:4 to 100:1)

Page 100

1                    ANDREW MOORE

2        A.  Not that I can recall.

3        Q.  Okay.

4            So your response of the "Let's party" GIF,

5    is that because you knew the videos were going to be

6    released within the next 24 hours?

7        A.  I can't recall why I used that GIF.

8        Q.  Was -- was this work that you were doing

9    with CMP in July of 2015 fun for you?

10        A.  Sometimes.  Although -- yeah, sometimes.

11        Q.  Okay.  Are you still in charge of posting

12    to the CMP -- using the CMP Twitter handle?

13        A.  No.

14        Q.  Do you know who handles the CMP Twitter

15    account now?

16        A.  No.

17        Q.  Going back to -- do you know who create --

18    you said that CMP had a Facebook account, correct?

19        A.  Yes.  Uh-huh.

20        Q.  Did you create that Facebook account?

21        A.  I don't believe so, no.

22        Q.  Did you have permission to post from the

23    CMP Facebook account?

24        A.  Yes.

25        Q.  Did anyone else have permission to post

Page 101

```
1                 ANDREW MOORE
2    from the CMP Facebook account?
3         A.  Yes.
4         Q.  Who else?
5         A.  I believe David had permission.
6         Q.  Anyone else?
7         A.  Not that I know of.
8         Q.  Did you create the content that was used
9    for the CMP Facebook account?
10        A.  Sometimes.
11        Q.  Did Mr. Daleiden create content that was
12   used for the CMP Facebook account?
13        A.  Sometimes he did, yes.
14        Q.  What type of content would you tweet from
15   the CMP Twitter handle?
16        A.  I don't recall.  I mean, there were images,
17   text, but I don't recall the specifics of the
18   content that I tweeted -- tweeted out.
19        Q.  Did you tweet links to the CMP videos
20   during the summer of 2015?
21        A.  I don't -- I can't recall specifically
22   tweeting out those links.
23        Q.  And what type of content would you post to
24   the CMP Facebook page?
25        A.  An example would be a press release.
```

● Plaintiffs' Trial Designations (101:8 to 101:13)    ● Defs . Counter Designations 9/24 (101:23 to 101:25)

Page 104

1              ANDREW MOORE

2    anything on behalf of AUL to -- to push CMP's

3    Twitter handle or get people to follow CMP's Twitter

4    handle?

5        A.  No.  I don't recall specifically working on

6    that, no, at that organization.

7        Q.  Prior to the release of the videos did you

8    assist CMP or Mr. Daleiden in the creation of

9    hashtags to be used with the videos?

10       A.  I don't recall if I participated in that

11   before -- before those videos were released.

12              (Moore Exhibit 281 was marked

13               as requested.)

14   BY MS. MARTIN:

15       Q.  I'm going to show you a document.  This is

16   being marked as Moore 281.

17       A.  Very good.  Thank you.

18       Q.  So I've put a two-page e-mail chain in

19   front of you with the Bates No. CM-19227 through

20   228, and when I refer to the Bates numbers, I'm

21   referring to the little numbers at the bottom of the

22   page.

23       A.  Where exactly?

24       Q.  They're down at the bottom right-hand

25   corner of the page.  Oh, yours may be covered by the

Page 105

1              ANDREW MOORE

2    exhibit sticker.

3         A.  Sorry.  You're saying that's a date?

4         Q.  No, no, no.  It's a Bates number.  It's

5    more for identification purposes.

6         A.  Oh, I thought you said dates.

7         Q.  Sorry.

8         A.  Yep.

9         Q.  So this e-mail chain -- would you agree

10   that this looks to be an e-mail chain dated

11   July 13th and 14th, 2015 between you, Mr. Daleiden,

12   and Bryan Kemper?

13        A.  Yes.

14        Q.  Who is Bryan Kemper?

15        A.  He's a pro-life individual.

16        Q.  Do you know what organization he works for?

17        A.  Yes.

18        Q.  Which organization?

19        A.  Priests For Life.

20          THE REPORTER:  I'm sorry?

21          THE WITNESS:  Priests For Life.

22   BY MS. MARTIN:

23        Q.  Prior to July of 2015 had you had

24   interactions with Mr. Kemper?

25        A.  Yes.

Plaintiffs' Trial Designations (105:9 to 105:19)

Page 106

1             ANDREW MOORE

2     Q.  Did you -- prior to July of 2015 had you

3  spoken to Mr. Kemper about your work with CMP?

4     A.  I don't recall discussing that with him.

5     Q.  Okay.  The subject line of this e-mail is

6  "Re: Hashtag"; is that correct?

7     A.  Yes.

8     Q.  All right.  Starting from the first in time

9  e-mail, which is the e-mail at the bottom, it says

10  "Andy Moore wrote:  I'm going to strongly" --

11  "strongly" in all caps -- "suggest #HUMANCAPITAL";

12  do you see that?

13     A.  Yes, I do.

14     Q.  Was -- sorry.  Did Mr. Daleiden ask for

15  your -- your input in which hashtag to use?

16     A.  I don't recall if he asked me that.

17     Q.  And Mr. Daleiden then responded to your

18  e-mail saying "My concern is that it's just too

19  abstract, it's an economic term.  Can we brainstorm

20  all of our options" and he lists a few options

21  below; do you see that?

22     A.  Yes, I do.  Yep.

23     Q.  And the final e-mail you responded "Other

24  than that one."  Are you -- when you say "other than

25  that one," are you referring to the hashtag "Human

Page 107

1　　　　　　　ANDREW MOORE

2　capital" that you suggested at the bottom?

3　　　A.　I have to assume so, yes.

4　　　Q.　"I like #PLANNEDPARENTHOODSELLSBABYPARTS

5　and #BABYPARTSFORSALE"; is that correct?　Did you

6　suggest those two hashtags?

7　　　A.　Yes.

8　　　Q.　Do you know what hashtag ultimately was

9　decided on?

10　　　A.　Yes.

11　　　Q.　What was that hashtag?

12　　　A.　PP sells baby parts.

13　　　Q.　Do you know who made the final decision on

14　what hashtag to use?

15　　　A.　I don't recall who made the final decision.

16　　　Q.　Would Mr. Daleiden have had final input on

17　the hashtag used?

18　　　A.　I believe so, yes.

19　　　　　　　　(Moore Exhibit 282 was marked

20　　　　　　　　as requested.)

21　BY MS. MARTIN:

22　　　Q.　I'm going to hand you what is marked as

23　Moore Exhibit 282.

24　　　A.　Thank you.

25　　　Q.　This is a one-page e-mail with the Bates

Plaintiffs' Trial Designations (107:13 to 107:18, 107:19 to 108:6)

Page 108

ANDREW MOORE

1            ANDREW MOORE

2     No. CM-18537.  This appears to be an e-mail from --

3     dated August 19, 2015 from Mr. Daleiden to five

4     individuals including Andy Moore, who is you,

5     correct?

6         A.  Yes.

7         Q.  Okay.  And did I correctly represent what

8     the e-mail is?

9          MS. HARLE:  Objection, vague.

10    BY THE WITNESS:

11        A.  I don't believe you talked about the

12    substance of the e-mail, but --

13        Q.  Sorry.  The date -- the date and the

14    individuals on the e-mail.

15        A.  Yeah, I agree that regarding the date and

16    number of individuals on the e-mail.

17        Q.  Okay.  The subject line is "FB article

18    example," and Mr. Daleiden says "This is the kind of

19    solid mainstream article that we should be posting

20    to the CMP Facebook and Twitter every four hours"

21    with a link to an article; is that correct?

22        A.  Yes.

23        Q.  Did Mr. Daleiden often forward examples of

24    things that he wanted to see on the CMP Facebook and

25    Twitter?

Page 110

1                    ANDREW MOORE

2    Twitter without discussing with Mr. Daleiden?

3         A.  I don't recall the specific arrangement we

4    had about that.

5              (Moore Exhibit 283 was marked

6              as requested.)

7    BY MS. MARTIN:

8         Q.  Okay.  I'm showing you what's marked as

9    Moore Exhibit 283.

10        A.  Thank you.

11        Q.  This is a one-page e-mail with the Bates

12   number CM-18512.  This appears to be an e-mail -- an

13   e-mail exchange between Mr. Daleiden and Andy Moore

14   dated July 20 -- sorry -- August 21, 2015; is that

15   correct?

16        A.  Yes.

17        Q.  The subject line is "Re:  E-mail blast re

18   #PROTESTPP"; is that correct?

19        A.  Yes.

20        Q.  Okay.  The first e-mail -- the oldest

21   e-mail in time seems to be an e-mail from you to

22   Mr. Daleiden with some text regarding a post; is

23   that correct?

24        A.  No.

25        Q.  Okay.  What -- what is the first e-mail

Page 112

1                 ANDREW MOORE

2        A.  I don't believe I said that I sent e-mails

3   out from CMP.

4        Q.  Did you ever send out e-mails on behalf of

5   CMP?

6        A.  I don't recall.

7        Q.  Do you recall if Mr. Daleiden sent out

8   e-mails on behalf of CMP?

9        A.  No, I don't recall.

10       Q.  The document we're looking at, the subject

11   line says "E-mail blast."  What is your

12   understanding of an e-mail blast?

13       A.  An e-mail that is sent to, you know,

14   several -- more than two or three people.

15       Q.  Are e-mail blasts sometimes sent to member

16   lists or member dislists -- organization's members

17   lists?

18       A.  Yes.

19       Q.  Are you aware of whether this e-mail that

20   we're discussing and the proposed language was going

21   to be sent to CMP's member list?

22       A.  I believe it would have been, yes.

23       Q.  Did you often assist Mr. Daleiden in

24   preparing such -- such e-mails for CMP?

25       A.  I don't know exactly what you mean by

Plaintiffs' Trial Designations (112:10 to 112:22)

Page 113

1           ANDREW MOORE

2    "often."

3       Q.  On more than one occasion did you help

4    Mr. Daleiden prepare e-mails to send out to CMP's

5    e-mail list?

6       A.  Yes.

7       Q.  And on those occasions did the CMP

8    e-mails -- did the e-mails sent to CMP's list

9    often -- strike the "often" -- include a donate

10   link?

11      A.  Sometimes.

12      Q.  And in this e-mail that we're looking at

13   Mr. Daleiden proposes some -- an edit, he asked you

14   to include a line to the e-mail.  If Mr. Daleiden

15   suggested an edit, would you make that edit?

16      A.  Yes.

17      Q.  In the content -- in the e-mail blast

18   subject -- sorry, not subject.  In the body it says

19   "Please visit protestpp.com now to find a protest

20   location near you."  Do you know what protestpp.com

21   is?

22      A.  Yes.

23      Q.  What is protestpp.com?

24      A.  It is a pro-life Website.

25      Q.  And what -- does protestpp.com help

Plaintiffs' Trial Designations (113:3 to 113:11)

Page 116

1              ANDREW MOORE

2      Q.  Who was your contact at Protest PP for the

3  Website, related to your work on the Website?

4      A.  Eric Scheidler.

5      Q.  Sorry.  And then I think we spoke a little

6  bit about this before, but did you -- did you --

7  actually, strike that.  We'll come back to that.

8          Regarding Protest PP, do you know who led

9  the group or led the coalition?

10      A.  I don't know specifically who led the

11  coalition.

12              (Moore Exhibit 284 was marked

13               as requested.)

14  BY MS. MARTIN:

15      Q.  Okay.  I'm going to show you what's marked

16  as Moore 284.

17          THE REPORTER:  Moore --

18          MS. MARTIN:  284.

19  BY MS. MARTIN:

20      Q.  This is a one-page e-mail with the Bates

21  CM-18823.  This looks to be an e-mail chain

22  between -- dated July 16, 2015 between you and David

23  Daleiden; is that correct?

24      A.  Yes.

25      Q.  Have you seen this document before?

Page 117

1　　　　　ANDREW MOORE

2　　A.　Yes.

3　　　Q.　All right.　The first in time e-mail David

4　Daleiden asks you to do a match-up graphic, and he

5　specifies that this is "For CMP, not" -- in all

6　caps -- "for AUL"; do you see that?

7　　A.　I do, yes.

8　　　Q.　At this period of time, July 16, 2015, post

9　release -- video release, were you working -- were

10　you also -- were you creating social media content

11　for both CMP and AUL regarding the videos?

12　　A.　Yes.

13　　　Q.　And why did Mr. Daleiden -- do you know why

14　Mr. Daleiden would specify who the graphic was for,

15　which organization the graphic was for?

16　　A.　That would be something he would have to

17　tell you.

18　　　Q.　Did you ever create one graphic but put two

19　different logos on -- put two logos on it so that

20　both parties, CMP and AUL, could send it out as its

21　own -- as its own?

22　　A.　Well, there seems to be two questions

23　there.　Could you help me out by re- -- restating

24　that?

25　　　Q.　When you created graphics for CMP to post

Page 123

1              ANDREW MOORE

2    have any conversations with people in your life who

3    asked you if they could donate to CMP?

4         A.  I'm not sure which videos you're referring

5    to.

6         Q.  Any -- any of the videos released after

7    July 14th.

8         A.  And your question on that one was?

9         MS. MARTIN:  Can you read back my question.

10              (Record read as requested.)

11   BY THE WITNESS:

12        A.  I don't recall any such conversations.

13        Q.  In any time prior to the video release, so

14   any time prior to July 14th, 2015, did you have any

15   conversations in which you asked people to donate to

16   CMP?

17        A.  Not that I recall.

18        Q.  In the period prior to July 14, 2014 did

19   you send any e-mails to people that you know asking

20   them to donate to CMP?

21        A.  Not that I can recall.

22        Q.  Do you know -- sorry.  Do you know what the

23   Human Capital Project is?

24        A.  Yes.

25        Q.  What is the Human Capital Project?

Defs. 2d Set of X-designations and Objs.  9/27 (123:22 to 124:7)

MOORE, ANDREW

Page 124

1              ANDREW MOORE

2          A.  It's the project conducted by The Center

3      for Medical Progress to document the injustice being

4      perpetrated by Planned Parenthood.

5          Q.  Was the Human Capital Project just one of

6      CMP's projects?

7          A.  Yes, it was one of CMP's projects.

8          Q.  Do you know when planning for the Human

9      Capital Project began?

10         A.  No.

11         Q.  Do you know who came up with the idea for

12     the project?

13         A.  No.

14         Q.  Were you involved in the Human Capital

15     Project?

16         A.  Yes.

17         Q.  And what was your involvement?

18         A.  Helping to create the Web page that talked

19     about the Human Capital Project.

20         Q.  And when you refer to that Web page, do you

21     mean the CMP Website?

22         A.  Yes.

23         Q.  Did you post to the CMP Website information

24     related to the Human Capital Project?

25         A.  Yes.

Page 127

1                 ANDREW MOORE

2        A.  Which videos specifically?

3        Q.  The Human Capital Project videos.

4           MS. HARLE:  Objection, lacks foundation,

5    overbroad.

6    BY THE WITNESS:

7        A.  Yeah.  I'm not sure exactly which videos

8    you're referring to.

9        Q.  Okay.  I understand there's a series of

10   these videos.  Generally do you know what -- do you

11   know what the general content of these videos

12   included?

13       A.  Footage of people involved in the abortion

14   industry discussing the injustice that they were

15   carrying out.

16       Q.  So by "footage" would that include

17   conversations with abortion providers, conversations

18   between David Daleiden and abortion providers?

19       A.  Yes.

20       Q.  Would it include conversations between

21   other CMP employees and abortion providers?

22       A.  I'm not sure.

23       Q.  Would it include conversations between

24   David Daleiden and Planned Parenthood employees and

25   staff who are not abortion providers?

Page 128

1           ANDREW MOORE

2        MS. HARLE:  Objection, lacks foundation.  I

3    don't think you've even established which videos

4    he's seen or that he's seen videos.  Without showing

5    him any, it seems pretty vague.

6    BY THE WITNESS:

7        A.  Yes.

8        Q.  Would -- oh, along with the videos that

9    were posted, the Human Capital Project videos, were

10    there press releases that went along with those

11    videos?

12        A.  Yes.

13        Q.  Were you involved with drafting those press

14    releases?

15        A.  Not that I recall.

16        Q.  Were you involved in uploading those -- or

17    posting those press releases to CMP's Website?

18        A.  Sometimes.

19        MS. MARTIN:  So I think this might be a

20    good time to take lunch.

21        THE VIDEOGRAPHER:  We are going off the

22    record at 1:04.

23            (Whereupon, at 1:04 p.m., the

24             deposition was recessed, to

25             reconvene at 2:00 p.m., this

1            ANDREW MOORE

2   anti-abortion activists held by Planned Parenthood,

3   would you expect that you could walk up and attend a

4   conference?

5      MS. HARLE:  Objection, lacks foundation,

6   speculation, incomplete hypothetical.

7   BY THE WITNESS:

8      A.  It really is not up to me whether they

9   would allow me to attend or not.  So I can't speak

10   to that.

11      Q.  I think a few minutes ago you said you

12   weren't sure if David Daleiden needed to use a

13   different name.  Do you think -- do you know why he

14   chose to use a different name?

15      A.  Yes.

16      Q.  Why did he choose to use a different name?

17      A.  Because he didn't want to use the name

18   David Daleiden.

19      Q.  And why didn't he want to use the name

20   David Daleiden?

21      MS. HARLE:  Objection, speculation.

22   BY THE WITNESS:

23      A.  I'm not sure why he wanted to make that

24   decision.

25      Q.  Did you have any -- have you had any

● Plaintiffs' Trial Designations (136:11 to 136:18)

1             ANDREW MOORE

2    BY THE WITNESS:

3       A. Yeah. I don't have knowledge either way on

4    that matter.

5       Q. Did you have any conversations with

6    Mr. Daleiden or other CMP employees about whether

7    they told Planned Parenthood employees they were

8    wearing cameras?

9       A. Not that I can recall.

10       Q. Did Mr. Daleiden consult with you in --

11    sorry. At any period in time before July 14, 2015

12    did Mr. Daleiden consult with you regarding video

13    editing?

14       A. Yes.

15       Q. As part of that consultation did he ask for

16    your advice?

17       A. Yes.

18       Q. Did you give him advice?

19       A. Yes.

20       Q. And was that -- did he ask for any feedback

21    on the content of the videos?

22       A. Yes.

23       Q. And did you provide that feedback on the

24    content of the videos?

25       A. On certain of the videos, yes.

Plaintiffs' Trial Designations (140:10 to 140:25)

1          ANDREW MOORE

2          So I believe you stated that you didn't

3     upload anything but you posted videos to the CMP

4     Website; is that correct?

5          A.  I don't believe I said I didn't upload

6     anything.

7          Q.  Okay.  A few minutes ago I think you did

8     say that you posted videos to the CMP Website; is

9     that correct?

10         A.  Oh, yes.

11         Q.  Okay.  The videos that you posted, would

12    they -- would they be linked to YouTube?

13         A.  In some cases, yes.

14         Q.  On the Website would you then see a --

15    the -- a picture -- sorry -- a picture of the video

16    with a -- with the red YouTube arrow in the middle?

17         A.  In some cases, yes.

18         Q.  Okay.  Do you -- do you rem- -- do you

19    recall any instances where you up- -- where you

20    posted video that wasn't a YouTube link, posted

21    video to the CMP Website that wasn't a YouTube link?

22         A.  I don't recall such instances, no.

23         Q.  Okay.

24         Prior to July 14, 2015 when the first video

25    was posted to CMP's Website, did Mr. Daleiden send

Plaintiffs' Trial Designations (145:24 to 146:7)

Page 146

1                    ANDREW MOORE

2     you any previews of videos?

3          A.  Yes.

4          Q.  When Mr. Daleiden provided you previews of

5     the videos, did he ask for your comment or feedback

6     on those videos?

7          A.  In some cases, yes.

8                    (Moore Exhibit 286 was marked

9                     as requested.)

10    BY MS. MARTIN:

11         Q.  So I'm handing you what's marked as Moore

12    Exhibit 286.

13         A.  Thank you.

14         Q.  And for the record, this is a one-page

15    e-mail, CM-03816.  This appears to be an e-mail

16    chain between you and Mr. Daleiden dated May 19th

17    and May 20th, 2015; is that --

18         A.  Mine says CM-03817.

19         Q.  I'm sorry.  Did I say the number

20    backward -- the number wrong?

21         A.  I heard 6.

22         Q.  I apologize.  It's CM-03817.

23         A.  Okay.

24         Q.  I apologize.  Again, this looks to be a

25    document -- an e-mail chain between you and

Page 147

1                ANDREW MOORE

2    Mr. Daleiden dated May 19th and May 20th, 2015; is

3    that correct?

4        A.  Yes.

5        Q.  Have you seen this document before?

6        A.  Yes.

7        Q.  Okay.  So on May 19th Mr. Daleiden sent an

8    e-mail that said "This is a rough draft of episode 1

9    of the Human Capital Web series documentary"; do you

10   see that?

11       A.  Yes, I do.

12       Q.  And then at the end he asks you for

13   thoughts.  You respond with "Hi David.  Some

14   thoughts."  Is it fair to say that these are your

15   thoughts about the videos that he linked to you

16   below?

17       A.  That's correct.

18       Q.  Okay.

19          So if you look at your response, your first

20   bullet point says in quotes "Real life?  What about

21   'current widespread practices' or something?  Real

22   life to me makes it seem like you're suggesting that

23   people may think that this is not real life, i.e. a

24   hoax, and why even put that idea in their head.

25   This is a minor point, perhaps pedantic."

1              ANDREW MOORE

2          Were you concerned that people wouldn't

3    believe the claims CMP was making unless the videos

4    were presented in a specific way?

5          A.  I'm not sure which claims you're referring

6    to.

7          Q.  Okay.  Would you -- were you concerned that

8    people wouldn't believe the entire content of the

9    CMP videos unless the videos were presented in a

10   specific way?

11         MS. HARLE:  Objection, vague.

12   BY THE WITNESS:

13         A.  Yeah.  It's hard for me to know how other

14   people would take this information.

15        Q.  Okay.  Well, why were -- why did -- why --

16   sorry.  Why did you seem to be concerned that people

17   would think this was a hoax?

18         MS. HARLE:  Objection, misstates the

19   document.

20   BY THE WITNESS:

21        A.  I don't recall why I wrote that.

22        Q.  So moving down underneath the bullet points

23   you say "Damn, this whole product is so" -- "so" in

24   all caps -- "strong.  The high number of

25   conspirators adds so much credibility, so much

Page 156

1          ANDREW MOORE

2      A.  Yes.

3      Q.  Okay.  Was it -- is it your understanding

4  that this 10 or 11 minutes was the first 10 or 11

5  minutes of the video that Mr. Daleiden took as part

6  of the Human Capital Project?

7      A.  No.

8      Q.  Was this 10 or 11 minutes that you looked

9  at from other parts of the longer video?

10        MS. HARLE:  Objection, vague, lacks

11  foundation, speculation.

12  BY THE WITNESS:

13      A.  Yeah.  I don't fully understand that

14  question.

15      Q.  Okay.  Will you agree, though, that

16  according to this e-mail you saw somewhere between

17  10 and 11 minutes of video?

18      A.  Yes, I agree.

19      Q.  And your comment about "this whole product"

20  is only referring to those 10 or 11 minutes of

21  video, correct?

22      A.  Yes, I believe so.

23            (Moore Exhibit 287 was marked

24             as requested.)

25  BY MS. MARTIN:

● Plaintiffs' Trial Designations (156:23 to 157:17)

Page 157

1            ANDREW MOORE

2    Q.  I'm going to hand you what is marked 287.

3     THE REPORTER:  I'm sorry?

4     MS. MARTIN:  287.

5  BY MS. MARTIN:

6    Q.  This is a one-page document Bates

7  No. CM-02700.  Have you seen this document before?

8    A.  Yes.  Yes, I have.

9    Q.  And this appears to be an e-mail chain

10  between you and David Daleiden dated May 24, 2015,

11  correct?

12    A.  Correct.  Yeah.

13    Q.  And the subject line is "Re: StemExpress

14  convo snippet," correct?

15    A.  Correct.

16    Q.  What is your understanding of a snippet?

17    A.  A portion of a whole.

18    Q.  Okay.  So did Mr. Daleiden often send you

19  snippets of videos?

20     MS. HARLE:  Objection, vague as to time.

21  BY THE WITNESS:

22    A.  I don't know.  I'd have to define "often"

23  before I could respond.

24    Q.  In the period of time from early 2015

25  through the release of the first video in July --

● Plaintiffs' Trial Designations (157:18 to 157:19, 157:22 to 158:9)

1          ANDREW MOORE

2     July 14, 2015 would Mr. Daleiden send you snippets

3     of video?

4         A.  Yes.

5         Q.  And your understanding is that a snippet is

6     a portion of a -- is part of -- sorry -- is from a

7     larger portion, it's just a small part of a larger

8     portion?

9         A.  Correct.  Yes.

10        Q.  Okay.  So when Mr. Daleiden would send you

11    snippets, he would not be sending you the full

12    video, he would be sending you just a portion of the

13    video?

14        A.  You're referring --

15        Q.  And by -- and by "full" -- I'll clarify --

16        A.  Sorry.

17        Q.  -- what I mean by "full video." That he is

18    not sending you the 500 hours of raw footage, he is

19    sending you a portion of that video.

20        MS. HARLE:  Objection, assumes facts.

21    There's been -- no one's established the total

22    amount of video footage.

23    BY THE WITNESS:

24        A.  I don't understand this document refers to

25    video.  So I don't know if your comment is regarding

Page 159

1          ANDREW MOORE

2    this document or -- your question rather.

3        Q.  Okay.  Sorry.  So in this -- in this e-mail

4    Mr. Daleiden sends you what appears to be the

5    transcription of a conversation, correct?

6        A.  Yeah.  Correct.  Yes.

7        Q.  Okay.  And you respond "Powerful stuff.  I

8    can't even imagine what it must be like to be in a

9    room with these monsters"; is that correct?

10       A.  That's correct.

11       Q.  Okay.  Was it your understanding that this

12   conversation snippet -- that this conversation

13   snippet was from one of the videos that Mr. Daleiden

14   obtained during the Human Capital Project?

15       A.  Yes.

16       Q.  And was it -- is it -- sorry.  Okay.  And

17   does this convo snippet appear to be part of a

18   larger, longer conversation?

19        MS. HARLE:  Objection, speculation.

20   BY THE WITNESS:

21       A.  There's really no way for me to know

22   looking at just this section here.

23       Q.  Okay.  Again, going back to your definition

24   of snippet, that it's part of a larger, is that --

25   that's what you said that snippet means, correct?

Plaintiffs' Trial Designations (159:3 to 159:15, 159:23 to 160:9)

Page 160

1                    ANDREW MOORE

2          A.  Yes.

3          Q.  So if Mr. Daleiden called this a convo

4    snippet, was it your assumption this was just part

5    of the conversation?

6          A.  It's my understanding that it's part of a

7    piece of video footage, but I couldn't answer with

8    regards to whether it was a portion of just one

9    conversation.

10         Q.  Okay.  And did you -- did you ever see the

11   video that went along with this snippet, this

12   transcribed snippet?

13         A.  I believe so, yes.

14         Q.  Okay.  Did you ever see the full video that

15   went along with the conversation -- the whole

16   conversation that the snippet is part of?

17         A.  I can't recall.

18         Q.  So reading this snippet without any video

19   to go along with it, you would not be aware of what

20   else was said as part of a larger conversation,

21   correct?

22         A.  Well, that assumes there was more of this

23   conversation not included here, and I don't know

24   that.  So...

25         Q.  So your comment about "being in the room

Plaintiffs' Trial Designations (160:10 to 161:7)

1              ANDREW MOORE

2    with these monsters," is that based on only what

3    you're read on this page?

4        A.  No.

5        Q.  What was that comment from?  Sorry.  What

6    did you mean, then, by "these monsters"?

7        A.  That the conversation here is monstrous.

8        Q.  Okay.  The conversation is monstrous.

9    Okay.

10          On July 14, 2015 did you post a video to

11    the CMP Website that was created by David Daleiden?

12          MS. HARLE:  I'm sorry.  I missed -- I

13    missed the date on the --

14          MS. MARTIN:  July 14, 2015.

15          MS. HARLE:  On that date?

16          MS. MARTIN:  Yeah.

17    BY THE WITNESS:

18        A.  I don't recall.

19        Q.  As -- I guess a more general question.  Do

20    you remember any of the dates that you posted video

21    on CMP's Website?

22        A.  No, I don't.

23        Q.  All right.  So you're not -- at this moment

24    you can't recall if you were the person that posted

25    the video on July 14th?

Page 165

1            ANDREW MOORE

2     A.  I don't recall.

3     Q.  Do you recall if anyone besides David

4  Daleiden ever provided --

5     A.  I don't recall that either.

6           (Moore Exhibit 288 was marked

7             as requested.)

8  BY MS. MARTIN:

9     Q.  So I'm going to hand you what's marked as

10  Moore 288.

11      THE REPORTER:  I'm sorry?

12      MS. MARTIN:  Moore 288.

13  BY MS. MARTIN:

14     Q.  This is a one-page e-mail with the Bates

15  stamp CM-05456.  Have you seen this e-mail before?

16     A.  Yes.

17     Q.  Okay.  This appears to be an e-mail chain

18  between you and Mr. Daleiden dated July 13, 2015; is

19  that correct?

20     A.  Correct.

21     Q.  And the subject line is "Re: Final video"?

22     A.  Yes.

23     Q.  On July 13, 2015 at 10:05 p.m. Mr. Daleiden

24  sent you a YouTube link; is that correct?

25      MS. HARLE:  Objection.  I just want to note

Page 166

1                ANDREW MOORE

2    that the time stamps appear to be off here.  I don't

3    know if it's a time difference or what, but I

4    wouldn't want him to testify to something that, you

5    know, we're not sure about the accuracy of that.

6    BY MS. MARTIN:

7        Q.  Okay.  I'll take the time stamp out of

8    that, but on Monday, July 13, 2015 it appears

9    Mr. Daleiden sent you a YouTube link, correct?

10       A.  Correct.  Yes.

11       Q.  And it appears the subject line is "Final

12   video," correct?

13       A.  Correct.

14       Q.  At that time was it your understanding

15   that this was the final video that you were going to

16   post to the CMP Website?

17       A.  It's so long ago that I don't -- I couldn't

18   tell you with certainty what -- what the desire was

19   there.

20       Q.  Okay.  Was Mr. Daleiden in the habit of

21   calling things final videos that were not final?

22         MS. HARLE:  Objection, vague, speculation.

23   BY THE WITNESS:

24       A.  Not that I'm aware of, no.

25       Q.  Okay.  In response to Mr. Daleiden's link,

Page 167

1                    ANDREW MOORE

2    you responded by asking "Are people going to be

3    clear that the footage at the beginning of the video

4    is archival in nature?  I assume so, but just

5    wondering," ellipses, and Mr. Daleiden responded

6    back "Does it matter," smiley face"; do you see

7    that?

8         A.  I do.

9         Q.  Okay.  And you responded to Mr. Daleiden

10   with "Not terribly, LOL"; do you see that?

11        A.  Yes.

12        Q.  What did you mean by that?  What did you

13   mean when you told Mr. Daleiden that it didn't

14   matter if people were going to be clear that the

15   footage was archival in nature?

16        MS. HARLE:  Misstates the document.

17   BY THE WITNESS:

18        A.  It would have been a preference I had, but

19   not a very strongly held preference, which is why I

20   would have said that it didn't matter terribly.

21        Q.  Sorry.  A preference -- what do you mean by

22   preference?

23        A.  A preference about the nature of the

24   beginning of the video.

25        Q.  So were you concerned that people wouldn't

Page 170

1              ANDREW MOORE

2    was one that I used.

3        Q.  All right.

4           Are you aware of whether the CMP videos

5    posted in the summer of 2015 had -- one, had a

6    consistent theme?

7           MS. HARLE:  Objection, vague.

8    BY THE WITNESS:

9        A.  The only consistent theme I'm aware of is

10    that there were individuals involved in the abortion

11    industry who were discussing the acts of injustice

12    that they were perpetrating.

13        Q.  And in this instance related to the videos,

14    what do you mean by "the acts of injustice that they

15    were perpetrating"?

16        A.  Well, whether it was killing small people

17    who had no ability to fight back or raise a voice in

18    protest or whether it was selling the broken bodies

19    of those people they killed or whether it was the

20    tone and the attitude they had towards their

21    activities, that's some of the examples of their

22    perpetrating of injustice.

23        Q.  I believe one of the -- one of those

24    injustices that you just named involved selling and

25    Planned Parenthood's supposed sale of fetal tissue

● Defs. 2d Set of X-designations and Objs. 9/27 (170:4 to 170:6, 170:9 to 171:8)

Page 171

1          ANDREW MOORE

2    was a theme of the videos posted on the CMP Website

3    in the summer of 2015, correct?

4        A.  Correct.

5        Q.  Are you aware of whether these -- the

6    videos that were posted on the CMP Website during

7    the summer of 2015 caused public outrage against

8    Planned Parenthood?

9        MS. HARLE:  Objection, vague, calls for

10   speculation.

11   BY THE WITNESS:

12       A.  I don't believe it would be fair to say the

13   videos caused the outrage, but rather the words

14   spoken by the abortion industry personnel.

15       Q.  Was it your intention that the videos

16   should cause outrage?

17       A.  No.

18       Q.  Was it CMP's intention that the videos

19   would cause outrage?

20       MS. HARLE:  Objection, speculation.

21       MR. MONAGHAN:  Objection, speculation.

22   BY THE WITNESS:

23       A.  I don't know that to be a fact.

24       Q.  Okay.  Did you ever have any conversations

25   with Mr. Daleiden about his intentions for the

● Defs. 2d Set of X-designations and Objs. 9/27 (171:12 to 171:19, 171:23 to 172:17)

Page 172

1          ANDREW MOORE

2     video?

3          A.  Yes.

4          Q.  And what were Mr. Daleiden's intentions?

5          A.  One of the stated intentions was to allow

6     the American people to get an inside look at the

7     truth of what the abortion industry was involved in.

8          Q.  And once the American people saw this, what

9     did Mr. -- what did Mr. Daleiden tell you that he

10    wanted to happen?

11         A.  I don't recall him telling me what he

12    wanted to happen.

13         Q.  What did you personally want to happen once

14    the American people saw these videos?

15         A.  I wanted them to respond in the way they

16    would respond to any evidence of injustice committed

17    against fellow humans.

18              (Moore Exhibit 289 was marked

19               as requested.)

20    BY MS. MARTIN:

21         Q.  I'm going to give you what's marked as

22    Moore 289.

23         A.  Thank you.

24         Q.  Okay.  So this is a one-page e-mail with

25    the Bates No. CM-03937.  Have you seen this document

Page 173

| | ANDREW MOORE |
|---|---|

1　　　　　　　　ANDREW MOORE

2　before?

3　　　　A.　I have, yes.

4　　　　Q.　For the record, this appears to be an

5　e-mail chain.　The first in time e-mail is dated

6　May 1st and it's between David Daleiden and Ryan

7　Gonzalez, and the rest of the e-mail chain is dated

8　May 2nd between yourself and David Daleiden; is that

9　correct?

10　　　　A.　Correct.　Yes.

11　　　　Q.　And the subject is "Re: Deb on Vimeo."　Do

12　you know what that subject line refers to?

13　　　　A.　I believe so, yes.

14　　　　Q.　Okay.　And what does that -- what is your

15　understanding of what that refers to?

16　　　　A.　It refers to footage of someone named Deb

17　on Vimeo.

18　　　　Q.　Do you know who Deb is?

19　　　　A.　Yes.

20　　　　Q.　And who's Deb?

21　　　　A.　An abortionist.

22　　　　Q.　Do you know her last name?

23　　　　A.　Yes.

24　　　　Q.　What's her last name?

25　　　　A.　Nucatola.

Plaintiffs' Trial Designations (173:4 to 174:7)

Page 174

1              ANDREW MOORE

2         Q.  And so your understanding is that this was

3    a -- sorry.  What is Vimeo?

4         A.  It's a video platform similar to YouTube.

5         Q.  Okay.  Are you able to post videos to Vimeo

6    that are private?

7         A.  Yes.

8         Q.  Did -- are you aware of whether Ryan

9    Gonzalez used Vimeo to post private videos in May of

10   2015?

11        A.  I don't know who posted the videos.

12        Q.  Are you aware of whether CMP or

13   Mr. Daleiden used Vimeo as the -- as a way to send

14   drafts of their vid- -- of the videos back and

15   forth?

16        A.  I believe so, yes.

17        Q.  Okay.  So Mr. Gonzalez provided

18   Mr. Daleiden with this -- this video, and

19   Mr. Daleiden forwarded it to you saying "New draft,

20   thoughts."

21          MS. HARLE:  Objection, assumes facts.

22   BY MS. MARTIN:

23        Q.  So you see Mr. Daleiden's e-mail on May 2nd

24   saying "New drafts, thoughts"?

25        A.  Correct.

1            ANDREW MOORE

2        Q.  And above that there's a response from you

3    that says "I think this looks awesome."  Would you

4    agree that your response is to Mr. Daleiden's

5    e-mail?

6        A.  It's not immediately clear from this

7    document.

8        Q.  Okay.  In the second e-mail from the top

9    Mr. Daleiden says "I'm actually really dissatisfied

10    with this version compared to the previous one.  I

11    think we need to make it shorter, but I'm worried

12    that this video gets really bogged down in the

13    middle during her lengthy and technical description

14    of the abortion technique."  Do you see that?

15        A.  Yes.

16        Q.  Okay.  And your response to Mr. Daleiden

17    says "Well, yes, if I had one critique it would be

18    length.  Could you do a shorter version that is more

19    digestible and then a more thorough academic legal

20    version"; do you see that?

21        A.  Yes, I do.

22        Q.  And you continue "You don't want

23    potentially angry/upset people not" -- with "not"

24    being in all caps -- "becoming angry/upset thus

25    stigmatizing the industry because the video length

1            ANDREW MOORE

2    caused them to keep scrolling"; do you see that?

3        A.  I do.

4        Q.  From your experience with social media and

5    Web communication, do people often -- sorry.  From

6    your experience with social media and Internet, do

7    people seem to have limited attention spans?

8        A.  Yes.

9        Q.  And you wanted to make sure that the video

10   length would cause people to watch the video,

11   correct?

12       A.  That's not something I had stated.

13       Q.  But you state that "you don't want

14   potentially angry/upset people not becoming

15   angry/upset thus stigmatizing the industry because

16   the video length would cause them to keep

17   scrolling."  Were you worried that a long video

18   would keep people -- stop people from watching the

19   video or cause people to scroll past the video

20   because it was too long?

21       MR. LANGDON:  Objection, vague.

22   BY MR. MARTIN:

23       Q.  So you were concerned that the video be --

24   your concern was that you wanted the video to be a

25   length that would cause people to actually want to

Page 177

1               ANDREW MOORE

2     watch, correct?

3          A.  That's not -- I don't believe that's an

4     accurate representation of my opinion here.

5          Q.  Okay.  So what is your opinion here?  What

6     were you saying to Mr. Daleiden about your -- what

7     was your critique about the length?

8          A.  That if the video was unnecessarily long

9     people watching the video would be consuming less --

10     more information that was incidental than they

11     needed to, and therefore they would not be consuming

12     the information that was most newsworthy.

13          Q.  And -- but you say in the video, though,

14     that you're -- that -- that you don't want people --

15     you don't want the length to cause them to keep

16     scrolling.  What do you mean by "keep scrolling"?

17          A.  That if someone was scrolling through

18     Facebook and they saw a video that was 30 minutes

19     versus a video that was 30 seconds, they would be

20     more likely to become engaged with the shorter

21     video.

22          Q.  All right.  So, again, your concern was

23     that the video be a length that would cause people

24     to want to stop and watch it, correct?

25          A.  I wouldn't say that that caused them to

Plaintiffs' Trial Designations (177:5 to 177:21)

Page 178

1                    ANDREW MOORE

2    stop and watch it.

3         Q.  Okay.  Because your -- because if people

4    didn't watch, they wouldn't get angry or upset at

5    the content, correct?

6         A.  Correct.  Yes.

7         Q.  Because you can't get angry or upset at

8    something you don't watch?

9           MS. HARLE:  Objection, vague, incomplete

10    hypothetical, calls for speculation.

11    BY THE WITNESS:

12         A.  If people are not presented with the full

13    extent of the injustice being perpetrated by Planned

14    Parenthood, then they won't have the information

15    available to them to have a proportionate response.

16         Q.  And when you say "the full extent," how

17    would people be presented with the full extent if

18    the video was short?

19         A.  Because if there's incidental footage, for

20    instance, walking down a hallway or something like

21    that, that doesn't really contribute much to the

22    conversation or to people's understanding.  So...

23         Q.  And would you -- would you consider that

24    type of footage, somebody walking down a hallway, to

25    be something that would be included on the more

Page 180

1              ANDREW MOORE

2     more medical terminology that wouldn't be beneficial

3     to nonmedical people.  Is that -- am I

4     misunderstanding what you said?

5        A.  No.  No.

6        Q.  Okay.

7           Now, you state "Could you do a shorter

8     version that is more digestible and then a more

9     thorough academic, legal version?"  A shorter

10     version that is more digestible would not include

11     all footage that was used in a more thorough

12     academic, legal version, correct?

13        A.  Correct.

14        Q.  So a shorter version would by the nature of

15     being shorter include some editing, correct?

16        A.  Correct.

17        Q.  And who was in charge of making the

18     decisions about the editing included in the -- in

19     the videos?

20        A.  I'm not sure.

21        Q.  So a shorter version that is more

22     digestible, would that be something that people

23     would be more apt to not scroll past because it was

24     shorter?

25           MS. HARLE:  Objection, calls for

Plaintiffs' Trial Designations (180:7 to 180:16, 180:21 to 180:24)

Page 181

1　　　　　　ANDREW MOORE

2　speculation.

3　BY THE WITNESS:

4　　A.  I believe so.

5　　Q.  Okay.  And your language -- your statement

6　here that you don't want potentially angry/upset

7　people not becoming angry/upset, does that mean that

8　you expected people watching these videos to become

9　angry and upset?

10　　　　MS. HARLE:  Misstates the document.

11　BY THE WITNESS:

12　　A.  That's not something I said.

13　　Q.  Okay.  Well, what did you mean here when

14　you said you don't want potentially angry/upset

15　people not becoming angry/upset?

16　　A.  My point there was that if people see and

17　they're able to digest and consume the information,

18　they're more likely to become upset than if they had

19　not consumed the information.

20　　Q.  Okay.  And the content on -- the content of

21　the video would cause people to become angry and

22　upset?

23　　A.  I don't -- it's hard for me to say what

24　exactly would cause people to become upset.

25　　Q.  Did you intend for people to become angry

Plaintiffs' Trial Designations (181:4 to 181:4, 181:13 to 181:19)

1　　　　　　ANDREW MOORE

2　So I wouldn't know if it had all been posted to the

3　CMP Website.

4　　　Q.  But you were never tasked with putting all

5　the raw footage up on the CMP Website, you

6　personally, correct?

7　　　A.  No.

8　　　Q.  Do you know where all of the raw footage

9　was stored during the period of time prior to the

10　 first video release?

11　　　　MS. HARLE:  Objection, assumes facts,

12　 speculation.

13　BY THE WITNESS:

14　　　A.  I don't know where it was all stored.

15　　　Q.  Did you post video -- the CMP videos

16　directly to any other social media platform?

17　　　A.  Yes.

18　　　Q.  Which platforms?

19　　　A.  Twitter and Facebook.

20　　　Q.  And on Twitter and Facebook were you using

21　the CMP Twitter handle and the CMP Facebook page?

22　　　A.  I don't recall if I did that using the CMP

23　social media accounts.

24　　　Q.  Did you -- did you post any of the CMP

25　videos on your -- or links to the CMP videos on your

Page 188

                    ANDREW MOORE

1    personal Facebook page?

2        A.  Yes.

3        Q.  Did you post any of the links to the CMP

4    videos on your personal Twitter?

5        A.  Yes.

6        Q.  Did you post links to the CMP videos using

7    the AUL Twitter handle?

8        A.  Yes.

9        Q.  Did you post links to the CMP videos using

10   the AUL -- on the AUL Facebook page?

11       A.  Yes.

12       Q.  Did you post links to the CMP videos using

13   any other organization's Twitter handle?

14       A.  I don't recall.

15       Q.  Using any other organization's Facebook --

16   on any other organization's Facebook page?

17       A.  I don't recall specifics on that.

18       Q.  Were you involved in any of the decisions

19   about when to publish or post the videos?

20       A.  I don't recall.

21       MS. HARLE:  At some point maybe in the next

22   15 minutes or so --

23       THE WITNESS:  I was just thinking --

24       MS. HARLE:  -- if we could take a break.

Page 204

1              ANDREW MOORE

2        A.  Yes.

3        Q.  What are those?

4        A.  A family in Nazi Germany who would shelter

5    Jews and tell the Nazi officials that they were not

6    harboring Jews I believe would be a justified

7    instance of lying.

8                    (Moore Exhibit 291 was marked

9                     as requested.)

10   BY MS. MARTIN:

11       Q.  I'm going to give you what's marked as

12   Moore 291.

13       A.  Thank you.

14       Q.  Do you -- do you rec- -- sorry.  Do you

15   recognize the document that I've put in front of

16   you?

17       A.  No.

18       Q.  Do you recognize parts of the document that

19   I've put in front of you?

20       A.  Yes.

21       Q.  I'll just state for the record that this

22   exhibit is some excerpts from Mr. Moore's Twitter

23   page, personal Twitter page.

24            Are you the only person that posts to your

25   personal Twitter handle?  I guess, actually, let me

Plaintiffs' Trial Designations (204:8 to 205:8)

Page 205

1                    ANDREW MOORE

2    back up for one second.  Is @thirtyone_8 your

3    personal Twitter handle?

4        A.  It is, yes.

5        Q.  And are you the only person that posts from

6    this Twitter handle?

7        A.  I'm the only person that posts to that

8    Twitter handle.

9        Q.  Okay.  Just to clarify, is there anyone

10   else or any organization that posts from this

11   Twitter handle?

12       A.  There may be bots that tweet from that

13   handle.

14       THE REPORTER:  I'm sorry.  I can't hear

15   you.

16       THE WITNESS:  I was saying there may be

17   bots that tweet from that handle.

18   BY MS. MARTIN:

19       Q.  Can you take a --

20       A.  Programs.

21       Q.  Can you take a minute and just look through

22   these few pages and let me know if you think -- if

23   any of those tweets may have come from a bot?

24       A.  The tweet on the 28th of July 2015 is quite

25   something.  Yeah.  They all look like they're from

Plaintiffs' Trial Designations (205:21 to 206:15)

MOORE, ANDREW

Page 206

1          ANDREW MOORE

2     me.  I never thought my 3-year-old would learn that

3     phrase, but there you go.

4          Q.  So I right now am -- I'm going to point you

5     to on page 2 of 4 there is a tweet from

6     September 4th, 2015; do you see that?

7          A.  Yes.

8          Q.  Can you read that tweet?

9          A.  Yes.

10         Q.  Sorry.  Can you read it out loud for the

11    record.

12         A.  Yes.  "This is a war and in any war you

13    have to employ the tactics of war, including

14    spying," and it's "@fatherfrankpavone,

15    #HIDDENHARVEST #PPSELLSBABYPARTS."

16         Q.  And directly above that you see a meme with

17    that -- that statement, correct?

18         A.  Correct.

19         Q.  What do you mean when you say "This is a

20    war"?  What did you mean when you said "This is a

21    war"?

22         A.  I mean this is a war.

23         Q.  What -- what is -- what do you mean by

24    "this"?

25         A.  Fair enough.  The work of ending abortion

Plaintiffs' Trial Designations (206:16 to 207:6)

Page 207

1          ANDREW MOORE

2   is a war.

3       Q.  And it goes on to say "In any war you have

4   to employ the tactics of war, including spying."

5   Would you include wearing concealed video cameras to

6   be spying?

7          MR. LANGDON:  Objection, vague.

8   BY THE WITNESS:

9       A.  Not necessarily.

10      Q.  Would you -- when would that not be spying?

11          MS. HARLE:  Objection, vague, overbroad.

12  BY THE WITNESS:

13      A.  If they were not switched on.

14      Q.  Fair.  Would you consider wearing concealed

15  video cameras that were actively recording to be

16  spying?

17      A.  Not necessarily.

18      Q.  And why would that not necessarily be

19  spying?

20      A.  Because someone may be in the privacy of

21  their own home.

22      Q.  Would you consider someone wearing a hidden

23  video camera that is actively recording at a

24  public -- no.  Would you consider anyone -- someone

25  wearing a hidden video camera that was actively

● Plaintiffs' Trial Designations (207:9 to 207:10, 207:13 to 207:13, 207:14 to 208:18)

1                    ANDREW MOORE

2   recording at an industry conference to be spying?

3        A.  Not necessarily.

4        Q.  And why not necessarily?

5        A.  Because it depends -- depends how you

6   define spying.

7        Q.  Okay.  What is your definition of spying?

8        A.  I haven't really given that much thought,

9   to be honest.

10        Q.  If -- if you had to give spying a

11   definition right now, what would it be?

12        A.  I would think of the spies, I don't know,

13   from the World War II era perhaps who were secret

14   agents, you know, who were a part of a government

15   operation.

16        Q.  Okay.

17        A.  That would be generally the way I would

18   consider a spy.

19        Q.  Okay.  So your definition of spying would

20   only include government actors --

21            MS. HARLE:  Objection, misstates his

22   testimony.

23            MS. MARTIN:  I was going to finish the

24   question.

25   BY MS. MARTIN:

Page 210

1　　　　　　ANDREW MOORE

2　would be great.

3　　　　MS. HARLE:  These aren't his words.  This

4　is a quote from someone else.  So...

5　BY MS. MARTIN:

6　　　Q.  But he -- you typed this quote in your --

7　and put it publicly on your Twitter page, correct?

8　　　A.  Correct.

9　　　Q.  Why did you use this quote?

10　　　A.  Because I agree with the quote.

11　　　Q.  And what part of this quote do you agree

12　with?

13　　　A.  All of it.

14　　　Q.  Okay.  So when you tweeted this, what did

15　you mean by "including spying"?

16　　　A.  Well, as I mentioned before, I haven't

17　spent a whole lot of time thinking about the exact

18　definition of spying, but that if I did think about

19　it I would think of, you know, a war-time spy with a

20　mandate from the military generally.  That would be

21　the first thing that would come to mind.

22　　　Q.  Okay.  Are you aware of any mandate from

23　the military that Mr. Daleiden had -- has or had?

24　　　A.  No.

25　　　Q.  Okay.  So when you said that this quote is

Page 211

1              ANDREW MOORE

2    talking about this is war, meaning trying to end

3    abortion, what -- what spying would be used to help

4    end abortion?

5         MS. HARLE:  Objection, speculation, vague.

6    BY THE WITNESS:

7         A.  Well, I'm sure there's many kinds of spying

8    that could be employed.

9         Q.  And what type of spying could be employed?

10        A.  I haven't given it a whole lot of thought.

11   So I don't really have an opinion on specifically

12   what kind of spying could be employed.

13        Q.  Does spying include an element of lying?

14         MS. HARLE:  Objection, vague, speculation,

15   incomplete hypothetical.

16   BY THE WITNESS:

17        A.  It -- not necessarily.

18        Q.  Could spying include wearing a hidden video

19   camera that is actively recording in a place where

20   no one else knows you're wearing the video camera?

21        A.  Spying could include that.

22        Q.  So -- sorry.  So by wearing a hidden camera

23   that's actively recording in a place where no one

24   else knew that there was a camera, was Mr. Daleiden

25   doing some form of spying?

Page 219

1              ANDREW MOORE

2      A.  I don't know with certainty who he's

3   referring to or what he's referring to as having an

4   empire.

5      Q.  For you personally was releasing these

6   videos about getting Planned Parenthood defunded?

7          MS. HARLE:  Objection, vague, asked and

8   answered.

9          MR. LANGDON:  And lacks foundation.

10  BY THE WITNESS:

11     A.  So I'm clear, what do you mean when you say

12  for you personally what was the purpose of these

13  videos?  Are you asking me to project what others

14  wanted to happen as a result --

15     Q.  No.  I'm saying what did you want -- is one

16  of the things from the videos that you wanted to

17  happen was for Planned Parenthood to end up

18  defunded?

19          MS. HARLE:  Asked and answered.

20  BY THE WITNESS:

21     A.  My desire for the videos was for the

22  American people to learn the truth about the abuses

23  carried out by Planned Parenthood, and then let the

24  people decide what -- what should be done.

25     Q.  What was the public reaction to the videos?

● Defs. 2d Set of X-designations and Objs. 9/27 (219:15 to 219:18, 219:21 to 219:24)

Page 238

```
 1              ANDREW MOORE
 2       Q.  All right.  But you attended the rally that
 3   was in 297?
 4       A.  Correct.
 5       Q.  Okay.
 6       A.  Yes.  Yes.
 7       Q.  Okay.
 8          On -- and on August 22nd, 2015 it seems
 9   that there were multiple #PROTESTPP rallies across
10    the country, correct?
11       A.  Yes.  Correct.
12       Q.  Okay.  Okay.  What was your reaction to
13   seeing people come out for these rallies?
14       A.  I was glad that people were participating
15   in the democratic process.
16       Q.  Did people at these rallies -- at the rally
17   that you attended seem to be angry?
18        MS. HARLE:  Objection, speculation.
19   BY THE WITNESS:
20       A.  I couldn't speak for all of them.
21       Q.  Did you speak to people at the rally who
22   you did not come to the rally with?
23       A.  Yes.
24       Q.  Okay.  Did any of the people that you spoke
25   to mention that they were angry at Planned
```

● Defs. 2d Set of X-designations and Objs. 9/27 (238:12 to 238:15)

Page 244

1                    ANDREW MOORE

2        Q.  Did any of those people make reference to

3    the fact that they were angry about the videos?

4            MS. HARLE:  Asked and answered.

5    BY THE WITNESS:

6        A.  I don't recall people stating to me that

7    they were angry about the videos.

8        Q.  Did any of the people communicating with

9    you after the release of the videos indicate that

10   they were planning to threaten anyone at Planned

11   Parenthood?

12       A.  No.

13       Q.  Did anyone who communicated with you

14   directly after the videos indicate that they wanted

15   to defund Planned Parenthood?

16       A.  Would you mind repeating that last question

17   one more time?

18       Q.  Did anyone who communicated to you after

19   the -- who communicated to you personally after the

20   videos were released indicate that they wanted to

21   defund Planned Parenthood?

22       A.  Yes.

23       Q.  Did anyone indicate -- did anyone who

24   communicated with you after the release of the

25   videos indicate that they wanted to put Planned

Page 1

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3               SAN FRANCISCO DIVISION

4

5    PLANNED PARENTHOOD FEDERATION )

6    OF AMERICA, INC., ET AL.,    )

7                        )

8         PLAINTIFFS,     )

9                        )

10      vs.              ) CASE NO. 3:16-CV-0236-WHO

                    )

11   CENTER FOR MEDICAL PROGRESS,  )

12   ET AL.,             )

13                       )

14        DEFENDANTS.     )

15   _____)

16

17         DEPOSITION OF PHILLIP S. CRONIN

18            TUESDAY, MAY 28, 2019

19

20

21   REPORTED BY:

22   GINA M. CURRIE,

23   CSR NO. 8429

24   JOB NO.  3396297

25   PAGES 1 - 35

Page 5

1    of Troy Newman with Mayall Hurley.

2         MR. DICKINSON:  Did you get that, Gina?

3         THE COURT REPORTER:  I'm going to need a

4    spelling.

5         I'm sorry?  I didn't hear that.

6         MR. DICKINSON:  Yeah, could the second counsel

7    state your appearance again, please.

8         MR. RHOMBERG:  I'm not counsel, I'm one of the

9    defendants in the case, Albin Rhomberg.

10        MR. DICKINSON:  Albin Rhomberg.

11        THE COURT REPORTER:  I thought I heard an

12    attorney.

13        MR. DICKINSON:  So we have two.  Is there anybody

14    else on the phone?

15              PHILIP S. CRONIN,

16    having first been duly sworn, was examined and testified

17    as follows:

18              EXAMINATION

19    BY MS. BOMSE:

20        Q   Good afternoon, Mr. Cronin.

21             I said it before, but let me just do it again

22    formally and on the record.  My name is Amy Bomse.  I'm a

23    lawyer representing the plaintiffs in this case who are

24    various Planned Parenthood entities.

25             Would you do me a favor and state and spell your

Plaintiffs' Trial Designations (5:20 to 6:3)

1    name for the record.

2      A    Yes. My name is Phillip Steven Cronin. And

3    that's C-r-o-n-i-n, Phillip with two Ls.

4      Q    Thank you. And, Mr. Cronin, I wonder if Counsel

5    could provide you with the notice of your deposition so we

6    can just have a look at that.

7      MR. DICKINSON: I'm an Indian giver.

8      MS. BOMSE: Madam Reporter, we are going to mark

9    that as the first exhibit in the deposition and it's going

10    to be Exhibit 580.

11      (Deposition Exhibit 580 was marked for

12      identification by the court reporter.)

13      Q    BY MS. BOMSE: Mr. Cronin, if you would have a

14    look at Exhibit 580 and just tell me if you have seen it

15    before.

16      A    I don't recall seeing this before.

17      Q    That's fine.

18      Is it your understanding that you are appearing

19    for a deposition today pursuant to receiving a notice

20    asking you to so appear?

21      A    Yes, I am aware of that.

22      Q    Thank you.

23      Okay. Let me just go over a few deposition

24    basics. Have you had your deposition taken before ever?

25      A    No, I have not.

1    are creating a written transcript, we need to follow a few

2    formalities that we don't in normal conversation.

3         I need to -- you need to wait until my question

4    is finished before you answer and you need to respond with

5    a verbal response; for example, a yes, a no, what have

6    you, rather than nodding your head.

7         Do you understand?

8    A   I understand, yes.

9    Q   Terrific.  Thank you.

10         Mr. Cronin, is there any reason -- a medical

11    reason that you're not able to give me your best testimony

12    today?

13    A   No.

14    Q   Thank you.

15         All right.  Are you currently working --

16    A   No.

17    Q   -- professionally?

18    A   No, I'm retired.

19    Q   Okay.  And at some point you were a practicing

20    lawyer; is that right?

21    A   Yes.

22    Q   What was the area?  What type of law did you

23    practice?

24    A   Different areas of the law at different times.

25    From about 1973 to about 2003, I practiced mainly criminal

1    law as a prosecutor and as -- on the deputy district

2    attorney level San Mateo County, Tulare County, and also

3    as an assistant U.S. attorney in Fresno.  And then the --

4    from about 2006 to about 2000 and -- I'm sorry, I'm

5    getting -- I meant to say from '92 to -- I'm getting a

6    little confused here.  From '72 to about '92, criminal law

7    as a prosecutor, and then from '92 to 2004 I was county

8    counsel in Fresno, and from 2004 to 2010 I was -- I taught

9    at law school -- criminal law school.

10       Q    You taught in law school?

11       A    Yeah, I taught criminal law and procedure in law

12    school.

13       Q    Okay.  Thank you.

14            What law school did you teach at?

15       A    San Joaquin College of Law in Fresno -- or in

16    Clovis, rather.

17       Q    Got it.

18            Okay.  Mr. Cronin, I'm going to ask your counsel

19    to provide you with the document -- well, to provide to

20    the court reporter first for marking as an exhibit PC 1

21    through 3.

22            MR. DICKINSON:  What's the number, Amy, 581?

23            MS. BOMSE:  1 through 3 -- oh, and the exhibit

24    number is 581.

25            MR. DICKINSON:  I'm actually marking them, if

Page 10

1　　that's all right with everybody.

2　　　　　MS. BOMSE:  Good with me.

3　　　　　(Deposition Exhibit 581 was marked for

4　　　　　identification by the court reporter.)

5　　　　　MR. DICKINSON:  Okay.  Witness has the documents.

6　　　　　MS. BOMSE:  Okay.  Excellent.

7　　　Q　　BY MS. BOMSE:  Mr. Cronin, the first thing I want

8　　to have you notice is that in the bottom right corner of

9　　the three pages that you have been handed as Exhibit 581

10　　are the initials PC and then the numbers 1 through 3.

11　　　　　Do you see that?

12　　　　　MR. DICKINSON:  I actually covered it up a little

13　　bit.

14　　　　　THE WITNESS:  Oh, yeah, I see it.  Okay.

15　　　Q　　BY MS. BOMSE:  Okay.  And those -- and those

16　　numbers reflect the fact that these are documents produced

17　　by you through your counsel in this case.

18　　　　　Do you understand that?

19　　　A　　Yes.

20　　　Q　　Okay.  Now, I'm not necessarily going to ask you

21　　at first to refer to this document as much as giving it to

22　　you in case it's helpful in answering my questions, but --

23　　but first I'm going to just start asking questions without

24　　specifically referring you to anything in the document.

25　　　　　So my first question is:  Is it correct that you

CRONIN, PHILLIP

1     served as the agent for service of process for a company

2     called Biomax Procurement Service?

3         A    Yes, that's correct.

4         Q    And you were initially asked to do this by Katie

5     Short?

6         A    Yes, that's right.

7         Q    How do you know Ms. Short?

8         A    I've known Katie Short for a number of years

9     probably because we both attended the same Catholic church

10    for mass and would chat afterwards and got to know her on

11    that basis.

12        Q    Okay.  And what -- when Ms. Short first asked you

13    about serving as agent service of process, what do you

14    recall her saying to you?

15        A    She -- as best as I can recall, she indicated to

16    me that this company, that they had formed or were going

17    to form, would be not entering into any contracts and

18    would mainly provide David Daleiden and -- with the access

19    to various Planned Parenthood offices for the purpose of

20    investigative journalism.

21        Q    Okay.  When you say would provide David Daleiden

22    with access, what do you mean by that?

23        A    Well, that he would be representing himself as

24    being an officer of this corporation and that the

25    corporation was interested in obtaining fetal body parts.

Plaintiffs' Trial Designations (11:21 to 11:25)

1    Q    Okay.  And you understood that Mr. Daleiden --

2    so -- strike that.

3         What did -- why did the corporation need an agent

4    for service of process?

5    A    I guess in case any members of the company got

6    sued that I would handle the -- I would be responsible for

7    seeing that they received notice of their subpoenas.

8    Q    Do you understand why Ms. Short couldn't serve as

9    the agent for service of process?

10   A    No.  No, I don't, except she was the attorney for

11   I think the Life Legal Defense fund or something, so I

12   imagine there might have been a conflict there.  I don't

13   know.

14   Q    Have you done any work with Life Legal Defense

15   fund?

16   A    No.

17   Q    Do you know Mary Riley?

18   A    No, I've never heard of her.

19   Q    All right.  If you could turn to the second page

20   of the e-mail chain, on the bottom is the first e-mail in

21   this string of e-mails.  It's from David Daleiden to you

22   dated August 26th, 2013.

23        You see that?

24   A    Oh, the August 26th is the one on the bottom?

25   Q    I'm asking you to look at the very last e-mail on

Plaintiffs' Trial Designations (12:3 to 12:13, 12:19 to 13:18)

1    PC 02.  It starts, "Hi, Phil.  I'm David Daleiden."

2        A    Yeah, I see that.

3        Q    Okay.  And was this the first contact you've ever

4    had -- you had had with Mr. Daleiden?

5        A    I'm not sure if I had a -- I remember having a

6    telephone conversation, a very brief one, with him and I'm

7    not sure of the chronology, whether or not the e-mail

8    preceded the telephone call.  It looks like it did, but I

9    don't have the independent recollection about the order of

10   sequence.

11       Q    Okay.  That's fine.

12           So Mr. Daleiden entitled his e-mail to you

13   "Pro-life Investigative Project."  Did you -- what did you

14   understand him to mean by that?

15       A    Well, that basically his organization was for the

16   promotion of life of the unborn and the investigation had

17   to do with the investigative journalism that they were

18   involved in.

19       Q    Okay.  Did you know whether Mr. Daleiden was a

20   journalist?

21       A    No, I didn't know, but the way I had been told

22   about their method of getting information was similar to

23   what Mike Wallace used to do on 60 Minutes with sort of

24   this sub rosa type of investigation.

25       Q    Okay.  So when you say what you had been told,

● Defs.  2d Set of X-designations and Objs.  9/27 (13:19 to 14:2)

1    you're talking about what Katie explained to you?

2       A    I think either Katie or David.

3       Q    Okay.  And can you just tell me what it was that

4    they explained to you about their investigative methods?

5       A    Only that they would be videotaping or taping

6    conversations with Planned Parenthood officials and

7    officers with the ultimate goal of distribution of those

8    videotapes to the public at large sometime at a later

9    date.

10      Q    What did you understand was the goal of

11   distributing those videotapes to the public?

12      A    My understanding was it was to educate the public

13   as to what was going on and with the idea that perhaps

14   appropriate legislation could be effected that would ban

15   the dismemberment and sale of fetal parts and organs.

16      Q    And how did you get that understanding?

17      A    I think that was my own conjecture on the matter,

18   plus what I had been told by Katie and what David had told

19   me.

20      Q    When you answered my question just now about what

21   was the purpose, are you able to distinguish between what

22   you know now about what Mr. Daleiden and his colleagues

23   did and simply asked to describe what your understanding

24   was at the time or is it mixed together?

25      A    Given the length of time that's passed, it's kind

Page 15

1    of hard for me to distinguish what I knew then and what I

2    know now.  I mean, I obviously acquired more information

3    as time went by, but -- but for me to say exactly what I

4    knew at the time of this letter other than the fact that

5    they were involved in investigative journalism and to

6    expose practices that hopefully could be remedied.

7        Q    Okay.  Now, did you have an -- did Mr. Daleiden

8    explain to you why he couldn't serve as agent for service

9    of process?

10       A    No, he didn't explain that to me.

11       Q    Did you have any experience as acting as an agent

12   for service of process?

13       A    No, I had no experience of that sort.

14       Q    What's your understanding as to why Ms. Short

15   approached you to be the agent for service of process?

16       A    I'm not sure why she did apart from the fact

17   that, you know, we knew each other and we were on friendly

18   terms.

19       Q    You didn't ever ask her that?

20       A    No, I never asked her.

21       Q    What did you understand would be the business of

22   the new company?

23       A    Ostensibly I think the business was to -- the

24   procurement of fetal body parts and tissues and specimens.

25   That was their ostensible purpose.

Page 16

1      Q    But you understand that it was actually a front

2    company for the undercover operation?

3      A    That's correct.

4      Q    So if you look at the e-mail, your response to

5    Mr. Daleiden, you say that Katie has spoken to you briefly

6    and that you were -- that you were interested but you

7    wanted to discuss the matter with Mr. Daleiden.

8         Do you see that?

9      A    Yes, I see that.

10     Q    Okay.  And you said specifically, "I would like

11   to know some specifics about you, your new corporation,

12   your goals, your legal status."

13     A    Yes, I see that.

14     Q    Do you see that?

15     A    I see that.

16     Q    Okay.  Okay.  And at some point you said you did

17   have a conversation with Mr. Daleiden; correct?

18     A    Yes.

19     Q    And what did Mr. Daleiden tell you about himself?

20     A    I don't really recall him discussing himself

21   except that he had this project and what the -- what I've

22   previously testified to as far as the objectives of the

23   project and -- and then that's about it.

24     Q    I'm sorry.  I missed that last thing you said.

25     A    I said that was about the sum and substance.  The

1   conversation was in 2013 I think and so I'm not sure, just

2   because of the passage of almost six years, what specific

3   details he went into.  I don't recall right now.

4        Q    Sure.  Did you understand that part of the

5   project was to be using cameras to record Planned

6   Parenthood staff without their knowledge?

7        A    Yes.

8        Q    Did you have any conversations with Mr. Daleiden

9   about whether or not that was legal?

10       A    No.

11       Q    Did you ever ask anyone about whether recording

12   individuals without their knowledge is illegal?

13       A    No.

14       Q    Was that something that concerned you?

15       A    No, because I -- again, I equated it with the

16   type of investigative journalism that goes on in the media

17   and, as an example, with Mike Wallace and 60 Minutes,

18   where they would go in with a secret mic and a camera and

19   record conversations and then later put it on their

20   reporting on the air to educate the people about that

21   particular subject.

22       Q    Okay.  So anything else that you can remember

23   about what Mr. Daleiden said to you on the call other than

24   that he was creating a Biomax in order to do an

25   investigative journalism program?

CRONIN, PHILLIP

Page 18

1    A    No, I don't recall anything further.

2        Q    If you look at the bottom of the first page of

3    Exhibit 581, there's an e-mail from Mr. Daleiden to you.

4        A    Yes, I see that.

5        Q    And he says -- in the second paragraph he says,

6    "When it gets nearer to the time that we release this

7    project, we could easily switch you out for someone else."

8            Do you see that?

9    A    Yes.

10        Q    Do you remember a conversation with Mr. Daleiden

11    about the idea that, before the project was released to

12    the public, you would remove yourself as the agent of

13    service of process?

14        A    I vaguely remember a conversation in -- just

15    before they were going to release the -- the films where

16    Mr. Daleiden had told me that the time of the release was

17    imminent and that if I chose to resign as agent for

18    service of process that would be all right with him.

19        Q    In fact, that was a --

20        A    That was in 20 -- 2015 I think.

21        Q    Right.  And that was a requirement of yours for

22    agreeing to be the agent for service of process, that you

23    could remove yourself before the project became public;

24    correct?

25        A    I think so, yes.

Page 19

1     Q    And why was that? Why was that important to you?

2     A    Well, I didn't -- the goals had been achieved and

3 they were going to disband, I gather, and there would be

4 no purpose in having an agent for service of process.

5     Q    Okay. So you were -- your -- your point was that

6 you would resign as agent for service of process when

7 there was no longer an organization at all; is that what

8 you're telling me?

9     A    Right.

10     Q    Okay. So were you willing to stay on as agent

11 for service of process as long as the entity was still

12 functioning?

13     A    Up until the release of the videotapes.

14     Q    Right. So even if Biomax continued to exist in

15 some form, you were not willing to continue to act as

16 agent for service of process once the videos were

17 published; right?

18     A    That's correct.

19     Q    I'm just trying to understand why that was. Why

20 was that one of your conditions?

21     A    My service was complete. The mission was

22 accomplished and, therefore, there was no point in my

23 being -- continuing being the agent for service of

24 process.

25     Q    If you look at what Mr. Daleiden wrote to you on

Plaintiffs' Trial Designations (19:1 to 20:15)

1   August 27th, he says -- he said, "We could easily switch

2   you out for someone else, even if that be an attorney or

3   just me at this point."

4        Do you see that?

5   A   Yes.

6   Q   "Because it wouldn't matter anymore."

7        Do you see that?

8   A   Yes.

9   Q   Why -- why did you -- why did it -- why would it

10  not matter anymore who was the agent for service of

11  process for Biomax at that point to your understanding?

12  A   Because I think the objective of the project

13  would have been accomplished and there would be no need to

14  maintain the -- that Biomax was going to do any business

15  in the fetal tissue and fetal organ business.

16  Q   When you resigned as agent for service of

17  process, did you understand that Biomax was ending its

18  corporate existence?

19  A   That was my impression.

20  Q   Did anyone -- strike that.

21       Was it your understanding that Mr. Daleiden

22  wanted you to serve as agent for service of process

23  because you aren't someone who is publicly associated with

24  antiabortion activity?

25  A   I don't know.  That would be conjecture on my

Plaintiffs' Trial Designations (20:16 to 20:19)

CRONIN, PHILLIP

Page 21

1     part.  I don't really know why they asked me.

2          Q    Okay.  Why were you interested in serving as

3     agent for service of process?

4          A    Well, I wasn't initially interested.  I mean,

5     they approached me and I was retired and was not involved

6     in any project, so I thought this would be a project worth

7     serving if the videotapes could educate the public and

8     perhaps result in some legislation that would deal with

9     the problem of fetal body parts.

10         Q    So you were interested in supporting the project?

11         A    I was interested in seeing that something happens

12    effectively and within the confines of the legal process

13    to change what was going on that was -- so I mean, to that

14    extent, I guess I was.

15         Q    Okay.  When you said to me you were interested in

16    legislation to deal with the problem of fetal body parts,

17    what do you mean by that?

18         A    Legislation that would prohibit the dismemberment

19    of babies in order to procure their organs and body parts

20    for sale and to educate the people, the public as to the

21    enormity of -- of the -- of abortions.

22         Q    So you wanted the public to be educated about the

23    enormity of abortions?

24         A    Yes.

25         Q    Did you want the public to be educated about the

Defs. 2d Set of X-designations and Objs. 9/27 (21:2 to 22:8)

1    enormity of abortions in order for -- ultimately for there

2    to be legislation that would outlaw abortion?

3         A    Ultimately, yes.

4         Q    Did you have any conversations with Katie Short

5    about that goal?

6         A    No.

7         Q    How about Mr. Daleiden?

8         A    No.

9              MS. BOMSE:  All right.  Mr. Dickinson, if you

10   could hand Mr. Cronin the document with the Bate stamp PC

11   00012.

12             MR. DICKINSON:  Is that going to be 582?

13             MS. BOMSE:  It is.  Thank you very much.

14             MR. DICKINSON:  Okay.  He's got it.

15             (Deposition Exhibit 582 was marked for

16             identification by the court reporter.)

17        Q    BY MS. BOMSE:  Mr. Cronin, do you have

18   Exhibit 582 in front of you?

19        A    Yes, I do.

20        Q    Okay.  And this is -- this is an e-mail on the

21   top that you forwarded to your counsel, Mr. Dickinson, on

22   February 23rd, 2016; correct?

23        A    Right.

24        Q    And below it is an e-mail that you received from

25   Katie Short on August 28, 2013; correct?

1     A    That's correct.

2       MS. BOMSE:   Okay.   Mr. Dickinson, if you could

3   give Mr. Cronin PC 0004 which will be Exhibit 583.

4       (Deposition Exhibit 583 was marked for

5       identification by the court reporter.)

6       MR. DICKINSON:   Okay.   He's got it.

7       MS. BOMSE:   Wonderful.

8     Q    BY MS. BOMSE:   Mr. Cronin, the e-mail on the

9   bottom of this chain is dated July 3rd, 2015, and in it

10   Mr. Daleiden is writing to you that the project is drawing

11   to a close and letting you know that you -- it's time for

12   you to resign if you wish.

13       Do you see that?

14     A    Yes, I see that.

15     Q    And this is the -- the conversation that you

16   previously described to me where Mr. Daleiden was letting

17   you know that the project was coming to a close; is that

18   correct?

19     A    No, I don't think -- if I said that we had had a

20   conversation about this, I think I might have been

21   confusing the e-mail with the conversation, but I only

22   had --

23     Q    Understood.

24     A    As I recall, I only had one telephone

25   conversation with Mr. Daleiden and that was at the

CRONIN, PHILLIP

Page 24

1    beginning in 2013, so I think --

2       Q    That's fine.  So I -- this is -- so it turns out

3    that what you recalled was about an e-mail exchange rather

4    than an oral conversation; correct?

5       A    That's correct.

6       Q    Okay.  And between the time that you had the

7    conversation with Mr. Daleiden and then agreed to be agent

8    for service of process for Biomax and this time that

9    Mr. Daleiden told you that the project was coming to a

10   close, did you have any involvement in Mr. Daleiden's

11   project --

12      A    No.

13      Q    -- other than serving as agent for service of

14   process?

15      A    No.

16      Q    Did you have any conversations with Mr. Daleiden

17   during that time period?

18      A    No.

19      Q    Any communications with Ms. Short about the

20   project during that time period?

21      A    No.

22      Q    Any communication with anyone associated with the

23   investigation --

24      A    No.

25      Q    -- about the investigation?

1        A    No.

2              MS. BOMSE:  Mr. Dickinson, if you could hand

3    Mr. Cronin a copy of his declaration in this matter.

4              MR. DICKINSON:  Okay.  Do you want to mark it as

5    an exhibit?

6              MS. BOMSE:  I do.  Exhibit 584, please.

7              MR. DICKINSON:  Okay.

8              MS. BOMSE:  Thank you.

9              (Deposition Exhibit 584 was marked for

10              identification by the court reporter.)

11        Q    BY MS. BOMSE:  Mr. Cronin, I'll give you a moment

12    to flip through the document and then my first question is

13    just do you recognize it.

14        A    Yes, I've seen this before.

15        Q    Okay.  On the third page of the -- of

16    Exhibit 584, is that your signature?

17        A    Yes -- you mean on page 2 of the --

18        Q    It is on page 2.  It's the third -- yeah, I'm

19    sorry.  That was confusing.  You're right that it's page 2

20    of the declaration.

21        A    Right.

22        Q    It's page 3 of this document.

23        A    Oh, okay.

24        Q    So either way, page 2 of the Declaration of

25    Phillip Cronin, is that your signature?

CRONIN, PHILLIP

1        A    That's my signature, yes.

2        Q    Okay.  And did you read this Declaration of

3    Phillip Cronin before you signed it?

4        A    Yes.

5        Q    And you understood that you were signing it under

6    penalty of perjury; correct?

7        A    Yes.

8        Q    And everything in the declaration that you signed

9    is accurate; correct?

10        A    Yes, as far as I can recall now.

11        Q    At the time that you signed it, did you have any

12    question as to whether it was accurate?

13        A    No.

14        Q    All right.  If you would turn to Exhibit B to

15    your declaration.

16        A    All right.

17        Q    Have you seen Exhibit B before?

18        A    Yes.

19        Q    What is Exhibit B?

20        A    It's a Resignation of Agent Upon Whom Process May

21    Be Served.  It's my resignation which I signed and which

22    was filed on July 7th, 2015.

23        Q    Okay.  And that's your signature there on the

24    bottom; correct?

25        A    That's correct.

1      Q    Okay.  And you filed this with the Secretary of

2   State?

3      A    Yes, that is correct.

4      Q    Great.  All right.  If you could turn to Exhibit

5   C.  Exhibit C, the first page is a document entitled

6   "Exhibit Rules and Regulations," and then the second two

7   pages of Exhibit C are "Application and Agreement for

8   Exhibit Space," and there's two pages to that document.

9      A    Right.

10     Q    Is this a document that you had ever seen before

11  your counsel provided it to you in connection with this

12  declaration?

13     A    No, I had never seen this before Mr. Dickinson

14  provided me with the exhibits.

15     Q    On the third page of Exhibit C at the bottom

16  there is a section called "Total Fees."

17         Do you see that?

18     A    Yes, I see that.

19     Q    Okay.  And the total fees due to NAF, N-A-F, were

20  $3,235; correct?

21     A    Yes.

22     Q    And below that it states, "Charge total fees to

23  my," and there's a checkmark next to "Visa."

24         Do you see that?

25     A    Yes.

1      Q   And then below that there's a Visa card number?

2      A   Yes.

3      Q   Do you see that?

4      A   Yes.

5      Q   And an expiration date.

6          Do you see that?

7      A   Right.

8      Q   And below that it says, "Name of Cardholder" and

9   it's written "Phil Cronin."

10         Do you see that?

11     A   Yes.

12     Q   To your -- you didn't have the Visa card with the

13   number 5815-8900-0006-6028, did you?

14     A   No, I did not.

15     Q   Okay.  And below the "Name of Cardholder" is a --

16   is a line for "Signature of Cardholder."

17         Do you see that?

18     A   Yes.

19     Q   And that's not your signature, is it?

20     A   That's not my signature, no, and I never --

21     Q   Okay.

22     A   I never write Phil Cronin.  It's either Phillip

23   Cronin or Phillip S. Cronin.  I never write Phil Cronin.

24     Q   And you never authorized anyone to sign your name

25   on your behalf on this registration form, did you?

1      A   No, I did not.

2      Q   If you could, turn to Exhibit D.  Exhibit D is a

3   photocopy of three Visa cards:  Two issued by the Bank of

4   America and one by Chase.

5         Do you see that?

6      A   Yes.

7      Q   Okay.  And the Bank of America card on the top

8   left says "The Center for Medical Progress."

9         Do you see that?

10     A   Yes.

11     Q   And below that is your name "Phil Cronin";

12   correct?

13     A   Right.

14     Q   Did you ever authorize anyone to obtain a bank

15   card on your behalf --

16     A   No.

17     Q   -- for The Center for Medical Progress -- no?

18     A   No.

19     Q   Okay.  Thank you.

20         Did you ever work for The Center for Medical

21   Progress?

22     A   No, I never even heard of The Center for Medical

23   Progress until my attorney told me about it.

24     Q   Do you know someone named Susan Merritt?

25     A   No, I don't.

1     Q    Okay.  You were never a business partner in

2   Biomax, were you?

3     A    No, I was not.

4     Q    You were never the accountant for Biomax, were

5   you?

6     A    No, I was not.

7     Q    Okay.  Do you know Troy Newman?

8     A    No, I don't know Troy Newman.

9     Q    Okay.  Do you know Albin Rhomberg?

10     A    No, I don't know him.

11     Q    Okay.  Do you know Adrienne Lopez?

12     A    No, I do not know her.

13     Q    Do you intend to testify at the trial of Planned

14   Parenthood versus CMP?

15     A    That depends if I'm subpoenaed to testify, but --

16     Q    Have you been asked?

17     A    -- I have no plans to do so.

18     Q    You haven't been asked by anyone representing any

19   defendants?

20     A    No.

21     Q    Were you surprised when you were provided with

22   the documents attached to your declaration?

23     A    Are those --

24     Q    Specifically the one showing your credit card --

25   a credit card with your name and the one showing a

Page 31

1    signature on a document --

2        A    Yes.

3        Q    -- for Phil Cronin?

4        A    I was completely surprised and flabbergasted.

5        Q    That wasn't what you agreed to when you agreed to

6    be agent for service of process; correct?

7        A    Not at all.

8            MS. BOMSE:  All right.  Thank you very much.  I

9    have no further questions at this time.

10           MR. DICKINSON:  Counsel on the phone, party on

11   the phone, any questions for Mr. Cronin?

12           MR. KOZINA:  None at this time.  Thank you.

13           THE COURT REPORTER:  Who was that speaking,

14   please?

15           MR. KOZINA:  Pardon me?

16           MR. DICKINSON:  Yeah, the court reporter needs

17   you to identify yourself.

18           MR. KOZINA:  My name is Vladimir Kozina

19   representing Troy Newman.

20           THE COURT REPORTER:  Thank you.

21           MR. DICKINSON:  Okay.  Thanks.

22           It appears that we --

23           MR. KOZINA:  Thank you.

24           MR. DICKINSON:  Go ahead.

25           It appears we have no further questions.

1        UNITED STATES DISTRICT COURT

2        NORTHERN DISTRICT OF CALIFORNIA

3

4    PLANNED PARENTHOOD            )

5    FEDERATION OF AMERICA,        )   Case No.

6    INC., et al,              )   3:16-CV-00236

7         Plaintiffs,          )

8          vs.              )

9    THE CENTER FOR MEDICAL        )   Pages 1-314

10     PROGRESS, et al,           )

11        Defendants.            )

12                      )

13

14

15          Los Angeles, CA

16    VIDEOTAPED DEPOSITION OF KATHLEEN M. BRYAN

17            TAKEN ON

18       FRIDAY, MARCH 22, 2019

19

20

21

22    Job No. 157901

23    Reported by:

24    BRENDA R. COUNTZ, RPR-CRR

25    CSR NO. 12563

1          MR. MONAGHAN:  John Monaghan, American

2    Center For Law and Justice, for defendant Troy

3    Newman.

4          MR. ANTHONY:  Greg Anthony representing

5    the witness, Kate Bryan.

6          THE VIDEOGRAPHER:  Will the court

7    reporter please swear in the witness.

8

9              KATHLEEN M. BRYAN

10          having been first duly sworn, was

11          examined and testified as follows:

12

13              EXAMINATION

14    BY MR. HUYNH:

15        Q.  Good morning, Ms. Bryan.

16        A.  Good morning.

17        Q.  Would you please state your full name

18    for the record?

19        A.  Kathleen Mary Bryan.

20        Q.  How do you spell that?

21        A.  K-A-T-H-L-E-E-N, M-A-R-Y, B-R-Y-A-N.

22        Q.  What is your home address?

23        A.  1420 State Street.  That's in Brighton,

24    Michigan, 48116.

25        Q.  Do you have a business address?

1      A.   I do not.

2      Q.   What's your date of birth?

3      A.   8-13-1984.

4      Q.   Have you had your deposition taken

5    before?

6      A.   No.

7      Q.   So I'm going to go over some ground

8    rules to how this process works.  So the court

9    reporter to my right is transcribing this

10    deposition so you need to give verbal answers.

11    The court reporter can't take down head nods or

12    head shakes.

13         Do you understand that?

14      A.   I do.

15      Q.   You must wait until I finish asking the

16    question before you answer.

17         Do you understand that?

18      A.   I do.

19      Q.   If you don't understand a question,

20    tell me and I'll try to clarify.  If you answer

21    the question, then I will assume you understood.

22         Is that fair?

23      A.   Yes.

24      Q.   If you need a break, please tell me.  I

25    will ask that you finish any pending question but

1    Girl Revolution?

2        A.  Yes.

3        Q.   Does One Girl Revolution do any work

4    involving Planned Parenthood?

5        A.  No.

6        Q.   Prior to being self-employed in June

7    2018, you were employed at CRC Public Relations;

8    is that correct?

9        A.  That is correct.

10       Q.   And you were employed at CRC Public

11   Relations from April 2016 to June 2018, correct?

12       A.  That is correct.

13       Q.   Your position was senior account

14   executive, correct?

15       A.  That is correct.

16       Q.   At CRC Public Relations from April 2016

17   to June 2018, did you do any work involving

18   Planned Parenthood?

19       A.  Yes.

20       Q.   What was the work that you did that

21   involved Planned Parenthood?

22           MR. ANTHONY:  Object that it would call

23   for a narrative and that it is overbroad as to

24   time.  It's nonspecific.  And I don't think

25   you've defined Planned Parenthood in this

1    deposition.

2         But if you have, Kate, an understanding

3    or believe you have an understanding of what he

4    means by Planned Parenthood and you can answer

5    the question based on fact, you should try to do

6    so.

7         THE WITNESS:  I don't understand the

8    question.  Can you rephrase?

9    BY MR. HUYNH:

10        Q.   What don't you understand about the

11   question?

12        A.   Can you repeat it?

13        Q.   What was the work that you did at CRC

14   Public Relations from April 2016 to June 2018

15   that involved Planned Parenthood?

16        MR. ANTHONY:  Same objection.

17        Brenda, if I say "Same objection," can

18   you incorporate it by reference in the same

19   words?

20        If I can ask for a stipulation that any

21   time I say "Same objection," that it would just

22   be the immediate objection being interposed; that

23   way we don't have to repeat all the words?

24        MR. HUYNH:  That's fine.

25        MR. ANTHONY:  Everyone agrees.

Plaintiffs' Trial Designations (34:13 to 34:15)

1          THE WITNESS:  I'm not sure how to

2    answer the question.  I still don't understand.

3          MR. HUYNH:  Can you repeat the

4    question, please?

5          MR. ANTHONY:  Listen to the question

6    and if there is a part of the question you don't

7    understand, maybe let the attorney know.

8          (The record was read by the reporter.)

9          MR. ANTHONY:  The same objections as

10   before.  Do you understand the question?  Or if

11   not, on what basis are you not understanding it?

12         THE WITNESS:  I understand.

13         The same work, working in public

14   relations, writing press releases, pitching op

15   eds, pitching people to media.

16   BY MR. HUYNH:

17      Q.   Were there specific projects that you

18   worked on at CRC Public Relations from April 2016

19   to June 2018 that involved Planned Parenthood?

20         MR. ANTHONY:  The same objection as

21   before.

22         THE WITNESS:  I think that's privileged

23   information.

24         MR. ANTHONY:  I think he's asking right

25   now for a yes or a no, if there were particular

Plaintiffs' Trial Designations (35:13 to 35:15)

1        THE WITNESS:  Yes.

2    BY MR. HUYNH:

3     Q.  Could you tell me about the work that

4    you did involving Planned Parenthood?

5        MR. ANTHONY:  I just didn't hear you.

6    Your voice faded off.  Can you speak a little

7    more audibly?

8    BY MR. HUYNH:

9     Q.  Sure.  Could you please tell me the

10    work you did involving Planned Parenthood at the

11    American Principles Project?

12        MR. ANTHONY:  Timeframe?

13        MR. HUYNH:  Counsel, it's defined that

14    she worked there from August 2013 to February

15    2016.

16        MR. ANTHONY:  Overbroad, nonspecific,

17    unspecified, nonspecific, nondefined as to time

18    so as to be potentially though not necessarily

19    intentionally burdensome and vexing.

20        I think that's a yes or a no.

21        THE WITNESS:  Can you repeat the

22    question?  Sorry.

23    BY MR. HUYNH:

24     Q.  Could you please tell me the work you

25    did involving Planned Parenthood at the American

Plaintiffs' Trial Designations (44:24 to 45:1)

Page 45

1    Principles Project?

2         MR. ANTHONY:  Same objection that I

3    just articulated.  Let me add on to that because

4    I didn't hear it properly before.

5         Potentially invasive or potentially

6    implicating the enumerated constitutionally

7    protected -- I think we are calling those

8    testimonial privileges.

9         Other than that, to the extent that

10   there might be privacy interests or nondisclosure

11   agreements, et cetera, that would be up to you to

12   assert, Kate.

13        THE WITNESS:  Mainly writing, like

14   writing and political commentary in the media.

15   BY MR. HUYNH:

16      Q.   What were the specific projects that

17   you worked on at the American Principles Project

18   that involved Planned Parenthood?

19        MR. ANTHONY:  Same objection.

20   Overbroad, vague as to time, nonspecific,

21   undefined, potentially and not necessarily and

22   certainly not intentionally oppressive, vexing

23   and harassing of the witness as phrased and

24   potentially implicating the constitutionally

25   enumerated testimonial privileges and otherwise

Page 46

1    First Amendment speech association and privacy

2    and contractual nondisclosure agreements.

3         But you should try to answer as you

4    navigate through that.

5         THE WITNESS:  The only thing that comes

6    to mind is Center for Medical Progress.

7    BY MR. HUYNH:

8        Q.   Why did you leave the American

9    Principles Project?

10         MR. ANTHONY:  Objection, relevance,

11    calls for a narrative.

12         THE WITNESS:  Job change.

13    BY MR. HUYNH:

14        Q.   No other specific reason?

15        A.   No.

16        Q.   Prior to your role as director of

17    communications of the American Principles

18    Project, you were communications director at Live

19    Nation, correct?

20        A.   Live Action?

21        Q.   Live Action, thank you.

22        A.   That is correct.

23        Q.   And you were communications director at

24    Live Action from December 2011 to August 2013,

25    correct?

Plaintiffs' Trial Designations (46:5 to 46:6, 46:23 to 47:1)

1        A.   That is correct.

2        Q.   Did you do any work involving Planned

3   Parenthood as communications director at Live

4   Action from December 2011 to August 2013?

5             MR. ANTHONY:  Objection, overbroad,

6   vague, unspecific, nondefined as to time,

7   potentially though not necessarily and certainly

8   not intentionally burdensome, oppressive, vexing,

9   harassing of this particular witness.

10            Other than that --

11            THE WITNESS:  Yes.

12   BY MR. HUYNH:

13        Q.   What were the specific projects that

14   you worked on at Live Nation from December 2011

15   to August 2013 that involved Planned Parenthood?

16            MR. ANTHONY:  Same objection.

17            THE WITNESS:  I was involved in two

18   investigations.  One was their gendercide

19   investigation and the other was infanticide.

20            MR. ANTHONY:  Would you mark the

21   transcript for me, Madam Reporter?  Just indicate

22   at the front of the book that I asked for the

23   transcript be marked.

24   BY MR. HUYNH:

25        Q.   What was the gendercide investigation?

Page 57

1    BY MR. HUYNH:

2       Q.   Do you know if Mr. David Daleiden wrote

3    the initial draft of these press releases that

4    CRC Public Relations worked on for CMP?

5          MR. ANTHONY:  Objection to form and

6    objection to the extent that the question as

7    stated could but doesn't necessarily implicate

8    enumerated constitutional testimonial privileges.

9          THE WITNESS:  Yes, he probably did.

10   BY MR. HUYNH:

11      Q.   And for these press releases that

12   Mr. Daleiden wrote initially, did you make any

13   edits to them?

14         MR. ANTHONY:  Objection to form.  We

15   still haven't defined which particular presses we

16   are talking about.  It calls for speculation.  I

17   have to add that.

18           And then the question as stated could,

19   or potentially, but doesn't necessarily implicate

20   the previously enumerated constitutionally

21   protected privilege, testimonial privileges.

22         THE WITNESS:  Potentially.

23   BY MR. HUYNH:

24      Q.   Did Mr. Daleiden ask you for any advice

25   about the press releases that he drafted for CMP?

Plaintiffs' Trial Designations (57:2 to 57:4, 57:9 to 57:9)

1    these talking points looked like?

2         MR. ANTHONY:  Objection to form.

3         THE WITNESS:  I don't remember if there

4    were talking points so I wouldn't remember what

5    they looked like.

6    BY MR. HUYNH:

7       Q.   For these press releases that you

8    worked on at the American Principles Project and

9    CRC Public Relations related to CMP, where did

10    you get your information for the press releases?

11         MR. ANTHONY:  Objection to form.

12         THE WITNESS:  Clarification; I didn't

13    do press releases at American Principles Project

14    with anything to do with CMP.

15         So do you mean for CRC?

16    BY MR. HUYNH:

17      Q.   Let's start with CRC.

18      A.   Can you repeat the question, just

19    regarding CRC?

20      Q.   For the press releases that you worked

21    on at CRC Public Relations related to CMP, where

22    did you get your information for the press

23    releases?

24         MR. ANTHONY:  Objection to form.

25         THE WITNESS:  It depends on the press

1    release but probably David Daleiden.

2    BY MR. HUYNH:

3        Q.  Anyone else you would have received

4    information from?

5            MR. ANTHONY:  Objection.  Sounds like

6    an incomplete hypothetical question.  Otherwise,

7    lacks foundation, calls for speculation, so

8    objection to form.

9            If you understand that question, I

10   don't want you to guess or speculate.  He doesn't

11   want your opinion.  You are a fact witness.  He

12   wants facts that you recall.  He doesn't want you

13   to guess.

14           THE WITNESS:  The only other people

15   that I would have received additional information

16   from at CRC is other employees at CRC.

17   BY MR. HUYNH:

18       Q.  So besides Mr. Daleiden and CRC

19   employees, you did not receive information for

20   the press releases related to CMP, correct?

21           MR. ANTHONY:  Objection to form.

22           THE WITNESS:  Not to my knowledge.

23   BY MR. HUYNH:

24       Q.  And who at CRC Public Relations gave

25   you information related to the press releases

Page 85

1   perform abortions?

2       MR. ANTHONY:  Same objection.  It's a

3   form objection.

4       THE WITNESS:  Can you repeat the

5   question?

6   BY MR. HUYNH:

7       Q.  What are your views on doctors who

8   perform abortions?

9       A.  I believe that they are murdering

10  innocent human beings.

11      MR. ANTHONY:  Would you mark the

12  transcript for me, please.  Thanks, Brenda.

13      THE WITNESS:  And failing women.

14  BY MR. HUYNH:

15      Q.  Why do you believe that?

16      A.  Because I believe that every human

17  being is unique and a gift to this world.

18      MR. ANTHONY:  Would you mark the

19  transcript please, Brenda.

20  BY MR. HUYNH:

21      Q.  What do you think should happen to

22  doctors who perform abortions?

23      MR. ANTHONY:  That's been asked and

24  answered, counsel, but if you want to prolong the

25  deposition she can answer it again.

● Plaintiffs' Trial Designations (85:7 to 85:10, 85:13 to 85:13)

1      Q.   Were you aware by 2011 that sting

2   operations on Planned Parenthood would lead to

3   protests against Planned Parenthood?

4          MR. ANTHONY:  Objection to form.

5          THE WITNESS:  Do you want to repeat the

6   question?

7   BY MR. HUYNH:

8      Q.   Yes.  Were you aware by 2011 that sting

9   operations on Planned Parenthood would lead to

10    protests against Planned Parenthood?

11         MR. ANTHONY:  Objection to form.

12         THE WITNESS:  I was not aware that it

13   would lead to protests.

14   BY MR. HUYNH:

15     Q.   When did you hear about this

16   demonstration mentioned in this article?

17     A.   Right now.

18     Q.   You know David Daleiden, right?

19     A.   I do.

20     Q.   When did you first meet him?

21     A.   I met David in December of 2011.

22     Q.   Where did you meet him?

23     A.   In the Live Action office in San Jose,

24   California.

25     Q.   When did he first discuss with you the

1     project that is the subject of this lawsuit?

2        A.   When did he first discuss the Center

3     for Medical Progress investigation?

4        Q.   Correct.

5          MR. ANTHONY:  Objection to form.

6          THE WITNESS:  May of 2015.

7     BY MR. HUYNH:

8        Q.   So when you met him at the Live Action

9     offices in San Jose, California in 2011, he did

10     not mention the CMP investigation to you?

11          MR. ANTHONY:  Objection to form.

12          THE WITNESS:  He did not.

13     BY MR. HUYNH:

14        Q.   What did you discuss with Mr. Daleiden

15     in San Jose in December of 2011?

16        A.   We were colleagues at Live Action, so

17     probably Live Action.

18        Q.   Did Mr. Daleiden approach you about the

19     CMP project that is the subject of this lawsuit?

20          MR. ANTHONY:  Objection to form.

21          THE WITNESS:  Can you rephrase the

22     question?

23     BY MR. HUYNH:

24        Q.   Was Mr. Daleiden the one who approached

25     you about the CMP project that is the subject of

Plaintiffs' Trial Designations (97:24 to 98:1)

Page 98

1   this lawsuit?

2         MR. ANTHONY:  Objection to form.

3         THE WITNESS:  Yes.

4   BY MR. HUYNH:

5     Q.   When did he approach you?

6     A.   May of 2015.

7     Q.   How did he approach you?

8         MR. ANTHONY:  Objection to form.

9         THE WITNESS:  We were at a wedding

10  together, a friend's wedding.

11  BY MR. HUYNH:

12    Q.   Whose wedding was that?

13        MR. ANTHONY:  Objection, relevance,

14  privacy.

15        THE WITNESS:  Anna Davin.

16  BY MR. HUYNH:

17    Q.   What did he tell you during that

18  wedding about the CMP project that is the subject

19  of this lawsuit?

20    A.   He told me that he had already

21  completed a two and a half year investigation

22  into Planned Parenthood and their involvement in

23  the harvesting and selling of baby body parts.

24    Q.   What else did he tell you?

25        MR. ANTHONY:  Would you mark the

1    transcript, please, Brenda, for me.

2         THE WITNESS:  That's it.

3    BY MR. HUYNH:

4         Q.   Did you ask him any questions?

5         A.   Not that I remember, not that I recall.

6         Q.   In this May 2015 conversation with

7    Mr. Daleiden, did he ask you for advice about the

8    project that is the subject of this lawsuit?

9         MR. ANTHONY:  Objection to form.

10         THE WITNESS:  Not that I recall.

11    BY MR. HUYNH:

12         Q.   At this May 2015 meeting with

13    Mr. Daleiden did he ask you to participate in

14    CMP's project?

15         A.   Not that I recall.

16         Q.   Did you tell him that you wanted to

17    participate in CMP's project?

18         A.   I don't remember exactly but I probably

19    said that I would help on a press level.

20         Q.   And what did you mean when you said you

21    would help on a press level?

22         A.   When he was releasing his videos, and

23    at that stage I didn't know exactly what were in

24    the videos but I knew that it was an

25    investigation.  When those became public I would

Page 100

1    circulate them to reporters that I knew.

2        Q.   So by 2015, if I recall correctly, you

3    were at CRC Public Relations at that point?

4        A.   No.  I was at American Principles

5    Project.

6        Q.   That's right.  Sorry about that.

7        A.   Okay.

8        Q.   Was he asking you for help on a press

9    level in your individual capacity?

10       A.   Yes.  We are friends.

11       Q.   When Mr. Daleiden told you that he had

12    conducted a two and a half year investigation

13    into Planned Parenthood, did you ask for a copy

14    of that investigation?

15       A.   I did not.

16       Q.   Did he ask you to donate money to CMP?

17       A.   He did not.

18       Q.   To your knowledge, what is the Center

19    for Medical Progress?

20           MR. ANTHONY:  Present tense.  What is,

21    to your knowledge, CMP.

22           THE WITNESS:  It's a citizen journalist

23    organization.

24    BY MR. HUYNH:

25       Q.   In 2015 what was your understanding of

1    what CMP was?

2        A.   A citizen journalist organization.

3        Q.   How did you become aware of CMP?

4        A.   When David Daleiden told me about it.

5        Q.   And that was in May 2015?

6        A.   Yes.

7        Q.   Do you know when CMP was created?

8        A.   I do not.

9        Q.   So you didn't help create CMP?

10       A.   No, I did not.

11       Q.   Are you aware that CMP is a nonprofit?

12       A.   Yes.

13       Q.   It was designated as a 501(c)(3)

14   organization?

15       A.   Is that a question?

16       Q.   Yes.

17       A.   Yes, it's on their website so it's

18   public information.

19       Q.   Do you know when it received approval

20   as a 501(3)(c) organization?

21       A.   I do not.

22       Q.   Were you involved in the approval

23   process at all?

24       A.   I was not.

25       Q.   So after this initial conversation with

1    Mr. Daleiden in May 2015, when did you become

2    involved with CMP?

3         MR. ANTHONY:  Objection to form.

4         THE WITNESS:  Probably July 2015 when

5    the videos were coming out.

6    BY MR. HUYNH:

7       Q.   Did Mr. Daleiden reach out back to you

8    first after that initial May 2015 meeting?

9       A.   We are friends so we probably spoke but

10   it would have been brief.

11      Q.   So in July 2015 when you first became

12   involved with CMP's project, what did

13   Mr. Daleiden tell you at that point?

14        MR. ANTHONY:  Objection to form,

15   misstates the prior testimony generally.

16        Answer to the extent that you

17   understand the question and you have a factual

18   basis.

19        THE WITNESS:  Can you repeat the

20   question?

21   BY MR. HUYNH:

22      Q.   So in July 2015 when you first became

23   involved with CMP's project, what did

24   Mr. Daleiden tell you at that point?

25        MR. ANTHONY:  Same form objection.

Plaintiffs' Trial Designations (102:4 to 102:5)

Page 104

1              MR. ANTHONY:  Objection.  "Just" is

2     sort of a nonspecific term which may or may not

3     be argumentative.

4              But if you understand what he means by

5     "just" in the context of that question you should

6     try to answer it according to your understanding.

7              THE WITNESS:  Can you restate that?

8     BY MR. HUYNH:

9        Q.  Let me try to clarify that.

10             For CMP's project that is at issue in

11    this lawsuit, who did you work with in relation

12    to that project?

13             MR. ANTHONY:  Objection to form.

14             THE WITNESS:  David Daleiden and CRC

15    Public Relations.

16    BY MR. HUYNH:

17       Q.   Sorry, but I thought you testified that

18    you were doing work for Mr. Daleiden and CMP in

19    your individual capacity?

20             MR. ANTHONY:  Objection, misstates her

21    prior testimony.

22             THE WITNESS:  That misstates.  I was

23    not doing work for him.

24    BY MR. HUYNH:

25       Q.   What were you doing for him?

1          MR. ANTHONY:  Objection to form.  When,

2     counsel?

3          THE WITNESS:  I was circulating press

4     releases and things that were already public, in

5     my individual capacity.

6     BY MR. HUYNH:

7          Q.   And how many hours per week did you

8     spend in circulating press releases and things

9     for CMP?

10         A.   Not that much, only a few hours a week.

11             As a clarification, probably the

12    majority of my work in a volunteer capacity was

13    booking media for David, so just scheduling

14    pretty much.

15         Q.   So for how long were you booking media

16    for Mr. Daleiden?

17         A.   I don't recall but maybe a couple of

18    hours a week.

19         Q.   I meant from what date to what date?

20         A.   July 2015 until when I ended up at CRC,

21    April 2016.

22         Q.   So by the time you left for CRC or you

23    started working for them, you weren't doing any

24    work in your individual capacity for Mr. Daleiden

25    or CMP anymore, correct?

1      A.   Correct.

2      Q.   You mentioned that you were a volunteer

3  so you weren't paid by Mr. Daleiden or CMP for

4  your work on behalf of them, correct?

5      A.   That is correct.

6      Q.   Besides booking media appearances for

7  Mr. Daleiden and CMP, what else did your role

8  involve?

9      A.   That's pretty much it.

10     Q.   Besides Mr. Daleiden, did you book

11  media appearances for any of the other defendants

12  in this case?

13     A.   No, not that I recall.

14        MR. HUYNH:  Let's mark this as

15  Exhibit 93.

16        THE WITNESS:  (Perusing.)

17        (Bryan Exhibit 93, Document Bates

18        Stamped CM 21359 to CM 21362, was

19        marked for identification.)

20        MR. HUYNH:  So Exhibit 39 is Bates

21  stamped CM 21359 to CM 21362.

22  BY MR. HUYNH:

23     Q.   This is a July 15, 2015 e-mail chain

24  between you and Mr. Daleiden, correct?

25     A.   Correct.

● Defendants' Affirmative Designations (106:2 to 108:4)

BRYAN, KATHLEEN

Page 107

1        Q.   Looking at the e-mail at the bottom of

2    this e-mail chain on the page Bates stamped CM

3    21361, Troy Newman wrote, "K, David said you

4    would help coordinate the media and stuff.  I'm

5    on a plane.  Is this your right e-mail?"

6          Do you see that?

7     A.   I see that.

8        Q.   The later K is addressing you, right?

9     A.   Presumably.

10        Q.   Next e-mail above that, you responded

11    to Mr. Newman and said, "Hey Troy, yes, this is

12    my e-mail.  I'm happy to help in any way I can.

13    I've been pitching the media like crazy and have

14    a few other friends in PR who are doing the same.

15    Let me know if anything comes up."

16          Do you see that?

17     A.   I see that.

18        Q.   So you helped CMP coordinate media

19    after CMP released its undercover videos, right?

20     A.   That is correct.

21        Q.   Specifically you helped CMP pitch its

22    undercover videos to the media?

23     A.   Yes.

24        Q.   How many media organizations did you

25    pitch?

Page 108

1       A.   I don't recall.

2       Q.   Which media organizations did you

3   pitch?

4       A.   A lot.

5       Q.   Do you have a rough estimate of how

6   many media organizations that you pitched?

7       A.   I don't.

8       Q.   Was it above 100?

9       A.   I would be guessing but probably 100.

10      Q.   More than 120?

11      A.   No.

12      Q.   What was your pitch to these media

13  organizations?

14      A.   I don't remember.

15          MR. ANTHONY:  Let's just slow down a

16  little.  Objection to form.

17          THE WITNESS:  I don't remember.

18  BY MR. HUYNH:

19      Q.   Who are your few other friends in PR

20  that also pitched the media on behalf of CMP?

21          MR. ANTHONY:  Objection to form.

22          THE WITNESS:  I would like to insert my

23  constitutional rights on that one.

24  BY MR. HUYNH:

25      Q.   Which constitutional rights?

Plaintiffs' Trial Designations (108:5 to 108:9)

1    privileges.  But we've asserted both objections.

2    You understand?

3        MR. HUYNH:  Yes.

4        MR. ANTHONY:  Good.

5    BY MR. HUYNH:

6        Q.   Were your few other friends in PR that

7    also pitched to media on behalf of CMP paid?

8        MR. ANTHONY:  Objection to form.

9        THE WITNESS:  No.

10   BY MR. HUYNH:

11       Q.   Did you show any materials to these

12   other friends in PR about CMP?

13       MR. ANTHONY:  Objection to form.

14       THE WITNESS:  Can you clarify?  Do you

15   mean like a press release or --

16   BY MR. HUYNH:

17       Q.   Sure.

18       A.   I would have sent them press releases

19   that were already public at that stage.

20       Q.   Did you send them anything else besides

21   press releases?

22       A.   No, not that I recall.

23       Q.   Going to the bottom of the page Bates

24   stamped CM 21360, Mr. Newman e-mailed you back

25   and asked, "Who are your spokespersons when David

Defendants' Affirmative Designations (110:23 to 111:9)

Page 111

1    is busy?"

2        Do you see that?

3    A.   I see that.

4    Q.   Does "our" refer to CMP?

5        MR. ANTHONY:  Objection, calls for

6    speculation, lacks foundation, form objection.

7    He doesn't want you to guess.

8        THE WITNESS:  When I received that

9    e-mail that's how I took it, is that it was CMP.

10   BY MR. HUYNH:

11       Q.   So Mr. Newman is asking who are CMP's

12   spokespersons when Mr. Daleiden is busy, correct?

13       MR. ANTHONY:  Hold on.  Same objection,

14   form.

15   BY MR. HUYNH:

16       Q.   In the e-mail above that you wrote to

17   Mr. Newman and said, "I've been pitching David

18   and he's been able to do all of the media I've

19   gotten so far.  I guess we'll cross that bridge

20   when we get to it."

21       Do you see that?

22   A.   I see that.

23       Q.   You forwarded the e-mails we just

24   looked at to David Daleiden, Anna Davin and

25   Ashley Baldwin, correct?

● Defendants' Affirmative Designations (111:16 to 112:20)

Page 112

1          MR. ANTHONY:  Objection to form.

2          THE WITNESS:  That is correct.

3    BY MR. HUYNH:

4       Q.   After you forwarded the e-mails to

5    Ms. Davin, she e-mailed you to say, "Don't let

6    him step into that.  Just my smiley opinion."

7          Do you see that?

8       A.  I see that.

9       Q.   "Him" in this even refers to

10   Mr. Newman, correct?

11       A.   That's how I took it at the time.

12       Q.   In the e-mail directly above that you

13   responded to Ms. Davin by saying, "I'm not, LOL.

14   Don't worry.  I love Troy and all of the pro-life

15   leaders involved in this.  But David, I am only

16   doing this for you.  I am not anyone else's comms

17   person and will not pitch anyone else."

18          You did not want Mr. Newman to be a

19   spokesperson for CMP, correct?

20       A.   That's not what this e-mail says.

21       Q.   That's not what you meant when you

22   wrote this e-mail back?

23          MR. ANTHONY:  Objection, slow down.  Do

24   you understand his pending question?  I think

25   there might be two questions pending but make

Page 113

1    sure you understand the question.

2          THE WITNESS:  Okay, can you repeat the

3    question or if there are two pending questions?

4    BY MR. HUYNH:

5      Q.   There was.  I think you answered the

6    question, looking at the real time, so I'll move

7    on to my next question.

8          In this e-mail you wrote to

9    Mr. Daleiden that, "This is your project and you

10   need to do the media for it," correct?

11         MR. ANTHONY:  Slow down.  Counsel, are

12   we on page 1360?

13         MR. HUYNH:  Yes, that is correct.

14         MR. ANTHONY:  Very good.

15   BY MR. HUYNH:

16     Q.   And it's the e-mail that is timed at

17   9:13 a.m.

18         Do you see that?

19     A.   I see that.

20     Q.   You believe the project that is the

21   subject of this lawsuit is Mr. Daleiden's

22   project, correct?

23     A.   Correct.

24     Q.   Why do you hold that belief?

25     A.   Because he's the founder of CMP and the

Page 114

1    lead investigator.

2        Q.   Looking at the next e-mail at 9:22 a.m.

3    on top of the page Bates stamped CM 21360 you

4    wrote to Mr. Daleiden, "Have you done any radio

5    and TV yet?  Also, is The Today Show still at

6    play?  A friend in PR and I are working on some

7    staff for Ya Bro.  Keep me in the loop."

8        Do you see that?

9        A.   I see that.

10       Q.   Who is your friend in PR who was

11   working on some stuff for Mr. Daleiden?

12       A.   I'd like to assert my constitutional

13   privilege here.

14       Q.   Your Fifth Amendment privilege?

15       A.   Fifth Amendment.

16       Q.   What stuff were you working on for

17   Mr. Daleiden that is referred to in this e-mail?

18       A.   Scheduling and pitching media

19   appearances for David.

20       Q.   In the next e-mail in the chain on the

21   bottom of the first page Bates stamped CM 21359,

22   Mr. Daleiden responded to you and said, "Have not

23   heard back from them.  Doing O'Reilly today on

24   CBS."

25       Do you see that?

● Plaintiffs' Trial Designations (114:16 to 114:19)   ● Defendants' Affirmative Designations (114:20 to 117:10)

1  A. I see that.

2  Q. And then directly above you replied to

3 Mr. Daleiden by saying, "Okay, sweet. You should

4 followup with them and/or send me their contact

5 info and I will call them as your comms director,

6 LOL."

7   Do you see that?

8  A. I see that.

9  Q. So this confirms you were

10 Mr. Daleiden's communications director, correct?

11  A. No.

12  Q. Well, it says here that you will call

13 the media as Mr. Daleiden's comms director. Is

14 that not what this sentence means?

15  A. "Comms director" is in quotes. David

16 didn't have a comms director.

17  Q. But you saw your role for Mr. Daleiden

18 as his communications director?

19  A. I did not.

20  Q. What did you see your role for

21 Mr. Daleiden as?

22  A. Public relations support, I guess.

23  Q. And how long would you say you were in

24 this role as public relations support for

25 Mr. Daleiden?

1        A.   Mainly just July 2015 as the videos

2    were coming out, from what I recall.

3        Q.   You didn't do public relations support

4    for Mr. Daleiden after July 2015?

5        A.   Not anything substantial that I

6    remember.

7        Q.   And what was some not substantial

8    things that you did for Mr. Daleiden after July

9    2015?

10       A.   I don't remember anything.

11       Q.   And when you say "substantial," do you

12   mean press releases?

13       A.   Yeah, or media pitching or anything

14   that I had done before.

15       Q.   LOL stands for laughed out loud,

16   correct?

17       A.   Laugh out loud, yes.

18       Q.   Why did you LOL after you referred to

19   yourself as Mr. Daleiden's communications

20   director?

21       A.   Because he didn't have a communications

22   director.

23       Q.   Would you characterize yourself as

24   CMP's public relations support person too?

25            MR. ANTHONY:  Objection to form.

1       THE WITNESS:  I would characterize

2  myself as a public relations contact for them.

3  BY MR. HUYNH:

4     Q.  And for how long?

5     A.  Well, I guess it depends because I

6  would have been the PR contact while I was at

7  CRC.  So if you include that, it would be

8  probably a couple of years, two years.

9     Q.  Two years from July 2015?

10    A.  Yes.

11     MR. ANTHONY:  Hold on.  I just want to

12  make sure I heard.

13     Did you say two years from July 2015?

14     MR. HUYNH:  Yes.

15     MR. ANTHONY:  Okay.

16  BY MR. HUYNH:

17     Q.  What were your responsibilities as

18  CMP's public relations contact?

19     A.  Mainly answering media requests and

20  then scheduling those interviews, and from time

21  to time pitching a press release or video.

22     Q.  Going back to this e-mail chain in a

23  12:46 p.m. e-mail Mr. Daleiden wrote to you, "Can

24  you guys get back to John Santucci from ABC Good

25  Morning America and let them know that the full

Defendants' Affirmative Designations (117:17 to 118:14)

BRYAN, KATHLEEN

Page 118

1    footage on YT is the highest quality available."

2        Do you see that?

3        A.  I see that.

4        Q.  Does YT refer to YouTube?

5        A.  That's how I would take it.

6        Q.  You responded that, "I can unless you

7    want to call him and I'm heading back to the

8    office now."

9        Do you see that?

10       A.  I see that.

11       Q.  So you were responsible for

12   communicating with the media regarding their

13   questions about CMP's undercover videos?

14       A.  Not solely but yes.

15       Q.  And when the media asked you questions

16   about the undercover videos, what did you tell

17   them?

18       MR. ANTHONY:  Objection to form.

19       THE WITNESS:  It depends on what the

20   questions were but I would have just told them

21   the truth that was revealed in the videos.

22   Everything that I was saying to them was already

23   public.

24   BY MR. HUYNH:

25       Q.  Did they ask you questions about the

1    A.   Yes.

2    Q.   Let's go back to your LinkedIn page,

3    and that's Exhibit 90.

4    A.   (Perusing.)

5    Q.   Why isn't your role as Mr. Daleiden's

6    public relations support person listed on your

7    LinkedIn page?

8         MR. ANTHONY:  Objection, form,

9    relevance, argumentative.  It's basically a

10   reprisal of the previous question, asked and

11   answered.

12        But go ahead if you understand his

13   question.  I think perhaps you are also asking

14   for a narrative.  But go ahead and let him know.

15        THE WITNESS:  I don't list any of my

16   former clients or current clients on my LinkedIn

17   page.

18        MR. ANTHONY:  Would you mark the

19   transcript, please, Brenda.

20        MR. HUYNH:  Let's mark the next exhibit

21   as Exhibit 94.

22        THE WITNESS:  (Perusing.)

23        (Bryan Exhibit 94, Document Bates

24        Stamped CM 05442 to CM 05443, was

25        marked for identification.)

● Defendants' Affirmative Designations (120:20 to 122:16)

BRYAN, KATHLEEN

Page 121

1          MR. HUYNH:  And for the record this is

2     a document Bates stamped CM 05442 to CM 05443.

3     BY MR. HUYNH:

4          Q.   This is a July 13, 2015 e-mail from you

5     to Mr. Daleiden, correct, at the top of the

6     chain?

7          A.   Yes.

8          Q.   You wrote, "I have a contract with

9     Drudge.  I'll send the video to them."

10          Do you see that?

11          A.   I see that.

12          Q.   Who is your contact at Drudge?

13          A.   I had numerous.  I don't recall who.

14          Q.   Who were your contacts at Drudge?

15          A.   I don't remember.

16          Q.   What video did you send to Drudge?

17          A.   Whatever the first video that CMP

18     released was.

19          Q.   Did you tell Drudge anything when you

20     sent them this video?

21          A.   Not that I recall.

22          Q.   So as CMP's public relations contact

23     you were responsible for sending CMP's undercover

24     videos to the media, correct?

25          MR. ANTHONY:  Objection to form, vague

1    as to time.  I think it's overstating the record

2    -- excuse me, misstating the testimony.

3         THE WITNESS:  Not solely but I did send

4    the video to some media.

5    BY MR. HUYNH:

6        Q.   When you say "not solely," did you do

7    anything else in your communications with media?

8        A.   I was not the only person.  That's what

9    I meant.

10       Q.   I see.  Who else was sending

11   videos -- strike that.

12            Who else was sending CMP's videos to

13   the media?

14            MR. ANTHONY:  Objection to form.

15            THE WITNESS:  CRC Public Relations and

16   probably others.  I'm not sure.

17   BY MR. HUYNH:

18       Q.   Did Mr. Daleiden hire CRC Public

19   Relations in relation to its undercover videos?

20            MR. ANTHONY:  Objection to form.

21            THE WITNESS:  I believe so, yes.

22   BY MR. HUYNH:

23       Q.   Do you know when they hired them?

24            MR. ANTHONY:  Objection to form.

25            THE WITNESS:  I have no idea.

Page 123

1          MR. HUYNH:  Let's mark this as

2     Exhibit 95.

3          THE WITNESS:  (Perusing.)

4          (Bryan Exhibit 95, Document Bates

5          Stamped CM 23422 to CM 23424, was

6          marked for identification.)

7          MR. HUYNH:  This is an e-mail chain

8     Bates stamped CM 23422 to CM 23424.

9     BY MR. HUYNH:

10         Q.   This is an August e-mail chain in 2015

11    between you and Mr. Daleiden, correct?

12         A.   Correct.

13         Q.   The e-mail at the bottom of this e-mail

14    chain on the page Bates stamped CM 23423 is an

15    August 21, 2015 e-mail at 2:04 p.m. from Rachel

16    Reeves to you and Mr. Daleiden, correct?

17         A.   I can't see who the e-mail is to but it

18    looks like that could be it.

19         Q.   So in Ms. Reeves e-mail she wrote, "Hi

20    Kate, my name is Rachel Reeves and I am the

21    producer for the TV show Facing Life Head-on

22    hosted by the Mattes of the Life Issues

23    Institute.

24         "We actually interviewed Troy Newman a

25    couple of years ago with an episode centered on

Defendants' Affirmative Designations (123:1 to 125:11)

Page 124

1    Operation Rescue and he gave me your contact

2    information."

3        Do you see that?

4    A.   I see that.

5    Q.   And her "Kate," to your understanding,

6    that refers to you, correct?

7    A.   Oh, at the top, "Hi Kate," yes.

8    Q.   Next paragraph and this reads, "Our

9    program covers stories on a variety of life

10   issues.  After the news that's broken over last

11   month regarding David's team and the Planned

12   Parenthood videos, we'd like to do an episode

13   highlighting the investigation and the appalling

14   information that has been brought into the

15   spotlight."

16       Do you see that?

17   A.   I see that.

18   Q.   Let's go to the top of the e-mail chain

19   on the page Bates stamped CM 23422.

20       You forwarded this e-mail chain or this

21   e-mail exchange from Ms. Reeves to Mr. Daleiden,

22   correct?

23   A.   Correct.

24   Q.   You asked Mr. Daleiden, "Should I be

25   sending these to CRC?  Troy keeps sending me all

BRYAN, KATHLEEN

Page 125

1    kinds of stuff for you and I'm afraid this stuff

2    is going to get lost in the shuffle.  If you are

3    paying them they should be able to handle all of

4    this so I will just start forwarding them."

5        Do you see that?

6    A.   I see that.

7    Q.   CRC is CRC Public Relations, correct?

8    A.   Correct.

9    Q.   To your knowledge did CMP or

10   Mr. Daleiden hire CRC Public Relations?

11   A.   I don't know.

12       Q.   As either Mr. Daleiden's public

13   relations support person or CMP's public

14   relations contact person, did you work in

15   collaboration with CRC Public Relations during

16   your time from -- sorry, strike that.

17       As either Mr. Daleiden's public

18   relations person or CMP's public relations

19   contact person, did you work in collaboration

20   with CRC Public Relations in July 2015?

21       MR. ANTHONY:  Objection to form.

22       THE WITNESS:  What do you mean by

23   "collaboration"?

24   BY MR. HUYNH:

25       Q.   Did you exchange information with CRC?

● Defendants' Affirmative Designations (125:17 to 126:10)

Page 126

1      A.   Yes.

2      Q.   What information did you exchange with

3  them?

4      A.   I don't recall specifically but

5  specifically press releases and videos and

6  forwarding requests like this, forwarding media

7  requests.

8      Q.   Did you do anything else in

9  collaboration with CRC?

10      A.   Not that I recall.

11        MR. ANTHONY:  Just a second.  Objection

12  to form.

13  BY MR. HUYNH:

14      Q.   Who at CRC Public Relations did you

15  work in collaboration with in July 2015?

16        MR. ANTHONY:  Objection to form.

17        THE WITNESS:  I don't recall

18  specifically.

19  BY MR. HUYNH:

20      Q.   Did you work with Peter Robbio,

21  R-O-B-B-I-O?

22      A.   I probably communicated with him.

23      Q.   Do you remember what those

24  communications entailed?

25      A.   I do not.

Page 127

1      Q.   Besides Mr. Robbio, did you communicate

2   with anyone else at CRC Public Relations in

3   relation to the CMP undercover videos?

4          MR. ANTHONY:  Objection to form.

5          THE WITNESS:  Possibly.  They have a

6   staff of 40 people so...

7   BY MR. HUYNH:

8      Q.   Do you remember any specific names?

9      A.   Greg Mueller.

10     Q.   Who else?

11     A.   That's the only one that comes to mind.

12     Q.   After this e-mail exchange with

13   Mr. Daleiden, did you start forwarding media

14   requests for interviews of him to CRC Public

15   Relations?

16     A.   Yes, from what I recall.

17     Q.   In addition to Mr. Daleiden, who else

18   did you communicate with at CMP?

19          MR. ANTHONY:  Objection to form.

20          THE WITNESS:  Anna Davin and that's all

21   I remember.

22   BY MR. HUYNH:

23     Q.   Do you know if Anna Davin's name is

24   Anna Bettisworth?

25     A.   Yes, that's her maiden name.

● Defendants' Affirmative Designations (127:17 to 129:7)

Page 128

1      Q.   Besides Ms. Bettisworth, you don't

2   recall communicating with anyone else at CMP

3   regarding the videos?

4         MR. ANTHONY:  Objection to form.

5         THE WITNESS:  Not that I recall.

6   BY MR. HUYNH:

7      Q.   So you don't recall communicating with

8   Mr. Newman?

9      A.   I didn't know that he was a member of

10  CMP, necessarily, because he was a board member.

11     Q.   You knew Mr. Newman was a board member?

12     A.   Yes.

13     Q.   So looking back at Exhibit 93 at the

14  end of the e-mail chain, so if you turn to the

15  page that is Bates stamped CM 21361, do you see

16  that Mr. Newman e-mailed you?

17     A.   I do.

18     Q.   So at that point you knew that

19  Mr. Newman was a board member at CMP?

20     A.   I do.  So he would have been another

21  person that I would have communicated with.

22     Q.   Did you communicate with Mr. Rhomberg

23  directly at all?  And by Mr. Rhomberg I mean

24  defendant Albin Rhomberg.

25     A.   Maybe.

Page 129

1      Q.   Do you recall any specific discussions

2    with Mr. Rhomberg?

3      A.   I do not.

4      Q.   Do you recall any specific discussions

5    with Mr. Newman?

6           MR. ANTHONY:  Objection to form.

7           THE WITNESS:  I do not.

8    BY MR. HUYNH:

9      Q.   Did you have any communications with

10   Ryan Gonzalez in connection with CMP's undercover

11   videos?

12          MR. ANTHONY:  Objection to form.

13          THE WITNESS:  Not that I recall.

14   BY MR. HUYNH:

15     Q.   To your knowledge what were the goals

16   of CMP?

17          MR. ANTHONY:  Objection to form.

18          THE WITNESS:  To my understanding the

19   goals of CMP was to expose the reality that

20   Planned Parenthood was harvesting and selling

21   baby body parts.

22          MR. ANTHONY:  Brenda, can you mark the

23   transcript for me, please.

24   BY MR. HUYNH:

25     Q.   Did you understand that one of the

● Defs . Counter Designations 9/24 (129:15 to 129:16, 129:18 to 129:21)

1   goals of CMP was to cut down on the number of

2   abortions in the country?

3        A.   I don't remember.

4        Q.   Was one of CMP's goals to turn public

5   sentiment against abortions?

6        A.   I think one of the goals of CMP was to

7   expose the reality of the fact that Planned

8   Parenthood was selling and harvesting baby body

9   parts of aborted babies.

10       Q.   But was that one of CMP's goals, to

11   turn public sentiment against abortion?

12       A.   Yes.

13       Q.   Was one of CMP's goals to instigate

14   criminal investigations of Planned Parenthood?

15       A.   I don't know.

16       Q.   Was one of CMP's goals to provoke

17   congressional investigations of Planned

18   Parenthood?

19       A.   I don't know.

20       Q.   Was one of the CMP's goals to defund

21   Planned Parenthood?

22       A.   To my understanding, yes.

23       Q.   Was one of CMP's goals to shut down

24   Planned Parenthood?

25       A.   I don't know.

Plaintiffs' Trial Designations (130:20 to 130:22)

1      Q.   Was one of CMP's goals to incite

2    protests against Planned Parenthood?

3      A.   I don't know.

4      Q.   Was one of CMP's goals to influence

5    legislation against abortion?

6      A.   I don't know.

7      Q.   Was one of CMP's goals to incite

8    threats against Planned Parenthood?

9          MR. ANTHONY:  Objection to form, lacks

10    foundation, argumentative.  It's a diatribe.

11    It's beneath the dignity of this witness.

12          THE WITNESS:  No, CMP is a peaceful

13    organization.

14    BY MR. HUYNH:

15      Q.   Why would you characterize CMP as a

16    peaceful organization?

17      A.   Because they are.

18      Q.   Why is that?

19      A.   David Daleiden is a peace-filled

20    person.

21          MR. ANTHONY:  Brenda, would you mark

22    the transcript for me, please.

23    BY MR. HUYNH:

24      Q.   And would you describe the other board

25    members of CMP in the same way as you have

● Defendants' Affirmative Designations (131:24 to 132:10)

1    described Mr. Daleiden?

2        A.  I don't know them that well, to be

3    honest.

4        Q.  So you don't know Mr. Newman that well?

5        A.  I don't.

6        Q.  You don't know Mr. Rhomberg that well?

7        A.  I do not.

8        Q.  You know Mr. Daleiden the best out of

9    the people involved with CMP?

10       A.  Yes.

11            MR. ANTHONY:  Let's just slow down and

12   let the gentleman get his entire question or

13   remark or commentary on the record.  That way

14   Brenda can get it down and then you speak.

15            And then you also take time to allow me

16   to interpose an appropriate objection, if called

17   for.

18            Makes sense?

19            THE WITNESS:  Yes.

20   BY MR. HUYNH:

21       Q.  Based on your testimony so far, would

22   you say that you were involved in CMP's media

23   strategy in relation to the undercover videos?

24            MR. ANTHONY:  Objection to form of the

25   question, overbroad based on your testimony so

Page 133

1    far.

2          He's giving you a reference point and

3    so you've got to interpret the question in the

4    manner the question is asked.  So that's the

5    reference point.  Nothing outside of that

6    reference point.

7          THE WITNESS:  Can you repeat the

8    question?

9    BY MR. HUYNH:

10       Q.   Sure.  Based on your testimony so far,

11   would you say that you were involved in CMP's

12   media strategy in relation to the undercover

13   videos?

14         MR. ANTHONY:  Same objection.

15         THE WITNESS:  Yes.

16   BY MR. HUYNH:

17       Q.   What was your role in terms of CMP's

18   media strategy?

19       A.   It would have been small.  I really

20   wasn't that involved in it but offering my

21   opinion, my thoughts.

22       Q.   What opinions or thoughts did you offer

23   to Mr. Daleiden or CMP regarding CMP's undercover

24   videos?

25         MR. ANTHONY:  Objection to form.

●  Defendants' Affirmative Designations (133:10 to 134:16)

1          THE WITNESS:  I don't recall.

2    BY MR. HUYNH:

3        Q.   Who else was involved with CMP's media

4    strategy?

5          MR. ANTHONY:  Objection to form.

6          THE WITNESS:  CRC Public Relations.

7    BY MR. HUYNH:

8        Q.   Anyone else?

9          MR. ANTHONY:  Objection to form.

10          THE WITNESS:  David Daleiden.

11    BY MR. HUYNH:

12        Q.   Anyone else besides CRC Public

13    Relations and Mr. Daleiden that was involved in

14    CMP's media strategy?

15          MR. ANTHONY:  Objection to form.

16          THE WITNESS:  Not that I recall.

17    BY MR. HUYNH:

18        Q.   What was CRC's public relations role in

19    relation to CMP's media strategy?

20          MR. ANTHONY:  Objection to form.

21          THE WITNESS:  They were running the

22    communications for CMP.

23    BY MR. HUYNH:

24        Q.   What does running the communications

25    for CMP mean?

Page 135

1       A.   Writing the press releases, proposing

2    media strategy, pitching out to the media,

3    drafting op eds.

4       Q.   So is CRC Public Relations the one who

5    did the initial draft of the press releases in

6    relation to the CMP undercover videos?

7          MR. ANTHONY:  Objection to form.

8          THE WITNESS:  I'm not sure.  I don't

9    know.

10   BY MR. HUYNH:

11      Q.   You don't know if Mr. Daleiden was the

12   person who did the initial drafts of the press

13   releases in relation to CMP's undercover videos?

14      A.   I don't recall.

15      Q.   Did you write any of the initial drafts

16   of CMP's press releases relating to its

17   undercover videos?

18          MR. ANTHONY:  Objection to form.

19          THE WITNESS:  Not that I recall.

20   BY MR. HUYNH:

21      Q.   Did CMP have particular media

22   organizations that it was targeting in relation

23   to CMP's undercover videos?

24          MR. ANTHONY:  Objection to form.

25          THE WITNESS:  Not that I recall.

● Plaintiffs' Trial Designations (135:15 to 135:17, 135:19 to 135:19)

1   pitched them about the undercover videos,

2   correct?

3     A.   Not that I recall.

4         MR. HUYNH:  Why don't we take our lunch

5   break.

6         THE VIDEOGRAPHER:  Off video at 1:01

7   p.m.

8      (Whereupon a lunch recess was taken

9      from 1:01 p.m. to 1:54 p.m.)

10

11      AFTERNOON SESSION

12

13       THE VIDEOGRAPHER:  Back on video at

14   1:54 p.m.

15      MR. HUYNH:  Let's mark this as

16   Exhibit 96.  This document is Bates stamped CM

17   03856 to CM 03874.

18       THE WITNESS:  (Perusing.)

19      (Bryan Exhibit 96, Document Bates

20      Stamped CM 03856 to CM 03874, was

21      marked for identification.)

22   BY MR. HUYNH:

23     Q.  Ms. Bryan, this is a July 13, 2015

24   e-mail from Mr. Daleiden to you and others,

25   correct?

Defendants' Affirmative Designations (140:15 to 144:11)

Page 141

1          A.   Correct.

2          Q.   In the fourth paragraph of this e-mail

3    Mr. Daleiden writes, "Please find attached CMP's

4    messaging guidelines for internal circulation

5    only, our press kit and several fact sheets to

6    bring you up to speed on various subtopics within

7    fetal trafficking.  Be mindful, however, to keep

8    the focus strictly on Planned Parenthood.  Our

9    press release is pasted below and our website

10   will be live on www.centerformedicalprogress.org

11   in six hours."

12          Do you see that?

13          A.   I do.

14          Q.   Who drafted this media kit that

15   Mr. Daleiden attached?

16          A.   I don't know.

17          Q.   Did you help prepare this media kit for

18   Mr. Daleiden?

19          A.   Not that I recall.

20          Q.   Did you communicate to the media about

21   information from this media kit?

22          MR. ANTHONY:  Objection to form of the

23   question.

24          THE WITNESS:  Can you repeat the

25   question?

Page 142

1    BY MR. HUYNH:

2        Q.   Yes.

3            Did you communicate to the media about

4    information from this media kit?

5            MR. ANTHONY:  Objection to form.

6            THE WITNESS:  Yes.

7    BY MR. HUYNH:

8        Q.   Did you verify that any of this

9    information was accurate before you communicated

10   it to the media?

11       A.   Any information that I conveyed to the

12   media I would have checked to make sure that it

13   was accurate.

14       Q.   How did you check that it was accurate?

15       A.   By watching the full footage of the

16   investigative videos that were released.

17       Q.   So you watched all the raw footage that

18   CMP took for the project at issue in this

19   lawsuit?

20           MR. ANTHONY:  Objection to form.

21           THE WITNESS:  CMP released the full

22   footage of all their videos that they released on

23   their website.  So yes, I would have.

24   BY MR. HUYNH:

25       Q.   You watched all of it?

1      A.   I watched all of it that was released

2   publicly on CMP's website.

3      Q.   Did that include the raw footage?  Let

4   me rephrase that.  Sorry.

5          Did that include the unedited footage?

6      A.   Of the videos that were released?

7      Q.   Yes.

8      A.   Yes.  CMP, every video that they

9   released, they released the full, unedited

10   footage.

11      Q.   And so did you watch the full, unedited

12   footage for every video?

13          MR. ANTHONY:  Objection to form.  Every

14   video on the website?  Is that what you mean?

15          MR. HUYNH:  Correct.

16          MR. ANTHONY:  Okay, thank you.

17          THE WITNESS:  Every video on the

18   website, yes, I would have watched the full

19   footage.

20   BY MR. HUYNH:

21      Q.   Let me backtrack a little bit.

22          So on the website, did CMP post the

23   full, unedited versions of the videos?

24          MR. ANTHONY:  Objection to form.

25          THE WITNESS:  Every video that CMP

1    released publicly, all of their edited versions,

2    they additionally released the full footage of

3    those videos.

4         So yes, I would have watched those

5    videos.

6    BY MR. HUYNH:

7         Q.   Let me just try to make sure I

8    understand your answers.

9         So you would have watched the full

10   footage of the videos that CMP released?

11        A.   Yes.

12        MR. ANTHONY:  Hold on.  Objection to

13   form.

14        Go ahead.  The answer is yes?

15        THE WITNESS:  Yes.

16   BY MR. HUYNH:

17        Q.   Did you verify that the videos were

18   properly edited?

19        MR. ANTHONY:  Objection to form.

20        THE WITNESS:  I don't understand the

21   question.

22   BY MR. HUYNH:

23        Q.   Let me rephrase.  That was a confusing

24   question.

25        Did you verify that the edited videos

1      A.   Not that I recall.

2           MR. HUYNH:  Let's mark the next exhibit

3    as 97.

4           THE WITNESS:  (Perusing.)

5           (Bryan Exhibit 97, Document Bates

6           Stamped CM 04486 to 89, was marked

7           for identification.)

8           MR. HUYNH:  This is a document Bates

9    stamped CM 04486 to 89.

10   BY MR. HUYNH:

11       Q.   This is a July 2015 e-mail chain

12   between you and Mr. Daleiden, correct?

13       A.   Correct.

14       Q.   In the July 6, 2015 e-mail at the top

15   of the chain, Mr. Daleiden attaches a PDF

16   entitled "Messaging Guidelines FT," right?

17       A.   That is correct.

18       Q.   Mr. Daleiden writes to you in the

19   e-mail, "Here is a draft messaging guide for

20   other pro-life groups.  Thoughts, please."

21       Do you see that?

22       A.   I see that.

23       Q.   Mr. Daleiden asked you for your

24   thoughts on the document entitled "Messaging

25   Guidelines," correct?

● Defendants' Affirmative Designations (149:2 to 150:13)

Page 150

1        A.   Correct.

2        Q.   These guidelines were for other

3    pro-life groups other than CMP, is that right?

4        A.   It looks like that is correct.

5        Q.   Let's turn to the attached messaging

6    guidelines, Bates stamped CM 04488 to 89.

7            Did you provide Mr. Daleiden any of

8    your thoughts on these messaging guidelines?

9        A.   I don't recall but if I had it would

10   have been minor.

11       Q.   And what thoughts would you have

12   provided?

13       A.   I don't know.

14       Q.   Did you tell him that any of this

15   information included in this messaging guidelines

16   was inaccurate?

17       MR. ANTHONY:  Objection, lacks

18   foundation that it's inaccurate.

19           Are you talking about a particular

20   claimed inaccuracy, counsel?  If not you are

21   asking her to review a two-page document, for the

22   record 488 and 489 of 97.

23           So you probably want to read the entire

24   document.

25       THE WITNESS:  (Perusing.)

1        MR. ANTHONY:  It was asked three or

2   four times.  Why don't we just ask the question

3   once and move on?

4        MR. CONDON:  Then we are going to talk

5   about it after?  Let's just move on.

6        MR. HUYNH:  The record will show what

7   it shows.

8        MR. ANTHONY:  Can I write that down?

9   Can you say that again?  Can I quote you on that?

10   BY MR. HUYNH:

11      Q.  What did you tell media organizations

12   about CMP's editing of their undercover videos?

13      MR. ANTHONY:  Objection to form.

14      THE WITNESS:  I don't remember.

15   BY MR. HUYNH:

16      Q.  Did you tell the media that the editing

17   of CMP's undercover videos was not distorted?

18      A.  I don't remember but any conversations

19   that I had with the media, they understand the

20   editing process because they do the same thing in

21   their own media editing for news programs.  They

22   understand the editing process so I really didn't

23   have to say that much to them.

24      Q.  Did you tell media organizations that

25   CMP edited -- strike that.

● Defendants' Affirmative Designations (155:11 to 157:14)

BRYAN, KATHLEEN

Page 156

1          Did you tell media organizations that

2    CMP's undercover videos was not highly edited?

3        A.   It's a matter of public record that

4    they were edited but that CMP always released the

5    full footage so I was always very honest about

6    that with the media.

7          We would suggest that they watch the

8    full footage.

9        Q.   You told the media that they should

10   watch the full footage?

11       A.   In addition to watching the short

12   versions as well.

13       Q.   Did you expect the media to watch the

14   full footage?

15          MR. ANTHONY:  Hold on.  Objection to

16   form because the media.

17          But go ahead.  As you understand the

18   question, you can answer if you have a factual

19   basis.  He doesn't want you to guess.  He doesn't

20   want you to make up an answer right now.

21          THE WITNESS:  My experience with the

22   media is they do their due diligence and so many

23   of the reporters that I spoke with, they wanted

24   to see the full footage and that's why CMP

25   released the full footage alongside the shorter

1    versions.

2    BY MR. HUYNH:

3        Q.   Which reporters told that you they

4    wanted to see the full footage?

5        A.   I don't recall.

6        Q.   Do you recall any questions that the

7    media had for you when you sent them any

8    information about CMP's undercover videos?

9            MR. ANTHONY:  Objection to form.

10           THE WITNESS:  The only questions that I

11   can recall is for more information but everything

12   was on the CMP website.  So we would always

13   suggest that they check out all the documentation

14   and additional footage on the CMP website.

15   BY MR. HUYNH:

16       Q.   What specific questions did they ask

17   you besides asking for more information?

18           MR. ANTHONY:  Objection to form.

19           THE WITNESS:  That's the main one that

20   I would remember.  I don't recall any specific

21   questions.

22   BY MR. HUYNH:

23       Q.   How about any general questions?

24           MR. ANTHONY:  Objection to form.

25           THE WITNESS:  A general question that

Page 161

1      A.   I was not.

2      Q.   Are you aware that CMP had donors who

3   funded its operations relating to its undercover

4   videos?

5         MR. ANTHONY:  Objection, foundation,

6   calls for speculation.

7         THE WITNESS:  I don't know how to

8   answer that question.

9         MR. ANTHONY:  Or have you heard?

10         THE WITNESS:  I just assumed.  I would

11   have assumed that they would have donors.  I

12   probably heard, yeah.

13   BY MR. HUYNH:

14      Q.   So Mr. Daleiden did not tell you that

15   he had donors funding his undercover video

16   project, correct?

17         MR. ANTHONY:  Objection to form.

18   That's not what she just said but that's a

19   different question.

20         THE WITNESS:  I don't recall any times

21   David telling me that.

22   BY MR. HUYNH:

23      Q.   Do you recall any time when any of

24   CMP's board members told you that they had donors

25   funding their operation?

● Defs. 2nd Round of Depo. Designations 10/9 (161:23 to 162:1)

Page 162

1        A.   I don't recall any times.

2        Q.   Do you know if CMP had particular

3    people it was targeting for donations.

4            MR. ANTHONY:  Objection to form.

5            THE WITNESS:  I don't know.

6            MR. HUYNH:  Let's mark the next exhibit

7    as 98.

8            THE WITNESS:  (Perusing.)

9            (Bryan Exhibit 98, Document Bates

10            Stamped CM 04387, was marked for

11            identification.)

12           MR. HUYNH:  This is an e-mail Bates

13    stamped CM 04387.

14    BY MR. HUYNH:

15       Q.   This is a July 13, 2015 e-mail that

16    Mr. Daleiden sent to you, correct?

17       A.   Correct.

18       Q.   Mr. Daleiden writes that he will handle

19    these guys directly.  He then proceeds to list a

20    bunch of people, correct?

21       A.   Correct.

22       Q.   To your knowledge are the people listed

23    here potential donors that Mr. Daleiden was

24    contacting?

25           MR. ANTHONY:  Hold on.  You mean were

Page 163

1    they at the time she received the e-mail?  Are

2    they now doesn't make sense, counsel.  She

3    wouldn't know if they are now.  I think you said

4    it in the present tense.

5    BY MR. HUYNH:

6         Q.   My question is to your knowledge are

7    the people listed here potential donors that

8    Mr. Daleiden was contacting?

9         A.   To my knowledge and the names that I

10   recognize on this list, they are media people.

11        MR. ANTHONY:  Can you mark the

12   transcript for me, Brenda.

13   BY MR. HUYNH:

14        Q.   Do you know how Mr. Daleiden compiled

15   this list?

16        MR. ANTHONY:  Objection to form.

17        THE WITNESS:  I do not.

18   BY MR. HUYNH:

19        Q.   Do you know how donors learned about

20   CMP?

21        MR. ANTHONY:  Objection to form.

22        THE WITNESS:  I do not.

23   BY MR. HUYNH:

24        Q.   Were e-mails sent to potential donors

25   by Mr. Daleiden?

● Defendants' Affirmative Designations (163:6 to 166:5)

1          MR. ANTHONY:  Objection to form.

2          THE WITNESS:  I don't know.

3    BY MR. HUYNH:

4      Q.   Was information sent to donors via

5    LISTSERV?

6          MR. ANTHONY:  Objection to form.

7          THE WITNESS:  I don't know.

8    BY MR. HUYNH:

9      Q.   Did you communicate with any potential

10   donors?

11         MR. ANTHONY:  Objection to form.

12         THE WITNESS:  Not to my knowledge, not

13   that I remember.

14   BY MR. HUYNH:

15     Q.   To your knowledge what is the Human

16   Capital Project?

17         MR. ANTHONY:  Objection to form.

18         You mean at present?

19         THE WITNESS:  Clarification, at

20   present?

21   BY MR. HUYNH:

22     Q.   Yes.

23     A.   The Human Capital Project was an

24   undercover investigation exposing the truth, the

25   reality that abortion was harvesting and selling

Page 165

1    baby body parts.

2        Q.   What was your understanding of the

3    Human Capital Project in July 2015?

4        A.   In July 2015 my understanding was the

5    same; that the Human Capital Project was an

6    investigation, an undercover investigation into

7    the abortion industry.

8        Q.   So your understanding of what the Human

9    Capital Project was or is has not changed from

10    July 2015 to the present?

11        A.   Correct.

12        Q.   Was the Human Capital Project a project

13    conducted by CMP?

14        A.   As I understand it, yes.

15        Q.   Do you know when the planning for the

16    Human Capital Project began?

17        A.   I do not.

18        Q.   Whose idea was the project?

19            MR. ANTHONY:  Objection to form.

20            THE WITNESS:  What project?

21    BY MR. HUYNH:

22        Q.   Let me clarify.

23            Whose idea was the Human Capital

24    Project?

25        A.   As I understand it, David Daleiden.

Page 166

1　　Q.　Anyone else?

2　　A.　Not to my knowledge.

3　　Q.　So to your knowledge Mr. Newman was not

4　the genesis of the idea for the Human Capital

5　Project?

6　　　MR. ANTHONY:　Objection, asked and

7　answered.　One answer doesn't suggest necessarily

8　the other but that's a separate question.　As

9　phrased, it's argumentative.　But don't argue the

10　 point.　Just ask the question as a matter of

11　 fact.

12　　　He doesn't want you to guess and he

13　 doesn't even want you to be badgered into

14　 adopting what he's saying if it's not true.　At

15　 least he shouldn't desire that outcome.

16　　THE WITNESS:　As I understand it and

17　from what I know, David Daleiden is the genesis

18　of the Human Capital Project.

19　BY MR. HUYNH:

20　　Q.　To your knowledge, is the Human Capital

21　Project complete?

22　　　MR. ANTHONY:　Objection to form.

23　　　THE WITNESS:　I don't know.

24　BY MR. HUYNH:

25　　Q.　You were involved in the Human Capital

● Defs. 2nd Round of Depo. Designations 10/9 (166:16 to 166:18)

Page 168

1    Diego?

2        A.   That is correct.  It wasn't in San

3    Diego.

4        Q.   San Jose, sorry.

5        A.   No, I met David Daleiden in San Jose in

6    2011.  The wedding was in Maryland in May of

7    2015.

8           MR. ANTHONY:  Same country though.

9    BY MR. HUYNH:

10       Q.   Why did you get involved with the Human

11   Capital Project?

12          MR. ANTHONY:  Objection, relevance,

13   calls for a narrative, Objection to form.

14          THE WITNESS:  I got involved in the

15   Human Capital Project because I believed that the

16   public deserved to know what the Center for

17   Medical Progress -- the findings that the Center

18   for Medical Progress had come across and I

19   believed that the public deserved to know the

20   truth.

21   BY MR. HUYNH:

22       Q.   What was the truth that you wanted the

23   public to know?

24       A.   That abortion kills innocent human

25   beings and that the abortion industry was using

● Defendants' Affirmative Designations (168:9 to 169:14)

1    -- not only exploiting women in those situations

2    but they were using the fetal baby body parts for

3    profit.  So they were exploiting women on two

4    circumstances.

5        Q.   And when you say abortion industry --

6            MR. ANTHONY:  Brenda, can you mark the

7    transcript for me, please.

8    BY MR. HUYNH:

9        Q.   And when you say the abortion industry,

10    that includes Planned Parenthood, correct?

11        A.   That is correct.

12        Q.   So you believed that Planned Parenthood

13    was exploiting women?

14        A.   Yes.

15        Q.   What evidence do you have that Planned

16    Parenthood was using baby body parts for profit?

17            MR. ANTHONY:  Counsel, you don't mean

18    that she has with her today, you mean aside from

19    the videos we've been talking about, anything

20    else?  Is that what you're asking about?

21            She didn't bring anything.  You've

22    established that.  But you're asking what she

23    knows or what she's heard, is that right?

24            MR. HUYNH:  We can go with that

25    clarification.

1      A.   Yes.

2          Q.   Out of those people who were working

3    for CMP, to your knowledge who worked on the

4    Human Capital Project?

5          ANTHONY:  Objection to form.

6          THE WITNESS:  I don't know.

7    BY MR. HUYNH:

8          Q.   Did Mr. Newman work on the Human

9    Capital Project?

10         A.   I don't know.

11         Q.   Did Mr. Rhomberg work on the Human

12   Capital Project?

13         A.   I don't know in what capacity you are

14   asking.

15         Q.   In any capacity.

16         A.   I don't know.

17         Q.   Do you know if Ryan Gonzalez worked on

18   the Human Capital Project?

19         A.   I believe he did.

20         Q.   And what did Mr. Gonzalez do for the

21   Human Capital Project?

22         A.   I believe he was a video editor.

23         Q.   So Mr. Gonzalez was the one who edited

24   CMP's undercover videos?

25         MR. ANTHONY:  Objection to form.  But

● Defs.  2nd Round of Depo.  Designations 10/9 (177:2 to 177:4, 177:6 to 177:6, 177:8 to 177:14)    ● Defendants'
Affirmative Designations (177:17 to 177:22)

1     Q.   To your knowledge did CMP create Biomax

2  Procurement Services, B-I-O-M-A-X?

3     A.  I don't know.

4     Q.   Was Biomax a company that CMP formed?

5     A.  I don't know.

6     Q.   So you wouldn't know when Biomax was

7  created?

8     A.  I don't know.

9     Q.   Do you know who came up with the idea

10  to create Biomax?

11     A.   I don't know.

12     Q.   Were you involved in creating Biomax?

13     A.   No.

14     Q.   Do you understand that Biomax is a

15  front organization for CMP's undercover

16  investigation?

17         MR. ANTHONY:  Objection, lacks

18  foundation, calls for speculation, argumentative.

19         Front organization, I don't know if you

20  want to define that, counsel, but if not then

21  I'll just add that the question is incoherent

22  because it's nondefined.

23         But if you have an idea of what you

24  understand a front organization to be or if you

25  have any foundation for answering the question,

● Defendants' Affirmative Designations (181:1 to 181:13)

Page 183

1    to your knowledge?

2          MR. ANTHONY:  Objection, argumentative,

3    lacks foundation, calls for speculation.

4          He's not asking for you to speculate

5    into other people's motivations.  If you had a

6    motivation -- he wants to know what you know.

7          Don't be badgered into providing an

8    answer that you think he desires just to expedite

9    our exit from this exercise.

10          THE WITNESS:  I don't know.

11    BY MR. HUYNH:

12        Q.  Did you hear Mr. Daleiden talk about

13    Biomax?

14        A.  The only time I ever would have heard

15    David talk about it was after the videos came out

16    in July 2015.

17        Q.  What did he say about Biomax?

18        A.  I don't recall.

19        Q.  Did he say that Biomax is a company

20    that supplies medical researchers with human

21    biological specimens?

22        A.  I don't recall.

23          MR. HUYNH:  Let's mark the next

24    exhibit.  I believe it's Exhibit 99.

25          THE WITNESS:  (Perusing.)

● Defendants' Affirmative Designations (183:12 to 184:11)

Page 184

1          (Bryan Exhibit 99, Document Bates

2          Stamped CM 00003 and 00004, was

3          marked for identification.)

4          MR. HUYNH:  For the record this is

5    Bates stamped CM 00003 to 4.

6    BY MR. HUYNH:

7       Q.   Do you know if this is a brochure that

8    Biomax created?

9       A.   I don't know.

10      Q.   Have you seen this document before?

11      A.   Not that I recall.

12      Q.   Under "About Biomax" on CMP 00003, it

13   says, "Biomax is a biological specimen

14   procurement organization."

15          Do you know if this statement is true?

16          MR. ANTHONY:  Objection to form.

17          THE WITNESS:  I don't know.

18   BY MR. HUYNH:

19      Q.   It goes on to say, "Biomax provides

20   tissue and specimen procurement for academic and

21   private bioscience researchers."

22          Do you know if this statement was true?

23          MR. ANTHONY:  Objection to form.

24          THE WITNESS:  I don't know.

25   BY MR. HUYNH:

Page 185

1       Q.   CMP actors in its undercover videos

2    were telling Planted Parenthood employees that

3    Biomax was supplying specimens to researchers,

4    right?

5          MR. ANTHONY:  Objection to form.

6          THE WITNESS:  Can you repeat that

7    question?

8    BY MR. HUYNH:

9       Q.   CMP actors in its undercover videos

10   were telling Planned Parenthood employees that

11   Biomax was supplying specimen's to researchers,

12   correct?

13         MR. ANTHONY:  Objection to form.

14         THE WITNESS:  I don't remember.

15   BY MR. HUYNH:

16      Q.   If you know, who is Susan Tenenbaum?

17      A.   I do not.

18         MR. HUYNH:  Let's mark this as

19   Exhibit 100.

20         THE WITNESS:  (Perusing.)

21         (Bryan Exhibit 100, Copies of

22         California Driver Licenses, was

23         marked for identification.)

24   BY MR. HUYNH:

25      Q.   Most of the people who went undercover

Defendants' Affirmative Designations (185:9 to 187:5)

1    as Biomax employees for the Human Capital Project

2    used fake names, correct?

3          MR. ANTHONY:  Objection to form.

4          THE WITNESS:  I don't know.

5    BY MR. HUYNH:

6        Q.   So in CMP's videos, did Mr. Daleiden

7    use the name Robert Sarkis?

8        A.   I don't remember.

9        Q.   In CMP's undercover videos, did Susan

10    Merritt use the name Susan Tanenbaum?

11        A.   I don't remember.

12          MR. ANTHONY:  Counsel, what was the

13    first name, Merritt?

14          MR. HUYNH:  Susan Merritt.

15          MR. ANTHONY:  Is it M-E-R-I-T-T?

16          MR. HUYNH:  Two Ts, two Rs.

17    BY MR. HUYNH:

18        Q.   In CMP's video did Brianna Baxter use

19    the name Brianna Allen?

20        A.   I don't know.

21        Q.   In CMP's videos, did Anna Bettisworth

22    use the name Rebecca Wagner?

23        A.   I don't know.

24        Q.   You watched CMP's undercover videos,

25    right?

1　　A.　Yes.

2　　Q.　Do you remember what name Anna

3　Bettisworth used?

4　　MR. ANTHONY:　Objection to form.

5　　THE WITNESS:　I don't.

6　　MR. HUYNH:　Let's look at what we

7　marked as Exhibit 100.

8　　MR. ANTHONY:　100, got it.

9　BY MR. HUYNH:

10　　Q.　Are these driver's license David

11　Daleiden and Susan Merritt used to infiltrate

12　Planned Parenthood conferences and facilities?

13　　MR. ANTHONY:　Objection to form,

14　argumentative.　Lacks foundation.　If you know

15　and if you understand the meaning that the

16　attorney is attributing in the word "infiltrate."

17　　THE WITNESS:　I don't know.

18　BY MR. HUYNH:

19　　Q.　Do you know where Mr. Daleiden or

20　Ms. Merritt obtained these driver's licenses?

21　　A.　I don't know.

22　　Q.　Did you have any involvement in

23　Mr. Daleiden and Ms. Merritt obtaining these

24　driver's license you see on Exhibit 100?

25　　A.　No.

● Defendants' Affirmative Designations (187:19 to 188:4)

1      Q.   Do you know who was involved in

2   obtaining the driver's licenses you see on

3   Exhibit 100?

4      A.   No.

5      Q.   Have you used a fake ID before?

6      A.   No.

7          MR. HUYNH:  Let's mark the next exhibit

8   as Exhibit 101.

9          THE WITNESS:  (Perusing.)

10          (Bryan Exhibit 101, Copies of Bank

11           of America Visa Cards, was marked

12           for identification.)

13   BY MR. HUYNH:

14      Q.   Exhibit 101 is Bates stamped CM 00005

15   and these are Bank of America and Chase debit

16   cards, correct?

17          MR. ANTHONY:  Objection to the form of

18   the question.  I don't think we are going to be

19   able to actually use these cards.  But go ahead.

20          MR. HUYNH:  They are pictures of cards.

21          MR. ANTHONY:  Now you've got it.

22          THE WITNESS:  They look like

23   photocopies of credit cards.

24   BY MR. HUYNH:

25      Q.   Have you seen these before?

1          MR. ANTHONY:  Objection, relevance

2     unless she takes your word for it, counsel, and

3     that would have to do with some sort of opinion

4     testimony.  She's a fact witness.  She doesn't

5     know you from Adam so how is she supposed to

6     answer your question?

7     BY MR. HUYNH:

8          Q.  Ms. Bryan, do you understand my

9     question?

10         A.  I don't.

11         Q.  Did Mr. Daleiden tell you that he

12     obtained the cards in false names?

13         A.  Not that I recall.

14         Q.  Did anyone at CMP tell you that CMP

15     employees obtained fake IDs using false names?

16         A.  Not that I recall.

17         Q.  Do you know Phil Cronin?

18         A.  No.

19         Q.  Have you heard his name before?

20         A.  Not that I recall.

21         Q.  Besides me just saying it.

22              So are you aware that CMP used his name

23     on a Visa debit card?

24         A.  No.

25         Q.  Have you attended any NAF conferences?

● Defendants' Affirmative Designations (190:17 to 190:20)

1      A.  I don't remember.

2      Q.  For the press releases that you wrote

3  for Mr. Daleiden, did you submit it to another

4  public relations individual for review?

5      A.  I don't remember.

6         MR. MONAGHAN:  If I may interject, let

7  it reflect on the record that Mr. Daleiden has

8  left.  I think he's gone to the other deposition

9  going on in this case.

10         MR. HUYNH:  Thank you.  I didn't

11  notice.

12         MR. ANTHONY:  Lost in deep

13  concentration.

14         MR. HUYNH:  Let's mark the next exhibit

15  as 103.

16         THE WITNESS:  (Perusing.)

17         (Bryan Exhibit 103, Document Bates

18         Stamped CM 05590 through 05592,

19         was marked for identification.)

20         MR. HUYNH:  This e-mail is Bates

21  stamped CM 05590 to 92.

22  BY MR. HUYNH:

23      Q.  If you look on the page Bates stamped

24  CM 05591, do you see the e-mail on July 10, 2015

25  where Mr. Newman said, "Dear friends of life, for

● Defendants' Affirmative Designations (224:14 to 227:4)

BRYAN, KATHLEEN

Page 225

1   the past three years Operation Rescue has had the

2   privilege of consulting on an ongoing undercover

3   investigation into the abortion cartel.  Now we

4   are now ready to release the shocking evidence to

5   the public."

6      Do you see that?

7   A.  I see that.

8   Q.  Two paragraphs down Mr. Newman wrote,

9   "We want to introduce you to our findings and the

10   project manager before we release it to the

11   national media."

12      Do you see that?

13   A.  I see that.

14   Q.  Mr. Newman went on to write, "I hope

15   you will join us for this invitation-only

16   conference call."

17      Do you see that?

18   A.  I see that.

19   Q.  Going to the page Bates stamped CM

20   005590 you responded, "I am so excited for this

21   release.  Praying for you and all involved and

22   I'm hoping to be on that call on Monday."

23      Do you see that?

24   A.  I see that.

25   Q.  The subject line of your e-mail on July

1    10, 2015 at 3:47 p.m. is, "Huge undercover

2    investigation to be released next week.  115 is

3    invited to preview documents before the national

4    press."

5          Do you see that?

6          A.  That's the subject line for the entire

7    chain.  That's not just my e-mail.

8          Q.  Okay, that appears to be the case.  The

9    other e-mails don't have a subject line but I

10   think we can assume that that's what the subject

11   line was for the previous e-mails.

12         A.  Yes.

13         Q.  What is 115 that is referred to in the

14   subject line of this e-mail that we're talking

15   about?

16         MR. ANTHONY:  Objection to form.

17         THE WITNESS:  It's a coalition of

18   pro-life leaders.

19   BY MR. HUYNH:

20         Q.  Who was part of 115?

21         MR. ANTHONY:  Objection to form.

22         THE WITNESS:  I don't know the entire

23   list.

24   BY MR. HUYNH:

25         Q.  Could you please give me the names that

1      you remember?

2            A.   Troy Newman, David Daleiden, Father

3      Frank Pavone, Lila Rose.

4                Those are the ones that come to mind.

5            Q.   Did you join the call with 115?

6            A.  I don't remember.

7            Q.   What documents did CMP preview to 115?

8            A.  I don't remember.

9            Q.   What findings did CMP introduce to 115?

10           A.  I don't remember.

11           Q.   Do you know if CMP only provided the

12     edited undercover videos of CMP to 115?

13           A.  I don't know.

14           Q.   Was Mr. Rhomberg part of 115?

15           A.  I don't know.

16           Q.   Who created 115?

17               MR. ANTHONY:  Objection to form.

18               THE WITNESS:  I don't know.

19     BY MR. HUYNH:

20           Q.   Let's go back to the e-mail Bates

21     stamped CM 05442 to 43.  That's Exhibit 94.

22           A.   (Perusing.)

23           Q.   If it helps, it's one double-sided

24     document.

25           A.   There you go.

Page 233

1    videos, did CMP show them to any law enforcement

2    agency?

3        A.   I don't remember.

4        Q.   Prior to publishing the videos, did you

5    show the undercover videos of CMP to any law

6    enforcement agency?

7        A.   I don't recall doing that.

8        Q.   After publishing its undercover videos,

9    did CMP show them to any law enforcement agency

10   to your knowledge?

11       A.   I don't know.

12       Q.   After publishing CMP's undercover

13   videos, did you show them to any law enforcement

14   agency?

15       A.   I don't recall.

16       Q.   What social media accounts did CMP

17   have?

18       MR. ANTHONY:  Hold on, objection to

19   form.

20       If you know.

21       THE WITNESS:  What I remember is that

22   they had a FaceBook, a Twitter account and a

23   YouTube page.

24   BY MR. HUYNH:

25       Q.   Did CMP have an Instagram account?

● Defendants' Affirmative Designations (233:16 to 236:8)

1          A.   I don't remember.

2          Q.   Did CMP have a blog?

3          A.   I don't remember.

4          Q.   Who created CMP's FaceBook, Twitter and

5    YouTube accounts?

6              MR. ANTHONY:  Objection to form.

7              THE WITNESS:  I don't know.

8    BY MR. HUYNH:

9          Q.   What was the purpose of these accounts?

10             MR. ANTHONY:  Objection to form.

11   BY MR. HUYNH:

12         Q.   Actually, let me clarify that.

13             What was the purpose of the social

14   media accounts that CMP created?

15         A.   I don't know.

16         Q.   Who manages CMP's social media

17   accounts?

18         A.   I don't know.

19         Q.   Do you manage CMP's social media

20   accounts?

21         A.   No.

22         Q.   Have you ever managed CMP's social

23   media accounts?

24         A.   No.  I was an admin on the FaceBook but

25   that was it.  I never managed the accounts.

Page 235

1        Q.   What do you mean by admin for the

2    FaceBook account?

3        A.   I had access to the back end of the

4    FaceBook account.

5        Q.   Were you the one who made decisions on

6    what content to post on CMP's FaceBook account?

7        A.   No.

8        Q.   Did you have input on what CMP posted

9    on its FaceBook account?

10            MR. ANTHONY:  Objection to form.

11            THE WITNESS:  Not that I recall.

12    BY MR. HUYNH:

13        Q.   Who created the content for CMP's

14    social media accounts?

15        A.   I don't remember.

16        Q.   What kind of content was posted on

17    CMP's social media accounts?

18            MR. ANTHONY:  Objection to form.

19            THE WITNESS:  Their videos, press

20    releases.  Beyond that I don't recall.

21    BY MR. HUYNH:

22        Q.   And the videos that you are referring

23    to are CMP's undercover videos in relation to the

24    Human Capital Project?

25        A.   Yes.

BRYAN, KATHLEEN

Page 236

1      Q.   And the press releases you are

2   referring to is related to CMP's Human Capital

3   Project, correct?

4      A.   Correct.

5      Q.   Did you see the messages that were

6   posted on CMP's FaceBook account?

7          MR. ANTHONY:  Objection to form.

8          THE WITNESS:  Yes, some of them.

9   BY MR. HUYNH:

10      Q.   And what did these messages say?

11          MR. ANTHONY:  Objection to form.  You

12   mean the ones that she saw, of course?

13          MR. HUYNH:  The ones that you saw.

14          MR. ANTHONY:  You remember, obviously,

15   it's more than one.  But I think he wants to know

16   generally and then go from there.

17          THE WITNESS:  Generally it was a

18   variety of different things.  So some people are

19   thanking CMP for their work.  Some people are

20   asking questions about where is the full footage

21   or more specific questions.

22          But it was overall pretty basic.  There

23   wasn't anything substantial.

24   BY MR. HUYNH:

25      Q.   In these messages that the public

BRYAN, KATHLEEN

Page 244

1    p.m.

2         (Break taken.)

3         THE VIDEOGRAPHER:  Back on video at

4    4:49 p.m.

5    BY MR. HUYNH:

6       Q.   What goals did Mr. Daleiden tell you he

7    wanted to accomplish with CMP's undercover

8    videos?

9         MR. ANTHONY:  Objection to form.

10        THE WITNESS:  I don't remember.

11   BY MR. HUYNH:

12      Q.   Did he tell you that he wanted the

13   public to be outraged after watching CMP's

14   undercover videos?

15        MR. ANTHONY:  Objection to form.

16        THE WITNESS:  I don't recall him saying

17   that.

18   BY MR. HUYNH:

19      Q.   Did Mr. Daleiden tell you that he

20   wanted the public to go protest against Planned

21   Parenthood after watching CMP's undercover

22   videos?

23      A.   I don't ever remember David saying

24   that.

25        MR. HUYNH:  Let's mark as the next

● Defendants' Affirmative Designations (244:25 to 245:11)

Page 245

1    exhibit as Exhibit 105.

2         THE WITNESS:  (Perusing.)

3         (Bryan Exhibit 105, Document Bates

4         Stamped CM 22625, was marked for

5         identification.)

6         MR. HUYNH:  This is an e-mail Bates

7    stamped CM 22625.

8    BY MR. HUYNH:

9       Q.  This is an July 17, 2015 e-mail from

10   Mr. Newman to you and others, correct?

11      A.  Correct.

12      Q.  In the third paragraph Mr. Newman wrote

13   to you that, "Our followup videos, in my opinion,

14   will not generate the sort of outrage that our

15   first one has."

16         Do you see that?

17         MR. ANTHONY:  Just a second.  I'm

18   looking at the top and I'm trying to understand.

19   It's from Troy Newman, actually, to David

20   Daleiden.  It looks like everyone else is cc'd.

21         Is that your understanding?

22         MR. HUYNH:  That's correct.

23         MR. ANTHONY:  Oh, okay.  I thought you

24   said that Troy was writing to Kate.

25         MR. HUYNH:  And others.

Page 249

1      A.   My goal was public awareness.  I

2   believe that the American public deserved to know

3   the truth that was captured on these videos.

4          MR. HUYNH:  Let's mark the next

5   document Bates stamped CM 20708 to 17 as

6   Exhibit 106.

7          THE WITNESS:  (Perusing.)

8          (Bryan Exhibit 106, Document Bates

9          Stamped CM 20708 through 20717,

10          was marked for identification.

11         MR. HUYNH:  For the record,

12   Mr. Daleiden just returned to the deposition.

13         MR. ANTHONY:  Just for the record, it

14   looks like a ten-page document marked CM 20708

15   through 17.

16         Counsel, is it just one e-mail chain?

17   Is it all referencing back to Troy Newman who

18   apparently sent it?

19         MR. HUYNH:  I'll ask about a specific

20   e-mail.

21         MR. ANTHONY:  It looks like it's

22   multiple, now that I look at it.

23   BY MR. HUYNH:

24      Q.   You are cc'd at the top of this e-mail

25   chain from Mr. Newman, correct?  Your name

Page 250

1    appears on the sixth line in the cc. field.

2        Do you see that?

3    A.  Yes.

4        Q.   Mr. Newman wrote, "Yes, this has

5    exceeded our expectations.  We are off to a great

6    start.  Let's remember the talking points.  This

7    is about Planned Parenthood, putting them in

8    jail, defending them, taking down their empire."

9        Do you see that?

10        MR. ANTHONY:  Counsel, did you say

11    "defending" or "defunding"?

12        MR. HUYNH:  I think I said "defending,"

13    according to the realtime.  So let me say that

14    again.

15        MR. ANTHONY:  That's what I heard.  It

16    says "defunding" them.

17    BY MR. HUYNH:

18        Q.   Mr. Newman wrote in this e-mail that,

19    "Yes, this has exceeded our expectations.  We are

20    off to a great start but let's remember the

21    talking points.  This is about Planned

22    Parenthood, putting them in jail, defunding them,

23    taking down their empire."

24        Do you see that?

25    A.   I see that.

● Defendants' Affirmative Designations (250:18 to 250:25)

Page 252

1      Q.   That's fair.

2           To your knowledge, by releasing the

3    undercover videos, CMP's goal was to put Planned

4    Parenthood employees in jail?

5           MR. ANTHONY:  Objection to form, lacks

6    foundation, calls for speculation.

7           How would she know?

8           THE WITNESS:  I don't know.

9    BY MR. HUYNH:

10     Q.   By releasing the undercover videos

11   CMP's goal was to put abortion doctors in jail?

12          MR. ANTHONY:  Same objection.

13          MR. MONAGHAN:  Objection, speculation.

14          THE WITNESS:  I don't know.

15   BY MR. HUYNH:

16     Q.   To your knowledge, by releasing its

17   undercover videos CMP's goal was to defund

18   Planned Parenthood?

19          MR. ANTHONY:  Same objection.

20          THE WITNESS:  I don't know.

21          MR. HUYNH:  Exhibit 107.

22          THE WITNESS:  (Perusing.)

23          (Bryan Exhibit 107, Document Bates

24          Stamped CM 20807 through 20828,

25          was marked for identification.)

● Defs. 2nd Round of Depo. Designations 10/9 (252:21 to 252:25)

1          MR. HUYNH:  For the record, this is

2     Bates stamped CM 20807 to 20828 and it's an

3     e-mail chain.

4          MR. ANTHONY:  For the record, it's a

5     22-page document which it looks on my reading to

6     be constituted of several e-mails, right?

7          MR. HUYNH:  Yes.

8          MR. ANTHONY:  I don't think you would

9     call this a single chain but different e-mails?

10          MR. HUYNH:  You can describe it like

11     that.

12          MR. ANTHONY:  Okay.

13     BY MR. HUYNH:

14       Q.  Ms. Bryan, for your reference I'm going

15     to refer you to the e-mail that's on page 20807

16     to 08, so the first two pages.  So looking at the

17     bottom of the first page, Bates stamp CM 20807,

18     this is a July 27, 2015 e-mail from you to a list

19     of individuals which includes Troy Newman, David

20     Daleiden and Albin Rhomberg, correct?

21          MR. ANTHONY:  Hold on.  I want to

22     identify on the record definitely that it's from

23     Kate to someone named Steven Ertelt, E-R-T-E-L-T,

24     and then numerous individuals who are cc'd,

25     including the ones that counsel referenced, and

● Defendants' Affirmative Designations (253:14 to 253:20)

Page 254

1    others that are blacked out so we don't know who.

2         THE WITNESS:  It looks to me like I've

3    responded to an e-mail chain that was already

4    going which was the 20-some pages with all those

5    people on it.

6    BY MR. HUYNH:

7         Q.   In this e-mail you sent a link to an

8    article from thehill.com, correct?

9         A.   Correct.

10        MR. HUYNH:  Exhibit 108.

11        THE WITNESS:  (Perusing.)

12        (Bryan Exhibit 108, Article

13        Entitled Anti-Abortion Hackers

14        Claimed to Have Hit Planned

15        Parenthood, was marked for

16        identification.)

17   BY MR. HUYNH:

18        Q.   The article that you sent a link to in

19   your e-mail is entitled "Anti-Abortion Hackers

20   Claimed to Have Hit Planned Parenthood."

21        Is that right?

22        A.   That's not what the article says.

23        Q.   You're correct.  Is the article

24   entitled "Anti-Abortion hackers," there's a word

25   that's cut off, "breached Planned Parenthood"?

● Defendants' Affirmative Designations (254:2 to 254:5)

1    videos CMP posted on-line?

2        A.   Can you repeat the question?

3        Q.   Yes.  Were you involved in planning any

4    protests or rallies related to the undercover

5    videos CMP posted on-line?

6        A.   I don't think so.  Not that I recall.

7        Q.   Do you know if CMP was involved in

8    planning any protests or rallies related to the

9    undercover videos it posted on-line?

10       A.   I don't know.

11       Q.   Do you know if Mr. Daleiden was

12   involved in planning any protests or rallies

13   related to the undercover videos CMP posted

14   on-line?

15       A.   I don't know.

16       Q.   The same question for Ms. Merritt?

17       A.   I don't know.

18       Q.   The same question for Mr. Rhomberg?

19       A.   I don't know.

20       Q.   Same question for Mr. Newman?

21       A.   I don't know.

22       Q.   Have you heard about the shooting at a

23   Planned Parenthood center in Colorado Springs in

24   2015?

25       A.   Yes.

● Defendants' Affirmative Designations (269:11 to 269:21)

1    BY MR. HUYNH:

2      Q.   Do you remember when CMP released that

3   statement?

4      A.   I do not.

5      Q.   Do you know the title of that

6   statement?

7      A.   I do not remember.

8      Q.   Do you remember what the statement from

9   CMP specifically said?

10      A.   I do not.

11      MR. HUYNH:   Let's mark Exhibit 109.

12      THE WITNESS:   May I get some water real

13   quick?

14      MR. HUYNH:   Sure.

15      THE WITNESS:   (Perusing.)

16      (Bryan Exhibit 109, Document Bates

17      Stamped CM 21300 through CM 21301,

18      was marked for identification.)

19   BY MR. HUYNH:

20      Q.   This e-mail chain is Bates stamped CM

21   21300 to CM 21301.   This is a July 16, 2015

22   e-mail chain between you, Mr. Daleiden, Ashley

23   Baldwin and Anna Bettisworth Davin, correct?

24      A.   Davin, yes, that is correct.

25      Q.   At 12:59 a.m. Mr. Daleiden wrote, "I

● Defendants' Affirmative Designations (272:11 to 273:23)

1  would like to do a conference call with everyone

2  here to assess what's happened thus far, analyze

3  where PP's messaging and strategy is heading,

4  determine how we can neutralize their talking

5  points and evolve our own and how to leverage all

6  of the momentum we are generating towards

7  successful, substantial and damaging law

8  enforcement and congressional action."

9      Do you see that?

10     A.  Yes, I see that.

11     Q.  At the top of this e-mail chain at 8:43

12  p.m. you wrote, "David, let's pick a time

13  tomorrow to talk.  Your A team is ready to rock.

14  When works for you?"

15      Do you see that?

16     A.  Yes, I see that.

17     Q.  Were you part of Mr. Daleiden's A team?

18     A.  The A team is Ashley and I'm an

19  honorary part of the A team, so yes.

20     Q.  What did this A team that consisted of

21  Ms. Baldwin, Ms. Davin and you do?

22     A.  We're friends with David, so we

23  supported him as friends.

24     Q.  Did this A team support Mr. Daleiden

25  with respect to CMP's undercover videos?

Page 274

1          MR. MONAGHAN:  Objection, vague, form.

2          THE WITNESS:  Yeah, I don't understand

3    what you are asking.

4    BY MR. HUYNH:

5          Q.   Did this A team help Mr. Daleiden with

6    respect to his release of CMP's undercover

7    videos?

8          MR. ANTHONY:  Object to the form of

9    "the team."  The question is compound and complex

10   because there are apparently different actors

11   that you are bringing into the question.

12          Do you want to ask her about her

13   understanding of what the A team did?

14   BY MR. HUYNH:

15          Q.   It's always to your understanding.

16          A.   To my understanding we supported him as

17   friends and listened to what he had to say and

18   prayed for him.

19          Q.   Besides listening to what Mr. Daleiden

20   had to say and praying for him with regards to

21   CMP's undercover videos, did you do anything else

22   to support him?

23          MR. ANTHONY:  You mean she personally?

24   When you say "you" are you talking about Kate

25   personally or the three members of the A team?

● Defendants' Affirmative Designations (274:5 to 274:7, 274:16 to 274:18)

BRYAN, KATHLEEN

Page 275

1　　　　I think you used the word "you" which

2　could have a singular or collective meaning.

3　　　　MR. HUYNH:  That's a fair point,

4　counsel.  Let me repeat the question.

5　BY MR. HUYNH:

6　　Q.  Besides listening to what Mr. Daleiden

7　had to say and praying for him with regards to

8　CMP's undercover videos, did this A team do

9　anything else to support him?

10　　　　MR. ANTHONY:  To her knowledge.

11　　　　He wants to know what you know about

12　what the A team did and I guess the individual

13　members that constitute the A team.

14　　　　THE WITNESS:  To my knowledge we did

15　that, but then also just we've all been involved

16　in the pro-life movement in the past so we would

17　just kind of talk through generally about what we

18　saw going on in the culture.

19　BY MR. HUYNH:

20　　Q.  To your knowledge did this A team

21　provide Mr. Daleiden feedback about CMP's

22　undercover videos?

23　　　　MR. ANTHONY:  Same objection as before.

24　　　　THE WITNESS:  Probably.

25　BY MR. HUYNH:

● Defendants' Affirmative Designations (275:20 to 275:24)

Page 276

1      Q.   To your knowledge did this A team

2   provide Mr. Daleiden advice about the release of

3   CMP's undercover videos?

4         MR. ANTHONY:  Same objection.

5         THE WITNESS:  Could you repeat the

6   question?  You say advice?

7   BY MR. HUYNH:

8      Q.   To your knowledge did the A team

9   provide Mr. Daleiden advice about the release of

10   CMP's undercover videos?

11        MR. ANTHONY:  Same objection.

12        THE WITNESS:  Probably.

13   BY MR. HUYNH:

14      Q.   What feedback did this A team provide

15   Mr. Daleiden about the release of CMP's

16   undercover videos?

17      A.   I don't recall.

18      Q.   What feedback did this A team provide

19   Mr. Daleiden about CMP's undercover videos?

20        MR. ANTHONY:  Same objection.

21        THE WITNESS:  I don't recall.

22   BY MR. HUYNH:

23      Q.   Did you end up having this update call

24   referred to in this e-mail with Mr. Daleiden?

25      A.   I think so.

● Defendants' Affirmative Designations (276:8 to 276:25)

Page 281

1        Q.   Do you see in this particular e-mail

2    from Mr. Daleiden he refers to Planned Parenthood

3    in the first paragraph?

4        A.   Yes.

5        Q.   In the third paragraph there I was just

6    reading do you see where it says PP?

7        A.   Yes, PP's messaging and strategy.

8        Q.   Does PP refer to Planned Parenthood?

9        A.   I would assume so.

10        MR. HUYNH:  Let's take a final break

11    and we can finish up.

12        THE VIDEOGRAPHER:  Off video at 5:40

13    p.m.

14        (Break taken.)

15        THE VIDEOGRAPHER:  Back on video at

16    5:53 p.m.

17    BY MR. HUYNH:

18        Q.   Did you do any public relations work

19    for Biomax?

20        A.   Not to my knowledge.

21        Q.   Have you done any work for Operation

22    Rescue?

23        A.   Not to my knowledge.

24        Q.   Have you done any work for Mr. Newman?

25        A.   Not that I recall.

● Defendants' Affirmative Designations (281:18 to 282:1)

Page 282

1          Q.   What have you done for CMP since 2015?

2               MR. ANTHONY:  Calls for a narrative.  I

3     think a lot of the testimony over the last

4     six-plus hours relates to that so I don't want

5     her to summarize that.

6               Why don't you summarize what you

7     already testified to, if you can, in response to

8     that and if there's anything else.

9               THE WITNESS:  Yes, I was their

10    publicist.

11    BY MR. HUYNH:

12         Q.   And how long were you CMP's publicist?

13              MR. ANTHONY:  I believe that has been

14    asked and answered but go ahead.

15              THE WITNESS:  Approximately two years.

16    BY MR. HUYNH:

17         Q.   And that would be two years from July

18    2015, correct?

19         A.   Correct.

20         Q.   How would you characterize your current

21    relationship with Mr. Daleiden?

22         A.   We are friends.

23         Q.   Do you currently have any business

24    relationship with Mr. Daleiden?

25         A.   No.

● Defendants' Affirmative Designations (282:9 to 282:19)

Page 286

1    about CMP's undercover videos today?

2        A.   No.

3        Q.   What did you talk to Mr. Daleiden about

4    today?

5        A.   My flight from Detroit.

6        Q.   Anything else?

7        A.   Not really.  Just friends catching up.

8    We said hello and that's it.

9            MR. ANTHONY:  It was a twilight flight,

10   wasn't it?

11           THE WITNESS:  We did talk about

12   twilight and the movies.

13   BY MR. HUYNH:

14       Q.   Have you spoken with Mr. Newman about

15   this lawsuit -- strike that.

16           Have you spoken with Mr. Newman about

17   this lawsuit?

18       A.   Not that I recall.

19       Q.   Have you spoken to Mr. Rhomberg about

20   this lawsuit?

21       A.   Not that I recall.

22       Q.   Have you spoken with any other

23   defendants in this case about this lawsuit?

24       A.   Not that I recall.

25       Q.   Have you read the complaint in this

● Defendants' Affirmative Designations (286:14 to 286:18)

BRYAN, KATHLEEN

Page 292

1  MR. ANTHONY:  Or ever?

2  THE WITNESS:  Not really except that

3 he's a CMP board member, so maybe that.

4 BY MR. HUYNH:

5  Q. From July 2015 and on, about how often

6 did you communicate with Mr. Rhomberg?

7  MR. ANTHONY:  Objection to form.

8  THE WITNESS:  Very rarely.

9 BY MR. HUYNH:

10  Q. And when you did communicate with

11 Mr. Rhomberg, what did you discuss with him?

12  A. I don't recall.

13  Q. Was your communication with

14 Mr. Rhomberg over the phone?

15  A. Yes.

16  Q. Were any of your communications by

17 e-mail with Mr. Rhomberg?

18  A. Not that I remember.

19  Q. Were any of your communications with

20 Mr. Rhomberg by text message?

21  A. I don't think so.

22  Q. By social media?

23  A. I don't think so.

24  Q. Have you met Mr. Newman before?

25  A. Troy Newman?

Defendants' Affirmative Designations (292:24 to 294:13)

BRYAN, KATHLEEN

Page 293

1　　Q.　Yes.

2　　A.　Yes.

3　　Q.　When did you first meet him?

4　　A.　I don't remember.

5　　Q.　Do you remember where you first met

6　him?

7　　A.　I do not.

8　　Q.　How would you characterize your current

9　relationship with Mr. Newman?

10　　　MR. MONAGHAN:  Objection, vague.

11　　　THE WITNESS:  I don't really have one.

12　BY MR. HUYNH:

13　　Q.　Have you ever had a professional

14　relationship with Mr. Newman?

15　　　MR. MONAGHAN:  Objection, vague.

16　　　THE WITNESS:  No, except that he was a

17　CMP board member.

18　BY MR. HUYNH:

19　　Q.　From July 2015 on, about how often did

20　you communicate with Mr. Newman?

21　　A.　Pretty rarely.

22　　Q.　By very rarely do you mean less than

23　ten times?

24　　A.　Sorry, what was the timeframe again?

25　　Q.　July 2015.

BRYAN, KATHLEEN

Page 294

1          A.   Until now?

2          Q.   Yes.

3          A.   I would say it was more than ten.

4          Q.   More than 20?

5          A.   Maybe.

6          Q.   More than 30?  I'm just trying to get a

7     range here.

8          A.   Probably not, no.

9          Q.   So between 20 and 30 you think?

10         A.   Yes.

11         Q.   What did you communicate about with

12    Mr. Newman in these 20 to 30 times you spoke with

13    him?

14         MR. ANTHONY:  Objection to form.

15         THE WITNESS:  Mainly just the media

16    requests that he was forwarding me that you

17    brought up earlier.

18    BY MR. HUYNH:

19         Q.   Did you communicate with Mr. Newman by

20    text message in July 2015 and on?

21         A.   Not that I remember.

22         Q.   Did you communicate with Mr. Newman on

23    social media from July 2015 and on?

24         A.   Not that I remember.

25         Q.   Have you met Susan Merritt?

● Defendants' Affirmative Designations (294:15 to 294:24)

Page 1

1        IN THE UNITED STATES DISTRICT COURT

    FOR THE NORTHERN DISTRICT OF CALIFORNIA

2

3     - - - - - - - - - - - - - -+

                |

4     PLANNED PARENTHOOD        |

 FEDERATION OF AMERICA,    |

5     INC., et al,          |

                |

6          Plaintiffs,    |  Case Number:

                |

7     vs.              |  3:16-cv-00236

                |

8     THE CENTER FOR MEDICAL    |

 PROGRESS, et al,         |

9                 |

      Defendants.     |

10                |

    - - - - - - - - - - - - - -+

11

12

13        CONFIDENTIAL - ATTORNEYS' EYES ONLY

14         Videotaped Deposition of

15          PETER R. ROBBIO

16         in Arlington, Virginia

17        taken on Thursday, April 11, 2019

18              9:34 a.m.

19

20

21

22

23    Job No. 158908

24    Reported by:  Laurie Donovan, RPR, CRR, CLR

25

Page 41

1    it was Mr. Daleiden or the Center for Medical

2    Progress that was a client of CRC Public Relations

3    at any time?

4       A   I don't.

5       Q   Okay.  You did -- it is true that you,

6    in your capacity at CRC Public Relations, worked

7    with Mr. Daleiden at least in 2015; is that

8    correct?

9       A   Correct.

10      Q    Okay, but you're not sure who exactly

11   was the client; am I understanding correctly?

12      A    I was instructed to help David Daleiden

13   and Center for Medical Progress garner media

14   attention, so that's, that's what I did, just

15   that.  Sorry.

16      Q   And is it -- as I understand it, you

17   also are just not sure whether Mr. Daleiden

18   formally remains former -- excuse me -- formally

19   remains a client of CRC Public Relations; is that

20   correct?

21      A   Correct.

22      Q   And likewise, you don't, you don't know

23   whether the Center for Medical Progress formally

24   remains a client of CRC Public Relations; is that

25   correct?

● Defs. 2d Set of X-designations and Objs. 9/27 (41:5 to 42:2)

1       A   That is correct.

2       Q   Okay.

3           (Discussion was held off the

4           record.)

5    BY MR. KAMRAS:

6       Q   In 2015, at that time you were a senior

7    vice president at CRC Public Relations, correct?

8       A   Correct.

9       Q   Okay.  Were there any other -- well,

10   strike that.  One moment.

11          Have you heard of Creative Response

12   Concepts?

13      A   Yes.

14      Q   Okay.  Creative Response Concepts, Inc.?

15      A   I think I've, yeah, I've read that

16   phrase somewhere, yes.

17      Q   Okay.  Do you -- does Creative Response

18   Concepts have any relationship to CRC Public

19   Relations?

20      A   I mean I, I'm not -- I don't, I don't

21   have an understanding of, you know, corporate

22   documents or structure, but it's my, you know,

23   casual understanding that it's -- that's CRC,

24   that's us.

25      Q   Okay, and that's really what I want to

Page 47

1    to two and a half years, so that gets us to

2    roughly 1990 or maybe 1991?

3        A    Correct.

4        Q    And what did, what did you do after

5    that?

6        A    Worked for a company called Stanley

7    Bostitch.

8        Q    Stanley Bostitch?

9        A    Yes.

10       Q    What does that company do?

11       A    Well, it does a lot of things, but I

12   worked for the division that sold pneumatic

13   construction power tools.

14       Q    And was that in a media relations

15   capacity?

16       A    No.  I was a sales rep.

17       Q    Okay.  How long were you there?

18       A    Until about '93, '94.

19       Q    What -- where did you go next?

20       A    Well, so, so during that time, I -- it

21   was semi-paid or unpaid.  I ran a number of

22   campaigns from '90, early '92 through 1995 in New

23   Hampshire, political campaigns, one for alderman,

24   for Tim Reiniger, and another one for state

25   senate, Richard Donnay.

Plaintiffs' Trial Designations (47:19 to 48:12)

1     Q    And then also in connection with Pat

2   Buchanan's --

3     A    And then --

4     Q    -- presidential campaign?

5     A    And then from there I was hired by Pat

6   Buchanan's presidential campaign in 1995.  It

7   might have been even late '94.  Sorry.

8     Q    And you were -- in what capacity were

9   you serving with Mr. Buchanan's presidential

10   campaign?

11     A    I was the campaign manager for New

12   Hampshire.

13     Q    And I meant to look this up, but I

14   failed to.  I generally don't remember how, how

15   Mr. Buchanan fared in the New Hampshire campaign.

16     A    You don't?

17     Q    I don't.

18     A    It was his only victory.

19     Q    Okay.  Congratulations.

20     A    Thank you.

21     Q    And I, and I apologize.

22     A    That's all right.

23     Q    I don't mean that as an insult in any

24   way.  So --

25     A    I should, should clarify.  His only

Page 49

1    electoral victory.  He won a -- I think he won a

2    caucus in Alaska or Louisiana before that, but --

3    sorry.

4         Q    No problem.

5         A    I don't want to exaggerate.

6         Q    So did -- so how long did you stay

7    working with the Buchanan campaign?  When did you

8    end your job there?

9         A    The, the primary was in February of

10   1996, and, and I stayed in New Hampshire after

11   that.  I moved on to, to work as the deputy chief

12   of staff to the governor of New Hampshire.

13        Q    Who was that?

14        A    Steve Merrill, M-E-R-R-I-L-L.

15        Q    Am I correct that you were -- just

16   backing up for a moment -- that you were with the

17   Buchanan campaign until I suppose such time as the

18   Buchanan campaign ended?

19        A    No.

20        Q    Okay.

21        A    Well, clarification.  Until the Buchanan

22   campaign ended in New Hampshire.  It went on

23   nationally, but I, I stayed back.

24        Q    I see.  You -- so you weren't -- why is

25   it that you did not continue working on the

Page 50

1    Buchanan campaign beyond New Hampshire?

2        A    I don't know, really.  Probably a number

3    of factors, but I can't put my -- I don't know the

4    exact reason.

5        Q    Okay, but once it ended in New Hampshire

6    and you got your victory --

7        A    Yeah.

8        Q    -- you, you left the campaign and you

9    stayed in New Hampshire?

10        A    Correct.

11        Q    Okay, and how long were you serving as

12    deputy chief of staff?

13        A    Until the end of his term, which was

14    probably January of 1997.  He decided not to run

15    for reelection, so . . .

16        Q    Okay.  What was next?

17        A    From there I did a number of different

18    consulting work for nonprofits and political

19    campaigns.

20        Q    What -- was Mr. Merrill, was he a

21    Democrat or a Republican or independent?

22        A    He's a Republican.

23        Q    Okay.  So you said you had done -- you

24    did -- after leaving or after Mr. Merrill decided

25    to not seek reelection, you then did work for some

Plaintiffs' Trial Designations (50:20 to 50:22)

1   nonprofits and some political consulting.

2       How long did you do that?

3    A   I did that until the year 1999.

4    Q   Is that when you joined CRC?

5    A   No. I worked on the Forbes campaign.

6    Q   How long did you work on the Forbes

7   campaign?

8    A   And, and just a clarification.

9   Technically, the Forbes campaign, I was a

10   consultant, so I wasn't an employee of the

11   campaign, so it was basically the same type of

12   work before that, and I was on that until February

13   of 2000.

14    Q   Why did you choose to join the Forbes

15   campaign as a consultant or work for them as a

16   consultant?

17    A   I liked Steve Forbes' positions.

18    Q   On anything in particular?

19    A   I thought he would make a great

20   president. He had -- he wanted to privatize --

21   well, he wanted to eliminate the income tax and

22   replace it with a flat tax. Yeah, he had a number

23   of other really great positions.

24    Q   Okay. You worked on that campaign until

25   February of 2000?

Plaintiffs' Trial Designations (51:6 to 51:17, 51:24 to 52:2)

ROBBIO, PETER

Page 52

1    A    Correct.  I was a consultant for them

2    until February of 2000, yes.

3        Q    And then what was next?

4        A    I, I frankly just took some time off,

5    but I did do a bit of contract work for CRC that

6    summer, and then they offered me a job in August

7    of 2000.

8        Q    And have you been with CRC since August

9    of 2000?

10       A    Correct.

11       Q    Okay.  Backing up to the consulting work

12    that you conducted after, after you were with

13    Mr. Merrill, do you recall the nonprofits or, or

14    organizations that you did consulting work for?

15       A    Sure.

16            MR. STRAWBRIDGE:  Let me just

17        caution the witness here.

18            You may answer that question to the

19        extent that you're revealing, you know, work

20        you did for nonprofit associations and, and

21        entities for which your work was public, but

22        in order to protect the associational privacy

23        of those clients and third parties, do not

24        disclose relationships or work that you did

25        that is not public.

Page 57

1    recall?

2        A    No.

3        Q    Okay.  Who were the two state senate

4    candidates in New Hampshire?

5        A    Timothy Reiniger and Patricia Krueger.

6        Q    Okay, and this was -- go ahead.

7        A    Sorry, sorry.  I, I did do some work --

8    I was on the payroll for a gentleman running for

9    governor.  I feel kind of bad.  I can't remember

10    his name.

11        Q    This was in New Hampshire?

12        A    Yes.  Jim Rubens.

13        Q    Okay, great.

14        A    Sorry.

15        Q    No.  Thank you.

16            So you began contract work for CRC in,

17    in 2000, and you were offered a job in August of

18    2000.

19            What was your title, if you can recall,

20    in, when you first started in August of 2000?

21        A    Account executive.

22        Q    What are the responsibilities or what

23    were your responsibilities as an account

24    executive?

25        A    To, to help generate media coverage for

ROBBIO, PETER

Page 58

1    clients.

2         Q    How long were you in that role?

3         A    I, I honestly just don't, don't recall

4    the actual transitions, but I can list you the

5    various transitions.

6         Q    Sure.  What was your next position?

7         A    Senior account executive.

8         Q    And what was after senior account

9    executive?

10        A    Account manager.

11        Q    And what position did you have after

12   account manager?

13        A    I, I really don't remember if there's a

14   senior account manager anymore or if there was one

15   back then.  I just don't recall.  I'm sorry, but

16   possibly senior account manager.

17        Q    And what came after senior -- well,

18   account manager or senior account manager?

19        A    Vice president of accounts.

20        Q    And what was your title after vice

21   president of accounts?

22        A    Senior vice president.

23        Q    Of accounts?

24        A    Just senior vice president.

25        Q    Senior vice president, which is your

Plaintiffs' Trial Designations (58:25 to 59:2)

Page 59

1    current title?

2        A    Correct.

3        Q    Okay, so, and you --

4        A    Can I interrupt?

5        Q    Go ahead.

6        A    If we're going to get into, you know,

7    all my duties and it's going to be a while, I

8    would like to take a break.

9              MR. KAMRAS:  Okay.  Great.  Let's

10       take a break.

11             THE VIDEOGRAPHER:  All right.  The

12       time is 10:39.  We are going off the record.

13             (Whereupon, a short recess was

14             taken.)

15             THE VIDEOGRAPHER:  The time is

16       10:49.  We are back on the record.

17   BY MR. KAMRAS:

18       Q    Welcome back, Mr. Robbio.

19       A    Thank you.

20       Q    You understand you're still under oath?

21       A    Yes.

22       Q    Okay.  At the -- I want to focus on the

23   period 2015.  Do you recall what your title was in

24   2015?

25       A    Senior vice president.

1    Q   Okay, your current title?

2    A   Correct.

3    Q   Okay, and what are your responsibilities

4  at senior vice president?

5    A   To garner as much media attention as I

6  can for my clients.

7    Q   And how do you do that?  How do you

8  garner media attention for your clients?

9    A   I review their goals and their assets,

10  their strengths and weaknesses, and come up with a

11  strategic plan to present it to the media.  Also

12  understand the current news cycles so that that

13  can be -- you know, so we can help get them more

14  media attention.

15    Q   Anything else that comes to mind?

16    A   I supervise employees.  I train them and

17  assist them in doing the same, yeah.

18    Q   Okay, and so in connection now

19  specifically with the Center for Medical Progress

20  and Mr. Daleiden, when do you -- what is the

21  earliest point that you recall becoming aware of

22  Mr. Daleiden?

23          MR. STRAWBRIDGE:  Object to the

24    form of the question.

25          THE WITNESS:  I was introduced to

1      David over email in early July 2015.

2   BY MR. KAMRAS:

3      Q    Early -- I'm sorry. Did you say early

4   July?

5      A    Early July of 2015.

6      Q    Had you known of Mr. Daleiden before

7   this email introduction?

8      A    No.

9      Q    Had you heard of his name?

10      A    No.

11      Q    Had you heard -- prior to this email

12   introduction, had you heard of the Center for

13   Medical Progress?

14      A    No.

15      Q    Had you, had you heard of Biomax prior

16   to this email introduction?

17      A    No.

18      Q    Who, who did this, this email come from

19   in early July of 2015? Who sent it?

20        MR. STRAWBRIDGE: Object to the

21     form of the question.

22        THE WITNESS: Greg Mueller.

23   BY MR. KAMRAS:

24      Q    And was anyone else copied on the email

25   other than Mr. Mueller and yourself?

●   Defs. 2d Set of X-designations and Objs. 9/27 (61:3 to 61:22)

1      A   I don't recall.

2         Q   Do you, do you recall whether

3   Mr. Daleiden was copied on the email?

4      A   Oh.  Sorry.  Yes.

5         Q   So the email was from Mr. Mueller to

6   you, copying Mr. Daleiden, correct?

7      A   Correct.

8         Q   And do you recall whether there was

9   anyone else in any way that was on that email?

10            MR. STRAWBRIDGE:  Object to the

11        form of the question.

12            THE WITNESS:  That's what I, I

13        don't recall.  I don't recall anyone else.

14   BY MR. KAMRAS:

15        Q   And what -- did you understand, upon

16   receiving that email in early July 2015, that

17   Mr. Daleiden was at that time a client of CRC

18   Public Relations?

19            MR. STRAWBRIDGE:  Object to the

20        form of the question.

21            THE WITNESS:  I understood that

22        email to mean that we would -- that I would

23        be engaged in getting him media attention,

24        period.

25

1    BY MR. KAMRAS:

2        Q   And did you have any understanding with

3    respect to whether the Center for Medical Progress

4    was also to be -- strike that.

5            Did you have any understanding about

6    whether you were also to be engaged in garnering

7    media attention for the Center for Medical

8    Progress?

9        A   From that email?

10       Q   Yes.

11       A   No.

12       Q   Did you have that understanding from any

13   other source?

14       A   In subsequent emails I was explained,

15   you know, the project.  It's -- my recollection of

16   that was just, you know, "Pete, meet David.  David

17   is, you know, going to be working with us," that

18   type of -- and that language.  I'm not sure what

19   the exact language was.

20       Q   Okay.  So your understanding is that

21   Mr. Mueller had had some prior discussion or

22   meeting with Mr. Daleiden prior to sending this

23   email to you?

24       A   I don't know for sure, but that's a safe

25   assumption.

Page 64

1      Q   Okay, and Mr. Mueller was directing

2  you -- was informing you that you would have --

3  that you were going to be engaged in work with

4  Mr. Daleiden?

5      A   Correct.

6      Q   Okay, and so you received that email,

7  and what happened next with respect to your work

8  with Mr. Daleiden?

9      A   I, I don't recall the exact steps, but

10  the procedure would have been to, you know,

11  inquire about his project and what we, what we,

12  what we would be promoting to the media.

13      Q   How did you -- how is it that you

14  discussed these matters with Mr. Daleiden?  Was it

15  in person, by phone, by email?

16          MR. STRAWBRIDGE:  Object to the

17  form of the question.

18          THE WITNESS:  It was either over

19  email or over conference calls.

20  BY MR. KAMRAS:

21      Q   And as we, we discussed earlier, the

22  first of the videotapes was released July --

23  publicly released July 14, 2015.

24          Can you tell me approximately how much

25  before that date this email that we've been

Page 65

1    discussing would have been?

2        A   I don't recall the exact day, and I

3    don't recall when July 4th happened that year,

4    so -- but it would have been, you know, perhaps

5    around the 6th or the 7th, but I, I just don't

6    recall the exact date.

7        Q   Do you recall that it was after July 4?

8        A   I do.

9        Q   So in the subsequent conversations and

10   emails, did you, in fact, inquire about

11   Mr. Daleiden's project?

12              MR. STRAWBRIDGE:  Object to the

13       form of the question.

14              THE WITNESS:  I guess -- no, I

15       didn't inquire.  I mean it was presented to

16       me, so I don't want to . . .

17   BY MR. KAMRAS:

18       Q   Okay.  It was presented to you by

19   Mr. Daleiden?

20       A   Oh.  It's not -- I, I don't recall if

21   Mr. Daleiden presented to me the project or if I

22   received the, the first information about the

23   project from Greg Mueller.

24       Q   So what information did you receive from

25   Mr. Mueller about the project?

1       A    That there were videos and that we would

2   be sharing with the media.

3       Q    Did you have any understanding whether

4   Mr. Daleiden or the Center for Medical Progress

5   was a paying client of CRC Public Relations?

6       A    I assumed they were, but I, I never saw

7   an invoice or, or, you know, saw anything like

8   that.

9       Q    With a typical client, would it have

10  been normal and customary in your practice to see

11  an invoice if they were a paying client?

12      A    I've rarely seen an invoice at CRC.

13      Q    For any client?

14      A    For any client.

15      Q    Okay.  So Mr. Mueller said that there

16  were videos that we, we -- I assume you mean CRC

17  Public Relations -- would be sharing with the

18  media, correct?

19      A    Mm-hmm.

20      Q    Did he provide you any more information

21  about the subject of the videos?

22      A    I don't have a recollection of, of what

23  exactly he said, but I have to -- yes.

24      Q    Can you provide me any information about

25  what he said?

1      A   I don't.  I'm sorry.  I don't.

2      Q   Okay.  Did you understand that the

3   videos concerned -- did you understand at the

4   time, when Mr. Mueller was first presenting this

5   engagement to you, that the videos concerned

6   Planned Parenthood?

7      A   I, I don't recall him using the words

8   "Planned Parenthood."

9      Q   Do you --

10     A   Sorry.  Not sorry, but . . .

11     Q   That's fine.  You recall what you can

12   recall.

13          Do you -- did he use, that you recall,

14   some other word that in some way refers to Planned

15   Parenthood?

16     A   I think -- I'm sorry.  I just don't

17   remember the, the exact conversation, and, and I

18   don't recall if it was the first press release

19   that I received or through a phone conversation

20   what the, the actual subject matter of the videos

21   were.

22     Q   Okay.  Did you understand from

23   Mr. Mueller whether the videos concerned abortion?

24     A   Yes.

25     Q   Did you understand at that time what

1    more, if anything, it concerned other than

2    abortion?

3        A   Yes.

4        Q   And what was that?

5        A   That they were -- they concerned the,

6    the sale of baby body parts.

7        Q   Was that a phrase that was used by

8    Mr. Mueller, "the sale of baby body parts"?

9        A   I, I heard him say that.

10       Q   Is that a phrase that you used on that

11   first call when -- or let me strike that.

12           Was that a phrase that he used when he

13   was first presenting the subject of the engagement

14   to you?

15       A   It's -- I'm unsure if he used that

16   phrase or used something like "hearts, lungs and

17   livers" or something like that as well.  I just

18   don't, don't recall the exact conversation.

19       Q   Meaning he may have used a phrase like

20   "the sale of hearts, lungs and livers"?  Is that

21   what you're saying?

22           MR. STRAWBRIDGE:  Object to the

23   form of the question.

24           THE WITNESS:  Yes.

25

Page 69

1    BY MR. KAMRAS:

2        Q   Do you recall whether Mr. Mueller said

3    anything else about the subject matter of the

4    videos in those early conversations?

5        A   I, I don't.  I don't, and it's, it's

6    very difficult to conflate the first conversation

7    with the first -- it's very difficult to separate

8    the first conversation from the first press

9    release to the project just getting off the

10    ground.  It was a very hectic and busy few days.

11        Q   When -- so you were describing the

12    conversation that -- conversation or conversations

13    that you had with Mr. Mueller.

14        When is the first time that you spoke

15    with Mr. Daleiden?

16        A   I don't recall the exact time, but

17    around that same time frame, somewhere between the

18    6th and the 14th.

19        Q   And do you -- did Mr. Daleiden describe

20    the project for which you were being engaged or

21    CRC was being engaged?

22            MR. STRAWBRIDGE:  Object to the

23    form of the question.

24            THE WITNESS:  No.

25

Defs. 2d Set of X-designations and Objs. 9/27 (69:14 to 69:18)

1    BY MR. KAMRAS:

2        Q    Okay.  Did, did Mr. Daleiden describe

3    the videos that you were being engaged to release

4    to the media?

5        A    I recall that conversation was more

6    about logistics, where were you -- you know, where

7    are you located.  If you need to go to a studio,

8    where do you -- you know, do you feel comfortable

9    on TV?  Do you need a car?  Those types of -- that

10    was that discussion.  It was really a logistical

11    discussion.

12        Q    This was -- I take it you're describing

13    your, your first conversation with Mr. Daleiden?

14        A    Exactly.

15        Q    Okay.  At any point after that first

16    conversation, did Mr. Daleiden describe to you the

17    videos that would be released to the media as part

18    of your -- as part of CRC's engagement?

19            MR. STRAWBRIDGE:  Object to the

20        form of the question.

21            THE WITNESS:  He did.

22    BY MR. KAMRAS:

23        Q    And how did, how did Mr. Daleiden

24    describe the videos?

25        A    There were numerous conversations.  It's

● Defs. 2d Set of X-designations and Objs. 9/27 (70:2 to 70:14, 70:23 to 72:1)

Page 71

1   hard to -- could you be a little bit more

2   specific?

3        Q    How did he describe the -- what it was

4   that he thought the videos conveyed?

5              MR. STRAWBRIDGE:  Object to the

6       form of the question.

7              THE WITNESS:  So he described the

8   first video, which I believe was Dr. Nucatola

9   as a doctor discussing the sale of -- I don't

10      remember the exact quote, but he loosely

11      described Dr. Nucatola discussing the sale of

12      baby body parts while chomping on a salad,

13      munching on a salad.

14              He described the next video as a

15      doctor talking about how she wants a

16      Lamborghini while negotiating pricing.

17  BY MR. KAMRAS:

18       Q    Do you recall his characterization of

19  any of the other videos?

20       A    No.

21       Q    Did Mr. Daleiden describe these videos

22  as evincing an intent by Planned Parenthood to

23  profit from the sale of fetal tissue?

24              MR. STRAWBRIDGE:  Object to the

25      form of the question.

1          THE WITNESS:  I believe so, yes.

2     BY MR. KAMRAS:

3          Q    Did you and Mr. Daleiden have

4     conversations prior to July 14 about how to, how

5     to characterize the videos when they were being

6     released to the press?

7               MR. STRAWBRIDGE:  Object to the

8          form of the question.

9               THE WITNESS:  No.

10    BY MR. KAMRAS:

11         Q    Do you, do you know whether Mr. Daleiden

12    or Mr. Mueller had any such conversations?

13         A    I don't.

14               MR. STRAWBRIDGE:  Object to the

15          form of the question.

16               THE WITNESS:  Sorry.  I don't know.

17    BY MR. KAMRAS:

18         Q    Did you have recommendations to

19    Mr. Daleiden about how the videos should be

20    characterized when presented to the media?

21               MR. STRAWBRIDGE:  Object to the

22          form.

23               THE WITNESS:  David was a unique

24          client.  He was very media-savvy.  The, the

25          release that accompanied the videos, the

● Defs. 2d Set of X-designations and Objs. 9/27 (72:3 to 72:9)

Page 78

1      A    I, I wouldn't say that.  I mean --

2      Q    Okay, all right, well, but let me try

3   this.  If I say "the undercover videos," you'll

4   understand that those refer to the videos that

5   Mr. Daleiden taped of Planned Parenthood employees

6   and then which were in some way released to the

7   media?

8      A    Correct.  Yes.

9      Q    Okay, great.  So when is it -- when was

10   the first time that you viewed any of the

11   undercover videos?

12      A    I, I don't remember the exact date, but

13   it was 24 to 48 hours before we released them.

14      Q    Did you view only the -- in that period,

15   24 to 48 hours --

16      A    About that.

17      Q    -- before -- strike that.

18         So we're talking about the period

19   basically July, roughly July 12th or 13th of 2015;

20   is that right?

21             MR. STRAWBRIDGE:  Object to the

22      form.

23             THE WITNESS:  Correct.  Yes.

24   BY MR. KAMRAS:

25      Q    Okay, and at that point did you view

Plaintiffs' Trial Designations (78:2 to 78:13, 78:25 to 79:3)

Page 79

1    only the video that would be released on July 14

2    of 2015 or something more than that?

3        A    Just that video.

4        Q    Did you, you -- that was -- do you have

5    a recollection of how long that video ran?

6        A    I don't.

7        Q    Would it be correct to say it was in the

8    range of five to ten minutes?

9            MR. STRAWBRIDGE:  Object to the

10        form of the question.

11            THE WITNESS:  I honestly don't

12        recall.  There -- I just don't recall that

13        first video, the length.

14   BY MR. KAMRAS:

15        Q    Okay.  Was it -- can you give me any

16   estimation of how long you understand that video

17   to be that you viewed?

18        A    I, I seem to just recall the -- thinking

19   eight minutes when you first asked the question,

20   but I, I don't know if that's accurate or not.

21        Q    And this was the video that was

22   thereafter, on July 14, released publicly,

23   correct?

24        A    The -- yeah, yes.

25        Q    That is to say, the video that you

Plaintiffs' Trial Designations (79:15 to 79:20)

1    viewed sometime in the range of July 12 or 13,

2    2015 is the same video that was then released

3    publicly on July 14?

4        A    I'm, I'm not 100 percent sure if

5    100 percent of the video is, is -- was the one

6    that was released.  I'm unaware of any edits that

7    were done if there were any edits, but it was my

8    understanding that it was the same video.

9        Q    Okay, and you understand that the video

10   that was released on July 14, 2015, was edited

11   down from some amount of larger video?

12       A    I do understand that, yes.

13       Q    Did you also view the, that larger

14   amount of video, that source material in the

15   period prior to July 14 of 2015?

16       A    No.

17       Q    So did you have any understanding prior

18   to July 14, when this first video was released,

19   of -- to what extent it was accurate in its

20   presentation of the material enclosed within it?

21          MR. STRAWBRIDGE:  Object to the

22      form of the question.

23          THE WITNESS:  I -- the -- it's -- I

24      guess I don't understand the question.  I'm

25      sorry.

Plaintiffs' Trial Designations (80:9 to 80:16)

Page 81

1   BY MR. KAMRAS:

2      Q    Did you know whether there were any

3   materials that -- strike that.

4           That first video, as you mentioned,

5   concerned Dr. Nucatola, correct?

6      A    Correct.

7      Q    And that included, as you -- that

8   included, as you indicated, a video from a lunch

9   where she was speaking with Mr. Daleiden, correct?

10     A    Correct.

11     Q    And do you know that that lunch lasted

12  close to three hours?

13     A    No.

14     Q    Okay.  Do you know that Mr. Daleiden had

15  videotape of the entirety of that lunch?

16     A    I didn't know it at the time, but I --

17  for a fact, I guess.

18     Q    Okay.

19     A    I guess I assumed that he did, but I, I

20  don't know.

21     Q    And you had not viewed that, the

22  entirety of the video of the lunch prior to

23  July 14, 2015?

24     A    Correct.

25     Q    Okay, and so you did not know prior to

Plaintiffs' Trial Designations (81:4 to 81:24)

1          You described a process where, with

2    respect to this first video that was released on

3    July 14 concerning Dr. Nucatola, that you viewed

4    the video that was released shortly before it was

5    released, 24 to 48 hours, right?

6          A    Yes.

7          Q    Okay.  Was that the same in the case of

8    all the other videos; that is to say you viewed

9    the video that was to be released for the first

10   time shortly before it was actually released?

11         A    I, I don't recall the process being any

12   different.

13         Q    Okay, and we also discussed how, with

14   respect to Dr. Nucatola's, the video of

15   Dr. Nucatola that was released on July 14, 2015,

16   that you had not viewed the larger source material

17   from which the video was taken prior to the

18   release of the video, right?

19         A    Correct.

20         Q    Okay, and, and is that also true that,

21   with respect to the other videos that were in

22   later weeks released, that prior to the release

23   you had not viewed the larger source material from

24   which those videos were taken?

25         A    Correct.

1           MR. STRAWBRIDGE:  Object to the

2       form of the question.

3           THE WITNESS:  Yes.

4   BY MR. KAMRAS:

5       Q    And -- thank you, and are you also aware

6   that some of the videos took place at conferences

7   hosted by the National Abortion Federation or NAF?

8       A    And you're asking about the public

9   videos, the videos that were released?

10      Q    No, not necessarily.  I'm asking about

11  any of the video that was recorded, including,

12  obviously, that which was released.

13      A    I, I don't have full knowledge of what

14  David recorded.

15      Q    Okay.  Do you have knowledge that any of

16  the recordings took place at conferences hosted by

17  the National Abortion Federation or NAF?

18      A    I've read news reports about that.

19      Q    Okay.  Did Mr. Daleiden discuss with

20  you -- excuse me -- how he was able to gain access

21  to the Planned Parenthood conferences?

22      A    No.

23      Q    Did he discuss with you how he was able

24  to gain access to Planned Parenthood facilities?

25      A    No.

ROBBIO, PETER

Page 86

1      Q   Did he discuss with you how he was able

2   to gain access to NAF conferences?

3      A   No.

4      Q   Did Mr. Daleiden discuss with you the

5   fact that he used a false identification?

6      A   No.

7      Q   Did he ever discuss with you how he

8   obtained that false identification?

9      A   No.

10      Q   Did he discuss --

11          MR. STRAWBRIDGE:  Object, object to

12      the form of the question.

13          THE WITNESS:  Sorry.  I'll slow

14      down.

15   BY MR. KAMRAS:

16      Q   Did Mr. Daleiden -- you're good?

17      A   I'm good.

18      Q   Okay.

19          Did Mr. Daleiden discuss with you how --

20   whether he signed any agreements in order to gain

21   access to the Planned Parenthood conferences?

22      A   No.

23      Q   Did he -- and I'm including -- by

24   "agreements," I'm including confidentiality

25   agreements.

Page 87

1    A    He did not discuss with me any, any

2    agreements.

3    Q    Okay.  Do you have an understanding that

4    he did sign any such agreements in order to access

5    the Planned Parenthood conferences?

6    A    No.

7    Q    Okay.  Did you have an understanding

8    that he signed confidentiality agreements in

9    accessing Planned Parenthood facilities?

10            MR. STRAWBRIDGE:  Object to the

11       form of the question.

12            THE WITNESS:  No.

13    BY MR. KAMRAS:

14    Q    Okay.  Did you -- you earlier referred

15    to the videos as the "undercover videos."

16        Do you recall that?

17    A    Yes.

18    Q    You understood that when Mr. Daleiden

19    was filming the videos which you refer to as the

20    "undercover videos," that he was taping people

21    without their knowledge, correct?

22            MR. STRAWBRIDGE:  Object to the

23       form of the question.

24            THE WITNESS:  Yes.

25

Plaintiffs' Trial Designations (87:18 to 87:21, 87:24 to 87:25)

Page 88

1     BY MR. KAMRAS:

2          Q   Okay, and you understood that that was

3     the case in all of the videos that he filmed,

4     correct?

5               MR. STRAWBRIDGE:  Object to the

6     form of the question.

7               THE WITNESS:  You said "all of the

8     videos."  I'm, I'm not 100 percent sure about

9     that.

10    BY MR. KAMRAS:

11         Q   Okay.  Fair.

12             All of the videos that were released,

13    did you believe that they were all filmed without

14    the subjects of the filming knowing that

15    Mr. Daleiden was taping them?

16              MR. STRAWBRIDGE:  Object to the

17    form of the question.

18              THE WITNESS:  I believe so, yes.

19    BY MR. KAMRAS:

20         Q   And did you ever ask Mr. Daleiden or

21    others whether it was legal for him to have done

22    so?

23         A   Yes.

24         Q   Who did you ask?

25              MR. STRAWBRIDGE:  Let me interject

ROBBIO, PETER

Page 90

1    BY MR. KAMRAS:

2        Q    Is that what you understood him to be

3    saying?

4        A    Broadly, yes.  Yeah.

5        Q    Okay, and you said that he said that as

6    a response to a media inquiry, correct?

7        A    Correct.

8        Q    So you understood that this was a

9    comment that was going to be publicly released,

10    correct?

11            MR. STRAWBRIDGE:  Object to the

12        form of the question.

13            THE WITNESS:  Correct.

14    BY MR. KAMRAS:

15        Q    Okay, and you -- was it important to you

16    whether it was true?

17        A    Yes, of course.

18        Q    Okay, but you, you didn't verify it

19    other than taking Mr. Daleiden's word?

20        A    Well, I'm, I'm not a lawyer, so I don't

21    want to pretend I am, but it was my understanding

22    that the first two videos were taped in a public

23    setting, so there was no expectation of privacy

24    there, and my understanding that the other videos

25    were taped in states that taping was allowable.

1     document which has been labeled as Exhibit 301,

2     and it's Bates-stamped at the bottom CM04004.

3          Are you familiar with the concept of a

4     Bates stamp?

5       A    No.

6       Q    It's a litigation procedure so we can

7     have unique identifying numbers for every page of

8     every document.

9       A    Okay.

10      Q    Okay, so that's what that is.

11          This is -- you'll see it's entitled

12     "Undercover Project to Expose Fetal Trafficking."

13          Do you see that at the top?

14      A    I do.

15       Q    And above that it says in the header,

16     "Draft Project Proposal."

17          Do you see that?

18      A    I do.

19      Q    Okay. Take a moment to look at this,

20     and my first question just is whether this is a

21     document that you believe you've seen before.

22         MR. STRAWBRIDGE: I'm going to --

23     while the witness is reviewing the document,

24     I just want to -- I'm not sure what the

25     protocol has been in this case with respect

Page 93

1　　to -- the document is marked "Attorneys' Eyes

2　　Only."　Actually, there was an earlier

3　　document that was also marked that way.

4　　　　　Are we marking the deposition

5　　transcripts as a whole in this case?

6　　　　　MR. KAMRAS:　We will, yes, and

7　　thank you for asking, so yes, let's

8　　provisionally mark the transcript as

9　　Attorneys' Eyes Only, and then there will be

10　　opportunity for de-designation if that's

11　　appropriate.

12　　　　　MR. STRAWBRIDGE:　I just wanted to

13　　know what the protocol was.　Thank you.

14　　　　　THE WITNESS:　Can you explain to me

15　　what that means?

16　　　　　MR. STRAWBRIDGE:　Nothing that you

17　　really need to worry about.

18　　　　　THE WITNESS:　So what, what was

19　　your question?

20　　BY MR. KAMRAS:

21　　　Q　The question is whether this is a

22　　document that you have seen before, that you

23　　recall.

24　　　A　I do not recall seeing this document.

25　　　Q　Okay.

● Defs. 2nd Round of Depo. Designations 10/9 (93:21 to 93:24)

1    to ask you with respect to goal number 2, "Create

2    public outrage at Planned Parenthood and liberal

3    university professors."

4        Do you see that?

5    A   I do.

6    Q   Okay.  Do you -- is this a, is this a

7    goal that Mr. Daleiden expressed to you when he

8    was discussing the project with which you worked

9    with him?

10        MR. STRAWBRIDGE:  Object to the

11    form of the question.

12        THE WITNESS:  I don't, I don't

13    recall him using this language, so I'm -- but

14    yeah, I don't recall him using this language.

15    BY MR. KAMRAS:

16    Q   Do you believe that -- did Mr. Daleiden

17    tell you that he intended to generate public

18    outrage at Planned Parenthood?

19        MR. STRAWBRIDGE:  Object to the

20    form of the question.

21        THE WITNESS:  Our conversations

22    were limited to getting media attention for

23    what he had found.  I mean it's -- yeah, I

24    think this is something you should probably

25    ask David if that's what his goals were.

1    BY MR. KAMRAS:

2       Q    I'm sure we will.

3            Did -- well, you said that his

4    conversations, your conversations with him was,

5    were about getting media attention for the

6    undercover videos.  For what purpose?  Why did he

7    want media attention?

8       A    I was --

9            MR. STRAWBRIDGE:  Object to the

10    form of the question.

11            THE WITNESS:  Sorry.

12            I was under the understanding that

13    he wanted the public to, to see what he had

14    found.

15    BY MR. KAMRAS:

16       Q    And did he tell you why?

17       A    I don't, I don't recall exactly why.  I

18    mean . . .

19       Q    Did he -- you'll see goal number 3 is to

20    "Deliver a major public relations blow to Planned

21    Parenthood."

22            Do you see that?

23       A    I do.

24       Q    Okay.  Was one of the -- did

25    Mr. Daleiden express to you that one of the

1    reasons he wanted the public to see what he had

2    found was in order to deliver a public relations

3    blow to Planned Parenthood?

4              MR. STRAWBRIDGE:  Object to the

5      form of the question.

6              THE WITNESS:  Just -- I mean I just

7      don't recall the conversations I had with him

8      with this much specificity, so . . .

9    BY MR. KAMRAS:

10     Q    Do you believe that he was engaging your

11   services in order to benefit Planned Parenthood?

12             MR. STRAWBRIDGE:  Object to the

13     form of the question.

14             THE WITNESS:  He was engaging our

15     services to get as much media attention to

16     his videos as possible.

17   BY MR. KAMRAS:

18     Q    And you had an understanding of how the

19   release of those videos would impact Planned

20   Parenthood, correct?

21             MR. STRAWBRIDGE:  Object to the

22     form of the question.

23             THE WITNESS:  As a PR professional,

24     I could understand how they would impact

25     them, I guess, yeah.

Plaintiffs' Trial Designations (98:10 to 98:11, 98:14 to 98:16)

1    BY MR. KAMRAS:

2       Q    And what was that understanding?

3       A    That they would have to try to explain

4    what was happening in the videos.

5       Q    They would have to explain to whom?

6       A    Media requests, asking them about the

7    videos.

8       Q    Anyone other than media?

9       A    I'm sure there would be, but I, I'm --

10   you know, my, my job was for media, to handle the

11   media.

12      Q    You, you also had a background, as we've

13   discussed, in politics, correct?

14      A    Correct.

15      Q    You understood that the release of

16   videos was likely to cause inquiry from Congress,

17   correct?

18           MR. STRAWBRIDGE:  Object to the

19   form of the question.

20           THE WITNESS:  It's, it's unclear to

21   me whether, before the release of the videos,

22   there were already inquiries about Congress,

23   but there probably were elected officials who

24   are stewards of taxpayers' money that would

25   have, you know, questions and concerns, and

1    also legal authorities that would have

2    questions and concerns about what they saw in

3    the videos.

4    BY MR. KAMRAS:

5    Q    And if you look at goal number 4 of this

6    document, it says "Promote state defunding efforts

7    for Planned Parenthood."

8    Did Mr. Daleiden ever articulate to you

9    prior to the release of the videos that his intent

10    in releasing the videos was to defund Planned

11    Parenthood?

12    MR. STRAWBRIDGE: Object to the

13    form of the question.

14    THE WITNESS: Again, it's -- the

15    state defunding efforts were a great media

16    hook to generate more interest in the videos,

17    so I, I mean as far as, you know, the goals

18    beyond that, I'm -- I don't, I don't recall

19    any specific discussions with David about

20    that.

21    I, I, you know, do recall him

22    saying the phrase "defund Planned

23    Parenthood," but it's unclear to me whether

24    that was a big goal or if it was in the

25    context of a media campaign.

Plaintiffs' Trial Designations (100:5 to 100:11, 100:14 to 101:18)

1    BY MR. KAMRAS:

2        Q    I want to make sure I understand.  When

3    you said that, that state defunding was a "media

4    hook" to generate more interest in the videos,

5    what did you mean by that?

6        A    We're always -- when working on

7    projects, you're always looking for "media

8    inflection points," we call them, something that

9    the media is covering that your story pertains to,

10    and there were numerous stories about

11    congressional efforts or state efforts to regulate

12    the abortion industry, and we had, you know,

13    videos that were part of that story.  We tried to

14    be part of that story.

15        Q    And that helped -- if I understand you

16    correctly, that helped generate increased media

17    attention to the videos?

18        A    I believe so, yes.

19        Q    I want to focus your attention now on

20    the sort of middle portion of the page.

21        A    Okay.

22        Q    And you'll see it starts "The

23    foundational goal."

24        Do you see where I am?

25        A    I do.

Page 104

1   know.

2   Q   Okay.  He never -- well, let me make

3   sure I understand.  He, he never, he never limited

4   his, his disagreement with abortion to those that

5   involved fetal tissue donation, correct?

6           MR. STRAWBRIDGE:  Object to the

7   form of the question.

8           THE WITNESS:  Yes, he didn't --

9   yes, he didn't put that limiting clause on

10   any discussion of being Pro-Life.

11   BY MR. KAMRAS:

12   Q   Okay.  So if you look back at the first

13   page, you'll see that there are three appendices

14   noted, 1, 2 and 3?

15   A   Correct.

16   Q   Okay, and what I want to actually now

17   show you is what we will mark as Exhibit 302.  Is

18   that right?

19           (Exhibit 302 was marked for

20           identification.)

21   BY MR. KAMRAS:

22   Q   And you'll see that this document, like

23   Exhibit 301, says "Draft Project Proposal" at the

24   top and again "confidential" and again "copyright

25   2013, David Daleiden," and you'll see that it is

Plaintiffs' Trial Designations (104:2 to 104:5, 104:8 to 104:10)

Page 110

1    it, that federal law provides that a clinic can be

2    reimbursed for certain costs associated with

3    facilitating fetal tissue donation for the purpose

4    of research?

5           MR. STRAWBRIDGE:  Object to the

6      form of the question.

7           THE WITNESS:  Prior to the videos?

8    BY MR. KAMRAS:

9      Q    Correct.

10     A    Yes, I was unaware of that.

11     Q    Okay, and so what about the videos, in

12   your opinion, made it -- helped frame and present

13   the issue in a way that benefited the Pro-Life

14   movement?

15          MR. STRAWBRIDGE:  Object to the

16     form of the question.

17          THE WITNESS:  Well, there are a

18     number of ways.

19          So first, most of the public looks

20     at an unborn child as a mass of tissue, and

21     to have medical professionals use words like

22     "heart, lungs and livers" brings home the

23     reality that it was an actual child.

24          And then secondly, having a doctor

25     on camera saying "I want a Lamborghini" shows

1      that there's quite a, quite a bit of money to

2      be had by people that do this, and I think

3      both of that -- both of those items would

4      probably cause people to rethink their

5      opinion of the, you know, of abortion.

6    BY MR. KAMRAS:

7        Q   Cause people to rethink their opinion of

8    abortion generally is what you're saying; not

9    limited to abortions that are -- that result in

10   fetal tissue donation?

11       A   Well, I think the, the first point I

12   made was abortion generally and then, secondly, as

13   it pertains to fetal tissue.

14       Q   And would your, would your view about

15   the impact of the videos change if it were the

16   case that the medical professionals that you

17   described were, in fact, not intending to profit

18   from the facilitation of fetal tissue donation?

19             MR. STRAWBRIDGE:  Object to the

20       form of the question.

21             THE WITNESS:  I'm, I'm just -- is

22       that a polling question?  I don't --

23   BY MR. KAMRAS:

24       Q   I didn't mean it as such.

25       A   I don't understand.

1      Q   You, you had, you had said that the --

2   you said that having -- as I recall, you said that

3   having a medical professional discuss a

4   Lamborghini was something that you thought would

5   cause public opinion to shift on this issue, and

6   my question is whether you would believe that

7   public opinion would not shift in the same way if,

8   in fact, the providers were, were, were not, were

9   not intending to seek a profit from facilitating

10    fetal tissue donation?

11             MR. STRAWBRIDGE:  Object to the

12      form of the question.

13             THE WITNESS:  It's, it's hard to,

14      hard to say.  I mean you're asking me to kind

15      of -- yeah, it's hard to say, hard to answer

16      that question.

17   BY MR. KAMRAS:

18      Q   All right, but you believe that the

19   comment about -- and this is -- in particular,

20   you're referring to Dr. Gatter who referred to a

21   Lamborghini.  You feel that that was a

22   particularly impactful comment on the public?

23      A   I do, yes.

24      Q   And it was impactful, because it

25   suggested that, according to the videos, that

1    planned Parenthood providers were hoping to profit

2    from facilitating fetal tissue donation?

3            MR. STRAWBRIDGE:  Object to the

4    form of the question.

5            THE WITNESS:  Yeah, I guess I

6    object to the form of the question as well.

7    It, it is suggested that, that they were

8    profiting from the sale of -- you call them

9    "fetal tissue."  I call them, you know,

10    "aborted babies."

11    BY MR. KAMRAS:

12        Q    Okay, and I understand, but the point

13    being that the reason why -- the point that I'm

14    trying to make, anyway, or ask is that the reason

15    that -- strike that.

16            The reason why the Lamborghini comment,

17    in your view, was impactful to the public is

18    because it suggested that providers, medical

19    providers at Planned Parenthood were intending and

20    seeking to profit from the sale of the aborted

21    remains; is that correct?

22            MR. STRAWBRIDGE:  Object to the

23    form of the question.

24            THE WITNESS:  I, I'm just making

25    sure I answer your question accurately.  I'm

1      sorry.  Could you just repeat it?  I

2      apologize.

3   BY MR. KAMRAS:

4      Q    Yeah, no problem.

5          The -- you had mentioned that the --

6   that Dr. Gatter's comment about a Lamborghini was

7   impactful, and I just want to confirm that the

8   reason you believe it was impactful is because it

9   suggested that Planned Parenthood providers were

10   intending to profit from the sale of fetal tissue

11   or the remains of an abortion?

12              MR. STRAWBRIDGE:  Object to the

13      form of the question.

14              THE WITNESS:  Yes, that's one of

15      the reasons why that was impactful, yes.

16   BY MR. KAMRAS:

17      Q    What were the other reasons, if any?

18      A    Well, I, I don't think people are aware

19   that, that the product of abortion was, had any

20   value.  I don't -- I mean there's a number of

21   reasons, but that is the primary one.  The --

22      Q    Go ahead.

23      A    The statement shows that there's a lot

24   of profit or indicates that there's a lot of

25   profit.  The statement indicates that there is

Defs.  2d Set of X-designations and Objs.  9/27 (114:5 to 115:5)

Page 115

1    value in, in the product of abortion, and, and

2    then the general discussion alerts people that

3    there are actually organs in, in the womb and not

4    just unviable tissue mass, as most of the public

5    has been led to believe.

6        Q    Okay.  Anything else?

7        A    I think that's it.

8        Q    Great.  Thank you.

9            MR. STRAWBRIDGE:  Is this a good

10    time for a break?

11            MR. KAMRAS:  That's fine.  Sure.

12            MR. STRAWBRIDGE:  Let's go off the

13    record.

14            THE WITNESS:  Thank you.

15            THE VIDEOGRAPHER:  The time is

16    12:06, and we are going off the record.

17            (Whereupon, the lunch recess was

18            taken.)

19            THE VIDEOGRAPHER:  The time is

20    1:02, and we are back on the record.

21    BY MR. KAMRAS:

22        Q    Good afternoon, Mr. Robbio.  Welcome

23    back.  Do you understand you're still under oath?

24        A    I do.

25        Q    Okay, great.

Page 134

1      Q   Knowing that now, does it surprise you

2   that there were threats made against these

3   doctors, given the content of the videos?

4           MR. STRAWBRIDGE:  Object to the

5   form of the question.

6           THE WITNESS:  Am I surprised?  I

7   guess yes, I am surprised there were death

8   threats.

9   BY MR. KAMRAS:

10      Q   Are you surprised that there were

11   threats, if not death threats, that were made

12   against Dr. Nucatola and other providers?

13           MR. STRAWBRIDGE:  Object to the

14   form of the question.

15           THE WITNESS:  I'm not surprised by

16   negative reaction.  I, I guess I don't -- I

17   guess I'll leave it at that.  I'm not sure

18   how to answer your question.

19   BY MR. KAMRAS:

20      Q   Did you anticipate, prior to the release

21   of the videos, that the providers who were shown

22   in the videos might be the recipient of threats?

23           MR. STRAWBRIDGE:  Object to the

24   form of the question.

25           THE WITNESS:  I was -- I really was

● Defs. 2d Set of X-designations and Objs. 9/27 (134:1 to 134:8)     ● Plaintiffs' Trial Designations (134:20 to 135:2)

1       just too busy about the roll-up campaign.  I

2       did not, you know, consider that.

3               MR. KAMRAS:  I'm going to mark as

4       next Exhibit 305.

5               (Exhibit 305 was marked for

6               identification.)

7       BY MR. KAMRAS:

8           Q    And Mr. Robbio, if you look back at

9       Exhibit 304, you'll see right under that list of

10      recipients that we walked through, there is a

11      hyperlink entitled "MessagingGuidelinesFT.pdf."

12          Do you see that?

13          A    I do see that.

14          Q    And you'll see that that email is

15      Bates-stamped, as we discussed, CM03856 through 87

16      [sic] -- and the next document --

17              THE REPORTER:  87?

18              MR. KAMRAS:  Yes.

19      BY MR. KAMRAS:

20          Q    And the next document that I provided

21      you is the next page in order.  This is Exhibit

22      305, right below you.

23          A    Right, but I, I think you misspoke.  I

24      think you said "87" when you said that to her.

25          Q    You are right.  So I'll try that again.

Page 138

1          So the, the messaging, the first point

2     is that "PP sells aborted baby parts."  Is that a,

3     a messaging, a type of messaging that you had

4     discussed with Mr. Daleiden prior to the release

5     of the first video?

6               MR. STRAWBRIDGE:  Object to the

7          form of the question.

8               THE WITNESS:  I don't, I don't

9          understand why you mean by -- what you mean

10          by "discuss."  Were the words said?  I, I

11          vaguely remember those words being used, but

12          I, I don't remember a discussion about using

13          those words.

14     BY MR. KAMRAS:

15          Q   Do you recall any discussion about, with

16     Mr. Daleiden about what the messaging for the

17     videos, the undercover videos should be?

18          A   No.

19          Q   Okay.  At any time?

20          A   There -- and I don't remember a specific

21     instance, but I have a, a general recollection to,

22     after media interviews, about discussing answers

23     to certain questions, about using your main point

24     first, condensing your, condensing your points,

25     you know, not repeating a negative, just general,

● Defs.  2d Set of X-designations and Objs.  9/27 (138:15 to 139:23)

Page 139

1    you know, talk, uh, media training guidelines.

2        Q    Okay.  Do you -- I had asked you whether

3    you recall a conversation prior to the release of

4    the video, the first of the videos with

5    Mr. Daleiden, about developing the messaging for

6    the videos.

7            Did you -- do you recall a conversation

8    with Mr. Mueller, prior to the release of the

9    first videos, regarding the messaging for the

10   undercover videos?

11       A    I don't, I don't.

12       Q    Is it your best recollection that the

13   points listed here under "Messaging," the three

14   main points, are ones that were developed by

15   Mr. Daleiden?

16           MR. STRAWBRIDGE:  Object to the

17   form of the question.

18           THE WITNESS:  I don't know who

19   developed these points.

20   BY MR. KAMRAS:

21       Q    Okay.  You have no, no recollection that

22   would help us understand that?

23       A    No.

24           MR. KAMRAS:  Okay.  I'm going to

25   mark the next document as Exhibit 306.

Page 151

1    charge were in order to reimburse for time and

2    space?

3              MR. STRAWBRIDGE:  Object to the

4        form of the question.

5              THE WITNESS:  That information was

6        not in the press release.

7    BY MR. KAMRAS:

8        Q    Okay, and do you believe that the press

9    release was misleading by having omitted that

10   information?

11       A    No.

12       Q    No?  Why is that?

13       A    I, I think -- I considered these

14   statements to be broad disclaimers to cover

15   yourself legally, so I didn't really look at these

16   as, as a, as an informed, you know, informed -- I

17   just looked at those as just broad statements to

18   cover yourself legally.

19       Q    Okay.  So now, you hadn't actually

20   viewed the video, the long video, the unedited

21   video, correct?

22       A    Correct.

23       Q    But nonetheless, you having -- having

24   not viewed the video, you discounted any

25   statements that Dr. Nucatola said that were

1    contrary to the sentiment of the press release?

2         MR. STRAWBRIDGE:  Object to the

3    form of the question.

4         THE WITNESS:  Yeah, I, I took your

5    question as now do I consider the press

6    release misleading.  I don't think the press

7    release is misleading, and at the time when

8    these discussions were happening, I really

9    looked at those, those points that were

10    brought up in the videos that were

11    highlighted by others, that they were just,

12    you know, disclaimers of people just trying

13    to cover themselves while they were doing

14    something to reap huge amounts of money.

15   BY MR. KAMRAS:

16    Q    But at that time -- so, for example, on

17   July 14, at the time of Ms. Short's email

18   exchange, at that time had you reviewed the

19   unedited video of Dr. Nucatola's lunch?

20    A    No.

21    Q    So you hadn't had the opportunity at

22   this time, on July 14, to actually review and

23   evaluate for yourself the statements that

24   Dr. Nucatola made and the context of those

25   statements?

1    A   No.

2    Q   At any time have you seen the unedited

3   video of Dr. Nucatola's lunch?

4    A   I don't think so, no.

5    Q   So you can't really say whether the

6   video that was released on July 14 accurately

7   conveyed what was said at that lunch?

8       MR. STRAWBRIDGE:   Object to the

9      form of the question.

10       THE WITNESS:   The video does not

11      accurately convey every single word that was

12      said at that lunch, yes.

13   BY MR. KAMRAS:

14    Q   Right, but you also can't say, having --

15   since you haven't seen the unedited video, as I

16   understand it, you, you can't say whether the

17   video, the edited video that was released on

18   July 14 is an accurate depiction of Dr. Nucatola's

19   actual statements and message?

20       MR. MONAGHAN:   Objection.   Vague.

21       MR. STRAWBRIDGE:   And object to the

22      form of the question.

23       THE WITNESS:   The video has

24      Dr. Nucatola saying those statements.   Those

25      statements are pretty clear and unambiguous,

Plaintiffs' Trial Designations (153:2 to 153:4)

Page 163

1    Parenthood was doing based upon the videos that

2    you had seen, correct?

3        A    Correct.

4        Q    Which were not the unedited videos,

5    correct?

6        A    That is correct.

7            MR. STRAWBRIDGE:  Before you move

8    to a new document, can we take a short break?

9            MR. KAMRAS:  Sure.

10           THE WITNESS:  We're done with that

11   one?

12           MR. KAMRAS:  Well, actually, that's

13   a good question, and the answer is we are

14   done with it.

15           THE WITNESS:  Okay.

16           THE VIDEOGRAPHER:  The time is

17   2:12.  We are going off the record.

18           (Whereupon, a short recess was

19           taken.)

20           THE VIDEOGRAPHER:  The time is

21   2:25.  We are back on the record.

22           MR. KAMRAS:  Okay, Mr. Robbio, I am

23   marking as Exhibit 309 a document that is

24   Bates-stamped CM25467 through 669.

25

Page 164

1          (Exhibit 309 was marked for

2          identification.)

3    BY MR. KAMRAS:

4      Q   And this is an email string primarily,

5    maybe exclusively among you, Mr. Mueller and

6    Mr. Daleiden, dated July 22, 2015.

7          This, this was after the release of the

8    second video, correct?

9      A   July 22, yes.

10     Q   Okay, and if you start at the beginning

11   of the exchange, which is to say the last page of

12   the document --

13     A   Mm-hmm.

14     Q   -- there's -- it's an email -- if you

15   look at the second to the last page, at the very,

16   very bottom, you'll see it's an email from you,

17   and then the, the body of the email is on the very

18   last page, and it just says "do you need a car,

19   please let me know," and then there's reference to

20   Gear Monkey Studio.

21     A   Mm-hmm.

22     Q   And then "Please let me know about the

23   car and talking points.  Thanks."

24          Do you see that?

25     A   I do.

ROBBIO, PETER

Page 165

1      Q    Okay, and this is -- this was an email

2    to Mr. Daleiden, correct?

3      A    I believe so, yes.

4      Q    And in fact, if you look on the second

5    page of this document, which is Bates stamp 25468,

6    you'll see there's the reply from David Daleiden,

7    right?

8      A    Yes.

9      Q    Okay, and he -- and in the very first

10    line of Mr. Daleiden's email, he says "Talking

11    points for Hannity."

12        Do you see that?

13      A    I do.

14      Q    Do you have an understanding of whether

15    he's referring to Sean Hannity?

16      A    Yes.

17      Q    Okay, and when he -- when Mr. Daleiden

18    says "talking points for Hannity," is it your

19    understanding that these are talking points that

20    would be provided to Mr. Hannity prior to

21    Mr. Hannity's interview of Mr. Daleiden?

22              MR. STRAWBRIDGE:  Object to the

23    form of the question.

24              THE WITNESS:  Yeah, I'm not quite

25    sure what exactly you're asking.

● Defs. 2nd Round of Depo. Designations 10/9 (165:9 to 166:14)

Page 166

1    BY MR. KAMRAS:

2        Q    Well, let's go back --

3        A    I can explain what these are.

4        Q    Okay.  You can explain what is meant by

5    "talking points"?

6        A    Well, I think you know what talking

7    points are, but I can explain what I mean by --

8    what this email is.

9        Q    Okay, sure.

10       A    So typically when you book a TV

11   interview, the producer will ask you for two or

12   three points to help the producer prepare the

13   host, and these were the, the points that we

14   provided to the producer.

15       Q    Okay.  So that's, that's what I

16   understood the email to mean, but I appreciate the

17   confirmation.  No, I mean that's why I was asking

18   you.  I was looking for information.

19       A    Okay.  The way you asked the question, I

20   thought you were saying that these are the points

21   that Sean Hannity should use, and that's not the

22   case.

23       Q    So, so the -- as you, as you are

24   explaining it to me, these are points that

25   Mr. Daleiden or -- well, strike that.  Who

Page 168

1    preinterviews, and now they are done through

2    talking points.

3        Q    Okay.

4        A    Okay.

5        Q    And let's look at the talking points.

6            The first is "Dr. Gatter is clearly

7    haggling over the price of baby parts."

8            You understand that this is a reference

9    to Dr. Gatter who is -- who was, who was depicted

10    in the second video to be released, correct?

11        A    Correct.

12        Q    Okay, and it says, "She admits that PP

13    doesn't 'have to do anything,' yet still gets

14    paid, doesn't want to 'lowball,' starts out at $75

15    per specimen, and by the end of the conversation

16    is suggesting that $100 per specimen is not enough

17    and we may have to 'bump it up.'  She understands

18    that payment per specimen is only for high quality

19    'tissue that you actually take, not just tissue

20    that someone volunteers and you can't find

21    anything,'" and it concludes, "This is flat out

22    profiteering on fetal tissue with no relation

23    whatsoever to actual costs."

24            Do you see that?

25        A    I do.

• Defs. 2d Set of X-designations and Objs. 9/27 (168:5 to 169:12)

1　　　Q　Okay, and then in the second talking

2　point, it says, "Last week, PP admitted three key

3　things:  One, they harvest fetal organs; Two, they

4　receive payment in connection with this; and

5　Three, they support this all at the national

6　level.  Their only denial is that they receive any

7　'financial benefit' or 'profit,' and we are

8　starting to see that this is a lie, because the

9　so-called 'reimbursement' they take in far exceeds

10　any real or imagined costs of harvesting."

11　　　Do you see that?

12　　　A　I do.

13　　　Q　Okay, and these are, these are based

14　upon -- these talking points are based upon the

15　videos that had been released to date as well as

16　apparently some admissions that are claimed to

17　have been made by Planned Parenthood, correct?

18　　　　　MR. STRAWBRIDGE:  Object to the

19　form of the question.

20　　　　　THE WITNESS:  David wrote these.

21　I'm, I'm not sure what he based this on.

22　BY MR. KAMRAS:

23　　　Q　Okay, and you understand that what these

24　talking points were intended to convey is that

25　Planned Parenthood was allegedly engaged in an

1    effort supported at the national level to

2    profiteer from the harvest and sale of fetal

3    tissue, right?

4         MR. STRAWBRIDGE:  Object to the

5    form of the question.

6         THE WITNESS:  These talking points

7    were written to convey what, what they say,

8    and I guess, three, "they support this all at

9    the national level."

10   BY MR. KAMRAS:

11       Q    Right.  So it was supported at the

12   national level, right?

13       A    That's what it says, yes.

14       Q    And, and what was supported was an

15   effort at the national level to engage in a, the

16   process of "profiteering" is the word used with

17   respect to the sale of fetal tissue, correct?

18       A    The way I read this talking point is

19   that "Planned Parenthood admitted three items:  1,

20   that they harvest fetal organs; 2, that they

21   receive payment in connection with this; and 3,

22   that this is supported at the national level."

23   That's, that's how I read that talking point.

24       Q    Right, and the, and first talking

25   point refers to, in the last sentence, "this is

1    they were written by Mr. Daleiden, but did you

2    review them before they were conveyed to

3    Mr. Hannity or his producer?  Excuse me.

4        A    I might have, but I don't recall

5    exactly.

6        Q    Okay, and, and you're obviously a media

7    relations -- you have a lot of experience in media

8    relations, correct?

9        A    Correct.

10       Q    Okay, and so you presumably have some

11   sense of, you know, how the media is going to

12    digest talking points, correct?

13       A    Correct.

14            MR. STRAWBRIDGE:  Object to the

15        form of the question.

16            THE WITNESS:  Sorry.  Yes.

17   BY MR. KAMRAS:

18       Q    You have, you have some understanding of

19   how talking points are going to be understood by

20   the media?

21            MR. STRAWBRIDGE:  Object to the

22        form of the question.

23            THE WITNESS:  I, I do have some

24        experience with that, yes.

25

1    BY MR. KAMRAS:

2        Q    Okay, and when you look at these talking

3    points, you understand that what they convey is

4    that Planned Parenthood is engaged in an effort at

5    the national level to profit from the sale of

6    fetal tissue?

7                MR. STRAWBRIDGE:  Object to the

8        form of the question.

9                THE WITNESS:  I, I still dispute

10        your declaration that this says that.  I mean

11        it clearly states that there are three things

12        admitted, and the three things are -- you

13        know, referred to those three things.  I

14        don't, I don't see how this second talking

15        point refers back to the last line of the

16        first talking point.

17                Secondly, there's clearly a

18        misunderstanding of how the media consumes

19        these talking points.  These were, these were

20        provided so the show can understand what

21        David plans to say.

22                Oftentimes -- I don't remember if

23        this happened in this instance -- the media

24        will take all these points and do the

25        opposition research to ask hard questions and

Page 174

1    follow-up questions to dispute these claims.

2    So it's, you know, I, I just -- you know, a

3    lot of what you're saying is just incorrect.

4    BY MR. KAMRAS:

5        Q    Okay.  Do you, do you have any

6    recollection of whether Mr. Hannity disputed any

7    of these talking points?

8        A    I, I don't recall.  I don't recall.

9        Q    And isn't it, in fact, the case that you

10    knew, at the time this interview was happening,

11    that Mr. Hannity was a friendly audience for

12    Mr. Daleiden?

13            MR. STRAWBRIDGE:  Object to the

14        form of the question.

15            THE WITNESS:  I would say "fair"

16        more than "friendly."

17    BY MR. KAMRAS:

18        Q    Mr. Hannity -- Mr. Hannity is an

19    advocate of the Pro-Life movement, correct?

20            MR. STRAWBRIDGE:  Object to the

21        form of the question.

22            THE WITNESS:  I don't, I don't know

23        that.

24    BY MR. KAMRAS:

25        Q    Okay.  What's, what's your -- having

Page 180

1              (Witness peruses document.)

2              THE WITNESS:  Okay.

3    BY MR. KAMRAS:

4        Q    And having read it -- so first -- well,

5    I'll strike that.

6              Looking at the last sentence, "They,"

7    which is in reference to Planned Parenthood and

8    their political allies, "They will attack me and

9    my organization all day long, but that does not

10    change the fact about what our investigation has

11    uncovered and what the American people now know,

12    that Planned Parenthood is engaged in an

13    enterprise-wide operation that traffics and sells

14    baby body parts."

15              Do you see that?

16        A    I do.

17        Q    And do you agree that this is what the

18    investigation had uncovered?

19              MR. STRAWBRIDGE:  Object to the

20    form of the question.

21              THE WITNESS:  You're asking me my

22    personal opinion about what the investigation

23    uncovered?

24    BY MR. KAMRAS:

25        Q    Yes.  I'm asking whether you agree with

Defs. 2d Set of X-designations and Objs. 9/27 (180:4 to 181:23)

Page 181

1    this statement that what the investigation had

2    uncovered was that --

3        A    Yeah.

4        Q    -- Planned Parenthood had "engaged in an

5    enterprise-wide operation that traffics and sells

6    baby body parts."

7        A    Yeah, I think I, I think I would agree

8    with that.

9        Q    Okay, and, and this is, this is what the

10   tapes, the undercover videos and the tapes

11   released to the public were intended to convey; is

12   that your understanding?

13            MR. STRAWBRIDGE:  Object to the

14       form of the question.

15            THE WITNESS:  I think that the

16       tapes were intended to convey what David

17       found in his investigation.

18   BY MR. KAMRAS:

19       Q    And what he found in his investigation

20   is what this message sets forth; is that correct?

21            MR. STRAWBRIDGE:  Object to the

22       form of the question.

23            THE WITNESS:  Yeah, I agree.  Yes.

24   BY MR. KAMRAS:

25       Q    Okay, and that's what he intended to

Page 182

1    convey in these videos that were released to

2    public?

3              MR. STRAWBRIDGE:  Object to the

4        form.

5              THE WITNESS:  I'm not going to

6        follow you to that last bridge, no.  I don't

7        know what he intended to convey.

8    BY MR. KAMRAS:

9        Q    Okay.  Do you, do you believe that's

10   what -- but you believe that's what the released

11   videos to the public conveyed?

12             MR. STRAWBRIDGE:  Object to the

13       form.

14             THE WITNESS:  In the videos I saw

15       people asking to exchange money for baby body

16       parts, so that proves the second half of the

17       sentence, and in the response, there were

18       statements from executives of Planned

19       Parenthood responding, so that leads me to

20       believe that it was enterprise-wide.

21             So yes, I, I think that the whole

22       story together conveys that.

23   BY MR. KAMRAS:

24       Q    Conveys the, the statement that is set

25   forth in this last sentence of the, of the media

● Defs. 2d Set of X-designations and Objs. 9/27 (182:9 to 183:4)

Page 183

1   response?

2        A   In my, in my opinion, yes.  It seemed

3   like there was an enterprise-wide operation that

4   exchanged baby body parts for money.

5        Q    And when, when you were helping

6   facilitate this media campaign, this is the

7   message that you were intending to convey to the

8   media?

9             MR. STRAWBRIDGE:  Object to the

10       form of the question.

11            MR. MONAGHAN:  Join in the

12       objection.

13            THE WITNESS:  "The message that you

14       were intending to convey to the media."  I

15       don't -- could you just restate the question

16       so I can understand it better?

17   BY MR. KAMRAS:

18       Q    Yeah, just that you were part of the

19   media campaign, correct, that was involved in

20   releasing Mr. Daleiden's, the edited versions of

21   Mr. Daleiden's undercover videos, right?

22       A   Yes.

23            MR. STRAWBRIDGE:  Object to the

24       form of the question.

25            THE WITNESS:  Sorry.  Yes.

Page 218

1          MR. KAMRAS:  Yes.

2          (Witness peruses document.)

3          MR. STRAWBRIDGE:  Are you done

4     reviewing the document?

5          THE WITNESS:  I am.

6          MR. STRAWBRIDGE:  Do you need a

7     question read back to you?

8          THE WITNESS:  You asked me if I

9     recalled focus groups?

10    BY MR. KAMRAS:

11         Q    That's exactly what I asked you, yes.

12         A    Yes.

13         Q    Okay.  When do you recall focus groups

14    occurring?

15         A    I don't know when they exactly occurred.

16         Q    This email is dated August of 2015.  Do

17    you believe it occurred -- they occurred after

18    this email?

19         MR. STRAWBRIDGE:  Object to the

20    form of the question.

21         THE WITNESS:  I don't know.  The

22    email seems to suggest that, but I don't

23    know.

24    BY MR. KAMRAS:

25         Q    Okay.  Is it your belief that they

Page 219

1　occurred in 2015?

2　　A　Yes.

3　　Q　Okay, and do you -- are you able -- did

4　it occur -- did they occur before or after

5　Thanksgiving, for example?

6　　A　I really don't have a recollection, so I

7　guess I'll just leave it at that.

8　　Q　Okay.  Did, did Kellyanne Conway's

9　company conduct the focus groups?

10　　A　Yes, they did.

11　　　Can I rephrase that answer?

12　　Q　Sure.

13　　A　Yeah, that's, that's my understanding.

14　So I wasn't part of the planning.  That's my

15　understanding, that she -- but I don't have any

16　direct knowledge that they, they did the focus

17　groups.

18　　Q　Okay.  Do you know how many focus groups

19　there were?

20　　A　I do not.

21　　Q　Do you know -- can you give me any

22　estimate of the number?

23　　A　I don't.

24　　Q　Did they occur -- to your knowledge, did

25　they occur all at once in a sort of concentrated

1   the results of the focus groups?  I, I guess

2   because you asked for a document, it's not really

3   apparent that I received the information in a

4   document.  I, I don't have a recollection of

5   receiving -- it might have been just a line in an

6   email or a couple of paragraphs in an email, you

7   know, people sharing with me information.

8     Q   Okay.

9     A   I don't recall any formal document or

10   report that was shared with me.

11     Q   Okay, so, but you recall in some written

12   form reading something about the results of these

13   one or more focus groups?

14     A   I do.

15     Q   Okay, and do you recall what those

16   results were?

17     A   I, I don't recall the exact numbers,

18   but -- do you want me to broadly --

19     Q   I'd like to know anything you can

20   remember about the results.

21       MR. STRAWBRIDGE:  Object to the

22    form of the question.

23       MR. MONAGHAN:  Objection.  Form.

24       THE WITNESS:  That -- I'm sorry.

25       MR. MONAGHAN:  I was just going to

1    ask the court reporter if she got that,

2    because the focus was gone.

3         THE WITNESS:  That people who --

4    after being informed of the video, people had

5    a negative view of Planned Parenthood.

6    BY MR. KAMRAS:

7         Q    When you say "the video," do you know

8    what video was shown to the focus groups?

9         A    I'm sorry.  I actually misspoke.  I, I

10   don't even know if they were shown.  They may have

11   been described the video, but after they learned

12   about the video, their opinions on Planned

13   Parenthood were negative.

14        Q    Okay, and, and you still don't know --

15   well, I'll ask the question:  Do you know what

16   video they were either shown or that was described

17   to them?

18        A    No.  I have no idea.

19        Q    Do you recall anything more about the

20   focus groups' reaction to the video other than

21   that they had a negative view of Planned

22   Parenthood?

23        A    I recall there were maybe some quotes

24   included in my summary, but I don't recall the

25   quotes.

1       IN THE UNITED STATES DISTRICT COURT

2       FOR THE NORTHERN DISTRICT OF CALIFORNIA

3  - - - - - - - - - - - - - -+

             |

4   PLANNED PARENTHOOD     |

 FEDERATION OF AMERICA,   |

5    INC., et al,      |

             |

6      Plaintiffs,   |  Case Number:

             |

7   vs.        |  3:16-cv-00236

             |

8   THE CENTER FOR MEDICAL   |

 PROGRESS, et al,     |

9               |

    Defendants.   |

10              |

 - - - - - - - - - - - - - -+

11

12

13      CONFIDENTIAL - ATTORNEYS' EYES ONLY

14     Videotaped Deposition of

15      GREGORY MUELLER

16      Arlington, Virginia

17      Friday, April 12, 2019

18        9:36 a.m.

19

20

21

22

23   Job No. 158910

24   Reported by: Laurie Donovan, RPR, CRR, CLR

25

1　　American Center for Law & Justice, on behalf

2　　of defendant Troy Newman.

3　　　　　THE VIDEOGRAPHER:  All right.  Will

4　　the court reporter please swear in the

5　　witness.

6　　　　　　　* * * * *

7　　　　　GREGORY MUELLER,

8　　 having been first duly sworn, testified

9　　upon his oath as follows:

10　　　EXAMINATION BY COUNSEL FOR PLAINTIFFS

11　　BY MR. KAMRAS:

12　　Q　Good morning, Mr. Mueller.

13　　A　Good morning.

14　　Q　How are you?

15　　A　Good, sir.

16　　Q　Good.  Have you been deposed before?

17　　A　No.

18　　Q　Okay.  So let me give you just a few

19　　ground rules I'm sure you've or at least likely

20　　discussed with your counsel, but just so we're all

21　　on the same page, you understand that the oath you

22　　just took is the same oath that you would take if

23　　you were in a court?

24　　A　Yes, sir.

25　　Q　Okay.  So it has the same force and

Plaintiffs' Trial Designations (8:12 to 8:13)

1      Q    What search terms?

2      A    I used "David Daleiden," "Center for

3    Medical Progress," "focus groups."  If I recall,

4    maybe even "The Polling Company."

5      Q    Do you know one way or the other

6    whether, in fact, you used "The Polling Company"?

7      A    I don't recall.

8      Q    Okay, and do you know what search terms

9    Mr. Thompson used to conduct the search?

10      A    I do not.

11      Q    Okay.  So at some point -- I want to

12    talk a little bit about CRC and make sure I

13    understand sort of what CRC is.

14        So we've talked about how CRC at least

15    includes CRC Public Relations, right?  And at some

16    point I think in 2017, CRC acquired The Polling

17    Company; is that correct?

18      A    Yes.  It would have been last year,

19    actually.

20      Q    So it was in 2018?

21      A    Yeah, I'm pretty sure it was last year.

22      Q    Okay, and actually, before I continue,

23    did -- in conducting any of the, your search

24    terms -- excuse me.  In conducting the searches on

25    your own computer, did you use any version of

Plaintiffs' Trial Designations (15:14 to 15:21)

1    "Kellyanne" or "Kellyanne Conway" or "Conway" as a

2    search term?

3        A   I don't recall doing that.

4        Q   And you understand that Ms. Conway ran

5    The Polling Company prior to CRC's acquisition of

6    it, correct?

7        A   Well, what do you mean by "ran"?

8        Q   She was -- well, actually, I don't know.

9    What is your understanding of Ms. Conway's

10   relationship to The Polling Company prior to your

11   acquisition?

12       A   She was the head of it, I think the

13   owner of it.

14       Q   Okay.

15           MR. STRAWBRIDGE:  I know I'm late

16       here, but let me just -- I'll object to the

17       form of the question.

18   BY MR. KAMRAS:

19       Q   Okay.  So CRC acquired The Polling

20   Company, you think, in 2018, correct?

21       A   I think I recall that was the year,

22   yeah.

23       Q   Okay, and does The Polling Company -- is

24   The Polling Company -- how is The Polling Company

25   at this point today affiliated with CRC?

Plaintiffs' Trial Designations (16:8 to 16:13)

1      A    Well, CRC is an owner of The Polling

2    Company, but it's its own Sub S corporation.

3      Q    And who -- does it have its own board?

4      A    I think so.  I'm not 100 percent sure.

5    I wouldn't want to guess.  I'm not 100 percent

6    sure.  I don't know.

7      Q    Okay, so you're not sure if there's a

8    board?

9      A    I'm not sure there is a board, and I

10    don't recall that there is a board.  I'm assuming

11    there is, but I would be guessing.  I'm not aware

12    of who's on it.

13      Q    Okay, and who is the CEO of The Polling

14    Company?

15      A    I think -- would that also cover as

16    president?  He's either president or CEO.  I don't

17    recall what his official title is, but that would

18    be Brett Lloyd.

19      Q    Okay, and do you ever communicate with

20    Mr. Lloyd?

21      A    You mean just in conversation, or --

22      Q    In the course of doing your, your work.

23      A    Sure.

24      Q    Okay, and your -- remind me.  Your title

25    is what at CRC?

1       A    I'm president.

2       Q    You're the president and founder,

3    correct, of CRC?

4       A    Well, that's kind of loosely defined.  I

5    was there at the very beginning.

6       Q    Okay.  So you're, you're president

7    today, and it was founded -- CRC was founded when?

8       A    Officially 1989.  It was forming before

9    that, but officially 1989.

10      Q    And have you been president since 1989?

11      A    Actually, no.

12      Q    When did you become president?

13      A    That's a great question.  I actually

14   don't know if I recall when I became president.  I

15   was vice president for a while first, and I don't

16   recall the exact date.  I would be guessing.

17      Q    Did you become president -- are you able

18   to say whether it was before or after 2010?

19      A    It would have been before 2010.

20      Q    Before 2010?

21      A    Yes, sir.

22      Q    Do you know if it was before or after

23   2000?

24      A    I think it was, I think it was -- I'm

25   pretty sure it was before 2000.

1     Q   Okay.  Do you know if it was before or

2   after 1995?

3     A   That's -- I, I'm not, I'm not -- I don't

4   recall when we officially made me president or

5   when they officially made me president.

6     Q   Okay.  So you're currently president of

7   CRC, and it sounds like you have been for at least

8   19 years, maybe more.

9     A   I think that's pretty accurate.

10     Q   Okay, and in the course of your position

11   as president of CRC, do you have -- and for your

12   work, do you have conversations with Mr. Lloyd

13   concerning The Polling Company?

14          MR. STRAWBRIDGE:  Object to the

15     form of the question.

16          THE WITNESS:  Yes, I have

17     conversations with Mr. Lloyd.

18   BY MR. KAMRAS:

19     Q   Okay.  Do you, do you and he consult

20   about the work that The Polling Company is doing?

21     A   You mean specifically?

22     Q   I mean in any, in any way.

23     A   Yeah, yeah, we, we converse some about

24   what he's doing, what he's up to.  It's a separate

25   enterprise, so not all that often.

1      is, is any communication with Mr. Daleiden

2      that reflects litigation strategy or work

3      done in -- work prepared by his attorneys in

4      anticipation of litigation.  That's the

5      instruction.

6               THE WITNESS:  Our main job would,

7      would be to provide litigation communication

8      support.

9    BY MR. KAMRAS:

10       Q    Okay.  So is there any information that

11   Mr. Daleiden communicated to you which you believe

12   falls within the scope of the instruction that

13   your attorney provided?

14       A    I mean I, I would say there, there would

15   be some information in there that would be part of

16   his litigation strategy.

17       Q    Okay.  Is -- are you or CRC presently

18   engaged by Mr. Daleiden?

19       A    We, we are, we are assisting him in

20   litigation support, if that's what you're asking,

21   in terms of communications and media.

22       Q    Is there a formal engagement that -- so

23   strike that.

24       A    Right.

25       Q    By "we," you mean CRC --

1    Q   Has CRC been regularly invoicing

2  Mr. Daleiden or CMP since 2015?

3    A   I don't know.  I don't recall.  Again, I

4  don't send out the invoices and do all of the

5  accounting work, so I don't -- I'm not -- I don't,

6  I don't recall when we would be invoicing him last

7  before the one I just mentioned.

8    Q   Have, have you or CRC been doing work

9  for Mr. Daleiden or CMP on a regular basis since

10  2015?

11    A   How would you describe "regular"?

12    Q   Have you been doing work on let's just

13  say at least a quarterly basis for Mr. Daleiden or

14  CMP since 2015?

15         MR. STRAWBRIDGE:  Object to the

16    form of the question.

17         THE WITNESS:  I would say

18    quarterly.  It's, it's more of a hit-or,

19    hit-or-miss relationship.  When there are

20    inflection points, we try to help them out

21    with either communication support of some

22    kind.

23  BY MR. KAMRAS:

24    Q   What, what do you mean by "inflection

25  points"?

1      A    I would say with the, with the various

2    litigation, there is -- again, we, we're a PR

3    firm, so we do litigation communications work on

4    occasion, and he falls into that category on

5    occasion due to some of these lawsuits.

6      Q    Can you recall any of the particular

7    inflection points where you were asked by

8    Mr. Daleiden or CMP to provide some sort of

9    litigation PR work?

10           MR. STRAWBRIDGE:  I'll just object

11        to the extent the question calls for, and

12        give the same limiting instruction, that you

13        can answer that question to the extent it

14        doesn't require you to reveal information

15        about Mr. Daleiden's litigation strategy or

16        work prepared by his attorneys in

17        anticipation of litigation.

18    BY MR. KAMRAS:

19      Q    And are you following your counsel's

20    instruction?

21      A    Yes, sir.

22      Q    And I take it that that has been the

23    case throughout the morning, that when he has

24    instructed you, you've been following his

25    instruction?

1    not aware of who, other than CMP, for the invoices

2    in January 2019 or January/February of 2019,

3    whenever, whenever we invoiced them.

4        Q    Yeah, so let me make sure I'm --

5        A    Yeah.

6        Q    -- I'm being more broad --

7        A    Sure.

8        Q    -- which is I wanted to know:  In the

9    period of time that you, that CRC has been

10   providing services to Mr. Daleiden and CMP,

11   spanning to 2015 --

12       A    Okay.

13       Q    -- do you know whether your services,

14   CRC's services, have been paid for by a third

15   party?

16       A    Am I aware of that?

17       Q    Yes.

18       A    Yes.

19       Q    Okay, and do you know who or what third

20   parties?

21       A    If I recall, Students For Life.

22       Q    Is, is that Billy Valentine?  Is he

23   still affiliated with Students For Life?

24       A    I'm not aware of that.

25       Q    Who is the, who is the contact, if you

Plaintiffs' Trial Designations (42:8 to 42:21)

1    versions of those tapes publicly?  Are you aware

2    of that?

3                MR. STRAWBRIDGE:  Object to the

4       form of the question.

5                THE WITNESS:  I'm aware that he had

6       videotapes that he was looking to release to

7       the public.  I'm aware of that, yes.

8    BY MR. KAMRAS:

9       Q   Okay, and CRC was involved in the

10    process by which those tapes were released and,

11    and the media campaign associated with the release

12    of those tapes?

13       A   Yeah, our job was to basically help get

14    publicity for them.

15                MR. STRAWBRIDGE:  Let me just

16       advise the witness.

17                Give me a chance to get an

18       objection in before you answer --

19                THE WITNESS:  Sorry.

20                MR. STRAWBRIDGE:  -- Mr. Kamras'

21       question.

22                THE WITNESS:  Correct.

23    BY MR. KAMRAS:

24       Q   And so I wanted to understand whether

25    you had, you had any understanding whether

Plaintiffs' Trial Designations (48:9 to 48:14)

Page 60

1    And when was that?

2        A    Oh, let's see.  That would have been in

3    1985.

4        Q    And so what did you do between

5    graduating from college and 1989?

6        A    Oh, boy.  I came to Washington, and I

7    worked in the mail office of the United States

8    Senate, pitching mail at 4:30 in the morning.  I

9    did some fundraising work for different potential

10   candidates, some -- mostly volunteer work for

11   those first three months after I graduated, and

12   then, then after that, I think I was a file clerk

13   in a law firm.

14       Q    I'm sorry.

15       A    They talked me out of going to law

16   school.

17           And then after that, I think I joined

18   another -- I think I joined a think tank, and then

19   I went to another PR firm before we founded or CRC

20   was founded.

21           I think that covers it, to my best

22   recollection.

23       Q    What think tank?

24       A    It was, it was called the National

25   Conservative Foundation back then.

Plaintiffs' Trial Designations (60:4 to 60:13, 60:14 to 60:25)

1          THE REPORTER:  The National --

2          THE WITNESS:  -- Conservative

3   Foundation.

4  BY MR. KAMRAS:

5    Q   Has it changed names?

6    A   Well, I mean I don't know if it -- it

7  doesn't -- I don't think -- I don't, I don't know

8  this, so I would be guessing, but I don't know if

9  that any longer exists.  What it matured into was,

10   was today what's called the Media Research Center.

11   It was a media watchdog group.

12    Q  It's a media watchdog group that watches

13  for liberal bias; is that correct?

14          MR. STRAWBRIDGE:  Object to the

15   form of the question.

16          THE WITNESS:  Well, it does a lot

17   of things.  One of the things it does is

18   documents liberal media bias, and it does

19   analysis, studies.

20  BY MR. KAMRAS:

21    Q   Would it consider itself part of the

22  mainstream media?

23          MR. STRAWBRIDGE:  Object to the

24   form of the question.

25          THE WITNESS:  Would they?  You'd

Page 65

1    settled, and I don't recall how that -- right now

2    I don't remember how that work was done.  It was

3    like, I think for like a month, running surrogates

4    and putting people on radio shows and things like

5    that, so I, I don't, I don't recall how that

6    structure worked, whether that was directly with

7    the Dole campaign or, or another enterprise.

8         Q    Okay, and, and what about the Buchanan

9    campaigns?  The same question:  Was CRC retained,

10    or were you separately retained as part of that

11    campaign?

12         A    That would have been CRC was retained.

13         Q    Okay.  So in, in 2015, you were, as

14    we've established, you were president of CRC.

15    What was -- what were your responsibilities as

16    president?

17         A    Well, generally to play the role of the

18    strategist and consultant for our clients, engage

19    in media outreach, media relationships, if you

20    will, do some, some writing, and then I oversee

21    some of the higher level staff, but I oversee

22    staff.

23             I think that probably hits most of the

24    highlights.

25         Q    Okay.  Is there -- do you -- what is the

Plaintiffs' Trial Designations (65:13 to 65:24)

Page 66

1　distinction between "strategist" and "consultant"?

2　　A　I don't know if there really is one.

3　Basically we're just helping planning publicity

4　efforts, messaging, things like that.

5　　Q　And what does it mean to help plan

6　publicity efforts?

7　　　　MR. STRAWBRIDGE:  Object to the

8　form of the question.

9　　　　THE WITNESS:  It's usually general

10　press materials in terms of, you know, how do

11　you roll something out to get news attention.

12　How do you -- press releases or statements

13　that are going to be published, to get that

14　information out to the public through the

15　press.

16　BY MR. KAMRAS:

17　　Q　Does that include coordinating

18　interviews with TV, with TV personalities?

19　　A　Yes.

20　　Q　Same as to radio personalities?

21　　A　Correct.

22　　Q　Does that, does that include

23　coordinating with written media to try to get

24　stories placed?

25　　A　You mean reporters or editors or

Page 72

1    BY MR. KAMRAS:

2        Q    Welcome back, Mr. Mueller.

3        A    Thank you.

4        Q    You understand that you're still under

5    oath?

6        A    Yes.

7        Q    Okay.  How did you first become aware of

8    Mr. Daleiden?

9        A    I think I first met David when he was

10    working for Live Action.  I don't fully recall,

11    but I think that's when I first -- actually, I

12    don't even know if I physically met him.  He was

13    on conference calls.

14        Q    And what is Live Action?

15        A    It's a pro-life group, best I could

16    describe it.

17        Q    And it also had videotaped certain

18    abortion providers and released those tapes to the

19    media, correct?

20        A    I don't recall if they videotaped.

21    They, they may have, but they, they, they did work

22    that was somewhat similar.

23        Q    Somewhat similar to what Mr. Daleiden

24    and CMP later did in 2015?

25        A    I would say somewhat similar.

Plaintiffs' Trial Designations (72:7 to 72:16)

1      Q    Okay, and in what capacity was it that

2    you were on calls with Mr. Daleiden when he was at

3    Live Action?  What was your role?

4      A    If I recall, my role was to discuss

5    publicity efforts around that organization.

6      Q    Was CRC engaged by Live Action?

7      A    Yes.

8      Q    And do you recall what those publicity

9    efforts were?

10           MR. STRAWBRIDGE:  Let me just, let

11        me just caution the witness and, and just

12        state for the record that our understanding

13        of the issues in the case and the applicable

14        legal standards for overcoming First

15        Amendment privilege are such that we are, we

16        are in good faith producing a witness, and we

17        are going to allow inquiry into areas that

18        relate to Planned Parenthood and to

19        Mr. Daleiden and the activities of CMP, but I

20        think the witness has a First Amendment right

21        and a privilege not to disclose information

22        regarding activities they may have done for

23        other clients that are unrelated to Planned

24        Parenthood and are not otherwise public.

25           That is a limited instruction.  It

Plaintiffs' Trial Designations (73:6 to 73:7)

1     Q    Okay, and do you recall when you last

2   had dealings with Mr. Daleiden while he was at

3   Live Action?

4     A    No, I don't recall when he was last

5   there.

6     Q    Okay. Did you continue to have any

7   communication or conversations, interactions with

8   Mr. Daleiden after he left Live Action?

9     A    Can you restate the question?

10   Because --

11     Q    Sure. In between -- how about this?

12   Let me try this. When was the first time that you

13   and Mr. Daleiden spoke about the Center for

14   Medical Progress?

15     A    So he called me -- I forget the timing

16   of it now, but obviously it was before these,

17   before the publicity effort started, but he called

18   me -- I don't know the year and the time frame. I

19   can't, I can't recollect the year or the time

20   frame, but he, but he reached out to me by phone,

21   seeking interest in engaging our services.

22     Q    Sorry. Seeking interest --

23     A    He was seeking our services. He was

24   interested in, in seeking our services.

25     Q    Okay. So the, the undercover videos

1    that Mr. Daleiden filmed were released in July of

2    2015.

3          Do you recall that?

4      A    I don't recall the exact date, but I

5    think that in that time frame is correct.

6      Q    So with that -- and we'll date it with

7    more specificity later, but with that frame in

8    mind, can you tell me whether this call that you

9    were describing when Mr. Daleiden reached out to

10   you to solicit CRC's services, did that occur in

11   2015 or was it even before 2015?

12     A    I'm not 100 percent sure, but I'm fairly

13   confident that he called us within the same year,

14   calendar year as he was planning to release the

15   videos.  In other words, I don't think we -- I

16   don't think -- I think when he reached out to us,

17   it was in, it was in a -- I think it was in a --

18   I'm not fully confident about this, so I don't

19   recall specifically, but I think it was -- there

20   wasn't a lot of time between the time he called us

21   and the time he was releasing these videos.

22     Q    Okay.  So now working backwards, so

23   prior to that first call with respect to

24   Mr. Daleiden seeking CRC's services in connection

25   with the release of videos in 2015, prior to that

1    what you took "undercover" to mean.  I, I think --

2        A    "Undercover" to me means like when a

3    news, when a news outlet does an investigative

4    story, and essentially my understanding was he had

5    done an investigative story, and he was about to

6    publish the videos and the findings in those, in

7    those videos, and that he had, he had gone

8    undercover to do that.

9        Q    Do you, do you believe that the Planned

10    Parenthood providers were aware that he was

11    filming them in the course of him taking these

12    undercover videos?

13            MR. STRAWBRIDGE:  Object to the

14        form of the question.

15            THE WITNESS:  I don't have any idea

16        what the Planned Parenthood folks would have

17        thought or whoever he was, whoever he was

18        interviewing at the time.  I don't know what

19        they were thinking.

20    BY MR. KAMRAS:

21        Q    Okay.  I understand that you don't know

22    what they were thinking.  I'm asking what you took

23    from his use of the phrase "undercover video," so

24    I'll just ask you again.

25            When you had that first call and he

1    described these videos as "undercover" videos, was

2    it your impression that the Planned Parenthood

3    providers were aware of the fact that they were

4    being filmed?

5              MR. STRAWBRIDGE:  Object to the

6       form of the question.

7              MR. MONAGHAN:  Objection.

8              THE WITNESS:  I mean I, I was

9    assuming, which is an assumption, that when

10       somebody says they're going undercover, that

11       the person that they're interviewing is not

12       aware that they are being interviewed.

13    BY MR. KAMRAS:

14       Q    Okay.  That's what I would assume as

15    well.

16              Did Mr. Daleiden -- did Mr. Daleiden, on

17    that call or any other prior to the release of the

18    videos, describe -- well, strike that.

19              Did you, either then or later, come to

20    understand that Mr. Daleiden and his -- and others

21    at the Center for Medical Progress filmed these

22    undercover videos at -- including at Planned

23    Parenthood conferences?

24              MR. STRAWBRIDGE:  Object to the

25       form of the question.

Plaintiffs' Trial Designations (90:8 to 90:12)

1　　　　　　THE WITNESS:  Can you repeat the

2　　question?

3　BY MR. KAMRAS:

4　　Q　Sure.  Did you -- at some point did you

5　come to the understanding that Mr. Daleiden filmed

6　these videos at Planned Parenthood conferences?

7　　A　I mean -- you mean at some point during

8　our work for him?

9　　Q　Yes.

10　　　　　　MR. STRAWBRIDGE:  Same objection.

11　　　　　　THE WITNESS:  I think at some -- I

12　　mean obviously during our work, we knew

13　　that -- mostly what I knew was that he had,

14　　he had gotten them, uh, he had gotten the

15　　videos.  I didn't know all the specifics of,

16　　of how or where he got them, but I was aware

17　　they were at conferences.  I don't know if

18　　they were Planned Parenthood conferences, but

19　　they were conferences that involved folks

20　　from the abortion industry.

21　BY MR. KAMRAS:

22　　Q　Okay, so -- and were you aware -- either

23　on that first call or at any later point, did

24　Mr. Daleiden describe to you how he was able to

25　get access to these conferences?

● Defs. 2nd Round of Depo. Designations 10/9 (91:21 to 91:25)

1              MR. STRAWBRIDGE:  Object to the

2       form of the question.

3              THE WITNESS:  I don't recall any

4       discussion about how he went about it.  Most

5       of our discussions were about how we would

6       get publicity once he published the videos.

7       BY MR. KAMRAS:

8          Q    Again, on that first phone call or at

9       any other time, did Mr. Daleiden discuss with you

10      having signed confidentiality agreements in order

11      to access the conferences?

12             MR. STRAWBRIDGE:  Object to the

13      form of the question.

14             THE WITNESS:  I don't recall a

15      conversation I had with him that he informed

16      me of anything like that.  I just don't

17      recall that.

18      BY MR. KAMRAS:

19         Q    Did -- again, on that first phone call

20      or at any other time, did Mr. Daleiden discuss

21      with you having procured a false driver's license

22      in order to gain access to either conferences or

23      Planned Parenthood facilities?

24             MR. STRAWBRIDGE:  Object to the

25      form of the question.

● Defs. 2nd Round of Depo. Designations 10/9 (92:3 to 92:6, 92:19 to 92:23)

1            THE WITNESS:  I don't recall him --

2     I don't recall him ever informing me of that.

3     Most of our conversations were about media,

4     strategy to get publicity for the videos.

5     BY MR. KAMRAS:

6        Q    I understand.  I get that that was the

7     focus of your conversation.  I just want to make

8     sure I understand the full scope.

9            Did -- are you aware, whether from

10    Mr. Daleiden or otherwise, that he obtained a

11    false identification in the course of doing his

12    work with the Center for Medical Progress?

13            MR. STRAWBRIDGE:  You're asking if

14      he's aware today?

15    BY MR. KAMRAS:

16        Q    Yes.

17        A    That's what I was going to ask.

18            MR. MONAGHAN:  Objection.  Vague.

19            MR. STRAWBRIDGE:  I'll also object

20      to the form.

21            THE WITNESS:  Can you repeat,

22      please?

23    BY MR. KAMRAS:

24        Q    Yes.  Are you aware that Mr. Daleiden

25    obtained a false identification in order to gain

● Defs. 2nd Round of Depo. Designations 10/9 (93:1 to 93:4)

Page 105

1     were shorter versions of all of that tape which

2     was released to the public, correct?

3         A    Can you restate the question?  I'm

4     sorry.

5         Q    Yeah, so let's take the first video.

6     That first video; do you recall the first video

7     that was released on July 14, 2015, involved

8     Dr. Nucatola of Planned Parenthood?  Do you recall

9     that?

10        A    I recall the video.

11        Q    Okay, and you recall that at least

12    portions of that video were from a lunch that

13    Dr. Nucatola had with Mr. Daleiden when he was

14    posing undercover, correct?

15        A    Yes, I'm aware of that.

16        Q    Okay, and the video -- the actual lunch

17    was I think two and a half to three hours long.

18    Are you aware of that?

19        A    I was not aware of the details of that

20    lunch.

21        Q    You understand that it was -- all right.

22    Well, strike that.

23            There was a -- the video that was

24    released on July 14, 2015, by CMP was not the

25    video of the entire lunch, correct?

1              MR. STRAWBRIDGE:  Object to the

2       form of the question.

3              THE WITNESS:  I'm aware that the

4       videos -- there's raw footage, and then

5       there's the videos that were published for,

6       for public interest purposes.

7    BY MR. KAMRAS:

8       Q    Okay.  Did you -- prior to the release

9    of any of the videos, whether on July 14 or

10   otherwise, did you watch, as you put it, the "raw

11   footage" from which the released videos were

12   taken?

13      A    I watched, I watched, I watched the

14   videos that he was producing.  I don't, I don't

15   recall if I watched all the hours of the videos.

16      Q    Okay, and when you say "the videos that

17   he was producing," just so we're clear, you're

18   referring to the videos that typically ran a

19   number of minutes, correct?

20      A    Yeah.

21      Q    They would be maybe five minutes or

22   maybe even as long as ten minutes long, correct?

23              MR. MONAGHAN:  Objection.

24              MR. STRAWBRIDGE:  Object to the

25       form of the question.

● Plaintiffs' Trial Designations (106:8 to 106:20)     ● Defs.  2d Set of X-designations and Objs.  9/27 (106:21 to 106:22)

Page 107

1          THE WITNESS:  So the videos I

2    reviewed were what he was planning to release

3    to the public, and then our job was to help

4    him get attention for those.  These videos

5    were very similar to how you put a news

6    segment together, but frankly they were

7    longer than your average news segment that

8    you see on the nightly news or on cable TV.

9    Those are the videos I, I mostly focused on.

10   BY MR. KAMRAS:

11       Q    Okay, and you don't recall having viewed

12   the, as you put it, the "raw footage" from which

13   it was taken -- from which these produced videos

14   were taken?

15       A    I don't recall looking at hours and

16   hours of video, the raw, the raw video.

17       Q    Still focusing on the period of time

18   before the first video was released on July 14,

19   2015, did Mr. Daleiden, whether on that first call

20   or thereafter, describe to you what he hoped to

21   accomplish by releasing these videos to the

22   public?

23       A    I don't recall.  On that first call --

24   my best recollection of that first call and much

25   of the planning that we were involved in was about

● Defs.  2d Set of X-designations and Objs.  9/27 (107:1 to 107:9, 107:17 to 108:3)    ● Plaintiffs' Trial Designations (107:11 to 107:16)

1    the strategy to get the videos out through the

2    media to the public.  That was generally what most

3    of our conversations were about.

4        Q    Okay, but you understood that, as with

5    most clients, he had some reason for releasing

6    these videos, right?

7        A    Sure.  I think he was trying to get the

8    truth out about what he found.

9        Q    Okay, so that's -- I want to know what

10   he told you about, if anything, about what his

11   purpose was in releasing the videos.

12       A    This is on the first call or just

13   generally?

14       Q    At any time prior to the release of the

15   first video.

16       A    Okay.  I don't recall we had very much

17   of a conversation about what he was trying to

18   accomplish.  It seemed to me to be pretty obvious.

19   He was -- he had video of what was being, was

20   happening at these events, what they were talking

21   about, and he wanted to release that to the

22   public, and, and -- but I don't recall him

23   specifically saying here's our end game or here's

24   our objective.  I don't, I don't recall that.  It

25   may have happened, but I don't recall it.

Defs. 2d Set of X-designations and Objs. 9/27 (108:4 to 108:25)

Page 116

1          That was mostly the conversations we

2    had.  Is that going to -- was something like this

3    going to be a sort of negative public relations

4    problem?  Yeah, absolutely, and I think Planned

5    Parenthood stated so.

6        Q   But you understand that that was his

7    intent, right?  His intent was to create negative

8    public relations for Planned Parenthood?

9          MR. STRAWBRIDGE:  Object to the

10    form of the question.

11          THE WITNESS:  My understanding of

12    his intent -- and you'd have to ask him these

13    questions, and I'm sure you, you will -- was

14    he was simply trying to get this information

15    out to the public.  He was trying to get the

16    truth out to the public based on what his

17    investigations had found.

18    BY MR. KAMRAS:

19        Q   And, and his hope and expectation as set

20    forth here is that this would help to "create and

21    sustain an environment in which public policies

22    and initiatives that hurt the abortion industry

23    and restrict abortion will be more likely to be

24    successful."

25          MR. STRAWBRIDGE:  Object to the

● Defs. 2d Set of X-designations and Objs. 9/27 (116:6 to 116:8, 116:11 to 116:17)

1　　did, getting that out to the public, given

2　　the taxpayer funding of these, some of these

3　　organizations and this information, part of

4　　the, part of the goal was to put that on the

5　　radar of public policy professionals and, and

6　　law enforcement to, to see if there was any,

7　　any, any concerns that they would have with

8　　it.

9　BY MR. KAMRAS:

10　　　Q　Okay.  Do you -- where in this -- well,

11　strike that.

12　　　　What he says in this goal statement or

13　statement of goal is -- you're right.  He

14　references illegality, but what he says is "to

15　leverage evidence of Planned Parenthood's illegal

16　supply of fetal tissue to maximum negative

17　impact -- legal, political and professional,

18　public -- on Planned Parenthood."

19　　　　And so I want to understand whether

20　Mr. Daleiden expressed to you an intent and

21　expectation that by releasing these videos, having

22　filmed, produced and released these videos, that

23　he could leverage, make use of what he claimed was

24　evidence of illegal conduct in order to inflict

25　maximum negative impact on Planned Parenthood?

 1              MR. STRAWBRIDGE:  Object to the

 2      form of the question.

 3              THE WITNESS:  I don't recall

 4      specifically him putting it quite that way,

 5      but I, I recall conversations, although again

 6      most of our conversations were about

 7      publicity efforts, but I do recall

 8      conversations in which he was talking about

 9      that there were potentially illegal acts, in

10       his view, that was going on, or illegal

11      activity that was going on here, and that

12       this might have an impact on taxpayer funding

13      of the organization, that therefore these

14      videos would be of interest to the public who

15      are paying the taxes for that, that

16      organization.

17      BY MR. KAMRAS:

18          Q   Do you see taxpayer funding referenced

19      in this statement of goal on this page?

20          A   Not in this particular one, no.

21          Q   I'm going to turn to -- well, strike

22      that.

23              Turn to page 2 of the document, and

24      you'll see at the -- toward the top there's a

25      paragraph which is entitled "Finish NAF

1      confused by what you're trying to ask.

2    BY MR. KAMRAS:

3      Q    Well, strike it, strike it.

4      A    Yeah.

5      Q    Were you and C, or CRC -- excuse me.

6    I'll try that again.

7        Were you or CRC involved in helping to

8    coordinate messaging with AUL, NRLC, and SBA

9    concerning the release of the videos that

10    Mr. Daleiden had filmed and produced?

11      A    I mean -- do you mean was I talking to

12    these organizations on how they should message

13    once they came out?

14      Q    Well, start there, sure.

15      A    So again, our role in here in terms of

16    what they hired our PR firm to do was to provide a

17    media strategy to get the videos out once they

18    were published, and then that usually included a

19    press release that would go out to all the groups

20    so they could engage with that content and get

21    messages out as they saw fit to their audiences.

22    That's generally what we did.

23      Q    And did you have conversations with AUL,

24    NRLC, and SBA about what those press releases

25    should say or what the messaging about the videos

1    should be?

2        A    I don't recall -- I -- to the best of my

3    knowledge, we didn't write any of their press

4    releases for them.

5            In terms of us suggesting how they might

6    communicate or what was on the videos, that was

7    sort of in the press releases already.  All we did

8    was push them out, if you will, to different, some

9    of these different enterprises.

10            By the way, not all these enterprises.

11    I don't know that -- I don't recall some of these

12    enterprises being on list distributions when we

13    released videos, myself.  Some of them were, but

14    I'd have to go back and look.  I don't recall all

15    these organizations being on those distributions,

16    but the idea, the general question I think you're

17    asking is, did we assist in the messaging of, of

18    what was on these videos.  Yes.  That was part of

19    our role.

20        Q    And how did you assist in that

21    messaging?

22        A    Basically when the videos were coming

23    out, the press releases would go out, and then we

24    would communicate what was on the videos.

25    Basically the content again was already there.

Page 132

1    You didn't have to do very much messaging.

2        Q    When you say you would, you, CRC, would

3    communicate the content of the videos, communicate

4    to whom?  Just to make sure I understand.

5        A    So when the press releases were written,

6    we would send out emails to media and

7    organizations, alerting them to what was the

8    content of the videos, and then there would be a

9    statement from Mr. Daleiden in those.  He mostly

10    wrote his own stuff and his own statements.  He

11    would consult with me, "is this the best way to

12    say this," or something like that.

13        Q    Okay.  Why don't we turn to Exhibit 304.

14            MR. STRAWBRIDGE:  Should we take

15    lunch soon?  I don't know how long you want

16    to spend with this exhibit.

17            MR. KAMRAS:  Why don't we look at

18    this first, and then we can break.  That's

19    fine.

20            MR. STRAWBRIDGE:  Okay.  Is that

21    okay, is that okay with you?

22            THE WITNESS:  Yeah, that's fine.

23    BY MR. KAMRAS:

24        Q    I wanted to talk about this, because you

25    had referenced distribution lists --

Plaintiffs' Trial Designations (132:2 to 132:12, 132:13 to 132:13, 132:24 to 135:6)

1    A   Yes.

2    Q   -- and organizations that were on the

3  distribution lists, and you'll see that this is --

4  this, which is Exhibit 304, is an email dated

5  July 13, 2015.

6     Do you see that?

7    A   Yes, I do.

8    Q   Okay, and so that's the day before the

9  first video was to be released, correct?

10    A   I don't recall the exact date of when

11  the first video, but --

12    Q   Well, look down at the bottom of this

13  email, and you'll see --

14    A   So there's the -- okay, so there's the

15  embargo.  Got it.  Got it.

16    Q   Let me -- so we're not talking over each

17  other, if you look down at the bottom of the

18  email, you'll see that there's an "embargoed press

19  release concerning the release of a video

20  concerning Planned Parenthood," right?

21     Do you see that?

22    A   That's correct.

23    Q   Okay, and it's embargoed until 8:00 a.m.

24  on July 14, 2015, correct?

25    A   Correct.

Page 134

1      Q    Okay, and this email is dated the day

2   before, July 13.

3          Do you see that?

4      A    Yes, I do.

5      Q    Okay, and there are quite a number of

6   people who are identified on the "to" list.

7          Do you see that?

8      A    Yes, I do.

9      Q    Okay, and is this one of -- you had

10   mentioned that you recall there being like

11   distribution lists in which or through which the

12   videos would be circulated or press releases would

13   be circulated, and is this an example of such a

14   distribution list?

15      A    I mean are you asking me if the

16   information that we sent out when we release

17   videos, did it go to this list every time?

18      Q    This list or a, you know, similar list.

19      A    It would, it would be a similar list,

20   not this exact list.

21      Q    Okay, and, and this list includes --

22   you'll see that the email that Mr. Daleiden writes

23   is -- the greeting is "Dear Pro-Life Leaders."

24          Do you see that?

25      A    Yes, yes.  I'm sorry.  Yes.

1       Q    You do?  Okay, and the, the people to

2    whom this list -- excuse me -- this email was sent

3    include people from Americans United for Life,

4    right?

5          You see Charmaine Yoest there?

6       A    Yes, I do see Charmaine's name there.

7       Q    Okay, and it includes the people from

8    the Susan B. Anthony List, right?

9       A    Yes.

10      Q    Okay, and it includes people from Life

11   Legal Defense Foundation?

12              MR. MONAGHAN:  Objection.  Form.

13              THE WITNESS:  Okay.  So I am not

14       familiar with Life Legal Defense Foundation

15       or who, who works for them.

16   BY MR. KAMRAS:

17      Q    All right.  It includes representatives

18   from Alliance Defending Freedom, correct?

19      A    At that, at that time, that -- there was

20   an individual on here who worked there.

21      Q    Okay, and, and others.  Do you -- I

22   think there, there are people from the Federalist

23   Society.

24          Do you see that?  Mr. Leo --

25      A    Yes.

1     Q    -- for example?

2     A    Yep.

3     Q    Okay. There's Reverend Pavone from --

4   the national director of Priests for Life.

5      Do you see that?

6     A   Yes, I see his name.

7     Q    Okay. Are you familiar with Mister --

8   excuse me -- with Reverend Pavone?

9     A    Do I know Father Frank? Yeah, I'm aware

10   of who he is, yeah.

11     Q   Okay. There's Cheryl Sullenger from

12   Operation Rescue, correct?

13     A   She's on here, yeah.

14     Q   Okay. Shawn Carney from 40 Days For

15   Life.

16      Do you see him?

17     A   I do see him.

18     Q   Okay. Do you consider these to be, as

19   Mr. Daleiden described them, "pro-life leaders"?

20       MR. MONAGHAN: Objection.

21    Speculation.

22       MR. STRAWBRIDGE: Objection to

23    form.

24       THE WITNESS: Yeah, I'm not so sure

25    how you would define "pro-life leaders,"

Page 137

1       so . . .

2    BY MR. KAMRAS:

3       Q    And do you know -- again, do you know

4    whether -- strike that.

5           Mr. Daleiden continues, or he starts,

6    "Dear Pro-life Leaders, thank you for your passion

7    and your engagement thus far."

8           Do you see that?

9       A    I see that in the first sentence, yeah.

10      Q    Do you know how these pro-life leaders,

11   as Mr. Daleiden characterizes them, had been

12   engaged thus far?

13      A    I, I don't recall how they were, how --

14   what they might know at this point, based on this

15   date.

16      Q    But you do understand that there was

17   some coordination with these pro-life leaders

18   prior to the release of the first video?

19           MR. STRAWBRIDGE:  Object to the

20       form of the question.

21           MR. MONAGHAN:  Same objection.

22           THE WITNESS:  Ask me again.

23   BY MR. KAMRAS:

24      Q    Yeah, you had previously mentioned that,

25   for example, prior to the release of a video, you

1   would circulate the -- a press release, that you

2   would circulate the video, that there was some

3   discussion about messaging with other pro-life

4   organizations.

5        Do you recall that testimony?

6      A   Yes, yes, yes.  So, so if there were --

7   so information before a video, this video, went

8   out, obviously reached these people.

9      Q   Okay, and so I was just confirming that

10  prior to the release of the video, there was,

11  there was some coordination along the lines that

12  you had just described with --

13     A   True.

14     Q   -- these or other pro-life

15  organizations.

16     A   Accurate.

17        MR. KAMRAS:  Okay.  Okay.  I think

18  we can take a break.

19        MR. STRAWBRIDGE:  Okay.

20        THE VIDEOGRAPHER:  The time is

21  12:36.  We are going off the record.

22        (Whereupon, the lunch recess was

23        taken.)

24        THE VIDEOGRAPHER:  The time is

25  1:31, and we are back on the record.

1       A   Okay, yeah, so ask me your question

2   again.  I'm sorry.

3       Q   I think you --

4           MR. STRAWBRIDGE:  I'm not so sure

5   there's a pending question.

6   BY MR. KAMRAS:

7       Q   You answered it.

8       A   I'm sorry.  I was waiting for the next

9   question.  I'm sorry.

10      Q   All right.  Very good.  Thank you.

11          MR. KAMRAS:  Okay.  I'm going to

12   mark as next in order, which is Exhibit 321.

13          (Exhibit 321 was marked for

14           identification.)

15   BY MR. KAMRAS:

16      Q   This is an email string which is dated

17   July 15, 2015, Bates-stamped CM20708 through 717.

18          You're, you're certainly welcome to

19   review it in full, Mr. Mueller.  What I wanted to

20   direct your attention to is the fourth page, which

21   is Bates-stamped ending 711.

22          Do you see where I am?

23      A   Let me just flip to there.  Okay.  Yeah,

24   I'm on 711.

25      Q   Okay, and you'll see that this is

1    July 15, the day after the videos -- the first,

2    excuse me, of the videos was released, and there's

3    an email roughly in the middle of the page from

4    Autumn Christensen --

5        A    Yes.

6        Q    -- at 12:52 p.m.  Do you see that?

7        A    Yes, I see it.

8        Q    Okay.  Do you know who Autumn

9    Christensen is?

10       A    Yes.

11       Q    Who is Autumn?

12       A    Autumn is, is a pro-life sort of

13   activist, but she worked on Capitol Hill for a

14   while.  I think during this period she was on

15   Capitol Hill.

16       Q    Is -- Autumn worked with the Pro-Life

17   Caucus; is that correct?

18       A    I think that's correct, yes.

19       Q    Okay, and the Pro-Life Caucus, if I

20   understand correctly from Mr. Robbio yesterday, is

21   a caucus of members of Congress who are pro-life;

22   is that correct?

23       A    That's correct.

24       Q    Okay.

25       A    That's why it's called the Pro-Life

Page 148

1    Caucus.

2        Q   I got that.

3            MR. STRAWBRIDGE:  I wish all the

4    questions were that easy.

5    BY MR. KAMRAS:

6        Q   Yeah, yeah, and so what Ms. Christensen

7    says here is, "I have to congratulate David here

8    for doing a great job of working with folks on the

9    Hill to grease the skids so we could respond

10   appropriately quickly."

11           Do you see that?

12       A   I do.

13       Q   Okay, and you reply just above it, "Big

14   fat amen," right?

15       A   Mm-hmm, yes.

16       Q   Okay.  Do you have -- at the time you

17   wrote that, did you have an understanding of what

18   "folks on the Hill" Ms. Christensen was referring

19   to?

20       A   I do not.

21       Q   Okay.  Were you or CRC in any way

22   involved -- strike that.

23           What -- do you know what -- I mean you

24   replied "big fat amen," so when you did so, what

25   did you, what did you think she meant by "grease

MUELLER, GREGORY

Page 150

1   with folks on the Hill"?

2      A   I don't, I don't recall what she might

3   have meant about that. I think my comments were

4   mostly around the fact that the launch had been --

5   the launch of these videos had been pretty

6   successful.

7      Q   Okay. So your recollection is that

8   you're, you're really sort of agreeing with the

9   first sort of two and a half lines of her

10   eight-line email and not the rest of it?

11      A   I think the -- my comment here -- I

12   don't recall what I'm specifically talking about

13   in this comment, to be frank.

14      Q   All right, and so was -- were you or CRC

15   involved in working with members of Congress or,

16   or other politicians prior to the release of this

17   first video on July 14?

18      A   Most of our work was all publicity and

19   media, so we, we're not, we're not a lobbyist, so

20   we don't normally do work with anybody on the Hill

21   in that regard in terms of lobbying or anything

22   like that. Work product that we're involved with

23   might find its way up to the Hill through others

24   or we might send it out.

25      You know, obviously I was communicating

Defs. 2d Set of X-designations and Objs. 9/27 (150:14 to 151:4)

Page 151

1    with Autumn as, as -- I forget what her title was

2    at the Pro-Life Caucus, but most of the work we do

3    is more publicity driven, not trying to work

4    legislation or anything like that.

5        Q    Okay, but you, you did understand that

6    the communications or the, the literature or other

7    material that you provided to Ms. Christensen

8    would end up with at least some members of the

9    Pro-Life Caucus?

10        A    I don't know what she did with them when

11    she got them, but I would assume that she would

12    share certain bits of information with the members

13    of her caucus.

14        Q    I mean that was your expectation in

15    providing --

16        A    Yeah.

17        Q    -- that information to her, correct?

18        A    Yeah, when we sent the releases out

19    about the videos -- and, and I'm assuming she was

20    on the receiving list of some of these, I don't

21    recall, actually.  I'm assuming that she would --

22    part of her job -- you'd have to ask her, but part

23    of her job would be to disseminate those to the

24    Pro-Life Caucus.

25        Q    And on -- and you said that most of your

● Plaintiffs' Trial Designations (151:5 to 151:13)    ● Defs. 2d Set of X-designations and Objs. 9/27 (151:25 to 152:21)

1    work was with respect to media, and so what work

2    did you or CRC do prior to the release of the

3    first video to -- or with media in order to

4    prepare them for the release of the media --

5    excuse me -- of the videos?

6        A   So our basic work before the -- you're

7    asking what was the work that you would do before

8    the video would be released?

9        Q   Yeah, yeah.

10       A   Okay.  So our work would mostly be

11   involved with -- David largely wrote the press

12   releases, because he was the one that was most

13   familiar with what the videos were, the content of

14   them.  We mostly would discuss how we were going

15   to then get the videos out to the public and which

16   media outlets, or would you specifically pick one

17   or two journalists to give them to first, what's

18   known in our industry as an "exclusive," or did we

19   think we should just let them out and, and, and

20   have the media react to them however they saw fit

21   from a news standpoint.

22       Q   And which did you decide in this case?

23       A   I'm not remembering exactly.  I think --

24   I'm not 100 percent sure, but I think I recall

25   that we -- I think I recall that we just released

MUELLER, GREGORY

Page 166

1       Q    Okay, and then you reply, "Okay.  Wait.

2    If any of that could be wrong, that could be a

3    problem.  Stick to what you know and can prove."

4          Do you see that?

5       A    Yes, I do.

6       Q    Okay.  Why would it be a problem if any

7    of what Mr. Daleiden said had been wrong?

8       A    Well, first of all --

9            MR. STRAWBRIDGE:  Object to the

10       form of the question.

11            THE WITNESS:  Okay.  First of all,

12       as a public relations professional, we have

13       an obligation to make sure that information

14       that's going out is, is based on some level

15       of evidence, and we were very careful, if I

16       recall, during this, to stick to what was

17       found in his investigation on those videos,

18       the things he found in his investigation

19       based on those videos.

20            So I was always trying to be

21       careful, the best of my recollection at the

22       time, to be -- not to have any of this be

23       speculative.

24    BY MR. KAMRAS:

25       Q    Okay.  So you thought it was important

• Defs. 2d Set of X-designations and Objs.  9/27 (166:6 to 166:8, 166:11 to 166:23)

Page 167

1    that the information that was provided to the

2    media and made public was accurate?

3        A    I would say that's a fair term, yeah.

4    Mostly what I -- my view is the videos spoke for

5    themselves, so stick to what was in the video

6    investigation that you -- the things you

7    discovered, you're trying to get the truth out

8    about what you discovered.  So everything I was

9    writing here, my best recollection, had to do with

10    that.

11        Q    But we discussed earlier that you did

12    not view the raw footage of the videos prior to

13    the produced versions of the videos being

14    released, correct?

15        A    The best of my recollection, I did not

16    sit through hours and hours of whatever video, raw

17    video he had.  I was mostly focused on him saying

18    here is the stuff I'm going to publish, what do

19    you think, and I give him my opinion.

20        Q    Okay, and so you were -- I presume you

21    were relying on Mr. Daleiden to confirm that the

22    produced versions of the videos accurately

23    conveyed the subject and content of the raw

24    footage in the videos?

25        A    Say that -- repeat the question.  I'm

● Plaintiffs' Counter-Designations (167:11 to 167:19)

1　　　　　MR. MONAGHAN:  Objection.  Form.

2　　　　　THE WITNESS:  Okay.  I didn't

3　　　see -- again, most of my focus on the videos

4　　　was here's what I'm -- here's what we have,

5　　　here's what I have, and here's what we're

6　　　looking at rolling out, what do you think.

7　　BY MR. KAMRAS:

8　　　Q　All right, and just to be clear, what

9　　you, what you had that you were looking at was the

10　　produced versions of the videos that were going to

11　　be released publicly?

12　　　A　That, that's my recollection, okay?  I,

13　　I don't recall seeing a lot of footage beyond

14　　that, but I probably saw some.

15　　　Q　Okay.

16　　　A　One point I will make on that, though.

17　　All of the video footage -- most of the video

18　　footage that he got was published up afterwards.

19　　So in other words, they would go out with a five-

20　　to seven-, ten-minute video, whatever he was -- on

21　　any of these different sequences, and then after

22　　that was published, he would put, if I recall, the

23　　rest of the raw video largely up on the website,

24　　which, I might add, is more than a lot of news

25　　organizations do after they interview for 30

● Defs. 2d Set of X-designations and Objs. 9/27 (169:8 to 170:1)

Page 172

1    whether people were going to be more likely to

2    view the short produced forms of the video or the

3    long unedited versions of the videos?

4        A    Oh, I would anticipate that -- you're

5    asking my opinion about that --

6        Q    I'm asking if --

7        A    -- as a PR professional?

8        Q    -- at the time, at the time when you

9    were actually engaged in this project, what was

10   your expectation about whether people were going

11   to be more like -- once videos were released,

12   whether people were going to be more likely to

13   view the short produced versions of the videos or

14   the long unedited versions of the videos.

15               MR. STRAWBRIDGE:  Object to the

16       form.

17               THE WITNESS:  So I think our -- my

18       approach, my understanding of this was that

19       we were trying to produce it very similar to

20       how the news business goes about producing a

21       report.

22               You get, you get a lot of footage

23       in your investigation.  You can't use all of

24       it, because you have to disseminate it in a

25       reasonable way for the public to capture, and

Defs. 2d Set of X-designations and Objs. 9/27 (172:6 to 172:14, 172:17 to 174:4)

MUELLER, GREGORY

Page 173

1      that was basically what was done. It's very

2      similar to how you would produce a short -- a

3      longer form segment on a news program. So

4      that was basically the expectations.

5           Obviously, people are going to tend

6      to review something in a shorter form than

7      they are a longer form, but I think David was

8      very adamant about always, I think, pretty

9      sure, putting up information, the whole video

10      so people could see that, journalists could

11      look at it, and the public could see it, but

12      the idea that you would shorten a video to,

13      to get it out, just similar like the news

14      media does when they do their reporting, was

15      certainly the way, the way he went about it.

16   BY MR. KAMRAS:

17      Q    Okay, and I appreciate that explanation,

18   but what I heard in the middle of all that

19   explanation was an agreement that people were more

20   likely to view the short videos than the long

21   unedited versions.

22      A    I think it's an accurate statement that

23   people are going to see something in a shorter

24   form than a longer form, and that might then pique

25   their interest to go look at the longer form.

1    Q   Okay, and, and that was your expectation

2    at the time that these videos were released,

3    correct?

4    A   I think that's a fair assessment.

5        MR. KAMRAS:  Okay.  All right.

6    Mr. Mueller, I will hand you what will be

7    marked as Exhibit 323.

8        (Exhibit 323 was marked for

9        identification.)

10   BY MR. KAMRAS:

11   Q   This is a multiple-page email string,

12   beginning Bates stamp CM22260, running through 67,

13   and I want to start us at the beginning of the

14   exchange, which is to say the last page of the

15   document.

16   A   Okay.

17   Q   All right, and it just begins with an

18   email from you dated July 22 at 7:08 a.m., but

19   it's not clear what, if anything, was included in

20   that email.

21       Do you see where I am?

22   A   Yeah.

23   Q   Okay, and then there is another email

24   from you above that in which you are forwarding

25   what appears to be a link to a CBS news article.

MUELLER, GREGORY

Page 224

1　　　　A　　I don't, I don't recall, I don't recall

2　　now whether there was any conversation about that,

3　　but there might have been.

4　　　　Q　　And do -- and you recall that, in fact,

5　　the Pope did not reference these videos in his

6　　address to Congress?

7　　　　A　　I, I don't recall what the Pope said to

8　　Congress.

9　　　　Q　　Right.  He didn't reference abortion at

10　　all in his address to Congress?

11　　　　A　　He didn't?  I don't recall.

12　　　　　　MR. STRAWBRIDGE:  Object to the

13　　form of the statement.

14　　　　　　MR. MONAGHAN:  I'll join in that

15　　objection.

16　　　　　　MR. KAMRAS:  Okay.  We're going to

17　　mark as next Exhibit 326, and this one I

18　　actually don't have another copy of.

19　　　　　　(Exhibit 326 was marked for

20　　　　　　identification.)

21　　　　　　(Discussion was held off the

22　　　　　　record.)

23　　BY MR. KAMRAS:

24　　　　Q　　All right.  So this document which has

25　　been marked as Exhibit 326 is a two-page exchange

1    which is Bates-stamped CM07386 through 87, and it

2    is dated in early May of 2015.

3         Do you see that?

4    A    I do.

5    Q    Okay, and it begins with, on May 1, with

6    Kellyanne Conway emailing Mr. Daleiden.

7         Do you see that?

8    A    I, I do.

9    Q    And she says, "Dear Mr. Daleiden, thank

10   you for contacting us with respect to your focus

11   group needs," right?

12   A    I do see that, yes.

13   Q    Okay, and, and then Mr. Daleiden

14   replies.

15        Does this refresh your recollection

16   about whether any focus groups occurred in or

17   around the time of May 2015?

18             MR. STRAWBRIDGE:  I'll object to

19        the form of the question.

20             MR. MONAGHAN:  Join in the

21        objection.

22             MR. STRAWBRIDGE:  I'm sorry if you

23        pointed this out, Counsel.  I'll just note

24        for the record that this is not an email in

25        which the witness appears to have been

Page 227

1    the will -- the interest in doing focus groups.

2        Q    Do you know when that conversation

3    occurred?

4        A    I don't think I could put a date on it.

5        Q    Do you know whether it was before the

6    first video was released in July of 2015 or after?

7        A    My, my recollection -- and again, I

8    don't want to guess here too much.  My, my

9    recollection was when I had first heard a

10     discussion about this was, was after the videos

11     were out, but I, I'm not recalling specifically,

12     but I was, I was aware of conversations that were

13     being had about doing focus groups.

14        Q    Okay.  So now I'll have you look at what

15    was previously marked as Exhibit 316.

16        A    Do I have that one?

17        Q    You do now.

18        A    Okay.  Thank you.  This would be 18.

19        Q    Correct.

20            So this is now in August of 2015, and

21    you'll see that there is a -- this, this exchange

22    begins with an email from you, dated August 11, to

23    Mr. Ruddy and his colleague, Mr. Allen, as well as

24    Leonard Leo.

25            Do you see that?

Plaintiffs' Trial Designations (227:14 to 227:15)

1　　startle and concern anybody who saw what was

2　　in those videos.

3　BY MR. KAMRAS:

4　　Q　So isn't that a yes, that you expected

5　that the videos would generate negative publicity

6　and reaction towards Planned Parenthood?

7　　　　MR. MONAGHAN:  Objection.  Asked

8　　and answered.

9　　　　MR. STRAWBRIDGE:  Objection.

10　　　　MR. KAMRAS:  It's been asked.  I'm

11　　not sure it's been answered.

12　　　　MR. STRAWBRIDGE:  It certainly

13　　hasn't been answered the way that you would

14　　prefer, but I do think it has been answered.

15　　　　THE WITNESS:  Our goal in the, in

16　　this whole thing was to take David's

17　　investigation, what he found, which pretty

18　　much is on those videos, and, and take it to

19　　the public and, and, and encourage the public

20　　to see what's happening with money that

21　　they're, as taxpayers, funding an

22　　organization, and that organization is

23　　engaging in -- and that, in our view, was in

24　　the public interest, and the fact that we

25　　would hopefully get members of Congress or

1      elected officials or policymakers to consider

2      that information in the things they do daily

3      as representatives was absolutely one of the

4      goals.

5    BY MR. KAMRAS:

6      Q    Okay, and I understand you, you keep

7    talking about the goals, and what I actually asked

8    you about was your expectation.

9           And so isn't it true that your

10   expectation is that in bringing this

11   information -- that is, the videos -- to light,

12   and in particular in doing so in swing states and

13   key markets, as you put it, and targeting

14   vulnerable Democrats, that you expected that these

15   videos were going to generate negative publicity

16   and attention for Planned Parenthood?

17           MR. STRAWBRIDGE:  Object to the

18   form.

19           MR. MONAGHAN:  Join in the

20   objection.

21           THE WITNESS:  I don't think I

22   expected that if people saw these, they would

23   be excited about what was happening in

24   Planned Parenthood clinics.

25

1　don't recall how he used them.  Yeah, I don't

2　recall how, how David might have used them.  I

3　don't know.

4　　　Q　　And just to be clear, do you recall, if

5　it's at all different, how CMP may have used the

6　results?

7　　　A　　I was kind of suggesting David and CMP

8　are one.  I don't, I don't recall what he did

9　with -- when he got the results and all that, I

10　 don't know what he did with them, whether he

11　 talked to other people about them or shared them

12　 with people or not, other than the people that

13　 were involved in the, in, in the process.

14　　　Q　　Did you or CRC make use of the results

15　or findings from the focus group?

16　　　A　　I think the only thing we did was -- I

17　think we might have informed other people, but I

18　don't recall specifically who or how we did it,

19　about, about what the focus groups had found.

20　　　　　　MR. KAMRAS:  We'll mark this as

21　　　Exhibit 329.

22　　　　　　(Exhibit 329 was marked for

23　　　　　　identification.)

24　BY MR. KAMRAS:

25　　　Q　　This is a printout from last night, I

MUELLER, GREGORY

Page 263

1    will represent to you, from the CRC website.

2         Does this look familiar to you?

3              MR. STRAWBRIDGE:  I'll just note

4     for the record this appears to be a partial

5     capture of the website.  There's stuff cut

6     off on the right margin.

7              MR. KAMRAS:  You are correct.  So

8     stipulated.

9              MR. STRAWBRIDGE:  Okay.

10    BY MR. KAMRAS:

11       Q    Although I do not intend to ask you,

12    Mr. Mueller, about the right margin, but your

13    counsel is correct.

14              Does this nonetheless otherwise appear

15    to be a printout from CRC's website?

16       A    It does, but I will tell you that

17    there -- I don't know if I've actually seen this,

18    because we are recently updating the website,

19    because we have moved over to CRC Strategies, so I

20    don't know if I'm familiar with everything on

21    here, but it says our website, and I'm sure it is.

22       Q    Okay, and at the bottom -- this is

23    entitled "Case Studies" --

24       A    Right.

25       Q    -- as you see, and there are different

● Plaintiffs' Trial Designations (263:14 to 263:21, 263:22 to 264:12)

1    industries, it appears to me, that are being

2    described here, and in the bottom left is

3    "Politics."

4          Do you see that?

5    A    Correct.  Yes.

6    Q    Okay, and it says that "CRC spearheaded

7    a ten-week communications program when Justice

8    Neil Gorsuch was nominated for the Supreme Court."

9          Do you see that?

10   A    I do.

11   Q    Is that accurate?

12   A    That's accurate, yes, mm-hmm.

13   Q    And then under "Publications," it

14   provides or states that "CRC has promoted more

15   than 75 New York Times best sellers."

16         Do you see that?

17   A    Yes, I do.

18   Q    And then below that it has, "Some of the

19   best-selling authors we have worked with include,"

20   and then, among others, it has Newt Gingrich.

21         Do you see that?

22   A    Yes.

23   Q    Is that accurate?

24   A    That is accurate.

25   Q    And Matt Drudge; is that accurate?

MUELLER, GREGORY

Page 265

1      A   Correct.

2          MR. KAMRAS:  And I'm going to mark

3      as next in line, which is Exhibit 330.

4          (Exhibit 330 was marked for

5          identification.)

6      BY MR. KAMRAS:

7      Q   This is an article from the Judicial

8      Crisis Network, or I should say it's a post from

9      the Judicial Crisis Network.

10         Are you familiar with the Judicial

11     Crisis Network?

12     A   Yes, I am.

13     Q   Okay.  What is it?

14     A   It is a judicial activist 501(c)(4)

15     organization that gets involved in judicial

16     issues.

17     Q   And in -- you'll see that this is

18     actually a press release, I guess, and it's dated

19     January 9, 2017, and the contact for the press

20     release is Peter Robbio.

21         Do you see that?

22     A   Yes.

23     Q   Okay, and do you know whether

24     Mr. Robbio, in fact, worked on the campaign for

25     the Judicial Crisis Network?

• Plaintiffs' Trial Designations (265:2 to 265:3, 265:7 to 265:16, 265:17 to 266:3)

MUELLER, GREGORY

Page 266

1  A Yes.  Peter was, was one of our

2 executives that worked on -- comes in and out of

3 the JCN operation.

4  Q Okay, and the press release touts this

5 as a "$10 million campaign to preserve Justice

6 Scalia's legacy."

7   Do you see that?

8 A I do.

9  Q Okay, and then it begins, "The Judicial

10 Crisis Network (JCN) today announced plans for a

11 national campaign to confirm President Trump's

12 nominee to the Supreme Court."

13   Do you see that?

14 A I do.

15  Q This is the Gorsuch campaign, correct?

16 A Correct, on behalf of his nomination.

17  Q That is, this is the same campaign

18 that's referenced on your case studies website; am

19 I correct?

20  A Yes, that would be correct.

21  Q Okay, and so it continues, "Coming off

22 of its historic 'Let The People Decide' victory in

23 the Garland nomination battle" --

24  A Where are you here?  Are you --

25  Q This is the second sentence of the press

Plaintiffs' Trial Designations (266:9 to 266:16)

MUELLER, GREGORY

Page 267

1    release.

2       A    Oh, okay, you're there.   Okay, got it.

3    Yes, I see it.

4       Q    "Coming off of its historic 'Let The

5    People Decide' victory in the Garland nomination

6    battle, JCN will engage a comprehensive campaign

7    of paid advertising, earned media, research,

8    grassroots activity, and a coalition enterprise,

9    all adding up to the most robust in the history of

10    confirmation battles."

11       Is that -- that's the campaign in which

12    CRC participated?

13       A    Correct.

14       Q    And then on the next page of this press

15    release, in the paragraph beginning "The team."

16       Do you see that?

17       A    Yes.

18       Q    Okay.   It says, "The team leading the

19    campaign combines high-level GOP and conservative

20    campaign professionals, as well as some of the

21    nation's top conservative grassroots

22    organizations."

23       Do you see that?

24       A    I do.

25       Q    And then it says "they include," and the

Plaintiffs' Trial Designations (267:4 to 268:9)

1    first on the list is "CRC Public Relations --

2    President Greg Mueller will spearhead

3    communications and media strategy."

4         Do you see that?

5    A   I do.

6    Q   And is that correct?  Did you spearhead

7    communications and media strategy for this

8    campaign?

9    A   Yes.

10    Q   Okay, and do you agree with the Judicial

11    Crisis Network's characterization of you as a

12    conservative campaign professional?

13         MR. STRAWBRIDGE:  Can you just give

14    me a line reference?

15         MR. KAMRAS:  It's directly

16    preceding the reference of CRC Public

17    Relations.

18         MR. STRAWBRIDGE:  "The team . . .

19    combines high-level GOP and conservative

20    campaign professionals as well as some of the

21    nation's top conservative grassroots

22    organizations"?

23         MR. KAMRAS:  Yes.

24         MR. STRAWBRIDGE:  Okay.  I just

25    want to make sure I understood what you're

MUELLER, GREGORY

1     referring to.

2          I'll object to the form of the

3    question, but you can answer.

4          THE WITNESS:  Could you repeat it,

5    please?

6   BY MR. KAMRAS:

7     Q   Do you, do you consider yourself a,

8   either a high-level GOP or a conservative campaign

9   professional?

10     A   I would say part of my 30-year career,

11   it has involved working on conservative campaigns,

12   so it's probably an accurate reflection.

13     Q   And is it true that you've, in fact,

14   been characterized or referred to, rather, by the

15   Judicial Crisis Network as the group's "public

16   relations maestro"?

17     A   I don't know if I've -- what are you

18   referencing?

19     Q   You haven't heard that one?

20     A   A "public relations maestro"?  I might

21   have heard that around.  Somebody report that?

22     Q   Someone reported that.

23     A   Okay.

24     Q   Okay, and is it true that CRC has also

25   worked with the Federalist Society, has provided

1    media relations for the Federalist Society?

2        A    That's correct.

3        Q    Okay, and so we were, we were talking

4    about CRC's connection with helping support

5    Justice Gorsuch's nomination.  Is it also true

6    that CRC helped to support Justice Cavanaugh's

7    nomination?

8            MR. STRAWBRIDGE:  I want to just, I

9        want to just interject the caution I gave

10       earlier, which is that we're outside the

11       realm of CMP and David Daleiden.

12           I will instruct the witness not to

13       answer these questions except to the extent

14       it addresses information about CRC's work on

15       behalf of other clients that is already

16       publicly known.

17           So if you can answer that question

18       within the framework of that instruction,

19       please feel free to do so.

20   BY MR. KAMRAS:

21       Q    I assure you I, I know only what's

22   publicly known, and so the answer is publicly

23   known.

24           So is it, is it, is it true,

25   Mr. Mueller, that CRC also engaged in helping

1    media relations in connection with Justice

2    Kavanaugh's campaign -- excuse me -- Justice

3    Kavanaugh's nomination to the Supreme Court?

4        A    That would be accurate.

5        Q    Okay.  Do you know who Ed Whelen is?

6        A    Yes, I know Ed.

7        Q    Is it Whelan or Whelen?

8        A    Whelan.

9        Q    Whelen, okay, and during Justice

10   Kavanaugh's confirmation hearings, Mr. Whelan --

11       A    Yes, that's correct.

12       Q    -- suggested in Twitter that he had

13   obtained information that would exculpate then

14   Judge Kavanaugh from the sexual assault

15   allegations made by Christine Blasey Ford,

16   correct?

17       A    Correct.

18       Q    Okay, and specifically what he alleged

19   is that it was not then Judge Kavanaugh that had

20   sexually assaulted Ms. Ford, as she alleged, but

21   rather one of Judge Kavanaugh's classmates,

22   correct?

23       A    That he alleged that?

24       Q    That's what Mr. Whelan alleged, correct?

25       A    I think that would be an accurate

Page 272

1    reflection.

2        Q    Accurate or inaccurate?

3        A    Accurate.

4        Q    Okay, and is it true that CRC developed

5    a media strategy to draw attention to Mr. Whelan's

6    theory?

7            MR. STRAWBRIDGE:  Same -- I'm

8        sorry.  Are you done with your question?

9            MR. KAMRAS:  Yeah, I was done.

10           MR. STRAWBRIDGE:  Same question --

11       or same instruction that I gave previously.

12       Only answer that question to the extent you

13       can do so based on information that is public

14       about the extent of CRC's operations

15       unrelated to CMP or David Daleiden.

16           THE WITNESS:  So we -- during that,

17       his Twitter feed, we alerted press that he

18       was going to have an announcement.

19   BY MR. KAMRAS:

20       Q    You alerted press that Mr. Whelan was

21   going to have an announcement; is that correct?

22       A    Correct.

23       Q    Okay, and this, this was a -- and, and

24   actually Mr. Whelan indicated that he was going to

25   have an announcement that was to come in -- I

Plaintiffs' Trial Designations (272:16 to 273:14)

1    think it was 48 hours, right?

2        A    I didn't -- I don't recall whatever,

3    whatever, whatever, what he said specifically, but

4    there was a coming announcement that he was, he

5    was to tell -- to watch his Twitter feed was what

6    he was telling people.

7        Q    It was sort of a -- it was a tease,

8    right?  He was basically saying watch the Twitter

9    feed because something important is going to be

10   announced, right?

11       A    I think it would be accurate to say that

12   he was saying I've got something that I'm going to

13   be informing the public about, and you should

14   follow me.

15       Q    And, and that was an effort to generate

16   attention for Mr. Whelan's feed and whatever it is

17   that he was going to announce?

18           MR. STRAWBRIDGE:  Object to the

19       form of the question.

20           MR. MONAGHAN:  Join in the

21       objection.

22           THE WITNESS:  Repeat.  Sorry.

23   BY MR. KAMRAS:

24       Q    Yeah, that was an effort to generate

25   attention for Mr. Whelan's Twitter feed and

1    whatever it is that ultimately he was going to

2    announce regarding then Judge Kavanaugh, correct?

3      A    It's correct to say that he was -- he

4    had an announcement or he was building for an

5    announcement.  He was getting people to anticipate

6    that there was an announcement coming that was

7    important given his expertise as a legal analyst.

8          MR. KAMRAS:  Why don't we mark as

9    next in line, which is Exhibit 331, this

10    article from Politico, which is dated

11    September 21, 2018, which purports to depict

12    what it says is "conservative legal activist

13    Ed Whelan."

14          (Exhibit 331 was marked for

15          identification.)

16    BY MR. KAMRAS:

17      Q    Is that, in fact, a picture of

18    Mr. Whelan?

19      A    That is.  That's Ed.

20      Q    And it, it reads, "PR firm helped Whelan

21    stoke half-baked Kavanaugh alibi.  CRC Public

22    Relations, a powerhouse conservative firm, guided

23    Ed Whelan on a bad Twitter adventure."

24      Do you see that?

25      A    Yes.

Plaintiffs' Trial Designations (274:8 to 274:13)

1    from the Huffington Post, of which I'm sure you

2    agree in all regards.

3      In the third paragraph --

4      MR. MONAGHAN: Just a moment. Do

5    you have a copy?

6      MR. KAMRAS: I, I don't, I don't

7    have a copy. I'm sorry, Counsel.

8   BY MR. KAMRAS:

9     Q   In the third paragraph, it begins, "CRC

10   Public Relations is a staple of the conservative

11   public affairs ecosystem."

12      Do you agree with that statement?

13      MR. STRAWBRIDGE: Object to the

14   form of the question.

15      MR. MONAGHAN: Join in the

16   objection.

17      THE WITNESS: "Is a staple of the

18     conservative public affairs ecosystem." I

19     mean we're a public relations firm that works

20     with conservative groups and organizations.

21   BY MR. KAMRAS:

22     Q   It continues, "The firm originally

23   called Creative Response Concepts, was founded in

24   1989 but first achieved prominence in 2004 when it

25   coordinated the Swift Boat Veterans for Truth

● Plaintiffs' Trial Designations (277:9 to 277:12, 277:17 to 277:20, 277:22 to 278:5)

1    campaign, a nationwide PR and advertising campaign

2    to cast doubt on Democratic presidential candidate

3    John Kerry's war record."

4         Did CRC coordinate the Swift Boat

5    Veterans for Truth campaign?

6             MR. STRAWBRIDGE:  I'll just

7     interpose my prior instruction.  You may

8     answer that question to the extent it does

9     not require you to reveal nonpublic

10     information about work that you have done on

11     behalf of clients unrelated to CMP, David

12     Daleiden, or Planned Parenthood.

13         THE WITNESS:  CRC did media

14     relations work for the Swift Boat Veterans

15     for Truth.

16    BY MR. KAMRAS:

17     Q   Campaign?

18     A   Well, call it "campaign."  We were --

19    they were -- the Swift Boat, the Swift Boat

20    Veterans for Truth, actually Swift Boat Veterans

21    and POWs for Truth were a client of CRC's.  We

22    handled media relations is what we do --

23     Q   And --

24     A   -- media and representation.

25     Q   Sorry.

Plaintiffs' Trial Designations (278:13 to 278:25)

1      A    Sorry.

2      Q    And the -- this, this was a, at least

3    one of the products of the Swift Boat Veterans for

4    Truth was to release a, an advertisement during

5    John Kerry's presidential run in 2004, correct?

6      A    Part of the public effort on the Swift

7    Boat, that's what it was, an ad campaign.

8      Q    Right.  This was an ad campaign that,

9    that said that John Kerry was lying about his war

10   record, correct?

11     A    I'm trying to remember exactly what the

12   ad said, but they, they, they were challenging

13   his, his account of things during the time he was

14   over there, some of his fellow Swift Boaters.

15     Q    And John McCain criticized that ad,

16   didn't he?

17         MR. MONAGHAN:  Objection.  Form.

18         MR. STRAWBRIDGE:  I'm, I'm going to

19         object.  I'm just going to ask, just as a

20         matter of professional courtesy.  This is a

21         nonparty.  We're here on Rule 45 which

22         protects nonparties from unnecessary burdens

23         in discovery, and you are entitled to use

24         your time as you wish.  At some point we

25         cross the line from relevant information to

Plaintiffs' Trial Designations (279:2 to 279:14)

Page 280

1      completely irrelevant, if not harassing,

2      information, and we're getting close there.

3           So I would just please ask counsel,

4      at 4:35 now on a Friday afternoon, to

5      consider whether or not these questions are

6      really necessary of this nonparty witness in

7      this case.

8           MR. KAMRAS:  I note your objection,

9      and I'll assure you that we'll be done soon.

10          MR. STRAWBRIDGE:  Thank you.

11          MR. KAMRAS:  But I, I dispute the

12      relevance, but we'll be done soon, so you

13      don't have to worry about the burden.

14   BY MR. KAMRAS:

15      Q   Isn't it, isn't it true that John Kerry

16   [sic] criticized the Swift Boat for Veterans

17   advertisement?

18      A   John, John Kerry?

19      Q   Let me try that again.

20          Isn't it true that Senator John McCain

21      criticized the Swift Boat for Veterans

22      advertisement?

23          MR. STRAWBRIDGE:  Object to the

24      form of the question.

25          MR. MONAGHAN:  Same objection.

1          THE WITNESS:  I recall vaguely now

2     that senator McCain voiced his -- some level

3     of, of questions about the campaign, about

4     the ad, actually.

5          MR. KAMRAS:  Okay.  We'll mark as

6     next in line Exhibit 333.

7          (Exhibit 333 was marked for

8          identification.)

9     BY MR. KAMRAS:

10        Q    This is an article which I downloaded

11    from FoxNews.com, so you may have some, you know,

12    greater affinity for it, and it says at the top,

13    "Republican Senator John McCain, a former prisoner

14    of war in Viet Nam, called an ad criticizing John

15    Kerry's military service 'dishonest and

16    dishonorable,' and urged the White House on

17    Thursday to condemn it as well."

18         Do you recall Senator McCain's statement

19    as reported here?

20        A    I recall Senator McCain had criticism,

21    as I stated, of, of the ad, and I don't recall

22    exactly what he said, but I take it it's in the

23    Associated Press story here.

24        Q    Returning to Exhibit 331.  Maybe it's

25    332.

Plaintiffs' Trial Designations (281:1 to 281:4, 281:5 to 281:23)