Charles S. LiMandri (CA Bar No. 110841)
Paul M. Jonna (CA Bar No. 265389)
Jeffrey M. Trissell (CA Bar No. 292480)
B. Dean Wilson (CA Bar No. 305844)
Milan L. Brandon (CA Bar No. 326953)
FREEDOM OF CONSCIENCE DEFENSE FUND
P.O. Box 9520
Rancho Santa Fe, CA 92067
Tel: (858) 759-9948
cslimandri@limandri.com

*Attorneys for Defendants CMP, BioMax,
David Daleiden and Adrian Lopez*

Harmeet K. Dhillon (CA Bar No. 207873)
Gregory R. Michael (CA Bar No. 306814)
DHILLON LAW GROUP INC.
177 Post Street, Suite 700
San Francisco, CA 94108
415-433-1700
415-520-6593 (fax)
harmeet@dhillonlaw.com

*Attorneys for Defendants CMP, BioMax,
and David Daleiden*

Thomas Brejcha, *pro hac vice*
Peter Breen, *pro hac vice*
Matthew F. Heffron, *pro hac vice*
THOMAS MORE SOCIETY
309 W. Washington St., Ste. 1250
Chicago, IL 60606
Tel: (312) 782-1680
tbrejcha@thomasmoresociety.org
pbreen@thomasmorsociety.org

*Attorneys for Defendant David Daleiden*

Denise M. Harle (CA Bar No. 275561)
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd., NE
Suite D1100
Lawrenceville, GA 30043
Tel: (770) 339-0774
dharle@ADFlegal.org

*Attorneys for Defendants CMP, BioMax,
and David Daleiden*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PLANNED PARENTHOOD FEDERATION OF AMERICA, INC., et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>THE CENTER FOR MEDICAL PROGRESS, et al.,<br><br>Defendants. | Case No. 3:16-CV-00236-WHO<br><br>Hon. William H. Orrick III<br><br>**DEFENDANTS DALEIDEN, MERRITT & LOPEZ'S RULE 50(a) MOTION FOR JUDGMENT AS A MATTER OF LAW**<br><br>Trial Date: October 2, 2019<br>Courtroom: 2, 17th Floor |

# TABLE OF CONTENTS
DALEIDEN, MERRITT, & LOPEZ'S RULE 50(a) MOTION FOR JUDGMENT AS A MATTER OF LAW ..................1

IV. RICO ..................1

    A. That Defendants engaged in a "pattern" of predicate acts with the requisite "continuity" to constitute a violation of RICO ..................2

    B. That the alleged predicate acts (i.e., ID production or transfer) directly caused Plaintiffs' damages ..................2

    C. That Defendant Lopez or Defendant Merritt "conducted or participated" in any enterprise "through [a] pattern of racketeering activity" ..................3

    D. That Defendant Lopez or Defendant Merritt conspired in the performance of the alleged predicate acts ..................5

V. CIVIL CONSPIRACY ..................5

    A. Plaintiffs offered insufficient evidence of a "civil conspiracy," of any underlying bad acts or damages, or of any "agreement" or mutual "intention" to commit fraud, trespass, or illegal recording. Dkt. 983 at 88. ..................5

    B. Plaintiffs have introduced no evidence that Defendants Lopez or Merritt were acting as anything other than agents of the corporation that paid them. ..................7

VI. TRESPASS (PPFA, PPGC/PPCFC, PPRM) ..................7

VII. FRAUDULENT MISREPRESENTATION ..................7

    A. Plaintiffs have failed to present sufficient evidence for a reasonable jury to find that any of Defendants' representations made as part of their operation as undercover journalists were fraudulent. ..................7

    B. Even if Defendants' representations were fraudulent, Plaintiffs have provided no evidence of either actual or reasonable reliance. ..................11

VIII. PUNITIVE DAMAGES ..................12

CONCLUSION ..................14

# TABLE OF AUTHORITIES

*Cases:*

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ............................................................................................................. 1

*Animal Legal Def. Fund v. Wasden*,
    878 F.3d 1184 (9th Cir. 2018) ............................................................................... 8, 10, 13

*Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*,
    7 Cal.4th 503 (1994) ....................................................................................................... 6, 7

*Ashton v. KoonsFuller, P.C.*,
    No. 05-16-00130-CV, 2017 WL 1908624 (Tex. App. May 10, 2017) ..................... 11

*Attias v. CareFirst, Inc.*,
    365 F. Supp. 3d 1 (D.D.C. 2019) ................................................................................... 11

*Berg & Berg Enterprises, LLC v. Sherwood Partners, Inc.*,
    131 Cal. App. 4th 802 (2005) ............................................................................................ 7

*Bowden v. Caldor, Inc.*,
    350 Md. 4 (1998) ............................................................................................................. 13

*Butler v. Yusem*,
    44 So. 3d 102 (Fla. 2010) ............................................................................................... 11

*C & E Servs., Inc. v. Ashland, Inc.*,
    498 F. Supp. 2d 242 (D.D.C. 2007) .............................................................................. 11

*Chrysler Corp. v. Wolmer*,
    499 So. 2d 823 (Fla. 1986) ............................................................................................. 13

*Collins v. eMachines*, Inc.,
    202 Cal. App. 4th 249 (2011) ......................................................................................... 11

*Desnick v. Am. Broad. Co., Inc.*,
    4 F.3d 1345 (7th Cir. 1995) ............................................................................. 8, 10, 11, 14

*Destefano v. Children's Nat. Med. Ctr.*,
    121 A.3d 59 (D.C. 2015) ................................................................................................ 13

*Fields v. Twitter, Inc.*,
    881 F.3d 739 (9th Cir. 2018) ............................................................................................ 3

*Freund v. Nycomed Amersham*,
    347 F.3d 752 (9th Cir. 2003) .......................................................................................... 12

*Gen. Capital Grp. Beteligungsberatung GMBH v. AT & T*,
    407 S.W.3d 507 (Tex. App. 2013) ................................................................................. 12

*Gen. Motors Acceptance Corp. v. Cent. Nat. Bank of Mattoon*,
    773 F.2d 771 (7th Cir. 1985) .......................................................................................... 11

# TABLE OF AUTHORITIES—Continued

*Cases:*

*Grp. Hosp. Servs., Inc. v. Daniel*,
    704 S.W.2d 870 (Tex. App. 1985) .......................................................................... 13

*Saucier v. Countrywide Home Loans*,
    64 A.3d 428 (D.C. 2013) ........................................................................................ 11

*Soffer v. R.J. Reynolds Tobacco Co.*,
    187 So. 3d 1219 (Fla. 2016) ................................................................................... 13

*TMI, Inc. v. Brooks*,
    225 S.W.3d 783 (Tex. App. 2007) ..................................................................... 11, 12

*Tortu v. Las Vegas Metro. Police Dep't*,
    556 F.3d 1075 (9th Cir. 2009) .................................................................................. 1

*United States v. Alvarez*,
    567 U.S. 709 (2012) ................................................................................................. 8

*Valley Equip. Leasing, Inc. v. McGriff, Seibels & Williams of Oregon, Inc.*,
    No. 14-CV-02383-CMA-NYW, 2016 WL 1697861 (D. Colo. Apr. 28, 2016) ...... 11

*W. Fire Truck, Inc. v. Emergency One, Inc.*,
    134 P.3d 570 (Colo. App. 2006) ............................................................................ 13

*Statutes:*

18 U.S.C. § 1028 ............................................................................................................... 1

Fed. R. Civ. P. 50 .......................................................................................................... 1, 7

Fed. R. Civ. P. 50(a) ......................................................................................................... 1

*Other Authorities:*

Komal S. Patel, *Testing the Limits of the First Amendment: How Online
    Civil Rights Testing Is Protected Speech Activity*, 118 Colum. L.
    Rev. 1473 (2018) ......................................................................................... 11, 13, 14

# DALEIDEN, MERRITT, & LOPEZ'S RULE 50(a) MOTION FOR JUDGMENT AS A MATTER OF LAW

Pursuant to Federal Rule of Civil Procedure 50(a), Defendants David Daleiden, Sandra Merritt, and Gerardo Adrian Lopez, move for judgment as a matter of law as to the following issues. The concurrently filed motion of Defendants CMP and BioMax addresses (I) Damages, (II) The Recording Claims, and (III) The Breach of Contract Claims. This motion addresses (IV) RICO, (V) Civil Conspiracy, (VI) Trespass, (VII) Fraudulent Misrepresentation, and (VIII) Punitive Damages. That concurrently filed motion is expressly incorporated herein by reference.[1]

"[T]he standard for a directed verdict under Federal Rule of Civil Procedure 50(a) . . . is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict. If reasonable minds could differ as to the import of the evidence, however, a verdict should not be directed." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–51 (1986) (citation omitted). "The term[] . . . 'directed verdict' ha[s] now been . . . simply termed 'judgment as a matter of law.'" *Tortu v. Las Vegas Metro. Police Dep't*, 556 F.3d 1075, 1082 n.2 (9th Cir. 2009).

This motion addresses only the insufficiency of the evidence to be submitted to the jury, in accordance with Rule 50. Defendants reserve all other arguments and objections, including but not limited to legal arguments and objections that the Defendants made in connection with discovery motions, summary judgment, motions in limine, evidentiary rulings, and jury instructions.

## IV.   RICO

In addition to the general failure to prove actionable damages outlined in Section I, in the concurrently filed motion of Defendants CMP and BioMax, the Plaintiffs have failed to produce sufficient evidence for a reasonable jury to find in their favor as to the following elements of their RICO claim:[2]

---

[1] Defendants also hereby incorporate all arguments regarding insufficient evidence that Defendants made in their summary judgment briefing. Defendants also hereby incorporate all arguments made in Defendants Rhomberg's and Newman's motions for judgment as a matter of law.

[2] Plaintiffs have also failed to prove that the alleged predicate acts of production and transfer of false identifications were "in or affecting" interstate commerce as required by 18 U.S.C. § 1028. *See*

A. **That Defendants engaged in a "pattern" of predicate acts with the requisite "continuity" to constitute a violation of RICO**

No reasonable jury could find that Plaintiffs have shown by a preponderance of the evidence that Defendants' predicate acts were the type of activity that "posed a threat of continued criminal activity." JIs (Dkt. 983) at 63. In its Summary Judgment Order, this Court held that "a reasonable juror could rely on [Plaintiffs' evidence] to determine that defendants present a continuing threat of infiltration either by personal use of fake IDS or by assisting others' use of fake IDs to target plaintiffs in the future." MSJ Order at 29. At trial, however, Plaintiffs failed to provide any evidence on the basis of which a reasonable juror could find for Plaintiffs on this issue. On the contrary, *all* of the trial evidence suggested that the creation of fake IDs was a one-time, isolated occurrence undertaken by rank amateurs—not budding career criminals. *See* Trial Tr. at 2645:4-7; 2645:8-11; 2654:10-16; 2647:3-7; 2652:21-24 (Daleiden made only one driver's license and purchased two others from Craigslist, and he used them all only for the HCP).

As thoroughly explained in Defendants' summary judgment briefing, there is no way for two instances of producing a fake ID, only a few months apart from one another, for the purpose of a well-defined project with a clearly foreseeable endpoint, can qualify as a continuous pattern of predicate acts. *See* Dkt. 605 at 11-17. Therefore, no reasonable jury could find that they satisfy the "pattern" and "continuity" requirements of RICO.

B. **That the alleged predicate acts (i.e., ID production or transfer) directly caused Plaintiffs' damages**

Plaintiffs have failed to show that any of their damages were caused *directly* by one or more Defendants producing or transferring false identification documents. There is no evidence, for example, that Plaintiffs would have changed their actions if Defendants had used their real names. *See, e.g.*, Trial Tr. at 1524:17-22 (Dr. Nucatola "assumed NAF was the gold standard . . . for security," although she "had no knowledge in 2014 or to this day how NAF vets exhibitors");

---

Dkt. 605 at 9-10. But as that argument was decided by this Court on summary judgment, Defendants will not relitigate it here. *See* MSJ Order at 23-27.

1709:13 (Bonnie Smith, who was recorded by Defendants at an exhibitor booth: "I did not have knowledge of what that vetting process [for exhibitors] was."); *see also* Trial Tr. 1524-27, 3146, 3147, 3153-56, 1833, 1836; Ex. 7117 (all detailing Plaintiffs' failure to apply minimal security screening procedures to Defendants); Dkt. 657 at 24.

There is likewise no evidence that Plaintiffs suffered any harm resulting from the Defendants' entries into the conferences by means of false identifications. While at the conferences, Defendants not only inflicted no harm to person or property; they were socially and professionally welcomed. Indeed, most of those testifying to how they met Defendants admit that they were drawn to the BioMax booth initially themselves and remained there for the length of a conversation or that a colleague who was impressed with BioMax drew them there. *See, e.g.*, Trial Tr. at 1258:12-16 (Dr. Gatter testified that Daleiden and Merritt were "introduced to me at a professional meeting" "by a professional colleague" and "referred by a different professional colleague."); 2197:8-11 (Ex. 5081-C) (David Daleiden testified that Dr. Nucatola was trying to introduce Dr. Laura Dalton to them at one conference.); 2249:12-18 (David Daleiden testified that Dr. Nucatola introduced them to Dr. Mary Gatter); 1487:9-12 (Dr. Nucatola testified that one of her colleagues at PPFA asked her to go and meet the representatives of BioMax). No evidence exists that Defendants interfered with or disrupted the conferences in any way.

All of Plaintiffs' evidence confirms that the damages were caused by CMP's publication of the HCP videos, not by Defendants' production or transfer of fake IDs. *See* Section I in the CMP/BioMax motion. The indirect relationship between Defendants' alleged predicate acts and Plaintiffs' harms is fatal under RICO, where "the 'touchstone' . . . is the directness of the connection between defendants' act and plaintiffs' injuries." MSJ Order at 30 (citing *Fields v. Twitter, Inc.*, 881 F.3d 739 (9th Cir. 2018)).

C. That Defendant Lopez or Defendant Merritt "conducted or participated" in any enterprise "through [a] pattern of racketeering activity"

In order to prove a RICO claim against a particular Defendant, per this Court's instructions, Plaintiffs must prove that the Defendant "conducted or participated, directly or indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity. To conduct or

3
DEFENDANT DALEIDEN, MERRITT, & LOPEZ'S RULE 50(A) MOTION FOR
JUDGMENT AS A MATTER OF LAW—3:16-CV-00236-WHO

participate means that the Defendant *had to be involved in the operation or management* of the enterprise." Dkt. 983 at 58, 61.

Although Plaintiffs have not given a coherent theory of what the enterprise is for the purposes of RICO, there is no question that, on the evidence presented at trial, neither Lopez nor Merritt was "involved in the operation or management" of it, particularly if the "pattern of racketeering activity" "through" which they would have to have been involved is the creation and transfer of false IDs. Plaintiffs have provided no evidence whatsoever that either Merritt or Lopez exercised any influence over the "operation or management" of those activities. Rather, the undisputed evidence is that they had no control or influence over those aspects of the Human Capital Project, to the extent they knew about them at all. For example:

- o Trial Tr. at 2649:14-2650:6: Merritt and Lopez did not direct or control the undercover operation, the day-to-day operations of the undercover operation, or the daily activities of any individual involved with the CMP investigation.
- o Trial Tr. at 2657:20-2658:11: Daleiden kept his undercover investigators on a "need-to-know" basis re: the "overall plan" and "superstructure" of the investigation.

**Lopez:**

- o Trial Tr. at 586:3-587:1: Lopez testified that he went from transcribing videos to further involvement in research, factsheets, and logo design for CMP and was paid an hourly transcribing rate.
- o Trial Tr. at 638:4-10: Lopez testified that he wanted to assume a more important role at some point but "butted heads" with Daleiden, who made it clear it was not Lopez's project and "stay in his lane."
- o Trial Tr. at 2652:21-24: Daleiden testified that Lopez never used a fake identification; he used his own valid California driver's license.
- o Trial Tr. at 2652:25-2653:1: Daleiden testified that he did not believe Lopez ever knew about any fake IDs, "at least not specifically."

**Merritt:**

- o Trial Tr. at 2658:12-25: Merritt was an independent contractor of CMP hired for the specific task of playing the role of Susan Tennenbaum; CMP retained control over the character.
- o Trial Tr. at 2086:20-2087:14: David Daleiden testified that Merritt was an independent

contractor for the purpose of investigating, but not consulting.

- Trial Tr. at 2659:1-11: CMP retained control over all e-mails and written communications involving Susan Tennenbaum. All e-mails signed from that name were written by Daleiden with no review or approval from Merritt.

- Trial Tr. at 2659:12-2660:23: Merritt was not involved in the creation of BioMax, was not an employee of BioMax, had no access to BioMax e-mails or letterhead, did not have authority to sign contracts on behalf of BioMax, and did not sign any contracts on behalf of BioMax; contracts signed "Susan Tennenbaum" and binding BioMax were signed by Daleiden, rather than Merritt. Merritt never reviewed, saw, or even knew about any contracts and never agreed to be bound by them.

- Trial Tr. at 425:6-21: Daleiden asked Merritt to go undercover at conferences and provided her with many tools she would need, including the concealable cameras and fake i.d.

- Trial Tr. at 2126:14-2127:4 (Ex. 140): Daleiden had a "mock up photo ID card" made in the name of Susan Sarah Tennenbaum for the purpose of having an identification to use to pick up the conference badges they had purchased in that name.

In short, all of the evidence points to Mr. Lopez and Ms. Merritt having no role in the "operation or management" of any part of the HCP, including the creation or transfer of false identifications.

### D. That Defendant Lopez or Defendant Merritt conspired in the performance of the alleged predicate acts

In order to implicate any of the Defendants in a civil RICO conspiracy, Plaintiffs must show by a preponderance of the evidence that that Defendant "agreed to participate in the conspiracy with the knowledge and intent that at least one member of the racketeering conspiracy would intentionally commit, or cause, or aid and abet the commission of, two or more racketeering acts." Dkt. 983 at 70. Plaintiffs have produced **no** evidence that Mr. Lopez or Ms. Merritt agreed to participate in a plan that involved multiple acts of creating or transferring false identifications in violation of the federal racketeering laws. *See* collected evidence IV.C, *supra*.

## V. CIVIL CONSPIRACY

### A. Plaintiffs offered insufficient evidence of a "civil conspiracy," of any underlying bad acts or damages, or of any "agreement" or mutual "intention" to commit fraud, trespass, or illegal recording. Dkt. 983 at 88.

Plaintiffs offered insufficient evidence of a "civil conspiracy." As an initial matter, "civil conspiracy" is not a cognizable independent cause of action. Dkt. 124 at 18 ("Both sides agree that conspiracy is not 'is not a cause of action, but a legal doctrine that imposes liability on persons who,

although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration.' *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal.4th 503, 510-11, 28 Cal.Rptr.2d 475, 869 P.2d 454 (1994)."). Even if it were a cause of action, Plaintiffs offered insufficient evidence to prove any underlying fraud, trespass, or illegal recording, or of any cognizable damages, as discussed elsewhere herein.

Additionally, Plaintiffs offered insufficient evidence of any conspiratorial agreement or mutual intention. Plaintiffs offered no evidence that any individual Defendants believed they were committing any wrongful act; therefore, no two of them could have conspired to do so. *See, e.g.*, Trial Tr. at 2666:25-2667:2 (Daleiden testifying that neither he nor Merritt attempted to record any confidential conversations in California); Trial Tr. 831:18-21 (Rhomberg stating that "from the beginning" he was "impressed by how much David Daleiden was checking with multiple lawyers and so on"); Trial Tr. 2411-241 (Daleiden researched federal and state criminal laws to better understand what to investigate and to determine whether his findings should be brought to the attention of law enforcement.); Trial Tr. 2459:14-17 (Daleiden trained his investigators to conduct a legal and ethical investigation.); Trial Tr. 2585:10-2587:9 (Before creating his mock photo ID for "Robert Sarkis" that he used at all the conferences, Daleiden contacted the Huntington Beach Police Department and said that he needed "a prop photo ID" for a filming project, and said "I don't want to run afoul of any laws about counterfeiting documents or forging anything.").

In addition, the evidence reflects that Daleiden deliberately ran the Human Capital Project alone, keeping other people on a "need-to-know" basis—effectively "conspiring" with no one. Trial Tr. at 2657:20-2658:11 (Daleiden kept his undercover investigators on a "need-to-know" basis re: the "overall plan" and "superstructure" of the investigation); 2455:9-14 ("So this was my masterpiece, I consider it, and this was my project. There were very, very distinct levels or circles of involvement and knowledge that each people involved had. . . . [T]hat's an actual operational security kind of thing.").

The evidence also shows that that co-Defendants believed Mr. Daleiden to be very careful about avoiding breaking laws. *See, e.g.*, Trial Tr. at 513 (Merritt); 831:18-21 (Rhomberg).

/ / /

**B.    Plaintiffs have introduced no evidence that Defendants Lopez or Merritt were acting as anything other than agents of the corporation that paid them.**

As Defendants have argued elsewhere, Dkt. 603 at 3, "[a]gents and employees of a corporation cannot conspire with their corporate principal or employer where they act in their official capacities on behalf of the corporation and not as individuals for their individual advantage." *Applied Equip. Corp.*, 7 Cal. 4th at 512 n.4. The only way for a corporation to conspire with itself is if, via the conspiracy, its agents receive a "personal advantage or gain that is over and above ordinary professional fees earned as compensation for performance of the agency." *Berg & Berg Enterprises, LLC v. Sherwood Partners, Inc.*, 131 Cal. App. 4th 802, 834 (2005).

Plaintiffs offered no evidence that either Lopez or Merritt received any personal advantage or gain beyond ordinary professional pay for their work on the Human Capital Project. Therefore, no reasonable jury could find that Lopez or Merritt had "conspired" with the corporation that hired them.

## VI.    TRESPASS (PPFA, PPGC/PPCFC, PPRM)

Defendants contend that Plaintiffs have produced insufficient evidence that they committed trespass at all, as outlined in Defendants' summary judgment briefing. *See* Dkt. 603 at 23-24; Dkt. 609 at 16-18. Defendants also maintain that there is insufficient evidence to hold CMP directly liable for trespass, for reasons outlined elsewhere. *See* Trial Tr. at 3571–7. But since the Court has already decided both of those issues, Defendants will not relitigate them in the context of this Rule 50 motion.

In addition, Plaintiffs have failed to introduce sufficient evidence for a reasonable jury to find that any Defendant's alleged trespass caused any Plaintiff any actual damages. *See* Section I in the CMP/BioMax motion.

## VII.    FRAUDULENT MISREPRESENTATION

**A.    Plaintiffs have failed to present sufficient evidence for a reasonable jury to find that any of Defendants' representations made as part of their operation as undercover journalists were fraudulent.**

Plaintiffs have failed to show that Defendants' alleged misrepresentations and false promises ("representations") actually effected a fraud. False statements or representations for the purpose of

investigative journalism are not fraudulent. *See Animal Legal Def. Fund v. Wasden*, 878 F.3d 1184, 1193 (9th Cir. 2018) ("[A] false statement made in order to access a[] . . . facility cannot on its face be characterized as made to effect a fraud."). That's because under the First Amendment, the government may not restrict false speech unless it is "made 'for the purpose of material gain' or 'material advantage,' or [unless] such speech inflicts a 'legally cognizable harm.'" *Id.* at 1194 (quoting *United States v. Alvarez*, 567 U.S. 709, 723, 719 (2012)).

In *Wasden*, the Ninth Circuit held that Idaho's "ag-gag" law was unconstitutional insofar as it prohibited misrepresentations to gain access to agricultural facilities and to make audiovisual recordings without the owner's consent. *Id.* at 1194-99, 1203-1205; *see also Desnick v. Am. Broad. Co., Inc.*, 44 F.3d 1345, 1355 (7th Cir. 1995) ("[I]nvestigative television reportage . . . is entitled to all the safeguards with which the Supreme Court has surrounded liability for defamation. And it is entitled to them regardless of the name of the tort, and, we add, regardless of whether the tort suit is aimed at the content of the broadcast or the production of the broadcast."). This Court, then, must require more than evidence of representations merely to gain access to facilities and/or to film matters of public concern before sending this claim to the jury.

But the undisputed evidence here shows that all of Defendants' representations were part of legitimate undercover operations by citizen journalists who necessarily used subterfuge to access facilities and/or to film matters of public concern. There is no evidence Defendants' statements were for the purpose of their own material gain or inflicted any legally cognizable harm. For example:

- Defendants operated their "undercover project on a shoestring budget" and funded their series of investigations on a "piecemeal basis," often resulting in "long stretches of time when [they] couldn't do a whole lot because there wasn't a whole lot of funding." Trial Tr. 2454:1-12. The project operated on a budget of $120,000 over a period of 30 months, funded basically primarily by donations. Trial Tr. 2453:14-23.

- The budget was so small that Daleiden sometimes could not afford to make timely payments to Merritt, who received only a small amount of compensation for missing time from her regular work, and who had to take overnight trips to conduct her undercover investigations. Trial Tr. 2664:2-17.

- Daleiden identifies "as a citizen journalist or a citizen reporter" and considers that to be his "primary role and [his] primary job and what [he] spends [his] time doing." Trial Tr. 2302:1-6.

- Daleiden initiated the undercover reporting project "to gather and document evidence of how Planned Parenthood participates in the harvesting and trafficking of aborted fetal organs and tissues for profit," Trial Tr. 2185:2-7, which he understood to be "against the law." Trial Tr. 2301:2-5. He believed the project was a "legitimate journalistic project" because they "gathered facts and reported on true facts, and reported [their] findings accurately after gathering them." Trial Tr. 2641:13-19.

- In 2010, while Director of Research for Live Action, Daleiden discovered a series of evidence that led him to believe Planned Parenthood was engaging in illegal practices related to the harvesting and sale of fetal body parts, including (1) a Congressional hearing and investigation in 2000 about the harvesting of fetal body parts out of a Planned Parenthood in Kansas, Trial Tr. 2301:7-21; (2) ABC 20/20's investigation, as referenced in the Congressional hearing, related to the harvesting scheme in Kansas, Trial Tr. 2302:16-24, 2303:1-3; (3) an investigation by Life Dynamics documenting invoices for the sale of fetal body parts, Trial Tr. 2365:2-22, and (4) the research of Suzanne Rini, an investigative reporter, detailing widespread practices of fetal trafficking, Trial Tr. 2366:1-24.

- From 2010 through 2012, Daleiden became motivated to conduct his own investigation after discovering even more evidence of illegal fetal trafficking, including: (1) that Advanced Bioscience Resources was a main supplier of aborted fetal organs and tissues for researchers, akin to similar fetal tissue supplier organizations he saw in the ABC 20/20 report, Trial Tr. 2376:5-21; (2) that Dr. Ronald Berman with StemExpress, another fetal tissue supply organization, was both an abortion provider at Planned Parenthood Mar Monte and medical director of StemExpress, creating an unethical financial conflict of interest, Trial Tr. 2381:4-16; and (3) information on the StemExpress webpage (as saved in a 2012 screenshot and documented in Exhibit 24), offering 50 to 100 fetal body parts for sale, where "[y]ou could get a heart, you could get a heart with veins and arteries still attached, you could get a brain, you could get kidneys, you could get genitals. You could get the scalp. Really, anything you could imagine," according to Daleiden – including a drop-down menu for selecting one's preferred gestational age, Trial Tr. 2385:19-25, 2386:1-12.

- As a result of this and other evidence, Daleiden assembled a team to "carry out CMP's undercover journalism study on fetal trafficking," with Daleiden considering himself "the sole manager over the entire project." Trial Tr. 2075:1-10.

- Daleiden explained to Lopez, who was paid $15 an hour to transcribe videos, that the CMP project would entail working as "citizen journalists," and "the whole point would be to gather evidence, gather research, and [] coordinate with law enforcement with said research." Trial Tr. 636:11-22.

- Rhomberg believed the project would be similar to, and a follow-up on, the investigation ABC 20/20 had conducted in the year 2000, an investigation of which he "was well aware." Trial Tr. 696:3-13.

- o  Merritt began learning from Daleiden in 2013 about his discovery of the harvesting of aborted fetal body parts, Trial Tr. 499:11-23, including his discussions with fetal tissue procurement technician Perrin Larton, who had witnessed a baby "just f[a]ll out," born alive from a woman's uterus, as part of an organ harvesting scheme, Trial Tr. 503:4-16, and including Daleiden's discussions with Dr. Deisher about a Stanford study connecting a born-alive fetal heart to a Langendorff machine for experimentation. Trial Tr. 510:10-22.

- o  Merritt thought all of this "was too horrific in my mind to be continued to be covered up" and for there to be "no follow-through" on the ABC 20/20 investigation. "And . . . here it's still happening. I thought the truth needed to be told." Trial Tr. 512:6-10. As a result, Merritt agreed to become an "undercover investigator" for the Center for Medical Progress. Trial Tr. 512:11-13.

- o  The project's express goal to "ignite public outrage against the abortion industry" was predicated on the express premise of "*documenting, exposing, and reporting* one of the most sickening abuses of the abortion industry"—the criminal harvesting and trafficking of fetal organs and fetal tissue. Trial Tr. 2403:8-25, 2404:1-11 (emphasis added). The project's express goal to "[c]reate public outrage at Planned Parenthood and liberal university professors" was intended to inspire like-minded donors to help expose the fetal harvesting and trafficking scheme and to expose "taxpayer-funded researchers at major research universities who were the . . . end users of fetal organs and tissues." Trial Tr. 2404:17-25, 2405:1-10. The goal to "[d]eliver a major public relations blow to Planned Parenthood" was "predicated on the foundational goal of documenting and exposing . . . actual evidence of crimes within the space of harvesting and trafficking aborted fetal organs and tissues." Trial Tr. 2405:12-20.

- o  Daleiden testified that "my goal in releasing the videos publicly was to report on our findings to the public and [] to hopefully generate more pressure for law enforcement and others in positions of authority and official capacity to [] take action, to correct the problems that were documented by the videos." Trial Tr. 2640:3-8.

If this evidence is sufficient to establish fraud, then, contrary to the requirements of the First Amendment, essentially all undercover journalism would be fraudulent. *See, e.g., Desnick*, 44 F.3d at 1354-55 (dismissing a claim of fraud based on alleged misrepresentations made by investigative journalists in the course of an undercover filming campaign targeted at a medical practice). But "lying to gain entry merely allows the speaker to cross the threshold of another's property" and is not "coextensive" with material gain. *Wasden*, 878 F.3d at 1194, 1195. And making surreptitious audiovisual recordings of matters of public concern "is itself an inherently expressive activity" and protected by the First Amendment, meaning it does not, by itself, inflict a legally cognizable harm. *Id.* at 1203. Indeed, "there [i]s no fraud in a tester scheme because 'a scheme to expose publicly any bad practices that the investigative team discovered' [i]s not

fraudulent." Komal S. Patel, *Testing the Limits of the First Amendment: How Online Civil Rights Testing Is Protected Speech Activity*, 118 COLUM. L. REV. 1473, 1490 (2018) (quoting *Desnick*, 44 F.3d at 1355).

All of Plaintiffs' evidence of fraud, however, turns on the mere alleged falsity of Defendants' representations and the fact they were used to gain entry to various facilities and to film evidence of illegal activities. Such evidence is not sufficient to show that Defendants' representations "effect[ed] a fraud." *Wasden*, 878 F.3d at 1193. Defendants are therefore entitled to judgment as a matter of law on Plaintiffs' claim for fraudulent misrepresentation.

### B. Even if Defendants' representations were fraudulent, Plaintiffs have provided no evidence of either actual or reasonable reliance.

Plaintiffs have failed to establish that they either reasonably or actually relied on Defendants' representations. For the fraudulent misrepresentation claims arising under law in California, Colorado, Texas, and Washington D.C., Plaintiffs must show they reasonably relied on Defendants' representations. *See Saucier v. Countrywide Home Loans*, 64 A.3d 428, 438 (D.C. 2013); *Attias v. CareFirst, Inc.*, 365 F. Supp. 3d 1, 10 (D.D.C. 2019); *Valley Equip. Leasing, Inc. v. McGriff, Seibels & Williams of Oregon, Inc.*, No. 14-CV-02383-CMA-NYW, 2016 WL 1697861, at *6 (D. Colo. Apr. 28, 2016); *Ashton v. KoonsFuller, P.C.*, No. 05-16-00130-CV, 2017 WL 1908624, at *5 (Tex. App. May 10, 2017); *Collins v. eMachines*, Inc., 202 Cal. App. 4th 249, 259 (2011). For the claim arising under Florida law, Plaintiffs need not show reasonable reliance, but they must still show harm as a result of actual reliance. *Butler v. Yusem*, 44 So. 3d 102, 105 (Fla. 2010).

In order for reliance to be reasonable or justifiable, "a plaintiff cannot close his eyes and blindly rely upon the assurances of another absent some fiduciary relationship or emergency." *C & E Servs., Inc. v. Ashland, Inc.*, 498 F. Supp. 2d 242, 260 (D.D.C. 2007) (internal quotation marks omitted); *see also Gen. Motors Acceptance Corp. v. Cent. Nat. Bank of Mattoon*, 773 F.2d 771, 779 (7th Cir. 1985) ("[I]f ample opportunity exists to discover the truth, then reliance on misstatements is not justified."). In arm's-length transactions like those at issue here, a plaintiff "must exercise reasonable diligence for the protection of his or her own interests, and a failure to do so is not excused by mere confidence in the honesty and integrity of the other party." *TMI, Inc. v. Brooks*,

225 S.W.3d 783, 795 (Tex. App. 2007). And actual reliance, moreover, requires "[p]roof that the conduct was a substantial factor in bringing about the injury" and "must be established beyond mere conjecture, guess, or speculation." *Gen. Capital Grp. Beteligungsberatung GMBH v. AT & T*, 407 S.W.3d 507, 510 (Tex. App. 2013) (internal quotation marks omitted).

Here, Plaintiffs' putative reliance on Defendants' misrepresentations did not cause them any cognizable harm and was unreasonable. Plaintiffs trained personnel who interfaced with Defendants in granting them admission to their conferences and clinics. Trial Tr. 329, 3110, 3103, 3145-46. But Plaintiffs failed to make even minimal efforts to vet the authenticity of Defendants' representations, despite ample opportunities to do so, and there's no evidence Plaintiffs would not have admitted at least Daleiden and Merritt even if they had used their own names and identification. PPFA did not even go through the trouble of vetting BioMax as a potential business partner through a simple Google search. Trial Tr. 1524-27, 3146, 3147, 3153-56, 1833, 1836; Ex. 7117; Dkt. 657 at 24. *See also, e.g.*, Section I in the CMP/BioMax motion (absence of proximate cause).

Accordingly, there is insufficient evidence that Plaintiffs, from PPFA down to its affiliates, reasonably relied on Defendants' representations. Defendants are thus entitled to judgment as a matter of law on this claim.

## VIII. PUNITIVE DAMAGES

Plaintiffs are seeking punitive damages with respect to their claims of Trespass, Fraud, Florida, Maryland and Federal Wiretapping, and Civil Conspiracy. Dkt. 59, FAC, ¶¶ 171, 176, 196, 210, 231, 237; Dkt. 983 at 98–99. Plaintiffs do not seek punitive damages for their *California* recording claim, reflecting the parties' and the Court's conclusion that judgment as a matter of law is appropriate with respect to punitive damages under California law. *See* 20 Trial Tr. 3733:23–3736:5. This is because Plaintiffs "failed to submit appropriate evidence regarding the defendants' financial condition," which is required for punitive damages under California law. *Freund v. Nycomed Amersham*, 347 F.3d 752, 763 (9th Cir. 2003). However, to the extent there is any question as to the California claims, Defendants also seek judgment as a matter of law that punitive damages are not available under California law (with respect to the recording claims or fraud) due

to the absence of evidence of Defendants' financial condition.

Looking to the remaining claims, Florida law governs the state-law claims relating to the PPFA conferences in Miami and Orlando (Florida wiretapping, fraud, trespass). There, "the legal standard for establishing entitlement to punitive damages" is "that the plaintiff must prove by clear and convincing evidence that the conduct causing the damage was either 'intentional' or 'grossly negligent'." *Soffer v. R.J. Reynolds Tobacco Co.*, 187 So. 3d 1219, 1222 (Fla. 2016). With respect to "intentional" conduct, "punitive damages are warranted only where the egregious wrongdoing of the defendant, although perhaps not covered by criminal law, nevertheless constitutes a public wrong." *Chrysler Corp. v. Wolmer*, 499 So. 2d 823, 825 (Fla. 1986). With respect to "gross negligence," "the plaintiff must prove that the defendant's conduct was 'so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct.'" *Soffer*, 187 So. 3d at 1222.

The claims relating to the D.C. and Maryland conferences, and the site visits in Texas and Colorado, as well as the Federal Wiretapping claims generally, are subject to the law of those jurisdictions and federal law. Under the law of all of these jurisdictions, plaintiffs must prove malice. *Bowden v. Caldor, Inc.*, 350 Md. 4, 23 (1998); *Grp. Hosp. Servs., Inc. v. Daniel*, 704 S.W.2d 870, 875 (Tex. App. 1985); *W. Fire Truck, Inc. v. Emergency One, Inc.*, 134 P.3d 570, 578 (Colo. App. 2006); *Destefano v. Children's Nat. Med. Ctr.*, 121 A.3d 59, 66 (D.C. 2015).

Defendants are entitled to judgment as a matter of law with respect to all remaining punitive damages claims, because there was no evidence at trial that any of them committed any public wrong or gross negligence (Florida) or acted with "malice" (D.C., Maryland, Texas, Colorado, and federal), *i.e.*, engaged in "conscious and deliberate wrongdoing," or had an "evil or wrongful motive," an "intent to injure," or "ill will." *Bowden*, 350 Md. at 23. To the contrary, the evidence is that Defendants purpose in undertaking their traditional investigative journalism study was to uncover the Plaintiffs' criminal activity and publicize it for the public good. The "fraud," "unlawful recording," and "trespasses" at issue here are not wrongful for purposes of punitive damages. *See Wasden*, 878 F.3d at 1194 ("[A] false statement made in order to access a[] . . . facility . . . cannot on its face be characterized as made to effect a fraud"); Patel, *supra*, 118 COLUM. L. REV.

13

at 1490 ("[T]here [i]s no fraud in a tester scheme because 'a scheme to expose publicly any bad practices that the investigative team discovered' [i]s not fraudulent.") (quoting *Desnick*, 44 F.3d at 1355).[3]

## CONCLUSION

For the above reasons, and for those laid out in various co-Defendants' motions, Defendants here request that the Court grant the present motion for judgment as a matter of law.

Date:  November 11, 2019              Respectfully submitted

/s/ Charles S. LiMandri
Charles S. LiMandri (CA Bar No. 110841)
Paul M. Jonna (CA Bar No. 265389)
Jeffrey M. Trissell (CA Bar No. 292480)
B. Dean Wilson (CA Bar No. 305844)
Milan L. Brandon (CA Bar No. 326953)
FREEDOM OF CONSCIENCE DEFENSE FUND
P.O. Box 9520
Rancho Santa Fe, CA 92067
Tel: (858) 759-9948
Facsimile: (858) 759-9938
cslimandri@limandri.com
pjonna@limandri.com
jtrissell@limandri.com

*Attorneys for Defendants the Center for Medical Progress, BioMax Procurement Services, LLC, David Daleiden, and Gerardo Adrian Lopez*

/s/ Harmeet K. Dhillon
Harmeet K. Dhillon (CA Bar No. 207873)
Gregory R. Michael (CA Bar No. 306814)
DHILLON LAW GROUP INC.
177 Post Street, Suite 700
San Francisco, CA 94108
415-433-1700
415-520-6593 (fax)
harmeet@dhillonlaw.com

---

[3] As discussed above, Defendants reserve their objections to the Court's various rulings preventing Defendants from introducing evidence and proper jury instructions relevant to these and other issues.

Denise M. Harle (CA Bar No. 275561)
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd., NE
Suite D1100
Lawrenceville, GA 30043
Tel: (770) 339-0774
dharle@ADFlegal.org

*Attorneys for Defendants the Center for Medical Progress, BioMax Procurement Services, LLC, and David Daleiden*

/s/ Thomas Brejcha
Thomas Brejcha, *pro hac vice*
Peter Breen, *pro hac vice*
Matthew F. Heffron, *pro hac vice*
THOMAS MORE SOCIETY
309 W. Washington St., Ste. 1250
Chicago, IL 60606
Tel: (312) 782-1680
tbrejcha@thomasmoresociety.org
pbreen@thomasmorsociety.org

*Attorneys for Defendant David Daleiden*

/s/ Horatio G. Mihet
Horatio G. Mihet*
Liberty Counsel
hmihet@lc.org
P.O. Box 540774
Orlando, FL 32854
(407) 875-1776
*Admitted pro hac vice

Nicolaie Cocis CA Bar # 204703
Law Office of Nic Cocis and Associates
nic@cocislaw.com
38975 Sky Canyon Dr., Suite 211
Murrieta, CA 92563
(951) 695-1400

*Attorneys for Defendant Sandra Susan Merritt*