Edward L. White III, pro hac vice
Erik M. Zimmerman, pro hac vice
John A. Monaghan, pro hac vice
Christina A. Stierhoff, pro hac vice
AMERICAN CENTER FOR LAW & JUSTICE
3001 Plymouth Rd., Ste. 203
Ann Arbor, MI 48105
Tel: (734) 680-8007
ewhite@aclj.org
ezimmerman@aclj.org
jmonaghan@aclj.org
cstierhoff@aclj.org

Vladimir F. Kozina (#95422)
MAYALL HURLEY, P.C.
2453 Grand Canal Blvd.
Stockton, CA 95207
Tel: (209) 477-3833
VKozina@mayallaw.com

*Attorneys for Defendant Troy Newman*

UNITED STATES DISTRICT COURT,

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PLANNED PARENTHOOD FEDERATION OF AMERICA, et. al., <br><br> Plaintiffs, <br><br> vs. <br><br> THE CENTER FOR MEDICAL PROGRESS, et al., <br><br> Defendants. | Case No. 3:16-CV-00236 (WHO) <br><br> Judge William H. Orrick, III <br><br> **DEFENDANT TROY NEWMAN'S RULE 50(a) MOTION FOR JUDGMENT AS A MATTER OF LAW** <br><br> Trial Date: October 2, 2019 <br> Courtroom 2, 17th Floor |

1

**TABLE OF CONTENTS**

2    I.      Request for Rule 50 Relief………………………………..……………………………4

3    II.     Statement of Facts…………………………………………….……………………...4

4    III.    Fifth Amendment Inferences………………………………………….………..……9

5    IV.     Damages……………………………………………………….………………...10

6    V.      Law of Conspiracy…………………………………….…..……………………...12

7    VI.     Counts…………………………………………………….………………….....13

8            a.   RICO Conspiracy: Plaintiffs Have Failed to Present Direct or Indirect Evidence
                  That Newman Agreed to Further or Facilitate Any RICO Violation, Had Knowledge
                  of the Essential Nature and Scope of Any RICO Violation, or Intended to Participate
                  in Any RICO Violation……………..……………………………………...…..13

             b.   Conspiracy to Trespass: Plaintiffs Have Failed to Present Direct or Indirect
                  Evidence That Newman Knew That Other Defendants Would Commit a Trespass
                  and That Newman Agreed With and Supported the Other Defendants In Committing
                  That Trespass………………………..………………………………………...…16

             c.   Conspiracy to Commit Fraudulent Misrepresentation: Plaintiffs Have Failed to
                  Present Direct or Indirect Evidence That Newman Knew That Other Defendants
                  Would Commit Fraudulent Misrepresentation and/or a False Promise and That
                  Newman Agreed With and Supported the Other Defendants In Committing That
                  Fraudulent Misrepresentation or False Promise…………………………….....18

     VII.    Standing Issue…………………………………………..…………………..22

1

2

**TABLE OF AUTHORITY**

3

<u>**Case Law**</u>

*Accuimage Diagnostics Corp. v. Terarecon*, Inc., 260 F. Supp. 2d 941 (N.D. Cal. 2003)...………12

*Doe v. Glanzer*, 232 F.3d 1258 (9th Cir. 2000)…...……………………………………………….9

*Farley Transp. Co. v. Santa Fe Trail Transp. Co.*, 786 F.2d 1342 (9th Cir. 1985)……………...…4

*Lifshitz v. Walter Drake & Sons, Inc.*, 806 F.2d 1426 (9th Cir. 1986)……………………….…...4

*Reeves v. Teuscher*, 881 F.2d, 1495 (9th Cir. 1989)…………..……………………………………4

*Strong v. Wisconsin*, 544 F. Supp. 2d 748 (W.D. Wis. 2008)……......………………………….17

*Webb v. Sloan*, 64 F. App'x 657 (9th Cir. 2003)…………………………………………………4

*Ocasio v. United States*, 136 S. Ct. 1423 (2016)……………..……………………………………14

<u>**Codes**</u>

Cal. Const. Art. 1, § 15.………………………………………………………………………9

Cal. Evid. Code § 913.……………………………………………………………………………9

California Penal Code §632.……………………………………………….…………....13, 20

U.S. Const. amend. V.……………………………………………………………………………9

<u>**Rules**</u>

Fed. R. Civ. P. 50.………………………………………………………………………………4

Fed. R. Civ. P. 8.…………….....………………………………………………………17, 21

FRE 501.………………….………………………………………………………………………9

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

### I. Request for Rule 50(a) Relief

2          A motion for a matter of law is granted "if the court finds that a reasonable jury would not

3 have a legally sufficient evidentiary basis to find for that party on that issue." Fed. R. Civ. P.

4 50(a)(1). The court, when granting a motion for a matter of law can "[] resolve the issue against the

5 party; and [] grant a motion for judgment as a matter of law against the party on a claim or defense

6 that, under the controlling law, can be maintained or defeated only with a favorable finding on that

7 issue." Fed. R. Civ. P. 50(a)(1)(A)–(B). A judgment as a matter of law motion must be "made at

8 any time before the case is submitted to the jury" and "must specify the judgment sought and the

9 law and facts that entitle the movant to the judgment." Fed. R. Civ. P. 50(a)(2). The purpose of a

10 judgment as a matter of law is to "question only the sufficiency of the evidence relevant to the

11 grounds that it cites." *Lifshitz v. Walter Drake & Sons, Inc.*, 806 F.2d 1426, 1429 (9th Cir. 1986).

12 The Court should grant a defendant's Rule 50(a) motion if "no reasonable jury could have found

13 for Plaintiff." *Webb v. Sloan*, 64 F. App'x 657, 658 (9th Cir. 2003).

14          The Ninth Circuit requires that a judgment as a matter of law "must be made at the close of

15 all the evidence to be effective under Rule 50(b)." *Farley Transp. Co. v. Santa Fe Trail Transp.*

16 *Co.*, 786 F.2d 1342, 1346 (9th Cir. 1985). However, courts are "generally more liberal about what

17 suffices as a motion for a [judgment as a matter of law] after the close of all the evidence." *Reeves*

18 *v. Teuscher*, 881 F.2d, 1495, 1498 (9th Cir. 1989).  An "ambiguous or inartfully made motion for a

19 [judgment as a matter of law] or by an objection to an instruction for insufficient evidence to

20 submit an issue to the jury" can satisfy the Rule 50(a) requirements for the purpose of Rule 50(b).

21 *Id.*[1]

22 **II. Statement of Facts:**

23          In 2012, Mr. Daleiden met with Mr. Newman in Kansas to discuss the concept of an

24 undercover investigation that Mr. Daleiden had already been thinking about. 10/21/19 Trial Tr.

25 (Vol. 11 at 2050, 2057). Mr. Daleiden provided extensive testimony about Exhibit 123, a road map

26

27 [1] Defendant Troy Newman incorporates all of the other Defendants' Rule 50(a) Motions by
reference herein given the amount of overlap in the applicable law, and in order to cut down on
needless repetition.

28

document that he sent to Mr. Newman on January 28, 2013. *See, e.g., id.* at 2050–65, 2456–58. Mr. Daleiden explained that this document was not "a formal plan," but rather was "the bare bones of my thoughts" "describing initial concepts for an undercover investigation" that he "was brainstorming beginning in late 2012." *Id.* at 2052–53, 2064–65. Mr. Newman was just "one of many different people" that Mr. Daleiden wanted to "bounce[] ideas off" and get feedback from on the "concepts." *Id.* at 2064–65.

After Mr. Newman received this "initial concepts" document, he encouraged Mr. Daleiden "to continue [his] work on this idea that [he was] constructing." *Id.* at 2059. The discussions that Mr. Daleiden and Mr. Newman had at that time were "more conceptual" than "goal-oriented," and Mr. Daleiden shared his "desire to do a very detailed, comprehensive, in-depth, investigative journalism study of the harvesting and sale of fetal body parts. . . . I don't know . . . that those discussions really got very detailed into what's going to happen when the video is released. . . . I think that kind of concept was the extent of what we talked about." *Id.* at 2055–57.[2]

Mr. Daleiden provided extensive testimony about the fact that he "was the sole manager" of the undercover investigation and CMP's publication of videos. *Id.* at 2075, 2279–84. For instance, Mr. Daleiden testified that, "in order to carry out CMP's undercover journalism study on fetal trafficking, it certainly required more people than just me for specific tasks. Although in terms of actually managing the entire project, I was the sole manager over the entire project." *Id.* at 2075. He explained that he "personally made decisions about what roles various people" involved in the undercover work would have, and he was "the one who was leading the project." *Id.* at 2165–66. Mr. Daleiden hired the investigators, signed up and paid for the conferences, and oversaw and/or created BioMax's website, brochures, and business cards. *Id.* at 2105, 2111–14, 2118–21, 2651; Exh. 31 (brochure); Exh. 366 (business cards); Exh. 684 (website).

Mr. Daleiden explained that Mr. Newman <u>did not</u>:

- Do any undercover work for CMP or BioMax;

---

[2] *Cf. id.* at 2090 (Mr. Daleiden's January 2013 conversation with Mr. Rhomberg about CMP's first investigative project "was about the themes and concepts of the investigation.").

- Attend any conferences or meetings on behalf of CMP or BioMax;

- Record any individuals on behalf of CMP or BioMax;

- Direct or control the undercover operation; or

- Direct, oversee, or control the day-to-day activities of Mr. Daleiden or any other individuals involved in the undercover investigation.

*Id.* at 2648–50. Furthermore, Mr. Daleiden testified that, prior to the release of the videos, Mr. Newman was never told "that you [Mr. Daleiden] were going to use any fake IDs during the undercover investigation," that he did not "discuss the concept of using fake IDs" with Mr. Newman, that he did not "share any information with Mr. Rhomberg or Mr. Newman about the IDs that were going to be used during the investigation," and that he did not "tell Mr. Rhomberg or Mr. Newman that you [Mr. Daleiden] had made or were acquiring any fake IDs." *Id.*

During the course of the time that Mr. Newman was a CMP board member, Mr. Daleiden said he didn't remember ever updating Mr. Newman on the project: "I do recall specifically talking with Mr. Rhomberg over the phone at some point, that — you know, that we were going to be doing site visits. I don't recall having a similar conversation with Mr. Newman." 10/22/19 Trial Tr. (Vol. 12 at 2272–2273). Mr. Daleiden explained further that CMP as an organization was <u>not</u> involved in the day-to-day details of carrying on the investigation; rather, CMP created the concept for the project, provided funding, and is the entity that eventually published the videos. *Id.* at 2466. Specifically, the Board of CMP did not even consent of the creation of BioMax. *Id.* at 2461–2462. The reason that Mr. Daleiden valued Mr. Newman's discretion:

> in not talking about my plans for the project is *not* because I was intending to constantly update them. Particularly Troy, because he was out in Kansas. . . .
>
> [You] specifically asked me if I wanted them to be — people who would be good at keeping secrets because I would be constantly updating them on what I was doing. *That's not correct*. I had given them a certain amount of information at the beginning about conceptually what I wanted to do. . . . But it was . . . confidentiality or secrecy to protect what I had already said I was going to do, *not to protect ongoing disclosures or ongoing updates that I was intending to make to them, because I wasn't intending to make those constantly to them, and I didn't.*

*Id.* at 2058 (emphasis added). In other words, Mr. Daleiden believed that Mr. Newman appreciated

1  the undercover methodology that he intended to use for the project. *Id.* at 2059, 2090.

2       Mr. Daleiden further explained the strategy behind limiting Mr. Newman's and various

3  individuals' access to information about undercover investigations:

> [E]verything about this project was strictly on a *need-to-know* basis, and that even
> included . . . *the Board directors* for Center for Medical Progress. So this was my
> masterpiece, I consider it, and *this was my project*. There were very, very distinct
> levels or circles of involvement and knowledge that each people involved had. . . .
> *[T]hat's an actual operational security kind of thing*. . . .
>
> [When I worked at Live Action,] what we were informed about was that a good rule
> of thumb was that for every person that you tell about an undercover project like this
> before you release it, you should estimate that it's going to lose about 50 percent of
> its efficacy for each person that you tell.
>
> So that's why it's done on a need-to-know basis with the team that you're working
> with. . . . [T]here is sort of one level of knowledge that the people that actually wore
> cameras and went to the conferences or went to the meetings had, you know, based
> on how I trained them in order to actually run the scenario and fulfill their role.
>
> There's another level of knowledge that people who are more *peripherally involved,
> like corporate board directors* . . . would have knowing there is an undercover
> investigation going on; but as far as all the specific details and who is going where
> at what time and stuff like that, *they weren't involved in that*.

16  *Id.* at 2455–56 (emphasis added).

17       Other testimony corroborated the fact that Mr. Newman was not provided with much

18  information about the investigation during the time in which it was being conducted. For example,

19  Mr. Rhomberg testified that during some of the "occasional telephonic board meetings" with Mr.

20  Daleiden, Mr. Rhomberg, and Mr. Newman, there was some "quite limited" discussion "that the

21  project was going forward," but "*we didn't get into the details of the project*" "because the project

22  was . . . secret." *Id.* at 716–18. Mr. Rhomberg explained that he "was not very much aware or

23  involved with" "the kind of details of the tactics [Mr. Daleiden] was going to use," *id.* at 720–21,

24  and he did not know who the BioMax actors were (besides Mr. Daleiden) until after CMP began to

25  release videos. *Id.* at 723. Similarly, Susan Merritt testified that she did not know who Mr.

26  Newman was until sometime after CMP began publishing videos in 2015, *id.* at 531; and both her

27  and Adrian Lopez testified that they only met Mr. Newman after this lawsuit was filed. *Id.* at 531;

28  667.

1    Furthermore, Ms. Bryan testified that she only works for Mr. Daleiden as his

2  communications director, and she told Newman that Mr. Daleiden is the only spokesperson. Bryan

3  Depo. 110:23–114:1. Ms. Bryan also stated that the Human Capital Project is solely Mr. Daleiden's

4  project, and confirmed that Mr. Newman was not the genesis. Bryan Depo. 165:23–166:18. Lastly,

5  Ms. Bryan stated that she does not know Mr. Newman that well. Bryan Depo. 132:4–5.

6    Most of the relatively minimal information shared with Mr. Newman about the

7  investigation came as it was about to conclude, or was actually completed, in connection with

8  CMP's *preparations to publish its videos*. For example, Mr. Newman only learned of Mr.

9  Daleiden's visits to PPGC and PPRM "after the fact, *when I was getting ready to release the*

10  *videos*. I don't know that he was necessarily aware specifically of where we were going to be doing

11  site visits beforehand." *Id.* at 2272–73 (emphasis added).[3] In fact, in Exhibit 37, Mr. Newman

12  specifically emailed Mr. Daleiden seeking confirmation on what his role even was: "As I'm

13  thinking about getting the whole PLM [Pro-Life Movement] keyed into this I was wondering how

14  you want me to frame my involvement? What 'title; do you want me to use? Coordinator?

15  Member? Is OR part of the project, advisor? Etc. I just don't want to over or understate our

16  involvement." *Id.* at 2290–2291. Mr. Daleiden's response was that he was simply a board member.

17  *Id.*

18    Although numerous individuals, including Mr. Newman, received information related to the

19  upcoming publication of CMP's videos, Mr. Daleiden "directed" the editing and production of

20  CMP's published videos. *Id.* at 2279–84. In fact, Mr. Daleiden testified that Mr. Newman's term as

21  a CMP board member was not renewed after it expired at the end of 2015 because Mr. Newman

22  shared versions of yet-to-be-published CMP videos with certain individuals without Mr. Daleiden's

23  "permission or knowledge." *Id.* at 2275–78. Mr. Daleiden explained, "I saw it primarily at that time

24  as . . . a violation of my trust and direction of . . . how and in what order stuff was to be released,

25  and where. . . . [I]t was the people that he was sending it to at the time that he was sending it to,

26  _____

27  [3] *Cf. id.* at 2090 (Mr. Daleiden stated that "there were many different methods and tactics that I
used that [Mr. Rhomberg] wouldn't have necessarily been aware of at every moment.").

28

1  without any direction . . . or reference to my leadership and direction of it that was . . . very

2  bothersome for me." *Id.*

3  **III. Fifth Amendment Inferences:**

4     The Court's Order concerning adverse inferences (Dkt. #968) and reading of the inferences to

5  the jury due to Mr. Newman's valid exercise of his Fifth Amendment privilege violated Mr.

6  Newman's rights, and are improper with respect to non-parties Ms. Davin and Ms. Baxter for the

7  same reasons (in addition to the fact that the Ninth Circuit has not addressed the unusual situation

8  of whether inferences based upon non-party invocations of the privilege are ever permissible). *See,*

9  *e.g.,* U.S. Const. amend. V; Cal. Const. Art. 1, § 15; Cal. Evid. Code § 913; FRE 501; *Doe v.*

10 *Glanzer*, 232 F.3d 1258 (9th Cir. 2000). Defendants' positions concerning the various iterations of,

11 and purported need for, the inferences were set forth at length at Dkt. #823, 841, 853, 956 (and

12 related exhibits), as well as in numerous conferences during which the inferences were discussed,

13 and those arguments are incorporated herein. To summarize, a party requesting an adverse

14 inference must:

15
    - Specify what the requested inference is;
    - Show that the inference is tied to the actual question asked, and would not require
16     constructing an inference on another inference;
17  - Provide independent, admissible evidence of the fact to which the party refuses to
       answer;
18  - Show that there is a "substantial need" for an inference because the requested
       information relates to a central, core issue in the case; and
19  - Show that there is no other source of the requested information because the person
20     invoking the privilege was in exclusive possession of the information.

21 *See, e.g.*, Dkt. #823 and cases cited therein.

22     As explained in the briefing and during the conferences, none of the requested inferences

23 met the constitutional standard. Additionally, some of the inferences are supported by literally no

24 evidence in the record, either because the Court excluded the only item of evidence relating to the

25 inference (such as the theological book referenced in Newman #1) or the Plaintiffs offered no

26 exhibits or testimony into evidence to support the inference. In sum, the inferences should not be

27 considered in determining this motion and the Rule 50 motion(s) of other Defendants, and granting

28 the inferences was reversible error. [Note: This motion should be granted, in full, even assuming

9

1  the propriety of the inferences due to the extensive evidence establishing that Newman did not

2  conspire to violate RICO, commit fraud, or engage in any other tortious or illegal act.]

3      Furthermore, Mr. Newman maintains that the Fifth Amendment Inferences that were read to the

4  jury are not facts or evidence at trial. The Introductory Jury Instruction "6. What is Evidence"

5  states that "The evidence you are to consider in deciding what the facts are consists of: 1. the sworn

6  testimony of any witness; 2. the exhibits that are admitted into evidence; 3. any facts to which the

7  lawyers have agreed; and 4. any facts that I may instruct you to accept as proved." Dkt. #993 at 12.

8  The inferences do not fall under any of these categories. Moreover, the Introductory Jury

9  Instruction Number 1: Duty of Jury further states that "It is your duty to find the facts from all the

10  evidence in the case. To those facts you will apply the law as I give it to you. . . That means that

11  you must decide the case solely on the evidence before you." *Id.* at 7. Thus, the jury is to only

12  decide the case based on the evidence before them, and the inferences are not evidence.

13  **IV. Damages:**

14      Mr. Newman also joins in the Rule 50 Motion filed concurrently by Center for Medical

15  Progress, BioMax Procurement Services, David Daleiden, Susan Merritt, and Adrian Lopez ("CMP

16  Defendants") with regards to the damages claims.  All arguments in this section apply with equal

17  force to Mr. Newman because, as argued in that brief, the damages sought are not "directly tethered

18  to defendants" own conduct nor has the "causal nexus for the damages" been shown at trial.  MSJ

19  Ord. at 21.  The evidence shows that all the personal security costs were due to Plaintiffs' response

20  to publics' reaction to the release of the CMP videos. Trial Tr. at 1300:25-1301:7 (PPPSGV); Trial

21  Tr. at 1160-63 (PPPSGV); Trial Tr. at 1420:20-1421:6, 1425-1428 (PPOSBC); Trial Tr. at1823:7-

22  15 2970:7-23 (PPRM); Trial Tr. at 1615-22 (PPGC); Trial Tr. at 1812:14–1813:5 (PPFA). PPFA

23  also spent money on investigating the infiltration and improving security; these costs are simply not

24  damages. None of the damages sought against the CMP Defendants are recoverable under standard

25  legal principles. Thus it follows that an alleged conspirator in the actions of the CMP Defendants—

26  which caused no legally recoverable damages—similarly cannot be held liable for any damages in

27  this case.

28      Punitive Damages

Defendant Newman also joins in the Rule 50 Motion filed concurrently by the CMP Defendants with regards to the punitive damages claims. All arguments in this section apply with equal force to Mr. Newman because, as argued in that Rule 50 Motion, Plaintiffs have not proved that the conduct causing the damage was either "'intentional' or 'grossly negligent'" as required under Florida law and Plaintiffs have shown no malice, oppression, or fraud on Mr. Newman's part with regard to the other punitive damages claims. Therefore, no reasonable jury could find that Defendant Newman has caused Plaintiffs any cognizable actual damages.

In light of Plaintiffs' last-minute attempt to add Mr. Newman to several additional causes of action that were not asserted against him in the Amended Complaint, it is still unclear which claims, if any, could conceivably provide a basis for requesting a punitive damage verdict against him. Nevertheless, regardless of which claims are at issue, no reasonable juror could conclude that Mr. Newman, Mr. Rhomberg or any other Defendant acted with the kind of evil intent or deliberate disregard for the law that is required to pursue a punitive damages claim.

Although Plaintiffs spent extensive effort "proving" the undisputed fact that Mr. Newman (like millions of other Americans) opposes abortion on religious and moral grounds, a stated desire to see the illegal and unethical acts of abortion providers brought to light, prompting investigation and prosecution of the wrongdoers, is not evidence of any actionable "ill-will" for purposes of punitive damages. Additionally, as discussed herein and in the other Defendants' Rule 50 motions, voluminous evidence showed that the purpose of the investigative project was to expose illegal acts by researching, investigating, and publishing information about them. That is not an illegal or nefarious purpose; in fact, it is a laudable one. Further, it is undisputed, based on the evidence, that Mr. Newman had little to no information about or knowledge of the details of the specific events that purportedly give rise to punitive damage liability.

In light of the discovery rulings that severely limited Defendants' ability to obtain discovery that would help to highlight the truth of CMP's publications, and the fact that the jury has been advised that this litigation is not about the truth of those publications, it must be assumed for purposes of Plaintiffs' punitive damages request that BioMax's investigators did, in fact, uncover evidence of illegal acts. (Indeed, both houses of Congress conducted their own investigations,

1   which corroborated CMP's findings in detailed reports and resulting criminal referrals.) And, to

2   dispel any possible remaining doubt about whether Defendants actually intended to expose acts of

3   wrongdoing, all parties agree that CMP shared findings from its investigation *with numerous law*

4   *enforcement agencies*. Any claim for punitive damages against Mr. Newman is contrary to the

5   evidence, and should be dismissed as a matter of law.

6   **V. Law of Conspiracy**

7   Plaintiffs assert the concept of civil conspiracy to hold Mr. Newman liable on certain

8   counts, where "Newman may be held indirectly liable if plaintiffs prove at trial their knowledge of,

9   agreement to, or support of the fraudulent conduct that enabled" the tortious conduct. Ord. on

10  Summary Judgment, Dkt. #753 at 70 ("MSJ Ord."). Since civil conspiracy is not a cause of action,

11  the question is not, generically, whether a particular Defendant was part of "the" conspiracy, but

12  rather whether the Defendant conspired to further the commission of a particular tortious or illegal

13  act. In order for a particular Defendant to be held liable via conspiracy on a particular cause of

14  action, Plaintiffs must prove that the Defendant:

15  (a) had knowledge that another defendant planned to commit the specific wrongful act;
    (b) agreed with the other defendant that the wrongful act be committed; and
16  (c) cooperated or agreed to cooperate in the commission of that wrongful act.

17  *See, e.g.,* Dkt. #753, MSJ Ord. at 109; Pls.' Proposed Jury Instruction, Dkt. #971 at p. 127.

18  As noted in the consolidated motion to dismiss, Dkt. #79, to hold a Defendant liable under a

19  conspiracy theory, Plaintiffs were required to "clearly allege specific action on the part of each

20  defendant . . . within the sections of the complaint that contain plaintiff's claims for the underlying

21  torts." *Id.* at 17 (quoting *Accuimage Diagnostics Corp. v. Terarecon*, Inc., 260 F. Supp. 2d 941, 948

22  (N.D. Cal. 2003)). Although knowledge of the planned wrongful acts at issue is required—should

23  have known is not the standard, see Dkt. #753, MSJ Ord. at 109; Pls.' Proposed Jury Instruction,

24  Dkt. #971 at p. 127—mere knowledge of a wrongful act without cooperation or an agreement to

25  cooperate is insufficient to make a Defendant responsible for the harm. *See* Plaintiffs' Proposed

26  Jury Instruction, Dkt. #971 at p. 127.

27

28

**VI. Counts:**

Plaintiffs assert that Defendant Troy Newman is liable under these four Counts: [4]

> i.   RICO Conspiracy
> ii.  Conspiracy to Trespass
> iii. Conspiracy to Commit Fraudulent Misrepresentation and False Promise
> iv.  Conspiracy to Record (California Penal Code 632 ("Recording Statute"), Florida Recording Statute, Maryland Recording Statute, and Federal Recording Statute).

In order for this Court to find that it reasonable that the jury has a legally sufficient evidentiary basis to find for Plaintiffs in their claims against Mr. Newman, the Plaintiffs are required to prove each element of all four claims with evidence against Mr. Newman. In this case, Plaintiffs have failed to provide sufficient evidence to prove of the elements of their underlying claims of violation of RICO, Fraud, violations of the various recording claims, and trespass, as set forth in the CMP Defendants' Rule 50 Motion. Defendant Newman fully joins in this section of the Rule 50 Motion because any failure to prove the underlying bad act means he cannot be found liable for a conspiracy to have committed this act. Moreover, Plaintiffs have failed to meet their burden of proof for showing Mr. Newman was involved in a conspiracy to commit the following wrongful acts.

## A. RICO Conspiracy: Plaintiffs Have Failed to Present Direct or Indirect Evidence That Newman Agreed to Further or Facilitate Any RICO Violation, Had Knowledge of the Essential Nature and Scope of Any RICO Violation, or Intended to Participate in Any RICO Violation.

Plaintiffs' RICO conspiracy claim against Mr. Newman fails because Plaintiffs have not come forward with evidence necessary to prove the three elements of RICO conspiracy for establishing that Mr. Newman conspired to violate RICO through false identification. The Court instructed the jury that Plaintiffs had the burden to prove that Mr. Newman agreed to commit a substantive violation of RICO. 10/3/19 Trial Tr. (Vol. 2 at 202). When conspiracy is asserted as a basis for RICO liability, a plaintiff must prove, among other things, either an agreement that is a

---

[4] Newman objects to the fact that he was added to the Trespass Claim (Dkt. #990) and the Recording Claims (Dkt. #987).

1  substantive violation of RICO or that the defendants agreed to commit, or participated in, a

2  violation of two predicate offenses. Order, Doc. 753 at 31–32. Evidence that the defendant agreed

3  to the pursuit of a goal—such as investigating illegal and unethical activities—that could

4  potentially be achieved without the commission of RICO predicate acts is insufficient. *See, e.g.*,

5  *Ocasio v. United States*, 136 S. Ct. 1423, 1429–30 (2016). The three elements of a RICO

6  conspiracy agreement require: 1) that Mr. Newman agreed and intended to further or facilitate the

7  use of false identification that would satisfy all of the elements of a RICO violation; 2) that Mr.

8  Newman must have been aware of the essential nature and scope of the use and procurement of

9  false identification; and 3) that Mr. Newman intended to participate in the use and procurement of

10  false identification. Plaintiffs have failed to meet any of the three elements required.

11  During their case, Plaintiffs failed to present any evidence that Mr. Newman even knew

12  about, much less agreed and intended to further or facilitate, the use and procurement of false

13  identification. In fact, the evidence contradicts this notion in that Mr. Daleiden testified that Mr.

14  Newman did not do any undercover work, did not attend any conferences or meetings on behalf of

15  CMP or BioMax, and did not direct or control the operation. Moreover, he said that Mr. Newman

16  was not very involved at all during the time that CMP was conducting the investigation. He agreed

17  that Mr. Newman was "basically in the background." 10/31/19 Trial Tr. (Vol. 14 at 2648:9—

18  2651:11). More specifically, Mr. Daleiden testified that prior to the release of the videos, Mr.

19  Newman was never told that fake IDs were going to be used, the concept of using these IDs was

20  never discussed with him, and Mr. Newman was never told that Mr. Daleiden had made or

21  acquired fake IDs. 10/31/19 Trial Tr. (Vol. 14 at 2648:9—2651:11). Mr. Daleiden has also

22  specifically testified that Mr. Newman was *strictly on a need to know basis*" on everything

23  involving the project especially since the project was Mr. Daleiden's plan and "masterpiece."

24  10/23/19 Trial Tr. (Vol 13 at 2454:25–2455:16). Moreover, the deposition video testimony of Ms.

25  Bryan, Mr. Daleiden's communications person, made it clear that Newman was not involved in

26  decision making. In an email, the day of the first video release, from Newman to Ms. Bryan he

27  stated "Who are your spokespersons when Mr. Daleiden is busy?" Bryan Depo. 110:23–114:1. She

28  responded that it is only Mr. Daleiden, himself, and Ms. Bryan proceeded to testify that she will not

1    pitch anyone else because it is only Mr. Daleiden's project. *Id.*

2            Even when Mr. Daleiden testified to discussing "initial notes or concepts about the project"

3    with Mr. Newman, the Exhibit 123 email roadmap—which was more of a "conceptual" document

4    than a true roadmap—did not contain any information about the procurement or use of false

5    identification. 10/21/19 Trial Tr. (Vol 11 at 2051:7–2052:1). The email did not refer to assumed

6    identities and did not indicate a necessity to obtain false identification. The evidence in Exhibit 37

7    shows that, immediately before the release of the first video, Mr. Newman sent an email to Mr.

8    Daleiden asking how to label his level of involvement: "As I'm thinking about getting the whole

9    PLM [Pro-Life Movement] keyed into this I was wondering how you want me to frame my

10   involvement? What 'title' do you want me to use? Coordinator? Member? Is OR part of the project,

11   advisor? Etc. I just don't want to over or understate our involvement." 10/22/19 Trial Tr. (Vol 12 at

12   2290:16–2291:19). Mr. Daleiden's response was that Mr. Newman was simply a board member. *Id.*

13   Mr. Daleiden made it clear that he considered the members of the board to be only "peripherally

14   involved." 10/23/19 Trial Tr. (Vol. 13 at 2455–56). Furthermore, the two other Defendants who

15   went undercover, Ms. Merritt and Mr. Lopez, both specifically stated that they did not know Troy

16   Newman until *after* Plaintiffs' lawsuit was filed. 10/4/19 Trial Tr. (Vol 3 at 531:13–25); 10/8/19

17   Trial Tr. (Vol 4 at 667:10–13).

18           Therefore, there is no evidence that Mr. Newman knew about the use or procurement of

19   false identification, nor is there any evidence that he agreed to or intended to further or facilitate the

20   use and procurement of false identification. Because Plaintiffs failed to meet the elements required

21   to prove that Mr. Newman conspired to commit a RICO violation, the record contains no proof

22   beyond speculation to support a verdict against Mr. Newman on the RICO claim. As such, Mr.

23   Newman respectfully requests that the Court grant this Rule 50 motion as to Mr. Newman on the

24   RICO Claim.

25           **B. Conspiracy to Trespass: Plaintiffs Have Failed to Present Direct or Indirect**
             **Evidence That Newman Knew That Other Defendants Would Commit a**
26           **Trespass and That Newman Agreed With and Supported the Other Defendants**
             **In Committing That Trespass.**
27

28           Plaintiffs' conspiracy to trespass claim against Mr. Newman fails because Plaintiffs have

not come forward with evidence necessary to prove the two elements of conspiracy to trespass for establishing that Mr. Newman conspired to trespass. The Court held that "Newman may be indirectly liable if Plaintiffs prove at trial their knowledge of, agreement to, or support of the fraudulent conduct that enabled the trespasses and other tortious conduct." Order on Summary Judgment, Dkt. #753 at 70, Fn. 74. Thus, in order for the Plaintiffs to prove conspiracy to trespass they must show evidence supporting two elements: 1) Mr. Newman knew that other Defendants would commit a trespass, and 2) Mr. Newman agreed with and supported the other Defendants in committing that trespass. Plaintiffs have failed to meet the two elements required.

During their case, Plaintiffs failed to present any evidence that Mr. Newman knew that other Defendants had allegedly planned to trespass on Plaintiffs' property. As stated above, the evidence contradicts the notion that Mr. Newman was aware of Mr. Daleiden's plan. Mr. Daleiden testified that Mr. Newman was not involved in the Human Capital Project and did not direct or control any of the project. 10/31/19 Trial Tr. (Vol. 14 at 2648:9—2651:11). In fact, Mr. Daleiden stated that Mr. Newman was "basically in the background." 10/31/19 Trial Tr. (Vol. 14 at 2648:9—2651:11).  Mr. Newman was "*strictly on a need to know basis*" on everything involving the project. 10/23/19 Trial Tr. (Vol 13 at 2454:25–2455:16). Evidence from admitted Exhibit 68 showed that Mr. Daleiden continued to send only Mr. Rhomberg "Road Map[s]" after his initial email to Mr. Newman. In fact, Mr. Daleiden specifically testified that he would keep Mr. Rhomberg updated on the status of the project via phone calls, but he did not remember ever treating Mr. Newman the same. 10/22/19 Trial Tr. (Vol 12 at 2272:21–2273:8). Resultantly, there is no evidence that Mr. Newman knew of Mr. Daleiden's plans for anyone to allegedly trespass.

Furthermore, Plaintiffs failed to present any evidence that Mr. Newman agreed with and supported the other Defendants in the alleged trespass on Plaintiffs' property. The evidence provided at trial has not shown that Mr. Newman even knew that Mr. Daleiden's plan included alleged trespass, much less that he agreed to or encouraged this in any way. In fact, the two other Defendants, Ms. Merritt and Mr. Lopez, who allegedly trespassed with Mr. Daleiden did not even know of Mr. Newman until after this lawsuit was filed. 10/4/19 Trial Tr. (Vol 3 at 531:13–25); 10/8/19 Trial Tr. (Vol 4 at 667:10–13). Thus, the evidence shows that Mr. Newman could not have

1   agreed and supported a conspiracy considering the purported trespassers did not know of his

2   existence.

3       Additionally, on or about December 4, 2018, Mr. Rhomberg moved for summary judgment

4   on the three claims that he had knowledge were being asserted against him (the same three claims

5   that were asserted against Newman in the Amended Complaint): RICO, fraudulent

6   misrepresentation (via conspiracy), and the California UCL claim. At no point in Plaintiffs'

7   response did Plaintiffs refute Rhomberg's stated belief that only those claims were being asserted

8   against him. All the depositions occurred with the understanding that Mr. Rhomberg and Mr.

9   Newman were not included on the trespass claim, as indicated by the plain language of the claim

10  itself. Dkt. #59 at 53:3–5. With respect to the unpled recording claims (Dkt. #987), it would be

11  fundamentally unfair to include Mr. Newman on the trespass claim at the literal eleventh hour,

12  which Plaintiffs chose to expressly exclude him from while expressly including him on other

13  claims. *See* FRCP 8 (a complaint must provide a "short and plain statement" of each claim at issue,

14  including who the claim is being asserted against). At Plaintiffs' choosing, Mr. Newman was

15  deprived of any notice before, or during, the lengthy, years-long written discovery process that an

16  unpled trespass claim would later be asserted against them.

17      The various iterations of Plaintiffs' post-trial verdict forms further confirmed that Mr.

18  Newman was not included on the trespass claim. It is clearly improper, and inconsistent with the

19  federal rules, to add him to the trespass claim post-trial. Cf. Order, Dkt. #753 at 41 (concerning

20  unpled contract claims: "There are two problems. First, plaintiffs never identified Rhomberg and

21  Newman as defendants on this claim. As a result, they did not affirmatively move for summary

22  judgment on it; they argue that allowing plaintiffs to pursue this claim against them individually

23  would be prejudicial."); *Strong v. Wisconsin*, 544 F. Supp. 2d 748, 753, 768 (W.D. Wis. 2008)

24  ("[B]y specifically identifying in his complaint some defendants on his failure to intervene claim

25  and not others, plaintiff communicated to the defendants not included in the list that they were off

26  the hook," so those defendants could not be held liable on that claim).

27      Therefore, because the Plaintiffs have failed to meet the elements required to prove that Mr.

28  Newman conspired to trespass, the record contains no proof beyond speculation to support a

1   verdict against Mr. Newman on the Trespass Claim. Mr. Newman respectfully requests that the

2   Court grant this Rule 50 motion as to him on the trespass claim.

3          **C. Conspiracy to Commit Fraudulent Misrepresentation: Plaintiffs Have Failed to**
           **Present Direct or Indirect Evidence That Newman Knew That Other**
4          **Defendants Would Commit Fraudulent Misrepresentation and/or a False**
           **Promise and That Newman Agreed With and Supported the Other Defendants**
5          **In Committing That Fraudulent Misrepresentation or False Promise.**

6

7          Plaintiffs' conspiracy to commit fraudulent misrepresentation and/or false promise claims

8   against Mr. Newman fails because Plaintiffs have not come forward with evidence necessary to

9   prove the three elements required to establish that Mr. Newman conspired to fraudulently

10  misrepresent or promise. Specifically, the Plaintiffs had the burden to prove that Mr. Newman

11  conspired to commit fraud by presenting evidence supporting the three elements on conspiracy: 1)

12  Damage resulted to the Plaintiff; 2) Mr. Newman knew that other Defendants planned to

13  intentionally misrepresent or give false promise to Plaintiffs; and 3) Mr. Newman agreed with and

14  supported the other Defendants in intentionally misrepresenting or giving false promise to

15  Plaintiffs. Plaintiffs have failed to meet the three elements required.

16         During their case, Plaintiffs failed to present any evidence that Mr. Newman knew of,

17  agreed with, or supported the other Defendants in allegedly planning to intentionally misrepresent,

18  conceal, or give false promise to Plaintiffs. As stated above, the evidence contradicts the notion that

19  Mr. Newman was aware of Mr. Daleiden's plan. Mr. Daleiden testified that Mr. Newman was not

20  involved in the Human Capital Project and did not direct or control any of the project. 10/31/19

21  Trial Tr. (Vol. 14 at 2648:9—2651:11). In fact, Mr. Daleiden stated that Mr. Newman was

22  "basically in the background." 10/31/19 Trial Tr. (Vol. 14 at 2648:9—2651:11).  Mr. Newman was

23  "strictly on a need to know basis" on everything involving the project. 10/23/19 Trial Tr. (Vol 13 at

24  2454:25–2455:16). Evidence from admitted Exhibit 68 showed that Mr. Daleiden continued to send

25  only Mr. Rhomberg "Road Map[s]" after his initial email to Mr. Newman. In fact, Mr. Daleiden

26  specifically testified that although he would periodically keep Mr. Rhomberg updated on the status

27  of the project via phone calls, but he did not remember ever updating Mr. Newman in the same

28  way. 10/22/19 Trial Tr. (Vol 12 at 2272:21–2273:8). Even as a board member, Mr. Newman did

18

1   not know the specifics about anything BioMax planned to do, or did, because BioMax was created

2   unilaterally by Mr. Daleiden without the consent of the Board. 10/23/19 Trial Tr. (Vol 13 at

3   2461:25–2462:17). Mr. Daleiden testified that CMP Board members did not even vote on the

4   creation of BioMax. *Id.* The evidence is clear that Mr. Daleiden orchestrated his project by

5   compartmentalizing the specifics of what he told people—no one person, besides Mr. Daleiden

6   himself, ever knew the full plan, which was precisely how he wanted it. 10/23/19 Trial Tr. (Vol 13

7   at 2454:25–2455:16). Consequently, there is no evidence in the record to support the idea that Mr.

8   Newman knew of Mr. Daleiden's plans to allegedly commit fraud.

9        Additionally, the evidence shows that Mr. Newman could have not formed any agreements

10  with several of the other Defendants. Plaintiffs have alleged Ms. Merritt and Mr. Lopez committed

11  fraudulent misrepresentation and false promises along with Mr. Daleiden; however, these two

12  Defendants did not even know of Mr. Newman until after this lawsuit was filed. 10/4/19 Trial Tr.

13  (Vol 3 at 531:13–25); 10/8/19 Trial Tr. (Vol 4 at 667:10–13). If Mr. Newman was unaware of Mr.

14  Daleiden's plans for his project, and did not know two key Defendants, he certainly was not able to

15  agree and support any plan to misrepresent, conceal, or give false promise that they were engaged

16  in.

17       Furthermore, Mr. Newman should have been removed from the subparts of Plaintiffs'

18  fraudulent misrepresentation claim that are based solely upon a contractual promise. Plaintiffs'

19  Final Verdict Forms, Dkt. #995 at 12, 14. The Court addressed this very issue in its Order on the

20  motions for summary judgment (Dkt. #753), in footnote 39 on page 43: "Nor can Rhomberg or

21  Newman be held indirectly liable for the breaches of contract under the Conspiracy cause of action

22  (Count III) discussed below. Plaintiffs admit their conspiracy claim is grounded in defendants'

23  fraudulent conduct underlying their tort claims." *See also* Rhomberg/Newman MSJ, Dkt. #595, at

24  20 & n.17 (and cited cases) (noting that a person who is not a party to a contract owes no duties

25  under it and cannot be bootstrapped, via conspiracy, into a tort claim that arises from contractual

26  promises or duties).

27       Therefore, it is clear that Plaintiffs have failed to show that Mr. Newman knew of, agreed

28  with, and supported the other Defendants in misrepresenting, concealing, or giving false promise to

1  Plaintiffs. Therefore, because the Plaintiffs have failed to meet all of the required elements to prove

2  that Mr. Newman conspired with regard to fraudulent misrepresentation or false promises, the

3  record contains no proof beyond speculation to support a verdict against Mr. Newman on the fraud

4  claims. Mr. Newman respectfully requests that the Court grant this Rule 50 motion as to the fraud

5  claims.

6       **D. Conspiracy to Violate Recording Statutes: Plaintiffs Have Failed to Present**
       **Direct or Indirect Evidence That Newman Knew That Other Defendants**
7       **Would Intentionally Record a Confidential Communication Without the**
       **Consent of All the Parties and That Newman Agreed With and Supported the**
8       **Other Defendants In Intentionally Recording a Confidential Communication**
       **Without the Consent of All the Parties.**
9

10      Plaintiffs' conspiracy to violate Penal Code Section 632 ("California recording statute")

11  claim, Florida recording statute claim, Maryland recording statute claim, and the Federal recording

12  statute claim against Mr. Newman fail because Plaintiffs have not come forward with evidence

13  necessary to prove the two elements of conspiracy to violate recording statutes. The Court

14  instructed the jury that, under California law, the Plaintiffs must prove that a Defendant

15  intentionally recorded a confidential communication without the consent of all the parties to the

16  conversation. 10/3/19 Trial Tr. (Vol.2 at 199–200). In order to hold Mr. Newman liable, Plaintiffs

17  must prove that Mr. Newman conspired to violate the California recording statute by presenting

18  evidence supporting the two elements: 1) Mr. Newman knew that other Defendants planned to

19  intentionally record a confidential or private oral communication without the consent of all the

20  parties to the conversation; and 2) Mr. Newman agreed with and supported the other Defendants in

21  intentionally recording a confidential or private oral communication without the consent of all the

22  parties to the conversation.

23      During their case, Plaintiffs failed to present any evidence that Mr. Newman knew of,

24  agreed with, or supported the other Defendants in allegedly planning to record a confidential or

25  private oral communication without the consent of all the parties to the conversation. It is clear

26  from the above statement of facts and evidence that Mr. Newman did not have knowledge of nor

27  was he involved in Mr. Daleiden's full plan, based on Mr. Daleiden's own admissions. Even as a

28  board member, Mr. Newman did not know the specifics of BioMax's plans because Mr. Daleiden

1   testified that BioMax was created unilaterally and CMP board members did not vote on the

2   creation of BioMax. 10/23/19 Trial Tr. (Vol 13 at 2461:25–2462:17). The evidence is clear that Mr.

3   Daleiden orchestrated his project by compartmentalizing the specifics of what he told people—he

4   made it clear in his testimony that no one person knew the full plan other than him. 10/23/19 Trial

5   Tr. (Vol 13 at 2454:25–2455:16). There is simply no evidence to show that, even if Mr. Newman

6   had an understanding that Mr. Daleiden would be making undercover recordings, which he did not,

7   that he knew those recordings would be of confidential communications in two party consent states

8   in confidential locations where the other party would have a reasonable expectation of privacy; to

9   conclude otherwise is to impermissibly read facts into the record. Moreover, even the other

10   Defendants, Ms. Merritt and Mr. Lopez, who allegedly recorded confidential communications

11   alongside Mr. Daleiden, did not even know of Mr. Newman until after this lawsuit was filed.

12   10/4/19 Trial Tr. (Vol 3 at 531:13–25); 10/8/19 Trial Tr. (Vol 4 at 667:10–13). If Mr. Newman was

13   unaware of Mr. Daleiden's plans for his project, and did not know the other critical Defendants, he

14   certainly was not able to agree and support any plan to record a confidential communication

15   without the consent of all the parties to the conversation.

16       Additionally, it is fundamentally unfair to include Newman on any or all of the recording

17   claims at the literal eleventh hour, which Plaintiffs chose to expressly exclude him from. FRCP 8

18   requires a plaintiff to provide, in its complaint, "a short and plain statement" of each claim at issue,

19   including *who the claim is being asserted against*, and allegations in a complaint must be "direct."

20   FRCP 8(a)(2); 8(b)(1); 8(d)(1). Rule 8 ensures that each defendant is given fair notice at the outset

21   of a lawsuit of which claims and allegations are being "asserted against it," which has immense

22   implications for that defendant's motion to dismiss and/or answer, discovery, summary judgment,

23   and trial. It is patently unfair, and inconsistent with the federal rules, to add Newman to any or all

24   of the recording claims post-trial. *Cf.* Order, Dkt. #753 at 41 (noting, with respect to Plaintiffs'

25   attempt to include Newman on contract claims that were not pled against them, "There are two

26   problems. First, plaintiffs never identified Rhomberg and Newman as defendants on this claim. As

27   a result, they did not affirmatively move for summary judgment on it; they argue that allowing

28   plaintiffs to pursue this claim against them individually would be prejudicial.").

1   Accordingly, it is clear that Plaintiffs have failed to show that Mr. Newman knew of, agreed

2   with, and supported the other Defendants in any plan to record a confidential communication

3   without the consent of all the parties to the conversation. Therefore, because the Plaintiffs have

4   failed to meet all of the required elements to prove that Mr. Newman conspired to violate any of

5   the recording statutes, the record contains no proof beyond speculation to support a verdict against

6   Mr. Newman on the recording claims. Mr. Newman respectfully requests that the Court grant this

7   Rule 50 Motion as to him on the recording claims.

8   **VII. Standing Issue:**

9   Mr. Newman also joins in the Rule 50 Motion filed concurrently by the CMP Defendants with

10   regard to the insufficiency of the proof of any illegal video recording by the CMP Defendants. As

11   to all four jurisdictions whose law is relevant to Plaintiffs' recording claims, this Court has held

12   that a Plaintiff corporation has standing to sue for the recording of an individual "employee" or

13   "contractor" only if that individual was "recorded discussing internal matters of the corporation" or

14   "targeted . . . for recording because she could disclose information about the corporation's internal

15   matters." Dkt. 983 at 76, 81, 83, 87; 11/4/19 Trial Tr. (Vol. 16 at 3190:25-3191:1). Plaintiffs failed

16   as a matter of law to satisfy this standard as to several of its recording claims. Several recorded

17   individuals admit that they were not "targeted" for recording, for example:

18   o   **PPGC (FLA Forum):** Bonnie Smith admitted that she approached the exhibit table of her
        own accord. 10/17/19 Trial Tr. (Vol. 9 at 1715:16-21).

19

20   o   **PPFA:**
            ▪   **(FLA MedC):** June Gupta admitted that she approached BioMax. Trial Tr. at 2008:1-
21              24.
            ▪   **(CA NAF 2014)**: Deborah Nucatola admitted that she originally met Robert Sarkis by
22              approaching his booth. 10/21/19 Trial Tr. (Vol. 11 at 1494:3-9) [Ex. 6124].

23   Thus, lacking evidence that these individuals "discuss[ed] internal matters of the corporation"—

24   which Plaintiffs failed to produce—Plaintiffs PPSW, PPGC, PPFA, and PPNorCal have no

25   standing to bring the above recording claims under federal, Florida, or California law.

26   The videos submitted at trial were often extraordinarily short, frequently did not have

27   sound, and were submitted by a witness who was not even present for the taping itself and who

28   thus cannot testify to the mental state of the person recorded.  In short, the videos fail to show the

22

required elements of each cause of action.  The elements needed to prove conspiracy to violate the recording statutes are identical to those needed to prove violation of the recording statutes themselves, with the additional requirement of proving the elements of conspiracy. If the CMP Defendants successfully allege that the Plaintiffs have failed to meet their burden to prove all the elements of illegal recordings, this ruling must also apply to Mr. Newman who cannot have conspired to engage in an action which the Court has held did not violate any statute.

**VIII. Conclusion:**

WHEREFORE, for the foregoing reasons, Defendant Troy Newman is entitled to judgment as a matter of law.

Respectfully submitted on November 11, 2019,

/s/ Vladimir F. Kozina
Vladimir F. Kozina; SBN 95422
MAYALL HURLEY, P.C.
2453 Grand Canal Blvd.
Stockton, CA 95207
Tel: (209) 477-3833
Facsimile: (209) 473-4818
vkozina@mayallaw.com

/s/ Christina A. Stierhoff
John A. Monaghan, *pro hac vice*
Christina A. Stierhoff, *pro hac vice*
AMERICAN CENTER FOR LAW & JUSTICE
1000 Regent University Drive
Virginia Beach, VA 23464
Tel: (757) 955-8176
Facsimile: (757) 226-2836
jmonaghan@aclj.org
cstierhoff@aclj.org

/s/ Edward L. White III
Edward L. White III, *pro hac vice*
Erik M. Zimmerman, *pro hac vice*
AMERICAN CENTER FOR LAW & JUSTICE
3001 Plymouth Rd., Ste. 203
Ann Arbor, MI 48105
Tel: (734) 680-8007

1   Facsimile: (734) 680-8006
    ewhite@aclj.org
2   ezimmerman@aclj.org

3   *Attorneys for Defendant Troy Newman*

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

TROY NEWMAN'S RULE 50(A) MOTION FOR JUDGMENT AS A MATTER OF LAW
Case No. 3:16-CV-00236 (WHO)