Charles S. LiMandri (CA Bar No. 110841)
Paul M. Jonna (CA Bar No. 265389)
Jeffrey M. Trissell (CA Bar No. 292480)
B. Dean Wilson (CA Bar No. 305844)
Milan L. Brandon (CA Bar No. 326953)
FREEDOM OF CONSCIENCE DEFENSE FUND
P.O. Box 9520
Rancho Santa Fe, CA 92067
Tel: (858) 759-9948
cslimandri@limandri.com

*Attorneys for Defendants CMP, BioMax,
David Daleiden and Adrian Lopez*

Harmeet K. Dhillon (CA Bar No. 207873)
Gregory R. Michael (CA Bar No. 306814)
DHILLON LAW GROUP INC.
177 Post Street, Suite 700
San Francisco, CA 94108
415-433-1700
415-520-6593 (fax)
harmeet@dhillonlaw.com

*Attorneys for Defendants CMP, BioMax,
and David Daleiden*

Thomas Brejcha, *pro hac vice*
Peter Breen, *pro hac vice*
Matthew F. Heffron, *pro hac vice*
THOMAS MORE SOCIETY
309 W. Washington St., Ste. 1250
Chicago, IL 60606
Tel: (312) 782-1680
tbrejcha@thomasmoresociety.org
pbreen@thomasmorsociety.org

*Attorneys for Defendant David Daleiden*

Denise M. Harle (CA Bar No. 275561)
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd., NE
Suite D1100
Lawrenceville, GA 30043
Tel: (770) 339-0774
dharle@ADFlegal.org

*Attorneys for Defendants CMP, BioMax,
and David Daleiden*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

PLANNED PARENTHOOD FEDERATION OF AMERICA, INC., et al.,

        Plaintiffs,

    vs.

THE CENTER FOR MEDICAL PROGRESS, et al.,

        Defendants.

Case No. 3:16-CV-00236-WHO

Hon. William H. Orrick III

**DEFENDANTS CMP & BIOMAX'S RULE 50(a) MOTION FOR JUDGMENT AS A MATTER OF LAW**

Trial Date: October 2, 2019
Courtroom: 2, 17th Floor

## TABLE OF CONTENTS

CMP & BIOMAX'S RULE 50(a) MOTION FOR JUDGMENT AS A MATTER OF LAW ........................................................................................... 1

I.   DAMAGES ........................................................................................... 1

    A.   Plaintiffs have failed to show that their damages were caused by anything other than publication of the videos .......................... 2

    B.   Plaintiffs presented insufficient evidence that Defendants' "infiltration" proximately caused expenditures for investigation or prevention of future intrusions. .................................................... 3

    C.   Plaintiffs presented insufficient evidence of alleged security damages by failing to offer evidence of historical security expenditures as a baseline. ............................................................................................ 4

    D.   Plaintiff PPFA presented no evidence that it is entitled to compensation for voluntary grants to affiliates ................................ 5

II.   RECORDING CLAIMS (Federal, CA, MD, FL) ........................................ 6

    A.   FEDERAL RECORDING STATUTE ................................................... 6

        1.   Plaintiffs have not provided sufficient evidence that Defendants' intent in creating the recordings was to commit an illegal or tortious act. ............................................. 6

        2.   Plaintiffs have provided insufficient evidence of standing for any of the recordings at the PP National Meeting in the District of Columbia. ...................................................... 7

        3.   Plaintiffs have provided insufficient evidence of an objective or subjective expectation of privacy for any of the recordings taken at the PP National Meeting or for most recordings of the site visits. ................................................................ 8

    B.   CALIFORNIA RECORDING LAW .................................................... 8

        1.   Plaintiffs have provided insufficient evidence of corporate standing ..................................................................... 8

        2.   Plaintiffs have provided insufficient evidence of expectation of privacy ..................................................................... 9

            a.   2014 NAF Annual Meeting ............................... 9

            b.   Lunch meetings ................................................. 9

    C.   FLORIDA RECORDING LAW ........................................................ 10

        1.   Plaintiffs have provided insufficient evidence of corporate standing ................................................................... 10

        2.   Plaintiffs have provided insufficient evidence of expectation of

privacy.................................................................................................. 11

D.   MARYLAND RECORDING LAW ............................................................... 13

1.   Plaintiffs have provided insufficient evidence of corporate standing............................................................................................ 13

2.   Plaintiffs have provided insufficient evidence of expectation of privacy................................................................................................ 14

III.   BREACH OF CONTRACT CLAIMS ........................................................... 15

A.   CMP ALTER EGO LIABILITY .................................................................. 15

B.   PPFA EXHIBITOR AGREEMENTS ............................................................ 16

C.   NAF EXHIBITOR AND CONFIDENTIALITY AGREEMENTS ......................... 16

1.   That PP affiliates have standing as fourth-party beneficiaries................. 16

2.   That there was adequate consideration for the NAF NDA ..................... 17

3.   That the contracts were not void for vagueness .......................... 18

4.   That the definition of "confidential information" included anything disclosed on the HCP videos. ...................................... 18

D.   PPGC NDA ...................................................................................... 19

1.   That information obtained during the site visit qualified as Confidential Information under the PPGC NDA.......................... 19

2.   That any breach of the PPGC NDA caused PPGC any actual damages. .......................................................................... 20

CONCLUSION.................................................................................................... 20

# TABLE OF CONTENTS

*Cases:*

*Anderson v. Liberty Lobby, Inc.,* ..................................................................... 1
   477 U.S. 242 (1986)

*In re Hamada,* ..................................................................................... 5, 6
   291 F.3d 645 (9th Cir. 2002)

*Misik v. D'Arco,* ...................................................................................... 15
   197 Cal. App. 4th 1065 (2011)

*Olympic Capital Corp. v. Newman,* ................................................................. 15
   276 F. Supp. 646 (C.D. Cal. 1967)

*Postal Instant Press, Inc. v. Kaswa,* ............................................................... 15
   162 Cal.App.4th 1510 (2008)

*Quaestor Invs., Inc. v. State of Chiapas,* ............................................................ 5
   Case No. CV-95-6723 JGD (AJWx), 1997 U.S. Dist. LEXIS 24271 (C.D. Cal. Sept. 5, 1997)

*S.E.C. v. Hickey,* .................................................................................... 15
   322 F.3d 1123 (9th Cir. 2003)

*Schauer v. Mandarin Gems of Cal., Inc.,* ........................................................... 16
   125 Cal. App. 4th 949 (2005)

*Tortu v. Las Vegas Metro. Police Dep't,* ............................................................ 1
   556 F.3d 1075 (9th Cir. 2009)

*United States v. Boyce,* .............................................................................. 15
   38 F. Supp. 3d 1135 (C.D. Cal. 2014)

*United States v. Boyce,* .............................................................................. 15
   683 F. App'x 654 (9th Cir. 2017)

*United States v. Christensen,* ........................................................................ 6
   624 F. App'x 466 (9th Cir. 2015)


*Statutes:*

Cal. Civ. Code § 1559 ................................................................................ 16

Fed. R. Civ. P. 50 ............................................................................... 1, 6, 8

Fed. R. Civ. P. 50(a) ................................................................................. 1


*Other Authorities:*

ALAN S. GUTTERMAN, BUSINESS TRANSACTIONS SOLUTIONS § 100:24 (2019) ..................... 5

iv

**CMP & BIOMAX'S RULE 50(a) MOTION FOR**

**JUDGMENT AS A MATTER OF LAW**

Pursuant to Federal Rule of Civil Procedure 50(a), Defendants the Center for Medical Progress and BioMax Procurement Services, LLC move for judgment as a matter of law as to the following issues. This motion addresses (I) Damages, (II) The Recording Claims, and (III) The Breach of Contract Claims. Defendants Daleiden, Merritt, and Lopez's concurrently filed motion addresses (IV) RICO, (V) Civil Conspiracy, (VI) Trespass, (VII) Fraudulent Misrepresentation, and (VIII) Punitive Damages. That concurrently filed motion is expressly incorporated herein by reference.[1]

"[T]he standard for a directed verdict under Federal Rule of Civil Procedure 50(a) . . . is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict. If reasonable minds could differ as to the import of the evidence, however, a verdict should not be directed." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–51 (1986) (citation omitted). "The term[] . . . 'directed verdict' ha[s] now been . . . simply termed 'judgment as a matter of law.'" *Tortu v. Las Vegas Metro. Police Dep't*, 556 F.3d 1075, 1082 n.2 (9th Cir. 2009).

This motion addresses only the insufficiency of the evidence to be submitted to the jury, in accordance with Rule 50. Defendants reserve all other arguments and objections, including but not limited to legal arguments and objections that the Defendants made in connection with discovery motions, summary judgment, motions in limine, evidentiary rulings, and jury instructions.

## I.   DAMAGES

This Court wrote in its Summary Judgment Order: "The only allowable damages are those that are *directly tethered to defendants' own conduct*," and "*the causal nexus for the damages categorically allowed will still need to be shown at trial*." MSJ Order at 21 (emphasis added). Plaintiffs failed to demonstrate a direct causal nexus between Defendants' alleged wrongdoing and

---

[1] Defendants also hereby incorporate all arguments regarding insufficient evidence that Defendants made in their summary judgment briefing. Defendants also hereby incorporate all arguments made in Defendants Rhomberg's and Newman's motions for judgment as a matter of law.

their claimed damages. Therefore, their damages claims fail as a matter of law.

### A. Plaintiffs have failed to show that their damages were caused by anything other than publication of the videos.

As this Court held, "Planned Parenthood cannot recover for reputational damages or 'publication' damages' under the First Amendment." MSJ Order at 2. Plaintiffs have therefore sought to characterize their damages as non-reputational and not resulting from publication, but they failed to present any evidence at trial to support that characterization. Throughout the trial, Plaintiffs' witnesses conceded over and over that the measures for which they are seeking compensation were taken in response to the reputational hit their organizations and employees took after *publication* of the videos. For example:

- o Melvin Galloway admitted that he authorized protection for Dr. Nucatola because the video threw her into "this spotlight. And so I authorized and asked for 24/7 protection for Deb." Trial Tr. at 1812:14–1813:5

- o Galloway also characterized the Human Capital Project as an attack on Planned Parenthood's "brand" and admitted that he hired Thacher to prevent "harm in terms of our mission and brand." Trial Tr. at 1839:21–1840:18, 1854:17–24. Even their damages expert, CPA Greg Regan, later acknowledged that "[p]rotecting the brand" "could be involving a reputational matter." Trial Tr. at 3053.

- o Finally, Galloway admitted that Reputation.com subscriptions were obtained in direct response to video publications, not in response to the infiltration of the conferences. *See* Trial Tr. at 1825:6-10 ("[T]hese two, I can't remember their names, physicians, were featured in the video. Shortly after the video, I contacted Reputation.com. They remove your online presence. That is their purpose. Being exposed in the way that they were, one of the ways in which we wanted to mitigate that risk of exposure was to sort of remove their online presence.").

- o Dr. Gatter admitted that her subscription to Reputation.com was purchased after a video of her was published and not before, even though Dr. Nucatola's video had been posted the week before, and Planned Parenthood was aware of the infiltration and even that Dr. Gatter herself had been recorded. Trial Tr. at 1300:25-1301:7.

- o Bonner hired security out of concern for what people might think or how they might react to "what the narrated parts of the video were." Trial Tr. at 1160-63.

- o Witness Palmer testified that the videos' "publication" resulted in "threats," and in response PPGC provided security for Farrell. Trial Tr. at 1615-22. Palmer also admitted to hiring security for only one of the six abortion providers at his clinic after she was recorded at a NAF meeting. Trial Tr. at 1651:14-25.

o   Witness Dunn admitted that he decided to hire security guards for Dr. Russo only after the video of her was published, not a full year before when they first found out that Planned Parenthood had been infiltrated. Trial Tr. at 1420:20-1421:6. Dunn also admitted that Plaintiff PPOSBC had incurred security costs because the "videotapes and the release of the videotapes created an environment that was significantly changed for people who worked at Planned Parenthood." Trial Tr. at 1425-1428.

o   PPRM's legal counsel admitted that housing for Dr. Savita Ginde was provided in response *not to Defendants' infiltration*, but to threats on the internet pursuant to publication of the videos. Trial Tr. at 2970:7-23; *see also* Trial Tr. at 1823:7-15 (Melvin Galloway stating that Ginde had to relocate because of her exposure in the videos).

**B.      Plaintiffs presented insufficient evidence that Defendants' "infiltration" proximately caused expenditures for investigation or prevention of future intrusions.**

Planned Parenthood's "remedial measures" were in fact enhancements, designed to prevent entirely different threats than a BioMax-like infiltration. See, for example:

o   Plaintiffs upgraded to a "better system" after the release of the videos. Trial Tr. at 3063-64.

o   The work the consultants did was to prevent future, different infiltrations than the type in this case. Trial Tr. at 3074.

o   The background screening invoice was also premised on the idea that Defendants increased the overall threat level. Trial Tr. at 3086.

o   Plaintiffs' expert claimed that a daily charge for monitoring online media—which would have yielded no advance warning of BioMax's infiltration—is appropriate to charge to Defendants "in order to allow for the same level of assurance that an infiltration would not occur, this new type of infiltration." Trial Tr. at 3090.

o   BioMax didn't make fake conference badges; it purchased them through the normal registration process. Therefore, any enhanced security measure devised to prevent people from making fake badges was not necessary to prevent a BioMax-like infiltration. Trial Tr. at 3150.

o   There weren't exhibitors at the next conference that PP was hosting 10-12 days after the videos were released, for which Plaintiffs want Defendants to pay for their increased vetting procedures. There weren't any exhibitors at most PP conferences, and there was no evidence that BioMax itself had ever accessed such a conference. Nor were there any new start-up tissue companies registered to exhibit or invited by Nucatola. Trial Tr. at 3163-64. Therefore, increased vetting done for these conferences cannot be "directly tethered" to Defendants' infiltration. Trial Tr. at 3152-53.

The evidence further establishes that BioMax's infiltration was made possible by flawed implementation of existing security measures. For example:

3

o   Plaintiffs' expert acknowledged that any existing deficiencies in Planned Parenthood's system were not caused by Defendants, and that his damages calculation is premised not on rectifying deficiencies in Planned Parenthood's old security processes but on Planned Parenthood's claim of an *increased* threat as a result of the videos. Trial Tr. at 3076-77.

o   Plaintiffs were aware of multiple attempts to infiltrate their events before; they even knew Live Action had likely used fake names to infiltrate clinics. They already had physical security measures and access requirements in place. Therefore, BioMax's infiltration did not represent a novel threat. Trial Tr. at 3144-48, 3165-66.

o   Planned Parenthood provided no evidence that it had followed its existing "simple" security steps at the conferences BioMax attended. For example, it could not produce the "lookbook" or any evidence that it had been consulted. And conference staff were not trained to examine valid government-issued identification, despite such identification being a requirement for all attendees. They were not even trained to have attendees remove their identification from their wallet. Trial Tr. at 3145-3170.

o   PPRM CEO Cowart stated in an email at the time that "it was trivial to figure out" (Ex. 7117) how Defendants "infiltrated," and that PPRM prevents such security breaches by googling the vendors and their telephone numbers and then reviewing their written materials. PPFA's witness testified that, rather than taking such minimal, inexpensive measures that had proven effective for PPRM, PPFA hired consulting companies "to create systems that worked for us to manage sustainable event security and vetting processes and protocols." Trial Tr. at 3153-54.

The fact that, when considering their security needs *in the immediate aftermath of the negative public reaction to the videos*, PPFA found it necessary to heighten its security against risks that were wholly dissimilar to BioMax's infiltration cannot plausibly be "directly tethered" to Defendants' conduct.

### C.   Plaintiffs presented insufficient evidence of alleged security damages by failing to offer evidence of historical security expenditures as a baseline.

Plaintiffs did not perform a proper damages analysis. Their own witnesses testified that Plaintiffs had some security measures in place before the events at issue in this case ever took place. *See, e.g.*, Trial Tr. at 1843:19-1844:8 (Melvin Galloway testifying that PP had reviewed social media for potential threats even before Defendants' infiltration of their conferences.). But in asking for compensation for the security measures they took *after* the Human Capital Project, Plaintiffs failed to identify "any historical data to compare what they would have spent on various security-related expenses before the videos, as opposed to afterwards." Trial Tr. at 3469-72, 3475. Such a comparison is necessary to show the net amount of damages that might reasonably be imputed to

4

Defendants' conduct. *Id. Cf.* Trial Tr. at 1860 (Galloway conceding that a certain amount of the "online presence" that Reputation.com ultimately "reduced" may well have existed prior to July 2015). "It's a very basic concept." Trial Tr. at 3470. By failing to provide a baseline for comparison, Plaintiffs failed to prove that their alleged damages were actually caused by Defendants.

### D.   Plaintiff PPFA presented no evidence that it is entitled to compensation for voluntary grants to affiliates.

In order for PPFA to recover damages for money it granted to third-party affiliates to compensate them for expenses incurred in response to the HCP videos, PPFA must show that it was *obligated* to compensate those affiliates, by contract or otherwise. *See In re Hamada*, 291 F.3d 645, 651 (9th Cir. 2002) (In order for a court to find "equitable subrogation," "[f]irst, the claimant must have paid the debt owed to the lienholder in order to protect the claimant's own interest. Second, ***the claimant must not have acted as a volunteer***. Third, the claimant could not have been primarily liable for the debt he paid. Fourth, the claimant must have paid the entire debt owed to the lienholder. And, fifth, the subrogation must not work an injustice to the rights of others." (emphasis added)); *see also Quaestor Invs., Inc. v. State of Chiapas*, Case No. CV-95-6723 JGD (AJWx), 1997 U.S. Dist. LEXIS 24271, *15-16 (C.D. Cal. Sept. 5, 1997) ("[W]here a judgment creditor can identify a person or entity which is ***obligated to make payment to the judgment debtor***, and where that 'right to payment' is assignable, the right to payment can be assigned from a third party obligor to the judgment creditor" (emphasis added)); *see also* ALAN S. GUTTERMAN, BUSINESS TRANSACTIONS SOLUTIONS § 100:24 (2019) ("***An assignment must comply with the fundamental requirements of contracts generally***, and must not be contrary to express law or public policy." (emphasis added)).

PPFA provided no evidence that it was obligated to pay out either of the grants for which it seeks damages in this lawsuit.

- o PPRM's legal counsel admitted in testimony that the grant PPRM received from PPFA to compensate the affiliate for rent payments it made on behalf of Dr. Savita Ginde was a gratuitous gift, not an obligation on the part of PPFA, and further, that the housing itself was a gratuitous, non-obligatory benefit to Dr. Ginde—not owed to her under a contract or on any other legal basis. Trial Tr. at 3276-87.

5

1    ○ PPFA made no showing that it was legally obliged to compensate Planned Parenthood - Michigan for "Reputation.com" subscriptions.

2    Because PPFA "acted as a volunteer" in reimbursing its affiliates, it cannot be entitled to damages

3    for those amounts. *Hamada*, 291 F.3d at 651.

4    **II.    RECORDING CLAIMS (Federal, CA, MD, FL)**

5        **A.    FEDERAL RECORDING STATUTE**

6            **1.    Plaintiffs have not provided sufficient evidence that Defendants' intent**
7            **in creating the recordings was to commit an illegal or tortious act.**

8        Plaintiffs allege that Defendants' purpose in making their recordings was "to violate civil

9    RICO." Dkt. 983 at 84. To base a claim of violation of the federal recording statute on RICO, a

10   plaintiff must establish that the "recordings were essential to collecting illegal RICO income or that

11   this was [the defendant's] intended use." *United States v. Christensen*, 624 F. App'x 466, 475 (9th

12   Cir. 2015).[2] At a minimum, Plaintiffs would have to prove that Defendants recorded for the purpose

13   of committing RICO predicate acts.

14       Plaintiffs have made no showing that Defendants' purpose in making the recordings was to

15   commit *any* criminal or tortious act.[3] In fact, the uncontested evidence reflects that Defendants'

16   purpose in making the videos was to expose illegality related to fetal tissue procurement (payments,

17   methods, etc.) as well other unethical and shocking conduct in the abortion industry, including and

18   even particularly as to Planned Parenthood. These purposes were spelled out very clearly in

19   Exhibits 24 and 68, and in the testimony of multiple Defendants. *See, e.g.*, Trial Tr. at 430:24-

20   431:11 (Merritt testifying that the goal of the recordings was to uncover evidence of "battery,

21   medical ethics being violated, laws not being followed, partial-birth abortion procedure, changing

22   protocol without a patient's consent in order to profit from the sale of human body parts"); Trial

23   Tr. at 630:18-634:16 (Lopez testifying that further research led him to the conclusion that there was

24

25   [2] Defendants have elsewhere objected to this theory of liability as a matter of law. *See* Dkt. 603 at
26   15. For the purposes of Rule 50, Defendants confine themselves to pointing out that Plaintiffs have
     produced no evidence to support it.

27   [3] Plaintiffs abandoned their earlier claim that the purpose of the recording was to commit a tortious
28   invasion of privacy.

a market for fetal tissue that had a profit motive, and that it was worth going undercover to bring evidence to light to coordinate with law enforcement); Trial Tr. at 636:4-9 (Lopez testifying that he was concerned that babies were being born alive); Trial Tr. at 2301:1-2303:18 (Daleiden testifying that the reason he wanted to do the CMP investigation started with him seeing in 2010 congressional testimony and a 20/20 segment from 2000, both reporting abuses and fetal tissue trafficking, engaging whistleblowers in the fetal tissue industry).

Plaintiffs presented no evidence that Defendants had a second purpose for making the recordings that involved committing any RICO predicate acts. For this reason alone, Plaintiffs' Federal Recording Claim fails for lack of evidence.

> **2.    Plaintiffs have provided insufficient evidence of standing for any of the recordings at the PP National Meeting in the District of Columbia.**

This Court has held that a plaintiff corporation has standing to sue for the recording of an individual "employee" or "contractor" only if that individual was "recorded discussing internal matters of the corporation" or "targeted . . . for recording because she could disclose information about the corporation's internal matters." Dkt. 983 at 76, 81, 83, 87; Trial Tr. 3190:25-3191:1. Plaintiffs identify eight recordings taken at the Planned Parenthood National Meeting held in the District of Columbia. For none of these did they provide sufficient evidence to establish standing for the relevant corporations.[4]

The first two recordings listed are allegedly of PPGC, via Tram Nguyen and Jackie Krugler. No video of this conversation was put into evidence. Although a question was asked about it in Ms. Nguyen's video testimony, there is insufficient evidence from that to establish that Defendants' targeted Nguyen to discuss corporate internal matters or that such matters were discussed. There is no mention of Jackie Krugler, and, indeed, **Ms. Krugler's name was never mentioned in the entire course of the trial.**

The recordings of Linton (Ex. 5972a), admitted through the testimony of Jeffrey Palmer of

---

[4] The insufficiency of evidence as to corporate standing and expectations of privacy as to the other recordings is discussed in the sections below, on Plaintiffs' Ninth, Eleventh, and Twelfth Claims.

1  PPGC, and Westhoff (Ex. 6007a), Flood (Ex. 6012a), Fils-Aime and Grewer (both 6009a),

2  admitted through the testimony of Brandon Minow of PPFA, were all very short clips played

3  without sound. Neither the testimony nor the video evidence established that the individuals were

4  targeted or that the recordings discussed internal corporate matters.

5       Neither the recording of Jen Castle (Exs. 6010a, 597) nor her testimony provide any

6  evidence that she was targeted by Defendants or that she discussed internal matters of PPFA. Trial

7  Tr. 1969:11-1972:8.

8            **3.**     **Plaintiffs have provided insufficient evidence of an objective or subjective**

                    **expectation of privacy for any of the recordings taken at the PP National**

9                      **Meeting or for most recordings of the site visits.**

10       Plaintiffs have to demonstrate *at least*[5] that the recorded individual had a subjective

11  expectation of privacy *and* that that expectation was objectively reasonable. Dkt. 983 at 84. As noted

12  in the preceding section, only Castle and Nguyen testified about their expectation of privacy. For the

13  other six, there is no evidence at all. For both Castle and Nguyen, the evidence is undisputed that the

14  conversations took place in crowded areas with many other people about who could overhear. Trial

15  Tr. 1980:9-1982:9 (Ex. 6010-A) (Castle); Trial Tr. at 130:18-24. Nguyen testified that she expected

16  that the conversation could be overheard by others. Trial Tr. at 130:18-24.

17       Finally, there is no evidence of the subjective expectation of privacy of J.R. Johnstone or

18  Savita Ginde, filmed in the reception area of the PPRM clinic, or of the two PPGC receptionists,

19  filmed in the reception area of the PPGC clinic.

20       **B.**     CALIFORNIA RECORDING LAW

21            **1.**     **Plaintiffs have provided insufficient evidence of corporate standing.**

22       PPFA presented insufficient evidence of its standing as to the recording of Dr. Nucatola at

23  the 2014 NAF meeting. Dr. Nucatola was not targeted by Defendants at that meeting; she testified

24  that she approached the BioMax booth because she was asked to by someone at PPFA. Trial Tr.

25  _____

26  [5] Defendants maintain that, under federal and Florida law, Plaintiffs' evidentiary burden is even

higher, in that they should have to show that the recorded individual "exhibited" their expectation

27  of privacy. *See* Dkt. 603 at 10-14. For the purposes of Rule 50, however, Defendants focus on

Plaintiffs' failure to satisfy even the lesser standard set by this Court.

28

1487:6-14. The recording was played without sound, and there was no evidence that the recorded discussion was of PPFA internal corporate matters. (Ex. 6124). And PPFA presented no evidence of a second recording of Dr. Nucatola at the 2014 NAF meeting.

PPNorCal presented insufficient evidence of its standing as to the recording of Dr. Drummond-Hay. Dr Drummond-Hay admitted that she wandered to the booth rather than Defendants seeking her out, so there was no targeting. Trial Tr. at 1090:23-1091:12 (Ex. 6117). The conversations were not of internal corporate matters of PPNorCal; even in the general level conversation, it was not clear whether she was discussing her work as a contract abortion provider with PPNorCal or PPMM.

### 2. Plaintiffs have provided insufficient evidence of expectation of privacy.

#### a. 2014 NAF Annual Meeting

PPFA presented insufficient evidence that Dr. Nucatola had a reasonable expectation that she could not be overheard in her conversation with Defendants at their NAF 2014 exhibit booth, as Nucatola admitted there were people standing behind her when she talked to Merritt. Trial Tr. at 1491:2-7 (Ex. 6124).

PPNorCal presented insufficient evidence that Dr. Drummond-Hay had a reasonable expectation that she could not be overheard because Drummond-Hay admits, and video clips confirm, that she discussed fetal specimens in a crowded room without lowering her voice even when people were right next to her, including a security guard, waiter, woman, and child walking by within earshot. Trial Tr. at 1091-1103 (Exs. 5395-1-5, 7).

#### b. Lunch meetings

PPPSGV presented insufficient evidence that Dr. Gatter and Ms. Felczer had a reasonable expectation that their conversation with Defendants at their 2014 restaurant meeting could not be overheard by others because Gatter admitted that they spoke conversationally, in a public place, with no change in tone or topic when strangers and waitstaff were nearby, and that she did not expect the conversation to remain within the four people at the table. Trial Tr. at 1234-35, 1255:4-1284:9, 1272:14-1273:19, 1276:2-11, 1278:22-1279:16 (Exs. 5240-1; 5107-1; 6082). Merritt's testimony confirmed that both Gatter and Felczer discussed sensitive topics with no change in topic

9

1  or tone in the presence of waitstaff. Trial Tr. at 525:14-526:17, 528:6-529:7. Daleiden testified that

2  there were people in the restaurant and no one could be sure not to be overheard. Trial Tr. at

3  2620:2-21.

4      PPFA presented insufficient evidence that Dr. Nucatola had a reasonable belief her

5  conversation with Defendant could not be overheard by others as the undisputed testimony

6  establishes that she did not intend to limit hearers of her conversation. Dr. Nucatola admitted that

7  she did not use a confidential tone or change topics despite there being people eating at neighboring

8  tables within sight and hearing and despite the presence of waiters who could hear what she was

9  saying. Trial Tr. at 1503:2-10, 1506:25-1507:25, 1531:13-1535:12, 1549:5-16, 1551:21-1554:5 (Exs.

10  5074, 7106). She also testified that she does not believe she shared any confidential information.

11  Trial Tr. at 1541:17-1542:20.

12      Ms. Merritt confirmed that Dr. Nucatola did not moderate her voice or the topics discussed

13  at any time in response to the proximity of a man at a neighboring table or the presence of waitstaff.

14  Trial Tr. at 517:9-519:3, 522:14-22, 521:20-524:5. Daleiden confirmed that the party sat in a booth in

15  the public section of the restaurant, near the kitchen. Trial Tr. at 2240:10-2241:1. Indeed, Daleiden

16  testified that he was certain they could be overheard and feared they would be kicked out for having

17  a graphic conversation in public. Trial Tr. at 2669:14-2670:5.

18      C.  FLORIDA RECORDING LAW

19          1.  **Plaintiffs have provided insufficient evidence of corporate standing.**

20      PPFA offered insufficient evidence that Defendants targeted any of the four individuals in

21  eight recordings taken at the Forum and MeDC meetings taken in Florida. In each case, the video

22  either indicates that the recorded person approached the BioMax booth or personnel (Tr. Ex 6126,

23  6004-b) or the evidence is unclear how the conversation began, and no testimonial evidence shows

24  any targeting (Exs. 6021, 5218-2, 6121). There was also insufficient evidence that any of these

25  conversations involved internal matters of PPFA.

26      PPPSGV offered insufficient evidence to show targeting or a discussion of internal matters

27  for the conversations with Dr. Gatter at either the Forum meeting (Ex. 6021) or the MeDC meeting

28  (Ex. 6107).

PPCCC offered insufficient evidence of targeting or discussions of internal PPCCC matters in the conversation with Dr. Siegfried, the recording of which was played without sound. (Ex. 5990).

PPRM offered insufficient evidence of targeting or discussion of internal PPRM matters in the recording of the conversation with Dr. Ginde at the Forum meeting. Dr. Ginde approached the BioMax booth. The recording was played without sound. (Ex. 5960a).

PPGC offered insufficient evidence of targeting or discussion of internal PPGC matters in the recording of the conversation with Bonnie Smith at the MeDC meeting. Ms. Smith approached the BioMax exhibit booth. Trial Tr. at 1715:25- 1716:2 (Ex. 5966a).

PPPSW offered insufficient evidence of targeting or discussion of internal PPPSW matters in the recording of the conversation with Drs. Moran and Nguyen. (Ex. 6116).[6] Dr. Moran testified that he approached the BioMax booth because the conference organizers asked him to visit the exhibit booths. Trial Tr. at 988:10-18.

### 2.   Plaintiffs have provided insufficient evidence of expectation of privacy.

PPFA presented insufficient evidence that Dr. Nucatola had a reasonable expectation of privacy in her conversation recorded at an outdoor reception in Florida in 2014, because, based on a video clip, Lopez testified that hundreds of people were present, 10 to 15 close by ("enough to have to speak over"), during her conversation with him. Trial Tr. at 655:10-656:3 (Ex. 5218-2). In this same video, Dr. Nucatola introduced a woman named "Karen." PPFA put on no evidence that this is Karen Shea, but if it was, Ms. Shea did not testify as to her subjective expectation of privacy.

Dr. Nucatola did not testify about her second encounter with the Defendants, at an indoor reception, and thus there is no evidence of her subjective expectation of privacy in that encounter. (Ex. 6021). Dr. Nucatola also did not testify that she had any expectation of privacy at the BioMax exhibit booth at the MeDC conference in Orlando. Trial Tr. 1511:3 - 1512:20 (Ex. 6126).

PPPSGV presented insufficient evidence that Dr. Gatter had a reasonable expectation of privacy during her recorded conversation at the Forum meeting in Miami in 2014 because Gatter admitted that there were many people nearby this conversation, including a group of people directly

---

[6] Ms. Nguyen is associated with PPGC; Dr. Nguyen is associated with PPPSW.

1   behind her. She admitted she took no precaution to avoid being overheard and had no expectation

2   that the conversation would remain between the parties to the conversation. Trial Tr. at 1246-47,

3   1287:16-1289:15 (Ex. 6021).

4       PPFA also presented insufficient evidence that Dr. June Gupta had a reasonable expectation

5   of privacy in her conversation recorded at the exhibit booth in Orlando in 2015, because Gupta

6   admitted that others were within earshot of her conversation and that she made no indication—

7   explicit or implicit—that she expected confidentiality. Trial Tr. at 2008:1-24, 8-2011:7 (Ex. 6004-b).

8   Neither is there evidence of a reasonable expectation of privacy in Gupta's interaction from Orlando

9   in 2015, as it admittedly took place in the presence of guests and waitstaff not affiliated with Planned

10  Parenthood. Trial Tr. at 2011:8-2012:22 (Ex. 6121). In fact, Dr. Gupta did not claim that she

11  participated in a confidential conversation with Daleiden at that dinner. Trial Tr. at 2018-19.

12      PPFA presented insufficient evidence that Deborah VanDerhei had a reasonable

13  expectation of privacy in her conversation with Mr. Daleiden at the BioMax exhibit booth at the

14  MeDC conference in Orlando, Florida, because that conversation took place at such a volume that

15  Lisa David actually overheard it. Trial Tr. at 2674-2676.

16      PPGC offered insufficient evidence that Bonnie Smith had a reasonable expectation of

17  privacy in her conversation with Daleiden and Lopez at the BioMax exhibit booth at the MeDC

18  meeting in Orlando, the same location as the Vanderhei conversation that was overheard by Lisa

19  David at the next booth.

20      PPPSW offered insufficient evidence that Dr. Moran and Dr. Nguyen had a reasonable

21  expectation of privacy in their conversation with Daleiden, which took place at the BioMax booth at

22  the MeDC conference in Orlando, in the same location where Lisa David was able to overhear

23  Deborah Vanderhei. (Ex. 6116) Dr. Moran's sense of confidentiality came about simply because he

24  believed he was with like-minded people. Trial Tr. 1003:4-1004:2. Dr. Nguyen did not testify.

25      PPPSGV presented insufficient evidence that Dr. Gatter had a reasonable expectation of

26  privacy during her conversation recorded in 2015 in Orlando, Florida, because the conversation

27  took place in a crowded, poolside area, and Gatter admitted that she neither requested

28  confidentiality nor expected the conversation to remain between the parties to it. Trial Tr. at

1283:19-1284:9. She also admitted others were present, including waitstaff and other conference attendees. Trial Tr. at 1243:4-24 (Ex. 6107).

PPOSBC presented insufficient evidence that Jen Russo had a reasonable expectation of privacy in her dinner conversation recorded in Florida in 2015 because, reviewing the video of that conversation (Ex. 6121) their witness, Dunn, admitted that it took place in a crowded room, with waiters present, at a volume audible in a loud room, at a table at which she had no knowledge of some of the attendees. Trial Tr. at 1384:4-1385:19, 1416:20-1417:25. Russo herself did not testify.

PPRM offered insufficient evidence that Dr. Ginde had a reasonable expectation of privacy during her conversation with Defendants at the BioMax booth at the Forum meeting in Miami, Florida, in 2014 (Ex. 5960-A). Dr. Ginde did not testify.

PPCCC offered insufficient evidence that Virginia Siegfried had a reasonable expectation of privacy in her conversation with Defendants in 2014 in Miami because it took place at a poolside reception that their CEO, Ms. Tosh, admitted included many others, including, within sight, hotel guests with no affiliation with the conference. Trial Tr. at 352:19-353:21. Dr. Siegfried did not testify.

D.   MARYLAND RECORDING LAW

1.   **Plaintiffs have provided insufficient evidence of corporate standing.**

Plaintiffs base this claim on four recordings. For none of those recordings did Plaintiffs present any evidence that Defendants had targeted any of the participants to talk about internal corporate matters, or that such matters were discussed. Two of the recordings (Exs. 5749 and 5840) were played without sound, and none of the three featured individuals testified that they had been approached by Defendants or that they had talked about internal corporate matters. Two of the individuals (Schutt-Aine and Krugler) did not testify at all, and, as noted above, Krugler's name was never mentioned in the trial.

Another recording was introduced through Jen Castle, but her testimony did not provide any evidence that she or Ms. Vanderhei had been targeted by Defendants to talk about PPFA's internal corporate matters, and the conversation concerned general "messaging" thoughts about fetal tissue donation, not PPFA's internal matters. Trial Tr. at 1972:15-1974:24 (Ex. 5975a).

The final recording was of Dr. Nucatola. There is no evidence that the Defendants targeted

1   Dr. Nucatola in this conversation to talk about internal PPFA matters, or that such matters were

2   discussed. Trial Tr. at 1512:21-1514:6 (Ex 6129).

3                    **2.      Plaintiffs have provided insufficient evidence of expectation of privacy.**

4           As noted above, Schutt-Aine and Krugler did not testify, and thus Plaintiffs PPGC and

5   PPFA provided insufficient evidence of their subjective expectation of privacy. PPGC offered

6   insufficient evidence that Dr. Schutt-Aine and Ms. Nguyen had a reasonable expectation of privacy

7   in their conversation with Mr. Lopez. In the video introduced by Plaintiffs, the two discussed with

8   Mr. Lopez fetal tissue donation and abortion procedures in general, in a room with many other

9   people about. They did not express an expectation of confidentiality, and were both visibly drunk

10  and "kind of loud about it." Trial Tr. at 658:14-660:15 (Ex. 5749). PPGC witness Palmer

11  confirmed, watching the clip, that there were many people in the room during video of conversation

12  with Schutt-Aine and Nguyen. Trial Tr. at 1662:20-22. Palmer also confirmed that they did not

13  identify anything they said as "confidential." Trial Tr. at 1638:14-19.

14          PPFA also presented insufficient evidence that Castle or VanDerhei had an expectation of

15  privacy in their conversation with Defendants. Castle acknowledged the presence of others in the

16  mezzanine area in which she and VanDerhei spoke to Mr. Daleiden. Trial Tr. at 1986 (Exs. 5679 &

17  5975-A). She admitted that she never asked the Defendants not to repeat what she said in their

18  conversations. Trial Tr. at 1986:20-24.

19          Finally, Dr. Nucatola admitted that the area in which she spoke with Defendants at the

20  NAF 2015 conference was a noisy room with lots of people. Trial Tr. 1512:21 - 1513:25 (Ex. 6129).

21                                              * * *

22          Because Plaintiffs have failed to provide sufficient evidence for a reasonable jury to find in

23  their favor as to any of the above recording claims, the Court should grant Defendants judgment as

24  to each as a matter of law.

25  / / /

26  / / /

27  / / /

28  / / /

## III.     BREACH OF CONTRACT CLAIMS

### A.     CMP ALTER EGO LIABILITY

Plaintiffs have failed to produce sufficient evidence to hold CMP liable for violating any of the contracts at issue in this lawsuit.

Reverse veil piercing does not apply under California law. *See Postal Instant Press, Inc. v. Kaswa*, 162 Cal.App.4th 1510 (2008); *Olympic Capital Corp. v. Newman*, 276 F. Supp. 646, 658 (C.D. Cal. 1967); *see also United States v. Boyce*, 38 F. Supp. 3d 1135, 1156 (C.D. Cal. 2014), *aff'd*, 683 F. App'x 654 (9th Cir. 2017). California law controls the question of alter ego liability as to all of the contract claims in this case. *See S.E.C. v. Hickey*, 322 F.3d 1123, 1128 (9th Cir. 2003) (instructing federal courts to "apply the law of the forum state in determining whether a corporation is an alter ego of an individual). Therefore, CMP is not liable under reverse veil piercing for any of the contract claims in this case. *See also* Dkt. 976.

Absent this theory of reverse veil piercing, CMP cannot be held liable for the exhibit agreements since the uncontroverted evidence is that CMP never entered into any of the agreements. *See* Trial Tr. at 2462:12-14; 2466:22-24; 2467:1-2468:5.

Traditional alter ego doctrine also does not apply here, but if it did, Plaintiffs has failed to demonstrate that the two prongs of that doctrine are met:

- o   "a sufficient unity of interest and ownership between the corporation and the individual or organization controlling it that the separate personalities of the individual and the corporation no longer exist and"; and

- o   "treating the acts as those of the corporation alone will sanction fraud, promote injustice, or cause an inequitable result."

*Misik v. D'Arco*, 197 Cal. App. 4th 1065, 1072 (2011). The evidence plainly contradicts the first prong, in that the CMP Board of Directors did not even know about BioMax. *See* Trial Tr. at 2462. As to the second, Plaintiffs have not presented evidence that Daleiden or BioMax would not be able to pay an award issued in this case.

Thus, Plaintiffs have failed to produce sufficient evidence to hold CMP liable for violating any contract on any legal theory.

## B.   PPFA EXHIBITOR AGREEMENTS

In addition to the failure to prove CMP's liability, Plaintiffs have also failed to demonstrate that any breach of an exhibitor agreement caused any Plaintiff any actual damages. *See* Section I, *supra*.[7]

## C.   NAF EXHIBITOR AND CONFIDENTIALITY AGREEMENTS[8]

In addition to the failure to prove CMP's liability, Plaintiffs have also failed to introduce sufficient evidence of the following elements of their breach of contract claim as to the NAF Exhibitor and Confidentiality Agreements:

### 1.   That PP affiliates have standing as fourth-party beneficiaries

Plaintiffs have introduced **no evidence** that any party to the NAF contracts intended the corporate employees of conference attendees to benefit from those contracts, nor certainly have they produced any objective evidence of that intent, such that all parties to the contract would have a reasonable expectation that those employers could enforce it. *See* Dkt. 972 at 2 (relying on Cal. Civ. Code § 1559; *Schauer v. Mandarin Gems of Cal., Inc.,* 125 Cal. App. 4th 949, 957 (2005); et al.); *see also* Trial Tr. at 3205-06. The employers (Plaintiffs in this case) are in fact *fourth-party beneficiaries* to the contracts—if there were such a thing.

Mr. Daleiden's uncontested testimony is that there was no indication that the contracts were intended to protect Planned Parenthood. *See* Trial Tr. at 2514:18–2515:8 (he did not understand the contract to be between him and every other unnamed conference-goer); 2514:2-14 (he never received a list of attendees prior to, during, or after the NAF 2015 conference, as one sometimes does for other conferences); 2512:2-8 (as to the confidentiality agreement, no one from NAF ever suggested anyone else was a party to the agreement; "It was just presented like an

---

[7] Defendants reserve their other objections to Plaintiffs' cause of action for breach of the PPFA Exhibitor Agreements, including that no such breach ever occurred. But these issues have been argued in other contexts, *see, e.g.*, Dkt. 643 at 7-10, and decided on grounds other than the sufficiency of Plaintiffs' evidentiary showing at trial, *see* MSJ Order at 753 at 36-38; therefore, Defendants will not address them in the context of this Rule 50 Motion.

[8] Defendants note that Subsections 2, 3, and 4 of this Section were resolved by the Court shortly before this filing. *See* Dkt. 994 at 1-2. Nevertheless, Defendants maintain that they are entitled to judgment as a matter of law on those claims due to the insufficiency of Plaintiffs' evidence. Therefore, Defendants preserve their Rule 50 arguments on each of those points here.

1 acknowledgment of – of location secrecy.").

2      The contracts do not name corporate Plaintiffs as third-party beneficiaries. *See* Trial Ex.

3 217, 248, 370, 416. Plaintiffs are not even attendees of the conferences but are rather *employers* of

4 such attendees—and in some cases, not even that, *see* Dkt. 984 at 1-2; Trial Tr. at 1087:8-11 (Dr.

5 Drummond-Hay, Plaintiff PPNorCal's only witness, admitting to be an independent contractor and

6 not even an employee of PPNorCal). There is zero evidence that the contracts were intended to

7 benefit attendees' employers. *See* Trial Tr. at 954:5-954:11 (Melissa Fowler Testimony) ("Q. And

8 NAF would not allow a single representative of an entity to sign on behalf of all -- of other staff

9 members or whatever of that entity, is that correct? A. That's correct. Q. Okay. And, because NAF

10 viewed this as an agreement between the individual and NAF. Is that correct? A. Yes. That's

11 correct."). Moreover, the evidence suggests that even conference attendees—a group that *was*

12 mentioned in the agreements—did not believe that the agreements were intended to benefit them.

13 *See* Nguyen Video Deposition Testimony, 357:24-358:05 (Q: So this agreement prevents you from

14 disclosing NAF conference information. It protects NAF. It doesn't protect you; right?" A:

15 Correct.").

16      Plaintiffs have utterly failed to produce *any* evidence that Plaintiffs have standing to sue as

17 fourth-party beneficiaries, much less that their employees/contractors are third-party beneficiaries

18 of the NAF agreement—but in any event, those third-parties are not plaintiffs in this case, and thus

19 Defendants are entitled to a directed verdict as to the contract claims predicated on the NAF

20 conferences.

21           **2.**     **That there was adequate consideration for the NAF NDA**

22      Defendants have argued that the NAF NDA lacked adequate consideration, in that

23 Defendants had already performed their obligations under the Exhibitor Agreement before arriving

24 at the conferences, and they were not offered any new consideration for signing the NDAs at the

25 door. *See* Dkt. 643 at 15-16. Plaintiffs have presented no evidence on the basis of which a reasonable

26 jury could conclude that there was adequate consideration for the NAF NDA. The only evidence

27 presented was to the contrary. *See* Trial Tr. at 2473:15-21 (David Daleiden) ("Q. And you

28 mentioned that she sent an exhibitor prospectus. Now, did Ms. Davis send you any documents with

1  that initial email to BioMax indicating that the conference was private? A. No, none whatsoever. Q.

2  Did she mention confidentiality in the materials that were sent in the exhibitor prospectus? A. No,

3  she did not.").

4          **3.**     **That the contracts were not void for vagueness**

5      Plaintiffs have not presented sufficient evidence for a reasonable jury to find that the NAF

6  contracts are not void for vagueness. *See* Dkt. 643 at 16-19; Dkt. 984 at 2. All of the evidence

7  adduced at trial was to the contrary. *See, e.g.*, Trial Tr. at 2515:9-2516:8 (David Daleiden testifying

8  to confusion about the duration and meaning of the NAF NDA, including that it was "an

9  acknowledgment of, you know, sort of behavioral discretion while at the meeting and not calling

10  attention to the meeting while it was going on and not disrupting it"); 2497:10-2498:13 (David

11  Daleiden: "I think they spent all of approximately two seconds telling us what their -- what their

12  summary -- what their summation is of what that document meant. . . . And they said: It means you

13  have to be super secret and don't say National Abortion Federation. Say National Asparagus

14  Foundation or National -- I think I said, like, National Association of Fortune Tellers or something

15  like that. And they sort of laughed about it and that was it. . . . I understood that as basically a

16  location secrecy agreement.").

17          **4.**     **That the definition of "confidential information" included anything**

18                      **disclosed on the HCP videos.**

19      As elsewhere described, the NAF Exhibitor Agreement fails to define the term

20  "confidential information," while the NAF NDA's definition of "Confidential Information,"

21  understood the way that Plaintiffs suggest, is absurd. *See* Dkt. 643 at 17-18. And Mr. Daleiden's

22  uncontested testimony is that the only guidance he was given by representatives of NAF suggested

23  that the NDA required nothing more than behavioral discretion and "location secrecy" during the

24  duration of the conference. *See* Trial Tr. at 2515:9-2516:8; 2497:10-2498.

25      Plaintiffs offered no evidence that would permit a reasonable jury to find that Defendants

26  should have understood that the information they disclosed through the Human Capital Project

27  qualified as "confidential information" under either NAF Agreement.

28  / / /

5.  That any alleged breach of a NAF agreement caused any Plaintiff any actual damages.

*See* Section I, *supra.*

D.  **PPGC NDA**

In addition to the failure to prove CMP's liability, Plaintiffs have also failed to introduce sufficient evidence of the following elements of their breach of contract claim as to the PPGC NDA:

1.  That information obtained during the site visit qualified as Confidential Information under the PPGC NDA.

Plaintiffs failed to provide evidence that information obtained during the site visit qualified as "Confidential Information" under the PPGC NDA. *See* Dkt. 753, 53–54. On the contrary, Mr. Daleiden testified that that the information discussed was not confidential. *See* Trial Tr. at 2592:18-2593:14 (explaining that he filled in the subject matter of the NDA); 2594:12-2595:9 (explaining that he wrote in 'specific research programs' "to specifically limit the scope of the kind of -- whatever kind of confidential information either party would be disclosing or would want to disclose as confidential in the meeting that we were going to have with them. . . . I wrote that in to really keep it very tight and limited to what information could be considered confidential under this agreement. . . . [T]hey never asked me about it and never questioned it."); 2597:13-2598:12 ("I understood that if a party under this agreement was disclosing information that that party believed was confidential information and wanted it to be information that was kept confidential under this agreement, that they would specifically flag that information as confidential information before disclosing it to us. Q. And, again, all of that would have to also fall under the category of scientific research programs; correct? A. Yes. . . . I understood that if Planned Parenthood Gulf Coast or Melissa Farrell was going to disclose information about a specific scientific research project or a specific scientific research program that they had going on to actually do research with human subjects, that Melissa Farrell or someone else at PPGC would specifically flag that information as confidential information under the agreement before disclosing it to me."); *see also id.* at 2598:13-2600:19 (objections omitted) (noting that Ms. Farrell never said that any information would be confidential and never discussed the details of any scientific research program, but in fact

19

1   "specifically told us that we wouldn't be talking about confidential information at that meeting").

2   In her deposition testimony, Ms. Farrell confirmed that she did not verbally inform

3   Defendants during their site visit that what they were discussing or learning was confidential. *See*

4   Farrell Video Deposition Testimony, 189:18–190:9, 269:25–270:6.

5     **2.**   **That any breach of the PPGC NDA caused PPGC any actual damages.**

6   In its Summary Judgment Order, this Court allowed that PPGC might be entitled to

7   "damages for security measures implemented for targeted staff (e.g., Farrell and Nguyen)," "as

8   linked directly to Defendants' actions targeting and recording those staff members." Dkt. 753 at 55.

9   But PPGC has presented no evidence on the basis of which a reasonable jury could find that its

10  damages were caused by breach of the PPGC NDA. In fact, PPGC's own representative testified at

11  trial that "[t]he release of the public information" in the videos "is what caused the harm to

12  Planned Parenthood Gulf Coast." *See* Trial Tr. at 1647:22 – 1648.

13  **CONCLUSION**

14  For the above reasons, and for those laid out in various co-Defendants' motions,

15  Defendants here request that the Court grant the present motion for judgment as a matter of law.

16

17

18  Date:   November 11, 2019   Respectfully submitted

19  /s/ Charles S. LiMandri
    Charles S. LiMandri (CA Bar No. 110841)

20  Paul M. Jonna (CA Bar No. 265389)
    Jeffrey M. Trissell (CA Bar No. 292480)

21  B. Dean Wilson (CA Bar No. 305844)
    Milan L. Brandon (CA Bar No. 326953)

22  FREEDOM OF CONSCIENCE DEFENSE FUND
    P.O. Box 9520

23  Rancho Santa Fe, CA 92067
    Tel: (858) 759-9948

24  Facsimile: (858) 759-9938
    cslimandri@limandri.com

25  pjonna@limandri.com
    jtrissell@limandri.com

26
    *Attorneys for Defendants the Center for Medical Progress,*

27  *BioMax Procurement Services, LLC, David Daleiden, and*
    *Gerardo Adrian Lopez*

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

/s/ Harmeet K. Dhillon
Harmeet K. Dhillon (CA Bar No. 207873)
Gregory R. Michael (CA Bar No. 306814)
DHILLON LAW GROUP INC.
177 Post Street, Suite 700
San Francisco, CA 94108
415-433-1700
415-520-6593 (fax)
harmeet@dhillonlaw.com

Denise M. Harle (CA Bar No. 275561)
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd., NE
Suite D1100
Lawrenceville, GA 30043
Tel: (770) 339-0774
dharle@ADFlegal.org

*Attorneys for Defendants the Center for Medical Progress, BioMax Procurement Services, LLC, and David Daleiden*

/s/ Thomas Brejcha
Thomas Brejcha, *pro hac vice*
Peter Breen, *pro hac vice*
Matthew F. Heffron, *pro hac vice*
THOMAS MORE SOCIETY
309 W. Washington St., Ste. 1250
Chicago, IL 60606
Tel: (312) 782-1680
tbrejcha@thomasmoresociety.org
pbreen@thomasmorsociety.org

*Attorneys for Defendant David Daleiden*

/s/ Horatio G. Mihet
Horatio G. Mihet*
Liberty Counsel
hmihet@lc.org
P.O. Box 540774
Orlando, FL 32854
(407) 875-1776
*Admitted pro hac vice

Nicolaie Cocis CA Bar # 204703
Law Office of Nic Cocis and Associates
nic@cocislaw.com
38975 Sky Canyon Dr., Suite 211
Murrieta, CA 92563
(951) 695-1400

*Attorneys for Defendant Sandra Susan Merritt*