1

2

3                          UNITED STATES DISTRICT COURT

4                        NORTHERN DISTRICT OF CALIFORNIA

5

6    PLANNED PARENTHOOD FEDERATION          Case No.  16-cv-00236-WHO
     OF AMERICA, INC., et al., [1]
7
                    Plaintiffs,             ORDER RESOLVING UNFAIR
8                                           COMPETITION CLAIM AND
           v.                               ENTERING JUDGMENT
9
     CENTER FOR MEDICAL PROGRESS, et        Re: Dkt. Nos. 1048, 1059
10   al., [2]
11                  Defendants.

12                               INTRODUCTION

13        This Order addresses plaintiffs' Unfair Competition Law ("UCL") claim arising under

14   California Business & Professions Code section 17200 *et seq*. and their request for a permanent

15   injunction, and enters Judgment.  It follows a trial that commenced on October 2, 2019 and ended

16   with the jury's verdict, which was overwhelmingly in plaintiffs' favor, on November 15, 2019.  I

17   now find in plaintiffs' favor on the UCL claim; an abundance of evidence supports it.  I enter a

18   permanent injunction against the defendants, although more limited than sought by plaintiffs.  And

19   I enter Judgment in accordance with the verdict and the orders that preceded it. [3]

20

21   [1] Plaintiffs, as identified in the Final Preliminary Jury Instructions (Dkt. No. 850) are Planned
     Parenthood Federation of America (PPFA); Planned Parenthood: Shasta-Diablo, Inc. dba Planned
22   Parenthood Northern California (PPNorCal); Planned Parenthood Mar Monte, Inc. (PPMM);
     Planned Parenthood of the Pacific Southwest (PPPSW); Planned Parenthood Los Angeles (PPLA);
23   Planned Parenthood/Orange and San Bernardino Counties (PPOSBC); Planned Parenthood
     California Central Coast (PPCCC); Planned Parenthood Pasadena and San Gabriel Valley, Inc.
24   (PPPSGV); Planned Parenthood of the Rocky Mountains (PPRM); and Planned Parenthood Gulf
     Coast (PPGC) and Planned Parenthood Center for Choice (PPCFC).
25
     [2] Defendants, as identified in the Final Preliminary Jury Instructions (Dkt. No. 850) are the Center
26   for Medical Progress (CMP), BioMax Procurement Services (BioMax), David Daleiden, Sandra
     Susan Merritt, Adrian Lopez, Albin Rhomberg, and Troy Newman.
27
     [3] Certain claims were adjudicated against defendants on summary judgment.  Those claims were
28   (1) partial summary judgment to plaintiffs on the interstate commerce nexus for the false

United States District Court
Northern District of California

1

## BACKGROUND

2          The jury found the following defendants liable on the following claims:

3          <u>Trespass</u>.  Defendants Daleiden, Lopez, BioMax, and CMP's trespasses during two PPFA

4    conferences in Florida and one in Washington, D.C. caused actual damages to PPFA.  Rhomberg

5    and Newman conspired with those trespassing defendants.  Verdict at 1.  Defendants Daleiden,

6    Merritt, BioMax, and CMP's trespass at the PPGGC/PPCFC Health Center caused actual damages

7    to PPGC/PPCFC.  Defendants Rhomberg and Newman conspired with defendants to trespass at

8    that Health Center.  Verdict at 3.[4]

9          <u>Breach of PPFA Exhibitor Agreements</u>.  Defendants Daleiden, BioMax, and CMP

10   breached PPFA's Exhibitor Agreements at three PPFA Conferences, causing PPFA actual

11   damages.  Verdict 4-6.

12          <u>Breach of NAF Agreements</u>.  PPFA was actually damaged by defendants Daleiden,

13   Merritt, Lopez, BioMax, and CMP's breach of the 2014 and 2015 NAF Agreements.  Verdict at 7.

14          <u>Breach of PPGC Agreement</u>.  Daleiden, BioMax, and CMP breached the PPGC

15   Nondisclosure Agreement, causing actual damages to PPGC.  Verdict at 8.

16          <u>Fraudulent Misrepresentations</u>.  Defendants Daleiden, Merritt, Lopez, BioMax, CMP,

17   Rhomberg, and Newman committed or conspired to commit fraudulent misrepresentations against

18

19   identification predicate acts under RICO; (2) partial summary judgment to plaintiffs on Daleiden
20   and BioMax's breach of the PPFA Exhibitor Agreements; and (3) partial summary judgment in
     favor of PPFA against BioMax, Daleiden, and Lopez for trespass at the PPFA conferences in
21   Florida and Washington, D.C. and in favor of PPGC/PPCFC and PPRM on trespasses in Colorado
     and Texas (reserving for trial CMP's liability and actual damages).  Dkt. No. 753 at 134-135.  In
22   addition, in an Order dated November 11, 2019, I granted portions of plaintiffs' Rule 50 motion,
     finding that: (1) plaintiffs' employees and contractors are third-party beneficiaries of the NAF
23   Exhibitor and Confidentiality Agreements; (2) defendants Merritt, Daleiden, BioMax, and CMP
     breached the NAF 2014 Confidentiality Agreement and defendants Daleiden, Lopez, BioMax, and
24   CMP breached the NAF 2015 Confidentiality Agreement prohibiting "Videotaping or Other
     Recording"; and (3) defendants Daleiden, BioMax, and CMP breached the NAF Exhibitor Agreements
25   in 2014 and 2015 concerning the requirement to provide "truthful, accurate, complete, and not
     misleading" information.  Dkt. No. 994 at 1.
26

27   [4] I had determined that PPRM was nominally damaged by defendants' trespass at PPRM's clinic
     in Colorado.  The jury determined that PPFA was not damaged by defendants' trespass PPRM's
28   clinic, but that Rhomberg and Newman conspired with Daleiden, Lopez, Merritt, and CMP in that
     trespass.  Verdict at 2.

United States District Court
Northern District of California

PPFA, PPGC, PPOSB, and PPPSGV, causing actual damages to PPFA, PPGC, PPOSBC, and PPPSGV.  Verdict at 9-11.

False Promise Fraud.  Defendants Daleiden, Merritt, Lopez, BioMax, CMP, Rhomberg, and Newman committed or conspired to commit false promise fraud in connection with the PPFA's Exhibitor Agreements, causing actual damages to PPFA.  Verdict at 12-13.  Defendants Daleiden, Merritt, Lopez, BioMax, CMP, Rhomberg, and Neman committed or conspired to commit false promise fraud in connection with PPGC's Nondisclosure Agreement, causing actual damage to PPGC.  Verdict at 14-15.

RICO.  Defendants Daleiden, Merritt, Lopez, BioMax, CMP, Rhomberg, and Newman committed or conspired to violate the Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. §§ 1962(c) and 1962(d)), causing actual damages to PPFA, PPGC, PPOSBC, PPPSGV.  Verdict at 16-17.

Recording Law, California (Penal Code section 632).  Defendants Daleiden and Merritt violated Penal Code 632 by recording staff of PPNorCal, PPFA, and PPPSGV, causing actual damage to PPFA and PPPSGV.  Defendants Daleiden, Merritt, Lopez, BioMax, CMP, Rhomberg, and Newman conspired to violate Penal Code section 632. Verdict 19-20.

Recording Law, Florida.  Defendants Lopez and/or Daleiden violated Florida law by recording staff of PPFA, PPPSGV, PPCCC, PPRM, PPOSBC, PPCG, and PPPSW, causing actual damages to PPFA, PPOSBC, and PPPSGV.  Verdict 21-25.  Defendants Daleiden, Merritt, Lopez, BioMax, CMP, Rhomberg, and Newman conspired to violate Florida law.  Verdict at 26.

Recording Law, Maryland. Defendants Daleiden, Merritt, or Lopez violated Maryland law by recording PPFA, PPGC, and PPCFC staff causing actual damages to PPFA and PPGC. Verdict at 27-29.  Defendants Daleiden, Merritt, Lopez, BioMax, CMP, Rhomberg, and Newman conspired to violate the Maryland recording law.  Verdict at 30.

Recording Law, Federal.  Defendants Daleiden, Lopez, or Merritt violated the Federal recording law by recording PPFA, PPGC, PPCFC, PPRM, PPPSGV,  PPCCC, PPOSBC, PPPSW, and PPNorCal, causing actual damages to PPFA, PPGC PPOSBC, and PPPSGV.  Verdict at 31-40. Defendants Daleiden, Merritt, Lopez, BioMax, CMP, Rhomberg, and Newman conspired to

3

United States District Court
Northern District of California

1  violate the Federal recording law.  Verdict at 41.

2      Punitive Damages.  Defendants Daleiden, Merritt, BioMax, CMP, Newman, and

3  Rhomberg were liable for punitive damages for one or more of fraud, trespass, Florida recording,

4  Maryland recording, or Federal recording law claims.  Verdict at 42-43.

5      The UCL claim was not tried to the jury.  As a purely equitable claim, it was left for

6  adjudication by me, if necessary, following the trial.  *See, e.g., Cortez v. Purolator Air Filtration*

7  *Products Co*., 23 Cal. 4th 163, 179 (2000).  Relatedly, the issue of what – if any – injunctive relief

8  plaintiffs were entitled to remained outstanding.

9      After the verdict was rendered, I discussed with the parties how to resolve the remaining

10  issues.  While I agreed "with defendants that 'the facts underlying the jury verdict and the UCL

11  claim are nearly identical and the legal issues significantly overlap,'" and I was "inclined to

12  resolve these issues through briefing, supported by citations to the trial transcript and other

13  evidence in the record," I asked each side to "file a proffer identifying with specificity what

14  testimony or other evidence that was not submitted on summary judgment or adduced at trial they

15  intend to introduce in support of or in defense to the UCL claim and request for injunctive relief."

16  Dkt. No. 1036 (quoting Dkt. No. 1033).  After reviewing those proffers, and given the jury's

17  verdict, I determined that I could resolve the UCL claim solely on the "illegality" and "fraudulent"

18  UCL prongs and that I could address the appropriateness of any injunctive relief based on the trial

19  record and undisputed evidence.  Dkt. No. 1044.  I ordered plaintiffs to file proposed facts and

20  conclusions of law identifying "the precise injunctive relief they seek," the factual and legal bases

21  for that relief under the UCL, and (if sought) the factual and legal bases for injunctive relief under

22  their other claims.  *See* Dkt. Nos. 1044 (Minutes), 1046 (Transcript).

23      Having reviewed the proffers and the parties' briefing on the UCL claim and equitable

24  relief, I now resolve the remaining issues.  With respect to the equitable and injunctive relief based

25  on the UCL or other claims, given the evidence at trial – in particular regarding the backgrounds

26  of defendants, their prior acts and knowledge of tactics used to gather information on abortion

27  providers based on misrepresentations and surreptitious recordings, the roles and goals of each

28  defendant in the Human Capital Project ("HCP"), the testimony of the defendants on the stand

4

regarding their role and intent with respect to the HCP and Planned Parenthood specifically[5] – there is no need for further proceedings before I rule. Defendants were able to and did present evidence regarding these issues in their defense of plaintiffs' claims for liability under RICO (on whether the alleged criminal conspiracy under RICO was "open ended"), for conspiracy liability, for punitive damages, and more generally in support of their narrative that defendants were engaged only in legal journalistic efforts to uncover evidence of criminal activity.

With respect to balance of hardships and public interest (discussed more below), I likewise considered the evidence at trial, as well as defendants' proffer of evidence regarding the social utility of defendants' conduct. Dkt. No. 1041. Most of that evidence had already been submitted to me by defendants – in proffer form (by counsel) or in declaration form – at summary judgment, in connection with motions *in limine*, or during trial (to allow resolution of disputes over the relevance or admissibility of witness discovery or testimony at trial). I have considered and weighed defendants' beliefs about what that proffered evidence would show, and what the testimony and documents submitted to me showed, in reaching my determination that the public interest and balance of hardships weigh in favor of injunctive relief.

## I.    FINDINGS OF FACT

It is not necessary for me to find facts with respect to the merits of defendants' liability under the UCL claim: the illegal and fraudulent prongs of the UCL are satisfied given the jury's verdict that defendants engaged in numerous illegal and fraudulent acts in California and emanating from California, against California-based plaintiffs and others, committed in violation of California law, Federal law, and the laws of other jurisdictions. I discuss defendants' legal arguments about the inapplicability of the UCL in the next section and find that they lack merit.

Establishing a violation of the UCL does not determine what sort of equitable relief is appropriate for that violation or for the other claims on which plaintiffs prevailed at trial. I directed plaintiffs to prepare findings of fact and conclusions of law addressing the need for equitable relief and the appropriate scope of that relief under the UCL and any other claims on

---

[5] Newman did not testify at trial, but given the jury's verdict on the claims asserted against him, the jury likely took adverse inferences against him on the non-California claims.

United States District Court
Northern District of California

which plaintiffs intended to rely in support of their requested injunctive relief.  I will address the scope of injunctive relief later in this Order, but find the following facts that generally support the need for injunctive relief.

1.      In late 2012, David Daleiden traveled to Wichita, Kansas, the headquarters of Troy Newman's anti-abortion organization Operation Rescue, to discuss a plan to target Planned Parenthood through a series of undercover videos. Trial Tr. 2050:20-25; 2052:3-2053:4; 2054:1-15; TRX 24, TRX 123.

2.      In March 2013, Daleiden formed the Center for Medical Progress ("CMP"), with Newman joining as a board member shortly after CMP's creation. Trial Tr. 2055:12-23; TRX 132; TRX 338.  Daleiden was CMP's CEO.  Newman was Secretary of CMP.  Rhomberg was CMP's "Chief Financial Officer." TRX 338; TRX 37.

3.      CMP's plan was to create a video campaign (later known as the Human Capital Project or HCP) against Planned Parenthood with the objective of creating "maximum negative impact – legal, political, professional, public – on [Planned Parenthood]" and to "create public outrage towards" Planned Parenthood through a series of undercover gotcha videos. TRX 24, 67, 68, 106; Trial Tr. 3460:22-3461:3.

4.      Daleiden, acting as CMP's CEO, set up a front company called BioMax Procurement Services, LLC ("BioMax"). TRX 364; Trial Tr. 2104:11-14; 2461:25-2462:4; 2463:4-8 ("BioMax was organized as a vehicle . . . to use to do large parts of undercover works").

5.      Daleiden filed Articles of Organization for BioMax with the California Secretary of State listing "Susan Tennenbaum," as its manager, and signing her name.  There is no such person. TRX 364; Trial Tr. 2093:12-18; 2097:6-2098:8.

6.      Daleiden took significant steps  to make BioMax appear legitimate.  For example, he created a website for BioMax . Trial Tr. 2105:1-16 (Daleiden testimony regarding steps he took to make BioMax seem legitimate); TRX 123 (early roadmap noting the need to "park domain and temporary website of fake company").

7.      Daleiden hired co-conspirators Merritt and Lopez, and non-parties Brianna Baxter and Annamarie Bettisworth Davin, to pose as BioMax officers and employees and use those false

6

1    identities to infiltrate conferences and health centers to secretly film Planned Parenthood staff and

2    others. Trial Tr. 2086:20-2087:16; 2088:1-18; 2113:9-2114:8; 2161:12-23.  These individuals

3    were independent contractors of CMP. Trial Tr. 2086:20-2087:16; 2088:1-18; 2161:12-23;

4    2454:25-2455:1; TRX 352 (independent contractor agreement for Susan Merritt).

5           8.      Daleiden created fake names and backgrounds for the purported BioMax

6    employees, which he trained the CMP contractors to use. TRX 426 ("field worker employees,

7    which he trained the CMP contractors to use. TRX 426 ("field worker vocabulary"); TRX 549;

8    Trial Tr. 437:12-439:3, 438:7-439:2  (Merritt given instructions and background by Daleiden);

9    2161:24-2166:22 (Daleiden testimony about training contractors) 2168:13-2169:17 (Daleiden

10   testimony about his "training of undercover actors"); 2170:7-19 (Daleiden provided email with

11   "background information for the -- for the undercover investigator to know about their – about

12   their characters.").

13          9.      Daleiden also created business cards and promotional materials for BioMax.  The

14   promotional materials described BioMax as "a biological specimen procurement organization

15   headquartered in Norwalk, California." Trial Tr. 2114:17-19, 2116:8-22.  Daleiden and the CMP

16   contractors distributed the BioMax business cards and displayed promotional materials at

17   conferences. TRX 366, 654 (business cards); TRX 31 (BioMax brochure); Trial Tr. 2112:4-

18   2113:13; 2114:17-2116:22; *see also* Trial Tr. 1220:17-21, 1222:4-10; TRX 8017, 578, 1809.

19          10.     In addition, Daleiden created and/or solicited the production of fake California

20   drivers' licenses with the fake BioMax names for himself, Merritt and Baxter.  For his own ID, he

21   used an expired drivers' license and typed "Robert Daoud Sarkis" over his true name.  Through

22   Craigslist, Daleiden located a service in Southern California, which he paid to produce phony

23   drivers' licenses with the names "Susan Tennenbaum" and "Brianna Allen." TRX 140; Trial Tr.

24   2122:18-2133:2; 2154:5-2155:20; 3465:3-5.

25          11.     Daleiden had bank cards issued for BioMax under fictitious names or without the

26   consent of the named cardholder. TRX 140; TRX 584; Trial Tr. 2155:21-2156:23, 2157:15-25,

27   2158:3-2159:5; Court Ex. 5 at 30:21-31:7 (Cronin Dep.).

28          12.     Newman advised Daleiden and took credit for directing the Project. Trial Tr.

United States District Court
Northern District of California

7

1    3461:11-15; TRX 28 (press release).

2        13.    Rhomberg and Newman participated in CMP board meetings with Daleiden every

3    few months to discuss and receive updates on the progress of the project. Trial Tr. 704:2-19.

4    Daleiden sent them emails laying out a roadmap of the Human Capital Project's goals and

5    activities. TRX 67 (email to Rhomberg with roadmap); TRX 123 (email to Newman with road

6    map notes).

7        14.    Rhomberg and Newman knew that Daleiden and CMP had created a front company

8    to infiltrate conferences and health centers of abortion providers. Trial Tr. 719:14-720:5

9    (discussion of email from Daleiden that told Rhomberg the "infiltration was successful and

10   BioMax is now a known and trusted entity"); Trial Tr. 3462:6-9 ("Troy Newman understood that

11   BioMax was created as a front organization to provide a cover story to allow Daleiden, Merritt and

12   Lopez to tape plaintiffs' doctors and staff."); *see also* TRX 24.

13       15.    Rhomberg gave Daleiden tips regarding taping strategy, and the ultimate

14   distribution of the videos. TRX 64A, 65, 79, 380.  He also assisted Daleiden in fundraising and

15   was considered one of Daleiden's most trusted advisors. Trial Tr. 711:3-7, TRX 65.

16       16.    Daleiden updated Rhomberg on a meeting with Planned Parenthood's staff and

17   reported that Dr. Nucatola had believed the lies that Daleiden and Merritt told her. TRX 380.

18       17.    Rhomberg was aware that Daleiden was using a fake name because Daleiden called

19   Rhomberg while in character from PPGC's facility in Texas, identifying himself as "Robert

20   Sarkis." TRX 6103; Trial Tr. 722:21-5; 847:18-848:22.

21       18.    Daleiden and CMP used the same methods and strategies that Newman had

22   discussed in a book he published advocating sting operations against abortion providers. TRX 30;

23   Trial Tr. 3461:17-21. Newman "understood that the same methods and strategies were being used

24   by Daleiden, Merritt, and Lopez in recording Plaintiffs' doctors and staff" at PPFA and NAF

25   conferences, Planned Parenthood affiliate facilities, and restaurants. Trial Tr. 3462:3-5; *see also*

26   TRX 24.

27       19.    In 2013, Daleiden began to register BioMax as an exhibitor at reproductive health

28   conferences.  He registered "Brianna Allen" and "Susan Tennenbaum," who were purportedly

United States District Court
Northern District of California

representing BioMax, as attendees at the Association of Reproductive Healthcare Providers ("ARHP") in Denver in 2013. Trial Tr. 2430:11-24.

20.    Merritt attended the ARHP conference using the fake name "Susan Tennenbaum" and falsely claimed to be BioMax's CEO and founder (as she would continue to do at two NAF conferences and private meetings with individual doctors and staff of various Planned Parenthood affiliates). Trial Tr. 413:23-414:5.

21.    At ARHP, Merritt met two employees of the National Abortion Federation ("NAF").  As instructed by Daleiden, she told the NAF representatives that she was the CEO of BioMax, a start-up tissue procurement company. Trial Tr. 418:8-18; 427:6-428:6, 441:23-25; 2435:23-2436:13.

22.    Daleiden then emailed the NAF contacts Merritt made at ARHP – Jennifer Hart and Sandy Fulkerson-Schaeffer -- to obtain information about registration for NAF's 2014 conference in San Francisco, California. Trial Tr. 2472:9-2473: 10; TRX 414.  In reliance on the fact that they had met Merritt at a reproductive health conference and her lies about BioMax, NAF staff invited BioMax to exhibit at the 2014 NAF conference. Court Ex. 1 at 84:09-84:18; 84:19-85:07 (Davis Dep.)

23.    Daleiden registered BioMax as an exhibitor for NAF's 2014 annual conference.  He signed the name "Susan Tennenbaum" on the registration form.  In addition, he used the payment card he had obtained in the name of Phil Cronin and forged Cronin's signature in connection with paying for registration. TRX 370; Trial Tr. 2206:2-2211:6.

24.    Daleiden, Merritt and Baxter checked-in at NAF's registration desk using their fake California drivers' licenses.

25.    To protect the safety of all conference attendees, NAF requires all attendees to sign confidentiality agreements that specifically prohibit attendees from making video recordings. Trial Tr. 895:12-896:15; 898:19-899:7.  Daleiden, Merritt and Baxter all signed a confidentiality agreement promising not to make any video recordings even though they intended to secretly record the entire time they were at the conference. TRX 416, 1012; Trial Tr. 445:22-446:19; Trial Tr. 2212:21-2213:5.

United States District Court
Northern District of California

9

26.     Daleiden, Merritt and Baxter wore hidden video cameras and recorded everyone they spoke to at the NAF 2014 conference. Trial Tr. 450:5-8.

27.     Daleiden introduced himself to Dr. Deborah Nucatola at the NAF 2014 conference. Trial Tr. 1489:6-9; 1491:14-24.  He represented to her that he worked for BioMax and that BioMax was a tissue procurement organization that was interested in developing relationships with Planned Parenthood affiliates. 1491:14-1492:8.

28.     In September 2014, Daleiden, posing as "Briana Allen," emailed Vikky Graziani, the administrator for PPFA's Medical Services Department, asking to register BioMax as an exhibitor for PPFA's 2014 North American Forum on Family Planning ("Forum") in Miami, Florida. He used Dr. Nucatola as a reference. TRX 4051; Trial Tr. 2525:8-23.

29.     Ms. Graziani discussed BioMax with Dr. Nucatola, who explained that BioMax had exhibited at the 2014 NAF conference, that Dr. Nucatola had met BioMax representatives there, and based on her discussions with them, she believed BioMax would be a "good fit for [PPFA's] conferences."  Based on the false information that Dr. Nucatola passed along to Ms. Graziani, and the fact that BioMax had attended the 2014 NAF conference, PPFA permitted BioMax to attend its conferences as an exhibitor. Trial Tr. 2784:7-2785:20.

30.     As a condition of participation in the Planned Parenthood conferences, exhibitors must agree to a set of written terms and conditions.  Exhibitors must confirm that their exhibits are "educational and informative," provide information about services useful to the provision of reproductive health care, and are "beneficial to the interests of . . . clients and patients." TRX 1910. Daleiden (acting as "Brianna Allen") acknowledged, and therefore agreed to, PPFA's terms and conditions for exhibitors at PPFA conferences. TRX 1907; Trial Tr. 2526:20-2527:1.

31.     Daleiden subsequently registered BioMax as an exhibitor at two more PPFA conferences, Medical Director Conference ("MeDC") in Orlando, Florida and the PPFA 2015 National Conference in Washington D.C.  In so doing, he falsely represented that BioMax was a real tissue procurement company. TRX 1915; TRX 1920.

32.     PPFA requires all conferences attendees including exhibitors to present photo identification. Trial Tr. 3107:5-11.  Daleiden used his fake drivers' license at the registration desk

United States District Court
Northern District of California

1    at each PPFA conference. Trial Tr. 2226:14-16; 2718:24-2719:13; TRX 6119.

2        33.    At each of the reproductive health conferences he attended, Daleiden identified

3    himself as a representative of BioMax.  He distributed BioMax business cards with the fake name

4    "Robert Sarkis." Trial Tr. 2197:18-2199:6; 2200:6-14.

5        34.    Daleiden and Lopez wore hidden cameras at all PPFA conferences and secretly

6    recorded everyone they spoke to at the conferences. Trial Tr. 591:5-22.

7        35.    Daleiden registered BioMax for the NAF 2015 conference and, along with Merritt,

8    Davin, and Lopez, infiltrated the 2015 NAF conference in April 2015 in Baltimore, Maryland.

9    TRX 217 (NAF 2015 Registration); Trial Tr. 2232:5-2233:10 (Daleiden testimony that he signed

10   Susan Tennenbaum name on the registration).

11       36.    Lopez signed the NAF confidentiality agreement prohibiting videotaping prior to

12   attending the 2015 NAF annual conference even though he intended to secretly record the entire

13   time he was at the conference. Trial Tr. 614:5-11; TRX 248.

14       37.    In 2015, Daleiden told NAF staff that he had signed the confidentiality agreement,

15   which was untrue. TRX 6064 (NAF 2015 check-in video).  NAF staff believed Daleiden's lie and

16   therefore admitted him to the conference. Trial Tr. 970:21-971:6.

17       38.    After the 2014 NAF conference, Daleiden (posing as "Robert Sarkis") invited Dr.

18   Nucatola to lunch with him and Merritt (posing as "Susan Tennenbaum"), who were still both

19   claiming to be BioMax representatives. TRX 722, 8021.  Based on these false representations, Dr.

20   Nucatola met with Daleiden and Merritt at a restaurant in Los Angeles. Trial Tr. 1499:18-1500:1.

21   Daleiden and Merritt both wore hidden cameras and recorded the entire lunch meeting with Dr.

22   Nucatola without her knowledge or consent. Trial Tr. 462:15-463:4; TRX 6104.

23       39.    Daleiden met Dr. Mary Gatter when "Sarkis" infiltrated the Forum in Miami in

24   October 2014. TRX 683; TRX 8017; TRX 6021; Trial Tr. 2249:9-11.  Posing as "Robert Sarkis,"

25   he set up a lunch meeting with Dr. Gatter purportedly to discuss the possibility of starting a fetal

26   tissue donation program at PPPSGV.  "Sarkis" sent Dr. Gatter misinformation about BioMax to

27   entice her to meet with him. TRX 8017. TRX 683.

28       40.    "Sarkis" and "Tennenbaum" met with Dr. Gatter and her colleague, Laurel Felczer,

United States District Court
Northern District of California

1    in February 2015 in Pasadena, California. Trial Tr. 1228:23-1229:10; Trial Tr. 473:8-15; Trial Tr.

2    2254:7-12.  Daleiden and Merritt told Dr. Gatter that they were BioMax representatives.  Trial Tr.

3    473:16-19; 474:23-24; 476:1-477:20; TRX 6082.  Daleiden and Merritt both wore hidden cameras

4    and did not inform either Dr. Gatter or Ms. Felczer that they were being recorded. Trial Tr.

5    473:21-474:25.

6         41.    Daleiden met Dr. Savita Ginde at the Forum in Miami. Trial Tr. 2957:21-24; TRX

7    578; TRX 5960A.  Posing as "Robert Sarkis," he sent her an email seeking a meeting and

8    enclosing a copy of the BioMax brochure and a "welcome letter from our founder CEO, Susan

9    Tennenbaum." TRX 578; Trial Tr. 2260:19-61:12.  Dr. Ginde agreed to meet with "Sarkis" and

10   "Tennenbaum" and admitted them into the PPRM Stapleton campus for that purpose. Trial Tr.

11   2960:24-2962:1.

12        42.    Daleiden and Merritt both wore hidden cameras and filmed the entire meeting with

13   Dr. Ginde. Trial Tr. 2261:21-2262:14; 481:6-16.  Dr. Ginde and her staff were unaware they were

14   being filmed and did not consent to the filming. Trial Tr. 481:17-20.

15        43.    Daleiden (posing as "Robert Sarkis") met PPGC staff at the PPFA National

16   Conference in March 2015. Trial Tr. 2262:19-25.  "Sarkis" then sent a follow-up email afterward

17   to Tram Nguyen and Melissa Farrell, the head of research at PPGC. Trial Tr. 2262:19-2263:7;

18   TRX 1809.  Farrell agreed to meet with "Sarkis" and "Tennenbaum." TRX 653.

19        44.    Ms. Farrell requested that BioMax execute a non-disclosure agreement prior to any

20   meeting. TRX 653.  Daleiden signed the NDA on behalf of BioMax using the name "Susan

21   Tennenbaum," and agreed in the NDA that BioMax would not disclose confidential information.

22   Trial Tr. 2265:9-14.  In fact, he intended to disclose any information he thought would be harmful

23   to Planned Parenthood that he recorded at the meeting. Daleiden did not disclose this intent to Ms.

24   Farrell or anyone else at PPGC.

25        45.    Daleiden and Merritt presented their fake IDs to enter the PPGC facility.  Trial Tr.

26   482:13-19; TRX 6102; Trial Tr. 2271:9-24.  They both surreptitiously recorded the entire meeting,

27   including a tour of the employee-only pathology lab. Trial Tr. 483:10-24; 2268:17-2269:25.

28        46.    "Sarkis" and "Tennenbaum" would not have been admitted to the NAF

United States District Court
Northern District of California

1   conferences, the PPFA conferences, or the facilities at PPRM and PPGC, and would not have been

2   able to set up lunch meetings with Planned Parenthood staff, had they disclosed their true

3   identities and purpose. Trial Tr. 862:14-864:19 (NAF); 2782:7-2783:1 (PPFA); 2960:24-2962:1

4   (PPRM); 1601:16-1602:8 (PPGC).

5          47.     As a result of Defendants' conduct, Planned Parenthood incurred hundreds of

6   thousands of dollars in costs.  PPFA had to spend hundreds of thousands of dollars to prevent

7   additional infiltrations and revise its conference security protocols. TRX 8072 at 3; Trial Tr.

8   3131:2-3137.  PPFA, PPGC, PPOSBC and PPPSGV incurred costs for providing security to,

9   and/or relocating, individuals targeted by Defendants. TRX 8072 at 13.

10          48.     Daleiden's goal and life's work is to end legal abortion in America.  He has been an

11   anti-abortion activist since high school.  He believes that legal abortion "is a license for medical

12   professionals to kill children in the womb." Trial Tr. 2300:14-15.

13          49.     Prior to forming the Center for Medical Progress in 2013, Daleiden already had a

14   years-long track record of creating undercover videos about Planned Parenthood in his role as the

15   Director of Research for Live Action, an anti-abortion group. Trial Tr. 2040:1-2042:2.

16          50.     Daleiden is proud of the conduct he engaged in that was at issue in this case

17   (actions that the jury found to be fraudulent and criminal), which he believes exposed Plaintiffs'

18   criminal activity. Trial Tr. 2653:15-17.

19          51.     Newman and his organization, Operation Rescue, operate the website

20   abortiondocs.org, which publicizes the names, photographs and business addresses of abortion

21   providers, including Dr. Nucatola and Dr. Gatter. Trial Tr. 3460:13:17; TRX 22.

22          52.     Newman has described abortion providers as "murderers" in a published book in

23   which he called for their execution by the government to "expunge blood guilt from the land and

24   people." Trial Tr. 3460:2-11.

25          53.     Newman participated in the conspiracy described above because his goal is to

26   finish off Planned Parenthood and end abortion.  He considers Planned Parenthood to be a "death

27   machine." Trial Tr. 3463:6-12; TRX 47, 106.  Newman claimed responsibility for the work of the

28   HCP.  TRX 28.

United States District Court
Northern District of California

United States District Court
Northern District of California

54.     Rhomberg's goal and life's work is to end legal abortion in America. Trial Tr. 684:11-685:22.

55.     Prior to her work for CMP, Merritt worked on a project for Live Action, posing as someone she wasn't in order to obtain information from Planned Parenthood clinics. Trial Tr. 488-490.

56.     Each defendant has the ability to continue the activities found to be illegal by the jury.  CMP & BioMax are both still active. *See* Trial Tr. 2462:10-18; TRX 8060; 8069.

57.     CMP is still operational and intends to do multiple projects of which the Human Capital Project was the first. Trial Tr. 2297:2-15.

58.     CMP continues to have the same aims that were stated in its project proposals. Trial Tr. at 2299:24 - 2300:5 ("in terms of wanting to -- wanting to draw public attention and bring public pressure to bear for the sort of policy changes that would address criminal fetal trafficking and, hopefully, prompt the appropriate responses from the appropriate public authorities for activity like that, that's definitely still something that Center for Medical Progress wants to do.").

59.     Daleiden has continued to post videos of footage recorded at PPFA events, including as late as 2019. Trial Tr. at 2294:20-2295:15.

60.     In the summer of 2019, Daleiden, on behalf of CMP, created a campaign on the fundraising page GoFundMe to raise money to pay a court mandated fine related to the release of certain videos.  The campaign noted that "CMP has more videos to release soon" and asserts that the money CMP was fined could have instead been used "to produce more video exposes of Planned Parenthood's sale of baby body parts." ECF 662-1, Ex. 20.

Newman argues that the findings of fact about his activities are improper because they rely heavily on the adverse inferences on which I instructed the jury that they could rely in light of Newman's invocation of the Fifth Amendment and refusal to answer.  I also explained to the jury that the inferences could *not* be considered when determining Newman's liability under the California claims.  With respect to the non-California claims, the jury found Newman liable on conspiracy grounds for all of the claims presented to them.  Based on their express and implicit findings, the jury drew adverse inferences against Newman on which I may rely along with

14

1    evidence admitted at trial when determining the appropriate scope of injunctive relief under the

2    other claims against Newman.

3         With respect to the UCL, plaintiffs argue that while they cited Newman's inferences in

4    support of their proposed Findings of Fact, each of those proposed facts was corroborated by

5    exhibits and other witness testimony.  I agree.  The facts attributed to Newman in the Findings of

6    Fact are, for purposes of the UCL, corroborated by trial exhibits, including the correspondence

7    sent between Newman and Daleiden and the correspondence in which Newman took credit for the

8    HCP.[6]

9    **II.       MERITS OF THE UCL CLAIM**

10        **A.       Legal Standard**

11        The UCL authorizes the court to "make such orders or judgments ... as may be necessary to

12   prevent the use or employment by any person of any practice which constitutes unfair competition,

13   as defined in this chapter, or as may be necessary to restore to any person in interest any money or

14   property, real or personal, which may have been acquired by means of such unfair competition."

15   Cal. Bus. & Prof. Code § 17203.  Because a UCL claim is equitable in nature, the court, rather

16   than a jury, must decide whether there was a UCL violation and what equitable remedies, if any,

17   are appropriate is "subject to the broad discretion of the trial court." *Zhang v. Super. Ct.*, 57 Cal.

18   4th 364, 371 (2013).

19        In the Ninth Circuit, "it would be a violation of the Seventh Amendment right to jury trial

20   for the court to disregard a jury's finding of fact." *Acosta v. City of Costa Mesa*, 718 F.3d 800, 828

21   (9th Cir. 2013) (citing *Floyd v. Laws*, 929 F.2d 1390, 1397 (9th Cir. 1991)).  "[I]n a case where

22   legal claims are tried by a jury and equitable claims are tried by a judge, and the claims are 'based

23   on the same facts,' in deciding the equitable claims 'the Seventh Amendment requires the trial

24

25   ---

     [6] In their Reply, plaintiffs cite evidence and make arguments not presented in their Proposed
     Findings of Fact and opening brief.  Defendants object to that evidence and the arguments and ask
26   me to strike them or permit defendants to address the new evidence and arguments.  Dkt. No.
     1058.  That request is DENIED.  I have fully reviewed all of the evidence cited by all of the
27   parties in support or in opposition to judgment on the UCL claim and the equitable relief requested
     by plaintiffs.  At this stage, I can weigh the evidence – not only that cited to me by the parties but
28   also any evidence adduced at trial – as well as the merits of each side's arguments without the
     gloss provided by the parties.

United States District Court
Northern District of California

judge to follow the jury's implicit or explicit factual determinations.'" *Los Angeles Police Protective League v. Gates*, 995 F.2d 1469, 1473 (9th Cir. 1993) (quoting *Miller v. Fairchild Indus.*, 885 F.2d 498, 507 (9th Cir. 1989), *cert. denied*, 494 U.S. 1056 (1990)).

For purposes of this motion, I need only consider the illegal and fraudulent prongs of the UCL, given the jury's verdict finding defendants engaged in numerous illegal and fraudulent acts in California and emanating from California, against California-based plaintiffs and others, committed in violation of California law, Federal law, and the laws of other jurisdictions.

### B.   Business Conduct

As a threshold issue, defendants argue that the UCL does not apply to their conduct because they did not engage in any "business" or "commercial" acts that could constitute prohibited unfair business practices.  Defendants raised the identical argument on summary judgment, contending that the UCL claim failed because "there were no 'business practices' that any defendant engaged in with respect to each plaintiff," and that "defendants cannot be liable for 'unfair business acts' because there is 'no market' – presumably a for-profit market – for fetal tissue, and that any acts taken by or on behalf of BioMax or CMP could not, as a matter of law, constitute unfair business acts."  Dkt. No. 753 at 112.

I rejected that argument on summary judgment, finding that based on undisputed evidence "that Rhomberg and Newman – as well as CMP, BioMax, and Daleiden – engaged in practices that on their face can be considered 'business practices' under the UCL."  *Id.*  I noted that:

> [T]here is evidence, some of it disputed, showing that defendants' intent and purpose was to set up BioMax as a fictitious company operating in a real industry in competition with other companies (including Stem Express and other targets of the HCP). There is evidence that defendants made misrepresentations to the California Secretary of State as part of setting up the "front" company BioMax as well as websites, business cards, and business brochures that plaintiffs disputedly relied on to provide defendants access to their conferences and businesses.  These acts by defendants on their face are business acts. There is also evidence, some disputed, that the purpose of both CMP and the HCP (including the creation of the fake BioMax company) was to run plaintiffs' businesses out of business. These allegations are sufficient to bring a claim under the UCL.

*Id.* at 112-113.  The evidence at trial *confirmed* that defendants' intent and purpose was to set up

16

1    BioMax as a competitor tissue procurement company (registering with California's Secretary of

2    State, creating a website and marketing materials, and opening "company" credit cards) to position

3    itself as a competitor with other tissue procurement companies in order to gain access to and

4    gather information that they would use to seek the defunding and destruction of Planned

5    Parenthood (the umbrella organization and its affiliates) as a business.  *See* Findings of Fact *supra*.

6          Defendants rely on two cases holding that associations were not "businesses" under

7    Section 17200.  In *That v. Alders Maint. Assn.*, 206 Cal. App. 4th 1419 (Cal. App. 4th Dist. 2012),

8    the court rejected the idea that a homeowner's association could be considered a business under

9    the UCL, where plaintiff was attempting to challenge election-related activities conducted by the

10   HOA.  *Id.* at 1427 ("applying the UCL to an election dispute would simply make no sense").  In

11   *Bermudez v. Serv. Employees Intl. Union, Loc. 521*, 18-CV-04312-VC, 2019 WL 1615414, at *1

12   (N.D. Cal. Apr. 16, 2019), the plaintiff could not pursue a UCL claim for return of fees against a

13   union because the union "did not participate as a business in the commercial market, nor was its

14   policy of collecting fair-share fees a commercial activity."  *Id.* *1 n. 1.

15         Those cases are inapposite because Daleiden and BioMax (and the other defendants

16   "representing" BioMax) took numerous steps to set up a business.  Those acts, including

17   registering BioMax with the Secretary of State as a business and opening bank cards in BioMax's

18   name, are indisputably "business activity."  BioMax and Daleiden, Merritt, and Lopez (as well as

19   at least two other non-defendant co-conspirators) then represented themselves to plaintiffs and

20   numerous other individuals and entities as both an operational business and employees of that

21   business to solicit meetings and information in competition *with other businesses*.  Indeed, at trial

22   Daleiden testified that BioMax was, through conversations with other entities, "exploring the

23   possibility of -- well, sort of what it would take to work with, like, ethical tissue samples and do

24   ethical tissue procurement."  Trial Tr. 2175:12-17.

25         The UCL applies to defendants' conduct.

26   **C.      Fraudulent Conduct Under the UCL**

27         It is unclear whether plaintiffs seek to rest the merits of their UCL claim on *both* the illegal

28   and fraudulent prongs of the UCL.  In their proposed Judgment and Permanent Injunction,

United States District Court
Northern District of California

17

United States District Court
Northern District of California

1   plaintiffs do not address what the Judgment should look like with respect to their UCL claim.  *See*

2   Dkt. No. 1050 at 5 (incorporating language suggested by plaintiffs in December 2019 in response

3   to contemplated partial Rule 54(b) judgment).  But in their Memorandum in Support of Equitable

4   Relief, they repeatedly refer to "defendants' illegal and fraudulent" conduct as supporting their

5   requests for injunctive relief under the UCL.  *See, e.g.*, Dkt. No. 1049 at 2, 3.  Therefore, I assume

6   that they intend to seek judgment concerning the UCL under both prongs.

7       The standard for proving fraudulent conduct under the UCL is not as stringent as the

8   showing required for common law fraud and the persons protected from the fraudulent conduct are

9   different.  *See In re Tobacco II Cases*, 46 Cal. 4th 298, 312 (2009) ("The fraudulent business

10  practice prong of the UCL has been understood to be distinct from common law fraud. 'A

11  [common law] fraudulent deception must be actually false, known to be false by the perpetrator

12  and reasonably relied upon by a victim who incurs damages. None of these elements are required

13  to state a claim for injunctive relief' under the UCL. . . This distinction reflects the UCL's focus

14  on the defendant's conduct, rather than the plaintiff's damages, in service of the statute's larger

15  purpose of protecting the general public against unscrupulous business practices.") (quoting *Day

16  v. AT & T Corp.*, 63 Cal.App.4th 325, 332 (1998)).

17      There is some ambiguity in California law whether fraudulent conduct between

18  competitors is actionable under the UCL.[7]  That is not an issue here.  Defendants positioned

19  BioMax as a company offering tissue procurement services to plaintiffs (not as a competitor to

20  plaintiffs, but as a competitor to actual tissue procurement companies) and to all others who saw

21  the BioMax table (or were approached by defendants) at the conferences they infiltrated or saw

22  BioMax's websites or advertising materials.  *See* Findings of Fact.  The deceptions that the jury

23  found defendants engaged in, and the evidence at trial, are sufficient to sustain the UCL claim

24  under the fraudulent prong.  *See, e.g., Copart, Inc. v. Sparta Consulting, Inc.*, 339 F. Supp. 3d 959,

25  989 (E.D. Cal. 2018) ("Copart was not a competitor of Sparta, much less a direct competitor.

26  Instead, Copart was Sparta's consumer, and the jury found Copart was deceived by Sparta.").

27

28  [7] *See, e.g., Watson Laboratories, Inc. v. Rhone-Poulenc Rorer, Inc.*, 178 F. Supp. 2d 1099, 1121
    (C.D. Cal. 2001) (discussing competitor case).

### D.      Illegal and Fraudulent Conduct Under the UCL

The merits of plaintiffs' UCL claim under the illegal and fraudulent prongs is established based on facts expressly or implicitly found by the jury. *See L.A. Police Protective League v. Gates*, 995 F.2d 1469, 1473 (9th Cir. 1993). Based on the jury's explicit and implicit findings, and considering the totality of the evidence adduced at trial, I find that each defendant engaged in illegal and fraudulent conduct in violation of the UCL. The verdict – finding defendants liable for numerous claims under Federal, California, Florida, Washington, D.C., and Maryland laws – supports a finding that each of the defendants engaged in illegal and fraudulent acts under the UCL.

## III.     SCOPE OF INJUNCTIVE RELIEF

Having found the facts above and that the defendants are liable under the UCL, the issues become whether injunctive relief is appropriate and what the scope of the injunction should be. Plaintiffs ask me to impose the following injunction:

A.  Upon service of this order, all Defendants (except Lopez, unless he is acting in concert or participation with another Defendant) and their officers, agents, servants, employees, owners, and representatives, and all other persons, firms, or corporations acting in concert or participation with them are permanently enjoined from doing any of the following, with respect to PPFA and all Planned Parenthood affiliates (collectively referred to as "Planned Parenthood"):

(1) Entering or attempting to enter a Planned Parenthood conference, office, or health center, by misrepresenting their true identity, their purpose for seeking entrance, and/or whether they intend to take any video, audio, photographic, or other recordings once inside; and

(2) recording, without the consent of all persons being recorded:

(a) any meeting or conversation with Planned Parenthood staff that Defendants know or should know is private; or

(b) at a Planned Parenthood conference, office or health center.

B.  In addition, Defendants shall serve a copy of this injunction on any person who, in

1
2
3

active concert with Defendants, either has or intends to enter Planned Parenthood's property or record Planned Parenthood's personnel, and provide Plaintiffs with proof of service thereof.

4   Dkt. No. 1050 at 10-11.[8]

5       **A.      Legal Standard**

6           "According to well-established principles of equity, a plaintiff seeking a permanent

7   injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must

8   demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such

9   as monetary damages, are inadequate to compensate for that injury; (3) that, considering the

10  balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4)

11  that the public interest would not be disserved by a permanent injunction." *eBay Inc. v.*

12  *MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).  In addition, to establish standing plaintiffs

13  must demonstrate a "real and immediate" threat of future injury without an injunction – a

14  "showing of a[] real or immediate threat that the plaintiff will be wronged again" to justify

15  injunctive relief. *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983).

16          **1.      Irreparable Injuries and Inadequate Legal Remedies**

17          Defendants contend that plaintiffs cannot satisfy the first two prongs of the *eBay* test

18  because they cannot show that they will suffer "irreparable injuries" absent an injunction or that

19  legal remedies for future intrusions by defendants would be inadequate.  Defendants' argument

20  relies almost entirely on the amount of damages plaintiffs sought and were awarded by the jury to

21  compensate them for their security improvements following defendants' intrusions.  Defendants

22  contend that these damages are sufficient.

23          Plaintiffs respond that there was ample testimony at trial from their staff members

24  demonstrating how irreparable their injuries were and how insufficient the limited amount of

25  damages for security were, considering stress and anxiety defendants' intrusions caused their staff

26

27
28

---

[8] Plaintiffs do not seek injunctive relief against defendant Lopez as he "had no history of anti-abortion activity prior to his involvement in Defendants' illegal conspiracy."  Dkt. No. 1049 at 1 n. 1.

United States District Court
Northern District of California

and the significant disruption defendants' intrusions caused to their staff's normal roles and job duties (because they were diverted to investigating and tracking defendants' actions). They further assert that their damages were circumscribed and limited through court rulings. They contend that despite the award of compensatory and punitive damages, the narrow category of security damages allowed represented a small fraction of the damages that they initially sought and did not encompass all of the "security grants" PPFA gave to affiliates. They argue that in the Ninth Circuit, these types of difficulties in "establishing economic harm" due to "lack of proof of damages, and possible immeasurability or unascertainability of harm, [do] not mean" a plaintiff was not harmed, and that those difficulties weigh in favor of injunctive relief. *Continental Airlines, Inc. v. Intra Brokers, Inc.*, 24 F.3d 1099, 1105 (9th Cir. 1994); *see also Rent-A-Ctr., Inc. v. Canyon TV and Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991) (recognizing "that intangible injuries, such as damage to ongoing recruitment efforts and goodwill, qualify as irreparable harm").

        I agree that the extensive testimony at trial demonstrated irreparable injuries to plaintiffs flowing from defendants' conduct and that, for a number of reasons, a significant portion of plaintiffs' injuries could not adequately be addressed by damages or were difficult to measure if not impossible to accurately value as part of a request for damages. Those injuries include plaintiffs' staff reactions to the intrusions – even in situations where the staff did not believe that they personally had been recorded by defendants – and the disruptions to the normal work of plaintiffs in order to internally investigate and respond to defendants' intrusions. *See, e.g.*, Trial Tr. 1144:18-1145:3, 1519:1-10, 3173:10-19.[9] These injuries were not, and could not in the future, be adequately compensated by damages, given difficulties in their valuation and ascertainability.

---

[9] I do not rely on the damages that were cut from this case due to my rulings that damages resulting solely from third-parties' actions were barred as a form of "reputational damages" precluded by the First Amendment absent a defamation claim. While plaintiffs rely on one case finding that injunctive relief was supported by "damages" that were not cognizable under applicable laws, *Dairy Maid Dairy, Inc. v. U.S.*, 837 F. Supp. 1370, 1381 (E.D. Va. 1993) (recognizing that legal remedies can be considered inadequate, supporting injunctive relief, where damages capped by law), I do not need to rely on this category of damages in order to find that plaintiffs have shown adequate irreparable injuries and inadequate legal remedies.

United States District Court
Northern District of California

Plaintiffs sought (and were largely awarded) the narrow category of security damages that they could readily identify and prove up. But that does not minimize the fact that additional injuries (identified above) were suffered by plaintiffs, supporting their request for injunctive relief.

## 2.    Balance of Hardships

Considering the effect of injunctive relief on each party, defendants argue that this factor weighs against injunctive relief because it will impede their journalistic efforts protected by the First Amendment and hamper their ongoing efforts generally to oppose abortion and expose alleged criminal and other bad conduct by Planned Parenthood and its affiliates. Defendants note that the equities typically weigh heavily against injunctions that prohibit speech or conduct and argue that the injunction sought by plaintiffs would prevent defendants from engaging in legal conduct, like surreptitiously recording plaintiffs' staff in public places in states where the consent of all parties being recorded is not required or where they are recording evidence of actual criminal conduct.[10] Finally, defendants contend that because their actions forced plaintiffs to improve their conference and clinic security measures, plaintiffs are less likely to face future intrusions by defendants or like-minded individuals.

Defendants' arguments go too far. Simply claiming the mantel of a journalist does not give someone a license to trespass, illegally record, or otherwise commit violations of generally applicable laws.[11] The "evidence" defendants actually gathered and then published as a result of

---

[10] Defendants' cases are procedurally and factually inapposite; none of them address situations where a court considered injunctive relief following a judgment that defendants' conduct was illegal and therefore not protected by the First Amendment. Defendants' cases generally address situations where an injunction was appropriate to restrain government or union defendants from violating plaintiffs' First Amendment rights. *See Sammartano v. First Jud. Dist. Ct., in and for County of Carson City*, 303 F.3d 959, 973 (9th Cir. 2002) (reversing district court's refusal to enjoin policy prohibiting wearing of club insignia at a government facility); *see also Desnick v. American Broadcasting Companies*, 570 F. Supp. 2d 1229, 1256 (S.D. Cal. 2008) (requiring government to reinstate plaintiff's permit); *Swanson v. U. of Hawaii Prof. Assembly*, 269 F. Supp. 2d 1252, 1261 (D. Haw. 2003) (enjoining union from collecting fees contrary to plaintiff's First Amendment rights).

[11] "[G]enerally applicable laws do not offend the First Amendment simply because their enforcement against the press has incidental effects on its ability to gather and report the news." *Cohen v. Cowles Media Co.*, 501 U.S. 663, 669 (1991); *see also Desnick v. American Broadcasting Companies*, 44 F.3d 1345, 1355 (7th Cir. 1995) ("the media have no general immunity from tort or contract liability"); *Council on Am.-Islamic Rel. Action Network, Inc. v. Gaubatz*, 793 F. Supp. 2d 311, 330 (D.D.C. 2011) ("[T]he protections afforded by the First

the conduct the jury found was illegal did not itself show any illegal conduct by Planned

Parenthood or plaintiff affiliates.[12]  Further, that defendants' conduct caused plaintiffs to increase

their security measures for access to their conference and offices does not mean that plaintiffs no

longer face a threat of intrusion from defendants or those acting in concert with defendants.  The

defendants' history and longstanding opposition to the activities, if not the very existence, of

plaintiffs completely undermines their argument.  Plaintiffs' interim security measures might

discourage future intrusions by defendants directly, but with technological advances in

surreptitious recording and the very real possibility of acting in concert with others (who are not

yet known to plaintiffs), plaintiffs' security improvements do not diminish their hardship

argument.

   That said, the language of the injunction should be narrowed.  Plaintiffs admit that their

proposed language would prohibit "slightly more" conduct than the jury found defendants guilty

of, such as by using misrepresentations to gain access to "public" area of plaintiffs' offices.  Reply

at 8.  They argue that over-expansiveness is necessary and does not tip the balance of hardships

against an injunction because defendants "engaged in a long-running, fraudulent scheme" and in

these circumstances equity requires the injunction to be "'clear, simple and effective,' even if it

sweeps in some otherwise lawful conduct."  Reply at 8.  They ask for an over-expansive

injunction because they want "clear boundaries" to avoid future disputes about whether the

injunction was violated, for example, if defendants accessed "public" parts of plaintiffs'

conferences or offices by misrepresentation.

   The cases on which plaintiffs rely are far narrower or based on a far different record than

this one.  For example, in *Galella v. Onassis*, 353 F. Supp. 196, 237 (S.D.N.Y. 1972), *aff'd in part,*

---

Amendment, far reaching as they may be, do not place the unlawful acquisition of information
beyond the reach of judicial review.").

[12] The "evidence" gathered by defendants from their acts found to be illegal by the jury –
primarily the recordings taken by defendants – was submitted to both Judge Ryu and myself in
support of defendants' requests to compel discovery and on summary judgment.  None of it
showed that Planned Parenthood or its affiliates were engaged in the illegal sale of fetal tissue for
profit or illegal changes in abortion procedures to facilitate the harvesting of fetal tissue.

1    *rev'd in part*, 487 F.2d 986 (2d Cir. 1973), the court declined to use ambiguous and disputable

2    terms (like "prohibitions upon [] leaping, blocking, taunting, grunting, hiding and the like" and

3    ""harassing, endangering") in crafting an injunction against a photographer who had repeatedly

4    violated the privacy rights of his targets; instead, it used fixed "proscribed distances" to set the

5    limits of an injunction.  *Id*. at 237.  Similarly, in *Schenck v. Pro-Choice Network of W. New York*,

6    519 U.S. 357 (1997), the Court upheld an injunction placing restrictions on where and how anti-

7    abortion counsellors could approach people entering an abortion clinic by setting an absolute

8    boundary ("buffer zone").  The record justifying that absolute boundary was based on evidence

9    that many of the counsellors had been "arrested on more than one occasion for harassment, yet

10   persist in harassing and intimidating patients, patient escorts and medical staff" as well as the fact

11   that the "counselors remain free to espouse their message outside the 15–foot buffer zone."  *Id*. at

12   384-85.[13]

13        These "absolute boundary" injunctions are inapposite.  Here the issue is whether an

14   effective and clear injunction can be crafted that proscribes only the sort of illegal conduct that

15   defendants were found guilty of *or* whether I should sweep into the injunction conduct that may be

16   legal in some states and in some areas (*e.g.,* accessing public spaces in a hotel where plaintiffs

17   may be holding a conference or meeting, or recording in states where all-party consent is not

18   required).

19        I conclude that the injunctive relief to which plaintiffs are entitled extends only to that

20   conduct for which the defendants have been found guilty.  Plaintiffs are not wrong to fear that

21   defendants will take advantage of any ambiguity in the terms of an injunction to disrupt their work

22   and mission. [14]  However, a narrower injunction is feasible and necessary to avoid tipping the

23

24   [13] In an attempt to justify an injunction that sweeps in potentially more conduct than the jury or I
     determined was illegal, plaintiffs also rely on *Madsen v. Women's Health Ctr., Inc*., 512 U.S. 753

25   (1994).  There, the majority noted that an injunction that "incidentally affect[ed] expression" was
     not an impermissible prior restraint primarily because it was based on a record of "prior unlawful

26   conduct" that the injunction sought to directly remedy (violation of buffer-zones), but the majority
     also struck down provision of the injunction including prohibitions on displaying images and the

27   buffer zone on private property because those provisions "sweep more broadly than necessary to
     accomplish the permissible goals of the injunction."  *Id*. at 763 n.2 & 776.

28   [14] While many things were in dispute in this case, it is beyond dispute that plaintiffs and
     defendants have been and will continue to be opposed to each other's "life work" and "mission."

hardships away from plaintiffs and towards defendants.[15]  The injunction does not interfere in any

way with legal efforts of the defendants to oppose abortion and convince the public and

governmental actors to defund Planned Parenthood.

### 3. Public Interest

The public interest weighs in favor of granting injunctive relief to plaintiffs.[16]  Defendants

argue that their investigation uncovered illegal conduct and resulted in at least one plea deal by a

tissue procurement organization, spurred Congressional hearings, and caused the Department of

Justice to open an investigation, serving the public interest and weighing in favor of allowing

defendants to continue their investigatory efforts.[17]  However, there was no evidence submitted at

summary judgment or in pre-trial motions to show that any Planned Parenthood affiliate violated

any law in connection with the transfer of tissue to the company that entered the plea deal.[18]  In

---

[15] In justifying an injunction which covers legal conduct, plaintiffs rely on *Facebook, Inc. v. Power Ventures, Inc.*, 252 F. Supp. 3d 765, 784 (N.D. Cal. 2017), *aff'd*, 749 Fed. Appx. 557 (9th Cir. 2019) (unpublished) which noted that "even if" the injunction at issue there covered legal conduct courts have "equitable power to enjoin otherwise lawful activity."  That case relied solely on *U.S. v. Holtzman*, 762 F.2d 720 (9th Cir. 1985), which explained in depth that "although federal courts have the equitable power to enjoin otherwise lawful activity if they have jurisdiction [] and if the injunction is necessary and appropriate in the public interest to correct or dissipate the evil effects of past unlawful conduct, this power is not often necessary or appropriate, and is therefore infrequently exercised. Courts commonly have exercised this extraordinary power only in antitrust cases. . . .  Even in the antitrust area, however, a necessary and appropriate injunction against otherwise lawful conduct must be carefully limited in time and scope to avoid an unreasonably punitive or nonremedial effect" and struck down an injunction that was not "limited in time." *Id.* at 726.  This is not an antitrust case and plaintiffs' requested injunction is not limited in time or scope.

[16] The "public interest inquiry primarily addresses impact on non-parties rather than parties." *Sammartano v. First Jud. Dist. Ct., in and for County of Carson Cit*y, 303 F.3d 959, 974 (9th Cir. 2002).

[17] Defendants argue that I should hold further proceedings so I can "try" the public interest issue, considering the evidence defendants proffered in Dkt. No. 1041.  Oppo. at 1.  But the majority of this evidence – in proffer form (by counsel) or in declaration form – was presented by defendants to me at summary judgment, in connection with motions *in limine*, or during trial (to allow resolution of disputes over the relevance or admissibility of witness discovery or testimony at trial).  I have considered and weighed defendants' beliefs as to what that proffered evidence would show, and for the evidence submitted to me what it showed, in reaching my determination that the public interest weighs in favor of injunctive relief.

[18] Instead, the plea was based on the company's admission that it sold tissue at a profit to researchers.

addition, the Congressional hearings did not demonstrate that plaintiffs violated any federal law regarding the sale for profit of fetal tissue or alteration of abortion procedures (despite Congress having received the "evidence" uncovered by defendants through the HCP). Finally, no charges have resulted from the Department of Justice investigation.[19]

The evidence in the record is that Planned Parenthood provides extensive non-abortion related medical services and screenings to hundreds of thousands of patients each year who might not otherwise receive medical services. Trial Tr. 1589:2-19; 317:19-318:5; TRX 871.[20] The evidence, including from witnesses who testified at trial, shows a substantial disruption to those services and the siphoning off of staff time and expenses to address defendants' intrusions into plaintiffs' conferences and clinics. The public interest is served by a narrow injunction targeted to the illegal conduct that I and the jury found that the defendants committed.

### 4.    Real and Immediate Threat of Future Injury

Finally, defendants contend that plaintiffs cannot identify a true "real and immediate threat." They reason that defendants are now well known to plaintiffs (meaning there is no chance any defendant could gain access to plaintiffs' conferences or offices in the future), plaintiffs can point to no acts of deception or intrusion by these defendants since 2015, and any damages plaintiffs suffered are not irreparable as shown by the damages they sought and received for their improved security implemented following the release of defendants' videos.

Plaintiffs respond that the jury's implicit finding of an open-ended criminal enterprise itself is sufficient to satisfy this factor. They also contend that while the predicate acts supporting this claim were related to the false IDs, the ongoing nature of the criminal enterprise – whose overarching goal was to drive plaintiffs out of business – is ongoing according to defendants' own statements.

Given the totality of the evidence at trial regarding the background of defendants as well as

---

[19] No announcement has been made (or is expected to be made) if this investigation is continuing.

[20] Contrary to defendants' assertion in their Objections (Dkt. No. 1058 at 3-4), this evidence – which I may consider even if plaintiffs had not identified it in their Reply – does not discuss the "quality" of services but the nature and number of services.

United States District Court
Northern District of California

the past and continuing goals and aims of defendants with respect to Planned Parenthood, I conclude that plaintiffs have standing to seek injunctive relief. The evidence demonstrates a strong likelihood of future violations by defendants themselves or by defendants working in active concert with others. *See* Findings of Fact 49, 50, 55, 56, 57, 58, 59, 60. There is ample evidence that defendants relied on their past experience, using misrepresentations and surreptitious recordings, to target abortion providers and then used those and similar but more "advanced" tactics to carry out the HCP. While those pre-HCP acts and the actual acts used to carry out the HCP do not by themselves establish a real and immediate threat of future injury, they are strong evidence showing a continued reliance on those tactics and real threat of defendants utilizing them in the future. *See, e.g., Orantes-Hernandez v. Thornburgh*, 919 F.2d 549, 564 (9th Cir. 1990) ("Permanent injunctive relief is warranted where, as here, defendant's past and present misconduct indicates a strong likelihood of future violations."). Similarly, defendants' continued belief that their "journalistic" tactics were legal – despite pre-trial rulings by the Court and the jury's conclusions – is strong evidence that defendants intend to repeat them in the future. *See, e.g.*, Oppo. at 26:12-13. Finally, there was ample evidence that defendants' aims or goals were and remain to target if not "destroy" Planned Parenthood and its affiliates.[21]

Considering all of the relevant factors and the totality of the evidence, the evidence supports permanent injunctive relief in favor of plaintiffs, albeit narrower than what plaintiffs request.

**B.    Under the UCL**

**1.    Balance of Equities**

Specific to the UCL, the California Supreme Court has "emphasized that the equitable remedies of the UCL are subject to the broad discretion of the trial court" and that the "UCL does not require 'restitutionary or injunctive relief when an unfair business practice has been shown.

---

[21] The parties dispute the significance of CMP's interrogatory response that "Defendants have no definitive plans at this time to attend or enter any of Plaintiffs' or the National Abortion Federation's future conferences, meetings, or facilities." Dkt. No. 607-7 at 15:26–28. But whereas CMP could have said identified defendants had no plans or no future intent, the response was, instead, equivocal as to "definitive plans." CMP's equivocal response weighs in favor, if only slightly, as evidence of a real and imminent future harm.

Rather, it provides that the court 'may make such orders or judgments ... as may be necessary to prevent the use or employment ... of any practice which constitutes unfair competition ... or as may be necessary to restore ... money or property.'" *Zhang v. Super. Ct.*, 57 Cal. 4th 364, 371 (2013) (quoting *Cortez v. Purolator Air Filtration Products Co.*, 23 Cal.4th 163, 179-180 (2000)). That is a "a grant of broad equitable power," but one which should not be exercised "without consideration of the equities on both sides of a dispute." *Cortez*, 23 Cal. 4th at 180.

In considering what injunctive relief is appropriate under the UCL, I have considered all of the equitable considerations put forth by defendants, both in their initial proffer (Dkt. No. 1041) and in their opposition to plaintiffs' request for injunctive relief. Dkt. No. 1056. To repeat, those equities include, among others, that defendants' "investigative work" led to the prosecution and plea agreement of a tissue procurement operation in Orange County (although there was no evidence at summary judgment or pre-trial that any Planned Parenthood affiliate violated a law in transferring tissue to that company; the company's plea concerned *that* company's transfer of tissue to researchers). I have also considered that defendants' "investigative work" led to Congressional hearings and a Department of Justice investigation (although there is no evidence that any Federal government entity has concluded that any Planned Parenthood affiliate illegally profited from the sale of fetal tissue or altered procedures in violation of federal laws).

I have considered the equities put forward by plaintiffs, including the impacts that defendants' illegal and fraudulent conduct had on their staff, including the staff who were surreptitiously recorded and the staff who testified at trial. I considered the impact that the defendants' illegal and fraudulent conduct had on plaintiffs' ability to provide a secure environment for their affiliates and staff who attend PPFA's conferences, as well as staff and patients in their clinics.

I conclude that the equities tip sharply in plaintiffs' favor and justify the imposition of injunctive relief as an equitable remedy under the UCL.

## 2.      Scope

The UCL was not intended to regulate conduct "unconnected" to California, although it may be invoked by "out-of-state parties when they are harmed by wrongful conduct occurring in

United States District Court
Northern District of California

California." *Norwest Mortg., Inc. v. Super. Ct.*, 72 Cal. App. 4th 214, 222–25 (Cal. App. 4th Dist. 1999). Similarly, "out-of-state conduct causing injury within the state [can] be enjoined," but not "out-of-state conduct causing out-of-state injury." *Id.* at 224 n.12.

Defendants argue that the UCL, by itself, cannot support the broad injunction plaintiffs seek, which expressly covers conduct outside of California by all of the defendants (except Lopez) and protects PPFA and all-non-California affiliates. Plaintiffs respond that there is evidence of out-of-state conduct injuring California plaintiffs. For example, the jury awarded PPPSGV security costs (incurred in part as a result of defendants taping Dr. Gatter in Florida) and the jury awarded PPOSBC security costs (incurred as a result of defendants taping Dr. Russo in Florida). Pls. Mem. ISO Injunctive Relief [Dkt. No. 1049] at 5. However, plaintiffs do not identify what specific injunctive relief would be appropriate solely under the UCL in terms of which defendants it would cover or which plaintiffs it would benefit. Instead, plaintiffs dodge the question by arguing that the non-California plaintiffs are entitled to an injunction "that applies to all Planned Parenthood affiliates on their trespass and unlawful recording claims." *Id.*[22]

Given the limits of the UCL, I conclude that all named plaintiffs (except PPLA and PPMM who did not recover on any claim), are covered by the narrowed injunctive relief specified below based on the UCL against ***conduct occurring in California or conduct occurring outside of California that causes injury within California***.

### C.      Under the Laws of Trespass

As noted, plaintiffs assert that they are entitled to injunctive relief in light of the summary judgment and verdicts in their favor on trespass, which arose under the laws of Florida and Washington, D.C., with respect to the PPFA Conferences, and under the laws of Colorado and Texas, with respect to the clinic intrusion claims asserted by PPRM and PPGC/PPCFC. Defendants dispute the availability of injunctive relief under those jurisdictions' laws, pointing out

---

[22] With respect to those sources, plaintiffs rely only on my and the jury's findings with respect to the trespass claims (brought under the laws of Florida and the District of Columbia with respect to the PPFA conference and under the laws of Colorado and Texas with respect to the clinic intrusions), and two of the recording law claims (brought under the federal and Florida recording statutes). These bases for relief are addressed below.

United States District Court
Northern District of California

that the cases relied on by plaintiffs arose in the context of continuing or expressly threatened continued trespasses. As noted above, plaintiffs have standing to seek injunctive relief because of the realistic likelihood that defendants will continue their conduct to attempt to infiltrate PPFA's conferences and plaintiffs' offices, either directly or through individuals acting in concert with them.[23]

Defendants argue that injunctive relief cannot be based upon the trespass claims because they involved inherently factual situations arising under materially different state trespass laws. For example, trespass was found with respect to the PPFA conferences only after I reviewed PPFA's contracts with the hotels in Florida and Washington, D.C. and found that they conveyed sufficient "possessory interest" to PPFA to establish trespass. And, with respect to the Colorado and Texas clinic infiltrations, I had to consider each of those states' laws with respect to consent and whether fraud vitiated consent. Defendants also contend that trespass cannot be sustained where only public spaces (like hotel lobbies or reception areas) are accessed, yet plaintiffs' injunctive relief reaches into those public spaces. Given the fact-specific and state-specific issues, defendants argue that injunctive relief cannot be based on the trespass claims, let alone nationwide relief based on the laws of states not at issue in this case.

Plaintiffs, in Reply, argue that it can be assumed that all future PPFA conference will use similar hotel contracts, giving PPFA consistent and sufficient "possessory interest." They fault defendants for failing to identify any materially significant differences in each state's trespass laws regarding the issues of consent and when fraud vitiates consent that may lead to different conclusions. But it is plaintiffs who seek a nationwide injunction, not defendants. It is *plaintiffs'* burden to show how a finding of trespass – arising in different circumstances and considered

---

[23] *See Whelpley v. Grosvold*, 249 F. 812, 816 (9th Cir. 1918) (upholding an injunction based on evidence of "repeated and threatened to be repeated" trespasses "the effect of which would be to destroy the value of the appellee's leasehold interest, and for which damages were necessarily difficult of ascertainment and could be obtained, if at all, only by a multiplicity of suits. In such a case a suit in equity for an injunction is the permissible and the only adequate remedy."); *see also Empire Star Mines Co. v. Butler*, 62 Cal. App. 2d 466, 529 (Cal. App. 1st Dist. 1944) (authorizing injunctive relief in quiet title suit "against repeated or continuous trespasses. The property owner will not be relegated to successive suits for damages" based on evidence that defendants' practices had been ongoing for "a considerable period").

United States District Court
Northern District of California

United States District Court
Northern District of California

under different states' laws – supports their requested injunction.

Based on the record, the trespass claims support the following injunctive relief: *PPFA* is entitled to relief to prevent defendants from trespassing in *restricted areas* at future PPFA conferences, given the testimony about PPFA's security concerns at conferences, the testimony about their conference security protocols, and the testimony regarding the restricted-access provisions PPFA negotiates in all of their conference contracts.[24]  As to offices and clinics, PPFA, PPRM, and PPCG/PPCFC are also entitled to relief preventing defendants from trespassing in r*estricted areas* of their offices and clinics.[25]

### D.      Under the Federal and Florida Recording Statutes

Plaintiffs argue that they are entitled to injunctive relief, on a nationwide basis, under their federal wiretap claim and point out that defendants were found liable for 42 separate recordings under that law.  Verdict at 31-39.  Plaintiffs contend that injunctive relief is appropriate when there is a threat of continued violation, relying almost exclusively on *default judgment* cases brought against persons who pirated "satellite broadcasts of copyrighted television programming" without paying the subscription or broadcast fees.  *See, e.g*., *DISH Network L.L.C. v. Rios*, 2:14-CV-2549-WBS-KJN, 2015 WL 632242, at *2 (E.D. Cal. Feb. 13, 2015); *Dish Network L.L.C. v. Reed*, 2:14-CV-2548 KJM DAD, 2015 WL 4478243, at *1 (E.D. Cal. July 22, 2015), *report and recommendation adopted*, 2:14-CV-2548 KJM DAD, 2015 WL 13655446 (E.D. Cal. Sept. 16, 2015); *see also MAI Sys. Corp. v. Peak Computer, Inc*., 991 F.2d 511, 520 (9th Cir. 1993) (relying on specific statutory provision of the Copyright Act authorizing injunctive relief).  They are wrong to contend that these sorts of violations are "broadly similar" to the allegations and circumstances in this case.  *But see* Reply at 14.

---

[24] As defendants point out, the only conferences at issue – and the only hotel contracts reviewed – were for PPFA conferences.  The injunctive relief does not extend to "conferences" held by affiliates because there is absolutely no evidence in the record about what sorts of conferences they hold, where those conferences are held, and what sorts of restrictions are present in contracts for any conference held by affiliates.

[25] While the trespass claims support limited injunctive relief for these three plaintiffs, the other plaintiffs covered by the injunctive relief entered below are California plaintiffs who are entitled to the relief against intrusions into their offices or clinics under the UCL claim.

United States District Court
Northern District of California

1    Defendants argue that the facts and circumstances of the allegations (and jury verdict)

2    matter because a violation of the federal statute can be sustained only where that recording is made

3    "for the purpose of committing criminal or tortious acts," an inherently factual situation that

4    makes it inappropriate as a basis for the broad injunctive relief plaintiffs seek.  Plaintiffs respond

5    that given their security measures and defendants' "past history," any recordings that defendants

6    attempt of plaintiffs in the future are "likely" to be done with numerous tortious purposes intended

7    "such as violating RICO, defamation, false light, invasion of privacy, and tortious interference

8    with contractual relations."  Reply at 14 (citing an article on LiveAction.org noting, only, that pro-

9    life journalists "routinely use fake IDs in their work").

10    Plaintiffs rely on two clinic buffer-zone cases that largely upheld injunctions that arguably

11    impeded on anti-abortion protestors' speech rights, but they miss the significant distinctions

12    between those cases and this one.  In both of those cases, the bases for the injunctions were clearly

13    defined and repeatedly demonstrated (repeated violations of prior buffer zones and illegal

14    harassment at identified clinic locations).  In addition, the scope of the injunctive relief was

15    limited to the particular clinics and prevented only the specific conduct that created the

16    impermissible disruption of services and harassment (fixed buffer zones, amplified noise

17    prohibitions).  *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 776 (1994); *Schenck v. Pro-*

18    *Choice Network Of W. New York*, 519 U.S. 357, 361 (1997). These cases do not support plaintiffs'

19    overly expansive request here.[26]

20    With respect to injunctive relief under Florida law, plaintiffs note the Florida statute,

21    Section 934.10, provides that "injunctive relief" may be appropriate, but cite only one case in

22    support.  In *O'Brien v. O'Brien*, 899 So. 2d 1133, 1134 (Fla. 5th Dist. App. 2005), in the context

23    of a family law dispute, the court granted a permanent injunction to prohibit the wife's disclosure

24    of communications she had illegally intercepted on a computer and to "prevent her from engaging

25

26    _____

27    [26] I agree with plaintiffs that an injunction imposed in response to proven violations of the law, which might incidentally impact speech, is not a prior restraint.  *See, e.g., Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 763 n.2 (1994).  But, as in *Madsen*, plaintiffs' proposed injunction

28    sweeps too broadly and must be more narrowly tailored to match the conduct that caused plaintiffs the specific harms they sued over and on which they secured judgment.

in this activity in the future."  There was no discussion of the appropriateness of the injunction in that decision, only a statement that one was entered.  As I discussed on summary judgment, Florida law does not include the federal requirement that the recording be done for an illegal or tortious purpose but does require a showing that the person recorded had:

> a "reasonable" expectation of privacy of the persons recorded, as required under Florida's law consistent with the *Katz* factors. *See Katz v. United States*, 389 U.S. 347 (1967). As above, this challenge rests on disputed questions of material fact, considering the steps PPFA took to restrict access to its conferences and the participants' experiences that their conversations were sensitive, private, and would not be recorded. That the conversations took place at a conference, in an exhibit hall, or in a lobby do not by themselves mean the conversations were not subject to a subjective and objectively reasonable expectation of privacy. All of the facts and the contexts for each recording have to be considered."

Dkt. No. 753 at 86.  That the jury ultimately determined that defendants violated this statute, and that the subjects of the recordings had a reasonable expectation of privacy given the particular circumstances of each recording, does not provide a basis to prevent defendants from recording anyone, at anytime, anywhere "in" a "Planned Parenthood" conference, office, or clinic.

Recognizing the complexities presented by the breadth of plaintiffs' request for injunctive relief under the federal and Florida recording statutes, however, does not mean that injunctive relief is inappropriate.  It does mean that the relief must be significantly narrowed.  Plaintiffs object that narrowed relief is less clear and could lead to subsequent litigation over whether these defendants violated the terms of a narrowed injunction, but that is due to the nature of the claims on which they rest their request for injunctive relief and the scope of the relief requested.

### E.    Against Whom

As noted, plaintiffs seek to enjoin the specified conduct of each of the defendants (except Lopez), and those acting in concert or participation with them.[27]  I conclude that plaintiffs have demonstrated a reason and need for injunctive relief against each of the defendants.

The evidence showed that CMP and BioMax were created for the purpose of carrying out the HCP and are still controlled by Daleiden.  While CMP might have a broader mission (and may

---

[27] Dkt. No. 1049 at 1 n.1.

now or in the future undertake different "medical ethics" initiatives), the jury found it guilty of each of the claims asserted against it. Both entities should be restricted from engaging in that specific illegal conduct. The evidence showed that Daleiden took credit for the inception and formation of CMP and BioMax and directed the conduct of Merritt, Lopez, and the other non-defendant participants who made misrepresentations and infiltrated plaintiffs' conferences and offices. There is ample reason to enjoin Daleiden from engaging in the specific conduct that the jury and I found was illegal.

Defendants point to Merritt's unrebutted declaration that she did not intend to or have the ability to "go undercover" anymore given health and familial duties as reasons to deny injunctive relief against her. That declaration was insufficient to remove her from the reach of the RICO or UCL claims on summary judgment. The jury found her guilty of each claim presented to them. Considering the evidence regarding Merritt's history, prior activities, and post-HCP activities, as well as her testimony on the stand, I find that narrowed injunctive relief is appropriately entered against her.

The same is true with Rhomberg. Considering his background and role with CMP, as well as the jury's conclusions that Rhomberg conspired on every substantive claim submitted to them, I find that narrowed injunctive relief is appropriately entered against him.

Newman was found to have conspired with the other defendants on the federal and Florida recording claims and in each of the trespass claims. The jury clearly took adverse inferences against him based on my instructions and the other evidence in the case. With respect to the UCL, as noted, the adverse inferences were corroborated by other evidence in the record. I consider only the corroborated evidence regarding Newman's role with CMP and the HCP, as well as his efforts to take credit for the Project, in finding that the narrowed injunctive relief is also appropriate imposed against him under the UCL.

Defendants argue that plaintiffs are impermissibly attempting to drag in other non-defendants under the injunction, pointing to plaintiffs' proposed language that the injunction covers not only "their officers, agents, servants, employees, owners, and representatives" but also "all other persons, firms, or corporations acting in concert or participation with them" and requires

defendants to provide notice of this injunction to anyone acting in concert with them are all impermissibly broad provisions.  The injunctive relief language should track more closely the actual language of Rule 65(d)(2).  But note that the Rule's language itself provides that an injunction may extend to those with notice who are "in active concert of participation" with defendants.  I agree with plaintiffs that, given the history of defendants' employing the "undercover" tactics that the jury found were against the law in the past and advising others on the same, defendants should be required to provide a copy of the injunction to anyone who is acting in concert with them to violate the injunctive relief entered.

### F.      On Behalf of Whom

Plaintiffs seek an injunction benefitting not only the named plaintiffs' activities – wherever they occur – and the named plaintiffs' offices, but also the activities and offices of every non-plaintiff affiliate.  Defendants complain that there is no basis in law – under the UCL, the law of trespass, or the federal or Florida recording statutes—to justify such broad relief to anyone other than the actual plaintiffs in this case.  They point out that the affiliates are separate corporate entities from PPFA and that PPFA failed to provide evidence at trial that it was contractually bound to provide its affiliates security grants or other specific services.  Looking only to the named plaintiffs in this case, defendants also argue that because PPLA and PPMM did not establish any sort of damage or succeed on any claim, those two plaintiffs are not entitled to injunctive relief under the UCL or any other claim.

Plaintiffs argue that such broad relief is necessary because, as shown at trial, PPFA was injured when its affiliates were targeted by Defendants.  The evidence showed that PPFA investigates intrusions and threats at affiliate locations, provides security grants and conducts security reviews for its affiliates in response to instructions and threats, and provides other support like threat and incident tracking.  To provide full relief to PPFA and allow PPFA to protect its mission (even if it is not contractually required to provide all of these services to its affiliates), all of its affiliates must be covered by the injunction precisely because PPFA lacks an adequate legal remedy at law.  Plaintiffs also contend that broad relief that "incidentally benefits" non-plaintiff-affiliates is justified because Defendants "targeted" not only high ranking PPFA staff but also

35

affiliate staff as part of their goal to "destroy" Planned Parenthood.

Plaintiffs rely on only a few, inapposite cases.  In *Price v. City of Stockton*, 390 F.3d 1105 (9th Cir. 2004), plaintiffs (six former tenants and one nonprofit organization representing residence of Single Resident Occupancy, SRO, hotels) sought to enjoin a city from violating federal and state statutes in closing SRO hotels.  The district court granted broad injunctive relief enjoining the city from vacating, demolishing, or converting SRO Hotels and requiring the city to provide relocation assistance and replacement housing to all persons displaced. *Id*. at 1108.  The city challenged the injunction as overbroad because it benefitted all displaced persons, even ones who were not named plaintiffs.  The injunction was affirmed, with the Ninth Circuit noting that the city had to meet its obligations under the applicable laws and "remedy the harms shown by Plaintiffs, who include not only the individual named displacees but also Stockton Metro Ministry, whose ability to serve a broader population of low-income and homeless people has been hampered by the City's activities." *Id*. at 1117.  That situation is significantly different than the one here.  We do not have the failure of the government to adhere to a set of laws that specifically protect the named plaintiffs and the non-plaintiffs represented by the association.

Nor do we have a situation where it would be impracticable for a government officer enforcing a law to know whether a particular person was a named plaintiff and, therefore, covered by an injunction. *See Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1501-02 (9th Cir. 1996) (enjoining enforcement, as to all motorcycle riders, a "clear CHP citation policy in violation of the Fourth Amendment" because "the CHP policy regarding helmets is formulated on a statewide level, other law enforcement agencies follow the CHP's policy, and it is unlikely that law enforcement officials who were not restricted by an injunction governing their treatment of all motorcyclists would inquire before citation into whether a motorcyclist was among the named plaintiffs or a member of Easyriders, the plaintiffs would not receive the complete relief to which they are entitled without statewide application of the injunction.").[28]  Instead, we have findings by

---

[28] Plaintiffs' cases discussing nationwide injunctions issued against the government, seeking to enjoin enforcement of laws or regulations and binding government officers are even more inapposite. *See, e.g., Bresgal v. Brock*, 843 F.2d 1163, 1170 (9th Cir. 1987) (addressing injunction against Secretary of Labor); *City and County of San Francisco v. Trump*, 897 F.3d 1225, 1245

1    the court and a verdict by jury that defendants harmed a specific set of plaintiffs based on their

2    conduct in a limited number of states which violated a range of state laws and one federal law.

3          The record suggests that PPFA was injured by defendants' conduct targeted at its affiliates

4    because PPFA responds to incidents (like the intrusions and recordings that occurred here) by

5    providing affiliates with security services (security reviews and grants) and tracks and investigates

6    security incidents and "threats" more generally.  Plaintiffs rely on *Dairy Maid Dairy, Inc. v. U.S.*,

7    837 F. Supp. 1370 (E.D. Va. 1993), where the court noted that the plaintiffs' probable profits from

8    a contract (which would not be recoverable as damages) supported injunctive relief forcing the

9    government to implement a fair bidding process.  *Id*. at 1381.  Plaintiffs use that case to argue that

10   injunctive relief covering the non-plaintiff affiliates is merited here, where the record shows that

11   while PPFA provides security grants and other services to affiliates to investigate threats and

12   harassment, PPFA could not otherwise recover that "grant" money as damages.  But that one and

13   quite inapposite case is a particularly thin reed on which to rest such broad relief.  PPFA was able

14   to recover some of the security costs it expended, even if it expended those costs investigating

15   incidents at its affiliates.  And I recognize that the jury did not award PPFA damages for the

16   trespass at PPRM's clinic (seeking recovery of the security grant PPFA gave to PPRM to the

17   cover the relocation and security costs for Dr. Ginde of PPRM following defendants' intrusion),

18   but the lack of an award may well have been due to a failure of proof by the entity legally entitled

19   to recover those grants (either PPFA or PPRM, if PPRM had elected to pursue damages).

20         Absent applicable case law in support – for example, cases granting injunctions to an

21   association on behalf of individual members who are separate corporate entities – I will not extend

22   the scope of injunctive relief here to protect the non-plaintiff affiliates.  Plaintiffs have not shown

23   a basis in law for that type of expansive relief.[29]

24

25   (9th Cir. 2018 (remanding for development of a record to support a nationwide injunction against
     the government); *Los Angeles Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 664 (9th Cir. 2011)
26   (discussing injunction of federal regulation against Secretary of HHS).

27   [29] As to PPLA and PPMM, who did not recover on any of their claims but who are plaintiffs based
     in California, plaintiffs argue they should be covered by the injunction because "they face the
28   same threat of future harm as affiliates who did recover damages."  Reply at 12 n.2.  Plaintiffs cite
     no case in support.

United States District Court
Northern District of California

For the foregoing reasons, injunctive relief is warranted but will be limited to the plaintiffs who prevailed in in this action under the claims on which they recovered.

## IV.    CONCLUSIONS OF LAW

The conclusions of law supporting the finding of violation of California's Unfair Competition Law and the need for injunctive relief under the UCL, as well as under the laws concerning trespass of Florida, Washington, D.C., Colorado, and Texas and the federal and Florida recording statutes, are as follows.

1.    This Court and the jury have expressly found Defendants directly liable or liable as conspirators for trespass, breach of contract, fraud, and illegal recording.

2.    The jury impliedly found that Defendants' activities pose a threat of continued criminal conduct.

3.    My consideration of equitable relief must be consistent with the jury's express and implied findings.

4.    Plaintiffs are entitled to equitable relief under the UCL that prohibits Defendants from repeating their unlawful and fraudulent business practices that occur in California or that occur out-of-state that causes harm in California.

5.    Equitable relief is also warranted under Plaintiffs' claims for trespass under the laws of Florida, Washington, D.C., Colorado, and Texas and for violation of the federal and Florida recording statutes.

6.    This court has power to and should enjoin the Defendants from engaging in trespasses and unlawful recordings in those jurisdictions under those jurisdictions' laws.

7.    The court has power to and will grant injunctive relief in favor of the named plaintiffs who prevailed on claims as determined by the court or Jury.

8.    Injunctive relief should be granted against all Defendants (other than Defendant Lopez).

9.    The injunction should extend to all persons acting in concert or participation with the Defendants to engage in conduct prohibited by the injunction.

10.    The First Amendment does not bar the limited injunctive relief the Court awards.

United States District Court
Northern District of California

**V.    JUDGMENT AND INJUNCTION**

For the foregoing reasons, the following judgment is HEREBY ENTERED:

Pursuant to Federal Rule of Civil Procedure 54, the Court enters judgment as follows.

**1.    <u>Definitions</u>**

The following terms are defined as follows:

**A.**    <u>PPFA</u>:  Plaintiff Planned Parenthood Federation of America, Inc.

**B.**    <u>PPNorCal</u>:    Plaintiff Planned Parenthood Shasta-Diablo, Inc., dba Planned Parenthood Northern California.

**C.**    <u>PPMM</u>:  Plaintiff Planned Parenthood Mar Monte, Inc.

**D.**    <u>PPPSW</u>:  Plaintiff Planned Parenthood of the Pacific Southwest.

**E.**    <u>PPLA</u>:  Plaintiff Planned Parenthood of Los Angeles.

**F.**    <u>PPOSBC</u>:  Plaintiff Planned Parenthood of Orange and San Bernardino Counties, Inc.

**G.**    <u>PPCCC</u>:  Plaintiff Planned Parenthood of California Central Coast, fka Planned Parenthood of Santa Barbara, Ventura, and San Luis Obispo Counties, Inc.

**H.**    <u>PPPSGV</u>:  Plaintiff Planned Parenthood Pasadena and San Gabriel Valley, Inc.

**I.**    <u>PPRM</u>:  Plaintiff Planned Parenthood of the Rocky Mountains.

**J.**    <u>PPGC</u>:  Plaintiff Planned Parenthood Gulf Coast, Inc.

**K.**    <u>PPCFC</u>:  Plaintiff Planned Parenthood Center for Choice.

**L.**    <u>All Plaintiffs</u>:    PPFA, PPNorCal, PPMM, PPPSW, PPLA, PPOSBC, PPCCC, PPPSGV, PPRM, PPGC, and PPCFC.

**M.**    <u>CMP</u>:  Defendant Center for Medical Progress.

**N.**    <u>BioMax</u>:  Defendant BioMax Procurement Services, LLC.

**O.**    <u>Daleiden</u>:  Defendant David Daleiden.

**P.**    <u>Newman</u>:  Defendant Troy Newman.

**Q.**    <u>Rhomberg</u>:  Defendant Albin Rhomberg.

**R.**    <u>Merritt</u>:  Defendant Sandra Susan Merritt.

**S.**    <u>Lopez</u>:  Defendant Gerardo Adrian Lopez.

**T.**   All Defendants:   CMP, BioMax, Daleiden, Newman, Rhomberg, Merritt, and Lopez.

**2. Compensatory Damages on Each Claim**

The Court enters judgment on each claim for damages as to All Plaintiffs and All Defendants as follows.

**A.**   **First Claim for Relief:  Violation of RICO Act.**

All Defendants are jointly and severally liable to PPFA in the amount of $1,259,370 in RICO trebled actual damages.

All Defendants are jointly and severally liable to PPGC in the amount of $61,851 in RICO trebled actual damages.

All Defendants are jointly and severally liable to PPOSBC in the amount of $56,547 in RICO trebled actual damages.

All Defendants are jointly and severally liable to PPPSGV in the amount of $27,315 in RICO trebled actual damages.

PPNorCal, PPMM, PPPSW, PPLA, PPCCC, PPRM and PPCFC shall take nothing against All Defendants under this First Claim for Relief.

**B.**   **Second Claim for Relief:  Federal Wiretapping.**

All Defendants are jointly and severally liable to PPFA in the amount of $52,917 in compensatory damages and $10,000 in statutory damages, with PPFA having elected to accept statutory damages on the condition set forth below in Section III.

All Defendants are jointly and severally liable to PPGC in the amount of $20,617 in compensatory damages and $10,000 in statutory damages, with PPGC having elected to accept statutory damages on the condition set forth below In Section III.

All Defendants are jointly and severally liable to PPOSBC in the amount of $18,849 in compensatory damages and $10,000 in statutory damages, with PPOSBC having elected to accept statutory damages on the condition set forth below in Section III.

All Defendants are jointly and severally liable to PPPSGV in the amount of $9,105 in compensatory damages and $10,000 in statutory damages, with PPPSGV having elected to accept

United States District Court
Northern District of California

40

statutory damages on the condition set forth below in Section III.

All Defendants are jointly and severally liable to PPCFC in the amount of $10,000 in statutory damages.

All Defendants are jointly and severally liable to PPCCC in the amount of $10,000 in statutory damages.

All Defendants are jointly and severally liable to PPRM in the amount of $10,000 in statutory damages.

All Defendants are jointly and severally liable to PPPSW in the amount of $10,000 in statutory damages.

All Defendants are jointly and severally liable to PPNorCal in the amount of $10,000 in statutory damages.

PPMM and PPLA shall take nothing against All Defendants under this Second Claim for Relief.

**C.     Third Claim for Relief:  Civil Conspiracy.**

The Third Claim for Relief is based on all tort claims, except RICO, which has its own standard for conspiracy.  Each Defendant's liability for conspiracy is addressed under each individual claim.

**D.     Fourth Claim for Relief:  Breach of Contract (PPFA Exhibitor Agreements).**

Daleiden, BioMax and CMP are jointly and severally liable to PPFA in the amount of $419,790 in compensatory damages.

PPFA shall take nothing against Merritt and Lopez under this Fourth Claim for Relief.

**E.     Fifth Claim for Relief:  Breach of Contract (NAF Agreements).**

Daleiden, Merritt, Lopez, BioMax, and CMP are jointly and severally liable to PPFA in the amount of $49,360 in compensatory damages.

**F.     Sixth Claim for Relief:  Trespass.**

Daleiden, Lopez, BioMax, CMP, Rhomberg, and Newman are jointly and severally liable to PPFA in the amount of $419,790 in compensatory damages.

Daleiden, Merritt, BioMax, CMP, Rhomberg, and Newman are jointly and severally liable

United States District Court
Northern District of California

to PPRM in the amount of $1 in nominal damages.

Daleiden, Merritt, BioMax, and CMP, Rhomberg and Newman are jointly and severally liable to PPGC in the amount of $20,208 in compensatory damages.

**G.      Seventh Claim for Relief:  Business and Professions Code § 17200.**

Defendants are each liable for unlawful and fraudulent business practices that occurred in California and out-of-state unlawful and fraudulent business practices that caused harm in California.

**H.      Eighth Claim for Relief:  Fraud.**

All Defendants are jointly and severally liable to PPFA in the amount of $419,790 in compensatory damages.

All Defendants are jointly and severally liable to PPGC in the amount of $20,617 in compensatory damages.

All Defendants are jointly and severally liable to PPOSBC in the amount of $18,849 in compensatory damages.

All Defendants are jointly and severally liable to PPPSGV in the amount of $9,105 in compensatory damages.

PPCFC and PPRM shall take nothing against All Defendants under this Eighth Claim for Relief.

**I.      Ninth Claim for Relief:  California Penal Code § 632.**

All Defendants are jointly and severally liable to PPFA in the amount of $148,080 in trebled compensatory damages and $20,000 in statutory damages, with PPFA having elected to accept statutory damages on the condition set forth below in Section III.

All Defendants are jointly and severally liable to PPPSGV in the amount of $27,315 in trebled compensatory damages and $20,000 in statutory damages, with PPPSGV having elected to accept statutory damages on the condition set forth below in Section III.

All Defendants are jointly and severally liable to PPNorCal in the amount of $10,000 in statutory damages.

PPPSW, PPMM, PPOSBC, PPGC, PPCFC, and PPRM shall take nothing against All

42

Defendants under this Ninth Claim for Relief.

      **J.**       **Tenth Claim for Relief:  California Penal Code § 634.**

PPFA, PPNorCal, PPPSW, PPMM, PPOSBC, PPGC, PPCFC, and PPRM shall take nothing against All Defendants under this Tenth Claim for Relief.

      **K.**       **Eleventh Claim for Relief:  Florida Wiretapping.**

All Defendants are jointly and severally liable to PPFA in the amount of $49,360 in compensatory damages and $1,000 in statutory damages, with PPFA having elected to accept statutory damages on the condition set forth below in Section III.

All Defendants are jointly and severally liable to PPOSBC in the amount of $18,849 in compensatory damages and $1,000 in statutory damages, with PPOSBC having elected to accept statutory damages on the condition set forth below in Section III.

All Defendants are jointly and severally liable to PPPSGV in the amount of $9,105 in compensatory damages and $1,000 in statutory damages, with PPPSGV having elected to accept statutory damages on the condition set forth below in Section III.

All Defendants are jointly and severally liable to PPCCC in the amount of $1,000 in statutory damages.

All Defendants are jointly and severally liable to PPRM in the amount of $1,000 in statutory damages.

All Defendants are jointly and severally liable to PPGC in the amount of $1,000 in statutory damages.

All Defendants are jointly and severally liable to PPPSW in the amount of $1,000 in statutory damages.

Plaintiffs PPLA, PPNorCal, PPMM, and PPCFC shall take nothing against All Defendants under this Eleventh Claim for Relief.

      **L.**       **Twelfth Claim for Relief:  Maryland Wiretapping.**

All Defendants are jointly and severally liable to PPFA in the amount of $49,360 in compensatory damages and $1,000 in statutory damages, with PPFA having elected to accept statutory damages on the condition set forth below in Section III.

United States District Court
Northern District of California

All Defendants are jointly and severally liable to PPGC in the amount of $409 in compensatory damages and $1,000 in statutory damages, with PPGC having elected to accept statutory damages on the condition set forth below in Section III.

All Defendants are jointly and severally liable to PPCFC in the amount of $1,000 in statutory damages.

PPNorCal, PPPSW, PPMM, PPOSBC, and PPRM shall take nothing against All Defendants under this Twelfth Claim for Relief.

**M.      Thirteenth Claim for Relief:  Common Law Invasion of Privacy.**

All Plaintiffs shall take nothing against All Defendants under this Thirteenth Claim for Relief.

**N.      Fourteenth Claim for Relief:  California Constitutional Right of Privacy.**

PPFA, PPNorCal, PPPSW, PPMM, and PPOSBC shall take nothing against All Defendants under this Fourteenth Claim for Relief.

**O.      Fifteenth Claim for Relief:  Breach of Contract (PPGC NDA).**

Daleiden, BioMax, and CMP are jointly and severally liable to PPGC in the amount of $20,208 in compensatory damages.

PPGC shall take nothing against Merritt under this Fifteenth Claim for Relief.

PPCFC shall take nothing against BioMax, CMP, Daleiden, and Merritt under this Fifteenth Claim for Relief.

**3.  Deduplicated Compensatory, Statutory, and Nominal Damages.**

After removing duplication of compensatory, statutory, and nominal damages awards among claims, the Court enters judgment for damages in the following amounts.

All Defendants are jointly and severally liable to PPFA in the amount of $1,291,370 calculated as follows:

- $1,259,370 in RICO trebled actual damages
- $10,000 in Federal Wiretapping statutory damages
- $20,000 in California Penal Code § 632 statutory damages
- $1,000 in Florida Wiretapping statutory damages

- $1,000 in Maryland Wiretapping statutory damages

All Defendants are jointly and severally liable to PPNorCal in the amount of $20,000 calculated as follows:

- $10,000 in Federal Wiretapping statutory damages
- $10,000 in California Penal Code § 632 statutory damages

All Defendants are jointly and severally liable to PPPSW in the amount of $11,000 calculated as follows:

- $10,000 in Federal Wiretapping statutory damages
- $1,000 in Florida Wiretapping statutory damages

All Defendants are jointly and severally liable to PPOSBC in the amount of $67,547 calculated as follows:

- $56,547 in RICO trebled damages
- $10,000 in Federal Wiretapping statutory damages
- $1,000 in Florida Wiretapping statutory damages

All Defendants are jointly and severally liable to PPCCC in the amount of $11,000 calculated as follows:

- $10,000 in Federal Wiretapping statutory damages
- $1,000 in Florida Wiretapping statutory damages

All Defendants are jointly and severally liable to PPPSGV in the amount of $58,315 calculated as follows:

- $27,315 in RICO trebled damages
- $10,000 in Federal Wiretapping statutory damages
- $20,000 in California Penal Code § 632 statutory damages
- $1,000 in Florida Wiretapping statutory damages

All Defendants are jointly and severally liable to PPRM in the amount of $11,000 calculated as follows:

- $10,000 in Federal Wiretapping statutory damages
- $1,000 in Florida Wiretapping statutory damages

United States District Court
Northern District of California

1    Daleiden, Merritt, BioMax, CMP, Rhomberg, and Newman are jointly and severally liable

2    to PPRM for the additional amount of $1 in nominal damages.

3    All Defendants are jointly and severally liable to PPGC in the amount of $73,851

4    calculated as follows:

5         • $61,851 in RICO trebled damages

6         • $10,000 in Federal Wiretapping statutory damages

7         • $1,000 in Florida Wiretapping statutory damages

8         • $1,000 in Maryland Wiretapping statutory damages

9    All Defendants are jointly and severally liable to PPCFC in the amount of $11,000

10   calculated as follows:

11        • $10,000 in Federal Wiretapping damages

12        • $1,000 in Maryland Wiretapping statutory damages

13   On several of Plaintiffs' claims, the jury awarded higher actual damages than the available

14   statutory damages for Federal Wiretapping, California Penal Code § 632, Florida Wiretapping,

15   and Maryland Wiretapping.  Plaintiffs have elected statutory damages on these claims, but their

16   election is conditioned on the survival of their award of actual damages on other claims that

17   overlap the actual damages on the recording claims.  Should the damages awards on the non-

18   recording claims be vacated, reversed, remitted or otherwise altered, Plaintiffs reserve their right

19   to elect their actual damages, in lieu of statutory damages, on their recording claims.

20   PPMM and PPLA shall take nothing against All Defendants.

21   **4.  <u>Punitive Damages</u>**

22   In addition to compensatory, statutory, and nominal damages, the following Defendants

23   are severally liable to PPFA, PPGC, PPOSBC, PPPSGV, PPCCC, PPCFC, PPPSW, PPNorCal,

24   and PPRM for punitive damages in the following amounts.

25        **A.**    Daleiden:  $125,000.

26        **B.**    Merritt:  $25,000.

27        **C.**    BioMax:  $200,000.

28        **D.**    CMP:  $400,000

46

1

    **E.**    Newman:  $50,000

2

    **F.**    Rhomberg: $70,000.

3

**5. <u>Costs and Attorneys' Fees</u>**

4

      Plaintiffs are the prevailing party for purposes of taxable costs.  The amount of taxable

5

costs to be awarded, and the entitlement of any party to non-taxable costs and attorney's fees, shall

6

be determined in accordance with Local Rule 54.

7

**6. <u>Injunctive Relief</u>**

8

      For the reasons stated in the Court's findings of fact and conclusions of law, the Court

9

enters the following permanent injunction:

10

    A. Upon service of this Order, all Defendants (except Lopez, unless he is acting in

11

      concert or participation with another Defendant) and their officers, agents, servants,

12

      employees, owners, and representatives, and all others persons who are in active

13

      concert or participation with them are permanently enjoined from doing any of the

14

      following, with respect to PPFA, PPNorCal, PPPSW, PPOSBC, PPCCC, PPPSGV,

15

      PPRM, and PPGC/PPCFC:

16

      (1) Entering or attempting to enter a PPFA conference, or an office or health center

17

      of any plaintiff identified above, by misrepresenting their true identity, their

18

      purpose for seeking entrance, and/or whether they intend to take any video, audio,

19

      photographic, or other recordings once inside; and

20

      (2) recording, without the consent of all persons being recorded (where all party

21

      consent is required under the laws of the state where the recording is intended):

22

          (a) any meeting or conversation with staff of a plaintiff identified above

23

      that Defendants know or should know is private; or

24

          (b) in a restricted area at a PPFA conference or restricted area of an office

25

      or health center of any plaintiff identified above.  "Restricted area" is defined as

26

      areas not open to the general public at the time of the recording, for example areas

27

      requiring registration or an appointment to access.

28

    B. In addition, Defendants shall serve a copy of this injunction on any person who, in

United States District Court
Northern District of California

47

active concert or participation with Defendants, either has or intends to enter a restricted area at a PPFA conference or property of any plaintiff identified above or to record the staff of any plaintiff identified above without securing consent of all persons being recorded (where that consent is required under the laws of the state where the recording is intended), and provide Plaintiffs with proof of service thereof.

**IT IS SO ORDERED.**

Dated: April 29, 2020

William H. Orrick
United States District Judge

United States District Court
Northern District of California

48