Charles S. LiMandri (CA Bar No. 110841)
Paul M. Jonna (CA Bar No. 265389)
Jeffrey M. Trissell (CA Bar No. 292480)
B. Dean Wilson (CA Bar No. 305844)
Milan L. Brandon (CA Bar No. 326953)
FREEDOM OF CONSCIENCE DEFENSE FUND
P.O. Box 9520
Rancho Santa Fe, CA 92067
Tel: (858) 759-9948
cslimandri@limandri.com

*Attorneys for Defendants CMP, BioMax,
David Daleiden and Gerardo Adrian Lopez*

Thomas Brejcha, *pro hac vice*
Peter Breen, *pro hac vice*
Matthew F. Heffron, *pro hac vice*
THOMAS MORE SOCIETY
309 W. Washington St., Ste. 1250
Chicago, IL 60606
Tel: (312) 782-1680
tbrejcha@thomasmoresociety.org
pbreen@thomasmorsociety.org

*Attorneys for Defendant David Daleiden*

Harmeet K. Dhillon (CA Bar No. 207873)
Gregory R. Michael (CA Bar No. 306814)
Dorothy C. Yamamoto (CA Bar No. 306817)
DHILLON LAW GROUP INC.
177 Post Street, Suite 700
San Francisco, CA 94108
415-433-1700
415-520-6593 (fax)
harmeet@dhillonlaw.com

Denise M. Harle (CA Bar No. 275561)
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd., NE
Suite D1100
Lawrenceville, GA 30043
Tel: (770) 339-0774
dharle@ADFlegal.org

*Attorneys for Defendants CMP, BioMax, and
David Daleiden*

[Counsel for Defendants Troy Newman, Albin
Rhomberg, and Sandra Susan Merritt listed on
Signature Page]

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PLANNED PARENTHOOD FEDERATION OF AMERICA, INC., *et al.*, <br><br> Plaintiffs, <br><br> vs. <br><br> THE CENTER FOR MEDICAL PROGRESS, *et al.*, <br><br> Defendants. | Case No. 3:16-CV-00236 (WHO) <br><br> Judge William H. Orrick, III <br><br> **Defendants' Reply in Support of Their Joint Post-Judgment Motions (Dkt. #1080)** <br><br> Hearing Date: July 22, 2020 at 2:00 pm <br> Courtroom 2, 17th floor |

# Table of Contents

REPLY RE: MOTION FOR JUDGMENT AS A MATTER OF LAW .......................................1

I. No Reasonable Jury Could Find That Plaintiffs' "Damages" Were Directly Caused by Defendants' Alleged Unlawful Conduct or Breach of Contracts. ........................................1

    A. Plaintiffs' personal security costs were voluntary expenditures not directly caused by Defendants' allegedly wrongful conduct. ...........................................1

    B. PPFA's infiltration costs are not damages, proximately caused or otherwise. ........3

    C. Plaintiffs did not prove RICO damages. ...............................4

II. No reasonable jury could find that Plaintiffs established entitlement to punitive damages. ..................................................................7

III. No reasonable jury could find that any Defendant was liable under RICO. .......................9

    A. No reasonable jury could find that the alleged RICO predicate acts (unlawful ID production and transfer) directly caused any, or all, of Plaintiffs' asserted damages. ..............................................................9

    B. No reasonable jury could conclude that Plaintiffs proved that Defendants engaged in a pattern of RICO predicate acts. ...........................................9

IV. No Reasonable Jury Could Find That Plaintiffs Presented Sufficient Evidence to Support Their Fraudulent Misrepresentation Claim. ..............................................10

    A. Defendants' misrepresentations were "pure speech" and protected by the First Amendment. ..........................................................10

    B. Plaintiffs did not reasonably rely on Defendants' misrepresentations. .................12

V. No Reasonable Jury Could Find That Plaintiffs Established Their Recording Claims. ......12

    A. The Plaintiff corporations failed to establish standing. ...........................12

    B. Plaintiffs failed to put on evidence sufficient to show that Defendants recorded for the purpose of violating civil RICO. ..............................................14

    C. Plaintiffs failed to put on sufficient evidence of a reasonable expectation of privacy as to each recording. ................................................15

VI. No Reasonable Jury Could Find That Plaintiffs Proved Their Breach of Contract Claims. ..............................................................16

A. CMP is not liable under any contract under any theory. ........................16

B. No breach of PPFA Exhibitor Agreements caused damages. ................17

C. PPFA does not have standing to sue as a beneficiary of the NAF Exhibitor and Confidentiality Agreements. ..................................................................17

D. Defendants obtained no "Confidential Information" under the PPGC NDA. .......18

VII. The adverse inferences were erroneous and prejudiced all Defendants. ...........................18

VIII. No reasonable jury could find that any Defendant is liable on a civil conspiracy theory of liability. ...............................................................................................................................21

IX. Lopez and Merritt are not liable on any claim. ..........................................................24

A. RICO. ..................................................................................................................24

B. Civil Conspiracy: Agent Immunity. ..................................................................25

X. Plaintiffs Presented Insufficient Evidence that Rhomberg Was Liable. ..........................25

A. RICO. ..................................................................................................................25

B. Fraud. ..................................................................................................................27

C. Recording. ..........................................................................................................27

D. Trespass. .............................................................................................................28

XI. No reasonable jury could find that Newman was liable on any cause of action. ...............29

A. Inferences are not evidence, nor do they eliminate the need for evidence. ..........29

B. No reasonable jury could find Newman liable on any claim. ...............................29

C. Response to Plaintiffs' claim-specific arguments. ................................................32

D. No reasonable jury could find Newman liable for punitive damages. ..................34

REPLY RE: MOTION TO ALTER OR AMEND JUDGMENT ..........................................34

REPLY RE: MOTION FOR NEW TRIAL ........................................................................35

*Ainsworth v. Owenby*, 326 F. Supp. 3d 1111 (D. Ore. 2018)............................................6

*Allstate Insurance Co. v. Plambeck*, 802 F.3d 665 (5th Cir. 2015) ...............................6-7

*Angelou v. African Overseas Union*, 33 S.W.3d 269 (Tex. App. 2000) ..........................18

*Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006) .................................................5

*Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503 (1994)......................34

*AtPac, Inc. v. Aptitude Sols., Inc.*, 730 F. Supp. 2d 1174 (E.D. Cal. 2010) ....................3

*Baumer v. Pachl*, 8 F.3d 1341 (9th Cir. 1993) ........................................................21-22

*Baxter v. Palmigiano*, 425 U.S. 308 (1976) ........................................................19, 29

*Berg v. First State Ins.* 915 F.2d 460 (9th Cir. 1990)....................................................5

*Bird v. Glacier Elec. Coop., Inc.*, 255 F.3d 1136 (9th Cir. 2001) ..................................21

*Black v. Bank of America*, 35 Cal. App. 4th 1 (1990) ..................................................25

*Bokaie v. Green Earth Coffee LLC*, Case No. 18-cv-05244-JST, 2018 U.S. Dist. LEXIS 216960 (N.D. Cal. Dec. 27, 2018) ............................................................................6

*Britz Fertilizers, Inc. v. Bayer Corp.*, 665 F. Supp. 2d 1142 (E.D. Cal. 2009) .............17

*Butler v. Adoption Media, LLC*, 486 F. Supp. 2d 1022 (N.D. Cal. 2007)...............16-17

*City of Almaty v. Khrapunov*, 956 F.3d 1129 (9th Cir. 2020) .......................................6

*City of New York v. Venkataram*, 396 Fed. Appx. 722 (2d Cir. 2010) (unpublished) ...................6

*Delacruz v. State Bar of Cal.*, No. 5:14-CV-05336-EJD, 2015 WL 5697365 (N.D. Cal. Sept. 29, 2015)..................................................................................................................3

*Doe v. Glanzer*, 232 F.3d 1258 (9th Cir. 2000)......................................................19-20

*Doyle v. Taylor*, No. CV-09-158-RHW, 2010 WL 2163521 (E.D. Wash. May 24, 2010)..............3

*Escriba v. Foster Poultry Farms, Inc.*, 743 F.3d 1236 (9th Cir. 2014)............................1

*Gilbrook v. City of Westminster*, 177 F.3d 839 (9th Cir. 1999) ...................................33

*H. J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229 (1989).....................................9

*Hemi Group, LLC v. City of New York*, 559 U.S. 1 (2010) .................................................. 5

*Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258 (1992) ............................... 5

*Iannelli v. United States,* 420 U.S. 770 (1975) .................................................................. 14

*Kalow & Springnut, LLP v. Commence Corp.*, No. 07-3442 (FLW), 2009 WL 44748 (D.N.J. Jan. 6, 2009) ......................................................................................................................... 3

*LaSalle Bank Lake View v. Seguban*, 54 F.3d 387 (7th Cir. 1995) .................................... 19

*Navarrete v. Meyer*, 237 Cal. App. 4th 1276 (2015) ......................................................... 34

*Nintendo of Am., Inc. v. Dragon Pac. Int'l*, 40 F.3d 1007 (9th Cir. 1994) ...................... 34

*Oscar v. Univ. Students Co-Operative Ass'n*, 965 F.2d 783 (9th Cir. 1992) ..................... 6

*Peake v. Chevron Shipping Co.,* No. C 00-4228 MHP, 2004 U.S. Dist. LEXIS 15564 (N.D. Cal. Aug. 9, 2004) ............................................................................................................... 35

*Prime Media Group, LLC v. Acer Am. Corp.*, No. 12-cv-05020-BLF, 2015 U.S. Dist. LEXIS 15492 (N.D. Cal. Feb. 6, 2015) ........................................................................................... 19

*Project Veritas v. Ohio Election Comm'n*, 418 F. Supp. 3d 232 (S.D. Ohio 2019) ............... 11-12

*Rosario v. Livaditis*, 963 F.2d 1013 (7th Cir. 1992) .......................................................... 7

*Sedima v. Imrex Co.*, 473 U.S. 479 (1985) ..................................................................... 4, 5

*Singh v. U.S. Bank (In re Singh)*, Case No. 10-42260-E-13, 457 B.R. 790 (E.D. Cal. 2011) ....... 34

*Sonora Diamond Corp. v. Superior Ct.*, 83 Cal. App. 4th 523 (2000) .......................... 16-17

*SuccessFactors, Inc. v. Softscape, Inc.*, 544 F. Supp. 2d 975 (N.D. Cal. 2008) ................ 4

*Ticketmaster LLC v. Prestige Entm'nt West, Inc.*, 315 F. Supp. 3d 1147 (C.D. Cal. 2018) ............ 3

*Trs. of SAG-P Pension & Health Plans v. NYCA*, Inc., 572 F.3d 771 (9th Cir. 2009) ............ 17-18

*United States v. Alvarez*, 567 U.S. 709 (2012) ............................................................. 11-12

*United States v. Christian*, 356 F.3d 1103 (9th Cir. 2004) ............................................... 9

*United States v. Fuller*, 531 F.3d 1020 (9th Cir. 2008) ................................................... 9

*United States v. Vest*, 639 F. Supp. 899 (D. Mass 1986) ................................................ 14

*Wasden v. Animal Legal Def. Fund*, 878 F.3d 1184 (9th Cir. 2018)................................. 8, 10-12

*Woods v. START Treatment & Recovery Ctrs., Inc.*, 864 F.3d 158 (2d Cir. 2017)......................20

**Constitutions, Statutes, and Rules**

18 U.S.C. § 1028 ...........................................................................................7, 9, 10, 26

Computer Fraud and Abuse Act, 18 U.S.C. § 1030 .................................................. 3-4

RICO, 18 U.S.C. §§ 1961 *et seq.* ........................................................................*passim*

18 U.S.C. § 1962 .............................................................................................................5

18 U.S.C. § 1964(c) .....................................................................................................4, 5

18 U.S.C. §§ 2510 *et seq.* ............................................................................................ 14

Cal. Pen. Code § 632(c) ...............................................................................................28

FRE 403 .........................................................................................................................20

FRE 610 .........................................................................................................................20

Kan. Stat. § 21-6101 ......................................................................................................32

U.S. Const. amend. I.......................................................................................... 1, 2, 10-12

U.S. Const. amend. V ........................................................................................ 18-21, 29

**Other Authorities**

Ballentine's Law Dictionary (2010)..............................................................................29

## REPLY RE: MOTION FOR JUDGMENT AS A MATTER OF LAW

The central question is whether the jury's verdict was "supported by *substantial* evidence that is adequate to support the jury's findings." *Escriba v. Foster Poultry Farms, Inc.*, 743 F.3d 1236, 1242 (9th Cir. 2014) (emphasis added). As explained herein and in Defendants' motion, the answer is no, and Defendants are entitled to judgment as a matter of law.

## I. No Reasonable Jury Could Find That Plaintiffs' "Damages" Were Directly Caused by Defendants' Alleged Unlawful Conduct or Breach of Contracts.

Plaintiffs' argument in favor of their damages relies on a simple proposition: "directly caused" does not mean *directly* caused, but instead includes indirectly, remotely, and at the end of a long chain of intervening causes. It is only by rendering the "'touchstone' of directness" (Dkt. #753 at 31:3) meaningless that Plaintiffs can claim that, *e.g.*, expenses to install a home security system for Melissa Farrell were "directly" caused by trespass at the PPGC facility, as well as by fraud, breach of contract, and the production of fake IDs. Plaintiffs' damages evidence is insufficient as a matter of law.

### A. Plaintiffs' personal security costs were voluntary expenditures not directly caused by Defendants' allegedly wrongful conduct.

As Plaintiffs acknowledge, this Court held that personal security expenditures were "*potentially* recoverable" to the extent they were caused by the "*direct* [wrongful] acts of the defendants." Dkt. #753 at 2:22, 19:21-22 (emphasis added). The Court also ruled, however, that while recoverable in theory, such damages were "subject to proof and defenses at trial (including whether the damages were reasonably incurred or unnecessary as 'voluntarily incurred')." *Id.* at 19-20. The evidence at trial was clear that the personal security expenses for four staff members were all voluntarily incurred. Dkt. #1080 at 3-4. Although Plaintiffs assert that "the disclosure of these providers' identities was inherently dangerous," Dkt. #1092 at 4:17-18, no evidence of any post-release increase in third-party threats and security incidents was ever presented at trial. *See* Trial Tr. at 2559:3-17.

More importantly, "disclosure" means *publication*. In light of the First Amendment, the Court did not include disclosure (or publication) among the "*direct* acts of defendants" leading to potentially recoverable damages. Dkt. #753 at 19:21-22 (the "direct acts" were intrusions, misrepresentations, and targeting and recording of plaintiffs' staff"). Thus, expenses incurred because of "disclosure" are

not recoverable, both because of the First Amendment and the fact that *the publication*, *not* the trespass, breach of contract, fraud, recording, or predicate acts of making fake IDs, was the proximate and direct cause of the alleged "injury." In any event, Plaintiffs cited no evidence that there was any "disclosure" of any abortion provider's identity *that was not already public knowledge*. *See* Trial Tr. at 1463:22-1464:3; 1518:11-13.

Plaintiffs make no effort to point to any evidence showing that any of the personal security expenses were incurred "upon learning of the deception." Dkt. #753 at 75:9-10. On the contrary, Plaintiffs' own witnesses tied each expense to the *publication* of the videos. *See* Dkt. #1080 at 3-4. Plaintiffs freely admit these expenses were voluntarily incurred in anticipation of the reactions of third parties to the videos, relying on this Court's statement that the receipt of threats from third parties as "part of the motivation for paying for additional security measures does not break the causal chain." Dkt. #1092 at 4:12-15 (citing Dkt. #753 at 75). The fact that the causal chain is not broken says nothing about whether the purported cause (fraudulent misrepresentations, trespass, recordings) and effect (personal security expenses) are too far apart from each other on the chain for proximate causation purposes. Here, publication and anticipated third-party reactions are *proximate* causes in between Plaintiffs' purported cause and effect. Dkt. #1080 at 3-4. There was *no evidence* that, absent *publication* of the videos, any of these expenditures for personal security would have been made. See Dkt. #753 at 68, n.70 ("The burden of demonstrating that various invoices/categories of damages are recoverable within the bounds that I have adopted rests with plaintiffs.")

In response to Defendants' argument that Nucatola's personal security costs could not have been caused by breach of the PPFA contracts or trespass or recording at PPFA conferences (Dkt. #1080 at 5:1-10), Plaintiffs assert that the jury reasonably could have found that PPFA knew about Defendants' presence at the conferences, came to various conclusions based on that, and made various decisions related to Nucatola's security accordingly. Dkt. #1092 at 43-44. However, there was no evidence to support that hypothetical finding. PPFA CFO Melvin Galloway stated that *he* made the decision to hire security for Nucatola because of the "spotlight" on her following the release of the first video of her lunch meeting. Trial Tr. at 1812:14–1813:5. Galloway said nothing about PPFA conferences, Defendants' larger plan, or anything else that went into *his* decision to pay for security

1    for Nucatola. Anything else the jury might have speculated about Galloway's motivations, or the

2    existence and motivations of other PPFA decision-makers, would be unsupported by the evidence.

3    Likewise, Galloway decided to spend money on "essential monitoring" of the public profiles of "the

4    physicians and individuals who were exposed in the video." Trial. Tr. at 1843:9-15. There was no

5    testimony or other evidence that the PPFA contracts or conferences, or potential future releases of

6    recordings from those conferences, had anything to do with his decision to make those expenditures.

7    **B.**      **PPFA's infiltration costs are not damages, proximately caused or otherwise.**

8    PPFA now tacitly concedes that Defendants are not liable for "damages" in the form of costs

9    for security upgrades to prevent intrusions into conferences by third parties. Instead, PPFA contends

10    the measures were necessary to "repair what Defendants themselves broke, namely, the sense of trust

11    and security" in its conferences, and to prevent future intrusion by the defendants. Dkt. #1092 at 5:8-

12    18. PPFA cites no authority for how it could recover "sense of trust and security" damages under the

13    claims brought in this action, because none exists. Instead, Plaintiffs claim that the Computer Fraud

14    and Abuse Act, 18 U.S.C. § 1030 ("CFAA"), is the "law most analogous" in this situation. But there

15    is no need to look for an analogy; PPFA seeks damages under trespass, fraud, recording statutes, and

16    RICO for expenditures to prevent Defendants from entering PPFA's physical properties, and there is

17    no legal authority under those causes of action supporting the recovery of such amounts as damages.

18    Even the CFAA cases cited do not support PPFA's position. *Ticketmaster LLC v. Prestige*

19    *Entertainment West, Inc.*, 315 F. Supp. 3d 1147, 1173 (C.D. Cal. 2018), involved the costs of

20    identifying the source of, and stopping, an *active, ongoing* breach of the plaintiff's computer, as

21    opposed to investigating a *past* breach and upgrading systems to prevent a *future* breach. And in

22    *Kalow & Springnut, LLP v. Commence Corp.*, No. 07-3442 (FLW), 2009 WL 44748, at *2 (D.N.J.

23    Jan. 6, 2009), the "upgrade" at issue was the replacement of software actually disabled by an

24    embedded "time bomb." No actual damage to any system occurred in the present case.[1] The costs of

25

---

26    [1] Plaintiffs' other cases did not actually award damages for assessments or security upgrades, or engage in any analysis on the issue. *Delacruz v. State Bar of Cal.*, No. 5:14-CV-05336-EJD, 2015

27    WL 5697365 (N.D. Cal. Sept. 29, 2015); *AtPac, Inc. v. Aptitude Sols., Inc.*, 730 F. Supp. 2d 1174, 1184 (E.D. Cal. 2010); *Doyle v. Taylor*, No. CV-09-158-RHW, 2010 WL 2163521, at *3 (E.D. Wash.

28    May 24, 2010).

discovering the identity of the perpetrators and their methods have been allowed "where the offender has actually accessed protected information" since, in such cases, "discovering who has that information and what information he or she has is essential to remedying the harm," *SuccessFactors, Inc. v. Softscape, Inc*., 544 F. Supp. 2d 975, 981 (N.D. Cal. 2008), but no "protected information" was accessed in this case. Conversely, expenditures on discovering who damaged a system are "not essential to remedying or discovering the extent of the harm." *Id.*

Any homeowner would agree that an unauthorized entry into one's home damages one's sense of security, but that does not make the perpetrator liable for the cost of a security system. A bodily assault undoubtedly damages one's sense of personal security and trust, but that does not allow the victim to recover for the costs of a personal bodyguard, bullet-proof vest, or martial arts classes, even to protect against a future battery committed by the assailant himself. PPFA's reliance on an inapplicable statute and a broken corporate "sense of trust and security" to support its claims for infiltration damages proves Defendants' point that Plaintiffs may only collect damages for what Defendants broke, and Defendants didn't break anything.

### C. Plaintiffs did not prove RICO damages.

As explained in Defendants' motion, there was a *long series of events* between the purported RICO predicate acts and the actions of Defendants, Plaintiffs, and third parties that led Plaintiffs to decide to make the expenditures that Plaintiffs seek to recover as damages, and the jury found that no Plaintiff suffered any financial loss from the RICO predicate acts that was distinct from the damages that the jury awarded for the tort, contract, and recording claims. Dkt. #1080 at 16:18-19:7. *Plaintiffs do not dispute these facts*. Instead, Plaintiffs ignore the "touchstone of directness" for RICO damages and assert that the alleged predicate acts were an essential *but-for* cause of their damages within that long series of events: without first producing and transferring the ID's, Defendants could not have later accessed conferences, met key members of Plaintiffs' staff, or published their videos. Dkt. #1092 at 21:13-17, 22:7-18, 22:27-28. Plaintiffs' theory, however, is contrary to the plain language of the RICO statute, as well as the Supreme Court's RICO decisions.

18 U.S.C. § 1964(c) states that "[a]ny person injured in his business or property by reason of" a RICO violation "may sue therefor." As such, the "reason" for the injury to Plaintiffs' business or

property *must be RICO predicate acts*, not some other conduct. *Sedima v. Imrex Co.*, 473 U.S. 479, 496 (1985) (emphasis added) (a RICO plaintiff "only has standing if . . . he has been injured in his business or property by the conduct *constituting the violation*"). The Supreme Court has expressly rejected the argument "that a plaintiff is injured 'by reason of' a RICO violation, and therefore may recover, simply on showing that the defendant violated § 1962, the plaintiff was injured, and the defendant's violation was a 'but for' cause of plaintiff's injury. . . ." *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 265-66, 268 (1992). Rather, where a plaintiff's injuries do not flow *directly* from the defendants' *predicate* acts, but rather from *other* conduct by the defendants (or others), the plaintiff has failed to show proximate causation, and the RICO claim fails. *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 458 (2006).

By ignoring what Plaintiffs call "Defendants . . . 'one-step causation' argument," Dkt. #1092 at 21:11-13, they also ignore the Supreme Court decisions upon which that argument is based. For instance, the Court has stated:

> The general tendency of the law, in regard to damages at least, is *not to go beyond the first step*." . . . Because the City's theory of causation requires us to move well beyond the first step, that theory cannot meet RICO's direct relationship requirement.

*Hemi Group, LLC v. City of New York*, 559 U.S. 1, 10 (2010) (emphasis added) (citations omitted). As Plaintiffs admit, their "theory of causation requires us to move well beyond the first step," so under binding precedent, they "cannot meet RICO's direct relationship requirement." *See id.*

Further, Plaintiffs' RICO claim is premised upon the loss of "Plaintiffs' sense of security in their conferences." Dkt. #1092 at 23:27-28. Even assuming *arguendo* that this type of loss could give rise to a compensable injury under *other* types of causes of action, it is not an injury to "business or property," 18 U.S.C. § 1964(c), and therefore cannot supply the basis for a RICO claim. In *Berg v. First State Insurance Co.*, 915 F.2d 460 (9th Cir. 1990), the Ninth Circuit held that injury to "peace of mind" is "a personal injury in the form of emotional distress, not a claim for an injury to property as section 1964(c) requires. . . . Even if the directors had incurred pecuniary losses from emotional

distress, they would not be compensable under RICO."[2] In sum, the text of the RICO statute, and numerous Supreme Court cases interpreting it, demonstrate that Defendants are entitled to judgment as a matter of law on the RICO claim. As Plaintiffs acknowledge, and as the jury held, no Plaintiff *directly* incurred even one penny of injury to business or property from the production or transfer of fake IDs.[3]

Plaintiffs cite to *City of New York v. Venkataram*, 396 Fed. Appx. 722 (2d Cir. 2010)—an unpublished summary order—in which the defendant pled guilty to conspiracy, embezzlement, and fourteen RICO predicate offenses (money laundering), but asserted that the sole proximate cause of the plaintiff's damages was the embezzlement. *Id.* at 723-24. The court noted the difficulty in separating acts that create illegal proceeds from acts that hide such proceeds, especially since the defendant, as a part of the process of pleading guilty, *admitted* that money laundering was a necessary part of the embezzlement process. *Id.* at 724-25. Here, Plaintiffs did not pay Defendants any money; rather, Plaintiffs' asserted injury to business or property consists of their voluntary expenditures made to third parties stemming from Plaintiffs' diminished "sense of security in their conferences." Dkt. #1092 at 23:27-28.[4]

Additionally, Plaintiffs' reliance upon two wire and mail fraud cases is misplaced. In *Allstate Insurance Co. v. Plambeck*, 802 F.3d 665 (5th Cir. 2015), the court rejected the defendants' argument

---

[2] *Id.* at 464; *see also Oscar v. Univ. Students Co-Operative Ass'n*, 965 F.2d 783, 787 (9th Cir. 1992) (en banc); *Bokaie v. Green Earth Coffee LLC*, Case No. 18-cv-05244-JST, 2018 U.S. Dist. LEXIS 216960, at *15 (N.D. Cal. Dec. 27, 2018); *Ainsworth v. Owenby*, 326 F. Supp. 3d 1111, 1122-24 (D. Ore. 2018).

[3] The lack of a direct injury to business or property is further illustrated by the fact that two of the four Plaintiffs that were awarded RICO damages, PPOSBC and PPPSGV, *never came in contact with any fake IDs*. It is simply impossible to show that these Plaintiffs were *directly* injured "by reason of" a Defendant's production or transfer of a fake ID.

[4] To the extent that embezzlement or money laundering cases have any minimal relevance, the Ninth Circuit's recent decision in *City of Almaty v. Khrapunov*, 956 F.3d 1129 (9th Cir. 2020), is more applicable. There, the Ninth Circuit concluded that the plaintiffs' voluntary expenditures were not an injury to property caused by the predicate act of money laundering. *Id.* at 1132-33. Rather, like Plaintiffs here, the plaintiff "was not *separately* harmed" by the predicate act, which caused no "*independent* harm." *Id.* at 1133-34 (emphasis added). The same is true here concerning the alleged fake ID predicate acts.

6

Defs.' Reply ISO Post-Judgment Motions
– 3:16-CV-00236 (WHO)

that reliance is the key consideration in determining proximate causation in a RICO case premised upon mail and wire fraud. *Id.* at 676-77. Here, Defendants make no such argument. Moreover, in *Rosario v. Livaditis*, 963 F.2d 1013 (7th Cir. 1992), the *only* claims at issue were state law fraud and the RICO predicates of wire fraud and mail fraud, which were premised upon identical facts. *Id.* at 1021. The court ordered a new trial on the issue of RICO damages because the jury found that plaintiffs incurred injury to their business or property by reason of a RICO violation but awarded them $0 in damages on that claim. *Id.* at 1016, 1020-21. Here, by contrast, while Plaintiffs assert that Defendants' "scheme" involved hundreds of actions taken over the course of several years, the purported predicate acts are a proverbial drop in the bucket of that scheme: Daleiden's production and transfer of IDs, which consisted of only a handful of specific events.[5] These few discrete actions did not directly harm any Plaintiff's business or property and RICO liability cannot be based on them.

## II. No reasonable jury could find that Plaintiffs established entitlement to punitive damages.

Plaintiffs expressly admit that their punitive damages are impermissible *publication* damages that are premised upon Plaintiffs' assertion, unsupported by any evidence, that Defendants' public allegations about Plaintiffs' illegal conduct were false. Plaintiffs stated that they "presented substantial evidence that Defendants' goal was *to create a hit piece* against Planned Parenthood to provoke outrage," Dkt. #1092 at 17:10-11 (emphasis added). In other words, when Plaintiffs said in their Complaint that Defendants engaged in a fraudulent video smear campaign, Dkt. #59 at 2:25-27, 35:1, and that this lawsuit was brought "to recover damages for the ongoing harm to Planned Parenthood emanating from the video smear campaign," *id.* at 4:1-3, they meant it.

The question of whether punitive damages can be based upon the publication of defamatory statements is irrelevant to this case because Plaintiffs failed to prove that Defendants' statements

---

[5] Plaintiffs' assertion that "[t]he RICO claims and the fraud/trespass claims involved the same underlying facts," Dkt. #1092:20-21—as if all of the countless acts that Plaintiffs assert were part of the "fraudulent scheme" were also RICO predicate acts—is clearly incorrect. The question is whether the handful of acts that allegedly violated 18 U.S.C. § 1028(a) proximately caused any, or all, of Plaintiffs' alleged damages—as opposed to whether *all of Defendants' collective conduct over the course of thirty months* caused those damages—and the answer is no.

were, in fact, false. To the contrary, Plaintiffs failed to dispute that the jury was required to assume that Defendants did, in fact, uncover evidence of illegal conduct.[6] Instead, Plaintiffs assert that misrepresentations made as a part of an investigation that *actually exposes illegal conduct* can support a punitive damages award. Dkt. #1092 at 18:17-19. This is contrary to *Wasden v. Animal Legal Defense Fund*, 878 F.3d 1184 (9th Cir. 2018). In fact, in light of the additional scrutiny that tends to come whenever public allegations of illegal conduct are made, Plaintiffs go so far as to suggest that revealing actual illegal conduct is "conduct with a high probability of damage to [those whose illegal acts have been exposed] or with a conscious disregard for the life, safety or rights of [those] persons," at least when that illegal conduct is engaged in by abortion providers. *See* Dkt. #1092 at 17:3-6, 17:11-17, 18:17-19. Unsurprisingly, Plaintiffs provide no authority for the proposition that criminals can obtain punitive damages against those who expose their crimes.[7]

Additionally, Plaintiffs' attempt to section off, by state, the conduct purportedly justifying the punitive damages is unavailing. Plaintiffs assert that the fact that the punitive damages award does not comply with California requirements is irrelevant because they are not seeking punitive damages under California law, but most of the events giving rise to this case and allegedly causing Plaintiffs' damages and punitive damages, including the editing and publication of CMP's videos, occurred in California. *See, e.g.,* Dkt. #59 at 4:26-5:10. Also, the jury's verdict assessed punitive damages by Defendant without specifying which state(s)' laws each Defendant was liable under. Plaintiffs failed to prove that each particular Defendants' conduct within each of the relevant states met the requirements for punitive damages in those jurisdictions.

Concerning the remainder of Plaintiffs' punitive damages arguments, Defendants stand on the arguments set forth in their post-judgment motions.

---

[6] Dkt. #1080 at 14:1-23. Similarly, although Plaintiffs heavily rely on the fact that Defendants oppose abortion and Planned Parenthood on religious grounds, advocate for legislative and judicial restrictions on abortion, and want the government to investigate and prosecute abortion providers who commit crimes, Dkt. #1092 at 18:12-16, 66:21-67:5; *cf.* Dkt. #956 at 24:24-27:11, none of those things are improper, evidence of malice, or otherwise unlawful. And Plaintiffs offered no proof that Defendants actually defamed them, or intended to defame them.

[7] This also highlights the extent to which the punitive damages argument rests upon third-party harms; Plaintiffs heavily rely upon the personal thoughts and fears of non-parties who were concerned about what *other non-parties* might hypothetically do after watching CMP's videos.

8

**III.** **No reasonable jury could find that any Defendant was liable under RICO.**

    **A.** **No reasonable jury could find that the alleged RICO predicate acts (unlawful ID production and transfer) directly caused any, or all, of Plaintiffs' asserted damages.**

For the reasons discussed previously (§ I.C) and in Defendants' post-judgment motions, Plaintiffs failed to prove that the purported RICO predicate acts directly injured their business or property, so the RICO claim is without merit as a matter of law.

    **B.** **No reasonable jury could conclude that Plaintiffs proved that Defendants engaged in a pattern of RICO predicate acts.**

Plaintiffs take issue with referring to 18 U.S.C. § 1028 as an "identity theft statute" despite the fact that the Court did so in various orders, Dkt. #124 at 8:17, 11:6-9; Dkt. #753 at 23:8, 23:15, Regardless, Plaintiffs' absurd rewriting of the statute would make any college student who shows a bouncer or police officer a fake ID a felon,[8] and Plaintiffs failed to prove any violation of the statute as it is actually written. Plaintiffs' argument that merely *presenting* a fake ID violates § 1028[9] is a recycled form of their prior argument that *use* of a fake ID violates the statute, which the Court has already rejected. Dkt. #124 at 11; Dkt. #649 at 13-14.

Moreover, in order to prove a pattern of racketeering activity, Plaintiffs had to show (among other things) "a threat of continued *racketeering* activity," *i.e.*, that "*the racketeering predicates . . . amount to or pose a threat of continued criminal activity.*" *H. J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239-42 (1989) (emphasis added). Here, Plaintiffs were required to prove that there is or was a threat of continued violations of the identity theft statute. But by the time this action was filed, the most recent alleged violation was two years in the past; at the time of trial, it had been almost four more years since any alleged violation had occurred. Merely asserting that Defendants are likely to engage in future *lawful* anti-abortion advocacy, or conduct *lawful* investigations that do not entail the unlawful production or transfer of IDs, is not enough. Plaintiffs' argument that there

---

[8] Plaintiffs notably declined to refute this assertion. Dkt. #1092 at 24:26-28.

[9] Dkt. #1092 at 21:8-9, 23:23-24:2. *United States v. Fuller*, 531 F.3d 1020 (9th Cir. 2008), is an inapplicable decision under § 1028(a)(6). Additionally, *United States v. Christian*, 356 F.3d 1103 (9th Cir. 2004), was a probable cause case. This Court previously expressed "doubts that the dicta in *United States v. Christian*, 356 F.3d 1103, 1107 (9th Cir. 2004) . . . establishes the correct framework for determining what is a 'transfer' is under section 1028," Dkt. #753 at 32:26-28, and it appears that no other decision of any court has relied upon, or even mentioned, this dicta.

was sufficient evidence "for the jury to conclude that ID scanners would not end Defendants' use of *different*, and more advanced, tactics," Dkt. #1092 at 24:18-21 (emphasis added), is without merit because those *different* tactics would not entail the unlawful production or transfer of fake IDs.

Similarly, contrary to Plaintiffs' claim, Dkt. #1092 at 24:5-21, this Court's order deciding the California UCL claim and issuing an injunction based upon various non-RICO claims, Dkt. #1073, does not support the assertion that Plaintiffs met their burden to prove a continuing threat of *racketeering* activity. Plaintiffs argued that the alleged "criminal enterprise" was not limited to a few isolated alleged RICO predicate acts occurring several years ago, but extended to a variety of past and likely future conduct unrelated to the production and transfer of IDs. Dkt. #1073 at 26:20-23. The Findings of Fact that Plaintiffs cite to (#49, 50, and 55-60), which the Court cited as evidence of "a strong likelihood of future violations," did *not* reference the production or transfer of fake IDs; they stated, among other things, that Daleiden and Merritt had prior experience creating undercover videos, and that Daleiden and CMP intend to continue to post videos and conduct investigations. Dkt. #1073 at 13:13-18, 14:3-21, 27:2-4. Notably absent from this list (and from Plaintiffs' brief) are Findings of Fact #10, 24, 32, and 45, which discuss the production, transfer, and use of fake IDs. *Id.* at 7:19-24, 9:21-22, 10:27-11:1, 12:25-26.

In sum, there is no evidence of a threat that any Defendant will violate 18 U.S.C. § 1028 in the future; to the contrary, the most that the evidence arguably showed was that Daleiden's creation and acquisition of a few allegedly fake IDs was a one-time, isolated occurrence. Trial Tr. at 2645:4-7, 2645:8-11, 2654:5-2655:4, 2647:3-10, 2652:21-24. As such, Defendants are entitled to judgment as a matter of law on the RICO claim.

## IV. No Reasonable Jury Could Find That Plaintiffs Presented Sufficient Evidence to Support Their Fraudulent Misrepresentation Claim.

Plaintiffs presented insufficient evidence to support their fraudulent misrepresentation claim.

### A. Defendants' misrepresentations were "pure speech" and protected by the First Amendment.

In *Wasden*, the Ninth Circuit held that a misrepresentation made for the purpose of mere entry into another's premises is "pure speech" and protected by the First Amendment. 878 F.3d at 1194. To set aside Defendants' First Amendment protection, Plaintiffs must establish that Defendants

misrepresented themselves either (1) "'for the purpose of material gain' or 'material advantage,' or . . . (2) [to] inflict a 'legally cognizable harm.'" *Id.* (quoting *United States v. Alvarez*, 567 U.S. 709, 723, 719 (2012)). Defendants' misrepresentations about themselves, used only to gain fully paid entry to Plaintiffs' conferences as exhibitors, did neither, *see* Dkt. #1080 at 21-23; Dkt. #1092, and caused no legally cognizable harm (as discussed previously in section I).

In *Wasden*, the Ninth Circuit carefully distinguished between misrepresentation for the purpose of mere entry and the misrepresentation for the purpose of entering a premises to acquire a material or financial benefit, such as employment benefits or records. Using the Ninth Circuit's example, a teenager who misrepresents himself for the purpose of securing a restaurant reservation, then pays valuable consideration for the meal and leaves the restaurant no worse off, has engaged in "pure speech." 878 F.3d at 1195. Similarly, Plaintiffs received valuable consideration for Defendants' presence at the conferences; Defendants' presence left Plaintiffs no worse off. "This entry alone does not constitute a material gain." *Id.*

Plaintiffs now suggest, without any legal support, that Defendants received material gain from their entry into the conferences in the form of financial support from third parties. Dkt. #1092 at 25. However, implicit in the *Wasden* restaurant example is the principle that to establish fraud upon the Plaintiffs, Defendants must have gained something material *from Plaintiffs.* Otherwise, the restaurant could pursue the offending teenager for fraud damages if one of his guests paid for the meal. *Cf. Project Veritas v. Ohio Election Comm'n*, 418 F. Supp. 3d 232, 250 (S.D. Ohio 2019) ("[F]alse statements made to actually acquire agricultural production facility records inflict a property harm *upon the owner.*") (emphasis added) (citing *Wasden*, 878 F.3d at 1195). In other words, hypothetical financial gain from other sources cannot be the foundation for a claim that Plaintiffs were defrauded. Also, most journalistic endeavors have some means of financial support. Basing a finding of fraudulent misrepresentation on the Defendants' receipt of "secondary benefits," *Wasden*, 878 F.3d at 1195, would eliminate the category of "pure speech" that *Wasden* carefully protects. Nor does the possibility that a story may later be published about a plaintiff necessarily convert a journalist's entry by misrepresentation into an actionable one. *Id.* at 1195 n.9.

Ignoring the apt restaurant analogy, Plaintiffs try to analogize Defendants to people who have

fraudulently become employees and received wages and benefits from their employer targets. Dkt. #1092 at 26. Because Defendants paid Plaintiffs *valuable consideration* for entry into the conferences and sought financial support from *third parties* only, Plaintiffs' analogy doesn't work. Defendants obtained no material gain or advantage for purposes of fraudulent misrepresentation. *Alvarez*, 567 U.S. at 719; *Wasden*, 878 F.at 1194; *Project Veritas*, 418 F. Supp.3d at 250.[10]

**B.   Plaintiffs did not reasonably rely on Defendants' misrepresentations.**

The evidence does not support the jury's finding that Plaintiffs reasonably relied, or suffered harm from relying, on Defendants' misrepresentations about their identity. Plaintiffs suffered no legal damages as a result of Defendants' entry into the conferences. *See* § I. Additionally, Plaintiffs cannot claim to have done their "due diligence" to protect themselves from misrepresentations. Plaintiffs had trained personnel who interacted with some of the Defendants in granting them admission to their conferences and clinics. Trial Tr. at 3103:6-22, 3110:2-3111:1, 3145:17-3146:10. Plaintiffs nevertheless failed to make even minimal, or "trivial" (Exh. 7117), efforts to vet the authenticity of Defendants' identities, despite ample opportunities to do so. Given this lack of investigation, there's no evidence Plaintiffs would not have admitted at least Daleiden and Merritt even if they had used their own names and identification. PPFA did not even go through the trouble of vetting BioMax as a potential business partner through a simple Google search. Trial Tr. at 1835:4-1836:24, 3156:10-3157:2; Exh. 7117; Dkt. #657 at 24. Because their misrepresentations were "pure speech" protected by the First Amendment, and because there was insufficient evidence that Plaintiffs reasonably relied on the misrepresentations, Defendants are entitled to judgment as a matter of law on this claim.

**V.   No Reasonable Jury Could Find That Plaintiffs Established Their Recording Claims.**

**A.   The Plaintiff corporations failed to establish standing.**

Plaintiffs make no attempt to cite evidence from which a reasonable jury could have found standing as to each of the 43 recordings for which the jury found Defendants liable. Instead, Plaintiffs contend that since Defendants executed an undercover operation against "Planned Parenthood," every

---

[10] Plaintiffs also set up a straw man, asserting that Defendants' assertion of their First Amendment rights here is no different than recording and publishing videotapes of trials contrary to court rules. Dkt. #1092 at 26. Not so. Defendants contend that they broke no rules or laws whatsoever in exercising their First Amendment rights.

recording *ipso facto* "targeted" a particular employee or contractor "because she could disclose information about the corporation's internal matters." Dkt. #1006 at 74, 79, 81, and 85. In other words, in Plaintiffs' view, the jury instructions about corporate standing directed the jury to find corporate standing.[11] However, a plan to expose the practices of "Planned Parenthood" and "Planned Parenthood clinics" is an insufficient evidentiary basis on which a reasonable jury could find that, *in each of 43 distinct interactions*, the specific employee from a specific corporate entity was "targeted [] for recording because she could disclose information about the corporation's internal matters."

Indeed, Plaintiffs went out of their way to establish that Daleiden recorded people at PPFA conferences who were *not* affiliated with Planned Parenthood on topics having nothing to do with fetal tissue. Trial Tr. at 2192:13–2194:3. It is undisputed that Daleiden, Merritt, and Lopez turned on their recording equipment before entering the conference space and left it on, recording everything around them regardless of who they were speaking with. *E.g.,* Trial Tr. at 2198:10-15, 2200:15-24. Moreover, as noted in Defendants' motion, on many occasions, Plaintiffs' employees sought out and approached Defendants and initiated the conversations. *See, e.g.*, Trial Tr. at 1487:6-14 (Nucatola); Trial Tr. at 988:10-18 (Moran). To get around this obvious problem, Plaintiffs assert that "Defendants began targeting Planned Parenthood when they formulated their project. It is the first steps that matter, not the last." Dkt. #1092 at 30:16-18. However, "targeting" Planned Parenthood for an investigation obviously means something different than "targeting" particular individuals, as that term is used in the jury instructions regarding corporate standing. This effort to sidestep their failure to present evidence sufficient to establish corporate standing is unavailing.

Plaintiffs' trial strategy included, in many instances, playing very short clips, often without sound, of various individuals identified by another witness as being employed by one of the Plaintiffs. *See e.g.* Exh. 5749, 5972a, 6007a, 6009a, 6012a. Plaintiffs now have to live with the consequences

---

[11] Similarly, concerning the lack of evidence of employees or contractors being recorded "discussing internal matters of the corporation," Plaintiffs point to Lopez's testimony concerning *one* recorded conversation, with someone not identified as an employee or contractor for any Planned Parenthood clinic, that is not one of the recordings at issue in this case, about that person's "opinion" about "how fetal procurement would work with their clinic and so forth." Dkt. #1092 at 30:3-10. Apparently realizing the futility of the argument, they conclude, "[t]he fact of targeting is enough." *Id.* at 30:12.

of their strategy of providing as little detail as possible. As a result, the corporate Plaintiffs failed to present sufficient evidence of discussions of their internal matters, or the targeting of individual employees to disclose such information, to support standing for most of their recording claims.

**B.** **Plaintiffs failed to put on evidence sufficient to show that Defendants recorded for the purpose of violating civil RICO.**

Plaintiffs cite no evidence concerning the element of a criminal or tortious intent underlying the federal recording claim (18 U.S.C. § 2510 *et seq.*). Instead, Plaintiffs rely on the circular argument that "a reasonable jury could and did find that the recordings made by Defendants were an essential element of, and furthered, Defendants' criminal conspiracy." Dkt. #1092 at 31:14-16. Putting aside the fact that this is inconsistent with Plaintiffs' RICO argument that recordings could not have been made but for the prior RICO violation, both the statute and the instruction provide that the recording must be made for the purpose of *committing* a criminal or tortious *act*. Dkt. #1006 at 82:22-24.

Even using Plaintiffs' rewritten version of this element, the question remains: the recordings were made to further Defendants' criminal conspiracy to do what? "Conspiracy is an inchoate offense, the essence of which is an agreement to commit an unlawful *act*." *Iannelli v. United States,* 420 U.S. 770, 777 (1975) (emphasis added). In *U.S. v. Vest*, 639 F. Supp. 899 (D. Mass 1986), cited by Plaintiffs, the court found the recording at issue to be "in furtherance of a criminal conspiracy" because it "must be understood as an attempt to ensure that the [illegal] arrangement between Waters and [police officer] Tarantino was carried out . . . to force Tarantino to fulfill his end of the bargain" of accepting payment in exchange for keeping Waters from going to prison. *Id.* at 907. In the instant case, however, Plaintiffs have failed to identify any unlawful act that Defendants agreed to do that the recordings were in furtherance of. Plaintiffs' counsel said in closing:

> And you've seen the evidence of the defendants' motives: To destroy Planned Parenthood. And the recordings were made to try to achieve that goal. You've seen the evidence of the defendants' RICO scheme, the fake IDs and the fraud. And the recordings were all made to further that RICO enterprise.

Trial Tr. at 3948:3-6. It defies logic, and is contrary to the evidence, to conclude that Defendants recorded Plaintiffs for the purpose of committing or furthering RICO *predicate acts*, *i.e.*, producing or transferring fake IDs. Plaintiffs failed to produce evidence that the recordings were made for the purpose of committing any unlawful act, or even to "further a conspiracy" to do so.

14

### C. Plaintiffs failed to put on sufficient evidence of a reasonable expectation of privacy as to each recording.

Concerning the expectation of privacy element of the recording claims, this Court has held that "[t]he context of each recording must be analyzed based on its specific facts," Dkt. #753 at 83:1-2) (federal recording claim), and "[a]ll of the facts and the contexts for each recording have to be considered." *Id.* at 86:15-16 (Florida recording claim). Contrary to this holding, Plaintiffs contend that evidence of security measures limiting physical access to the meetings to registered, paying individuals "was sufficient to support the jury's conclusions that [all] attendees at the PPFA National Conference had a subjective expectation of privacy in their conversations with Defendants." Dkt. #1092 at 32:7-17. Plaintiffs further contend that, based on Jen Castle's testimony that *she* believed *her* conversation was confidential because "the content of the entire meeting was confidential" and her conversation was held in a crowded room and not easily overheard, the jury could infer that "all conference participants had a subjective and reasonable expectation" of privacy. *Id.* at 32:18-23. However, this evidence is not even sufficient to show that Castle had a subjective or objectively reasonable expectation of privacy, much less that *every other attendee* had such expectations.

Nothing in the federal or Florida recording statutes suggests that limiting access to paying attendees converts an entire venue, whether it be conference rooms, classrooms, lecture halls, or sports arenas, into a zone of privacy in which surreptitious recording is presumptively an invasion of privacy. Additionally, Castle's belief that "the content of the entire meeting is confidential" says nothing about the reasonableness of her belief that the particular conversation she held with Daleiden was "not subject to interception." Dkt. #1006 at 78, 82. Moreover, there is no evidence that Castle's experience of having a conversation in a crowded room that was "not easily overheard" was replicated in each of the other conversations at the PPFA National Conference in Washington, D.C. Indeed, Tram Nguyen testified exactly to the contrary, *i.e.*, that she expected that her conversation with Daleiden in a crowded room could be overheard by others. Exh. 4 at 130:18-24; Trial Tr. at 1724.

As to the PPGC site visit, Plaintiffs state that access security in the form of a security guard necessarily means that the receptionists "would have reason to believe" that the Defendants "would keep their conversations private." The receptionists' hypothetical belief about whether the conversation would be repeated is irrelevant to the question of an expectation that the conversation

was "not subject to interception." Similarly, Melissa Farrell's belief that her conversations were covered by the PPGC NDA does not speak to the issue of an expectation that the conversation was not subject to interception. Further, although Plaintiffs assert that, at PPRM, J.R. Johnstone met Defendants at the front door and took them to a private conference room to meet with Savita Ginde, Dkt. #1092 at 33:7-10, the jury neither saw nor heard evidence that Daleiden and Merritt recorded any conversations with Ginde or Johnstone in a private conference room. Exh. 5166A.

In defending the verdict as to the California, Florida, and Maryland conference recordings, Plaintiffs repeat their argument that the existence of NDAs and security measures limiting access to paid attendees substitutes for evidence that the recorded persons each believed that their conversations could not be overheard or were not subject to interception, even when the recorded individuals knew very well that their conversations might be overheard by others in the area. *See, e.g.*, Dkt. #1080 at 28:18-27. These claims fail for insufficiency of evidence.

## VI. No Reasonable Jury Could Find That Plaintiffs Proved Their Breach of Contract Claims.

Plaintiffs presented insufficient evidence in support of their contract claims. They failed to prove damages and causation, see § I, and otherwise offer insufficient evidence as discussed below.

### A. CMP is not liable under any contract under any theory.

It is undisputed that all the contracts at issue were signed on behalf of BioMax, not CMP, and Plaintiffs disavow any theory of liability based on reverse veil piercing. Dkt. #1092 at 40. Even if traditional alter ego doctrine applied, Plaintiffs offered insufficient evidence. "Alter ego is an extreme remedy, sparingly used." *Sonora Diamond Corp. v. Superior Ct.*, 83 Cal. App. 4th 523, 539 (2000). Plaintiffs failed to prove the necessary elements to apply this extreme remedy: (1) sufficient unity of interest and ownership; and (2) injustice or inequity absent application of the doctrine. *Id.* at 538-39. Although Daleiden had a key role in both entities and the work of both entities was related, Dkt. #1092 at 40-42, this does not amount to alter ego liability. *See Sonora Diamond Corp.*, 83 Cal. App. 4th at 538-39. Moreover, Plaintiffs offered insufficient evidence of "how the corporate structure was intended to deprive them of a right, or how it has been used to do so." *Butler v. Adoption Media, LLC*,

486 F. Supp. 2d 1022, 1071 (N.D. Cal. 2007). Plaintiffs' ideological opposition to Defendants does not render BioMax's separate legal existence unjust or inequitable. *Cf. id.* at 1066-71.

Plaintiffs now also invoke traditional principles of agency law, arguing that BioMax was somehow the agent of CMP. Dkt. #1092 at 42. Plaintiffs presented no evidence that CMP took over performance of BioMax's day-to-day operations. *Sonora Diamond Corp.*, 83 Cal. App. 4th at 542 ("As a practical matter, the parent must be shown to have moved beyond the establishment of general policy and direction for the subsidiary and in effect taken over performance of the subsidiary's *day-to-day* operations in carrying out that policy.") (emphasis in original).

**B.      No breach of PPFA Exhibitor Agreements caused damages.**

Plaintiffs failed to demonstrate that any breach of a PPFA exhibitor agreement caused any Plaintiff any actual damages (see § I above). Plaintiffs failed to show Defendants' alleged breach caused, or was even a substantial factor in, Nucatola allegedly needing security or PPFA allegedly needing "essential monitoring." The alleged harm would have been sustained even if Defendants had not breached. *See*, *e.g.*, *Britz Fertilizers, Inc. v. Bayer Corp.*, 665 F. Supp. 2d 1142, 1168 (E.D. Cal. 2009) ("[W]rongful conduct is not a substantial factor in bringing about harm to another if the harm would have been sustained even if the actor had not acted wrongfully.") (citation omitted). Plaintiffs' evidence is insufficient.

**C.      PPFA does not have standing to sue as a beneficiary of the NAF Exhibitor and Confidentiality Agreements.**

PPFA was not a party to the NAF contracts, but claims it is a third-party beneficiary. Dkt. #1092 at 44-47. A purported third-party beneficiary of a contract must show that the contract was made "expressly" for its benefit. One provision of the Confidentiality Agreement refers to "NAF members," but the contracts do not expressly provide anywhere that PPFA, or any other NAF members, were intended beneficiaries; rather, the agreements refer generally to the "quality and safety of services" provided by NAF members. Exh. 248 at ¶ 2; Exh. 416 at ¶ 2. This is not an express statement that PPFA was an intended beneficiary. *Trs. of SAG-P Pension & Health Plans v. NYCA*, Inc., 572 F.3d 771, 779 (9th Cir. 2009).

PPFA does not claim beneficiary status through the actual conference attendees, implicitly

acknowledging it is not a fourth-party beneficiary. Dkt. #1092 at 44-47; Dkt. #1080 at 36-37. Rather, PPFA claims it was somehow a conference "Attendee" itself. Dkt. #1092 at 47. PPFA concedes that the contract defines the term "Attendees" to mean the individuals who attended NAF's conferences, but claims that other provisions refer to *organizational* Attendees. *Id.* The contract contains no such provisions. One provision refers to "employees" of "Attendees" (Exh. 248 at ¶ 3), but nothing in the contract suggests that "Attendees" thereby means "organizations" such as PPFA. In any event, this is a far cry from a showing that the contracts were made "expressly" for PPFA's benefit. *NYCA, Inc.*, 572 F.3d at 779.

### D. Defendants obtained no "Confidential Information" under the PPGC NDA.

Plaintiffs offered no evidence that any information conveyed during the PPGC site visit was "identified at the time of disclosure as being of a confidential or proprietary nature," nor is there sufficient evidence that Defendants "reasonably understood" the information to be confidential. Exh. 447 at ¶ 1. Plaintiffs point to their witnesses Farrell and Nguyen's testimony about what *they* personally considered to be reasonable (Dkt. #1092 at 48), but only the reasonable understanding of *Defendants*—the "Recipients," for purposes of the PPGC NDA—is relevant. Dkt. #1080 at 37-38.

Plaintiffs cite *Angelou v. African Overseas Union*, 33 S.W.3d 269 (Tex. App. 2000) in support of their argument that an "unexpressed subjective intent is irrelevant" (Dkt. #1092 at 49), but that case is irrelevant. The contract in that case made no mention of what a party "understood," and the court properly disregarded the parties' understanding beyond what was reflected in the contract. 33 S.W.3d at 273-74, 278-80. Here, by contrast, as "the Recipients," Defendants' understanding is critically relevant. Exh. 447 at ¶ 1. Plaintiffs offered insufficient evidence that any of the information at issue was "confidential" as defined in the NDA.

### VII. The adverse inferences were erroneous and prejudiced all Defendants.

Plaintiffs failed to refute any of the points made in Defendants' motion, and in the prior briefing, concerning the adverse inferences.[12] First, the point of an inference is that it helps a party to

---

[12] In light of the voluminous briefing and many conference discussions concerning adverse

18

Defs.' Reply ISO Post-Judgment Motions
– 3:16-CV-00236 (WHO)

prove a *disputed* factual contention. As such, an inference concerning a fact that has been stipulated to is not "warranted or needed." *Prime Media Group, LLC v. Acer Am. Corp.*, No. 12-cv-05020-BLF, 2015 U.S. Dist. LEXIS 15492 (N.D. Cal. Feb. 6, 2015); *see also* Dkt. #853 at 1-2. Here, by providing, at the Court's suggestion (Dkt. #835 at 3), a long list of admissions concerning a variety of facts, Dkt. #841 at 4:18-7:18, Newman eliminated any alleged need or basis for adverse inferences concerning those facts. This is true regardless of whether the parties agreed or disagreed about whether the stipulated fact was relevant and admissible. If the fact is relevant to the case, and its presentation to the jury is not otherwise barred by evidentiary rules or constitutional provisions, the stipulation can be read to the jury by the Court; informing the jury that a witness declined to answer questions concerning that stipulated fact serves no constitutionally permissible purpose. Conversely, if the stipulated fact is irrelevant to the case and/or its presentation to the jury is otherwise barred, a party cannot sidestep the rules of evidence by obtaining an adverse inference concerning that fact. *See, e.g., Doe v. Glanzer*, 232 F.3d 1258, 1266 (9th Cir. 2000).

Second, Plaintiffs offer no authority for the proposition that an adverse inference can be based upon evidence that was never presented to the decision-maker (here, the jury) at the proceeding at issue. Dkt. #1092 at 50:23-51:9. Neither *Glanzer* nor the decisions it relied upon support that proposition.[13] Under Plaintiffs' contrary view, a party could manufacture a purported "substantial need" for an adverse inference instruction by simply declining to pursue other avenues of obtaining information, and by declining to offer admissible evidence into the record. That is not the law.

Third, it is undisputed that Inference #1 is unsupported by any admitted, or admissible, evidence.[14] Newman's counsel argued that admission of any portion, or all, of Newman's two-decade

---

inferences, Defendants' motion highlighted several of the most critical issues while expressly incorporating by reference all their previous arguments. Dkt. #1080 at 39:10-12. As such, Plaintiffs' suggestion that Defendants' objections to the inferences are limited to the specific things addressed *in more detail* in the post-judgment motion is clearly incorrect. *See, e.g.,* Dkt. #1092 at 52:2-5.

[13] *See, e.g., Baxter v. Palmigiano*, 425 U.S. 308, 317-18, 320 n.4 (1976) (corroborating evidence *was made part of the record* that the decision-making body based its decision upon); *LaSalle Bank Lake View v. Seguban*, 54 F.3d 387, 391 (7th Cir. 1995) ("[P]laintiff should have been put to its proof, either by way of evidentiary support for a motion for summary judgment or at trial.").

[14] Defendants' objections to the adverse inferences are not limited to Inference #1; rather, Inference #1 provides the clearest illustration of why *all* of the inferences are improper.

old Christian theological study "Their Blood Cries Out," which makes a theological case based on the Bible that the law and the government should treat abortion the same as murder, would violate FRE 403 and 610. Dkt. #956 at 24:24-27:11; Trial Tr. at 3403:25-3405:7. The Court excluded Plaintiffs' exhibit, which consisted of the cover page and page 166 of the book (Dkt. #806-7 at 53-54), under FRE 403. Dkt. #968 at 2:1-2. As the Ninth Circuit held in *Glanzer*, where the evidence at issue is inadmissible under FRE 403, there is no "substantial need" for the information, and no adverse inference based on a refusal to provide that information is proper. 232 F.3d at 1266-67.

Fourth, the Ninth Circuit has held that "no negative inference can be drawn . . . unless . . . there is not another less burdensome way of obtaining that information." *Glanzer*, 232 F.3d at 1265 (citations omitted). Daleiden's detailed testimony, along with the countless emails and other documents related to the investigation that are in the record, were "less burdensome way[s] of obtaining" information concerning the subject matter of the deposition questions that Newman, Baxter, and Davin declined to answer. *See id.* The fact that "Plaintiffs were deprived of the opportunity" to obtain *additional* answers to many of the same questions "*from* Newman, Baxter and Davin," Dkt. #1092 at 52:6-7 (emphasis added), is irrelevant.

Finally, "the danger of unfair prejudice is high when a jury is told that a witness declined to answer a question by invoking the Fifth Amendment; the implication is, at best, that the witness refused to answer because she had something to hide." *Woods v. START Treatment & Recovery Ctrs., Inc.*, 864 F.3d 158, 171 (2d Cir. 2017) (admission of adverse inferences, which were coupled with an instruction to the jury and were repeatedly emphasized by opposing counsel during closing, was prejudicial error). Further, as Defendants predicted (Dkt. #956 at 26:4-27:2; Trial Tr. at 3406:4-15), the adverse inference ruling allowed Plaintiffs to falsely claim, based solely upon Newman's valid exercise of his constitutional privilege in response to questions about an inadmissible religious text, that Newman supports vigilante acts of violence. Trial Tr. at 3990:11-19, 3991:11-19.[15] And,

---

[15] Defendants *repeatedly* objected to any adverse inferences throughout the case: at summary judgment, in a motion in limine, and in multiple briefs and conferences during the trial. Contrary to Plaintiffs' suggestion, Defendants were not required to filibuster Plaintiffs' closing argument with

incredibly, Plaintiffs are now relying on the adverse inference concerning this inadmissible religious text as a basis for arguing that Newman, *and other Defendants*, should be held liable for punitive damages. Dkt. #1092 at 18:12-15, 66:22-24. The impropriety of the inferences concerning Newman, Baxter, and Davin's personal beliefs about abortion is heightened by the fact that Newman had already stipulated that he opposes abortion on moral and religious grounds (Dkt. #841 at 6:20; Dkt. #853-1 at 1), and Plaintiffs themselves told the jury that this case "is not about abortion. This is not about pro-life or pro-choice." Trial Tr. at 3967:2-3. The unfair and significant prejudice to Newman, and all Defendants, is readily apparent.

## VIII. No reasonable jury could find that any Defendant is liable on a civil conspiracy theory of liability.

As noted in Defendants' motion, and as the jury was instructed, to establish conspiracy liability for any particular cause of action, Plaintiffs were required to prove that the Defendant:

(1) *knew* that another person planned to commit the wrongful act at issue (*e.g.*, the alleged RICO predicate acts);

(2) *agreed with* the other person's commission of that wrongful act;

(3) *intended* that the wrongful act be committed; and

(4) *cooperated or agreed to cooperate* despite having knowledge that another person would be committing the wrongful act.[16]

These principles fully apply to the RICO conspiracy claim; Plaintiffs must prove that the particular Defendant *knew about*, and *agreed to the commission of* (*i.e.*, "conspired for someone to commit"), the "particular" "crimes constituting a pattern of racketeering activity." Dkt. #1080 at 42:9-14 (quoting Final Jury Instructions, Dkt. #1006 at 63:8-12, and *Baumer v. Pachl*, 8 F.3d 1341, 1346 (9th Cir. 1993)). As Plaintiffs acknowledge, Dkt. #1092 at 53:3-5, they were required to prove "that

---

repeated *renewed* objections every time that Plaintiffs referred to inferences, evidence, or jury instructions that Defendants had previously objected to. Plaintiffs' reliance upon *Bird v. Glacier Elec. Coop., Inc.*, 255 F.3d 1136 (9th Cir. 2001), in which the Ninth Circuit held that improper comments in a closing argument violated due process despite the fact that they were not objected to, is misplaced.

[16] *See* Dkt. #1080 at 41:18-42:4 (citing Final Jury Instructions, Dkt. #1006 at 86:10-17). Defendants do not argue that a Defendant must *personally commit*, or agree to personally commit, predicate acts in order to be held liable via conspiracy liability. Individuals who personally commit wrongful acts may be held directly liable for their own conduct.

the Defendant agreed to participate in the conspiracy with the *knowledge and intent* that at least one member of the racketeering conspiracy would intentionally commit, or cause, or aid and abet the commission of, two or more racketeering acts." Dkt. #1006 at 68:11-14 (emphasis added); *see also Baumer*, 8 F.3d at 1346 (citations omitted) ("[A] defendant who did not agree to the commission of crimes constituting a pattern of racketeering activity is not in violation of section 1962(d). . . . '[A] RICO conspiracy requires proof of an agreement to violate a substantive RICO provision.' . . .").

As explained in Defendants' motion, no reasonable jury could conclude that Plaintiffs met their burden to prove that Merritt, Lopez, Rhomberg, and/or Newman (1) knew about, (2) agreed with, (3) intended the commission of, and (4) cooperated or agreed to cooperate despite having knowledge about, the particular wrongful acts at issue. *See* Dkt. #1006 at 86:10-17. Plaintiffs failed to rebut this fact, and instead made two arguments that are without merit.

First, Plaintiffs assert, *without citation to any evidence*, that "carrying out the goals of the [Human Capital] Project required the production and transfer of fake IDs." Dkt. #1092 at 53:7-10. This is a reiteration of Plaintiffs' previous argument that certain Defendants "should have known, if they did not actually know, that the conspiracy required the use of fake IDs." Dkt. #662 at 17:12-13. What matters, however, is not Plaintiffs' after-the-fact assertion that these Defendants *should have* known that Daleiden (or someone else) would produce and/or transfer fake IDs during the course of the project. To the contrary, Plaintiffs were required to prove—*but failed to prove*—that Merritt, Lopez, Rhomberg, and/or Newman *knew* (not should have known) *and intended* that Daleiden (or anyone else) would intentionally commit two or more violations of the federal identity theft statute. *See* Dkt. #1006 at 68:11-14. Plaintiffs cited no evidence that any of these Defendants knew anything about the alleged predicate acts, and Defendants' motion cites voluminous evidence proving that they had no such knowledge. In sum, even if one assumed for the sake of argument that Daleiden and/or the person who he obtained IDs from actually violated the identity theft law, there is no evidentiary basis for holding Merritt, Lopez, Rhomberg, and/or Newman liable via a RICO conspiracy theory.

Second, Plaintiffs argue against a point that Defendants *do not make*: that a Defendant must subjectively know that what he or she is doing, or has agreed to take part in, is actually illegal. Dkt. #1092 at 53:13-28. Rather, Defendants' argument is that one cannot prove an unlawful conspiracy by

merely proving an agreement to commit a *general type* of act that, depending on the circumstances, may or may not be legal. Civil conspiracy is an agreement "to commit a *wrongful* act," with the individuals involved each having actual knowledge that *a particular wrongful* act is going to be committed, and actual agreement and intention that *the particular wrongful* act would be committed. Dkt. #1006 at 86:5-6, 86:10-17. To illustrate, there are legal and illegal ways to acquire a Porsche. Merely proving that a defendant knew that another person intended to acquire a Porsche, and agreed (to some unspecified degree) to help him do so, is not sufficient evidence of a conspiracy to commit auto theft or extortion. In order to establish conspiracy liability, there must be evidence that the defendant knew *enough details about the specific means* by which the person would go about acquiring a Porsche (*e.g.*, that the person planned to use violence or extortionate threats against the owner of a Porsche) in order to prove that the defendant *knew* that the other person's acquisition of the Porsche would be *wrongful*. This is especially true when the defendant has past experience using *legal* means to acquire Porsches.

Here, agreeing to be associated with an investigation that would utilize undercover recordings, without more, is not proof of an agreement to commit a *wrongful* act. Plaintiffs could not meet their burden of proof by, for example, merely showing that a Defendant knew and agreed that an undercover investigation would take place, or knew and agreed that some undercover recordings would occur, because undercover investigations and recordings routinely occur and *are often legal*. Rather, Plaintiffs were required to prove—but failed to prove—that Merritt, Lopez, Rhomberg, and/or Newman each (a) were provided with enough *details* about the *specifics* of how the investigation was being carried out *by other individuals* to know that the investigation would be conducted in such a way that would necessarily be tortious, illegal, or otherwise wrongful, (b) nevertheless agreed with the commission of those wrongful acts and intended that they be committed, and (c) cooperated or agreed to cooperate despite having knowledge that another person would be committing the wrongful acts. Dkt. #1006 at 86:10-17.

As discussed in Defendants' motion, voluminous evidence established that Daleiden kept many details of what he was doing to himself as a matter of operational security and, as a result, the other individual Defendants were not aware of a variety of acts that are alleged to be wrongful. *See,*

*e.g.,* Dkt. #1080 at 43:22-28, 44:7-8, 46:16-47:12, 49:11-16, 49:27-50:6, 51:10-14, 52:22-57:7 (and evidence cited therein). Additionally, none of the early documents sent to Rhomberg and Newman that discussed concepts for the investigation, Exh. 67, 123, 24, included plans or proposals for the commission of illegal or other wrongful acts. The evidence further establishes that Daleiden went to great lengths to attempt to comply with the law, and other Defendants believed that Daleiden was very careful about complying with the law. *See, e.g.,* Trial Tr. at 513:2-8, 831:18-21, 2459:14-17, 2585:10-2587:9, 2666:25-2667:2. In sum, Plaintiffs failed to prove that Merritt, Lopez, Rhomberg, and/or Newman had the requisite knowledge about others' wrongful actions, agreement, intention, and cooperation to establish conspiracy liability.

## IX. Lopez and Merritt are not liable on any claim.

Contrary to Plaintiffs' groundless assertion (Dkt. #1092 at 65), by joining in the arguments of all their co-Defendants both Lopez and Merritt emphatically deny that Plaintiffs presented sufficient evidence to prove liability on *any* claim. *See, generally,* Dkt. #1080. Merritt and Lopez address separately only RICO and civil conspiracy because the facts relating to these two defendants on those two claims are uniquely insufficient.

### A. RICO.

Defendants Lopez and Merritt were not involved in any way in the "operation and management" of any RICO enterprise through the production and/or transfer of false identifications. Dkt. #1006 at 58, 61. The facts not only preclude a finding that they were "upper management," as Plaintiffs suggest (Dkt. #1092 at 54); they are also insufficient to establish any involvement on their part beyond simply performing specific job functions at the direction of their employer, with little or no knowledge of or assent to the actions of others involved in the Human Capital Project. *See* Dkt. #1080 at 43-44. The facts certainly do not establish that they were directly involved in the production or transfer of false identifications nor that they had sufficient knowledge of others' actions with false identifications to support finding them liable for a RICO conspiracy. *Id.* Lopez and Merritt are entitled to judgment as a matter of law on RICO liability.

Plaintiffs suggest, again, that Merritt's *use* of her assigned false identification constituted predicate acts of "transfer," citing a single citation in a Ninth Circuit case. Dkt. #1092 at 55. Merritt's

1   *use* of an identification is irrelevant, however, because this Court dismissed Plaintiffs' "possession"

2   and "use" false identification claims early on in this case. Dkt. #124 at 11-12. As previously briefed,

3   the federal identity fraud statute carefully distinguishes between "possession," "use," "transfer," and

4   "production" of false identifications, and only acts of "production" and "transfer" constitute predicate

5   acts in this case. Merritt's alleged using, presenting or showing an identification does not constitute

6   "transfer" of an identification under that statute. *See* Dkt. #659 at 13-14.

7       **B.      Civil Conspiracy: Agent Immunity.**

8       Moreover, Lopez and Merritt cannot be liable for conspiring with their own employer, under the

9   agent immunity rule. Whether there are others involved in the alleged conspiracy to whom that rule may

10  not apply is irrelevant; Merritt and Lopez are not liable in conspiracy for actions they took on behalf of

11  their employer, an alleged co-conspirator. Nor are exceptions to the agent immunity rule carved out for

12  attorneys who exceed the scope of their agency "for their own financial gain" applicable to Merritt and

13  Lopez. *See* Dkt. #1092 at 66 (citing cases denying agent immunity to attorneys who participate in a client's

14  fraud for their own financial gain). Merritt and Lopez did not exceed the narrow scope of their duties as

15  employees nor receive any financial benefit from the activities of their alleged co-conspirators beyond

16  their ordinary wages. By classic application of the agent immunity rule, they cannot be liable as co-

17  conspirators with their employer. Dkt. #1080 at 45.

18      Plaintiffs further mistakenly suggest that "agent immunity" does not apply in cases involving

19  more than a single corporation and its employees. Dkt. #1092 at 66-7. The case they cite states only

20  that agent immunity applies "with particular force" in cases involving only a single corporation and

21  its own employees. *Black v. Bank of America*, 35 Cal. App. 4th 1, *5-*6 (1990). It is just as true of

22  Merritt and Lopez as it was of the employees in that case that they were mere employees, who "carried

23  out but did not create [corporate] policies," and were therefore incapable of conspiring with their own

24  employer. *Id.* at *6 n.4.

25  **X.   Plaintiffs Presented Insufficient Evidence that Rhomberg Was Liable.**

26      **A.      RICO.**

27      For Rhomberg to be liable as a conspirator under RICO, Plaintiffs had to show that "for at

28  least two specific acts of racketeering, [Rhomberg] either committed those particular predicate acts

1  or conspired for someone to commit those particular predicate acts." Dkt. #1006 at 63. There was no
2  evidence that he did either.

3  Disregarding all exculpatory testimony from Daleiden and Rhomberg, Plaintiffs' evidence as
4  to all counts indicated that 1) Rhomberg knew about and agreed to be involved in a plan involving
5  actors working undercover to surreptitiously record abortion providers and others;[17] 2) that the
6  operation would involve going to industry conferences; 3) that Rhomberg learned no later than April
7  2014 that the undercover operation would involve using a fictional front company, BioMax; 4) that
8  he knew shortly after the fact that Daleiden had lunch with a Planned Parenthood abortion provider
9  in his persona as a BioMax representative; and 5) that he knew as it transpired in April 2015 that
10  Daleiden was at the PPGC facility using an assumed name.

11  These facts, taken separately or together, are insufficient to show that Rhomberg even knew
12  about fake IDs, much less that he conspired with Daleiden in the production of fake IDs. Plaintiffs
13  leap from Rhomberg's knowledge of actors and pseudonyms to him knowing about production of
14  fake IDs, as if no further evidence was needed. Plaintiffs then leap from fake IDs to fake IDs in
15  violation of federal law. Under this Court's MSJ ruling, for Rhomberg to conspire with Daleiden in
16  committing a violation of 18 U.S.C. §1028, Rhomberg would have had to know about 1) Daleiden's
17  use of the Internet to find a source, 2) the use of the IDs in different states, and/or 3) the defendants'
18  intent to "defraud" entities operating in interstate commerce. Dkt. #753 at 25:11-13; 26:20-24.
19  Plaintiffs make no effort to argue that the jury could "reasonably infer" that Rhomberg knew that
20  Daleiden would use or did use the Internet to find a source for the IDs. The first use of the IDs outside
21  of California occurred at the Forum meeting in October 2014, about a year after the IDs were made.
22  The Court has not explained whether this later use retroactively converted their *production* into a
23  federal crime, but in any event, Plaintiffs have not pointed to evidence from which the jury could

24

25  [17] Plaintiffs misrepresent the contents of an e-mail from Rhomberg to Daleiden as "claiming credit
26  for all the work on the project" and referring to Daleiden and himself as the two decision-makers for
   the project. Dkt. 1092 at 57:17-22. The e-mail in question was written in the post-investigation period,
27  and concerned strategies and decisions for *video releases*. Notably, Rhomberg takes credit only for
   his "knowledge and good intentions" over the past two and half years, not for any executive role
28  during the active phase of the investigation.

"reasonably infer" that Rhomberg knew any IDs would be used in other states, as there is no evidence that Rhomberg knew anything about the PPFA conferences or the 2015 NAF conference. As to affecting interstate commerce via an intent to "defraud," Plaintiffs presented no evidence that Rhomberg intended to inflict any financial losses on Planned Parenthood other than through publication of their wrongdoing.

**B. Fraud.**

This Court ordered the Plaintiffs to identify "the specific written or oral statements they believe are actionable misrepresentations, why each was false, why each was material, who reasonably relied on each, and what recoverable damage was caused from one or more misrepresentations to specific plaintiffs." Dkt. 753 at 73:18-21. When Rhomberg points out that there was no evidence that he even knew about almost all of the specified communications set forth in the jury instructions as forming the basis for fraud liability (Dkt. #1080 at 48:17–49:2), Plaintiffs respond with one or two items (PPGC phone call and BioMax presented as front company to NAF meeting attendees), contending they support the judgment against Rhomberg for every Plaintiff, for every form of damage. Dkt. #1092 at 59:11-17. It was exactly this sort of broad-brush approach that the court said was "wholly insufficient" to support summary judgment. (Dkt. #753 at 73:6-7). It is likewise insufficient to support the jury's verdict that Rhomberg is liable to any Plaintiff, and particularly to PPPSGV or PPOSBC for personal security damages, or to PPFA for infiltration damages.

As to promissory fraud, Plaintiffs point to no evidence that Rhomberg was aware of either the PPFA exhibitor agreements or the PPGC contracts, much less that he had any knowledge of their terms, much less that he had any knowledge of the specific terms (e.g., exhibits must be educational) that form the basis of the false promise claim.

**C. Recording.**

The jury found Rhomberg liable for conspiring to illegally record 43 conversations. Plaintiffs bore the burden of adducing evidence, for each recording on which liability is predicated, that Rhomberg knew that the activity of surreptitious recording was going to be carried out in such jurisdictions and under such circumstances as would be make such activity an unlawful act in the

relevant jurisdiction. Rhomberg was not ignorant of the law. Rather, there is no evidence that he knew *the fact* that recordings were going to take place in Florida or Maryland.[18] To the extent he had foreknowledge of the PPGC site visit, he would also have known that recording with one party's consent was legal under Texas law.

As to the meeting with Dr. Nucatola in California, Rhomberg also knew that the meeting took place in a restaurant, *i.e.*, a location where participants "may reasonably expect that the communication may be overheard." Calif. Pen. Code § 632(c). To the extent Mr. Rhomberg knew of any recordings at conferences, even if he knew they were in all-party consent states, he would also know that recordings at conference are much more likely to take place in large groups settings (as in fact was the case here; see e.g., Exh. 5218, 5840) than in intimate one-on-one conversations.

Plaintiffs are not entitled to a default assumption that every surreptitious recording is illegal as a substitute for actual evidence that Rhomberg knew that other defendants were recording in particular places and surroundings that would render such recordings illegal. "The context of each recording must be analyzed based on its specific facts." Dkt. 753 at 83:1-2.

### D. Trespass.

Plaintiffs do not dispute that there is no evidence that Rhomberg knew that the other defendants went to any PPFA conference or to the PPRM facility. Rather, they argue that they can bootstrap liability for trespass at PPGC into all the other trespass counts. However, Plaintiffs failed to put on sufficient evidence to show that Rhomberg "was aware that another Defendant or person planned to commit" the wrongful act" that is the subject of the conspiratorial agreement, and "agreed with the other Defendant or person and intended that the wrongful act be committed." Dkt. #1006 at 86:10-17.

---

[18] Ironically, Plaintiffs point to the February 2013 project proposal, Exh. 67, mentioning the annual NAF meetings as evidence the Rhomberg knew that Daleiden would be recording in California and Maryland. Dkt. #1092 at 6161:11-14. Plaintiffs have apparently forgotten that part of NAF's "gold standard" security is to conceal the location of its annual meetings. Trial Tr. at 877:13-22. Thus, there was no way for Mr. Rhomberg to know from the project proposal that Daleiden would be recording in California and Maryland.

**XI.** **No reasonable jury could find that Newman was liable on any cause of action.**

    **A.** **Inferences are not evidence, nor do they eliminate the need for evidence.**

Contrary to Plaintiffs' assertion, Dkt. 1092 at 63:2-9, Defendants do not argue that there is a blanket rule that valid adverse inferences must be completely disregarded in considering whether a jury's verdict was supported by sufficient evidence. Rather, there are three reasons that, in this case, the inferences should be given little to no weight. First, since the inferences were improper for the reasons discussed previously, they should be disregarded. Second, although the inferences may not be considered with respect to California claims, Trial Tr. at 3459:10-13, 3464:4-6, Plaintiffs repeatedly relied upon the inferences in their arguments that Newman should be liable for fraud and punitive damages, Dkt. #1092 at 18:12-15, 65:27-66:2, 66:22-24, both of which are based in large part on events occurring in California. Plaintiffs must point to *evidence* for these claims.

Third, an adverse inference is not *itself* evidence.[19] The jury was instructed that:

- "you must decide the case solely on the evidence before you," Dkt. #1006 at 7:6, 7:11;
- "[t]he evidence you are to consider in deciding what the facts are consists of: 1. the sworn testimony of any witness; 2. the exhibits that are admitted into evidence; 3. any facts to which the lawyers have agreed; and 4. any facts that I may instruct you to accept as proved," Dkt. #1006 at 12:1-6; and
- "[a]ny inference you may draw [from invocation of the Fifth Amendment] should be based upon all of the facts and circumstances in this case as you may find them." Trial Tr. at 3459:22-24; Dkt. #1006 at 31:12-13.

As such, with respect to non-California claims, Plaintiffs cannot simply rely on the inferences; they must point to substantial *evidence* that, whether standing alone or taken in conjunction with inferences, supports the verdict against Newman. *Baxter*, 425 U.S. at 317-18 (an inference "standing alone and without regard to the other evidence" "in and of itself is insufficient to support an adverse decision"). Plaintiffs failed to do so.

    **B.** **No reasonable jury could find Newman liable on any claim.**

It was not Newman's burden to prove that he did *not* know about, agree with, intend, and cooperate or agree to cooperate with, the various allegedly wrongful acts at issue (*e.g.*, the alleged

---

[19] *See, e.g.,* Inference, Ballentine's Law Dictionary (2010) (emphasis added) (an inference is "a permissible deduction *from the evidence before the court* which the jury may accept, reject, or accord such probative value as they desire. . . .").

1   RICO predicate acts, the alleged trespasses). Rather, it was Plaintiffs' burden to prove, with evidence,

2   that Newman *did*, in fact, know about, agree with, intend, and cooperate or agree to cooperate with,

3   those particular wrongful acts. Dkt. #1080 at 41:18-42:4; Dkt. #1006 at 86:10-17.

4       Voluminous trial testimony and other evidence established that Newman had no knowledge

5   of, or involvement in, almost all of the relevant events that Plaintiffs assert provide a basis for their

6   causes of action. Dkt. #1080 at 52:2-57:7. Rather than addressing any, or all, of the particulars of this

7   testimony, Plaintiffs categorically dismiss all of it as "self-serving testimony." Dkt. #1092 at 63:21.

8   Plaintiffs fail to explain, however, how it was *self*-serving for Daleiden and Rhomberg to explain that

9   Newman knew virtually nothing about the details of the investigation, and *self*-serving for Merritt

10  and Lopez to explain that they did not know Newman. Additionally, Plaintiff's suggestion that

11  Daleiden could not remember the subject matter of his conversations with Newman and Rhomberg,

12  Dkt. #1092 at 63:16-18, is contradicted by Daleiden's detailed testimony about what those

13  conversations did, and did not, cover. Trial Tr. at 2057:22-2058:20, 2455:3-2456:20, 2648:9-2650:15;

14  *cf.* Trial Tr. at 716:21-718:22. Also, it is one thing for Plaintiffs to argue that the jury was free to

15  *disregard* the testimony of Daleiden and Rhomberg about the limited scope of their occasional phone

16  conversations with Newman; it is quite another thing, however, for Plaintiffs to assert that the jury

17  was free to *speculate* about the content of those conversations, such as by *speculating* that Daleiden

18  told Rhomberg and Newman about the production and transfer of fake IDs on those calls. Dkt. #1092

19  at 64:26-27. Speculation is not *evidence*, substantial or otherwise.

20      Moreover, the testimony establishing that Newman did not know about, and was not involved

21  with, the details of how the investigation was being conducted is corroborated by the emails and other

22  documentary evidence *relied upon by Plaintiffs*. Daleiden first met Newman in late 2012 to discuss

23  concepts for an undercover project, Trial Tr. at 2054:1-3, and by May 2015, Daleiden's focus had

24  shifted from obtaining information to finalizing the videos for publication. Exh. 37. During the two

25  and a half years that Daleiden led the investigation, he sent countless emails and documents to a

26  variety of people associated with CMP and BioMax about all aspects of the investigation, as well as

27  Plaintiffs, conference organizers, and others. *See, e.g.,* Exh. 243, 414, 432, 549.

28      Among this thirty-month flood of emails, Plaintiffs point to only *two* emails that Daleiden

sent to Newman: a January 28, 2013 "very bare-bones" outline of "the fetal trafficking expose that I want to do" (Exh. 123), and a March 20, 2013 project proposal (Exh. 24). That's it. Newman was not copied on, or forwarded, the voluminous email trail through which Daleiden orchestrated all aspects of the investigation in 2013, 2014, and 2015. Newman did not receive additional emails about the project until May 2015, *after the investigative process had concluded*, as Daleiden was finalizing videos for publication. Exh. 37. This fact, coupled with the corroborating testimony discussed previously, conclusively established that Newman was not knowledgeable about, or a participant in, the RICO predicate acts, fraud, trespasses, and recording statute violations alleged by Plaintiffs.

None of the evidence cited by Plaintiffs supports an alternative conclusion:

- Daleiden's January 2013 outline mentioned, without detail, things such as "conference footage/interviews," "gotcha tapings," and "park domain and temporary website for fake company," but the fact that Daleiden's to-do list included reviewing "legal boundaries for moles" indicated that Daleiden intended to use *legal* means for the project. Exh. 123 at 1.
- Daleiden's March 2013 project proposal stated that "[t]he foundational goal of the project" was to "[c]atch fetal traffickers, especially Planned Parenthood clinics, violating laws, regulations and common decency." Exh. 24 at 11. Although the proposal stated that "[t]he proposed project will use a variety of innovative undercover techniques," no details were given about such techniques besides the fact that there would be "undercover footage from real-life moles and orchestrated 'stings.'" Exh. 24 at 1, 10.[20]
- In July 2015, Operation Rescue sent out an email that repeatedly identified Daleiden as the "Project leader" and "Project Manager" for the investigation, while repeatedly listing Newman's title as President of Operation Rescue. Exh. 28 at 3, 5. The email stated that "Newman serves on the Board of *Daleiden*'s Center for Medical Progress. During this investigation, Newman advised Daleiden, providing consultation services and material support." Exh. 28 at 3 (emphasis added). Newman's statement that he gave Daleiden advice is consistent with the testimony establishing that, although Daleiden *received* information and advice from numerous sources, he greatly limited the information that he *gave* to others about the details of the investigation. *See, e.g.,* Trial Tr. at 2064:23–2065:10, 2455:3–2456:20.
- In July 2015, Newman sent emails objecting to the fact that "a lot of people" who had no connection to CMP or Daleiden were "participating in speaking on the subject" of CMP's videos. Exh. 28 at 1. In this context, Newman said that "this originated from our office alone" and was an "undercover investigation by OR," referring to Newman's 2012 meeting with Daleiden at Operation Rescue's office. Exh. 28 at 1; Trial Tr. at 2050:23-25, 2057:10-15.
- In July 2015, CMP's board declined Neil Patel's offer to buy the right to publish CMP's videos. Trial Tr. at 760:12-13, 760:22-761:14; Exh. 39. In response, Newman suggested that

---

[20] Newman was *not* listed underneath the heading "THE TEAM"; he was listed under the heading of "Consultant." Exh. 24 at 12. Also, Plaintiffs clearly have no basis for asserting that this *March 2013* proposal's general reference to the prominence of NAF conferences, Exh. 24 at 5, somehow put Newman on notice at that time that the *2014* NAF conference would be held *in San Francisco*, and that Daleiden would later decide to record at that San Francisco conference. Dkt. #1092 at 66:26-28.

31

Defs.' Reply ISO Post-Judgment Motions
– 3:16-CV-00236 (WHO)

Patel could instead fund Newman's anti-abortion work with Operation Rescue: "I have been working to shut down abortion mills for years. This was only one of my plans. With the proper funding, we can finish off PP and end abortion within a few years. . . ." Exh. 39 at 1.

Several exhibits relied upon by Plaintiffs merely show that Newman advocates for the use of *lawful* means to oppose abortion, such as legislative changes, investigations, and prosecutions of those engaged in illegal activities; these exhibits do not rebut the fact that Newman did not know of, intend, or agree with any *unlawful* means purportedly used by any other Defendant in this case.

- Newman's book, *Abortion Free*, discusses the use of hidden video cameras by individuals who are good at role-playing to conduct stings at abortion clinics in order to document illegal activities. Exh. 30. Such recordings would be lawful in Newman's home state. *See* Kan. Stat. § 21-6101. The book does *not* discuss the acquisition or use of fake IDs, creating fake companies, entering contracts, Daleiden, CMP, or BioMax. Exh. 30.
- Newman's irrelevant theological study, which the Court excluded under FRE 403, merely argued that the law should change in the United States so that abortion is treated the same as murder. Dkt. #956 at 24:24-27:11.
- After the investigation was over and CMP had released its first video, Newman said "[t]his is about Planned Parenthood. Putting them in jail. Defunding them. Taking down their empire." Exh. 106 at 1. Similarly, Newman stated that this lawsuit and the related *NAF* lawsuit would not break his "willpower to destroy [Planned Parenthood's] death machine" by "exposing the Abortion Cartel's buying and selling babies bodies and body parts." Exh. 47. Newman's expressed hope that the videos would result in legislative and executive government action against those who committed crimes does not indicate that Newman had any knowledge of, or involvement in, the details of the investigation while it was ongoing.

For the reasons stated herein and in Defendants' motion, there was no evidentiary basis for the jury to conclude that Newman knew about, and conspired to engage in, any *wrongful* conduct.

## C.    Response to Plaintiffs' claim-specific arguments.

The lack of any evidentiary support is particularly glaring for the RICO claim. It is undisputed that, prior to the release of the videos: (1) Newman was never told "that [Daleiden was] going to use any fake IDs during the undercover investigation"; (2) Daleiden did not "discuss the concept of using fake IDs" with Newman; (3) Daleiden did not "share any information with Rhomberg or Newman about the IDs that were going to be used during the investigation"; and (4) Daleiden did not "tell Rhomberg or Newman that [he] had made or were acquiring any fake IDs."[21] Nor can Plaintiffs rely upon any adverse inference concerning Newman's purported knowledge about the IDs, as Plaintiffs

---

[21] Trial Tr. at 2648:9–2650:15; *cf.* Trial Tr. at 720:20-721:11, 723:23-725:25, 726:23-727:14, 728:4-729:2, 733:2-10, 832:2-833:7, 2648:9-2651:11.

32

Defs.' Reply ISO Post-Judgment Motions
– 3:16-CV-00236 (WHO)

withdrew their request for an adverse inference that "Troy Newman knew that David Daleiden and Susan Merritt obtained and used fake driver's licenses in the names of Robert Sarkis and Susan Tennenbaum in order to infiltrate Planned Parenthood and NAF conferences and facilities." Dkt. #956-1 at 7.

Nothing in Plaintiffs' brief changes the fact that the assertion that Newman knew about, agreed with, intended, and cooperated or agreed to cooperate with, the unlawful production or transfer of IDs is supported only by mere speculation. As discussed previously, Newman's *Abortion Free* book, and the two emails that Newman received from Daleiden at the outset of the investigation, do not mention the production or transfer of fake IDs as an investigatory tactic. Exh. 30, 123, 24.[22] In fact, the adverse inference that asserts that Newman understood that the same methods stated in his book were being used by Daleiden, Trial Tr. at 3462:3-5, *supports* the conclusion that Newman did not know that fake IDs would be produced or transferred. Also, while Plaintiffs rely on the fact that Newman had occasional phone calls with Daleiden and Rhomberg, they fail to mention the unrebutted testimony that *IDs were never discussed on those calls*. *See, e.g.,* Trial Tr. at 2648:9-2650:15.

Concerning the other claims, *Gilbrook v. City of Westminster*, 177 F.3d 839 (9th Cir. 1999), stands for the proposition that, if the plaintiff can prove that the defendant agreed "to accomplish some unlawful objective" through an "unlawful arrangement," the defendant "need not know the exact details of the plan" in order to be held liable. *Id.* at 856. That principle is not relevant here, however, because Plaintiffs failed to prove that Newman agreed to any "unlawful arrangement" in pursuit of some "unlawful objective." *See id.* Defendants' motion cited numerous cases that stand for the proposition that agreeing to have some affiliation with an undercover investigation *does not* give rise to conspiracy liability absent a showing that the individual knew of, and approved of, the use of *unlawful* investigatory tactics. Dkt. #1080 at 63:12-17, 63:25-28. Plaintiffs ignored all of these cases.

---

[22] Plaintiffs repeatedly assert that Newman could have known about the *use* of fake IDs. Dkt. #1092 at 64:16-19, 65:2-5. Putting aside the fact that there is no evidence to support that claim, as discussed in the RICO claim section, it is the *production or transfer* of IDs that is relevant, and there is no evidence that Newman agreed to a plan that called for ID production or transfer.

As explained in applicable case law and the jury instructions, "the conspiring defendants must have actual knowledge *that a tort is planned* and concur in the scheme *with knowledge of its unlawful purpose. . . ." Navarrete v. Meyer*, 237 Cal. App. 4th 1276, 1292 (2015) (emphasis added); Dkt. #1006 at 86:10-17. Plaintiffs failed to make that showing with respect to Newman.[23]

Further, as the Court has already recognized, Newman cannot "be held indirectly liable for the breaches of contract under the Conspiracy cause of action." Dkt. #753, at 43, n.39. Contrary to Plaintiffs' suggestion, Dkt. #1092 at 65:15-66:3, "a person who is not a party to a contract cannot be bootstrapped into a conspiracy tort."[24] As such, Newman, who was not a party to any contract, nor was he found liable for breaching any contract, is entitled to judgment concerning the "False Promise Fraud" subparts of the fraud claim, which were based solely upon breaches of contracts.

### D. No reasonable jury could find Newman liable for punitive damages.

The project proposal sent to Newman that Plaintiffs heavily rely on, Exhibit 24, outlined in considerable detail horrific, and indisputably criminal, activities occurring within the abortion and fetal tissue procurement industries. The extent to which CMP's investigation (and the ensuing Congressional investigations) ultimately corroborated the assertions made in the project proposal years later, while hotly contested by the parties, is irrelevant to the question of whether Newman's decision to have some affiliation with an investigation into those horrific allegations of criminal conduct was so grossly improper that a punitive damages award is warranted. There is no legally defensible basis for the punitive damages award against Newman.

### REPLY RE: MOTION TO ALTER OR AMEND JUDGMENT

Plaintiffs failed to address the holding in *Nintendo of Am., Inc. v. Dragon Pac. Int'l* that recovery of both statutory and actual damages is only justified when "two separate violations" fall under different legislation. 40 F.3d 1007, 1011 (9th Cir. 1994). Nintendo's claims were not "based on the same wrongful act," so damages could be awarded under both claims. *Id.* at 1010-1011. Here,

---

[23] Also, Plaintiffs provided no authority in response to Newman's argument that he is entitled to judgment as a matter of law on the trespass and recording claims since he was *expressly excluded* from them in the Amended Complaint. Dkt. #59.

[24] *Singh v. U.S. Bank (In re Singh)*, Case No. 10-42260-E-13, 457 B.R. 790, 805 (E.D. Cal. 2011) (citing *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503, 514 (1994)); *see also* Dkt. #987 at 2; Dkt. #595, at 20 & n.17.

1 Plaintiffs have asserted that one set of intertwined wrongful acts supports various claims, and the jury
2 repeatedly awarded identical damages amounts under multiple claims. Awarding Plaintiffs statutory
3 damages on top of the RICO damages constitutes a double recovery in these circumstances.

4     Furthermore, Plaintiffs should not receive damages under both federal and state recording
5 laws for the same recordings. The civil principle of double recovery is not the same as the double
6 jeopardy rule. Dkt. #1092 at 68. This Court recognized the principle of double recovery in *Peake v.*
7 *Chevron Shipping Co.,* where the plaintiff asserted both a contract claim and a tort claim as a result
8 of the same factual situation, holding that "[d]uplicate recovery of damages is barred, and neither
9 double recovery of the same item of loss nor double liability for the same item of injury is permitted."
10 No. C 00-4228 MHP, 2004 U.S. Dist. LEXIS 15564 at *8 (N.D. Cal. Aug. 9, 2004) (internal citation
11 omitted). Thus, Plaintiffs should not receive double recovery for the same recordings.

12     Moreover, Plaintiffs cannot recover punitive damages on the claims for which they elected
13 statutory damages or that are duplicative of any trebled damages. Neither the verdict form nor the
14 judgment differentiated between the state claims and the punitive relief, but instead only listed the
15 award by the Defendant's name. Dkt. #1011 at 42-43; Dkt. #1073 at 46-47; Dkt. #1074 at 9. The jury
16 could have made determinations, in whole or in part, on California conduct, so the punitive damages
17 award must meet the requirements of California as laid out in Dkt. #1080 at 66-67. With respect to
18 any other points or arguments, Defendants stand on what was said in their post-judgment motions
19 and previously herein.

20                              **REPLY RE: MOTION FOR NEW TRIAL**

21     Plaintiffs did not provide any argument or authority concerning why the "Court did not abuse
22 its discretion in excluding prejudicial and cumulative evidence on the same topic." Dkt. #1092 at 70.
23 There was substantial prejudice since these relevant video clips would have explained Defendants'
24 motive for participating in the investigation, that their suspicions were reasonable, and that Plaintiffs
25 lacked a reasonable expectation of privacy. *Id*; *see, e.g.,* Dkt. #878 & Dkt. #879. Defendants were
26 unfairly prejudiced and could not fairly defend themselves due to the erroneous evidentiary rulings.
27 With respect to any other points or arguments, Defendants stand on what was said in their post-
28 judgment motions and previously herein.

Respectfully submitted on June 29, 2020,

/s/ Charles S. LiMandri
Charles S. LiMandri (CA Bar No. 110841)
Paul M. Jonna (CA Bar No. 265389)
Jeffrey M. Trissell (CA Bar No. 292480)
B. Dean Wilson (CA Bar No. 305844)
Milan L. Brandon (CA Bar No. 326953)
FREEDOM OF CONSCIENCE DEFENSE FUND
P.O. Box 9520
Rancho Santa Fe, CA 92067
Tel: (858) 759-9948
Facsimile: (858) 759-9938
cslimandri@limandri.com
pjonna@limandri.com
jtrissell@limandri.com

*Attorneys for Defendants the Center for Medical Progress,
BioMax Procurement Services, LLC, Gerardo Adrian Lopez,
and David Daleiden*

/s/ Harmeet K. Dhillon
Harmeet K. Dhillon (CA Bar No. 207873)
Gregory R. Michael (CA Bar No. 306814)
Dorothy C. Yamamoto (CA Bar No. 306817)
DHILLON LAW GROUP INC.
177 Post Street, Suite 700
San Francisco, CA 94108
415-433-1700
415-520-6593 (fax)
harmeet@dhillonlaw.com
gmichael@dhillonlaw.com

Denise M. Harle (CA Bar No. 275561)
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd., NE
Suite D1100
Lawrenceville, GA 30043
Tel: (770) 339-0774
dharle@ADFlegal.org

*Attorneys for Defendants the Center for Medical Progress,
BioMax Procurement Services, LLC, and David Daleiden*

/s/ Thomas Brejcha

Thomas Brejcha, *pro hac vice*
Peter Breen, *pro hac vice*
Matthew F. Heffron, *pro hac vice*
THOMAS MORE SOCIETY
309 W. Washington St., Ste. 1250
Chicago, IL 60606
Tel: (312) 782-1680
Facsimile: (312) 782-1887
tbrejcha@thomasmoresociety.org
pbreen@thomasmoresociety.org
mheffron@thomasmoresociety.org

*Attorneys for Defendant David Daleiden*


/s/ Edward L. White III

Edward L. White III, *pro hac vice*
/s/ Erik M. Zimmerman

Erik M. Zimmerman, *pro hac vice*
John A. Monaghan, *pro hac vice*
Christina A. Stierhoff, *pro hac vice*
AMERICAN CENTER FOR LAW & JUSTICE
3001 Plymouth Rd., Ste. 203
Ann Arbor, MI 48105
Tel: (734) 680-8007; Fax: (734) 680-8006
ewhite@aclj.org
ezimmerman@aclj.org
jmonaghan@aclj.org
cstierhoff@aclj.org

Vladimir F. Kozina; SBN 95422
MAYALL HURLEY, P.C.
2453 Grand Canal Blvd.
Stockton, CA 95207
Tel: (209) 477-3833; Fax: (209) 473-4818
VKozina@mayallaw.com

*Attorneys for Defendant Troy Newman*


/s/ Catherine Short

Catherine W. Short (CA Bar No. 117442)
Corrine G. Konczal (CA Bar No. 320238)
LIFE LEGAL DEFENSE FOUNDATION
Post Office Box 1313
Ojai, CA 93024-1313
Tel: (707) 337-6880

kshort@LLDF.org
konczallaw@gmail.com

Michael Millen (CA Bar No. 151731)
ATTORNEY AT LAW
119 Calle Marguerita Ste. 100
Los Gatos, CA 95032
Tel: (408) 871-0777
Facsimile: (408) 866-7480
mikemillen@aol.com

*Attorneys for Defendant Albin Rhomberg*


/s/ Horatio G. Mihet
Horatio G. Mihet, *pro hac vice*
Liberty Counsel
hmihet@lc.org
P.O. Box 540774
Orlando, FL 32854
(407) 875-1776

Nicolaie Cocis (CA Bar # 204703)
Law Office of Nic Cocis and Associates
nic@cocislaw.com
38975 Sky Canyon Dr., Suite 211
Murrieta, CA 92563
(951) 695-1400

*Attorneys for Defendant Sandra Susan Merritt*


**Attestation Pursuant to Civ. L.R. 5.1(i)(3)**

As the filer of this document, I attest that concurrence in the filing was obtained from the other signatories.

/s/ Erik M. Zimmerman
Erik M. Zimmerman
*Counsel for Defendant Troy Newman*