1
2
3
4
5
6
7
8
9
10
11
12

United States District Court
Northern District of California

13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

PLANNED PARENTHOOD
FEDERATION OF AMERICA, INC., et al.,

Plaintiffs,

v.

CENTER FOR MEDICAL PROGRESS, et al.,

Defendants.

Case No. 16-cv-00236-WHO

**ORDER ON POST-TRIAL MOTIONS**

Re: Dkt. No. 1080

Following a five-week trial concerning defendants' targeting of plaintiff Planned Parenthood Federation of America (PPFA) and its affiliates through surreptitious recording of plaintiffs' staff members, the jury returned a verdict in favor of plaintiffs on November 15, 2019. Based on that verdict and on my findings of fact and conclusions of law supporting plaintiffs' Unfair Competition claim and injunctive relief, I entered judgment on April 29, 2020. Dkt. No. 1074. Defendants then moved pursuant to Rules 50(b), 59(a), and 59(e) for judgment as a matter of law, for a new trial, and to amend the Judgment. Defendants' Joint Post Judgement Motions (Mot.), Dkt. No. 1080 at 1.

Before the trial started, either at the motion to dismiss stage, on summary judgment, or *in limine,* I had ruled on each of the legal issues raised by defendants' current motions. They identify no reason to revisit those well-trod issues. And their challenges to the jury's verdict based on a purported lack of evidence are not well taken. The jury was entitled to reject defendants' testimony and rely on the documentary and other evidence to find in favor of plaintiffs. Sufficient evidence exists for each of the jury's determinations in the verdict. Defendants' motions are DENIED.

**BACKGROUND**

The factual background regarding the inception and execution of defendants' Human Capital Project (HCP) – the plan to target plaintiff Planned Parenthood Federation of America (PPFA) and its affiliates through surreptitious recording of plaintiffs' staff members in order to expose plaintiffs' conduct in the collection and transfer of fetal tissue that defendants contend was illegal or unethical – and the resulting infiltration of the PPFA and National Abortion Federation (NAF) conferences, plaintiffs' clinics, and the release of videos featuring surreptitious recordings of plaintiffs' staff has been thoroughly explicated in prior orders; I will not repeat it. *See* Dkt. Nos. 753, 1073.[1]

The legal theories underlying plaintiffs' claims against defendants have been repeatedly tested and, where appropriate, trimmed. Plaintiffs' theories were first tested on motions to dismiss and a related motion to strike under California's Anti-SLAPP law.[2] Those motions were decided in September 2016, in a 56-page opinion denying for the most part the motions to dismiss and the motion to strike. I did determine that plaintiffs could not assert mail or wire fraud predicate acts or acts based on 18 U.S.C. § 1028(a)(3) and §1028(a)(7) in support of their Racketeer Influenced and Corrupt Organizations (RICO) claims. *Id*. at 10–13. I also thoroughly reviewed defendants' arguments that their conduct was wholly protected under the First Amendment. *Id*. at 34–36. I rejected defendants' broad immunity argument but recognized that absent a defamation-type cause of action, plaintiffs could not seek reputational damages for "(lost profits, [or] lost vendors)

---

[1] Plaintiffs, as identified in the Final Preliminary Jury Instructions (Dkt. No. 850), are Planned Parenthood Federation of America (PPFA); Planned Parenthood: Shasta-Diablo, Inc. dba Planned Parenthood Northern California (PPNorCal); Planned Parenthood Mar Monte, Inc. (PPMM); Planned Parenthood of the Pacific Southwest (PPPSW); Planned Parenthood Los Angeles (PPLA); Planned Parenthood/Orange and San Bernardino Counties (PPOSBC); Planned Parenthood California Central Coast (PPCCC); Planned Parenthood Pasadena and San Gabriel Valley, Inc. (PPPSGV); Planned Parenthood of the Rocky Mountains (PPRM); and Planned Parenthood Gulf Coast (PPGC) and Planned Parenthood Center for Choice (PPCFC). Defendants, as identified in the Final Preliminary Jury Instructions, are the Center for Medical Progress (CMP), BioMax Procurement Services (BioMax), David Daleiden, Sandra Susan Merritt, Adrian Lopez, Albin Rhomberg, and Troy Newman.

[2] *See* California Code of Civil Procedure § 425.16, defining "strategic lawsuits against public participation" or SLAPP lawsuits.

United States District Court
Northern District of California

stemming from the publication conduct of defendants." *Id*. at 36. I concluded that "discovery will shed light on the nature of the damages for which plaintiffs seek recovery" and that "[r]esolution of this issue is more appropriately addressed at summary judgment or trial." *Id*.[3]

Defendants appealed my denial of the anti-SLAPP motion (based on the same arguments that defendants made in their motions to dismiss the California and other state law claims). In an order dated May 16, 2018, the Ninth Circuit affirmed the denial of the anti-SLAPP motion challenging the sufficiency of plaintiffs' state law claims. Dkt. Nos. 262, 309.

After extensive discovery – and the resolution of numerous discovery disputes by Magistrate Judge Donna M. Ryu – the case proceeded to summary judgment. In a 137-page opinion, I granted in part and denied in part defendants' motions for summary judgment and granted in part and denied in part plaintiffs' motion for summary judgment. Dkt. No. 753 (Summary Judgment Order). Of particular significance to the arguments raised by defendants in their post-trial motions, I again considered defendants' argument both that their conduct was fully protected by the First Amendment and that all of the damages plaintiffs sought were barred by the First Amendment. *Id*. at 15–22. I concluded, distilling various lines of Supreme Court precedent but also persuasive cases from the federal circuits and district courts, that plaintiffs' damages were limited but not barred. I found that plaintiffs would be entitled – assuming the jury agreed on the evidence submitted to them – to "intrusion" damages incurred to investigate and address the intrusion by defendants into the PPFA conferences and "security" damages incurred by plaintiffs with respect to their investigation of and subsequent measures taken to address the "targeting" of their staff members by defendants. *Id*. at 19-20.[4] I excluded numerous other categories of

_____

[3] I also noted that some of the damages pleaded by plaintiffs in their First Amended Complaint might fail on summary judgment or trial due to the hurdle of "proximate cause." *Id*. at 33–34.

[4] I agreed "with defendants that some of the damages plaintiffs seek here are more akin to publication or reputational damages that would be barred by the First Amendment. Others, however, are economic damages that are not categorically barred. Those that fall in the latter category result not from the acts of third parties who were motivated by the contents of the videos, but from the direct acts of defendants – their intrusions, their misrepresentations, and their targeting and surreptitious recording of plaintiffs' staff. Defendants are not immune from the damages that their intrusions into the conferences and facilities directly caused, nor from the damages caused by their direct targeting of plaintiffs' staff, that caused plaintiffs to bear costs in the form of private security for those staff members after plaintiffs became aware of defendants'

United States District Court
Northern District of California

damages that plaintiffs sought as impermissible reputational damages or because they were caused only by the publication of the CMP videos.[5]

In the Summary Judgment Order, I also concluded that there was sufficient evidence to let the RICO claims proceed to trial despite defendants' challenges to the essentially undisputed facts regarding the production and transfer of the fake IDs, the disputed facts regarding the alleged continuity of the alleged predicate acts and the RICO enterprise, and the disputed roles of the alleged RICO conspirators. *Id*. at 28–34. On the recording claims, I determined the standards for establishing a reasonable expectation of privacy under each relevant statute and rejected defendants' argument concerning the lack of corporate standing of plaintiff-organizations to assert the recording claims when the defendants had targeted their staff with the aim of recording them discussing internal corporate matters. *Id*. at 77–101. I granted partial summary judgment to plaintiffs with respect to breach of PPFA's agreements by Daleiden and BioMax, denied it as to CMP because plaintiffs did not adequately brief the alter ego basis, and granted defendant Merritt and Lopez's motion because neither of those defendants signed the PPFA agreements. On the NAF agreements, I explained that evidence could show that plaintiffs were third-party beneficiaries. *Id*. at 45. Finally, as to the PPCG non-disclosure agreement, I held that the NDA prohibited disclosure of "information reasonably understood – under an objective standard – as 'confidential under the circumstances of the disclosure,'" which would be determined by the jury. *Id*. at 53-55.[6]

---

ruse and recordings." *Id*. at 19.

[5] Significant categories of damages sought by plaintiffs were excluded from the case: "(1) costs of physical security assessments for plaintiffs' buildings and additional building and IT-security measures to physically protect plaintiffs' patients, information, offices, and clinics; (2) grants for security enhancements to affiliates experiencing increased security threats as a result of CMP's videos (PPFA only), other than personal security expenses for staff who were targeted by defendants; (3) costs of repairing and protecting PPFA website after hacking; (4) costs of repairing and protecting online appointment systems; (5) loss of revenue due to hack of the PPFA patient portal; (6) staff time spent monitoring threats and responding to protests and increased security incidents; (7) costs relating to vandalism to plaintiffs' offices and clinics; and (8) costs of the grief/stress hotline for staff related to the increase in threats." *Id*. at 20.

[6] I granted Merritt and Lopez's motions as to the breach of contract claims based on contracts they did not sign and granted Rhomberg and Newman's motions as to breach of contract claims asserted through the civil conspiracy claim. *Id*. at 41–43, 50–51, 54–55, 135.

4

Then came a slew of pretrial motions.  In my September 12, 2019 Order ruling on pretrial motions, I explained the following:

> Journalism vs. a Smear Campaign. These are the dueling narratives of this case. Defendants argue that they were involved in traditional under-cover journalism in order to expose violations of the law by Planned Parenthood with respect to PPFA and its affiliates' fetal tissue transfer programs. Plaintiffs argue that the goal of defendants' Human Capital Project (HCP) was to smear plaintiffs with allegations they profited from the fetal tissue transfer programs in order to drive PPFA and its affiliates out of business. These narratives are not directly and significantly relevant to the remaining claims and defenses in this case that are to be decided by the jury. However, they are central to the context of and the background to this case. Therefore, defendants are entitled to characterize their conduct as a journalistic enterprise and plaintiffs are entitled to attack that in part by exploring defendants' past conduct and writings regarding abortion.
>
> Illegal Conduct. The causes of action in this case concern whether the strategies chosen by the defendants with respect to the Human Capital Project broke the law and caused damage outside the First Amendment context. There are raging debates whether the videos show illegal conduct, whether 4 of 59 Planned Parenthood affiliates profited from selling fetal tissue, whether there have been any live births during abortion procedures at Planned Parenthood affiliates, and how government entities have responded to the HCP disclosures. Those debates are barely, if at all, relevant to the causes of action that will be tried to the jury. Evidence on those issues will be excluded under Federal Rule of Evidence 403 because it will confuse the jury about the issues it needs to decide, waste a significant amount of trial time, and be prejudicial.
>
> The defense argues that illegality by plaintiffs in their fetal tissue programs is critically related to their intent (under the federal wiretapping claim), to the reasonable expectations of privacy in recorded conversations, to the newsworthiness of defendants' publications, and to the social utility of defendants' conduct. Plaintiffs have dropped their invasion of privacy claims and publication of private facts hook for the federal wiretapping claim, so newsworthiness and social utility are no longer relevant to the claims and defenses to be decided by the jury. Similarly, while defendants' intent to violate RICO remains an element of the federal wiretapping claim, that intent must be established based on evidence defendants knew at the time of the inception of the HCP and prior to the first surreptitious recording. Defendants can present evidence of what they knew, what they believed, and how they carried out their journalistic endeavors through the HCP (the defense narrative discussed above) consistent with their intent. What defendants uncovered through the surreptitious recordings or through discovery in this case, and any expert opinion on that evidence, is not relevant.
>
> Because the California Penal Code section 633.5 "reasonable belief" defense is an issue that will be decided by the jury – as relevant

only to plaintiffs' Penal Code section 632 and 634 illegal recording and trespass claims – defendants Daleiden and Merritt may present evidence of what they knew or believed regarding plaintiffs' commission of violent felonies. That knowledge or belief must be based on what Daleiden or Merritt knew prior to their first surreptitious recording. Evidence regarding what Daleiden or Merritt learned following their first surreptitious recording cannot be relied on for this defense.

Evidence of possibly illegal conduct does not get into this case through the issue of reasonable expectation of privacy under the recording claims. Defendants argue that precluding this evidence will:

> hamstring Defendants' ability to argue that the individuals they recorded lacked any expectation of privacy as understood by the federal, Florida, and Maryland recording statutes. Defendants' experts will need to explain how certain medical procedures work in order to explain how the individuals recorded knew they were discussing wrongful conduct. See *Brugmann v. State*, 117 So. 3d 39, 49 (Fla. Dist. Ct. App. 2013) (identifying eight-factor test for determining reasonableness of expectation of privacy, including illegal conduct, intent, and content of communication, upon collecting cases).

Dkt. No. 772 at 11. But they fail, as they did on summary judgment, to specifically identify *any* much less *each* of the particular and actionable recordings that show plaintiffs' staff members discussing *illegal* conduct. To the extent that one or two of the actionable recordings might show plaintiffs' staff members expressing interest or theoretical ability to engage in conduct that defendants contend is illegal (but plaintiffs contend is not), the evidence and opinions defendants seek to bring in (mostly through their proposed experts as discussed in more depth below) is vastly outweighed by the Rule 403 considerations identified above.

Finally, the accounting issues regarding the fetal tissue programs of the four affiliate-plaintiffs is not directly and significantly relevant to the remaining claims and defenses in this case. Delving into these contested but minimally relevant issues, such as the proper interpretation of 42 U.S.C. § 289g-2 and whether indirect costs can be considered in evaluating compliance with the statute, is significantly outweighed by a number of Rule 403 factors, including juror confusion and waste of time.

In short, compliance with or alleged violation of federal laws (including but not limited to 42 U.S.C. § 289g-2 and the Partial Birth Abortion Ban) and whether babies were born alive at Planned Parenthood clinics to facilitate the affiliates' participation in fetal tissue donation programs will be excluded under Rule 403. I will draft a limiting instruction, to be provided for counsel's review prior to the final Pretrial Conference on September 23, 2019, explaining that the truth of the allegations made in the HCP videos regarding whether plaintiffs profited from the sale of fetal tissue or otherwise violated the law in securing tissue for those programs are not matters for the

United States District Court
Northern District of California

6

jury to decide.

>Newsworthiness. The newsworthiness of defendants' HCP, including the campaign and the videos, is no longer an issue for determination by the jury given that plaintiffs have dropped their invasion of privacy claims (Counts 13 and 14) and dropped the "publication of private facts" tort as a basis for liability under the federal wiretapping claim (Count 2). That does not preclude defendants from offering evidence that they believed at the commencement of the HCP that it would result in newsworthy information, or that in fact it generated attention in the media. However, the stories themselves will not be admissible under Rule 403.

>Government Investigations, Referrals, and Prosecutions. No evidence regarding government investigations, referrals, or prosecutions stemming from the HCP or otherwise will be admitted. Under Rule 403, the minimal relevance of this evidence to each side's narrative about this case is significantly outweighed by the dangers of unfair prejudice, confusing the issues, misleading the jury, and waste of time

Dkt. No. 804 at 1-4.

On September 29, 2019, in the Final Pretrial Minutes/Order I reminded the parties of the following:

>Truth
>If plaintiffs mention the term smear campaign in opening statements or closing arguments, that will not automatically open the door to the "truth" of the videos. The limiting instruction prepared by the Court is sufficient to remind the jury that the truth of the videos is not an issue for their decision. However, if plaintiffs intentionally use "smear" as a recurring theme in their case, or otherwise place the truth of the videos repeatedly and directly at issue, they run the risk of opening the door to the matters that I have excluded from this trial.

>Intent
>Evidence regarding defendants' intent is admissible with respect to their intent to commit the RICO enterprise and to the competing narratives of the parties (whether defendants set out to harm these plaintiffs and/or to uncover illegal conduct through tools of journalism) and punitive damage defense generally. The relevant information regarding this intent includes: (i) the information defendants had about alleged illegal conduct by plaintiffs that defendants possessed at the inception of the CMP when the goals of the Project were laid out and the strategies for the Project identified; (ii) comments defendants made – at inception of project, during the project, and after the project – regarding the Project itself; (iii) the strategies defendants employed as part of the Project; and (iv) the steps that defendants took to inform government officials or members of law enforcement about their findings, which as noted below should be agreed-to as stipulated fact or facts (because the evidence regarding the response of government officials or law enforcement is and continues to be excluded under the prior motion in limine rulings

United States District Court
Northern District of California

under Rule 403). The Court has already prepared a limiting instruction regarding media accounts that were published following the release of the HCP videos.

<u>Section 633.5 defense</u>. The only testimony that will be allowed regarding this defense must be based on information Daleiden or Merritt learned prior to the first recording any defendant made in California

Dkt. No. 835 at 2.

At the start of the trial, the jury was read the following Preliminary Instruction:

<u>PRELIMINARY INSTRUCTION NO. 18 – MATTERS NOT TO BE DECIDED BY THE JURY</u>
The claims and defenses in this case concern the strategies chosen and employed by the defendants. I need to emphasize what this case is not about. It is not about the truth of whether plaintiffs profited from the sale of fetal tissue or otherwise violated the law in securing tissue for those programs. It is not about whether any plaintiff actually engaged in illegal conduct. Those issues are a matter of dispute between the parties in the world outside this courtroom. In this courtroom your job is to consider the evidence related to the claims and defenses in this case in accordance with the instructions that I give you.

Final Preliminary Jury Instruction, Dkt. No. 850 at 19.  I repeated this instruction frequently during the trial as a limiting instruction.

To provide evidence in support of defendants' intent and case narrative, the parties reached a Stipulation on Law Enforcement Contacts that was read to the jury on October 31, 2020.  It identified each of defendant Daleiden's specific "contacts with members of law enforcement" and explained that he provided those "members of law enforcement with documents and recordings made by the Center for Medical Progress."  Dkt. No. 928.

In light of defendant Newman's and the two CMP contractors' invocation of the Fifth Amendment privilege against self-incrimination and refusal to answer questions in discovery, plaintiffs requested a series of adverse inferences to be read to the jury.  After reviewing the supporting evidence for each inference, and rejecting plaintiffs' requests for unsupported or ambiguous inferences, I issued a Final Order on Adverse Inferences on November 5, 2019.  Dkt. No. 968.  I read those adverse inferences to the jury and instructed at that time and in the Final Jury Instructions that "they may, but are not required" to, take the "specified inferences of fact" against Newman and the two contractors.

1          In an Order issued on November 11, 2019, I granted portions of plaintiffs' Rule 50 motion,

2   finding that: (1) plaintiffs' employees and contractors are third-party beneficiaries of the NAF

3   Exhibitor and Confidentiality Agreements; (2) defendants Merritt, Daleiden, BioMax, and CMP

4   breached the NAF 2014 Confidentiality Agreement and defendants Daleiden, Lopez, BioMax, and

5   CMP breached the NAF 2015 Confidentiality Agreement prohibiting "Videotaping or Other

6   Recording"; and (3) defendants Daleiden, BioMax, and CMP breached the NAF Exhibitor

7   Agreements in 2014 and 2015 concerning the requirement to provide "truthful, accurate, complete,

8   and not misleading" information.  Dkt. No. 994 at 1.

9          The jury returned its verdict on November 15, 2020.  It found defendants directly liable (or

10  indirectly liable through conspiracy) for plaintiffs' claims of: (i) trespass (under the laws of

11  Florida, Washington, D.C., Texas); (ii) Breach of PPFA's Exhibitor Agreements (EAs); (iii)

12  Breach of NAF Agreements; (iv) Breach of PPGC Agreement; (v) Fraudulent Misrepresentations;

13  (vi) False Promise Fraud; (vii) violation of the RICO Act, 18 U.S.C. §§ 1962(c) and 1962(d); (viii)

14  violations of recording laws (Federal, California, Florida, Maryland); (ix) and punitive damages

15  under Florida and Maryland law.  Verdict, Dkt. No. 1016.[7]

16         On April 29, 2020, after a further round of briefing supported by citations to evidence

17  admitted at trial, I issued a 48-page order containing findings of fact and conclusions of law on the

18  UCL claim, concluding that "Defendants are each liable for unlawful and fraudulent business

19  practices that occurred in California and out-of-state unlawful and fraudulent business practices

20  that caused harm in California."  Dkt. No. 1073 at 42.  I rejected plaintiffs' request for overbroad

21  and unsupported injunctive relief, granting instead narrow injunctive relief resting on the specific

22  conduct each defendant engaged in (as found by the jury and supported by my findings under the

23  UCL claim) in favor of only those plaintiffs who prevailed on their claims against those specific

24  defendants.  *Id*. at 47–48.  I entered judgment encompassing the damages awarded by the jury and

25  the injunctive relief.  *See* Dkt. Nos. 1073, 1074.

26

27

───────────────

28  [7] A detailed description of which plaintiffs prevailed against which defendants on which claims
    was laid out in the April 2020 Order on Equitable Relief.  Dkt. No. 1073 at 2–3.

United States District Court
Northern District of California

**LEGAL STANDARD**

Judgment as a matter of law under Rule 50(b) is granted "only if, under the governing law, there can be but one reasonable conclusion as to the verdict." *Winarto v. Toshiba Am. Elecs. Components, Inc.*, 274 F.3d 1276, 1283 (9th Cir. 2001); Fed. R. Civ. P. 50(b).  When evaluating such a motion, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 150 (2000).  The Ninth Circuit has made clear that a court "cannot disturb the jury's verdict if it is supported by substantial evidence." *Lambert v. Ackerley*, 180 F.3d 997, 1012 (9th Cir. 1999).  Substantial evidence means "evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion" from the same evidence. *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1066 (9th Cir. 2016) (internal quotation marks omitted).  "Thus, although the court should review the record as a whole, it must disregard evidence favorable to the moving party that the jury is not required to believe, and may not substitute its view of the evidence for that of the jury." *Reeves*, 530 U.S. at 151.  In other words, entry of judgment as a matter of law is warranted only "if the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *Castro*, 833 F.3d at 1066 (internal quotation marks omitted).

Under Federal Rule of Civil Procedure 59(a)(1), a court "may, on motion, grant a new trial on all or some of the issues." Fed. R. Civ. P. 59(a).  A trial court may grant a new trial, "even though the verdict is supported by substantial evidence, if the verdict is contrary to the clear weight of the evidence, or is based upon evidence which is false, or to prevent, in the sound discretion of the trial court, a miscarriage of justice." *United States v. 4.0 Acres of Land*, 175 F.3d 1133, 1139 (9th Cir. 1999).  The decision to grant a new trial falls within the sound discretion of the trial court. *Kode v. Carlson*, 596 F.3d 608, 611 (9th Cir. 2010).  However, a court should not grant a new trial unless it is "left with the definite and firm conviction that a mistake has been committed." *Landes Constr. Co. v. Royal Bank of Can.*, 833 F.2d 1365, 1372 (9th Cir. 1987) (internal quotations omitted).  On the other hand, a trial court may deny a motion for a new trial unless "there is an absolute absence of evidence to support the jury's verdict." *Hung Lam v. City*

United States District Court
Northern District of California

*of San Jose*, 869 F.3d 1077, 1084 (9th Cir. 2017) (internal quotation marks omitted).  In considering a Rule 59(a) motion, the court "is not required to view the trial evidence in the light most favorable to the verdict. Instead, the district court can weigh the evidence and assess the credibility of the witnesses." *Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd*., 762 F.3d 829, 842 (9th Cir. 2014).

Under Federal Rule of Civil Procedure 59(e), a motion to alter or amend a judgment may be granted only: "(1) if such motion is necessary to correct manifest errors of law or fact upon which the judgment rests; (2) if such motion is necessary to present newly discovered or previously unavailable evidence; (3) if such motion is necessary to prevent manifest injustice; or (4) if the amendment is justified by an intervening change in controlling law." *Allstate Ins. Co. v. Herron*, 634 F.3d 1101, 1111 (9th Cir. 2011).  In determining a Rule 59(e) motion, the "district court enjoys considerable discretion in granting or denying the motion" but "amending a judgment after its entry remains "an extraordinary remedy which should be used sparingly." *McDowell v. Calderon*, 197 F.3d 1253, 1255 n. 1 (9th Cir. 1999) (en banc) (per curiam).

## DISCUSSION

## I.      MOTION FOR JUDGMENT AS A MATTER OF LAW

### A.      Compensatory Damages

As noted above, through pretrial orders I narrowly limited the damages plaintiffs were allowed to pursue to "security" damages for the personal security measures plaintiffs implemented for staff "targeted" by defendants and "infiltration" damages incurred to investigate and remediate defendants' intrusions into plaintiffs' conferences and clinics.  The jury subsequently awarded compensatory damages to each of the plaintiffs that sought them based on the evidence admitted at trial.  Defendants contend, however, that there was insufficient evidence to allow the jury to do so.

#### 1.      Security damages

Defendants argue that plaintiffs at trial failed to "show that their security 'damages' were caused by anything other than publication of the videos, and publication damages are not recoverable." Mot. at 3.  They cite testimony from witnesses who admitted that part of the reason some of the security measures were implemented was due to concerns about the particular staff

11

1   members having been "spotlighted" by defendants' videos and how people other than defendants

2   might react to the videos.  Mot. at 3–5.  However, in each instance there was evidence on which a

3   reasonable juror could rely that staff who received the "security" services at issue or their affiliates

4   were targeted by defendants' infiltrations and recordings.  That is sufficient to remove this narrow

5   category of damages from the otherwise excluded "publication" damages.  That some of the

6   security services were not put in place until after specific HCP videos were released subsequent to

7   the initial videos (which in some instances was when a plaintiff learned that its staff had been

8   recorded) does not undermine the evidence that the expenses were incurred in response to

9   defendants' acts of targeting and recording these plaintiffs.[8]  Similarly, that plaintiffs did not go

10  out and provide security damages for each staff member or affiliate that was conceivably targeted

11  and/or recorded is irrelevant.[9]

12          There is sufficient evidence on which a reasonable jury could rely to find that plaintiffs'

13  security damages were incurred as a direct result of defendants' conduct targeting and recording

14  plaintiffs' staff.  There is no ground to support defendants' motion for judgment as a matter of law

15  given the evidence at trial.

16                          **2.      Infiltration damages**

17          Defendants also challenge the "infiltration" damages plaintiffs sought and were awarded

18  by the jury, arguing as a matter of law that defendants cannot be liable for improvements to

19  PPFA's conference and event security measures to "foil all possible" ways defendants might use

20  to infiltrate plaintiffs' conferences and events in the future.  I addressed and rejected this

21  argument, and the cases defendants cite in support, in prior orders pre-trial.  I will not address it

22

23  ───────────────────

24  [8] Whether or not these targeted individuals or their organizations received threats from individuals
    who might have been motivated by the content of the HCP videos is likewise irrelevant.  *But see*

25  Reply at 1–2.  There was, however, evidence at trial on which reasonable jurors were entitled to
    rely that given the history of violence against abortion providers the implementation of security
    measures for recorded staff was reasonable.

26  [9] Defendants contend that PPFA cannot be reimbursed for the $6,000 PPFA provided to PP

27  Michigan to pay for Reputation.com, because that was a "voluntary" payment to its affiliate.  Mot.
    at 12.  Plaintiffs respond that these damages were not, in fact, awarded by the jury, and plaintiffs

28  confirm they are not seeking them.  Defendants do not address or dispute plaintiffs' assertions on
    reply.

United States District Court
Northern District of California

1   again.

2          Plaintiffs submitted ample evidence regarding what they did to investigate defendants'

3   intrusions, why they hired Kroll Services and Thatcher Services, what investigations those entities

4   did and what recommendations they made, and which of those recommendations PPFA

5   implemented in light of defendants' actions and why.  Similarly, there was evidence about PPFA's

6   purchase of conference badge and ID scanners and the use of Lexis-Nexis to vet attendees.

7   Defendants cross-examined plaintiffs' witnesses on each of these topics and argued that the

8   expenditures were not necessary or were too remote in time or purpose from defendants' actions to

9   be recoverable.  They also attempted to establish, and argued to the jury, that plaintiffs knew or

10  should have known that their existing security measures were insufficient and, therefore, that the

11  amount of damages sought from defendants was unreasonable.  The jury clearly disagreed.  Based

12  on the evidence at trial, there is no reason to revisit the issue as a matter of law.  There was ample

13  evidence on which reasonable jurors could rely to award the infiltration damages.

14          Finally, defendants argue that plaintiffs did not present any historical expenditures to

15  provide a "baseline" of the conference and clinic security measures to allow the jury to assess

16  what reasonable infiltration damages should be awarded.  There was, however, evidence that

17  plaintiffs hired new consultants to address a new and different threat, so evidence regarding past

18  expenditures would have been of limited, if any, utility.  In any event, the defendants were free to

19  (and did) attempt to make that point and argue to the jury that these expenses were unreasonable.

20  The jury rejected that argument.

21          Defendants are not entitled to judgment as a matter of law or a reduction in the amount of

22  compensatory damages sought by and awarded to plaintiffs by the jury.  The damages are amply

23  supported by the evidence at trial and are sufficiently directly tied to the actions of defendants.[10]

24          **B.      Punitive Damages**

25          Defendants contend that plaintiffs failed to introduce sufficient evidence to meet the

26

27  ───────────────
    [10] Defendants only general Rule 50(b) argument regarding trespass that is not tied to Rhomberg or
    Newman is that "plaintiffs failed to adduce sufficient evidence" for a reasonable jury to find that
28  any defendants' trespass caused any actual damage.  Mot. at 20.  That argument fails for the
    reasons just discussed.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    standards for imposing punitive damages under the laws of Florida and the other relevant

2    jurisdictions.

3           Under Florida law, the jurors had to find by "clear and convincing evidence that the

4    Defendant was guilty of intentional misconduct or gross negligence, which was a substantial cause

5    of injury to the Plaintiffs." Final Jury Instructions at 97.  Defendants do not take issue with the

6    instruction.  Instead, they argue (consistent with their theory of the case) that no evidence supports

7    the imposition of punitive damages under Florida law because their purpose in attending PPFA's

8    Florida conferences was "journalistic" and their intent was to investigate and expose potential

9    illicit or illegal conduct in the sale and transfer of fetal tissue.  The jurors rejected that narrative in

10   favor of the evidence supporting plaintiffs' theory that defendants were not journalists but activists

11   who intentionally engaged in fraud and misrepresentations in order to harm and destroy

12   plaintiffs.[11]

13          Defendants separately argue that punitive damages cannot be awarded against Merritt, who

14   did nothing in Florida.  But she did engage in substantial conduct in Maryland, which creates a

15   sufficient basis to include her in the punitive damages award.  Defendants point to no error in the

16   instructions (the instructions, for example, did not indicate that Merritt had directly engaged in any

17   conduct in Florida).

18          Defendants then argue that punitive damages were likewise without evidentiary support for

19   the claims related to the federal recording statute and under Maryland's law, as the jurors were

20   instructed that they had to find "clear and convincing evidence that the Defendant engaged in that

21   conduct with malice, oppression, or fraud."  Final Jury Instructions (Dkt. No. 1006) at 95-96.[12]

22

---

23   [11]  These dueling narratives do not, contrary to defendants oft-repeated argument, turn on the truth

24   of allegations levelled against plaintiffs in the HCP videos.  They do, however, implicate
     defendants' intent at the inception and during the HCP, a topic that was extensively addressed by

25   witnesses and exhibits from both sides during the trial.

26   [12] Defendants mention site visits in Colorado and Texas, but the jury was never instructed about
     punitive damages based on conduct in those jurisdictions.  Therefore, conduct in those states is not

27   at issue.  In reply, defendants appear to take aim at the Verdict Form, criticizing it because it did
     not ask the jury to identify under which state laws punitive damages were awarded.  Reply at 8.

28   But the jury instructions, which the jury is presumed to follow, did.  Final Jury Instructions at 95-
     97; *see also Cheney v. Washington*, 614 F.3d 987, 997 (9th Cir. 2010).

14

United States District Court
Northern District of California

1    Again, this argument relies on defendants' rejected characterization of their conduct as journalists

2    protected by the First Amendment. Their legal arguments have been repeatedly rejected; there

3    was sufficient evidence on which jurors could reasonably rely to find malice, oppression, or fraud.

4          Next, defendants note that the jury was instructed that in weighing whether to impose

5    punitive damages under federal and Maryland law, it should consider "[i]n view of that

6    Defendant's financial condition, what amount is necessary to punish him and discourage future

7    wrongful conduct? You may not increase the punitive award above an amount that is otherwise

8    appropriate merely because a Defendant has substantial financial resources." *Id*. at 96. Similarly,

9    under Florida law, the jurors were instructed that in determining whether to impose punitive

10   damages, one of the factors to be considered is "the financial resources of Defendants," however,

11   "you may not award an amount that would financially destroy Defendants." *Id*. at 97. Defendants

12   argue that since no evidence regarding the financial condition of any defendant was introduced at

13   trial, punitive damages could not have been awarded under federal or Maryland law.

14         The law contradicts that argument. Cases from Florida and Maryland explain that

15   information regarding a defendant's financial conduction is not a precondition to an award or

16   instead is a burden of evidence placed on defendants who want to ensure punitive damages are not

17   "excessive". *See, e.g., Brooks v. Rios*, 707 So. 2d 374, 376 (Fla. 3d Dist. App. 1998) ("evidence

18   of a defendant's net worth … is not a prerequisite for such an award."); *Darcars Motors of Silver*

19   *Spring, Inc. v. Borzym*, 379 Md. 249, 275 (2004) ("plaintiff has no obligation to establish a

20   defendant's ability to pay punitive damage"); *see also Brooks*, 707 So. 2d at 376 ("A defendant

21   against whom punitive damages are sought, however, must present evidence as to his or her net

22   worth at trial to preclude a jury from assessing an unduly harsh penalty, as well as to preserve his

23   or her right to argue the excessiveness of the punitive award on appeal.").

24         Finally, defendants note that punitive damages are unconstitutional when the harms at

25   issue were inflicted on non-parties. They argue the jury may have impermissibly considered the

26   harm to non-parties when imposing punitive damages because they heard testimony from

27   plaintiffs' witnesses about their personal mental and emotional state after viewing or being made

28   aware of the HCP videos. However, the Supreme Court case on which defendants rely points out

15

1    that jurors may take into account whether "conduct that risks harm to many is likely more

2    reprehensible than conduct that risks harm to only a few" but that courts must provide defendants

3    the ability to object and seek relief from the risk that a jury might punish it for its harm to others,

4    through instructions or other rulings. *Philip Morris USA v. Williams*, 549 U.S. 346, 357 (2007).

5    Defendants here did not seek such relief. *See, e.g., Sony BMG Music Entm't. v. Tenenbaum*, 660

6    F.3d 487, 506 n. 20 (1st Cir. 2011) (*Philip Morris* argument waived where defendant did not

7    request a specific instruction).

8        The jury *was instructed* to focus on the harm caused to "plaintiff" when assessing punitive

9    damages. Final Jury Instructions at 95-96.  There was also a legitimate, different purpose for the

10   testimony to which defendants object; to support the reasonableness of the damages plaintiffs

11   incurred for the security and infiltration measures plaintiffs took in response to defendants'

12   conduct.  There is no indication that the jury was impermissibly punishing defendants for their

13   harm to non-parties.

14       Defendants are not entitled to judgment as a matter of law or other relief based on the

15   award of punitive damages.

16       **C.     RICO**

17       Under RICO, defendants argue initially that plaintiffs' evidence fails to show that the

18   predicate acts of production and transfer of fake IDs "directly caused" plaintiffs' economic losses.

19    They assert that the damages sought under RICO – the security and infiltration damages identified

20   above – were instead caused by a "long series of acts" separated from the transfer and production

21   of the IDs by too many steps.  Mot. at 16–19; Reply at 4–7.

22       The line of cases that defendants identify in their reply in support of their "one-step"

23   causation argument have been discussed numerous times; I will not repeat those discussions here.

24   Reply at 4–7.  Suffice it to say, the evidence at trial was consistent with plaintiffs' characterization

25   of the evidence at summary judgment: the production and transfer of the fake IDs was the crucial

26   act *by defendants* that allowed *defendants* entry into the conferences (presenting their IDs) and

27   their introduction to plaintiffs' staff, who were then targeted *by defendants*.  While there were

28   stages of defendants' plan between the production and transfer of the IDs, from the presentment of

16

those IDs at the conferences and clinics up to the defendants' achievement of their goal (the surreptitious video recordings), there was sufficient evidence that the fake IDs were the crucial component to achieve their goals, and that directly and proximately caused plaintiffs' damage to their business or property rights sufficient for RICO liability.[13]

Defendants also dispute the sufficiency of evidence on the pattern/open-ended continuity RICO element, arguing that all of their testimony related to the production and transfer of the fake IDs showed a "one-time" occurrence that is not likely to repeat.[14]   However, there was sufficient evidence on which a reasonable jury could rely to establish open-ended continuity, including the longstanding opposition between plaintiffs and defendants, the history and context of each defendant's past conduct, the defendants' conduct since the conclusion of the HCP, and CMP's status as an ongoing entity.   That each defendant's name is now well-known to plaintiffs only increases the likelihood that these individuals will produce or transfer or present fake IDs for themselves or others they are working in concert with.   *See* Findings of Fact and Conclusions of Law (Dkt. No. 1073) at 27.[15]

Defendants are not entitled to judgment as a matter of law on the RICO claim.[16]

**D.      Fraudulent Misrepresentation**

Defendants make several arguments that judgment as a matter of law should be entered in

---

[13] Plaintiffs' RICO damages are not undermined merely because the jury awarded similar or the same amount of damages under RICO and the trespass, breach of contract, and fraud claims. Defendants' actualized goal of infiltrating and surreptitiously recording plaintiffs – of which the production and transfer of fake IDs was a necessary and critical part – violated different statutes and caused similar and in some instances the same damages.   That proximate cause is satisfied under RICO simply means the causal link for the damages under the other claims is easily satisfied.

[14] I will not address defendants' argument that they could not have violated 18 U.S.C. § 1028 because they did not steal anyone's actual identity.   This argument should have been raised pre-trial – as their other RICO predicate act challenges repeatedly were at the motion to dismiss, summary judgment, or *in limine* stages – but defendants failed to do so.

[15] Relatedly, that the defendants have not – during the pendency of this litigation – attempted to produce, transfer, or present fake IDs does not "prove" there is no open-ended continuity, but only that defendants decided to avoid doing so while litigating this and the criminal matters pending in state court.

[16] Specific challenges made by Lopez, Merritt, and Rhomberg to the evidence regarding their connection to the RICO claims will be addressed below.

United States District Court
Northern District of California

their favor on the fraud claims.  First, defendants argue their conduct cannot be considered fraudulent under *Animal Legal Defense Fund v. Wasden*, 878 F.3d 1184 (9th Cir. 2018).  I have rejected this argument several times and will not revisit it, except to say that the jury clearly concluded based on sufficient evidence that defendants' fraudulent conduct caused ample "legally cognizable harm."

The second argument is that plaintiffs adduced insufficient evidence of reliance (actual reliance under the laws of Florida and reasonable reliance under the laws of California, Colorado, Texas, and D.C.).  There was ample testimony at trial that defendants would not have been allowed access to the conference, clinics, or lunch meetings absent their misrepresentations (the false names, their fake positions at the non-operational front company BioMax, and their false intent for securing that access).  Defendants argue that plaintiffs' failure to exercise reasonable diligence (for example, their failure to run background checks on the names of the individuals and company) precludes a finding of reasonable reliance.  They introduced evidence of what they characterized as plaintiffs' deficient security measures and failures and repeatedly argued this point.  The jury rejected that argument based on sufficient evidence.

### E.  Recording Claims

#### 1.  Entity Standing

Defendants assert at various points that none of the plaintiff entities had "corporate" standing to sue over defendants' recordings of their staff members.  In particular, they challenge the corporate standing of the plaintiff entities for the six recordings taken at the PPFA Conference in Washington, D.C.  They argue that the respective entity-plaintiffs lacked standing because they failed to introduce evidence (namely the audio of the clips) to show that those being recorded were disclosing corporate information or were targeted by defendants based on their relationships with the entity-plaintiffs.  They also challenge the evidence regarding the targeting of Nucatola and Drummond-Hay at the 2014 NAF Conference, and whether those recorded conversations disclosed internal business matters.  Similarly, defendants contend that there was insufficient evidence of targeting or disclosure of internal information by the four individuals captured in the eight recordings in Florida.

1    Defendants' argument fails.  There was ample evidence that they were specifically

2  targeting staff of PPFA and Planned Parenthood affiliates *because* those staff members could

3  divulge information about the internal matters of PPFA and the affiliates.  That directed targeting

4  and the fact that they recorded staff members from each of the relevant plaintiffs is sufficient.[17]

5  However, there was also significant evidence – from clips played with audio at trial, testimony

6  from those recorded, and testimony from defendants themselves about the questions they asked

7  and the information they sought to uncover – establishing that defendants asked about and staff

8  disclosed internal matters of the plaintiff entities.  Indeed, that was the goal of the recordings in

9  support of the Project.  The totality of the evidence was sufficient to establish corporate standing.

### 2.    Federal

11    Defendants challenge whether there was sufficient evidence that the intent or the purpose

12  of the recordings was to violate civil RICO – as required under the federal statute – when,

13  according to defendants, their purpose was a journalistic effort to expose illegal conduct in the sale

14  and transfer of fetal tissue.  As discussed, there was sufficient evidence regarding defendants'

15  intent to focus on PPFA and its affiliates for their surreptitious recordings in order to put them out

16  of business through the RICO enterprise alleged.

17    Defendants also challenge the sufficiency of evidence showing that those recorded had a

18  subjective expectation of privacy that was objectively reasonable.  They identify six recordings

19  taken at the 2015 PPFA National Conference where there was no evidence regarding the content

20  of the recorded discussions or testimony from the recorded individuals.  They contend that there

21  could not be any expectation of privacy where two other conference attendees (Nguyen and

22  Castle) were recorded in "crowded areas" of the conference where other people could have

23  theoretically overheard part of the conversations.  They claim that there was no evidence of

24  subjective expectations of privacy for the two individuals recorded in the "reception area" of the

---

[17] That defendants recorded everyone they encountered during the conferences and visits due a
technical need to keep the devices always on does not undermine the substantial evidence that the
plaintiffs were specifically targeted by defendants given the stated purpose and goals of the
Project.  Similarly, that in some of the videos the individuals recorded approached the BioMax
exhibit does not negate the fact that sufficient evidence showed defendants were at those
conferences to target and record plaintiffs' staff.

United States District Court
Northern District of California

1    PPRM clinic (Johnstone and Ginde) and assert that there was no evidence of expectations of

2    privacy for the two PPGC receptionists or for Farrell at the PPGC clinic.

3        With respect to the 2015 PPFA National Conference, there was significant evidence

4    introduced regarding the security measures that PPFA undertook relevant to creating a subjective

5    and objectively reasonable expectation of privacy including, most significantly, restricting access

6    to conference spaces to attendees bearing conference badges and employing door monitors where

7    the challenged recordings were made.  Witnesses testified that these measures gave them an

8    expectation of security and privacy in their interactions with other conference attendees, given

9    evidence that the purpose of these conferences was to provide a secure and safe space to discuss

10   their occupations.  They plausibly testified that they would not expect to be surreptitiously

11   recorded or overheard by those adverse to them when having conversations within those areas.

12       The same evidence, both general (security measures) and specific (attendees at those

13   conferences testifying as to their expectations of privacy given the very purpose of those

14   conferences), was adduced for each conference.  The jury could reasonably rely on the totality of

15   that evidence to establish both the subjective expectation of privacy and its objective

16   reasonableness.  There was also testimony from conference attendees about subjective

17   expectations of privacy at those conferences that jurors could rely on to determine subjective

18   expectations, even though each recorded individual did not testify.

19       Significant evidence regarding the security and access measures at the clinics was also

20   introduced, including the requirement for prior appointments to access the facilities, the use of

21   guards and screening devices further restricting access, the use of key cards and locked doors to

22   access meeting rooms and clinic spaces, and – at PPGC – the prior signing of the NDA required

23   by Farrell.  All of this evidence, in addition to the testimony of individuals recorded during the

24   clinic visits, was sufficient, even if every person recorded did not testify regarding her specific

25   expectation of privacy.

26               **3.    California**

27       Defendants argue that plaintiffs submitted insufficient evidence of Nucatola's expectation

28   of privacy at the 2014 NAF meeting under California law because she admitted that there were

United States District Court
Northern District of California

20

unknown people standing behind her during her conversation at the BioMax booth in the exhibitor

area and that there was insufficient evidence that Drummond-Hay had a reasonable expectation of

privacy when she spoke to defendants in a crowded room.  However, these conversations took

place in the restricted areas of the conference.  As noted above, there was significant evidence

supporting a reasonable expectation of privacy in these circumstances despite the chance that

some other conference attendee or hotel staff (both of whom had signed different confidentiality

agreements) could possibly have overheard some part of a conversation.[18]

Defendants also challenge the jury's finding of a reasonable expectation of privacy during

the lunch meeting at a restaurant where Gatter and Felczer were recorded and the lunch meeting at

a restaurant where Nucatola was recorded, given the fact that both recordings were made in public

restaurants and the speakers did not testify that they lowered their voices or changed topics when

waitstaff or others might overhear.  Defendants note that the Hon. Christopher C. Hite in the

criminal proceedings in California state court dismissed the Section 632 claim regarding one of

the lunches based on his findings that the individual recorded made no effort to confine her

conversation to the defendants and testified that she did not believe the conversation was

controversial or contained any questionable conduct necessitating a confidential communication.

Dkt. No. 1080-2.

The jury here reached a different conclusion than Judge Hite on that one lunch.  It heard

some similar but also some different testimony than was presented in the criminal proceedings,

including that the individual recorded was seated with her back to the wall, allowing her to see

nearby tables, and that she never noticed anyone interested or listening-in to their conversation.[19]

---

[18] Defendants point to Judge Hite's ruling in the state court criminal proceedings dismissing two criminal counts under California Penal Code section 632 because the conversations at issue – one taken in an elevator and another recorded in the main hotel lobby at the NAF conference in "areas open to the public and not part of the conference"– lacked "probable cause" of confidentiality, namely a reasonable expectation that the conversation was not being overheard or recorded.  Dkt. No. 1080-2.  Defendants do not argue on this motion that any of the NAF recordings that the jury found violated California law were recorded in similar circumstances.

[19] On the record before him, Judge Hite concluded that there was no evidence that the recorded individual had a "relationship with the defendants prior to lunch" or had "vetted" defendants prior to the lunch. Dkt. No. 1080-2.  In this trial, on the other hand, there was evidence that Daleiden, Merritt, and BioMax were vetted through their infiltration and appearance at the April 2014 NAF

United States District Court
Northern District of California

This claim was submitted to the jury on instructions not challenged post-trial. Based on a different record than Judge Hite had, the jury found liability.

### 4.   Florida

Similarly, defendants challenge the expectation of privacy showing for two recordings of Nucatola made during receptions at the conferences that were restricted to conference attendees and for her discussion with defendants at the BioMax booth in the restricted-access exhibitor hall. But Nucatola's specific testimony about her expectation of privacy at these conferences as well as the general testimony regarding the access-restrictions and security measures was sufficient. The same is true for defendants' challenges to the recordings of Gatter, Gupta, VanDerhei, Smith, Moran, Nguyen, Russo, Ginde, and Sigfried. Many of these witnesses testified about their expectations of privacy at the Florida conferences, although some did not. The jury was entitled to rely on the access-restriction and other security measures implemented by PPFA, as well as the specific testimony regarding subjective expectations of privacy, to conclude that each recording at issue violated the expectations of the privacy of those recorded.[20]

### 5.   Maryland

Finally, defendants' sufficiency challenges to the recordings that the jury concluded violated Maryland law also fail. The recordings at issue, again, were taken in restricted-access conference areas. That the rooms in which the conversations occurred were crowded or noisy does not defeat the significant evidence establishing a reasonable expectation of privacy based on the security-access measures and testimony from some of those who were recorded at the conference.

---

Conference, which was where the recorded individual first met Daleiden and Merritt and learned about BioMax. This was before the lunch meeting with defendants that occurred shortly thereafter.

[20] One specific and potentially distinguishing factor identified by defendants regarding the recording of Gupta during a dinner at the October 2015 Conference was the presence of guests, but that does not alter the reasonableness analysis. Testimony established that the dinner guests had to be registered along with the attendees and wore badges. Similarly, that there could have been guests "within sight" of an outdoor reception in a restricted-access area does not undermine Siegfried's expectation of privacy in a conversation with attendees in the restricted-access area.

F.      **Breach of Contract**

1.      **CMP Alter Ego**

Defendants contend that plaintiffs failed to adduce sufficient evidence to hold CMP liable for violation of any of the contracts at issue under the doctrine of alter ego liability.  They argue that California law does not recognize "reverse veil piercing" and that there was an insufficient showing of the requirements of traditional veil piercing, namely a sufficient unity of interest and ownership such that separate personalities of the individual and corporation no longer exist and treating the acts of the corporation alone will sanction fraud, promote injustice, or cause an inequitable result.

Defendants assert that the first prong cannot be met because the CMP Board of Directors did not even know about BioMax.  Mot. at 35.  However, there was evidence that CMP's Board members knew a front business (BioMax) had been created as a necessary step in the HCP and the jury was entitled to rely on that evidence.  On the second prong, defendants argue that there was no evidence that Daleiden or BioMax would be unable to pay any award in this case and/or that injustice would result.  But BioMax was, as the jury implicitly found, a fake "front" business, not a real business with any operations.  Undisputed evidence at trial demonstrated that all of the contractors were paid by CMP.  Allowing CMP to escape liability when it is the entity that funded the HCP, as shown by admissible evidence at trial, would result in injustice.

Plaintiffs also note that CMP could be held liable on an agency theory.  I agree.  There was sufficient evidence at trial for the jury to conclude that CMP was the undisclosed principal funding the HCP: it paid the expenses of the front entity (BioMax) including the salaries of the contractors who misrepresented themselves as BioMax employees when they were in reality contractors paid by CMP.

2.      **PPFA Exhibitor Agreements**

Defendants argue, resting on their challenge to the compensatory damages addressed above, that the breach claim fails because no damages were suffered as a result.  More specifically, they contend that Nucatola's security damages cannot be supported by this breach claim when the only videos of Nucatola released by HCP stemmed from her lunch with defendants

United States District Court
Northern District of California

and that PPFA was not entitled to "essential monitoring" damages.  I have addressed and rejected those arguments earlier in this Order.

### 3.    NAF Exhibitor and Confidentiality Agreements

In addition to their general argument that no compensatory damages stemmed from these breaches, addressed and rejected above, defendants contend that PPFA does not have standing to assert breach of the NAF agreements as "fourth-party" corporate beneficiaries, irrespective of whether its staff (who were taped) were appropriate third-party beneficiaries.  Mot at 36–37. Their argument rests mostly on rationales already rejected (Daleiden's subjective belief about who was protected by the EAs, the "failure" of NAF to provide a list of attendees prior to defendants' agreeing to the EAs, etc.).  There was significant evidence that PPFA's staff were targeted by defendants seeking to uncover information about PPFA's operations in violation of and using means expressly prohibited by the EAs.  The evidence also established that PPFA is itself a member of NAF, whose interests are expressly addressed and protected by the NAF agreements. That is sufficient.

### 4.    PPCG NDA

Defendants attack the breach of the PPCG NDA claim by arguing that plaintiffs failed to show that defendants secured "confidential information" during their recording at PPGC's clinic. In support, defendants point exclusively to Daleiden's subjective testimony that he did not believe any of the subjects discussed disclosed confidential information.  But the standard is not subjective, it is objective.  There was sufficient evidence from Farrell and Nguyen on which reasonable jurors could rely to conclude that the recipients should have reasonably understood the information disclosed to be confidential.

As to actual damages, defendants argue that none was shown to have resulted from the PPGC breach because one witness testified in her lay opinion that the videos – not the intrusion – caused the harm to PPGC and publication damages have been barred.  But substantial evidence supports the damages awarded to PPGC as incurred to protect specific staff members who were specifically targeted by defendants.

**G.      Fifth Amendment Privileges**

Defendants argue that the potential adverse inferences read to the jury – resulting from Newman and the two CMP contractors' refusal to answer questions based on the Fifth Amendment – "violated Newman's rights and prejudiced all Defendants." Mot. at 39. They reassert their prior arguments that plaintiffs failed to identify the inference, show the inference was tied to an actual question asked of each, provide independent admissible evidence in support, show a "substantial need" for the inference, and that there was no other source for the information covered by the inference. *Id.* In addition to the alleged prejudice to Newman from the improper inferences, the other defendants assert that they too were prejudiced by the three sets of inferences because the jury likely drew adverse inferences against them from Newman's and the two contractors' refusal to answer questions. *Id.* at 40.

I found that a number of narrowly drafted, specific inferences were appropriate after reviewing multiple rounds of briefing addressing caselaw and the identification of underlying and supporting facts. I rejected plaintiffs' request for overbroad or unsupported inferences and considered all and accepted some of defendants' objections to each proposed inference. Dkt. Nos. 806, 823, 838, 951, 953, 956, 964, 968. At the end of the process, I found:

> The inferences, identified below, are supported by the questions asked by plaintiffs in the depositions that Newman, Baxter, and Davin refused to answer under the Fifth Amendment. The inferences go to core, disputed issues regarding the defendants' intent, knowledge, and conduct in this case relevant to the claims arising under federal and the laws of Texas, Colorado, Florida, Maryland, and the District of Columbia, but not relevant to the claims arising solely under California law. Other evidence in this case, including admitted documentary evidence, support the existence of the facts that plaintiffs seek to establish through the inferences. Because of the nature of inferences, generally going to the defendants' intent and knowledge, the inferences cannot be otherwise adequately established through less burdensome means. There is no unfair prejudice to Newman, Baxter, Davin, or any of the testifying defendants from allowing the inferences identified below.

Dkt. No. 968 at 1. I read those inferences to the jury on November 6, 2019, Dkt. No. 1008, and instructed the jury that they were "permitted but not required to draw the inference that the withheld information would have been unfavorable to" Newman, Baxter and Davin and that if "a witness who asserts the Fifth Amendment is associated closely enough with a defendant, you may

25

but are not required to draw an adverse inference against the defendant." Trial Tr. 3458:22-24; 3463:6-19. I instructed that for "claims based on California law, you may not consider that, or speculate about why" Newman or the contractors "invoked the Fifth Amendment and refused to answer." *Id.*, 3458:10-13; 3464:4-6.

In the Final Jury Instructions, I instructed the jurors that they were permitted to but not required to draw the adverse inferences. *See* No. 8 at 30 ("in civil cases, you are permitted, but not required, to draw the inference that the withheld information would have been unfavorable to the Defendant"); No. 9. at 31 ("If a witness who asserts the Fifth Amendment is associated closely enough with a Defendant, you may, but are not required to, draw an adverse inference against the Defendant."). I also instructed that no inferences should be drawn with respect to claims arising under California law. *See* No. 8 at 30 ("For claims based on California law, you may not consider that, or speculate about why, Newman invoked the Fifth Amendment and refused to answer."); No. 9 at 31 ("For claims based on California law, you may not consider that, or speculate about why, Baxter or Davin invoked the Fifth Amendment and refused to answer.").

These instructions limited the scope of the allowable inferences and were provided after fully considering and rejecting defendants' "other evidence is sufficient" arguments. In Reply, defendants claim that Newman's stipulation to some facts eliminated the need for any additional inferences from him. Reply at 19. But I rejected that argument when it was first made. A defendant cannot avoid inferences by attempting to admit favorable, more limited facts, and to ignore unfavorable ones in an attempt to use the Fifth Amendment as both a shield and a sword.

Defendants' request for post-trial relief based on the adverse inferences is DENIED.

### H.     Civil Conspiracy

Defendants argue that there was insufficient evidence either of "an agreement which is a substantive violation of RICO (such as conducting the affairs of an enterprise through a pattern of racketeering)" or of "defendant's participation or agreement to participate in two predicate offenses." *Baumer v. Pachl*, 8 F.3d 1341, 1346 (9th Cir. 1993) (internal quotations to *United States v. Tille*, 729 F.2d 615, 619 (9th Cir. 1984) omitted). As discussed below, there was sufficient evidence that each defendant knew that to effectuate the goal of the HCP, defendants

needed to gain access to plaintiffs' conferences, facilities, and staff, and that false identities and fake IDs were, therefore, required.  Given the defendants' backgrounds, including their roles in prior undercover operations against abortion providers and the evidence regarding each defendants' knowledge of the use of those false identities during the HCP, the evidence was sufficient.

Second, defendants argue generally that they cannot be guilty of conspiring to conduct what they characterize was a lawful undercover investigation.  That characterization was rejected by the jury.

I will now turn to the defendant-specific challenges brought by Lopez, Merritt, Rhomberg, and Newman.

**I.      Lopez and Merritt**

**1.      RICO**

Defendants Lopez and Merritt argue, first, that they cannot be liable under RICO because there was insufficient evidence that they were involved in the "operation or management" of the RICO enterprise.  However, there was sufficient evidence that both knew from the HCP's inception that their goal was to use misrepresentations to gain access to conference and clinics and plaintiffs' staff more generally in order to surreptitiously record plaintiffs' staff.  There was sufficient evidence of these defendants' knowledge for the jury to find that they joined the Project with the goal to harm and end the viability of plaintiffs' operations. These two defendants were, as evidenced throughout the trial, key operatives whose participation was crucial to the Project and defendants' more general goal.  It does not matter that neither Lopez nor Merritt was the "ringleader" and that they followed Daleiden's directions where to go and whom they should target.  They did not need to be in charge; they only needed to have significant roles in operating the RICO enterprise, which they did.  That is sufficient.

Concerning their knowledge and intent that at least one member of the enterprise would commit two or more predicate acts, the evidence supports that Lopez knew of and that Merritt both knew of and used the fake IDs.  Merritt received and used one of the fake IDs and was with Daleiden when he repeatedly used his fake ID.   Lopez was with Daleiden at four conferences

United States District Court
Northern District of California

1   when Daleiden repeatedly used his fake ID and Lopez had to publicly refer to Daleiden by the

2   name on that fake ID during those conferences.  From this evidence, the jury could reasonably

3   conclude that both Lopez and Merritt knew and intended that the fake ID predicate acts would be

4   committed.

5               **2.      Conspiracy**

6         The final argument concerning Lopez and Merritt is that their conduct is protected by the

7   "agent immunity rule."  I addressed and rejected this legal argument on undisputed facts on

8   summary judgment.  I will not discuss it further.

9         **J.      Rhomberg**

10              **1.      Conspiracy/RICO**

11        Rhomberg argues that the evidence against him is insufficient for the RICO conspiracy

12  claim.  Defendants admit that he knew about plans to infiltrate conferences and meet with abortion

13  providers and do not dispute the evidence that Daleiden called Rhomberg during the PPGC visit,

14  where Daleiden identified himself as Sarkis to Rhomberg.  Instead, defendants contend that the

15  evidence is insufficient to show Rhomberg's knowledge of the intent of his co-conspirators to

16  commit the predicate fake ID acts.  They point to Daleiden's testimony that he created his fake ID

17  and procured and transferred the other two fake IDs without the knowledge or participation of any

18  of the other defendants.

19        To repeat, the jury was entitled to disbelieve Daleiden's testimony.  It could instead focus

20  on Rhomberg's background and prior involvement with the anti-abortion movement, his position

21  as a board member of CMP, his receipt of the HCP plans discussing infiltration and surreptitious

22  recordings by actors using false names, the call from Daleiden at PPGC, and his responses to

23  updates on the progress of the Project.  It was entitled to consider these factors as evidence to

24  conclude that Rhomberg knew that his co-conspirators would commit the fake ID predicate acts.

25              **2.      Conspiracy/Fraudulent Misrepresentations**

26        Regarding the conspiracy under the fraudulent misrepresentation claim, Rhomberg argues

27  that plaintiffs failed to show that he knew about and agreed with the plan that other defendants

28  would "intentionally misrepresent [themselves] to plaintiffs in a manner that would be tortious."

28

United States District Court
Northern District of California

Defendants note that I instructed the jury that "Plaintiffs contend that Defendants made three general categories of false statements of fact: (1) Defendants' use of fake names; (2) Defendants' provision of fake identifications; and (3) statements suggesting BioMax was a legitimate tissue procurement organization." Final Jury Instructions at 47.

Given the evidence of Rhomberg's knowledge and agreement to the scope and intent of the Project, as well as the establishment of the "front" company and use of "moles," there was sufficient evidence for the jury to rely on to find Rhomberg's knowledge and agreement to those frauds against PPFA, its affiliates, and its staff generally. While Rhomberg may not have known to which specific staff members the misrepresentations would be made (or the specific logistical details), he knew the target generally, the goal, and that the misrepresentations would be made. That is sufficient. There was likewise sufficient evidence of promissory fraud. Rhomberg may not have directed the Project, but he was aware of its goals and methods, including the use of false statements to "infiltrate," as outlined in Project proposals and in updates provided to him as a member of the CMP Board.

### 3. Conspiracy/Recordings

Rhomberg asserts that plaintiffs failed to provide sufficient evidence that he knew and agreed that his co-conspirators intended to infiltrate plaintiffs' conferences and clinics and make surreptitious recordings in violation of federal, California, Florida, and Maryland law. Rhomberg relies on Daleiden's testimony attempting to "walk back" other evidence regarding his co-conspirators' knowledge of, agreement with, and contributions to the methods and goals of the Project, including as addressed above the objectives of the RICO enterprise. But the jury was entitled to disregard Daleiden's testimony. The other evidence that reasonable jurors could rely on established Rhomberg's knowledge that "infiltration" was going to occur and that "undercover" recordings were going to be and were made of plaintiffs' staff members at conferences and at clinics around the country in order to produce "gotcha videos." The jury was entitled to reject Rhomberg's testimony that he was "impressed" by Daleiden's "checking" with lawyers and theologians prior to undertaking the recordings.

More fundamentally, Rhomberg knew and encouraged the specific conduct – surreptitious

29

United States District Court
Northern District of California

1   recordings at conferences, clinics, and lunches – for which the jury found him liable as a

2   conspirator.  He may not have known, in advance, the specific circumstances for each recording

3   made (which under the relevant jurisdictions impact the reasonableness of an expectation of

4   privacy), but there was sufficient evidence to find him liable as a conspirator for the recordings

5   which the jury determined violated the underlying recording laws.

6               **4.**        **Conspiracy/Trespass**

7        For similar reasons, the evidence regarding Rhomberg's knowledge of the goals and

8   methods of the Project, the updates provided to him as a board member of CMP including updates

9   on "site visits," and his receipt of the call from Daleiden and subsequent conversation during the

10   PPGC visit, is sufficient to hold Rhomberg liable for conspiracy to trespass.

11      **K.**      **Newman**

12             **1.**        **Evidence**

13        Newman argues first that there was no evidence (other than the inferences) showing that he

14   had any real knowledge about the goals, methods, or conduct of the Project.  He relies almost

15   exclusively on the trial testimony of Daleiden, which attempted to walk back *other* evidence

16   regarding Newman (and Rhomberg), including their touted purpose on CMP's Board in light of

17   their backgrounds (which for Newman included undercover and surreptitious recording operations

18   against abortion providers), their receipt of and input on the Project proposals and road maps

19   regarding the design and methods used in the Project, the updates on the Project provided to them

20   during board meetings, and Newman's claims of credit for the Project when the CMP videos were

21   released.  The jury was entitled to reject Daleiden's testimony (as well as the testimony from the

22   HCP public relations consultant, Byran) and rely on the other, sufficient evidence, and draw

23   reasonable inferences therefrom.

24              **2.**        **Conspiracy/RICO**

25        There was sufficient evidence on which the jury could rely to find that Newman had the

26   knowledge and intent that at least one member of the enterprise would commit two predicate acts

27   of producing and transferring fake IDs.  As with Rhomberg, the jury was entitled to disregard

28   Daleiden's testimony and instead focus on the evidence of Newman's background and prior

United States District Court
Northern District of California

1   involvement with the anti-abortion movement – including his extensive experience running

2   undercover operations and conducting surreptitious recordings of abortion providers – as well as

3   Newman's touted position and reason for his selection as a board member of CMP, his receipt of

4   the Project roadmap, HCP plans, and updates that repeatedly discussed infiltration and

5   surreptitious recording by "moles" and actors, and his claim of credit for and direction of the

6   Project itself.

### 3.    Conspiracy/Fraudulent Misrepresentations

8        Newman again relies on Daleiden's testimony concerning the conspiracy/fraudulent

9   misrepresentation and false promises claims.  The jury was entitled to reject Daleiden's testimony

10  in favor of other evidence supporting the conclusion that Newman knew – in light of his past

11  experiences, the reason for being sought out by Daleiden to serve on CMP's Board, and his claim

12  of credit for the Project – that misrepresentations to plaintiffs and their staff members were an

13  expected and necessary component of the Project and that they in fact occurred throughout the

14  Project as the "actors" achieved their repeated intrusions based on their misrepresentations and

15  false promises, and that the front company BioMax became a "trusted" entity.  That is sufficient.[21]

### 4.    Conspiracy/Trespass

17       Newman argues, first, that he cannot be held liable on a conspiracy theory for the trespass

18  or recording violations because he was excluded from those claims in the Amended Complaint.

19  This argument was raised and rejected on summary judgment, where Newman identified no actual

20  prejudice from any alleged confusion over which claims were asserted against him as a

21  conspirator, and I will not revisit it here.  On the question of evidence in support, there was

22  sufficient evidence on which reasonable jurors could rely that he knew and intended that his co-

23  conspirators would trespass at the conferences and clinics in light of the methods and goals of the

24  Project identified in communications at the Project's inception and as the Project was carried out.

25

26  _____

27  [21] Newman also argues in passing that because he could not be liable for conspiracy to breach the contracts at issue, he could not be liable for false promises fraud even if he knew and intended his co-conspirators to lie in their agreements with plaintiffs.  However, his liability for false promise fraud is separate from the breach of contract claims; it implicated different duties and conduct.

28  The conspiracy claim based on this fraud stands.

### 5.   Conspiracy/Recording

In addition to the rejected failure to plead argument, Newman raises the same arguments as Rhomberg that he cannot be held liable as a conspirator to violate the various recordings laws at issue unless there is direct evidence that he knew his co-conspirators intended to record in violation of specific state's laws.  I reject them for the same reasons.  There was sufficient evidence regarding Newman's knowledge of and encouragement of his co-conspirator's aim to infiltrate and surreptitiously record at conferences, clinics, and lunches to sustain the jury's determination regarding his liability for conspiracy to violate the recording statutes.

### 6.   Punitive Damages

Finally, Newman contends that the punitive damages awarded against him cannot stand because of Daleiden's testimony attempting to undercut the other evidence of Newman's significant role and involvement in the Project.  He also argues that because the evidence established only that he was motivated to join CMP and advise on the Project in order to uncover illegal or unethical conduct by plaintiffs, any allegation that his conduct was malicious or grossly negligent is defeated.  However, there was sufficient evidence for the jury to rely on to find that Newman's conduct with respect to CMP and the Project merited his inclusion in the punitive damages award.

Defendants' motion for judgment as a matter of law under Rule 50(b) is DENIED.

## II.   MOTION FOR A NEW TRIAL

Defendants move for a new trial arguing, first, that the jury's verdict and the Judgment are contrary to the clear weight of evidence for the reasons raised in their Rule 50(b) motion.  I reject those arguments for the reasons described above.  The verdict is not contrary to the clear weight of the evidence, is not based upon false evidence, and a new trial is not necessary to prevent a miscarriage of justice.

Defendants also move for a new trial based on mostly unidentified but allegedly erroneous "evidentiary rulings," including my rulings excluding from trial unidentified footage that defendants contend would have shown "illegal conduct" by plaintiffs that defendants contend should have been admitted to corroborate defendants' statements regarding the purpose of the

1    HCP.  Prior to each day of trial, and often at breaks during trial days, I reviewed tens to hundreds

2    of pages of defendants' proposed evidentiary submissions (deposition designations and counter-

3    designations) as well as the videos defendants wished to play in court.  I issued specific rulings

4    each day on those matters.  Defendants have chosen not to identify any of those specific

5    evidentiary rulings in their post-trial challenge.[22]  Defendants are not entitled to a new trial based

6    on their generalized objections to my evidentiary rulings.

7         Finally, defendants move for a new trial based on allegedly excessive damages.  But the

8    punitive damages awarded based on the jury instructions (identifying the factors the jury had to

9    consider in order to impose punitive damages under federal, Florida, and Maryland laws only)

10   were supported, were not excessive, and were not imposed to punish defendants for harm to non-

11   parties.

12        Defendants' motion for a new trial under Rule 59(a) is DENIED.

## III.    MOTION TO ALTER OR AMEND JUDGMENT

14        Finally, plaintiffs raise five arguments in favor of altering or amending the Judgment.[23]

### A.    PPRM nominal damages for trespass

16        Defendants argue first that PPRM is not entitled to nominal damages of $1 because the

17   verdict form did not ask the jurors to award a specific amount of nominal damages.  However, I

18   determined that nominal damages were mandatory for the trespass at issue as a matter of law.

19   Therefore, the issue was not submitted to the jury.  The Judgment appropriately includes $1 in

---

[22] Defendants point only to Docket No. 878 (where Rhomberg objected to the application of the "Party-Witness Testimonial Non-Consultation Rule") and Docket No. 879, where Lopez responded to plaintiffs' objections to evidence Lopez intended to use during his testimony.  Lopez argues that the proposed video evidence was relevant to both Lopez's motive to participate in the Project and to show recordings in crowded conference areas that undermined the recorded-individual's expectation of privacy.  Some of the evidence was allowed – as was significant other evidence supporting defendants' beliefs and intent – and some was not based on Rule 403 grounds.  Defendants do not identify which rulings were erroneous.

[23] Instead of arguing and fully supporting each specific objection to the Judgment within the 70 pages allowed for their post-trial brief, defendants instead attempt to incorporate prior arguments and refer to Dkt. No. 1033.  I have reviewed, again, Dkt. No. 1033.  However, I only address arguments defendants have supported (with statutory or case citations) and do not address unsupported arguments or arguments made only in passing (*i.e.*, defendants' assertion that the Judgment contains some unidentified "duplication" of damages and the passing objection to plaintiffs' "conditional" election of remedies).

United States District Court
Northern District of California

1    nominal damages to PPRM.

2        **B.      Election of remedies**

3        Defendants argue that plaintiffs cannot recover both punitive damages and statutory

4    damages for the same recording claims.  However, as each relevant statute allows both punitive

5    and statutory damages, that duplication is permissible.  *See* Fla. Stat. Ann. §§ 934.10(1)(a)-(d)

6    (may recover equitable relief; actual damages or $1,000 in statutory damages (whichever is

7    higher); punitive damages; and reasonable attorney's fees and costs); Md. Code Ann., Cts. & Jud.

8    Proc. §§ 10-410 (a)(1)-(3) (may recover actual damages or $1,000 in statutory damages

9    (whichever is higher); punitive damages; and reasonable attorney's fees and costs); 18 U.S.C. §§

10   2520(b)(1)-(3) (may recover equitable relief; "damages under subsection (c) and punitive damages

11   in appropriate cases"; and reasonable attorney's fees and costs).

12       Defendants contend that plaintiffs cannot be awarded damages for the same recordings

13   under both the federal and state recording laws, but that is permissible.[24] They argue that plaintiffs

14   cannot be awarded statutory damages "on top of the actual damages determined by the jury" that

15   plaintiffs have elected to receive under RICO because the damages stem from the same conduct.

16   However, the compensatory damages elected are RICO damages (and not under the contract or

17   tort claims, unless the RICO damages are reversed on appeal).  The statutory damages flow from

18   the recording claims.

19       Finally, defendants argue that the California statutory damages for the recording claim are

20   limited to $5,000 per lawsuit and not per recording.  *See Franklin v. Ocwen Loan Servicing, LLC*,

21   No. 18-CV-03333-SI, 2018 WL 5923450, at *7 (N.D. Cal. Nov. 13, 2018), *order clarified*, No.

22   18-CV-03333-SI, 2019 WL 452027 (N.D. Cal. Feb. 5, 2019) (limiting Cal. Penal Code § 632

23   damages to $5,000 per class member irrespective of the number of violations); *but see*

24   *Ronquillo-Griffin v. TELUS Communication, Inc*., No. 17-cv-129-JM (BLM), 2017 WL 2779329

25   (S.D. Cal. June 27, 2017) (allowing $5,000 statutory damages per violation).  Here, I conclude –

26

---

27   [24] *Peake v. Chevron Shipping Co., Inc*., C 00-4228 MHP, 2004 WL 1781008, at *3 (N.D. Cal.
     Aug. 10, 2004), the only case relied on by defendants, addresses duplicate recovery under tort and
28   contract claims and not recovery under the laws of two separate jurisdictions (federal and state).

34

1    especially given that multiple recordings were taken by multiple defendants at different locations

2    and at different times – that damages per violation are appropriate under Section 632.

3          **C.      Election between Statutory, Trebled, and Punitive Damages**

4          Defendants argue that plaintiffs cannot seek punitive damages that are duplicative of the

5    RICO trebled damages because the RICO trebled damages are themselves sufficiently punitive.

6    But Ninth Circuit law is to the contrary.  *See, e.g., Neibel v. Trans World Assur. Co.*, 108 F.3d

7    1123, 1131 (9th Cir. 1997) ("a plaintiff may receive both treble damages under RICO and state

8    law punitive damages for the same course of conduct.").  Defendants' supposition that the jury

9    "could have" assessed punitive damages on conduct that occurred in California – despite clear jury

10   instructions directing the jury to consider punitive damages only for the federal, Florida and

11   Maryland claims – is unfounded.

12         **D.      RICO**

13         Defendants re-raise their argument, rejected above, that the damages were not sufficiently

14   directly related to the RICO predicate acts.  There is no need to consider this argument again.

15         **E.      Injunction**

16         Finally, defendants challenge the narrow injunction I entered following further briefing

17   based on the verdict and the UCL Findings of Fact and Conclusions of Law.  As noted above,

18   plaintiffs sought an overbroad and vague injunction that was not adequately cabined or tied to the

19   specific illegal conduct the jury found that the defendants committed against specific plaintiffs.

20   Nonetheless, defendants argue that the much narrower and specific injunction I entered is contrary

21   to the evidence, based on the arguments I reject above.  There are no grounds raised in this motion

22   to justify altering the narrow and specific injunctive relief I ordered in the Judgment.

23         Defendants' motion to alter or amend the Judgment under Rule 59(e) is DENIED.

24                                 **CONCLUSION**

25         Defendants' motion for judgment as a matter of law, for a new trial, and for amendment or

26   alteration of the Judgment is DENIED.  Motions for attorney fees and costs are due fourteen days

27   from the date of this Order.  Defendants' obligation to post a bond to secure the Judgment on

28

United States District Court
Northern District of California

appeal is due fourteen days from the date of this Order.

   **IT IS SO ORDERED.**

Dated: August 19, 2020



William H. Orrick
United States District Judge