STEVEN L. MAYER (No. 62030)
SHARON D. MAYO (No. 150469)
JEREMY T. KAMRAS (No. 237377)
ARNOLD & PORTER KAYE SCHOLER LLP
Three Embarcadero Center, 10th Floor
San Francisco, California  94111-4024
Telephone:    (415) 471-3100
Facsimile:    (415) 471-3400
Email:   steve.mayer@arnoldporter.com
          sharon.mayo@arnoldporter.com
          jeremy.kamras@arnoldporter.com

DIANA STERK (admitted *pro hac vice*)
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, New York 10019-9710
Telephone:    (212) 836-8000
Email:   diana.sterk@arnoldporter.com

RHONDA R. TROTTER (No. 169241)
OSCAR D. RAMALLO (No. 241487)
ARNOLD & PORTER KAYE SCHOLER LLP
777 S. Figueroa Street, 44th Floor
Los Angeles, California 90017
Telephone:    (213) 243-4000
Email:   rhonda.trotter@arnoldporter.com
          oscar.ramallo@arnoldporter.com

BETH H. PARKER (No. 104773)
PARKER LAW & MEDIATION
553 Douglass Street
San Francisco, CA 94114
Telephone: (415) 531-1791
Email:  bparker@pppsgv.org

HELENE T. KRASNOFF
(admitted *pro hac vice*)
PLANNED PARENTHOOD FEDERATION
OF AMERICA
1110 Vermont Avenue, NW, Suite 300
Washington, DC  20005-6300
Telephone:    (202) 973-4800
Email:    helene.krasnoff@ppfa.org

AMY L. BOMSE (No. 218669)
ROGERS JOSEPH O'DONNELL
311 California St., 10th Floor
San Francisco, California 94104
Telephone: (415) 956-2828
Email: ABomse@rjo.com

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PLANNED PARENTHOOD FEDERATION OF AMERICA, INC., et al.,<br><br>Plaintiff,<br><br>vs.<br><br>CENTER FOR MEDICAL PROGRESS, et al.,<br><br>Defendants. | Case No.  3:16-cv-00236-WHO<br><br>**DECLARATION OF AMY L. BOMSE IN SUPPORT OF PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND NON-STATUTORY COSTS**<br><br>Date:      November 18, 2020<br>Time:     2:00 p.m.<br>Place:    Courtroom 2, 17th Floor<br>Judge:   Hon. William H. Orrick |

Page 1

DECLARATION OF AMY L. BOMSE IN SUPPORT OF PLAINTIFFS' MOTION FOR ATTORNEYS' FEES
AND NON-STATUTORY COSTS; Case No: 3:16-cv-00236-WHO

I, AMY L. BOMSE, declare:

1.  I am a shareholder at the firm of Rogers Joseph O'Donnell P.C. ("RJO"), and one of the counsel of record for Plaintiffs in the above-entitled action. I have personal knowledge of the facts stated in this declaration and, if called as a witness, I could and would testify competently to them.

2.  I obtained my bachelor degree *magna cum laude* from Yale University in 1989. I received my law degree from Duke Law School in 2001 and served as executive editor of the *Duke Law Journal*. I simultaneously obtained a Master's Degree in English Literature. While in law school, I worked for the Department of Justice Antitrust Division and the Federal Trade Commission. Following law school, I began work as an associate at Howard Rice Nemerovski Falk & Rabkin. I was elected a shareholder of that firm in 2011 and was a partner at Arnold & Porter Kaye Scholer ("A&P"), or its predecessor firms, from 2012 through mid-2019. In 2019, I joined RJO as a shareholder. My practice focuses on business litigation and civil rights.

3.  My civil rights experience includes representing the NAACP and several other minority-rights organizations in filing amicus briefs in support of voting rights in the Ninth Circuit and the Supreme Court. I represented the City and County of San Francisco in challenging the statutes that limited marriage to opposite-sex couples. I represented homeless individuals in Fresno over the destruction of campsites and personal property in collaboration with Central California Legal Services. I have also represented illegal immigrants in challenging deportation orders. I successfully argued an appeal in the Ninth Circuit of a deportation order of a Kenyan political activist who fled the country after being imprisoned by his political opponents.

4.  I am an experienced trial lawyer. Prior to the instant case, I played a lead role (first or second chair) in seven jury trials and have been counsel in numerous non-jury trials and arbitrations.

 **A.**  **General Summary Of Fees Sought And Method Of Tracking Attorney Fees.**

5.  From 2015 through mid-2019, Plaintiffs' only outside counsel was A&P.

In May 2019, I left A&P and joined RJO and continued to represent Plaintiffs alongside my former colleagues at A&P.  In addition, to these two firms, in-house counsel for Planned Parenthood Federation of America ("PPFA") and counsel to three California Planned Parenthood affiliates also worked on this case.

6.    During the time I worked at A&P, the firm maintained an electronic system for recording and managing time entries and costs incurred for individual matters. Timekeepers were (and I understand continues to be) required to record their time accurately and on a timely basis, providing a description of the work performed.  The time sought by this motion is based on the contemporaneous time records prepared by the various attorneys and legal assistants working on this case.

7.    Likewise, RJO maintains an electronic system for recording and managing time entries and costs incurred for individual matters.  It is my practice to timely record my time and tasks on a matter in the firm's electronic billing system and I followed that practice with respect to my time entries for this case.  All statements in this declaration concerning my personal time spent on various phases of the case are based on my review of time summaries prepared by A&P's or RJO's accounting departments, which reflect the hours I entered into the billing system on a contemporaneous basis.

8.    My standard hourly rate at A&P in 2016 was $750; in 2017, $790; in 2018, $840; in 2019, $925.  At RJO, my standard hourly rate is $675.

9.    In addition to the A&P and RJO outside counsel, through this motion Plaintiffs are seeking to recover legal fees of two in-house attorneys: Mai Ratakonda, a Senior Staff Attorney in the Public Policy, Litigation, and Law ("PPL&L") department at Planned Parenthood Federation of America ("PPFA") and Beth Parker, who was counsel to various California Planned Parenthood affiliates in various capacities throughout the litigation and was instrumental in securing outside counsel and interfacing between outside counsel and the California affiliates.

10.    The bills prepared for Planned Parenthood based on the attorneys and legal

assistants' entries indicate that from September 2015 through September 4, 2020, more than 130 attorneys worked on the case and 22 attorneys spent more than 250 hours on the case. For purposes of this motion, however, Plaintiffs have limited the fees they are seeking to the core team through trial of ten attorneys (Amy Bomse, Sharon Mayo, Jeremy Kamras, Steven Mayer, Rhonda Trotter, Oscar Ramallo, Diana Sterk, Meghan Martin, Matthew Diton, and Arielle Feldshon) and two legal assistants (Kinson Yee and Jerome Ferrer) in addition to two key in-house attorneys (Ms. Ratakonda and Ms. Parker).

11.     After reviewing the time spent by these attorneys, in the exercise of billing judgment, Plaintiffs are seeking to recover the fees incurred attributable to **19,897.8** hours spent by the A&P attorneys and legal assistants. In addition, Plaintiffs are also seeking to recover the fees incurred for my time at RJO, which amounts to **1142** hours (again, after the exercise of billing judgment). Finally, Plaintiffs' in-house counsel (Ms. Ratakonda and Ms. Parker) spent **1329.15** hours on this matter, for which Plaintiffs are seeking to recover.

12.     In total, the twelve attorneys and two paralegals worked a total of **21,226.95** hours on this case, representing **$18,398,453.00** in attorneys' fees at current market rates and **$15,959,319.00** at historic rates. For the purposes of this motion we have reduced the fees sought by 25%, to account for any potential inefficiency or duplication, in addition to reductions already made by individual time-keepers in the exercise of billing judgment. A full accounting of the hours and total fees sought is attached to this Declaration at Exhibit A.

13.     In order to demonstrate the reasonableness of the fees sought, we have grouped the billing entries into nine phases that correspond to the various stages of Plaintiffs' litigation efforts. These phases are as follows: (1) preparation of the Complaint and work successfully defeating in the trial court the pleadings motions filed by Defendants; (2) Defendants' unsuccessful interlocutory appeal from this Court's denial of their anti-SLAPP motions; (3) pre-trial discovery; (4) Defendants' unsuccessful motion to disqualify the Court and the mandamus proceeding related thereto; (5) the parties' cross-motions for summary judgment; (6) preparation for trial; (7) trial; (8) post-trial proceedings on the merits, including Plaintiffs'

successful efforts to obtain injunctive relief and defeat Defendants' post-trial motions; and (9) work on this fee motion through September 4, 2020.  For each of these phases, I shall describe the work that was done, who did it, and the total fees incurred.  Plaintiffs will submit supplemental declaration(s) addressing additional fees incurred in connection with this motion after September 4, 2020.

## II.    PHASE ONE: PRE-COMPLAINT ANALYSIS, DRAFTING AND RESPONDING TO PLEADINGS MOTIONS

14.    In the fall of 2015, Plaintiffs retained A&P to represent them *pro bono* to bring claims against the individuals and entities behind an extensive fraudulent scheme involving infiltration of conferences and health centers.  The initial team consisted of me, Sharon Mayo, Jee Young You, and several associates.

15.    Our first task was to gather the facts, analyze potential claims and draft the complaint.  This was a lengthy and complicated task because Defendants' misconduct occurred in multiple states, violated numerous state and federal statutes, and gave rise to several common law torts.  As a result, the original complaint asserted fourteen claims for relief, including violation of RICO, federal and state wiretapping statutes, breach of contract, trespass, fraud, invasion of privacy and civil conspiracy.  We brought the lawsuit initially on behalf of Planned Parenthood Federation of America and all seven California Planned Parenthood affiliates.

16.    The original complaint was filed on January 14, 2016.  Several months later, we amended the complaint to add Planned Parenthood of the Rocky Mountains and Planned Parenthood Gulf Coast ("PPGC") and Planned Parenthood Center for Choice; we also added an additional cause of action for breach of the PPGC non-disclosure agreement.

17.    Defendants responded to the amended complaint by filing multiple pleadings motions.  All Defendants other than Merritt filed a 64-page motion to dismiss attacking all fifteen causes of action as legally deficient on a wide variety of legal theories. Merritt filed a separate motion to dismiss also attacking all fifteen claims with overlapping but not identical legal arguments.  All Defendants other than Merritt filed an anti-SLAPP motion contending that Plaintiffs' complaint attacked Defendants' First Amendment activity and was legally deficient for

reasons similar to those advanced in their motion to dismiss.   Merritt also filed an anti-SLAPP motion which attacked both the sufficiency of the claims and made certain factual arguments.

18.      The trial team engaged in extensive legal research and drafted lengthy memoranda to address the numerous legal arguments made in Defendants' motions.  In addition, since Merritt's anti-SLAPP motion raised several factual issues, we had to prepare and file declarations addressing these issues.

19.      Argument on the four motions was heard in July 2016.  Given the number of issues, Ms. Mayo, Ms. You and I divided the argument.

20.      After briefing and argument, the Court issued a 56-page order rejecting all of Defendants' arguments and denying all four of their motions.

21.      *Fees for phase one*:  The total time spent on the pleadings phase that Plaintiffs are seeking in the motion is **1034.85** hours.  This is compromised principally of my time (265.7 hours) and Ms. Mayo's time (253.6) along with the time of in-house counsel Ms. Parker (324.25).  Plaintiffs are not seeking to recover for time spent by Ms. You or any of the associates involved in this phase.

22.      *My time billed in phase one:*  At the outset of the engagement I reviewed a draft complaint that had been prepared by a prior law firm, worked closely with our clients to consider potential claims and the strategic implications of various approaches, revised the draft complaint, and supervised extensive legal research concerning various legal claims and potential defenses to those claims.  I billed 80 hours in connection with the initial complaint and a further 20 hours related to fact discovery and drafting the amended complaint.

23.      As noted, Defendants filed extensive pleadings motions.  I took a lead role in determining our legal strategy for opposing the motions, supervised the team of several associates who performed most of the research, reviewed that research, and reviewed and edited all drafts.  I also worked closely with in-house counsel to integrate their comments and guidance on responding to the extensive motions and I argued substantial portions of the motions.  I billed 165.7 hours on this work.

### III.     PHASE TWO: INTERLOCUTORY APPEAL OF DENIAL OF ANTI-SLAPP

24.     Defendants appealed the denial of their anti-SLAPP motions, thus setting in motion a lengthy appellate process that went all the way to the Supreme Court.

25.     Work on the appeal began after Defendants filed a 69-page opening brief. In this brief, Defendants contended that this Court had erred in not requiring Plaintiffs to file declarations showing evidentiary support for each of their thirteen state-law causes of action, even though Defendants' anti-SLAPP motion was based largely on the complaint's alleged legal insufficiency.  Their brief also attacked each of these thirteen claims as legally invalid.

26.     We put together a team to work on the appeal that included Mr. Mayer, an appellate expert, and two associates in the firm's appellate and Supreme Court practice group. Other members of the trial team also contributed to the legal research and drafting.  On May 5, 2017, we filed a 74-page brief addressing both the novel legal question of whether Plaintiffs had to show the factual sufficiency of their claims and all of Defendants' myriad attacks on the sufficiency of the state-law claims as pled.

27.     The merits brief in the Ninth Circuit was written principally by me (on the state law issues) and jointly by Mr. Mayer and me (on the issue of whether this Court had to require Plaintiffs to make an evidentiary showing).  As discussed in more detail below, Mr. Mayer was principally responsible for drafting our responses to the petition for rehearing and rehearing en banc, the motion to stay the mandate, and the opposition to the petition for certiorari.

28.     After we filed our brief, Defendants moved to strike a single sentence from our brief and impose sanctions.  Plaintiffs were obliged to spend further time addressing this motion.  The Ninth Circuit struck the single sentence but rejected Defendants' efforts to have Plaintiffs sanctioned for its inclusion.

29.     Defendants also submitted additional purportedly relevant authority after the close of briefing.  We analyzed the additional authority and prepared a short letter brief explaining why the new authority was inapposite.

30.     We also spent substantial time preparing for the oral argument.  We conducted several moot arguments internally as well as a moot with the clients.  I argued the

1    appeal in the Ninth Circuit on November 17, 2017.

2           31.    After oral argument, the Court issued an order asking the parties to brief

3    the relevance of a new state court of appeal decision on interlocutory appeal.  Plaintiffs did so.

4           32.    The Ninth Circuit held in Plaintiffs' favor across the board, holding that

5    this Court had properly refused to require Plaintiffs to demonstrate the factual sufficiency of their

6    state-law claims and rejecting all of Defendants' attacks on the legal sufficiency of these claims.

7           33.    Defendants then filed a petition for rehearing and rehearing en banc.  This

8    petition merited a serious response because a concurring opinion had suggested the need for en

9    banc review on the issue of whether Ninth Circuit should overrule precedent and no longer permit

10   interlocutory appeals from the denial of an anti-SLAPP motion.  The appellate team filed an

11   opposition to the rehearing petition explaining why the decision was a poor vehicle to address the

12   issue raised by the concurring opinion and why the decision was consistent with prior Ninth

13   Circuit anti-SLAPP jurisprudence.  The Ninth Circuit denied both panel rehearing and rehearing

14   en banc.

15          34.    Defendants then sought a stay of the mandate pending disposition of their

16   forthcoming petition for writ of certiorari.  Plaintiffs filed an opposition explaining why the

17   petition for certiorari was unlikely to be granted and why the stay would prejudice Plaintiffs.  The

18   Ninth Circuit denied the motion.

19          35.    Defendants then filed a petition for a writ of certiorari and the Supreme

20   Court requested a response from Plaintiffs.  Plaintiffs therefore prepared a brief in opposition to

21   the petition.  The Supreme Court denied the petition on April 1, 2019.

22          36.    *My time billed in phase two*:  I billed over 300 hours to work related to the

23   anti-SLAPP appeal.  In the exercise of billing judgment I have written off over eighty hours.  I

24   reviewed Defendants' opening brief, conferred with Mr. Mayer, in-house counsel and others

25   within the firm's appellate department concerning the arguments advanced and our response.

26   Two associates in our appellate practice group prepared an initial draft of the brief, which Mr.

27   Mayer and I reviewed and edited, with me taking the lead on the state law issues and Mr. Mayer

28

focusing on the federal law issue.  I spent considerable time preparing for the oral argument because there were so many legal issues raised by the appeal.  Throughout the appeal, there were numerous collateral filings.  Mr. Mayer took the lead in responding to various letters and motions, but I reviewed all submissions, conferred with Mr. Mayer and kept the client and trial team updated on the status of the appeal.

## IV.    PHASE THREE: DISCOVERY

37.    Defendants moved to stay the entire case pending their appeal of the Court's denial of their anti-SLAPP motions.  Plaintiffs prepared an opposition to the motion for a stay, arguing that the Court could and should permit discovery to go forward on the federal claims.  The Court denied the motion to stay the federal claims, finding that the interests of justice were "best served by completing as much discovery as possible so that the case can get to trial as quickly as possible once it returns from the Ninth Circuit."  ECF 146 at 2.  Accordingly, the Court ordered written discovery on the federal claims to proceed while the appeal was pending.

38.    As a result of this ruling, written discovery lasted from mid-2016 through mid-2019.  Defendants took advantage of the time to propound nearly 400 document requests as well as over 100 interrogatories (most propounded on all or multiple plaintiffs) and over 100 requests for admission.

39.    Responding to this number of discovery requests was extremely burdensome and time-consuming.  A single set of 10 interrogatories propounded on all ten Plaintiffs required us to work with in-house counsel or other knowledgeable staff at each client, draft separate responses based on the information gathered and obtain verifications from each client.  Even then, Defendants were dissatisfied with the responses and after the meet and confer process, we agreed to amend the responses.  That required drafting revised responses and obtaining new verifications from ten separate clients.  A more detailed description of each phase of discovery follows.

### A.   Written Discovery

#### 1.   Document Collection and Review.

40.      At the outset of the case, Ms. Mayo, Ms. You and I along with two senior associates interviewed executives and in-house counsel for each client to identify key custodians of records.  Based on that information, working with a document vendor we initially collected electronic documents from 30 custodians across the ten clients.  In all, we collected over a terabyte of electronic data.

41.      Based on Defendants' document requests, we developed search terms to identify a universe of potentially responsive documents.  We then designed a set of document reviewer instructions in order to train the attorneys who would be reviewing the documents to identify responsive documents.  A team of contract attorneys managed by A&P attorneys, including Ms. Martin, and a team of A&P staff attorneys were trained and reviewed documents for responsiveness.  The contract attorneys billed over 412 hours; the staff attorneys billed over 2500 hours; we only seek fees for the time of staff attorney, Ms. Martin.  Over the course of discovery, Plaintiffs produced over 20,000 pages of documents.

42.      Document review and production was made more time consuming by the need to protect the identities of non-publicly known members of Plaintiffs' staff.  This was necessary due to the long history of harassment of Planned Parenthood staff by anti-abortion activists such as Defendants, which the Court recognized and, on that basis, permitted the use of DOEs.  At Defendants' insistence, Plaintiff were required to greatly expand the number of individuals receiving an individual DOE identifier (rather than mere redaction).  Ultimately, Plaintiffs created 1094 unique DOE identifiers and redacted virtually every document by replacing names with DOE identifiers in order to the protect the identities of Planned Parenthood and Planned Parenthood vendors' staff members.

43.      In addition to collecting electronic documents, attorneys interviewed Plaintiffs' staff to ensure that our record collection was complete and to identify additional documents that could not be effectively located through electronic searches.  For example, to locate the hard copy documents evidencing Plaintiffs' security expenses incurred as result of

Defendants' infiltration and targeting, Ms. You, working with several associates, interviewed key employees, including the heads of security, chief financial executives, and chief operations officers, and assembled the evidence—invoices, contracts, emails—of Plaintiffs' expenditures.

44.     We also drafted document requests and interrogatories to further develop the factual record and reviewed and analyzed Defendants' responses and brought motions challenging Defendants' deficient responses to document requests and interrogatories.

45.     One of the most significant discovery projects was the team's review, logging, and analysis of over 600 hours of illegally recorded videotapes from the NAF and PPFA conferences and the Planned Parenthood health centers that Defendants invaded.  To review this enormous amount of data and identify evidence in support of our case, Matt Diton, an associate, developed a reviewer template.  Over thirty lawyers reviewed portions of the recordings and took notes using the template.  These notes were then assembled into a large database that allowed us to identify clips to use at deposition and trial.  Plaintiffs are not seeking fees for the work of the attorneys who conducted this review other than Mr. Diton and Ms. Feldshon, who were the supervisors.

**2.     Third Party Discovery.**

46.     Defendants also served third party subpoenas on tissue procurement companies and university researchers that contracted with certain Planned Parenthood affiliates. We provided information about the case and ongoing discovery disputes to these third parties and reviewed documents third parties produced.  A particularly time consuming issue (relative to the other third party subpoenas) concerned Defendants' efforts to subpoena the financial records of Planned Parenthood of the Pacific Southwest ("PPPSW") through its bank.  In order to protect its financial privacy, PPPSW was required to intervene and agree to review the bank's documents and produce responsive material.  When it turned out the documents Defendants' sought did not exist, Defendants baselessly refused to accept PPPSW's explanation and refiled their motion to compel against the bank.

### B.      Written Discovery: Motion Practice

47.      Discovery was hotly contested in every respect, from questions of relevance to the appropriateness of confidentiality designations and use of DOE identifiers for Plaintiffs' staff.  The parties brought at least 30 discovery motions, the vast majority of which were brought by Defendants and which were denied by Magistrate Judge Ryu, who was assigned to hear discovery disputes.  Defendants regularly challenged Judge Ryu's orders.  These challenges were uniformly rejected by this Court.  Nonetheless, Defendants' practice of "appealing" discovery orders significantly increased the amount of discovery motion practice throughout the case.

### 1.      Defendants Refused To Produce Documents Concerning The Human Capital Project On Relevance Grounds And, In A Second Round Of Briefing, Asserted First Amendment Privilege; The Court Granted Plaintiffs' Motion To Compel.

48.      In response to Plaintiffs' document requests, CMP/BioMax and Daleiden initially produced only 300 documents, nearly all of which were already in Plaintiffs' possession because they were communications Defendants had sent to Plaintiffs' staff as part of their fraudulent scheme.  Defendants refused to produce communications among the Defendants and others working on the fraudulent scheme regarding investigating Planned Parenthood and took the position that only documents that involved specific logistical plans to infiltrate a particular PPFA conference or affiliate health center were discoverable.  Plaintiffs were therefore forced to file a motion to compel.

49.      At the hearing, Magistrate Judge Ryu rejected Defendants' relevance objection.  Defendants then pivoted to a new position that the documents in question were protected by various First Amendment privileges.  Because Defendants had failed to brief that assertion previously, Judge Ryu gave Defendants a new opportunity to do so.  In response to this brief, we researched and briefed the parameters of the various First Amendment protections and explained why they did not defeat our discovery demands.  Judge Ryu granted our motion.  The documents Defendants were forced to produce became critical evidence concerning their motives and tactics.

### 2. Defendants Repeatedly Sought To Use Civil Discovery To Attempt To Substantiate Their Irrelevant Claims Against Planned Parenthood, Thus Forcing Plaintiffs To Oppose Multiple Motions To Compel

50.     Defendants sought to use civil discovery to attempt to substantiate their irrelevant claims that Planned Parenthood was profiting from the sale of fetal tissue and engaging in illegal abortion procedures.  Responding to their overly broad, unduly burdensome and frequently entirely irrelevant discovery was time-consuming: the legal team spent time drafting objections to improper and duplicative requests, meeting and conferring over those objections, and briefing opposition to motions to compel and subsequent meritless challenges to Judge Ryu's orders denying the motions.  Even after Judge Ryu and this Court repeatedly affirmed that extensive discovery concerning fetal tissue donation and abortion procedure was impermissible, Defendants sought the same information through depositions, setting the stage for further rounds of discovery motion practice.

### a. Defendants' First Motion To Compel Further Responses To Interrogatories Concerning "Profit" From Fetal Tissue Was Largely Denied.

51.     Defendants' first motion to compel fetal tissue-related discovery concerned certain interrogatory responses.  Plaintiffs objected on relevance and burden grounds.  Defendants brought a motion to compel via the Court's informal discovery process.  Plaintiffs researched and drafted their portion of the five-page letter, and prepared for and appeared at oral argument.  At the hearing, the parties cited certain evidence from Defendants' surreptitiously-obtained video recordings.  Judge Ryu requested the parties to submit certain specifically-identified materials, but warned the parties to submit only the specific items she requested.  Defendants blatantly ignored her instruction and produced a new video composed of various edited snippets designed to further Defendants' irrelevant claims about Planned Parenthood.  Plaintiffs objected to the submission in a letter to Defendants, which Defendants ignored, and then in a letter to the Court.  Judge Ryu agreed that the materials were beyond what she had ordered and refused to review them for her ruling.

52.     Judge Ryu broadly rejected Defendants' arguments and refused to require Plaintiffs to provide the extensive information about fetal tissue programs Defendants sought.

Defendants filed objections to Judge Ryu's order and this Court ordered Plaintiffs to respond to the objections. To respond, we researched the applicable legal standard and explained that Defendants had failed to meet (or even address) that standard. The Court affirmed Judge Ryu's order.

       b.  **Judge Ryu Rejected Defendants' Second Motion To Compel Documents Related To Fetal Tissue Donation And Abortion Practices As Confusing, Convoluted And In Violation Of Various Local Rules.**

    53.   Defendants then sought leave to depart from the Court's streamlined discovery process to file a more extensive motion to compel documents relating to fetal tissue donation and abortion procedures. The Court permitted Defendants to do so. Defendants filed a 15-page motion to compel against Planned Parenthood (and third parties Advanced Biosciences Resources and the Regents of the University of California). The motion was accompanied by a 167-page purported separate statement, two declarations and 390 pages of exhibits. Senior associate Ms. Sterk took the lead in preparing Plaintiffs' response to the opposition and separate statement.

    54.   Judge Ryu found that Defendants' motion violated the local rules by failing to address proportionality and exceeding page limits by including argument in the separate statement. Instead of denying the motion, however, in the interests of justice she offered Defendants' an opportunity to try again "even though a new motion will likely impose a burden on Plaintiffs for which they bear little responsibility." ECF 352 at 3.

       c.  **Defendants' Renewed Second Chance Motion To Compel, Which Plaintiffs Opposed, Was Largely Denied.**

    55.   Defendants then filed a new motion to compel, which Plaintiffs opposed and which Judge Ryu largely denied. ECF 442 at 6 ("Defendants' renewed second chance motion does not comply with the Local Rules or the court's explicit instructions."). Defendants filed objections to Judge Ryu's order and this Court ordered Plaintiffs to respond. Plaintiffs did so, and the Court affirmed Judge Ryu's order. ECF 466.

    56.   In addition to those described above, the parties filed numerous additional

discovery disputes concerning document production, use of confidentiality designation and further interrogatory responses.  See e.g. joint letter re amending protective order and allowing redaction without DOE identifiers [ECF 163]; omnibus joint letter brief re seventeen discovery disputes [ECF 166]; joint letter brief re plaintiffs' use of AEO designation [ECF 203]; joint letter brief re Defendants' designation of materials as outside-counsel eyes-only [ECF 311]; and joint letter brief re Defendants' motion to compel production of additional security reports [ECF 560].

57.     One particular series of motions that demonstrates how Defendants' litigation strategy unnecessarily expanded the work required to complete discovery involved challenges to Defendants' privilege log.  In the fall of 2018, Plaintiffs pressed Defendants on their deficient privilege log, which contained more than 2,500 entries—an enormous number in light of the fact that CMP had produced less than 5,000 documents.  For example, few entries reflected that the communications for which Defendants claimed the attorney-client privilege related to legal advice; Defendants attempted to cloak with privilege their communications with donors by analogizing them to "investors" in CMP; and Defendants asserted that scores of people were either "employees" of CMP or "CMP lawyers and staff."  In addition, Defendants raised picayune challenges to Plaintiffs' privilege log, while simultaneously delaying providing further information regarding their own improper log entries.  The matter came to a head in a November 29, 2018 meet and confer, after which Defendants requested that Plaintiffs refrain from presenting the discovery dispute to Judge Ryu for a week while they re-reviewed their documents.  Plaintiffs declined, and sent over a draft of the joint discovery letter.  Rather than using the week to re-review their documents, Defendants spent the week drafting *three separate unilateral discovery letters* to Judge Ryu regarding Plaintiffs' privilege log, in a proverbial "race to the courthouse."

58.     Judge Ryu was not pleased, and ordered the parties to meet and confer and set a briefing schedule for cross-motions over the Christmas and New Year holidays.  ECF 372.  The briefing resulted in two orders that Defendants submit to Judge Ryu a substantial number of documents for *in camera* review.  ECF 459, 540.  Following a hearing on February 14, 2019 and

DECLARATION OF AMY L. BOMSE IN SUPPORT OF PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND NON-STATUTORY COSTS; Case No: 3:16-cv-00236-WHO

her *in camera* review, Judge Ryu issued a series of orders finding that scores of Defendants'

documents should not have been withheld for privilege, and collectively ordering Defendants to

produce to Plaintiffs over 200 previously logged documents.  ECF 473, 537, 538 and 577.  Judge

Ryu denied very nearly all of Defendants' challenges to Plaintiffs' privilege log.  ECF  473, 576.

Ms. Mayo took the lead on these privilege log issues with assistance from Ms. Martin.

### C.    Depositions.

59.     Depositions of the parties' fact witnesses began in February 2019 and

lasted through trial.  In all, the parties took 52 depositions in North Carolina, Washington D.C.,

Philadelphia, Chicago, Seattle, San Diego, Los Angeles and the Bay Area.  Defendants sought a

corporate deposition for each of the ten Plaintiffs and designated extremely broad 30(b)(6) topics.

Defendants also took the deposition of another nine Planned Parenthood doctors and medical

staff.  Plaintiffs deposed the five individual defendants as well as Center For Medical Progress's

principal funders, its video editor, its social media coordinator, two of the undercover actors, and

two public relations consultants who worked for Defendants.  Plaintiffs also deposed CMP's

corporate representative.  Defendants designated David Daleiden as CMP's corporate

representative but insisted that his deposition in his individual and representative capacity be

limited to a single seven-hour day.  Plaintiffs were forced to go to the Magistrate Judge to obtain

an order that Daleiden appear for a separate full day in each capacity.

60.     Another time consuming aspect of this case was reviewing deposition

transcripts for confidentiality to ensure sensitive security information, testimony covered by the

protective order, and Planned Parenthood employees and staff names were designated

appropriately to protect that testimony from being publicly filed or released on the internet by

Defendants.  Ms. Martin managed a team of associates and staff attorneys and associates to

conduct the confidentiality review.

61.     A chart identifying the attorneys who took, defended and otherwise were

involved in the deposition preparation is attached as Exhibit B.

62.     **Deposition Preparation for Plaintiffs' Witnesses**:  For every designated

30(b)(6) witness, we worked with the clients to identify the appropriate corporate representative, ran searches through the produced documents to identify relevant documents, reviewed and analyzed the documents, and prepared witness outlines to use in preparing the witnesses. The assigned attorney(s) met with the witness telephonically at least once and for a full day of witness preparation prior to each deposition. For PPFA, because of the breadth of the topics propounded by Defendants, we were required to present four separate 30(b)(6) witnesses.

63.     **Protective Order**: Despite the denial of their motions to compel seeking irrelevant information concerning fetal tissue programs and other asserted illegal conduct, Defendants attempted to discover the same information through depositions. Plaintiffs were therefore forced to file a motion for a protective order, which Judge Ryu granted. Defendants filed objections to Judge Ryu's order, to which Plaintiffs were required to respond. This Court affirmed the protective order. ECF 534.

64.     During depositions, Defendants brought multiple further discovery motions seeking further time, contending that various witnesses were unprepared, and that Plaintiffs' counsel improperly instructed witnesses not to answer or made other improper objections. See e.g. ECF 617 (Defendants' motion to compel seeking (1) further deposition time due to alleged improper speaking objections and instructions not to answer compel and (2) further deposition of PPRM and PPGC on the subject of placental tissue research.) Plaintiffs were required to spend considerable time addressing these motions. With minor exceptions, Judge Ryu denied all of Defendants' deposition-related discovery motions and this Court affirmed all of Judge Ryu's rulings rejecting Defendants' motions.

**D.     Expert Discovery**

65.     We considered this case to be a largely fact-driven case without a significant expert component. However, we identified one area in which we believed expert testimony was necessary: the history of anti-abortion harassment. We interviewed several candidates, and retained Professor David Cohen, an expert in the field. We worked with Professor Cohen to develop his opinions and provide materials required for his expert report.

66.     Defendants identified six experts: an accountant with purported expertise in whether Plaintiffs' profited from the sale of fetal tissue (an issue this Court ultimately ruled was a legal issue, not an accounting issue and, in any event, irrelevant), an IT expert to testify about a system-wide hack of Planned Parenthood tied to Defendants' video scheme, two security experts and two medical doctors to opine on abortion-related topics (which this Court ultimately ruled were irrelevant to any issue in the case).

67.     After receiving Defendants' disclosures and reports, we identified areas in which we believed rebuttal expert testimony was needed, engaged in a search process to retain rebuttal experts, and assisted them in developing their opinions and expert reports.  We designated four rebuttal experts: an accounting professor to rebut the opinions relating to Planned Parenthood's alleged "profiting" from fetal tissue donation, a medical expert to rebut Defendants' medical experts' opinions, a physical security expert and a computer security expert.  We then deposed all of Defendants' experts and prepared and defended the depositions of our experts. *See* Exhibit B.

68.     Here too, there was time-consuming motion practice.  Defendants sought to designate a "rebuttal" damages expert even though Plaintiffs did not designate a damages expert and thus there was nothing to rebut.  Defendants filed a motion to exclude Plaintiffs from offering percipient witness testimony about damages and to belatedly designate their damages expert.  Plaintiffs prepared and filed an opposition distinguishing Defendants' authority on the necessity of expert testimony.  The Court denied Defendants' motion to exclude but allowed Defendants' late designation.

**E.     My Discovery-Related Hours.**

69.     As the team leader, I supervised our entire team through the discovery phase.  In 2016, I billed 318.8 hours for discovery related work.  To keep our team well-coordinated, we had weekly team meetings.  I prepared agendas for those meetings and assigned associates to various discovery-related tasks and reviewed their progress.  I interfaced with our ten clients concerning initial disclosures, drafted initial disclosures and our initial case

management conference statement, and conferred with opposing counsel.  I devoted substantial time to negotiating with opposing counsel concerning the protective order for the case.  When we were unable to reach an agreement with opposing counsel, I assisted in drafting an informal motion advocating for a protective order that would protect the privacy and interests of Planned Parenthood, which the Court largely adopted.  I reviewed and edited our discovery responses and reviewed and edited our affirmative discovery.

70.     In fall 2016, the parties exchanged the first sets of documents.  I supervised our review and analysis of Defendants' initial production.  I engaged in multiple meet and confer calls with Defendants concerning the scope of discovery.  By October 2016, the parties were at loggerheads over numerous discovery issues and filed an omnibus discovery dispute letter to the court that contained briefing on multiple discovery disputes.  I drafted and/or edited Plaintiffs' submission regarding each of those disputes.  In addition, in 2016, we subpoenaed documents from NAF.  Defendants moved to quash that subpoena and we opposed that motion.  I supervised the research and drafting of our successful opposition.

71.     In 2017, I billed 343.2 hours to discovery related tasks.  As with 2016, I spent significant time supervising our large team, preparing for and leading weekly team and following up with team members.  I participated in extensive meet and confer conferences concerning (1) the appropriate scope of discovery and whether and to what extent Defendants' were entitled to discovery relating to Plaintiffs' fetal tissue donation programs, (2) ESI search terms, and (3) Defendants' complaints about Plaintiffs' use of confidentiality designations and DOE identifiers.  I drafted or edited numerous informal discovery motions.  I worked closely with the client on key strategy issues.

72.     I billed 788.9 hours to discovery related work in 2018; I have written off 200 hours in an exercise of billing judgment.  A significant portion of my 2018 hours relate to hard-fought discovery motions including Plaintiffs' motion to compel, which I was heavily involved in drafting and argued, and Plaintiffs' opposition to Defendants' three motions to compel, all of which I also either drafted or edited and argued.  Because these discovery motions

concerned Defendants' efforts to obtain sensitive client information, I worked closely with senior executives and in-house attorneys for the clients and also spent substantial time conferring internally with senior attorneys, particularly Mr. Kamras. I also was heavily involved in briefing and argument concerning Plaintiffs' use of DOE identifiers, AEO designations and security redactions. I met with representatives of defense counsel for a full day to allow them to review security redactions and then engaged in extensive follow up conversations about remaining disputed redactions.

73.     In 2018, I also supervised and was heavily involved in a time-consuming process to identify the specific out-of-pocket damages suffered by our 10 clients, and to assemble the supporting documentation.

74.     In 2018, we also recruited two additional senior associates due to departures and the increasing demands of the case. I was involved in educating these new attorneys about the case and ensuring that tasks were transitioned appropriately.

75.     I billed 161.5 hours to discovery related tasks in 2019, a significant portion of which related to preparing, defending or taking depositions, meeting and conferring with opposing counsel concerning depositions and motion practice related to depositions. I participated in preparing many of our 30(b)(6) witnesses including the corporate witnesses for PPNorCal, PPPSW and PPRM and PPFA. I prepared and defended the deposition of Dr. Mary Gatter, one of Defendants' principal targets and a key witness, and Deborah VanDerhei, the former head of PPFA's Consortium of Abortion Providers. I also took the depositions of Ryan Gonzalez, CMP's video editor and Philip Cronin, who acted as the agent for service of process for CMP's front company, BioMax and who provided critical testimony about Defendants' misuse of his identity.

76.     In expert discovery, I took the lead in our search for an expert on abortion-related violence and harassment, retained Plaintiffs' expert, David Cohen, assisted him in preparing his report, which included providing materials and reviewing drafts. I then prepared Mr. Cohen for his expert deposition and defended him at his deposition. I was also closely

involved in expert-related discovery concerning Defendants' attempt to establish through expert testimony that Plaintiffs who facilitated their patients' choice to donate fetal tissue had profited from this program. I deposed Defendants' expert on this topic. I then took the lead in identifying an economist to rebut Defendants' expert, Dr. Elizabeth Eccher, assisted her in developing her opinions and prepared and defended her deposition. I also took the deposition of Defendants' medical expert, Dr. Forrest Smith, and Defendants' expert, Paul Zimmer. I worked closely with Mr. Kamras in preparing our damages expert, Greg Regan, for deposition.

## V.   PHASE FOUR:  MOTION TO DISQUALIFY JUDGE ORRICK

77.   In June 2017, 17 months into the case (and over two years into the parallel NAF case), Daleiden filed a motion to disqualify Judge Orrick in the NAF and Planned Parenthood cases. The motion claimed that the Court was biased in favor of Plaintiffs and against Defendants in part because the Court had many years earlier sat on the board of a charitable organization that housed a health center operated by Planned Parenthood Northern California ("PPNorCal").

78.   Given the advanced stage of the case and Judge Orrick's extensive familiarity with the facts, legal issues and procedural history, disqualification threatened to impose significant prejudicial delay. Accordingly, Plaintiffs opposed the disqualification motion. In preparing the opposition, our attorneys worked closely with PPNorCal's staff and the executive staff of Good Samaritan, the charitable organization on whose board Judge Orrick had served, to learn the history of the relationship (if any) between the affiliate and the charitable organization, including the role of the board (or lack thereof) in that relationship. Based on that work, we filed a motion and supporting declaration establishing that PPNorCal had only a professional contractual relationship with Good Samaritan, not a partnership as Defendants asserted.

79.   The motion to disqualify Judge Orrick from the NAF case was heard first and denied by Judge Donato, who was randomly assigned after Judge Orrick referred the motion to another judge. Although the issues were virtually identical in the two cases, Defendants

insisted that there be a second round of briefing concerning their identical motion in the Planned

Parenthood case.  After the second round of briefing, Judge Donato denied the motion to

disqualify and held that the sole distinction between NAF and Planned Parenthood—the presence

of a Planned Parenthood affiliate that had a relationship with a charitable organization on whose

board Judge Orrick had once served was based on a "conclusory characterization" and

exaggeration of Judge Orrick's relationship with the affiliate.

80.     Defendants filed a petition for writ of mandamus in the Ninth Circuit

asserting that the denial of Defendants' motion to disqualify was clearly erroneous.  The Court of

Appeals ordered Plaintiffs to file a response to the petition.  The opposition was principally draft

by appellate specialist Mr. Mayer, with assistance from myself and a senior associate.  Case 17-

73313, ECF 14.  The Ninth Circuit denied the petition summarily.  *Id.*, ECF 17.

81.     Plaintiffs are seeking attorney's fees for 129 hours relating to opposition to

Defendants' motion to disqualify the Court and related writ.  Mr. Kamras and I were principally

involved in investigating the facts relating to Defendants' motion and drafting the successful

opposition brief in the trial court.  Mr. Mayer was principally in charge of successfully

responding to Defendants' writ petition.

## VI.     PHASE FIVE: SUMMARY JUDGMENT

82.     In December 2018, before a single deposition was taken and while key

discovery disputes were pending, Defendant Rhomberg filed a motion for summary judgment

arguing that Plaintiffs could not establish proximately-caused damages as a matter of law.  We

drafted an opposition to the motion and arguing, inter alia, that the motion was premature.  The

Court agreed and denied the motion.

83.     In May 2019, Defendants filed six separate summary judgment motions

(representing 144 pages of argument) and a *Summary Judgment Style Anti-SLAPP Motion*.

Defendants also filed more than 1600 pages of evidence in support of their seven motions along

with a Daleiden Declaration supported by another 1600 pages of supporting materials.  Plaintiffs

filed a consolidated 88-page opposition to Defendants' motions for summary judgment and a

1    separate opposition to Defendants' *Summary Judgment Style Anti-SLAPP Motion*.

2        84.    Plaintiffs' filed a motion for summary judgment seeking summary

3    judgment on their trespass, fraud, unfair competition and breach of contract claims.  Plaintiffs

4    also sought partial summary judgment on the predicate offense element of their RICO claim.

5    Finally, Plaintiffs sought summary judgment on Defendants' affirmative defenses.

6        85.    Oral argument on the motions was held on July 17, 2019.

7        86.    The Court entered its order on the motions for summary judgment on

8    August 23, 2019.  The Court's order was 137 pages in length.

9        87.    Attorneys and staff spent 1810.4 hours on the summary judgment phase of

10   the case, which, as noted above, involved eight dispositive motions.  Plaintiffs' affirmative

11   motion for summary judgment was drafted by Ms. Sterk, Mr. Ramallo, Ms. Martin and me.

12   Plaintiffs' opposition to Defendants' motions and their reply memorandum in support of their

13   motion were drafted and/or edited by Mr. Mayer.  He assigned a member of the team to draft

14   each individual argument, which he then edited and compiled into the final document.  In

15   addition to Mr. Mayer, the team that worked on the summary judgment opposition and reply

16   briefing included me, Mr. Ramallo, Ms. Martin, Mr. Diton, Ms. Sterk, and Ms. Feldshon.  Ms.

17   Martin was principally responsible for pulling together and arranging the massive documentation

18   necessary to support the summary judgment briefs.

19   **VII.    PHASE SIX:  PRE-TRIAL**

20       88.    After the briefing and argument on summary judgment was complete, we

21   turned our attention to the extensive trial preparation tasks.  These included identifying a jury

22   consulting firm, engaging in a mock jury exercise, drafting the juror questionnaire and voir dire

23   questions, selecting trial exhibits, reviewing Defendants' trial exhibits, selecting witnesses,

24   creating a draft witness order, identifying and preparing 11 evidentiary motions and preparing

25   trial materials, including a statement of the case, preliminary jury instructions and a detailed

26   statement of damages.  We engaged in extensive meet and confer with Defendants' counsel to

27   prepare joint submissions and narrow areas of dispute.  Attorneys and staff spent 3701.3 hours

28

preparing for trial during the pre-trial phase.

89.     I was involved in all aspect of the pre-trial planning and tasks.  I reviewed deposition exhibits and provided input concerning exhibit selection.  I also reviewed exhibits included in Defendants' exhibit list and identified those that we would stipulate to admission and identified objections where applicable.  I worked with the team to identify potential motions in limine.  I drafted motions to exclude Defendants' experts and opposing Defendants' motions to exclude Plaintiffs' experts.  I participated in witness selection and preparing our witness order.  I participated in strategy sessions concerning case themes, anticipated Defense themes and how we would rebut those.  In all, I spent 451.3 hours on pre-trial work.

## VIII.   PHASE SEVEN: TRIAL

90.     The trial spanned six weeks, from the start of October through November 15, when the jury rendered its verdict.  Plaintiffs' case in chief was presented to the jury for 15.5 court days and Plaintiffs put on 23 live witnesses and 6 witnesses via deposition.  Attached to this declaration as Exhibit C is a table identifying all witnesses and the individual Plaintiffs' counsel who directed the examination or cross-examination.

91.     Plaintiffs trial team consisted of five attorneys who presented evidence to the jury and an additional four attorneys who assisted in preparing witnesses, trial exhibits, drafting briefs and letters to the Court, arguing motions and engaging in strategic planning.  The trial team was assisted by two paralegals who worked on the case full time for the six-week trial.

92.     With few exceptions, the trial team worked at least 12-15 hours every day throughout the entire trial period participating in the trial proceedings, drafting examinations, preparing witnesses, assembling evidence, researching legal issues as they emerged, drafting letters and briefs, designating deposition testimony and drafting objections to Defendants' designations, preparing closing argument, preparing and arguing proposed jury instructions and verdict form and a myriad other trial tasks.

93.     On trial days, the trial team assembled by 7 a.m. at the courthouse to discuss any pending issues.  The trial day with the Court began every morning at 7:30 a.m. with a

Page 24

pre-jury session to address legal issues.  The parties presented evidence from 8:00 a.m. to 1 p.m. followed by strategy sessions, working with witnesses and other trial preparation tasks.

94.    Throughout the trial, there were continuing legal disputes that required written submissions, research and argument.  The majority of the disputes related to Defendants' repeated contention that Plaintiffs had "opened the door" to evidence concerning abortion practices and fetal tissue donation.  For example, after only one and one-half witnesses had been presented, Defendant Newman filed a 12-page brief making the "opened the door" argument. Plaintiffs' counsel were required to spend substantial time responding to the arguments in written submissions and preparing for oral argument on this topic.

95.    Defendants also frequently attempted to introduce objectionable evidence from their secretly recorded videos, necessitating written objections.  An example is ECF 874, a letter we submitted objecting to six video clips that Defendants wished to show the jury on relevance and Evidence Code 403 grounds.  The Court sustained our objections.  Defendants also sought to introduce irrelevant and inflammatory evidence about a collection of fetuses discovered decades ago, which had no connection to Plaintiffs or any issue in the case.  After Plaintiffs drafted and filed a motion, the evidence was excluded.  ECF 875.

96.    Another legal issue that consumed substantial resources arose from the assertion by Defendant Newman and two CMP accomplices of their Fifth Amendment right not to testify at deposition.  Newman's nearly continuous assertion of the privilege over a seven-hour deposition foreclosed for Plaintiffs an important source of discovery and admissions, and deprived them of critical evidence to use at trial against all Defendants.  This resulted in a hard-fought battle beginning at the pretrial conference and continuing through the trial over what adverse inferences, if any, the Court would permit the jury to draw from these Fifth Amendment assertions.  The parties submitted multiple rounds of briefing and charts of proposed inferences to be drawn, with citations to the corroborating evidence, culminating in the Court's Final Order on Adverse Inferences.  ECF 968.  Team members Ms. Mayo, Ms. Sterk, and Ms. Ramallo were principally responsible for the work on this issue.

DECLARATION OF AMY L. BOMSE IN SUPPORT OF PLAINTIFFS' MOTION FOR ATTORNEYS' FEES
AND NON-STATUTORY COSTS; Case No: 3:16-cv-00236-WHO

97.     Plaintiffs are not requesting compensation for time spent attending trial by those attorneys, such as Mr. Mayer, who attended the trial but did not examine witnesses or play a direct role in supporting witness examination.  Plaintiffs request compensation only for these attorneys' trial time that concerned drafting materials such as proposed jury instructions and letter briefs on the discovery issues that arose during trial and preparing oral argument for the Court.

98.     Attorneys and staff devoted 4219.3 hours during the six-week trial phase of the litigation.

99.     As a member of our trial team, I prepared for and presented the direct examinations of Jenna Tosh, the CEO of PPCCC, Melissa Fowler of NAF, Sheri Bonner, the CEO of PPPSGV, Dr. Mary Gatter, Jeffrey Palmer, the COO of PPGC, Jennifer Castle of PPFA, Michelle Davidson of NAF, and Plaintiffs' expert Professor David Cohen.  For each of those witnesses I participated in multiple preparation sessions, reviewed relevant documents and prepared examination outlines.  In addition, I conducted the adverse direct examination of Defendant Adrian Lopez, examined third-party witness Perrin Larton of Advanced Bioscience Resources and I conducted the cross-examination of Defendants' statistics expert, Michael New. I participated in trial team strategy sessions throughout the six-week span of the trial, drafted letter briefs on evidentiary issues that arose mid-trial, presented argument to the court on those issue and participated in trial witness prep sessions.  Collectively, I spent 305 hours during the trial period.

## IX.     PHASE EIGHT: POST-TRIAL

100.     The jury returned a verdict "overwhelmingly in Plaintiffs' favor on November 15, 2019."  ECF 1073 at 1.  The jury found all Defendants liable either directly or through conspiracy for trespass, fraud, RICO, violation of three state recording laws and the federal recording law.  The jury found Daleiden, BioMax, CMP, Lopez and Merritt liable for breach of contract.  The jury found all Defendants but Lopez liable for punitive damages.  In total, the jury award in excess of $2.2 million in compensatory and punitive damages.

101.     The Court and parties then turned to the equitable portions of the case,

Page 26

DECLARATION OF AMY L. BOMSE IN SUPPORT OF PLAINTIFFS' MOTION FOR ATTORNEYS' FEES
AND NON-STATUTORY COSTS; Case No: 3:16-cv-00236-WHO

Plaintiffs' claim under California's Unfair Competition Law ("UCL") and claim for injunctive relief. Plaintiffs prepared two documents: (1) a memorandum addressing the law and facts concerning Defendants' violation of the UCL, Plaintiffs' entitlement to injunctive relief based on the jury verdict, the scope of the injunctive relief, proposed conclusions of law and the specific injunction sought; and (2) a brief setting forth sixty separate findings of fact established by the trial record which formed the basis for Plaintiffs' requested injunctive relief. Each of the sixty findings of fact was supported by citations to the trial record including testimony and admitted evidence. The Findings of Fact were hyperlinked to the evidentiary record so that the Court staff was able to efficiently review the evidence Plaintiffs presented as supporting their proposed Findings.

102.     In order to prepare these documents, a team of attorneys from the trial team researched the legal issues, identified the findings necessary to support for the relief sought and reviewed the lengthy factual record including the 4,224 page trial transcript and the 285 trial exhibits to identify the evidentiary support for those findings. Mr. Mayer took the lead role in drafting the opening legal memorandum in support of Plaintiffs' claim for injunctive relief, while Mr. Ramallo took the lead role in preparing the reply memorandum. Ms. Martin and I were principally responsible for drafting the findings of fact and reviewing the factual record.

103.     On April 29, 2020, the Court found all Defendants liable for violation of the UCL. The Court made its own sixty findings of fact, substantially agreeing with Plaintiffs' proposed findings. The Court also granted Plaintiffs injunctive relief, enjoining Defendants and any third party acting in concert with Defendants from entering or attempting to enter a Planned Parenthood conference, office or health center by misrepresenting their identity or purpose and recording a private meeting or conversation.

104.     On May 26, 2020, Defendants filed their 83-page Joint Post-Judgment Motions. Plaintiffs filed a 70-page successful opposition to Defendants' motion, with Mr. Mayer taking the lead role in drafting and editing. As with the motion on injunctive relief, in our opposition to Defendants' post-trial motion we provided a document with hyperlinks to the trial

record in support of our memorandum.  On August 19, 2020, the Court denied Defendants'

motion.

## X.      PHASE NINE: FEES AND COSTS MOTION

105.      The final phase of the trial is the assembly of Plaintiffs' bill of costs and

motion to recover non-statutory costs and attorneys' fees as prevailing party.  Because of his

experience in working on fee motions, Mr. Mayer played an active role in organizing the

preparation of this motion for attorneys' fees.  Mr. Diton drafted the legal memorandum, which

was edited by Mr. Mayer.  Because of my role in the case from the inception, I took on the lead

role in drafting the instant declaration.  Ms. Martin compiled the bill of costs and its supporting

documentation. In addition, I reviewed my own time records, categorized them into the various

phases, identified appropriate write-offs in the exercise of billing judgment.  Through September

4, I spent 64.4 hours on the attorneys' fee motion.

///
///
///

## XI.    MEET AND CONFER

106.        As required by Civil Local Rule 54-5(b)(1), counsel for Plaintiffs met and conferred with counsel for Defendants on September 4, 2020 in an attempt to resolve any disputes with respect to Plaintiffs' fee request.  While Defendants' counsel noted it would be difficult to argue that Plaintiffs were not entitled to recover their fees and costs, the parties were unable to agree on the amount of fees and costs Plaintiffs should be awarded.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed this 18th day of September 2020 in San Francisco, CA.


                           */s/ Amy L. Bomse*
                           AMY L. BOMSE

**ECF ATTESTATION**

In accordance with Civil Local Rule 5-1(i)(3), I attest that concurrence in the filing of this document has been obtained from the signatory.

Dated: September 18, 2020                             /s/ *Steven L. Mayer*
                                                                          Steven L. Mayer

**<u>Exhibit A</u>**

| Attorney | Values | Phase 1 - Complaint | Phase 2 - Anti-SLAPP Appeal | Phase 3 - Discovery | Phase 4 - Disqualification | Phase 5 - MSJs | Phase 6 - Pre-Trial | Phase 7 - Trial | Phase 8 - Post-Trial | Phase 9 - Fee Motion | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Attorney Hours and Fees Through September 4, 2020** | | | | | | | | | | | |
| **Bomse, Amy L.** | | | | | | | | | | | |
| | Hours | 265.7 | 220.7 | 1335.4 | 45.4 | 295.8 | 478 | 305 | 121 | | 3067 |
| | Historic Fees | $197,559 | $171,388 | $1,091,244 | $36,271 | $220,055 | $411,547 | $205,875 | $89,945 | | $2,423,883 |
| | Current Fee Amount | $245,773 | $204,148 | $1,235,245 | $41,995 | $273,615 | $442,150 | $282,125 | $111,925 | | $2,836,975 |
| **Diton, Matthew** | | | | | | | | | | | |
| | Hours | | | 394.1 | 8.8 | 95.2 | 40.9 | 31.3 | 74.2 | 29.6 | 674.1 |
| | Historic Fees | | | $231,503 | $5,261 | $66,194 | $28,630 | $21,910 | $60,427 | $24,124 | $438,048 |
| | Current Fee Amount | | | $321,192 | $7,172 | $77,588 | $33,334 | $25,510 | $60,473 | $24,124 | $549,392 |
| **Feldshon, Arielle Z.** | | | | | | | | | | | |
| | Hours | | | 470.1 | | 51.2 | 247.9 | 409.8 | 109.5 | 69.4 | 1357.9 |
| | Historic Fees | | | $256,763 | | $28,096 | $140,064 | $231,537 | $71,999 | $46,845 | $775,302 |
| | Current Fee Amount | | | $317,318 | | $34,560 | $167,333 | $276,615 | $73,913 | $46,845 | $916,583 |
| **Ferrer, Jerome E.** | | | | | | | | | | | |
| | Hours | 73 | 4.9 | 604.2 | | 148.9 | 247.7 | 306.7 | 161 | 4.6 | 1551 |
| | Historic Fees | $25,915 | $1,768 | $234,235 | | $58,807 | $97,842 | $121,147 | $64,895 | $1,863 | $606,470 |
| | Current Fee Amount | $29,565 | $1,985 | $244,701 | | $60,305 | $100,319 | $124,214 | $65,205 | $1,863 | $628,155 |
| **Kamras, Jeremy T.** | | | | | | | | | | | |
| | Hours | | | 775.9 | 29.1 | 46.1 | 228 | 494.3 | 106.7 | 11 | 1691.1 |
| | Historic Fees | | | $697,832 | $24,118 | $44,262 | $220,020 | $477,000 | $107,506 | $11,165 | $1,581,901 |
| | Current Fee Amount | | | $787,539 | $29,537 | $46,792 | $231,420 | $501,715 | $108,301 | $11,165 | $1,716,467 |
| **Martin, Meghan C.** | | | | | | | | | | | |
| | Hours | | | 1480.1 | | 225.5 | 517.7 | 504.5 | 126 | 47.7 | 2901.5 |
| | Historic Fees | | | $698,327 | | $111,531 | $256,262 | $249,728 | $67,795 | $24,522 | $1,408,163 |
| | Current Fee Amount | | | $806,655 | | $122,898 | $282,147 | $274,953 | $68,670 | $25,997 | $1,581,318 |
| **Mayer, Steven L.** | | | | | | | | | | | |
| | Hours | | 154.8 | | 33.2 | 253.3 | 141.2 | 104.5 | 138.4 | 11.7 | 837.1 |
| | Historic Fees | | $179,213 | | $38,512 | $309,026 | $172,264 | $127,490 | $175,832 | $14,976 | $1,017,313 |
| | Current Fee Amount | | $198,144 | | $42,496 | $324,224 | $180,736 | $133,760 | $177,152 | $14,976 | $1,071,488 |
| **Mayo, Sharon D.** | | | | | | | | | | | |
| | Hours | 253.6 | 44.1 | 656.5 | | 41.8 | 292.4 | 426.4 | 71.7 | 14 | 1800.5 |
| | Historic Fees | $212,612 | $38,433 | $613,029 | | $40,801 | $290,923 | $424,268 | $77,471 | $15,190 | $1,712,726 |
| | Current Fee Amount | $275,156 | $47,849 | $712,303 | | $45,353 | $317,254 | $462,644 | $77,795 | $15,190 | $1,953,543 |
| **Ramallo, Oscar** | | | | | | | | | | | |
| | Hours | | | | | 137.6 | 209.6 | 104.4 | 109.7 | 9.3 | 570.6 |
| | Historic Fees | | | | | $119,024 | $181,304 | $90,306 | $99,107 | $8,463 | $498,204 |
| | Current Fee Amount | | | | | $125,216 | $190,736 | $95,004 | $99,827 | $8,463 | $519,246 |
| **Sterk, Diana** | | | | | | | | | | | |
| | Hours | | | 1154.1 | | 279 | 421.7 | 570.4 | | 4.9 | 2430.1 |
| | Historic Fees | | | $961,818 | | $238,545 | $362,091 | $487,692 | | $4,459 | $2,054,605 |
| | Current Fee Amount | | | $1,352,221 | | $326,895 | $494,092 | $668,319 | | $4,721 | $2,846,247 |
| **Trotter, Rhonda** | | | | | | | | | | | |
| | Hours | | | 398.1 | | 75.7 | 552.4 | 458.8 | 44.7 | 9.5 | 1539.2 |
| | Historic Fees | | | $416,015 | | $79,107 | $577,258 | $479,446 | $50,891 | $10,925 | $1,613,641 |
| | Current Fee Amount | | | $457,815 | | $87,055 | $635,260 | $527,620 | $51,405 | $10,925 | $1,770,080 |
| **Yee, Kinson** | | | | | | | | | | | |
| | Hours | 118.3 | 9.1 | 713.1 | 9.3 | 91.4 | 207.4 | 162.5 | 106.4 | 60.2 | 1477.7 |
| | Historic Fees | $39,631 | $3,185 | $265,927 | $3,255 | $35,146 | $79,849 | $62,563 | $41,422 | $23,478 | $554,454 |
| | Current Fee Amount | $46,137 | $3,549 | $278,109 | $3,627 | $35,646 | $80,886 | $63,375 | $41,496 | $23,478 | $576,303 |
| **Ratakonda, Mai** | | | | | | | | | | | |
| | Hours | | | 103.4 | | 16.2 | 20.4 | 100.7 | | | 240.7 |
| | Historic Fees | | | $94,094 | | $14,742 | $18,564 | $91,637 | | | $219,037 |
| | Current Fee Amount | | | $94,094 | | $14,742 | $18,564 | $91,637 | | | $219,037 |
| **Parker, Beth** | | | | | | | | | | | |
| | Hours | 324.25 | | 356 | 19.5 | 52.7 | 96 | 240 | | | 1088.45 |
| | Historic Fees | $282,098 | | $341,760 | $19,695 | $55,862 | $101,760 | $254,400 | | | $1,055,575 |
| | Current Fee Amount | $361,539 | | $396,940 | $21,743 | $58,761 | $107,040 | $267,600 | | | $1,213,622 |
| **Total Hours** | | 1034.85 | 433.6 | 8441 | 145.3 | 1810.4 | 3701.3 | 4219.3 | 1169.3 | 271.9 | 21226.95 |
| **Total Historic Fees** | | $757,814 | $393,986 | $5,902,544 | $127,112 | $1,421,194 | $2,938,377 | $3,324,997 | $907,288 | $186,010 | $15,959,319 |
| **Total Current Fee Amount** | | $958,169 | $455,674 | $7,004,129 | $146,569 | $1,633,648 | $3,281,269 | $3,795,089 | $936,161 | $187,746 | $18,398,453 |
| **25% Discount of Current Fees** | | $718,627 | $341,755 | $5,253,097 | $109,927 | $1,225,236 | $2,460,952 | $2,846,317 | $702,120 | $140,810 | $13,798,840 |

## **Exhibit B**

**PPFA v. CMP**
**List of Depositions**

| Deposition | Responsible Attorney |
|---|---|
| 02-05-2019 Deposition of James Holman | Diana Sterk |
| 02-12-2019 Deposition of Gene Boyett (PP NorCal 30(b)(6)) | Jeremy Kamras |
| 02-13-2019 Deposition of Kevin Paul (PPRM 30(b)(6)) | Sharon Mayo/Meghan Martin |
| 03-05-2019 Deposition of Jenna Tosh (PPCCC 30(b)(6)) | Rhonda Trotter |
| 03-06-2019 Deposition of Franklin Rosado (PPFA 30(b)(6)) | Jeremy Kamras |
| 03-08-2019 Deposition of Krista Noah (PPFA 30(b)(6)) | Diana Sterk |
| 03-13-2019 Deposition of Troy Newman | Sharon Mayo |
| 03-14-2019 Deposition of Albin Rhomberg | Diana Sterk |
| 03-19-2019 Deposition of Jeffrey Palmer (PPGC 30(b)(6)) | Diana Sterk |
| 03-20-2019 Deposition of Melissa Farrell | Sharon Mayo/Meghan Martin |
| 03-21-2019 Deposition of Tram Nguyen | Diana Sterk |
| 03-22-2019 Deposition of Annamarie Davin | Jeremy Kamras |
| 03-22-2019 Deposition of Kathleen Bryan | Tommy Huynh |
| 03-22-2019 Deposition of Linda Pahl (PPLA 30(b)(6)) | Rhonda Trotter |
| 03-26-2019 Deposition of Brandon Minow | Meghan Martin |
| 03-27-2019 Deposition of Adrian Lopez | Diana Sterk |
| 03-27-2019 Deposition of Sheri Bonner (PPPSGV 30(b)(6)) | Matt Diton |
| 03-28-2019 Deposition of Francis Pickford (PPPSW 30(b)(6)) | Jeremy Kamras |
| 04-02-2019 Deposition of Deborah Nucatola | Jeremy Kamras |
| 04-03-2019 Deposition of Deborah VanDerhei | Amy Bomse |

**PPFA v. CMP**
**List of Depositions**

| Deposition | Responsible Attorney |
|---|---|
| 04-9-2019 Deposition of Mary Gatter | Amy Bomse |
| 04-10-2019 Deposition of Andrew Moore | Meghan Martin |
| 04-11-2019 Deposition of Dorothy Furgerson | Diana Sterk |
| 04-11-2019 Deposition of Peter Robbio | Jeremy Kamras |
| 04-12-2019 Deposition of Greg Mueller | Jeremy Kamras |
| 04-12-2019 Deposition of Perrin Larton | Meghan Martin |
| 04-15-2019 Deposition of Ryan Gonzalez | Amy Bomse/Arielle Feldshon |
| 04-16-2019 Deposition of David Daleiden | Rhonda Trotter/Diana Sterk |
| 04-17-2019 Deposition of David Daleiden (CMP 30(b)(6)) | Rhonda Trotter/Diana Sterk |
| 04-18-2019 Deposition of Michelle Syzmanski (PPMM 30(b)(6)) | Matt Diton |
| 04-18-2019 Deposition of Sandra Merritt | Sharon Mayo/Meghan Martin |
| 04-19-2019 Deposition of Sandra Merritt | Sharon Mayo/Meghan Martin |
| 04-26-2019 Deposition of Jonathan Perkins | Sharon Mayo |
| 04-29-2019 Deposition of James Wood | Diana Sterk |
| 04-30-2019 Deposition of David Cohen | Amy Bomse |
| 05-01-2019 Deposition of Brian Prendergast | Diana Sterk |
| 05-02-2019 Deposition of Paul Zimmer | Amy Bomse |
| 05-04-2019 Deposition of John Horst | Jeremy Kamras |
| 05-09-2019 Deposition of Jon Dunn (PPOSBC 30(b)(6)) | Sharon Mayo |
| 05-10-2019 Deposition of Elizabeth Eccher | Amy Bomse |

**PPFA v. CMP**
**List of Depositions**

| Deposition | Responsible Attorney |
|---|---|
| 05-11-2019 Deposition of Brianna Baxter | Sharon Mayo |
| 05-16-2019 Deposition of Forrest Smith | Amy Bomse |
| 05-20-2019 Deposition of Albin Rhomberg (Day 2) | Jeremy Kamras |
| 05-20-2019 Deposition of Emily Schifrin (PPFA 30(b)(6)) | Jeremy Kamras |
| 05-20-2019 Deposition of Nichelle Davis | Sharon Mayo |
| 05-20-2019 Deposition of Ondrej Krehel | Jeremy Kamras |
| 05-28-2019 Deposition of Philip Cronin | Amy Bomse |
| 05-28-2019 Deposition of Theresa Deisher | Rhonda Trotter |
| 05-29-2019 Deposition of Jennifer Kerns | Rhonda Trotter |
| 05-30-2019 Deposition of Katharine Sheehan | Jeremy Kamras |
| 06-27-2019 Deposition of Danny Coulson | Rhonda Trotter |
| 08-16-2019 Deposition of Julia Kohn | Jeremy Kamras |
| 09-19-2019 Deposition of Brandon Minow (Day 2) | Sharon Mayo |
| 09-19-2019 Deposition of Greg Regan | Jeremy Kamras |
| 10-11-2019 Deposition of Janet Smith | Rhonda Trotter |
| 10-30-2019 Deposition of Linda Tracy | Diana Sterk |

**Exhibit C**

# PPFA v. CMP
## List of Trial Witnesses

| Deposition | Responsible Attorney |
|---|---|
| Jenna Tosh | Amy Bomse |
| Sandra Merritt | Sharon Mayo |
| Adrian Lopez | Amy Bomse |
| Albin Rhomberg | Jeremy Kamras |
| Melissa Fowler | Amy Bomse |
| Dr. Tom Moran | Diana Sterk |
| Dr. Leslie Drummond-Hay | Sharon Mayo |
| Sheri Bonner | Amy Bomse |
| Nichelle Davis | via videotape - Sharon Mayo |
| Dr. Mary Gatter | Amy Bomse |
| Jon Dunn | Sharon Mayo |
| Dr. Deborah Nucatola | Jeremy Kamras |
| Deborah Vanderhei | via videotape -Amy Bomse |
| Jeffrey Palmer | Amy Bomse |
| Melissa Farrell | via videotape - Sharon Mayo |
| Bonnie Smith | Diana Sterk |
| Tram Nguyen | via videotape - Diana Sterk |
| Melvin Galloway | Jeremy Kamras |
| Jennifer Castle | Amy Bomse |
| June Gupta | Diana Sterk |

**PPFA v. CMP**
**List of Trial Witnesses**

| Deposition | Responsible Attorney |
| --- | --- |
| David Daleiden | Rhonda Trotter |
| Phil Cronin | via videotape - Amy Bomse |
| Vicky Graziani | Diana Sterk |
| Michelle Davidson | Amy Bomse |
| David Cohen | Amy Bomse |
| Kevin Paul | Sharon Mayo |
| Greg Regan | Jeremy Kamras |
| Brandon Minow | Sharon Mayo |
| Greg Mueller | via videotape - Jeremy Kamras |
| Perrin Larton | Amy Bomse |
| Linda Tracy | Diana Sterk |
| Michael New | Amy Bomse |
| Kathleen Bryan | via videotape - Tommy Hunyh |
| Paul Zimmer | Jeremy Kamras |
| Jonathan Perkins | Sharon Mayo |

2