STEVEN L. MAYER (No. 62030)
SHARON D. MAYO (No. 150469)
JEREMY T. KAMRAS (No. 237377)
ARNOLD & PORTER KAYE SCHOLER LLP
Three Embarcadero Center, 10th Floor
San Francisco, California 94111-4024
Telephone:    (415) 471-3100
Facsimile:    (415) 471-3400
Email: steven.mayer@arnoldporter.com
       sharon.mayo@arnoldporter.com
       jeremy.kamras@arnoldporter.com

DIANA STERK (admitted pro hac vice)
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019-9710
Telephone:    (212) 836-8000
Email: diana.sterk@arnoldporter.com

RHONDA R. TROTTER (No. 169241)
OSCAR RAMALLO (No. 241487)
ARNOLD & PORTER KAYE SCHOLER LLP
777 S. Figueroa Street, 44th Floor
Los Angeles, California 90017
Telephone:    (213) 243-4000
Email: rhonda.trotter@arnoldporter.com
       oscar.ramallo@arnoldporter.com

BETH H. PARKER (No. 104773)
PARKER LAW & MEDIATION
553 Douglass Street
San Francisco, CA 94114
Telephone:    (415) 531-1791
Email:  bparker@pppsgv.org

HELENE T. KRASNOFF
(admitted pro hac vice)
PLANNED PARENTHOOD FEDERATION
OF AMERICA
1110 Vermont Avenue, NW, Suite 300
Washington, DC 20005-6300
Telephone:    (202) 973-4800
Email: helene.krasnoff@ppfa.org

AMY L. BOMSE (No. 218669)
ROGERS JOSEPH O'DONNELL
311 California St., 10th Floor
San Francisco, California 94104
Telephone:    (415) 956-2828
Email: ABomse@rjo.com

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PLANNED PARENTHOOD FEDERATION OF AMERICA, INC., et al.,<br><br>Plaintiff,<br><br>vs.<br><br>CENTER FOR MEDICAL PROGRESS, et al.,<br><br>Defendants. | Case No. 3:16-cv-00236-WHO<br><br>**DECLARATION OF JEREMY T. KAMRAS IN SUPPORT OF PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND NON-STATUTORY COSTS**<br><br>Date:    November 18, 2020<br>Time:    2:00 p.m.<br>Place:   Courtroom 2, 17th Floor<br>Judge:   Hon. William H. Orrick |

1  I, Jeremy T. Kamras, declare:

2  1. I am a partner at the law firm of Arnold & Porter Kaye Scholer LLP ("A&P") and
3  one of the counsel of record for Plaintiffs in the above-entitled action. Unless stated otherwise, I
4  have personal knowledge of the facts stated in this declaration and, if called as a witness, I could
5  and would testify competently to them.

6  **A. Personal Background.**

7  2. I obtained my bachelor's degree *summa cum laude* from Columbia University in
8  1998, at which time I also was inducted into Phi Beta Kappa. I obtained my law degree *cum*
9  *laude* from Harvard Law School in 2001. While in law school, I interned in the Major Frauds
10 Unit at the U.S. Attorney's Office for the Southern District of California.

11 3. After graduating from law school, I began work as an associate at Sullivan &
12 Cromwell LLP in New York. I was admitted to the New York State Bar in 2002, and worked at
13 Sullivan & Cromwell until 2004. Sullivan & Cromwell was lead national coordinating counsel
14 for defense of antitrust litigation against Microsoft Corporation, and I served on that team
15 throughout my time at Sullivan & Cromwell, including on the trial team at a multi-week trial in
16 Minnesota state court in which the damages sought were approximately $1.2 billion. (The case
17 settled prior to verdict.)

18 4. In 2004, I began a clerkship in San Francisco for the Honorable Carlos T. Bea on
19 the Ninth Circuit Court of Appeals. That clerkship concluded in 2005, when I was also admitted
20 to the California State Bar.

21 5. Following my clerkship, in 2006, I joined what was then Howard Rice
22 Nemerovski Canady Falk & Rabkin P.C. I worked as an associate until 2011, when I was elected
23 Director. (Howard Rice was a professional corporation, and therefore did not have partners.)
24 While at Howard Rice, I also externed at the San Francisco District Attorney's Office. Effective
25 January 1, 2012, Howard Rice combined with Arnold & Porter, which I joined the same day as a
26 partner, and where I remain in that capacity.

27 6. My commercial practice focuses on complex commercial litigation, including
28 cases involving fraud, contractual disputes, and intellectual property. My pro bono experience

includes successfully representing an individual seeking adjustment of immigration status in a matter that spanned approximately 10 years, and involved hearings and motions before both the Ninth Circuit and the Board of Immigration Appeals. I also served as co-counsel to the National Center for Lesbian Rights in the first civil fraud action brought in California against a mental health therapist for having engaged in so-called "conversion therapy."

7. I am an experienced trial attorney. Prior to the instant case, I served as lead or co-lead counsel in at least seven jury trials, and have served in support roles in others.

**B.    Method of Tracking Fees.**

8. It is my habit to record the time I spend on a matter and a description of my work in the firm's electronic billing system on a daily basis. I typically review my time entries once further before submitting them to be included within a bill. All the statements in this declaration about how much time I spent on various aspects of this case are based on my review of time summaries prepared by A&P's accounting department, which reflect the hours I entered into the billing system on a daily basis.

9. My standard hourly rate in 2016 was $785; in 2017, $825; in 2018, $875; in 2019, $965, and in 2020, $1,015.

**C.    Role in Litigation.**

*Phase I: Complaint and Pleadings Motions*.

10. I first became involved in the Planned Parenthood case in May 2016, prior to the hearing on Defendants' motions to dismiss and anti-SLAPP motions. Until that point, the case had been led by Amy Bomse (partner), Sharon Mayo (senior counsel) and Jee Young You (counsel). Ms. You was expected to take maternity leave, and therefore Ms. Bomse asked if I could join the team in anticipation of Ms. You's leave. My role at that point was limited, and was primarily to help Ms. Bomse and others prepare for the hearing on the motions, including by relying on my background litigating trade secret misappropriation to address an argument that Plaintiffs' claims were preempted by the California Uniform Trade Secret Act and by helping to moot Ms. Bomse and otherwise discuss issues likely to arise at the hearing. My total time incurred in this phase of the litigation was approximately 10 hours, but given that I was "getting

up to speed" and my more ancillary role, I have written this time off.

*Phase II: Interlocutory Appeal from Denial of anti-SLAPP Motions.*

11. I played a similarly limited role in connection with Defendants' appeal from the denial of their anti-SLAPP motions. I was not a primary author of any of the briefs or related papers, but I did review and offer revisions on some. I also conferred with Ms. Bomse in anticipation of the oral argument. My total time incurred in this phase of the litigation was approximately 16 hours, but given my more ancillary role, I have written this time off.

*Phase III: Pre-trial Discovery.*

12. My role on the case was more substantial with respect to discovery, which, in my case, spanned more than three years, over which period I billed about 890 hours, about 12 percent of which I have written off, as detailed below, resulting in about 776 hours.

13. *Research*. The Court gave the parties considerable guidance in its order denying Defendants' motions to dismiss, including identifying issues that it would revisit at summary judgment. Part of Plaintiffs' discovery plan, therefore, was to conduct additional legal research regarding these issues so that Plaintiffs could properly tailor their discovery. Among these issues were questions relating to causation and the implication of the First Amendment, including with respect to damages. I directed some of this research, and in some cases, conducted independent research myself. For purposes of this motion, I have written off approximately 50 hours of this time, particularly where I conducted the research myself, which I likely would not have done in a commercial matter. The remaining time spent on this sort of research was approximately 27 hours.

14. *Written discovery*. I took the lead in drafting certain affirmative written discovery, particularly interrogatories, and then engaging in meet-and-confer correspondence and ultimately moving to compel additional responses. Collectively, this accounted for about 55 hours of my time. I also took the lead in responding to certain written discovery, particularly a series of requests for admission directed to multiple Plaintiffs concerning their fetal tissue donation programs and accounting relating to them. This required discussions with representatives from each of the responding Plaintiffs, in addition to drafting and revisions. Collectively, this

1    accounted for about 26 hours of my time.  I also participated in helping to draft responses to
2    interrogatories concerning damages.  This accounted for an additional 12 hours.

3       15. *Document discovery*.  In certain cases, I also reviewed documents produced by
4    Defendants.  This accounted for about 14 hours.  Likewise, I reviewed certain of Plaintiffs'
5    documents and portions of the raw footage recorded by Plaintiffs, and as necessary, summarized
6    the same.  This accounted for about 30 hours.

7      16. *Depositions*.  At the end of 2018, and beginning in earnest in 2019, depositions
8    began.  I was heavily involved in this stage of the litigation.  Among other things, I helped to
9    negotiate the scope of Defendants' 30(b)(6) deposition notices, which included 21 different
10   general topics, each of which included multiple subtopics, and assisted in Plaintiffs' efforts to
11   object in certain cases.  I also participated generally in developing Plaintiffs' strategy both with
12   respect to defending witnesses and identifying and taking depositions.

13     17. I personally prepared and defended the following fact witnesses:  Dr. Deborah
14   Nucatola (PPFA and PPLA); Dr. Katherine Sheehan (PPPSW); PPFA's Chief Technology
15   Officer and 30(b)(6) deponent regarding its information technology systems, Franklin Rosado;
16   PPFA's National Director for Accreditation & Evaluation and 30(b)(6) deponent regarding
17   accreditation of Planned Parenthood affiliates, including with respect to their fetal tissue donation
18   programs, Emily Schifrin; PPFA's National Director for Research, Evaluation & Data Analytics,
19   Julia Kohn; PPNorCal's Vice-President of Information Technology & Facilities and 30(b)(6)
20   deponent on all topics, Gene Boyett; and PPPSW's Vice President of Finance and 30(b)(6)
21   deponent on all topics, Francis Pickford.

22     18. I also took the depositions of Greg Mueller and Peter Robbio, respectively, the
23   President and Senior Vice President of what is now named CRC Advisors, the public relations
24   firm that CMP and Mr. Daleiden used to assist in the media campaign by which they publicized
25   the recordings of Plaintiffs.  In addition, I assisted in taking the deposition of Annemarie
26   Bettisworth Davin, a participant in Defendants' efforts to record Plaintiffs.

27     19. In total, I defended or took the depositions of 10 fact witnesses, each of which, on
28   average, required approximately 26 hours.  In the case of witnesses I was defending, it is my

1  typical practice to prepare by reviewing relevant documents, written discovery and where
2  available, testimony. I then would typically spend the better part of a day, if not an entire day,
3  preparing the witness; in at least one case, preparation spanned multiple days. Many of the
4  witnesses required at least this much preparation, given the wide range of topics for which some
5  witnesses were designated or the number and length of recordings relevant to that witness. Some
6  witnesses also had given prior testimony, requiring still further preparation. In most cases
7  (except in the case of negotiated or ordered restrictions), the depositions went an entire seven
8  hours on the record, which often equated to ten-hour days or longer. Taking depositions required
9  a similar amount of time, first to review potentially relevant documents, then to develop an
10 outline, and then to take the deposition. The above, in total, accounted for approximately 263
11 hours. This does not include travel time, including multiple cross-country trips and trips to
12 southern California, which I wrote off.

13   20. In addition to my work related to fact witnesses, I also participated in expert
14 discovery, primarily related to damages. This included collaborating with Plaintiffs' damages
15 expert, Gregory Regan of Heming Morse; and in facilitating his access to documents, other
16 discovery and clients so that he could investigate and assess the claimed damages and their
17 amounts. I also reviewed his report, and provided input as appropriate. Following the Court's
18 ruling on summary judgment, in which certain damages were excluded, Mr. Regan had to revise
19 his analysis. I then prepared him for, and defended him at, his deposition. I likewise worked
20 with Plaintiffs' information technology security expert, Ondrej Krehel of LIFARS, who opined
21 with respect to the "hack" of PPFA's website following Defendants' release of videos, and the
22 security measures undertaken to address the website and PPFA's cybersecurity generally in the
23 aftermath. As with Mr. Regan, I facilitated Mr. Krehel's access to discovery, reviewed his report,
24 and prepared him and defended him at his deposition. Last, I also took the deposition of John
25 Horst, Defendants' competing information technology security expert. Collectively, this work
26 relating to expert discovery accounted for approximately 85 hours.

27   21. In addition to the above, I also directed or participated in various discovery related
28 motions. For example, Defendants sought to use in the criminal preliminary hearing pending

before Judge Hite in San Francisco Superior Court certain discovery, including deposition transcripts and videos, obtained in this action. I directed the response to this request, including Plaintiffs' strategy and drafting the written response. Defendants also subpoenaed bank statements for PPPSW from its bank; here again, I directed our response, and reviewed and revised a motion to quash. I also helped direct and draft a motion to amend the protective order to restrict Mr. Daleiden's access to documents designated as Attorneys Eyes Only and used during deposition. Collectively, this work accounted for about 24 hours.

22.  In addition to the above specific projects, there were a great number of other day-to-day tasks not necessarily uniquely attributable to any of the above tasks, but typical of any complex, contested and enduring litigation. These included attending team meetings at which we discussed schedule and tasks; discussing strategy with senior attorneys, specifically Ms. Bomse and Ms. Mayo; updating and conferring with various client representatives; reviewing, revising and addressing correspondence, internal email, discovery responses, case management and other filings and orders; and attending hearings and helping to prepare for the same. This accounted for the remaining portion of time spent on discovery or otherwise during the discovery phase, roughly 266 hours over the course of three years, or, on average, a little more than 7 hours per month.

*Phase IV:  Motion to Disqualify Judge Orrick*

23.  In June 2017, Defendants filed a motion to disqualify the Court. Defendants asserted that the Court was biased in favor of Plaintiffs and against Defendants in part because, Defendants alleged, the Court had many years earlier sat on the board of a charitable organization (Good Samaritan) that thereafter housed a health center allegedly operated by PPNorCal. I helped to oppose the motion, including helping investigate the history of PPNorCal and any relationship with Good Samaritan, and to direct, review and revise the opposition to the motion. Defendants' motion was denied, and Defendants then petitioned for a writ of mandamus from the Ninth Circuit Court of Appeals. Here, I deferred to Steve Mayer, given his appellate experience; but given my knowledge of the facts, I did provide limited consultation. Collectively, I spent about 29 hours working on issues related to Defendants' attempt to disqualify the Court.

*Phase V: Motions for Summary Judgment*

24.     I did not take primary drafting responsibility in connection with Plaintiffs' motion for summary judgment or opposing Defendants' cross-motions. I did, however, participate in strategy discussions, review and revise some of the papers, and prepare for and argue portions of the motion and opposition. Collectively, this accounted for about 46 hours of work.

*Phase VI:  Preparation for Trial*

25.     The pretrial task that accounted for the largest portion of my pretrial time was motions in limine. I lead the effort in selecting Plaintiffs' motions in limine and directing the drafting of those motions, including reviewing and revising those motions. I met and conferred with Defendants regarding the parties' respective motions in limine. And I led the effort to respond to Defendants' 26 motions in limine spanning 63 pages (plus declarations spanning an additional 173 pages), including drafting several of the oppositions myself, and organizing and in some case reviewing and revising the remainder. This was a substantial effort, not only because of the number of motions, but because Plaintiffs had only one week to respond. I also organized our team in preparing to argue the motions, and prepared to argue several myself. Collectively, including the work related to Plaintiffs' motions in limine, opposing Defendants' motions in limine and the arguments for both, this accounted for about 107 hours.

26.     In addition, I participated in multiple strategy meetings regarding the upcoming trial; assisted in and observed the mock trial; observed certain witnesses and counsel during the preliminary hearing in the criminal matter, both to assess the witnesses' demeanor and the arguments being advanced by counsel; attended pretrial conferences; reviewed the juror questionnaire; and began drafting witness outlines in preparation for trial. Collectively, this accounted for an additional 121 hours.

*Phase VII: Trial*

27.     As the Court well knows, the trial itself lasted approximately six weeks, although there were a number of "dark days" throughout. As a core member of the trial team, I attended trial every day. I also examined several witnesses, including conducting an adverse direct of one of the Defendants, Albin Rhomberg, and directing one of Plaintiffs' key witnesses, Dr. Deborah

1  Nucatola, who was surreptitiously recorded at a Los Angeles restaurant and was featured in the
2  first video released by Defendants.  Both examinations were challenging.  As Mr. Rhomberg's
3  counsel made clear in her opening statement, Mr. Rhomberg's defense was that he allegedly was
4  only tangentially involved in Defendants' conspiracy, and allegedly had no knowledge of some of
5  the key facts, including Mr. Daleiden's procurement and use of false identification.
6  Mr. Rhomberg had not directly admitted his knowledge of certain of these facts in documents or
7  deposition testimony; I therefore had to elicit that testimony through the trial examination.
8  Dr. Nucatola's testimony was complicated by the fact that by the time of trial, she had previously
9  testified in three different fora.  I also assisted in preparing the adverse examination of
10 Mr. Daleiden, including spending substantial time developing modules for a re-"direct" after
11 Mr. Daleiden testified on his own behalf.

12       28.     I also took the lead in matters relating to damages.  I therefore directed PPFA's
13 Chief Operating Office Melvin Galloway, who laid the foundation for much of PPFA's claimed
14 damages, coordinated with other counsel and witnesses relating to damages, and directed
15 Plaintiffs' damages expert, Mr. Regan.  Mr. Regan's examination required substantial preparation
16 in order to categorize and simplify the damages being sought, which arose at different time
17 periods; related to varied and multiple products and services; and were incurred by different
18 Plaintiffs.  Likewise, I cross-examined Defendants' damages expert, Paul Zimmer.  I therefore
19 also delivered the closing argument and rebuttal arguments on damages.  Those too required
20 substantial time, both to amass all of the trial evidence regarding damages and clearly explain the
21 damages and how they related to each cause of action.

22       29.     Throughout trial, I also assisted with various motions, including a motion in limine
23 to exclude certain late-noticed witnesses and a motion in limine to exclude admission of the
24 20/20 video that Mr. Daleiden claimed was among the reasons he undertook to surreptitiously
25 record Plaintiffs.  I also drafted the opposition to Defendants' motion to introduce additional
26 evidence to cure the admission of certain videotape deposition testimony by Tram Nguyen, and
27 the opposition to one of Defendants' repeated motions to introduce evidence regarding abortion
28 and fetal tissue collection procedures, also arguing that motion.

30.     Collectively, the above accounted for about 494 hours, or roughly 12 hours on average daily during the duration of the trial (including the 5 or more hours in court each day of testimony).  Of course, in many cases, the days were much longer than 12 hours.

*Phase VIII:  Post-Trial Proceedings*

31.     After the jury rendered its verdict, I assisted in preparing the form of judgment to be entered by the Court, and later with the reply briefing on Plaintiffs' request for injunctive relief.  This accounted for about 36 hours.

32.     I also assisted in responding to Defendants' motion for judgment as a matter of law, or in the alternative, a new trial.  Having directed Mr. Rhomberg's examination at trial, I provided direction on this portion of the opposition, and reviewed and revised the draft, which was primarily drafted by Matthew Diton.  And having focused on damages at trial, I took the lead in drafting certain portions of the opposition relating to Plaintiffs' compensatory damages.  In addition, I reviewed and provided recommended revisions to multiple drafts of the brief as a whole.  Collectively, this accounted for about 58 hours of my time.

33.     Other matters arose as well, including Defendants' motion seeking a stay of execution of the judgment or a reduction in the bond amount.  These accounted for about 12 additional hours.

*Phase IX:  Fees Motion*

34.     My work on the fees motion has been limited to participating in some strategy discussions, drafting this declaration, and reviewing others' declarations.  That has accounted for about 11 hours of time.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 18th day of September, 2020, in San Francisco, California.

　　　　　　　　　　　　　　　　　　　  /s/ *Jeremy T. Kamras*　　　　　
　　　　　　　　　　　　　　　　　　　JEREMY T. KAMRAS

**ECF ATTESTATION**

In accordance with Civil Local Rule 5-1(i)(3), I attest that concurrence in the filing of this document has been obtained from the signatory.

Dated: September 18, 2020                    /s/ *Steven L. Mayer*
                                                                    Steven L. Mayer