
1 | STEVEN L. MAYER (No. 62030)
SHARON D. MAYO (No. 150469)
JEREMY T. KAMRAS (No. 237377)
ARNOLD & PORTER KAYE SCHOLER LLP
Three Embarcadero Center, 10th Floor
San Francisco, California 94111-4024
Telephone:    (415) 471-3100
Facsimile:    (415) 471-3400
Email: steven.mayer@arnoldporter.com
       sharon.mayo@arnoldporter.com
       jeremy.kamras@arnoldporter.com

DIANA STERK (admitted pro hac vice)
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019-9710
Telephone:    (212) 836-8000
Email: diana.sterk@arnoldporter.com

RHONDA R. TROTTER (No. 169241)
OSCAR RAMALLO (No. 241487)
ARNOLD & PORTER KAYE SCHOLER LLP
777 S. Figueroa Street, 44th Floor
Los Angeles, California 90017
Telephone:    (213) 243-4000
Email: rhonda.trotter@arnoldporter.com
       oscar.ramallo@arnoldporter.com

BETH H. PARKER (No. 104773)
PARKER LAW & MEDIATION
553 Douglass Street
San Francisco, CA 94114
Telephone:    (415) 531-1791
Email: bparker@pppsgv.org

HELENE T. KRASNOFF
(admitted pro hac vice)
PLANNED PARENTHOOD FEDERATION
OF AMERICA
1110 Vermont Avenue, NW, Suite 300
Washington, DC 20005-6300
Telephone:    (202) 973-4800
Email: helene.krasnoff@ppfa.org

AMY L. BOMSE (No. 218669)
ROGERS JOSEPH O'DONNELL
311 California St., 10th Floor
San Francisco, California 94104
Telephone:    (415) 956-2828
Email: ABomse@rjo.com

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PLANNED PARENTHOOD FEDERATION OF AMERICA, INC., et al., <br><br> Plaintiff, <br><br> vs. <br><br> CENTER FOR MEDICAL PROGRESS, et al., <br><br> Defendants. | Case No. 3:16-cv-00236-WHO <br><br> **DECLARATION OF SHARON D. MAYO IN SUPPORT OF PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND NON-STATUTORY COSTS** <br><br> Date:    November 18, 2020 <br> Time:   2:00 p.m. <br> Place:   Courtroom 2, 17th Floor <br> Judge:  Hon. William H. Orrick |

- 1 -
DECLARATION OF SHARON D. MAYO IN SUPPORT OF
PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND NON-STATUTORY COSTS
Case No: 3:16-cv-00236-WHO

I, SHARON D. MAYO, declare:

1. I am a Senior Counsel at Arnold & Porter Kaye Scholer LLP ("A&P"), and one of the counsel of record for Plaintiffs in the above-entitled action. Unless stated otherwise, I have personal knowledge of the facts stated in this declaration and, if called as a witness, I could and would testify competently to them.

**A.   Personal Background.**

2. I obtained a bachelor of arts degree in history and political science *cum laude* from Claremont McKenna College in 1986. After taking a year off to work, I attended Loyola Law School in Los Angeles, California, obtaining my juris doctor degree in 1990. I was admitted to the California Bar in December 1990.

3. After law school, I began work as a litigation associate in the boutique law firm of Quinn, Kully and Morrow in Los Angeles, California, and then A&P following Quinn, Kully and Morrow's merger into A&P in 1996. I was elected to the partnership of A&P effective January 1, 1999, where I remain, serving in a Senior Counsel role.

4. In my thirty years of practice, I have litigated scores of complex matters in state and federal courts, primarily in the defense of products liability mass tort actions, and antitrust and financial services class actions. Although most of my work is on the defense side, I have significant experience obtaining judgments on behalf of plaintiffs, including a $4.8 million fraud judgment in favor of online giving platform Network for Good against United Way of the Bay Area, and a $1.25 million copyright infringement judgment against the owner of multiple radio stations. I was lead trial counsel in both of these cases.

**B.   Method of Tracking Fees.**

5. It is my practice to timely record my time and description of my tasks on a matter in A&P's electronic billing system, and to review them again before they are billed to the client. In preparing this declaration, I carefully reviewed each of my time entries in this matter as reflected in the firm's billing system. The statements in this declaration regarding the number of hours I spent on various tasks related to this case are based on my contemporaneous time records. As the billing attorney on many matters over the years, I routinely exercise

- 2 -

DECLARATION OF SHARON D. MAYO IN SUPPORT OF
PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND NON-STATUTORY COSTS
Case No: 3:16-cv-00236-WHO

1  judgment in preparing client bills—writing off or reducing the time billed where appropriate—
2  where, for example, I believe there has been duplication of effort, lack of efficiency, or the
3  results of the time expended are not commensurate with the effort.  Before preparing my
4  declaration for this fee motion, I reviewed all of my time entries for this matter and wrote off a
5  number of hours even before the additional adjustments described herein.

6  **6.** My standard hourly rate in 2015 was $910; in 2016, $825; in 2017, $865; in
7  2018, $920; in 2019, $995, and in 2020, $1085.

8  **C.    Role in Litigation.**

9  *Phase I: Complaint and Pleadings Motions.*

10  7.  In the fall of 2015, Amy Bomse asked me to join the initial team of lawyers to
11  represent Planned Parenthood in this matter.  We began by gathering the facts, analyzing the
12  potential legal claims and drafting the complaint.  This took significant effort given that
13  Defendants' misconduct spanned years and a number of states, targeted multiple Planned
14  Parenthood affiliates, and implicated numerous state and federal statutes and potential common
15  law claims.  We conducted numerous interviews of Plaintiffs' doctors and staff, reviewed hours
16  of Defendants' publicly available videotape, reviewed materials available from the related case
17  brought by the National Abortion Federation and the action brought by Stem Express in state
18  court, and extensively researched potential causes of action.  Our factual investigation was
19  made more complicated by the fact that some of the Defendants and their accomplices used
20  false identities.  The breadth of Defendants' scheme necessarily required a lengthy and complex
21  investigation, and resulted in a complaint (and then an amended complaint) asserting multiple
22  claims for relief, including violation of the RICO Act, federal and state wiretapping statutes,
23  breach of contract, trespass, fraud, invasion of privacy and civil conspiracy, and breach of a
24  non-disclosure agreement.

25  8.  Defendants attacked the Amended Complaint with two motions to dismiss and
26  two anti-SLAPP motions.  The motions challenged the sufficiency of each of the fifteen causes
27  of action in the Amended Complaint, and presented both legal and factual arguments.  I worked
28  on the briefing and declarations in opposition to the motions, conferred with the team and our

1   clients on strategy issues, and along with Amy Bomse and Jee Young You, prepared to argue
2   the motions.  My total time incurred in this phase of the litigation was approximately 254 hours.

3   *Phase II: Interlocutory Appeal from Denial of anti-SLAPP Motions.*

4   9. I had only a supporting role in the briefing of Defendants' appeal of the Court's
5   denial of the anti-SLAPP motions.  Amy Bomse and Steve Mayer were the principal architects
6   and drafters of Plaintiffs' appellate brief; however, given my deep involvement in the factual
7   and legal development of the claims and the briefing on the motions to dismiss, I reviewed and
8   revised multiple drafts of the brief, and consulted with Ms. Bomse and Mr. Mayer on strategy
9   for the briefing and oral argument.  My total time incurred in this phase of the litigation was
10  approximately 44 hours.

11  *Phase III: Pre-trial Discovery.*

12  10. Given my long tenure on this matter, I played a significant role in virtually every
13  aspect of the discovery phase of the case – from preparation of Initial Disclosures and
14  attendance at the Rule 26 meeting of counsel, to defending one of the last depositions before
15  trial.  Working with two former A&P associates (whose significant time on this matter we have
16  decided not to claim in this motion), I oversaw the investigation into sources of electronic
17  documents from our clients and participated in interviews to determine the sources of electronic
18  information and how it could be gathered and searched.  Most of Plaintiffs' documents were
19  electronically stored, and I negotiated with Defendants' counsel the ESI protocol used in this
20  case.

21  11. At the outset of the litigation, I was deeply involved in drafting or revising the
22  initial sets of written discovery to Defendants, and in preparing Plaintiffs' responses to the
23  written discovery served by Defendants.  As the Court is aware, there were multiple discovery
24  disputes between the parties, and I led or participated in several meet and confer sessions with
25  opposing counsel, and briefed and argued discovery motions.  These discovery disputes
26  included multiple motions to compel production of documents, motions for protective order
27  regarding Plaintiffs' documents regarding abortion procedures, and defending Plaintiffs'
28  designation of sensitive documents as "outside attorneys' eyes only" and Plaintiffs' redactions

1  of documents to protect Planned Parenthood security information.

2      12.    One particular discovery issue in which I took the lead role was in a months-long challenge to Defendants' privilege log and defending the predictable attacks by Defendants' on Plaintiffs' privilege logs. Defendants' privilege log was, on its face, woefully deficient. By way of example, few entries reflected that the logged communications related to legal advice; Defendants attempted to cloak with privilege their communications with donors by analogizing them to "investors" in CMP; and Defendants asserted that scores of people either were "employees" of CMP or "CMP lawyers and staff." It took multiple rounds of briefing and argument and *in camera* review by Magistrate Judge Ryu to force Defendants to provide a reasonable privilege log and to obtain the documents improperly withheld from production.

    13.    The deposition phase of this matter was particularly long and contentious. Of the more than 50 depositions that were taken in this matter, I prepared and defended the following fact witnesses: Kevin Paul, PPRM's General Counsel and 30(b)(6) witness; Melissa Farrell, PPGC's Research Director; Jon Dunn, PPOSBC's CEO and 30(b0(6) witness; and Brandon Minow, PPFA's director of event planning and 30(b)(6) witness (for his second deposition regarding certain PPFA damages claims).

    14.    I also took the depositions of Defendant Troy Newman, who asserted his Fifth Amendment privilege not to testify for virtually the entire deposition; Defendant Sandra Susan Merritt, which lasted a day and a half; Brianna Baxter, the CMP actor who posed as a BioMax employee while making undercover CMP videos alongside Defendant Merritt; Jonathan Perkins, Defendants' security expert; and third party and former NAF employee Nichelle Davis, NAF's group purchasing manager with whom Defendants communicated to register for the 2014 NAF conference in San Francisco.

    15.    Each of these depositions required significant preparation time. For witnesses I was defending, I needed to review not only any potentially relevant documents, but also the video taken by CMP actors of the witness or their doctors and staff. For some of Plaintiffs' witnesses, we had to address their understandable security concerns in advance of and during the depositions, which added to the time required. Preparation sessions took at least one full

1  day, and for some witnesses, multiple days.  Two of the adverse depositions that I took required
2  more than  the usual review of documents and videos and outline preparation.  We suspected
3  that Defendant Troy Newman and CMP actor Briana Baxter might assert their Fifth
4  Amendment privilege at deposition.  To prepare for those depositions, we had to conduct
5  research regarding the implications of Fifth Amendment assertions at deposition, and how those
6  depositions could—or could not—be used at trial.  The outlines for the Newman and Baxter
7  depositions required considerable attention, as the ordinary approach of asking broad questions
8  with appropriate follow-up would not be useful.

9  16. In addition to the specific projects called out above, and as is typical in any
10 lengthy, commercial litigation matter, there were other required tasks not readily put into any
11 specific category, but typical of any complex, contested and enduring litigation.  These included
12 attending team meetings at which we discussed schedule, strategy and tasks; updating and
13 conferring with our clients; reviewing and responding to correspondence, internal email,
14 discovery responses, case management and other filings and orders; and attending hearings and
15 preparing for the same.

16 *17.* My work during the discovery phase of this litigation accounted for
17 approximately 657 hours.

18 *Phase IV:  Motion to Disqualify Judge Orrick*

19 **18.** My role with respect to Defendants' June 2017 motion to disqualify Judge
20 Orrick from presiding over this case was limited to reviewing the briefing and consulting with
21 Amy Bomse on strategy.  Given my minimal support role on this issue, I have written off the
22 approximately three hours of time incurred in this phase.

23 *Phase V: Motions for Summary Judgment*

24 19. I did not have principal drafting responsibility in connection with Plaintiffs'
25 motion for summary judgment or opposing Defendants' cross-motions. My primary task was to
26 analyze Defendants' evidence submitted with the summary judgment briefing and to prepare
27 Plaintiffs' evidentiary objections to that evidence.  I also participated in strategy discussions,
28 reviewed and revised some of the draft briefs, and prepared to argue portions of the motion and

opposition.  I spent approximately 79 hours of work on the summary judgment motions and oppositions, but have reduced that time by fifty percent in recognition of my supporting role in this phase.

*Phase VI:  Preparation for Trial*

20. In the lead-up to the October 2019 trial, my assignments included a significant amount of work preparing Plaintiffs' deposition designations and reviewing Defendants' designations.  Another time-consuming task was preparing oppositions to a number of Defendants' motions in limine, and preparing to argue those motions.  As the lawyer with principal responsibility for the Fifth Amendment issues that arose in deposition, I also led the briefing and argument of Fifth Amendment and adverse inference issues regarding the testimony of Troy Newman, Brianna Baxter and Annamarie Bettisworth Davin.  The adverse inference issue required detailed analysis of the depositions, legal research, crafting the specific adverse inferences, marshaling the supporting evidence for those inferences and preparing charts for the Court, and multiple rounds of briefing and argument.

21. In addition to the tasks identified above for which I had a primary role, I participated in strategy sessions regarding witnesses to call and in what order to present them; assisted with the mock jury exercise; reviewed and revised numerous pre-trial filings including the Final Pretrial Conference statement, witness and exhibit lists, proposed jury instructions, verdict form, and juror questionnaire; worked with my colleague Meghan Martin on obtaining certified transcriptions of the video clips that Plaintiffs planned to utilize at trial; and worked on trial examination outlines for the witnesses I was assigned to present or cross-examine at trial.

22. My work during the pretrial phase of the case totaled approximately 292 hours.

*Phase VII: Trial*

23. The trial spanned approximately six weeks, in October and November 2019.  I was one of five attorneys on the core trial team, and attended trial every day.  I conducted the adverse direct examination of Defendant Merritt, called as the second witness in our case.  The examination was long and contentious; Defendant Merritt had worked with Daleiden from the very first undercover recordings in the CMP project, and we needed to present to the jury

through Merritt's testimony the story of multiple unlawful recordings and trespasses at conferences, Planned Parenthood healthcare centers, and meetings with Plaintiffs' staff and doctors at restaurants.  Merritt's testimony would lay out the factual framework of Plaintiffs' case, on which we would build with the other witnesses.  We also needed to introduce into evidence multiple video recordings proving Plaintiffs' claims.  When Defendant Merritt was questioned by her own counsel, she testified to a series of events, based on a short and unremarkable video clip, that were intended to cast doubt on NAF's security procedures for its Annual Meeting in San Francisco—specifically, that her NAF conference badge was in her purse as she walked freely through the conference space without being stopped by security.  Because Ms. Merritt's counsel had not identified the video clip the evening before her testimony as required by the Court's trial procedures, we were not able to challenge this alleged series of events—asserted by Ms. Merritt for the first time at trial—while she was on the witness stand.  Instead, we had to wait until we could review the full footage to determine that Ms. Merritt's trial narrative was false, and was disproved by a section of the same clip from a few minutes earlier, and footage with the same date/time stamp from the camera worn by Mr. Daleiden.  I successfully persuaded the Court to allow Plaintiffs to re-call Ms. Merritt to the stand to prove that her trial narrative was false, and then cross-examined Ms. Merritt with the longer clip to impeach her earlier testimony.

24.     I also presented a number of Planned Parenthood witnesses at trial, including Dr. Leslie Drummond-Hay; PPOSBC CEO Jon Dunn; PPRM general counsel Kevin Paul; and PPFA conference planner Brandon Minow.  This involved preparing examination outlines, reviewing their deposition transcripts to identify likely areas of cross-examination, preparing the witnesses to testify, and then putting them on the stand.  Finally, I conducted the cross-examination of Defendants' security expert Jonathan Perkins to conclude the presentation of evidence at trial.

25.     Trial days were long—beginning at 7:00 a.m., and regularly lasting more than 12 hours—including court time, strategy meetings, briefing and arguing the adverse inference issue and the many other motions that arose during trial, preparing witnesses and examination

outlines, reviewing video clips that each side intended to play for the jury, assisting with closing argument and demonstratives, and addressing the myriad factual, legal and technical issues that arise during any trial. My work on the trial amounted to approximately 426 hours.

*Phase VIII: Post-Trial Proceedings*

26. Post-trial proceedings included briefing and submissions on a variety of issues, including a proposed judgment, resolution of Plaintiffs' claims for equitable and injunctive relief, Defendants' Rule 50 motions, Defendants' motion to stay enforcement of judgment, and miscellaneous motions to seal and to extend time for various motions. In this phase, I drafted portions of, or reviewed and edited various briefs, and participated in strategy sessions. I took the lead in drafting portions of Plaintiffs' opposition to the Rule 50 motions related to the liability of Defendant Troy Newman, and also the propriety of the adverse inferences the Court determined that the jury were permitted, but not required, to draw. My time for this phase of the proceedings totaled approximately 72 hours.

*Phase IX: Fees Motion*

27. In addition to reviewing my time entries and preparing this declaration, my contribution to Plaintiffs' attorneys' fees motion has been to provide advice on format, scope and strategy based on my recent prior experience submitting a successful attorneys' fees motion following a jury trial in another federal case. I also contributed to the section of the Bomse declaration addressing the sections on the privilege log motions, and the issue of adverse inferences that the jury was permitted to draw based on the Fifth Amendment privilege assertions by Defendant Troy Newman and two other witnesses during their depositions. I spent a total of approximately 9 hours on this motion, but that time has not been incorporated into the fees calculated to date.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 18th day of September, 2020, in Mill Valley, California.

/s/ *Sharon D. Mayo*
SHARON D. MAYO

- 9 -
DECLARATION OF SHARON D. MAYO IN SUPPORT OF
PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND NON-STATUTORY COSTS
Case No: 3:16-cv-00236-WHO

**ECF ATTESTATION**

In accordance with Civil Local Rule 5-1(i)(3), I attest that concurrence in the filing of this document has been obtained from the signatory.

Dated: September 18, 2020             /s/ *Steven L. Mayer*
                                          Steven L. Mayer